1   Stephen P. Berzon (SBN 46540)
    Scott A. Kronland (SBN 171693)
2   Jonathan Weissglass (SBN 185008)
    Linda Lye (SBN 215584)
3   Danielle E. Leonard (SBN 218201)
    ALTSHULER BERZON LLP
4   177 Post Street, Suite 300
    San Francisco, CA 94108
5   Telephone: (415) 421-7151
    Facsimile: (415) 362-8064
6   Email: skronland@altshulerberzon.com
    Email: llye@altshulerberzon.com
7   Email: dleonard@altshulerberzon.com

8   *Attorneys for Plaintiffs*

9   Jonathan P. Hiatt (SBN 63533)
    James B. Coppess (*Pro Hac Vice* Application forthcoming)
10  Ana L. Avendaño (SBN 160676)
    AFL-CIO
11  815 Sixteenth Street, N.W.
    Washington, D.C. 20006
12  Telephone: (202) 637-5053
    Facsimile: (202) 637-5323
13  Email: aavendan@aflcio.org

14  *Attorneys for Plaintiff AFL-CIO*

15  (Counsel list continued on next page)

16                  UNITED STATES DISTRICT COURT

17              NORTHERN DISTRICT OF CALIFORNIA

18   AMERICAN FEDERATION OF LABOR AND          )   Case No. _____
     CONGRESS OF INDUSTRIAL ORGANIZATIONS;     )
19   SAN FRANCISCO LABOR COUNCIL; SAN          )
     FRANCISCO BUILDING AND CONSTRUCTION       )   **MEMORANDUM IN SUPPORT**
20   TRADES COUNCIL; and CENTRAL LABOR         )   **OF MOTION FOR TEMPORARY**
     COUNCIL OF ALAMEDA COUNTY,                )   **RESTRAINING ORDER AND**
21                                             )   **PRELIMINARY INJUNCTION**
                    Plaintiffs,                )
22                                             )
             v.                                )
23                                             )
     MICHAEL CHERTOFF, Secretary of Homeland Security; )
24   DEPARTMENT OF HOMELAND SECURITY;          )
     JULIE MYERS, Assistant Secretary of Homeland )
25   Security; U.S. IMMIGRATION AND CUSTOMS    )
     ENFORCEMENT; MICHAEL ASTRUE, Commissioner )
26   of Social Security; and SOCIAL SECURITY   )
     ADMINISTRATION,                           )
27                                             )
                    Defendants.                )
28   _____)

1 | (Counsel list continued from first page)

2 | Linton Joaquin (SBN 73547)
Marielena Hincapi  (SBN 188199)
3 | Monica T. Guizar (SBN 202480)
NATIONAL IMMIGRATION LAW CENTER
4 | 3435 Wilshire Blvd., Suite 2850
Los Angeles, CA 90010
5 | Telephone: (213) 674-2850
Facsimile: (213) 639-3911
6 | Email: guizar@nilc.org

7 | Lucas Guttentag (SBN 90208)
Jennifer C. Chang (SBN 233033)
8 | Mónica M. Ramírez (SBN 234893)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
9 | Immigrants' Rights Project
39 Drumm Street
10 | San Francisco, CA 94111
Telephone: (415) 343-0770
11 | Facsimile: (415) 395-0950
E-mail: jchang@aclu.org
12 |
Omar C. Jadwat (*Pro Hac Vice* Application forthcoming)
13 | AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Immigrants' Rights Project
14 | 125 Broad Street, 18th Floor
New York, NY 10004
15 | Telephone: (212) 549-2620
Facsimile: (212)-549-2654
16 | Email: ojadwat@aclu.org

17 | Alan L. Schlosser (SBN 49957)
Julia Harumi Mass (SBN 189649)
18 | ACLU FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
19 | San Francisco, CA 94111
Telephone: (415) 621-2493
20 | Facsimile: (415) 255-1478
E-mail: aschlosser@aclu.org
21 |
*Attorneys for Plaintiff Central Labor Council of Alameda County*
22 |
David A. Rosenfeld (SBN 58163)
23 | Manjari Chawla (SBN 218556)
WEINBERG, ROGER & ROSENFELD
24 | A Professional Corporation
1001 Marina Village Parkway, Suite 200
25 | Alameda, California 94501-1091
Telephone: (510) 337-1001
26 | Facsimile: (510) 337-1023
Email: drosenfeld@unioncounsel.net
27 |
*Attorneys for Plaintiffs San Francisco Labor Council,*
28 | *San Francisco Building and Construction Trades Council,*
*and Central Labor Council of Alameda County*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    Social Security Administration No-Match Letters . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    Employer Verification of Work Authorization and Sanctions . . . . . . . . . . . . . . . . . 6

    C.    The New Department of Homeland Security Rule . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    D.    Implementation of the New Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.    The DHS Rule and Guidance Letter are Contrary to the Governing Statute . . . . . . 13

        A.    The DHS Rule and Guidance Letter are Premised on an Interpretation of the Statutory Term "Knowing" that is Not What Congress Meant . . . . . 14

        B.    The DHS Rule Also Upsets the Balance that Congress Struck in Establishing System of Initial Verification of Work-Authorization Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        C.    The DHS Rule is Also Contrary to Statute by Requiring Verification of Employees Who Were Exempted by IRCA's "Grandfather" Provision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    II.    Neither SSA Nor DHS Have Statutory Authority to Use the SSA Earnings Suspense File and the "No Match" Letter as a Tool for Enforcing the Immigration Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        A.    The SSA Cannot Use Its Power to Process Tax Data for Purposes of the Social Security Program to Instead Help DHS Enforce Immigration Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        B.    The DHS Final Rule Commandeers Authority That Congress Has Delegated Only to the IRS and the SSA . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        C.    DHS Cannot Commandeer DOJ Authority to Interpret the IRCA Discrimination Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    III.    The Balance of Hardships Overwhelmingly Favors a Stay Until this Action Can be Heard on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        A.    Plaintiffs Will Suffer Immediate, Irreparable Harm Absent a Stay . . . . . . . 29

        B.    Preserving the Status Quo Will Not Cause any Real Harm to the Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

1
2

APPENDIX  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## TABLE OF AUTHORITIES

2

### CASES

3

*American Corn Growers Assn. v. EPA,*
  291 F.3d 1 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

4

*American Fin. Servs. Ass'n v. FTC,*
5    767 F.2d 957 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

6

*Barrick Goldstrike Mines Inc. v. Browner,*
  215 F.3d 45 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

7

*Bowen v. Michigan Academy of Family Physicians,*
8    476 U.S. 667 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

9

*Cement Kiln Recycling Coalition v. EPA,*
  _F.3d._, 2007 WL 2011748 (D.C. Cir. July 13, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

10

*Chamber of Commerce of U.S. v. Reich,*
11    74 F.3d 1322 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

12

*Chevron, U.S.A., Inc. v. NRDC,*
  467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

13

*Clarke v. Ofc. of Fed. Housing Enterp. Oversight,*
14    355 F. Supp.2d 56 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

15

*Collins Foods Int'l v. INS,*
  948 F.2d 549 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

16

*Dart v. United States,*
17    848 F.2d 217 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18

*Federal Maritime Comm. v. Seatrain Lines, Inc.,*
  411 U.S. 726 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

19

*Garrett v. Escondido,*
20    465 F.Supp.2d 1043 (S.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

21

*General Electric Co. v. EPA,*
  290 F.3d 377 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

22

*Gonzales v. Oregon,*
23    546 U.S. 243, 126 S.Ct. 904 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 22

24

*Gorbach v. Reno,*
  219 F.3d 1087 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

25

*Hoffman Plastic Compounds, Inc. v. NLRB,*
26    535 U.S. 137 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

27

*Jorgensen v. Cassiday,*
  320 F.3d 906 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

28

*Land Council v. McNair*,
  __ F.3d ___, 2007 WL 1880990 (9th Cir., July 02, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Louisiana Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Lozano v. City of Hazleton*,
  459 F.Supp.2d 332 (M.D. Pa. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*MCI Tele. Corp. v. American Tel. & Telegraph Co.*,
  512 U.S. 218 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 23

*Mester Manufacturing Co. v. INS*,
  879 F.2d 561 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Michigan v. E.P.A.*,
  268 F.3d 1075 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*National Treasury Employees Union v. Chertoff*,
  452 F.3d 839 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 24, 27

*National Treasury Employees Union v. U.S. Dept. of Treasury*,
  838 F.Supp. 631 (D. D.C. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*New El Rey Sausage Co. v. INS*,
  925 F.2d 1153 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Patagonia Corp. v. Bd. of Govs. of Fed. Res. System*,
  517 F.2d 803 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Romero v. INS*,
  39 F.3d 977 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*,
  29 F.3d 655 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Scherr v. Volpe*,
  466 F.2d 1027 (7th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Securities and Exchange Commission v. Sloan*,
  436 U.S. 103 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Shays v. FEC*,
  414 F.3d 76 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Stark v. Wickard*,
  321 U.S. 288 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Sutton v. United Air Lines Inc.*,
  527 U.S. 471 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Temple Univ. v. White*,
  941 F.2d 201 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Heredia,*
  483 F.3d 913 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

*United States v. Jewell,*
  532 F.2d. 697 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14, 15, 17

*Zheng v. Ashcroft,*
  332 F.3d 1186 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## STATUTES AND REGULATIONS

8 C.F.R.
  §274 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 21

20 C.F.R.
  §422.120 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 26

26 C.F.R.
  §301.6721-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
  §301.6724-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 29
  §31.6051-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
  §31.6051-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

5 U.S.C.
  §551(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  §701(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  §706(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 25, 30

6 U.S.C.
  §112(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
  §542 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

8 U.S.C.
  §1103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30
  §1324a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
  §1324b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 20, 29, 30
  §1360(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

26 U.S.C.
  §6103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 25, 27
  §6721 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
  §6724 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 29

42 U.S.C. §432 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 25

## OTHER AUTHORITIES

Pub. L. No. 99-603, 100 Stat. 3359 (1986), *codified at* 8 U.S.C. §1324a
  Historical and Statutory Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 23

Pub. L. 104-208, Div. C, title IV, Substitle A, §§401-02 (1996),
  110 Stat. 3009-655, *codified at* 8 U.S.C. §1324a Historical and Statutory Notes . . . . . . . . 20

Pub. L. 107-128, 115 Stat. 2407 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Pub. L. No. 108-156, 117 Stat. 1944 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

H.R. 138, 110th Cong., §3 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

H.R. 2954, 110th Cong., §313 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

H.R. 3333, 109th Cong., §224(a) (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

H.R. 4437, 109th Cong., §701(a) (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

H.R. 5507, 109th Cong., §2 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

S. 1639, 110th Cong., §308 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

S. 1984, 110th Cong., §256 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

S. 2611, 109th Cong. §301(d) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

S. 2611, 109th Cong. §301(e) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

H. Rep. 99-682, pt. I (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 7, 19, 20

H. Rep. 99-682, pt. II (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 17

**INTRODUCTION**

On August 15, 2007, the Department of Homeland Security ("DHS") published a Final Rule that would commandeer the Social Security tax system for immigration-enforcement purposes. The rule would place millions of U.S. citizens and non-citizens with work authorization at risk of losing their jobs because of discrepancies in a Social Security Administration ("SSA") database. The rule becomes effective on September 14, 2007, but DHS and SSA plan to jump the gun. Beginning on September 4, 2007, they plan to mail SSA "no-match" letter packets to employers that will include a separate DHS guidance letter about compliance with the Final Rule.

