United States General Accounting Office   /4/005

# GAO
## Testimony


141005

For Release
on Delivery
Expected at
10:30 a.m. EST
Friday
March 30, 1990

IMMIGRATION REFORM: Employer Sanctions and the Question of Discrimination

Statement of
Charles A. Bowsher
Comptroller General
of the United States

Before the
Committee on the Judiciary
United States Senate



Mr. Chairman and Members of the Committee:

We are pleased to be here today to highlight the key issues noted in our March 29 report on the Immigration Reform and Control Act of 1986 (IRCA) and the question of discrimination.

The act requires employers to verify the employment eligibility of workers. It imposes civil and criminal penalties (sanctions) against employers who knowingly hire unauthorized workers. The act also requires us to issue three annual reports to Congress for the purpose of determining whether IRCA's employer verification and sanctions section has (1) created an unnecessary burden on employers, (2) been carried out satisfactorily, and (3) resulted in a pattern of discrimination against eligible workers. We are also to determine whether frivolous discrimination complaints have been filed under IRCA's antidiscrimination section to harass employers.

We found that there has been widespread discrimination. But was there discrimination as a result of IRCA? That is the key question Congress directed us to answer. Our answer is yes.

Whether discrimination resulted from the law is difficult to prove or disprove. First, there is an absence of a sensitive pre-IRCA measure of discrimination. Further, there is no comparison group

1

not subject to IRCA. Recognizing these limitations, we used the best available evidence to meet our congressional mandate.

For our third report, we (1) reviewed federal agency implementation of IRCA, (2) reviewed discrimination complaints filed with federal agencies and data from groups representing aliens, and (3) used additional methods to obtain data on IRCA's effects. These methodologies included a statistically valid survey of over 9,400 of the Nation's employers, which projects to a universe of about 4.6 million employers. In collaboration with the Urban Institute, we also did a "hiring audit" in which pairs of persons matched closely on job qualifications applied for jobs with 360 employers in two cities. One member of each pair was a "foreign-appearing, foreign-sounding" Hispanic and the other was an Anglo with no foreign accent.

ILLEGAL IMMIGRATION BEING REDUCED;
LAW NOT AN UNNECESSARY BURDEN

Our criteria for determining if the implementation of the sanctions section has caused an "unnecessary" regulatory burden on employers were based on whether the law's objectives were realized. We found that the burden of applying the law's verification requirements was not "unnecessary" because the law has apparently reduced illegal immigration and employment, as Congress envisioned. While not conclusive, nearly all available

2

data suggests the law's objectives have been at least partially realized. For example,

-- a statistical study by the Urban Institute concluded that the law had slowed illegal immigration,

-- two surveys in Mexico found that people believe it is now harder to find work in the United States, and

-- about 16 percent of aliens apprehended during employer sanction investigations during August and September 1989 reported difficulty finding a job because of the law's verification system.

## INS AND LABOR HAVE MET THEIR MINIMUM RESPONSIBILITIES UNDER THE LAW

To determine if the sanctions section was carried out "satisfactorily," we determined whether the government developed plans and policies and implemented procedures that could reasonably be expected to (1) educate employers about their requirements under the law and (2) identify and fine violators. We found that INS and Labor have generally fulfilled their responsibilities under this definition of "satisfactorily." However, we also found that INS could improve its methods for determining employer compliance with the law's requirements.

3

As of September 1989, INS had issued notices of intent to fine employers for about 3,500 violations for knowingly hiring or continuing to employ unauthorized aliens. There were also about 36,000 violations for not completing the verification forms. The total fines assessed were about $17 million. Our review of about 300 randomly selected employer sanction case files showed that INS field offices had correctly carried out the Commissioner's policy on employer fines. Between September 1987 and September 1989, Labor officials completed over 77,000 inspections of employers' verification forms.

