**United States Government Accountability Office**

# GAO

## Report to Congressional Requesters

August 2005

# IMMIGRATION ENFORCEMENT

# Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts



G A O

Accountability ★ Integrity ★ Reliability

GAO-05-813



**GAO Highlights**

Accountability · Integrity · Reliability

Highlights of GAO-05-813, a report to congressional requesters

**August 2005**

# IMMIGRATION ENFORCEMENT

## Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts

## Why GAO Did This Study

The opportunity for employment is one of the most important magnets attracting illegal immigrants to the United States. Immigration experts state that strategies to deter illegal immigration require both a reliable employment eligibility verification process and a worksite enforcement capacity to ensure that employers comply with immigration-related employment laws. This report examines (1) the current employment verification (Form I-9) process and challenges, if any, facing verification; and (2) the priorities and resources of U.S. Immigration and Customs Enforcement's (ICE) worksite enforcement program and any challenges in implementing the program.

## What GAO Recommends

GAO recommends that the Secretary of Homeland Security set a target time frame for completing the department's review of the Form I-9 process and issuing final regulations on the process, assess the feasibility and costs of addressing the Basic Pilot Program's current weaknesses, and establish additional output goals and measures and set a target time frame for developing outcome goals and measures for the worksite enforcement program. In written comments on a draft of this report, DHS agreed with our recommendations.

www.gao.gov/cgi-bin/getrpt?GAO-05-813.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Richard M. Stana at (202) 512-8777 or stanar@gao.gov.

## What GAO Found

The current employment verification process is based on employers' review of documents presented by new employees to prove their identity and work eligibility. On the Form I-9, employers certify that they have reviewed employees' documents and that the documents appear genuine and relate to the individual presenting them. However, various studies have shown that document fraud (use of counterfeit documents) and identity fraud (fraudulent use of valid documents or information belonging to others) have made it difficult for employers who want to comply with the employment verification process to hire only authorized workers and easier for unscrupulous employers to knowingly hire unauthorized workers. The large number and variety of documents acceptable for proving work eligibility have also hindered verification efforts. In 1997, the former Immigration and Naturalization Service (INS), now part of the Department of Homeland Security (DHS), issued an interim rule on a reduction in the number of acceptable work eligibility documents and, in 1998, proposed a further reduction, but this proposal has not yet been finalized. DHS is currently reviewing the list of acceptable work eligibility documents, but has not established a target time frame for completing this review. The Basic Pilot Program, a voluntary program through which participating employers electronically verify employees' work eligibility, has potential to help enhance the verification process and substantially reduce document fraud. Yet, current weaknesses in the program, such as the inability of the program to detect identity fraud, DHS delays in entering data into its databases, and some employer noncompliance with pilot program requirements could, if not addressed, have a significant impact on the program's success. Furthermore, U.S. Citizenship and Immigration Services officials stated that the current Basic Pilot Program may not be able to complete timely verifications if the number of employers using the program significantly increased.

Worksite enforcement is one of various immigration enforcement programs that compete for resources and, under the former INS and now under ICE, worksite enforcement has been a relatively low priority. Consistent with DHS's mission to combat terrorism, after September 11, 2001, INS and then ICE focused worksite enforcement resources mainly on removing unauthorized workers from critical infrastructure sites to help address those sites' vulnerabilities. Since fiscal year 1999, the numbers of employer notices of intent to fine and administrative worksite arrests have generally declined, according to ICE, due to various factors such as document fraud, which makes it difficult to prove employer violations. ICE has not yet developed outcome goals and measures for its worksite enforcement program, which, given limited resources and competing priorities for those resources, may hinder ICE's efforts to determine resources needed for the program.

_____ **United States Government Accountability Office**

# Contents

| **Letter** | | 1 |
|---|---|---|
| | Results in Brief | 5 |
| | Background | 8 |
| | Various Weaknesses Have Undermined the Employment Verification Process, but the Basic Pilot Program Shows Potential to Enhance the Process | 14 |
| | Competing Priorities and Lack of Outcome Goals and Measures May Hinder Worksite Enforcement Efforts | 30 |
| | Conclusions | 42 |
| | Recommendations for Executive Action | 44 |
| | Agency Comments | 44 |

| **Appendix I** | **Employment Eligibility Verification Form (Form I-9)** | 46 |
|---|---|---|

| **Appendix II** | **Scope and Methodology** | 49 |
|---|---|---|

| **Appendix III** | **Information on the Electronic Form I-9** | 54 |
|---|---|---|

| **Appendix IV** | **Data on Employer Participation in and Use of the Basic Pilot Program** | 55 |
|---|---|---|

| **Appendix V** | **Comments from the Department of Homeland Security** | 57 |
|---|---|---|

| **Appendix VI** | **GAO Contact and Staff Acknowledgments** | 59 |
|---|---|---|

| **Figures** | | |
|---|---|---|
| | Figure 1: Basic Pilot Program Verification Process | 12 |
| | Figure 2: Number of Queries Authorized by DHS through the Automated Check and the Immigration Status Verifier Check | 26 |

Figure 3: Investigative Agent Work-years Spent on Worksite
Enforcement Efforts and Agent Work-years Spent on
Other Investigative Areas for Each Fiscal Year from 1999
through 2003                                                              33
Figure 4: Number of Notices of Intent to Fine Issued to Employers
for Each Fiscal Year from 1999 through 2004                               35
Figure 5: Number of Worksite Enforcement Arrests for Each Fiscal
Year from 1999 through 2003                                               36
Figure 6: Number of Basic Pilot Program Queries Run by
Participating Employers for Each Fiscal Year from 2000
through 2004                                                              55
Figure 7: Number of Basic Pilot Program Queries that Resulted in
Employment Authorizations for Each Fiscal Year from
2000 through 2004                                                         56

## Abbreviations

| | |
|---|---|
| DHS | Department of Homeland Security |
| ICE | U.S. Immigration and Customs Enforcement |
| IIRIRA | Illegal Immigration Reform and Immigrant Responsibility Act |
| INS | U.S. Immigration and Naturalization Service |
| IRCA | Immigration Reform and Control Act |
| SSA | Social Security Administration |
| USCIS | U.S. Citizenship and Immigration Services |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

# G A O
**Accountability * Integrity * Reliability**

**United States Government Accountability Office**
**Washington, DC 20548**

August 31, 2005

The Honorable Jim Sensenbrenner, Jr.
Chairman
Committee on the Judiciary
House of Representatives

The Honorable John N. Hostettler
Chairman
Subcommittee on Immigration, Border Security, and Claims
Committee on the Judiciary
House of Representatives

According to the final report of the U.S. Commission on Immigration
Reform, immigration contributes to the U.S. national economy by helping
to keep viable segments of certain labor-intensive industries, expand
foreign trade, provide valuable language and cultural expertise to U.S.
companies, and contribute to the economic revitalization of some
communities.[1] Yet, the commission also noted that immigration,
particularly illegal immigration, has adverse consequences, such as
helping to depress wages for low-skilled workers and creating net fiscal
costs for state and local governments. Aliens, including temporary foreign
workers, legally enter and reside in the United States through a variety of
channels, such as immigration and work visa programs, but aliens also
illegally enter or overstay visas and reside in the United States. The former
U.S. Immigration and Naturalization Service (INS) estimated that about
7 million unauthorized aliens resided in the United States by January 2000,
and other organizations estimated that the unauthorized alien population
was about 10 million in 2004.[2]

---

[1]U.S. Commission on Immigration Reform, *Becoming an American: Immigration and Immigrant Policy* (Washington, D.C: September 1997).

[2]In March 2003, the Immigration and Naturalization Service was merged into the
Department of Homeland Security. The service's immigration functions were divided
between U.S. Citizenship and Immigration Services, U.S. Immigration and Customs
Enforcement, and U.S. Customs and Border Protection. U.S. Immigration and Customs
Enforcement is responsible for managing and implementing the worksite enforcement
program.

The opportunity for employment is one of the most important magnets attracting illegal aliens to the United States. To help reduce the attraction of this magnet, in 1986 Congress passed the Immigration Reform and Control Act (IRCA),[3] which made it illegal for individuals and entities to knowingly hire, continue to employ, or recruit or refer for a fee unauthorized workers. The act established a two-pronged approach for helping to limit the employment of unauthorized workers: (1) an employment verification process through which employers verify newly hired employees' work eligibility and (2) a sanctions program for fining employers who do not comply with the act. Under the employment verification process, employees and employers must complete the Employment Eligibility Verification Form (Form I-9) to certify that the employees are authorized to work in the United States.[4] Those employers who do not follow the verification process can be sanctioned for knowingly hiring, continuing to employ, or recruiting or referring for a fee unauthorized workers or for improperly completing Forms I-9. Efforts to enforce these sanctions are referred to as worksite enforcement.

In the nearly 20 years since the passage of IRCA, the employment eligibility verification process and worksite enforcement program have remained largely unchanged. Following the passage of the act, the U.S. Commission on Immigration Reform and various immigration experts concluded that deterring illegal immigration requires, among other things, strategies that focus on disrupting the ability of illegal aliens to gain employment through a more reliable employment eligibility verification process and a more robust worksite enforcement capacity. In particular, the commission report and other studies have found that the single most important step that could be taken to reduce unlawful migration is the development of a more effective system for verifying work authorization. Yet in the 8 years since the commission's final report, few substantial enhancements have been applied to the employment verification process, and the approach continues to rely on the Form I-9, a procedure of which the commission was roundly critical because of its vulnerability to fraud and potential to cause discrimination. Moreover, in previous work, we reported that employers of unauthorized aliens faced little likelihood that INS would investigate, fine, or criminally prosecute them, a circumstance

---

[3]P.L. 99-603, 8 U.S.C. 1324a et seq.

[4]See appendix I for a copy of the Form I-9.

that provides little disincentive for employers who want to circumvent the law.[5]

You asked us to review the federal government's policies and programs aimed at enforcing immigration laws in the workplace. This report addresses the following questions: (1) How does the current employment verification process function and what are the challenges facing verification? (2) What are the priorities and resources of U.S. Immigration and Customs Enforcement's (ICE) worksite enforcement program and what challenges, if any, has the agency faced in implementing the program?

To address these objectives, we interviewed officials from the Department of Homeland Security's (DHS) U.S. Citizenship and Immigration Services (USCIS) and ICE, and officials from the Social Security Administration (SSA) in headquarters and selected field locations. We obtained from them information on the Form I-9 process and the Basic Pilot Program, a voluntary program through which participating employers verify employees' work eligibility by electronically checking information on employees' Forms I-9 with information in SSA and DHS databases. We analyzed information from these agencies, as well as related laws and regulations, to determine how the current Form I-9 process functions, identify any challenges in the current Form I-9 process, and examine DHS plans to modify the process. We also interviewed representatives of 23 employers;[6] 12 employer, employee, and advocacy groups;[7] and

---

[5]GAO, *Illegal Aliens: Significant Obstacles to Reducing Unauthorized Alien Employment Exist*, GAO/GGD-99-33 (Washington, D.C.: Apr. 2, 1999).

[6]One of the 23 employers we interviewed did not participate in the Basic Pilot Program. As a result, when we discuss the views of employers on the Basic Pilot Program, we refer to the views of the 22 employers we interviewed that participated in the program. The 23 employers we interviewed were located in the following states: California, Illinois, Michigan, New Jersey, New York, and Texas. They were part of the following industries: meatpacking, transportation, health care, landscaping, manufacturing, accommodation, food services, agriculture, janitorial and maintenance, temporary employment, critical infrastructure, local government, and newspaper. According to Department of Labor data, there were about 5.6 million employer firms in the United States in 2002. The most current data available on the number of employers in the United States were from 2002.

[7]We interviewed officials from 9 employer and employee associations in the following industries: construction, agriculture, accommodation, food services, retail, health care, and meat. We interviewed officials from three advocacy groups that represent a range of views on immigration-related issues.

6 immigration experts[8] to obtain their views on the Form I-9 process and the Basic Pilot Program. We selected the employers to interview based on a mix of criteria, such as the number of employers' pilot program queries and geographic location. We selected the employer, employee, and advocacy groups to interview based on a mix of criteria, such as industry representation and range of views on immigration issues. In addition, we examined USCIS and SSA guidance, instructions, and agreements for the Basic Pilot Program and the results and methodology of an independent evaluation of the program completed by the Institute for Survey Research at Temple University and Westat in June 2002.[9] We analyzed data on employer participation in and use of the Basic Pilot Program to determine how participation and use have changed since fiscal year 2000. We assessed the reliability of these data by reviewing them for accuracy and completeness, interviewing agency officials knowledgeable about the data, and examining documentation on how the data are entered, categorized, and verified in the databases. We determined that the independent evaluation and these data were sufficiently reliable for the purposes of our review.

To obtain information on the worksite enforcement program priorities and resources, we interviewed officials from ICE, the SSA Office of the Inspector General, the Department of Labor, the Federal Bureau of Investigation, and the Office of Special Counsel for Immigration-Related Unfair Unemployment Practices. We also interviewed officials from 12 of the 26 ICE Special Agent in Charge field offices[10] and 4 U.S. Attorney's Offices[11] that were located in the same areas as 4 of the field offices we visited. We selected the 12 field offices based on a mix of criteria, such as number of investigations conducted by field offices, number of

---

[8]The 6 immigration experts we interviewed have a range of views on immigration-related issues.

[9]Institute for Survey Research and Westat, *Findings of the Basic Pilot Program Evaluation* (Washington, D.C.: June 2002).

