**United States Government Accountability Office**

# GAO

Testimony

Before the Subcommittee on Immigration, Border Security, and Citizenship, Committee on the Judiciary, U.S. Senate

For Release on Delivery
Expected at 2:00 p.m. EDT
Monday, June 19, 2006

# IMMIGRATION ENFORCEMENT

## Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts

Statement of Richard M. Stana, Director
Homeland Security and Justice



G A O

Accountability * Integrity * Reliability

GAO-06-895T

**G A O**
Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-06-895T, a testimony
before the Subcommittee on Immigration,
Border Security, and Citizenship,
Committee on the Judiciary, U.S. Senate

June 19, 2006

## IMMIGRATION ENFORCEMENT

## Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts

### Why GAO Did This Study

The opportunity for employment is one of the most important magnets attracting illegal immigrants to the United States. The Immigration Reform and Control Act (IRCA) of 1986 established an employment eligibility verification process and a sanctions program for fining employers for noncompliance. Few modifications have been made to the verification process and sanctions program since 1986, and immigration experts state that a more reliable verification process and a strengthened worksite enforcement capacity are needed to help deter illegal immigration. This testimony is based on GAO's August 2005 report on the employment verification process and worksite enforcement efforts. In this testimony, GAO provides observations on (1) the current employment verification process and (2) U.S. Immigration and Customs Enforcement's (ICE) priorities and resources for the worksite enforcement program and the challenges it faces in implementing that program.

### What GAO Recommends

We recommended that the Department of Homeland Security (DHS) set time frames for completing its review of the Form I-9 and that U.S. Citizenship and Immigration Services in DHS assess the costs and feasibility of addressing Basic Pilot Program weaknesses. DHS agreed with these recommendations and is taking steps to assess the pilot program's weaknesses.

www.gao.gov/cgi-bin/getrpt?GAO-06-895T.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Richard M. Stana at (202) 512-8777 or stanar@gao.gov.

### What GAO Found

The current employment verification (Form I-9) process is based on employers' review of documents presented by new employees to prove their identity and work eligibility. On the Form I-9, employers certify that they have reviewed documents presented by their employees and that the documents appear genuine and relate to the individual presenting the documents. However, document fraud (use of counterfeit documents) and identity fraud (fraudulent use of valid documents or information belonging to others) have undermined the employment verification process by making it difficult for employers who want to comply with the process to ensure they hire only authorized workers and easier for unscrupulous employers to knowingly hire unauthorized workers with little fear of sanction. In addition, the large number and variety of documents acceptable for proving work eligibility has hindered employer verification efforts. In 1998, the former Immigration and Naturalization Service (INS), now part of DHS, proposed revising the Form I-9 process, particularly to reduce the number of acceptable work eligibility documents, but DHS has not yet finalized the proposal. The Basic Pilot Program, a voluntary program through which participating employers electronically verify employees' work eligibility, shows promise to enhance the current employment verification process, help reduce document fraud, and assist ICE in better targeting its worksite enforcement efforts. Yet, several weaknesses in the pilot program's implementation, such as its inability to detect identity fraud and DHS delays in entering data into its databases, could adversely affect increased use of the pilot program, if not addressed.

The worksite enforcement program has been a relatively low priority under both INS and ICE. Consistent with the DHS mission to combat terrorism, after September 11, 2001, INS and then ICE focused worksite enforcement efforts mainly on detecting and removing unauthorized workers from critical infrastructure sites. Since fiscal year 1999, the numbers of employer notices of intent to fine and administrative worksite arrests have generally declined. According to ICE, this decline is due to various factors, such as the prevalence of document fraud that makes it difficult to prove employer violations. ICE officials told us that the agency has previously experienced difficulties in proving employer violations and setting and collecting fine amounts that meaningfully deter employers from knowingly hiring unauthorized workers. In April 2006, ICE announced a new interior enforcement strategy to target employers who knowingly hire unauthorized workers by bringing criminal charges against them, and ICE has reported increases in the number of criminal arrests and indictments since fiscal year 2004. However, it is too early to tell what effect, if any, this new strategy will have on enhancing worksite enforcement efforts and identifying unauthorized workers and their employers.

Mr. Chairman and Members of the Subcommittee:

I appreciate the opportunity to be here today to participate in this hearing on immigration enforcement at the workplace. As we and others have reported in the past, the opportunity for employment is one of the most important magnets attracting unauthorized immigrants to the United States. To help address this magnet, in 1986 Congress passed the Immigration Reform and Control Act (IRCA),[1] which made it illegal for individuals and entities to knowingly hire, continue to employ, or recruit or refer for a fee unauthorized workers. The act established a two-pronged approach for helping to limit the employment of unauthorized workers: (1) an employment verification process through which employers verify all newly hired employees' work eligibility and (2) a sanctions program for fining employers who do not comply with the act. Efforts to enforce these sanctions are referred to as worksite enforcement and are conducted by U.S. Immigration and Customs Enforcement (ICE).

