

United States Government Accountability Office
Washington, DC 20548

July 11, 2006

The Honorable Jim McCrery
Chairman
Subcommittee on Social Security
Committee on Ways and Means
House of Representatives

The Honorable Jim Ramstad
Chairman
Subcommittee on Oversight
Committee on Ways and Means
House of Representatives

Subject: Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work

To lawfully work in the United States, individuals must provide identification and evidence of work authorization to their employers. Individuals who are not U.S. citizens must have authorization to work from the Department of Homeland Security (DHS). Yet individuals without these required authorizations can gain employment using fraudulent documents containing fictitious information or information that belongs to someone else or by being hired by an employer who does not follow the law. In prior GAO work on these issues, we have reported that Social Security Administration (SSA) and Internal Revenue Service (IRS) data can be useful for identity and employment eligibility verification as well as to facilitate more effective worksite enforcement. However, the use of these data has drawbacks since they contain some erroneous information and information about hundreds of thousands or even millions of U.S. citizens and work-authorized aliens. Because the confidentiality of tax data is considered crucial to voluntary taxpayer compliance, IRS is restricted under Section 6103 of the Internal Revenue Code from sharing taxpayer information with third parties except in very limited circumstances. Currently, IRS is not authorized to share taxpayers' information for worksite enforcement efforts. However, SSA is authorized to provide DHS a specific data file that contains information compiled from employer earnings reports and SSA data.

The House and the Senate are considering legislation to reform immigration laws and strengthen enforcement. As part of these deliberations, there are proposals to share earnings data with DHS for worksite enforcement. To better understand how such data could be used, the Subcommittees on Social Security and on Oversight of the House Ways and Means Committee requested that we assess DHS's use of the data it already receives from SSA and determine what changes or improvements could be made to effectively use earnings data for enforcement.

**GAO-06-814R DHS Use of Earnings Data**

In summary, sharing earnings data has the potential to assist DHS in detecting unauthorized work and enforcing immigration laws. However, DHS has not yet fully determined how it would use earnings data in a program of general worksite enforcement. As policymakers consider providing DHS additional earnings data, they should also consider how DHS would use these data and how DHS would safeguard taxpayer information. To address the subcommittees' request, we describe the earnings data that might be useful to DHS in its worksite enforcement efforts, highlighting both the benefits and the limitations associated with each source of data.

We built on prior GAO work, as cited in the attached briefing, and gathered additional information from SSA, IRS, DHS, and the Department of Health and Human Services (HHS). To determine what information is most useful to DHS and how it could be used effectively, we interviewed agency officials to obtain their perspectives on the potential benefits and limitations of using various data that provide information on unauthorized workers. We examined five datasets: SSA's Nonwork Alien File, SSA's Earnings Suspense File, HHS's National Directory of New Hires, information on income tax returns reporting wage income filed using Individual Taxpayer Identification Numbers, and DHS's current electronic employment eligibility verification program transaction data. We used this information and our analyses of the datasets to assess what specific sources could provide the most useful information consistent with DHS's needs and priorities. We assessed the barriers DHS might face in using the data as an effective tool for worksite enforcement given DHS's limited worksite enforcement resources. Because of time constraints, we did not determine the amount of additional resources DHS would have to invest in order to make these sources useful. Further, although we interviewed knowledgeable officials about the contents of these files, we did not determine the extent to which these databases actually contain information about unauthorized work. For more detailed information about our scope and methodology, see the appendix. We performed our work between October 2005 and June 2006 in accordance with generally accepted government auditing standards.

We are sending copies of this briefing to the Secretary of Homeland Security, the Commissioner of Social Security, the Commissioner of Internal Revenue, the Secretary of Health and Human Services, and other interested parties. Copies will also be made available to others upon request. In addition, the report will be available at no charge on GAO's Web site at http://www.gao.gov. Please contact us at the numbers shown below if you or your staff have any questions about this report. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this briefing.

Sincerely yours,

*[signatures]*

| | | |
|---|---|---|
| Barbara D. Bovbjerg | Richard M. Stana | Michael Brostek |
| Director, Education, Workforce, and Income Security Issues | Director, Homeland Security and Justice Issues | Director, Tax Issues Strategic Issues Team |
| (202) 512-7215 | (202) 512-8777 | (202) 512-9110 |
| bovbjergb@gao.gov | stanar@gao.gov | brostekm@gao.gov |

Enclosure

(130528)

Briefing for Congressional Staff  Page 1

# IMMIGRATION ENFORCEMENT:

## Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work

### Why GAO Did This Study

In our prior work, we have reported that certain earnings data collected by the Social Security Administration (SSA) and the Internal Revenue Service (IRS) from employers could be useful to the Department of Homeland Security (DHS) for identifying unauthorized work. The House and Senate are considering legislation to reform immigration laws and strengthen their enforcement. There are proposals to allow DHS access to earnings data to identify unauthorized workers. To better understand how such data could be used, the House Ways and Means Subcommittee on Social Security and the Subcommittee on Oversight requested that we review how DHS uses earnings data that it already receives from SSA and consider changes or improvements that could be made.

To address the subcommittees' request, we describe the earnings data that might be useful to DHS in its worksite enforcement efforts, highlighting both the benefits and the limitations associated with each source of data.

### Agency Comments

We provided a copy of this briefing to the Social Security Administration, the Internal Revenue Service, the Department of Homeland Security, and the Department of Health and Human Services. All four agencies provided technical comments, which we have incorporated as appropriate.

