1  Stephen P. Berzon (SBN 46540)
   Scott A. Kronland (SBN 171693)
2  Jonathan Weissglass (SBN 185008)
   Linda Lye (SBN 215584)
3  Danielle E. Leonard (SBN 218201)
   ALTSHULER BERZON LLP
4  177 Post Street, Suite 300
   San Francisco, CA 94108
5  Telephone: (415) 421-7151
   Facsimile: (415) 362-8064
6  Email: skronland@altshulerberzon.com
   Email: llye@altshulerberzon.com
7  Email: dleonard@altshulerberzon.com

8  *Attorneys for Plaintiffs*

9  Jonathan P. Hiatt (SBN 63533)
   James B. Coppess (*Pro Hac Vice* Application forthcoming)
10 Ana L. Avendaño (SBN 160676)
   AFL-CIO
11 815 Sixteenth Street, N.W.
   Washington, D.C. 20006
12 Telephone: (202) 637-5053
   Facsimile: (202) 637-5323
13 Email: aavendan@aflcio.org

14 *Attorneys for Plaintiff AFL-CIO*

15 (Counsel list continued on next page)

16                    UNITED STATES DISTRICT COURT

17                  NORTHERN DISTRICT OF CALIFORNIA

18 AMERICAN FEDERATION OF LABOR AND          ) Case No. _____
   CONGRESS OF INDUSTRIAL ORGANIZATIONS;     )
19 SAN FRANCISCO LABOR COUNCIL; SAN          )
   FRANCISCO BUILDING AND CONSTRUCTION       ) **DECLARATION OF TYLER**
20 TRADES COUNCIL; and CENTRAL LABOR         ) **MORAN IN SUPPORT OF**
   COUNCIL OF ALAMEDA COUNTY,                ) **TEMPORARY RESTRAINING**
21                                           ) **ORDER AND PRELIMINARY**
                  Plaintiffs,                ) **INJUNCTION**
22                                           )
            v.                               )
23                                           )
   MICHAEL CHERTOFF, Secretary of Homeland Security; )
24 DEPARTMENT OF HOMELAND SECURITY;          )
   JULIE MYERS, Assistant Secretary of Homeland )
25 Security; U.S. IMMIGRATION AND CUSTOMS    )
   ENFORCEMENT; MICHAEL ASTRUE, Commissioner )
26 of Social Security; and SOCIAL SECURITY   )
   ADMINISTRATION,                           )
27                                           )
                  Defendants.                )
28 _____  )

   DECLARATION OF TYLER MORAN, Case No. _____

1   (Counsel list continued from first page)

2   Linton Joaquin (SBN 73547)
    Marielena Hincapié (SBN 188199)
3   Monica T. Guizar (SBN 202480)
    NATIONAL IMMIGRATION LAW CENTER
4   3435 Wilshire Blvd., Suite 2850
    Los Angeles, CA 90010
5   Telephone: (213) 674-2850
    Facsimile: (213) 639-3911
6   Email: guizar@nilc.org

7   Lucas Guttentag (SBN 90208)
    Jennifer C. Chang (SBN 233033)
8   Mónica M. Ramírez (SBN 234893)
    AMERICAN CIVIL LIBERTIES UNION FOUNDATION
9   Immigrants' Rights Project
    39 Drumm Street
10  San Francisco, CA 94111
    Telephone: (415) 343-0770
11  Facsimile: (415) 395-0950
    E-mail: jchang@aclu.org

12  Omar C. Jadwat (*Pro Hac Vice* Application forthcoming)
13  AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    Immigrants' Rights Project
14  125 Broad Street, 18th Floor
    New York, NY 10004
15  Telephone: (212) 549-2620
    Facsimile: (212)-549-2654
16  Email: ojadwat@aclu.org

17  Alan L. Schlosser (SBN 49957)
    Julia Harumi Mass (SBN 189649)
18  ACLU FOUNDATION OF NORTHERN CALIFORNIA
    39 Drumm Street
19  San Francisco, CA 94111
    Telephone: (415) 621-2493
20  Facsimile: (415) 255-1478
    E-mail: aschlosser@aclu.org

