1  Stephen P. Berzon (SBN 46540)
   Scott A. Kronland (SBN 171693)
2  Jonathan Weissglass (SBN 185008)
   Linda Lye (SBN 215584)
3  Danielle E. Leonard (SBN 218201)
   ALTSHULER BERZON LLP
4  177 Post Street, Suite 300
   San Francisco, CA 94108
5  Telephone: (415) 421-7151
   Facsimile: (415) 362-8064
6  Email: skronland@altshulerberzon.com
   Email: llye@altshulerberzon.com
7  Email: dleonard@altshulerberzon.com

8  *Attorneys for Plaintiffs*

9  Jonathan P. Hiatt (SBN 63533)
   James B. Coppess (*Pro Hac Vice* Application forthcoming)
10 Ana L. Avendaño (SBN 160676)
   AFL-CIO
11 815 Sixteenth Street, N.W.
   Washington, D.C. 20006
12 Telephone: (202) 637-5053
   Facsimile: (202) 637-5323
13 Email: aavendan@aflcio.org

14 *Attorneys for Plaintiff AFL-CIO*

15 (Counsel list continued on next page)

16                UNITED STATES DISTRICT COURT

17                NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 18 AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS; 19 SAN FRANCISCO LABOR COUNCIL; SAN FRANCISCO BUILDING AND CONSTRUCTION 20 TRADES COUNCIL; and CENTRAL LABOR COUNCIL OF ALAMEDA COUNTY, 21     Plaintiffs, 22     v. 23 MICHAEL CHERTOFF, Secretary of Homeland Security; 24 DEPARTMENT OF HOMELAND SECURITY; JULIE MYERS, Assistant Secretary of Homeland 25 Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MICHAEL ASTRUE, Commissioner 26 of Social Security; and SOCIAL SECURITY ADMINISTRATION, 27     Defendants. 28 | Case No. _____  **DECLARATION OF KENNETH S. APFEL IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

DECLARATION OF KENNETH S. APFEL, Case No. _____

1  (Counsel list continued from first page)

2  Linton Joaquin (SBN 73547)
   Marielena Hincapié (SBN 188199)
3  Monica T. Guizar (SBN 202480)
   NATIONAL IMMIGRATION LAW CENTER
4  3435 Wilshire Blvd., Suite 2850
   Los Angeles, CA 90010
5  Telephone: (213) 674-2850
   Facsimile: (213) 639-3911
6  Email: guizar@nilc.org

7  Lucas Guttentag (SBN 90208)
   Jennifer C. Chang (SBN 233033)
8  Mónica M. Ramírez (SBN 234893)
   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
9  Immigrants' Rights Project
   39 Drumm Street
10 San Francisco, CA 94111
   Telephone: (415) 343-0770
11 Facsimile: (415) 395-0950
   E-mail: jchang@aclu.org
12
   Omar C. Jadwat (*Pro Hac Vice* Application forthcoming)
13 AMERICAN CIVIL LIBERTIES UNION FOUNDATION
   Immigrants' Rights Project
14 125 Broad Street, 18th Floor
   New York, NY 10004
15 Telephone: (212) 549-2620
   Facsimile: (212)-549-2654
16 Email: ojadwat@aclu.org

17 Alan L. Schlosser (SBN 49957)
   Julia Harumi Mass (SBN 189649)
18 ACLU FOUNDATION OF NORTHERN CALIFORNIA
   39 Drumm Street
19 San Francisco, CA 94111
   Telephone: (415) 621-2493
20 Facsimile: (415) 255-1478
   E-mail: aschlosser@aclu.org
21
   *Attorneys for Plaintiff Central Labor Council of Alameda County*
22
   David A. Rosenfeld (SBN 58163)
23 Manjari Chawla (SBN 218556)
   WEINBERG, ROGER & ROSENFELD
24 A Professional Corporation
   1001 Marina Village Parkway, Suite 200
25 Alameda, California 94501-1091
   Telephone: (510) 337-1001
26 Facsimile: (510) 337-1023
   Email: drosenfeld@unioncounsel.net
27
   *Attorneys for Plaintiffs San Francisco Labor Council,*
28 *San Francisco Building and Construction Trades Council,*
   *and Central Labor Council of Alameda County*

DECLARATION OF KENNETH S. APFEL, Case No. _____

I, Kenneth S. Apfel, declare as follows:

1. From 1997 until 2001, I served as the Commissioner of the Social Security Administration ("SSA"). I am currently a professor and Director of the Management, Finance and Leadership Program at the University of Maryland's School of Public Policy.

2. I was the first Senate-confirmed Commissioner of Social Security after the SSA became an independent agency and a new Cabinet-level position was authorized by Congress. I had previously served as Associate Director for Human Resources at the Office of Management and Budget, and as Assistant Secretary for Management and Budget at the United States Department of Health and Human Services. Prior to joining the faculty of the University of Maryland, I held the Sid Richardson Chair in Public Affairs at the LBJ School of Public Affairs the University of Texas in Austin.

