PETER D. KEISLER
Assistant Attorney General
THOMAS DUPREE
Deputy Assistant Attorney General
SCOTT N. SCHOOLS
United States Attorney
JOANN M. SWANSON
Chief, Civil Division
JONATHAN LEE
Assistant U. S. Attorney
SANDRA SCHRAIBMAN (D.C. Bar No. 188599)
DANIEL E. BENSING (D.C. Bar No. 334268)
Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6114
Washington, D.C.  20001
Telephone:  (202) 305-0693
Facsimile:  (202) 616-8460

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF LABOR AND )
  CONGRESS OF INDUSTRIAL ) Case No. 07-4472 CRB
ORGANIZATIONS, et al., )
 )
                    Plaintiffs, ) **OPPOSITION TO PLAINTIFFS'**
 ) **MOTION FOR TEMPORARY**
     v. ) **RESTRAINING ORDER**
 )
MICHAEL CHERTOFF, Secretary of Homeland )
  Security, et al., )
 )
                    Defendants. )
_____ )

## Introduction

At issue in this case is a regulation, "Safe Harbor Procedure for Employers Who Receive a No-Match Letter," promulgated by the United States Department of Homeland Security (DHS), which provides guidance and clarity for employers when they are notified by the Social Security Administration (SSA) that the social security number presented by an employee is found not to

match that employee's name in the SSA database. 72 Fed. Reg. 45611 (August 15, 2007).  In the past, when employers received a "no-match letter" from SSA in response to such a discrepancy, employers have expressed concern about potential immigration law liability in the event that the employee is later determined by the government not to be legally authorized to work at the job. Similarly, some employees have expressed concern about the risk of being improperly terminated solely as a result of such SSA letters.  Indeed, according to plaintiffs, the SSA letters have themselves prompted the precipitous firings of many employees without the employers taking the time to determine if the discrepancies were the result of a clerical, or other error, or allowing employees the time to meet with SSA to resolve the discrepancies.

        The regulation addresses those concerns and establishes a "safe harbor" procedure consisting of recommended reasonable steps which an employer can take to resolve the name/social security number discrepancy.  DHS commits through the regulation that "[b]y taking these steps in a timely fashion, an employer would avoid the risk that the no-match letter would be used as any part of an allegation that the employer had constructive knowledge that the employee was not authorized to work in the United States." 72 Fed. Reg. 45613.  In an effort to inform employers of the new safe harbor, SSA will enclose in the same envelope with its no-match letters from DHS providing guidance to employers.

        Plaintiffs, exclusively labor unions, seek to enjoin the implementation of the regulation and to stop SSA from sending out the DHS letters in the same envelopes with the SSA no-match letters. Their Motion for a Temporary Restraining Order should be denied on numerous grounds because they fail to meet the requirement for temporary injunctive relief. Plaintiffs bring this as a facial challenge raising the interests of unidentified employers, who have not yet received any letters and whom the plaintiffs do not represent, and of unidentified employees, and whose interests are even

more attenuated at this time. Plaintiffs rely on speculation atop speculation to allege that their members or their affiliates' members will suffer the requisite injury-in-fact. But plaintiffs cannot show that the requested injunctive relief will redress the alleged harm, indeed, the regulation may in act to alleviate the concerns of employers and prevent many of the precipitous terminations that plaintiffs allege occur now solely as a result of receipt of the SSA letter. Thus, plaintiffs cannot demonstrate the requisite concrete, actual injury to themselves or to any of their members at this time. Moreover, even if plaintiffs could meet the standing requirements, those claims of potential future injury to unnamed and presently unidentifiable employees cannot on their face establish irreparable harm, nor can plaintiffs rely on any alleged administrative burden or inconvenience to employers -- whom they do not represent -- or to unidentified employees who may have to take a day or more off from work and deal with the SSA. Case law establishes that those incidental burdens are not irreparable harm.

Further, plaintiffs cannot establish the requisite likelihood of success on the merits. As discussed below and also in the preamble to the regulation, the regulation is not inconsistent with the relevant statutes and does not, as plaintiffs assert, impose any new obligation on employers or change or expand the standard of liability under the immigration laws. The regulation does not alter the law prohibiting the employment of unauthorized workers or expand the legal definition of "knowing" employment of unauthorized aliens. Instead, it clarifies current procedure and establishes an optional, safe harbor procedure that employers can follow, if they wish, in response to an SSA no-match letter. Nor does the regulation authorize improper use of social security information or confidential taxpayer data.

Finally, the public interest balancing test weighs heavily in favor of the regulation. Plaintiffs have not demonstrated any likelihood of success on the merits, their allegations of injury are entirely

speculative, and their claims of irreparable harm specious. However, the public interest strongly favors this regulation, which will not only assist in identifying unauthorized workers and so promote better enforcement of the immigration laws, by also, but providing a clear, regulatory safe harbor, the rule will help employers avoid the risk of liability and protect employees from improper termination or other abuses at the hands of employers who claim they do not know how to respond to no-match letters.

