UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL CHERTOFF, Secretary of Homeland Security, et al., <br><br> Defendants. | Case No. 07- |

## DECLARATION OF DAVID A. RUST

I, David A. Rust, declare and state as follows:

1.  I am the Acting Deputy Commissioner for Disability and Income Security Programs (ODISP) in the Social Security Administration (SSA). ODISP is the component in SSA that is responsible for all program policy, including oversight of the enumeration and wage reporting policies. The information set forth herein is based upon my personal knowledge and understanding of SSA's overall operations, and from information provided to me by SSA personnel with relevant knowledge.

2.  SSA maintains earnings information on workers. When employers report wages on Form W-2 (Wage and Tax Statement), SSA credits those wages to the worker's account. However, SSA cannot credit wages if the name and Social Security Number (SSN) of the worker on the W-2 Form do not match the name and SSN in SSA's records

Attachment A

(no-match discrepancy).

3. If SSA is unable to match the name and SSN with its records, SSA is unable to attribute the earnings to an individual worker's record. There are a number of reasons why reported information may not agree with our records, such as typographical errors, unreported name changes, inaccurate or incomplete employer's records, or misuse of an SSN.

4. SSA tries to resolve no-match discrepancies by sending letters to the employer and the affected worker and asking for additional information, as needed. These letters are referred to as "no-match" letters, and their purpose is to obtain corrected information to help SSA identify the individual to whom earnings belong and to post the earnings to the individual's earnings record. SSA began sending "no-match" letters to workers in 1979 and to employers in 1994.

5. Currently, no-match letters are sent to any employer who reports more than 10 no-matches that represent more than 0.5% of the W-2s included in the employer wage report. The letter asks the employer to prepare a Form W-2c (Corrected Wage and Tax Statement) for each of the SSNs that the employer is able to correct, and asks the employer to respond within 60 days with the information that the employer was able to correct so that SSA can maintain an accurate earnings record for each employee.

6. No-match letters do not imply that the employer or the employee intentionally provided incorrect information. SSA cautions employers that taking action against an employee based on nothing more than a no-match letter may violate the law.

7.  Recently, the no-match letter was revised in light of the Department of Homeland Security (DHS) "Safe Harbor Procedure for Employers Who Receive a No-Match Letter" regulation. The list of common reasons for name/SSN mismatches contained in the SSA letter was revised to include the possibility that the name or SSN was false or that the number was assigned to someone else. SSA added language to the letter explaining that receipt of the letter did not make any statement about an employee's immigration status and that the letter alone should not be used to take any adverse action against an employee. The letter also referred to a DHS insert to inform employers of their obligations under immigration laws.

8.  The DHS insert and SSA "no match" letter are currently part of the same electronic package that is transmitted to a vendor for production and mailing. If SSA were to remove the DHS insert document and the related language from the "no match" letter it would take SSA an additional 30 days. It would also require a complex series of systems actions and validations. Similarly, if SSA were required to replace the DHS insert document after it has been removed, it would take an additional 30 days.

9.  SSA delayed sending the no-match letters for several months in 2007 because of ongoing policy discussion with DHS concerning its final rule and then because of possible enactment of immigration legislation by Congress. There was much coordination with DHS required to ensure that the SSA letter and DHS insert were not inconsistent with DHS policy or possible comprehensive immigration reform.

10. From a computer systems perspective, any delay in printing and mailing the no-match letters will cause SSA harm. SSA's Office of Systems, Division of Annual Wage Reporting and Balancing (DAWRB) currently has over 141,000 pending no-match letters. As described below, the mailing of these notices will impact the Employer 800 number and field offices. To minimize the impact on SSA's field offices and the Employer 800 number, SSA is regulating the volume of notices which are sent each day. SSA was to release 500 notices on September 4, 2007, and again on September 5, 2007; 2500 notices on September 6, 7, and 8, 2007; 3200 notices per day from September 10 through November 7, 2008; and 300 notices (remainder), on November 8, 2007. Any delay in sending out the letter would cause SSA either to greatly compress this schedule or extend it later towards the end of the calendar year. If SSA cannot send out the first no-match letters until the week of October 1, 2007, compressing the schedule in that manner would amount to doubling the daily output to 6400 per day.

