# EXHIBIT A

Robert P. Charrow (CA SBN 44962)
Laura M. Klaus (DC SBN 294272) (*Pro Hac to be Filed*)
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, N.W., Ste. 500
Washington, D.C. 20006
Telephone: (202) 533-2396
Facsimile: (202) 261-0164
Email: charrowr@gtlaw.com
Email: klausl@gtlaw.com

William J. Goines (SBN 61290)
Karen Rosenthal (SBN 209419)
Cindy Hamilton (SBN 217951)
GREENBERG TRAURIG, LLP
1900 University Avenue, Fifth Floor
East Palo Alto, CA 94303
Telephone: (650) 328-8500
Facsimile: (650) 328-8508
Email: goinesw@gtlaw.com
         rosenthalk@gtlaw.com

Attorneys for Plaintiff-Intervenors

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS; SAN FRANCISCO LABOR COUNCIL; SAN FRANCISCO BUILDING AND CONSTRUCTION TRADES COUNCIL; and CENTRAL LABOR COUNCIL OF ALAMEDA COUNTY,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL CHERTOFF, Secretary of Homeland Security; DEPARTMENT OF HOMELAND SECURITY; JULIE MYERS, Assistant Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MICHAEL ASTRUE, Commissioner of Social Security; and SOCIAL SECURITY ADMINISTRATION,<br><br>Defendant(s). | Case No. C07-04472 CRB<br><br>**[PROPOSED] COMPLAINT IN INTERVENTION** |

SV 346217603v1

[PROPOSED] COMPLAINT IN INTERVENTION
C07-04472 CRB

SAN FRANCISCO CHAMBER OF COMMERCE,
CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, GOLDEN GATE RESTAURANT ASSOCIATION,
NATIONAL ROOFING CONTRACTORS ASSOCIATION, AMERICAN NURSERY & LANDSCAPE ASSOCIATION,
INTERNATIONAL FRANCHISE ASSOCIATION, and UNITED FRESH PRODUCE ASSOCIATION,

    Plaintiff-Intervenors

v.

MICHAEL CHERTOFF, Secretary of Homeland Security; DEPARTMENT OF HOMELAND SECURITY;
JULIE MYERS, Assistant Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MICHAEL ASTRUE, Commissioner of Social Security; and SOCIAL SECURITY ADMINISTRATION,

    Defendants.

## I.    PRELIMINARY STATEMENT

1.    On August 15, 2007, the Secretary of Homeland Security issued a Final Rule that sought to change the nation's human resource practices for all American businesses large and small. The Final Rule, which was to become effective on September 14, 2007, would require businesses to resolve so-called "no-match" letters from the Social Security Administration in 30 days, and if unable to do so, then employees are given an additional 63 days to do so or risk termination. The Secretary had announced that starting on September 4, "no-match" letters identifying approximately 8,000,000 employees would be sent by the Social Security Administration to 140,000 employers nation-wide. A "no-match" occurs whenever there is a discrepancy between an employee's name and Social Security Number ("SSN") in the Social Security Administration ("SSA") database. SSA, though, has acknowledged that its database contains more than 17 million so-called no-matches. Many are due to benign causes such as a change of name following marriage, a clerical error by the employee, employer or SSA, use of multiple surnames, varied naming conventions or other reasons having

nothing to do with an employee's immigration status. Given that the correlation between an employee's immigration status and an employer's receipt of a no-match letter for that employee is unknown or low, using the no-match letter as a tool to enforce immigration laws is wasteful, costly to the business community, and an awkward attempt by the Department of Homeland Security ("DHS") to commandeer the Social Security retirement and disability systems to enforce the nation's immigration laws, all at the expense of innocent employers and employees.

2. The Secretary certified that this regulation, affecting virtually every business in the United States, "would not have a significant economic impact on a substantial number of small entities," including the nation's 5,300 hospitals, more than 2,000 colleges and universities, and nearly 900,000 small business restaurants employing more than 11 million workers. 72 Fed. Reg. 45611, 45623 (Aug. 15, 2007). Accordingly, the Secretary refused to conduct a regulatory flexibility analysis, as required by the Regulatory Flexibility Act. *See* 5 U.S.C. § 601 *et seq.* This lawsuit seeks an order declaring that the Final Rule is invalid (i) for want of a regulatory flexibility analysis, (ii) for want of statutory authorization, (iii) for want of evidence in the preamble to the proposed or final rule that a no-match letter reliably indicates an employee's immigration status, and vacating the Final Rule and enjoining its enforcement as detailed below.

