Robert P. Charrow (CA SBN 44962)
Laura M. Klaus (DC SBN 294272) (*Pro Hac to be filed*)
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
Telephone: (202) 533-2396
Facsimile: (202) 261-0164
Email: charrowr@gtlaw.com; klausl@gtlaw.com

William J. Goines (CA SBN 061290)
Karen Rosenthal (CA SBN 209419)
GREENBERG TRAURIG, LLP
1900 University Ave., 5th Fl.
East Palo Alto, CA 94303
Telephone: (650) 328-8500
Facsimile: (650) 328-8508
Email: goinesw@gtlaw.com; rosenthalk@gtlaw.com

Counsel for Plaintiff-Intervenors

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, *et al.*,<br><br>        Plaintiffs,<br><br>        and<br><br>SAN FRANCISCO CHAMBER OF COMMERCE, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, GOLDEN GATE RESTAURANT ASSOCIATION, NATIONAL ROOFING CONTRACTORS ASSOCIATION, AMERICAN NURSERY & LANDSCAPE ASSOCIATION, INTERNATIONAL FRANCHISE ASSOCIATION, and UNITED FRESH PRODUCE ASSOCIATION,<br><br>        Plaintiff-Intervenors<br><br>        v.<br><br>MICHAEL CHERTOFF, *et al.*,<br><br>        Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CASE NO. C07-04472CRB<br><br>PLAINTIFF-INTERVENORS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR APPLICATION FOR PRELIMINARY INJUNCTION<br><br>Date: October 1, 2007<br>Time: 2:30 p.m.<br>Place: Courtroom 8, 19th Fl. |

GREENBERG TRAURIG LLP

GREENBERG TRAURIG LLP

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT .................................................................................. 1

INTRODUCTION .................................................................................................... 2

STATEMENT OF FACTS ......................................................................................... 4

    A.    Social Security Administration "No-Match" Letters .................................. 5

    B.    Employer Verification of Work Authorization and
           Employer Sanctions ................................................................................. 7

    C.    The DHS Final Rule ................................................................................. 8

    D.    Implementation of the DHS Final Rule by DHS and SSA ......................... 10

    E.    Effect of Implementation of the New DHS Final Rule ............................ 12

ARGUMENT ......................................................................................................... 12

I.    Legal Standards ........................................................................................... 12

    A.    Preliminary Injunction ............................................................................. 12

    B.    Regulatory Flexibility Act ....................................................................... 13

    C.    Administrative Procedure Act .................................................................. 13

II.    Plaintiff-Intervenors Are Substantially Likely to Succeed on
      The Merits of Their Claims ........................................................................ 13

    A.    Defendants Violated the Regulatory Flexibility Act ................................. 14

    B.    Defendants Violated the Administrative Procedure Act ........................... 18

III.    Plaintiff-Intervenors and Their Members Will Suffer Immediate
       and Irreparable Harm Should the Final Rule Be Implemented ...................... 19

IV.    Defendants Will In No Way Be Harmed by the Issuance of the
       Injunctive Relief Requested ....................................................................... 23

V.    The Equitable Relief Requested Is in the Public Interest ............................. 23

VI.    Conclusion    ........................................................................................... 24

APPENDIX

Declaration of Elizabeth C. Dickson

Declaration of Robert J. Dolibois

Declaration of Robert Craig Silvertooth

GREENBERG TRAURIG LLP

GREENBERG TRAURIG LLP

1

**TABLE OF AUTHORITIES**

Page

2

**Cases**

3

*Aeronautical Repair Station Ass'n, Inc. v. Fed. Aviation Admin.,*

4

_ F.3d _, 2007 WL 2033228 (D.C. Cir. July 17, 2007)......................................13,17

5

*Cement Kiln Recycling Coalition v. Environmental Protection Agency,*

6

255 F.3d 855 (D.C. Cir. 2001)................................................................17

7

*Cheema v. Thompson,*

67 F.3d 883 (9th Cir. 1995) ...................................................................21

8

*Chevron v. Natural Res. Def. Council,*

9

467 U.S. 837 (1984) .............................................................................13

10

*Environmental Defense Ctr., Inc. v. Environmental Protection Agency,*

11

344 F.3d 832 (9th Cir. 2003) .................................................................18

12

*Grand Canyon Air Tour Coalition v. Fed. Aviation Admin.,*

13

154 F.3d 455 (D.C. Cir. 1998)................................................................18

14

*Napa Valley Publishing Co. v City of Calistoga,*

255 F. Supp. 2d 1176 (N.D. Cal. 2002) ...................................................19

15

*Navajo Nation v. U.S. Forest Serv.,*

16

479 F.3d 1024 (9th Cir. 2007) ...............................................................21

17

*N.W. Mining Ass'n v. Babbitt,*

18

5 F. Supp. 2d 9 (D.D.C. 1998)...............................................................14

19

*North Carolina Fisheries Ass'n, Inc. v. Daley,*

16 F. Supp. 2d 647 (E. D. Va. 1997) ......................................................16

20

*Patriot Contract Servs. v. United States,*

21

388 F. Supp. 2d 1010 (N.D. Cal. 2005)....................................................19

22

*Ragsdale v. Wolverine World Wide, Inc.,*

23

535 U.S. 81 (2002) .............................................................................23

24

*Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of*

*Agriculture,* 415 F.3d 1078 (9th Cir. 2005)..............................................18

25

*Regents of Univ. of Cal. v. Am. Broadcasting Cos.,*

26

747 F.2d 511 (9th Cir. 1984) ................................................................20

27

*Rent-A-Center, Inc. v. Canyon Tele. & Appliance Rental, Inc.,*

28

944 F.2d 597 (9th Cir. 1991) ............................................................20,22

GREENBERG TRAURIG LLP

*Save our Sonoran, Inc. v. Flowers,*
   408 F.3d 1113 (9th Cir. 2005) ...................................................................... 13

*Taylor v. Westly,*
   488 F.3d 1197 (9th Cir. 2007) ...................................................................... 13


**Statutes and Regulations**

Administrative Procedure Act, 5 U.S.C. §§ 551-559, §§ 701-706
   5 U.S.C. § 553 ............................................................................................ 17
   5 U.S.C. § 706(2)(A) ................................................................................ 3,14
   5 U.S.C. § 706(2)(C) ..................................................................................... 3

Regulatory Flexibility Act, 5 U.S.C. §§ 601 612 ......................................... 2, 15
   5 U.S.C. § 601(4) ........................................................................................... 4
   5 U.S.C. § 601(6) ........................................................................................ 4,8
   5 U.S.C. § 605(b) ................................................................................... 8,14,16
   5 U.S.C. § 611 .............................................................................................. 13

