# APPENDIX

Robert P. Charrow (CA SBN 44962)
Laura M. Klaus (DC SBN 294272) (*Pro Hac to be filed*)
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
Telephone: (202) 533-2396
Facsimile: (202) 261-0164
Email: charrowr@gtlaw.com; klausl@gtlaw.com

William J. Goines (CA SBN 061290)
Karen Rosenthal (CA SBN 209419)
GREENBERG TRAURIG, LLP
1900 University Ave., 5th Fl.
East Palo Alto, CA 94303
Telephone: (650) 328-8500
Facsimile: (650) 328-8508
Email: goinesw@gtlaw.com; rosenthalk@gtlaw.com

Counsel for Plaintiff-Intervenors

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, *et al.*, <br><br> Plaintiffs, <br><br> and <br><br> SAN FRANCISCO CHAMBER OF COMMERCE, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, GOLDEN GATE RESTAURANT ASSOCIATION, NATIONAL ROOFING CONTRACTORS ASSOCIATION, AMERICAN NURSERY & LANDSCAPE ASSOCIATION, INTERNATIONAL FRANCHISE ASSOCIATION, and UNITED FRESH PRODUCE ASSOCIATION, <br><br> Plaintiff-Intervenors <br><br> v. <br><br> MICHAEL CHERTOFF, *et al.*, <br><br> Defendants | CASE NO. 3:07-cv-04472-CRB <br><br> **DECLARATION OF ELIZABETH C. DICKSON** |

DECLARATION OF ELIZABETH C. DICKSON   - 1 -
3:07cv04472 CRB

I, Elizabeth C. Dickson, declare as follows:

1) I am the Chair of the Subcommittee on Immigration for the Chamber of Commerce of the United States of America ("U.S. Chamber"), a Plaintiff-Intervenor in this case, established as a not-for-profit corporation under Internal Revenue Code, § 501(c). The U.S. Chamber has approximately 500 employees. I am also the Manager of Immigration Services for a Company that is a member of the U.S. Chamber and that has received No-Match Letters in the past.

2) I chair the U.S. Chamber's thirty (30) plus member Subcommittee on Immigration that determines the U.S. Chamber's position and sets strategy on issues including immigration reform, visa and border policy.

3) The U.S. Chamber is a small entity as that term is used in the Regulatory Flexibility Act. Approximately 300,000 of the U.S. Chamber's member businesses also are small entities within the meaning of the Regulatory Flexibility Act.

4) The U.S. Chamber has had an opportunity to assess some of the effects of the DHS Final Rule which is the subject of this litigation both on itself as an employer and on its small business members. I understand that many small entities, including those that are members of the U.S. Chamber, are highly likely to receive a so-called "no match" letter from the Social Security Administration.[1] The economic burden associated with the implementation and effects of the DHS Final Rule are significant, especially for a substantial number of small employers. These

---

[1] This is based on the DHS' and Social Security Administration's statement that 4.0% of the SSA database contained unresolved mismatches and it further assumes a uniform distribution of those mismatched Social Security numbers across the population. See Testimony of Stewart A. Baker, Assistant Secretary for Policy, DHS, Before the Subcomm. on Oversight of the House Comm. on Ways and Means (Feb. 16, 2006). It also assumes that the Social Security Administration will only send a no-match letter to an employer with ten or more mismatched Social Security numbers and the number of mismatches represents more than 0.5 percent of the total Forms W-2 in the employer's submitted wage report.

burdens are direct and immediate and will have an adverse impact on the productivity of small businesses.

5) For example, to accommodate the DHS Final Rule, employers, both large and small, will have to develop new human resource systems to resolve mismatches within the tight time constraints set out in the rule. The overwhelming majority of businesses currently resolve SSN mismatches by asking the employee to resolve it. In our experience, it frequently takes employees many attempts and months to complete that process. In my experience, the Social Security offices in some states may take even longer to resolve mismatches. Now, employers and employees have been able to do this at their leisure. Even then, it is not a quick or easy process. In many cases, employees, especially where the mismatch is due to marriage and name-change, have to obtain copies of their birth and marriage certificates, fill out an application for a corrected Social Security card and submit that application and documentation along with proof of identity (*e.g.*, passport or U.S. driver's license) to the local office of the Social Security Administration. This is necessarily a slow process. Aside from the time commitment involved in obtaining the required documentation, the employee can only visit the local Social Security Administration office during business hours. Although employees are permitted to mail that application and documentation, in most instances, because original documentation is required and that documentation (such as driver's licenses or passports) cannot easily be out of the control of the employee, a personal visit or two is required. Moreover, SSA's ability to respond to requests to reissue Social Security cards varies state by state. The SSA offices in some states are very slow, particularly states with large populations. Other states' SSA offices are able to quickly resolve these issues. In some states, such as Virginia, before employees can effectuate name changes or correct typographical errors in their birth certificates, they must apply to the local circuit court which must then issue a new record. Only then can the employee go to the local SSA office to

DECLARATION OF ELIZABETH C. DICKSON     - 3 -
3:07CV04472 CRB

resolve any mismatch. This process can delay resolution of any mismatch by more than one month.

6) Under the DHS Final Rule, employers will have to use a totally different system. Rather than having an employee resolve the mismatch at the employee's own pace, that resolution will have to be accomplished within ninety days. This necessarily will have a significant impact on a substantial number of small entities.

