1  Robert P. Charrow (CA SBN 44962)
   Laura M. Klaus (DC SBN 294272) (*Pro Hac to be filed*)
2  GREENBERG TRAURIG, LLP
   800 Connecticut Avenue, N.W., Suite 500
3  Washington, D.C. 20006
   Telephone: (202) 533-2396
4  Facsimile: (202) 261-0164
   Email: charrowr@gtlaw.com; klausl@gtlaw.com
5
   William J. Goines (CA SBN 061290)
6  Karen Rosenthal (CA SBN 209419)
   GREENBERG TRAURIG, LLP
7  1900 University Ave., 5th Fl.
   East Palo Alto, CA 94303
8  Telephone: (650) 328-8500
   Facsimile: (650) 328-8508
9  Email: goinesw@gtlaw.com; rosenthalk@gtlaw.com

10 Counsel for Plaintiff-Intervenors

11           UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
12
   AMERICAN FEDERATION OF LABOR AND   )
13 CONGRESS OF INDUSTRIAL ORGANIZATIONS, )
   *et al.*,                          )
14                                    )
       Plaintiffs,                    )
15                                    )
       and                            )
16                                    )
   SAN FRANCISCO CHAMBER OF COMMERCE, )
17 CHAMBER OF COMMERCE OF THE UNITED  )  CASE NO. 3:07-cv-04472-CRB
   STATES OF AMERICA, GOLDEN GATE     )
18 RESTAURANT ASSOCIATION, NATIONAL   )  **DECLARATION OF**
   ROOFING CONTRACTORS ASSOCIATION,   )  **ROBERT CRAIG SILVERTOOTH**
19 AMERICAN NURSERY & LANDSCAPE       )
   ASSOCIATION, INTERNATIONAL FRANCHISE )
20 ASSOCIATION, and UNITED FRESH PRODUCE )
   ASSOCIATION,                       )
21                                    )
       Plaintiff-Intervenors          )
22                                    )
       v.                             )
23                                    )
   MICHAEL CHERTOFF, *et al.*,        )
24                                    )
       Defendants                     )
25

26

27

28

- 1 -    DECLARATION OF ROBERT CRAIG SILVERTOOTH
         3:07-cv-04472-CRB

I, Robert Craig Silvertooth, declare under penalty of perjury as follows:

1. I am the Director of Federal Affairs of the National Roofing Contractors Association ("NRCA"), a Plaintiff-Intervenor in this case, established as a not-for-profit corporation under Internal Revenue Code, § 501(c). NRCA has approximately 70 employees.

2. In my professional capacity, I am responsible for monitoring, developing and advocating policy positions on various federal regulations and legislation. My issue specialization has focused on policy relating to immigration, labor, tax, energy, environmental regulation, labor, federal procurement, health care, and civil litigation reform. I co-chair the Essential Worker Immigration Coalition as well as the Construction Organizations for Sensible Taxation coalition. I am a trustee for the Associated Specialty Contractors, an active member of the Alliance to Save Energy, and currently serve on the U.S. Chamber of Commerce's Labor Relations Committee.

3. NRCA is a small entity as that term is used in the Regulatory Flexibility Act. More than 95 percent of NRCA's member businesses also are small entities within the meaning of the Regulatory Flexibility Act.

4. NRCA has had an opportunity to assess some of the effects of the DHS Final Rule which is the subject of this litigation both on itself as an employer and on its small business members. The costs associated with the implementation and effects of the Department of Homeland Security ("DHS") Final Rule are significant, especially for a substantial number of small employers in the construction industry and are not recoverable. These effects are direct and immediate and will have an adverse impact on the productivity of small businesses.

5. Of immediate concern to NRCA is the sample population of construction workers that could be the subject of a "no match" letter. Employment in the construction industry grew by 559,000 workers in 2006, and Hispanic workers, mostly foreign born, were responsible for

nearly two-thirds (66.5%) of the increase in industry employment. About 60 percent of that increase, or 335,000, went to foreign-born Hispanics. And most of these foreign-born Hispanic workers are recent arrivals, having arrived in the U.S. since 2000. In fact, the number of recent arrivals employed in the construction industry rose by 255,000 in 2006, representing 45.6 percent of the total increase in industry employment last year. In total, the construction industry employed 2.9 million Hispanic workers in 2006.

