Stephen P. Berzon (SBN 46540)
Scott A. Kronland (SBN 171693)
Jonathan Weissglass (SBN 185008)
Linda Lye (SBN 215584)
Danielle E. Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: skronland@altshulerberzon.com
Email: llye@altshulerberzon.com
Email: dleonard@altshulerberzon.com

*Attorneys for Plaintiffs*

Jonathan P. Hiatt (SBN 63533) (*Pro Hac Vice* Application pending)
James B. Coppess
Ana L. Avendaño (SBN 160676)
AFL-CIO
815 Sixteenth Street, N.W.
Washington, D.C. 20006
Telephone: (202) 637-5053
Facsimile: (202) 637-5323
Email: aavendan@aflcio.org

*Attorneys for Plaintiff AFL-CIO*

(Counsel list continued on next page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS; SAN FRANCISCO LABOR COUNCIL; SAN FRANCISCO BUILDING AND CONSTRUCTION TRADES COUNCIL; and CENTRAL LABOR COUNCIL OF ALAMEDA COUNTY, <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL CHERTOFF, Secretary of Homeland Security; DEPARTMENT OF HOMELAND SECURITY; JULIE MYERS, Assistant Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MICHAEL ASTRUE, Commissioner of Social Security; and SOCIAL SECURITY ADMINISTRATION, <br><br> Defendants. | Case No. C07-4472 CRB <br><br> **NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT; APPENDICES A-C** <br><br> Date:  October 1, 2007 <br> Time:  2:30 p.m. <br> Place:  Courtroom 8, 19th Floor |

1   (Counsel list continued from first page)

2   Linton Joaquin (SBN 73547)
    Marielena Hincapié (SBN 188199)
3   Monica T. Guizar (SBN 202480)
    NATIONAL IMMIGRATION LAW CENTER
4   3435 Wilshire Blvd., Suite 2850
    Los Angeles, CA 90010
5   Telephone: (213) 674-2850
    Facsimile: (213) 639-3911
6   Email: guizar@nilc.org

7   Lucas Guttentag (SBN 90208)
    Jennifer C. Chang (SBN 233033)
8   Mónica M. Ramírez (SBN 234893)
    AMERICAN CIVIL LIBERTIES UNION FOUNDATION
9   Immigrants' Rights Project
    39 Drumm Street
10  San Francisco, CA 94111
    Telephone: (415) 343-0770
11  Facsimile: (415) 395-0950
    E-mail: jchang@aclu.org
12
    Omar C. Jadwat (*Pro Hac Vice* Application pending)
13  AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    Immigrants' Rights Project
14  125 Broad Street, 18th Floor
    New York, NY 10004
15  Telephone: (212) 549-2620
    Facsimile: (212)-549-2654
16  Email: ojadwat@aclu.org

17  Alan L. Schlosser (SBN 49957)
    Julia Harumi Mass (SBN 189649)
18  ACLU FOUNDATION OF NORTHERN CALIFORNIA
    39 Drumm Street
19  San Francisco, CA 94111
    Telephone: (415) 621-2493
20  Facsimile: (415) 255-1478
    E-mail: aschlosser@aclu.org
21
    *Attorneys for Plaintiff Central Labor Council of Alameda County*
22
    David A. Rosenfeld (SBN 58163)
23  Manjari Chawla (SBN 218556)
    WEINBERG, ROGER & ROSENFELD
24  A Professional Corporation
    1001 Marina Village Parkway, Suite 200
25  Alameda, California 94501-1091
    Telephone: (510) 337-1001
26  Facsimile: (510) 337-1023
    Email: drosenfeld@unioncounsel.net
27
    *Attorneys for Plaintiffs San Francisco Labor Council,*
28  *San Francisco Building and Construction Trades Council,*
    *and Central Labor Council of Alameda County*

## NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION

Please take notice that on October 1, 2007, at 2:30 p.m., in Courtroom 8, 19th Floor, before the Honorable Charles R. Breyer, Plaintiffs will move the Court for entry of a preliminary injunction prohibiting Defendants from giving effect to or otherwise taking any action to implement or enforce the Final Rule adopted by the Department of Homeland Security, "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 77 Fed. Reg. 45611 (Aug. 15, 2007), including by mailing or otherwise causing to be sent to employers Social Security Administration no-match letter packets that include or reference the Department of Homeland Security's guidance letter concerning the Final Rule.

This motion is made pursuant to FRCP 65 on the ground that Plaintiffs meet the requirements for a preliminary injunction because they have demonstrated: 1) a likelihood of success on the merits and the possibility of irreparable injury, or 2) serious questions about the legality of Defendants' conduct and that the balance of hardships tips sharply in Plaintiffs' favor. *Lands Council v. Martin*, 479 F.3d 636, 639 (9th Cir. 2007).

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in Support of Preliminary Injunction, the Declarations in Support of Motion for Preliminary Injunction, the First Amended Complaint For Injunctive And Declaratory Relief, the Plaintiffs' Request for Judicial Notice in Support of Temporary Restraining Order and Preliminary Injunction, the [Proposed] Order Granting Plaintiffs' Motion for a Preliminary Injunction, the complete files and records of this action, and such other and further matters as the Court may properly consider.

Dated:  September 11, 2007         Respectfully submitted

                                   Stephen P. Berzon
                                   Scott A. Kronland
                                   Jonathan Weissglass
                                   Linda Lye
                                   Danielle E. Leonard
                                   ALTSHULER BERZON LLP

                                   Jonathan P. Hiatt
                                   James B. Coppess
                                   Ana Avendaño
                                   AFL-CIO

1

2

3

Linton Joaquin
Marielena Hincapié
Monica T. Guizar
NATIONAL IMMIGRATION LAW CENTER

4

5

6

Lucas Guttentag
Jennifer C. Chang
Mónica M. Ramírez
AMERICAN CIVIL LIBERTIES UNION FOUNDATION

7

Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION FOUNDATION

8

9

Alan L. Schlosser
Julia Harumi Mass
ACLU FOUNDATION OF NORTHERN CALIFORNIA

10

11

David A. Rosenfeld
Manjari Chawla
WEINBERG, ROGER & ROSENFELD

12

13

by: _/s/Scott A. Kronland_____
            Scott A. Kronland

14

Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

**SUMMARY OF ARGUMENT**

The Department of Homeland Security ("DHS") published a Final Rule on August 15, 2007 that would commandeer the Social Security tax system for immigration-enforcement purposes. This action challenges the Final Rule and the plan by DHS and the Social Security Administration ("SSA") to implement the Final Rule.

The SSA periodically generates "no-match" letters to employers when names and Social Security numbers submitted on Forms W-2 do not match SSA's records. These no-match letters have been issued for years and have nothing to do with the immigration laws. Under the new DHS rule, however, employers that receive no-match letters will face civil and criminal liability under the immigration laws for "knowing[ly]" employing unauthorized workers unless the no-match is resolved with SSA. To implement the Final Rule, SSA and DHS plan to mail no-match letters to employers that include a DHS guidance letter. That guidance letter informs employers, pursuant to the Final Rule, that they should fire workers who cannot resolve no-matches with SSA or re-verify their work authorization within 93 days. The DHS/SSA mailing would reach 140,000 employers and cover about 8 million employees.

The DHS rule will place in jeopardy the jobs of millions of U.S. citizens and other employees who are legally working because there are many reasons for SSA no-matches that are unrelated to unauthorized work. No-matches occur because of clerical errors, employee name changes after marriage or divorce, employees who use a less "foreign" name in the workplace, different naming conventions, such as multiple surnames, common in many parts of the world, and many other reasons. The SSA receives about *8 to 11 million* earnings reports per year that fail to match SSA records, and the Earnings Suspense File contains about *255 million* unmatched records. When the SSA has been able to reconcile unmatched records, most involved U.S. citizens. The SSA does not know what proportion of all no-match letters relate to unauthorized work.

The Court issued a temporary restraining order on August 31, 2007 to prevent the DHS Final Rule from becoming effective and to stay the SSA/DHS joint no-match mailing to employers. The

1    Court should now convert the temporary restraining order to a preliminary injunction to preserve the

2    status quo pending a decision on the merits.  Plaintiffs have a very strong likelihood of success on

3    their claims, and the balance of equities tips sharply in favor of a stay pending judicial review.

4        1.    The DHS Final Rule is contrary to the governing statute because it expands civil and

5    criminal liability under the immigration laws far beyond what Congress intended.  Congress

6    provided for liability when an employer continues to employ a worker *"knowing"* the worker is an

7    "unauthorized alien."  8 U.S.C. §1324a(a)(2) (emphasis added).  The word *knowing* is "a familiar

8    term of art" that describes a state of mind necessary for civil or criminal liability; it has a meaning

9    "Congress is presumed to have known and adopted."  *United States v. Jewell*, 532 F.2d. 697, 703

10   (9th Cir. 1976) (en banc).  The DHS rule would change the agency's definition of  "knowing" to

11   provide that an employer receiving a no-match letter and failing to take action has "constructive

12   knowledge" the worker is an "unauthorized alien."  Given the many reasons for no-matches that

13   have nothing to do with unauthorized work, and that neither SSA nor DHS knows what proportion

14   of no-matches relate to unauthorized work, the DHS rule lowers the *mens rea* for liability and

15   adopts a different standard than Congress intended.

16        The DHS rule also is contrary to the governing statute because it disturbs the careful

17   balance that Congress struck in establishing the details of a system for verification of

18   work-authorization status upon the initial hire.  Congress was concerned that continuing verification

19   would place undue burdens on employers and employees and also lead employers to discriminate

20   against all employees with "foreign" appearances because of fears about immigration-law liabilities.

21   The DHS rule creates the same problems Congress intentionally sought to avoid because it

22   effectively establishes a system of continuing verification for millions of employees each year who

23   are covered by SSA no-match letters.

24        The DHS rule is also in conflict with the statute because it requires employers to verify the

25   status of employees hired before the Immigration Reform and Control Act ("IRCA") was adopted

26   even though Congress exempted those employees through a "grandfather" provision.

27        2.    In addition to and independent from the conflicts between the DHS rule and the

28   governing statute,  the rule also must be set aside because the agency's decision to adopt the rule

1    was arbitrary and capricious.

2       First, the agency failed to articulate a "rational connection between the facts found and the

3    choice made." *Motor Vehicle Mfgs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43

4    (1983). The agency's Notice of Proposed Rule and Notice of Final Rule acknowledge that there are

5    many causes for SSA no-match letters and do not cite to any data showing that no-match letters are

6    reliable indicators of unauthorized work. Yet the agency's rule treats no-match letters as placing

7    employers on notice that it is highly probable a particular employee lacks work authorization. The

8    agency never justifies this leap in logic.

9       Second, when an agency adopts a rule that changes the agency's prior position, the agency

10    "is obligated to supply a reasoned analysis for the change." *State Farm*, 463 U.S. at 42. In the past,

11    DHS and its predecessor agencies informed employers that they had no immigration-law duty to

12    address SSA no-match letters. The new DHS rule, in direct contrast, interprets the immigration

13    laws as requiring employers to investigate no-matches lest they incur civil and criminal liability.

14    Meanwhile, there have been no changes in the process by which SSA generates no-match letters.

15    An agency's failure to acknowledge and justify its change of position requires – by itself – that the

16    agency's action be set aside as arbitrary and capricious. *Fox Television Stations, Inc. v. Federal*

17    *Communications Com'n*, 489 F.3d 444, 457 (2d Cir. 2007).

18       3.    The DHS/SSA plan to use no-match letters as an immigration-enforcement tool also

19    must be set aside because it exceeds the authority Congress granted to these agencies. Federal

20    agencies are purely "creature[s] of statute," and they have no authority beyond what Congress has

21    conferred. *Michigan v. EPA,* 268 F.3d 1075, 1081 (D.C. Cir. 2001).

22       Congress established SSA as an "independent agency" to administer the social security

23    program. 42 U.S.C. §901. SSA has authority to process Forms W-2 only for purposes of that

24    program and in accordance with a statutorily sanctioned agreement between SSA and the Internal

25    Revenue Service. *See* 26 U.S.C. §6103(l)(5); 42 U.S.C. §432**.** Nothing in Congress' grant of

26    authority to SSA authorizes the agency to use the process of reconciling earnings reports with its

27    database as a tool for immigration-law enforcement.

28

1    For its part, DHS has a congressional grant of authority to administer the immigration laws,

2    not to establish employers' responsibilities in responding to SSA no-match letters. Congress gave

3    the authority to regulate tax reporting obligations to the Internal Revenue Service, which already has

4    regulations on this issue. When Congress allocates authority to regulate in certain areas to particular

5    agencies, Congress' decision must be respected. *See, e.g., National Treasury Employees Union v.*

6    *Chertoff*, 452 F.3d 839, 860 (D.C. Cir. 2006).

7    Finally, DHS also has no authority to interpret the immigration law's anti-discrimination

8    provisions, which DHS's rule and guidance letter purport to do, because Congress gave *that*

9    authority to the Department of Justice. *See* 8 U.S.C. §1324b(c).

10    4.    The balance of equities tips sharply in favor of maintaining the status quo until

11    plaintiffs' claims can be heard. Employers, who have intervened as plaintiffs, will face the

12    administrative costs and disruptions of complying with the Final Rule. Those costs cannot be

13    recovered after the fact because the government will be immune from damages liability.

