# Rules and Regulations

Federal Register
Vol. 72, No. 157
Wednesday, August 15, 2007

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each week.

---

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 274a**

[ICE 2377-06; DHS Docket No. ICEB-2006-0004]

**RIN 1653-AA50**

**Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**

**AGENCY:** U.S. Immigration and Customs Enforcement, DHS.

**ACTION:** Final rule.

---

**SUMMARY:** U.S. Immigration and Customs Enforcement is amending the regulations relating to the unlawful hiring or continued employment of unauthorized aliens. The amended regulation describes the legal obligations of an employer, under current immigration law, when the employer receives a no-match letter from the Social Security Administration or receives a letter regarding employment verification forms from the Department of Homeland Security. It also describes "safe-harbor" procedures that the employer can follow in response to such a letter and thereby be certain that the Department of Homeland Security will not use the letter as any part of an allegation that the employer had constructive knowledge that the employee referred to in the letter was an alien not authorized to work in the United States. The final rule adds two more examples to the current regulation's definition of "knowing" to illustrate situations that may lead to a finding that an employer had such constructive knowledge. These additional examples involve an employer's failure to take reasonable steps in response to either of two events: The employer receives a written notice from the Social Security Administration (such as an "Employer Correction Request" commonly known as an employer "no match letter") that the combination of name and Social Security account number submitted to the Social Security Administration for an employee does not match agency records; or the employer receives written notice from the Department of Homeland Security that the immigration status or employment-authorization documentation presented or referenced by the employee in completing Form I-9 was not assigned to the employee according to Department of Homeland Security records. (Form I-9 is retained by the employer and made available to DHS investigators on request, such as during an audit.) The rule also states that DHS will continue to review the totality of relevant circumstances in determining if an employer had constructive knowledge that an employee was an unauthorized alien in a situation described in any of the regulation's examples. The "safe-harbor" procedures include attempting to resolve the no-match and, if it cannot be resolved within a certain period of time, verifying again the employee's identity and employment authorization through a specified process.

**DATES:** This rule is effective September 14, 2007.

**FOR FURTHER INFORMATION CONTACT:** Ron Shelkey, Office of Investigations, Worksite Enforcement Unit, U.S. Immigration and Customs Enforcement, Department of Homeland Security, 425 I Street, NW., Room 1000; division 3, Washington, DC 20536. Telephone: (202) 514-2844 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

Table of Contents

I. Background
  A. History of the Rulemaking
  B. The Issue Presented
  C. Final Rule
II. Comments and Responses
  A. Authority to Promulgate the Rule
  B. Changes in Legislation
  C. Constructive Knowledge
  D. Fourteen-Day and Sixty-Day Time Frames
  E. Practical Application
    1. Letters Sent to Employers
    2. Labor Certification or an Application for Prospective Employer
    3. Written Notice From SSA
    4. Written Notice From DHS
    5. Clarity and Reasonable Steps
    6. Verification and Recordkeeping
    7. Mechanics of Form I-9 Verification
    8. Other Employer Responsibilities
  F. Discrimination
  G. Firing of Employees
  H. Economic Impact
  I. SSA and DHS Database Issues
  J. Cost to the Government
  K. General Impact
  L. Privacy
  M. Proposed Changes in Form I-9
III. Regulatory Requirements
  A. Regulatory Flexibility Act
  B. Unfunded Mandates Reform Act of 1995
  C. Small Business Regulatory Enforcement Fairness Act of 1996
  D. Executive Order 12866 (Regulatory Planning and Review)
  E. Executive Order 13132 (Federalism)
  F. Executive Order 12988 (Civil Justice Reform)
  G. Paperwork Reduction Act

**Part 274a—Control of employment of Aliens**

## I. Background

### A. History of the Rulemaking

The Department of Homeland Security (DHS) published a proposed rule in the **Federal Register** on June 14, 2006, that would amend the regulations relating to the unlawful hiring or continued employment of unauthorized aliens. 71 FR 34,281 (proposed Jun. 14, 2006). A sixty-day public comment period ended on August 14, 2006.

A number of commenters, in comments and separate communications, requested that DHS extend the comment period beyond the normal sixty-day period established in the proposed rule. After careful consideration of the requests, DHS believes that the sixty-day comment period was reasonable and sufficient for the public to review the proposed rule and provide any comments. Accordingly, DHS has declined to extend the comment period.

DHS received approximately 5,000 comments in response to the proposed rule from a variety of sources, including labor unions, not-for-profit advocacy organizations, industry trade groups, private attorneys, businesses, and other interested organizations and individuals. The comments varied considerably; some commenters strongly supported the rule as proposed, while others were critical of the proposed rule and suggested changes. A number of comments had no bearing on the proposed rule or criticized the rule for not addressing other immigration-law issues. Comments seeking changes in United States statutory laws, changes in

**45612**    Federal Register / Vol. 72, No. 157 / Wednesday, August 15, 2007 / Rules and Regulations

regulations or forms unrelated to or not addressed by the proposed rule, changes in procedures of agencies other than DHS, or resolution of other issues were not within the scope of the rulemaking or the authority of DHS, and are not addressed in this final rule.

The comments frequently repeated specific issues (including specific text). Approximately 4,800 comments in several mass mailings were received. Several organizations also submitted identical or nearly identical comments.

At the request of a broad-based coalition of national business and trade associations, DHS met with representatives of the organization and its constituent organizations on June 20, 2006. A summary of that meeting including a list of attendees has been placed on the docket for this rulemaking.

Each comment received was reviewed and considered in the preparation of this final rule. This final rule addresses the comments by issue rather than by referring to specific commenters or comments. All of the comments received electronically or on paper may be reviewed at the United States Government's electronic docket system, www.regulations.gov, under docket number ICEB–2006–0004.

### B. The Issue Presented

Employers annually send the Social Security Administration (SSA) millions of earnings reports (W–2 Forms) in which the combination of employee name and social security number (SSN) does not match SSA records. In some of these cases, SSA sends a letter, such as an "Employer Correction Request", that informs the employer of the mismatch. The letter is commonly referred to as an employer "no-match letter." There can be many causes for a no-match, including clerical error and name changes. One potential cause may be the submission of information for an alien who is not authorized to work in the United States and who may be using a false SSN or a SSN assigned to someone else. Such a letter may be one indicator to an employer that one of its employees may be an unauthorized alien.

U.S. Immigration and Customs Enforcement (ICE) sends a similar letter (currently called a "Notice of Suspect Documents") after it has inspected an employer's Employment Eligibility Verification forms (Forms I–9) during an investigation audit and after unsuccessfully attempting to confirm, in agency records, that an immigration status document or employment authorization document presented or referenced by the employee in completing the Form I–9 was assigned to that person. (After a Form I–9 is completed by an employer and employee, it is retained by the employer and made available to DHS investigators on request, such as during an audit.)

This regulation describes an employer's current obligations under immigration laws, and its options for avoiding liability, after receiving such a letter from either SSA or DHS. The regulation specifies step by step actions that can be taken by the employer that will be considered by DHS to be a reasonable response to receiving a no-match letter—a response that will eliminate the possibility that the no-match letter can be used as any part of an allegation that an employer had constructive knowledge that it was employing an alien not authorized to work in the United States, in violation of section 274A(a)(2) of the Immigration and Nationality Act (INA), 8 U.S.C. 1324a(a)(2). This provision of the INA states:

> It is unlawful for a person or other entity, after hiring an alien for employment in accordance with paragraph (1), to continue to employ the alien in the United States *knowing* the alien is (or has become) an unauthorized alien with respect to such employment. [Emphasis added.]

Both regulation and case law support the view that an employer can be in violation of section 274A(a)(2), 8 U.S.C. 1324a(a)(2) by having constructive rather than actual knowledge that an employee is unauthorized to work. A definition of "knowing" first appeared in the regulations on June 25, 1990 at 8 CFR 274a.1(l)(1). *See* 55 FR 25,928. That definition stated:

> The term "knowing" includes not only actual knowledge but also knowledge which may fairly be inferred through notice of certain facts and circumstances which would lead a person, through the exercise of reasonable care, to know about a certain condition.

As noted in the preamble to the original regulation, that definition, which is essentially the same as the definition adopted in this rule, is consistent with the Ninth Circuit's holding in *Mester Mfg. Co. v. INS*, 879 F.2d 561, 567 (9th Cir. 1989) (holding that when an employer who received information that some employees were suspected of having presented a false document to show work authorization, such employer had constructive knowledge of their unauthorized status when the employer failed to make any inquiries or take appropriate corrective action). The court cited its previous opinion explaining "deliberate failure to investigate suspicious circumstances imputes knowledge." *Id.* at 567 (citing *United States v. Jewell*, 532 F.2d 697 (9th Cir. 1976) (en banc)). *See also New El Rey Sausage Co. v. INS*, 925 F.2d 1153, 1158 (9th Cir. 1991).

The preceding regulatory language also begins the current regulatory definition of "knowing," which is still at 8 CFR 274a.1(l)(1). In the current definition, additional language follows this passage, describing situations that may involve constructive knowledge by the employer that an employee is not authorized to work in the United States. This language was added on August 23, 1991. *See* 56 FR 41,767. The current definition contains an additional, concluding paragraph, which specifically precludes use of foreign appearance or accent to infer that an employee may be unlawful, and to the documents that may be requested by an employer as part of the verification system that must be used at the time of hiring, as required by INA section 274A(a)(1)(B), 8 U.S.C. 1324a(a)(1)(B). This paragraph will be described in greater detail below. The verification system referenced in this paragraph is described in INA section 274A(b), 8 U.S.C. 1324a(b).

