Stephen P. Berzon (SBN 46540)
Scott A. Kronland (SBN 171693)
Jonathan Weissglass (SBN 185008)
Linda Lye (SBN 215584)
Danielle E. Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: skronland@altshulerberzon.com
Email: llye@altshulerberzon.com
Email: dleonard@altshulerberzon.com

*Attorneys for Plaintiffs*

Jonathan P. Hiatt (SBN 63533)
James B. Coppess (*Pro Hac Vice* Application forthcoming)
Ana L. Avendaño (SBN 160676)
AFL-CIO
815 Sixteenth Street, N.W.
Washington, D.C. 20006
Telephone: (202) 637-5053
Facsimile: (202) 637-5323
Email: aavendan@aflcio.org

*Attorneys for Plaintiff AFL-CIO*

(Counsel list continued on next page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS; SAN FRANCISCO LABOR COUNCIL; SAN FRANCISCO BUILDING AND CONSTRUCTION TRADES COUNCIL; and CENTRAL LABOR COUNCIL OF ALAMEDA COUNTY,

Plaintiffs,

v.

MICHAEL CHERTOFF, Secretary of Homeland Security; DEPARTMENT OF HOMELAND SECURITY; JULIE MYERS, Assistant Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MICHAEL ASTRUE, Commissioner of Social Security; and SOCIAL SECURITY ADMINISTRATION,

Defendants.

Case No. ____________

**DECLARATION OF NIK THEODORE IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

(Counsel list continued from first page)

Linton Joaquin (SBN 73547)
Marielena Hincapié (SBN 188199)
Monica T. Guizar (SBN 202480)
NATIONAL IMMIGRATION LAW CENTER
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA 90010
Telephone: (213) 674-2850
Facsimile: (213) 639-3911
Email: guizar@nilc.org

Lucas Guttentag (SBN 90208)
Jennifer C. Chang (SBN 233033)
Mónica M. Ramírez (SBN 234893)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0770
Facsimile: (415) 395-0950
E-mail: jchang@aclu.org

Omar C. Jadwat (*Pro Hac Vice* Application forthcoming)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2620
Facsimile: (212)-549-2654
Email: ojadwat@aclu.org

Alan L. Schlosser (SBN 49957)
Julia Harumi Mass (SBN 189649)
ACLU FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-1478
E-mail: aschlosser@aclu.org

*Attorneys for Plaintiff Central Labor Council of Alameda County*

David A. Rosenfeld (SBN 58163)
Manjari Chawla (SBN 218556)
WEINBERG, ROGER & ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501-1091
Telephone: (510) 337-1001
Facsimile: (510) 337-1023
Email: drosenfeld@unioncounsel.net

*Attorneys for Plaintiffs San Francisco Labor Council, San Francisco Building and Construction Trades Council, and Central Labor Council of Alameda County*

I, Nik Theodore, declare as follows:

1. I am the Director of the Center for Urban Economic Development and Associate Professor of Urban Planning and Policy at the University of Illinois at Chicago. I have a BA in Political Science and Urban Studies from Macalester College, a Masters in Urban Planning and Policy from the University of Illinois at Chicago, and a PhD in Public Policy Analysis from the University of Illinois at Chicago. I have published more than 100 academic articles, book chapters, and technical reports on low-wage work, economic development, immigration and other topics, including informal labor markets and temporary work. In 2003 I co-authored a research study on the impact of the Social Security Administration's (SSA) "no-match" letter policy on workers and employers.

2. I have been retained by the plaintiffs in *American Federation of Labor-Congress of Industrial Organizations v. Chertoff* to provide information about the Social Security Administration's "no-match letters" and to analyze the likely impact of the new regulation by the Department of Homeland Security (DHS) on employers and employees.

3. I have reviewed the new DHS regulation and the accompanying guidance letter explaining the regulation. The information in this declaration is based upon these documents, my past research on SSA no-match letters, as well as my overall training and expertise in labor market research and public policy analysis.

