1   Stephen P. Berzon (SBN 46540)
    Scott A. Kronland (SBN 171693)
2   Jonathan Weissglass (SBN 185008)
    Linda Lye (SBN 215584)
3   Danielle E. Leonard (SBN 218201)
    ALTSHULER BERZON LLP
4   177 Post Street, Suite 300
    San Francisco, CA 94108
5   Telephone: (415) 421-7151
    Facsimile: (415) 362-8064
6   Email: skronland@altshulerberzon.com
    Email: llye@altshulerberzon.com
7   Email: dleonard@altshulerberzon.com

8   *Attorneys for Plaintiffs*

9   Jonathan P. Hiatt (SBN 63533) ((*Pro Hac Vice* Application pending)
    James B. Coppess
10  Ana L. Avendaño (SBN 160676)
    AFL-CIO
11  815 Sixteenth Street, N.W.
    Washington, D.C. 20006
12  Telephone: (202) 637-5053
    Facsimile: (202) 637-5323
13  Email: aavendano@aflcio.org

14  *Attorneys for Plaintiff AFL-CIO*

15  (Counsel list continued on next page)

16              UNITED STATES DISTRICT COURT

17             NORTHERN DISTRICT OF CALIFORNIA

18  AMERICAN FEDERATION OF LABOR AND           ) Case No. 07-4472-CRB
    CONGRESS OF INDUSTRIAL ORGANIZATIONS;      )
19  SAN FRANCISCO LABOR COUNCIL; SAN           )
    FRANCISCO BUILDING AND CONSTRUCTION        ) **FIRST AMENDED COMPLAINT**
20  TRADES COUNCIL; and CENTRAL LABOR COUNCIL  ) **FOR DECLARATORY AND**
    OF ALAMEDA COUNTY,                         ) **INJUNCTIVE RELIEF**
21                                             )
                 Plaintiffs,                   )
22          v.                                 )
                                               )
23  MICHAEL CHERTOFF, Secretary of Homeland Security; )
    DEPARTMENT OF HOMELAND SECURITY;           )
24  JULIE MYERS, Assistant Secretary of Homeland )
    Security; U.S. IMMIGRATION AND CUSTOMS     )
25  ENFORCEMENT; MICHAEL ASTRUE, Commissioner  )
    of Social Security; and SOCIAL SECURITY    )
26  ADMINISTRATION,                            )
                                               )
27               Defendants.                   )
    _____)
28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, Case No. 07-4472-CRB

1    (Counsel list continued from first page)

2    Linton Joaquin (SBN 73547)
      Marielena Hincapié (SBN 188199)
3    Monica T. Guizar (SBN 202480)
      NATIONAL IMMIGRATION LAW CENTER
4    3435 Wilshire Blvd., Suite 2850
      Los Angeles, CA 90010
5    Telephone: (213) 674-2850
      Facsimile: (213) 639-3911
6    Email: guizar@nilc.org

7    Lucas Guttentag (SBN 90208)
      Jennifer C. Chang (SBN 233033)
8    Mónica M. Ramírez (SBN 234893)
      AMERICAN CIVIL LIBERTIES UNION FOUNDATION
9    Immigrants' Rights Project
      39 Drumm Street
10   San Francisco, CA 94111
      Telephone: (415) 343-0770
11   Facsimile: (415) 395-0950
      E-mail: jchang@aclu.org
12
      Omar C. Jadwat (*Pro Hac Vice* Application pending)
13   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
      Immigrants' Rights Project
14   125 Broad Street, 18th Floor
      New York, NY 10004
15   Telephone: (212) 549-2620
      Facsimile: (212)-549-2654
16   Email: ojadwat@aclu.org

17   Alan L. Schlosser (SBN 49957)
      Julia Harumi Mass (SBN 189649)
18   ACLU FOUNDATION OF NORTHERN CALIFORNIA
      39 Drumm Street
19   San Francisco, CA 94111
      Telephone: (415) 621-2493
20   Facsimile: (415) 255-1478
      E-mail: aschlosser@aclu.org
21
      *Attorneys for Plaintiff Central Labor Council of Alameda County*
22
      David A. Rosenfeld (SBN 58163)
23   Manjari Chawla (SBN 218556)
      WEINBERG, ROGER & ROSENFELD
24   A Professional Corporation
      1001 Marina Village Parkway, Suite 200
25   Alameda, California 94501-1091
      Telephone: (510) 337-1001
26   Facsimile: (510) 337-1023
      Email: drosenfeld@unioncounsel.net
27
      *Attorneys for Plaintiffs San Francisco Labor Council,*
28   *San Francisco Building and Construction Trades Council,*
      *and Alameda County Central Labor Council*

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, Case No. 07-4472-CRB

1  Plaintiffs allege as follows:

2  **INTRODUCTION**

3        1.        This action challenges a new Department of Homeland Security ("DHS") rule that

4  would commandeer the Social Security tax system for immigration-enforcement purposes.  The new

5  rule would place in jeopardy the jobs of  U.S. citizens and non-citizens legally authorized to work

6  simply because of discrepancies in the government's error-prone Social Security earnings database.

