1  Matthew Ross (SBN 084703)
   Philip Monrad (SBN 151073)
2  LEONARD, CARDER, LLP
   1330 Broadway, Suite 1430
3  Oakland, CA 94612
   Telephone:    (510) 272-0169
4  Facsimile:    (510) 272-0174
   Email:        MRoss@leonardcarder.com; PMonrad@leonardcarder.com
5
   Robert M. Weinberg  (*pro hac vice* application forthcoming)
6  Leon Dayan          (*pro hac vice* application forthcoming)
   Jennifer L. Hunter     (*pro hac vice* application forthcoming)
7  BREDHOFF & KAISER, PLLC
   805 Fifteenth Street, NW, Tenth Floor
8  Washington, D.C. 20008
   Telephone:    (202) 842-2600
9  Facsimile:    (202) 842-1888
   Email:        LDayan@bredhoff.com; JHunter@bredhoff.com
10
   *Attorneys for Plaintiff-Intervenors*
11
                    UNITED STATES DISTRICT COURT
12
                  NORTHERN DISTRICT OF CALIFORNIA
13
   AMERICAN FEDERATION OF LABOR        )
14 AND CONGRESS OF INDUSTRIAL          )  Case No.: 07-04472(CRB)
   ORGANIZATIONS; SAN FRANCISCO        )
15 LABOR COUNCIL; SAN FRANCISCO        )
   BUILDING AND CONSTRUCTION           )  [Proposed]
16 TRADES COUNCIL; and CENTRAL         )  **COMPLAINT IN INTERVENTION**
   LABOR COUNCIL OF ALAMEDA            )  (Administrative Procedures Act Case)
17 COUNTY,                             )
                                       )
18          Plaintiffs,                )
                                       )
19          v.                         )
                                       )
20 MICHAEL CHERTOFF, Secretary of      )
   Homeland Security; DEPARTMENT OF    )
21 HOMELAND SECURITY; JULIE MYERS,     )
   Assistant Secretary of Homeland Security; )
22 U.S. IMMIGRATION AND CUSTOMS        )
   ENFORCEMENT; MICHAEL ASTRUE,        )
23 Commissioner of Social Security; and )
   SOCIAL SECURITY ADMINISTRATION,     )
                                       )
24          Defendants.                )
                                       )
   _____ )

UNITED FOOD AND COMMERCIAL            )
WORKERS INTERNATIONAL UNION;          )
UNITED FOOD AND COMMERCIAL            )
WORKERS LOCAL 5; UNITE HERE; and      )
UNITE HERE LOCAL 2,                   )
                                      )
     Plaintiff-Intervenors,            )
                                      )
     v.                                )
                                      )
MICHAEL CHERTOFF, Secretary of        )
Homeland Security; DEPARTMENT OF      )
HOMELAND SECURITY; JULIE MYERS,       )
Assistant Secretary of Homeland Security;  )
U.S. IMMIGRATION AND CUSTOMS          )
ENFORCEMENT; MICHAEL ASTRUE,          )
Commissioner of Social Security; and  )
SOCIAL SECURITY ADMINISTRATION,       )
                                      )
     Defendants.                       )

_____

Plaintiff-Intervenors (hereinafter "Plaintiffs") allege as follows:

**OVERVIEW**

1.      The Immigration Reform and Control Act of 1986 (IRCA or "Act"), 8 U.S.C. § 1324a *et seq.*, imposes civil and criminal sanctions against employers who hire a person "knowing" that the person is an alien unauthorized to work in the United States, or who continue to employ a person "knowing" that the person is an unauthorized alien. This action challenges the validity of a final rule adopted by the Department of Homeland Security on August 15, 2007, entitled "Safe Harbor Procedures for Employers That Receive a No Match Letter." 72 Fed. Reg. 45611 (Aug. 15, 2007) ("DHS Final Rule" or "Rule").

2.      The DHS Final Rule has two components: First, it creates a legal fiction by deeming the bare receipt by an employer of a "no-match" letter from the Social Security Administration (SSA)—a letter stating that a social security number (SSN) reported by the employer with respect to a particular employee does not match the SSN in the SSA's (error-

1    prone) database—to constitute evidence that the employer "know[s]" that the employee in

2    question is an alien not authorized to work in the United States.  Second, the Rule requires

3    employers in receipt of a no-match letter to conduct a prescribed investigation and follow other

4    specified procedures for a period running 93 days, in order to determine whether the listed

5    person is likely to be an unauthorized alien.  The employer may use the first 30 days to examine

6    its own records, and need allow the employee only the remaining 63 days to resolve the

7    discrepancy by working through the Social Security Administration bureaucracy or otherwise.

