1  PETER D. KEISLER
   Assistant Attorney General
2  THOMAS H. DUPREE JR.
   Deputy Assistant Attorney General
3  SCOTT N. SCHOOLS
   United States Attorney
4  SANDRA SCHRAIBMAN (D.C. Bar No. 188599)
   DANIEL E. BENSING (D.C. Bar No. 334268)
5  Attorneys, U.S. Department of Justice
6  Civil Division, Federal Programs Branch
7  20 Massachusetts Ave., N.W., Room 6114
   Washington, D.C. 20001
8  Telephone: (202) 305-0693
   Facsimile: (202) 616-8460
9  Daniel.Bensing@USDOJ.gov

10             UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12

13

14  AMERICAN FEDERATION OF LABOR AND      )
       CONGRESS OF INDUSTRIAL              )  Case No. 07-4472 CRB
15     ORGANIZATIONS, et al.,              )
                                           )
16                  Plaintiffs,            )  **DEFENDANTS' OPPOSITION
                                           )  TO PLAINTIFFS' MOTIONS
17  SAN FRANCISCO CHAMBER                  )  FOR PRELIMINARY
       OF COMMERCE, et al.,                )  INJUNCTION**
18                                         )
19            Plaintiffs-Intervenors,      )
                                           )
20                  and                    )
                                           )
21  UNITED FOOD AND COMMERCIAL            )
22     WORKERS INTERNATIONAL UNION, et al., )
                                           )
23            Plaintiffs-Intervenors       )
                                           )
24         v.                              )  Date: October 1, 2007
                                           )  Time: 2:30 p.m.
25  MICHAEL CHERTOFF, Secretary of Homeland )  Place: Courtroom 8, 19th Floor
26     Security, et al.,                   )       Hon. Charles Breyer
                                           )
27                  Defendants.            )
                                           )
28  ─────────────────────────────────────)

Opposition to Plaintiffs' Motions for Preliminary Injunction (Case No. 07-4472 CRB)

1

## **TABLE OF CONTENTS**

2
Page

3

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5

6    A.    The SSA No-Match Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

7    B.    DHS Policies to Enforce Employer Compliance With The Immigration Laws  . . 5

8          1.    Employer Sanctions Under The IRCA . . . . . . . . . . . . . . . . . . . . . . . . . 5

9          2.    ICE Investigative Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

10

11   C.    The Safe Harbor Rulemaking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

12         1.    Impetus For The Rulemaking–Employer Confusion . . . . . . . . . . . . . . . 8

13         2.    The Significance Of No-Match Letters To Immigration Enforcement . . . 9

14         3.    The Rulemaking Proceeding And Rationale For The Rule . . . . . . . . . . . 10

15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

16

17   I.    Plaintiffs Lack Standing And Their Claims Are Not Ripe  . . . . . . . . . . . . . . . 14

18         A.    Plaintiffs Lack Standing To Challenge The DHS Rule. . . . . . . . . . . . . 14

19         B.    Ripeness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

20   II.   Plaintiffs' Arguments Fail On The Merits . . . . . . . . . . . . . . . . . . . . . . . . . . 24

21         A.    The DHS Safe Harbor Rule Is Consistent With The Governing

22               Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

23               1.    The Rule Does Not Impose New Legal Obligations Or

24                     Change The Definition of Knowing . . . . . . . . . . . . . . . . . . . . . 24

25               2.    The Safe Harbor Rule Does Not Establish A New
                       "Re-verification Obligation . . . . . . . . . . . . . . . . . . . . . . . . . 29

26

27

28

B.    The DHS Safe Harbor Rule is Not Arbitrary or Capricious . . . . . . . . . . 31

    1.    Standard of Review Under The Administrative
        Procedure Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    2.    No-Match Letters Are Potentially Relevant Evidence
        to Establish an Employer's Knowing Violation of the
        Immigration Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    3.    DHS Has Not Changed Position on The Significance
        Of No-Match Letters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    4.    The Time Limits For The Safe Harbor Rule . . . . . . . . . . . . . . . 37

C.    DHS and SSA Have Not Exceeded Their Statutory Authority . . . . . . . 38

    1.    There Is No Statutory Prohibition on SSA Including a
        DHS Letter in its No-Match Mailings, Nor Is It
        Inconsistent With SSA's Programs . . . . . . . . . . . . . . . . . . . . . . . 38

    2.    The DHS Rule Does Not Affect Tax Reporting Obligations . . . . 39

    3.    The DHS Rule Does Not Interfere with DOJ's Authority to
        Enforce IRCA's Anti-Discrimination Provision . . . . . . . . . . . . 39

D.    DHS Was Not Required to Perform a Regulatory Flexibility
    Act Analysis Before Adopting the Safe Harbor Rule . . . . . . . . . . . . . 41

    1.    The Safe Harbor Rule is Not a Rule Subject To the Regulatory
        Flexibility Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    2.    Even If The Safe Harbor Rule Was Not An Interpretive
        Rule and The RFA Applied, Its Requirements Are
        Satisfied By The Secretary's Certification That the
        Rule Would Not Impose Significant Costs On
        Small Businesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

III.    The Balance of Harms Strongly Favor the Defendants . . . . . . . . . . . . . . . . . . 50

    A.    The Plaintiffs Will Suffer Little if Any Harm . . . . . . . . . . . . . . 50

    B.    The Defendants And The Public Face Substantial Harm . . . . . . 54

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

# TABLE OF AUTHORITIES

**CASES**                                                                                          Page(s)

A.O. Smith Corp. v. FTC,
        530 F.2d 515 (3d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    52

Abbott Labs. v. Gardner,
        387 U.S. 136 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

Alenco Communications, Inc. v. FCC,
        201 F.3d 608 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    49

Am. Mining Cong. v. Mine Safety and Health Administration,
        995 F. 2d 1106 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42, 43

American-Arab Anti-Discrimination Committee v. Thornburgh,
        970 F.2d 501 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15, 16

Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife,
        273 F.3d 1229 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32

Ass'n of American Medical Colleges v. U.S.,
        217 F.3d 770 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23, 24

Ass'n of Irritated Residents v. EPA,
        2007 WL 2033262 (July 17, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

Associated Fisheries of Me. Inc. v. Daley,
        127 F.3d 104 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    49

Associated Gen. Contractors of Cal. v. Coalition for Econ. Equity,
        950 F.2d 1401 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

Baker v. United States,
        722 F.2d 517 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,
        462 U.S. 87 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32

Bennett v. Spear,
        520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

Caroline M. Corp., Inc. v. Baldrige,
        844 F.2d 686 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    53

Cement Kiln Recycling Coalition v. EPA,
  255 F.3d 855 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Cement Kiln Recycling Coalition v. EPA,
  493 F.3d 207 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Citizens to Preserve Overton Park, Inc. v. Volpe,
  401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

City of Los Angeles v. Lyons,
  461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

Collins Food Int'l. v. INS,
  948 F.2d 549 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Diamond v. Charles,
  476 U.S. 54 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Earth Island Institute v. Ruthenbeck,
  490 F.3d 687 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Friends of the Clearwater v. Dombeck,
  222 F.3d 552 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,
  528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

General Electric Co. v. EPA,
  290 F.3d 377 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Goldie's Bookstore, Inc. v. Superior Court,
  739 F.2d 466 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Health Ins. Ass'n of America, Inc. v. Shalala,
  23 F.3d 412 (D.C.Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Hemp Indus. Ass'n v. DEA,
  333 F.3d 1082 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Hopi Tribe v. Navajo Tribe,
  46 F.3d 908 (9th Cir. 1995), cert. denied, 516 U.S. 931 (1995) . . . . . . . . . . . . . . . . . 32

Hunt v. Washington State Apple Adver. Comm'n,
  432 U.S. 333 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Lee v. State of Oregon,
    107 F.3d 1382 (9th Cir. 1997), cert. denied, 522 U.S. 927 (1997) . . . . . . . . . . . . 15, 18

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

M.G. Maher & Co., Inc. v. United States,
    26 C.I.T. 1040, 2002 WL 2005839 (Ct. Int'l Trade 2002) . . . . . . . . . . . . . . . . . . . . . 45

Marsh v. Oregon Natural Resources Council,
    490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

McMichael v. County of Napa,
    709 F.2d 1268 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Mester Mfg. Co. v. INS,
    879 F.2d 561 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 36

Mid-Tex Elec. Coop., Inc. v. FERC,
    773 F.2d 327 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Miller v. Cal. Pac. Med. Ctr.,
    19 F.3d 449 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Nat'l Ass'n of Home Builders v. Norton,
    340 F.3d 835 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

National Alliance for the Mentally Ill v. St. Johns Cty.,
    376 F.3d 1292 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

National Ass'n for Home Care v. Shalala,
    135 F. Supp. 2d 161 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

National Wrestling Coaches Ass'n v. U.S. Dept. of Education,
    366 F.3d 930 (D.C. Cir. 2004, reh'g denied, 383 F.3d 1047 (D.C. Cir. 2004),
    cert. denied, 545 U.S. 1103 (2005), reh'g denied, 545 U.S. 1154 (2005) . . . . . . . . 19, 20

New El Rey Sausage Co. v. INS,
    925 F.2d 1153 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

North Carolina Fisheries Ass'n, Inc. v. Daley,
    16 F. Supp. 2d 647 (E.D. Va. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

1

2      Northwest Airlines, Inc. v. FAA,
              795 F.2d 195 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18, 53

3

4      O'Shea v. Littleton,
              414 U.S. 488 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

5
       Paralyzed Veterans of America v. West,
6             138 F.3d 1434 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

7      Renal Physicians Assn. v. U.S. Dept. of HHS,
              489 F.3d 1267 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 20
8

9      Renegotiation Bd. v. Bannercraft Co.,
              415 U.S. 1 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52
10

11     Reno-Sparks Indian Colony v. EPA,
              336 F.3d 899 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

12
       Sampson v. Murray,
13            415 U.S. 61 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

14     Sargent v. Block,
              576 F. Supp. 882 (D.D.C. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46
15

16     State of Colo. ex rel. Colorado State Banking Bd. v. Resolution Trust Corp.,
              926 F. 2d 931 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46
17

18     Taylor v. Westly,
              488 F.3d 1197 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
19

20     Toilet Goods Ass'n v. Gardner,
              387 U.S. 158 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22, 23
21

22     U.S. Cellular Corp. v. FCC,
              254 F.3d 78 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

23     United States v. Jewell,
              532 F.2d 697 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
24

25     Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,
              454 U.S. 464 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
26

27     Warth v. Seldin,
              422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

28

Whitmore v. Arkansas,
        495 U.S. 149 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Wisc. Gas Co. v. FERC,
        758 F.2d 669 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**STATUTES AND REGULATION**

5 U.S.C. § 553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

5 U.S.C. § 601 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

5 U.S.C. § 605(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

5 U.S.C. § 706(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

8 C.F.R. § 274a.1(l) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

8 C.F.R. § 274a.2(b)(1)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

8 C.F.R. § 274a.7(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

8 C.F.R. § 274a.10(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

8 U.S.C. § 1324(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

8 U.S.C. §1324a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

8 U.S.C §1324b(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

20 C.F.R. § 422.120 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

26 U.S.C. § 6103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

31 U.S.C. § 1535 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

42 U.S.C. § 405(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

55 Fed. Reg. 25928-01 (June 25, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

56 Fed. Reg. 41767-01 (August 23, 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

71 Fed. Reg. 34,281-1 (June 14, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

72 Fed. Reg. 45611 (August 15, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Pub. L. No. 99-603 § 101(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 29

**Introduction**

Plaintiffs' challenge to the "no-match" regulation promulgated by the Department of Homeland Security (DHS) rests on a fundamentally false premise. Plaintiffs contend that the regulation reflects a change from past practice and will impose new burdens on employers who receive "no-match" letters from the Social Security Administration (SSA) advising them that the name and social security number presented by an employee and filed on a wage statement do not match the information in SSA's records. Plaintiffs are mistaken. DHS has long treated an employer's receipt of such letters -- together with the employer's failure to take reasonable steps to resolve the mismatch -- as evidence in enforcement proceedings of an employer's constructive knowledge that it has hired, or continues to employ, an individual who lacks work authorization.

For this reason, the contention repeated throughout plaintiffs' briefs -- that the rule attaches new legal significance to no-match letters -- is incorrect. Since SSA began sending no-match letters to employers in 1994, they have been used as evidence and investigative tools in enforcement proceedings. The rule does not change this practice. Rather, the rule was developed as a way of addressing employer confusion over the proper response to receiving a no-match letter. Employers knew that these letters could be used against them in enforcement proceedings, and thus sought guidance on steps they could take that DHS would view as constituting a reasonable response, thereby ensuring that these letters would *not* be used as evidence of their constructive knowledge.  Such guidance to employers also protects employees by removing any pressure employers may feel to make snap judgments about the legal status of their workforce, thus reducing employees' risk of being summarily fired solely because their employer received a no-match letter.

Opposition to Plaintiffs' Motions for Preliminary Injunction (Case No. 07-4472 CRB)

The DHS rule provides that guidance for the benefit of both employers and employees by establishing a "safe harbor" procedure consisting of reasonable steps that an employer can take to resolve a mismatch. The employer is not required to take these steps. Indeed, an employer that elects not to follow the safe harbor procedure is not exposed to any additional legal jeopardy than it would face without the rule. Under current law, an employer who ignores a no-match letter risks having that letter used to prove its constructive knowledge, and the same is true under the rule.

An employer's decision to forego the safe harbor does not establish constructive knowledge. Rather, it just means that DHS *may* rely upon the no-match letter as a single piece of evidence in building an overall case, just as DHS may do under current law. Conversely, an employer that follows the safe harbor procedure has no guarantee that DHS will not bring an enforcement action. The only thing the safe harbor procedure ensures is that DHS will not seek to rely on the no-match letter as proof of constructive knowledge. Plaintiffs' rhetoric notwithstanding, the no-match rule is a *limit* on the evidence DHS may use in the event it brings an enforcement action.

