PETER D. KEISLER
Assistant Attorney General
THOMAS H. DUPREE JR.
Deputy Assistant Attorney General
SCOTT N. SCHOOLS
United States Attorney
SANDRA SCHRAIBMAN (D.C. Bar No. 188599)
DANIEL E. BENSING (D.C. Bar No. 334268)
Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6114
Washington, D.C.  20001
Telephone:  (202) 305-0693
Facsimile:  (202) 616-8460
Email: Daniel.Bensing@usdoj.gov

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, et al., | ) Case No. 07-4472 CRB |
| Plaintiffs, | ) **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION** |
| SAN FRANCISCO CHAMBER OF COMMERCE, et al., | |
| Plaintiffs-Intervenors, | |
| and | |
| UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, et al., | |
| Plaintiffs-Intervenors | |
| v. | |
| MICHAEL CHERTOFF, Secretary of Homeland Security, et al., | |
| Defendants. | |

Pursuant to Rule 201 of the Federal Rules of Evidence, Defendants respectfully request that the Court take judicial notice of the following documents, all of which are either documents created or maintained by federal government agencies or publicly available on the world wide web and are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." These documents are attached as exhibits hereto:

Exhibit A:  Letter from DHS, Office of the General Counsel, to W.E. Welch & Associates, Inc. (March 30, 2005).

Exhibit B: Letter from DHS, Office of the General Counsel, to Tyson Foods, Inc. (March 16, 2005).

Exhibit C:  Letter from DOJ, Office of Special Counsel for Immigration-Related Unfair Employment Practices, to employer in New York, NY (Sept. 16, 2005), employer name redacted.

Exhibit D:  Letter from DOJ, Office of the General Counsel, to Alston & Bird, LLP in response to October 14, 1998 letter.

Exhibit E:  Office of the Inspector General, Social Security Administration, Audit Report No. A-08-05-25023, Social Security Number Misuse in the Service, Restaurant, and Agriculture Industries (April 2005).

Exhibit F:  Office of the Inspector General, Social Security Administration, Management Advisory Report No. A-08-02-22077, Social Security Number Integrity: An Important Link in Homeland Security (May 2002).

Exhibit G:  Office of the Inspector General, Social Security Administration, Audit Report No. A-03-03-13026, Follow-Up Review of Employers With the Most Suspended Wage Items (Oct. 2003).

Exhibit H:  Office of the Inspector General, Social Security Administration, Audit Report No. A-03-05-25007, Usefulness of Decentralized Correspondence in Focusing Employer-Assistance Activities (Sept. 2005).

Exhibit I:  Letter from Western Growers to DHS (Aug. 11, 2006) regarding proposed regulations on safe-harbor procedures for employers who receive a no-match letter, ICEB-2006-0004.

1

Exhibit J:  Letter from National Council of Agricultural Employers to DHS (Aug. 14, 2006)
2
        regarding proposed regulations on safe-harbor procedures for employers who receive a
        no-match letter, ICEB-2006-0004.
3

Exhibit K:  Chirag Mehta, Nik Theodore, and Marielena Hincapie, Social Security
4
        Administration's No-Match Letter Program: Implications for Immigration Enforcement
        and Workers' Rights (Center for Urban Economic Development, University of Illinois at
5
        Chicago 2003).
6

Exhibit L:  Letter from the Chamber of Commerce to DHS (Aug. 14, 2006) regarding proposed
7
        regulations on safe-harbor procedures for employers who receive a no-match letter,
        ICEB-2006-0004.
8

Exhibit M:  Letter from NFIB: The Voice of Small Business to DHS (Aug. 14, 2006) regarding
9
        proposed regulations on safe-harbor procedures for employers who receive a no-match
10
        letter, ICEB-2006-0004.
11
Exhibit N:  Letter from Tyson Foods, Inc. to DHS (Dec. 30, 2004).
12

13
DATED: September 18, 2007                    Respectfully submitted,
14

15
                                             PETER D. KEISLER
                                             Assistant Attorney General
16
                                             THOMAS DUPREE
                                             Deputy Assistant Attorney General
17

18
                                             SCOTT N. SCHOOLS
19
                                             United States Attorney
20

21
                                             _____/s/_____
22

23
                                             SANDRA SCHRAIBMAN
                                             DANIEL E. BENSING (D.C. Bar No. 334268)
24
                                             Attorneys, U.S. Department of Justice
                                             Civil Division, Federal Programs Branch
25
                                             20 Massachusetts Ave., N.W., Room 6114
                                             Washington, D.C.  20001
26
                                             Telephone:  (202) 305-0693
                                             Facsimile:  (202) 616-8460
27
                                             E-mail: Daniel.Bensing@USDOJ.gov
28

1

2                                    Certificate of Service

3

4          I hereby certify that on this 18th day of September, 2007, I caused to be served by mail and
    e-mail a copy of the Request for Judicial Notice in Support of Defendants' Opposition to Plaintiffs'
5   Motions for Preliminary Injunction and Exhibits A through N upon the following counsel:

6                  Scott A. Kronland
                   Altshuler Berzon LLP
7                  177 Post St.
                   San Francisco, California 94108
8
9                  skronland@altshulerberzon.com

10                 Counsel for AFL-CIO, et al.

11

12                 Robert Charrow
                   Greenberg Traurig, LLP
13                 800 Connecticut Avenue, N.W. Ste. 500
                   Washington D.C. 20006
14
15                 charrowr@gtlaw.com

16                 Counsel for San Francisco Chamber of Commerce, et al.

17

18                 Leon Dayan
                   Bredhoff & Kaiser
19                 805 Fifteenth St., N.W. Tenth Floor
                   Washington, D.C. 20008
20
21                 LDayan@Bredhoff.com

22                 Counsel for UNITE HERE, et al.

23

24                                       /s/
                   _____
25                                  Daniel Bensing

26

27

28

# EXHIBIT A

*Office of the General Counsel*
**U.S. Department of Homeland Security**
Washington, DC 20528

 **Homeland Security**

March 30, 2005

W.E. Welch & Associates, Inc.
2502 Urbana Pike
Suite 200
Ijamsville, Maryland 21754

**RE:    Social Security No Match Letter**

Dear W.E. Welch & Associates:

Thank you for your January 6, 2004 letter to Secretary Ridge. The Department of Homeland Security (DHS) apologizes that it did not respond to your important inquiry in a more timely fashion. While DHS is unable to provide your company legal advice, we can offer the following general comments that may be of help.

You state in your letter that you are frustrated as an employer when you receive information from the Social Security Administration (SSA) stating that SSA was not able to verify the social security number of certain employees ("no match letter"). Specifically, you state that receipt of such letter leaves you feeling helpless in dealing with a situation where the employee may in fact not be authorized to work and could be present in the United States illegally.

As we explain below, you as an employer are not helpless in that situation and may, in fact, be required to take further action to confirm the employment eligibility of the employee. Depending on the outcome of that action, termination of the employment relationship may be warranted. The laws and regulations surrounding employment verification are complex and DHS is working with the Social Security Administration and other departments to improve the process and our enforcement of the laws. As evidenced by several recent successful investigations, the Immigration and Customs Enforcement component of DHS has increased its enforcement of illegal workers, particularly at locations where such employment could pose a threat to public safety or national security.

As you learned from the SSA no match letter, receipt of the information discrepancy is not sufficient, in and of itself, to impart constructive knowledge that an employee is not authorized to work. Discrepancies between SSA records and the information submitted to SSA by employers can result from a variety of causes, such as transcribing or transposition errors inadvertently made by the employee, employer, or SSA, or failure of the employee to inform

Letter to W.E. Welch & Associates, Inc.
Re: Social Security No Match Letter

SSA of a name change. It would therefore be inappropriate for an employer to take any adverse action against an employee based solely on receipt of a no match letter from SSA.

There are instances, however, when no-match discrepancies result from an employee's intentional use of a false name or invalid social security number to obtain unauthorized employment, to evade the reporting of income, or to avoid detection by law enforcement authorities.

Employers should therefore follow a reasonable and prudent course of action to determine the cause of no-match discrepancies and make a good faith effort to identify and correct inaccuracies in SSA reporting or company records that may have led to inaccurate information being provided to SSA. Generally, an employer in receipt of a SSA no match letter should:

1. Check company personnel records to ensure that the discrepancy did not result from a typographical, clerical, or transcribing error in the name or social security number submitted to SSA.

2. Notify the employee that the company has received a no match letter from SSA and ask the employee to (i) verify that the name and SSN in company records is correct, and (ii) resolve the discrepancy with SSA. Employees should be given a reasonable time to do so.

If a discrepancy cannot be satisfactorily resolved, and: (1) a social security card was provided by the employee as a List C document to establish employment eligibility, or any other document used to satisfy the requirements in section 2 of the Form I-9 contained the SSN in question; and (2) based on the totality of the circumstances the employee's identity or employment eligibility is reasonably called into question, then your company may have sufficient grounds to take additional action.

Steps an employer should take to ensure that the individual is authorized to work may include, but are not limited to, re-verification of employment authorization in section 3 of the Employment Eligibility Verification form (Form I-9) if the individual's identity is not in question, or, if identity is in question, completion of a new Form I-9. We would not consider any document that includes a SSN that has been called into question by unresolved no match information provided by SSA to be a document that reasonably appears to be genuine, or to relate to the person presenting it, for Form I-9 verification or re-verification purposes (such a document may include a driver's license or other document using the questionable SSN as its identification number as well as a social security account number card itself).

If the employer remains unsatisfied that an employee is authorized to work after making a good faith effort to identify and resolve no-match discrepancies, consulting with the employee and giving him or her a reasonable amount of time to resolve the matter, and otherwise reviewing the relevant circumstances in their totality, including when appropriate, reverification of employment eligibility, a decision to terminate employment may then be appropriate.

2

Letter to W.E. Welch & Associates, Inc.
Re: Social Security No Match Letter

Section 274A of the Immigration and Nationality Act (INA) prohibits the knowing employment of unauthorized aliens. This law also requires employers to verify the employment eligibility and identity of each newly hired employee using the Employment Eligibility Verification form (Form I-9). The Form I-9 requires employers to examine employment eligibility and identity documentation presented by the employee and attest, under penalty of perjury, that the documents presented appear to be genuine and to relate to the employee named, and, to the best of their knowledge, that the employee is eligible to work in the United States. Failure to meet the requirements of section 274A of the INA may subject employers to civil and criminal penalties. DHS may consider an employer who takes no corrective action to be in violation of section 274A(a)(2) of the INA if the employee is subsequently determined to be unauthorized.

Finally, I suggest that you as an employer may want to consider participating in the I-9 Basic Pilot Program, which USCIS recently announced would be expanded to all fifty states. 59 Federal Register 75997. Participation in the Basic Pilot Program enables employers to confirm the social security number of new hires at the time the Form I-9 is completed and improves an employer's ability to know whether an employee is authorized for employment. Employers may request additional information about the Basic Pilot Program by writing to the U.S. Citizenship and Immigration Services, 20 Massachusetts Avenue, NW., ULLICO Building, 4th Floor, Washington, DC 20529, Attention: SAVE Program. Employers may also fax a request for information to the SAVE Program at (202) 514-9981, or call the SAVE Program toll free at 888-464-4218.

We hope this information is helpful. If you have any questions regarding this letter, please contact ███████████ in the Department of Homeland Security's Office of General Counsel at ██████████.

Sincerely,

Daniel Brown
Deputy Associate General Counsel (BTSIS)

3

# EXHIBIT B



Office of the General Counsel
U.S. Department of Homeland
Security
Washington, DC 20528

March 16, 2005

█████████████

Senior Vice President
Human Resources
Tyson Foods, Inc.
2210 Oaklawn
Springdale, AR 72762-6999

**RE: Social Security Administration No-Match Letters**

Dear ████████:

I am writing in response to your December 30, 2004, letter to the Secretary, in which you request clarification of whether your company's processes upon receipt of a "no match" letter from the Social Security Administration (SSA) are lawful. According to your letter, when Tyson Foods, Inc. (Tyson) receives a no-match letter from SSA, the company requests the employee to provide evidence of any necessary correction. Further, Tyson requests the employee to report back within a certain timeframe that the correction has been made or is in process. Failure to report back to Tyson "results in the individual's termination." Although we cannot provide you legal advice, we offer the following general comments that may assist you in evaluating your company's employment verification policies.

Section 274A(a)(2) of the Immigration and Nationality Act (INA), 8 U.S.C. § 274A(a)(2), prohibits employers from continuing to employ an individual knowing that he or she is or has become unauthorized to work in the United States with respect to such employment. An employer's receipt of a no match letter by itself does not impart knowledge to the employer that the employees identified in the letter are unauthorized to work. While there may be instances when a discrepancy is due to the employee's use of a false name or invalid social security account number (SSN) in order to obtain unauthorized employment, there will also be instances when the discrepancy between SSA records and information submitted to SSA by the employer may be due to errors inadvertently made by the employee, employer, or SSA when recording information, or failure of the employee to inform SSA of errors or a name change. Without more information than what is contained in the no match letter, the letter alone is insufficient to impart knowledge to the employer of unauthorized employment.

Although a no match letter alone does not provide constructive knowledge that the individual is unauthorized to work in the United States, it may raise a material question about the identity of

████████

March 16th, 2005
Page 2

the employee, the validity of the SSN recorded in section 1 and/or section 2 of the Employment Eligibility Verification form (Form I-9), the genuineness of any documents listed in section 2 that contain the SSN, and the relation of these documents to the individual presenting them. The employer, without further inquiry, cannot reasonably continue to rely upon Form I-9 information, the material accuracy of which has been called into question by receipt of a no match letter as assurance that it is employing an individual who is authorized to work in the United States. The employer should ask the employee to resolve the discrepancy with SSA, and the employee should be given a reasonable amount of time to do so. Because SSA does not always provide written confirmation that the discrepancy has been resolved, the employer should not require that the employee provide such written confirmation. If the employee fails to resolve the discrepancy, and: (1) the employee provided a social security card as a List C document to establish employment eligibility or any other document used to satisfy the requirements in section 2 of the Form I-9 contained the SSN in question; or (2) based on the totality of the circumstances, the employee's identity is called into question, then DHS may consider an employer to be in violation of section 274A(a)(2) of the INA if it does not take reasonable steps to ensure that the individual is authorized to work, and the individual is in fact an unauthorized alien.

In situations where the employee fails to resolve the discrepancy, the employer should not immediately terminate the employee without further action. The steps an employer could take to ensure that the individual is authorized to work are reverification of employment authorization in section 3 of the Form I-9 if the individual's identity is not in question, or, if identity is in question, completion of a new Form I-9. We would not consider any document that includes a SSN that has been called into question by an unresolved no match letter to be a document that reasonably appears to be genuine, nor would we consider it to relate to the person presenting it for Form I-9 verification or reverification purposes (such a document may include a driver's license or other document using the questionable SSN as its identification number as well as a social security account number card itself). If the employer remains unsatisfied that the employee is authorized to work, termination may be appropriate.

If you have any questions regarding this letter, please contact ████████ in the Department of Homeland Security's Office of General Counsel at ████████. Information regarding compliance with the anti-discrimination provisions of section 274B of the INA may be obtained from the Office of the Special Counsel for Immigration-Related Unfair Employment Practices within the Civil Rights Division of the U.S. Department of Justice, 1425 New York Avenue, NW, Suite 9000, Washington, DC 20005, 1-800-255-7688.

Sincerely,

Daniel Brown
Deputy Associate General Counsel (BTSIS)

# EXHIBIT C



**U.S. Department of Justice**

RECEIVED
CIVIL RIGHTS DIVISION    Civil Rights Division

2005 OCT 19 PM 1:08

OFFICE OF SPECIAL
COUNSEL (I.R.U.E.P.)   *Special Counsel for Immigration Related*
                        *Unfair Employment Practices*
                        *P.O. Box 27728*
                        *Washington, DC 20038-7728*

September 16, 2005

█████████████████████
919 Third Avenue
New York, NY 10023

　　　　Re:　　Employer Responses to Social Security Mis-Match Letters

Dear█████████:

　　　　This is in response to your June 10, 2005 letter, in which you seek advice concerning the interplay among the Immigration and Nationality Act's (INA) anti-discrimination and employer sanctions provisions, and the Social Security Administration's (SSA) mis-match program.

　　　　Please note that this Office cannot give you an advisory opinion on any particular case of alleged discrimination, or on any set of facts involving a particular individual or entity. However, we can provide general guidelines concerning the coverage of the INA's anti-discrimination provisions. Further, the Department of Homeland Security and the Office of the General Counsel for the former Immigration and Naturalization Service have released a number of opinion letters concerning employer responsibilities under the INA's employment sanctions provisions with fact patterns similar to that presented in your letter. See, for example, letter from Pamela J. Turner, Assistant Secretary for Legislative Affairs, to the Honorable John N. Hostettler (August 9, 2004) (Hostettler letter) (attached), letter from Paul Virtue, General Counsel, to the Honorable Robert F. Smith (November 19, 1998) (Smith letter) (attached), letter from David Martin, General Counsel, to████████(December 23, 1997) (75 Interpreter Releases 246 (February 9, 1998)) (█████ letter) (attached to your June 10 letter), and letter from Paul W. Virtue, General Counsel, to████ ████████(April 12, 1999) (█████letter) (also attached to your June 10 letter).

　　　　In your letter, you ask a number of questions concerning appropriate employer conduct following receipt of a no-match letter:

　　　　　　What should an employer do when it receives a no-match letter? Is it sufficient to notify the employee and ask them to correct the information with the Social Security Administration (SSA)? Must an employer reverify the individual named in the no-match letter? What is a reasonable amount of time for an employer to provide an employee to discuss the issue with the SSA? What should an employer do if it receives a second or third no-match letter?

You also ask how an employer should respond to an employee's explanation regarding the no-match letter:

> What should an employer do if it receives a new Social Security number from the employee? What should the employer do if the new Social Security number then appears on a subsequent no-match letter.

Finally, you ask whether an anonymous tip concerning the employment eligibility of an employee supports a constructive knowledge finding.

To begin, we note but disagree with your assertion that guidance is needed because federal laws and policies conflict. Employer conduct that is necessary for compliance with the INA's employer sanctions provisions will not violate the INA's anti-discrimination provisions. Further, compliance with the employer sanctions provisions does not require unlawful discrimination against workers, and compliance with the anti-discrimination provisions does not necessitate that employers disregard their duties under the employer sanctions provisions.

The letters previously issued on the no-match issue provide valuable information and advice for employers regarding the interplay between the SSA's mis-match letters and enforcement of the prohibition against knowingly hiring and employing undocumented workers. The Smith letter notes that the "SSA notice of a mismatch does not trigger by itself an obligation to reverify work authorization." The ███ letter notes that there are legitimate reasons for discrepancies with names and Social Security numbers, and that notice from the SSA of a discrepancy, without more, neither places an employer on notice that an employee is unauthorized to work nor requires reverification of documents or further inquiry as to the employee's work authorization. See also Hostettler letter. In short, an employer should not impute or infer information about an employee's employment status solely because it has received notice of a no match.

If an employer, in response to a mis-match letter, asks an employee to follow-up with the Social Security Administration, it should be aware that SSA has advised OSC that resolving the discrepancy may take up to sixty days, and therefore provide the employee with a sufficient period of time in which to resolve the discrepancy. Please also note that there will be instances in which an employee does not receive additional documentation and will have nothing new to provide to the employer even though he or she has resolved the discrepancy. If the employee provides documentation different than that originally provided when completing the I-9 Form, the ███ letter provides helpful advice concerning how an employer should correct I-9 Forms to reflect the updated information received from employees, and the extent to which an employer should investigate particular discrepancies. For example, the letter notes that "all such situations should be reviewed in the light of common sense." The letter recognizes that there are discrepancies that do not raise suspicion, including transcription errors, changes of last names due to marriage, and cultural naming practices, and also identifies discrepancies that deserve follow-up, including wholesale name changes.

Although the answer will always depend upon the specific facts before the employer, an employer may, without violating the INA's anti-discrimination provisions, generally question an

2

individual who presents two sets of identical documentation containing different names and/or birth dates to determine the authenticity and genuineness of the second set of documents.

Employers must take care to treat in the same manner all individuals identified in the no-match letter, and all individuals who present documents containing discrepancies. An employer cannot treat members of minority groups differently than other individuals when responding to either mis-match letters or employment eligibility verification issues. Similarly, an employer may not treat individuals differently because of their citizenship or immigration status, or perceived citizenship status. For example, an employer could violate the INA's anti-discrimination provisions if it requires Hispanic employees to provide extensive documentation of a marriage and name change yet accepts without question similar explanations from non-Hispanic employees.

Regarding anonymous tips, we urge restraint: such tips may be based in whole, or in part, on factors such as an individual's race, national origin, accent, manner of dress, etc. Such factors are not relevant in determining whether an individual is authorized to work in the United States. Whether an employer should respond to an anonymous tip depends on the specific facts at hand, including the substantive nature of the information provided.

For additional information concerning appropriate employer conduct under the employer sanctions provisions, we suggest that you contact the Department of Homeland Security.

I hope that you find this information helpful.

Sincerely,

William J. Sanchez
Special Counsel

Attachments:

3

# EXHIBIT D



U.S. Department of Justice
Immigration and Naturalization Service

HQCOU 90/10.10-C

625 I Street NW
Washington, DC 20536

Alston & Bird, L.L.P.
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424

Dear ▮▮▮▮▮▮▮:

Thank you for your letter dated October 14, 1998 in which you ask whether an employer
will be deemed to have knowledge that an employee is unauthorized to work solely based upon
the employees' presentation of a second set of employment verification documents that contain a
new name and document number. You also ask in your letter about how an employer is to make
corrections to the Employment Eligibility Verification form (Form I-9). We apologize for the
delay in answering your letter. Although we are unable to provide legal advice, we can offer the
following general comments that may be helpful to you.

The example in your letter describes a situation in which an employee, after having
previously completed section 1 of the Form I-9 and presented a social security card for
completion of section 2, later presents a different social security card that contains a new name
and number with the request that the employer correct the employee's employment records. The
new information presented by the employee is not necessarily an indication that the employee is
an unauthorized alien. However, it constitutes notice to the employer that requires further
inquiry by the employer before the employer can accept the new card and make the appropriate
changes to the Form I-9. An employer on notice may be subject to a civil money penalty for
knowingly continuing to employ an unauthorized alien if the employer fails to act upon the
notice, and the individual is in fact unauthorized to work. In addition, an employer may be
subject to civil or criminal penalties if it knowingly provides or attests to false information on a
Form I-9. Where the Form I-9 was initially completed with correct information, but a change in
circumstances of the employee or employer has rendered minor information outdated (e.g., legal
name change, change in address), the employer does not have a continuing duty to update the
Form I-9.

02/24/2005  12:33    [redacted]                                    PAGE  12/15
06/25/2004  09:17    [redacted]                DGC DHS            PAGE  10

Letter to [redacted]                                              Page 2
Re: Duplicate Social Security Numbers

In the example above, upon being presented with a new social security card, the employer should inquire of the employee the reason for the change. If presentation of the new card is for the purpose of replacing information on the Form I-9 that was incorrectly provided at its initial completion, the employer should review the new card and accept it if it appears to be genuine and to relate to the individual presenting it. Because a complete change in name and number calls into question the identity of the individual presenting the document as verified by the employer at the initial completion of the Form I-9, the employer may need to make additional inquiries of the employee in order to make its determination as to the card's genuineness and whether it appears to relate to the employee. This may mean requesting the employee to present a List B identity document to reestablish the individual's identity.

There are a variety of reasons why an employee may present a document that contains a changed name and document number. Whether the employer will be placed on notice that the employee is an unauthorized alien depends on the circumstances of the particular case. It is possible that an employee who presents a new social security card containing a completely new name and number was previously unauthorized to work in the United States rather than presently unauthorized to work. However, especially in cases where the corrections to the name and social security number are minor, other reasons may exist for the change in name and/or number, such as a spelling correction or correction of a number transposition. Therefore, the extent of the employer's inquiry will depend upon the facts of each particular case. Once the employer is satisfied that the new documentation reasonably relates to the individual, the employer must accept the documentation. If the employer discovers that the employee intentionally provided false information at the initial completion of the Form I-9, internal policies of the employer rather than the INA will govern the situation. The employer may treat that situation in a manner consistent with how it treats other employee fraud and criminal conduct in the workplace that is of similar gravity. If the employer is not satisfied that the document relates to the individual, the employer should not accept the document but should request other acceptable I-9 documentation from the employee. An employer who continues to employ an employee who cannot present such documentation may be subject to penalties under section 274A of the INA. Concerns the employer may have regarding the anti-discrimination provisions of section 274B of the INA should be addressed to the Office of Special Counsel, 1425 New York Avenue, NW., Suite 9000, Washington, D.C. 20005, 1-800-255-7688.

The employer should also confirm the accuracy of section 1 of the Form I-9 with the employee. The manner in which corrections to the Form I-9 should be accomplished is in the discretion of the employer since neither the statute nor regulations cover this issue. We suggest that the corrections be made on the initial form itself, but in such a way so as not to completely obliterate the information that was provided by the employee at the form's initial completion.

02/24/2005  12:33
06/25/2004  09:17

OGC DHS

PAGE  11

SEP-24-2004  18:01         INS GENERAL COUNSEL                          P.15

Letter to                                                      Page 3
Re:  Duplicate Social Security Numbers


Corrections made to section 1 of the Form I-9 should be initialed and dated by the employee.
Corrections made to section 2 of the Form I-9 should be initialed and dated by the employer.

I hope that this information is of assistance.

Sincerely,


Dea D. Carpenter
Chief, Employer Sanctions & Civil
   Document Fraud Division
Office of the General Counsel

# EXHIBIT E

**OFFICE OF
THE INSPECTOR GENERAL**

**SOCIAL SECURITY ADMINISTRATION**

**SOCIAL SECURITY NUMBER MISUSE
IN THE SERVICE,
RESTAURANT, AND
AGRICULTURE INDUSTRIES**

**APRIL 2005          A-08-05-25023**

# AUDIT REPORT



# Mission

We improve SSA programs and operations and protect them against fraud, waste, and abuse by conducting independent and objective audits, evaluations, and investigations.  We provide timely, useful, and reliable information and advice to Administration officials, the Congress, and the public.

# Authority

The Inspector General Act created independent audit and investigative units, called the Office of Inspector General (OIG).  The mission of the OIG, as spelled out in the Act, is to:

- ○ Conduct and supervise independent and objective audits and investigations relating to agency programs and operations.
- ○ Promote economy, effectiveness, and efficiency within the agency.
- ○ Prevent and detect fraud, waste, and abuse in agency programs and operations.
- ○ Review and make recommendations regarding existing and proposed legislation and regulations relating to agency programs and operations.
- ○ Keep the agency head and the Congress fully and currently informed of problems in agency programs and operations.

To ensure objectivity, the IG Act empowers the IG with:

- ○ Independence to determine what reviews to perform.
- ○ Access to all information necessary for the reviews.
- ○ Authority to publish findings and recommendations based on the reviews.

# Vision

By conducting independent and objective audits, investigations, and evaluations, we are agents of positive change striving for continuous improvement in the Social Security Administration's programs, operations, and management and in our own office.

# SOCIAL SECURITY

**MEMORANDUM**

Date:     April 29, 2005                                              Refer To:

To:       The Commissioner

From:     Inspector General

Subject:  Social Security Number Misuse in the Service, Restaurant, and Agriculture Industries
(A-08-05-25023)

## OBJECTIVE

Our objective was to assess the potential for misuse of Social Security numbers (SSN) in the service, restaurant, and agriculture industries.[1]

## BACKGROUND

Because SSA calculates future benefit payments based on the earnings an individual has accumulated over his or her lifetime, accuracy in recording those earnings is critical. SSA's ability to do so, however, greatly depends on employers and employees correctly reporting names and SSNs on Forms W-2, *Wage and Tax Statement*.  SSA uses automated edits to match employees' names and SSNs with Agency records to ensure earnings are properly credited to the Master Earnings File.  SSA places wage items that fail to match name and SSN records into its Earnings Suspense File (ESF).[2]  As of October 2004, the ESF had accumulated about $463 billion in wages and 246 million wage items for Tax Years (TY) 1937 through 2002.[3]

In January 2001, we issued a Management Advisory Report, *Obstacles to Reducing Social Security Number Misuse in the Agriculture Industry* (A-08-99-41004), in which we assessed the potential for SSN misuse in the agriculture industry.  The wage information in the previous report covered TYs 1996 through 1998.  In the 2001 report, we determined that agriculture employers submitted thousands of wage items for which the employee's name and/or SSN did not match SSA records, resulting in millions of

---

[1] For purposes of this review, we use the term "SSN misuse" throughout this report to refer to situations in which individuals used SSNs not issued to them by SSA to obtain employment.  Furthermore, we define the service industry as being comprised of temporary labor and cleaning services employers.

[2] A wage item is an individual employee report prepared by employers on a Form W-2 after the close of the calendar year that shows wages paid and taxes withheld during the prior calendar year.

[3] TY 2002 data was not available when we began our analysis of ESF data for TYs 1999 through 2001.

dollars in suspended wages.  Because of continuing congressional interest in the ESF and employers who continually have wage items going into the ESF, we elected to conduct a review that not only addressed employers in the agriculture[4] industry but included employers in the service and restaurant industries as well.[5]

To accomplish our objective, we obtained ESF data for TYs 1999 through 2001.  This data represents the most complete tax data available at the start of our audit, given the inherent lag in posting annual wage information.  We then identified the 100 employers in each of the service, restaurant, and agriculture industries who contributed the most wage items to the ESF for the 3-year period.[6]  For the 300 employers selected, we analyzed ESF data to identify reporting irregularities, such as SSNs that SSA either had never issued or assigned to another individual.  We also contacted selected employers and industry associations to obtain information on their experiences with employees who provided names and/or SSNs that did not match SSA's records.  See Appendix B for additional information on our scope and methodology.

## RESULTS OF REVIEW

Based on our analysis of ESF data and interviews with employers and industry associations, we believe SSN misuse in the service, restaurant, and agriculture industries is widespread.  For example, for TYs 1999 through 2001, the 300 employers we reviewed submitted over 2.7 million wage items for which the employee's name and/or SSN did not match SSA records.  These wage items represented $9.6 billion in suspended earnings over the 3-year period.  In total, 14 percent of the wage items submitted by these 300 employers did not match names/SSNs contained in SSA files.  For the 100 agriculture employers, about 48 percent of the wage items they submitted failed to match SSA records.

We identified various types of reporting irregularities, such as invalid, unassigned and duplicate SSNs and SSNs belonging to young children and deceased individuals.  While we recognize there are legitimate reasons why a worker's name and SSN may not match SSA files, such as a legal name change, we believe the magnitude of incorrect wage reporting is indicative of SSN misuse.  Employers and industry association representatives acknowledged that unauthorized noncitizens contribute to SSN misuse.[7]

---

[4] In our January 2001 report, we reviewed ESF data for 20 agriculture employers in California and Florida for TYs 1996 through 1998.  In the current audit, we focused on the 100 agriculture employers nationwide who contributed the most wage items to the ESF for TYs 1999 through 2001.

[5] SSA statistics show these three industries account for approximately one-half of all wage items in the ESF.

[6] While we recognize that some employers may report wages under more than one employer identification number, we did not combine ESF wage items posted under multiple employer identification numbers to determine the 100 employers in each industry.

[7] We use the term "unauthorized noncitizens" when referring to individuals who do not have permission from DHS to work in the United States but who are working—regardless of whether they entered the country legally or illegally.

Page 3 - The Commissioner

To its credit, SSA recognizes the impact SSN misuse has on its programs, including growth of the ESF, and has taken steps to reduce such activity.  However, SSA's ability to combat SSN misuse is hampered because employers do not routinely use the Agency's Employee Verification Service (EVS) and we are not aware of instances where IRS has imposed existing civil penalties against employers who submit inaccurate wage reports.  Furthermore, privacy and disclosure issues (that is, the inability to routinely share information regarding employers who filed large numbers or percentages of wage statements with inaccurate SSNs) have limited collaborative efforts between SSA and DHS.

## SSN MISUSE IN THE SERVICE, RESTAURANT, AND AGRICULTURE INDUSTRIES IS WIDESPREAD

Over 2.7 million (14 percent) of the 19.2 million wage items submitted by the 300 employers we reviewed did not match SSA records and were posted to the ESF, as shown in Table 1.

**Table 1:**  Percentage of Wage Items Posted to the ESF for TYs 1999-2001

| Industry | Number of W-2s Submitted | Number of ESF Items | Percent of W-2s Posted to the ESF | Median[8] Employer Percentage | Range of Employer Percentages Low | High |
|---|---|---|---|---|---|---|
| Service | 8,920,746 | 1,132,070 | 13 | 30 | 1 | 93 |
| Restaurant | 9,061,420 | 1,026,620 | 11 | 15 | 2 | 70 |
| Agriculture | 1,264,716 | 602,075 | 48 | 68 | 3 | 85 |
| Totals | 19,246,882 | 2,760,765 | 14 | 32 | 1 | 93 |

The percentage of wage items posted to the ESF over the 3-year period ranged from a low of 11 percent for the restaurant industry to a high of about 48 percent for the agriculture industry.  Moreover, 263 (88 percent) of the 300 employers experienced increases in the percentage of suspended wage items from TYs 1999 through 2001.[9] The 37 employers who did not experience a percentage increase still contributed over 244,000 wage items and over $793 million to the ESF over the 3-year period.

---

[8] We calculated the median percentage for each industry by arranging the individual employer percentages in numerical order and averaging the two middle employers' percentages.

[9] An increase or decrease in suspended wage items for a particular employer could occur for a number of reasons, including a change in the number of employees or even the volume of items moved from the ESF to wage earners' records.

Page 4 - The Commissioner

## Types of Reporting Irregularities

During our review of ESF data for these 300 employers, we identified various types of reporting irregularities that we believe indicate SSN misuse. These irregularities include large numbers of invalid, unassigned, and duplicate SSNs and SSNs belonging to young children and deceased individuals (see Appendix C).[10] Our analysis showed the following.

- SSA had never assigned about 680,000 (25 percent) of the reported SSNs. Over 48,000 of these SSNs were not valid because they did not fall within the ranges of numbers SSA has authorized for use.

- The remaining 2 million (75 percent) SSNs were numbers SSA had assigned to someone else. About 9,500 of these SSNs belonged to young children, and about 5,400 belonged to deceased individuals.

Additional analysis of the ESF data showed that these employers submitted over 16,000 duplicate SSNs during each year of our audit period—meaning multiple employees used the same SSN to work for one employer. One restaurant employer submitted over 4,100 duplicate SSNs in TY 2001. That same year, an agriculture employer submitted over 900 duplicate SSNs, and an employer in the service industry submitted over 2,100.

While we recognize there are legitimate reasons why a worker's name and SSN may not match SSA's files, such as a name change, we believe the nature and extent of the reporting irregularities discussed above, and shown in Appendix C, indicate SSN misuse.

## Unauthorized Noncitizen Workforce Is a Contributor to SSN Misuse

Several of the employers and industry associations we contacted acknowledged that unauthorized noncitizens contribute to SSN misuse. For example, one employer told us his restaurants and many others would be forced to close if they did not hire unauthorized noncitizens. A temporary labor service employer acknowledged that some of his former employees were unauthorized noncitizens who used invalid, unassigned, and deceased individuals' SSNs. Furthermore, the president of a large growers' association stated that farm labor contractors employ a large number of unauthorized noncitizens.

During our previous review of SSN misuse in the agriculture industry, SSA senior staff acknowledged the agriculture industry is the largest contributor to the ESF, and the intentional misuse of SSNs by unauthorized noncitizens has been a major contributor to

---

[10] We reviewed the alerts for deceased individuals in our August 2002 audit *Effectiveness of the Social Security Administration's Earnings After Death Process* (A-03-01-11035). We found both indications of SSN misuse as well as opportunities for SSA to educate employers on the proper reporting of wages after an employee's death.

Page 5 - The Commissioner

the ESF's growth.[11]  SSA senior staff told us employers hire unauthorized workers because there is nothing to prevent them from doing so.  That is, employers know SSA has no legal authority to levy fines and penalties, and they are not concerned about potential IRS sanctions.

In a March 2001 report, SSA noted that many suspended wage items involve the agriculture industry, which has transient employees who may not have work authorizations from DHS.[12]  Other high turnover industries, such as restaurants and temporary service employers, have similar profiles.[13]  In an August 2004 report, the Government Accountability Office (GAO) noted that Treasury's Inspector General for Tax Administration estimated that, in TY 2000, over 250,000 illegal aliens had wage statements with invalid SSNs.[14]

## OBSTACLES HINDER SSA INITIATIVES TO REDUCE ITS VULNERABILITY TO SSN MISUSE

Despite a number of initiatives to reduce SSA's vulnerability to SSN misuse, significant obstacles remain.  SSA's ability to combat SSN misuse is hampered because employers do not routinely use EVS and we are not aware of instances where IRS has imposed existing civil penalties against employers who submit inaccurate wage reports. Furthermore, privacy and disclosure issues have limited collaborative efforts between SSA and DHS.

---

[11] *Obstacles to Reducing Social Security Number Misuse in the Agriculture Industry* (A-08-99-41004), January 2001.

[12] *SSA Key Initiative Plan and Schedule: Reduce Earnings Suspense File* (KI #46), March 15, 2001.

[13] *Management Advisory Report: Review of Service Industry Employer with Wage Reporting Problems* (A-03-00-10022), September 2001.

[14] *Tax Administration: IRS Needs to Consider Options for Revising Regulations to Increase the Accuracy of Social Security Numbers on Wage Statements* (GAO-04-712), August 2004.

Page 6 - The Commissioner

## SSA Outreach to Employers

SSA has initiated several efforts to educate employers about the importance of accurate wage reporting.  SSA assists employers in verifying employees' names and SSNs through EVS.  Employers can verify up to 5 names/SSNs by calling a toll-free telephone number, or they can fax up to 50 names/SSNs directly to an SSA field office. Employers who need to verify more than 50 names/SSNs can do so by submitting a list of the names/SSNs to SSA, using a process called EVS for registered users.  In addition, SSA initiated the Social Security Number Verification Service (SSNVS) as a pilot project in March 2002.  This on-line service allows a small number of pre-selected employers to verify employees' names/SSNs using their personal computers.[15]  SSA senior staff told us the Agency plans to make SSNVS available to all employers in 2005.

SSA also provides assistance to employers through its Employer Service Liaison Officers (ESLO).  SSA provides ESLOs in each of its regions nationwide to (1) answer employers' questions on wage reporting submissions; (2) encourage employers to use SSA's various programs, such as EVS; (3) conduct wage-reporting seminars, in partnership with the IRS; and (4) contact employers with significant suspended wage items in their regions.

To further assist SSA management in monitoring employer wage reporting, the Agency is developing an Earnings Data Warehouse to provide trend information on employer wage reporting.  Knowing employer reporting trends could assist ESLOs in focusing their outreach efforts.[16]

## Employers Do Not Routinely Use EVS

SSA made EVS available to employers to assist them in verifying employee names and SSNs with SSA records, thus reducing the incidents of incorrect wage reporting. However, six of the nine employers we interviewed did not routinely use EVS.  Some employers stated they did not do so because SSA takes too long to respond to their requests.  One employer told us he does not use EVS because SSA does not require that he do so.  The six employers who stated they did not routinely use EVS experienced increases in the percentage of suspended wage items for TYs 1999 through 2001.  In our September 2002 audit of the EVS system, we noted

---

[15] Under SSNVS, an employer can either key in up to 10 names/SSNs at a time for immediate verification or submit a file containing the names/SSNs.  The maximum number of SSNs allowed per file is 250,000.  SSA provides a response to the employer the next business day.

[16] In our October 2004 report, *Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001* (A-03-03-13048), we recommended SSA track employer trends in the Earnings Data Warehouse, such as increases in the volume of wage items in suspense as well as the percent of an employer's payroll in the ESF.

Page 7 - The Commissioner

that, of the 6.5 million employers in the United States, only 392 employers/third-party payroll companies used the EVS for registered users process between Calendar Years 1999 to 2001.[17]

We believe EVS is a useful tool for employers who are committed to improving the accuracy of their wage reporting.  For example, a temporary staffing company who began using EVS in 2001 and SSNVS in 2003 experienced a significant decrease in the percentage of suspended wage items.  The employer's Director of Human Resources stated his company sent out directives to its corporate offices nationwide instructing them not to refer individuals who did not have a valid SSN to a client company.  Further, he told us his company places posters in its corporate offices (in various languages) to inform prospective employees that the company verifies applicants' names/SSNs before referral to a client company.  The Director believes his company will continue to experience decreases in the number of suspended wage items because of its use of SSNVS and its commitment to only refer individuals who have valid SSNs.

### The IRS Does Not Generally Penalize Employers

Because SSA has no legal authority to levy fines and penalties against employers who submit inaccurate wage reports, it relies on the IRS to enforce penalties for inaccurate wage reporting.[18]  In our January 2001 report on the agriculture industry (see Appendix D), we noted that SSA senior staff did not believe employers had an incentive to submit accurate annual wage reports because the IRS rarely enforced existing penalties.  SSA staff believed applying penalties would have a rippling effect on employers who consistently misreported wage information and serve as a deterrent to SSN misuse.  Furthermore, SSA senior staff told us the Agency could provide the IRS with sufficient evidence to show an employer knew or should have known its employees' SSNs were incorrect.  For example, a reasonable person should recognize it is not feasible for hundreds of workers to have the same or consecutively numbered SSNs.

In our January 2001 report, we also noted that SSA and the IRS held discussions to explore the enforcement of an existing penalty provision ($50 per error) for employers who repeatedly submit erroneous name and/or SSN information.  To implement the penalty, SSA and the IRS agreed the Agencies must (1) jointly define the circumstances for applying penalties, (2) identify information needed from SSA for the IRS to support applying penalties, and (3) develop the proposed data flow and procedures to be followed.

According to an August 2004 GAO report, the IRS can identify and penalize employers who file wage statements with inaccurate SSNs but does not have a dedicated compliance program for doing so.[19]  Additionally, GAO reported that IRS regulations

---

[17] *The Social Security Administration's Employee Verification Service for Registered Employers,* (A-03-02-22008), September 2002.

[18] Internal Revenue Code Section 6721.

[19] *Tax Administration: IRS Needs to Consider Options for Revising Regulations to Increase the Accuracy of Social Security Numbers on Wage Statements* (GAO-04-712), August 2004.

Page 8 - The Commissioner

permit the IRS to waive potential penalties if employers demonstrate a "reasonable cause" for the waiver.[20]  In its report, GAO opined that the IRS' criteria for meeting the waiver are such that few, if any, employers are likely to be penalized for submitting inaccurate SSNs.  In fact, GAO reported that the IRS could not provide any record that it had penalized an employer for inaccurate wage reporting.  GAO also noted that IRS officials said they would consider changes, including requiring that employers verify SSNs provided by employees, as part of the "egregious" employer study.[21] Furthermore, GAO stated that, because the IRS believes some portion of inaccurate SSNs on wage statements is attributable to illegal aliens using invalid SSNs, it would likely consider the views of other potentially affected Federal agencies before changing its penalty program.

In our October 2004 report on employers with the most items in the ESF,[22] we noted that the IRS reviewed the employee records at 78 "egregious" employers to determine whether penalties should be assessed.  Of the 78 employers, 50 were large employers with a high number of ESF items, and the other 28 employers were smaller companies with 93 percent or more of their payroll going into the ESF.  In all 78 cases the IRS did not see penalty potential because the employers (1) used the information from the IRS Form W-4 (*Employee's Withholding Allowance Certificate*) to prepare the W-2 and (2) attempted to correct the W-2 information when SSA notified them that the information did not match Agency records.

We acknowledge SSA's efforts in working with the IRS to improve employer wage reporting.  However, until the IRS requires that egregious employers verify employees' SSNs and holds them accountable for their actions through an effective employer penalty program, we do not believe employer wage reporting will significantly improve. We believe SSA could assist the IRS in its efforts to apply penalties by providing them with sufficient evidence to show an employer knew, or should have known, its employees' SSNs were incorrect.  Because SSA relies on the IRS to enforce penalties for inaccurate wage reporting, we will provide Treasury's Inspector General for Tax Administration with a copy of this report under separate cover.

---

[20] The Tax Reform Act of 1986 (Public Law 99-514), the Omnibus Budget Reconciliation Act of 1989 (Public Law 101-239), and Internal Revenue Code Section 6724(a) authorizes a "reasonable cause waiver."  To qualify for a "reasonable cause waiver," employers must be able to demonstrate they solicited an SSN from each employee one to three times, depending on the circumstances, and that they used this information to complete the wage statements.

[21] For the purpose of this report, we defined "egregious" employers as those who filed large numbers or percentages of wage statements with inaccurate SSNs repeatedly over several years.  On March 10, 2004, Mark E. Everson, Commissioner of the IRS, presented testimony (*Individual Taxpayer Identification Numbers and Social Security Number Matching)* before the House Ways and Means Subcommittee on Oversight and Subcommittee on Social Security regarding IRS' study of "egregious employers."

[22] *Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001* (A-03-03-13048), October 2004.

Page 9 - The Commissioner

**Limited Collaboration Between SSA and DHS**

In our January 2001 report regarding SSN misuse in the agriculture industry, we reported that SSA and Immigration and Naturalization Service (INS)[23] senior staff told us collaboration between the two agencies had been limited.  Although SSA recognized that unauthorized noncitizens contributed to SSN misuse and ESF growth, the Agency determined it could not share specific information with the INS regarding employers who experience high name and SSN error rates because of privacy and disclosure laws.

We recommended that SSA (1) collaborate with the INS to develop a better understanding of the extent immigration issues contribute to SSN misuse and growth of the ESF and (2) reevaluate its application of existing disclosure laws or seek legislative authority to remove barriers that would allow the Agency to share information regarding chronic problem employers with INS.  SSA disagreed and stated its interpretation of privacy and disclosure issues is accurately applied and continues to provide sufficient authority to share information with other agencies in situations that are consistent with the purpose of the Social Security programs and SSA's disclosure policies.

Although SSA continues to coordinate with DHS on immigration issues, it does not routinely share information regarding egregious employers who submit inaccurate SSNs.  In our opinion, any serious plan to address SSN misuse and growth of the ESF must allow SSA to share such information with DHS.  We recognize SSA has no control over immigration policy; however, we are concerned that social, political, and economic issues associated with the enforcement of immigration laws impact SSA's ability to address SSN misuse.  We believe SSA, Congress and other relevant stakeholders must recognize that, until the issue of SSN misuse by unauthorized noncitizens is addressed, the ESF will continue to grow.  Accordingly, we encourage SSA to further this dialogue and attempt to negotiate a coordinated strategy.  Because we believe intentional misuse of SSNs by unauthorized noncitizens has been a major contributor to the ESF's growth, we will provide a copy if this report under separate cover to the DHS Inspector General.

## CONCLUSION AND RECOMMENDATIONS

We believe SSN misuse within the service, restaurant, and agriculture industries results in millions of dollars in wages that SSA cannot post to workers' earnings records.  We recognize no single agency can adequately combat this problem.  However, given the large number and/or percentage of wage statements employers submitted with inaccurate SSNs and the nature of the reporting irregularities, we believe SSA should take additional measures to ensure SSN integrity.

In previous reports, we made recommendations to help reduce the growth of the ESF.  The report titles are listed in Appendix D.  We continue to support the recommendations made in these reports and encourage SSA to continue its initiative to collaborate with

---

[23] On March 1, 2003, the responsibility for providing immigration-related services and benefits was transferred from INS to the U.S. Citizenship and Immigration Services, a bureau of DHS.

DHS to develop a better understanding of the extent that immigration issues contribute to SSN misuse and growth of the ESF.  Furthermore, we continue to believe SSA should seek legislative authority to remove barriers that would allow the Agency to share information regarding chronic problem employers with DHS.  In addition to the previously suggested actions, we recommend that SSA:

1. Continue to collaborate with IRS regarding wage reporting issues, including assisting the IRS in its development of an effective employer penalty program.

2. Encourage IRS to require employers who file large numbers or percentages of wage statements with inaccurate SSNs to verify employees' SSNs.

## AGENCY COMMENTS AND OIG RESPONSE

We believe SSA's response and planned actions adequately address Recommendation 1.  However, we believe SSA's response to Recommendation 2 does not effectively address our concern that employers who consistently submit erroneous or incorrect wage reports are not required to verify employees' SSNs.

SSA disagreed with Recommendation 2.  SSA stated it will continue to offer and encourage all employers to use the free verification services for wage reporting. Furthermore, SSA stated it will defer to IRS as to whether specific employers should be required to use the verification services.  While we acknowledge the IRS governs the wage reporting process, we continue to believe SSA should encourage the IRS to require employers who file large numbers or percentages of wage statements with inaccurate SSNs to verify employees' SSNs.  As discussed in the report, the IRS is considering requiring egregious employers to verify employees' SSNs.

We did not intend to suggest that small companies who may occasionally submit a high percentage of incorrect wage reports should be required to verify employee's SSNs. Rather, our intent was to encourage SSA to urge the IRS to require larger employers

Page 11 - The Commissioner

who consistently submit erroneous or incorrect wage reports to verify employee' SSNs. Until the IRS requires chronic problem employers to verify employees' SSNs and holds them accountable for their actions, we do not believe employer wage reporting will significantly improve. Accordingly, we encourage SSA to reconsider its response to Recommendation 2.

SSA also provided technical comments that we considered and incorporated, where appropriate. The full text of SSA's comments is included in Appendix E.

Patrick P. O'Carroll, Jr.

# *Appendices*

APPENDIX A – Acronyms

APPENDIX B – Scope and Methodology

APPENDIX C – Analysis of Employers' Earnings Suspense File Wage Items for Tax Years 1999-2001

APPENDIX D – Prior Office of the Inspector General and Government Accountability Office Reports

APPENDIX E – Agency Comments

APPENDIX F – OIG Contacts and Staff Acknowledgments

*Appendix A*

# Acronyms

| | |
|---|---|
| DHS | Department of Homeland Security |
| ESF | Earnings Suspense File |
| ESLO | Employer Service Liaison Officer |
| EVS | Employee Verification Service |
| GAO | Government Accountability Office |
| INS | Immigration and Naturalization Service |
| IRS | Internal Revenue Service |
| SSA | Social Security Administration |
| SSN | Social Security Number |
| SSNVS | Social Security Number Verification Service |
| TY | Tax Year |

# Scope and Methodology

To accomplish our objective, we performed the following steps.

- Reviewed Social Security Administration (SSA) policies and procedures and applicable federal laws and regulations regarding employer wage reporting.

- Obtained Earnings Suspense File (ESF) data for Tax Years (TY) 1999 through 2001 for all employers with at least 200 mismatched wage items.

- Identified the top 100 employers in the service, restaurant, and agriculture industries (total of 300 employers) who contributed the most wages to the ESF for the 3-year period.

- Calculated error rates for each employer by dividing the number of ESF wage items by the total number of W-2s submitted by the employer for each year and for the combined years.

- Contacted nine employers and five industry associations to obtain information on their experiences with employees who provide names/Social Security numbers (SSN) that do not match SSA's records.  We limited our selection to employers and industry associations in California and Florida because these States account for a significant portion of the wage items posted to the ESF for the review period.

- Analyzed ESF data for each of the 300 employers.  Specifically, we categorized the ESF wage items for each of the 3 years to include the following reporting irregularities: unassigned, invalid and duplicate SSNs and SSNs belonging to young children (under age 13) and deceased individuals.

- Reviewed prior SSA Office of the Inspector General and Government Accountability Office reports.  See Appendix D for a list of the reports.

The SSA entity reviewed was the Office of Public Services and Operations Support under the Deputy Commissioner for Operations and the Office of Earnings, Enumeration and Administrative Systems under the Deputy Commissioner for Systems. This audit did not include an evaluation of SSA's internal controls over the wage reporting process, nor did we attempt to establish the reliability or accuracy of the wage data.  However, we determined that ESF data are sufficiently reliable during a prior review.[1]  We conducted our audit from May through September 2004 in accordance with generally accepted government auditing standards.

---

[1] *Performance Measure Review: Reliability of the Data Used to Measure the Accuracy of Earnings Posted* (A-03-00-10004), May 2001.

## *Appendix C*

# Analysis of Employers' Earnings Suspense File Wage Items for Tax Years 1999-2001

| Types of Reporting Irregularities | Industry | | | |
|---|---|---|---|---|
| | Service | Restaurant | Agriculture | Totals |
| Social Security Numbers (SSN) with All Zeros or with Zeros as the Area, Group or Serial Numbers | 7,715 | 9,936 | 12,618 | 30,269 |
| SSNs with All 9's | 14 | 1,155 | 58 | 1,227 |
| SSNs with Area Number 666 | 289 | 228 | 264 | 781 |
| SSNs with Area Numbers 773-999 | 4,997 | 9,294 | 1,263 | 15,554 |
| Unassigned SSNs[1] | 285,071 | 222,600 | 124,212 | 631,883 |
| Valid SSNs Assigned to Young Children[2] | 4,675 | 2,510 | 2,284 | 9,469 |
| Valid SSNs Assigned to Deceased Individuals | 2,749 | 1,549 | 1,054 | 5,352 |
| Other Valid SSNs with Name Mismatches | 826,560 | 779,348 | 460,322 | 2,066,230 |
| Totals | 1,132,070 | 1,026,620 | 602,075 | 2,760,765 |

---

[1] This category includes SSNs that the Social Security Administration (SSA) has never assigned.

[2] This category includes SSNs that SSA assigned to children under age 13.

*Appendix D*

# Prior Office of the Inspector General and Government Accountability Office Reports

| Report Identification Number | Report Title | Date Issued |
|---|---|---|
| A-03-03-13048 | *Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001* | October 2004 |
| GAO-04-712 | *Tax Administration: Internal Revenue Service Needs to Consider Options for Revising Regulations to Increase the Accuracy of Social Security Numbers on Wage Statements* | August 2004 |
| A-03-03-13026 | *Follow-Up Review of Employers with the Most Suspended Wage Items* | October 2003 |
| A-03-02-22008 | *The Social Security Administration's Employee Verification Service for Registered Employers* | September 2002 |
| A-03-01-11035 | *Effectiveness of the Social Security Administration's Earnings After Death Process* | August 2002 |
| A-03-01-30035 | *Management Advisory Report:  Recent Efforts to Reduce the Size and Growth of the Social Security Administration's Earnings Suspense File* | May 2002 |
| A-03-00-10022 | *Management Advisory Report:  Review of Service Industry Employer with Wage Reporting Problems* | September 2001 |
| A-03-00-10004 | *Performance Measure Review:  Reliability of the Data Used to Measure the Accuracy of Earnings Posted* | May 2001 |
| A-08-99-41004 | *Obstacles to Reducing Social Security Number Misuse in the Agricultural Industry* | January 2001 |
| A-03-97-31003 | *The Social Security Administration's Earnings Suspense File Tactical Plan and Efforts to Reduce the File's Growth and Size* | February 2000 |
| A-03-98-31009 | *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items* | September 1999 |

## *Appendix E*

# Agency Comments



# SOCIAL SECURITY

**MEMORANDUM**                                                    34124-24-1253

Date:     April 12, 2005                              Refer To: S1J-3

To:       Patrick P. O'Carroll, Jr.
          Inspector General

From:     Larry W. Dye        /s/
          Chief of Staff

Subject:  Office of Inspector General (OIG) Draft Report, "Social Security Number Misuse in the Service, Restaurant, and Agriculture Industries" (A-08-05-25023)--INFORMATION

We appreciate OIG's efforts in conducting this review.  Our comments to the recommendations are attached.

Please let us know if we can be of further assistance.  Staff questions may be referred to Candace Skurnik, Director of the Audit Management and Liaison Staff, at extension 54636.

Attachment:
SSA Response

**COMMENTS ON THE OFFICE OF INSPECTOR GENERAL (OIG) DRAFT REPORT, "SOCIAL SECURITY NUMBER MISUSE IN THE SERVICE, RESTAURANT, AND AGRICULTURE INDUSTRIES" (A-08-05-25023)**

Thank you for the opportunity to review and comment on the draft report. We note that the Inspector General (IG) believes the Social Security Administration (SSA) should seek legislative authority to remove barriers that would allow the Agency to share information regarding chronic problems with the Department of Homeland Security (DHS), as mentioned in the OIG's 2001 report, "Obstacles to Reducing Social Security Number Misuse in the Agriculture Industry." The IG correctly notes that currently there are privacy and disclosure laws that prohibit SSA from sharing such tax return information with agencies other than the Internal Revenue Service (IRS).

SSA will continue to work with IRS regarding wage reporting issues; however, it is beyond our purview to advance legislation to amend the Internal Revenue Code in order to allow DHS access to tax return information.

Recommendation 1

SSA should continue to collaborate with IRS regarding wage reporting issues, including assisting the IRS in its development of an effective employer penalty program.

Comment

We agree. SSA will continue to collaborate with IRS regarding wage reporting issues, including assisting IRS in its efforts to improve the employer penalty program (if and when IRS chooses to modify its existing program).

SSA has had an interagency effort in place with IRS since 2004 to collaborate on issues of mutual concern. Since SSA has no legal authority to levy fines and penalties for inaccurate wage reporting, we must rely on IRS to do so.

We continue to encourage IRS to require employers who file large numbers of wage statements with inaccurate Social Security numbers (SSNs) to verify employees' SSNs by using SSA's Employee Verification Service (EVS). We believe that this process will improve the accuracy of our earnings records and limit the growth of the Earnings Suspense File.

Recommendation 2

SSA should encourage IRS to require employers who file large numbers or percentages of wage statements with inaccurate SSNs to verify employees' SSNs.

<u>Comment</u>

We disagree.  Both SSA and IRS struggle with the issue of wage statements with inaccurate SSNs.  In many cases, the employers are simply reporting the best information they have in their records.  Furthermore, in the selected industries, turnover is very high and employment is for only short periods of time.  Many of these workers move on to other jobs prior to the employer recognizing the inaccurate information.  SSA's verification services are valuable tools for improving wage reporting and SSA will continue to offer and encourage all employers to use the free verification services for wage reporting purposes.  However, since the wage reporting process is ultimately governed by IRS, we defer to IRS as to whether specific employers should be required to use the verification services.

*Appendix F*

# OIG Contacts and Staff Acknowledgments

*OIG Contacts*

Kimberly A. Byrd, Director, (205) 801-1605

Jeff Pounds, Audit Manager, (205) 801-1606

*Acknowledgments*

In addition to those named above:

Cliff McMillan, Senior Auditor

Susan Phillips, Auditor

Kim Beauchamp, Writer-Editor

For additional copies of this report, please visit our web site at www.ssa.gov/oig or contact the Office of the Inspector General's Public Affairs Specialist at (410) 965-3218. Refer to Common Identification Number A-08-05-25023.

# DISTRIBUTION SCHEDULE

Commissioner of Social Security

Office of Management and Budget, Income Maintenance Branch

Chairman and Ranking Member, Committee on Ways and Means

Chief of Staff, Committee on Ways and Means

Chairman and Ranking Minority Member, Subcommittee on Social Security

Majority and Minority Staff Director, Subcommittee on Social Security

Chairman and Ranking Minority Member, Subcommittee on Human Resources

Chairman and Ranking Minority Member, Committee on Budget, House of Representatives

Chairman and Ranking Minority Member, Committee on Government Reform and Oversight

Chairman and Ranking Minority Member, Committee on Governmental Affairs

Chairman and Ranking Minority Member, Committee on Appropriations, House of Representatives

Chairman and Ranking Minority, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations,
   House of Representatives

Chairman and Ranking Minority Member, Committee on Appropriations, U.S. Senate

Chairman and Ranking Minority Member, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, U.S. Senate

Chairman and Ranking Minority Member, Committee on Finance

Chairman and Ranking Minority Member, Subcommittee on Social Security and Family Policy

Chairman and Ranking Minority Member, Senate Special Committee on Aging

Social Security Advisory Board

# Overview of the Office of the Inspector General

The Office of the Inspector General (OIG) is comprised of our Office of Investigations (OI), Office of Audit (OA), Office of the Chief Counsel to the Inspector General (OCCIG), and Office of Executive Operations (OEO). To ensure compliance with policies and procedures, internal controls, and professional standards, we also have a comprehensive Professional Responsibility and Quality Assurance program.

## Office of Audit

OA conducts and/or supervises financial and performance audits of the Social Security Administration's (SSA) programs and operations and makes recommendations to ensure program objectives are achieved effectively and efficiently. Financial audits assess whether SSA's financial statements fairly present SSA's financial position, results of operations, and cash flow. Performance audits review the economy, efficiency, and effectiveness of SSA's programs and operations. OA also conducts short-term management and program evaluations and projects on issues of concern to SSA, Congress, and the general public.

## Office of Investigations

OI conducts and coordinates investigative activity related to fraud, waste, abuse, and mismanagement in SSA programs and operations. This includes wrongdoing by applicants, beneficiaries, contractors, third parties, or SSA employees performing their official duties. This office serves as OIG liaison to the Department of Justice on all matters relating to the investigations of SSA programs and personnel. OI also conducts joint investigations with other Federal, State, and local law enforcement agencies.

## Office of the Chief Counsel to the Inspector General

OCCIG provides independent legal advice and counsel to the IG on various matters, including statutes, regulations, legislation, and policy directives. OCCIG also advises the IG on investigative procedures and techniques, as well as on legal implications and conclusions to be drawn from audit and investigative material. Finally, OCCIG administers the Civil Monetary Penalty program.

## Office of Executive Operations

OEO supports OIG by providing information resource management and systems security. OEO also coordinates OIG's budget, procurement, telecommunications, facilities, and human resources. In addition, OEO is the focal point for OIG's strategic planning function and the development and implementation of performance measures required by the Government Performance and Results Act of 1993.

# EXHIBIT F

# OFFICE OF
# THE INSPECTOR GENERAL

## SOCIAL SECURITY ADMINISTRATION

### SOCIAL SECURITY NUMBER
### INTEGRITY:  AN IMPORTANT LINK
### IN HOMELAND SECURITY

### May 2002     A-08-02-22077

# MANAGEMENT
# ADVISORY REPORT



# Mission

We improve SSA programs and operations and protect them against fraud, waste, and abuse by conducting independent and objective audits, evaluations, and investigations.  We provide timely, useful, and reliable information and advice to Administration officials, the Congress, and the public.

# Authority

The Inspector General Act created independent audit and investigative units, called the Office of Inspector General (OIG).  The mission of the OIG, as spelled out in the Act, is to:

- Conduct and supervise independent and objective audits and investigations relating to agency programs and operations.
- Promote economy, effectiveness, and efficiency within the agency.
- Prevent and detect fraud, waste, and abuse in agency programs and operations.
- Review and make recommendations regarding existing and proposed legislation and regulations relating to agency programs and operations.
- Keep the agency head and the Congress fully and currently informed of problems in agency programs and operations.

To ensure objectivity, the IG Act empowers the IG with:

- Independence to determine what reviews to perform.
- Access to all information necessary for the reviews.
- Authority to publish findings and recommendations based on the reviews.

# Vision

By conducting independent and objective audits, investigations, and evaluations, we are agents of positive change striving for continuous improvement in the Social Security Administration's programs, operations, and management and in our own office.



# SOCIAL SECURITY

MEMORANDUM

**Date:** May 9, 2002

**To:** The Commissioner

**From:** Inspector General

**Subject:** Social Security Number Integrity:  An Important Link in Homeland Security
(A-08-02-22077)

## OBJECTIVE

The objective of this Management Advisory Report is to provide information regarding (1) how Social Security number (SSN) integrity has become a critical element in the protection of our homeland, (2) what the Social Security Administration (SSA) and SSA's Office of the Inspector General (OIG) have done to ensure the SSN's integrity, and (3) what tasks remain in this important effort.

## BACKGROUND

As the Office of Homeland Security stated in its report, *Securing the Homeland, Strengthening the Nation*, "The Government of the United States has no more important mission than fighting terrorism overseas and securing the homeland from future terrorist attacks."  Federal agencies, including SSA, have embraced this challenge—one of monumental scale and complexity.  We believe strengthening SSN integrity is one way in which SSA can make an important contribution to this national goal.

In the past, OIG has issued numerous reports addressing SSN integrity (Appendix A). These reports included recommendations that addressed vulnerabilities in several SSA processes including SSN assignment and issuance, employer wage reporting, and death master file reporting and issuance.  SSA elected to implement many of these recommendations.  Additionally, after the events of September 11, 2001, SSA revisited its position on many prior OIG recommendations that it had either not yet implemented or disagreed with.  In several cases, SSA decided to escalate the implementation of some recommendations, while it reversed its position on others.

Page 2 – The Commissioner

## SCOPE AND METHODOLOGY

In preparing this report, we obtained and reviewed information from various sources, including the Office of Homeland Security's web site, previous OIG reports, statistics and case summaries from our Office of Investigations and Fraud Hotline, and preliminary drafts of certain legislation. Although we did not perform an audit of a specific SSA entity, most of the information contained herein relates to responsibilities of the Office of Program Benefits under the Deputy Commissioner for Disability and Income Security Programs. We performed this work in March 2002 in accordance with the President's Council on Integrity and Efficiency's *Quality Standards for Inspections*.

## RESULTS OF REVIEW

We have long been aware that failure to protect the integrity of the SSN has enormous financial consequences for the Government, the people, and the business community. We now know that shortcomings in the SSN issuance process can have far graver consequences than previously imagined. The difficult lessons of September 11, 2001 have taught us that SSA can no longer afford to operate from a "business as usual" perspective. Whatever the cost, whatever the sacrifice, we must protect the number that has become our national identifier; the number that is the key to social, legal, and financial assimilation in this country.

We recognize SSA alone cannot resolve the monumental issues surrounding homeland security. Efforts to make our Nation safer will involve new or expanded initiatives by almost every segment of our population, including State and local governments, private industry, non-governmental organizations, and citizens. However, we also recognize that, in endeavoring to protect our homeland, no Government system or policy should be ignored. As such, SSA, as a Federal agency and public servant, must resolve to review its systems and processes for opportunities to prevent the possibility that anyone might commit or camouflage criminal activities against the United States. We believe SSN integrity is a link in our homeland security goal that must be strengthened.

### HOW DOES SSN INTEGRITY IMPACT HOMELAND SECURITY?

*How can we assist the Administration's efforts to investigate the initial attacks <u>and</u> prevent future attacks?*

In the weeks following September 11, concerned citizens across the Nation asked many questions about the terrorists. For example, how were these individuals able to assimilate into our society? What documentation allowed them to do so, and how did they obtain it? Are there more terrorists hiding in the United States, and, if so, how can law enforcement officials locate them? Who are their supporters in the United States? Most importantly, many asked "how can we assist in efforts to investigate the attacks and prevent future attacks?"

Page 3 – The Commissioner

For SSA's OIG, the answer to many of these questions revolved around one item—the SSN.  A unique set of nine numbers assigned to almost everyone in the United States.  In fact, today, approximately 300 million people have an SSN.  The SSN is critical to SSA's implementation of its programs and operations.  While this was originally the SSN's only intended use, the SSN quickly became our de facto national identifier, used as a key means of identification in both the public and private sectors.

As use of the SSN has grown, so has its misuse.  Because the SSN is so heavily relied upon as an identifier, it is a valuable commodity for criminals.  It can be obtained illegally in many ways:  presenting false documentation to SSA; stealing another person's SSN; purchasing an SSN on the black market; using the SSN of a deceased individual; and creating a nine-digit number out of thin air.  As we have learned through the terrorist investigations, even a legally obtained SSN can be used to facilitate an unlawful act.

In Fiscal Year 2001, OIG's Fraud Hotline received over 115,000 allegations of fraud.  Of this total, over 55 percent were allegations of SSN misuse.  Examples of this type of fraud include use of an improperly obtained SSN to obtain a driver's license or a credit card, open a bank account, or secure a loan.  The remaining allegations were of program or employee fraud, receipt of Social Security benefits, or other fraud having a direct effect on the Social Security Trust Fund.  Experience has shown that these cases often also include implications of SSN misuse.

Given the magnitude of such allegations and competing priorities, OIG is regrettably unable to investigate a large percentage of the possible criminal violations involving SSN misuse.  Nevertheless, in response to the September 11 attacks, we have committed extensive resources to investigating cases in which SSNs may have been used to facilitate or camouflage terrorist crimes.  The following examples summarize a few of the many cases we pursued involving SSN misuse and possible terrorist activity or connections.  These cases also illustrate SSA's vulnerability to counterfeit evidentiary documents that individuals sometimes use to inappropriately obtain an SSN.

✓ On December 6, 2001, a Federal Grand Jury in Phoenix, Arizona, returned a 41-count indictment against an individual for, among other crimes, 2 counts of *Furnishing False Information as an Identity to Obtain an SSN* and 25 counts *of Using an SSN Assigned to Someone Else*.  The Investigation revealed that the individual, a licensed commercial pilot, obtained an initial SSN in July 1992 in Mesa, Arizona.  In August 1999, the individual used a counterfeit Somali passport in another name to obtain an additional SSN.

The indictment stated the individual interchanged the names and SSN's on a variety of official documents, including Federal Aviation Administration documents.  He also obtained driver's licenses in both names and used both identities on a variety of loan and credit card applications, leases and more.

Page 4 – The Commissioner

✓ Based on a referral from an SSA field office employee, SSA's OIG and other law enforcement agencies arrested an individual for possessing counterfeit documents, violating the Immigration and Nationality Act, and filing a fraudulent SSN application. The individual had a Pakistani passport that contained a counterfeit non-immigrant U.S. visa and a counterfeit I-94, *Arrival/Departure Record*. He also had a genuine SSN card; a counterfeit, blank SSN card; a counterfeit Alien Registration card; and numerous credit cards.

The individual obtained the genuine SSN card by submitting an application to SSA with the counterfeit non-immigrant visa as proof of his immigration status. The suspect stated he filed for an SSN twice. The first time he filed, he was denied, but he received an SSN on his second try at a different SSA field office. The suspect purported to have paid $1,200 for the counterfeit U.S. visa and SSN card.

In addition, our Office of Audit (OA) is conducting an audit in which we are reviewing SSA's procedures for verifying documents submitted with SSN applications. Although we plan to issue the final report in the Summer of 2002, preliminary results indicate that approximately 8 percent (over 100,000) of the 1.2 million original SSNs assigned to non-citizens in Calendar Year 2000 may have been based on invalid immigration documents. We believe results and examples like those cited above illustrate the necessity to verify all evidentiary documents submitted with SSN applications. We recognize SSA is moving toward this goal; however, we are concerned that delays in implementation could result in thousands more improperly assigned SSNs. Accordingly, we urge the Agency to establish a firm time frame by which it will commit to independently verifying all immigration documents before assigning an SSN.

## WHAT STEPS HAVE SSA AND OIG TAKEN TO ADDRESS THIS CRITICAL ISSUE?

Both SSA and OIG promptly accepted the challenge of addressing the Agency's role in homeland security. Recognizing the SSN's importance in non-citizens' assimilation in U.S. society, SSA established an Enumeration Task Force to examine and establish policy that would strengthen the Agency's procedures. As a member of this Task Force, OIG has shared many insights and ideas with the Agency, which we believe will help increase the integrity of the enumeration process. Additionally, since moments after the initial terrorist attacks, OIG has been fully engaged in investigating these crimes. We assisted in search, rescue and recovery efforts, and we devoted extensive resources to developing information regarding possible co-conspirators in the attacks. As evidenced by our actions, SSA and OIG are committed to bringing to justice individuals who participated in these terrible acts and improving procedures for ensuring SSN integrity, thereby strengthening our link in the homeland security chain.

## ENUMERATION TASK FORCE

The Enumeration Task Force is re-examining the entire enumeration process, including previous OIG recommendations, to identify ways SSA can strengthen its enumeration policies and procedures. On November 1, 2001, SSA's then-Acting Commissioner issued a memorandum to SSA executive staff announcing seven reforms the

Page 5 – The Commissioner

Enumeration Task Force recommended and the Agency would implement to address enumeration-related vulnerabilities. In that memorandum, the Acting Commissioner committed that SSA would institute these reforms by February 2002. Additionally, the Enumeration Task Force added another planned initiative to the list after the November 2001 memorandum, bringing the total short-term projects to eight. SSA has implemented several of these initiatives, while others have been delayed. A chart containing the status of each initiative is included as Appendix B. These initiatives are as follows.

1. Provide refresher training on enumeration policy and procedures, with emphasis on enumerating non-citizens, for all involved staff.

2. Convene a joint task force between SSA, the Immigration and Naturalization Service (INS), the Department of State (DoS), and the Office of Refugee Resettlement to resolve issues involving enumeration of non-citizens, including working out procedures for verifying INS documents before SSN issuance.

3. Eliminate driver's licenses as a reason for a non-work number.

4. Provide an alternative to giving out a Numident printout for SSN verification.

5. Lower the age tolerance from age 18 to age 12 for mandatory interview procedures, including verification of birth records before enumeration for all applicants age 1 and over for original SSNs and require evidence of identity for all children, regardless of age.

6. Determine the feasibility of photocopying (or scanning) all documentary evidence submitted with SSN applications.

7. Change the Modernized Enumeration System to provide an electronic audit trail, regardless of the mode used to process SSN applications.

8. Implement the SSN Verification System.

## OIG INITIATIVES

OIG has taken the challenge of addressing homeland security and the SSN's role in this endeavor seriously. We are committed to providing whatever assistance we can in bringing to justice those who committed the unfathomable terrorist acts against our Nation. Additionally, we will provide whatever knowledge and resources we have to affect significant changes in Federal programs so that not one more terrorist can use our own systems and processes to facilitate such crimes. As evidenced by the myriad efforts OIG has already taken, our resolve is deep.

### *Investigative Efforts*

OIG special agents, computer specialists, and attorneys have long worked closely with Federal, State and local law enforcement officials to investigate and prosecute SSN misuse.  Since September 11, we have further increased our efforts in this area, working aggressively to support the Administration's efforts to investigate the attacks and prevent future incidents.  Examples of our efforts follow.

✓ Within minutes of the attack on the World Trade Center, the Special Agent-in-Charge for OIG New York Field Division contacted the Federal Bureau of Investigation (FBI), offering the services of all the special agents under his command.  In the days following the attacks, several of these special agents assisted in search, rescue and recovery efforts at Ground Zero.

✓ Nationally, OIG has been an active participant in the FBI's Joint Terrorism Task Force.  We have provided round-the-clock support to the national criminal investigation of the terrorist attacks.  Our special agents, computer specialists, and attorneys have helped identify, detain, indict, and convict individuals who may have a relationship with terrorist activities.

✓ OIG quickly assigned its agents in the New York/New Jersey area to the FBI investigation.  Additionally, OIG had representatives assigned to the FBI's Strategic Information and Operations Center and to the National Infrastructure Protection Center.  The OIG's Electronic Crimes Team assisted the FBI, while our computer specialists wrote programs to more specifically query SSA's data bases for FBI-requested information.  Additionally, OIG agents fielded SSN information requests on suspects and witnesses, each of which was routed through the FBI's Baltimore office to our Headquarters.  Many SSA OIG investigators are working full-time on the terrorism investigation and responding to allegations of SSN misuse.

✓ "Operation Safe Travel" began in September 2001 when SSA OIG agents developed information that individuals working at the Salt Lake City International Airport were misusing SSN's for security badge applications and I-9's, (*Employment Eligibility Verification*).  Under the direction of the U.S. Department of Justice (DoJ), investigators subpoenaed records for all 9,000 airport employees with security badges to identify instances of SSN misuse.  They identified 61 individuals with the highest-level security badges and 125 individuals with lower level badges who misused SSN's.  A Federal grand jury indicted 69 individuals for Social Security and INS violations.  Sixty-one of the 69 individuals arrested had an SSN misuse charge by the U.S. Attorney.  On December 11, 2001, SSA's OIG agents and other members of the Operation Safe Travel Task Force arrested 50 individuals.  To date, more than 20 have been sentenced after pleading guilty to violations cited in the indictments.  Many are now involved in deportation proceedings.  There were other similar airport operations after the Salt Lake City Operation, and more are underway. In conjunction with DoJ, we are looking at other critical infrastructure facility sites.

Page 7 – The Commissioner

### Audit Efforts

Our OA produced in-depth responses to two congressional inquiries assessing SSA's policies and procedures for issuing original and replacement Social Security (SS) cards. In early October 2001, we assessed SSA's business processes for issuing and protecting SSNs. This assessment addressed evidence presented with SSN applications; computerized controls; SSA's accounting for SS cards; additional training for SSA employees; public awareness on the proper use and dissemination of the SSN; and SSA's coordination efforts with other Federal agencies.

Later in October, we assessed SSA's programs and operations to identify counterfeit and stolen SS cards and described SSA's coordination efforts with other Federal agencies to identify suspected terrorists. Additionally, in October, we provided our views to SSA's Enumeration Task Force on techniques to improve SSN verification and decrease incidents of identity theft with new categories of SSNs, suggestions on photograph identifications, and additional automated controls.

Our OA is conducting a follow-up review of SSA's procedures for verifying evidentiary documents presented by non-citizens in applying for original SSNs. We will evaluate SSA's progress in implementing prior recommendations and also quantify the extent to which SSA is detecting false documents presented by foreign-born individuals.

### WHAT TASKS REMAIN TO ENSURE SSN INTEGRITY IN A POST-SEPTEMBER 11TH ENVIRONMENT?

We have seen the enactment of *The Identity Theft and Assumption Deterrence Act of 1998* and the *Internet False Identification Prevention Act of 2000*. The former is the first Federal legislative response to the growing wave of identity thefts and imposes criminal sanctions for those who create false identities or misappropriate someone else's. It is also the first piece of legislation that recognized the SSN as a means of identification. The latter closed a loophole left by the first, enabling law enforcement agencies to pursue those who could previously sell counterfeit SS cards legally, by maintaining the fiction that such cards are "novelties," rather than counterfeit documents. Both pieces of legislation are helpful but mainly treat the identity theft disease in its later stages, rather than at its onset. In most cases, identity theft begins with the misuse of an SSN, and, while the ability to punish identity theft is important, the ability to *prevent* it is even more critical.

How do we do this? Our audit and investigative work has shown that there are three stages at which protections for the SSN must be put in place: upon issuance, during the life of the number holder, and upon that individual's death.

Page 8 – The Commissioner

## Assignment/Issuance of an SSN

In Fiscal Year 2001, SSA issued over 18.4 million original and replacement SS cards. Approximately 1.5 million of the original SSNs were issued to non-citizens. When SSA assigns an SSN or issues an SS card, it is critical that SSA independently verify the authenticity of the birth records, immigration records, and other identification documents the applicant presented.

In several previous audit reports, OIG recommended independent verification of birth and immigration records submitted to support an SSN application. Additionally, we recommended full and expedited implementation of a joint Enumeration at Entry program to issue SSNs to non-citizens upon their entry into the United States with the INS and DoS. However, before September 11, the Agency disagreed with our recommendation to independently verify birth and immigration records. The Agency stated that delaying the receipt of SSNs for thousands of non-citizens, most of whom were legitimately entitled to a number, was not acceptable. Rather, they preferred to work with the INS on improving existing systems until the Enumeration at Entry program could be implemented. Unfortunately, until September 11, SSA had little success encouraging the INS to move quickly on either of these planned initiatives. SSA representatives have reported that negotiations with INS are proceeding more smoothly and at a faster pace.

SSA's Enumeration Task Force recommended that the Agency seek independent verification of all non-citizen documents before assigning an SSN. Additionally, the Agency is planning to implement a process requiring verification of all U.S. birth certificates for anyone applying for an SSN after the age of 1. We believe implementation of these actions will have an immediate positive impact on the assignment of SSNs based on fraudulent documents. Both recommendations were also included in House Bill 2036, *The Social Security Number Privacy and Identity Theft Prevention Act of 2001*. This legislation would *require* SSA to verify birth records and provide a status report, with the Attorney General, on the joint initiative to enumerate non-citizens at entry.

Unfortunately, full implementation of the initiative to verify immigration documents has been delayed, perhaps for 6 months or more. SSA is waiting for the INS to incorporate information on certain immigrants with work authorization in its data base. Additionally, another delay will be necessary while SSA and the INS work out the details for obtaining access to the INS' data base on non-immigrants or those who may have temporary authorization to work in the United States. As a result, for at least several more months, SSA will continue to issue SSNs to non-citizens without obtaining independent verification of evidentiary documents from the issuing agency.

This continued practice concerns us greatly. We understand the agencies need sufficient time and planning to effectively adopt the Enumeration at Entry program. However, we strongly believe the Agency should immediately begin verifying non-citizen documents before issuing SSNs, regardless of the time delay required for the individual

to obtain an SSN.  While SSA should strive for timely customer service, this desire must be balanced against enumeration integrity and the security of our Nation's borders.  To emphasize the importance of the implementation of the Enumeration at Entry program, we recently issued correspondence to the Inspectors General for DoJ and DoS asking that they advise us of the feasibility of INS and DoS meeting the proposed due dates for systems changes needed to support the program.

### Protection During the Life of the Number Holder

Once SSA issues an SSN and it becomes an integral part of the number holder's life, it becomes difficult to give the SSN the degree of privacy it requires.  Businesses and Government agencies nationwide rely on the SSN as a convenient means of record keeping.  By doing so, these entities collect, store, and, sometimes, share a lifetime of personal information associated with the number.  With this information, a criminal can commit financial fraud, and, in some cases, camouflage other crimes.  The challenge for SSA and the Congress is to find a balance between ensuring the SSN's privacy and ensuring that businesses and Federal and State agencies are not unduly limited in the process.  Despite this challenge, there are important steps we can take.

✓ ***Limit the SSN's public availability to the greatest extent practicable, without unduly limiting commerce.***

We recognize it is virtually impossible to turn back the clock and limit the use of the SSN to Federal programs.  We have, therefore, focused our efforts on limiting the public availability of SSN information.  We have worked with Federal, State, and local agencies; SSA; the Congress; and the public to strengthen controls over the SSN and prosecute those who misuse it.  Several of our recommendations are contained in pending legislation, including provisions in Senate Bill 848, the *Social Security Number Misuse Prevention Act of 2001*; Senate Bill 1055, the *Privacy Act of 2001*; and House Bill 2036, the *Social Security Number Privacy and Identity Theft Prevention Act of 2001*.

✓ ***Prohibit the sale of SSNs, prohibit their display on public records, and limit their use to valid transactions.***

Recent and proposed legislation addresses important elements in protecting one's SSN.  We support the pending legislation and encourage Congress to expedite such measures.

✓ ***Enact strong enforcement mechanisms and stiff penalties to further discourage SSN misuse.***

OIG special agents and attorneys have long worked closely with Federal, State and local law enforcement officials to investigate and prosecute SSN misuse. Since September 11, we have further increased our efforts in this area, working aggressively to support the Administration's efforts to investigate the attacks and

prevent future incidents.  However, we have been limited in our ability to respond to these concerns as a consequence of balancing priority matters with existing resources.  We believe more resources should be directed to investigating and prosecuting such crimes.

### Protection of the SSN After the Number Holder's Death

Finally, we must do more to protect the SSN after the number holder's death. SSA receives death information from a variety of sources and compiles a Death Master File, which is updated monthly, transmitted to various Federal agencies, offered for sale to the public, and available for access over the Internet.  There is no question this information must be accurate.  However, we also believe the practice of offering this information to the general public needs serious consideration.

## CONCLUSION

SSA and OIG promptly responded to the challenge of ensuring SSN integrity as a part of homeland security efforts.  We recognize that "business as usual" is no longer permissible and have committed significant resources and energy in developing improved procedures in our enumeration business practice.  Despite SSA's commitment to this endeavor, more needs to be done to ensure the SSN's link to homeland security is strong and durable.  We believe that the current efforts of the Executive Branch and the Congress to work together to address these concerns will continue.

## AGENCY COMMENTS

As we made no recommendations in the report, SSA elected not to provide a formal response.  Rather, the Agency provided minor technical comments, which we have incorporated where appropriate.

James G. Huse, Jr.

# *Appendices*

Appendix A – Prior Office of the Inspector General Audit Reports

Appendix B – Status of Enumeration Task Force Recommendations

Appendix C – Acronyms

Appendix D – OIG Contacts and Staff Acknowledgment

*Appendix A*

# PRIOR OFFICE OF THE INSPECTOR GENERAL AUDIT REPORTS

| Social Security Administration Office of the Inspector General Reports Related to Social Security Number Integrity | |
|---|---|
| *Name and Common Identification Number* | *Date Report Issued* |
| *Canada's Experience in Charging a User Fee for Social Insurance Number Cards* (A-06-97-62003) | May 1997 |
| *Management Advisory Report: Activity Related to the Suspense File* (A-03-96-31001 and A-03-96-31002) | September 1997 |
| *Follow-Up of the Internal Controls over the Modernized Enumeration System* (A-04-96-44001) | March 1998 |
| *Payment of Benefits to Individuals Who Do Not Have Their Own Social Security Number* (A-04-96-42000) | March 1998 |
| *Performance Measure Audit: Timely Issuance of Social Security Number Cards* (A-02-97-93003) | April 1998 |
| *Assessment of the Social Security Administration's Processing of Requests for Social Security Numbers in Emergency Situations* (Limited Distribution) (A-08-97-44001) | June 1998 |
| *Management Advisory Report: Using Social Security Numbers to Commit Fraud* (A-08-99-42002) | May 1999 |
| *Management Advisory Report: Analysis of Social Security Number Misuse Allegations Made to the Social Security Administration's Fraud Hotline* (A-15-99-92019) | August 1999 |
| *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items* (A-03-98-31009) | September 1999 |
| *Review of Controls Over Nonwork Social Security Numbers* (A-08-97-41002) | September 1999 |

| | |
|---|---|
| *The Social Security Administration is Pursuing Matching Agreements with New York and Other States Using Biometric Technologies (A-08-98-41007)* | January 2000 |
| *Performance Measure Review:  Reliability of the Data Used to Measure Social Security Number Request Processing (A-02-99-01009)* | March 2000 |
| *Improving the Usefulness of the Social Security Administration's Death Master File (A-09-98-61011)* | July 2000 |
| *Effectiveness of Internal Controls in the Modernized Enumeration System (A-08-97-41003)* | September 2000 |
| *Procedures for Verifying Evidentiary Documents Submitted with Original Social Security Number Applications (A-08-98-41009)* | September 2000 |
| *Obstacles to Reducing Social Security Number Misuse in the Agriculture Industry (A-08-99-41004)* | January 2001 |
| *Force Processing of Magnetic Media Wage Reports with Validation Problems (A-03-99-31001)* | May 2001 |
| *Management Advisory Report:  Review of Service Industry Employer with Wage Reporting Problems (A-03-00-10022)* | September 2001 |
| *Audit of the Enumeration at Birth Program (A-08-00-10047)* | September 2001 |
| *Replacement Social Security Number Cards: Opportunities to Reduce the Risk of Improper Attainment and Misuse (A-08-00-10061)* | September 2001 |
| *Congressional Response Report:  SSN Misuse – A Challenge for the Social Security Administration (A-08-02-22030)* | October 2001 |
| *Congressional Response Report:  Terrorist Misuse of Social Security Numbers (A-08-02-32041)* | October 2001 |
| *Disclosure of Personal Beneficiary Information to the Public (Limited Distribution) (A-01-01-01018)* | December 2001 |

# Status of Enumeration Task Force Recommendations

| Status of Enumeration Task Force Recommendations | |
|---|---|
| *Description of Recommendation* | *Status as of March 30, 2002* |
| Provide refresher training on enumeration policy and procedures, with emphasis on enumerating non-citizens, for all involved staff. | Ongoing.  Refresher training was conducted on December 19 and 20, 2001.  Additionally, an interactive video training session was held on January 31, 2002.  During the week of February 11, 2002, field office managers reviewed a daily maximum of 50 non-citizen enumeration actions.  Managers provided feedback on problems or trends.  Further action will be decided based on these findings, which were being evaluated at the time of this review. |
| Convene a joint task force between the Social Security Administration (SSA), the Immigration and Naturalization Service (INS), and the Department of State (DoS) to resolve issues involving enumerating non-citizens, including working out procedures for verifying INS documents before the Social Security number (SSN) is assigned. | Ongoing.  On January 3, 2002, SSA signed a protocol with the DoS outlining procedures for SSA use of information housed in the Refugee Data Center, which will be used to enumerate refugees.  The procedure to verify immigration documents for refugees before assigning an SSN became effective in February 2002.<br><br>SSA, INS, and DoS are also working together to implement the Enumeration at Entry program.  Additionally, the INS has taken several steps to improve the timeliness of its data entry process.  Once corrected, SSA will begin electronically verifying all non-citizen immigration documents before assigning an SSN.  However, it is our understanding that corrections required by INS have been delayed.  Therefore, SSA may not begin to implement this policy until late in Calendar Year 2002. |
| Eliminate driver's licenses as a reason for a non-work SSN. | Completed.  SSA notified the governors of all States in February 2002, and the policy went into effect on March 1, 2002. |

| | |
|---|---|
| Provide an alternative to issuing a Numident printout for SSN verification. | Completed.  The "NUMI-lite" went into production in SSA field offices in March 2002.  This printout provides less identification information and therefore is less likely to facilitate identity theft. |
| Lower the age tolerance from 18 to 12 for mandatory interview procedures, including verification of birth records before enumeration for all applicants for original SSNs and require evidence of identity for all children, regardless of age. | Ongoing.  The policy change needed to lower the age tolerance for mandatory interviews from 18 to 12 requires a regulatory change.  Additionally, eliminating an existing waiver provision for those under age 7 will require a regulation.  However, in the interim, SSA will rely on refresher training to strengthen existing policies.  Beginning in May 2002, SSA will verify birth records for all applicants for original SSNs over the age of 1. |
| Determine the feasibility of photocopying (or scanning) all documentary evidence submitted with SSN applications. | Ongoing.  Between February and March 2002, SSA conducted a pilot in two field offices to photocopy all evidence submitted in conjunction with SSN applications and ship them weekly to SSA's record storage facility for scanning.  As of April 1, 2002, SSA was conducting the cost-benefit analysis for the pilot. |
| Change the Modernized Enumeration System to provide an electronic audit trail, regardless of the mode used to process SSN applications. | Completed.  The audit trail went into production in mid-December 2001. |
| Implement the SSN Verification System. | Ongoing.  SSA implemented a pilot of the on-line version in April 2002. |

*Appendix C*

# Acronyms

| | |
|---|---|
| DoJ | Department of Justice |
| DoS | Department of State |
| FBI | Federal Bureau of Investigation |
| INS | Immigration and Naturalization Service |
| OA | Office of Audit |
| OIG | Office of the Inspector General |
| SS | Social Security |
| SSA | Social Security Administration |
| SSN | Social Security Number |

*Appendix D*

# OIG Contacts and Staff Acknowledgments

## OIG Contacts

Kimberly A. Byrd, Director, Southern Audit Division, (205) 801-1605

Jeffrey Pounds, Deputy Director, Birmingham Field Office, (205) 801-1606

## Staff Acknowledgments

In addition to those named above:

Kathy Buller, Counsel to the Inspector General

George Penn, Senior Attorney

Tom Sipes, Special Agent-in-Charge

Charles Lober, Senior Auditor

Kathy Youngblood, Senior Auditor

Susan Phillips, Auditor

Kimberly Beauchamp, Writer/Editor

For additional copies of this report, visit our web site at www.ssa.gov/oig or contact the Office of the Inspector General's Public Affairs Specialist at (410) 966-1375.  Refer to Common Identification Number A-08-02-22077.

# DISTRIBUTION SCHEDULE

|  | No. of Copies |
|---|---|
| Commissioner of Social Security | 1 |
| Management Analysis and Audit Program Support Staff, OFAM | 10 |
| Inspector General | 1 |
| Assistant Inspector General for Investigations | 1 |
| Assistant Inspector General for Executive Operations | 3 |
| Assistant Inspector General for Audit | 1 |
| Deputy Assistant Inspector General for Audit | 1 |
|    Director, Systems Audit Division | 1 |
|    Director, Financial Management and Performance Monitoring Audit Division | 1 |
|    Director, Operational Audit Division | 1 |
|    Director, Disability Program Audit Division | 1 |
|    Director, Program Benefits Audit Division | 1 |
|    Director, General Management Audit Division | 1 |
| Team Leaders | 25 |
| Income Maintenance Branch, Office of Management and Budget | 1 |
| Chairman, Committee on Ways and Means | 1 |
| Ranking Minority Member, Committee on Ways and Means | 1 |
| Chief of Staff, Committee on Ways and Means | 1 |
| Chairman, Subcommittee on Social Security | 2 |
| Ranking Minority Member, Subcommittee on Social Security | 1 |
| Majority Staff Director, Subcommittee on Social Security | 2 |
| Minority Staff Director, Subcommittee on Social Security | 2 |
| Chairman, Subcommittee on Human Resources | 1 |
| Ranking Minority Member, Subcommittee on Human Resources | 1 |
| Chairman, Committee on Budget, House of Representatives | 1 |
| Ranking Minority Member, Committee on Budget, House of Representatives | 1 |
| Chairman, Committee on Government Reform and Oversight | 1 |
| Ranking Minority Member, Committee on Government Reform and Oversight | 1 |
| Chairman, Committee on Governmental Affairs | 1 |

| | |
|---|---|
| Ranking Minority Member, Committee on Governmental Affairs | 1 |
| Chairman, Committee on Appropriations, House of Representatives | 1 |
| Ranking Minority Member, Committee on Appropriations, House of Representatives | 1 |
| Chairman, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, House of Representatives | 1 |
| Ranking Minority Member, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, House of Representatives | 1 |
| Chairman, Committee on Appropriations, U.S. Senate | 1 |
| Ranking Minority Member, Committee on Appropriations, U.S. Senate | 1 |
| Chairman, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, U.S. Senate | 1 |
| Ranking Minority Member, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, U.S. Senate | 1 |
| Chairman, Committee on Finance | 1 |
| Ranking Minority Member, Committee on Finance | 1 |
| Chairman, Subcommittee on Social Security and Family Policy | 1 |
| Ranking Minority Member, Subcommittee on Social Security and Family Policy | 1 |
| Chairman, Senate Special Committee on Aging | 1 |
| Ranking Minority Member, Senate Special Committee on Aging | 1 |
| Vice Chairman, Subcommittee on Government Management Information and Technology | 1 |
| President, National Council of Social Security Management Associations, Incorporated | 1 |
| Treasurer, National Council of Social Security Management Associations, Incorporated | 1 |
| Social Security Advisory Board | 1 |
| AFGE General Committee | 9 |
| President, Federal Managers Association | 1 |
| Regional Public Affairs Officer | 1 |
| **Total** | **97** |

# Overview of the Office of the Inspector General

## Office of Audit

The Office of Audit (OA) conducts comprehensive financial and performance audits of the Social Security Administration's (SSA) programs and makes recommendations to ensure that program objectives are achieved effectively and efficiently. Financial audits, required by the Chief Financial Officers Act of 1990, assess whether SSA's financial statements fairly present the Agency's financial position, results of operations, and cash flow. Performance audits review the economy, efficiency, and effectiveness of SSA's programs. OA also conducts short-term management and program evaluations focused on issues of concern to SSA, Congress, and the general public. Evaluations often focus on identifying and recommending ways to prevent and minimize program fraud and inefficiency.

## Office of Executive Operations

The Office of Executive Operations (OEO) supports the Office of the Inspector General (OIG) by providing information resource management; systems security; and the coordination of budget, procurement, telecommunications, facilities and equipment, and human resources. In addition, this office is the focal point for the OIG's strategic planning function and the development and implementation of performance measures required by the Government Performance and Results Act. OEO is also responsible for performing internal reviews to ensure that OIG offices nationwide hold themselves to the same rigorous standards that we expect from the Agency, as well as conducting employee investigations within OIG. Finally, OEO administers OIG's public affairs, media, and interagency activities and also communicates OIG's planned and current activities and their results to the Commissioner and Congress.

## Office of Investigations

The Office of Investigations (OI) conducts and coordinates investigative activity related to fraud, waste, abuse, and mismanagement of SSA programs and operations. This includes wrongdoing by applicants, beneficiaries, contractors, physicians, interpreters, representative payees, third parties, and by SSA employees in the performance of their duties. OI also conducts joint investigations with other Federal, State, and local law enforcement agencies.

## Counsel to the Inspector General

The Counsel to the Inspector General provides legal advice and counsel to the Inspector General on various matters, including: 1) statutes, regulations, legislation, and policy directives governing the administration of SSA's programs; 2) investigative procedures and techniques; and 3) legal implications and conclusions to be drawn from audit and investigative material produced by the OIG. The Counsel's office also administers the civil monetary penalty program.

# EXHIBIT G

**OFFICE OF
THE INSPECTOR GENERAL**

**SOCIAL SECURITY ADMINISTRATION**

**FOLLOW-UP REVIEW
OF EMPLOYERS WITH THE MOST
SUSPENDED WAGE ITEMS**

**October 2003          A-03-03-13026**

# AUDIT REPORT



# Mission

We improve SSA programs and operations and protect them against fraud, waste, and abuse by conducting independent and objective audits, evaluations, and investigations.  We provide timely, useful, and reliable information and advice to Administration officials, the Congress, and the public.

# Authority

The Inspector General Act created independent audit and investigative units, called the Office of Inspector General (OIG).  The mission of the OIG, as spelled out in the Act, is to:

- Conduct and supervise independent and objective audits and investigations relating to agency programs and operations.
- Promote economy, effectiveness, and efficiency within the agency.
- Prevent and detect fraud, waste, and abuse in agency programs and operations.
- Review and make recommendations regarding existing and proposed legislation and regulations relating to agency programs and operations.
- Keep the agency head and the Congress fully and currently informed of problems in agency programs and operations.

To ensure objectivity, the IG Act empowers the IG with:

- Independence to determine what reviews to perform.
- Access to all information necessary for the reviews.
- Authority to publish findings and recommendations based on the reviews.

# Vision

By conducting independent and objective audits, investigations, and evaluations, we are agents of positive change striving for continuous improvement in the Social Security Administration's programs, operations, and management and in our own office.

# *Executive Summary*

## OBJECTIVE

The objectives of the audit were to determine whether (1) wage reporting had improved among the original 100 employers in our September 1999 report, *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items (A-03-98-31009),* and (2) the Social Security Administration (SSA) had taken steps to implement our recommendations from the 1999 report.

## BACKGROUND

Our September 1999 report identified those employers with the most suspended wage items from Tax Years (TYs) 1993 through 1996.  In the report, we concluded that a relatively small number of employers account for a disproportionate share of the suspended items and dollars in the Earnings Suspense File (ESF), which is the repository for wage items reported under a name and Social Security number (SSN) that does not match SSA records.  In this report, we recommended that SSA (1) develop a corrective action plan for problem employers, (2) establish preventive controls related to wage reporting, (3) identify problem employers, and (4) use software to identify employers using the same address.  SSA agreed with Recommendations 1 and 3 and disagreed with Recommendations 2 and 4.

## RESULTS OF REVIEW

Our review of the ESF activity for the original 100 employers during TYs 1997 to 2000 showed that, of the original 100 employers in our prior review:

- 40 were still on the Top 100 employers list for the follow-up period, and
- 60 were no longer on the Top 100 employers list for the follow-up period.

Of the 60 employers that were no longer on the Top 100 employers list in TYs 1997 to 2000:

- 14 employers showed *increased* reporting accuracy from the original period to the follow-up period;
- 19 employers showed *decreased* reporting accuracy from the original period to the follow-up period; and
- 27 employers did not have sufficient wage items in TY 2000 to determine the reporting accuracy.

We found that some of the employers no longer on the Top 100 list were reporting their wages under different Employer Identification Numbers.  In addition, it is possible that some of these employers were no longer in business.

SSA has taken steps to address two of the recommendations through its efforts to assist employers and hold them accountable for their wage reporting, including (1) improving programs to assist employers with wage reporting problems, (2) focusing Employer Service Liaison Officer's (ESLO) resources on the largest contributors to the ESF, and (3) coordinating activities with the Internal Revenue Service so employers who continually report significant name/SSN mismatches can be penalized.  However, SSA still needs to do more in establishing preventive controls to detect wage reporting errors and irregularities.  The Agency has established an Earnings Data Warehouse that will eventually be able to track employer reporting errors.  Furthermore, the Agency has not identified employers that report the same address for many employees.   We believe that this "address" control, or similar controls, could assist the Agency in detecting potential SSN misuse.

## CONCLUSIONS AND RECOMMENDATIONS

To ensure SSA can identify employer reporting trends and focus its efforts on the employers with the most significant problems, we continue to recommend that SSA establish preventive controls to detect wage reporting errors and irregularities, including a link between the new Earnings Data Warehouse and ESLO efforts.

## AGENCY COMMENTS

SSA agreed with our recommendation, stating the Earnings Data Warehouse will provide employer reporting trends in early 2004, and the ESLOs will have access to this data.

# *Table of Contents*

**Page**

**INTRODUCTION**.................................................................................................1

**RESULTS OF REVIEW** ......................................................................................3

Status of 100 Employers on 1993 to 1996 List......................................................3

Original Employers Still Among the Top 100 Employers ...................................5

Original Employers No Longer Among the Top 100 Employers ........................5

Agency Progress on Earlier Recommendations....................................................6

Improving Programs to Assist Employers...........................................................6

Coordination with the Internal Revenue Service ................................................9

Preventive Controls and Address Standardization Software ...........................10

**CONCLUSIONS AND RECOMMENDATIONS**...................................................13

**APPENDICES**

Appendix A – Earlier Audit Findings Related to the Top 100 Employers

Appendix B – Status of Office of the Inspector General Recommendations Made in
              September 1999 Top 100 Report

Appendix C – Scope and Methodology

Appendix D – Initial Top 100 Listing Highlighting Status in Follow-Up Period

Appendix E – Agency Comments

Appendix F – OIG Contacts and Staff Acknowledgments

# *Acronyms*

| | |
|---|---|
| EIN | Employer Identification Number |
| ESF | Earnings Suspense File |
| ESLO | Employer Service Liaison Officer |
| EVS | Employee Verification Service |
| IRS | Internal Revenue Service |
| MEF | Master Earnings File |
| OPSOS | Office of Public Service and Operations Support |
| SSA | Social Security Administration |
| SSN | Social Security Number |
| SSNVS | Social Security Number Verification Service |
| TY | Tax Year |
| W-2 | Wage and Tax Statement |

# *Introduction*

## OBJECTIVE

The objectives of the audit were to determine whether (1) wage reporting had improved among the original 100 employers in our September 1999 report, *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items,* and (2) the Social Security Administration (SSA) had taken steps to implement our recommendations from the 1999 report.

## BACKGROUND

Title II of the Social Security Act requires that SSA maintain records of wages employers pay to individuals.  Employers report their employees' earnings to SSA annually on a *Wage and Tax Statement* (Form W-2).  SSA uses manual and automated edits to match employees' Social Security numbers (SSN) and names to SSA's master file to post their earning to the Master Earnings File (MEF).  The Earnings Suspense File (ESF) contains wage items that fail to match SSA's name and SSN records.  As of July 2002, SSA's ESF contained about 236 million wage items and $374 billion in wages that could not be posted to individual earnings records.  In Tax Year (TY) 2000, the ESF increased by 9.6 million items and $49 billion.

Wages in the ESF affect an individual's Social Security benefits.  SSA uses earnings posted to the MEF to determine eligibility for retirement, survivors, disability, and health insurance benefits and calculate benefit amounts.  If earnings are not properly posted to an individual's earning record, the person will not receive credit for them.

In September 1999, we issued an audit report that identified the 100 employers with the most suspended wage items from TYs 1993 to 1996.  We concluded that a relatively small number of employers account for a disproportionate share of the suspended items and dollars in the ESF, and many of these suspended wage items exhibited patterns of reporting errors and irregularities.  We are doing a follow-up review for the following reasons: (1) ongoing congressional interest in the ESF; (2) the ESF's continued growth; and (3) changes SSA made in the earnings reporting area since our 1999 report.

In our prior report, we recommended that SSA:

- Develop and implement a corrective action plan for the 100 employers and continue its current efforts to contact those employers who are responsible for large numbers of suspended wage items.

- Establish preventive controls to detect wage reporting errors and irregularities.

- Identify those employers who continually submit annual wage reports with large numbers and/or percentages of unassigned, identical, and/or consecutively numbered SSNs.

- Run address standardization software as soon as practical after employers submit their annual wage reports to identify employers that report the same address for many employees.

In its comments to our 1999 report, SSA stated that, overall, the findings paralleled its experience with employer reporting problems.  SSA indicated that implementing the recommendations would not necessarily influence an employee to provide his/her employer with the correct name/SSN or an employer to improve the accuracy of wage reporting.  In addition, SSA stressed that it has no compliance authority and is dependent on the Internal Revenue Service (IRS) efforts in this area.

Specifically, SSA agreed with our recommendations to develop a corrective action plan for the 100 employers and identify those employers who continually submit annual wage reports with mismatched names and SSNs.  However, SSA disagreed with the remaining two recommendations, but stated it would explore the feasibility of implementing preventive controls and address standardization software.  See Appendix B for the original recommendations and SSA's most recent comments.

## SCOPE AND METHODOLOGY

Our audit did not include an evaluation of SSA's internal controls over the wage reporting process.  The purpose of our review was to determine how SSA used the wage reporting data the Agency had accumulated.  We did not focus our efforts on the collection of wage reporting data, nor did we attempt to establish the reliability or accuracy of such data.  We provide additional information on our scope and methodology in Appendix C.  The entity audited was SSA's Office of Public Services and Operations Support (OPSOS) under the Deputy Commissioner of Operations and the Office of Earnings, Enumeration and Administrative Systems under the Deputy Commissioner of Systems.  We conducted our follow-up audit in Baltimore, Maryland, and the Office of Audit in Philadelphia, Pennsylvania, between August 2002 and May 2003.  We conducted our audit in accordance with generally accepted government auditing standards.

# *Results of Review*

Of the original 100 employers with wage reporting problems in TYs 1993 to 1996 (hereafter called the original period), 40 employers were still on the top 100 list for TYs 1997 to 2000 (hereafter called the follow-up period).  Of the remaining 60 employers, 14 improved their reporting accuracy, whereas the remaining 46 either showed declining reporting accuracy or the accuracy could not be determined.  SSA has taken steps to implement two of the recommendations from our earlier audit report. However, the Agency still needs to do more in establishing preventive controls to detect wage reporting errors and irregularities.  The Agency has established an Earnings Data Warehouse that will eventually be able to track employer reporting errors.  Furthermore, SSA has not taken steps to implement address standardization software to identify employers who report the same address for many employees.

## STATUS OF 100 EMPLOYERS ON 1993 TO 1996 LIST

Our review of the ESF activity for the original 100 employers during TYs 1997 to 2000 showed that these employers submitted over 1.3 million items to the ESF, compared with about 1.2 million items submitted by these same employers during TYs 1993 to 1996. This is an increase of about 12 percent (140,000 items) from the original period to the follow-up period.  Furthermore, our analysis showed that, of the original 100 employers in our prior review:

- 40 were still on the Top 100 employers list for the follow-up period; and
- 60 were no longer on the Top 100 employers list for the follow-up period.

Of the 60 employers that were no longer on the Top 100 employers list:

- 14 employers showed *increased* reporting accuracy[1] from the original period to the follow-up period;
- 19 employers showed *decreased* reporting accuracy from the original period to the follow-up period; and
- 27 employers did not have sufficient wage items in TY 2000 to determine the reporting accuracy.

Figure 1 is a graphic representation of the status of the 100 employers, and Appendix D provides more details on the status of the original 100 employers.

---

[1] We define reporting accuracy as the percent of reported wage items that fail to match the name and/or SSN in SSA's records and are posted to the ESF.  Increased reporting accuracy means fewer of the reported wage items go into the ESF over a period of time.



**Figure 1: Status of the Original 100 Employers During Tax Years (TY) 1997-2000**



Employers are required to report their earnings under an Employer Identification Number (EIN),[2] and employers can report earnings using more than one EIN. We were unable to identify all employers using multiple EINs during our follow-up period. Based on our analysis of employers where we were able to link EINs, we believe more of the original employers would have a significant number of ESF items, and the number of original employers on the follow-up Top 100 list would have been larger, had these employers reported their wages under the same EIN during the follow-up period.

We were able to learn more about the true reporting trends among the original Top 100 employers through (1) SSA's earnings record system, which often cross references different EINs used by the same employer, and (2) discussions with Employer Service Liaison Officers (ESLO) who were aware of the different EINs being used by employers.

At least 12 of the 60 employers who were not on the follow-up Top 100 list reported their wages under a different EIN(s) during TYs 1997 to 2000.[3] For example, one employer in the hotel industry (employer #11 in Appendix D) reported 19,641 wage items during TYs 1993 to 1996 that went into the ESF. During TY 1996 alone, the employer reported 278,819 W-2s, of which 9,421 went into suspense. During the follow-up period, this same employer reported only 25 wage items that went into the ESF in total. However, we learned that this employer reported the bulk of its W-2s using two different EINs after TY 1996 and ceased using the EIN in our study by TY 2000. This same employer reported 391,047 wage items to SSA in TY 2000 under

---

[2] The EIN is a nine-digit number assigned by the IRS to sole proprietors, corporations, partnerships, estates, trusts, and other entities for tax filing and reporting purposes.

[3] We looked for anomalies, such as a new reporting EIN, when the number of wage items reported annually during the TYs 1993 to 2000 period dropped significantly.

2 different EINs, of which 18,841 wage items went into the ESF.  Had all of this employer's wages been reported under the original EIN, we believe this employer would have been on the follow-up Top 100 employers list.

## ORIGINAL EMPLOYERS STILL AMONG THE TOP 100 EMPLOYERS

Forty of the original 100 employers are also on the Top 100 list for the follow-up period. These 40 employers reported over 1 million suspended wage items during the 4-year follow-up period, or an average of 25,100 per employer.  In the original 4-year period, these 40 employers reported 649,000 suspended wage items, or an average of 16,200 per employer.  Furthermore, these 40 employers represent 55 percent of all suspended wage items on the original Top 100 list, and 76 percent of all suspended wage items on the Top 100 list for the follow-up period.

All but 4 of these 40 employers showed decreased reporting accuracy during the follow-up period.  All four employers showing improved accuracy had been contacted by SSA's ESLOs during the follow-up period.  We discuss ESLO activity later in this report.

## ORIGINAL EMPLOYERS NO LONGER AMONG THE TOP 100 EMPLOYERS

While 60 percent of the original employers were no longer on the follow-up Top 100 list, most fell off the list because of a change in how they reported wages to SSA rather than improvements in their reporting.  We found that 14 employers showed a clear improvement in their reporting accuracy.  As a result, they were no longer on the Top 100 employers list for the follow-up period.  The percentage of wage items sent to the ESF decreased during the 2 review periods for these 14 employers, which included growers, restaurants, employment agencies, a retail store, and a local government.

For example, one restaurant employer (employer #44) significantly decreased both the number and percentage of W-2 items going to the ESF from 1996 to 2000, even though its payroll increased during the same period.  In 1996, almost 37 percent of the employer's reported W-2s did not match SSA's records and were sent to the ESF.  The percent of wages going into the ESF decreased to 2 percent in 2000.

We learned that SSA's ESLOs contacted 11 of the 14 employers who improved their reporting accuracy.  In addition, one of these employers verified its employees' names and SSNs through SSA's Employee Verification Service (EVS).[4]  It appears that SSA's services allowed these employers to improve their wage reporting during the follow-up period.

The remaining 46 employers either (1) showed a decrease in their reporting accuracy or (2) did not report wage items during the entire period, and we were unable to determine their true reporting accuracy.  Nineteen employers showed a decrease in their reporting accuracy from TY 1996 to TY 2000.  We were unable to determine the reporting accuracy for another 27 employers, since 19 employers (70 percent) reported no wage items in TY 2000, and another 8 employers (30 percent) reported 10 percent or less of their TY 1996 wage items in TY 2000.  As noted above, some of these employers may

---

[4] We discuss EVS later in this report.

be reporting their wages under a different EIN(s).  In addition, it is possible that some of these employers were no longer in business.

# AGENCY PROGRESS ON EARLIER RECOMMENDATIONS

SSA has taken steps to address two of the recommendations through its efforts to assist employers and hold them accountable for their wage reporting, including (1) improving programs to assist employers with wage reporting problems, (2) focusing resources on the largest contributors to the ESF, and (3) coordinating activities with the IRS so employers who continually report significant name/SSN mismatches can be penalized.  However, SSA still needs to do more in establishing preventive controls to detect wage reporting errors and irregularities.  The Agency has established an Earnings Data Warehouse that will eventually be able to track employer reporting errors.  Furthermore, the Agency has not identified employers that report the same address for many employees.

## IMPROVING PROGRAMS TO ASSIST EMPLOYERS

Since our 1999 audit, SSA has taken steps to assist the Top 100 employers, as well as other employers, with their wage reporting.  These new efforts include expanded employer correspondence to notify employers of name/SSN mismatches in their wage reports and developing an on-line employee verification program to assist employers with name/SSN mismatches before the wage reports are submitted.  SSA also assists employers' wage reporting through its ESLOs, though we did not find a high correlation between the Top 100 employers and those contacted by the ESLOs.  We also did not find any corrective action plans specific to the 100 employers identified in our earlier audit.

### Employer Correspondence

In TY 2001, SSA improved its notification process for employers by increasing the number of "no match" letters—or educational correspondence—it sends to employers who submit W-2s containing name and/or SSN information that does not agree with SSA's records.  Although SSA has been sending educational correspondence letters to specific employers since 1994, in TY 2001, it began sending letters to all employers where the name and/or SSN on just one W-2 did not agree with SSA's records.  SSA sent employers approximately 950,000 letters in TY 2001, an almost 9-fold increase from the previous year.

While we find this to be an encouraging step, SSA announced a new policy effective for TY 2002 wage reporting.  Employers will receive a letter if they submit more than 10 W-2s that SSA could not process if those W-2s represent more than one-half of 1 percent of the W-2s reported.[5]  As a result of this change, SSA estimates it will send 129,000 letters to employers, or about 820,000 fewer letters than in TY 2001.  As with the earlier criteria, this change may overlook small employers or employers who submitted only a few records that SSA could not process.  SSA attributed the change in policy to a business decision to balance improving the wage reporting process with using Agency resources effectively.

### Employee Verification Services

SSA is expanding its current EVS programs[6] to include an on-line service called the Social Security Number Verification Service (SSNVS).  SSNVS is being piloted among a few employers, but SSA hopes it will encourage more employers to use SSA's name/SSN verification program for new employees.  Our September 2002 report[7] noted that very few employers are using the current EVS system for registered users.  This program uses diskettes and magnetic media rather than on-line processes.  In the report, we stated that only 392 of approximately 6.5 million employers in the United States were using SSA's EVS during TYs 1999 to 2001.  We also noted that SSA did not disclose pertinent information that could have assisted users.  Specifically, SSA did not inform employers when a submitted SSN belonged to a deceased individual or when the SSN was issued for non-work purposes.  SSA has stated it intends to modify both EVS and SSNVS to disclose the pertinent information to employers.

Our earlier report also determined that only 10 of the Top 100 employers with the largest number of suspended items registered for and used SSA's EVS during TYs 1999 to 2001.  A review of the EVS registration list showed that the 10 employers signed up for the program in 1997 or later.  The 10 employers represent just 3 percent of the employers that used EVS during a recent 3-year period, 1999-2001; however, they accounted for 25 percent or 13.5 million of the SSNs submitted to EVS.  Three employers alone submitted over 11.8 million SSNs.

---

[5] Before this, SSA only sent letters to employers who submitted more than 10 W-2s that SSA could not process if those W-2s represented more than 10 percent of the W-2s reported.

[6] The purpose of the EVS program is to ensure employees' names and SSNs are valid before the employers' W-2s are submitted to SSA.  The use of EVS is voluntary and can assist employers in eliminating common SSN reporting errors.  Depending on the number of SSNs they want to verify at one time, employers can call an 800-number for 5 or fewer or submit a paper request of up to 50 names directly to a SSA field office.  Employers who wish to verify 51 or more SSNs at once are encouraged to register for the EVS program.

[7] *The Social Security Administration's Employee Verification Service for Registered Employers* (A-03-02-22008), September 2002.

Of the 10 employers registered to use EVS, only 9 were using it during our follow-up period. Of these 9 employers, our review determined that:

- 6 were still in the Top 100;
- 2 were no longer in the Top 100 but reported little or no earnings for at least 1 of the years in the follow-up period, so we could not determine their overall accuracy; and
- 1 was no longer in the Top 100 and had improved its wage reporting.

### *Employer Service Liasion Officers*

Since 1996, SSA's OPSOS has developed a national listing of employers who submit 100 or more suspended wage items. These lists are sent to regional ESLOs for follow-up contacts with the employers.[8] SSA does not direct the ESLOs to contact specific employers or follow up with the ESLOs regarding what contacts were made and the results of the contacts. For 2001, the number of employers on these lists ranged from 238 (Kansas City Region) to 3,826 (San Francisco Region)—see Table 1.

**Table 1: Employer Service Liaison Officer Contacts and Comments**

| Region | Employers with More than 100 Items in ESF for TY 2001 | Employers on Top 100 List Contacted by ESLO | Stated Mandatory Use of EVS May Improve Employer Wage Reporting | Stated IRS Penalties May Improve Employer Wage Reporting |
|---|---|---|---|---|
| Atlanta | 1,909 | 0 | -- | x |
| Boston | 303 | 1 | x | x |
| Chicago | NP | 9 | x | x |
| Dallas (1) | NP | 11 | x | x |
| Denver (1) | NP | 2 | x | x |
| Kansas City | 238 | 0 | -- | -- |
| New York | 787 | 7 | x | x |
| Philadelphia | 478 | 1 | -- | x |
| San Francisco | 3,826 | 23 | -- | -- |
| Seattle | 761 | 5 | x | x |
| **Totals** | **8,302** | **59** | **6** | **8** |

NP = Not Provided by ESLO.
Note1: One response was provided covering both the Dallas and Denver Regions.

All nine regional ESLOs responded to our questionnaire regarding employer contacts in their region.[9] All the responding ESLOs received a list from OPSOS showing employers in their region with 100 and more items in the ESF for TY 2001. Seven of the 9 ESLOs reported they contacted at least some of the Top 100 employers from our prior audit. These contacts were made by telephone, letter, and in person. In total, ESLOs

---

[8] SSA maintains ESLOs in each Region. The ESLOs' responsibilities include (1) answering employers' questions on wage report submissions; (2) encouraging employers to use SSA's various programs, such as EVS; (3) conducting wage-reporting seminars, in partnership with the IRS, for employers, payroll service providers, and payroll software companies; and (4) contacting employers with significant suspended wage items in their regions.

[9] Although SSA has 10 regions, there are 9 ESLOs. The Dallas and Denver regions share an ESLO.

contacted 59 of the Top 100 employers, including 25 of the 40 employers that were still in the Top 100 list as of TY 2000.  One of the ESLOs who did not contact the Top 100 employers during this period stated he had contacted the employers in the past, but other workloads had proved more productive.

Another ESLO noted that the list OPSOS provided did not highlight the Top 100 employers from our earlier audit.  When we spoke to OPSOS staff, they pointed out that ESLOs are not provided with information related to employer reporting trends, but rather each ESLO has discretion as to which employers they contact.

When asked for comments regarding ways to improve employer reporting, ESLOs commented that better coordination is needed between several Federal agencies, including SSA, the IRS, and the Bureau of Citizenship and Immigration Services. Furthermore, most of the ESLOs supported the mandatory use of EVS among employers and IRS penalties for submitting incorrect wage reports.  Other ESLO comments included the following.

- Until employers can verify the name and SSN before hiring an employee, wage items will continue to go into suspense since the individual is on the payroll before the problem is detected.

- The problem often relates to the nature of the workforce, such as the widespread presence of illegal workers, which is not under SSA's control.

- Some employers may see the IRS penalty as a cost of doing business.

## COORDINATION WITH THE INTERNAL REVENUE SERVICE

SSA and the IRS are coordinating their efforts to identify problem employers, which will assist the IRS in assessing penalties against noncompliant employers. The Internal Revenue Code allows the agency to penalize an employer if it fails to file a complete and accurate wage reporting form.[10]  The penalty is $50 per incorrect form, with a $250,000 yearly limit.  For business with average receipts not more than $5 million, the limit is $100,000 yearly. [11]

In November 1998, SSA proposed that the IRS and SSA work together to develop employer incentives that could encourage improved wage reporting.  In August 2000, SSA provided the IRS a list of the most egregious noncompliant employers for TYs 1997 and 1998 so the Agency could determine whether penalties should be assessed.  The IRS did not assess penalties against the employers on the 1997 and 1998 lists since the statute of limitations expired before it could take action.  The Treasury Inspector General for Tax Administration estimated that the IRS, if it had acted timely, could have assessed penalties between $26.0 and $29.7 million against

---

[10] 26 U.S.C. § 6721 (2003).

[11] *See id.* The gross receipts test is met when, for any calendar year, the average annual gross receipts for the most recent 3 taxable years do not exceed $5 million.  In addition, any reference to an entity includes a reference to any predecessor of that entity, and, the Internal Revenue Code allows for exceptions if the errors are due to reasonable cause.

93 employers for TY 1997 and an additional 98 employers for TY 1998.[12]  Based on our analysis, we believe the same conditions existed for TYs 1999 and 2000, and a like amount of penalties could have been assessed for those years.

In February 2002, the IRS met again with SSA to develop a program for referring the problem employers.  Using employer reporting data from TYs 1997 through 2000, the IRS stated it intended to do the following.

- Analyze and develop a list of the most egregiously noncompliant employers for TYs 1997 through 2000.  This was to be completed within 120 days from the receipt of the 1999 and 2000 data from SSA.

- Develop a contact letter to notify the most egregiously noncompliant employers of their responsibility to file correct information returns.  This letter was to be written within 60 days after receiving data from SSA.

- Take corrective actions when the facts and circumstances show the employer knowingly or willfully failed to comply with the requirements of section 6721 of the Internal Revenue Code.  Corrective actions may include another letter, a telephone call or visit by an IRS representative, a proposed penalty assessment, and/or an examination.[13]

The first proposed penalties are scheduled for June 2004 for W-2s filed for TY 2002.

## PREVENTIVE CONTROLS AND ADDRESS STANDARDIZATION SOFTWARE

SSA had not developed preventive controls to detect wage reporting problems and had instead removed some of the controls already in place.  Furthermore, SSA had not taken steps to implement address standardization software to identify employers who report the same address for many employees.

### Preventive Controls

SSA had not established preventive controls to detect wage reporting errors and irregularities.  In response to this recommendation in our original report, SSA stated it was exploring the feasibility of establishing an Earnings Suspense Management Information Database, which would allow the Agency to better monitor wage reporting errors and irregularities and more rapidly share information with the IRS.  However, in its most recent response to our recommendation, SSA noted it had explored and implemented several innovations to improve the preventative controls established to detect wage reporting errors and irregularities, including:

---

[12] *The Internal Revenue Service Does Not Penalize Employers that File Wage and Tax Statements with Inaccurate Social Security Numbers* (Ref. Number 2002-30-156), Treasury Inspector General for Tax Administration, September 2002.

[13] *See id.*

- Increasing the threshold at which reports would be returned to employers from 10 percent of the wage report being correct to at least 50 percent of the wage report being correct – that is, containing correct name/SSN combinations. However, SSA noted this policy change had no payoff.
- Identifying the largest contributors to the ESF and providing the employer information to regional offices for discretionary contact. SSA noted the contacts have educated employers on the importance of correct reporting but added the Agency has seen little payoff.

Based on these experiences, SSA believed the expected return on investment did not justify the use of the software development resources that would be required for this project.

We believe the innovations listed above did not have a chance to come to fruition. For example, in our May 2001 Office of the Inspector General report,[14] we commented on the employer threshold and found that SSA's policies and procedures did not improve employer wage reporting as intended because they were not tracking key information. Among other findings, the prior report found SSA (1) had no management information system to identify chronic problem employers and (2) force processed[15] wage reports for the same employers for 2, and sometimes 3, consecutive years.

For TYs 1995 and earlier, SSA accepted magnetic media[16] if as few as 10 percent of the names and SSNs matched SSA's records. SSA increased the acceptance threshold to 30 percent for TY 1996 and to 50 percent for TY 1997 (with a maximum of 5,000 errors allowed). However, as a result of its determination that this threshold was not having its intended effect, SSA increased the acceptance threshold to 95 percent beginning in TY 2000, accepting wage reports with 95 percent of the name/SSN combinations incorrect. Only 5 percent of the items on a wage report would be correctly posted to an individual's earnings record, and the remaining 95 percent would be sent to the ESF.

In the May 2001 report, we disagreed with changing the threshold to 95 percent, stating that, by raising the wage reporting acceptance threshold to 95 percent and continuing to force process wage reports for the same employers, SSA had removed some preventative controls that were in place. We encouraged SSA to reconsider eliminating the 50-percent threshold until it had sufficient time to determine the impact this policy change will have on the ESF. We still believe a 50-percent threshold would be a more viable preventive control than a 95-percent threshold.

---

[14] *Force Processing of Magnetic Media Wage Reports with Validation Problems* (A-03-99-31001), May 2001.

[15] *See id.* SSA uses a procedure known as force processing to process employer wage reports that do not meet its acceptance standards. When force processing wage reports, SSA suspends a systems edit and notifies the employer it will force process a wage report one time only. Force processing of wage reports results in unmatched W-2s going directly to the ESF.

[16] Employers with 250 or more employees are required to use magnetic media (tape, diskette, or cartridge) when reporting wage information to SSA.

We also believe improved management information related to employer reporting could focus ESLO contacts in the region and make their efforts more productive. SSA is establishing an Earnings Data Warehouse that can track employer-specific reporting trends.[17] This facility will be able to determine the percent of an employer's payroll that contains name and SSN mismatches. This information, combined with the ESLO efforts, could allow for better targeting of problem employers.

### Address Standardization Software

Our first report recommended that SSA run address standardization software as soon as practical after employers submit wage reports to identify employers that report the same address for many employees. SSA disagreed with this recommendation, stating it would review the feasibility of this recommendation. SSA later stated it had decided not to run address standardization software. SSA stated if the name/SSN on the wage report matched SSA's records, the address is immaterial; and if the item does not match SSA's records, the mismatch is the reporting problem. Furthermore, SSA noted that in many cases, especially in the agricultural workforce, a number of people may live at the same address. The Agency stated that this is often the case for a transient workforce where specific apartments or homes are provided as a temporary residence. As a result, SSA believes the potential return on investment does not appear to justify the developmental costs that would be incurred to implement this recommendation.

While we understand the Agency's position, we continue to believe duplicate mailing addresses on W-2s may be an indicator of SSN fraud. Our original report found that 94 of the 100 employers reported duplicate mailing addresses for 3 or more employees, involving almost 73,000 suspended W-2s and $194 million in suspended wages. In light of increasing concerns about SSN misuse in the U.S. economy, maintaining management information on address trends, or other similar trends, may assist SSA in detecting such SSN misuse and allow the Office of the Inspector General to investigate the more egregious situations.

---

[17] SSA Office of Systems staff said this facility should be able to track employer-specific trends by fall 2003.

# *Conclusions and Recommendations*

SSA has taken steps to implement two of the recommendations from our prior report. However, while SSA's actions have helped improve the wage reporting of some of the 100 employers, wage reporting problems still exist.  In addition, we continue to believe establishing preventive controls and implementing address standardization software, or similar controls to detect potential SSN misuse, will help alleviate some of the wage reporting problems and protect the integrity of the SSN.

To ensure SSA can identify employer reporting trends and focus its efforts on the employers with the most significant problems, we continue to recommend that SSA establish preventive controls to detect wage reporting errors and irregularities, including a link between the new Earnings Data Warehouse and ESLO efforts.

## AGENCY COMMENTS

SSA agreed with our recommendation, stating the Earnings Data Warehouse will provide employer reporting trends in early 2004, and the ESLOs will have access to this data.

# *Appendices*

# Earlier Audit Findings Related to the Top 100 Employers

In our earlier audit,[1] we noted that 84 of the 100 employers experienced increases in suspended wage items over the 4-year period (1993 to 1996), including 27 employers with increases of 100 percent or more.

Patterns of reporting errors and irregularities exhibited by the 100 employers included the following.

- Ninety-six employers reported 109,360 unassigned Social Security numbers (SSN), numbers never issued by the Social Security Administration, representing about $298.5 million in suspended wages.

- Thirty-six employers reported 3,127 of the 109,360 unassigned SSNs as "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."

- Ninety-four employers reported duplicate mailing addresses for 3 or more employees, involving 72,770 suspended *Wage and Tax Statements* (Form W-2) or 21 percent of the 340,922 suspended wage items for these employers in 1996. Suspended wages involving duplicate addresses totaled about $193.7 million.

- Eighty-six employers reported 3 or more consecutively numbered SSNs involving 4,910 W-2s and $14.4 million in suspended wages.  We defined consecutive SSNs as those where the first six digits were identical.

- Sixty-nine employers reported 16,742 identical W-2s, representing $31.1 million in suspended wages, that were used 2 or more times by employees working for the same employer.

---

[1] *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items* (A-03-98-31009), September 1999.

*Appendix B*

# Status of Office of the Inspector General Recommendations Made in September 1999 Top 100 Report

**Recommendation 1:**  Develop and implement a corrective action plan for the 100 employers and continue efforts to contact those employers responsible for large numbers of suspended wage items.

**Status:**  The Social Security Administration (SSA) agreed and implemented the recommendation on October 2, 2001.

> SSA Response:  SSA agreed that these employers should take corrective action. SSA is in its third year of contacting employers with 100 or more items in the suspense file.  It plans to continue these efforts as a way of educating those employers on the importance of submitting accurate wage reports.
>
> SSA's payoff from these efforts has been that it has learned a lot about those who cause the most items to be placed in the suspense file.  The most egregious offenders are not improving their name/number accuracy and are not interested in learning how to do so, although SSA recognizes that some employers are interested and appreciate the educational contacts it makes.  SSA believes improvement will only come through some stronger action.
>
> In addition, a change has already been made that will be included in notices sent in February 2000 for Tax Year 1999.  SSA is inserting a section in the notice informing employers about their responsibilities and employee rights.  This has become necessary because SSA does not want employers to abuse the information sent them by releasing employees without giving them the opportunity to correct their records or explain why information may be incorrect.

**Recommendation 2:** Establish preventive controls to detect wage reporting errors and irregularities.

**Status:**  SSA disagreed.

> SSA Response: SSA has explored and implemented several innovations to improve the preventative controls established to detect wage reporting errors and irregularities.  The threshold at which reports would be returned was increased from 10 to 50 percent with no payoff to SSA.  SSA has also identified the largest contributors to the suspense file and provided the employer information to its regional offices for discretionary contact.  SSA's contacts have educated employers on the importance of correct reporting, but it has seen little payoff.

Based on SSA's experiences, it believes the expected return on investment does not justify the use of the software development resources that would be required for this project.

**Recommendation 3:**  Identify those employers who continually submit annual wage reports with large numbers and/or percentages of unassigned, identical, and/or consecutively numbered Social Security numbers (SSN).

**Status:**  SSA agreed and administratively closed out the recommendation on September 5, 2000.

> SSA Response: Regional offices receive listings of those employers creating 100 or more suspense items and make discretionary contact.  SSA also provides employers with educational notices when the number of errors in a report submittal exceed 10 percent.

**Recommendation 4:** Run address standardization software as soon as practical after employers submit their annual wage reports to identify employers who report the same address for many employees.

**Status:**  SSA disagreed and closed this recommendation on December 31, 2000.

> SSA Response:  SSA explored the feasibility of implementing this recommendation.  The Office of the Inspector General stated that identifying employers who report the same address for numerous employees could point to a reporting problem.  Operations existing processes already identify name/SSN mismatches.  If the wage items in question match SSA's Numident and post to individual records on the Master Earnings File, the address reported by the employer is immaterial.  Items that do not match the Numident and fall to suspense indicate a reporting problem.  Through the processes already in place, SSA does send correspondence to the employers requesting that corrective action be taken.

*Appendix C*

# Scope and Methodology

To meet our objective, we:

- Reviewed Social Security Administration (SSA) policies and procedures for maintaining individual earnings records.

- Reviewed prior SSA Office of the Inspector General and Treasury Inspector General for Tax Administration reports related to the Earnings Suspense File (ESF) and inaccurate wage reporting.

- Reviewed SSA's most recent actions related to recommendations in our September 1999 report, *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items,* and discussed SSA's employer follow-up actions with staff in the Office of Public Services and Operations Support.

- Contacted SSA's regional Employer Service Liaison Officers for information regarding employer contact and suspended wage items.

- Reviewed SSA's actions targeting employers who submit large numbers of suspended wage items to the ESF.

- Reviewed SSA's ESF activity for 1997 to 2000 for the original 100 employers with the most suspended wage items in 1993 to 1996.

- Created a new Top 100 employers list using the same criteria we used in the original Top 100 report. We identified all employers who contributed 200 or more wage items to the ESF in each of the 4 years in our follow-up period, 1997 to 2000. Using these data, we selected the 100 employers who had the most suspended wage items over the 4-year period. We then determined how many employers from the earlier audit were still on this new Top 100 listing and analyzed the reporting activity related to each of these 100 employers.

  The following are some important factors regarding the methodology used in our follow-up review that need to be considered.

  ➢ These employers were identified using a specific methodology. This is not the only methodology one could use, but using auditor's judgment, we determined it was a useful way of identifying reporting trends.

  ➢ The list is based on wage items reported under an Employer Identification Number (EIN), and some employers report under multiple EINs. Hence, while the trends noted in the audit relate to the EIN, they do not

necessarily give a complete picture of the employer.  Furthermore, not all employers report their wages in the same way, so one company may report all of its operations under a single EIN and another may use multiple EINs.  However, SSA's systems house the wage data under EINs and do not allow us to focus on individual employers.  As a result, the audit is identifying the 100 EINs with the most suspended wage items and not necessarily the 100 employers with the most suspended wage items.

➤ Employers are allowed to switch their EINs for reporting.  As a result, we found instances where wages were reported under different EINs over the 4-year period.  Under our methodology, if a company switched EINs between 1993 and 1996, it may have failed to report over 200 items in a particular year under a particular EIN and therefore never have made the top 100 listing.  However, if one were to look at the employer over the 4-year period rather than the EIN they might have been among the top 100 employers.  The same reasoning holds true for our follow-up period, 1997 to 2000, when reviewing the reporting activity of the original top 100 employers.

➤ Some employers are on the list because of their employment volume rather than significant problems with their reporting accuracy.  For example, some employers are reporting only 1 percent of their employees with name/Social Security number mismatches, but they are on the list because 1 percent of their total payroll is a large number.  These employers may not have the same underlying problems as the smaller employer reporting as much as 85 percent of its payroll in error.

*Appendix D*

# Initial Top 100 Listing Highlighting Status in Follow-Up Period

| 1993-96 Ranking | State | Tax Year (TY) 1996 W-2s Reported | TY 1996 W-2s in ESF | TY 2000 W-2s Reported | TY 2000 W-2s in ESF | Present in 1997-2000 Top 100 Employers? | Reporting Accuracy | | Has the Reporting Accuracy Improved? |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | TY 1996 Percent of Reported W-2s in the Earnings Suspense File (ESF) | TY 2000 Percent of Reported W-2s in ESF | |
| 1 | CA | 331,348 | 7,621 | 358,238 | 3,938 | Yes | 2.30% | 1.10% | Yes |
| 2 | IL | 237,656 | 17,019 | 229,361 | 33,829 | Yes | 7.16% | 14.75% | No |
| 3 | FL | 236,139 | 13,577 | 209,921 | 20,367 | Yes | 5.75% | 9.70% | No |
| 4 | MI | 559,694 | 11,237 | 533,439 | 15,037 | Yes | 2.01% | 2.82% | No |
| 5 | SC | 98,020 | 9,594 | 103,641 | 11,006 | Yes | 9.79% | 10.62% | No |
| 6 | IL | 10,053 | 4,790 | 5,571 | 3,896 | Yes | 47.65% | 69.93% | No |
| 7 | GA | 51,465 | 6,536 | 46,416 | 11,472 | Yes | 12.70% | 24.72% | No |
| 8 | CA | 57,639 | 9,107 | 95,250 | 20,182 | Yes | 15.80% | 21.19% | No |
| 9 | CA | 20,356 | 6,290 | 0 | 0 | No | 30.90% | NA | Unknown |
| 10 | CA | 9,629 | 6,336 | 8,616 | 5,171 | Yes | 65.80% | 60.02% | Yes |
| 11 | DC | 278,819 | 9,421 | 0 | 0 | No | 3.38% | NA | Unknown |
| 12 | TX | 29,953 | 5,576 | 0 | 0 | No | 18.62% | NA | Unknown |
| 13 | OK | 215,189 | 6,456 | 254,990 | 11,527 | Yes | 3.00% | 4.52% | No |
| 14 | CA | 24,920 | 5,245 | 32,617 | 9,475 | Yes | 21.05% | 29.05% | No |
| 15 | GA | 26,982 | 4,559 | 11,012 | 5,183 | Yes | 16.90% | 47.07% | No |
| 16 | MI | 593,667 | 5,343 | 599,972 | 7,209 | Yes | 0.90% | 1.2% | No |
| 17 | IL | 9,027 | 659 | 10,494 | 7,500 | Yes | 7.30% | 71.47% | No |
| 18 | FL | 225,759 | 4,809 | 134 | 0 | No | 2.13% | 0.00% | Unknown |
| 19 | CA | 188,000 | 564 | 0 | 0 | No | 0.30% | NA | Unknown |
| 20 | CA | 224,099 | 4,814 | 4,712 | 15 | No | 2.15% | 0.32% | Unknown |

| 1993-96 Ranking | State | TY 1996 W-2s Reported | TY 1996 W-2s in ESF | TY 2000 W-2s Reported | TY 2000 W-2s in ESF | Present in 1997-2000 Top 100 Employers? | Reporting Accuracy | | Has the Reporting Accuracy Improved? |
| | | | | | | | TY 1996 Percent of Reported W-2s in ESF | TY 2000 Percent of Reported W-2s in ESF | |
|---|---|---|---|---|---|---|---|---|---|
| 21 | CA | 80,038 | 4,242 | 0 | 0 | No | 5.30% | NA | Unknown |
| 22 | TX | 45,371 | 4,401 | 40,729 | 5,655 | Yes | 9.70% | 13.88% | No |
| 23 | CA | 94,608 | 5,551 | 146,911 | 12,919 | Yes | 5.87% | 8.79% | No |
| 24 | MA | 35,131 | 3,100 | 0 | 0 | No | 8.82% | NA | Unknown |
| 25 | CA | 5,971 | 4,039 | 8,297 | 6,495 | Yes | 67.64% | 78.28% | No |
| 26 | CA | 11,464 | 3,474 | 15,500 | 4,870 | Yes | 30.30% | 31.42% | No |
| 27 | IL | 6,807 | 3,604 | 0 | 0 | No | 52.95% | NA | Unknown |
| 28 | OR | 44,277 | 4,655 | 49,988 | 3,580 | Yes | 10.51% | 7.16% | Yes |
| 29 | CA | 4,216 | 2,783 | 2,052 | 1,350 | No | 66.01% | 65.79% | Yes |
| 30 | KY | 93,733 | 4,218 | 81,819 | 9,485 | Yes | 4.50% | 11.59% | No |
| 31 | KS | 29,804 | 3,143 | 99 | 26 | No | 10.55% | 26.26% | Unknown |
| 32 | NY | 11,030 | 2,386 | 9,726 | 2,514 | No | 21.63% | 25.85% | No |
| 33 | IL | 6,249 | 3,384 | 1,014 | 763 | Yes | 54.15% | 75.25% | No |
| 34 | AR | 578,903 | 3,216 | 0 | 0 | No | 0.56% | NA | Unknown |
| 35 | NC | 107,036 | 2,701 | 99,668 | 2,391 | No | 2.52% | 2.40% | Yes |
| 36 | TX | 39,144 | 3,569 | 24,546 | 1,276 | Yes | 9.12% | 5.20% | Yes |
| 37 | NY | 26,459 | 1,449 | 14,912 | 55 | No | 5.48% | 0.37% | Yes |
| 38 | TX | 8,256 | 2,633 | 6,076 | 2,402 | No | 31.89% | 39.53% | No |
| 39 | CA | 4,317 | 3,084 | 0 | 0 | No | 71.44% | NA | Unknown |
| 40 | KS | 155,893 | 2,879 | 136,577 | 8,555 | Yes | 1.85% | 6.26% | No |
| 41 | CA | 3,401 | 2,648 | 0 | 0 | No | 77.86% | NA | Unknown |
| 42 | CA | 4,748 | 2,713 | 57 | 0 | No | 57.14% | 0.00% | Unknown |
| 43 | AZ | 7,543 | 2,481 | 9,511 | 3,357 | Yes | 32.89% | 35.30% | No |
| 44 | IL | 7,386 | 2,721 | 8,148 | 162 | No | 36.84% | 1.99% | Yes |
| 45 | IL | 5,407 | 2,682 | 10,399 | 6,727 | Yes | 49.60% | 64.69% | No |
| 46 | CA | 64,356 | 2,439 | 0 | 0 | No | 3.79% | NA | Unknown |
| 47 | SC | 4,641 | 1,935 | 7,076 | 3,310 | No | 41.69% | 46.78% | No |
| 48 | CA | 3,658 | 2,798 | 2,864 | 4 | No | 76.49% | 0.14% | Yes |

| 1993-96 Ranking | State | TY 1996 W-2s Reported | TY 1996 W-2s in ESF | TY 2000 W-2s Reported | TY 2000 W-2s in ESF | Present in 1997-2000 Top 100 Employers? | Reporting Accuracy | | Has the Reporting Accuracy Improved? |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | TY 1996 Percent of Reported W-2s in ESF | TY 2000 Percent of Reported W-2s in ESF | |
| 49 | WA | 3,841 | 2,027 | 3,527 | 2,128 | No | 52.77% | 60.33% | No |
| 50 | NY | 26,091 | 3,511 | 0 | 0 | No | 13.46% | NA | Unknown |
| 51 | OH | 66,903 | 3,244 | 47,769 | 7,976 | Yes | 4.85% | 16.70% | No |
| 52 | TN | 93,011 | 1,973 | 51,458 | 1,403 | No | 2.12% | 2.73% | No |
| 53 | CA | 9,351 | 2,191 | 0 | 0 | No | 23.43% | NA | Unknown |
| 54 | IL | 2,554 | 1,866 | 2,329 | 1,806 | No | 73.06% | 77.54% | No |
| 55 | FL | 5,085 | 2,603 | 0 | 0 | No | 51.19% | NA | Unknown |
| 56 | FL | 1,977 | 952 | 0 | 0 | No | 48.15% | NA | Unknown |
| 57 | CA | 11,019 | 2,485 | 14,921 | 4,790 | Yes | 22.55% | 32.10% | No |
| 58 | CA | 6,345 | 1,715 | 6,344 | 2,396 | No | 27.03% | 37.77% | No |
| 59 | CA | 6,639 | 2,722 | 0 | 0 | No | 41.00% | NA | Unknown |
| 60 | OH | 37,573 | 2,928 | 35,772 | 7,061 | Yes | 7.79% | 19.74% | No |
| 61 | WA | 3,394 | 2,348 | 3,880 | 2,622 | No | 69.18% | 67.58% | Yes |
| 62 | FL | 3,824 | 1,028 | 0 | 0 | No | 26.88% | NA | Unknown |
| 63 | IA | 5,132 | 2,330 | 6,473 | 4,126 | Yes | 45.40% | 63.74% | No |
| 64 | CA | 7,086 | 2,551 | 10,354 | 4,794 | Yes | 36.00% | 46.30% | No |
| 65 | CA | 17,730 | 3,617 | 15,661 | 5,089 | Yes | 20.40% | 32.49% | No |
| 66 | NY | 443,776 | 2,214 | 442,395 | 943 | No | 0.50% | 0.21% | Yes |
| 67 | TX | 2,958 | 1,692 | 0 | 0 | No | 57.20% | NA | Unknown |
| 68 | CA | 2,990 | 1,944 | 3,252 | 2,234 | No | 65.02% | 68.70% | No |
| 69 | WA | 2,955 | 1,868 | 4,194 | 2,785 | Yes | 63.21% | 66.40% | No |
| 70 | TX | 14,767 | 1,611 | 12,359 | 1,554 | No | 10.91% | 12.57% | No |
| 71 | WA | 3,712 | 2,261 | 5,221 | 3,574 | Yes | 60.91% | 68.45% | No |
| 72 | CA | 7,159 | 2,125 | 685 | 133 | No | 29.68% | 19.42% | Unknown |
| 73 | NC | 32,368 | 2,576 | 27,271 | 3,375 | Yes | 7.96% | 12.38% | No |
| 74 | NJ | 9,614 | 1,692 | 9,583 | 1,776 | No | 17.60% | 18.53% | No |
| 75 | CA | 2,486 | 1,771 | 3,651 | 2,755 | No | 71.24% | 75.46% | No |
| 76 | MN | 280,056 | 2,261 | 407,714 | 7,458 | Yes | 0.81% | 1.83% | No |

| 1993-96 Ranking | State | TY 1996 W-2s Reported | TY 1996 W-2s in ESF | TY 2000 W-2s Reported | TY 2000 W-2s in ESF | Present in 1997-2000 Top 100 Employers? | Reporting Accuracy | | Has the Reporting Accuracy Improved? |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | TY 1996 Percent of Reported W-2s in ESF | TY 2000 Percent of Reported W-2s in ESF | |
| 77 | UT | 57,373 | 3,245 | 91,086 | 5,222 | Yes | 5.66% | 5.73% | No |
| 78 | IL | 3,645 | 2,501 | 4,647 | 3,565 | Yes | 68.61% | 76.72% | No |
| 79 | CA | 3,084 | 2,098 | 3,810 | 2,919 | No | 68.03% | 76.61% | No |
| 80 | AL | 58,598 | 2,464 | 64,325 | 4,031 | Yes | 4.20% | 6.27% | No |
| 81 | CA | 2,749 | 2,326 | 3 | 0 | No | 84.60% | 0.00% | Unknown |
| 82 | CA | 2,746 | 1,870 | 0 | 0 | No | 68.10% | NA | Unknown |
| 83 | TX | 20,661 | 4,191 | 32,282 | 8,931 | Yes | 20.28% | 27.67% | No |
| 84 | CA | 2,167 | 1,610 | 2,224 | 1,651 | No | 74.30% | 74.24% | Yes |
| 85 | CA | 6,735 | 1,842 | 5,603 | 1,818 | No | 27.35% | 32.45% | No |
| 86 | CA | 1,930 | 1,396 | 1,268 | 909 | No | 72.33% | 71.69% | Yes |
| 87 | TX | 377,808 | 1,660 | 343,106 | 1,480 | No | 0.44% | 0.43% | Yes |
| 88 | TX | 18,474 | 2,637 | 20,937 | 2,283 | No | 14.27% | 10.90% | Yes |
| 89 | FL | 4,589 | 2,249 | 3,424 | 2,237 | Yes | 49.01% | 65.33% | No |
| 90 | NC | 3,244 | 2,725 | 277 | 176 | No | 84.00% | 63.54% | Unknown |
| 91 | CA | 5,519 | 320 | 8,121 | 2.620 | No | 5.80% | 32.26% | No |
| 92 | NJ | 4,126 | 2,779 | 3,111 | 0 | No | 67.35% | 0.00% | Yes |
| 93 | FL | 16,033 | 1,378 | 41,772 | 2,286 | No | 8.59% | 5.47% | Yes |
| 94 | CA | 8,578 | 1,587 | 9,645 | 2,435 | No | 18.50% | 25.25% | No |
| 95 | NJ | 4,974 | 2,514 | 7 | 0 | No | 50.54% | 0.00% | Unknown |
| 96 | CA | 35,006 | 1,478 | 33,405 | 2,093 | No | 4.22% | 6.27% | No |
| 97 | CA | 1,699 | 1,347 | 2,555 | 2,177 | No | 79.30% | 85.21% | No |
| 98 | TX | 15,115 | 1,766 | 13,941 | 3,320 | No | 11.68% | 23.81% | No |
| 99 | IL | 50,135 | 2,509 | 54,303 | 689 | No | 5.00% | 1.27% | Yes |
| 100 | KS | 52,516 | 1,843 | 50,317 | 1,830 | No | 3.51% | 3.64% | No |
| Totals | | 6,738,264 | 340,922 | 5,085,385 | 365,153 | | | | |

**Note:** Some of the TY 1996 accuracy rates have been adjusted from the earlier audit to (1) show a more precise rate and (2) account for the most recent employer wage reporting information available in the Agency's systems.

*Appendix E*

# Agency Comments



# SOCIAL SECURITY

**MEMORANDUM**                                        32226-24-950

Date:        October 17, 2003                                        Refer To: S1J-3

To:          James G. Huse, Jr.
             Inspector General

From:        Larry W. Dye   /s/
             Chief of Staff

Subject:     Office of the Inspector General (OIG) Draft Report, "Follow-up Review of
             Employers with the Most Suspended Wage Items" (A-03-03-13026)--
             INFORMATION


             We appreciate OIG's efforts in conducting this follow-up review.  Our comments
             on the recommendations are attached.

             Please let us know if we can be of further assistance.  Staff questions can be
             referred to Janet Carbonara at extension 53568.

             Attachment:
             SSA Response

**COMMENTS ON THE OFFICE OF THE INSPECTOR GENERAL (OIG) DRAFT REPORT, "FOLLOW-UP REVIEW OF EMPLOYERS WITH THE MOST SUSPENDED WAGE ITEMS" A-03-03-13026**

We appreciate the opportunity to comment on the draft report.  As stated in this report, the Agency has, and continues to pursue activities that would remove items from the Earnings Suspense File (ESF) and promote prevention efforts.  We have worked with the Internal Revenue Service (IRS) to encourage them to consider penalizing employers who continually have larger amounts or percentages of wage items placed in the ESF during wage and tax statement processing.  To assist IRS in the analysis of this proposal, we provided IRS with a list of the Top 100 employers of wage items placed in the ESF based on both volume and percentage for tax years 1999 and 2000.  In addition, we have worked with the Treasury Inspector General (IG) to further support this activity.  Based on a Treasury IG report, the IRS is studying the effect of imposing penalties on the most egregious employers who place items in the ESF.

Below are our specific comments to the recommendation.

**Recommendation 1**

Establish preventive controls to detect wage reporting errors and irregularities, including a link between the new Earnings Data Warehouse and Employer Service Liaison Officer (ESLO) efforts.

**Comment**

We agree.  Phase II of the Earnings Data Warehouse (EDW), scheduled for implementation in March 2004, will incorporate employer records (W-3's) with much of the associated detail. Phase II will have historical data from receipt year 1999 (tax year 1998) through the present receipt year data and will also have the data to identify employers who have, or had, incorrect name/SSN combinations.

Additionally, our ESLOs go through extensive efforts to assist employers in their wage reporting issues.  ESLOs will have access to EDW through the Brio tool, an on-line analytical processing tool used to analyze data, and are able to perform ad-hoc queries on a larger number of data sources.

*Appendix F*

# OIG Contacts and Staff Acknowledgments

## OIG Contacts

Walter Bayer, Director, (215) 597-4080

## Staff Acknowledgments

In addition to those named above:

Michael Thomson, Senior Auditor

Richard Devers, Senior Auditor

For additional copies of this report, please visit our web site at http://www.ssa.gov/oig or contact the Office of the Inspector General's Public Affairs Specialist at (410) 966-1375. Refer to Common Identification Number A-03-03-13026.

# EXHIBIT H

# OFFICE OF
# THE INSPECTOR GENERAL

## SOCIAL SECURITY ADMINISTRATION

**USEFULNESS OF DECENTRALIZED
CORRESPONDENCE IN FOCUSING
EMPLOYER-ASSISTANCE ACTIVITIES**

**September 2005**          **A-03-05-25007**

# AUDIT REPORT



# Mission

We improve SSA programs and operations and protect them against fraud, waste, and abuse by conducting independent and objective audits, evaluations, and investigations.  We provide timely, useful, and reliable information and advice to Administration officials, the Congress, and the public.

# Authority

The Inspector General Act created independent audit and investigative units, called the Office of Inspector General (OIG).  The mission of the OIG, as spelled out in the Act, is to:

- ❍ Conduct and supervise independent and objective audits and investigations relating to agency programs and operations.
- ❍ Promote economy, effectiveness, and efficiency within the agency.
- ❍ Prevent and detect fraud, waste, and abuse in agency programs and operations.
- ❍ Review and make recommendations regarding existing and proposed legislation and regulations relating to agency programs and operations.
- ❍ Keep the agency head and the Congress fully and currently informed of problems in agency programs and operations.

To ensure objectivity, the IG Act empowers the IG with:

- ❍ Independence to determine what reviews to perform.
- ❍ Access to all information necessary for the reviews.
- ❍ Authority to publish findings and recommendations based on the reviews.

# Vision

By conducting independent and objective audits, investigations, and evaluations, we are agents of positive change striving for continuous improvement in the Social Security Administration's programs, operations, and management and in our own office.

# *Executive Summary*

## OBJECTIVE

Our objective was to determine whether employee addresses within the Social Security Administration's (SSA) Decentralized Correspondence (DECOR) file can provide useful information to strengthen the Agency's employer-assistance activities.

## BACKGROUND

The purpose of the DECOR process is to contact employees and employers to resolve Social Security number (SSN) and/or name discrepancies on reported earnings. Such earnings are posted to the Agency's Earnings Suspense File (ESF) until the discrepancies can be resolved. The DECOR letter provides the wage earner with information about the reported name/SSN and wage amount, and requests that the reported information be reviewed, verified or corrected where possible, and returned. While SSA sends most of the DECOR letters to employees, SSA also sends a letter to the employer when an employee's address is unavailable. SSA uses the replies to resolve the earnings discrepancies. For Tax Year (TY) 2002, SSA mailed approximately 9.5 million DECOR letters, relating to approximately $60.4 billion in wages, to employees and employers. Approximately 7.6 million of these letters were sent directly to employees.

## RESULTS OF REVIEW

Our review of the TY 2002 DECOR employee file indicates that employees living in 10 States represent 72 percent of the items in the file, even though these States represent about 48 percent of the national workforce. We also found inconsistencies in the volume of suspended wage items for particular States when compared to those States' share of the national workforce. For example, while the State of California has 11 percent of the Nation's workforce, it represents about 30 percent of the suspended items in the file.

Our audit also indicates that SSA's strategy for assisting employers with wage reporting problems may not sufficiently account for the diffusion of reporting problems throughout the country. The Agency aligns its Employer Service Liaison Officer (ESLO) activities on a regional basis, and identifies the employers located in each region by using the payroll address of each employer. However, an employer operating in multiple States may have its most significant problems in another part of the country. For example, we identified an employer with a payroll address in Texas being assisted by the Dallas-based ESLO, and yet the majority of the employees with suspended wage items resided in California under the jurisdiction of a different ESLO.

Finally, we found problematic national trends, including valid SSNs being misused hundreds of times in multiple States and the same employee address being used by thousands of individuals.  In 11 cases, a valid SSN was used more than 400 times by various individuals during TY 2002.  For instance, we found 1 case where a valid SSN belonging to a child was used to report 742 wage items by individuals residing in 42 different States.  These trends should be of interest to SSA in its efforts to reduce the size of the ESF as well as protect the integrity of the SSN.

## CONCLUSION AND RECOMMENDATIONS

The DECOR employee file provides a useful profile of the employers submitting wage reports with name/SSN mismatches.  By using the address information, the Agency's ESLOs can learn more about the specific problems of employers within their jurisdiction.  Furthermore, by knowing specifically where DECOR letters are mailed, the Agency can better target its employer outreach efforts.  Finally, potential SSN misuse and other trends can be proactively monitored by the Agency as it attempts to protect the integrity of the SSN.

To improve the focus of the Agency's employer-assistance activities and protect the integrity of the SSN and associated earnings postings, we recommend SSA:

- Consider using addresses in the DECOR employee file to enhance coordination among ESLOs when the employer wage reporting problems relate to multiple regions around the country.

- Consider using addresses in the DECOR employee file to identify relevant trends among employees with suspended wages and focus ESLO efforts.

- Review and correct the earnings record of the child noted in this report, as well as the earnings records related to the remaining 10 valid SSNs misused more than 400 times.

## AGENCY COMMENTS

SSA agreed with our recommendations.  The full text of SSA's comments is included in Appendix G.

# *Table of Contents*

**Page**

**INTRODUCTION** ...................................................................................................1

**RESULTS OF REVIEW** ........................................................................................3

Suspended Wage Items by Employee Address .......................................................3

Employer Service Liaison Officer's Coverage ........................................................5

Other Trends Among the Suspended Wage Items....................................................7

- Frequently Misused Social Security Numbers ..............................................7

- Frequent Addresses .......................................................................................8

**CONCLUSIONS AND RECOMMENDATIONS**....................................................10

**APPENDICES**

**APPENDIX A** – Acronyms

**APPENDIX B** – Decentralized Correspondence Flowchart

**APPENDIX C** – Scope and Methodology

**APPENDIX D** – Ranking of States by Suspended Wage Items and State Workforce

**APPENDIX E** – Prior OIG Report Ranking of States by Total Suspended Wage Items

**APPENDIX F** – Additional Analysis on the Decentralized Correspondence Employer File

**APPENDIX G** – Agency Comments

**APPENDIX H** – OIG Contacts and Staff Acknowledgments

# *Introduction*

## OBJECTIVE

Our objective was to determine whether employee addresses within the Social Security Administration's (SSA) Decentralized Correspondence (DECOR) file can provide useful information to strengthen the Agency's employer-assistance activities.

## BACKGROUND

Title II of the Social Security Act requires that SSA maintain the reported earnings records of individuals.[1]  SSA uses these reported earnings to determine whether an individual is entitled to receive retirement, survivors, disability and health insurance benefits and to calculate benefits.  SSA validates the names and Social Security numbers (SSN) on the *Wage and Tax Statement* (Form W-2) against information in its records.  Earnings containing names and/or SSNs that do not match SSA's records cannot be posted to an individual's earnings record in SSA's Master Earnings File (MEF).[2]  Instead, these wages are placed in SSA's Earnings Suspense File (ESF)—a repository for unmatched wages.  As of October 2004, the ESF had accumulated about $463 billion in wages and 246 million wage items for Tax Years (TY) 1937 through 2002 that could not be posted to individuals' earnings records.  Accumulation over TYs 1993 through 2002 accounts for $322 billion of the $463 billion in suspended wages, or 70 percent.[3]

The purpose of the DECOR process is to contact employees and employers to resolve SSN and/or name discrepancies on wage items stored in the ESF.  The letter provides the wage earner with information about the reported name/SSN and wage amount, and requests that the reported information be reviewed, verified or corrected where possible, and returned.  While SSA sends most of the DECOR letters to employees,[4] SSA sends a letter to the employer when an employee's address is incomplete or incorrect.[5]  SSA

---

[1] The Social Security Act § 205(c)(2)(A), 42 U.S.C. § 405(c)(2)(A).

[2] The MEF contains all earnings data reported by employers and self-employed individuals.  The data is used to calculate the Social Security benefits due an individual with an earnings record.

[3] These numbers relate to wages reported by employers and not self-employment income.  SSA maintains a separate ESF file for suspended self-employment income.

[4] SSA uses employee addresses reported on the W-2.

[5] SSA uses the employer address related to the Employer Identification Number (EIN) reported on the W-2.  The EIN is a 9-digit number assigned by the Internal Revenue Service (IRS) to sole proprietors, corporations, partnerships, estates, trusts, and other entities for tax filing and reporting purposes.  The employer address related to the EIN is provided by the IRS.

uses the responses to resolve the earnings discrepancies.  For TY 2002,[6] SSA mailed approximately 9.5 million DECOR letters, relating to approximately $60.4 billion in wages, to employees and employers.[7]  See appendices B and F for more background on the DECOR letters.  Approximately 7.6 million DECOR letters were sent to employees and another 1.9 million letters were sent to employers (see Table 1).  Furthermore, our analysis of the entire TY 2002 DECOR file showed there were about 884,000 specific employers in this file.

**Table 1:  Breakout of the Tax Year 2002 DECOR File**

| File Contents | Wage Items | Wages | Percent of Items Per File |
|---|---|---|---|
| **Employee File** | 7.6 million | $49.8 billion | 80 |
| **Employer File** | 1.9 million | $10.6 billion | 20 |
| **Total** | **9.5 million** | **$60.4 billion** | **100** |

We analyzed the 9.5 million wage items contained in the TY 2002 DECOR file and determined that approximately 9 million (94 percent) of these wage items were related to TY 2002, while the remainder related to prior TYs.  For example, approximately 264,000 wage items related to TY 2001 (see Table 2).

**Table 2:  Reported Tax Years in the Entire DECOR File**

| Tax Year | Number of Wage Items | Volume of Wages |
|---|---|---|
| **2002** | 8,992,179 | $57.6 billion |
| **2001** | 264,477 | $1.4 billion |
| **2000** | 130,689 | $.8 billion |
| **1978-1999** | 142,266 | $.6 billion |
| **Blank** | 278 | $.004 billion |
| **Total** | **9,529,889** | **$60.4 billion** |

**Note:**  Blank indicates that there was no tax year associated with these wage items.

---

[6] Although the letters were mailed during Calendar Year (CY) 2003, the majority of these wage items related to TY 2002.  As a result, we will refer to this file as a "TY 2002" file in this report.  We reviewed the TY 2002 DECOR mailer file since that was the most recent file available at the time of our review.

[7] Our report does not discuss self-employment income nor the letters sent to individuals with suspended self-employment income.  During CY 2003, SSA sent approximately 131,000 letters to individuals with suspended self-employment income.

# *Results of Review*

Our review of the TY 2002 DECOR employee file indicates that employees living in 10 States represent 72 percent of the items in the file, even though these States represent about 48 percent of the national workforce.  We also found inconsistencies in the volume of suspended wage items for particular States when compared to those States' share of the national workforce.  For example, while the State of California has 11 percent of the Nation's workforce, it represents about 30 percent of the suspended items in the file.  Our audit also indicates that SSA's strategy for assisting employers with wage reporting problems may not sufficiently account for the diffusion of reporting problems throughout the country.  The Agency aligns its Employer Service Liaison Officer (ESLO) activities on a regional basis using the payroll address of an employer. However, an employer operating in multiple States may have its most significant problems in another part of the country.  For example, we identified an employer with a payroll address in Texas being assisted by the Dallas-based ESLO, and yet the majority of the employees with suspended wage items resided in California under the jurisdiction of a different ESLO.  Finally, we found problematic national trends, including valid SSNs being misused hundreds of times in multiple States and the same employee address being used by thousands of individuals.  In 11 cases, a valid SSN was used more than 400 times by various individuals during TY 2002.  For instance, we found 1 case where a valid SSN belonging to a child was used to report 742 wage items by individuals residing in 42 different States.  These trends should be of interest to SSA in its efforts to reduce the size of the ESF as well as protect the integrity of the SSN.

## SUSPENDED WAGE ITEMS BY EMPLOYEE ADDRESS

Our analysis identified the States with employees contributing the highest number of items to the DECOR employee file.[8]  The top 10 States[9] accounted for 72 percent of the TY 2002 DECOR letters sent to employees even though they represent about 48 percent of the national workforce as shown in Table 3 (see Appendix D for a ranking of all 50 States and the District of Columbia).  When we compared these 10 States to the top 10 States in terms of total workforce, we found inconsistencies in the volume of suspended wage items for particular States when compared to those States' share of the national workforce.  For example, while the State of California has 11 percent of the Nation's workforce, it represents about 30 percent of the suspended items in the file. However, in the case of New York, the State had about half the expected proportion of

---

[8] This analysis was based on DECOR letters sent to employees in the 50 States plus the District of Columbia; or about 80 percent of all suspended wage items.  We reviewed the DECOR employee file since it contained the employees' addresses.  As we noted earlier, SSA will send a letter to an employer when it lacks a valid address for the employee.  Since items in the DECOR employee file represent ESF wage items, our findings should directly correlate with the contents of the TY 2002 ESF.  See Appendix F for more on the DECOR letters sent to employers.

[9] In our analysis of the 20 percent of DECOR notices sent to employer addresses we found that the same 10 States were predominant.

suspended items when compared to its percent of the national workforce, and Georgia had the same suspended item and workforce percentages.

### Table 3:  Comparison of the Top Ten States Ranking of Suspended Wages Items and National Workforce
(Based on a Review of the Tax Year 2002 DECOR Employee File)

| States [1] | Ranking in Terms of Wage Items | Percent of DECOR Notices | Ranking in Terms of State Workforce | Percent of the National Workforce [2] |
|---|---|---|---|---|
| California | **1** | 29.7 | **1** | 11.0 |
| Texas | **2** | 9.6 | **2** | 7.0 |
| Florida | **3** | 6.8 | **4** | 5.7 |
| Illinois | **4** | 6.2 | **6** | 4.3 |
| New Jersey | **5** | 4.0 | **9** | 3.1 |
| New York | **6** | 3.4 | **3** | 6.6 |
| Arizona | **7** | 3.3 | **21** | 1.8 |
| North Carolina | **8** | 3.2 | **10** | 3.0 |
| Washington | **9** | 3.2 | **15** | 2.2 |
| Georgia | **10** | 3.0 | **11** | 3.0 |
| **Totals** | | **72.4%** | | **47.7%** |

**Notes:** (1) Our analysis does not include DECOR letters sent to Guam, Puerto Rico, American Samoa, Virgin Islands, Marshall Islands, and overseas addresses related to the Armed Forces.  A total of 4,397 letters related to these locations.

(2) State workforce statistics were taken from *State Statistics*, Office of Policy, SSA, December 2003, http://mwww.ba.ssa.gov/policy/docs/quickfacts/state_stats/.

We also noticed differences in the State rankings in the DECOR employee file compared to the national workforce.  These differences could be attributed to a number of factors, including the type of industries predominant in each State as well the level of unauthorized work and SSN misuse.[10]  As we have noted in our earlier review of this area, the three industries contributing the highest number of items to the ESF include agriculture, restaurants and services.[11]  SSA has previously stated that many suspended items involve the agricultural industry, which has transient employees who

---

[10] For example, the State of Arizona's ranking in the DECOR employee notices was much higher than its ranking by State workforce.  According to a March 2005 report from the Pew Hispanic Center, *Estimates of the Size and Characteristics of the Undocumented Population*, Arizona is now among the States with the largest number of undocumented migrants (approximately 500,000 out of a 10 million undocumented migrant population for 2002 through 2004).  In addition, a February 2005 Federal Trade Commission report entitled, *National and State Trends in Fraud & Identity Theft*, lists the Phoenix-Mesa-Scottsdale area in Arizona as the number one major metropolitan statistical area in the United States for identity theft (out of 49 major metropolitan areas).

[11] SSA OIG, *Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001* (A-03-03-13048), October 2004.

may not have work-authorization from the Department of Homeland Security.[12]  Other high turnover industries, such as fast food, restaurants and other service industries, have similar profiles.  Frequent job and residential changes are not uncommon with members of these workforces.  These actions complicate name/SSN correction efforts when recontacts are necessary.

## EMPLOYER SERVICE LIAISON OFFICER'S COVERAGE

Some of the other trends we noticed in the DECOR employee file, such as the distribution of an employer's workers across multiple States, should be of interest to SSA in terms of understanding the source of wage items going into the ESF.  SSA provides assistance to employers through ESLOs located in 10 regions throughout the United States.  The ESLOs (1) answer employers' questions on wage reporting submissions; (2) encourage employers to use SSA's various programs, such as the Employee Verification Service; (3) conduct wage-reporting seminars, in partnership with the IRS; and (4) contact employers with significant suspended wage items in their regions.

Since 1996, SSA's Office of Public Service and Operations Support has developed a national listing of employers, who submit 100 or more suspended wage items.  The listing uses the employer's address related to the EIN to determine the relevant region.  These lists are sent to regional ESLOs for follow-up contacts with the employers.  SSA does not direct the ESLOs to contact specific employers or follow up with the ESLOs regarding what contacts were made and the results of the contacts.[13]

We reviewed the DECOR employer letters sent to five Texas-based employers highlighted in an earlier audit for having a large number of suspended wages items.[14]  We determined that three of the five employers had more than half of their employee problems fall outside Region VI,[15] thereby falling under the jurisdiction of another ESLO (see Table 4).  SSA sent 2,082 DECOR letters to employees of one these companies, of which 1,959 (or 90.1 percent) were sent to employees who resided outside of Region VI.  Again, this distribution of an employer's workforce problems may call for greater coordination between the ESLO in Region VI and other relevant ESLOs.

---

[12] SSA OIG, *Status of the Social Security Administration's Earnings Suspense File* (A-03-03-23038), November 2002.

[13] In our discussions with SSA staff we learned that some ESLO regions are still sending out large volumes of correspondence to employers asking them to correct their wage reports.  We were also told that a few years ago the ESLOs had a concerted effort to contact the employers with more than 100 items in suspense but the response rate from the employers was very low.

[14] SSA OIG, *Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001* (A-03-03-13048), October 2004.

[15] SSA's Region VI includes Arkansas, Louisiana, Oklahoma, New Mexico and Texas.

**Table 4: Review of Five Employers in Texas[1]**
**(Comparison of Payroll Address and Tax Year 2002 DECOR Employee File Address)**

| Employer | Industry | Total Items in DECOR Employee File[2] | Total Items in Region VI | Total Items in Other Regions | Percent in Other Regions |
|---|---|---|---|---|---|
| 1 | Services | 27,225 | 5,785 | 21,440 | 78.8 |
| 2 | Services | 13,327 | 5,458 | 7,869 | 59.1 |
| 3 | Services | 3,646 | 3,646 | 0 | 0 |
| 4 | Restaurant | 3,171 | 2,876 | 295 | 9.3 |
| 5 | Services | 2,082 | 206 | 1,876 | 90.1 |

**Note:** (1) These Texas-based employers were among the Top 100 employers in the United States during TYs 1997-2001. *See* SSA OIG, *Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001* (A-03-03-13048), October 2004.
(2) Our comparison is based on the suspended wage items in the DECOR employee file, where employee addresses were available. Each employer above had at least 83 percent of their overall suspended wage items in the employee file.

The above comparison indicates that an ESLO with a full understanding of the wage item distribution throughout the country could be in a better position to assist an employer and pinpoint potential weaknesses in its payroll process. For instance, employer #5 in Table 4 above with 90.1 percent of the letters mailed to employees who reside outside Region VI may want to know which States in particular have employees with mismatched names and SSNs. If the ESLO had the same information we used as part of this audit, he or she could share with this employer the fact that most of the problems relate to California-based employees (see Figure 1). We spoke to the Dallas Region ESLO about our findings and she stated that this employee information could assist her in her discussions with employers and/or other ESLOs around the country.

**Figure 1:  Distribution of Employee Addresses**
**Related to Texas-Based Employer #5 (from Table 4)**



**Note:  The Other category includes 26 States with 72 or fewer items per State.**

By using the employee address information, SSA can learn more about the suspended wage items than simply the employer's payroll address and determine those regions experiencing the highest volume of wage reporting problems. As a result, we believe that this DECOR information can assist ESLOs in targeting areas of the country in need

of additional education or special programs/pilots.  For example, SSA may want to schedule seminars on the Social Security Number Verification System (SSNVS)[16] in those areas of the country where employee mismatches are most frequent.

## OTHER TRENDS AMONG THE SUSPENDED WAGE ITEMS

We also reviewed the DECOR employee file for potential SSN misuse trends across the Nation.  We reviewed both multiple uses of the same SSN by different individuals and duplicate addresses.  These trends should be of interest to SSA in its efforts to ensure employees receive notice of wage reporting problems and protect the integrity of the SSN.

### Frequently Misused Social Security Numbers

In our analysis of the top 100 SSNs appearing most frequently within the DECOR employee file for the entire Nation we determined that 74 of these 100 SSNs were valid SSNs issued by SSA and used during TY 2002 by various individuals throughout the country to report over 21,000 wage items.[17]  Of these valid SSNs, 11 numbers were used more than 400 times.[18]

We profiled 1 of these 11 valid SSNs that appeared in the DECOR employee file and determined that there were 742 uses of this particular SSN reported by 716 employers for individuals residing in 42 different States.[19]  We reviewed SSA's systems and determined that the owner of this SSN is a child who was born in Mexico in September 1991.  Of the 742 wage items reported under this SSN, the State of California accounted for 450 wage items, or 61 percent.[20]  A further review of the ESF for TYs 1998 through 2001 showed that the child's SSN was used over 3,900 times.

We reviewed the child's earnings record to determine how many of the reported wage items may have been posted to his record in the MEF.  We determined that for TYs 1998 through 2003 (when the child was 7 through 12 years of age), there were 15 wage postings related to employers in the restaurant and manufacturing industries, with approximately $126,247 of total earnings posted to the child's record (see Table 5).

---

[16] SSNVS is an on-line service that enables employers and submitters to verify employee names and SSNs with information in SSA's records for the W-2 reporting purposes.

[17] The remaining 26 SSNs were invalid numbers such as 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.

[18] A review of the 11 numberholders' information indicates that 5 of the 11 were born outside of the United States, 5 were born in California, and 1 numberholder was born in Maryland.  Furthermore, the ages of these individuals in TY 2002 ranged from 1 to 65 years of age.

[19] These numbers only relate to the DECOR employee file where we can obtain an employee address. We found that this SSN had been used an additional 177 times in the DECOR employer file related to 168 employers.

[20] Within the State of California, individuals living in the city of Los Angeles used this SSN 159 times.

A review of the W-2s used to report these TY 1998 through 2003 posted wages indicate the earners lived in at least five different addresses within California during this period.[21]

**Table 5: Questionable Postings to Child's Earnings Record**

| Tax Year | Age at Time of Posting | Number of Wage Postings | Total Annual Wages Posted |
|---|---|---|---|
| 1998 | 7 | 3 | $30,331 |
| 1999 | 8 | 3 | $25,728 |
| 2000 | 9 | 3 | $24,677 |
| 2001 | 10 | 2 | $31,140 |
| 2002 | 11 | 3 | $10,438 |
| 2003 | 12 | 1 | $3,933 |
| Totals | | 15 | $126,247 |

The above case, as well as the other SSNs used multiple times, represents ongoing SSN misuse within the economy that not only leads to an increase in the size of the ESF, but can also lead to erroneous postings within SSA's records and deterioration in the quality of information in SSA's MEF.  In this case, the child's earnings record appears to have postings that will need to be corrected.[22]  We referred the above case to SSA staff for additional review to determine if some of the wages need to be removed and placed into the ESF.

**Frequent Addresses**

We reviewed trends related to the most frequently used addresses within the TY 2002 DECOR employee file and determined that 6 of the top 10 most frequently used addresses were located in the State of Florida (see Table 6).  In addition, all six of these Florida addresses related primarily to agricultural employers.  The remaining four addresses represented the services industry.  Of the 15,133 suspended wage items listed below, the State of Florida accounted for 11,122 wage items (or 73.5 percent), with corresponding wages totaling about $19.2 million.  The address receiving the highest volume of DECOR letters (Address #1 in Table 6) was a "general delivery"[23] address located in a Florida city known for its farmlands and high population of farmworkers.

---

[21] In addition, some postings were under the same last name as the child, though it is possible the name relates to a family member.

[22] During the Annual Wage Reporting process, SSA checks the Numident for the reported SSN for the date of birth.  If the date of birth indicates the numberholder is a child age 6 or younger, the earnings will be identified as a Young Children's Earnings Record item and placed into suspense.

[23] A "General Delivery" address is used when an individual wants his/her mail to be held at a Main Post Office for up to 30 days.  The United States Postal Service's website notes that "This is also a great option if you don't have a permanent address."

**Table 6:  Frequency of Addresses in TY 2002 DECOR Employee File**

| Address | Location of Address | Industry | Wage Items in ESF (Per Address) | ESF Wages | Number of Employers | Type of Location |
|---|---|---|---|---|---|---|
| 1 | Florida | Agriculture | 3,748 | $2.9 million | 33 | General Delivery |
| 2 | Florida | Agriculture | 2,521 | $5.9 million | 11 | Post Office Box |
| 3 | Florida | Agriculture | 2,261 | $3.3 million | 107 | Post Office Box |
| 4 | Florida | Agriculture | 920 | $2.7 million | 8 | Post Office Box |
| 5 | Florida | Agriculture | 851 | $2.4 million | 4 | Employer Address |
| 6 | Florida | Agriculture | 821 | $1.9 million | 7 | Street Address |
| 7 | California | Services | 1,353 | $6.8 million | 8 | Employer Address |
| 8 | Georgia | Services | 933 | $1.8 million | 16 | Street Address |
| 9 | Tennessee | Services | 914 | $4.7 million | 254 | Employer Address |
| 10 | Kansas | Services | 811 | $4.4 million | 208 | Apartment Building |
| Total | | | 15,133 | $36.8 million | 656 | |

These frequently used addresses indicate that employees may not learn about their suspended earnings since the DECOR letters are being sent to (1) incomplete addresses (i.e. an address missing an apartment unit number), (2) employer addresses, and/or (3) general addresses.  For example, it is possible that some transient workers are using a "general delivery" address while working for a short time in a particular region of the country.

# Conclusions and Recommendations

The DECOR employee file provides a useful profile of the employers submitting wage reports with name/SSN mismatches. By using the address information, the Agency's ESLOs can learn more about the specific problems of employers within their jurisdiction. Furthermore, by knowing specifically where DECOR letters are mailed, the Agency can better target its employer outreach efforts. Finally, potential SSN misuse and other trends can be proactively monitored by the Agency as it attempts to protect the integrity of the SSN.

To improve the focus of the Agency's employer-assistance activities and protect the integrity of the SSN and associated earnings postings, we recommend SSA:

1. Consider using addresses in the DECOR employee file to enhance coordination among ESLOs when the employer wage reporting problems relate to multiple regions around the country.

2. Consider using addresses in the DECOR employee file to identify relevant trends among employees with suspended wages and focus ESLO efforts.

3. Review and correct the earnings record of the child noted in this report, as well as the earnings records related to the remaining 10 valid SSNs misused more than 400 times.

## AGENCY COMMENTS

SSA agreed with our recommendations. The full text of SSA's comments is included in Appendix G.

# *Appendices*

*Appendix A*

# Acronyms

| | |
|---|---|
| CY | Calendar Year |
| DECOR | Decentralized Correspondence |
| EDCOR | Educational Correspondence |
| EIN | Employer Identification Number |
| ESF | Earnings Suspense File |
| ESLO | Employer Service Liaison Officer |
| IRS | Internal Revenue Service |
| MEF | Master Earnings File |
| OIG | Office of the Inspector General |
| SSA | Social Security Administration |
| SSN | Social Security Number |
| SSNVS | Social Security Number Verification System |
| TY | Tax Year |
| U.S.C. | United States Code |
| WRPS | Wage Reporting Problem Service |

Forms

| | |
|---|---|
| Form W-2 | *Wage and Tax Statement* |

## Appendix B

# Decentralized Correspondence Flowchart



# Scope and Methodology

To meet our objective, we performed the following steps:

- Reviewed prior Social Security Administration (SSA) Office of the Inspector General reports related to the Earnings Suspense File (ESF) and inaccurate wage reporting.

- Reviewed applicable Federal laws and regulations, as well as SSA policies and procedures for maintaining individual earnings records and contacting employers with suspended wages.

- Visited the Wilkes-Barre Data Operations Center to perform a walk-through of the Decentralized Correspondence (DECOR) process and review available workload data to determine the overall effectiveness of the DECOR process.  We also interviewed SSA staff during the walk-through process to gain a further understanding of the DECOR process.

- Obtained a copy of the DECOR mailer file from SSA related to wage reports submitted during the Tax Year (TY) 2002 reporting period.[1]  This file contained 9,529,889 wage items, with a corresponding value of $60.4 billion dollars.[2]

- Analyzed the DECOR file to understand the trends among letters going to employees and employers.  For example, we reviewed the employee file to (1) rank the States in terms of the volume of items in the file, (2) identify duplicate addresses and multiple uses of the same SSNs, and (3) determine where employees for specific employers actually resided.

- We obtained State workforce data from SSA's website, compared this workforce data with other sources, and discussed the reliability of these numbers with SSA staff.

- Obtained copies of *Wage and Tax Statements* (Form W-2) from SSA's Office of Central Operations to determine employee addresses for wage items that were not part of our TY 2002 DECOR employee file.

---

[1] Although the majority of the DECOR file related to TY 2002 wages, some wages related to earlier tax years were also reported to SSA during the same period and placed in this file.  However, for the purposes of this report, we are referring to the DECOR file as a TY 2002 file.

[2] Earnings items identified as self-employment income for TY 2002 were not included in this population since self-employment data were contained in a separate file.

We found that DECOR data was sufficiently reliable to meet the objectives of our review.  Our work was conducted at SSA's Data Operations Center in Wilkes-Barre, Pennsylvania and at SSA Headquarters in Baltimore, Maryland.  The fieldwork was conducted between July 2004 and April 2005.  The SSA entity responsible for the maintenance of the ESF is the Office of Central Operations within the Office of the Deputy Commissioner of Operations.  Our review was conducted in accordance with generally accepted government auditing standards.

# Ranking of States by Suspended Wage Items and State Workforce

**Table D-1: Comparison of States Ranking
of Suspended Wages Items and National Workforce**
(Based on a Review of the Tax Year 2002 DECOR Employee File)

| States and District of Columbia[1] | Ranking in Terms of Wage Items | Percent of DECOR Notices | Ranking in Terms of State Workforce[2] | Percent of the National Workforce |
|---|---|---|---|---|
| CALIFORNIA | 1 | 29.66 | 1 | 11.01 |
| TEXAS | 2 | 9.64 | 2 | 6.97 |
| FLORIDA | 3 | 6.80 | 4 | 5.68 |
| ILLINOIS | 4 | 6.18 | 6 | 4.33 |
| NEW JERSEY | 5 | 3.99 | 9 | 3.14 |
| NEW YORK | 6 | 3.40 | 3 | 6.55 |
| ARIZONA | 7 | 3.35 | 21 | 1.77 |
| NORTH CAROLINA | 8 | 3.24 | 10 | 2.96 |
| WASHINGTON | 9 | 3.19 | 15 | 2.17 |
| GEORGIA | 10 | 3.00 | 11 | 2.95 |
| COLORADO | 11 | 2.45 | 22 | 1.59 |
| OREGON | 12 | 1.92 | 28 | 1.25 |
| MASSACHUSETTS | 13 | 1.85 | 13 | 2.27 |
| VIRGINIA | 14 | 1.73 | 12 | 2.73 |
| NEVADA | 15 | 1.40 | 35 | 0.73 |
| INDIANA | 16 | 1.25 | 14 | 2.30 |
| TENNESSEE | 17 | 1.21 | 17 | 2.07 |
| MICHIGAN | 18 | 1.19 | 8 | 3.65 |
| MINNESOTA | 19 | 1.13 | 20 | 1.99 |
| MARYLAND | 20 | 1.04 | 19 | 2.05 |
| UTAH | 21 | 1.00 | 34 | 0.80 |
| SOUTH CAROLINA | 22 | 0.99 | 24 | 1.43 |
| WISCONSIN | 23 | 0.94 | 16 | 2.12 |
| PENNSYLVANIA | 24 | 0.90 | 5 | 4.44 |
| OHIO | 25 | 0.87 | 7 | 3.95 |
| CONNECTICUT | 26 | 0.83 | 27 | 1.29 |
| OKLAHOMA | 27 | 0.82 | 29 | 1.20 |
| KANSAS | 28 | 0.72 | 31 | 1.03 |
| ALABAMA | 29 | 0.66 | 23 | 1.49 |
| MISSOURI | 30 | 0.57 | 18 | 2.04 |
| KENTUCKY | 31 | 0.51 | 25 | 1.41 |

| States [1] | Ranking in Terms of Wage Items | Percent of DECOR Notices | Ranking in Terms of State Workforce [2] | Percent of the National Workforce |
|---|---|---|---|---|
| NEW MEXICO | 32 | 0.47 | 37 | 0.60 |
| IDAHO | 33 | 0.45 | 41 | 0.47 |
| ARKANSAS | 34 | 0.36 | 32 | 0.92 |
| RHODE ISLAND | 35 | 0.34 | 43 | 0.40 |
| MISSISSIPPI | 36 | 0.30 | 33 | 0.92 |
| IOWA | 37 | 0.28 | 30 | 1.12 |
| NEBRASKA | 38 | 0.27 | 36 | 0.67 |
| LOUISIANA | 39 | 0.27 | 26 | 1.40 |
| DELAWARE | 40 | 0.18 | 45 | 0.32 |
| DISTRICT OF COLUMBIA | 41 | 0.16 | 49 | 0.24 |
| NEW HAMPSHIRE | 42 | 0.14 | 39 | 0.51 |
| WYOMING | 43 | 0.07 | 51 | 0.20 |
| WEST VIRGINIA | 44 | 0.05 | 38 | 0.58 |
| HAWAII | 45 | 0.05 | 42 | 0.45 |
| MAINE | 46 | 0.04 | 40 | 0.48 |
| ALASKA | 47 | 0.04 | 50 | 0.24 |
| MONTANA | 48 | 0.04 | 44 | 0.34 |
| SOUTH DAKOTA | 49 | 0.03 | 46 | 0.30 |
| VERMONT | 50 | 0.02 | 47 | 0.25 |
| NORTH DAKOTA | 51 | 0.02 | 48 | 0.24 |
| Totals [3] | | 100.0% | | 100.0% |

**Notes:** (1) Our analysis does not include DECOR letters sent to Guam, Puerto Rico, American Samoa, Virgin Islands, Marshall Islands, and overseas addresses related to the Armed Forces. A total of 4,397 letters related to these locations.

(2) State workforce statistics were taken from *State Statistics*, Office of Policy, SSA, December 2003, http://mwww.ba.ssa.gov/policy/docs/quickfacts/state_stats/.

(3) Percentages may not add to 100 percent due to rounding.

# Prior OIG Report Ranking of States by Total Suspended Wage Items

In prior Office of the Inspector General (OIG) reports[1] we identified the 100 employers responsible for sending the most wage items to the Earnings Suspense File (ESF) during specific Tax Years (TY).  We also identified the States represented by these employers, noting that this State address may relate more to payroll issues than the physical location where an employer does most of its business (see Table E-1).  For example, in our October 2004 audit covering TYs 1997 to 2001, we stated that 54 of the 100 employers had registered addresses in 3 States – California, Texas, and Illinois – representing almost 1.5 million wage items and over $4.8 billion in wages during TYs 1997 to 2001.  California, with 25 employers, had the highest number of Top 100 employers.

**Table E-1:  Ranking of States in Terms of Top 100 Employers and Total Suspended Wage Items**

| State | Employers Per State | Ranking By Items | Total Suspended Wage Items | Total Suspended Wages |
|-------|---------------------|------------------|----------------------------|-----------------------|
| CALIFORNIA | 25 | 1 | 682,506 | $1,992,526,035 |
| TEXAS | 15 | 2 | 401,167 | $1,693,153,169 |
| ILLINOIS | 14 | 3 | 376,731 | $1,177,333,106 |
| FLORIDA | 4 | 4 | 165,594 | $420,648,214 |
| NEW YORK | 2 | 5 | 102,601 | $536,922,065 |
| KENTUCKY | 3 | 6 | 100,452 | $360,311,159 |
| OHIO | 4 | 7 | 90,780 | $323,966,821 |
| GEORGIA | 3 | 8 | 84,025 | $352,544,591 |
| MINNESOTA | 3 | 9 | 83,835 | $362,464,910 |
| MICHIGAN | 2 | 10 | 81,439 | $286,958,774 |
| NEW JERSEY | 3 | 11 | 77,993 | $169,914,341 |
| SOUTH CAROLINA | 2 | 12 | 68,731 | $285,456,146 |
| OKLAHOMA | 1 | 13 | 43,375 | $117,983,189 |
| TENNESSEE | 2 | 14 | 41,282 | $176,646,164 |
| NEW MEXICO | 1 | 15 | 36,455 | $147,551,907 |

---

[1] SSA OIG, *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items* (A-03-98-31009), September 1999; *Follow-Up Review of Employers with the Most Suspended Wage Items* (A-03-03-13026), October 2003; and *Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001*(A-03-03-13048), October 2004.

| State | Employers Per State | Ranking By Items | Total Suspended Wage Items | Total Suspended Wages |
|---|---|---|---|---|
| KANSAS | 2 | 16 | 35,130 | $161,259,665 |
| WISCONSIN | 2 | 17 | 34,575 | $118,018,390 |
| WASHINGTON | 2 | 18 | 31,651 | $92,689,767 |
| ARIZONA | 2 | 19 | 29,867 | $47,460,216 |
| LOUISIANA | 1 | 20 | 25,175 | $92,689,698 |
| UTAH | 1 | 21 | 24,827 | $67,498,582 |
| ARKANSAS | 1 | 22 | 24,780 | $92,649,911 |
| NEBRASKA | 1 | 23 | 18,852 | $197,524,222 |
| IOWA | 1 | 24 | 18,311 | $112,317,486 |
| OREGON | 1 | 25 | 18,228 | $68,088,754 |
| COLORADO | 1 | 26 | 15,162 | $65,223,596 |
| NORTH CAROLNA | 1 | 27 | 14,838 | $51,128,279 |
| TOTALS | 100 | | 2,728,362 | $9,570,929,156 |

*Appendix F*

# Additional Analysis on the Decentralized Correspondence Employer File

We performed further analysis of the Decentralized Correspondence (DECOR) employer file to identify any problematic trends among the employers.  In particular, we wanted to determine the volume of DECOR letters going to individual employers.

## VOLUME OF NOTICES MAILED TO INDIVIDUAL EMPLOYERS

We reviewed 5,164 employers listed in the DECOR employer file that had 200 or more items combined in both the Employer and Employee DECOR files.  Our review indicates that some employers have a significant volume of wage items with an incomplete/incorrect address.  As a result, the Social Security Administration (SSA) has mailed individual employers thousands of pieces of mail.  For example, SSA mailed 95 employers more than 1,000 letters each (see Table F-1).  One employer, a staffing company with a payroll address in the State of New York, received 13,954 letters from SSA.[1]

**Table F-1:  Volume of DECOR Letters Mailed to Employers**
**(Among Employers with 200 or More Items in Suspense and**
**at Least 1 Item in the DECOR Employer File)**

| Number of DECOR Letters Per Employer | Number of Employers | Total Number of DECOR Letters Mailed | Associated Wages |
|---|---|---|---|
| **Greater than 1,001** | 95 | 184,876 | $770 million |
| **501 up to 1,000** | 204 | 138,357 | 510 million |
| **101 up to 500** | 1,411 | 300,664 | 1,150 million |
| **1 to 100** | 3,454 | 153,322 | 797 million |
| **Total** | **5,164** | **777,219** | **$3,227 million** |

While the percent of employers receiving a large volume of letters is small, these employers represent a large number of the letters being mailed.  Furthermore, these incorrect addresses also represent a missed opportunity to contact wage earners.

---

[1] We contacted the Employer Service Liaison Officer for Region II (New York) and determined that this employer is currently participating in the Social Security Number Verification System (SSNVS) program.  SSNVS is an on-line service that enables employers and submitters to verify employee names and SSNs with information in SSA's records for the W-2 reporting purposes.  SSNVS was first piloted in March 2003 and was made available to the entire nation in June 2005.

## DOUBLE NOTIFICATION OF SUSPENDED WAGE ITEMS

In addition to the DECOR letters, SSA also sends educational correspondence (EDCOR) to employers who submit W-2s containing name and/or Social Security number (SSN) information that does not agree with SSA's records. EDCOR notices list up to 500 SSNs but do not provide names. SSA requests that employers file corrected W-2(s) to correct the error(s). As a result, employers may receive both DECOR and EDCOR letters from SSA. Criteria for sending these notices are shown in Table F-2.

**Table F-2: SSA's Criteria for Sending EDCOR Notices**

| | |
|---|---|
| **2003** **and later years** (*Tax Year 2002 and later*) | Notices were sent to employers who submitted a wage report containing more than 10 W-2s that SSA could not process, and the mismatched forms represented more than .5 percent of the total W-2s in the report. |
| **2002** (*Tax Year 2001*) | Notices were sent to employers who submitted a wage report where the name and/or SSN on even one W-2 did not agree with SSA's records. (The decision to send a letter to every employer with even one "no match" was made in May 2000.) |
| **2001** **and prior years** (*Tax Year 2000 and prior*) | Notices were sent to employers who submitted a wage report containing more than 10 W-2s that SSA could not process, and the mismatched forms represented more than 10 percent of the total W-2s in the report. |

We identified the 10 employers who received the highest volume of notices related to the entire TY 2002 DECOR file and found that all 10 would have also received an EDCOR notice from SSA. As a result, the staffing company we mentioned earlier would receive 13,955 letters from SSA – 13,954 DECOR notices and 1 EDCOR notice.[2] Our July 2002 audit of the DECOR process recommended that SSA review methods for eliminating this duplication.[3] We made this recommendation at a time when SSA was sending EDCOR notices to every employer, regardless of the number of wage items in suspense. SSA has since restricted its EDCOR notices to a specific threshold (as shown in Table F-2). Nonetheless, our current review still indicates that an opportunity may exist to reduce some of the duplication.

---

[2] The EDCOR notice would only disclose 500 specific SSNs with no additional identifying information. However, SSA does have the ability to provide all of the data related to the suspended wages if the employer contacts the local Employer Service Liaison Officer.

[3] SSA OIG, *Effectiveness of the Social Security Administration's Decentralized Correspondence Process* (A-03-01-11034), July 2002.

*Appendix G*

# Agency Comments



# SOCIAL SECURITY

**MEMORANDUM**

**Date:** September 23, 2005                                    **Refer To:** S1J-3

**To:** Patrick P. O'Carroll, Jr.
Inspector General

**From:** Larry W. Dye /s/
Chief of Staff

**Subject:** Office of the Inspector General (OIG) Draft Report, "Usefulness of Decentralized Correspondence in Focusing Employer-Assistance Activities" Revised Agency Response (A-03-05-25007)--INFORMATION

We appreciate OIG's concern related to our previous comments to the subject report. We have reevaluated our response and have attached our revised comments on the draft report's recommendations. Please disregard our previous response.

Please let me know if you have any questions. Staff inquiries may be directed to Candace Skurnik, Director, Audit Management and Liaison Staff, at extension 54636.

Attachment:
SSA Response

COMMENTS ON THE OFFICE OF THE INSPECTOR GENERAL'S (OIG) DRAFT
REPORT, "USEFULNESS OF DECENTRALIZED CORRESPONDENCE (DECOR) IN
FOCUSING EMPLOYER-ASSISTANCE ACTIVITIES" (A-03-05-25007)

Thank you for the opportunity to review and provide comments on this draft report. The Social
Security Administration (SSA) shares OIG's concern about wage reports with name/Social
Security number (SSN) mismatches. The SSA Employer Services Liaison Officers (ESLO)
perform an important service educating the employer community to improve the wage reporting
process.

While SSA has the ESLOs contact employers who have 100 items or more in suspense each tax
year, SSA does not have any enforcement or sanction authority to apply against those employers.
This authority resides with the Internal Revenue Service (IRS). We defer to the IRS with regard
to the effectiveness of employer sanctions.

Additionally, concerning the finding of incomplete or outdated addresses for employees, the
report should note that the Agency only has the ability to send DECOR notices to the address
that is provided by the employer via the wage and tax statement (Form W-2).

## Recommendation 1

Consider using addresses in the DECOR employee file to enhance coordination among ESLOs
when the employer wage reporting problems relate to multiple regions around the country.

## Comment

We agree to consider using addresses in the DECOR employee file as a means to enhance
coordination among ESLOs when employer wage reporting problems relate to multiple regions
around the country. While the DECOR addresses point to common geographic areas that are a
work source for those mismatched individuals, the wage reporting problem, and the employer's
responsibility set by IRS for accurate wage reporting, rests at the location that administers
employee intake procedures and payroll, regardless of where the employee resides. Coordination
among ESLOs has been in place to provide support in determining the wage reporting
administrative location of an employer.

To assist the ESLOs in coordinating employer wage reporting problems, SSA implemented the
Wage Reporting Problem Service (WRPS) nationally in 2003. The WRPS coordinates the
efforts of ESLOs in reporting and resolving wage reporting problems throughout the country. If
an employer in a particular State has a wage reporting problem for a given year, that information
is captured on the WRPS and is available for ESLOs in all SSA regions to view for status.
ESLOs also have the ability of transferring employer wage problems to another ESLO whose
region has jurisdiction of that employer. The WRPS accepts referrals of potential wage reporting
problems from SSA employees in the SSA field offices, teleservice centers, processing service
centers, and regional offices. WRPS sends the referral to the ESLO in the regional office that
services the postal zip code of that employer.

DECOR is a national effort rather than a geographically-based effort. Employers are advised to
contact the ESLO parallel to their payroll/tax or human resource office(s) for assistance with

DECOR and, in addition, to learn how to verify employee taxpayer identification information (name and SSN) to prevent suspense items. The example cited on page 3 of the draft report of the Dallas contact where the employees worked in California but the employer is headquartered in Texas, occurs commonly in all regions. Large corporations do not confine themselves to SSA's regional boundaries; however, the place where the employee worked is not material when mailing DECOR notices.

## Recommendation 2

Consider using addresses in the DECOR employee file to identify relevant trends among employees with suspended wages and focus ESLO efforts.

## Comment

We agree to consider using addresses in the DECOR employee file as means to identify trends among employees and employers. Employee address information in itself will not help focus ESLO outreach efforts since the appropriate contact is with the employer who submits the wage reports. A more effective approach is ESLO review of the Earnings Suspense File to identify employers who have reporting problems that need to be addressed. ESLO experience has been that educational outreach is not a strong motivator for change with employers who have found their current wage reporting methods meet their needs without fear of any retribution.

Additionally, the DECOR file currently does not provide the functionality required to support the recommended analysis. Implementation of this recommendation will likely require the development of data mining and analytical tools to provide trend analyses to the ESLOs. This would require a new initiative to be considered in conjunction with other wage-related software development initiatives and prioritized for submission to the Agency's Information Advisory Board accordingly.

In the meantime, the ESLOs will continue to work with problem reporters, promoting the use of existing tools including Electronic Wage Reporting, AccuWage and Social Security Number Verification Service to facilitate improved reporting.

## Recommendation 3

Review and correct the earnings record of the child noted in this report, as well as the earnings records related to the remaining 10 valid SSNs misused more than 400 times.

## Comment

We agree. We are taking the necessary corrective actions on the records with problems identified by OIG.


[SSA also provided a technical comment which has been addressed, where appropriate, in this report.]

*Appendix H*

# OIG Contacts and Staff Acknowledgments

## *OIG Contacts*

Walter Bayer, Director, Philadelphia Audit Division, (215) 597-4080

Cylinda McCloud-Keal, Audit Manager, (215) 597-0572

## *Acknowledgments*

In addition to those named above:

Frank Trzaska, Auditor-in-Charge

Rich Devers, Information Technology Specialist

Annette DeRito, Writer/Editor

For additional copies of this report, please visit our web site at www.socialsecurity.gov/oig or contact the Office of the Inspector General's Public Affairs Specialist at (410) 965-3218.  Refer to Common Identification Number A-03-05-25007.

# DISTRIBUTION SCHEDULE

Commissioner of Social Security

Office of Management and Budget, Income Maintenance Branch

Chairman and Ranking Member, Committee on Ways and Means

Chief of Staff, Committee on Ways and Means

Chairman and Ranking Minority Member, Subcommittee on Social Security

Majority and Minority Staff Director, Subcommittee on Social Security

Chairman and Ranking Minority Member, Subcommittee on Human Resources

Chairman and Ranking Minority Member, Committee on Budget, House of Representatives

Chairman and Ranking Minority Member, Committee on Government Reform and Oversight

Chairman and Ranking Minority Member, Committee on Governmental Affairs

Chairman and Ranking Minority Member, Committee on Appropriations, House of Representatives

Chairman and Ranking Minority, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations,
   House of Representatives

Chairman and Ranking Minority Member, Committee on Appropriations, U.S. Senate

Chairman and Ranking Minority Member, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, U.S. Senate

Chairman and Ranking Minority Member, Committee on Finance

Chairman and Ranking Minority Member, Subcommittee on Social Security and Family Policy

Chairman and Ranking Minority Member, Senate Special Committee on Aging

Social Security Advisory Board

# Overview of the Office of the Inspector General

The Office of the Inspector General (OIG) is comprised of our Office of Investigations (OI), Office of Audit (OA), Office of the Chief Counsel to the Inspector General (OCCIG), and Office of Executive Operations (OEO).  To ensure compliance with policies and procedures, internal controls, and professional standards, we also have a comprehensive Professional Responsibility and Quality Assurance program.

## Office of Audit

OA conducts and/or supervises financial and performance audits of the Social Security Administration's (SSA) programs and operations and makes recommendations to ensure program objectives are achieved effectively and efficiently.  Financial audits assess whether SSA's financial statements fairly present SSA's financial position, results of operations, and cash flow.  Performance audits review the economy, efficiency, and effectiveness of SSA's programs and operations.  OA also conducts short-term management and program evaluations and projects on issues of concern to SSA, Congress, and the general public.

## Office of Investigations

OI conducts and coordinates investigative activity related to fraud, waste, abuse, and mismanagement in SSA programs and operations.  This includes wrongdoing by applicants, beneficiaries, contractors, third parties, or SSA employees performing their official duties.  This office serves as OIG liaison to the Department of Justice on all matters relating to the investigations of SSA programs and personnel.  OI also conducts joint investigations with other Federal, State, and local law enforcement agencies.

## Office of the Chief Counsel to the Inspector General

OCCIG provides independent legal advice and counsel to the IG on various matters, including statutes, regulations, legislation, and policy directives.  OCCIG also advises the IG on investigative procedures and techniques, as well as on legal implications and conclusions to be drawn from audit and investigative material.  Finally, OCCIG administers the Civil Monetary Penalty program.

## Office of Executive Operations

OEO supports OIG by providing information resource management and systems security.  OEO also coordinates OIG's budget, procurement, telecommunications, facilities, and human resources.  In addition, OEO is the focal point for OIG's strategic planning function and the development and implementation of performance measures required by the Government Performance and Results Act of 1993.

# EXHIBIT I

WESTERN GROWERS
™
*Fresh produce from our families to yours.*

August 11, 2006

**VIA ELECTRONIC MAIL AND U.S. MAIL**

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

> Re:  **Docket No. ICEB-2006-0004**
> **Safe Harbor Procedures for Employers Who Receive a No-Match Letter**
> **(FR 71:114, p. 34281)**

To Whom It May Concern:

Attached for your consideration are comments on the proposed regulations from Western Growers, an agricultural trade association that represents the California and Arizona fresh fruit, vegetable and nut industry.

Please contact me at (949) 863-1000 or at 17620 Fitch Street, Irvine, CA 92614 if you have any questions about our comments.

Sincerely,

Jasper E. Hempel
Executive Vice President,
General Counsel

---

COMMENTS OF

**WESTERN GROWERS**

In Response To

**DEPARTMENT OF HOMELAND SECURITY**

Proposed Regulation On

**Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**

**8 CFR Part 274a**

**[RIN 1653-AA50]**

**ICE 2377-06**

**DHS Docket No. ICEB-2006-0004**

**Introduction**

Western Growers respectfully but strongly objects to adoption of the proposed so-called "safe-harbor procedure" regulation that imposes a constructive knowledge standard on employers who receive Social Security "No-Match" letters. Without Congress first enacting comprehensive immigration reform that contains and implements a workable and legal guest worker program, the proposed rule is potentially devastating and ruinous to California and Arizona fresh fruit, vegetable and nut growers, packers, shippers and processors.

In our opinion, the proposed rule is ill-conceived, puts California and Arizona farmers in further jeopardy of discrimination lawsuits, does not acknowledge that enhanced border security and enforcement is already resulting in labor and crop shortages and is irrationally punitive to the United States agricultural sector.

**Western Growers**

Western Growers is an agricultural trade association whose almost 3,000 members grow, pack and ship 90 percent of the fresh vegetables and nearly 70 percent of the fresh fruit and nuts grown in Arizona and California, about one-half of the nation's fresh produce. Western Growers members grow the best medicine in the world – fresh fruits, vegetables, and nuts.

Western Growers is a member of the Agricultural Coalition for Immigration Reform (ACIR) and the National Coalition of Agricultural Employers (NCAE). Both are large national coalitions of agricultural employers who support comprehensive immigration reform and who have filed separate, more legally oriented comments on the proposed regulations. Western Growers is also a signatory to those comments and those comments are incorporated herein. Western Growers will focus here on more general impacts of the proposed regulations on its members.

Western Growers, ACIR and NCAE strongly support AgJOBS, which is included in the Senate's Comprehensive Immigration Reform package, and reform of the H-2A temporary agricultural worker program which currently is inaccessible to most farmers in California and Arizona. We also support an earned adjustment of status for experienced agricultural workers currently employed in agriculture. These experienced farm workers are necessary to maintain current levels of agricultural production.

To help our members stay competitive in an increasingly fierce global marketplace, Western Growers provides a host of services on which our members rely, including representation in government affairs; communications and media relations; and international trade and transportation services, just to name a very few.

One of our services, for example, is offered by our affiliated Western Growers Assurance Trust (WGAT). WGAT is the largest provider of health benefits for the fresh produce industry offering a variety of health care, dental, vision service and life insurance plans to fresh produce farmers, their employees, and others affiliated with the agriculture industry. Today, more than 100,000 farm employees and their dependents receive employer sponsored health benefits through WGAT. For over 30 years WGAT has contracted directly with doctors, dentists, pharmacies and hospitals in Mexico to provide seasonal farmworkers with access to healthcare in Mexico. This benefit may be jeopardized if the proposed rule is implemented.

A Western Growers core belief is that the U.S. economy needs additional workers to do many of the jobs that U.S. workers will not do and especially in agriculture. It is beyond dispute that Americans do not raise their children to perform farm labor or otherwise work in the fields, vineyards, and orchards of our country's farms.

The reality is that Western Growers members just do not have enough agricultural workers today (See Crop and Labor Loss section below) and the adoption of the proposed regulation will only exacerbate the situation and drive more farmers out of business or out of the United States.

The simple fact is: our crops are going to be harvested by foreign workers. The only issue is whether or not the harvesting occurs in the United States where our economy will benefit from the 3.5 jobs created upstream and downstream for every farmworker job, or whether another country will reap those economic benefits.

Comprehensive immigration reform that contains a reliable, legal guest worker program must be established so that workers can come legally to our country and become legally employed in jobs where there are insufficient domestic workers to do the job. Until then, this proposed rule must not be adopted.

## Legal Impact on Arizona and California Fresh Produce Sector by Proposed Regulation

Today, under the Immigration Reform and Control Act of 1986 [IRCA] and Illegal Immigration Reform and Immigrant Responsibility Act of 1996 [IIRIRA], if a prospective employee presents identity and work authorization documents that appear valid on their face, the agricultural employer must accept those documents without further investigation or risk being sued for discrimination and bias.

The proposed regulation puts too much responsibility on employers to

distinguish genuine identity papers, such as birth certificates and Social Security cards, from sophisticated forgeries readily available for nominal cost across the border.

Current immigration law requires the employer try to resolve a social security mismatch when a No-Match Letter is received. But, a U.S. Department of Justice regulation states the letter is not proof of illegality and that the employee cannot be fired solely because of a no-match letter. The proposed rule turns that regulation upside down.

In our opinion, the proposed regulation would create a presumption of illegal status when the employer gets a mismatch letter. If the employer doesn't resolve the mismatch in 60 days, the employer must fire the employee or risk prosecution for knowingly hiring an illegal immigrant.

Penalties for failing to resolve the mismatch include civil fines and criminal prosecution on either felony or misdemeanor charges, depending upon the frequency of violations by the employer.

But, if the regulation is passed, trying to resolve the mismatch also places Arizona and California farmers in the "Catch-22" situation of being sued for discrimination. The most recent example of this real dilemma can be found in the case of *Zamora v. Elite Logistics, Inc.*, (No. 4-3205) (10th Cir., June 6, 2006), in which the employer is required to go to trial because the employer tried to verify legal status of a Hispanic employee.

The proposed regulation affects all employers but it would have a most devastating effect on California and Arizona agriculture, where an estimated 50 to 80 percent of the workers who harvest fruit, vegetables and other crops are illegal immigrants. We hasten to add that our employers are not now knowingly hiring illegal immigrants because they do comply with IRCA and all other existing law.

In our opinion, mere adoption of this proposed regulation without a guest-worker program in place will immediately cut off any hope of our members hiring agricultural employees, putting agricultural employers out of business, forcing operations to Mexico and other foreign countries and thereby increasing our dependence on other countries for our food supply.

First passing and implementing comprehensive immigration reform that includes a reliable and legal guest worker program, where guest workers would be provided a counterfeit-proof ID card, in our opinion, solves the Social Security no-match issue far better than this proposed rule.

**Enforcement is Already Working:    Labor and Crop Shortages are Accelerating and Farmers Are Moving Out of Country Because of  Failure of Immigration Reform and Labor Shortages**

Western Growers members are reporting labor shortages in increasing numbers throughout California and Arizona due in part to the ever tightening enforcement of the Southwest border. If our farmers cannot obtain an adequate labor supply, they will be forced to go out of business and sell their farms to developers, or alternatively, they will move their production to Mexico or other countries where those willing to do agricultural work are plentiful. The marketplace has dictated that production must be moved out of the United States where there is insufficient harvest labor.

Western Growers is currently conducting a member labor and crop loss survey. The partial responses initially reflect that California and Arizona Western Growers members have already incurred crop losses of $4,954,000 to date resulting from labor shortages caused by increased border enforcement and failure to enact immigration reform.

More alarming, perhaps, is the fact that the partial survey results show that WG members have moved 12,255 acres of high value fruit and vegetable production to Mexico over the past couple of years.  This means that additional tens to hundreds of millions dollar in crop value have moved to Mexico in addition to countless on and off- farm jobs.  The trend continues with a couple of members reporting that they plan to move 1400 acres to Mexico within the year. Anecdotal information from Yuma, Arizona shows that less vegetable acreage is being leased in the Yuma area than ever before with reports that acreage is being replaced in Mexico.

Consumers and, therefore, supermarkets and food service vendors demand a year round supply of the highest quality fresh fruits, nuts and vegetables. It is unacceptable for the producer to fail to deliver these products to market because of a shortage of harvest labor. If the supermarket or food service vendor cannot obtain domestically grown fresh produce when it needs it, they will buy that produce from Mexico, China, Chile or any other country that will provide that supply.

As we move crop production out of the United States and as we import more produce, the United States will become increasingly dependent on foreign nations for its food. We will then be as dependent on foreign food as we are now dependent on other countries for oil.

In our very strong opinion, maintaining a safe, healthy and abundant domestic supply of fresh fruits, nuts and vegetables is a national security imperative that cannot be ignored.  The proposed regulations, we believe, will hasten the departure to other countries of our domestically grown fresh fruits,

vegetables and nuts.

**Conclusion**

As stated at the outset, Western Growers respectfully but strongly objects to the adoption of the proposed regulations.     Adoption of the proposed regulations now, we fervently believe, could put the Arizona and California fresh produce sector out of business, a result that no one wants - not the President, not the Department of Homeland Security, not Congress, not American consumers or Western Growers members.

Western Growers implores the Department of Homeland Security to not pursue the proposed regulations until comprehensive immigration reform that includes a guest worker program has been passed by Congress, signed by the President and regulations implementing comprehensive immigration reform have been adopted.  Thank you for your consideration.

EXHIBIT J

August 14, 2006

<u>**VIA ELECTRONIC MAIL AND U.S. MAIL**</u>

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

      **Re:**    **Docket No. ICEB-2006-0004**
              **Safe Harbor Procedures for Employers Who Receive a No-Match Letter**
              **(FR 71:114, p. 34281)**

To Whom It May Concern:

      The National Council of Agricultural Employers ("NCAE") and the undersigned agricultural organizations hereby submit these comments on the Bureau of Immigration and Customs Enforcement, Department of Homeland Security's ("DHS") Proposed Rule regarding "no-match" letters published in the *Federal Register* on June 14, 2006 (71 *Federal Register* 34281).

      NCAE is a national association based in Washington, D.C. that represents growers and agricultural organizations on agricultural labor, employment and immigration issues. Formed as a non-profit organization in 1964, NCAE represents the agricultural industry's interests before Congress and federal agencies on critical farm labor and immigration issues. NCAE's membership includes agricultural employers with operations in all 50 states that hire the vast majority of the national labor-intensive agricultural workforce.

      NCAE represents the interests of the agricultural industry nationally on federal public policy issues with respect to immigration, and NCAE was actively engaged in the legislative and regulatory process that preceded and followed the enactment of the Immigration Reform and Control Act of 1986 and Illegal Immigration Reform and Immigrant Responsibility Act of 1996. Currently, it is actively engaged in promoting comprehensive immigration reform, including proposals that would ensure American agriculture a legal workforce. Because NCAE members employ a largely alien workforce, they regularly face confusing, "Catch-22"-type situations regarding no-match letters. Thus, NCAE and its membership have an interest in, and would be affected by, the above-referenced Proposed Rule. Following are NCAE's comments to the DHS Proposed Rule.

**Overview and Recommendation**

Federal law governing the employment of persons authorized to work in the U.S. is broken. The employer sanctions provisions of the Immigration Reform And Control Act of 1986 ("IRCA") that attempted to eliminate the job magnet for undocumented aliens failed because Congress did not provide a means by which employers effectively could screen out fraudulent documents.[1] IRCA also failed to provide legal channels through a workable guest worker program by which employers could obtain legal alien workers when U.S. workers were unavailable. Ironically, IRCA was successful in one regard. It provided an effective anti-discrimination provision that subjected vigilant employers to litigation if they did not comply with the complex hiring provisions of the new employer sanctions law.

In 1996, Congress again failed to take steps to make employers sanctions work. While it enacted a pilot electronic verification program in order to screen out fraudulent employment authorization documents through the use of Social Security Administration ("SSA") and Immigration and Nationality Services ("INS") databases, the program was voluntary in nature. Moreover, Congress again failed to provide workable guest worker programs and legal avenues for employers to obtain alien workers when shortages of U.S. workers existed.

In the midst of congressional failure to stem the flow of illegal workers, SSA began issuing SSA mismatch letters on a regular basis in approximately 1993. In communications to employers, the SSA indicated to employers that no-match letters were limited to correction of Social Security accounts for the benefit of workers without any reference to immigration-related requirements of the letters. Given the failures of Congress to enact legislation that effectively controls undocumented workers, the SSA mismatch letter has evolved to the point where it has now become the centerpiece of employer sanctions enforcement, as evidenced by DHS' proposed no-match rule. NCAE believes the use of the SSA no-match letter for immigration purposes is premature and represents an unwise approach from both a legal and practical perspective.

NCAE believes that there is a distinction between a SSA no-match letter and a no-match letter issued by DHS after an audit of an employer's I-9 Forms and related documents. Clearly, DHS has the legal authority to inform employers of no-matches based on DHS' review of its own databases and to undertake compliance action based upon the employer's alleged constructive knowledge if the employer fails to take corrective action after receiving notice from DHS. The comments in this letter generally relate to the Proposed Rule's inclusion of SSA no-match letters.

**The Experience of Agricultural Employers with No-Match Letters**

For over ten years, agricultural employers have received Social Security mismatch letters. The subject of mismatch letters presents extremely confusing legal and practical issues for

---

[1] 8 U.S.C. § 1324a.

Docket No. ICEB-2006-0004
August 14, 2006
Page 3 of 14

employers, particularly agricultural employers, who employ a large number of aliens. Immigration and employment lawyers are not in agreement as to whether mismatch letters impose immigration compliance obligations. Moreover, government officials and private sector attorneys often reach vastly different conclusions on this subject. Disagreement and confusion are rampant and well-intended employers are left without a clear understanding of their compliance responsibilities.

NCAE members have had substantial concerns regarding whether mismatch letters put them on notice that they may be in violation of the employment authorization provisions of the immigration law, since the Social Security card is one of the most commonly used employment authorization documents. Some lawyers have taken the position that the federal Privacy Act prohibits the use of no-match letters by employers for immigration purposes. Given the high level of confusion surrounding mismatch letters, it is imperative that "bright line" rules be provided to employers regarding their legitimate obligations.

To the extent that the Proposed Rule attempts to clarify the process regarding mismatch letters, DHS' efforts should be commended. As described more fully below, however, NCAE submits that the Proposed Rule is plagued by substantial legal, jurisdictional and practical problems that can only be fixed through legislation. At a minimum, consideration of the Proposed Rule should be deferred until Congress completes its work on comprehensive immigration reform.

**No-Match Letter Policy Changes Should Be Made Through the Legislative Process**

NCAE submits that the Proposed Rule is premature, inasmuch as Congress is in the process of attempting to pass comprehensive immigration reform that should address the SSA no-match issue. The House of Representatives has passed a worksite enforcement bill (H.R. 4437) and the Senate (S. 2611) a comprehensive bill that includes enforcement, guest worker, earned adjustment of status provisions for businesses, as well as the Agricultural Job Opportunities, Benefits, and Security Act ("AgJOBS") H-2A reform and earned adjustment provisions for agricultural employers. These bills address both employer sanctions provisions, and to a lesser extent, SSA responsibilities. NCAE believes that it is preferable for Congress, through legislation, to address the interrelationship between the SSA mismatch issue, immigration compliance and national origin and citizenship status discrimination lawsuits in order to provide employers a "bright line" for compliance.

As discussed more fully below, a regulatory proposal cannot effectively address the conflicting compliance challenges posed by the SSA no-match issue. DHS' well-intended but piecemeal approach would lead to extraordinary confusion and litigation by worker rights organizations and others challenging employer refusals to hire and terminations based on the proposed no-match rule. This would ultimately increase employers' administrative challenges and exposure to liability. Accordingly, it is critical that Congress address the SSA no-match issue in the context of comprehensive immigration reform. NCAE members, who strive to

Docket No. ICEB-2006-0004
August 14, 2006
Page 4 of 14

comply with conflicting compliance obligations in the immigration and employment realms, would benefit tremendously from the "bright line" guidance of comprehensive legislative reform.

**Substantial Legal and Jurisdictional Problems Warrant Deferral of the Proposed Rule**

*Federal Privacy Act Issues*

SSA has encouraged employers to verify the Social Security numbers of persons they employ and to use its Employee Verification Service ("EVS") in doing so. SSA makes clear in its written communications to employers that the Federal Privacy Act[2] prohibits the use of the information received from SSA regarding employee names and Social Security numbers "for a purpose other than that for which it was requested" and that persons who violate this prohibition are subject to fines and imprisonment. SSA communications also indicate that SSA will verify the names and numbers of applicants or employees to ensure that the records are correct solely for the purpose of my completing Internal Revenue Service ("IRS") Forms W-2 (Wage and Tax Statement).[3] There is no reference to any purpose related to immigration compliance, notwithstanding the fact that the Social Security card is one of the most commonly used work authorization documents.

According to DHS Secretary Michael Chertoff, DHS is seeking to implement a regulation designed to provide employers with "the necessary tools to increase the likelihood that they are [only] employing" authorized workers, and also will help DHS identify employers acting in blatant disregard of immigration laws.[4] While NCAE supports the Secretary's desire to ensure compliance with our immigration laws, over which he has jurisdiction, there nonetheless is concern regarding the agency's ability to do through use of SSA no-match letters or information that SSA otherwise provides to employers regarding the validity of Social Security number information.

The privacy protections attending the Social Security card are so important that other federal agencies, such as DHS, are not permitted to have access to such information. This is recognized in this year's Senate-passed immigration reform legislation, S. 2611, Title III, Section 301(e)(1). The Senate bill authorizes SSA to disclose to DHS, upon written request by the Secretary of Homeland Security, the identity of employers who submit more than 100 "mismatches" or more than 10 duplicate Social Security numbers. Without such legislative authorization, the Privacy Act would prohibit disclosure of such information.

---

[2] 8 U.S.C. § 552a(I).

[3] *See, e.g.*, "Employee Verification Service (EVS) Verification of Names and Social Security Numbers," November 2002 (Updated in 2006), page 4, Social Security Administration, ICN: 43700.

[4] *See* DHS Press Release available at http://www.dhs.gov/dhspublic/display?them=43&content=5684&print=true.

Docket No. ICEB-2006-0004
August 14, 2006
Page 5 of 14

Given the warnings provided to employers by SSA regarding the Privacy Act limitations on the usage of SSA no-match information, as well as the limitations on access to such information imposed on other government agencies, NCAE is concerned the DHS' Proposed Rule ignores these limitations and ultimately will result in litigation.  Rather than achieving the clarity and regulatory guidance in this complex area that employers seek, it is likely that it would have the opposite effect by fostering lawsuits and further adding to the confusion that exists in the employer community.

NCAE's concerns in this regard are highlighted by the fact that SSA publications regarding no-match letters inform employees that a no-match letter "does not make any statement about an employee's immigration status and is not a basis, in and of itself, for taking any adverse action against an employee.  Doing so could subject you to anti-discrimination or labor law sanctions."[5]

*Discrimination Lawsuits*

The Proposed Rule also cannot eliminate through the regulatory process potential discrimination lawsuits that employers that comply with the rule may face based on the provisions of other federal laws.  The anti-discrimination provisions of Title VII of the Civil Rights Act of 1964[6] ("Title VII") and the anti-discrimination provisions of IRCA,[7] as well as State anti-discrimination laws, pose a real threat to employers that terminate or refuse to hire workers based on SSA no-match letters.   DHS' Proposed Rule will force employers to refuse to hire or to terminate job applicants and employees if, after following the compliance procedures, the documents that they provided cannot be verified under the SSA or DHS databases.  It is precisely because of these types of adverse employment decisions in the context of the employment verification process that employers have been sued for discrimination.

Discrimination actions under IRCA are particularly troublesome to agricultural employers, who are put in a "Catch-22" position by conflicting obligations.  By way of explanation, two essential components of IRCA are employers' obligation to comply with the employment eligibility requirements of the law and face sanctions if they do not, and provisions prohibiting unfair immigration-related employment practices based on citizenship status and national origin.  After the enactment of IRCA, agricultural organizations throughout the U.S. conducted extensive compliance programs for employers, informing them of their obligations under these new laws.  Such programs sometimes were conducted with the participation of lawyers from the then Immigration and Naturalization Service and the Department of Justice's Office of Special Counsel for Immigration Related Unfair Employment Practices ("OSC").

---

[5] "Employer Reporting Instructions & Information, Social Security Number Verification, Restrictions on Using SSNVS," 2005, Social Security Online, www.ssa.gov/employer/ssnvrestrict htm

[6] 42 U.S.C. § 2000e-2.

[7] 8 U.S.C. § 1324b.

Docket No. ICEB-2006-0004
August 14, 2006
Page 6 of 14

Unfortunately, lawyers from these agencies with very distinct missions often would not agree as to what employer compliance obligations were, given the tension created by one component that encouraged vigilant review of work eligibility documents and another that stressed that employers face discrimination charges if they were too aggressive in evaluating the documents presented during the work authorization process.

The result of these competing provisions of the law was a lack of compliance clarity for the employer community and exposure to discrimination lawsuits and government actions. During the past 20 years, more agricultural employers have been charged with discrimination under IRCA for being overly zealous in complying with the employment eligibility requirements, than employers charged with violating the employer sanctions provisions. Well-intended employers have been caught in the jaws of an IRCA Catch-22 situation as a result.

NCAE recognizes that DHS' proposed safe harbor provision of the Proposed Rule is intended to insulate employers from liability related to employment eligibility compliance; however, as a DHS-issued rule, it lacks the authority to provide similar protection against discrimination lawsuits brought under Title VII of the Civil Rights Act or the unfair immigration-related employment practice provisions of IRCA and other federal and state laws. NCAE questions whether the Proposed Rule's mere statement that employers that follow the Proposed Rule will be protected from liability under 274B(a)(6) of the INA, the anti-discrimination provision of IRCA that is enforced by the Office of Special Counsel within the Department of Justice, will in fact protect employers from suits under that provision.

Several examples illustrate the dangers employers would face from following the Proposed Rule with regard to federal discrimination law. A decision recently issued by the U. S. Court of Appeals for the Tenth Circuit in *Zamora v. Elite Logistics, Inc.,* (No. 04-3205) (10th Cir. June 6, 2006), highlights the treacherous path employers tread when they engage in post-hiring verification of Social Security cards of employees, once the validity of the card has been called into question. The court in *Zamora* reversed a grant summary judgment for the employer in a Title VII discrimination claim based on race or national origin. The case involved circumstances in which an employer followed up on information it received in auditing its I-9 Forms that the plaintiff, who had satisfied the employment verification requirements when initially hired, had a Social Security number that had been used by another person on three different occasions in another state. The employer's effort to verify the validity of plaintiff's Social Security card and the alleged facts that stemmed therefrom resulted in an allegation of discrimination, which the Court of Appeals held needed to be determined by a trier of fact. As has been the case with IRCA's sanctions and anti-discrimination provisions, the Social Security mismatch problem highlighted by *Zamora* retains the "damned if you do and damned if you don't" dilemma that employers face.

An arbitration decision also highlights the potential problem for employers faced with termination decisions with workforces governed by collective bargaining agreements requiring just cause for termination. In *Hotel Employees and Restaurant Employees Union, Local 2 v.*

Docket No. ICEB-2006-0004
August 14, 2006
Page 7 of 14

*San Francisco Central Travelodge Joint Venture*, in a decision dated May 3, 2000, an Arbitrator found that seven unionized housekeeping employees who were discharged for failing to correct mismatched Social Security information were not discharged for just cause and, therefore, the employer was in violation of the governing collective bargaining agreement.  The employer had offered the employees several chances over two years to provide the correct information, but finally discharged the employees due to their failure to comply with the employer's reasonable rules, a violation recognized as just cause in the collective bargaining agreement.  In particular, the employer believed that it could be found to have constructive knowledge of the employees' unauthorized work status and could therefore face severe penalties from the SSA, the (former) INS and the IRS.

However, the Arbitrator ordered the employees reinstated and made whole for their lost wages and benefits.  The parties settled this case during subsequent litigation in federal court, with the employer agreeing to pay the employees $50,000 in back pay and to provide conditional reinstatement.  *San Francisco Central Travelodge Joint Venture v. Hotel Employees and Restaurant Employees Union, Local 2,* No. C-01-1371 (N.D. Cal. Apr. 6, 2001).  The employer paid dearly in this case despite significant efforts to comply with the law in a scenario that would likely remain unchanged, and maybe made even more confusing, under the Proposed Rule.

> *Discrimination Charges When Employers Attempt to Use the H-2A Temporary and Seasonal Alien Agricultural Worker Program*

To make matters worse, it is the experience of NCAE members and many agricultural employers that state and federal departments of labor often discourage attempts to verify Social Security names and numbers under SSA's EVS prior to hiring and during employment.  For users of the H-2A temporary and seasonal alien agricultural worker program,[8] this problem is intensified by the fact that the local state workforce agencies are required to actively refer qualified domestic workers to H-2A employers prior to the departure of the certified H-2A workers from their home country. Few, if any, state workforce agencies use the authority conferred under IRCA to verify the legal status of the workers they refer and provide certification of employment eligibility to the employer to whom the worker is referred.[9]

Instead, H-2A employers are often flooded with illegal workers by the state workforce agencies, and employers must risk a discrimination lawsuit by refusing to hire or terminating an illegal worker in order to avoid violating immigration law.  NCAE members have had state workforce agencies refer so-called "U.S. workers" in response to an H-2A labor certification application, only to be audited later by INS and be told that "U.S. workers" referred by the state were illegal aliens.  To avoid this problem, some employers have participated in SSA's EVS system, attempting to verify the validity of the Social Security cards provided by state agency referrals. Efforts to verify all applicants' work eligibility through the EVS has been used by the

---

[8] *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a).

[9] 8 U.S.C. § 1324a(a)(5).

Docket No. ICEB-2006-0004
August 14, 2006
Page 8 of 14

U.S. Department of Labor ("USDOL") as the basis to deny an employer's application to participate in the H-2A program, alleging that use of the EVS system discriminates against U.S. workers. H-2A employers have had to litigate this issue in order to hire legal alien workers.[10]

In a related troubling example, a federal court in Washington State recently granted class action status to a lawsuit by farm workers claiming they were unlawfully denied jobs or fired because a farm labor contractor and two farms it represented preferred legally admitted H-2A workers over U.S. workers in violation of federal and state law." *Perez-Farias v. Global Horizons Inc.*, No. CV-05-3061-FVS (E.D. Wash July 28, 2006). The court rejected the defendants' argument that any class certified by the court should exclude at least 264 potential class members who had provided the contractor with Social Security numbers that did not match federal government records. The contractor maintained that it acted legally because it discharged such individuals if they could not correct the mismatch within 30 days, assuming that they were illegal. The court rejected this argument, holding that the mismatch of employee names and Social Security account numbers could occur for reasons having nothing to do with immigration status.

In essence, the a consequence of the federal court's decision is that an employer that assumed that it complied with the safe harbor provisions of the Proposed Rule by using SSA's EVS system to consistently check the Social Security number provided by each applicant for employment referred by the state, could be subject to a lawsuit by so-called "U.S. workers" allegedly discriminated against through the use of the mismatch process. DHS' safe harbor provision would provide no protection under those circumstances, even though the employer's actions fully comported with the purpose and intent of the Proposed Rule.

The examples discussed above demonstrate that only a comprehensive legislative solution can effectively clarify an employer's obligations under federal immigration and employment law. Piecemeal clarification attempts, though commendable, would only complicate an extremely confusing area through litigation challenging the Proposed Rule that likely would ensue. There is no doubt that mismatch letters put employers in an untenable position regarding immigration law compliance and add to their anxiety about the legal status of their workers. Adopting the Proposed Rule would impose another set of obligations on employers without providing employers protection from the omnipresent threat of discrimination lawsuits and Privacy Act challenges to the Proposed Rule. Worse yet, the Proposed Rule might even mislead employers into believing that they are protected from discrimination lawsuits if their conduct qualifies for the safe harbor provision. As a foreseeable consequence, unsuspecting employers would be subject to increased litigation and government actions even though they were acting in full compliance with DHS' new mismatch policy.

This dilemma underscores the importance of delaying consideration of the Proposed Rule until Congress passes comprehensive immigration reform. NCAE recommends that DHS

---

[10] *See, e.g., Global Horizons, Inc. (Valley Fruit Orchards) v. U.S. Dept. of Labor*, 2005-TLC-00009 (June 1, 2005).

Docket No. ICEB-2006-0004
August 14, 2006
Page 9 of 14

and the Bush Administration insist that Congress produce comprehensive immigration reform legislation that resolves all of the problems presented by the Proposed Rule. This could be achieved by a telephonic and electronic verification system that would eventually require all employers to verify through DHS the employment eligibility of all hires. A tamper-proof and biometric Social Security card could be the centerpiece of this system. If a Social Security card and/or specified alien employment authorization documents were required of all applicants, employers that failed to comply with the verification system's requirements would be subject to compliance actions by DHS and subject to penalties.

If an effective mandatory verification system that checked documents against the databases of SSA and DHS were enacted, there would be no need for the Proposed Rule because applicants would be screened out of the hiring process at the outset and the no-match problem would be substantially eliminated. Consequently, another component of comprehensive immigration reform should be to clarify that for purposes of reporting employee Social Security wages and taxes, the SSA no-match issue should remain exclusively a matter under the jurisdiction of SSA and the IRS to ensure that information is accurately reported so that individual accounts are properly credited. Legislation should clarify that SSA no-matches are not an immigration compliance issue. Current Privacy Act protections of SSA no-match data should remain.

**Practical Problems with the Proposed Rule**

Under the Proposed Rule, an employer would have between 14 and 60 days, depending on the circumstances, to verify the legitimacy of an employee's documents. If an employer could not do so at the end of the 60-day period, it would be required to have the employee complete a new Form I-9 within 3 days without using the document, be it an SSN or alien work authorization document, that could not be verified. If the employee could not provide alternative work authorization and identity documents to complete a new Form I-9, the employer would have to terminate the employee or face potential liability.

*A Final Rule Should Have Prospective Application*

The Proposed Rule does not indicate when it would be effective. Many NCAE members are small employers with limited administrative staff. It would be a tremendous burden for such employers to have to follow the procedural steps set forth in the Proposed Rule on a retroactive basis. Should DHS decide to issue a final rule, it should clarify that it would have prospective application only to those no-match letters received after the date the rule becomes final.

*The Highly Seasonal Nature of Agricultural Employment Must Be Accommodated*

Compliance with the Proposed Rule would be difficult for many agricultural employers. Most of NCAE's members employ a large number of seasonal workers. Migrant agricultural workers move frequently to maintain continuous employment. They may work only several days

Docket No. ICEB-2006-0004
August 14, 2006
Page 10 of 14

to a number of months for an employer and then move on to another employer for another brief period of employment. Following up on employee mismatches could be extremely problematic. Due to the very short seasons of many agricultural operations, an employee may not be employed at the time an employer receives a no-match letter. This is especially true of SSA no-match letters which many employers receive in the late Winter or early Spring of the year when many seasonal employees are not employed. Under such circumstances it would be impossible within a short period of time for an employer to communicate with a former employee listed in a no-match letter in order to satisfy the 14 day requirement under the Proposed Rule. Former workers seldom leave forwarding telephone numbers where they can be contacted. Moreover, once the season is over, farm workers typically are terminated, rather than put into lay-off status until the next season. Most are not in employee status at the time their former agricultural employers receive a no-match letter.

In these scenarios, an employer could send a letter to an employee's forwarding address if one is provided, but there is no guaranteed method to ensure that the employee receives and replies to the no-match letter. Many employers would not have the opportunity to have a face to face discussion with the mismatched employee to resolve the issue. This puts employers in a bind in that they could lose the benefit of the safe harbor provision because of the nature of the work and workforce, despite good faith compliance efforts.

Although NCAE submits that the Proposed Rule should be deferred pending comprehensive legislative reform, should the rule be adopted, NCAE requests that DHS take into account the unique circumstances of seasonal agricultural employment and migrant workforce issues. An employer of seasonal workers should be able to satisfy its obligations under the Proposed Rule and benefit from a safe harbor protection if it can establish that the worker was not employed during the 14 to 60 day window of correction following the receipt of the no-match letter and that the employer sent a letter to the last known mailing address of the worker, if one were provided, requesting that the Social Security records be corrected. If a forwarding address were not provided, the proposed rule should be inapplicable to the employer, unless, as discussed below, the worker seeks reemployment at a later time.

If employees listed on a no-match letter the prior season return the following season, the Proposed Rule should be applicable at the time of rehire. The applicant should be required within the applicable timeframes under the Proposed Rule to establish their employment eligibility before being hired. In this case, the safe harbor provision would apply if proper verification could be made at the time. If the employer could prove that a migrant or seasonal employee left employment of his or her own volition prior to resolution of the work eligibility issue during the 14 to 60 day timeframe, the safe harbor should apply.

*The 14-Day Correction Window Should Be Expanded for Employers of Seasonal Workers*

Many agricultural employers are small and do not have personnel departments. Because many are seasonal businesses, their workforces expand from a small year' round work force to a

Docket No. ICEB-2006-0004
August 14, 2006
Page 11 of 14

large seasonal work force for a few critical production and harvest periods during the year. The hiring and employment eligibility verification of a large number of newly hired seasonal workers, coupled with the potential obligation imposed under DHS' proposed rule to verify the status of a person who was listed on a no-match letter during a prior year of employment would impose a significant administrative challenge to many small employers.

Consequently, NCAE recommends that DHS expand the proposed window of verification of 14 days to 60 days to 30 to 60 days. The expansion from 14 to 30 days would allow small employers the opportunity to cope with their initial employment eligibility duties, as well as the newly proposed no-match responsibilities.

*Joint Employment Relationships that Characterize Seasonal Agricultural Employment Must Be Accommodated*

The Proposed Rule does not address the thorny issue of joint employment relationship with respect to employers' obligations under the Proposed Rule. In other words, where a grower pays an independent contractor to provide workers for a limited duration, who has the responsibility under the Proposed Rule to comply with the no-match procedures in order to obtain the safe harbor provision—the independent contractor or the grower?

In the agricultural context, agricultural entities frequently pay a farm labor contractor ("FLC"), as an independent contractor, a fee to provide workers for a limited duration, with the express understanding that the FLC is the employer for all purposes, including employment eligibility verification. As with most independent contractor relationships, there is no "bright line" as to whether an independent contractor relationship exists between the employer and FLC. The  joint employer principles set forth under the federal Fair Labor Standards Act[11] and the federal Migrant and Seasonal Agricultural Worker Protection Act,[12] that govern employment law obligations in seasonal agricultural work are broader than traditional independent contractor rules. For example, a grower that believed that the FLC was an independent contractor and employer responsible for I-9 Form completion may nonetheless found to be the joint employer for other purposes.

NCAE recommends that the Proposed Rule should clarify that the existing definition of the term "independent contractor" contained in DHS' current regulations, with a minor modification, is determinative of compliance responsibilities under the procedures forth in the Proposed Rule.[13] NCAE suggests that the existing definition of "independent contractor" in DHS' regulations be modified to emphasize that great weight will be placed on the fact that an entity completed the I-9 Form as part of the employment eligibility verification process in

---

[11] 29 U.S.C. §§ 201 *et seq.*

[12] 29 U.S.C. §§ 1801 *et seq.*

[13] 8 C.F.R. § 274a.1(j).

Docket No. ICEB-2006-0004
August 14, 2006
Page 12 of 14

determining which entity is responsible for complying with the no-match verification procedures
set forth in the Proposed Rule.

**Adverse Consequences of Implementing the Proposed Rule Without Comprehensive
Legislative Immigration Reform**

*Decimation of the Labor-Intensive Agricultural Workforce Without a Viable Legal Means
of Replacing It*

If the Proposed Rule takes effect before Congress enacts comprehensive reform
legislation, including provisions similar to the AgJOBS agricultural guest worker and earned
adjustment of status provisions contained in S. 2611, it likely will have a devastating effect on
labor-intensive American agriculture. Understanding the agricultural labor context at issue here
is critical to reaching this conclusion. It is well-established that the U.S. agricultural workforce
has become increasingly populated by foreign workers who lack proper work authorization.

Shortly after the passage of IRCA in 1986, the USDOL began conducting yearly National
Agricultural Worker Surveys ("NAWS"). Among other questions, the survey asked seasonal
agricultural workers each year whether they were authorized to work in the U.S. In the last year
the NAWS survey was conducted, during fiscal year 1997-98, 52% of seasonal agricultural
workers admitted they were unauthorized. A straight line extrapolation to 2005 of the statistics
from 1989 through 1998 suggests the percentage of U.S. farm workers who are unauthorized to
work in 2005 was 76%. Most experts agree that the statistics based on self identification in the
NAWS survey are likely very conservative, thus the actual figure is probably much higher.
Further, labor intensive agriculture not only faces a shortage of legal workers, it has for the past
several years also been experiencing actual shortages of workers. During the past several years
there have been shortages in the lettuce and vegetable harvests in border areas in Arizona and
California. During the past year and currently, agricultural growers in a number of crops on the
West Coast are facing shortages of labor. Other states from coast to coast are reporting labor
shortages in a number of crops.

American labor intensive agriculture is predominantly undocumented not because
agricultural employers ignore the law but because the current law is dysfunctional and provides
no viable means of screening out fraudulently documented workers and obtaining legal
agricultural workers. Because the current H-2A temporary and seasonal alien agricultural
worker program is severely flawed and largely unworkable, a reformed program is contained in
the Senate bill, S. 2611, along with earned adjustment of status provisions.

*Recycling Undocumented Workers and Punishing Law Abiding Employers
to the Benefit of Those That Are Unscrupulous*

The fact that the increasingly limited labor supply is largely undocumented poses
substantial problems to the agricultural industry. The Proposed Rule would exacerbate these

Docket No. ICEB-2006-0004
August 14, 2006
Page 13 of 14

problems, at least for those employers who complied with the rule. Meanwhile, unscrupulous employers would benefit from ignoring the Proposed Rule. Several negative consequences – many of them wholly unintended – would arise if the Proposed Rule were implemented.

Law-abiding employers would likely lose a significant part of their workforces under the Proposed Rule. A result of the Proposed Rule's procedures is that a substantial number of workers would not return to work once the employer has placed the burden upon them to verify their work authorization because they would be unable to do so. Good employers would be devastated by losing employees *en masse.* As an unintended consequence, the employees who quit after being confronted with a no-match situation they could not resolve would simply recycle themselves to work for a new employer.

Employers who have lost most of their workforce would need to hire new employees, many of whom would end up as no-match employees down the road, continuing a cycle that the Proposed Rule never intended to put in motion. Meanwhile, the same undocumented employees would merely move to a new employer and subsequently put that employer in the untenable position of needing to confront no-matches at the peril of losing its workforce. In this regard, the Proposed Rule punishes good employers and aggravates problems that only a comprehensive legislative solution can remedy.

As discussed in detail above, law-abiding employers who follow the Proposed Rule would put themselves at risk of being subject to discrimination lawsuits and adverse government actions. The safe harbor provision would not protect employers from expensive, time-consuming and frustrating litigation to defend discrimination charges. This ultimately would prove counterproductive to employer compliance with the provisions of the Proposed Rule.

**Summary**

Unless the issues raised by the Proposed Rule are resolved legislatively in an immigration reform package that provides "bright line" guidance and protection for employers regarding work authorization compliance, SSA no-match compliance and protections against discrimination charges, the Proposed Rule will only aggravate the dysfunctional legal framework that attempts to govern the flow of undocumented workers into the U.S. It will heighten the lack of respect for the legal system among U.S. employers that are being asked to be the mainstay of immigration law enforcement in this country. The Proposed Rule, though well-intended, "jumps the gun" by taking the issue out of Congress' hands, where it belongs.

For the foregoing reasons, NCAE submits that consideration of the Proposed Rule should be deferred pending enactment of comprehensive legislative reform. Should DHS decide to finalize and adopt the Proposed Rule, NCAE respectfully requests that its concerns and suggestions described above be addressed by the final rule. NCAE appreciates the opportunity to comment on this Proposed Rule.

Docket No. ICEB-2006-0004
August 14, 2006
Page 14 of 14

Sincerely yours,

Sharon M. Hughes, CAE
Executive Vice President
National Council of Agricultural Employers

Angelica Nurseries
Agricultural Affiliates
California Avocado Commission
California Farm Bureau Federation
Florida Citrus Mutual
Florida Citrus Packers
Florida Fruit and Vegetable Association
New England Apple Council
Ohio Farm Bureau
U.S. Apple Association
Wasco County Fruit and Produce League
Washington Growers League
Western Growers

# EXHIBIT K

# Social Security Administration's No-Match Letter Program: Implications for Immigration Enforcement and Workers' Rights

Chirag Mehta

Center for Urban
Economic Development

Nik Theodore

Center for Urban
Economic Development

Marielena Hincapié

National Immigration
Law Center

November 2003

Center for Urban Economic Development
University of Illinois at Chicago

Center for Community
Change/National Campaign for Jobs
and Income Support

National Interfaith Committee for
Worker Justice

National Immigration Law Center

Jobs with Justice

This study is supported by grants from the Rockefeller Foundation and
Rosenberg Foundation.

## ACKNOWLEDGEMENTS

The partners in this study would like to acknowledge the following organizations for their research support:

American Friends Service Committee, TX
Association of Haitian Women, MA
Boston Jobs with Justice
California Committee on Occupational Safety and Health
Catholic Charities of Dallas
Catholic Charities, CA
Catholic Charities, NY
Catholic Legal Immigration Network
Centro Sin Fronteras, IL
Chicago ACORN
Chicago Interfaith Committee on Workers' Issues
Chicago Jobs with Justice
Chicago Workers' Center
El Centro Inc., Kansas City, KS
Equal Justice Center, TX
Greater Boston Legal Services
Hotel Employees and Restaurant Employees Local 1, IL
Hotel Employees and Restaurant Employees Local 450, IL
Indianapolis Jobs with Justice
Inmigrantes Latinos en Acción, TX
International Union of Operating Engineers Local 150, IL
Latino Organization of the Southwest, IL

Michigan Migrant Legal Services
Michigan Organizing Project
New Jersey Immigration Policy Network
New York Civic Participation Project
The New York Immigration Coalition
One World Community Health Center, NE
Programa Cielo, IL
SEIU Local 1, IL
SEIU Local 32BJ, NY
Service Employees International Union Local 790, CA
Somos un Pueblo Unido, NM
St. Pius V, IL
St. Sylvester, IL
Su Casa, OH
Sweatshop Watch, CA
UCLA Center for Labor Research and Education
United Electrical, Radio and Machine Workers of America, IL
United Food and Commercial Workers Local 1445, MA
United Food and Commercial Workers Local 1500, NY
UNNIR, IL
Voces de la Frontera, WI

We would like to thank the following individuals for their help in implementing the survey and conducting in-depth interviews with workers and employers: Katy Nuñez-Adler, Stephanie Alaimo, Jacobita Alonso, Elizabeth Ballesteros, Carolina Bank, Ken Barger, Maria Luisa Bautista, Tim Bell, Van Bensett, Rebecca Burwell, Jennie Busch, Gloria Bustamante, Rosi Carrasco, Ashley Carter, Josefina Castillo, Fr. Brendan Curran, Russ Davis, Ana Maria Diaz, Marc Doussard, Daniel Duberstein, Donya Fernandez, Mary Lee Fitzsimmons, Socorro Flores, Michael Flynn, Yolanda Gallo, Adda García, Anita Grabowski, Maricella Guadarrama, Sarita Gupta, Juana Guzman, Tiffany Heath, Karen Herrling, Angela

Jamison, Nathalia Jaramillo, Karen Leon, Melinda Lewis, Minsu Longiaru, Roberto Lopez, Emma Lozano, Martin Manteca, Vicky Mayster, Mary Beth Maxwell, Dan McMahon, Yvonne Montejano, Victor Narro, Christine Neumann-Ortiz, Mary Ochs, Jose Oliva, Veronica Ortiz, Eleuteria Rosales, Julien Ross, Gouri Sadhwani, Margaret Singer, Maureen Sullivan, Jose Torres, and Martin Unzueta.

We also would like to thank the following individuals for their comments on previous drafts of this report: Ron Baiman, Tim Bell, Josh Bernstein, Marc Doussard, Adda García, Sarita Gupta, Kimary Lee, Melinda Lewis, Nina Martin, Yvonne Montejano, Victor Narro, Joe Persky, Alicia Tanguma, and Svjetlana Tepavcevic.

Finally, we acknowledge the Rockefeller Foundation and Rosenberg Foundation for their financial assistance without which this study could not have been completed.

Additional copies of this report can be downloaded on-line from the Center for Urban Economic Development website at www.uic.edu/cuppa/uicued.

Please direct questions or requests for further information to:

Chirag Mehta
Research Associate
Center for Urban Economic
Development
University of Illinois at Chicago
Ph: 312-355-0744
Email: cmehta3@uic.edu

Nik Theodore
Director
Center for Urban Economic
Development
University of Illinois at Chicago
Ph: 312-996-8378
Email: theodore@uic.edu

Marielena Hincapié
Staff Attorney
National Immigration Law Center
405 14th Street, Suite 1400
Oakland, CA 94612
Ph: (510) 663-8282 ext. 305
Email: hincapie@nilc.org

Project# 490

# TABLE OF CONTENTS

**Executive Summary** ............................................................................ i

**Introduction** ................................................................................... 1

**The SSA No-Match Letter Program and Its Impact on the ESF** ....................... 5
Employer no-match letters ................................................................ 6
No-match letters are unlikely to generate corrections in SSN information ............ 7

**Employer No-Match Letter Program and Immigration Enforcement** ............... 13
Employers often indiscriminately fire workers with unmatched SSNs ................ 13
Employers use letters to undermine workers' rights .............................. 16
Firings do not remove undocumented immigrants from the labor market ........... 18
Employers retain undocumented immigrants ...................................... 19
Some employers use no-match letters to take advantage of workers .................. 23
Indiscriminate firings impact authorized workers ................................ 25
Using SSA no-match letters as immigration enforcement tools replicates
ineffectiveness of IRCA's employer sanctions provisions ....................... 27
No-match letters are inappropriate as an immigration enforcement tool ............ 30

**Policy Recommendations** ................................................................ 32
The no-match letter program ........................................................ 32
On-line verification system ......................................................... 33
Comprehensive immigration reform ............................................... 34

Appendix A: Sample No-match Letter Sent to Employers ..................................... 36

Appendix B: Methodology .................................................................. 42

Appendix C: Summary of SSA ESF Correction Programs ..................................... 47

Appendix D: SSA No-Match Letter Sent to New Mexico Employer ..................... 49

References ................................................................................. 50

## EXECUTIVE SUMMARY

The U.S. Social Security Administration (SSA) began its employer "no-match letter" program to help properly allocate the billions of dollars of contributions collected from workers with incorrectly filed Social Security numbers (SSNs). Under the program, SSA sends letters to employers every year that identify the Social Security numbers of employees who do not match names or numbers in SSA's records. The goal of the no-match letter program is to reduce the size of the Earnings Suspense File (ESF), which holds unallocated funds collected from workers whose SSN filed on their W-2s does not match names in SSA's database.

Although they were not designed as a mechanism of immigration enforcement, employer no-match letters inadvertently have become *de facto* immigration enforcement tools. Employers have fired thousands of workers identified in no-match letters, assuming that they are undocumented immigrants. In addition, many workers identified in the letters have quit their jobs out of concern that immigration authorities may raid their workplace. Further evidence indicates that many employers have used the letters to undermine workers' right to organize and to cut pay and benefits.

This study, conducted by the Center for Urban Economic Development at the University of Illinois at Chicago and immigrant rights organizations, assesses the wide-ranging impacts of SSA's no-match letter program on local labor markets and immigration enforcement efforts. The findings are based on the results of the No-Match Letter Survey of 921 workers who were identified in no-match letters sent to 342 employers in 18 states. The survey was conducted between June 1 and September 15, 2003. Among the major findings of this study are the following:

### 1. No-match letters have been ineffective in reducing the size of the ESF

The fact that most workers with unmatched SSNs are undocumented immigrants has confounded SSA's efforts to mitigate growth of the ESF through the no-match letter program.

- When compared to other means SSA uses to correct unmatched names and SSNs, audits by SSA's Office of Inspector General (OIG) indicate that no-match letters account for 2 percent or less of total corrections.

- A substantial number of workers with wage items in the ESF are undocumented immigrants who, because they are unable to obtain a legitimate SSN, will be unable to provide corrected information.

### 2. No-match letters have inadvertently encouraged employers to fire workers with unmatched SSNs

Even with clear guidance from SSA stating that employers should not take adverse actions against any employee who is identified in a no-match letter, employers mistakenly perceive no-match letters to be a matter of immigration enforcement. Left to interpret the letters without a clear understanding of immigration laws, employers frequently take adverse actions against identified workers without actual or constructive knowledge of their immigration status.

i

- Thirty-four percent of workers who were fired reported that their employer failed to grant them an opportunity to correct their SSN.

- No-match letters frequently list authorized workers, placing them at risk of wrongful termination.

### 3. The no-match letter program has encouraged some employers to take advantage of workers with unmatched SSNs

Employers often use the information in no-match letters to take advantage of workers by undermining their right to organize or by cutting wages and benefits.

- Twenty-five percent of workers reported their employers fired them in retaliation for complaining about inadequate worksite conditions.

- Twenty-one percent of workers listed in no-match letters reported their employer fired them in retaliation for union activity.

- Many workers reported that while their employers retained them despite incorrect SSNs, their wages were reduced or their benefits were cut.

### 4. No-match letters are ill-suited as immigration enforcement tools

Rather than removing undocumented immigrants from labor markets, the no-match letter program has catalyzed a policy-induced churning in local labor markets as workers either are fired or quit their jobs only to join the overcrowded pool of workers vying for positions in traditional immigrant occupations. Furthermore, the no-match letter program does not substantially deter employers from retaining or hiring undocumented immigrants. Twenty-three percent of employers retained workers with unmatched SSNs who failed to correct their information with the SSA.

### 5. Policy recommendations

Given the fruitless performance and negative consequences of the no-match letter program, SSA should end the program and consider alternative tools for reducing the size of the ESF. Furthermore, the findings call into question efforts that rely on employers to verify or correct workers' SSNs including SSA's pilot electronic SSN verification system.

Comprehensive immigration reform is necessary to halt growth in the ESF, and more importantly, to reconcile employers' demand for workers, immigrants' needs for employment, and U.S. immigration policy. Comprehensive immigration reform must include a plan for how to provide legal status to current and future immigrants who will, despite border-enforcement measures and employer sanctions, find a job with or without a valid Social Security number.

# INTRODUCTION

We come here to work and these companies have grown on our cheap labor....
They always knew that we didn't have documents, I don't understand why they are
doing this to us.

> Comments by a worker after being fired for having an unmatched Social Security
> number (Interview #1 2003).

This problem is not caused by Target.  The federal government has put Target and
many other employers in a very uncomfortable situation.

> Representative of Target Corporation commenting on the company's dilemma in
> responding to the Social Security Administration's no-match letter (quoted in Hamill
> 2003).

Each year, the Social Security Administration (SSA) posts billions of dollars
to the Earnings Suspense File (ESF) because employee names and Social Security
numbers (SSNs) on wage filings do not match records in SSA databases.  The ESF,
which contains Social Security contributions made by workers, grew dramatically
during the 1990s, and by July 2002, stood at $374 billion (SSA OIG 2003).  There are
several reasons why workers' SSNs may not match records in SSA's databases.  In
some cases, a clerical error, such as the misspelling of a person's name or the
transposition of numbers in the SSN, results in a mismatch on an employee's record.
In other cases, workers have submitted an invalid SSN because they are
undocumented immigrants who do not have proper employment authorization.

In its effort to reduce the size of the ESF and to properly allocate
contributions to workers' accounts, SSA sends "no-match" letters to employers as
part of its Educational Correspondence program.  Under this program, when SSA
detects a mismatched name and SSN on a filed wage report, a letter is mailed to
notify the employer of the problem (see Appendix A for a copy of a no-match letter
sent to employers in 2003).  SSA assumes that most of the earnings in the ESF
belong to workers with valid SSNs, and therefore simple notification would allow
employers and workers to quickly correct the problem.

1

However, no-match letters erroneously have come to be seen as a tool of immigration enforcement.  The widespread perception that the employer no-match letter program[1] is a component of an integrated immigration control effort has caused the program to have a series of harmful labor market effects.  Anecdotal evidence suggests that employers, after receiving no-match letters, have fired thousands of workers assuming they are undocumented immigrants who have used false SSNs to obtain employment.  Employers fear that retaining these workers might place them in violation of federal immigration laws.  Firings have become commonplace and are indicative of the way in which many employers respond to the letters when workers with unmatched SSNs are on their payroll.  For example, in 2003, Peco Foods Inc. of Canton, Mississippi fired 200 workers who were identified in a no-match letter (Matthews 2003); Suncast Inc., a Chicago-area outdoor garden product manufacturer, dismissed more than 100 workers because they did not correct their information before the expiration of a company-imposed 30-day deadline (Bolzen 2003); and PartyLite Gifts, a candle manufacturer near Chicago, fired 25 workers who were identified in a no-match letter (Bolzen 2003).

Many workers also assume that the letter has been sent as a matter of immigration enforcement.  Employers have complained that when they notify employees of the need to correct their SSN, workers often quit rather than risk being caught by immigration authorities and deported.  Employers find this unexpected turnover disruptive to their staffing and workflow.  Many employers, averse to such disruptions, may choose to retain workers with unmatched SSNs despite the risk.

Workers' rights advocates and business organizations have requested that SSA discontinue sending no-match letters to employers on the grounds that the letters confuse employers and have resulted in thousands of unnecessary job separations.  For its part, SSA contends that it must continue the program to meet its

---

[1] SSA also sends no-match letters to workers to their places of residence.  In this study, all references to SSA's no-match letter program relate only to letters SSA sends to employers.

2

congressionally mandated obligation to slow the growth of the ESF. To its credit, SSA has taken concrete steps to make it clear to employers that the no-match letter is not being sent as part of an immigration enforcement effort. SSA recently included the following language in the 2003 letter to further clarify this issue for employers:

> IMPORTANT: This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security Number. Nor does it make any statement about the employee's immigration status.

However, despite these efforts, there is scant evidence that employers' misconceptions about the connection between no-match letters and immigration enforcement have improved.

Employer no-match letters inescapably have become *de facto* immigration enforcement tools. While Immigration and Customs Enforcement (ICE) (formerly part of the enforcement division of the Immigration and Naturalization Service) receives headlines for highly publicized raids on employers, as they did when approximately 300 workers in 16 states were detained for allegedly working without legal status for Wal-Mart Inc. and its subcontractors, the no-match letter program has quietly resulted in the removal of perhaps *tens of thousands* of workers from their jobs. A crucial difference between these efforts is that when ICE raids workplaces, there is a policy and legal framework that directs those actions. The no-match letter program, on the other hand, is not a sanctioned immigration enforcement program, a point that is almost entirely lost on employers. Upon receipt of a letter, employers unilaterally determine whether workers are undocumented immigrants. The actions employers take against these workers vary based on their workforce needs and their (often faulty) understanding both of complex immigration laws and of the no-match letter program.

This report examines the wide-ranging impacts of employer no-match letters on the ESF, local labor markets, and immigration enforcement using a survey of 921 workers employed by 342 companies in 18 states who were identified in no-match

letters sent to their employers (hereafter referred to as the No-Match Letter Survey). These data are supplemented by in-depth interviews with 26 workers, discussions with a small group of employers, and publicly available data.

In this report, case studies and quotes are drawn from interviews with workers and employers.  To protect their privacy, the names used to identify these individuals are not their own.  However, names of workers and employers drawn from media sources and other publications are reproduced here as published.

## THE SSA NO-MATCH LETTER PROGRAM AND ITS IMPACT ON THE ESF

Under Title II of the Social Security Act, SSA is required to maintain records of the wages paid by employers.  At the end of each tax year (TY), employers report employees' earnings to SSA and the Internal Revenue Service (IRS) through the Wage and Tax Statement (IRS Form W-2).  SSA then posts reported earnings for every employee to an earnings record in the Master Earnings File which is used to determine an individual's eligibility for, as well as the amount of, their retirement, disability, or survivor benefits.  In instances where SSA cannot match an employee's SSN and name as reported on the W-2, the worker's earnings are posted to the ESF.

SSA's campaign to reduce the size of the ESF is a response to its staggering growth in recent years.  As of July 2002, the ESF contained some 236 million wage items totaling approximately $374 billion, representing unaccounted for wages reported for TY 1937 through TY 2000 (SSA OIG 2002).  In TY 2000 alone, SSA posted 9.6 million items and $49 billion in wages to the ESF, a nearly seven-fold increase during the decade (SSA OIG 2003).

Table 1: Growth in the Earnings Suspense File

| Tax year | Total items in suspense as of July 2002 | Total wages in suspense as of July 2002 |
|----------|----------------------------------------:|----------------------------------------:|
| 1990 | 3,497,285 | $  9,286,663,303 |
| 1991 | 3,360,453 | $  9,819,241,451 |
| 1992 | 3,932,560 | $ 11,426,894,284 |
| 1993 | 4,791,851 | $ 14,757,140,537 |
| 1994 | 5,095,635 | $ 16,260,016,741 |
| 1995 | 5,529,921 | $ 18,657,123,092 |
| 1996 | 6,118,639 | $ 22,295,985,657 |
| 1997 | 6,506,174 | $ 26,222,918,498 |
| 1998 | 7,136,668 | $ 31,280,270,975 |
| 1999 | 8,332,253 | $ 39,026,283,645 |
| 2000 | 9,596,161 | $ 49,398,030,726 |

Source: SSA OIG 2002.

5

Figure 1: Growth of ESF, 1990 - 2000



Source: SSA OIG 2002.

**Employer no-match letters**

Prior to 2002, SSA sent letters only to employers if they submitted 10 or more unmatched SSNs and the wages earned by workers with unmatched SSNs represented more than 10 percent of payroll (SSA OIG 2002). Under these criteria, SSA sent between 40,000 and 110,000 letters annually to employers. SSA dramatically increased its use of no-match letters in 2002 by sending notices to all employers filing wage reports resulting in one or more unmatched SSNs. In 2002, SSA mailed letters to approximately 950,000 employers, each listing up to 500 unmatched SSNs (SSA OIG 2002).

There are a number of reasons an employee's SSN as reported on their W-2 might trigger a no-match letter. Among workers who have authorization to work, the most common reasons include: (1) an error in the spelling of an employee's name or in the SSN; (2) an unreported name change following a marriage or divorce; and (3) an incomplete or missing name on the W-2. Immigrants are more likely to be identified in no-match letters because they often use compound, maternal or paternal last names; have commonly misspelled names; and often inconsistently spell their

6

names on various legal documents.  Finally, workers who once worked without authorization but have since obtained legal status and a valid SSN, yet continue working under the old SSN for fear of losing their job, might also trigger a no-match letter.

Citing cost factors and the relative ineffectiveness of no-match letters in correcting erroneous information, SSA curtailed the number of letters sent in 2003.[2]  SSA sent no-match letters only to those employers with 10 or more unmatched SSNs that accounted for at least one-half of 1 percent of the total number of wage items the employer reported in TY 2002.  With these thresholds in place, SSA estimates it will mail 130,000 no-match letters in 2003.[3]

**No-match letters are unlikely to generate corrections in SSN information**

Data from the No-Match Letter Survey and other evidence suggest that, for several reasons, the no-match letter program will not produce a substantial number of corrections to wage items in the ESF.  First, when compared to other tools SSA uses to correct unmatched names and SSNs, SSA's own audits indicate that employer no-match letters account for only a minimal percentage of total corrections (Table 2).  Of the various mechanisms used, the most effective method of correcting mismatches is the Single Select Process (see Appendix C for a description of each program).  In TY 1998, for example, this process was responsible for 61 percent of all corrections.  The Educational Correspondence (EDCOR) program that primarily involves the mailing of no-match letters to employers, on the other hand, was responsible for just 2 percent or less of all corrections.

---

[2] SSA estimates that administrative costs incurred in TY 2001 in attempting to correct no-matches and reduce the ESF include (SSA OIG 2000):  $5.4 million to send notices to every individual whose name and SSN do not match SSA's records; $600,000 to send 944,000 notices to all employers who submitted wage reports with at least one item posted to the ESF; more than $200,000 for system maintenance and cyclical changes; and an average of $9.00 for each call to SSA's national toll free telephone number generated by the notices.  SSA estimates the agency received about 100,000 inquiries throughout 2002 regarding the TY 2001 letter.

[3] As of September 26, 2003, SSA had mailed 98.5 percent (124,000) of the letters slated to be mailed in TY 2002.

Table 2: SSA Processes for Addressing the ESF

| SSA process | % of total corrections attributed to process |
|---|---|
| Single Select Process | 61% |
| Prior Reinstate Process | 17% |
| Decentralized Correspondence (DECOR) Process | 8% |
| IRS Reinstatement Process | 8% |
| Item Correction | 2% |
| Operation 30 | 2% |
| Other (including the no-match letter program) | 2% |

Source: SSA OIG 2002.

Second, a substantial number of workers with wage items in the ESF are undocumented immigrants who, because they are unable to obtain a legitimate SSN, will be unable to provide corrected information.[4] SSA cannot credit undocumented immigrants with wages earned under false SSNs until workers obtain a valid SSN, at which time the worker must file to have his or her earnings record amended. To many workers whose employers have received a no-match letter, this point is obvious. One undocumented immigrant interviewed for this study remarked, "Don't they [SSA] know that most of us are undocumented? They must know that the information will never be corrected until they give us valid Social Security numbers" (Interview #2 2003).

There appears to be a relationship between increases in undocumented immigration and increases in the ESF. The dramatic growth of the ESF has coincided with rising levels of undocumented immigration (Figures 2 and 3). Because undocumented immigrants are barred from drawing on the Social Security contributions they make, earnings levels in the ESF continue to climb.

---

[4] A recent evaluation of the SSA's Tactical Plan for addressing the growth of the ESF indicates that SSA is aware that "industries hiring transient employees who may not have work authorization from the Immigration and Naturalization Service may account for a major portion of ESF wage items" (SSA OIG 2000).

Figure 2: Flow of undocumented Mexican immigrants to the U.S., 1946-1998



Source: NAID 2003.

Figure 3: Annual suspended earnings, 1946-2000



Source: SSA OIG 2003.

Providing further evidence of the relationship between growth of the ESF and growth in the undocumented population, Table 3 demonstrates that the distribution of no-match letters across states closely matches the distribution of undocumented immigrants by state.

Table 3: Distribution of employer no-match letters in 2003 across states versus distribution of undocumented immigrants

| State | # of employer no-match letters mailed as of 7/12/03 | # of undocumented persons residing in state (in thousands) |
|---|---|---|
| California | 28,935 | 2,209 |
| Texas | 10,853 | 1,041 |
| Florida | 6,123 | 337 |
| Illinois | 5,612 | 432 |
| New York | 5,091 | 489 |
| New Jersey | 4,154 | 221 |
| Washington | 4,043 | 136 |
| North Carolina | 3,956 | 206 |
| Arizona | 3,675 | 283 |
| Georgia | 3,654 | 228 |
| Colorado | 3,102 | 144 |
| Oregon | 2,459 | 90 |
| Massachusetts | 2,141 | 87 |
| Virginia | 1,901 | 103 |
| Michigan | 1,742 | 70 |
| Nevada | 1,541 | 101 |
| Maryland | 1,525 | 56 |
| Tennessee | 1,486 | 46 |
| Utah | 1,409 | 65 |
| South Carolina | 1,333 | 36 |
| Indiana | 1,278 | 45 |
| Wisconsin | 1,268 | 41 |
| Pennsylvania | 1,247 | 49 |
| Oklahoma | 1,216 | 46 |
| Ohio | 1,212 | 40 |
| Minnesota | 1,180 | 60 |
| Connecticut | 1,097 | 39 |

Sources: SSA 2003 and U.S. INS 2003.

SSA officials are aware that no-match letters are not generating a substantial number of corrections to wage items in the ESF. SSA's own figures indicate that throughout the 1990s, the number of wage items in the ESF increased markedly – despite stepped up efforts to improve the no-match letter program's effectiveness. Commenting on the inability of the program to substantially reduce the size of the ESF, an SSA spokesperson explained that the agency scaled back the scope of the program in 2003 because the expanded program in 2002 "yielded a substantially low

number" of corrected records (quoted in Malone 2003). SSA also concedes rising contributions from unauthorized workers prevent the agency from slowing the growth of the ESF. A recent evaluation conducted by SSA's Office of the Inspector General reported that agency officials believe that "illegal aliens" account for a large part of the growth of the ESF: "SSA suspects that employers in certain high turnover industries compound the problem because they may knowingly hire illegal aliens with fraudulent identification …" (SSA OIG 2000).

Although no-match letters have failed to generate a substantial number of corrected wage items in the ESF, there is an on-going debate over whether to use employer no-match letters to achieve immigration enforcement goals. Some policymakers and special interest groups contend that the letters have had the unintended, though desirable, effect of removing undocumented immigrants from their jobs. They insist that this is reason enough to continue sending no-match letters to employers.

For all intents and purposes, employer no-match letters have assumed a prominent role as *de facto immigration enforcement instruments*, raising several concerns for policymakers. The primary concern is that these letters are not part of a coherent immigration enforcement effort and, therefore, employers by default set their own standards for compliance based on their understanding of complex immigration rules. Even with clear guidance from SSA stating that employers should not take adverse actions against any employee who is identified in a no-match letter, employers inconsistently apply their own standards for compliance and frequently take adverse actions against identified workers whom they assume are undocumented immigrants.

A related concern is that, while perhaps sharing general standards of compliance, employers may only selectively comply with those standards. In many cases, employers knowingly hire undocumented immigrants and therefore knowingly are out of compliance with immigration laws. Despite receiving no-match letters,

11

which they too perceive as being part of an immigration enforcement effort, these employers decide to retain workers identified in the letters, despite the perceived risks of doing so.  In still other cases, employers use the information provided in the letters to take advantage of undocumented immigrants by lowering their wages, cutting their benefits, and undermining their right to organize.

The next section explores whether SSA's no-match letter program has served as a successful immigration enforcement tool by examining both the program's track record in deterring employers from hiring undocumented immigrants and its impact on workers' rights.

## EMPLOYER NO-MATCH LETTER PROGRAM AND IMMIGRATION ENFORCEMENT

The previous section showed that the no-match letter program has been ineffective in lowering the number of unmatched wage items in the ESF. This section demonstrates that the no-match letter program is an inappropriate and ineffective immigration enforcement tool because:

- it operates outside the parameters of immigration enforcement – SSA's mandate is to administer the benefits under its purview, not to engage in immigration enforcement – leading to unlawful and indiscriminate firing of workers identified in no-match letters;

- the program exerts little influence over a broad segment of employers that will continue to employ workers with unmatched SSNs to meet their workforce needs;

- it places excessive leverage in the hands of employers that choose to use the no-match letters to extract wage concessions from workers, cut workers' benefits, and undermine workers' rights.

This section presents findings from the No-Match Letter Survey, a survey of a non-random sample of 921 workers representing the actions of 342 employers in 18 states. Additional data were obtained through in-depth interviews with 26 workers in seven states. While the evidence presented here is substantial and the findings are indicative of the experiences of workers affected by employer no-match letters, because the survey is based on a non-random sample, summary statistics should be treated as illustrative rather than statistically representative (see Appendix B for a description of the survey methodology).

**Employers often indiscriminately fire workers with unmatched SSNs**

Responses to the No-Match Letter Survey indicate that in many, and perhaps most, cases (53.6 percent) employers responded to the receipt of a no-match letter by discharging the listed workers (Table 3). A small share of these employers re-hired the dismissed workers at a later date. Given that over half of employers identified in the survey discharged workers with unmatched SSNs, the 950,000 letters sent to

13

employers in 2002 have likely resulted in the termination of employment for tens of thousands of workers.

Table 3: Frequency of employers' responses to receipt of SSA no-match letter

| Action | % of employers taking such action against at least one worker (n=315) |
|---|---|
| fired workers without expectation of re-hiring | 41.3% |
| fired workers with expectations of re-hiring | 6.3% |
| fired workers and re-hired workers later | 3.8% |
| fired workers and re-hired them later without benefits | 2.2% |
| employer did not fire workers, but they lost seniority | 0.6% |
| no action and employer did not threaten to take action | 22.9% |
| workers quit before employer took action | 14.6% |
| other action | 5.1% |
| none of the above | 6.7% |

Percentages exceed 100 percent because some employers with multiple workers with unmatched SSNs took more than one course of action.

Employers have discharged workers despite SSA's guidance that such action may be unwarranted and, in some cases, unlawful.[5]  SSA's clearly stated position is that an employer should not take actions against any employee because of a no-match letter.  In the 2003 letter, for example, the agency advises employers that, because the letters in many cases do not signal unlawful employment, "[y]ou should not use this letter to take any adverse action against an employee just because his or her Social Security number appears on the list, such as laying off, suspending, firing or discriminating against that individual.  Doing so could, in fact, violate state or federal law and subject you to legal consequences."[6]

---

[5] There is evidence that suggests not all regional offices of SSA are properly guiding employers on the relationship between issues raised by no-match letters and issues related to immigration enforcement. One employer in New Mexico shared with advocates a letter he received from an SSA regional office in Colorado notifying the employer that the agency discovered one employee had a fraudulent SSN. The letter instructed the employer that it "cannot legally employ him/her until he/she received the proper work authorization from Immigration and Naturalization Service."  See Appendix D for a copy of the letter.

[6] Employers may be subject to liability under a range of employment and labor laws including, but not limited to, Title VII of the Civil Rights Act, Americans with Disabilities Act, Fair Labor Standards Act, Occupational Safety and Health Act, and the National Labor Relations Act.

In many instances, despite clear instructions in the letter, employers either indiscriminately fire workers with unmatched SSNs or they give them unreasonably short deadlines to correct their information. It appears most of the employers that decide to fire workers do so without first re-verifying their immigration status. Of the employers that discharged workers and did not re-hire them, 58 percent (n=108) never requested that workers provide proof of authorization (e.g., green card, work permit) to re-verify their immigration status. It is reasonable to assume that in most of these cases, employers do not have constructive knowledge about workers' immigration status and fire them based on the assumption that they are undocumented immigrants. Additionally, 34 percent of workers (weighted n=139) who were fired reported that their employer failed to grant them an opportunity to correct their SSN. Of those who reported they were allowed to make corrections, workers were only given a median of 15 days (weighted n=166) to make the necessary changes – an insufficient period of time for workers to communicate with SSA and receive corrected information.[7]

Additional support for the conclusion that a substantial number of employers do not provide workers sufficient opportunities to correct discrepancies in their Social Security information comes from an outside evaluation of the Basic Pilot, an employment eligibility verification pilot program operated by SSA and Citizenship and Immigration Services (CIS), conducted by the Institute for Survey Research at Temple University and Westat, Inc. (U.S. DOJ INS 2002). The Basic Pilot allows employers to electronically verify the employment authorization of newly hired workers.[8] The evaluation found that participating employers did not inform 73

---

[7] For workers who are indeed authorized to work, correcting their information (such as the spelling of their name) might mean they will also have to go to the Citizenship and Immigration Services (CIS) (formerly part of the service division of the Immigration and Naturalization Service) to correct the source documents before being able to correct their records with SSA, which will undoubtedly take more than 15 days.

[8] The Basic Pilot was authorized under the Illegal Immigration Reform and Individual Responsibility Act of 1996 (IIRIRA) (Pub. L. No. 104-208), which also required that this independent evaluation of the pilot program be conducted.

percent of employees who had problems with their work authorization, thus precluding them from correcting their information.

**Employers use letters to undermine workers' rights**

Rather than a sincere effort to comply with immigration laws, some employers have used no-match letters to justify the firing of workers in retaliation for supporting union organizing campaigns or for complaining about poor working conditions. The No-Match Letter Survey found that 21 percent (weighted n=135) of workers reported their employer permanently fired them in retaliation for their union activity. Additionally, 25 percent (weighted n=132) of workers reported that employers fired them in retaliation for complaining about inadequate worksite conditions.

Dan McMahon, Field Director of Organizing for the Chicago and Northeast Illinois District Council of Carpenters, explained how some employers in the residential construction industry hypocritically use the no-match letter to their advantage: "The contractors that are hiring undocumented workers, they get the no-match letter and they ignore it, that's unless the workers try to organize and then [the no-match letter] magically appears" (Interview McMahon 2003).

---

**Employers use no-match letters to undermine workers' right to organize**

*The following is a transcript of testimony presented by a supermarket worker from Los Angeles, California in 2003 at a hearing on the impact of the SSA's no-match letters (UCLA Center for Labor Research and Education 2003).*

I'm a market worker and member of the worker's union. I'm moved by everything that's happening here. It's really sad what's happening to our communities, to all these people.

We were organizing an independent union in the market, in our workplace. We had small resources, so we decided to start organizing ourselves. It was really good because we were overworked, underpaid, abused; so we decided to organize ourselves into a union. We went to election, actually, and we were unsuccessful, but that doesn't discourage workers. We continued to organize and, last year, October 1st, the market fired sixty workers, all immigrants. All these workers were really brave workers. After that, we all believed that this was something that was unjust, for all of us.

The management used these letters only against those workers who were pro-union workers and not those workers who were pro-company workers. But after the suspension of 60 workers, we decided to continue organizing, and we have been organizing ourselves since then. This program doesn't discourage other workers or myself, and we know that we have to continue fighting because this is just an injustice that we face and that many others face around the country. I just think it is really sad. But even though these situations are really sad, I believe they are really good. These situations are motivating people, creating new leaders, and this situation is a favor to the labor movement in the United States.

A case referred to the National Labor Relations Board's (NLRB) General Counsel for advice illustrates how employers that might otherwise ignore a no-match letter might be tempted to use it punitively to undermine union organizing drives. In *Personal Optics a/k/a Style Eyes of California* (Case 21-CA-34087 2001), the employer allegedly used information provided in the 2000 no-match letter to fire 45 workers who had invalid SSNs, most of whom were supporting a union organizing drive. While the NLRB General Counsel advised that the union's case for charging the employer with unfair labor practices was weak and recommended dismissing the charge, the General Counsel suggested that the employer's anti-union animus may have been a motivating factor in its decision to fire the workers with unmatched SSNs:

> The timing of the terminations, and the Employer's inconsistent responses to the 2000 and 1998 no-match letters, are suspicious. It took the Employer three months after receiving the 2000 no-match letter to conduct its audit, and the Employer terminated employees with SSN discrepancies soon after employees began visibly supporting the Union and only about a week after the Union filed the representation petition. In contrast, the Employer's 1998 investigation, which occurred in the absence of union activity, took only two weeks and the Employer failed to terminate all employees who actually had invalid SSNs (NLRB 2001).

The case of *Tuv Taam Corp* demonstrates how some employers inappropriately use the implication that workers identified in no-match letters are undocumented immigrants to justify illegal behavior. The employer argued that firing workers striking against unfair labor practices (ULP) was not itself a ULP because the workers were undocumented immigrants (340 NLRB No. 86). The employer based its determination of the workers' immigration status on a no-match letter it received months after firing the workers. Finding no merit in this defense, the NLRB ruled that immigration status has "no bearing on whether [the company] did, in fact, commit the unfair labor practices of which it has been accused" (340 NLRB No. 86). It ruled that the employer committed a ULP by firing the workers and it indicated that it did not consider a no-match letter to be, on its own, "legally cognizable evidence regarding the immigration status of [the fired workers]" (340 NLRB No. 86).

**Firings do not remove undocumented immigrants from the labor market**

  Further demonstrating that the no-match letter program has little potential as a viable immigration enforcement tool, even when employers discharge workers who have unmatched SSNs, many workers find their way back into the labor market, sometimes returning to the same employer.  This is not to imply that the labor market effects of no-match letters are inconsequential or benign.  The no-match letter program has catalyzed a policy-induced churning in local labor markets as workers either are fired or quit their jobs only to join the overcrowded pool of workers vying for positions in traditional immigrant occupations.  The demand for undocumented immigrants, which seems to have taken on the characteristic of a structural demand for unauthorized workers to fill jobs at below-market wage rates, remains strong.  This means that displaced workers can be re-employed quickly, particularly if they are willing to tolerate low pay and inferior working conditions.  The no-match letter program is unable to deter the re-employment of undocumented immigrants, at least until the next round of letters is mailed to employers and the process of churning starts anew.

  Fueling the growth of the contingent labor market, employers often replace workers with unmatched SSNs with workers supplied by temp agencies because staffing agencies, as the employer of record, bear the legal responsibility for ensuring that workers dispatched to job sites have authorization to work.  One factory worker who was fired because of an unmatched SSN explained that his employer explicitly instructed he and other workers who lost their jobs to go to a particular temp agency where they would be assigned to their original jobs, but at half the hourly wage and without the fringe benefits they received when they were employed directly by the company (Interview #4 2003).

  Perhaps more destructive to the wages and working conditions in local labor markets is that, in the search for alternative employment, many workers with unmatched SSNs will be driven deeper into the underground economy where

employer preferences for hiring undocumented workers on a no-questions-asked basis is strongest. This has the effect of swelling the ranks of the underground economy where cash payments are common and wage and hour as well as health and safety violations are the norm. Moreover, this segment of the economy lies beyond the reach of government regulatory institutions and, therefore, predatory employment practices largely go unchecked. These ramifications of no-match letters are serious and represent highly damaging distortions to the operations of local labor markets.

### Employers retain undocumented immigrants

The experience of discharged workers suggests that employers' desires to comply with immigration laws are not the principal factor influencing decisions regarding how to handle the problem of unmatched SSNs. Rather, employers' decisions are based on how they weigh the costs and benefits of compliance with federal immigration laws. Scrupulous employers that are risk averse may be quick to fire employees

---

**Employers hesitate to fire skilled workers**

Carlos first received notice from his employer, a large Chicago-area beverage distributor, that he was named in a no-match letter in the summer of 2003 (Interview #9 2003). His employer explained that Carlos and 12 other workers would have 30 days to correct their SSN information or else they would lose their jobs.

On the day of the deadline, the workers decided to go to work as if the deadline did not exist because they did not believe the employer would actually fire them. After all, the employer had already extended the deadline once before.

The workers were correct. Their supervisors did not protest when the workers punched in and went to work. According to Carlos, most of the supervisors welcomed their return. Many supervisors and managers indicated that they needed the workers because they could not find replacements. One supervisor said, "We really need you anyway… If you guys want to keep your job, I don't care." Carlos has five years with the company working as a forklift driver. He explains that you cannot hire a guy off the street to do his job. Carlos drove a forklift and earned $11 per hour. Most of the 13 workers named in the no-match letter were skilled workers like Carlos.

---

identified in a no-match letter, especially if they have large numbers of workers with unmatched SSNs on their payroll and if they have ready access to a pool of replacement workers. Unscrupulous employers also may attempt to realize benefits from firing workers who are attempting to organize collective bargaining units. On the other hand, some employers, while concerned about employing undocumented immigrants, may also incur significant lost revenues if discharging workers seriously disrupts the operation of their businesses. In such cases, employers often decide to run the risks associated with retaining workers they assume are unauthorized.

19

Many employers retain workers with unmatched SSNs, sometimes with knowledge that the workers do not have proper work authorization. Data from the No-Match Letter Survey indicate that 23 percent of employers (n=315) did not fire or threaten to fire workers with unmatched SSNs (Table 3). Furthermore, among the subset of workers whose employers never threatened to fire them (all of whom are undocumented immigrants), approximately one-third (weighted n=46) were asked for a green card to re-verify their immigration status. In these cases, employers likely knew their workers with unmatched SSNs were undocumented immigrants, but chose to continue employing them anyway. The evaluation of the Basic Pilot by Temple University and Westat offers additional evidence that a large percentage of employers continue employing workers even if their SSN or immigration documents are incorrect. Forty-four percent of the employees whose authorization to work could not be confirmed were still working for the same employer six months after receiving a final non-confirmation from the Basic Pilot program (U.S. DOJ INS 2002).

Employers are likely to retain workers with unmatched SSNs when the costs associated with firing employees outweigh their assessment of the risk of being penalized for retaining unauthorized workers. Workers interviewed for this study who were able to keep their jobs despite being identified in a no-match letter believe their employers chose not to fire them because doing so would unnecessarily disrupt the operation of the business. One worker, a skilled shipping clerk who operates a forklift and other machinery, said his employer extended the deadline for correcting his information twice for a total of two months because his supervisor was on leave at the time the no-match letter arrived and the identified worker was the only one who could do the job (Interview #4 2003). Another skilled worker employed at a small family-owned business making custom furniture reported that her employer reluctantly fired her only to re-hire her later, even though it knew she was an undocumented immigrant, because the company could not find anyone to replace her (Interview #5 2003).

20

While undocumented immigrants are popularly perceived as unskilled workers who are easily replaceable, the fact that many employers retain unauthorized workers suggests that many companies depend on these workers. Mike Flynn, Executive Director of Su Casa, a community organization in Cincinnati, has been working with employers to devise strategies to address the disruptions created by no-match letters. He says "there are many employers that say they are willing to pay to sponsor their employees to get them legal," because they need these workers and the skills they bring to the job. Flynn continues:

> There will always be unscrupulous employers that will take advantage of undocumented [immigrant] workers. But there are many decent employers that are caught in between their economic reality and what they think is the law. Employers see a talented workforce in the area and what they want is to stabilize this workforce. They want to be able to use all of their skills (Interview Flynn 2003).

The economic reality for many employers is that they rely on undocumented immigrants and cannot easily replace these workers without disrupting operations. This is a prime motivating factor that guides employers' decisions regarding how to respond to employer no-match letters. An attorney representing construction firms in North Carolina explained the situation confronting his clients this way:

---

**No-match letters put employers between a "rock and hard-place"**

Mike is an owner of a small business that runs a packaging company in Ohio (Interview #10 2003). When he received the no-match letter from SSA, he didn't know what to do. At first, he told the workers to get the information corrected and that they shouldn't come back to work until they had it corrected. At first, he thought that this was simply a clerical error that had to be fixed. Indeed, some of the unmatched SSNs were the result of clerical errors. But after some workers quit because they couldn't fix their information, Mike came to the conclusion that many were receiving the "no-match" letter because they were undocumented immigrants.

Mike's new concern was that he might have violated the law by hiring undocumented immigrants. The company followed the I-9 process as required by law, but he says that it is impossible to know in 100 percent of all cases whether the workers are undocumented.

He didn't want to fire workers partly because he couldn't afford to lose his skilled workforce. His clients are mainly blue chip companies with specialized needs. Because his company packages food and medical products, it has to meet FDA regulations. Therefore, workers receive comprehensive training and it is important that they keep their workers to avoid additional training costs and gaps in production. But Mike was also worried about violating IRCA's anti-discrimination laws. In his words, he was "between a rock and a hard-place."

This entire experience has led Mike to believe that the real solution is legalization. He knows that there are thousands of new immigrants in Ohio who are willing to work hard and they have skills. In his opinion, it's in the best interest of employers and workers that they be legalized.

I've had clients get no-match letters with as many as 99 employees listed out of a couple hundred total …. But even if it's just 25 percent, that could be devastating. It might not cause the company to close, but with respect to completing a project, it could be disastrous (quoted in Parker 2002).

Sometimes employers, in their attempt to continue employing workers with unmatched SSNs while at the same time demonstrating compliance with immigration laws, will go so far as to ask workers to obtain new (fraudulent) SSNs and return to work. One factory worker explained that his employer was flush with work at the time it received a no-match letter (Interview #6 2003). The factory was operating seven days a week and some employees were working 12-hour days. When the letter arrived, company officials asked workers to obtain new documents so they could keep working. Despite the fact that workers did not provide the employer with new documents, the company decided to continue their employment.

Employers are obliged to notify workers of problems with their SSN, yet some do little else to ensure that workers correct their information if the companies consider them essential employees. One worker who is employed at a plastics company in Chicago, explained that she and 30 other workers were recently notified by the company that they were listed on a no-match letter (Interview #7 2003). All of the workers are skilled supervisors, quality control experts, and machine operators who earn more than $11 per hour. The company has experienced very little turnover and

> **Employers rely on skilled workers, regardless of their status**
>
> Patricia was working for a small family-owned business for four years doing specialized work making designer furniture by hand when her employer notified her that it had received a no-match letter indicating her SSN was incorrect (Interview #5 2003). The owner asked her if she was working legally and Patricia told them that she was working with an SSN that was not her own. Initially, the employer told her not to worry and that they would help her get a new SSN. She and her employer had a strong working relationship and they needed her expertise, and so they were willing to help her, Patricia believes. At the time, she was earning $13 per hour. She started at $10 per hour and learned the job fast. The person that she replaced just didn't know how to do the job, so her employer was happy to have her and was serious about trying to keep her.
>
> A short while after her talk with the owner about her SSN, she was told that she couldn't stay on the job because her number was incorrect. She thinks that the owners' accountants or lawyers advised them to terminate her employment.
>
> Patricia spent the next month unemployed. The bills went unpaid and it put a lot of stress on her husband and two small children. Eventually, she found minimum-wage work, but that didn't last for more than a week.
>
> A short while later, the employer that fired her called her back to the job because they couldn't find anyone to replace her. They told her not to worry about her social security number and that she should just come back to work.

the workforce is quite established. After a company-imposed deadline passed, the employer declined to take action, and all of the workers remain on the job.

## Some employers use no-match letters to take advantage of workers

There are employers that, despite the risk of retaining potentially unauthorized workers, use no-match letters to take advantage of undocumented immigrants by reducing their pay or cutting their benefits. Several cases illustrate the problem associated with providing no-match information to unscrupulous employers.

An employer in Wisconsin asked workers named in a no-match letter to provide a new SSN if they wished to retain their jobs. Indeed, workers who presented new, fraudulent documents were allowed to continue working for the company. However, their hourly wages were reduced from $9.72 to the starting wage of $7.35 and they lost their healthcare benefits and vacation time (Interview #8 2003). In Chicago, a worker with an unmatched SSN working for medium-sized manufacturer found herself in a similar situation. She explained, "I was told by the human resource manager that if I quit before I was laid off, I could come back to work three weeks later without a problem, but at six dollars per hour, not the twelve that I am making now" (quoted in Jacobo 2003). In some cases, employers go so far as to supply workers with fraudulent identification—for a price. In Indiana, local police are currently investigating a supervisor at one company for allegedly having provided

> **Employers retaliate against workers for seeking information about their rights**
>
> When Cristina's employer received a no-match letter in the summer of 2003, it gave her until the end of the month to correct her Social Security number or else she would be discharged (Interview #11, 2003). Cristina worked as a machine operator at a Chicago-based mailing service earning $8 per hour. She was one of 64 workers with unmatched SSNs identified in the letter.
>
> But before the deadline, the company abruptly fired 17 of the workers, including Cristina. Cristina believes that the employer singled out these 17 workers because they collectively sought assistance from a legal assistance organization. They had received advice from the organization and presented the company with a letter from informing the employer of their obligations and of the workers' rights. In her opinion, the firing was a form of retaliation for going to an outside organization for assistance and for standing up for their rights.
>
> Cristina finds the whole issue unfair. "All of these immigrants are paying taxes. Also, many of these immigrants are doing work that native-born workers won't do. Many have kids that were born here. But the workers don't have any rights."

fraudulent identification to employees with unmatched SSNs.  In exchange for the identification, the supervisor kept workers' first 10 paychecks (Toth 2003).

Authorized workers also are not immune to employers seeking advantage over workers identified in no-match letters.  Juan Morales, a baker working for a supermarket in California, was on medical leave when he was fired from his job because he had an unmatched SSN.  Despite the fact he is legally authorized to work, the company fired him while he was on medical leave recovering from injuries sustained when a 300 pound rack of ice cream fell on him.  While difficult to prove, Juan is certain that the company fired him because of his injuries.  "I am a risk.  I am injured.  If they take me back and I get injured again, I will be more expensive to them than I already am," explains Morales (Interview 2003).  Another authorized worker from North Carolina, also on medical leave, was fired from her hotel job because she had an unmatched SSN.  In this instance, according to an advocate working on her case, the employer attempted to deny her workers' compensation benefits by arguing before North Carolina's Industrial Commission that she was not entitled to benefits because she was an unauthorized worker (Interview Duberstein 2003).  The Commission, however, turned down the request and she later was reinstated.

Michael Wilson, a U.S.-born citizen from Virginia and a union steward in his employers' vehicle maintenance division for nine years, was fired in 2003 because his employer believed he committed document fraud when it was discovered his SSN was incorrect (Interview Wilson 2003).  Despite the fact that Michael received corrected documents from SSA within three weeks of being notified by his employer that his SSN did not match, his employer still maintained that Michael committed document fraud and he was terminated.  After being out of work and without pay for four months, a panel reviewing his grievance found the employer's case to be without merit and reinstated Michael with full back pay.  Michael is still uncertain why his employer was so earnest about firing him even though it was obvious that the problem with his SSN was SSA's mistake and it was easily resolved.  When

asked what can be done to prevent employers from using no-match letters to take advantage of workers, he explains, "There needs to be more accountability built into the system; impose penalties against employers that take [unnecessary] adverse action against employees that are identified in these letters" (Interview Wilson 2003).

**Indiscriminate firings impact authorized workers**

When employers indiscriminately fire workers with unmatched SSNs—34 percent (weighted n=139) of fired workers reported that they were never given an opportunity to correct their information – it raises concerns that workers who are authorized to work may be unfairly terminated if they are listed in no-match letters. Authorized workers who are Latin American immigrants are particularly vulnerable because employers may assume they are undocumented because of their national origin.  Results from the No-Match Letter Survey suggest that the no-match letter program has led to the firing of authorized workers – possibly an unavoidable outcome of the program given that employers often assume workers identified in the letters are not authorized to work.  The survey found that of the 28 workers reporting they had authorization to work, nine were fired (of which only one was reinstated).

---

**Employment-related national-origin discrimination cases on the rise**

An indicator that employer no-match letters might be contributing to an increase in national-origin discrimination is the rise in number of immigration-related unfair employment referrals and investigations fielded by the U.S. Department of Justice Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC).

For example, the number of OSC investigations into terminations stemming from SSN verification matters is on the rise. From 1994 to 2000, OSC conducted just 20 investigations into matters related to employers that fired workers upon verifying their SSNs.  From 2001 through 2003, OSC opened 29 investigations.  Three of the investigations opened after 2001 resulted in out-of-court settlements in favor of the charging parties and 10 investigations remain open. It is important to note that OSC only has jurisdiction to take complaints of citizenship or national origin discrimination, and therefore investigate, from "protected individuals" which includes U.S. citizens, certain lawful permanent residents, refugees, and individuals granted asylum. OSC can also take complaints alleging document discrimination (document abuse) from any person who is authorized to work.

Figure: Number of OSC Investigations into Employee Terminations Resulting from SSN Verification, March 1994 to August 2003



Source: U.S. DOJ OSC 2003

The evaluation of the Basic Pilot provides further insights into the problems that authorized workers face as a result of the no-match letter program. The Basic Pilot operates much like employer no-match letters except that the intent of Basic Pilot is to confirm at the point of hire whether new employees are authorized to work in the U.S. When employers submit (electronically or telephonically) SSNs of newly hired employees into the Basic Pilot and SSNs do not match records in SSA's database, employers are notified that SSA cannot confirm the validity or correctness of the employee's SSN. When the Basic Pilot issues this "tentative non-confirmation" of a worker's SSN, it is analogous to SSA sending employers a no-match letter. The Basic Pilot is problematic because it frequently is unable to confirm SSNs belonging to a substantial number of authorized workers. The Temple University and Westat study indicates that the Basic Pilot failed to initially confirm the work authorization status of 22 percent of employees who were in fact authorized to work, in part because SSA's database contains inaccurate information (authors' calculation based on U.S. DOJ, INS 2002).

Many newly hired employees whose work authorization status was tentatively unconfirmed by the Basic Pilot experienced some form of adverse action by their employer (U.S. DOJ, INS 2002). For example, among workers whose SSNs were initially unconfirmed:

- 28 percent reported that the pilot employer withdrew the job offer (implying that they were not even given an opportunity to resolve the problem and possibly that the employer used the Basic Pilot as a pre-employment screening tool which is prohibited); and
- 45 percent reported they were not allowed to continue working while correcting their records, had their pay cut, or had their job training delayed despite the prohibition that employers take adverse action against employees who are contesting the tentative non-confirmation or who are attempting to correct their information.

The inability of the SSA's no-match letter program and the Basic Pilot to consistently confirm the SSNs of authorized workers should be anticipated. Reporting errors on the part of employers or workers and errors in SSA's own

26

databases are to be expected and when these errors occur, SSA may be unable to confirm that authorized workers have a valid SSN.  However, the negative consequences for these human errors can be substantial, particularly for authorized workers who are Latin American.  Employers have come to see the no-match letter as a signal that workers identified in the letter are undocumented, especially if they are of Latin American origin.  This employer attitude is perhaps irreversible given the public prominence the no-match letter program has achieved.  In this environment the impact of errors on authorized workers becomes magnified.

**Using SSA no-match letters as immigration enforcement tools replicates ineffectiveness of IRCA's employer sanctions provisions**

The ineffectiveness of no-match letters as immigration enforcement tools is predictable given what is known about employers' behavior in the context of employer sanctions under the Immigration Reform and Control Act of 1986 (IRCA).[9]  Employer sanctions and the I-9 process established under IRCA were intended to prevent employers from *knowingly* hiring undocumented immigrants under the assumption that penalties would substantially reduce employer demand for unauthorized workers.  The I-9 process was instituted to help employers discern at the point of hire whether workers are authorized to work.  However, the I-9 process and employer sanctions have decisively failed to diminish the flow of undocumented immigrants into U.S. labor markets.  Furthermore, there is evidence that these policies have generated their own labor market imperfections, such as reducing earnings for all Latin American immigrants and other workers who "appear" to be undocumented immigrants, as well as the significant narrowing of job opportunities for these workers (Dávila et al. 1998; Massey et al. 2002).

Most accounts of the failure of IRCA to reduce the demand for unauthorized immigrants cite the minimal risks associated with violating the Act and the lack of enforcement of employer sanctions for hiring unauthorized workers.  Since the passage of IRCA, the emphasis has been on removing undocumented immigrants

---

[9] Pub. L. No. 99-603.

from the labor market, rather than punishing the employers that hire them.  As Alexander Aleinikoff (2000),[10] senior associate at the International Migration Policy Program at the Carnegie Endowment for International Peace, explained:

> In its early years enforcing the law, the INS focused on educating employers about their new responsibilities to check documents.  In the 1990s, the agency shifted its emphasis to removing undocumented workers found through "audits" of employer records.  In some local offices, novel arrangements with employers permitted them to terminate undocumented employees over time while they recruited lawful replacement workers.  …[F]or the most part, the agency was satisfied when the employer fired the unauthorized immigrant—leaving the employee free to seek work elsewhere.

Massey, Durand, and Malone (2002) contend that the federal government's commitment to enforcing employer sanctions has been, at best, weak.

> After IRCA's initial authorization of new funds for the Department of Labor to undertake work-site inspections, internal enforcement of U.S. immigration laws was quietly but steadily reduced.  In 1999, only 2 percent of the INS budget was devoted to the enforcement of employer sanctions, only one-fifth of their time was devoted to work-site enforcement, yielding only 340 full-time person-equivalents to monitor all jobs in the United States.

The lax enforcement of employer sanctions also is responsible for encouraging unscrupulous employers to continue hiring undocumented immigrants, but at lower rates of compensation and in poorer working conditions as a way to compensate for the risks associated with employer sanctions (Massey et al. 2002).  Even Latino immigrants with legal status experience wage penalties that some studies suggest are the basis of wage discrimination against "at-risk" workers, or workers who appear to be undocumented immigrants (Cobb-Clark et al. 1995; Bansak and Raphael 1998; Mehta et al. 2002).  Prior to IRCA and the advent of employer sanctions, studies found little if any wage penalty for working without legal status (Phillips and Massey 1999).  IRCA-initiated employer sanctions established penalties against employers for knowingly hiring undocumented immigrants thereby creating a financial risk for

---

[10] Mr. Aleinikoff served as General Counsel for the Immigration and Naturalization Service (INS) from 1994 to mid-1995, and then as Executive Associate Commissioner for Program until January 1997.

hiring these workers.  Subsequently, employers paid at-risk workers less than workers who either had legal documents or were assumed to have legal status.

On the other hand, some employers simply ceased hiring or were overly cautious in hiring workers who they thought might be undocumented immigrants because they were "foreign sounding" or "foreign looking."  The U.S. General Accounting Office found that nearly one in five employers admitted to some form of discriminatory treatment on the basis of national origin or citizenship following the passage of IRCA (U.S. GAO 1990).  The outcome was an increased crowding of at-risk workers—or in other words, Latin American immigrant workers—into a narrow band of mostly low-wage occupations and industries.

These characterizations of the approach to enforcing employer sanctions and their effect on employer behavior and workers' employment prospects is strikingly similar to what has been observed under the no-match letter program.  As is the case with IRCA's employer sanctions, the risk of IRS penalties[11] has encouraged many employers to close the door on workers with unmatched SSNs.  Moreover, just as employers disregard penalties under IRCA and continue to employ undocumented immigrants, employers continue to retain workers with unmatched SSNs, even when they are aware the workers are undocumented.  For these employers, the benefits – which include hiring at below-market wages and employing a flexible workforce – outweigh the risk of penalties.  Some employers go further, using the leverage created by the no-match letter to undermine workers' rights and to suppress wages and other forms of compensation.

---

[11] Although employers have been concerned about the potential of IRS fines that were referenced in previous versions of the employer no-match letter, the IRS has recently issued guidance stating that an SSA no-match letter will not trigger such a penalty. The IRS went on to explain that only the IRS could notify an employer of its intent to fine the employer based on having filed an incorrect taxpayer identification number (which is an SSN for employees), but that employers can claim that it relied in good faith on the information provided by the employee. Such a "safe harbor" provision would allow an employer to have any potential fine waived (Dobbins 2003).

**No-match letters are inappropriate as an immigration enforcement tool**

Despite employers' troubling conflict of interest in responding to SSA's no-match letters, some immigration control advocates continue to argue that the letters ought to be used as a tool for enforcing immigration laws that prohibit employers from employing undocumented workers.  The no-match letter program, they argue, has had the desired, albeit unintended, effect of weeding out undocumented immigrants from the labor market.  Dan Stein, Executive Director of the Federation for American Immigration Reform (FAIR), one of the leading national organizations calling for reducing immigration, offered this complaint after SSA scaled back its no-match letter program in 2003: "It's aggravating beyond belief that the Social Security Administration isn't waking up to its responsibility to be part of the federal government's immigration enforcement arm" (quoted in Sheridan 2003).  David Ray, another spokesperson for FAIR, added, "These letters serve as a huge deterrent. … If people think they can live the good life as illegal immigrants, there is no incentive to play by the rules" (quoted in Avila and Franklin 2002).

However, this investigation has revealed that there are several reasons why immigration authorities and policymakers should view with skepticism the use of employer no-match letters as immigration enforcement tools.  First, employers have a conflict of interest in fairly meeting their obligations to SSA.  This investigation has found that employers' decisions regarding how to respond to no-match letters are driven more by the perception of the costs and benefits associated with firing or retaining workers with unmatched SSNs than with their legal obligations (which, in any event, seem to be poorly understood).  Therefore, a substantial number of employers will continue to hire and retain undocumented immigrants, even when they are fully aware workers lack legal status.  Furthermore, unscrupulous employers may use no-match letters to take advantage of workers' vulnerable position, undermining their rights and reducing their compensation.

Second, any immigration enforcement tool must ensure that employers do not violate workers' rights in their efforts to comply with the law.  In the process of

responding to no-match letters, many employers have undermined workers'
employment rights. Firing workers without constructive knowledge of their lack of
immigration status, which must be arrived at on a case-by-case basis, is the most
discernible violation of these rights. However, in their haste to remove
undocumented immigrants from their worksites, employers have systematically
undermined other aspects of the employment eligibility rights of workers such as re-
verifying their legal status. The violation of these rights not only is detrimental to
undocumented immigrants but also to authorized workers who are discharged when
employers assume everyone listed in the no-match letter is undocumented.

Third, it is highly unlikely that the no-match letter program could be more
successful than IRCA and its employer sanctions provisions in limiting the
employment of undocumented immigrants. Workers with unmatched SSNs who
were fired or quit in response to being identified in a no-match letter likely have
found employment elsewhere. Many workers interviewed for this study reported
that they found new employment in a matter of days or weeks, either with another
"mainstream" employer, in the underground economy, or through a temporary
staffing agency. The no-match letter program, although responsible for disrupting
local labor markets, has not prevented employers from hiring undocumented
immigrants. A partnership with ICE to use SSA's database of names and addresses
of persons with unmatched SSNs as an immigration enforcement tool would likely
produce similar outcomes.

Given the dismal performance and harmful consequences of the no-match
letter program, SSA should consider alternative tools for meeting its objectives.
Furthermore, the outcomes of this program indicate that solutions to issues related to
immigration enforcement should be addressed by the relevant agencies, namely the
U.S. Immigration and Customs Enforcement, not the Social Security
Administration.

# POLICY RECOMMENDATIONS

This investigation has shown that SSA's no-match letter program has been futile at accomplishing its stated goal of generating substantial numbers of corrections of unmatched wage items and thereby reducing the ESF. In addition, the program has proven ineffective and inappropriate as an immigration enforcement tool and has generated a host of negative labor market outcomes for workers with unmatched SSNs, including:

- the termination of employment without the opportunity to correct SSN information;
- retaliation by employers for labor organizing or raising complaints about worksite conditions; and
- reduction of wage and non-wage compensation.

The remainder of this study provides policy recommendations to eliminate some of the negative consequences associated with no-match letters.

## The no-match letter program

SSA should focus its efforts on mailing no-match letters only to workers at their home address, and suspend correspondence to employers. SSA should address the growth of the ESF using the other mechanisms that have proven

---

**SSA no-match letter program puts workers at risk, and their families under stress**

Isabel has worked for five years at the factory where she is presently employed as a janitor (Interview #2 2003). During the summer of 2002, her employer notified her and 100 other workers that they had SSNs that were unmatched. All 100 workers decided they wanted to address this problem together. They sought help from their union that is trying to get them work permits. Isabel also approached a local immigrant rights organization for help. With help from their union and community organizations, the workers have been able to prevent the company, at least in the short term from firing any workers.

Isabel thinks that despite their success in delaying any action, she is afraid for her job. The whole experience, she says, has taken a psychological toll on her and the other workers. Everyone works in fear. There are rumors that ICE is going to come in and raid the factory. Twenty workers have already quit because they feared being caught by immigration authorities.

Isabel's family also feels the effects of this problem because they depend on Isabel's income for survival. Before her current job, she worked two to three jobs at once just to make ends meet. She also has health benefits through the company, life insurance and vacation that she most certainly will not be able to find elsewhere.

When asked whether these troubles make her feel like going back to Mexico, Isabel responds and says, "I am here as a matter of necessity. I must stay and face these challenges. This isn't half of what I've suffered. Nobody wanted to rent me a home when I first immigrated. I was living in garages."

to be considerably more effective in crediting earnings in the ESF to workers with valid SSNs.

**On-line verification system**

Implementation of the Social Security Number Verification Service (SSNVS) may exacerbate the problems workers are experiencing because of no-match letters. The SSNVS currently operates as a pilot Internet-based system that enables a select group of 100 registered employers to determine the veracity of employees' SSNs. Although SSA may view SSNVS merely as an extension of the no-match letter program, the accessibility of electronic SSN information creates additional, unique problems. The impact of the Basic Pilot on newly hired employees provides the best insights into how an expanded SSNVS would operate. Without fixing errors in SSA's databases, the SSNVS most likely will replicate the failure of the Basic Pilot to accurately and consistently provide initial confirmation of SSNs belonging to authorized workers. SSA should treat such errors as unacceptable because, as this study and the evaluation of the Basic Pilot have demonstrated, employers frequently take adverse actions against workers with SSNs that SSA suggests may be invalid— even when explicitly advised by the agency not to do so.

Second, without the proper safeguards and penalties on employers for improper use of the system, the SSNVS likely will reproduce discriminatory problems encountered by workers as a result of the Basic Pilot and the no-match letter program. The Basic Pilot has encouraged employers to pre-screen employees who are more frequently foreign born (U.S. DOJ INS 2002). Employer no-match letters have led employers to assume that workers with unmatched SSNs are undocumented immigrants resulting in thousands of indiscriminate firings. SSA does not have mechanisms in place to ensure that employers do not use the SSNVS to selectively scrutinize workers' information based on their national origin.

Auditors correctly recommend that the Basic Pilot should not be expanded without making several enhancements. The same recommendation should apply to

33

the SSNVS.  SSA should not expand the SSNVS until it has improved the accuracy of data in the system and has developed mechanisms to prevent employers from:

- abusing the system to retaliate against workers;
- selectively pre-screening workers based on their national origin;
- invading workers' privacy; and
- taking adverse actions against workers without giving them sufficient opportunities to correct their SSN information.

**Comprehensive immigration reform**

The operation of the no-match letter program reveals many of the contradictory and destructive impacts of current U.S. immigration policy.  Although SSA did not design the program to be an immigration control effort, it nonetheless has thrust the agency into the arena of immigration enforcement.  It is not surprising that the no-match letter program has failed here.  Complex push and pull factors fuel the growth of undocumented immigration, factors with which the program cannot contend.  Even 17 years of employer sanctions under IRCA have been unable to deter employers from hiring undocumented immigrants.

Halting the growth of the ESF requires comprehensive immigration policy reform.  Millions of undocumented immigrants are working in the U.S. and many more will emigrate because there are employers that will hire them, despite the risks.  Immigration policy has to face up to this reality.  Removing undocumented immigrants from U.S. labor markets is impossible and undesirable.  The Urban Institute estimates that there currently are 5.2 million undocumented immigrants in the U.S. (Capps et al. 2003).  Most studies on undocumented immigrants suggest that a narrow band of occupations in the service and manufacturing sectors are highly dependent on the labor of undocumented immigrants.

Given these realities, immigration reform should include legalization of the current workforce.  Legalization accomplishes at least two objectives.  First, for SSA's purposes, legalization would allow SSA to post wage items in the ESF to accounts of presently undocumented immigrants.  If an undocumented immigrant

34

has worked in the U.S. using an invalid SSN (that is, if SSN never issued a valid SSN), the worker may request that their earnings from prior work performed under an invalid SSN be redirected from the ESF into their valid earnings record (SSA OIG 2003).  However, if undocumented workers are not given valid SSNs, their earnings may permanently sit in the ESF.

Second, legalization helps achieve the more important objective of reconciling employers' demand for workers, immigrants' needs for employment, and U.S. immigration policy.  Comprehensive immigration reform must include a plan for how to provide legal status to current and future immigrants who will, despite stepped up border-enforcement measures and employer sanctions, find a job with or without a valid Social Security number.

APPENDIX A: SAMPLE NO-MATCH LETTER SENT TO EMPLOYERS

# Social Security Administration
# Retirement, Survivors and Disability Insurance

Employer Correction Request                                    CODE V

Office of Central Operations
300 N. Greene Street
Baltimore, MD 21290-0300

Date: July 17, 2003
EIN: 13-1084740

..................................................................

Establishment Number: HART    MRN: 21898500028    WFID: 402015-01

**Why You Are Getting This Letter**

Some employee names and Social Security numbers that you reported on the Wage and Tax Statements (Forms W-2) for tax year 2002 do not agree with our records. We need corrected information from you so that we can credit your employees' earnings to their Social Security record. It's important because these records can determine if someone is entitled to Social Security retirement, disability and survivors benefits, and how much he or she can receive. If the information you report to us is incorrect, your employee may not get benefits he or she is due.

There are several reasons why the information reported to us doesn't agree with our records, including:

- Errors were made in spelling an employee's name or listing the Social Security number

- An employee did not report a name change following a marriage or divorce

- The name or Social Security number information were incomplete or left blank on the W-2 report sent to the Social Security Administration

**IMPORTANT:** This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number. Nor does it make any statement about an employee's immigration status.

See Next Page

Visit our website at http:.www.ssa.gov

36

You should not use this letter to take any adverse action against an employee just because his or her Social Security number appears on the list, such as laying off, suspending, firing, or discriminating against that individual. Doing so could, in fact, violate state or federal law and subject you to legal consequences.

**For Spanish-speaking individuals:** Esta carta y los documentos adjuntos proveen información sobre las acciones que debe tomar para corregir algunos de los nombres y números de Seguro Social que usted informó en la Declaración de Retención de Salarios (formulario W-2, "Wage and Tax Statement", en inglés) de sus empleados. Si usted necesita una traducción de esta carta, por favor, llámenos al número de teléfono gratis, 1-800-772-1213, de 7:00 a.m. a 7:00 p.m. hora del este.

Esta carta no implica que usted ni su empleado intencionadamente proveyó información incorrecta sobre el nombre o número de Seguro Social del empleado. Esto no es una razón, de por sí, para que usted tome ninguna acción adversa en contra del empleado, tal como supensión, despedida o discriminación del individuo que aparece en la lista. Cualquier empleador que usa la información en esta carta para justificar una acción adversa en contra de un empleado puede violar la ley estatal o federal y estar sujeto a consecuencias legales. Además, esta carta no hace ninguna declaración sobre el estado de inmigración de su empleado.

**What You Should Do**

It would be a great help to us if you could respond within 60 days with the information that you are able to correct so that the Social Security Administration can maintain an accurate earnings record for each employee and make sure your employees get the benefits they are due.

We have attached some materials to help you:

- A list of the Social Security numbers that do not match our records. (If the list shows you have "MORE" Social Security numbers to correct than listed, please call us at 1-800-772-6270 for assistance.)
- Instructions on "How To Correct Social Security Numbers".
- Tips on "Annual Wage Report Filing" for the future.

Visit our website at http://www.ssa.gov

37

13-1084740                                          Page 3 of 8

**If You Have Any Questions**

If you have any questions, please call us toll-free at 1-800-772-6270 between 7:00 a.m. and 7:00 p.m., Eastern time, Monday through Friday. We can answer most questions over the phone. You can also write us at the address shown on the first page of this letter. If you do call, please have this letter with you. It will help us answer your questions. Also, general program information is available from our website at http://www.ssa.gov/employer.

W. Burnell Hurt
Associate Commissioner for
Central Operations

Visit our website at http://www.ssa.gov

38

13-1084740                                            Page 4 of 8

## SOCIAL SECURITY NUMBERS THAT DO NOT MATCH OUR RECORDS

| | | | |
|---|---|---|---|
| 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 | 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 | 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 | 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 |
| 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 | 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 | 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 | 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 |
| 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 | 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 | 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 | |

Visit our website at http://www.ssa.gov

13-1084740

# How To Correct SSNs

Complete Forms W-2c (Corrected Wage and Tax Statement) for each of the SSNs listed that you are able to correct. You also need to file a Form W-3c (Transmittal of Corrected Wage and Tax Statements) whenever you file Forms W-2c. You don't need to prepare Forms W-2c for all the SSNs that you reported. If an employee does not provide corrected information or no longer works for you and you are unable to contact him/her, document your records with the information you relied on in completing the W-2 or the efforts you made to contact your former employee. Retain this information in your files; do not send it to SSA. You should provide all corrections as soon as possible. Please follow the guidelines below before preparing Forms W-2c.

You also need to file a Form W-3c (Transmittal of Corrected Wage and Tax Statements) whenever you file Forms W-2c.

- Compare your employment records to the Forms W-2 you reported for the SSNs included on the attached list.

- If your employment records and Forms W-2 do not match, prepare Forms W-2c with the corrected information from your employment records. (Do not send copies of proofs of identity or other documents in addition to, or in place of, the Forms W-2c.)

- If your employment records and Forms W-2 match, ask your employee to check his/her Social Security card and to inform you of any name or SSN difference between your records and his/her card. If your employment records are incorrect, correct your records.

- If your records match the information on the employee's Social Security card, have the employee contact any Social Security office to resolve the issue. Tell the employee that once he/she has visited the Social Security office he/she should inform you of any changes and correct your records accordingly.

- SSA may also send the employee a notice regarding this issue. You should discuss with the employee any changes you make to your employment records.

- If you wish to file your Form W-2c corrections electronically or on magnetic media, call SSA at 1-800-772-6270 to request a copy of the "Magnetic Media Reporting and Electronic Filing of W-2c Information (MMREF-2)".

- We suggest using AccuW2C to identify possible "Magnetic Media Reporting and Electronic Filing of W-2c Information (MMREF-2)" formatting errors. You can download AccuW2C from the Internet at:

http://www.ssa.gov/employer/accuwage

Visit our website at http://www.ssa.gov

40

13-1084740                                                    Page 6 of 8

- If you wish to file paper Forms W-2c, you can get them from the Internal
  Revenue Service.  Paper Forms W-2c should be sent to the following
  address:

    Social Security Administration
    Data Operations Center
    Attention:  W-2c Process
    P.O. Box 3333
    Wilkes-Barre, Pennsylvania 18767-3333

Visit our website at http://www.ssa.gov

41

## APPENDIX B: METHODOLOGY

### 1. Worker survey

The sampling methodology used for this study was designed to maximize the response rate within the population of workers identified in employer no-match letters. Given the sensitive nature of this study, the survey was implemented through community-based organizations, community colleges, social service providers, and churches that have established relationships with undocumented immigrants and other low-wage earning workers who are characteristic of workers identified in no-match letters.

The University of Illinois at Chicago Center for Urban Economic Development (UIC-CUED) recruited organizations identified through the partners in this study—Center for Community Change/National Campaign for Jobs and Income Support, National Immigration Law Center, National Interfaith Committee for Worker Justice, and Jobs with Justice. A letter requesting participation was sent to all member organizations. To augment the list of organizations volunteering to participate in response to the recruitment letter, UIC-CUED recruited additional organizations based on the demographic make-up of their constituents and their geographical location. The intent here was to ensure that workers were recruited through a wide range of sources so as to minimize bias associated with geography and surveying through organizations. In total, 41 organizations in 18 states participated in the survey. Participating organizations are located in the following states: California, Connecticut, Illinois, Indiana, Kansas, Massachusetts, Michigan, Mississippi, Missouri, Nebraska, New Jersey, New Mexico, New York, North Carolina, Ohio, Texas, Washington, and Wisconsin.

Once organizations were selected as survey sites, UIC-CUED trained staff from local organizations to recruit their members, constituents, and clients for participation in the survey. Trained interviewers approached all of their members, clients, or constituents from June 1st through September 15th, 2003 to request voluntary participation in the survey. Potential respondents were read a description

42

of the project and then given the opportunity to stop or to continue with the survey. Only volunteers whose employers had notified them that they were identified in a no-match letter after January 1st 2001 were allowed to participate. The survey was designed in English and translated into Spanish, Polish, and Portuguese.

<u>Statistical implications of non-random sampling</u>

The sample produced for this study is a non-random sample. One potential implication of the sampling technique is that workers who have experienced an adverse action by their employer might be more likely to respond to the survey than workers who were unaffected. To limit the self-selection bias in the sample to the greatest extent possible, organizations recruited participants in neutral locations such as churches, classrooms, and social service agencies where workers congregate for reasons other than to seek assistance for employment-related problems. No substantial variation in the frequency of adverse action taken by employers and the method of recruitment of research subjects was found. Moreover, variation in union status, occupation and industry generated no substantial variation in the frequency of reports of adverse action taken by employers against workers with unmatched SSNs.

<u>Weighting respondents</u>

Respondents employed by the same company almost always will experience the same action by the employer (known as cluster bias). Cluster bias affects the outcome of several statistics including the frequency of employers' actions against workers identified in no-match letters. For example, if one company employed all 921 respondents and the company fired all 921 respondents for being identified in the no-match letter, it would be meaningless to report that out of 921 respondents, 100 percent were fired because they all worked for the same company. To account for employer cluster bias, each respondent was assigned a weight. The weight equals *1/total number of workers working for the same employer*. Weighting statistics influenced by employer cluster bias in this way to minimize cluster bias means, for example, that the responses of 20 workers employed by the same company are given the same weight as the response of 1 worker who is the sole respondent from a given

43

company.  Frequency distributions and averages were weighted for the following statistics:

- Share of workers given an opportunity to correct their information;
- Median number of days workers were given to correct their information;
- Share of workers indicating employers used the letters to retaliate against them for union activity or for complaining about worksite conditions.

The following tables summarize the demographic characteristics of the sample generated from the No-Match Letter Survey.

Table B1: Sample Characteristics – Gender

| Gender | Percent of sample (n=804) |
|---|---|
| Male | 53.4 |
| Female | 46.6 |

Table B2: Sample Characteristics – State distribution of workers

| State | Frequency | Percent |
|---|---|---|
| Illinois | 456 | 49.5 |
| Texas | 127 | 13.8 |
| California | 88 | 9.6 |
| Wisconsin | 61 | 6.6 |
| Massachusetts | 58 | 6.3 |
| Indiana | 32 | 3.5 |
| Kansas | 27 | 2.9 |
| Ohio | 21 | 2.3 |
| Nebraska | 17 | 1.8 |
| North Carolina | 10 | 1.1 |
| New Mexico | 6 | 0.7 |
| Mississippi | 5 | 0.5 |
| New York | 5 | 0.5 |
| Other | 3 | 0.3 |
| Connecticut | 1 | 0.1 |
| Michigan | 1 | 0.1 |
| Missouri | 1 | 0.1 |
| New Jersey | 1 | 0.1 |
| Washington | 1 | 0.1 |

Table B3: Sample Characteristics – State distribution of employers

| State | Number of employers | Percent of total employers |
|---|---|---|
| California | 62 | 17.6% |
| Connecticut | 1 | 0.3% |
| Illinois | 53 | 15.0% |
| Indiana | 29 | 8.2% |
| Kansas | 26 | 7.4% |
| Massachusetts | 48 | 13.6% |
| Michigan | 1 | 0.3% |
| Missouri | 1 | 0.3% |
| Mississippi | 2 | 0.6% |
| North Carolina | 3 | 0.8% |
| Nebraska | 15 | 4.2% |
| New Jersey | 1 | 0.3% |
| New Mexico | 3 | 0.8% |
| New York | 5 | 1.4% |
| Ohio | 17 | 4.8% |
| Texas | 54 | 15.3% |
| Washington | 1 | 0.3% |
| Wisconsin | 29 | 8.2% |
| Unknown | 2 | 0.6% |

Table B4: Sample Characteristics – Industry distribution

| Industry | Frequency | Percent (weighted n=312) |
|---|---|---|
| manufacturing | 62 | 19.8 |
| restaurant and/or bar | 41 | 13.2 |
| retail store | 35 | 11.3 |
| other | 30 | 9.5 |
| warehouse/distribution | 28 | 9 |
| janitorial | 22 | 7 |
| temp agency | 18 | 5.9 |
| hotel | 18 | 5.8 |
| construction | 17 | 5.6 |
| health care | 11 | 3.6 |
| transportation | 10 | 3 |
| farming/agriculture | 6 | 2.1 |
| private home cleaning | 3 | 1 |
| child care | 3 | 1 |
| school/educational institution | 3 | 1 |
| don't know | 3 | 1 |
| security | 1 | 0.2 |

Table B5: Sample Characteristics – Occupational distribution

| Occupation | Frequency | Percent (weighted n=207) |
|---|---|---|
| production occupations | 59 | 28.4 |
| transportation and material moving occupations | 40 | 19.6 |
| building and grounds cleaning and maintenance occupations | 40 | 19.1 |
| food preparation and serving related occupations | 25 | 11.9 |
| sales and related occupations | 16 | 7.7 |
| construction and extraction occupations | 13 | 6.3 |
| office and administrative support occupations | 5 | 2.4 |
| healthcare support occupations | 3 | 1.4 |
| personal care and service occupations | 3 | 1.4 |
| farming, fishing and forestry occupations | 1 | 0.6 |
| education, training, and library occupations | 1 | 0.5 |
| installation, maintenance, and repair occupations | 1 | 0.5 |
| healthcare practitioners and technical occupations | 0 | 0.1 |

Table B6: Sample Characteristics – National origin

| Country/Region | Frequency | Percent (n=736) |
|---|---|---|
| Mexico | 622 | 84.5 |
| Brazil | 31 | 4.2 |
| Guatemala | 25 | 3.4 |
| Central America | 16 | 2.2 |
| Peru | 11 | 1.5 |
| El Salvador | 10 | 1.4 |
| Colombia | 5 | 0.7 |
| Ecuador | 4 | 0.5 |
| Honduras | 4 | 0.5 |
| South America | 3 | 0.4 |
| Bolivia | 2 | 0.3 |
| Argentina | 1 | 0.1 |
| Dominican Republic | 1 | 0.1 |
| Fiji | 1 | 0.1 |

## 2.  Worker and employer interviews

Organizations participating in this study also recruited respondents for in-depth interviews.  The goal of the interviews was to gain a more nuanced understanding of the circumstances influencing employers' actions against workers identified in no-match letters.  Organizations in one state also recruited employers to be interviewed for this study.  Interviews were conducted with the guarantee of confidentiality for all who volunteered.

## APPENDIX C: SUMMARY OF SSA ESF CORRECTION PROGRAMS

SSA primarily attempts to correct wage items in the ESF through four methods. The following is a description of each method and the extent to which that method leads to corrections (SSA OIG 2002a).

***The Single Select process accounted for 61 percent of corrections.*** This process assumes the worker's name is correct and that the SSN is incorrect. SSA then compares the worker's name against records in its Numident database, which contains all valid SSNs. If Numident shows only one SSN that matches the name, then SSA corrects the SSN and posts the worker's earnings appropriately.

***The IRS Reinstatement process accounted for 8 percent of corrections.*** The IRS conducts a similar process to correct mismatches and provides SSA with a file containing items it has resolved so that SSA can locate the workers to whom the suspended items should be credited.

***The DECOR process accounted for 8 percent of corrections.*** Once items are placed in the ESF, SSA generates letters, which are sent to employees at their home address. However, if SSA does not have an address for the worker or if it is incomplete on the W-2, the notice is sent to the employer. In TY 2000, SSA sent approximately 9.5 million DECOR notices (also known as "employee no-match letters"). Of the letters sent to employees, 40 percent are returned as undeliverable. The letters sent to employees with earnings recorded in the ESF include a response form the employee can use to report corrected information to the agency. Similarly, the letters sent to employers are regard an individual employee with earnings recorded in the ESF and includes a response form the employer can use to report corrected information to the SSA.

SSA reviews responses to the DECOR letter and, if the information matches its records, the earnings are properly posted to the individual's earnings record. If an individual does not respond, his or her information then goes through an additional

process called FERRET, through which an address file for this person is created. Then the worker's name or parts of it are compared against IRS data.

***The EDCOR process accounted for at most 2 percent of corrections.***  EDCOR includes the employer no-match letter program that SSA began in 1994 to notify businesses that the reports they filed contained information that did not match the agency's records.  The stated purpose for sending these no-match letters to employers is to ensure that employers and employees have an opportunity to correct the information in order for workers to receive proper credit for their earnings.

### APPENDIX D: SSA NO-MATCH LETTER SENT TO NEW MEXICO EMPLOYER

 **SOCIAL SECURITY ADMINISTRATION**

201 W. 8ᵗʰ St  Suite 700
Pueblo, CO 81003
Phone: (719) 545-9248
Fax:    (719) 542-2948
August 6, 2003



▇▇▇▇▇▇▇NM▇▇▇

Dear Sir/Madam:

We have been advised that your company has reported wages for ▇▇▇▇▇▇ under the Social Security number of ▇▇▇▇▇▇▇. You are hereby advised that this number does not belong to your employee and any documentation received from him/her that indicates otherwise is fraudulent. You are requested to immediately stop submitting wage reports for this person under above Social Security number. You should also correct all of your payroll and tax records.

According to our records, your employee does not have a valid SSN as we believe him/her to be an undocumented alien. Due to this fact, your company and any other company cannot legally employ him/her until he/she receives the proper work authorization from Immigration and Naturalization Service (INS). Any questions regarding this matter should be directed to _Leslie Montoya at (719) 545-3052 ext. _213.

Thank you,

*Leslie Montoya*

49

## REFERENCES

Aleinikoff, A. (2000). "Illegal Employers." *The American Prospect.* December 4.

Avila, Oscar and Franklin, Stephen (2002). "Social Security notices put jobs in jeopardy," *Chicago Tribune*, June 4.

Bansak, C. and Raphael, S. (1998) "Immigration Reform and the Earnings of Latino Workers: Do Employer Sanctions Cause Discrimination?" Discussion Paper 98-20, *University of California San Diego, Department of Economics.*

Bolzen, S. (2003). "Latinos start boycott against Batavia firms," *Chicago Tribune*, August 12.

Brown, R. (2003). "Many fired Peco workers leaving," *The Clarion-Ledger* (Jackson, MS), August 17.

Capps, R., Fix, M., Passel, J.S., Ost, J., and Perez-Lopez, D. (2003). *Immigrant Families and Workers: A Profile of the Low-Wage Immigrant Workforce.* Washington: The Urban Institute.

Cobb-Clark, D. A., Shields, C. R. and Lowell, L. B. (1995) "Immigration Reform: The Effects of Employer Sanctions and Legalization on Wages," *Journal of Labor Economics* 13(3): 472-98.

Dávila, A., Pagán, J. A., and Grau, M. V. (1998). "The Impact of IRCA on the Job Opportunities and Earnings of Mexican-American and Hispanic-American Workers." *International Migration Review* 32(1): 79-95.

Dobbins, Thomas (2003). Letter to Michael O' Neill, Chairman, and Ms. Connie Davis, Information Reporting Program Advisory Committee, Wage and Investment Subgroup.  Department of the Treasury, Internal Revenue Service.  September 24.

Hamill, S.D. (2003). "Firings are protested at Vernon Hills Store," *Chicago Tribune*, January 21.

Jacobo, B. (2003). "Between a rock and a hard place; workers laid-off after getting no-match letters have few options," *El Conquistador-Northwest/Aurora Edition*, June 13.

Malone, J. (2003). "Social Security Agency sharply reduces effort to validate cards," *Cox News Service*, June 11.

Massey, D.S., Durand, J., and Malone, N.J. (2002). *Beyond Smoke and Mirrors: Mexican Immigration in an Era of Economic Integration.* New York: Russell Sage Foundation.

Matthews, P. (2003). "Plan to round up, deport illegals angers activists," *The Clarion-Ledger* (Jackson, MS), August 12.

Mehta, C., Theodore, N., Mora, I., and Wade, J. (2002). *Chicago's Undocumented Immigrants: An Analysis of Wages, Working Conditions and Economic Contributions.* Chicago: Center for Urban Economic Development, University of Illinois at Chicago.

NLRB [National Labor Relations Board] (2001). *Personal Optics a/k/a Style Eyes of California* Case 21-CA-34087.

NLRB [National Labor Relations Board] (2003). *Tuv Taam Corp.* 340 NLRB No. 86.

NAID [North American Integration and Development Center], School of Public Policy and Social Research, UCLA (2003). Downloaded from http://naid.sppsr.ucla.edu/tables.PDF. October 31, 2003.

Parker, L. (2002). "Social Security campaign costs immigrants their jobs," *USA Today*, August 9.

Phillips, J.A. and Massey, D.S. (1999) "The New Labor Market: Immigrants and Wages After IRCA," *Demography* 36(2): 233-46.

Sheridan, Mary Beth (2003). "Social Security Scales Back Worker Inquiries; Agency Contacted Employers When False Data Were Used but Got Little Response," *Washington Post*, June 18.

SSA [Social Security Administration] (2003). EDCOR Notice Count by State For Receipt Year 2003, as of 07/12/2003, response to FOIA request.

SSA OIG [Social Security Administration, Office of the Inspector General] (1999). *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items* (A-03098-31009). September.

SSA OIG [Social Security Administration, Office of the Inspector General] (2000). Evaluation Report: The Social Security Administration's Earnings Suspense File Tactical Plan and Efforts to Reduce the File's Growth and Size (A-03-97-31003). February.

SSA OIG [Social Security Administration, Office of the Inspector General] (2002). *Congressional Response Report: Status of the Social Security Administration's Earnings Suspense File* (A-03-03-23038). November.

SSA OIG [Social Security Administration, Office of the Inspector General] (2003). *Congressional Response Report: Social Security Administration Benefits Related to Unauthorized Work* (A-03-03-23053), March 18.

Toth, S. (2003). "Employer's actions may discourage deception; data verified with Social Security," *South Bend Tribune*, July 28.

UCLA Center for Labor Research and Education (2003). Transcript of worker's testimony to officials from the San Francisco Region of the Social Security Administration.  May.

U.S. DOJ, INS [Department of Justice, Immigration and Naturalization Service] (2002). INS Basic Pilot Evaluation Summary Report. Prepared by the Institute for Survey Research, Temple University, Washington D.C., and Westat, Rockville, MD.

U.S. DOJ [Department of Justice, Civil Rights Division, Office of Special Counsel] (2003). Response to Freedom of Information Act request.

U.S. Immigration and Naturalization Service, Office of Policy and Planning (2003). "Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000." Downloaded from http://uscis.gov/graphics/shared/aboutus/statistics/Ill_Report_1211.pdf November 3, 2003.

**Interviews**

#1 (2003). Chicago, August.

#2 (2003). Texas, August.

#3 (2003). Chicago, September.

#4 (2003). Chicago, July.

#5 (2003). Chicago, August.

#6 (2003). Chicago, September.

#7 (2003). Chicago, September.

#8 (2003). Wisconsin, July.

#9 (2003). Chicago, September.

#10 (2003). Ohio, September.

#11 (2003). Chicago, September.

Flynn, Michael (2003).  Executive Director, Su Casa, September.

McMahon, Dan (2003).  Field Director of Organizing for the Chicago and Northeast Illinois District Council of Carpenters, September.

Morales, Juan (2003).  Worker, October.

Duberstein, John (2003).  Americorps member and Program Coordinator, Centro de Acción Latino, October.

Wilson, Michael (2003).  Worker, October.

EXHIBIT L

CHAMBER OF COMMERCE

OF THE

UNITED STATES OF AMERICA

1615 H STREET, N W
WASHINGTON, D C  20062
202/463-5422 · 202/463-5901 FAX

RANDEL K. JOHNSON
VICE PRESIDENT
LABOR, IMMIGRATION &
EMPLOYEE BENEFITS

ANGELO I. AMADOR
DIRECTOR
IMMIGRATION POLICY

August 14, 2006

**VIA ELECTRONIC MAIL**

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N.W., 2nd Floor
Washington, DC 20529

      **RE:**    **DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor
Procedures for Employers Who Receive a No-Match Letter**

Dear Director:

      On behalf of the United States Chamber of Commerce ("Chamber") and the other groups
listed below we would like to submit the following comments on the proposed rule cited above.
The Chamber is the world's largest business federation, representing more than three million
businesses of every size, sector, and region.

      The proposed rule would change existing regulations on how employers are expected to
respond to "no-match letters" from the Social Security Administration ("SSA") or the
Department of Homeland Security ("DHS"). This is being done at a time in which both houses
of Congress have passed legislation that includes new employment eligibility systems and
enforcement mechanisms. Thus, the Chamber requests that the regulation be withdrawn until
Congress acts regarding comprehensive immigration reform. In the alternative, the Chamber
asks for clarification regarding the substantive issues presented by the regulation as well as
additional time for employers to conform to the new system and process. No-match letter and
overall employment eligibility and verification standards include companies and organizations
across a wide spectrum of businesses and industries.

      The Chamber understands several of the concerns expressed by DHS, however, we think
that the proposed rule is untimely because it undermines the current legislative process. It also
does not properly consider the economic ramifications of acting outside the Administration's
own stated goal of enacting comprehensive immigration reform. This proposed rule only
muddies the waters during this critical time of debate. The Chamber believes that new rules on
employment verification should occur within the context of comprehensive immigration reform.

We should let these discussions continue without adding new bureaucratic burdens on well-intentioned employers or penalizing needed hardworking immigrants.

I.      **Issues Addressed by the Proposed Regulation Should be Part of Comprehensive Immigration Reform Legislation.**

DHS should let Congress continue to move the immigration debate forward as a whole and not section out areas to regulate; a piecemeal approach is not prudent. Both the Senate (S. 2611) and House (H.R. 4437) bills currently pending include stringent employment eligibility and verification systems and strengthened interior enforcement procedures.  They also significantly change an employer's responsibilities when verifying the identity and work authorization eligibility of its workforce.  Each measure specifically addresses the case when an employer receives a no-match letter from the SSA or from DHS.  It is important to let this ongoing, fruitful debate run its course without undermining it with regulations that may lead to duplicative and possibly contradictory proposals.  The proposed regulation should only be enacted as part of comprehensive immigration reform.  To advance an enforcement-only regulation independently—without a legalization program for current unauthorized workers and a guest worker program to address our future workforce needs—is short-sighted and not responsive to our nation's economic needs.

Should DHS go forward with the proposed regulation, we request that it takes into consideration the substantive issues presented below that are of great concern to the Chamber, its members, and the other groups listed at the end of these comments:

II.     **What constitutes receipt according to DHS? When Do Employers "Receive" No-Match Letters?**

The regulation does not state what happens in the instance where an SSA no-match letter goes directly to an employee at the employer's place of business.  Is the employer considered to be on notice and have constructive knowledge?  For this particular instance please outline what an employer should do to take advantage of the safe-harbor provision.

III.    **Constructive Knowledge and the Time Granted to an Employer to Take Reasonable Steps in Response to SSA No-match Letters and Written Notifications from DHS.**

*A. Constructive Knowledge Standard*

The proposed regulation would significantly increase the scope of constructive knowledge in certain circumstances.  It states that "the employer's obligations under current law, which is that if the employer fails to take reasonable steps after receiving such information, and if the employee is in fact an unauthorized alien, the employer may be found to have had

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 3 of 8

constructive knowledge of that fact."[1]  The regulation defines what constitutes a "reasonable response" by an employer to a no-match letter and mandates specific steps to be taken by the employer within defined periods of time.  The regulation's preamble suggests that taking such measures may allow the employer to avoid liability and mitigate or eliminate potential penalties, but leaves much unanswered.

### B.  What Constitutes a Reasonable Response?

The proposal states that within 14 days of receipt of the no-match notice, an employer must attempt to resolve the discrepancy by checking its personnel and payroll records to determine whether the discrepancy results from a clerical error. If it is simply a clerical mistake, the employer is to contact SSA and administratively correct the information. If it is not clerical, the employer must approach the employee and confirm that the information that was provided by the employee to the employer is indeed accurate. If there was an inadvertent mistake when transmitting the information, the employer should correct immediately and inform SSA. If however, the employee says that initial information provided is accurate, the employer must direct the employee to the local SSA office where the employee has to resolve the issue.

After an employer has determined that a discrepancy is not from a clerical error on the part of the employer, the proposed regulation states that the "employer takes reasonable steps, within 14 days, to attempt to resolve the discrepancy; such steps may include: . . . if [the records] are correct according to the employee, requesting the employee to resolve the discrepancy with the Social Security Administration, such as by visiting a Social Security Administration office."[2] The regulation then goes on to state that if the discrepancy has not been resolved within 60 days, and if the employee's identity and work authorization cannot be verified at that time, then employers "must choose between taking action to terminate the employee or facing the risk that DHS may find that the employer had constructive knowledge the employee was an unauthorized alien."[3]  There are two main issues that arise from the above:

1. These timeframes (14 days and 60 days) are not practical or fair.  Both large and small employers will be faced with challenges to meet this standard.  Large employers may receive several no-match letters at a time, which are likely to include hundreds of names.  Particularly in decentralized operations, the necessary follow-up and personnel interviews will take significant man hours to accomplish.  As a result, it will be very difficult to resolve all of the letters in the prescribed time period.  Small businesses face even more hurdles to comply.  They often do not have a full-time administrative staff to address these issues in a 14-day timeframe.  Small business owners often have to run the business, oversee bookkeeping, supervise employees and perform multiple administrative duties.  Adding this clerical review and follow up with each employee will only add to these tasks.  The 14-day period is accordingly not reasonable and will be unduly

---

[1] *See* Safe-Harbor Procedures for Employers Who Receive a No-Match Letter, 71 Fed. Reg. 34,282 (2006) to be codified at 8 CFR 274a) (proposed June 14, 2006).
[2] *Id*. at 34,285.
[3] *Id*. at 34,283.

burdensome for small employers as well.  The allotted time by which an employer must respond to a no-match is not an adequate, nor a reasonable time-period for an employer to have to act. We therefore request that this be changed to a reasonable time frame standard, which would then acknowledge the difference in sophistication of the over seven million employers in the United States.

2.  It is also unclear from the regulation as to what occurs between the 14-day and 60-day time period and request clarification on the issue.  It is our assumption that the employer has 14-days to inform the employee of the discrepancy and determine whether it is a clerical mistake.  Thereafter, the employer has 60-days, from the date of receipt of the letter or notice, to ensure and confirm that the discrepancy has been rectified.  Thus, an employee has less than two months to work out a resolution if there is an error between themselves and the Social Security Administration, which might not be enough time.  Finally, it is the Chamber's reading and understanding that as a matter of fairness and reasonableness,  an employer can continue to employ an employee between the 14 and 60-day period, even if there is an unresolved discrepancy.

## IV.    Requirement to Fill Out New I-9 Forms.

As noted above, the proposed regulation requires that employers verify the employee's identity and work authorization within 60 days following notice of a discrepancy and that "the employer complete a new I-9 Form for the employee, using the same procedures as if the employee were newly hired."[4]  This provision needs to be clarified for employers.  Based on the proposed regulation, it seems that if there was simply a clerical error that is found within the 14-day window, the employer needs only to record that they spoke with SSA and it was worked out, but the employer does not need to complete a new I-9 Form for the employee that received a no-match.  Also according to the regulation, if an employee could not resolve his or her issue with SSA regarding the no-match within 60 days, an employer may complete a new I-9 Form for that employee and continue to hire him or her as long as they do not use the disputed no-match documents to verify work authorization.

What is unclear is what an employer is to do if the employee does indeed resolve the no-match issue within the 60-day time period.  Does the employer have to do a new I-9 Form to record the resolved social security number?  It is the Chamber and the signatories' belief that requiring a new I-9 Form every time there is a discrepancy that must be corrected with the SSA would be a burdensome process for our employers, both financially and administratively.  Oftentimes, large employers are informed of hundreds of no-matches on a monthly basis.  These no-match letters are often the product of name changes for newly married or divorced employees who have not yet applied for a new social security card to reflect their new name.  Having to enforce a blanket requirement that requires an employer and employee to fill out and complete new I-9 Forms for nearly every no-match would be unduly burdensome on the employer with minimal benefit to the government's interest.

---

[4] *See* Safe-Harbor, 71 Fed. Reg. at 34,283.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 5 of 8

Additionally, this process would create inconsistent results.  For example, some employees change their names for any number of reasons and properly report this to the SSA.  Therefore, these employees would not have a no-match, but the employee's name would be different from that listed on the original I-9 Form.  This would require some employees who had a name change to fill out a new I-9 Form (those who initially forgot to report it to the SSA) but not others (those who had immediately reported their name change to the SSA).  It would seem inconsistent to only require new I-9 Forms for some name changes but not others.  Finally, we would like to caution DHS regarding the potential fallout from the implementation of this policy.  It will create further incentives for fraud and misreporting.  Employees required to fill out a new I-9 Form can simply provide new false information and documentation.

In the alternative, the employee should be required to provide documentation to the employer within a reasonable period of time, such as 120 days, establishing that the employee has corrected the discrepancy with the SSA.  This additional time will allow for more accurate reporting.  Otherwise, an employee may simply present new false documentation to the employer when filling out the new I-9 Form.  This would not meet the objective sought by this additional requirement.

Finally, the actions an employer must take under the proposed regulation, when re-verification does not produce a satisfactory result, are vague.  DHS needs to clearly state if it wants employers to terminate the employment relationship under such circumstances.  Furthermore, if so, it must also state that employers should be indemnified from possible liability arising from the employee's termination in accordance with new protocol outlined in the regulation.  For example, the proposed regulation states that if the "employee's identity and work authorization" is verified "even if the employee is in fact an unauthorized alien, the employer will not be considered to have constructive knowledge."[5]  However, the proposed regulation is unclear as to what an employer should do when a potential United States citizen or work-authorized alien is not able to satisfy the verification requirements in the time periods allotted.

Again, the current legislative proposals specifically and clearly provide indemnification from liability to an employer who terminates an employee after following the appropriate protocol—another reason to wait for the legislative process to work.  It is unclear whether a regulation could legally provide for such indemnification.  Meanwhile, this proposed regulation definitely has the potential of catching even the best-intentioned employers in a new array of litigation due to a myriad of conflicting federal laws and regulations, such as those dealing with civil rights.

## V.    Totality of the Circumstances Standard.

One of the ways that an employer can be notified of a name discrepancy is through written notification from DHS.  The proposed regulation explains that DHS will take into account the totality of relevant circumstances when making a determination whether the employer had constructive knowledge that the alien was unauthorized to work.  It, therefore,

---

[5] *See* Safe-Harbor, 71 Fed. Reg. at 34,283.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 6 of 8

seems that receipt of notification alone is not absolutely determinative regarding whether an employer had constructive knowledge. Please provide clarification whether this reading is accurate.

Regarding the receipt of a SSA no-match letter, a comparable standard to that of the totality of the relevant circumstances is not applied. Determining whether an employer had constructive knowledge is not purely an objective finding and there should be a comparable standard included in the regulation. Imputation of constructive knowledge in all instances should depend on the totality of relevant circumstances. An example that highlights the importance of SSA taking into account the totality of the circumstances is as follows: It is common that after an immigrant enters the US they informally change their name so to "Americanize" it. More often than not the immigrant does not file for a legal name change and, as a result, this can trigger a no-match and the employee can be subsequently discharged by the employer. It is an instance like this when SSA should take into account the totality of the circumstances. That is what is reasonable and equitable and conforms to the standard used by DHS as noted in the proposed regulation.

## VI.    Accuracy and Effectiveness of the System.

As previously noted, one of the ways by which an employer can be put on notice is by receiving a written notification from DHS. Unlike SSA, DHS does not have a mechanism in place that regularly checks and reports mismatched immigration documents. Rather, DHS generally is made aware of mismatched immigration documents in the context of an I-9 Forms audit. As noted in the proposed regulation, if an employer receives a letter from DHS, s/he is expected to resolve the issue by "tak[ing] reasonable steps, within 14 days of receiving the notice, to attempt to resolve the question raised by DHS about the immigration status document or the employment authorization document."[6] However, DHS provides no specific guidance as to what those steps should be and what an employer should do to rectify the situation. <u>We request that this process be outlined and explained and that time be provided for further comment.</u>

In addition to the substantive issues addressed above, the proposed regulation would also adversely impact the U.S. economy and our country's national security.

## VII.    De-stabilizing Effect on the U.S. Economy.

It is estimated that annually 500,000 essential workers enter the U.S. to perform much needed labor without work authorization. Our economy not only absorbs these needed workers, but it depends on it for our current level of growth. There are currently an estimated 12 million unauthorized workers in the U.S. This proposed regulation will strip needed workers from employers without providing employers with an alternative legal channel by which to recruit to fill the gaps created by a combination of an aging workforce domestically, higher educational attainment by the domestic population, and a booming economy with full levels of employment.

---

[6] *See* Safe-Harbor, 71 Fed. Reg. at 34,285.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 7 of 8

It is well documented that about five percent of the total U.S. workforce has no work authorization.  It could easily be deduced that an even smaller percentage of the total U.S. workforce is working with made up names and social security numbers.  Nevertheless, this small percentage of essential workers is overrepresented in sectors of the economy and regions of the country where the gap between the availability of a domestic workforce and the jobs available is greater.

Increasing interior enforcement and strengthening the employment eligibility and verification system without a legalization program for current unauthorized workers and a guest worker program to address our future workforce needs would be detrimental to the U.S. economy and the stability of an essential workforce.  This is precisely why the proposed regulation should be coupled with comprehensive immigration reform.  Immigration reform must be comprehensive, not disjunctive.

**VIII.   Firing of Immigrant Workers and the Potential Growth of the Underground Economy.**

Another reality of this proposal is that if an employer receives a no-match letter, many employees will simply be fired because employers will not want to risk liability by taking unnecessary steps to remedy the situation on behalf of the employee.  If terminated, those who lack work authorization will not simply leave the U.S.  Rather, they will likely enter the underground workforce.  This is yet one more reason why this proposal should be part and parcel of comprehensive immigration reform.  As stated, we request that the regulation be held until Congress negotiates a House and Senate compromise—given that both houses of Congress have spoken of their desire to legislate in this field by passing proposals, which are quite similar in the area of worker employment eligibility and verification.

Furthermore, this proposed regulation addresses the employers who are trying to comply with the law but it does not address those underground employers who are completely non-compliant and do not complete the required I-9 Form and instead pay workers under the table.  These indeed are the bad actor employers, yet the regulation gives them a free pass.  By not addressing this real and thriving underground economy and only proposing increased regulations on those employers trying to act in accordance with the law, this regulation acts as an incentive for employers and employees to enter the underground economy.  Workers in the black-market economy do not pay taxes and remain in the shadows and employers are not held accountable.  Creating further incentives to thrive only within the underground economy is neither sound economic policy nor in our country's national security interest.

**IX.   The Fine Line Between Compliance and Violation.**

Out of fear of non-compliance with DHS's proposed regulation, employers might be extra vigilant in trying to verify an employee's identity and eligibility to work in the U.S.  However, there is a fine line for the employer between ensuring that the workforce is legal and violating existing anti-discriminations laws.  For example, should an employee present

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 8 of 8

documents other than a Social Security card when completing the I-9 Form and there is subsequently a no-match letter issued. The employer then confronts the employee and request to see the Social Security card. Clearly, this would present an issue regarding anti-discrimination laws already in effect. The Chamber requests that DHS provide clarification on how an employer should respond to such a situation.

## X.  Conclusion

As explained, the proposed regulations are misguided and will have an adverse effect on the nation's economy and its overall national security. For the reasons stated above, the Chamber urges DHS to withdraw this proposed regulation and to wait for Congress to finish its work on comprehensive immigration reform, as the Administration continues to insist.

We greatly appreciate the excellent relationship we have developed with the DHS and hope to continue to expand that relationship in the future as we work to address this important issue.

Respectfully submitted,

Randel K. Johnson                           Angelo I. Amador
Vice President                              Director
Labor, Immigration and Employee Benefits    Immigration Policy

**Also on behalf of:**

Associated Builders and Contractors

Associated General Contractors of America

American Hotel & Lodging Association

American Seniors Housing Association

College and University Professional Association for Human Resources

Ingersoll Rand Company

National Association of Convenience Stores

Professional Landcare Network

Retail Industry Leaders Association

Tree Care Industry Association

EXHIBIT M



1201 F, St, NW, Suite 200, Washington, DC 20004
(202) 554-9000

August 14, 2006

Hon. Michael Chertoff
Secretary
Department of Homeland Security
Bureau of Immigration and Customs Enforcement
Washington, DC 20528

**RE: PROPOSED RULE ON THE SAFE-HARBOR PROCEDURES FOR EMPLOYERS WHO RECEIVE A NO-MATCH LETTER (DKT NO ICEB-2006-0004).**

Dear Secretary Chertoff:

On behalf of the small-business owners represented by the National Federation of Independent Business (NFIB), I am writing to offer comments on the Department of Homeland Security (DHS) Bureau of Immigration and Customs Enforcement's (BICE) Proposed Rule on the Safe-Harbor Procedures for Employers Who Receive a No-Match Letter, listed in the Federal Register on June 14, 2006 (71 Fed. Reg. 34281). NFIB appreciates DHS's efforts to give businesses guidance on how to handle no-match letters.

NFIB is the nation's largest small business advocacy organization, with offices in Washington, D.C. and all 50 state capitals. NFIB serves the needs of small business on a broad spectrum of issues. Ninety percent of NFIB members have fewer than 20 employees. The typical NFIB member employs five workers and reports gross sales of around $350,000 per year.

Clarification of the employer's obligation upon receiving a no-match letter and the safe harbor provided for in the proposed regulation is critical. This is particularly important given that DHS now intends to utilize no-match information in their enforcement activities. These

Comments by NFIB on the Proposed Rule with Request for Comment        Page 2
Safe-Harbor Procedures for Employers Who Receive a No-Match Letter
August 14, 2006

procedures are consistent with the suggested steps given by the Social Security Administration (SSA) on what to do when you receive a no-match letter.

When SSA began sending no-match letters to employers, businesses were told the intent was not enforcement of immigration laws but to correct any mistakes so that social security funds were properly allocated. There are many causes for such a no-match, including clerical error and name changes. Allowing SSA no-match data to be used by DHS for immigration enforcement might create anxiety for employers who are told that while unlawful to hire illegal workers it is also unlawful to scrutinize documents. Employers must accept documents if they "appear reasonably genuine on their face" or risk the threat of being faced with a discrimination lawsuit. This regulation will give our small employers who follow the law and verify their worker's identity and employment eligibility to the best of their ability a safe harbor from fines if appropriate action is taken upon receipt of a no-match letter.

Employers are obligated to take reasonable action when they have been notified they may have hired an illegal alien. The guidance put forth by this regulation is necessary because while the SSA has told employers that the receipt of a no-match does not mean that their employee is illegal, a substantial number of workers identified by no-match letters are undocumented immigrants who are unable to provide legitimate social security numbers. The proposed rule spells out steps to be taken to resolve the discrepancy. If that discrepancy cannot be resolved within 60 days, the regulation states that the employer must reverify the employee's identity and employment authorization or terminate the employee.

Because this proposed rule states that inaction after the receipt of a no-match constitutes knowingly employing an illegal worker, NFIB has concerns about the time frame given to resolve the issue. First, the regulation should specify whether the employer has 14 calendar days or 14 government working days. NFIB suggests that employers would need the time frame to be based on government working days because the resolution involves contacting either SSA or DHS.

**Comments by NFIB on the Proposed Rule with Request for Comment**                Page 3
**Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**
**August 14, 2006**

Another concern with the 60-day time frame is that employers only have 14 days to act. This leaves the employee with 46 days to follow-up with any action that needs to done on their part. If an employer participates in the Basic Pilot program an employee who receives a tentative nonconfirmation has only eight days to correct potential problems with SSA. It raises questions as to why employees get 46 days to correct problems with work authorization after a no-match letter and eight days with the Basic Pilot, the effort on behalf of the employee should the same in both instances. Additionally this time frame provides a new opportunity for illegal workers to game the system. This could be a problem for employers because they have to keep employees that have no intention of contacting SSA because they do not have legal work status. According to research by Center for Urban Economic Development at University of Illinois on the no-match program, few corrections are actually made because of these letters since most of the workers identified are not authorized to work. Allowing 46 days gives employees a chance to maintain employment with full knowledge that there will not be any corrections made with SSA or DHS. If the employer suspects that the employee is making no effort to resolve the no-match issue they have no choice but to wait out the remaining 46 days before terminating the employee and starting the hiring and training process, just simply prolonging the inevitable.

NFIB questions why employees cannot correct their information within the same time frame as employers. If a 60-day time frame is adopted, 30 days should be allowed for both the employer and the employee. If DHS intends to keep the employer deadline at 14 days then employees should be given that same deadline.

NFIB is also concerned that DHS will not be flexible with the 14-day deadline. Small businesses often have problems with rigid deadlines that do not allow the agency to evaluate why an employer might have missed the deadline. Thanks in part to the efforts of NFIB, the Occupational Safety and Health Administration allows small businesses to file appeals even if they missed a deadline because of a mistake or with a reasonable excuse. DHS allows themselves flexibility in the rules by stating that DHS will look at all the behaviors of the offending employers specifying that the safe harbor procedures cannot be used to avoid liability if the employer demonstrates they had knowledge their employee was an unauthorized alien. NFIB

**Comments by NFIB on the Proposed Rule with Request for Comment**     Page 4
**Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**
**August 14, 2006**

hopes that DHS will look at all the circumstances surrounding an employer who unknowing hired and illegal worker but inadvertently missed the 14-day deadline.

NFIB urges DHS to carefully consider the full impact the proposed rule will have on small business.  By setting forth "options" for avoiding liability, the proposed rule has in effect created additional recordkeeping and other compliance requirements on a substantial number of small entities.  Pursuant to the Regulatory Flexibility Act, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, NFIB requests that the agency carefully determine whether the proposed rule will have a significant economic impact.

NFIB appreciates the opportunity to provide comments on DHS's Proposed Rule on the Safe-Harbor Procedures for Employers Who Receive a No-Match Letter. Please do not hesitate to contact us if you have any questions.

Sincerely,

Dan Danner
Executive Vice President
Public Policy and Political

# EXHIBIT N

 Tyson Foods, Inc.



EXEC SEC

BY: ......................

JAN 4 '05 RCVD

December 30, 2004

Secretary Tom Ridge
Department of Homeland Security
3801 Nebraska Ave. N.W., Building 1
Washington, DC 20528

   Re:  Social Security Administration "No Match" Letters

Dear Mr. Ridge:

  We are writing to gain clarification of our processes with regard to the receipt of letters from the Social Security Administration, which report that certain employees' records in the Social Security database do not match the records we provide to the federal government for tax purposes ("no match letters"). We understand these are notices of a mismatch between the data we report and the data contained in the Social Security records and could be the result of data entry error, name changes (whether through changes in marital status or other means), or misrepresentations.

  When we receive no match letters we ask the individuals to go to the Social Security office to correct the inconsistency in the databases because we desire integrity in our Human Resources Information Systems. We thus ask that individual to provide us evidence of any necessary correction so that we can ensure not only that our internal records are correct but also that we will not receive repeated "no match" letters relating to that individual. We ask the individual to report back to us within a given time frame that the correction has been made or is in process. A failure to do so results in the individual's termination.

  A number of third party organizations have asked us to reconsider this policy. They believe that we should only provide the individual the no match letter and then leave it to the individual to correct without having any further duties to report to us. This leaves us with the possibility that the individual will not correct the records and we will receive further no match letters on that individual. Additionally, given past historical evidence that has, at a minimum, suggested that many of the individuals appearing on such letters who choose not to correct the information have misrepresented their identity, we have some concern that a complete lack of

**Tyson Foods, Inc.** 2210 W. Oaklawn  Springdale, AR 72762-6999 479-290-4000  www.tysonfoodsinc.com

 Tyson Foods, Inc.

follow up on our part will result in people working in our employ under incorrect identities, albeit unknowingly.

These organizations point to a number of opinion letters that state that no match letters, standing alone, are not evidence of falsification or a lack of an authorization to work in the United States. On that basis, they want us to change our policy and allow such individuals to continue to work regardless of the individuals' action or inaction with respect to such no match letters. We appreciate their counsel and have a desire to foster a good relationship with such groups; however, we have a legitimate interest also in ensuring that our databases have correct information with regard to our employees and that our employees are not working under incorrect identities.

Given these factors, we would like your opinion as to the following: (1) whether our current process is lawful and appropriate and (2) whether it would be appropriate for us to follow the counsel of these third party organizations who are requesting that we discontinue our process and not follow-up at all.

Sincerely,

Senior Vice President
Human Resources

cc:    Assistant Secretary Asa Hutchinson
       Department of Homeland Security
       3801 Nebraska Ave. N.W., Building 5
       Washington, DC 20528