Linda Claxton (SBN 125729)
linda.claxton@ogletreedeakins.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
633 West Fifth Street, 53rd Floor
Los Angeles, California 90071
Telephone: (213) 239-9800
Facsimile: (213) 239-9045

Attorneys for Amicus Curiae
THE NATIONAL FEDERATION OF
INDEPENDENT BUSINESS LEGAL FOUNDATION

Karen R. Harned
Elizabeth Gaudio
NFIB Legal Foundation
1201 F Street, N.W.
Suite 200
Washington D.C., 20004
Telephone: (202) 406-4443
Facsimile: (202) 479-9059

Of Counsel

Ogletree Deakins

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS; SAN FRANCISCO LABOR COUNCIL; SAN FRANCISCO BUILDING AND CONSTRUCTION TRADES COUNCIL; AND CENTRAL LABOR COUNCIL OF ALAMEDA COUNTY,

Plaintiffs,

v.

MICHAEL CHERTOFF, Secretary of Homeland Security; DEPARTMENT OF HOMELAND SECURITY; JULIE MYERS, Assistant Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MICHAEL

Case No. 07-04472(CRB)

**AMICUS MEMORANDUM OF POINTS AND AUTHORITIES OF PROPOSED AMICUS CURIAE NATIONAL FEDERATION OF INDEPENDENT BUSINESS LEGAL FOUNDATION IN SUPPORT OF PLAINTIFF INTERVENORS ' REGULATORY FLEXIBILITY ACT CAUSE OF ACTION**

Date: October 1, 2007
Time: 10:00 am
Judge: Hon. Charles R. Breyer
Place: Courtroom 8

ASTRUE, Commissioner of Social Security; and SOCIAL SECURITY ADMINISTRATION,

Defendants.

SAN FRANCISCO CHAMBER OF COMMERCE, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, GOLDEN GATE RESTAURANT ASSOCIATION, NATIONAL ROOFING CONTRACTORS ASSOCIATION, AMERICAN NURSERY & LANDSCAPE ASSOCIATION, INTERNATIONAL FRANCHISE ASSOCIATION, and UNITED FRESH PRODUCE ASSOCIATION

Plaintiff-Intervenors,

v.

MICHAEL CHERTOFF, Secretary of Homeland Security; DEPARTMENT OF HOMELAND SECURITY; JULIE MYERS, Assistant Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MICHAEL ASTRUE, Commissioner of Social Security; and SOCIAL SECURITY ADMINISTRATION,

Defendants.

TABLE OF CONTENTS

**Page(s)**

I. NFIB LEGAL FOUNDATION'S STATEMENT OF INTEREST ........................ 1

II. STATEMENT OF FACTS ........................ 3

III. ARGUMENT ........................ 4

**A.** Background and Mechanics of the Regulatory Flexibility Act ........................ 4

**B.** There is No Record Basis for Defendants' No SEISNSE Certification ........ 7

**C.** Courts Have Carefully Scrutinized No SEISNSE Certifications ................ 10

IV. CONCLUSION ........................ 13

Ogletree Deakins

## TABLE OF AUTHORITIES


Page(s)

**FEDERAL CASES**

*American Oceans Campaign v. Daley*
183 F. Supp. 2d 1 (D.D.C. 2000) .......... 11

*Associated Fisheries of Maine, Inc. v. Daley*
127 F.3d 104 (1st Cir. 1997) .......... 10, 11

*Blue Water Fisherman's Ass'n v. Mineta*
122 F. Supp. 2d 150 (D.D.C. 2000) .......... 10

*Marsh v. Oregon Natural Res. Council*
490 U.S. 360 (1989) .......... 10

*Nat'l Ass'n for Home Care v. Shalala*
135 F. Supp. 2d 161 (D.D.C. 2001) .......... 10

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*
417 F.3d 1272 (D.C. Cir. 2005) .......... 2

*Nat'l Ass'n of Psychiatric Health Sys.*, 120 F. Supp. 2d at 44 n.8 .......... 11, 12

*North Buckhead Civic Ass'n v. Skinner*
903 F.3d 1533 (11th Cir. 1990) .......... 11

*North Carolina Fisheries Ass'n v. Daley*
16 F. Supp. 2d 647 (E.D. Va. 1997) .......... 7, 12

