1  CYNTHIA L. RICE SBN 87630
   crice@crla.org
2  CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
   631 Howard Street, Suite 300
3  San Francisco, CA 94105
   Telephone: 415 777-2752
4  Facsimile:  415 543-2752

5  Attorneys for Amicus Curiae
   California Rural Legal Assistance, Inc.
6

7                    UNITED STATE DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
8

9

10 AMERICAN FEDERATION OF LABOR          )    CASE NO. 07-04472(CRB)
   AND CONGRESS OF INDUSTRIAL            )
11 ORGANIZATIONS; SAN FRANCISCO          )
   LABOR COUNCIL; SAN FRANCISCO          )    MEMORANDUM OF POINTS AND
12 BUILDING AND CONSTRUCTION             )    AUTHORITIES BY AMICUS CURIAE
   TRADES COUNCIL; AND CENTRAL           )    CALIFORNIA RURAL LEGAL
13 LABOR COUNCIL OF ALAMEDA              )    ASSISTANCE, INC. IN SUPPORT
   COUNTY,                               )    PLAINTIFFS'/INTERVENORS' MOTION
14                        Plaintiffs,    )    FOR PRELIMINARY INJUNCTION
        v.                               )
15                                       )
   MICHAEL CHERTOFF, Secretary of        )
16 Homeland Security; DEPARTMENT OF      )
   HOMELAND SECURITY; JULIE MYERS,)
17 Assistant Secretary of Homeland Security; )   Date:  October 1, 2007
   U.S. IMMIGRATION AND CUSTOMS          )    Time:  10:00 am
18 ENFORCEMENT; MICHAEL ASTRUE,          )    Judge: Hon. Charles R. Breyer
   Commissioner of Social Security; and  )    Courtroom: 8
19 SOCIAL SECURITY ADMINISTRATION, )
                                         )
20 Defendants.                           )
   _____       )
21 SAN FRANCISCO CHAMBER OF              )
   COMMERCE, CHAMBER OF                  )
22 COMMERCE OF THE UNITED STATES         )
   OF AMERICA, GOLDEN GATE               )
23 RESTAURANT ASSOCIATION,               )
   NATIONAL ROOFING CONTRACTORS          )
24 ASSOCIATION, AMERICAN NURSERY         )
   & LANDSCAPE ASSOCIATION,              )
25 INTERNATIONAL FRANCHISE               )
   ASSOCIATION, and UNITED FRESH         )
26 PRODUCE ASSOCIATION                   )
                                         )
27 Plaintiff-Intervenors,                )
                                         )
28                          v.           )
   MICHAEL CHERTOFF, Secretary of        )

Amicus Curiae CRLA Memo of Ps&As ISO Preliminary Inj.  CASE NO. 07-04472(CRB)

1  Homeland Security; DEPARTMENT OF    )
   HOMELAND SECURITY; JULIE MYERS,)
2    Assistant Secretary of Homeland Security;   )
   U.S. IMMIGRATION AND CUSTOMS    )
3  ENFORCEMENT; MICHAEL ASTRUE,    )
   Commissioner of Social Security; and    )
4  SOCIAL SECURITY ADMINISTRATION, )
   Defendants.                                           )
5  _____)

6

7                              **INTRODUCTION**

8        By contemporaneously filed ex parte request, California Rural Legal Assistance, Inc.

9  ("CRLA") seeks leave to participate in this action as an amicus curiae with respect to

10 Plaintiffs'/Intervenors' Motion for Preliminary Injunction. Proposed Amicus CRLA respectfully

11 submits the following (Proposed) Amicus Memorandum of Points and Authorities Supporting

12 Plaintiffs/Intervenors' Motion for Preliminary Injunction. CRLA represents and has represented

13 many individuals who in the past have suffered inconvenience, delays and even the loss of monetary

14 benefits as a result of incorrect information maintained in the records of the Social Security

15 Administration. CRLA submits this memorandum in order to advise the court, and the parties to this

16 action, of the existence of information which should be considered when determining whether to

17 issue the preliminary injunction in this matter. Specifically, CRLA's experience indicates that there

18 are significant problems with the SSA's no-match system as utilized by the California Employment

19 Development Department ("EDD") which have adversely affected the rights of individuals legally

20 entitled to live and work in the United States.

