1  Matthew Ross (CA Bar No. 084703)
2  Philip Monrad (CA Bar No. 151073)
   Leonard, Carder, LLP
3  1330 Broadway, Suite 1430
   Oakland, CA 94612
4  Telephone: (510) 272-0169
   Facsimile: (510) 272-0174
5  Email: MRoss@leonardcarder.com; PMonrad@leonardcarder.com
6
   Robert M. Weinberg (D.C. Bar No.08530)
7  Leon Dayan (D.C. Bar No. 444144)
   Jennifer L. Hunter (D.C. Bar No. 495827)
8  BREDHOFF & KAISER, PLLC
9  805 Fifteenth Street, NW, Tenth Floor
   Washington, D.C. 20008
10 Telephone: (202) 842-2600
   Facsimile: (202) 842-1888
11 Email: LDayan@bredhoff.com; JHunter@bredhoff.com
12
   Attorneys for Plaintiff-Intervenors UFCW et al
13

                UNITED STATES DISTRICT COURT FOR THE
14                  NORTHERN DISTRICT OF CALIFORNIA
15

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, et al., <br><br>           Plaintiffs, <br><br> SAN FRANCISCO CHAMBER OF COMMERCE, et al., <br><br>           Plaintiffs-Intervenors, <br><br> and <br><br> UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, et al., <br><br>           Plaintiffs-Intervenors, <br><br> v. <br><br> MICHAEL CHERTOFF, Secretary of Homeland Security, et al., <br><br>           Defendants. | Case No. C07 04472 CRB <br><br> DECLARATION OF MICHAEL CASEY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION <br><br> Date: October 1, 2007 <br> Time: 2:30 p.m. <br> Place: Courtroom 10, 19th Floor <br> Hon: Charles Breyer |

DECLARATION OF MICHAEL CASEY ISO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; CASE NO. C07 04472 CRB

I, Michael Casey, do hereby declare as follows:

1. I am President of UNITE HERE Local 2, ("Local 2"), a plaintiff-intervenor union in this lawsuit. Local 2 represents approximately twelve thousand hotel and restaurant employees in San Francisco and San Mateo Counties, California. Our craft jurisdiction extends to hospitality workers in hotels, restaurants, clubs, convention and other hospitality facilities and other hospitality employers.

2. Local 2 is an affiliate of plaintiff-intervenor UNITE HERE International Union, which, in turn, is affiliated with Change to Win, a federation of seven international unions. Local 2 is also a member of the San Francisco Central Labor Council, an original plaintiff in this lawsuit.

3. In the course of representing our members, I and members of my staff have, on many occasions, been asked to help our members who have been the subject of Social Security Administration ("SSA") "no-match letters."

4. Local 2 has learned from its experience in assisting such members that SSA no-match letters are generated for a host of innocent reasons such as typographical errors, name changes resulting from marriage, and differing naming conventions in cultures outside the United States. A substantial proportion of the hospitality workers in the San Francisco Bay Area, and in the hotels and restaurants with which Local 2 has contracts, are persons of color, foreign-born, or both; and these workers are particularly vulnerable to improper employer responses to these no-match letters.

5. Some of the larger employers of hotel workers in San Francisco have been represented for purposes of collective bargaining by the "San Francisco Multi-Employer Group" (the "SFMEG"). During the 2004-2006 contract negotiations, the SFMEG consisted of thirteen hotel employers in San Francisco, employing approximately 4,000 Local 2 members. The prior collective bargaining agreement with the SFMEG expired in 2004. Based on my experience, it is highly likely that, in any particular year, at least one and more likely several of the SFMEG employers will receive a "no match" letter.

6. Prior to and following the 2004 expiration of the Local 2/SFMEG agreement, Local 2 engaged in contentious contract negotiations with the SFMEG over the terms of a successor agreement. Local 2 ultimately concluded a new collective bargaining agreement (CBA) with the SFMEG in September, 2006. During the course of the negotiations that led to that 2006 CBA, one of the provisions for which Local 2 fought hard was a provision protecting employees from misuses of no-match letters. Local 2 fought hard for that provision because, as I have stated, SSA no-match letters are in the experience of Local 2 generated for a variety of innocent reasons, and because some of our members have been terminated for failing to re-verify their immigration status in the wake of a no-match letter. We successfully challenged those terminations through the grievance process, but to avoid such misuse of no-match letters, we have proposed language addressing the problem in our contract negotiations. The employers initially resisted adding an explicit provision addressing this subject, but the 2006 CBA between Local 2 and SFMEG contains the explicit provision for which Local 2 fought. The provision in question sets forth a procedure that the employer is to follow in the event an employee is listed on a "no-match" letter. The employer is to notify the listed employees and advise them that a failure to correct the mismatch could lead to adverse consequences with respect to their entitlement to Social Security benefits, such as their receiving smaller payments from the Social Security Administration than they are entitled to when they retire. The provision states that the employer is not, however, permitted to discharge an employee solely on the basis of a no-match letter. The SMFEG collective bargaining agreement remains in effect until August, 2009.

7. Local 2 has also negotiated similar contract changes and language with hotels that do not belong to the SFMEG, including two Marriott International, Inc. ("Marriott") properties: the San Francisco Marriott Hotel and the Renaissance Stanford Court. The Marriott CBA is set to expire in August, 2009.

