1  Stephen P. Berzon (SBN 46540)
   Scott A. Kronland (SBN 171693)
2  Jonathan Weissglass (SBN 185008)
   Linda Lye (SBN 215584)
3  Danielle E. Leonard (SBN 218201)
   ALTSHULER BERZON LLP
4  177 Post Street, Suite 300
   San Francisco, CA 94108
5  Telephone: (415) 421-7151
   Facsimile: (415) 362-8064
6  Email: skronland@altshulerberzon.com
   Email: llye@altshulerberzon.com
7  Email: dleonard@altshulerberzon.com

8  *Attorneys for Plaintiffs*

9  Jonathan P. Hiatt (SBN 63533) (Admitted *Pro Hac Vice*)
   James B. Coppess
10 Ana L. Avendaño (SBN 160676)
   AFL-CIO
11 815 Sixteenth Street, N.W.
   Washington, D.C. 20006
12 Telephone: (202) 637-5053
   Facsimile: (202) 637-5323
13 Email: aavendan@aflcio.org

14 *Attorneys for Plaintiff AFL-CIO*

15 (Counsel list continued on next page)

16
                    UNITED STATES DISTRICT COURT
17                 NORTHERN DISTRICT OF CALIFORNIA

18
   AMERICAN FEDERATION OF LABOR AND          )   Case No. C07-4472 CRB
19 CONGRESS OF INDUSTRIAL ORGANIZATIONS;     )
   SAN FRANCISCO LABOR COUNCIL; SAN          )
20 FRANCISCO BUILDING AND CONSTRUCTION       )   **PLAINTIFFS' REPLY**
   TRADES COUNCIL; and CENTRAL LABOR         )   **MEMORANDUM IN SUPPORT**
21 COUNCIL OF ALAMEDA COUNTY,                )   **OF MOTION FOR A**
                                             )   **PRELIMINARY INJUNCTION**
22            Plaintiffs,                     )
                                             )
23       v.                                   )   Date:   October 1, 2007
                                             )   Time:   2:30 p.m.
24 MICHAEL CHERTOFF, Secretary of Homeland Security; )  Place:  Courtroom 8, 19th Floor
   DEPARTMENT OF HOMELAND SECURITY;          )
25 JULIE MYERS, Assistant Secretary of Homeland )
   Security; U.S. IMMIGRATION AND CUSTOMS    )
26 ENFORCEMENT; MICHAEL ASTRUE, Commissioner )
   of Social Security; and SOCIAL SECURITY   )
27 ADMINISTRATION,                           )
                                             )
28            Defendants.                     )
   _____ )

1  (Counsel list continued from first page)

2  Linton Joaquin (SBN 73547)
   Marielena Hincapié (SBN 188199)
3  Monica T. Guizar (SBN 202480)
   NATIONAL IMMIGRATION LAW CENTER
4  3435 Wilshire Blvd., Suite 2850
   Los Angeles, CA 90010
5  Telephone: (213) 674-2850
   Facsimile: (213) 639-3911
6  Email: guizar@nilc.org

7  Lucas Guttentag (SBN 90208)
   Jennifer C. Chang (SBN 233033)
8  Mónica M. Ramírez (SBN 234893)
   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
9  Immigrants' Rights Project
   39 Drumm Street
10 San Francisco, CA 94111
   Telephone: (415) 343-0770
11 Facsimile: (415) 395-0950
   E-mail: jchang@aclu.org
12
   Omar C. Jadwat (Admitted *Pro Hac Vice*)
13 AMERICAN CIVIL LIBERTIES UNION FOUNDATION
   Immigrants' Rights Project
14 125 Broad Street, 18th Floor
   New York, NY 10004
15 Telephone: (212) 549-2620
   Facsimile: (212)-549-2654
16 Email: ojadwat@aclu.org

17 Alan L. Schlosser (SBN 49957)
   Julia Harumi Mass (SBN 189649)
18 ACLU FOUNDATION OF NORTHERN CALIFORNIA
   39 Drumm Street
19 San Francisco, CA 94111
   Telephone: (415) 621-2493
20 Facsimile: (415) 255-1478
   E-mail: aschlosser@aclu.org
21
   *Attorneys for Plaintiff Central Labor Council of Alameda County*
22
   David A. Rosenfeld (SBN 58163)
23 Manjari Chawla (SBN 218556)
   WEINBERG, ROGER & ROSENFELD
24 A Professional Corporation
   1001 Marina Village Parkway, Suite 200
25 Alameda, California 94501-1091
   Telephone: (510) 337-1001
26 Facsimile: (510) 337-1023
   Email: drosenfeld@unioncounsel.net
27
   *Attorneys for Plaintiffs San Francisco Labor Council,*
28 *San Francisco Building and Construction Trades Council,*
   *and Central Labor Council of Alameda County*

**SUMMARY OF ARGUMENT**

Defendants' arguments are all premised on a central contention that the Final Rule does not impose any new obligations. That central contention is wrong. The rule changes the definition of "knowing" to expand immigration-law liability beyond what Congress intended. Only after expanding liability does the rule provide a safe harbor from that liability. The effect of the rule is to create a new legal obligation to re-verify or terminate employees who are listed on SSA no-match letters.

Defendants do not dispute that *"knowing"* is an unambiguous term, or that constructive knowledge is a narrow doctrine that applies only where a person is aware of a "high probability" a fact is true and deliberately avoids knowledge. Defendants also do not dispute that a no-match letter does *not* make it highly probable a particular worker is unauthorized. It follows that employers have no obligation to re-verify a no-match employee or risk being deemed to have constructive knowledge the worker is unauthorized. The Final Rule would provide otherwise, so it is *not* just an articulation of existing law.

In this regard, it is significant that SSA has sent out, just since 2000, more than 1,400,000 no-match letters to employers listing tens of millions of employees. Yet Defendants cannot point to a single reported decision by a court or administrative hearing officer in which an employer who failed to investigate the no-match letter was held to have constructive knowledge a worker was unauthorized.

Defendants have argued to this Court that under the Final Rule a no-match letter would serve as but a single piece of evidence in proving constructive knowledge. That is not what the Final Rule states. The rule allows an employer's failure to re-verify an employee listed in a no-match letter to be considered constructive knowledge without the need for additional evidence. The DHS guidance letter also instructs employers to apply the safe-harbor procedures uniformly to all employees listed in all SSA no-match letters.

Whether an agency's actions create additional obligations is judged by how the agency's actions affect the public, not what the agency claims. Thus, *Chamber of Commerce v. Dep't of Labor*, 174 F.3d 206 (D.C. Cir. 1999), held that an agency directive imposed new obligations as a

1  practical matter because employers that did not follow the directive faced OSHA inspections.

2  Likewise, *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13 (D.C. Cir. 2001), held that a rule

3  imposed new obligations as a practical matter because broadcasters that failed to follow the rule

4  faced FCC investigations.  Here the practical effect of DHS' actions is to require employers to re-

5  verify and terminate no-match employees by using the DHS safe harbor.  The threat of civil and

6  criminal liability is much more severe than threats of mere inspections and investigations.

7  Defendants' contention in their legal papers that the DHS Final Rule creates no obligations

8  also is refuted by DHS' own interpretation of the rule, set out in the guidance letter that would be

9  attached to every SSA no-match letter.  And, it is refuted by Secretary Chertoff's statements at his

10  press conference to announce the Final Rule.

11  Once Defendants' mischaracterization of the rule is set aside, Defendants' arguments about

12  likelihood of success on the merits, standing, ripeness, and the balance of equities all fail:

13  1.  The DHS rule, properly understood, is inconsistent with the governing statute

14  because it expands immigration-law liability beyond what Congress intended.  The unambiguous

15  term *"knowing"* does not encompass a duty to investigate.  Congress made a purposeful distinction

16  in the immigration laws between knowledge and recklessness.  The statutory sections immediately

17  surrounding 8 U.S.C. §1324a impose liability for recklessness.  By contrast, 8 U.S.C. §1324a makes

18  it unlawful to continue to employ a worker "knowing" –  not "knowing or in reckless disregard of

19  the fact that" – the worker is an "unauthorized alien."  The DHS Rule allows liability to be imposed

20  for recklessness or negligence and thereby contradicts the statute.

21  2.  Moreover, the rule is arbitrary and capricious.  Defendants concede that there was no

22  evidence before the agency during the rulemaking to show a high probability that a no-match letter

23  relates to unauthorized work.  Yet DHS promulgated a Final Rule that would place employers at

24  risk of liability for "knowing[ly]" employing unauthorized workers unless they re-verify the

25  authorization status of all 8,000,000-plus no-match employees within a strict deadline, thereby

26  placing millions of U.S. citizens and authorized workers at risk of losing their jobs.  A rule is

27  arbitrary and capricious where, as here, the agency did not establish a  "rational connection between

28  the facts found and the choice made." *Motor Vehicle Mfgs. Ass'n v. State Farm Mutual Auto. Ins.*

1    *Co.*, 463 U.S. 29, 43 (1983).

