AO 91 (Rev. 5/85) Criminal Complaint

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

## *United States District Court*

APR 1 4 2006

_____**NORTHERN**_____ DISTRICT OF _____**NEW YORK**_____

LAWRENCE K. BAERMAN, CLERK
ALBANY

**UNITED STATES OF AMERICA**

**CRIMINAL COMPLAINT**

v.

**Case Number: 06-M- 106 (RFT)**

**ROBERT BELVIN,**
**Defendant**

I, DONALD J. O'BRIEN, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From in or about <u>October 2004 through the present</u>, in the State and Northern District of New York, the defendant, ROBERT BELVIN, knowingly conspired with others to transport, harbor, and encourage and induce to reside in the United States, unlawful aliens, for commercial advantage or private financial gain, in violation of of Title <u>8</u>, United States Code, Sections <u>1324(a)(1)(A)(v)(I)</u>.

I further state that I am a <u>Special Agent</u> of Immigration and Customs Enforcement and that this complaint is based on the following facts:

Continued on the attached sheet and made a part hereof:    ☒ YES      NO

_____
DONALD J. O'BRIEN, Special Agent, ICE
Signature of Complaint

Sworn to before me, and subscribed in my presence,

April 14, 2006                                             at    Albany, N.Y.
Date                                                              City and State

RANDOLPH F. TREECE, United Stated Magistrate Judge
Name and Title of Judicial Office

_____
Signature of Judicial Officer

**ATTACHMENT "A"**

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS AND SEARCH WARRANTS**

I, Donald J. O'Brien, being duly sworn, state the following:

1. I am a Special Agent of United States Immigration and Customs Enforcement (ICE) and have been employed in that capacity since March 2003. Prior to that, I was employed by the U.S. Immigration and Naturalization Service as an Inspector and Special Agent from November 1989 to March 2003. I am currently assigned to the Resident Agent in Charge of the ICE Office of Investigations in Albany, New York.

2. The facts contained in this affidavit are known to me through personal knowledge and from statements, recordings and reports received from other law enforcement officers during the course of this investigation. As this affidavit is submitted for the limited purpose of establishing probable cause to support the arrest and search warrants identified in paragraphs 3 and 4 herein, I have not included every fact known to me or other law enforcement personnel concerning this investigation. Where actions, conversations and statements of others are related herein, they are related only in substance and in part.

3. This affidavit is in support of applications for eight criminal complaints for the following charges and individuals as specified below:

    A) For violations of Title 8, United States Code (USC), Section 1324 (a) (1) (A) (v) (I) (Conspiracy to Transport, Harbor, and Encourage and Induce to Reside in the United States, Unlawful Aliens, for Commercial Advantage or Private Financial Gain) against:

    **ROBERT BELVIN** (DOB: 03/14/63). BELVIN was the General Manager of IFCO SYSTEMS NORTH AMERICA, North East Industrial Park, 2 Van Buren Boulevard, Building 19, Guilderland, New York, from on or about December 20, 2004 to January 9, 2006;

    **ABELINO ("LINO") CHICAS** (DOB: 11/10/65), a naturalized United States citizen from El Salvador. CHICAS is an Assistant General Manager of the Houston West plant of IFCO SYSTEMS NORTH AMERICA, located at 6829 Flintlock Road, Houston, Texas. Evidence indicates that CHICAS helped establish the Guilderland IFCO location, and was present there, in or about October and November 2004;

    **JAMES RICE** (DOB: 10/10/69). RICE was a New Market Development and Regional General Manager of IFCO SYSTEMS NORTH AMERICA,

6829 Flintlock Road, Houston, Texas. RICE was employed with IFCO from at least on or about February 2005 until November 23, 2005. Evidence indicates that RICE assisted in establishing the Guilderland IFCO in or about October, November and December 2004. He is also known to have been present at the Guilderland IFCO on or about 04/20/05, 05/23/05, 07/27/05, 08/10/05, 10/5/05, 10/22/05 and 10/25/05;

**WILLIAM ("BILL" or "BILLY") HOSKINS** (DOB: 03/07/77). HOSKINS is the General Manager of IFCO SYSTEMS NORTH AMERICA, 10725 Evendale Drive, Cincinnati, Ohio, and a New Market Development Manager for IFCO; HOSKINS is known to have been present at the Guilderland IFCO at least on or about 11/08/05, 11/29/05, 12/01/05, 12/14/05 and 01/09/06;

**MICHAEL ("MIKE") AMES** (DOB: 04/13/62). AMES is the General Manager of IFCO SYSTEMS NORTH AMERICA, 57 Brigham Street, Westborough, Massachusetts. AMES is known to have been present at the Guilderland IFCO at least on or about 10/05/05;

**DARIO SALZANO** (DOB: 03/01/70); SALZANO has been the Assistant General Manager of IFCO SYSTEMS NORTH AMERICA, North East Industrial Park, 2 Van Buren Boulevard, Building 19, Guilderland, New York, from at least in or about February 2005 to the present;

**SCOTT DODGE** (DOB: 01/20/1963). DODGE was a foreman at IFCO SYSTEMS NORTH AMERICA, North East Industrial Park, 2 Van Buren Boulevard, Building 19, Guilderland, New York, from at least in or about February 2005 to July 2005. DODGE then moved to the position of foreman at the IFCO satellite location at the Target Distribution Center, 1800 State Highway 5S, Amsterdam, New York, 12010, where he worked until at least February 13, 2006 as the foreman in charge of operations; and

B) For violations of Title 18, USC, Section 371 (Conspiracy) to Commit Title 18, USC, Section 1546(a) and (b) (Fraud and Misuse of Visas, Permits, and other documents) against:

**MISAEL ROMERO** (DOB: 07/22/1966). ROMERO, who is an illegal alien from Honduras and is the subject of a final order of removal from the U.S., was a foreman at IFCO SYSTEMS NORTH AMERICA, North East Industrial Park, 2 Van Buren Boulevard, Building 19, Guilderland, New York, from at least in or about February 2005 to July 2005. ROMERO then moved to the IFCO satellite location at the Target Distribution Center, 1800 State Highway 5S, Amsterdam, New York.

4. This affidavit will also include facts that demonstrate probable cause that evidence of the aforementioned criminal offense, as well as the criminal offenses of Title 8, USC,

Section 1324 (a) (the Unlawful Transportation, Harboring, and Encouraging and Inducing to Reside in the United States, of Unlawful Aliens, for Commercial Advantage or Private Financial Gain, and the Unlawful Hiring of at Least 10 Unauthorized Aliens in a 12-Month Period); Title 18, USC, Section 371 (Conspiracy) and Title 18, USC, Section 1546 (Fraud and Misuse of Visas, Permits, and other Documents) exists in the form of "Attachments B & C" (items to be seized) at the following locations (more fully described in "Attachment D") for which search warrants are requested:

  A) IFCO Systems North America
     North East Industrial Park
     2 Van Buren Boulevard, Building 19
     Guilderland, New York 12009

  B) 2349 Western Avenue (known as "the red house")
     Guilderland, New York 12084

  C) 454 State Route 146 (known as "the yellow house")
     Guilderland, New York 12009

  D) 1213 State Street, lower unit
     Schenectady, New York 12304

## NATURE OF INVESTIGATION

5. On February 10, 2005, the Immigration and Customs Enforcement (ICE) office in Latham, New York, received a call from a person who stated that he worked for a company by the name of IFCO, a pallet company located in Guilderland, New York. The reporting party (RP1) stated that he witnessed Hispanic co-workers tearing up their W-2's. RP1 claimed that he asked an IFCO Systems assistant general manager why the other workers were ripping up their W-2 forms and the manager told him that all of the Hispanic males were illegal aliens, had fake social security cards and did not intend to file their taxes. Agents from ICE and the New York State Police (NYSP) conducted surveillance of IFCO Systems, located at 2 Van Buren Boulevard, Guilderland, New York 12009 (hereinafter, " the Guilderland IFCO Systems" or "the Guilderland IFCO") and observed that it was a pallet manufacturing/refurbishing warehouse where several Hispanic men were operating forklifts.

