U.S. DISTRICT COURT
**N.D. OF N.Y.**
**FILED**

MAR **0 7** 2007

LAWRENCE K. BAERMAN, CLERK
ALBANY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Action No. |
| v. | 07-CR-110 |
| ROBERT BELVIN, | PLEA AND COOPERATION AGREEMENT |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

GLENN T. SUDDABY, United States Attorney for the Northern District of New York (by Tina Sciocchetti, appearing) and ROBERT BELVIN (with Kent Sprotbery, Esq., appearing) hereby enter into the following Plea Agreement regarding the disposition of certain criminal charges against the Defendant:

1.      **Defendant's Promises.**  In return for the consideration described below, ROBERT BELVIN agrees as follows:

a.      The Defendant will waive indictment and enter a plea of guilty to a two-count Information charging him with conspiracy to transport and harbor illegal aliens for commercial advantage and private financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) (Count I), and conspiracy to possess five or more identification documents with the intent to use unlawfully, in violation of 18 USC § 1028 (f) (Count II).

b.      The Defendant will cooperate with the United States in the investigation and prosecution of others, as more fully set forth below.

2. **Potential Penalties.** ROBERT BELVIN understands that his guilty plea to the Information will subject him to the following potential penalties:

    a.    <u>Maximum terms of imprisonment</u>:

        i.    Count I – 10 years (8 U.S.C. § 1324(a)(1)(B)(i))

        ii.    Count II – 5 years (18 U.S.C. § 1028(b)(2)(B))

    b.    <u>Supervised Release</u>: In addition to imposing any other penalty, the sentencing Court may require the Defendant to serve a term of supervised release of up to 3 years for Count I, and 1 year for Count II, to begin at the expiration of any term of imprisonment imposed upon him. (18 U.S.C. § 3583) Should the Defendant be placed on a term of supervised release and subsequently violate any of the terms and conditions of that release before the expiration of such term, he may be sentenced to up to 2 years imprisonment (Count I) and 1 year imprisonment (Count II) in addition to any prison term previously imposed upon him and in addition to the statutory maximum term of imprisonment set forth above. Under some circumstances, the Court may also extend the term of supervised release, and it may modify, reduce, or enlarge the conditions of such release.

    c.    <u>Maximum fine for each Count</u>: $250,000. (18 U.S.C. § 3571)

    d.    <u>Special Assessment</u>: The Defendant will be required to pay an assessment of $200.00, which is due and payable at the time of sentencing. (18 U.S.C. § 3013) The Defendant agrees to deliver a check or money order to the Clerk of the Court in the amount of $200.00, payable to the U.S. District Court at the time of his sentencing.

e.    Interest and penalties:  Interest and penalties may accrue, as a matter of law, on any unpaid financial obligation imposed as part of the Defendant's sentence, from as early as the date of sentencing.

f.    Collateral Consequences:  Conviction of a felony under this Agreement may result in the loss of certain civil rights, including, but not limited to, the right to vote or the right to possess firearms.

3.    **Sentencing Factors.**  ROBERT BELVIN understands that the sentence to be imposed upon him is within the discretion of the sentencing Court, subject to the statutory maximum penalties and the provisions of the Sentencing Reform Act and the United States Sentencing Guidelines promulgated thereunder, as modified by *United States v. Booker*, 543 U.S. 220 (2005).  In imposing the sentence, the Court must take into account the Sentencing Guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a).  While the Court is not ultimately bound to impose a sentence within the applicable Sentencing Guidelines range, its sentence must be reasonable based upon consideration of all relevant sentencing factors.

4.    **Elements of the Offense.**  ROBERT BELVIN understands the following legal elements of the offenses stated in the Information, and admits that those elements accurately describe his criminal conduct:

a.    Conspiracy

i.    The defendant and one or more others entered into the unlawful agreements charged in the Information;
ii.    The defendant wilfully became a member of each of the conspiracies knowing of at least one of the objects of each conspiracy and intending to accomplish that object.

