

You Are Here: Department of Commerce > Newsroom > Secretary's Speeches > Transcript-Immigration Reform Press Conference

## Secretary's Speech

**TRANSCRIPT**
Friday, August 10, 2007

**CONTACT OFFICE OF PUBLIC AFFAIRS**
202-482-4883

# U.S. Secretary of Homeland Security Michael Chertoff
# U.S. Secretary of Commerce Carlos M. Gutierrez
# Immigration Reform Press Conference
# Washington, D.C.

**SECRETARY CHERTOFF:** As you can see, I'm here with Secretary Carlos Gutierrez of the Department of Commerce. I want to thank you all for coming. As you doubtless know, Secretary Gutierrez and I spent a good deal of time over the last several months working with Congress to develop a workable solution to the challenge of immigration in this country.

We're obviously disappointed in the fact, as is the President, that Congress has not chosen to act on our comprehensive solution. The Senate bill that we worked on would have given us important new tools and resources to strengthen border security, increase and toughen interior enforcement, and help meet the needs of our growing economy through a temporary worker program. Our hope is that the key elements of the Senate bill will see the light of day at some point. But until Congress chooses to act, we're going to be taking some energetic steps of our own.

Today the administration is announcing a package of initiatives that will significantly strengthen our hand with respect to immigration enforcement, including interior enforcement, and will also strengthen many other aspects of our immigration system.

I'd like to talk about two key elements of our interior enforcement approach, and Secretary Gutierrez will discuss some of the steps we're taking with respect to visas and temporary workers.

We all know that a critical part of immigration enforcement is effective interior and worksite enforcement. The reason for that is because the magnet that brings most economic migrants into this country is work. And if we have worksite enforcement directed at illegal employment, we strike at that magnet.

Now, over the last year, we've stepped up our efforts quite considerably to hold employers accountable when they willfully break the law by hiring illegal workers. Indeed, Immigration and Customs Enforcement has made more than 3,200 administrative arrests to date this fiscal year.

Last fiscal year, we brought 716 criminal cases. This fiscal year, which is still not complete, we've already gotten 742 criminal arrests in worksite enforcement cases. So we are continuing to move ahead

aggressively, and each year we have dramatically increased the numbers of these cases.

We're going to continue to clamp down on employers who knowingly and willfully violate the laws. But at the same time, we want to make sure that employers who do want to do the right thing have effective tools and clear guidance so they can maintain a stable, legal work force.

The first element of this is something that we call E-Verify. As many of you know, we currently have a voluntary program that allows employers to quickly and reliably check the work status of their employees online, using a computer-based tool. It's called the Employment Eligibility Verification System. It also has been known as Basic Pilot. What the system does is it compares information taken from the I-9 employment verification form, which establishes a person's work eligibility, and matches it against more than 425 million records held in the Social Security database. And it also checks against 60 million records held in DHS's immigration databases.

I've seen this system work. It's quick and it's easy to use. More than 19,000 employers across the country rely on it, it has no charge, and it's available in all the states. And what it simply does is it tells you whether the particular document matches the Social Security number and whether both of those are genuine when compared to these databases.

Because of the success of this system and its ability to take the guesswork, or some of the guesswork out of employment document review, we're going to be strengthening and expanding the system and giving it a new name: E-Verify.

Now, let me make it clear that under the Senate bill, which did not pass, we would have actually made enrollment in E-Verify mandatory for employers. And although voluntary participation has been strong under the existing state of the law, we cannot mandate all employers to use this system. But we will want to encourage as many companies as possible to use E-Verify, and we're going to start with the federal government.

We want to lead by example. For this reason, today we are announcing that the administration has initiated a rulemaking process to require new federal contractors to enroll in E-Verify. In order to do this, we're going to amend the federal acquisition regulations, which are the rules that basically govern federal contracting, and we're going to require that federal contractors who receive new federal contracts use the E-Verify system to check the employment eligibility of the contractor work force that will work on those contracts. In other words, using E-Verify will become a contract performance requirement once the regulatory process is complete, which will probably take several months. And once the regulation is effective, if a federal contractor fails to use the system for employers who are working on federal contracts, their contract will be subject to being terminated for non-performance.

Even as we wait to get through the regulatory process, we're going to take some immediate steps here at the Department of Homeland Security to modify the Homeland Security Acquisition Manual to encourage vendor participation in the E-Verify system.

