

**Direct Dial Number**
**(404) 888-1728)**

July 18, 1997

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Dea D. Carpenter, Esquire
Associate General Counsel
Chief - Employer Sanctions & Civil Document Fraud Division
Office of General Counsel
Immigration and Naturalization Service
U.S. Department of Justice
425 I Street, N.W.
Washington, D.C.  20536

RE:  I-9 Compliance Inquiry
<u>LM File No: ROPAAA.1001</u>

Dear Ms. Carpenter:

I am writing to request your guidance on an I-9/employer sanctions compliance matter.

One of my clients received a letter from the Social Security Administration (copy attached) identified as a "reminder" for the employer to show correct names and social security numbers for its employees when more than 10% of the W-2 forms the employer filed showed names or numbers that do not match Social Security Administration records.

Apart from the Social Security Administration's concerns, my question more specifically is: what action, if any, is an employer obligated to take with respect to checking its I-9 recordkeeping and potentially undertaking new I-9 verifications for the cited employees in response to such a letter from the Social Security Administration? Otherwise stated, does such a letter from the Social Security Administration constitute the type of information which puts an employer on notice that the cited employees may be unauthorized workers, thereby imposing liability on the employer for "knowingly continuing to employee an unauthorized worker" if it does not conduct I-9 reverification?

**No-Match Cert. Admin. Record  1**

Dea D. Carpenter, Esquire
July 18, 1997
Page - 2 -


LITTLER MENDELSON

You will note that the Social Security Administration letter gives no direction to the employer about anything having to do with I-9 compliance. The applicable federal regulations on I-9 compliance are silent about this factual scenario, and I have been unable to identify any administrative case law from OCAHO which deals with this situation.

Absent some clear directive from the Social Security Administration, the regulations or case law, the employer is hesitant to pursue I-9 reverification for fear of violating the antidiscrimination rules. (In fact, all of the employees cited in the Social Security Administration letter are Hispanic.) Moreover, experience has shown that the naming conventions used in the Spanish-speaking world often account for confusion over names in our Anglo society, with perhaps three or four name variations being possible for one individual — which clearly could explain at least some of the record discrepancies at the Social Security Administration.

A related issue is what should the employer do if, after the employee is informed of the Social Security number discrepancy, the employee later comes forward with a supposedly corrected/new social security number; does the employer have the right to see the actual new card or should it merely change the social security number in its W-2 reporting and recordkeeping based on the employee's say so? Should the employer conduct a new I-9 verification? Does it matter whether the employee did or did not use the original (apparently erroneous) social security card as a Section 2 verification document on the I-9 form? (Also remember, the employee would have filled in his social security number in Section 1 even if the card was not used as a Section 2 verification document.)

Other issues include how quickly an employer must act, if at all; whether a cited employee should/must be suspended (leave without pay, etc.) pending resolution of the social security number discrepancy and, if not suspended immediately, how much time the employee should be given before conducting a new I-9 verification (if necessary) or else terminating/suspending the employee?

Thank you for considering this complex and confusing situation, and I look forward to receiving your guidance in due course.

Sincerely,



BRL:cs
Enclosure



Immigration and Naturalization Service

---

Office of the General Counsel

425 I Street, N.W.
Washington, D.C. 20536

HQCOU 90/10.10-C

DEC 2 3 1997

Littler Mendelson
1100 Peachtree St., N.E.
Suite 2000
Atlanta, GA 30309-4520

Dear Mr. Larson:

Thank you for your letter asking about the responsibilities under section 274A of the
Immigration and Nationality Act (INA) of an employer who has received information from the
Social Security Administration (SSA) indicating that Forms W-2 filed by the employer show
names or Social Security numbers (SSNs) of employees that do not agree with SSA records.
Although we are unable to provide you with legal advice specific to your client. we are able to
make some general observations which may be helpful to you.

As you correctly note, there may be many legitimate reasons for a discrepancy between the name
and SSN reported by an employee on the W-2 and/or Form I-9 and SSA records.  We would not
consider notice of this discrepancy from SSA to an employer by itself to put the employer on
notice that the employee is unauthorized to work, or to require reverification of documents or
further inquiry as to the employee's work authorization.  Whether an employer has been put on
notice of an unauthorized employment situation is, however, an individualized determination that
depends on all the relevant facts, and there may be specific situations in which SSA notice of an
SSN irregularity would either cause, or contribute to, such a determination.

In particular, we note that SSA has provided to your client employer the following information:

**A valid SSN must have a total of nine digits.  The first three digits are
referred to as the area, the next two as the group, and the last four as
the serial.  No SSNs with a 000 area number, or an area number in the
800 or 900 series, have been issued.  Also, no SSNs with a 00 group or
0000 serial number have been issued.**

An SSN containing an unissued area, group or serial number as described above. or a number of
digits other than nine, is an invalid SSN.  If an employee provides to an employer with
knowledge of these facts an invalid SSN (either in section 1 of the Form I-9 or on a Social
Security card presented to the employer and recorded in section 2), it is possible that the INS

**No-Match Cert. Admin. Record  3**

could consider a failure to follow up on this knowledge with further inquiry to constitute knowing employment of an unauthorized alien, should the employee turn out to be unauthorized to work. An employer that knows the above quoted SSA information but employs an individual using a known invalid SSN conceivably could be subject to penalties not only under section 274A of the INA, but to civil or even criminal penalties under section 274C of the INA and Title 18 of the U.S. Code for document fraud or false attestations.

Your letter raises the question of an employer's responsibilities if it learns from its employee that the employee's name or SSN is different from that shown on the Form I-9. Upon receipt of information from the employee indicating that any information recorded on the employee's Form I-9 is erroneous, the employer should correct it in a manner that shows the correct information without obliterating the formerly recorded information. For example, a way to do this is to draw a single line through the incorrect information, record the correct information in the nearest available space on the Form I-9, and initial and date the correction. If the correction is to section 1 of the Form I-9, the employee should also initial the correction. If the new information contradicts Form I-9 section 2 information, such as the name or SSN of the employee as shown on previously presented documentation, the employer may request to see acceptable Form I-9 documentation showing the correct information in order to ensure accuracy. These corrections will protect the employee as well as the employer by ensuring that INS or other federal officers authorized to inspect the Form I-9 will receive up-to-date and accurate information regarding the employee.

Learning of a change to an employee's Social Security information does not by itself put the employer on notice that the employee is presently not work authorized. Indeed, one scenario that has come to the attention of the INS on occasion is the following: An employee has been working under a false SSN. The employee subsequently becomes work authorized and obtains a legitimate SSN. Wishing to ensure that his earnings are credited, the employee tells his employer that his SSN has changed. Depending on the circumstances, this notification may put the employer on notice not that the employee is unauthorized, but that the employee has committed fraud. Knowing false statements on the Form I-9, or the use of false documents to obtain employment, are felonies that are not excused by subsequent grants of work authorization or lawful status. An employer who suspects them may apply, in a nondiscriminatory manner, any policies it applies generally to suspected criminal conduct in its workplace, or to suspected false statements in employment documentation. If an employer determines that an employee has fraudulently executed the Form I-9, the employer should not continue to rely on that form as a verification of employment eligibility, and should require that the employee complete a new Form I-9 if the employer continues the employment (while retaining the original form for the designated period as evidence of compliance with the verification requirements at the time of hire). Criminal conduct involving the Form I-9 may be reported to the INS.

We strongly emphasize that this does not mean that all changes to name or SSN information recorded on the Form I-9 mean that fraud has taken place. Each such case should be considered on its particular facts. One fact of general application is that names may change for a variety of reasons, but SSNs do not change (although they may be recorded erroneously on forms). For this reason, a claimed change of SSN is arguably a situation that raises more of a red flag than a

claimed change of name. Of course, all such situations should be reviewed in the light of common sense. A change to an SSN that merely corrects a transcription error, such as recording one or two digits erroneously, would be an unlikely indicator of fraud, but if an employee reports what is clearly an entirely different SSN than the one he or she previously has used, something is wrong. Similarly, receipt of information showing that an employee has been working under a completely different name than his or her actual name reasonably raises questions about an employee's identity that are not raised by change of a last name due to marriage, correction of a middle initial, reconciliation of an incorrectly or differently recorded ethnic name, or other legitimate corrections.

This information relates to an employer's responsibilities under section 274A of the INA. For specific advice relating to immigration-related discrimination concerns, we recommend that you contact the Office of Special Counsel for Immigration-Related Unfair Employment Practices within the Civil Rights Division of the Department of Justice.

I hope this information is helpful. If you have any further questions, please contact ███████ ████████, Associate General Counsel, at (202) 514-2895.

Very truly yours,

David A. Martin
General Counsel



**U.S. Department of Justice**
Immigration and Naturalization Service

HQCOU 90/10.10-C

*425 I Street NW*
*Washington, DC 20536*

▨▨▨
Alston & Bird, L.L.P.
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424

Dear ▨▨▨▨:

    Thank you for your letter dated October 14, 1998 in which you ask whether an employer will be deemed to have knowledge that an employee is unauthorized to work solely based upon the employees' presentation of a second set of employment verification documents that contain a new name and document number. You also ask in your letter about how an employer is to make corrections to the Employment Eligibility Verification form (Form I-9). We apologize for the delay in answering your letter. Although we are unable to provide legal advice, we can offer the following general comments that may be helpful to you.

    The example in your letter describes a situation in which an employee, after having previously completed section 1 of the Form I-9 and presented a social security card for completion of section 2, later presents a different social security card that contains a new name and number with the request that the employer correct the employee's employment records. The new information presented by the employee is not necessarily an indication that the employee is an unauthorized alien. However, it constitutes notice to the employer that requires further inquiry by the employer before the employer can accept the new card and make the appropriate changes to the Form I-9. An employer on notice may be subject to a civil money penalty for knowingly continuing to employ an unauthorized alien if the employer fails to act upon the notice, and the individual is in fact unauthorized to work. In addition, an employer may be subject to civil or criminal penalties if it knowingly provides or attests to false information on a Form I-9. Where the Form I-9 was initially completed with correct information, but a change in circumstances of the employee or employer has rendered minor information outdated (e.g., legal name change, change in address), the employer does not have a continuing duty to update the Form I-9.

No-Match Cert. Admin. Record  6

02/24/2005  12:33
06/25/2004  09:17

PAGE  12/15
PAGE  10

DGC DHS

Letter to
Re:  Duplicate Social Security Numbers

Page 2

In the example above, upon being presented with a new social security card, the employer should inquire of the employee the reason for the change.  If presentation of the new card is for the purpose of replacing information on the Form I-9 that was incorrectly provided at its initial completion, the employer should review the new card and accept it if it appears to be genuine and to relate to the individual presenting it.  Because a complete change in name and number calls into question the identity of the individual presenting the document as verified by the employer at the initial completion of the Form I-9, the employer may need to make additional inquiries of the employee in order to make its determination as to the card's genuineness and whether it appears to relate to the employee.  This may mean requesting the employee to present a List B identity document to reestablish the individual's identity.

There are a variety of reasons why an employee may present a document that contains a changed name and document number.  Whether the employer will be placed on notice that the employee is an unauthorized alien depends on the circumstances of the particular case.  It is possible that an employee who presents a new social security card containing a completely new name and number was previously unauthorized to work in the United States rather than presently unauthorized to work.  However, especially in cases where the corrections to the name and social security number are minor, other reasons may exist for the change in name and/or number, such as a spelling correction or correction of a number transposition.  Therefore, the extent of the employer's inquiry will depend upon the facts of each particular case.  Once the employer is satisfied that the new documentation reasonably relates to the individual, the employer must accept the documentation.  If the employer discovers that the employee intentionally provided false information at the initial completion of the Form I-9, internal policies of the employer rather than the INA will govern the situation.  The employer may treat that situation in a manner consistent with how it treats other employee fraud and criminal conduct in the workplace that is of similar gravity.  If the employer is not satisfied that the document relates to the individual, the employer should not accept the document but should request other acceptable I-9 documentation from the employee.  An employer who continues to employ an employee who cannot present such documentation may be subject to penalties under section 274A of the INA.  Concerns the employer may have regarding the anti-discrimination provisions of section 274B of the INA should be addressed to the Office of Special Counsel, 1425 New York Avenue, NW., Suite 9000, Washington, D.C. 20005, 1-800-255-7688.

The employer should also confirm the accuracy of section 1 of the Form I-9 with the employee.  The manner in which corrections to the Form I-9 should be accomplished is in the discretion of the employer since neither the statute nor regulations cover this issue.  We suggest that the corrections be made on the initial form itself, but in such a way so as not to completely obliterate the information that was provided by the employee at the form's initial completion.

02/24/2005  12:33  ███████

06/25/2004  09:17  ███████

███  ███

OGC  DHS

SEP-24-2004  10:01   ING GENERAL COUNSEL                    ███████   P.13

Letter to ███████                                         Page 3
Re:  Duplicate Social Security Numbers

Corrections made to section 1 of the Form I-9 should be initialed and dated by the employee.
Corrections made to section 2 of the Form I-9 should be initialed and dated by the employer.

I hope that this information is of assistance.

Sincerely,

Dea D. Carpenter
Chief, Employer Sanctions & Civil
   Document Fraud Division
Office of the General Counsel

6/24/2005   12:33                                                    PAGE 14/15
06/25/2004   09:17                          OGC DHS                  PAGE 15



U.S. Department of Justice

Immigration and Naturalization Service

---

HQ 274A

Office of the General Counsel                    425 Eye Street N.W.
                                                 Washington, D.C. 20536

FEB 17 1994

California Farm Bureau Federation
Office of the General Counsel
1601 Exposition Boulevard, FB3
Sacramento, CA  95815-5318

Dear _____

This letter is in response to your correspondence dated August
11, 1993, concerning the receipt of a letter from the social
Security Administration (SSA).  The SSA letter in question
informs an employer that the social security number of an
employee does not agree with SSA records.  Specifically, you ask
whether an employer who receives this letter from SSA can
continue to rely on the employment eligibility documents
presented by that employee, assuming the documents appear on
their face to be genuine and to relate to the employee?

If the document or documents presented to verify work
authorization appear on their face to be genuine and to
reasonably relate to the individual, the subsequent receipt of
the SSA letter mentioned above does not impose any affirmative
duty upon the employer to investigate further into an employee's
eligibility to work in the United States.  In addition, the
receipt of this SSA letter by an employer, without more, would
not be sufficient to establish constructive knowledge on the part
of the employer regarding the employment eligibility of the named
employee.  As you correctly note in your correspondence, this
letter from SSA could be prompted by a number of different
reasons having nothing to do with an employee's eligibility to
work in the United States.

The answer provided above specifically applies to a situation
where the employer receives such a letter from SSA and the
employer has no additional evidence that an employee may not be
work authorized.  It should be noted, however, that if an employer
receives notice from the Immigration and Naturalization Service
(INS) that a social security card or other document presented to
establish work authorization is not valid, the employer does have
a duty to inquire further to ensure that the individual is
authorized to work in the United States before the employer can
continue to employ that individual.  In addition, while an
employer has no affirmative duty to inquire into an employee's

TOTAL P.15

employment eligibility based solely upon receipt of a letter from
SSA. If for some reason the employer discovers evidence that an
employee may not be authorized to work in the United States, the
employer must inquire further to verify the employment
eligibility of that employee.  If the employer is unable to
verify work authorization, the employer cannot continue to employ
that individual.

It should be noted that telephonic inquiries from employers
regarding the employment authorization of employees will not be
honored by INS.[1]  However, if an employer suspects fraud, as it
relates to INS documents, the employer may ask INS to physically
examine the documents.

I hope that the above information is helpful to you.  If you have
any further questions, please contact ████████████████
███████████ at (202) 514-2895.

Sincerely,

for  Paul W. Virtue
Acting General Counsel

_____

   [1]  (The only exception is where the written consent of that
individual has been obtained.)  See Salinas-Pena v. INS, No. 86-
1022-DA (D.Oregon, March 16, 1988).

- 2 -



HQCOU 90/10.15-C

Office of the General Counsel

425 I Street NW
Washington, DC 20536

NOV 1 9 1998

The Honorable Robert F. Smith
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Smith:

Thank you for your letter of August 18, 1998 to ████████ of this office. We appreciated the opportunity to meet with you and Congressman Cal Dooley in July regarding your agricultural employer constituents' concerns about their responsibilities under the Immigration and Nationality Act (INA) with respect to information they receive from the Social Security Administration (SSA) regarding mismatched Social Security numbers (SSNs).

████████ has been in contact with Emily Beizer of Congressman Dooley's office with respect to your request to schedule a follow-up meeting, and we would be glad to meet with you again. We have also spoken with SSA regarding the Privacy Act concerns raised at the meeting, since the INS defers to SSA's legal interpretation as to permissible uses and disclosures of information supplied to employers by SSA regarding SSN mismatches. SSA has informed us that the Privacy Act does not prohibit an employer from using SSA mismatch information for the purposes of complying with its obligations under the INA. Although employer sanctions cases involve fact-based determinations that are not always amenable to bright-line rules, we can summarize our position on SSA mismatch notices with the following general guidelines:

- Because there may be many reasons for a mismatch between employer records and SSA records that have nothing to do with work authorization, SSA notice of a mismatch does not trigger by itself an obligation to reverify work authorization.

- However, the steps an employer should take to reconcile the mismatch with respect to SSA and IRS reporting, such as examining the employee's Social Security card and confirming his or her identity and SSN, may provide the employer with knowledge that is relevant to the employer's INA compliance. In particular, if the employee has been given the opportunity to explain and reconcile a discrepancy between the employer's records and SSA's records and has failed to do so satisfactorily, or if the employer learns that the employee is not authorized to work, the employer may be considered by the INS to have violated the prohibition against

No-Match Cert. Admin. Record  11

Page 2

knowingly continuing to employ an unauthorized alien if it does not take reasonable steps, such as reverification, to ensure that the employee is authorized to work. In those cases, the normal standards that have developed in INS regulations and relevant case law as to what constitutes actual or constructive knowledge of unauthorized status would apply.

- The Privacy Act does not prohibit an employer from using SSA mismatch information to comply with its responsibilities under the INA, including correcting or updating Forms I-9 with more accurate information about an employee's identity or SSN, or providing the information to the INS. If an employer learns through the process of reconciling its records with SSA's records that an employee is not authorized to work, the fact that the employer learned the information in that manner does not excuse it from taking necessary action to remain in compliance with the INA, including terminating the employee in appropriate circumstances.

I hope this information is useful. If we may be of assistance in the future, please let us know. The contact person in my office on this matter (including scheduling a meeting if desired) is Associate General Counsel ████████ (telephone ████████).

Sincerely,

Paul W. Virtue
General Counsel

**No-Match Cert. Admin. Record  12**



Civil Rights Division

*Special Counsel for Immigration Related*
*Unfair Employment Practices - CRT*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*

April 1, 2004

By First Class Mail
Ana Avendaño Denier
Associate General Counsel
American Federation of Labor and Congress
of Industrial Organizations
815 16th St. NW
Washington, D.C. 20006

Re:  Social Security No-Match Letters

Dear Ms. Avendaño Denier:

This letter addresses your request for guidance concerning appropriate employer action upon receipt of a Social Security no-match letter. In particular, this letter addresses whether the validity of an employee's completed employment eligibility verification form (INS Form I-9) is called into question when the employer receives a Social Security no-match letter.

The receipt of a no-match letter, standing alone, does not indicate to an employer that he or she need question the genuineness of documents or information previously presented to complete an INS Form I-9. This applies equally to the situation where the employee presents a Social Security card to establish employment eligibility under List C of the INS Form I-9. The General Counsel's office of the former Immigration and Naturalization Service has stated, in a number of earlier opinion letters, that receipt of the no-match letter, standing alone, does not place the employer on notice of an employee's unauthorized status or "require reverification of documents or further inquiry as to the employee's work authorization." See December 23, 1997, letter from David A. Martin, General Counsel. Actual or constructive knowledge of undocumented status is a case-by-case determination and depends upon the individual circumstances and totality of the circumstances before the employer, including any admission by an employee that he or she is undocumented, information learned from other sources, or follow-up activity in response to the receipt of the no-match letter.

Both the former INS General Counsel's office and the Social Security Administration have noted that there are many reasons for issuance of a no-match letter, including errors made in spelling an employee's name or the recording of the Social Security number, and the failure to report a name change after marriage or divorce, among other reasons. Further, the Social

Security Administration states clearly that a no-match letter makes no statement about an employee's immigration status.

An employer's decision to terminate an employee based solely upon the receipt of a no-match letter may constitute citizenship status or national origin discrimination, or unfair documentary practices, in violation of the anti-discrimination provision of the Immigration and Nationality Act, 8 U.S.C. § 1324b, which is enforced by the Office of Special Counsel for Immigration Related Unfair Employment Practices ("Office of Special Counsel") of the Civil Rights Division of the U.S. Department of Justice.

I hope this information is useful. If the Office of Special Counsel may be of assistance in the future, please let us know.

Sincerely,

Sarah DeCosse
Senior Trial Attorney
Office of Special Counsel for
    Immigration-Related Unfair
    Employment Practices



U.S. Department of Justice
Immigration and Naturalization Service

HQCOU 90/10.15-C

Office of the General Counsel                    425 I Street NW
                                                 Washington, DC 20536

APR 12 1999

Dear

     Thank you for your letter of June 1, 1998, posing questions about our letter of December 23, 1997 to an attorney regarding employers' responsibilities under section 274A of the Immigration and Nationality Act (INA) with respect to information on Social Security numbers. Please accept our apologies for the delay.

     Our letter stated that notice from the Social Security Administration (SSA) to an employer notifying it of a discrepancy between wage reporting information and SSA records with respect to an employee does not, by itself, put an employer on notice that the employee is not authorized to work. We explained that because there are a number of reasons why there might be such a discrepancy that do not relate to a lack of work authorization, and because actual or constructive knowledge of unauthorized status is a case-by-case determination, we would not consider notice from SSA of a discrepancy, without more, to constitute actual or constructive notice of unauthorized status. Your letter takes the position that in situations other than a reported discrepancy that "clearly relates to a misspelled name or transposed digits in the SSN," the report would constitute not only constructive, but actual knowledge of unauthorized status, given that the employee necessarily used a Social Security card as proof of employment eligibility. You also suggest that, in light of section 274A's goal of preventing the employment of unauthorized aliens, the employer should "assume an irregularity in this situation" and require new documentation confirming employment eligibility and/or suspend the employee until the situation has been resolved.

     We disagree. Section 274A does indeed serve the important goal of deterring illegal immigration by reducing opportunities for unauthorized employment, but the statute, in conjunction with section 274B, couples this goal with appropriate concern that U.S. citizens or noncitizen nationals, lawful permanent resident aliens and other work-authorized aliens not lose

employment opportunities unnecessarily as a result of section 274A. It is simply not true that notice of a discrepancy with SSA records is actual notice of a lack of work authorization unless the error is clearly a minor typographical one. For example, consider the hypothetical case of employee Pat Smith, whose W-2 is a mismatch because SSA records indicate that the SSN pertains to Patricia Jones. That is an entirely different name, but in our hypothetical is explained by the fact that Ms. Jones has become Mrs. Smith but has neglected to report that change to SSA. Does notice of this discrepancy by itself immediately put the employer on actual notice that Mrs. Smith is an unauthorized alien, as you suggest, and therefore put it in violation of section 274A if it does not immediately suspend her? It does not. Furthermore, your assumption that an employee about whom SSA has reported a discrepancy necessarily has used a Social Security card as proof of work authorization is incorrect. The Social Security number may be written in section 1 of the Form I-9, but the employee may have presented a List A document, or a List C document other than a Social Security card in conjunction with a List B document.

We emphasize that although it is incorrect to assume that an SSA discrepancy necessarily indicates unauthorized status, it would be equally incorrect for an employer to assume that in all cases it may safely ignore any possible INA relevance or consequences of SSA discrepancies. For example, perhaps an employer receives information from some other source (such as a tip from another employee) indicating that an employee is unauthorized, and also receives notice from SSA that the employee's SSN does not match. In considering whether the totality of the circumstances rises to actual or constructive knowledge, the SSA notice is a relevant fact that would support a conclusion that it does. This is the type of situation we had in mind when we said in our December 23, 1997 letter that although an SSA notice of discrepancy standing alone does not itself put the employer on notice of unauthorized status, there may be situations in which such notice would cause or contribute to a determination that the employer has been put on notice.

In addition, an employer should not ignore the consequences of the follow-up activity it should perform in response to an SSA notice in order to reconcile its records for SSA purposes, such as verifying names and SSNs by examining Social Security cards. While this activity is not required by the INA (nor is it prohibited by it), the knowledge obtained by an employer through this process may have INA implications. For example, consider the case of an employee who, when asked to show his Social Security card for SSA reconciliation purposes, states that he is an unauthorized alien and does not have one. If that employee's employment is continued, the employer has violated section 274A. There is no safe harbor for such information just because it was learned as a result of non-INA-related business activity. As explained in our December 23, 1997 letter, if the employer learns reliable information that contradicts the Form I-9, such as a different Social Security number or name, the Form I-9 should be corrected in a non-destructive manner and, if the contradiction is with section 2 information, the employer should review acceptable Form I-9 documentation showing the correct information. Furthermore, if an employee has been given the opportunity for wage reporting purposes to explain and reconcile a reported discrepancy with SSA records, and has failed to do so satisfactorily, that is an entirely different situation from an initial SSA notice standing alone. The INS would be much more likely at that point to consider that employer to have violated section 274A if it continues the employment without taking appropriate steps to reverify work authorization, and the employee is in fact unauthorized.

**No-Match Cert. Admin. Record  16**

Page 3

Your letter also asks for clarification of our previous statement that an employer could be held liable for knowingly employing an unauthorized alien if it hires someone using a known invalid SSN. Again, let us consider a fact pattern: An employer knows (as all employers reasonably should) that all SSNs have 9 digits. An employee provides an SSN (either in section 1 or section 2 of the Form I-9) that has only 6 digits. An employer knows the SSN is unauthorized, the INS may charge that employer with the knowing hire of an unauthorized alien. Further, the employer attests under penalty of perjury in section 2 of the Form I-9 that "to the best of my knowledge the employee is eligible to work in the United States." If, in fact, to the best of the employer's knowledge the employee is using an invalid SSN, that is a false attestation.

Your letter questions why the employer may be liable "for the employee's failure to record the SSN correctly," when it is the employee rather than the employer who declares under penalty of perjury that the information in section 1 of the Form I-9 is correct. It is true that the employer is not the guarantor of the section 1 information supplied by the employee and is not required to investigate its truthfulness, but the employer's certification in section 2 that to the best of its knowledge the employee is work authorized (as well as potential liability for aiding and abetting an employee's perjury), means that it cannot knowingly condone a false section 1. If the employer knows at the time of hire that section 1 information is incorrect, it cannot execute the section 2 certification. In the scenario in the preceding paragraph, the employer may be liable under section 274A not because the SSN is incorrect, but because it knew that it was incorrect and accepted it anyway.

This information pertains as well to your question about our statement that an employer should not rely on a Form I-9 as a verification of employment eligibility if the employer determines that the employee has fraudulently executed it. You point out that a false statement on the Form I-9 (for example, a false date of birth) may have "nothing to do with the individual's right to work." Our prior letter used the term "fraudulently" advisedly, according to its common-law meaning of a material misrepresentation upon which the recipient of the misrepresentation detrimentally relies. There may be circumstances in which an employee's false statement on the Form I-9 is unrelated to the purpose of the Form – verification of authorization to work – and therefore would not be "fraudulent." However, employers should exercise caution about drawing that conclusion, as all the information on the Form I-9 is there for a reason. For example – using the examples you mention, lies about age or address – the false statement would be entirely material to the purpose of the Form I-9 if it was made to reconcile the section 1 information with the age or address shown in false documents presented for section 2. As a general matter, a Form I-9 that contains a statement by an employee that was knowingly false when it was made is not a trustworthy document. We believe that an employer who discovers that its employee has lied on a Form I-9 about any fact is fully entitled to take reasonable steps (such as a reverification) to ensure that the employee has not also lied about his or her work authorization or anything else on the form, and that if it continues the employment without doing so, it is taking a risk that it may be held liable if in fact the employee is not authorized.

Page 4

     You state that the Internal Revenue Service issues to aliens who lack employment authorization but who need to file tax returns "Individual Taxpayer Identification Numbers ('ITINs') that resemble SSNs with respect to numbers and order of digits, but begin with a '9,'" and that in cases where an authorized worker has not received an SSN "the worker would expect to record the ITIN in section 1 of the I-9 form." That would be incorrect. No number other than a Social Security account number should be recorded in the designated space in section 1 of the Form I-9. Social Security numbers do not begin with a "9" and, except in extremely rare situations as individually determined by SSA on a case-by-case basis for extraordinary and compelling reasons, they do not change; an individual's SSN is his or her number for life.

     I hope this information is useful. If we may be of assistance in the future, please let us know.

               Sincerely,

               Paul W. Virtue
               General Counsel

U.S. Department of Homeland Security
Washington, DC 20528

August 9. 2004



# Homeland Security

The Honorable John N. Hostettler
U.S. House of Representatives
Washington, DC 20515-6216

Dear Mr. Chairman:

Thank you for your letter concerning an employer's responsibilities under section 274A of the Immigration and Nationality Act (INA) upon receipt of a Social Security Administration (SSA) "No Match" letter.

The letters issued by the INS Office of the General Counsel opine on the meaning of section 274A(a)(2) of the INA and the precise issue of whether constructive knowledge that an individual is an unauthorized alien may be imparted to an employer that is in receipt of a "No Match" letter issued by the SSA. As section 274A(a)(2) of the INA provides, it is unlawful for an employer to continue to employ an individual knowing that he or she is unauthorized to work in the United States. Those letters explain that an employer's receipt of a "No Match" letter by itself does not impart knowledge to the employer that the employee identified in the letter is unauthorized to work. The INS Office of General Counsel did recognize, however, that it would be "incorrect for an employer to assume that in all cases it may safely ignore any possible INA relevance or consequences of SSA discrepancies." *See* April 12, 1999 letter from INS General Counsel Paul Virtue to ██████████████████.

While the Department of Homeland Security recognizes this issue, the Department does not believe it would be appropriate at this time to recall the opinion letters previously issued by the INS Office of General Counsel. Discrepancies between SSA records and information submitted to SSA by the employer may be due to a variety of reasons, such as errors inadvertently made by the employee, employer, or SSA when recording information, or failure of the employee to inform SSA of errors or a name change.

The "No Match" letter indicates that SSA is not able to associate the name and SSN in question to any individual's wage record and, therefore, is unable to give the worker credit for those wages. The letter does not indicate, and SSA is unable to determine, the reason(s) for the cited mismatches. Though there will be instances when a discrepancy is due to the employee's use of a false name or invalid social security number in order to obtain unauthorized employment, without more information than that contained in the "No Match" letter, we have not concluded that the letter alone is sufficient to impart knowledge to the employer of unauthorized employment.

In your June 3, 2004 letter, you draw a parallel between the "No Match" letter situation and the verification process for new hires specified by the Basic Pilot Program. Under the Basic Pilot Program, participating employers are subject to the provisions of section

2

274A(a)(1)(A) of the INA for failure to terminate the employee if they continue to employ any employee after receiving a final nonconfirmation. You suggest in your letter that employers in receipt of a "No Match" letter should have the same ability to terminate the employment of an employee who is the subject of the letter if, when given an opportunity to resolve the discrepancy with SSA, the employee does not do so. In that situation, the employer has evidence beyond receipt of the "No Match" letter, and depending on the circumstances, the employer may have knowledge that the alien is not employment authorized. *See* April 12, 1999 letter to ███████████. Before terminating employment, however, the employer should consider the laws which prohibit discrimination based on national origin or citizenship status, enforced by the Office of Special Counsel for Immigration-Related Unfair Employment Practices within the Department of Justice.

I appreciate your interest in the Department of Homeland Security and I look forward to working with you on future homeland security issues. If I may be of further assistance, please contact the Office of Legislative Affairs at (202) 205-4412.

Sincerely,

Pamela J. Turner
Assistant Secretary for Legislative Affairs

 Tyson Foods, Inc.



December 30, 2004

Secretary Tom Ridge
Department of Homeland Security
3801 Nebraska Ave. N.W., Building 1
Washington, DC 20528

      Re:   Social Security Administration "No Match" Letters

Dear Mr. Ridge:

      We are writing to gain clarification of our processes with regard to the receipt of letters from the Social Security Administration, which report that certain employees' records in the Social Security database do not match the records we provide to the federal government for tax purposes ("no match letters"). We understand these are notices of a mismatch between the data we report and the data contained in the Social Security records and could be the result of data entry error, name changes (whether through changes in marital status or other means), or misrepresentations.

      When we receive no match letters we ask the individuals to go to the Social Security office to correct the inconsistency in the databases because we desire integrity in our Human Resources Information Systems. We thus ask that individual to provide us evidence of any necessary correction so that we can ensure not only that our internal records are correct but also that we will not receive repeated "no match" letters relating to that individual. We ask the individual to report back to us within a given time frame that the correction has been made or is in process. A failure to do so results in the individual's termination.

      A number of third party organizations have asked us to reconsider this policy. They believe that we should only provide the individual the no match letter and then leave it to the individual to correct without having any further duties to report to us. This leaves us with the possibility that the individual will not correct the records and we will receive further no match letters on that individual. Additionally, given past historical evidence that has, at a minimum, suggested that many of the individuals appearing on such letters who choose not to correct the information have misrepresented their identity, we have some concern that a complete lack of

**Tyson** Tyson Foods, Inc.

follow up on our part will result in people working in our employ under incorrect identities, albeit unknowingly.

These organizations point to a number of opinion letters that state that no match letters, standing alone, are not evidence of falsification or a lack of an authorization to work in the United States. On that basis, they want us to change our policy and allow such individuals to continue to work regardless of the individuals' action or inaction with respect to such no match letters. We appreciate their counsel and have a desire to foster a good relationship with such groups; however, we have a legitimate interest also in ensuring that our databases have correct information with regard to our employees and that our employees are not working under incorrect identities.

Given these factors, we would like your opinion as to the following: (1) whether our current process is lawful and appropriate and (2) whether it would be appropriate for us to follow the counsel of these third party organizations who are requesting that we discontinue our process and not follow-up at all.

Sincerely,



Senior Vice President
Human Resources

cc:    Assistant Secretary Asa Hutchinson
       Department of Homeland Security
       3801 Nebraska Ave. N.W., Building 5
       Washington, DC 20528

Office of the General Counsel
U.S. Department of Homeland
Security
Washington, DC 20528



# Homeland Security

March 16, 2005

███████████████
Senior Vice President
Human Resources
Tyson Foods, Inc.
2210 Oaklawn
Springdale, AR  72762-6999

**RE: Social Security Administration No-Match Letters**

Dear ██████████:

I am writing in response to your December 30, 2004, letter to the Secretary, in which you request clarification of whether your company's processes upon receipt of a "no match" letter from the Social Security Administration (SSA) are lawful. According to your letter, when Tyson Foods, Inc. (Tyson) receives a no-match letter from SSA, the company requests the employee to provide evidence of any necessary correction. Further, Tyson requests the employee to report back within a certain timeframe that the correction has been made or is in process. Failure to report back to Tyson "results in the individual's termination." Although we cannot provide you legal advice, we offer the following general comments that may assist you in evaluating your company's employment verification policies.

Section 274A(a)(2) of the Immigration and Nationality Act (INA), 8 U.S.C. § 274A(a)(2), prohibits employers from continuing to employ an individual knowing that he or she is or has become unauthorized to work in the United States with respect to such employment. An employer's receipt of a no match letter by itself does not impart knowledge to the employer that the employees identified in the letter are unauthorized to work. While there may be instances when a discrepancy is due to the employee's use of a false name or invalid social security account number (SSN) in order to obtain unauthorized employment, there will also be instances when the discrepancy between SSA records and information submitted to SSA by the employer may be due to errors inadvertently made by the employee, employer, or SSA when recording information, or failure of the employee to inform SSA of errors or a name change.  Without more information than what is contained in the no match letter, the letter alone is insufficient to impart knowledge to the employer of unauthorized employment.

Although a no match letter alone does not provide constructive knowledge that the individual is unauthorized to work in the United States, it may raise a material question about the identity of

████████████████

March 16th, 2005
Page 2

the employee, the validity of the SSN recorded in section 1 and/or section 2 of the Employment Eligibility Verification form (Form I-9), the genuineness of any documents listed in section 2 that contain the SSN, and the relation of these documents to the individual presenting them. The employer, without further inquiry, cannot reasonably continue to rely upon Form I-9 information, the material accuracy of which has been called into question by receipt of a no match letter as assurance that it is employing an individual who is authorized to work in the United States. The employer should ask the employee to resolve the discrepancy with SSA, and the employee should be given a reasonable amount of time to do so. Because SSA does not always provide written confirmation that the discrepancy has been resolved, the employer should not require that the employee provide such written confirmation. If the employee fails to resolve the discrepancy, and: (1) the employee provided a social security card as a List C document to establish employment eligibility or any other document used to satisfy the requirements in section 2 of the Form I-9 contained the SSN in question; or (2) based on the totality of the circumstances, the employee's identity is called into question, then DHS may consider an employer to be in violation of section 274A(a)(2) of the INA if it does not take reasonable steps to ensure that the individual is authorized to work, and the individual is in fact an unauthorized alien.

In situations where the employee fails to resolve the discrepancy, the employer should not immediately terminate the employee without further action. The steps an employer could take to ensure that the individual is authorized to work are reverification of employment authorization in section 3 of the Form I-9 if the individual's identity is not in question, or, if identity is in question, completion of a new Form I-9. We would not consider any document that includes a SSN that has been called into question by an unresolved no match letter to be a document that reasonably appears to be genuine, nor would we consider it to relate to the person presenting it for Form I-9 verification or reverification purposes (such a document may include a driver's license or other document using the questionable SSN as its identification number as well as a social security account number card itself). If the employer remains unsatisfied that the employee is authorized to work, termination may be appropriate.

If you have any questions regarding this letter, please contact ████████████ in the Department of Homeland Security's Office of General Counsel at ████████. Information regarding compliance with the anti-discrimination provisions of section 274B of the INA may be obtained from the Office of the Special Counsel for Immigration-Related Unfair Employment Practices within the Civil Rights Division of the U.S. Department of Justice, 1425 New York Avenue, NW, Suite 9000, Washington, DC 20005, 1-800-255-7688.

Sincerely,

Daniel Brown
Deputy Associate General Counsel (BTSIS)

*Office of the General Counsel*
**U.S. Department of Homeland**
**Security**
Washington, DC 20528



March 30, 2005

W.E. Welch & Associates, Inc.
2502 Urbana Pike
Suite 200
Ijamsville, Maryland 21754

**RE:     Social Security No Match Letter**

Dear W.E. Welch & Associates:

Thank you for your January 6, 2004 letter to Secretary Ridge. The Department of Homeland
Security (DHS) apologizes that it did not respond to your important inquiry in a more timely
fashion. While DHS is unable to provide your company legal advice, we can offer the following
general comments that may be of help.

You state in your letter that you are frustrated as an employer when you receive information
from the Social Security Administration (SSA) stating that SSA was not able to verify the social
security number of certain employees ("no match letter"). Specifically, you state that receipt of
such letter leaves you feeling helpless in dealing with a situation where the employee may in fact
not be authorized to work and could be present in the United States illegally.

As we explain below, you as an employer are not helpless in that situation and may, in fact, be
required to take further action to confirm the employment eligibility of the employee.
Depending on the outcome of that action, termination of the employment relationship may be
warranted. The laws and regulations surrounding employment verification are complex and
DHS is working with the Social Security Administration and other departments to improve the
process and our enforcement of the laws. As evidenced by several recent successful
investigations, the Immigration and Customs Enforcement component of DHS has increased its
enforcement of illegal workers, particularly at locations where such employment could pose a
threat to public safety or national security.

As you learned from the SSA no match letter, receipt of the information discrepancy is not
sufficient, in and of itself, to impart constructive knowledge that an employee is not authorized
to work. Discrepancies between SSA records and the information submitted to SSA by
employers can result from a variety of causes, such as transcribing or transposition errors
inadvertently made by the employee, employer, or SSA, or failure of the employee to inform

Letter to W.E. Welch & Associates, Inc.
Re: Social Security No Match Letter

SSA of a name change. It would therefore be inappropriate for an employer to take any adverse action against an employee based solely on receipt of a no match letter from SSA.

There are instances, however, when no-match discrepancies result from an employee's intentional use of a false name or invalid social security number to obtain unauthorized employment, to evade the reporting of income, or to avoid detection by law enforcement authorities.

Employers should therefore follow a reasonable and prudent course of action to determine the cause of no-match discrepancies and make a good faith effort to identify and correct inaccuracies in SSA reporting or company records that may have led to inaccurate information being provided to SSA. Generally, an employer in receipt of a SSA no match letter should:

1. Check company personnel records to ensure that the discrepancy did not result from a typographical, clerical, or transcribing error in the name or social security number submitted to SSA.

2. Notify the employee that the company has received a no match letter from SSA and ask the employee to (i) verify that the name and SSN in company records is correct, and (ii) resolve the discrepancy with SSA. Employees should be given a reasonable time to do so.

If a discrepancy cannot be satisfactorily resolved, and: (1) a social security card was provided by the employee as a List C document to establish employment eligibility, or any other document used to satisfy the requirements in section 2 of the Form I-9 contained the SSN in question; and (2) based on the totality of the circumstances the employee's identity or employment eligibility is reasonably called into question, then your company may have sufficient grounds to take additional action.

Steps an employer should take to ensure that the individual is authorized to work may include, but are not limited to, re-verification of employment authorization in section 3 of the Employment Eligibility Verification form (Form I-9) if the individual's identity is not in question, or, if identity is in question, completion of a new Form I-9. We would not consider any document that includes a SSN that has been called into question by unresolved no match information provided by SSA to be a document that reasonably appears to be genuine, or to relate to the person presenting it, for Form I-9 verification or re-verification purposes (such a document may include a driver's license or other document using the questionable SSN as its identification number as well as a social security account number card itself).

If the employer remains unsatisfied that an employee is authorized to work after making a good faith effort to identify and resolve no-match discrepancies, consulting with the employee and giving him or her a reasonable amount of time to resolve the matter, and otherwise reviewing the relevant circumstances in their totality, including when appropriate, reverification of employment eligibility, a decision to terminate employment may then be appropriate.

No-Match Cert. Admin. Record  26

Letter to W.E. Welch & Associates, Inc.
Re: Social Security No Match Letter

Section 274A of the Immigration and Nationality Act (INA) prohibits the knowing employment of unauthorized aliens. This law also requires employers to verify the employment eligibility and identity of each newly hired employee using the Employment Eligibility Verification form (Form I-9). The Form I-9 requires employers to examine employment eligibility and identity documentation presented by the employee and attest, under penalty of perjury, that the documents presented appear to be genuine and to relate to the employee named, and, to the best of their knowledge, that the employee is eligible to work in the United States. Failure to meet the requirements of section 274A of the INA may subject employers to civil and criminal penalties. DHS may consider an employer who takes no corrective action to be in violation of section 274A(a)(2) of the INA if the employee is subsequently determined to be unauthorized.

Finally, I suggest that you as an employer may want to consider participating in the I-9 Basic Pilot Program, which USCIS recently announced would be expanded to all fifty states. 59 Federal Register 75997. Participation in the Basic Pilot Program enables employers to confirm the social security number of new hires at the time the Form I-9 is completed and improves an employer's ability to know whether an employee is authorized for employment. Employers may request additional information about the Basic Pilot Program by writing to the U.S. Citizenship and Immigration Services, 20 Massachusetts Avenue, NW., ULLICO Building, 4th Floor, Washington, DC 20529, Attention: SAVE Program. Employers may also fax a request for information to the SAVE Program at (202) 514-9981, or call the SAVE Program toll free at 888-464-4218.

We hope this information is helpful. If you have any questions regarding this letter, please contact ▮▮▮▮▮▮▮▮▮ in the Department of Homeland Security's Office of General Counsel at ▮▮▮▮▮▮▮▮.

Sincerely,

Daniel Brown
Deputy Associate General Counsel (BTSIS)

3

# SCHULTE ROTH & ZABEL LLP

919 Third Avenue
New York, NY 10022
(212) 756-2000
fax (212) 593-5955

*www.srz.com*

Writer's Direct Number ▬▬▬▬▬

Writer's E-mail Address ▬▬▬▬▬▬▬

June 10, 2005

**VIA FAX AND MAIL**

William J. Sanchez, Esq.
Special Counsel
U.S. Department of Justice
Civil Rights Division
Office of Special Counsel for Immigration-Related
  Unfair Employment Practices
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530

Re:   Social Security "No Match" Letters

Dear Special Counsel Sanchez:

This law firm represents several clients that have received "no match" letters from the Social Security Administration ("SSA").  The purpose of this letter is to obtain written guidance on the duties of an employer upon receipt of one or more no match letters.  Employers need guidance to resolve the conundrum presented by conflicting federal laws and policies:  the potential of penalties pursuant to Immigration and Nationality Act, as amended by the Immigration Reform and Control Act of 1986, for employing workers without valid work authorization, versus the potential of liability for discrimination for terminating such employees pursuant to Title VII of the Civil Rights Act of 1964 and/or the INA.[*]

What should an employer do when it first receives an SSA no match letter listing a social security number provided by an employee (whether on the I-9, W-4, employment application, or other document)?  Is it enough for the employer to notify the employee of the SSA letter and direct the employee to correct the issue with the SSA?  Will an employer be deemed to violate section 274A of the INA if it continues the employment without reverifying work authorization?  If so, how should such reverification take place?

---

[*]   The primary guidance issued concerning the legal responsibilities of an employer in receipt of a no match letter from SSA are two opinion letters from the Office of the General Counsel of the Immigration and Naturalization Service (copies enclosed), dated December 23, 1997 and April 12, 1999.

9877207.2

William J. Sanchez, Esq.
June 10, 2005
Page 2

Neither the opinion letters nor the SSA's no match letter provides guidance on the time period an employee has to explain and reconcile a reported discrepancy. What is a reasonable time period for the employee to clarify or explain the discrepancy? What should the employer do if it receives a second SSA no match letter listing an employee's social security number for the second time? Should the employer give the employee another chance to explain, clarify or correct the issue with the SSA? What should the employer do if it receives a no match letter listing an employee's social security number for the third time? Is the employer required, or permitted, to terminate employment if it receives a third SSA no match letter listing the same employee's social security number?

Numerous scenarios arise once an employer confronts employees about an SSA no match letter. If an employee provides an entirely new social security number as an explanation in response to an SSA no match letter, what should the employer do? If that new number appears on a subsequent SSA no match letter, does that provide an employer with evidence of fraud and lack of work authorization permitting termination of employment? Does an anonymous tip that the employee is not authorized to work rise to the level of an employee tip referenced in the 1999 opinion letter providing support for a constructive knowledge finding? Your guidance on these additional issues would be appreciated.

Your answers to the foregoing questions are needed to provide guidance to employers. Thank you in advance for your anticipated assistance.

Respectfully submitted,



# SCHULTE ROTH & ZABEL LLP

919 Third Avenue
New York, NY 10022
(212) 756-2000
fax (212) 593-5955

*www.srz.com*

Writer's Direct Number

████████████

Writer's E-mail Address

████████████████

November 28, 2005

## VIA FAX AND MAIL

William J. Sanchez, Esq.
Special Counsel
U.S. Department of Justice
Civil Rights Division
Office of Special Counsel for Immigration-Related
  Unfair Employment Practices
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530

Robert C. Divine, Esq.
Chief Counsel
Department of Homeland Security
U.S. Citizenship & Immigration Services
Office of the General Counsel
20 Massachusetts Avenue, N.W.
Washington, D.C.  20529

Re:  Social Security "No Match" Letters

Dear Messrs. Sanchez and Divine:

I write to follow-up on Mr. Sanchez's letter to me dated September 16, 2005 (enclosed) responding to my letter (enclosed) requesting written guidance on the duties of an employer upon receipt of one or more Social Security Administration ("SSA") social security no match letters.  I thank Mr. Sanchez and the Office of Special Counsel for their response, but am writing to request additional clarification.  At the suggestion set forth in Mr. Sanchez's letter, I also am requesting a response from the Department of Homeland Security.

For purposes of the question below, please assume that following an employer's receipt of an SSA no match letter:

(1) The employer double checked its records to determine if it made an error in transcribing the employee's name or social security number, and found no errors.

(2) The employer notified the employee of the SSA letter and requested the employee to double check his or her records to determine if the employee made an error in reporting the information to the employer, and the employee advised his or her employer that the information was correct.

(3) The employer directed the employee to correct the issue with the SSA.  The employer provided the SSA's telephone number and address.

9877207.2

**No-Match Cert. Admin. Record  30**

William J. Sanchez, Esq.
Robert C. Divine, Esq.
November 28, 2005
Page 2

(4) One year later, the employer receives another SSA letter including the same employee's social security number.

(5) The employer requested the employee to produce his/her social security card and, upon review, the information matched what the employee has provided to the employer.

(6) The employer re-verified employment authorization by again administering the I-9 Form.

(7) The employer again requested the employee to follow-up with SSA.

(8) Another year passes, and the employer receives a third SSA letter including the same employee's social security number.

(9) The employer has no other information indicating the employee is providing false information or is not authorized to work in the United States.

(10) The employer informs the employee of the third letter and requires that the employee provide evidence from the SSA of resolution of the discrepancy within sixty (60) days. The employee fails to do so.

QUESTION: In these circumstances, is the employer required, or permitted, to terminate employment of the employee?

Are any of the actions taken by the employer in the foregoing steps (#s 1-10) problematic or should have been handled differently? For example, should the employer have given the employee the 60-day deadline after receipt of the first no match letter, rather than waiting until after the third no match letter? What should an employer do if, after advising an employee to go to SSA to resolve the discrepancy to protect the employee's retirement benefits, the employee says something to the effect of "I can't go to the SSA"?

Thank you in advance for your anticipated assistance.

Respectfully submitted,



Enclosures

9877207.2



**U.S. Department of Justice**

RECEIVED        Civil Rights Division
CIVIL RIGHTS DIVISION

2005 OCT 19  PM 1: 08

OFFICE OF SPECIAL
COUNSEL (I.R.U.E.P.) *Special Counsel for Immigration Related*
*Unfair Employment Practices*
*P.O. Box 27728*
*Washington, DC  20038-7728*

September 16, 2005

███████████

919 Third Avenue
New York, NY  10023

Re:    Employer Responses to Social Security Mis-Match Letters

Dear ███████████:

This is in response to your June 10, 2005 letter, in which you seek advice concerning the interplay among the Immigration and Nationality Act's (INA) anti-discrimination and employer sanctions provisions, and the Social Security Administration's (SSA) mis-match program.

Please note that this Office cannot give you an advisory opinion on any particular case of alleged discrimination, or on any set of facts involving a particular individual or entity.  However, we can provide general guidelines concerning the coverage of the INA's anti-discrimination provisions.  Further, the Department of Homeland Security and the Office of the General Counsel for the former Immigration and Naturalization Service have released a number of opinion letters concerning employer responsibilities under the INA's employment sanctions provisions with fact patterns similar to that presented in your letter.  See, for example, letter from Pamela J. Turner, Assistant Secretary for Legislative Affairs, to the Honorable John N. Hostettler (August 9, 2004) (Hostettler letter) (attached), letter from Paul Virtue, General Counsel, to the Honorable Robert F. Smith (November 19, 1998) (Smith letter) (attached), letter from David Martin, General Counsel, to ███████████ (December 23, 1997) (75 Interpreter Releases 246 (February 9, 1998)) (██████ letter) (attached to your June 10 letter), and letter from Paul W. Virtue, General Counsel, to ██████ (April 12, 1999) (██████ letter) (also attached to your June 10 letter).

In your letter, you ask a number of questions concerning appropriate employer conduct following receipt of a no-match letter:

What should an employer do when it receives a no-match letter?  Is it sufficient to notify the employee and ask them to correct the information with the Social Security Administration (SSA)?  Must an employer reverify the individual named in the no-match letter?  What is a reasonable amount of time for an employer to provide an employee to discuss the issue with the SSA?  What should an employer do if it receives a second or third no-match letter?

You also ask how an employer should respond to an employee's explanation regarding the no-match letter:

> What should an employer do if it receives a new Social Security number from the employee?  What should the employer do if the new Social Security number then appears on a subsequent no-match letter.

Finally, you ask whether an anonymous tip concerning the employment eligibility of an employee supports a constructive knowledge finding.

To begin, we note but disagree with your assertion that guidance is needed because federal laws and policies conflict.  Employer conduct that is necessary for compliance with the INA's employer sanctions provisions will not violate the INA's anti-discrimination provisions.  Further, compliance with the employer sanctions provisions does not require unlawful discrimination against workers, and compliance with the anti-discrimination provisions does not necessitate that employers disregard their duties under the employer sanctions provisions.

The letters previously issued on the no-match issue provide valuable information and advice for employers regarding the interplay between the SSA's mis-match letters and enforcement of the prohibition against knowingly hiring and employing undocumented workers.  The Smith letter notes that the "SSA notice of a mismatch does not trigger by itself an obligation to reverify work authorization."  The ███████letter notes that there are legitimate reasons for discrepancies with names and Social Security numbers, and that notice from the SSA of a discrepancy, without more, neither places an employer on notice that an employee is unauthorized to work nor requires reverification of documents or further inquiry as to the employee's work authorization.  See also Hostettler letter.  In short, an employer should not impute or infer information about an employee's employment status solely because it has received notice of a no match.

If an employer, in response to a mis-match letter, asks an employee to follow-up with the Social Security Administration, it should be aware that SSA has advised OSC that resolving the discrepancy may take up to sixty days, and therefore provide the employee with a sufficient period of time in which to resolve the discrepancy.  Please also note that there will be instances in which an employee does not receive additional documentation and will have nothing new to provide to the employer even though he or she has resolved the discrepancy.  If the employee provides documentation different than that originally provided when completing the I-9 Form, the ███████ letter provides helpful advice concerning how an employer should correct I-9 Forms to reflect the updated information received from employees, and the extent to which an employer should investigate particular discrepancies.  For example, the letter notes that "all such situations should be reviewed in the light of common sense."  The letter recognizes that there are discrepancies that do not raise suspicion, including transcription errors, changes of last names due to marriage, and cultural naming practices, and also identifies discrepancies that deserve follow-up, including wholesale name changes.

Although the answer will always depend upon the specific facts before the employer, an employer may, without violating the INA's anti-discrimination provisions, generally question an

2

individual who presents two sets of identical documentation containing different names and/or birth dates to determine the authenticity and genuineness of the second set of documents.

Employers must take care to treat in the same manner all individuals identified in the no-match letter, and all individuals who present documents containing discrepancies. An employer cannot treat members of minority groups differently than other individuals when responding to either mis-match letters or employment eligibility verification issues. Similarly, an employer may not treat individuals differently because of their citizenship or immigration status, or perceived citizenship status. For example, an employer could violate the INA's anti-discrimination provisions if it requires Hispanic employees to provide extensive documentation of a marriage and name change yet accepts without question similar explanations from non-Hispanic employees.

Regarding anonymous tips, we urge restraint: such tips may be based in whole, or in part, on factors such as an individual's race, national origin, accent, manner of dress, etc. Such factors are not relevant in determining whether an individual is authorized to work in the United States. Whether an employer should respond to an anonymous tip depends on the specific facts at hand, including the substantive nature of the information provided.

For additional information concerning appropriate employer conduct under the employer sanctions provisions, we suggest that you contact the Department of Homeland Security.

I hope that you find this information helpful.

Sincerely,

William J. Sanchez
Special Counsel

Attachments:

3

# House Committee on Ways and Means

http://waysandmeans.house.gov/hearings.asp?formmode=printfriendly&id=5159

**SECOND IN A SERIES OF SUBCOMMITTEE HEARINGS ON SOCIAL SECURITY NUMBER HIGH-RISK ISSUES**

**HEARING**

BEFORE THE

SUBCOMMITTEE ON SOCIAL SECURITY

AND

SUBCOMMITTEE ON OVERSIGHT

OF THE

COMMITTEE ON WAYS AND MEANS

U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED NINTH CONGRESS

SECOND SESSION

————

FEBRUARY 16, 2006

————

**SERIAL 109-60**

————

Printed for the use of the Committee on Ways and Means

## COMMITTEE ON WAYS AND MEANS
BILL THOMAS, California, *Chairman*

E. CLAY SHAW, JR., Florida
NANCY L. JOHNSON, Connecticut
WALLY HERGER, California
JIM MCCRERY, Louisiana
DAVE CAMP, Michigan
JIM RAMSTAD, Minnesota
JIM NUSSLE, Iowa
SAM JOHNSON, Texas
PHIL ENGLISH, Pennsylvania
J.D. HAYWORTH, Arizona
JERRY WELLER, Illinois
KENNY C. HULSHOF, Missouri
SCOTT MCINNIS, Colorado
RON LEWIS, Kentucky
MARK FOLEY, Florida
KEVIN BRADY, Texas
PAUL RYAN, Wisconsin
ERIC CANTOR, Virginia
JOHN LINDER, Georgia
BOB BEAUPREZ, Colorado
MELISSA A. HART, Pennsylvania
CHRIS CHOCOLA, Indiana
DEVIN NUNES, California

CHARLES B. RANGEL, New York
FORTNEY PETE STARK, California
SANDER M. LEVIN, Michigan
BENJAMIN L. CARDIN, Maryland
JIM MCDERMOTT, Washington
JOHN LEWIS, Georgia
RICHARD E. NEAL, Massachusetts
MICHAEL R. MCNULTY, New York
WILLIAM J. JEFFERSON, Louisiana
JOHN S. TANNER, Tennessee
XAVIER BECERRA, California
LLOYD DOGGETT, Texas
EARL POMEROY, North Dakota
STEPHANIE TUBBS JONES, Ohio
MIKE THOMPSON, California
JOHN B. LARSON, Connecticut
RAHM EMANUEL, Illinois

### SUBCOMMITTEE ON SOCIAL SECURITY
JIM MCRERY, Louisiana, *Chairman*

E. CLAY SHAW, JR., Florida
SAM JOHNSON, Texas
J.D. HAYWORTH, Arizona
KENNY C. HULSHOF, Missouri
RON LEWIS, Kentucky
KEVIN BRADY, Texas
PAUL RYAN, Wisconsin

SANDER M. LEVIN, Michigan
EARL POMEROY, North Dakota
XAVIER BECERRA, California
STEPHANIE TUBBS JONES, Ohio
RICHARD E. NEAL, Massachusetts

### SUBCOMMITTEE ON OVERSIGHT
JIM RAMSTAD, Minnesota, *Chairman*

2

**No-Match Cert. Admin. Record  36**

ERIC CANTOR, Virginia
BOB BEAUPREZ, Colorado
JOHN LINDER, Georgia
E.CLAY SHAW, JR., Florida
SAM JOHNSON, Texas
DEVIN NUNES, California
J.D. HAYWORTH, Arizona

JOHN LEWIS, Georgia
EARL POMEROY, North Dakota
MICHAEL R. MCNULTY, New York
JOHN S. TANNER, Tennessee
CHARLES B. RANGEL, New York

Allison H. Giles, *Chief of Staff*
Janice Mays, *Minority Chief Counsel*

———

Pursuant to clause 2(e)(4) of Rule XI of the Rules of the House, public hearing records of the Committee on Ways and Means are also published in electronic form. **The printed hearing record remains the official version.** Because electronic submissions are used to prepare both printed and electronic versions of the hearing record, the process of converting between various electronic formats may introduce unintentional errors or omissions. Such occurrences are inherent in the current publication process and should diminish as the process is further refined.

## C O N T E N T S

Advisory of February 9, 2006 and revised advisory of February 16, 2006 announcing the hearing

### WITNESSES

Internal Revenue Service, Hon. Mark W. Everson, Commissioner

Social Security Administration, Hon. James B. Lockhart, III, Deputy Commissioner

U.S. Department of Homeland Security, Hon. Stewart A. Baker, Assistant Secretary for Policy

———

Social Security Administration, Hon. Patrick P. O'Carroll, Inspector General

U.S. Government Accountability Office, Barbara Bovbjerg, Director, Education, Workforce, and Income Security Issues

3

**No-Match Cert. Admin. Record  37**

SUBMISSIONS FOR THE RECORD

Davis, Robert, Rockwall, TX, letter

National Consumer Law Center, Boston, MA, letter

---

**SECOND IN A SERIES OF SUBCOMMITTEE HEARINGS ON SOCIAL SECURITY NUMBER HIGH-RISK ISSUES**

Thursday, February 16, 2006

House of Representatives,
Subcommittee on Social Security,
Subcommittee on Oversight,
Committee on Ways and Means,
*Washington, DC.*

The Subcommittees met, pursuant to notice, at 10:04 a.m., in room 1100 Longworth House Office Building, Hon. Jim McCrery (Chairman of the Subcommittee on Social Security), and Hon. Jim Ramstad (Chairman of the Subcommittee on Oversight) presiding.

[The advisory and revised advisory announcing the hearing follow:]

---

Chairman MCCRERY. The hearing will come to order. Good morning, everyone. Welcome to our Joint Subcommittee on Social Security and Subcommittee on Oversight hearing on employer wage reporting. Today's hearing is the second in a series of hearings on high-risk issues related to Social Security Numbers (SSNs). Today, we will examine the longstanding and troubling issue of how some employers fail to report wages with accurate SSNs and the inadequate Federal response. Wages that are reported under incorrect or false SSNs are logged into a database within the Social Security Administration (SSA) called the Earnings Suspense File (ESF). This file has records of earnings that could not be linked to the correct worker. Employee data was first entered into the ESF in 1937, when wages became subject to Social Security taxes. Between 1937 and 2003, nearly 255 million wage records for about $520 billion in earnings, accumulated in the ESF.

The ESF is not just an administrative headache or a bureaucratic wasteland. It is a symptom of more serious problems. Research by the SSA's Inspector General (IG) and the U.S. Government Accountability Office (GAO), indicates evidence of SSN misuse and unauthorized work by foreign-born workers. For example, according to a GAO study of SSNs frequently appearing in the ESF, wages claimed by foreign-born workers

who had earnings before they were issued an SSN have grown over time, from an average of about 7 percent for years 1937 to 1985, to 47 percent for the year 2003.

Inaccurate SSN reporting has repercussions for workers' Social Security benefits, tax compliance, and immigration law compliance.  Three government agencies play a role when employer wage reports end up in the ESF.  The SSA is responsible for accurately keeping track of workers' earnings for benefit purposes.  The U.S. Internal Revenue Service (IRS) is responsible for enforcing penalties to ensure employers report wages accurately for tax and benefit purposes.  The U.S. Department of Homeland Security (DHS) is responsible for ensuring unauthorized workers do not work using false information that results in their earnings records ending up in the ESF.

Unfortunately, the problem of a growing ESF has existed for decades.  The responsible government agencies have been slow to work together toward a comprehensive solution.  In addition, they have not adequately enforced the laws and regulations that would prevent inaccurate wage reporting.  Last December, the House of Representatives passed legislation, H.R. 4437, the "Border Protection, Anti-Terrorism, and Illegal Immigration Control Act of 2005", which would take action where government agencies have not by requiring employers to verify the SSNs and employment eligibility of their employees with SSA and DHS.

Today, we need to hear about what actions Federal agencies can and will take to address inaccurate wage reporting.  We also want to examine options that Congress should consider to achieve a balanced and workable approach to improve the accuracy of wage reporting without unduly burdening employees, employers, and our economy.  I want to thank all of our witnesses for coming today, and I look forward to your testimony.  Now, I would like to ask my colleague, the Ranking Member, Mr. Levin, for any comments he may make.

[The prepared statement of Chairman McCrery follows:]

Mr. LEVIN.  Mr. Chairman, I have a statement.  Let me submit it for the record.  I take it without objection.

[The prepared statement of Mr. Levin follows:]

Chairman MCCRERY.  Thank you.

Mr. LEVIN.  I would just quickly summarize it, because we want to get on with the testimony, and I am really very glad that all three of the agencies are represented here today.

We know that data regarding the no--the lack of match in the reporting.  We also I believe have some idea as to what each of the three agencies is supposed to be doing, what your primary function is.

**No-Match Cert. Admin. Record  39**

So the question today I think, in part, is whether there is an adequate meshing of your responsibilities and of the information that you have; whether a primary problem in terms of our immigration policies relates to the interaction among the three agencies; what impact there would be on each of your agencies if there were a further requirement of the sharing of information.

So we look forward to it.  This is not a new problem, and the immigration aspect of this is not a new issue.  We have been dealing with this for years, and I hope we can approach this issue with both determination and also with some care.  Thank you.

Chairman MCCRERY.  Thank you, Mr. Levin.  Any Member wishing to submit a statement for the record may do so, without objection.  Mr. Ramstad, Chairman of the Subcommittee on Oversight.

Chairman RAMSTAD.  Thank you, Mr. Chairman.  As Chairman of the Subcommittee on Oversight, I look forward to this second joint hearing in the last 2 years on the topic of Employer Wage Reporting.  Thank you, Chairman McCrery, for your leadership in this area and for summarizing why we are here today and also summarizing the last hearing in 2004, when we heard there was a growing problem with the misuse of the SSN and a failure by employers to accurately report the names and SSNs of employees.  As we all know, this was contributing to a growing account of mismatched wages at SSA called the Earnings ESF.

The message of the hearing 2 years ago was that the three agencies involved in the process, who are represented very well here today-- the SSA, the IRS, and the DHS, needed to work better together to address the problem.

We are here today to see in the area of information sharing if progress has been made.  This is an important problem for a number of reasons.  When wages are reported to incorrect SSNs, it can prevent individuals from receiving the Social Security benefits that are due them, creating a number of other problems for other government agencies involved, as I think we all understand.

I just want to highlight, briefly, a couple of my concerns at the outset of the hearing and look forward to the responses from the witnesses.  First, why is not more being done to enforce the laws and regulations that require accurate wage reports from employers.  It appears that we have laws on the books that are not being enforced.  In fact, it also appears that the IRS regulations make it virtually impossible to impose and collect penalties on employers who report inaccurate SSNs for their employees.  If this is so, we need to know what can be done to correct this problem and remove this barrier to enforcement.

Second, I would like to know if the three Agencies--SSA, the IRS, and DHS--are satisfied with the current level of information sharing with respect to name and SSN mismatches; in other words, if progress is being made and if it is satisfactory progress in terms of the all critical information sharing.  If not, I think this panel needs to know what

**No-Match Cert. Admin. Record  40**

additional information they would like to access and why. Finally, there have been proposals to require that employers do more to verify the eligibility of their employees for work.

I also look forward, gentlemen, to your views on the impact of expanded verification. Let me again thank the witnesses for being here today. I look forward to hearing from you and working with you to address these important problems. Thank you again, Mr. Chairman, for your leadership.

[The prepared statement of Chairman Ramstad follows:]

Chairman MCCRERY. Thank you, Mr. Chairman. Now, we will hear from the Ranking Member of the Subcommittee on Oversight, Mr. Lewis.

Mr. LEWIS OF GEORGIA. Thank you very much, Mr. Chairman. The Subcommittee on Oversight joined the Subcommittee on Social Security in today's hearing to discuss issues involving SSNs that do not match employees' names when submitted to SSA and the IRS. The Subcommittee held a similar hearing on this subject just 2 years ago. Under current law, employers are required to obtain the name and SSN of each worker so that wage income and tax withholding amounts can be sent to the IRS and SSA for tax and Social Security benefit purposes.

It is important that this information be correct for the processing of tax returns and recording of Social Security benefits. The IRS rejects tax returns and SSA puts earning records in a ESF when workers' names and SSNs do not match. Today, I welcome back Commissioner Everson and Deputy Secretary Lockhart to discuss these issues again with us. In addition, I welcome Assistant Secretary Baker from DHS, Inspector General O'Carroll from SSA, and Barbara Bovbjerg from GAO.

Some propose that the DHS have access to more SSA and IRS information to target employers involving illegal workers for immigration enforcement purposes and to mandate that employers verify that all individuals they employ are authorized to work in the U.S. Mr. Chairman, I look forward to the testimony of these witnesses, and I thank them for being here. Thank you, Mr. Chairman.

[The prepared statement of Mr. Lewis of Georgia follows:]

Chairman MCCRERY. Thank you, Mr. Lewis. Now, we will welcome our first panel of the day: the Honorable Mark W. Everson, Commissioner, IRS; the Honorable James B. Lockhart, III, Deputy Commissioner of SSA; the Honorable Stewart A. Baker, Assistant Secretary for Policy at DHS.

Welcome, gentlemen. Thank you very much for appearing before us today, and if you would, your entire written testimony will be submitted for the record, but if you could summarize that in about 5 minutes, we would appreciate that. We will begin with Mr. Everson.

**No-Match Cert. Admin. Record  41**

**STATEMENT OF THE HONORABLE MARK W. EVERSON, COMMISSIONER, INTERNAL REVENUE SERVICE**

Mr. EVERSON.  Thank you Chairman Ramstad and McCrery, Ranking Members Lewis and Levin.  Now, I mentioned the Oversight Committee first, sir, just because that is out of pure self-interest.  I appreciate the opportunity to appear before you today.  I commend you for your continuing interest in SSN high-risk issues.  Simply stated, there are two important public policy interests at issue today.  As a former Deputy Commissioner of Immigration, I know that a sound system of immigration is one which allows only those here legally to remain in our country.

On the other hand, in my job as IRS Commissioner, we want our share of your money whether or not you earned it legally or illegally.  Two years ago, you convened a hearing where we talked about the I-10 program.  Since that time, the improvements to that program, which we spoke about, have had the desired effect.  I-10s are increasingly associated with the filing of tax returns and less a source document for identity creation. That is good news for tax administration.

Nevertheless, while our actions have helped tax administration in the sense that individuals who might not otherwise do so are filing tax returns and participating in the tax system, they have not done anything to reduce SSN mismatches.  As both Commissioner Lockhart's written testimony and my own indicate, there are millions of mismatches each year.  I would make two points about the mismatches.  The first is that over 50 percent of the mismatches occur in just four states--California, Texas, Florida, and Illinois. Almost 29 percent of the mismatches take place in California alone; whereas, only 12 percent of 1040s are filed in that State.

Secondly, I would note that about 75 percent of the mismatched W-2s report wages of less than $10,000.  In fact, the average wage of all mismatches is only about $6,700 annually.  The current process for following up on mismatches lags well behind the date of hire for the employee in question.  Many of the employees generating a mismatch letter have long since terminated their employment.  The system as it operates today is simply not timely.  The IRS has been asked whether we could do a better job of issuing penalties for employers who fail to include accurate SSNs or TINs on their employment returns.  Under the law, we may impose a penalty of $50 on an employer for each W-2 or 1099 that omits the required information or includes an inaccurate SSN or TIN, unless the filer shows reasonable cause for the omission or inaccuracy.

The law, however, places the burden on the employee or payee to provide the employer or payor with an accurate SSN or TIN.  This is an important distinction.  The GAO and others have suggested that we reexamine our due diligence or reasonable cause standards.  I am also aware that there are calls to increase information sharing amongst Federal agencies.

As members of Ways and Means well know, the standards of 6103 pertaining to the protection of taxpayer information are quite strict.  Any effort to improve employer

verification through increased information sharing should take into account the implications to 6103 and taxpayer privacy. Thank you.

[The prepared statement of Mr. Everson follows

Chairman MCCRERY. Mr. Lockhart.

**STATEMENT OF THE HONORABLE JAMES B. LOCKHART, III, DEPUTY COMMISSIONER OF SOCIAL SECURITY, SOCIAL SECURITY ADMINISTRATION**

Mr. LOCKHART. Chairman Ramstad, Chairman McCrery, Ranking Members Levin and Lewis, and Members of the Subcommittee, thank you all for asking me here today to discuss the steps that SSA has taken to strengthen the wage reporting process. I will summarize my written statement with a focus on our efforts to reduce the Earnings ESF and on our cooperative efforts with other Federal agencies.

The primary purpose for the SSN--for assigning a number and issuing a card is the same today as when we started doing this in 1936: it is to accurately report and record the earnings of people who work in jobs covered by Social Security. Earnings posted to an individual SSN are used to determine eligibility for and the amount of Social Security benefits for that worker and for his/her family. In order for wages to be credited, the worker's name and SSN on the W-2 must match the name and number on our records. We process about 235 million W-2 reports annually, coming from about 6.6 million employers, and that represents a total wage amount of about $4 trillion.

To prevent mistakes, we encourage employers to use our employee verification system or our newer Social Security Number Verification System (SSNVS), the latter system permits employers to verify via the Internet the accuracy of employees' names and SSNs. This service was expanded to all employers last June. We estimate between these two systems and the Basic Pilot, which I will talk about later, we have had 67 million verifications last year. About one million was from the Basic Pilot. After the W-2s are filed, we process them. We have about 10 percent invalid names and social security combinations at that point. We have a whole series of computer routines to identify commonly occurring errors. Using these routines, we post more than half of this 10 percent to the correct SSN. The remainder is recorded in the ESF.

For the latest year, for which we have information, which is taxpayer year 2003. As of October 2005, about 8.8 million or 3.7 percent of the total W-2s remained in the ESF. They represent about $58 billion in wages and $7.2 billion in payroll taxes. I hasten to add that those payroll taxes have been credited to the Trust Funds. We carry out a number of activities to further reduce the ESF. For example, we notify all employees when we cannot process their W-2s due to mismatches and ask them to work with us to resolve the problems. We also notify employers with a significant number of mismatches. The intent of these no-match letters is to improve the accuracy of wage

**No-Match Cert. Admin. Record  43**

reporting.  We also request the employer to submit corrected W-2s so that the future earnings will be accurate.

Beginning in April 2003, we implemented a new process that we estimate will electronically find another 30 million matches.  Already this new process using innovative techniques and the worker's detailed earnings record has matched 11 million W-2s with the correct earnings record.  Despite all these efforts, the file continues to grow.  Our IG, Pat O'Carroll, whom you will hear from later, and many others believe that this growth is due to unauthorized work by non-citizens and that stronger worksite enforcement is needed.  President Bush has called for comprehensive immigration reform, including stronger border security, strengthened worksite enforcement, and a temporary worker program.  Our ability to improve our employee wage reporting process depends on cooperation with other Federal partners, such as DHS and the IRS, who are with us today, and the U.S. Department of State.

An important cooperative effort is the Basic Pilot, which is a nationwide system in which SSA supports DHS in asssisting employers to confirm employment eligibility for newly hired workers.  Participating employers register with DHS to use its automated system and to provide employee information to SSA to verify the name, date of birth, and SSN.  If we cannot also verify U.S. citizenship, DHS reviews whether the employee is a work-authorized non-citizen.  In all cases, they notify the employer of the employee's current work status.

In conclusion, I want to thank you for inviting me here today.  I look forward to working with you to continue to strengthen Social Security's employer wage reporting process, and I will be happy to answer any questions.

[The prepared statement of Mr. Lockhart follows:]

Chairman MCCRERY.  Thank you.  Mr. Baker.

## STATEMENT OF STEWART A. BAKER, ASSISTANT SECRETARY FOR POLICY, U.S. DEPARTMENT OF HOMELAND SECURITY

Mr. BAKER.  Thank you, Chairman McCrery, Chairman Ramstad, Ranking Members Levin and Lewis.  It is a pleasure to be here.  I don't think I have testified here since the 1980s, when I was a private lawyer talking about the then new U.S.-Canada Free Trade Agreements.  It is great to be back.  I would like to talk--begin by talking about the border, our Southwest border.  I think we have all been shocked by the amount of violence that we have seen there recently.  Assaults--this is not just a newspaper phenomenon--assaults on border patrol agents has doubled in the last year.  The reason we think that that has happened is that as our border control efforts have gotten stronger, we have begun to interfere with the livelihoods of the people who make their living smuggling human beings across the border, and they are fighting back.

**No-Match Cert. Admin. Record  44**

We can continue and we will continue to strengthen border controls, but that cannot ever be a complete solution to the problem of border incursions. The reason that those coyotes are making a living smuggling people across the border is because once people get across the border, they can get a very good job in the United States, with a driver's license and a fake SSN. That is, in fact, what many people do.

Until we can address the problem that is drawing people across that border, we will always have difficulties at the border. We will always have people slipping across, and then we will always have people living in our cities and our countryside who are living outside the law, in the shadows, afraid to talk to law enforcement, afraid to talk to the authorities, afraid to complain when employers abuse them.

We shouldn't allow people to live in our country under those conditions. We need to move them into a temporary worker program where they can come out of the shadows, live in the light, have a temporary job in the United States, go home with a nest egg, and begin a life there.

They won't do that, however, until we can persuade people that it is not easy to get a job in the United States just by making up a SSN. That is why we are here today. We believe that false SSNs are a major part of the immigration fraud that enables people to work illegally in the United States, we are very eager to get access to information that SSA has about people whose names and birth dates do not match their SSNs.

The SSA identifies 8, 9 million people in that state every year. The SSA does an enormous amount of work to try to clear up those mismatches, because it is in the interest of the individual to clear that up so that they can actually get their benefits. Yet, a very small percentage of people actually clear that up, which suggests that for many of them it is not possible to clear it up because they have used a false SSN to get their job. We think that it could be as high as 90 or 95 percent of those mismatches are people who have made up their SSNs. That is based on our experience with the basic pilot initiative.

Chairman Ramstad asked are we satisfied with the amount of data sharing today, and while we have got very good cooperative relationships with the IRS and with SSA, we are not fully satisfied because current law, Section 6103, makes it very difficult to share all of the information that we would like to have about the mismatches and other aspects of Social Security fraud that may also indicate immigration fraud.

The kinds of things that we could do with that information, according to the General Accounting Office, there are dozens of employers who have used the same SSN for a hundred employees or more. That suggests that this is not just employees who are part of the problem, but employers, some employers, of very limited number, but they should be at the top of our list for enforcement calls. We don't know who they are. We can't know who they are under the current interpretations of the law that SSA and IRS have, and until there is a cure to that, I think that we will not be able to target employers who are probably part of the problem. We will not be able to do a completely effective job of identifying people who may be engaged in immigration fraud who are working in

chemical plants, where sabotage or even a mistake could kill thousands of Americans, or working in the baggage handling area of airports; working in nuclear power plants.

Again, we would like to be able to target our enforcement in the places where the problems are to be able to identify people, employers, and workers who ought to be at the top of our list for enforcement. I recognize that there are legitimate privacy and revenue collection concerns at stake here, but we face unprecedented levels of immigration as well, illegal immigration. We have got to gain control of our borders or some day terrorists will use exactly the same kind of coyote service that economic migrants are using to get across that border. The only way to get control of that border is to get control of workplace hiring so that it is not as easy as it is today to get a job illegally. Having access to some of the information SSA has today would move us a long way down that road. Thank you very much.

[The prepared statement of Mr. Baker follows:]

Chairman MCCRERY. Mr. Baker, this may not be in our Committee's jurisdiction, but has your Department proposed any specific language to change Section 6103 of the Internal Revenue Code, which would allow greater sharing of information?

Mr. BAKER. There is no formal proposal today as I speak, but we are certainly working with the rest of the Administration on ideas about how to solve that problem.

Chairman MCCRERY. Should we expect some offering from the Administration relatively soon with respect to this problem?

Mr. BAKER. I certainly hope so.

Chairman MCCRERY. Is there disagreement among the agencies in the executive branch about how to solve this sharing problem?

Mr. BAKER. I think we all recognize the importance of the immigration problem and the value that this information could provide. We also recognize that there are privacy and revenue consequences to making this decision, so it has been a very collegial discussion thus far.

Chairman MCCRERY. Good.

Mr. EVERSON. Could I comment on that, sir?

Chairman MCCRERY. Sure.

Mr. EVERSON. I agree exactly with Secretary Baker's characterization of the discussions that have been held. I just do want to emphasize that in terms of tax administration, I view this as an important discussion, because of the fact that we have

**No-Match Cert. Admin. Record  46**

made progress in having people who are in the country illegally and working illegally pay their taxes. That is my principal concern as a tax administrator.

There is, on the other hand, a very important concern, which was very eloquently laid out by the Secretary, about having a legal system of immigration. I don't understate, though, the impact of this on tax administration, should we share the information. It is a very important policy choice that is how I would phrase it.

Chairman MCCRERY. In other words, you are saying that were we to loosen the current rules with regard to sharing information, lest we do it very carefully, it could result in lower compliance from a tax standpoint? Is that what you are saying?

Mr. EVERSON. I think that I would be even a little sharper on that--

Chairman MCCRERY. It may be.

Mr. EVERSON. --to say that right now, as an example, we process 2 million returns a year in our volunteer sites around the country. These are community-based organizations largely working with immigrant groups. There will certainly be a chilling effect on participation in the tax system if those volunteers say, "Look, this information will now be transmitted to Homeland." I am not saying don't do that. Please get me right on this. I am just saying if we do this, we all have to do it together with our eyes wide open.

Chairman MCCRERY. That is why I asked the question about whether all the agencies are cooperating on this, and if there was squabbling among the agencies and the executive branch about how to solve this. I probably should have put it more positively like you did and said you should all work together to make sure that we go in with our eyes wide open and try to avert any unforeseen or unintended consequences, I should say, of our changes. Mr. Baker, you speak with some enthusiasm about getting to this problem and solving this problem. Yet, worksite enforcement arrests by DHS have declined, as well as notices of intent to fine employers. Do you have reasons for this and will your enthusiasm perhaps spread to the rest of the Agency to correct this decline?

Mr. BAKER. I hope so. I am new to the area and maybe that is why I speak with such enthusiasm. Yes, there is no doubt that there have been difficulties mounting effective worksite enforcement programs. In many cases, that is because of the low fines and the very substantial administrative law judge procedures that have been necessary to follow and difficulty actually collecting the fines once they have been imposed. Even people who have a pattern and practice of violation, the people who are the worst violators, I think the fine is $10,000. It is a cost of doing business for the worst employers.

We do have to have a coherent, comprehensive approach to worksite enforcement that addresses those issues as well, but as we have begun to work on border enforcement, we have seen time and again that we have got to do interior enforcement at the same time and also have a temporary worker program for the people who will be displaced by our enforcement efforts.

13    **No-Match Cert. Admin. Record 47**

Chairman MCCRERY.  On another matter that could help you do your job, some time ago, Congress required SSA to provide what was then some other agency, but is now under the DHS, a data file called the Non-Work Alien File.  The DHS basically says this file is so messed up it is unusable.  We can't use it.  It is not good data.  What did DHS do to reach that conclusion, and why do you think you cannot use the information for immigration enforcement purposes?

Mr. BAKER.  I am not prepared to say we can't use it, but there were a number of challenges there.  We can start with the fact that SSA, of course, has an SSN.  The DHS ordinarily does not have a SSN in its records, because most of the time when we encounter an alien, even if we are going to be authorizing him to work, he may not have an SSN.  Our files are not matched up.  When we get the information from SSA, our experience is about half of the people we can't tell who they are.  We can't match our records and theirs.

In addition, SSA data, when it comes to us is pretty far out of date.  It is about a year, a year and half out of date.  It is not their fault, because they get the information late, but that means that people have moved on.  That makes it difficult to find people.

Plus in that year and a half or perhaps even earlier, a number of people who originally get a non-work SSN, they are here.  They may marry a U.S. citizen.  They become authorized to work by virtue of a change in their status.  We find that about 40 percent of the people on that list actually are legally entitled to work.  They just are using an old SSN.

That made it--meant the data was not great for doing enforcement.  There were other problems.  We don't have any mainframes at DHS, but SSA works off big mainframe computers with big tapes and they--for years they sent over what they had, which was their tape, and we didn't what to do with it.

A lot of these problems have begun to recede.  We are getting the information on a disk in Excel spreadsheet form, which we can manipulate, and we are expecting a new batch of data in the next couple of weeks.

Our analysis of the most recent Excel spreadsheet data that we got is that there are things that we can do with it.  Even though not everybody on there is unauthorized to work, the fact is that probably 60 percent of them are not authorized and yet they are making contributions.

So, we have begun to do analysis of well who are the employers who have the largest number of non-work aliens working for them.  Many of them will be authorized, but many of them will not be.  So you begin to wonder whether some of these employers ought to be the first to get the visit from DHS.

When we get the new data in a week or two, we hope to do a more sophisticated analysis of that information and begin to use it in prioritizing our investigations.

**No-Match Cert. Admin. Record  48**

Chairman MCCRERY.  Thank you.  Perhaps when you forward to the legislative branch your recommendations for changes in the law to facilitate sharing of information, you could also tell us whether this particular exercise is still worth it, and if it's not, we will junk it.  If so, perhaps you can explain how we might make it better between the two Agencies--SSA and DHS?

Mr. BAKER.  We will gladly do that.

Chairman MCCRERY.  Mr. Levin?

Mr. LEVIN.  Thank you.  Thank you, Mr. Chairman.  Let me follow up with your salient questions.  First ask you, Mr. Baker, you mentioned some of the problems with the present laws and regulations relating to employer responsibilities.  Has DHS or its predecessors suggested amendments to the laws that would make it easier to enforce employer obligations?

Mr. BAKER.  This is part of the review that we are going through right now.  As you know, there is legislation that has passed the--some legislation on immigration reform has passed the House, and there is a companion bill in the Senate being marked I think in early March.  We are as an Administration looking for a way to engage in that process so that we can make suggestions for ways to improve worksite enforcement.  That is an ongoing discussion inside the Administration, which I hope will result in action fairly soon.

Mr. LEVIN.  You favor tightening the requirements in the enforceability of the employer obligations?

Mr. BAKER.  I certainly believe that if we do not deal with the fact that it is so easy to get a job in the United States, with a minimum of fake documents that can be purchased for $50 bucks out in Adams Morgan today, that if we don't solve that problem, we won't solve the border problem.

Mr. LEVIN.  I understand that.

Mr. BAKER.  We won't solve the illegals.

Mr. LEVIN.  Your position is there should be a tightening of the requirements of the employer?

Mr. BAKER.  I think the employer will have to take more responsibility for making sure that his employees are actually authorized to work in the United States, and we need to find a way to give employers tools to do that.

Mr. LEVIN.  When you say tools, right now you think the main problem is that when employers hire people who are not legally here, that it is the lack of tools that leads them to hiring these people?

**No-Match Cert. Admin. Record  49**

Mr. BAKER.  I think, in fact, that is in many cases.

Mr. LEVIN.  You think that is the main problem?

Mr. BAKER.  Yes.  In many cases, employers are--have no interest in hiring illegal employees.  They have a set of procedures that they follow that are required by current law, but which are not adequate to actually screen out illegal immigrants.  I have had businesses complain about the large number of identification documents that they are required to accept as proof of identity.

In some cases, employers have said you have made it too easy for people to engage in fraud.

Mr. LEVIN.  All right.  It will be interesting to pursue that.  Let me--you talk about the data being a year, 2 years old.  The data that you are suggesting be obtained from SSA and IRS would remain that old, would it not?

Mr. BAKER.  It would.  It would always be at least a year out of date.

Mr. LEVIN.  When you say the reason you haven't used the data you now have is because it is too old.  What does that mean for your request or your suggestion that you receive more old data?

Mr. BAKER.  Well, that was one of five significant problems.  I left out one.  One of the other problems was that I think the data included everybody who had ever worked since this program began in the 1970s, even if they hadn't worked in 20 years.  What we are interested, of course, in receiving is data about people who were working last year.  It will not be perfect, because of the lag, but we still believe that we can use it to find information that will allow us to prioritize our enforcement efforts.

Mr. LEVIN.  I think my time has expired.  Let me just mention--you mentioned about the differences among the agencies and the Commissioner, IRS Commissioner, responded.  I think you would agree that there are some competing, at least if not competing, different considerations here.

Mr. EVERSON.  Absolutely.

Mr. LEVIN.  I don't think we should characterize this discussion of competing interests or needs as kind of--I don't think any of us want to minimize them or suggest that it is not important for you to have a full-scale intelligent discussion of how you mesh competing interests, competing needs; that the potential problem of there being less information received by IRS if you were to dispose more information to other agencies, not that that is the answer, but I think we need to be careful to not be--not to--to minimize the importance of this kind of a intelligent interagency discussion, which I hope you will share with us at some point, when it is appropriate.  Thank you.

**No-Match Cert. Admin. Record  50**

Chairman MCCRERY:  No, it is an excellent point, Mr. Levin.  Chairman Ramstad.

Chairman RAMSTAD.  Thank you, Mr. Chairman.  Commissioner Everson, I just want to clarify a point.  I know the IRS has the authority to impose penalties on employers who fail to file the correct wage information of their employees.  Hasn't the IRS been imposing penalties and collecting money from employers who repeatedly submit mismatched W-2s?

Mr. EVERSON.  Not in any meaningful sense I would say, sir.  What really happens here is that those penalties are very hard to sustain.  It is not unlike what Secretary Baker was just talking about in terms of the hurdles you have to go through.  The basic dilemma here is that the employer has to have accurate records, but it is the employee who is on the hook for providing the accurate information to the employer.  If the employer has made a reasonable effort, then those penalties are going to be abated.

The second point I would make here involves looking at what we are trying to address, and you are, the $345 billion a year.  In the employment tax area, that is about $60 billion a year.  We have something like 2,500 front line auditors and collection officers who work on that piece of our business.  This is also, I would say, not a very profitable corner of our world--to chase after those penalties.

That having been said, the final thing I would say is that we have launched a study of some 300 employers who have a particularly egregious record here.  Three-quarters of their employees seem to have mismatches, and we have a number of audits going on them on employment taxes generally. If there are reasons to impose some of these penalties, we will certainly do so.  I don't want to mislead you to say that it would make sense from a tax administration point of view to suddenly ramp this up just to help Secretary Baker.

Chairman RAMSTAD.  Well, just to follow up on Secretary Baker's point made during his testimony.  As I understand it, if that scenario unfolded of an employer hiring a hundred employees on the same day and all hundred employees submit signed W-4s using the same SSN, it seems to me it would be obvious to any employer that he or she was receiving inaccurate information.  As I understand the situation, under IRS regulations, the employer could not be held responsible for submitting inaccurate information to the IRS?  Is that correct?  Shouldn't the IRS have the ability to penalize employers for this kind of conduct?

Mr. EVERSON.  I think we have the ability, sir.  It is a question of what procedures they took and then what the employees would have presented to them.  I think that example is obviously a rather extreme instance, which why we have concluded the study that we are working on -- to see what we can do in these most extreme cases.  We are following up on that basket of the 300.  I think it is with 297 that we have seen that kind of a conduct.

I am hopeful that we will sustain some penalties in that area.  Again, I don't think that is--I don't--I would agree with Secretary Baker's characterization of this.  That is at the

fringe.  That is not going to change the immigration problem in terms of interior enforcement.

What he seeks to do, which I understand the benefit of and think is important, is to have a system potentially that would check everybody and then not to follow--if that fellow is trying to break the law, the status, or the behavior that you are talking about, that is one thing.  The vast bulk of this is people who have been duped by false documents let us say.

Chairman RAMSTAD.  Well, so pursuant to that study, it is conceivable that you would recommend changing the IRS regulations so it could take action against employers who knowingly submit false information?

Mr. EVERSON.  Yes, sir.  I think it would--

Chairman RAMSTAD.  You and or SSA?

Mr. EVERSON.  We have been encouraged to do that.  This is a tricky area, again, because this is reasonable cause area, but I think we will learn something very real from the work we are doing.

Chairman RAMSTAD.  When do you expect the results of that and when can we learn about them?

Mr. EVERSON.  Assuming you don't do another hearing on this for a year, I think we will know quite a bit by then.  I don't know where we are on each and every one of those audits.

Chairman RAMSTAD.  My time has expired.  Let me just make a comment:  I understand the tax gap, and I think you are doing an excellent job overall, Commissioner.  I understand the tax gap, but I also understand the billions and billions of dollars that the American people are spending that we are appropriating for DHS and border patrol, and I think closer cooperation, and more stringent enforcement are appropriate.

Yes, we might risk loosing millions of dollars of tax revenues, but when you look at the number one function of the Federal Government, to keep people safe and now to keep people safe from terrorists, it doesn't take a genius to figure out how to get into this country illegally and do us harm.  God knows how many al Qaeda sleeper cells are amongst us.  We don't know, nor does the CIA or the FBI.

I would just like to make that point.  I am sure you don't disagree and I am sure no Member of this panel disagrees.

Mr. EVERSON.  Yes, sir, if I--could I respond?

Chairman RAMSTAD.  Please.

**No-Match Cert. Admin. Record  52**

Mr. EVERSON.  I agree with that entirely.  I would also note that the kind of discussion we are having today about the routine sharing of information for this purpose, important as that policy objective would be, does not run to the issue of terrorism.  It is my understanding that in the context of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (U.S.A. Patriot) Act of 2001 (P.L. 107-56), there was discussion about having more sharing of taxpayer information for anti-terrorism purposes, and that proposal was knocked down.

I would ask that we consider revisiting that issue. If we are going to open up this issue for immigration purposes, I would hope that we would look at 6103 for the potentially more devastating terrorism issue.  I would be surprised if Secretary Baker is adverse to that.

Mr. BAKER.  I would be delighted.

Chairman RAMSTAD.  Well, again, Commissioner, I think you make a very good point in conclusion and thank you again for the job you are doing.  I appreciate your responses.

Chairman MCCRERY.  Mr. Lewis.

Mr. LEWIS OF GEORGIA.  Thank you very much, Mr. Chairman.  Mr. Commissioner, there is a view in certain quarters, maybe in Washington, maybe in some other places, that you and the IRS have all of this information, just plenty of information on unauthorized workers and that you are not sharing this information with DHS.  Is it your role to locate and identify illegal or unauthorized workers and turn them into the DHS or immigration officials?

Mr. EVERSON.  No, sir, and I think that is the nub of this issue.  We run an independent database, and 6103 provides very strict standards as to what can be shared. It does not allow routine information to be shared at this stage through SSA over to DHS. There is a written testimony that indicates last year we issued approximately a million six I-10s.  An I-10 is a tracking number that we use for someone to file tax returns.

It used to be, the last time I was here, that we had a bigger problem with aliens not filing because of concerns over identity creation documents.  Now, we have a better handle on that.  These documents are are being used for tax returns, but an alien is encouraged through VITA site or elsewhere to come in and file a tax return, and they are confident that their information is not going across town to Homeland.

Mr. LEWIS OF GEORGIA.  Thank you very much, Mr. Commissioner.

Secretary Baker could tell the Members of the Committee how do you reach a happy medium and not violate privacy when you are asking DHS or asking IRS for information?  I would like for you to just elaborate.  What are your feelings about people's SSN the IRS information being put in a super, super agency made available to DHS?  I know we need to protect our country, but it isn't something about violating the civil liberties, the civil rights of people?

**No-Match Cert. Admin. Record  53**

Mr. BAKER.  I would be glad to address that.  I completely agree with you that privacy is part of our country's most important values, and we need to protect that.  The kinds of information that we are asking for here, in this context, is not tax return information, the kinds of information that people are most concerned about the privacy of.  This is information, by and large, that says this person with this SSN works for this employer, and that is really, in most cases, the extent of the information that we are trying to get.  That is private tax information because it has been reported on a tax form to the government, but there is nothing inherently related to income tax about that information.

While it is necessary, I think after 6103 was passed, to engage in a privacy discussion about any such information, we are trying in our discussion of this to avoid intruding into the most private aspects of people's tax returns.

Mr. LEWIS OF GEORGIA.  Mr. Commissioner, as the former INS Deputy Administrator, what are your views on?

Mr. EVERSON.  I have to be careful here, sir, because I have a current position in this Administration, but I do have some experience in this area.  These are two very important national interests.  I say frequently in speeches that we can't allow our tax system to become broken the way our immigration laws and our drug laws are where they are viewed as optional for people.  I couldn't agree more with the Secretary and with the President, who has said we have to fix our immigration system.

If we do this, as this President and the Secretary have said, we have to go forward with a very strong program which gives people a legal vehicle to be here, but, on the other hand, has a very strong interior enforcement program to make sure if they're not here legally, they don't remain. I implemented the '86 act--that was my job in the Reagan days.  If we fail to do that, and the '86 act didn't have the teeth in it to do that, we really won't have helped Secretary Baker, and we will make my job or my successor's job worse. If we are going to go forward on this, we have to go all the way and do it right with a liberal, if you will, employment program, but a strict enforcement program on the interior.

Mr. LEWIS OF GEORGIA.  Thank you very much.  Thank you, Mr. Chairman.

Chairman MCCRERY.  Mr. Johnson.

Mr. JOHNSON OF TEXAS.  Thank you, Mr. Chairman.  Let me ask the SSA guy one question.  Have y'all stopped giving away cards on phone calls?

Mr. LOCKHART.  We don't give cards away on phone calls.  To get a new card, you have to come into the office and present identification information and birth certificates or other evidence.

Mr. JOHNSON OF TEXAS.  Do you know of people getting more than one?

Mr. LOCKHART.  People can get replacement cards, if you mean that.  They can come in, but the law was changed last year, and we are following the new rules.

Mr. JOHNSON OF TEXAS.  No, I just wondered if you all were enforcing the law?

Mr. LOCKHART.  We are enforcing the law, and we are tracking to make sure that no one gets more than 3 a year and 10 in a lifetime.

Mr. JOHNSON OF TEXAS.  Okay.  Thank you very much.  Mr. Baker I don't agree with you on anything you said.  I would like to know when you are going to stop the Catch and Release program, because that is part of the problem on the border; and, furthermore, how do you differentiate between other than Hispanic and Hispanics that come across.

Mr. BAKER.  I certainly agree with you that the Catch and Release program--

Mr. JOHNSON OF TEXAS.  When are you going to stop it?

Mr. BAKER.  We are--the Secretary has said that we are trying to stop it by the end of this fiscal year, which is in October.  The difficulty with the Catch and Release program--it is not a program.  Catch and Release arises with non-Mexican illegal crossers of the border, whom we cannot simply return across the border, as we do with Mexicans.  We have to put them in detention while we wait for them to have their identity and nationality established, and then send them back to their home country.  That takes a long time, and it fills up an enormous number of the detention beds that we have.

The difficulty, the way Catch and Release began was we ran out of beds.  We just didn't have any space for people.  We had to release them.  What we are trying to do now is to make sure we have enough beds, enough space, to put everyone who crosses that border, who is not a Mexican, in detention and send them home.

We are doing that today with Guatemalans, Hondurans, Nicaraguans--most of the large numbers of immigrants who come across that border illegally and who have begun to do it in large numbers.  There is still the biggest part of the season for crossing that border is still to come, and it is going to be a question whether we can continue to have the space to put all of them and get them back to their home countries quickly enough.

Mr. JOHNSON OF TEXAS.  Well, you keep talking about other than Mexican.  Are you deporting the Mexicans?

Mr. BAKER.  Yes, the Mexicans are taken back across the border.  When they are captured, they don't have to be detained.  They can be taken right back to the border.

Mr. JOHNSON OF TEXAS.  What kind of law change do you need to do the same with the others?

Mr. BAKER.  The biggest problem we are facing today, the largest numbers that we have not been able to get a handle on are Salvadoran immigrants.  The reason is that they cannot be subject to expedited removal in the same way that other nationalities can because of a lawsuit that was filed in the 1980s--the last time I was here before this Committee that lawsuit was pending.  We have an injunction against us, along with several other injunctions that are that old that make it very difficult to move them quickly through the process.

Mr. JOHNSON OF TEXAS.  Well, if you don't have room for them, do you let them get out and go to work?  Do you give them a green card?

Mr. BAKER.  We have no choice but to let them go and in general if they are--we essentially give them a court date and say please show up for your court date.

Mr. JOHNSON OF TEXAS.  Yes, sure, and they don't come.

Mr. BAKER.  I entirely agree with you.  This is not the right way to run a system, but we do not always have the space for them.  We have asked for Congress to take a look at the injunction process that affects immigration law so that some of these immigration laws that are older than my kids can be taken off the--the injunction can be taken off--

Mr. JOHNSON OF TEXAS.  Okay.  Well, I hope y'all will get with it faster.  Let me ask the IRS one question.  According to the Center for Immigration Studies, in 2004 you only--only three employers were fined for hiring illegals--only three.  I think that is kind of unacceptable.  Do you know--are y'all trying to rectify that problem?  I know you have discussed it a little bit already.

Mr. EVERSON.  Well, sir, I think that we want to do more here, but again there is this conundrum where the employer has to have accurate documents, but the burden is on the employee, provide the documents to the employer, not vice versa, so you have a reasonable cause exception here.  We are looking at whether we can tighten it up.  These 300 audits or investigations that we are doing will help us see this. The real answer here, again, is not to have us enforce the immigration laws since we are trying to go after the tax gap and all those other things, but we are going to do what we can.

Mr. JOHNSON OF TEXAS.  Thank you, sir.  Thank you, Mr. Chairman.

Chairman MCCRERY.  Thank you, Mr. Johnson.  Mr. Becerra.

Mr. BECERRA.  Thank you, Mr. Chairman.  Thank you to the witnesses.  Let me follow up on Mr. Johnson's questions, because I think that is very important.  Commissioner, is the IRS capable of trying to detect employers who are violating our immigration laws or those individual employees who may be violating immigration laws without having to search for SSA records as well as INS or immigration records?

Mr. EVERSON.  Not to any meaningful extent, sir, given the press of the tax gap and the other compliance areas.  As I indicated, I can't recall if you were in the room, we have about 2,500 front line people who work on employment taxes.  That is out of our front line enforcement personnel of about 20,000, and they have to take care of all employment tax issues where you are my employee, which from our point of view, is the substantially more important issue. I have come on hard times in my small business, so I am taking your Social Security out, but I am not sending it over to Jim.  That is a problem.

Mr. BECERRA.  Let me ask you this:  Is it still the case that some $300 to $350 billion of taxes that are owed go unpaid?

Mr. EVERSON.  Yes, sir.  We just updated our study on the tax gap and refined it from last year, relating to the year 2001, and the gross tax gap is about $345 billion.

Mr. BECERRA.  Most of it has nothing to do whether there is an undocumented immigrant working in this country paying or not paying taxes.

Mr. EVERSON.  That is correct.  We have a very high compliance rate in this country.  It is  about 83 and half percent, but the amount of money that we could bring in by improving that is significant.

Mr. BECERRA.  What happens if all of a sudden we announce that the Federal Government is going to allow IRS to share information with DHS for immigration purposes to try to track down undocumented immigrants?  Do you think those undocumented immigrants who are here without documents to work but are working and actually are filing tax returns, do you think they are going to file tax returns?

Mr. EVERSON.  Well, this is the basic concern that I have outlined and the situation that as we have these discussions that are referenced that I think we all need to consider.  Because right now, increasingly, people who are here working illegally feel comfortable participating in the tax system.

Mr. BECERRA.  We have less compliance, chances are, if we found that all of a sudden IRS is complying with DHS on sharing information about people's tax filing?

Mr. EVERSON.  I agree with that in the short term.  However, if Secretary Baker is able to really fix this problem and the people in the country are here legally, over the long term, we will get it right.  Where we can't go is not fix that situation and hurt tax administration.

Mr. BECERRA.  Well, let's turn to Secretary Baker.  Before I leave you, Mr. Commissioner, I want to thank you for your quick action recently on this Refund Freeze program that you have.  Once the taxpayer advocate indicated that there were some real problems in the way some low-income individuals were having their legitimate refunds suspended for over a period of 8 months to more than a year in some cases.

**No-Match Cert. Admin. Record  57**

I want to thank you for the action you have taken to make sure that folks who exist on $13,000 a year are able to get their refund that they legitimately earned.  I want to thank you for that.

Mr. EVERSON.  Yes, sir.  Thank you.

Mr. BECERRA.  Will we have now notice go out for this filing period coming up?

Mr. EVERSON.  Yes, the notices will go out.  We are putting that in place this filing season.

Mr. BECERRA.  How about all those folks who still haven't received their refunds who legitimately earned them who are still waiting?

Mr. EVERSON.  We are going to have to work through the old inventory probably after we get out of this filing season.  We will do that as quickly as we possibly can.

Mr. BECERRA.  Can we chat about that, because there are a whole bunch of folks who are existing on meager incomes who are still waiting.

Mr. EVERSON.  We are going to do it as quickly as we can, sir.

Mr. BECERRA.  Thank you.  Mr. Secretary, let me ask you a couple of questions, and also I think Mr. Johnson touched on this.  We have a number of folks that we have acted on to deport from this country because they don't have the permission to be here, and that is the way we should handle it.  We have a whole bunch of folks who are employing these individuals and creating this tremendous magnet for people from across the world to come into this country to work, because even if they are working at substandard wages here in this country, they are still making more than they could have ever hoped to have made in their home country.

If we are not prosecuting folks who are hiring folks who don't have the right to work in this country, and if we allow people to make the excuse that they reasonably relied on documents of someone who is a clear immigrant to work in this country, how will we ever solve the problem of legitimately allowing only those entitled to work in this country to do so?

Mr. BAKER.  I think you make a good point.  There is no doubt the vast majority of people who have employed illegal immigrants don't know it, obeyed the law, and were the victims of someone who gave them false documents.  I think there are also people whose business model is violating the immigration law.  We need tools to go after them, whether it is criminal law or higher fines, and ability to attack pattern or practice, we do need authority to do that.

Mr. BECERRA.  Would you agree with the Commissioner that if we give you better tools, you can do a better job than if you necessarily went out and started getting

**No-Match Cert. Admin. Record  58**

information from the IRS to try to help you track down that information through some indirect way?

Mr. BAKER.  We do need the information.  There is no doubt about that.  We have not asked for tax return information, so we are not asking for the kind of information that would directly impinge on people's willingness to file tax returns.  There is no doubt, as Mr. Johnson suggests, we would also need the ability to put people in detention while we are trying to get them out of the country.

Mr. BECERRA.  Absolutely.  Absolutely.  Thank you very much.  Thanks, Mr. Chairman.

Chairman MCCRERY.  Yes, sir.  Mr. Hayworth.

Mr. HAYWORTH.  Mr. Chairman, thank you for holding this joint hearing.  My gratitude is exceeded only by my disappointment and that is putting it mildly for the ample display of what can only be described as a schizophrenic policy concerning our borders and the presence of illegal aliens, not undocumented workers--that is Orwellian newspeak--workers who have documents galore coming in to our system.

What distresses me most is the complete and utter lack of urgency inherent in all the remarks and testimony we have received this morning.  Secretary Baker, please pass along to Secretary Chertoff, who I am sure is here testifying in other areas this morning, my genuine concern that the evaluation he proffered in Houston in November when he said it was his goal to gain operational control of our borders in 5 years time.  For a Nation at war, that is wholly unacceptable.

Commissioner Everson, thank you for coming, sir, and I realize you have worn both hats at different times in history.  To suggest on one hand that we can have strict enforcement at the same time liberal employment, which it is not my intent to put words in your mouth, sir, but I take as well, basically, the status quo.  Let us continue to let businesses gainfully employ illegals or perhaps more accurately in terms of keeping with the stated policy of the Administration create a new type of program that the intent may not be amnesty, but that is really what it is.

Mr. EVERSON.  If I could, sir, I want to clarify this.

Mr. HAYWORTH.  Please do.

Mr. EVERSON.  I am saying if you clearly clamp down on the illegal, you will want to expand legal.  That is all I am saying.

Mr. HAYWORTH.  Okay.  Well, I thank you.  Reclaiming my time, let me also get you to clarify granted the fact that revenue is the middle name of the organization that you so ably represent, Commissioner, if you had the opportunity to have bank robbers file returns and gain that revenue, do you think that would be helpful for paying the Nation's

25

bills?  Would you suggest that as a policy action?  If we could get the identity of bank robbers and other thieves in our society and get the revenue, a portion of that revenue that they have attained through ill-gotten gains, would that be helpful to solve the revenue challenges we confront?

Mr. EVERSON.  Well, sir, we obviously pursue illegal source income, and it is an important part of criminal prosecution.  Again, as I stated at the top of the hour, we want our share, our tax share, whether the income was earned legally or illegally.

Mr. HAYWORTH.  Yes, again--but again, I want to understand this.  Revenue is the final notion.  However you can get your hands on it, however it is earned, the bottom line with your organization is getting that revenue?

Mr. EVERSON.  That is correct, sir.

Mr. HAYWORTH.  It would follow that if there are criminal enterprises, we want that revenue as well, and if we just have to look the other way on the criminal enterprise at hand to gain the revenue, well, so be it.

Mr. EVERSON.  No.  That is not what we are doing.  I don't agree with that at all.  That is a mischaracterization.

Mr. HAYWORTH.  Good.  Mr. Commissioner, please, please.  Reclaiming my time, I offer the mischaracterization purposefully, Mr. Chairman, and with your indulgence, because it points out the inherent schizophrenia of the policy the Administration and quite frankly many on the right and left--on the right for cheap labor, on the left for cheap votes--are trying to create for a Nation at war.

It is inherently disappointing and inherently dangerous, and it is the wrong path at the wrong reasons for the wrong times.  I have heard from all three of you gentlemen words to the effect that we have to bring people out of the shadows.

I believe, gentlemen, we will be far better off shining the lights on employers and employees alike, enforcing existing laws, beefing those laws up where we need to, and I will just tell you I appreciate the spirit in which you come, but whether it is 5 year's time to get control of the border or a year's time to come back with an incisive report, gentlemen, the legislative branch can only do so much.  The executive branch exists, of course, to administer and execute the laws.

We may have imperfection in laws.  There is testimony that exists today in some ways that we can help streamline and improve it, but please understand, and convey to all of your cohorts in the Administration though we may, for the most part, share a letter of affiliation politically, there is deep dissatisfaction across the Nation with the continued pursuit of a schizophrenic policy that is wholly impractical.  I thank you for your time and your indulgence.  I thank you, Mr. Chairman.

No-Match Cert. Admin. Record  60

Chairman MCCRERY.  Yes, sir.  Thank you, Mr. Hayworth.  Gentlemen, we have a couple of votes on the floor, so if you don't mind, we are going to recess the Subcommittee just long enough for us to go over and vote and return.  If the first panel wouldn't mind staying, there are still members who would like to address questions to you.  Is that satisfactory?

Mr. EVERSON.  I never like taking questions from Earl Pomeroy, if that is who you mean?

[Laughter.]

Chairman MCCRERY.  Well, I don't know if he will come back, but the Committee is in recess.

[Recess.]

Chairman MCCRERY.  The Committee will come to order.  Thank you, gentlemen, for being patient and waiting as we completed those votes on the floor.  Now, we will resume questioning with Mr. Pomeroy.

Mr. POMEROY.  I thank the Chair and especially note my feelings of appreciation to Commissioner Everson.  Now that I am not Ranking Member anymore, I did not expect such courtesy as to have you wait.  The--you will forgive my confusion, but in reading the testimony, I am having a little trouble understanding where principally this worksite enforcement business falls.  I have listened very closely to the discussion earlier in this hearing.  I think it was Congressman Johnson, who noted that worksite enforcement actions were three last year.  That is from a number of 417 in 1999; three in 2004.

Now, this worksite enforcement of the immigration law, Mr. Baker, is principally DHS Immigration; right?

Now, I note in your testimony you state a vigorous enforcement of our worksite immigration laws is a crucial step in moving toward a system where foreign migrant workers are employed in this country legally and transparently.

Can you describe to us how this jibes?  It looks to us like worksite enforcement has not been something that has been subject to much attention at DHS.

Mr. BAKER.  I am glad to address that.  There has been a shift in the way in which we have approached worksite enforcement, including a focus on critical infrastructures, as I said earlier.  We are particularly concerned about people who are not here legally working in baggage handling facilities at airports or at chemical plants where they could do real damage with an act of sabotage or just an accident.

There has also been an increased focus on trying to find ways to work with employers to get employers to do some more work, take more responsibility for doing some of the

**No-Match Cert. Admin. Record  61**

screening; getting employers to join the basic pilot so that they can check people at the intake point rather than afterwards when we are trying to get access to no-match records.

I think there is no doubt that we need to expand our enforcement efforts.  We need better tools to be able to do that.  I am hoping that the Administration shortly will be proposing new ways of doing enforcement so that we can improve our record.

Mr. POMEROY.  The DHS is having a tough week, and let me acknowledge that I think you have a very difficult job, an impossible job, in light of some of the circumstances--various laws  and then circumstances on the ground leave you to resolve.

Sometimes I think that from the dais here we don't appropriately recognize the extraordinary difficulty of your mission.  Having said that, it seems to me that this is a time where DHS, this enormous Agency, that obviously has yet to figure out how to effectively use all the wherewithal at its disposal, be it natural disaster response in Katrina, as we are seeing in the Senate this week, or worksite immigration law enforcement, which has dropped to three actions last year, even though your testimony this morning says it is a crucial step--your words.  We have got some hesitation about now you want to get all this IRS data.  I don't know that you have fully figured out how to use the data you have already got.

Now that is--maybe in the rest of my time we can get to the bottom whether or not we think that there is quite the treasure trove of information here that you think there is.  You indicate that there is a--this SSN mismatch is all about evasion of immigration laws.

Commissioner Everson, do you think--or Commissioner Lockhart--are there other explanations?  Do you conclude that all of these mismatches represent a fraudulent effort to hide illegal immigration or sometimes do people just screw up, and it is inadvertent error or attributed to other reasons?

Mr. LOCKHART.  You want me to go?--Well, certainly the mismatch file, which , as I said, confirms about 8.8 million was for tax year 2003, is composed of a lot of different pieces.  We do a lot of scrubbing to try to correct typographical errors and other things, but certainly people change their names.  People get married, change their names, and--or the people use the wrong name with the employer, or they mainly use a nickname that doesn't match the name in our records.  There is a lot of activity in the suspense file that is not related to undocumented workers.  On the other hand, there is probably a significant number that is related to undocumented workers.

Mr. POMEROY.  Fifty-fifty.  Ninety-ten?  Any idea?

Mr. LOCKHART.  We really don't have good data on that.  I would say it is less than the 90 to 95 percent that DHS has said, but I don't know how much less.

Mr. POMEROY.  Okay.  My time is up, Mr. Chairman.  I thank you.  Mr. Everson, next time.

**No-Match Cert. Admin. Record  62**

[Laughter.]

Mr. EVERSON.  I will look forward to it, sir.

[Laughter.]

Chairman MCCRERY.  Ms. Tubbs Jones.

Ms. TUBBS JONES.  Thank you, Mr. Chairman.  Good afternoon, good morning, gentlemen.  It is still morning.  Let me start with Secretary Baker.  How are you, sir?

Mr. BAKER.  Very good.  Thank you.

Ms. TUBBS JONES.  Good.  I need my glasses, because this print is too little.  Maybe that is why your employers don't want to fill this out.  The OMB Form 1615-0047, Employment Eligibility Verification, are you familiar with that form?

Mr. BAKER.  I am not sure that I am.

Ms. TUBBS JONES.  Okay.  Novena.  It is called an I-9?

Mr. BAKER.  Yes.

[Laughter.]

Ms. TUBBS JONES.  All I have to do is give you the right number; right?

Mr. BAKER.  Yes, exactly.

Ms. TUBBS JONES.  Okay.  The I-9 has a section that gives employee information and verification, and the employee is required to fill that out with an SSN.  Then Section Two is an Employer Review and Verification and has several sections to it.  Then it gives the employer--it gives the employer as well as you a list of acceptable documents to document the employee eligibility and the like.  Now, this is the same information that you are asking that the IRS provide to you, or you would like to have from the IRS for purposes of preventing terrorism or whatever; right?

Mr. BAKER.  Much of it, yes.

Ms. TUBBS JONES.  Now, when you receive this form the employers, what do you do with it?

Mr. BAKER.  We actually, as I remember, we ask them to hang onto that.  I am not sure that we are asking them to file that.

29     **No-Match Cert. Admin. Record  63**

Ms. TUBBS JONES.  Okay.  You ask the employer to hang onto it, so it is information that is within your grasp, since it is a form required by your Department?

Mr. BAKER.  We could ask for it, yes.

Ms. TUBBS JONES.  Right.  Have you ever used this information in order to reach the compliance that you are trying to get from the IRS?

Mr. BAKER.  The difficulty with that information is it is in the hands of the employer, and the question is which employer--if we went to an employer, we could say we would like to see your I-9 forms.

The difficulty is in choosing which employer we are going to devote scarce investigative resources to, and what we are hoping is that access to the Social Security information will allow us to say, well, here is a place we ought to look as opposed to--

Ms. TUBBS JONES.  Well, now, let me ask you this:  Historically, before you ever had this form, you have a group of employers who you believe historically have not complied with or have been--what is the better word--consistently employing people without verifiable or legitimate papers to be in the United States; right?

Mr. BAKER.  Right.  Yes.

Ms. TUBBS JONES.  It clearly is more than the three that you have investigated since 1999; right?

Mr. BAKER.  I am sure there are more people than that.

Ms. TUBBS JONES.  Wouldn't that be a logical place to start with the employers, just to--even if you just want to try it out and see if it would work and that you wouldn't use scarce resources in order to do that?

Mr. BAKER.  The difficulty is picking the right people; picking companies where we are most likely to find abuses.  This is a tool that would allow us to identify people who are mostly likely to have abuses to find.

Ms. TUBBS JONES.  The IRS has suggested to you that the 300 worst companies are in agriculture, restaurant, and day labor groups.  Is that a logical place for you to start your search?

Mr. BAKER.  Yes.  Certainly, we could look in those industries, but then we would be picking blind among an enormous number of restaurants.

Ms. TUBBS JONES.  I am a former prosecutor, and one of the offenses that we deal with--we couldn't catch the person stealing the car, but they were driving the car, so there is an offense called receiving stolen property, other than theft.  There is something in the

30

course of what you do that you don't have to necessarily establish the underlying offense, but you could look at the fact that these people were there or whatever in order to reach some compliance.  I hate I am running out of time with just you.

I would just hope that there will be other processes by which you would try to figure out how you handle that.  I am not necessarily totally in support of the IRS not having to provide the information.  I am still angry that when I pick up the phone and call--dial my bank I have to give my SSN in order to reach my money.  It is clearly we have gone outside of the traditional private area or what we call private in the sake of tapping my telephone and so forth and so on.

Maybe there would be an opportunity to do what you want to do without reaching into the private area--private information of people.

Mr. BAKER.  We are not asking for authority to tap your telephone.

Ms. TUBBS JONES.  Oh, I know you personally are not doing that, but somebody is. Not my personal phone, but I mean--well, we won't--what I am talking about? Everybody does.  It has been all over TV.

I yield back my time.  Thanks--if I have any.

Chairman MCCRERY.  Thank you. Mr. Everson, Mr. Lockhart, and Mr. Baker, thank you very much for your testimony, and your answering our questions.  We look forward to having you back in not too many more months to get an update on this important issue.  Thank you.

Mr. BAKER.  Thank you.

Chairman MCCRERY.  Now, I would call the second panel.  The Honorable Patrick P. O'Carroll, Inspector General, SSA; Barbara D. Bovbjerg, Director, Education, Workforce, and Income Security Issues, General Accountability Office (GAO).

Thank you, both, for being patient, as we worked our way through the first panel and the votes like the first panel, your written testimony will be admitted to the record in its entirety, and we would like for you to summarize your testimony in about 5 minutes.  We will begin with Mr. O'Carroll.

## STATEMENT OF THE HONORABLE PATRICK P. O'CARROLL, INSPECTOR GENERAL, SOCIAL SECURITY ADMINISTRATION

Mr. O'CARROLL.  Good afternoon, Chairman McCrery, Chairman Ramstad, and Members of both Subcommittees.  Thank you for the invitation to be here today.  Today's issue is one of the most persistent we have faced in our 11 years as an organization--SSN misuse as it pertains to the reporting of wages.  As you know, SSA receives wage reports, W-2 forms from employers, and posts the wages to workers' accounts.

When a wage report contains errors and cannot be properly posted to a worker's account, it is instead placed in the ESF.  As of November 2005, there were 255 million wage items placed in the ESF, representing $520 billion in wages through Tax Year 2003.  In 1998, SSA's first IG testified before Congress and identified the major challenges facing SSA. After solvency, the first challenge on his list was the ESF.  In 2002, SSA's second IG testified that the ESF remained one of the great challenges facing SSA. He also placed particular emphasis on immigration, and on the impact unauthorized workers have on the ESF.

Now, I stand before you, as SSA's third IG. The ESF remains one of SSA's greatest challenges, and the most significant impediments to resolving that challenge are unchanged:  first, the lack of sanctions against the most egregious employers; and, second, legal obstacles that prevent SSA from sharing data with employers and immigration authorities.  It would be an unfortunate neglect of the trust placed in us if SSA's fourth IG someday testifies that the same two obstacles remain in place.

Last year, we issued two audit reports that highlighted the need for an effective program of sanctions against employers who repeatedly submit high volumes of erroneous wage reports: the first report noted significant problems in the restaurant, service, and agriculture industries, and repeated prior recommendations for SSA to intensify talks with the IRS aimed at convincing IRS to make more effective use of existing sanctions.

The second report recommended more outreach to employers as part of the issuance of "no-match" letters by SSA.  However, SSA responded that with no fear of retribution, employers had generally determined that their current practices met their needs.

A high proportion of ESF entries results from wages reported for work performed by non-citizens who do not have work authorization from DHS.  Unfortunately, SSA and the IRS interpret current law so as to prohibit SSA from sharing information from the ESF with the DHS, even as it pertains to the most consistently egregious employers. Information that could help address the ESF problem is in SSA's hands, but SSA must remain mute.  The authority to sanction and deter employers is in the IRS' hands, but the IRS rarely exercises that authority.

While the ESF is the largest repository of misinformation, another file exists that is similarly troubling.  Each year, SSA is required by law to submit to DHS the names and SSNs of all employees with wages reported under the "non-work" SSNs.

While SSA shares this information with DHS, little has been done to analyze and utilize the information, and, more importantly, the disclosure laws I mentioned earlier also prohibit SSA from informing employers that they have illegal workers in their employment.

In summary, disclosure laws handcuff SSA and DHS and keep them from making meaningful progress with respect to unauthorized non-citizens, and with regard to the

ESF, this difficulty is exacerbated by the lack of sanctions against employers who have been given no reason to comply with the law.

Without meaningful change, you will likely hear the same frustration from my successor that you have heard from my predecessors and from me.

Thank you again for inviting me to be here today, and I will be happy to address any questions you may have.

[The prepared statement of Mr. O'Carroll  follows:]

Chairman MCCRERY.  Thank you, Mr. Inspector General.  Ms. Bovbjerg.

**STATEMENT OF BARBARA D. BOVBJERG, DIRECTOR, EDUCATION, WORKFORCE, AND SECURITY ISSUES, U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

Ms. BOVBJERG.  Thank you, Mr. Chairman.  Good afternoon, Mr. Chairman, Ms. Tubbs Jones.  I am happy to be back today, this time to discuss the use of SSN data to reduce unauthorized work.  No one is lawfully permitted to work in the U.S. without a valid SSN and either citizenship or work authorization.  Yet, non-citizens work without such authorization and gain employment using false information.  How such unauthorized work can be detected and prevented clearly continues to challenge the agencies involved.

Today, I would like quickly to discuss two things:  the Social Security data that can help identify unauthorized employment and issues for improving the usefulness of the data.  First, let me talk about the Social Security data.  The SSA has two types of data useful to preventing and detecting unauthorized work:  the Participant Records and the Earnings Reports.  Participant records that include the name, date of birth, and SSN, among other things, can be used to verify that a worker seeking employment is providing the SSN assigned to someone of that name.

The SSA uses these data to provide both batch and web-based verification services for employers' use on a voluntary basis.  The service is designed to assure accurate employer wage reporting and discourage hiring of unauthorized workers are offered free of charge.  The SSA also uses Participant Records in a verification system developed by DHS--DHS offers electronic verification of worker status by a program called the Basic Pilot.

This program sends employee data through SSA to verify name and SSN, and, for non-citizens, also through DHS to verify that the person is both legally present and authorized to work.  This system too is voluntary and has only recently been available nationwide.  None of these verification systems is widely used by employers.

The SSA's earnings data provide a different sort of information.  There are two SSA data files for these records that Mr. O'Carroll mentioned.  The first, SSA's Non-Work Alien

**No-Match Cert. Admin. Record  67**

File, contains earnings reports that are posted under non-work authorized SSNs. These records are thought to belong to a group of people who may be in the U.S. legally that may also be working without authorization. Under law, SSA passes this file to DHS annually, but, as Mr. O'Carroll stated, little has been done with that information.

The second type of earnings data is found in the ESF. The ESF holds earnings reports where the name and SSN cannot be matched to records in SSA's Participant Files. The GAO has reported that this file, which contains almost 300 million records, appears to include an increasing number of earnings records associated with unauthorized work, but is not regularly used as a DHS enforcement tool because the file contains legally protected taxpayer information. Let me turn now to the usefulness of the data in addressing unauthorized work.

Under the current arrangement with the Non-Work Alien File, DHS staff believe they would have to invest significant resources to determine which workers are truly still unauthorized; a number of those whose records are in the Non-Work Alien file may have been authorized but have not informed SSA of the change in status. Also, the lack of a common identifier for records in DHS and SSA files makes the matching process difficult and time consuming, and the lack of industry codes associated with the employers prevents DHS from targeting employers in the critical infrastructure areas that are important to homeland security.

The ESF, on the other hand, potentially has employer information that is more useful to DHS, but some of the same difficulties that pertain to the Non-Work File could also affect the Suspense File's usefulness, and the sensitivity of sharing taxpayer records means the case for their use outside SSA must be truly compelling. If the challenges of the ESF can be overcome, authorizing transmittal of at least some of that protected information to DHS might be warranted. It is likely that producing accurate and useful unauthorized work data from these records could require a continued effort on the part of SSA, DHS, and IRS, but these efforts will be of little value without credible and coordinated enforcement programs in place.

The three agencies will still need to improve employer reporting and worksite enforcement efforts, if measures to improve the usefulness of existing data are to bear fruit.

In conclusion, the Federal Government can make better use of information it already has to support enforcement of immigration, work authorization, and tax laws. The Suspense and Non-Work Alien Files have promise. The best information in the world won't make a difference if the relevant Federal agencies cannot work together to improve employer reporting compliance and conduct targeted and effective worksite enforcement. That concludes my statement. I welcome your questions.

[The prepared statement of Ms. Bovbjerg follows:]

34

**No-Match Cert. Admin. Record  68**

Chairman MCCRERY.  Thank you, Ms. Bovbjerg.  To both of you, you both mentioned in your testimony how the recent trends in the ESF seems to indicate an increase in illegal work and SSN fraud and misuse.  I wonder if I can get you to expound upon that a little bit.  You have obviously, both offices, done extensive examination of the composition of the ESF.  Can you, for example, describe the characteristics of employers with the largest number or highest percentage of wage reports in the ESF, or the characteristics of employees whose earnings are in the ESF?

Mr. O'CARROLL.  I will respond first.  What has come out in previous testimony is that sort of the trends that we are coming up with are that the three employment groups with the largest number of wage reports in the ESF are the service industry, the restaurant industry, and the agriculture industry.

In one of our previous testimonies, we indicated that the states with the most wage reports in the ESF are California, Texas, and Illinois.  What we are finding is that about the same number of wage reports go into the ESF every year, which is about 9 million reports.  Although the number of wage reports going into the ESF is level over the last several years, we are finding that the number of problem employers is increasing.  Therefore,  although we have identified these problem employers, they keep posting more and more wage reports into the ESF, which is problematic.

Ms. BOVBJERG.  We took a little different cut at the ESF.  We looked at records between 1985 and the year 2000.  There were 85 million records.  We found certain types of errors come up all the time.  Nine million of the records had SSNs of all zeros.  For 3.5 million of the records, employers used the same SSN for multiple workers in the same year.  One and half million had SSNs had never been issued.  There were a lot of these types of problems.  We found an industry concentration similar to the IG findings we saw eating and drinking establishments, and, we found construction was the second largest industry in the group of records that we looked at.  We also found that 8,900 employers--this is out of the 6 million who send information annually to SSA--8,900 were responsible for more than 30 percent of the ESF records we reviewed.

The reason that we think that there could be more unauthorized work coming into the ESF is that we looked at reinstatements.  You really can't tell from looking at the ESF records where people were born and who they are. That information wouldn't be in the ESF.  You can tell something by looking at information on those records that were reinstated to someone's Social Security account.  We looked at 265 numbers that came up more than a thousand times in the period that we examined.

Of those, there were 13 million reinstatements to almost 12 million different people on these most frequently used numbers.  What we found was that in 1986, about 8 percent of those people who received reinstatements were foreign-born.  The vast majority was U.S.-born.  By 2000, the majority was still U.S.-born, but we were up to about 20 percent of the reinstates being foreign-born.  Of those, almost half involved earnings received prior to the individual getting a work authorized SSN.  We thought that while it is a

tremendous exaggeration to say that the ESF represents unauthorized work, I think it is fair to say that there is an increase in mismatches that are the result of unauthorized work.

Chairman MCCRERY.  Thank you.  Ms. Bovbjerg, you are familiar with, I am sure, the bill that the House recently passed.  It hasn't passed the Senate, so it is not law, just a House-passed bill.  That bill would require employers to verify SSNs and employment eligibility through an electronic system modeled on the Basic Pilot program.

Your organization, the GAO, though, in a 2005 report stated that the Basic Pilot program has some serious weaknesses.  It does not detect identify theft.  The DHS databases are not up to date.  Employers may use the verification service to engage in discriminatory practices, and verifications may be delayed if system use increases substantially.  Based on the GAO's research, if the Basic Pilot were to be made mandatory, as under the provisions of the House bill, would this system have the capacity to handle some 6 million employers in this country?

Ms. BOVBJERG. We have some concern about that.  When we did that work last year and looked at the processes at DHS, one of our recommendations was to assess the feasibility and cost of correcting the weaknesses in the Basic Pilot.  This is a recommendation that the Department has accepted and said that they will pursue.  Simply doing that is a big job.  Making sure that those things are corrected is an even bigger job.  I don't know whether they will be ready or not, but it would be something that I think DHS should be concerned about.  SSA, however, says that they are ready for their part in a mandatory Basic Pilot.

Chairman MCCRERY.  How many employers now are covered under the Basic Pilot?

Mr. O'CARROLL.  I have that figure.  About 8,000 employers are under the Basic Pilot.

Chairman MCCRERY.  Eight thousand.

Mr. O'CARROLL.  Out of 6.5 million employers.

Chairman MCCRERY.  Eight thousand.  We go from 8,000 to 6.5 million.  Have you have any thoughts on if the Basic Pilot were made mandatory, would we see an increase in the use of counterfeit documents, like the SSN card or would we see an increase in identity theft, because people would know that they are being checked?

Ms. BOVBJERG.  If everything is up and running, and we are--we as a government--are able to run a verification process like that--

Chairman MCCRERY.  Right.

Ms. BOVBJERG.  --I think it would undermine the value of the fake identity information.  You would have to have a working system with a credible enforcement program behind it.

Chairman MCCRERY.  Which may involve changes to the SSN card itself, to make it tamper proof or less subject to theft, or--

Ms. BOVBJERG.  It depends really on what kind of role that the Social Security card would have in the whole I-9 process, which I know is under review at DHS.

Chairman MCCRERY.  Are you concerned that we are not ready as a government to move forward with making this program mandatory for all employers?

Ms. BOVBJERG.  I always like to try things out before we go to a full implementation, and I know we have been running the Basic Pilot as a pilot program.  I think what we found is that a significant portion of the verifications have to be done by hand.  That concerns me for opening it up to 6 million employers.  Does that mean we can't do it?  No.  I think it means that we would have to really plan how we go forward and how long it is going to take to be ready to do that.  I would be concerned if we went ahead with a mandatory verification where the government is not really prepared to provide the verifications that are required.

Chairman MCCRERY.  Mr. O'Carroll, do you have any thoughts on this?

Mr. O'CARROLL.  I concur. The reason we endorse pilots is to test a process to see how it is working.  As I noted before, what we are getting from employers in terms of the Basic Pilot from our surveys is that employers like it.  They feel it is working well.  It is getting a great response.  I think our responsibility and the GAO's responsibility is to monitor these pilots; give them some time to work out; and then report back.  We have been working on surveys in relation to the Basic Pilot, and in relation to SSNVS to get more information for the Subcommittee as to the viability of rolling the Basic Pilot out to all 6.5 million employers.

Chairman MCCRERY.  Okay.  Thank you.  Mr. Lewis.

Mr. LEWIS OF GEORGIA.  Thank you, Mr. Chairman.  Ms. Bovbjerg, your testimony implies that you think that the IRS should share tax return information with DHS.  Are you saying or suggesting that the law should be changed?

Ms. BOVBJERG.  I am not ready to suggest that today.  We have work underway for these Subcommittees looking at the Non-Work Alien File and how useful that might truly be to DHS enforcement efforts and what alternatives exist.  Certainly the Earnings ESF could be an alternative, and it is something that we will also look at.  I would say that even if there are data that could help DHS, if DHS is not ready to use that information in a credible enforcement program, that would not meet our criteria for providing tax access.

Mr. LEWIS OF GEORGIA.  Do you happen to know the views or the position of the Comptroller General?

Ms. BOVBJERG.  On this particular issue?

Mr. LEWIS OF GEORGIA.  Right.

Ms. BOVBJERG.  I do not. I have not spoken to him directly on this exact issue.  I know that when we ask for 6103 authority ourselves, we only do it when we are positive that we need access to that information to do something in particular that we have already figured out what we are going to do.  I am just a little concerned about going forward and saying DHS needs this information.  When I am not sure they are ready to use it in an enforcement program.

Mr. LEWIS OF GEORGIA.  Thank you very much.  Mr. O'Carroll, do you believe employers should have a greater responsibility to verify the identity, SSN, and immigration status of their employees?  Where should the burden be?

Mr. O'CARROLL.  Mr. Lewis, I believe that employers do have such a responsibility.  For example, we have noted in one of our audits that a certain employers are reporting the same SSN for 900 different employees. There are trends, and I think that is the important part.

Mr. LEWIS OF GEORGIA.  Let me--you are saying a certain employer--

Mr. O'CARROLL.  Yes.  One employer.

Mr. LEWIS OF GEORGIA.  One--the same SSN--

Mr. O'CARROLL.  Nine hundred times.

Mr. LEWIS OF GEORGIA.  Is that widespread or just one of the tools?

Mr. O'CARROLL.  I am using that as an egregious example, Mr. Lewis.  What we are also finding is that certain employers are using sequential SSNs numerous times. They will submit an SSN for an employee. Then for the next employee, use the next SSN in the sequence. There are egregious employers out there. We think that it should be brought to their attention that they are incorrectly reporting the SSNs so that they can take corrective actions.

Mr. LEWIS OF GEORGIA.  Are you prepared today to make any particular recommendation for additional employer responsibility?  If so, who supports your position?

Mr. O'CARROLL.  I believe what we noticed from the first panel today was that we have got three agencies that have equal concerns in terms of information that is being supplied by the employers.  Each one has mentioned it in one way, shape, or form. We all have concerns as to the information we are getting from employers and we need to have methods to encourage employers to verify the SSNs they are reporting.  Yes, I think that

**No-Match Cert. Admin. Record  72**

employers should--the laws that we have now should be used to force employers use better scrutiny in terms of the SSNs they are reporting.

Mr. LEWIS OF GEORGIA.  Thank you very much.  Thank you, Mr. Chairman.

Chairman MCCRERY.  Mr. Ramstad.

Chairman RAMSTAD.  Thank you, Mr. Chairman.  I want to thank both the witnesses for their testimony.  Director Bovbjerg?

Ms. BOVBJERG.  Bovbjerg.

Chairman RAMSTAD.  Bovbjerg.  I would like to ask you a question, if I may please?  The GAO's 2005 report on immigration enforcement, are you familiar with that report?

Ms. BOVBJERG.  Yes, I am.

Chairman RAMSTAD.  The report found that the number of notices of intent to fine, as well as worksite enforcement arrests, by DHS had decreased considerably since 1999 in that 6-year period.  In fact, the report found that worksite enforcement arrests had declined by 84 percent between 1999 and 2003.  Shouldn't we be concerned with this lack of enforcement and since the GAO released its report last year, have you noticed any changes or improvements made by DHS in fulfilling its responsibilities?

Ms. BOVBJERG.  We know that what we were told about the drop off in the intention to fine and in the arrests had to do with not only a shift of focus to the anti-terrorism efforts that Secretary Baker spoke about in critical infrastructure areas; airports; power plants; and so on, that the agency is also looking at alternatives to making arrests and fines; that they are looking more at civil settlements as a way of more effective use of their resources.

Whether they have taken actions that would change that approach I do not know. Our report was released at the end of the summer, in August, so there hasn't been a lot of time for DHS response to it.

I do think that DHS has been very clear with us that there is a shift in priorities.  They have limited enforcement resources, and we--in always looking at any kind of enforcement--I look at pension enforcement, too--we always say it is better to target the limited resources that you have.

I think the question here is it only critical infrastructure enforcement that the Congress wants to see or does the Congress want to see a more general worksite enforcement, in which case those priorities would need to be reordered.

Chairman RAMSTAD.  Doesn't that mean enforcement is essentially a joke?  An 84 percent decrease.  I understand the reordering of priorities, but I also understand the laws

**No-Match Cert. Admin. Record  73**

and the regulations, and it seems to me that we shouldn't be picking and choosing which laws to enforce.  You haven't really seen any changes or improvements by DHS in this regard since that report; is that a correct statement?

Ms. BOVBJERG.  I cannot really answer that question because I am not an expert on the immigration issue.

Chairman RAMSTAD.  I understand.  Let me ask you for the remaining minute or two I have, IG O'Carroll, about information sharing between SSA and DHS.  I know in a 2001 report, the SSA IG recommended that SSA collaborate with INS, which, of course, was then incorporated in DHS, to develop a better understanding of the extent that immigration issues contribute to SSN misuse and the growth of the ESF.  Also, the SSA IG recommended that the SSA, reevaluate its application of existing disclosure laws or come to Congress for legislative authority to remove barriers that pertain to information sharing.

Given the fact that this information sharing issue has been studied exhaustively I know by the SSA IG and so forth, do you have any conclusion or observations as to which data would you recommend SSA share with DHS?

Mr. O'CARROLL.  Yes, Chairman Ramstad.  There is some very basic information that I believe would be useful, and it ties into my answer to Mr. Lewis.  We have information on chronically bad employers, the ones that are hiring the vast majority of employees posting bad wages or using bad SSNs to post their employees wage reports. We feel that that is important that we should be able to inform those employers that one, we will be employing and notifying DHS of the trends in that employment industry, and the most egregious employers that are involved in the industry and posting bad wage reports and two, as part of SSA's employer outreach programs and let them know that they are one of the worst violators in forms of the posting bad wages reports.  I think that would have a very positive effect in terms of the education of employers as well as enforcement.

Chairman RAMSTAD.  Again, I want to thank both the witnesses.

Chairman MCCRERY.  Ms. Tubbs Jones.

Ms. TUBBS JONES.  Thank you, Mr. Chairman.  I always have to take myself back to other jobs when I start thinking about some of this.  When I first became the elected DA in Cuyahoga County, Ohio, we had no computer system connecting the prosecutor, the courts, the sheriff.  It was the craziest thing, and I sat and said, it can't be that all these smart people can't figure out what they are supposed to do with all this information.

I am stunned in your statement--I think it is Ms. Bovbjerg's statement--let me check and make sure before I--no, I am sorry--Mr. O'Carroll's statement at page 5, you say while SSA and DHS have extensive information at their disposal, they have been unable to find a way to work with the information to prevent, detect, and enforce unauthorized employment.

40

How many people do you have allocated to figuring out a way you work with all this information to get an answer?

Mr. O'CARROLL.  Being in the IG's office, we have made recommendations to SSA and to DHS to work those issues out. What was stated in the earlier testimony this morning from DHS is that they have problems with the SSA information they are given. For example, SSA tracks the individuals by their SSN, while DHS indicated that it tracks the individual by their Alien Number. Because of that, they have had difficulties in matching the SSA information.

We have made numerous recommendations asking for the two agencies to work with each other.  I agree with you, Congresswoman Tubbs Jones, I think technology has caught up to a point now that with the other information that is in that file, even though one agency tracks under one number, and another agency tracks under a different number, that they should be able to find a commonality to be able to identify which person is which, and pick up the trends. It ties in with what my colleagues from GAO have found that there is a lot of useful information that is going over to DHS that they can be using for their trend analysis if they have inclination to use the available computer technology to be able to make that information viable.

Ms. TUBBS JONES.  The money that comes from--okay.  I am an employee, and I am in an ESF.  The dollars, the FICA dollars that I pay, where do they sit?  Do they collect interest?  What happens with those dollars if I am in the ESF mode?  The employer had to pay it, whether it was right or wrong; right?

Ms. BOVBJERG.  Yes.  We--the government have already spent that money.  It is just cash into the Treasury.

Ms. TUBBS JONES.  It is just cash into the Treasury?

Ms. BOVBJERG.  Yes.  Yes.  The record of that contribution of yours--SSA doesn't know it is yours, or it wouldn't be in the ESF.

Ms. TUBBS JONES.  Right.  Understand.

Ms. BOVBJERG.  It is still there, with your earnings record.

Ms. TUBBS JONES.  What would you--what is your recommendation?  Take your--can you take your hat off as an employee of the Federal Government--

Ms. BOVBJERG.  Never.

Ms. TUBBS JONES.  --let's see.  I give you immunity.  With what the heck should we be doing?  This is outrageous that we can't work out a system in which to address this.  I am big on privacy.  I don't want you to invade my privacy, and I have already claimed that my SSN is used for everything but my Social Security.  What would you do?  You have

been in this business a long time.  Let us figure it out.  What can we do?  I have got probably 2 minutes, so each of you get a minute left.

Ms. BOVBJERG.  Okay.  Well, I will talk fast.  I can never take my GAO hat off.

Ms. TUBBS JONES.  Okay.  Pretend.  I want to put another hat on top of the GAO hat.  Consultant to the Subcommittee on Social Security .

Ms. BOVBJERG.  We have said before that we need to improve the data that are reported at the worksite; that that would help SSA.  It would also help discourage unauthorized work.

Ms. TUBBS JONES.  Then better thing we need to do is have one location?  If you want to go work for ABC Company, you come to this location.  You give us the information, and we send all that information to ABC company, then we already have a place where we collect all the information about workers.  Has anybody ever thought about that?

Ms. BOVBJERG.  Well, in some ways, a verification system--

Ms. TUBBS JONES.  The lady behind you is frowning.  Come on you can tell me.

Ms. BOVBJERG.  --in some ways a verification system that does go to SSA and DHS is going to a central repository.

I think that really what I am talking about is that we have not established a credible system of penalizing employers for misreporting.  That is something that the IRS is working on I understand.  That is something that they need to work on with SSA and DHS.  It is not only a tax issue, and it is something that would help reduce suspense file mismatches.  It is very fundamental.  The other side is that we need to devote some resources, whether existing resources or additional resources I don't know, but we need to devote some resources to general worksite enforcement at DHS.

Ms. TUBBS JONES.  Begging your indulgence, Mr. Chairman, can I get a 1-minute response from Mr. O'Carroll?

Mr. O'CARROLL.  Probably the most valuable lesson that I learned from the first panel today was when the Commissioner of IRS asked for 1 year to come back and report to you to see what has changed in that year.  One of those things I would like to see changed in that year is that IRS would use their enforcement capabilities to penalize the employers that are chronically misreporting wage information.

The other thing that I would like to see happen in this year regarding the information that we have been giving to DHS, which is identifying problem employers for non-work aliens would be, for DHS to initiate some action on the information.  Hopefully, in my tenure as the IG, we will see that these three agencies are talking to each other and that we get synonymous databases where we can all be working off of the same information.

Ms. TUBBS JONES. My guess is the employers know what a hard time we are having trying to figure this out, and they said, the heck with y'all. We will just go on and do our thing, and when you all catch up with us, we will have gotten our workers, made our money, and probably gone bankrupt or whatever.

Thank you, Mr. Chairman.

Chairman MCCRERY. You are quite welcome. Mr. Levin.

Mr. LEVIN. Thank you. I am sorry I was at another meeting, and I missed the testimony. I guess I think I know enough about it to ask a couple quick questions. Your comment about wishing that we would penalize employers for false information more effectively. This has been an issue we have been discussing for a long time. The assumption underlying that statement is that in many cases, we know enough, we have enough information, to put to employers who are not meeting the law. Is that a correct statement?

Ms. BOVBJERG. In my belief, we do. The reasonable cause standard that the IRS uses is waived if there is intentional disregard. I still do not understand why intentional disregard is not used more frequently because, as Mr. O'Carroll reported, we have employers who time after time after time use the same SSN for all their employees. That is a little different I would submit than goofing up and mis-reporting once.

Mr. LEVIN. I think it is important for us to take that into account because if the focus is mainly on the data, we may not understand the full picture, because what you are saying is in many cases where we have the data, and much of it relates to a smaller number of states, and I think you testified a relatively small number of companies, there hasn't been effective action vis a vis those companies.

Secondly, if all this data pours in, how do you think it is disaggregated by DHS so that they can go after their main target and that is potential terrorists? Has anyone figured out what the relationship would be between more data available to DHS and the implementation of their basic function?

Ms. BOVBJERG. That is a concern we have, and that is something that we are going to look at as part of the work that we are doing for the Subcommittees on the non-work alien file and other sources of data that might be useful to DHS.

Mr. LEVIN. Okay. Thank you, Mr. Chairman.

Chairman MCCRERY. Thank you, Mr. Levin. Thank you, Mr. Ramstad, Mr. Lewis, and thank you, Mr. O'Carroll and Ms. Bovbjerg, very much for your testimony. This is an issue that does require I think a lot of thought, and we are looking forward to receiving at some point from the Administration some concrete proposals as to how to tighten this system to say the least. Thank you very much.

Ms. BOVBJERG.  Let us know if we can help.

Chairman MCCRERY.  The hearing is adjourned.

[Whereupon, at 12:43 p.m., the Subcommittee was adjourned.]
[Questions submitted by Chairman McCrery to the Honorable James B. Lockhart and his responses follow:]

**Question:  The SSA sends letters to employers who report more than 10 W-2s with a name/SSN mismatches, representing at least one-half of one percent of all W-2s reported by the employer.  The SSA also sends a letter to each employee who has earnings with a name/SSN mismatch.  What is the impact of these letters on removing wage reports from the earnings suspense file?**

Answer:  The SSA has ongoing efforts, such as the No Match Letter and the Social Security Statement, that provide individuals with an opportunity to review and correct their earnings records.  In addition to SSA's initiatives, a worker may discover an error in his/her earnings when s/he gets a Form W-2 with incorrect information, or even when the IRS withholds an expected income tax refund.  Once an error is identified, there are several ways the worker can notify SSA to correct the earnings record.  However, we cannot quantify the number of wage reports removed from the earnings suspense file as a result of any one of these ongoing efforts.

As noted, the employer and employee No Match letters are one way SSA tries to notify a worker of the possibility of errors in his/her Social Security record.  Letters sent to employees include a scannable form on which the worker may submit corrections to SSA.  For tax year (TY) 2003, we removed 206,000 records from the earnings suspense file based on these scannable forms.  We cannot tell how many records were corrected by employees contacting SSA in another way, for example by contacting a local filed office.

Similarly, the employer No Match letter asks employers to submit a corrected Form W-2 if the original information that the employer submitted was incorrect.  Our best proxy for gauging responses to the employer no match letter is the number of corrected Forms W-2 (W-2C) SSA receives that correct only name and/or SSN.  For TY 2003, we received 241,000 such corrected W-2s.  However, of those, approximately 196,000 provided corrected information on wage items SSA had already been able to correct and post to the worker's record.  Generally, this occurs because the employee No Match is sent prior to the employer's No Match letter, allowing the employee to take action to correct his/her record before the employer submits a Form W-2C.  Fewer than 7,000 records were actually removed from the suspense file as a result of corrected Forms W-2.  The remaining Forms W-2C submitted did not provide correct information.

It should be noted that, in some cases, the employee's information on the submitted Form W-2 is more current than the information in SSA's records (for example, when an employee gives her married name to her employer but has never notified SSA to report her legal name change).  It is the employee's responsibility to update his or her

information with SSA. Once SSA's records have been updated to reflect the most current information, the wages can be posted to the individual's record. A corrected Form W-2 is not needed.

**Question: In 2002, rather than send letters to employers with more than 10 W-2s with name/SSN mismatches, SSA sent letters to each employer with even one W-2 with a name/SSN mismatch. Why did SSA not continue that policy?**

Answer: In calendar year 2001 (Tax Year (TY) 2000), SSA sent 109,157 letters to employers. In calendar 2002 (TY 2001), SSA sent 950,000 letters to employers. Every employer with even one name/SSN combination that did not match SSA records received a letter. In evaluating the effectiveness of this activity, we determined that the total cost to SSA, including the cost of producing and mailing the letters and handling follow-up calls to employers, was approximately $1.3 million. For reasons discussed above, we estimate that only about 35,000 items were actually removed from the suspense file. As a result, SSA determined that sending letters to all employers with W-2s that could not be posted was disruptive and not a cost-effective use of resources. In calendar year 2003 (TY 2002), SSA instituted our current threshold for sending employer No Match letters, sending 126,000 such letters to employers. However, though the number of letters was greatly reduced, the No Match letters that were sent to employers covered 7.6 million out of a total of 9.8 million mismatches, at a savings of approximately $1 million from the previous year. In addition, employers received 1.9 million individual letters for employees, for whom we did not have valid addresses.

**Question: Several bills introduced this Congress would require employers to verify the employment eligibility of new hires through a database that combines data from the SSA's SSN applications and DHS's immigration records. Currently, in the Basic Pilot program, the two sources of data are kept separate, and each agency independently verifies the information without sharing it with the other agency. Is there any particular advantage or disadvantage to combining the databases? Would it increase the accuracy of the data? Would it increase the speed of verifications? Would it improve program administration? What effect might it have on the privacy of personal information?**

Answer: The Basic Pilot Program matches the information submitted by an employer against the information in SSA databases and DHS databases. Each agency maintains the data necessary for the administration of its programs. By specializing, each agency focuses on its respective primary mission. Each must be responsible for its own business processes, including the collection, integrity and accuracy of certain information. If these databases were to be combined, one agency would be burdened with the management of data which it does not collect, cannot verify and which is not related to its business purposes. Also, it would require additional resources for that agency. Further, a combined data base would be less accurate than two separate data bases since combining the data would involve transmitting updated information from the source data base. At any point in time, some data on the combined data base would be out of sync with the source data base that contains the most current information.

Since the current process is online, the increase in the speed of verifications would probably be negligible. Creating a database maintained by one agency might well increase the length of time to correct information because each agency would retain the applicable business process to ensure that policy was followed in entering and/or correcting the data.

With regard to the effect on the privacy of personal information, combining the databases could undermine certain privacy interests currently recognized in the Privacy Act of 1974 (P.L. 93-579). For example, the Privacy Act protects the principle of minimization, which ensures that agencies retain only such information necessary to accomplish a program mission. In addition, the Privacy Act also suggests that information be collected to the extent possible from the subject of the record, as opposed to other sources such as Federal agencies. However, if Federal statute required combining the databases, every effort would be made to assure that the newly created system of records would conform to Privacy Act principles and standards for security, just as the separate databases are protected today.

**Question: In a 2001 report, Obstacles to Reducing SSN Misuse in the Agriculture Industry, the SSA IG recommended proposing legislation that would provide SSA with authority to require chronic problem employers to use the Agency's SSN verification services. At the time, SSA disagreed, saying the IRS already had authority to penalize employers who do not comply with wage reporting requirements. However, as the IRS has no record of penalizing even employers with high name/SSN mismatch rates in their wage reports, would SSA rethink its position?**

Answer: We continue to believe that the ability to impose sanctions on employers who fail to provide matched names and SSNs for their employees should be the sole responsibility of the IRS. Sanctions against employers serve as a tool to obtain compliance with employment tax withholding and reporting requirements which are under the jurisdiction of the IRS. Unlike the IRS, SSA does not have the tools to enforce a compliance program against employers. Attempting to establish such a program within SSA would take resources away from SSA's primary mission and could adversely affect public trust and confidence in the program.

We note that the Administration recognizes worksite enforcement as a critical component of comprehensive immigration reform, and it supports mandating an employment eligibility verification system in a manner that is not overly burdensome to employers. The Administration looks forward to working with Congress to ensure that implementation of such a system makes efficient use of technology, is operationally effective, and gives employers the tools they need to verify work eligibility quickly and accurately.

**Question: In a February 2005 report, GAO said that SSN verification services for paper or phone requests require the worker's date of birth, but that electronic requests do not. Why is the date of birth required only for verification through**

**certain media?  Would correcting this inconsistency in SSN verification services help prevent individuals from using the SSNs of children to engage in unauthorized work?**

Answer:  The SSA has always offered name/SSN verification services to employers to ensure that an employee's name/SSN matches for wage reporting purposes.  The telephone and paper listing versions of the Employee Verification Service, and our Field Office procedures, have been in use for many years, and require four fields for verification: name, SSN, date of birth (DOB), and gender.

SSA's new SSNVS was designed as a quicker and more convenient verification service for employers.  During its development, we obtained input from potential users.  Employers advised SSA that requiring DOB and gender presented an additional, and perhaps unnecessary, burden, since this information is not needed for wage reporting and is not included on the Form W-2.  In response to that feedback, SSA designed SSNVS to include the DOB and gender as optional fields to help employers to distinguish between, for example, two Pat Smiths.

The SSA did not change the other verification services which require the DOB and gender field when SSNVS was developed.  However, we continue to examine the requirements in our verification systems to determine whether changes may be needed.

**Question:  The SSA requires employers to register to use the Agency's SSN verification services if the employer is requesting more than 50 verifications, or any number of verifications using magnetic media.  Therefore, employers calling the Agency's toll-free 1-800 number to verify up to five names and SSNs are not required to register, nor is anybody requesting verification of up to 50 names by submitting the request on paper.  What does the registration agreement require of employers?  Why does the Agency have different registration requirements based on the number of requests and the media used, especially since the GAO noted in February 2005 report that some SSA officials believe that some larger employers with significant turnover have dedicated staff whose job is to call the 1-800 number throughout the day to bypass the five-worker per call verification limit?**

Answer:  Through our toll-free numbers, SSA offers Employee Verification Service (EVS) for up to five name/SSN combinations at a time.  For purposes of this activity, the employer's EIN (Employer Identification Number) is verified, but we do not require registration.  In addition, up to 50 name/SSN combinations can be submitted on paper to our local field offices for EVS.  Again, registration is not required.

For large scale EVS requests, that is, over 50 name/SSN combinations, a registration process is required.  To register for EVS, employers must complete a registration form and have it signed by a manager or authorized official of the company.  The title of the signer must follow the signature.  The employer must also sign and date a Federal privacy act statement.  These forms (and explicit instructions) are available in the Employee Verification Service Handbook at http://www.ssa.gov/employer/ssnvadditional.htm.  The

registration form and the privacy act statement must be mailed or faxed to SSA.  Once SSA has processed the registration request, SSA mails the employer a Requester Identification Code.  This code must be displayed on the paper or magnetic media submission and on any EVS correspondence with SSA.

The Federal Privacy Act Statement makes it clear that anyone who obtains SSN verification information under false pretenses, or uses it for a purpose other than for which it was requested, may be punished by fine, imprisonment or both.  It also makes it clear that any employer that uses the information SSA provides regarding name/SSN verification as a pretext for taking adverse action against an employee may violate state or Federal law and be subject to legal consequences.

We are studying the issue you raise regarding different registration requirements to determine whether procedures are needed to advise employers calling the 800 number of the sensitivity of the verification information they are requesting and the importance of using it carefully.

**Question:  The SSA currently does not have authority to pursue civil or criminal penalties for employers who submit wage reports with name/SSN mismatches. Similarly, SSA does not have the authority to require employers with a high number or percentage of name/SSN mismatches in their wage reports to confirm employees' information using the Agency's verification services.  Would you recommend that Congress give SSA such authority?  If Congress were to give such authority to SSA, how might the Office of the Inspector General utilize it?  Could you provide your recommendations for specifying such authority?**

Answer:  Currently, the U.S. Department of the Treasury and, specifically, the IRS have enforcement authority over employers with respect to the submission of wage reports and payment of employment and income taxes both for the employer and the employee.

The SSA processes wage reports (W-2s) as an agent for the IRS.  These tax documents are submitted each year by employers.  The IRS is aware of any errors in these reports. The IRS has full enforcement authority over employers with regard to the submission of erroneous tax information, including the submission of erroneous W-2s.  In addition, DHS has sole authority to enforce worksite compliance with immigration laws.

The SSA is not an enforcement agency.  The SSA IG does investigate cases where, for example, individuals defraud the Social Security system of funds or submit false information in order to claim benefits.  Any information developed by the IG is then turned over to appropriate SSA employees or to a US attorney for appropriate action. However, SSA does not have expertise in enforcement of tax reporting requirements. Before making such a fundamental change in SSA's mission from that of a benefit paying agency to tax reporting enforcement agency with concurrent jurisdiction with IRS, I believe Congress would want to carefully consider the impact of such a change on SSA priorities and costs.  Such a change would alter the perception of the Agency in the eyes of the public as well as diminish the enforcement effectiveness of the IRS and DHS.

48

**Question:  The Commissioner of the IRS expressed concern in his testimony about the effect of increased enforcement of wage reporting accuracy on tax compliance. What are your thoughts on the potential implications for Social Security's finances? In other words, do you believe increased enforcement would result in more payroll taxes being collected, or less?  Also, please provide any information you have on the effect of non-payment of payroll taxes on the wages of tax paying workers.  In other words, if employers can hire employees while avoiding payroll taxes, does that depress wages for all employees?**

Answer:  By law, the OASDl trust funds are ultimately credited with amounts reflecting tax liability due for all wages in OASDl covered employment reported by employers on Forms 941 and W2 (and not with amounts actually collected).  The IRS and SSA have programs in place to resolve inconsistencies in total wages reported by employers on the forms.  Hence, an increase in enforcement of wage reporting accuracy on employers would influence OASDl revenue only to the extent that it affects the amount and timing of wages reported by employers.

With regard to whether increased enforcement activity in this area would result in a decrease in wage reporting and therefore a decrease in wage tax receipts, SSA would defer to the expertise of the IRS in evaluating the impacts of this type of change on wage reporting and tax compliance.

The SSA would defer to IRS and the U.S. Department of Labor with respect to the impact of nonpayment of payroll taxes on the wages of taxpaying workers.

**Question:  The Immigration Reform and Control Act (IRCA) of 1986 (P.L. 99-603) prohibited the hiring of illegal aliens and mandated fines for violators.  Why then are employers not permitted to use the SSA's SSN verification services to screen potential workers before they are hired?  Would it require a change in law to allow employers to use the SSA's SSN verification services to verify information on potential hires?  What would Congress need to do to be sure that applicants are screened before they start working?**

Answer:  There would need to be a change in law in order for SSA to verify information on potential hires.  Under existing law, the purpose for which SSA verifies SSNs for employers is not for employment verification purposes.  The only system that verifies work authorization is the Basic Pilot.  SSA's employee verification service is for employer wage reporting purposes under the provisions of section 232 of the Social Security Act (P.L. 74-271).  In these situations, there is an established relationship between the employers and the individuals.

Under the Privacy Act of 1974 (P.L. 93-579) routine use provision (5 U.S.C. § 552a (b)(3)), SSA may disclose information for a purpose which is compatible with the purpose for which we collect and maintain information. SSA's disclosure regulations that implement the Privacy Act (20 C.F.R. § 401.150) provide that we may disclose information where necessary to carry out SSA's programs.  Under the Social Security

Act, SSA collects enumeration information in order to assign SSNs so that SSA can post wage credits to the appropriate worker. The SSA verifies SSNs for employers solely for the purpose of accurately completing the Internal Revenue service's Forms W-2 (Wage and Tax Statement). Forms W-2s are submitted to SSA for the purpose of posting earnings to an individual's record, which will be used to determine future Social Security benefits. Absent a change in law, SSA lacks authority under the Privacy Act to disclose the information prior to the creation of the employer-employee relationship.

Concerning SSN verification for 'potential' employees (e.g., when an individual has filed an application for employment but the employer has not made a commitment to hire hirnlher), we note that there is no established relationship between the employer and the individual, i.e., there is no basis to assume that the employer will hire and submit a wage report for himlher. Thus, the employer has no need to verify the SSN for wage reporting purposes. In such cases, we cannot establish the requisite Privacy Act and regulatory compatibility criteria to justify verifying SSNs for the employer. In addition, our understanding is that individuals are not required to complete the Form 1-9 (which requires their SSNs) until after they are hired. Pertinent language on the 1-9 form indicates that it is "To be completed and signed by the <u>employee</u> the time <u>employment</u> begins." (Our emphasis.) We believe a change in law may be necessary in order to verify the SSN before the person is hired.

An employer may use DHS' Basic Pilot or SSA's SSNVS services immediately after hiring an individual. If the employer submits information about an employee that does not match information in DHS or SSA records, the employers should ask the employee to contact SSA and/or DHS to correct its records.

[Questions submitted by Chairman McCrery to the Honorable Patrick P. O'Carroll and his responses follow:]

**Question: In a 2001 report, the SSA IG recommended that SSA collaborate with the U.S. Immigration and Naturalization Service (INS) (which was incorporated into DHS to develop a better understanding of the extent to which immigration issues contribute to SSN misuse and growth of the ESF. Also, the SSA IG recommended that SSA reevaluate its application of existing disclosure laws or seek legislative authority to remove barriers that would allow the Agency to share information regarding chronic problem employers with the INS. Given that the SSA IG has extensively studied the ESF, what data would you recommend SSA share with the DHS?**

Answer: The SSA has information related to suspended wages, including information reported by the employer during the Annual Wage Reporting process and information provided by the IRS. As part of the Agency's efforts to resolve employee name and SSN discrepancies, SSA places suspended wage data into a Decentralized Correspondence (DECOR) mailer file so notices can be sent to employees and employers. This information includes:

- Employee's name as reported on the *Wage and Tax Statement* (Form W-2);
- Employee's SSN as reported on the W-2;
- Employee's address as reported on the W-2;
- Employer's *Employer Identification Number* (EIN) as reported on the W-2;
- Address associated with the EIN taken from SSA's Employer Identification File supplied by the IRS;
- Employee's wages as reported on the W-2; and
- Tax year associated with the wages on the W-2.

We believe DHS representatives are in a better position to determine the full extent of SSA information that would assist them in properly enforcing the Nation's immigration laws. However, initially, DHS may be most interested in a list of employers who repeatedly and egregiously file incorrect wage reports, because it appears to indicate the employment of unauthorized noncitizens. For example, SSA could provide DHS information regarding the top 100 employers with the largest number or percentage of wage items in the ESF. To pursue possible investigation and enforcement actions against these employers, DHS would need the employer's name and address, the number of employees with mismatched names/SSNs, the percent of reported payroll that these suspended items represent, and the tax year(s) in question. If DHS determined a more in-depth investigation was necessary, it might also need individual taxpayers' names and reported SSNs to assist them in reviewing employee files. The SSA obtains this information through the wage reporting process and IRS records. Accordingly, the employee wage information is subject to privacy protections afforded by Section 6103 of the Internal Revenue Code. As such, any data sharing would likely require discussions between SSA, DHS and IRS to ensure a proper understanding of the data and compliance with existing laws.

**Question: In a 2001 report, *Obstacles to Reducing SSN Misuse in the Agriculture Industry*, the SSA IG recommended introducing legislation that would provide SSA with authority to require chronic problem employers to use the Agency's SSN verification services. At the time, SSA disagreed, saying the IRS already had authority to penalize employers who do not comply with wage reporting requirements. Given the fact that the IRS has no record of penalizing even employers with the largest number or percentage of name/SSN mismatches on W-2s reported, would you encourage SSA to rethink its position?**

Answer: We made this recommendation to SSA for the purpose of addressing employers who frequently and egregiously report wages for employees with name and SSN discrepancies. We continue to believe that to significantly stem the growth of SSA's ESF, chronic problem employers should be required to use a verification service. At the time of our 2001 report, the SSA/DHS Basic Pilot was not widely available. However, this program is now open to all employers nationwide. This program has an advantage over SSA's enumeration verification services in that it also provides information to employers regarding an employee's work authorization status. Accordingly, we would now encourage the use of this program.

51

We certainly recognize the implications of requiring employers to use such a service—including the impact on labor availability for employers who are reliant on the unauthorized noncitizen workforce. However, in lieu of IRS penalties and DHS workplace enforcement, we believe requiring chronic problem employers—who do not already do so—to use the SSA/DHS Basic Pilot could be the best method to address ESF growth. Given that IRS and DHS currently have primary enforcement authority, many of these employers may also be hiring individuals in violation of the Immigration and Naturalization Act (P.L. 99-603), and the Basic Pilot is primarily maintained by DHS, we believe DHS may now be in a better position to enforce a provision such as the one we recommended in our 2001 report.

**Question: The SSA currently does not have authority to pursue civil or criminal penalties for employers who submit wage reports with name/SSN mismatches. Would you recommend that Congress give SSA such authority? If Congress were to give such authority to SSA, how might the Office of the IG utilize it? Could you provide your recommendations for specifying such authority?**

Given that many of these employers may also be hiring individuals in violation of the Immigration and Naturalization Act and misreporting wages in violation of the Internal Revenue Code, we believe IRS and DHS may be in a better position to pursue civil or criminal penalties for employers who submit wage reports with name/SSN mismatches.

However, if Congress were to afford SSA with the authority to pursue civil or criminal penalties for employers who submit wage reports with name/SSN mismatches, the Office of the IG could utilize such authority under section 1129 of the Social Security Act for false statements and/or representations made to SSA, the felony fraud provisions of the Act found in Title II (42 U.S.C. § 408(a)(1)-(8) and Title XVI (42 U.S.C. § 1383a(a)(1)-(4)), and various Title 18 criminal provisions. With such authority, we recognize that potential jurisdictional issues with IRS will need to be resolved.

**Question: In a February 2005 report, GAO said that SSN verification services for paper or phone requests require the worker's date of birth, but that electronic verification requests do not. Would correcting this inconsistency in SSN verification services help prevent individuals from using the SSNs of children to engage in unauthorized work?**

We agree that requiring the employee's date of birth in SSA's electronic employee verification services would offer an additional level of assurance concerning the identity of the employee and potentially prevent individuals from misusing the SSNs of children. The employee's date of birth is currently an optional field in SSA's Employer Verification Service for Registered Users and SSNVS. As a result, these systems are already capable of verifying an employee's date of birth when it is provided by an employer. Furthermore, SSA participates in the joint SSA/DHS Basic Pilot program, which requires the employee's date of birth as part of the overall verification process.

[Questions submitted by Chairman McCrery to Barbara Bovbjerg and his responses follow:]

**Question:  If the Basic Pilot were made mandatory, is it likely that we would see an increase in the use of counterfeit documents like the SSN card?  Would we see an increase in identity theft?**

Answer:  In our August 2005 report on employment verification and worksite enforcement efforts, we said that the Basic Pilot Program has potential to help enhance the verification process and substantially reduce document fraud (use of counterfeit documents) but is unable to detect identity fraud (fraudulent use of valid documents or information belonging to others).  A mandatory Basic Pilot verification could make some counterfeit documents more difficult to use to falsely demonstrate work authorization.  For example, if an unauthorized worker presented counterfeit documents containing false information, the Basic Pilot program would not confirm the worker's eligibility because the Employment Eligibility Verification Form I-9 information, such as a false name or SSN, would not match the SSA's and DHS database information.  An increase in counterfeit Social Security cards, specifically, seems unlikely because the Social Security card is only 1 of 15 documents that can be used to prove eligibility to work.  While workers are required to provide an SSN, they are not required to show the card to obtain employment.  In addition, use of a counterfeit Social Security card with a false name or number could be detected by employers using the Basic Pilot.

On the other hand, the Basic Pilot's verification system cannot detect identity fraud.  The fraudulent use of documents containing the real names, SSNs, and alien identification numbers of work-authorized persons could be used to demonstrate work eligibility and would not be detected through Basic Pilot's verification system.  An unauthorized worker could present valid documentation belonging to a work-authorized person or could present counterfeit documentation that contains valid information and appears authentic.  In either instance, the Basic Pilot may verify the employee as work-authorized because the documentation matched SSA and DHS data.  It is possible, therefore, that identity fraud could increase with mandatory verification, as unauthorized workers could have new incentives to use identities of work-authorized individuals.  However, the extent to which identity fraud might increase and unauthorized work might decrease is unknown.  The DHS is currently considering possible ways to enhance the Basic Pilot Program to help detect cases of identity fraud.

The requirements established in the REAL ID Act of 2005 (P.L. 109-13) for the issuance of state driver's licenses and identification documents, have the potential to improve identity verification.  However, this form of identification is 1 of 20 documents acceptable for proving identity in the I-9 process, and identity fraud could still be possible.

**Question:  Several bills introduced this Congress would require employers to verify the employment eligibility of new hires through a database that combines data from the SSA's SSN applications and the DHS immigration records.  Currently, in the**

53

**Basic Pilot program, the two sources of data are kept separate, and each agency independently verifies the information for employers without sharing it with the other agency. Is there any particular advantage or disadvantage to combining the databases? Would it increase the accuracy of the data? Would it increase the speed of verifications? Would it improve program administration? What effect might it have on the privacy of personal information?**

Answer: Combining DHS's immigration records and SSA's cardholder data likely would not improve the employment eligibility verification process because the existing problems in the verification process are not related to the data sources being kept separate. Using two different databases to verify different pieces of information does not hinder the verification process, as long as the employment verification program is able to query the appropriate databases to verify the relevant information. Delays identified in Basic Pilot's verification process are often the result of delays entering data into DHS's database after DHS makes its initial work eligibility determinations. Since its database is not up-to-date, DHS employees need to verify some work authorizations manually. Combining the databases would not increase the speed of verifications if the speed of DHS's data entry remains unchanged.

Combining the databases would also not improve the accuracy of results provided to the employer because the source of the information would remain the same. The SSA's cardholder identification file is used to verify name, SSN, and citizenship, and DHS's immigration records are used to verify employment authorization using an alien identification number. The SSA's database contains demographic information collected when the SSN was issued or updated, as with a name change, its database does not reliably contain up-to-date information on the work authorization status of noncitizens. Although combining the two could update SSA's work authorization data, combination is unnecessary for establishing work authorization.

The SSA's program administration might be slightly improved by linking the databases and updating some SSA information on work authorization, but combining them would not be necessary to achieve these improvements. For example, if DHS's data could be used to automatically update SSA's work authorization information, SSA's Nonwork Alien file could potentially become more accurate. However, linking the two databases may be challenging due to the lack of a common identifier. It is not clear how difficult the task of linking the two databases might be, but our ongoing work for the Subcommittee on coordination between SSA and DHS will address these issues.

In addition to providing little, if any, advantage in terms of speed or accuracy, there are possible disadvantages to combining the databases. These databases were developed to aid in the administration of two different programs. Combining them could detract from their intended purposes and could prove costly.

**Question: In an August 2005 report, GAO said that document and identity fraud have undermined the "Form I-9" process—the process required under immigration law by which employers verify the identity and employment eligibility of newly**

**hired employees. The GAO recommended a reassessment of the Form I-9 process, including the possibility of reducing the number of acceptable work eligibility documents. Some bills have been introduced this Congress that would make the SSN card the sole identity and employment eligibility document employers could accept, or alternatively would use a combination of an SSN card and a state driver's license or ID card that complies with standards established in the REAL ID Act or a Federally-issued ID document. Do you have any thoughts or recommendations on how to reduce the documents employees are required to present to prove identity and employment eligibility?**

Answer:  The DHS is currently assessing possible revisions to the number of acceptable work eligibility documents but has not established a target time frame for completing this assessment.  Completion of this assessment and issuance of final regulations on acceptable work eligibility documents should strengthen the current employment verification process and make it simpler and more secure.  In addition to a reduction in the number of acceptable work eligibility documents, enhancing the integrity of identity and work eligibility documents is also an important consideration in making the employment verification process more secure.  We have previously reported on the possible use of biometrics in verification and identification processes.  Biometrics can theoretically be very effective personal identifiers because the characteristics they measure are thought to be distinct to each person.  While biometrics show promise in enhancing verification and identification processes, we have also reported on the trade-offs for using biometric indicators, such as concerns regarding the protections under current law for biometric data and the absence of clear criteria governing data sharing.

The Social Security card is of limited use in proving eligibility to work and does not verify identity at all, it is a weak document in the I-9 process, which requires employers to verify the identity and work authorization of newly hired employees.  The Social Security card is 1 of 15 documents that may be used to establish an individual's eligibility to work.  The card has had many different versions and is easily counterfeited. There is also a history of vulnerabilities in the process of issuing numbers to noncitizens, including limited verification of identity and work authorization documents.  In addition, while Social Security cards issued for nonwork purposes carry the label "Not Valid for Employment," nonwork cards issued before May 1982 do not include this statement.  We have work ongoing on Social Security card enhancement that will be issued later this month.

Under the REAL ID Act, state-issued driver's licenses and identification documents could improve the identity portion of the employment eligibility verification process. The licenses will be required to include physical security features to prevent counterfeiting and tampering, these identification documents could make the I-9 process less vulnerable to fraud and counterfeiting.  However, even under REAL ID Act standards, identity theft could be possible, and each additional document permitted to establish identity and eligibility to work is another opportunity for document fraud and identity theft.

**Question:  In a February 2005 report, the GAO said that the SSN verification services for paper or phone requests require the worker's date of birth, but the electronic requests do not.  Would correcting this inconsistency in SSN verification services help prevent individuals from using the SSNs of children to engage in unauthorized work?**

Answer:  Requiring the worker's date of birth for SSN verification services could help prevent use of children's SSNs for unauthorized work if employers used the services more frequently and if they refused to hire persons with name, SSN, and birth date combinations that obviously belonged to children.  Requiring the date of birth could also help identify other types of fraud, wherein the worker is young, but the SSN is assigned to someone who would be much older or vise versa.  The birth date is one additional piece of information that would have to match SSA's data, persons using this information fraudulently would need more than a name and SSN.

[Questions submitted by Chairman McCrery to the Honorable Mark W. Everson and his responses follow:]

**Question:  The SSA IG has recommended in the past that SSA seek legislative authority to create an SSA-based sanctions program for employers submitting wage reports with mismatched names and SSNs.  What are your thoughts about giving SSA such authority?**

Answer:  We believe that the ability to impose sanctions on employers who fail to take appropriate steps to provide matched names and SSNs for their employees is an essential tool in the effort to obtain high rates of compliance with employment tax withholding and reporting rules. We caution, however, that only a portion of mismatches are due to willful or negligent disregard by employers of current law requirements, the cases where sanctions are likely to be reasonable and effective.  The details of an additional, SSA-based sanctions program are unspecified at this point, we do not have a view about whether such a program would reduce mismatches and improve compliance with the tax law.  However, since the institutional roles of the IRS and SSA are different, it is possible that a well-designed compliance program administered by SSA could complement the IRS's current program.

**Question:  In your testimony, you said that about half of wage reports in the suspense file had income tax withheld, and that the withholding tends to be significantly less compared to returns with valid SSNs.  Does this mean increased enforcement will yield little taxes?  What about Social Security and Medicare taxes?  Also, how can you be certain that correct withholding rates are being applied to workers with mismatched wage reports and that they do not have additional earnings being reported under other incorrect SSNs?**

Answer:  Although we estimate the total income tax impact of the W-2s with invalid SSNs is significant, the benefit of pursuing the associated employees with enforcement resources would be very low.  Our analysis found that the estimated average tax impact

**No-Match Cert. Admin. Record  90**

per invalid W-2 is only about $170 for those with withholding and about $90 on those without withholding. In addition, with about 98% of these W-2s with invalid SSNs reporting less than $30,000 in wages, many of the associated employees may not even be required to file tax returns.

Our primary means of dealing with egregious underwithholding is through our Withholding Compliance Program (WCP). For this program, we aggregate the wages and withholding on all W-2s reporting the same SSN, whether valid or invalid, and subject these amounts to our WCP criteria. (Employees who use more than one invalid SSN may be in the program more than one time since we have no way to aggregate these W-2s.) If an employee's aggregated W-2 information shows egregious underwithholding, we send a withholding "lock-in" letter to each of his/her employers. This letter is intended to ensure the employers withhold the correct amount of taxes on future wages paid to the employee. This is one of our most effective and least costly enforcement programs. Provided the employer complies with the lock-in letter, the IRS will receive close to the correct amount of income taxes, regardless of whether the employee files a return or not. WCP also will identify the small percentage of employees with invalid SSNs that are egregious under-withholders.

In our TY 2004 study of W-2s with invalid SSNs, we did not include any analysis of withholding rates for Social Security and Medicare taxes. However, the IRS and SSA use the Combined Annual Wage Reporting (CAWR) program to identify discrepancies between the amounts of withheld Social Security and Medicare taxes that employers report to SSA on W-2s and the amounts reported to the IRS on Forms 941. The SSA corresponds with the employer on cases that do not balance. Any cases not resolved after this reconciliation are sent to the IRS for further action.

**Question: In your testimony, you discuss a survey of 297 employers the IRS has recently concluded. You said it points out the difficulties associated with assessing or sustaining a penalty for employers with high rates of name/SSN mismatches in their wage reports: document fraud, high employee turnover, and the lag time from when an employee earns wages and when the IRS notifies an employer of the mismatch. Given these difficulties, would it be a better solution to allow the IRS to share some limited amount of tax information with the DHS so that they could target immigration law enforcement, rather than pursue IRS penalties?**

Answer: As you know, comprehensive immigration reform--- including border security, interior enforcement, and a temporary worker program --- is a top Administration priority. The Administration believes that worksite enforcement is critical to the success of immigration reform. I am well aware of various legislative proposals to help address this problem, including requiring more information sharing between Federal agencies. Whatever the ultimate solution, we have to try to minimize the negative consequences on employers, employees and our national economy. As a former Deputy Commissioner at INS, I am sensitive to the need for a system of immigration that functions effectively. Having said that, any significant change requiring improved information sharing between Federal agencies or between Federal agencies and employers must account for

protections found in section 6103 of the Internal Revenue Code.  This section protects taxpayers from having their tax return information shared with third parties.  We must make sure that any change in the current system encourages the type of behavior that we desire from both employees and employers.

**Question:  Given the current difficulties of correcting wage reports due to high employee turnover and the lag time between when an employee earns wages and when the IRS notifies an employer of a mismatch, would a better solution be to require employers with high mismatch rates to participate in the Basic Pilot?**

Answer:  The intent of the Basic Pilot program, developed by DHS, is to inform employers whether their employees are authorized to work in the United States.  From a tax administration perspective, however, there is no distinction between taxpayers who are authorized to work in this country and those who are not.  Further, the ability of an employer to verify an employee's work eligibility does little to ensure that the employee will file an income tax return.

**Question:  The SSA testimony stated that SSA and the IRS have established an interagency effort and are working to resolve issues and cooperate on efforts that cross agency lines. Could you describe what these interagency Committees have discussed, and what have been some of the results of their deliberations?**

Answer:  We believe the SSA testimony refers to a group of executives from the IRS and SSA that meets semi-annually to discuss issues of mutual interest and to determine how the two agencies can best work together to address these issues.  The most recent meeting occurred in November 2005 and included discussions on:

- The long-term viability of the electronic reporting system for ERISA reports sent to SSA (agreed to convene joint group to pursue solutions)
- Allowing IRS employees outside of the Philadelphia campus to have electronic access to wage reporting data maintained by SSA (agreed that the IRS would submit a formal proposal)
- Providing SSA with regular updates of the IRS file which they use to authenticate users of SSNVS, a SSN verification system for employers (agreed to get appropriate individuals from both agencies together to discuss the issues)

**Question:  Some bills have been introduced that would prohibit employers from deducting business expenses for wages paid to unauthorized workers.  What are your views on that option?  Would it serve as an incentive for employers to use the Basic Pilot to verify their workers' employment eligibility?  Would it make sense to expand that prohibition to any wages reported under mismatched names and SSNs?**

Answer:  While the intent of such proposals is to reduce the number of unauthorized workers and to create an incentive for employers to make additional efforts to correct mismatched names and SSNs, a rule prohibiting employers from deducting these wages would be difficult to administer and would also have a negative effect on tax

compliance. We anticipate that it would be difficult to determine whether a business's deductions were attributable to wages paid to an unauthorized worker, even in an audit. Moreover, disallowing the deduction might make it less costly for employers to pay employees "under the table," thereby reducing employment taxes collected from the employer and providing more opportunity for employees to evade taxation. The tax code currently provides for penalties for failure to file correct information returns and payee statements. (Sections 6721-6725).

**Question:  Has the IRS audited employers who use day-laborer sites to determine if they are withholding income taxes and paying Social Security and Medicare payroll taxes on their employees?  If employers are hiring people under the table and not paying the appropriate taxes, does it depress wages for other American workers?**

Answer:  The IRS does not specifically target day-laborer sites in its employment tax examinations.  However, all W-2s are subject to review for appropriate income tax withholding through our Withholding Compliance program.  We address issues related to proper payments of Social Security and Medicare payroll taxes through the Combined Annual Wage Reporting program.  (See response to #2 above.)  Although the IRS uses such programs to address the issues of withholding and payment of appropriate taxes, we are not in a position to comment on the impact that nonpayment of these taxes may have on wages paid to other American workers.

**Question:  Section 6103 of the Internal Revenue Code was enacted to prevent the inappropriate use of confidential taxpayer information. It is based on the presumption that confidential taxpayer information should not be used for non-tax reasons except in compelling circumstances. In your opinion, to what extent does enforcement of immigration or other laws justify an exception to that presumption? What safeguards would you recommend to ensure that the use of confidential taxpayer information be limited to compelling circumstances?**

Answer:  We believe that any use of confidential taxpayer information for non-tax purposes carries a risk of reducing voluntary compliance with the tax laws, undermining the primary objective of the IRS and reducing the availability and utility of the information sought.  Administering the tax system is the responsibility of this Agency, it is institutionally difficult for us to weigh other objectives against the value of high rates of compliance with the tax law.

Similarly, it is not within our expertise to advise on the mechanisms that should be utilized to balance objectives, such as the value of enforcing the immigration laws, against the value of voluntary compliance with the tax laws.

For an analysis of the appropriate balance between taxpayer privacy and other important policy concerns, we refer you to a study produced by the Treasury Department.  The report states that "additional exceptions to the confidentiality of taxpayer information under section 6103 should be granted in rare circumstances and only where the Agency can demonstrate, using established criteria, a need for the information that clearly

outweighs taxpayer privacy interests and concerns about the effects on voluntary tax compliance." *Report to The Congress on Scope and Use of Taxpayer Confidentiality and Disclosure Provisions*, Office of Tax Policy, Department of the Treasury, at 69 (October 2000), *available at* http://treas.gov/offices/tax-policy/library/confide.pdf.

[Questions submitted by Chairman McCrery to the Honorable Stewart A. Baker and his responses follow:]

**Question:  If the Basic Pilot were made mandatory, is it likely that we would see an increase in the use of counterfeit documents like the SSN card? Would we see an increase in identity theft?**

Answer:  In our August 2005 report on employment verification and worksite enforcement efforts, we said that the Basic Pilot Program has potential to help enhance the verification process and substantially reduce document fraud (use of counterfeit documents) but is unable to detect identity fraud (fraudulent use of valid documents or information belonging to others).[1] A mandatory Basic Pilot verification could make some counterfeit documents more difficult to use to falsely demonstrate work authorization. For example, if an unauthorized worker presented counterfeit documents containing false information, the Basic Pilot program would not confirm the worker's eligibility because the Employment Eligibility Verification Form I-9 information, such as a false name or Social Security number (SSN), would not match the Social Security Administration's (SSA) and the Department of Homeland Security's (DHS) database information.  An increase in counterfeit Social Security cards, specifically, seems unlikely because the Social Security card is only one of 15 documents that can be used to prove eligibility to work. While workers are required to provide a Social Security number, they are not required to show the card to obtain employment. In addition, use of a counterfeit Social Security card with a false name or number could be detected by employers using the Basic Pilot.

On the other hand, the Basic Pilot's verification system cannot detect identity fraud.  The fraudulent use of documents containing the real names, SSNs, and alien identification numbers of work-authorized persons could be used to demonstrate work eligibility and would not be detected through Basic Pilot's verification system. An unauthorized worker could present valid documentation belonging to a work-authorized person or could present counterfeit documentation that contains valid information and appears authentic. In either instance, the Basic Pilot may verify the employee as work-authorized because the documentation matched SSA and DHS data.  It is possible, therefore, that identity fraud could increase with mandatory verification, as unauthorized workers could have new incentives to use identities of work-authorized individuals. However, the extent to which identity fraud might increase and unauthorized work might decrease is unknown. DHS is currently considering possible ways to enhance the Basic Pilot Program to help detect cases of identity fraud.

The requirements established in the Real ID Act of 2005 for the issuance of state driver's licenses and identification documents, have the potential to improve identity

60

verification.[2] However, this form of identification is one of 20 documents acceptable for proving identity in the I-9 process, and identity fraud could still be possible.

––––––

[1] GAO, *Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts*, GAO-05-813 (Washington, D.C.: August 31, 2005).

[2] P.L. 109-13, 49 U.S.C 30301 note.

**Question:  Several bills introduced this Congress would require employers to verify the employment eligibility of new hires through a database that combines data from the Social Security Administration's (SSA's) SSN applications and the U.S. Department of Homeland Security's (DHS's) immigration records. Currently, in the Basic Pilot program, the two sources of data are kept separate, and each agency independently verifies the information for employers without sharing it with the other agency. Is there any particular advantage or disadvantage to combining the databases? Would it increase the accuracy of the data? Would it increase the speed of verifications? Would it improve program administration? What effect might it have on the privacy of personal information?**

Answer:  Combining DHS's immigration records and SSA's cardholder data likely would not improve the employment eligibility verification process because the existing problems in the verification process are not related to the data sources being kept separate.  Using two different databases to verify different pieces of information does not hinder the verification process, as long as the employment verification program is able to query the appropriate databases to verify the relevant information. Delays identified in Basic Pilot's verification process are often the result of delays entering data into DHS's database after DHS makes its initial work eligibility determinations. Because its database is not up-to-date, DHS employees need to verify some work authorizations manually. Combining the databases would not increase the speed of verifications if the speed of DHS's data entry remains unchanged.

Combining the databases would also not improve the accuracy of results provided to the employer because the source of the information would remain the same.  SSA's cardholder identification file is used to verify name, SSN, and citizenship, and DHS's immigration records are used to verify employment authorization using an alien identification number. Because SSA's database contains demographic information collected when the SSN was issued or updated, as with a name change, its database does not reliably contain up-to-date information on the work authorization status of noncitizens. Although combining the two could update SSA's work authorization data, combination is unnecessary for establishing work authorization.

SSA's program administration might be slightly improved by linking the databases and updating some SSA information on work authorization, but combining them would not be necessary to achieve these improvements.  For example, if DHS's data could be used

to automatically update SSA's work authorization information, SSA's Nonwork Alien file could potentially become more accurate. However, linking the two databases may be challenging due to the lack of a common identifier. It is not clear how difficult the task of linking the two databases might be, but our ongoing work for the subcommittee on coordination between SSA and DHS will address these issues.

In addition to providing little, if any, advantage in terms of speed or accuracy, there are possible disadvantages to combining the databases. These databases were developed to aid in the administration of two different programs. Combining them could detract from their intended purposes and could prove costly.

**Question:  In an August 2005 report, the U.S. Government Accountability Office (GAO) said that document and identity fraud have undermined the "Form I-9" process—the process required under immigration law by which employers verify the identity and employment eligibility of newly hired employees. The GAO recommended a reassessment of the Form I-9 process, including the possibility of reducing the number of acceptable work eligibility documents. Some bills have been introduced this Congress that would make the SSN card the sole identity and employment eligibility document employers could accept, or alternatively would use a combination of an SSN card and a State driver's license or ID card that complies with standards established in the REAL ID Act (P.L. 109-13) or a Federally-issued ID document. Do you have any thoughts or recommendations on how to reduce the documents employees are required to present to prove identity and employment eligibility?**

Answer:  DHS is currently assessing possible revisions to the number of acceptable work eligibility documents but has not established a target time frame for completing this assessment. Completion of this assessment and issuance of final regulations on acceptable work eligibility documents should strengthen the current employment verification process and make it simpler and more secure.  In addition to a reduction in the number of acceptable work eligibility documents, enhancing the integrity of identity and work eligibility documents is also an important consideration in making the employment verification process more secure.  We have previously reported on the possible use of biometrics in verification and identification processes.[1]  Biometrics can theoretically be very effective personal identifiers because the characteristics they measure are thought to be distinct to each person.  While biometrics show promise in enhancing verification and identification processes, we have also reported on the trade-offs for using biometric indicators, such as concerns regarding the protections under current law for biometric data and the absence of clear criteria governing data sharing.

Because the Social Security card is of limited use in proving eligibility to work and does not verify identity at all, it is a weak document in the I-9 process, which requires employers to verify the identity and work authorization of newly hired employees. The Social Security card is one of 15 documents that may be used to establish an individual's eligibility to work. The card has had many different versions and is easily counterfeited. There is also a history of vulnerabilities in the process of issuing numbers to noncitizens,

**No-Match Cert. Admin. Record  96**

including limited verification of identity and work authorization documents. In addition, while Social Security cards issued for nonwork purposes carry the label "Not Valid for Employment," nonwork cards issued before May 1982 do not include this statement. We have work ongoing on Social Security card enhancement that will be issued later this month.

Under the Real ID Act of 2005, state-issued driver's licenses and identification documents could improve the identity portion of the employment eligibility verification process. Because the licenses will be required to include physical security features to prevent counterfeiting and tampering, these identification documents could make the I-9 process less vulnerable to fraud and counterfeiting. However, even under Real ID Act standards, identity theft could be possible, and each additional document permitted to establish identity and eligibility to work is another opportunity for document fraud and identity theft.

––––––––

[1] GAO, *Technology Assessment: Using Biometrics for Border Security*, GAO-03-174 (Washington, D.C.: Nov. 15, 2002).

**Question:  In a February 2005 report, the GAO said that the SSN verification services for paper or phone requests require the worker's date of birth, but the electronic requests do not. Would correcting this inconsistency in SSN verification services help prevent individuals from using the SSNs of children to engage in unauthorized work?**

Answer:  Requiring the worker's date of birth for SSN verification services could help prevent use of children's SSNs for unauthorized work if employers used the services more frequently and if they refused to hire persons with name, SSN, and birth date combinations that obviously belonged to children. Requiring the date of birth could also help identify other types of fraud, wherein the worker is young, but the SSN is assigned to someone who would be much older or vise versa. Because the birth date is one additional piece of information that would have to match SSA's data, persons using this information fraudulently would need more than a name and SSN.

[Questions submitted by Chairman Ramstad to the Honorable Mark W. Everson and his responses follow:]

**Question:  During the hearing, I asked you if an employer hired 100 hundred employees on the same day and they all submitted signed W-4s using the same SSN would the IRS have the ability to penalize the employer. You responded that you thought the IRS would have the ability to penalize the employer. Treasury Regulation 301.6724-1(g) indicates that if an employer receives a signed W-4 from an employee that the employer would have satisfied due diligence requirements, and therefore would not be penalized. Given this provision in the regulations, please**

**No-Match Cert. Admin. Record  97**

**explain why you think the IRS would have the ability to sustain penalties in the case I described.**

Answer:  An information return penalty is waived for reasonable cause if the filer made an initial and, if necessary, annual request that the payee provide an accurate SSN/TIN, or establishes that due diligence was otherwise used. An information return filer may establish reasonable cause for failure to include required information by showing that the failure was due to events beyond the filer's control, including actions of the payee providing the necessary information, and that the filer acted in a responsible manner. Acting in a responsible manner means that the filer exercised reasonable care, which is that standard of care that a reasonable prudent person would use under the circumstances in the course of its business in determining its filing obligations and undertook significant steps to avoid or mitigate the failure to provide correct information. Accepting the same SSN for 100 employees on the same day would not qualify for penalty waiver under the prudent person standard.

**Question:  In your testimony you said that increased enforcement of accurate reporting of names and SSNs could have a negative revenue impact by driving workers into the underground economy. Has the IRS done any empirical studies to determine the effect of increased enforcement?**

Answer:  We have not specifically measured the impact of enforcement efforts targeting name/SSN mismatches on Forms W-2. However, based upon our recent compliance check of a limited number of employers, we found that employers relied upon information provided by employees. Although employers unknowingly reported mismatched names and numbers, many withheld and paid social security and employment taxes on behalf of their employees. Anecdotal evidence suggests that employees who deliberately provide false information to employers do so to remain anonymous to the IRS. Any enforcement effort may impact worker classification from employee to independent contractor, resulting in lost withholding opportunities. Additionally, such efforts could prompt a cash-based workforce to avoid information reporting entirely, since it is more likely that cash payments are not reported on information documents.

**Question:  It has been the law since 1996 that a person who receives a Social Security number solely for the purpose of receiving federal benefits is not supposed to be able to receive the Earned Income Tax Credit. However, it is my understanding that because of the failure to share information between SSA and IRS, that these individuals have been receiving the EITC every year. Do you have an estimate as to how much Earned Income Tax Credit dollars have been improperly paid out to individuals who have a Social Security number solely for the purpose of receiving federal benefits?**

Answer:  The IRS cannot estimate the amount of EITC dollars paid in error to individuals who have a SSN solely for the purpose of receiving federal benefits. Although information passed on to the IRS from SSA since 1980 contains an indicator showing that

an SSN recipient is not authorized to work in the United States, the data does not distinguish between those who receive an SSN in order to obtain government benefits from those who obtain an SSN for other purposes that currently may allow a person to qualify for EITC.

**Question:  There is a proposal in the President's Budget that would address the issue of individuals improperly receiving EITC refunds with an SSN issued solely for the purposes of receiving Federal benefits. How would the proposal address this problem?**

Answer:  In 1996, Congress enacted a provision (IRC sec. 32(m)) that was intended to deny the EITC to individuals who were not authorized to work in the United States. This provision requires EITC claimants to provide a valid SSN for themselves and their qualifying children. It explicitly denies the EITC to noncitizens who are not authorized to work in the United States but who, under clause (II) of sec. 205(c)(2)(B)(i) of the Social Security Act, obtain an SSN solely for the purpose of claiming government benefits (such as public assistance). The 1996 Act also gave the IRS the authority to automatically deny such claims during processing using "mathematical error" procedures. (Without mathematical error authority, the IRS can still deny ineligible claims through the examination process. However, more ineligible claims can be denied through the less labor-intensive mathematical error procedures.)

At the time of enactment, it was thought that this provision would effectively restrict EITC eligibility to U.S. citizens, permanent residents ("green card" holders), and other noncitizens who obtain an SSN because their visas authorize them to work in the United States. These individuals are entitled to obtain an SSN under clause (I) of sec.205(c)(2)(B)(i) of the Social Security Act.

However, Sec. 32(m) inadvertently allows some undocumented workers to receive the EITC. Until recently, it was possible for some individuals to receive social security numbers for reasons other than to obtain federal benefits -- e.g., to obtain a driver's license in some states or, before the adoption of ITINs, to file a tax return. Further, while SSA records contain an indicator showing that an SSN holder is not authorized to work in the United States, the records do not distinguish between those who receive an SSN in order to obtain government benefits from those who obtain an SSN for other purposes. As a result, the IRS has never used its mathematical error authority to deny EITC claims of certain undocumented workers, for fear of denying the credit to individuals who are technically eligible (albeit undocumented workers).

In the FY 2007 budget, the Administration is proposing that sec. 32(m) be rewritten to state that for purposes of the EITC, a valid SSN is one issued either to a citizen of the United States or pursuant to clause I of section 205(c)(2)(B)(i) of the Social Security Act. This modification would effectively deny EITC eligibility to individuals who were issued SSNs for any non-work reason -- as was the intent of Congress in 1996. Further, this modification would allow the IRS to implement the existing math error authority to deny

65                     **No-Match Cert. Admin. Record  99**

the EITC to undocumented workers, because individuals identified by SSA as unauthorized to work in the United States would generally be ineligible for the EITC.

**Question:  The House recently passed the "Border Protection, Antiterrorism, and Illegal Immigration Control Act of 2005," which would allow the Secretary of the Department of Homeland Security to access any information maintained by any department or agency of the government concerning any person seeking any benefit or privilege under immigration laws. Does the IRS believe that this provision would apply to taxpayer returns or taxpayer information?**

Answer:  The Administration is working on a legal determination as to whether this provision would apply to tax payer returns or taxpayer information. From a tax administration perspective, the IRS recommends that the legislative provision reference 26 USC § 6103. In the Administration's legislative discussions, we have proposed language that specifically refers to § 6103.

[Questions submitted by Chairman Ramstad to the Honorable James B. Lockhart and his responses follow:]

**Question:  Does SSA share the opinion of DHS that the non-work alien file is inaccurate and unusable for DHS agents seeking individuals who performed unauthorized to work? Has DHS informed SSA of the problems it has experienced with the non-work alien file?**

Answer:  The information provided to the Department of Homeland Security (DHS) is based on wages the Social Security Administration (SSA) posts to the earnings records of the individuals assigned the particular Social Security numbers (SSN). The information in the report to DHS accurately reflects these posted earnings. The report also includes the most current data SSA has to provide to DHS. The data is in the format agreed to in a Memorandum of Understanding (MOU) between SSA and DHS. It is unclear why the information contained in the file would be unusable for DHS agents seeking individuals who performed unauthorized work.

8 U.S.C. § 1360(c)(2) required SSA to provide information concerning the earnings reported on SSNs issued to aliens not entitled to work under the Immigration and Nationality Act. This statute provides:

"If earnings are reported on or after January 1, 1997, to the Social Security Administration on a social security account number issued to an alien not authorized to work in the United States, the Commissioner of Social Security shall provide the Attorney General with information regarding the name and address of the alien, the name and address of the person reporting the earnings, and the amount of the earnings. The information shall be provided in an electronic form agreed upon by the Commissioner and the Attorney General."

66

SSA entered into a data-sharing MOU with the Immigration and Nationality Service (INS) in 1999 to implement the requirement regarding reporting earnings on aliens not authorized to work. SSA began sending this information to INS for Tax Year 1996 in 1998, and has continued sending the file on an annual basis. The MOU transitioned to DHS when the functions of INS migrated to DHS. SSA is currently reviewing this MOU to determine if it needs to be updated.

In addition to providing the data as required by the MOU, at DHS' request, SSA provides the identical information to DHS in a file that could be used on a personal computer. This file format was first sent in 2004 for TY 2002. SSA continues to send both files to DHS.

[Questions submitted by Chairman Ramstad to the Honorable Stewart A. Baker and his responses follow:]

**Question: In your testimony, you said that DHS sees a clear benefit to receiving from the Social Security Administration portions of the no-match data that is currently protected by taxpayer privacy laws. Yet you did not specify exactly what information DHS proposes that it receive. Can you provide us with specifics about what DHS thinks it should receive? For example, are you seeking information relating to all employers with mismatches, or just certain employers with egregious problems?**

Answer:  DHS would emphasize the need for information relating to all employers with earnings that appear in the Social Security Administration's (SSA) Earnings Suspense File (ESF).  The fact that a large percentage of employees and employers who receive SSA "no match" letters fail to correct or address these discrepancies indicates that there is widespread use of fraudulent social security numbers.  The SSA Inspector General has also acknowledged that unauthorized employees or illegal immigrants account for a significant, growing portion of entries in the ESF.

With access to the ESF data, DHS would be able to address targeted weaknesses in critical infrastructure and other national security related areas and industries, in addition to identifying and targeting enforcement efforts toward the obvious egregious employers.  Access to this data should be broad enough for DHS to target known fraud schemes such as use of a Social Security Number by multiple employees or use of Social Security Numbers belonging to dead persons or persons too young to work report income contributions.  Data access must be sufficiently broad to allow DHS to address and target new fraud schemes as they emerge.  Access to the ESF data would enhance hundreds of existing worksite enforcement investigations by helping to refute an employer's "good faith" defense.

DHS is looking to establish a good, flexible data-sharing relationship with the SSA to address today's most apparent problems, but also to adjust and respond to future challenges related to illegal immigration.  Once the widespread use of fraudulent Social Security Numbers is eliminated, criminal organizations and other immigration violators will look for other ways to circumvent the immigration and employment laws.  DHS must be ready to respond to these new challenges with the appropriate tools.

**No-Match Cert. Admin. Record  101**

**Question: In 1996, Congress required SSA to provide DHS with a data file called the Non-Work Alien file, which contains information on wages reported to Social Security numbers issued for non-work purposes. For years, the DHS did not use this information because of computer compatibility problems. You indicated at the hearing that DHS was not ready to say the file was unusable. Can you explain what DHS is doing to analyze this information, and explain if and when this can be used for immigration enforcement purposes?**

Answer:  From 1997 to 2004, SSA forwarded the NWAF to the INS and later to DHS as required by law and consistent with a Memorandum of Understanding.  However, formatting issues made it difficult to use the NWAF.  Beginning in February 2005, DHS/ICE and SSA worked together to convert that data into a more usable format.

During FY 2006, DHS successfully accessed and analyzed NWAF data (a list of names and SSNs of individuals originally issued) for the first time and conducted DHS immigration record checks on a sampling of aliens' names and other information from the NWAF.  Preliminary results of these checks indicate that only 34 percent of the individuals named in the file are actually authorized to work in the United States, an indication that this information could be valuable in conducting enforcement investigations.  On April 4, 2006, ICE received the most recent NWAF data from SSA and has started to analyze this new dataset.

[Submissions for the record follow:]

Davis, Robert, Rockwall, TX, letter

National Consumer Law Center, Boston, MA, letter

# House Committee on Ways and Means

http://waysandmeans.house.gov/hearings.asp?formmode=printfriendly&id=4779

Opening Statement of The Honorable Jim McCrery, Chairman, and a Representative in Congress from the State of Louisiana

February 16, 2006

Good morning and welcome to our joint Social Security Subcommittee and Oversight Subcommittee hearing on employer wage reporting.  Today's hearing is the second in a series of hearings on high-risk issues related to Social Security numbers, or SSNs.  Today, we'll examine the longstanding and troubling issue of how some employers fail to report wages with accurate SSNs and the inadequate Federal response.

Wages that are reported under incorrect or false SSNs are logged into a database within the Social Security Administration, called the Earnings Suspense File.  This file has records of earnings that could not be linked to the correct worker.  Employee data was first entered into the suspense file in 1937, when wages became subject to Social Security taxes.  Between 1937 and 2003, nearly 255 million wage records for about $520 billion in earnings accumulated in the suspense file.

The suspense file is not just an administrative headache or a bureaucratic wasteland; it is a symptom of serious problems.  Research by the Social Security Administration's Inspector General and the Government Accountability Office, or GAO, indicates evidence of SSN misuse and unauthorized work by foreign-born workers.

For example, according to a GAO study of SSNs frequently appearing in the suspense file, wages claimed by foreign-born workers who had earnings before they were issued an SSN have grown over time, from an average of about 7 percent for years 1937-1985 to 47 percent for the year 2003.

Inaccurate SSN reporting has repercussions for workers' Social Security benefits, tax compliance, and immigration law compliance.  Three government agencies play a role when employer wage reports end up in the suspense file.  The Social Security Administration is responsible for accurately keeping track of workers' earnings for benefit purposes.  The Internal Revenue Service is responsible for enforcing penalties to ensure employers report wages accurately for tax and benefit purposes.  The Department of Homeland Security is responsible for ensuring unauthorized workers do not work using false information that results in their earnings records ending up in the suspense file.

Unfortunately, the problem of a growing suspense file has existed for decades.  The responsible government agencies have been slow to work together toward a

69    **No-Match Cert. Admin. Record  103**

comprehensive solution.  In addition they have not adequately enforced the laws and regulations that would prevent inaccurate wage reporting.

Last December the House of Representatives passed legislation, the *Border Protection, Antiterrorism, and Illegal Immigration Control Act of 2005* (H.R. 4437), which would take action where government agencies have not, by requiring employers to verify the SSNs and employment eligibility of their employees with the Social Security Administration and the Department of Homeland Security.

Today, we need to hear about what actions Federal agencies can and will take to address inaccurate wage reporting.  We also want to examine options that Congress should consider to achieve a balanced and workable approach to improve the accuracy of wage reporting without unduly burdening employees, employers and our economy.

Thank you for coming today, and I look forward to your testimony.

## House Committee on Ways and Means

http://waysandmeans.house.gov/hearings.asp?formmode=printfriendly&id=4780

Opening Statement of The Honorable Sander M. Levin, a Representative in Congress from the State of Michigan

February 16, 2006

Today's hearing will examine a long-standing challenge at the intersection of immigration law and tax collections which may be growing.  GAO and the Social Security Inspector General report an increasing number of W-2 forms being submitted to the IRS and the Social Security Administration in which the employee's name and Social Security number do not match.  Some of these "no matches" are honest mistakes, but others represent employees working under false names or Social Security numbers, either because they are illegal immigrants or to commit other fraud.

There are larger immigration issues surrounding the failure of some employers to verify work status for their employees, either at the time or later, when they are informed that the employee's name and Social Security number do not match.  Those issues are out of the jurisdiction of the Ways & Means Committee, although I am pleased to see that the Department of Homeland Security will testify today and may be able to answer our questions about overall enforcement of immigration laws.

The issue before the Ways & Means Committee is whether the Social Security Administration and the Internal Revenue Service should share personal information currently protected by taxpayer privacy laws with the Department of Homeland Security in order to identify those in this country and working illegally, and if they did, what

**No-Match Cert. Admin. Record  104**

burdens that would impose on the agencies and their collection of income and payroll taxes.

I hope our witnesses today will help us explore two key issues.

1. First, what impact would such information sharing have on the effectiveness of our tax collection efforts?
2. Second, would the sharing of taxpayer information substantially improve our enforcement of immigration laws?

## House Committee on Ways and Means

http://waysandmeans.house.gov/hearings.asp?formmode=printfriendly&id=4778

Opening Statement of The Honorable Jim Ramstad, Chairman, and a Representative in Congress from the State of Minnesota

February 16, 2006

Today, the Subcommittees on Oversight and Social Security are holding their second joint hearing in the last two years on the topic of employer wage reporting.  In 2004, we heard that there was a growing problem with the misuse of the Social Security number and a failure by employers to accurately report the names and Social Security numbers of their employees, which was contributing to a burgeoning account of mismatched wages at the Social Security Administration called the Earning Suspense File.  The message of the hearing was that the three agencies with a stake in this process – the SSA, the IRS, and the Department of Homeland Security – needed to work better together to address the problem.

In many ways, today's hearing seems like, in the words of Yogi Berra, "déjà vu all over again."  Little progress has been made since the Subcommittees last met.  The Earnings Suspense File continues to grow, little enforcement action is being taken, and there is still a clear need for the IRS, SSA, and DHS to improve their coordination.

This is an important subject for a number of reasons.  When wages are reported to incorrect Social Security numbers it can prevent individuals from receiving the Social Security benefits due them and create a number of other problems for the government agencies involved.  In addition, in many cases, employees are providing inaccurate personal information to employers because they are illegal aliens, and do not have valid Social Security numbers, and do not have permission to work.

I want to highlight a couple of my major concerns at the outset of the hearing.

- First, I want to know why the IRS does not do more to enforce the laws that require accurate wage reports from employers.  We have laws on the books that

71

**No-Match Cert. Admin. Record  105**

the IRS has apparently never enforced.  In fact, IRS regulations appear to make it impossible to impose and collect penalties on employers who report inaccurate Social Security numbers for their employees.  I would like to know why this is so, and what the IRS intends to do about it.

- Second, I would like to know if the SSA, IRS, and DHS are satisfied with the current levels of information shared about name and Social Security number mismatches.

If not, I would like to know what additional information they would like to access, and why.

- Finally, there have been proposals to require that employers do more to verify the eligibility of their employees for work.  I look forward to the witnesses' views on the impact of expanded verification.

I want to thank the witnesses, and I look forward to making some progress in addressing this growing problem.

# House Committee on Ways and Means

http://waysandmeans.house.gov/hearings.asp?formmode=printfriendly&id=4712

Opening Statement of The Honorable John Lewis, a Representative in Congress from the State of Georgia

February 16, 2006

The Oversight Subcommittee is joining the Social Security Subcommittee in today's hearing to discuss issues surrounding Social Security numbers that do not match employees' names when submitted to the Social Security Administration (SSA) and Internal Revenue Service (IRS).

The Subcommittee held a similar hearing on this subject two years ago.  Under current law, employers are required to obtain the name and Social Security number of each worker so that wage income and tax withholding amounts can be sent to the IRS and SSA for tax and Social Security benefit purposes. It is important that this information be correct for the IRS's processing of tax returns and the SSA's recording of Social Security benefits.  The IRS rejects tax returns and the SSA puts earning records in a "suspense file" when workers' names and Social Security numbers do not match.  I welcome back IRS Commissioner Everson and SSA Deputy Secretary Lockhart to discuss these issues again with us.

An additional witness has been added to our witness list this year.  I welcome Assistant Secretary Baker of the Department of Homeland Security (DHS).  Some propose that the DHS have access to more SSA and IRS information (1) to target employers involved in

hiring illegal workers for immigration enforcement purposes and (2) to mandate that employers verify all individuals' authorization to work in the U.S. before hiring. I will be interested in your views on these and other issues raised in your testimony.

Thank you.

# House Committee on Ways and Means

http://waysandmeans.house.gov/hearings.asp?formmode=printfriendly&id=4707

Statement of The Honorable Mark W. Everson, Commissioner, Internal Revenue Service

Testimony Before the Subcommittee on Oversight
of the House Committee on Ways and Means

February 16, 2006

Chairman Ramstad, Chairman McCrery, Ranking Members Lewis and Levin, and Members of the Subcommittees on Oversight and Social Security, thank you for the opportunity to once again appear before you to discuss these issues.

I would like to do two things this morning. First, I wish to try to frame the issues, at least from an IRS perspective. Second, I want to discuss in more detail IRS's role in this process and what we have done and are doing internally relative to the issues that surround the mismatching of Social Security Numbers (SSN).

**Framing the Issues**

Perhaps the most difficult part of these issues is framing them properly and understanding fully the different, yet sometimes complementary, roles performed by the Social Security Administration (SSA), the U.S. Department of Homeland Security (DHS) and the Internal Revenue Service (IRS).

We at the IRS support and appreciate the jobs being done at SSA in maintaining and protecting the Social Security Trust Funds and at DHS in enforcing our immigration laws, but our function is tax administration. Our job is to make sure that everyone who earns income within our borders pays the proper amount of taxes, even if they may not be working here legally. If someone is working without authorization in this country, he or she is not absolved of tax liability. Instead of an SSN to file a tax return, that person frequently uses an Individual Taxpayer Identification Number (ITIN).

Almost two years ago, these same Subcommittees held a hearing where I talked about our ITIN program. While I understand that is not the subject of this hearing, it is important to understand that the ITIN program is bringing taxpayers into the system. In calendar year 2005, we had 1.6 million applications for ITINs, which were accompanied by 1.4 million

**No-Match Cert. Admin. Record 107**

returns.  The number of returns associated with ITIN applications is up 40 percent from calendar year 2004.

I know many Members of these Subcommittees are vitally concerned with the issues surrounding mismatching names and social security numbers and I am well aware of various legislative proposals to help address this problem.  These proposals range from requiring the employers to check the validity of a SSN prior to hiring, to increasing penalties on employers who fail to submit a proper SSN for an employee, to requiring more information sharing between Federal agencies.  Whatever the ultimate solution, we have to try to minimize the negative consequences on employers, employees and our national economy.

As you know, comprehensive immigration reform--- including border security, interior enforcement, and a temporary worker program --- is a top Administration priority.  The Administration believes that worksite enforcement is critical to the success of immigration reform.  Further, as immigration laws are enforced, the Administration believes that comprehensive immigration reform also requires us to improve those laws by creating a temporary worker program that rejects amnesty and relieves pressure on the border.

As the Commissioner of the IRS, it is not my role to advocate public policy changes.  However, as a former Deputy Commissioner at INS, I am sensitive to the need for a system of immigration that functions effectively.  I can, also, if you like, talk about the impact of various proposals on tax administration.

**IRS's Role in the Mismatch Program**

Each year, employers send their W-2s and W-3s into the SSA by February 28 (or March 31 if filed electronically).  The SSA processes and then attempts to reconcile any mismatches.  They then send the information to the IRS on a weekly basis.  IRS culls out any unusable records and those W-2s which are not related to the current tax year. For Tax Year (TY) 2004, the resulting IRS file contained more than 231 million W-2s from the SSA.  This represents a decline of approximately 6.5 percent from the corresponding file for TY 2000.  At this point, we are unable to explain this decline in the number of W-2s, but it is an area of concern for tax compliance, particularly if it represents misclassification of employees as independent contractors or otherwise.  The decline in the number of W-2s has been accompanied by a corresponding decline in the number of mismatches that could not be validated.

Of the 231 million W-2s in IRS's TY 2004 file, approximately 223 million had matching names and SSNs.  Some of these matches resulted from SSA's successful use of their techniques for resolving mismatches. For the balance of approximately 8 million TY 2004 W-2s for which there was no valid match, IRS used several additional methods to match the numbers. We were able to match approximately 60 thousand more names with SSNs, leaving a balance of about 7.9 million W-2s where there is no valid name and social security number match.

**No-Match Cert. Admin. Record  108**

To help correct SSN mismatches, the SSA sends letters to both employers and employees asking that they take steps to match the names with the SSNs. These letters do not go to all employers. Letters are sent to employers who submit a wage report containing more than 10 Forms W-2 that SSA cannot process, and the mismatched forms represent more than one-half of one percent (1/2 percent) of the total Forms W-2 in the report. In TY 03, the SSA sent over 121,000 such letters to employers, inquiring about 7.2 million invalid W-2s. Thus, there is no letter sent to the employers of the other 0.7 million mismatches

There are two interesting aspects to these mismatches. The first is geographical. Over 50 percent of the mismatches are found in four states, California, Texas, Florida and Illinois. California has the far greatest number of mismatches totaling nearly 2.3 million, or approximately 29 percent of the mismatch total.

The second is economic. About 75 percent of all mismatched W-2s report wages of less than $10,000. If we focus only on those mismatched W-2s with no withholding, the percentage increases to 90 percent. Only about 2 percent of all W-2s with invalid SSNs report wages greater than $30,000. In fact, the average wage for all mismatches is only about $6700 annually. Bear in mind, that many employees receive more than one W-2 in a tax year, so these numbers may not reflect gross income.

From a tax administration perspective, we know that for TY 2004 there were approximately $53 billion in wages reported on W-2s with invalid social security numbers, with about a quarter of that amount, or $13.3 billion, on W-2s with no withholding. About 56 percent of the $53 billion came from W-2s reporting wages between $10,000 and $30,000.

On the high end, only about 1 percent of the wages ($0.5B) were reported on mismatched W-2s showing wages in excess of $100,000. Average wages on these W-2s were about $303,000, and about 30 percent of the mismatches in this category had no withholding.

**Legal Requirements on Employers**

It is important to point out that the SSA has no enforcement power, and cannot impose penalties on employers for failure to correct SSN mismatches. IRS, however, does have enforcement power and can assess penalties. Therefore, it might be helpful if I walk you through our legal authority.

Under section 6041 and 6011 of the Internal Revenue Code (IRC) employers and other payors must include correct SSNs or Taxpayer Identification Numbers (TINs) on forms W-2 reporting wages or salaries paid to employees.

Under section 6721, we may impose a $50 penalty on an employer for each W-2 or 1099 that omits or includes an inaccurate SSN/ TIN unless the filer (employer, other payor, etc.) shows reasonable cause for the omission or inaccuracy. The maximum penalty for any employer or payor in a calendar year is $250,000. If the violation is deemed to be

**No-Match Cert. Admin. Record 109**

willful, the fine is the greater of $100 or 10 percent of the unreported amount per violation with no maximum.

Section 6109 places the burden on the employee or the payee to provide the employer or payor with an accurate SSN or TIN. This is an important distinction because the employer can have any penalty imposed for failing to include an accurate SSN or TIN on the return abated, if the employer made an initial and, if necessary, annual request that the payee provide an accurate SSN/TIN, or establishes that due diligence was otherwise used, such as by obtaining a statement from the employee under penalties of perjury that the SSN or TIN is accurate.

As you can see, what is important here is that the employer or payor makes a request, or repeats a request, for an accurate SSN or TIN. If he does, he has performed due diligence and has reasonable cause to believe the SSN or TIN is correct. As a result, under section 6724, a penalty assessed against an employer under section 6721 will be abated. These liberal due diligence standards for employers serve an important role in tax administration. Imposing harsh or inflexible penalties on employers could drive them into the cash economy, with no reporting at all.

As I indicated when I was before these two Subcommittees in 2004, because of the reasonable cause provision in the tax law, I am unaware of IRS sustaining any penalty against an employer for failure to provide an accurate SSN for an employee. That has not changed.

**Problems Associated With Sustaining Penalties**

The fact that we have not sustained a penalty against an employer probably shocks many of you. To some extent, it shocks me as well.

The U.S. Government Accountability Office (GAO) and others have suggested that perhaps we should re-examine our due diligence or reasonable cause standard and we have pledged to look at that with input from SSA and DHS. However, based on what we know now both about the employer base and the employees subject to mismatches, we have been unable to settle on any specific changes in the reasonable cause standard that might be warranted. However, we will continue to look at it and evaluate it in light of any new information.

For example, our Small Business/Self-Employed (SB/SE) division recently conducted its own analysis of a small number of employers with a high percentage of mismatches. What we found points out some of the difficulties associated with either assessing or sustaining a penalty.

From the information provided by SSA on invalid SSNs, SB/SE selected a group of 297 businesses, all of whom had reported invalid social security numbers for 75 percent of their employees. In essence, these were the worst of the worst in terms of invalid

numbers.  The limited size of this study limits its usefulness, but it does provide some interesting information.

IRS sent a survey to each of these employers with instructions to complete it and return it within 30 days.  We identified our first problem when the address we had for 58 companies on the list was either incorrect or the questionnaire was returned as undeliverable.

Another 48 companies did not respond at all.  This was a bad move on their part in that we told them in the cover letter that if they failed to respond to the questionnaire that they would be subject to penalties.  We are already in the process of starting these examinations.

That left us with a sample of 191 companies that responded in some way to the questionnaire.

Of these 191 companies, 57 percent were in three industry categories, agriculture (30 percent), temporary labor (18 percent) and janitorial (9 percent).

We asked several questions about hiring practices and verification procedures. Specifically, 76 percent of the respondents said they asked for a social security card. Thirty-eight percent said they would not hire someone who did not have a social security card.

This number in particular intrigues me, as I am sure it does you.  Remember these are companies in which 75 percent of the SSNs on the employee W-2s were invalid.  If, in fact, these employers did demand a social security card prior to hiring, then it may point to the widespread availability of forged or fake social security cards.

When we asked these employers what steps they took to verify the SSN provided by their employees, more than half said they took no action at all.  Only eight percent said they used the Social Security Administration's telephone verification system, and only four percent said they used the SSA's electronic verification system.

On average, companies in the survey had an annual turnover rate of 125 percent. The highest turnover rate was more than 400 percent.  Undoubtedly, this makes it very difficult to follow up with employees when SSA notifies them of the SSN/name mismatch.

Contributing to this problem is the lag time between when an employee is hired and when the employer learns that he/she has been given an invalid number.

For example, an employee who is hired today will complete his or her W-4 form (Employee's Withholding Allowance Certificate) and I-9 (required by DHS).  Typically these are held on file in the employer's office.

At the end of this year, the employer will send the employee's W-2 along with those of his or her other employees to the SSA. These are due at SSA by February 28 (or March 31 if filed electronically). SSA begins to sort the forms and within a few weeks concludes that there is a mismatch between the name and social security number given by the employee. A letter is then sent by SSA, first to the employee and then later to the employer (assuming the employer meets the SSA screening criteria), telling them that the SSN provided by the employer is invalid.

In this scenario, a year or more has passed before the employer learns for the first time that the number given by an employee is bad. If a business has a high turnover rate then it is unlikely the employee is still with the same company.

The lag time is even greater for the IRS. The earliest we will know of a possible mismatch will be in June when we begin our own efforts to correct the mismatches that have been identified by SSA. We will scrub the numbers through our filters for the rest of the year to see if we can find a match. As a result, two years have passed from the time the employee was originally hired before we even begin to think about doing some type of examination of the employer.

**General Conclusions**

Based on all of the work we have done in the mismatch area, we can draw some general conclusions:

- Individuals in the mismatch file tend to be low wage earners. Approximately 75 percent earn less than $10,000 and 98 percent earn less than $30,000.

- There is withholding on nearly 50% of the wage earners in the mismatch file but there tends to be significantly less withholding among the mismatches as compared to returns with valid social security numbers.

- The analysis of our limited group of 191 companies shows that most of the employers (57 percent) fall into three business groups, agriculture, temporary employment and janitorial.

- That same small group experienced extremely high turnover, making it likely that by the time an employer is advised of a mismatch, the employee has already left the company.

- Employers may or may not be notified that there is a mismatch, depending on whether they meet SSA's screening criteria.

- There does not appear to be much potential to collect significant penalties from employers under the current system because they can easily show due diligence.

**Considerations Concerning Changes to Current Penalty Program**

**No-Match Cert. Admin. Record  112**

We continue to consider ways to improve the current system and stand ready to work with our colleagues at SSA and DHS in any manner we can. For instance, we just announced a partnership between the IRS and the United States Citizenship and Immigration Services (USCIS) to conduct a pilot test to identify options to overcome the challenges surrounding data sharing between the two agencies. The GAO in a recent report indicated that data sharing between IRS and USCIS can help improve (1) tax compliance if businesses applying to sponsor immigrant workers are required to meet tax filing and payment requirements, and (2) the accuracy and timeliness of USCIS's immigration eligibility decisions if it obtained tax data from IRS to help insure business sponsors meet eligibility criteria. The project has a June 2007 implementation date.

In addition, we would, of course, work to execute any changes Congress determines to bring into effect. We would, however, call two issues to your attention that could be problematic with certain changes in the current regime.

First, any significant change requiring improved information sharing between Federal agencies or between Federal agencies and employers must account for protections found in section 6103 of the Internal Revenue Code. This section protects taxpayers from having their tax return information shared with third parties.

Second, we must make sure that any change in the current system encourages the type of behavior that we desire from both employees and employers. Imposing procedures on employers that are too stringent or requiring too much documentation from employees may have the effect of driving certain economic activities "underground". At least now we are collecting some taxes in these areas and we are working to collect even more.

Thank you for inviting me to testify this morning. I will be happy to take any questions you may have.

# House Committee on Ways and Means

http://waysandmeans.house.gov/hearings.asp?formmode=printfriendly&id=4708

Statement of The Honorable James B. Lockhart, III, Deputy Commissioner of Social Security, Social Security Administration

Testimony Before the Subcommittee on Oversight of the House Committee on Ways and Means

February 16, 2006

Chairman McCrery, Chairman Ramstad, Ranking Members Levin and Lewis, and members of the Subcommittees:

Thank you for asking me to be here today to discuss the steps the Social Security Administration (SSA) has taken to improve and strengthen the wage reporting processes and our efforts to reduce the size of the earnings suspense file, which I will describe in more detail later.  SSA is committed to ensuring that we maintain accurate earnings records for all workers, and we have taken vigorous steps to improve our processes.

Purpose of the SSN

The primary purpose for which SSA assigns a number and issues a card is the same today as it was at the program's inception in 1936: to accurately report and record the earnings of people who work in jobs covered by Social Security.  Of course, the key to tracking a worker's earnings is the Social Security number (SSN).

SSA has assigned over 433 million SSNs since 1936.  Earnings posted to an individual's SSN are used to determine eligibility for and the amount of Social Security benefits to which that worker and his or her family may be entitled.  Ultimately, the SSN is also used to track payment of those benefits.

The Social Security card was not designed to be a personal identification document—that is, the card does not establish that the person presenting the card is actually the person whose name and SSN appear on the card.  Although the card itself is counterfeit resistant, it does not contain information that would allow the card to be used as proof of identity.

Over time, SSA developed different tools to assist employers in verifying a worker's SSN.  We encourage employers to use any of these processes to improve the accuracy of wage reports so that Social Security can properly credit employees' earnings records.  In addition, the use of verification processes minimizes the employer's processing costs and reduces the number of forms that an employer may need to submit.

Initially, SSA used a manual process for verifications, which was highly labor-intensive.  This process became increasingly cumbersome over time as the verification workloads increased.

Over the years, SSA has worked to offer employers alternative methods to verify SSNs.  One of those methods is the Employee Verification System (EVS).  EVS is a free, convenient way for employers to verify employee SSNs.  It provides employers with several options depending on the number of SSNs to be verified.  For up to five SSNs, employers can call SSA's toll-free number for employers (1-800-772-6270) weekdays from 7:00 a.m. to 7:00 p.m.  Eastern Standard Time.  Employers may also use this number to get answers to any questions they may have about EVS or to request assistance.  In Fiscal Year 2004, SSA responded to nearly 1.4 million calls.

Employers also have the option to submit a paper listing to the local Social Security office to verify up to 50 names and SSNs.  In addition, employers may use a simple registration process to verify requests of more than 50 names and SSNs or for any

80

number of requests submitted on magnetic media. Currently, almost 17,000 employers have registered for this verification service.

To further increase the ease and convenience of verifying employee SSNs, SSA developed the Social Security Number Verification Service (SSNVS), which is an internet option that permits employer's to quickly verify the accuracy of employees' names and SSNs by matching the employee-provided information with SSA's records. SSA expanded this service to all employers in June 2005. We processed over 25.7 million verifications for over 12,000 employers in 2005.

On June 2, 2005 the Commissioner of Social Security announced the nationwide rollout of the Social Security Number Verification Service (SSNVS) at the SSA sponsored National Payroll Reporting Forum in Baltimore, Maryland. SSA has publicized SSNVS in various ways. An article on SSNVS was placed in the SSA/IRS Reporter that is sent to over 6.5 million employers. It was also featured in the SSA wage reporting email newsletter, *W2News*. We have also highlighted SSNVS in our many speaking engagements before the employer community. There is a special section on SSA's website for employers that highlights and explains the use of SSNVS.

In addition, employers may participate in the Basic Pilot program, an ongoing initiative in which SSA supports the Department of Homeland Security (DHS) in assisting employers confirming employment eligibility for newly hired employees. Participating employers register with DHS to use the DHS' automated system to verify an employee's SSN and work authorization status. The information the employer submits to DHS is sent to SSA to verify that the social security number and name submitted match information in SSA records. SSA will also confirm US citizenship, thereby confirming work authorization; DHS confirms current work authorization for all non-citizens. DHS will notify the employer of the employee's current work authorization status. This program is also available to all employers, subject to available resources.

In 2005, through the EVS, SSNVS, and Basic Pilot programs, we estimate we provided a total of 67 million employer verifications, up from 62 million in 2004.

The Wage Reporting Process

I would now like to discuss the process for reporting and crediting wages. Our role in the wage reporting process is to ensure that all workers receive credit for the work for which they and their employers paid Social Security taxes.

Employers report wages to SSA on Forms W-2 (Wage and Tax Statement). SSA processes the Form W-2 data for tax purposes for the Internal Revenue Service (IRS). Self-employed individuals report information on self-employment income to IRS on Schedule SE. IRS then sends this self-employment information to SSA. SSA uses the SSN to record employees' earnings.

**No-Match Cert. Admin. Record  115**

Accurate earnings information is vitally important to our Agency's administration of the Social Security program because a worker's earnings record is the basis for computing retirement, survivors and disability benefits. If a worker's earnings are not properly recorded, he or she may not qualify for Social Security benefits or the benefit amount payable may be wrong.

Each year, SSA processes approximately 235 million W-2s from 6.6 million employers that are sent to the SSA either on electronic media or on paper. Almost 150 million wage earners work in jobs covered by Social Security, which means that many workers worked in more than one job during a year. While some employers continue to send us their reports on paper, we encourage electronic filing. We work with the employer community to educate them on the advantages of this method and expect its use to expand as technology improves. In fact, in FY 2005, 66 percent of W-2s were filed electronically, up from less than 10 percent in 1999. We believe the increase in electronic filing will reduce errors over time.

SSA also offers a suite of services called Business Services Online (BSO). BSO offers Internet services for businesses and employers who exchange information with Social Security. Available services for registered users include the ability to report W-2s via the internet.

As you know, SSA mails Social Security Statements to workers over age 25 each year (approximately 143 million in 2005). The Statement is a concise, easy-to-read personal record of the earnings on which the worker has paid Social Security taxes during his or her working years and a summary of the estimated benefits the individual and his/her family may receive as a result of those earnings. We encourage workers to review the Statement to ensure that the information in SSA's records is correct and to contact SSA to make any corrections necessary.

Later in life, when a person files for benefits, an SSA employee reviews the earnings record with the worker and assists the worker to establish any earnings that are not shown or are not correctly posted. However, since it may be difficult for the worker to accurately recall past earnings or to obtain evidence of them, SSA strives to maintain accurate records at the time the wages are reported.

<u>The Earnings Suspense File</u>

The Earnings Suspense File, or simply suspense file, is an electronic holding file for wage items reported on Forms W-2s that cannot be matched to the earnings records of individual workers. A mismatch occurs when SSA cannot match the name and SSN on the W-2s submitted to information in SSA's records. If SSA later resolves the mismatch, we can remove the item from the suspense file and credit the wages to that person's record.

Since the beginning of the program in 1936 and through Tax Year (TY) 2003, the most recent year for which data is available, the suspense file contained about 255 million W-

2s.  While the suspense file represents an accounting of unassociated wage items, the taxes on these wages have been paid into to the trust funds.  In TY 2003, $7.2 billion in payroll taxes were credited to the Trust Funds based on wage items placed in the suspense file.  This represented approximately 1.3 percent of total payroll taxes credited to the Trust Funds.

In order for wages to be credited to the correct worker, the worker's name and SSN on the W-2 must match the name and SSN recorded on the master record of SSNs assigned, the "Numident" file.  As I discussed earlier, we receive about 235 million W-2 reports annually, representing reports from 6.6 million employers that total about $4 trillion in reported wages.

Ten percent of the W-2s received by SSA have invalid name and SSN combinations when they first come to us.  In our initial processing, the computer system uses more than twenty automated routines to identify commonly occurring errors that, when corrected, enable the W-2 to be properly posted.

A number of these processing routines address discrepancies between the name reported on the W-2 and the name on SSA records.  For example, compound surnames which are hyphenated, such as "Mary Smith - Jones", sometimes cause a "no match."  Others assume that the reported name is correct but that some mistake has been made with the SSN.  The reported SSN is screened for a variety of prescribed common mistakes, such as transposing digits, in an effort to obtain a match.

For TY 2003, using computer routines we were able to post more than half of all W-2s received with invalid name/SSN combinations to the correct SSN.  The balance, 4.1 percent of total W-2s received for TY 2003, was initially recorded in the suspense file.  As of October, 2005, approximately 8.8 million W-2s (3.7 percent of the total) representing $57.8 billion in wages remained in the suspense file for TY 2003.

Subsequent processing reduces this amount further.  SSA removes wage items from the suspense file on an ongoing basis and posts them to the correct worker's record.  Reinstatements can occur when a worker provides evidence of missing wages after reviewing the Security Statement. Over time, the percentage of W-2s for a given year or period of years that remain in the suspense file declines as a result of this subsequent processing.  Historically, approximately 2 percent of all wage items for a given year remain in the suspense file.

Removing W-2 Items from the Suspense File

SSA is dedicated to reducing the suspense file's rate of growth as well as to reducing its current size.  We want to make sure that individuals receive full credit for their earnings and the correct benefit amount when the time comes.  As part of this effort, SSA employees carry out a number of activities in addition to our SSN verification services,

which we have described earlier, to assure that the correct earnings are credited to correct individuals' records.

For example, SSA sends a letter, called the "No Match" letter, to employers who submitted a significant number of Forms W-2 that could not be matched to an individual's earnings record. The intent of these "No Match" letters is to improve the accuracy of wage reporting and the accuracy of Social Security benefits payable to eligible wage earners and their families. SSA also requests the employer to submit corrected W-2s so that future reports will be accurate.

In 2005, SSA sent 127,652 of these letters to employers who submitted wage reports containing a number of Form W-2s that SSA could not process.

SSA also notifies employees when we cannot process their W-2s due to mismatches and asks them to work with us to resolve the problem. In 2005, we sent 9.6 million such letters to employees, of which 1.5 million were sent to employers because we did not have addresses for the employee.

Beginning in April 2003, SSA implemented a new process that will electronically find millions of additional matches of W-2s in the suspense file and post those W-2s to the earnings records of the correct individuals. SSA's previous processes to match the name and SSN used only the Numident. The new process also uses the worker's detailed earnings record, which includes employer information and the master beneficiary record for those who are receiving benefits, to credit the missing earnings to the correct worker. This new process also employs additional techniques with earnings record patterns to match the earnings to the correct individual.

As a result of this new process, we have removed more than 11 million W-2s from the suspense file and posted them to the correct earnings records. It is estimated that a total of 30 million items will be removed from the suspense file and credited to the records of individual workers through these new efforts.

Despite all these efforts, over time the suspense file continues to grow. SSA's Inspector General will testify later that this growth is due to "unauthorized work by non-citizens" and that stronger worksite enforcement is needed.

This growth points to the larger issue of the increase in illegal immigration and subsequent illegal employment. To address the security risks from illegal entry into the U.S. as well as current challenges concerning legal immigration, President Bush has called for a three part comprehensive reform of our immigration system to:

1. "Secure the border by catching those who enter illegally, and hardening the border to prevent illegal crossings."
2. "Strengthen enforcement of our immigration laws within our country."
3. "Create a temporary worker program that will take pressure off the border, bring workers from out of the shadows and reject amnesty."

<u>Partnership With Other Agencies</u>

As I mentioned earlier, our ability to improve our employer wage reporting process depends partially on our relationships with the DHS and the IRS. I want to highlight several efforts that we have undertaken with our federal partners to strengthen the integrity of the SSN and improve the wage reporting process.

For example, we are working with DHS, pursuant to the Intelligence Reform and Terrorism Prevention Act, on an interagency task force for the purpose of improving the security of Social Security cards and numbers. The task force will establish additional security requirements, including standards for safeguarding cards from counterfeiting, tampering, alteration, and theft; verifying documents submitted for the issuance of replacement cards; and increasing enforcement against the fraudulent use or issuance of Social Security numbers and cards.

The Enumeration-at-Entry process is a joint effort with DHS and the Department of State (DOS). DHS and DOS collect enumeration data as part of the immigration process and give it to SSA for use in enumerating aliens. This effort to strengthen the integrity of the SSN and improve government efficiency began in October 2002.

Our efforts to collaterally verify documents with the issuing agencies significantly improve the integrity of the SSN. SSA works closely with DHS to verify all immigration documents submitted in support of an application for an SSN and with DOS to verify the documents of refugees. We work with the Department of Justice to verify the documents of some individuals granted asylum.

As I mentioned earlier, we also support DHS in its ongoing initiative known as the Basic Pilot. The Basic Pilot is a voluntary tool used by participating employers to confirm the employment eligibility of newly hired employees.

As of February 14, 2006, DHS and SSA have signed agreements with over 5000 employers, representing about 22,500employer sites. This represents more than a 50 percent increasesince the expansion of the Basic Pilot to employers in all States. On the date of expansion (December 20, 2004), there were 2924 participating employers. In FY 2005, SSA handled over 980,000 Basic Pilot queries. The Basic Pilot allows an employer to confirm the validity of a SSN and whether a person is authorized to work on the front end of the relationship rather than after a W-2 has been filed.

In addition to these initiatives, SSA participates with DHS in an executive level steering committee to oversee and direct cooperative activities. This committee was formed in 2003. At its last meeting, the committee addressed a number of initiatives to strengthen the processes used to assign social security numbers.

These meetings have stimulated a high level of staff-to-staff contacts that occur informally nearly every day. Also, over the past year, the two agencies have engaged in a number of informal cooperative efforts such as workgroups to address specific

85    **No-Match Cert. Admin. Record  119**

requirements of joint interest, such as provisions of the Intelligence Reform and Terrorism Prevention Act and the Real ID Act.

We have also established an interagency effort with IRS and are working to resolve issues and cooperate on efforts that cross agency lines. We meet as necessary to address issues as they come up. Recent discussions have focused on developing automated systems to support the employer community in the reporting of wages and related matters.

Each year, SSA hosts the National Payroll Reporting Forum. IRS routinely participates in this training endeavor, which focuses on the latest changes for the upcoming tax season, how to file electronically, SSNVS, etc. Representatives from businesses, payroll providers, and other groups attend. The 2006 forum is scheduled for late May.

I would like to discuss the Agency's role in identifying and reporting fraudulent activities related to the Social Security program. The employees in our local offices are instructed to be alert for reports of fraudulent activities. When such activities come to their attention, they document the problem and refer the matter to the Agency's Inspector General. Staff in the local IG office investigate the matter further. They then present violations to the local U.S. Attorney, who decides whether to bring charges. To facilitate the process, the Agency has assigned staff attorneys from the Agency's Office of General Counsel to assist US Attorneys in prosecuting violations related to the Social Security Act.

Because of the interdependence of Federal governmental functions, it is critically important that Federal agencies work together to effectively combat identity theft. SSA currently cooperates with many agencies, including the Internal Revenue Service, the Departments of Justice, Homeland Security, State, Health and Human Services, Education, and Treasury, and the Federal Trade Commission. We share and verify information with these agencies, and we work together to improve the interfaces between our business processes. We are working with many agencies in an Interagency Identity Theft Working Group to broaden and strengthen the cooperation among Federal agencies. The Working Group is developing a summary of Federal agencies' activities to combat identity theft. It will facilitate sharing of best practices and expertise and will result in the development of new approaches to combat identity theft and solutions to common challenges.

Conclusion

I would like to conclude by emphasizing our commitment to strengthening our wage reporting processes to help ensure the accuracy of the earnings records that we maintain for all workers. We continue to explore ways to improve the accuracy of our earnings report records and to limit the growth of the suspense file. We believe our efforts help to ensure that we remain good stewards of the Trust Funds.

I want to thank you, Chairman McCrery, Chairman Ramstad, and members of both Subcommittees for inviting me here today.  I look forward to working with you to continue to improve SSA's processes.  I will be happy to answer any questions you might have.

# House Committee on Ways and Means

http://waysandmeans.house.gov/hearings.asp?formmode=printfriendly&id=4709

Statement of The Honorable Stewart A. Baker, Assistant Secretary for Policy, U.S. Department of Homeland Security

Testimony Before the Subcommittee on Oversight of the House Committee on Ways and Means

February 16, 2006

INTRODUCTION

Chairman McCrery, Chairman Ramstad, Ranking Members Levin and Lewis, and Members of the Subcommittees on Oversight and Social Security:  I would like to thank you for the opportunity to appear before you today as you examine the current employment eligibility verification process, specifically the mismatching of Social Security Numbers (SSNs).  I appreciate the Subcommittees' decision to devote attention to this issue because mismatching can be an indication of a significant problem, namely the use of fraudulent SSNs by unauthorized workers.  If left unaddressed, this problem risks undermining the Administration's efforts to stop illegal immigration.

In my testimony, I would like to focus on one potential – and promising – way of dealing with this problem that the Subcommittees have already identified.  I speak about improved cooperation between the Social Security Administration (SSA) and the Department of Homeland Security (DHS) to detect and prevent violations of immigration law.

BACKGROUND

As the Members of the Subcommittees know, the border with Mexico is an increasingly violent place.  In part, that is because our efforts to restrict illegal crossings are beginning to work.  Criminal gangs who traffic in drugs or human beings make their profits by illegal crossings, and as DHS border enforcement grows, it is not surprising that attacks on the Border Patrol have increased.

The best way to reduce the attacks – and the illegal trade in human beings – is to reduce the incentives to cross the border illegally in the first place.  For one thing, that means relieving pressure on the border by creating a temporary work program that provides a

87

legal channel for honest workers and employers to support their families and our economy without violating our laws.  For another, it means reducing the ability of illegal immigrants to find easy employment in the United States.  As Secretary Chertoff stated in his testimony before the Senate Judiciary Committee on October 18, 2005, a tough interior enforcement strategy is one of the three pillars of the President's strategy for comprehensive immigration reform, along with securing the border and creating a temporary worker program.

A vigorous enforcement of our worksite immigration laws is a crucial step in moving towards a system where foreign migrant workers are employed in this country legally and transparently.  Currently, people who enter the United States illegally to find employment live in the shadows of our society, enjoying no legal protection in the workplace.  The Temporary Worker Program, which the President proposed, will create instead a system where foreign workers necessary for our economy can work here legally and without fear.  But both employers and employees will be slow to move toward such a transparent and open system unless they know that we are determined to enforce forcefully and faithfully our immigration laws in the workplace.  For the Temporary Worker Program to be successful, we need to foster a culture of compliance with the law among both employers and workers, and we need to have the necessary tools to do so.

The DHS task of effectively enforcing laws that prohibit the employment of illegal immigrants depends on the Department's ability to obtain and use information indicating potential violations of immigration laws.  I therefore encourage the Subcommittees to consider two questions:  first, whether the information already collected by SSA suggests a significant problem with our existing enforcement of immigration laws; and, second, whether providing such information to DHS would improve such enforcement.

## SSN MISMATCHING INDICATES WIDESPREAD EVASION OF IMMIGRATION LAWS

With respect to the first question, the answer seems quite clear.  Studies conducted by both the SSA Inspector General and the Government Accountability Office (GAO) have documented that a significant percentage of the SSNs listed on earnings reports filed by employers (commonly known as Forms W-2) result in a "no-match" against the master system of SSNs kept by SSA.  As the GAO report submitted on February 4, 2005 indicated, approximately 10 percent of the SSNs listed on earning reports submitted by employers to SSA initially do not match SSA's records.  Even after SSA applies a range of validation measures to reconcile the existing "no-matches," still about 4 percent of the earnings reports remain unattributed to valid SSNs.  This number amounts to almost 9 million reports per year, representing $57.8 billion in earnings for Tax Year 2003.  These remaining unreconciled reports are then placed in the Earnings Suspense File (ESF).

SSA then employs additional measures to reconcile these earning reports.  As a part of these efforts, SSA notifies employers with a significant number of mismatches, requesting that these employers correct the filed earning reports.  SSA also sends similar "no-match" letters to employees, whose earning reports could not be processed because

of the mismatch, asking them likewise to correct the error.  The number of these "no-match" letters is considerable.  The SSA's Inspector General indicated in his September 2002 testimony before the Subcommittee on Social Security that earlier that year SSA sent out about 800,000 of such letters to employers and some 7 million letters to employees.  Testifying before the Subcommittee on Oversight in March 2004, Deputy Commissioner Lockhart indicated that the number of "no-match" notices sent the following year, in 2003, was targeted at larger employers:  That year, SSA mailed out over 125,000 such notices to employers covering 9.5 million employees.  In many instances, where SSA does not have a valid address for an employee, the employee-directed notice is sent to the employer.

These discrepancies are quite easy to correct.  All an employer or an employee must do is inform SSA of the correct SSN to which the earnings should be attributed.  If the earnings are legitimate, it is in the interests of the worker to ensure that the record is accurate, because a worker's future retirement and disability benefits depend upon SSA's record of his wages.  If some of the worker's wages are not recorded, that may imperil his ability to get benefits in the future, or may limit the amount of those benefits.

Despite all of these incentives, the manifest reality is that very few employers or employees respond to the "no-match" letters.  Some of this may be explained by confusion about what to do, resulting in employers simply not doing anything.  Still, given the fact that simple errors can be corrected easily by both the employer and the employee, the extremely low return rate signals that an overwhelming percentage of the "no-match" instances cannot be explained by legitimate discrepancies and, as the GAO's February 2005 report indicated, suggests an attempt to obtain unauthorized employment through means of fraudulent SSNs.

There may, of course, be some innocent explanations for the discrepancies.  For instance, a mismatch can result from a misspelling in the employee's name, from a change of name after marriage or for other reasons, from a failure to match correctly the record of an employee with a compound last name, or from confusion between the worker's last and first names.  Notably, however, all of these mistakes are easy to correct, yet the stark reality is that, despite all incentives to do so, only a very small percentage of workers take the necessary action to rectify them.

A similar situation can be seen with respect to "no-matches" that result because the SSN listed on the earning report is composed solely of zeroes.  Some of the SSNs that use all zeros result from instructions issued to employers who file their earning reports electronically to use all zeros in the SSN field when they do not have a number for their worker.  Such a mismatch is, again, easy to correct.  Yet, as I just discussed, very few employers or employees take the necessary action to do so.

The persistent failure of an overwhelming percentage of both employers and employees who receive the "no-match" letter from SSA to correct the reported error strongly suggests that an innocent explanation cannot account for all of the mismatches.  The evidence indicates that there is likely an entrenched and widespread practice of using

89

fraudulent SSNs to evade compliance with immigration laws.  As the SSA's Inspector General acknowledged in his September 2002 testimony before the Subcommittee on Social Security, illegal immigrants account for a significant portion of items in the ESF. The GAO report, completed in February of last year, suggests that the problem has only increased in magnitude in the subsequent years.

USE OF SSA'S "NO-MATCH" DATA IN THE ENFORCEMENT OF IMMIGRATION LAWS

DHS sees a clear benefit to receiving portions of the "no-match" data from SSA in assisting with the Department's mission to enforce immigration laws at the workplace. As I already stated, the SSA is using a variety of innovative and sophisticated methods to identify the SSNs to which the unreconciled earning reports should be attributed before sending out the "no-match" letters with respect to the remaining reports.  The database of "no-match" letters, therefore, is already targeted to those unattributed earning reports that cannot be explained by, say, a simple misspelling in the employee's name or a typographical error in his SSN.  These true "no-match" letters could aid an U.S. Immigration and Customs Enforcement investigation of an employer violating immigration laws.  However, due to statutory restrictions, DHS is currently not permitted access to the "no-match" data.

The GAO report reveals precisely the kind of data that, if made available to DHS, would trigger instant attention from our immigration enforcers.  For example, GAO cited many examples where employers used the same SSN for as many as 10 different workers in the same tax year, and did so as many as 308 times over a 16-year period studied. Astonishingly, GAO discovered over a hundred occurrences where employers used the same SSN for more than a 100 earnings reports, and even an instance where the same employer used one SSN for 2,580 different earnings reports in a single tax year. Obtaining information about potential immigration violators will allow the immigration components of DHS to target its enforcement efforts at such employers – those with the worst record of submitting compliant SSNs for their employees

Here, I would direct the Subcommittees' attention to the GAO finding that, during the period from 1985 to 2000, a relatively small percentage of employers – only about 0.2 percent – were responsible for over 30 percent of the total number of ESF reports. Moreover, the types of employers most frequently associated with incorrect earnings reports belonged to industry groups historically known to employ illegal immigrants, such as agriculture, food and beverage industry, and construction and other trade services.  The SSA Inspector General has similarly found that employers in these industries are most likely to file earning reports with incorrect information.  Given this correlation, some portions of the "no-match" data would assist the Department with its enforcement energies.

On the basis of the "no-match" letters, the Department could easily identify those employers that have either a large or a disproportionate number of employees without a matching SSN.  The Department could then concentrate its efforts on these employers,

asking them to indicate whether their employees have corrected the inaccurate records, or to explain what steps the employers have taken to clear up the "no-match" reports, or to provide some other satisfactory explanation for the discrepancies.

We are aware that the vast majority of employers do wish to comply with the rules, and we are committed to working with those employers to clarify their responsibilities to attempt to resolve "no-match" letters. Working together would help to ensure that all employers take necessary action to correct circumstances that would lead a reasonable person to believe that the worker is undocumented, and would further eliminate the ability of illegal immigrants to obtain employment.

Eliminating the use of phony numbers will go a long way toward preventing more common immigration violations. But immigration violators will look for other ways to beat the system. Instead of phony names or numbers, they will use real ones. Adults may use the numbers of infants, or a group of workers may share a single valid name and number. These frauds, too, can be discouraged by a careful review of SSA data, but not by a single-minded focus on "no-match" letters. That is why DHS would like to further establish a good data-sharing relationship with SSA, not a single-shot approach that deals only with today's most obvious problem.

I want to stress that all of the parties here today, including DHS, are committed to preserving the privacy of sensitive data. The information DHS seeks is the identities and contact information of employers and employees whose behavior requires further examination. We understand that this is sensitive data, and we will ensure the appropriate privacy protections are in place to protect U.S. citizens from potential abuse.

I also want to acknowledge that the current prohibition on sharing of the information collected from earning statements reflects a legitimate concern about the need to ensure effective tax collection. This is an important interest, and it should, of course, be carefully considered as we think about the ways to enhance data-sharing between SSA and DHS. But we also need to consider carefully the significant interest that we have in ensuring effective enforcement of our worksite immigration laws and fostering a culture of compliance among both employers and employees.

<u>CONCLUSION</u>

I thank Members of the Subcommittees for the opportunity to address them today on this important issue, and I stand ready to answer any questions.

# House Committee on Ways and Means

http://waysandmeans.house.gov/hearings.asp?formmode=printfriendly&id=4710

Statement of The Honorable Patrick P. O'Carroll, Inspector General, Social Security Administration

Testimony Before the Subcommittee on Oversight
of the House Committee on Ways and Means

February 16, 2006

Good Morning, Chairman McCrery, Mr. Levin, Chairman Ramstad, Mr. Lewis.  It's a pleasure to be here today to discuss these important issues of mutual interest.  I was disappointed when I was unable to testify at the first hearing in this "SSN High-Risk Issues" series due to a previously scheduled trip abroad, but I understand that the hearing went very well, and I'm pleased to be here for the second hearing in the series.

Since this is our first time together since I was sworn in as the Social Security Administration's (SSA) Inspector General, I'd like to take just a moment to familiarize you with our organization.  We were established on March 31, 1995, the day SSA became independent of the Department of Health and Human Services (HHS) by virtue of the Social Security Independence and Program Improvements Act of 1994.  Prior to that, the Inspector General for HHS was charged with stewardship responsibilities over SSA's programs and operations.  Last year, we marked the completion of our first decade of service as an organization, and I believe that our accomplishments over that first decade are a testament not only to our talented and hard-working staff, but to SSA and its leadership, who have been ceaselessly supportive of our efforts.

Our office, like all Federal offices of Inspector General, has two statutory components:

Our Office of Investigations is comprised of 388 Special Agents and support staff, located in about 70 cities across the country.  By conducting independent criminal investigations into violations of the Social Security Act and the U.S. Criminal Code, we protect SSA funds, SSA programs, and most importantly, SSA employees on a daily basis.  We also work closely with other Federal agencies to ensure homeland security, and provide for disaster relief and integrity in recovery operations, such as in the aftermath of Hurricane Katrina last year.  In Fiscal Year 2005, the Office of Investigations opened over 9,500 criminal investigations, resulting in well over 2,000 convictions, and almost a quarter billion dollars in restitution orders, repayment agreements, fines, recoveries and savings.  Our Special Agents are among the most talented and committed law enforcement officers in the land, and I'm enormously proud of the work they do.

**No-Match Cert. Admin. Record  126**

Our Office of Audit is equally impressive. Across the country, some 154 auditors and support personnel conduct in-depth audits and reviews of Social Security programs and operations to ensure that tax dollars are wisely spent and benefits are properly paid. In Fiscal Year 2005, the Office of Audit issued 108 reports, identifying potential savings of about $375 million, and over $187 million in funds that could be put to better use.

In addition to these statutory components, our Office of Chief Counsel, in addition to providing legal advice and guidance to me and my staff, administers the Civil Monetary Penalty (CMP) program. Through their efforts, imposing civil penalties on those who would defraud SSA, or would use SSA's good name to deceive the American public, we assessed more than $700,000 in penalties and assessments in Fiscal Year 2005.

Finally, our Office of Resource Management makes all of our work possible. By providing budget, human resource, information technology, and other critical services, they keep the Office of the Inspector General running.

Over the course of what is now almost 11 full years, we have seen issues resolved and, more often, new issues arise, but there are issues that we inherited on Day One that are still with us after all this time. The challenges we are discussing today are among those that have persisted.

As you know, SSA receives wage reports from employers and posts the wages to workers' accounts. This enables SSA to make accurate benefit eligibility determinations and administer its programs. But when a wage report contains errors, and cannot be properly posted to a worker's account, it is instead placed in the Earnings Suspense File, or ESF, until it can be resolved. As of November 2005, there were 255 million wage items placed in the ESF, representing $520 billion in wages through Tax Year 2003. Looking at ESF entries on a yearly basis, the number of entries increased significantly during the decade between 1993 and 2003, but starting in 2001, the increases stopped, and began holding steady. While this is a hopeful sign, we do not believe it means that a solution has been found. To the contrary, while hard work by my office and by SSA has slowed the tide, the same obstacles to truly meaningful improvement in the ESF that existed a decade ago remain in our paths today.

In 1998, less than 3 years after the formation of our office, SSA's first confirmed Inspector General testified before Congress and identified the eight greatest challenges facing SSA. After identifying solvency as the first issue, he stated that "Second is the problem of erroneous wage reports held in SSA's Suspense Account. At the end of FY 1997, the cumulative balance of employee wages held in SSA's suspense account exceeded $240 billion, and it continues to grow. Unless corrected, suspended wages could reduce the amount of Title II benefits paid to individuals and their families. SSA must implement its newly established tactical plan to resolve suspended wages and evaluate its effectiveness." In the years that followed, we made many recommendations through our audit work and provided evidence through our investigations of a need to implement those recommendations, but the issue remained largely unresolved.

**No-Match Cert. Admin. Record  127**

More than 4 years later, in 2002, SSA's second confirmed Inspector General appeared before Congress and testified that the ESF remained one of the great challenges facing SSA.  In that testimony, he identified the two most significant obstacles to improvement in the ESF.  First, he pointed out that without a robust program of sanctions against employers who habitually misreport earnings for their employees, there is no incentive for employers to comply with the law, and that the authority to impose such sanctions rested with the Internal Revenue Service (IRS).  Second, he emphasized the role that unauthorized non-citizens play in the increases in the ESF, and the fact that IRS disclosure laws limited the data sharing necessary to bring about significant improvement.  Again, our efforts, and SSA's efforts, continued, but these two obstacles remained in place.

Now, 4 more years have passed, and I stand before you as SSA's third confirmed Inspector General.  More recommendations have been made to SSA; some have been agreed to, some have even been implemented.  Nevertheless, the ESF remains one of SSA's greatest challenges, and the most significant impediments to resolving that challenge are unchanged:  the lack of a meaningful program of sanctions against the most egregious employers, and legal obstacles that prevent SSA from sharing meaningful data with immigration authorities and employers.

I would submit that it would be an unfortunate neglect of the trust placed in all of us if, when my tenure is over, SSA's fourth confirmed Inspector General walks through these doors and tells the same story.

Last year, we issued two audit reports that highlighted the need for effective sanctions against problem employers.  One of these reports addressed the issue of misreported wages in some of the most problematic industries—the restaurant, service, and agriculture industries—and repeated yet again the need to collaborate with the IRS on an effective sanctions program.  Unfortunately, talks with the IRS have been ongoing for years, and even with respect to the nation's most egregious violators of the wage reporting laws, sanctions are rarely imposed.  We have recommended in the past that SSA seek legislative authority to create an SSA-based sanctions program, but they have responded that this authority is properly with the IRS.  We have recommended repeatedly that SSA intensify talks with the IRS to bring about a robust IRS-based sanctions program using long-existing authority, and SSA has generally followed our recommendations, but to no avail.  Whether through the creation of new authority or more active use of existing authority, sanctions are an absolutely critical element of any plan that hopes to reduce the size of the ESF in a meaningful way.

The second report we issued last year sought new approaches to the problem, recognizing that while sanctions and expanded disclosure authority were the keys to significant progress, other measures could be taken that would at least bring about some degree of improvement.  We looked at SSA's process for notifying employers and wage-earners of misreported wages, a process known as "DECOR," or Decentralized Correspondence.  When name and SSN information on a W-2 form do not match, and the wages must be posted to the ESF, SSA sends a "no-match letter" to either the employee or, if there is no

proper address for the employee, to the employer, pointing out the discrepancy and requesting a correction. Since prior recommendations dealing with encouraging IRS to make better use of its authority to impose sanctions had not yet borne fruit, this report instead focused on actions that SSA can take with the information in the DECOR database to bring about some degree of improvement in the wage reporting process.

We made several recommendations to SSA aimed at improving outreach, education, and trend analysis. While SSA agreed with many of our points, they returned to the issue that has become a central theme in looking at the ESF, stating that employers would still have little reason to change their ways. In its comments, SSA stated that "educational outreach is not a strong motivator for change with employers who have found their current wage reporting methods meet their needs without fear of any retribution."

The disclosure issue is similarly daunting. We believe the chief cause of wage items being posted to the ESF instead of an individual's earnings record is unauthorized work by noncitizens. Under existing law, as interpreted by SSA and the IRS, SSA cannot share data from the ESF with the Department of Homeland Security (DHS). For example, these laws make it impossible for SSA to provide DHS information regarding even the most egregious employers who routinely submit large numbers of inaccurate wage statements in which employee SSNs and names do not match SSA records. We believe disclosure limitations such as these perpetuate illegal work, erroneous wage reports, and the growth of the ESF. Most of the information necessary to address the ESF problem is in SSA's possession, but SSA must remain mute; all of the authority to sanction employers and deter continued violations is in the IRS' hands, but the IRS chooses not to act. The only greater surprise than this bureaucratic gridlock is the fact that the ESF is not even larger than it is.

While the ESF is by far the larger indicator of unauthorized noncitizens working in the U.S., another indicator which involves a smaller population of individuals engaged in unauthorized work is the Nonwork Alien, or NWALIEN File, and here again, disclosure issues pose an obstacle. We have issued multiple reports, and are on the verge of issuing yet another, that address the impact that non-citizens without authorization to work in the United States are having on SSN integrity, the Agency's future responsibility to pay benefits and, even more disturbing, improper employment in sensitive and critical industries. In 2000, 2001, and again in 2005, we examined SSN misuse and wage reporting issues with a focus on wages improperly earned by non-citizens without authorization to work in the United States—those whom SSA has assigned "nonwork" Social Security numbers. Each time, we identified as a significant obstacle in addressing this issue the limited ability of SSA to share information. SSA is required by law to annually share with DHS the NWALIEN File, a file of noncitizens who have received earnings using a non-work Social Security number. However, since this law was enacted in 1996, little has been done by SSA and DHS to analyze, attempt to reconcile and/or correct, and use this information for immigration enforcement purposes. Additionally, SSA believes privacy provisions of the Internal Revenue Code prohibit SSA from notifying employers when employees with non-work SSNs, who may not have DHS authorization to work, are in their employ. While SSA and DHS have extensive

95

information at their disposal, they have been unable to find a way to work with the information to prevent, detect, and enforce unauthorized employment.

In short, our work has shown, over the course of more than a decade, that until these obstacles are removed, either through legislation or cooperation, there is unlikely to be a truly meaningful reduction in the size of the ESF. Unless and until employers are either required to verify SSNs prior to submitting wage reports, or faced with stiff penalties for erroneous wage reports, there is no incentive for employers to do anything differently. And with limited ability to share meaningful information with immigration authorities and employers, there is relatively little SSA can do alone to address the significant impact non-citizens have on the ESF, the NWALIEN file, and ultimately, SSN integrity.

The information is at our fingertips. We can identify the most egregious employers with respect to wage reporting irregularities, but no action is taken against them by IRS, and no action can be taken against them by our office or by SSA. We can identify the employers with the most unauthorized non-citizens on their payrolls, but we cannot tell the employers who the unauthorized employees are. We know the scope of the unauthorized non-citizen issue is significant, but SSA cannot share adequate information with DHS to provide truly useful information.

We will, of course, continue our work aimed at quantifying and identifying discrete issues and proposing program improvements, but these improvements will likely continue to be relatively minor when viewed against the size of the ESF. We stand ready, however, to work with you and other members of Congress to bring about truly meaningful change.

Thank you again for inviting me to speak with you today, and I'd be happy to answer any questions.

## House Committee on Ways and Means

http://waysandmeans.house.gov/hearings.asp?formmode=printfriendly&id=4711

Statement of Barbara D. Bovbjerg, Director, Education, Workforce, and Income Security Issues, U.S. Government Accountability Office

Testimony Before the Subcommittee on Oversight of the House Committee on Ways and Means

February 16, 2006

Messrs. Chairmen and Members of the Subcommittees:

I am pleased to be here today to discuss Social Security numbers (SSNs) and their use in preventing and detecting unauthorized work. To lawfully work in the United States,

**No-Match Cert. Admin. Record  130**

individuals must have a valid SSN and, if they are not citizens, authorization to work from the Department of Homeland Security (DHS). Noncitizens seeking work are required to provide both an SSN and evidence of work authorization to their employers. Yet individuals without these required authorizations can gain employment with false information. How these instances of unauthorized work can be identified or prevented challenges the federal agencies involved.

In prior GAO work on these issues, we have reported on the use of Social Security Administration (SSA) data for identity and employment eligibility verification. Although SSA's verification systems have improved, use of SSA information in worksite enforcement continues to be challenging. Today I will discuss two issues: (1) the Social Security data that could help identify some unauthorized employment and (2) coordination among SSA, DHS, and the Internal Revenue Service (IRS) to improve the accuracy and usefulness of such data.

My statement is based primarily on prior GAO work on these topics.[1] We are presently conducting additional work for these subcommittees examining the use of SSA data for detecting unauthorized work. To determine how SSA and DHS are coordinating to improve earnings data, we conducted interviews with officials from SSA, the SSA Office of the Inspector General, and DHS. In addition, we obtained and reviewed data from SSA on individuals who had reported earnings under a nonwork SSN, and we reviewed other documentation provided to us by these agencies. We began this review in October 2005 in accordance with generally accepted government auditing standards, and our work is ongoing.

In summary, SSA has two types of data that could be useful for addressing unauthorized work— Social Security records for individuals and earnings reports. Individual Social Security records include name, date of birth, and SSN, among other things. SSA uses these data to provide SSN verification services free of charge to employers wishing to assure themselves that the names and SSNs that their workers provided match SSA's records. SSA also uses Social Security records in a work authorization verification system called the Basic Pilot program developed by DHS, which offers electronic verification of worker status. These systems are voluntary and not widely used by employers. SSA's earnings records provide a different sort of information that could be used for identifying unauthorized work. SSA uses such records to produce two relevant files. SSA's Nonwork Alien File contains earnings reports that are posted to SSNs that were issued for nonwork purposes, which suggests individuals are working without DHS work authorization. By law, SSA provides nonwork alien information to DHS annually, and our ongoing work for you suggests that a number of these records are associated with people who became work authorized some time after receiving their nonwork SSNs. A second file of interest, the Earnings Suspense File (ESF), contains earnings reports in which the name and SSN do not match SSA's records.[2] We have reported that this file, which contained 246 million records as of November 2004, appears to include an increasing number of records associated with unauthorized work.[3]

Improving the usefulness of SSA data could help identify some unauthorized work and ensure that limited enforcement resources are targeted effectively. Ensuring that the most useful data are available requires close coordination among the three federal agencies involved in collecting and using the data—SSA, IRS, and DHS. We have previously recommended that IRS work with DHS and SSA as it considers strengthening its employer wage reporting regulations, as such action could improve the accuracy of reported wage data, and that DHS, with SSA, determine how best to use such wage data to identify potential illegal work activity.

**Background**

The Social Security Act of 1935 authorized the SSA to establish a record-keeping system to help manage the Social Security program and resulted in the creation of the SSN. SSA uses the SSN as a means to track workers' earnings and eligibility for Social Security benefits. Through a process known as enumeration, each eligible person receives a unique number, which SSA uses for recording workers' employment history and Social Security benefits. SSNs are routinely issued to U.S. citizens, and they are also available to noncitizens lawfully admitted to the United States with permission to work. Lawfully admitted noncitizens who lack DHS work authorization may qualify for an SSN for nonwork purposes when a federal, state, or local law requires that they have an SSN to obtain a particular welfare benefit or service. In this case, the Social Security card notes that the SSN is "Not Valid for Employment."[4] As of 2003, SSA had assigned slightly more than 7 million nonwork SSNs. Over the years, SSA has tightened the requirements for assigning nonwork SSNs.

In 1986, Congress passed the Immigration Reform and Control Act (IRCA), which made it illegal for individuals and entities to knowingly hire and continue to employ unauthorized workers. The act established a two-pronged approach for helping to limit the employment of unauthorized workers: (1) an employment verification process through which employers are to verify newly hired workers' employment eligibility and (2) a sanctions program for fining employers who do not comply with the act. Under the employment verification process, workers and employers must complete the Employment Eligibility Verification Form (Form I-9) to certify that the workers are authorized to work in the United States. Those employers who do not follow the verification process can be sanctioned.

**SSA Individual Records and Earnings Reports Can Identify Some Unauthorized Work**

SSA has two types of data useful to identifying unauthorized work—individual Social Security records and earnings reports. Its individual records, which include name, date of birth, and SSN, among other things, can be used to verify that a worker is providing the SSN that was assigned to a person of that name. These records are used in verification services that are available free of charge to employers on a voluntary basis. SSA's earnings reports could also be used to identify some unauthorized work by reporting

98

noncitizens who may have worked without authorization and employers who have a history of providing SSN/name combinations that do not match SSA records.

**SSA Records Provide Verification Services to Improve Wage Data**

SSA uses individual Social Security records in its Employee Verification Service (EVS) and the Web-based SSN Verification Service (SSNVS), which employers can use to assure themselves that the names and SSNs of their workers match SSA's records. The services, designed to ensure accurate employer wage reporting, are offered free of charge. Employer use is voluntary. Although these systems only confirm whether submitted names and SSNs match, they could help employers identify workers who provide an SSN with fictitious information.

Over the years, SSA has developed several different verification methods under EVS. For example, employers may submit lists of workers' names and SSNs by mail on a variety of media, such as magnetic tapes or diskettes. Alternatively, employers may call a toll-free number or present a hard-copy list via fax, mail, or hand delivery to a local SSA office. SSA verifies the information received from employers by comparing it with information in its own records. SSA then advises the employer whether worker names and SSNs match. EVS offers the benefit of verifying name and SSN combinations for a company's entire payroll. However, the system would not be able to detect a worker's misuse of another person's name and SSN as long as the name and SSN matched. Employers do not widely use this service.

In an attempt to make verification more attractive to employers, in 2005, SSA implemented the Web-based SSNVS. It is designed to respond to employer requests within 24 hours. Requests of up to 10 worker names and SSNs can be verified instantaneously. Larger requests of up to 250,000 names can be submitted in a batch file, and SSA will provide results by the next business day. While this new system is attracting more employer interest, it is still not widely used.

SSA also uses its records in a work eligibility verification system developed by DHS called the Basic Pilot, which offers electronic verification of work authorization for newly hired workers.[5] Use of this program by employers is also voluntary, and the service has been available nationwide only since December 2004. Employers who agree to participate must electronically verify the status of all newly hired workers within 3 days of hire, using information that a new hire is required to provide. Under this program, an employer electronically sends worker data through DHS to SSA to check the validity of the SSN, name, date of birth, and citizenship provided by the worker. SSA records are used to confirm information on citizens. For noncitizens, SSA confirms SSN, name, and date of birth, then refers the request to DHS to verify work authorization status against DHS's automated records.[6] If DHS cannot verify work authorization status for the submitted name and SSN electronically, the query is referred to a DHS field office for additional research by immigration status verifiers. If SSA is unable to verify the SSN, name, and date of birth or DHS record searches cannot verify work authorization, a tentative nonconfirmation response is transmitted to the employer. After checking the

99

accuracy of the information and resubmitting the information, if necessary, the employer must advise the worker of the finding and refer him or her to either DHS or SSA to correct the problem. During this time, employers are not to take any adverse actions against those workers related to verification, such as limiting their work assignments or pay. When workers do not contest their tentative nonconfirmations within the allotted time, the Basic Pilot program issues a final nonconfirmation. Employers are required to either immediately terminate employment or notify DHS of their continued employment.

Like SSA's verification services, the Basic Pilot is voluntary and is not widely utilized. As of January 2006, about 5,500 businesses nationwide had registered to participate, although a significantly smaller number of these are active users.[7] Active participants have made about 4.7 million initial verification requests over a 5-year period (981,000 requests were made in fiscal year 2005). DHS reported on actions taken to address weaknesses in the program that had been identified during the early years of the program. They included delays in updating immigration records, erroneous nonconfirmations, and program software that was not user friendly. We subsequently reported on additional challenges, specifically, the capacity constraints of the system, its inability to detect identity fraud, and the fact that the program is limited to verifying work authorization of newly hired workers.[8]

## SSA Earnings Data May Be Used to Identify Some Unauthorized Work

SSA's earnings records can also provide information on unauthorized work. There are two sets of data that are relevant to unauthorized work. The first set, the Nonwork Alien File, contains earnings reports for SSNs that were issued for nonwork purposes. The second set, the Earnings Suspense File, contains earnings reports in which the name and SSN do not match. Both could help identify some unauthorized work.

### SSA's Nonwork Alien File

SSA is required by law to provide its Nonwork Alien File to DHS since it suggests a group of people who are in the United States legally but may be working without authorization.[9] Since 1998, SSA has provided DHS annual data on over half a million persons with earnings listed under nonwork SSNs. The file includes annual earnings amounts, worker names and addresses, and employer names and addresses as well.

DHS has found this file to be of little use to enforcement activities, however. According to DHS officials, the file is currently not an effective tool for worksite enforcement due in part to inaccuracies in the data and the absence of some information that would help the department efficiently target its enforcement.[10]

In fact, because SSA only updates work authorization status at the request of the SSN holder, individuals in the file may now be U.S. citizens or otherwise legal workers who simply have not updated their status with SSA. Our ongoing work in this area suggests that a number of these records are indeed associated with people who later obtained permission to work from DHS. SSA policy is to update work authorization status when

100

the SSN holder informs the agency of the status change and provides supporting documentation.[11] Unless the individual informs SSA directly of the status change, SSA's enumeration records will continue to show the person as unauthorized to work and will record his or her earnings to the Nonwork Alien File. Currently, the extent to which such noncitizens are included in the file is unknown, but SSA and DHS officials have both acknowledged that the file may include a number of people who are currently authorized to work.

DHS officials said that the file would be of greater value if it contained DHS's identifying numbers—referred to as alien registration numbers. According to DHS officials, because persons in the file do not have an identifier in common use by both agencies, they cannot automatically be matched with DHS records. As a result, DHS officials told us that they use names and birth dates to match the records, which can result in mismatches because names can change and numbers in birth dates may be transposed. SSA officials have said that generally they do not collect alien registration numbers from noncitizens. Collecting the alien registration number and providing it in the Nonwork Alien File is possible, they stated, but would require modifications to SSA's information systems and procedures. They also noted that SSA would only be able to collect the alien registration number when noncitizens are assigned an SSN or when such an individual updates his or her record. As part of its procedures, SSA is required to verify the immigration status of noncitizens before assigning them an SSN, which requires using alien registration numbers.[12] However, some noncitizens, such as those who have temporary visas, (e.g. students) may not have an alien registration number. In these cases, SSA would not be able to include the number in the Nonwork Alien File.

The time it takes SSA to validate earnings reports and convey the Nonwork Alien File to DHS also makes the file less effective for worksite enforcement. When SSA finishes its various processes to ensure that the file includes the appropriate data, the reported earnings can be up to 2 years old. By that time, many of the noncitizens included in the file may have changed employers, relocated, or changed their immigration status, resulting in out-of-date data on individuals or ineffective leads for DHS agents.[13]

A DHS official told us that if the Nonwork Alien File were to contain industry codes for the reporting employers, DHS could target those in industries considered critical for homeland security purposes, which would be consistent with DHS's mission and enforcement priorities. Having information about the industries the employers are in would help them better link the data to areas of high enforcement priority, such as airports, power plants, and military bases.

**Earnings Suspense File**

Another SSA earnings file, referred to as the Earnings Suspense File, contains earnings reports in which the name and SSN do not match SSA's records, suggesting employer or worker error or, potentially, identity theft and unauthorized work. We have reported that this file, which contained 246 million records as of November 2004, appears to include an increasing number of records associated with unauthorized work. SSA's Office of the

101

Inspector General has used the ESF to identify employers who have a history of providing names and SSNs that do not match.

When SSA encounters earnings reports with names and SSNs that do not match, it makes various attempts to correct them using over twenty automated processes. However, about 4 percent of all earnings reports still remain unmatched and are electronically placed in the ESF, where SSA uses additional automated and manual processes to continue to identify valid records. Forty-three percent of employers associated with earnings reports in the ESF are from only 5 of the 83 broad industry categories, with eating and drinking establishments and construction being the top categories. A small portion of employers also account for a disproportionate number of ESF reports. For example, only about 8,900 employers—0.2 percent of all employers with reports recorded in the ESF for tax years 1985-2000—submitted over 30 percent of the reports we analyzed.[14]

Our past work has documented that individuals who worked prior to obtaining work authorization are a growing source of the unmatched earnings reports in the ESF that are later reinstated to a worker's account. Once workers obtain a valid SSN, they can provide SSA evidence of prior earnings reports representing unauthorized employment prior to receiving their SSN. Such earnings reports can then be used to determine a worker's eligibility for benefits.[15]

DHS officials believe that the ESF could be useful for targeting its limited worksite enforcement resources. For example, they could use the ESF to identify employers who provide large numbers of invalid SSNs or names and SSNs that do not match. They told us that these employers may knowingly hire unauthorized workers with no SSN or fraudulent SSNs and that employers who are knowingly reporting incorrect information about their workers might also be involved in illegal activities involving unauthorized workers.

However, it is not clear that the ESF, which is much larger than the Nonwork Alien File, would be manageable or allow for targeted enforcement. The ESF contains hundreds of millions of records, many unrelated to unauthorized work, making it difficult to use for targeting limited resources. While the ESF may help identify some of the most egregious employers of unauthorized workers, in terms of poor earnings reporting, its focus is not on unauthorized workers. Our work has shown that most of the reinstatements from the file belong to U.S.-born citizens, not to unauthorized workers.[16] In addition, because the ESF contains privileged taxpayer data, SSA cannot share this information with DHS without specific legislative authorization.[17] SSA's Office of the Inspector General has recommended that SSA seek legislative authority to share this data with DHS, but SSA responded that it is beyond the agency's purview to advance legislation to amend the Internal Revenue Code in order to allow DHS access to tax return information.[18] IRS officials have also expressed concern that sharing this data could decrease tax collections and compliance.[19] We are examining the usefulness of SSA data to DHS for these subcommittees, and will consider ESF issues as part of this work.

**Closer Coordination by SSA, IRS, and DHS Could Improve Usefulness of SSA Earnings Data**

Improving the usefulness of the data could help ensure that limited enforcement resources are targeted effectively. SSA data could help identify areas of unauthorized work, but closer collaboration among SSA, IRS, and DHS can help to ensure that the most useful data are available in a form that can be used efficiently for enforcement.

Under the current data-sharing arrangement, DHS officials believe the agency would have to invest significant resources to determine whether employers it targets are really hiring persons who are not work authorized. DHS has stated that determining which nonwork SSN holders are now authorized to work may not be cost-effective and would pull resources from other national security-related initiatives.[20] Neither SSA nor DHS is able to easily and quickly update work status because they lack a common identifier for their records. Updating status without a common identifier may not be practical because different spellings or name variations confound large-scale matching efforts. For example, an August 2005 report from the SSA's Office of the Inspector General highlights a substantial proportion of cases in which names were inconsistent between SSA and DHS.[21] In at least six reports in recent years, SSA's Office of the Inspector General has recommended or mentioned prior recommendations that SSA work with DHS to update information about work authorization.[22] SSA officials maintain that it is their policy to make changes to the Social Security record only if the SSN holder initiates the changes and provides evidentiary documents from DHS. SSA further states that a "resolution of the discrepant information between DHS and SSA would require more than a simple verification."[23]

Despite the many problems with the data, there are steps that could be taken to improve them. For example, the employers who submit the most earnings reports for nonwork SSNs might be good candidates for outreach and education about verifying work eligibility. SSA's Office of the Inspector General officials suggested that DHS send letters to employers of persons with nonwork SSNs. These letters could encourage persons listed as having nonwork SSNs, who are now authorized to work, to update their records. The ESF also has the potential to provide useful information to DHS, but this information has protected tax status. Although some of the same difficulties that pertain to the Nonwork Alien File could also affect the usefulness of the ESF to DHS enforcement efforts, if these challenges could be overcome, authorizing transmittal of at least some of the ESF information to DHS might be warranted.

Producing accurate, useful data will require substantial continued effort on the part of SSA, DHS, and the IRS: these efforts will be of little value, however, if the data are not used for enforcement and to stimulate changes in employer and employee behavior. We have reported previously that the IRS program of employer penalties is weak, because of limited requirements on employers to verify and report accurate worker names and SSNs; we have recommended that IRS consider strengthening employer requirements, a course that could over time improve the accuracy of wage data reported to SSA.[24] We have also reported that, consistent with DHS's primary mission in the post-September 11

103

environment, DHS enforcement resources have focused mainly on critical infrastructure industries in preference to general worksite enforcement. [25] In such circumstances, coordination to leverage usable and useful SSA data is essential to ensure that limited DHS worksite enforcement resources are targeted effectively.

**Concluding Observations**

The federal government likely can make use of information it already has to better support enforcement of immigration, work authorization and tax laws. The Earnings Suspense and the Nonwork Alien files have potential, but even the best information will not make a difference if the relevant federal agencies do not have credible enforcement programs. In fact, sharing earnings data to identify potential unauthorized workers could unnecessarily disclose sensitive taxpayer information if the data are not utilized by enforcement programs. To address unauthorized work more meaningfully, IRS, DHS and SSA need to work together to improve employer reporting, develop more usable and useful data sets for suspicious earnings reports, and better target limited enforcement resources.  We look forward to contributing to this endeavor as we continue to conduct our work on using SSA data to help reduce unauthorized work.

This concludes my prepared statement. I will be happy to answer any questions you may have.



action for, the development of new entry-exit controls for persons entering with visas, reissuance of Border Crossing Cards to give them greater integrity, and providing significant new resources for inspections.

*Monitoring and evaluating new initiatives.* The various intended and unintended consequences of the new resources, policies, and initiatives in and between ports of entry make clear the need for careful monitoring. The Commission reiterates its 1994 recommendation that a systematic assessment of the effectiveness of new border strategies be undertaken by internal and external evaluators. IIRIRA mandates a General Accounting Office five-year evaluation of border management. This study should be underwritten with sufficient resources and expertise to ensure that Congress and the Executive Branch gain an independent view of the new policies' effectiveness.

■ **Reducing the employment magnet is the linchpin of a comprehensive strategy to deter unlawful immigration.** Economic opportunity and the prospect of employment remain the most important draw for illegal migration to this country. Strategies to deter unlawful entries and visa overstays require both a reliable process for verifying authorization to work and an enforcement capacity to ensure that employers adhere to all immigration-related labor standards. The Commission continues to believe the following areas of worksite regulation and enforcement require improvement:

*Employment authorization verification system.* In our 1994 report, the Commission concluded that the single most important step that could be taken to reduce unlawful migration was development of a more effective system for verifying work authorization.

U.S. COMMISSION ON IMMIGRATION REFORM



A large majority of employers will comply with the law, and they will not knowingly hire illegal aliens. However, the widespread availability of fraudulent documents makes it easy for illegal aliens to obtain jobs because employers generally have no way of determining if the workers are authorized or not. The minority of employers who knowingly hire illegal aliens, often to exploit their labor, find protection from sanctions by going through the motions of compliance while accepting counterfeit documents. The absence of a secure verification process also heightens the potential for discrimination against legally-authorized, foreign-looking or -sounding workers because employers fear that they may be inadvertently hiring illegal aliens.

The Commission concluded that the most promising option for verifying work authorization is a computerized registry based on the social security number; it unanimously recommended that such a system be tested not only for its effectiveness in deterring the employment of illegal aliens, but also for its protections against discrimination and infringements on civil liberties and privacy.[14] The Commission urged the Administration "to initiate and evaluate pilot programs using the proposed, social security-based computerized verification system in at least five states with the highest levels of illegal immigration . . ." In the interim, we recommended that INS should continue to implement pilot programs already underway that permit employers to verify the work authorization of these newly-hired workers who attest to being aliens. The existing pilot, since expanded, was a good mechanism through which INS could develop the data and other systems that would be needed in the more extensive pilots envisioned by the Commission. They continued to

---

[14] The Concurring Statement of Commissioners Leiden and Merced can be found in the Commission's 1994 report.

U.S. COMMISSION ON IMMIGRATION REFORM



have a fatal flaw, however, in that an illegal alien could attest to being a U.S. citizen and thereby escape verification by INS.

The Commission's recommendation for a verification pilot that involved both citizens and aliens was incorporated in modified form in IIRIRA.[15]  Congress mandated that the Attorney General establish a pilot confirmation system using a telephone line or other electronic media.  The Commissioner of Social Security was mandated to establish a reliable, secure method to verify the social security number provided by a new hire as part of the employment confirmation process.  Pilot programs testing the new confirmation process were to be implemented in, at a minimum, five of the seven states with the highest estimated illegal alien population.  Participation in the pilot programs is to be voluntary for most employers.  The legislation mandated participation by federal agencies and the Congress.  Companies violating employer sanctions provisions can also be required to participate.  The Attorney General is to report on the pilot programs after three and four years of operation.

The first of these pilot projects was to begin not later than one year from enactment of IIRIRA, or about August 1997.  The first pilot project, starting in Chicago, began in late August.  Called the "Joint Employment Verification Project" (JEVP], the pilot involves INS and the Social Security Administration.  The verification pilot will test many of the requirements of the "Basic Pilot Program" mandated in § 403(a) of IIRIRA.

---

[15] IIRIRA, Title IV—Enforcement of Restrictions Against Employment, Subtitle A: Pilot Programs for Employment Eligibility Confirmation, sections 401-405.

U.S. COMMISSION ON IMMIGRATION REFORM



The JEVP will have prospective new employees fill out the current INS Form I-9, submit identification documents listed in the legislation, and include a photograph. Employers will then contact the Social Security Administration [SSA] through a touch-tone telephone (being developed under a contract with ATT) that will electronically verify identity and authorization/nonauthorization to work using the employee's social security number. If either of these is not confirmed, the prospective employee must be notified. The employee may then withdraw or contest this tentative nonconfirmation. In this case, the prospective employee has ten days in which to provide additional or corrected information to the employer. If this still does not produce confirmation of employment authorization, the employee will be told to contact SSA [for citizens] or INS [for noncitizens] to correct their record(s) and/or their status. During this confirmation process, employees cannot be terminated. If still unconfirmed at the end of the process, the employee then may be terminated. As mandated by IIRIRA, INS plans to expand implementation of the JEVP into five additional states by the end of September 1997.

In addition, IIRIRA mandates two other pilot projects, a "citizen attestation pilot project" and a "machine readable document pilot project." INS currently is formulating these additional pilot projects. The "citizen attestation pilot project" will be similar to the INS' current Employment Verification Program, while the "machine readable document pilot project" is a variation of the JEVP and the "Basic Pilot Project."

The current pilot programs are a useful step in improving verification, but they do not fully solve the problems we have identified. The Commission reiterates its support for



pilot-testing approaches that do not require employers to use the current I-9 procedure. The I-9 is flawed in several ways. First it is a document system, which is prone to counterfeiting. Second, it requires employees to specify if they are citizens or aliens. This latter requirement increases the potential for discrimination based on alienage or presumed alienage. Third, it presents an added paperwork burden for employers who must keep the I-9 file. The current pilot programs help address the first problem by providing for telephone or computer verification of information provided in the I-9. It does not address the second or third problems, however.

A system based on verification of an employee's social security number, with a match to records on work authorization for aliens, eliminates any determinations by the employer and can be implemented electronically, thus eliminating the need for work authorization documents. The Commission recognizes that the data systems are not yet in place for this preferred process to work. The federal government does not have the capacity to match social security numbers with INS work authorization data without some of the information captured on the I-9. Congress should provide sufficient time, resources, and authorities to permit development of this capability.

The Commission urges the Administration and Congress to monitor closely and evaluate the effects of these various pilot programs. As discussed in our earlier report, the evaluation should assess their effects in reducing fraud, reducing the potential for discrimination, reducing emplyers' time, resources, and amount of paperwork, and protecting privacy and civil liberties. The evaluation should be carried out by nationally-respected outside evaluators. It should be

U.S. COMMISSION ON IMMIGRATION REFORM



conceived as a continuing evaluation whose results are used in modifying and improving the pilots as they are implemented.

*Counterfeit documents.* The Commission recommended action to reduce the availability of counterfeit documents and the fraudulent access to so-called "breeder documents," particularly birth certificates used to establish identity. The Commission is pleased to note progress in the development of new and more tamper-proof basic documents that could serve as verification documents until a general, nationwide verification system is fully in place. The Commission also believes that the federal government should develop a package of incentives and disincentives to encourage states and other localities to develop standards for issuing birth and death certificates and drivers' licenses. The Commission is pleased to note that its 1994 recommendation for imposing additional penalties on those producing and selling counterfeit documents was adopted in the IIRIRA.

*Antidiscrimination strategies.* In its 1994 report, the Commission expressed its concern regarding the discrimination that occurs against citizens and noncitizens as a result of the current employer sanctions system. To address this issue, the Commission recommended development of a new verification process to deter immigration-related discrimination. We also urged more proactive strategies to identify and combat immigration-related discrimination at the workplace, as well as a new study to document the nature and extent of the problem. Revisiting this issue three years later, the Commission finds that there have been a number of changes that are relevant to the Commission's recommendations.

First, the Office of Special Counsel [OSC] for unfair immi-

U.S. COMMISSION ON IMMIGRATION REFORM



gration-related employment practices, formerly housed as an independent agency within the Department of Justice, has been incorporated into the DOJ's Civil Rights Division. This organizational change seems to have been well received within the Department as both the Division and OSC focus on protecting the rights of immigrants and racial and ethnic minorities.

The number of OSC staff, however, has decreased from thirty-six to about twenty-five since FY 1994. This downward trend harms OSC's ability to take the proactive role that the Commission recommended (e.g. increasing independent, targeted investigations and beginning testing programs). The Commission urges attention to this matter, as well as to the long delay in confirming a Special Counsel to head the office.

A significant portion of OSC's efforts have been directed toward the education of employees and employers, and we support these efforts. OSC has awarded 114 grants totaling $2.09 million since FY 1990 and contracted out for a five-year national public affairs/communications strategy. Its attorneys and staff have made 1,000 presentations in the last ten years, and its grantees have averaged 1,700 presentations per year. OSC also has coordinated its educational efforts with the Equal Employment Opportunity Commission, INS, and DOL and has Memoranda of Understanding with these and other agencies.

Despite this apparent coordination, however, OSC has not been involved in designing and monitoring the verification pilot programs. Reducing immigration-related employment discrimination against foreign-looking or -sounding persons was a key goal of the Commission's proposed verification

U.S. COMMISSION ON IMMIGRATION REFORM



system. OSC should play a role in monitoring the verification pilots to see if the discrimination is indeed reduced as predicted.

The Commission also reiterates its recommendation for a methodologically-sound study to document the nature and extent of unfair immigration-related employment practices that have occurred since the General Accounting Office's 1990 report. Only through such a study can it be determined whether employer sanctions-related discrimination has increased or decreased and how the pilot programs compare with the current situation on this indicator.

In 1996, IIRIRA changed the INA by requiring that an intent to discriminate must be proven for an employer to be found guilty of violating IRCA's antidiscrimination procedures with respect to document requests. Some believe that the intent standard will be a difficult one to prove and that it provides the employer with a loophole. The actual effect of this provision will be known only as OSC implements the statutory change and should be monitored.

*Labor standards enforcement.* Protecting authorized workers from employment abuses and substandard conditions and practices remains an essential ingredient of a strategy to combat illegal migration. Employers who hire illegal aliens tend to violate other labor standards and *vice versa*. Recently uncovered examples of exploitation of illegal aliens, including indentured servitude, highlight the necessity of enhanced labor standards enforcement. The Commission recommended in our 1994 report the allocation of increased staff and resources to the Department of Labor for the enforcement of wage and hour and other labor standards. We continue to believe that these additional resources are necessary, and the Commission continues to urge Congress to

U.S. COMMISSION ON IMMIGRATION REFORM



authorize and fund additional labor standards investigators whose work should target industries hiring significant numbers of illegal aliens. As described more fully later in this report, we believe that the Department of Labor should have full capacity and authority to sanction employers who fail to verify work authorization as part of the agency's duties in enforcing labor standards.

- **Restricting eligibility of illegal aliens for publicly-funded services or assistance except those made available on an emergency basis or for similar compelling reasons to protect public health and safety or to conform to constitutional requirements.** Although public benefit programs do not appear to be a major magnet for illegal migrants, it is important that U.S. benefit eligibility policies send the same message as immigration policy: Illegal aliens should not be here and, therefore, should not receive public assistance except in unusual circumstances. The Commission recommended drawing a line between illegal aliens and lawfully-resident immigrants with regard to benefits eligibility, in part to reinforce this message. Immigrants are welcome in the country and, therefore, should be eligible for our basic safety nets; illegal aliens are not welcome and should not receive our assistance. We continue to believe that this demarcation between legal and illegal aliens makes sense. The Commission urges the Congress to reconsider the changes in welfare policy enacted in 1996 that blur the distinctions between legal and illegal aliens by treating them similarly for the purposes of many public benefit programs.

- **Strategies for addressing the causes of unlawful migration in source countries.** An effective strategy to curb unauthorized movements includes cooperative efforts with source countries to address the push factors that cause people to seek new lives in the United States. The Commission contin-

United States General Accounting Office

# GAO

## Report to Congressional Committees

April 1999

# ILLEGAL ALIENS

# Significant Obstacles to Reducing Unauthorized Alien Employment Exist



No-Match Cert. Admin. Record  148



United States
General Accounting Office
Washington, D.C. 20548

General Government Division

B-278845

April 2, 1999

The Honorable Orrin G. Hatch
Chairman
The Honorable Patrick J. Leahy
Ranking Minority Member
Committee on the Judiciary
United States Senate

The Honorable Henry J. Hyde
Chairman
The Honorable John Conyers, Jr.
Ranking Minority Member
Committee on the Judiciary
House of Representatives

One of the primary magnets attracting illegal aliens to the United States is jobs. Even among those who enter the United States legally (e.g., as tourists or students), many are believed to overstay their visas and take jobs. The Department of Justice's Immigration and Naturalization Service (INS) estimated that about 5 million illegal aliens resided in the United States in October 1996, and that their numbers increased at an average rate of about 275,000 per year between October 1992 and October 1996. Many immigration experts have said that as long as opportunities for employment exist, the incentive to enter the United States illegally or overstay visas will persist and efforts at the U.S. borders to prevent illegal entry will be undermined. Therefore, these experts believe that reducing the magnet of employment should be an integral part of a comprehensive strategy to reduce illegal immigration.

This is our second of six planned reports on the Attorney General's strategy to deter illegal entry into the United States. These reports are mandated by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (1996 Act), Public Law 104-208. In our first report,[1] we discussed the Attorney General's strategy to deter illegal entry along the southwest border. As agreed with your committees, this second report reviews the strategy's objective related to enforcing workplace immigration laws. Specifically, this report addresses the following: (1) the effectiveness of the current employment verification process in preventing

---

[1]Illegal Immigration: Southwest Border Strategy Results Inconclusive; More Evaluation Needed (GAO/GGD-98-21, Dec. 11, 1997).

GAO/GGD-99-33 Unauthorized Employment of Aliens

**No-Match Cert. Admin. Record  150**

B-278845

employers from hiring unauthorized aliens,[2] (2) INS' efforts to improve the employment verification process, (3) the level of effort INS and the Department of Labor devoted to worksite enforcement activities and the results of these activities, and (4) changes being made to INS' worksite enforcement program.

## Results in Brief

More than 12 years after the Immigration Reform and Control Act (IRCA) of 1986[3] created an employment verification process intended to prevent employers from hiring unauthorized aliens, significant numbers of unauthorized aliens can still obtain employment. The effectiveness of the current verification process, which relies on identity and employment eligibility documents that employees are to show employers, can be undermined by unauthorized aliens using fraudulent documents. Fraudulent documents, which can often appear genuine, are widely available and widely used by unauthorized aliens to obtain employment.

INS has undertaken several initiatives to improve the employment verification process to make it less susceptible to fraud, but significant obstacles remain. First, as mandated in the 1996 Act, INS is testing or expects to test three pilot programs in which employers electronically verify an employee's eligibility to work. However, employer participation in the pilot programs under way has been significantly less than INS anticipated. Other federal and state agencies that have contact with potential participants generally have not had a role in informing them about INS' pilot programs. According to INS, Labor, and Social Security Administration (SSA) officials, some employers believe that pilot participation could place them at a disadvantage, relative to nonparticipating competitors, in a tight labor market.

Second, INS has made little progress toward its goal of reducing the number of documents that employers can accept to determine employment eligibility. In February 1998, INS issued proposed regulations to reduce the number of documents that can be used from 27 to 14. However, INS received numerous comments on the proposed regulations and INS officials do not know when these regulations will be finalized. Lastly, INS has begun issuing new documents with increased security features, which INS hopes will make it easier for employers to verify the documents' authenticity. However, aliens are statutorily permitted to show

---

[2] We use the term "unauthorized aliens" to refer to aliens who do not have permission from INS to work in the United States but who are working, regardless of whether they entered legally or illegally. Unauthorized aliens in the United States are subject to removal from the country by INS.

[3] P.L. 99-603, 8 U.S.C. 1324a et seq.

**No-Match Cert. Admin. Record  151**

B-278845

employers various documents other than the INS documents that authorize aliens to work, and other widely used documents (e.g., Social Security cards and birth certificates) do not have the security features of the INS documents.

Since 1994, INS has devoted about 2 percent of its enforcement workyears to its worksite enforcement program, which is designed to detect noncompliance with IRCA. In 1998, INS completed about 6,500 investigations of employers, which equated to about 3 percent of the country's estimated number of employers of unauthorized aliens. Labor has provided limited assistance to INS in identifying employers suspected of hiring unauthorized workers, and, under a new agreement with INS, Labor's role in this area will be reduced. Labor believes that delving into immigration-related worksite enforcement matters, such as the immigration status of workers, could hamper its own mission of enforcing workplace standards by limiting workers' willingness to report possible violations to Labor.

The results of INS' worksite enforcement program indicate it has infrequently imposed sanctions on employers. Although a major goal of the program was to target for investigation employers who knowingly violated the law, more than 8 out of 10 investigations completed during the period we reviewed did not result in a penalty. INS officials attributed these modest results to various factors. They stated that the widespread use of fraudulent documents made it difficult for INS to prove that an employer knowingly hired an unauthorized alien. In addition, they stated that INS' requirement that district worksite programs meet various numerical goals, such as identifying a certain number of unauthorized aliens, may have placed an undue focus on arresting unauthorized aliens and may have undermined INS' overall goal to target employers suspected of being major violators.

INS is in the process of changing its approach to worksite enforcement. The Service has developed an interior enforcement strategy with five strategic priorities. Two of the priorities involve worksite enforcement, with one calling for INS to pursue the criminal investigation of employers who are flagrant or grave violators. However, the strategy does not define "flagrant or grave violation." According to an INS official, as of March 1999, INS was still developing implementation plans for the five strategic priorities. Since INS is just beginning this new approach, it is too soon to know how the proposed changes will be implemented or to assess their impact on the employment of unauthorized workers.

**No-Match Cert. Admin. Record  152**

B-278845

We have made recommendations to the Commissioner of INS for addressing certain issues identified during our review.

## Background

IRCA made it illegal for employers knowingly to hire or continue to employ or recruit or refer for a fee unauthorized aliens. IRCA required employers to comply with an employment verification process intended to provide employers with a means to avoid hiring unauthorized aliens. Generally, IRCA requires employers to verify the identity and eligibility of all new employees hired after November 6, 1986.

Under IRCA, employers must request newly hired employees to present a document or documents that establish their identity and eligibility to work. As of February 1999, INS rules allowed employees to present 27 different documents—8 that establish both identity and eligibility to work (e.g., a U.S. passport or INS permanent resident card, which is also called a "green card"); 12 that establish identity (e.g., a driver's license); and 7 that establish eligibility to work (e.g., a Social Security card, other than one containing the following legend: "Not Valid for Employment"). The employment verification process that INS established pursuant to IRCA requires employers to complete the Employment Eligibility Verification Form, INS Form I-9, certifying that they have reviewed the documents and that the documents appear genuine and relate to the individual.[4] In making their certifications, employers are expected to judge whether the documents presented are obviously counterfeit or fraudulent.[5] Unless INS has evidence that the employer knew the employee was unauthorized to work, employers are deemed in compliance with the law if they have followed the verification procedures, even though an unauthorized alien may have presented fraudulent documents that appeared genuine.

IRCA provides penalties or sanctions against employers who violate the law. Employers who fail to properly complete, retain, or present for inspection a Form I-9 may face civil fines ranging from $100 to $1,000 for each employee for whom the form was not completed, retained, or presented. Employers who knowingly hire or continue to employ unauthorized aliens may be fined from $250 to $10,000, depending upon whether the violation is a first or subsequent offense. Employers who engage in a pattern or practice of knowingly hiring or continuing to employ

---

[4] Appendix I contains a copy of the Form I-9 and a complete list of the 27 acceptable documents.

[5] We use the term "fraudulent" throughout this report to refer to situations in which unauthorized aliens illegally used documents for the purposes of obtaining employment. For our purposes, fraudulent documents include documents that were illegally manufactured as well as genuine documents used illegally (e.g., an unauthorized alien using another person's valid document).

B-278845

unauthorized aliens are subject to criminal penalties consisting of fines up to $3,000 per employee and/or up to 6-months imprisonment.

During the legislative debate on IRCA, concerns were expressed that employers fearing sanctions would not hire "foreign-looking or foreign-sounding" citizens and aliens authorized to work. As a result, IRCA prohibits employers with four or more employees from discriminating against any authorized worker on the basis of citizenship or national origin. IRCA established Justice's Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) to investigate certain charges of discrimination.[6]

INS has a worksite enforcement program that is responsible for checking employer compliance with IRCA's verification requirements and enforcing IRCA's employer sanctions provisions. Labor has agreed to assist INS by checking employer compliance with verification requirements in the course of some of its own employer investigations.

## Findings From Our March 1990 Study of IRCA's Employment-Related Provisions

In March 1990, we issued our third and final report required by IRCA.[7] In that report, we concluded that, on the basis of our analysis of INS apprehension data and research by other organizations, employer sanctions had slowed illegal immigration. However, we also concluded that the prevalence of counterfeit and fraudulent documents was threatening the security of IRCA's employment verification process for prohibiting unauthorized alien employment. As a result, unauthorized aliens' use of fraudulent documents was undermining IRCA's employment verification process and improvements were needed. On the basis of responses from about 4,400 employers who responded to our survey, we also concluded that, while about 65 percent of employers were complying with the Form I-9 verification requirements, most employers wanted a simpler or better verification system. A majority of the employers we surveyed indicated that the federal government should consider such

---

[6]OSC is responsible for investigating charges of citizenship status discrimination against employers with 4 or more employees and national origin discrimination by employers with 4 to 14 employees. Title VII of the Civil Rights Act of 1964 and the remedies against discrimination it provides remain in effect. Title VII prohibits discrimination against anyone on the basis of national origin in hiring, discharging, recruiting, assigning, compensating, and other terms and conditions of employment. Charges of national origin discrimination against employers with 15 or more employees are generally filed with the Equal Employment Opportunity Commission.

[7]IRCA required us to issue three studies on IRCA's implementation. In response, we issued the following reports: Immigration Reform: Status of Implementing Employer Sanctions After One Year (GAO/GGD-88-14, Nov. 5, 1987); Immigration Reform: Status of Implementing Employer Sanctions After Second Year (GAO/GGD-89-16, Nov. 15, 1988); and Immigration Reform: Employer Sanctions and the Question of Discrimination (GAO/GGD-90-62, Mar. 29, 1990).

No-Match Cert. Admin. Record  154

B-278845

things as reducing the number of work authorization documents INS issued and establishing systems for employers to contact INS and SSA to verify INS documents and Social Security numbers (SSN).

We also concluded that there was widespread discrimination against eligible workers as a result of IRCA. We stated that many employers appeared confused over the variety of documents that could be used to verify employment and uncertain about how to comply with IRCA's verification system. For example, some employers did not accept valid work authorization documents, and some employers said they only asked alien employees, rather than all employees, to show documents. Noting that this uncertainty and confusion as well as the prevalence of fraudulent documents may have caused the widespread pattern of discrimination, we concluded that a simpler system that relied on the use of fewer documents could reduce discrimination.

## Illegal Alien Employment Is a Small Portion of the Total Workforce, but Is Significant in Certain Industries

No one knows exactly how many unauthorized aliens are illegally employed in the United States or what percentage of the total workforce they represent. According to the Bureau of Labor Statistics, about 132 million people were employed in the civilian labor force as of October 1998. Even if all of the estimated 5 million illegal aliens residing in the United States as of October 1996 held jobs in October 1998, they would have represented less than 4 percent of the nation's workforce. The results from INS' inspection of a random sample of the nation's 6.5 million employers in fiscal year 1997 indicated that about 195,000 employers (or about 3 percent) had employed unauthorized aliens.

Illegal alien employment has been shown to be more significant in certain industries and locations. For example, Labor's National Agricultural Workers Survey estimated that 37 percent of the agricultural workers in 1995 were illegal. There is also evidence that the meatpacking, construction, and garment industries have employed large numbers of unauthorized aliens. For example, in February 1998, we reported that in 1996 and 1997, INS found that about 23 percent of the workers at seven Nebraska and Iowa meatpacking plants had questionable documents.[8] INS' inspection of 89 construction businesses in Las Vegas, NV, starting in March 1995 found that 39 percent of the approximately 6,000 employees for whom a Form I-9 was completed appeared to be unauthorized to work. Similarly, inspections of 74 Los Angeles area garment contractors in March

---

[8] Community Development: Changes in Nebraska's and Iowa's Counties With Large Meatpacking Plant Workforces (GAO/RCED-98-62, Feb. 27, 1998).

No-Match Cert. Admin. Record  155

B-278845

1998 revealed that 41 percent of the 7,100 employees at these worksites were unauthorized to work.

## INS Worksite Enforcement Program

INS Investigations is responsible for enforcing IRCA's employer sanctions provisions. Investigations receives information, referred to as leads, from a variety of sources, including the public and other federal or state agencies, regarding unauthorized alien employment. Worksite enforcement unit supervisors are to systematically analyze these leads and, as a first priority, open investigations on employers suspected of knowingly hiring unauthorized aliens and/or suspected of engaging in abusive employment practices.

To track employer sanctions case activity, Investigations field personnel are to prepare Employer Case Activity Reports documenting such case activities as the opening of a case, a Form I-9 inspection, or the arrest of unauthorized aliens. Data from these reports are to be entered into INS' Employer Case Activity database. For ease of presentation, we refer to this database as the Employer Sanctions database throughout this report. The database contains case-specific information submitted by local INS offices since August 1989. As of May 1998, the system contained data on over 69,000 employer sanctions cases.

In May 1998, INS issued a directive regarding worksite enforcement operations. According to the Executive Associate Commissioner for Field Operations, the directive was intended to provide consistency among INS districts in conducting worksite operations. Under the directive, all investigations in which INS believes an employer is unknowingly hiring unauthorized aliens must start with a review of Form I-9 and other employment records. INS is then to hold a seminar for these employers to educate them on such things as how to properly prepare the Form I-9 and how to detect fraudulent documents. The employers are then to be given a list of aliens INS believes are unauthorized to work. The employer must either re-verify that the alien is authorized to work or dismiss the alien. INS could then inform the employer that it intended to arrest any unauthorized aliens. For investigations in which INS believes an employer is knowingly hiring unauthorized aliens, INS is to arrest the unauthorized aliens first, followed by a review of the Form I-9 and other employment records. In addition, before an enforcement action can be conducted at an employer's place of business, INS worksite enforcement units must prepare an operational plan to be approved by either the INS Regional Director or the Executive Associate Commissioner for Field Operations.

**No-Match Cert. Admin. Record  156**

B-278845

Before this directive, the decision of whether INS arrested unauthorized aliens before or after a Form I-9 inspection was left to the discretion of the INS district office. In addition, there was no requirement that INS hold seminars for employers or that operational plans be approved by the regional office or headquarters.

## Objectives, Scope, and Methodology

As agreed with your offices, this report addresses the following: (1) the effectiveness of the current employment verification process in preventing employers from hiring unauthorized aliens, (2) INS' efforts to improve the employment verification process, (3) the level of effort INS and Labor devoted to worksite enforcement activities and the results of these activities, and (4) changes being made to INS' worksite enforcement program.

To determine the effectiveness of the current employment verification process, we reviewed previous reports by us and others, such as the Commission on Immigration Reform and other immigration researchers. In addition, we held discussions with INS, Labor, and SSA officials and analyzed data from INS' Employer Sanctions database to obtain INS statistics on the use of fraudulent documents by unauthorized aliens.

To determine what actions INS had undertaken to improve the employment verification process, we held discussions with and obtained documents from INS, SSA, Labor, and OSC officials. Using a data collection instrument, we surveyed worksite enforcement unit supervisors representing 32 of INS' 33 districts who attended a national worksite enforcement conference in San Diego in June 1998. We also contacted representatives of four national organizations representing business owners or employee unions to discuss their views on INS' efforts to improve the employment verification process.

To determine the extent of INS' activities in worksite enforcement and the results of these activities, we analyzed INS budget data, workload data from INS' Employer Sanctions database, and responses provided by the 32 INS worksite enforcement unit supervisors who responded to our survey. In addition to surveying these supervisors about their offices' coordination with Labor, we also surveyed Labor officials from 10 districts in states with a high number of unauthorized aliens about their enforcement activities and coordination with INS. We also analyzed Labor workload data to determine the extent to which Labor referred cases to INS for investigation, and we conducted structured telephone interviews with state labor officials in six states to determine the extent to which they coordinated their role with INS.

**No-Match Cert. Admin. Record  157**

B-278845

To identify changes being made to INS' worksite enforcement program, we reviewed INS strategy documents, attended INS meetings in which INS officials explained worksite enforcement program changes, and discussed a draft of INS' interior enforcement strategy with INS headquarters and regional officials.

We discussed the strengths and limitations of INS' automated workload data with INS headquarters officials and with investigators at the local level, but we did not independently verify the validity of the data. These officials indicated that the data could be used to accurately portray trends over time. See appendix II for a more complete description of our objectives, scope, and methodology.

We did our work from December 1997 through March 1999 in accordance with generally accepted government auditing standards. We requested comments on a draft of this report from the Attorney General, Secretary of Labor, and Commissioner of Social Security. Justice and SSA provided written comments, which are summarized at the end of this letter. Justice's written comments are contained in appendix III. Labor did not provide comments.

## Fraudulent Documents Have Undermined the Effectiveness of INS' Employment Verification Process

The employment verification process can be easily thwarted by fraud. Large numbers of unauthorized aliens have either fraudulently used valid documents that belong to others or presented counterfeit documents as evidence of employment eligibility. As a result, unauthorized aliens have been able to circumvent the current employment verification process, thereby making it difficult for employers who are willing to comply with the law by hiring only authorized workers to do so.

Various studies have pointed out that fraudulent documents are largely responsible for the ineffectiveness of the employment verification process. For example, we reported in 1990 that the prevalence of fraudulent documents threatened to undermine the employment verification process and the system needed improvement.[9] In its 1997 report to Congress, the Commission on Immigration Reform reiterated its 1994 conclusion that the single most important step that could be taken to reduce unlawful migration was the development of a more effective system for verifying work authorization. It noted that the widespread availability of fraudulent documents makes it easy for unauthorized aliens to obtain jobs. Similarly, INS has noted that the proliferation of inexpensive fraudulent documents

---

[9]GAO/GGD-90-62.

No-Match Cert. Admin. Record  158

B-278845

makes it almost impossible for employers to ensure employment to only authorized workers.

Our analysis of INS data showed that large numbers of unauthorized aliens have used fraudulent documents to obtain employment. Between October 1, 1996, and May 29, 1998, INS completed about 9,600 employer investigations that were based on leads from various sources, such as the public or other agencies. In about 3,500 investigations (or 36 percent) INS reported that about 78,000 fraudulent documents pertaining to about 50,000 unauthorized aliens were used to obtain employment. In about 2,100 (or 60 percent) of the 3,500 investigations in which INS found fraudulent documents, INS determined that the employer had complied with the employment verification process and did not knowingly hire unauthorized aliens, but that unauthorized aliens' use of fraudulent documents circumvented the process. In the other 1,400 (or 40 percent) of the 3,500 investigations involving fraudulent documents, INS decided to fine the employer, take no action against the employer for various reasons (e.g., the employer went out of business), or issue the employer a warning notice. Of the 78,000 fraudulent documents identified, about 60 percent were INS documents, such as permanent resident cards; about 36 percent were Social Security cards; and about 4 percent were other documents, such as drivers' licenses. These documents were either counterfeit documents or genuine documents used fraudulently to obtain employment.

Large-scale counterfeiting of employment eligibility documents has reportedly made such documents widely available. According to a January 1997 Justice Office of Inspector General (OIG) audit report, on the basis of a review of 30 INS fraud cases in 5 INS district offices, INS confiscated nearly 300,000 counterfeit documents.[10] Nearly all of these counterfeited documents were confiscated in Los Angeles. In May 1998, INS seized more than 24,000 counterfeit Social Security cards in Los Angeles after undercover agents purchased 10,000 counterfeit INS permanent resident cards from a counterfeit document ring. In November 1998, INS seized more than 2 million counterfeit documents in Los Angeles, including INS permanent resident cards, Social Security cards, and drivers' licenses from various states. According to INS, these counterfeit documents were headed for distribution points around the country.

---

[10]Immigration and Naturalization Service Replacement of Resident Alien Identity Cards, U.S. Department of Justice, Office of Inspector General, Audit Report 97-06, January 1997. The OIG selected a judgmental sample from INS investigations that were conducted between 1990 and 1995 involving major counterfeit document seizures in Atlanta, Chicago, Los Angeles, Miami, and New York.

**No-Match Cert. Admin. Record  159**

B-278845

# INS Is Taking Steps to Improve Verification Process, Yet Considerable Obstacles Remain

The 1996 Act mandated INS to test three pilot programs in which employers use computer technology to verify employees' eligibility to work. INS has one of the three pilot programs under way, but, reportedly, reluctance on the part of some employers to participate in the pilot has made it difficult for INS to meet its enrollment goal. Also, in accordance with the 1996 Act, INS has removed some documents from the list of those that can be considered by employers, but this still leaves 27 acceptable documents that employees can use for employment verification purposes. To give employers confidence in the integrity of certain INS documents, INS has begun issuing documents more resistant to tampering and counterfeiting to lessen the potential of fraudulent document use. However, opportunities still exist for unauthorized aliens to use fraudulent documents because alien employees are statutorily permitted to present documents other than INS-issued documents to demonstrate employment eligibility, and these may have fewer security features.

## INS Has Had Difficulty in Meeting Its Pilot Program Enrollment Goal

As mandated in the 1996 Act, INS is testing or expects to test three programs to make it possible for employers to electronically verify an employee's eligibility to work. The 1996 Act allows the pilots to last up to 4 years; generally, employer participation in these pilot programs is voluntary. Under the first pilot, called the Basic Pilot, the employer is to verify the employment eligibility of all new hires, regardless of citizenship status, by querying an SSA database containing the names of all individuals with Social Security numbers. If the SSA database cannot confirm employment eligibility and the employee indicated that he or she is not a citizen or national of the United States, an employer would then query INS' database containing the names of all of those individuals to whom INS has issued alien numbers. Employers in the five states with the highest estimated numbers of illegal aliens—California, New York, Texas, Florida, and Illinois—are eligible to participate in the Basic Pilot. As of November 1998, 1,341 employers had signed up to participate in the Basic Pilot.

Under the second pilot, called the Citizen Attestation Pilot, employers are to verify with the INS database only those newly hired employees who claim to be aliens. The 1996 Act limits this pilot to states that meet specific requirements for issuing drivers' licenses and identity documents. INS plans to test the Citizen Attestation Pilot in Arizona, Massachusetts, Maryland, Michigan, and Virginia.

The third pilot, called the Machine-Readable Document Pilot, is to verify all new employees who present a driver's license or identification document that contains a machine-readable SSN. INS plans to test the Machine-Readable Document Pilot only in Iowa because it is the only state

**No-Match Cert. Admin. Record  160**

B-278845

with a machine-readable SSN, name, and date of birth on its drivers'
licenses or identification cards.

Even before mandated to do so, INS was testing electronic verification. In
1995, INS began testing electronic verification systems similar to the Basic
and Citizen Attestation Pilots. As of November 1998, 1,178 employers
participated in these pre-1996 Act pilots.

INS' original goal was to have 16,000 employers enrolled in all of its pilot
programs by the end of fiscal year 1999. However, INS has had difficulty in
meeting this enrollment goal. As of November 1998, INS had enrolled 2,519
employers, or about 16 percent of its goal. Some employers are reportedly
reluctant to participate in the pilots because of concern that participation
may have a negative economic impact on their businesses. According to
officials with whom we spoke from INS, Labor, and SSA, employers in
some industries believe that in the current tight labor market, they would
not have enough authorized workers applying for jobs if they participated
in a verification pilot. The employers reportedly fear that they could be put
at a competitive disadvantage because employees rejected by the
verification system might go to work for competitors who are not enrolled
in a pilot. In addition, according to INS officials, some employers are
reluctant to participate because (1) they do little hiring, (2) illegal alien
employment is not a problem in their industry, or (3) they fear
participating will bring additional INS scrutiny (e.g., a Form I-9
inspection). Also, INS believes some multistate employers that want to
consolidate verification operations to one location are reluctant to
participate because they cannot comply with the 1996 Act's statutory
requirement that verification be completed within 3 days after an
employee is hired.

According to INS officials, INS' failure to meet its enrollment goal was
affected primarily by employer reluctance to participate in the pilots and
not by the fact that two pilot programs have not yet been implemented. As
a result of its difficulty in recruiting participants for its Basic Pilot, INS has
adjusted its enrollment goal. INS plans to reduce its employer enrollment
goal for fiscal year 1999 from the original 16,000 to 5,000.

The 1996 Act required the Attorney General to widely publicize the pilot
programs and required INS district offices in which pilot programs are to
be implemented to assist those employers wishing to participate. INS'
Internet World Wide Web site has information about the pilots, and INS
officials told us they have presented information about the pilots at various
employer association meetings. In addition, according to these officials,

**No-Match Cert. Admin. Record  161**

B-278845

each of the 12 INS districts in which the Basic Pilot is operating has an INS liaison officer who is responsible for conducting outreach activities, such as conducting employer seminars to explain the pilots. In responding to our survey on how active their districts' outreach efforts have been, 8 of the 12 worksite unit supervisors indicated that the efforts have been somewhat active, 2 indicated very active, and 2 indicated not active at all.

Other federal and state agencies, such as Labor and state labor agencies, have contact with employers who might be interested in INS' pilot programs. These agencies did not have a formal role in informing employers about INS' pilot programs and generally said they did not do so. For example, officials from 7 of the 10 Labor offices we contacted stated that they did not inform employers about INS' pilot programs. In addition, neither the informational material for employers that OSC provided us nor OSC's Web site mentioned INS' pilot programs. In addition, none of the representatives from the six state labor agencies we contacted said their agencies distributed information about INS' pilot programs, although all of the representatives said they would be willing to do so. Officials in charge of INS' pilot programs stated that INS has contracted with a public relations firm to conduct more extended outreach about the pilot programs. In December 1998, the contractor submitted the strategy for the outreach campaign, which is set to begin in April 1999.

Although electronic verification could be an improvement over the current verification process, it also has limitations. For example, an unauthorized alien could use the documents of an authorized worker and thereby circumvent the process. In May 1998, INS selected two contractors to conduct an evaluation of the effectiveness of its pilot programs in preventing unauthorized alien employment and ensuring authorized workers do not encounter discrimination. According to INS' Director of Research, as of December 1998, the evaluation plan was under development.

## Little Progress in Reducing the Number of Acceptable Documents

Various studies of IRCA's employment verification process have advocated that the number of documents that employees can use to demonstrate employment eligibility should be reduced to make the employment verification process more secure and to reduce employer confusion. For example, in 1990, we reported that the multiplicity of documents contributed to (1) employer confusion about how to comply with the employment verification requirements and (2) discrimination against authorized workers.[11] INS first published a proposed rule to reduce the

[11]GAO/GGD-90-62.

No-Match Cert. Admin. Record  162

B-278845

number of documents that can be used to demonstrate employment eligibility in 1993.

The 1996 Act mandated that four documents be eliminated from the statutory list of acceptable documents that can be used to demonstrate employment eligibility.[12] However, the Attorney General retained her authority to add documents to the list as specified in the statute under certain circumstances. At the time of the 1996 Act's enactment, 29 acceptable documents were designated by regulation.

In September 1997, INS issued an interim rule (1) eliminating four documents from the list of documents that establish both identity and employment eligibility, (2) redesignating one document that the 1996 Act removed (using the Attorney General's authority to designate additional documents), and (3) limiting the use of another document. The interim rule also added two new types of receipts that an individual can present in lieu of an acceptable document from the list. According to INS, the purpose of the interim rule was to maintain the status quo as much as possible until INS completed a separate rulemaking proceeding that would make comprehensive changes to the employment verification process, a further reduction in the number of acceptable documents, and a revision to the Form I-9.[13]

In February 1998, INS issued proposed regulations that would cut the number of documents by half. The rule proposed maintaining the number of documents that establish both identity and employment eligibility at 8, and reducing the number of documents that establish (1) identity only, from 12 to 3 documents, and (2) employment eligibility only, from 7 to 3 documents. According to an INS official, INS received about 70 comments on the proposed regulations. Some of the comments have caused INS to revisit several issues related to the documents INS planned to eliminate from the list. According to this official, INS does not know when the proposed regulations will be finalized. As of February 1999, employees

---

[12]The 1996 Act mandated the elimination of the Certificate of United States Citizenship, the Certificate of Naturalization, an unexpired foreign passport with an endorsement that identifies employment eligibility, and a birth certificate from the list of acceptable documents.

[13]In response to the 1996 Act, the interim rule eliminated the Certificate of United States Citizenship and Certificate of Naturalization; restricted the use of an unexpired foreign passport; and, due to public concerns, designated the use of a birth certificate until completion of a separate rulemaking procedure. INS also eliminated two other documents, the Refugee Travel Document and the Re-entry Permit. However, INS has made changes to the list since the previous regulations were issued. It designated a new document that will eventually replace another document already on the list. The net effect of the interim rule was to reduce the number of documents that established identity and employment eligibility from 10 to 8 documents.

**No-Match Cert. Admin. Record  163**

B-278845

could still use 27 different documents to demonstrate their authorization to work.

## Increasing Document Integrity

INS has taken steps to increase the integrity of the documents it issues to reduce fraudulent document use and make it easier for employers to verify the authenticity of the cards they review. For example, in February 1997, INS began issuing a new Employment Authorization Document containing visible security features, such as a hologram. In April 1998, INS also began issuing a new version of the card for lawful permanent resident aliens. In addition to a hologram, the card contains other visible security features, such as a digital photograph and fingerprint images.

However, there will still be ample opportunities for unauthorized aliens to use fraudulent documents to obtain employment. INS plans to replace previous versions of the permanent resident cards issued between 1989 and 1998 with the new version as these cards expire. It could take up to 10 years before all previous versions are replaced. Cards issued from 1977 to 1989 have no expiration date and will remain valid until INS replaces them. This means that existing versions, which are more susceptible to counterfeiting, could still be used fraudulently to obtain employment. Also, statute allows alien employees to present various documents other than the INS documents to demonstrate they are authorized to work in this country. Therefore, unauthorized aliens seeking employment can circumvent the improved security features of INS documents by simply presenting non-INS documents—such as Social Security cards—to employers. Documents such as the Social Security card do not contain enhanced security features at the level of those contained in the new INS cards, and, as previously noted, counterfeit Social Security cards were reported to be widely available. Although SSA has developed several prototype counterfeit-resistant cards as required by the 1996 Act, according to an SSA official, SSA had no plans to replace the existing card with one that contains enhanced security features.

## INS and Labor Worksite Enforcement Efforts Have Been Limited

Enforcing the employer sanctions provisions of IRCA will continue to be important because no verification system is foolproof, unauthorized aliens can still use fraudulent documents to circumvent the employment verification process, and not all employers may want to comply with the law. INS has devoted a relatively small percentage of its enforcement resources to worksite enforcement. As a result, the number of employer investigations INS has conducted yearly is only a fraction of the estimated number of employers who may have hired unauthorized aliens. To efficiently use its limited worksite enforcement resources, INS has intended to target its investigative efforts on 15 industries with a history of

me

reason

B-278845

using unauthorized labor. During a recent 20-month period, INS conducted about 60 percent of its investigations in targeted industries and about 40 percent in nontargeted industries. Despite a formal agreement that was in effect from June 1992 to November 1998 that sought to enhance cooperation and coordination between Labor and INS, Labor provided limited assistance and had rarely referred employers suspected of hiring unauthorized aliens to INS. Labor is concerned that because most of its investigations are based on employee complaints, actively assisting INS with immigration-related worksite enforcement could reduce employees' willingness to report employer workplace violations to Labor, thus adversely affecting its ability to enforce labor standards. A new agreement signed November 23, 1998, limited this assistance even further.

## INS Assigned a Relatively Small Portion of Its Resources to Worksite Enforcement

Relative to other enforcement programs in INS, worksite enforcement has received a relatively small portion of INS' staffing and enforcement budget. INS' overall enforcement budget grew by about 130 percent between fiscal years 1994 and 1998, from about $1 billion to nearly $2.4 billion. However, INS' Investigations budget, which includes worksite enforcement, increased about 62 percent during this same period. Most of the increased enforcement funding was directed at the southwest border, where a buildup of about 4,000 border patrol personnel was intended to prevent illegal alien entry.

From fiscal years 1994 to 1998, the amount of time that INS personnel spent on all enforcement programs increased from about 12,000 workyears to about 18,800, an increase of about 57 percent. During this same period, the amount of time that INS personnel spent on worksite enforcement increased about 28 percent, from 243 to 311 workyears.[14] These increases notwithstanding, INS consistently devoted about 2 percent of its enforcement workyears to worksite enforcement during this period. (Fig. 1 shows the percentage of time that INS devoted to its enforcement programs in fiscal year 1998.)

---

[14]We could not determine a specific dollar amount spent on worksite enforcement activities because, according to INS officials, INS does not track expenditures within the Investigations budget. INS uses staff workyears reported through its Performance Analysis System to determine the level of effort devoted to specific investigative activities. Worksite workyears include time spent by Investigations agents only.

No-Match Cert. Admin. Record  165

B-278845

**Figure 1:  INS Enforcement Program Workyears for Fiscal Year 1998**



Inspections
1% Intelligence
2% Worksite investigations [a]
Border Patrol
Other investigations [b]
Detention and deportation

N = 18,824

Note: For the major INS enforcement programs, fiscal year 1998 workyears are budget amounts. Actual workyear data for these programs were not available at the time of our review.

[a]Includes actual time spent by INS agents and support staff on investigations that target employers who are suspected of hiring unauthorized workers.

[b]Includes all other investigations (other than employers), such as criminal aliens, drug trafficking, fraud, smuggling, and immigration status violations.

Source: GAO analysis of INS data.

The number of employer investigations INS is able to conduct each year covers only a fraction of the estimated number of employers who may have unauthorized aliens. As previously noted, the results from INS' inspection of a random sample of the nation's 6.5 million employers in fiscal year 1997 indicated that about 195,000 employers had employed unauthorized aliens. In fiscal year 1998, INS' worksite investigators completed about 6,100 lead-driven investigations[15] and about 400 compliance audits[16] for a total of about 6,500 investigations, which equated

[15]These investigations were opened in response to a complaint by the public or a referral by another agency.

[16]Each year from fiscal year 1989 through fiscal year 1998, INS headquarters selected for inspection a random sample of the nation's employers to determine a nationwide employer compliance rate with

**No-Match Cert. Admin. Record  166**

B-278845

to about 3 percent of the estimated number of employers of unauthorized aliens.

According to worksite program officials, significantly increasing the funding for and staff assigned to worksite investigations may not significantly reduce unauthorized alien employment. Even with a two- or three-fold increase in staffing levels, INS would still only be able to investigate a small portion of the estimated number of employers who may have unauthorized aliens and remove only a fraction of the estimated number of unauthorized alien workers. According to these and other INS officials, most employers want to comply with the law and not hire unauthorized aliens. Therefore, the increased use of electronic verification by those who may be unknowingly hiring unauthorized aliens would permit INS to concentrate its limited enforcement staff on those who knowingly violate the law.

To best use its limited worksite enforcement staff, INS' priority has been to target for investigation employers in specific industries, such as farming, construction, apparel, hotels and motels, and eating and drinking places that historically have had a high probability of violations. However, of the approximately 11,000 cases opened between October 1996 and May 1998, about 43 percent were opened in industries other than those targeted. About 38 percent of the 11,000 cases were in 2 of the targeted industries, eating and drinking places (about 31 percent) and hotels and motels (about 7 percent). According to INS' worksite enforcement program officials, despite their intent to target employers in certain industries, INS opened most investigations on the basis of the leads it received, not by industry.

## Labor's Activities Are Limited to Reviewing Employers' Compliance With Paperwork Requirements

The INS and Labor agreement that was in effect between June 1992 and November 1998 called for the agencies to work together, but at the same time, limited how far Labor would go in cooperating and coordinating with INS. As a result, Labor had provided little assistance to INS in identifying employers suspected of hiring unauthorized workers. A new agreement signed on November 23, 1998, limits Labor assistance even further.

In June 1992, officials from INS and Labor's Employment Standards Administration signed a memorandum of understanding that was intended to, among other things, foster cooperation and coordination between INS

IRCA's employment verification provisions. INS discontinued this annual program, called the General Administrative Plan, beginning with fiscal year 1999, to make what it considers more efficient use of its limited enforcement resources. We used the fiscal year 1997 compliance results to determine the estimated number of employers who may have unauthorized aliens because complete fiscal year 1998 data were not available at the time of our review.

**No-Match Cert. Admin. Record  167**

B-278845

and Labor, clarify the enforcement role of each agency, and ensure more efficient use of resources. The memorandum called for the cross training of staff, sharing of automated information, and conducting of joint activities when appropriate. Labor was to review employer compliance with the employment verification requirements during the course of its own investigations. Since Labor visited many more worksites in connection with its own mission than INS resources would permit, Labor's inspections were to bolster INS' coverage of worksites.

In the memorandum, Labor agreed to make prompt referrals to INS of employers suspected by Labor to have knowingly hired unauthorized aliens. However, the memorandum also stated that Labor "will take no action which will compromise its ability to carry out its fundamental mission, regardless of the workers' immigration status" (underlining added). Labor officials told us that they have interpreted this to mean that if Labor investigators delve into worksite immigration matters, beyond reviewing Form I-9s, it could have a detrimental effect on Labor's primary mission of enforcing worker protection laws. A Labor official told us that about 70 percent of Labor's investigations are based on worker complaints. Labor initiates the other 30 percent of its investigations. If employees perceived that Labor investigators were trying to determine their immigration status and possibly report those who may be unauthorized to INS, it would have a "chilling effect" on employees' willingness to report workplace violations.

Labor's concern with preserving the integrity of its mission-related investigations has prevented Labor investigators from carrying out all of the provisions of the memorandum with INS. For example, although the agreement calls for Labor to "make prompt referrals of employers suspected of knowingly hiring unauthorized aliens," Labor field officials told us that they do not conduct any investigative activities to determine whether employees may be unauthorized. The Labor Field Operation Handbook states that the role of Labor investigators does "not include investigating beyond the records (e.g., interviewing employees for I-9 purposes)." Instead, Labor's assistance to INS has primarily been in the form of reviewing employers' Form I-9 paperwork and providing the results to INS. Even in this area, Labor has decreased its activity, although not because of any conflict in mission. The percentage of inspections in which Labor investigators did not determine whether employers were in compliance with Form I-9 paperwork requirements increased from 13 percent of Labor inspections in fiscal year 1990 to 26 percent in fiscal year 1998. According to Labor officials, the increase has been due, in part, to the shortened time that investigators spend at worksites. In many cases,

**No-Match Cert. Admin. Record 168**

B-278845

these officials stated, investigators complete their inspections and leave worksites within 3 days. Since regulations require that employers be given 3 days' advance notice before their Form I-9s will be reviewed, Labor investigators are frequently gone from worksites by the time employers are required to make their Form I-9s available for review.

Labor has referred few employers suspected of hiring unauthorized workers to INS. Of the over 367,000 employer Form I-9 reviews that Labor conducted between fiscal years 1988 and 1998, Labor data showed it referred to INS 236 employers it suspected of having unauthorized aliens. Further, according to Labor and INS field officials, the agencies have undertaken few cooperative efforts, such as cross training, sharing data, or conducting joint investigations.

On November 23, 1998, the INS Commissioner and Labor's Assistant Secretary, Employment Standards Administration, signed a new Memorandum of Understanding. Similar to the 1992 agreement, the purpose of the new agreement is to foster appropriate cooperation and coordination between INS and Labor. In addition, the agreement is intended to enhance worksite enforcement of employer sanctions and labor standards to reduce the employment of unauthorized workers in the United States. According to the agreement, unauthorized workers' willingness to accept substandard wages and working conditions provides opportunities for some employers to hire unauthorized aliens. INS and Labor officials told us and the agreement suggests that unauthorized aliens are a source of "cheap labor," and that their employment leads to the degradation of overall workplace conditions.

Under this agreement, however, Labor will significantly reduce its reviews of employer compliance with IRCA's employment verification procedures. Labor will no longer review employer compliance with the employment verification procedures in investigations stemming from complaints, which account for about 70 percent of all Labor investigations. Labor will only review employer compliance in noncomplaint-driven investigations. The agreement calls for Labor to refer to INS all suspected serious violations, such as the use of fraudulent documents to obtain employment or employers' knowingly hiring unauthorized aliens, but only in noncomplaint-driven investigations.

The agreement is intended to avoid discouraging unauthorized workers from complaining about labor standards violations out of fear of the possible consequences, such as apprehension and possible removal by INS. According to Labor officials, there is a misperception among the

**No-Match Cert. Admin. Record  169**

B-278845

immigrant working community, actively promoted by those who do not want employees to cooperate with Labor, that cooperating with Labor will automatically result in an INS inspection. As a result, according to these officials, Labor investigators have had increasing difficulty in getting employees to cooperate with them. The new agreement is meant to correct this misperception so those workers understand that Labor will not report the results of any of its complaint-driven investigations to INS. Labor officials told us that they hoped the new agreement would result in more employee cooperation, thereby enabling Labor to better enforce workplace labor standards. INS worksite program officials told us that they believe the new agreement may create more barriers to enforcing employer sanctions and reducing unauthorized alien employment. For example, the agreement does not require Labor to refer to INS any serious violations Labor investigators may encounter during investigations that are based upon complaints.

In contrast to this new agreement, the U.S. Commission on Immigration Reform has advocated that Labor take a more active role in employer sanctions enforcement. In its 1997 report, the Commission stated that Labor's participation in verifying that only authorized workers are hired should be seen as integral to its mission of protecting U.S. workers. It recommended that Labor be responsible for verifying employer compliance with the employment verification requirements.

## INS Worksite Investigation Efforts Produced Modest Results

The results from INS' worksite enforcement program have been modest. Although a major INS goal was to investigate employers that it believed intentionally hired illegal workers and were "major violators" and/or abusive employers, 83 percent of the INS lead-driven workplace investigations resulted in no employer sanctions. Our examination of about 800 closed cases with the most complete data available, revealed that INS had collected about $2.5 million, or about one-half of the $4.9 million that employers had been ordered to pay.

Overall, INS arrested about 27,500 unauthorized workers during the course of its worksite investigations, including about 12,700 at the worksites of employers found to be in compliance with the Form I-9 requirements. Because of INS data limitations, we could not determine how many of these aliens were subsequently released, how many were placed into deportation hearings, and how many were removed from the country. However, INS said that in light of limited detention capacity, the 1996 Act's requirement that INS detain virtually all criminal aliens gives INS less flexibility to detain noncriminals.

**No-Match Cert. Admin. Record  170**

B-278845

## Worksite Program in Relation to the Government Performance and Results Act

The Government Performance and Results Act, Public Law 103-62, requires agencies to prepare strategic plans and yearly program performance goals. One of the goals in Justice's September 1997 Strategic Plan was to reduce the incentives for unauthorized employment by (1) focusing enforcement efforts in areas that have a high probability of violation and (2) facilitating the replacement of unauthorized workers with legal workers.

In line with these strategic goals, INS established a goal that its worksite program would investigate employers who intentionally hired unauthorized aliens, that is, substantive violators. To measure its effectiveness in meeting this goal, INS set a goal that 60 percent of all fines should be for substantive violations, and that 146 criminal cases would be presented for prosecution. Further, INS' worksite program was to serve as a catalyst for lawful employment by causing as many as 38,507 jobs to be vacated by unauthorized aliens and, therefore, made available for authorized workers. This figure was to be calculated by adding the number of unauthorized aliens INS arrested to the number that left their job due to an INS enforcement action.

## INS Proposed to Fine a Small Portion of Investigated Employers

INS' priority in the worksite enforcement area has been to investigate employers who intentionally hire illegal workers, including prosecuting some employers for criminal violations. However, over a recent 20-month period, INS found IRCA violations and proposed to fine employers in less than 20 percent of the investigations it completed. According to the most recent nationwide data available from INS' Employer Sanctions database, about 9,600 lead-driven employer investigations[17] were completed between October 1, 1996, and May 29, 1998.[18] Of these investigations, 17 percent were served with a Notice of Intent to Fine (NIF) for IRCA violations.

About one-half of the fines proposed by INS were for paperwork violations (i.e., for failing to complete or improperly completing Form I-9s), and one-half were for substantive violations (i.e., knowingly hiring or continuing to employ unauthorized aliens).[19] In addition, INS found 49 percent of the

---

[17]We omitted General Administrative Plan (GAP) cases from our analyses of INS investigative efforts because we wanted to analyze the results of districts' targeting efforts. GAP investigations rarely resulted in fines (1 percent) or warnings (10 percent).

[18]INS officials told us that the Employer Sanctions database was likely to be more complete for cases completed after October 1, 1996. After this date, INS' priorities for worksite enforcement emphasized accurate reporting of employer sanctions case activity. We obtained a copy of the database as of May 29, 1998.

[19]The INS official who provided us with the database told us that agents in the field are instructed to report that an investigation has resulted in a NIF only after district counsel has approved the NIF and it had been served on the employer. According to the Employer Sanctions database, 170 investigations (2 percent) were categorized as NIFs, but there was no additional information on the size of the proposed

**No-Match Cert. Admin. Record  171**

B-278845

9,634 employers in compliance with paperwork requirements, although this did not necessarily mean that the entire workforce was authorized for employment. INS issued a warning notice to 13 percent of the 9,634 employers[20] and took no action in 18 percent of the cases.[21] About 59 percent of the fines INS issued in fiscal year 1998 were for substantive violations, nearly meeting its goal of 60 percent.

In about 2 percent of the investigations, INS initiated criminal proceedings against an employer. In its midyear review of its fiscal year 1998 priorities, INS expressed concern that its criminal case accomplishments were lagging. The emphasis on criminal cases was intended to refocus worksite enforcement on the most serious offenders. By the end of fiscal year 1998, INS had presented 127 criminal investigations, about 87 percent of its goal.

Figure 2 shows the results of INS' completed investigations during the 20-month period from October 1996 to May 1998.

---

fines or on whether the fines were assessed for paperwork or substantive violations. This official believed that some of these cases were misreported by agents in the field and advised us not to count them as NIFs.

[20]The use of warning notices was a policy decision adopted in 1987 as a matter of INS discretion. Warning notices are used when INS believes an employer will come into compliance without a fine.

[21]INS completed a case with a determination of "no action" when a determination of compliance, warning, or fine could not be reached for the following reasons: the business closed or changed owners during the investigation; there were no employees; all alien employees were hired before November 6, 1986; the case was transferred to another INS office; the business was the subject of a recent inspection; or INS had already opened an investigation on this business.

No-Match Cert. Admin. Record  172

B-278845

**Figure 2: Results of INS Investigations Completed Between October 1, 1996, and May 29, 1998**



N = 9,634

▓▓▓ Percentage and type of fines imposed on investigated employers by INS

Note: Includes all lead-driven administrative investigations; excludes random compliance investigations (n=992).

[a]Includes all investigations where INS reported that a fine was assessed, but no information was reported on the type or size of the fine (n=170); no administrative disposition was recorded (n=76); and a determination of compliance, warning, or fine could not be reached, for the following reasons: the business closed or changed owners during the investigation; there were no employees; all alien employees were hired before November 6, 1986; the case was transferred to another INS office; the business was subject to a recent inspection; or INS had already opened an investigation on this business (n=1,730).

Source: GAO analysis of INS Employer Sanctions database.

According to INS program officials, several factors may have affected INS' ability to achieve more significant results. For example, the prevalent use of fraudulent documents makes it difficult for INS to prove that an employer knowingly hired an unauthorized alien. In addition, in the pursuit to meet numerical program goals, such as identifying unauthorized aliens, districts may have overemphasized the importance of removing aliens from the workplace to the detriment of the program's overall goal to investigate employers who knowingly violated the law.

**No-Match Cert. Admin. Record 173**

B-278845

## INS Collected a Small Portion of Assessed Fines

INS data on the collection of employer sanctions fines are limited, but the most complete data available showed that INS collected about one-half of the amount that employers were ordered to pay. During the period we examined, INS issued about $13 million in NIFs to 1,655 employers. After INS issues a NIF, the employer has an opportunity to negotiate the fine amount and payment schedule with INS and may receive a smaller fine. Following settlement discussions, INS issues a Final Order for the amount of the fine.[22] Because this process may take some time to complete, INS' Employer Sanctions database for the period we examined did not contain complete data on the size of the Final Orders negotiated between INS and employers, or the amount collected from employers.[23] Therefore, to gain a better understanding of INS' enforcement results, we only analyzed closed cases with generally complete information.[24] We found that in cases closed between October 1, 1996, and February 1, 1998, INS issued NIFs against 833 employers for a total of $6.1 million. Final Orders were issued against 794 employers for $4.9 million, and a total of $2.5 million (or 51 percent of the amount ordered) was collected. Reasons given by INS officials explaining why the total amount due was not collected were the following: (1) the employer went out of business; (2) the employer filed for bankruptcy; (3) the employer died; or (4) the business moved, and INS was unable to track down the employer.

## Whether Unauthorized Aliens Were Replaced by Authorized Workers Is Unknown

In fiscal year 1998, INS identified 44,474 jobs held by unauthorized workers, or about 15 percent above its fiscal year 1998 goal of 38,507 jobs. However, whether authorized workers replaced these unauthorized workers as INS envisioned is unknown. According to INS officials, INS does not generally follow up to determine who is hired in positions that are vacated as a result of an INS enforcement action. Also, the Employer Sanctions database does not contain reliable information on the subsequent disposition of aliens who are arrested in worksite enforcement actions.[25] Thus, we could not determine how many of these aliens were

---

[22] Employers may also request a hearing with an administrative law judge to contest the fine.

[23] The OIG reported in 1996 that INS' system for tracking and collecting fines needed improvement and recommended that INS develop a better system for tracking financial transactions. INS recently implemented a new system to track the collection of employer sanctions fines. After February 1, 1998, INS no longer kept track of fine collections information in the Employer Sanctions database.

[24] INS considers a worksite case "completed" when an administrative disposition of compliance, fine, warning, or no action has been reached or a criminal case has been initiated. However, a case is not considered "closed" until final action on the case is completed and no further action is required by either the government or the subject of the investigation to finally adjudicate the case.

[25] An INS official told us that data reported on the subsequent dispositions of arrested aliens were not reliable during the period we examined. This official told us that INS has subsequently revised the form used for data submission to collect more reliable information on this data element.

No-Match Cert. Admin. Record  174

B-278845

placed into deportation hearings and how many were removed from the country. In a 1995 INS Investigations review of the worksite program, INS acknowledged that its inability to remove aliens found illegally working in the United States eroded program effectiveness. In its fourth quarter review of fiscal year 1998 performance, INS indicated that its detention beds are to be used for mandatory criminal detainees in fiscal year 1999. This, combined with a reduction in budgeted detention space, would impede efforts to detain and remove unauthorized aliens. If unauthorized aliens are not removed, it is possible that they may obtain employment elsewhere, diluting INS' goal of making jobs available for authorized workers.

INS arrested about 27,500 unauthorized aliens during the 9,600 worksite investigations it completed between October 1, 1996, and May 29, 1998. These arrests were made in cases where INS determined the employer complied with Form I-9 paperwork requirements as well as in cases where employers did not comply. In over one-half of the 4,755 completed investigations in which INS found that employers complied with Form I-9 paperwork requirements, on the basis of a review of employers' Form I-9s, INS also found that unauthorized aliens were present (see fig. 3). INS arrested 12,698 unauthorized aliens in these worksites. In a portion of cases, INS investigators could not arrest identified unauthorized aliens because, for example, by the time the investigators went back to the worksite to make arrests, the aliens had left their jobs. According to INS officials, fraudulent document use by unauthorized aliens made it difficult for employers who complied with the Form I-9 verification requirements to avoid hiring unauthorized aliens. Officials also told us that it was often difficult to prove that employers had knowingly hired unauthorized aliens.

Figure 3 shows that in 82 percent of the 1,655 completed investigations in which INS found employers to be noncompliant and proposed to fine employers, INS found that unauthorized aliens were present. INS arrested 7,055 unauthorized aliens in these worksites. INS also arrested 7,739 unauthorized aliens in investigations where INS initiated a criminal case, where employers received warning notices, or where INS completed the case with a determination of no action.

**No-Match Cert. Admin. Record  175**

B-278845

Figure 3: Percentage of Cases in Which Unauthorized Aliens Were Arrested or Identified During INS Employer Worksite Investigations, October 1, 1996, to May 29, 1998



Note 1: Figure does not include investigations that are completed with the issuance of a warning notice; categorized as NIFs but with no information on the size and type of the fine; or completed without the determination of fine, warning, or compliance. The figure also does not include cases with missing data regarding the numbers of aliens arrested or identified.

Note 2: "Identified" refers to unauthorized aliens identified during worksite operations, but not arrested. This category includes unauthorized aliens identified through the I-9 audit that left employment, but were not arrested.

Source: GAO analysis of INS Employer Sanctions database.

## INS' Investigations in Targeted Industries and "High-Alien" States Were Slightly More Productive, but Results of Targeting Were Mixed

Worksite investigations in targeted industries have proven only slightly more productive than investigations in other industries in terms of fines assessed, substantive fines assessed, and unauthorized aliens arrested. In 5,265 targeted industries investigations completed between October 1, 1996, and May 29, 1998, fines were assessed in 19 percent of the cases, and 58 percent of these fines were for substantive violations.[26] In the other 4,203 investigations of nontargeted industries,[26] fines were assessed in 15 percent of the cases, and 47 percent of the fines were for substantive violations. INS arrested unauthorized aliens in 48 percent of the targeted

[25]A number of cases (n=166) contained no information on the employer's industry code. These cases were omitted from this analysis.

No-Match Cert. Admin. Record  176

B-278845

industry investigations compared to 43 percent of the nontargeted investigations. However, the extent to which INS assessed fines and made arrests varied considerably among the targeted industries.

INS fined a higher percentage of employers in certain targeted industries than in others. For example, INS fined more than 20 percent of the employers in the industrial categories of "eating and drinking places" (24 percent); "miscellaneous food preparation, including seafood preparation" (28 percent); and "apparel and textile products" (44 percent). In contrast, INS fined less than 10 percent of the employers in the industrial categories of "hotels and motels" (5 percent); "nursing homes, nursing care facilities" (6 percent); and "meat products and meat preparation" (7 percent). Table 1 summarizes the results of INS worksite investigations completed over the 20-month period from October 1996 to May 1998.

Table 1 also shows that INS made arrests in certain targeted industries at higher levels than others. For example, INS made arrests in over 60 percent of the completed investigations in the industrial categories of "landscape and horticultural services" (66 percent, 1,154 arrests) and "miscellaneous food preparation" (61 percent, 672 arrests). In contrast, INS made arrests in less than 30 percent of the completed investigations in the industrial categories of "hotels and motels" (28 percent, 544 arrests) and "nursing homes, nursing care facilities" (29 percent, 42 arrests).

**No-Match Cert. Admin. Record  177**

B-278845

**Table 1: Results of INS Worksite Investigations Completed in Targeted and Nontargeted Industries, October 1996 – May 1998**

| Type of industry[b] | Number of investigations completed | Fines[a] Percentage assessed substantive fine | Percentage assessed paperwork fine | Arrests Percentage of investigations with aliens arrested | Number of aliens arrested |
|---|---|---|---|---|---|
| **Targeted industries** | **5,265** | **11** | **8** | **48** | **14,434** |
| Eating and drinking places | 2,672 | 14 | 10 | 49 | 4,559 |
| Hotels and motels | 678 | 2 | 3 | 28 | 544 |
| General building contractors | 354 | 6 | 5 | 58 | 1,398 |
| Apparel and textile products | 343 | 32 | 12 | 55 | 2,643 |
| Landscape and horticultural services | 293 | 7 | 8 | 66 | 1,154 |
| Masonry, stonework, tile, plaster, insulation | 192 | 9 | 6 | 55 | 538 |
| Roofing, siding, sheet metal | 159 | 6 | 8 | 54 | 575 |
| Services to dwellings, buildings (includes janitorial) | 139 | 4 | 9 | 34 | 462 |
| General farm and field crops | 99 | 4 | 6 | 57 | 468 |
| Nursing homes, nursing care facilities | 82 | 2 | 4 | 29 | 42 |
| Miscellaneous food preparation (includes seafood) | 81 | 16 | 12 | 61 | 672 |
| Meat products, preparation | 76 | 3 | 4 | 57 | 1,135 |
| Heavy construction (not buildings) | 70 | 6 | 4 | 33 | 152 |
| Forestry | 20 | 10 | 0 | 40 | 61 |
| Farm labor contractors and labor management services | 7 | 0 | 0 | 43 | 31 |
| **Nontargeted industries** | **4,203** | **7** | **8** | **43** | **12,649** |
| **Total** | **9,468** | **9** | **10** | **46** | **27,083** |

[a]Category does not include investigations reported as ending with dispositions of Notice of Intent to Fine and where the Employer Sanctions database had no information regarding the type of fine assessed.

[b]Does not include investigations where no standard industry code was recorded (n=166).

Source: GAO analysis of INS Employer Sanctions database.

INS' worksite priorities also call for investigating employers who knowingly hire unauthorized aliens in those geographic areas that have traditionally employed unauthorized aliens. Investigations in the seven states with the highest number of estimated illegal alien residents as of October 1996[27] were slightly more productive than investigations in the rest of the country. The 5,202 worksite investigations in the high-alien states resulted in fines in 20 percent of the cases, and 54 percent of these were for substantive violations. The 4,432 worksite investigations in the other

---

[27]See INS Releases Updated Estimates of U.S. Illegal Population (Washington, D.C.: U.S. Immigration and Naturalization Service News Release, Feb. 1997). These states are California, Texas, Florida, New York, Illinois, New Jersey, and Arizona.

No-Match Cert. Admin. Record  178

B-278845

states resulted in fines in 14 percent of the cases, and 54 percent of the fines were for substantive violations. A total of 16,048 unauthorized aliens were arrested in cases in the 7 high-alien states, and a total of 11,444 unauthorized aliens were arrested in cases in the other states.

## INS Is Changing Its Approach to Worksite Enforcement

INS' approach to how it will enforce IRCA's employer sanctions provisions is changing. In January 1999, INS issued an Interior Enforcement Strategy. According to the strategy, the primary strategic goal of INS' interior enforcement is to reduce the size and annual growth of the illegal resident population. The strategy established the following five strategic priorities:

- identify and remove criminal aliens;
- deter, dismantle, and diminish smuggling or trafficking of aliens;
- respond to community complaints about illegal immigration;
- minimize immigration benefit fraud; and
- block and remove employers' access to unauthorized workers.

With respect to the strategy's second priority, INS law enforcement efforts are to focus on disrupting and dismantling the criminal infrastructure that encourages and benefits from illegal migration, such as alien smugglers and counterfeit document producers. According to an INS official, INS expects that its new emphasis on dismantling the criminal infrastructure that supports unauthorized employment will result in (1) fewer worksite investigations and removals of unauthorized aliens from the workplace, (2) more criminal employer investigations, and (3) heavier penalties.

With respect to the strategy's fifth priority to block and remove employers' access to unauthorized workers, the INS official responsible for drafting the strategy told us that INS will continue using the worksite procedures outlined in the May 1998 directive to build relationships with employers to create an effective deterrent to illegal immigration. Under the May directive, which we previously described, INS' worksite enforcement efforts are to be focused on employers, not unauthorized aliens. By educating employers whom INS has found—through Form I-9 and employment record reviews—to have unknowingly hired unauthorized aliens, INS expects that such employers will be better able to comply with IRCA. This, in turn, would enable INS to focus its limited worksite enforcement resources on employers suspected of criminal activities. INS has not specified how much resources it intends to devote to such employer compliance efforts. According to an INS official, as of March 1999, INS was in the process of developing implementation plans for the strategic priorities.

B-278845

The strategy calls for INS to prioritize and aggressively pursue criminal investigation of employers who are flagrant or grave violators. However, the strategy does not define "flagrant or grave violation." As previously discussed, INS' previous worksite enforcement goal was similar, that is, to investigate employers who were "major violators." Yet, 83 percent of its investigations resulted in no employer sanctions.

In the months preceding issuance of the final interior enforcement strategy, worksite investigations field units had already begun instituting new procedures in response to the anticipated strategy changes. For example, an INS Central Region official told us employer investigations are now focused on those employers who INS believes may have committed criminal violations. Generally, investigations in this region are not opened in cases where the only allegation is the presence of unauthorized aliens. INS worksite program officials told us that worksite enforcement units in its other two regions continue to open investigations on the basis of the perceived merit of the lead (e.g., a strong allegation that there are unauthorized aliens at a business), even if there is no indication that the employer is involved in criminal activity.

INS plans to implement its new strategy over a 5-year period. During fiscal years 1999 and 2000, INS expects its district directors to conduct threat assessments and use intelligence information to identify the most significant illegal alien problems in their respective districts, including industries that rely on unauthorized alien employment. Using this information, INS plans to focus its enforcement efforts and resources in the geographic areas and industries that have the most serious problems with unauthorized alien employment.

The strategy does not clearly describe the specific measures INS will use to gauge its performance. The strategy states that INS will evaluate its performance on the basis of such things as changes in the behavior or business practices of persons and organizations. One possible measure INS lists for gauging effectiveness in the worksite area is change in the wage scales in certain targeted industries. However, INS has not yet specified how wage scales will be measured; what constitutes a targeted industry and the direction, magnitude, and timing of the expected wage effect; and how INS plans to relate any changes to either its enforcement efforts or other immigration-related causes. According to the strategy, the specific performance measurements within the context of the strategy will be developed in the annual performance plans required by the Government Performance and Results Act.

**No-Match Cert. Admin. Record 180**

B-278845

Because INS is just beginning this new approach and is still developing implementation plans, it is too soon to tell how or how well INS will implement its strategy. It is also too soon to tell what impact, if any, the new approach will have on dismantling the infrastructure that supports illegal migration and employers' access to undocumented workers.

## Conclusions

INS faces significant obstacles to reducing unauthorized alien employment. Although IRCA established a process for employers to follow to verify employees' eligibility to work in the United States, significant numbers of unauthorized aliens still obtain employment because the process can be circumvented or easily thwarted by fraud. Employers who want to comply with the law by hiring only authorized workers can be deceived by unauthorized aliens' use of widely available fraudulent documents. Other employers who may seek "cheap labor" could intentionally hire unauthorized aliens under the guise of having complied with the employment verification requirements. In general, employers of unauthorized aliens have faced little likelihood that INS would (1) investigate them, (2) be able to prove that they knowingly hired unauthorized aliens, (3) collect fines, or (4) criminally prosecute them. Further, Labor's efforts to identify employers suspected of hiring unauthorized aliens have been limited and appear likely to be even more limited in the future.

Because enforcement measures can only go so far, we believe INS is going in the right direction by testing electronic verification procedures, proposing to significantly reduce the number of authorization and identification documents, and making documents more tamper resistant to try to improve the verification process. However, obstacles, such as reluctance on the part of some employers to participate in INS' electronic verification pilot programs, have hampered INS' ability to improve the process. Because tools such as electronic verification will be effective with employers in industries with a history of reliance on unauthorized aliens only to the extent that they use them, getting such employers to participate in the electronic verification pilots is important. Labor and other agencies that have contact with employers generally have not augmented INS' outreach efforts by disseminating information on the pilots.

In addition to these obstacles, INS' interior enforcement strategy does not define the criteria for initiating investigations of employers suspected of criminal violations, which is an investigative priority. Having clear criteria is important if INS is to effectively focus its limited staff to achieve its enforcement goals and intended results.

B-278845

## Recommendations

We recommend that the INS Commissioner

- as part of the outreach program for INS' pilot programs, seek assistance from federal and state agencies, such as the Department of Labor and state labor agencies, in disseminating information to employers about the programs and

- in implementing the interior enforcement strategy, clarify the criteria for opening investigations of employers suspected of criminal activities.

## Agency Comments and Our Evaluation

We requested comments on a draft of this report from Justice, Labor, and SSA. On March 1, 1999, Justice's Assistant Attorney General for Administration provided written comments addressing its activities related to our two recommendations and two other issues (see app. III).

With respect to our recommendation that INS seek assistance from federal and state agencies in disseminating information to employers about the employer verification pilot programs, Justice agreed that more systematic coordination with other agencies could be useful. Justice stated that it would add this type of coordination effort to other recruitment efforts under way. Justice did not agree, however, that it is appropriate at this time to involve OSC in publicizing the verification pilot programs. Justice's rationale was that the verification pilot programs are still in the test stage, have not been evaluated for their impact on immigration-related job discrimination, and might pose a conflict of interest to OSC. That is, OSC's litigation stance could be compromised if it were to challenge the employment practices of employers it had informed about the pilot.

We continue to believe that OSC should assist INS in disseminating information about the pilots. Our recommendation is not intended to suggest that these agencies endorse the pilot programs. Indeed, we agree that evaluative data are needed to determine the merits of the programs. A sound evaluation, however, requires that a sufficient number of employers volunteer to participate in the pilots so that the results can be meaningfully analyzed and interpreted. Agencies, including OSC, can make clear that by providing information on verification pilot programs, they are merely making employers aware of verification options, and not endorsing the programs or making assurances that employers would not be investigated or prosecuted if circumstances warrant it.

Our draft report, which was prepared before INS issued its final interior enforcement strategy, recommended that the INS Coimmissioner, in the final interior enforcement strategy, address (1) the criteria for opening

**No-Match Cert. Admin. Record  182**

investigations of employers suspected of criminal activities and (2) how INS will investigate employers against whom there have been no allegations of criminal activities, but who may not be complying with IRCA's requirements. Justice did not comment specifically on this recommendation, but stated that since we finished our data collection, INS had completed its interior enforcement strategy.

INS issued its final interior enforcement strategy in January 1999. We reviewed the final strategy and made revisions to the report to reflect the new information and the need to clarify the criteria for opening investigations of employers suspected of criminal activities. Also, the final strategy contains a strategic priority to block and remove employers' access to unauthorized workers that was not in the draft strategy. This priority and INS' explanation on how it plans to implement it appears to address the second part of our initial recommendation. Therefore, we deleted this portion of the recommendation from this report.

Justice raised two other issues concerning our draft report. First, Justice indicated that it does not favor a rule requiring aliens to show only INS-issued work authorization documents as proof of employment eligibility, even if the INS documents are more fraud resistant than other documents. Justice expressed the concern that such a requirement could increase immigration-related employment discrimination because some employers may require foreign-looking U.S. citizens to present INS-issued work authorization documents.

We are not suggesting that aliens be required to show only their INS-issued work authorization document. Our intent is to point out that, although INS has made progress in increasing the integrity of some documents, the verification system can still be undermined through fraudulent use of non-INS work authorization documents. We revised this report to clarify this point.

Second, Justice characterized our draft report as suggesting that a conflict exists between INS' and Labor's missions, whereas Justice believes they are complementary. We agree with Justice that the missions of the two agencies are complementary. As noted in this report, however, Labor officials expressed concern that using Labor investigators to identify and refer to INS workers who may be unauthorized could deter unauthorized workers from reporting labor standards violations, thus compromising Labor's fundamental mission of rooting out employers who violate labor standards. To the extent that this observation is true, our intent was to point out the potential for such a conflict in certain circumstances.

No-Match Cert. Admin. Record  183

B-278845

We also received technical comments from Justice and SSA, and we incorporated them in this report as appropriate. Labor did not provide comments on the draft report.

We are sending copies of this report to the Honorable Janet Reno, Attorney General; the Honorable Doris Meissner, Commissioner, Immigration and Naturalization Service; the Honorable Alexis Herman, Secretary of Labor; the Honorable Kenneth Apfel, Commissioner, Social Security Administration; the Honorable Jacob Lew, Director, Office of Management and Budget; and other interested parties. We will also make copies available to others upon request.

If you or your staff have any questions concerning this report, please contact me on (202) 512-8777. This report was done under the direction of Evi L. Rezmovic, Assistant Director, Administration of Justice Issues. Other major contributors are listed in appendix IV.

Richard M. Stana
Associate Director, Administration
of Justice Issues

No-Match Cert. Admin. Record  184

# Contents

| | |
|---|---|
| **Letter** | 1 |
| **Appendix I** **Employment Eligibility Verification Form I-9 and Current List of Acceptable Documents** | 38 |
| **Appendix II** **Objectives, Scope, and Methodology** | 41 |
| **Appendix III** **Comments From the Department of Justice** | 43 |
| **Appendix IV** **Major Contributors to This Report** | 47 |

**Tables**

Table 1: Results of INS Worksite Investigations Completed in Targeted and Nontargeted Industries, October 1996 – May 1998 ........ 29

**Figures**

Figure 1: INS Enforcement Program Workyears for Fiscal Year 1998 ........ 17

Figure 2: Results of INS Investigations Completed Between October 1, 1996, and May 29, 1998 ........ 24

Figure 3: Percentage of Cases in Which Unauthorized Aliens Were Arrested or Identified During INS Employer Worksite Investigations, October 1, 1996, to May 29, 1998 ........ 27

Figure I.1: Employment Eligibility Verification Form I-9 ........ 38, 39

Figure I.2: Current List of Acceptable Documents for Employment Eligibility Verification ........ 40

# Contents

## Abbreviations

| | |
|---|---|
| INS | Immigration and Naturalization Service |
| IRCA | Immigration Reform and Control Act |
| NIF | Notice of Intent to Fine |
| OIG | Office of the Inspector General |
| OSC | Office of Special Counsel |
| SSA | Social Security Administration |
| SSN | Social Security number |
| GAP | General Administrative Plan |

**No-Match Cert. Admin. Record  186**

Appendix I

# Employment Eligibility Verification Form I-9 and Current List of Acceptable Documents

---

Figure I.1: Employment Eligibility Verification Form I-9

---

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB No. 1115-0136
**Employment Eligibility Verification**

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. **ANTI-DISCRIMINATION NOTICE.** It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|

| Address (Street Name and Number) | | Apt. # | Date of Birth (month/day/year) |
|---|---|---|---|

| City | State | Zip Code | Social Security # |
|---|---|---|---|

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
A citizen or national of the United States
A Lawful Permanent Resident (Alien # A_____
An alien authorized to work until ___/___/___
(Alien # or Admission # _____

| Employee's Signature | Date (month/day/year) |
|---|---|

**Preparer and/or Translator Certification.** *(To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.*

| Preparer's/Translator's Signature | Print Name |
|---|---|

| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|

(continued)

GAO/GGD-99-33 Unauthorized Employment of Aliens

**No-Match Cert. Admin. Record  187**

Appendix I
Employment Eligibility Verification Form I-9 and Current List of Acceptable Documents

---

**Section 2. Employer Review and Verification.**  To be completed and signed by employer.  Examine one document from List A OR examine one document from List B **and** one from List C as listed on the reverse of this form and record the title, number and expiration date, if any, of the document(s)

| List A | OR | List B | AND | List C |
|---|---|---|---|---|

Document title: _____

Issuing authority: _____

Document #: _____

    Expiration Date *(if any):* __/__/__

Document #: _____

    Expiration Date *(if any):* __/__/__

**CERTIFICATION** - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on *(month/day/year)* __/__/__ and that to the best of my knowledge the employee is eligible to work in the United States.  (State employment agencies may omit the date the employee began employment).

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|
| Business or Organization Name | Address *(Street Name and Number, City, State, Zip Code)* | Date *(month/day/year)* |

---

**Section 3. Updating and Reverification.**  To be completed and signed by employer

| A. New Name *(if applicable)* | B. Date of rehire *(month/day/year) (if applicable)* |
|---|---|

C.  If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

    Document   Title   _Document   #: _____Expiration  Date  if  any):_ __/__/__

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date *(month/day/year)* |
|---|---|

Form I-9 (Rev. 11 21-91) N

**No-Match Cert. Admin. Record  188**

Appendix I
Employment Eligibility Verification Form I-9 and Current List of Acceptable Documents

**Figure I.2: Current List of Acceptable Documents for Employment Eligibility Verification**

| A<br>Documents that establish both identity and employment eligibility | B<br>Documents that establish identity | C<br>Documents that establish employment eligibility |
|---|---|---|
| U.S. passport (unexpired or expired) | Driver's license or identification card issued by a state or outlying possession of the United States, provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address | U.S. Social Security card issued by SSA (other than a card stating it is not valid for employment) |
| Unexpired foreign passport, with form I-551 stamp | Identification card issued by federal, state, or local government agency or entity, provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address | Certification of Birth Abroad issued by the Department of State (form FS-545 or form DS-1350) |
| Alien registration receipt card with photograph or permanent resident card (INS form I-551) | School identification card with a photograph | Original or certified copy of a birth certificate issued by a state, county, or municipal authority or outlying possession of the United States bearing an official seal |
| Unexpired temporary resident card (INS form I-688) | Voter's registration card | Native American tribal document |
| Unexpired employment authorization card (INS form I-688A) | U.S. military card or draft record | U.S. citizen identification card (INS form I-197) |
| Unexpired employment authorization document issued by INS, which contains a photograph (INS form I-766) | Military dependent's identification card | Identification card for use of resident citizen in the United States (INS form I-179) |
| Unexpired employment authorization document issued by INS, which contains a photograph (INS form I688B) | U.S. Coast Guard Merchant Mariner card | Unexpired employment authorization document issued by the INS (other than those listed under A list) |
| For aliens authorized to work for a specific employer, unexpired foreign passport with form I-94 containing an endorsement of aliens' nonimmigrant status | Native American tribal document | |
| | Drivers' license issued by a Canadian government authority | |
| | School record or report card[a] | |
| | Clinic, doctor, or hospital record[a] | |
| | Day-care or nursery school record[a] | |

Note: For employment eligibility verification purposes, one document from list A or one each from list A and B are required.

[a]For persons under age 18 who are unable to present a document listed above.

Source: INS, "List of Acceptable Employment Eligibility Verification Documents for Form I-9," under interim rules, as of Sept. 30, 1997.

GAO/GGD-99-33 Unauthorized Employment of Aliens

No-Match Cert. Admin. Record  189

Appendix II

# Objectives, Scope, and Methodology

Our objectives were to determine (1) the effectiveness of the current employment verification process in preventing employers from hiring unauthorized aliens, (2) the Immigration and Naturalization Service's (INS) efforts to improve the employment verification process, (3) the level of effort INS and the Department of Labor devoted to worksite enforcement activities and the results of these activities, and (4) changes being made to INS' worksite enforcement program.

To determine the effectiveness of the current employment verification process, we reviewed research and analytic reports that we issued and those issued by INS, the Department of Justice's Office of Inspector General, Labor, the Commission on Immigration Reform, and other immigration researchers. In addition, we held discussions with INS, Labor, and Social Security Administration (SSA) officials and analyzed data from INS' database of employer sanctions cases to obtain INS statistics on the use of fraudulent documents by unauthorized aliens.

To determine what actions INS had undertaken to improve the employment verification process, we held discussions with and obtained documents from INS, SSA, Labor, and Justice's Office of Special Counsel for Immigration-Related Unfair Employment Practices officials. Using a data collection instrument, we surveyed INS managers, representing worksite enforcement units in 32 of INS' 33 districts, who attended INS' June 1998 national worksite enforcement conference in San Diego. We asked respondents questions about the availability of pilot programs, the extent to which INS staff made efforts to enroll employers in the pilot programs, and the level of interest in the pilots among employers in their districts. We contacted representatives of four national organizations representing business owners or employee unions to discuss INS' pilot verification projects, among other issues. We selected three of these organizations because they represented business owners or employees in industries that INS targeted in its worksite enforcement investigations. We selected the fourth organization because it represented business owners in a wide range of industries.

To determine the extent of INS' resources devoted to activities in the worksite area, we analyzed INS budget data and workload data. To determine the results of these worksite activities, we also analyzed data from INS' database of employer sanctions investigations. This database contains such information as the business' name, address, location, industry code, owner name, and number of employees. In addition, it contains information on the predication for opening the investigation (i.e., whether the case was lead-driven or randomly selected for a compliance

**No-Match Cert. Admin. Record  190**

inspection); the investigation's administrative and/or criminal disposition (e.g., compliance, warning notice, notice of intent to fine, or initiation of a criminal case); the number of unauthorized aliens identified and arrested by INS; the number and type of fraudulent documents identified by INS; the number and type of violations by employers; the amount of civil monetary penalties; and the amount collected by INS.

INS provided us with a CD-ROM containing information on its employer sanctions investigations for the period of October 1, 1996, to May 29, 1998. We analyzed this time period because INS officials told us that the database was likely to be more complete and accurate for this period than for previous time periods. According to these officials, starting in fiscal year 1997, the INS priorities for worksite enforcement emphasized accurate reporting of employer sanctions case activity. Also, we believed that analyzing cases opened or completed after October 1, 1996, would be more representative of INS' recent investigative activities. We discussed the strengths and limitations of these data with INS headquarters officials and with investigators at the local level, but we did not independently verify the validity of these data.

In our survey of INS worksite enforcement unit supervisors (previously described), we also asked questions about the type and extent of (1) worksite activities in the supervisors' districts and (2) coordination with Labor and other federal and state agencies. To further determine the extent of Labor's coordination with INS, we conducted structured telephone interviews with Labor officials from districts in Los Angeles; San Diego; Phoenix; Houston, TX; Chicago; Miami, FL; Baltimore; Atlanta; northern New Jersey; and New York. We selected these offices because they were in the seven states with the highest reported number of illegal aliens, based on INS data collected in 1996 (each state had an estimated population of over 100,000 illegal alien residents), or because INS worksite enforcement unit supervisors indicated they had either good coordination or problems coordinating with Labor. We also analyzed Labor workload data to determine the extent to which Labor referred cases to INS for investigation and conducted structured interviews with state labor officials from California, Texas, Florida, Illinois, New York, and New Jersey to determine the extent to which they coordinated their activities with INS.

To identify changes being made to INS' worksite enforcement program, we reviewed INS strategy documents, attended INS meetings in which INS officials explained worksite enforcement program changes, and discussed these changes with INS headquarters and regional officials.

Appendix III

# Comments From the Department of Justice



**U. S. Department of Justice**

*Washington, DC 20530*

MAR - 1 1999

Mr. Richard M. Stana
Associate Director
Administration of Justice Issues
General Government Division
United States General Accounting Office
Washington, DC   20548

Dear Mr. Stana:

On February 2, 1999, you provided the Attorney General a copy of
the draft report entitled ILLEGAL ALIENS: Significant Obstacles
to Reducing Unauthorized Alien Employment Exist with a request
for comments by February 17, 1999.  The following observations
represent the Department's views on the issues presented in this
report and are comprised of the consolidated remarks of the
Immigration and Naturalization Service (INS) and the Office of
Special Counsel for Immigration Related Unfair Employment
Practices (OSC).  We address our activities related to the two
recommendations contained in this report.  Our comments also
cover promotion of the employment verification pilot program,
aliens' ability to choose which documents to show for employment
eligibility, and cooperation between the Department of Labor
(DOL) and the INS.

The Department has long recognized that employment in the United
States is one of the key magnets attracting illegal aliens to
this country.  As your report reflects, the INS is addressing
this issue in a variety of ways--conducting worksite operations,
working to reduce the number of documents that can be used for
employment verification purposes, improving the security of INS
documents, and conducting employment verification pilots.  At the
same time, OSC works to ensure equal employment opportunities for
all eligible workers by preventing and combating immigration-
related job discrimination through its education and law
enforcement responsibilities.

Outreach on the INS Pilot Program.  As part of the INS' outreach
efforts to enroll employers in the employment verification
pilots, the GAO recommends that the INS "seek assistance from
federal and state agencies, such as the Department of Labor and
state labor agencies, in disseminating information to employers
about the programs." To date, the INS has worked with state
departments of labor in connection with the employment pilots on

**No-Match Cert. Admin. Record  192**

Appendix III
Comments From the Department of Justice

Mr. Richard M. Stana                                                    2

a case-by-case basis.  For example, the INS has had extensive
discussions about the employment verification pilots with the New
York State Department of Labor.  The INS agrees that more
systematic coordination with other agencies such as state
departments of labor could be useful in disseminating information
to employers about the pilots, and will add this to the other
recruitment efforts underway.

In the section discussing the INS' efforts to recruit volunteer
pilot employers, the GAO notes that the OSC, among other federal
and state agencies that have contact with employers, has not had
a formal role in informing employers about the INS pilot
programs. (See Draft Report at 23.)  One example cited is the
absence of informational material on the INS pilots from the
OSC's web site and employer outreach materials.  While the OSC
and the INS share a common mission in educating employers on
their responsibilities under the law in order to prevent
immigration related job discrimination, the OSC has a particular
obligation to enforce the law against such discrimination.  At
present, the OSC does not publicize the electronic employment
verification pilot programs because they are still in the pilot
and test stage and have not been evaluated for their impact on
immigration-related job discrimination.  The INS is coordinating
such evaluations and the OSC has worked cooperatively with the
INS and its outside evaluators for these and other purposes.
Nonetheless, it is premature for the OSC to involve itself in
publicizing the pilot programs, when doing so might pose a
potential conflict of interest, i.e., if the OSC were to
challenge unlawful employment practices by pilot employers, and
may compromise its litigation stance.

Interior Enforcement Strategy.  The GAO also recommends that the
final interior enforcement strategy address 1) criteria for
opening investigations of employers suspected of criminal
activities; and 2) investigations of employers against whom there
have been no allegations of criminal activities, but who may not
be complying with Immigration Reform and Control Act's
requirements.  Since GAO finished its data collection in November
1998, the INS has completed its interior enforcement strategy.
(Copy enclosed.)  The strategy states that, during Phase One, the
INS will begin to identify and target specific industries or
localities with a high concentration of criminal activity
associated with illegal migration, including smuggling, document
or visa fraud, unauthorized employment, and worker exploitation
and abuse.  These industries and localities will be identified
based on annual threat assessments prepared by field offices and
supplemented by intelligence and information gathered from the
United States Attorney's offices, other law enforcement sources,
and local government and community leaders.  These assessments
will be further reviewed and consolidated at the regional and
headquarters levels.

Now on p. 13.

Appendix III
**Comments From the Department of Justice**

Mr. Richard M. Stana                                              3

<u>Documentation to Verify Employment Eligibility.</u> The draft report
states in several places that the effectiveness of the employment
eligibility verification (Form I-9) process and concomitant INS
worksite enforcement efforts are limited because non-U.S.
citizens may show documents other than INS-issued work
authorization as proof of employment. (<u>See</u> Draft Report at 4,
19, 26-27). The report reasons that other forms of work
authorization are not as fraud resistant as certain new INS
documents that contain various high tech security features.

While the Department recognizes that its worksite enforcement
efforts may be limited by allowing a wide range of documents to
prove employment eligibility, we would not favor a rule requiring
that aliens show INS-issued documents for Form I-9 purposes at
this time. Such a rule would be a major departure from
established practice under Immigration Reform and Control Act,
which allows both citizens and aliens to choose which documents
to show. The effort to curb illegal employment must be balanced
with other factors, such as ensuring that all legal workers have
the means to demonstrate their eligibility to work and avoiding
undue burdens on employers and employees. In particular, the
Department's experience indicates that adoption of a requirement
that non-U.S. citizens show only INS-issued work authorization as
proof of employment eligibility could increase immigration-
related employment discrimination. Such a rule could encourage
employers to require INS-issued documentation from U.S. citizens
who appear to them to be "foreign." Similarly, in order to make
the improved security features on employment documents as
effective as possible to reduce the number of jobs filled by
unauthorized workers, employer education is important. Employers
must be able to understand how to fulfill their responsibilities
not to discriminate against U.S. citizens and authorized workers
and not to knowingly hire unauthorized workers. For these
reasons, we propose that the report recognize these
countervailing concerns in its discussion of limiting the choice
of non-citizens with respect to which documents to show for
employment eligibility purposes.

<u>INS and DOL Cooperation.</u> The report suggests a conflict between
the INS mission of reducing unauthorized alien employment and the
DOL's mission of enforcing worker protection laws. (<u>See</u> Draft
Report at 4, 28, 32-37). We believe that these two missions are
complementary, not conflicting, and that a comprehensive strategy
for controlling and deterring illegal immigration must include
effective enforcement of both employer sanctions and basic fair
labor standards. The recent agreement between the INS and the
DOL, dated November 23, 1998, reflects this fact built on lessons
the two agencies have learned over the past decade. The INS'
enforcement of the immigration laws can deter violations of labor
standards by preventing the employment of unauthorized workers
who become victims of sub-standard wages and working conditions.
Illegal employment practices artificially suppress wages, lead to

Now on pp. 3, 11, and 15.

Now on pp. 3, 16, and 18-
21.

**No-Match Cert. Admin. Record  194**

Appendix III
Comments From the Department of Justice

Mr. Richard M. Stana                                              4

the degradation of overall conditions in the workplace, and
deprive authorized U.S. workers of decent job opportunities. The
DOL's responsibility is to enforce labor statutes to ensure that
all covered workers are afforded the full benefits and
protections of labor laws, regardless of their immigration
status. Targeted enforcement of labor standards can serve as a
meaningful deterrent to illegal immigration, and helps level the
playing field for employers who seek to comply with the
immigration laws.

The Department appreciates the opportunity to comment on the
draft report and hopes the GAO will find our comments beneficial
to its efforts. We have transmitted the Department's technical
comments under separate cover and understand that they will be
handled appropriately. If you have any questions concerning the
Department's comments, you may contact the Audit Liaison Office
on 202-514-0469 for assistance.

Sincerely,

Stephen R. Colgate
Assistant Attorney General
   for Administration

Enclosure

Appendix IV

# Major Contributors to This Report

| | |
|---|---|
| **General Government Division, Washington, D.C.** | Evi L. Rezmovic, Assistant Director<br>Stuart M. Kaufman, Senior Social Science Analyst<br>Katherine M. Wheeler, Publishing Advisor<br>Charlotte A. Moore, Communications Analyst |
| **Office of the General Counsel, Washington, D.C.** | Ann H. Finley, Senior Attorney |
| **Los Angeles Field Office** | Michael P. Dino, Evaluator-In-Charge<br>Tom Jessor, Senior Evaluator<br>Nancy K. Kawahara, Senior Evaluator<br>Stacia Levenfeld, GAO Intern |

No-Match Cert. Admin. Record  196

**No-Match Cert. Admin. Record  197**

## Ordering Information

The first copy of each GAO report and testimony is free. Additional copies are $2 each. Orders should be sent to the following address, accompanied by a check or money order made out to the Superintendent of Documents, when necessary. VISA and MasterCard credit cards are accepted, also. Orders for 100 or more copies to be mailed to a single address are discounted 25 percent.

Order by mail:

U.S. General Accounting Office
P.O. Box 37050
Washington, DC 20013

or visit:

Room 1100
700 4th St. NW (corner of 4th and G Sts. NW)
U.S. General Accounting Office
Washington, DC

Orders may also be placed by calling (202) 512-6000 or by using fax number (202) 512-6061, or TDD (202) 512-2537.

Each day, GAO issues a list of newly available reports and testimony. To receive facsimile copies of the daily list or any list from the past 30 days, please call (202) 512-6000 using a touch-tone phone. A recorded menu will provide information on how to obtain these lists.

For information on how to access GAO reports on the INTERNET, send e-mail message with "info" in the body to:

info@www.gao.gov

or visit GAO's World Wide Web Home Page at:

http://www.gao.gov



PRINTED ON RECYCLED PAPER

United States
General Accounting Office
Washington, D.C. 20548-0001

Official Business
Penalty for Private Use $300

Address Correction Requested

| Bulk Rate |
| Postage & Fees Paid |
| GAO |
| Permit No. G100 |



(183620)

*162489/073881*

United States General Accounting Office

# GAO

## Testimony

Before the Subcommittee on Immigration and Claims
Committee on the Judiciary, House of Representatives

For Release on Delivery
Expected at 10:00 a.m. EDT
Thursday July 22, 1999

# ILLEGAL ALIENS

# Fraudulent Documents Undermining the Effectiveness of the Employment Verification System

Statement of Richard M. Stana, Associate Director
Administration of Justice Issues
General Government Division





Accountability * Integrity * Reliability

*162489 / 073881*

No-Match Cert. Admin. Record  200

Statement

# Illegal Aliens: Fraudulent Documents Undermining the Effectiveness of the Employment Verification System

Mr. Chairman and Members of the Subcommittee:

I am pleased to be here today to discuss the impact of fraudulent documents on the effectiveness of the employment verification system established by the Immigration Reform and Control Act (IRCA) of 1986 and efforts to reduce such fraudulent use. My statement will summarize pertinent information from two of our reports: Illegal Aliens: Significant Obstacles to Reducing Unauthorized Alien Employment Exist (GAO/GGD-99-33, Apr. 2, 1999) and Social Security: Mass Issuance of Counterfeit-Resistant Cards Expensive, but Alternatives Exist (GAO/HEHS-98-170, Aug. 20, 1998).

The availability of jobs is one of the primary magnets attracting illegal aliens to the United States. Immigration experts believe that as long as opportunities for employment exist, the incentive to enter the United States illegally will persist and efforts at the U.S. borders to prevent illegal entry will be undermined. IRCA's employment verification system was intended to prevent employers from hiring aliens unauthorized to work, therefore reducing the job magnet.

In this statement, I make the following points:

- Significant numbers of aliens unauthorized to work in the United States have used fraudulent documents to circumvent the employment verification process designed to prevent employers from hiring them.

- The Immigration and Naturalization Service (INS) has taken steps to reduce the number of documents that could be used to verify employment eligibility and to improve the security features in its work authorization documents. However, opportunities still exist for unauthorized aliens to circumvent the employment verification process and obtain employment.

- In 1997, the Social Security Administration (SSA) estimated the cost of producing and issuing a counterfeit-resistant Social Security card that could be used to establish employment eligibility to all 277 million cardholders ranged from $3.9 billion to $9.2 billion, depending on which types of security features and data were incorporated into the card. While alternatives exist that could reduce these costs, these options require legislative action to move forward.

**No-Match Cert. Admin. Record  201**

Illegal Aliens: Fraudulent Documents Undermining the Effectiveness of the Employment Verification System

## Background

IRCA[1] made it illegal for employers knowingly to hire unauthorized aliens. IRCA requires employers to comply with an employment verification process intended to provide employers with a means to avoid hiring unauthorized aliens. The process requires newly hired employees to present documentation establishing their identity and eligibility to work. Employees have the choice of presenting 1 document establishing both identity and eligibility to work (e.g., an INS permanent resident card) or 1 document establishing identity (e.g., a driver's license) and 1 establishing eligibility to work (e.g., a Social Security card) from a list of 27 acceptable documents.[2] Generally, employers cannot require employees to present a specific document. Employers are to review the document or documents that an employee presents and complete an Employment Eligibility Form, INS Form I-9. On the form, employers are to certify that they have reviewed the documents and that the documents appear genuine and relate to the individual. Employers are expected to judge whether the documents are obviously fraudulent. INS is responsible for checking employer compliance with IRCA's verification requirements.

## Fraudulent Documents Have Undermined Effectiveness of INS' Employment Verification Process

IRCA's employment verification process is easily thwarted by fraud. Large numbers of unauthorized aliens have used fraudulent documents to circumvent the employment verification process. For example, data from INS' employer sanctions database showed that over the 20-month period from October 1996 through May 1998, about 50,000 unauthorized aliens used 78,000 fraudulent documents to obtain employment. About 60 percent of the fraudulent documents used were INS documents; 36 percent were Social Security cards, and 4 percent were other documents, such as drivers' licenses. During this same time period, INS determined that about 2,100 employers it had investigated had complied with the employment verification process and did not knowingly hire unauthorized aliens, but that these employers hired unauthorized aliens who used fraudulent documents to circumvent the process.

Counterfeit employment eligibility documents are widely available. For example, in November 1998 in Los Angeles, INS seized nearly 2 million counterfeit documents, such as INS permanent resident cards and Social Security cards, that were headed for distribution points around the country.

---

[1] P.L. 99-603, 8 U.S.C. 1324a et seq.

[2] Attachment I lists the 27 acceptable documents.

No-Match Cert. Admin. Record  202

## INS Is Taking Steps to Improve the Verification Process, But Opportunities for Fraud Will Still Exist

INS has undertaken two initiatives to improve the verification process. First, INS has started the process to reduce the number of documents that employees can present to determine employment eligibility. Second, it has begun issuing new documents with increased security features that it hopes will make it easier for employers to verify the documents' authenticity. However, opportunities for unauthorized aliens to use fraudulent documents to obtain employment will still exist.

Various studies of IRCA's employment verification process have advocated that the number of documents be reduced to make the process more secure and reduce employer confusion. For example, in 1990 we reported that the multiplicity of documents contributed to (1) employer confusion about how to comply with the employment verification requirements and (2) discrimination against authorized workers.[3]

INS first proposed reducing the number of usable documents in 1993; however, INS has made little progress to date in reducing the number of documents that employers can accept to determine employment eligibility. In February 1998, INS issued proposed regulations to reduce the number of such documents that can be used from 27 to 14. Under the proposed regulations, INS plans to:

- Retain all eight of the documents that currently establish both identity and employment eligibility, including the INS permanent resident card and the various versions of INS' employment authorization card.

- Eliminate 9 of the 12 documents that establish identity, such as the school identification, voter registration, and various military identification cards.

- Eliminate five of the seven documents that establish employment eligibility, such as the Certificate of Birth Abroad issued by the State Department and the U.S. citizen identification card, a card no longer issued by INS. INS proposes to retain the Social Security card and the Native American tribal document and add the Arrival-Departure Record, Form I-94 for aliens authorized to work for a specific employer.

According to an INS official, as of July 14, 1999, comments on the proposed regulations were being reviewed within INS.

---

[3] Immigration Reform: Employer Sanctions and the Question of Discrimination (GAO/GGD-90-62, Mar. 29, 1990).

**No-Match Cert. Admin. Record 203**

Illegal Aliens: Fraudulent Documents Undermining the Effectiveness of the Employment
Verification System

INS has also begun issuing new documents with increased security features, which it hopes will make it easier for employers to verify the documents' authenticity. In February 1997, INS began issuing a new Employment Authorization Card with improved security features, including a hologram, microprinting, and etched barcoding. In April 1998, INS began issuing a newer version of the card for lawful permanent residents, commonly called the green card, with improved security features, including a hologram, a digital photograph, and an optical memory stripe containing information on the cardholder.

With respect to the new security features on INS documents, this may not have a significant impact on unauthorized aliens' use of fraudulent documents to obtain employment. According to an INS official in Los Angeles, that office has already seized counterfeit versions of the new green card INS began issuing in April 1998. According to this official, the counterfeit cards do not have all of the security features of the new INS green card. While they are easily detectable by trained INS employees, they will appear genuine to untrained employers. Consequently, they could be used to obtain employment. Also, current procedures do not require aliens to show employers the INS document that authorizes them to work. Other widely used documents, such as the Social Security card, do not have the security features of the INS documents. Further, INS plans to phase in the replacement of existing versions of the permanent resident card issued between 1989 and 1998 as they expire, which could take up to 10 years. Cards issued from 1977 to 1989 have no expiration date and will remain valid until INS replaces them. Therefore, unauthorized aliens seeking employment can circumvent the improved security features of INS documents by simply presenting counterfeit versions of the new cards, less secure versions of INS documents, or non-INS documents (e.g., Social Security cards) to employers.

## Enhancing the Social Security Card for Employment Eligibility Verification Would Be Costly

Because the Social Security card has become one of the primary documents to determine employment eligibility, it is important that this card be a secure document. This would mean that there are strict controls over card issuance and that the card itself be counterfeit-resistant. Unfortunately, neither situation is currently true. Historically, the purpose of the Social Security card was to document the card holder's Social Security number, not serve as a means of identifying the individual. Consequently, the controls over whom the card was given to and the security features built into the card have not traditionally been a priority.

Regarding the controls over card issuance, since 1978 SSA has required applicants for original Social Security numbers to provide proof of age,

No-Match Cert. Admin. Record  204

Illegal Aliens: Fraudulent Documents Undermining the Effectiveness of the Employment Verification System

identity, and citizenship or alien status. However, the identity data contained in Social Security records are only as reliable as the evidence on which they are based. Regarding security features of the card, SSA introduced its first counterfeit-resistant card in response to the Social Security Amendments of 1983.[4] Since that time, the current card has incorporated certain limited security features including use of banknote paper, a marbleized pattern on the card that shows signs of alteration, small multicolor discs randomly placed on the card, and printing that has a raised effect and can be difficult to replicate. However, concerns continue to be raised that the card's security features did not make it significantly more difficult to counterfeit and that employers could not easily determine a card's authenticity for work authorization purposes.

Because of these concerns, Congress in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996[5] (IIRIRA) required SSA to develop cost estimates for a prototype counterfeit-resistant card made of durable tamper-resistant material with various security features that could be used in establishing reliable proof of citizenship or legal noncitizenship status. In 1997, SSA estimated the cost of issuing the enhanced cards to all 277 million current number holders and provided estimates for 7 card options employing a range of card technology features.

SSA assumed that it would use existing Social Security application procedures to reissue all enhanced cards and establish reliable proof of the citizenship or alien status for number holders for whom proof had not been previously established. SSA reported that the total cost of issuing the new cards would range from $3.9 billion to $9.2 billion, depending on the technology selected, and would involve 73,000 work years.[6] These technologies ranged from the use of plastic cards with multicolor, miniprinting, and transparent holograms to digital photographs and optical memory storage. SSA's estimates showed that processing costs for five of the seven card options, which mainly included personnel costs, accounted for about 90 percent of the estimated costs to issue an enhanced card. So, regardless of the option selected, issuing an enhanced card to all number holders would involve an enormous cost and have a significant impact on SSA's resources.

---

[4] P.L. 98-21.

[5] P.L. 104-208, 110 Stat. 3009-719.

[6] Attachment II contains a table showing the enhanced card options and associated costs for issuing them to all number holders.

**No-Match Cert. Admin. Record 205**

Illegal Aliens: Fraudulent Documents Undermining the Effectiveness of the Employment Verification System

IIRIRA also required us to review SSA's cost estimates. We found the estimates to be generally reasonable.[7] However, we also identified the following alternatives to the mass reissuance of a new Social Security card, which could provide a more cost-effective approach to preventing those individuals who are unauthorized to work from obtaining jobs:

- Issue a new enhanced Social Security card only to those who need it to prove work eligibility. For retired individuals who are no longer working and the very young who have not entered the workforce, there may be little advantage to issuing a new card. Also, many individuals of working age would not change jobs and would have no need for the card. Bureau of Labor Statistics data suggested this approach could have reduced the number of individuals "needing" an enhanced card from 277 million to an estimated 118 million. This option could help increase control over illegal workers while significantly reducing cost.

- SSA could issue the new card only to those applying for a new Social Security number and those who normally request replacement cards. This option would also substantially reduce the cost of card issuance. But this option provides no new employment authorization internal controls for many current number holders.

If Congress decides to change the Social Security card to enhance employer reliance on that document for work eligibility determinations, it would need to specifically provide funding to accomplish it. The Social Security trust funds have historically borne the cost of issuing original and replacement cards. However, under section 274A of the Immigration and Nationality Act (8 U.S.C. 1324a), payment for major changes, such as implementation of an enhanced counterfeit-resistant Social Security card, cannot be paid for by the trust funds.

## Conclusions

Significant numbers of unauthorized aliens can still obtain employment because IRCA's employment verification process can be easily thwarted by fraud. INS has efforts under way to reduce the number of documents that can be used for employment verification purposes and improve the integrity of the documents it issues. However, this will not substantially affect unauthorized aliens' ability to obtain employment. The most common counterfeited documents will still remain on the list of acceptable documents. In addition, counterfeiters may be able to manufacture "passable versions" of even the most secure INS documents, thwarting

[7] Social Security: Mass Issuance of Counterfeit-Resistent Cards Expensive, but Alternatives Exist (GAO/HEHS-98-170, Aug. 20, 1998).

No-Match Cert. Admin. Record  206

Illegal Aliens: Fraudulent Documents Undermining the Effectiveness of the Employment Verification System

INS' hope of giving employers more confidence in the authenticity of the documents they review.

Providing a more secure Social Security card to all current number holders was estimated to cost between $3.9 billion and $9.2 billion, depending on which types of security features and data were incorporated into the card. While alternatives exist that could reduce these costs, these options require legislative action to move forward.

The steps being considered to improve document security could make it more difficult for an unauthorized alien to obtain employment. But significant numbers of unauthorized aliens can still obtain employment because the employment verification process can be circumvented or easily thwarted by the use of widely available fraudulent documents.

Mr. Chairman, this concludes my prepared statement. I would be pleased to answer any questions your or other members of the Subcommittee may have.

### Contact and Acknowledgment

For further information regarding this testimony, please contact Richard M. Stana at (202) 512-8777. Individuals making key contributions to this testimony included Michael P. Dino, Nancy Kawahara, Tom Jessor, Roland H. Miller III, Jeff Bernstein, and Jacquelyn Stewart.

No-Match Cert. Admin. Record 207

Attachment I

# Current List of Acceptable Documents for Employment Eligibility Verification

| A<br>Documents that establish both identity and employment eligibility | B<br>Documents that establish identity | C<br>Documents that establish employment eligibility |
|---|---|---|
| U.S. passport (unexpired or expired) | Driver's license or identification card issued by a state or outlying possession of the United States, provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address | U.S. Social Security card (other than a card stating that it is not valid for employment) |
| Unexpired foreign passport, with form I-551 stamp | Identification card issued by federal, state, or local government agency or entity, provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address | Certification of Birth Abroad issued by the Department of State (form FS-545 or form DS-1350) |
| Alien registration receipt card with photograph or permanent resident card (INS form I-551) | School identification card with a photograph | Original or certified copy of a birth certificate issued by a state, county, or municipal authority or outlying possession of the United States bearing an official seal |
| Unexpired temporary resident card (INS form I-688) | Voter registration card | Native American tribal document |
| Unexpired employment authorization card (INS form I-688A) | U.S. military card or draft record | U.S. citizen identification card (INS form I-197) |
| Unexpired employment authorization document issued by INS, which contains a photograph (INS form I-766) | Military dependent's identification card | Identification card for use of resident citizen in the United States (INS form I-179) |
| Unexpired employment authorization document issued by INS, which contains a photograph (INS form I-688B) | U.S. Coast Guard Merchant Mariner card | Unexpired employment authorization document issued by the INS (other than those listed under A list) |
| For aliens authorized to work for a specific employer, unexpired foreign passport with form I-94 containing an endorsement of aliens' nonimmigrant status | Native American tribal document | |
| | Driver's license issued by a Canadian government authority | |
| | School record or report card[a] | |
| | Clinic, doctor, or hospital record[a] | |
| | Day-care or nursery school record[a] | |

Note: For employment eligibility verification purposes, one document from list A or one each from list B and C are required.

[a]For persons under age 18 who are unable to present a document listed above.

Source: INS, "List of Acceptable Employment Eligibility Verification Documents for Form I-9," under interim rules, as of Sept. 30, 1997.

No-Match Cert. Admin. Record  208

GAO/T-GGD/HEHS-99-175

No-Match Cert. Admin. Record  209

Attachment II

# SSA's Estimates of Cost to Issue 277 Million Enhanced SSN Cards

**(Dollars in billions)**

| Card option | Card description | Processing cost | Card, equipment, and number holder correspondence cost | Total cost |
|---|---|---|---|---|
| 1 | Basic plastic with name and SSA data printed on front. There are two versions; one with and one without a statement concerning number holder's citizenship status. | $3.6 | $0.3 | $3.9 |
| 2 | Plastic with name and SSN data on front and electronically captured photograph and sex and date-of-birth data on back. | 3.9 | 0.4 | 4.3 |
| 3 | Plastic with name and SSN data on front and a secure bar code data storage stripe to hold identifying information and a biometric indentifier on back.[a] | 3.9 | 0.4 | 4.3 |
| 4 | Plastic with name and SSN data on front and optical data storage stripe on back that can store large amounts of identifying information. | 3.9 | 5.3 | 9.2 |
| 5 | Plastic with name and SSN data on front and a magnetic stripe on back. | 3.6 | 0.4 | 4.0 |
| 6 | Plastic with name and SSN data and photograph on front and a magnetic stripe on back. | 3.9 | 0.4 | 4.3 |
| 7 | Plastic with name and SSN data and a microprocessor (computer chip) on front and a magnetic stripe and photograph on back. | 3.9 | 3.4 | 7.3 |

[a]Biometric indentifiers can capture a living personal characteristic such as a fingerprint in digital or analog form.

Source: SSA, Report to Congress on Options for Enhancing the Social Security Card (Sept. 1997).

**No-Match Cert. Admin. Record  210**

# OFFICE OF
# THE INSPECTOR GENERAL

## SOCIAL SECURITY ADMINISTRATION

### SOCIAL SECURITY NUMBER INTEGRITY:  AN IMPORTANT LINK IN HOMELAND SECURITY

### May 2002    A-08-02-22077

# MANAGEMENT ADVISORY REPORT



## Mission

We improve SSA programs and operations and protect them against fraud, waste, and abuse by conducting independent and objective audits, evaluations, and investigations. We provide timely, useful, and reliable information and advice to Administration officials, the Congress, and the public.

## Authority

The Inspector General Act created independent audit and investigative units, called the Office of Inspector General (OIG). The mission of the OIG, as spelled out in the Act, is to:

- ○ Conduct and supervise independent and objective audits and investigations relating to agency programs and operations.
- ○ Promote economy, effectiveness, and efficiency within the agency.
- ○ Prevent and detect fraud, waste, and abuse in agency programs and operations.
- ○ Review and make recommendations regarding existing and proposed legislation and regulations relating to agency programs and operations.
- ○ Keep the agency head and the Congress fully and currently informed of problems in agency programs and operations.

To ensure objectivity, the IG Act empowers the IG with:

- ○ Independence to determine what reviews to perform.
- ○ Access to all information necessary for the reviews.
- ○ Authority to publish findings and recommendations based on the reviews.

## Vision

By conducting independent and objective audits, investigations, and evaluations, we are agents of positive change striving for continuous improvement in the Social Security Administration's programs, operations, and management and in our own office.



# SOCIAL SECURITY

MEMORANDUM

Date:  May 9, 2002

To:    The Commissioner

From:  Inspector General

Subject: Social Security Number Integrity:  An Important Link in Homeland Security
(A-08-02-22077)

## OBJECTIVE

The objective of this Management Advisory Report is to provide information regarding
(1) how Social Security number (SSN) integrity has become a critical element in the
protection of our homeland, (2) what the Social Security Administration (SSA) and
SSA's Office of the Inspector General (OIG) have done to ensure the SSN's integrity,
and (3) what tasks remain in this important effort.

## BACKGROUND

As the Office of Homeland Security stated in its report, *Securing the Homeland,
Strengthening the Nation*, "The Government of the United States has no more important
mission than fighting terrorism overseas and securing the homeland from future terrorist
attacks."  Federal agencies, including SSA, have embraced this challenge—one of
monumental scale and complexity.  We believe strengthening SSN integrity is one way
in which SSA can make an important contribution to this national goal.

In the past, OIG has issued numerous reports addressing SSN integrity (Appendix A).
These reports included recommendations that addressed vulnerabilities in several SSA
processes including SSN assignment and issuance, employer wage reporting, and
death master file reporting and issuance.  SSA elected to implement many of these
recommendations.  Additionally, after the events of September 11, 2001, SSA revisited
its position on many prior OIG recommendations that it had either not yet implemented
or disagreed with.  In several cases, SSA decided to escalate the implementation of
some recommendations, while it reversed its position on others.

Page 2 – The Commissioner

## SCOPE AND METHODOLOGY

In preparing this report, we obtained and reviewed information from various sources, including the Office of Homeland Security's web site, previous OIG reports, statistics and case summaries from our Office of Investigations and Fraud Hotline, and preliminary drafts of certain legislation. Although we did not perform an audit of a specific SSA entity, most of the information contained herein relates to responsibilities of the Office of Program Benefits under the Deputy Commissioner for Disability and Income Security Programs. We performed this work in March 2002 in accordance with the President's Council on Integrity and Efficiency's *Quality Standards for Inspections*.

## RESULTS OF REVIEW

We have long been aware that failure to protect the integrity of the SSN has enormous financial consequences for the Government, the people, and the business community. We now know that shortcomings in the SSN issuance process can have far graver consequences than previously imagined. The difficult lessons of September 11, 2001 have taught us that SSA can no longer afford to operate from a "business as usual" perspective. Whatever the cost, whatever the sacrifice, we must protect the number that has become our national identifier; the number that is the key to social, legal, and financial assimilation in this country.

We recognize SSA alone cannot resolve the monumental issues surrounding homeland security. Efforts to make our Nation safer will involve new or expanded initiatives by almost every segment of our population, including State and local governments, private industry, non-governmental organizations, and citizens. However, we also recognize that, in endeavoring to protect our homeland, no Government system or policy should be ignored. As such, SSA, as a Federal agency and public servant, must resolve to review its systems and processes for opportunities to prevent the possibility that anyone might commit or camouflage criminal activities against the United States. We believe SSN integrity is a link in our homeland security goal that must be strengthened.

### HOW DOES SSN INTEGRITY IMPACT HOMELAND SECURITY?

*How can we assist the Administration's efforts to investigate the initial attacks and prevent future attacks?*

In the weeks following September 11, concerned citizens across the Nation asked many questions about the terrorists. For example, how were these individuals able to assimilate into our society? What documentation allowed them to do so, and how did they obtain it? Are there more terrorists hiding in the United States, and, if so, how can law enforcement officials locate them? Who are their supporters in the United States? Most importantly, many asked "how can we assist in efforts to investigate the attacks and prevent future attacks?"

Page 3 – The Commissioner

For SSA's OIG, the answer to many of these questions revolved around one item—the SSN. A unique set of nine numbers assigned to almost everyone in the United States. In fact, today, approximately 300 million people have an SSN. The SSN is critical to SSA's implementation of its programs and operations. While this was originally the SSN's only intended use, the SSN quickly became our de facto national identifier, used as a key means of identification in both the public and private sectors.

As use of the SSN has grown, so has its misuse. Because the SSN is so heavily relied upon as an identifier, it is a valuable commodity for criminals. It can be obtained illegally in many ways: presenting false documentation to SSA; stealing another person's SSN; purchasing an SSN on the black market; using the SSN of a deceased individual; and creating a nine-digit number out of thin air. As we have learned through the terrorist investigations, even a legally obtained SSN can be used to facilitate an unlawful act.

In Fiscal Year 2001, OIG's Fraud Hotline received over 115,000 allegations of fraud. Of this total, over 55 percent were allegations of SSN misuse. Examples of this type of fraud include use of an improperly obtained SSN to obtain a driver's license or a credit card, open a bank account, or secure a loan. The remaining allegations were of program or employee fraud, receipt of Social Security benefits, or other fraud having a direct effect on the Social Security Trust Fund. Experience has shown that these cases often also include implications of SSN misuse.

Given the magnitude of such allegations and competing priorities, OIG is regrettably unable to investigate a large percentage of the possible criminal violations involving SSN misuse. Nevertheless, in response to the September 11 attacks, we have committed extensive resources to investigating cases in which SSNs may have been used to facilitate or camouflage terrorist crimes. The following examples summarize a few of the many cases we pursued involving SSN misuse and possible terrorist activity or connections. These cases also illustrate SSA's vulnerability to counterfeit evidentiary documents that individuals sometimes use to inappropriately obtain an SSN.

✓ On December 6, 2001, a Federal Grand Jury in Phoenix, Arizona, returned a 41-count indictment against an individual for, among other crimes, 2 counts of *Furnishing False Information as an Identity to Obtain an SSN* and 25 counts *of Using an SSN Assigned to Someone Else.* The Investigation revealed that the individual, a licensed commercial pilot, obtained an initial SSN in July 1992 in Mesa, Arizona. In August 1999, the individual used a counterfeit Somali passport in another name to obtain an additional SSN.

The indictment stated the individual interchanged the names and SSN's on a variety of official documents, including Federal Aviation Administration documents. He also obtained driver's licenses in both names and used both identities on a variety of loan and credit card applications, leases and more.

Page 4 – The Commissioner

✓ Based on a referral from an SSA field office employee, SSA's OIG and other law enforcement agencies arrested an individual for possessing counterfeit documents, violating the Immigration and Nationality Act, and filing a fraudulent SSN application. The individual had a Pakistani passport that contained a counterfeit non-immigrant U.S. visa and a counterfeit I-94, *Arrival/Departure Record*. He also had a genuine SSN card; a counterfeit, blank SSN card; a counterfeit Alien Registration card; and numerous credit cards.

The individual obtained the genuine SSN card by submitting an application to SSA with the counterfeit non-immigrant visa as proof of his immigration status. The suspect stated he filed for an SSN twice. The first time he filed, he was denied, but he received an SSN on his second try at a different SSA field office. The suspect purported to have paid $1,200 for the counterfeit U.S. visa and SSN card.

In addition, our Office of Audit (OA) is conducting an audit in which we are reviewing SSA's procedures for verifying documents submitted with SSN applications. Although we plan to issue the final report in the Summer of 2002, preliminary results indicate that approximately 8 percent (over 100,000) of the 1.2 million original SSNs assigned to non-citizens in Calendar Year 2000 may have been based on invalid immigration documents. We believe results and examples like those cited above illustrate the necessity to verify all evidentiary documents submitted with SSN applications. We recognize SSA is moving toward this goal; however, we are concerned that delays in implementation could result in thousands more improperly assigned SSNs. Accordingly, we urge the Agency to establish a firm time frame by which it will commit to independently verifying all immigration documents before assigning an SSN.

## WHAT STEPS HAVE SSA AND OIG TAKEN TO ADDRESS THIS CRITICAL ISSUE?

Both SSA and OIG promptly accepted the challenge of addressing the Agency's role in homeland security. Recognizing the SSN's importance in non-citizens' assimilation in U.S. society, SSA established an Enumeration Task Force to examine and establish policy that would strengthen the Agency's procedures. As a member of this Task Force, OIG has shared many insights and ideas with the Agency, which we believe will help increase the integrity of the enumeration process. Additionally, since moments after the initial terrorist attacks, OIG has been fully engaged in investigating these crimes. We assisted in search, rescue and recovery efforts, and we devoted extensive resources to developing information regarding possible co-conspirators in the attacks. As evidenced by our actions, SSA and OIG are committed to bringing to justice individuals who participated in these terrible acts and improving procedures for ensuring SSN integrity, thereby strengthening our link in the homeland security chain.

## ENUMERATION TASK FORCE

The Enumeration Task Force is re-examining the entire enumeration process, including previous OIG recommendations, to identify ways SSA can strengthen its enumeration policies and procedures. On November 1, 2001, SSA's then-Acting Commissioner issued a memorandum to SSA executive staff announcing seven reforms the

Page 5 -- The Commissioner

Enumeration Task Force recommended and the Agency would implement to address enumeration-related vulnerabilities. In that memorandum, the Acting Commissioner committed that SSA would institute these reforms by February 2002. Additionally, the Enumeration Task Force added another planned initiative to the list after the November 2001 memorandum, bringing the total short-term projects to eight. SSA has implemented several of these initiatives, while others have been delayed. A chart containing the status of each initiative is included as Appendix B. These initiatives are as follows.

1. Provide refresher training on enumeration policy and procedures, with emphasis on enumerating non-citizens, for all involved staff.

2. Convene a joint task force between SSA, the Immigration and Naturalization Service (INS), the Department of State (DoS), and the Office of Refugee Resettlement to resolve issues involving enumeration of non-citizens, including working out procedures for verifying INS documents before SSN issuance.

3. Eliminate driver's licenses as a reason for a non-work number.

4. Provide an alternative to giving out a Numident printout for SSN verification.

5. Lower the age tolerance from age 18 to age 12 for mandatory interview procedures, including verification of birth records before enumeration for all applicants age 1 and over for original SSNs and require evidence of identity for all children, regardless of age.

6. Determine the feasibility of photocopying (or scanning) all documentary evidence submitted with SSN applications.

7. Change the Modernized Enumeration System to provide an electronic audit trail, regardless of the mode used to process SSN applications.

8. Implement the SSN Verification System.

**OIG INITIATIVES**

OIG has taken the challenge of addressing homeland security and the SSN's role in this endeavor seriously. We are committed to providing whatever assistance we can in bringing to justice those who committed the unfathomable terrorist acts against our Nation. Additionally, we will provide whatever knowledge and resources we have to affect significant changes in Federal programs so that not one more terrorist can use our own systems and processes to facilitate such crimes. As evidenced by the myriad efforts OIG has already taken, our resolve is deep.

Page 6 – The Commissioner

### Investigative Efforts

OIG special agents, computer specialists, and attorneys have long worked closely with Federal, State and local law enforcement officials to investigate and prosecute SSN misuse. Since September 11, we have further increased our efforts in this area, working aggressively to support the Administration's efforts to investigate the attacks and prevent future incidents. Examples of our efforts follow.

✓ Within minutes of the attack on the World Trade Center, the Special Agent-in-Charge for OIG New York Field Division contacted the Federal Bureau of Investigation (FBI), offering the services of all the special agents under his command. In the days following the attacks, several of these special agents assisted in search, rescue and recovery efforts at Ground Zero.

✓ Nationally, OIG has been an active participant in the FBI's Joint Terrorism Task Force. We have provided round-the-clock support to the national criminal investigation of the terrorist attacks. Our special agents, computer specialists, and attorneys have helped identify, detain, indict, and convict individuals who may have a relationship with terrorist activities.

✓ OIG quickly assigned its agents in the New York/New Jersey area to the FBI investigation. Additionally, OIG had representatives assigned to the FBI's Strategic Information and Operations Center and to the National Infrastructure Protection Center. The OIG's Electronic Crimes Team assisted the FBI, while our computer specialists wrote programs to more specifically query SSA's data bases for FBI-requested information. Additionally, OIG agents fielded SSN information requests on suspects and witnesses, each of which was routed through the FBI's Baltimore office to our Headquarters. Many SSA OIG investigators are working full-time on the terrorism investigation and responding to allegations of SSN misuse.

✓ "Operation Safe Travel" began in September 2001 when SSA OIG agents developed information that individuals working at the Salt Lake City International Airport were misusing SSN's for security badge applications and I-9's, (Employment Eligibility Verification). Under the direction of the U.S. Department of Justice (DoJ), investigators subpoenaed records for all 9,000 airport employees with security badges to identify instances of SSN misuse. They identified 61 individuals with the highest-level security badges and 125 individuals with lower level badges who misused SSN's. A Federal grand jury indicted 69 individuals for Social Security and INS violations. Sixty-one of the 69 individuals arrested had an SSN misuse charge by the U.S. Attorney. On December 11, 2001, SSA's OIG agents and other members of the Operation Safe Travel Task Force arrested 50 individuals. To date, more than 20 have been sentenced after pleading guilty to violations cited in the indictments. Many are now involved in deportation proceedings. There were other similar airport operations after the Salt Lake City Operation, and more are underway. In conjunction with DoJ, we are looking at other critical infrastructure facility sites.

Page 7 – The Commissioner

*Audit Efforts*

Our OA produced in-depth responses to two congressional inquiries assessing SSA's policies and procedures for issuing original and replacement Social Security (SS) cards. In early October 2001, we assessed SSA's business processes for issuing and protecting SSNs. This assessment addressed evidence presented with SSN applications; computerized controls; SSA's accounting for SS cards; additional training for SSA employees; public awareness on the proper use and dissemination of the SSN; and SSA's coordination efforts with other Federal agencies.

Later in October, we assessed SSA's programs and operations to identify counterfeit and stolen SS cards and described SSA's coordination efforts with other Federal agencies to identify suspected terrorists. Additionally, in October, we provided our views to SSA's Enumeration Task Force on techniques to improve SSN verification and decrease incidents of identity theft with new categories of SSNs, suggestions on photograph identifications, and additional automated controls.

Our OA is conducting a follow-up review of SSA's procedures for verifying evidentiary documents presented by non-citizens in applying for original SSNs. We will evaluate SSA's progress in implementing prior recommendations and also quantify the extent to which SSA is detecting false documents presented by foreign-born individuals.

## WHAT TASKS REMAIN TO ENSURE SSN INTEGRITY IN A POST-SEPTEMBER 11TH ENVIRONMENT?

We have seen the enactment of *The Identity Theft and Assumption Deterrence Act of 1998* and the *Internet False Identification Prevention Act of 2000*. The former is the first Federal legislative response to the growing wave of identity thefts and imposes criminal sanctions for those who create false identities or misappropriate someone else's. It is also the first piece of legislation that recognized the SSN as a means of identification. The latter closed a loophole left by the first, enabling law enforcement agencies to pursue those who could previously sell counterfeit SS cards legally, by maintaining the fiction that such cards are "novelties," rather than counterfeit documents. Both pieces of legislation are helpful but mainly treat the identity theft disease in its later stages, rather than at its onset. In most cases, identity theft begins with the misuse of an SSN, and, while the ability to punish identity theft is important, the ability to *prevent* it is even more critical.

How do we do this? Our audit and investigative work has shown that there are three stages at which protections for the SSN must be put in place: upon issuance, during the life of the number holder, and upon that individual's death.

Page 8 – The Commissioner

**Assignment/Issuance of an SSN**

In Fiscal Year 2001, SSA issued over 18.4 million original and replacement SS cards. Approximately 1.5 million of the original SSNs were issued to non-citizens. When SSA assigns an SSN or issues an SS card, it is critical that SSA independently verify the authenticity of the birth records, immigration records, and other identification documents the applicant presented.

In several previous audit reports, OIG recommended independent verification of birth and immigration records submitted to support an SSN application. Additionally, we recommended full and expedited implementation of a joint Enumeration at Entry program to issue SSNs to non-citizens upon their entry into the United States with the INS and DoS. However, before September 11, the Agency disagreed with our recommendation to independently verify birth and immigration records. The Agency stated that delaying the receipt of SSNs for thousands of non-citizens, most of whom were legitimately entitled to a number, was not acceptable. Rather, they preferred to work with the INS on improving existing systems until the Enumeration at Entry program could be implemented. Unfortunately, until September 11, SSA had little success encouraging the INS to move quickly on either of these planned initiatives. SSA representatives have reported that negotiations with INS are proceeding more smoothly and at a faster pace.

SSA's Enumeration Task Force recommended that the Agency seek independent verification of all non-citizen documents before assigning an SSN. Additionally, the Agency is planning to implement a process requiring verification of all U.S. birth certificates for anyone applying for an SSN after the age of 1. We believe implementation of these actions will have an immediate positive impact on the assignment of SSNs based on fraudulent documents. Both recommendations were also included in House Bill 2036, *The Social Security Number Privacy and Identity Theft Prevention Act of 2001*. This legislation would *require* SSA to verify birth records and provide a status report, with the Attorney General, on the joint initiative to enumerate non-citizens at entry.

Unfortunately, full implementation of the initiative to verify immigration documents has been delayed, perhaps for 6 months or more. SSA is waiting for the INS to incorporate information on certain immigrants with work authorization in its data base. Additionally, another delay will be necessary while SSA and the INS work out the details for obtaining access to the INS' data base on non-immigrants or those who may have temporary authorization to work in the United States. As a result, for at least several more months, SSA will continue to issue SSNs to non-citizens without obtaining independent verification of evidentiary documents from the issuing agency.

This continued practice concerns us greatly. We understand the agencies need sufficient time and planning to effectively adopt the Enumeration at Entry program. However, we strongly believe the Agency should immediately begin verifying non-citizen documents before issuing SSNs, regardless of the time delay required for the individual

Page 9 – The Commissioner

to obtain an SSN. While SSA should strive for timely customer service, this desire must be balanced against enumeration integrity and the security of our Nation's borders. To emphasize the importance of the implementation of the Enumeration at Entry program, we recently issued correspondence to the Inspectors General for DoJ and DoS asking that they advise us of the feasibility of INS and DoS meeting the proposed due dates for systems changes needed to support the program.

**Protection During the Life of the Number Holder**

Once SSA issues an SSN and it becomes an integral part of the number holder's life, it becomes difficult to give the SSN the degree of privacy it requires. Businesses and Government agencies nationwide rely on the SSN as a convenient means of record keeping. By doing so, these entities collect, store, and, sometimes, share a lifetime of personal information associated with the number. With this information, a criminal can commit financial fraud, and, in some cases, camouflage other crimes. The challenge for SSA and the Congress is to find a balance between ensuring the SSN's privacy and ensuring that businesses and Federal and State agencies are not unduly limited in the process. Despite this challenge, there are important steps we can take.

✓ *Limit the SSN's public availability to the greatest extent practicable, without unduly limiting commerce.*

We recognize it is virtually impossible to turn back the clock and limit the use of the SSN to Federal programs. We have, therefore, focused our efforts on limiting the public availability of SSN information. We have worked with Federal, State, and local agencies; SSA; the Congress; and the public to strengthen controls over the SSN and prosecute those who misuse it. Several of our recommendations are contained in pending legislation, including provisions in Senate Bill 848, the *Social Security Number Misuse Prevention Act of 2001*; Senate Bill 1055, the *Privacy Act of 2001*; and House Bill 2036, the *Social Security Number Privacy and Identity Theft Prevention Act of 2001*.

✓ *Prohibit the sale of SSNs, prohibit their display on public records, and limit their use to valid transactions.*

Recent and proposed legislation addresses important elements in protecting one's SSN. We support the pending legislation and encourage Congress to expedite such measures.

✓ *Enact strong enforcement mechanisms and stiff penalties to further discourage SSN misuse.*

OIG special agents and attorneys have long worked closely with Federal, State and local law enforcement officials to investigate and prosecute SSN misuse. Since September 11, we have further increased our efforts in this area, working aggressively to support the Administration's efforts to investigate the attacks and

Page 10 – The Commissioner

prevent future incidents.  However, we have been limited in our ability to respond to these concerns as a consequence of balancing priority matters with existing resources.  We believe more resources should be directed to investigating and prosecuting such crimes.

**Protection of the SSN After the Number Holder's Death**

Finally, we must do more to protect the SSN after the number holder's death. SSA receives death information from a variety of sources and compiles a Death Master File, which is updated monthly, transmitted to various Federal agencies, offered for sale to the public, and available for access over the Internet.  There is no question this information must be accurate.  However, we also believe the practice of offering this information to the general public needs serious consideration.

## CONCLUSION

SSA and OIG promptly responded to the challenge of ensuring SSN integrity as a part of homeland security efforts.  We recognize that "business as usual" is no longer permissible and have committed significant resources and energy in developing improved procedures in our enumeration business practice.  Despite SSA's commitment to this endeavor, more needs to be done to ensure the SSN's link to homeland security is strong and durable.  We believe that the current efforts of the Executive Branch and the Congress to work together to address these concerns will continue.

## AGENCY COMMENTS

As we made no recommendations in the report, SSA elected not to provide a formal response.  Rather, the Agency provided minor technical comments, which we have incorporated where appropriate.

James G. Huse, Jr.

# *Appendices*

Appendix A – Prior Office of the Inspector General Audit Reports

Appendix B – Status of Enumeration Task Force Recommendations

Appendix C – Acronyms

Appendix D – OIG Contacts and Staff Acknowledgment

*Appendix A*

# PRIOR OFFICE OF THE INSPECTOR GENERAL AUDIT REPORTS

| Social Security Administration Office of the Inspector General Reports Related to Social Security Number Integrity | |
|---|---|
| *Name and Common Identification Number* | *Date Report Issued* |
| *Canada's Experience in Charging a User Fee for Social Insurance Number Cards (A-06-97-62003)* | May 1997 |
| *Management Advisory Report: Activity Related to the Suspense File (A-03-96-31001 and A-03-96-31002)* | September 1997 |
| *Follow-Up of the Internal Controls over the Modernized Enumeration System (A-04-96-44001)* | March 1998 |
| *Payment of Benefits to Individuals Who Do Not Have Their Own Social Security Number (A-04-96-42000)* | March 1998 |
| *Performance Measure Audit: Timely Issuance of Social Security Number Cards (A-02-97-93003)* | April 1998 |
| *Assessment of the Social Security Administration's Processing of Requests for Social Security Numbers in Emergency Situations (Limited Distribution) (A-08-97-44001)* | June 1998 |
| *Management Advisory Report: Using Social Security Numbers to Commit Fraud (A-08-99-42002)* | May 1999 |
| *Management Advisory Report: Analysis of Social Security Number Misuse Allegations Made to the Social Security Administration's Fraud Hotline (A-15-99-92019)* | August 1999 |
| *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items (A-03-98-31009)* | September 1999 |
| *Review of Controls Over Nonwork Social Security Numbers (A-08-97-41002)* | September 1999 |

A-1

**No-Match Cert. Admin. Record 224**

| | |
|---|---|
| *The Social Security Administration is Pursuing Matching Agreements with New York and Other States Using Biometric Technologies (A-08-98-41007)* | January 2000 |
| *Performance Measure Review: Reliability of the Data Used to Measure Social Security Number Request Processing (A-02-99-01009)* | March 2000 |
| *Improving the Usefulness of the Social Security Administration's Death Master File (A-09-98-61011)* | July 2000 |
| *Effectiveness of Internal Controls in the Modernized Enumeration System (A-08-97-41003)* | September 2000 |
| *Procedures for Verifying Evidentiary Documents Submitted with Original Social Security Number Applications (A-08-98-41009)* | September 2000 |
| *Obstacles to Reducing Social Security Number Misuse in the Agriculture Industry (A-08-99-41004)* | January 2001 |
| *Force Processing of Magnetic Media Wage Reports with Validation Problems (A-03-99-31001)* | May 2001 |
| *Management Advisory Report: Review of Service Industry Employer with Wage Reporting Problems (A-03-00-10022)* | September 2001 |
| *Audit of the Enumeration at Birth Program (A-08-00-10047)* | September 2001 |
| *Replacement Social Security Number Cards: Opportunities to Reduce the Risk of Improper Attainment and Misuse (A-08-00-10061)* | September 2001 |
| *Congressional Response Report: SSN Misuse – A Challenge for the Social Security Administration (A-08-02-22030)* | October 2001 |
| *Congressional Response Report: Terrorist Misuse of Social Security Numbers (A-08-02-32041)* | October 2001 |
| *Disclosure of Personal Beneficiary Information to the Public (Limited Distribution) (A-01-01-01018)* | December 2001 |

**No-Match Cert. Admin. Record  225**

*Appendix B*

# Status of Enumeration Task Force Recommendations

| Status of Enumeration Task Force Recommendations | |
|---|---|
| **Description of Recommendation** | **Status as of March 30, 2002** |
| Provide refresher training on enumeration policy and procedures, with emphasis on enumerating non-citizens, for all involved staff. | Ongoing.  Refresher training was conducted on December 19 and 20, 2001.  Additionally, an interactive video training session was held on January 31, 2002.  During the week of February 11, 2002, field office managers reviewed a daily maximum of 50 non-citizen enumeration actions.  Managers provided feedback on problems or trends.  Further action will be decided based on these findings, which were being evaluated at the time of this review. |
| Convene a joint task force between the Social Security Administration (SSA), the Immigration and Naturalization Service (INS), and the Department of State (DoS) to resolve issues involving enumerating non-citizens, including working out procedures for verifying INS documents before the Social Security number (SSN) is assigned. | Ongoing.  On January 3, 2002, SSA signed a protocol with the DoS outlining procedures for SSA use of information housed in the Refugee Data Center, which will be used to enumerate refugees.  The procedure to verify immigration documents for refugees before assigning an SSN became effective in February 2002.<br><br>SSA, INS, and DoS are also working together to implement the Enumeration at Entry program.  Additionally, the INS has taken several steps to improve the timeliness of its data entry process.  Once corrected, SSA will begin electronically verifying all non-citizen immigration documents before assigning an SSN.  However, it is our understanding that corrections required by INS have been delayed.  Therefore, SSA may not begin to implement this policy until late in Calendar Year 2002. |
| Eliminate driver's licenses as a reason for a non-work SSN. | Completed.  SSA notified the governors of all States in February 2002, and the policy went into effect on March 1, 2002. |

**No-Match Cert. Admin. Record  226**

| | |
|---|---|
| Provide an alternative to issuing a Numident printout for SSN verification. | Completed. The "NUMI-lite" went into production in SSA field offices in March 2002. This printout provides less identification information and therefore is less likely to facilitate identity theft. |
| Lower the age tolerance from 18 to 12 for mandatory interview procedures, including verification of birth records before enumeration for all applicants for original SSNs and require evidence of identity for all children, regardless of age. | Ongoing. The policy change needed to lower the age tolerance for mandatory interviews from 18 to 12 requires a regulatory change. Additionally, eliminating an existing waiver provision for those under age 7 will require a regulation. However, in the interim, SSA will rely on refresher training to strengthen existing policies. Beginning in May 2002, SSA will verify birth records for all applicants for original SSNs over the age of 1. |
| Determine the feasibility of photocopying (or scanning) all documentary evidence submitted with SSN applications. | Ongoing. Between February and March 2002, SSA conducted a pilot in two field offices to photocopy all evidence submitted in conjunction with SSN applications and ship them weekly to SSA's record storage facility for scanning. As of April 1, 2002, SSA was conducting the cost-benefit analysis for the pilot. |
| Change the Modernized Enumeration System to provide an electronic audit trail, regardless of the mode used to process SSN applications. | Completed. The audit trail went into production in mid-December 2001. |
| Implement the SSN Verification System. | Ongoing. SSA implemented a pilot of the on-line version in April 2002. |

B-2

*Appendix C*

# Acronyms

| | |
|---|---|
| DoJ | Department of Justice |
| DoS | Department of State |
| FBI | Federal Bureau of Investigation |
| INS | Immigration and Naturalization Service |
| OA | Office of Audit |
| OIG | Office of the Inspector General |
| SS | Social Security |
| SSA | Social Security Administration |
| SSN | Social Security Number |

*Appendix D*

# OIG Contacts and Staff Acknowledgments

## OIG Contacts

Kimberly A. Byrd, Director, Southern Audit Division, (205) 801-1605

Jeffrey Pounds, Deputy Director, Birmingham Field Office, (205) 801-1606

## Staff Acknowledgments

In addition to those named above:

Kathy Buller, Counsel to the Inspector General

George Penn, Senior Attorney

Tom Sipes, Special Agent-in-Charge

Charles Lober, Senior Auditor

Kathy Youngblood, Senior Auditor

Susan Phillips, Auditor

Kimberly Beauchamp, Writer/Editor

For additional copies of this report, visit our web site at www.ssa.gov/oig or contact the Office of the Inspector General's Public Affairs Specialist at (410) 966-1375.  Refer to Common Identification Number A-08-02-22077.

# DISTRIBUTION SCHEDULE

| | No. of Copies |
|---|---|
| Commissioner of Social Security | 1 |
| Management Analysis and Audit Program Support Staff, OFAM | 10 |
| Inspector General | 1 |
| Assistant Inspector General for Investigations | 1 |
| Assistant Inspector General for Executive Operations | 3 |
| Assistant Inspector General for Audit | 1 |
| Deputy Assistant Inspector General for Audit | 1 |
| Director, Systems Audit Division | 1 |
| Director, Financial Management and Performance Monitoring Audit Division | 1 |
| Director, Operational Audit Division | 1 |
| Director, Disability Program Audit Division | 1 |
| Director, Program Benefits Audit Division | 1 |
| Director, General Management Audit Division | 1 |
| Team Leaders | 25 |
| Income Maintenance Branch, Office of Management and Budget | 1 |
| Chairman, Committee on Ways and Means | 1 |
| Ranking Minority Member, Committee on Ways and Means | 1 |
| Chief of Staff, Committee on Ways and Means | 1 |
| Chairman, Subcommittee on Social Security | 2 |
| Ranking Minority Member, Subcommittee on Social Security | 1 |
| Majority Staff Director, Subcommittee on Social Security | 2 |
| Minority Staff Director, Subcommittee on Social Security | 2 |
| Chairman, Subcommittee on Human Resources | 1 |
| Ranking Minority Member, Subcommittee on Human Resources | 1 |
| Chairman, Committee on Budget, House of Representatives | 1 |
| Ranking Minority Member, Committee on Budget, House of Representatives | 1 |
| Chairman, Committee on Government Reform and Oversight | 1 |
| Ranking Minority Member, Committee on Government Reform and Oversight | 1 |
| Chairman, Committee on Governmental Affairs | 1 |

| | |
|---|---|
| Ranking Minority Member, Committee on Governmental Affairs | 1 |
| Chairman, Committee on Appropriations, House of Representatives | 1 |
| Ranking Minority Member, Committee on Appropriations, House of Representatives | 1 |
| Chairman, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, House of Representatives | 1 |
| Ranking Minority Member, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, House of Representatives | 1 |
| Chairman, Committee on Appropriations, U.S. Senate | 1 |
| Ranking Minority Member, Committee on Appropriations, U.S. Senate | 1 |
| Chairman, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, U.S. Senate | 1 |
| Ranking Minority Member, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, U.S. Senate | 1 |
| Chairman, Committee on Finance | 1 |
| Ranking Minority Member, Committee on Finance | 1 |
| Chairman, Subcommittee on Social Security and Family Policy | 1 |
| Ranking Minority Member, Subcommittee on Social Security and Family Policy | 1 |
| Chairman, Senate Special Committee on Aging | 1 |
| Ranking Minority Member, Senate Special Committee on Aging | 1 |
| Vice Chairman, Subcommittee on Government Management Information and Technology | 1 |
| President, National Council of Social Security Management Associations, Incorporated | 1 |
| Treasurer, National Council of Social Security Management Associations, Incorporated | 1 |
| Social Security Advisory Board | 1 |
| AFGE General Committee | 9 |
| President, Federal Managers Association | 1 |
| Regional Public Affairs Officer | 1 |
| **Total** | **97** |

# Overview of the Office of the Inspector General

## Office of Audit

The Office of Audit (OA) conducts comprehensive financial and performance audits of the Social Security Administration's (SSA) programs and makes recommendations to ensure that program objectives are achieved effectively and efficiently. Financial audits, required by the Chief Financial Officers Act of 1990, assess whether SSA's financial statements fairly present the Agency's financial position, results of operations, and cash flow. Performance audits review the economy, efficiency, and effectiveness of SSA's programs. OA also conducts short-term management and program evaluations focused on issues of concern to SSA, Congress, and the general public. Evaluations often focus on identifying and recommending ways to prevent and minimize program fraud and inefficiency.

## Office of Executive Operations

The Office of Executive Operations (OEO) supports the Office of the Inspector General (OIG) by providing information resource management; systems security; and the coordination of budget, procurement, telecommunications, facilities and equipment, and human resources. In addition, this office is the focal point for the OIG's strategic planning function and the development and implementation of performance measures required by the Government Performance and Results Act. OEO is also responsible for performing internal reviews to ensure that OIG offices nationwide hold themselves to the same rigorous standards that we expect from the Agency, as well as conducting employee investigations within OIG. Finally, OEO administers OIG's public affairs, media, and interagency activities and also communicates OIG's planned and current activities and their results to the Commissioner and Congress.

## Office of Investigations

The Office of Investigations (OI) conducts and coordinates investigative activity related to fraud, waste, abuse, and mismanagement of SSA programs and operations. This includes wrongdoing by applicants, beneficiaries, contractors, physicians, interpreters, representative payees, third parties, and by SSA employees in the performance of their duties. OI also conducts joint investigations with other Federal, State, and local law enforcement agencies.

## Counsel to the Inspector General

The Counsel to the Inspector General provides legal advice and counsel to the Inspector General on various matters, including: 1) statutes, regulations, legislation, and policy directives governing the administration of SSA's programs; 2) investigative procedures and techniques; and 3) legal implications and conclusions to be drawn from audit and investigative material produced by the OIG. The Counsel's office also administers the civil monetary penalty program.