The SSA generates these no-match letters to employers when names and Social Security numbers submitted by employers on Forms W-2 do not match SSA's records. The accompanying DHS guidance letter will inform employers, pursuant to the Final Rule, that they face civil and criminal liability under the immigration laws for "knowing[ly]" employing unauthorized workers unless the no-match is resolved – and that employers should fire workers who cannot resolve a no-match with SSA within 90 days.

The unprecedented, joint SSA/DHS mailing to employers is set to run from September 4 to November 9, 2007. This round of letters would reach about 140,000 employers and affect about 8 million employees. It would be the first time that the SSA's Earnings Suspense File, a confidential tax records database that Congress prohibited SSA from sharing with DHS, has been used as an immigration-enforcement tool.

The DHS rule would place in jeopardy the jobs of employees who are legally working because there are many reasons for SSA no-matches that are entirely unrelated to unauthorized work. The SSA receives about *8 to 11 million* earnings reports per year that fail to match SSA records, and the Earnings Suspense File contains about *255 million* unmatched records. No-matches occur because of clerical errors by employers or SSA, employee name changes after marriage or divorce, foreign-born employees who use a less "foreign" name in the workplace, different naming conventions, such as multiple surnames, common in many parts of the world, and many other reasons. When the SSA has been able to reconcile no-matches, most involved U.S. citizens. The SSA itself is not an immigration agency and does not know whether a particular no-match letter, or

1    what proportion of all no-match letters, relate to unauthorized work.

2         We demonstrate below that we have a very strong likelihood of success on our legal

3    challenge to the DHS Final Rule and to the DHS/SSA scheme to implement that rule.

4         As an initial matter, the new rule is contrary to the governing statute because it would

5    expand civil and criminal liability under the immigration laws far beyond what Congress intended.

6    Congress provided for liability when an employer continues to employ a worker "*knowing*" the

7    worker is an "unauthorized alien."  8 U.S.C. §1324a(a)(2) (emphasis added).  The word "knowing"

8    is "a familiar term of art" that describes a state of mind necessary for civil or criminal liability; it has

9    a meaning that "Congress is presumed to have known and adopted."  *United States v. Jewell*, 532

10   F.2d. 697, 703 (9th Cir. 1976) (en banc).  The DHS rule would change the agency's definition of

11   *"knowing"* to provide that an employer receiving a no-match letter and failing to take action has

12   "constructive knowledge" the worker is an "unauthorized alien."  Given the many reasons for

13   no-matches that have nothing to do with unauthorized work, and that neither SSA nor DHS knows

14   what proportion of no-matches relate to unauthorized work, the DHS rule is premised on a

15   definition of "*knowing"* that the term will not bear.

16        The Ninth Circuit already has explained that "[t]o preserve Congress' intent in passing the

17   employer sanctions provisions of [the immigration laws] . . . the doctrine of constructive knowledge

18   must be sparingly applied,"  *Collins Foods Int'l v. INS*, 948 F.2d 549, 555 (9th Cir. 1991), and that

19   "the INS [now DHS] cannot make generalized accusations for the purpose of forcing employers to

20   reverify the authorization of their employees."  *New El Rey Sausage Co. v. INS*, 925 F.2d 1153,

21   1158 (9th Cir. 1991).  Yet that is essentially what the DHS rule seeks to accomplish.  The rule

22   impermissibly redefines "*knowing*" as a lesser state of mind, so as to turn all no-match letters into

23   "generalized accusations" about work-authorization status, so as to force employers to reverify the

24   work-authorization status of millions of employees each year.

25        The rule also is contrary to the governing statute because it disturbs the careful balance that

26   Congress struck in establishing the details of a system for verification of work-authorization status

27   upon the initial hire.  Congress was concerned that continuing verification would place undue

28   burdens on employers and employees and also lead employers to discriminate against all employees

with "foreign" appearances because of fears about immigration-law liabilities. The DHS rule creates exactly the same problems Congress intentionally sought to avoid because it effectively establishes a system of continuing verification for the millions of employees each year who are covered by SSA no-match letters.

Finally, the joint DHS/SSA plan to implement the Final Rule is beyond the statutory authority of these agencies. SSA is authorized to use tax reports solely for purposes of managing the Social Security program. Only Congress can decide whether to authorize the use of tax reports for immigration-enforcement purposes. Bills to accomplish this have been introduced in Congress but have not been adopted. Such legislation raises serious policy issues because the use of tax reports for immigration enforcement would encourage "off-the-books" work and thereby lose the taxes presently paid on those wages. For its part, DHS lacks the authority to dictate how employers respond to SSA no-match letters, which are part of the tax reporting system. Only the Internal Revenue Service has authority to regulate responsibilities for correcting tax reports.

We also demonstrate below that the balance of hardships overwhelmingly favors a stay to preserve the status quo until this action is heard on the merits.

The DHS rule is a major change in existing policy, and the proposed rule lay dormant for an entire year until DHS published it as a Final Rule after Congress recessed without adopting immigration legislation that DHS had supported. No law or emergency requires that the rule be implemented immediately, without judicial review. There certainly is no emergency that requires the DHS/SSA mailings to commence on September 4, 2007 – 10 days *before* the Final Rule becomes effective.

On the other hand, once the mailings commence, employees who are U.S. citizens or non-citizens with legal work authorization, many of whom will be workers represented by the Plaintiff labor federations, will face the loss of their jobs unless they can resolve an SSA data discrepancy within a 90-day deadline. These employees will have to take off work – in all likelihood without pay – to visit SSA field offices that will be inundated with similar requests for no-match corrections. Some workers will lack birth certificates or other necessary identification documents. SSA already has informed DHS that in "difficult cases" no-match issues will not be

1  resolved by the deadline.  Those workers will be fired.  Additionally, some employers receiving the

2  SSA/DHS mailing will terminate workers precipitously because they fear liability, particularly when

3  the workers have a "foreign" appearance or accent.  It will be impossible to completely undo the

4  harm later.

5       All that being so, the Court should enjoin the Final Rule, and any actions to implement the

6  Final Rule, until this action can be heard on the merits.

7  **BACKGROUND**

8  **A.      Social Security Administration No-Match Letters.**

9       The Social Security Act of 1935 authorizes the SSA to establish a recordkeeping system for

10  the Social Security program.  *See* 42 U.S.C. §432.   Employers annually report employee wages

11  using Forms W-2, and SSA posts those earnings to its Master Earnings File, so workers will receive

12  credit for them when they apply for Social Security benefits.  When SSA is unable to match a

13  worker's name and Social Security Number ("SSN") with its records, those earnings are posted to

14  SSA's Earnings Suspense File, remaining there until they can be matched with SSA records.  *See* 20

15  C.F.R. §422.120.

16       SSA collects wage report information to make benefits eligibility determinations and

17  calculations.  The wage report information collected by SSA, including the information posted to

18  the Earnings Suspense File, does not contain information about an employee's work authorization

19  status.  As former Social Security Commissioner Kenneth S. Apfel explains, SSA does not know the

20  percentage of earnings reports in the Earnings Suspense File that reflect unauthorized work.  Nor

21  does SSA know whether a particular earnings report in the Earnings Suspense File reflects

22  unauthorized work.  Apfel Decl. at ¶8.[1]

23       The most recent Government Accountability Office ("GAO") report on the Earnings

24  Suspense File concluded that it "[c]ontains information about many U.S. citizens as well as non-

25  ───────────────────

26     [1] *See generally* GAO Report 06-814R, Immigration Enforcement: Benefits and Limitations
27  to Using Earnings Data to Identify Unauthorized Work (July 11, 2006); GAO Report 06-458T,
    Social Security Numbers: Coordinated Approach to SSN Data Could Help Reduce Unauthorized
28  Work (Feb. 16, 2006).  These Reports are attached as Exhibits Q to O to Plaintiffs' Request for
    Judicial Notice ("RJN").

1  citizens" and that "the overall percentage of unauthorized workers is *unknown*."  RJN, Exh. Q at 8

2  (emphasis added).  When SSA ultimately has been able to resolve data discrepancies, "most . . .

3  belong to U.S.-born citizens, not to unauthorized workers," which GAO concluded "is an indication

4  that *a significant number of earnings reports in the [Earnings Suspense File] belong to U.S.*

5  *Citizens and work-authorized noncitizens*."  *Id.* (emphasis added).[2]

6      The ESF contains more than *255 million* mismatched earnings records and is growing at the

7  rate of *8 million to 11 million* records per year.  *Id.* at 8.  About 4 percent of annual Form W-2

8  earnings reports wind up in the Earnings Suspense File.  RJN, Exh. O at 8.

9      There are many reasons unrelated to an employee's work authorization status why earnings

10  reports might not match SSA records.  These include:  1) administrative errors at SSA (for example,

11  an erroneous assignment of a SSN that SSA has previously assigned to another individual);

12  2) transcription errors in spelling an employee's name or recording the SSN, 3) employee name

13  changes after marriage or divorce, 4)  employees that use a less "foreign" sounding first name for

14  work purposes; and 5) different naming conventions (such as the use of multiple surnames) that are

15  commonplace in many parts of the world, particularly some Latin American and Asian countries.  It

16  is more common for foreign-born and female workers to be the subject of a discrepancy.  Apfel

17  Decl. at ¶7; Theodore Decl. at ¶11.

18      As part of its effort to credit earnings properly, SSA periodically sends out "no-match"

19  letters to employers.  Apfel Decl. at ¶11; 20 C.F.R. §422.120.  A no-match letter indicates that

20  Forms W-2 filed by the employer show a name and SSN combination that does not agree with SSA

21  records.  The no-match letter is merely a voluntary request by SSA to employers for assistance in

22  resolving mismatches, so that earnings reports can be properly credited to the wage earner for

23  retirement, disability, and social security benefits.  Apfel Decl. at ¶10.

24

25  _____

26      [2] SSA's huge databases generally are rife with inaccuracies.  When SSA assigns an SSN to an individual, it creates a Master Earnings File for each person in its "Numident" file.  Apfel Decl.