Following the government's extensive efforts to educate employers, including direct contact with over 2 million employers, GAO estimates that 3.8 million (83 percent) of the 4.6 million employers in the survey population were aware of the law. Of the 2.4 million employers who were aware of the law and hired at least one employee during 1988, GAO estimates that 1.6 million (65 percent) reported being in full compliance with the verification requirement.

NO EVIDENCE OF FRIVOLOUS COMPLAINTS

Our review of the Office of Special Counsel and the Equal Employment Opportunity Commission's discrimination data found no evidence of frivolous IRCA discrimination complaints to harass employers.

4

## EMPLOYERS REPORTED DISCRIMINATORY PRACTICES RESULTING FROM THE LAW

On the question of discrimination, our survey results indicate that national origin discrimination resulting from IRCA, while not pervasive, does exist at levels that amount to more than "just a few isolated cases" and constitutes "a serious pattern of discrimination." We estimate that 461,000 (or 10 percent) of the 4.6 million employers in the survey population nationwide began one or more practices that represent national origin discrimination. The survey responses do not reveal whether the persons affected by the discrimination were eligible to work. However, given that these employers hired an estimated 2.9 million employees in 1988, we believe it is reasonable to assume that many eligible workers were affected.

An estimated 227,000 employers reported that they began a practice, as a result of IRCA, not to hire job applicants whose foreign appearance or accent led them to suspect that they might be unauthorized aliens. Also, contrary to IRCA, an estimated 346,000 employers said that they applied IRCA's verification system only to persons who had a "foreign" appearance or accent. Some employers began both practices.

Employers reported that they engaged in practices which under the law would be classified as discriminatory verification and hiring practices. These employers were in a variety of industries and

5

areas of the Nation and included firms of various sizes. The levels of discrimination ranged by geographical location from 3 to 16 percent and were higher in areas having high Hispanic and Asian populations.

These employer responses specifically related the discriminatory hiring and verification practices to IRCA. Therefore, they represent "new" national origin discrimination that would not have occurred without IRCA. There is no evidence that would lead us to believe that employers who said they discriminated as a result of IRCA did not. But even if some employers did not report accurately, the remaining group would be substantial.

Since these data meet the criteria in the law and its legislative history, we concluded that the national origin discriminatory practices reported do establish a widespread pattern of discrimination. On the basis of the information available, we determined that it is more reasonable to conclude that a substantial amount of these discriminatory practices resulted from IRCA rather than not.

Finally, our hiring audit of 360 employers in Chicago, Illinois, and San Diego, California, showed that the "foreign-appearing, foreign-sounding" Hispanic member of the matched pairs was three times more likely to encounter unfavorable treatment than the Anglo non-foreign-appearing member of the pairs. For example,

the Anglo members received 52 percent more job offers than the Hispanics. These results, taken together with the survey responses, show a serious problem of national origin discrimination that we believe IRCA exacerbated.

## EMPLOYERS REPORTED OTHER FORMS OF DISCRIMINATORY PRACTICES

While our statutory determination is limited to national origin discrimination that can be linked directly to IRCA's sanctions section, our survey results indicate that the law also resulted in citizenship discrimination.

We estimate that an additional 430,000 employers (9 percent) said that because of the law they began hiring only persons born in the United States or not hiring persons with temporary work eligibility documents. These practices are illegal and can harm people, particularly those of Hispanic and Asian origin.

Adding these employers to those who began national origin discrimination, we estimate that 891,000 (19 percent) of the 4.6 million employers in the survey population nationwide began one or more discriminatory practices as a result of the law.

7

## EMPLOYERS WANT IMPROVED VERIFICATION SYSTEM

About 78 percent of employers said they wanted a simpler or better verification system. The portion of employers who wanted these changes was 16 to 19 percent greater among those who reported discriminatory practices than among those who did not report discriminatory practices. We believe the responses tend to reflect employers' confusion and uncertainty about the law's verification system and that a simpler system that relies on fewer documents could reduce discrimination.