[10]We met with officials from the following 8 field offices: Los Angeles and San Diego, California; Chicago, Illinois; Detroit, Michigan; Newark, New Jersey; New York City, New York; and Houston and San Antonio, Texas. We spoke with officials from the following 4 field offices over the telephone: Denver, Colorado; Miami, Florida; Buffalo, New York; and Seattle, Washington.

[11]We met with officials from the following 3 U.S. Attorney's Offices: the Southern District of New York U.S. Attorney's Office; the Southern District of Texas U.S. Attorney's Office; and the Western District of Texas U.S. Attorney's Office. We spoke with the Southern District of California U.S. Attorney's Office over the telephone.

investigators in each field office, and geographic location. We analyzed ICE headquarters and field office guidance, memos, and other documents on worksite enforcement to evaluate ICE's priorities for and management of worksite enforcement efforts. In addition, we analyzed ICE data on worksite enforcement and assessed the data reliability by reviewing data for accuracy and completeness, interviewing agency officials knowledgeable about the data, and examining documentation on how the data are entered, categorized, and verified in the databases. We determined that these data were sufficiently reliable for the purposes of our review. For more detailed information on our scope and methodology, see appendix II. We conducted our work from September 2004 through July 2005 in accordance with generally accepted government auditing standards.

## Results in Brief

The employment verification process is primarily based on employers' review of their new employees' work eligibility documents, but various weaknesses, such as the process' vulnerability to fraud, have undermined this process. Employers certify on the Form I-9 that they have reviewed documents presented by their employees and that the documents appear genuine and relate to the individual presenting them. However, various studies have shown that document fraud (use of counterfeit documents) and identity fraud (fraudulent use of valid documents or information belonging to others) have made it difficult for employers who want to comply with the employment verification process to ensure that they hire only authorized workers and have made it easier for unscrupulous employers to knowingly hire unauthorized workers. The large number and variety of documents included in the list of acceptable documents for proving work eligibility have also undermined the process. We have previously reported on federal government efforts to reduce the number of acceptable work eligibility documents and make the remaining acceptable documents more secure. In 1997, the former INS issued an interim rule on reductions in the number of acceptable work eligibility documents and, in 1998, proposed a further reduction. However, DHS has not yet finalized the proposal, and the 1997 interim rule remains in effect. Although department officials told us that the agency is currently assessing modifications to the list of acceptable work eligibility documents, the department has not established a target time frame for completing this assessment and issuing final regulations on the list of acceptable documents. In addition, the Basic Pilot Program has potential to enhance this process and help to significantly reduce document fraud. According to ICE officials, access to Basic Pilot Program information could help the agency better target its worksite enforcement efforts at those employers

who do not follow program requirements. If the program is expanded, however, several current weaknesses in the program, including its inability to detect identity fraud, DHS delays in entering data into its databases that may lengthen the pilot program verification process, and some employer noncompliance with pilot program requirements intended to protect employees from discriminatory practices, could become more significant and adversely affect a greater number of employers and employees, if not addressed. Additionally, USCIS officials told us that the current Basic Pilot Program may not be able to complete timely verifications of work eligibility if the number of employers using the program were to significantly increase, primarily because of limited program funding and the growth in other verification programs. These officials said that USCIS is planning to fund an evaluation of the Basic Pilot Program to assess, among other things, the program's current costs, any improvements in DHS data accuracy, and employers' compliance with program requirements. Although the results of this evaluation should help provide information on the pilot program's weaknesses, without information on the feasibility and costs of addressing those weaknesses, USCIS and Congress cannot effectively assess possibilities for future implementation of the program, including increased program usage.

Worksite enforcement is one of various immigration enforcement programs that compete for resources and, under the former INS and now under ICE, worksite enforcement has been a relatively low priority. Consistent with the DHS mission to combat terrorism, after September 11, 2001, INS and then ICE focused worksite enforcement resources mainly on identifying and removing unauthorized workers from critical infrastructure sites, such as airports and nuclear power plants, to help address vulnerabilities at those sites. We previously reported that if businesses at such sites were to be compromised by terrorists, this would pose a threat to domestic security.[12] In fiscal year 1999, INS devoted about 9 percent of its agent investigative work-years to worksite enforcement, and in fiscal year 2003 ICE devoted about 4 percent, although ICE has proposed increasing resources for worksite enforcement. The number of notices of intent to fine issued to employers for knowingly hiring unauthorized workers or improperly completing Forms I-9 and the number of administrative worksite arrests have also generally declined. For

---

[12]GAO, *Immigration Enforcement: DHS Has Incorporated Immigration Enforcement Objectives and Is Addressing Future Planning Requirements*, GAO-05-66 (Washington, D.C.: Oct. 8, 2004).

example, the number of notices of intent to fine generally decreased from 417 in fiscal year 1999 to 3 in fiscal year 2004. ICE has attributed this decline to various factors including the widespread use of counterfeit documents that make it difficult for ICE agents to prove that employers knowingly hired unauthorized workers. In addition, INS and ICE have faced difficulties in setting and collecting fine amounts from employers and in detaining unauthorized workers arrested at worksites. According to ICE, pursuit of civil settlements with employers rather than administrative fines could help address some of the difficulties faced in the fines process, but it is too early to tell what effect, if any, use of civil settlements will have on worksite enforcement efforts. Furthermore, although ICE has identified two output measures for the worksite enforcement program, these measures address only two elements of the program. Without additional output goals and measures for the worksite enforcement program, ICE's ability to effectively determine resources needed for the program may be hindered, especially given ICE's limited resources and competing priorities for those resources. Although ICE is developing outcome goals and measures for the worksite enforcement program, until it finalizes these goals and measures, the agency may not be able to effectively evaluate the results of program efforts.

To strengthen the current employment verification process, we are recommending that the Secretary of Homeland Security set a specific time frame for completing the department's review of the Form I-9 process, including an assessment of the possibility of reducing the number of acceptable work eligibility documents, and issuing final regulations on changes to the Form I-9 process and an updated Form I-9. To assist Congress and USCIS in assessing the possibility of increased or mandatory use of the Basic Pilot Program, we are recommending that the Secretary of Homeland Security direct the Director of USCIS to include, in the planned evaluation of the Basic Pilot Program, an assessment of the feasibility and costs of addressing the Basic Pilot Program's current weaknesses, including its inability to detect identity fraud, delays in entry of employment authorization information into databases, and employer noncompliance with program procedures, and resources that would be needed to support increased or mandatory use of the program. To help evaluate the results of worksite enforcement program efforts and determine resource levels needed for the program, we are recommending that the Secretary of Homeland Security direct the Assistant Secretary for ICE to establish additional output goals and measures for the worksite enforcement program, and set a target time frame for completing the assessment and development of outcome goals and measures for the

program. In commenting on a draft of this report, DHS agreed with the recommendations.

# Background

IRCA provided for sanctions against employers who do not follow the employment verification (Form I-9) process. Employers who fail to properly complete, retain, or present for inspection a Form I-9 may face civil or administrative fines ranging from $110 to $1,100 for each employee for whom the form was not properly completed, retained, or presented.[13] The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996 limited employer liability for certain technical violations of Form I-9 paperwork requirements.[14] According to the act, a person or entity is considered to have complied with the employment verification process if the person or entity made a good faith attempt to properly complete the Form I-9.[15] Employers who knowingly hire or continue to employ unauthorized aliens may be fined from $275 to $11,000 for each employee, depending on whether the violation is a first or subsequent offense. Employers who engage in a pattern or practice of knowingly hiring or continuing to employ unauthorized aliens are subject to criminal penalties consisting of fines up to $3,000 per unauthorized employee and up to 6 months imprisonment for the entire pattern or practice.

ICE is primarily responsible for enforcing the employer sanction provisions of IRCA as well as many other immigration-related laws. ICE has approximately 5,000 investigative agents in 26 Office of Investigations field offices that are headed by special agents in charge. ICE's Worksite Enforcement/Critical Infrastructure Unit oversees programs to protect U.S. critical infrastructure, including military, economic, industrial, and transportation infrastructure, and manages the agency's worksite

---

[13]In 1999, the Department of Justice increased the amounts of the civil penalties from those established in IRCA to the current levels to reflect a ten percent adjustment for inflation. 8 C.F.R. § 274a.10(b). Under the Federal Civil Monetary Penalties Inflation Adjustment Act of 1990, as amended, federal agencies are to make regular adjustments for inflation of civil monetary penalties that they are charged with enforcing. 28 U.S.C. 2641 note.

[14]8 U.S.C. 1324a(b). IIRIRA of 1996 was enacted within a larger piece of legislation, the Omnibus Consolidated Appropriations Act, 1997, P.L. 104-208.

[15]According to IIRIRA, a person or entity with certain Form I-9 paperwork violations must be informed of the violation and provided with a period of not less than 10 business days to correct the violations. If the person or entity does not correct the violations within the specified time period, the person or entity would not be considered to have made a good faith attempt to comply with the Form I-9 requirement.

enforcement efforts. Prior to the creation of ICE in March 2003, INS enforced IRCA and other immigration-related laws.

| Basic Pilot Program Employment Verification Process | IIRIRA required INS to operate three voluntary pilot programs to test electronic means for employers to verify an employee's eligibility to work: the Basic Pilot Program, the Citizen Attestation Verification Pilot Program, and the Machine-Readable Document Pilot Program. The three pilot programs were to test whether pilot verification procedures could improve the existing Form I-9 process by reducing (1) document fraud and false claims of U.S. citizenship, (2) discrimination against employees, (3) violations of civil liberties and privacy, and (4) the burden on employers to verify employees' work eligibility. IIRIRA established the three pilot programs to be in effect for 4 years, but Congress extended authorization for the pilots for an additional 2 years in 2002 and for another 5 years in 2003.[16] Congress also mandated DHS to expand the Basic Pilot Program to employers in all 50 states by December 2004, which DHS did.[17] DHS terminated the Citizen Attestation Verification Pilot Program and the Machine-Readable Document Pilot Program in 2003 because of technical difficulties and unintended consequences, such as |
|---|---|

---

[16]Basic Pilot Extension Act of 2001, P.L. 107-128 and Basic Pilot Program Extension and Expansion Act of 2003, P.L.108-156.

[17]P.L. 108-156. IIRIRA required the INS to initially operate the Basic Pilot Program in at least five of the seven states with the highest estimated population of undocumented aliens in the United States. In 1997, INS began offering participation in the Basic Pilot Program to employers in California, Florida, Illinois, New York, and Texas. In 1999, INS began offering participation in the Basic Pilot Program to employers in Nebraska because, at the time, INS was conducting an initiative in the state, called Operation Vanguard, to help the meatpacking and processing industry gain and maintain a legal workforce.

increased fraud and discrimination, identified in evaluations of the programs.[18]

The Basic Pilot Program is a part of USCIS's Systematic Alien Verification for Entitlements Program, which provides a variety of verification services for federal, state, and local government agencies. USCIS estimates that there are more than 150,000 federal, state, and local agency users that verify immigration status through the Systematic Alien Verification for Entitlements Program. In fiscal year 2004, about 2,300 employers actively used the Basic Pilot Program within the Systematic Alien Verification for Entitlements Program.

The Basic Pilot Program provides participating employers with an electronic method to verify their employees' work eligibility. Employers may participate voluntarily in the Basic Pilot Program but are still required to complete Forms I-9 for all newly hired employees in accordance with IRCA. After completing the forms, these employers query the pilot program's automated system by entering employee information provided on the forms, such as name and Social Security number, into the pilot Web site within 3 days of the employees' hire date. The pilot program then electronically matches that information against information in SSA and, if necessary, DHS databases to determine whether the employee is eligible to work, as shown in figure 1. The Basic Pilot Program electronically notifies employers whether their employees' work authorization was

---

[18]Under the Citizen Attestation Verification Pilot Program, only the status of newly hired employees attesting to being work-authorized noncitizens was electronically checked against information in INS databases. The evaluation of this pilot program identified several problems, including inherent discrimination against work-authorized noncitizens and the lack of strong safeguards against fraudulent citizenship attestions. The evaluation stated that individuals who attested to being citizens did not need to show documents proving their citizen status, and the individuals' information was not queried through the pilot program. The Machine-Readable Document Pilot Program was initiated only in Iowa because Iowa was the sole state at the start of the pilot program issuing driver's licenses and identification cards that included machine-readable information needed for completing the Form I-9 (e.g., name, date of birth, Social Security number). In evaluating this pilot program, the Institute for Survey Research and Westat found that the program had a number of technical and procedural problems, such as card reader difficulties in reading the driver's licenses and Iowa's no longer requiring the Social Security number as the driver's license number. This change in Iowa's requirements resulted in the inability of employers to use the readers on driver's licenses without Social Security numbers. See Institute for Survey Research and Westat, *Findings of the Citizen Attestation Verification Pilot Program Evaluation* (Washington, D.C.: April 2003) and Institute for Survey Research and Westat, *Findings of the Machine-Readable Document Pilot Program Evaluation* (Washington, D.C.: May 2003).

confirmed. Those queries that the DHS automated check cannot confirm the pilot refers to USCIS staff, called immigration status verifiers, who check employee information against information in other DHS databases.

**Figure 1: Basic Pilot Program Verification Process**



Source: GAO analysis based on USCIS information.