As the U.S. Commission on Immigration Reform reported, immigration contributes to the U.S. national economy by providing workers for certain labor-intensive industries and contributing to the economic revitalization of some communities.[2] Yet, the commission also noted that immigration, particularly illegal immigration, can have adverse consequences by helping to depress wages for low-skilled workers and creating net fiscal costs for state and local governments. Following the passage of IRCA, the U.S. Commission on Immigration Reform and various immigration experts have concluded that deterring illegal immigration requires, among other things, strategies that focus on disrupting the ability of illegal immigrants to gain employment through a more reliable employment eligibility verification process and a more robust worksite enforcement capacity. In particular, the commission report and other studies have found that the single most important step that could be taken to reduce unlawful migration is the development of a more effective system for verifying work authorization. In the nearly 20 years since passage of IRCA, the employment eligibility verification process and worksite enforcement program have remained largely unchanged. Moreover, in previous work, we reported that employers of unauthorized aliens faced little likelihood that the

---

[1] Pub. L. No. 99-603, 8 U.S.C. 1324a et seq.

[2] U.S. Commission on Immigration Reform, *Becoming an American: Immigration and Immigrant Policy* (Washington, D.C: September 1997).

GAO-06-895T

Immigration and Naturalization Service (INS)[3] would investigate, fine, or criminally prosecute them, a circumstance that provides little disincentive for employers who want to circumvent the law.[4] The legislative proposals currently under consideration would revise the current employment verification process and the employer sanctions program.

My testimony today is based on our August 2005 report to Congress on the employment verification process and ICE's worksite enforcement program.[5] Specifically, I will discuss our observations on (1) the current employment verification process and (2) ICE's priorities and resources for the worksite enforcement program and the challenges it has faced in implementing that program.

To address these objectives, we reviewed federal laws and information obtained from ICE, U.S. Citizenship and Immigration Services (USCIS), and Social Security Administration (SSA) officials in headquarters and selected field locations. We examined regulations, guidance, past GAO reports, and other studies on the employment verification process and the worksite enforcement program. We also analyzed the results and examined the methodology of an independent evaluation of the Basic Pilot Program, an automated system through which employers electronically check employees' work eligibility information against information in Department of Homeland Security (DHS) and SSA databases, conducted by the Institute for Survey Research at Temple University and Westat in June 2004.[6] Furthermore, we analyzed data on employer use of the Basic Pilot Program and on worksite enforcement and assessed the data reliability by reviewing them for accuracy and completeness, interviewing agency officials knowledgeable about the data, and examining documentation on how the data are entered, categorized, and verified in

---

[3]In March 2003, INS was merged into the Department of Homeland Security, and its immigration functions were divided between U.S. Citizenship and Immigration Services, U.S. Immigration and Customs Enforcement, and U.S. Customs and Border Protection. U.S. Immigration and Customs Enforcement is responsible for managing and implementing the worksite enforcement program.

[4]GAO, *Illegal Aliens: Significant Obstacles to Reducing Unauthorized Alien Employment Exist*, GAO/GGD-99-33 (Washington, D.C.: Apr. 2, 1999).

[5]GAO, *Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts*, GAO-05-813 (Washington, D.C.: Aug. 31, 2005).

[6]Institute for Survey Research and Westat, *Findings of the Basic Pilot Program Evaluation* (Washington, D.C.: June 2004).

the databases. We determined that the independent evaluation and these data were sufficiently reliable for the purposes of our review. We conducted the work reflected in this statement from September 2004 through July 2005 in accordance with generally accepted government auditing standards.

## Summary

The employment verification process is primarily based on employers' review of work eligibility documents presented by new employees, but various weaknesses, such as the process' vulnerability to fraud, have undermined this process. Employers certify that they have reviewed documents presented by their employees and that the documents appear genuine and relate to the individual presenting the documents. However, document fraud (use of counterfeit documents) and identity fraud (fraudulent use of valid documents or information belonging to others) have made it difficult for employers who want to comply with the employment verification process to ensure that they hire only authorized workers and have made it easier for unscrupulous employers to knowingly hire unauthorized workers with little fear of sanction. In addition, the large number and variety of documents acceptable for proving work eligibility have hindered employers' verification efforts. In 1998, the former INS proposed revising the verification process and reducing the number of acceptable work eligibility documents; that proposal was never acted upon. DHS, however, at the direction of Congress, introduced the Basic Pilot Program, an automated system for employers to electronically check employees' work eligibility information with information in DHS and SSA databases, that may enhance this process. This program shows promise to help reduce document fraud and assist ICE in better targeting its worksite enforcement efforts. Yet, a number of weaknesses in the pilot program's implementation, including its inability to detect identity fraud and DHS delays in entering data into its databases, could adversely affect increased use of the pilot program, if not addressed. In addition, USCIS officials told us the current Basic Pilot Program may not be able to complete timely verifications if the number of employers using the program significantly increased.  About 8,600 employers have registered to use the Basic Pilot Program, and a smaller number of these employers are active users.