### Summary

Access to earnings data maintained by the Social Security Administration and by the Internal Revenue Service could help the Department of Homeland Security target the limited resources it has for worksite enforcement. A variety of databases could help identify potential unauthorized work. Each affords information about a segment of the unauthorized workforce.

Table 1: Key Characteristics of Data Sources

| Source | Description |
|---|---|
| Social Security Administration | **Nonwork Alien File** <br> This file contains earnings and demographic data for over 500,000 individuals who earned income using Social Security numbers (SSN) issued for nonwork purposes. DHS has estimated that about one-third are work authorized. |
| Social Security Administration | **Earnings Suspense File (ESF)** <br> This file contains earnings reports with names and SSNs that do not match SSA's records. Employers submitting large numbers of unmatched reports may suggest employment of unauthorized workers. However, the file includes much information about citizens, including records that are the result of errors, in addition to persons using false SSNs or SSNs belonging to others, or persons for whom the employer has no SSN. About 8 million to 11 million records are added annually, but the number of unauthorized workers is not known. |
| Department of Health and Human Services | **National Directory of New Hires (NDNH)** <br> This file contains up-to-date reports on new hires and quarterly wages on almost all workers, including U.S. citizens, for child support enforcement purposes. Over 500 million quarterly wage records and over 60 million new hire reports are entered yearly. NDNH contains only records with names and SSNs that match SSA's records. Names and SSNs that do not match are maintained separately. |
| Internal Revenue Service | **Individual Taxpayer Identification Numbers (ITINs) with Wage Income** <br> IRS could identify taxpayers who filed tax returns using an ITIN and had wage income. To be issued an ITIN, an individual must be ineligible for an SSN. About 530,000 ITIN holders submitted tax returns with wage income in 2001. IRS officials believe that almost all returns filed with ITINs claiming wages are from unauthorized workers. |
| Department of Homeland Security | **Electronic Employment Eligibility Verification Transaction Data** <br> DHS maintains transaction records of employment eligibility verification queries electronically submitted by participating employers. Under the voluntary Basic Pilot program, employers made over 900,000 queries in fiscal year 2005. If made mandatory, these data could potentially be used for worksite enforcement. |

Although there is potential benefit to sharing the information contained in these data sources, they include sensitive personal information, protected by various laws and regulations, such as the Privacy Act and the Internal Revenue Code. To be useful, each would require additional time and resources. In addition, none of the data sources is comprehensive. Each has limitations. Some limitations are shared; others are unique to the source.

### Briefing Structure

| | | |
|---|---|---|
| Background | pages | 2-3 |
| DHS's Needs and Priorities | page | 4 |
| Privacy Legislation | page | 5 |
| Potential Earnings Data Sources | page | 6 |
|    Nonwork Alien File | page | 7 |
|    Earnings Suspense File | page | 8 |
|    National Directory of New Hires | page | 9 |
|    Individual Taxpayer Identification Numbers with Wage Income | page | 10 |
|    Electronic Employment Eligibility Verification Transaction Data | page | 11 |
| Concluding Observations | page | 12 |
| **Appendix:** Scope, Methodology, Contributors | page | 13 |

# Background



Figure 1: Flow of Earnings Data Collection

To verify employment eligibility, workers must provide
- Proof of identity
- Proof of U.S. citizenship or work authorization

Employers gather information about workers using
- I-9 Employment Eligibility Verification
- W-4 Employee's Withholding Allowance Certificate

Employers report name, SSN, and address upon hire and wages on a quarterly basis to designated state agencies
- Quarterly Wage Reports
- W-4 Data
→ State Workforce Agency → State Directory of New Hires → National Directory of New Hires

At year end, employers send
- W-2 Wage and Tax Statement → SSA

worker sends
- IRS 1040 US Individual Income Tax Return
- W-2 copy
→ IRS

Sources: GAO and Art Explosion.
Note: State workforce agencies also supply information on unemployment insurance to NDNH.

## Background

To lawfully work in the United States, individuals are required to provide identification and evidence of work authorization to their employers. Individuals who are not U.S. citizens must have authorization to work from DHS. Information about work authorization is gathered using DHS's Employment Eligibility Verification Form I-9, which requires that employers verify the identity and employment eligibility of newly hired workers. DHS is testing electronic employment verification through its statutorily mandated Basic Pilot program, a voluntary program through which participating employers electronically verify newly hired employees' work eligibility by checking information maintained in SSA and DHS databases. As of June 2006, about 9,300 employers have registered to use the Basic Pilot. Pending immigration reform legislation would require mandatory participation in this program for all employers.

Employers are also obligated to gather and report information about their workers to state and federal agencies upon hiring them and periodically thereafter. This information is used to administer tax and social security programs and to enforce child support laws. Information gathered for tax withholding purposes is collected on the IRS Form W-4, Employee's Withholding Allowance Certificate. Information on wages paid to workers is reported to the SSA annually on the IRS's Form W-2, Wage and Tax Statement. Some of this information is also collected for the National Directory of New Hires (NDNH), which was created by Congress to assist in establishing and enforcing child support orders. Within 20 days after hiring a new worker, employers are required to report the name, SSN, and address provided on the W-4 to a designated state agency that maintains a state directory of new hires. The state, in turn, is required to report this information to the National Directory within 3 days of entry into the state directory. Employers also submit quarterly wage statements to state workforce agencies, and this information is added to the NDNH. Periodic statements on persons who have applied for or received unemployment benefits are also supplied to the National Directory by state workforce agencies. The Office of Child Support Enforcement at the U.S. Department of Health and Human Services maintains this directory, and SSA's National Computer Center houses it.