21  *Attorneys for Plaintiff Central Labor Council of Alameda County*

22  David A. Rosenfeld (SBN 58163)
23  Manjari Chawla (SBN 218556)
    WEINBERG, ROGER & ROSENFELD
24  A Professional Corporation
    1001 Marina Village Parkway, Suite 200
25  Alameda, California 94501-1091
    Telephone: (510) 337-1001
26  Facsimile: (510) 337-1023
    Email: drosenfeld@unioncounsel.net

27  *Attorneys for Plaintiffs San Francisco Labor Council,*
28  *San Francisco Building and Construction Trades Council,*
    *and Central Labor Council of Alameda County*

DECLARATION OF TYLER MORAN, Case No. _____

I, Tyler Moran, declare as follows:

1.      I am the Employment Policy Director at the National Immigration Law Center (NILC).  I have been employed with NILC from 2002 to the present.

2.      NILC is a national legal advocacy organization whose mission is to advance and promote the rights of low-income immigrants and their family members. NILC has trained over 10,000 advocates, attorneys, and government officials on how to identify and combat citizenship and national origin discrimination as well as helping protect the employment rights of all employees, regardless of immigration status.

3.      As NILC's Employment Policy Director, one of the major issues I concentrate on is the Social Security Administration's (SSA) "no-match" program, and its impact on immigrant workers. Over the years, my work on this issue includes monitoring of the impact of the proposed rule on immigrant workers, and training attorneys, unions, and social service providers on the SSA no-match program.  NILC also provides legal advice on cases involving workers who have been fired as a result of the SSA no-match letters.  NILC's publications on the SSA no-match letters are the premier resource for employee advocates throughout the nation.

4.      NILC, through its legal assistance programs, has assisted employees and organizations in correcting no-match discrepancies and educating employers and employees about their responsibilities in responding to no-match letters.

5.      Through my years of experience working on the SSA no-match letter issue, I have gained first-hand knowledge of the broad range of reasons why individuals appear on an SSA no-match letter, including typographical errors on the employer's W-2, changing marital status, changing citizenship status, obtaining a new Social Security number (SSN), and many other legitimate reasons.  I have seen many work-authorized immigrants and other lawful workers receive no-match letters, and have observed the difficulties faced by these employees in resolving those discrepancies with the SSA.

6.      In my experience, it can often take employees much longer than 93 days to resolve mismatches in the SSA database.  For example, NILC recently advised an employee of The Smithfield Packing Company ("Smithfield") in North Carolina who encountered great difficulty and

DECLARATION OF TYLER MORAN, Case No. _____          1

1    spent four months trying to resolve a mismatch.

2    7.      After the Department of Homeland Security ("DHS") issued its proposed regulations on

3    "Safe Harbor Procedures for Employers Upon Receipt of a No-Match Letter" in June of 2006, the

4    Smithfield Packing Company ("Smithfield") began implementing the proposed regulation.  In

5    November of 2006, Smithfield notified several of its employees that it had received notices from the

6    SSA of discrepancies and in conjunction with DHS, asked workers to correct the discrepancy within

7    60 days. (This was the time period provided for in the proposed rule.)

8    8.      A lawfully authorized employee at Smithfield received such a letter.  That worker, a native

9    of Honduras with Temporary Protected Status ("TPS") and a valid employment authorization

10   document ("EAD"), was informed by Smithfield of the discrepancy and instructed to visit the SSA

11   office to correct the situation.  The worker was forced to visit the SSA local office a total of five (5)

12   times before she could resolve the discrepancy, over the course of four months.  SSA required the

13   worker to present identity documents, including her immigration documents that demonstrated she

14   had TPS, and her U.S. Citizenship and Immigration Services ("USCIS") issued employment

15   authorization document.

16   9.      Once the worker finally received documentation from the SSA that the discrepancy was

17   resolved, Smithfield, unconvinced of the resolution because the name and SSN used by the worker

18   were the same as those on the no-match letter, fired the worker despite her lawful status and

19   authorization to work.  NILC has filed a complaint with the Department of Justice, Office of Special

20   Counsel for Unfair Immigration-Related Employment Practices

21   on her behalf.