3. I have been asked by the plaintiffs in *American Federation of Labor and Congress of Industrial Organizations, et al. v. Chertoff* to provide information about the information in the SSA's Earnings Suspense File (ESF) and the SSA no-match letter program. This declaration is based on my experience as former Commissioner of the SSA, as well as my general expertise in the area of public management.

4. For the reasons explained in greater detail below: (1) the SSA maintains an Earnings Suspense File which contains earnings reports from employer Wage and Tax Statements (Form W-2) with names and social security numbers (SSNs) that do not match SSA records. As of 2005, the ESF contained approximately 255 million records. (2) There are many reasons why an earnings report would not match SSA records, including administrative errors by SSA, transcription errors, unreported name changes

1

after a marriage or divorce, and many other reasons unrelated to an employee's work authorization status. The SSA does not have any information on why a particular earnings report is in the ESF. (3) The ESF does not collect information about immigration status. As a result, the SSA does not know whether any particular earnings report in the ESF is attributable to work by an unauthorized worker. Available data does indicate, however, that a significant number of earnings reports in the ESF belong to U.S. citizens and work-authorized non-citizens. (4) The SSA seeks to reduce the size of the ESF so that earnings reports can be properly credited to the wage earner. To do so, SSA uses a number of procedures to correct its database, including sending the "no-match letters" to employers, advising them that the W-2 information that they submitted does not match the name and SSN contained in SSA records. No-match letters are a voluntary request to employers by SSA for assistance in resolving data discrepancies. (5) The SSA has never used no-match letters as an immigration enforcement tool as it does not have the authority to enforce immigration law. Nor does existing data support such use of no-match letters. This is so because the SSA does not know whether any employee identified in a no-match letter is unauthorized to work, and indeed, many records in the ESF, from which no-match letters are drawn, belong to U.S. citizens and work-authorized non-citizens. (6) It may be difficult for SSA offices to process requests to resolve mismatched records by U.S. citizens and work-authorized aliens in a timely fashion.

5. As of November 2005, SSA had assigned about 435 million SSNs "for the primary purpose of accurately reporting and recording the earnings of people who work in jobs covered by Social Security." When SSA assigns an SSN to an individual, it

2

creates a Master Earnings File for each person in its "Numident" file containing relevant information about the SSN holder. *Congressional Response Report: Accuracy of the Social Security Administration's Numident File* (Office of the Inspector General, Social Security Administration, A-08-06-26100, Dec. 2006), page 1. At the end of each calendar year, employers are required to furnish a Form W-2 to each employee to whom it has paid remuneration for services, and must also submit this information to SSA. The information contained on the Form W-2 is critical data used by SSA in assigning social security benefits. When an employer submits a Form W-2 report to SSA, the agency posts the employee's earnings to the employee's Master Earnings File. SSA can only post this information successfully to a worker's master record if the name and SSN reported on the Form W-2 match the information on SSA's Numident file for that individual. This information is then used to determine an individual's eligibility for, and the amount of, any retirement, disability or survivor benefits administered by SSA. If the name and SSN combination on a wage statement do not match SSA records, SSA follows various procedures to try to match the wage statement information to its records. But if SSA cannot resolve the discrepancy, SSA is unable to post the employee's earnings to the employee's Master Earnings File. Instead, the wage statement and associated wages are placed in the ESF.

6.    The ESF represents the cumulative of wage statements received by the SSA since 1937 for which SSA does not have a matching name and SSN. As of October 2005, the ESF contained approximately 255 million records Tax Years (TY) 1937 through 2003, representing about $520 billion in wages. *Inspector General's Statement*

3

*on SSA's Major Management Challenges* (Office of the Inspector General, Social Security Administration, A-02-07-17075, Nov. 2006), page 1;

7. There are many reasons why the name and SSN combination on an earnings report would not match SSA records. These include, but are not limited to: (a) administrative errors at SSA (for example, an erroneous assignment of a SSN that has previously been assigned to another individual), (b) an unreported employee name change after a marriage or divorce, (c) transcription errors by the employer or SSA in the employee's name or social security number, (d) incomplete, transposed, or missing names or social security number either in SSA records or on the earnings report, or (e) a discrepancy created by an employee's use of multiple or compound names. It is extremely common for foreign-born and female workers to be the subject of a discrepancy. Workers from Latin American countries, for example, may use compound last names, a portion of which may be inadvertently reflected on SSA records as a middle name. Limited English proficient workers from Asian and African countries may use inconsistent transliterations of their first and last names. Some foreign-born workers may use a less "foreign" first name in the workplace, and have identification documents using that first name, but SSA's records may reflect the name the worker was using when the SSN originally was assigned.

8. SSA collects wage report information for the purpose of determining benefit calculations and eligibility for workers. The wage report information collected by SSA, including the wage report information posted to the ESF, does not contain any information about an employee's work authorization status. SSA does not know the percentage of earnings reports in the ESF that reflect unauthorized work. Nor does SSA

4

know the likelihood that a particular earnings report in the ESF reflects unauthorized work.