## FACTUAL AND REGULATORY BACKGROUND

### A.    The SSA No Match Letter Program

Employers send to the Social Security Administration (SSA) millions of earnings reports annually (W-2 Forms).  In some instances, the combination of employee name and social security number (SSN) does not match SSA records.  If an employer sends W-2s that create ten or more "no matches," SSA may send a letter to the employer seeking correction of a list of a minimum of ten mismatches.  This letter is commonly referred to as a "no-match letter."  There are many causes for no-matches, including clerical error and name changes.  However, one cause for no-matches is employer submission of information for an alien who is not authorized to work in the United States and who is using a false SSN or SSN assigned to someone else.  Such a letter may be one of the only indicators to an employer that one or more of its employees may be an alien who is not authorized by law to work in the United States.  See 72 Fed. Reg. 45611, 45612 (August 15, 2007).

### B.    The New DHS Safe Harbor Regulation

Since 1986, section 274A(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1324a(a), has prohibited the hiring of aliens who are not authorized to work in the United States or continuing employment of the alien "*knowing* the alien is (or has become) an unauthorized alien with respect to such employment" (emphasis added).  Immigration Reform and Control Act of 1986, Pub.

Law No. 99-603, title I, part A, § 101, 100 Stat. 3359, 3360 (Nov. 6, 1986).

Pursuant to regulatory authority delegated to implement the immigration laws, 8 U.S.C. 1103, the Immigration and Naturalization Service promulgated 8 C.F.R. § 274a.1(l) to define "knowing" to include knowledge which may fairly be inferred through notice of certain facts and circumstances which would lead a person, through the exercise of reasonable care, to know the facts.  55 Fed. Reg. 25928-1 (June 25, 1990).  This definition was in response to and consistent with the standards enunciated by the Ninth Circuit in <u>Mester Manufacturing Co. v. INS</u>, 879 F.2d 561, 567 (9th Cir. 1989).  Examples were added to this definition in 1991.  56 Fed. Reg. 41767-1 (Aug. 23, 1991).

The current version of § 274a.1(l) provide:

(l)(1) The term *knowing* includes not only actual knowledge but also knowledge which may fairly be inferred through notice of certain facts and circumstances which would lead a person, through the exercise of reasonable care, to know about a certain condition. Constructive knowledge may include, but is not limited to, situations where an employer:

(I) Fails to complete or improperly completes the Employment Eligibility Verification Form, I–9;

(ii) Has information available to it that would indicate that the alien is not authorized to work, such as Labor Certification and/or an Application for Prospective Employer; or

(iii) Acts with reckless and wanton disregard for the legal consequences of permitting another individual to introduce an unauthorized alien into its work force or to act on its behalf.

(2) Knowledge that an employee is unauthorized may *not* be inferred from an employee's foreign appearance or accent. Nothing in this definition should be interpreted as permitting an employer to request more or different documents than are required under

section 274(b) of the Act or to refuse to honor documents tendered that on their face reasonably appear to be genuine and to relate to the individual.

8 C.F.R. § 274a.1(l).

On June 14, 2006, DHS proposed to amend 8 C.F.R. § 274a.1(1) to further describe an employer's current obligations under the immigration laws, and its options for avoiding liability, after receiving a no-match letter from either SSA or DHS and to provide clearer guidance to employers on what steps DHS would consider to be reasonable in attempting to resolve the discrepancies. 71 Fed. Reg. 34,281 (June 14, 2006). The proposed rule outlined the history of the definition of knowing, and explained specific steps that an employer could take that will be considered by DHS to be a reasonable response to receiving a no-match letter. The proposed rule explained that this response would eliminate the possibility that DHS, when seeking money penalties against an employer, will allege, based on the totality of relevant circumstances, that an employer had *constructive knowledge* that the employer was employing an alien not authorized to work in the United States, in violation of 8 U.S.C. § 1324a(a)(2).

DHS proposed to add two more examples to the existing examples of information available to an employer indicating that an employee could be an alien who is not authorized to work in the United States. The proposed rule also explicitly stated the employer's obligations under current law and clarified that whether an employer would be found to have constructive knowledge in cases such as in the examples in the current regulation and in the proposed rule, depended on the "totality of relevant circumstances" present in the particular case. The example provided in the proposed rule, and relevant here was that the employer received written notice from SSA that the combination of name and SSN submitted for an employee does not match SSA records

During the sixty day public comment period, DHS received public comments from a variety

of sources, including labor unions, not-for-profit advocacy organizations, industry trade groups, private attorneys, businesses, and other interested organizations and individuals.  In response to the public comments, DHS modified the rule to accommodate employers who may seek the safe harbor and their employees.  DHS provided that the reasonable steps could include additional time for an employer to check its records and correct any errors 30 calendar days rather than only 14 calendar days.  The final rule expanded also the 60-day time frame for resolving discrepancies with SSA to a 90-day time frame.  SSA anticipates that it will be able to resolve nearly all claims in this 90 day time frame.  72 Fed. Reg. at 45617. The final rule clarified also that only letters "to the employer" are covered by the rule.  72 Fed. Reg. 45611-1 (August 15, 2007).  As DHS explained in the preamble to the final rule:

> [T]he safe-harbor provisions establish one course of action that an employer may take after receiving a notice from SSA or DHS.  The provisions contemplate that the particular steps undertaken by the employer in response to an SSA or DHS notice, along with the time the employer takes to act and follow up with appropriate inquiries, will be relevant considerations in the determination of whether the employer took reasonable steps to avoid a finding of constructive knowledge under 8 CFR 274a.1.  The ultimate determination of whether an employer will be found to have knowingly employed an unauthorized alien will be based on the totality of the circumstances.  The safe-harbor procedure is simply one way for employers to avoid liability under the INA for knowingly employing unauthorized aliens after receiving SSA or DHS notices.

72 Fed. Reg. at 45620-2.  The rule, therefore, provides clearer guidance to employers on a course of action to limit their possible liability if investigation determines that they have employed aliens who are not authorized to work in the United States.  DHS will implement the new rule, in part, by

including letters describing the new rule and its safe harbor provision in SSA no-match letters sent to employers.  (A copy is attached to plaintiffs' complaint.)

### C.    Plaintiffs' Claims and Allegations

Plaintiffs, four labor unions, Complaint ("Compl.") ¶ 8-14,bring this suit on behalf of their members, who they allege will be adversely affected in several ways by the DHS no match regulation.  First, plaintiffs contend that the receipt by employers of the DHS insert in an SSA no match letter, "will lead some employers to immediately fire workers with no SSN matches," Compl. ¶ 52, even though such actions may expose the employer to substantial civil liability.  Second, plaintiffs contend that should employers attempt to take advantage of the new safe harbor provision, "lawfully employed workers will immediately be forced to expend time and effort to resolve SSA data discrepancies, including taking time off work without pay to visit SSA field offices.  Compl. ¶ 54.  Of course, employees would directly and substantially benefit by resolving such discrepancies, since it would result in their SSA retirement accounts being credited with their earnings.  Finally, plaintiffs posit that "[m]any lawfully employed workers will be unable to resolve date discrepancies with the SSA bureaucracy within the 90-day deadline set out in the DHS Final Rule and will for that reason be terminated from their jobs." Compl. ¶ 55.

Plaintiffs contend that the DHS rule is unlawful as it exceeds DHS' authority under the immigration laws, Compl. ¶¶ 57, 61, 65, 68 is arbitrary and capricious under the Administrative Procedure Act, Compl. ¶ 59, will cause workers to be fired in violation of the Due Process Clause, ¶ 63, and unlawfully utilizes the SSA tax information processing system, Compl. ¶¶ 67, 70.

### ARGUMENT

### I    The Standard for Granting Preliminary Injunctive Relief

In determining whether to grant a preliminary injunction, courts in the Ninth Circuit

traditionally consider "(1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to the moving party if the relief is not granted; (3) the extent to which the balance of hardships favors the respective parties; and (4) in certain cases, whether the public interest will be advanced by granting the preliminary relief." Miller v. California Pacific Medical Center, 19 F.3d 449, 456 (9th Cir. 1994) (en banc). The moving party must demonstrate either "(1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits." Id. (internal quotation omitted). "Under either formulation of the test, the party seeking the injunction must demonstrate that it will be exposed to some significant risk of irreparable injury." Associated General Contractors of Calif. v. Coalition for Economic Equity, 950 F.2d 1401, 1410 (9th Cir. 1991). As shown below, plaintiffs have failed to satisfy those requirements for preliminary injunctive relief.

## II.    Plaintiffs Lack Standing to Challenge the DHS Rule

It is axiomatic that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold, bedrock requirement imposed by Article III of the Constitution by alleging an actual case or controversy. See, e.g., City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983); Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982); O'Shea v. Littleton, 414 U.S. 488, 493 (1974); McMichael v. County of Napa, 709 F.2d 1268, 1269 (9th Cir. 1983).

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 562 (1992). The "irreducible constitutional minimum of standing contains three elements." Id. at 560. These are (1) the plaintiff must have suffered an "injury in fact" which is "concrete and particularized" and "actual or

imminent," not conjectural or hypothetical; (2) the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision from the court. <u>Id</u>. at 560-61. <u>See also</u> <u>Lee v. State of Oregon</u>, 107 F.3d 1382, 1387 (9th Cir.), <u>cert</u>. <u>denied</u>, 522 U.S. 927 (1997). Standing requires more than "conclusory" allegations of harm; it requires the party seeking to invoke the jurisdiction of the court to allege facts sufficient to show interest and injury. <u>Baker v. United States</u>, 722 F.2d 517, 519 (9th Cir. 1983).