11. When employers receive no-match letters, they may call SSA's Employer 800 number. In addition, employers may direct employees to visit a local SSA field office to resolve the no-match. In addition to resolving no-match discrepancies, SSA's field offices conduct a substantial amount of SSA business including: **conducting interviews to obtain, clarify, and verify information about individual applicants' initial and continuing eligibility for retirement, survivors, disability, black lung, health insurance benefits, and eligibility for supplemental security income payments. They adjudicate, and authorize payment for, claims for benefits and eligibility to all programs administered by SSA. They conduct interviews and develop, investigate, and resolve**

postentitlement actions, including SSI redeterminations, which may involve suspension, resumption, or termination of eligibility or payments. They are also responsible for approving the selection of representative payees for individuals. In addition to resolving no-match issues, the SSA Employer 800 number is used for other employer wage reporting questions or problems such as questions regarding Cost of Living Adjustments (COLA), maximum wage contributions and the amount for a tax credit, the maximum amount of earnings subject to Social Security taxes, Social Security contribution rates, access to Social Security Number Verification Services, whether services performed by foreign students/exchange visitors are covered, etc.

12. In order to minimize the impact of the mailing of the no-match letters on SSA's Employer 800 number and our field offices, SSA decided to spread the mailing of the 141,000 no-match letters, affecting 8 million employees, over a two-month period (currently planned for September 2007-early November 2007). SSA's peak workload period for the Employer 800 number and the field offices traditionally starts in December and peaks in the January-to-March quarter. The no-match process gives employers 90 days to resolve issues and correct their records with SSA. Consequently, if the mailing of the letters is delayed beyond September 15th, there will be a significant workload impact on SSA's regular operations well into the second quarter of FY 2008 (January through March 2008).

13. SSA's conduct of its business would be harmed by delaying the sending of these no-match letters. In FY 2007, SSA's Employer 800 number received 28 percent more calls

in the January-to-March quarter than the prior quarter. The addition of calls from the no-match letters will generate much higher busy rates. Therefore, there will be a significant impact on SSA's ability to answer calls from employers attempting to register so they can file online wage reports, verify SSNs of employees and correct wage reports. There will be a comparable impact on SSA's 1300 field offices. As a result of the DHS regulation, we anticipate they will receive a substantial number of additional contacts from employees who are identified on no-match letters. The field offices are extremely busy in the first quarter of each calendar year. Up to a million customers visit the SSA field offices in January to file retirement and disability claims, report post-entitlement changes and resolve SSN issues. Adding a substantial number of additional visitors during this period will severely tax SSA's facilities and our employees.

14. In the second quarter of fiscal year (FY) 2007 (January-March), SSA received a total of almost 2.3 million benefit claims. It expects to receive 2.2 million total claims in the first quarter of FY 2008 (October-December) and 2.4 million claims in the second quarter of FY 2008. The resultant increase in total claims workload in the second quarter of FY 2008 would be 5.1% over the totals for the same quarter in the previous FY and an 8.6% increase from the first to second quarter in FY 2008.

In the second quarter of FY 2007, SSA received a total of almost 1.15 million disability benefit claims. Of these, 860,000 required the most time to process. It expects to receive 840,000 of time-intensive disability claims in the first quarter of FY 2008 and 910,000 claims in the second quarter of FY 2008. The resultant increase in disability claims

workload in the second quarter of FY 2008 would be 5.7% over the totals for the same quarter in the previous FY and an 8.2% increase from the first to the second quarter in FY 2008.

At the same time that these expected significant increases in claims occur in the second quarter of FY 2008, SSA will have severe budgetary constraints which will limit its hiring capability throughout FY 2008, and it will be unable to divert additional resources to address employer inquiries generated by the no-match letters. It is critical, therefore, that SSA be able to send out its no match letters as quickly as possible so that it may deal with those inquiries before the onslaught of claims hits SSA in the second quarter of FY 2008.

15. In addition to these concerns, further delay in the mailing of the no-match letters increases the likelihood that employer wage reports for tax year 2007 will continue to have the same errors that were identified on the tax year 2006 reports. Those employees will continue to have wage discrepancies, and the number of records SSA will need to correct in the future will grow.

16. Finally, the impact on SSA's next Annual Wage Reporting release (tax year (TY) 2007 in January 2008) will be significant if the no-match letters are not mailed immediately. SSA is currently in the process of making the changes for TY 2007 and validating those changes. Beginning in December 2007, SSA will move the TY 2007 changes to the integration phase, and throughout December 2007 and January 2008, SSA will be testing those changes in the integration phase. In order to regulate the issuances of the

no-match letters over the coming months, SSA must use a manual, rather than automated process. If SSA must manually process the 2007 no-match letters into the beginning of the next tax year, there would be a significant impact on the January 2007 Annual Wage Reporting release. Further delays would require SSA to divert programmers, who have already closed out TY 06 processing and are focused on TY 2007 validation/testing, back to TY 2006 processing introducing potential for delay/error in the introduction of 2007 changes.

I hereby declare under penalty of perjury (28 U.S.C. § 1746) that the foregoing statement is true and correct to the best of my knowledge and belief. Executed this 5th day of September, 2007, in Baltimore, Maryland.

_____
David A. Rust