## II. JURISDICTION AND VENUE

3. This court has subject matter jurisdiction over this action pursuant to:

    a. 28 U.S.C. § 1331, which confers original jurisdiction over all civil suits arising under the Constitution and the laws of the United States, and 28 U.S.C. § 2201 (authorizing declaratory relief), 5 U.S.C. § 601 *et seq.* (Regulatory Flexibility Act), and 5 U.S.C. § 701 *et seq.* (judicial review provisions of the Administrative Procedure Act).

    b. Venue is proper pursuant to 28 U.S.C. § 1391(e).

## III. VENUE AND INTRA-DISTRICT ASSIGNMENT

4. Venue is proper in this Court pursuant to 28 U.S.C. §1391(e) because Plaintiff-Intervenors San Francisco Chamber of Commerce and Golden Gate Restaurant Association reside in this judicial district.

5. Pursuant to Local Rule 3-2(d), an intra-district assignment to the San Francisco or Oakland Division is proper because a substantial part of the events giving rise to the claims in this action will occur in the County of San Francisco. Plaintiff-Intervenors San Francisco Chamber of Commerce and Golden Gate Restaurant Association reside in the City and County of San Francisco, and Defendant Social Security Administration maintains a Regional Office in San Francisco.

### IV.    PARTIES

**A.    Plaintiff-Intervenors**

6. Plaintiff-Intervenor San Francisco Chamber of Commerce ("San Francisco Chamber") is a not-for-profit membership corporation organized under the laws of the State of California and headquartered in San Francisco. The San Francisco Chamber is a small entity within the meaning of the Regulatory Flexibility Act and is both an employer and a membership organization. The San Francisco Chamber has approximately 2,000 members, more than 80% of which are small businesses within the meaning of section 3 of the Small Business Act, most of which are headquartered in the Northern District of California. Many of the small businesses would receive no-match letters from SSA in the event that the Final Rule at issue in this case was to become effective. Indeed, for many of its small business members, the likelihood of receiving such letter exceeds 90%. The San Francisco Chamber understands that the financial costs associated with resolving no-match letters are substantial and not necessarily linear. Those costs involve overtime for those in human resources, lost productivity for those employees named in such letters, and increased unemployment insurance premiums in the event that the employees who are unable to resolve a no-match within the requisite period are terminated. Based on the San Francisco Chamber's experience, it is highly unlikely that SSA would be able to resolve the more than 8 million no-matches within the time contemplated by the Final Rule. The San Francisco Chamber and its members will be imminently and irreparably harmed if the Final Rule was to go into effect. The San Francisco Chamber is bringing this suit both on its behalf as a small entity employer and on behalf of its members many of which will also receive such letters.

7. Plaintiff-Intervenor Chamber of Commerce of the United States of America ("Chamber of Commerce") is a not-for-profit membership corporation headquartered in Washington,

D.C. and employing more than 500 individuals. The Chamber of Commerce is the world's largest business federation with an underlying membership of more than 3 million businesses of all sizes, sectors, and regions. The Chamber of Commerce is a small organization within the meaning of the Regulatory Flexibility Act and more than 96% of its members are small businesses as that term is defined in section three of the Small Business Act. Based on the Chamber's experience as an employer it is highly unlikely that SSA would be able to resolve the more than 8 million no-matches within the time contemplated by the Final Rule. The Chamber and its members will be imminently and irreparably harmed if the Final Rule was to go into effect. The Chamber is bringing this suit both on behalf of itself as a small entity employer which is apt to receive a no-match letter and on behalf of its members many of which will also receive such letters.

8. Plaintiff-Intervenor Golden Gate Restaurant Association ("GGRA") is a not-for-profit membership corporation headquartered in San Francisco. GGRA has more than 800 restaurant members throughout the Northern District of California; many of those members have received no-match letters in the past and fully expect to receive them in the future. GGRA is a small organization within the meaning of the Regulatory Flexibility Act and most of its members are small businesses within the meaning of section 3 of the Small Business Act. Based on GGRA's experience as an employer, it is highly unlikely that SSA would be able to resolve the more than 8 million no-matches within the time contemplated by the Final Rule. GGRA and its members will be imminently and irreparably harmed if the Final Rule was to go into effect. GGRA is bringing this suit both on its behalf as a small entity employer and on behalf of its members many of which will receive no-match letters.