Immigration Reform and Control Act of 1986,
   8 U.S.C. § 1101-1537 .................................................................................. 1,2
   8 U.S.C. § 1324a ....................................................................................... 3,13
   8 U.S.C. § 1324a(a)(1)(A) ............................................................................. 7
   8 U.S.C. § 1324a(a)(1)(B) ............................................................................. 7
   8 U.S.C. § 1324a(a)(2) ................................................................................... 7
   8 U.S.C. § 1324a(b) ....................................................................................... 7
   8 U.S.C. § 1324a(e)(4)-(5) ............................................................................ 7
   8 U.S.C. § 1324a(f) ........................................................................................ 7
   8 U.S.C. § 1324b(a)(1) ................................................................................... 8

Small Business Act, 15 U.S.C. §§ 631-657
   15 U.S.C. § 632 ............................................................................................. 4

Internal Revenue Code, 26 U.S.C. §§ 1-9801
   26 U.S.C. § 6103(*l*)(5) .................................................................................. 5

Social Security Act of 1935, as amended, 42 U.S.C. § ................................... 5
   42 U.S.C. § 432 ............................................................................................. 5

Title VII of Civil Rights Act of 1964
   42 U.S.C. § 2000e, *et seq.* ...................................................................... 12, 20

Federal Rules of Civil Procedure
   Rule 65 .......................................................................................................... 2

GREENBERG TRAURIG LLP

Code of Federal Regulations
8 C.F.R. § 274a.1(*l*)(1) ...................................................................9,10,17
8 C.F.R. § 274a.2 ........................................................................................7
20 C.F.R. § 422.120 ................................................................................5,6
26 C.F.R. § 31.6051 ...................................................................................5

Federal Register
72 Fed. Reg. 45611 (August 15, 2007)....................................................2,9
72 Fed. Reg. 45612 (August 15, 2007)......................................................17
72 Fed. Reg. 45613 (August 15, 2007)......................................................22
72 Fed. Reg. 45618 (August 15, 2007)......................................................10
72 Fed. Reg. 45623 (August 15, 2007)..................................................*passim*
71 Fed. Reg. 34281 (June 14, 2006).......................................................9,15
71 Fed. Reg. 34284 (June 14, 2006).......................................................8,14
65 Fed. Reg. 80029 (December 20, 2005)..................................................16
43 Fed. Reg. 60158 (December 26, 1978)....................................................5

**Miscellaneous**

Executive Order 12,866, 58 Fed.Reg. 51,735 (1993)...........................................1

Report of the Government Accountability Office, GAO-06-814R (July 16, 2006)
Available at <http://www.gao.gov/new.items/d06814r.pdf> (last viewed
September 11, 2007).................................................................................2,5,6

Testimony of Stewart A. Baker, Assistant Secretary for Policy, Department
Of Homeland Security Before the Subcomm. on Oversight of the House
Comm. on Ways and Means (February 16, 2006)................................................6

Social Security Administration website:
<http://www.ssa.gov/legislation/nomatch2.htm> (last viewed
September 6, 2007)..................................................................................6,8,17

<http://www.ssa.gov/legislation/FINAL%20TY2006%20EDCOR%20Code%
20V%2008202007.htm SSA> (last viewed Sept. 10, 2007) ...........................................23

# SUMMARY OF ARGUMENT

This case involves a challenge to a final rule issued by the Secretary of Homeland Security ("Secretary") on August 15, 2007, that under the guise of enforcing immigration laws, would subject American businesses to criminal liability and civil fines or discrimination suits and would subject millions of employees to termination for no good reason. The effects of this rule are particularly burdensome for small businesses or not-for-profit entities. The Final Rule expressly amends the definition of "knowing" in the regulations implementing the Immigration Reform and Control Act ("IRCA"). And, it imposes a requirement on employers that does not exist under current law. Under the Final Rule, employers who receive a Social Security "no-match" letter would be required to resolve the mismatch with the employee's assistance within ninety days or, failing that, the employer is faced with a Hobson's choice--whether to terminate all employees with unresolved mismatch letters or only those who appear to be foreign-born, in which case, the employer risks liability for discrimination under both federal and state law. The alternative, to do nothing, subjects the employer to the risk of criminal or civil prosecution. The record fails to provide a rational relationship between a Social Security mismatch and an employee's immigration status. Both the Government Accountability Office ("GAO") and the Social Security Administration ("SSA") have concluded that a mismatch cannot be used to ascertain an employee's immigration status. Equally critical is that before an employer is even afforded the opportunity to face the Hobson's choice, that employer must make significant expenditures of time, resources and capital to develop and implement systems to track and resolve Social Security mismatches within the tight time constraints of the new rule. The record fails to provide any assessment of whether these mismatches can be resolved within those time constraints. The compliance burden will be particularly great for small businesses. It will impede recruitment, reduce productivity and undermine goodwill for those companies, particularly those engaged in construction or seasonal work, where the size of the

workforce changes quickly over time. Notwithstanding these obvious economic effects, the

Secretary did not undertake a regulatory flexibility analysis as required by the Regulatory Flexibility

Act ("RFA"), but instead simply certified that the Final Rule "would not have a significant economic

impact on a substantial number of small entities." 72 Fed. Reg. 45623. The Secretary provided no

factual basis for this conclusion as required by the RFA. That failure alone requires the entry of a

preliminary injunction especially, where, as here, the law of this Circuit recognizes that loss of

goodwill and interference with recruitment constitute irreparable harm for purposes of Rule 65 of the

Federal Rules of Civil Procedure. For these reasons and the reasons set forth by Plaintiffs in their

Motion and Memorandum of Points and Authorities in Support, Plaintiff-Intervenors request the

entry of such a preliminary injunction.

## INTRODUCTION

The Final Rule at issue in this litigation, the "Safe Harbor Procedures for Employers That

Receive a No Match Letter," 72 Fed. Reg. 45611 (Aug. 15, 2007), was to become effective on

September 14, 2007. SSA issues "no-match" letters in an effort to resolve discrepancies between an

employee's name and his or her Social Security number ("SSN") in its database. SSA's database

contains more than 255 million mismatched records. *See* Report of the GAO (July 11, 2006), GAO-

06-814R at 8 (left column) (available at <http://www.gao.gov/new.items/d06814r.pdf> (last viewed

September 11, 2007).("GAO Report"). According to both SSA and the Department of Homeland

Security ("DHS"), these "no-matches" often result from benign causes, such as clerical errors, name

changes due to marriage or divorce, use of multiple surnames, or other naming conventions, or any

number of other reasons that have nothing to do with an employee's immigration status. The

Secretary's Final Rule requires employers and employees to resolve these "no-match" letters in less

than ninety-three days or risk criminal liability and civil fines (for employers) or termination (for

GREENBERG TRAURIG LLP

employees).[1]  The Final Rule thus places jobs of employees legally working in the United States at risk without any factual basis.  And, the Final Rule imposes obligations on businesses to reverify their employees' work authorization status even though under current law, employers need verify work-authorization status only upon the initial hire or upon the expiration of temporary work authorization licenses.  Although the Final Rule affects virtually every business in the United States, the Secretary certified that its rule "would not have a significant economic impact on a substantial number of small entities." 72 Fed. Reg. 45623.  Accordingly, the Secretary conducted no regulatory flexibility analysis under the RFA.