7) First, human resources departments will have to put systems into place designed to resolve mismatches with the employee's cooperation within the ninety-day window. This will entail in some cases, hiring human resource specialists, education, training and legal counsel both in-house and from outside consultants and attorneys. Large companies have the resources, systems, and training capabilities to drive compliance throughout the organization. At my company, we developed and were planning to conduct a series of web-based tutorials for all those in our Human Resources Department so that they could better understand their obligations under the Final Rule. This took considerable time and effort. The overwhelming majority of small businesses do not currently have such systems in place because there is no time limit on the resolution of any mismatch. These systems will likely vary from employer to employer, but they will have one thing in common, they will take time and money to develop and implement. The notion that the Final Rule imposes no economic burden on an employer or employee is far-fetched.

8) Second, in order for employees to resolve mismatches, they will now have to take time off during the ninety-day window. This will adversely affect productivity especially for small businesses, where every employee counts. For businesses with seasonal variations, compliance will produce a particularly significant and costly hardship. Moreover, it will have a more focused adverse impact on those businesses with a higher percentage of women employees

between ages 18 and 35, because a large percentage of mismatches are due to name changes associated with marriage. The loss of productivity will necessary affect Plaintiff-Intervenors' members' goodwill which, once tarnished, cannot be recovered.

9) Third, where a mismatch cannot be resolved in the ninety-day window and the employee can provide no additional documentation to meet the employment eligibility verification requirement for the new I-9 form, the employer then has to face the dilemma of termination, criminal liability or fine, or a possible discrimination suit. Assume that an employer has ten employees who have been unable to resolve their mismatches within the requisite ninety-day period. Further assume that six of those employees appear to be U.S.-born, but the remaining four look foreign. If the employer terminates the four who appear to be foreign-born, but not the six who appear to be U.S.-born, and it turns out that the employer guessed wrong, it is likely that the employer would be sued under Title VII of the Civil Rights Act for race or national origin discrimination. Employers who wish to avoid the risk of such suits would have little choice but to terminate all ten employees or terminate none and face possible criminal liability or civil fines. This is no idle speculation. One of our member companies has already developed a policy, which would be implemented should the Final Rule go into effect, that instructs its managers that if a no-match letter cannot be resolved within the ninety-three day window, "you must terminate the employee." This policy would apply to United States citizens and anyone who is authorized to work in the United States. The company's policy further instructs its managers that an employee may not be rehired at a later date unless he or she provides new identification or work authorization. These three alternatives would engender significant, adverse economic harm and the likelihood that one of them would occur is 100 percent because they are mutually exclusive.

10) The economic burden of the Final Rule is further heightened by inconsistencies in the advice provided in the DHS guidance letter for complying with the Final Rule. At one point, DHS

DECLARATION OF ELIZABETH C. DICKSON    - 5 -
3:07cv04472 CRB

advises employers that continuing to employ an employee where the mismatch cannot be resolved within the ninety-day period and for whom no additional documentation is available, subjects that employer to "the risk of [liability] for violating the law." In the next paragraph, however, DHS advises employers that if they terminate an employee based solely on a mismatch letter, the employer may "violate the law." This confusion alone is costly especially to small businesses who will have to hire counsel to guide them through this legal thicket.

11) We understand from our members that some businesses will seek to utilize subcontractors to reduce the likelihood of receiving a mismatch letter. This will have a dramatic impact especially on a significant number of small entities.

12) In our experience, these costs and economic burdens will be substantial, however, even these substantial impact assumes that the Social Security Administration would be able to process the abnormally large number of no-matches within the time constraints contemplated by the DHS Final Rule. We do not think that is likely. In our view, the DHS Final Rule will have the same effect on the Social Security Administration that post-September 11, 2001 changes to immigration rules that took effect in January 2007, had on the State Department's processing of passport applications. There, an increase of 5,000,000 passport applications from 2006 to 2007, caused a massive backlog in passport application processing times which was abated only by hiring hundreds of new adjudicators, temporary transfers of employees to passport centers and the opening of a new facility to handle the applications. The passport backlog caused inconvenience only; the backlog caused by this rule will likely cause people to lose their jobs. Indeed, many employees who receive letters may attempt to obtain a passport to meet the new I-9 employment eligibility requirements. The State Department has reported that the waiting period for a standard passport application is now six to eight weeks and three weeks for expedited service, which requires the payment of a substantial fee. *See*

DECLARATION OF ELIZABETH C. DICKSON    - 6 -
3:07cv04472 CRB

<http://www.cnn.com/2007/TRAVEL/09/07/us.passports.ap/indix.html> (last viewed September 10, 2007).

13) Terminating employees who are authorized to work in the United States carries substantial economic burdens. An employer has to first hire additional employees to replace terminated employees. The hiring and training process and loss of experienced workforce carries cost, none of which was examined by DHS. Termination also will drive up employer's unemployment insurance premiums across all sectors. This too is an economic impact that DHS failed to address in its rulemaking. The overall effect of the rule on productivity, we believe, would be significant for all businesses, but particularly for small businesses. The fact that no effort was made by DHS to identify, let alone assess, the impact of its Final Rule is unfortunate.

14) The economic and human resource costs associated with the DHS Final Rule are already occurring in anticipation of the regulation and would be even more severe upon its effective date and, in our view, would cause irreparable injury to our members.

15) The economic and human resource burdens and loss of goodwill noted above are not recoverable costs and will not be recoverable by the U.S. Chamber or its members. This is not a situation in which these costs or harms can be recovered as damages or otherwise. Thus the Final Rule will have a significant, non-recoverable economic impact on a substantial number of small entities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed September 11, 2007



Elizabeth C. Dickson

DECLARATION OF ELIZABETH C. DICKSON    - 7 -
3:07cv04472 CRB