6. The demographic composition of the construction workforce, coupled with a SSA database that is notoriously inaccurate, is of deep concern to NRCA. The construction industry absorbed 40.6 percent of the total growth in U.S. employment of foreign-born Hispanics between 2005 and 2006. Frequently, "no match" notices result from name changes and clerical errors, such as transposed numbers or other honest mistakes. For the construction industry, and specifically the roofing sector, the mismatch problem is exceptionally severe as workers who identify themselves as being Latino or Hispanic represent fully one-quarter of the construction workforce. Name-matching problems with SSA are common among this community due to multiple surnames of individuals, rather than the traditional first-middle-last name pattern of most native-born Americans. According to a July 11, 2006, Government Accountability Office ("GAO") report, the SSA database contains incomplete and outdated data. NRCA is deeply concerned with the prospect of terminating employees who are legitimately authorized to work, but who have been unable to obtain a resolution within the allotted 90-day period due to corrupt data. It is particularly troubling, given that the GAO has confirmed that the database, which DHS suggests should be used to determine work eligibility, is rife with inaccurate data.

7. Given the inaccurate SSA database, and the likelihood construction will receive a disproportionate percentage of "no match" letters issued, NRCA believes the proposed

- 3 -   DECLARATION OF ROBERT CRAIG SILVERTOOTH
3:07-cv-04472-CRB

timeframe of 90 days to resolve a discrepancy is impractical and economically disruptive. The 90-day period is not a viable timeframe in which to rectify data problems simply due to the problems attendant to erroneous and incomplete records in the SSA system. DHS has provided no credible assurance that the 90-day time period is an adequate amount of time in the current enforcement environment, let alone in a new era in which DHS ramps up efforts to identify the estimated 12 million undocumented immigrants in the U.S. economy. There is every reason to believe SSA's resources and infrastructure will be stretched beyond capacity if DHS moves forward with this proposal, and regrettably, honest employers and lawfully-employed workers will be harmed in the process. Both large and small employers will be severely challenged to meet this standard. Large employers may receive several "no-match" letters simultaneously – each containing multiple names, magnifying the difficulty of resolving all of the discrepancies within the prescribed timeframe. Regarding smaller firms, they often do not have a full-time administrative staff to address these issues. Small business owners often have to run the business, oversee bookkeeping, supervise its employees and perform administrative duties. The construction industry would be particularly hard hit by this requirement, as most firms are small and operate outside of a conventional office environment. Employers in the construction industry spend the bulk of their time at job sites, not an office; they are frequently not even near a computer, let alone hard copies of their employment records. For these reasons, the 90-day period is unreasonable and will be unduly burdensome for employers.

8. Further, the average construction company is a small business, with a lean administrative staff and the bulk of its workforce (including management) outside of the home office. The typical NRCA member hires approximately 35 employees and can ill afford shocks to the size of its labor force, whereas a larger firm possesses a stronger capacity for absorbing such

disruptions. This is especially true in construction. Our industry operates under unique demands such as weather restrictions, performance and bonding requirements in contracts, and strict timetables for delivery of the construction product and service. Absorbing labor shortages in the middle of projects is potentially disastrous for small construction companies, as failure to meet timetables can result in non-payment by the building owner or general contractor. Further, worker shortages disproportionately impact smaller construction companies because it jeopardizes their ability to bid for future contracts.

9. Under the DHS Final Rule, employers will need to implement costly new human resources procedures and/or absorb new costs associated with legal and consultancy services. Human resources departments will have to put systems into place designed to resolve mismatches with the employee's cooperation within the 90-day timeframe. Such systems will necessitate education, training and legal counsel both in-house and from outside consultants/attorneys. As the overwhelming majority of NRCA members do not currently have such systems in place, these new costs will be assumed and will alter cash-flow in a negative fashion.

10. An unfortunate, yet certain, consequence of the DHS proposal is that if an employer receives a "no-match" letter, many employees will simply be fired. Given the complexity of the proposed rule, many employers will choose to endure the economic disruption associated with losing a valued employee, rather than risk legal liability by attempting to remedy the "no-match" notice. Out of caution, panic and confusion surrounding the intricacies of the rule, and unfortunately ethnic profiling as well, many employers will select the safe legal route by shedding the potential legal liability associated with workers who are the subject of "no-match" notices. Once again, the integrity of the SSA database comes into play, as U.S. citizens and legally-authorized immigrants will undoubtedly face termination.

Unquestionably, wrongful terminations are not DHS' intent, but DHS should bear in mind its culpability in such terminations should it proceed with the rule.

11. The economic and human resource costs associated with the DHS Final Rule are already occurring in anticipation of the regulation and would be even more severe upon its effective date and, in our view, would cause immediate and irreparable injury to NRCA and its members.

I declare under penalty of perjury that the foregoing is true and correct.

Executed September 11, 2007

*R. Craig Silvertooth* (signature)

R. Craig Silvertooth