14    Many individual members of the plaintiff labor organizations also will suffer severe and

15    irreparable harm. The upcoming SSA/DHS no-match mailing will directly affect about *600,000* of

16    those union members. Reich Decl., ¶4. Absent a stay, workers will be falsely accused of being

17    "illegal aliens" unless they can prove otherwise. Particularly for workers with a "foreign"

18    appearance or accent, the accompanying stigma and fear of loss of their livelihood can never be

19    adequately remedied. Workers covered by a no-match letter also will need to contact SSA field

20    offices, perhaps several times, to attempt to resolve no-matches. For many workers, that will mean

21    a loss of pay. That monetary loss is real harm that will not be remedied.

22    Pursuant to the DHS rule and guidance letter, workers will be fired, even though they are

23    U.S. citizens or non-citizens with work authorization, simply because they cannot resolve a no-

24    match with the SSA bureaucracy by the deadline. SSA concedes that in "difficult cases," SSA may

25    be unable to resolve discrepancies within the 90-day timeframe. Appendix A at 45617; *see also*

26    DHS Opp. to TRO at 7 (SSA "anticipates that it will be able to resolve *nearly all claims* in this 90-

27    day time frame") (emphasis added). This subset of the 8 million employees covered by no-match

28    letters – many of whom will be U.S. citizens or non-citizens with work authorization – will be fired

1  even if they insist their names and SSNs are accurate.  Based on past experience, moreover, some

2  workers with lawful status but a "foreign" appearance or accent will be fired immediately because

3  their employers fear immigration-law liability.  Theodore Decl. at ¶¶19-25.  The Court *will never*

4  *know* who those workers are so no remedy will be provided.

5      By contrast to the immediate harm to workers and employers that would occur absent a stay,

6  preservation of the status quo until this action can be decided on the merits would not cause any

7  significant harm to the government defendants.

8      SSA is not an immigration-enforcement agency, so SSA would not be prevented from

9  carrying out *its own* statutory functions by a preliminary injunction.  SSA can simply send out its

10  traditional no-match letters in the interim, something that SSA has been doing since 1994.  Indeed,

11  SSA would be better able to perform *its own* mission absent the additional inquiries generated by

12  the DHS rule and guidance letter.

13      Nor would DHS suffer significant harm from a stay.  DHS would not be precluded from

14  continuing to enforce the immigration laws.  Neither DHS nor its predecessor agency saw any need

15  to promulgate the Final Rule during the first 20 years after IRCA was adopted.  Moreover, DHS

16  allowed the proposed rule to lay dormant *for an entire year* before DHS ultimately adopted it only

17  after Congress chose not to adopt immigration legislation that DHS supported.

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    A.    Social Security Administration No-Match Letters . . . . . . . . . . . . . . . . . . . . . . . . .  1

    B.    Employer Verification of Work Authorization and Sanctions . . . . . . . . . . . . . . . .  3

    C.    The New Department of Homeland Security Rule  . . . . . . . . . . . . . . . . . . . . . . . . .  4

    D.    Implementation of the New Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

    I.    The DHS Rule and Guidance Letter are Contrary to the Governing Statute . . . . . . .  9

        A.    The DHS Rule and Guidance Letter are Premised on an Interpretation of the Statutory Term "Knowing" that is Not What Congress Meant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

        B.    The DHS Rule Also Upsets the Balance that Congress Struck in Establishing a System of Initial Verification of Work-Authorization Status  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

        C.    The DHS Rule is Also Contrary to Statute by Requiring Verification of Employees Who Were Exempted by IRCA's "Grandfather" Provision  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

    II.    The DHS Rule and Guidance Letter are Arbitrary and Capricious  . . . . . . . . . . . .  20

        A.    The Agency Failed to Establish a Rational Connection Between the Facts Relied Upon and the Choices Made . . . . . . . . . . . . . . . . . . . . . . .  20

        B.    The Agency Failed to Provide a Reasoned Explanation for Changing its Position on the Significance of No-Match Letters  . . . . . . . . . . . . . . . . .  23

    III.    The DHS/SSA Plan to Use No-Match Letters as an Immigration-Enforcement Tool Exceeds the Authority Congress Granted to these Agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

        A.    SSA has Statutory Authority to Process Tax Reports for Purposes of the Social Security Program, not for Purposes of Enforcing the Immigration Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

        B.    DHS Lacks Authority to Prescribe Employers' Tax Reporting Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

        C.    DHS Lacks Authority to Issue Interpretations of the IRCA Anti-Discrimination Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

    IV.    The Balance of Hardships Overwhelmingly Favors Preserving the Status Quo Until this Action Can be Heard on the Merits . . . . . . . . . . . . . . . . . . .  30

A.    The Failure to Issue a Preliminary Injunction Would Result in
Immediate, Irreparable Harm to Employees and Employers . . . . . . . . . . . 30

B.    Preserving the Status Quo Will Not Cause Significant Harm to the
Government Defendants  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1

# TABLE OF AUTHORITIES

2

## CASES

3

*Allee v. Medrano*,
  416 U.S. 802 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

4

*Barrick Goldstrike Mines Inc. v. Browner*,
  215 F.3d 45 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

5

6

*Bennett v. Spear*,
  520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

7

*Brown v. Board of Educ.*,
  347 U.S. 483 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

8

9

*Bureau of Alcohol, Tobacco, and Firearms v. Fed'l Labor Relations Auth.*,
  464 U.S. 89 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

10

*Cabo Distrib. Co., Inc. v. Brady*,
  821 F. Supp. 582 (N.D. Cal. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

11

*California Rural Legal Assistance v. Legal Services Corp.*,
  917 F.2d 1171 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

12

13

*Cement Kiln Recycling Coalition v. EPA*,
  __F.3d.__, 2007 WL 2011748 (D.C. Cir. July 13, 2007) . . . . . . . . . . . . . . . . . . . . . . . 18

14

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

15

16

*Chevron, U.S.A., Inc. v. NRDC*,
  467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 18

17

*City of Brookings Mun. Telephone Co. v. F.C.C.*,
  822 F.2d 1153 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

18

19

*Clarke v. Ofc. of Fed. Housing Enterp. Oversight*,
  355 F. Supp.2d 56 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

20

*Collins Foods Int'l v. INS*,
  948 F.2d 549 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

21

22

*Croplife America v. EPA*,
  329 F.3d 876 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

23

*Desert Citizens Against Pollution v. Bisson*,
  231 F.3d 1172 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

24

25

*Director, Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*,
  512 U.S. 267 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

26

27

*El Rescate Legal Servs. v. Executive Office of Immigration Review*,
  959 F.2d 742 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

28

*Fair Housing of Marin v. Combs,*
    285 F.3d 899 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

*Federal Maritime Comm. v. Seatrain Lines, Inc.,*
    411 U.S. 726 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Fox Television Stations, Inc. v. Federal Communications Com'n,*
    489 F.3d 444 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Garrett v. Escondido,*
    465 F.Supp.2d 1043 (S.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

*General Electric Co. v. EPA,*
    290 F.3d 377 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Gonzales v. Oregon,*
    546 U.S. 243, 126 S.Ct. 904 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9, 18

*Gorbach v. Reno,*
    219 F.3d 1087 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 27

*Heckler v. Matthews,*
    465 U.S. 728 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

*Hoffman Plastic Compounds, Inc. v. NLRB,*
    535 U.S. 137 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 16

*INS v. Cardoza-Fonseca,*
    480 U.S. 421 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*Jorgensen v. Cassiday,*
    320 F.3d 906 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

*LaFevre v. Sec'y, Dep't of Veterans Affairs,*
    66 F.3d 1191 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Lands Council v. McNair,*
    __ F.3d ___, 2007 WL 1880990 (9th Cir. July 2, 2007) . . . . . . . . . . . . . . . . . . . .  9, 31

*Lands Council v. Martin,*
    479 F.3d 636 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

*Lozano v. City of Hazleton,*
    459 F.Supp.2d 332 (M.D. Pa. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

*MCI Tele. Corp. v. American Tel. & Telegraph Co.,*
    512 U.S. 218 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*Marsh v. Oregon Natural Resources Council,*
    490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Mester Manufacturing Co. v. INS,*
    879 F.2d 561 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 12, 13, 14

*Michigan v. EPA*,
   268 F.3d 1075 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Motor Vehicle Mfgs. Ass'n v. State Farm Mutual Auto. Ins. Co.*,
   463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22, 23

*National Coalition Against the Misuse of Pesticides v. Thomas*,
   809 F.2d 875 (D.C. Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*National Fuel Gas Supply Corp. v. F.E.R.C.*,
   468 F.3d 831 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*National Treasury Employees Union v. Chertoff*,
   452 F.3d 839 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*National Treasury Employees Union v. U.S. Dept. of Treasury*,
   838 F.Supp. 631 (D.D.C. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*New El Rey Sausage Co. v. INS*,
   925 F.2d 1153 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14, 15

*Northwest Env'l Defense Center v. Bonneville Power Admin.*,
   477 F.3d 668 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Oregon v. Ashcroft*,
   368 F.3d 1118 (9th Cir. 2004), *aff'd Gonzales v. Oregon*, 546 U.S. 243 (2006) . . . . . . . . . 25

*Owner-Operator Indpt. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
   __ F.3d __, 2007 WL 2089740 (D.C. Cir. July 24, 2007) . . . . . . . . . . . . . . . . . . . . . . . . 20

*Pacific Coast Fed. of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
   426 F.3d 1082 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Ramaprakash v. FAA.*,
   346 F.3d 1121 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Rapanos v. United States*,
   126 S.Ct. 2208 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Romero v. INS*,
   39 F.3d 977 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Scherr v. Volpe*,
   466 F.2d 1027 (7th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Temple Univ. v. White*,
   941 F.2d 201 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*U.S. Telephone Assoc. v. FCC*,
   28 F.3d 1232 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Heredia,*
  483 F.3d 913 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14, 22

*United States v. Jewell,*
  532 F.2d. 697 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Williams v. United States,*
  503 U.S. 193 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Zheng v. Ashcroft,*
  332 F.3d 1186 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## STATUTES AND REGULATIONS

8 C.F.R.
  §274a.1(l)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
  §274a.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  §374a.2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

20 C.F.R. §422.120 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 26

26 C.F.R.
  §301.6721-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  §301.6724-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 28
  §31.6051-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
  §31.6051-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

5 U.S.C.
  §553(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
  §706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20
  §706(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 25

8 U.S.C.
  §1103(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29
  §1324a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
  §1324a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
  §1324a(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16, 17
  §1324a(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15
  §1324a(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15
  §1324b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
  §1324b(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 29
  §1324b(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
  §1360(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

26 U.S.C.
  §6103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 26, 27
  §6721 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  §6724 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 28

42 U.S.C.
  §432 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 26, 27
  §901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27
  §2000e-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

1

**RULES**

2    Federal Rule of Civil Proceure 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

3

**OTHER AUTHORITIES**

4    H.R. 138, 110th Cong., §3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

5    H.R. 2954, 110th Cong., §313 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

6    H.R. 3333, 109th Cong., §224(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

7    H.R. 5507, 109th Cong., §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

8    H.R. Rep. 99-682(I), (II), 1986 USCCAN 5649 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 16

9    Pub. L. No. 99-603 § 101(a)(3), 100 Stat. 3359 (1986), *codified at* 8 U.S.C. § 1324a . . . . .  3, 19

10    Pub. L. 104-208, Div. C, title IV, Subtitle A, §§401-02,
       110 Stat. 3009-655 (1986), *codified at* 8 U.S.C. §1324a Historical and Statutory Notes . .  17

11
      Pub. L. 107-128, §2, 115 Stat. 2407 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17
12
      Pub. L. 108-156, §2, 117 Stat. 1944 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17
13
      S. 1984, 110th Cong., §256 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27
14
      S. 2611, 109th Cong. §301(e) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27
15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BACKGROUND**

**A.    Social Security Administration No-Match Letters.**

The Social Security Act of 1935 authorizes SSA to establish a record-keeping system for the Social Security program. *See* 42 U.S.C. §432.  Employers annually report employee wages using Forms W-2, and SSA posts those earnings to its Master Earnings File, so workers receive credit for them when they apply for Social Security benefits.  When SSA is unable to match a worker's name and Social Security Number ("SSN") with its records, those earnings are posted to SSA's Earnings Suspense File until they can be matched with SSA records. *See* 20 C.F.R. §422.120.

Wage reports collected by SSA do not contain information about an employee's citizenship or work-authorization status.  As former Social Security Commissioner Kenneth S. Apfel explains in his declaration:  SSA does not know the percentage of earnings reports in the Earnings Suspense File that reflect unauthorized work; nor does SSA know whether a particular earnings report in the Earnings Suspense File reflects unauthorized work.  Apfel Decl. at ¶8.[1]

There are many reasons unrelated to an employee's work-authorization status why earnings reports may not match SSA records.  These include:  1) administrative errors at SSA (for example, erroneous assignment of an SSN previously assigned to another individual); 2) transcription errors in spelling an employee's name or recording the SSN; 3) employee name changes after marriage or divorce; 4)  employees who use a less "foreign" sounding first name for work purposes; and 5) different naming conventions (such as the use of multiple surnames) that are common in many parts of the world, particularly in some Latin American and Asian countries.  It is more common for the records of foreign-born and female workers to be the subject of data discrepancies.  Apfel Decl. at ¶7; Theodore Decl. at ¶11.

The Earnings Suspense File contains more than *255 million* mismatched earnings records and is growing at the rate of *8 million to 11 million* records per year.  RJN, Exh. Q at 8.  About 4

---

[1] *See generally* GAO Report 06-814R, Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work (July 11, 2006); GAO Report 06-458T, Social Security Numbers: Coordinated Approach to SSN Data Could Help Reduce Unauthorized Work (Feb. 16, 2006).  These Reports are attached as Exhibits Q to O to Plaintiffs' Request for Judicial Notice ("RJN").