### C. Final Rule

The final rule amends the definition of "knowing" in 8 CFR 274a.1(l)(1), in the portion relating to "constructive knowledge." First, it adds two more examples to the existing examples of information available to an employer indicating that an employee could be an alien not authorized to work in the United States. It also explicitly states the employer's obligations under current law after receiving a no-match letter or the other information identified in 8 CFR 274a.1. If the employer fails to take reasonable steps after receiving such information, and if the employee is in fact not authorized to work in the United States, the employer may be found to have had constructive knowledge of that fact. The final rule also states explicitly another implication of the employer's obligation under current law—whether an employer would be found to have constructive knowledge in particular cases of the kind described in each of the examples (the ones in the current regulation and in the new regulation) depends on the "totality of relevant circumstances" present in the particular case. This standard applies in all cases.

The additional examples are:

(1) Written notice to an employer from SSA, e.g. an "Employer Correction Request," that the combination of name and SSN submitted for an employee does not match SSA records; and

(2) Written notice from DHS that the immigration status document, or employment authorization document, presented or referenced by the employee in completing Form I-9 was assigned to another person, or that there is no agency record that the document was assigned to anyone.

The regulation also describes more specifically the steps that an employer might take after receiving a no-match letter, steps that DHS considers reasonable. By taking these steps in a timely fashion, an employer would avoid the risk that the no-match letter would be used as any part of an allegation that the employer had constructive knowledge that the employee was not authorized to work in the United States. The steps that a reasonable employer may take include the following:

(I) A reasonable employer checks its records promptly after receiving a no-match letter to determine whether the discrepancy results from a typographical, transcription, or similar clerical error in the employer's records, or in its communication to the SSA or DHS. If there is such an error, the employer corrects its records, informs the relevant agencies; verifies that the name and number, as corrected, match agency records—in other words, verifies with the relevant agency that the information in the employer's files matches the agency's records; and makes a record of the manner, date, and time of the verification. ICE would consider a reasonable employer to have acted promptly if the employer took such steps within thirty days of receipt of the no-match letter.

(II) If such actions do not resolve the discrepancy, a reasonable employer would promptly request that the employee confirm that the employer's records are correct. If they are not correct, the employer would take the actions needed to correct them, inform the relevant agencies (in accordance with the letter's instructions, if any), and verify the corrected records with the relevant agency. If the records are correct according to the employee, the reasonable employer would ask the employee to pursue the matter personally with the relevant agency, such as by visiting a local SSA office, bringing original documents or certified copies required by SSA, which might include documents that prove age, identity, citizenship or alien status, and other relevant documents, such as proof of a name change, or by mailing these documents or certified copies to the SSA office, if permitted by SSA. ICE would consider a reasonable employer to have acted promptly if the employer took such steps within thirty days of receipt of the no-match letter. The regulation provides that a discrepancy will be considered resolved only if the employer verifies with SSA or DHS, as the case may be, that the employee's name matches in SSA's records the number assigned to that name, or, with respect to DHS letters, verifies the authorization with DHS that DHS records indicate that the immigration status document or employment authorization document was assigned to the employee. In the case of a number from SSA, the valid number may be the number that was the subject of the no-match letter or a different number, for example a new number resulting from the employee's contacting SSA to resolve the discrepancy. Employers may verify a SSN with SSA by telephoning toll-free 1-800-772-6270, weekdays from 7 a.m. to 7 p.m. EST. See http://www.ssa.gov/employer/ssnvadditional.htm. For information on SSA's online verification procedure, see http://www.ssa.gov/employer/ssnv.htm. Employers should make a record of the manner, date, and time of any such verification, as SSA may not provide any documentation.

(III) The regulation also describes a verification procedure that the employer may follow if the discrepancy is not resolved within ninety days of receipt of the no-match letter. This procedure would verify (or fail to verify) the employee's identity and work authorization. If the described procedure is completed, and the employee is verified, then even if the employee is in fact not authorized to work in the United States, the employer will not be considered to have constructive knowledge of that fact based on receipt of the no-match letter. This final rule, however, will not provide a safe harbor for employers that for some other reason have actual or constructive knowledge that they are employing an alien not authorized to work in the United States.

If the discrepancy referred to in the no-match letter is not resolved, and if the employee's identity and work authorization cannot be verified using a reasonable verification procedure, such as that described in this regulation, then the employer must choose between:

(1) Taking action to terminate the employee, or

(2) Facing the risk that DHS may find that the employer had constructive knowledge that the employee was an unauthorized alien and therefore, by continuing to employ the alien, violated INA section 274A(a)(2), 8 U.S.C. 1324a(a)(2).

The procedure to verify the employee's identity and work authorization described in the rule involves the employer's and employee's completing a new Form I-9, Employment Eligibility Verification Form, using the same procedures *as if* the employee were newly hired, as described in 8 CFR 274a.2, with certain restrictions. The regulation identifies these restrictions:

(1) Under the regulation, both Section 1 ("Employee Information and Verification") and Section 2 ("Employer Review and Verification") would need to be completed within ninety-three days of receipt of the no-match letter. Therefore, if an employer and employee tried to resolve the discrepancy described in the no-match letter for the full ninety days provided for in the regulation, they have an additional three days to complete a new Form I-9. Under current regulations, three days are provided for the completion of the form after a new hire. 8 CFR 274a.2(b)(1)(ii).

(2) No document containing the SSN or alien number that is the subject of the no-match letter, and no receipt for an application for a replacement of such a document, may be used to establish employment authorization or identity or both.

(3) No document without a photograph may be used to establish identity (or both identity and employment authorization). (This is consistent with the documentary requirements of the United States Citizenship and Immigration Services' Electronic Employment Verification System (EEVS) (formerly called the "Basic Pilot Program"). See http://uscis.gov/graphics/services/SAVE.htm.)

Employers should apply these procedures uniformly to all of their employees having unresolved no-match indicators. If they do not do so, they may violate applicable anti-discrimination laws. The regulation also amends the last paragraph of the current definition of "knowing." The existing regulations provide, in relevant part, that—

Nothing in this definition should be interpreted as permitting an employer to request more or different documents than are required under section 274[A](b) of the Act or to refuse to honor documents tendered that on their face reasonably appear to be genuine and to relate to the individual.

The final rule clarifies that this language applies to employers that receive no-match letters, but that employers who follow the safe harbor procedures set forth in this rule uniformly and without regard to perceived national origin or citizenship status as required by the provisions of

274B(a)(6) of the INA will not be found to have engaged in unlawful discrimination. This clarification is accomplished by adding the following language after "individual":

> Except a document about which the employer has received written notice described in paragraph (l)(1)(iii) of this section and with respect to which the employer has received no verification as described in paragraphs (l)(2)(i)(C) or (l)(2)(ii)(B) of this section.

Alternative documents that show work authorization are specified in 8 CFR 274a.2(b)(1)(v). Examples are a United States passport (unexpired or expired), a United States birth certificate, or any of several documents issued to lawful permanent resident aliens or to nonimmigrants with work authorization.

There may be other procedures a particular employer could follow in response to a no-match letter, procedures that would be considered reasonable by DHS and inconsistent with a finding that the employer had constructive knowledge that the employee was an unauthorized alien. But such a finding would depend on the totality of relevant circumstances. An employer that followed a procedure other than the "safe-harbor" procedures described in the regulation would face the risk that DHS may not agree.

It is important that employers understand that the proposed regulation describes the meaning of constructive knowledge and specifies "safe-harbor" procedures that employers could follow to avoid the risk of being found to have constructive knowledge that an employee is not authorized to work in the United States based on receipt of a no-match letter. The regulation would not preclude DHS from finding that an employer had *actual* knowledge that an employee was an unauthorized alien. An employer with actual knowledge that one of its employees is an unauthorized alien could not avoid liability by following the procedures described in the proposed regulation. The burden of proving actual knowledge would, however, be on the government. Further, DHS may find that the employer had constructive notice from other sources. Finally, it is important that employers understand that the resolution of discrepancies referenced in a no-match letter, or other information that an employee's SSN presented to an employer matches the records for the employee held by the SSA, does not, in and of itself, demonstrate that the employee is authorized to work in the United States. For example, an alien not authorized to work in the United States may present a fraudulent name and matching fraudulent SSN, and this rule does not address such fraud.

II. Comments and Responses

*A. Authority to Promulgate the Rule*

Several commenters suggested that DHS does not have the authority to adopt the proposed rule. Different commenters suggested that DHS was intruding on the authority of the SSA, the Department of Justice (DOJ), or the Internal Revenue Service (IRS). These comments seem to indicate a lack of understanding of the nature of the rule, DHS's role in employer sanctions, and the relationship of authority among the agencies. DOJ, the IRS, and SSA all were involved in the promulgation of the proposed rule.

DHS has the authority to investigate and pursue sanctions against employers who knowingly employ or continue to employ unauthorized aliens or who do not properly verify employees' employment eligibility. Section 274A of the INA, 8 U.S.C. 1324a, requires all United States employers, agricultural associations, agricultural employers, farm labor contractors, or persons or other entities who recruit or refer persons for employment for a fee, to verify the employment eligibility and identity of all employees hired to work in the United States. To comply with the law, an employer, or a recruiter or referrer for a fee, must complete an Employment Eligibility Verification form (Form I-9) for all employees, including United States citizens. 8 CFR 274a.2. Forms I-9 are not routinely filed with any government agency. Employers are responsible for maintaining these records, which ICE may request from them. *See* 71 FR 34,510 (June 15, 2006).