4. As described more fully below:

(a) the SSA Earnings Suspense File (ESF) contains more than 255 million records, and although precise figures are unknown – even to SSA – a substantial number of these records belong to U.S. citizens and non-citizens who are authorized to work;

(b) the SSA database contains tax records and was not designed to collect or provide information about work-authorization status. There are no data to support the conclusion that a mismatched SSA record is a reliable indicator that an employee lacks work authorization;

(c) empirical research demonstrates that in the past when SSA has sent no-match letters to employers – and even though those letters expressly cautioned employers not to assume that the no-match letter is an indication that the employee lacks work authorization – there has been the widespread practice among employers of discharging those employees listed in the letters. The evidence indicates that the discharges in response to SSA no-match letters affected lawfully employed, authorized workers; and

(d) the new DHS regulation is highly likely to magnify the demonstrated negative effects of employer sanctions and SSA no-match letters. As a result, the DHS regulation will likely result in widespread discriminatory terminations of lawfully authorized workers based on national origin, a swelling of "off the books" employment, and major and immediate disruptions in the workforce.

## I. The Social Security Administration Database

5. Under Title II of the Social Security Act, SSA is required to maintain records of wages paid by employers. At the end of each tax year, employers report employees' earnings to SSA and the Internal Revenue Service through the Wage and Tax Statement (IRS form W-2). SSA then posts reported earnings for every employee to an earnings record in the Master Earnings File. In instances where SSA cannot match an employee's Social Security number and name as reported on the W-2, the employee's earnings are posted to the ESF.

6. The purpose of the SSA database is to collect earnings, and it is not designed to collect information on immigration status. The records in the database always have been and still do come from tax information, and they have nothing to do with immigration status.

7. Each year SSA posts billions of dollars to the ESF because employee names and Social Security numbers on wage filings do not match records in SSA databases. In an effort to reduce the size of the ESF and to properly allocate contributions to workers' accounts, SSA sends "no-match" letters to employers as part of its Educational Correspondence program. Under this program, when SSA detects a mismatched name and Social Security number on a filed wage report, a letter is mailed to notify the employer of the problem. As of 2005, the ESF contained more than 255 million mismatched records, growing at a rate of 8 million to 11 million records a year (GAO,

2006a: 8). In recent years, approximately 4 percent of employee earnings reports have been posted to the ESF (GAO, 2006b: 8).

8. There are a number of reasons an employee's Social Security number as reported on his/her W-2 might trigger a no-match letter. Common reasons include: (a) an error in the spelling of an employee's name or a transposition of numerals in the reported Social Security number; (b) an unreported name change following a marriage or divorce; (c) an incomplete or missing name on the W-2. Foreign-born workers are more likely to be identified in no-match letters because they often (a) use compound maternal or paternal last names; (b) have commonly misspelled names; and (c) may inconsistently spell their names on various legal documents. Finally, workers who once were employed without authorization but have since obtained legal status and a valid Social Security number may continue to work under the old Social Security number for fear of losing their job.

9. A recent GAO (2006a: 8, emphasis added) report concluded that the ESF "[c]ontains information about many U.S. citizens as well as noncitizens" and that "the overall percentage of unauthorized workers is *unknown.*" When SSA has ultimately been able to resolve discrepancies "most ... belong to U.S.-born citizens," not to unauthorized workers (ibid). "This is an indication that a significant number of earnings reports in the [ESF] belong to U.S. citizens and work-authorized noncitizens" (ibid). There is simply no data to support the conclusion that a mismatched SSA record is a reliable indicator that the employee lacks work authorization.

## II. Past Experience with SSA No-Match Letters

10. Empirical research demonstrates that SSA no-match letters have caused (a) a widespread and large-scale employer practice of discriminatorily discharging workers, including those with valid work authorization; (2) a swelling in off-the-books employment; and (3) major and immediate disruptions in the workforce.