7  The rule also would provide a further incentive for unauthorized work to take place off-the-books,

8  causing the government to lose Social Security taxes now paid on those wages.

9        2.        The new rule, "Safe Harbor Procedures for Employers That Receive a No Match

10  Letter," 72 Fed. Reg. 45611 (Aug. 15, 2007), would threaten employers with liability for illegally

11  employing unauthorized workers if the employer receives a "no-match" letter from the Social

12  Security Administration ("SSA"), unless the employer complies with specified "safe harbor"

13  procedures.  Those procedures include terminating employees who cannot resolve data

14  discrepancies within 90 days.  But the SSA's no-match letters, which SSA sends to employers when

15  an employee name and Social Security number on a W-2 form do not match the SSA database, have

16  nothing to do with a worker's immigration status.  The new rule greatly expands liability in a

17  manner contrary to the governing statute adopted by Congress.

18        3.        The new rule also violates the Administrative Procedure Act's prohibition on

19  arbitrary and capricious agency action, 5 U.S.C. §706(2)(A), because DHS has failed to engaged in

20  reasoned decision-making.  The DHS rule is not predicated on any finding that SSA no-match

21  letters are a reliable indicator of immigration status.  Moreover, the agency reversed its

22  interpretation of an employer's obligations upon receiving SSA no-match letters without providing a

23  reasoned explanation for that reversal.

24        4.        This action further alleges that the Defendants' plan to implement the new rule

25  exceeds the authority that Congress granted to DHS and SSA.  Congress carefully balanced many

26  policies in adopting and amending the nation's immigration laws and tax laws. Whether to now

27  begin using SSA's confidential earnings database for immigration-enforcement purposes is a

28  decision only Congress can make.

1    5.    Plaintiffs seek a temporary restraining order, preliminary injunction, and permanent

2    injunction to prohibit Defendants from implementing the new rule and a declaratory judgment that

3    the new rule is invalid.

4    **JURISDICTION**

5    6.    This Court has jurisdiction over the claims alleged in this Complaint pursuant to

6    28 U.S.C. §1331 (federal question), 28 U.S.C. §2201 (declaratory relief), and 5 U.S.C. §§701-706

7    (Administrative Procedures Act).

8    **VENUE AND INTRA-DISTRICT ASSIGNMENT**

9    7.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(e) because Plaintiffs San

10   Francisco Labor Council, San Francisco Building and Construction Trades Council, and Central

11   Labor Council of Alameda County reside in this judicial district.

12   8.    Pursuant to Local Rule 3-2(d), an intra-district assignment to the San Francisco or

13   Oakland Division is proper because a substantial part of the events giving rise to the claims in this

14   action will occur in the County of San Francisco.  Plaintiffs San Francisco Labor Council and San

15   Francisco Building and Construction Trades Council reside in the City and County of San

16   Francisco, Defendant Social Security Administration maintains a Regional Office in San Francisco,

17   and Plaintiff American Federation of Labor and Congress of Industrial Organizations' affiliated

18   unions have members employed in San Francisco who would be subject to the challenged

19   government action.

20   **PARTIES**

21   9.    Plaintiff American Federation of Labor and Congress of Industrial Organizations

22   ("AFL-CIO") is a labor federation comprised of 55 national and international labor unions that

23   collectively represent more than ten million working men and women throughout the United States,

24   in virtually every type of job and industry.  The mission of the AFL-CIO is to serve as an advocate

25   for workers, to improve the lives of working families, and to bring fairness and dignity to the

26   workplace, including by fighting discrimination.  The AFL-CIO sues on behalf of itself, its affiliated

27   unions, and the members of its affiliate unions.

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, Case No. 07-4472-CRB    2

1    10.    In the past, many workers represented by AFL-CIO affiliated unions who are U.S.