8    If, at the end of the 93-day period, the mismatch has not been resolved in a manner favorable to

9    the employee, the Rule provides that the employer, while insulated from liability for that period,

10   becomes exposed to liability for a "knowing" IRCA violation immediately thereafter unless it

11   terminates the employee at once.

12        3.    In adopting the Rule, the DHS has imposed on employers a duty to investigate

13   and reverify the immigration status of already-hired workers upon learning information that

14   neither establishes that the workers in question are in fact unauthorized aliens or that they are

15   even highly likely to be unauthorized aliens.  Imposition of such a duty is inconsistent with

16   Congress' deliberate choice to make "knowledge" the standard of scienter for such IRCA

17   violations, and with Congress' concomitant choice to reject a negligence standard or any other

18   standard that could be plausibly construed to encompass such a duty.

19        4.    Imposition of this duty on employers will have a direct, adverse impact on U.S.

20   citizen employees and other employees authorized to work in the United States, because under

21   the DHS Final Rule, authorized employees listed on a no-match letter will be compelled in many

22   instances to go to SSA offices during working hours and to convince the SSA bureaucracy to

23   correct its records in a period of as little as sixty days—a period that even the Rule's preamble

24

1    acknowledges will be insufficient in the most difficult cases, and that, in truth, will all but

2    certainly be insufficient in many other cases as well.

3        5.    Plaintiffs each act in two separate capacities.  Each plaintiff is a labor

4    organization that represents employees of other employers, and each is also an employer of its

5    own staff employees.  Plaintiffs challenge the DHS Final Rule both (a) in their representative

6    capacity on behalf of the workers in the bargaining units that they or their local unions represent,

7    in order to prevent harm to employees and labor organizations that the Rule will cause, and (b) in

8    their separate capacity as employers, to prevent the harms to their interest as employers which

9    would result from their being threatened with civil and criminal sanctions for conduct that

10    Congress did not intend to penalize, and their interest in not being compelled to expend scarce

11    resources conducting investigations and inquiries that Congress did not intend for them to have

12    to conduct.

13                    **JURISDICTION**

14        6.    This Court has jurisdiction over the claims alleged in this Complaint pursuant to

15    28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory relief), and 5 U.S.C. §§ 701-

16    706 (Administrative Procedures Act).

17            **VENUE AND INTRA-DISTRICT ASSIGNMENT**

18        7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e), because the venue

19    here was properly laid in the original complaint that initiated this action.  Even viewing the

20    instant complaint-in-intervention independently from the original complaint, venue would lie,

21    because plaintiffs UNITE HERE Local 2 and United Food and Commercial Workers (UFCW)

22    Local 5 reside in this judicial district.  For the same reasons, intradistrict assignment to the San

23    Francisco and Oakland divisions is proper.

24

**PARTIES**

8.      Plaintiff United Food and Commercial Workers International Union (UFCW) is an international union representing 1.3 million working grocery, food processing, retail, manufacturing, and other workers throughout the United States.  UFCW is one of the largest unions that has a substantial proportion of immigrant members.  UFCW was one of the labor organizations which submitted comments objecting to the DHS Final Rule.   UFCW is also an employer.  UFCW's headquarters is located at 1775 K Street NW, Washington, District of Columbia, 20006.

9.      Plaintiff UFCW Local 5 is a labor organization that represents approximately 25,000 employees, including employees lawfully working in the United States in the food, retail, and agriculture industries who have been the subject of SSA no-match letters sent to their employers.  An important part of Local 5's mission is to advocate on behalf of workers so that their rights in the workplace are protected and so that they are not victims of unlawful discrimination.   Local 5 represents many members of Latin American and Asian descent who use compound last names or inconsistently transliterate their names, which may result in inadvertent errors or discrepancies in their SSA records.  UFCW Local 5 was formed from a merger of smaller local unions, and is the successor in interest to the merged unions; therefore references to UFCW Local 5 in this Complaint refer as well to the predecessor entities whose interests it succeeds.  UFCW Local 5 is an employer with respect to its own staff employees, and, in its capacity as an employer, UFCW Local 5 has in the past received an SSA no-match letter and there is a substantial possibility that it could receive another such letter in the future.  The headquarters of UFCW Local 5 are located at 240 South Market Street San Jose, 95113.  Local 5 also has sub-offices in Alameda and Contra Costa counties, among others.