Plaintiffs, unions and business associations, seek to enjoin the implementation of the regulation and to stop SSA from sending out the DHS's guidance letters in the same envelopes with the SSA no-match letters. Their Motions for Preliminary Injunction should be denied on numerous grounds because they fail to meet the requirements for preliminary injunctive relief. As an initial matter, plaintiffs lack standing to raise a facial challenge to the rule. They rely on speculation atop speculation to allege that employers, unions or their members will suffer the requisite injury-in-fact. But plaintiffs cannot show that the rule will cause injury or that the requested injunctive relief will redress the alleged harm. Indeed, the safe harbor provisions of

Opposition to Plaintiffs' Motions for Preliminary Injunction (Case No. 07-4472 CRB)      - 2 -

the regulation are designed to alleviate the concerns of employers and prevent many of the precipitous terminations that allegedly occur now solely as a result of receipt of the SSA letter. Thus, plaintiffs cannot demonstrate the requisite concrete, actual injury to themselves or to any of their members at this time.

Further, plaintiffs cannot establish the requisite likelihood of success on the merits. As discussed below and also in the preamble to the regulation, this interpretive rule does not, as plaintiffs assert, impose any new obligation on employers or change or expand the standard of liability under the immigration laws. The regulation does not alter the law prohibiting the employment of unauthorized workers or expand the legal definition of "knowing" employment of unauthorized aliens. Instead, it clarifies DHS' interpretation of the law and establishes an optional, safe harbor procedure that employers can follow, if they wish, in response to an SSA no-match letter.

Finally, the public interest balancing test weighs heavily in favor of the regulation. Plaintiffs' allegations of irreparable harm are entirely speculative. However, the public interest strongly favors this regulation, which will not only assist well-intentioned and law-abiding employers to hire and retain only those individuals authorized to work in the United States. Furthermore, by providing a clear, regulatory safe harbor, the rule will help employers avoid the risk of liability and protect employees from improper termination.

## STATUTORY AND REGULATORY BACKGROUND

### A.    The SSA No-Match Program

Pursuant to 42 U.S.C. § 405(c)(2)(A) and (3) the Social Security Administration (SSA) maintains earnings information on workers for the purpose of determining eligibility for and the amount of Social Security benefits to which a worker and his or her dependents may be entitled.

1    When employers annually report wages on Form W-2 (Wage and Tax Statement), SSA credits

2    those wages to the worker's account.  However, SSA can credit wages only if the name and

3    social security number (SSN) of the worker on the W-2 Form match the name and SSN in SSA's

4
5    records.  If, after a computer verification process to identify common errors, SSA cannot match

6    the name and SSN, SSA cannot credit the wages to anyone's account.  Instead, SSA puts the

7    wages into an Earnings Suspense File until it can determine which worker's account should be

8    credited.  20 C.F.R. § 422.120.

9
         There could be several reasons that the names and SSNs submitted by an employer might

10   not match.  For example, a name could be misspelled on the W-2 Form; the SSN could be

11   recorded incorrectly; or the worker may not have reported to SSA a name change caused by

12
13   marriage or divorce. And in some cases, individuals submit false social security numbers to

14   employers so that they may obtain employment.  Whatever the reason, SSA tries to resolve the

15   discrepancy so that it can properly credit the wages.

16
         Beginning in 1979, SSA has sent a letter (no-match letter) to each worker whose earnings

17   reported on the W-2 Form could not be credited because of a discrepant name or SSN.  The letter

18
19   alerted the worker to the discrepancy and asked the worker for corrected information to help SSA

20   identify who should be credited with the earnings.  In 1994, SSA also started sending no-match

21   letters to employers who submitted significant numbers of wage reports that could not be

22
23   credited to workers' records.  The letter informed the employer of discrepancies and listed the

24   SSNs to which SSA could not credit reported wages.  The no-match letter asked the employer to

25   prepare a corrected Wage and Tax Statement (W-2c) for each listed SSN that the employer could

26   correct or to ask the employee to contact SSA to correct an error in its records.  Currently, SSA

27   sends the letter only to those employers who report more than ten no-matches that represent more

28

than 0.5% of the total number of W-2s included in the employer's wage report.

SSA has developed computer software that permits it to correct many common name/SSN discrepancies based on a series of computer matching routines that can identify errors such as misspellings, first name/last name reversals and name changes due to marriage or divorce that have not been reported to SSA.  See Declaration of John Simermeyer at ¶¶ 5-6.  Where these computer matching routines correct an error and assign the wage earnings to the correct employee account, SSA does not need to send a no-match letter to either employer or employee.

The no-match letter to employers states that the letter is not a basis for the employer to take adverse action, such as laying off, firing, suspending, or discriminating against the employee.  Furthermore, the letter states there is no implication that the employer or employee intentionally gave the Government wrong information about the employee's name or SSN.

**B.    DHS Policies To Enforce Employer Compliance With The Immigration Laws**

**1.    Employer Sanctions Under the IRCA**

Under the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 (1986), employers were made subject to civil and criminal sanctions for hiring aliens who are not authorized to work in the United States, 8 U.S.C. § 1324a(a)(1), and also when the employer is found to "continue to employ the alien . . . knowing that the alien is (or has become) an unauthorized alien with respect to such employment," id. § 1324a(a)(2).  An employer can be subject to civil penalties, assessed through an administrative proceeding, 8 C.F.R. § 274a.10(b), of up to $11,000 for each unauthorized worker.  8 U.S.C. § 1324a(e)(4).[1]/  Employers may also face criminal sanctions for continuing to employ a worker who the employer learns is not

---

[1]/    An employer may also face civil penalties for failing to utilize the I-9 Form to verify eligibility to work. 8 U.S.C. § 1324a(a)(1)(B).

Opposition to Plaintiffs' Motions for Preliminary Injunction (Case No. 07-4472 CRB)        - 5 -

authorized to work. See 8 U.S.C. § 1324a(f); 8 C.F.R. § 274a.10(a).   An employer found to be

engaged in a pattern of hiring or continuing the employment of illegal aliens is subject to

additional fines and imprisonment of six months.  8 U.S.C. § 1324a(f)(1).   Employers may be

held liable for bringing in and harboring illegal aliens.  8 U.S.C. § 1324(a)(1).

Immigration regulations have long recognized that proof that an employer hired an

employee "knowing" him to lack authorization to work can be established either by proof that the

employer had  actual knowledge of the worker's illegal status, or that he had "constructive

knowledge" of that fact.  In 1991, the Immigration and Naturalization Service promulgated 8

C.F.R. § 274a.1(*l*) to define the knowledge element of "knowing" employment of unauthorized

workers to "include[] not only actual knowledge but also knowledge which may fairly be inferred

through notice of certain facts and circumstances which would lead a person, through the

exercise of reasonable care, to know about a certain condition." 56 Fed. Reg. 41767-01 (August

23, 1991).  As the INS noted in its interim rule notice published the previous year, this definition

was drafted in response to and consistent with the standards enunciated by the Ninth Circuit in

Mester Mfg. Co. v. INS, 879 F.2d 561, 567 (9th Cir. 1989).  55 Fed. Reg. 25928-01 (June 25,

1990).  The provisions of the new Safe Harbor rule do not materially change this standard.  The

new definition states

> The term knowing includes having actual or constructive
> knowledge.  Constructive knowledge is knowledge that may fairly
> be inferred through notice of certain facts and circumstances that
> would lead a person, through the exercise of reasonable care, to
> know about a certain condition.

Id. 72 Fed. Reg. 45611, 45623 (Aug. 15, 2007).  See generally United States v. Jewell, 532 F.2d

697, 700 (9th Cir. 1976).

2.    **ICE Investigative Practices**

Employers are required to verify the employment eligibility of newly hired employees by examining certain types of approved documentation submitted by the applicant and completing an Employment Eligibility Verification Form I-9, which requires the employer to certify that he has found the documentation submitted meets the legal requirements. 8 C.F.R. § 274a.2(b)(1)(ii). Employers are required to retain the original of the I-9 so that it may be inspected by agents of Immigration and Customs Enforcement, (ICE, a component of DHS), and although not so required, often employers retain copies of the supporting documentation submitted by the employee.

Upon three days notice, ICE agents can appear at an employer's place of business and audit the employer's compliance with the immigration law. No subpoena or warrant is required to conduct this type of investigation. 8 U.S.C. § 1324a(e)(2)(A). Employers must retain and make available to ICE all I-9's for three years after the date of hire or one year after the date the individual's employment is terminated, whichever is later. 8 U.S.C. § 1324a(b)(3), (e)(2)(A); 8 C.F.R. § 274a.2(b)(2). If a Notice to Inspect is accompanied by an administrative subpoena, ICE may compel production of all I-9s and other relevant documents. 8 C.F.R. § 274a.2(b)(2)(ii). In the course of such inspections, ICE typically reviews all documents relating to employees' immigration status found in an employer's files and frequently discovers no-match letters received from SSA.[2]/

---

[2]/        DHS will not obtain taxpayer information from SSA as a result of this new rule. DHS, like other law enforcement agencies can obtain tax information in a number of ways, including under the provision of 26 U.S.C. § 6103. DHS may also lawfully obtain no match letters directly from the employer pursuant to other legal authority, such as inspection of employer records pursuant to 8 U.S.C. § 1324(e)(2)(A) or subpoena of employer records pursuant to 8 U.S.C. § 1324a(e)(2)(c). Notwithstanding plaintiffs' insinuations in their earlier briefs, the issue of whether a no match letter is "taxpayer return information" is simply not relevant to the validity of the no match regulation. See First Spero Declaration (filed on August 31, 2007).

## C.    The Safe Harbor Rulemaking

### 1.    Impetus For The Rulemaking–Employer Confusion

As plaintiffs correctly point out, one major impetus for the rulemaking was the consistent, and growing, evidence that SSA no-match letters, in combination with the 1991 regulation defining constructive knowledge for purposes of the immigration laws, were generating significant employer confusion and uncertainty.[3/]  The former INS provided numerous advice letters to employers and their counsel, and to Members of Congress, regarding the proper consideration and handling of SSA no-match letters in the circumstances of particular cases. Following the transfer of INS functions to DHS, DHS continued to provide advice as further factual situations were presented, but it was clear that employers' uncertainty and confusion about no-match letters and their implications under the immigration laws was not abating.  For example, in a March 30, 2005 letter to W.E. Welch & Associates, Inc., (Defendants' Attachment A),  DHS notes that "receipt of the information discrepancy is not sufficient, in and of itself, to impart constructive knowledge that an employee is not authorized to work," id. at 1, but that there are "instances . . . when no-match discrepancies result from an employee's intentional use of a false name or invalid social security number to obtain unauthorized employment," id. at 2. The letter suggests that the employer follow "a reasonable and prudent course of action to determine the cause of no-match discrepancies."  Id.  In light of this history, DHS determined that fuller, clearer advice to employers was needed, and that such guidance needed to be disseminated more broadly than was possible through letters responding to individuals or single employers.

---

[3/]    See Plaintiffs' Request for Judicial Notice, Exhibits F – K ;  Defendants' Attachments A-D. Defendants are asking the Court to take judicial notice of the attachments referenced in defendants' Opposition (correspondence relating to no-match letters).

### 2.     The Significance Of No-Match Letters to Immigration Enforcement

Over the course of its administration of the immigration laws, DHS has concluded, as have other organizations that have studied this issue, in particular the Office of Inspector General of the Social Security Administration ("Inspector General") that a name/SSN discrepancy on a W-2 form submitted to an employer is frequently the result of deliberate immigration fraud, i.e. unauthorized workers make up, buy or steal SSNs and use those SSNs to obtain employment.

First and foremost, ICE investigators have often found, through audits and other investigative techniques, that in cases where employers have knowingly hired or retained unauthorized workers, that unauthorized workers frequently present made-up, purchased or stolen SSNs to obtain employment, and, significantly, that no-match letters found in these employers' files frequently directly correlate with the SSN fraud perpetrated by the illegal workers.  See Second Declaration of James Spero at ¶¶ 8-12.

Additionally, the Government Accountability Office has reached the same conclusion, noting, most recently in a report to Congress dated July 11, 2006 (GAO-06-814R; Plaintiffs' Exhibit Q) that "we have reported that Social Security Administration (SSA) and Internal Revenue Service (IRS) data can be useful for identity and employment eligibility verification as well as to facilitate more effective worksite enforcement." Id. at 1.   Moreover, the Inspector General has repeatedly issued reports on the misuse of SSNs by unauthorized workers.  For example, in the Inspector General's April 2005 Audit Report titled "Social Security Number Misuse in the Service, Restaurant, and Agriculture Industries" (A-08-05-25023),[4]/ the Inspector General noted that its investigation identified various SSN reporting irregularities and concluded:

> While we recognize there are legitimate reasons why a worker's

---

[4]/     Attachment __ hereto.

Opposition to Plaintiffs' Motions for Preliminary Injunction (Case No. 07-4472 CRB)      - 9 -

> name and SSN may not match SSA files . . . we believe the
> magnitude of incorrect wage reporting is indicative of SSN misuse.
> Employers and industry association representatives acknowledged
> that unauthorized noncitizens contribute to SSN misuse.

Id. at 2.

In another report, "Social Security Number Integrity: An Important Link in Homeland Security" (May 2002/A-08-02-22077), the Inspector General has expanded on the extensive criminal misuse of SSNs:

> As the use of SSNs has grown, so has its misuse. Because the SSN
> is so heavily relied upon as an identifier, it is a valuable commodity
> for criminals. It can be obtained illegally in many ways: presenting
> false documentation to SSA; stealing another person's SSN;
> purchasing an SSN on the black market; using the SSN of a
> deceased individual; and creating a nine digit number out of thin
> air.