*North Carolina Fisheries Ass'n v. Daley*
27 F. Supp. 2d 650 (E.D. Va. 1998) ("*NCFA II*") .......... 12

*Oceana, Inc. v. Evans*
384 F. Supp. 2d 203 (D.D.C. 2005) .......... 10

*Robertson v. Methow Valley Citizens Ass'n*
490 U.S. 332 (1989) .......... 11

*Southern Offshore Fishing Ass'n v. Daley*
995 F. Supp. 1411 (M.D. Fla 1998) .......... 12

*U.S. Cellular Corp. v. FCC*
254 F.3d 88 (CA DC 2001) .......... 11

*U.S. Telecomm. Ass'n v. FCC*
400 F.3d 29 (D.C. Cir. 2005) .......... 2, 11

**FEDERAL STATUTES**

5 U.S.C. 601(6) .......... 3

5 *U.S.C.* § 601 *et seq.* (2006) .......... 2

5 U.S.C. § 603(a) .......... 4, 6

5 U.S.C. § 603(b) .......... 6

5 U.S.C. § 604 .......... 12

5 U.S.C. § 604(a) .......... 6

5 U.S.C. § 604(a)(3) .......... 6

5 U.S.C. § 604(a)(5) .......... 6

5 U.S.C. § 605(b) .......... 1, 4, 6

5 U.S.C. § 611(a)(1) & (2) .......... 10

5 U.S.C. § 706 .......... 10

5 U.S.C. § 706(2) .......... 4

8 U.S.C. § 1324a(a)(1)(A) .......... 3

8 U.S.C. § 1324a(a)(2) .......... 3

8 U.S.C. S 1324a(a)(1)(A)-(2) .......... 7

Internal Revenue Code § 501(c)(3) .......... 2

Pub. L. No. 96-354, 94 Stat. 1164, § 2(b) (codified at 5 U.S.C. § 601) .......... 6

Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 ("RFA") .......... 1, 4

U.S.C. § 601(3)(b) .......... 4

**OTHER AUTHORITIES**

142 CONG. REC. S3245 (daily ed. Mar. 29, 1996)....................10

71 Fed. Reg. 34281 (June 14, 2006)....................3

72 Fed. Reg. 45611 (Aug. 15, 2007)....................1, 3, 7

72 Fed. Reg. 45623....................7, 8

72 Fed. Reg. 45624 (Aug. 15, 2007)....................9

Immigration Reform and Control Act of 1986 (“IRCA”)....................3

IRCA....................3, 7

Small Business Regulatory Enforcement Fairness Act of 1996....................4

W. MARK CRAIN, THE IMPACT OF REGULATORY COSTS ON SMALL FIRMS 4 (2005)....................5

William J. Dennis, Jr., *NFIB National Small Business Poll: The Changing Search for Employees*, vol. 1....................9

William J. Dennis, Jr., *NFIB National Small Business Poll: Coping with Regulation*, vol. 1....................5

William J. Dennis, Jr., *NFIB National Small Business Poll: Training Employees*, vol. 5....................9

Ogletree Deakins

By contemporaneously filed ex parte request, the National Federation of Independent Business Legal Foundation ("NFIB Legal Foundation") has moved to participate in this action as an amicus curiae with respect to Plaintiff-Intervenors' First Cause of Action. Plaintiff-Intervenors there allege that Defendants violated the Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 ("RFA"), in promulgating a new rule, "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" set forth at 72 Fed. Reg. 45611 (Aug. 15, 2007) (hereinafter the "Final Rule"). In summary, Plaintiff-Intervenors' First Cause of Action takes cogent issue with the Department of Homeland Security's ("DHS") finding, purportedly made pursuant to the RFA, 5 U.S.C. § 605(b), that the interim final rule at issue will not have a "significant impact on a substantial number of small entities," or "SEISNSE."

Proposed Amicus NFIB Legal Foundation respectfully submits the following (Proposed) Amicus Memorandum of Points and Authorities Supporting Plaintiff-Intervenors' RFA Cause of Action. Not only does the Proposed Amicus NFIB Legal Foundation have members adversely affected by DHS's failure to comply with the RFA, NFIB has a special and demonstrated interest and expertise in Federal Government-wide RFA compliance. Proposed Amicus thus respectfully submits that it will present additional argument and perspective that will inform this Court's consideration of Plaintiff-Intervenors' well-founded RFA claim.