21        Implementation of a no-match notification process will likely result in the same kinds of

22 errors particularly for low wage immigrant and non-English speaking workers. The impacts of such

23 a system on low wage workers is such that the Defendants should not be allowed to implement it.

                           **STATEMENT OF INTEREST**

24        CRLA is a non-profit legal services provider funded in part by the Legal Services

25 Corporation. CRLA has provided representation to low income persons in the rural areas of

26 California for more the 40 years. CRLA has 20 offices located throughout California that provide

27 direct legal services to farm workers and other low wage workers on a variety of issues including

28

1    labor and employment and public benefits. In our 40 year history, we have been involved in

2    thousands of cases involving the Social Security Administration either directly or indirectly. In

3    addition to representing individuals who filed claims for social security benefits, CRLA provides

4    assistance to clients who are seeking unemployment insurance benefits and public housing, and

5    health and income maintenance benefits. We have also helped workers correct SSA records which

6    were incomplete or inaccurate due to error or employer fraud. In our experience, Social Security

7    records are rife with errors, and this has been the case for the decades. However, the circumstances

8    under which our clients are encountering problems relating to inaccuracies in records maintained by

9    the Social Security Administration are becoming more frequent and more difficult to resolve. If the

10    Final Rule goes into effect and the No-Match letters as drafted are sent out, we expect that many low

11    income workers in our service area will be adversely impacted.

12                                **ARGUMENT**

13         1. EVIDENCE WILL DEMONSTRATE THAT THE SSA RECORDS MATCH SYSTEM
           IS NOT A RELIABLE METHOD FOR DETERMINING FRAUD

14

15         In the last several years, in the course of representing our farm worker clients, and other low

16    wage workers, we have noticed an increase in the number of problems that workers are encountering

17    when state agencies rely upon records of the Social Security Administration for identity verification.

18    This is particularly true for Latinos and non-English speakers. Our experience with the Employment

19    Development Department (EDD) – the California agency that processes claims for unemployment

20    insurance – is most demonstrative.

21         EDD implemented an "Identity Alert" process in 2003 designed to alert the agency of

22    potentially fraudulent unemployment insurance claims. This system relies, in part, on a secondary

23    verification of claimant names and social security numbers through the Social Security

24    Administration (SSA). As a result of the implementation of this system, CRLA field offices have

25    provided legal assistance to dozens of unemployment insurance applicants who have encountered

26    problems because of inconsistencies in records maintained by their employers, EDD and/or the

27    SSA. Attempts to verify identity by relying on consistency in data between the employer, EDD and

28    SSA, have resulted in delays in processing of unemployment insurance claims for citizens, and legal

1   permanent residents who are authorized to work and collect unemployment benefits. Most of these

2   cases are for low wage Latino workers who do not speak English. As pointed out in Plaintiffs'

3   complaint and moving papers, this is for a variety of reasons.

4       Over the course of our 40 years of representing low income families CRLA has represented

5   tens of thousands of Latinos in a variety of matters. Our advocates encounter misspelling of Latino

6   names by employers, landlords and frequently by state and federal agencies. Common occurrences

7   that we see include confusing "b" for "v"; "s" for "z"; "l" for "ll"; "j" for "g"; "e" for "i"; "r" for

8   "rr"; and "y" for "x". Additionally, many Latinos use a double last name including a paternal and

9   maternal surname. We frequently encounter situations where the surnames are reversed; one of the

10  surnames is recorded as the first name, or either the paternal or maternal surname is dropped

11  altogether. Other examples include dropping the "De" or "La" connectors included in names such

12  as "De La Rosa" or "De Jesus", which not only changes the alphabetical listing of the name, but

13  sometimes results in a surname being recorded as a first name.

14      In addition to the errors regarding the names reported, we often find inconsistencies in

15  records where the social security number is transposed or incorrectly recorded by the employer or

16  the processing agency, resulting in an inconsistency with the SSA records. Many of our clients are

17  not fully literate and might not notice such an error on a check stub or W-2 form.