8. On August 15, 2007, the Department of Homeland Security ("DHS") issued a final rule ("Rule") entitled "Safe Harbor Procedures for Employers that Receive a No-Match Letter." The Rule's original effective date was September 14, 2007, but the Rule has been temporarily enjoined through October 1, 2007. The Rule sets forth a "safe harbor" procedure and states that,

if an employer follows that procedure upon receiving a no-match letter, the employer will not be charged with knowingly hiring or continuing to hire an unauthorized alien worker on the basis of the no-match letter. One step the employer must take under the DHS Rule's safe harbor procedure is termination of any employee whose name appears on a no-match letter if the discrepancy identified in the letter cannot be resolved within 93 days of the employer's receipt of the no-match letter. Under the CBAs negotiated between Local 2 and Marriott and Local 2 and the SFMEG, an employer is not permitted to take such action against an employee solely on the basis that the employee's name appears on a no-match letter and the discrepancy has not been resolved within a given time; the employer instead is prohibited from doing so.

9. On August 21, 2007, less than one week after DHS issued the Rule (and more than one week before this lawsuit was filed by the original plaintiffs), Marriott sent Local 2 a letter, authored by its Senior Vice President and Deputy General Counsel Nancy C. Lee, and addressed to my attention. A true and correct copy of that letter is attached to this Declaration as Exhibit 1. The Marriott letter begins by stating Marriott's position that the Final Rule "requir[es] that [employers] take affirmative steps to respond to no-match letters sent by the Social Security Administration ('SSA'), including termination of the employee if the discrepancies cannot be resolved within 93 days of receipt of the letter," and that, under the Rule, "[a] failure to take action on an SSA no-match letter . . . could subject employers to both criminal and administrative sanctions." The Marriott letter then says that "[i]n light of this change in the law," Marriott believes that certain "language in the recently negotiated contract between Local 2, United Here and the San Francisco Marriott and the Renaissance Stanford Court is no longer consistent with the law." The "language" to which the letter refers is in the provision described above concerning no-match letters. The letter goes on to request that Local 2 "meet to negotiate amendments to the language in question which are consistent with the new law," or, "[a]lternatively," that Local 2 and Marriott "sign a side letter reflecting that . . . wherever a conflict exists between the CBA and the regulations, compliance with the regulations will not be a violation of the CBA."

10. Eight days later, on August 29, 2007, the SFMEG, through its counsel William Dritsas, sent Local 2 a letter to much the same effect, again to my attention. A true and correct copy of that letter is attached to this Declaration as Exhibit 2. The SFMEG letter states that "[t]he employers [represented by SFMEG] plan to act in accordance with the procedures specified by this new Federal Rule." The letter also requests that Local 2 meet with SFMEG to discuss amending or renegotiating the no-match provision in Local 2's agreement with the SFMEG employers.

11. Marriott and the SFMEG employers have indicated in the two letters just discussed that, as soon as the Rule becomes effective, they will follow the "safe harbor" procedure in the Rule upon receiving "no match" letters, rather than the far more employee-protective procedure specified in the collective bargaining agreements. By taking the position that following the DHS "safe harbor" procedure is required by law, Marriott has indicated that it will follow the DHS procedure and not the CBA procedure. And SFMEG has stated expressly that the employers for whom it negotiates will follow the DHS procedure. I therefore expect that, if the Rule is allowed to take effect and the current temporary restraining order (TRO) is lifted, the policy of Marriott and the SFMEG employers will be to act in accordance with the "safe harbor" procedures set forth in the DHS Rule instead of in accordance with the procedure set forth in the CBAs they entered into with Local 2.

12. The adoption of the DHS Rule on August 15, 2007 was expressly cited by Marriott and the SFMEG employers as the direct and sole cause of their decisions to announce the course of action just described. Before that date, the employers had agreed to follow the procedure set out in their respective CBAs. After that date, the employers stated that they would follow the different and far more restrictive DHS "safe harbor" procedure.

13. If the TRO were lifted and the DHS Rule were to be allowed to take effect, Local 2 would suffer multiple actual or imminent injuries.

    a. First, in light of Marriott's and the SFMEG employers' plans to follow the DHS "safe harbor" procedure upon the Rule's taking effect, Local 2 will immediately be the victim of the equivalent of a repudiation by these major employers of an important, bargained-

for contract obligation. And, even if contrary to their stated positions, Marriott and SFMEG were, upon the lifting of the TRO, to maintain the status quo for some period, and thus to temporarily suspend the policy they have announced of following the DHS "safe harbor" procedure, the CBA provisions regarding no-match letters would still be in imminent jeopardy because the threat of unilateral repudiation of the CBAs no-match provision by the employers would constantly be looming.

      b. Second, Local 2 would be required upon the lifting of the TRO to direct its limited resources away from other representational activities on behalf of its members and toward engaging in discussions and negotiations with employers over a matter that, but for the Rule, would not be a matter of controversy between the parties.

      c. Third, the existence of the Rule will, in future negotiations with these and other employers with whom Local 2 bargains, cause employers to resist agreeing to provisions, such as the CBA provisions described above, that are highly protective of the rights of employees listed in no-match letters and insist instead on provisions tracking the DHS Rule's far less protective "safe harbor" procedure, since the Rule promises employers immunity from sanctions and criminal penalties if they follow that procedure, and Local 2 cannot of course make any such promise. Local 2 therefore will be severely prejudiced in its ability to negotiate on behalf of represented employees if the Final Rule is allowed to take effect.

      d. Local 2 members listed on future "no-match" letters for any of a number of innocent reasons having nothing to do with their authorization to work in the United States will be at greater risk of losing their jobs, because they may not be able to rectify the discrepancy within the limited period of time set forth in the DHS "safe harbor" procedure.

    I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and if called upon I could and would competently testify thereto.

    Executed at San Francisco, California on September 25, 2007.

                            By:_____/S/_____
                                 Michael Casey, President
                                 UNITE HERE Local 2

I attest that concurrence in the filing of this document has been obtained from the signatory.
          /s/_____ Philip C. Monrad,

1

DECLARATION OF MICHAEL CASEY ISO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; CASE NO. C07 04472 CRB