2    The agency tries to save the rule by introducing declarations and other documents not in the

3    rulemaking record. Such documents cannot be considered in defending an APA challenge. Even if

4    they could be considered, however, they do not provide data on the number or percentage of no-

5    matches that relate to unauthorized work, which is the critical evidence missing from the

6    rulemaking record. The agency appears to reason that because unauthorized workers using false

7    SSNs will generate no-match letters, a no-match letter must be a reliable indicator of unauthorized

8    work. That reasoning rests on a logical fallacy because there are many reasons for no-matches and

9    U.S. citizens and other authorized employees make up the vast bulk of the on-the-books workforce.

10    The rule is also arbitrary and capricious because the agency failed to acknowledge and

11    explain why the agency decided in the Final Rule to break with how the government treated no-

12    match letters in the past. *Ramaprakash v. FAA.*, 346 F.3d 1121, 1125 (D.C. Cir. 2003). The

13    agency's denial of any shift in position is contradicted by the record; at least from 1994 (when SSA

14    began sending out employer no-match letters) through 2004, the government consistently took the

15    position that employers had no duty to re-verify no-match employees. The Final Rule takes the

16    opposite position. DHS cannot avoid the APA requirement of explaining during rulemaking any

17    deviations from past agency positions by pointing to two 2005 letters by a DHS employee that shift

18    the agency closer to the position in Final Rule. Those letters do not acknowledge and explain the

19    break from past precedent either.

20    3.    Defendants get the law backwards in arguing that SSA can join with DHS to enforce

21    the immigration laws because no statute prohibits it. Agency action must be affirmatively

22    authorized. *Michigan v. E.P.A.* 268 F.3d 1075, 1082 (D.C. Cir. 2001). No statute permits SSA to

23    turn its no-match mailings into an immigration-enforcement tool, so SSA's actions are *ultra vires*

24    and must be enjoined. The only potential source of statutory authority cited by Defendants, the

25    Economy Act, deals only with the sale of "goods or services," and therefore does not apply.

26    Defendants also offer no statutory authority for DHS to interpret the anti-discrimination laws.

27    Contrary to Defendants' contention, that is exactly what DHS tries to do in the Final Rule and DHS

28    guidance letter, and that action is *ultra vires* as well.

4.     Plaintiffs easily meet their burden of establishing standing at this procedural stage. They plead factual allegations of injury that are more than sufficient to establish associational and organizational standing. And, they have introduced evidence to show a likelihood of proving those allegations. Defendants' standing arguments are premised on their erroneous contention the rule imposes no additional obligations and therefore would cause no harm.

Defendants are also wrong that Plaintiffs lack standing because injury to their members will stem from the actions of employers. When a plaintiff is an object of the government's action, the plaintiff has standing to challenge that action even if the direct injury will be delivered by a third party. *Bennett v. Spear,* 520 U.S. 154, 170 (1997). Here, the point of the rule is to change employer behavior by requiring employers to re-verify and terminate employees, so employees are an object of the government's action and have standing to challenge it. For the same reason, Plaintiffs' injuries will be redressed by a favorable decision. The record includes employer declarations establishing that employers will change their behavior if the Final Rule is implemented, but not otherwise.

Plaintiffs claims are ripe because they are primarily legal claims, the Final Rule is final agency action, and the rule will be implemented immediately. A delay in judicial review would not aid resolution of the claims but would cause hardship to plaintiffs because the DHS/SSA mailing to 140,000 employers would commence and more than 8,000,000 workers would be affected.

5.     Defendants say almost nothing about the second of the two factors the Court must consider in deciding whether to enter a preliminary injunction, which whether the balance of hardships favors a stay. Defendants do not dispute that SSA can just send out its traditional no-match letters pending a decision on the merits. They argue the public interest favors providing "guidance" to employers, but the public interest also favors judicial review of the Final Rule, agencies operating within their statutory authority and citizens and authorized workers not being improperly terminated. No emergency requires implementing the Final Rule before a decision on whether it is lawful. On the other hand, Plaintiffs and their members would suffer immediate, serious, irreparable harm absent a stay. The balance of hardships therefore tips overwhelmingly in favor of preserving the status quo.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      The Final Rule Imposes New Obligations by Placing Employers That Do Not
        Investigate the Work-authorization Status of Employees Covered by SSA
        No-match Letters at Risk of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        A.      The rule changes the definition of "knowing" to expand the doctrine
                of constructive knowledge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        B.      The rule's expansion of the doctrine of constructive knowledge is not
                just a statement of existing law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        C.      The rule creates new obligations as a practical matter, and that is
                the relevant inquiry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.     The Final Rule is Contrary to the Governing Statute Because it Expands
        Liability Beyond What Congress Intended . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.    The Final Rule and Guidance Letter Are Arbitrary and Capricious . . . . . . . . . . . 11

        A.      The agency did not rely on data that establishes a reliable correlation
                between a mismatched SSA record and unauthorized work . . . . . . . . . . . 11

        B.      The agency failed to justify a reversal of position about employers'
                obligations upon receiving no-match letters . . . . . . . . . . . . . . . . . . . . . . . 14

IV.     SSA and DHS Are Exceeding Their Statutory Authority . . . . . . . . . . . . . . . . . . . . 15

        A.      No statute authorizes SSA to join with DHS in enforcing the
                immigration laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        B.      DHS has usurped DOJ's authority to interpret the anti-discrimination
                laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

V.      Plaintiffs Have Standing and Their Claims Are Ripe . . . . . . . . . . . . . . . . . . . . . . . 17

        A.      Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        B.      Ripeness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VI.     The Balance of Equities Tips Overwhelmingly in Favor of Maintaining the
        Status Quo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

1

## TABLE OF AUTHORITIES

2

### CASES

3

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

4

*Alvarado Community Hosp. v. Shalala*,
   155 F.3d 1115 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

5

6

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

7

*Barrick Goldstrike Mines Inc. v. Browner*,
   215 F.3d 45 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

8

9

*Bd. of Natural Res. v. Brown*,
   992 F.2d 937 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

10

*Bennett v. Spear*,
   520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19

11

12

*Bowles v. Seminole Rock & Sand Co.*,
   325 U.S. 410 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

13

*Brown v. Board of Educ.*,
   347 U.S. 483 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

14

15

*Building & Const. Trades Council v. Downtown Development, Inc.*,
   448 F.3d 138 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

16

*Buono v. Kempthorne*,
   ___ F.3d. ___, No. 05-55852, 2007 WL 2493512 (9th Cir. Sept. 6, 2007) . . . . . . . . . . . . 21

17

18

*CRLA v. Legal Servs. Corp.*,
   917 F.2d 1171 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

19

*Camp v. Pitts*,
   411 U. S. 138 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

20

21

*Central Delta Water Agency v. United States*,
   306 F.3d 938 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

22

*Chamber of Commerce v. Dep't of Labor*,
   174 F.3d 206 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

23

24

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

25

*Collins Foods Int'l v. INS*,
   948 F.2d 549 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9, 10

26

27

*Community for Creative Non-Violence v. Lujan*,
   908 F.2d 992 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28

*Desert Citizens Against Pollution v. Bisson,*
    231 F.3d 1172 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*El Rescate Legal Servs. v. Executive Office of Immigration Review,*
    959 F.2d 742 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Ethyl Corp. v. E.P.A.,*
    51 F.3d 1053 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*Fair Housing of Marin v. Combs,*
    285 F.3d 899 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Fox Television Stations, Inc. v. F.C.C.,*
    489 F.3d 444 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*Gilliam v. Nevada Power Co.,*
    488 F.3d 1189 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Gorbach v. Reno,*
    219 F.3d 1087 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*Hall v. Norton,*
    266 F.3d 969 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Heckler v. Matthews,*
    465 U.S. 728 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Hunt v. Washington State Apple Advertising Comm.,*
    432 U.S. 333 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*MD/DC/DE Broadcasters Ass'n v. F.C.C.,*
    236 F.3d 13 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

*Mester Mfg. Co. v. INS,*
    879 F.2d 561 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

*Michigan v. E.P.A.,*
    268 F.3d 1075 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*Motor Vehicle Mfgs. Ass'n v. State Farm Mutual Auto. Ins. Co.,*
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*National Alliance for the Mentally Ill v. St. Johns Cty.,*
    376 F.3d 1292 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*National Wrestling Coaches Assn. v. U.S. Dept. of Education,*
    366 F.3d 930 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*New El Rey Sausage Co. v. INS,*
    925 F.2d 1153 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*Northwest Env'l Def. Ctr. v. Bonneville Power Admin.*,
  477 F.3d. 668 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Ramaprakash v. FAA.*,
  346 F.3d 1121 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Renal Physicians Assn. v. U.S. Dept. of HHS*,
  489 F.3d 1267 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*San Diego County Gun Rights Comm. v. Reno*,
  98 F.3d 1121 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*,
  100 F.3d 1443 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Stewart Foods, Inc.*,
  64 F.3d 141 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Thomas v. Union Carbide Agr. Prods. Co.*,
  473 U.S. 568 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Toilet Goods Assoc. v. Gardner*,
  387 U.S. 158 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Heredia*,
  483 F.3d 913 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Jewell*,
  532 F.2d 697 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Washington Toxics Coalition v. U.S. Dep't of Interior*,
  457 F.Supp.2d 1158 (W.D. Wash. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**STATUTES AND REGULATIONS**

5 U.S.C.
  §706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
  §706(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

8 U.S.C.
  §1324(a)(1)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
  §1324(a)(1)(A)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
  §1324(a)(1)(A)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
  §1324(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
  §1324a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
  §1324a(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  §1324c(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

31 U.S.C. §1535 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

8 C.F.R.
   §274a.1(l)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
   §274a.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28 C.F.R. §44.200(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## OTHER AUTHORITIES

G. Williams, Criminal Law: The General Part 159 (2d ed. 1961) . . . . . . . . . . . . . . . . . . . . . . . . .  2

**ARGUMENT**

Defendants' central contention is that this lawsuit is much ado about nothing. Notwithstanding 5,000 comments submitted during rulemaking, Secretary Chertoff's press conference to announce the Final Rule as part of an immigration-enforcement crackdown, overwhelming evidence the rule will cause a nationwide change in employer behavior and adversely affect U.S. citizens and other authorized workers, Defendants insist the rule does not expand liability under the immigration laws. According to Defendants, the rule does nothing more than offer employers a "safe harbor" from immigration-law liability that already exists.