6. Information from the IFCO Systems North America, Inc. (hereinafter, "IFCO" or "IFCO Systems") public website states that IFCO Systems N.V. is a Dutch company which provides "international logistics service[s]" worldwide. The website states that in the U.S., IFCO Systems provides a national network of pallet management services, which consists of the procurement, reconditioning, and distribution of wood

3

pallets to and from the manufacturing and retail sectors. The North American headquarters are located in Houston, Texas. ICE's investigation of IFCO focused on this pallet management services division which has approximately 53 primary pallet refurbishment centers across the country. A press release contained on the website, dated October 7, 2004, announced the grand opening of IFCO's pallet services facility in Guilderland.

7. On February 11, 2005, another call was received by an agent from the Latham ICE office from an employee of Guilderland IFCO (RP2). RP2 reported that his employer had arranged for the transportation of illegal aliens from Texas to Guilderland to work for IFCO. RP2 also stated that his supervisors at the company tasked him on a daily basis with driving illegal aliens to and from work each day. RP2 further stated that IFCO Systems had planned to transport another 10-15 illegal aliens from Texas to Guilderland to staff an additional swing shift. ICE and NYSP agents subsequently conducted surveillance at the Guilderland IFCO. The agents observed vehicles transporting Hispanic workers to IFCO. One of the vehicles was a mini-van driven by an individual agents later identified from department of motor vehicles information as Scott DODGE.

8. On February 28, 2005, ICE spoke with the Guilderland, New York Police Department (GPD) regarding a vehicle accident involving Hispanic males that occurred on February 25, 2005. The GPD reported that their investigation led them to a white building on the premises of the Governor's Inn Motel and Suites at 2505 Western Avenue, where they discovered 10 illegal aliens. Robert J. BELVIN, who identified himself as the General Manager at IFCO Systems in Guilderland, appeared at the Governor's Inn and advised the GPD that the men worked for him at IFCO. The three individuals involved in the accident were taken to the GPD police station and questioned regarding the accident and GM BELVIN accompanied them. The GPD advised BELVIN that his employees had reported to them that they were not in the United States legally and BELVIN claimed that he had documentation in his office to prove the men were legally in the U.S. and properly documented.

9. On March 2, 2005, GM Robert BELVIN returned to the GPD to produce the driver of the vehicle involved in the aforementioned accident (whom he had brought to the station after the accident) but explained that the driver did not accompany him again because he "took off." In a resulting discussion regarding his Spanish-speaking employees that was videotaped by the GPD booking camera, BELVIN described how he transported his employees back and forth to work every day, and around town. BELVIN added that IFCO Systems paid for the employees to stay at three houses, including the Governor's Inn, and a red and yellow house, and deducted $35 per week from the employees' paychecks to cover the expense. Sometime after this encounter, IFCO stopped using the Governor's Inn location to house employees.

10. On March 7, 2005, the GPD contacted ICE regarding an attempted rape complaint they had received. Officers from the GPD and the Albany County Sheriff's Office had interviewed six Hispanic males at 454 State Route 146, Altamont, New York,

4

(the "yellow house") and all of the men claimed IFCO Systems in Guilderland employed them. ICE agents proceeded to the residence to ascertain the immigration status of the six individuals. Five of the six aliens were illegally present in the United States and ICE took them into custody.

11. ICE agents took sworn statements from the five IFCO Systems employees who were taken into ICE custody in Guilderland on March 7, 2005. The statements revealed the following:

   A) <u>Ovidio Rodas-Diaz</u>, citizen of Honduras, stated that he hired in Guilderland in November 2004 by an IFCO supervisor named James from Texas. Rodas-Diaz stated that he told James that he did not have documents to work in the U.S., but that he was still asked to sign a blank I-9 form (Employment Eligibility Verification). Rodas-Diaz stated that he showed no identification or immigration documents before being hired. Rodas-Diaz stated that IFCO Systems paid the rent for the house that he lived in and deducted $38 from his weekly paycheck to cover the expense. Rodas-Diaz said that approximately fifteen Guilderland IFCO workers were without valid immigration documents, were illegal, and many of those came from Texas. Rodas-Diaz stated that when new employees traveled to Albany from Texas to work at the Guilderland IFCO Systems, Robert BELVIN reimbursed them for the cost of their bus tickets. Rodas-Diaz also stated that an IFCO Systems employee named Scott transported him and the other illegal alien IFCO employees to and from work each day.

   B) <u>Santos Guillermo Paguada-Oliva</u>, citizen of Honduras, stated that Rodas-Diaz arranged to get him a job in Guilderland. Paguada-Oliva stated that his first day of work was the date of his arrest. He further stated that he was going to live at 454 State Route 146, Altamont, New York "the yellow house", and was told by Rodas-Diaz he would not be responsible for paying rent because the company paid for the people to live in the house. Paguada-Oliva identified the van registered to Scott DODGE and stated that he was taken to work in that vehicle. Paguada-Oliva claimed that when he arrived at work a man (later identified on a videotape shown to Paguada-Oliva as Robert BELVIN) asked him for identification. He produced a "green card" and social security card that he had purchased in Queens, New York. Paguada-Oliva stated he was never asked to sign a form I-9 (Employment Verification Form).

   C) <u>Felix Antonio Quezada-Espinoza, AKA: Leonel Morillo</u>, citizen of Nicaragua, who had been ordered removed from the U.S. and was the subject of an outstanding warrant of removal, stated that while living in Houston, Hispanic people told him that IFCO Systems hired illegal aliens as long as they provided either a real or fake "green card" and a social security card. Quezada-Espinoza stated that when he went to the IFCO Systems location in Houston he was introduced to an El-Salvadorian manager named CHICAS.

Quezada-Espinoza stated CHICAS told him he needed a "green card" and social security card to work at IFCO. Quezada-Espinoza stated that he told CHICAS that he did not have the cards but would get them. Quezada-Espinoza stated that he obtained false documents, returned to IFCO Systems and showed them to CHICAS, who then hired him to work at the Houston IFCO. Quezada-Espinoza stated that he had confided to a Houston IFCO supervisor named Nelson that unlike Nelson, who was a legal resident, he was without papers.

Quezada-Espinoza stated that on December 16, 2004, he and two other illegal alien employees from the Houston IFCO, in addition to a man legally in the U.S., were driven to the Houston bus terminal and handed bus tickets to Albany by CHICAS. Quezada-Espinoza stated he asked to be transferred to the Guilderland IFCO because it was a new location and he thought he could make more money there. Upon arrival in Albany, the men were picked up by Hispanic workers from the Guilderland IFCO and transported to the white house at the Governor's Inn (2505 Western Avenue, Guilderland). Quezada-Espinoza stated that he stayed at the white house for approximately one week but was moved from there to the yellow house (454 State Route 146, Altamont) with some of the other Hispanic workers because the first house was overcrowded with employees and the company had located the second house for employees to live in. Quezada-Espinoza stated that the company paid the rent at those houses and deducted $33.00 to $35.00 dollars from each employee's check on a weekly basis to cover the expenses. Quezada-Espinoza stated that there was a third house where other illegal workers also lived.

Quezada-Espinoza also stated that Robert BELVIN, a manager named Craig, and "Scott" transported the workers to and from work. Quezada-Espinoza estimated that 25-30 illegal aliens worked at the Guilderland IFCO and that approximately 50 illegal aliens worked at IFCO's Houston location. Quezada-Espinoza stated that no one from IFCO Systems ever asked him to fill out W-4 or I-9 forms.