3

    b.    <u>Object of Conspiracy in Count I – Transporting Illegal Aliens</u>

        i.    The defendant knew or was in reckless disregard of the fact that an alien had come to, entered, or remained in the United States in violation of law;

        ii.    The defendant or a conspirator would knowingly transport and move, or attempt to transport and move, the alien within the United States by means of transportation or otherwise;

        iii.    The transportation was in furtherance of the alien's violation of law.

    c.    <u>Object of Conspiracy in Count I – Harboring Illegal Aliens</u>

        i.    The defendant knew or was in reckless disregard of the fact that an alien was in the United States in violation of law;

        ii.    The defendant or a conspirator would knowingly harbor or attempt to harbor the alien in any place;

        iii.    Harboring encompasses conduct tending to substantially facilitate an alien's remaining in the United States illegally.

    d.    <u>Commercial advantage and private financial gain</u>

        i.    "Commercial" relates to commerce and is from the point of view of profit, having profit as the primary aim;

        ii.    "Advantage" denotes a benefit, profit, or gain of any kind;

        iii.    Private financial gain is established by a pecuniary motive;

        iv.    Proof of actual payment or an agreement to pay is not required.

    e.    <u>Reckless disregard of alienage</u>

        i.    Being aware of, but consciously and carelessly ignoring, facts and circumstances clearly indicating that the alleged alien was in fact an alien who had entered, or remained or resided in, the United States in violation of law.

    f.    <u>Object of the Conspiracy in Count II – To Possess 5 or More Identification Documents with Intent to Use Unlawfully</u>

        i.    The defendant conspired to possess five or more identification documents (other than those issued lawfully for the use of the possessor);

        ii.    The defendant did so knowingly and willfully, with the intent to unlawfully use the identification documents;

iii.    The identification document was or appeared to be issued by or under the authority of the United States.

5.    **Factual Basis for the Plea.**    ROBERT BELVIN admits the following facts, which establish his guilt with respect to the offense stated in the Information:

a.    From approximately December 2004 through January 8, 2006, the defendant was the general manager of the Albany, N.Y., pallet management plant of IFCO Systems North America ("IFCO"). The Albany plant, which opened in October 2004, procured, reconditioned and distributed wooden pallets. It was an IFCO "Greenfield Initiative" plant, meaning that one of IFCO's three new market development managers was responsible for starting up the plant and making it operational. After a period of months, management of the plant was to fall to IFCO's vice president for the east coast. Thus, while he worked at IFCO, the defendant was supervised by IFCO's vice president for the east coast, IFCO's vice president for new market development, and new market development manager, James Rice, who started up the Albany plant and was present there with the defendant for much of the time between January and September 2005. When Rice was fired from the company at the end of November 2005, another new market development manager, William Hoskins, assumed responsibility for the development of the plant and directly supervised the defendant until the defendant's termination in January 2006.

b.    During his two interviews for the general manager position, IFCO managers, including an IFCO vice president, asked the defendant if he spoke Spanish (he did not) and whether he had any problem working with Hispanics. When he started management of the Albany plant, the defendant learned that the plant was staffed with Spanish-speaking Hispanic laborers from outside of the region that had been sent by either T.S., an employee at IFCO's Cincinnati, Ohio, plant, or

Abelino "Lino" Chicas, an employee at one of IFCO's Houston, Texas, plants. Documents show, and the defendant soon learned, that every employee that had been sent to the Albany plant through T.S. and Chicas was an illegal alien. Because the defendant could not communicate with these pallet workers, he initially relied on Chicas to communicate work-related matters to them by telephone. The defendant was trained to identify a foreman who could speak English and act as a translator for the him to the pallet workers, and he did so.

        c.      When the defendant began to hire pallet workers, he was trained that IFCO's business model was to use Hispanic laborers. Rice told him that the company had not had success with "white boys" and non-Hispanics in its plants and that he should seek to fill pallet worker positions with Hispanics. His immediate supervisors, first Rice and then Hoskins, instructed the defendant and his assistant managers to seek out workers at Hispanic grocery stores and Mexican restaurants and to advertise through Hispanic newspapers. Another IFCO senior manager advised him to staff the two IFCO off-site facilities that the defendant managed with Hispanics in order to increase production at those plants. In addition, all of his supervisors, including Rice, Hoskins, and the two IFCO vice presidents who supervised him, repeatedly instructed the defendant to turn to T.S. and Chicas for additional pallet workers. On several occasions, T.S. and Chicas sent Hispanic laborers to the defendant. Documents establish that all of these workers were illegal aliens. T.S. once demanded payment from the defendant for bringing five workers from Cincinnati to Albany. When the defendant failed to pay, Hoskins sent the defendant an email instructing him to pay T.S. this "compensation."

        d.      As he was trained to do, the defendant authorized reimbursement of bus transportation for many of the illegal alien employees Soto and Chicas referred to the Albany plant.