What we're going to do is we're going to designate a vendor's participation in the system as a positive consideration to be part of the mix in evaluating DHS procurements. In other words, you're going to get points, positive points, for participating in the system if you want to get a significant DHS contract. We're doing it, again, to encourage companies who want to do business with DHS, to demonstrate that they have a legal work force. Enrolling in E-Verify will help to provide that assurance.

We also are trying to take advantage of some of the recent steps we've been able to put into effect to

strengthen and enhance the value of E-Verify as a tool. E-Verify now has the capability–and we're going to expand this across the system—to use an enhanced photographic capability that will allow employers to check the photograph on some of the documents which are presented in the I-9 process against the original of the document in the database. So, for example, if you have an employee who is presenting an official employment authorization document, or who is presenting a green card, a permanent residence card, the employer who participates in this enhanced photo tool will be able to see a duplicate, an exact duplicate, of the photograph being presented on the—by the person who is seeking employment and measure that against an original version of the photograph in the database at DHS. This way, you'll be able to determine that the person hasn't phonied up the document or substituted a phony photograph for a real photograph. It's again an effort to make this tool as robust as possible.

It will also, by the way, help attack the problem of identity fraud. And we want to continue to work not only with our partners in other government agencies, but with the states, to roll this photographic comparison capability across a number of different databases, including passports and driver's licenses in states that are willing to participate.

Now, another major component of interior enforcement is accountability. Employers have to be held accountable if they are given clear notice of the fact that they may be hiring illegal aliens. To this end, we're today issuing a final regulation, which will be effective in 30 days, that outlines the specific steps an employer should take if that employer receives a no-match letter from the Social Security Administration that informs the employer that there is an employee whose name and Social Security number do not match government records.

Now, a lot of times these matches are the result of an honest clerical mistake, or something like a change of status when somebody gets married and they don't update their records. But in many cases, the failure to have a match with records is a good indicator that the employee has provided a phony Social Security number to the employer or, perhaps, that the employer himself has provided a fake number. We have seen instances where employers have submitted the same Social Security number for multiple employees.

How big is the problem? Out of 250 million wage reports the Social Security Administration receives every year, as many as four percent show no matches. Now, many employers take steps to resolve these discrepancies, but some of them do not, and some of them have hidden behind the idea that there is confusion in the rules. So what this regulation does is it sets forth a clear choice. There is a right way to react to a no-match letter, which, if followed in good faith, will give the employer a safe harbor against liability, and there's also a wrong way to respond, which is to ignore it. And the regulation makes clear that if you ignore a no-match letter you are putting yourself in a position where that fact will be used against you if the time comes to assess liability.

So let me lay out what the path is for those people who receive no-match letters. Within 30 days of getting a no-match letter, businesses should check their records to make sure the discrepancy isn't simply a clerical or administrative error; somebody mistyped a named or mistyped a number.

If that is not the source of the problem, the employer then has to bring the employee in and ask the employee to confirm the accuracy of the information and, if necessary, contact the Social Security Administration to correct the problem. As I say, in some cases, that will be an update to a marital status or something of that sort, and the problem will be corrected. And by the way, the good news there is that it will eliminate a problem down the line if the employee ever seeks to actually receive some of their rightful Social Security benefits.

But if the problem cannot be resolved within 90 days, then either the employee has to come forth with some

new reliable evidence that they are authorized to work, like a passport, or if work eligibility cannot be confirmed after 90 days, the company is going to have to terminate the employee.

In other words, receiving a no-match letter puts the company on notice that there is a discrepancy or a problem with the records pertaining to a particular employee. What the company may not do is simply ignore the problem. And if the company does nothing to resolve the problem or doesn't act in good faith, that company can be held liable for employing an unauthorized worker and could face stiff penalties or sanctions.

At the same time, the regulation does provide a safe harbor for employers who follow the guidance and perform due diligence so that they do try to comply with their legal obligations. We don't want to punish people who try to do the right thing. And this regulation lays out a clear path to doing the right thing, which will afford protection for employers who are following the law.

Ultimately, these guidelines will make it more difficult for illegal aliens to use a fraudulent Social Security number to get a job, and it will help employers take appropriate action to protect themselves.

Of course, because Congress didn't pass the comprehensive immigration measure, we don't have all the tools we'd like to have, but we're going to continue to work closely with Congress to improve our ability to share no-match data with other government agencies, including Immigration and Customs Enforcement, so we can more effectively target our enforcement efforts.