27  at ¶5.  A recent report by the SSA's Inspector General determined that there were approximately 17.8 million discrepancies out of the 435 million records in the Numident file.  Of those 17.8

28  million discrepancies,  12.7 million – or 71.3% – concerned native-born U.S. citizens' records.  *Id.* at ¶13.

1    The Internal Revenue Service ("IRS") can sanction employers for submitting false tax

2    information, but an employer's obligations under the tax code are satisfied by accurately

3    transmitting the name and SSN obtained from the employee on Form W-4.  *See* 26 U.S.C. §§6721,

4    6724; 26 C.F.R. §§301.6721-1, 301.6724-1; *see also* RJN, Exh. M at 4.  The IRS does not impose

5    penalties on employers based on an SSA no-match letter.   The IRS imposes penalties only if the

6    IRS has sent a penalty notice.  *See* RJN, Exh. R at 10.  Insofar as the tax code is concerned, the IRS

7    already has issued guidance on the steps to take if notified by IRS of a discrepancy.  *Id.*

8    SSA is not an immigration agency, and SSA does not know whether a particular no-match

9    relates to unauthorized work.  Until now, SSA's no-match letters explained to employers:  "This

10   letter does not imply that you or your employee intentionally gave the government wrong

11   information . . . . [n]or does it make any statement about an employee's immigration status."  RJN,

12   Exh. D.  Until now, SSA no-match letters have never been accompanied by any letter to the

13   employer from DHS or any of its predecessor agencies with authority over immigration.

14   The only source of SSA's information about a taxpayer's earnings is the tax return

15   information on Forms W-2, which SSA processes as an agent of the IRS.  SSA is prohibited by

16   statute from sharing information with other federal agencies, including DHS.  26 U.S.C. §6103.

17   The use of tax returns to enforce the immigration laws presents a significant policy issue, because it

18   would encourage more "off-the-books" employment, and "off-the-books" employment deprives the

19   Social Security program of the taxes that otherwise would be paid on those earnings.

20   **B.    Employer Verification of Work Authorization and Sanctions.**

21    Prior to the adoption of the Immigration Reform and Control Act ("IRCA") in 1986, no

22   sanctions were imposed on employers for hiring unauthorized workers.  The imposition of employer

23   sanctions was very controversial, and Congress carefully crafted IRCA's employer-sanctions

24   provisions to meet competing policy goals and political pressures.  Congress wanted to discourage

25   illegal immigration, but Congress also was concerned about disrupting the existing workforce and

26   imposing undue burdens on employers and lawful workers.  H. Rep. 99-682(I), at 56, 60, 90 (1986),

27   1986 USCCAN 5649, 5660, 5664, 5694.  Congress also was concerned that IRCA would lead

28

1  employers fearing IRCA liability to shun all workers with a "foreign" appearance or accent.  H. Rep.

2  99-682(I), at 68, H. Rep. 99-682(II), at 12 (1986), 1986 USCCAN at 5672, 5761.

3        IRCA made it unlawful for the first time for employers to "to hire . . . for employment in the

4  United States an alien *knowing* the alien is an unauthorized alien."  8 U.S.C. §1324a(a)(1)(A)

5  (emphasis added).  IRCA also separately made it unlawful for employers to hire without complying

6  with an initial employment eligibility verification process established by Congress.  8 U.S.C.

7  §1324a(a)(1)(B).  That process requires the employee to present the employer with documents to

8  show proof of identity and work authorization and requires the employer and employee to complete

9  and employment verification form (Form I-9).  8 U.S.C. §1324a(b); 8 C.F.R. §274a.2.  Congress has

10  paid careful attention to this initial verification process; federal immigration law prohibits the

11  Executive Branch from making any changes to that verification process without advance notice to

12  Congress.  8 U.S.C. §1324a(b)(2)(3).

13        When Congress adopted IRCA, it included a "grandfather" clause for current employees.

14  Neither the initial-hire or continuing-to-employ provisions apply to anyone hired before the

15  enactment of the statute in 1986.  Pub. L. No. 99-603, §101(a)(3), 100 Stat. 3359, *codified at* 8

16  U.S.C. §1324a Historical and Statutory Notes.  For employees hired after the effective date of the

17  statute,  Congress chose not to impose any continuing verification requirement.  *See* H.R. Rep.

18  99-682(I), at 57, 1986 USCCAN at 5661 ("The Committee does not intend to impose a continuing

19  verification requirement on employers.").  IRCA only makes it unlawful for an employer "to

20  continue to employ an alien . . . *knowing* the alien is (or has become) an unauthorized alien with

21  respect to such employment."  8 U.S.C. §1324a(a)(2) (emphasis added).  Employers that violate

22  IRCA are subject to civil and criminal liability.  8 U.S.C. §1324a(e)(4)-(5), (f).

23        At the same time Congress imposed employer sanctions, Congress also wanted to prevent

24  employer discrimination based on national origin or citizenship status.  To that end, the immigration

25  laws make it illegal for employers to discriminate based on national origin or citizenship status by

26  requesting "more or different documents than are required" for the initial I-9 verification or

27  "refusing to honor documents . . . that on their face reasonably appear to be genuine."  8 U.S.C.

28  §1324b(a)(1), (6).

1      Congress' concerns that employer sanctions would lead to discrimination based on national

2  origin turned out to be well founded.  IRCA required GAO to report to Congress on this issue, and

3  the GAO reported that employer sanctions were responsible for "a widespread pattern of

4  discrimination."  RJN, Exh. L at 6 (GAO, Immigration Reform: Employer Sanctions and the

5  Question of Discrimination (March 30, 1990)).  GAO estimated that "227,000 employers . . . began

6  a practice, as a result of IRCA, not to hire job applications whose foreign appearance or accent led

7  them to suspect they might be unauthorized aliens . . . . [and] an estimated 346,000 employers . . .

8  applied IRCA's verification system only to persons who had a  foreign' appearance or accent." *Id.*

9  at 5.  GAO also estimated that "an additional 430,000 employers . . . began hiring only persons born

10  in the United States or not hiring persons with temporary work eligibility documents.  These

11  practices are illegal and can harm people, particularly those of Hispanic or Asian origin." *Id*. at 7.

12      Evidence that employer sanctions led to "a widespread pattern of discrimination" based on

13  "foreign" appearance or accent became an important consideration in subsequent debates about

14  employer sanctions.

15  **C.      The New Department of Homeland Security Rule.**

16      As previously stated, IRCA makes it unlawful to "knowingly" employ an "unauthorized

17  alien."  Until now, the enforcing agencies have recognized that no-matches occur for many reasons

18  and therefore have consistently interpreted the statute to mean that receipt of an SSA no-match letter

19  does not constitute "constructive knowledge" that a worker is unauthorized.  *See* RJN Ex. G (April

20  12, 1999 opinion letter from INS General Counsel) ("Notice from [SSA]to an employer notifying it

21  of a discrepancy between wage reporting information and SSA records with respect to an employee

22  does not, by itself, put an employer on notice that the employee is not authorized to work."); *accord*

23  RJN Exhs. H-J (opinion letters from INS General Counsel); Exh. F (August 9, 2004 letter from

24  DHS to Congressman); Exh. K (April 1, 2004 OSC letter).  As DHS itself explained in the past:

25          Discrepancies between SSA records and information submitted to SSA by the employer may
          be due to a variety of reasons . . . The letter does not indicate, and SSA is unable to
26          determine, the reason(s) for the cited mismatches . . . without more information than that
          contained in the "No Match" letter, we have not concluded that the letter alone is sufficient
27          to impart knowledge to the employer of unauthorized employment.

28  RJN Ex. F (emphasis added).

1    Then, on June 14, 2006, DHS sought to abandon that consistent interpretation and gave

2  notice of a proposed rule that would effectively presume constructive knowledge when an employer

3  receives an SSA no-match letter, unless the employer reverifies the employee's work authorization.

4  RJN, Exh. A (Proposed Rule). More than 5,000 comments were received during the 60-day

5  comment period, including comments that disputed Homeland Security's authority to adopt the rule

6  absent a change in statute. *See* RJN, Exh. B, at 45611 (Final Rule) (also attached hereto as

7  Appendix A). After the comment period closed on August 14, 2006, the proposed rule lay dormant

8  for a year. On August 15, 2007, shortly after Congress left for recess without enacting immigration

9  reform legislation that DHS urged, the agency issued a final rule. *Id*. The rule will become effective

10  on September 14, 2007. *Id.*

11    The new DHS rule amends the definition of "*knowing*" in 8 C.F.R. §274a.1(l)(1), and

12  therefore how DHS interprets the term "knowing" in IRCA. The new definition of "knowing" lists,

13  as an example of an employer who has "constructive knowledge" that an employee is an

14  unauthorized alien, an employer that "fails to take reasonable steps" after receiving an SSA no-

15  match letter. The first part of the amended regulation provides:

16    (1)(1) The term *knowing* includes having actual or constructive knowledge. . . .
      Examples of situations where the employer may, depending upon the totality of the
17    relevant circumstances, have constructive knowledge that an employee is an
      unauthorized alien include, but are not limited to, situations where the employer:
18    . . . .
        (iii) Fails to take reasonable steps after receiving information indicating that the
19    employee may be an alien who is not employment authorized, such as –
      . . . .
20        (B) Written notice to the employer from the Social Security Administration
      reporting earnings on a Form W-2 that employees' names and corresponding social
21    security account numbers fail to match Social Security Administration records . . . .

22    Having created a threat of employer sanctions liability for employers receiving SSA no-

23  match letters, the amended regulation then offers employers a "safe harbor." Under the amended

24  regulation, an employer receiving a no-match letter "will be considered by the Department of

25  Homeland Security to have taken reasonable steps – and receipt of the written notice will therefore

26  not be used as evidence of constructive knowledge – if the employer" takes the actions specified by

27  DHS. *Id.* at 45624. These are "the only combination of steps that will guarantee that DHS will not

28  use the employer's receipt of the notices from SSA . . . as evidence of constructive knowledge that

1  an employee is an unauthorized alien." *Id.* at 45618.

2      To qualify for the DHS "safe harbor," an employer that determines the SSA no-match was

3  not the result of its own clerical error must instruct an employee who claims the name and SSN are

4  correct to resolve the discrepancy with SSA within 90 days after receipt of the no-match letter. *Id.*

5  at 45624.  If the employee is unable to resolve the discrepancy with SSA within 90 days, the

6  employer cannot continue to employ the worker unless the employer can complete within three days

7  a new employment eligibility verification, on a new I-9 form, as if the employee never had been

8  hired and verified in the first place. *Id.*  The new verification cannot involve any document that

9  contains the disputed SSN, even if the employee still insists the SSN is correct. *Id.*  If employees

10  insist their names and SSNs on their identification documents are correct but have not resolved the

11  discrepancy with SSA by the deadline, the employer would have to fire them.