Contributing to the uncertainty that arises from the variety of documents in use is the prevalence of counterfeit documents. INS apprehensions of unauthorized aliens show they commonly have counterfeit or fraudulently obtained documents--Social Security cards or one of the various INS alien work eligibility cards. By the mid-1990s, INS plans to (1) reduce from 10 to 2 the number of work eligibility cards it issues and to make these 2 cards more difficult to counterfeit and (2) replace over 20 million old INS cards with the new ones. However, this schedule depends on additional funding and personnel. Unless this process is expedited, little will be accomplished in the near term to reduce employer confusion and uncertainty about aliens' work eligibility status.

8

## IMPROVED VERIFICATION SYSTEM NEEDED
## IF SANCTIONS ARE RETAINED

We identified three possible reasons why employers discriminated: (1) lack of understanding of the law's major provisions, (2) confusion and uncertainty about how to determine eligibility, and (3) the prevalence of counterfeit and fraudulent documents that contributed to employer uncertainty over how to verify eligibility.

Our work suggests that the discrimination we found could be reduced by (1) increasing employer understanding through effective education efforts, (2) reducing the number of work eligibility documents, (3) making the documents harder to counterfeit, thereby reducing document fraud, and (4) applying the new documents to all members of the workforce.

Such actions would make it easier for employers to comply with the law. They would relieve employer concerns about counterfeit documents. And tney would reduce employer confusion over the many documents which can now be used for verifying work eligibility.

Congress anticipated that the verification system might need improvement. Section 101(a)(1) of IRCA establishes procedures govenning proposals to improve the employment verification system. The section specifies that improvements to the

9

verification system proposed by the President should provide for reliable determinations of employment eligibility and identity, be counterfeit-resistant, protect individual privacy, and not be used for law enforcement purposes unrelated to IRCA.

Reducing the number of eligibility documents will raise many concerns--ranging from civil liberty issues to cost and logistics issues. Should Congress opt for this solution, it will have to carefully weigh these concerns as it pursues the dual objectives of assuring that jobs are reserved for citizens and legal aliens and reducing discrimination in the employment process.

## MATTERS FOR CONGRESSIONAL CONSIDERATION

In summary, the discrimination we found is serious and requires the immediate attention of both Congress and the Administration. There are two ways to proceed.

One way is to rely upon the President to propose verification system changes he deems necessary, pursuant to the provisions of section 101(a)(1) of IRCA. This course would leave the initiative for action up to the executive branch. However, the necessary changes would require extensive debate and discussion between the legislative and executive branches before a final decision could be made on the solution.

10

Case 3:07-cv-04472-CRB    Document 7-13    Filed 08/29/2007    Page 12 of 13

The second alternative is for Congress to initiate discussions with the executive branch and interested parties on solutions to the IRCA verification problem that should be considered in light of our findings. This alternative could expedite the process, given the lengthy time frames set by section 101(a)(1).

In the final analysis, Congress has the following options: (1) leaving the sanctions and antidiscrimination provisions of the law as is for the present time, (2) repealing these provisions, or (3) leaving the current provisions in place and enacting legislation to amend IRCA's verification system to reduce the extent of discrimination resulting from IRCA.

The exact nature of the solution will emerge only after the debate that is inherent in the democratic process.

Should Congress decide to retain sanctions and improve the current verification system, three principles for improving the system while reducing discrimination need to be kept in mind. These are: (1) reducing the number of work eligibility documents, (2) making the documents more counterfeit-resistant and less vulnerable to being used fraudulently, and (3) applying any reduced work eligibility documents to all members of the workforce. Congress could then defer further consideration of repealing the sanctions and antidiscrimination provisions of IRCA

11

until a simpler and more reliable verification system has been in place for sufficient time to evaluate its effectiveness.

- - - - -

That concludes my prepared statement. My colleagues and I will be pleased to answer questions.

12