In cases when the pilot system cannot confirm an employee's work authorization status either through the automatic check or the check by an immigration status verifier, the system issues the employer a tentative

nonconfirmation of the employee's work authorization status. In this case, the employers must notify the affected employees of the finding, and the employees have the right to contest their tentative nonconfirmations within 8 working days by contacting SSA or USCIS to resolve any inaccuracies in their records.[19] During this time, employers may not take any adverse actions against those employees, such as limiting their work assignments or pay. When employees do not contest their tentative nonconfirmations within the allotted time, the Basic Pilot Program issues a final nonconfirmation for the employees. Employers are required to either immediately terminate or notify DHS of the continued employment of workers who do not successfully contest the tentative nonconfirmation and those who the pilot program finds are not work-authorized.

## Recent Proposals Related to Employment Verification and Worksite Enforcement

There is ongoing congressional consideration about employment verification and worksite enforcement efforts, and various initiatives have been proposed related to these issues, including possible new temporary worker programs. Since January 2004, the current administration has discussed the possibility of initiating a guest worker program in which foreign workers would be granted status for employment in the United States for a specified period of time. Similarly, some recent legislative proposals would provide a means for foreign workers to obtain temporary employment and possible permanent residency or citizenship at a later date. Other initiatives propose revising visa programs to increase the number of foreign workers legally admitted to the United States. In addition, legislative proposals have addressed methods for enhancing employment verification and worksite enforcement efforts. For example, one proposal would make use of the Basic Pilot Program mandatory for all employers, and another would increase the fine amounts for employers who knowingly hire unauthorized workers. These initiatives reflect

---

[19]In February 2005 we reported that verification services, like the Basic Pilot Program, provide a valuable opportunity to prevent many unintended or careless mistakes when hiring new workers and reporting worker earnings. In particular, we concluded that the Basic Pilot Program provides an option for addressing the problem of unauthorized workers' earnings posted to the Earnings Suspense File, which occurs when individuals' names or Social Security numbers in wage reports do not match SSA records. According to SSA officials, when individuals contest SSA tentative nonconfirmations, SSA can update the individuals' information in the SSA database when, for example, individuals provide information on name changes or correct inaccurate birthdates. SSA officials said that such updates may help prevent wage reporting problems and the posting of individuals' wage information to the Earnings Suspense File. GAO, *Social Security: Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports*, GAO-05-154 (Washington, D.C.: Feb. 4, 2005).

differing perspectives on employment verification and worksite enforcement and touch on a variety of related issues, such as the number of foreign workers, if any, needed in the United States, the economic impact of illegal aliens residing in the country, and policy decisions on ways to address the millions of illegal aliens in the United States.

## Various Weaknesses Have Undermined the Employment Verification Process, but the Basic Pilot Program Shows Potential to Enhance the Process

The current employment verification process relies on employers' review of work eligibility documents to determine whether employees are authorized to work, but the process has several weaknesses. Document and identity fraud have hindered employers' efforts to reliably verify employees' work eligibility under the Form I-9 process. In addition, the large number and variety of documents acceptable for proving work eligibility have undermined the process. We have previously reported on the need to reduce the number of acceptable work eligibility documents and to improve the integrity of the documents.[20] The Basic Pilot Program, as a voluntary, automated verification program, offers a mechanism with potential to enhance the employment verification process by reducing document fraud. ICE officials said that access to Basic Pilot Program information could help the agency better target its worksite enforcement efforts by identifying employers who do not follow program requirements. However, existing weaknesses in the program, such as the inability of the program to detect identity fraud, delays in entering data into DHS databases, and some employer noncompliance with pilot program requirements, could become more significant and additional resources could be needed if employer participation in the program greatly increased or was made mandatory.

## Current Employment Verification Process Based on Employers' Review of Documents

In 1986, IRCA established the employment verification process based on employers' review of documents presented by employees to prove identity and work eligibility. Under the process, employers must request that newly hired employees present a document or documents that confirm employees' identity and work eligibility. On the Form I-9, employees must attest that they are U.S. citizens, lawfully admitted permanent residents, or aliens authorized to work in the United States. Employers must then certify that they have reviewed the documents presented by their employees to establish identity and work eligibility and that the

---

[20]GAO, *Immigration Reform: Employer Sanctions and the Question of Discrimination,* GAO/GGD-90-62, (Washington, D.C.: Mar. 29, 1990) and GAO/GGD-99-33.

documents appear genuine and relate to the individual presenting them. In making their certifications, employers are expected to judge whether the documents presented are obviously counterfeit. Employers are deemed in compliance with IRCA if they have followed the verification procedures, including instances when an unauthorized alien may have presented fraudulent documents that appeared genuine. In addition, on the Form I-9, employers are required to reverify the employment eligibility of individuals whose work authorization has expired, such as aliens with temporary work authorization, to determine whether the individuals are authorized to continue to work.

## Document and Identity Fraud Have Undermined the Form I-9 Process

Since the passage of IRCA in 1986, document fraud (use of counterfeit documents) and identity fraud (fraudulent use of valid documents or information belonging to others) have made it difficult for employers who want to comply with IRCA to ensure that they employ only authorized workers through the current verification and reverification processes. In its 1997 report to Congress, the U.S. Commission on Immigration Reform noted that the widespread availability of false documents made it easy for unauthorized aliens to obtain jobs in the United States. In 1999, we reported that large numbers of unauthorized aliens have either fraudulently used valid documents that belong to others or presented counterfeit documents as evidence of employment eligibility.[21] Furthermore, in 2004 we reported that unauthorized workers were able to use false documents to illegally gain entry to secure areas of critical infrastructure sites, such as airports, nuclear power plants, and military bases.[22] Representatives from some of the employers and employer associations we interviewed for this review indicated that, in cases where employees present documents that employers suspect of being counterfeit, employers may not request that these employees present other documents proving their work eligibility because the employees could claim that employers are discriminating against them. To help protect against discriminatory hiring practices, such as employers requesting specific documents from foreign-looking or sounding employees, employers are prohibited under IRCA from requesting that new employees present specific documents from among the list of acceptable documents to prove their identity and work eligibility.

---

[21]GAO/GGD-99-33.

[22]GAO, *Overstay Tracking: A Key Component of Homeland Security and a Layered Defense*, GAO-04-82 (Washington, D.C.: May 21, 2004).

Although studies suggest that the majority of employers comply with IRCA and try to hire only authorized workers, the studies have also noted that some employers knowingly hire unauthorized workers, often to exploit the workers' low cost labor.[23] In 1997, the U.S. Commission on Immigration Reform reported that the minority of employers who knowingly hired illegal aliens avoided sanctions by going through the motions of compliance while accepting false documents. Likewise, in 1999 we concluded that those employers who do not want to comply with IRCA can intentionally hire unauthorized aliens under the guise of having complied with the employment verification requirements by claiming that unauthorized workers presented false documents to obtain employment.[24]

## Large Number and Variety of Acceptable Documents Have Hindered Employer Verification Efforts

The large number and variety of documents that are acceptable for proving work eligibility have also complicated employer verification efforts under IRCA. Following passage of IRCA in 1986, employees could present any of 29 different documents to establish their identity and/or work eligibility. In a 1997 interim rule, INS reduced the number of acceptable work eligibility documents from 29 to 27. Eight of these documents establish both identity and employment eligibility (e.g., U.S. passport or permanent resident card); 12 documents establish identity only (e.g., driver's license); and 7 documents establish employment eligibility only (e.g., Social Security card without the legend "Not Valid for Employment").[25] The interim rule implemented changes to the list of acceptable work eligibility documents mandated by IIRIRA and was intended to serve as a temporary measure until INS issued final rules on modifications to the Form I-9. In 1998, INS proposed a further reduction in the number of acceptable work eligibility documents to 14 but did not finalize the proposed rule.

Since the passage of IRCA, various studies have addressed the need to reduce the number of acceptable work eligibility documents to make the employment verification process simpler and more secure. In 1990, we reported that the multiplicity of work eligibility documents contributed to (1) employer uncertainty about how to comply with the employment

---

[23]There are no current reliable data available on the number or percentage of employers who seek to comply with IRCA and those who attempt to circumvent it.

[24]GAO/GGD-99-33.

[25]See appendix I for the complete list of acceptable work eligibility documents.

verification requirements and (2) discrimination against authorized workers.[26] A 1992 report prepared by the Senate Committee on the Judiciary noted that the first step to simplifying the employment verification process was to reduce the current list of acceptable work eligibility documents and make them more counterfeit-proof.[27] In 1998, INS noted that, when IRCA was first passed, a long, inclusive list of acceptable work eligibility documents was allowed for the Form I-9 to help ensure that all persons who were eligible to work could easily meet the requirements, but as early as 1990, there had been evidence that some employers found the list confusing. In 1999 we reported that various studies of IRCA's employment verification process advocated that the number of documents that employees can use to demonstrate employment eligibility should be reduced to make the employment verification process more secure and easier to understand.[28]

Additionally, some of the employers, employer associations, and immigration experts we interviewed for this review told us that the large number of documents acceptable for proving work eligibility and the fact that the Form I-9 has not been updated have impeded employer efforts to verify employment eligibility. Representatives from three employer associations said that member employers have expressed concerns that the Form I-9 has not been updated to reflect changes in the list of acceptable work eligibility documents, causing confusion among some employers regarding which documents are acceptable. In addition, among the 23 employers we interviewed, 5 discussed the need to update the Form I-9 to reflect revisions to the list of acceptable work eligibility documents. Two of these employers told us that they manually edit the Form I-9 to reflect the changes in the list of acceptable work eligibility documents.

DHS officials told us that the department is assessing possible revisions to the Form I-9 process, including revisions to the number of acceptable work eligibility documents, but has not established a target time frame for

---

[26]GAO/GGD-90-62.

[27]U.S. Senate, Committee on the Judiciary, Subcommittee on Immigration and Refugee Affairs, *Options for an Improved Employment Verification System* (Washington, D.C.: Sept. 23, 1992).

[28]GAO/GGD-99-33.

completing this assessment.[29] They said that the *Handbook for Employers*, which provides guidance for completing the Form I-9, would also need to be updated. In May 2005, DHS released an updated version of the Form I-9 that changed references from INS to DHS but did not modify the list of acceptable work eligibility documents on the Form I-9 to reflect changes made to the list by the 1997 interim rule. In the absence of final regulations and an updated Form I-9 and handbook, employers, employees, and other stakeholders may not clearly understand the Form I-9 process, particularly which documents are acceptable for proving work eligibility.

## Proposals Have Been Made to Improve Document Integrity

We have previously reported on efforts to enhance the integrity of acceptable work eligibility documents, which could help reduce document fraud and make the employment verification process more secure, especially if the number of acceptable documents was reduced. For example, in 1999 we reported that INS had taken steps to increase the integrity of immigration documents, such as by issuing new employment authorization documents with visible security features like holograms and by issuing permanent resident cards with digital photographs and fingerprint images.[30] We noted that, although INS enhanced the integrity of its documents, unauthorized aliens could present non-INS documents, such as Social Security cards, to employers to prove work eligibility. In 1998, we reported on estimates of costs associated with alternative proposals for SSA issuance of enhanced Social Security cards.[31] We are currently reviewing SSA efforts to enhance the integrity of Social Security cards and how enhanced cards might strengthen the employment verification process and plan to report on these issues next year.

In addition, we have previously reported on the possible use of biometrics in verification and identification processes—such as those used at U.S. ports of entry.[32] Biometrics covers a wide range of technologies that can be

---

[29]In addition to developing a rule on the reduction of the number of acceptable work eligibility documents, DHS is also developing regulations on the electronic Form I-9, which employers were authorized to use beginning at the end of April 2005. See appendix III for more information on the electronic Form I-9.

[30]GAO/GGD-99-33.

[31]GAO, *Social Security: Mass Issuance of Counterfeit-Resistant Cards Expensive, but Alternatives Exist*, GAO/HEHS-98-170 (Washington, D.C.: Aug. 20, 1998).

[32]GAO, *Technology Assessment: Using Biometrics for Border Security*, GAO-03-174 (Washington, D.C.: Nov. 15, 2002).

used to verify identity by measuring and analyzing human characteristics.[33] Biometrics can theoretically be very effective personal identifiers because the characteristics they measure are thought to be distinct to each person. Because they are tightly bound to an individual, biometrics are more reliable, cannot be forgotten, and are less easily lost, stolen, or guessed. While biometrics may show promise in enhancing verification and identification processes, we have also reported on the trade-offs for using biometric indicators, such as concerns regarding the protections under current law for biometric data, the absence of clear criteria governing data sharing, and infrastructure processes such as the binding of an identity to the biometric data. We reported that while a biometric placed on a token, such as a passport or visa, cannot necessarily link a person to his or her identity, it can reduce the potential for an individual to assume multiple identities. We also reported that although federal agencies are required by statute to provide security protections for information collected and maintained by or for the agency commensurate with the risk and magnitude of harm that would result from unauthorized disclosure, disruption, modification, or destruction of the information, poor information security is a widespread federal problem with potentially severe consequences. In reporting on the possible use of biometrics in verification and identification processes, we identified several examples of such risks associated with using biometric data.[34]

Recent laws and legislative proposals have addressed possible ways to enhance the integrity of documents and strengthen the employment verification process. The Real ID Act of 2005 mandated that states must meet minimum standards in developing and issuing driver's licenses before federal government authorities can accept state driver's licenses as identification for official purposes.[35] These standards include (1) adding physical security features to prevent counterfeiting and tampering, (2) including common machine-readable technology on driver's licenses, and (3) requiring driver's license applicants to provide evidence of their dates of birth and Social Security numbers. The Intelligence Reform and Terrorism Prevention Act of 2004 required SSA to form a task force to, among other things, establish standards for safeguarding Social Security

---

[33]GAO, *Information Security: Challenges in Using Biometrics*, GAO-03-1137T (Washington, D.C.: Sept. 9, 2003).