Under both INS and ICE, worksite enforcement has been a relatively low priority. Consistent with the DHS mission to combat terrorism, after September 11, 2001, INS and then ICE focused worksite enforcement resources mainly on identifying and removing unauthorized workers from critical infrastructure sites, such as airports and nuclear power plants, to help address vulnerabilities at those sites.  In fiscal year 1999, INS devoted

about 240 full-time equivalents (or about 9 percent of its total investigative agent work-years) to worksite enforcement, while in fiscal year 2003 it devoted about 90 full-time equivalents[7] (or about 4 percent of total agent work-years). Furthermore, between fiscal years 1999 and 2003 the number of notices of intent to fine issued to employers for knowingly hiring unauthorized workers or improperly completing employment verification forms and the number of administrative worksite arrests generally declined. ICE has attributed this decline to various factors, including the widespread use of counterfeit documents that make it difficult for ICE agents to prove that employers knowingly hired unauthorized workers. In addition, INS and ICE have faced difficulties in setting and collecting fine amounts from employers and in detaining unauthorized workers arrested at worksites. In April 2006 ICE announced a new interior enforcement strategy as part of the Secure Border Initiative. Under this strategy, ICE plans to target employers who knowingly employ unauthorized workers by bringing criminal charges against them. While ICE has taken some steps to address difficulties it has faced in implementing worksite enforcement efforts and has announced a new interior enforcement strategy, it is too early to tell what effect, if any, these steps will have on identifying the millions of unauthorized workers and the employers who hired them.

In our August 2005 report, we recommended that DHS establish specific time frames for completing its review of the Form I-9 process to help strengthen the current employment verification process. We also recommended that USCIS include an assessment of the feasibility and costs of addressing the Basic Pilot Program's weaknesses in its evaluation of the program. DHS agreed with our recommendations and plans to include information on addressing the pilot program's weaknesses in the evaluation.

## Background

IRCA provided for sanctions against employers who do not follow the employment verification (Form I-9) process. Employers who fail to properly complete, retain, or present for inspection a Form I-9 may face civil or administrative fines ranging from $110 to $1,100 for each employee for whom the form was not properly completed, retained, or presented. Employers who knowingly hire or continue to employ unauthorized aliens may be fined from $275 to $11,000 for each employee, depending on whether the violation is a first or subsequent offense. Employers who

---

[7]One full-time equivalent is equal to one work-year or 2,080 non-overtime hours.

engage in a pattern or practice of knowingly hiring or continuing to employ unauthorized aliens are subject to criminal penalties consisting of fines up to $3,000 per unauthorized employee and up to 6 months imprisonment for the entire pattern or practice.

## Basic Pilot Program Employment Verification Process

The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA)[8] of 1996 required INS and SSA to operate three voluntary pilot programs to test electronic means for employers to verify an employee's eligibility to work, one of which was the Basic Pilot Program.[9] The Basic Pilot Program was designed to test whether pilot verification procedures could improve the existing employment verification process by reducing (1) false claims of U.S. citizenship and document fraud; (2) discrimination against employees; (3) violations of civil liberties and privacy; and (4) the burden on employers to verify employees' work eligibility.

The Basic Pilot Program provides participating employers with an electronic method to verify their employees' work eligibility. Employers may participate voluntarily in the Basic Pilot Program, but are still required to complete Forms I-9[10] for all newly hired employees in accordance with IRCA. After completing the forms, these employers query the pilot program's automated system by entering employee information provided on the forms, such as name and social security number, into the pilot Web site within 3 days of the employees' hire date. The pilot program then electronically matches that information against information in SSA and, if necessary, DHS databases to determine whether the employee is eligible to work, as shown in figure 1. The Basic Pilot Program electronically notifies employers whether their employees' work authorization was confirmed. Those queries that the DHS automated check cannot confirm are referred to DHS immigration status verifiers

---

[8] 8 U.S.C. 1324a(b). IIRIRA was enacted within a larger piece of legislation, the Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208.

[9] The other two pilot programs mandated by IIRIRA—the Citizen Attestation Verification Pilot Program and the Machine-Readable Document Pilot Program—were discontinued in 2003 due to technical difficulties and unintended consequences identified in evaluations of the programs. See Institute for Survey Research and Westat, *Findings of the Citizen Attestation Verification Pilot Program Evaluation* (Washington, D.C.: April 2003) and Institute for Survey Research and Westat, *Findings of the Machine-Readable Document Pilot Program Evaluation* (Washington, D.C.: May 2003).

[10] The Form I-9 is completed by employers in verifying the work eligibility of all newly hired employees.

who check employee information against information in other DHS databases.

**Figure 1: Basic Pilot Program Verification Process**



Source: GAO analysis based on USCIS information.

In cases when the pilot system cannot confirm an employee's work

authorization status either through the automatic check or the check by an immigration status verifier, the system issues the employer a tentative nonconfirmation of the employee's work authorization status. In this case, the employers must notify the affected employees of the finding, and the employees have the right to contest their tentative nonconfirmations by contacting SSA or USCIS to resolve any inaccuracies in their records within 8 days. During this time, employers may not take any adverse actions against those employees, such as limiting their work assignments or pay. Employers are required to either immediately terminate the employment, or notify DHS of the continued employment, of workers who do not successfully contest the tentative nonconfirmation and those who the pilot program finds are not work-authorized.

# Various Weaknesses Have Undermined the Employment Verification Process, but Opportunities Exist to Enhance It

## Current Employment Verification Process Is Based on Employers' Review of Documents

In 1986, IRCA established the employment verification process based on employers' review of documents presented by employees to prove identity and work eligibility. On the Form I-9, employees must attest that they are U.S. citizens, lawfully admitted permanent residents, or aliens authorized to work in the United States. Employers must then certify that they have reviewed the documents presented by their employees to establish identity and work eligibility and that the documents appear genuine and relate to the individual presenting them. In making their certifications, employers are expected to judge whether the documents presented are obviously counterfeit or fraudulent. Employers are deemed in compliance with IRCA if they have followed the Form I-9 process, including when an unauthorized alien presents fraudulent documents that appear genuine.