At the end of the calendar year, employers report wages to SSA using Form W-2, and individuals file their income tax returns with IRS using IRS Form 1040, US Individual Income Tax Return. IRS requires a unique taxpayer identification number, such as an SSN, to process any tax return or tax-related document. In certain limited situations, SSA issues SSNs to noncitizens for nonwork purposes. A 1996 law requires SSA to provide DHS an annual electronic file listing persons who have earnings but who were issued an SSN for nonwork purposes. Noncitizens that are not eligible to obtain an SSN but require a taxpayer identification number for tax-processing purposes may obtain Individual Taxpayer Identification Numbers (ITINs) from IRS. Although precise data have not been compiled, Treasury's Office of the Inspector General has estimated that hundreds of thousands of ITINs have been issued to noncitizens who may not be authorized to work but subsequently earn wage income.

# Background

As SSA posts earnings to workers' Social Security records through various automated processes, reports with names and SSNs that do not match SSA's records and cannot be identified are placed in the Earnings Suspense File (ESF), remaining there until they can be linked to a valid SSN and name. In the past, we have noted that a small percentage of employers were responsible for a disproportionate percentage of the unidentified earnings reports. Some records are posted to the ESF when, for example, employers use the same SSN for multiple workers in a single tax year, submit invalid SSNs, or submit incomplete information. Employers are instructed to enter all zeros for the SSN if the worker has applied for a card but the number is not received in time for filing. These records, if not changed later, would also be posted to the ESF.

**Figure 2: Earnings Data Collection and Reporting**



Sources: GAO and Art Explosion.

[a] Electronic employment eligibility verification is currently operating as the Basic Pilot program, which is voluntary for employers, but under immigration reform bills under consideration, it could become mandatory.

# DHS's Needs and Priorities

## Past DHS Enforcement Efforts

We have reported that consistent with DHS's mission to combat terrorism, after September 11, 2001, the department focused its worksite enforcement resources on removing unauthorized workers from critical infrastructure sectors. As a result, worksite enforcement for noncritical infrastructure has been a relatively low priority for DHS. For example, the number of administrative worksite arrests declined from 2,849 in fiscal year 1999 to 445 in fiscal year 2003. Between fiscal years 1999 and 2003, the percentage of agent work-years spent on worksite enforcement efforts generally decreased from about 9 percent to about 4 percent.

Although SSA was required by law to provide DHS with an annual listing of persons who have earnings but who have an SSN issued for nonwork purposes, DHS has so far made little use of this information for worksite enforcement. According to DHS officials, until 2005 the data came from SSA in an electronic format that was incompatible with their systems. Although DHS has overcome the technical impediments, DHS officials remain concerned that these earnings data are outdated and that many listed individuals may have become work authorized. In addition, officials said that this source may not help DHS agents prove that employers knowingly hired unauthorized workers because all of the individuals in the file have valid name and SSN combinations.

## DHS's Current Goals and Enforcement Priorities

While DHS's worksite enforcement efforts continue to focus mainly on detecting unauthorized workers in critical infrastructure sectors, in April 2006, DHS announced a new interior enforcement strategy to complement border security efforts. This strategy expands efforts to target employers of unauthorized workers, immigration violators, and criminal networks that support illegal immigration and bring criminal charges against them, rather than relying on penalizing these employers through use of administrative monetary fines. According to DHS, for 2005 DHS increased its worksite enforcement efforts, with criminal worksite arrests increasing from 160 in 2004 to 176 in 2005, and the number of criminal convictions increasing from 87 to 160 over the same time period.

DHS has proposed increasing agent and support resources by 206 positions for all of its worksite enforcement efforts in 2007 to increase investigations of employers who hire significant numbers of unauthorized workers. To help target such employers and help address SSN abuses that allow unauthorized workers to illegally obtain employment, DHS has requested new statutory authority to access additional earnings data from SSA. Various immigration reform proposals would provide additional resources for enforcement. The immigration reform bill that the Senate passed in May 2006 provides DHS with access to some earnings data for worksite enforcement purposes.

## DHS's Current Data Needs

According to DHS officials, they have not yet fully determined what their future data needs under a mandatory electronic employment eligibility verification system might be. Regardless of whether or not electronic verification becomes mandatory, DHS officials said that access to a list of employers who submit large numbers of inaccurate records could be helpful. This list would include certain employers who have been sent letters indicating that names and SSNs on earnings reports could not be matched to SSA records. DHS officials believe that these data could provide investigative leads on employers who may be engaged in illegal employment activities. In addition, because this dataset includes employers who have been notified of such mismatches, it may help agents demonstrate that employers have knowingly continued to employ unauthorized workers, although they have been apprised of such mismatches.

DHS officials also told us that they have been analyzing earnings information that DHS already receives to determine how this information might best be used. For example, DHS is attempting to match the information with other databases that contain information on criminal noncitizens. However, they have not determined how useful the data might be and are continuing to further explore their potential usefulness.

# Privacy Legislation

### Privacy-Related Legislation

- **The Privacy Act of 1974** regulates the government's use of information by limiting the collection, disclosure, and use of personal information maintained in agencies' systems of records.