22   10.     Based on the experience of this and many other workers counseled by NILC, I do not believe

23   that the 93-day deadline imposed without exception by the DHS Final Rule is nearly enough time to

24   allow workers to resolve these mismatches.  Many workers will be terminated as a result of this new

25   rule, and its unreasonable deadlines.

26   11.     In addition to causing many lawful workers to face the burden of time and expense dealing

27   with the SSA, based on past experience with no-match letters, many employers will not wait for the

28   93-day time period before firing workers.  While the letters are sent by SSA only for the purpose of

DECLARATION OF TYLER MORAN, Case No. _____                                    2

properly crediting employee earnings, many employers believe that the letters indicate that workers are not authorized for employment.

12.    Examples of adverse employment actions against U.S. citizens and other work-authorized non-citizens because of SSA no-match letters in the past include:

- ·Mr. James Heggen. An employer in Massachusetts refused to hire Mr. Heggen, a lawful permanent resident of the United States, for a permanent clerical position due to a typographical error on his Social Security card. Mr. Heggen's name appears as "Heggen" on his alien registration card or "green card," but on his Social Security card, his name is spelled "Hegen"-with one less "g." The employer denied Mr. Heggen a permanent position, claiming that it had to be more careful in these times. As an immigrant from the Caribbean, who received his immigration papers as a child long ago, Mr. Heggen cannot file for a correction of his Social Security card locally. Correcting this minor Social Security discrepancy would take several months. NILC was eventually able to resolve the situation by negotiating a permanent position for Mr. Heggen with the employer.

- Mr. Samuel Harris. In late summer of 2003, Mr. Samuel Harris, an African American man in Virginia, was fired from his job because his employer received an SSA no-match letter regarding a discrepancy with respect to Mr. Harris's SSN. Mr. Harris is a U.S. citizen. The SSA had issued Mr. Harris a duplicate SSN that belonged to a deceased person. Although Mr. Harris was able to correct his information with SSA, his employer refused to continue to employ him, thinking that Mr. Harris was engaging in identity theft or similar wrongdoing. He was fired and out of work for several months and had to file an arbitration case to get his job back.

- Mrs. Noelle Lopez. In July 2002, Mrs. Lopez, a worker from North Carolina, was injured on the job. While she was on leave, her employer notified her that it had received an SSA no-match letter for her. Mrs. Lopez was eventually able to correct the discrepancy with the SSA, which was based on a typographical error in the W-2 that her employer had filed with SSA. The employer, however, required Ms. Lopez to re-verify that she continued to be eligible to work in the United States because her work authorization had expired. She had

DECLARATION OF TYLER MORAN, Case No. _____    3

1    employment authorization based on Temporary Status Program (TPS), and had already

2    applied for a renewal, but the Immigration and Naturalization Service (INS) sent her an

3    Employment Authorization Document (EAD) with someone else's picture, which then took

4    a while to get corrected.

5    12.    NILC has witnessed the great harm to U.S. citizens and work-authorized immigrants that

6    employer misuse of the SSA no-match letters has caused in the past. Employers often use no-match

7    letters as a reason to fire or suspend employees temporarily without pay. The letters have also been

8    used to undermine or eliminate organizing activity at worksites or to simply fire long-term workers

9    only to replace them with temporary workers.

10    13.    Based on NILC's experience over the years, but in particular with SSA's policy in 2002

11    where the agency sent the no-match letter to almost one million employers, the DHS no-match rule

12    could potentially result in employers precipitously and indiscriminately firing workers who appear

13    on a no-match letter before workers have a chance to show that they are on the letter because of the

14    simple human error, database errors, or life changes. As a result, these mass no-match firings may

15    include the terminations of thousands of work-authorized employees who routinely receive SSA

16    no-match letters.

17    14.    SSA has informed NILC that it intends to send the no-match letters to 140,000 employers

18    between September 2007 and November 2007, and that those letters will impact approximately 8.7

19    million employees with mismatches. In 2005, SSA sent no-match letters to approximately 127,000

20    employers, which covered 7.3 million mismatched records.

21

22    I declare under penalty of perjury under the laws of the United States of America that the

23    foregoing is true and correct.

24    Executed this 28 of August 2007 at Boise, Idaho.

25

26

27    Tyler Moran

28

DECLARATION OF TYLER MORAN, Case No. _____    4