9. In addition to the use of No-Match Letters, SSA sends Social Security Statements annually to all workers. Part of the reasoning for these annual mailings was to help workers verify the accuracy of their earnings records. SSA's experience has been that many people come forward to SSA to correct their records, records that often had previously been stored in the ESF. These were citizens who had earnings records included in ESF for many of the reasons listed above.

10. When SSA is able to resolve a mismatched record in the ESF, the record is later credited, or "reinstated" to the individual's Master Earnings File. The majority of reinstatements are made for U.S. citizens. As the GAO recently concluded, "[t[his is an indication that a significant number of earnings reports in the ESF still belong to U.S. citizens and work-authorized noncitizens." *Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work* (Government Accounting Office, July 2006, GAO-06-814R), page 8.

11. In an effort to reduce the size of the ESF and to ensure that workers are properly credited for their earnings for social security benefits purposes, SSA sends "no-match" letters to employers whose earnings report information does not match SSA records. No-match letters are a voluntary request to employers for assistance in resolving mismatches so that earnings reports can be properly credited to the wage earner for future retirement, disability and social security benefits.

12. The SSA is not the agency that enforces federal immigration law. SSA has never used no-match letters as an immigration enforcement tool. The information

5

contained in the ESF does not support the use of no-match letters as an immigration enforcement tool. This is so because the SSA does not know whether a wage report in the ESF or, in turn, an employee identified in a no-match letter, is unauthorized to work. Indeed, because there is no data on the percentage of earnings reports in the ESF that are attributable to unauthorized work, there is similarly no data to support any assertion that an employee who is the subject of a no-match letter is unauthorized to work. At the same time, SSA experience with "reinstatements" demonstrates that a significant percentage of earnings reports in the ESF are attributable to U.S. citizens and work-authorized non-citizens. As a result, a significant number of employees who are the subject of a no-match letter are likely to be U.S. citizens and work-authorized aliens.

13. While SSA has made continual efforts to correct its database, there are still many inaccuracies. According to a recent report by the SSA's Inspector General, there are approximately 17.8 million discrepancies out of the 435 million records in the Numident file. These include: 12.7 million (3.3%) discrepancies out of the 380 million native-born U.S. citizens' records; 248,000 (3.1%) discrepancies out of the 8 million foreign-born US citizens' records contain discrepancies; and 4.8 million (10.4%) discrepancies out of foreign-born/non-U.S. citizen workers' records. *Congressional Response Report: Accuracy of the Social Security Administration's Numident File* (Office of the Inspector General, Social Security Administration, A-08-06-26100, Dec. 2006), pp 5-11.

14. I have been informed that SSA intends to send no-match letters to approximately 140,000 employers, pertaining to about 8 million employees, in the two-month period between September 4, 2007 and November 9, 2007. As discussed above, a

significant number of these 8 million employees are likely to be U.S. citizens and work-authorized aliens, and there is no basis for concluding that any particular employee who is the subject of a no-match letter is unauthorized to work.

15. A U.S. citizen or work-authorized alien who is the subject of a no-match letter can contact the SSA to resolve the data discrepancy. SSA will then request that the individual submit documentation to support the request. Depending on the reason for the discrepancy and the availability of documents to support the request, a mismatched earnings report can take a considerable length of time to resolve. For example, a work-authorized individual may have to first correct their records with the Department of Homeland Security which could an unknown period of time to resolve, and then take those documents to SSA for the agency to correct the discrepancy.

16. Another major factor that affects the time it takes to resolve mismatched earnings reports is SSA staffing resources. If SSA sends 140,000 no-match letters affecting over 8 million employees, it is likely to receive a surge in applications to resolve mismatched earnings reports. Because federal agencies such as the SSA generally maintain staffing levels to meet current workload needs, the anticipated surge in applications to resolve mismatched earnings in the relatively brief two-month period from early September to early November 2007 is likely to strain SSA staffing levels. As a result, it may take considerably in excess of 90 days to resolve any given mismatched earnings report, even if the worker makes prompt efforts to resolve the discrepancy. This will almost assuredly cause citizens to be deemed as unauthorized to work simply because the agency is unprepared for this new workload.

17. Based on my past experience at SSA, I am very concerned that there will be many legally authorized workers who cannot resolve a mismatched earnings report by any arbitrary deadline. Many workers with limited English proficiency will encounter added difficulties. There are U.S. workers who do not maintain their official records, such as birth certificates, and do not have U.S. passports or driver's licenses. Workers falsely accused of being unauthorized based on the no-match letter may be unfairly harmed. I am also very concerned about the ability of SSA field offices to deal with an influx of workers and employers seeking to correct mismatched records by a deadline.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 28th day of August 2007 at College Park, Maryland.

_____
Kenneth S. Apfel

8