An organization can assert standing in two ways – "in its own right to seek judicial relief from injury to itself," or as a "representative of its members." <u>Warth</u>, 422 U.S. at 511. Here, plaintiffs exclusively seek to pursue claims on behalf of their members. <u>See</u> Compl. ¶¶ 51-55. An organization suing on behalf of its members must allege facts sufficient to show, at a minimum, that its "members would otherwise have standing to sue in their own right[.]" <u>Hunt v. Washington State Apple Adver. Comm'n</u>, 432 U.S. 333, 343 (1977). <u>See also</u> <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 181 (2000); <u>American-Arab Anti-Discrimination Committee v. Thornburgh</u>, 970 F.2d 501, 509 (9th Cir. 1992). This obligation extends to identifying the members of a plaintiff organization that have suffered, or will imminently suffer, harm; the failure to do so precludes organizational standing. <u>See</u> <u>National Alliance for the Mentally Ill v. St. Johns Cty.</u>, 376 F.3d 1292, 1296 (11th Cir. 2004) (organizations' "failure to identify an injured constituent prevents them from asserting associational standing") (citing <u>Arizonans for Official English v. Arizona</u>, 520 U.S. 43, 66 (1997)).[1]/

_____

[1]/     face <u>See also</u> <u>Diaz v. Hood</u>, 342 F. Supp. 2d 1111, 1117 (S.D. Fla. 2004) ("[g]enerally, a failure to identify a single injured constituent prevents an organization from asserting associational standing"); <u>Hill v. Park</u>, No. 03-4677, 2004 WL 180044, at *6 (E.D.Pa. Jan. 27, 2004) (organizational plaintiff's failure to "identify any single member whose interests would confer associational standing" is grounds for dismissal); <u>American Immigration Lawyers Ass'n v. Reno</u>, 18

The organizational plaintiffs here have not alleged sufficient facts to demonstrate that any of their members have suffered an actual injury or an <u>imminent</u> future injury,  <u>See</u> <u>American-Arab Anti-Discrimination Committee</u>, 970 F.2d at 510 (organization lacked standing to sue on behalf of members where it failed to allege that members are subject to or will be subject to deportation under challenged statute).  Plaintiffs contend that certain of  their members have been injured by the existing SSA program of sending no match letters.  However, plaintiffs then make the entirely unsupported leap that the implementation of the new DHS regulation, including the insert of a DHS letter in the SSA no match letters, will somehow injure additional members.  Defendants disagree – in fact the new safe harbor provision of the regulation will address many of the concerns that plaintiffs allege – but the fundamental point is that plaintiffs offer nothing beyond speculation that the new regulation will make things worse, and thus cause them harm.

Presumably, plaintiffs rely on the declaration of Dr. Nik Theodore, who at paragraph 17 asserts that "the DHS regulation is therefore likely to magnify the demonstrated effects of employer sanctions and SSA no-match letters."  Yet other than a vague reference to his "past research and expertise" he offers no basis for that conclusion.  The mere fact that a plaintiff "can 'imagine circumstances in which [the plaintiff] could be affected by the agency's action'" is not enough to confer standing where there is no current injury and the plaintiff relies wholly on the threat of future injury.  <u>Northwest Airlines, Inc. v. FAA</u>, 795 F.2d 195, 201 (D.C. Cir. 1986).  Here, by filing a facial

F. Supp. 2d 38, 51 (D.D.C. 1998) (organization is required to "identify[] the member or members of plaintiff organizations that have, or will suffer, harm"), <u>aff'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 199 F.3d 1352 (D.C. Cir. 2000); <u>Maine Ass'n of Interdependent Neighborhoods v. Commissioner, Maine Dep't of Human Servs.</u>, 747 F. Supp. 88, 92 (D. Me. 1990) (allegation that "M.A.I.N. has members who are the head of a Food Stamp household but are not the primary wage earners" was insufficient to establish claim of associational standing where complaint, "[did] not identify the member allegedly affected . . . , nor [did] it identify any of the factual circumstances supporting her claim to be subject to the regulation").

challenge, plaintiffs have identified no employers who will receive DHS letters and so are in no position even to speculate as to who the employees might be, much less that these employees are members of their organizations.

At most, plaintiffs posit the prospect that after an employer receives a letter describing the new safe harbor regulation, that employer might take actions different than it would otherwise have taken, and further that the employer might take steps to verify information with SSA and, finally, if those steps were not successful in 93 days, the employee might be terminated. Since the initial letters will be mailed out over a period of two months, plaintiffs ability to show immediate harm is even less. This is far too attenuated a series of suppositions to establish standing for a facial challenge. "Injury in fact" requires injury that is concrete "in both a qualitative and temporal sense." Whitmore v. Arkansas, 495 U.S. 149, 155 (1990). A plaintiff must show that he or she "has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." Lyons, 461 U.S. at 102 (citations and internal quotations). Threatened rather than actual injury may satisfy Article III standing requirements only if the threat is likely and imminent. A threatened injury must be "certainly impending" to constitute injury-in-fact for purposes of Article III standing. Lujan, 504 U.S. at 564 n. 2; Whitmore, 495 U.S. at 158. The Supreme Court has consistently held that claims of threatened injury that were too speculative failed to support Article III standing. See, e.g., Lujan, 504 U.S. at 563-64; Whitmore, 495 U.S. at 156-57; Diamond v. Charles, 476 U.S. 54, 66 (1986); Lyons, 461 U.S. at 105-08. Plaintiffs allegations are far too attenuated and speculative to support standing.[2]/