9. Plaintiff-Intervenor National Roofing Contractors Association ("NRCA") is a not-for-profit membership organization headquartered in Rosemont, Illinois and employing more than 70 individuals. The NRCA is a small organization within the meaning of the Regulatory Flexibility Act and more than 95% of its 4,200 members are small businesses within the meaning of section 3 of the Small Business Act. More than 30 of its small business members are headquartered in this District. The financial costs for NRCA and its members to resolve no-match letters are substantial and not necessarily linear. Those costs involve overtime for those in human resources, lost productivity for

those employees named in such letters, increased unemployment insurance premiums in the event that the employees who are unable to resolve a no-match letter within the requisite period and are terminated. Based on NRCA's experience as an employer, it is highly unlikely that SSA would be able to resolve the more than 8 million no-matches within the time contemplated by the Final Rule. NCRA and its members will be imminently and irreparably harmed if the Final Rule was to go into effect. NRCA is bringing this suit both on behalf of itself as a small entity employer which is apt to receive a no-match letter and on behalf of its members, many of which will also receive such letters.

10. Plaintiff-Intervenor United Fresh Produce Association ("United Fresh ") is a not-for-profit membership organization headquartered in Washington, D.C. United Fresh has more than 290 small business members; many of those members have received no-match letters in the past and fully expect to receive them in the future. United Fresh is a small organization within the meaning of the Regulatory Flexibility Act and most of its business members are small businesses within the meaning of section 3 of the Small Business Act. Based on United Fresh's experience as an employer, it is highly unlikely that SSA would be able to resolve the more than 8 million no-matches within the time contemplated by the Final Rule. United Fresh and its members will be imminently and irreparably harmed if the Final Rule was to go into effect. United Fresh is bringing this suit both on its behalf as a small entity employer and on behalf of its members many of which will receive no-match letters.

11. Plaintiff-Intervenor American Nursery & Landscape Association ("ANLA") is a not-for-profit membership corporation headquartered in Washington, D.C. ANLA has more than 2,000 members, 98% of which are small businesses; many of those members have received no-match letters in the past and fully expect to receive them in the future. ANLA is a small organization within the meaning of the Regulatory Flexibility Act and most of its members are small businesses within the meaning of section 3 of the Small Business Act. Based on ANLA's experience as an employer, it is highly unlikely that SSA would be able to resolve the more than 8 million no-matches within the time contemplated by the Final Rule. ANLA and its members will be imminently and irreparably harmed if the Final Rule was to go into effect. ANLA is bringing this suit both on its behalf as a small entity employer and on behalf of its members many of which will receive no-match letters.

12. Plaintiff-Intervenor International Franchise Association ("IFA") is a not-for-profit membership corporation headquartered in Washington, D.C. IFA has more than 11,000 members, including 1,200 franchisor members, 10,000 franchisee members and 400 supplier members. Approximately half of IFA's franchisor members and virtually all of its franchisee members are small businesses; many of those members have received no-match letters in the past and fully expect to receive them in the future. IFA is a small organization within the meaning of the Regulatory Flexibility Act and many of its members are small businesses within the meaning of section 3 of the Small Business Act. Based on IFA's experience as an employer, it is highly unlikely that SSA would be able to resolve the more than 8 million no-matches within the time contemplated by the Final Rule. IFA and its members will be imminently and irreparably harmed if the Final Rule was to go into effect. IFA is bringing this suit both on its behalf as a small entity employer and on behalf of its members many of which will receive no-match letters.

**B.  Defendants**

13. Defendant Department of Homeland Security is the federal agency charged with, *inter alia*, the administration and enforcement of federal immigration laws. DHS promulgated the rule entitled "Safe Harbor Procedures for Employers That Receive a No Match Letter," 72 Fed. Reg. 45611 (Aug. 15, 2007), that is challenged in this litigation.

14. Defendant U.S. Immigration and Customs Enforcement ("ICE") is a federal agency within DHS responsible for investigating and enforcing immigration laws, including 8 U.S.C. § 1324a. DHS and ICE created the Guidance Letter regarding the DHS Final Rule that SSA intends to send to employers along with its "no-match" letters.