On August 28, 2007, the American Federation of Labor and Congress of Industrial Organizations, San Francisco Labor Council, San Francisco Building and Construction Trades Council, and Central Labor Council of Alameda County ("Plaintiffs") filed a complaint for declaratory and injunctive relief.  Plaintiffs charged that the Final Rule is inconsistent with 8 U.S.C. § 1324a and therefore violates 5 U.S.C. § 706(2)(A) (First Claim), that the Final Rule is arbitrary and capricious agency action in violation of 5 U.S.C. § 706(2)(A) (Second Claim), that the Final Rule exceeds the statutory authority of DHS, U.S. Immigration and Customs Enforcement ("ICE") and SSA in violation of 5 U.S.C. § 706(2)(C) (Third, Fifth, Sixth and Seventh Claims), and that the Final Rule will deprive employers and employees of reasonable notice and due process in violation of 5 U.S.C. § 706(2)(C) and the Due Process Clause of the U.S. Constitution (Fourth Claim). Plaintiffs requested a temporary restraining order and a preliminary injunction pending a decision on the merits, enjoining the implementation of the Final Rule.  On August 31, 2007, this Court granted the motion for a temporary restraining order.

---

[1]    The no-match letter must be resolved within ninety days; the Final Rule gives the employee three additional days to provide the employer with additional identification to support a new I-9 provided the identification does not use the mismatched Social Security number.

GREENBERG TRAURIG LLP

On September 7, 2007, San Francisco Chamber of Commerce, Chamber of Commerce of the United States of America, Golden Gate Restaurant Association, National Roofing Contractors Association, American Nursery & Landscape Association, International Franchise Association, and United Fresh Produce Association ("Plaintiff-Intervenors") filed a motion to intervene in this lawsuit and filed a Proposed Complaint-in-Intervention, adopting several of the claims already alleged by Plaintiffs and, in addition, seeking to vacate the Final Rule until the Secretary has completed the regulatory flexibility analysis required by law. Plaintiff-Intervenors now join in Plaintiffs' motion for preliminary injunction[2] and additionally request a preliminary injunction until such time as the Secretary and DHS comply with the Regulatory Flexibility Act.

## STATEMENT OF FACTS

Plaintiff-Intervenors are all not-for-profit membership corporations that are considered to be small entities within the meaning of the Regulatory Flexibility Act.[3] *See* Complaint-in-Intervention, ¶¶ 6-12. Each is an employer and each has a significant number of members which are small businesses within the meaning of section 3 of the Small Business Act that do business in the Northern District of California. *Id.* In addition, Plaintiff-Intervenors San Francisco Chamber of Commerce ("San Francisco Chamber") and Golden Gate Restaurant Association ("GGRA") are organized under the laws of the State of California and headquartered in San Francisco. *Id.* at ¶¶ 6, 8. Many of Plaintiff-Intervenors' small business members would have received no-match letters from SSA in the event that the Final Rule at issue in this case was to become effective. Indeed, for many of these small business members, the likelihood of receiving such letters is extremely high.

---

[2]    Plaintiff-Intervenors therefore adopt the Plaintiffs' legal arguments with respect to the overlapping claims and incorporate those arguments by reference as if they were set forth fully in this memorandum.

[3]    Not for profit enterprises are small entities under the Regulatory Flexibility Act. *See* 5 U.S.C. § 601(4), (6).

GREENBERG TRAURIG LLP

This is the case for some of the Plaintiff-Intervenors in their own right as well. *See* Declaration of Elizabeth Dickson ("Dickson Decl.") at ¶¶ 1, 4.

A.     Social Security Administration "No Match" Letters

The Social Security Act of 1935 authorizes SSA to establish a record-keeping system to manage the Social Security program.  Congress also granted SSA authority to process tax information for purposes of administering the Social Security program, as a specific exception to the exclusive tax authority of the Internal Revenue Service ("IRS").  *See* 26 U.S.C. § 6103(*l*)(5); Social Security Act, § 232, 42 U.S.C. § 432.  Pursuant to that delegation of authority, the IRS and SSA created a joint system for the processing of Forms W-2 called the Combined Annual Wage Reporting System ("CAWR").  *See* 43 Fed. Reg. 60158 (Dec. 26, 1978) (codified at 26 C.F.R. § 31.6051).

Under the CAWR, employers annually report employee earnings using Forms W-2, and SSA posts those earnings to individual employees' Social Security records so employees will receive credit for those earnings when they apply for Social Security benefits--either retirement or disability.  SSA then forwards the Forms W-2 to the IRS.

If SSA cannot match the name and Social Security Number ("SSN") on a Form W-2 with SSA's records, SSA places the earnings report in its Earnings Suspense File.  *See* 20 C.F.R § 422.120.  The earnings remain in the Earnings Suspense File until SSA can link them to a name and SSN.

Every year, SSA receives millions of earnings reports that the SSA cannot match with its records.  The Earnings Suspense File is a huge database that contains more than 255 million unmatched earnings records and that is growing at the rate of 8 to 11 million unmatched records per year.  GAO Report at 8.  About four percent of annual Form W-2 earnings reports are placed in the

GREENBERG TRAURIG LLP

1   SSA's Earnings Suspense File. *See* Testimony of Stewart A. Baker, Assistant Secretary for Policy,

2   DHS, Before the Subcomm. on Oversight of the House Comm. on Ways and Means (Feb. 16, 2006).

3       SSA records are mismatched for many reasons unrelated to immigration status including: (a)

4   clerical errors by either an employer or SSA in spelling an employee's name or recording the SSN,

5   (b) SSA's issuance of duplicate SSNs or re-issuance of SSNs of deceased individuals, (c) employee

6   name changes after marriage or divorce, (d) employees that use a less "foreign" sounding first name

7   for work purposes, and (e) different naming conventions (such as the use of multiple surnames) that

8   are commonplace in many parts of the world, particularly in some Latin American and Asian

9   countries.  The GAO Report on the SSA's Earnings Suspense File concluded that the file "[c]ontains

10  information about many U.S. citizens as well as non-citizens" and that "the overall percentage of

11  unauthorized workers is unknown."  GAO Report at 8.  When SSA ultimately has been able to

12  resolve data discrepancies, GAO reported that "a significant number of earnings reports in the ESF

13  still belong to U.S. citizens and work-authorized non-citizens." *Id.*

14

15

16      As part of its administration of the Social Security program, SSA periodically sends out

17  letters, commonly known as "no-match" letters, informing employers that SSNs and employee

18  names reported on Forms W-2 did not match SSA's records. *See* 20 C.F.R. § 422.120.