1   percent of annual Form W-2 earnings reports wind up in the Earnings Suspense File.  RJN, Exh. O

2   at 8.  The most recent Government Accountability Office ("GAO") report on the Earnings Suspense

3   File concluded that it "[c]ontains information about many U.S. citizens as well as non-citizens" and

4   that "the overall percentage of unauthorized workers is *unknown*."  RJN, Exh. Q at 8 (emphasis

5   added).  When SSA ultimately has been able to resolve data discrepancies, "most . . . belong to

6   U.S.-born citizens, not to unauthorized workers," which GAO concluded "is an indication that *a*

7   *significant number of earnings reports in the [Earnings Suspense File] belong to U.S. Citizens and*

8   *work-authorized noncitizens*."  *Id.* (emphasis added).[2]

9           As part of its effort to credit earnings properly, SSA periodically sends out "no-match"

10  letters to employers.  Apfel Decl. at ¶11; 20 C.F.R. §422.120.  A no-match letter indicates that

11  Forms W-2 filed by the employer contain a name and SSN combination that does not agree with

12  SSA records.  The no-match letter is merely a voluntary request by SSA to employers for assistance

13  in resolving mismatches so the earnings reports can be properly credited to the wage earner.  Apfel

14  Decl. at ¶10.  The Internal Revenue Service ("IRS") can sanction employers for submitting false tax

15  information, but an employer's obligations under the tax code are satisfied by accurately

16  transmitting the name and SSN obtained from the employee on Form W-4.  *See* 26 U.S.C. §§6721,

17  6724; 26 C.F.R. §§301.6721-1, 301.6724-1; *see also* RJN, Exh. M at 4.

18          SSA is not an immigration agency and, as previously stated, SSA does not know whether a

19  particular no-match relates to unauthorized work.  Until now, SSA's no-match letters explained to

20  employers:  "This letter does not imply that you or your employee intentionally gave the government

21  wrong information . . . . [n]or does it make any statement about an employee's immigration status."

22  RJN, Exh. D.   Until now, SSA no-match letters have never been accompanied by a letter from DHS

23  or any of its predecessor agencies with authority over immigration.

24

25  _____

26          [2] SSA's huge databases generally are rife with inaccuracies.  When SSA assigns an SSN to
    an individual, it creates a Master Earnings File for each person in its "Numident" file.  Apfel Decl.
27  at ¶5.  A recent report by the SSA's Inspector General concluded that approximately 17.8 million of
    the records in the Numident file contain discrepancies.  Of those 17.8 million discrepancies,  12.7
28  million – or 71.3% – relate to native-born U.S. citizens' records.  *Id.* at ¶13.

1  **B.**     **Employer Verification of Work Authorization and Sanctions.**

2          Prior to adoption of the Immigration Reform and Control Act ("IRCA") in 1986, no

3  sanctions were imposed on employers for hiring unauthorized workers.  The imposition of employer

4  sanctions was controversial, and Congress crafted IRCA's employer-sanctions provisions to meet

5  competing policy goals and political pressures.  Congress wanted to discourage illegal immigration,

6  but Congress also was concerned about disrupting the existing workforce and imposing burdens on

7  employers and lawful workers.  H. Rep. 99-682(I), at 56, 60, 90 (1986), 1986 USCCAN 5649, 5660,

8  5664, 5694.  Congress also was concerned that IRCA would lead employers fearing IRCA liability

9  to shun all workers with a "foreign" appearance or accent.  H. Rep. 99-682(I), at 68, H. Rep.

10  99-682(II), at 12 (1986), 1986 USCCAN at 5672, 5761.

11          IRCA made it unlawful for the first time for employers to "to hire . . . for employment in the

12  United States an alien *knowing* the alien is an unauthorized alien."  8 U.S.C. §1324a(a)(1)(A)

13  (emphasis added).  IRCA also separately made it unlawful for employers to hire new employees

14  without complying with an initial employment eligibility verification process established by

15  Congress.  8 U.S.C. §1324a(a)(1)(B).  That process requires the employee to present the employer

16  with documents to show proof of identity and work authorization and requires the employer and

17  employee to complete and employment verification form (Form I-9).  8 U.S.C. §1324a(b); 8 C.F.R.

18  §274a.2.  Federal immigration law prohibits the Executive Branch from making any changes to that

19  verification process without advance notice to Congress.  8 U.S.C. §1324a(b)(2)(3).

20          When Congress adopted IRCA, it included a "grandfather" clause for current employees.

21  Neither the initial-hire or continuing-to-employ provisions apply to anyone hired before the

22  enactment of the statute in 1986.  Pub. L. No. 99-603, §101(a)(3), 100 Stat. 3359, *codified at* 8

23  U.S.C. §1324a Historical and Statutory Notes.  For employees hired after the effective date of the

24  statute, Congress chose not to impose any continuing verification requirement.  *See* H.R. Rep.

25  99-682(I), at 57, 1986 USCCAN at 5661 ("The Committee does not intend to impose a continuing

26  verification requirement on employers.").  IRCA only makes it unlawful for an employer "to

27  continue to employ an alien . . . *knowing* the alien is (or has become) an unauthorized alien with

28  respect to such employment."  8 U.S.C. §1324a(a)(2) (emphasis added).  Employers that violate

1   IRCA are subject to civil and criminal liability.  8 U.S.C. §1324a(e)(4)-(5), (f).

2          At the same time Congress imposed employer sanctions, Congress also wanted to prevent

3   employer discrimination based on national origin or citizenship status.  To that end, the immigration

4   laws make it illegal for employers to discriminate based on national origin or citizenship status by

5   requesting "more or different documents than are required" for the initial I-9 verification or

6   "refusing to honor documents . . . that on their face reasonably appear to be genuine."  8 U.S.C.

7   §1324b(a)(1), (6).

8          Congress' concerns that employer sanctions would lead to discrimination based on national

9   origin turned out to be well founded.  IRCA required GAO to report to Congress on this issue, and

10  the GAO reported that employer sanctions were responsible for "a widespread pattern of

11  discrimination."  RJN, Exh. L at 6 (GAO, Immigration Reform: Employer Sanctions and the

12  Question of Discrimination (March 30, 1990)).  GAO estimated that "227,000 employers . . . began

13  a practice, as a result of IRCA, not to hire job applications whose foreign appearance or accent led

14  them to suspect they might be unauthorized aliens . . . . [and] an estimated 346,000 employers . . .

15  applied IRCA's verification system only to persons who had a 'foreign' appearance or accent."  *Id.*

16  at 5.  GAO also estimated that "an additional 430,000 employers . . . began hiring only persons born

17  in the United States or not hiring persons with temporary work eligibility documents.  These

18  practices are illegal and can harm people, particularly those of Hispanic or Asian origin."  *Id*. at 7.

19  In total, GAO found that nearly 20 percent of employers surveyed "began one or more

20  discriminatory practices as a result of the law."  *Id.*

21         Evidence that employer sanctions led to "a widespread pattern of discrimination" based on

22  "foreign" appearance or accent became an important consideration in subsequent debates about

23  employer sanctions.

24  **C.     The New Department of Homeland Security Rule.**

25         As previously stated, IRCA makes it unlawful to continue to employ a worker "*knowing*" the

26  worker is an "unauthorized alien."  Until now, the enforcing agencies have recognized that SSA

27  no-matches occur for many reasons and therefore that an employer receiving a no-match letter does

28  not "know[]" a worker is unauthorized or have any immigration-law obligation to investigate.  *See*

1  RJN Ex. G (April 12, 1999 opinion letter from INS General Counsel) ("Notice from [SSA] to an

2  employer notifying it of a discrepancy between wage reporting information and SSA records with

3  respect to an employee does not, by itself, put an employer on notice that the employee is not

4  authorized to work."); *accord* RJN Exhs. H-J (opinion letters from INS General Counsel); Exh. F

5  (August 9, 2004 letter from DHS to Congressman); Exh. K (April 1, 2004 OSC letter).  As DHS

6  itself explained in the past:

7     Discrepancies between SSA records and information submitted to SSA by the employer may

8     be due to a variety of reasons . . . The letter does not indicate, and SSA is unable to

9     determine, the reason(s) for the cited mismatches . . . without more information than that

10    contained in the "No Match" letter, we have not concluded that the letter alone is sufficient

11    to impart knowledge to the employer of unauthorized employment.

12 RJN Ex. F (emphasis added).

13    On June 14, 2006, DHS sought to abandon that consistent interpretation and gave

14 notice of a proposed rule that effectively would presume the employer has knowledge a worker is

15 unauthorized whenever the employer receives an SSA no-match letter, unless the employer re-

16 verifies the employee's work authorization.  RJN, Exh. A (Proposed Rule). More than 5,000

17 comments were received during the 60-day comment period, including comments that disputed

18 Homeland Security's authority to adopt the rule absent a change in statute.  *See* RJN, Exh. B, at

19 45611 (Final Rule) (also attached hereto as Appendix A).  After the comment period closed on

20 August 14, 2006, the proposed rule lay dormant for an entire year.  On August 15, 2007, shortly

21 after Congress left for recess without enacting immigration reform legislation that DHS urged, the

22 agency issued a final rule.  *Id.*  That rule was to become effective on September 14, 2007.  *Id.*

23    The new DHS rule amends the definition of "*knowing*" in 8 C.F.R. §274a.1(l)(1), and

24 therefore how DHS interprets the term "knowing" in IRCA.  The new definition of "knowing" lists,

25 as an example of an employer with "constructive knowledge" that an employee is an unauthorized

26 alien, an employer that "fails to take reasonable steps" after receiving an SSA no-match letter.  The

27 first part of the amended regulation provides:

28    (1)(1) The term *knowing* includes having actual or constructive knowledge. . . .

Examples of situations where the employer may, depending upon the totality of the relevant circumstances, have constructive knowledge that an employee is an unauthorized alien include, but are not limited to, situations where the employer: . . . .

 (iii) Fails to take reasonable steps after receiving information indicating that the employee may be an alien who is not employment authorized, such as – . . . .

 (B) Written notice to the employer from the Social Security Administration reporting earnings on a Form W-2 that employees' names and corresponding social security account numbers fail to match Social Security Administration records . . . .[3]

Having created a threat of civil and criminal liability for employers receiving SSA no-match letters, the amended regulation then offers employers a "safe harbor."  Under the amended regulation, an employer receiving a no-match letter "will be considered by the Department of Homeland Security to have taken reasonable steps – and receipt of the written notice will therefore not be used as evidence of constructive knowledge – if the employer" takes the actions specified by DHS.  *Id.* at 45624.  These are "the only combination of steps that will guarantee that DHS will not use the employer's receipt of the notices from SSA . . . as evidence of constructive knowledge that an employee is an unauthorized alien." *Id.* at 45618.

To qualify for the DHS "safe harbor," an employer that determines the SSA no-match was not the result of its own clerical error must instruct an employee within 30 days of receiving the no-match letter that the employee has 60 days to resolve the discrepancy with SSA.  *Id.* at 45624.  If the employee is unable to resolve the discrepancy with SSA within 90 days of the date of the no-match letter, the employer cannot continue to employ the worker unless the employer can complete within three days a new employment eligibility verification, on a new I-9 form, as if the employee never had been hired and verified in the first place.  *Id.*  This new verification cannot involve any document that contains the disputed SSN, even if the employee still insists the SSN is correct.  *Id.*  If employees insist their names and SSNs on their identification documents are correct but have not

---

[3] The amended regulation also lists, as an example of an employer that may be charged with knowledge an employee lacks work authorization, an employer that fails to act after receiving "[w]ritten notice . . . from the Department of Homeland Security that the immigration status document or employment authorization document [used by the employee] in completing Form I-9 is assigned to another person, or that there is no agency record that the document has been assigned to any person."

1  resolved the discrepancy with SSA by the deadline, the employer must fire them.

2       To ensure that employers understand that SSA no-match letters now carry *immigration law*

3  obligations, DHS and SSA intend to include a letter to the employer from Homeland Security with

4  each SSA no-match letter.  *See* RJN, Exh. C (DHS Guidance Letter) (also attached hereto as

5  Appendix B).  The letter is to "provide guidance on how to respond to the enclosed letter from the

6  Social Security Administration (SSA) . . . in a manner that is consistent with your obligations under

7  United States Immigration Laws."  *Id.*

8       The Homeland Security guidance letter contains questions and answers, which begin with

9  the following:

10      **Q:  Can I simply disregard the letter from SSA?**

11      **A:  No.**  You have received official notification of a problem that may have
        significant legal consequences for your employees.  If you elect to disregard the
12      notice you have received and it is determined that some employees listed in the
        enclosed letter were not authorized to work, the Department of Homeland Security
13      (DHS) could determine that you have violated the law by knowingly continuing to
        employ unauthorized persons.  This could lead to civil and criminal sanctions.
14

15  *Id.* (boldface in original).

16      After threatening employers with "civil and criminal sanctions," the DHS letter then answers

17  the question **"Q: What should I do?"** by explaining that "You should" follow Homeland Security's

18  new "safe harbor" procedures.  *Id.* (boldface in original).  The letter assures employers that, if they

19  follow those procedures for every no-match, they will not be liable for discrimination if they

20  terminate employees:  **"Q: Will I be liable for discrimination charges brought by the United**

21  **States if I terminate the employee after I follow the steps outlined above?  A: No.** . . . ."  *Id.*

22  (boldface in original).

23  **D.    Implementation of the New Rule.**

24      SSA planned to start mailing no-match letter packets containing the DHS guidance letter on

25  September 4, 2007.  Between September 4 and November 9, 2007, SSA intended to mail no-match

26  letters to more than 140,000 employers around the country, affecting about eight million employees.