DHS may conduct investigations for violations of section 274A of the INA either on its own initiative or in response to third-party complaints that have a reasonable probability of validity. If DHS determines after investigation that an employer has violated section 274A of the INA by knowingly employing unauthorized aliens, DHS may issue and serve a Warning Notice or may commence administrative proceedings against the employer by issuing and serving a Notice of Intent to Fine (Form I-763). *See* 8 CFR 274a.9(a)-(d). An employer who wishes to contest the fine may request a hearing before a DOJ administrative law judge. *See* 8 CFR 274a.9(e); 28 CFR part 68.

DHS's authority to investigate and pursue sanctions against employers who knowingly employ or continue to employ unauthorized aliens necessarily includes the authority to decide not to pursue sanctions against employers who follow the DHS-recommended procedure. In essence, this final rule limits DHS's discretion to use an employer's receipt of a particular written notice from SSA or DHS as evidence of constructive knowledge for those employers who follow the DHS procedure. *See, e.g., Lopez v. Davis,* 531 U.S. 230, 240-41 (2001) (upholding categorical limitation of discretion through rulemaking). The rule does not affect the authority of the SSA to issue no-match letters, the authority of the IRS to impose and collect taxes, or the authority of DOJ to enforce the anti-discrimination provisions of the INA or adjudicate notices of intent to fine employers.

DOJ also has an enforcement role in the context of employer sanctions. In addition to adjudicating Notices of Intent to Fine, DOJ—through its Office of Special Counsel for Immigration-Related Unfair Employment Practices—is responsible for enforcing the anti-discrimination provisions of section 274B of the INA, 8 U.S.C. 1324b. *See* 28 CFR part 44. While charges of unfair immigration-related employment practices may be filed by any DHS officer, they are primarily brought by individuals who believe that they are victims of discriminatory practices. *See* 28 CFR 44.300. Although individuals generally bring charges on their own behalf, DOJ and DHS may nevertheless file such charges.

SSA, by contrast, does not have an immigration enforcement role. Instead, SSA collects employee earnings reports from employers through IRS Wage and Tax Statements (Forms W-2) in order to properly administer Social Security benefits. *See* 26 CFR 31.6051-2(a). SSA receives over 250 million earnings reports from employers each year. The vast majority of these reports are successfully matched with individual earnings records, which are then used to calculate future Social Security benefits, such as retirement, disability, and survivors' benefits. Every year, however, the SSA is unable to post some wage reports to individual earnings records because some employees' reported combinations of names and SSNs do not match SSA records. As mentioned earlier, there are many causes for such a no-match, including clerical error and name change. One cause is the submission of information for an alien who is not authorized to work in the United States and is using a false SSN or an SSN assigned to someone else. For example, in 2002 the SSA was unable to match almost 9 million wage reports, representing $56 billion in earnings. At

the end of tax year 2003, the Earnings Suspense File (ESF) contained approximately 255 million wage reports, representing $519.6 billion in earnings. The ESF is an electronic holding file for wage items reported on Forms W-2 that cannot be matched to the earnings records of individual workers. These wage reports have accumulated since the beginning of the program and date back as far as 1936. One method SSA relies on to resolve these mismatches is issuing employers an "Employer Correction Request"—more commonly known as an SSA employer "no-match letter."

One commenter suggested that DHS lacks authority to promulgate regulations related to Form I-9 verification and acceptable documents, claiming that this authority is vested in the Attorney General and the DOJ. This comment misinterprets the division of authority under the Homeland Security Act of 2002 (HSA), Public Law 107-296, 116 Stat. 2135 (Nov. 25, 2002). The HSA abolished the Immigration and Naturalization Service (INS) and transferred its functions to DHS, including those functions relating to employer sanctions. See HSA sections 441, 471, 6 U.S.C. 251, 291; INA section 103(a)(1), 8 U.S.C. 1103(a)(1). The HSA required a division of regulatory authority between DOJ and the newly created DHS, commensurate with the transfer of functions of the former INS from DOJ to DHS. That transfer included the functions of the employment verification system and the regulations for the administration of that system. See 68 FR 10,353 (March 5, 2003).

Some commenters mistakenly believed that this rule results in changes to the employment verification system that would require congressional notification. See INA section 274A(d), 8 U.S.C. 1324a(d). This rule merely clarifies current standards related to constructive knowledge. It does not change the verification system, so the notification requirements are inapplicable. Nor does this rule affect the EEV Program, so any limitations that apply to changes in the EEV Program do not apply to this rule.

Other commenters suggested that DHS lacks authority to regulate SSA notices. This final rule only addresses how DHS will treat an employer's knowledge of the name and SSN discrepancy from a written notice from the SSA, such as an "Employer Correction Request" or no-match notice, in investigating the unlawful hiring or continued employment of unauthorized aliens. SSA and DHS, as coordinating agencies within the Executive Branch, are each taking steps to improve the no-match process and the public's understanding of that no-match process in the immigration context.

Finally, one commenter suggested that this rule grants DHS access to tax information covered by section 6103 of the Internal Revenue Code of 1986, 26 U.S.C. 6103. Under section 6103, the IRS, and any other official or employee who acquires the information from the IRS in the course of official duties, may not provide tax returns or tax information to outside agencies or others except under certain circumstances. The same information, however, in the hands of an individual employer is not subject to any restrictions by section 6103. Tax information in the hands of the originator of that information (the employer) is frequently and unquestionably subject to demand in criminal, civil, and regulatory matters by federal, state, and local law enforcement officials. This rule does not provide DHS with access to any tax information governed by section 6103 of the Internal Revenue Code. This rule affects only DHS consideration of SSA no-match letters sent by the SSA to an employer and in the hands of the employer during an investigation of the employer's records, and that letter in the hands of the recipient does not qualify as tax information covered by section 6103.

B. Changes in Legislation

Many commenters argued that a regulatory change is unwise in light of the congressional debate over comprehensive immigration reform. As the President has indicated, the Administration supports comprehensive immigration reform that will secure the border, strengthen enforcement of immigration laws in the nation's interior, and create a temporary worker program, address the millions of undocumented immigrants in the country without providing amnesty, and promote the assimilation of newcomers. DHS believes that worksite enforcement is a critical component of comprehensive immigration reform, and supports mandating an employment eligibility verification system in a manner that is not overly burdensome for American employers. Accordingly, DHS supports legislative provisions that strengthen document verification and related requirements, and that provide a safe harbor for those employers who in good faith comply with the law.

Although DHS is working with Congress to enact such legislation, DHS cannot predict when Congress will pass such legislation. The further development of regulations under existing law is quite common and regulatory action continues when Congress is considering legislative proposals. In the interim, however, this rule will provide employers with the information they need to respond to receipt of the no-match letters.

Others argue that the regulation should wait because it may prove to be inconsistent with, or superfluous to, future legislation, and that this might cause confusion on the part of employers. DHS believes that there is an immediate benefit to providing this rule change. If future legislation requires an adjustment, the regulation can be amended.

C. Constructive Knowledge

A number of commenters suggested that the proposed rule impermissibly expands the concept of constructive knowledge. DHS disagrees.

The current regulations provide that "The term knowing includes not only actual knowledge but also knowledge which may fairly be inferred through notice of certain facts and circumstances which would lead a person, through the exercise of reasonable care, to know about a certain condition." 8 CFR 274a.1(l)(1). This rule will revise the structure of the definition to separate references to actual knowledge from constructive knowledge, but it will retain the same definition of constructive knowledge: "[c]onstructive knowledge is knowledge that may fairly be inferred through notice of certain facts and circumstances that would lead a person, through the exercise of reasonable care, to know about a certain condition."

This is consistent with the common definition that "constructive knowledge" is "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." Black's Law Dictionary (8th ed. 2004). The use of the term and its meaning is common, although the application to specific facts is subject to interpretation. See, e.g., Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913 (2005) (company's liability for product that facilitates copyright infringement); Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238 (2000) (transferee's liability under ERISA for prohibited transaction); Faragher v. City of Boca Raton, 524 U.S. 775 (1998) (employer's vicarious liability for sexual harassment in workplace). DHS is including an illustrative definition in the regulations to more clearly distinguish "constructive notice" from actual notice without changing the meaning of either term.

Courts have long held that constructive knowledge is applicable in situations involving employment of unauthorized aliens. In *Mester Manufacturing v. INS*, 879 F.2d 561, 566 (9th Cir. 1989), the INS notified an employer that immigration status documents presented by certain employees for completion of Forms I–9 were fake, yet the employer took no action. Analogizing to the criminal law, the Ninth Circuit held that the INS demonstrated Mester had knowledge because Mester "failed to take appropriate corrective action" after "receiv[ing] specific information that several of his employees were likely to be unauthorized." *Id.* at 566–67. The Ninth Circuit invoked constructive knowledge again in *New El Rey Sausage Co. v. INS*, 925 F.2d 1153, 1158 (9th Cir. 1991), in which it pointed out that "employers, far from being allowed to employ anyone except those whom the government had shown to be unauthorized, have an affirmative duty to determine that their employees are authorized."

A number of commenters have argued that the present rule impermissibly expands the reach of constructive knowledge, citing *Collins Food Int'l v. INS*, 948 F.2d 549 (9th Cir. 1991). In *Collins Food*, the Ninth Circuit held that a finding of constructive knowledge could not be based on (1) The employer's extending an offer of employment prior to conducting a Form I–9 verification, and (2) the employer's accepting a Social Security card as evidence of employment authorization when the back of the card did not match the Social Security card pictured in the INS Handbook for Employers. *Id.* at 552, 554. In doing so, the court applied the doctrines set out in *Mester* and *New El Rey Sausage* but cautioned against an expansive application of constructive knowledge:

[The Immigration Reform and Control Act of 1986], as we have pointed out, is delicately balanced to serve the goal of preventing unauthorized alien employment while avoiding discrimination against citizens and authorized aliens. The doctrine of constructive knowledge has great potential to upset that balance, and it should not be expansively applied.