*The widespread practice of terminating employees identified in no-match letters*

11. With regard to the prevalence and extent of employee firings following the receipt of an employer no-match letter, our survey conducted in 2003 of 921 workers employed by 342 companies in 18 states who were identified in no-match letters sent to their employers (hereafter referred to the No-Match Letter Survey) (Mehta, Theodore, and Hincapie, 2003) found evidence of mass layoffs following the receipt of a no-match letter by an employer. Responses to the No-Match Letter Survey reveal that in most cases (54 percent), employers responded to the receipt of a no-match letter by discharging listed employees. Given that more than half of employers identified in the survey discharged workers with unmatched Social Security Numbers, the 950,000 no-match letters sent to employers in 2002 likely resulted in the termination of employment of tens of thousands of workers.

12. It is noteworthy, however, that employers discharged workers despite guidance from SSA that such action may be unwarranted and even unlawful. SSA's clearly stated

position was that an employer should not take actions against any employee because of a no-match letter. For example, in the 2003 employer no-match letter, the agency advises employers that, because the letters in many cases do not signal unlawful employment,

> You should not use this letter to take any adverse action against an employee just because his or her Social Security number appears on the list, such as laying off, suspending, firing or discriminating against that individual. Doing so could, in fact, violate state or federal law and subject you to legal consequences.

13. In many instances, despite clear instructions in the no-match letter, employers indiscriminately fired workers with unmatched Social Security numbers. We noted that authorized workers who are immigrants from Latin America are especially vulnerable because employers might assume they are undocumented based on their national origin. In addition, we found evidence that employees reporting that they are authorized workers have been fired and not reinstated after their employer received a no-match letter.

14. Our research findings demonstrate that in the majority of cases considered, employers took precipitous action and terminated employees, even when those employers did not have any knowledge, constructive or otherwise, about the immigration status of employees. Furthermore, our study revealed that work-authorized employees were discharged after their employer received a no-match letter.

*No-Match Letters have led to an Increase in Off-the-Books Employment*

15. Our research study noted that the SSA no-match letter program has resulted in a policy-induced churning in local labor markets because listed employees have been terminated in large numbers by their employers. This occurred despite SSA's caution that adverse action should not be taken against employees listed in the letter. This has fueled the growth in off-the-books employment and contingent work arrangements as employers have resorted to hiring workers through temporary staffing agencies, using cash payments to avoid filing W-2 forms, and other types of unregulated employment.

*No-Match Letters have Created Workplace Disruptions*

16. Our research found instances in which SSA no-match letters caused employers to experience major disruptions in workflow and diminished quality, thereby threatening their supplier and customer relations. No-match letters have disrupted competitive conditions within cornerstone industries in the American economy. From manufacturing to agriculture and services, the no-match letter program has disproportionately impacted labor-intensive industries and firms, potentially leading to significant economy-wide job losses and higher prices.

## III. Anticipated Effects of the DHS Regulation

17. Our research has documented the effects of SSA no-match letters on employers and employees, including mass firings of employees listed in no-match letters. These effects occurred, even though the SSA no-match letters expressly cautioned employers that the letters are not indicative of an employee's work-authorization status. However, the DHS regulation sends employers the strong signal that a no-match letter is indicative of an employee's work-authorization status. I believe, based on my past research and expertise in labor market research and public policy analysis, that the DHS regulation is therefore likely to magnify the demonstrated effects of employer sanctions and SSA no-match letters. That is, the DHS regulation will directly cause employers to terminate employees listed in no-match letters, particularly foreign-born workers, even though they are legally authorized to work.

*Employers are Likely to Treat DHS Regulation as Mandatory*

18. Although the regulation is phrased in terms of a "safe harbor," I believe that employers are likely to react to the regulation as though it imposes mandatory obligations. I have reviewed the regulation and the DHS letter explaining the regulation. The first question on the letter is whether the employer can "simply disregard the letter from SSA." The answer, printed in bold, is "No." The letter then goes on to list the steps the employer "should take" to resolve the mismatch. Even though the 2003 no-match letters expressly cautioned employers not to take adverse action against employees upon

receipt of said letters, our research found that a substantial percentage of employers nevertheless terminated employees listed in the no-match letters. Based on this past experience with employer responses to no-match letters, it is reasonable to conclude that the new regulation will, at a minimum, cause employers to take some action in response to the letters. Moreover employers are likely to feel compelled to follow the course of action set forth in the regulation including re-verifying the work authorization of employees who are listed in no-match letters.