2    citizens or non-citizens lawfully working in the United States have been the subject of every round

3    of "no-match" letters sent by the SSA to employers.  The Government Accountability Office reports

4    that about four percent of all Forms W-2 submitted by employers report earnings that cannot be

5    matched with SSA records and that are therefore placed in SSA's Earnings Suspense File.  On

6    information and belief, the AFL-CIO's affiliated unions represent tens of thousands or hundreds of

7    thousands of workers who are lawfully working in the United States but have earnings in the

8    Earnings Suspense File and are likely to be the subject of SSA no-match letters issued in the future.

9    11.    Plaintiff San Francisco Labor Council is a labor federation comprised of about 150

10    affiliated member unions that collectively represent more than 150,000 men and women working in

11    San Francisco.  The mission of San Francisco Labor Council is to improve the lives of workers,

12    their families, and others by bringing economic justice to the workplace and social justice to the

13    community.  In the past, lawfully authorized workers represented by the San Francisco Labor

14    Council's affiliates have been the subject of no-match letters issued by the SSA and upon

15    information and belief are likely to be the subject of no-match letters issued in the future.  The San

16    Francisco Labor Council sues on behalf of itself, its affiliated unions, and the members of its

17    affiliate unions.

18    12.    Plaintiff San Francisco Building and Construction Trades Council is a labor

19    organization consisting of 28 affiliates who collectively represent approximately 10,000 building

20    and construction trade workers in San Francisco.  San Francisco Building and Construction Trades

21    Council is dedicated to representing and protecting the interests of San Francisco's building and

22    construction trades workers.  In the past, lawfully authorized workers represented by the San

23    Francisco Building and Construction Trades Council's affiliates have been the subject of no-match

24    letters issued by the SSA and upon information and belief are likely to be the subject of no-match

25    letters issued in the future. The San Francisco Building and Construction Trades Council sues on

26    behalf of itself, its affiliated unions, and the members of its affiliate unions.

27    13.    Plaintiff Central Labor Council of Alameda County ("Alameda County CLC"), a

28    chartered affiliate of the AFL-CIO, is a local labor federation whose affiliates are 130 labor unions

1  that collectively represent more than 76,000 diverse workers working in Alameda County in private

2  industry and public institutions.  These workers together speak nearly 100 languages and hail from

3  scores of countries.  The Alameda County CLC advocates for workers so that they can earn a better

4  living and is committed to fighting workplace discrimination.  It has also led campaigns to pass

5  living wage ordinances to improve conditions for non-members, with which the Alameda County

6  CLC often works on a variety of public interest causes related to minimum wage laws, healthcare,

7  quality schools and affordable housing.  The Alameda County CLC sues on behalf of itself, its

8  affiliated unions, and the members of its affiliate unions.

9        14.    Members of the Alameda County CLC's affiliated unions who are U.S. citizens or

10  non-citizens authorized to work have been the subject of SSA "no-match" letters in the past.  These

11  letters have significantly impacted low-income workers of Latin American and Asian descent who

12  use compound last names or inconsistently transliterate their names, which may result in inadvertent

13  errors or discrepancies in their SSA records.  Employers have harassed and intimidated many of

14  these workers, especially those who work in construction, manufacturing, healthcare and the

15  expanding service and janitorial sector, because of "no-match" letters.  The Alameda County CLC is

16  less able to organize and advocate for workers effectively when workers fear "no-match" abuse by

17  employers.  Upon information and belief, members of the Alameda County CLC's affiliated unions

18  who are authorized to work are likely to be the subject of no-match letters issued in the future.

19        15.    Plaintiffs AFL-CIO, San Francisco Labor Council, San Francisco Building and

20  Construction Trades Council, and Central Labor Council of Alameda County are also employers

21  subject to the Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C. §1324a-§1324b.

22        16.    Defendant Michael Chertoff is the Secretary of the Department of Homeland

23  Security and is responsible for all functions of DHS and its component organizations.  He is sued in

24  his official capacity.

25        17.    Defendant Department of Homeland Security is a federal agency charged with, *inter*

26  *alia*, the administration and enforcement of federal immigration laws.  DHS promulgated the rule

27  entitled "Safe Harbor Procedures for Employers That Receive a No Match Letter," 72 Fed. Reg.

28  45611 (Aug.15, 2007), that is challenged in this litigation.

1    18.    Defendant U.S. Immigration and Customs Enforcement ("ICE") is a federal agency

2    within DHS responsible for investigating and enforcing immigration laws, including 8 U.S.C.

3    §1324a.  DHS and ICE created the Guidance Letter regarding the DHS Final Rule that the SSA

4    intends to send to employers along with its "no-match" letters.

5    19.    Defendant Julie Myers is the Assistant Secretary of Homeland Security for ICE and

6    is responsible for all functions of ICE and its component organizations.  She is sued in her official

7    capacity.

8    20.    Defendant Social Security Administration is a federal agency charged with

9    administration of the Social Security Act, and with processing tax information for the purpose of

10    administering the Social Security program.  Defendant SSA maintains databases of tax information

11    and periodically generates "no-match" letters to employers that submit Forms W-2 to report

12    employee earnings if employee names and Social Security Numbers do not match SSA records.  *See*

13    42 U.S.C. §432; 20 C.F.R. §422.120.  Beginning on September 4, 2007, defendant SSA intends to

14    send the DHS/ICE Guidance Letter to employers along with its "no-match" letters.