1          10.      Plaintiff UNITE HERE is an international union representing a diverse

2    membership of more than 450,000 in the apparel and textiles, hotel, casino, food service, and

3    restaurant industries.  A substantial proportion of UNITE HERE's membership is composed of

4    immigrants.  UNITE HERE was one of the labor organizations which submitted comments

5    objecting to the DHS Final Rule.  UNITE HERE is also an employer.  UNITE HERE's

6    headquarters is located at 275 7th Avenue, New York, New York, 10001.

7          11.      Plaintiff UNITE HERE Local 2 is a labor organization that represents

8    approximately 12,000 employees, including employees lawfully working in the United States

9    who have been the subject of SSA no-match letters sent to their employers.  UNITE HERE Local

10   2 has in the past successfully represented, including in cases litigated before arbitrators,

11   employees unjustly discharged in response to no-match letters.   A substantial portion of Local

12   2's members work in the hospitality industry.  An important part of Local 2's mission is to

13   advocate on behalf of workers so that their rights in the workplace are protected and so that they

14   are not victims of unlawful discrimination.   Local 2 represents many members of Latin

15   American and Asian descent who use compound last names or inconsistently transliterate their

16   names, which may result in inadvertent errors or discrepancies in their SSA records.  Local 2 is

17   also an employer.  The principal office of UNITE HERE Local 2 is located at 209 Golden Gate

18   Avenue, San Francisco, California 94102.

19         12.      In the past, workers represented by, and members of, the plaintiff labor

20   organizations have been the subject of no-match letters sent by the SSA to their employers.  The

21   U.S. Government Accountability Office (GAO) reports that about four percent of all Forms W-2

22   submitted by employers report earnings that cannot be matched with SSA records and that are

23   therefore placed in SSA's Earnings Suspense File.  On information and belief, Plaintiffs

24

1    represent thousands of workers who are lawfully working in the United States but have earnings

2    in the Earnings Suspense File, and who therefore are likely to be the subject of SSA no-match

3    letters issued in the future.

4        13.    Defendant Michael Chertoff is the Secretary of the Department of Homeland

5    Security and is responsible for all functions of DHS and its component organizations. He is sued

6    in his official capacity.

7        14.    Defendant Department of Homeland Security is a federal agency charged with, *inter*

8    *alia,* the administration and enforcement of federal immigration laws. DHS promulgated the rule

9    entitled "Safe Harbor Procedures for Employers That Receive a No Match Letter," 72 Fed. Reg.

10   45611 (Aug. 15,2007), that is challenged in this litigation.  Defendant U.S. Immigration and

11   Customs Enforcement ("ICE") is a federal agency within DHS responsible for investigating and

12   enforcing immigration laws, including 8 U.S.C. § 1324a. DHS and ICE created the DHS/ICE

13   Guidance Letter regarding the DHS Final Rule that the SSA intends to send to employers along

14   with its "no-match" letters.

15       15.    Defendant Julie Myers is the Assistant Secretary of Homeland Security for ICE

16   and is responsible for all functions of ICE and its component organizations. She is sued in her

17   official capacity.

18       16.    Defendant Social Security Administration is a federal agency charged with

19   administration of the Social Security Act, and with processing tax information for the purpose of

20   administering the Social Security program. Defendant SSA maintains databases of tax

21   information and periodically generates "no-match" letters to employers that submit Forms W-2

22   to report employee earnings if employee names and Social Security Numbers do not match SSA

23   records. *See* 42 U.S.C. §432; 20 C.F.R. §422.120.

24

1    17.    Defendant Michael Astrue is the Commissioner of Social Security and is

2    responsible for all programs administered by the SSA. He is sued in his official capacity.

3    **FACTS**

4    18.    The  Social Security Act of 1935 authorizes the SSA to establish a record-keeping

5    system to manage the Social Security program. Congress also granted SSA authority to process

6    tax information for purposes of administering the Social Security program, as a specific exception

7    to the exclusive tax authority of the Internal Revenue Service (IRS). *See* 26 U.S.C. §6103 (1)(5);

8    42 U.S.C. §432. Pursuant to that delegation of authority, the IRS and SSA created a joint system

9    for the processing of Forms W-2 called the Combined Annual Wage Reporting System (CAWR).