Id. at 3.[5]/

### 3.    The Rulemaking Proceeding And Rationale For The Rule

On June 14, 2006, DHS proposed to amend 8 C.F.R. § 274a.1(*l*) to clarify DHS' interpretation of the law and the steps an employer could take after receiving a no-match letter from either SSA or DHS. 71 Fed. Reg. 34,281-1 (June 14, 2006). The proposed rule outlined the history of the definition of "knowing," and, in response to the continued request for practical guidance from employers, also described specific steps that an employer could take after receiving a no-match letter. The rule provides that if an employer took these steps in a timely

---

[5]/    Attachment E, hereto. These conclusions have been confirmed by numerous other Inspector General Reports. For example, in the SSA/IG October 2003 Audit Report titled "Follow-Up Review of Employees With the Most Suspended Wage Items" (A-03-03-13026), Attachment G, regional Employer Service Relations Officers commented that "the [no-match] problem often relates to the nature of the workforce, such as the widespread presence of illegal workers." Id. at 9. See also September 2005 Audit Report titled "Usefulness of Decentralized Correspondence in Focusing Employer-Assistance Activities" (A-03-05-25007). Attachment H.

fashion, DHS would view the employer's reaction to the no-match letter to have been "reasonable" and would not seek to use the employer's receipt of the no-match letter in any possible future enforcement action against the employer under 8 U.S.C. § 1324a(a)(2) to establish that the employer had constructive knowledge that the employee identified in the letter was not authorized to work in the United States.

The proposed rule identified examples of information available to an employer that, based on past DHS enforcement practices, could, in the totality of the circumstances, indicate that an employee may be an alien unauthorized to work in the United States. One example of such information was an SSA no-match letter. The proposed rule also explicitly restated the employer's obligations under pre-existing law and clarified that whether an employer may be found, in any enforcement action, to have had constructive knowledge depended on the "totality of relevant circumstances" present in a particular case.

DHS received public comments from a variety of sources, including labor unions, not-for-profit advocacy organizations, industry trade groups, private attorneys, businesses, and other interested organizations and individuals. In response to the public comments, DHS modified the rule to accommodate concerns expressed by both employers and employees. DHS agreed that it would consider an employer to have acted reasonably, and thus to have qualified for the safe harbor in the rule, if the employer checked its records and corrected any errors within 30 days of receiving a no-match letter, doubling the 14-day period set out in the proposed rule. The final rule also expanded the overall 60-day time frame for resolving discrepancies with SSA to a 90-day time frame. The final rule additionally clarified that only letters "to the employer" are covered by the rule; thus, the final rule did not address SSA no-match letters sent directly to the employee. 72 Fed. Reg. 45611-1 (August 15, 2007).

1    The final rule provides clearer guidance to employers on a course of action to limit their

2    possible liability if subsequent investigation by ICE determines that they have employed aliens

3    who are not authorized to work in the United States.  As DHS explained in the preamble to the

4    final rule:

5

6        [T]he safe-harbor provisions establish one course of action that an employer may
         take after receiving a notice from SSA or DHS.  The provisions contemplate that
7        the particular steps undertaken by the employer in response to an SSA or DHS
         notice, along with the time the employer takes to act and follow up with
8        appropriate inquiries, will be relevant considerations in the determination of
         whether the employer took reasonable steps to avoid a finding of constructive
9        knowledge under 8 CFR § 274a.1.  The ultimate determination of whether an
         employer will be found to have knowingly employed an unauthorized alien will be
10       based on the totality of the circumstances.  The safe-harbor procedure is simply
         one way for employers to avoid liability under the INA for knowingly employing
11       unauthorized aliens after receiving SSA or DHS notices.

12

13   72 Fed. Reg. at 45620-2.

14                              **Summary of Argument**

15       Both the Union Plaintiffs (AFL-CIO, et al.) and the Business Plaintiffs (San Francisco

16   Chamber of Commerce, et al.) lack standing to challenge the DHS Safe Harbor Rule because

17   their claims of injury are based almost entirely on speculation and the relief they seek will not

18

19   redress their alleged injury.  For similar reasons, their claims are not ripe at this time, before any

20   employer has attempted to use the Rule's safe harbor and before any post-Rule enforcement

21   action by DHS.

22       Contrary to plaintiffs' assertions, the Safe Harbor Rule does not impose new obligations

23

24   on employers, nor does it change the standard of what is a "knowing" violation of the prohibition

25   on the employment of unauthorized workers.  See 8 U.S.C. § 1324a(a).  Instead this rule provides

26   guidance as to DHS' understanding of that statute and, in response to employer uncertainty,

27   creates a "safe harbor" for employers, by identifying a non-exclusive procedure that employers

28

1    can undertake upon receipt of a no-match letter which, if completed, will ensure that the no-

2    match letter is not used against them in an enforcement action. Additionally, because the rule is

3    interpretive it does not impose new obligations on employers, DHS was not required to perform a

4    Regulatory Flexibility Act analysis.

5

6         The rule is not arbitrary and capricious since it is based on the experience of DHS, as

7    confirmed by GAO and the Inspector General, that no-match can indicate misuse of SSNs by

8    unauthorized workers. Nor does the rule depart from prior DHS and INS legal opinions on the

9    significance of no-match letters.

10

11        Finally, the application of the traditional preliminary injunction balancing factors weighs

12   strongly in defendants' favor, as any harm to plaintiffs is remote and speculative at this time,

13   while the harm to the public in delaying this much-needed guidance on no-match letters is

14   serious.

15                                    **ARGUMENT**

16

17        In determining whether to grant a preliminary injunction, courts in the Ninth Circuit

18   traditionally consider "(1) the likelihood of the moving party's success on the merits; (2) the

19   possibility of irreparable injury to the moving party if relief is not granted; (3) the extent to which

20   the balance of hardships favors the respective parties; and (4) in certain cases, whether the public

21   interest will be advanced by granting the preliminary relief." Miller v. Cal. Pac. Med. Ctr., 19

22   F.3d 449, 456 (9th Cir. 1994) (en banc). The moving party must demonstrate either "(1) a

23   combination of probable success on the merits and the possibility of irreparable harm, or (2) the

24   existence of serious questions going to the merits, the balance of hardships tipping sharply in its

25   favor, and at least a fair chance of success on the merits." Id. (internal quotation omitted); see

26

27   also Taylor v. Westly, 488 F.3d 1197, 1200 (9th Cir. 2007). "Under either formulation of the

28

Opposition to Plaintiffs' Motions for Preliminary Injunction (Case No. 07-4472 CRB)        - 13 -

test, the party seeking the injunction must demonstrate that it will be exposed to some significant risk of irreparable injury." Associated Gen. Contractors of Cal. v. Coalition for Econ. Equity, 950 F.2d 1401, 1410 (9th Cir. 1991). As shown below, plaintiffs have failed to satisfy those requirements for preliminary injunctive relief.

## I.    Plaintiffs Lack Standing And Their Claims Are Not Ripe

### A.    Plaintiffs Lack Standing To Challenge The DHS Rule.

It is axiomatic that those who seek to invoke the jurisdiction of the federal courts must satisfy the bedrock requirement imposed by Article III of the Constitution by alleging an actual case or controversy. See, e.g., City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983); Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982); O'Shea v. Littleton, 414 U.S. 488, 493 (1974); McMichael v. County of Napa, 709 F.2d 1268, 1269 (9th Cir. 1983).

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum of standing contains three elements." Id. These are (1) the plaintiff must have suffered an "injury in fact" which is "concrete and particularized" and "actual or imminent," not conjectural or hypothetical; (2) the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court;" and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" from the court. Id. at 560-61. Accord Lee v. State of Oregon, 107 F.3d 1382, 1387 (9th Cir. 1997), cert. denied, 522 U.S. 927 (1997) (internal quotations and citations omitted). Standing requires more than "conclusory" allegations of harm; it requires the party seeking to invoke the jurisdiction of the court to allege facts sufficient to

1   show interest and injury.  Baker v. United States, 722 F.2d 517, 519 (9th Cir. 1983).

2       An organization can assert standing in two ways – "in its own right to seek judicial relief

3   from injury to itself," or as a "representative of its members."  Warth v. Seldin, 422 U.S. 490,

4   511 (1975).  Here, Union Plaintiffs seek to pursue claims of both the unions themselves and their

5

6   members.  See Union Plaintiffs' First Amended Complaint (Union Plaintiffs' Complaint) ¶¶ 9-

7   15, 52-58.  Business Plaintiffs similarly seek to pursue claims on behalf of both themselves and

8   their members.  See Business Plaintiffs' Complaint, ¶¶ 6-12, 52-56.   An organization suing on

9   behalf of its members must allege facts sufficient to show, at a minimum, that its "members

10  would otherwise have standing to sue in their own right[.]"  Hunt v. Washington State Apple

11  Adver. Comm'n, 432 U.S. 333, 343 (1977).  See also Friends of the Earth, Inc. v. Laidlaw Envtl.

12

13  Servs. (TOC), Inc., 528 U.S. 167, 181 (2000); American-Arab Anti-Discrimination Committee v.

14  Thornburgh, 970 F.2d 501, 509 (9th Cir. 1992).  This obligation extends to identifying the

15  members of a plaintiff organization that have suffered, or will imminently suffer, harm; the

16  failure to do so precludes organizational standing.  See National Alliance for the Mentally Ill v.

17

18  St. Johns Cty., 376 F.3d 1292, 1296 (11th Cir. 2004) (organizations' "failure to identify an

19  injured constituent prevents them from asserting associational standing") (citing Arizonans for

20  Official English v. Arizona, 520 U.S. 43, 66 (1997)).

21      1.  The organizational plaintiffs here have not alleged sufficient facts to demonstrate that

22  any of their members have suffered an actual injury or face an imminent future injury.  See

23  American-Arab Anti-Discrimination Committee, 970 F.2d at 510 (organization lacked standing

24

25  to sue on behalf of members where it failed to allege that members are subject to or will be

26  subject to deportation under challenged statute).  Both Union Plaintiffs and Business Plaintiffs

27  contend that certain of their respective unidentified members have been injured by the existing

28

1    SSA program of sending no-match letters.  However, plaintiffs then make the entirely

2    unsupported leap that the implementation of the new DHS regulation, including the insert of a

3    DHS letter in the SSA no-match letters, will somehow injure additional members or cause

4    additional injury to members that are already injured by the current SSA program of sending no-

5    match letters.  Defendants disagree because, in fact, the new safe harbor provision of the

6    regulation will address many of the concerns that plaintiffs raise, and, if anything, should reduce

7    the potential for employers to misunderstand a no-match letter and make unnecessary

8    terminations.  But the fundamental point is that plaintiffs offer nothing beyond speculation that

9    the new regulation will make things worse, and thus cause them harm.

10

11           Both sets of plaintiffs essentially claim injury based not upon what DHS or SSA have

12   done or plan to do, but based upon what each set of plaintiffs fears will be done by some

13   employers in reaction to the new regulation.  Both groups of plaintiffs, for example, submit

14   declarations articulating unsupported predictions that, upon receiving no-match letters, some

15   employers will summarily terminate employees who are the subjects of such letters.  Union

16   Plaintiffs, for example, rely upon unsubstantiated testimony that maintains: "An unfortunate, yet

17   certain, consequence of the DHS proposal is that if an employer receives a 'no-match' letter,

18   many employees will simply be fired . . . . Out of caution, panic and confusion surrounding the

19   intricacies of the rule, and unfortunately ethnic profiling as well, many employers will select the

20   safe legal route by shedding the potential legal liability associated with workers who are the

21   subject of 'no-match' notices." Declaration of Robert Craig Silvertooth, ¶ 10. Business

22   Plaintiffs, in turn, rely on their own attenuated speculation that, pursuant to the challenged

23   regulation, "where a mismatch cannot be resolved in the ninety-day window and the employee

24   can provide no additional documentation . . . the employer then has to face the dilemma of

25

26

27

28

termination, criminal liability or fine, or a possible discrimination suit." Declaration of Elizabeth C. Dickson, ¶ 9.

Both sets of plaintiffs neglect to mention, however, that they face the same risks and costs even if the challenged regulation were never implemented. No-match letters are commonly used by ICE as one component of an enforcement action when I-9 audits of businesses are conducted. First Declaration of James C. Spero, ¶¶ 2 - 7; Second Spero Decl., ¶¶ 8-12. ICE currently expects employers who receive no-match letters to take "reasonably affirmative measures to resolve any discrepancies" or else risk being found to have constructive knowledge that they are employing unauthorized workers. First Spero Decl. at ¶ 7. Accordingly, the alleged risk of unjustified firings posited by the plaintiffs already exists, ¶ 10, whether or not the challenged regulation goes into effect.

Business Plaintiffs construct a false dichotomy between the current legal regime and the changes that they allege the rule would cause, by asserting that, prior to promulgation of the challenged regulation, employers and employees have been able to resolve mismatches "at their leisure." Dickson Decl. ¶5. To the contrary, absent the challenged rule, employers know that an ICE investigation and enforcement action could occur at any time, but they do not know how long they have to address any mismatch, nor what steps DHS might deem reasonable. Thus employers currently have more incentive to summarily terminate employees who are the subject of no-match letters than they would under the Safe Harbor rule.

The mere fact that a plaintiff "can 'imagine circumstances in which [the plaintiff] could be affected by the agency's action'" is not enough to confer standing where there is no current injury and the plaintiff relies wholly on the threat of future injury. Northwest Airlines, Inc. v. FAA, 795 F.2d 195, 201 (D.C. Cir. 1986), quoting U.S. v. Students Challenging Regulatory

1    Action Procedures, 412 U.S. 669, 688-89 (1973).  At most, plaintiffs posit the prospect that after

2    an employer receives a letter describing the new safe harbor regulation, that employer might take

3    actions different than it would otherwise have taken, further that the employer might ask the

4
     employee to take steps to verify information with SSA and, finally, if those steps were not
5
6    successful in 93 days, the employee might be terminated.  This is far too attenuated a series of

7    suppositions to establish standing for a facial challenge.  A threatened injury must be "certainly

8    impending" to constitute injury-in-fact for purposes of Article III standing.  Lujan, 504 U.S. at

9
     564 n. 2; Whitmore v. Arkansas, 495 U.S. 149, 158 (1990).  The Supreme Court has consistently
10
11   held that claims of threatened injury that were too speculative failed to support Article III

12   standing.  See, e.g., Lujan, 504 U.S. at 563-64; Whitmore, 495 U.S. at 156-57; Diamond v.

13   Charles, 476 U.S. 54, 66 (1986); Lyons, 461 U.S. at 105-08.  The Ninth Circuit has also

14   "'repeatedly found a lack of standing where the litigant's claim relies upon a chain of speculative

15
     contingencies.'"  Lee, 107 F.3d at 1389 (quoting Nelsen v. King County, 895 F.2d 1248, 1252
16
17   (9th Cir. 1990)).