## I. NFIB LEGAL FOUNDATION'S STATEMENT OF INTEREST

The National Federation of Independent Business ("NFIB") is the nation's oldest and largest, non-profit, national organization dedicated to representing the interests of small-business owners throughout all 50 states, including over 22,000 members in the state of California. NFIB's national membership consists of independently-owned and operated businesses that have non-dominant market positions within their industry. The majority of NFIB members have an average of five employees and annual net profits of $40,000 to $50,000 annually.

In 2000, NFIB established the NFIB Legal Foundation to help ensure that federal and state agencies comply with the law in their treatment of small businesses. The NFIB Legal Foundation is an Internal Revenue Code § 501(c)(3) public interest law firm created to protect the rights of America's small-business owners by ensuring that the voice of small business is heard in the nation's courts.

One of the NFIB Legal Foundation's primary concerns is agency compliance with the RFA, 5 *U.S.C.* § 601 *et seq.* (2006), the federal law charged with protecting small businesses from onerous regulations. The NFIB Legal Foundation has filed over 20 comments with various federal agencies on RFA compliance matters. The D.C. Court of Appeals has acknowledged the RFA's importance in federal rulemaking when it held that an agency's failure to undertake required regulatory flexibility analysis is not an error that can be considered "harmless." *U.S. Telecomm. Ass'n v. FCC*, 400 F.3d 29, 42 (D.C. Cir. 2005). In addition to the submission of comments to agencies, the NFIB Legal Foundation has vindicated its members' interests in RFA compliance in court. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272 (D.C. Cir. 2005) (finding RFA applied to Army Corps' Clean Water Act nationwide permit rulemaking).

The interests of the NFIB Legal Foundation in a meaningful and thorough regulatory flexibility analysis are harmed by DHS's Final Rule. This rule was promulgated without adherence to the requirements of the RFA. Specifically, the Secretary of Homeland Security refused to adequately consider the effects of the rule and possible exemptions or less stringent standards for compliance by small businesses.

The purpose of this brief is to assist the court by providing several important factual and policy considerations for its review. First, the brief summarizes the history, need for and relevant provisions of the RFA. Second, the brief addresses the policy behind the RFA and reviews the statutory requirements that an agency must follow to comply with the law. Finally, by applying the RFA requirements to the case at hand and using a persuasive federal case as a guide, the brief explores the inadequacy of DHS's rulemaking.

## II. STATEMENT OF FACTS

On June 14, 2006, the Secretary of Homeland Secretary issued a notice of proposed rulemaking concerning a plan to use "No-Match" letters from the Social Security Administration ("SSA") to police illegal immigration. 71 Fed. Reg. 34281 (June 14, 2006). In the notice, the Secretary certified that the new rule "would not have a significant economic impact on a substantial number of small entities," and "would not affect small entities as that term is defined in 5 U.S.C. 601(6)." *Id.* at 34284. He further stated that "the rule would not mandate any new burdens on the employer." *Id.*

On August 15, 2007, DHS issued its Final Rule, entitled "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," to become effective on September 14, 2007. See 72 Fed. Reg. 45611 (Aug. 15, 2007). The effect of the Final Rule is to amend the Immigration Reform and Control Act of 1986 ("IRCA"), which prohibits employers from hiring an alien while "knowing the alien is an unauthorized alien." 8 U.S.C. § 1324a(a)(1)(A). IRCA also prohibits continued employment of an alien while "knowing the alien is (or has become) an unauthorized alien with respect to such employment." 8 U.S.C. § 1324a(a)(2). The Final Rule amends the definition of "knowing" in these passages to include the "constructive knowledge" of an employer who has received a no-match letter and has not taken "reasonable steps" to ascertain the employee's status. 72 Fed. Reg. 45611.

The Final Rule allows employers to avoid the penalties of the IRCA if they take certain steps. The employer must verify within 30 days that the failure to match the employee's Social Security information with federal records was not due to the employer's error and advise the employee to correct the problem through SSA within 90 days. *Id.* at 45624. If the discrepancy between records still exists, the employer must either terminate the employee or have the employee complete a new set of employment eligibility verification documents on a new Form I-9 with a document that contains photo

identification, within three days. *Id.* These documents may not contain the disputed Social Security Number, even if the employee maintains that the disputed number is correct. *Id.*

On August 31, 2007, this Court's Temporary Restraining Order halted the issuance of the first wave of no-match letters, which SSA intended to mail between September 4, 2007 and November 9, 2007. It was estimated that approximately 140,000 employers would have received letters affecting approximately 8.7 million employees.