18      A review of a sample of our recent EDD cases shows that inconsistencies occur due to

19  employer error, SSA error, and very occasionally, worker error.

20      <u>Employer Errors</u> – These are the most typical errors that we encounter. Information

21  reported by the employer on check stubs, W-2 forms and reports submitted to the EDD is often

22  erroneous and inconsistent. Many involve workers who were employed by a farm labor contractor

23  or other unsophisticated employers. These forms are completed on the job, in the fields or at other

24  job sites, not in the comfort of a personnel office. W-4 Forms and I-9 forms are sometimes filled

25  out by foreman or co-workers because the worker himself is not literate. Other errors are caused

26  by the fact that the California Department of Motor Vehicles has made an error in the information

27  printed on an individual's driver's license. If the information is taken from that driver's license

28  rather than the social security card, it will result in a no-match. Even if the information on the W-4

1   and I-9 is correct, errors occur when preparing the W-2 forms and tax and withholding reports. In
2   one recent case a CRLA client had three different employers during the same base period for her
3   unemployment insurance claim. Each employer prepared a W-2 form with a different name, only
4   one of which matched the SSA records.

5       Workers often do not notice the error, due to limited literacy. Additionally, these errors are
6   common and workers have had little reason to worry about these inconsistencies in the past.
7   Previously inconsistencies were cleared up when the worker filed tax returns, and until recently,
8   were easily resolved even when applying for unemployment insurance benefits or other state or
9   federal benefits.

10      SSA Error

11      We have also encountered a number of cases where the SSA record is in error due to a simple
12  transposition of the name or even the number issued on the card to the worker. However, the SSA
13  has made more significant errors as well. For example, in one instance we represented an
14  indigineous farm worker who was not literate in English or Spanish and relied upon her
15  Purepecha/Spanish speaking bilingual husband to help her fill out forms and communicate with state
16  agencies through a Spanish/English interpreter. Her claim for unemployment insurance benefits was
17  delayed because of a no-match during the secondary verification process. She is and was a legal
18  permanent resident fully authorized to work in the United States. The SSA had erroneously entered
19  the information from her birth certificate or Alien Identification Card, and issued her a Social
20  Security card in the wrong name. She didn't appreciate the error and had worked, filed taxes, and
21  received unemployment insurance benefits using her correct name without incident. However, after
22  institution of the mechanized secondary verification system by EDD, she became caught up in a two
23  year process of telephone calls, visits to state and federal offices and ultimately required the
24  assistance of one of our attorneys to correct her records and resolve the pending matters.

25      Employee Error

26      There are certainly times when a worker inadvertently enters incorrect information on a W-4
27  form or other employment record. Even if a worker notices there is an error on his check stub or W-
28  2, it is often easier to resolve it at the time they file their tax return rather than to try and have the

1    employer to correct the records. Our clients often have no connection with the personnel or payroll

2    department. If they were to raise such an issue, it would have to be with their foreman or supervisor

3    whose main concern is to get the harvest work done. Because such a simple request could be

4    construed as making trouble, and trouble makers are the first to go during seasonal layoffs, we know

5    that workers are reluctant to raise even the most routine issues that might make more work for their

6    immediate supervisor.[1]

7        ## 2. THE SAFE HARBOR PROVISIONS WILL PUT LOW WAGE WORKERS AT RISK FOR TERMINATION.

8

9        The National Federation of Independent Business Legal Foundation in its Amicus Curiae

10   brief describes the burdens that an employer must bear in order to meet the standard set out in the

11   Final Rule. *(See*, Amicus Memorandum of Points and Authorities of Proposed Amicus Curiae

12   National Federation of Independent Business Legal Foundation in Support of Plaintiff Intervenors

13   ' Regulatory Flexibility Act Cause of Action, pp. 8-9). In industries that employ immigrant and

14   limited English speaking workers, at the minimum wage or lower, these burdens will cut into the

15   bottom line and result in terminations.