Defendants' arguments are all premised on this central contention about the insignificance of the DHS rule. That being so, we turn immediately to Defendants' central contention and demonstrate that it is wrong. The rule does *not* simply create a safe harbor from existing liability. The rule changes the definition of "knowing" to expand liability beyond what Congress intended. Under the new definition of "knowing," an employer's mere failure to investigate the work-authorization status of an employee covered by a no-match letter can establish that the employer has "constructive knowledge" the worker is unauthorized. By broadening the constructive-knowledge doctrine, the rule places employers receiving SSA no-match letters at risk of civil and criminal liability unless they follow the DHS safe-harbor procedures by re-verifying millions of existing employees. The rule thereby creates the liability that makes a safe harbor necessary.

After demonstrating that Defendants' central contention about the DHS rule must be rejected, we then demonstrate that Defendants' arguments about likelihood of success on the merits, standing and ripeness, and the balance of equities must be rejected as well. Those other arguments are all premised on the erroneous contention that the DHS rule does not impose new obligations.

**I.    The Final Rule Imposes New Obligations by Placing Employers That Do Not Investigate the Work-Authorization Status of Employees Covered by SSA No-match Letters at Risk of Liability.**

    **A.    The rule changes the definition of "knowing" to expand the doctrine of constructive knowledge.**

The starting point in assessing whether the DHS rule imposes new obligations is with existing law. Congress made it unlawful to employ a worker *"knowing"* the worker is an "unlawful

1  alien." 8 U.S.C. §1324a(a)(1)(A) (emphasis added). The government does not dispute that

2  "knowing" is an unambiguous term of art. The government also does not dispute that constructive

3  knowledge, also called wilful blindness, is a highly distinctive state of mind that exists only in the

4  limited circumstance when a person "is aware that the fact in question is highly probable but

5  consciously avoids enlightenment." *United States v. Jewell*, 532 F.2d 697, 704 (9th Cir. 1976) (en

6  banc). The person must "refrain[] from obtaining the confirmation because he want[s] . . . to be

7  able to deny knowledge. This, and this alone, is wilful blindness.'" *Id.* at 700 n.7 (quoting G.

8  Williams, Criminal Law: The General Part 159 (2d ed. 1961)). This mens rea of wilful blindness

9  "is categorically different from negligence or recklessness." *United States v. Heredia,* 483 F.3d

10  913, 918 n.4 (9th Cir. 2007) (en banc).

11      Defendants also concede that an SSA no-match letter does *not* "make[] the employer aware

12  of facts that establish it is highly probable that any worker identified in the letter is unauthorized."

13  Opp. at 27:21-27. Nor do Defendants dispute that, insofar as the tax laws are concerned, the

14  employer need only make sure the employer is accurately transmitting on a Form W-2 the name and

15  SSN provided by the employee on Form W-4.

16      From all this, it follows that neither of the two requirements for establishing constructive

17  knowledge are met when an employer does not re-verify the work-authorization status of a no-match

18  employee: 1) the SSA no-match letter does not make the employer aware of a "high probability" a

19  particular worker is unauthorized, and 2) an employer that simply checks to make sure it is

20  accurately transmitting the employee-provided name and SSN is not purposefully avoiding anything.

21  In sum, existing immigration law imposes no obligation to investigate the work-authorization status

22  of employees covered by no-match letters.

23      We now turn to the new DHS rule. The rule amends the definition of "knowing" in DHS'

24  regulations. The new definition lists as an "[e]xample of a situation where the employer may,

25  depending on the totality of relevant circumstances, have constructive knowledge that an employee

26  is an unauthorized alien . . . situations where the employer: . . . (iii) Fails to take reasonable steps

27  after receiving information indicating that the employee may be an alien who is not employment

28  authorized such as . . . [an SSA no-match letter]." Pls. Mem., App. A (Final Rule) at 45623-24.

1    Under that new definition of "knowing," a no-match letter is treated as "information

2 indicating that the employee may be an alien who is not employment authorized," and an employer

3 who does not conduct a follow-up investigation is treated as having "fail[ed] to take reasonable

4 steps after receiving [that] information." *Id.*  Such a *failure to investigate* can be deemed,

5 "depending on the totality of relevant circumstances," to constitute "knowledge." *Id.*

6    Under the plain language of the new rule, an employer who fails to investigate risks being

7 deemed to have constructive knowledge of what the investigation might have disclosed.  The DHS

8 guidance letter will make that abundantly clear to employers.  *See* Pls. Mem., App. B.  That is a

9 change in law that expands liability.  The change has huge practical significance when SSA plans to

10 send out, this year alone, more than 140,000 no-match letters affecting more than 8,000,000 existing

11 employees, including U.S. citizens and authorized workers.

12    Only after changing the definition of "knowing" to expand employer liability does the DHS

13 rule then offer a safe harbor by providing that DHS will consider an employer "to have taken

14 reasonable steps – and receipt of [the no-match letter] will therefore not be used as evidence of

15 constructive knowledge – if the employer takes the following actions," which include terminating

16 employees.  (Pls. Mem., App. A at 45624).  Thus, the rule does not merely offer a safe harbor from

17 existing liability; it first creates the need for the safe harbor it offers by expanding the constructive-

18 knowledge doctrine to place employers at risk of liability unless they investigate.  While Defendants

19 insist "[t]he regulation does not . . . expand the legal definition of 'knowing' employment of

20 unauthorized aliens" (Opp. at 3:9-11), that is precisely what the new regulation does.

21

22    **B.    The rule's expansion of the doctrine of constructive knowledge is not just a statement of existing law.**

23    Defendants claim that the Final Rule merely clarifies existing law.  They assert that an

24 employer who fails to re-verify the work-authorization status of a no-match employee already can be

25 deemed to have "constructive knowledge" of unauthorized work.  That is not true.  As explained

26 above, "constructive knowledge" is a very narrow doctrine that imposes liability on a person who

27 lacks actual knowledge if the lack of actual knowledge is attributable to *wilful blindness*.  As further

28 explained – and as Defendants do not dispute – the essential requirements for wilful blindness are

1   not met by the failure to investigate a no-match letter.

2        The doctrine of constructive knowledge is no broader under the immigration laws than under

3   other statutes; indeed, the Ninth Circuit has cautioned that "[t]o preserve Congress' intent in passing

4   the employer sanctions provisions of IRCA . . . the doctrine of constructive knowledge must be

5   *sparingly applied*." *Collins Foods Int'l v. INS*, 948 F.2d 549, 555 (9th Cir. 1991) (emphasis added).

6   The DHS rule is not simply articulating current law regarding constructive knowledge.

7        In this regard, SSA has sent more than 1,400,000 no-match letters to employers just since

8   2000, covering tens of millions of individual workers.  Moran Decl. at 13-14.  Yet Defendants do

9   not cite, and we are unable to locate, a single reported decision by a court or administrative hearing

10  officer that concludes an employer's failure to act upon receipt of a no-match letter establishes that

11  the employer had constructive knowledge that a worker was unauthorized.

12       Defendants also make the very different contention that, under current law, DHS could "rely

13  upon a no-match letter as a single piece of evidence in building an overall case."  Opp. at 2:11-12.

14  But the Final Rule does not merely provide that a no-match letter can be one piece of circumstantial

15  evidence that an employer knows a worker lacks authorization.  What the Final Rule provides is that

16  the "[f]ail[ure] to take reasonable steps after" receiving a no-match letter may itself be treated as

17  "constructive knowledge" a worker lacks authorization, depending on "the totality of the

18  circumstances."  Pls. Mem. App. at 45623.  The Final Rule does not require additional evidence of

19  knowledge.

20       The DHS letter also does *not* tell the recipient employers that, if an employee's appearance

21  on the no-match list is the only indication that an employee is undocumented, the employer need not

22  conduct the "safe harbor" steps.  If the letter said that, then at least the government's litigation

23  position would be consistent with what DHS proposes to tell employers in its guidance letter.

24  Instead, the letter is designed to cause – and certainly will have the effect of causing – employers

25  who lack any evidence pointing to an employee's undocumented status at the time of receiving the

26  letter to take the same steps as employers who have possession of some evidence pointing in that

27  direction at the time of receiving the letter.  *See* Pls. Mem., App. B (instructing employers to "apply

28  these . . . steps *uniformly to all employees* listed in the enclosed SSA letter") (emphasis added).