D) <u>Carlos Humberto Romero-Morataya, AKA: Jose Mauricio-Hernandez</u>, citizen of El Salvador, who was wanted on an outstanding probation violation based upon a drug conviction, stated that IFCO Systems manager Lino CHICAS in Houston had originally hired him even though CHICAS knew that Romero-Morataya was an illegal alien and had previously been deported because they were friends. Romero-Morataya stated that he transferred to the Guilderland IFCO Systems from the Houston IFCO on November 15, 2004. Romero-Morataya stated that he was promised increased pay to join CHICAS who had already arrived at the Guilderland location to get the operation started. Romero-Morataya stated that he traveled from Houston to Albany by bus with a ticket that was purchased by IFCO Systems. Romero-Morataya stated that other IFCO Systems employees traveled to the Albany area with bus

tickets paid for by the company. Romero-Morataya stated that upon arrival in Albany, he was picked-up at the bus terminal by CHICAS who immediately took him to the IFCO Guilderland location and familiarized him with the operation of the warehouse. Romero-Morataya stated that he was later driven to the white house located at the Governor's Inn and housed with the other Hispanic employees from the company. Romero-Morataya stated that IFCO Systems paid the rent at the house but deducted $45 to $50 dollars from his weekly paycheck to cover the expense. Romero-Morataya stated that IFCO Systems rented three houses where the Hispanic employees lived. Romero-Morataya stated further that Robert BELVIN, Scott DODGE, and another IFCO manager transported him and the other Hispanic workers that lived in the houses to work each day.

E) <u>Elmer Alexander Rivas-Gonzalez</u>, citizen of El Salvador, who had a criminal history in Texas and had previously been removed from the U.S. as an aggravated felon, subsequently pleaded guilty in the Northern District of New York to aggravated criminal reentry into the United States. Rivas-Gonzalez stated that after entering the U.S., he went to Houston. While in Houston, Rivas-Gonzalez arranged through a friend to meet with IFCO Systems manager Lino CHICAS to get hired. Rivas-Gonzalez stated that he and four other illegal aliens met with CHICAS at the company office in Houston in late December 2004. Rivas-Gonzalez stated that CHICAS asked him if he had papers to work in the U.S. and that he advised CHICAS that he did not have papers. Rivas-Gonzalez stated that CHICAS told him that he could still work for IFCO Systems and that papers would be provided to him later. Rivas-Gonzalez stated that he and a group of new IFCO Systems workers were driven to the Houston bus terminal and given bus tickets to Albany by CHICAS. Rivas-Gonzalez stated that he lived in the red house (2349 Western Avenue, Guilderland, NY) and that IFCO Systems deducted money from his paycheck to cover the rent expense.

12. On March 8, 2005, Guilderland IFCO GM Robert BELVIN appeared at the ICE office in Latham, New York, to inquire about the status of his employees. BELVIN claimed that none of his employees showed up for work and inquired where they were. ICE agents advised BELVIN they had taken five IFCO employees into custody the night before. BELVIN expressed surprise at the illegal status of his employees and claimed that all of his employees had filled out I-9 forms (Employment Eligibility Verification) and produced immigration documents when they were hired.

13. On March 22, 2005, agents from ICE and the NYSP interviewed a former employee from the Guilderland IFCO who had recently been fired. The employee stated that he/she had been hired in December 2004 in Guilderland by James RICE. He/she was mainly assigned administrative duties such as new-hire paperwork, payroll and the production of spreadsheets and data entry. BELVIN terminated the employee at IFCO Systems in late February or early March 2005 and paid the employee one

week's severance pay. BELVIN further advised the employee not to apply for unemployment because the company would fight the claim.

The employee stated the following:

A) It was a common practice for the Guilderland IFCO Systems to hire workers who lacked social security cards or produced identification cards that contained photos that bore no resemblance to the person possessing them. The employee voiced concerns about these practices to GM Robert BELVIN and an assistant GM, but these managers simply told the employee to just do his/her job and not worry about such issues;

B) An assistant GM instructed the employee to enter "eight" for the number of allowances on the W-4 tax forms for some of the Hispanic workers to limit withholding from their paychecks because those employees were not going to file tax returns anyway;

C) Lino CHICAS, who worked for IFCO Systems in Houston, brought many of the Hispanic workers that staffed the Guilderland IFCO from Texas;

D) Some of the other Hispanic employees who worked at IFCO Systems in Guilderland traveled to the area by Greyhound bus and were reimbursed for the cost of the bus ticket by IFCO Systems;

E) There were three locations where the Hispanic workers from Guilderland IFCO Systems lived. On occasion, the employee was asked to drive the Hispanic employees to doctor's appointments or drop them off at home. The locations included the white house at the Governor's Inn motel, a red farm house on Western Avenue near the Governor's Inn (which investigation revealed is 2349 Western Avenue, Guilderland, NY), and a yellow house (which investigation revealed is 454 State Route 146, Altamont, New York);

F) IFCO Systems paid the rent for the aliens' housing. In fact, the employee was asked to deliver IFCO company checks for rent to the Governor's Inn and the owners of the red house. The amount of the rent checks varied, dependant upon how many individuals were residing at the locations at any given time and the cost of utilities for the prior month (generally in the $800.00 - $1,200.00 range). IFCO Systems then deducted approximately $35 dollars from each employee's paycheck per week to cover the expense; and

G) The employee believed that IFCO Systems had similar employment practices regarding the transportation and housing of illegal alien employees nationwide.

14. ICE and the NYSP employed the assistance of a confidential informant (CI) in the IFCO investigation. The CI had no criminal record or criminal charges pending and

had participated in a previous ICE investigation that led to the successful prosecution of alien smugglers in Texas. Prior to working with ICE, the CI had entered the United States illegally and had been arrested by the Border Patrol. ICE has provided the CI an employment authorization document and temporary status enabling him to remain in the U.S. while he is working on ICE investigations. ICE and the NYSP paid stipend funds to the CI during the IFCO investigation.

15. On April 2, 2005, the CI introduced himself to a group of Hispanic workers from the Guilderland IFCO Systems at a grocery store. The CI advised the workers that he was illegally in the United States and that he was looking for a job.

16. On April 6, 2005, agents from ICE and the NYSP conducted surveillance at the red house (2349 Western Avenue, Guilderland) where the workers told the CI to meet them, and observed the CI and other alien workers being picked up by Scott DODGE and taken to IFCO. In a recorded conversation at the Guilderland IFCO, the CI spoke to GM Robert BELVIN, through a Spanish-speaking employee from the red house who translated for the CI. The CI advised BELVIN that he wanted to work at IFCO. BELVIN asked for his "papers." The CI indicated that he did not possess papers, but he would buy some in New York City over the weekend. BELVIN told the CI that he would allow the CI to start working at IFCO Systems but that the CI would have to produce documents by the following Monday or the time he worked at the company until then would be for free. The CI provided a name for a time card. Later that day, BELVIN told the CI that he could live at the red house with the other IFCO workers and the CI took up residence there that evening. Beginning on June 17, 2005, IFCO Systems began to deduct a portion of the CI's paycheck to reimburse the company for his rent and utilities. Until approximately July 2005, the CI was driven to work at the Guilderland IFCO – along with the other aliens from the red and yellow houses – by Scott DODGE. Although DODGE initially told the CI that no one paid him for the transportation, the CI and the other aliens paid DODGE $10 per week, raised to $15 when the price of gas went up, for the transportation on a weekly basis.

17. On April 8, 2005, the CI reported to ICE a conversation he had at the red house (2349 Western Avenue, Guilderland) with Misael ROMERO, one of the undocumented workers with whom he resided who was employed as a foreman at the Guilderland IFCO Systems. ICE databases reveal that ROMERO is present in the United States illegally and is the subject of a final order of removal. The CI stated that he advised ROMERO that he planned to travel to NYC so that he could find a document vendor to purchase a green card and social security card. The CI stated that ROMERO asked him if he could assist with a payroll problem that GM Robert BELVIN presented to ROMERO regarding two IFCO employees who had used the same social security number for employment. The CI stated that ROMERO then produced a social security card in the name of one of the employees and asked the CI if he could get another card with the same name but a different number.

18. On April 11, 2005, in a recorded conversation between the CI and GM Robert BELVIN, the CI again told BELVIN that he was illegally in this country, and said he

9

traveled to New York City but was unable to purchase documents because they were too expensive. The CI promised that he would get documents that week and BELVIN replied, "That will work." The CI spoke to BELVIN in English during this conversation and subsequently spoke English unless otherwise noted herein.