6

In addition, from the time he started his job until on or about mid-July 2005, the defendant and/or his assistant managers transported the illegal alien employees to and from work on a daily basis, and to the bank to cash their payroll checks. When illegal alien employees experienced difficulty cashing their paychecks because they lacked proper documentation, the defendant called bank personnel and intervened.

        e.      Rice instructed the defendant to house the pallet workers coming to Albany in three residences near the plant that IFCO had secured to house these workers. Even after he learned that the workers living at the houses were illegal aliens, the defendant wrote and authorized IFCO checks to landlords. Pursuant to instruction from Hoskins, he also later sought additional housing for workers. The cost of the rent and utilities was deducted from the pallet workers' pay on a weekly basis. Senior IFCO managers were aware of the housing provided to the pallet workers, and in July 2005, the Houston payroll office took over the process of paying the landlords and deducting rental costs from the workers' paychecks. The defendant authorized the purchase of beds for the illegal alien employees who lived in the IFCO houses, and from time to time provided funds for the aliens' living expenses, such as food and clothing – expenses for which IFCO reimbursed him.

        f.      On March 7, 2005, police officers and immigration agents conducted an investigation at one of the IFCO houses and detained five aliens. The next day, none of the remaining Hispanic pallet workers came to work at the Albany plant out of fear of immigration authorities. The defendant went to the ICE office in Latham, NY and was told that the detained employees were illegal aliens. When the agents asked whether the employees completed I-9 employment eligibility documents, the defendant replied that they did even though he did not know

what an I-9 was. Immediately upon leaving ICE, the defendant spoke to each of his supervisors – Rice and the two IFCO vice presidents responsible for his plant. He discussed with them the immigration detentions and the failure of the remaining workers to report for work. He told them that he had learned from ICE that the workers, including his foreman, were illegal aliens and expressed concern that the remaining employees at his plant were also illegal aliens. None of his supervisors expressed surprise that the workers were illegal aliens. They advised the defendant not to worry about the events, that things like this had happened before and the workers who had stayed away from the plant would return after things calmed down. The vice presidents assured the defendant that the company would support him through the drop in production and that he should turn to Chicas and Soto to get additional employees. When some of the workers returned days later, the defendant continued to employ them and provide for their housing and transportation, though he knew from these and earlier events that they were illegal aliens.

g. After the March 2005 encounter with immigration, the defendant and Rice reviewed pallet worker files and supplemented many of them with I-9 forms that had not been completed when the employees were hired. The defendant signed the I-9 verifications, under penalty of perjury, without making any effort to verify the employment eligibility of the individual workers and knowing that they were probably false. The defendant and Rice doctored these employee files for the purpose of misleading immigration authorities in the event they came to the plant to further investigate. Though the immigration "raid" of the Albany workers was well-known to top-level managers, some of whom spoke to the defendant about it at the national manager's meeting in April 2005, no manager ever took steps to verify the employment eligibility of the remaining workers at the Albany plant, to train the defendant concerning procedures for avoiding the employment of

8

illegal alien workers, or to ensure that the Albany plant was properly verifying the employment eligibility of new workers. Instead, staffing of pallet workers at the plant largely continued as it had before – Spanish-speaking men without families, who lived in the IFCO houses and required transportation, typically sent by T.S. and Chicas from Cincinnati, Texas, or the New York City area.