The message we are conveying today is pretty simple: We are serious about immigration enforcement. We have been serious over the last few years about immigration enforcement. Last May, when the President announced a multi-part strategy to deal with this problem, we began flowing resources and efforts not only at the border but at the interior. We have seen some dramatic results. Among the results, have been a noticeable downturn in the people that we are detecting crossing the border, some very good anecdotal evidence that suggests that people are beginning to give up on trying to cross the border. And there was a recent study in the paper yesterday that indicated that remittances going overseas are going down, which is another indicator of the fact that we may be seeing some lessened illegal activity.

At the same time, there's going to be an economic consequence to tough law enforcement, and I think that's the second part of the challenge that we have that Secretary Gutierrez is going to talk about.

**SECRETARY GUTIERREZ:** Thank you, Secretary Chertoff, and thank you for your continued leadership. As we've often said, we believe immigration is the social issue of our time. While we had hoped to get comprehensive reform passed on Capitol Hill, President Bush remains absolutely committed to addressing this issue. We will not sit idly by as the situation worsens. We will use every available tool to provide America's farmers, ranchers and small businesses with a legal work force to stay in business and keep our economy strong.

Today we are announcing a package of administrative reforms that sharpen the tools we have to protect the American people and make our immigration system even more workable. This package of reforms, first and foremost, deals with security, as Secretary Chertoff has outlined. That is the utmost priority of the federal government, and security must come first.

But the economic security of our nation is also essential. We do not have the workers our economy needs to keep growing each year. The demographics simply are not on our side. While Congress has not passed a new temporary worker program, we do have existing programs on the books that help provide workers in industries like agriculture, landscaping, hospitality and lodging.

During the legislative process, we heard from many people involved, especially farmers and small business owners, that these programs could be made easier to use while protecting the rights of workers. That's why the Department of Labor will be reviewing ways to make the H-2A Agricultural Seasonal Worker Program more workable, while protecting the rights of workers. The Department of Labor will also issue regulations streamlining the H-2B program for non-agricultural seasonal employees who work in industries ranging from hospitality to crab picking. Finally, the administration will study possible administrative reforms to the programs for temporary high-skilled workers.

With historically low 4.6 percent unemployment, it is clear that there are jobs that Americans aren't willing to do or that Americans are not available to do, and we need to acknowledge this reality. That means looking at ways to improve these vital programs so they are workable, realistic, and help meet the demands of our economy.

This is just one piece of a much larger puzzle. Ultimately—ultimately, Congress will have to pass comprehensive immigration reform. Without reform, we're going to end up with a patchwork of laws nationwide. As of July the 2nd, more than 1,400 immigration bills had been submitted by state lawmakers, and since January, 170 of those bills have become laws. Without reform, we will also see many of our agricultural products coming from overseas. And without reform, small businesses and farmers are going to go out of business. This issue is not going to go away; Congress needs to act.

We will enforce the laws on the books, address what we can through administrative means, and continue to highlight the need for a comprehensive immigration reform that is essential for our nation's future security and prosperity.

Thank you. Now I'll be happy to take questions.

**QUESTION:** Secretary Chertoff, could you respond first to employers' concerns that the no-match letter is going to cause huge havoc? And then could both of you also speak to the larger goal behind all these rules and regulations? Are you trying to force Congress's hand? Are you trying to squeeze employers? What's the larger purpose?

**SECRETARY CHERTOFF:** Well, first of all, the havoc—the only havoc that will be created will be to the extent that people are employing illegals. Obviously those illegals are likely to end up leaving the work force. That may reflect the fact that illegals do perform a lot of work in some sectors of the economy in this country. And ultimately, the solution for the problem of filling that gap is a solution that requires congressional action, in terms of temporary work requirements, in some way to meet these labor needs.

Let me be very clear about what we're doing here. I have said with absolute consistency, from before we started the immigration reform effort earlier this year, that I was determined to enforce the laws of this country to the utmost of my vigor. And we've done that since we've—at least since I've been Secretary. We had hoped that immigration reform on a comprehensive basis would give us a much wider set of tools; we don't have that. We still think Congress can act on it. But until the laws change, we are enforcing the laws as they are to the utmost of our ability, using every tool that we have in the toolbox, and we're going to sharpen some of those tools.

So this is not a reaction to anything. It is simply the discharge of certainly my oath of office, which requires me to execute the laws as they are.