12      To ensure that employers understand that SSA no-match letters now carry *immigration law*

13  obligations, DHS intends to include a letter to the employer from Homeland Security with each SSA

14  no-match letter. *See* RJN, Exh. C (DHS/ICE Guidance Letter) (also attached hereto as

15  Appendix B).  The letter is to "provide guidance on how to respond to the enclosed letter from the

16  Social Security Administration (SSA) . . . in a manner that is consistent with your obligations under

17  United States Immigration Laws." *Id.*

18      The Homeland Security guidance letter contains questions and answers, which begin with

19  the following:

20      **Q:  Can I simply disregard the letter from SSA?**

21      **A:  No.**  You have received official notification of a problem that may have
22      significant legal consequences for your employees.  If you elect to disregard the
        notice you have received and it is determined that some employees listed in the
23      enclosed letter were not authorized to work, the Department of Homeland Security
        (DHS) could determine that you have violated the law by knowingly continuing to
24      employ unauthorized persons.  This could lead to civil and criminal sanctions.

25  *Id.* (boldface in original).

26      After threatening employers with "civil and criminal sanctions," the DHS letter then answers

27  the question **"Q: What should I do?"** by explaining that "You should" follow Homeland Security's

28  new "safe harbor" procedures.  *Id.* (boldface in original).  The letter assures employers that, if they

1  follow those procedures for every no-match, they will not be liable for discrimination if they

2  terminate employees:  **"Q: Will I be liable for discrimination charges brought by the United**

3  **States if I terminate the employee after I follow the steps outlined above?  A: No. . . . ."** *Id.*

4  (boldface in original).

5  **D.    Implementation of the New Rule.**

6          DHS initially announced that SSA would not begin sending out new no-match letter packets

7  until after the new rule becomes legally effective on September 14, 2007.  Avendaño Decl. at ¶3.

8  Plaintiffs subsequently learned that SSA will actually start mailing revised no-match letter packets

9  and the DHS/ICE Guidance letter on September 4, 2007 (*i.e.,* 10 days before the rule even becomes

10 effective). *Id.* at ¶¶4-5.  Between September 4 and November 9, SSA intends to mail no-match

11 letters to 140,000 employers around the country, affecting about eight million employees.  *Id.* at ¶5;

12 Moran Decl. at ¶14.

13         In its Notice of Final Rule, DHS does not even offer an estimate of what proportion of

14 records in the SSA's Earnings Suspense File relate to unauthorized work, conceding that "there are

15 many causes for a no-match, including clerical error and name change" (Appendix A at 45616), and

16 that "studies from the Governmental Accountability Office and other sources describe challenges

17 that must be addressed." *Id.* at 45622.

18         If the new no-match letters are sent, employers would immediately face the administrative

19 burdens and expense of compliance.  As Nik Theodore, Professor of Urban Planning and Policy at

20 the University of Illinois at Chicago has documented through empirical research, SSA no-match

21 letters have the resulted in the mass and precipitous firing of work-authorized employees, a swelling

22 in "off-the books" employment, and "major disruptions in workflow," "potentially leading to

23 significant economy-wide job losses and higher prices."  Theodore Decl. at ¶¶10-14.  These effects

24 occurred even though SSA no-match letters previously expressly cautioned employers "not use this

25 letter to take any adverse action against an employee." *Id.* at ¶¶12, 17.

26         Because the DHS Rule expressly instructs employers to take action in response to the no-

27 match letter, the DHS Rule is likely to magnify these demonstrated effects of SSA no-match letters.

28 *Id.* at ¶17.  Based on past experience with no-match letters and employer sanctions, some employers

1  will jump to the erroneous conclusion that all employees with no-matches and a "foreign"

2  appearance or accent lack lawful work authorization and will terminate or choose not to hire such

3  employees, including U.S. citizens and authorized workers. *Id.* at ¶¶19-25.

4      Other employees, though lawfully working in the United States, suddenly will face a 90-day

5  deadline for resolving an SSA database discrepancy. SSA field offices generally are open only

6  during business hours, when many employees are working, and the offices are likely to face in

7  influx of employees with similar no-match problems. Mismatched records for lawfully immigrants

8  have taken many months to resolve with SSA. *See* Moran Decl. at ¶6-9 (lawful immigrant from

9  Honduras took four months to resolve no-match). Some workers will be required to travel to

10  remedy the situation. *Id*. at ¶12 (typographical error on Social Security card issued many years ago

11  could not be resolved locally). According to former Social Security Commissioner Apfel, "it may

12  take considerably in excess of 90 days to resolve any given mismatched earnings report, even if the

13  worker makes prompt efforts to resolve the discrepancy." Apfel Decl. at ¶16. Commissioner Apfel

14  is "very concerned that there will be many legally authorized workers who cannot resolve a

15  mismatched earnings report by any arbitrary deadline." *Id.* at ¶17. DHS acknowledges that in

16  "difficult cases," SSA may be unable to resolve discrepancies within the 90-day timeframe.

17  Appendix A at 45617. The new rule does not provide for that contingency.

18      By expressly recasting SSA no-match letters as immigration-enforcement documents, the

19  DHS Rule is also likely to exacerbate the rise in off-the-books employment and disruptions in the

20  workplace, "including disruptions in workflow, job losses (especially in labor-intensive industries),

21  and higher consumer prices," created by SSA no-match letters. Theodore Decl. at ¶¶26-27.

22                                                **ARGUMENT**

23      "A preliminary injunction should issue when the plaintiff shows either: (1) a likelihood of

24  success on the merits and the possibility of irreparable injury; or (2) that serious questions going to

25  the merits were raised and the balance of hardships tips sharply in the plaintiff's favor. These two

26  alternatives are extremes of a single continuum in which the greater the relative hardship to the

27  party seeking the preliminary injunction, the less probability of success must be shown." *Land*

28  *Council v. McNair*, __ F.3d ___, 2007 WL 1880990, at *2. (9th Cir., July 02, 2007) (internal

1    citations, quotations and brackets omitted).

2    **I.    The DHS Rule and Guidance Letter are Contrary to the Governing Statute.**

3        IRCA makes it unlawful "to hire . . . for employment in the United States an alien *knowing*

4    the alien is an unauthorized alien." 8 U.S.C. §1324a(a)(1)(A) (emphasis added).  IRCA also makes

5    it unlawful for an employer "to continue to employ an alien . . . *knowing* the alien is (or has become)

6    an unauthorized alien with respect to such employment." 8 U.S.C. §1324a(a)(2) (emphasis added).

7    The DHS Final Rule would amend the agency's definition of "knowing."

8        An agency's interpretation of a statute is reviewed under the familiar two-part test set out in

9    *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984).  The first step in that inquiry requires the

10   court to determine what Congress intended. *Id.* at 842.  "[T]he court, as well as the agency, must

11   give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43.  In ascertaining

12   Congress' intent, courts look to the text, to the legislative purpose and history, and to the overall

13   structure of the act.  *Gonzales v. Oregon*, 546 U.S. 243, 126 S.Ct. 904, 920, 921 (2006) (declining to

14   defer to Attorney General's interpretation because it was "inconsistent with the design of the

15   statute," "beyond his expertise and incongruous with the statutory purposes").  "If the intent of

16   Congress is clear, that is the end of the matter." *Chevron,* 467 U.S. at 842.  If the statute is

17   ambiguous, a court proceeds to the second step of the *Chevron* inquiry, and will defer to an agency's

18   interpretation of the statute if it is "reasonable." *Id.* at 845.  But a court must still reject an agency's

19   interpretation if "it appears from the statute or its legislative history that the accommodation [of

20   conflicting policies] is not one that Congress would have sanctioned." *Id.*[3]

21       In this case, the DHS Final Rule is contrary to the statute for three reasons.  First, it expands

22   IRCA civil and criminal liability beyond what Congress intended, by re-defining the unambiguous

23

24       [3]  Because the Final Rule is reviewable agency action, 5 U.S.C. §§551(13), 701(b)(2), 702,
     the Administrative Procedure Act ("APA") requires the court to "hold unlawful and set aside" the

25   Final Rule if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with
     law," or "in excess of statutory . . . authority." 5 U.S.C. §706(2)(A), (C).  Agency action that is

26   "contrary to the text, structure and history" of the statute must be set aside. *American Corn
     Growers Assn. v. EPA*, 291 F.3d 1, 5, 8-9 (D.C. Cir. 2002).  A court may "invalid[ate agency action]

27   on APA grounds without reaching *Chevron* step two." *Shays v. FEC*, 414 F.3d 76, 96 (D.C. Cir.

28   2005).  If the court reaches *Chevron* step two, however, the analysis "overlaps with the arbitrary and
     capricious standard." *Id.*

1  statutory term "*knowing*."  Second, it effectively establishes a new requirement of continuing

2  verification for existing employees, which upsets the delicate policy balance struck by Congress

3  when it chose to create a detailed and specific employment verification system limited to new hires.

4  Third, it would require verification of employees hired before 1987 even though Congress exempted

5  them from IRCA through a "grandfather" provision.

6
    **A.    The DHS Rule and Guidance Letter are Premised on an Interpretation of the
7            Statutory Term "Knowing" that is Not What Congress Meant.**

8           An agency is owed no deference when it seeks to give a statutory term a meaning it cannot

9  bear.  *See, e.g., MCI Tele. Corp. v. American Tel. & Telegraph Co.*, 512 U.S. 218, 231 (1994)

10 (rejecting agency's interpretation of statutory term "modify"); *National Treasury Employees Union*

11 *v. Chertoff*, 452 F.3d 839, 864 (D.C. Cir. 2006) (invalidating DHS's final rule that failed to give

12 meaning to "collective bargaining" rights granted by statute);  *Zheng v. Ashcroft*, 332 F.3d 1186,

13 1194 (9th Cir. 2003) (rejecting INS definition of "acquiescence" as contrary to unambiguous

14 Congressional use of term).  The term "*knowing*" is "a familiar term of art" that describes a state of

15 mind necessary for civil or criminal liability; it has a meaning that "Congress is presumed to have

16 known and adopted."  *United States v. Jewell*, 532 F.2d. 697, 703 (9th Cir. 1976) (en banc)

17 (construing "knowingly" in case involving transportation of drugs).  Because "knowing" is "a term

18 of art, . . . DHS was not free to treat it as an empty linguistic vessel."  *Chertoff*, 452 F.3d at 860; *id.*

19 at 864 ("we owe no deference to DHS's interpretation" of statutory term "collective bargaining").