[34]GAO-03-174.

[35]P.L. 109-13, 49 U.S.C. 30301 note.

cards from counterfeiting, tampering, alteration, and theft.[36] In addition to these laws, various legislative proposals address possible ways to make identity and work eligibility documents more secure and to enhance the employment verification process. For example, one recent proposal would mandate that individuals can present only machine-readable, counterfeit and tamper-resistant Social Security cards to obtain employment. According to the proposal, these machine-readable cards would allow employers to check employees' work authorization status against information maintained in an employment eligibility database.[37] These laws and proposals differ in the extent to which they address issues related to enhancing employment verification through electronic means, such as the availability and accessibility of machine-readable technology and the security and privacy of information maintained on documents and in databases.

## Basic Pilot Program Shows Promise in Enhancing Employment Verification, but Current Weaknesses Could Undermine Increased Use

### Basic Pilot Program May Help Employers Reliably Verify Work Eligibility and Decrease Document Fraud

Various immigration experts have noted that the most important step that could be taken to reduce unlawful migration is the development of a more effective system for verifying work authorization. In particular, the U.S. Commission on Immigration Reform concluded that the most promising option for verifying work authorization was a computerized registry based on employers' electronic verification of an employee's Social Security number with records on work authorization for aliens. The Basic Pilot Program, which is currently available on a voluntary basis to all employers in the United States, operates in a similar way to the computerized registry recommended by the commission. Yet only a small portion—about 2,300

---

[36]P.L. 108-458.

[37]Illegal Immigration Enforcement and Social Security Protection Act of 2005, H.R. 98, 109th Cong.

in fiscal year 2004—of the approximately 5.6 million employer firms nationwide actively used the pilot program.[38]

The Basic Pilot Program assists employers in detecting document fraud by helping to eliminate employer guesswork as to whether information contained on work eligibility documents presented by employees is authentic or counterfeit. If newly hired employees present counterfeit documents containing false information, the pilot program would not confirm the employees' work eligibility because the employees' Form I-9 information, such as a false name or Social Security number, would not match SSA and DHS database information when queried through the Basic Pilot Program. In the evaluation of the Basic Pilot Program, the Institute for Survey Research at Temple University and Westat found that the program appeared to reduce unauthorized employment arising from employee presentation of counterfeit or altered documents containing false information. Twenty of the 22 employers we interviewed who participated in the Basic Pilot Program indicated that the program helps them to reliably verify newly hired employees' work authorization status.

**ICE Sees Additional Benefit in Access to Basic Pilot Program Data**

ICE has no direct role in monitoring employer use of the Basic Pilot Program and does not have direct access to program information, which is maintained by USCIS. ICE officials noted that, in a few cases, they have requested and received pilot program data from USCIS on specific employers who participate in the program and are under ICE investigation. ICE officials told us that program data could indicate cases in which employers do not follow program requirements and therefore would help ICE better target its worksite enforcement efforts toward those employers. For example, the Basic Pilot Program's confirmation of numerous queries of the same Social Security number could indicate that the Social Security

---

[38]The number of employers who actively used the program in fiscal year 2004 includes a small number of employers who switched between two versions of the program and, as a result, were counted twice as active users. USCIS is not able to easily determine which employers were counted twice. In addition, the approximately 2,300 employers who actively used the pilot program in fiscal year 2004 do not reflect the number of worksites or individual business establishments using the program. In 2002, the most recent year for which data are available, there were approximately 5.6 million firms in the United States. Under the Basic Pilot Program, one employer may have multiple worksites that use the pilot program. For example, a hotel chain could have multiple individual hotels using the Basic Pilot Program. This hotel chain would represent one employer using the pilot program. A firm is a business organization consisting of one or more domestic establishments in the same state and industry that were specified under common ownership or control. See appendix IV for data on employer participation and use of the Basic Pilot Program.

number is being used fraudulently or that an unscrupulous employer is knowingly hiring unauthorized workers by accepting the same Social Security number for multiple employees. However, USCIS officials stated that they have concerns about providing ICE with broader access to Basic Pilot Program information for the worksite enforcement program. USCIS officials said that, if ICE has access to pilot program information for worksite enforcement purposes, that access might create a disincentive for employers to participate in this voluntary program and could be used for purposes other than identifying potentially unscrupulous employers. These officials stated that employers may be less likely to join or participate in the program because the employers may believe that they are more likely to be targeted for a worksite enforcement investigation as a result of program participation.

ICE suggested that there could be possible benefits to their worksite enforcement efforts if employers were required to participate in a mandatory automated verification program like the Basic Pilot Program. ICE officials said that a mandatory automated verification system could help ICE focus worksite enforcement efforts on employers who try to evade using the program. They also stated that a mandatory system like the pilot program could limit the ability of employers who knowingly hired unauthorized workers to claim that the workers presented false documents to obtain employment, assisting ICE agents in proving employer violations of IRCA. Officials from 7 of the 12 Special Agent in Charge field offices we interviewed suggested that a mandatory Basic Pilot Program could help them better target their worksite enforcement efforts.

**Basic Pilot Program Does Not Help Employers Detect Identity Fraud in Verifying Employees' Work Eligibility**

Although an automated verification program like the Basic Pilot Program has potential to enhance the employment verification process and help employers detect use of counterfeit documents, the program cannot currently help employers detect identity fraud. In 2002 we reported that, although not specifically or comprehensively quantifiable, the prevalence of identity fraud seemed to be increasing, a development that may affect employers' ability to reliably verify employment eligibility.[39] If an unauthorized worker presents valid documentation that belongs to another person authorized to work, the Basic Pilot Program may find the worker to be work-authorized. Similarly, if an employee presents counterfeit documentation that contains valid information and appears

---

[39]GAO, *Identity Theft: Prevalence and Cost Appear to Be Growing*, GAO-02-363 (Washington, D.C.: Mar. 1, 2002).

authentic, the Basic Pilot Program may verify the employee as work-authorized. DHS officials told us that the department is currently considering possible ways to enhance the Basic Pilot Program to help it detect cases of identity fraud, for example, by modifying the program to provide a digitized photograph associated with employment authorization information presented by an employee. Yet, DHS cannot fully assess possible ways to modify the Basic Pilot Program to address identity fraud in the absence of data on the costs and feasibility of implementing such modifications.

In addition, the Basic Pilot Program does not assist employers in verifying the work authorization status of employees whose status requires reverification and therefore does not help employers detect document or identity fraud in the reverification process. Employers currently may not use the Basic Pilot Program to re-verify the employment eligibility of individuals whose work authorization has expired, and employers agree not to use the pilot program for reverification when registering to participate in the program. Therefore, participating employers cannot fully use the Basic Pilot Program to verify the work authorization status of all employees for whom verification, including reverification, is required under the Form I-9 process. According to one USCIS official, the pilot program does not face any technological or other limitations that would prevent the program from being used for reverification purposes, if such use was required or allowed as part of the pilot program.

**Delays in Data Entry May Lengthen the Pilot Program Verification Process**

Another current weakness in the Basic Pilot Program that could affect the program's success if use increased or was made mandatory is delays in the entry of information on immigrants' and nonimmigrants' arrivals and employment authorization into DHS databases. Although the majority of pilot program queries entered by participating employers are confirmed via the automated SSA and DHS verification checks, about 15 percent of queries authorized by DHS required manual verification by immigration status verifiers in fiscal year 2004.[40] According to USCIS, immigration status verifiers typically resolve cases referred to them for verification within 24 hours, but a small number of cases take longer. For example, nine employers we interviewed reported that a small number of

---

[40]In fiscal year 2004, about 10 percent of total Basic Pilot Program queries were referred to DHS for verification. Of these queries referred to DHS for verification, about 85 percent were confirmed via the DHS automated check.

immigration status verifier verifications took longer than 24 hours to resolve, with a few verifications taking as long as 2 weeks to resolve.

Immigration status verifiers reported that the primary reason for queries to require verification by them is because of delays in entry of employment authorization information into DHS databases. USCIS officials told us that those verifications that take longer than a few days to resolve are generally caused by delays in the entry of data on employees who received employment authorization documents generated by a computer and camera that are not directly linked to DHS databases, such as those used at ports of entry for refugees and at USCIS field offices. They said that information on the employment authorization documents generated through this process is electronically sent to USCIS headquarters for entry but is sometimes lost or not entered into databases in a timely manner. By contrast, employment authorization documents issued at USCIS service centers are produced via computers that are used to update data in USCIS databases, which USCIS officials told us represent the majority of employment authorization documents currently issued by USCIS. The Temple University Institute for Survey Research and Westat found that verifications that require immigration status verifiers' review lengthen the time needed to complete the employment verification process. In addition, among the 22 employers we interviewed, 7 reported that they may experience some losses in work time, training, or money for background checks and physicals when employees contest tentative nonconfirmations.

USCIS has taken steps to increase the timeliness and accuracy of information entered into databases used as part of the Basic Pilot Program. In June 2004, USCIS reported that, among other improvements, it had started work to expedite data entry for new lawful permanent residents and arriving nonimmigrants and to improve data entry for changes in work authorization status.[41] For example, USCIS said that it has worked to reduce the time in which data are available for Basic Pilot Program verifications by expediting submission of data on newly arrived immigrants and nonimmigrants from ports of entry and field offices to USCIS service centers for data entry. The agency reported that, as a result of its efforts, data on new immigrants are now typically available for verification within 10 to 12 days of an immigrant's arrival in the United States while previously, the information was not available for up to 6 to 9 months after arrival. Moreover, USCIS reported it has worked to

---

[41]DHS, *Report to Congress on the Basic Pilot Program* (Washington, D.C.: June 2004).

increase the timeliness and availability of temporary work authorization information in its databases by increasing the number of employment authorization documents issued by service centers as compared with the number of documents issued through computers not directly linked to DHS databases. The department reported that, while in 1999 less than half of all employment authorization documents were issued by service centers, over three-quarters of the cards are now issued through service centers. USCIS officials told us that the agency has continued these efforts to improve the timeliness and accuracy of information entered into DHS databases and noted that the agency is currently planning to fund another evaluation of the Basic Pilot Program that will include a review of the accuracy of DHS database information.

Furthermore, analysis of the Basic Pilot Program database indicates that the timeliness and accuracy of the DHS automated checks against the Basic Pilot Program database have improved. In fiscal year 2004, about 10 percent of all queries were referred to DHS for verification. Among those queries authorized by DHS, the percentage of queries verified by the DHS automated check increased from about 67 percent in fiscal year 2000 to about 85 percent in fiscal year 2004, as shown in figure 2.

**Figure 2: Number of Queries Authorized by DHS through the Automated Check and the Immigration Status Verifier Check**



Number of queries

Employment authorizations issued by DHS immigration status verifier review

Employment authorizations issued by DHS automated check

Source: GAO analysis of USCIS data.

Note: Data have been rounded to the nearest hundred.

Although USCIS has taken some steps to improve the timeliness and accuracy of information entered into databases used as part of the Basic Pilot Program and plans to review the accuracy of database information as part of its planned evaluation of the pilot program, USCIS cannot effectively assess future use of the pilot program, including possible increased program usage, without information on the costs and feasibility of ways to further reduce delays in the entry of information into DHS databases.

**Employer Noncompliance with Pilot Program Procedures May Adversely Affect Employees**

Another factor that may reduce the effectiveness of the pilot program if usage is increased or made mandatory is employer noncompliance with Basic Pilot Program requirements. These requirements are intended to safeguard employees queried through the program from such harm as discrimination or reduced training and pay. The Temple University

Institute for Survey Research and Westat evaluation of the Basic Pilot Program concluded that the majority of employers surveyed appeared to be in compliance with Basic Pilot Program procedures. However, the evaluation found evidence of some noncompliance with these procedures that specifically prohibit screening job applicants and taking actions that adversely affect employees while they are contesting tentative nonconfirmations, such as limiting employees' work assignments or pay. For example, 30 percent of the employers surveyed for the evaluation reported restricting work assignments while employees contested tentative nonconfirmations, a practice that is prohibited under the Basic Pilot Program. Of the 22 employers we interviewed who participate in the pilot, 7 reported using the Basic Pilot Program in a way that did not conform with pilot program procedures, including using the pilot program to screen job applicants before offering jobs to the applicants.

The Basic Pilot Program provides a variety of reports that may help USCIS determine whether employers follow program requirements. For example, these reports could help USCIS identify employers who do not appear to refer employees contesting tentative nonconfirmations to SSA or DHS, which is required under pilot program procedures. USCIS could then follow up to determine if such employers are following pilot procedures that require employers to refer all employees with tentative nonconfirmations to SSA or DHS. USCIS officials told us that efforts to review employers' use of the pilot program have been limited by lack of staff available to oversee and examine employer use of the program, and they noted that there are currently 15 USCIS headquarters staff members responsible for administering USCIS verification programs, including the Basic Pilot Program. The officials said that, as part of the next evaluation of the pilot program, USCIS plans to assess the extent to which employers follow pilot program requirements and procedures, such as employer adherence to requirements to notify employees of tentative nonconfirmations. However, without information on the costs and feasibility of routinely reviewing employers' use of the pilot program, USCIS cannot fully determine possible ways to regularly examine employer use of the program and therefore the extent to which employers comply with pilot program requirements.