## Form I-9 Process Is Vulnerable to Document and Identity Fraud

Since passage of IRCA in 1986, document and identity fraud have made it difficult for employers who want to comply with the employment verification process to ensure they hire only authorized workers. In its 1997 report to Congress, the Commission on Immigration Reform noted that the widespread availability of false documents made it easy for

unauthorized aliens to obtain jobs in the United States. In past work, we reported that large numbers of unauthorized aliens have used false documents or fraudulently used valid documents belonging to others to acquire employment, including at critical infrastructure sites like airports and nuclear power plants.[11] In addition, although studies have shown that the majority of employers comply with IRCA and try to hire only authorized workers, some employers knowingly hire unauthorized workers, often to exploit the workers' low cost labor. For example, the Commission on Immigration Reform reported that employers who knowingly hired illegal aliens often avoided sanctions by going through the motions of compliance while accepting false documents. Likewise, in 1999 we concluded that those employers who do want to comply with IRCA can intentionally hire unauthorized workers under the guise of having complied with the employment verification requirements by claiming that unauthorized workers presented false documents to obtain employment.[12]

## The Number and Variety of Acceptable Documents Hinders Employer Verification Efforts

The large number and variety of documents that are acceptable for proving work eligibility have complicated employer verification efforts under IRCA. Following the passage of IRCA in 1986, employees could present 29 different documents to establish their identity and/or work eligibility. In a 1997 interim rule, INS reduced the number of acceptable work eligibility documents from 29 to 27.[13] The interim rule implemented changes to the list of acceptable work eligibility documents mandated by IIRIRA and was intended to serve as a temporary measure until INS issued final regulations on modifications to the Form I-9. In 1998, INS proposed a further reduction in the number of acceptable work eligibility documents to 14, but did not finalize the proposed rule.

Since the passage of IRCA, various studies have addressed the need to reduce the number of acceptable work eligibility documents to make the employment verification process simpler and more secure. For example, we previously reported that the multiplicity of work eligibility documents contributed to (1) employer uncertainty about how to comply with the

---

[11]GAO/GGD-99-33, and GAO, *Overstay Tracking: A Key Component of Homeland Security and a Layered Defense*, GAO-04-82 (Washington, D.C.: May 21, 2004).

[12]GAO/GGD-99-33.

[13]Eight of these documents establish both identity and employment eligibility (e.g., U.S. passport or permanent resident card); 12 documents establish identity only (e.g., driver's license); and 7 documents establish employment eligibility only (e.g., social security card).

employment verification requirements and (2) discrimination against authorized workers.[14] In 1998, INS noted that, when IRCA was first passed, a long inclusive list of acceptable work eligibility documents was allowed for the Form I-9 to help ensure that all persons who were eligible to work could easily meet the requirements, but as early as 1990, there had been evidence that some employers found the list confusing.

According to DHS officials, the department is assessing possible revisions to the Form I-9 process, including reducing the number of acceptable work eligibility documents, but has not established a target time frame for completing this assessment and issuing regulations on Form I-9 changes. DHS released an updated version of the Form I-9 in May 2005 that changed references from INS to DHS but did not modify the list of acceptable work eligibility documents on the Form I-9 to reflect changes made to the list by the 1997 interim rule. Moreover, DHS recently issued interim regulations on the use of electronic Forms I-9, which provide guidance to employers on electronically signing and storing Forms I-9.[15]

## The Basic Pilot Program Shows Promise to Enhance Employment Verification, but Current Weaknesses Could Undermine Increased Use

Various immigration experts have noted that the most important step that could be taken to reduce illegal immigration is the development of a more effective system for verifying work authorization. In particular, the Commission on Immigration Reform concluded that the most promising option for verifying work authorization was a computerized registry based on employers' electronic verification of an employee's social security number with records on work authorization for aliens. The Basic Pilot Program, which is currently available on a voluntary basis to all employers in the United States, operates in a similar way to the computerized registry recommended by the commission, and shows promise to enhance employment verification and worksite enforcement efforts. Only a small portion—about 8,600 as of June 2006—of the approximately 5.6 million

---

[14]GAO, *Immigration Reform: Employer Sanctions and the Question of Discrimination*, GAO/GGD-90-62 (Washington, D.C.: Mar. 29, 1990).

[15]In October 2004, Congress authorized the electronic Form I-9 to be implemented by the end of April 2005. See Pub. L. No. 108-390.

employer firms nationwide have registered to use the pilot program, and about 4,300 employers are active users.[16]

The Basic Pilot Program enhances the ability of participating employers to reliably verify their employees' work eligibility and assists participating employers with identification of false documents used to obtain employment by comparing employees' Form I-9 information with information in SSA and DHS databases. If newly hired employees present counterfeit documents, the pilot program would not confirm the employees' work eligibility because their employees' Form I-9 information, such as the false name or social security number, would not match SSA and DHS database information when queried through the Basic Pilot Program.