- **Internal Revenue Code Section 6103**, as amended by the Tax Reform Act of 1976, governs sharing of taxpayer information. The law provides that tax returns and taxpayer information are confidential and may not be disclosed or shared except under limited circumstances.

- **The Computer Matching and Privacy Protection Act of 1988** protects personal information by requiring agencies to enter into written agreements, referred to as matching agreements, when they share information protected by the Privacy Act of 1974 for the purpose of conducting computer matches.

- **The E-Government Act of 2002** strives to enhance protection for personal information in government information systems or information collections by requiring that agencies conduct privacy impact assessments.

### Related GAO Reports

*Privacy: Key Challenges Facing Federal Agencies*. GAO-06-777T. Washington, D.C.: May 17, 2006.

*Personal Information: Agency and Reseller Adherence to Key Privacy Principles*. GAO-06-421. Washington, D.C.: April 4, 2006.

### Data-Sharing Concerns

Advances in information technology make it easier than ever for the federal government to obtain and process personal information about citizens and resident noncitizens in many ways and for many purposes. Federal agencies are increasingly using data sharing to help verify data provided by applicants for government programs or benefits, or to make eligibility decisions. In some cases, data sharing is required by statute. Although such data-sharing arrangements can be useful, several laws and regulations govern the collection, use, and sharing of individuals' taxpayer identifying information. These laws combine to protect sensitive taxpayer identifying data but also provide a structure that allows data to be shared in certain limited instances.

Increased data-sharing could provide DHS with detailed information to use in conducting worksite enforcement. Specifically, various forms of earnings data may provide leads to assist DHS in identifying unauthorized workers or companies participating in fraudulent employment practices. For example, in 1996 Congress required SSA to share certain earnings information with DHS. These arrangements have both benefits and drawbacks. For example, we have reported IRS's concerns that additional disclosure of information in its files could affect taxpayers' willingness to voluntarily comply with tax laws. Specifically, IRS officials have expressed concerns that if information on unauthorized workers is shared with DHS, some unauthorized workers may move into underground jobs and avoid their tax obligations.

As one of the largest repositories of personal information, IRS is often at the center of concerns over the sharing of sensitive personal identifying data. Because the confidentiality of tax data is considered crucial to voluntary taxpayer compliance, IRS is restricted under Section 6103 of the Internal Revenue Code from sharing taxpayer information with third parties, including other government agencies, except in very limited circumstances. Currently, IRS is not authorized to share taxpayers' information for worksite enforcement efforts. However, SSA is authorized to provide DHS a specific data file that contains certain information compiled from employer earnings reports and SSA data. A statutory exemption to Section 6103 would be required for DHS to obtain broad access to taxpayer information.

Some privacy advocates have expressed concern that expanded sharing of some data may conflict with fundamental privacy principles contained in the Privacy Act, specifically that data acquired for one purpose may not be used for a different purpose without public notification or an individual's consent.

# Potential Earnings Data Sources

## Potential Data Sources

**Nonwork Alien File**
Earnings reports for Social Security numbers issued for nonwork purposes.

**Earnings Suspense File**
Earnings reports with names and SSNs that do not match SSA's records.

**National Directory of New Hires**
Employer reports of all new hires and quarterly wages to state directories of new hires and state workforce agencies.

**Individual Taxpayer Identification Numbers with Earnings from Wages**
Information from tax returns submitted by taxpayers who were not authorized to obtain an SSN, were issued an ITIN, and reported earnings from wages.

**Electronic Employment Eligibility Verification Transaction Data**
Employment eligibility verification queries submitted by employers.

## Overview of Earnings Data Sources

While each data source can provide useful leads for detecting unauthorized work, each source affords information on only a segment of this population. There are various ways in which unauthorized workers obtain employment without the proper documentation, including
- using a nonwork SSN for work or working after authorization expires;
- making up an SSN or using another individual's SSN but not the corresponding name;
- using another person's valid name and SSN combination;
- working for cash without an SSN; or
- using an ITIN as an SSN.

As figure 3 shows, each data source can reveal different types of unauthorized work (shown inside the shaded area), but none is comprehensive. A portion of unauthorized work, such as work done using someone else's valid name and SSN combination (identity theft) or unreported work, is not easily detected using these data.

**Figure 3: Availability of Data on Unauthorized Work in Selected Data Sources**



Sources: GAO and Art Explosion.
Note: Sizes of circles are not to scale. The chart includes instances of both identity theft and the fraudulent use of invalid name/SSN combinations. The use of someone else's valid name and SSN combination (with or without permission) is referred to as identity theft. While other databases may contain earnings information for persons using some information belonging to others, such fraudulent use is easier to detect in these databases because the records may contain someone else's name or SSN, but not both together.

Because these earnings data were not developed to identify unauthorized work, they often lack key enforcement information. As a result, each source contains data that are incomplete or outdated. The information in the files can also be misleading. The mere fact that an earnings report appears in one of these files is not necessarily indicative that an unauthorized worker is associated with the report. Additional investigation would be required to determine whether unauthorized work actually occurred.

# Potential Earnings Data Sources

## Features

**Description**
Earnings reports for persons issued SSNs for nonwork purposes.

**Responsible Agency**
SSA.

**Information Sources**
Employer reports (W-2) and income tax returns (1040) for self-employed are supplemented with demographic information on each SSN holder.