[2]/     For example, in Lujan, plaintiffs challenged a regulation promulgated by the Secretary of the Interior that made the Endangered Species Act ("ESA") inapplicable to American actions in foreign countries. Plaintiffs claimed that they had observed the habitats of certain endangered species in

The Ninth Circuit has also "'repeatedly found a lack of standing where the litigant's claim relies upon a chain of speculative contingencies.'" <u>Lee</u>, 107 F.3d at 1389 (quoting <u>Nelsen v. King County</u>, 895 F.2d 1248, 1252 (9th Cir. 1990)). In <u>Lee</u>, the court considered a class action challenge to Oregon's Death With Dignity Act, which permitted a competent terminally-ill adult to legally request medication to end his or her life. The named plaintiffs consisted of a terminally-ill patient in a nursing home, doctors and nursing homes. 107 F.3d at 1386-1387. The court held that none of the named plaintiffs had suffered an injury-in-fact and therefore lacked standing. <u>Id</u>. at 1390-1391. The terminally-ill patient claimed that the Act created a risk that she would take her own life against her true intent because: "(1) persons with a terminal disease are at a greatly increased risk for depression; (2) depression carries with it a serious risk of becoming suicidal; and (3) primary care physicians regularly miss suicidal depression in their own patients." <u>Id</u>. at 1388. The court held that this increased risk was not enough to show injury; rather the patient had to make an "individualized showing that there is a very significant possibility that the future harm will ensue." <u>Id</u>. at 1388-1389 (citations and internal quotations omitted). The fact that the asserted injury was the threat of death did not relieve the plaintiffs "from the requirement of asserting some significant possibility of injury." <u>Id</u>. at 1389-90. Here, in addition to plaintiffs having to speculate as to the identities of both employers and employees, potential harm depends on the actions of third parties not before the court

---

certain foreign countries, and that they intended to return to those countries to try to see the animals at some point in the future. They feared that American development in foreign countries, unchecked by the ESA, would harm the species in which they were interested. 504 U.S. at 563-64. The Court held that plaintiffs only alleged an injury at some indefinite future time, which does not rise to the level of an imminent injury that is "certainly impending." Plaintiffs' "some day" intentions to return to the places they had visited before could not support a finding of actual or imminent injury. <u>Id</u>. <u>See</u> <u>also</u> <u>Schmier</u>, 279 F.3d at 821-22 (plaintiff attorney lacked standing to challenge court rules prohibiting citation to unpublished opinions because alleged harm was inability to cite and rely on unpublished opinion that some day, in some case of his, might somehow help a client obtain some favorable result).

1    – the employers.

2        Even if the plaintiffs have standing, they seek a remedy that will not provide them with any

3    effective relief.  As the D.C. Circuit has noted in another context, "[t]he effect of the safe harbor

4    provision has been to identify one relatively simple method of proof [the agency] finds persuasive,

5    and there is no reason to think [the agency] will find this method of proof any less persuasive if the

6    safe harbor is invalidated."  Renal Physicians Assn. v. U.S. Dept. of HHS, 489 F.3d 1267, 1277

7    (D.C. Cir. 2007).  The interpretations previously provided by the INS and cited by the plaintiffs are

8    consistent with the rule, and restraining the rule and the letters will not change that interpretation.

9

10   **III.    The DHS No Match Regulation is Not Contrary to Governing Statutes**

11       **a.    The Regulation Does Not Establish New Legal Obligations on Employers**

12       Plaintiffs' arguments that the DHS no match regulation is contrary to relevant immigration

13   statutes are premised on a fundamental mis-reading of the regulation.  As discussed in the preamble

14   to the regulation, 72 Fed. Reg. at 45614, the regulation does not expand liability through a

15   redefinition of "knowingly," nor does it establish new verification procedures, or in any way impose

16   new obligations on employers or to employees.  It does not change the existing law, particularly the

17   longstanding prohibition on the continued employment of unauthorized workers. 8 U.S.C. § 1324a.

18   Instead, in the interest of providing clarification and guidance to employers who receive no match

19   letters, it makes two changes to the existing rule, 8 C.F.R. § 274a.1(l).

20       1.  In providing guidance to the public on the meaning of the term "knowing," and

21   specifically in the meaning of "constructive knowledge," the rule provides two additional examples

22   of facts that may be considered relevant to making the determination of "constructive knowledge"

23   in a civil or criminal enforcement proceeding.  If the employer fails to take reasonable steps in

24   response to the receipt of either: (a) a no match letter from SSA, 8 C.F.R. § 274a.1(l)(iii)(B); or (b)

a letter from DHS noting that the employee's immigration documents were assigned to someone else, 8 C.F.R. § 274a.1(l)(iii)(B), DHS would consider that failure to act relevant to a determination of liability under section 1324a.  However, these are only examples and are not dispositive in any enforcement proceeding, as the regulation clearly notes that these are only "[e]xamples of situations where the employer may, <u>depending on the totality of the relevant circumstances</u>, have constructive knowledge . . ." <u>Id</u>. § 274a.1(l)(1) (emphasis added).  This is not an exclusive list of factors that are relevant to the constructive knowledge determination, instead it is an effort to provide greater guidance to employers.