15. Defendant Michael Chertoff is the Secretary of Homeland Security ("Secretary"), the agency responsible for having issuing the regulation at issue and the agency that will implement the regulation at issue. Defendant Chertoff is being sued in his official capacity only.

16. Defendant Julie Myers is the Assistant Secretary of Homeland Security for ICE, the agency within the Department of Homeland Security ("DHS") directly responsible for implementing, investigating and enforcing immigration laws, including the no-match letters and Final Rule. Defendant Myers is being sued in her official capacity only.

17. Defendant Social Security Administration is a federal agency charged with administration of the Social Security Act, and with processing information to administer Social Security programs. Defendant SSA maintains databases of employee information and periodically generates "no-match" letters to employers that submit Forms W-2 to report employee earnings if employee names and SSNs do not match SSA records. *See* Social Security Act § 232, 42 U.S.C. § 432; 20 C.F.R. § 422.120. Beginning on September 4, 2007, Defendant SSA intended to send the DHS/ICE Guidance Letter to employers along with its "no-match" letters.

18. Defendant Michael Astrue is the Commissioner of Social Security and is responsible for all programs administered by SSA. He is sued in his official capacity.

## V.   BACKGROUND

### A.   Social Security Administration "No Match" Letters

19. The Social Security Act of 1935 authorizes SSA to establish a record-keeping system to manage the Social Security program. Congress also granted SSA authority to process tax information for purposes of administering the Social Security program, as a specific exception to the exclusive tax authority of the Internal Revenue Service ("IRS"). *See* 26 U.S.C. § 6103(l)(5); SSA § 232, 42 U.S.C. § 432. Pursuant to that delegation of authority, the IRS and SSA created a joint system for the processing of Forms W-2 called the Combined Annual Wage Reporting System ("CAWR"). *See* 43 Fed. Reg. 60158 (Dec. 26, 1978) (codified at 26 C.F.R. § 31.6051).

20. Under the CAWR, employers annually report employee earnings using Forms W-2, and SSA posts those earnings to individual employees' Social Security records so employees will receive credit for those earnings when they apply for Social Security benefits--either retirement or disability. SSA then forwards the Forms W-2 to the IRS.

21. If SSA cannot match the name and Social Security Number ("SSN") on a Form W-2 with SSA's records, SSA places the earnings report in its Earnings Suspense File. *See* 20 C.F.R § 422.120. The earnings remain in the Earnings Suspense File until SSA can link them to a name and SSN.

22. Every year, SSA receives millions of earnings reports that the SSA cannot match with its records. The Earnings Suspense File is a huge database that contains more than 255 million

unmatched earnings records and that is growing at the rate of 8 to 11 million unmatched records per year. About four percent of annual Form W-2 earnings reports are placed in the SSA's Earnings Suspense File.

23. SSA records are mismatched for many unrelated to immigration status including: (a) clerical errors by either an employer or SSA in spelling an employee's name or recording the SSN, (b) SSA's issuance of duplicate SSNs or re-issuance of SSNs of deceased individuals, (c) employee name changes after marriage or divorce, (d) employees that use a less "foreign" sounding first name for work purposes, and (e) different naming conventions (such as the use of multiple surnames) that are commonplace in many parts of the world, particularly in some Latin American and Asian countries.

24. The most recent Government Accountability Office ("GAO") report on the SSA's Earnings Suspense File concluded that the file "[c]ontains information about many U.S. citizens as well as non-citizens" and that "the overall percentage of unauthorized workers is *unknown*." GAO-06-814R, at 8 (emphasis added). When SSA ultimately has been able to resolve data discrepancies, "most . . . belong to U.S.-born citizens, not to unauthorized workers," which GAO concluded "is an indication that a significant number of earnings reports in the [Earnings Suspense File] belong to U.S. Citizens and work-authorized noncitizens." *Id.*

25. As part of its administration of the Social Security program, SSA periodically sends out letters, commonly known as "no-match" letters, informing employers that SSNs and employee names reported on Forms W-2 did not match SSA's records. *See* 20 C.F.R. § 422.120.

26. SSA no-match letters are purely advisory. SSA has no authority to sanction employers that fail to respond to no-match letters.