19      SSA no-match letters are purely advisory.  SSA has no authority to sanction employers that

20  fail to respond to no-match letters.  SSA is not an immigration agency and does not know whether a

21  particular SSN listed in a no-match letter relates to unauthorized work.   SSA also is prohibited by

22  tax privacy statutes from sharing the information in the Earnings Suspense File with the DHS.  Until

23  now, SSA's no-match letters explained to employers: "This letter does not imply that you or your

24  employee intentionally gave the government wrong information" and "makes no statement regarding

25  an employee's immigration status." <http://www.ssa.gov/legislation/nomatch2.htm> (last viewed

26  Sept. 6, 2007).

27

28

GREENBERG TRAURIG LLP

Until now, the SSA has never included information from an immigration-enforcement agency with its no-match letters. *See* Complaint-in-Intervention, ¶ 28.

B.    Employer Verification of Work Authorization and Employer Sanctions

The Immigration Reform and Control Act of 1986 ("IRCA") made it unlawful for employers to "to hire . . . for employment in the United States an alien *knowing* the alien is an unauthorized alien." 8 U.S.C. § 1324a(a)(1)(A) (emphasis added).  IRCA also separately made it unlawful for employers to hire without complying with an initial verification process established by Congress. *See* 8 U.S.C. § 1324a(a)(1)(B).  That verification process requires the employee to present the employer with documents to show proof of identity and work authorization and requires the employer and employee to complete an I-9 verification form. *See* 8 U.S.C. § 1324a(b); 8 C.F.R. § 274a.2.  To satisfy the I-9 requirements, Plaintiff-Intervenors and their members require all prospective employees to provide documentation proving identity and demonstrating that the employee is authorized to work in the United States.  Thus, prospective employees provide various documents including United States passports, alien registration cards (*i.e.*, Green Card), and Employee Authorization Documents issued by the DHS permitting the individual to work in the United States. *See* Complaint-in-Intervention at ¶ 30.

IRCA also makes it unlawful for an employer "to continue to employ an alien . . . *knowing* the alien is (or has become) an unauthorized alien with respect to such employment." 8 U.S.C. § 1324a(a)(2) (emphasis added).  Employers that violate IRCA are subject to civil and criminal liability. *See* 8 U.S.C. § 1324a(e)(4)-(5), (f).

At the same time that Congress imposed employer sanctions, Congress also wanted to prevent employer discrimination based on national origin or citizenship status.  IRCA therefore makes it illegal for employers to discriminate based on national origin or citizenship status, including by requesting "more or different documents than are required" for the initial I-9

GREENBERG TRAURIG LLP

1  verification or "refusing to honor documents . . . that on their face reasonably appear to be genuine."

2  8 U.S.C. § 1324b(a)(1), (6).

3      Congress intentionally did not impose in IRCA any employment authorization verification

4  for existing employees.  Congress also chose not to impose ongoing re-verification requirements

5  after the initial hire unless documents evidencing temporary work authorization are time limited.

6      C.    The DHS Final Rule

7      Until now, neither DHS nor its predecessor immigration-enforcement agencies had taken the

8  position that an employer's failure to make further inquiries into an SSA no-match letter meant that

9  the employer had actual knowledge that it was employing an unauthorized worker.  The Immigration

10  and Naturalization Service had recognized that no-match discrepancies occur for many innocent

11  reasons and therefore consistently advised employers in opinion letters that "[w]e would not consider

12  notice of this discrepancy from SSA to an employer by itself to put the employer on notice that the

13  employee is unauthorized to work."  The most recent SSA letter on the materiality of a no-match

14  letter states as follows:  "This notice also specifically cautions employers that these letters . . . do not

15  make any statement about an employee's immigration status[.]"

16  <http://www.ssa.gov/legislation/nomatch2.htm> (last viewed Sept. 6, 2007).

17

18      On June 14, 2006, Defendant Chertoff issued a notice of proposed rulemaking soliciting

19  public comments on his proposal to use the Social Security database, and, in particular, SSA no-

20  match letters as vehicle for enforcing the immigration laws.  *See* 71 Fed. Reg. 34281 (June 14,

21  2006).  The preamble concluded, in part, as follows:

22

23          The Secretary of Homeland Security, in accordance with the Regulatory
           Flexibility Act, 5 U.S.C. 605(b), has reviewed this regulation and, by
24          approving it, certifies that this rule would not have a significant economic
           impact on a substantial number of small entities.  This rule would not affect
25          small entities as that term is defined in 5 U.S.C. 601(6).
26

27  *Id.* at 34284.  As result, the Secretary did not conduct a Regulatory Flexibility Act analysis.

28

GREENBERG TRAURIG LLP

More than 5,000 comments were received by DHS during the 60-day comment period, including comments that disputed DHS' authority to adopt the rule, and DHS' assertion that the rule "would not affect small entities." 72 Fed. Reg. 45611. Plaintiff-Intervenors or coalitions of which they are members were among those that submitted comments objecting to the rule. The comment period closed on August 14, 2006.

Shortly after Congress left for recess without enacting immigration reform legislation urged by DHS, the agency issued its final rule. *See* 72 Fed. Reg. 45611 (Aug. 15, 2007). The DHS Final Rule was to become legally effective on September 14, 2007.

The DHS Final Rule will amend the definition of "knowing" in 8 C.F.R. § 274a.1(*l*)(1), the regulatory subsection that defines the term "knowing" for purposes of IRCA. The amended regulation will list, as an example of an employer that has "constructive knowledge" that an employee is an "unauthorized alien," an employer that receives a SSA no-match letter and then "fails to take reasonable steps." The first part of the amended regulation will provide:

> (*l*)(1) The term knowing includes having actual or constructive knowledge. . .
> . Examples of situations where the employer may, depending upon the totality
> of the relevant circumstances, have constructive knowledge that an employee
> is an unauthorized alien include, but are not limited to, situations where the
> employer:
>
> . . . .
>
> (iii) Fails to take reasonable steps after receiving information indicating that
> the employee may be an alien who is not employment authorized, such as -
>     . . . .
>
> (B) Written notice to the employer from the Social Security
> Administration reporting earnings on a Form W-2 that employees' names and
> corresponding social security account numbers fail to match Social Security
> Administration records . . . .

Having created a threat of IRCA liability for employers receiving SSA no-match letters, the DHS Final Rule then offers employers a "safe harbor." An employer receiving a SSA no-match letter "will be considered by DHS to have taken reasonable steps - and receipt of the written notice

GREENBERG TRAURIG LLP

1  will therefore not be used as evidence of constructive knowledge - if the employer" takes the actions

2  specified by DHS. These are "the only combination of steps that will guarantee that DHS will not

3  use the employer's receipt of the notices from SSA . . . as evidence of constructive knowledge that an

4  employee is an unauthorized alien." 72 Fed. Reg. at 45618.