27  Avendaño Decl. at ¶5; Moran Decl. at ¶14.  SSA intended to revise its usual no-match letter for this

28  special mailing.  The revised SSA no-match letters would state:  "You should follow the

1   instructions contained in . . . the attached letter from the Department of Homeland Security," and

2   "You should not ignore this letter and do nothing.  That could ... as the Department of Homeland

3   Security has advised us, expose you to liability under immigration law."  RJN, Exh. E (model 2007

4   no match letter) (also attached hereto as Appendix C).  That mailing was put on hold by the Court's

5   temporary restraining order.

6        If the new no-match letters are sent, employers would immediately face the administrative

7   burdens and expense of compliance.  As Nik Theodore, Professor of Urban Planning and Policy at

8   the University of Illinois at Chicago has documented through empirical research, SSA no-match

9   letters have resulted in the mass and precipitous firing of work-authorized employees, a swelling in

10  "off-the books" employment, and "major disruptions in workflow," "potentially leading to

11  significant economy-wide job losses and higher prices."  Theodore Decl. at ¶¶10-14.  These effects

12  occurred even though SSA no-match letters previously expressly cautioned employers to "not use

13  this letter to take any adverse action against an employee."  *Id.* at ¶¶12, 17.  Because the DHS Rule

14  expressly instructs employers to take action in response to the no-match letter, the DHS Rule is

15  likely to magnify these demonstrated effects of SSA no-match letters.  *Id.* at ¶17.  Based on past

16  experience with no-match letters and employer sanctions, some employers will jump to the

17  erroneous conclusion that all employees with no-matches and a "foreign" appearance or accent lack

18  lawful work authorization and will terminate or choose not to hire such employees, including U.S.

19  citizens and authorized workers.  *Id.* at ¶¶19-25.

20       Other employees, though lawfully working in the United States, suddenly will face a

21  deadline for resolving an SSA database discrepancy.  SSA field offices generally are open only

22  during business hours, when many employees are working, and the offices are likely to face an

23  influx of employees with similar no-match problems.  Mismatched records for lawful immigrants

24  have taken many months to resolve with SSA.  *See* Moran Decl. at ¶6-9 (lawful immigrant from

25  Honduras took four months to resolve no-match).  Some workers will be required to travel to

26  remedy the situation.  *Id*. at ¶12 (typographical error on Social Security card issued many years ago

27  could not be resolved locally).  According to former Social Security Commissioner Apfel, "it may

28  take considerably in excess of 90 days to resolve any given mismatched earnings report, even if the

1    worker makes prompt efforts to resolve the discrepancy." Apfel Decl. at ¶16.  Commissioner Apfel

2    is "very concerned that there will be many legally authorized workers who cannot resolve a

3    mismatched earnings report by any arbitrary deadline." *Id.* at ¶17.  DHS acknowledges that in

4    "difficult cases," SSA may be unable to resolve discrepancies within the 90-day timeframe.

5    Appendix A at 45617.  The new rule does not provide for that contingency.

6                                          **ARGUMENT**

7          "A preliminary injunction should issue when the plaintiff shows either: (1) a likelihood of

8    success on the merits and the possibility of irreparable injury; or (2) that serious questions going to

9    the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.  These two

10   alternatives are extremes of a single continuum in which the greater the relative hardship to the

11   party seeking the preliminary injunction, the less probability of success must be shown." *Lands*

12   *Council v. McNair*, __ F.3d ___, 2007 WL 1880990, at *2. (9th Cir., July 02, 2007) (internal

13   citations, quotations and brackets omitted).

14   **I.      The DHS Rule and Guidance Letter are Contrary to the Governing Statute.**

15         Agency action must be set aside if it is not consistent with a statute adopted by Congress.

16   5 U.S.C. §706(2)(A), (C).  An agency's interpretation of the governing statute is reviewed under the

17   familiar two-part test set out in *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984).  The first step

18   requires the court to determine if Congress' intent is clear.  *Id.* at 842.  "[T]he court, as well as the

19   agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43.  In

20   ascertaining Congress' intent, courts look to the text, to the legislative purpose and history, and to

21   the overall structure of the act.  *Gonzales v. Oregon*, 546 U.S. 243, 126 S.Ct. 904, 920, 921 (2006)

22   (declining to defer to Attorney General's interpretation because it was "inconsistent with the design

23   of the statute," "beyond his expertise and incongruous with the statutory purposes").  "If the intent

24   of Congress is clear, that is the end of the matter," *Chevron*, 467 U.S. at 842, and the court must set

25   aside any agency action that is not consistent with that intent.

26         If the statute is ambiguous, a court proceeds to the second step of the *Chevron* inquiry, and

27   will ordinarily defer to an agency's interpretation of the statute if it is "reasonable." *Id.* at 845.  But

28   a court must still reject an agency's interpretation if "it appears from the statute or its legislative

1   history that the accommodation [of conflicting policies] is not one that Congress would have

2   sanctioned." *Id*. Thus, even if the agency's interpretation does not conflict with an explicit

3   congressional directive, it must be set aside if it is unreasonable.

4       In this case, the DHS Final Rule and guidance letter are contrary to statute for three reasons.

5   First, they expand civil and criminal liability under the immigration laws beyond what Congress

6   intended, by impermissibly stretching the meaning of the unambiguous statutory term "*knowing*."

7   Second, they effectively establish a new requirement of *continuing* verification for millions of

8   existing employees, which upsets the delicate policy balance struck by Congress when it chose to

9   create a detailed employment verification system limited to new hires. Third, they require

10  verification of employees hired before 1987 even though Congress exempted those employees from

11  IRCA through a "grandfather" provision.

12

13          **A.    The DHS Rule and Guidance Letter are Premised on an Interpretation of the
                    Statutory Term "Knowing" that is Not What Congress Meant.**

14      IRCA makes it unlawful "to hire . . . for employment in the United States an alien *knowing*

15  the alien is an unauthorized alien." 8 U.S.C. §1324a(a)(1)(A) (emphasis added). IRCA also makes

16  it unlawful for an employer "to continue to employ an alien . . . *knowing* the alien is (or has become)

17  an unauthorized alien with respect to such employment." 8 U.S.C. §1324a(a)(2) (emphasis added).

18  The DHS Final Rule would amend the agency's definition of "knowing."

19      1.    The term "*knowing*" is "a familiar term of art" that describes a state of mind necessary

20  for civil or criminal liability; it has a meaning that "Congress is presumed to have known and

21  adopted." *United States v. Jewell*, 532 F.2d. 697, 703 (9th Cir. 1976) (en banc) (construing

22  "knowingly" in case involving transportation of drugs). Because knowing is "a term of art, . . . DHS

23  was not free to treat it as an empty linguistic vessel." *National Treasury Employees Union v.

24  Chertoff*, 452 F.3d 839, 860 (D.C. Cir. 2006). And, an agency's interpretation must be rejected

25  when it would give a statutory term a meaning the term cannot bear. *See, e.g., MCI Tele. Corp. v.

26  American Tel. & Telegraph Co.*, 512 U.S. 218, 231 (1994) (rejecting agency's interpretation of

27  statutory term "modify"); *Chertoff*, 452 F.3d at 864 (invalidating DHS's final rule that failed to give

28  meaning to "collective bargaining" rights granted by statute); *Zheng v. Ashcroft*, 332 F.3d 1186,

1  1194 (9th Cir. 2003) (rejecting INS definition of "acquiescence" as contrary to unambiguous

2  Congressional use of term).[4]

3      The Ninth Circuit held in *Jewell* that the term "knowing" encompasses both "positive

4  knowledge" and the state of mind often called willful blindness or constructive knowledge, *i.e.* "a

5  mental state in which the defendant is aware that the fact in question is highly probable but

6  consciously avoids enlightenment." *Jewell*, 532 F.2d at 704.  But this "state of mind differs from

7  positive knowledge only so far as necessary to encompass a calculated effort to avoid the sanctions

8  of the statute while violating its substance.  A court can properly find willful blindness only where it

9  can almost be said that the defendant actually knew."  *Id.* (citations, internal quotation marks

10 omitted).  The Ninth Circuit reaffirmed *Jewell* as a "rather straightforward matter of statutory

11 interpretation" in another en banc decision 30 years later, *United States v. Heredia*, 483 F.3d 913,

12 918 (9th Cir. 2007) (en banc).  The Court explained that "willful blindness . . . *is categorically*

13 *different from negligence or recklessness*."  *Id.* at 918 n.4 (emphasis added).  "A willfully blind

14 defendant is one who took *deliberate* actions to avoid confirming criminality.  A reckless defendant

15 is one who merely knew of a substantial and unjustifiable risk that his conduct was criminal; a

16 negligent defendant is one who should have had similar suspicions but, in fact, did not."  *Id.* at 918

17 n.4 (emphasis in original).

18      Not surprisingly, in its first decision addressing IRCA's employer sanctions provision,

19 *Mester Manufacturing Co. v. INS*, 879 F.2d 561, 567 (9th Cir. 1989), the Ninth Circuit relied on

20 *Jewell* to establish the meaning of the term "knowing" in IRCA.  In *Mester*, the INS specifically

21 notified the employer that certain of its employees were suspected unlawful aliens and that, if their

22 green cards matched numbers listed in the INS' letter to the employer, the green cards were

23 _____

24     [4] *See also Rapanos v. United States*, 126 S.Ct. 2208, 2220-21, 2224-25 (2006) (plurality)
(rejecting agency's interpretation of statutory term "the waters of the United States"); *Director,*

25 *Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 272-76,
280-81 (1994) (rejecting agency's interpretation of statutory term "burden of proof"); *INS v.*

26 *Cardoza-Fonseca*, 480 U.S. 421, 448-49 (1987) (rejecting agency's  interpretation of term
"well-founded fear of persecution"); *Bureau of Alcohol, Tobacco, and Firearms v. Fed'l Labor*

27 *Relations Auth.*, 464 U.S. 89, 90-91 (1983) (rejecting agency's interpretation of term "official

28 time").

1  fraudulent.  Nonetheless, the employer continued to employ the workers.  The Ninth Circuit held

2  that those facts provided sufficient evidence to find that the employer had at least "constructive

3  knowledge" that the employees lacked work authorization.

4        The Ninth Circuit also applied the *Jewell* definition of "knowing" in *New El Rey Sausage*

5  *Co. v. INS*, 925 F.2d 1153 (9th Cir. 1991), another IRCA case that involved essentially the same

6  situation as in *Mester*.  The INS delivered a letter to the employer stating: "Unless these individuals

7  can provide valid employment authorization . . . they are to be considered unauthorized aliens . . . ."

8  *Id*. at 1155.  The Ninth Circuit held that the employer's failure to seek employment authorization

9  documents from these employees after receiving "specific, detailed information" from the INS as to

10  "whom it considered unauthorized and why" provided sufficient evidence that the employer had at

11  least constructive knowledge the employees lacked work authorization.  *Id*. at 1158.

12       The Ninth Circuit also noted in *New El Rey*, however, that Congress decided not to impose a

13  continuing verification requirement in IRCA (*id*. at 1158 n.8), and the Ninth Circuit cautioned that

14  "*the INS cannot make generalized accusations for the purpose of forcing employers to reverify the*

15  *authorization of their employees.*"  *Id*. at 1158 (emphasis added).

16       Finally, in *Collins Foods Int'l v. INS*, 948 F.2d 549 (9th Cir. 1991), the Ninth Circuit

17  reiterated that the "constructive knowledge" necessary to establish a violation of IRCA is drawn

18  from *Jewell*, and means "'a mental state in which the defendant is aware that the fact in question is

19  *highly probable* but consciously avoids enlightenment.'"  *Id.* at 555 n.17 (quoting *Jewell*, 532 F.2d

20  697) (emphasis added).  In *Collins Foods*, the Ninth Circuit held that an employer could *not* be

21  charged with the knowledge necessary for an IRCA violation simply because the employer could

22  have discovered a Social Security card was fraudulent by comparing it to an example in the INS

23  manual.  The Ninth Circuit also explained that:

24           IRCA is . . . delicately balanced to serve the goal of preventing
             unauthorized alien employment while avoiding discrimination against
25           citizens and authorized aliens.  The doctrine of constructive
             knowledge has great potential to upset that balance, and it should not
26           be expansively applied.  The statute prohibits the hiring of an alien
             "*knowing* the alien is an unauthorized alien . . . with respect to such
27           employment.  8 U.S.C. 1324a(a)(1)(A) (emphasis added).  Insofar as
             that prohibition refers to actual knowledge, as it appears on its face,
28           any employer can avoid the prohibited conduct with reasonable ease.

1

> When the scope of liability is expanded by the doctrine of
> constructive knowledge, the employer is subject to penalties for a
> range of undefined acts that may result in knowledge being imputed to
> him. To guard against unknowing violations, the employer may . . .
> avoid hiring anyone with an appearance of alienage. *To preserve
> Congress' intent in passing the employer sanctions provisions of
> IRCA, then, the doctrine of constructive knowledge must be sparingly
> applied.*

2

3

4

5

6    948 F.2d at 554-55 (emphasis added).

7         2.    The DHS Final Rule is contrary to the statute because it seeks to re-define a familiar

8    statutory term of art, "knowing," and thereby to impose civil and criminal liability on employers

9    under circumstances Congress never intended.