948 F.2d 554–55.

Some commenters have argued that *Collins Food* limits findings of constructive knowledge to situations in which employers have been explicitly warned by DHS that an employee may be an unauthorized alien. Thus, they suggest, DHS is impermissibly expanding constructive knowledge by including receipt of written notice from SSA as an example of a situation that may lead to a finding of constructive knowledge.

This is an incorrect reading of *Collins Food*. Indeed, *Collins Food* distinguished *Mester* and *New El Rey Sausage* precisely because "Collins Food did not have the kind of positive information that the INS had provided in *Mester* and *New El Rey Sausage*." 948 F.2d at 555. Nothing in *Collins Food*—or any other case cited by the commenters—suggests that such "positive information" indicating certain employees may be unauthorized aliens must come from DHS and not from SSA.

Additionally, these comments do not distinguish between an affirmative obligation to resolve the issues raised by the no-match letters and the "safe harbor" from use of the no-match letter as part of a determination of constructive knowledge. This final rule does not require an employer to take any particular action; the rule simply provides a clear method for employers to exercise reasonable care in addressing "no-match" letters.

Nor does this rule require that employers avail themselves of the safe-harbor procedure. As many commenters point out, receipt of written notice from DHS resulting from a Form I–9 audit creates a duty to investigate, whereas receipt of an SSA no-match letter may create such a duty depending on the totality of the circumstances. DHS acknowledges that an SSA no-match letter by itself does not impart knowledge that the identified employees are unauthorized aliens.

DHS is aware that SSA no-matches may occur due to a name change or typographical error. In some situations a listed SSN is facially suspect, such as when the first three numbers of an employee's claimed SSN are "000," or are in "800" or "900" series, which are not used. DHS believes that the initial submission of Form I–9 with facially incorrect information is problematic, and that this type of information cannot be created by an innocent transcription or typographic error. A letter from DHS or SSA stating that such a number has been checked and does not match agency records reinforces the suspect nature of the original information. In other situations, an SSA no-match letter sent to the employer may be the first indication of a suspect number, and when combined with other evidence known to the employer, "would lead a person, through the exercise of reasonable care, to know" that the employee is not authorized to work. 8 CFR 274a.1(l)(1).

A number of commenters have suggested that SSA no-match letters issued in the past claim to make no statement about an individual's immigration status, and employers are confused about their obligations under the civil rights laws. To the extent employers were confused, this rule should provide clear guidance.

One commenter requested that DHS clarify whether employers who follow the procedures herein will be protected from all claims of constructive knowledge, or just claims of constructive knowledge based on the letters for which the employers followed the safe-harbor procedure. DHS has amended the language in the final rule at paragraphs (l)(2)(i) and (l)(2)(ii) to clarify that (1) An employer who follows the safe-harbor procedure will be considered to have taken reasonable steps in response to the notice, and (2) the employer's receipt of the written notice will therefore not be used as evidence of constructive knowledge. If, in the totality of the circumstances, other independent evidence exists to prove that an employer has constructive knowledge, the employer may still face liability. This could be unusual, however, in the situation where an employer carefully follows the safe-harbor procedures provided in this regulation and has no information suggesting that the employee is using another person's identity. Also, as noted in the proposed rule, this safe-harbor procedure does not protect an employer who has actual, as opposed to constructive, knowledge that an employee is an unauthorized alien.

*D. Fourteen-Day and Sixty-Day Time Frames*

Several commenters suggested that the fourteen calendar-day time frame in the proposed rule was insufficient for employers to review their records to determine if a typographical or other error caused the no-match, correct their records and verify the corrected information to attempt to resolve a discrepancy in an SSA letter or a question raised in a DHS letter. The commenters proposed a range of alternatives, from fifteen business days to one hundred and twenty days. After careful consideration, DHS is extending the initial fourteen-day time frame to thirty calendar days. 8 CFR 101(h). DHS believes that this provides sufficient time for employers to take certain reasonable steps to resolve the problem.

Many commenters also suggested that the sixty-day time frame in the proposed rule for an employee to resolve the no-match with DHS and SSA was insufficient. Most argued for an extension by claiming that SSA would be unable to resolve discrepancies

Federal Register / Vol. 72, No. 157 / Wednesday, August 15, 2007 / Rules and Regulations    45617

between names and SSNs and that DHS would be unable to resolve questions about immigration status within this time frame. DHS has consulted with SSA throughout this rulemaking and on this particular issue. SSA has informed DHS that, if employer and employee act in a timely manner, a 90-day timeframe will be sufficient for all but the most difficult cases. DHS has extended the time to ninety calendar days.

This rule does not create a new requirement that an employer resolve a discrepancy within ninety days. Instead, the rule creates a safe harbor from use of the no-match letter as part of an allegation of constructive knowledge if the employer takes certain steps to resolve the discrepancy. In situations not covered by this rule, constructive knowledge will continue to be based on a number of factors, including whether the employer made a good-faith but ultimately unsuccessful attempt to comply with the safe-harbor procedure.

Some commenters requested that the time frame be tolled in certain circumstances—for example, fourteen days from the date the "appropriate human resource staff" at the employer reads the letter. DHS declines to adopt such a proposal because it would add too much inconsistency and unpredictability. In addition, since the time period has been extended to thirty days, the concern about misdirected mail is somewhat mitigated. Moreover, the employer can control the receipt of the no-match letter in the same manner as it controls all related correspondence through the address that it submits on its filings.

Others have asked that DHS create special rules for special circumstances, such as seasonal workers, teachers on sabbatical, and employees who are out of the office for an extended period due to excused absence or disability. DHS recognizes that there may be situations where employers may not be able to avail themselves of the safe-harbor procedure as described herein. This rule provides an option, not a requirement. DHS is attempting to provide a safe-harbor procedure with as much general application as possible for employers. In these types of special circumstances, an employer should make a good faith effort to resolve the situations as rapidly as practicable, and keep a file documenting such efforts.

Some have complained that the proposed rule did not clarify what steps employers must complete within the fourteen-day time frame. To provide more clarity, DHS has amended the text of this final rule to provide that employers must check and resolve any discrepancies within their own records within thirty calendar days of receiving notice from SSA, or contact the local DHS office within thirty days of receiving notice from DHS. If an employer receives, for example, an SSA "Employer Correction Request" notice and determines that the discrepancy referenced is not due to the employer's records, the employer must promptly ask employees to check their own records, confirm the information in the employer's records, and follow up with SSA as appropriate. Although this action need not occur within thirty days, employers must nevertheless act within a reasonable time frame in order to satisfy this promptness requirement. It is also important for employers to notify employees promptly if further action is required so they have a reasonable amount of time to contact the appropriate agency, and so that the agency can correct its records within the ninety-day time frame.

The steps and time frames are illustrated, as in the proposed and final rules, in the following table:

COMPARISON OF TIMING OF ACTIONS UNDER PROPOSED AND FINAL RULES

| Action | Proposed rule | Final rule |
| --- | --- | --- |
| Employer receives letter from SSA or DHS indicating mismatch of employee, name and Social Security number. | Day 0 | Day 0. |
| Employer checks own records, makes any necessary corrections of errors, and verifies corrections with SSA or DHS. | 0–14 days | 0–30 days. |
| If necessary, employer notifies employee and asks employee to assist in correction | 0–60 days | 0–90 days. |
| If necessary, employer corrects own records and verifies correction with SSA or DHS | 0–60 days | 0–90 days. |
| If necessary, employer performs special I-9 procedure | 60–63 days | 90–93 days. |

Some commenters have asked about the employee's status and the employer's liability while an employer is following the safe-harbor procedure. An employer is prohibited from knowingly employing unauthorized aliens, so an employer may not continue to employ an individual if the employer obtains actual knowledge during the safe-harbor procedure that the individual is an unauthorized alien. If the employer does not obtain actual knowledge during the safe-harbor process, and instead merely has information that could lead to a finding of constructive knowledge from the no-match letter, the employer may continue to employ the individual until all of the steps in the safe-harbor procedure are completed. This, of course, only speaks to an employee's immigration status and the employer's liability under the immigration laws, and does not speak to what actions an employer could or should take under its own internal personnel policies—for example, termination of employment based on an employee's failure to show up for work or an employee's false statements to the employer.

E. Practical Application

1. Letters Sent to Employers

Several commenters questioned how the rule would apply when a no-match letter is sent to the employee, rather than the employer. DHS agrees that greater detail is warranted and has amended paragraphs (l)(iii)(B) and (C) of the final rule to clarify that the rule applies to "[w]ritten notice *to the employer* from the [SSA or DHS]." (Emphasis added.) The rule now explicitly states that the examples of constructive knowledge and the safe-harbor procedure apply only to written notice that is issued directly to the employer. Some commenters have requested that the time frame be tolled until the letter is received by a particular person designated by the employer. As stated previously, no rule of this nature can fit every circumstance and DHS declines to make such a series of changes. Moreover, the employer controls the flow of mail within its business and can determine the office within its organization that becomes the recipient of all mail from DHS and SSA.