*Discriminatory terminations of authorized workers based on national origin*

19. Existing research also leads me to conclude that the DHS regulation is likely to magnify the discriminatory terminations of authorized workers based on national origin that have been documented to result from employer sanctions and SSA no-match letters.

20. Research by the GAO (1990: 1, 6) found "widespread discrimination" by employers charged with verifying the employment eligibility of workers under the Immigration Reform and Control Act (IRCA). In testimony before the United States Senate Committee on the Judiciary, the GAO reported results from a hiring audit in which matched pairs of persons with substantially similar employment qualifications applied for jobs. For this study, "One member of each pair was a 'foreign-appearing, foreign-sounding' Hispanic and the other was an Anglo with no foreign accent" (Ibid: 2). The GAO concluded that "national origin discrimination … does exist at levels that amount to more than 'just a few isolated cases' and constitutes 'a serious pattern of

discrimination" (Ibid: 5). Although the survey did not indicate whether affected persons were authorized to work, the GAO stated that "we believe it is reasonable to assume that many eligible workers were affected" (Ibid). Moreover, the discrimination found was not a reflection of existing discriminatory practices arising from other public policies or pre-existing employer practices; rather, the discriminatory employer responses documented in the study "represent 'new' national origin discrimination that would not have occurred" without the policy in question (Ibid: 6). Furthermore, the GAO deemed the discrimination identified in the study to be "a serious problem of national origin discrimination" that was "exacerbated" by the policy and that also "resulted in citizenship discrimination" (Ibid: 7).

21. The GAO concluded that " an estimated 227,000 employers ... began a practice, as a result IRCA, not to hire job applicants whose foreign appearance or accent led them to suspect they might be unauthorized aliens ... [and] an estimated 346,000 employers ... applied IRCA's verification system only to persons who had a 'foreign' appearance or accent" (Ibid: 5). "[A]n additional 430,000 employers ... began hiring only persons born in the United States or not hiring persons with temporary work eligibility documents. These practices are illegal and can harm people, particularly those of Hispanic or Asian origin" (Ibid: 7).

22. Given the widespread discrimination that the GAO found to occur because of IRCA's requirements that employers verify work authorization at the initial time of hire, it is reasonable to conclude that similar discrimination will also occur if employers are

required to re-verify work authorization after employment has commenced. The new DHS regulation effectively requires an employer to re-verify the work authorization of employees once it receives the no-match latter. Given GAO's findings of discrimination it is fair to conclude that the new DHS regulation will similarly result in widespread discrimination against authorized workers.

23. The evaluation of the Basic Pilot provides further insights into the problems that authorized workers face as a result of the no-match letter program. The Basic Pilot operates much like employer no-match letters except that the intent of Basic Pilot is to confirm at the point of hire whether new employees are authorized to work in the United States. When employers submit (electronically or telephonically) Social Security numbers of newly hired employees into the Basic Pilot and Social Security numbers do not match records in SSA's database, employers are notified that SSA cannot confirm the validity or correctness of the employee's Social Security number. When the Basic Pilot issues this "tentative non-confirmation" of a worker's Social Security number, it is analogous to SSA sending employers a no-match letter. The Basic Pilot is problematic because it frequently is unable to confirm Social Security numbers belonging to a substantial number of authorized workers. A Temple University and Westat study indicated that the Basic Pilot failed to initially confirm the work authorization status of 22 percent of employees who were in fact authorized to work, in part because SSA's database contains inaccurate information (authors' calculation based on DOJ, INS 2002).