15    21.    Defendant Michael Astrue is the Commissioner of Social Security and is responsible

16    for all programs administered by the SSA.  He is sued in his official capacity.

## BACKGROUND

### Social Security Administration "No Match" Letters

19    22.    The Social Security Act of 1935 authorizes the SSA to establish a record-keeping

20    system to manage the Social Security program.  Congress also granted SSA authority to process tax

21    information for purposes of administering the Social Security program, as a specific exception to the

22    exclusive tax authority of the Internal Revenue Service ("IRS").  *See* 26 U.S.C. §6103 (l)(5); 42

23    U.S.C. §432.  Pursuant to that delegation of authority, the IRS and SSA created a joint system for

24    the processing of Forms W-2 called the Combined Annual Wage Reporting System ("CAWR").  43

25    Fed. Reg. 60158 (Dec. 26, 1978) (codified at 26 C.F.R. §31.6051).

26    23.    Under the CAWR, employers annually report employee earnings using Forms W-2,

27    and SSA posts those earnings to individual workers' Social Security records so workers will receive

28    credit for those earnings when they apply for Social Security.  The SSA then forwards the Forms W-

1    2 to the IRS.

2        24.    If the SSA cannot match the name and Social Security Number ("SSN") on a Form

3    W-2 with SSA's records, the SSA places the earnings report in its Earnings Suspense File.  *See*

4    20 C.F.R §422.120.  The earnings remain in the Earnings Suspense File until SSA can link them to

5    a name and SSN.

6        25.    Every year, the SSA receives millions of earnings reports that the SSA cannot match

7    with its records.  The Earnings Suspense File is a huge database that contains more than 255 million

8    unmatched earnings records and that is growing at the rate of 8 to 11 million unmatched records per

9    year.  About four percent of annual Form W-2 earnings reports are placed in the SSA's Earnings

10   Suspense File.

11       26.    Although some mismatched SSA records result from employees without work

12   authorization using false SSNs, there also are many reasons unrelated to immigration status for

13   mismatched records.  These include a) clerical errors by either an employer or the SSA in spelling

14   an employee's name or recording the SSN; b) the SSA's issuance of duplicate SSNs or reissuance of

15   SSNs of deceased individuals; c) employee name changes after marriage or divorce; d) employees

16   that use a less "foreign" sounding first name for work purposes; and e) different naming conventions

17   (such as the use of multiple surnames) that are commonplace in many parts of the world,

18   particularly in some Latin American and Asian countries.

19       27.    The most recent Government Accountability Office ("GAO") report on the SSA's

20   Earnings Suspense File concluded that the file "[c]ontains information about many U.S. citizens as

21   well as non-citizens" and that "the overall percentage of unauthorized workers is *unknown*."  GAO-

22   06-814R, at 8 (emphasis added).  When the SSA ultimately has been able to resolve data

23   discrepancies, "most . . . belong to U.S.-born citizens, not to unauthorized workers," which GAO

24   concluded "is an indication that a significant number of earnings reports in the [Earnings Suspense

25   File] belong to U.S. Citizens and work-authorized noncitizens."  *Id.*

26       28.    As part of its administration of the Social Security program, SSA periodically sends

27   out letters, commonly known as "no-match" letters, informing employers that SSNs and employee

28   names reported on Forms W-2 did not match SSA's records.  *See* 20 C.F.R. § 422.120.

29.    SSA no-match letters are purely advisory.  SSA has no authority to sanction employers that fail to respond to no-match letters.

30.    Pursuant to its regulations, SSA notifies the IRS of incomplete or inaccurate earnings reports.  20 C.F.R. §422.120.  In 1986, Congress authorized IRS to impose sanctions on employers that submit false or inaccurate tax information.  26 U.S.C. §6721; *see also* 26 C.F.R. §301.6721-1.  Under IRS regulations, an employer is not subject to sanction if the employer accurately and in good faith transmits the name and SSN provided by an employee.  26 U.S.C. §6724(a); 26 C.F.R. §301.6724-1.  Insofar as the Internal Revenue Code is concerned, a reasonable employer response to a no-match letter is to confirm that the employer is accurately transmitting the name and SSN provided by the employee and to advise the employee that SSA is reporting a no-match. *Id.*

31.    SSA is not an immigration agency and does not know whether a particular SSN listed in a no-match letter relates to unauthorized work.   SSA also is prohibited by tax privacy statutes from sharing the information in the Earnings Suspense File with the DHS.  Until now, SSA's no-match letters explained to employers: "This letter does not imply that you or your employee intentionally gave the government wrong information" and "makes no statement regarding an employee's immigration status."   Until now, the SSA has never included information from an immigration-enforcement agency with its no-match letters.