10   43 Fed. Reg. 60158 (Dec. 26, 1978) (codified at 26 C.F.R. §31.6051).

11   19.    Under the CAWR, employers annually report employee earnings using Forms W-

12   2, and SSA posts those earnings to individual workers' Social Security records so workers will

13   receive credit for those earnings when they apply for Social Security. The SSA then forwards the

14   Forms W-2 to the IRS.

15   20.    If the SSA cannot match the name and Social Security Number (SSN) on a Form

16   W-2 with SSA's records, the SSA places the earnings report in its Earnings Suspense File. *See*  20

17   C.F.R §422.120.   The earnings remain in the Earnings Suspense File until SSA can link them to a

18   name and SSN.  Every year, the SSA receives millions of earnings reports that the SSA cannot

19   match with its records.  On information and belief, the Earnings Suspense File is a huge database

20   that contains more than 255 million unmatched earnings records and that is growing at the rate of

21   8 to 11 million unmatched records per year. About four percent of annual Form W-2 earnings

22   reports are placed in the SSA's Earnings Suspense File.  Although some mismatched SSA records

23   result from employees without work authorization using false SSNs, there also are many reasons

24

1   unrelated to immigration status for mismatched records. These include a) clerical errors by either

2   an employer or the SSA in spelling an employee's name or recording the SSN; b) the SSA's

3   issuance of duplicate SSNs or reissuance of SSNs of deceased individuals; c) employee name

4   changes after marriage or divorce; d) employees that use a less "foreign" sounding first name for

5   work purposes; and e) different naming conventions (such as the use of multiple surnames) that

6   are commonplace in many parts of the world, particularly in some Latin American and Asian

7   countries.

8        21.     The most recent Government Accountability Office (GAO) report on the SSA's

9   Earnings Suspense File concluded that the file "[c]ontains information about many U.S. citizens

10  as well as non-citizens" and that "the overall percentage of unauthorized workers is *unknown.*"

11  GAO-06-814R, at 8 (emphasis added). When the SSA ultimately has been able to resolve data

12  discrepancies, "most... belong to U.S.-born citizens, not to unauthorized workers," which GAO

13  concluded "is an indication that a significant number of earnings reports in the [Earnings

14  Suspense File] belong to U.S. Citizens and work-authorized noncitizens." *Id.*

15       22.     As part of its administration of the Social Security program, SSA periodically

16  sends out letters, commonly known as "no-match" letters, informing employers that SSNs and

17  employee names reported on Forms W-2 did not match SSA's records. *See* 20 C.F.R. § 422.120.

18       23.     SSA no-match letters are purely advisory. SSA has no authority to sanction

19  employers that fail to respond to no-match letters.

20       24.     Pursuant to its regulations, SSA notifies the IRS of incomplete or inaccurate

21  earnings reports. 20 C.F.R. §422.120. In 1986, Congress authorized IRS to impose sanctions on

22  employers that submit false or inaccurate tax information. 26 U.S.C. §6721; *see also* 26 C.F.R.

23  §301.6721-1. Under IRS regulations, an employer is not subject to sanction if the employer

24

1   accurately and in good faith transmits the name and SSN provided by an employee. 26 U.S.C.

2   §6724(a); 26 C.F.R. §301.6724-1.

3        25.     Insofar as the Internal Revenue Code is concerned, a reasonable employer

4   response to a no-match letter is to confirm that the employer is accurately transmitting the name and

5   SSN provided by the employee and to advise the employee that SSA is reporting a no-match. *Id.*

6        26.     SSA is not an immigration agency and does not know whether a particular SSN

7   listed in a no-match letter relates to unauthorized work.   SSA also is prohibited by tax privacy

8   statutes from sharing the information in the Earnings Suspense File with the DHS. Until now,

9   SSA's no-match letters explained to employers:  "This letter does not imply that you or your

10  employee intentionally gave the government wrong information" and "makes no statement

11  regarding an employee's immigration status."

12       27.     Until now, the SSA has never included information from an immigration-

13  enforcement agency with its no-match letters.  The Immigration Reform and Control Act of 1986

14  ("IRCA") made it unlawful for employers to "to hire ... for employment in the United States an

15  alien knowing the alien is an unauthorized alien." 8 U.S.C. §1324a(a)(l)(A).