18        2.  Plaintiffs also lack standing because they seek a remedy that will not provide them

19   with any effective relief, so they fail to satisfy the requirement that an alleged injury is likely to

20   be redressed by a favorable decision.  Lujan, 504 U.S. at 560-561. Given that the challenged

21   regulation does not change the longstanding practice by ICE of using no-match letters as

22
     evidence of constructive knowledge, see First Spero Decl. ¶¶ 4-8, any injury that plaintiffs claim
23
24   occurs as a result of this practice would not be redressed by enjoining the regulation.  As the D.C.

25   Circuit has recently acknowledged in rejecting a challenge to a voluntary safe harbor provision,

26   invalidating the challenged regulation will not necessarily change the behavior of third parties

27   that have directly caused the alleged injuries.  Renal Physicians Assn. v. U.S. Dept. of HHS, 489

28

F.3d 1267, 1277 (D.C. Cir. 2007).[6]/ The interpretations previously provided by the INS and ICE, and cited by the plaintiffs, are consistent with the challenged rule, and enjoining the rule will not change these longstanding interpretations and practices.

The relief sought by plaintiffs here cannot redress the alleged because, as to each set of plaintiffs, there is no evidence that a favorable ruling would alter essential third-party conduct. Neither set of plaintiffs is alleging that they will experience imminent, direct injury traceable to DHS and redressable by the relief they seek. Instead, they would only obtain relief from the injuries they alleged if their requested change in government policy were to alter the behavior of certain third parties – i.e., certain employers – who plaintiffs speculate will otherwise commit injurious acts such as terminating employees without cause or take actions that would impose enormous administrative costs. See, e.g., Silvertooth Decl. ¶ 10; Dickson Decl. ¶¶ 5, 7, 9.

The declarations relied upon by Union Plaintiffs make clear that their claims of injury and redressability rely upon speculation as to actions that they allege the challenged rule will cause some employers, not the government, to take. These declarations refer, for example, to "fear of employers' potential abuse of no-match letters," Declaration of Tim Paulson, ¶ 5; Declaration of

_____

[6]/    The D.C. Circuit concluded that to establish standing the plaintiff "needs to show that the decision of clinics to reduce the hourly wage of medical directors is linked to the continuing existence of the safe-harbor provision such that invalidating the provision will be reasonably likely to cause the clinics to raise the hourly wage." Renal Physicians, 489 F.3d at 1276. Because the law that the regulations interpreted remained in effect, plaintiffs failed to show that eliminating the safe harbor would change the behavior of the third party clinics. Id. This decision relied upon an earlier decision in National Wrestling Coaches Ass'n v. U.S. Dept. of Education, 366 F.3d 930 (D.C. Cir. 2004), reh'g denied, 383 F.3d 1047 (D.C. Cir. 2004), cert. denied, 545 U.S. 1103 (2005), reh'g denied, 545 U.S. 1154 (2005). In that case, the court upheld the dismissal for lack of standing of a challenge alleging that certain Department of Education regulations and guidance discriminated against male athletes by causing educational institutions to cut or reduce men's sports teams. The Court held that because the alleged injury resulted from independent decisions of educational institutions rather than from the challenged regulations themselves, plaintiffs lacked standing as the relief sought would not redress their alleged injuries. 366 F.3d at 933.

Sharon Cornu, ¶ 5, and "employees . . . afraid that their employers will fire them" being "less likely to stand up for their rights or publicly support a union organizing campaign," Paulson Decl., ¶ 5. Because these alleged injuries are neither directly traceable to DHS nor redressable by means of the relief that plaintiffs seek, see Lujan, 504 U.S. at 560-61; Renal Physicians, 489 F.3d at 1277; National Wrestling, 366 F.3d at 938-40, plaintiffs fail to meet the requirements of standing.

Union Plaintiffs maintain that "of the approximately 8 million employees who will be affected by the upcoming SSA no-match letters, about 600,000 would be AFL-CIO union members." Declaration of Michael Reich, ¶ 4. However, enjoining the challenged regulation would not diminish the number of union members (or total number of employees for that matter) who are likely to receive SSA no-match letters. And because, if the challenged regulation were enjoined, these no-match letters would continue to be only one possible type of evidence of constructive knowledge in an ICE enforcement action, see Second Spero Decl., ¶¶ 2-8, Union Plaintiffs would continue to face the risks of injury due to employer "abuse" of no-match letters or decisions to fire employees rather than incur the costs of investigating the reasons for the mismatch or verifying the employee's legal status. See Second Spero Decl., ¶ 4. Because the risk of enforcement action against the employers, including ICE's possible reliance on no-match letters and employer responses thereto, remains whether or not the challenged regulation is enjoined, Union Plaintiffs cannot satisfy the redressability prong of standing.

Nor would the injunction sought by Business Plaintiffs redress the injuries they claim to face, given that the challenged regulation does not "alter [] the legal regime" to which the regulated entities' actions are subject. See Bennett v. Spear, 520 U.S. 154, 178 (1997). Indeed, as discussed in more detail below, see infra, Part II.A, the DHS Safe Harbor Rule does not

establish new legal obligations on employers. 72 Fed. Reg. at 45612-15. Thus the implementation of the Safe Harbor Rule, or the distribution of the DHS letter by SSA, does not affect the likelihood that an employer will be subject to an ICE inspection or other official investigation. As noted, SSA will not provide copies of no-match letters to DHS and hence the failure of the employer to act within 93 days will not result in enforcement action by ICE.

Instead, the Rule does not come in to play unless and until (a) ICE investigates an employer, (b) ICE finds that the employer was employing illegal workers, and (c) ICE discovers a no-match letter in the employers' records. Furthermore, the No-Match Rule does not increase the risk that employers will be found to have violated 8 U.S.C. § 1324a. If an employer is investigated, a finding that the employer had constructive knowledge will be based on "the totality of relevant circumstances." 72 Fed. Reg. at 45620-2. The steps set forth in the Safe Harbor rule are not the only means for an employer who receives No-Match letters to avoid a finding of constructive knowledge; nor will employers who follow the Safe Harbor procedures be entirely insulated from being found to have hired unauthorized aliens with constructive knowledge of their ineligibility. The Safe Harbor under the Rule does not amount to blanket immunity because employers who follow the Safe Harbor steps may nevertheless be found to have acted with constructive knowledge on the basis of evidence that does not involve no-match letters.

Thus, if Business Plaintiffs were granted the relief they seek, and the No-Match Rule were enjoined, Business Plaintiffs would nevertheless continue to face the risk of the injuries of which they complain. For example, Business Plaintiffs would still either incur the cost of "human resource systems to resolve mismatches," Dickson Decl. ¶¶ 5, 7, or run the risk of not resolving mismatches in advance of an ICE enforcement action and having a no-match letter

deemed to support a finding of constructive knowledge.    To the contrary, because the same legal

regime would remain in place with or without an injunction, the predicted injuries would be

equally likely or unlikely regardless of whether the injunction sought by Business Plaintiffs is

granted.  Accordingly, Business Plaintiffs fail to establish standing because they fail to establish

that the relief they seek would redress the harm they allege.

### B.    Plaintiffs Claims Are Not Ripe

.Plaintiffs' claims are not ripe for judicial review at this time.   Ripeness is a prudential

doctrine intended, in part, to prevent judicial review of legal issues outside the limits of a court's

Article III jurisdiction over cases and controversies.  See Earth Island Institute v. Ruthenbeck,

490 F.3d 687, 694-696 (9th Cir. 2007).   In Earth Island Institute, the court reiterated the doctrine

that a purely legal question could be resolved in a pre-enforcement suit, Abbott Labs. v. Gardner,

387 U.S. 136, 140 (1967), but that legal questions were unripe for judicial review where, as here,

the regulations' effects were speculative and the plaintiff's primary conduct was not affected.

Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 163-64 (1967).  Both Union and Business

Plaintiffs complain that the DHS regulation and the mailing of SSA no-match letters will cause

employers to fire employees to the detriment of their members.   See supra at 16 –18. But

because several intervening events must occur before there could be any harm to any plaintiff and

the necessary combination of such events is highly speculative, none of plaintiffs' claims are ripe

for review at this time.

For the same reasons that plaintiffs have failed to demonstrate injury in fact that

establishes standing, see supra at 16-18, or irreparable injury justifying issuance of a preliminary

injunction, see infra at 49-53, they have also failed to establish that their claims are ripe for

judicial review.  In order for these claims to be ripe, a number of speculative and unlikely events

would need to occur.  The Union Plaintiffs' claims are not ripe until a member of a union has

been terminated from employment.  And the Business Plaintiffs' claims are not ripe until an

employer has been subject to an investigation or enforcement action by ICE.

As the Court noted in Toilet Goods, supra at 164, in determining that the plaintiffs'

challenge in that case was not ripe, "[a]t this juncture we have no idea whether or when such an

inspection will be ordered and what reasons the Commissioner will give to justify his order."  Id.

at 163.  Here, the uncertainties are even greater as they involve the possible, but entirely

unpredictable, actions of at least three parties – employers, their employees, and DHS in its

enforcement actions.  It is uncertain how employers will use the new safe harbor procedures and

the guidance of the regulation, how employees will respond to requests by employers that they

resolve name/SSN disparities and what, if any, future enforcement actions DHS will take in

response to employers' use of (or decision not to use) the new Safe Harbor.  The ultimate

conclusion of the Toilet Goods Court applies with equal force here: "[w]e believe that judicial

appraisal of these factors is likely to stand on a much surer footing in the context of specific

application of this regulation than could be the case in the framework of the generalized

challenge made here."  Id. at 164.   See also Ass'n of American Medical Colleges v. U.S., 217

F.3d 770 (9th Cir. 1999) (affirming dismissal as unripe of allegations that an alleged program of

audits by the government was being used to coerce settlements under a Hobson's choice to avoid

suit under the False Claims Act).[2]/

---

[2]/      Individuals can challenge agency rules requiring them to conform their conduct to a particular standard because the disregard of mandatory rules gives rise to a meaningful risk that the agency will bring an enforcement proceeding. The Safe Harbor rule imposes no mandatory obligations, however, and it therefore does not increase the risk that an employer will be the subject of an enforcement action. It would be singularly inappropriate to find irreparable injury arising out of employers' voluntary efforts to avoid enforcement actions, particularly because courts lack jurisdiction to review agencies' discretionary decisions to bring (or not to) such actions in the first place. See Ass'n

**II.     Plaintiffs' Arguments Fail On The Merits**

      **A.     The DHS Safe Harbor Rule Is Consistent With The Governing Statutes**

            **1.     The Rule Does Not Impose New Legal Obligations Or Change The Definition of "Knowing"**

The plaintiffs' arguments that the DHS Safe Harbor Rule is contrary to relevant immigration statutes are premised on a fundamental misreading of the regulation.  As discussed in the preamble to the rule, it does not expand liability through a redefinition of "knowing."

> This regulation describes an employer's current obligations under immigration laws, and its options for avoiding liability, after receiving such a letter from either SSA or DHS.  The regulation specifies step by step actions that can be taken by the employer that will be considered by DHS to be a reasonable response to receiving a no-match letter – a response that will eliminate the possibility that the no-match letter can be used as any part of an allegation that an employer had constructive knowledge

72 Fed. Reg. at 45612.  And again later,

> The rule does not impose upon employers any new responsibilities that do not already exist under current law.  With or without this rule, employers who have constructive knowledge that certain employees are unauthorized aliens should terminate employment or risk sanctions from DHS.

72 Fed. Reg. at 45621.

Instead, in response to requests for clarification and guidance from employers who receive no-match letters,[8]/ the Rule provides guidance as to DHS' interpretation of the term "knowing."

_____

of Irritated Residents v. EPA, 2007 WL 2033262, at *4 (July 17, 2007) ("Enforcement actions are generally within [the] exclusion [from APA review], because 'a court would have no meaningful standard against which to judge the agency's exercise of discretion' in deciding how to enforce the statutory provisions.") (quoting Heckler v. Chaney, 470 U.S. 821, 830 (1985)).

[8]/     See Plaintiffs' Requests for Judicial Notice, Exhibits F -K; Defendants' Attachments A-D.

1    First, in providing guidance to the public on the meaning of the term "knowing," the rule

2   informs the public of DHS' interpretation of the law by providing two additional examples of

3   facts that DHS believes may be relevant to making the determination of "constructive

4   knowledge" in a civil or criminal enforcement proceeding.  If the employer fails to take

5   reasonable steps in response to the receipt of either: (a) a no-match letter from SSA, 8 C.F.R. §

6   274a.1(l)(iii)(B); or (b) a letter from DHS noting that the employee's immigration documents

7   were assigned to someone else, or there is no agency record of the document, 8 C.F.R. §

8   274a.1(l)(iii)(C), DHS would consider that failure to act relevant to a determination of liability

9   under § 1324a.  However, these are only offered as examples and, contrary to the plaintiffs'

10  repeated mischaracterizations of the rule, are not dispositive of the employer's constructive

11  knowledge of any employee's illegal work status.  The regulation clearly notes that these are only

12  "[e]xamples of situations where the employer may, depending on the totality of relevant

13  circumstances, have constructive knowledge . . ." Id. § 274a.1(l)(1) (emphasis added).  Nor is

14  this an exclusive list of factors that are relevant to the constructive knowledge determination.

15     Second, the rule offers employers a safe harbor in "an attempt to reduce confusion

16  regarding employers' responsibilities under immigration law by providing them a DHS-approved

17  method for resolving Social Security mismatches." 72 Fed. Reg. at 45621.  Employers are

18  assured that if they follow the steps recommended by the regulation, 8 C.F.R. § 274a.1(l)(2)(i),

19  they will receive the benefit of a safe harbor, i.e. "receipt of the written [no-match] notice will

20  therefore not be used as evidence of constructive knowledge" in any enforcement proceeding.  Id.

21  at 45616.[2]/  Thus, the Safe Harbor Rule, while not imposing any obligations on employers, does

---

[2]/     It is, of course, possible that the employer could still be found, on the basis of other evidence
to have knowingly employed  an undocumented worker, but it will have immunity from DHS' use
of the no-match letter against it in any future enforcement proceeding.