## III. ARGUMENT

The RFA requires an agency to consider the economic impact that any new regulation would have on so-called "small entities." 5. U.S.C. § 601(3)(b). If the agency concludes that there is such an impact, it must engage in the analysis required by the RFA. 5 U.S.C. § 603(a). If the agency concludes that there is no such impact, or that such an impact is insignificant, then the agency may certify this finding, preempting the need for a complete RFA analysis. 5 U.S.C. § 605(b). This certification is subject to judicial review, and may be set aside if it is found to be "arbitrary and capricious" or "unwarranted by the facts." 5 U.S.C. § 706(2).

The Secretary of Homeland Security's determination that the Final Rule would have no "significant economic impact on a substantial number of small entities" is arbitrary and capricious and unwarranted by the facts. His assertion that the Final Rule does not mandate any new burdens on employers is plainly false. Therefore, the Final Rule should be set aside, and the Secretary should be required to analyze all economic costs to small businesses before issuing a final rule.

### A. Background and Mechanics of the Regulatory Flexibility Act

The costs of regulatory compliance are often constant and fixed, with no consideration of the size of the entity being regulated. Nevertheless, an entity's size determines its ability to comply with onerous regulations while continuing to invent, produce and compete. In September 1980, Congress passed the RFA to address these

concerns. 5 *U.S.C.* §§ 601-612. The RFA was not intended to create special treatment for small businesses. Instead, it was designed to ensure that agencies consider the possible anti-competitive effects their regulations might have on small businesses. Sixteen years later, Congress enacted the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA) to, *inter alia*, provide a private right of action for small entities that are adversely affected by final agency action to obtain judicial review of an agency's compliance with key provisions of the RFA. Congress found that judicial review was necessary because the requirements of the RFA "ha[d] too often been ignored by government agencies, resulting in greater regulatory burdens on small entities than necessitated by statute." P.L. 104-121, § 202(5)-(6).

Small businesses face a disproportionate burden in complying with federal regulations.[1] These businesses often have a smaller volume of production over which to spread the costs of compliance. Concerning the effect of regulations in general, NFIB polls have found that 26% of employers name "extra paperwork" as the single greatest burden imposed by new regulations. William J. Dennis, Jr., *NFIB National Small Business Poll: Coping with Regulation*, vol. 1, issue 5 (2001), at 3, available at http://www.nfib.org/object/3105105.html. The RFA was intended to ease the burdens faced by small businesses in complying with federal regulations. It achieved this objective by increasing both agency awareness and agency understanding of the impact of expansive regulations on small businesses. Congress explained that the RFA was designed to:

> [E]stablish as a principle of regulatory issuance that agencies *shall* endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulation. To achieve this

[1] *See* W. MARK CRAIN, THE IMPACT OF REGULATORY COSTS ON SMALL FIRMS 4 (2005) (finding that small firms paid $7,647 per employee to comply with federal regulations – 45% more than the $5,282 spent by large firms).

> principle, agencies are required to solicit and consider flexible regulatory proposals and to explain the rationale for their actions to assure that such proposals are given serious consideration.

*RFA, Congressional Findings and Declaration of Purposes*, Pub. L. No. 96-354, 94 Stat. 1164, § 2(b) (codified at 5 U.S.C. § 601) (emphasis added).

The RFA places the onus of performing regulatory analyses on the regulating agencies.[2] The RFA exempts an agency from the requirement to conduct a regulatory flexibility analysis for a proposed or final rule "if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." The statute requires that the certification be accompanied by "a statement providing the factual basis of such certification." 5 U.S.C. § 605(b). The requirement for a "factual basis" for the certification -- as opposed to "the reasons" – was added to the RFA by SBREFA in 1996.

---

[2] Specifically, the RFA (as amended by SBREFA) states that "whenever an agency is required. . . to publish a general notice of proposed rulemaking for any proposed rule, the agency shall prepare and make available for comment an initial regulatory flexibility analysis. . . [(IRFA)]" that "describe[s] the impact of the proposed rule on small entities." 5 U.S.C. § 603(a). The IRFA must contain certain elements, including "an estimate of the number of small entities to which the proposed rule will apply" and "a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities." 5 U.S.C. § 603(b).