16       Low wage workers generally, and farm workers in particular do not have sick time,

17   vacation time or compensatory time that can be taken to deal with personal business. Many farm

18   workers are employed for periods of 60 to 120 days during which they are unlikely to have a single

19   scheduled week day off. If they take a day off to visit the SSA office to correct their records, they

20   not only lose a day's pay, they risk being replaced altogether. There are no incentives for an

21   employer to give unpaid time off – much the less paid time off – to a worker who needs to clear

22   up a discrepancy. Other low wage industries like garment, car washes, landscaping, janitorial and

23   maid services take a similar approach. If a worker has to be replaced for a day it is just as easy to

24   _____

25       [1]Low wage immigrant workers are particularly vulnerable to retaliation due to their

26   dependence on each paycheck and their tendency to work in low-skilled jobs where employers
     consider them expendable. These workers, who disproportionately include women and

27   minorities, are reluctant to assert their rights due to a legitimate fear of retaliation. See Lora Jo
     Foo, The Informal Economy: The Vulnerable and Exploitable Immigrant Workforce and the

28   Need for Strengthening Worker Protective Legislation, 103 Yale L.J. 2179, 2182 (1994).

1   replace him for the rest of the work season – particularly when there is no guarantee that a one day

2   visit to the SSA will resolve the issue.

3        It is also our experience that unsophisticated employers do not seek the advice of counsel

4   when they receive such letters. The implied threat that their failure to act will be held against them,

5   will weigh heavily in favor of getting rid of the problem by getting rid of the worker.

6        3. The SSA's Current System is Generating No-Match Letters for Authorized Workers

7   Despite the Filtering Procedures Described By Defendants.

8        Defendants make much of computer systems SSA has created to eliminate no-matches

9   caused by error. (Defendants' Opposition to Plaintiffs' Motions for Preliminary Injunction at pp.

10  34-35). However, this system does not seem to have eliminated no-matches in the context of checks

11  done by the SSA for the California EDD. Indeed, it does not appear that even Defendants are of the

12  opinion that the 9.5 million discrepancies that were NOT resolved by the computer programs

13  represented fraudulent records, since the SSA sent out only 121,000 letters from that list. Defendants

14  provide no information about how many no match letters have been sent out that have affected

15  individuals who, like CRLA's clients, are legally authorized to live and work in the United States.

16  Opp. at p.35, n. 18; (Declaration of John Simermeyer, dated September 18, 2007, pp.3-4, ¶ 6).

17       The OIG report relied upon by Defendants identifies a much narrower pattern of abuse that

18  could be addressed through proper filtering of the no-match information prior to sending out no-

19  match letters. For example, OIG Audit Report A-08-05-25023 found income reported for SSA

20  numbers assigned to deceased and minor children, and for a staggering number of invalid numbers

21  that had never been assigned (25% of the total), many of which were not in the range of numbers

22  issued by the SSA and were, therefore, not likely to be transposition errors. Additionally, the audit

23  identified a pattern of employers who submitted large numbers of duplicate SSN's, meaning that

24  multiple employees used the same SSN to work for one employer. Tailoring a no-match notification

25  to identify employers with these patterns would be far less likely to impact individuals like CRLA's

26  clients, who are legally entitled to work in the United States and are the victims of an minor clerical

27

28

1    error.[2]

2                                    **CONCLUSION**

3         CRLA has submitted this brief to apprise the court of the potential impact the Final Rule will

4    have on its client community if the No-Match letters go out as drafted.   While most of the

5    information provided by this brief is anecdotal, it suggests that formal discovery will reveal that the

6    no-match criteria utilized by Defendants impacts innocent individuals in a manner that outweighs

7    any benefit provided by the policy.   Accordingly, CRLA respectfully urges this court to grant the

8    preliminary injunction.

9         Dated: September 23, 2007                CALIFORNIA RURAL LEGAL ASSISTANCE, INC.

10                                                 _____
                                                   Cynthia L. Rice
11                                                 Attorney for Amicus Curiae California Rural Legal
                                                   Assistance, Inc.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26         [2]The supporting declaration  indicates that the current threshhold is more than 10 no-

27    matches and more than 0.5% of items on an employers wage report.  There does not appear to be
      any distinction made based upon the nature of the no-matches. (Declaration of John Simermeyer,
28    *supra*, at ¶ 6.)

     Amicus Curiae CRLA Memo of Ps&As ISO Preliminary Inj.  CASE NO. 07-04472(CRB)                8