1    Moreover, although Defendants tout the use of no-match letters as "a single piece of

2 evidence," Defendants do not cite *any* reported administrative or judicial decision that considers a

3 no-match letter as evidence of knowledge.  That is not surprising in light of the disclaimer on the

4 no-match letter.  The SSA no-match letter states, on its face, that it does not make "*any statement*"

5 about an employee's immigration status.  Pls. Mem., App. C; Pls. 1st RJN, Ex. D.  Likewise, the

6 SSA no-match letter states, on its face, that "[t]his letter *does not imply* that . . . your employee

7 intentionally gave the government wrong information."  *Id*. (emphasis added).  It is difficult to

8 imagine a stronger statement that the letter is *not* notice to the employer that an employee is using a

9 false SSN and therefore that the letter would *not* have evidentiary value as such a notice.

10    Neither of the two immigration-enforcement prosecutions described by the Defendants'

11 declarant (Second Spero Decl. ¶¶9-13) involved the introduction of no-match letters into evidence

12 to prove constructive knowledge.  They were both egregious cases in which employers had *actual*

13 *knowledge* of immigration law violations and pled guilty to serious crimes after charges were filed.

14    In the IFCO Systems case, the company's general manager personally discussed with

15 prospective employees their lack of work authorization and advised them how to purchase fake

16 documents.  Pls. 2d RJN, Ex. A at ¶¶18, 23-24, 29 (affidavit of ICE special agent in support of

17 criminal complaint against IFCO officers); Ex. B at 9-11 (IFCO plea agreement).  In the Golden

18 State Fence Company case, the company employed workers after being given written notice by both

19 the INS and then by its successor, ICE, that those workers were "unauthorized aliens."  Company

20 officials pled guilty "to hiring at least 10 individuals, with *actual knowledge* that the individuals

21 were unauthorized alien workers."  *Id*., Ex. C (ICE press release on Golden State Fence Company

22 case) (emphasis added).

23    The description of those two criminal prosecutions involving employers with actual

24 knowledge of immigration-law violations does nothing to show that existing law considers no-

25 match letters proof of constructive knowledge, and that the Final Rule is just a statement of that

26 existing law, as Defendants claim.  As discussed in our opening brief (Pls. Mem. at 11-12), the

27 "constructive knowledge" case on which Defendants rely (Opp. at 6, citing *Mester Mfg. Co. v. INS*,

28

1  879 F.2d 561 (9th Cir. 1989)), concerned notice *by INS* of fraudulent *immigration* documents that

2  directly evidenced the workers' unlawful status.

3  The declarant is also wrong that the government "has consistently viewed failure by . . . an

4  employer to take any action to address the no-match as possible evidence that the employers know

5  that the employees in question are not authorized to work in the United States." Second Spero Decl,

6  ¶7. The assertion is directly contradicted by prior INS opinion letters, which instruct employers that

7  immigration law does *not* require them to take action upon receipt of a no-match letter, and by the

8  2004 DHS letter that adopts the same interpretation of IRCA. Pls. 1st RJN, Exs. F - J; *see also id.*,

9  Ex. K (2004 DOJ letter stating employers need not re-verify employees listed in SSA no-match

10  letters)[1]

11  The sum of the matter is that the Final Rule would change existing law by expanding the

12  constructive knowledge doctrine. The expansion of the constructive knowledge doctrine would

13  allow DHS to establish liability by showing an employer failed to investigate an SSA no-match

14  letter. That, in turn, would force employers that receive no-match letters to seek refuge in the DHS

15  safe-harbor procedure. To qualify for the safe harbor, employers would have to require millions of

16  existing workers, including U.S. citizens and non-citizens with work authorization, to resolve no-

17  matches with SSA within a 60-day deadline or lose their jobs.[2]

18
19  ### C. The rule creates new obligations as a practical matter, and that is the relevant inquiry.

20  Whether an agency's actions create additional legal obligations also must be assessed by

21  considering how the agency's actions will impact the regulated public, not on the form the agency's

22

---

23  [1]Defendants also invoke the existing definition of "constructive knowledge" in 8 C.F.R.
24  §274a.1(l) as support for the Final Rule. But to the extent that definition departs from the definition
    of knowing in the *Jewell-Collins* line of cases, the definition is itself contrary to law and cannot
25  rescue the Final Rule. And, as stated above in the text, after that definition was adopted, INS did
    *not* interpret it as requiring re-verification of no-match employees.
26

27  [2]The safe harbor allows 90 days from the date of the no-match letter to correct the
    discrepancy, but the employer need not tell the worker about the no-match letter for 30 days, so the
28  worker would have just 60 days to resolve the no match with SSA. *See* Pls. Mem., App. A at
    45624.

1  actions take.  In *Chamber of Commerce v. Dep't of Labor*, 174 F.3d 206 (D.C. Cir. 1999), for

2  example, the D.C. Circuit considered a "Directive" issued by the Occupational Safety and Health

3  Administration providing that employers in certain industries would be inspected unless they

4  adopted a safety and health program that contained elements that went beyond existing law.  *Id*. at

5  208.  OSHA argued that the Directive was not binding because "an employer's participation in the

6  [program] is strictly voluntary."  *Id.* at 209.  The Court rejected the agency's argument, concluding

7  that the "Directive is . . . . the practical equivalent of a rule that obliges an employer to comply or to

8  suffer the consequences; the voluntary form of the rule is but a veil for the threat it obscures."  *Id.* at

9  210.

10       Likewise, in *MD/DC/DE Broadcasters Ass'n v. F.C.C.*, 236 F.3d 13 (D.C. Cir. 2001), the

11  D.C. Circuit considered a Federal Communications Commission rule that broadcasters reporting

12  "few or no" women and minority applicants could be subject to an FCC investigation.  The FCC

13  argued that the rule imposed no obligations, but the Court reasoned that "[i]nvestigation by the

14  licensing authority is a powerful threat, almost guaranteed to induce the desired conduct."  *Id.* at 19.

15  The Court therefore concluded that because the rule, as a practical matter, "compell[ed]"

16  broadcasters to generate more applications from women and minorities, the rule constituted a racial

17  classification subject to strict scrutiny.  *Id.* at 20-21.

18       Here the practical effect of DHS' actions is to require employers to investigate the work-

19  authorization status of employees subject to no-match letters and terminate employees by using the

20  DHS safe harbor.  Although Defendants insist that compliance is "voluntary," employers are obliged

21  to comply or risk civil and criminal liability.  The threat in this case is much more severe than the

22  threat of an OSHA inspection in *Chamber of Commerce v. Dep't of Labor* or the threat of an FCC

23  investigation in *MD/DC/DE Broadcasters.*  Here the employer faces civil and criminal liability, not

24  just an investigation or inspection.

25       Defendants' contention in their legal papers that the DHS Final Rule creates no obligations

26  also is refuted by DHS' own interpretation of the rule, set out in the guidance letter that would be

27  attached to every SSA no-match letter.  *Cf. Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410,

28  1218-19 (1945) ("Any doubts concerning this interpretation of [the] rule . . . are removed by

1  reference to the administrative construction . . . . in a Bulletin issued by the Administrator

2  concurrently with the . . . Regulation.").  In the guidance letter, DHS informs employers directly and

3  unequivocally that they have an obligation to address no-match letters: **"Q: Can I simply disregard**

4  **the letter from SSA?  A: No."**  Pls. Mem., App. B (boldface in original).  The guidance letter then

5  threatens employers with serious consequences if they do not follow DHS' instructions: "[T]he

6  Department of Homeland Security (DHS) could determine that you have violated the law by

7  knowingly continuing to employ unauthorized persons.  This could lead to civil and criminal

8  sanctions."  *Id.*

9       According to Defendants, this letter "does not mandate that employers do anything."  Opp. at

10  26:19.  That is not how any reasonable employer would interpret the letter.  Nor are Defendants

11  correct that "the language in the DHS insert letter mirrors the use of 'should' in the SSA [no-match]

12  letter."  Opp. at 26 n. 10.  The SSA no-match letter asks employers for assistance: "It would be a

13  great help to us if you could respond within 60 days . . . ."  The DHS insert letter threatens

14  employers with "civil and criminal sanctions" unless they follow DHS' instructions, which include

15  terminating employees who cannot straighten out the problem in 60 days.  When coupled with the

16  threat of civil and criminal sanctions for failing to follow agency guidance, the word "should"

17  imposes an obligation.  As previously stated, the threat in this case is much more severe than in

18  *Chamber of Commerce v. Dep't of Labor* and  *MD/DC/DE Broadcasters*, which rejected similar

19  agency arguments that compliance was "voluntary."

20       DHS' interpretation of its Final Rule as imposing *an obligation* to investigate and resolve

21  no-matches also is made crystal clear by Secretary Chertoff's statement at the press conference to

22  unveil the rule:

23      There is a right way to react to a no-match letter, which, if followed in good faith,
    will give the employer a safe harbor against liability, and there's also a wrong way to

24      respond, which is to ignore it. And the regulation makes clear that if you ignore a
    no-match letter you are putting yourself in a position where that fact will be used

25      against you if the time comes to assess liability.
    .   .   .

26

27      What the company may not do is simply ignore the problem. And if the company
    does nothing to resolve the problem or doesn't act in good faith, that company can be

28      held liable for employing an unauthorized worker and could face stiff penalties or
    sanctions.