19. On or about April 11, 2005, an ICE agent interviewed a bank officer from the Bank of America on Western Avenue in Guilderland, where agents observed IFCO employees taking undocumented workers to cash their paychecks. According to the bank officer, GM Robert BELVIN told the bank that his employees might be coming in without sufficient identification to cash checks and vouched that it was all right to cash checks for them.

20. On April 15, 2005, the CI received a paycheck issued from an IFCO Systems account from headquarters in Houston, TX. The paycheck was issued in the first name the CI gave the Guilderland IFCO and was given to the CI despite the fact that he had never provided identification documents to BELVIN or any other IFCO Systems employee. The next paycheck the CI received was issued by IFCO's payroll company Ceridian and was in the name of the second identity he provided to IFCO. Robert BELVIN provided the CI his third paycheck, again made payable to the first name the CI provided, from IFCO's non-payroll "BRE Imprest" account. The remaining paychecks to the CI were issued from IFCO's payroll company.

21. On April 19, 2005, agents from ICE and the NYSP met with the CI and provided him with two false social security cards and a false Resident Alien Card. One of the social security cards and the Resident Alien Card were for the CI to give to GM Robert BELVIN to satisfy his request for documentation so that the CI could be paid. The cards were in a different name than the name the CI had earlier given to BELVIN and contained a photograph of someone other than the CI. The second social security card was supplied to the CI to satisfy BELVIN's request of Misael ROMERO to rectify the payroll problem that had arisen when two IFCO employees had used the same social security number.

22. On April 20, 2005, the CI was asked to act as a Spanish-language translator for employees at a meeting at Guilderland IFCO conducted by an assistant general manager and Scott DODGE, at which IFCO Systems New Market Development Manager James RICE was present. The meeting was recorded. The IFCO managers inquired which employees were having problems with their identification that was causing the employees problems in cashing their paychecks. The employees were advised to go to the Price Chopper grocery store to apply for an Advantage Card that could be used as an additional form of identification at the bank. The managers told the workers that even with poor identification they could get a Price Chopper Advantage Card and that would then facilitate cashing their paychecks. During the meeting, one of the employees was advised that he would be terminated under his current name and rehired under a different name.

10

Upon completion of the meeting, in a recorded conversation, the CI met with James RICE and IFCO's bookkeeper regarding the false identification he had obtained for himself and the social security card he had obtained for the other IFCO employee. The CI told RICE that he was able to take care of the problem with the duplicate social security number that had arisen with the employee and showed him the social security card he had obtained. The CI also explained to RICE that he had obtained "papers" for himself, and showed RICE a Resident Alien card in someone else's name that contained a photo that was not of the CI. The CI told RICE that the picture on the card was not his but said that he did not have enough money to buy better "papers." RICE examined the card and advised the CI that "this will probably work." RICE photocopied the false green card to "see what it looks like," and stated, "it looks like you to me." RICE then stated that he did not have the CI on his employee list and another manager told RICE that the CI was on the list under a different name. RICE advised the IFCO bookkeeper to change the CI's name on the payroll to the name on the identification. The CI also gave the bookkeeper the new social security card obtained for the employee who had been using a duplicate number.

23. On April 25, 2005, in a recorded conversation, GM Robert BELVIN asked the CI if he could obtain identification documents for four new employees that had arrived over the past weekend from Houston. The CI explained that the undocumented employees did not have money to buy their papers and BELVIN responded, "I can't buy their papers. I can give them money for food or something." BELVIN told the CI that later in the day, someone would take the employees that needed documents to get photographs for the documents and that he would purchase beds for them.

24. On April 26, 2005, the CI met with agents from ICE and the NYSP and informed them that GM Robert BELVIN approached him about obtaining an identity document for another undocumented Guilderland IFCO Systems employee. The CI provided agents with photographs of the five undocumented employees and ICE produced non-genuine Resident Alien cards and social security cards in the names of the five subject employees.

25. On May 2, 2005, an ICE agent provided the CI with a non-genuine Resident Alien Card and social security card produced at the ICE Forensic Document Laboratory in the first identity he had provided GM Robert BELVIN when he was hired. The green card bore a true photograph of the CI. Later that day, in a recorded conversation with BELVIN, the CI displayed the green card. He discussed the high quality of the card and said that the cards for the other workers would be similar. BELVIN asked the CI the status of the documents for the other employees. When the CI inquired whether or not he should see the bookkeeper to once again have his name changed on IFCO's payroll to reflect the name on his new documents, BELVIN responded affirmatively. The CI told BELVIN that he had some friends in Houston who would come to work for IFCO and BELVIN stated that he would pay to transport the CI's friends from Houston to Guilderland. BELVIN also told the CI that he would contact IFCO Systems assistant General Manager Lino CHICAS in Houston and would advise him to expect a call from the CI regarding hiring the CI's friends.

11

26. On May 3, 2005, the CI reported to ICE that he had been involved in a vehicular accident while driving an IFCO Systems tractor-trailer on the company property in Guilderland. A GPD officer investigated the accident and later reported to ICE that GM Robert BELVIN approached him on the scene and claimed that the CI was legally in the United States, and showed the officer a copy of the CI's fraudulent Alien Resident Card.

27. On May 3, 2005, the CI placed a recorded phone call to IFCO Systems assistant manager Lino CHICAS in Houston on CHICAS's IFCO cell phone. During the conversation, which took place in Spanish, the CI advised CHICAS that he worked for GM Robert BELVIN at the IFCO Systems location in Guilderland where he learned that CHICAS should be contacted regarding hiring in Texas. The CI further explained to CHICAS that two of his Mexican friends had just crossed the border and that he would like to know if CHICAS can assist them in coming to the IFCO location in Guilderland. CHICAS asked the CI if his friends had documents so they could travel by bus to Guilderland, to which the CI replied they did not. CHICAS advised the CI that transportation to Guilderland would be difficult without ID because there were "checks" and the workers needed identification to buy a bus ticket. CHICAS stated that the CI should have his friends contact him so that he could find out what type of identification they had and see if he could help them get up to Guilderland to work.

28. On May 9, 2005, agents from ICE provided the CI with four of the five sets of Alien Resident Cards and social security cards that GM Robert BELVIN asked the CI to obtain for undocumented IFCO employees. Later that day, in recorded a conversation, the CI advised BELVIN that he was in possession of the documents. BELVIN thanked the CI and told him that the company appreciated his efforts in procuring the documents. In another recorded conversation that day, the CI told BELVIN that the last set of documents BELVIN had requested was delayed because there was a problem with the document vendor in New York City in the production of the card.

29. On May 16, 2005, in a recorded conversation, GM Robert BELVIN spoke to the CI at the Guilderland IFCO. IFCO foremen Scott DODGE and Misael ROMERO were present. The CI advised BELVIN that he had provided identification documents to the remaining illegal alien for whom BELVIN had requested that the CI procure identity documents. The CI also advised BELVIN that he paid close to $1,000 to get documents for the other IFCO Systems employees for whom BELVIN requested them and that the employees, two of whom had left the company, had failed to pay him back. BELVIN told the CI he would give him $300 to cover the expense for the documents for the departed workers and warned him not to get any more documents because the workers had taken advantage of him. BELVIN stated that he would obtain the $300 by signing over paychecks due the departed workers to Misael ROMERO because ROMERO was viewed as management and had the "perfect papers" to cash the checks at the bank. BELVIN agreed to compensate the CI for

12

time he lost at work while he was obtaining the fraudulent documents for the employees.

30. On May 23, 2005, the CI reported to ICE that New Market Development Manager James RICE had been working at the IFCO Systems location in Guilderland. The CI stated that RICE would be in the area for an unknown period of time and had been taking day trips to the Boston area to start-up a new IFCO Systems location there. The CI stated that RICE advised the CI that the CI would be assisting RICE at the new location because he spoke Spanish and Portuguese and would be able to translate when they recruited new employees.