        h.    During the course of his employment, the defendant knowingly accepted fraudulent identification documents as alleged proof of employment eligibility for pallet workers, and on several occasions, employed workers who were unable to produce any valid identification documents. Under Rice's direction, in some instances, and the direction of IFCO's payroll and human resources employees in others, he manipulated employee paperwork in order to keep illegal aliens employed. For example, in one instance, a worker was "fired" under the name and social security number he had been using, and "hired" under a new name and social security number. In another instance, when a former pallet worker from another plant came to Albany to work and submitted a different social security number than he had previously used, IFCO human resources advised the defendant to pay the worker as an "independent contractor" and then told the defendant to hire the worker with the old identity information. When a bookkeeper raised concerns to defendant about the quality of the documents that workers submitted, he reprimanded her.

        i.    As he was trained to do, the defendant paid illegal alien employees who lacked documentation to be set up in IFCO's third-party payroll service with the plant's manual checks until the workers produced usable social security numbers. Payroll employees at IFCO's headquarters in Houston approved these manual payroll checks and assisted Albany in the calculation of deductions for the employees.

j.      With Rice's knowledge, the defendant approved a $500 pay advance to help a pallet worker get his father into the United States (from Nicaragua) to work at the Albany plant. When the father, Vincente Rivera, began working at IFCO, he attempted to use a social security number already being used by another worker and could not get set up in IFCO's payroll. The defendant issued or approved of seven manual payroll checks to Rivera, with assistance from IFCO's payroll in Houston who were aware that Rivera lacked a social security number. A payroll supervisor finally told Rice that Rivera could no longer get paid until the legal requirements were satisfied. Rice advised the defendant to give Rivera a week off to acquire documents. In the event Rivera was unable to obtain documents, Rice advised that he be terminated and rehired if he showed up with documents at a later time. Defendant ultimately helped Rivera obtain fraudulent identification documents in another identity, and kept him employed at IFCO.

k.      In April 2005, a government cooperating witness (CW) presented himself to the defendant as an illegal alien without documents seeking a job at IFCO. The defendant hired him, and further provided him with company housing and transportation. During the course of the CW's employment at IFCO, which lasted until December 2005, the defendant accepted several sets of fraudulent employment eligibility documents from the CW, including a set of documents in a different name with someone else's photo and a set the CW told the defendant he had purchased in NYC.

l.      At the same time the defendant believed the CW was obtaining documents from a vendor in NYC, he learned that four new pallet workers lacked the identification documents they needed to work at IFCO and get set up in payroll. On April 25, 2005, he asked the CW to obtain fraudulent documents for these four employees and for Vincente Rivera. The defendant

10

arranged for the CW and these five employees to get photographs for the documents, and gave the CW paid time off from work to obtain them. With ICE's assistance, the CW provided the illegal alien employees each with a United States resident alien card and a social security card, which they used to maintain their employment at IFCO and get paid. When the CW told the defendant that three of the workers failed to pay him for the documents, the defendant told the CW that he would deduct the funds from the workers' paychecks, though he never did.

    m.  In May 2005, when the CW was involved in a vehicle accident at the plant, the defendant lied to a police officer who responded to investigate that the CW was legally in the country, and provided the officer with a copy of fraudulent documents from the CW's employee file. In July 2005, the defendant promoted the CW to the Albany foreman management position, with Rice's approval, even though the CW had told both of them that he was an illegal alien with fraudulent work documents.

    n.  In August 2005, police stopped a vehicle with four illegal alien pallet workers from Albany's plant – two of whom were charged with possession of fraudulent documents. The defendant advised the two remaining alien workers to keep their identification documents in the trunk of their vehicles in order to avoid arrest for possession of false documents, and to stop making disturbances that would attract the attention of the police. When the workers stated that they were afraid of immigration and concerned that the police would come to the IFCO house where they were living, the defendant advised them to stay at another IFCO residence.

    o.  In November 2005, the defendant arranged for the transportation of seven alien workers from Albany to the IFCO plant in Westborough, MA. This transportation was arranged after consultation with Rice and Michael Ames, the general manager of Westborough plant.