**SECRETARY GUTIERREZ:** I'd just add to that, Mr. Secretary, the point about – we wanted comprehensive

immigration reform, and that was a set of new laws that would help on the security and on the economic side. We weren't able to achieve that. But we still have an obligation to try to solve these problems.

So we're going to do everything we can that is allowed by the law on an administrative basis, by the executive branch. And that includes security, but it also includes making these temporary worker programs workable. Today they're not being used because they are not workable. So we'll analyze them, review them, the Department of Labor will do that. And we'll see if we can make them more workable to help business have a legal path to hiring workers and have a legal work force.

**QUESTION:** Your message to Congress seems quite clear. What is your message to employers, especially in agriculture? Are you saying, you guys just aren't trying hard enough to get legal workers, or good luck? Where are they going to come from?

**SECRETARY CHERTOFF:** Well, I think part of it is what Secretary Gutierrez said. We have an obligation to try to make the existing programs work as efficiently as possible. I do think there's a larger issue here as to whether there is a sufficient work force of American citizens or people who are authorized to work to do this kind of agricultural work. And it creates a real dilemma for the agricultural sector, and we appreciate that. And I don't think this is a surprise. We have said this repeatedly over the last year.

Nevertheless, this is a circumstance in which we find ourselves. We're going to do the very best we can to make the legal channel as appealing as possible. But at the end of the day, the enforcement of the law is going to have some consequences. The one thing I think we've tried to do from the very beginning is to be really up front and transparent about what the consequences of these decisions are. We don't get a vote in Congress. We can't make Congress pass it. But we can be very sure that we let Congress understand the consequences of the choices that Congress makes. We do the very best we can to mitigate the harm, but in the end, we have to follow the law.

**QUESTION:** Well, isn't it true, though, that you're basically trying to turn up the heat on Congress by hoping that employers who will be squeezed here will get to their members of Congress—

**SECRETARY GUTIERREZ:** We heard from employers consistently that they did not believe they had the tools and that they didn't have the law to be able to enforce what we're asking them to enforce. We had that in the comprehensive immigration reform package. What we're going to do with our executive branch authority, the President's authority, is to give employers tools to the extent that we can. But this is all about giving them tools that they repeatedly told us they did not have.

**SECRETARY CHERTOFF:** Yes, Pete, let me just say one other thing, because I do think it's very important. There is—and again, I'd go back to things I said before we even started this year—there is a credibility problem the government has built up over 30 years on this issue, because we've had 30 years—and particularly after the 1986 act, there was real lack of vigor. And there's some cynicism and certainly skepticism about whether the government has ever really been serious about enforcement.

I think we've done a lot in the last couple years to show we are serious about it. And so this is not an effort to punish Congress. This is an effort to execute the law and also to keep faith with the American public. Now, we may tell the public we think we need to do some additional things, but I think job one for the federal government is always to say to the people of this country, we will discharge the obligations that you have placed upon us, particularly as it relates to issues of sovereignty and security at our nation's borders.

**QUESTION:** Mr. Secretary, could you tell us how you could actually enforce all of these new rules? It's well and good to have the match letter rules and to have the verification on Basic Pilot, but if you don't have

enough people to go out and inspect the workplaces and do that, isn't it a hollow requirement?

**SECRETARY CHERTOFF:** Well, of course, part of what are committed to do here is to raise the number of people we have to do enforcement, raise the number of people we put at the border. And Congress, of course, is going to have to give us the funding to do this.

Now, as with any other enforcement action, like enforcing the narcotics laws, we don't necessarily catch everybody who breaks the law. But we're going to catch—not only are we going to catch a larger percentage, but with these tools, once we do catch somebody, there's going to be no place to hide. If we get somebody who's gotten no-match letter—and we do get a lot of tips, we get a lot of informants; it's amazing the number of people who come forward and tell us about illegality in the workplace—and we go in, we see that someone's gotten no-match letters and they've simply put them in the wastebasket, that's going to be awfully hard for them to explain to a jury when the time comes for their trial.

So these tools will help us enforce the law. But I also have to go back to the fact that we had asked Congress to give us clear authority to have information sharing with the Social Security Administration so that they could identify those companies which have the highest percentage of no-match letters. Congress didn't give us that; we've asked for that for two years. That would certainly be a major step forward in allowing us to target the worst of the worst, the worst offenders.