20          The term "knowing" encompasses both "positive knowledge" and the state of mind often

21 called willful blindness or constructive knowledge, *i.e.* "a mental state in which the defendant is

22 aware that the fact in question is highly probable but consciously avoids enlightenment."  *Jewell*,

23 532 F.2d at 704.  But this "state of mind differs from positive knowledge only so far as necessary to

24 encompass a calculated effort to avoid the sanctions of the statute while violating its substance.  A

25 court can properly find willful blindness only where it can almost be said that the defendant actually

26 knew."  *Id.* (citations, internal quotation marks omitted).  The Ninth Circuit reaffirmed *Jewell* as a

27 "rather straightforward matter of statutory interpretation" in another en banc decision 30 years later,

28 *United States v. Heredia*, 483 F.3d 913, 918 (9th Cir. 2007) (en banc).  The Court explained that

1  "willful blindness . . . *is categorically different from negligence or recklessness.*"  *Id.* at 918 n.4

2  (emphasis added).  "A willfully blind defendant is one who took *deliberate* actions to avoid

3  confirming criminality.  A reckless defendant is one who merely knew of a substantial and

4  unjustifiable risk that his conduct was criminal; a negligent defendant is one who should have had

5  similar suspicions but, in fact, did not."  *Id.* at 918 n.4 (emphasis in original).

6      Not surprisingly, in its first decision addressing IRCA's employer sanctions provision,

7  *Mester Manufacturing Co. v. INS*, 879 F.2d 561, 567 (9th Cir. 1989), the Ninth Circuit relied on

8  *Jewell* to establish the meaning of the term "knowing" in IRCA.  In *Mester*, the INS notified the

9  employer that certain of its employees were suspected unlawful aliens and that, if their green cards

10  matched numbers listed in the INS' letter to the employer, the green cards were fraudulent.  The

11  employer continued to employ the workers.  The Ninth Circuit held that those facts provided

12  sufficient evidence to find that the employer had at least "constructive knowledge" the employees

13  lacked work authorization.

14      The Ninth Circuit also applied the *Jewell* definition of "knowing" in *New El Rey Sausage*

15  *Co. v. INS*, 925 F.2d 1153 (9th Cir. 1991), another IRCA case that involved essentially the same

16  situation as in *Mester*.  The INS delivered a letter to the employer stating: "Unless these individuals

17  can provide valid employment authorization . . . they are to be considered unauthorized aliens . . . ."

18  *Id*. at 1155.  The Ninth Circuit held that the employer's failure to seek employment authorization

19  documents from these employees after receiving "specific, detailed information" from the INS as to

20  "whom it considered unauthorized and why" provided sufficient evidence that the employer had at

21  least constructive knowledge the employees lacked work authorization.  *Id*. at 1158.

22      The Ninth Circuit also noted in *New El Rey*, however, that Congress decided not to impose a

23  continuing verification requirement in IRCA (*id.* at 1158 n.8), and the Ninth Circuit cautioned that

24  "*the INS cannot make generalized accusations for the purpose of forcing employers to reverify the*

25  *authorization of their employees.*"  *Id*. at 1158 (emphasis added).

26      Finally, in *Collins Foods Int'l v. INS*, 948 F.2d 549 (9th Cir. 1991), the Ninth Circuit

27  reiterated that the "constructive knowledge" necessary to establish a violation of IRCA is drawn

28  from *Jewell*, and means " a mental state in which the defendant is aware that the fact in question is

1    *highly probable* but consciously avoids enlightenment.'" *Id.* at 555 n.17 (quoting *Jewell*, 532 F.2d

2    697) (emphasis added).  In *Collins Foods*, the Ninth Circuit held that an employer could not be

3    charged with the knowledge necessary for an IRCA violation simply because the employer could

4    have discovered a Social Security card was fraudulent by comparing it to an example in the INS

5    manual.  The Ninth Circuit also explained that:

6    　　　IRCA is . . . delicately balanced to serve the goal of preventing
     　　　unauthorized alien employment while avoiding discrimination against
7    　　　citizens and authorized aliens.  The doctrine of constructive
     　　　knowledge has great potential to upset that balance, and it should not
8    　　　be expansively applied.  The statute prohibits the hiring of an alien
     　　　"*knowing* the alien is an unauthorized alien . . . with respect to such
9    　　　employment.  8 U.S.C. 1324a(a)(1)(A) (emphasis added).  Insofar as
     　　　that prohibition refers to actual knowledge, as it appears on its face,
10   　　　any employer can avoid the prohibited conduct with reasonable ease.
     　　　When the scope of liability is expanded by doctrine of constructive
11   　　　knowledge, the employer is subject to penalties for a range of
     　　　undefined acts that may result in knowledge being imputed to him.
12   　　　To guard against unknowing violations, the employer may . . . avoid
     　　　hiring anyone with an appearance of alienage.  *To preserve Congress'*
13   　　　*intent in passing the employer sanctions provisions of IRCA, then, the*
     　　　*doctrine of constructive knowledge must be sparingly applied.*

14

15   948 F.2d at 554-55 (emphasis added).

16   　　　The DHS Final Rule is contrary to the statute because it seeks to re-define a familiar

17   statutory term of art, "knowing," and thereby to impose civil and criminal liability on employers

18   under circumstances Congress never intended.

19   　　　Unlike the information received by the employers *from the INS* in *Mester* and *New El Rey,* a

20   no-match letter comes from a database of tax information maintained by the SSA that was never

21   designed to collect information on immigration status.  Apfel Decl. at ¶8; Theodore Decl. at ¶6.  No

22   studies support the conclusion that a mismatched SSA record is a reliable indicator that an employee

23   lacks work authorization.  Apfel Decl. at ¶12; Theodore Decl. at ¶9.  The SSA itself has never used

24   no-match letters as an immigration enforcement tool.  Apfel Decl. at ¶12.  The SSA does not know

25   whether any employee identified in a no-match letter is unauthorized to work.  *Id.*  There are many

26   reasons for SSA no-matches that are unrelated to work authorization status, including clerical errors,

27   name changes, and different naming conventions throughout the world.  *Id.* at ¶7; Theodore Decl. at

28   ¶8.

Because there is no basis for concluding that a no-match letter is a reliable indicator that an employee is unauthorized to work, an employer receiving such a letter does not become "aware that the fact in question [*i.e.*, that a worker lacks authorization] is *highly probable*." *Collins Foods*, 948 F.2d at 555 n.17 (quoting *Jewell*, 532 F.2d 697) (emphasis added). DHS does not have access to SSA's Earnings Suspense File, and no one knows what percentage of the *255 million-plus* unmatched records relate to unauthorized work. The most recent GAO study reports that this figure is *unknown.* RJN, Exh. Q at 8. DHS' Notice of Final Rule does not even offer an estimate.[4]

Equally to the point, an employer that simply handles a no-match letter consistently with the tax code, by making sure the employer correctly transmitted the name and SSN provided by the employee and telling the employee about the no-match, is not an employer "who took *deliberate* actions to avoid confirming criminality," *Heredia*, 483 F.3d 913 at 918 n.4 (emphasis in original), or "consciously avoid[ed] enlightenment.'" *Collins Foods*, 948 F.2d at 555 n.17 (quoting *Jewell*, 532 F.2d 697). SSA is not an immigration-enforcement agency. Apfel Decl. at ¶12. And the employer has no duty to re-verify the immigration-status of employees whose immigration status already was verified on the initial hire. The employer who does not do so in response to a no-match letter is not "consciously avoiding" anything. To be sure, Congress *could have* made employers liable for recklessness or negligence in employing unauthorized workers, but Congress chose not to do so. (Given the unreliability of a no-match letter as an indicia of work-authorization status, and the number of inaccuracies in SSA's database, continuing to employ a worker after receiving a no-match lack would be unlikely to qualify as recklessness or negligence in any event.)

DHS essentially seeks to manufacture deliberate indifference through bootstrapping: DHS tells the employer it has a non-existent duty to follow-up on the immigration status of employees who are subject to no-match letters. *See* Appendix B ("Q: Can I simply disregard the letter from SSA? A: No."). DHS then construes the employer's failure to act as "constructive knowledge" of illegality. That is exactly what the Ninth Circuit already stated that the agency could not do in *New*

---

[4] It bears emphasis that workers who are the subject of a no-match letter already would have gone through an initial I-9 verification process when they were hired. Until now, no-match letters correctly advised that they "make[] no statement regarding an employee's immigration status." RJN, Exh. D. There have been no changes in how no-match letters are generated.

1  *El Rey*: "make generalized accusations for the purpose of forcing employers to reverify the

2  authorization of their employees."  925 F.2d at 1158.

3        The DHS rule cannot be sustained as merely providing a "safe harbor" for employers.  The

4  threshold legal problem with the rule is that it attempts *to lower the state of mind necessary to*

5  *violate IRCA*, so as to create the need for a "safe harbor" in the first place.  DHS itself interprets its

6  new rule as establishing an immigration-law duty for employers to deal with no-match letters.  DHS

7  would tell employers unequivocally in the Homeland Security guidance letter: "**Q:   Can I simply**

8  **disregard the letter from SSA?  A. No.**"  *See* Appendix B (boldface in original).  Only after telling

9  employers they have an IRCA duty to address no-match letters or face "civil and criminal sanctions"

10  can DHS offer its safe-harbor to employers, *i.e.* its response to the question "**What should I do?**"

11  *Id.* (boldface in original).

12        In sum, the DHS rule cannot stand because it impermissibly changes the meaning of the

13  statutory term "knowing," and thereby expands civil and criminal liability for employing a worker

14  who turns out to be unauthorized.  Even if the Court were to get to step two in the *Chevron* analysis,

15  moreover, the rule still would be invalid because it upsets Congress' "delicately balanced" policy

16  goals and expands employer liability "beyond that outlined in the narrowly-drawn statute."  *Collins*,

17  948 F.2d at 554.  DHS' effort to re-prioritize these policy considerations "is not one that Congress

18  would have sanctioned."  *Chevron*, 467 U.S. at 845.

19
20
    **B.     The DHS Rule Also Upsets the Balance that Congress Struck in Establishing
            System of Initial Verification of Work-Authorization Status.**

21        The new rule also is contrary to statute because it effectively establishes a continuing work-

22  authorization *re*-verification system for millions of workers.  That system would upset the balance

23  struck by Congress when it adopted IRCA's controversial employer sanctions provisions.  Congress

24  sought to create a mechanism that would discourage illegal immigration while at the same time

25  minimizing both administrative burdens on employers and national-origin discrimination against

26  employees.  To that end, Congress crafted a system of *initial* verification of work authorization at

27  the time of hire for employees hired after November 6, 1986.  DHS's rule, by contrast, establishes a

28  *reverification* system as "the only combination of steps that will guarantee that DHS will not use the

1  employer's receipt of the notices from SSA . . . as evidence of constructive knowledge that an

2  employee is an unauthorized alien." 72 Fed.Reg. at 45618.  In doing so, the DHS rule imposes

3  additional burdens on employers and creates increased potential for national-origin discrimination

4  against employees, thereby undermining Congress's decision to limit verification obligations.