**Current Program May Not Complete Timely Verifications if Use Greatly Increased**

According to USCIS officials, due to the growth in other USCIS verification programs, current USCIS staff may not be able to complete timely verifications if the number of employers using the Basic Pilot Program were to significantly increase. In particular, these officials said that if a significant number of new employers registered for the program or if the program were mandatory for all employers or a segment of

employers, additional resources would be needed to maintain timely verifications, given the growth in other verification programs. For example, the REAL ID Act of 2005[42] mandated that states must meet minimum standards in issuing driver's licenses and nondriver identification cards, including verifying the immigration status of all noncitizen applicants, before federal government authorities can accept the licenses and cards for official purposes beginning in 2008. Currently, USCIS has approximately 38 immigration status verifiers available for completing Basic Pilot Program verifications, and these verifiers reported that they are able to complete the majority of current required checks within their target time frame of 24 hours.[43] However, USCIS officials said that because of the growth in other verification programs that would increase the number of verifications that require checks by immigration status verifiers, the agency has serious concerns about its ability to complete timely verifications if the number of Basic Pilot Program users greatly increased.

USCIS officials also stated that the agency lacks funding to further expand the Basic Pilot Program. The Basic Pilot Program and other verification programs have been funded by fees USCIS receives from applicants for adjudication of immigration and citizenship benefits. USCIS allocated about $3.5 million from its fee accounts for all of its verification programs, including the Basic Pilot Program, in fiscal year 2005.[44] USCIS officials said that this allocation included a $500,000 increase for additional employee verifications by employers using the Basic Pilot Program. However, these officials told us that current funding levels allocated for USCIS verification programs would not be sufficient to cover costs associated with mandatory use of the Basic Pilot Program for all employers, should this be adopted. In 2004, we reported that USCIS fees were not sufficient to fully

---

[42]P.L. 109-13, codified at 49 U.S.C. 30301.

[43]Other immigration status verifiers are dedicated to completing manual verifications for other USCIS verification programs.

[44]According to USCIS, in fiscal year 2005, the agency allocated about $475,000 to reimburse SSA for Basic Pilot Program query costs and about $337,500 for employer query costs. In addition, USCIS estimated about $7 million in annual costs for verifications by immigration status verifiers.

fund the agency's operations but noted that cost data were insufficient to determine the full extent of the funding shortfall.[45]

The Temple University Institute for Survey Research and Westat estimated a range of costs associated with expanding the dial-up version of the pilot program,[46] including costs for making the program mandatory for a selected group of employers, like employers with more than 10 employees, and making the program mandatory for all employers, regardless of the number of employees. The report estimated that a mandatory dial-up version of the pilot program for all employers would cost the federal government, employers, and employees about $11.7 billion total per year, with employers bearing most of the costs.[47] USCIS has worked with participating employers to switch them to the Web-based version of the program and discontinued the dial-up version in June 2005. The Temple University Institute for Survey Research and Westat did not estimate costs for a mandatory Web-based version, although they noted that operating costs associated with such a program would be less than for the dial-up version because employer computer maintenance and telephone costs would be lower. As part of the next evaluation of the pilot program, USCIS plans to assess the costs and potential time frames associated with making the Web-based version mandatory for all employers or specific segments of employers. Given the growth in other USCIS verification programs, USCIS cannot effectively assess potential costs for making the Web-based version of the Basic Pilot Program mandatory without information on other possible resources needed for the program, such as staff needed for conducting manual verifications.

---

[45]GAO, *Immigration Application Fees: Current Fees Are Not Sufficient to Fund U.S. Citizenship and Immigration Services' Operations,* GAO-04-309R (Washington, D.C.: Jan. 5, 2004). In April 2004, USCIS raised its fees for immigration benefit applications.

[46]Under the dial-up version of the Basic Pilot Program, employers installed pilot program software directly onto a computer and used a dedicated telephone line to access the pilot system.

[47]The Institute for Survey Research and Westat estimated that the contractor who runs the Basic Pilot Program charged $0.28 per query. They estimated that it cost about $6 to resolve each query that required review by immigration status verifiers.

## Competing Priorities and Lack of Outcome Goals and Measures May Hinder Worksite Enforcement Efforts

The worksite enforcement program is one of various ICE immigration enforcement programs, and has been a relatively low priority. Since fiscal year 1999, the number of notices of intent to fine issued to employers for violations of IRCA and the number of administrative worksite arrests have declined, which, according to ICE, are due to various factors, such as the widespread use of counterfeit documents that make it difficult for ICE agents to prove employer violations. INS and ICE have also faced difficulties in setting and collecting meaningful fine amounts and in detaining unauthorized workers arrested at worksites. In addition, ICE has not yet developed outcome goals and measures for the worksite enforcement program, making it difficult for ICE and Congress to assess program performance and determine resource levels for the program.

## Worksite Enforcement Has Been a Relatively Low Priority for ICE, but ICE Has Proposed Additional Resources for the Program

Worksite enforcement is one of various immigration enforcement programs formerly managed by INS and now managed by ICE, and competes for resources with these other program areas, such as alien smuggling and fraud. Among INS and ICE responsibilities, worksite enforcement has been a relatively low priority. For example, in the 1999 INS Interior Enforcement Strategy, the strategy to block and remove employers' access to undocumented workers was the fifth of five interior enforcement priorities.[48] In this same year, we reported that, relative to other enforcement programs in INS, worksite enforcement received a small portion of INS's staffing and enforcement budget. We noted that the number of employer investigations INS was able to conduct each year covered only a fraction of the estimated number of employers who may have hired unauthorized aliens.[49]

In keeping with the primary mission of DHS to combat terrorism, after September 11, 2001, INS and then ICE focused investigative resources primarily on national security cases, such as investigations of aliens in the United States who may have overstayed their authorized time periods for being in the country and the National Security Entry and Exit Registration System; on participation in Joint Terrorism Task Forces;[50] and on critical

---

[48]INS, *Interior Enforcement Strategy* (Washington, D.C.: January 1999).

[49]GAO/GGD-99-33.

[50]The National Security Entry and Exit Registration System domestic registration required selected groups of aliens from a number of countries to register with immigration authorities between November 2002 and April 2003. Joint Terrorism Task Forces are multi-agency investigative teams composed of federal, state, and local agencies that work jointly with other nonmember agencies to investigate terrorism matters.

infrastructure protection. In particular, INS and then ICE focused available resources for worksite enforcement mainly on identifying and removing unauthorized workers from critical infrastructure sites, such as airports and nuclear power plants, to help reduce vulnerabilities at those sites. In 2004, we reported that, if critical infrastructure-related businesses were to be compromised by terrorists, this would pose a serious threat to domestic security.[51] In 2003, we testified that, given ICE's limited resources, it needs to ensure that it targets those industries where employment of illegal aliens poses the greatest potential risk to national security.[52] According to ICE officials, the agency adopted this focus on critical infrastructure protection because the fact that unauthorized workers can obtain employment at critical infrastructure sites indicates that there are vulnerabilities in those sites' hiring and screening practices, and unauthorized workers employed at those sites are vulnerable to exploitation by terrorists, smugglers, traffickers, or other criminals.

Consistent with these priorities, in 2003 ICE headquarters issued a memo requiring field offices to request approval from ICE headquarters prior to opening any worksite enforcement investigation not related to the protection of critical infrastructure sites, such as investigations of farms and restaurants. ICE officials told us that the purpose of this memo was to help ensure that field offices focused worksite enforcement efforts on critical infrastructure protection operations. Field office representatives told us that noncritical infrastructure worksite enforcement was one of the few investigative areas for which offices had to request approval from ICE headquarters to open an investigation. According to ICE, the agency recently issued a memo delegating authority to approve noncritical infrastructure worksite enforcement cases to field offices' Special Agents in Charge. Eight of the 12 offices we interviewed told us that worksite enforcement was not an office priority unless the worksite enforcement case related to critical infrastructure protection. ICE has inspected Forms I-9 and employer records at hundreds of critical infrastructure sites as of March 2005. For example, as part of Operation Tarmac, ICE conducted investigations at nearly 200 airports nationwide and, as part of Operation Glow Worm, conducted investigations at more than 50 nuclear power

---

[51]GAO-05-66.

[52]GAO, *Homeland Security: Challenges to Implementing the Immigration Interior Enforcement Strategy*, GAO-03-660T (Washington, D.C.: Apr. 10, 2003).

plants as of March 2005.[53] Between October 2004 and the beginning of May 2005, about 77 percent of the worksite enforcement cases opened by ICE were related to critical infrastructure protection.[54]

Since fiscal year 1999, INS and ICE have dedicated a relatively small portion of overall agent resources to the worksite enforcement program. As shown in figure 3, in fiscal year 1999, INS allocated about 240 full-time equivalents to worksite enforcement efforts, while in fiscal year 2003, ICE allocated about 90 full-time equivalents.[55] Between fiscal years 1999 and 2003, the percentage of agent work-years spent on worksite enforcement efforts generally decreased from about 9 percent to about 4 percent.

---

[53]Operations Tarmac and Glow Worm were ICE initiatives to detect and remove unauthorized workers from airports and nuclear power plants, respectively.

[54]Data are not available on the number of critical infrastructure and noncritical infrastructure worksite enforcement cases ICE opened prior to fiscal year 2005 because before fiscal year 2005, ICE's case management system did not distinguish between the two case types.

[55]One full-time equivalent is equal to one work-year or 2,080 nonovertime hours.



**Figure 3: Investigative Agent Work-years Spent on Worksite Enforcement Efforts and Agent Work-years Spent on Other Investigative Areas for Each Fiscal Year from 1999 through 2003**

Source: GAO analysis of INS case management data.

Although worksite enforcement may remain a low priority relative to other programs, ICE has proposed increasing agent resources for the worksite enforcement program by adding staff to its headquarters' worksite enforcement unit,[56] which was comprised of three staff members as of July 2005, and hiring additional worksite enforcement staff for field offices. In particular, ICE plans to use the $5 million provided for fiscal year 2005 by a congressional conference report for the worksite enforcement program to fund additional headquarters positions for the worksite enforcement unit.[57] In its fiscal year 2006 budget submission, ICE requested funding for 117 compliance officers, 20 additional investigative agents, and

---

[56]ICE headquarters' worksite enforcement unit is responsible for managing the agency's worksite enforcement program.

[57]H.R. Conf. Rep. 108-774 (2004) accompanying the Department of Homeland Security Appropriations Act, 2005, P.L. 108-334.

6 additional program managers for worksite enforcement. ICE has proposed hiring these compliance officers to conduct the administrative elements of worksite enforcement cases, such as the inspection of Forms I-9 and other employment records. ICE officials said that these officers would pass cases involving potential criminal violations to investigative agents for review. ICE officials told us that the agency would use the compliance officers only for worksite enforcement efforts. According to ICE, compliance enforcement officers are less costly than investigative agents. ICE estimates that each investigative agent would cost the agency approximately $167,000 to $176,000 in fiscal year 2006, while one compliance enforcement officer would cost about $76,000. At this point, it is unclear what impact, if any, these additional resources would have on worksite enforcement efforts.

## ICE Attributes Decline in Numbers of Employer Fine Notices and Worksite Arrests to Document Fraud and Resource Allocation Decisions

The number of notices of intent to fine issued to employers as well as the number of unauthorized workers arrested at worksites have generally declined. Between fiscal years 1999 and 2004, the number of notices of intent to fine issued to employers for improperly completing Forms I-9 or knowingly hiring unauthorized workers generally decreased from 417 to 3.[68] (See figure 4.)

---

[68]ICE worksite enforcement investigations can span several fiscal years. For example, ICE can open an investigation in one fiscal year, but may not complete the case, including issuing a notice of intent to fine, if warranted, for several fiscal years. In addition, after ICE issues a notice of intent to fine, employers may negotiate with ICE attorneys to set a final amount for the fine. Therefore, ICE could issue a notice of intent to fine in one fiscal year, but not issue the final order for the fine until the following fiscal year.

**Figure 4: Number of Notices of Intent to Fine Issued to Employers for Each Fiscal Year from 1999 through 2004**



Notices of intent to fine

Fiscal year

Source: GAO analysis of INS and ICE case management data.

The number of unauthorized workers arrested during worksite enforcement operations has also declined since fiscal year 1999. As shown in figure 5, the number of administrative worksite arrests declined by about 84 percent from 2,849 in fiscal year 1999 to 445 in fiscal year 2003.

**Figure 5: Number of Worksite Enforcement Arrests for Each Fiscal Year from 1999 through 2003**



Number of arrests

Source: GAO analysis of INS case management data.

According to ICE records, worksite enforcement criminal arrests totaled 159 in fiscal year 2004 and 81 in the period from October 2004 through April 2005.[59]

ICE attributes the decline in the number of notices of intent to fine issued to employers and number of administrative worksite arrests to various factors including the widespread availability and use of counterfeit

[59]These data on worksite enforcement criminal arrests for fiscal years 2004 and 2005 do not include data on the number of worksite enforcement administrative arrests for those fiscal years. Fiscal year 2004 and 2005 data cannot be compared with data for previous fiscal years because the way INS agents entered data on investigative work-years into the INS case management system differs from the way ICE agents enter such data into the ICE system. Following the creation of ICE in March 2003, the case management system used to enter and maintain information on immigration investigations changed. With the establishment of ICE, agents began using the legacy U.S. Customs Service's case management system, called the Treasury Enforcement Communications System, for entering and maintaining information on investigations, including worksite enforcement operations. Prior to the creation of ICE, the former INS entered and maintained information on investigative activities in the Performance Analysis System, which captured information on immigration investigations differently than the Treasury Enforcement Communications System.

documents and the allocation of resources to other priorities. Various studies have shown that the availability and use of fraudulent documents have made it difficult for ICE agents to prove that employers knowingly hire unauthorized workers. For example, in previous work we reported that the prevalence of document fraud made it difficult for INS to prove that an employer knowingly hired an unauthorized alien.[60] In 1996, the Department of Justice Office of the Inspector General reported that the proliferation of cheap fraudulent documents made it possible for the unscrupulous employer to avoid being held accountable for hiring illegal aliens.[61] ICE officials told us that employers who agents suspect of knowingly hiring unauthorized workers can claim that they were unaware that their workers presented false documents at the time of hire, making it difficult for agents to prove that the employer willfully violated IRCA. In commenting on a draft of this report, ICE also noted that the IIRIRA provision that limited employer liability for certain Form I-9 paperwork violations affects ICE's ability to substantiate employer charges for knowingly hiring unauthorized workers and, therefore, the number of notices of intent to fine that ICE issues. This provision came into effect in 1996, so it is unclear what effect, if any, the provision had on the decline in the number of notices of intent to fine issued between fiscal years 1999 and 2004.