Although ICE has no direct role in monitoring employer use of the Basic Pilot Program and does not have direct access to program information, which is maintained by USCIS, ICE officials told us that program data could indicate cases in which employers do not follow program requirements and therefore would help the agency better target its worksite enforcement efforts toward those employers. For example, the Basic Pilot Program's confirmation of numerous queries of the same social security number could indicate that a social security number is being used fraudulently or that an unscrupulous employer is knowingly hiring unauthorized workers by accepting the same social security number for multiple employees. ICE officials noted that, in a few cases, they have requested and received pilot program data from USCIS on specific employers who participate in the program and are under ICE investigation. However, USCIS officials told us that they have concerns about providing ICE broader access to Basic Pilot Program information because it could create a disincentive for employers to participate in the program, as employers may believe that they are more likely to be targeted for a worksite enforcement investigation as a result of program participation. According to ICE officials, mandatory employer participation in the Basic

---

[16]The approximately 8,600 employers who registered to use the Basic Pilot Program do not reflect the number of worksites or individual business establishments using the program. The about 5.6 million firms in the United States was the number of firms in 2002, which is the most current data available. Under the Basic Pilot Program, one employer may have multiple worksites that use the pilot program. For example, a hotel chain could have multiple individual hotels using the Basic Pilot Program, but the hotel chain would represent one employer using the pilot program. A firm is a business organization consisting of one or more domestic establishments in the same state and industry that were specified under common ownership or control.

Pilot Program would eliminate the concern about sharing data and could help ICE better target its worksite enforcement efforts on employers who try to evade using the program. Moreover, these officials told us that mandatory use of an automated system like the pilot program, could limit the ability of employers who knowingly hired unauthorized workers to claim that the workers presented false documents to obtain employment, which could assist ICE agents in proving employer violations of IRCA.

Although the Basic Pilot Program may enhance the employment verification process and a mandatory program could assist ICE in targeting its worksite enforcement efforts, weaknesses exist in the current program. For example, the current Basic Pilot Program cannot help employers detect identity fraud. If an unauthorized worker presents valid documentation that belongs to another person authorized to work, the Basic Pilot Program would likely find the worker to be work-authorized. Similarly, if an employee presents counterfeit documentation that contains valid information and appears authentic, the pilot program may verify the employee as work-authorized. DHS officials told us that the department is currently considering possible ways to enhance the Basic Pilot Program to help it detect cases of identity fraud, for example, by providing a digitized photograph associated with employment authorization information presented by an employee.

Delays in the entry of information on arrivals and employment authorization into DHS databases can lengthen the pilot program verification process for some secondary verifications. Although the majority of pilot program queries entered by employers are confirmed via the automated SSA and DHS verification checks, about 15 percent of queries authorized by DHS required secondary verifications by immigration status verifiers in fiscal year 2004.[17] According to USCIS, cases referred for secondary verification are typically resolved within 24 hours, but a small number of cases take longer, sometimes up to 2 weeks, due to, among other things, delays in entry of data on employees who received employment authorization documents generated by a computer and

---

[17]In fiscal year 2004, only about 8 percent of total Basic Pilot Program queries were referred to DHS for verification. Of these queries referred to DHS for verification, about 85 percent were confirmed via the DHS automated verification check.

camera that are not directly linked to DHS databases.[18] Secondary verifications lengthen the time needed to complete the employment verification process and could harm employees because employers might reduce those employees' pay or restrict training or work assignments, which are prohibited under pilot program requirements, while waiting for verification of their work eligibility.[19] DHS has taken steps to increase the timeliness and accuracy of information entered into databases used as part of the Basic Pilot Program and reports, for example, that data on new immigrants are now typically available for verification within 10 to 12 days of an immigrant's arrival in the United States while, previously, the information was not available for up to 6 to 9 months after arrival.[20]

Furthermore, employer noncompliance with Basic Pilot Program requirements may adversely affect employees queried through the program. The Temple University Institute for Survey Research and Westat evaluation of the Basic Pilot Program concluded that the majority of employers surveyed appeared to be in compliance with Basic Pilot Program procedures. However the evaluation and our review found evidence of some noncompliance with these procedures, such as those that prohibit screening job applicants or limiting of employees' work assignments or pay while contesting tentative nonconfirmations. The Basic Pilot Program provides a variety of reports that may help USCIS determine whether employers follow program requirements, but USCIS officials told us that their efforts to review employers' use of the pilot program have been limited by lack of staff available to oversee and examine employer use of the program.

According to USCIS officials, due to the growth in other USCIS verification programs, current USCIS staff may not be able to complete timely secondary verifications if the number of employers using the program significantly increased. In particular, these officials said that if a significant number of new employers registered for the program or if the

---

[18]Information on employment authorization documents generated through this process is electronically sent to USCIS headquarters for entry, but is sometimes lost or not entered into databases in a timely manner. By contrast, employment authorization documents issued at USCIS service centers are produced via computers that are used to update data in USCIS databases, which USCIS officials told us represent the majority of employment authorization documents currently issued by USCIS.

[19]Institute for Survey Research and Westat.

[20]DHS, *Report to Congress on the Basic Pilot Program* (Washington, D.C.: June 2004).

program were mandatory for all employers, additional staff would be needed to maintain timely secondary verifications. USCIS has approximately 38 Immigration Status Verifiers allocated for completing Basic Pilot Program secondary verifications, and these verifiers reported that they are able to complete the majority of manual verification checks within their target time frame of 24 hours. However, USCIS officials said that the agency has serious concerns about its ability to complete timely verifications if the number of Basic Pilot Program users greatly increased.