**Persons Included**
Persons issued nonwork SSNs, who have reported earnings. Includes some persons who are authorized to work but have not changed their work status in SSA's records.

**Information Included**
Worker's name, SSN, address, other identifying information; employer, employer identification number, employer's address, earnings amounts.

**Size**
Over 500,000 unique SSNs per year.

**Time Frame**
Provided yearly to DHS about 13 months after end of the tax year.

### Related GAO Reports

*Social Security Numbers: Coordinated Approach to SSN Data Could Help Reduce Unauthorized Work.* GAO-06-458T. Washington, D.C.: February 16, 2006.

*Social Security: Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports.* GAO-05-154. Washington, D.C.: February 4, 2005.

*Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts.* GAO-05-813. Washington, D.C.: August 31, 2005.

## Nonwork Alien File

SSA's Nonwork Alien File can be used to identify persons who have SSNs that were issued for nonwork purposes but have earnings. Since 1982, when SSA began issuing cards indicating they are not valid for employment, SSA has issued over 7 million individuals an SSN for nonwork purposes, and over 500,000 of these persons have earnings posted in the file each year. Since 2002, the number of SSNs issued for nonwork purposes has fallen to 15,000 per year. Although SSA is required by a 1996 statute to provide DHS access to this file annually, DHS has so far made limited use of this information. DHS officials told us they did not have the ability to read the information until 2005 and they are uncertain the data are useful for law enforcement purposes. Because some of SSA's information on immigration status is outdated, the file currently includes a significant number of individuals who received work authorization but have not corrected their SSA record. If supplemented with more up-to-date information on immigration status from DHS, the Nonwork Alien File could be made more useful for worksite enforcement purposes.

**Potential Benefits**
- The file is narrowly targeted. It includes information about workers who have been issued nonwork SSNs but are working.
- DHS could focus on employers with large numbers of records or on individual workers.
- The file is produced using records from one tax year, which allows DHS to focus on persons working in the most recent tax year.
- SSA has statutory authority to share this information with DHS.

**Potential Limitations**
- Immigration status is not up to date, as work authorization status of many listed individuals may have changed since obtaining their nonwork SSNs. On the basis of two samples—one random, one judgmental—and transaction data from the electronic employment eligibility verification system, DHS has estimated that approximately one-third of the persons in the file have become work authorized. Updating immigration status in the SSA database is challenging because of the lack of a common identifier between SSA and DHS databases.
- Form W-2 data filed with SSA and Form 1040-series returns filed with IRS are generally not submitted until after the close of the year, and undergo another year of processing before being shared with DHS.
- DHS officials believe that this source may not help prove that employers knowingly hired unauthorized workers because the individuals in the file have valid name and SSN combinations.
- The file would not include workers using fictitious SSNs or name and SSN combinations that do not match SSA's data because the file was created to identify only persons known to have been issued nonwork numbers.
- Employers' addresses from W-2 reports cannot always be used to determine whether certain individuals are working at specific worksites or to identify suspicious patterns based on worksites, as addresses are not necessarily worksite specific. DHS officials acknowledged this limitation, but still believed that use could be made of these data.
- Includes sensitive taxpayer information—1996 statue provides DHS access to this file annually.

# Potential Earnings Data Sources

| Features | Earnings Suspense File |
|---|---|

**Description**
Earnings reports with names and SSNs that do not match SSA's records.

**Responsible Agency**
SSA.

**Information Source**
Employer reports (W-2).

**Persons Included**
Persons whose names are inconsistent with SSA's records due to errors or obsolete data; persons using false SSNs or SSNs belonging to others with an incorrect name; and persons for whom the employer has no SSN.

**Information Included**
Worker's name, SSN; employer's identification number, and earnings amount.

**Size**
255 million records as of 2005. In recent years, 8 million to 11 million new records have been added per year.

**Time Frame**
Cumulative from 1937.
Processing is finished 21-22 months after the end of the tax year.

### Related GAO Reports

*Social Security: Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports.* GAO-05-154. Washington, D.C.: February 4, 2005.

*Tax Administration: IRS Needs to Consider Options for Revising Regulations to Increase the Accuracy of Social Security Numbers on Wage Statements.* GAO-04-712. Washington, D.C: August 31, 2004.

SSA's Earnings Suspense File is a large, cumulative file that could be used to identify employers who consistently submit large numbers or percentages of invalid name and SSN combinations, an indication that they may be disregarding laws. Because, by definition, the records in the file cannot be assigned to an individual's Social Security record, the portion of these earnings that represent unauthorized work is unknown. Reinstatements, which are previously unidentified records from the ESF that are later credited or "reinstated" to an individual's Social Security record, provide some indication of the types of persons whose records are in the ESF. The number of reinstatements to probable unauthorized workers is growing, but our prior work has shown that most reinstatements are still made to U.S.-born citizens. This is an indication that a significant number of earnings reports in the ESF still belong to U.S. citizens and work-authorized noncitizens. DHS is seeking access to a list of employers sent "no match" letters indicating a certain number of names and SSNs on earnings reports submitted could not be matched to SSA records. In one of many efforts to match earnings information to individual records, SSA sends letters to employers who submit a wage report containing more than 10 Forms W-2 that SSA cannot process and in which the mismatches represent more than 0.5 percent of the total Forms W-2 in the employer's submitted wage report.