2.  Second, the regulation establishes a safe harbor for employers who receive a no-match letter.  8 C.F.R. § 274a.1(l)(c).  When employers take the steps specified by the regulation.  It is possible that the employer could still be found, on the basis of other evidence to have knowingly employed an undocumented worker, but it will have immunity from DHS' use of the no-match letter against it in any future enforcement proceeding.

Crucially, however, the regulation doe not impose any obligation on the employer to take these steps to attempt to resolve the discrepancy in the employee's social security information.  If the employer wants to take advantage of the safe harbor offered by the regulation, it "must" and "should" take certain steps specified by the rule, 8 C.F.R. § 274a.1(l)(2), (and the advisory letter so states), but the employer is not required to avail itself of the safe harbor

**B.      The DHS Rule Does Not Alter the Law on What is a "Knowing" Violation of the Immigration Laws.**

Plaintiffs' argument that the DHS regulation attempts to change the standard of what is a "knowing " violation of the immigration laws is a  red herring. The regulation does not change existing statutory prohibitions, nor does it impose new obligations.  Instead it provides a common

sense solution to the very real problem of the uncertainty inherent in SSA's no match letters, which plaintiffs claim has led to the unwarranted termination of many employees. And, even if <u>Chevron</u> deference is inapplicable here, as no binding obligations are established by the DHS rule, it may still "merit some deference whatever its form given the specialized experience and broader investigations and information available to the agency" <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944).

Moreover, the guidance provided by the rule is consistent with the trilogy of Ninth Circuit cases addressing the meaning of "constructive knowledge" under the immigration laws. In both <u>Mester Manf. Co. V. INS</u>, 879 F.2d 561 (9th Cir. 1989), and <u>New El Rey Sausage Co. V. INS</u>, 925 F.2d. 1153 (9th Cir. 1991), the INS provided the employer with specific evidence that the employee was unauthorized (e.g. a computer search the employee had submitted an invalid green card), and the employer nevertheless continued the employ the individual. Under those circumstances, and without the employer offering any evidence in rebuttal, the Ninth Circuit had no difficulty in concluding that the employer had constructive knowledge that the employee was unauthorized to work. Here, if the employer follows all of the steps required for the safe harbor, and still cannot establish that the employee has provided a matching name and social security number, and if the employee was in fact unauthorized, DHS would similarly be entitled to conclude that the employer has constructive knowledge of the employee's unauthorized status. As the Court noted in <u>El Rey Sausage</u>, "[n]otice that these documents are incorrect places the employer in the position it would have been if the alien had failed to produce the documents in the first place: it has failed to adequately ensure that the alien is authorized." 925 F.2d at 1158.[3]/

---

[3]/    Plaintiffs' invocation of <u>Collins Food v. INS</u>, 948 F.2d 549 (9th Cir. 1991), is wide of the mark. In <u>Collins</u>, the Court reversed an INS finding of constructive knowledge that was based on only two, somewhat problematic, determinations by an Administrative Law Judge: first, that the employer offered the employee the job without verifying his immigration status, and second, that the employer's agent failed to compare the reverse side of the employee's (fraudulent) social security

Finally, plaintiffs assert that past INS General Counsel letters support their position. Plaintiffs' assertion that the DHS rule "abandons" prior "consistent interpretation" by INS and DHS, and their implication that no-match letters could not be used in the past by the government to assert constructive knowledge, is   wrong and relies on selective quotes -- and even more selective omissions -- from the INS General Counsel and DHS letters on which they rely. See Pls. Mem. at 8-9. citing to Exh. F-J. As the DHS rule plainly establishes, consistent with past interpretation and with the INS and DHS letters, "there are many causes for such a no-match, including errors and name changes," 71 Fed. Reg. 34281, 34282 (June 14, 2006), and DHS is aware that SSA no matches may occur due to a name change or typographical error," and "DHS acknowledges that an SSA no-match letter by itself does not impart knowledge that the identified employees are unauthorized aliens." 72 Fed. Reg. 45616 (Aug. 15, 2007).