27. Pursuant to its regulations, SSA notifies the IRS of incomplete or inaccurate earnings reports. *See* 20 C.F.R. § 422.120. In 1986, Congress authorized IRS to impose sanctions on employers that submit false or inaccurate tax information. *See* 26 U.S.C. § 6721; *see also* 26 C.F.R. § 301.6721-1. Under IRS regulations, an employer is not subject to sanction if the employer accurately and in good faith transmits the name and SSN provided by an employee. *See* 26 U.S.C. § 6724(a); 26 C.F.R. § 301.6724-1. Insofar as the Internal Revenue Code is concerned, a reasonable

employer's response to a no-match letter is to confirm that the employer is accurately transmitting the name and SSN provided by the employee and to advise the employee that SSA is reporting a no-match. *Id.*

28. SSA is not an immigration agency and does not know whether a particular SSN listed in a no-match letter relates to unauthorized work. SSA also is prohibited by tax privacy statutes from sharing the information in the Earnings Suspense File with the DHS. Until now, SSA's no-match letters explained to employers: "This letter does not imply that you or your employee intentionally gave the government wrong information" and "makes no statement regarding an employee's immigration status." Until now, the SSA has never included information from an immigration-enforcement agency with its no-match letters.

**B.  Employer Verification of Work Authorization and Employer Sanctions**

29. The Immigration Reform and Control Act of 1986 ("IRCA") made it unlawful for employers to "to hire . . . for employment in the United States an alien *knowing* the alien is an unauthorized alien." 8 U.S.C. § 1324a(a)(1)(A) (emphasis added).

30. IRCA also separately made it unlawful for employers to hire without complying with an initial verification process established by Congress. *See* 8 U.S.C. § 1324a(a)(1)(B). That verification process requires the employee to present the employer with documents to show proof of identity and work authorization and requires the employer and employee to complete an I-9 verification form. *See* 8 U.S.C. § 1324a(b); 8 C.F.R. § 274a.2. To satisfy the I-9 requirements, Plaintiffs require all prospective employees to provide documentation proving identity and demonstrating that the employee is authorized to work in the United States. Thus, prospective employees provide various documents including United States passports, alien registration cards (*i.e.*, Green Card), and Employee Authorization Documents issued by the DHS permitting the individual to work in the United States.

31. IRCA also makes it unlawful for an employer "to continue to employ an alien . . . *knowing* the alien is (or has become) an unauthorized alien with respect to such employment." 8 U.S.C. § 1324a(a)(2) (emphasis added).

32. IRCA specifically exempted employees hired before IRCA's enactment on November 6, 1986, from the hiring prohibition and the verification process. Pub. L. No. 99-603 § 101(a)(3), 100 Stat. 3359 (1986) (codified at 8 U.S.C. § 1324a note).

33. Employers that violate IRCA are subject to civil and criminal liability. *See* 8 U.S.C. § 1324a(e)(4)-(5), (f).

34. At the same time that Congress imposed employer sanctions, Congress also wanted to prevent employer discrimination based on national origin or citizenship status. IRCA therefore makes it illegal for employers to discriminate based on national origin or citizenship status, including by requesting "more or different documents than are required" for the initial I-9 verification or "refusing to honor documents . . . that on their face reasonably appear to be genuine." 8 U.S.C. § 1324b(a)(1), (6).

35. Congress intentionally did not impose in IRCA any employment authorization verification for existing employees. Congress also chose not to impose ongoing re-verification requirements after the initial hire unless documents evidencing temporary work authorization are time limited.

C. **New Department of Homeland Security Rule**

36. Until now, neither DHS nor its predecessor immigration-enforcement agencies had taken the position that an employer's failure to make further inquiries into the work-authorization status of an employee subject to an SSA no-match letter meant that the employer had actual knowledge that it was employing an unauthorized worker. The Immigration and Naturalization Service had recognized that no-match discrepancies occur for many innocent reasons and therefore consistently advised employers in opinion letters that "[w]e would not consider notice of this discrepancy from SSA to an employer by itself to put the employer on notice that the employee is unauthorized to work." The most recent SSA letter on the materiality of a no-match letter states as follows: "This notice also specifically cautions employers that these letters . . . do not make any statement about an employee's immigration status[.]" <http://www.ssa.gov/legislation/nomatch2.htm> (last viewed Sept. 6, 2007).