5      To qualify for the DHS "safe harbor," an employer that determines the SSA no-match was

6  not the result of its own clerical error (which must be done in 30 days) must instruct the employee

7  who claims that the name and SSN are correct to resolve the discrepancy with SSA within 90 days of

8  receipt of the no-match letter. If the employee is unable to resolve the discrepancy with SSA within

9  90 days, the employer cannot continue to employ the individual unless the individual can complete

10  within three days a new employment eligibility verification, on a new I-9 form, using only

11  documents that contain photo identification and no documents that contain the disputed SSN, even if

12  the employee still insists the SSN is correct. If employees insist that their names and SSNs on their

13  identification documents are correct but have not resolved the discrepancy with SSA by the deadline,

14  or cannot produce the required additional proscribed identification, the employer would have to fire

15  them in order to be afforded the "safe harbor."

16      D.    Implementation of the DHS Final Rule by DHS and SSA

17      On September 4, 2007, DHS and SSA intended to begin sending employers no-match letters

18  that will be accompanied by a letter from DHS and ICE (hereinafter the "DHS/ICE Guidance

19  Letter"). SSA expected to mail these letters to approximately 140,000 employers around the

20  country, affecting approximately 8.7 million employees. *See* Complaint-in-Intervention at ¶ 50.

21  SSA's mailings were to continue after November 9, 2007, to hundreds of thousands of other

22  employers. *Id.* This Court's Temporary Restraining Order of August 31, 2007, temporarily

23  precluded the issuance of those joint SSA-DHS letters. The DHS/ICE Guidance Letter states that it

24  will "provide guidance on how to respond to the enclosed letter from the Social Security

GREENBERG TRAURIG LLP

1  Administration (SSA) . . . in a manner that is consistent with your obligations under United States

2  Immigration Laws."

3      The DHS/ICE Guidance Letter contains questions and answers, which begin with the

4  following:

5          Q:    Can I simply disregard the letter from SSA?

6

7          A:    No.  You have received official notification of a problem that may
               have significant legal consequences for your employees.  If you elect to
8               disregard the notice you have received and it is determined that some
               employees listed in the enclosed letter were not authorized to work, the
9               Department of Homeland Security (DHS) could determine that you have
               violated the law by knowingly continuing to employ unauthorized persons.
10              This could lead to civil and criminal sanctions.

11     After threatening employers with civil and criminal liability, the DHS/ICE Guidance Letter

12  then asks: "Q:  What should I do?" and responds that "You should" follow the steps set out in the

13  DHS Final Rule.

14     The DHS/ICE Guidance Letter assures employers that, if they follow those procedures for

15

16  every no-match, they will not be liable for discrimination if they terminate employees:

17          Q:    Will I be liable for discrimination charges brought by the United States
               if I terminate the employee after I follow the steps outlined above?

18

19          A:    No. . . . ."

20     The DHS/ICE Guidance Letter conveniently ignores those Civil Rights laws administered by

21  other federal agencies, by the States, or by private interests, such as Title VII of the Civil Rights Act

22  of 1964, 42 U.S.C. § 2000e *et seq.*, and California anti-discrimination laws, all of which would be

23  potentially implicated were an employer to terminate employees solely because of the Final Rule or

24  because of the Final Rule as implemented by the Guidance Letter.

25     SSA has revised its no-match letters so that they direct employers to follow the instructions

26  in the accompanying DHS/ICE Guidance Letter.

27

28

GREENBERG TRAURIG LLP

E.     Effect of Implementation of the New DHS Final Rule

Implementation of the DHS Final Rule following the expiration of this Court's TRO will immediately impose new obligations in violation of law on every employer governed by IRCA.

Irrespective of how the DHS Final Rule is characterized, the economic impact associated with implementing DHS' Final Rule is substantial, immediate, and irreparable. Those costs involve hiring, training and overtime for those in human resources (*see* Dickson Decl. at ¶¶ 5,7, lost productivity for those employees named in no-match letters (*id.* at 8), loss of goodwill (*id.*), and increased unemployment insurance premiums in the event that the employees who are unable to resolve a no-match within the requisite period are terminated (*id.* at ¶ 13). The economic impact of DHS' rule is particularly severe for seasonal businesses who face unique hiring demands during a short season. *See* Declaration of Robert J. Dolibois ("Dolibois Decl.") at ¶¶ 3-4,7. This harm cannot be recovered. Moreover, based on Plaintiff-Intervenors' experience, it is highly unlikely that SSA will be able to resolve the more than 8 million no-matches within the time contemplated by the Final Rule. Dickson Decl. at ¶ 12; Declaration of Robert Craig Silvertooth ("Silvertooth Decl.") at ¶ 7. This situation further exacerbates the imminent and irreparable harm to Plaintiff-Intervenors and their members caused by the Final Rule if it were to go into effect.

**ARGUMENT**

**I.     LEGAL STANDARDS**

A.     Preliminary Injunction

The Ninth Circuit recently described the tests for entitlement to a preliminary injunction:

> Under the traditional test, a plaintiff must show: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). The alternative test requires that a plaintiff demonstrate either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor. These two formulations represent two points on a sliding scale in which

GREENBERG TRAURIG LLP

the required degree of irreparable harm increases as the probability of success decreases. They are not separate tests but rather outer reaches of a single continuum.

*Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007), *quoting Save our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005). As set forth below, Plaintiff-Intervenors have demonstrated a need for, and entitlement to, injunctive relief. In contrast, under DHS' theory, it would suffer no harm if an injunction is entered since it believes that the Final Rule does not change anything.

### B.    Regulatory Flexibility Act

Small entities are entitled to judicial review of an agency's Regulatory Flexibility Act analysis or an agency's certification that no such analysis is required. *See* 5 U.S.C. § 611. DHS receives no deference for its interpretation of its obligations under the RFA. *See Aeronautical Repair Station v. FAA*, __ F.3d __, 2007 WL 203228, slip op. at 26 (D.C. Cir. July 17, 2007).

### C.    Administrative Procedure Act

This suit challenges the statutory authority of DHS to issue the Final Rule. In *Chevron I* challenges, such as this, the agency is entitled to no deference. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984). Nor is the agency entitled to deference with respect to the factual predicates underlying its Final Rules which arise under the Social Security Act because that is not a statute DHS administers. *See id.* at 843.

## II.    PLAINTIFF-INTERVENORS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

Plaintiff-Intervenors are substantially likely to succeed on the merits of their claims because the promulgation of the DHS Final Rule violates the RFA's requirement that either an analysis of the economic impact of the Final Rule be conducted prior to promulgation or a certification, based on facts, be made that there is no substantial economic impact of the rule on a significant number of small entities. The DHS Final Rule also violates the APA, as well as IRCA, 8 U.S.C. § 1324a, because it expands civil and criminal liability for employers and a system for re-verification of

GREENBERG TRAURIG LLP

employees' work authorization status that is inconsistent with the statute and Congress's intent, and therefore a violation of 5 U.S.C. § 706(2)(A). Finally, the DHS Final Rule is arbitrary and capricious and therefore a violation of 5 U.S.C. § 706(2)(A) because it presumes that a mismatched SSN indicates a employee's immigration status when SSA has expressly stated that this is not so in the vast majority of cases.