10        Unlike the information derived from the INS' own data that the agency provided to

11   employers in *Mester* and *New El Rey,* a no-match letter comes from a database of tax information

12   maintained by the SSA that does not include information on immigration status. Apfel Decl. at ¶8;

13   Theodore Decl. at ¶6. No studies support the conclusion that a mismatched SSA record is a reliable

14   indicator that an employee lacks work authorization. Apfel Decl. at ¶12; Theodore Decl. at ¶9. The

15   SSA itself has never used no-match letters as an immigration enforcement tool. Apfel Decl. at ¶12.

16   The SSA does not know whether any employee identified in a no-match letter is unauthorized to

17   work. *Id.* There are many reasons for SSA no-matches that are unrelated to work authorization

18   status, including clerical errors, name changes, and different naming conventions throughout the

19   world. *Id.* at ¶7; Theodore Decl. at ¶8. DHS does not have access to SSA's Earnings Suspense File,

20   and no one knows what percentage of the *255 million-plus* unmatched records relate to unauthorized

21   work. The most recent GAO study reports that this figure is *unknown.* RJN, Exh. Q at 8. DHS'

22   Notice of Final Rule does not even attempt to offer an estimate. It also bears emphasis that workers

23   who are the subject of a no-match letter already would have gone through an initial I-9 verification

24   process when they were hired. Until now, no-match letters correctly advised that they "make[] no

25   statement regarding an employee's immigration status." RJN, Exh. D. There have been no changes

26   in how no-match letters are generated.

27        Because a no-match letter is not a reliable indicator that an employee is unauthorized to

28   work, an employer receiving such a letter does not become "aware that the fact in question [*i.e.*, that

1   a worker lacks authorization] is *highly probable*."  *Collins Foods*, 948 F.2d at 555 n.17 (quoting

2   *Jewell*, 532 F.2d 697) (emphasis added).  And, absent evidence the no-match letter is a reliable

3   indicator of unauthorized work, a necessary requirement for "constructive knowledge" under the

4   *Jewell* test  is lacking.[5]

5       Equally to the point, an employer that simply handles a no-match letter consistently with the

6   tax code, by making sure the employer correctly transmitted the name and SSN provided by the

7   employee, is not an employer "who took *deliberate* actions to avoid confirming criminality,"

8   *Heredia*, 483 F.3d 913 at 918 n.4 (emphasis in original), or "consciously avoid[ed] enlightenment.'"

9   *Collins Foods*, 948 F.2d at 555 n.17 (quoting *Jewell*, 532 F.2d 697).  SSA is not an immigration-

10  enforcement agency, and the employer has no duty to re-verify the immigration-status of employees

11  whose immigration status already was verified on the initial hire.  The employer who does not do so

12  in response to an SSA no-match letter is not "consciously avoiding" anything.  To be sure, Congress

13  *could have* given employers a duty to investigate or made employers liable for recklessness or

14  negligence in employing unauthorized workers, but Congress chose not to do so.

15      DHS essentially seeks to manufacture deliberate indifference through bootstrapping:  DHS

16  tells the employer it has a non-existent duty to follow-up on the immigration status of employees

17  who are subject to no-match letters.  *See* Appendix B ("Q: Can I simply disregard the letter from

18  SSA?  A:  No.").  DHS then treats the employer's failure to act as "constructive knowledge" of

19  illegality.  That is exactly what the Ninth Circuit already stated that the agency could not do in *New*

20  *El Rey*: "make generalized accusations for the purpose of forcing employers to reverify the

21  authorization of their employees."  925 F.2d at 1158.

22      The DHS rule cannot be sustained as merely providing a "safe harbor" for employers.  The

23  threshold legal problem with the rule is that it attempts *to lower the state of mind necessary to*

24  *violate IRCA*, so as to create the need for a "safe harbor" in the first place.  DHS itself interprets its

25  _____

26      [5] By contrast, another portion of the DHS regulation which plaintiffs do not challenge, tracks

27  *Mester* by listing, as an example of when an employer may be charged with knowledge of
    unauthorized work, the situation in which an employer fails to act after receiving notice from DHS

28  that "the immigration status document or [DHS] employment authorization" used by the employer is
    invalid or assigned to another person based on DHS' own data.

new rule as establishing an immigration-law duty for employers to deal with no-match letters. DHS would tell employers unequivocally in the Homeland Security guidance letter: *"***Q: Can I simply disregard the letter from SSA? A. No.***" See* Appendix B (boldface in original). Only after telling employers they have an IRCA duty to address no-match letters or face "civil and criminal sanctions" can DHS offer its safe-harbor to employers, *i.e.* its response to the question "**What should I do?**" *Id.* (boldface in original).

In sum, the DHS rule cannot stand because it impermissibly changes the meaning of the statutory term "knowing," and thereby expands civil and criminal liability for employing a worker who turns out to be unauthorized.

**B.    The DHS Rule Also Upsets the Balance that Congress Struck in Establishing a System of Initial Verification of Work-Authorization Status.**

The new rule also is contrary to statute because it effectively sets up a work-authorization re-verification system for millions of existing employees. Congress sought in the immigration laws to create a mechanism that would discourage illegal immigration while at the same time minimizing both administrative burdens and national-origin discrimination against employees. To that end, Congress crafted a system of *initial* verification of work authorization at the time of hire for employees hired after November 6, 1986. By contrast, the DHS's rule, establishes a *re-verification* system as "the only combination of steps that will guarantee that DHS will not use the employer's receipt of the notices from SSA . . . as evidence of constructive knowledge that an employee is an unauthorized alien." 72 Fed.Reg. at 45618. In doing so, the DHS rule imposes additional burdens on employers and creates increased potential for national-origin discrimination against employees, thereby undermining the compromise struck by Congress.

IRCA represented a sea change in immigration law because Congress for the first time imposed sanctions against employers that knowingly employ "unauthorized aliens." 8 U.S.C. §1324a(a). In addition to adopting civil and criminal penalties for knowingly employing undocumented workers (8 U.S.C. §§1324a(e)(4)(A), 1324a(f)(1)), IRCA also "establish[ed] an extensive 'employment verification system,'" "mandat[ing] that employers verify the identify and eligibility of all new hires by examining specified documents before they begin work." *Hoffman*

1  *Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147-48 (2002).  IRCA thus required that, after

2  November 6, 1986, employers must follow detailed procedures in verifying employment at the time

3  of initial hire.  8 U.S.C. §1324a(b)).  "This verification system is critical to the IRCA regime."

4  *Hoffman*, 535 U.S. at 147-48.

5       The issues of employer sanctions and work-authorization verification procedures garnered

6  substantial congressional attention.  Sensitive to the concern that IRCA "plac[ed] an undue burden

7  on employers in requiring them to do the paperwork and keep records on employees," H. Rep. 99-

8  682(I) at 90, 1986 USCCAN at 5694, Congress sought "to minimize the burden and the risk placed

9  on the employer in the verification process."  *Collins*, 948 F.2d at 554.  At the same time, Congress

10 also was of the view that "the imposition of employer sanctions will give rise to employment

11 discrimination against Hispanic Americans and other minority members." H. Rep. 99-682(II) at 12,

12 1986 USCCAN at 5761.  It "believe[d] that every effort must be taken to minimize the potentiality

13 of discrimination and that a mechanism to remedy any discrimination that does occur must be a part

14 of this legislation."  H. Rep. 99-682(I) at 90, 1986 USCCAN at 5694.

15      Congress therefore took pains to consider these concerns – minimizing burdens on

16 employers and discrimination against employees – in crafting a detailed, but limited, system for

17 employer verification of work authorization status *at the time an employee initially is hired*.

18 H. Rep. 99-682(I) at 56, 1986 USCCAN at 5660 (adopting approach that "would be the least

19 disruptive to the American businessman and would also minimize the possibility of employment

20 discrimination").  Congress prescribed all the details for the initial verification procedure, 8 U.S.C.

21 §1324a(b), but said nothing about a system for re-verifying work authorization because Congress

22 did "not intend to impose a continuing verification obligation on employers."  H. Rep. 99-682(I) at

23 57, 1986 USCCAN at 5661.  Congress also made clear that if employers go beyond statutorily-

24 required verification procedures, they may be liable for national origin discrimination.  H. Rep. 99-

25 682(I) at 62, 1986 USCCAN at 5666 ("if the verification procedure is followed, the language is

26 intended to make clear that there is no requirement that an employer request additional

27 documentation or that an employee produce additional documentation"); 8 U.S.C. §1324b.

28 Congress also took the unusual step of prohibiting the administration from making changes to the

1  verification system without advance notice to Congress.  8 U.S.C. §1324a(b)(2)(3).[6]

2       In short, Congress made the considered judgment that the most effective means for enforcing

3  employer sanctions, while minimizing burdens on employers and discrimination against employees,

4  would be a circumscribed system of employer verification at the time of initial hire.  And while

5  Congress over the last twenty years has enacted detailed, but limited, provisions regarding

6  verification upon initial hire, it has stuck to its decision not to create a continuing re-verification

7  requirement.[7]

8       The DHS rule contravenes Congress's intent. The Ninth Circuit in *Collins* recognized that

9  IRCA is "delicately balanced," and rejected an expansive definition of "constructive knowledge"

10 because it would "upset that balance."  948 F.2d at 554-55.  Similarly, DHS's new rule would upset

11 the balance struck by Congress by effectively imposing a continuing re-verification process for

12 millions of existing employees whose SSNs are the subject of SSA no-match letters.  The rule

13 would result in additional administrative burdens for employers and would cause the termination of

14 existing workers who cannot rectify erroneous no-matches within 90 days.  It also would increase

15

16 ─────────────────────

17      [6] On numerous instances since IRCA, Congress has revisited the issue of employer verification and created pilot programs for electronic employment eligibility verification of *new* hires.  Consistent with Congress' expressed desire in IRCA to minimize burdens on employers, it made participation in these programs entirely voluntary. *See* Illegal Immigration and Immigrant Responsibility Act of 1996 ("IIRAIRA"), Pub. L. 104-208, Div. C, title IV, Subtitle A, §§401-02, Sept. 30, 1996, 110 Stat. 3009-655, 8 U.S.C. §1324a Historical and Statutory Notes (creating 4-year "pilot programs of employment eligibility confirmation" and prohibiting DHS from requiring entities other than federal agencies to participate); Pub. L. 107-128, §2, Jan. 16, 2002, 115 Stat. 2407 (extending pilot program to 6 years); Pub. L. 108-156, §2, Dec. 3, 2003, 117 Stat. 1944 (extending pilot program to 11 years).

18

19

20

21

22

23      [7]An existing regulation requires re-verification only "[i]f an individual's employment authorization expires." 8 C.F.R. §374a.2(b)(vii).  The obligation to re-verify under these limited circumstances is consistent with the statutory prohibition against continuing to employ an alien "knowing the alien is (*or has become*) an unauthorized alien with respect to such employment." 8 U.S.C. §1324a(a)(2) (emphasis added).  When there is a change in work-authorization status known to the employer based on the face of the information provided at initial verification, re-verification is consistent with Congress' intent because the employer otherwise would "know[]" from the *initial verification*, that "the alien . . . has become . . . an unauthorized alien."  By contrast, a system of continuing verification for millions of employees subject to SSA no-match letters is not consistent with Congress' intent.

24

25

26

27

28

1    the potential for discrimination against lawfully authorized workers based on national origin.

2    Theodore Decl. at ¶¶17, 19-25.  These are dangers Congress was concerned about when it enacted

3    IRCA.

4    　　　　Where an agency's interpretation would bring about "the very thing which Congress

5    intended to prevent," the Supreme Court has not hesitated to reject the agency's interpretation.

6    *Federal Maritime Comm. v. Seatrain Lines, Inc.*, 411 U.S. 726, 739 (1973) (rejecting agency's

7    assertion of authority to shield certain merger agreements from antitrust liability where Congress

8    sought to avoid "decrease in competition through . . . mergers").  Further, "[i]t would be anomalous

9    for Congress to have so painstakingly described" a system for employment verification at the time

10   of initial hire, including the type of documents that must be presented and the employer's

11   obligations in reviewing them, "but to have given [DHS], just by implication, authority to" create

12   from whole cloth its own process for re-verification.  *Gonzales v. Oregon*, 546 U.S. 243, 126 S.Ct.

13   904, 918, 920 (2006) (refusing to apply *Chevron* deference to Attorney General's interpretive rule

14   because "[t]he authority desired by the Government is inconsistent with the design of the statute in

15   . . . fundamental respects"); *Romero v. INS*, 39 F.3d 977, 980 (9th Cir. 1994) (where

16   "comprehensive scheme" for deporting immigrants who make "material misrepresentations"

17   reflected Congressional intent not to deport for non-material misrepresentations, statutory authority

18   to deport immigrants for failure to "comply with the conditions of any [immigration] status" did not

19   authorize INS to deport immigrants for non-material misrepresentations).

20   　　　 DHS will argue that its rule does not *require* employers to follow DHS' re-verification

21   protocol but merely offers them a safe harbor if they chose to do so.  But courts construe agency

22   action as "binding as a practical matter" "if the language of the document is such that private parties

23   can rely on it as a norm or safe harbor by which to shape their actions."  *General Electric Co. v.*

24   *EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (internal quotation marks, citation omitted); *see also*

25   *Cement Kiln Recycling Coalition v. EPA*, __F.3d.__, 2007 WL 2011748, *18 (D.C. Cir. July 13,

26   2007) ("an agency's pronouncement that a document is non-binding will not make it so").  DHS'

27   rule threatens employers with civil and potentially criminal liability, and DHS' safe harbor is "the

28   only combination of steps that will guarantee that DHS will not use the employer's receipt of the

1   notices from SSA . . . as evidence of constructive knowledge that an employee is an unauthorized

2   alien."  Appendix A at 45618.