Others have asked whether this safe-harbor procedure applies to information employers receive from SSA through sources other than no-match letters. DHS is not extending the safe-harbor procedures that far. For example, the rule does not extend to instances where SSA provides optional SSN verification methods that are described at *http://*

www.ssa.gov/employer/ssnv.htm. If an employer uses one of these verification tools and learns that an employee's combination of name and SSN do not match SSA records, this safe-harbor procedure technically does not apply. Nor does this rule extend to information received through participation in the USCIS' EEV Program or ICE Mutual Agreement between Government and Employers (IMAGE) program. In an effort to clarify this, DHS has amended (l)(1)(iii)(B) to specifically reference, as an example, earnings on Form W–2. However, DHS fully considers all of an employer's attempts to verify employment authorization status and to employ only authorized workers in determining whether to pursue sanctions. All of these good-faith efforts militate against such sanctions. The rule provides a distinct safe-harbor provision if an employer follows the specified procedures in those instances where the employer has been contacted by SSA or DHS.

The final rule addresses only the limited situation in which the employer receives a no-match letter from SSA or DHS. DHS, however, may exercise its prosecutorial discretion favorably for employers who take other affirmative steps to ensure that they do not employ aliens who are not authorized to work in the United States, such as the affirmative use of:

- SSA's Social Security Number Verification System (SSNVS) (see http://www.ssa.gov/employer/ssnv.htm),
- USCIS' Systematic Alien Verification for Entitlements (SAVE) Program and EEV (see https://www.vis-dhs.com/EmployerRegistration), or
- ICE's IMAGE program (http://www.ice.gov/partners/opaimage/index.htm).

Employers should always document their efforts to ensure that they do not employ aliens who are not authorized to work in the United States. SSA and EEV do not routinely provide documentary evidence of internet or other verification attempts, but employers can print screens to record their actions and both SSA and DHS computer systems record all transactions. The employer's best interest lies in recording its own efforts so that such documentation can be provided in any later inspections.

2. Labor Certification or an Application for Prospective Employer

Other commenters suggested clarifying the "Labor Certification or an Application for Prospective Employer" example in paragraph (l)(1)(iii)(A) of the proposed rule. The proposed rule adopted this language directly from the existing 8 CFR 274a.1(l)(1)(ii), which is in turn based on *United States v. American McNair, Inc.*, 1 OCAHO 1846 (No. 285; Jan. 8, 1991). In *American McNair*, an administrative law judge upheld the INS's finding of constructive knowledge because the employer knew a particular employee was "ineligible for amnesty" and the employer filed a labor certificate and employment-based visa petition in order "to get [the employee] legalized." *Id.* at 1846, 1854–55. As some commenters pointed out, however, the language in the proposed rule could be confusing and it does not refer to any particular named documents or forms. Accordingly, DHS has adopted one commenter's suggested revision. The rule now includes language providing that "[a]n employee's request that the employer file a labor certification or employment-based visa petition on behalf of the employee" as an example of a situation that may, depending on the totality of relevant circumstances, require an employer to take reasonable steps in order to avoid a finding by DHS that the employer has constructive knowledge that the employee is an unauthorized alien. DHS recognizes, though, that not all situations involving such a request will be evidence of constructive knowledge—for example, employers may have work-authorized employees who are seeking permanent residency.

3. Written Notice From SSA

Some commenters also suggested clarifying an employer's duties under the proposed safe-harbor provision at (l)(2)(i)(A)(2), stating that the rule should not indicate that employers are responsible for advising employees how to resolve the discrepancy with SSA or determining what documentation employees may need to resolve the discrepancy. DHS agrees that the employer's obligation under the safe-harbor procedure does not extend this far. DHS has therefore amended the text of the final rule to state that employers need only advise the employee of the time within which the discrepancy must be resolved and share with the employee any guidance the SSA notice may provide on how the discrepancy might be resolved.

4. Written Notice From DHS

A number of commenters pointed out that paragraph (l)(2)(ii) of the proposed rule, which sets forth a procedure to follow after receiving written notice from DHS, only speaks of an employer's responsibilities to address the questions about employment authorization raised in the DHS notice, and does not mention what role an employee has in resolving these questions. These DHS letters, which are generally issued by ICE on behalf of DHS, usually contain guidance on steps the employer should take to avoid sanctions from DHS and provide a point of contact within DHS if the employer has questions or believes the letter has been issued in error. The particular steps that an employer or employee would take to resolve any error or discrepancy may depend on the facts and circumstances of each case. Thus, DHS agrees that employees may have a role in resolving discrepancies if the letter is issued in error, but declines to amend the DHS safe-harbor procedure.

5. Clarity and Reasonable Steps

A number of commenters expressed concern that the proposed rule does not provide enough clarity because it includes too many optional steps and references to vague notions of reasonableness. For example, paragraph (l)(2)(A)(1) of the proposed rule lists an employer's obligations under the SSA safe-harbor procedure, but begins by stating that an employer must "take[ ] reasonable steps, within 14 days, to attempt to resolve the discrepancy; such steps may include * * *." Since the purpose of the rule is to provide employers with clarity, DHS has amended the safe-harbor procedure to provide clearer steps for employers to take and particular time frames in which the employers should complete the steps. DHS has removed the references to "reasonable steps" in the safe-harbor procedure because this procedure is itself a combination of reasonable steps. As noted in the proposed rule, there may be other reasonable steps. This regulation, however, identifies the combination of reasonable steps that DHS has approved for resolution of notices from SSA and DHS, and it is the only combination of steps that will guarantee that DHS will not use the employer's receipt of the notices from SSA and DHS as evidence of the employer's constructive knowledge that its employee is an unauthorized alien.

6. Verification and Recordkeeping

Some commenters have expressed concern over the recordkeeping requirements under the safe-harbor procedure. For example, paragraphs (l)(2)(i)(A)(1) and (l)(2)(i)(A)(2) of the proposed rule required employers to make records, but the proposed rule did not specify the manner of recordkeeping for verified resolutions of SSA discrepancies. Also, the recordkeeping requirements for the Form I–9 verification under (l)(2)(iii) suggested to some that employers would need to

retain the new Form I-9 for a different period of time than the employers would need to retain the old Form I-9. DHS has amended the rule in response.

The safe-harbor procedure requires employers, in some circumstances, to "verify with the Social Security Administration that the employee's name and social security account number, as corrected, match Social Security Administration records." Employers may do so in any manner they choose. For example, *http://www.ssa.gov/employer/ssnv.htm* describes how employers may verify this information over the internet, and *http://www.ssa.gov/employer/ssnvadditional.htm* describes other methods, such as an SSA 1-800 number.

The final rule provides for employers to store records of verified resolutions along with the employee's Form I-9. This may be accomplished by updating the employee's Form I-9 or completing a new Form I-9 to the extent that verified resolutions demonstrate inaccuracies in the employee's initial Form I-9. As noted elsewhere, Form I-9 completion and retention options have recently been expanded. 71 FR 34,510 (June 15, 2006).

Similarly, the final rule clarifies the safe harbor's retention requirements for the Form I-9 verification under (l)(2)(iii) so that the new Form I-9 will be retained for the same period as the original Form I-9. The date of hire for purposes of section 274A(b)(3) of the INA, 8 U.S.C. 1324a(b)(3), and 8 CFR 274a.2(b)(2)(i) is still the same date, even though the safe-harbor procedure under (l)(2)(iii) requires that the employer complete a new Form I-9 "using the same *procedures* as if the employee were newly hired." (Emphasis added). For example, an employer completes a Form I-9 when an employee is hired in September 1998, and then completes a new Form I-9 verification under (l)(2)(iii) in July 2007 after learning that the employee is the subject of an unresolved SSA no-match letter. The employee then accepts another position on February 1, 2008, at which point the employment contract terminates. In this example, the employer would need to retain both Forms I-9 until February 1, 2009.

Employers are encouraged to document telephone conversations, in addition to retaining all SSA correspondence, computer-generated printouts, e-mails and SSNVS screen prints evidencing that the discrepancy has been corrected. Lastly, employers should confirm and document that the discrepancy referenced in the no match letter has been resolved via SSNVS or the SSA 1-800 number.

7. Mechanics of Form I-9 Verification

Some commenters requested that DHS clarify how an employer can complete a new Form I-9 verification when an employee insists that the disputed SSN and name are correct. If an employee insists that the disputed SSN number and name are correct, the employee should contact SSA and correct SSA's records. The rule contemplates that employees will be able to correct the SSA's records within ninety days of the employer's receipt of the notice. If the employee insists that the SSN is correct but takes no action during those ninety days to resolve the SSA notice, employers wishing to receive the benefits of the safe harbor must proceed with the special Form I-9 verification procedure, which provides the employer with assurance that the employee is not an unauthorized alien. During this Form I-9 verification, the employer may not rely on documents containing the disputed SSN, but can and should rely on other documents listed in 8 CFR 274a.2(b)(1)(v) that do not contain a SSN but that can nevertheless demonstrate identity and employment authorization—for example, a United States passport, DHS Permanent Resident Card, or other specified DHS immigration documents. Employers who continue to employ an employee without resolving the discrepancy and without successfully completing the Form I-9 verification in (l)(2)(iii) will not qualify for the safe-harbor provision.