24. Many newly hired employees whose work authorization status was tentatively unconfirmed by the Basic Pilot experienced some form of adverse action by their employer (DOJ, INS 2002). For example, among workers whose Social Security number was initially unconfirmed:

- 28 percent reported that the pilot employer withdrew the job offer (implying that they were not even given an opportunity to resolve the problem and possibly that the employer used the Basic Pilot as a pre-employment screening tool which is prohibited); and
- 45 percent reported they were not allowed to continue working while correcting their records, had their pay cut, or had their job training delayed despite the prohibition that employers take adverse action against employees who are contesting the tentative non-confirmation or who are attempting to correct their information.

25. The inability of SSA's no-match letter program and the Basic Pilot to consistently confirm the Social Security numbers of authorized workers should be anticipated. Reporting errors on the part of employers or workers and errors in SSA's own databases are to be expected and, when these errors occur, SSA may be unable to confirm that authorized workers have a valid Social Security number. However, the negative consequences for these human errors can be substantial, particularly for authorized workers who are immigrants from Latin American countries. Employers have come to see the no-match letter as a signal that workers identified in the letter are undocumented,

especially if they are of Latin American origin. As discussed above, however, there is no data to support the assumption that no-match letters indicate the individual lacks work authorization. This employer attitude is perhaps irreversible given the public prominence the no-match letter program has achieved. The new DHS regulation will exacerbate this situation by attributing immigration significance to the no-match letter. In this environment, the impact of errors on authorized workers becomes magnified.

*The DHS Regulation will Result in a Swelling of Off-the-Books Employment*

26. By recasting SSA no-match letters as immigration-enforcement documents and therefore drawing an explicit link in the minds of employers between the issuance of a no-match letter and the lack of work-authorization of some or all employees listed in the letter, the DHS is exacerbating the problem of work that is unmonitored, unregulated, and off the books. It is likely that as employers seek to avoid the workplace disruptions that will be caused by the DHS rule, many will turn to off-the-books employment as a way to circumvent the rule. This will mitigate the effectiveness of the rule, while leading to the unintended consequence of driving more work into the unregulated economy.

*The DHS Regulation will Result in Workplace Disruptions*

27. Similarly, transforming the SSA no-match letter into an immigration-enforcement tool will compound the already-documented workplace disruptions caused by no-match

letters, including disruptions in workflow, job losses (especially in labor-intensive industries), and higher consumer prices.

## IV. Other issues

28. I have been informed that the AFL-CIO is affiliated with 55 unions that have a collective membership of 10 million workers. Because approximately 4 percent of earnings reports submitted to SSA are posted to the ESF, it is reasonable to conclude that hundreds of thousands of workers who belong to AFL-CIO-affiliated unions have earnings reports posted to the ESF and thus may be the subject of a no-match letter. Based on overall data regarding the ESF, it is also reasonable to conclude that a significant number of these hundreds of thousands of members of AFL-CIO- affiliated unions are U.S. citizens or non-citizens who are authorized to work.

## References

U.S. DOJ, INS [Department of Justice, Immigration and Naturalization Service] (2002). *INS Basic Pilot Evaluation Summary Report*. Prepared by the Institute for Survey Research, Temple University, Washington D.C., and Westat, Rockville, MD.

GAO [Government Accountability Office] 2006a. *Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work.* Washington, DC: GAO.

GAO [Government Accountability Office] 2006b. *Social Security Numbers: Coordinated Approach to SSN Data Could Help Reduce Unauthorized Work.* Washington, DC: GAO.

GAO [General Accounting Office] 1990. *Immigration Reform: Employer Sanctions and the Question of Discrimination.* Washington, DC: GAO.

Mehta, C., Theodore, N. Hincapie, M. 2003. *Social Security Administration's No-Match Letter Program: Implications for Immigration Enforcement and Workers' Rights.* Chicago: Center for Urban Economic Development, University of Illinois at Chicago.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 27 day of August 2007 at Chicago, Illinois.