**Employer Verification of Work Authorization and Employer Sanctions**

32.    The Immigration Reform and Control Act of 1986 ("IRCA") made it unlawful for employers to "to hire . . . for employment in the United States an alien *knowing* the alien is an unauthorized alien."  8 U.S.C. §1324a(a)(1)(A) (emphasis added).

33.    IRCA also separately made it unlawful for employers to hire without complying with an initial verification process established by Congress.  8 U.S.C. §1324a(a)(1)(B).  That verification process requires the employee to present the employer with documents to show proof of identity and work authorization and requires the employer and employee to complete an I-9 verification form. 8 U.S.C. §1324a(b); 8 C.F.R. §274a.2.

34.    IRCA also makes it unlawful for an employer "to continue to employ an alien . . .
*knowing* the alien is (or has become) an unauthorized alien with respect to such employment."  8
U.S.C. §1324a(a)(2) (emphasis added).

35.    IRCA specifically exempted workers hired before IRCA's enactment on November
6, 1986, from the hiring prohibition and the verification process.  Pub. L. No. 99-603 § 101(a)(3),
100 Stat. 3359 (1986) (codified at 8 U.S.C. § 1324a note).

36.    Employers that violate IRCA are subject to civil and criminal liability.  8 U.S.C.
§1324a(e)(4)-(5), (f).

37.    At the same time that Congress imposed employer sanctions, Congress also wanted
to prevent employer discrimination based on national origin or citizenship status.  IRCA therefore
makes it illegal for employers to discriminate based on national origin or citizenship status,
including by requesting "more or different documents than are required" for the initial I-9
verification or "refusing to honor documents . . . that on their face reasonably appear to be genuine."
8 U.S.C. §1324b(a)(1),(6).

38.    Congress intentionally did not impose in IRCA any employment authorization
verification for existing employees.  Congress also chose not to impose ongoing re-verification
requirements after the initial hire.

**New Department of Homeland Security Rule**

39.    Until now, neither DHS nor its predecessor immigration-enforcement agencies had
taken the position that an employer's failure to inquire into the work-authorization status of an
employee subject to an SSA no-match letter meant that the employer had knowledge that it was
employing an unauthorized worker.  The Immigration and Naturalization Service had recognized
that no-match discrepancies occur for many innocent reasons and therefore consistently advised
employers in opinion letters that "[w]e would not consider notice of this discrepancy from SSA to
an employer by itself to put the employer on notice that the employee is unauthorized to work."

40.    On June 14, 2006, DHS gave notice of a proposed rule that would address the
responsibilities of employers that receive SSA no-match letters.  More than 5,000 comments were
received by DHS during the 60-day comment period, including comments that disputed DHS'

1    authority to adopt the rule.  Plaintiff AFL-CIO was among those who submitted comments objecting

2    to the rule.  After the comment period closed on August 14, 2006, the proposed rule lay dormant for

3    a year.

4           41.      Shortly after Congress left for recess without enacting immigration reform

5    legislation urged by DHS, the agency issued a final rule on August 15, 2007 (hereinafter, the "DHS

6    Final Rule").   The DHS Final Rule is entitled "Safe-Harbor Procedures for Employers Who

7    Receive a No-Match Letter" and published at 72 Fed. Reg. 45611.  The DHS Final Rule will

8    become legally effective on September 14, 2007.

9           42.      The DHS Final Rule will amend the definition of "*knowing*" in 8 C.F.R.

10   §274a.1(l)(1), the regulatory subsection that purports to define the term "knowing" for purposes of

11   IRCA.   The amended regulation will list, as an example of an employer that has "constructive

12   knowledge" that an employee is an "unauthorized alien," an employer that receives a SSA no-match

13   letter and then "fails to take reasonable steps."   The first part of the amended regulation will

14   provide:

15        (1)(1) The term *knowing* includes having actual or constructive knowledge. . . .
          Examples of situations where the employer may, depending upon the totality of the
16        relevant circumstances, have constructive knowledge that an employee is an
          unauthorized alien include, but are not limited to, situations where the employer:
17          . . . .
            (iii) Fails to take reasonable steps after receiving information indicating that the
18        employee may be an alien who is not employment authorized, such as –
            . . . .
19           (B) Written notice to the employer from the Social Security Administration
          reporting earnings on a Form W-2 that employees' names and corresponding social
20        security account numbers fail to match Social Security Administration records . . . .