16       28.     IRCA also separately made it unlawful for employers to hire without complying with

17  an initial verification process established by Congress. 8 U.S.C. §1324a(a)(l)(B). That

18  verification process requires the employee to present the employer with documents to show proof

19  of identity and work authorization and requires the employer and employee to complete an 1-9

20  verification form.  8 U.S.C. §1324a(b); 8 C.F.R. §274a.2.

21       29.     IRCA also makes it unlawful for an employer "to continue to employ an alien ...

22  knowing the alien is (or has become) an unauthorized alien with respect to such employment." 8

23  U.S.C. §1324a(a)(2).

24

1        30.    IRCA specifically exempted workers hired before IRCA's enactment on November

2    6, 1986, from the hiring prohibition and the verification process. Pub. L. No. 99-603 § 101(a)(3),

3    100 Stat. 3359 (1986) (codified at 8 U.S.C. § 1324a note).

4        31.    Employers that violate IRCA are subject to civil and criminal liability. 8 U.S.C.

5    § 1324a(e)(4)-(5),(f).

6        32.    At the same time that Congress imposed employer sanctions, Congress also

7    wanted to prevent employer discrimination based on national origin or citizenship status. IRCA

8    therefore makes it illegal for employers to discriminate based on national origin or citizenship

9    status, including by requesting "more or different documents than are required" for the initial I-9

10    verification or "refusing to honor documents ... that on their face reasonably appear to be genuine,

11    for the purpose of discriminating on the basis of national origin or citizenship." 8 U.S.C.

12    § 1324b(a)(l),(6).

13        33.    Congress deliberately chose not to impose ongoing re-verification requirements

14    after the initial hire, recognizing that the imposition of added expenses and duties on employers

15    beyond that involved in a prohibition against the "knowing" hiring or retention of unauthorized

16    workers might tempt more employers to avoid hiring noncitizens or persons of foreign national

17    origin in the first instance—a prospect Congress sought to avoid—and might also endanger the

18    support of the employer community, which has long opposed regulations making the hiring and

19    retention of employees more costly.

20        34.    Until now, neither DHS nor its predecessor immigration-enforcement agencies had

21    taken the position that an employer's failure to inquire into the work-authorization status of an

22    employee subject to an SSA no-match letter meant that the employer had knowledge that it was

23    employing an unauthorized worker. The Immigration and Naturalization Service had recognized

24

1   that no-match discrepancies occur for many innocent reasons and therefore consistently advised

2   employers in opinion letters that "[w]e would not consider notice of this discrepancy from SSA to

3   an employer by itself to put the employer on notice that the employee is unauthorized to work."

4       35.    On June 14, 2006, DHS gave notice of a proposed rule that would address the

5   responsibilities of employers that receive SSA no-match letters. More than 5,000 comments were

6   received by DHS during the 60-day comment period, including comments that disputed DHS'

7   authority to adopt the rule.  Plaintiffs UNITE HERE and UFCW were among those who submitted

8   comments objecting to the rule.  The comment period closed on August 14, 2006.

9       36.    DHS issued a final rule on August 15, 2007 (hereinafter, the "DHS Final Rule").

10  The DHS Final Rule is entitled "Safe-Harbor Procedures for Employers Who Receive a No-Match

11  Letter," and is published at 72 Fed. Reg. 45611.

12      37.    The DHS Final Rule will amend the definition of "knowing" in 8 C.F.R.

13  §274a.l(*l*)(l), the regulatory subsection that purports to define the term "knowing" for purposes

14  of IRCA.  The amended regulation will list, as an example of an employer that has "constructive

15  knowledge" that an employee is an "unauthorized alien," an employer that receives a SSA no-match

16  letter and then "fails to take reasonable steps." The first part of the amended regulation will

17  provide:

18       (*l*)(1) The term *knowing* includes having actual or constructive knowledge....

19       Examples of situations where the employer may, depending upon the totality of

20       the relevant circumstances, have constructive knowledge that an employee is an

21       unauthorized alien include, but are not limited to, situations where the employer:

22       …

23

24

1

2

   (iii) Fails to take reasonable steps after receiving information indicating that the

employee may be an alien who is not employment authorized, such as –

3

4

   (B) Written notice to the employer from the Social Security Administration

reporting earnings on a Form W-2 that employees' names and corresponding

5

social security account numbers fail to match Social Security Administration

6

records ....