1  impose a binding constraint on the ability of DHS to use no-match letters in future enforcement

2  proceedings.

3        The regulation does not impose any obligation on the employer to take these steps, or any

4  steps, to attempt to resolve the discrepancy in the employee's social security information.  If the

5  employer wants to take advantage of the safe harbor offered by the rule, the rule (as well as the

6  DHS no-match letter) informs the employer that it "should" take certain steps specified by the

7  rule, 8 C.F.R. § 274a.1(l)(2).  But, nothing in the rule or letter can be construed as an obligation

8  on the employer to utilize the safe harbor.  The employer is told what it "should" do to utilize the

9  safe harbor, not what it "must" do as a requirement of federal law.[10]/

10

11       The Union Plaintiffs repeatedly mischaracterize the DHS letter which is to accompany

12 SSA no-match letters sent to employers, Union Plaintiffs' Appendix B, as imposing new

13 obligations.  See Union Plaintiffs' Memorandum at 15-20.  First, the Union Plaintiffs gloss over

14 the very first line of the letter, which describes its significance: "The purpose of this letter is to

15 provide you with additional guidance on how to respond . . ." to an SSA no-match letter.

16 Appendix B at 1 (emphasis added).   The first question in the letter ("**Q: Can I simply disregard**

17 **the letter from SSA?**")[11]/ does not mandate that the employer do anything, but provides

18 guidance from DHS concerning the potential risks of disregarding the no-match letter.  If the

19 employer is found to have employed an unauthorized worker, DHS "could determine that you

20 have violated the law by knowingly continuing to employ unauthorized persons.  This could lead

21 to civil and criminal sanctions."  Id. (emphasis added).  This merely restates the preexisting legal

22

23

24

25  ─────────────────

26 [10]/     Indeed, the language in the DHS insert letter mirrors the use of "should" in the SSA letter,
    See Union Plaintiffs' Appendix C at 2 ("**What You Should Do**  It would be a great help to us if you
27  would respond within 60 days . . .") (bold in original).

28 [11]/     All **bold** material from the Guidance letter was from the original.

prohibition against continuing to employ unauthorized workers, 8 U.S.C. § 1324a(a)(2), and

reminds employers that DHS may enforce that law when it can prove a knowing violation.

The Union Plaintiffs then flatly misstate the answer to the next question ("**Q: What should I do?**") (Appendix B) by stating that the answer is that "'You should' follow Homeland Security's new 'safe harbor' procedures." Union Plaintiffs' Memorandum at 7:17-18. In fact, the answer provided by the letter is no different than the consistent guidance ICE and INS (and DOJ's Civil Rights Division), have provided to employers since the enactment of IRCA's employer sanctions provisions 21 years ago: "**A: You should take reasonable steps to resolve the mismatch,** and apply these reasonable steps uniformly to all employees . . ." But rather than leave the employer to guess at what ICE or a Court or Administrative Law Judge might some day conclude is reasonable, the letter then identifies the safe harbor steps that DHS considers reasonable and which it agrees to be bound by in future enforcement proceedings.

The Union Plaintiffs' argument that the DHS regulation attempts to change the standard of what is a "knowing" violation of the immigration laws is, again, premised on a misreading of the rule. The regulation does not change existing statutory prohibitions on employing unauthorized workers, nor does it alter the definition of "constructive knowledge" contained in the regulatory definition section itself, 8 C.F.R. § 274a.1(l)(1), which has remained substantively unchanged since 1991. The Union Plaintiffs begin by reviewing the case law on what constitutes a knowing violation of the immigration laws, Union Plaintiffs' Memorandum at 10-13, and then attack an assertion that they contend underlies the Safe Harbor rule: that the mere receipt of a no-match letter makes the employer aware of facts that establish that it is highly probable that any worker identified in the letter is unauthorized. See Union Plaintiffs' Memorandum at 13:27-14:4. However, this has never been the position of DHS or of its predecessor agency, the

Immigration and Naturalization Service, nor is it DHS' position now.  The DHS Guidance letter

explicitly disclaims this assertion:

> **Q: Does receiving a mismatch letter, standing alone, indicate**
> **that I ought to terminate the employees whose numbers did not**
> **match SSA records?**
>
> **A:** There are many reasons for a mismatch between employer and
> SSA records, including transcription errors and name changes due
> to marriage that are not reported to SSA.  Employers should not
> assume that the mismatch is the result of any wrongdoing on the
> part of the employee.

Union Plaintiffs' Appendix B at 2.  The preamble to the Rule is equally clear, noting that "[t]here

can be many causes for a no-match, including clerical error and name changes."  72 Fed. Reg. at

45612.

Yet, while DHS has long recognized that no-match letters are not dispositive of either the

unauthorized status of a worker, or of an employer's constructive knowledge, they are certainly

relevant evidence in an enforcement proceeding under 8 U.S.C. § 1324a.  As indicated by the

Second Spero Declaration, ¶¶ 8-12, it has long been the experience of ICE and others, such as the

SSA Inspector General, that employees identified in no-match letters are often not authorized to

work, and therefore that a no-match letter can be relevant to whether the employer had actual or

constructive knowledge of an employee's illegal status. Cf. Fed. R. Evid 401 ("'Relevant

evidence' means evidence having any tendency to make the existence of any fact that is of

consequence to the determination of the action more or less probable that it would be without the

evidence.").

Ultimately, the Union Plaintiffs' argument comes down to an assertion that no-match

letters can <u>never</u> be relevant in an employer enforcement  proceeding to establish, as part of the

totality of circumstances, that an employer had knowledge of a worker's unauthorized status.

1    And that assertion is obviously false.[12]/

2        **2.    The Safe Harbor Rule Does Not Establish A New "Re-verification**
3            **Obligation**

4        The Union Plaintiffs challenge the new rule because it "effectively" establishes a "work-

5    authorization re-verification system" for employers.  See  Union Plaintiffs' Memorandum at

6    15:12-13.  As discussed above, the Safe Harbor Rule does not impose any new obligations on

7    employers to utilize its safe harbor provision or to otherwise reverify its employees' work

8    authorization status.  To be sure, employers may need to recheck information submitted by

9    employees when that information has been called into question.  72 Fed. Reg. at 45623.  But that

10   obligation stems not from this rule, but from the statutory requirement that employers not

11   "continue to employ the alien . . . knowing the alien is (or has become) an unauthorized alien . .

12   ."  8 U.S.C. § 1324a(a)(2).

13       The Safe Harbor Rule is not "binding as a practical matter" on employers, General

14   Electric Co. v. EPA, 290 F.3d 377, 383 (D.C. Cir. 2002), because in the rule, the preamble and

15   the guidance letter DHS has been absolutely clear in stating that employers are not required to

16   follow the safe harbor provision, but rather have the option of so doing, nor does it otherwise

17   impose any obligation on employers.  8 C.F.R. § 274a.1(1)(c); 72 Fed. Reg. at 45621 ("The rule

18   does not impose on employers any new responsibilities that do not already exist under current

19   law."); Union Plaintiffs' Appendix B at 1 ("The purpose of this letter is to provide you with

---

[12]/    The Union Plaintiffs contention that the Rule is invalid "because it indiscriminately applies to employees who were hired before IRCA was adopted," Memorandum at 19, is simply wrong as a matter of law.  As the Union Plaintiffs note, IRCA expressly exempted these employees from the employer sanctions provisions at issue, see Pub. L. No. 99-603 § 101(a)(3), codified at 8 U.S.C. § 1324A Historical and Statutory Notes ("Grandfather for current employees"), a point confirmed by the regulations, 8 C.F.R. § 274a.7(a).  Since the statutory employer sanctions provision does not apply to such employees, it follows inexorably that regulations to construe the employer sanctions statute are also inapplicable.

Opposition to Plaintiffs' Motions for Preliminary Injunction (Case No. 07-4472 CRB)        - 29 -

additional guidance . . .”).  In <u>General Electric</u>, the Court had to determine whether an EPA

“Guidance Document” that specified two alternative approaches to performing a risk assessment

as required by the Toxic Substances Control Act constituted a legislative rule.  The court noted

that “an agency pronouncement will be considered binding as a practical matter if it either

appears on its face to be binding . . . or is applied by the agency in a way that indicates it is

binding.”  <u>Id.</u> at 297  (citations omitted).  The court concluded that the language of the Guidance

document demonstrated that it was establishing a binding requirement for regulated parties in

preparing a risk assessment:

> . . . even though the Guidance Document gives applicants the
> option of calculating risk in either of two ways (assuming both are
> practical) it still requires them to conform to one or the other, that
> is not to submit an application based upon a third way.
> * * *
> To the applicant reading the Guidance Document the message is
> clear: in reviewing applications the Agency will not be open to
> considering approaches other than those prescribed in the
> Document.

<u>Id.</u> at 298.  By contrast, the preamble to the DHS Rule expressly recognizes that “[t]here may be

other procedures a particular employer could follow in response to a no-match letter, procedures

that would be considered reasonable by DHS and inconsistent with a finding that an employer

had constructive knowledge. . .”  72 Fed. Reg. at 45614.

    The other case cited by the Union Plaintiffs, <u>Cement Kiln Recycling Coalition v. EPA</u>,

493 F.3d 207 (D.C. Cir. 2007), further supports defendants’ position that the Safe Harbor Rule is

not binding on employers.  At issue in that case was an EPA “guidance document” containing

technical recommendations for human health risk assessments in connection with permitting for

hazardous waste combustors, <u>id.</u> at 214, which the plaintiffs contended was binding guidance and

so should have been promulgated through notice-and-comment rulemaking.  But the Court

rejected that challenge for essentially the same reasons that this Court should reject Union Plaintiffs' arguments. First, the court noted that "the document declares that 'this guidance does not impose legally binding requirements on EPA, states or the regulated community.'" Id. at 227. And while the court did note that "an agency's pronouncement that a document is non-binding will not make it so," the court also concluded the sentence with "where there is evidence – or practice – to the contrary." Id. at 228. The court then held that the Union Plaintiffs had "failed to point to any evidence suggesting that the document is anything other than what EPA asserts it is: a non-binding statement of EPA policy." Id. The Union Plaintiffs here suffer from an equally fatal absence of evidence in their challenge to the Safe Harbor Rule.[13]/

**B.      The DHS Safe Harbor Rule is Not Arbitrary or Capricious**

**1.  Standard Of Review Under The Administrative Procedure Act**

The Administrative Procedure Act provides that agency action may be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or if the action fails to meet statutory, procedural, or constitutional requirements. 5 U.S.C. § 706(2). Under these deferential standards, the agency's decision is entitled to a presumption of regularity and must be upheld if rationally based. Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971).

To determine whether agency action is arbitrary or capricious, a court must consider

---

[13]/    These cases are inapposite for an additional reason. In both cases, plaintiffs argued that the guidance documents in question were in fact binding legislative rules that should have been promulgated through notice-and-comment rulemaking under 5 U.S.C. § 553. Here, DHS chose to permit notice-and-comment on this interpretive rule, given the importance of the issue. Needless to say, the fact that DHS elected to permit additional public participation on this rule does not change its character as a non-binding, interpretive rule. See Fn. 23, infra.

"whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989), or the absence of "a rational connection between the facts found and the choice made," Motor Vehicles Mfrs. Ass'n, supra. See also Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 105 (1983). Regulations are presumed to be valid, and therefore review is deferential to the agency. Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835, 841 (9th Cir. 2003). A court is not empowered to substitute its judgment for that of the agency. Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, 273 F.3d 1229, 1236 (9th Cir. 2001). An agency's decision is "entitled to substantial deference and must be upheld if it rests on a rational basis." See Hopi Tribe v. Navajo Tribe, 46 F.3d 908, 914 (9th Cir. 1995), cert. denied, 516 U.S. 931 (1995); see also Friends of the Clearwater v. Dombeck, 222 F.3d 552, 556 (9th Cir. 2000).

### 2. No-Match Letters Are Potentially Relevant Evidence To Establish An Employer's Knowing Violation Of The Immigration Laws

In contending that DHS has not articulated a "rational connection between the facts found and the choice made," Union Plaintiffs' Memorandum at 20, citing Motor Vehicle Mfrs. Ass'n, supra, the Union Plaintiffs attack a straw man. Without any citation, the Union Plaintiffs offer the following (patently false) articulation of the rationale for the Safe Harbor rule:

> . . . the DHS rule is premised on SSA no-match letters serving as reliable indicators of unauthorized-work status – and therefore, as establishing the "high probability" of unauthorized status that would be necessary for the recipient to have "constructive knowledge" (see pp. __, supra), [sic]

Union Plaintiffs' Memorandum at 21:4-21:7. In fact, DHS has not made any such sweeping assertion, either in the Safe Harbor Rule or in prior statements, and instead has repeatedly recognized that, while a no-match letter may be relevant evidence in an enforcement action, the

Opposition to Plaintiffs' Motions for Preliminary Injunction (Case No. 07-4472 CRB)    - 32 -

no-match letter alone does not demonstrate that an employee is not work authorized or that, if the employee is later found to be unauthorized, the employer had knowledge of that fact.

Both sets of plaintiffs repeatedly contend that no-match letters have absolutely no relevance or connection whatsoever to the employer's knowledge of an employee's work authorization status and therefore the Safe Harbor rule is arbitrary and capricious. But DHS had available to it information from numerous sources indicating that an employee name/SSN discrepancy is often a result of an unauthorized worker using an SSN that is not his. See pp. 8-10, supra.

In fact, several commenters on the Safe Harbor Rule candidly admitted that employers were using large numbers of undocumented workers. For example, Western Growers estimated as many as 80% of workers harvesting crops in California and Arizona are illegal immigrants.[14] The National Council of Agricultural Employers noted that many of its members' employees "would not return to work once the employer has placed the burden upon them to verify their work authorization because they would be unable to do so."[15]

Even the Union Plaintiffs' own declarant, Dr. Nik Theodore, has confirmed that undocumented workers often use false SSNs. In November of 2003, Dr. Theodore co-authored a study titled "Social Security Administration's No-Match Letter Program: Implications for Immigration Enforcement and Worker's Rights," published by the Center for Urban Economic Development at the University of Illinois at Chicago.[16] Dr. Theodore's report notes that,

---

[14] August 11, 2006 comments of Western Growers, Attachment I, hereto, at third unnumbered page of five pages of comments.