The RFA further states that "when an agency promulgates a final rule. . . after being required. . . to publish a general notice of proposed rulemaking. . . the agency shall prepare a final regulatory flexibility analysis." 5 U.S.C. § 604(a). The statute specifies, *inter alia*, that the regulatory flexibility analysis must include (1) "a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available"; and (2) "a description of the steps that the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of the applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. §§ 604(a)(3) & (5).

In performing the RFA analysis, agencies must identify and publicize the cost consequences of a proposed regulatory action. This facilitates communication between the agency and those affected by the proposed action. Requiring agencies to analyze and consider the impacts on small businesses also serves to evoke alternative regulations — such as extending timelines, imposing different requirements on different entities based on a specified standard, or foregoing regulation of these businesses — that can serve the dual purposes of meeting the regulatory goal and protecting small businesses against impulsive regulations.

Finally, the RFA seeks to remove barriers to the marketplace and foster continued growth of small businesses. Monies spent on complying with cumbersome regulations cannot also be spent expanding the business, hiring additional employees or providing existing employees with greater benefits. Thus, enforcing the RFA is paramount to removing the regulatory barriers to entrepreneurial success.

**B. <u>There is No Record Basis for Defendants' No SEISNSE Certification</u>**

The RFA requires an agency head to make a "certification" of no SEISNSE for the agency to discharge itself from further RFA obligations. As Plaintiff-Intervenors have demonstrated, DHS failed to conduct a proper regulatory flexibility analysis of the Final Rule, and DHS's conclusory conjecture that it "has reviewed this regulation and, by approving it, certifies that this rule would not have a significant economic impact on a substantial number of small entities" (72 Fed. Reg. 45623) is insufficient. The law requires more. The RFA places the affirmative duty on the regulating agency to calculate its rule's economic impact on small businesses. *See North Carolina Fisheries Ass'n v. Daley*, 16 F. Supp. 2d 647, 653 (E.D. Va. 1997).

DHS has attempted to skirt its RFA requirements by falsely declaring that the Final Rule imposes no new requirements on businesses and instead merely provides "guidance" to employers who receive no-match letters. Specifically, DHS asserted that the Final Rule

[13] 8 U.S.C. S 1324a(a)(1)(A)-(2). The Rule would expand this pool of employers to those

who have "constructive knowledge" of an alien's unauthorized status; moreover, employers in receipt of no-match letters would be imputed to have such constructive knowledge. *See* 72 Fed. Reg. 45611. This change will vastly broaden the field of employers affected and potentially penalized by IRCA. As mentioned above, this group would initially include 140,000 employers, with more to follow. It is, therefore, difficult to see how DHS concluded that the regulation would have no effect on small entities or impose no added burdens on such entities.

Nevertheless, in an attempt to justify its SEISNSE certification, the Secretary of Homeland Security indicated that "[t]he rule does not mandate any new burdens on the employer and does not impose any new or additional costs on the employer, but merely adds specific examples and a description of a 'safe-harbor' procedure to an existing DHS regulation for purposes of enforcing the immigration laws and providing guidance to employers." 72 Fed. Reg. 45623. In reality, the Final Rule presents employers with a Hobson's choice and effectively imposes substantive new mandates on employers who receive no-match letters. If employers are faced with a choice of complying with the specified "safe harbor" procedures or confronting liability for illegally employing unauthorized workers, no rational employer would choose to ignore the "safe harbor" procedures. Employers now have a duty to investigate and resolve inconsistencies by following the detailed interactive process proscribed in the Final Rule. The Final Rule imposes a number of new requirements on employers who receive a no-match letter from the Social Security Administration that will have a significant monetary and administrative impact on small entities, including the following:

- Employer "must check its records to determine whether the discrepancy results from a typographical, transcription, or similar clerical error."
- Employer "must correct [any clerical] error and inform the Social Security Administration of [any clerical error] (in accordance with the written notice's instructions, if any)."

- Employer "must also verify with the Social Security Administration that the employee's name and social security account number, as correct, match Social Security Administration records. The employer should make a record of the manner, date, and time of such verification, and then store such record with the employee's Form I-9(s)."
- Employer "must again verify the employee's employment authorization and identity within an additional three days by following the verification procedure specified in paragraph (l)(2)(iii) of this section" . . . "if the employer [wa]s unable to verify with the Social Security Administration within ninety days of receiving the written notice that the employee's name and social security account number matches the Social Security administration's records."