1    Pls. 2d RJN., Ex. D (Aug. 10, 2007 Press Conference by Secretary Chertoff).

2         Secretary Chertoff also explained at the same press conference that for employers to deal

3    with no-match letters the "right way" and avoid "stiff penalties," they must give workers just 60

4    days to resolve no-matches with SSA. *Id.* If the worker cannot do so by the deadline or prove work

5    authorization using a different name and/or SSN, "the company is going to have to terminate the

6    employee." *Id.*

7    **II.    The Final Rule Is Contrary to the Governing Statute Because it Expands Liability
8         Beyond What Congress Intended.**

9         Once Defendants' overly modest interpretation of DHS' rule is set aside, it follows that the

10   DHS rule is inconsistent with the governing statute because it expands immigration-law liability

11   beyond what Congress intended.

12        The unambiguous term *"knowing"* does not encompass a duty to investigate, regardless of

13   whether a reasonably curious person might do so. Congress made a purposeful distinction in the

14   immigration laws between knowledge and recklessness. The statutory sections immediately

15   surrounding 8 U.S.C. §1324a impose liability for recklessness. *See* 8 U.S.C. §1324a(a)(1)(A)(ii)

16   ("knowing or in reckless disregard of the fact that"); §1324(a)(1)(A)(iii) ("knowing or in reckless

17   disregard of the fact that"); §1324(a)(1)(A)(iv) ("knowing or in reckless disregard of the fact that");

18   §1324(a)(2) ("knowing or in reckless disregard of the fact that"); §1324c(a)(5) ("with knowledge or

19   in reckless disregard of the fact that"). By contrast, 8 U.S.C. §1324a makes it unlawful to hire or

20   continue to employ a worker "knowing" –  not "knowing or in reckless disregard of the fact that" –

21   the worker is an "unauthorized alien." The DHS Rule allows liability to be imposed for

22   recklessness or negligence and thereby contradicts the statute.

23        The DHS rule also is contrary to Congress' intent to require only initial verification of

24   employees upon hire, not a scheme of continuing verification. Congress was concerned that

25   continuing verification requirements would overly burden employers and increase national-origin

26   discrimination. Pls. Mem. at 15-19. As the Ninth Circuit has explained, "[t]o preserve Congress'

27   intent in passing the employer sanctions provisions of [the immigration laws] . . . the doctrine of

28   constructive knowledge must be sparingly applied," *Collins Foods*, 948 F.2d at 555, and "the INS

1    [now DHS] cannot make generalized accusations for the purpose of forcing employers to reverify

2    the authorization of their employees." *New El Rey Sausage Co. v. INS*, 925 F.2d 1153, 1158 (9th

3    Cir. 1991). Yet that is precisely what the DHS rule would accomplish. The rule expands the

4    constructive knowledge doctrine so as to turn all no-match letters into "generalized accusations"

5    about work authorization status and force employers to re-verify the work authorization status of

6    millions of employees each year. That is contrary to Congress' intent.[3]

7        If Defendants' position in this case were correct, and DHS can turn no-match letters into

8    "generalized accusations" that require re-verification, then DHS could do the same thing with

9    virtually *any* information. For example, some undocumented workers use public transportation

10   because they cannot qualify for drivers' licenses. DHS could change its rule to provide that

11   employers who learn employees use public transportation and fail to re-verify the employees' work

12   authorization status can be deemed to have "constructive knowledge" the workers are not

13   authorized. Just as *some* workers identified in no-match letters lack work authorization, *some*

14   workers who use public transportation lack work authorization, so the rationale for the hypothetical

15   rule would be identical to what the government contends is sufficient to justify the no-match rule.

16   This hypothetical example shows the wisdom of the Ninth Circuit's admonition in *Collins Foods*

17   that "[t]o preserve Congress' intent" to limit employers' immigration-law obligations (and thereby

18   avoid causing national-origin discrimination) "the doctrine of constructive knowledge must be

19   sparingly applied." 948 F.2d at 555.

20       Finally, Defendants acknowledge that the employer sanctions regime does not apply to

21   workers hired before IRCA's enactment. Opp. at 29 n.12. They seek to dismiss the significance of

22   this by arguing that the new Final Rule therefore does not apply to pre-IRCA employees either. *Id*.

23   But nowhere does the rule or, more critically as a practical matter, the DHS guidance letter that

24   would be attached to every SSA no-match letter, set out the critical exception. To the contrary,

25   DHS admonishes employers to apply the new measures "to *all* employees." Pls. Mem., App. B

26

27       [3]Re-verification under the DHS safe harbor also requires the employee to present photo

28   identification, *see* Pls. Mem., App. A, at 45624, §(l)(2)(iii)(A)(3), when Congress intentionally did
     not require workers to have photo identification to complete the I-9 Form. 8 C.F.R. §274a.2.

(emphasis added); *see also id.* (urging employers to apply the same procedure "to *all* employees" to avoid discrimination liability) (emphasis added).  DHS indiscriminately instructs employers to complete a new I-9 if the SSA no-match is not resolved "as if the employee in question were newly hired." *Id*.  It then intones that if the employer cannot confirm that the employee is authorized to work "by following the [enumerated] procedures," "you risk liability for violating the law by continuing to employ unauthorized persons." *Id*.  In short, DHS applies its rule to pre-IRCA hires and would thereby cause the wrongful termination of those employees.

## III.    The Final Rule and Guidance Letter Are Arbitrary and Capricious.

### A.    The agency did not rely on data that establishes a reliable correlation between a mismatched SSA record and unauthorized work.

That *some* employees covered by a no-match letter lack work authorization is too thin a factual foundation to rationally support a Final Rule that requires *all* employers to investigate and re-verify *all* no-match workers' authorization status or face being charged with constructive knowledge if they do not terminate employees who are unable to resolve the problem within 60 days.  Defendants confirm there was no evidence before the agency during the rulemaking to show the percentage of no-match letters that relate to unauthorized work.  Opp. at 27, 32 (acknowledging DHS has never claimed a high correlation rate).  The most that DHS knew, as it explained in the Notice of Final Rule, is that unauthorized work is one of *many* possible causes of mismatched SSA records.  *See* Pls. Mem., App. A at 45612 ("there can be many causes for a no-match"); *id.* at 45614, 45616.

The government now seeks to defend the rule by submitting two declarations.  *See* Simermeyer Decl.; Second Spero Decl.  As an initial matter, litigation affidavits cannot be used to present evidence and reasoning that was not in the administrative record.  *Alvarado Community Hosp. v. Shalala*, 155 F.3d 1115, 1124 (9th Cir. 1998) (rejecting affidavits created for litigation to defend APA challenge); *Community for Creative Non-Violence v. Lujan,* 908 F.2d 992, 998 (D.C. Cir. 1990) (litigation affidavits are "manifestly inappropriate for a case alleging only violations of the Administrative Procedure Act"); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401

1  U.S. 402, 419 (1971) ("These affidavits were merely 'post hoc' rationalizations, which have

2  traditionally been found to be an inadequate basis for review") (citation omitted).

3      But even if the Court *could* consider these declarations to support the Final Rule, they fall

4  far short of presenting the necessary factual data.  The SSA declaration describes "computer

5  matching routines" the SSA employs to reduce the mismatch rate.  Simermeyer Decl. at ¶4; Opp. at

6  34.  But SSA never claims these pre-1985 automated processes weed out all mismatches based on

7  clerical errors, name changes, alternative name forms, nicknames, naming conventions in Latin

8  American and Asian countries, or other reasons unrelated to immigration status.  *Id.*  All the SSA

9  declaration shows is that, in the absence of the "computer matching routines," there would be more

10 no-matches.  SSA does not attempt to provide an estimate of the number or percentage of no-

11 matches that relate to unauthorized work, which is the critical evidence missing from the

12 rulemaking record.

13      Defendants also submit a declaration from an ICE official stating that ICE considers no-

14 match letters to be an "an important tool" in enforcement investigations.  Second Spero Decl. ¶9-

15 12.[4]  Again, the declaration offers no data on the number or percentage of no-matches that relate to

16 unauthorized work.  All it shows it that employers who knowingly hire unauthorized workers may

17 receive no-match letters.

18      Defendants apparently reason that because an unauthorized worker using a false SSN may

19 cause a no-match in the SSA database, a no-match letter must be relieable evidence a worker is

20 unauthorized.  Opp. at 32-33; *see also id.* at 9 (claiming that investigations of employers who hire

21 unauthorized workers find workers with false SSNs); Second Spero Decl. ¶4, 9, 11 (same).  But that

22 reasoning rests on a logical fallacy.  That an overwhelming proportion of the prison population

23 consists of persons who lack a college education does not, for example, mean that the population of

24 persons who lack a college education contains a high proportion of criminals.  Likewise, that many

25 unauthorized workers submit false SSNs does not mean that there is a high probability a worker

26  _____

27      [4] As explained at p. 5, *supra*, the two enforcement cases described by the declarant involved
    employers that had actual knowledge of immigration fraud and unauthorized work, not cases in
28  which employers who *lacked* actual knowledge were considered to have "constructive knowledge"
    because they failed to re-verify employees after receiving no-match letters.

1  listed on a no-match letter is unauthorized.  The government's reasoning is based on the logical

2  fallacy of "affirming the consequent" (if A then B, B therefore A), which the courts have rejected.

3  *See Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1197 (9th Cir. 2007) ("This argument rests on the

4  logical fallacy of affirming the consequent."); *In re Stewart Foods, Inc.* 64 F.3d 141, 145 (4th Cir.