31. On June 8, 2005, the GPD responded to a domestic dispute call at the red house (2349 Western Avenue, Guilderland, NY) involving illegal-alien IFCO foreman Misael ROMERO and his girlfriend. ROMERO fled before the GPD arrived. The following day, the CI advised GM Robert BELVIN that he would be leaving the area for a while because of increased police presence at the red house where he lived. On June 10, 2005, at the direction of ICE, the CI stopped working at IFCO.

32. On June 28, 2005, an ICE agent took a sworn statement from Benjamin Ulloa-Bueso, citizen of Honduras, who was illegally in the United States and had an outstanding warrant of removal pending. Ulloa-Bueso had been arrested by the GPD during the course of a traffic stop. Ulloa-Bueso stated that in August 2001, he had been hired to work at IFCO Systems in Cincinnati. Ulloa-Bueso stated that he did not have immigration documents when he was hired. Ulloa-Bueso stated that he believed that there were 18-20 alien workers at the Cincinnati plant.

Ulloa-Bueso said that in approximately May 2005, an IFCO manager advised him that he was being transferred to the Guilderland IFCO Systems because there was more work there than in Cincinnati. Ulloa-Bueso stated that he purchased his own bus ticket from Cincinnati to Albany but was reimbursed by a boss named Jaime when he arrived. Ulloa-Bueso stated that he lived in the red house (2349 Western Avenue, Guilderland, NY) and that IFCO Systems paid the rent and deducted $40 per week from his paycheck to cover the expense. Ulloa-Bueso stated the company gave him, and the other workers from the red house, a ride to work each day in a van driven by "Scott" and that Scott charged each of them $10 per week for the transportation.

33. On July 5, 2005, the CI returned to work at IFCO. The following day, in a recorded conversation, GM Robert BELVIN advised the CI that the CI was going to be promoted to the position of foreman at IFCO Systems. BELVIN further stated that he did not want problems with the police to continue with the employees at the yellow or red houses. BELVIN also advised the CI that he no longer wanted IFCO Systems foreman Scott DODGE to be responsible for transporting the employees from these houses to and from work. BELVIN also stated during the conversation that his own vehicle had been destroyed taking the employees to and from work. In a recorded meeting with the Spanish-speaking pallet workers three days later, for

13

whom the CI translated, GM Robert BELVIN and Assistant GM Dario SALZANO advised the employees that there was going to be a "no tolerance" policy regarding behavior at the yellow and red houses that might attract the attention of the police. BELVIN also advised employees that management, including himself and Scott DODGE, would no longer transport them to and from work.

34. On July 27, 2005, in a recorded conversation, the CI discussed with GM Robert BELVIN two Brazilians that had applied to work at IFCO Systems in Guilderland. The CI told BELVIN that the Brazilians were illegal aliens that had previously been picked up by the Border Patrol. BELVIN replied that as long as the Brazilians had identification they could be employed at IFCO and it would be against the law for him to question their "papers."

35. On August 18, 2005, the CI reported to ICE that the IFCO Systems bookkeeper had advised him that like the other aliens, he should have claimed to be married with six dependants on his W-4, in order to reduce the amount withheld from his paycheck for income taxes. The CI stated that the bookkeeper changed his W-4 to reflect the higher amount of dependants. ICE agents have in evidence pay stubs for the CI from April 14, 2005, to September 2, 2005, that reflect a status of single with three exemptions. Beginning on September 2, 2005, the exemptions on the CI's pay stubs show single with six dependants. Copies of pay stubs for other illegal aliens employed at IFCO that have been obtained by ICE also show exemptions of single with six dependents.

36. On August 26, 2005, the NYSP stopped four illegal aliens on a traffic stop. All four stated that they worked at IFCO in Guilderland. Two of the illegal aliens produced fraudulent Alien Resident Cards, and were arrested and charged in state court. The other two aliens were released by the NYSP on ICE's direction.

37. On August 27, 2005, in a recorded meeting in GM Robert BELVIN's office at which Assistant GM Dario SALZANO was present, the CI and BELVIN discussed the arrests the previous day. BELVIN stated that the incident was similar to the previous incident when several IFCO Systems employees were arrested as result of the attempted rape investigation. BELVIN recounted how at that time he was scared to go to the police department and to immigration regarding the arrests. BELVIN stated that the worst thing the workers could do was to carry their false papers and that otherwise the police would not have touched them. BELVIN also recounted that the day after the attempted rape investigation many of the employees did not report to work and he had no workers. BELVIN stated, "… the company supported me and said I know you're not going to be up to speed like you were" and "when we had a problem like that the company still supported me 100 percent." BELVIN then asked the CI what happened to the two men who had been stopped by the police but were not arrested. When the CI stated that the employees were at work, BELVIN instructed him to bring the men to him. BELVIN then addressed the two employees and the CI acted as an interpreter. BELVIN first gave the employees tips to avoid being arrested in the future, including not carrying their false documents. One of the

14

workers advised BELVIN that he was worried about immigration and BELVIN reassured the employees that the police were not after them. The employees told BELVIN that they were afraid to go back to the yellow house (454 State Route 146, Altamont, New York) because that is where the police dropped them off. BELVIN encouraged the workers not to be afraid because the police had already cleared them and would not return without a reason. BELVIN then suggested that if the employees were still scared they should spend the day at the red house (2349 Western Avenue, Guilderland, New York).

38. On August 31, 2005, an ICE agent took a sworn statement from Javier Valle-Lazo, citizen of Nicaragua, who had been arrested by the NYSP during the traffic stop on August 26, 2005. Valle-Lazo stated he entered the U.S. illegally through Texas in early 2005. He made arrangements with another Nicaraguan who was working at the Guilderland IFCO to be hired there and a Spanish-speaking man that he didn't know drove him from Texas to Guilderland with three other people. Valle-Lazo stated that he and one of the other workers stayed in Guilderland, and the third went to Cincinnati. Valle-Lazo stated that upon being hired at IFCO Systems in Guilderland, he was asked to sign forms but was not asked to produce documents showing he was authorized to work in the United States. Valle-Lazo stated that after working for approximately one week, he was asked by someone at IFCO Systems if he had a social security card to which he answered he did not. Valle-Lazo stated that he was told he could continue to work but that he would not be paid until he got documents. Valle-Lazo stated that the boss James, who was in charge of everything, later warned him again that he needed to get documents or he would no longer be permitted to work. After James gave him an additional week to obtain the documents, he bought some and then began getting paid. Valle-Lazo stated that he believed that at least twenty-five to thirty of the IFCO Systems workers in Guilderland were illegal. Valle-Lazo stated that he lived at the red house (2349 Western Avenue, Guilderland) and that the company paid the rent but deducted it from his check. Valle-Lazo also stated that Scott DODGE drove him to and from work each day.

39. On August 31, 2005, an ICE agent took a sworn statement from Leonidas Buezo, citizen of Honduras, the other illegal alien who had been arrested by the NYSP during the traffic stop on August 26, 2005. Buezo stated that IFCO Systems foreman Misael ROMERO was his friend and that while Buezo lived and worked in New Jersey, he was contacted by ROMERO to work at the IFCO location in Guilderland. Buezo stated that on his first day of work he met GM Robert BELVIN, and that BELVIN reimbursed him the cost of his bus ticket from New Jersey to Albany. Buezo stated that ROMERO asked him to sign forms on his first day, but he didn't understand them because they were written in English. Buezo stated that he presented a fake Alien Registration Card and fake social security card to be hired. Buezo stated that he lived at the yellow house (454 State Route 146, Altamont) and that the company paid the rent but deducted $55 weekly from his paycheck to cover the expense. Buezo stated that foreman ROMERO drove him to and from work each day.

40. On September 16, 2005, the CI placed a recorded phone call to IFCO Systems manager Lino CHICAS on CHICAS's IFCO Systems cell phone. CHICAS asked about the status of the CI's friends who were supposed to come to see him about working at the Guilderland IFCO. The CI told CHICAS that his friends had recently crossed the border and he would have them contact CHICAS when he heard from them. CHICAS stated that he would help them get up to NY. During the conversation, CHICAS confirmed that he was helping James RICE find workers to staff the new IFCO Boston-area plant.