11

Rice, Ames, and the defendant had been told that the workers were illegal aliens from Brazil. The defendant made travel reservations for the employees and took them to the bus station. When a clerk questioned the identity of one of workers whose identity document did not match the reservation name, the defendant vouched for all of the workers so that the clerk would allow their travel. The defendant paid for the bus tickets with his personal credit card, later receiving reimbursement from IFCO.

p.    In December 2005, the defendant learned from one of his pallet workers that the worker had relatives in Texas who were willing to come to work at the Albany plant, but were afraid to travel by bus for fear of detection by immigration. The defendant asked Lino Chicas to speak with the aliens to allay their fears about immigration, and Chicas agreed to do so. The defendant then learned that a female who knew the aliens would arrange for their transportation to Albany for a fee. The defendant negotiated directly with the woman, and with approval from his supervisor Hoskins, and the assistance of Chicas, he made arrangements with her to transport the alien workers to Albany in exchange for payment. Though the workers were en route to the Albany plant, for an unknown reason they never arrived.

q.    During the time he managed the Albany plant, the defendant failed to pay legal overtime rates to the piece-rate pallet workers, as he was trained to do. The plant's weekly payroll, submitted to the Houston payroll office, showed a limit of 40 hours for each piece-rate worker, while the time cards, kept locally, recorded the true overtime hours worked. Piece-rate workers received "straight time" pay – not "time and a half" – for overtime hours.

r.    The defendant's undertook all of the aforementioned acts in order to keep the Albany plant staffed with pallet workers, to keep up production, and to build IFCO's commercial

advantage in the Albany area, particularly with respect to its direct competitor Power Pallet. Because his employment, salary and bonuses were directly tied to the productivity and profitability of the Albany plant, he also acted to keep his job and increase his pay. The defendant was fired from IFCO for reasons unrelated to any of the aforementioned criminal activity.

s.      On April 19, 2006, ICE and other agencies executed a search warrant at the Albany IFCO plant. Twenty four of the twenty six pallet workers at the plant were illegal aliens, and included many hired during the defendant's management of the plant.

t.      The Defendant understands that the sentencing Court may make factual findings with respect to any and all sentencing factors and issues, including those referenced in the United States Sentencing Guidelines, whether or not such factors or issues have been admitted by the Defendant or stipulated by the parties. In making those findings by a preponderance of the evidence, the Court may consider any reliable evidence, including hearsay. The Defendant agrees that his sentence may be determined based upon such judicial fact-finding.

6.      **Use of Defendant's Admissions.** The Defendant agrees that the statements made by him in signing this Agreement, including the factual admissions set forth above in paragraph 5, shall be admissible and useable against the Defendant by the United States in any subsequent criminal or civil proceeding, even if he fails to enter a guilty plea pursuant to this Agreement, or if such a guilty plea is later vacated or withdrawn. The Defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent these rules are inconsistent with this paragraph or with this Agreement generally.

7.      **Defendant's Cooperation.** ROBERT BELVIN agrees to cooperate with the United States pursuant to the following terms and conditions:

a.    The Defendant will truthfully disclose all information with respect to the activities of the Defendant and others concerning all matters about which the U.S. Attorney's Office and law enforcement agencies designated by this Office may inquire of him.

b.    The Defendant will cooperate fully with the U.S. Attorney's Office and the designated law enforcement agencies, in any manner requested, in any criminal investigation.

c.    The Defendant will testify truthfully before the grand jury and/or at any trial or other proceeding with respect to any matters about which he may be questioned.

d.    The Defendant will not reveal his cooperation or any information with respect to any related investigation or prosecution to anyone, without the prior consent of the U.S. Attorney's Office.

e.    The Defendant will at all times give complete, truthful, and accurate information and testimony. The Defendant will neither attempt to protect any person who has been involved in criminal activity, nor will he falsely implicate anyone in criminal activity.

f.    The Defendant consents to adjournments of sentencing pending the completion of his cooperation, as determined to be necessary by the U.S. Attorney's Office.

g.    The Defendant will not commit any further crime whatsoever, nor will he violate any condition of release or supervision imposed by the Court.

h.    Any self-incriminating information provided by the Defendant, pursuant to his cooperation, which was not previously known to the United States, and any information directly or indirectly derived therefrom, may not be used against him by this Office in a further criminal prosecution of him, except in (i) a prosecution for perjury, making a false statement, or obstruction