**QUESTION:** Well, if I can just follow up. Does this mean that there will be no more enforcers?

**SECRETARY CHERTOFF:** No, we're bringing more enforcers on. We've added more. We're asking Congress in the current budget to give us more money for enforcement, more beds, more agents. I think if you look at the sheet we've put out, we're committed ultimately to having over 31,000 beds, bringing more border agents and ICE agents on. There will never, of course, be an agent to investigate every single violation across the country, just as there will never be enough narcotics enforcers to investigate every time somebody sells a small amount of drugs. But experience shows if you're smart and how you prioritize, you can have a major impact.

And let me just say one thing. This is an area where experience shows deterrence really works marvelously. We are starting to see employers on their own beginning to check their work force because they see what's coming and they don't want to take the risk of liability. So I think it's like the tax laws. We rely on a lot of self-policing with our tax code. And I think this is an area where we're going to get a lot of that self-policing as well.

**QUESTION:** Mr. Secretary, when are these measures going to be actually implemented? I know this is a final rule, but is there a time—is there a timeline, a waiting period?

**SECRETARY CHERTOFF:** The no-match regulation will be effective in 30 days, and then what will happen is the Social Security Administration will begin to send the letters out. They will not send all of them out at once, they'll probably send about 15,000 out a week, over a period of probably about eight to 10 weeks. So it will flow over a period of time.

The new contractor regulation actually has to go through a regulatory process. That's going to be a few months. But we at Homeland Security are going to put the—what I call the positive point element in as quickly as we can.

**QUESTION:** Mr. Secretary, the AFL-CIO is saying that they're afraid that legal immigrants may suffer discrimination because of this. And the Chamber of Commerce is saying we're afraid businesses are going to

get sued because of that; they're both talking about challenging these regulations in court. Your reaction to that?

**SECRETARY CHERTOFF:** This is really easy. When you get the letter, you have to apply the rule evenhandedly across your entire workforce. Discrimination is not permitted. It is not hard to understand what the rule is. The rule is, you don't make a distinction in how you apply the rule depending on a person's last name or their appearance. Any employer who doesn't understand how to apply something in a neutral fashion has probably already been sued hundreds of times.

So this is an effort—some people are making this a lot more complicated than it is. We have all kinds of requirements under our legal system for checking identification and checking records, and it's always the same principle—neutral, evenhanded, based on your—no discrimination based on your ethnic background. I think there's not going to be any difficulty in understanding that, and I think that people who violate that rule and use it as a pretext will face some—

**QUESTION:** Mr. Secretary, what do you think of the—challenge you in court—

**SECRETARY CHERTOFF:** People challenge things in court all the time. We'll defend it vigorous—

**QUESTION:** You're comfortable with it, that you've got footing?

**SECRETARY CHERTOFF:** Yes, very comfortable, yes.

**SECRETARY GUTIERREZ:** Businesses have understood for a long time, we have clear anti-discrimination laws on the books. Part of enforcing the law is also enforcing our anti-discrimination laws. And we'll be just as vigilant about that as all the other things we've talked about.

**QUESTION:** How about the likelihood here that you're going to drive a lot of employers and employees underground, and employers will stop filing I-9s and will stop withholding taxes?

**SECRETARY CHERTOFF:** Well, that's actually—an employer who does that is making a deliberate decision to compound their legal difficulties by committing tax crimes as well as immigration crimes. I think most employers want to follow the law. I think if you give them clear guidance and a way to do it, they will do it. Obviously, there are employers who deliberately violate the law, and we will come down on them like a ton of bricks, as we has been doing, and that means felonies, and not just administrative slaps on the wrist.

**QUESTION:** By law, Social Security cannot tell you who they send a match letter to. And two, are you going to involve state and local authorities in this kind of enforcement of employers?

**SECRETARY CHERTOFF:** Well, first of all, I don't necessarily agree that by law Social Security can't give us some information about where to target, based on number of no-match letters. That's a legal issue we are currently addressing, although I will agree that Congress—we have asked Congress to make it clear that this kind of sharing can take place, and they have not yet stepped up to the plate.

In terms of state and locals, we have a program where we do train state and locals in terms of their learning how to do things like deportation or helping us enforce immigration laws. It's optional, it's not mandatory. And of course any communities that want to participate in the program, we will welcome to participate in the program.