5          1.     IRCA represented a sea change in immigration legislation because Congress for the

6  first time imposed sanctions against employers that knowingly employ "unauthorized aliens."  8

7  U.S.C. §1324a(a).  In addition to adopting civil and criminal penalties for knowingly employing

8  undocumented workers (8 U.S.C. §§1324a(e)(4)(A), 1324a(f)(1)), IRCA also "establish[ed] an

9  extensive  employment verification system,'" "mandat[ing] that employers verify the identify and

10  eligibility of all new hires by examining specified documents before they begin work." *Hoffman*

11  *Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147-48 (2002).  IRCA thus required that, after

12  November 6, 1986, employers must follow detailed procedures in verifying employment at the time

13  of initial hire.  8 U.S.C. §1324a(b)).  "This verification system is critical to the IRCA regime."

14  *Hoffman*, 535 U.S. at 147-48.

15        The issues of employer sanctions and work-authorization verification procedures garnered

16  substantial Congressional attention.  Sensitive to the concern that IRCA "plac[ed] an undue burden

17  on employers in requiring them to do the paperwork and keep records on employees," H. Rep. 99-

18  682(I) at 90, 1986 USCCAN at 5694, Congress sought "to minimize the burden and the risk placed

19  on the employer in the verification process." *Collins*, 948 F.2d at 554.  At the same time, Congress

20  also was of the view that "the imposition of employer sanctions will give rise to employment

21  discrimination against Hispanic Americans and other minority members." H. Rep. 99-682(II) at 12,

22  1986 USCCAN at 5761.  It "believe[d] that every effort must be taken to minimize the potentiality

23  of discrimination and that a mechanism to remedy any discrimination that does occur must be a part

24  of this legislation."  H. Rep. 99-682(I) at 90, 1986 USCCAN at 5694.

25        Congress therefore took pains to consider these concerns – minimizing burdens on

26  employers and discrimination against employees – in crafting a detailed, but limited, system for

27  employer verification of work authorization status *at the time an employee initially is hired*.

28  H. Rep. 99-682(I) at 56, 1986 USCCAN at 5660 (adopting approach that "would be the least

disruptive to the American businessman and would also minimize the possibility of employment

discrimination"). Congress prescribed all the details for the initial verification procedure, 8 U.S.C.

§1324a(b), but said nothing about a system for reverifying work authorization because Congress did

"not intend to impose a continuing verification obligation on employers." H. Rep. 99-682(I) at 57,

1986 USCCAN at 5661. Congress also made clear that employers should not go beyond statutorily-

required verification procedures. H. Rep. 99-682(I) at 62, 1986 USCCAN at 5666 ("if the

verification procedure is followed, the language is intended to make clear that there is no

requirement that an employer request additional documentation or that an employee produce

additional documentation"); 8 U.S.C. §1324b.[5]

    In short, Congress made the considered judgment that the most effective means for enforcing

employer sanctions, while minimizing burdens on employers and discrimination against employees,

would be a circumscribed system of employer verification at the time of initial hire. And while

Congress over the last twenty years has enacted detailed, but limited, provisions regarding

verification upon initial hire, it has never created a continuing reverification requirement.[6]

_____

    [5] On numerous instances since IRCA, Congress has revisited the issue of employer verification and created pilot programs for electronic employment eligibility verification of *new* hires. Consistent with Congress' expressed desire in IRCA to minimize burdens on employers, it made participation in these programs entirely voluntary. *See* Illegal Immigration and Immigrant Responsibility Act of 1996 ("IIRAIRA"), Pub. L. 104-208, Div. C, title IV, Substitle A, §§401-02, Sept. 30, 1996, 110 Stat. 3009-655, 8 U.S.C. §1324a Historical and Statutory Notes (creating 4-year "3 pilot programs of employment eligibility confirmation" and prohibiting DHS from requiring entities other than federal agencies to participate); Pub. L. 107-128, §2, Jan. 16, 2002, 115 Stat. 2407 (extending pilot program to 6 years); Pub. L. 108-156, §2, Dec. 3, 2003, 117 Stat. 1944 (extending pilot program to 11 years).

    [6]An existing regulation requires reverification "[i]f an individual's employment authorization expires." 8 CFR §374a.2(b)(vii). The obligation to reverify under these limited circumstances is consistent with the statutory prohibition against continuing to employ an alien "knowing the alien is (*or has become*) an unauthorized alien with respect to such employment." 8 U.S.C. §1324a(a)(2) (emphasis added). When there is a change in work-authorization status known to the employer based on the face of the information provided at initial verification, reverification is consistent with Congress' intent because the employer otherwise would "know[]" from the *initial verification*, that "the alien . . . has become . . . an unauthorized alien." The obligation for continuing verification under these limited circumstances is very different from a system of continuing verification for millions of employees subject to SSA no-match letters.

1    2.    The DHS rule contravenes Congress's intent and is entitled to no *Chevron* deference.

2    The Ninth Circuit in *Collins* recognized that IRCA is "delicately balanced," and rejected an

3    expansive definition of "constructive knowledge" because it would "upset that balance." 948 F.2d

4    at 554-55. Similarly, DHS's new rule would upset the balance struck by Congress by effectively

5    imposing a continuing reverification process for millions of existing employees whose SSNs are the

6    subject of SSA no-match letters. The rule would result in additional administrative burdens for

7    employers and would cause the termination of existing workers who cannot rectify erroneous no-

8    matches within 90 days. It also would increase the potential for discrimination against lawfully

9    authorized workers based on national origin. Theodore Decl. at ¶¶17, 19-25. These are dangers

10   Congress was concerned about when it enacted IRCA.

11   DHS may argue that its rule does not *require* employers to reverify work authorization,

12   merely offering them a safe harbor if they do so. But courts construe agency action as "binding as a

13   practical matter" "if the language of the document is such that private parties can rely on it as a

14   norm or safe harbor by which to shape their actions." *General Electric Co. v. EPA*, 290 F.3d 377,

15   383 (D.C. Cir. 2002) (internal quotation marks, citation omitted); *see also Cement Kiln Recycling*

16   *Coalition v. EPA*, _F.3d._, 2007 WL 2011748, *18 (D.C. Cir. July 13, 2007) ("an agency's

17   pronouncement that a document is non-binding will not make it so"). Moreover, DHS' own

18   guidance letter makes clear that DHS interprets its rule to mean that employers cannot simply ignore

19   the no-match letter and must have some system for continuing verification of no-match employees

20   that is uniformly applied to avoid conflicting with anti-discrimination provisions. DHS' safe harbor

21   is "the only combination of steps that will guarantee that DHS will not use the employer's receipt of

22   the notices from SSA . . . as evidence of constructive knowledge that an employee is an

23   unauthorized alien." Appendix A at 45618. *Cf. Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d

24   45, 48-49 (D.C. Cir. 2000) ("a preamble plus a guidance plus an enforcement letter from EPA could

25   crystallize an agency position").

26   Congress intended only a system of initial verification, not a system of continuing

27   verification for millions of employees every year. *See New El Rey*, 925 F.2d at 1158 n.8. Such a

28   system would disturb the delicate balance between, on one hand, discouraging illegal immigration

1    and, on the other, imposing administrative burdens on employers and fomenting national-origin

2    discrimination.  Where an agency's interpretation would bring about "the very thing which Congress

3    intended to prevent," the Supreme Court has not hesitated to reject the agency's interpretation.

4    *Federal Maritime Comm. v. Seatrain Lines, Inc.*, 411 U.S. 726, 739 (1973) (rejecting agency's

5    assertion of authority to shield certain merger agreements from antitrust liability where Congress

6    sought to avoid "decrease in competition through . . . mergers").

7         Further, "[i]t would be anomalous for Congress to have so painstakingly described" a system

8    for employment verification at the time of initial hire, including the type of documents that must be

9    presented and the employer's obligations in reviewing them, "but to have given [DHS], just by

10   implication, authority to" create from whole cloth its own process for reverification.  *Gonzales v.*

11   *Oregon*, 546 U.S. 243, 126 S.Ct. 904, 918, 920 (2006) (refusing to apply *Chevron* deference to

12   Attorney General's interpretive rule because "[t]he authority desired by the Government is

13   inconsistent with the design of the statute in . . . fundamental respects"); *Romero v. INS*, 39 F.3d

14   977, 980 (9th Cir. 1994) (where "comprehensive scheme" for deporting immigrants who make

15   "material misrepresentations" reflected Congressional intent not to deport for nonmaterial

16   mispresentations, statutory authority to deport immigrants for failure to "comply with the conditions

17   of any [immigration] status" did not authorize INS to deport immigrants for nonmaterial

18   misrepresentations).

19        "[W]hat we have here . . . is effectively the introduction of a whole new regime of

20   regulation" in the form of employer reverification.  *MCI*, 512 U.S. at 231.  This new regime is "not

21   the one that Congress established."  *Id.* (agency's authority to "modify" statute's requirements did

22   not authorize it to exempt regulated entities from statutory requirements).  DHS cannot parlay

23   Congress' creation of a regime of initial verification into a system of continuing verification lasting

24   an indefinite duration.  *See Securities and Exchange Commission v. Sloan,* 436 U.S. 103, 111-12

25   (1978) (statutory authority of Securities and Exchange Commission to issue order suspending

26   trading in a security for initial 10-day period did not authorize agency to issue series of consecutive

27   orders and thus suspend trading indefinitely).  "If extension of the [verification system] is desirable,

28   the proper source of that power is Congress."  *Id.* at 117.

**C.    The DHS Rule is Also Contrary to Statute by Requiring Verification of Employees Who Were Exempted by IRCA's "Grandfather" Provision.**

Finally, the DHS rule is contrary to statute because it fails to exclude employees who were hired before IRCA was adopted on November 6, 1986.  Congress exempted these employees from both the initial-hire and continuing-to-employ prohibitions in IRCA.  *See* Pub. L. No. 99-603 § 101(a)(3), 100 Stat. 3359 (1986), *codified at* 8 U.S.C. § 1324a Historical and Statutory Notes ("(3) GRANDFATHER FOR CURRENT EMPLOYEES. -- (A) Section 274A(a)(1) of the Immigration and Nationality Act shall not apply to the hiring, or recruiting or referring of an individual for employment which has occurred before the date of the enactment of this Act [Nov. 6, 1986]; (B) Section 274A(a)(2) of the Immigration and Nationality Act shall not apply to continuing employment of an alien who was hired before the date of the enactment of this Act [Nov. 6, 1986].").   The new DHS rule, by contrast, would dictate that employers must discharge such employees if they are the subject of a no-match letter and their work-authorization cannot be verified.