In addition, according to ICE, the allocation of INS and ICE resources to other priorities has contributed to the decline in the numbers of notices of intent to fine and worksite arrests. For example, INS focused its worksite enforcement resources on egregious employer violators who were linked to other criminal violations like smuggling, fraud, or worker exploitation, and de-emphasized administrative employer cases and fines. Furthermore, INS investigative resources were redirected from worksite enforcement activities to criminal alien cases, which consumed more investigative hours by the late 1990s than any other enforcement activity. After September 11, 2001, INS and ICE focused investigative resources on national security cases and, in particular, focused worksite enforcement efforts on critical infrastructure protection, which is consistent with DHS's primary mission to combat terrorism. According to ICE, the redirection of

---

[60]GAO/GGD-99-33 and GAO, *Identity Fraud: Prevalence and Links to Alien Illegal Activities*, GAO-02-830T (Washington, D.C.: June 25, 2002).

[61]Department of Justice, Office of the Inspector General, *Immigration and Naturalization Service Efforts to Combat Harboring and Employing Illegal Aliens in Sweatshops*, I-96-08 (Washington, D.C.: May 1996).

resources from other enforcement programs to perform national security-related investigations resulted in fewer resources for traditional program areas like fraud and noncritical infrastructure worksite enforcement. Additionally, some ICE field representatives, as well as immigration experts we interviewed, noted that the focus on critical infrastructure protection does not address the majority of worksites in industries that have traditionally provided the magnet of jobs attracting illegal aliens to the United States.

## INS and ICE Have Faced Difficulties in Setting Fine Amounts and in Detaining Unauthorized Workers, but Have Taken Steps to Address Difficulties

INS and ICE have faced difficulties in setting and collecting final fine amounts that meaningfully deter employers from knowingly hiring unauthorized workers and in detaining unauthorized workers arrested at worksites. ICE officials told us that because fine amounts are so low, the fines do not provide a meaningful deterrent. These officials also said that when agents could prove that an employer knowingly hired an unauthorized worker and issued a notice of intent to fine, the fine amounts agents recommended were often negotiated down in value during discussions between agency attorneys and employers. The amount of mitigated fines may be, in the opinion of some ICE officials, so low that they believe that employers view the fines as a cost of doing business, making the fines an ineffective deterrent for employers who attempt to circumvent IRCA. ICE officials at 11 of the 12 field offices at which we interviewed staff said that they experienced instances in which fine amounts were mitigated down in value. According to ICE, the agency mitigates employer fine amounts because doing so may be a more efficient use of government resources than pursuing employers who contest or ignore fines, which could be more costly to the government than the fine amount sought. Recently, ICE settled a worksite enforcement case with a large company without going through the administrative fine process. As part of the settlement, the company agreed to pay $11 million and company contractors agreed to pay $4 million in forfeitures—more than any administrative fine amount ever issued against an employer for IRCA violations, according to ICE.

One ICE official said that use of such civil settlements instead of pursuit of administrative fines, specifically in regard to investigations of noncritical infrastructure employers, could be a more efficient use of investigative resources. ICE officials also said that use of civil settlements could help ensure employers' future compliance by including in the settlements a requirement to enter into compliance agreements, such as the Basic Pilot Program. ICE recently employed this strategy in its $15 million settlement with the large company. As part of the settlement, the company agreed to

enter into a compliance program with ICE. Other compliance agreements with employers could involve mandatory participation in the Basic Pilot Program. Additionally, ICE officials said that the agency has proposed working with employers who are not the subjects of worksite enforcement investigations to help them ensure compliance with IRCA through enhanced education and partnerships. In April 2005, ICE issued its interim strategic plan, which, as part of its objective on identifying critical industries for worksite enforcement operations, included an approach for partnering with businesses to help them comply with IRCA.[62] This partnership program, called the ICE Mutual Agreement between Government and Employers, is intended to provide employers with training and best practices for complying with IRCA. In addition to implementing this partnership program, ICE plans to promote expanded use of the Basic Pilot Program to help encourage employers in critical industries to strengthen their ability to verify employees' work eligibility. The practice of civil settlements with employers and joint compliance programs are in the early stages of implementation; therefore the extent to which they may address the difficulties faced in setting fine amounts that provide a meaningful deterrent is not yet known.

The former INS also faced difficulties in collecting total fine amounts from employers, but collection efforts have improved. We previously reported that the former INS faced difficulties in collecting total fine amounts from employers for a number of reasons including that employers went out of business, moved, or declared bankruptcy.[63] In 1996, the Department of Justice Office of the Inspector General reported that the deterrent effect of civil fines on sweatshop operators was adversely affected by collection difficulties and noted that INS had no national system for billing, tracking, and collecting employer fines. In 1998, INS created the Debt Management Center to centralize the collections process, and the center is now responsible for collecting fines ICE issued against employers for violations of IRCA and providing other collection services for ICE and USCIS. The

---

[62]ICE's objective for identifying critical industries for worksite enforcement operations included the following five elements: (1) identify and remove unauthorized workers from critical industries; (2) implement and expand an ICE-employer partnership program to enhance employer compliance, training, and information sharing; (3) investigate criminal employers linked to smuggling, trafficking, worker exploitation, and other criminal violations; (4) revitalize employer sanctions to provide financial deterrence; and (5) promote use of employment eligibility verification technology, like the Basic Pilot Program. See ICE, *Interim Strategic Plan* (Washington, D.C.: April 2005).

[63]GAO/GGD-99-33.

ICE Debt Management Center has collected total amounts on most of the invoices issued to employers for final fine amounts between fiscal years 1999 and 2004—about 94 percent as of the end of June 2005.[64]

In addition, ICE's Office of Detention and Removal has limited detention space, and unauthorized workers detained during worksite enforcement investigations are a low priority for that space.[65] In 2004, the Under Secretary for Border and Transportation Security sent a memo to the Commissioner of U.S. Customs and Border Protection and the Assistant Secretary for ICE outlining the priorities for the detention of aliens. According to this memo, aliens who are subjects of national security investigations were among those groups of aliens given the highest priority for detention, while aliens arrested as a result of worksite enforcement investigations were among those groups of aliens given the lowest priority. Officials in 8 of the 12 field offices we interviewed told us that lack of sufficient detention space has limited the effectiveness of worksite enforcement efforts. For example, ICE officials stated that if investigative agents arrest unauthorized aliens at worksites, the aliens would likely be released because the Office of Detention and Removal detention centers do not have sufficient space to house the aliens. Field office representatives said that offices can expend a large amount of resources to arrest unauthorized aliens at worksites and that these aliens would likely be released and may re-enter the workforce, in some cases returning to the worksites from where they were originally arrested. As a result, the use of resources to arrest unauthorized aliens at worksites may be unproductive. A congressional conference report for fiscal year 2005 provided funds to the Office of Detention and Removal for an additional 1,950 bed spaces.[66] Given competing priorities for detention space, the effect, if any, these additional bed spaces will have on ICE's priority given to workers detained as a result of worksite enforcement operations cannot currently be determined.

---

[64]The Debt Management Center issues invoices to employers for collecting fine amounts. According to ICE, multiple invoices can be issued for each final order for an employer fine, as a payment plan is typically established for employers as part of the final order for the fine amount.

[65]The Office of Detention and Removal is primarily responsible for identifying and removing criminal aliens from the United States. The office is also responsible for managing ICE's space for detaining aliens.

[66]H.R. Con. Rep. 109-72 (2005) accompanying the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, P.L. 109-13.

## ICE Has Not Yet Developed Outcome Goals and Measures for Worksite Enforcement

Given ICE's limited resources and competing priorities for those resources, ICE's lack of performance goals and measures for the worksite enforcement program may hinder the agency's ability to effectively determine and allocate resources for the program. Performance goals and measures are intended to provide Congress and agency management with the information to systematically assess a program's strengths, weaknesses, and performance. A performance goal is the target level of performance—either output or outcome—expressed as a tangible, measurable objective against which actual achievement will be compared. A performance measure can be defined as an indicator, statistic, or metric used to gauge program performance and may typically include outputs and outcomes. Outputs provide status information about an initiative or program in terms of completing an action in a specified time frame. Outcomes show results or outcomes related to an initiative or program in terms of its effectiveness, efficiency, or impact. Outputs should support or lead to outcomes and, for each outcome goal, there are typically several output goals. Outputs and outcomes together help agencies determine and report on products or services provided through a program and the results of those products or services.

ICE lacks output goals and measures necessary to inform its resource allocation decisions. Output goals and measures are an essential management tool in managing programs for results. They help provide the information that agencies need to aid in determining resources for a program and whether they are using program resources efficiently and effectively. ICE officials told us that the agency does not plan to focus on developing and using output goals and measures for worksite enforcement, such as the number of cases initiated or number of worksite arrests made, because they believe that such goals and measures do not adequately indicate ICE's level of effort for worksite enforcement. Therefore, the ICE officials said that ICE plans to focus on developing outcome goals and measures for the program that better reflect the program's effect. Yet in its fiscal year 2006 budget request, ICE identified two output measures for its worksite enforcement program: a 20 percent increase in the number of administrative worksite case completions and criminal employer case presentations made to the U.S. Attorney's Office in fiscal year 2007 and a 30 percent increase in these two indicators in fiscal year 2008. Although these two measures would provide a general indication of ICE's level of worksite enforcement activity, these measures alone would not allow ICE or Congress to effectively determine resources needed for the worksite enforcement program because these indicators address only two elements of the worksite enforcement program and do not address other program elements, such as critical infrastructure

protection. Furthermore, in July 2005 the Secretary of Homeland Security discussed the need for DHS, of which ICE is a part, to be an effective steward of its resources. Without additional output goals and measures for worksite enforcement, ICE's ability to effectively determine and allocate worksite enforcement resources needed to meet program goals, especially given other agency priorities for resources, and to fully assess whether the agency is using those resources effectively and efficiently in implementing the program may be hindered.

In addition, ICE lacks outcome goals and measures that may hinder its ability to effectively assess the results of its worksite enforcement program efforts, including critical infrastructure protection efforts. Outcome measures provide agencies with an assessment of the results of a program activity or policy compared to its intended purposes. ICE officials told us that the agency plans to develop outcome goals and measures for its worksite enforcement program, but it has not yet developed these goals and measures. As a first step, ICE officials told us that field offices conducted baseline threat-level assessments in August and September 2004 to help identify regional risks, such as risks to critical infrastructure sites. These officials stated that an action plan will be developed to address these risks. Field office agents will then measure how well a particular threat has been addressed by measuring the impact of ICE's investigative activities on deterring threats or decreasing vulnerabilities to national security. ICE has not yet established target time frames for developing worksite enforcement program outcome goals and measures and, without these goals and measures, ICE may not be able to effectively assess the results of program efforts. For example, until ICE fully develops outcome goals and measures, it may not be able to completely determine the extent to which its critical infrastructure protection efforts have resulted in the elimination of unauthorized workers' access to secure areas of critical infrastructure sites, one possible goal that ICE may use for its worksite enforcement program.

## Conclusions

Efforts to reduce the employment of unauthorized workers in the United States necessitate a strong employment eligibility verification process and a credible worksite enforcement program to help ensure that employers are meeting verification requirements. The current Form I-9 employment verification process has not fundamentally changed since its establishment in 1986, and ongoing weaknesses in the process have undermined its effectiveness. Although DHS and the former INS have been assessing changes in the process since 1997, DHS has not yet issued final regulations on these changes, and it has not established a definitive time frame for

completing the assessment. Completion of this assessment and issuance of final regulations should strengthen the current employment verification process and make it simpler and more secure. Furthermore, the Basic Pilot Program, or a similar automated verification system, if implemented on a much larger scale, shows promise for enhancing the employment verification process and reducing document fraud. However, current weaknesses in pilot program implementation would have to be fully addressed to help ensure the efficient and effective operation of an expanded or mandatory pilot program, or a similar automated employment verification program, and the cost of additional resources would be a consideration. Although USCIS plans to review current pilot program weaknesses, additional information on the costs and feasibility of addressing these weaknesses is needed to assist USCIS and Congress in assessing possible future use of the Basic Pilot Program, including increased program usage.