# Competing Priorities and Implementation Challenges Have Hindered Worksite Enforcement Efforts

## Worksite Enforcement Has Been a Relatively Low Priority

Worksite enforcement is one of various immigration enforcement programs that competes for resources and among INS and ICE responsibilities, and worksite enforcement has been a relatively low priority. For example, in the 1999 INS Interior Enforcement Strategy, the strategy to block and remove employers' access to undocumented workers was the fifth of five interior enforcement priorities.[21] In that same year, we reported that, relative to other enforcement programs in INS, worksite enforcement received a small portion of INS's staffing and enforcement budget and that the number of employer investigations INS conducted each year covered only a fraction of the number of employers who may have employed unauthorized aliens.[22]

In keeping with the primary mission of DHS to combat terrorism, after September 11, 2001, INS and then ICE focused investigative resources primarily on national security cases. In particular, INS and then ICE focused available resources for worksite enforcement on identifying and removing unauthorized workers from critical infrastructure sites, such as airports and nuclear power plants, to help reduce vulnerabilities at those sites. We previously reported that, if critical infrastructure-related businesses were to be compromised by terrorists, this would pose a

---

[21]INS, *Interior Enforcement Strategy* (Washington, D.C.: Jan. 1999).

[22]GAO/GGD-99-33.

serious threat to domestic security. According to ICE, the agency adopted this focus on critical infrastructure protection because the fact that unauthorized workers can obtain employment at critical infrastructure sites indicates that there are vulnerabilities in those sites' hiring and screening practices, and unauthorized workers employed at those sites are vulnerable to exploitation by terrorists, smugglers, traffickers, and other criminals. ICE has inspected Forms I-9 and employer records at hundreds of critical infrastructure sites, including at about 200 airports as part of Operation Tarmac and at more than 50 nuclear power plants as part of Operation Glow Worm.[23] More recently, ICE announced conducting worksite enforcement operations at other critical infrastructure sites, including at an airport, chemical plants, and a water and power facility.

Since fiscal year 1999, INS and ICE have dedicated a relatively small portion of overall agent resources to the worksite enforcement program. As shown in figure 2, in fiscal year 1999 INS allocated about 240 full-time equivalents to worksite enforcement efforts, while in fiscal year 2003, ICE allocated about 90 full-time equivalents. Between fiscal years 1999 and 2003, the percentage of agent work-years spent on worksite enforcement efforts generally decreased from about 9 percent to about 4 percent.[24]

---

[23]Operations Tarmac and Glow Worm were ICE initiatives to detect and remove unauthorized workers from airports and nuclear power plants, respectively.

[24]More recent data on investigative agent work-years cannot be shared publicly.

**Figure 2: Investigative Agent Work-years Spent on Worksite Enforcement Efforts and Agent Work-years Spent on Other Investigative Areas for Each Fiscal Year from 1999 through 2003**



Source: GAO analysis of INS case management data.

Although worksite enforcement has been a low priority relative to other programs, ICE has proposed increasing agent resources for the worksite enforcement program. For example, in its fiscal year 2007 budget submission, ICE requested funding for 206 additional positions for worksite enforcement. Yet, at this point, it is unclear what impact, if any, these additional resources would have on worksite enforcement efforts.

**ICE Attributes Decline in Numbers of Employer Fine Notices and Worksite Arrests to Document Fraud and Resource Allocation Decisions**

The number of notices of intent to fine issued to employers as well as the number of unauthorized workers arrested at worksites have generally declined.[25] Between fiscal years 1999 and 2004, the number of notices of intent to fine issued to employers for improperly completing Forms I-9 or knowingly hiring unauthorized workers generally decreased from 417 to 3. (See fig. 3.)

**Figure 3: Number of Notices of Intent to Fine Issued to Employers for Each Fiscal Year from 1999 through 2004**



Source: GAO analysis of INS and ICE case management data.

The number of unauthorized workers arrested during worksite enforcement operations has also declined since fiscal year 1999. As shown in figure 4, the number of worksite arrests for administrative violations of immigration law, such as for violating the terms of a visa, declined by about 84 percent from 2,849 in fiscal year 1999 to 445 in fiscal year 2003.

---

[25]If warranted as a result of a worksite enforcement operation, ICE may issue a notice of intent to fine to an employer that specifies the amount of the fine ICE is seeking to collect from the employer. This amount may be reduced after negotiations between ICE attorneys and the employer.

**Figure 4: Number of Administrative Worksite Enforcement Arrests for Each Fiscal Year from 1999 through 2003**



Source: GAO analysis of INS case management data.

ICE attributes the decline in the number of notices of intent to fine issued to employers and number of administrative worksite arrests to various factors including the widespread availability and use of counterfeit documents and the allocation of resources to other priorities. Various studies have shown that the availability and use of fraudulent documents have made it difficult for ICE agents to prove that employers knowingly hired unauthorized workers. ICE officials also told us that employers who agents suspect of knowingly hiring unauthorized workers can claim that they were unaware that their workers presented false documents at the time of hire, making it difficult for agents to prove that the employer willfully violated IRCA.