**Potential Benefits**
- Could allow DHS to focus on employers who appear most likely to be disregarding the laws—records in the ESF could be the result of SSN misuse or unauthorized work activities, such as hiring persons with no SSN, fictitious SSNs, or SSN and name combinations that do not match SSA's records.
- Provides historical information—allows DHS to focus on employers who repeatedly submit large numbers of unmatched reports year after year.

**Potential Limitations**
- Does not contain information about immigration status.
- Contains information about many U.S. citizens as well as noncitizens—the overall percentage of unauthorized workers is unknown.
- Contains information on persons whose information does not match SSA's records, sometimes for unintentional reasons.
- Employers are instructed to submit earnings reports using all zeros if an individual's SSN is not available.
- Employers' addresses are not included once the earnings report is posted to the ESF, but could potentially be added.
- Listing employers by number of records in file could be misleading. For example, an employer with 35 different employer identification numbers in more than 10 states may appear lower on a list of employers by number of records in the file than an employer with fewer identification numbers.
- Includes sensitive taxpayer information that is protected by various laws and regulations—requires statutory authority to provide DHS access.

# Potential Earnings Data Sources

## Features

**Description**
Employers report all new hires and quarterly wages to state new hire directories and workforce agencies.

**Responsible Agency**
Office of Child Support Enforcement, Department of Health and Human Services.

**Information Sources**
W-4 information, quarterly wage reports, and state unemployment insurance records.

**Persons Included**
Persons whose name and SSN match SSA's records.

**Information Included**
Worker's name, SSN, address; employer, employer's identification number, address; quarterly wages, unemployment insurance receipt.

**Size**
Over 500 million quarterly wage reports and over 60 million new hire reports annually.

**Time Frame**
Updated continuously—earnings reports added quarterly.

## Related GAO Reports

*Improper Payments: Federal and State Coordination Needed to Report National Improper Payment Estimates on Federal Programs.* GAO-06-347. Washington, D.C.: April 14, 2006.

*Disability Insurance: SSA Should Strengthen Its Efforts to Detect and Prevent Overpayments.* GAO-04-929. Washington, D.C.: September 10, 2004.

*Unemployment Insurance: Increased Focus on Program Integrity Could Reduce Billions in Overpayments.* GAO-02-697. Washington, D.C.: July 12, 2002.

## National Directory of New Hires

The Department of Health and Human Services' National Directory of New Hires contains more up-to-date employment information than the other data sources and could be used to supplement the Nonwork Alien File by providing more recent earnings and employment information. However, because it does not contain information on work authorization status, supplemental information would be required to make the NDNH useful for identifying unauthorized work. SSA's records contain information related to citizenship and work authorization status, but we have previously reported that SSA's information on work authorization status is not up to date. Since its creation, Congress has authorized use of NDNH data by certain other federal and state agencies for specific purposes other than child support. For example, the Department of Education uses the data to locate persons delinquent in their student loan payments. State workforce agencies have access to determine whether unemployment insurance beneficiaries are working. IRS has access to the NDNH to verify a claim of employment in a tax return and to verify claims for the Earned Income Tax Credit. SSA has access to help it administer its Supplemental Security Insurance and Old-Age, Survivors, and Disability Insurance programs.

**Potential Benefits**
- The database includes employer reports of hiring, if the name and SSN match SSA's records, and wages paid to most workers. Names and SSNs that do not match SSA's records are maintained in a separate file, similar to SSA's ESF.
- The database includes information that is much more current than information in other databases—earnings based on quarterly wage files, which may be only a few months old.

**Potential Limitations**
- Does not contain information about immigration status and cannot be used alone for immigration enforcement purposes. The file would need supplemental data to be useful for identifying unauthorized work, but supplementing data with up-to-date DHS immigration status would be challenging. SSA's work authorization data could be added, but these data are not up-to-date.
- Employers' addresses from W-4 records cannot always be used to determine whether certain individuals are working at specific worksites or to identify suspicious patterns based on worksite, as addresses are not necessarily worksite specific. Although DHS has not seen the NDNH data, DHS officials acknowledged this limitation of employer addresses in general and believed that use could be made of earnings data containing employers' addresses.
- Includes sensitive information that is protected by statute—requires statutory authority to provide DHS access.

# Potential Earnings Data Sources

## Features

**Description**
Information from tax returns submitted by ITIN holders with reported wages.

**Responsible Agency**
IRS.

**Information Source**
Annual income tax returns.

**Persons Included**
Persons who have been issued an ITIN and submit a tax return claiming wage income.

**Information Included**
Worker's name, address, and earnings in the last tax year.

**Size**
About 530,000 in tax year 2001.

**Time Frame**
Yearly income tax returns. Initial processing is finished 6 months after the end of the tax year.

## Related GAO Reports

*Internal Revenue Service: Individual Taxpayer Identification Numbers Can Be Improperly Obtained and Used.* GAO-04-529T. Washington, D.C.: March 10, 2004.

*Tax Administration: IRS Needs to Consider Options for Revising Regulations to Increase the Accuracy of Social Security Numbers on Wage Statements.* GAO-04-712. Washington, D.C.: August 31, 2004.

*Taxpayer Information: Options Exist to Enable Data Sharing between IRS and USCIS, but Each Presents Challenges.* GAO-06-100. Washington, D.C.: October 11, 2005.