More importantly, neither plaintiffs' conclusory arguments nor the letters plaintiffs rely on serves to prohibit or render inconsistent the clarification that DHS has provided in the new rule. Indeed, as stated in Pls. Exh. G, a 1999 opinion letter from the INS General Counsel, while one cannot assume from a no-match letter alone that the person is an unauthorized alien,

> an employer should not ignore the consequences of the follow-up activity it should perform in response to an SSA notice in order to reconcile its records for SSA purposes, such as verifying names and SSNs by examining Social Security cards. While this activity is not required by the INA (nor is it prohibited by it), the

---

card with examples provided by INS. Whether an employer's receipt of, and response to, a no-match letter is sufficient, standing alone, to support a finding of constructive knowledge for purposes of 8 U.S.C. 1324a, is only a question appropriate for an as-applied or post-enforcement challenge.  For purposes of this facial challenge, Plaintiffs must show that no-match letters can <u>never</u> provide evidence of constructive knowledge.  As their own expert's prior statements show, they cannot make any such claim.

knowledge obtained by an employer through this process may have INA implications.
* * * Furthermore, if an employee has been given the opportunity for wage reporting
purposes to explain and reconcile a reported discrepancy with SSA records, and has
failed to do so satisfactorily, that is an entirely different situation from an initial SSA
notice standing alone. The INS would be much more likely at that point to consider
that employer to have violated section 274A if it continues the employment without
taking appropriate steps to reverify work authorization, and the employee is in fact
unauthorized. (emphasis added.)

IV.    **The DHS No Match Regulation Does Not Violate Any SSA or Tax Confidentiality Laws.**

Despite plaintiffs' hints and insinuations, DHS will not obtain taxpayer information from SSA under this new rule. No match letters provide information to employers and employees, but DHS will not receive such information from SSA under the new rule,[4]/ See Spero Declaration, ¶ 5. Plaintiffs argue that there is something improper about the DHS regulation because the SSA database of names and associated social security numbers is utilized to assist employers and employees in resolving discrepancies that may have immigration law ramifications. While plaintiffs repeatedly insist that the SSA's database is maintained for the "*sole* purpose of administering social security benefits," Plaintiffs; Memorandum at 24:13-14 (emphasis added), they offer no citation for that

---

[4]/    DHS, like other law enforcement agencies can obtain tax information in a number of ways, including under the provisions of 26 U.S.C. § 6103. DHS may also lawfully obtain no match letters directly from the employer pursuant to other legal authority, such inspection of employer records pursuant to 8 U.S.C. § 1324(e)(2)(A), subpoena of employer records pursuant to 8 U.S.C. § 1324a(e)(2)(c), or a grand jury subpoena. The issue of whether a no match letter is "taxpayer return information" is simply not relevant to the validity of the no match regulation.

assertion.[5]/  In fact, there is no such legal prohibition on utilizing the SSA database for other purposes, so long as the taxpayer information contained in the database is protected from disclosure to DHS or anyone else.  This DHS regulation is promulgated pursuant to its authority to adopt regulations necessary and appropriate to enforce the immigration laws. 8 U.S.C. § 1324a.

Finally, Plaintiffs argue that, by promulgating the Regulation, DHS has effectively "commandeer[ed]" DOJ authority to interpret *and enforce* the anti-discrimination provisions of the statute at issue, 8 U.S.C §1324b(c).  At best, this suggestion misinterprets the respective authorities of DHS and DOJ to promulgate rules and enforce the provisions of those rules and related statutes.  And it misunderstands DOJ Office of Special Counsel for Immigration Related Unfair Employment Practice's ("OSC") retained role under the Homeland Security Act of 2002, as well as the purported employer immunity under the "safe-harbor."

As Plaintiffs correctly point out, "Congress provided the responsibility for enforcing certain provisions of the immigration laws, including the anti-discrimination provisions, would remain with DOJ..." Memorandum, 29.  Indeed, DOJ OSC is charged with enforcing IRCA's anti-discrimination provisions, and DHS does not attempt to abrogate that function.  Accordingly, any suggestion that DHS, by virtue of promulgating the Rule, has attempted to alter that role and exceeded its authority, is untrue.

Moreover, Plaintiffs have omitted important and relevant portions of the Guidance Letter in an apparent attempt to suggest that the safe-harbor procedure will absolutely immunize an employer from national origin discrimination.  Memorandum at 28, Appendix B.  Indeed, Plaintiffs have curiously left out clear DHS instruction to employers that the "safe-harbor" provisions do no such

---

[5]/    In fact, under 26 U.S.C. § 6103, the Secretary of Treasury can share taxpayer information, such as is included in the SSA database with federal law enforcement agencies in appropriate circumstances.

thing.  See Appendix B.  The complete question and instruction to employers, as set forth in the

Guidance Letter,  read as follows:

> **Q: Will I be liable for any discrimination charges brought by the United**
>
> **States if I terminate the employee after following the steps outlined**
>
> **above?**
>
> A: No.  *An employer that receives such a letter and terminates employees*
>
> *without attempting to resolve the mismatches, or who treats employees*
>
> *differently based upon national or other prohibited characteristics, may be*
>
> *found to have engaged in unlawful discrimination*.  However, if an employer
>
> that follows all of the procedures outlined by DHS in this letter (and
>
> http://www.ice.gov) cannot determine that an employee is authorized to work
>
> in the United States, and therefore terminates that employee, then that
>
> employer will not be subject to suit by the United States under the
>
> Immigration and Nationality Act's anti-discrimination provision.