37. On June 14, 2006, Defendant Chertoff issued a notice of proposed rulemaking soliciting public comments on his proposal to use the Social Security database, and, in particular, SSA no-match letters as vehicle for enforcing the immigration laws. *See* 71 Fed. Reg. 34281 (June 14, 2006). The preamble concluded, in part, as follows:

> The Secretary of Homeland Security, in accordance with the Regulatory Flexibility Act, 5 U.S.C. 605(b), has reviewed this regulation and, by approving it, certifies that this rule would not have a significant economic impact on a substantial number of small entities. This rule would not affect small entities as that term is defined in 5 U.S.C. 601(6). *Id.* at 34284.

38. As result, the Secretary did not conduct a Regulatory Flexibility Act analysis.

39. More than 5,000 comments were received by DHS during the 60-day comment period, including comments that disputed DHS' authority to adopt the rule, and DHS' assertion that the rule "would not affect small entities." Plaintiff-Intervenors or coalitions of which they are members were among those that submitted comments objecting to the rule. The comment period closed on August 14, 2006.

40. Shortly after Congress left for recess without enacting immigration reform legislation urged by DHS, the agency issued its final rule on August 15, 2007 (hereinafter, the "DHS Final Rule"). *See* 72 Fed. Reg. 45611 (Aug. 15, 2007). The DHS Final Rule is entitled "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." The DHS Final Rule was to become legally effective on September 14, 2007.

41. The DHS Final Rule will amend the definition of *"knowing"* in 8 C.F.R. § 274a.1(*l*)(1), the regulatory subsection that defines the term "knowing" for purposes of IRCA. The amended regulation will list, as an example of an employer that has "constructive knowledge" that an employee is an "unauthorized alien," an employer that receives a SSA no-match letter and then "fails to take reasonable steps." The first part of the amended regulation will provide:

> (<u>l</u>)(1) The term *knowing* includes having actual or constructive knowledge. . . . Examples of situations where the employer may, depending upon the totality of the relevant circumstances, have constructive knowledge that an employee is an unauthorized alien include, but are not limited to, situations where the employer:
>
> . . . .
>
> (iii) Fails to take reasonable steps after receiving information indicating that the <u>employee may be an alien who is not employment authorized, such as</u> –

    . . . .
    (B) Written notice to the employer from the Social Security Administration reporting earnings on a Form W-2 that employees' names and corresponding social security account numbers fail to match Social Security Administration records . . . .

42. Having created a threat of IRCA liability for employers receiving SSA no-match letters, the DHS Final Rule then offers employers a "safe harbor." An employer receiving a SSA no-match letter "will be considered by the Department of Homeland Security to have taken reasonable steps – and receipt of the written notice will therefore not be used as evidence of constructive knowledge – if the employer" takes the actions specified by DHS. These are "the only combination of steps that will guarantee that DHS will not use the employer's receipt of the notices from SSA . . . as evidence of constructive knowledge that an employee is an unauthorized alien." 72 Fed. Reg. at 45618.

43. To qualify for the DHS "safe harbor," an employer that determines the SSA no-match was not the result of its own clerical error (which must be done in 30 days) must instruct the employee who claims that the name and SSN are correct to resolve the discrepancy with SSA within 90 days of receipt of the no-match letter. If the employee is unable to resolve the discrepancy with SSA within 90 days, the employer cannot continue to employ the individual unless the individual can complete within three days a new employment eligibility verification, on a new I-9 form, using only documents that contain photo identification and no documents that contain the disputed SSN, even if the employee still insists the SSN is correct. If employees insist that their names and SSNs on their identification documents are correct but have not resolved the discrepancy with SSA by the deadline, or cannot produce the required additional photo identification, the employer would have to fire them in order to be afforded the "safe harbor."

D.  **Implementation of the DHS Final Rule by DHS and SSA**

44. On September 4, 2007, DHS and SSA intended to begin sending employers no-match letters that will be accompanied by a letter from DHS and ICE (hereinafter the "DHS/ICE Guidance Letter"). This Court's Temporary Restraining Order of August 31, 2007, temporarily precluded the issuance of those letters. The DHS/ICE Guidance Letter states that it will "provide guidance on how

to respond to the enclosed letter from the Social Security Administration (SSA) . . . in a manner that is consistent with your obligations under United States Immigration Laws."