A.    Defendants Violated the Regulatory Flexibility Act

DHS failed to conduct a proper regulatory flexibility analysis of its Final Rule as required by the RFA. Plaintiff-Intervenors and a significant portion of their members are small entities within the meaning of the RFA. There is no dispute that the RFA applies here. *See* 71 Fed. Reg. at 34284; 72 Fed. Reg. at 45623. Congress enacted the RFA to require agencies to consider the potential impact of their regulations on small businesses, including small entities such as Plaintiff-Intervenors in this case. *See* Regulatory Flexibility Act, Pub. L. No. 96-354, 94 Stat. 1164, § 2 (1980). The RFA thus requires agencies to "solicit and consider flexible regulatory proposals and . . . explain the rationale for their actions to assure that such proposals are given serious consideration." *Id.* at § 2(b). An agency may avoid performing a regulatory flexibility analysis only if the head of the agency certifies that the rule will not have "a significant economic impact on a substantial number of small entities" and provides a factual basis for that certification. 5 U.S.C. § 605(b);[4] *N.W. Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 15-16 (D.D.C. 1998).

In this case, the Secretary did not consider the potential impact of the DHS Final Rule on small businesses. The Secretary did not solicit and consider flexible regulatory proposals or undertake any effort to give serious consideration to any alternative proposals. The Secretary did not

GREENBERG TRAURIG LLP

---

[4]    Section 605(b) states: "If the head of the agency makes a certification under the preceding sentence, the agency shall publish such certification in the Federal Register at the time of publication of general notice of proposed rulemaking for the rule or at the time of publication of the final rule, along with a statement providing the factual basis for such certification."

assess the economic impact of the provision on small entities, or explain the factual, policy and legal rationale for the Final Rule. Although the Final Rule shifts the cost of investigation and resolution of no-matches to employers, the Secretary did not assess the cost of that compliance on small businesses, or whether ninety days was sufficient for a small business to resolve inconsistencies. The Secretary did not undertake any effort to determine whether the cost of compliance is linear, *ie.*, $1,000 per no-match letter, or exponential (or some other non-linear function), *i.e.*, increasing at a different rate as the numbers increase. The Secretary made no effort to determine the cost to small businesses of terminated employees, or the cost to the public as the pool of unemployed workers increases or the amount of unemployment benefits increases. Nor did the Secretary consider the impact of increases in unemployment insurance premiums on small businesses in the event a small business were forced to terminate an employee on account of a no-match letter. Similarly, the Secretary did not assess the costs of rehiring or replacing terminated employees or the potential disruption to small businesses caused by compliance with the Final Rule. Instead, the Secretary simply announced in the notice of proposed rulemaking that the rule would not have a significant economic impact on a substantial number of small entities. *See* 71 Fed. Reg. 34281. And, although commenters disputed the impact of the rule on small businesses, in the Final Rule, the Secretary summarily dismissed these comments as "speculative" or misplaced based on the belief that "[t]he rule does not mandate any new burdens on the employer and does not impose any new or additional costs on the employer, but merely adds specific examples and description of a 'safe-harbor' procedure to an existing DHS regulation for purposes of enforcing the immigration laws and providing guidance to employers." 72 Fed. Reg. at 45623.

The Secretary's certification is insufficient as a matter of fact and law. First, no one can assess the Secretary's certification. The Secretary does not identify what he considered to be a small business or entity. He does not define what he considered to be a "significant economic impact."

GREENBERG TRAURIG LLP

These deficiencies alone are sufficient to require remand to the Secretary. *See* 65 Fed. Reg. 80029-80045 (Dec. 20, 2000) (where the Department of Labor was forced to reconsider its certification under the RFA for these reasons and after withdrawing the certification, provided a sixteen- page economic analysis in the Federal Register on the effect of its new rules on small businesses).

Second, the Secretary confuses fact and law. The RFA requires that a certification state the "factual basis" on which it rests. 5 U.S.C. § 605(b). The Secretary's assertion that the DHS Final Rule imposes no additional legal obligations on employers is not a fact, but a conclusion of law. This is not a trivial distinction because the RFA does not turn on whether a regulation imposes new obligations on small businesses. Rather, it turns on the overall impact the regulation will have on small entities. *See North Carolina Fisheries Ass'n, Inc. v. Daley*, 16 F. Supp. 2d 647 (E.D. Va. 1997). In *Daley*, the government certified that its proposed rule (a new fishing quota for summer flounder) would not have any economic impact on a significant number of small entities. As its factual basis, the Secretary stated that the new fishing quota was no different than the previous quota. The court held that this statement "does not provide a factual basis. There is no explanation why the fact that the quotas are the same means there will be no impact." *Id.* at 652. The court therefore found that the certification violated the RFA. *Id.* Even if it imposes no new "requirements," the DHS Final Rule is aimed at modifying or changing employers' behavior. Under these circumstances, whether or not it imposes "new requirements," a regulatory flexibility analysis is required. There is nothing in the RFA that relieves an agency of its obligation to conduct such an analysis merely because the agency believes its regulation does not change existing requirements on small businesses.

Second, even if the Secretary's justification were a "factual" basis, the Secretary's statement is inaccurate. The DHS Final Rule does change the law in a number of ways and for a number of reasons. First, the Secretary expressly states that this "final rule amends the definition of 'knowing'

in 8 C.F.R. 274a.1(*l*)(1) in the portion relating to 'constructive knowledge.'" 72 Fed. Reg. at 45612. Under current law, an SSA no-match letter has no probative value with respect to an employee's immigration status. The SSA notice to employers specifically "cautions employers that these [no-match] letters [] do not make any statement about an employee's immigration status[.]" <http://www.ssa.gov/legislation/nomatch2.htm> (last viewed September 6, 2007). Not only does the Final Rule expressly state that the receipt of an SSA no-match letter may have probative value with respect to employees' immigration status, it expressly states the criteria under which it will have such probative value and the criteria under which it will not have probative value. The fact that this Final Rule was issued as a substantive rule under 5 U.S.C. § 553 underscores its substantive effect. *See also* 72 Fed. Reg. at 45623 (certifying that DHS considers this rule a "significant regulatory action" under Executive Order No. 12,866 because it raises "novel policy issues."). If the DHS Final Rule were merely a vanilla restatement of existing law or simply provided guidance to bureaucrats, it would neither have raised novel policy questions nor have been published as a substantive rule.