3         Moreover, DHS is bound by its own interpretation of the rules in its guidance letter, *see*

4   *Williams v. United States*, 503 U.S. 193, 200-201 (1992), and the guidance letter makes clear that

5   DHS interprets its rule to mean that employers cannot simply ignore the no-match letter and must

6   instead have *some protocol* for re-verifying the work-authorization status of no-match employees

7   that is uniformly applied to all no-match employees so as to avoid liability under IRCA's anti-

8   discrimination provisions.  *See* Appendix B ("Q:  Can I simply disregard the letter from SSA?  A:

9   No. . . .  Q:  What should I do?  A:  You should take reasonable steps to resolve the mismatch."); *cf.*

10   *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48-49 (D.C. Cir. 2000) ("a preamble plus a

11   guidance plus an enforcement letter from EPA could crystallize an agency position"); *U.S.*

12   *Telephone Assoc. v. FCC*, 28 F.3d 1232, 1234-36 (D.C. Cir. 1994) (concluding that although agency

13   "labeled the standards as a policy statement and reiterated 12 times that it retained discretion to

14   depart from the standards in specific applications," the standards were nonetheless binding in

15   practice); *LaFevre v. Sec'y, Dep't of Veterans Affairs*, 66 F.3d 1191, 1198 (Fed. Cir. 1995)

16   (concluding that agency's refusal to create a presumption that certain diseases were connected to

17   military service was a binding rule because it had an "immediate and practical effect") (citation

18   omitted); *Croplife America v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003) ("the agency's

19   characterization of its own action is not controlling if it self-servingly disclaims any intention to

20   create a rule with the 'force of law,' but the record indicates otherwise").

21

22        **C.**    **The DHS Rule is Also Contrary to Statute by Requiring Verification of Employees Who Were Exempted by IRCA's "Grandfather" Provision.**

23         Finally, the DHS rule is contrary to statute because it indiscriminately applies to employees

24   who were hired before IRCA was adopted.  Congress exempted these employees from both IRCA's

25   initial-hire and continuing-to-employ prohibitions.  *See* Pub. L. No. 99-603 § 101(a)(3), 100 Stat.

26   3359 (1986), *codified at* 8 U.S.C. § 1324a Historical and Statutory Notes ("(3) GRANDFATHER

27   FOR CURRENT EMPLOYEES. -- (A) Section 274A(a)(1)  of the Immigration and Nationality Act

28   shall not apply to the hiring, or recruiting or referring of an individual for employment which has

1  occurred before the date of the enactment of this Act [Nov. 6, 1986]; (B) Section 274A(a)(2) of the

2  Immigration and Nationality Act shall not apply to continuing employment of an alien who was

3  hired before the date of the enactment of this Act [Nov. 6, 1986].").  The new DHS rule, by contrast,

4  would dictate that employers must discharge such employees if they are the subject of a no-match

5  letter and their work-authorization cannot be verified.

6  **II.    The DHS Rule and Guidance Letter are Arbitrary and Capricious.**

7      In addition to and wholly independent from the conflicts between the DHS rule and the

8  governing structure, the new rule also must be set aside because the agency's decision to adopt the

9  rule was arbitrary and capricious.  First, the agency failed to establish a rational connection between

10  the facts regarding no-match letters and the rule the agency adopted.  Second, the agency failed to

11  offer a reasoned explanation for changing its position about the significance of no-match letters.

12
13  **A.    The Agency Failed to Establish a Rational Connection Between the Facts Relied Upon and the Choices Made.**

14      Courts are required to set aside agency action as "arbitrary" or "capricious," 5 U.S.C.

15  §706(2)(A), unless the agency has examined the relevant data and articulated a satisfactory

16  explanation for its action that includes a "rational connection between the facts found and the choice

17  made." *Motor Vehicle Mfgs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983);

18  *Owner-Operator Indpt. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.* __ F.3d __, 2007

19  WL 2089740, *14 (D.C. Cir. July 24, 2007); *Northwest Env'l Defense Center v. Bonneville Power*

20  *Admin.*, 477 F.3d 668, 687 (9th Cir. 2007); *see also* 5 U.S.C. §553(c) (requiring statement of "basis

21  and purpose" of rule).   The reviewing court's inquiry into agency decisionmaking is "searching and

22  careful," *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989); *Pacific Coast*

23  *Fed. of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005),

24  and the court  "must be able to discern" the connection between facts relied upon and choices made

25  from "the record and the agency decision."  *See City of Brookings Mun. Telephone Co. v. F.C.C.*

26  822 F.2d 1153, 1165 (D.C. Cir. 1987); *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943);

27  *Bonneville Power*, 477 F.3d at 688.

28      The reasoned explanation required for valid, final agency decisions cannot be supplied after

1    the fact. "Post hoc rationalizations advanced to remedy inadequacies in the agency's record or its

2    explanation are bootless." *See National Coalition Against the Misuse of Pesticides v. Thomas*, 809

3    F.2d 875, 882-83 (D.C. Cir.1987); *accord Bonneville Power*, 477 F.3d at 688.

4            While the DHS rule is premised on SSA no-match letters serving as reliable indicators of

5    unauthorized-work status – and, therefore, as establishing the "high probability" of unauthorized

6    status that would be necessary for the recipient to have "constructive knowledge" (*see* pp. __,

7    *supra*), the agency does not rely upon *any* evidence that no-match letters *are* reliable indicators of

8    unauthorized work. The Notice of Proposed Rule and Notice of Final Rule do not cite *any* data,

9    studies, or reports that calculate the probability that a no-match letter relates to unauthorized work.

10   *See* RJN, Exhs. A, B. To the contrary, DHS concedes there are "many" causes for no-match letters,

11   and the most DHS ever claims is that one of those many causes *may* be the use of a false SSN by an

12   unauthorized worker.[8]

13           Nor could DHS have calculated the percentage of no-match letters that relate to

14   unauthorized work. Congress prohibited SSA from turning over the information in the Earnings

15   Suspense File to DHS. 26 U.S.C. §6103. SSA itself is not an immigration agency and does not

16   know the correlation between a no-match SSN and unauthorized work. *See* RJN, Exh. F (2004

17   letter from DHS to Congress) ("The letter does not indicate, and SSA is unable to determine, the

18   reason(s) for the cited mismatches"); RJN, Exh. Q at 8 (most recent GAO report concluding that the

19   Earnings Suspense File "[c]ontains information about many U.S. citizens as well as non-citizens"

20   and that "the overall percentage of unauthorized workers is *unknown*." (emphasis added)).

21           DHS leaps from the assertion that one of many causes for a no-match letter is an

22   "unauthorized alien" working under a false SSN to a rule that deems no-match letters to impart

23

24           [8] *See* Appendix A (Final Rule), 72 Fed. Reg. at 45612 ("There can be many causes for a no-
25   match, including clerical error and name changes. One potential cause may be the submission of
     information for an alien who is not authorized to work in the United States and who may be using a
26   false SSN or a SSN assigned to someone else."); *id.* at 45614 ("As mentioned earlier, there are
     many causes for such a no-match, including clerical error and name change. One cause is the
27   submission of information for an alien who is not authorized to work in the United States and is
     using a false SSN or an SSN assigned to someone else."); *id.* at 45616 ("DHS is aware that SSA no-
28   matches may occur due to a name change or typographical error.").

1    "constructive knowledge" that employees are not authorized to work – unless the employer re-

2    verifies their work-authorization status within 90 days.  The only place in the Notice of Final Rule

3    where DHS even tries to explain how it moved from point A (the assertion) to point B (the rule) is

4    the following statement:

> DHS recognizes that studies from the Government Accountability Office and other sources
> describe challenges that must be addressed.  However, the rule does not rely on the SSA no-
> match letters as anything more than indicators of a potential problem – whether that problem
> is that the employer's records and wage reporting are inaccurate, that the employee is not
> receiving credit through the SSA for wages earned, or that the employee is potentially an
> authorized alien.  The rule merely provides a safe-harbor from a finding of constructive
> knowledge of employing unlawful workers based on the no-match letter.

9    Appendix A (Final Rule), 72 Fed. Reg at 45622.   That explanation is not a "rational connection

10    between the facts found and the choice made." *State Farm*, 463 U.S. at 43.  Acknowledging that

11    SSA no-match letters are nothing "more than indicators of a potential problem," DHS never

12    explains why there is a rational connection between a potential problem with numerous causes

13    having nothing to do with immigration status and a high probability of unauthorized status.  Yet the

14    DHS rule places employers that receive no-match letters at risk of IRCA liability for "knowing[ly]

15    employing "unauthorized aliens."  As such, DHS' explanation (or lack thereof) falls far short of the

16    standard for reasoned decision-making imposed by the APA.  *See, e.g., State Farm*, 463 U.S. at 48;

17    *Bonneville Power Admin.*, 477 F.3d at 690; *City of Brookings*, 822 F.2d at 1168; *National Fuel Gas*

18    *Supply Corp. v. F.E.R.C.* 468 F.3d 831, 844 (D.C. Cir. 2006).

19            Similarly, the DHS rule also is arbitrary and capricious because the rule proceeds from the

20    unsupported premise that employers that receive no-match letters and do not re-verify employees'

21    immigration status are taking "*deliberate* actions to avoid confirming criminality."  *Heredia*, 483

22    F.3d 913 at 918 n.4 (emphasis in original).  As explained above, one of the necessary criteria for

23    charging a party with "constructive knowledge" is that the party not only be aware of a high

24    probability that a fact is true but also that the party "consciously avoid[] enlightenment.'"  *Collins*

25    *Foods*, 948 F.2d at 555 n.17 (quoting *Jewell*, 532 F.2d 697).  *See* pp. __, *supra*.  DHS's Notice of

26    Proposed Rule and Notice of Final Rule lack an explanation of why employers who treat SSA no-

27    match letters as tax-reporting documents (which is what they are), and who simply confirm the

28    employer is correctly transmitting the name and SSN provided by the employee (which is an

1  employer's only obligation under the Internal Revenue Code, *see* pp. ___, *supra*), are deliberately

2  avoiding anything.

3

**B.      The Agency Failed to Provide a Reasoned Explanation for Changing its Position
4            on the Significance of No-Match Letters.**

5      The DHS rule also must be set aside as arbitrary and capricious because the agency failed to

6  provide a reasoned explanation for reversing the consistent prior position of DHS and its

7  predecessor immigration-enforcement agencies about the significance of SSA no-match letters –

8  *i.e.*, that employers receiving no-match letters have no immigration-law obligation to re-verify

9  employees' work-authorization status.

10     When an agency adopts a rule that changes the agency's prior position, the agency "is

11  obligated to supply a reasoned analysis for the change." *State Farm*, 463 U.S. at 42; *Bonneville*

12  *Power Admin.*, 477 F.3d at 687; *Fox Television Stations, Inc. v. Federal Communications Com'n*,

13  489 F.3d 444, 457 (2d Cir. 2007) (agency must "provide a reasoned analysis for departing from

14  prior precedent"). "An agency's failure to come to grips with conflicting precedent constitutes an

15  inexcusable departure from the essential requirement of reasoned decision making," *Ramaprakash*

16  *v. FAA.*, 346 F.3d 1121, 1125 (D.C. Cir. 2003), and by itself justifies striking down a rule as

17  arbitrary and capricious. *Fox Television Stations*, 489 F.3d at 457 (invalidating FCC policy with

18  respect to "fleeting expletives" on television as reversal of agency position without any

19  explanation); *Bonneville Power Admin.*, 477 F.3d at 687 (invalidating agency decision for lack of

20  reasoned explanation of change in position).

21     A series of INS General Council opinion letters issued during the 1990s (after SSA began

22  issuing employer no-match letters in 1994), set out the agency's consistent position that employers

23  have no duty *under immigration laws* to investigate or attempt to resolve no-matches. For example,

24  the INS General Counsel explained:

25          [Y]ou ask whether an employer who receives this letter from SSA can continue to
             rely on the employment eligibility documents presented by that employee . . . . If the
26          document or documents presented to verify work authorization appear on their face
             to be genuine and to reasonably relate to the individual, *the subsequent receipt of the*
27          *SSA letter mentioned above does not impose any affirmative duty upon the employer*
             *to investigate further into an employee's eligibility to work in the United States.*

28

RJN, Exh. J (emphasis added); *see also* Exh. I ("We would not consider notice of this discrepancy from SSA to an employer by itself to put the employer on notice that the employee is unauthorized to work, or *to require reverification of documents or further inquiry as to the employee's work authorization*") (emphasis added); Exh. H ("Because there may be many reasons for a mismatch between employer records and SSA records that have nothing to do with work authorization, SSA notice of a mismatch *does not trigger by itself an obligation to re-verify work authorization*") (emphasis added); Exh. G ("You suggest that, in light of section 274A's goal of preventing the employment of unauthorized aliens, the employer should 'assume an irregularity in this situation' *and require new documentation confirming employment eligibility . . . We disagree* ") (emphasis added).  In 2004, DHS, as the new agency responsible for enforcing 8 U.S.C. §1324a, explicitly adhered to INS' previous position.  RJN, Exh. F ("the Department does not believe it would be appropriate at this time to recall the opinion letters previously issued by the INS Office of General Counsel").

By contrast, the DHS rule informs employers, quite clearly, that *immigration law* requires that they take steps to resolve no-matches.  *See* Appendix B (**"**The purpose of this letter is to provide you with additional guidance on how to respond to the enclosed letter from the Social Security Administration (SSA) in a manner that is consistent with your obligations under United States immigration laws . . . **Q. Can I simply disregard the letter from SSA? A. No. . . . Q. What should I do?  A. You should take reasonable steps to resolve the mismatch**") (boldface in original).