Other commenters asked what DHS expects employers to do when they follow the procedure in (l)(2)(i) but an employee with an unmatched SSN fails to resolve the discrepancy with SSA. Under the safe harbor procedures of this rule, employers should complete the special I-9 verification at this point. The safe-harbor procedure, however, is merely one way for employers to avoid liability under the INA for knowingly hiring or continuing to employ unauthorized aliens. Employers are free to develop other reasonable methods for resolution of SSA notices, although they face the risk that DHS may not agree that their methods are reasonable. To gain the benefits of this safe-harbor procedure, however, the employer must proceed to the special Form I-9 verification stage described in (l)(2)(iii). If this special Form I-9 verification is unsuccessful, or if the employee refuses to participate in the Form I-9 verification, the employer risks being deemed to have constructive knowledge of unlawful employment of workers in a subsequent enforcement action. As discussed below, however, it is important that employers not administer the Form I-9 verification on a discriminatory basis. Thus, an employer who wishes to follow the safe-harbor procedure should require a Form I-9 verification of all employees who fail to resolve SSA discrepancies, and apply a uniform policy to all employees who refuse to participate or whose Form I-9 verification is unsuccessful.

Some asked for clarification whether the Form I-9 verification stage is optional—in other words, whether employers would be able to terminate employment after sixty [now ninety] days with no resolution and without conducting the Form I-9 verification described in (l)(2)(iii). The Form I-9 verification step in the procedure offers the employee one last chance to show the employer that he or she is not an unauthorized alien. Employers who follow the safe harbor procedure and complete the I-9 verification should not be tempted to mistakenly terminate employment for citizens and authorized aliens. *See also* section III.G. The procedures in this rule provide only a safe harbor in limited circumstances and do not prohibit an employer from terminating the employment relationship.

This Form I-9 verification does not include verifying with SSA that the name and SSN match SSA's records. Because the Form I-9 verification will only be performed when discrepancies are not resolved within the ninety-day period, the name and SSN listed on the new Form I-9 will not match SSA's records. This mismatch will still occur despite the fact that the Form I-9 verification should provide the employer with additional, documentary evidence of the employee's authorization to work. Employers may request, however, that the employee continue to pursue resolution of the discrepancy and inform the employer when the discrepancy is resolved, so that the employer can ensure that another SSA no-match letter will not be generated the following year. Without pursuing resolution of the mismatch, employees' earnings will not be properly credited to their individual earning records.

Some commenters have suggested that the Form I-9 verification described in (l)(2)(iii) may constitute document abuse. "A person's or other entity's request, for purposes of satisfying the requirements of [INA section 274A(b), 8 U.S.C. 1324a(b),] for more or different documents than are required under such section or refusing to honor documents tendered that on their face reasonably

**45620** Federal Register / Vol. 72, No. 157 / Wednesday, August 15, 2007 / Rules and Regulations

appear to be genuine shall be treated as an unfair immigration-related employment practice if made for the purpose or with the intent of discriminating against an individual in violation of [INA section 274B(a)(1), 8 U.S.C. 1324b(a)(1)]." INA section 274B(a)(6), 8 U.S.C. 1324a(a)(6). This section is referring to the employment verification requirements under section 274A(b) of the INA, 8 U.S.C. 1324a(b), for persons or entities "hiring, recruiting, or referring an individual for employment."

The safe-harbor procedure described in the present rule, however, does not concern the employment verification requirements under section 274A(b) of the INA, 8 U.S.C. 1324a(b). Instead, it relates to section 274A(a)(2) of the INA, 8 U.S.C. 1324a(a)(2), and whether an employer's actions in response to a no-match letter will lead to a finding that the employer knowingly continued to employ unauthorized aliens. Unlike employers who are conducting an initial Form I–9 verification at the time of hire or a reverification under 8 CFR 274a.2(b)(1)(vii), employers performing a Form I–9 verification under paragraph (l)(2)(iii) as part of the safe-harbor procedure will be determining whether they may continue to employ an individual after receiving notification from SSA or DHS of a problem that remains unresolved. Also, any document presented that contained a suspect SSN or alien registration number would not be facially valid. Under these circumstances, employers can properly require the employee to present a document that does not contain the suspect SSN or alien number, treating all similarly situated individuals in the same manner without regard to their perceived national origin or citizenship status, without committing document abuse under section 274B(a)(6) of the INA, 8 U.S.C. 1324b(a)(6).

Moreover, DHS is not persuaded that the panel opinion's logic in *Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106 (10th Cir. 2006), affects this analysis. In *Zamora*, a panel of the Tenth Circuit stated, in a footnote, that the document abuse provision at section 274B(a)(6) of the INA, 8 U.S.C. 1324b(a)(6), might apply to continuing-to-employ situations, but the court also pointed out that the district court held otherwise and that the appeals court would not reach the issue because plaintiff did not appeal that portion of the decision. *See* 449 F.3d at 1113 & n.7. This language was merely dicta, and it does not prevent DHS from promulgating this safe-harbor procedure. As discussed below, the panel opinion no longer has any precedential value. Moreover, in the context of the special verification procedures in paragraph (l)(2)(iii) the employer would be determining whether a document is facially valid (and whether they may continue to employ an individual) after not merely receipt of a no-match letter, but several failed attempts to resolve the discrepancy over more than 90 days after receiving notification from SSA or DHS of the discrepancy. Under ICE's considered interpretation of the relevant statutory provisions (which included consultation with the Department of Justice), section 274B(a)(6) of the INA does not prohibit employers from taking the steps outlined in this regulation and preamble uniformly and without regard to perceived national origin or citizenship status.

8. Other Employer Responsibilities

Some commenters expressed concerns about employers' responsibilities in certain situations that are not specifically addressed by the proposed rule. This rule is not intended to provide bright-line guidance for all possible situations that may arise when employers try to resolve problems raised by SSA or DHS notices. While these safe-harbor provisions provide guidance on what employer actions will not lead to a finding of constructive knowledge of an employee's unauthorized status in certain situations, failure to adhere to the guidance will not necessarily constitute constructive knowledge, either. Rather, the benchmark of constructive knowledge is reasonableness. The rule states that whether an employer will be found to have constructive knowledge that an employee is an unauthorized alien will depend on the totality of relevant circumstances.

Accordingly, the safe-harbor provisions establish one course of action that an employer may take after receiving a notice from SSA or DHS. The provisions contemplate that the particular steps undertaken by the employer in response to an SSA or DHS notice, along with the time the employer takes to act and follow up with appropriate inquiries, will be relevant considerations in the determination of whether the employer took reasonable steps to avoid a finding of constructive knowledge under 8 CFR 274a.1. The ultimate determination of whether an employer will be found to have knowingly employed an unauthorized alien will be based on the totality of the circumstances. The safe-harbor procedure is simply one way for employers to avoid liability under the INA for knowingly employing unauthorized aliens after receiving SSA or DHS notices.

Employers may wish to consider enrolling in USCIS's EEV Program (described at *http://www.uscis.gov/graphics/services/SAVE.htm*), ICE's IMAGE program (described at *http://www.ice.gov/partners/opaimage/index.htm*), or other programs administered by private companies that offer electronic Form I–9 completion and retention along with automatic verification through SSA and DHS databases. Employers may find that their use of these programs to verify employment authorization for all new hires reduces problems resulting from discrepancies between employees' Forms I–9 and information in SSA and DHS databases.

*F. Discrimination*

Several commenters have cited *Zamora v. Elite Logistics, Inc.*, supra, to argue that the rule conflicts with the anti-discrimination provisions of section 274B of the INA, 8 U.S.C. 1324b. The panel opinion in *Zamora*, which the Tenth Circuit has vacated, would have held only that the district court erred in granting summary judgment to the employer, concluding that a reasonable jury could find that the stated reasons for the employer's conduct were, in fact, a pretext for unlawful discriminatory treatment. *Zamora v. Elite Logistics, Inc.*, 316 F.Supp.2d 1107, 1116, 1117–21 (D.Kan. 2004) (granting summary judgment and dismissing case), *rev'd* 449 F.3d at 1115, 1117 (facts not uncontroverted; summary judgment reversed), *vacated* 478 F.3d 1160 (10th Cir. Feb. 26, 2007) (en banc) (affirming judgment of the district court by an equally divided court; affirming judgment). The court of appeals, sitting *en banc*, affirmed by an equally divided court the district court's summary judgment in favor of the employer as to Zamora's claim that his suspension violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, and affirmed the district court's summary judgment in favor of the employer as to Zamora's claim that his termination violated Title VII.

An argument that *Zamora* illustrates a conflict between this rule and the antidiscrimination provisions reads too much into the record in *Zamora*. *Zamora* involved a nationality discrimination claim under Title VII of the Civil Rights Act of 1964, not an unfair immigration related employment practice claim under section 274B of the INA, 8 U.S.C. 1324b. *See* 449 F.3d at 1111. We agree that the concurrences and dissent in the en banc decision make much of the issue, but the issue

remains dicta as the court affirmed the district court on narrow grounds arising only under Title VII. The opinions issued in this litigation do not indicate that the receipt of a no-match letter formed the basis for any action by the employer. *Zamora* illustrates the need for clear procedures on mismatches and this rule provides one such clarification. This rule does not, as the commenters suggest, conflict with the anti-discrimination provisions of the INA or title VII. Employers must comply with all federal statutes in making employment decisions.

### G. Firing of Employees

Many commenters argued that the rule would result in employers' immediately firing an employee upon receipt of a no-match letter. The firing of any employee or "churning" of the workforce because of the receipt of a no-match letter is speculative, and is neither required by nor a logical result of the rule being adopted. If, in fact, an employer obtains actual knowledge that a specific employee is an unauthorized alien as a result of the no-match letter—for example, the employee tells the employer so—then the employer should terminate employment. If the employer is concerned about constructive knowledge rather than actual knowledge, however, this safe-harbor procedure is simply one method of resolving the problem while ensuring that DHS does not use the employer's receipt of a DHS or SSA notice as evidence of constructive knowledge.