21          43.      Having created a threat of IRCA liability for employers receiving SSA no-match

22   letters, the DHS Final Rule then offers employers a "safe harbor."   An employer receiving a SSA

23   no-match letter "will be considered by the Department of Homeland Security to have taken

24   reasonable steps – and receipt of the written notice will therefore not be used as evidence of

25   constructive knowledge – if the employer" takes the actions specified by DHS.    These are "the only

26   combination of steps that will guarantee that DHS will not use the employer's receipt of the notices

27   from SSA . . . as evidence of constructive knowledge that an employee is an unauthorized alien."

28   72 Fed. Reg. at 45618.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, Case No. 07-4472-CRB    9

44.     To qualify for the DHS "safe harbor," an employer must check its own records within 30 days of receipt of an SSA no-match letter to determine if the no-match was the result of its own clerical error.  If the employer determines the no-match was not the result of its own clerical error, it must instruct an employee who claims the name and SSN are correct to resolve the discrepancy with SSA within 90 days after receipt of the employer's receipt of the no-match letter. If the employee is unable to resolve the discrepancy with SSA within 90 days of the employer's receipt of the no-match letter, the employer cannot continue to employ the worker unless the worker can complete within three days a new immigration verification, on a new I-9 form, using only documents that contain photo identification and no documents that contain the disputed SSN, even if the employee still insists the SSN is correct.  The DHS "safe harbor" thus provides employees only 60 days to resolve the discrepancy with SSA because the DHS rule gives the employer 30 days to check its own records, and only after this initial step is complete need it advise the employee of the no-match.  If employees insist their names and SSNs on their identification documents are correct but have not resolved the discrepancy with SSA by the deadline, or cannot produce the required additional photo identification, the employer would have to fire them.

### Implementation of the DHS Final Rule by DHS and SSA

45.     On September 4, 2007, DHS and SSA intend to begin sending employers no-match letters that will be accompanied by a letter from DHS and ICE (hereinafter the "DHS/ICE Guidance Letter").  The DHS/ICE Guidance Letter states that it will "provide guidance on how to respond to the enclosed letter from the Social Security Administration (SSA) . . . in a manner that is consistent with your obligations under United States Immigration Laws."

46.     The DHS/ICE Guidance Letter contains questions and answers, which begin with the following:

**Q:     Can I simply disregard the letter from SSA?**

**A:     No.** You have received official notification of a problem that may have significant legal consequences for your employees.  If you elect to disregard the notice you have received and it is determined that some employees listed in the enclosed letter were not authorized to work, the Department of Homeland Security (DHS) could determine that you have violated the law by knowingly continuing to employ unauthorized persons.  This could lead to civil and criminal sanctions.

1   47.    After threatening employers with civil and criminal liability, the DHS/ICE Guidance

2   Letter then asks: **"Q:  What should I do?"** and responds that "You should" follow the steps set out

3   in the DHS Final Rule.

4   48.    The DHS/ICE Guidance Letter assures employers that, if they follow those

5   procedures for every no-match, they will not be liable for discrimination if they terminate

6   employees:

7   **Q:    Will I be liable for discrimination charges brought by the United States
        if I terminate the employee after I follow the steps outlined above?**

8   **A:    No. . . . ."**

9

10  49.    SSA has revised its no-match letters so that they direct employers to follow the

11  instructions in the accompanying DHS/ICE Guidance Letter.

12  50.    SSA and DHS intend to commence sending the revised no-match letters and the

13  DHS/ICE Guidance Letter to employers on September 4, 2007.  Between September 4, 2007 and

14  November 9, 2007, the SSA expects to mail no-match letters to approximately 140,000 employers

15  around the country.  Each letter will list at least 10 mismatched SSNs and some letters will list 500

16  or more.   Approximately 8.7 million employees will be affected by this initial wave of mailings.

17  51.    SSA will continue to mail additional batches of no-match letters after November 9,

18  2007, to hundreds of thousands of other employers.

19  **Effect of Implementation of the New DHS Final Rule**

20  52.    Adoption of the DHS Final Rule on September 14, 2007 will immediately impose

21  new obligations in violation of law on every employer governed by IRCA.  The imminent SSA

22  mailing on September 4, 2007 will immediately impose substantial administrative costs on at least

23  140,000 employers, and additional employers will be affected as SSA continues in the future to send

24  out no-match letters accompanied by the DHS/ICE Guidance Letter.

25  53.    A substantial portion of the several million no-match SSNs that are listed in the

26  initial round of SSA no-match letters will relate to U.S. citizens or non-citizens lawfully entitled to

27  work.  On information and belief, a substantial number of these workers are members of unions

28  affiliated with Plaintiffs.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, Case No. 07-4472-CRB    11

54.    Employees who are the subject of the SSA no-match letter and DHS/ICE Guidance Letter will immediately be stigmatized as presumptively "illegal aliens."