7

8

   38.     Having created a threat of IRCA liability for employers receiving SSA no-match

9

letters by deeming receipt of a no-match letter to be evidence that the employer "know[s]" that

10

listed persons are unauthorized aliens, the DHS Final Rule then offers employers what it terms a

11

"safe harbor." An employer receiving a SSA no-match letter "will be considered by the

12

Department of Homeland Security to have taken reasonable steps - and receipt of the written

13

notice will therefore not be used as evidence of constructive knowledge - if the employer" takes

14

the actions specified by DHS.   These are "the only combination of steps that will guarantee that

15

DHS will not use the employer's receipt of the notices from SSA ... as evidence of constructive

16

knowledge that an employee is an unauthorized alien." 72 Fed. Reg. at 45618.

17

   39.     To qualify for the DHS "safe harbor," an employer must check its own records

18

within 30 days of receipt of an SSA no-match letter to determine if the no-match was the result

19

of its own clerical error.  If the employer determines the no-match was not the result of its own

20

clerical error, it must instruct instruct an employee who claims the name and SSN are correct to

21

resolve the discrepancy with SSA within 90 days after the employer's receipt of the no-match

22

letter. If the employee is unable to resolve the discrepancy with SSA within that 90-day period,

23

the employer is prohibited from continuing to employ the worker unless the worker can complete

24

within three days a new immigration verification, on a new Form I-9, using only documents that

1    contain photo identification and no documents that contain the disputed SSN, even if the employee

2    still insists the SSN is correct.  The DHS "safe harbor" is thus structured so that employees are

3    guaranteed only 60 days to resolve the discrepancy with SSA, because the DHS rule gives the

4    employer 30 days to check its own records without notifying the employee, and only after this

5    initial step is complete need it advise the employee of the no-match.  (Indeed, because the

6    employer need not advise the employee immediately, but only reasonably promptly, at the end of

7    the 30-day period, employees will often have fewer than 60 days.)  If employees insist their

8    names and SSNs on their identification documents are correct but have not resolved the

9    discrepancy with SSA by the deadline, or cannot produce the required additional photo

10   identification, the employer would have to terminate them.

11          40.     DHS and SSA intend to send employers no-match letters that will be accompanied

12   by a letter from DHS and ICE (hereinafter the "DHS/ICE Guidance Letter"). The DHS/ICE

13   Guidance Letter states that it will "provide guidance on how to respond to the enclosed letter

14   from the Social Security Administration (SSA)… in a manner that is consistent with your

15   obligations under United States Immigration Laws."

16          41.     The DHS/ICE Guidance Letter contains questions and answers, which begin with

17   the following:

18          **Q:     Can I simply disregard the letter from SSA?**

19          **A:     No.** You have received official notification of a problem that may have significant

20          legal consequences for your employees. If you elect to disregard the notice you have

21          received and it is determined that some employees listed in the enclosed letter were not

22          authorized to work, the Department of Homeland Security (DHS) could determine that you

23

24

1    have violated the law by knowingly continuing to employ unauthorized persons. This could

2    lead to civil and criminal sanctions.

3        42.    After threatening employers with civil and criminal liability, the DHS/ICE Guidance

4    Letter then asks: **"Q: What should I do?"** and responds that "You should" follow the steps set

5    out in the DHS Final Rule.

6        43.    The DHS/ICE Guidance Letter assures employers that, if they follow those

7    procedures for every no-match, they will not be liable for discrimination if they terminate

8    employees:

9    **Q:    Will I be liable for discrimination charges brought by the United States if I**

10    **terminate the employee after I follow the steps outlined above?**

11    **A:    No**

12        44.    SSA has revised its no-match letters so that they direct employers to follow the

13    instructions in the accompanying DHS/ICE Guidance Letter.

14        45.    SSA and DHS intend to commence sending the revised no-match letters and the

15    DHS/ICE Guidance Letter to employers imminently.  Prior to the TRO entered in this case, the

16    SSA expected by November 9, 2007 to mail no-match letters to approximately 140,000

17    employers around the country.  Several million employees will be affected by this mailing.

18        46.    SSA will continue to mail additional batches of no-match letters after November

19    9, 2007, to numerous other employers.