[15] August 14, 2006 comments of National Council of Agricultural Employers, Attachment J hereto at 13.

[16] Attachment K, hereto.

1    although there are sometimes innocent explanations for a mismatch, "[i]n other cases, workers

2    have submitted an invalid SSN because they are undocumented immigrants who do not have

3    proper employment authorization." Attachment K at 1. The Study further recognizes that this is

4    a common explanation for no-matches, as "[e]mployers have complained that when they notify

5    

6    employees of the need to correct their SSN, workers <u>often</u> quit rather than risk being caught by

7    immigration authorities and deported." <u>Id</u>. at 2 (emphasis added).

8        Throughout plaintiffs' arguments is the assumption that the vast majority of no-matches

9    are caused by clerical errors, inconsistent spelling conventions, failures of employees to notify

10   SSA of name changes due to marriage or divorce and similar innocent reasons. Plaintiffs are

11   evidently unaware that before sending out no-match letters to employers, SSA "attempts to

12   

13   resolve discrepancies between the employer's reports and SSA records by running the no-

14   matches items through a series of automated processes." <u>See</u> Declaration of John Simermeyer at

15   ¶ 4.[12]/ Mr. Simermeyer, the Associate Commissioner for the SSA Office of Earnings,

16   

17   Enumeration, and Administrative Systems explains the operation of these "computer matching

18   routines."

19       The routines can resolve name discrepancies caused by
         misspellings, typographical errors, first name and last name

20       transpositions, and female surname changes (e.g. marriage or
         divorce). The routines also can resolve discrepancies from the use

21       of a derivative nick name or a proper name or from scrambling
         compound or hyphenated surnames. The routines can resolve SSN

22       discrepancies such as simple numeral transpositions. <u>The</u>
         <u>computer matching routines identify many, but not all, of these</u>

23       <u>types of discrepancies</u>.

24   

25   <u>Id</u>. (emphasis added). Accordingly, plaintiffs' concern about authorized workers being fired

26   _____

27   [12]/    Although the no-match letters identify four possible reasons for no-match letters, as a
         practical matter the software used by SSA catches and corrects many errors that result from

28   misspellings and name changes.

1   because they cannot resolve innocent mistakes like typographical errors or Hispanic name

2   variations, are largely unfounded as many of these errors will by caught and corrected by SSA

3   computers and never result in no-match letters sent to their employers. Id.[18]/

4      In sum, it is not arbitrary and capricious for DHS to recognize that many unauthorized

5

6   workers are engaging in social security fraud to obtain employment.

7      **3. DHS Has Not Changed Position On The Significance of No-Match Letters**

8      Nor has DHS changed its position from that previously articulated in its guidance letters

9   to employers who inquired about the legal significance of receiving a no-match letter from SSA.

10  Union Plaintiffs' Memorandum at 23-25. It has been DHS' consistent position, as confirmed in

11  the Safe Harbor Rule's preamble, that "an SSA no-match letter by itself does not impart

12  knowledge that the identified employees are unauthorized aliens." 72 Fed. Reg. at 45616. This

13

14  is consistent with DHS' previous statements that "receipt of the information discrepancy is not

15  sufficient, in and of itself, to impart constructive knowledge that an employee is not authorized to

16  work." Attachment A at 1.

17

18     However, Plaintiffs fail to cite to the critical portion of this letter that reminds employees

19  that it would be "incorrect for an employer to assume that in all cases it may safely ignore any

20  possible INA relevance or consequences of SSA discrepancies." Id. (quoting April 12, 1999

21  letter from INS General Counsel Paul Virtue, Plaintiffs' Exhibit G). Similarly, in a March 16,

22  2005 letter from the DHS General Counsel to an employer, DHS stated that

23
          [a]lthough a no-match letter alone does not provide constructive
24

25
    ─────────────────────────────
26  [18]/    For example, in tax year 2003, SSA received approximately 234 million W-2 forms from
    employers. Of those, approximately 20.7 million reflected a name/SSN discrepancy. Through the
27  operation of SSA's computer matching routines, approximately 11.2 million of those discrepancies
    were resolved and corrected by SSA and the earnings were then credited to the proper account.
28  Hence, SSA did not send out a no-match letter as to those W-2s. Simermeyer Decl. ¶ 7.

knowledge that the individual is unauthorized to work in the
United States, it may raise a material question about the identity of
the employee, the validity of the SSN recorded in section 1 and/or
section 2 of the Employment Eligibility Verification form (Form I-
9), the genuineness of any documents listed in section 2 that
contain the SSN, and the relation of these documents to the
individual presenting them.  The employer, without further inquiry,
cannot reasonably continue to rely upon Form I-9 information, the
material accuracy of which has been called into question by receipt
of a no-match letter as assurance that it is employing an individual
who is authorized to word in the United States.

Id. at 1-2.  This DHS letter also provides steps that an employer could take upon receipt of an

SSA no-match letter, such as asking the employee to resolve the discrepancy with SSA.

Moreover, the guidance provided by the rule is consistent with the trilogy of Ninth Circuit

cases addressing the meaning of "constructive knowledge" under the immigration laws.  In both

Mester Mfg. Co. v. INS, 879 F.2d 561 (9th Cir. 1989), and New El Rey Sausage Co. v. INS, 925

F.2d.1153 (9th Cir. 1991), the INS provided the employer with specific evidence that the

employee  was unauthorized, and the employer nevertheless continued to employ the individual.

Under those circumstances, and without the employer offering any evidence in rebuttal, the Ninth

Circuit had no difficulty in concluding that the employer had constructive knowledge that the

employee was unauthorized to work.  In Collins Food Int'l. v. INS, 948 F.2d 549 (9th Cir. 1991),

the Court reversed an INS finding of constructive knowledge that was based on only two,

somewhat problematic, determinations by an Administrative Law Judge: first, that the employer

offered the employee the job without verifying his immigration status, and second, that the

employer's agent failed to compare the reverse side of the employee's (fraudulent) social security

card with examples provided by INS. Whether an employer's receipt of, and response to, a no-

match letter is sufficient, standing alone, to support a finding of constructive knowledge for

purposes of 8 U.S.C. § 1324a is only a question appropriate for an as-applied or post-

1    enforcement challenge.  For purposes of this facial challenge, Plaintiffs must show that no-match

2    letters can <u>never</u> provide evidence of constructive knowledge.  As their own expert's prior

3    statements show, they cannot support any such claim.

4              **4.    The Time Limits For The Safe Harbor Rule**

5

6         Finally, all plaintiffs object to the fact that the Safe Harbor Rule provides the employer

7    can only give the employee  90 days to resolve a discrepancy with SSA if the employer wants to

8    take advantage of the safe harbor.  However, some deadline is obviously necessary and this

9    period was significantly extended (from 60 days) after comments, 72 Fed. Reg. at 45617.

10   Crucially, SSA has confirmed that "if employer and employee act in a timely manner, a 90-day

11   time frame will be sufficient for all but the most difficult cases."  72 Fed. Reg. at 45617.

12

13        Moreover, where the employee cannot resolve the no-match letter within the 90 days

14   allowed by the safe harbor, the employer may elect to retain the employee so long as the

15   employer knows that his employee is making good faith efforts to continue to resolve the

16   discrepancy.  If the employer is later subject to an enforcement action and the

17   employee is ultimately found to have been unauthorized, the employer could still argue that he

18

19   had a good faith belief that the employee was ultimately going to resolve the discrepancy.  It is

20   reasonable, in many circumstances, for an employer to assume that only those employees who are

21   confident that they are legal workers will continue attempting to resolve the name/SSN

22   discrepancy with SSA for the entire 90-day period and beyond.

23

24        Even in this hypothetical situation, the employer is in a better position to demonstrate his

25   lack of constructive knowledge than if he had not followed the Rule's safe harbor steps.  He will

26   be able to argue to ICE that, in response to the no-match letter, he has reviewed his records,

27   asked the employee to double check his information and then urged the employee to resolve the

28

discrepancy with SSA, and followed up to confirm that the employee continues to actively attempt to resolve the matter.

### C.    DHS And SSA Have Not Exceeded Their Statutory Authority

#### 1.    There Is No Statutory Prohibition On SSA Including a DHS Letter In Its No-Match Mailings, Nor Is It Inconsistent With SSA's Programs

In order to inform employers about the Safe Harbor Rule, SSA intends include a short, two-page letter from DHS in each of its no-match mailings.

The Union Plaintiffs challenge the inclusion of this letter as *ultra vires* conduct by SSA. Union Plaintiffs' Memorandum at 25-28. But they cite no provision of law prohibiting such cooperation, which is routine among federal agencies. The statute establishing the Social Security Administration provides broad authority to "administer the old-age, survivors, and disability insurance programs . . . and the supplemental security income program . . ." 42 U.S.C. § 901, but does not prohibit  cooperation with other federal agencies. See also Economy Act, 31 U.S.C. § 1535 (authorizing agencies to place orders for goods or services with other agencies).

Nor do the Union Plaintiffs explain how including the DHS letter in no-match mailings is in any way inconsistent with the programs administered by SSA. If anything, by giving employers an additional reason to resolve name/SSN disparities, the DHS letter actually promotes SSA's goal of moving items out of the Earnings Suspense File and properly crediting the accounts of wage-earners.

#### 2.    The DHS Rule Does Not Affect Tax Reporting Obligations

Nothing in the Safe Harbor Rule or the guidance letter makes any reference to the employer's tax obligations or purports to tell the employer how to comply with its tax obligations. It is not unusual that a document prepared for tax purposes, such as a W-2 form, can be relevant to some other government program. Merely because DHS believes that no-match

1    letters may be relevant in immigration enforcement proceedings does not constitute usurpation of

2    the statutory responsibilities of the Internal Revenue Service.

3            3.    **The DHS Rule Does Not Interfere With DOJ's Authority To Enforce**
4                  **IRCA's Anti-Discrimination Provisions**

5        The Union Plaintiffs argue that, by promulgating the Regulation, DHS has effectively

6    usurped DOJ's[19]/ authority to interpret the anti-discrimination provisions of the statute at issue, 8

7    U.S.C §1324b(c).  However, this suggestion misinterprets the respective authorities of DHS and
8
9    DOJ to promulgate rules and administer the provisions of those rules and related statutes.  It also

10   misstates DOJ Office of Special Counsel for Immigration Related Unfair Employment Practices'

11   ("OSC") retained role under the Homeland Security Act of 2002, as well as the purported

12   employer immunity under the Safe-Harbor rule.

13       As the Union Plaintiffs correctly point out, "IRCA created within the Department of
14
15   Justice, the [OSC], and charged that office – not the INS – with responsibility for administering

16   the statute's anti-discrimination provisions."  Memorandum, 29.  Indeed, DOJ OSC is charged

17   with administering IRCA's anti-discrimination provisions, and DHS does not attempt to abrogate

18   that function through the Rule or the Guidance Letter.  Those documents only state what IRCA

19   already provides:  that an employer may be found to have engaged in unlawful discrimination by
20
21   OSC if an employer treats employees differently based upon national origin or other prohibited

22   characteristics.  Accordingly, DHS, by virtue of promulgating the Rule, has not purported to alter

23   OSC's role or exceed its statutory authority.  Indeed in the preamble to the Rule, DHS explicitly

24

25   [19]/    The Union Plaintiffs now also appear to believe that the Guidance Letter usurps the
     "authority" of the Equal Employment Opportunity Commission ("EEOC").  See Plaintiff's
26   Memorandum, fn. 12.  It is unclear to what authority the Union Plaintiffs are referring but, in any
     case, the Guidance Letter purports to do no such thing. Notwithstanding the content of the Guidance
27   Letter, the EEOC will continue to enforce Title VII of the Civil Rights Act of 1964, and will bring
28   charges if and when it deems it appropriate.

1   indicates that DOJ, the IRS and SSA all were involved in the promulgation of this rule.  72 Fed.

2   Reg. at 45614.

3       Moreover, the Union Plaintiffs have omitted important and relevant portions of the

4   Guidance Letter in an apparent attempt to suggest that the safe harbor procedure will absolutely

5   immunize an employer from national origin discrimination.  Union Plaintiffs' Memorandum at

6

7   29, Appendix B.  Indeed, the Union Plaintiffs have curiously left out the clear instruction to

8   employers that the "safe-harbor" provisions do no such thing.  The complete question and

9   instruction to employers, as set forth in the Guidance Letter, read as follows:

10

11          **Q: Will I be liable for any discrimination charges brought by
            the United States if I terminate the employee after following
12          the steps outlined above?**

13          A: No.  <u>An employer that receives such a letter and terminates
            employees without attempting to resolve the mismatches, or who
14          treats employees differently based upon national origin or other
            prohibited characteristics, may be found to have engaged in
15          unlawful discrimination.</u>  However, if an employer that follows all
            of the procedures outlined by DHS in this letter (and
16          http://www.ice.gov) cannot determine that an employee is
            authorized to work in the United States, and therefore terminates
17          that employee, and if that employer applied the same procedures to
            all employees referenced in the mismatch letter, then that employer
18          will not be subject to suit by the United States under the
            Immigration and Nationality Act's anti-discrimination provision.
19

20

21   <u>Id.</u>  (emphasis added).

22       **D.    DHS Was Not Required To Perform a Regulatory Flexibility Act Analysis
                Before Adopting The Safe Harbor Rule**

23

24       Business Plaintiffs assert that DHS failed to conduct a proper regulatory flexibility

25   analysis of the potential impact of its rule on small businesses and entities.  <u>See</u> Regulatory

26   Flexibility Act, 5 U.S.C. § 601 <u>et seq.</u> ("RFA") Business Plaintiffs' Compl. ¶¶ 57-61.  This

27   argument fails for two reasons.  First, a regulatory flexibility analysis is not required for

28

1  interpretive rules, and the Safe Harbor rule challenged here is interpretive.  Second, even if the

2  DHS Rule were deemed to be substantive, the Secretary reasonably concluded and certified that a

3  regulatory flexibility analysis was unnecessary because the rule does not impose significant costs

4  on small businesses.