72 Fed. Reg. 45624 (Aug. 15, 2007).

In addition to failing to quantify the administrative costs associated with investigating no-match letters, the Final Rule fails to consider the economic impact that employee terminations will have on small businesses who are unable to resolve no-match discrepancies. Under the Final Rule employers will be forced to terminate employees if no-match discrepancies remain after 93 days. This will undoubtedly result in the termination of many employees and create job vacancies that are particularly problematic for small businesses.

NFIB has conducted several polls of its members to determine the effect that the hiring and firing processes have on small businesses. One poll concluded that 71% of employers found it difficult to find qualified employees and 75% stated that they would rather "do all they can to keep employees" rather than find new ones. William J. Dennis, Jr., *NFIB National Small Business Poll: The Changing Search for Employees*, vol. 1, issue 1 (2001), at 2-6, available at http://www.nfib.org/object/2937236.html. Moreover, 68% of small-business owners reported that they have responded to tight labor markets, at least in part, by going without needed employees. The lack of a full employee complement has its

most severe impact on small employers themselves. In 83% of the cases where small employers are short-handed, the owners are personally required to work more hours. *Id.* at 3.

Furthermore, 64% of employers polled found that when a small business lacks qualified employees, the business must spend time and resources on extensive training. *Id.* at 3. In fact, 90% of employers reported that it takes up to a year to train employees to perform their jobs to a satisfactory level. William J. Dennis, Jr., *NFIB National Small Business Poll: Training Employees*, vol. 5, issue 1 (2005), at 18, available at http://www.nfib.org/object/training.html. These research findings demonstrate the economic costs that small businesses will incur from terminations imposed by the Final Rule.

### C. **Courts Have Carefully Scrutinized No SEISNSE Certifications**

Turning to this Court's review authority, the RFA's judicial review provisions state that review is subject to the standards set forth in "Chapter 7" of the Administrative Procedure Act ("APA"), specifically 5 U.S.C. § 706. 5 U.S.C. § 611(a)(1) & (2); *see also Nat'l Ass'n for Home Care v. Shalala*, 135 F. Supp. 2d 161, 168 (D.D.C. 2001); *Blue Water Fisherman's Ass'n v. Mineta*, 122 F. Supp. 2d 150, 175 (D.D.C. 2000) ("The standard of review is the same as that under the APA"). According to the legislative history for SBREFA, which enacted the RFA's judicial review provisions: "[I]f the court finds that a final agency action was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law, the court may set aside the rule or order the agency to take other corrective action."[3] 142 CONG. REC. S3245 (daily ed. Mar. 29, 1996) (statement of Sen.

---

[3] Similarly, SBREFA's main drafter confirmed sub-section 611(a)(1) & (2)'s express terms, stating:

> Review under these sections is not limited to the agency's compliance with the procedural aspects of the RFA; final agency actions under these sections will be subject to the normal judicial review standards of Chapter 7 of Title 5.

142 Cong. Rec. E571-01, E574 (daily ed. Apr. 19, 1996) (remarks of Rep. Hyde). Chairman Hyde further specifically stated that the "normal" standards include the "arbitrary and

Ogletree Deakins

Bond). While judicial review under APA standards is limited, it is not perfunctory. *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 212 (D.D.C. 2005) ("[T]his Court undertakes a 'searching and careful' examination . . . .") (quoting *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989)).

Nor can Defendants water down their obligations under the RFA. Agencies must do more than give RFA compliance a try. The standard for RFA compliance was derived from one of the first cases brought under the SBREFA amendments to the RFA, *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997). In that case, the First Circuit found that the RFA imposes upon agencies obligations similar to those under the National Environmental Protection Act ("NEPA"). The court explained that, as with the RFA's analytical requirements, "[t]he [environmental impact statement] requirement is meant to inform the agency and the public about potential adverse ecological effects and about the availability, if any, of less harmful alternatives prior to a final decision on the fate of a particular project or rule." *Id.* *See also Nat'l Ass'n of Psychiatric Health Sys.*, 120 F. Supp. 2d at 44 n.8 (also analogizing the RFA to NEPA EIS requirements).