5  1995) ("This type of inference is an example of affirming the consequent, a classic form of invalid

6  reasoning").  Absent data showing a high correlation between no-match letters and unauthorized

7  work, a no-match letter is not reliable evidence of anything.[5]

8          In sum, DHS knew at the time that it created the Final Rule only that a worker's

9  unauthorized status is *one of many causes* for a no-match letter, and did not know the correlation

10  rate between no-match letters and unauthorized status.  From that lack of data, DHS promulgated a

11  Final Rule that would place employers at risk of liability for "knowing[ly]" employing unauthorized

12  workers unless they re-verify the authorization status of all 8,000,000-plus no-match employees

13  within a strict deadline, thereby placing millions of U.S. citizens and authorized workers at risk of

14  losing their jobs.  The paltry factual record and flawed logic does not satisfy the APA's requirement

15  of articulating a "*rational* connection between the facts found and the choice made." *State Farm* ,

16  463 U.S. at 43 (emphasis added).

17

18          [5]  In addition to two post-hoc affidavits, Defendants also seek to rely upon an academic

19  article and reports by the SSA Inspector General that were not referred to in the Notice of Proposed
    Rule or Notice of Final Rule, and that DHS conspicuously fails to certify were part of the

20  administrative record considered by DHS in adopting the rule.  Opp. at 9-12, 32-35; Defs' Request
    for Judicial Notice (stating only that documents were "created or maintained by federal government

21  agencies" or "publicly available on the world wide web").  Documents not certified to have been
    part of the administrative record cannot justify the agency's decisionmaking process because such

22  documents cannot have served as the basis for the agency's decision. *Camp v. Pitts*, 411 U. S. 138,
    142 (1973) ("the focal point for judicial review should be the administrative record already in

23  existence, not some new record made initially in the reviewing court"); *accord Southwest Ctr. for

24  Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).  Regardless, nothing
    in those reports reveals the probability or rate of correlation between SSA no-matches and

25  unauthorized status, which is the crucial, missing data.

26          The only documents submitted by Defendants from the rulemaking record, two employers'
    comments on the proposed rule, only support the undisputed points that there are unauthorized

27  workers in the U.S. workforce, and that some workers who are the subject of no-match letters are

28  unauthorized.  Opp. at 33 (citing Western Growers and National Council of Agricultural Employers
    comments on rule).

1
2
**B.     The agency failed to justify a reversal of position about employers' obligations upon receiving no-match letters.**

3     Defendants do not dispute that DHS failed to acknowledge and explain why the agency

4     decided in the Final Rule to break with how the government treated no-match letters in the past.

5     Under the APA, this "failure to come to grips with conflicting precedent constitutes an inexcusable

6     departure from the essential requirement of reasoned decision making." *Ramaprakash v. FAA*, 346

7     F.3d 1121, 1125 (D.C. Cir. 2003); *Fox Television Stations, Inc. v. F.C.C.*, 489 F.3d 444, 457 (2d

8     Cir. 2007); 5 U.S.C. §706(2)(A).

9     Defendants insist that the Final Rule's expansion of the constructive-knowledge doctrine to

10    cover no-match letters is *not* really a change in position. But that plainly is untrue. After SSA

11    initiated the employer no-match letter in 1994, a series of INS opinion letters publicly affirmed that

12    immigration law imposed no obligation upon employers to investigate no-match letters. *See* Pls. 1st

13    RJN, Exs. G - J. In 2004, DHS and DOJ publicly affirmed that interpretation. *Id.*, Exs. F, K. The

14    Final Rule states that there is such an obligation. The change in position is obvious.

15    According to Defendants, however, there has been no change in position because two March

16    2005 letters to individual employers from a DHS deputy associate general counsel began to shift

17    closer to the interpretation of "knowing" that is now articulated in the Final Rule. Defs. RJN, Exs.

18    A, B. The two March 2005 letters will not bear the weight the Defendants would now place upon

19    them. They clearly state that they are just "general comments," not "legal advice," and certainly do

20    not state that employers may be found to have constructive knowledge of unauthorized work unless

21    they re-verify and terminate no-match employees by a fixed deadline. Moreover, those two letters

22    do not provide any acknowledgment of or explanation for a change in the agency's 1994-2004

23    interpretation of the statute either.

24    The APA's requirement that agencies candidly acknowledge and explain during rulemaking

25    a change from a prior position would mean little if the agency could avoid the requirement entirely

26    by first issuing a letter that itself lacks the required explanation for the shift in position. Since 1994,

27    there have been no relevant changes to IRCA or to SSA's process for generating no-match letters

28    and, at least during the period from 1994-2004, the agency consistently took the position that

1    employers had no duty to re-verify the status of employees covered by no-match letters.  The APA

2    does not permit that prior precedent to be swept under the rug during rulemaking.  *See, e.g.*,

3    *Northwest Env'l Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d. 668, 687-88 (9th Cir. 2007) ("an

4    agency changing its course must supply a reasoned analysis indicating that prior policies and

5    standards are being deliberately changed, not casually ignored").

6    **IV.     SSA and DHS Are Exceeding Their Statutory Authority.**

7           **A.     No statute authorizes SSA to join with DHS in enforcing the immigration laws.**

8           Congress never granted SSA the authority to assist DHS with its immigration-enforcement

9    efforts and, therefore, SSA's participation in the joint no-match mailing with DHS is *ultra vires*

10   conduct that violates the APA, 5 U.S.C. §706(2)(C).  Defendants respond that Congress has not

11   *prohibited* SSA from taking this action, Opp. at 38, but that argument gets the law backwards.  *See,*

12   *e.g.*, *Michigan v. E.P.A.* 268 F.3d 1075, 1082 (D.C. Cir. 2001) ("Were courts to presume a

13   delegation of power absent an express withholding of such power, agencies would enjoy virtually

14   limitless hegemony . . . we will not presume a delegation of power based solely on the fact that there

15   is not an express withholding of such power"); *accord Ethyl Corp. v. E.P.A.*, 51 F.3d 1053, 1060

16   (D.C. Cir. 1995) ("We refuse, once again, to presume a delegation of power merely because

17   Congress has not expressly withheld such power").

18          The only statute cited by Defendants as authority for SSA's conduct is the Economy Act,

19   which does not even arguably apply here.  Opp. at 38; 31 U.S.C. §1535 ("The head of an agency or

20   major organizational unit within an agency may place an order with a major organizational unit

21   within the same agency or another agency for goods or services").  SSA obviously is not accepting

22   an order for "goods and services."  Rather, SSA has altered its no-match mailing to serve as an

23   immigration-enforcement tool.  The existence of the Economy Act also demonstrates that Congress

24   provides *express* statutory authority for agencies to act outside their delegated jurisdiction, even for

25   something as mundane as one agency purchasing goods from another.

26          Defendants offer generalizations about "routine" agency "cooperation," but that cooperation

27   must always derive from statutory authority granted by Congress.  Otherwise agencies could join

28   together in the name of interagency "cooperation" to erase the careful choices Congress made about

1  how to allocate power.  Because there is no *statute* that delegates to SSA the authority to use the

2  process of reconciling a tax database maintained for the social security program to instead aid DHS'

3  immigration-enforcement efforts, the joint SSA/DHS no-match packet mailing must be enjoined as

4  *ultra vires*.  As pointed out in our opening papers, bills to provide such authority have been

5  introduced in Congress but not adopted.  *See* Pls. Mem. at 27 n.10.[6]

6  **B.    DHS has usurped DOJ's authority to interpret the anti-discrimination laws.**

7  Defendants argue that DHS has not sought to offer an interpretation of the anti-

8  discrimination laws.  But DHS unambiguously instructs employers that if they follow DHS safe-

9  harbor procedures, by requiring employees to re-verify their work authorization using different

10  documents, and terminate those employees who do not comply, employers *"will not be found to*

11  *have engaged in unlawful discrimination."*  Pls. Mem., App. A at 45613-14 (emphasis added); *see*

12  *also* App. B ("Q: Will I be liable for discrimination charges brought by the United States if I

13  terminate the employee after following the steps outlined above?  A: No.").

14  Defendants also argue that because DHS' interpretation of the anti-discrimination provisions

15  is *correct*, DHS is not usurping the exclusive authority of DOJ's Office of Special Counsel to

16  interpret those provisions.  Opp. at 39 ("[t]hose documents only state what IRCA already

17  provides").  In fact, DHS' interpretation *conflicts* with the interpretation of the IRCA anti-

18  discrimination provisions in DOJ's regulations, which consider an employer's request for any

19  additional documents to be evidence of discrimination.  *See* 28 C.F.R. §44.200(a)(3) ("A person's

20  . . . request, for purposes of satisfying the requirements of 8 U.S.C. §1324a(b), for more or different

21  documents than are required under such section . . . shall be treated as an unfair immigration-related

22  employment practice relating to the hiring of individuals.").  Moreover, whether DHS' interpretation

23  of the anti-discrimination provisions is correct is beside the point, which is that DHS is not the

24

25  [6] Defendants state that DHS will not know the identity of the 140,000 employers receiving
no-match letters in the SSA/DHS mailing.  Defendants' point is apparently that while employers

26  finding a letter from DHS attached to the SSA no-match letter may *assume* DHS has gained access
to their confidential tax reports, there will be no violation of the express statutory prohibition

27  against SSA sharing such information.  Our point, however, is that SSA has no current statutory
authority for using the no-match mailing to help enforce the immigration laws, regardless of

28  whether taxpayer confidentiality is actually compromised.