41. On October 5, 2005, a recorded meeting took place at the Guilderland IFCO with the CI, New Market Development Manager James RICE, GM Robert BELVIN, Assistant GM Dario SALZANO, the IFCO bookkeeper and GM Mike AMES from the new Boston IFCO Systems location in Westborough, MA. During the meeting, RICE and AMES discussed staffing the IFCO Systems location in Westborough with some of the Brazilians that lived in that area. After the meeting, in a recorded conversation in which the CI, RICE and the IFCO bookkeeper were present, the CI asked RICE if it was okay to staff the Westborough location with illegal workers like the company did in Guilderland because he knew several Brazilians that wanted to work in Westborough. James RICE responded in a sarcastic tone, "You guys are not illegal, you're legal," and "Yeah, we don't have any illegal people here." The bookkeeper responded to RICE, "Right." RICE further stated that he could not hire anyone that is illegal, that they must have "a social security card or the right id," but that he was not "an expert" regarding documents. RICE continued that as long as the employees brought him "some sort" of identification, it would be "the same deal" as it was in the Guilderland location.

42. On or about October 12, 2005, the CI was sent to IFCO's location in Westborough, MA help recruit and train new Spanish and Portuguese-speaking employees. In a recorded a conversation there which took place on October 20, 2005, IFCO Systems GM Mike AMES told the CI that he knew where near where he lived where they might be able to find a Brazilian that could be hired as foreman. The CI explained to AMES that the Brazilians in the area were illegal aliens. AMES stated that he was sure that the business center might help them become U.S. citizens. AMES then called New Market Development Manager James RICE and spoke to him on the phone about staffing at the Westborough plant. AMES stated that he had two workers who used to work at the Guilderland plant who had returned to the Boston area "because of immigration stuff." AMES told RICE that he was going to a bakery (where Brazilian day workers congregated) to meet with the girlfriend of a potential employee who could translate for him. AMES and the CI proceeded to the bakery and the CI spoke in Portuguese to the woman AMES told RICE about. The CI informed AMES that the woman said about the potential workers that "They don't have no documents, no papers, no permission to work in the United States." The CI indicated that he told the woman, "O.K., we know the deal" to which AMES responded: "But, you know how to work the deal...I want to make sure they get paid for working. I don't want it to end up where they can't be paid, because of identity, ID, you know what I'm saying."

43. On October 23, 2005, the CI picked up three Brazilian illegal aliens at the IFCO Systems location in Westborough and drove them back to Guilderland IFCO for training as he had been instructed to do by New Market Development Manager James RICE and GM Robert BELVIN. The next day, the CI again was sent to pick up Brazilians (two) at the Westborough IFCO to bring them to Guilderland for training. In a recorded conversation that took place at the Westborough plant while he was there, the CI told GM Mike AMES that the Brazilians were illegal aliens and lacked documents and that if he got pulled over by the police transporting the aliens he would call AMES. AMES responded, "Call me." The CI told AMES that as he had told BELVIN and RICE, every one of the Brazilian workers was an illegal alien, had no documents and had crossed the border, including one who was arrested by Border Patrol. GM AMES replied that the CI knew how to get these illegal workers paid and that the IFCO Guilderland bookkeeper knew how to take care of their paperwork. AMES asked the CI to make the employees "feel comfortable" by telling them that they did not need to open a bank account but could cash their paychecks with whatever identification they had at the Bank of America because IFCO checks were drawn on that bank.

44. On October 25, 2005, the CI placed a recorded phone call to New Market Development Manager James RICE. RICE instructed the CI to use public transportation to transport undocumented Westborough IFCO workers in order to avoid detection by law enforcement. The CI told RICE that he was afraid to transport any more workers from the Boston plant to Albany because he was afraid to be pulled over by the police. During the conversation the CI stated:

"Yes....the reason why I call you, because more people call me and to be honest with you, ah I'm feel uncomfortable like a to bring those people from Boston to Albany, like a very nervous because a too many cops and I'm afraid to get pulled over...I'm kind of, that's the thing what I talk to you about it, I'm afraid, do you remember the time what happened here in Albany, the cops pull over and nobody have no papers so they got deported too, and I am afraid to death to be deported and those guys too."

RICE asked the CI, "They don't have papers?" and the CI responded, "No you know I told you no one have a paper at all." The following exchange then took place:

RICE: "Well they can't, how are we gonna, they got to
      have papers."
CI: "Fake papers."
RICE: "Well I mean as long as they're papers."
CI: "Yeah ok, but you know the deal, everybody have a
    fake paper like I am."
RICE (laughing): "Don't tell me that, okay. Oh so you're just
              worried if they ran their papers they'd get in
              trouble."
CI: "No, no, they do have false documents."

RICE: "Right…right."
CI: "They have immigration false documents."
RICE: "That's a big deal."

RICE ultimately advised the CI to put the illegal-alien employees on the bus.

The following day, in a recorded conversation, the CI told GM Robert BELVIN about being afraid to transport the employees from Westborough to Guilderland because they were illegal aliens who carried fraudulent identification. BELVIN advised the CI to have the employees place their fake documents in the trunk of the car when they traveled.

45. On October 27, 2005, the CI reported to ICE that GM Robert BELVIN asked the CI to purchase social security cards for three new Brazilian employees that were hired at the Guilderland IFCO. The following day, in a recorded conversation, the CI told GM Robert BELVIN and Assistant GM Dario SALZANO that he was helping to obtain social security cards for the new Brazilian employees. SALZANO told the CI to make sure the employees knew that without "papers," they could not be paid, and the CI responded that he would get them the "papers" they needed.

46. On November 4, 2005, the CI reported to ICE that he accompanied GM Robert BELVIN in transporting illegal alien IFCO employees to the Schenectady bus terminal. These were seven Brazilian IFCO Westborough employees who had traveled to IFCO Guilderland for training and they were taking the bus back to Boston. The CI reported that BELVIN had obtained bus tickets for the employees from the bus station attendant and distributed them to the men. Using the CI as an interpreter, BELVIN then instructed the employees to wait in the terminal until their bus departed to avoid being seen.

On November 7, 2005, agents from ICE interviewed employees from Greyhound Bus Lines at the Schenectady bus terminal. The employees provided the ICE agents with a printout of the names of the IFCO employees that took the bus back to the IFCO Westborough location. A Greyhound employee recalled handling the ticket transaction. The Greyhound employee reported that one of the passengers had attempted to sign for the tickets, but his identification did not exactly match the name that was on his ticket. The employee stated further that at that time, GM Robert BELVIN produced his identification to the employee, stated that he had purchased the tickets, and signed for the tickets. Records of this transaction obtained from Greyhound Bus Lines concerning the aliens' bus tickets contain BELVIN's signature and confirm that BELVIN purchased the tickets with his credit card.

47. On November 8, 2005, agents from ICE and the NYSP conducted surveillance at 1213 State Street in Schenectady, New York, a residence that was being used to house alien workers from the Guilderland IFCO Systems. Agents observed the owner of the home leave with two Hispanic males who came out of the house. The van stopped to pick up three more Hispanic males who were standing outside a

residence on Albany Street in Schenectady. The van eventually continued to the Guilderland IFCO and dropped the men off for work. Social Security Administration (SSA) records indicate that 10 employees on the Guilderland IFCO's payroll for the year 2005 who listed this address were using social security numbers that were either invalid or did not match the true names associated with those social security numbers in SSA's databases. ICE database checks on the 10 employees did not reveal a lawful status for any of them.

48. On November 8, 2005, IFCO New Market Development Manager William HOSKINS was present at the IFCO Guilderland plant. Among the things HOSKINS did was to meet with the pallet repairmen, most of whom were illegal aliens. At the meeting, which was recorded, the CI translated for the workers so they could understand HOSKINS.