14

of justice; (ii) a prosecution for any homicide or act of terrorism; or (iii) any prosecution of the Defendant permitted herein as a result of his failure to comply with the terms of this Agreement.

        i.      Any self-incriminating information provided by the Defendant, pursuant to his cooperation, that was not previously known to the United States will not be used in determining the applicable Sentencing Guidelines range, pursuant to U.S.S.G. § 1B1.8.

        j.      At or before the time of sentencing, the U.S. Attorney's Office will advise the Court of the nature and extent of the cooperation and assistance provided by ROBERT BELVIN pursuant to this Agreement. If the U.S. Attorney's Office determines that the Defendant has provided "substantial assistance" in the investigation or prosecution of other persons who have committed offenses, it may, in its sole discretion, recommend a downward departure pursuant to U.S.S.G. § 5K1.1. However, the U.S. Attorney's Office has not promised that such a motion will be made.

        i.      In deciding whether the Defendant has provided "substantial assistance" warranting a motion for a downward departure under § 5K1.1, the U.S. Attorney's Office may consider any fact that, in its sole discretion, it deems relevant, including facts known to this Office at the time of the execution of this Agreement. However, the decision of the U.S. Attorney's Office with respect to a motion for a downward departure will not be conditioned upon any particular outcome of any criminal investigation or prosecution.

        ii.      If the sentencing of the Defendant is conducted before he has, in the judgment of the U.S. Attorney's Office, completed his cooperation, the U.S. Attorney's Office may, in its sole discretion, decline to make a motion for a downward departure under § 5K1.1 and defer

its determination as to whether the Defendant has provided "substantial assistance" warranting a motion for a downward departure under Fed. R. Crim. P. 35(b) for up to one year after sentencing.

    iii.  Should the U.S. Attorney's Office decide to make a motion for downward departure, its recommendation as to the extent of such a departure is a matter within the sole discretion of the United States Attorney.

    iv.  Even if a motion for departure is made by the U.S. Attorney's Office, based upon the Defendant's perceived "substantial assistance," the final decision as to how much, if any, reduction in sentence is warranted because of that assistance, rests solely with the sentencing Court.

   8.  **Government's Promises and Reservation of Rights.** In exchange for the plea of guilty to the Information by ROBERT BELVIN and his continuing compliance with all of the terms of this Plea Agreement, the United States Attorney's Office for the Northern District of New York agrees as follows:

    a.  It will bring no further federal criminal charges against the Defendant relating to the conduct in the Northern District of New York, committed before the date of this Agreement, which is described in the Information and the Defendant's admissions in paragraph 5 for so long as the guilty plea and sentence on the Information remain in effect.

    b.  If the guilty plea to the Information is later withdrawn or vacated, the charges not prosecuted pursuant to subparagraph 8a of this Agreement may be filed and prosecuted, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the filing of any such charges. The Defendant waives any defense or objection to the filing and

16

prosecution of any such charges that are not time-barred by the applicable statute of limitations as of the date of this Agreement.

      c.     The U.S. Attorney's Office will take no position with respect to the imposition of the least severe sentence permitted within the applicable Sentencing Guidelines range determined by the Court.

      d.     The U.S. Attorney's Office reserves the right to advise the sentencing Court and the Probation Office of any information, in aggravation or mitigation of sentencing, whether or not encompassed within the Information

    9.    **Stipulations.** The U.S. Attorney's Office and ROBERT BELVIN agree to stipulate at sentencing to the statement set forth in subparagraph (a) below, subject to the caveats set forth in the subparagraphs following.

      a.    <u>Stipulations</u>

        i) The number of unlawful aliens transported and harbored was 6-24. U.S.S.G. 2L1.1(b)(2)(A).

        ii) The defendant was a manager or supervisor (but not an organizer or leader) of criminal activity that involved five or more participants. U.S.S.G. 3B1.1(b).

        iii) The U.S. Attorney's Office will recommend a 2-level downward adjustment to the applicable Sentencing Guidelines range if, (A) through the time of sentencing, the Defendant clearly demonstrates "acceptance of responsibility" to the satisfaction of the Government for the offense, as defined in U.S.S.G. § 3E1.1(a); and (B) the Government does not learn of new evidence of conduct committed by the Defendant, either before or after his guilty plea, that constitutes "obstruction of justice," as defined in U.S.S.G. § 3C1.1. If the Defendant clearly