**QUESTION:** Mr. Secretary, it appears that a lot of what you're doing is already regulatory authority that

you have, that you can do without congressional legislation. I'm wondering why you're doing it now. Why didn't you do it before? Because if that confidence wasn't there with America, it could have helped get your bill through (inaudible) through Congress.

**SECRETARY CHERTOFF:** What we're doing now is what I would say is—these measures are imperfect. These are tools which are not the newest tools and the best tools we could use. We looked at these programs late last year, early this year, and we thought, you know, this is kind of a half measure; wouldn't it be better to get the full measure and the sharpest, newest tools if Congress passes them and gives it to us.

Time has run out. So now we're going to go back to the old tools, and we're going to sharpen them up as best we can. I'm not going to tell you that it's as good as what we were looking to get out of Congress, but given that I think, for the time being, we can't assume Congress is going to give us the new tools, we're going to have rehabilitate the old tools and do the best we can.

**QUESTION:** When you discuss additional funding for detention and some of the other things, is that money that came—that you're expecting to come through, or that has already come through, or you're shifting money?

**SECRETARY CHERTOFF:** The President's budget request for '08—of course it's still before Congress—has sought a substantial funding for border enforcement and related activities, including beds, agents, technology, fencing, things of that sort. There are now—the appropriations process is underway. There are measures that are considering how much money to fund us. I don't want to start negotiating conference here in front of the press, but it's obviously important that Congress give us the kind of funding we need to do the job, and of course in subsequent years, as well.

**QUESTION:** Can you elaborate a little more on the punishment—Secretary Chertoff—for employers who ignore the no-match letters? How big might the fines be, for instance?

**SECRETARY CHERTOFF:** Well, we have a current set of fines which I think range up to $2,200 per employer for first offense, and then it goes up for second and third offense. We're going to try, by the way, to use our existing authority to raise those fines somewhat.

But here's what the real hammer is: If you went back six, seven, eight years ago, you saw a lot of administrative action, not much criminal action. We have totally turned that around now. Now, if you look at two years ago we had about 125, 130 criminal cases. Last year we had 716. This year we're up to 742. That's felony cases. In many instances that's substantial jail time if you're convicted, forfeitures in some cases, fines, and other penalties.

So I'm not saying that every time you flub a no-match letter you're going to go to jail, but I'm saying if it turns out that we have systemic violations of the law, willful violations of the law that meet the criminal standard, then employers who commit those kinds of crimes are going to be facing criminal prosecutions, and we're going to continue to push forward on that front.

**QUESTION:** Many farmers say that by the time they get a no-match letter, these people they've hired have picked their crop and they're gone, and that this isn't going to work. (Inaudible.)

**SECRETARY GUTIERREZ:** Part of what we want to look at is the agricultural temporary workers program. We know it's very cumbersome. It doesn't lend itself to be used in an industry where you have perishable products, and where the permits take too long. So we want to go back, review that, and make those

systems more workable. But we've got farm organizations calling us today, saying, we need people to help us with our grapes, and we don't have them. That's the kind of thing that we have to address, and we'll do that by making the current programs more workable.

**QUESTION:** But won't this be disruptive to agriculture? How disruptive do you think it's going to be?

**SECRETARY CHERTOFF:** I think it's—this issue about disruption to agriculture we heard last year, because even putting aside no-match letters, just our increased work at the border was actually causing a drop in the number of workers coming across, because, frankly, we're making it harder for illegals to come across. That's why we were trying to get a comprehensive solution here.

Let me come back to one thing, just to make sure I've put it in perspective, on the issue of the no-match letters. This is what I call the rule of reasoned principle. We're not looking to punish people for honest mistakes, clerical errors, or imperfections in process. This rule is designed to create a safe harbor for those who act in good faith, even if they make mistakes.

But when we talk about people who deliberately violate the law—and I'm not talking about just not handling the no-match letter right, I mean people who willfully and consciously hire illegals, knowing that they're doing it, and knowing that they're committing crimes in order to do it, including identity theft—those are the people we're going to be targeting for criminal sanctions. The person who does their best, in good faith, has nothing to fear from this. This should be welcome to them, because we're giving them clear guidance on a safe harbor.

But the person who—and we've seen this in cases—systematically goes out to provide phony documentation or to tell people how they can lie on their records in order to have work here when they're out of status, that's the person who does have to fear vigorous enforcement on the criminal side.

White House | Privacy Policy | FOIA | USA.gov | No FEAR Act | Disclaimer | Forms | Information Quality | Fair Act | ESR System