**II.    Neither SSA Nor DHS Have Statutory Authority to Use the SSA Earnings Suspense File and the "No Match" Letter as a Tool for Enforcing the Immigration Laws.**

The DHS/SSA plan to use SSA no-match letters as an immigration enforcement tool – by imposing immigration-law obligations on employers that receive them – is also invalid because it exceeds the authority Congress granted to those agencies.

Federal agencies are purely "creature[s] of statute," and have no authority beyond that conferred by Congress.  *Michigan v. E.P.A*. 268 F.3d 1075, 1081 (D.C. Cir. 2001); *see also Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("an agency literally has no power to act . . . unless and until Congress confers power upon it"); *Gorbach v. Reno,* 219 F.3d 1087, 1093 (9th Cir. 2000) ("An agency may not confer power upon itself").  Agency authority cannot be presumed from Congress' failure to  withhold that authority.  *See Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc) ("Were courts to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony").  And, where Congress carefully divided statutory authority to regulate an area among agencies, one agency cannot intrude on the authority granted to another agency.  *See, e.g.,*

1  *Chertoff*, 452 F.3d at 865 (Congress' delegation of authority to DHS to create a human resource

2  system did not include power to encroach upon authority granted to Federal Labor Relations

3  Authority); *cf. Sutton v. United Air Lines Inc.*, 527 U.S. 471, 480 (1999) (where Congress divided

4  authority to enforce a statute among three administrative agencies, none had authority to interpret

5  the generally applicable provisions of that act).

6        An agency's "actions in excess of statutory jurisdiction [and] authority" violate the

7  Administrative Procedures Act.  *See* 5 U.S.C. § 706(2); *Gorbach*, 219 F.3d at 1099.  Such actions

8  will be enjoined as *ultra vires.  See Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328

9  (D.C. Cir. 1996); *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)); *see also Bowen v.*

10  *Michigan Academy of Family Physicians*, 476 U.S. 667, 681 (1986); *Stark v. Wickard*, 321 U.S.

11  288, 310 (1944).

12       **A.**    **The SSA Cannot Use Its Power to Process Tax Data for Purposes of the Social Security Program to Instead Help DHS Enforce Immigration Laws.**

13

14        Congress granted to SSA the authority to collect and process tax reports for the *sole* purpose

15  of administering social security benefits.  SSA's authority to process tax information is a specific

16  exception to the exclusive authority over taxation otherwise granted to the Internal Revenue Service

17  and to the general rule – intended to protect privacy and encourage compliance with the tax laws –

18  that tax reports are confidential information that cannot be shared with other agencies.  *See* 26

19  U.S.C. §6103, §6103(l)(5) ("[u]pon written request by the Commissioner of Social Security, the

20  Secretary [of the Treasury] may disclose information returns . . . *for the purpose of* – (A) carrying

21  out, in accordance with an agreement entered into pursuant to section 232 of the Social Security Act

22  [*i.e.* 42 U.S.C. §432], an effective return processing program." (emphasis added); 42 U.S.C. §432

23  ("The Secretary of the Treasury shall make available information returns . . . to the Commissioner of

24  Social Security *for the purposes of this subchapter and subchapter XI of this chapter*. The

25  Commissioner of Social Security and the Secretary of the Treasury are authorized to enter into an

26

27

28

1    agreement for the processing by the Commissioner of Social Security of information contained in

2    returns.").[7]

3         In 1978, the IRS and SSA entered into the agreement for tax information processing

4    referenced in these authorizing statutes  43 Fed. Reg. 60158 (Dec. 26, 1978) (codified at 26 C.F.R.

5    §31.6051).  Since then, employers have reported the amount of wages paid, the amount of

6    withholdings and other tax information for each of their employees by filing Forms W-2 with SSA.

7    *See* 26 C.F.R. §§31.6051-1, 31.6051-2.   SSA processes the forms, records the wage information on

8    each employee's earnings record, and then forwards the forms to IRS.  *Id*.   As discussed above, if

9    the employee's name and SSN do not match with SSA's database, the earnings are placed in the

10   Earnings Suspense File.  20 C.F.R. §422.120(a).

11        SSA regulations set out the process by which SSA attempts to resolve discrepancies between

12   employer-reported W-2 information and its earnings databases, pursuant to its authority to

13   administer social security benefits.  Those regulations provide for SSA to send "no match" letters to

14   employees and employers "request[ing]" assistance in resolving the discrepancy.  20 C.F.R.

15   §422.120.  SSA has no authority to sanction employees or employers that fail to respond.

16        Until now, SSA has understood that its only statutory authority is to administer the Social

17   Security program and that the only purpose of "no match" letters is to assist in that process.  Now,

18   however, SSA is trying to turn the no-match letter into an immigration-enforcement tool, by

19   revising its own no-match letter to provide: "You should follow the instructions contained in . . . the

20   attached letter from the Department of Homeland Security,"  and "You should not ignore this letter

21   and do nothing.  That could ... as the Department of Homeland Security has advised us, expose you

22   to liability under immigration law."  RJN, Exh. E (model 2007 no match letter) (also attached hereto

23   as Appendix C).  SSA also will include the DHS/ICE Guidance Letter with every SSA no-match

24   letter. The DHS letter has nothing to do with the Social Security program that Congress authorized

25   SSA to administer, but concerns "*your obligations under United States immigration laws.*"

26   Appendix B.

27   _____

28        [7] The statutory "subchapters" referred to in 42 U.S.C. §432 are the subchapters regarding
     social security benefits.

Nothing in the statutory authority Congress granted to the SSA comes remotely close to authorizing SSA to use its power to collect tax information for the purpose of the Social Security program for the very different purpose of enforcing the immigration laws.  Indeed, Congress has considered, but ultimately declined, on multiple occasions to involve SSA with immigration enforcement in a similar manner to what SSA and DHS wish to accomplish here.[8]  Because SSA's use of no-match letters to assist DHS in the enforcement of immigration laws exceeds SSA's statutory authority, it must be enjoined under 5 U.S.C. §706(2)(C).

---

[8] The Administration-backed S.2611 "Comprehensive Immigration Reform Act of 2006," which passed the Senate on May 25, 2006, but was not enacted, would have amended the Social Security Act to require SSA to "establish a reliable, secure method" to match an employee's name and social security number to information in SSA's records for the purpose of verifying work authorization, *see* S.2611, 109th Cong. §301(d) (2006) (amending 42 U.S.C. §405(c)(2), and would also have amended the Internal Revenue Code to authorize SSA to disclose no-matches to DHS upon request, *see* S.2611, §301(e) (amending Section 6103(l) of the Internal Revenue Code of 1986).  *See also, e.g.,* H.R. 4437, 109th Cong., §701(a) (passed House Dec. 12, 2005) (requiring DHS to establish telephone or other electronic verification system and requiring SSA  to "establish a reliable, secure method, which . . . compares the name and social security account number provided in an inquiry against such information maintained by the Commissioner"); H.R. 3333, 109th Cong., §224(a) (referred to House subcommittee Aug. 23, 2005) (requiring SSA to send no-match letters every year to each employer with 10 or more no-matches and to instruct such employers to notify employees that they must "correct the mismatch with the Social Security Administration or the employer will be required to terminate their employment"); H.R. 5507, 109th Cong., §2 (referred to House subcommittee May 25, 2006) (amending 42 U.S.C. 405(c)(2) to require SSA to share no-match letters with DHS and to inform employers that SSA is providing a copy of such letter to DHS to assist DHS "in the enforcement of applicable Federal immigration laws").  Additional legislative proposals pending in the current Congress that would accomplish the same ends as the DHS rule include H.R. 138, 110th Cong., §3 (introduced Jan. 4, 2007) (requiring employers receiving no-match letters to reverify employee's work authorization); S. 1639, 110th Cong., §308 (returned to Senate Calendar June 28, 2007) (amending 42 U.S.C. §405(c)(2) to require SSA to "establish a reliable, secure method" to compare name and social security information provided by employee to SSA records for purpose of establishing work authorization); H.R. 2954, 110th Cong., §313 (referred to House subcommittee July 19, 2007) (requiring employers receiving SSA no-match letters to reverify employee's work authorization); S. 1984, 110th Cong., §256 (referred to Senate Committee Aug. 2, 2007) (amending 42 U.S.C. §405(c)(2) to require SSA to "establish a reliable, secure method" to compare name and social security information provided by employee to SSA records for purpose of establishing work authorization).

**B.    The DHS Final Rule Commandeers Authority That Congress Has Delegated Only to the IRS and the SSA.**

Just as SSA's authorizing statutes do not authorize SSA to use its authority to send out no-match letters for immigration-enforcement purposes, DHS' authorizing statutes do not authorize DHS to dictate how employers respond to SSA no-match letters.

Congress established the Department of Homeland Security by merging 22 existing agencies into one new cabinet-level agency. *Chertoff*, 452 F.3d at 845; *see also* Pub. L. No. 107-296, 116 Stat. 2135 (2002) (the "Homeland Security Act"). Prior to creation of DHS, the Department of Justice ("DOJ") and the Attorney General were responsible for oversight of INS, and the enforcement of immigration laws. The Homeland Security Act eliminated INS, and created a new agency within DHS to enforce the immigration laws, called Immigration and Customs Enforcement ("ICE").[9] The Homeland Security Act also required that some provisions of immigration laws remained within the enforcement authority of the Attorney General and DOJ. 8 U.S.C. §1103. The authority of DHS is therefore bounded by the limits of authority granted to other agencies:

> The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: Provided, however, That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

8 U.S.C. §1103(a)(1). The Secretary of DHS is also generally granted authority over the functions of all of the component agencies within the agency. 6 U.S.C. §112(a)(3).

Nothing in these general grants of authority to enforce immigration laws authorizes DHS to regulate employer responses to notices of mismatches between their Forms W-2 and the SSA database. The Form W-2 is a tax report, not an immigration or work-authorization document; the Earnings Suspense File is maintained to manage the Social Security program, not the immigration

---

[9] *See* Pub. L. No. 107-296 §471 (abolishing INS), §442 (establishing Bureau of Border Security); §1502 (requiring reorganization plan); 6 U.S.C. §542 (replacing Bureau of Border Security with ICE).

1  laws; and DHS is not even permitted access to the data in the Earnings Suspense File.[10]

2      Moreover, the Internal Revenue Service – not DHS – has authority to sanction employers

3  that submit incorrect tax reports and, therefore, authority to prescribe their obligations in submitting

4  and correcting Forms W-2.  Very detailed IRS regulations already provide that there is no penalty

5  for submitting an incorrect tax information statement if the filer has "reasonable cause," which

6  includes "events beyond the filer's control" such as "actions of the payee or any other person

7  providing necessary information with respect to the return or payee statement."  26 C.F.R.