Even with a strengthened employment verification process, a credible worksite enforcement program is needed because no verification process is foolproof and not all employers may want to comply with the law. ICE's focus on critical infrastructure protection since September 11, 2001 is consistent with the DHS mission to combat terrorism by detecting and mitigating vulnerabilities to terrorist attacks at critical infrastructure sites which, if exploited, could pose serious threats to domestic security. This focus on critical infrastructure protection, though, generally does not address noncritical infrastructure employers' noncompliance with IRCA. As a result, employers, particularly those not located at or near critical infrastructure sites, who attempt to circumvent IRCA face less of a likelihood that ICE will investigate them for failing to comply with the current employment verification process or knowingly hiring unauthorized workers. ICE is taking some steps to address difficulties it has faced in its worksite enforcement efforts, but it is too early to tell whether these steps will improve the effectiveness of the worksite enforcement program. In addition, given ICE's limited resources and competing priorities for those resources, additional output goals and measures are needed to help ICE track the progress of its worksite enforcement efforts, effectively determine the resources needed to meet worksite enforcement program goals, and ensure that program resources are used efficiently and effectively. Moreover, a target time frame for developing outcome goals and measures is needed to assist Congress and ICE in determining whether the worksite enforcement program, including critical infrastructure protection, is achieving its desired outcomes.

## Recommendations for Executive Action

To strengthen the current employment verification process, we recommend that the Secretary of Homeland Security take the following action:

- set a specific time frame for completing the department's review of the Form I-9 process, including an assessment of the possibility of reducing the number of acceptable work eligibility documents, and issuing final regulations on changes to the Form I-9 process and an updated Form I-9.

To assist Congress and USCIS in assessing the possibility of increased or mandatory use of the Basic Pilot Program, we recommend that the Secretary of Homeland Security direct the Director of USCIS to take the following action:

- include, in the planned evaluation of the Basic Pilot Program, an assessment of the feasibility and costs of addressing the Basic Pilot Program's current weaknesses, including its inability to detect identity fraud in the verification and reverification processes, delays in entry of new arrival and employment authorization information into DHS databases, and employer noncompliance with program procedures, and resources needed to support any increased or mandatory use of the program.

To assist Congress and ICE in determining the resources needed for the worksite enforcement program and to help ensure the efficient and effective use of program resources, we recommend that the Secretary of Homeland Security direct the Assistant Secretary for ICE to take the following two actions:

- establish additional output goals and measures for the worksite enforcement program to clearly indicate the target level of ICE worksite enforcement activity and the resources needed to implement the program, and

- set a specific time frame for completing the assessment and development of outcome goals and measures for the worksite enforcement program to provide a target level of performance for worksite enforcement efforts and measures to assess the extent to which program results have met program goals.

## Agency Comments

We requested comments on this report from the Secretary of Homeland Security. In its response, DHS agreed with our recommendations. DHS's

comments are reprinted in Appendix V. DHS also provided technical comments, which we considered and incorporated where appropriate. We also received technical comments from SSA, which we considered and incorporated where appropriate.

As arranged with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days after the date of this report. At that time, we will send copies of this report to the Secretary of Homeland Security, the Secretary of Labor, the Attorney General, the Commissioner of the Social Security Administration, the Director of the Office of Management and Budget, and appropriate congressional committees. We will also make copies available to others upon request. In addition, the report will be available at no charge on GAO's Web site at http://www.gao.gov.

If you or your staff have any questions regarding this report, please contact me at (202) 512-8777 or stanar@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this report are listed in appendix VI.

Richard M. Stana

Richard M. Stana
Director, Homeland Security
   and Justice Issues

# Appendix I: Employment Eligibility Verification Form (Form I-9)

OMB No. 1615-0047; Expires 03/31/07

**Employment Eligibility Verification**

## INSTRUCTIONS
PLEASE READ ALL INSTRUCTIONS CAREFULLY BEFORE COMPLETING THIS FORM.

**Anti-Discrimination Notice.** It is illegal to discriminate against any individual (other than an alien not authorized to work in the U.S.) in hiring, discharging, or recruiting or referring for a fee because of that individual's national origin or citizenship status. It is illegal to discriminate against work eligible individuals. Employers **CANNOT** specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1- Employee.** All employees, citizens and noncitizens, hired after November 6, 1986, must complete Section 1 of this form at the time of hire, which is the actual beginning of employment. **The employer is responsible for ensuring that Section 1 is timely and properly completed.**

**Preparer/Translator Certification.** The Preparer/Translator Certification must be completed if Section 1 is prepared by a person other than the employee. A preparer/translator may be used only when the employee is unable to complete Section 1 on his/her own. However, the employee must still sign Section 1 personally.

**Section 2 - Employer.** For the purpose of completing this form, the term "employer" includes those recruiters and referrers for a fee who are agricultural associations, agricultural employers or farm labor contractors.

Employers must complete Section 2 by examining evidence of identity and employment eligibility within three (3) business days of the date employment begins. If employees are authorized to work, but are unable to present the required document(s) within three business days, they must present a receipt for the application of the document(s) within three business days and the actual document(s) within ninety (90) days. However, if employers hire individuals for a duration of less than three business days, Section 2 must be completed at the time employment begins. **Employers must record: 1)** document title; **2)** issuing authority; **3)** document number, **4)** expiration date, if any; and **5)** the date employment begins. Employers must sign and date the certification. Employees must present original documents. Employers may, but are not required to, photocopy the document(s) presented. These photocopies may only be used for the verification process and must be retained with the I-9. **However, employers are still responsible for completing the I-9.**

**Section 3 - Updating and Reverification.** Employers must complete Section 3 when updating and/or reverifying the I-9. Employers must reverify employment eligibility of their employees on or before the expiration date recorded in Section 1. Employers CANNOT specify which document(s) they will accept from an employee.

- If an employee's name has changed at the time this form is being updated/reverified, complete Block A.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee is still eligible to be employed on the same basis as previously indicated on this form (updating), complete Block B and the signature block.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee's work authorization has expired or if a current employee's work authorization is about to expire (reverification), complete Block B and:

- examine any document that reflects that the employee is authorized to work in the U.S. (see List A or C),

- record the document title, document number and expiration date (if any) in Block C, and

- complete the signature block.

**Photocopying and Retaining Form I-9.** A blank I-9 may be reproduced, provided both sides are copied. The instructions must be available to all employees completing this form. Employers must retain completed I-9s for three (3) years after the date of hire or one (1) year after the date employment ends, whichever is later.

**For more detailed information, you may refer to the Department of Homeland Security (DHS) Handbook for Employers, (Form M-274). You may obtain the handbook at your local U.S. Citizenship and Immigration Services (USCIS) office.**

**Privacy Act Notice.** The authority for collecting this information is the Immigration Reform and Control Act of 1986, Pub. L. 99-603 (8 USC 1324a).

This information is for employers to verify the eligibility of individuals for employment to preclude the unlawful hiring, or recruiting or referring for a fee, of aliens who are not authorized to work in the United States.

This information will be used by employers as a record of their basis for determining eligibility of an employee to work in the United States. The form will be kept by the employer and made available for inspection by officials of the U.S. Immigration and Customs Enforcement, Department of Labor and Office of Special Counsel for Immigration Related Unfair Employment Practices.

Submission of the information required in this form is voluntary. However, an individual may not begin employment unless this form is completed, since employers are subject to civil or criminal penalties if they do not comply with the Immigration Reform and Control Act of 1986.

**Reporting Burden.** We try to create forms and instructions that are accurate, can be easily understood and which impose the least possible burden on you to provide us with information. Often this is difficult because some immigration laws are very complex. Accordingly, the reporting burden for this collection of information is computed as follows: 1) learning about this form, 5 minutes; 2) completing the form, 5 minutes; and 3) assembling and filing (recordkeeping) the form, 5 minutes, for an average of 15 minutes per response. If you have comments regarding the accuracy of this burden estimate, or suggestions for making this form simpler, you can write to U.S. Citizenship and Immigration Services, Regulatory Management Division, 111 Massachusetts Avenue, N.W., Washington, DC 20529. OMB No. 1615-0047.

**NOTE:** This is the 1991 edition of the Form I-9 that has been rebranded with a current printing date to reflect the recent transition from the INS to DHS and its components.

**EMPLOYERS MUST RETAIN COMPLETED FORM I-9**
**PLEASE DO NOT MAIL COMPLETED FORM I-9 TO ICE OR USCIS**

Form I-9 (Rev. 05/31/05)Y

Appendix I: Employment Eligibility
Verification Form (Form I-9)

OMB No. 1615-0047; Expires 03/31/07

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**Employment Eligibility Verification**

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. **ANTI-DISCRIMINATION NOTICE:** It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins.

| Print Name: Last | First | Middle Initial | Maiden Name |
| --- | --- | --- | --- |

| Address (Street Name and Number) | Apt. # | Date of Birth (month/day/year) |
| --- | --- | --- |

| City | State | Zip Code | Social Security # |
| --- | --- | --- | --- |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):

☐ A citizen or national of the United States
☐ A Lawful Permanent Resident (Alien #) A _____
☐ An alien authorized to work until ___/___/___
(Alien # or Admission #) _____

| Employee's Signature | Date (month/day/year) |
| --- | --- |

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Preparer's/Translator's Signature | Print Name |
| --- | --- |

| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
| --- | --- |

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C, as listed on the reverse of this form, and record the title, number and expiration date, if any, of the document(s).

| List A | OR | List B | AND | List C |
| --- | --- | --- | --- | --- |
| Document title: _____ | | _____ | | _____ |
| Issuing authority: _____ | | _____ | | _____ |
| Document #: _____ | | _____ | | _____ |
| Expiration Date (if any): ___/___/___ | | ___/___/___ | | ___/___/___ |
| Document #: _____ | | | | |
| Expiration Date (if any): ___/___/___ | | | | |

**CERTIFICATION - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (month/day/year) ___/___/___ and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment.)**

| Signature of Employer or Authorized Representative | Print Name | Title |
| --- | --- | --- |

| Business or Organization Name | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
| --- | --- | --- |

**Section 3. Updating and Reverification.** To be completed and signed by employer.

| A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable) |
| --- | --- |

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

Document Title: _____    Document #: _____    Expiration Date (if any): ___/___/___

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
| --- | --- |

NOTE: This is the 1991 edition of the Form I-9 that has been rebranded with a current printing date to reflect the recent transition from the INS to DHS and its components.

Form I-9 (Rev. 05/31/05)Y Page 2

Appendix I: Employment Eligibility
Verification Form (Form I-9)

## LISTS OF ACCEPTABLE DOCUMENTS

| LIST A | | LIST B | | LIST C |
|---|---|---|---|---|
| Documents that Establish Both Identity and Employment Eligibility | OR | Documents that Establish Identity | AND | Documents that Establish Employment Eligibility |
| 1. U.S. Passport (unexpired or expired) | | 1. Driver's license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address | | 1. U.S. social security card issued by the Social Security Administration (other than a card stating it is not valid for employment) |
| 2. Certificate of U.S. Citizenship (Form N-560 or N-561) | | | | |
| 3. Certificate of Naturalization (Form N-550 or N-570) | | 2. ID card issued by federal, state or local government agencies or entities, provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address | | 2. Certification of Birth Abroad issued by the Department of State (Form FS-545 or Form DS-1350) |
| 4. Unexpired foreign passport, with I-551 stamp or attached Form I-94 indicating unexpired employment authorization | | 3. School ID card with a photograph | | 3. Original or certified copy of a birth certificate issued by a state, county, municipal authority or outlying possession of the United States bearing an official seal |
| 5. Permanent Resident Card or Alien Registration Receipt Card with photograph (Form I-151 or I-551) | | 4. Voter's registration card | | |
| 6. Unexpired Temporary Resident Card (Form I-688) | | 5. U.S. Military card or draft record | | |
| | | 6. Military dependent's ID card | | 4. Native American tribal document |
| 7. Unexpired Employment Authorization Card (Form I-688A) | | 7. U.S. Coast Guard Merchant Mariner Card | | 5. U.S. Citizen ID Card (Form I-197) |
| 8. Unexpired Reentry Permit (Form I-327) | | 8. Native American tribal document | | 6. ID Card for use of Resident Citizen in the United States (Form I-179) |
| 9. Unexpired Refugee Travel Document (Form I-571) | | 9. Driver's license issued by a Canadian government authority | | |
| 10. Unexpired Employment Authorization Document issued by DHS that contains a photograph (Form I-688B) | | For persons under age 18 who are unable to present a document listed above: | | 7. Unexpired employment authorization document issued by DHS (other than those listed under List A) |
| | | 10. School record or report card | | |
| | | 11. Clinic, doctor or hospital record | | |
| | | 12. Day-care or nursery school record | | |

**Illustrations of many of these documents appear in Part 8 of the Handbook for Employers (M-274)**

Form I-9 (Rev. 05/31/05)Y Page 3

# Appendix II: Scope and Methodology

To determine how the employment eligibility verification (Form I-9) process functions, we examined laws related to the employment verification process, including the Immigration Reform and Control Act of 1986 and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996; federal regulations on the Form I-9 process; and former U.S. Immigration and Naturalization Service (INS) guidance on the Form I-9, such as the *Handbook for Employers*, which provides instructions for completing the form. We evaluated this information to identify the Form I-9 requirements, including employer and employee responsibilities for completing the form, and challenges to meeting those requirements. We examined our past reports and other studies, such as the 1997 U.S. Commission on Immigration Reform Report to Congress, to obtain further information on the employment verification process. We analyzed former INS plans for addressing Form I-9 challenges, including its plans to modify the list of acceptable work eligibility documents. We also examined U.S. Immigration and Customs Enforcement's (ICE) interim guidelines on the electronic Forms I-9 to determine what guidance, if any, they provide to employers using the electronic form.