In addition, according to ICE, the allocation of INS and ICE resources to other priorities has contributed to the decline in the number of notices of intent to fine and worksite arrests. For example, INS focused its worksite enforcement resources on egregious violators who were linked to other criminal violations, like smuggling, fraud or worksite exploitation, and de-emphasized administrative employer cases and fines. Furthermore, ICE investigative resources were redirected from worksite enforcement activities to criminal alien cases, which consumed more investigative hours by the late 1990s than any other enforcement activity. After

GAO-06-895T

September 11, 2001, INS and ICE focused investigative resources on national security cases, and in particular, focused worksite enforcement efforts on critical infrastructure protection, which is consistent with DHS's primary mission to combat terrorism. According to ICE, the redirection of resources from other enforcement programs to perform national security-related investigations resulted in fewer resources for traditional program areas like fraud and noncritical infrastructure worksite enforcement. Additionally, some ICE field representatives, as well as immigration experts, noted that the focus on critical infrastructure protection does not address the majority of worksites in industries that have traditionally provided the magnet of jobs attracting illegal aliens to the United States.

As part of the Secure Border Initiative, in April 2006 ICE announced a new interior enforcement strategy to target employers of unauthorized aliens, immigration violators, and criminal networks. Under this strategy, ICE plans to target employers who knowingly employ unauthorized workers by bringing criminal charges against them. ICE has reported increases in the numbers of criminal arrests, indictments, and convictions between fiscal years 2004 and 2005 as a result of these efforts.[26] Between fiscal years 2004 and 2005, ICE reported that the number of criminal arrests increased from 160 to 165. Furthermore, in fiscal year 2005 ICE reported that the number of criminal indictments and convictions were 140 and 127, respectively, and in fiscal year 2004 the number of indictments and convictions were 67 and 46, respectively. In addition, ICE reported arresting 980 individuals on administrative immigration violations in fiscal year 2005 as a result of its worksite enforcement efforts.

---

[26]Data from fiscal years 2004 and 2005 cannot be compared with data for previous fiscal years because the way INS agents entered data on investigations into the INS case management system differs from the way ICE agents enter such data into the ICE system. Following the creation of ICE in March 2003, the case management system used to enter and maintain information on immigration investigations changed. With the establishment of ICE, agents began using the legacy U.S. Customs Service's case management system, called the Treasury Enforcement Communications System, for entering and maintaining information on investigations, including worksite enforcement operations. Prior to the creation of ICE, the former INS entered and maintained information on investigative activities in the Performance Analysis System, which captured information on immigration investigations differently than the Treasury Enforcement Communications System.

**INS and ICE Have Faced Difficulties in Setting Fine Amounts and in Detaining Unauthorized Workers, but Have Taken Steps to Address Difficulties**

INS and ICE have faced difficulties in setting and collecting fine amounts that meaningfully deter employers from knowingly hiring unauthorized workers and in detaining unauthorized workers arrested at worksites. ICE officials told us that because fine amounts are so low, the fines do not provide a meaningful deterrent. These officials also said that when agents could prove that an employer knowingly hired an unauthorized worker and issued a notice of intent to fine, the fine amounts agents recommended were often negotiated down in value during discussion between agency attorneys and employers. The amount of mitigated fines may be, in the opinion of some ICE officials, so low that they believe that employers view the fines as a cost of doing business, making the fines an ineffective deterrent for employers who attempt to circumvent IRCA. According to ICE, the agency mitigates employer fine amounts because doing so may be a more efficient use of government resources than pursuing employers who contest or ignore fines, which could be more costly to the government than the fine amount sought.

An ICE official told us that use of civil settlements and criminal charges instead of pursuit of administrative fines, specifically in regard to noncritical infrastructure employers, could be a more efficient use of investigative resources. In 2005, ICE settled a worksite enforcement case with a large company without going through the administrative fine process. As part of the settlement, the company agreed to pay $11 million and company contractors agreed to pay $4 million in forfeitures—more than an administrative fine amount ever issued against an employer for ICE violations. ICE officials also said that use of civil settlements could help ensure employers' future compliance by including in the settlements a requirement to entire into compliance agreements, such as the Basic Pilot Program. In addition, as part of ICE's new interior enforcement strategy, the agency plans to bring criminal charges against employers who knowingly hire unauthorized workers, rather than using administrative fines to sanction employers. The practice of using civil settlements and criminal charges against employers is in the early stages of implementation; therefore, the extent to which it may help limit the employment of unauthorized workers is not yet known.