## Individual Taxpayer Identification Numbers with Wage Income

Income tax returns filed using Individual Taxpayer Identification Numbers that report wage income could provide a targeted list of unauthorized workers. Although precise data have not been compiled, hundreds of thousands of aliens with ITINs earn wage income. In March 2004, we reported that IRS and the Treasury Inspector General for Tax Administration have concluded that most of the taxpayers who file tax returns with ITINs are unauthorized workers. Because such a list could be compiled only from individual income tax returns, using this information for enforcement could provide a disincentive to comply with income tax filing requirements.

Table 2: Characteristics of Tax Returns Filed Using ITINs and Reporting Wages

| Category | Tax year 2000 | Tax year 2001 | % change |
|---|---|---|---|
| Individual income tax returns (Form 1040) | 353,000 | 530,000 | 50% |
| Paper filed Forms 1040 | 309,000 | 444,000 | 44% |
| Electronically filed[a] Forms 1040 | 44,000 | 86,000 | 95% |

Source: Treasury Inspector General for Tax Administration

[a] According to IRS officials, IRS does not accept Forms 1040 filed electronically if the SSN on the W-2 does not match the SSN on the 1040 (in this case, the ITIN on the 1040). The Treasury Inspector General for Tax Administration reported that some individuals and tax preparation programs were replacing the SSN on the W-2 with the ITIN.

**Potential Benefits**
- ITINs are issued only to individuals unable to obtain an SSN, but who need a taxpayer identification number for tax purposes. Such persons are generally not eligible to work in the United States.
- Although estimates are not precise, the Treasury Inspector General for Tax Administration has concluded that hundreds of thousands of tax returns filed with ITINs each year likely involve unauthorized workers.
- IRS officials believe that almost all ITIN holders whose wages are reported on Form W-2 are improperly using fabricated SSNs or SSNs belonging to other people.

**Potential Limitations**
- IRS does not regularly generate a listing of ITIN holders with earnings.
- Data are not current, as information is derived from income tax returns.
- Information on employer names and addresses is not readily available to be included, as these items are not collected during processing of tax returns. If employer addresses were collected, these cannot always be used to target specific worksites, as addresses are not necessarily worksite specific. Although DHS has not seen the ITIN data, DHS officials acknowledged this limitation of employer addresses in general, and believed that use could be made of employer addresses.
- Offers information on the segment of the unauthorized workforce that files tax returns. Confidentiality of tax data is considered to be fundamental to taxpayers' willingness to report their tax obligations accurately. To the extent that ITIN holders become aware of greater sharing of information by IRS with other agencies, some of them may move into underground jobs and avoid their tax obligations.
- Includes sensitive taxpayer information that is protected by various laws and regulations—requires statutory authority to provide DHS access.

# Potential Earnings Data Sources

## Features

**Description**
Employment eligibility verification queries submitted by participating employers.

**Responsible Agencies**
DHS and SSA.

**Information Source**
Employer submissions based on information from Form I-9.

**Persons included**
Currently, persons whose employers participated in the Basic Pilot program. If the program becomes mandatory, all workers whose employers are required to participate.

**Information Included**
Worker's name, SSN, date of birth, citizenship status, hire date, Alien Number (if applicable), employer, and status of query.

**Size**
As of June 2006, about 9,300 employers have registered for the program, and those employers who actively used the program submitted over 900,000 queries in fiscal year 2005. If it became mandatory, 5 million to 6 million employers would be required to participate.

**Time Frame**
Employer submissions are ongoing
*Immigration Enforcement:*

## Related GAO Reports

*Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts.* GAO-05-813. Washington, D.C.: August 31, 2005.

*Immigration Enforcement: Preliminary Observations on Employment Verification and Worksite Enforcement Efforts.* GAO-05-822T. Washington, D.C.: June 21, 2005.

## Electronic Employment Eligibility Verification Transaction Data

Transaction data from employer queries of an electronic employment eligibility verification system could be mined for patterns suggesting unauthorized work. Under the current voluntary Basic Pilot program, transaction data are rarely shared with enforcement agents. If the program remains voluntary and the data are used for worksite enforcement purposes, U.S. Citizenship and Immigration Services officials are concerned that such use could create a disincentive for employers to participate. If electronic verification becomes mandatory, the transaction data could provide more comprehensive information that is potentially more useful for worksite enforcement.

**Potential Benefits**
- Patterns suggesting unauthorized work could be detected in employer queries. For example, employers submitting the same name and SSN multiple times or many employers submitting the same name and SSN.
- Use of transaction data could limit the ability of employers who knowingly hired unauthorized workers to claim that the workers presented false documents to obtain employment, assisting DHS's Immigration and Customs Enforcement agents in proving that employers knowingly hired unauthorized workers.

**Potential Limitations**
- Although the potential impact of mandatory electronic employment eligibility verification on identity fraud is not clear, as it becomes more difficult for undocumented workers to find work without a name and SSN that match DHS's and SSA's records, there could be an increase in identity fraud.
- To ensure that all employers have registered to use the mandatory system, DHS would need a listing of all employers. One version of proposed legislation requires that SSA provide DHS a listing of all employers who have not registered to participate in electronic employment eligibility verification but have submitted earnings reports.
- Investigative resources are needed to follow up on worksite leads, and these resources may not be available in appropriate numbers once electronic verification becomes mandatory.
- Query patterns that appear to suggest unauthorized work can be misleading. For example, one suggestion for using the Basic Pilot transaction data was to detect potential cases of identity fraud by investigating instances suggesting fraudulent use of SSNs. One pattern that suggests unauthorized work is the submission of the same SSN by multiple employers. However, there might be valid reasons, including one person holding multiple part-time jobs at the same time or one person holding multiple jobs sequentially—like a transient construction worker. SSA officials gave us examples of longshoremen or construction workers bringing in stacks of W-2s for 1 year when applying for retirement benefits. DHS officials acknowledged this limitation, but stated that they would likely use the data only when the number of multiple uses was significant. This limitation could also be resolved by requiring workers to provide additional information to establish identity.