Id.  (emphasis added)

**IV.    The Balancing of Equities Counsels Against the Entry of a TRO**

As discussed herein, plaintiffs have not established that the new DHS Safe Harbor Rule is

unlawful and hence they have no likelihood of success on the merits.  Nor can plaintiffs show

irreparable injury, either in their associational capacities or to their members. As shown above, the

claims that some persons, whom plaintiffs cannot identify, may at some indeterminate time in the

future be fired is conclusory and speculative, at best. Indeed, if such terminations do take place,

plaintiffs have more than amply identified the receipt of the SSA no match letter by itself as being

as likely, if not more likely, to lead to termination. A temporary restraining order or preliminary

1    injunction will not alleviate that potential.

2        The claim that employers will have to bear administrative burdens in taking steps to clarify
3
     their social security status is not sufficient to establish irreparable injury, since the burden and
4
     expense of complying with administrative process does not constitute irreparable harm. Sampson
5
6    v. Murray, 415 U.S. 61 (1974);  A.O. Smith Corp. v. FTC, 530 F.2d 515 (3d Cir. 1976) (even if

7    plaintiffs consider the new rule to require action, cost of compliance with government regulation is

8    not irreparable injury, but regular business expense). That employees may have to take off work to
9
     go to the local Social Security office, even as many as five separate trips as one of plaintiffs'
10
     declarants describes, and lose pay as a result is similarly deficient.  "Mere litigation expense, even
11
12   substantial and unrecoupable cost, does not constitute irreparable injury."  Renegotiation Board v.

13   Bannercraft Co., 415 U.S. 1, 24 (1974);

14        Finally, fears that, due to the operation of the regulation, some employees might lose their
15
     jobs if unable to obtain clarification of their status from SSA are also insufficient, since "[speculative
16
17   injury does not constitute irreparable injury."  Goldie's Bookstore, Inc. v. Superior Court, 739 F.2d
18
     466, 472 (9th Cir. 1984).  As the D.C. Circuit has noted, "[b]are allegations of what is likely to occur
19   are of no value * * * The key word in this consideration is irreparable. Mere injuries, however

20   substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not

21   enough."  Wisc. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C.Cir. 1985).  "A plaintiff must do more
22
     than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate
23
24   immediate threatened injury as a prerequisite to preliminary injunctive relief."  Caroline M. Corp.,

25   Inc. v. Baldrige, 844 F.2d 686, 674 (9th Cir. 1988).

26        Finally, and most critically, this new regulations will strongly advance the public interest in

27   the fair and effective enforcement of the immigration laws.  The new rule provides much-needed
28

clarity to employers as to the actions that they may take in response to the receipt of a no match letter from SSA. Employers who utilize the safe harbor option will avoid the dilemma of whether to take no action and risk liability or to possibly terminate a valued employee, where the employer may also risk liability in possible a suit by the former employee. The issuance of a TRO at this point would cause confusion among employers who have been assuming that the rule would go into effect or operating under advice previously given by the Immigration and Naturalization Service or DHS consistent with the language of the rule and the DHS letters. Additionally, an order enjoining SSA from sending out no match letters (which cannot, at this point, be "uncoupled" from the DHS letters describing the new rule), would also frustrate the purpose of providing notice to employees that their social security earnings are not being credited to their accounts.

For all of these reasons, the balancing of equities strongly favors defendants and hence the Court should deny plaintiffs' motion for a TRO.

### CONCLUSION

Wherefore, plaintiffs' Motion for Temporary Restraining Order should be denied.

DATED: August 31, 2007                    Respectfully submitted,


                                          PETER D. KEISLER
                                          Assistant Attorney General
                                          THOMAS DUPREE
                                          Deputy Assistant Attorney General


                                          SCOTT N. SCHOOLS
                                          United States Attorney

                                          JOANN M. SWANSON
                                          Chief, Civil Division

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JONATHAN LEE
Assistant U. S. Attorney
Assistant Chief, Civil Division
450 Golden Gate Ave., 9th Floor
San Francisco, Cal. 94102
Telephone: 415-436-6909
Facsimile: 415-436-6748
E-mail: Jonathan.Lee@ USDOJ.gov


_____ /s/ _____

SANDRA SCHRAIBMAN
DANIEL E. BENSING (D.C. Bar No. 334268)
Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6114
Washington, D.C.  20001
Telephone:  (202) 305-0693
Facsimile:  (202) 616-8460

1

2

3

<u>Certificate of Service</u>

4

5

    I hereby certify that on this 31st day of August, 2007, I caused to be served by mail and e-
6 mail a copy of Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order upon
the following counsel:

7

8          Scott A. Kronland
           Altshuler Berzon LLP
9          177 Post St.
           San Francisco, California 94108
10

11         Counsel for Plaintiffs

12

13

14

15                              /s/
                   _____
16                              Daniel Bensing

17

18

19

20

21

22

23

24

25

26

27

28