45. The DHS/ICE Guidance Letter contains questions and answers, which begin with the following:

> **Q: Can I simply disregard the letter from SSA?**
> **A:** No. You have received official notification of a problem that may have significant legal consequences for your employees. If you elect to disregard the notice you have received and it is determined that some employees listed in the enclosed letter were not authorized to work, the Department of Homeland Security (DHS) could determine that you have violated the law by knowingly continuing to employ unauthorized persons. This could lead to civil and criminal sanctions.

46. After threatening employers with civil and criminal liability, the DHS/ICE Guidance Letter then asks: **"Q: What should I do?"** and responds that "You should" follow the steps set out in the DHS Final Rule.

47. The DHS/ICE Guidance Letter assures employers that, if they follow those procedures for every no-match, they will not be liable for discrimination if they terminate employees:

> **Q: Will I be liable for discrimination charges brought by the United States if I terminate the employee after I follow the steps outlined above?**
> **A:** No. . . . ."

48. The DHS/ICE Guidance Letter conveniently ignores those Civil Rights laws administered by other federal agencies, by the States, or by private interests, such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., Ku Klux Klan Act of 1867, 42 U.S.C. §§ 1981, 1988, California Anti-Discrimination Laws, all of which would be potentially implicated were an employer to terminate employees solely because of the Final Rule or because of the Final Rule as implemented by the Guidance Letter.

49. SSA has revised its no-match letters so that they direct employers to follow the instructions in the accompanying DHS/ICE Guidance Letter.

50. SSA and DHS intended to commence sending the revised no-match letters and the DHS/ICE Guidance Letter to employers on September 4, 2007. Between September 4, 2007 and November 9, 2007, the SSA expected to mail no-match letters to approximately 140,000 employers

- 14 -

[PROPOSED] COMPLAINT IN INTERVENTION
C07-04472 CRB

around the country. Each letter will list at least 10 mismatched SSNs and some letters will list 500 or more. Approximately 8.7 million employees will be affected by this initial wave of mailings.

51. SSA will continue to mail additional batches of no-match letters after November 9, 2007, to hundreds of thousands of other employers.

E.  **Effect of Implementation of the New DHS Final Rule**

52. Implementation of the DHS Final Rule following the expiration of this Court's TRO will immediately impose new obligations in violation of law on every employer governed by IRCA.

53. The imminent SSA mailing will immediately impose substantial administrative costs on at least 140,000 employers, including Plaintiff-Intervenors and their members, and additional employers will be affected as SSA continues in the future to send out no-match letters accompanied by the DHS/ICE Guidance Letter. Given that the initial DHS/SSA mailing would cover approximately 8.7 million SSNs, the cost to resolve those will easily exceed $100 million and there is no assurance that they could be resolved within the regulatory period. Indeed, there is no evidence whatsoever in the administrative record to suggest that the so-called "safe harbor" window can be achieved, especially when SSA will be flooded with such requests.

54. A substantial portion of the several million no-match SSNs that are listed in the initial round of SSA no-match letters will relate to U.S. citizens or non-citizens lawfully entitled to work. A substantial number of these United States citizen no-matches are employed by Plaintiff-Intervenors and their small business members.

55. As a result of implementation of the DHS Final Rule, including the DHS/ICE Guidance Letter, Plaintiff-Intervenors and their members will immediately be forced to spend time and effort to resolve SSA data discrepancies, including taking time to visit SSA field offices that are open only during business hours and that will be overwhelmed with similar requests from other employers and employees.

56. Many individuals lawfully employed by the Plaintiff-Intervenors and their small business members will be unable to resolve data discrepancies with the SSA bureaucracy within the 90-day deadline set out in the DHS Final Rule; those employees risk termination even though they are United States Citizens or lawful immigrants. SSA already has told DHS that in "difficult cases,"

SSA may be unable to resolve discrepancies within the 90-day timeframe. Despite all these costs, the majority of which will be borne by "small entities," as that term is defined in the Regulatory Flexibility Act, the Secretary, in issuing the Final Rule, certified, without any factual basis, that the Final Rule "would not have a significant economic impact on a substantial number of small entities." 72 Fed. Reg. 45611, 45623 (Aug. 15, 2007). Accordingly, the Secretary did not conduct an initial regulatory flexibility analysis or a final regulatory flexibility analysis or comply with any other requirement of the Regulatory Flexibility Act.