DHS' section entitled "economic impact" does not rescue its conduct for purposes of the RFA. *See Aeronautical Repair Station Ass'n, Inc. v. Fed. Aviation Admin.*, *supra*, slip op. at 14 (rejecting FAA's argument that its final economic evaluation of the effects of a rule on the industry and responding to comments was sufficient to comply with the RFA because it did not consider significant alternatives or explain why each alternative which affected small entities was rejected). The Secretary's unadorned and unexplained statement is in marked contrast to the analyses undertaken by other agencies and upheld by the courts of appeals as sufficient to satisfy the agency's certification obligations under the RFA. *See e.g.*, *Cement Kiln Recycling Coalition v. Environmental Protection Agency*, 255 F.3d 855 (D.C. Cir. 2001) (where the D.C. Circuit upheld EPA's certification because in seeking to determine whether its regulations would have "significant economic impact" on a "substantial number of small entities," the agency examined the entities that

1    would be directly affected by its rules and the compliance costs would exceed one percent of annual

2    sales for only two entities); *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agriculture*, 415

3    F.3d 1078, 1101-02 (9th Cir. 2005) (where the Ninth Circuit found that the agency satisfied its

4    obligations under the RFA by conducting a detailed economic assessment of the impact of its

5    proposed rule on small business, considering alternatives and explaining why those alternative were

6    rejected), *Environmental Defense Ctr., Inc. v. Environmental Protection Agency*, 344 F.3d 832, 879

7    (9th Cir. 2003) (where the court found EPA reasonably certified and conducted the economic

8    analyses sought by the petitioners when it convened a "Small Business Advocacy Review Panel"

9    before publishing its notice of proposed rule, and adopted and explained the provisions that had been

10   designed to minimize the impact on small entities); *Grand Canyon Air Tour Coalition v. Fed.*

11   *Aviation Admin.*, 154 F.3d 455, 470-71 (D.C. Cir. 1998) (where RFA analysis deemed adequate

12   because the agency did a lengthy analysis of the economic impact of its proposed rule on small

13   businesses, responded to comments by the Small Business Administration and others, and

14   considered at least seven alternatives to the rule).

15          The Secretary's conclusion that its Final Rule will have no economic impact on a significant

16   number of small entities is note supported by the record. Here, DHS did not examine the obvious

17   risks, potential costs and effects of compliance with its Final Rule.

18          B.      Defendants Violated the Administrative Procedure Act

19          Plaintiff-Intervenors have alleged that the DHS Final Rule is inconsistent with the

20   Administrative Procedure Act in two respects. First, the Final Rule is not authorized by IRCA.

21   Second, the assumption underlying the Final Rule, namely that a no-match is probative of

22   immigration status is not supported by the record and is inconsistent with statements of the SSA, the

23   agency charged with administering the Social Security program. Rather than repeat the arguments

GREENBERG TRAURIG LLP

1    that Plaintiffs have made in their Memorandum in Support of Motion for Preliminary Injunction,

2    Plaintiff-Intervenors adopt those arguments as if they were set forth in this brief.

3    **III.    PLAINTIFF-INTERVENORS AND THEIR MEMBERS WILL SUFFER**
      **IMMEDIATE AND IRREPARABLE HARM SHOULD THE FINAL RULE BE**
4     **IMPLEMENTED**

5            The DHS Final Rule will irreparably harm small businesses both with respect to their RFA

6    and APA claims and large businesses with respect to their APA claims.  The normal rule in this

7
      Court is that if a party cannot be made whole through money damages when the claim is resolved on
8
9    the merits, then the economic harm qualifies as "irreparable harm."  *See Patriot Contract Servs. v.*

10   *United States*, 388 F. Supp. 2d 1010, 1026 (N.D. Cal. 2005); *Napa Valley Publishing Co. v. City of*

11   *Calistoga*, 255 F. Supp. 2d 1176, 1181 (N.D. Cal. 2002) (holding that "[t]he issue with respect to

12   irreparable injury is whether, if the preliminary injunction is denied, the plaintiff can be made whole

13
      should it prove victorious at trial . . . . ").
14
15           Many Plaintiff-Intervenors will receive no-match letters in their capacity as employers.  *See*

16   Dickson Decl. at ¶ 4.  Many of Plaintiff-Intervenors' members also will receive no-match letters.  *Id.*

17   Plaintiff-Intervenors' members have received these letters in the past.  *See id.* at ¶ 1; Silvertooth

18   Decl. at ¶ 6.  To accommodate the Final Rule, both large and small businesses will have to develop

19   new human resource systems to resolve mismatches within the tight time constraints set out in the

20   Final Rule.  *See* Dickson Decl. at ¶7; Declaration of Robert J. Dolibois ("Dolibois Decl.") at ¶ 5;

21   Silvertooth Decl. at ¶ 9.  This activity necessarily diverts resources and adversely affects

22   productivity and undermines goodwill.  Dickson Dec. at ¶ 8; Dolibois Dec. at ¶ 5; Silvertooth Decl.

23
      at ¶¶ 8,9.  These costs are not recoverable, Dickson Decl. at ¶ 15, and if, as Plaintiff-Intervenors
24
25   believe, the Final Rule is invalid, the costs are not true compliance costs.  This is not speculative

26   harm as many member companies, both large and small, already have developed procedures that

27   would be implemented if the Final Rule goes into effect.  *See* Dickson Decl. at ¶¶ 7, 9.  Since many

28

GREENBERG TRAURIG LLP

1    members will receive no-match letters and since many of those members will terminate employees

2    who are unable to resolve the mismatch within the time period, the effects on productivity and the

3    loss of goodwill will be significant and will be especially profound for small businesses. *Id.* at ¶ 8;

4    Silvertooth Decl. at ¶¶ 8-10; Dolibois Decl. at ¶ 5. This type of economic disutility constitutes

5    irreparable harm. This Circuit has long recognized "that intangible injuries such as damage to

6
     ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Rent-A-Center, Inc. v.*
7
     *Canyon Tele. & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (citing *Regents of Univ. of*
8
     *Cal. v. Am. Broadcasting Cos.*, 747 F.2d 511, 519-520 (9th Cir, 1984)).
9

10        Second, even if employees are able to resolve the mismatch within ninety-three days, the

11   Final Rule still imposes non-recoverable costs that are associated with the accelerated resolution

12   process for no-match letters. Employees will have to take time off during the ninety-day window to

13   resolve mismatches. When this ninety-day window falls within a company's peak season (*e.g.*

14   Christmas for retailers; tax season for accountants and tax preparers, summer months for roofers,

15
     harvest season for produce companies, or planting season for nurseries and landscapers), the loss of
16
     employee time is particularly profound and imposes additional, non-recoverable costs and burdens
17
18   on both the company and its other employees as well as undermining goodwill. This impact cannot

19   be recovered at a later date. That is, by definition, irreparable harm. *See Rent-A-Center, Inc.*, 747

20   F.2d at 519-20.

21        Third, as noted, where mismatches cannot be resolved within the ninety-three day period, an
22
     employer must confront a dilemma. The employer can chose among one of three alternatives, none
23
24   of which is acceptable economically. The employer can terminate those employees with unresolved

25   mismatches who appear to be foreign-born, but retain those employees who appear to be native. If

26   the employer guesses wrong and some or all of the foreign-looking employees are in fact authorized

27   to work in the United States, the employer would be subject to suit under Title VII of the Civil

28

Rights Act of 1964. On the other hand, the employer can act uniformly and terminate all employees with unresolved mismatches even those that it knows are U.S. citizens or otherwise authorized to work in the United States. This is an economically disastrous option especially for small businesses and in certain industries, such as construction, will have a disparate impact on Hispanic employees. The third option is to do nothing and risk criminal or civil enforcement actions. This option too carries unacceptable ramifications.