Rather than acknowledge and explain this change of position, DHS incorrectly asserts that the new rule is no break from the past.  *See* Appendix A at 45612 ("[t]his regulation describes an employer's current obligations under immigration laws"); *id*. at 45615 ("[t]his rule merely clarifies current standards related to constructive knowledge").  But the change of agency position is apparent.  The agency and its predecessor previously told employers that immigration law does not require them to take action in response to a no-match letter.  The new rule, however, requires employers who receive such a letter to re-verify the immigration status of its employees or face

1  prosecution.[9]

2      There has been no change in SSA's methodology for generating no-match letters or the

3  governing statute.  DHS' failure to acknowledge and explain its change of position violated the

4  agency's APA duty to "supply a reasoned analysis indicating that prior policies and standards are

5  being deliberately changed, not casually ignored."  *Bonneville Power Admin.*, 477 F.3d at 688.  By

6  adopting the rule without such a reasoned analysis, the agency "crosse[d] the line from the tolerably

7  terse to the intolerably mute." *Id.*

8  **III.    The DHS/SSA Plan to Use No-Match Letters as an Immigration-Enforcement Tool
        Exceeds the Authority Congress Granted to these Agencies.**

9
        **A.    SSA has Statutory Authority to Process Tax Reports for Purposes of the Social
            Security Program, not for Purposes of Enforcing the Immigration Laws.**
10

11      Federal agencies are purely "creature[s] of statute," and they have no authority beyond what

12  Congress has conferred.  *Michigan v. EPA,* 268 F.3d 1075, 1081 (D.C. Cir. 2001) (setting aside

13  agency action that exceeded agency's statutory authority); *see also Oregon v. Ashcroft*, 368 F.3d

14  1118, 1125 (9th Cir. 2004), *aff'd Gonzales v. Oregon*, 546 U.S. 243 (2006) (same); *Gorbach v.

15  Reno*, 219 F.3d 1087, 1093 (9th Cir. 2000) (same); 5 U.S.C. § 706(2)(C) (providing for court review

16  of agency "actions in excess of statutory . . . authority").  Moreover, "[a]gency authority may not be

17  lightly presumed. Were courts to presume a delegation of power absent an express withholding of

18  such power, agencies would enjoy virtually limitless hegemony . . . ." *Michigan v. EPA*, 268 F.3d at

19  1082 (citation, internal quotation marks omitted).

20      Congress has not embraced the theory of a "unified" Executive branch.  Rather, Congress

21  grants authority to regulate in certain areas to particular agencies, and Congress' decisions about

22  allocating authority must be respected.  *See, e.g., Chertoff*, 452 F.3d at 865 (DHS lacked power to

23

24      [9] The government states that prior opinion letters warned employers that an SSA no-match
25  letter could become relevant to immigration-law liability if an employer acquired information that
    an employee lacked work-authorization status while attempting to resolve a mismatch for SSA
26  record-keeping purposes.  Defs' TRO Opp. Mem. at17-18.  But the agency's previous position was
    that while an employer might *voluntarily* take steps to investigate a mismatch to assist the SSA and
27  IRS, "*this activity is not required by the INA*."  *Id.* at 17 (emphasis added) (quoting RJN, Exh. G).
    In direct contrast, the new regulation requires employers to investigate.  *See* Appendix B (" Q. Can I
28  simply disregard the letter from SSA? A. No.").

1  encroach upon authority Congress granted to Federal Labor Relations Authority).

2  Congress established the Social Security Administration "as an independent agency" to

3  "administer the old-age, survivors, and disability insurance program . . . and the supplemental

4  security income program." 42 U.S.C. §901.  Congress also granted SSA authority to process tax

5  reports as a specific exception to the otherwise exclusive authority of the Internal Revenue Service

6  over tax reporting and the general rule (*see* 26 U.S.C. §6103) that tax reports are confidential

7  information that cannot be shared with other agencies.  The Internal Revenue Code provides that

8  "[u]pon written request by the Commissioner of Social Security, the Secretary [of the Treasury] may

9  disclose information returns . . . *for the purpose of* – (A) carrying out, in accordance with an

10 agreement entered into pursuant to section 232 of the Social Security Act [*i.e.* 42 U.S.C. §432], an

11 effective return processing program." 26 U.S.C. §6103(l)(5) (emphasis added).  Similarly, the

12 Social Security Act provides that "[t]he Secretary of the Treasury shall make available information

13 returns . . . to the Commissioner of Social Security *for the purposes of* this subchapter and

14 subchapter XI of this chapter." 42 U.S.C. §432 (emphasis added).  The statutory "subchapters"

15 referred to in 42 U.S.C. §432 are subchapters concerning social security benefits, so information

16 returns are made available to SSA "for the purposes of" the social security program.

17 Pursuant to this express statutory authorization, IRS and SSA entered into an agreement for

18 the processing of tax reports.  43 Fed. Reg. 60158 (Dec. 26, 1978).  Pursuant to that agreement,

19 employers report employee earnings by filing Forms W-2 with SSA, and SSA processes the forms,

20 records earnings information on each employee's SSA earnings record, and forwards the Forms to

21 IRS.  *See* 26 C.F.R. §§31.6051-1, 31.6051-2.  When an employee name and SSN do not match with

22 SSA's records, the earnings report is placed in SSA's Earnings Suspense File, and SSA issues no-

23 match letters as part of its efforts to accurately credit those earnings.  *See* 20 C.F.R. §422.120.

24 Nothing in the authority Congress granted to SSA comes close to authorizing SSA to use the

25 process of reconciling earnings reports as a tool for the enforcement of the immigration laws.

26 The joint SSA/DHS mailing, however, unquestionably involves SSA using its no-match letters as an

27 immigration-enforcement tool rather than just to administer the social security program.  SSA's

28 revised no-match letter instructs employers that "[y]ou should follow the instructions contained in

1   . . . the attached letter from the Department of Homeland Security," and "[y]ou should not ignore

2   this letter and do nothing.  That could . . . expose you to liability under immigration law."  RJN,

3   Exh. E (model 2007 no match letter) (also Appendix C).  SSA plans to include DHS' guidance letter

4   with every SSA no-match letter.  The DHS letter has nothing at all to do with the social security

5   program that Congress authorized SSA to administer, but concerns employers' "obligations under

6   United States immigration laws."  Appendix B.

7        These actions exceed the SSA statutory authority to "administer the old-age, survivors, and

8   disability insurance program . . . and the supplemental security income program," 42 U.S.C. §901,

9   and to process tax reports "for the purpose of" those programs and pursuant to an agreement with

10  the IRS.  26 U.S.C. §6103(l)(5); 42 U.S.C. §432.  As such, they must be set aside as *ultra vires.*

11  Congress has considered, but ultimately declined, on multiple occasions to involve SSA with

12  immigration enforcement in a similar manner to what SSA and DHS wish to accomplish here.[10]

13  Unless and until that authority is granted by Congress, the agency is powerless to act.  *See Gorbach,*

14  219 F.3d at 1093 ("An agency may not confer power upon itself").  Whether to use the tax reporting

15  system to enforce the immigration laws presents policy issues only Congress can decide because 1)

16  a substantial number of U.S. citizens and work-authorized non-citizens would be affected due to

17

18       [10] The Administration-backed S.2611 "Comprehensive Immigration Reform Act of 2006,"
    would have amended the Internal Revenue Code to authorize SSA to disclose no-matches to DHS
19  upon request.  S. 2611, 109th Cong. §301(e) (2006) (amending Section 6103(l) of the Internal
    Revenue Code of 1986).  *See also, e.g.,* H.R. 3333, 109th Cong., §224(a) (referred to House
20  subcommittee Aug. 23, 2005) (requiring SSA to send no-match letters every year to each employer
    with 10 or more no-matches and to instruct such employers to notify employees that they must
21  "correct the mismatch with the Social Security Administration or the employer will be required to
    terminate their employment"); H.R. 5507, 109th Cong., §2 (referred to House subcommittee May
22  25, 2006) (amending 42 U.S.C. 405(c)(2) to require SSA to share no-match letters with DHS and to
    inform employers that SSA is providing a copy of such letter to DHS to assist DHS "in the
23  enforcement of applicable Federal immigration laws").  Additional legislative proposals pending in
    the current Congress that would accomplish the same ends as the DHS rule include H.R. 138, 110th
24  Cong., §3 (introduced Jan. 4, 2007) (requiring employers receiving no-match letters to re-verify
    employee's work authorization); H.R. 2954, 110th Cong., §313 (referred to House subcommittee
25  July 19, 2007) (requiring employers receiving SSA no-match letters to re-verify employee's work
    authorization); S. 1984, 110th Cong., §256 (referred to Senate Committee Aug. 2, 2007) (amending
26  42 U.S.C. §405(c)(2) to require SSA to "establish a reliable, secure method" to compare name and
    social security information provided by employee to SSA records for purpose of establishing work
27  authorization).

28

1   serious inaccuracies in SSA's databases and 2) more work would inevitably be shifted "off-the-

2   books," depriving the social security program of the taxes presently paid on those wages.

3       **B.    DHS Lacks Authority to Prescribe Employers' Tax Reporting Obligations.**

4       Just as SSA's authorizing statutes do not authorize SSA to use its authority to send out no-

5   match letters for immigration-enforcement purposes, DHS' authorizing statutes do not authorize

6   DHS to dictate how employers respond to SSA no-match letters.  That authority rests with the

7   Internal Revenue Service.  *Cf. Chertoff*, 452 F.3d at 865 ("[DHS] cannot commandeer the resources

8   of an independent agency and thereby fundamentally transform its functions, absent a clearer

9   indication of congressional intent").

10      Congress granted to DHS the authority to administer and enforce the immigration laws, not

11  the tax laws.  *See* 8 U.S.C. §1103(a)(1).  The Form W-2 is a tax report, not an immigration or work-

12  authorization document; the Earnings Suspense File is maintained to manage the social security

13  program, not the immigration laws; and the SSA is not even permitted to grant DHS access to all the

14  records in the Earnings Suspense File, which contains confidential information about millions of

15  U.S. citizens.[11]

16      The Internal Revenue Service – not DHS – has authority to sanction employers that submit

17  incorrect tax reports and, therefore, authority to prescribe their obligations in submitting and

18  correcting Forms W-2.  Very detailed IRS regulations already provide that there is no penalty for

19  submitting an incorrect tax information statement if the filer has "reasonable cause," which includes

20  "events beyond the filer's control" such as "actions of the payee or any other person providing

21  necessary information with respect to the return or payee statement."  26 C.F.R.

22  §301.6724-1(a)(2)(i), (c)(6); *see also* 26 U.S.C. §6724(a).  Under the IRS regulations, the filer is not

23  responsible for "incorrect information provided by the payee (or any other person) upon which

24  information the filer relied in good faith."  26 C.F.R. §301.6724-1(c)(6)(ii).  Under IRS regulations,

25  employers can rely, in submitting their Forms W-2 and responding to no-match letters, upon the

26  _____

27      [11]  By contrast, when Congress decided to allow DHS limited access to certain information
    collected by SSA, it expressly granted such access. *See* 8 U.S.C. §1360(c)(2) (directing SSA to
28  provide DHS with the "Nonwork Alien File," which contains the records of earnings reported on
    Forms W-2 using a specific series of SSNs issued to aliens who lack work authorization).

1   name and SSN provided by the employee on the Form W-4.

2        That being so, IRS already has concluded that employers receiving no-match letters do *not*

3   have any duty to investigate the reason for the no-match, aside from ensuring that the employer is

4   correctly transmitting the name and SSN provided by the employee.  Absent action by Congress, any

5   expansion in employers' obligations must come from action by the Internal Revenue Service – not

6   DHS.

7        **C.    DHS Lacks Authority to Issue Interpretations of the IRCA Anti-Discrimination**

8            **Provisions.**

9        Finally, DHS also has no authority to interpret IRCA's anti-discrimination provisions, which

10  DHS's rule and guidance letter purport to do, because Congress gave *that* authority to the

11  Department of Justice.

12       The guidance letter informs employers that the "safe-harbor" procedure set out by DHS will

13  immunize the employer from charges of national-origin discrimination: "Q. Will I be liable for

14  discrimination charges brought by the United States if I terminate the employee after following the

15  steps outlined above?  A. No . . . ."  Appendix B.   Likewise the DHS rule provides that, although

16  DHS regulations do not otherwise "permit[] an employer to request more or different documents

17  than are required under [IRCA's employment verification provision] or that on their face reasonably

18  appear to be genuine," there is an exception for employers following the DHS safe-harbor after a

19  no-match letter.  Appendix A at 45612; *id.* at 45613-14 ("The final rule clarifies that... employers

20  who follow the safe harbor procedures set forth in this rule uniformly and without regard to

21  perceived national origin or citizenship status as required by the provisions of [8 U.S.C.

22  §1324b(a)(6)] will not be found to have engaged in unlawful discrimination.").

23       DHS has no authority to interpret the IRCA anti-discrimination provisions.  IRCA created

24  within the Department of Justice, the Office of the Special Counsel for Immigration-Related Unfair

25  Employment Practices, and charged that office – not the INS – with responsibility for administering

26  the statute's anti-discrimination provisions.  8 U.S.C. §1324b(c).  Congress never transferred that

27  responsibility from the Department of Justice to DHS when DHS absorbed INS functions.  8 U.S.C.