Some commenters have suggested that promulgation of this final rule will lead to massive firings across the nation. Indeed, one commenter suggested that this safe-harbor procedure will cause employers to "precipitously and indiscriminately" fire employees who are the subject of an SSA no-match letter before the employees are given an opportunity to resolve the problem. As numerous commenters point out, however, employers in the past have been confused about their responsibilities when they receive SSA no-match letters, and this has occasionally resulted in unwarranted termination of work-authorized individuals. This final rule is an attempt to reduce confusion regarding employers' responsibilities under immigration law by providing them a DHS-approved method for resolving Social Security mismatches. This rule should not result in the firing of legally authorized workers.

Moreover, concern over "massive firings" appears to be directed at the issuance of SSA no-match letters themselves, rather than the application of this safe-harbor procedure. For example, some commenters claimed that SSA no-match letters will be used as a pretext for discriminatory firings or retaliation against workers who exercise their workplace rights. As noted above, DHS will not be directing the SSA to issue (or not issue) a no-match letter to an employer. DHS is simply providing guidance to employers on how they may avoid a constructive knowledge finding as they try to resolve the mismatch if they should receive such a notice, and how they may acquire a safe harbor from the use of that letter as evidence of constructive knowledge in establishing liability under the INA.

Commenters were also concerned that the rule puts employers in a "no-win situation," in which they would be liable for discrimination if they terminate an employee who is the subject of a no-match letter, but could also be liable for continuing to employ an alien with constructive knowledge that the alien is unauthorized if they retain the employee. The rule does not impose upon employers any new responsibilities that do not already exist under current law. With or without this rule, employers who have constructive knowledge that certain employees are unauthorized aliens should terminate employment or risk sanctions from DHS. Moreover, employers will not be engaging in unlawful discrimination by uniformly following the procedures of this regulation without regard to perceived national origin or citizenship status.

By contrast, other commenters suggested that the rule will have no impact because employees in the low-wage service industry will simply switch employers if their current employer receives a no-match letter. Changing jobs is not a costless endeavor, however, and an alternative to leaving undisturbed an illegal employment relationship is unacceptable. To the extent the employees referenced in these comments *are* authorized to work, the employees have an incentive to correct the no-match situation. If such a situation stands uncorrected the employees may not receive credit for their earnings.

### H. Economic Impact

A number of commenters suggested that the rule would have a substantial economic impact on specific sectors of the economy and the economy broadly. After reviewing these comments, DHS concludes that the suggested impact is speculative. The commenters provided no specific evidence or analysis to support this conclusion. In addition, DHS has found no evidence in the record that substantially supports the notion that the rule will have such an impact. For example, an agriculture association noted the amount of production acreage being moved to Mexico and suggested that its members were required to do so by a lack of labor to cultivate and harvest crops. The reasons that growers may change their acreage under cultivation and where they cultivate are not driven by whether they may find a safe harbor under this rule from possible sanctions for employing aliens not authorized to work. DHS does not believe that this rule has any such economic impact.

Other commenters disagreed over whether the most significant impact would be on large or small businesses—some arguing that corporate structure would impede rapid resolution under the proposed time frame, and others arguing that small businesses would not have the resources to respond to the no-match letters. DHS does not believe that either argument warrants a change in the rule. All employers have the ability to establish their own mailing addresses for personnel management operations and do so routinely in filings with United States governmental agencies. Small employers incrementally have smaller numbers of employees and less difficulty controlling this process. Moreover, both types of commenters misapprehended the rule as an affirmative requirement, rather than an offer of a safe harbor from potential sanctions.

Another commenter expressed concern that these safe-harbor provisions would be too burdensome in the temporary labor context because employers will have difficulty resolving the SSA no-match after the individual is no longer an employee. This rule does not impose on employers a duty to resolve all SSA no-match letters. If the individual is no longer an employee at the time the employer receives the no-match letter, the employer need not act on the SSA no-match letter because the employer is no longer employing the individual.

Some commenters expressed concern that resolution of the SSA no-match letters places too heavy a burden on businesses in general. This concern, however, relates to requirements that currently exist. This regulation does not impose any new duties upon employers, who already have an obligation to avoid liability for inaccurate wage reporting under the Internal Revenue Code. Under existing law, the IRS is authorized to fine employers $50 for each failure to file a complete and accurate wage reporting form (Form W–2), up to a maximum of $100,000 or $250,000. 26

**45622**  Federal Register / Vol. 72, No. 157 / Wednesday, August 15, 2007 / Rules and Regulations

CFR 301.6721–1(a). Employees have an obvious interest in accurate reporting as well. Accurate wage reporting through the use of a Form W–2 allows the SSA to match reported wages to an individual's earnings record, and these reported wages are then used to determine eligibility and amounts for Social Security retirement, disability, and survivors' benefits. The present rule simply provides guidance to employers about what steps they may take in order to avoid being found to have constructive knowledge that an employee is an unauthorized alien.

### I. SSA and DHS Database Issues

Several commenters argued that the rule is unwise because the SSA or DHS records may contain inaccuracies or missing information, or because the SSA records are not designed to be used for immigration enforcement. DHS recognizes that studies from the Governmental Accountability Office and other sources describe challenges that must be addressed. However, the rule does not rely on the SSA no-match letters as anything more than indicators of a potential problem—whether that problem is that the employer's records and wage reporting are inaccurate, that the employee is not receiving credit through the SSA for wages earned, or that the employee is potentially an unauthorized alien. The rule merely provides a safe-harbor from a finding of constructive knowledge of employing unlawful workers based on the no-match letter. Accordingly, DHS does not believe that these issues warrant changes in the rule as proposed.

### J. Cost to the Government

Several comments expressed concern about the costs that the rule would impose on DHS and SSA. For example, some comments suggested that DHS and SSA would be required by this rule to make a "massive investment" in educational programs. DHS does not believe that an outreach program would cost a substantial amount. None of the comments provided specific data on which DHS can rely and that provide a reasonable basis for generating specific costs. Although DHS appreciates the concern expressed, DHS believes that any costs can be resolved through the regular fiscal budgeting for the Executive Branch.

### K. General Impact

Some commenters argue that the rule will have no effect on illegal immigration, and will simply encourage unauthorized aliens to find jobs in the unregulated underground cash economy. This again misunderstands the purpose of the rule. DHS is promulgating this rule to provide guidance to those employers who want to know how they can comply with employment verification requirements after receiving notices from DHS and SSA. This rule will likely have no effect on those employers who are willing to risk civil and criminal penalties in order to hire and exploit unauthorized aliens. DHS also does not view this rule as an easy fix to end employment of unauthorized aliens, but rather as one piece of a comprehensive strategy to resolve a complicated problem. Similarly, commenters' concerns about diminished tax revenue as a result of illegal employment practices and increased costs to DHS and SSA as a result of this final rule have been considered but do not warrant changes in the rule.

Some commenters suggested that the Form I–9 verification procedure under paragraph (l)(2)(iii) would further encourage widespread identity theft and/or document fraud, as undocumented aliens seek ways to avoid the law. For example, an unauthorized alien could simply produce another false document, perhaps one that contains a different SSN or alien registration number. This reasoning does not withstand scrutiny.

First, DHS does not believe that its regulations create the market for such criminal conduct. Instead, this market is fueled by a number of factors, such as a desire by some aliens to work in the United States without regard to United States immigration laws, a high demand for inexpensive labor in certain sectors of the economy, limitations in the existing employment eligibility verification framework, unscrupulous employers willing to exploit unauthorized aliens for profit, and fraudulent document preparers willing to violate the law.

Second, the safe-harbor procedure also deters identity theft, document fraud, and similar crimes by providing employers with notice of a potential problem. The rule provides a last-resort Form I–9 verification procedure to verify an employee's employment authorization and identity. In the event that the employer is unable to verify within ninety days of receiving the SSA or DHS notice that a document, alien number, or SSN is assigned to the employee, this procedure may help expose a larger identity theft problem. Under paragraph (l)(2)(iii)(A)(2), the employer may not accept another document to establish work authorization that contains the same number that is or was the subject of a no-match notification from SSA or DHS. An employee who produces different documents with different numbers, then, depending on the circumstances, may put the employer on notice that the employee has committed document fraud. Thus, an employee who provides such notification would not only face general policies that the employer applies to employees suspected of criminal conduct, see, e.g., Contreras v. Cascade Fruit Co., 9 OCAHO No. 1090 (Feb. 4, 2003), but the employee could also face federal prosecution for fraudulently completing a Form I–9. Facing possible termination or prosecution, it is unlikely that undocumented aliens will be "encouraged" by the amended rule to continue to commit such crimes to gain employment.

### L. Privacy

Some commenters argued that the proposed rule will not make the world safer or enhance the freedom of citizens; rather, it will lead to neighbors spying on neighbors and the criminalization of good citizens. DHS disagrees. Effective worksite enforcement plays an important role in the fight against illegal immigration and in protecting our homeland. Unauthorized workers employed at sensitive sites and critical infrastructure facilities—such as airports, seaports, nuclear plants, chemical plants, and defense facilities—pose serious homeland security threats. Moreover, DHS has been charged with enforcing United States laws prohibiting employment of unauthorized aliens.