55.    The receipt of the SSA no-match letter and DHS/ICE Guidance Letter will lead some employers to immediately fire workers with SSN no-matches, even though they are lawfully entitled to work, because the worker's "foreign" appearance or accent causes the employer to fear IRCA liability.   Such firings have occurred in the past after no-match letters were issued, and the DHS Final Rule will exacerbate this problem.

56.    As a result of implementation of the DHS Final Rule, including the DHS/ICE Guidance Letter, lawfully employed workers will immediately be forced to expend time and effort to resolve SSA data discrepancies, including taking time off work without pay to visit SSA field offices that are open only during business hours and that will be overwhelmed with similar requests from other workers.

57.    Many lawfully employed workers, including members of Plaintiffs' affiliate unions, will be unable to resolve data discrepancies with the SSA bureaucracy within the nominal 90-day but actual 60-day deadline set out in the DHS Final Rule, and will for that reason be terminated from their jobs.  SSA already has told DHS that in "difficult cases," SSA may be unable to resolve discrepancies within even a 90-day timeframe.

58.    Plaintiff AFL-CIO has already devoted resources to commenting on the proposed rule to draw attention to the adverse impact of the rule on members of its affiliate unions.  Plaintiffs have also devoted resources, and – if the regulation goes into effect – will have to continue to devote resources to answering inquiries from workers who are the subject of no-match letters about their rights in light of the new regulation and also from their affiliate unions about the impact of the new DHS rule on the affiliate unions' collective bargaining agreements, to developing and disseminating public education materials about the new regulations, and to conducting training and other outreach about the new regulation.  If the regulation goes into effect, Plaintiffs will also have to devote resources to combating the ill effects of the DHS rule by, for example, advocating on behalf of workers who are unjustly terminated by their employers because of the new regulation.  Plaintiffs have limited institutional resources and if they did not have to expend resources

1  responding to the DHS rule, they could and would instead allocate these resources to other critical

2  activities in furtherance of their mission of advocating on behalf of workers.

3  **FIRST CLAIM FOR RELIEF**

4  **(Violation by DHS of 8 U.S.C. §1324a and 5 U.S.C. §706(2)(A))**

5  59.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth

6  herein.

7  60.    The DHS Final Rule and DHS/ICE Guidance Letter are inconsistent with the

8  governing statute, 8 U.S.C. §1324a, because it expands civil and criminal liability for employers

9  based on a definition of "knowing" that is not what Congress meant by the term "knowing" in

10  IRCA.   The DHS Final Rule and DHS/ICE Guidance Letter are also inconsistent with the

11  governing statute because they establish a system for reverification of the work authorization status

12  of continuing employees that is not consistent with Congress' intent to establish a system of

13  verification of work-authorization status only upon initial hire.  The DHS Final Rule and DHS/ICE

14  Guidance Letter are also inconsistent with statute because they fail to exempt employees hired

15  before IRCA was adopted.  The DHS Final Rule and DHS/ICE Guidance Letter are agency action

16  "not in accordance with law" and violate 5 U.S.C. §706(2)(A).

17  **SECOND CLAIM FOR RELIEF**

18  **(Violation by DHS of 5 U.S.C. §706(2)(A) and 5 U.S.C. §553(c))**

19  61.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth

20  herein.

21  62.    The DHS Final Rule and DHS/ICE Guidance Letter are arbitrary and capricious

22  agency action in violation of 5 U.S.C. §706(2)(A) because they treats the receipt of an SSA no-

23  match letter as indicating a high probability that a mismatched SSN relates to unauthorized work

24  when DHS does not have access to the Earnings Suspense File and does not know the probability

25  that an SSN relates to unauthorized work.  The DHS Final Rule and DHS/ICE Guidance Letter are

26  also arbitrary and capricious because they are based on the incorrect premise that employers

27  receiving no-match letters have a pre-existing non-IRCA obligation to inquire into the work-

28  authorization status of employees who are the subject of a no-match letter.

1      63.     The DHS Final Rule is also arbitrary and capricious agency action in violation of

2 5 U.S.C. §706(2)(A) and 5 U.S.C. §553(c) because DHS failed to engaged in reasoned decision-

3 making, as the Final Rule lacks any rational connection between facts relied upon and the choices

4 made by the agency and the agency reversed course in interpreting and applying 8 U.S.C. §1324a

5 without providing any reasoned explanation for the reversal.

6 **THIRD CLAIM FOR RELIEF**

7 **(Violation by DHS of 5 U.S.C. §706(2)(C))**

8      64.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth

9 herein.