20        47.    The DHS, by promulgating its Rule, intended to cause, and will cause, most of the

21    140,000 employers who receive no-match letters accompanied by the DHS/ICE Guidance Letter

22    to alter their conduct so as to avoid civil or criminal penalty proceedings initiated by DHS, ICE,

23

24

1    or the U.S. Department of Justice. The investigation that recipient employers will be compelled

2    to immediately perform will impose substantial administrative costs on employment.

3            48.    A substantial portion of the several million no-match SSNs that are listed in the

4    initial round of SSA no-match letters will relate to U.S. citizens or non-citizens lawfully entitled

5    to work. On information and belief, a substantial number of these workers are represented by the

6    plaintiffs in this case, such as plaintiffs UNITE HERE Local 2 and UFCW Local 5.

7            49.    As a result of implementation of the DHS Final Rule, including the DHS/ICE

8    Guidance Letter, lawfully employed workers will immediately be forced to expend time and

9    effort to resolve SSA data discrepancies, including taking time off work without pay to visit SSA

10    field offices that are open only during business hours and that will be overwhelmed with similar

11    requests from other workers as well as the other business of the SSA.

12            50.    Many lawfully employed workers, including those employed by plaintiffs or their

13    local unions, will be unable to resolve data discrepancies with the SSA bureaucracy within the

14    60-day period provided for in the DHS Final Rule and will for that reason be terminated from

15    their jobs. SSA already has told DHS that in "difficult cases," SSA may be unable to resolve

16    discrepancies within the timeframe established by the Rule.

17            51.    Because plaintiffs have, in the past, devoted resources to representing lawfully

18    authorized employees wrongly discharged or threatened with discharge by reason of an

19    employer's receipt of a no-match letter, and because the DHS Final Rule is designed to induce,

20    and can be expected to induce, far more employers to use no-match letters as grounds for

21    terminating or threatening the termination of employees, the plaintiffs expect that if the Rule

22    goes into effect, plaintiffs will be required to expend more scarce resources on no-match issues

23

24

1   instead of on matters that would further their other legitimate objectives as representatives of

2   employees.

### FIRST CLAIM FOR RELIEF

**(Violation by DHS of 8 U.S.C. §1324a and 5 U.S.C. §706(2)(A))**

5   52.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth

6   herein.

7   53.     The DHS Final Rule, on its face and as proposed to be implemented through the

8   DHS/ICE Guidance Letter, is inconsistent with the governing statute, 8 U.S.C. §1324a, because

9   it expands civil and criminal liability for employers based on a definition of "knowing" that is

10  inconsistent with that word's plain meaning and inconsistent with Congress' intent in IRCA in

11  limiting employer liability to "knowing" violations.  The DHS Final Rule, on its face and as

12  proposed to be implemented through the DHS/ICE Guidance Letter, is also inconsistent with the

13  governing statute because it establishes a duty to reverify the work authorization status of

14  continuing employees that is not consistent with Congress' intent to establish a system of

15  verification of work-authorization status only upon initial hire with no continuing duty to

16  investigate. The DHS Final Rule is agency action "not in accordance with law" and violates 5

17  U.S.C. §706(2)(A).

### SECOND CLAIM FOR RELIEF
**(Violation by DHS of 5 U.S.C. §706(2)(A))**

19
20  54.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth

herein.

21
22  55.     The DHS Final Rule, on its face and as proposed to be implemented through the

DHS/ICE Guidance Letter, is "arbitrary" and "capricious" agency action in violation of 5 U.S.C.

23
§706(2)(A), because it is predicated on a fiction to the effect that bare receipt of a no-match letter

24

by an employer constitutes evidence that each employee listed in such a letter is known by the employer to be an unauthorized alien, and because it treats the receipt of an SSA no-match letter as indicating a high probability that a mismatched SSN relates to unauthorized work when in fact DHS does not know the probability that such an SSN relates to unauthorized work and did not identify or rely on any evidence in the administrative record establishing that probability.

56.     The DHS Final Rule is also arbitrary and capricious because DHS failed to engage in reasoned decision-making, inasmuch as the Rule lacks any rational connection between facts relied upon and the choices made by the agency, and the agency—which for over a decade had said, through its predecessor agencies, that an employee's appearance on a no-match letter did not establish constructive knowledge that the listed employee was unauthorized— reversed course in interpreting and applying 8 U.S.C. § 1324a without providing a sufficient explanation for the reversal.