5

6         **1.**      **The Safe Harbor Rule is Not a Rule Subject To The Regulatory**
                     **Flexibility Act**

7

8       The requirements of the RFA do not apply to interpretive rules such as the one challenged

9  here.[20]/  In <u>National Ass'n for Home Care v. Shalala</u>, 135 F. Supp. 2d 161 (D.D.C. 2001), the

10  court held that the challenged regulations were merely interpretive rules, to which the RFA did

11  not apply. 135 F. Supp. 2d at 166.  In that case, the court found that the statute was so specific in

12  requiring that the Health Care Financing Administration ("HCFA") establish an interim payment

13  system for reimbursing Medicare-certified home health agencies that HCFA's regulation

14  propounding new maximum per-beneficiary limits was merely an interpretive rule, rather than a

15  substantive rule, and thus exempt from RFA requirements. <u>Id.</u> at 164.

16

17       While, in the interest of transparency and good government, DHS chose here to

18  promulgate the Safe Harbor rule through notice and comment rule-making, and chose, in an

19  abundance of caution, to address the RFA by making a § 605(b) certification, such voluntary

20  measures do not render the challenged regulation a "substantive rule" as Business Plaintiffs

21

22

23

24

_____

25  [20]/       Section 604(a) of the RFA requires that an RFA analysis of the impact of a rule upon
   small businesses or entities be conducted "[w]hen an agency promulgates a final rule under section

26  553 of this title, <u>after being required by that section or any other law to publish a general notice of</u>

27  <u>proposed rulemaking</u>." (emphasis added). Accordingly, the RFA would not apply to the challenged
   rule if it is deemed to be an interpretive rule, for which DHS was not <u>required</u> to publish a general

28  notice of proposed rulemaking but instead chose to publish such a notice.

assert.  See Business Plaintiffs' Memorandum at 17.[21]/  In Hemp Indus. Ass'n v. DEA, 333 F.3d

1082, 1087 (9th Cir. 2003), the Ninth Circuit applied three criteria articulated by the D.C. Circuit

for determining whether a rule is interpretive or substantive.  These criteria, first set forth in

American Mining Cong. v. Mine Safety and Health Administration, 995 F. 2d 1106, 1109 (D.C.

Cir. 1993), find that a rule is substantive (1) when, in the absence of the rule, there would not be

an adequate legislative basis for enforcement action; (2) when the agency has explicitly invoked

its general legislative authority; or (3) when the rule effectively amends a prior legislative rule.

Hemp, 333 F.3d at 1087.[22]/

    Applying these criteria to the rule challenged here, the rule is clear that it is not

"substantive" as Business Plaintiffs claim.  An enforcement action does not depend upon this

rule; the agency has not explicitly invoked its legislative authority; and the rule does not

effectively amend a prior legislative rule.  While Business Plaintiffs attempt to contend that

DHS' characterization of the rule as a "significant regulatory action" under Executive Order No.

12,866 that raises "novel policy questions" renders the rule "substantive," Business Plaintiffs'

Memorandum at 17,  there is no support for such a conclusion.  By definition, interpretive rules

are those that clarify or explain existing laws or regulations.  Paralyzed Veterans of America v.

---

[21]/    Merely because the Secretary of DHS made a certification under § 605(b) of the RFA does
not mean that, as Business Plaintiffs maintain "[t]here is no dispute that the RFA applies here."
Business Plaintiffs' Memorandum at 14.  Instead, even when an agency performed an RFA analysis
in the preamble to a rule that it "did not believe the statute required" but conducted all the same "in
the 'spirit' of the RFA," such analysis was not treated as a concession that the RFA applied.  Cement
Kiln Recycling Coalition v. EPA, 255 F.3d 855, 868 (D.C. Cir. 2001).

[22]/    Although Hemp noted that the American Mining case also looked to a fourth criteria,
publication of the rule in the Code of Federal Regulations, the Ninth Circuit pointed out that a
subsequent D.C. Circuit opinion, Health Ins. Ass'n of America, Inc. v. Shalala, 23 F.3d 412 (D.C.Cir.
1994), held that publication in the CFR does not necessarily mean that a rule is substantive and that
the Ninth Circuit has not held otherwise.  Hemp, 333 F.3d at 1087.

1  West, 138 F.3d 1434, 1436 (Fed. Cir. 1998).   Certainly, the scope of an interpretive rule cannot,

2  as Business Plaintiffs would have it, be limited to "merely a vanilla restatement of existing law"

3  or "guidance to bureaucrats."  Business Plaintiffs' Memorandum at 17.   Instead, "[i]nterpretive

4  rules instruct as to what an agency thinks a statute or regulation means." Reno-Sparks Indian

5  Colony v. EPA, 336 F.3d 899, 909 (9th Cir. 2003).

6

7        Nor is it of any relevance that DHS did not explicitly rely on the interpretive rule

8  exception to notice and comment rulemaking in promulgating the rule, or characterize the rule as

9  interpretive.  Id. at n. 12 (noting that "[t]he EPA is entitled to raise the interpretive rule exception

10 even though the agency did not rely on it when it promulgated the rule.  The ultimate decision

11 whether a rule is legislative or interpretive is for the court to make. . .") (internal citations

12 omitted) (emphasis added).[22]/

13

14        **2.      Even If The Safe Harbor Rule Was Not An Interpretive Rule And The RFA**
          **Applied, Its Requirements Are Satisfied By The Secretary's Certification**
15        **That the Rule Would Not Impose Significant Costs On Small Businesses.**

16        An RFA is not required where the head of an agency certifies that the regulation will not

17 have a significant economic impact on a substantial number of such entities.   Section 605(b) of

18 the RFA provides as follows:

19

20        Sections 603 and 604 of this title shall not apply to any proposed or final rule if
          the head of the agency certifies that the rule will not, if promulgated, have a
21        significant economic impact on a substantial number of small entities.  If the head
          of the agency makes a certification under the preceding sentence, the agency shall
22        publish such certification in the Federal Register at the time of publication of
          general notice of proposed rulemaking for the rule or at the time of publication of
23

24  _____

25 [22]/      The D.C. Circuit has emphasized that an agency's use of notice and comment rulemaking
   does not weigh against a determination that a rule is interpretive, stating that "[t]he protection that
26 Congress sought to secure by requiring notice and comment for legislative rules is not advanced by
   reading the exemption for 'interpretive rule' so narrowly as to drive agencies into pure ad hocery."
27 American Mining Congress, 995 F.2d 1106, 1112.  Nor does a rule's restriction of agency discretion,
28 or "binding effect" upon the agency, render a rule legislative rather than interpretive.  Id. at 1111.

the final rule, along with a statement providing the factual basis for such certification.

5 U.S.C. § 605(b).

Here, in promulgating the DHS No-Match Regulation, the Secretary of DHS has certified, pursuant to § 605(b) of the RFA, that the rule "would not have a significant economic impact on a substantial number of small entities" because:

> [t]he rule does not mandate any new burdens on the employer and does not impose any new or additional costs on the employer, but merely adds specific examples and a description of a 'safe-harbor' procedure to an existing DHS regulation for purposes of enforcing the immigration laws and providing guidance to employers.

72 Fed. Reg. 45611, 45623 (emphasis added).  See also 23-27, supra. The Secretary properly concluded that there was no need to conduct an RFA analysis of the economic impact of the new regulation because the regulation does not change the existing obligations of employers – small or large – to comply with 8 U.S.C. § 1324a(a)(2), which may require employers to take reasonable steps to confirm their employees' work authorization when confronted with information that calls the employees' legal status into question.  Instead, the regulation simply created safe harbor procedures that employers may choose to follow on a voluntary basis, and employers that forgo the safe harbor do not face risks higher than under pre-existing law.

Where, as here, a new regulation does not impose any new compliance costs, courts have recognized that a § 605(b) certification is proper.  For example, where a Customs Service regulation set a new deadline for exporters to file for a refund of certain previously collected taxes, a § 605(b) certification by the Secretary of Treasury that the regulation had no "significant economic impact" for purposes of the RFA was deemed sufficient. M.G. Maher & Co., Inc. v. United States, 26 C.I.T. 1040, 1043, 2002 WL 2005839 (Ct. Int'l Trade 2002).  The court agreed with the Customs Service that the new rule did not impose any new compliance costs, stating that

"it is clear that Congress envisioned that the relevant 'economic impact' was <u>the impact of compliance with the proposed rule</u> on regulated small entities." <u>Id.</u> at 1043 (emphasis in original) (quoting <u>Mid-Tex Elec. Coop., Inc. v. FERC</u>, 773 F.2d 327, 342 (D.C. Cir. 1985)).[24]/

Similarly, here, the costs that Business Plaintiffs claim they would incur as a result of DHS' no-match regulation would be equally likely to be incurred even absent the challenged regulation. SSA has been sending out no-match letters to employers since 1994, however, so businesses have long been faced with the burdens identified by Business Plaintiffs. Prior to promulgation of the challenged rule, employers may well have endeavored to resolve mismatches as promptly as possible, and thereby incurred many of the costs complained of by Business Plaintiffs, including developing human resource systems to resolve mismatches, having employees take time off work to address their mismatches, and terminating employees. <u>See</u> Dickson Decl. ¶¶ 5-9. Just as, in <u>Maher</u>, exporters were found to face the economic burden of searching their own records both before and after promulgation of the challenged regulation, here too Business Plaintiffs face the same economic burdens with or without the challenged regulation. Thus, the Secretary's § 605(b) certification is justified.[25]/

Business Plaintiffs do not and cannot support their contention that a more elaborate

_____

[24]/     The <u>Maher</u> court also rejected plaintiffs' alternative argument that the Customs Service was arbitrary and capricious in not studying the cost to businesses of compiling their own records to make a refund request. <u>Id.</u> at 1043-44. Claimants' difficulties in searching their own records if the Customs Services's records were incomplete, the court reasoned, did not change as a result of the regulation; therefore, the regulation added no burden, since both before and after the regulation – indeed, even if the court invalidated the regulation – the exporters would have the same need to incur costs of searching their own records to determine whether they had a claim. <u>Id.</u>

[25]/     Business Plaintiffs claim that the Secretary's certification is insufficient because it is not supported by a "factual basis," but instead by a "conclusion of law." This is incorrect, because the Secretary determined as a legal matter that the Rule imposes no new or additional legal obligations on employers, and hence could conclude as a factual matter that no additional costs or burdens are imposed on employers.

factual record is required to support the Secretary's certification than what is contained in the preamble to the regulation. Courts have routinely accepted §605(b) certifications that are similar to that made by the Secretary here. For example, the Tenth Circuit upheld as proper the Resolution Trust Corporation's certification under 5 U.S.C. § 605(b) where "[t]he basis for the RTC's certification is its determination that the rule will not impose compliance requirements on depository institutions of any size. It imposes no performance standards, no fees, no reporting or record keeping criteria, nor any other type of restriction or requirement with which depository institutions must comply. Thus, it does not have the type of economic impact addressed by the RFA." State of Colo. ex rel. Colorado State Banking Bd. v. Resolution Trust Corp., 926 F.2d 931, 948 (10th Cir. 1991).[26]/

In accepting the RTC's certification, the court noted favorably that "the RTC carefully addressed the sole public comment that challenged its certification." Id. Similarly, here, DHS has addressed, under the heading "Economic Impact," the comments it received, although it appears that none of the comments received indicated that an RFA analysis, if conducted, would find significant impact upon small businesses or entities. DHS noted that "commentators disagreed over whether the most significant impact would be on large or small businesses – some arguing that corporate structure would impede rapid resolution under the proposed time frame, and others arguing that small businesses would not have the resources to respond to the no-match letters" and responded in part that "both types of commenters misapprehended the rule as an affirmative requirement, rather than an offer of a safe harbor from potential sanctions." 72 Fed. Reg. 45611, 45621. DHS

---

[26]/    See also Sargent v. Block, 576 F. Supp. 882, 893 (D.D.C. 1983) (accepting agency's conclusory statement even though "the basis for the department's conclusion could have been more fully documented").

also addressed the concerns expressed by some commentators that "resolution of the SSA

no-match letters places too heavy a burden on businesses in general," explaining that

"[t]his concern, however, relates to requirements that currently exist . . . . The present rule

simply provides guidance to employers about what steps they may take in order to avoid

being found to have constructive knowledge that an employee is an unauthorized alien."

Id. at 45621-22.  Moreover, the Chamber of Commerce's own comments on the proposed

rule made no mention of any potential impact on small business or entities, and no request

to conduct a regulatory flexibility analysis.[27]/  It is not surprising, therefore, that DHS did

not address in the Federal Register the objections the Chamber never raised until the

moment it chose to intervene in this lawsuit.

         To support their contention that the Secretary's § 605(b) certification rests upon an

insufficient factual basis, Business Plaintiffs rely upon one case, North Carolina Fisheries

---

[27]/     Instead, the Chamber's comments appeared to articulate more general objections to the
enforcement of immigration law as regards unauthorized workers, stating in pertinent part:

> It is estimated that annually 500,000 essential workers enter the U.S. to perform
> much needed labor without work authorization . . . . This proposed regulation will
> strip needed workers from employers without providing employers with an
> alternative legal channel by which to recruit to fill the gaps created by a combination
> of an aging workforce domestically, higher educational attainment by the domestic
> population, and a booming economy with full levels of employment.

Letter from the Chamber of Commerce (August 14, 2006): ICEB-2006-0004-0135 at 6-7
(Attachment L at 6).

         While one commenter, NFIB, did "urge[] DHS to carefully consider the full impact the
proposed rule will have on small business," and requested that the agency determine pursuant to the
RFA "whether the proposed rule will have a significant economic impact," this comment did not
offer any factual support to suggest that if an RFA analysis were conducted it would conclude that
there was significant impact on small businesses or entities, other than the unsupported assertion that
"[b]y setting forth 'options' for avoiding liability, the proposed rule has in effect created additional
record keeping and other compliance requirements on a substantial number of small entities." NFIB
(August 14, 2006; ICEB 2006-0004-0194) at 4. Attachment M).