*Associated Fisheries of Maine* then proceeded to analogize judicial review of agency RFA compliance to that respecting NEPA. 127 F.3d at 114. In both instances, judicial review is subject to APA standards. While deferential, it is not toothless. For instance, *American Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 4 (D.D.C. 2000), found NEPA violations based on the Commerce Department's failure to consider whether more comprehensive analyses were required, consider a reasonable range of alternatives, and explain the impacts of the proposed action and alternatives.[4] *Id.* at 20-21. The RFA

---

capricious" standard. *Id.*

[4] Furthermore, while the RFA is considered primarily procedural, *U.S. Cellular Corp. v. FCC*, 254 F.3d 88 (CA DC 2001), that statute imposes "action forcing provisions" that require agencies to focus attention on the impacts of various proposed alternatives on small businesses, just as NEPA does through the procedural requirement of "evaluating a proposed project's environmental impact." *See North Buckhead Civic Ass'n v. Skinner*, 903 F.3d 1533, 1540 (11th Cir. 1990), *citing Robertson v. Methow Valley Citizens Ass'n*, 490 U.S. 332, 348-49 (1989). And, failure to adhere even to the RFA's purely procedural mandates is not an error which can be considered "harmless."



Ogletree Deakins

requires consideration of similar factors, but from a small business perspective. Thus, while subsequent decisions have distilled the NEPA-based standards set forth in *Associated Fisheries of Maine*, they do not and should not truncate courts' and agencies' APA-based obligations.

In fact, under the RFA, courts have reviewed no SEISNSE certifications such as DHS's in the case at bar carefully, especially where, as here, the agency's finding of no SEISNSE is cursory and hedged. *See, e.g., Nat'l Ass'n of Psychiatric Health Sys.*, 120 F. Supp. at 43-44; *Southern Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411 (M.D. Fla 1998); *North Carolina Fisheries Ass'n v. Daley*, 27 F. Supp. 2d 650, 654-55 (E.D. Va. 1998) ("*NCFA II*"). It is thus simply not the case that the RFA is subject to a standard of review regarding whether the agency simply checked the appropriate procedural boxes as it proceeded through the rulemaking.

One notable federal case, *NCFA II, supra*, 27 F. Supp. 2d at 650, paralleled the case at hand. In *Daley*, the Department of Commerce imposed a quota on summer flounder catches in North Carolina. *Id*. at 654. The agency certified under the RFA that the rule would not have a significant economic impact on small businesses and did not complete a regulatory flexibility analysis. *Id*. at 655. As support for the certification, the agency merely stated that the quota had remained constant from the previous year. *Id*. The district court ruled that the agency improperly certified the rule and ordered an economic analysis to determine the effect of the rule on small entities. *Id.* The government's refusal to recognize the economic impact of its regulatory actions caused the court to "question the agency's willingness to consider less severe alternatives" and accuse the agency of certifying the rule as a means to avoid preparing a regulatory flexibility analysis or considering any suitable alternatives. *Id*.

---

*See U.S. Telecom Ass'n v. F.C.C.*, 400 F.3d at 42 (stating there is no "argument that the Commission's failure was harmless, as it is impossible to determine whether a final regulatory flexibility analysis which must include an explanation for the rejection of alternatives designed to minimize significant economic impact on small entities, see [5 U.S.C.] § 604(a)(3) - would have affected the final order when it was never prepared in the first place").

DHS's Final Rule and certification raises markedly similar concerns. The Secretary for Homeland Security did not conduct a regulatory flexibility analysis in connection with the no-match rule as required by 5 U.S.C. § 604. In fact, by certifying the Final Rule, the agency seemingly ignored the RFA concerns that many business entities, including NFIB, raised in response to the proposed rule. Defendants' complete disregard for the RFA's statutory obligations is improper and runs contrary to the RFA's policy of protecting small businesses. The RFA requires more than a few unsupported, declaratory sentences justifying the Secretary of Homeland Security's certification. This Court should not sanction attempts by government entities to ignore economic realities, narrowly define terms to suit their particular needs and evade mandated legal obligations imposed on them by Congress.

## IV. CONCLUSION

For the foregoing reasons, the Court should grant relief requested by Plaintiff-Intervenors' in response to their First Cause of Action.

DATED: September 18, 2007

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By: /s/ Linda Claxton
Linda Claxton
Attorneys for
Amicus Curiae the National Federation of Independent Business Legal Foundation