1   agency with authority to adopt rules that interpret those provisions.  DHS also cannot limit the

2   OSC's prosecutorial discretion, which DHS purports to do in its guidance letter.  The letter instructs

3   employers that, if they follow DHS' instructions, they "will not be subject to suit by the United

4   States under the Immigration and Nationality Act's anti-discrimination provision."  Pls. Mem., App.

5   B.  DHS is not the agency that enforces those provisions.

6   **V.    Plaintiffs Have Standing and Their Claims Are Ripe.**

7          Defendants' standing and ripeness arguments are premised on their central contention that

8   the new DHS regulation does not change existing legal obligations for employers receiving SSA

9   no-match letters.  Opp. at 1-3, 12, 49-50.  As already demonstrated, that central contention is wrong.

10  *See* pp. 1-9, *supra*.  Defendants' actions would expand IRCA liability; that expansion of IRCA

11  liability would cause imminent injury to Plaintiffs; and enjoining Defendants' actions would prevent

12  that imminent injury.  For these reasons, the Plaintiffs have standing and their claims are ripe for

13  judicial review.

14         **A.    Standing.**

15         Standing, like other elements of a plaintiff's case, need only be "supported . . . with the

16  manner and degree of evidence required at the successive stages of the litigation."  *Lujan v.*

17  *Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *see also Steel Co. v. Citizens for a Better Env't,*

18  523 U.S. 83, 104 (1998) (plaintiffs at the motion-to-dismiss phase need only show that the facts

19  alleged, if proved, would confer standing); *Central Delta Water Agency v. United States,* 306 F.3d

20  938, 947 (9th Cir. 2002) ("[A]t the summary judgment stage the plaintiffs need not establish that

21  they in fact have standing, but only that there is a genuine question of material fact as to the standing

22  elements.").  At the preliminary injunction stage, plaintiffs need only show a likelihood of

23  establishing standing based on the pleadings.  *See, e.g., Bennett v. Spear*, 520 U.S. 154, 168 (1997);

24  *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1176-77 (9th Cir. 2000).  Plaintiffs have

25  pled factual allegations of injury resulting from the government's actions  that are more than

26  sufficient to establish both associational and organizational standing at this stage of the litigation.

27  Plaintiffs also have presented declarations to show a likelihood of proving those allegations.

28

1    Plaintiffs have associational standing to sue on behalf of their union members because their

2  members will be injured by DHS' rule. *See Hunt v. Washington State Apple Advertising Comm.*,

3  432 U.S. 333, 342-43 (1977). Plaintiffs have presented uncontroverted evidence that the upcoming

4  no-match mailing will affect about 600,000 union members. Reich Decl., ¶; *see also* First Amended

5  Complaint ("FAC") ¶¶ 9-15, 53. Some members will be fired, even though they are U.S. citizens or

6  work-authorized, simply because they cannot resolve a no-match discrepancy with the SSA

7  bureaucracy within the nominal 90-day but actual 60-day deadline set out by the regulation. *See*

8  Apfel Decl. ¶17; Moran Decl. ¶6; Theriault Decl. ¶7; FAC ¶57. Loss of a job is an economic injury

9  that constitutes injury-in-fact for standing. *See, e.g., Sierra Club v. Morton*, 405 U.S. 727, 733

10  (1972); *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996). Union

11  members covered by a no-match also will need to visit SSA field offices, perhaps several times,

12  which will mean a loss of pay for many workers. FAC ¶56; Moran Decl ¶8; Chavez-Thompson

13  Decl. ¶5. Loss of pay is also an economic injury. Moreover, union members covered by no-match

14  letters will suffer the stigma of being viewed as presumptive "illegal aliens" and face potential

15  discrimination from employers because of the government's actions. Apfel Decl. ¶¶ 7, 17;

16  Chavez-Thompson Decl. ¶4; Moran Decl. ¶¶11-13; FAC ¶54. *Cf. Heckler v. Matthews*, 465 U.S.

17  728, 739 (1984) (stigma as injury); *Brown v. Board of Educ.*, 347 U.S. 483, 494 (1954).

18    The government is wrong that Plaintiffs lack standing because the harm to their members

19  will flow from the actions of third-party employers. *See* Opp. at 16, 18-19. The Supreme Court has

20  held that where the party challenging a rule is an "object" of the government's regulation, that party

21  has standing despite the government's insistence that the alleged injury would result not from its

22  own actions but rather from the actions of a third party.

23    In *Bennett*, the plaintiffs were water users who challenged a Biological Opinion given

24  pursuant to the Endangered Species Act because they feared the Opinion would cause a third party

25  to reduce the amount of water made available to plaintiffs. 520 U.S. at 168. The Court flatly

26  rejected the government's argument that plaintiffs lacked standing to challenge the Opinion.

27  Instead, the Court held that because the statutory scheme subjected the third party to potential

28  sanctions if the third party disregarded the Opinion without sufficient basis, the Opinion – though it

1    "theoretically served an 'advisory function'" – in reality "ha[d] a powerful coercive effect" on the

2    third party.  *Id.*  As such, the third party's action in response to the opinion was not "independent,"

3    and a plaintiff affected by the government-coerced third party action was an object of the

4    government action and had standing to challenge the Opinion.

5         Because the point of the new DHS rule is to make clear to employers that they must

6    terminate employees who are unable to resolve no-matches or else face civil or criminal liability,

7    Plaintiffs' standing to challenge the rule on behalf of their union members is as strong as in *Bennett.*

8    Union members who are the objects of no-match letters and are authorized to work certainly face at

9    least a "credible threat" that they will be harmed by the government's actions.  *See Hall v. Norton*,

10   266 F.3d 969, 976 (9th Cir. 2001) ("evidence of a credible threat" of harm "falls well within the

11   range of injuries to cognizable interests that may confer standing"); *Central Delta Water Agency*,

12   306 F.3d at 950 ("a credible threat of harm is sufficient to constitute an actual injury for standing

13   purposes, whether or not a statutory violation has occurred").

14        Defendants are also wrong that to establish associational standing at this stage of the

15   litigation the union Plaintiffs must identify a specific union member who will be harmed.  *Building*

16   *& Const. Trades Council v. Downtown Development, Inc.*, 448 F.3d 138, 145 (2d Cir. 2006)

17   ("[D]efendants cite to no authority – nor are we aware of any– that supports the proposition

18   that an association must 'name names' in a complaint in order properly to allege injury in fact to its

19   members."); *CRLA v. Legal Servs. Corp.*, 917 F.2d 1171 (9th Cir. 1990) (allegations that union

20   members would be injured by regulation if it were enforced were sufficient to establish standing

21   even though union plaintiffs did not identify specific union members).  In the case that Defendants

22   cite, *National Alliance for the Mentally Ill v. St. Johns Cty.*, 376 F.3d 1292 (11th Cir. 2004), the

23   organizational plaintiffs were unable to identify any injured constituents at the summary judgment

24   stage even after defendants had provided them with specific factual information about all the

25   persons who could have asserted injuries.  In this case, the DHS/SSA joint mailing has not yet

26   occurred, and the list of employees covered is within Defendant SSA's control.  Plaintiffs have

27   presented statistical evidence there is a less than one in a million chance that fewer than 400,000 of

28   their members are included.  Reich Decl. ¶4.  If it becomes necessary to identify some specific union

1   members affected, that easily would be accomplished through discovery.

2       The union Plaintiffs also have standing in their own right.  An organizational plaintiff has

3   standing if it will itself suffer injury-in-fact, such as through the frustration of its mission and

4   diversion of its resources.  *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002); *El*

5   *Rescate Legal Servs. v. Executive Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991)

6   (en banc).  To deal with the fallout of the new DHS regulation, Plaintiffs will be forced to expend

7   resources educating members about the impact of the rule, assisting members in resolving no-match

8   situations and mitigating the impact of the rule on their members.  *See* FAC ¶58; Theriault Decl.

9   ¶6-7; Paulson Decl. ¶5; Cornu Decl. ¶5.  Those are resources that will be diverted from activities

10  that would further Plaintiffs' organizational mission.  *See* Theriault Decl. ¶3, Paulson Decl. ¶2,

11  Cornu Decl. ¶2; Chavez-Thompson Decl. ¶3.  Employers also already have claimed the right to

12  repudiate collective bargaining agreement provisions dealing with no-match letters based on the

13  DHS Final Rule, so the injury to unions as organizations could not be more imminent or concrete.

14  *See* Casey Decl., ¶¶9-12 (employer notifications to HERE Local 2, an affiliate of Plaintiff San

15  Francisco Labor Council, sent before the TRO was entered).

16      Finally, the government is wrong that the harm to Plaintiffs is too speculative and will not be

17  redressed by a favorable decision.  *See* Opp. at 16, 18.  Plaintiffs have presented uncontroverted

18  evidence that the upcoming no-match mailing will affect about 600,000 of their members.  Reich

19  Decl. ¶4.  In light of the size of the affected population, it is certain that Plaintiffs and their members

20  will suffer every harm alleged in the First Amended Complaint and supported by the accompanying

21  declarations.  A favorable decision will prevent that harm by striking down the Final Rule.