49. On November 14, 2005, the CI placed a recorded phone call to Houston IFCO Systems assistant manager Lino CHICAS on CHICAS's IFCO cell phone. During the conversation, CHICAS advised the CI that he was at a new IFCO Systems location in St. Louis that he had staffed with twenty-two workers. CHICAS advised the CI that he would try to find workers from St. Louis to send to Guilderland.

50. On or about November 23, 2005, New Market Development Manager James RICE was fired from IFCO.

51. On November 29, 2005, the CI reported to ICE that he was asked to attend a meeting at the IFCO Guilderland plant between New Market Development Manager William HOSKINS from Cincinnati, Assistant GM Dario SALZANO, and a general manager from IFCO in Jacksonville, Florida. At the meeting, William HOSKINS told the CI that he wanted him (the CI) to fly to Houston to meet with IFCO Systems assistant manager Lino CHICAS. HOSKINS instructed him to coordinate with CHICAS who was going to arrange for the CI to transport a vanload of new employees to the Guilderland IFCO.

52. On November 30, 2005, in a recorded conversation, GM Robert BELVIN told the CI that he did not want the CI to go to Houston to work with CHICAS and drive the vanload of new workers back to Guilderland. BELVIN told the CI that the employees just have to go to the IFCO Systems plant in Houston and they will be given money and bus tickets, and that he would reimburse the Houston office for the cost of the tickets. BELVIN stated that he had done this with CHICAS before and CHICAS was well aware of this practice for the transportation of new workers. BELVIN remarked "Buddy I've been down this road before." BELVIN told the CI that the workers coming from Houston better have "papers" with them.

53. Later that day, the CI placed a recorded phone call to IFCO Systems assistant manager Lino CHICAS on CHICAS's IFCO cell phone. The CI explained to CHICAS that GM Robert BELVIN objected to him going to Houston and that BELVIN advised the CI that the employees should be transported by bus. CHICAS

asked the CI to advise BELVIN to email CHICAS the names of the men who needed bus tickets so that he could have them purchased, and that BELVIN would later need to reimburse the cost of the tickets. The CI told CHICAS that BELVIN asked him to make sure that the new employees had identification and social security cards, and BELVIN had suggested that CHICAS take care of obtaining them because he knew how to do it. CHICAS responded that he thought he could do it and if the employees did not have documents, "we will find them some."

54. On December 1, 2005, in a recorded conversation, the CI, GM Robert BELVIN, Assistant GM Dario SALZANO, New Market Development Manager William HOSKINS and a general manager from Jacksonville, Florida, discussed finding workers. The manager in Florida stated that he was not sure that he should say this in front of the CI, but he used a finder's fee as an incentive to recruit new employees. BELVIN stated he had a similar practice in which he paid $150 dollars if the new employee stayed for at least two months. The managers discussed finding workers by placing an advertisement in a Spanish-speaking newspaper. BELVIN stated that he and Scott DODGE had called Lino CHICAS for more workers. BELVIN then called CHICAS and discussed the transportation from Houston to Guilderland of a group of new employees who knew some of the current Guilderland employees. BELVIN told CHICAS that the prospective workers were afraid to travel by bus to Guilderland because they feared being caught by immigration. BELVIN inquired whether he could put the workers in touch with CHICAS so that CHICAS could give them a "comfort level" and "put them at ease" about coming up to Albany. CHICAS agreed. BELVIN advised CHICAS that he would have the new employees go to a plant manager at the Houston IFCO to get their bus fare and that he would later pay for the tickets. BELVIN further asked CHICAS to ensure that the prospective employees had the "right paperwork" so that as soon as they arrived they could be put to work.

55. On December 4, 2005, the CI reported to ICE that a relative of an illegal alien who worked at the Guilderland IFCO with the CI had called him to talk to him about transporting the workers from Houston that BELVIN had recently discussed with CHICAS. The woman stated that she was making arrangements to transport the employees by van because they were afraid to travel by bus. She further stated that she expected payment from IFCO to transport the workers, based on what the employees would pay if they took the bus from Houston. The CI told Robert BELVIN about this phone call and later called the woman to tell her that BELVIN assented to the plans. In subsequent recorded conversations, the CI advised BELVIN the particulars of the transportation of the alien workers. BELVIN asked the CI if the employees had papers and the CI advised him that the woman had provided them with fake social security cards and fake identification.

56. On December 6, 2005, the woman contacted the CI and told him that the planned transportation of the alien workers had been cancelled because the driver wanted to be paid in advance of making the trip. The CI indicated that he might contact "Lino" at the Houston IFCO to see if something could be done and the woman stated that

she knew Lino. The CI advised GM Robert BELVIN about the problems in arranging for the transportation of the alien workers, and BELVIN asked the CI to arrange for him to speak directly to the female arranger and he would see if he could "bridge this gap." The following day, in a recorded conversation, BELVIN spoke to the female arranger and advised her that he and CHICAS would work out with her the details of transporting the new employees.

57. On December 12, 2005, in a recorded meeting with GM Robert BELVIN and Assistant GM Dario SALZANO, the CI discussed the workers that were going to be transported from Houston. BELVIN explained to the CI that everything was going to go through Houston IFCO Systems assistant manager Lino CHICAS. The aliens were supposed to bring their documents to CHICAS at the Houston IFCO plant so that any problems could be addressed before they were sent to Guilderland. BELVIN explained that CHICAS would photocopy the workers' social security cards and identification, and would process them in Houston so that none of the employees were "kicked back" or rejected by payroll in Houston because of their identification. BEVLIN stated that between himself and IFCO Houston, the transportation of the employees would be paid. BELVIN explained to the CI that he and CHICAS had exchanged emails that contained the names of the new workers.

58. On December 12, 2005, in a recorded phone call, Lino CHICAS told the CI that he had spoken to the woman arranging the transportation of alien workers to IFCO Guilderland, and that he was going to pay her $300 per person to transport seven employees by van. CHICAS confirmed that the woman was to bring the workers to IFCO Systems in Houston so they could fill out paperwork and have their documents copied. CHICAS also told the CI that he was sending an email to GM Robert BELVIN with details about the new employees.

On December 14, 2005, in recorded conversations, the CI spoke to the female coordinating the transportation of the undocumented alien employees to the Guilderland IFCO, and called IFCO Systems New Market Development Manager William HOSKINS at the Guilderland IFCO to relay what the arranger had stated. The CI told HOSKINS that eight workers were on their way to Guilderland, and they were delayed because "every single one of them" was an illegal alien and some of them were having problems getting social security cards and identification. The CI asked HOSKINS if he was going to pay the driver of the van gas money for the trip when he arrived as the arranger was requesting. HOSKINS replied that he would do so and advised the CI, "Just get 'em here and we'll deal with it."

Later that day, in a recorded conversation at the Guilderland IFCO, the CI advised Assistant GM Dario SALZANO that the eight workers were on their way and that when they arrived, the company was going to have to pay the driver $300 for each worker who was being transported. SALZANO indicated his understanding and discussed buying air mattresses for the new workers and dividing them between the yellow house (454 State Route 146, Altamont, New York) and the red house (2349

21

Western Avenue, Guilderland). For reasons unknown to ICE, the 10 illegal-alien workers being transported in concert with the female arranger never arrived at IFCO.

59. On December 16, 2005, the CI left the Guilderland IFCO at the instruction of ICE. The CI returned to Guilderland IFCO on January 9, 2006. Shortly thereafter, the CI was fired and was told that his services were no longer needed.

60. On or about January 8, 2006, Guilderland IFCO GM Robert BELVIN was fired from IFCO.

61. On February 9, 2006, a former bookkeeper from the Guilderland IFCO Systems met with investigators from the Department of Labor at her request. The bookkeeper reported that she was instructed by former GM Robert BELVIN and others at IFCO headquarters in Houston to record only up to 40 hours of work per week on the payroll records for all "piece rate workers" (including the pallet repairmen) that was sent to headquarters. The bookkeeper kept separate records locally regarding the true hours worked by these employees. The bookkeeper stated that the IFCO procedures meant that these piece rate "Mexican workers" were underpaid for the overtime they worked. The bookkeeper also reported to the investigators that IFCO Guilderland housed these "Mexican workers," and deducted money from their paychecks for housing. The bookkeeper reported that the company transported the "Mexican workers" to and from work each day. The bookkeeper stated that payroll records were computerized locally and at headquarters.