17

demonstrates "acceptance of responsibility" to the satisfaction of the Government and promptly enters a plea of guilty, thereby permitting the U.S. Attorney's Office to avoid preparing for trial and permitting the Government and the Court to allocate their resources efficiently, the U.S. Attorney's Office will move for an additional downward adjustment of 1 level, if the Defendant otherwise qualifies under U.S.S.G. § 3E1.1(b).

      b.     Until the Probation Office has fully investigated the defendant's criminal history, it is not possible to predict with certainty the Defendant's Criminal History Category.

      c.     It is understood that these stipulations cannot and do not bind the sentencing Court, which may make independent factual findings by a preponderance of the evidence and may reject any or all stipulations between the parties. The rejection of any or all stipulations by the Court will not be the basis for the withdrawal of a plea of guilty by the Defendant, and will not release either the U.S. Attorney's Office or the Defendant from any other portion of this Agreement, including any other stipulations agreed to herein.

      d.     No stipulation in this Agreement shall affect the parties' respective obligations to ensure that, to the extent possible, the Court has all information pertinent to its determination of an appropriate sentence. The parties may provide any such factual information to the Probation Office and/or to the Court, without limitation, before or after the completion of the Presentence Investigation Report, and agree that the submission of such information shall not be deemed "advocacy" in violation of any stipulation in this Agreement.

      e.     To the extent the stipulations above do not reflect agreement on any factor or issue potentially affecting the applicable advisory Sentencing Guidelines range, the Defendant and

the U.S. Attorney's Office each expressly reserves the right to advocate if, and how, any such factor or issue would apply under the Sentencing Guidelines.

10.    **Preliminary Sentencing Guidelines Estimates.** The Defendant understands that any estimate of the Defendant's total offense level, criminal history score, and/or Sentencing Guidelines range provided before sentencing is preliminary and is not binding on the parties to this Agreement, the Probation Office, or the Court.

11.    **Remedies for Breach.** Should the U.S. Attorney's Office determine that the Defendant, after the date of this Plea Agreement, (i) has committed any further crime or violated any condition of release or supervision imposed by the Court (whether or not charged); (ii) has given false, incomplete, or misleading testimony or information; or (iii) has breached any condition of this Agreement, the U.S. Attorney's Office will have the right, in its sole discretion, to void this Agreement, in whole or in part. In the event of any such breach, the Defendant will not be permitted to withdraw his guilty plea under this Agreement, but will thereafter be subject to prosecution for any federal criminal violation of which the U.S. Attorney's Office has knowledge, including but not limited to charges that this Office has agreed not to prosecute.

a.    The Defendant waives any defense or objection to the commencement of any such prosecution that is not time-barred by the applicable statute of limitations as of the date of this Agreement, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of any such prosecution.

b.    Moreover, in connection with any such prosecution, any information, statement, or testimony provided by the Defendant, and all leads derived therefrom, may be used against him, without limitation.

19

c.    In the event of any such breach by the Defendant, the U.S. Attorney's Office will have the right, in its sole discretion, to do the following, notwithstanding any contrary provision or stipulation in this Plea Agreement:

i.    to advocate if, and how, any particular adjustment or specific offense characteristic affects the applicable Sentencing Guidelines range;

ii.    to utilize any information, statement, or testimony provided by the Defendant in determining the applicable Sentencing Guidelines range, notwithstanding U.S.S.G. § 1B1.8;

iii.    to decline to move for and/or to withdraw a motion for a downward departure under U.S.S.G. § 5K1.1, even if the Defendant had provided "substantial assistance" to the United States prior to breaching any term of this Agreement;

iv.    to recommend a specific sentence of imprisonment within or above the applicable Sentencing Guidelines range determined by the Court.

12.    **Limitations on Agreement.** This Agreement is limited to the U.S. Attorney's Office for the Northern District of New York and cannot bind other federal, state or local prosecuting authorities. Furthermore, this Agreement does not prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the Defendant.