8  §301.6724-1(a)(2)(i), (c)(6); *see also* 26 U.S.C. §6724(a).  Under the IRS regulations, the filer is not

9  responsible for "incorrect information provided by the payee (or any other person) upon which

10  information the filer relied in good faith."  26 C.F.R. §301.6724-1(c)(6)(ii).  The upshot of the IRS

11  regulations is that employers can rely, in submitting their Forms W-2, upon the name and SSN

12  provided by the employee on the Form W-4.   Absent action by Congress, any expansion in

13  employers' duties in addressing tax reporting errors must come from the Internal Revenue Service –

14  not Homeland Security.

15      **C.  DHS Cannot Commandeer DOJ Authority to Interpret the IRCA Discrimination Provisions.**

16

17      Finally, DHS also has no authority to interpret IRCA's anti-discrimination provisions, which

   DHS's rule and guidance letter purport to do, because Congress gave *that* authority to the DOJ.

18      The guidance letter informs employers that the "safe-harbor" procedure set out by DHS will

19  immunize the employer from charges of national-origin discrimination: **"Q. Will I be liable for**

20  **discrimination charges brought by the United States if I terminate the employee after**

21  **following the steps outlined above?  A. No** . . . ."  *See* Appendix B.  Likewise the rule provides

22  that, although DHS regulations do not otherwise "permit[] an employer to request more or different

23

24  _____

25      [10]  By contrast, when Congress decided to allow DHS access to information collected by SSA, it expressly granted narrow access. *See* 8 U.S.C. §1360(c)(2) (directing SSA to provide DHS

26  with the "Nonwork Alien File," which contains the records of earnings reported on Forms W-2 using a specific series of SSNs issued to aliens who lack work authorization).  Congress declined to

27  allow SSA to similarly disclose information from the Earning Suspense File, which contains information about U.S. citizens and non-citizens authorized to work.

28

documents than are required under [IRCA's employment verification provision] or that on their face reasonably appear to be genuine," there is an exception for employers following the DHS safe-harbor after a no-match letter.  Appendix A at 45612; *id.* at 45613-14 ("The final rule clarifies that... employers who follow the safe harbor procedures set forth in this rule uniformly and without regard to perceived national origin or citizenship status as required by the provisions of [8 U.S.C. §1324b(a)(6)] will not be found to have engaged in unlawful discrimination.").

DHS has no authority to interpret the IRCA anti-discrimination provisions.  IRCA created within the DOJ the Office of the Special Counsel for Immigration-Related Unfair Employment Practices, and charged that office – not the INS – with enforcing the statute's anti-discrimination provisions.  8 U.S.C. §1324b(c).   As part of the reorganization of agencies to create DHS, Congress provided that responsibility for enforcing certain provisions of the immigration laws, including the anti-discrimination provisions, would remain with DOJ, and that the Attorney General's interpretation would be binding.  8 U.S.C. §1103.  Again, the DHS Final Rule exceeds statutory authority and violates 5 U.S.C. §706(2)(C).

### III.    The Balance of Hardships Overwhelmingly Favors a Stay Until this Action Can be Heard on the Merits.

#### A.    Plaintiffs Will Suffer Immediate, Irreparable Harm Absent a Stay.

Implementation of the DHS Final Rule will cause irreparable harm to both employers and employees.  *Cf. Garrett v. Escondido*, 465 F.Supp.2d 1043 (S.D. Cal. 2006) (issuing preliminary injunction against ordinance that prohibited landlords from renting to undocumented aliens; landlords and employees established irreparable harm); *Lozano v. City of Hazleton*, 459 F.Supp.2d 332 (M.D. Pa. 2006) (issuing TRO against ordinances that required tenants to obtain proof of legal citizenship or residence and prohibiting employers from employing undocumented aliens; tenants and business owners established irreparable injury).  The initial round of revised SSA no-match mailings that include the DHS guidance letter implementing the new rule is scheduled to run from September 4, 2007 to November 9, 2007, reach about 140,000 employers, and will impact approximately eight million employees.  Moran Decl. at ¶14.

1    Employers, faced with a letter from DHS explicitly instructing them that they may *not*

2    disregard the SSA no-match letter lest they risk civil and criminal liability, will be compelled to take

3    action.  The administrative costs of complying with the new "safe harbor" procedures could not be

4    recovered after the fact.  Employers also will face massive business disruption in the face of

5    uncertainty over employee's status as employees attempt to resolve discrepancies with the SSA.

6    Theodore Decl. at ¶27; Reiff Decl. at ¶3 & Exh. A.

7    The approximately eight million employees covered by the initial wave of SSA no-match

8    letters will include many employees who are U.S. citizens or non-citizens lawfully working but

9    whose SSNs –  for a host of reasons, such as clerical errors, name changes, different naming

10    conventions in other countries, etc. –  simply did not match with SSA records.   That subset of

11    workers would include many workers represented by affiliates of the plaintiff AFL-CIO, which

12    collectively represent about 10 million working men and women.  Chavez-Thompson Decl. at ¶2;

13    Theodore Decl. ¶28.  These workers would then face a 90-day deadline to resolve a data mismatch

14    with the SSA bureaucracy.   As with most government agencies, SSA field offices generally are

15    open only during normal business hours, so many employees would have to take time off – without

16    pay – to bring their identification to the field offices to attempt to clear up the data problem.  *See*

17    Moran Decl. at ¶12 (describing mismatch problem that could not be solved locally); ¶¶6- 9

18    (describing worker's four-month effort to resolve mismatch).  That loss of pay could not be

19    remedied after the fact.

20    SSA field offices, moreover, are likely to be busy with similar mismatch issues raised by

21    millions of other workers.  Commissioner Apfel expressed "concern about the ability of SSA field

22    office to deal with an influx of workers and employers seeking to correct mismatched records by a

23    deadline." Apfel Decl. ¶17.  Some workers do not maintain copies of official documents, such as

24    birth certificates, that may be necessary to correct the errors.  Indeed, SSA already has advised DHS

25    that there will be "difficult cases" in which the deadline cannot be met. *See also* Moran Decl. at ¶10.

26    Those "difficult cases" will involve lawful employees who lose their jobs because of a data

27    discrepancy beyond their control; the harm they suffer could not be remedied after the fact.

28

1    Based on past experience with no-match letters, moreover, some of the 140,000 employers

2    covered by the initial SSA mailing would react to the no-match packets and DHS guidance by

3    immediately terminating affected workers with a "foreign" appearance or accent because of fear of

4    IRCA liability, including U.S. citizens and non-citizens legally authorized to work.   Theodore Decl.

5    at ¶¶17, 19-25; Moran Decl. at ¶11.   The disruption to those workers' lives could not be undone

6    after the fact.

7         **B.     Preserving the Status Quo Will Not Cause any Real Harm to the Defendants.**

8         By contrast to the irreparable harm that would flow to Plaintiffs if the regulation is

9    implemented, a stay of the DHS Final Rule would not cause any real harm to the Defendants.   DHS

10   would not be precluded from continuing to enforce IRCA.   Any argument that a stay of the rule

11   would interfere with DHS's functions is belied by the fact that neither DHS nor its predecessor

12   agency saw any need to promulgate this regulation for the past 20 years since the adoption of IRCA.

13   (Indeed, INS opinion letters, taking precisely the opposite position from the new regulation, asserted

14   that the agency would *not* view mere receipt of an SSA no-match letter as constructive knowledge

15   that an employee lacked work authorization).   The DHS rule itself, moreover, lay dormant for an

16   entire year before DHS ultimately adopted it after the Congressional recess. *See National Treasury*

17   *Employees Union v. U.S. Dept. of Treasury*, 838 F.Supp. 631, 640 (D.D.C. 1993) ("threat of harm to

18   the government is negligible" where "Customs service continues to function without" information,

19   gathering of which plaintiff sought to enjoin, and agency "waited nearly a year to gather these

20   questionnaires").

21        For its part, SSA could continue to send out no-match letters that advise employers of data

22   discrepancies.  SSA is not an agency that enforces the immigration laws, and SSA would not be

23   prevented from performing its *own* statutory functions if it does not include a DHS guidance letter

24   implementing the new DHS rule in the no-match packets sent to employers.

25        Moreover, the public interest weighs strongly in favor of a stay where, as here, the regulation

26   sought to be enjoined is contrary to a statute adopted by Congress and in excess of the agencies'

27   statutory authority. *Id.* ("The preservation of . . . the legality of the process by which government

28   agencies function certainly weighs heavily in the public interest."); *see also Clarke v. Ofc. of Fed.*

MEMORANDUM ISO MOTION FOR TRO & PRELIMINARY INJUNCTION, Case No. _____    31

1  *Housing Enterp. Oversight*, 355 F. Supp.2d 56, 66 (D. D.C. 2004) ("there is a substantial public

2  interest in ensuring that [the agency] acts within the limits of its authority").[11]

3  **CONCLUSION**

4    For the foregoing reasons, the Court should stay the DHS Final Rule, which will become

5  legally effective on September 14, 2007, until this action can be heard on the merits.  The Court also

6  should stay the SSA's mailing of revised no-match packets to implement the DHS Final Rule,

7  which is scheduled to begin on September 4, 2007.

8  Dated:  August 29, 2007     Respectfully submitted

9          Stephen P. Berzon
          Scott A. Kronland
10         Jonathan Weissglass
          Linda Lye
11         Danielle E. Leonard
          ALTSHULER BERZON LLP
12

13         Jonathan P. Hiatt
          James B. Coppess
          Ana Avendaño
14         AFL-CIO

15         Linton Joaquin
          Marielena Hincapi
16         Monica T. Guizar
          NATIONAL IMMIGRATION LAW CENTER
17

18         Lucas Guttentag
          Jennifer C. Chang
19         Mónica M. Ramírez
          AMERICAN CIVIL LIBERTIES UNION FOUNDATION

20         Omar C. Jadwat
          AMERICAN CIVIL LIBERTIES UNION FOUNDATION
21

22         Alan L. Schlosser
          Julia Harumi Mass
          ACLU FOUNDATION OF NORTHERN CALIFORNIA
23

24  ——————————————

25    [11] No bond is necessary in this case for each of the following separate and independent
26  reasons.  First, Plaintiffs have a strong likelihood of success on the merits.  *Scherr v. Volpe*, 466
F.2d 1027, 1035 (7th Cir. 1972).  Second, there is no realistic likelihood of harm to defendants from
27  enjoining their conduct.  *Jorgensen v. Cassiday,* 320 F.3d 906, 919 (9th Cir. 1996).  And third, the
"equities of potential hardships to the parties" weigh in favor of plaintiffs.  *Temple Univ. v. White,*
28  941 F.2d 201, 220 (3d Cir. 1991).  In any event, there is no risk of monetary loss to defendants from
enjoining the conduct at issue.

1

David A. Rosenfeld
Manjari Chawla
2       WEINBERG, ROGER & ROSENFELD

3

4

by:   /s/Scott A. Kronland
5               Scott A. Kronland

6       Attorneys for Plaintiffs

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28