To determine challenges to the Form I-9 process and obtain information on the Basic Pilot Program, we also interviewed and obtained information from U.S. Citizenship and Immigration Services (USCIS), ICE, and Social Security Administration (SSA) officials. In addition, we interviewed representatives of 23 employers; 12 employer, employee, and advocacy groups; and 6 immigration experts to obtain their views on employment verification and worksite enforcement.[1] We selected the employers to interview based on a mix of the following criteria: the total number of Basic Pilot Program queries; the total number or percentage of pilot program queries that resulted in authorized employment, tentative nonconfirmations, and final nonconfirmations; geographic proximity to the ICE field offices we visited; previous records of being sanctioned for Form I-9 violations; and industry categorization. The 23 employers we interviewed were located in the following states: California, Illinois, Michigan, New Jersey, New York, and Texas. The 23 employers were also part of the following industries: meat processing, transportation, health care, landscaping, manufacturing, accommodation, food services, agriculture, janitorial and maintenance, temporary employment, critical infrastructure, local government, and newspaper.

---

[1]According to Department of Labor data, there were about 5.6 million employer firms in the United States in 2002, the year for which the most current data are available.

One of the employers we interviewed did not participate in the Basic Pilot Program. As a result, when we discuss employers' views on the Basic Pilot Program, we refer to the views of the 22 employers we interviewed who participated in the Basic Pilot Program.

We selected the 9 employer and employee associations with which to meet based on a mix of criteria, including industry categorization, gross output by industry in 2002, number of paid employees by industry in 2002, and estimates of the number of illegal immigrants employed by industry.[2] We interviewed officials from employer and employee associations in the following industries: construction, agriculture, accommodation, food services, retail, health care, and meat. We selected the 3 advocacy groups to interview based on the groups' interest in issues related to employment verification and worksite enforcement efforts and interviewed officials from advocacy groups that represent a range of views on these issues. We selected the 6 immigration experts to interview based on the experts' range of views on immigration issues. We analyzed information from these agencies, employers, groups, and experts to determine their views on the Form I-9 process and difficulties in verifying work eligibility through the process. We used information obtained from employers, employer and employee associations, and advocacy groups only as anecdotal examples, as information from these entities cannot be generalized to all employers and groups in the United States.

Furthermore, we evaluated information from USCIS and SSA on the Basic Pilot Program, including the Basic Pilot Program user's manual and memorandum of understanding for employers, to determine how the pilot program functions and how it might assist participating employers in reliably verifying employees' work eligibility and in detecting counterfeit documents. We analyzed this information to determine ongoing challenges in implementing the Basic Pilot Program and ways these challenges could affect increased or mandatory use of the pilot program. We did not evaluate security measures in place for the Basic Pilot Program or the program's vulnerability to security risks. To identify pilot program challenges, we examined the findings and methodology of the evaluation of the Basic Pilot Program completed by the Institute for Survey Research at Temple University and Westat in June 2002. In addition, we analyzed

---

[2]At the time of selection, 2002 data on gross output by industry from the Bureau of Economic Analysis, Department of Commerce were the most current data available. Also, the most recent data available on the total number of paid employees by industry from the U.S. Census Bureau, Department of Commerce were from 2002.

data on employer participation in and use of the Basic Pilot Program, including data on Basic Pilot Program employment authorizations, to determine how participation and use have changed since fiscal year 2000. We assessed the reliability of these data by reviewing them for accuracy and completeness, interviewing agency officials knowledgeable about the data, and examining documentation on how the data are entered, categorized, and verified in the databases. We determined that the independent evaluation and these data were sufficiently reliable for the purposes of our review.

To obtain information on the implementation of the worksite enforcement program, we interviewed officials from ICE, the SSA Office of the Inspector General, the Department of Labor, the Federal Bureau of Investigation, and the Office of Special Counsel for Immigration-Related Unfair Unemployment Practices. We also interviewed officials from 12 of the 26 ICE Special Agent in Charge field offices. We met with officials from the following 8 field offices: Los Angeles and San Diego, California; Chicago, Illinois; Detroit, Michigan; Newark, New Jersey; New York City, New York; and Houston and San Antonio, Texas. We spoke with officials from the following 4 field offices over the telephone: Denver, Colorado; Miami, Florida; Buffalo, New York; and Seattle, Washington. We selected the 12 field offices based on a mix of the following criteria: the number of investigators in each field office in fiscal year 2003, the number of investigations conducted by each field office in fiscal year 2003,[3] the estimated number of undocumented immigrants in the state in which each field office was located, the number of sanctions issued to employers as a result of closed cases located in the same city as the field office between calendar years 1986 and 2000,[4] the number of critical infrastructure operations in which the field office participated from October 2001 through April 2004, the number of employers located in the same city as the field office that participated in the Basic Pilot Program, and geographic area. We also interviewed officials from 4 U.S. Attorney's Offices that were located in the same areas as 4 of the field offices we visited. We met with officials from the following 3 U.S. Attorney's Offices:

[3]At the time of selection, the most current data available on the number of investigators in each field office and the number of investigations conducted by each field office were from fiscal year 2003.

[4]At the time of selection, the most current data available on the number of sanctions issued to employers located in the same city as the field offices were from calendar years 1986 through 2000.

the Southern District of New York U.S. Attorney's Office; the Southern District of Texas U.S. Attorney's Office; and the Western District of Texas U.S. Attorney's Office. We spoke with the Southern District of California U.S. Attorney's Office over the telephone. We used information obtained from the field offices only as anecdotal examples, as information from these entities cannot be generalized to all field offices in the United States.

We analyzed ICE headquarters and field office guidance, memos, and other documents on worksite enforcement to evaluate ICE's priorities for and management of worksite enforcement efforts and to identify any challenges in program implementation. We analyzed ICE's April 2005 Interim Strategic Plan to determine ICE's strategy for its worksite enforcement program. We also examined former INS guidance and strategies and other studies, such as reports from the Department of Justice Office of the Inspector General, to determine how worksite enforcement priorities, implementation, and challenges have evolved.

In addition, we separately analyzed ICE and INS data on the worksite enforcement program and assessed their validity and reliability by reviewing them for accuracy and completeness, interviewing agency officials knowledgeable about the data, and examining documentation on how the data are entered, categorized, and verified in the databases. We determined that the data from each agency were sufficiently reliable for the purposes of our review. However, we could not compare the INS and ICE data because, following the creation of ICE in March 2003, the case management system used to enter and maintain information on immigration investigations changed. With the establishment of ICE, agents began using the legacy U.S. Customs Service's case management system, called the Treasury Enforcement Communications System, for entering and maintaining information on investigations, including worksite enforcement operations. Prior to the creation of ICE, the former INS entered and maintained information on investigative activities in the Performance Analysis System, which captured information on immigration investigations differently than the Treasury Enforcement Communications System.

Additionally, ICE officials indicated that, in a few cases, the INS and ICE data did not completely account for all worksite enforcement operations results. ICE officials told us that agents use judgment in categorizing cases entered into both systems and there are a limited number of instances in which agents did not appropriately categorize cases. For example, ICE officials told us that, in reviewing worksite enforcement cases in the ICE

system for fiscal year 2004, they found a few cases that agents inappropriately categorized as worksite enforcement.

To determine the investigative agent work-years, or full-time equivalents, that INS spent on the worksite enforcement program for each fiscal year from 1999 through 2003, we divided the total hours INS reported spending on employer investigations by the total hours spent on all investigations, including agent hours spent on leave, training, and other administrative and noninvestigative work. We then multiplied this result by 2,080 hours, which constitute one work-year, to determine the number of work-years spent on worksite enforcement.

We conducted our work from September 2004 through July 2005 in accordance with generally accepted government auditing standards.

# Appendix III: Information on the Electronic Form I-9

In October 2004, Congress authorized the electronic Form I-9 to be implemented by the end of April 2005.[1] ICE has provided interim guidelines for using electronic Forms I-9, until the agency issues final regulations on their use. The interim guidelines specify that employers will have options for completing, signing, storing, and presenting for inspection electronic Forms I-9. For example, the guidelines note that employers may choose to complete Forms I-9 on paper and store the forms electronically or they may choose to both electronically complete and store Forms I-9. The guidelines also state that electronic signatures could be generated through various technologies such as electronic signature pads, personal identification numbers, biometrics, and dialog boxes. The guidelines also state that employers could use electronic storage systems to retain Forms I-9 that include quality assurance steps to prevent and detect the unauthorized creation, addition, alteration, deletion, or deterioration of electronically stored data. In addition, employers may consider an electronic storage system that includes an indexing system and ability to reproduce legible and readable hard copies of electronically stored forms.

---

[1]P.L. 108-390.

# Appendix IV: Data on Employer Participation in and Use of the Basic Pilot Program

Employer participation in and use of the Basic Pilot Program has generally increased. Between fiscal years 2002 and 2004, the number of employers actively using the Basic Pilot Program increased from 1,205 to 2,305. In addition, as shown in figure 6, the number of total queries processed through the Basic Pilot Program has generally increased since fiscal year 2000.

**Figure 6: Number of Basic Pilot Program Queries Run by Participating Employers for Each Fiscal Year from 2000 through 2004**



Source: GAO analysis of data from U.S. Citizenship and Immigration Services.

Note: Data have been rounded to the nearest thousand.

As shown in figure 7, the majority of Basic Pilot Program queries that resulted in employment authorizations for each fiscal year from 2000 through 2004 were issued by SSA.

**Appendix IV: Data on Employer Participation in Use of the Basic Pilot Program**

**Figure 7: Number of Basic Pilot Program Queries that Resulted in Employment Authorizations for Each Fiscal Year from 2000 through 2004**



Source: GAO analysis of data from U.S. Citizenship and Immigration Services.

Note: Data have been rounded to the nearest hundred.

# Appendix V: Comments from the Department of Homeland Security

U.S. Department of Homeland Security
Washington, DC 20528



August 26, 2005

Richard M. Stana
Director, Homeland Security
 and Justice Issues
Government Accountability Office
Washington, DC 20548

Dear Mr. Stana:

   Re:  Draft Report GAO-05-813, Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts.

Thank you for the opportunity to review the draft report.  The following represents the Departmental response to the recommendations contained in the draft report.

**Recommendation:**  To strengthen the current employment verification process, GAO recommends the Secretary of Homeland Security take the following Action:

- Set a specific timeframe for completing the department's review of the Form I-9 process, including an assessment of the possibility of reducing the number of acceptable work eligibility documents, and issuing final regulations on changes to the Form I-9 process and an updated Form I-9.

**Response:**  Concur.  The Department's Immigration and Customs Enforcement (ICE) agrees that a timeframe should be established to assess the possibility of reducing the number of acceptable work eligibility documents for the I-9 Form.

**Recommendation:**  To assist Congress and U.S. Citizenship and Immigration Services (USCIS) in assessing the possibility of increased or mandatory use of the Basic Pilot Program, GAO recommends the Secretary of Homeland Security direct the Director of USCIS to take the following action:

- Include, in the planned evaluation of the Basic Pilot Program, an assessment of the feasibility and costs of addressing the Basic Pilot Program's current weaknesses, including its inability to detect identity fraud in the verification and re-verification processes, delays in entry of new arrival and employment authorization information into DHS databases, employer noncompliance with program procedures, and resources needed to support any increased or mandatory use of the program.

**Response:**  Generally Concur.  The Basic Pilot Program has the potential to enhance the verification process and substantially reduce document fraud.  The testing of alternative pilots and

www.dhs.gov

Appendix V: Comments from the Department
of Homeland Security

continuous improvements to the Basic Pilot has collectively made a step toward developing
workable alternatives to enhance the employment verification process. Furthermore, it has been
important to test and evaluate alternative employment verification systems before creating an
expensive new mandatory national employment verification system. USCIS concurs with GAO's
recommendation concerning USCIS' upcoming evaluation of the Basic Pilot Program. The
evaluation, which will begin in the fall of 2005, will evaluate the new Web-based access method
to determine the extent to which it resolves the deficiencies found in the computer and modem
access method evaluated earlier. The assessment also will address why some employers appear
to have more problems following proper pilot procedures than others. In addition, the evaluation
will address the feasibility and cost accuracy of the pertinent databases.

**Recommendation:** To assist Congress and ICE in determining the resources needed for the
worksite enforcement program and to help ensure the efficient and effective use of program
resources, GAO recommends the Secretary of Homeland Security direct the Assistant Secretary
for ICE to take the following two actions:

- Establish additional output goals and measures for the worksite enforcement program to
  clearly indicate the target level of ICE worksite enforcement activity and the resources
  needed to implement the program, and

- Set a specific timeframe for completing the assessment and development of outcome
  goals and measures for the worksite enforcement program to provide a target level of
  performance for worksite enforcement efforts and measures to assess the extent to which
  program results have met program goals.

**Response:** Concur. ICE Office of Investigations will proceed with the recommendation to
establish additional goals and measures for the worksite enforcement program to more clearly
indicate ICE's target level of activity, based on current resources and mandates. The established
goals and measures also will address the needed resources to implement the program and achieve
the target level of activity. The Office of Investigations will establish a timeframe for completing
the assessment and development of outcome goals and measures for the worksite enforcement
program.

We thank you again for the opportunity to review the report and provide comments.

Sincerely,

Steven J. Pecinovsky
Director
Departmental GAO/OIG Liaison Office

# Appendix VI: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Richard M. Stana (202) 512-8777 |
| **Staff Acknowledgments** | In addition to the contact named above, Orlando Copeland, Michele Fejfar, Ann H. Finley, Rebecca Gambler, Kathryn Godfrey, Charles Michael Johnson, Eden C. Savino, and Robert E. White made key contributions to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice:  (202) 512-6000<br>TDD:  (202) 512-2537<br>Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

PRINTED ON ♺ RECYCLED PAPER