The former INS also faced difficulties in collecting fine amounts from employers, but collection efforts have improved. We previously reported that the former INS faced difficulties in collecting fine amounts from employers for a number of reasons, including that employers went out of

business, moved, or declared bankruptcy.[27] In 1998, INS created the Debt Management Center to centralize the collections process, and the center is now responsible for collecting fines ICE issued against employers for violations of IRCA, among other things. The ICE Debt Management Center has succeeded in collecting the full amount of final fines on most of the invoices issued to employers between fiscal years 1999 and 2004.[28]

In addition, ICE's Office of Detention and Removal has limited detention space, and unauthorized workers detained during worksite enforcement investigations have been a low priority for that space.[29] In 2004, the Under Secretary for Border and Transportation Security sent a memo to the Commissioner of U.S. Customs and Border Protection and the Assistant Secretary for ICE outlining the priorities for the detention of aliens. According to the memo, aliens who are subjects of national security investigations were among those groups of aliens given the highest priority for detention, while those arrested as a result of worksite enforcement investigations were to be given the lowest priority. ICE officials stated that the lack of sufficient detention space has limited the effectiveness of worksite enforcement efforts. For example, they said that if investigative agents arrest unauthorized aliens at worksites, the aliens would likely be released because the Office of Detention and Removal detention centers do not have sufficient space to house the aliens and they may re-enter the workforce, in some cases returning to the worksites from where they were originally arrested. Congress has provided funds to the Office of Detention and Removal for additional bed spaces. Yet, given competing priorities for detention space, the effect, if any, these additional bed spaces will have on ICE's priority given to workers detained as a result of worksite enforcement operations cannot currently be determined.

---

[27]GAO/GGD-99-33.

[28]The Debt Management Center issues invoices to employers for collecting fine amounts. According to ICE, multiple invoices can be issued for each final order for an employer fine, as a payment plan is typically established for employers as part of the final order for the fine amount.

[29]The Office of Detention and Removal is primarily responsible for identifying and removing criminal aliens from the United States. The office is also responsible for managing ICE's space for detaining aliens.

## Concluding Observations

Efforts to reduce the employment of unauthorized workers in the United States necessitate a strong employment eligibility verification process and a credible worksite enforcement program to ensure that employers meet verification requirements. The current employment verification process has not fundamentally changed since its establishment in 1986, and ongoing weaknesses have undermined its effectiveness. Although DHS and the former INS have been contemplating changes to the Form I-9 since 1997, DHS has not yet issued final regulations on these changes, and it has not yet established a definitive time frame for completing the assessment. We recommended that DHS set a target time frame for completing this assessment and issuing final regulations to strengthen the current employment verification process and make it simpler and more secure. Furthermore, the Basic Pilot Program shows promise for enhancing the employment verification process and reducing document fraud if implemented on a much larger scale. However, current weaknesses in pilot program implementation would have to be fully addressed to help ensure the efficient and effective operation of an expanded or mandatory pilot program, or a similar automated employment verification program, and the cost of additional resources would be a consideration. USCIS is currently evaluating the Basic Pilot Program to include, as we have recommended, information on addressing the program's weaknesses to assist USCIS and Congress in addressing possible future use of the Basic Pilot Program.

Even with a strengthened employment verification process, a credible worksite enforcement program would be needed because no verification system is foolproof and not all employers may want to comply with IRCA. ICE's focus of its enforcement resources on critical infrastructure protection since September 11, 2001, is consistent with the DHS mission to combat terrorism by detecting and mitigating vulnerabilities to terrorist attacks at critical infrastructure sites which, if exploited, could pose serious threats to domestic security. This focus on critical infrastructure protection, though, generally has not addressed noncritical infrastructure employers' noncompliance with IRCA. As a result, employers, particularly those not located at or near critical infrastructure sites, who attempted to circumvent IRCA have faced less of a likelihood that ICE would investigate them for failing to comply with the current employment verification process or for knowingly hiring unauthorized workers. ICE is taking some steps to address difficulties it has faced in its worksite enforcement efforts, but it is too early to tell whether these steps will improve the effectiveness of the worksite enforcement program and help ICE identify the millions of unauthorized workers and the employers who hired them.

This concludes my prepared statement. I would be pleased to answer any questions you and the Subcommittee Members may have.

## GAO Contact and Staff Acknowledgments

For further information about this testimony, please contact Richard Stana at 202-512-8777.

Other key contributors to this statement were Frances Cook, Michelle Cooper, Orlando Copeland, Michele Fejfar, Rebecca Gambler, Kathryn Godfrey, Eden C. Savino, and Robert E. White.

# Related GAO Products

*Social Security Numbers: Coordinated Approach to SSN Data Could Help Reduce Unauthorized Work.* GAO-06-458T. February 16, 2006.

*Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts.* GAO-05-813. August 31, 2005.

*Immigration Enforcement: Preliminary Observations on Employment Verification and Worksite Enforcement Efforts.* GAO-05-822T. June 21, 2006.

*Social Security: Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports.* GAO-05-154. February 4, 2005.

*Immigration Enforcement: DHS Has Incorporated Immigration Enforcement Objectives and Is Addressing Future Planning Requirements.* GAO-05-66. October 8, 2004.

*Overstay Tracking: A Key Component of Homeland Security and a Layered Defense.* GAO-04-82. May 21, 2004.

*Homeland Security: Challenges to Implementing the Immigration Interior Enforcement Strategy.* GAO-03-660T. April 10, 2003.

*Identity Fraud: Prevalence and Links to Alien Illegal Activities.* GAO-02-830T. June 25, 2002.

*Illegal Aliens: Significant Obstacles to Reducing Unauthorized Alien Employment Exist.* GAO/GGD-99-33. April 2, 1999.

*Immigration Reform: Employer Sanctions and the Question of Discrimination.* GAO/GGD-90-62. March 29, 1990.

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice:  (202) 512-6000<br>TDD:  (202) 512-2537<br>Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

PRINTED ON ♻ RECYCLED PAPER