# Concluding Observations

## Concluding Observations

It is DHS's responsibility to enforce the nation's immigration laws. SSA, IRS, HHS, and DHS collect a wealth of earnings data, work authorization data, or both that could be mined to help detect unauthorized work and enforce immigration laws. These data are potentially useful whether or not immigration reform is enacted. If mandatory electronic employment verification is enacted, earnings data may be useful to determine whether employers are complying with verification requirements. Each data source presents both benefits and limitations, and their usefulness to DHS is not yet entirely clear. DHS officials believe that information from the Earnings Suspense File might be more useful for identifying employers of unauthorized workers than the information it currently receives, but no one data source provides a full picture of unauthorized work.

While our prior work notes the benefits of earnings information for detecting unauthorized work, additional disclosure of earnings information should be carefully weighed against the various drawbacks—especially privacy considerations. All of the data sources have information that could potentially provide false leads. IRS has expressed concerns that additional disclosure of sensitive taxpayer data could affect taxpayers' willingness to voluntarily comply with tax laws. All of the files contain sensitive personal information, including information on U.S. citizens. Providing earnings data to DHS could involve divulging information about hundreds of thousands or even millions of U.S. citizens and work-authorized aliens.

Data-sharing has potential to assist DHS in detecting unauthorized work and enforcing immigration laws, but as Congress considers providing DHS additional earnings data, it might consider how DHS will use particular data elements in a program of general worksite enforcement. Specifically, policymakers might also usefully consider the following questions:
- What information does DHS believe would be most useful?
- How would DHS use these data in a program of general worksite enforcement?
- What steps would DHS take to safeguard personal information and protect it from misuse?
- Would DHS require entire earnings files or could SSA or IRS provide some limited, well-defined subset of information from the files?
- Is information from one file sufficient, or would information from multiple files provide more comprehensive information?
- Would it be beneficial to provide the information on a trial basis for evaluation purposes?
- Given its limited resources, how useful might data with high potential for false leads be to DHS?
- Do the benefits of identifying potential unauthorized workers outweigh the costs of potentially decreased employer compliance with reporting requirements and loss of privacy for U.S. citizens?
- To what extent, if any, would additional data sharing be needed if mandatory electronic employment verification is enacted?

# Appendix

## Contributors

If you have any questions concerning this briefing, please call Barbara Bovbjerg, Director, Education, Workforce, and Income Security Issues, at (202) 512-7215; Michael Brostek, Director, Tax Issues, Strategic Issues Team, (202) 512-9110; or Richard Stana, Director, Homeland Security and Justice Issues, at (202) 512-8777.

Other key contributors to this report were Blake Ainsworth, Lara Laufer, Jeff Bernstein, Susan Bernstein, Rebecca Gambler, and Paul Wright.

## Scope and Methodology

To provide information about potential uses of earnings data in DHS's worksite enforcement efforts, we gathered information from SSA, IRS, DHS, HHS, and past GAO work on the datasets that might provide information on employers hiring unauthorized workers. Building on work by the SSA Office of the Inspector General and DHS, we assessed past and potential uses of these datasets. To determine what information is most useful to DHS, we interviewed DHS officials to understand what they hoped to obtain from various files and how this information would serve enforcement priorities. We also obtained SSA's and IRS's perspectives on the feasibility of various options. We used this information and our analyses of the datasets to assess what specific sources would provide the most useful information consistent with DHS's needs and priorities. To understand how DHS could use the data effectively, we interviewed DHS officials about their experiences with files they have access to, the barriers DHS might face in using other files, and specific technical or resource requirements that may help or hinder this effort. We also discussed what, if anything, could be done to change either the process for sharing earnings data or the specific content of the file itself to make it a more effective tool for DHS's enforcement priorities and limited worksite enforcement resources. To understand how statutory prohibitions on sharing sensitive taxpayer information are appropriately addressed, we worked with our counsel and relevant agency counsel.

We examined five datasets: SSA's Nonwork Alien File, SSA's Earnings Suspense File, HHS's National Directory of New Hires, IRS's information on income tax returns reporting wage income filed using Individual Taxpayer Identification Numbers, and DHS's current electronic employment eligibility verification program transaction data—collected in the voluntary Basic Pilot program. We used prior GAO work, reviewed technical documents, and interviewed agency officials about these files' technical content and the feasibility of using this information to target enforcement.

Because of time constraints, we did not determine the amount of additional time and resources DHS would have to invest in order to make these sources useful. Further, we did not determine the extent to which these databases actually contain information about unauthorized work. However, we interviewed knowledgeable officials about the contents of these files.

We performed our work between October 2005 and June 2006 in accordance with generally accepted government auditing standards.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| Order by Mail or Phone | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone: Voice: (202) 512-6000<br>                  TDD:   (202) 512-2537<br>                  Fax:   (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

PRINTED ON RECYCLED PAPER