## VI.  CLAIMS

### FIRST CAUSE OF ACTION
Failure to Perform a Regulatory Flexibility Analysis
(5 U.S.C. § 601 *et seq.*)

57. Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1–56, above.

58. The Final Rule will have a significant economic impact on a substantial number of small entities, including Plaintiff-Intervenors and their small business members. Most small business employers will have to devote substantial additional resources toward complying with the Final Rule, and some will lose employees who are otherwise qualified and lawful residents of the United States merely because SSA is unable to resolve discrepancies in their database within the requisite timer period. The loss of otherwise qualified and lawful employees will impede productivity and profitability and interfere with normal and lawful business operations. On information and belief, the economic impact on small entities will easily exceed $100 million per annum.

59. Despite the Final Rule's significant economic impact on small entities, the Secretary failed to undertake a regulatory flexibility analysis, as required by law. Instead, the Secretary certified, without providing a factual basis as required by the Regulatory Flexibility Act, that the Final Rule would have no significant economic impact on a substantial number of small entities.

60. The Secretary's certification that there would be no significant economic impact is wrong and is not supported by the record or the sound factual basis required by the Regulatory Flexibility Act. In short, the Secretary violated the RFA.

61. As a result of the aforesaid violation, Plaintiff-Intervenors and their small entity members will suffer imminent and irreparable injury if the Final Rule were to go into effect.

## SECOND CAUSE OF ACTION
Excess of Statutory Authority
(8 U.S.C. § 1324a & 5 U.S.C. §§ 706(2)(A), (C))

62. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

63. The DHS Final Rule is inconsistent with the governing statute, 8 U.S.C. § 1324a, because the Final Rule expands civil and criminal liability for employers based on a definition of "knowing" that is not what Congress meant by the term "knowing" in the IRCA. The DHS Final Rule is also inconsistent with the governing statute because it establishes a system for re-verification of the work authorization status of continuing employees that is not consistent with Congress' intent to establish a system of verification of work-authorization status only upon initial hire. The DHS Final Rule is agency action "not in accordance with law" and therefore, violates 5 U.S.C. § 706(2)(A). It is also in excess of the agency's "statutory jurisdiction, authority" or "statutory right," within the meaning of 5 U.S.C. § 706(2)(C).

## THIRD CAUSE OF ACTION
Arbitrary and Capricious
(5 U.S.C. § 706(2)(A))

64. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

65. The DHS Final Rule is "arbitrary" or "capricious" agency action in violation of 5 U.S.C. § 706(2)(A) because it presumes a mis-matched SSN is indicative of an employee's immigration status when DHS does not have access to the Earnings Suspense File, does not know the probability that an SSN and name mismatch is associated with an undocumented employee, and when the Government Accountability Office has expressly stated that the vast majority of SSN and name mismatches in the SSA database involve United States citizens.

WHEREFORE, Plaintiffs pray that the Court:

1. Enter a preliminary injunction, pending a decision on the merits, enjoining the Defendants from (i) implementing the Final Rule entitled "Safe Harbor Procedures for Employers That Receive a No Match Letter," 72 Fed. Reg. 45611 (Aug. 15, 2007), and (ii) mailing new SSA "no-match" letters in an envelope that includes the DHS/ICE Guidance Letter concerning the DHS Final Rule.

2. Enter a declaratory judgment as to Counts II and III that the DHS Final Rule is invalid and a permanent injunction to prohibit Defendants from implementing it or otherwise giving effect to the Final Rule.

3. Enter a declaratory judgment as to Count I that DHS failed to undertake the required Regulatory Flexibility Act analysis and a permanent injunction to prohibit Defendants from implementing its Final Rule or otherwise giving effect to the Final Rule until such time as Defendant Chertoff discharges his responsibilities under the Regulatory Flexibility Act to the satisfaction of the Court, and retain jurisdiction of this case to ensure compliance with the Regulatory Flexibility Act.

4. Award Plaintiff-Intervenors their costs and expenses, including reasonable attorney's fees whether under the Equal Access to Justice Act or otherwise, and expert witness fees; and

5. Award such further and additional relief as is just and proper

Dated:                                              GREENBERG TRAURIG, LLP


                                                    By:_____
                                                        Robert P. Charrow
                                                        William J. Goines
                                                        Karen Rosenthal
                                                        Cindy Hamilton

                                                    Attorneys for Plaintiff-Intervenors