These are not speculative options. One member of the U.S. Chamber already has expressly instructed its managers that if no-match letters cannot be resolved within the ninety-three day window, "you must terminate the employee." Dickson Decl. at ¶ 9. That company has further instructed that such an employee may not be rehired at a later date unless he or she provides new identification or work authorization. *Id.* These employees will be fired even though they may be lawful residents of the United States. To view termination of employees as anything other than irreparable injury both to the employer and employee is "callous." *Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1046 (9th Cir. 2007). The fact that the Final Rule places employers between a rock and a hard place-either terminate employees who are unable to resolve mismatch letters or risk criminal prosecution or employment discrimination suits--alone constitutes irreparable harm under the law of this circuit. *See Cheema v. Thompson*, 67 F.3d 883 (9th Cir. 1995) (forcing a plaintiff to chose between obeying religious tenets or school rules constitutes irreparable harm).

Finally, for certain sectors, the impact of this Final Rule is particularly burdensome and its effects will be felt immediately. Seasonal employers must be able to quickly hire large numbers of employees for work during a concentrated period of time. For example, the nursery growers who service orchards in this District will be hiring employees for their peak season which lasts only a few weeks during the fall. *See* Dolibois Decl. at ¶ 3. Those employers must have systems in place to track no-match letters. Employees in seasonal work move from employer to employer tracking the

GREENBERG TRAURIG LLP

different crops. Therefore, if an employer wishes to rehire that employee during its next peak

season, it will have a system that tracks employees who have been the subject of a no-match letter

even though they were not employed by that employer when the no-match letter was received. That

is the only way to avoid hiring employees "known" to be subject to a SSA mismatch letter. *See*

Dolibois Decl. at ¶ 6. This would damage these employers' ongoing recruiting efforts and would

undermine the goodwill associated with these companies. *See id.* at ¶ 7. As noted, these types of

injuries qualify as irreparable harm. *See Rent-A-Center, Inc.*, 944 F.2d at 603.

The effects also will be felt immediately by employers in the construction industry. These

employers have a disproportionate number of Hispanic employees who are authorized to work in the

United States. Silvertooth Decl. at ¶ 5. Name-matching problems with SSA are common among this

population. *Id.* at ¶ 6. As a result, these employers consistently receive no-match letters but unlike

many employers, those engaged in the construction business do not have a typical office with

support staff that is equipped to respond to these letters within the ninety-day window. *See*

Silvertooth Decl. at ¶ 7. Therefore, the DHS Rule places unreasonable economic burdens on this

sector.

This is no benign regulation necessitating only revisions to paperwork or systems. It is a

pernicious regulation that affects every employer and employee in this country. It requires

employers that wish to avoid discrimination litigation to terminate all employees who are unable to

resolve SSA mismatch letters within ninety-three days even though the government knows that the

overwhelming majority of the mismatches involve lawful employees or employees who are U.S.

citizens.[5] *See* 72 Fed. Reg. at 45613 (advising employers that if no-matches cannot be resolved, the

---

[5]    As a legal matter, the presumption imposed by the DHS Final Rule, that a mismatch is evidence of unlawful employment status, is itself invalid where, as here, that presumption has been proven to be untrue in the run of cases. A rule based on such a presumption is arbitrary and capricious. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 93 (2002).

1    employer must terminate the employee or face the risk of criminal or civil prosecution); *see also*

2    <http://www.ssa.gov/legislation/FINAL%20TY2006%20EDCOR%20Code%20V%2008202007.ht

3    m SSA> (last viewed Sept. 10, 2007) (instructing employers that all employees must be treated

4    uniformly). What is particularly callous is that DHS never even considered these effects.

**IV.    DEFENDANTS WILL IN NO WAY BE HARMED BY THE ISSUANCE OF THE INJUNCTIVE RELIEF REQUESTED**

7    Defendants would not be harmed by a preliminary injunction should this Court grant the

8    relief requested. If their statements in defense of the Final Rule are accepted at face value, they

9    cannot be harmed by a preliminary injunction because, according to them, the Final Rule changes

10    nothing.

**V.    THE EQUITABLE RELIEF REQUESTED IS IN THE PUBLIC INTEREST**

13    The issuance of equitable relief is clearly in the public interest. The implementation of the

14    Final Rule subjects millions of employees to termination. The Secretary already has represented that

15    the Final Rule poses "novel policy issues." 72 Fed. Reg. 45623. It is in the public interest to have

16    an independent arbiter resolve this important and "novel" issues before they are implemented.

GREENBERG TRAURIG LLP

GREENBERG TRAURIG LLP

## VI.   CONCLUSION

For the foregoing reasons, the Preliminary Injunction should issue as requested.

Respectfully submitted,


/s/  Robert P. Charrow
Robert P. Charrow (CA SBN 44962)
Laura Klaus (DC SBN 294272) (*Pro Hac to be Filed*)
Laura Reiff (DC SBN 424579) (*Pro Hac to be Filed*)
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
Telephone:  (202) 533-2396
Facsimile:  (202) 261-0164
Email: charrowr@gtlaw.com
Email: klausl@gtlaw.com
Email: reiffl@gtlaw.com

William J. Goines (CA SBN 061290)
Karen Rosenthal (CA SBN 209419)
GREENBERG TRAURIG, LLP
1900 University Ave., 5th Fl.
East Palo Alto, CA  94303
Telephone:  (650) 328-8500
Facsimile:  (650) 328-8508
Email:  goinesw@gtlaw.com
Email:  rosenthalk@gtlaw.com

Robin S. Conrad (DC SBN 342774) (*Pro Hac to be Filed*)
Shane Brennan (DC SBN 456402) (*Pro Hac to be Filed*)
National Chamber
   Litigation Center, Inc.
1615 H Street, N.W.
Washington, D.C. 20062
Telephone: (202) 463-5337
Facsimile: (202) 463-5346
Email: RConrad@uschamber.com
Email: SBrennan@uschamber.com


Counsel for Plaintiff-Intervenors