28  §1103(a)(1).   Hence, DHS' rule and guidance letter exceed DHS's authority by exercising powers

1   Congress granted to the Department of Justice and must be set aside for that reason as well.[12]

2 **IV.    The Balance of Hardships Overwhelmingly Favors Preserving the Status Quo Until this Action Can be Heard on the Merits.**

3

    **A.    The Failure to Issue a Preliminary Injunction Would Result in Immediate, Irreparable Harm to Employees and Employers.**

4

5        Unless the Court converts its temporary restraining order to a preliminary injunction, the

6 DHS Final Rule will become effective and DHS and SSA will proceed immediately with a joint

7 mailing of no-match packets that will reach 140,000 employers and cover about 8 million

8 employees.  That mailing will occur before this action can be heard on the merits, and it will cause

9 severe and irreparable harm.  *Cf. Garrett v. Escondido*, 465 F.Supp.2d 1043 (S.D. Cal. 2006)

10 (issuing preliminary injunction against ordinance that prohibited landlords from renting to

11 undocumented aliens; landlords and employees established irreparable harm); *Lozano v. City of*

12 *Hazleton*, 459 F.Supp.2d 332 (M.D. Pa. 2006) (issuing temporary restraining order against

13 ordinances that required tenants to obtain proof of legal citizenship or residence and prohibiting

14 employers from employing undocumented aliens; tenants and business owners established

15 irreparable injury).

16        As an initial matter, employers (who have now intervened as plaintiffs) would bear the

17 expense of complying with the new DHS rule and the accompanying disruption of their businesses.

18 Theodore Decl. at ¶27; Reiff Decl. at ¶3 & Exh. A; *see also Cabo Distrib. Co., Inc. v. Brady*, 821 F.

19 Supp. 582, 600 (N.D. Cal. 1992) (issuing preliminary injunction where business would suffer

20 financial losses and have no claim for damages against government defendant for such losses).

21 Employers also would be put to the choice between risking a violation of the immigration laws by

22 employing workers with unresolved SSA no-matches and risking a violation of the

23

24     [12] The DHS guidance letter also appears to usurp the authority of the Equal Employment Opportunity Commission ("EEOC") by instructing employees that if they "terminate . . .

25 employee[s]" they will not be "liable for discrimination charges brought by the United States." Appendix B.  The EEOC – not DHS – is responsible for addressing charges of national origin

26 discrimination under Title VII of the Civil Rights Act of 1964.  42 U.S.C. §2000e-5.  No-match letters appear to disparately impact Latino and Asian workers with lawful status because of different

27 naming conventions in countries and inconsistent translations of names, so an employer's use of no-match letters to place additional burdens on workers would raise Title VII issues.  DHS cannot

28 dictate how the EEOC will view those issues.

1    anti-discrimination laws by firing workers based on a criteria more likely to apply to lawful

2    foreign-born workers than to lawful U.S.-born workers because of issues regarding multiple

3    surnames and inconsistent translations of foreign names.

4         For their part, many individual members of the plaintiff labor organizations also will suffer

5    severe and irreparable harm absent a stay. Labor organizations unquestionably have standing to

6    protect the interests of their members. *See, e.g., California Rural Legal Assistance v. Legal*

7    *Services Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990) (standing of AFL-CIO to represent the interests

8    of union members); *Allee v. Medrano*, 416 U.S. 802, 819 n.13 (1974) ("the Union has standing as a

9    named plaintiff to raise any of the claims that a member of the union would have standing to raise").

10   The upcoming SSA/DHS no-match mailing will affect about *600,000* of those members. Reich

11   Decl., ¶4 (expert opinion of labor economist based on statistical analysis). Hence, the plaintiff labor

12   organizations are the organizations best situated to represent the interests of U.S. citizens and other

13   lawfully authorized workers who would be caught up in the DHS no-match dragnet.[13]

14        Absent a stay, many workers will be falsely accused of being "illegal aliens" unless they can

15   prove otherwise. Particularly for workers with a "foreign" appearance or accent, the accompanying

16   stigma and fear of loss of their livelihood could never be adequately remedied after the fact. *Cf.*

17   *Heckler v. Matthews*, 465 U.S. 728, 739 (1984) (classification inflicted harm by "stigmatizing

18   members of the disfavored group as 'innately inferior' and therefore as less worthy participants in

19   the political community"); *Brown v. Board of Educ.*, 347 U.S. 483, 494 (1954) (stigma "may affect

20   . . . hearts and minds in a way unlikely ever to be undone."). As the former SSA Commissioner

21   Apfel explains: Foreign-born workers with lawful status are particularly likely to be subject to an

22   SSA data discrepancy because of different naming conventions and inconsistent translations of

23

24        [13] Standing is determined at this stage of the case based on the pleadings. *See, e.g., Desert
25   Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000). Plaintiffs not only have pled
     the facts to establish standing (First Amended Complaint, ¶¶ 9-15, 53-58), but also have presented
26   evidence that the probability the upcoming no-match mailing will affect fewer than 400,000 AFL-
     CIO members is less than one in a million. Reich Decl, ¶4. That easily establishes standing and
27   also easily meets the test for the issuance of a preliminary injunction, which requires only a
     "possibility of irreparable injury." *Lands Council*, 2007 WL 1880990, at *2; *cf. City of Los Angeles
28   v. Lyons*, 461 U.S. 95, 105 (1983) (no likelihood plaintiff would be affected by challenged conduct).

1  foreign names, and "[w]orkers falsely accused of being unauthorized based on a no-match letter may

2  be unfairly harmed."  Apfel Decl., ¶¶7, 17; *see also* Chavez-Thompson Decl., ¶4 ("The impact of

3  no-match letters falls especially hard on foreign-born workers whom employers may wrongly

4  assume are unauthorized.").

5       Workers covered by a no-match letter also will need to contact SSA field offices, perhaps

6  several times, to attempt to resolve no-matches.  For many workers, that will mean a loss of pay.

7  Chavez-Thompson Decl., ¶5.  That monetary loss is real harm that cannot be remedied after the fact

8  because the government will be immune from damages liability.

9       Some workers will be fired, even though they are U.S. citizens or non-citizens with work

10  authorization, simply because they cannot resolve a no-match with the SSA bureaucracy by the

11  deadline.  The DHS safe-harbor actually allows the worker only 60 days, because the employer may

12  wait 30 days before notifying the worker of the problem.  The DHS letter instructs employers that if

13  they continue to employ workers who have not fixed SSA no-match discrepancies by the deadline,

14  "you risk liability for knowingly continuing to employ unauthorized persons."  Appendix B.  And,

15  the SSA letter instructs employers that "[y]ou should apply the procedures provided in [the DHS

16  letter] uniformly to all employees," so employers cannot make exceptions.  Appendix C.

17       Employees who are authorized to work may not be able to correct SSA data discrepancies in

18  time.  Apfel Decl. at ¶17 ("Based on my past experience at SSA, I am very concerned that there will

19  be many legally authorized workers who cannot resolve a mismatched earnings report by any

20  arbitrary deadlines"); Moran Decl. at ¶6 (lawful immigrant from Honduras took four months to

21  resolve mismatch).  SSA concedes that in "difficult cases," SSA may be unable to resolve

22  discrepancies within the 90-day timeframe, Appendix A at 45617; *see also* DHS Opp. to TRO at 7

23  (SSA "anticipates that it will be able to resolve *nearly all claims* in this 90-day time frame")

24  (emphasis added).  Pursuant to the DHS rule, this subset of employees, many of whom will be U.S.

25  citizens or non-citizens with work authorization, will be fired.[14]  This will cause severe harm to

26

27       [14]This injury is attributable to the DHS rule and DHS/SSA joint mailing, notwithstanding
28  DHS' characterization of the rule as just a "safe harbor."  The threat of civil and potentially criminal
(continued...)

1   those workers and their families.  And, neither the Court nor the government *will ever know* who

2   those workers are so no remedy will ever be provided.

3       The DHS/SSA joint mailing also will lead to the immediate termination of some lawfully

4   authorized workers.  Theodore Decl. at ¶¶11-14, 17.  Immediate firings have occurred in the past

5   despite admonitions on prior no-match letters, and the DHS/SSA joint mailing will exacerbate the

6   problem by explicitly linking the no-match letter with unauthorized work status.  *Id*, ¶17.  Again, the

7   workers' identities will be unknown so it will be impossible to remedy the harm.

8       Finally, implementation of the DHS rule will cause immediate harm to the plaintiff labor

9   organizations themselves because their institutional resources will be diverted by the need to assist

10  their members.  Theriault Decl. at ¶¶6-7; Paulson Decl. at ¶5; Cornu Decl. at ¶5; *cf. Fair Housing of*

11  *Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (non-profit organization suffered injury-in-fact

12  where its mission was to promote equal housing opportunities and discrimination by defendant

13  apartment owner complex "diver[ted] . . . its resources and frustrat[ed] . . . its mission"); *El Rescate*

14  *Legal Servs. v. Executive Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991) ("The

15  allegations that the [agency's] policy frustrates the[] goals [of these organizations] and requires the

16  organizations to expend resources in representing clients they otherwise would spend in other ways

17  is enough to establish standing").

18
19      **B.    Preserving the Status Quo Will Not Cause Significant Harm to the Government
        Defendants.**

20      By contrast to the immediate harm to workers and employers that would occur absent a

21  preliminary injunction, a stay in the implementation of the DHS rule until this action can be decided

22  on the merits would not cause any significant harm to the government defendants.

23

24

25  _____

    [14](...continued)

26  liability will have a "virtually determinative effect" on employers.  *Cf. Bennett v. Spear*, 520 U.S.
    154, 170 (1997) (defendant agency's action caused injury to plaintiff, even though the injury was

27  directly inflicted by a third party, because the agency's conduct had a "virtually determinative

28  effect" on the third party's actions, even though the third party was "technically free to disregard"
    the agency action).

1    SSA is not an immigration-enforcement agency, so SSA would not be prevented from

2  carrying out *its own* statutory functions by a preliminary injunction.  SSA can simply send out its

3  traditional no-match letters in the interim, something that SSA has been doing since 1994.  Rust

4  Decl. (Doc. No. 25-3), at ¶4.  SSA claims it takes 30 days to revise the "electronic packet" sent to

5  the vendor to return to the traditional no-match letter (*id.* at ¶8.), so between the time the temporary

6  restraining order was issued and the time of the preliminary injunction hearing, SSA will have had

7  sufficient time to carry out *its own* mission by making the switch.[15]

8    Moreover, SSA created its own logistical difficulties by switching the "electronic packet" for

9  the no-match mailing before the DHS Rule even would have become effective.  The DHS rule had

10  attracted 5,000 comments, many of them pointing out legal flaws, so the agencies knew there would

11  be a serious legal challenge.  SSA then voluntarily "delayed sending the no-match letters for several

12  months in 2007" so it could coordinate with DHS.  Rust Decl. at ¶9.  To the extent judicial review

13  of the DHS rule causes some minor logistical issues for SSA, they are issues that SSA should have

14  anticipated and could have avoided.

15    Nor would DHS suffer significant harm from a stay to preserve the status quo until this

16  action is heard on the merits.  DHS would not be precluded from continuing to enforce the

17  immigration laws.  Neither DHS nor its predecessor agency saw any need to promulgate the Final

18  Rule during the first 20 years after IRCA was adopted.  (Indeed, INS opinion letters took the

19  opposite position from the DHS rule about the implications of SSA no-match letters.)  Moreover,

20  DHS allowed the proposed rule to lay dormant *for an entire year* before DHS ultimately adopted it

21  after the congressional recess.  *See National Treasury Employees Union v. U.S. Dept. of Treasury*,

22  838 F.Supp. 631, 640 (D.D.C. 1993) ("threat of harm to the government is negligible" where

23  "Customs service continues to function without" information, gathering of which plaintiff sought to

24  enjoin, and agency "waited nearly a year to gather these questionnaires").

25  _____

26    [15] SSA has complained that a delay in the no-match mailing will lead to increased work
    during the agency's "peak" period in January to March.  Rust Decl. (Doc. No. 25-3) at ¶12.  But
27  SSA acknowledges that it is the DHS guidance letter that would increase SSA's workload by
    generating more inquiries at SSA field offices.  *Id.* at ¶13.  Rather than being harmed, SSA will be
28  *better* able to perform its own statutory functions if the DHS rule is not implemented.

1      Finally, the public interest weighs strongly in favor of a stay of the rule to allow time for

2  judicial review. *National Treasury Employees Union,* 838 F.Supp. at 640 ("The preservation of . . .

3  the legality of the process by which government agencies function certainly weighs heavily in the

4  public interest."); *see also Clarke v. Ofc. of Fed. Housing Enterp. Oversight*, 355 F. Supp.2d 56, 66

5  (D.D.C. 2004) ("there is a substantial public interest in ensuring that [the agency] acts within the

6  limits of its authority").

7                                    **CONCLUSION**

8      For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be granted.

9  Dated:  September 11, 2007          Respectfully submitted

10                                     Stephen P. Berzon
                                       Scott A. Kronland
11                                     Jonathan Weissglass
                                       Linda Lye
12                                     Danielle E. Leonard
                                       ALTSHULER BERZON LLP
13
                                       Jonathan P. Hiatt
14                                     James B. Coppess
                                       Ana Avendaño
15                                     AFL-CIO

16                                     Linton Joaquin
                                       Marielena Hincapié
17                                     Monica T. Guizar
                                       NATIONAL IMMIGRATION LAW CENTER
18
                                       Lucas Guttentag
19                                     Jennifer C. Chang
                                       Mónica M. Ramírez
20                                     AMERICAN CIVIL LIBERTIES UNION FOUNDATION

21                                     Omar C. Jadwat
                                       AMERICAN CIVIL LIBERTIES UNION FOUNDATION
22
                                       Alan L. Schlosser
23                                     Julia Harumi Mass
                                       ACLU FOUNDATION OF NORTHERN CALIFORNIA
24
                                       David A. Rosenfeld
25                                     Manjari Chawla
                                       WEINBERG, ROGER & ROSENFELD
26
                                       by:  /s/Scott A. Kronland
27                                              Scott A. Kronland

28                                     Attorneys for Plaintiffs