The purpose of the proposed safe-harbor procedure is not to encourage unlawful spying or criminalize the legitimate actions and behavior of good citizens. The rule will provide clarity for employers trying to comply with the law. Employers have a legal obligation under existing law to hire only authorized workers. Employers may not knowingly employ unauthorized aliens and must take action when the federal government notifies them that they may have employed unauthorized aliens or risk being found to have constructive knowledge of that unauthorized employment. Those employers who abuse the immigration system and break the law must be held accountable for their actions. Those employers who were unaware of the facts but act in a reasonable manner to take corrective action when necessary after receiving an SSA or DHS notice will not be found to have violated their legal obligations of the INA.

### M. Proposed Changes in Form I–9

Several commenters suggested that the list of documents that are acceptable

proof of employment authorization and other aspects of Form I-9 be improved. DHS recognizes the need to update the list of acceptable documents and make other changes. For example, DHS has also adopted regulations permitting employers to retain and store Form I-9 in electronic format. 71 FR 34,510 (June 15, 2006). DHS will review these recommendations further and may make additional improvements in the future.

### III. Regulatory Requirements

#### A. Regulatory Flexibility Act

The Secretary of Homeland Security, in accordance with the Regulatory Flexibility Act, 5 U.S.C. 605(b), has reviewed this regulation and, by approving it, certifies that this rule would not have a significant economic impact on a substantial number of small entities. This rule would not affect small entities as that term is defined in 5 U.S.C. 601(6). This rule describes when receipt by an employer of a no-match letter from SSA or DHS may result in a finding that the employer has constructive knowledge that it is employing an alien not authorized to work in the United States. The rule also describes steps that DHS would consider a reasonable response by an employer to receipt of a no-match letter. The rule does not mandate any new burdens on the employer and does not impose any new or additional costs on the employer, but merely adds specific examples and a description of a "safe-harbor" procedure to an existing DHS regulation for purposes of enforcing the immigration laws and providing guidance to employers.

#### B. Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in one year, and it would not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995, Public Law 104-4, 109 Stat. 48 (1995), 2 U.S.C. 1501 et seq.

#### C. Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996, Public Law 104-121, 804, 110 Stat. 847, 872 (1996), 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic or foreign markets.

#### D. Executive Order 12866 (Regulatory Planning and Review)

DHS considers this rule a "significant regulatory action" under Executive Order No. 12,866, 58 FR 51,735 (Sept. 30, 1993) as amended. Under Executive Order 12,866, a significant regulatory action is subject to an Office of Management and Budget (OMB) review and to the requirements of the Executive Order. The Executive Order defines "significant regulatory action" as one that is likely to result in a rule that may (1) have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities; (2) create a serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights or obligations of recipients thereof; or (4) raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order. Because this rule describes what specific steps an employer that has received a no-match letter could take that will eliminate the possibility that DHS will find that the employer has constructive knowledge that it is employing an unauthorized alien, this rule raised novel policy issues.

#### E. Executive Order 13132 (Federalism)

This rule does not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order No. 13,132, 64 FR 43,255 (Aug. 4, 1999), this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

#### F. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order No. 12,988, 61 Fed. Reg. 4729 (Feb. 5, 1996).

#### G. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995, 44 U.S.C. 3501, et seq., all Departments are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule. This rule does not impose any additional information collection burden or affect information currently collected by ICE.

### List of Subjects in 8 CFR Part 274a

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

■ Accordingly, part 274a of chapter I of title 8 of the Code of Federal Regulations is amended as follows:

### PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 1. The authority citation for part 274a continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1324a; 8 CFR part 2.

■ 2. Section 274a.1(l) is revised to read as follows:

#### § 274a.1 Definitions.

\* \* \* \* \*

(l)(1) The term *knowing* includes having actual or constructive knowledge. Constructive knowledge is knowledge that may fairly be inferred through notice of certain facts and circumstances that would lead a person, through the exercise of reasonable care, to know about a certain condition. Examples of situations where the employer may, depending on the totality of relevant circumstances, have constructive knowledge that an employee is an unauthorized alien include, but are not limited to, situations where the employer:

(i) Fails to complete or improperly completes the Employment Eligibility Verification, Form I-9;

(ii) Acts with reckless and wanton disregard for the legal consequences of permitting another individual to introduce an unauthorized alien into its work force or to act on its behalf; and

(iii) Fails to take reasonable steps after receiving information indicating that the employee may be an alien who is not employment authorized, such as—

(A) An employee's request that the employer file a labor certification or employment-based visa petition on behalf of the employee;

(B) Written notice to the employer from the Social Security Administration reporting earnings on a Form W-2 that employees' names and corresponding social security account numbers fail to

match Social Security Administration records; or

(C) Written notice to the employer from the Department of Homeland Security that the immigration status document or employment authorization document presented or referenced by the employee in completing Form I–9 is assigned to another person, or that there is no agency record that the document has been assigned to any person.

(2)(i) An employer who receives written notice from the Social Security Administration as described in paragraph (l)(1)(iii)(B) of this section will be considered by the Department of Homeland Security to have taken reasonable steps—and receipt of the written notice will therefore not be used as evidence of constructive knowledge—if the employer takes the following actions:

(A) The employer must check its records to determine whether the discrepancy results from a typographical, transcription, or similar clerical error. If the employer determines that the discrepancy is due to such an error, the employer must correct the error and inform the Social Security Administration of the correct information (in accordance with the written notice's instructions, if any). The employer must also verify with the Social Security Administration that the employee's name and social security account number, as corrected, match Social Security Administration records. The employer should make a record of the manner, date, and time of such verification, and then store such record with the employee's Form I–9(s) in accordance with 8 CFR 274a.2(b). The employer may update the employee's Form I–9 or complete a new Form I–9 (and retain the original Form I–9), but the employer should not perform a new Form I–9 verification. The employer must complete these steps within thirty days of receiving the written notice.

(B) If the employer determines that the discrepancy is not due to an error in its own records, the employer must promptly request that the employee confirm that the name and social security account number in the employer's records are correct. If the employee states that the employer's records are incorrect, the employer must correct, inform, verify, and make a record as set forth in paragraph (l)(2)(i)(A) of this section. If the employee confirms that its records are correct, the employer must promptly request that the employee resolve the discrepancy with the Social Security Administration (in accordance with the written notice's instructions, if any). The employer must advise the employee of the date that the employer received the written notice from the Social Security Administration and advise the employee to resolve the discrepancy with the Social Security Administration within ninety days of the date the employer received the written notice from the Social Security Administration.

(C) If the employer is unable to verify with the Social Security Administration within ninety days of receiving the written notice that the employee's name and social security account number matches the Social Security Administration's records, the employer must again verify the employee's employment authorization and identity within an additional three days by following the verification procedure specified in paragraph (l)(2)(iii) of this section.

(ii) An employer who receives written notice from the Department of Homeland Security as described in paragraph (l)(1)(iii)(C) of this section will be considered by the Department of Homeland Security to have taken reasonable steps—and receipt of the written notice will therefore not be used as evidence of constructive knowledge—if the employer takes the following actions:

(A) The employer must contact the local Department of Homeland Security office (in accordance with the written notice's instructions, if any) and attempt to resolve the question raised by the Department of Homeland Security about the immigration status document or employment authorization document. The employer must complete this step within thirty days of receiving the written notice.

(B) If the employer is unable to verify with the Department of Homeland Security within ninety days of receiving the written notice that the immigration status document or employment authorization document is assigned to the employee, the employer must again verify the employee's employment authorization and identity within an additional 3 days by following the verification procedure specified in paragraph (l)(2)(iii) of this section.

(iii) The verification procedure referenced in paragraphs (l)(2)(i)(B) and (l)(2)(ii)(B) of this section is as follows:

(A) The employer completes a new Form I–9 for the employee, using the same procedures as if the employee were newly hired, as described in section 274a.2(a) and (b) of this part, except that—

(1) The employee must complete Section 1 ("Employee Information and Verification") and the employer must complete Section 2 ("Employer Review and Verification") of the new Form I–9 within ninety-three days of the employer's receipt of the written notice referred to in paragraph (l)(1)(iii)(B) or (C) of this section;

(2) The employer must not accept any document referenced in any written notice described in paragraph (l)(1)(iii)(C) of this section, any document that contains a disputed social security account number or alien number referenced in any written notice described in paragraphs (l)(1)(iii)(B) or (l)(1)(iii)(C) of this section, or any receipt for an application for a replacement of such document, to establish employment authorization or identity or both; and

(3) The employee must present a document that contains a photograph in order to establish identity or both identity and employment authorization.

(B) The employer must retain the new Form I–9 with the prior Form(s) I–9 in accordance with 8 CFR 274a.2(b).

(3) Knowledge that an employee is unauthorized may not be inferred from an employee's foreign appearance or accent. Nothing in this definition should be interpreted as permitting an employer to request more or different documents than are required under section 274A(b) of the Act or to refuse to honor documents tendered that on their face reasonably appear to be genuine and to relate to the individual, except a document about which the employer has received written notice described in paragraph (l)(1)(iii) of this section and with respect to which the employer has received no verification as described in paragraphs (l)(2)(i)(C) or (l)(2)(ii)(B) of this section.

**Michael Chertoff,**
*Secretary.*
[FR Doc. E7–16066 Filed 8–14–07; 8:45 am]
**BILLING CODE 4410–10–P**

---

## DEPARTMENT OF TRANSPORTATION

**Federal Aviation Administration**

**14 CFR Part 23**

**[Docket No. CE270; Special Condition No. 23–210–SC]**

**Special Conditions: Adam Aircraft, Model A700; Fire Extinguishing for Aft Fuselage Mounted Engines**

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final special conditions.

**SUMMARY:** These special conditions are issued for the Adam Aircraft, Model A700 airplane. This airplane will have