10      65.     The DHS Final Rule and DHS/ICE Guidance Letter exceeds DHS' statutory

11 authority, in violation of 5 U.S.C. §706(2)(C), by seeking to impose immigration-law obligations on

12 employers and employees in responding to an SSA no-match letter.

13 **FOURTH CLAIM FOR RELIEF**

14 **(Violation by DHS, ICE and SSA of  5 U.S.C. §706(2)(B) and Due Process Clause)**

15      66.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth

16 herein.

17      67.     The DHS Final Rule and DHS/ICE Guidance Letter, and SSA's distribution of that

18 letter with its no-match letters, will impose unreasonable deadlines on employers and employees

19 and will cause some lawfully employed workers to be fired from their jobs without due process

20 because of erroneous government data bases, and because SSA is not able to resolve a data

21 discrepancy by an arbitrary deadline.  As such, Defendants' actions violate 5 U.S.C. §706(C) and

22 the Due Process Clause of the U.S. Constitution.

23 **FIFTH CLAIM FOR RELIEF**

24 **(*Ultra Vires* Agency Action by DHS and ICE)**

25      68.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth

26 herein.

27      69.     The DHS' Rule and DHS/ICE Guidance Letter are *ultra vires* actions in excess of

28 statutory authority granted to DHS, ICE, and SSA by Congress.

**SIXTH CLAIM FOR RELIEF**

**(Violation by DHS, ICE and SSA of 5 U.S.C. §706(2)(C))**

70.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

71.     DHS, ICE, and SSA have no statutory authority to use the SSA tax information processing system in general, and the SSA no-match letters in particular, as tools for the enforcement of immigration laws.

72.     The plan by DHS, ICE, and SSA to include the DHS/ICE Guidance Letter to employers along with SSA no-match letters is agency action in excess of the statutory authority of DHS, ICE, and SSA, and therefore violates 5 U.S.C. §706(2)(C).

**SEVENTH CLAIM FOR RELIEF**

**(*Ultra Vires* Agency Action by SSA, DHS, and ICE)**

73.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

74.     DHS, ICE, and SSA have no statutory authority to use the SSA tax information processing system in general, and the SSA no-match letters in particular, as tools for the enforcement of immigration laws.

75.     The plan by DHS, ICE, and SSA to include the DHS/ICE Guidance Letter to employers along with SSA no-match letters exceeds the statutory authority of DHS, ICE, and SSA, and therefore each agency is acting *ultra vires* and in violation of the statutes delegating authority to those agencies.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

1.     Enter a temporary restraining order and a preliminary injunction, pending a decision on the merits, that enjoins Defendants from implementing the Department of Homeland Security rule entitled "Safe Harbor Procedures for Employers That Receive a No Match Letter," 72 Fed. Reg.

1  45611 (Aug.15, 2007), including by commencing the mailing of new SSA "no-match" letter packets

2  that include the DHS/ICE Guidance Letter concerning the DHS Final Rule.

3          2.      Upon hearing the merits, enter a declaratory judgment that the DHS Final Rule is

4  invalid and a permanent injunction to prohibit Defendants from implementing or otherwise giving

5  effect to the DHS Final Rule.

6          3.      Award Plaintiffs their costs and expenses, including reasonable attorney's fees and

7  expert witness fees; and

8          4.      Award such further and additional relief as is just and proper.

9  Dated: September 11, 2007          Stephen P. Berzon
                                      Scott A. Kronland
10                                    Jonathan Weissglass
                                      Linda Lye
11                                    Danielle E. Leonard
                                      ALTSHULER BERZON LLP
12
                                      Jonathan P. Hiatt
13                                    James B. Coppess
                                      Ana Avendaño
14                                    AFL-CIO

15                                    Linton Joaquin
                                      Marielena Hincapié
16                                    Monica T. Guizar
                                      NATIONAL IMMIGRATION LAW CENTER
17
                                      Lucas Guttentag
18                                    Jennifer C. Chang
                                      Mónica M. Ramírez
19                                    AMERICAN CIVIL LIBERTIES UNION FOUNDATION

20                                    Omar C. Jadwat
                                      AMERICAN CIVIL LIBERTIES UNION FOUNDATION
21
                                      Alan L. Schlosser
22                                    Julia Harumi Mass
                                      ACLU FOUNDATION OF NORTHERN CALIFORNIA
23
                                      David A. Rosenfeld
24                                    Manjari Chawla
                                      WEINBERG, ROGER & ROSENFELD
25

26

27                                    by:    /s/   Scott A. Kronland
                                                   Scott A. Kronland
28
                                      Attorneys for Plaintiffs