## THIRD CLAIM FOR RELIEF
### (Violation by DHS of 5 U.S.C. §706(2)(C))

57.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

58.     The DHS Final Rule, on its face and as proposed to be implemented through the DHS/ICE Guidance Letter, exceeds DHS' statutory authority, in violation of 5 U.S.C. §706(2)(C), by seeking to impose immigration-law obligations on employers and employees in responding to an SSA no-match letter.

## FOURTH CLAIM FOR RELIEF
### (Violation by DHS, ICE and SSA of 5 U.S.C. §706(2)(B) and Due Process Clause)

59.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

60.     The DHS Final Rule and DHS/ICE Guidance Letter, and SSA's distribution of that letter with its no-match letters, will impose unreasonable deadlines on employers and employees and will cause some lawfully employed workers to be fired from their jobs without due process because of erroneous government databases, and because SSA is not able to resolve a data discrepancy by an arbitrary deadline. As such, Defendants' actions violate 5 U.S.C. §706(C) and the Due Process Clause of the U.S. Constitution.

**FIFTH CLAIM FOR RELIEF**
(*Ultra Vires* **Agency Action by DHS and ICE**)

61.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

62.     The DHS' Rule and DHS/ICE Guidance Letter are *ultra vires* actions in excess of statutory authority granted to DHS, ICE, and SSA by Congress.

**SIXTH CLAIM FOR RELIEF**
(**Violation by DHS, ICE and SSA of 5 U.S.C. §706(2)(C)**)

63.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

64.     DHS, ICE, and SSA have no statutory authority to use the SSA tax information processing system in general, and the SSA no-match letters in particular, as tools for the enforcement of immigration laws.

65.     The plan by DHS, ICE, and SSA to include the DHS/ICE Guidance Letter to employers along with SSA no-match letters is agency action in excess of the statutory authority of DHS, ICE, and SSA, and therefore violates 5 U.S.C. §706(2)(C).

**SEVENTH CLAIM FOR RELIEF**
*(Ultra Vires* **Agency Action by SSA, DHS, and ICE)**

66.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

67.     DHS, ICE, and SSA have no statutory authority to use the SSA tax information processing system in general, and the SSA no-match letters in particular, as tools for the enforcement of immigration laws.

68.     The plan by DHS, ICE, and SSA to include the DHS/ICE Guidance Letter to employers along with SSA no-match letters exceeds the statutory authority of DHS, ICE, and SSA, and therefore each agency is acting *ultra vires* and in violation of the statutes delegating authority to those agencies.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

1.     Enter a preliminary injunction, pending a decision on the merits, that enjoins Defendants from implementing the Department of Homeland Security rule entitled "Safe Harbor Procedures for Employers That Receive a No Match Letter," 72 Fed. Reg. 45611 (Aug.15, 2007), including by commencing the mailing of new SSA "no-match" letter packets that include the DHS/ICE Guidance Letter concerning the DHS Final Rule.

2.     Upon hearing the merits, enter a declaratory judgment that the DHS Final Rule is invalid and a permanent injunction to prohibit Defendants from implementing or otherwise giving effect to the DHS Final Rule.

3.     Award Plaintiffs their costs and expenses, including reasonable attorney's fees and expert witness fees; and

1    4.    Award such further and additional relief as is just and proper.

2

3                               Respectfully submitted,

4                               _____/s/_____
                                Matthew Ross (SBN 084703)
5                               Philip Monrad (SBN 151073)
                                LEONARD, CARDER, LLP
6                               1330 Broadway, Suite 1430
                                Oakland, CA 94612
7                               Telephone:    (510) 272-0169
                                Facsimile:    (510) 272-0174
8                               Email:        MRoss@leonardcarder.com;
                                              PMonrad@leonardcarder.com
9
                                Robert M. Weinberg
10                              Leon Dayan
                                Jennifer L. Hunter
11                              BREDHOFF & KAISER, PLLC
                                805 Fifteenth Street, NW, Tenth Floor
12                              Washington, D.C. 20008
                                Telephone:    (202) 842-2600
13                              Facsimile:    (202) 842-1888
                                Email:        LDayan@bredhoff.com;
14                                            JHunter@bredhoff.com

15                              *Attorneys for Plaintiff-Intervenors UFCW et al.*

16   Dated: September 12, 2007

17

18

19

20

21

22

23

24

[Proposed] Complaint in Intervention Case No. 3:07-cv-04772(CRB)                    21