Ass'n, Inc. v. Daley, 16 F. Supp. 2d 647, 652 (E.D. Va. 1997), which is factually

distinguishable from the instant case. In that case, the court rejected the Secretary of

Commerce's certification, pursuant to 5 U.S.C. § 605(b), that the challenged rule, which

established a coastwide quota for summer flounder as part of a fishery management plan

by the National Marine Fisheries Service, would have no significant economic impact on

small entities. Id. at 647. The court rejected as insufficient the Secretary's statement that

"[t]he recommended 1997 quota [for summer flounder] is no different from the 1996

coastwide harvest limit of 18.51 million lb.," id. at 652, noting that "[w]hile this is a

'statement,' it does not provide a factual basis. There is no explanation why the fact that the

quotas are the same means there will be no impact." Id. (emphasis added).   What seemed

to concern the court most in that case was that the government agency did not consider

that changes in the economy from one year to the next might cause changes in the potential

economic effect of the same quota.   For that reason, the court commented that "[t]he

Secretary must believe the economy never changes" and emphasized that "[w]hile the

federal government cannot be expected to explore every possible contingency before

certifying that there is no significant impact, the government must make some showing

that it has at least considered the potential effects of *this* quota, *this* year." Id. at 652

(emphasis in original).

        Here, there are no changed factual circumstance such as those present in North

Carolina Fisheries that require such consideration.  Plaintiffs here make no claim, for

example, that a changing economy requires DHS to analyze the potential effect of the

challenged rule in the current economic environment.  Instead, there is no need for

economic or other factual analysis, since a straightforward reading of the regulation at

issue makes clear that it is not imposing any new burden on the employer.  While Business

Plaintiffs may characterize this as a "legal conclusion" – that the Rule imposes no new

"compliance" obligations on employers – it  ultimately leads to a "factual" conclusion that

the regulation would impose no compliance costs on employers.

The RFA is purely procedural, and does not impose a substantive mandate upon

federal agencies.  See Alenco Communications, Inc. v. FCC, 201 F.3d 608, 625 (5th Cir.

2000) ("The  RFA is a procedural rather than substantive agency mandate"); Associated

Fisheries of Me. Inc. v. Daley, 127 F.3d 104, 114 (1st Cir. 1997) (holding that RFA does

not command agencies to take substantive measures).  Accordingly, agencies are required

only to engage in a "reasonable" and "good faith" effort to comply with the Act.  Alenco,

201 F.3d at 625.  As the D.C. Circuit has explained, because the RFA is "[p]urely

procedural" in nature, it "requires nothing more than that the agency file [an RFA analysis]

demonstrating a reasonable, good faith effort to carry out [RFA's] mandate."  U.S.

Cellular Corp. v. FCC, 254 F.3d 78, 88 (D.C. Cir. 2001) (internal quotation marks and

citation omitted).

**III.     The Balance Of Harms Strongly Favors The Defendants**

**A. The Plaintiffs Will Suffer Little If Any Harm**

Neither the Business or Union Plaintiffs shows irreparable injury.  The new Safe

Harbor Rule provides guidance to employers and limits the enforcement discretion of DHS

where employers take advantage of the safe harbor, but it does not change existing legal

obligations.  Therefore, all of the alleged harms and costs that the Union and Business

Plaintiffs identify stem from the obligations and impact of the employer sanctions enacted

by Congress in 1986, or from the operation of the SSA's no-match program; nothing in the

Safe Harbor Rule affects the status quo as to either. So, for example, this rule will not

require "employers, both large and small, . . . to develop new human resource systems to

resolve mismatches," Dickson Declaration, ¶ 5, since employers have been receiving (and

presumably responding to) no-match letters from SSA since at least 1994 when SSA

began sending these letters to employers. See supra at 5; 21. And employers have been

under an obligation not to knowingly continue employing unauthorized workers since the

enactment of 8 U.S.C. § 1324a in 1986. Employer human resource departments have

undoubtedly been addressing no-match issues for years and this rule, which merely

provides an optional safe harbor, does not mandate a change in employer practices.

In fact, in 2004, DHS received a letter from Tysons Food, a large employer,

seeking guidance on its obligations under the immigration law that described its practice

upon receiving no-match letters, which is strikingly similar to the safe harbor steps·

recommended by DHS:

> When we receive no-match letters we ask the
> individuals to go to the Social Security office to correct the
> inconsistency in the databases because we desire integrity in
> our Human Resources Information Systems. We thus ask
> that individual to provide us evidence of any necessary
> correction so that we can ensure not only that our internal
> records are correct but also that we will not receive repeated
> "no-match" letters relating to that individual. We ask the
> individual to report back to us within a given time frame that
> the correction has been made or is in process. A failure to
> do so results in the individual's termination.

December 30, 2004 letter from Tysons Foods (Attachment N).

The claim that employees will have to bear administrative burdens in taking steps

to clarify their social security status is also insufficient to establish irreparable injury for

several reasons. First, it is self-evident that any authorized worker who learns of a no-

1    match problem with his social security earnings will invariably take steps to rectify that

2    problem with SSA.  Whatever costs or inconvenience are associated with that process will

3    be incurred regardless of whether his employer asks him to promptly resolve the issue,

4    since the employee will do so simply as a matter of self-interest to ensure that he is

5    properly credited with his SSA wages.  Former SSA Commissioner Apfel's Declaration

6    confirms that "SSA's experience has been that many people come forward to SSA to

7    correct their records, records that often had previously been stored in the ESF." Apfel

8    Declaration, ¶ 9.  The Safe Harbor Rule will not add to the burden on the employee – at

9    most it will cause him to have to take these steps sooner rather than later, which does not

10

11   constitute injury, much less irreparable injury.  See Maher, supra, 26 CIT at 1043-44

12

13   (establishing a filing deadline for certain tax refunds imposed no new economic burden).

14        Moreover, the burden of resolving a discrepancy is not great. In all but the most

15   difficult cases it can be resolved through "a personal visit or two" to an SSA office or

16   other government agency, and perhaps the costs associated with correspondence in lieu of

17

18   a personal visit.  See Dickson Declaration, ¶ 5.  Contrary to plaintiffs' claims, courts have

19   long recognized that the burden and expense of complying with a government

20   administrative process does not constitute irreparable harm. Sampson v. Murray, 415 U.S.

21   61 (1974);  A.O. Smith Corp. v. FTC, 530 F.2d 515 (3d Cir. 1976) (even if plaintiffs

22   consider the new rule to require action, cost of compliance with government regulation is

23   not irreparable injury, but regular business expense).[28]/  In a related context, the Court has

24   held that "[m]ere litigation expense, even substantial and unrecoupable cost, does not

25

26

27   _____

28   [28]/    Otherwise, using plaintiffs' logic, any regulation that might lead a business or a person to
     expend money that cannot be recouped from the government would be, per se, irreparable injury.

1    constitute irreparable injury." <u>Renegotiation Bd. v. Bannercraft Co.</u>, 415 U.S. 1, 24 (1974)

2        Finally, fears that, due to the operation of the regulation, some employees might

3    lose their jobs if unable to obtain clarification of their status from SSA are also

4    insufficient, since "[s]peculative injury does not constitute irreparable injury." <u>Goldie's</u>

5    <u>Bookstore, Inc. v. Superior Court</u>, 739 F.2d 466, 472 (9th Cir. 1984).[29]/  As the D.C.

6

7    Circuit has noted, "[b]are allegations of what is likely to occur are of no value . . . The key

8    word in this consideration is <u>irreparable</u>. Mere injuries, however substantial, in terms of

9    money, time and energy necessarily expended in the absence of a stay are not enough."

10   <u>Wisc. Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985).

11

12       The alleged injury to employees that the Union Plaintiffs allege is premised on the

13   following, speculative chain of events arising after the receipt by the employer of a no-

14   match letter: <u>first</u>, an employer must elect to attempt to utilize the optional safe harbor;

15   <u>second</u>, neither the employee nor the employer can resolve the mismatch through a review

16   of their own records; <u>third</u>, the employee cannot resolve the matter with SSA within 90

17   days; <u>fourth</u>, the employee cannot present the employer with new documentation to permit

18   the employer to re-verify his work status; and <u>fifth and finally</u>, the employer must then

19   decide to terminate the employee.  This speculative causal chain is insufficient to

20

21   demonstrate immediate irreparable injury, since "[a] plaintiff must do more than merely

22   allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate*

23   immediate threatened injury as a prerequisite to preliminary injunctive relief." <u>Caroline</u>

24   <u>M. Corp., Inc. v. Baldrige</u>, 844 F.2d 686, 674 (9th Cir. 1988).

25

26

27   _____

28   [29]/    As discussed above, the injury alleged by plaintiff is so speculative that it is neither actual nor imminent, much less irreparable.  <u>See</u> <u>supra</u> at 15-18.

Opposition to Plaintiffs' Motions for Preliminary Injunction (Case No. 07-4472 CRB)- 52 -

Presumably, plaintiffs rely on the declaration of Dr. Nik Theodore, who at paragraph 17 asserts that "the DHS regulation is therefore likely to magnify the demonstrated effects of employer sanctions and SSA no-match letters." Yet other than a vague reference to his "past research and expertise" he offers no basis for his conclusion that offering employers a safe harbor will increase unnecessary terminations. Certainly, the informed judgment of DHS, which is entitled to at least as much weight as Dr. Theodore's speculation, is precisely to the contrary. "The firing of any employee . . . because of receipt of a no-match letter is speculative and is neither required by nor a logical result of the rule being adopted." 72 Fed. Reg. at 45621. The lack of any evidence offered by plaintiffs to support their allegation that employees will lose their jobs is fatal to their claims of both standing and irreparable injury, since the mere fact that a plaintiff "can 'imagine circumstances in which [the plaintiff] could be affected by the agency's action'" is simply not enough.   <u>Northwest Airlines.</u> 795 F.2d at 201.

**B. The Defendants And The Public Face Substantial Harm**

Finally, and most critically, the new Safe Harbor Rule will strongly advance the public interest in providing much-needed clarity to employers as to the actions that they may take in response to the receipt of a no-match letter from SSA. Employers who utilize the safe harbor option will avoid the dilemma of whether to take no action and risk liability or to possibly terminate a valued employee, where the employer may also risk liability from a possible a suit by the former employee. An injunction barring employers from utilizing the safe harbor procedures can only cause confusion among employers, many of whom have expressed uncertainty about the steps that they should take upon receipt of a no-match letter. <u>See</u> Union Plaintiffs' exhibits F-K; defendants' exhibits A-D.

1    Additionally, as explained in the Declaration of David Rust filed on September 5,

2  2007, the entry of a preliminary injunction will further delay SSA from sending out no-

3  match letters for the 2006 tax year and so frustrate the purpose of providing notice to

4  employers that their employees' social security earnings are not being credited to their

5  accounts.  SSA's intention had been to mail the no-match letters (to include the DHS

6  insert letter) from approximately early September, through early November.   This time

7  window was critical since "SSA's peak workload period . . . traditionally starts in

8  December and peaks in the January-to-March quarter." Rust Decl. ¶ 12.  Consequently, if

9  there is an extended delay in sending the no-match letters, the workload from resolving

10  name/social security number discrepancies will be pushed over into SSA's period of peak

11  workload and interfere with its ability to carry out its core functions.

12    Additionally, the Rust Declaration quantifies the scope of the workload, explaining

13  that SSA has approximately 141,000 letters to send out relating to discrepancies in the

14  SSA accounts of some eight million workers. Rust Decl. ¶ 12.  While SSA intended to

15  begin  sending only a few hundred letters per day, it also intended to quickly ramp up to

16  goal of 3,200 notices per day beginning on September 10, 2007.   Thus, any extended

17  delay in sending the no-match letters will either compress the time SSA has to respond to

18  inquires generated by no-match letters or push those responsibilities over  into its period of

19  peak workload.

20

21

22

23

24

25

26

27

28

Opposition to Plaintiffs' Motions for Preliminary Injunction (Case No. 07-4472 CRB)- 54 -

**CONCLUSION**

Wherefore, the Motions for Preliminary Injunction filed by the Union Plaintiffs and the Business Plaintiffs-intervenors, should be denied.


DATED: September 18, 2007                    Respectfully submitted,


                                             PETER D. KEISLER
                                             Assistant Attorney General
                                             THOMAS H. DUPREE JR.
                                             Deputy Assistant Attorney General


                                             SCOTT N. SCHOOLS
                                             United States Attorney



                                             _____/s/_____
                                             SANDRA SCHRAIBMAN
                                             DANIEL E. BENSING (D.C. Bar No.
                                             334268)
                                             Attorneys, U.S. Department of Justice
                                             Civil Division, Federal Programs Branch
                                             20 Massachusetts Ave., N.W., Room 6114
                                             Washington, D.C. 20001
                                             Telephone: (202) 305-0693
                                             Facsimile: (202) 616-8460
                                             E-mail: Daniel.Bensing@USDOJ.gov

1
2
3

<u>Certificate of Service</u>

4

5        I hereby certify that on this 18th day of September, 2007, I caused to be served by

6    mail and e-mail a copy of Defendants' Oppositions to Plaintiffs' Motions for Preliminary
     Injunction, Proposed Order and the Declaration of John Simermeyer and the Second

7    Declaration of James C. Spero of upon the following counsel:

8                    Scott A. Kronland

9                    Altshuler Berzon LLP
                     177 Post St.

10                   San Francisco, California 94108

11                   skronland@altshulerberzon.com

12
                     Counsel for AFL-CIO, et al.
13

14                   Robert Charrow

15                   Greenberg Traurig, LLP
                     800 Connecticut Avenue, N.W. Ste. 500

16                   Washington D.C. 20006

17                   charrowr@gtlaw.com

18                   Counsel for San Francisco Chamber of Commerce, et al.

19

20                   Leon Dayan
                     Bredhoff & Kaiser

21                   805 Fifteenth St., N.W. Tenth Floor

22                   Washington, D.C. 20008

23                   LDayan@Bredhoff.com

24                   Counsel for UNITE HERE, et al.

25

26                              /s/

27                   _____
                              Daniel Bensing

28

Opposition to Plaintiffs' Motions for Preliminary Injunction (Case No. 07-4472 CRB)- 56 -