22      In the redressibility cases the government relies upon, *Renal Physicians Assn. v. U.S. Dept.*

23  *of HHS*, 489 F.3d 1267 (D.C. Cir. 2007), and *National Wrestling Coaches Assn. v. U.S. Dept. of*

24  *Education*, 366 F.3d 930 (D.C. Cir. 2004), the plaintiffs' injuries were caused by the actions of third

25  parties, and there was no evidence the third parties would act any more favorably toward the

26  plaintiffs if the plaintiffs were granted the relief the sought against the government.  Here the entire

27  point of the Final Rule is to change employer behavior upon receiving no-match letters, and the

28  record includes employer declarations establishing that a change in employer behavior will occur if

1  the Final Rule is implemented, and that employers consider these changes unwanted, costly and

2  inefficient.  Dickson Decl. at ¶¶5, 7, 9, 13; Dolibois Decl. at ¶¶4-7; Silvertooth Decl. at ¶¶4, 8-9.

3  The Final Rule's expansion of liability is what will produce the changed behavior, so it will not

4  occur if the Final Rule is enjoined.  And, since the Final Rule's safe-harbor procedures include the

5  termination of employees who cannot resolve no-matches, invalidating the Final Rule will prevent

6  those terminations and the other injuries alleged by Plaintiffs.[7]

7      **B.    Ripeness.**

8      The prudential doctrine of ripeness considers two factors: "'the fitness of the issues for

9  judicial decision,' and 'the hardship to the parties of withholding court consideration.'"  *Thomas v.*

10  *Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 581 (1985) (quoting *Abbott Labs. v. Gardner*, 387

11  U.S. 136, 149 (1967)); *see also Buono v. Kempthorne*, ___ F.3d. __, No. 05-55852, 2007 WL

12  2493512, at *8 (9th Cir. Sept. 6, 2007).[8]

13      "[A] claim is 'fit for decision if the issues raised are primarily legal, do not require further

14  factual development, and the challenged action is final.'"  *Buono*, 2007 WL 2493512, at *8 (citation

15  omitted).  Here, the central questions are primarily legal: whether the DHS rule conflicts with the

16  statute, whether the rule is arbitrary and capricious, and whether Defendants exceeded their statutory

17  authority.  There is no question that the Final Rule is final agency action and that Defendants are

18  poised to implement the rule by sending out 140,000 letters affecting more than 8,000,000 workers.

19  *Cf. id.* at *10 ("the certainty of the governmental action taking place is sufficiently ripe to allow

20

21  _____

22      [7] Although the union Plaintiffs have more than met their burden at this stage of the litigation
to show standing, the Court need not even reach that issue to grant the preliminary injunction.  The
business Plaintiffs have joined in the motion for a preliminary injunction.  As long as one plaintiff

23  with standing is seeking the same relief, it is not necessary to consider the standing of the rest.  *Cf.*

24  *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263-264 (1977) (refusing to consider
whether the other individual and corporate plaintiffs had standing since at least one plaintiff had

25  demonstrated standing); *Bd. of Natural Res. v. Brown*, 992 F.2d 937, 943 (9th Cir. 1993) (same).

26      [8] There is also a constitutional component to ripeness that is closely related to the

27  requirement of injury-in-fact under the standing doctrine and asks whether there is "a concrete
impact upon the parties arising from the dispute."  *Buono*, 2007 WL 2493512, at *6-7.  As detailed

28  above, Plaintiffs easily satisfy the injury-in-fact requirement and the harms they allege are
"concrete."  *See* pp. 17-21, *supra*.

1  review").  Delaying resolution of Plaintiffs' legal challenge would not accomplish any clarifying

2  function or otherwise assist the Court's determination.  *See, e.g., Barrick Goldstrike Mines Inc. v.*

3  *Browner*, 215 F.3d 45, 49 (D.C. Cir. 2000) (concluding that legal claims were ripe for review where

4  "[n]othing we can imagine happening would bring the issues into greater focus or assist in

5  determining them"); *see also Union Carbide Agr. Prods. Co.*, 473 U.S. at 581.

6         The "ripeness" case cited and relied upon by Defendants, *Toilet Goods Assoc. v. Gardner*,

7  387 U.S. 158 (1967) (*see* Opp. at  23), was nothing like this one.  In *Toilet Goods*, the plaintiffs

8  brought a pre-enforcement challenge to a regulation that allowed the imposition of sanctions for

9  refusing access to Food and Drug Administration inspectors.  It was unclear whether or when the

10  agency action that threatened to harm plaintiffs' interests – an inspection – would ever occur.  *See*

11  *id.* at 163.  Unlike the situation in *Toilet Goods*, the harms threatening plaintiffs do not depend on

12  any subsequent agency action that may never occur; the harms flow directly from the Final Rule and

13  the imminent SSA/DHS mailing to implement the rule.  *See Washington Toxics Coalition v. U.S.*

14  *Dep't of Interior*, 457 F.Supp.2d 1158, 1172-73 (W.D. Wash. 2006) (finding *Toilet Goods*

15  inapplicable where there was no "cognizable benefit to waiting for further factual development"

16  because "[t]he regulation itself effects a significant change" and "the regulation here is the action

17  being challenged"); *Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000) (en banc) (distinguishing

18  *Toilet Goods*).  DHS' safe harbor requires employers to terminate workers or face civil and criminal

19  liability.  The harm to workers will occur in advance of any potential enforcement action.

20         Defendants assert that the Plaintiffs' claims are not ripe until union members are fired (Opp.

21  at 23), but they do not identify a single reason why forcing workers to suffer such injuries would

22  assist in the resolution of the primarily legal claims in this case.  Meanwhile, delaying judicial

23  review would cause serious hardship to Plaintiffs and their members because the Final Rule will go

24  into effect and the SSA/DHS mailing will occur.  For all these reasons, Plaintiffs' claims are ripe.

25  **VI.    The Balance of Equities Tips Overwhelmingly in Favor of Maintaining the Status Quo.**

26         Defendants say very little about one of the two factors on the sliding scale the Court must

27  use in deciding whether to enter a preliminary injunction  – whether the balance of hardships favors

28  a stay until the merits of the case can be heard.

1    The government does not dispute that SSA can go back to sending out its traditional no-
2  match letters and thereby fully carry out its own mission while this case proceeds.  All that the
3  government argues is that the public interest favors providing employers with "guidance."  But the
4  public interest also favors judicial review to ensure that the DHS Final Rule is legal and, therefore,
5  that the guidance is correct.  And, the public interest favors agencies not exceeding their statutory
6  jurisdiction and citizens and authorized workers *not* being improperly terminated.  That DHS
7  allowed its proposed rule to languish for a full year after the comment period closed demonstrates
8  there is no emergency that requires the rule be implemented before judicial review.  The government
9  does not contend otherwise.

10    On the other hand, U.S. citizens and non-citizens with work authorization, and the unions
11  responsible for representing them, will suffer real harm in the absence of a stay.  The government
12  contends the harm is speculative because it depends on the actions of individual employers and
13  employees.  To the contrary, with 140,000 no-match letters covering more than 8,000,000
14  employees, it is certain that every harm set out in our moving papers – and supported by the
15  accompanying declarations – will occur.   Legal workers will be falsely accused; they will lose pay;
16  and they will be fired because they cannot resolve no-matches with the SSA bureaucracy within 60
17  days of being informed of them.  Labor unions will have to devote their limited resources to trying
18  to protect the jobs of falsely accused no-match workers.

19    The government observes paternalistically that workers would benefit from fixing no-
20  matches with SSA, but that does not mean the workers would benefit from having their jobs made
21  dependent on fixing no-matches with SSA within 60 days.  No matter what additional, "beneficial"
22  condition were placed on continued employment, some of the 8,000,000 employees would fail to
23  meet that condition and be fired.  It also is no comfort that SSA believes that, if workers are diligent,
24  SSA can resolve "nearly all" no-matches within 60 days.  With a population of 8,000,000 affected
25  workers, the gap between "nearly all" and "all" could mean tens of thousands of authorized workers
26  losing their jobs before a merits decision because of discrepancies in SSA's error-filled database.

27                                             **CONCLUSION**

28    The motion for a preliminary injunction should be granted.

1   Dated:  September 25, 2007          Respectfully submitted,

2                                       Stephen P. Berzon
                                        Scott A. Kronland
3                                       Jonathan Weissglass
                                        Linda Lye
4                                       Danielle E. Leonard
                                        ALTSHULER BERZON LLP
5
                                        Jonathan P. Hiatt
6                                       James B. Coppess
                                        Ana Avendaño
7                                       AFL-CIO

8                                       Linton Joaquin
                                        Marielena Hincapié
9                                       Monica T. Guizar
                                        NATIONAL IMMIGRATION LAW CENTER
10
                                        Lucas Guttentag
11                                      Jennifer C. Chang
                                        Mónica M. Ramírez
12                                      AMERICAN CIVIL LIBERTIES UNION FOUNDATION

13                                      Omar C. Jadwat
                                        AMERICAN CIVIL LIBERTIES UNION FOUNDATION
14
                                        Alan L. Schlosser
15                                      Julia Harumi Mass
                                        ACLU FOUNDATION OF NORTHERN CALIFORNIA
16
                                        David A. Rosenfeld
17                                      Manjari Chawla
                                        WEINBERG, ROGER & ROSENFELD
18
                                        by:   /s/Scott A. Kronland
19                                                  Scott A. Kronland

20                                      Attorneys for Plaintiffs

21

22

23

24

25

26

27

28