62. On February 13, 2006, agents from ICE and the NYSP were given a tour of the Target distribution center located at 1800 State Highway 5S, Amsterdam, New York, by company security personnel. Located within the distribution center was an area designated for IFCO Systems where on-site pallet repair services are performed. Agents observed that a visitor's logbook located in the lobby of the facility contained the names of IFCO foreman Scott DODGE and Misael ROMERO, both of whom previously worked at the IFCO Systems location in Guilderland. ROMERO is a citizen of Honduras who is in the United States illegally and is the subject of a final order of removal.

63. On March 29, 2006, the CI returned to the Guilderland IFCO Systems warehouse to ask for his final paycheck. The CI observed a number of employees known to him to be illegal aliens working as pallet repairmen in the warehouse. In a recorded conversation, Assistant GM Dario SALZANO told the CI that staffing of the pallet repairmen fluctuated between 12 and 18 workers. SALZANO also stated that these workers still lived in the red house (2349 Western Avenue, Guilderland, NY), and the yellow house (454 State Route 146, Altamont). The CI then visited the houses referenced by SALZANO. At the yellow house, the CI spoke to an IFCO employee who stated that 11 Guilderland IFCO workers resided at the house, six in the lower unit and five in the upper unit. The CI continued to the red house and observed that approximately eight illegal-alien workers currently resided at that house. The CI continued to the residence at 1213 State Street in Schenectady and spoke to two

illegal-alien former co-workers who stated that the owner of the house lived in the upper unit, and that they and another IFCO employee lived in the lower unit.

## BANKING AND PAYROLL EVIDENCE

64. A review of IFCO Systems bank records by ICE and the NYSP reveals cancelled checks from IFCO's "BRE Imprest" account, during the time period October 2004 through December 2005, for: rent and utilities to the owners of the red house (2349 Western Avenue, Guilderland, NY), the yellow house (454 State Route 146, Altamont), and the white house at the Governor's Inn; payments to IFCO Guilderland employees without lawful immigration status for travel expenses and for pay; and the purchase of beds for undocumented alien employees at IFCO Guilderland. One of the rent checks is signed by James RICE, and many of the other checks are signed by GM Robert BELVIN.

65. NYSP financial investigators and an agent from the SSA compared the social security numbers for pallet management services employees that were reported on Form W-2 wage and tax statements in IFCO Systems North America's payroll records for the calendar year 2005, with databases of valid social security numbers at the SSA. This comparison revealed the following:

   A) Approximately 53.4% of the social security numbers contained on the IFCO Systems North America payroll of approximately 5,800 workers for 2005 are either invalid, do not match the true name registered with the SSA for that number, or belong to children or deceased persons. The SSA considers a payroll mismatch rate of 1% or greater to be abnormal; and

   B) Approximately 31% of the social security numbers contained on the Guilderland IFCO 2005 payroll are either invalid, do not match the true name registered with the SSA for that number, or belong to children or deceased persons. Payroll records for Guilderland IFCO also reveal that the names and social security numbers from the fraudulent documents that the CI provided to illegal-alien employees at the request of GM Robert BELVIN on May 9, 2005, were used to generate pay for those employees.

66. According to the SSA, in 2004 and 2005, at least 13 written notifications were sent to IFCO Systems headquarters in Houston, TX, notifying IFCO that there were discrepancies with the Social Security numbers that had been reported on the W-2 payroll records of several of IFCO's pallet management services operations for the prior year. The notifications indicated, in each year, that more than 1,000 employee social security numbers did not match the records of the SSA. Less than 1% of these mismatches were subsequently corrected with the SSA. The SSA offers employers a program by which they can gain free access to a system to verify the social security numbers provided by applicants. IFCO does not participate in this program.

## SEARCH OF THE IFCO GUILDERLAND

67. The probable cause described above demonstrates that there is evidence regarding the criminal violations described in paragraphs 3 and 4 above, located at the Guilderland IFCO, in the form of the items described in Attachment B. In the experience of your affiant, the items described in Attachment B, including payroll records, records relating to hiring, records and ledgers related to financial disbursements, employee information, I-9s, tax records, and related items, are of the type created and maintained at a business such as IFCO Guilderland. In addition, based upon the course of criminal conduct described above, your affiant expects to locate undocumented alien workers on the premises, as well as evidence of fraudulent employment and identification documents possessed by these employees and former like employees.

68. Search of Computers. As the probable cause described above demonstrates the use of IFCO Guilderland computers to record and transmit payroll for undocumented alien employees, and the use of electronic mail by co-conspirators to communicate concerning the identities of undocumented workers and details regarding their transportation among IFCO plants, there is probable cause to search the computers at the IFCO Guilderland site. Additional probable cause is based upon your affiant's experience from prior investigations that businesses maintain many of the items to be seized at the Guilderland IFCO, including employee lists, state and local filings, tax information, and financial ledgers, in computerized form.

Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

   a. Computer storage devices (like hard disks, diskettes, tapes, laser disks, CD-ROMs, and DVD drives) can store the equivalent of hundreds of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence, and he might store criminal evidence in random order or with deceptive file names or deceptive file extensions. This requires searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it may be impractical to attempt this kind of data search on site.

   b. Searching computer systems for criminal evidence is a highly technical process, requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even

computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and from destructive codes imbedded in the system, such as "booby traps"), a controlled environment is essential to its complete and accurate analysis.

Based upon your affiant's consultation with experts in computer searches, data retrieval from computers and related media, and consultations with other agents who have been involved in the search of computers and retrieval of data from computer systems, your affiant knows that searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following:

a.  The peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence contained therein. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices. If the analyst determines that the I/O devices, software, documentation, and data security devices are not necessary to retrieve and preserve the data after inspection, the government will return them within a reasonable time.

b.  In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices as well as the central processing unit (CPU). Further, the analyst again needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software that may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

c.  I have been advised by computer forensic experts who have conducted computer searches that people commonly store information on their computers, without periodically cleaning out all of their computer files. I

25

also know that even if files have been deleted, they will be sent to a recycling bin. These files can easily be restored if they are retained in the recycling bin. A user can delete the files in the recycling bin, but as described below, the date is still on the computer. Even if a computer file has been deleted, the actual data in the file is not erased; only the index or directory to the file is deleted. The file remains stored on the hard drive of the computer in "slack space." ("Slack space" refers to space on a computer's hard drive that his available for use by the computer. As time passes, and space on the hard drive is needed for other functions, slack space is randomly overwritten with other data.). There is technology which would enable a computer forensic expert to retrieve files from "slack space." There is also currently software that allows an individual to delete all of the files in the computer's "slack space."

## SEARCHES OF UNDOCUMENTED ALIEN RESIDENCES

69. The probable cause described above demonstrates that IFCO Guilderland is housing undocumented alien workers at the residences located at 2349 Western Avenue, Guilderland, NY (the red house), 454 State Route 146, Altamont (the yellow house) and at the lower unit of 1213 State Street, Schenectady. Based upon those facts and your affiant's experience in searching residences of undocumented alien workers, I would expect to find at those residences items such as those listed in Attachment C. These include undocumented aliens, fraudulent employment and identification documents, and records related to employment, pay, taxes, housing and transportation -- including in this case, that provided by IFCO.

## CONCLUSION

70. Based on the foregoing, I believe there is probable cause to support the issuance of the arrest warrants detailed in paragraph 3, above, for the offenses identified therein, and the issuance of the search warrants identified in paragraph 4, above, for the items specified in attachments B and C.

Donald J. O'Brien
Special Agent
U.S. Immigration and Customs Enforcement

Sworn and subscribed to before me this 14th day of April, 2006.

HON. RANDOLPH F. TREECE
UNITED STATES MAGISTRATE JUDGE