13.    **Agreement Not Binding on the Court.** The Court is neither a party to, nor bound by this Agreement. The Court may accept or reject this Plea Agreement or defer a decision until it has considered the Presentence Investigation Report prepared by the U.S. Probation Office.

a.    If the Court rejects the provisions of this Agreement permitting the Defendant to plead guilty to the Information in satisfaction of other charges, which provisions were negotiated pursuant to Fed. R. Crim. P. 11(c)(1)(A), the Court will afford the Defendant an opportunity to withdraw his plea of guilty prior to sentencing, pursuant to Fed. R. Crim. P. 11(c)(5) & (d).

b.    The Court is not bound by any recommendation, stipulation, or request made by the parties, pursuant to Fed. R. Crim. P. 11(c)(1)(B), as to the appropriate sentence, and the Defendant may not withdraw his plea of guilty if the Court declines to follow any such recommendation, stipulation, or request. The U.S. Attorney's Office reserves the right to support and defend, in connection with any post-sentencing proceedings, any decision the Court may make with regard to the Defendant's sentence, whether or not such decision is consistent with this Office's recommendations, stipulations, or requests.

14.    **Waiver of Defendant's Rights.**  The Defendant acknowledges that he has read each of the provisions of the entire Plea Agreement with the assistance of counsel and understands its provisions. The Defendant further acknowledges that his plea is voluntary and did not result from any force, threat, or promises (other than the promises in this Plea Agreement).

a.    The Defendant understands his right to assistance of counsel at every stage of the proceeding and has discussed his constitutional and other rights with defense counsel. The Defendant understands that by entering a plea of guilty, he will be giving up his rights (i) to be presumed innocent until proven guilty beyond a reasonable doubt; (ii) to plead not guilty; (iii) to trial by jury; (iv) to confront, cross-examine, and compel the attendance of witnesses at trial; (v) to present evidence in his defense; and (vi) to remain silent and refuse to be a witness against himself by asserting the privilege against self-incrimination.

21

b.      The Defendant has been advised by defense counsel of the nature of the charges to which he is entering a guilty plea and the nature and range of the possible sentence. The Defendant understands the sentencing Court's obligation to consider the United States Sentencing Guidelines (as explained further in paragraph 3 above) and the Court's discretion to depart from those Guidelines under some circumstances or otherwise to impose a reasonable sentence outside of the applicable Sentencing Guidelines range.

15.     **Waiver of Appeal and Collateral Attack.** The Defendant acknowledges that, after consultation with defense counsel, he fully understands the extent of his rights to appeal, and/or to collaterally attack the conviction and sentence in this case. The Defendant waives any and all rights, including those conferred by 18 U.S.C. § 3742 and/or 28 U.S.C. § 2255, to appeal or collaterally attack his conviction and any sentence of imprisonment of 24 months or less (the high end of the Guidelines with acceptance of responsibility credit), including any related issues with respect to the establishment of the advisory Sentencing Guidelines range or the reasonableness of the sentence imposed. The Defendant acknowledges that the number of months specified above is not a promise of any particular sentence and is not binding on the Court. The Defendant agrees that, should the sentence imposed exceed 24 months, this would not permit him to withdraw his guilty plea or to appeal or collaterally attack his conviction, but would merely allow the Defendant to appeal or collaterally attack the sentence imposed by the Court, to the extent permitted by 18 U.S.C. § 3742 and/or 28 U.S.C. § 2255.

16.     **Memorialization of Agreement.** No promises, agreements or conditions other than those set forth in this Agreement will be effective unless memorialized in writing and signed by all

22

parties or confirmed on the record before the Court. This Agreement, to become effective, must be signed by all of the parties listed below.

GLENN T. SUDDABY
United States Attorney
Northern District of New York

Dated: _2/22_ , 2007          By: _____
                                   Tina Sciocchetti
                                   Assistant U.S. Attorney
                                   Bar Roll No. 105218

Dated: _2/7_ , 2007          _____
                                   ROBERT BELVIN
                                   Defendant

Dated: _2/16_ , 2007          _____
                                   Kent Sprotbery, Esq.
                                   Attorney for Defendant
                                   Bar Roll No. 507098

23