

**United States General Accounting Office**

## Testimony

Before the Subcommittee on Immigration and Claims,
Committee on the Judiciary,
House of Representatives

For Release on Delivery
Expected at 2:00p.m. EDT
Wednesday, June 19, 2002

# IMMIGRATION ENFORCEMENT

# Challenges to Implementing the INS Interior Enforcement Strategy

Statement by Richard M. Stana, Director, Justice Issues





GAO-02-861T

**No-Match Cert. Admin. Record 233**

Mr. Chairman and Members of the Subcommittee:

I am pleased to be here today to discuss selected issues pertaining to the Immigration and Naturalization Service's (INS) enforcement of immigration laws within the interior of the United States.

In the 1990s, INS developed a strategy to control illegal immigration across the U.S. border and a strategy to address enforcement priorities within the country's interior. In 1994, INS's Border Patrol issued a strategy to deter illegal entry. The strategy called for "prevention through deterrence"; that is, to raise the risk of being apprehended for illegal aliens to a point where they would consider it futile to try to enter. The plan called for targeting resources in a phased approach, starting first with the areas of greatest illegal activity. In 1999, the INS issued its interior enforcement strategy designed to deter illegal immigration, preventing immigration-related crimes, and removing those illegally in the United States. Historically, Congress and INS have devoted over five times more resources in terms of staff and budget on border enforcement than on interior enforcement.

In my statement today, I make the following points:

- INS's interior enforcement strategy is designed to address the detention and removal of criminal aliens, the dismantling and diminishing of alien smuggling operations, community complaints about illegal immigration, immigration benefit and document fraud, and employers' access to undocumented workers. INS faces numerous enforcement issues in each area.
- INS could do a better job of using its limited interior enforcement resources. For strategy implementation to be effective, INS needs better data to determine staff needs, reliable information technology, clear and consistent guidelines and procedures for working-level staff, effective collaboration and coordination within INS and with other agencies, and performance measures that help INS assess program results.
- Having an effective interior strategy is an essential complement to having an effective border strategy. Addressing management challenges is important if INS is to achieve their full potential.

My testimony today will be based primarily on the results of work that we have completed in recent years, namely, our February 1999 testimony on INS's efforts to identify and remove criminal aliens,[1] our April 1999 report on INS's worksite enforcement program,[2] our May 2000 report on alien smuggling,[3] our May 2001 report on the processing of immigration benefits,[4] our January 2002 report on immigration benefit

---

[1] U.S. General Accounting Office, *Criminal Aliens: INS' Efforts to Identify and Remove Imprisoned Aliens Continue to Need Improvement*, GAO/T-GGD-99-47 (Washington, D.C.: Feb. 25, 1999).

[2] U.S. General Accounting Office, *Illegal Aliens: Significant Obstacles to Reducing Unauthorized Alien Employment Exist*, GAO/GGD-99-33 (Washington, D.C.: Apr. 2, 1999).

[3] U.S. General Accounting Office, *Alien Smuggling: Management and Operational Improvements Needed to Address Growing Problem*, GAO/GGD-00-103 (Washington, D.C.: May 1, 2000).

[4] U.S. General Accounting Office, *Immigration Benefits: Several Factors Impede the Timeliness of Application Processing*, GAO-01-488 (Washington, D.C.: May 4, 2001).

No-Match Cert. Admin. Record  234

fraud,[5] and our March 2002 report on INS' Forensic Document Laboratory.[6] In these reports we made many recommendations to improve INS operations. INS has implemented or is in the process of implementing some of these recommendations. We plan to follow up on INS's plans to improve the various programs.

## Components of the Interior Enforcement Strategy

In January 1999, INS issued its Interior Enforcement Strategy. This strategy focuses resources on areas that would have the greatest impact on reducing the size and annual growth of the illegal resident population. Certain criteria were used to develop the priorities and activities of the strategy. The criteria focused on potential risks to U.S. communities and persons, costs, capacity to be effective, impact on communities, potential impact on reducing the size of the problem, and potential value for prevention and deterrence. The strategy established the following five areas in priority order:

1. Identify and remove criminal aliens and minimize recidivism. Under this strategic priority, INS is to identify and remove criminal aliens as they come out of the federal and state prison systems and those convicted of aggravated felonies currently in probation and parole status.

2. Deter, dismantle, and diminish smuggling or trafficking of aliens. This strategic priority calls for INS to disrupt and dismantle the criminal infrastructure that encourages and benefits from illegal migration. INS efforts are to start in source and transit countries and continue inside the United States, focusing on smugglers, counterfeit document producers, transporters, and employers who exploit and benefit from illegal migration.

3. Respond to community reports and complaints about illegal immigration. In addition to responding to local law enforcement issues and needs, this strategic priority emphasizes working with local communities to identify and address problems that arise from the impact of illegal immigration, based on local threat assessments.

4. Minimize immigration benefit fraud and other document abuse. Under this strategic priority, INS is to aggressively investigate and prosecute benefit fraud and document abuse to promote integrity of the legal immigration system.

5. Block and remove employers' access to undocumented workers. The strategy emphasizes denying employers access to unauthorized workers by checking their compliance with the employment verification requirements in the Immigration Reform and Control Act of 1986. Coupled with its efforts to control smuggling activity, this effort could have a multiplier effect on access of employers to illegal workers and on the overall number of illegal residents in the country.

---

[5] U.S. General Accounting Office, *Immigration Benefit Fraud: Focused Approach Is Needed to Address Problems*, GAO-02-66 (Washington, D.C.: Jan. 31, 2002).
[6] U.S. General Accounting Office, *INS Forensic Document Laboratory: Several Factors Impeded Timeliness of Case Processing*, GAO-02-410 (Washington, D.C.: Mar. 13, 2002).

**No-Match Cert. Admin. Record  235**

Figure 1 shows that INS has generally allocated its interior enforcement resources consistent with these priorities and that the workyears devoted to several of INS's interior enforcement efforts have either declined or stayed about the same between fiscal years 1998 and 2001.

Figure 1:  INS Investigations Workyears



Note:  Workyear totals do not include administrative time.

Source:  GAO's analysis of INS's data.

**Challenges Exist in Implementing Interior Enforcement Programs**

Our work has shown that INS faces numerous daunting enforcement issues. For example, the potential pool of removable criminal aliens and fugitives numbers in the hundreds of thousands. Many are incarcerated in hundreds of federal, state, and local facilities, while others are fugitives at large across the country. The number of individuals smuggled into the United States has increased dramatically, and alien smuggling has become more sophisticated, complex, organized, and flexible.  Thousands of aliens annually illegally seek immigration benefits, such as work authorization and change of status, and some of these aliens use these benefits to enable them to conduct criminal activities.  Hundreds of thousands of aliens unauthorized to work in the United States have used fraudulent documents to circumvent the process designed to prevent employers from hiring them.  In many instances, employers are complicit in this activity.

**No-Match Cert. Admin. Record  236**

Given the nature, scope, and magnitude of these activities, INS needs to ensure that it is making the best use of its limited enforcement resources. We found that fundamental management challenges exist in several of INS's interior enforcement programs and that INS could do a better job using its limited resources.

<u>Need for Better Staff Levels and Allocations</u>

In several reports we noted that INS did not believe it had sufficient staff to reach its program goals. Having data on how to effectively allocate staff and placing sufficient staff in the right locations is important if INS is to achieve program goals.

Staff shortages have contributed to INS's inability to promptly remove the majority of criminal aliens after they have completed their prison sentences. In 1995, INS did not place into removal proceedings 57 percent of potentially deportable criminal aliens who were released from federal prisons and state prisons from 5 states. In 1997, INS did not place about 50 percent of these aliens. We reported that, although the removal of criminal aliens was an INS management priority, INS was facing the same staff shortage issues in 1997 as it had in 1995. In particular, agent attrition – about 30 percent in 1995, and about 32 percent in 1997- continued to impede INS's ability to meet its program goals. INS has told us that since 1997, the attrition rates of agents in this program has stabilized and that, in fiscal year 2003, the agents from this program would be reclassified as detention removal officers, which INS believes should further help reduce attrition.

INS's Forensic Document Laboratory (FDL) has been beset with staff shortages for years. According to FDL officials, staff shortages have made it difficult for the FDL to stay current with its workload and produce timely responses to requests for forensic document examination. Congress's January 2002 supplemental appropriation will nearly double FDL's current staff of 35.

Even if INS had additional staff working in these program areas, it lacked good management information to determine how many staff it needed to meet its program goals and how best to allocate staff given the limited resources it did have. With respect to its program for removing incarcerated criminal aliens, INS told us that beginning in fiscal year 2002, the agency implemented our recommendation to use a workload analysis model to help identify the resources the agency needs for its criminal alien program in order to achieve overall program goals and support its funding and staffing requests. We have not reviewed this new model to ascertain its usefulness.

With respect to alien smuggling, INS lacked field intelligence staff to collect and analyze information. Both 1998 and 1999 INS Annual Performance Plan reports stated that the lack of intelligence personnel hampered the collection, reporting, and analysis of intelligence information. Although INS's Intelligence Program proposed that each district office have an intelligence unit, as of January 2000, 21 of INS's 33 districts did not have anyone assigned full-time to intelligence-related duties.

GAO-02-861T

**No-Match Cert. Admin. Record  237**

The worksite enforcement program received a relatively small portion of INS's staffing and budget. In fiscal year 1998, INS completed a total of 6,500 worksite investigations, which equated to about 3 percent of the estimated number of employers of unauthorized aliens. Many immigration experts have said that as long as opportunities for employment exist, the incentive to enter the United States illegally or overstay visas will persist, and efforts at the U.S. borders to prevent illegal entry will be undermined.

<u>Need for Better Information Technology</u>

INS has had long-standing difficulty developing and fielding information systems to support its program operations. In 1990, we reported that INS managers and field officials did not have adequate, reliable, and timely information to effectively carry out the agency's mission. We also reported that INS had not conducted a comprehensive agencywide information needs assessment. As a result, program and management data were kept in a loose collection of automated systems, as well as a number of ad hoc labor-intensive manual systems.

Effectively using information technology continues to remain a challenge for INS. For example, benefit fraud investigations have been hampered by a lack of integrated information systems. The operations units at the four INS service centers that investigate benefit fraud operate different information systems that do not interface with each other or with the units that investigate benefit fraud at INS district offices. As a result, sharing information about benefit applicants is difficult. The INS staff who adjudicate applications did not have routine access to INS's National Automated Immigration Lookout System (NAILS). Not having access to or not using NAILS essentially means that officers may be making decisions without access to or using significant information and that benefits may be granted to individuals not entitled to receive them. Thus, INS is not in the best position to review numerous applications and detect patterns, trends, and potential schemes for benefit fraud.

FDL's database, the Forensic Automated Case and Evidence Tracking System (FACETS), did not contain sufficient data for managers to know the exact size and status of the laboratory's pending workload or how much time is spent on each forensic case by priority category. As a result, FDL managers were not in the best position to make fact-based decisions about case priorities, staffing, and budgetary resource needs.

With respect to the criminal alien program, INS lacked a nationwide data system containing the universe of foreign-born inmates for tracking the hearing status of each inmate. In response to our recommendation, INS developed a nationwide automated tracking system for the Bureau of Prisons and deployed the system to all federal institutional hearing program sites. INS said that it was working with the Florida Department of Corrections to integrate that state's system with INS's automated tracking system. INS also said that it planned to begin working with New York, New Jersey, and Texas to integrate their systems and then work with California, Illinois, and Massachusetts. INS projected that this entire project will be completed by the end of fiscal year 2002. We have not examined these new systems to ascertain their effectiveness.

**No-Match Cert. Admin. Record  238**

INS lacked an agencywide automated case tracking and management system that prevented antismuggling program managers from being able to monitor their ongoing investigations, determine if other antismuggling units were investigating the same target, or know if previous investigations had been conducted on a particular target. In response to our recommendation, INS deployed an automated case tracking and management system for its alien smuggling investigations to many of its antismuggling units by August 2001 and planned to complete deployment by the end of fiscal year 2002. Again, we have not examined the new system to ascertain its effectiveness.

Need for Better Guidance to Program Staff

Our review of the various program components of the interior enforcement strategy found that working-level guidance was sometimes lacking or nonexistent. INS had not established guidance for opening benefit fraud investigations or for prioritizing investigative leads. Without such criteria, INS cannot be ensured that the highest-priority cases are investigated and resources are used optimally.

INS's interior enforcement strategy did not define the criteria for opening investigations of employers suspected of criminal activities. In response to our recommendation, INS clarified the types of employer-related criminal activities that should be the focus of INS investigations.

INS's alien smuggling intelligence program had been impeded by a lack of understanding among field staff about how to report intelligence information. Staff were unclear about guidelines, procedures, and effective techniques for gathering, analyzing, and disseminating intelligence information. They said that training in this area was critically needed.

Need for Better Program Collaboration/Coordination

Over the years, we have issued a number of reports identifying program coordination and cooperation both within INS and between INS and other agencies as problematic. This was verified as an issue in a 1995 GAO survey of INS managers and in our reviews of individual program components. For example, although both the Border Patrol and INS's Office of Investigations have antismuggling units that conduct alien smuggling investigations, these units operate through different chains of command with different reporting structures. INS's antismuggling program lacked coordination, resulting in multiple antismuggling units overlapping in their jurisdictions, making inconsistent decisions about which cases to open, and functioning autonomously and without a single chain of command. INS investigation officials told us that the autonomy of individual units and the lack of a single chain of command were major obstacles to building a more effective antismuggling program.

INS's approach to addressing benefit fraud is fragmented and unfocused. INS's interior enforcement strategy does not address how the different INS components that conduct

**No-Match Cert. Admin. Record  239**

benefit fraud investigations are to coordinate their investigations. Also, INS had not established guidance to ensure the highest-priority cases are investigated.

With respect to collaboration with other agencies, some of our reports have noted the importance of INS working with other governmental entities to achieve program objectives.[7]  For example, with respect to worksite enforcement, we recommended that INS seek assistance from federal and state agencies, such as the Department of Labor and state labor agencies, in disseminating information to employers about INS's pilot programs for verifying employees' eligibility to work.  INS has implemented our recommendation with respect to state labor agencies, but coordinating with the Labor Department is problematic because of the different interests of the two agencies.  That is, Labor officials will not delve into worksite immigration matters if it would have a detrimental effect on Labor's primary mission of enforcing worker protection laws.  If employees perceived that Labor investigators were trying to determine their immigration status and possibly report those who may be unauthorized to INS, it would have a "chilling effect" on employees' willingness to report workplace violations.  With respect to criminal aliens, INS needed to work with states to make enhancements to the removal process, such as reducing the number of state prison facilities that served as intake, hearing, and release sites for foreign-born inmates.  At the time our work was completed, INS had variable success with getting states to agree to make such reductions.

<u>Need for Better Performance Measures</u>

INS does not have established outcome-based performance measures in place that would help it assess the results of its interior enforcement strategy.  We have found this to be an issue in both border enforcement and interior enforcement areas.  For example, we have issued several reports pertaining to INS's border strategy and have noted that INS has not evaluated the strategy's overall effects on illegal entry and has not analyzed key performance data.

While INS had met its numeric goals for its antismuggling program, it had not yet developed outcome-based measures that would indicate progress toward the strategy's objective of identifying, deterring, disrupting, and dismantling alien smuggling.  This was also the case for the INS intelligence program. INS had not developed outcome-based performance measures to gauge the success of the intelligence program to optimize the collection, analysis, and dissemination of intelligence information.

INS had not yet established outcome-based performance measures that would help it assess the results of its benefit fraud investigations. Additionally, INS had not established goals or measurement criteria for the service center operations units that conduct fraud investigation activities.

INS's interior enforcement strategy did not clearly describe the specific measures INS would use to gauge its performance in worksite enforcement. For example, the strategy states that INS will evaluate its performance on the basis of such things as changes in the

---

[7] GAO/T-GGD-99-47, GGD-99-33, GGD-00-103, GAO-02-66.

**No-Match Cert. Admin. Record  240**

behavior or business practices of persons and organizations. Although INS indicated that it would gauge effectiveness in the worksite area by measuring change in the wage scales of certain targeted industries, it left unclear a number of questions related to how it would do this. For example, INS did not specify how wage scales would be measured; what constituted a targeted industry; and how it would relate any changes found to its enforcement efforts or other immigration-related causes. The strategy stated that specific performance measurements would be developed in the annual performance plans required by the Government Performance and Results Act.

According to INS's fiscal year 2003 budget submission, the events of September 11th have required INS to reexamine strategies and approaches to ensure that INS efforts fully address threats to the United States by organizations engaging in national security crime. As a result, with regard to investigating employers who may be hiring undocumented workers, INS plans targeted investigations of industries and businesses where there is a threat of harm to the public interest.  However, INS had not set any performance measures for these types of worksite investigations.

**Concluding Observations**

Having an effective interior enforcement strategy is an essential complement to having an effective border strategy. To be sure, INS's tasks with regard to interior enforcement are considerable given the nature, scope, and magnitude of illegal activity. Nevertheless, in reviewing our work, we find that INS is an agency that faces significant challenges in appropriately staffing program areas, providing reliable information for program management, establishing clear and consistent guidance for working-level staff to do their jobs consistent with the goals of the program, promoting collaboration and coordination within INS and with other agencies, and developing outcome-based measures that would indicate progress toward the strategy's objectives. Addressing these issues is important if INS is to achieve full program potential.

Mr. Chairman, this concludes my prepared statement, I would be pleased to answer any questions that you or other members of the subcommittees may have.

No-Match Cert. Admin. Record  241

**Contacts and Acknowledgments**

For further information regarding this testimony, please contact Richard M. Stana at
(202) 512-8777.  Individuals making key contributions to this testimony included Evi L.
Rezmovic and Michael P. Dino.

(440141)

**No-Match Cert. Admin. Record  242**

Statement of the Hon. James G. Huse, Jr., Inspector General,
Social Security Administration

Testimony Before the Subcommittee on Social Security
of the House Committee on Ways and Means
and
Subcommittee on Immigration, Border Security and Claims
Committee on the Judiciary

Hearing on Preserving the Integrity of Social Security Numbers and
Preventing Their Misuse by Terrorists and Identity Thieves

September 19, 2002

**Introduction**

Good afternoon, Chairman Shaw, Chairman Gekas, Ranking Member Matsui, Ranking Member Jackson
Lee, and Members of the Subcommittees on Social Security and Immigration, Border Security, and
Claims. I welcome the opportunity to be here today to discuss homeland security as it relates to the
integrity of the Social Security number (SSN). This is my seventh appearance before a congressional
hearing this year to discuss the importance of extending protections for SSN integrity, and I cannot bring
this message to Congress too often.

My testimony today follows up my June 25th testimony before Chairman Gekas, Ranking Member
Jackson Lee, and Members of the Subcommittee on Immigration, Border Security, and Claims. Today I
would like to examine further the role SSN fraud plays in crime and terrorist activity, and some methods
by which criminal fraud is executed utilizing stolen or fraudently-obtained SSNs.

The problem of SSN fraud as it applies to terrorist activities can be very different from using the SSN
for illicit gain. Let me focus on the challenge of homeland security, because while the financial crimes
involving SSN misuse are also serious, they are perhaps less deadly and yet better known to Congress.
Both aspects are part of the growing phenomenon of false identity, and both call for protecting the
integrity of the SSN.

Let me say at the outset that the Social Security Administration (SSA) has worked very hard in recent
years and made significant progress in strengthening the defenses of the SSN, implementing important
suggestions our office has made and working with us to find solutions. There is more to be done, and it
includes legislative action.

Our audit and investigative work identifies three distinct approaches to SSN integrity for which
legislation is critically needed. The first area is limiting the use and display of the SSN already in
circulation in the public and private sectors. Second, the present arsenal of criminal, civil, and
administrative penalties is clearly insufficient to deter and/or punish identity thieves. The third approach
is requiring the cross-verification of SSNs through both governmental and private sector systems of
records to identify and address anomalies in SSA's files, and in data bases at various levels of
government and the financial sector. I will discuss these further below.

**The Risk to Homeland Security**

In calendar year 2000 alone, SSA issued approximately 1.2 million SSNs to non-citizens, out of some
5.5 million SSNs issued in all. A recently conducted Office of Inspector General (OIG) study indicates

**No-Match Cert. Admin. Record  243**

that 8 percent (about 96,000) of those 1.2 million SSNs were based on invalid immigration documents, which SSA processes did not detect. We have no way of determining how many SSNs have been improperly assigned to non-citizens.

The issuance of SSNs based on invalid documentation creates a homeland security risk. My office has participated in 24 airport security operations across the country with the Department of Justice (DOJ) and its Joint Terrorism Task Forces and other Federal agencies since the 9/11 terrorist attacks a year ago. The aim is to ensure that no airport employee who has misrepresented his or her SSN and identity has access to secure areas of the Nation's airports. OIG's focus in airport security operations has been SSN misuse and false statements. Hundreds of people have been arrested to date, and more importantly, have been denied access to the secure areas that represent a significant vulnerability to terrorism.

Immediately after the terrorist attack of September 11, 2001, we sought to determine if and how the hijackers might have obtained SSN's. We may never know with absolute certainty how many of the 19 hijackers of September 11th used improperly obtained SSNs, or how they obtained them. The investigation into the events of that day, and related work, revealed the importance of the SSN in any attempt at assimilation into American society. Today, it is unrealistic to believe that the SSN is simply a number for tracking workers' earnings and the payment of social insurance benefits. The SSN has become the *de facto* national identifier. Protecting the integrity of that identifier is as important to our homeland security as any border patrol or airport screening.

Let me give you an example of this threat from a case that is just completing the sentencing phase. The Anti-Terrorist Task Force arrested a naturalized American citizen who had trained with Palestinian guerrilla groups in Lebanon since he was 12 years old. He was carrying a loaded semi-automatic pistol and an assault rifle in the back seat of his car, along with four loaded 30-round magazines for the rifle and hundreds of rounds of additional ammunition. In his home were a calendar with September 11th circled in red, three different Social Security cards in his name, a false Alien Registration Card, evidence of credit card fraud and $20,000 in cash, as well as a wood carved plaque with the name of the terrorist group "Hamas" on it. We determined he had obtained the three different SSNs from SSA by falsifying two of his three SSN applications. He had used them to get jobs as a security guard and as an employee with the multi-billion-dollar Intel Corporation, when a criminal history check would have kept him from getting either job under his true identity.

Failure to protect the integrity of the SSN has enormous financial consequences for the Government, the people, and the business community. We must protect the number that has become our national identifier and the key to social, legal, and financial assimilation in our country.

It is becoming more and more apparent that those connected with terrorism will at some point obtain SSNs. They may buy them, they may create them, or they may obtain them from SSA directly through the use of falsified immigration records. But to operate in the United States, they need those numbers, and we must take those steps necessary to ensure that those numbers do *not* come from SSA.

While SSA alone cannot solve the complicated problem of homeland security, no government agency, system or policy should be ignored. Congress and SSA, as public stewards, must continue their efforts to strengthen the systems and processes that minimize the use of SSNs for illegal purposes. SSN integrity is a link in our homeland security that must be strengthened and sustained.

### Federal Interagency Coordination and Cooperation

You have asked that I comment on Federal interagency coordination and cooperation to verify

**No-Match Cert. Admin. Record 244**

identification documents and to detect and prevent fraud. We recently issued a Management Advisory Report entitled *Social Security Number Integrity: An Important Link in Homeland Security*. This report said it is critical that SSA independently verify the authenticity of the birth records with States, immigration records with Immigration and Naturalization Service (INS), as well as other identification documents presented by an applicant for an SSN.

Additionally, in other reports, we have urged full and expedited implementation of a joint Enumeration at Entry program in which the Agency would issue SSNs to non-citizens upon their entry into the United States, based on information obtained from INS and the Department of State. Until September 11th, SSA had limited success encouraging INS to move quickly on these planned initiatives.

We continue to work with other Federal officials to ensure that we are doing all that we can to assist the DOJ and others to use SSN information in the homeland security context. We are in constant contact with these Federal officials and agencies and with other committees of both houses of Congress to provide expertise and assistance in the analysis of data and the creation of legislation aimed at protecting the SSN and preventing it from being used improperly. We appreciate your interest in these issues, and your support of increasing cooperation, coordination, and information sharing between SSA and the Departments of Justice, State, and Treasury.

**Legislative Proposals to Combat SSN Misuse and Protect Privacy**

Let me take this opportunity to recommend some legislative proposals aimed at combating SSN misuse and protecting privacy. While no legislation can eradicate SSN misuse and identity theft altogether, the criminal penalties that exist today are clearly insufficient to either deter or punish identity thieves. Members of both houses of Congress have introduced legislation over the past several years to deal with the national dilemma presented by SSN misuse and identity theft.

The felony provisions of the Social Security Act have no civil or administrative counterparts. Federal prosecutors cannot pursue every SSN violation criminally, or even civilly. We have found the Civil Monetary Penalty program to be an effective tool in the similar area of program fraud, and could have a useful impact in the area of SSN misuse if Congress would grant us such authority. We have asked before, and I ask again—vest in us the authority to impose penalties against those who misuse SSNs.

We also believe it is time to consider enhancing the penalties for identity theft violations. Congress should also move beyond the penalties for the improper use of another person's identity to address the problem of selling SSNs and other Social Security information. We should strengthen the laws on sales and enhance the sentencing guidelines to allow us to better address this aspect of identity theft today. Congress might consider something on the order of escalating penalties, perhaps parallel to the treatment of drug cases.

**Controlling SSNs in Circulation**

Another area in which legislation is sorely needed is in limiting the use and display of the SSN in the public and private sectors. Although we cannot return the SSN to its simple status of a half-century ago, we must take steps to limit its use and to limit the *expansion* of its use. First and foremost, it is time to make the difficult determinations as to those uses that are appropriate and necessary, and those that are merely convenient.

One easy decision can be made now. The public display of SSNs—on identification cards, motor vehicle records, court documents, and the like—must be curtailed immediately. Those who use the SSN

**No-Match Cert. Admin. Record  245**

must share the responsibility for ensuring its integrity. We can prevent identity thieves and other criminals from walking out of a municipal courthouse with the means of committing state-facilitated identity theft. The cost to the victims of identity theft, and to all of us, is too great. And the potential for using SSNs to support acts of violence and terrorism is unthinkable.

Congress should consider requiring the cross-verification of SSNs through both governmental and private sector systems of records to identify and address anomalies in SSA's files, and in data bases at various levels of government and the financial sector. Only in such a way can we combat and limit the spread of false of identification and SSN misuse. In this way can we correct errors on a timely basis that might otherwise keep workers from receiving full credit for years of labor, credit that can be nullified by simple typographical errors in submitting their data. Similarly, all law enforcement agencies should be provided the same SSN cross-verification capabilities currently granted to employers. The rewards of cross-verification can be great, and it does not require major expenditures of money or the creation of new offices or agencies. It would use data the Federal, State and local governments and the financial sector already have.

I have come before you today not only to report on what has been done so far, but also to ask that Congress instruct us on the path to follow in resolving conflicts of law and policy. We face contradictions among serious and legitimate interests regarding the sharing of information between agencies—and, indeed, often within a single agency—and privacy, and between Federal laws pertaining to immigration and our Nation's economic interests.

In this vein, I would urge Congress to examine whether sufficient authority—and, indeed, requirement—for data-sharing exists in current law. In recent months, SSA has sent about 800,000 letters to employers and some 7 million letters to workers in an attempt to clean up discrepancies created when employers submit employee names and SSNs which do not match information in SSA files. SSA provides the Internal Revenue Service (IRS) with information on the employers with the highest volume of discrepancies, because only the IRS can levy penalties. SSA has no authority to levy penalties when employers submit invalid name and SSN combinations. SSA does not have a similar process in place to share this mismatched data with the INS. As we have learned since September 11 of last year, agencies must be able to share information that can make linkages that will help head off threats and enforce our laws. That authority must be made clear in statute.

We still need legislation that regulates the use of the SSN and provides enforcement tools to punish its misuse. If we are to head off the many crimes identity theft breeds—the fraud against public and private institutions, the ruin of people's security, possibly even the disguising of terrorists as ordinary people—we need legislation with provisions such as:

- Restrictions on the private and governmental use of SSNs. This should include restrictions on the sale of SSNs by governmental agencies, prohibition of the display of SSNs on government checks and driver's licenses or motor vehicle registrations, and some prohibitions of the sale, purchase, or display of the SSN in the private sector.

- Prohibitions of prison inmate access to SSNs.

- Restrictions on unfair or deceptive acts or practices, such as refusals to do business without receipt of an SSN.

- Confidential treatment of credit header information.

**Two Small Changes in Existing Law Would Strengthen SSN Integrity**

**No-Match Cert. Admin. Record 246**

We have recently had several cases in which an individual with a legitimate SSN sells that SSN to a third person. The seller may or may not then go to SSA and request a replacement Social Security card. This furthers the phenomenon of false identity.

The issue is this: how can we charge the individual who sells his SSN? The identity theft statute forbids the use of *another person's* means of identification without lawful authority. Likewise, the Social Security Act prohibits a person from presenting another person's SSN as his or her own. It does not appear to address the situation of a person selling his or her own SSN to a third person.

We are currently researching whether there is a criminal statute such as conspiracy or aiding and abetting that may be applicable. We are also looking at whether such people may be prosecuted for making false statements if they return to SSA and request a replacement card.

Legislative action should resolve this problem. A suggested solution may be to amend section 208 of the Social Security Act, 42 U.S.C. 408, to add a subsection prohibiting the sale of an individual's SSN by that individual. SSA assigns an individual a unique SSN to accurately track the wages and earnings of the individual. SSA regulations state that "Social Security number cards are the property of SSA and must be returned upon request." Such language should also apply to the number itself. The SSN was not meant to be the property of the individual it identifies, and its sale by any person, including the persons identified by the number, should be made illegal.

I would mention one other problem that could be easily remedied with minor changes in the law. Current language in 18 U.S.C. § 1028 primarily addresses fraud in connection with identification documents. It has been a problem to proceed under the statute when we arrest someone with a sheet or printout of, say, 50 to 100 SSNs as these SSNs are not technically on a Social Security card. Therefore, in any amendment or new legislation put forth, I would urge you to address both the Social Security card and SSN.

## SSNs, Immigrants, and the Earnings Suspense File

SSA's Earnings Suspense File (ESF) is an indicator of the problem. The ESF is the Agency's record of annual wage reports submitted by employers for which employee names and SSNs fail to match SSA's records.

Most immigrants—about 75 percent—come to the United States legally, many to join close family members. However, INS estimated the illegal immigrant population reached about 5 million in 1996, not including the 3 million who were given amnesty under the Immigration Reform and Control Act of 1986. INS estimates the number of undocumented (i.e., illegal) immigrants continues to grow by about 275,000 each year.

To acquire an SSN improperly, undocumented immigrants either apply for a "legitimate" SSN using false documents, or they create or purchase a counterfeit Social Security card. Since an undocumented immigrant is not required to show a Social Security card prior to hiring, he or she may simply invent a nine-digit number. These are all criminal acts. This SSN may be one the Agency has already assigned to another individual (stolen SSN) or one never assigned (fake SSN).

SSA acknowledges that illegal immigrants account for a significant portion of items in the ESF. Three industries—agriculture, food and beverage, and services—account for almost half the wage items in the ESF. Agriculture is the largest contributor, representing about 17 percent of all ESF items. In one study of 20 agriculture employers, we determined that 6 of every 10 wage reports submitted by these

**No-Match Cert. Admin. Record  247**

employers had incorrect names or SSNs. From 1996 through 1998, these 20 employers submitted over 150,000 wage items for which the employee's name and/or SSN did not match SSA records, representing almost $250 million in suspended wages over the 3-year period.

A moment ago, I discussed SSA's letters to employers and workers aimed at clearing up discrepancies in the ESF. As I noted, SSA has no legal authority to levy fines and penalties against employers or employees who submit incorrect SSN information on wage reports. As provided by law, SSA must rely on the IRS to enforce penalties for inaccurate wage reporting and upon the INS to enforce immigration laws. IRS has been reluctant to apply penalties, and SSA and the INS have had limited collaboration on the issue.

Applying penalties would have a ripple effect on employers who consistently submit wage reports for employees whose names and SSNs do not match SSA's records. Although SSA is primarily interested in penalizing the most egregious employers, IRS staff expressed concern with the application of even these penalties. IRS senior staff members believe they and SSA would have a difficult time determining whether an employer exercised appropriate diligence in obtaining the necessary information from employees. We believe SSA could provide the IRS with sufficient evidence to show an employer knew or should have known its employees' SSNs were incorrect. Despite the concerns of IRS, the two agencies held discussions to explore the enforcement of an existing penalty provision ($50 per incorrect wage report) for employers who repeatedly submit erroneous name and/or SSN information.

In calendar year 2000, based on this agreement, SSA provided a list of 100 of the most egregious employers to the IRS. These employers submitted the largest number of name/SSN match failures in consecutive years. The IRS expressed interest in the listing but, to date, has not assessed penalties.

SSA's coordination with the INS has been minimal. For example, SSA does not provide the INS a list of employers who repeatedly submit erroneous name and/or SSN information. In a previous audit report, we recommended that SSA:

(1) collaborate with INS to develop a better understanding of the extent that immigration issues contribute to SSN misuse and growth of the ESF, and

(2) re-evaluate its application of existing disclosure laws or seek legislative authority to remove barriers and allow SSA to share with the INS information regarding employers who chronically submitted incorrect wage reports. SSA disagreed with our recommendations and stated that its interpretation of the privacy and disclosure issues is accurately applied and continues to provide appropriate disclosure guidance within existing authority.

The intent of our recommendations was to suggest that the Agency look for avenues under current law and regulations first before seeking legislative authority. We acknowledge SSA's efforts to combat SSN misuse and reduce the ESF's growth. However, given the magnitude of SSN misuse by unauthorized non-citizens, we continue to believe SSA should take preemptive and preventive measures to ensure the SSN's integrity. We continue to believe that the sharing of such information in certain situations would stem the growth of SSN misuse for employment purposes.

## The Fruits of Illegal Labors

SSA allows an individual to present evidence of a work history on a non-work SSN or as an illegal alien, and to receive credit for the work towards Old-Age, Survivors and Disability Insurance (OASDI) benefits. SSA provides these benefits to people based upon their lifetime earnings reported under a valid SSN. The number of quarters of earnings maintained on the ESF determines whether an individual

has enough credits for insured status. SSA creates a work history for all individuals with a valid SSN, even when:

- those earnings are based on a non-work SSN, or

- those earnings are added later for an individual who was in the country illegally at the time of earnings but who subsequently becomes eligible for a valid SSN.

As long as an individual can prove that earnings belong to him or her, SSA will provide earnings credits to that individual. Once these earnings are recorded, these individuals are essentially treated as any other individual applying for OASDI benefits.

One problem is the widespread use of non-work SSNs by people who work in the economy illegally. The earnings from illegal work from these people is recorded directly in the SSA claims systems for their future credit. In our September 1999 report, *Review of Controls Over Non-work Social Security Numbers* (A-08-97-1002), we estimated that unauthorized earnings associated with non-work SSNs may have already cost SSA's trust funds $287 million, and could cost the trust funds as much as $63 million annually. In our report, we recommended that SSA propose legislation to prohibit the crediting of non-work earnings and related quarters of coverage for purposes of benefit entitlement.

In addition, people who are in the country illegally and working under a created SSN, or misusing someone else's SSN, can later rebuild their earnings record from wage items posted to the ESF. In such a case, an individual could work illegally in the United States for 25 years, later request and receive a valid SSN, and then ask SSA to locate those suspended earnings that SSA could not post due to an invalid name/SSN combination. Once found, SSA can reinstate these earnings to this individual's earnings record. The individual claiming the wages would only need to provide corroborating documents, such as relevant wage reports, for the period of claimed earnings. These newly posted earnings can then be used to make the individual eligible for OASDI benefits.

Our reviews of the suspended wages in the ESF suggest that illegal work is the primary cause of suspended wages. These claims represent a future obligation to the SSA that is growing at a rapid rate. Under current SSA procedures, workers who are subsequently issued a legal residency card under an amnesty or other INS procedures can subsequently recover most of these wage claims.

In addition, we do not have a good number for illegal aliens receiving work credits. We routinely identify some of them through our audits and investigations, but these are not all-encompassing. For example, in a recent report, we projected that almost 100,000 non-citizens obtained SSNs in calendar year 2000 with false documents. Approximately 42 percent of those had earnings posted to their accounts, thereby receiving work credits. Nonetheless, this figure does not take into account any future wages these 100,000 may earn. Furthermore, the 100,000 figure does not include illegal aliens using other people's SSNs for work purposes and whose earnings either end up in the ESF or incorrectly posted to the legitimate number-holders' accounts.

SSA has recently changed its policies governing the issuance of non-work SSNs so that it is likely that fewer than 30,000 non-work SSNs will be issued in 2002. However, many non-work SSNs remain in circulation. Prior to the recent curtailment, SSA had issued roughly 7.3 million non-work SSNs since 1974.

Viewed another way, although such aliens may be residing and working illegally in our country, they are doing work for pay, they are paying taxes, and they are accumulating earnings records with SSA in the same manner as legal workers. SSA's policy of allowing such workers who subsequently obtain

**No-Match Cert. Admin. Record  249**

*bona fide* SSNs to recreate their files so as to capture the fruits of their labors are drawn from the agency's mission, history, and understanding of the Social Security Act, rather than from a lack of concern for immigration law.

Here, once again, I submit that we are in need of this body's guidance to resolve a dilemma of legitimate interests. We find ourselves stuck in a quagmire of contradictory interests that has resulted in the absense of clear, controlling laws and regulations, or in the ignoring of those laws and regulations that do exist.

## Conclusion

We believe SSA has a clear and important role in homeland security. We appreciate your interest in these issues, and your support of increasing cooperation, coordination, and information sharing between SSA and the Departments of Justice, State, and Treasury. We believe our earlier recommendations and legislative proposals should be considered in any future discussion on homeland security. It is also important that we be able to reduce the growth of the ESF, and I commend SSA for the efforts it has made. More needs to be done, even though the ESF problem is more a symptom of the undermining of SSN integrity rather than a cause of it. Finally, we need to change the current laws which allow illegal work to be used in obtaining Federal benefits. Ours is a Nation of laws, and those laws originate here. I ask for your help in clarifying and strengthening the laws, and toughening the penalties that are designed to improve the integrity of the SSN, which is a key component of homeland security .

Thank you.

**No-Match Cert. Admin. Record  250**

# *CONGRESSIONAL RESPONSE REPORT*

## Use and Misuse of the Social Security Number

### A-03-03-24048



## August 2003

## Mission

We improve SSA programs and operations and protect them against fraud, waste, and abuse by conducting independent and objective audits, evaluations, and investigations. We provide timely, useful, and reliable information and advice to Administration officials, the Congress, and the public.

## Authority

The Inspector General Act created independent audit and investigative units, called the Office of Inspector General (OIG). The mission of the OIG, as spelled out in the Act, is to:

○ Conduct and supervise independent and objective audits and investigations relating to agency programs and operations.
○ Promote economy, effectiveness, and efficiency within the agency.
○ Prevent and detect fraud, waste, and abuse in agency programs and operations.
○ Review and make recommendations regarding existing and proposed legislation and regulations relating to agency programs and operations.
○ Keep the agency head and the Congress fully and currently informed of problems in agency programs and operations.

To ensure objectivity, the IG Act empowers the IG with:

○ Independence to determine what reviews to perform.
○ Access to all information necessary for the reviews.
○ Authority to publish findings and recommendations based on the reviews.

## Vision

By conducting independent and objective audits, investigations, and evaluations, we are agents of positive change striving for continuous improvement in the Social Security Administration's programs, operations, and management and in our own office.

# *Background*

In response to a July 21, 2003 request from the Chairman of the Subcommittee on Social Security, and following a July 10th *Hearing on Use and Misuse of Social Security Numbers,* we are providing the enclosed report which contains information related to:

- enumeration,[1]
- electronic verification of Social Security numbers (SSN),
- enhancement of civil and criminal remedies,
- provisions for statutory authority to share information with law enforcement partners, and
- funding resources for activities related to combating identity theft or SSN misuse.

## TESTIMONY ON USE AND MISUSE OF THE SSN

On July 10, 2003, the Inspector General (IG) of the Social Security Administration (SSA) testified before the House Ways and Means Committee, Subcommittee on Social Security. In that testimony, the IG noted that the Nation needs to protect the SSN at three stages: upon issuance, during the life of the numberholder, and following the numberholder's death. The IG stated:

- At Stage One, the Office of the Inspector General (OIG) is working closely with the Subcommittee and SSA to strengthen controls over the enumeration process, ensure the integrity of identification documents, and make it as difficult as possible to fraudulently obtain an SSN from the Government.

- At Stage Two, where the OIG has focused most of its efforts, the Office has made the most progress. In the last several years, we have conducted numerous audits and made sweeping recommendations to SSA to improve the SSN misuse problem in the earnings reporting process, and most importantly, to improve controls over SSN misuse as it pertains specifically to Homeland Security.

- Stage Three, following the death of the numberholder, is an area in which the OIG is working hard to ensure that, through timely reporting, appropriate cross-matching, and better controls, the SSNs of deceased individuals are not recycled for inappropriate purposes.

---

[1] Enumeration is the process of assigning and issuing SSNs to individuals.

# *Results of Review*

The Chairman of the Social Security Subcommittee requested we respond to 13 questions. We have provided the responses in the section below.

**Question #1:** *Under current law, the Social Security Administration (SSA) requires proof of identity, age, and U.S. citizenship or immigration status to obtain a Social Security number (SSN) or file for benefits. However, SSA does not require photo identification to obtain an SSN or file for benefits, correct? Would you say this is a vulnerability in the application process that should be fixed?*

**Answer to Question #1:** You are correct, SSA does not require photo identification to obtain an SSN or file for benefits. Although we recognize the value of photo identification, we are unaware of any evidence to support the premise that photo identification has a higher probative value than other forms of identification. Individuals who present fraudulent identity documents can easily obtain fraudulent photo identification documents as well. Absent baseline photo identification with biometric attributes, it is difficult to ensure photo identification will provide greater assurance that individuals are who they say they are. In addition, there are segments of the population who legitimately do not have photo identification. For example, young children and individuals who do not drive may have no need for photo identification. Also, individuals who are victims of theft or catastrophic events (for example, fires and floods) may not have photo identification documents and need their SSN to obtain new ones.

SSA is conducting a pilot study to determine whether the Agency should change the requirements for identity documentation related to SSN assignment. For example, SSA will examine the efficacy of requiring two identity documents when an individual does not have photo identification. Preliminary results indicate that over 70 percent of applicants present photo identification documents. SSA is also conducting a pilot study wherein it will request photo identification from individuals filing for Title II and XVI disability benefits. In addition, SSA will require that individuals allow the Agency to take their photographs and make these photographs a part of their disability claims folder. SSA is conducting this pilot to determine whether photo identification will strengthen the integrity of the disability claims process by helping ensure the individual filing an application is the same individual examined by the consultative examination physician. This pilot is scheduled to run through November 2003. SSA will evaluate the results of the pilot and expand or modify its procedures accordingly.

**Question #2:** *In your testimony, you say that SSA should limit the number of replacement SSN cards that are issued to an individual. How should replacement cards be limited in your review?*

---

**No-Match Cert. Admin. Record  254**

**Answer to Question #2:**  In our September 2001 report, *Replacement Social Security Number Cards: Opportunities to Reduce the Risk of Improper Attainment and Misuse* (A-08-00-10061), we stated we believed the potential for individuals to improperly obtain and misuse replacement SSN cards was significant based on our work at SSA field offices and analysis of national data.  Accordingly, we recommended that SSA develop regulations and incorporate appropriate system controls to limit the number of replacement SSN cards.  To address extraordinary circumstances that warrant exceptions (for example, the homeless population), we recommended that SSA require management approval.

SSA has drafted regulations limiting the number of replacement SSN cards issued to individuals to 2 per year, with a lifetime limit of 10.  We support this legislative proposal.

**Question #3:**  *In your testimony, you say that SSA should require better cross-verification of records in the enumeration at birth process.  Vulnerabilities in this method of SSN issuance are particularly important, because over two-thirds of new SSNs are issued this way.  Could you elaborate on the vulnerabilities your office has found with the enumeration at birth process?  What action, if any, has SSA taken to address this vulnerability?  How would you suggest this issue be addressed?*

**Answer to Question #3:**  In our September 2001 report, *Audit of Enumeration at Birth Program* (A-08-00-10047), we found that birth registration data provided to SSA by the test hospitals and State Bureaus of Vital Statistics (BVS) were generally accurate and reliable.  However, we identified weaknesses in controls and operations that we believed SSA needed to address to reduce the enumeration at birth (EAB) program's vulnerability to potential error and misuse and to enhance program efficiency.  Accordingly, we recommended that SSA re-invest some of the savings realized by the EAB program and provide necessary funding, during future contract negotiations, for the BVSs to perform periodic, independent reconciliations of registered births with statistics obtained from hospitals' labor and delivery units and periodically verify the legitimacy of sample birth records obtained from hospitals.  In addition, we recommended that SSA enhance its duplicate record detection and prior SSN detection routines to provide greater protection against the assignment of multiple SSNs.  We plan to start a follow-up review of the EAB program in Fiscal Year (FY) 2004 which, once completed, we can share with you and your staff.

According to SSA's EAB Project Director, contracts renegotiated in December 2002, which became effective on January 1, 2003, did not include language that required that States reconcile registered births with statistics from hospital labor and delivery units.  SSA has had several discussions with the National Association of Public Health Statistics and Information Systems (NAPHSIS) regarding the most cost-effective method of reconciling births with statistics from hospitals and verifying the legitimacy of sample birth records.  SSA and NAPHSIS have been unable to agree on a viable method of addressing this issue, primarily because of financial considerations.  Regarding our recommendation on duplicate record detection, SSA has looked at the detection routines and practices to determine whether there are feasible software

modifications to the Automated Enumeration Screening Process that would provide greater protection.  However, SSA has made no decisions to implement changes at this time.

**Question #4:**  *Several witnesses testified about use of the SSNs of young children to commit identity theft.  Please provide any statistical information you can obtain regarding the extent to which this occurs and is prosecuted.  Is it usually a family member who commits identity theft using a child's SSN, or an unrelated person?  Would it be advisable to stop issuing SSNs to children prior to when they start working?*

**Answer to Question #4:**  We queried our systems to obtain statistical information pertaining to the use of children's SSNs, specifically, to determine the extent to which these SSNs are used in identity thefts and later prosecuted.  We also attempted to determine whether it is usually a family member who commits identity theft using a child's SSN, or an unrelated person.  Unfortunately, the information requested cannot be retrieved electronically.

Regarding the matter of not issuing an SSN until an individual starts working, it would be inadvisable, as well as impractical, to cease the practice of issuing SSNs to children at birth.  For example, the Internal Revenue Service (IRS) requires that parents provide an SSN when claiming children as dependents.  Furthermore, children need an SSN to obtain benefits, such as in cases where a parent dies, and when a child becomes disabled.

**Question #5:** *The witness for the Identity Theft Resource Center recommended creation of a Death Master File that contains every death, as well as a file with minors' names, dates of birth and SSN, to be given to credit agencies to help prevent identity theft based on those SSNs.  He also recommended restricting the publication of SSNs (including those of deceased individuals) on websites.  What are your thoughts on these issues?*

**Answer to Question #5:**  Protection of the integrity of the SSN is one of our most important missions.  As I stated in my testimony before this Subcommittee, "Perhaps the most important step we can take in preventing SSN misuse is to limit the SSN's easy availability."

In both our audit work and criminal investigations, we have seen the use of a deceased individual's SSN for fraudulent purposes.  As I also said in my testimony, "…we are working hard to ensure that, through timely reporting, appropriate cross-matching, and better controls, the SSNs of deceased individuals are not recycled for inappropriate purposes."  Therefore, we support any protection of the SSN, including the restriction of its publication on websites where the general public would have access.

Regarding the proposal for the creation of a Death Master File that would contain every death, as well as the creation of a file with minors' names, dates of birth and SSNs, we are proponents of the ability to cross-verify an individual's SSN.  This is an important

tool in the fight against SSN misuse.  We have submitted legislative proposals to allow the OIG to verify SSNs for law enforcement, currently being performed through a Memorandum of Understanding with SSA, and to provide SSA information to law enforcement in a life-threatening situation.  We do have concerns about the creation of a file with minors' names, dates of birth and SSNs.  The potential misuse of such a central file without adequate privacy controls could far outweigh its usefulness.  Such a file should be created only with rigid safeguards, with consequences for those who improperly release or use its information.  We urge that the creation of such a file be done carefully and with due diligence to protecting the rights of the minors.

While providing this information to credit agencies should help prevent identity theft, we believe law enforcement should also have access to the databases.  As I stated above, cross-verification of an SSN is an important tool in the fight against SSN misuse.  These databases would provide a wealth of vital information to law enforcement in their daily fight against crime.

**Question #6:**  *Knowing that we cannot eliminate the use of the SSN, your staff has worked tirelessly to protect SSNs upon issuance, during the life of the numberholder, and even after the numberholder's death.  Central to that process, you emphasized in your testimony that Congress should consider requiring cross-verification of SSNs throughout both governmental databases (including the SSA's) and the financial sector. Are you talking about a new database, or are you suggesting that existing verification processes be used to better advantage?  How would this limit the spread of false identification and SSN misuse?*

**Answer to Question #6:**  We are not suggesting a new database of SSNs, but rather better use of existing verification processes.  We believe matching the names and SSNs in SSA's records to those of Federal and State agencies, employers, and legitimate private sector entities is one way to ensure the integrity of the SSN as well as the reliability of information in all databases.  SSA's verification programs, such as the Employee Verification Service (EVS) for employers, are a key part of this process.  In fact, SSA plans to place its employer verification system on-line to increase employer participation.  This program, called the Social Security Number Verification Service (SSNVS), is being piloted.  SSA is also piloting an SSN verification program for private companies since, as we noted in our testimony, the Patriot Act requires that the Department of the Treasury develop a system for domestic financial institutions to verify the identities of foreign nationals seeking to open accounts with information held by Federal agencies.

SSA has other completed and ongoing pilots that offer examples of better data sharing between the Agency and private sector.  For example, we recently reported on the SSN Feedback Pilot, an experiment between SSA and the Office of Child Support Enforcement to verify employee data through the W-4 reporting process.  In an April 2003 Congressional Response Report: *Review of the Social Security Number Feedback Pilot Project* (A-03-03-13017), we noted that the final evaluation of the pilot stated that the SSN Pilot feedback to employers improved the timeliness of employer corrections

---

**No-Match Cert. Admin. Record  257**

as well as the accuracy of information used by both the Government and private sector. The report estimates employers were notified of name and SSN mismatches 12 to 18 months earlier than under the regular wage reporting process at SSA. In addition, the report noted that the SSN Pilot increased the annual wage reporting accuracy of the SSN Pilot employers by approximately 10 percent. SSA also has an ongoing pilot with the Bureau of Citizenship and Immigration Services assisting employers with both SSN verification and immigration status.

SSA also allows other Federal and State entities, such as State motor vehicle agencies, the Department of Education, State Temporary Assistance for Needy Families agencies, the Department of Veterans Affairs, prisons, and State unemployment agencies to match their data against SSA's SSN information. It is the responsibility of these non-SSA parties to make the necessary corrections to their own records to ensure the integrity of their data.

Even with these projects underway, more can be done. Our September 2002 report on EVS for registered users, *The Social Security Administration's Employee Verification Service for Registered Employers* (A-03-02-22008), noted that only 392 of approximately 6.5 million employers in the United States used SSA's EVS in the last 3 years. We also noted that SSA did not disclose pertinent information that could have assisted users. Specifically, SSA did not inform employers when a submitted SSN belonged to a deceased individual or when the SSN was issued to the individual for nonwork purposes. SSA has stated it intends to modify both EVS and SSNVS to disclose the pertinent information to employers.

We believe this cross-verification improves the integrity of SSN data, reduces improper payments, and detects and deters SSN misuse before it can become more widespread. Greater reliance on data matching should also lead to fewer opportunities for identity theft.

**Question #7:** *How is SSA doing in ensuring the accuracy of its databases? Are they making this a system priority? Have they incorporated information from the Death Master File into all SSN verification processes? If not, when will this be done?*

**Answer to Question #7:** We have previously issued several audit reports related to the accuracy of the Death Master File (DMF)—which contains approximately 69 million records—and noted it relies on two types of recordkeeping. First, the DMF does not contain every deceased SSN holder and therefore the absence of a particular person in the DMF is not necessarily proof the person is alive, as we discussed in our July 2000 audit report, *Improving the Usefulness of Social Security Administration's Death Master File* (A-09-98-61011). Second, the DMF contains the SSNs of individuals who are not actually deceased, as we discussed in our June 2001 audit report, *Old-Age, Survivors and Disability Insurance Benefits Paid to Deceased Auxiliary Beneficiaries* (A-01-00-20043). Furthermore, an academic research study, *Social Security Bulletin, The Social Security Administration's Death Master File: The Completeness of Death Reporting at Older Ages*, Vol. 64, No. 1, 2001/2002, concluded that the File's

---

completeness varies significantly based on the age of the decedents.  The results were that death reporting for individuals age 65 or older was over 95 percent complete.  However, the DMF contained only 42 percent of deaths for deceased individuals under age 25 and 74 percent for those ages 25 to 54.

In September 1999, SSA contracted with NAPHSIS to develop standards and guidelines for a Nation-wide Electronic Death Registration (EDR) system, including the on-line verification of SSNs.  This system would enable SSA to receive death reports within 5 days of death and 24 hours of receipt in the State BVSs.  This system would automate the death registration process and enable SSA to receive more timely and accurate death reports, resulting in significant program and workyear savings.  In addition, EDR provides the infrastructure for other Federal and State agencies that rely on such information to detect and prevent erroneous payments to deceased individuals.

However, SSA needs to implement a number of systems modifications to realize the benefits of EDR.  Furthermore, SSA needs to encourage State BVS agencies to establish EDR systems.  SSA agreed to obtain systems support for EDR and stated that implementation is scheduled for September 2003.  At that time, SSA expects to be able to process records from State BVS agencies that implement EDR systems.  However, full implementation with 90 percent of the States participating will not occur until 2005 or later.  Consequently, SSA also agreed to continue to work with NAPHSIS to develop and implement EDR and stated it had awarded contracts in September 2002 to New York City, South Dakota, Montana, and Minnesota.

Finally, a review of SSN verification programs indicates that not all of these programs have been updated to include information from the DMF.  As noted in our response to Question #6 above, SSA had not incorporated the DMF into EVS for registered employers, though the Agency has plans to do so.  Furthermore, not all of the State motor vehicle agencies that verify their data against SSA are receiving information on SSNs that belong to deceased individuals.  We believe that providing entities with this information during the verification process assists both SSA and the verifying entity with data integrity.  If the individual being verified is deceased, a new document will not be issued under that SSN.  However, if the individual being verified is incorrectly shown as deceased on Agency records, the alert to the verifying entity should cause the individual to contact SSA so the information can be corrected.

**Question #8, Part I:** *You mentioned in your testimony that we need enhanced penalties for SSA employees who assist criminals in obtaining SSNs.  Could you describe cases you have worked on?*

**Answer to Question #8, Part I:**  Typically, SSA employees who assist individuals in illegally obtaining SSNs will enter into the SSA system to issue an SSN that has not been previously assigned to an individual.  For a fee, the SSA employee provides the SSN to a third party (or middleman) who then resells the SSN.  This provides the ultimate recipient of the SSN with a unique SSN not associated with another person or the recipient.

---

**No-Match Cert. Admin. Record  259**

**Question #8, Part II:** *What penalties applied under current law?*

**Answer to Question #8, Part II:** Depending on the individual facts as well as the decision of the prosecuting Assistant United States Attorney (AUSA), examples of potential penalties include, but are not limited to, a violation of

1. section 208 of the Social Security Act, 42 U.S.C. § 408, which carries a penalty of up to 5 years in prison and/or a fine under title 18 of the United States Code;

2. 18 U.S.C. § 371, which carries a penalty of up to 5 years in prison and/or a fine under title 18 of the United States Code; or

3. 18 U.S.C. § 201, which carries a penalty of up to 15 years and/or a fine under title 18 of the United States Code or not more than three times the monetary equivalent of the thing of value.

**Question #8, Part III:** *What additional penalties are needed?*

**Answer to Question #8, Part III:** Under the current statutes cited above, there is no minimum sentence. As a result, under the current sentencing guidelines, SSA employees convicted of selling hundreds of SSNs are receiving only months in jail or no jail time at all, only probation. Three examples include the following.

1. A former Service Representative sentenced to 3 years' probation and community service after pleading guilty to a bribery charge in connection with issuing 100 to 200 Social Security cards to illegal aliens. The Service Representative received between $50 and $150 for each card.

2. A former Service Representative was convicted of selling approximately 300 SSNs to illegal aliens over a 4-year period, receiving $400 for each number/card. The Service Representative received 3 years' probation and was fined $2,000.

3. A former Service Representative admitted to processing "hundreds" of fraudulent SSN cards, receiving $100 to $200 for each card. The Service Representative was sentenced to 4 months in jail and 3 years' probation.

The additional penalties we seek will structure the penalties based on the severity of the SSA employee's actions, providing for a minimum sentence. SSA employees issuing SSNs are in a position of trust. When this trust is violated, the effect on SSA's programs and operations and on the public in general can be devastating. Fortunately, the number of SSA employees taking part in these crimes is small. However, these crimes strike at SSA's core mission. Participation in such crimes cannot be tolerated.

**No-Match Cert. Admin. Record  260**

The proposed penalty structure is as follows:

1. imprisonment not less than 1 year and up to 5 years and a fine under title 18 of the United State Code for the fraudulent sale or transfer of not more than 50 Social Security account numbers and/or Social Security account number cards;

2. imprisonment not less than 5 years and up to 10 years and a fine under title 18 of the United State Code for the sale or transfer of more than 50, but not more than 100 Social Security account numbers and/or Social Security account number cards; or

3. imprisonment not less than 10 years and up to 20 years and a fine under title 18 of the United State Code for the sale or transfer of more than 100 Social Security account numbers and/or Social Security account number cards.

**Question #9, Part I:**  *You mentioned in your testimony that we need civil monetary penalties for SSN misuse, since criminal prosecution is not always available for SSN misuse and other Social Security-related crimes.  In what cases is criminal prosecution not pursued?*

**Answer to Question #9, Part I:**  Because of the volume of cases in some Districts, the U.S. Attorney's office has instituted a minimum loss requirement to pursue a case either criminally or civilly.  Depending on the office, this requirement could be from $10,000 to $100,000 or higher for fraud cases.  Under section 1129 of the Social Security Act, 42 U.S.C. § 1320a-8, the U.S. Attorney must prosecute or decline the case criminally and decline the case civilly before we may proceed.

As an example, if the minimum loss requirement is $50,000 in the U.S. Attorney's office and the Social Security-related loss is $30,000, without some other compelling reason to prosecute the case, for example the accused is a public official, the U.S. Attorney's office will usually decline to prosecute the case criminally and civilly.  In addition, if the potential defendant is sympathetic in some regard, an AUSA may decline to prosecute them criminally.

In addition, the civil monetary penalties we are seeking would expand the scope of section 1129.  Currently, the section applies only to false statements or misrepresentations of a material fact in relation to an individual's right to receive benefits or the amount of benefits under the Social Security Act.  Our legislative proposals would provide us with the tools to pursue civil monetary penalties for the misuse of the SSN in cases where Social Security benefits were not involved, thus providing more support for U.S. Attorneys.  This is an important step if we are serious about protecting the integrity of the SSN.

**Question #9, Part II:**  *Why is it sometimes a better course of action to obtain punishment through civil monetary penalties?*

---

**Answer to Question #9, Part II:**  Civil monetary penalties may be imposed against an individual who improperly receives Social Security benefits without subjecting the individual to potential prison time for a criminal conviction or the stigma of a criminal conviction.  Particularly if the individual does not have a criminal record, this can be a viable alternative to a criminal prosecution.  This resolution will reverberate throughout the community and could make someone who was contemplating doing the same thing think twice.  Ability to impose a civil monetary penalty shows that, while the individual may not be criminally prosecuted, they will be responsible for their fraudulent actions.

**Question #10, Part I:**  *You mentioned in your testimony that current law providing criminal penalties designed for crimes involving SSNs or SSN cards is not enough, because it does not provide for punishment for SSN misuse itself.  During the General Accounting Office's testimony, they showed us examples of how agents used fraudulent documents to obtain SSNs and how they used fraudulent SSN cards and other documents to obtain driver's licenses.  How would these crimes be punishable under current law?*

**Answer to Question #10, Part I:**  The ultimate decision on which statute to proceed under rests with the applicable U.S. Attorney.  Under the factual situation as you have described, the perpetrator of the fraud could potentially be prosecuted under sections 208(a)(6) and (a)(7)(A) of the Social Security Act, 42 U.S.C. § 408(a)(6) and (a)(7)(A).  It is a violation of section 208(a)(6) of the Social Security Act, 42 U.S.C. § 408(a)(6), for an individual to furnish false information to set up their account with SSA, including receipt of an SSN.

It is a violation of section 208(a)(7)(A) of the Social Security Act, 42 U.S.C. § 408(a)(7)(A) to "willfully, knowingly, and with intent to deceive," use an SSN acquired by providing false information to SSA.

Violators of either section may be fined under title 18, U.S.C., and/or imprisoned for not more than 5 years.

In addition, if an SSA employee takes part in the crime, by fraudulently providing an SSN to the individual, knowing the information was false, the SSA employee may be guilty of aiding and abetting, punishable as if a principal.  The SSA employee may also potentially be charged under 18 U.S.C. § 371, the *Conspiracy to Commit Offense or to Defraud United States.*  Finally, if money or something of value changed hands, both the SSA employee providing the SSN and the individual receiving the SSN may be guilty of violating 18 U.S.C. § 201, *Bribery of Public Officials and Witnesses.*

**Question #10, Part II:**  *How would the changes you propose make it possible, or at least easier, to punish these crimes?*

**Answer to Question #10, Part II:**  As stated in my testimony, the changes "must provide meaningful criminal penalties in the Social Security Act, must provide enhanced penalties for those few SSA employees who betray the public trust and assist criminals

in obtaining SSNs, and must provide an administrative safety net in the form of Civil Monetary Penalties to allow some form of relief when criminal prosecution is not available for SSN misuse and other Social Security-related crimes."

As discussed in more detail in Questions 8, 9 and 12, we have submitted several proposals in this area.  One proposal would enhance criminal penalties for SSA employees who assist criminals in obtaining SSNs.  This proposal is designed to provide mandatory minimum sentences for SSA employees based on the number of SSNs and/or Social Security cards they have provided to criminals.

In addition, we have submitted a proposal to enhance the penalties for violations of section 208 of the Social Security Act, 42 U.S.C. § 408 involving an SSN and/or Social Security card for repeat offenders and those who used the SSN and/or Social Security card for terrorism, a crime of violence, or trafficking in drugs.

The third proposal would expand the current authority under section 1129 of the Social Security Act, 42 U.S.C. § 1320a-8 to include the criminal provisions of section 208 of the Social Security Act, 42 U.S.C. § 408, as well as the legislative proposals regarding SSA employees, an individual selling their own SSN for fraudulent purposes, and assisting another person to improperly obtain a second SSN or a number that purports to be an SSN.  This proposal provides an administrative safety net, allowing us to pursue the violators administratively when criminal and civil prosecution may not be available through a U.S. Attorney's office.

**Question #10, Part III:**  *Could you give examples of cases to clarify how current law fails to adequately punish SSN misuse?*

**Answer to Question #10, Part III:**  One area is where an individual sells his or her own SSN for fraudulent purposes.  We believe the individual could potentially be prosecuted for aiding and abetting a crime or under 18 U.S.C. § 371, *Conspiracy to Commit Offense or to Defraud United States*.  However, there have been several cases where the U.S. Attorney was reluctant to pursue the criminal prosecution of an individual for selling his or her own SSN.

**Question #11, Part I:**  *Witnesses at the hearing testified about how identity thieves may repeatedly use a victim's information to open bank accounts, get credit, or commit crimes.  Current law does not provide for more severe penalties for repeat SSN misuse offenders, correct?*

**Answer to Question #11, Part I:**  Section 208 of the Social Security Act, 42 U.S.C. § 408 provides for a penalty of up to 5 years for a violation of the section.  It does not provide enhanced penalties for repeat offenders or those who use SSNs in connection with drug trafficking, a crime of violence, or terrorism.
18 U.S.C. § 1028(a)(7) provides for a penalty for knowingly transferring or using, without lawful authority, the means of identification of another person.  The penalty for violating this statute is not more than 15 years' imprisonment and/or a fine if the means of

---

identification was used to obtain item(s) of value totaling over $1,000 during any 1-year period. If the offense is committed after a prior conviction under this statute has become final, the penalty is up to 20 years' imprisonment and/or a fine.

**Question #11, Part II:** *What enhanced penalty structure would you suggest for repeat offenders, or for those who use SSNs in connection with drug trafficking, a crime of violence, or terrorism?*

**Answer to Question #11, Part II:** We would suggest the following enhanced penalty structure for violations of section 208 of the Social Security Act, 42 U.S.C. § 408.

1. If the SSN is used to facilitate an act of international and/or domestic terrorism, up to 25 years.

2. If the SSN is used to facilitate drug trafficking or in connection with a violent crime, up to 20 years.

3. After a prior offense under this section, up to 10 years.

4. Leave the rest of the violations at the current punishment, up to 5 years.

**Question #11, Part III:** *Is there precedent in current law for such enhanced penalties?*

**Answer to Question #11, Part III:** Yes. 18 U.S.C. § 1028, *Fraud and Related Activity in Connection With Identification Documents and Information*, provides for enhanced penalties for a conviction involving a prior offense, terrorism, a crime of violence or to facilitate drug trafficking. The initial punishment for a violation under § 1028 is a fine under this title and either imprisonment for not more than either 3 years or 15 years, depending upon the facts. Under 18 U.S.C. § 1028(b)(3) and (4) state:

   (3) a fine under this title or imprisonment for not more than 20 years, or both, if the offense is committed—

      (A) to facilitate a drug trafficking crime (as defined in section 929(a)(2));

      (B) in connection with a crime of violence (as defined in section 924(c)(3)); or

      (C) after a prior conviction under this section becomes final.

   (4) a fine under this title or imprisonment for not more than 25 years, or both, if the offense is committed to facilitate an act of international terrorism (as defined in section 2331(1) of this title);

18 U.S.C. § 1030, *Fraud and Related Activity in Connection With Computers*, provides enhanced penalties for a subsequent conviction. Specifically, 18 U.S.C. § 1030(3)(A) and (B) state:

      (c) The punishment for an offense under subsection (a) or (b) of this section is—

**No-Match Cert. Admin. Record  264**

(3) (A) a fine under this title or imprisonment for not more than five years, or both, in the case of an offense under subsection (a)(4) or (a)(7) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph; and

(B) a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(4), (a)(5)(A)(iii), or (a)(7) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this section;

**Question #11, Part IV:** *What do you think of the Identity Theft Resource Center's suggestion to provide enhanced penalties for stealing a child's identity?*

**Answer to Question #11, Part IV:** We support enhanced penalties for those who perpetrate identity theft. We have submitted a legislative proposal to enhance penalties for SSA employees who assist criminals in obtaining SSNs (see Question #8 above) as well as a legislative proposal to enhance the penalty structure for violations under section 208 of the Social Security Act, 42 U.S.C. § 408. (See Question #10 above.)

We agree those less able to protect themselves should be provided additional protections. The proposal by the Identity Theft Resource Center for an enhanced penalty for anyone who commits child identity theft has merit. We would offer to work with the Subcommittee as to what the enhanced penalty should be.

**Question #12, part I:** *In your testimony you mentioned that the Commissioner has ad hoc authority to permit sharing of SSA information with law enforcement and requested that the SSA IG be given statutory authority to share SSA information with law enforcement partners when disclosure is necessary to protect lives, without prior authorization from the Commissioner. Please elaborate on the circumstances under which the SSA IG would release information according to this proposal?*

**Answer to Question #12, part I:** 20 C.F.R. § 401.195 provides that the Commissioner of SSA, or his or her designee, may disclose information if not prohibited by Federal law. The example provided in the regulation is the disclosure of information necessary to respond in a life-threatening situation. This designation is on an ad hoc basis.

Shortly after September 11, 2001, the then acting Commissioner of Social Security, pursuant to this regulation, designated me to provide such information to law enforcement in terrorist investigations. In addition, during the Washington area sniper investigation, when law enforcement officers requested help from our Special Agents, this regulation provided us with the authority to respond.

Our legislative proposal codifies this authority in the OIG within a limited scope. It would apply only to the disclosure of SSA information to respond to a life-threatening situation. As with the current designation, the ultimate responsibility as to when to disclose rests with the IG.

The proposal also requires that the IG advise, within a reasonable time, the Commissioner of SSA or his or her designee each time disclosure is made pursuant to this legislation. In addition, an annual report must be filed with the Committee on Ways and Means of the House of Representatives and the Senate Finance Committee setting forth each disclosure made during the previous FY.

During an investigation involving a life-threatening situation, time is of the essence. The time lost securing the needed authorization can mean the difference between success or failure in locating the subject and/or victim. This delay can be lengthened if the information is needed after hours or during a weekend.

This legislative proposal will save precious time when a life can be in the balance. Our proposal will allow us to assist Federal, State and local law enforcement officers in a timelier manner. We believe we have shown we are responsible in our disclosure policy and would not abuse this authority.

**Question #12, Part II:** *Do other Inspectors General have authority similar to what you are requesting?*

**Answer to Question #12, Part II:** We are not aware of any other IG with similar authority. We would point out that we are aware of no other IG with access to databases with as much information as the SSA databases, except for perhaps databases at the IRS.

**Question #12, Part III:** *Please cite examples of how having this authority would have helped.*

**Answer to Question #12, Part III:** There have been two instances of missing children in which the OIG was contacted by law enforcement to provide information. In the first instance, a local police department advised OIG of the murder of a child for the insurance benefits. The police department went on to advise that the suspect had taken out an insurance policy on another child and expressed its concern that the suspect, whose whereabouts were unknown, intended to murder the second child. The police department requested the SSN for the child to contact the National Insurance Bureau and locate the suspect via the address on the policy.

In the second instance, a child was reported missing in an area near a Social Security office. Law enforcement officers requested assistance in identifying individuals who may have been at the Social Security office.

**Question #13:** *What level of administrative funding does the SSA Inspector General receive for activities related to combating identity theft or SSN misuse? What types of activities are supported by this funding? Is this level of funding sufficient?*

**Answer to Question #13:** The OIG does not receive funding designated to be expended for specific initiatives. However, we can estimate the level of expenditures incurred by initiative. During FY 2002, approximately $10 million or 13 percent of our appropriation was dedicated to combating SSN misuse. For FY 2003, we expect to expend the same percentage of our appropriation in this effort.

The OIG conducts a number of activities related to combating identity theft and/or SSN misuse, including examining in detail the operations of SSA's enumeration business process, and applies the lessons learned from investigative casework in analyzing threats and vulnerabilities. These audit reports address various issues, including how SSA manages the enumeration business process and ensures SSA takes appropriate steps to address vulnerabilities. The OIG also produces reports from its analysis of the Annual Wage Reporting business process. Since the SSN is used as the identifier in this process, and millions in incoming wages cannot be matched to the name and/or SSN on SSA's records, key Homeland Security issues are brought forth by this process.

The OIG's investigative efforts related to SSN misuse focuses primarily on identifying those who attempt to obtain or use false or fraudulent SSNs. Determining the intent for which the number is sought is the predominant factor as to whether the investigation is considered part of our Homeland Security program. Investigations generally falling into this category include operations worked in conjunction with, or under the direction of, Offices of the United States Attorney's Joint Terrorism Task Forces at airports, power plants, and other critical infrastructures as well as activities with Foreign Terrorist Tracking Task Forces. It also includes cases involving the misuse of SSNs by (1) legal or illegal aliens whose motives for being in the United States are suspect; (2) extremist groups in this country who are intent on disrupting Federal activities; or (3) U.S. citizens who are sympathetic to foreign causes and attempt to gain or produce identity documents bearing SSNs to conceal the true identity of others.

The OIG also performs legal and legislative work to use and strengthen the legal tools available for defense of the SSN. This will continue to include a proactive role in advocating measures to enhance SSN integrity.

We also perform outreach work to support our advocacy to increase public awareness of the broad issues surrounding SSN integrity.

To augment our efforts at combating SSN misuse and identity theft, in our FY 2002 budget request, we introduced the concept of the OIG Social Security Number Integrity Protection Team. This integrated model combines the talents of auditors, criminal investigators and attorneys in a comprehensive approach allowing SSA and the OIG to effectively address this ever-increasing problem and provide assistance to SSA, Congress, the public, and other law enforcement agencies. Although funds were not appropriated to support this concept for FYs 2002 and 2003, the FY 2004 budget includes $2.2 million to fund the hiring of additional staff and support costs for the first year of a 5-year implementation period.

**No-Match Cert. Admin. Record  267**

# *Appendices*

**Appendix A** – *Acronyms*

**Appendix B** – *Scope and Methodology*

**Appendix C** – *Prior Office of the Inspector General Reports*

*Appendix A*

---

# Acronyms

| | |
|---|---|
| AUSA | Assistant United States Attorney |
| BVS | Bureau of Vital Statistics |
| DMF | Death Master File |
| EAB | Enumeration at Birth |
| EDR | Electronic Death Registration |
| ESF | Earnings Suspense File |
| EVS | Employee Verification Service |
| FY | Fiscal Year |
| IG | Inspector General |
| INS | Immigration and Naturalization Service |
| IRS | Internal Revenue Service |
| MEF | Master Earnings File |
| NAPHSIS | National Association of Public Health Statistics and Information Systems |
| OIG | Office of the Inspector General |
| SSA | Social Security Administration |
| SSN | Social Security Number |
| SSNVS | Social Security Number Verification Service |
| TY | Tax Year |

---

*Appendix B*

# Scope and Methodology

We limited our review to summarizing prior Office of the Inspector General and Social Security Administration work regarding Social Security number misuse. We focused mainly on past results of Office of the Inspector General audits and investigations. We conducted our review in accordance with the Quality Standards for Inspections issued by the President's Council on Integrity and Efficiency.

*Appendix C*

# Prior Office of the Inspector General Reports

| Social Security Administration, Office of the Inspector General Reports Related to Social Security Number Integrity | | |
|---|---|---|
| **Common Identification Number** | **Report Title** | **Date Issued** |
| A-03-03-13017 | *Congressional Response Report: Review of the Social Security Number Feedback Pilot Project* | April 2003 |
| A-09-03-23067 | *Congressional Response Report: The Social Security Administration's Efforts to Process Death Reports and Improve Its Death Master File* | January 2003 |
| A-09-02-22023 | *Effectiveness of the Social Security Administration's Death Termination Process* | September 2002 |
| A-03-02-22008 | *The Social Security Administration's Employee Verification Service for Registered Employers* | September 2002 |
| A-08-00-10047 | *Audit of Enumeration At Birth Program* | September 2001 |
| A-08-00-10061 | *Replacement Social Security Cards: Opportunities to Reduce the Risk of Improper Attainment and Misuse* | September 2001 |
| A-01-00-20043 | *Old-Age, Survivors and Disability Insurance Benefits Paid to Deceased Auxiliary Beneficiaries* | June 2001 |
| A-09-98-61011 | *Improving the Usefulness of the Social Security Administration's Death Master File* | July 2000 |

# DISTRIBUTION SCHEDULE

Commissioner of Social Security

Office of Management and Budget, Income Maintenance Branch

Chairman and Ranking Member, Committee on Ways and Means

Chief of Staff, Committee on Ways and Means

Chairman and Ranking Minority Member, Subcommittee on Social Security

Majority and Minority Staff Director, Subcommittee on Social Security

Chairman and Ranking Minority Member, Subcommittee on Human Resources

Chairman and Ranking Minority Member, Committee on Budget, House of Representatives

Chairman and Ranking Minority Member, Committee on Government Reform and Oversight

Chairman and Ranking Minority Member, Committee on Governmental Affairs

Chairman and Ranking Minority Member, Committee on Appropriations, House of Representatives

Chairman and Ranking Minority, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations,
  House of Representatives

Chairman and Ranking Minority Member, Committee on Appropriations, U.S. Senate

Chairman and Ranking Minority Member, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, U.S. Senate

Chairman and Ranking Minority Member, Committee on Finance

Chairman and Ranking Minority Member, Subcommittee on Social Security and Family Policy

Chairman and Ranking Minority Member, Senate Special Committee on Aging

Social Security Advisory Board

# Overview of the Office of the Inspector General

## Office of Audit

The Office of Audit (OA) conducts comprehensive financial and performance audits of the Social Security Administration's (SSA) programs and makes recommendations to ensure that program objectives are achieved effectively and efficiently. Financial audits, required by the Chief Financial Officers' Act of 1990, assess whether SSA's financial statements fairly present the Agency's financial position, results of operations and cash flow. Performance audits review the economy, efficiency and effectiveness of SSA's programs. OA also conducts short-term management and program evaluations focused on issues of concern to SSA, Congress and the general public. Evaluations often focus on identifying and recommending ways to prevent and minimize program fraud and inefficiency, rather than detecting problems after they occur.

## Office of Executive Operations

The Office of Executive Operations (OEO) supports the Office of the Inspector General (OIG) by providing information resource management; systems security; and the coordination of budget, procurement, telecommunications, facilities and equipment, and human resources. In addition, this office is the focal point for the OIG's strategic planning function and the development and implementation of performance measures required by the *Government Performance and Results Act*. OEO is also responsible for performing internal reviews to ensure that OIG offices nationwide hold themselves to the same rigorous standards that we expect from SSA, as well as conducting investigations of OIG employees, when necessary. Finally, OEO administers OIG's public affairs, media, and interagency activities, coordinates responses to Congressional requests for information, and also communicates OIG's planned and current activities and their results to the Commissioner and Congress.

## Office of Investigations

The Office of Investigations (OI) conducts and coordinates investigative activity related to fraud, waste, abuse, and mismanagement of SSA programs and operations. This includes wrongdoing by applicants, beneficiaries, contractors, physicians, interpreters, representative payees, third parties, and by SSA employees in the performance of their duties. OI also conducts joint investigations with other Federal, State, and local law enforcement agencies.

## Counsel to the Inspector General

The Counsel to the Inspector General provides legal advice and counsel to the Inspector General on various matters, including: 1) statutes, regulations, legislation, and policy directives governing the administration of SSA's programs; 2) investigative procedures and techniques; and 3) legal implications and conclusions to be drawn from audit and investigative material produced by the OIG. The Counsel's office also administers the civil monetary penalty program.

# OFFICE OF
# THE INSPECTOR GENERAL

## SOCIAL SECURITY ADMINISTRATION

### FOLLOW-UP REVIEW
### OF EMPLOYERS WITH THE MOST
### SUSPENDED WAGE ITEMS

**October 2003**      **A-03-03-13026**

# AUDIT REPORT



## Mission

We improve SSA programs and operations and protect them against fraud, waste, and abuse by conducting independent and objective audits, evaluations, and investigations. We provide timely, useful, and reliable information and advice to Administration officials, the Congress, and the public.

## Authority

The Inspector General Act created independent audit and investigative units, called the Office of Inspector General (OIG). The mission of the OIG, as spelled out in the Act, is to:

- Conduct and supervise independent and objective audits and investigations relating to agency programs and operations.
- Promote economy, effectiveness, and efficiency within the agency.
- Prevent and detect fraud, waste, and abuse in agency programs and operations.
- Review and make recommendations regarding existing and proposed legislation and regulations relating to agency programs and operations.
- Keep the agency head and the Congress fully and currently informed of problems in agency programs and operations.

To ensure objectivity, the IG Act empowers the IG with:

- Independence to determine what reviews to perform.
- Access to all information necessary for the reviews.
- Authority to publish findings and recommendations based on the reviews.

## Vision

By conducting independent and objective audits, investigations, and evaluations, we are agents of positive change striving for continuous improvement in the Social Security Administration's programs, operations, and management and in our own office.

# *Executive Summary*

## OBJECTIVE

The objectives of the audit were to determine whether (1) wage reporting had improved among the original 100 employers in our September 1999 report, *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items (A-03-98-31009),* and (2) the Social Security Administration (SSA) had taken steps to implement our recommendations from the 1999 report.

## BACKGROUND

Our September 1999 report identified those employers with the most suspended wage items from Tax Years (TYs) 1993 through 1996. In the report, we concluded that a relatively small number of employers account for a disproportionate share of the suspended items and dollars in the Earnings Suspense File (ESF), which is the repository for wage items reported under a name and Social Security number (SSN) that does not match SSA records. In this report, we recommended that SSA (1) develop a corrective action plan for problem employers, (2) establish preventive controls related to wage reporting, (3) identify problem employers, and (4) use software to identify employers using the same address. SSA agreed with Recommendations 1 and 3 and disagreed with Recommendations 2 and 4.

## RESULTS OF REVIEW

Our review of the ESF activity for the original 100 employers during TYs 1997 to 2000 showed that, of the original 100 employers in our prior review:

- 40 were still on the Top 100 employers list for the follow-up period, and
- 60 were no longer on the Top 100 employers list for the follow-up period.

Of the 60 employers that were no longer on the Top 100 employers list in TYs 1997 to 2000:

- 14 employers showed *increased* reporting accuracy from the original period to the follow-up period;
- 19 employers showed *decreased* reporting accuracy from the original period to the follow-up period; and
- 27 employers did not have sufficient wage items in TY 2000 to determine the reporting accuracy.

We found that some of the employers no longer on the Top 100 list were reporting their wages under different Employer Identification Numbers. In addition, it is possible that some of these employers were no longer in business.

**No-Match Cert. Admin. Record 276**

SSA has taken steps to address two of the recommendations through its efforts to assist employers and hold them accountable for their wage reporting, including (1) improving programs to assist employers with wage reporting problems, (2) focusing Employer Service Liaison Officer's (ESLO) resources on the largest contributors to the ESF, and (3) coordinating activities with the Internal Revenue Service so employers who continually report significant name/SSN mismatches can be penalized. However, SSA still needs to do more in establishing preventive controls to detect wage reporting errors and irregularities. The Agency has established an Earnings Data Warehouse that will eventually be able to track employer reporting errors. Furthermore, the Agency has not identified employers that report the same address for many employees.  We believe that this "address" control, or similar controls, could assist the Agency in detecting potential SSN misuse.

## CONCLUSIONS AND RECOMMENDATIONS

To ensure SSA can identify employer reporting trends and focus its efforts on the employers with the most significant problems, we continue to recommend that SSA establish preventive controls to detect wage reporting errors and irregularities, including a link between the new Earnings Data Warehouse and ESLO efforts.

## AGENCY COMMENTS

SSA agreed with our recommendation, stating the Earnings Data Warehouse will provide employer reporting trends in early 2004, and the ESLOs will have access to this data.

# *Table of Contents*

**Page**

**INTRODUCTION**.................................................................................................1

**RESULTS OF REVIEW** .......................................................................................3

    Status of 100 Employers on 1993 to 1996 List.......................................................3

        Original Employers Still Among the Top 100 Employers ....................................5

        Original Employers No Longer Among the Top 100 Employers ........................5

    Agency Progress on Earlier Recommendations .....................................................6

        Improving Programs to Assist Employers............................................................6

        Coordination with the Internal Revenue Service ...............................................9

        Preventive Controls and Address Standardization Software ............................10

**CONCLUSIONS AND RECOMMENDATIONS**....................................................13

**APPENDICES**

Appendix A – Earlier Audit Findings Related to the Top 100 Employers

Appendix B – Status of Office of the Inspector General Recommendations Made in
          September 1999 Top 100 Report

Appendix C – Scope and Methodology

Appendix D – Initial Top 100 Listing Highlighting Status in Follow-Up Period

Appendix E – Agency Comments

Appendix F – OIG Contacts and Staff Acknowledgments

# *Acronyms*

| | |
|---|---|
| EIN | Employer Identification Number |
| ESF | Earnings Suspense File |
| ESLO | Employer Service Liaison Officer |
| EVS | Employee Verification Service |
| IRS | Internal Revenue Service |
| MEF | Master Earnings File |
| OPSOS | Office of Public Service and Operations Support |
| SSA | Social Security Administration |
| SSN | Social Security Number |
| SSNVS | Social Security Number Verification Service |
| TY | Tax Year |
| W-2 | Wage and Tax Statement |

# *Introduction*

## OBJECTIVE

The objectives of the audit were to determine whether (1) wage reporting had improved among the original 100 employers in our September 1999 report, *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items,* and (2) the Social Security Administration (SSA) had taken steps to implement our recommendations from the 1999 report.

## BACKGROUND

Title II of the Social Security Act requires that SSA maintain records of wages employers pay to individuals. Employers report their employees' earnings to SSA annually on a *Wage and Tax Statement* (Form W-2). SSA uses manual and automated edits to match employees' Social Security numbers (SSN) and names to SSA's master file to post their earning to the Master Earnings File (MEF). The Earnings Suspense File (ESF) contains wage items that fail to match SSA's name and SSN records. As of July 2002, SSA's ESF contained about 236 million wage items and $374 billion in wages that could not be posted to individual earnings records. In Tax Year (TY) 2000, the ESF increased by 9.6 million items and $49 billion.

Wages in the ESF affect an individual's Social Security benefits. SSA uses earnings posted to the MEF to determine eligibility for retirement, survivors, disability, and health insurance benefits and calculate benefit amounts. If earnings are not properly posted to an individual's earning record, the person will not receive credit for them.

In September 1999, we issued an audit report that identified the 100 employers with the most suspended wage items from TYs 1993 to 1996. We concluded that a relatively small number of employers account for a disproportionate share of the suspended items and dollars in the ESF, and many of these suspended wage items exhibited patterns of reporting errors and irregularities. We are doing a follow-up review for the following reasons: (1) ongoing congressional interest in the ESF; (2) the ESF's continued growth; and (3) changes SSA made in the earnings reporting area since our 1999 report.

In our prior report, we recommended that SSA:

- Develop and implement a corrective action plan for the 100 employers and continue its current efforts to contact those employers who are responsible for large numbers of suspended wage items.

- Establish preventive controls to detect wage reporting errors and irregularities.

**No-Match Cert. Admin. Record  280**

- Identify those employers who continually submit annual wage reports with large numbers and/or percentages of unassigned, identical, and/or consecutively numbered SSNs.

- Run address standardization software as soon as practical after employers submit their annual wage reports to identify employers that report the same address for many employees.

In its comments to our 1999 report, SSA stated that, overall, the findings paralleled its experience with employer reporting problems. SSA indicated that implementing the recommendations would not necessarily influence an employee to provide his/her employer with the correct name/SSN or an employer to improve the accuracy of wage reporting. In addition, SSA stressed that it has no compliance authority and is dependent on the Internal Revenue Service (IRS) efforts in this area.

Specifically, SSA agreed with our recommendations to develop a corrective action plan for the 100 employers and identify those employers who continually submit annual wage reports with mismatched names and SSNs. However, SSA disagreed with the remaining two recommendations, but stated it would explore the feasibility of implementing preventive controls and address standardization software. See Appendix B for the original recommendations and SSA's most recent comments.

## SCOPE AND METHODOLOGY

Our audit did not include an evaluation of SSA's internal controls over the wage reporting process. The purpose of our review was to determine how SSA used the wage reporting data the Agency had accumulated. We did not focus our efforts on the collection of wage reporting data, nor did we attempt to establish the reliability or accuracy of such data. We provide additional information on our scope and methodology in Appendix C. The entity audited was SSA's Office of Public Services and Operations Support (OPSOS) under the Deputy Commissioner of Operations and the Office of Earnings, Enumeration and Administrative Systems under the Deputy Commissioner of Systems. We conducted our follow-up audit in Baltimore, Maryland, and the Office of Audit in Philadelphia, Pennsylvania, between August 2002 and May 2003. We conducted our audit in accordance with generally accepted government auditing standards.

# *Results of Review*

Of the original 100 employers with wage reporting problems in TYs 1993 to 1996 (hereafter called the original period), 40 employers were still on the top 100 list for TYs 1997 to 2000 (hereafter called the follow-up period). Of the remaining 60 employers, 14 improved their reporting accuracy, whereas the remaining 46 either showed declining reporting accuracy or the accuracy could not be determined. SSA has taken steps to implement two of the recommendations from our earlier audit report. However, the Agency still needs to do more in establishing preventive controls to detect wage reporting errors and irregularities. The Agency has established an Earnings Data Warehouse that will eventually be able to track employer reporting errors. Furthermore, SSA has not taken steps to implement address standardization software to identify employers who report the same address for many employees.

## STATUS OF 100 EMPLOYERS ON 1993 TO 1996 LIST

Our review of the ESF activity for the original 100 employers during TYs 1997 to 2000 showed that these employers submitted over 1.3 million items to the ESF, compared with about 1.2 million items submitted by these same employers during TYs 1993 to 1996. This is an increase of about 12 percent (140,000 items) from the original period to the follow-up period. Furthermore, our analysis showed that, of the original 100 employers in our prior review:

- 40 were still on the Top 100 employers list for the follow-up period; and
- 60 were no longer on the Top 100 employers list for the follow-up period.

Of the 60 employers that were no longer on the Top 100 employers list:

- 14 employers showed *increased* reporting accuracy[1] from the original period to the follow-up period;
- 19 employers showed *decreased* reporting accuracy from the original period to the follow-up period; and
- 27 employers did not have sufficient wage items in TY 2000 to determine the reporting accuracy.

Figure 1 is a graphic representation of the status of the 100 employers, and Appendix D provides more details on the status of the original 100 employers.

---

[1] We define reporting accuracy as the percent of reported wage items that fail to match the name and/or SSN in SSA's records and are posted to the ESF. Increased reporting accuracy means fewer of the reported wage items go into the ESF over a period of time.

**No-Match Cert. Admin. Record 282**

## Figure 1: Status of the Original 100 Employers During Tax Years (TY) 1997-2000



- ■ Still on TY 1997-2000 Top 100 List
- ■ Not on the TY 1997-2000 Top 100 List - Increased Reporting Accuracy
- □ Not on the TY 1997-2000 Top 100 List - Decreased Reporting Accuracy
- ■ Not on the TY 1997-2000 Top 100 List - Reporting Accuracy Not Determined

Employers are required to report their earnings under an Employer Identification Number (EIN),[2] and employers can report earnings using more than one EIN.  We were unable to identify all employers using multiple EINs during our follow-up period.  Based on our analysis of employers where we were able to link EINs, we believe more of the original employers would have a significant number of ESF items, and the number of original employers on the follow-up Top 100 list would have been larger, had these employers reported their wages under the same EIN during the follow-up period.

We were able to learn more about the true reporting trends among the original Top 100 employers through (1) SSA's earnings record system, which often cross references different EINs used by the same employer, and (2) discussions with Employer Service Liaison Officers (ESLO) who were aware of the different EINs being used by employers.

At least 12 of the 60 employers who were not on the follow-up Top 100 list reported their wages under a different EIN(s) during TYs 1997 to 2000.[3]  For example, one employer in the hotel industry (employer #11 in Appendix D) reported 19,641 wage items during TYs 1993 to 1996 that went into the ESF.  During TY 1996 alone, the employer reported 278,819 W-2s, of which 9,421 went into suspense.  During the follow-up period, this same employer reported only 25 wage items that went into the ESF in total.  However, we learned that this employer reported the bulk of its W-2s using two different EINs after TY 1996 and ceased using the EIN in our study by TY 2000.  This same employer reported 391,047 wage items to SSA in TY 2000 under

---

[2] The EIN is a nine-digit number assigned by the IRS to sole proprietors, corporations, partnerships, estates, trusts, and other entities for tax filing and reporting purposes.

[3] We looked for anomalies, such as a new reporting EIN, when the number of wage items reported annually during the TYs 1993 to 2000 period dropped significantly.

---

2 different EINs, of which 18,841 wage items went into the ESF. Had all of this employer's wages been reported under the original EIN, we believe this employer would have been on the follow-up Top 100 employers list.

## ORIGINAL EMPLOYERS STILL AMONG THE TOP 100 EMPLOYERS

Forty of the original 100 employers are also on the Top 100 list for the follow-up period. These 40 employers reported over 1 million suspended wage items during the 4-year follow-up period, or an average of 25,100 per employer. In the original 4-year period, these 40 employers reported 649,000 suspended wage items, or an average of 16,200 per employer. Furthermore, these 40 employers represent 55 percent of all suspended wage items on the original Top 100 list, and 76 percent of all suspended wage items on the Top 100 list for the follow-up period.

All but 4 of these 40 employers showed decreased reporting accuracy during the follow-up period. All four employers showing improved accuracy had been contacted by SSA's ESLOs during the follow-up period. We discuss ESLO activity later in this report.

## ORIGINAL EMPLOYERS NO LONGER AMONG THE TOP 100 EMPLOYERS

While 60 percent of the original employers were no longer on the follow-up Top 100 list, most fell off the list because of a change in how they reported wages to SSA rather than improvements in their reporting. We found that 14 employers showed a clear improvement in their reporting accuracy. As a result, they were no longer on the Top 100 employers list for the follow-up period. The percentage of wage items sent to the ESF decreased during the 2 review periods for these 14 employers, which included growers, restaurants, employment agencies, a retail store, and a local government.

For example, one restaurant employer (employer #44) significantly decreased both the number and percentage of W-2 items going to the ESF from 1996 to 2000, even though its payroll increased during the same period. In 1996, almost 37 percent of the employer's reported W-2s did not match SSA's records and were sent to the ESF. The percent of wages going into the ESF decreased to 2 percent in 2000.

We learned that SSA's ESLOs contacted 11 of the 14 employers who improved their reporting accuracy. In addition, one of these employers verified its employees' names and SSNs through SSA's Employee Verification Service (EVS).[4] It appears that SSA's services allowed these employers to improve their wage reporting during the follow-up period.

The remaining 46 employers either (1) showed a decrease in their reporting accuracy or (2) did not report wage items during the entire period, and we were unable to determine their true reporting accuracy. Nineteen employers showed a decrease in their reporting accuracy from TY 1996 to TY 2000. We were unable to determine the reporting accuracy for another 27 employers, since 19 employers (70 percent) reported no wage items in TY 2000, and another 8 employers (30 percent) reported 10 percent or less of their TY 1996 wage items in TY 2000. As noted above, some of these employers may

---

[4] We discuss EVS later in this report.

be reporting their wages under a different EIN(s). In addition, it is possible that some of these employers were no longer in business.

## AGENCY PROGRESS ON EARLIER RECOMMENDATIONS

SSA has taken steps to address two of the recommendations through its efforts to assist employers and hold them accountable for their wage reporting, including (1) improving programs to assist employers with wage reporting problems, (2) focusing resources on the largest contributors to the ESF, and (3) coordinating activities with the IRS so employers who continually report significant name/SSN mismatches can be penalized. However, SSA still needs to do more in establishing preventive controls to detect wage reporting errors and irregularities. The Agency has established an Earnings Data Warehouse that will eventually be able to track employer reporting errors. Furthermore, the Agency has not identified employers that report the same address for many employees.

### IMPROVING PROGRAMS TO ASSIST EMPLOYERS

Since our 1999 audit, SSA has taken steps to assist the Top 100 employers, as well as other employers, with their wage reporting. These new efforts include expanded employer correspondence to notify employers of name/SSN mismatches in their wage reports and developing an on-line employee verification program to assist employers with name/SSN mismatches before the wage reports are submitted. SSA also assists employers' wage reporting through its ESLOs, though we did not find a high correlation between the Top 100 employers and those contacted by the ESLOs. We also did not find any corrective action plans specific to the 100 employers identified in our earlier audit.

### *Employer Correspondence*

In TY 2001, SSA improved its notification process for employers by increasing the number of "no match" letters—or educational correspondence—it sends to employers who submit W-2s containing name and/or SSN information that does not agree with SSA's records. Although SSA has been sending educational correspondence letters to specific employers since 1994, in TY 2001, it began sending letters to all employers where the name and/or SSN on just one W-2 did not agree with SSA's records. SSA sent employers approximately 950,000 letters in TY 2001, an almost 9-fold increase from the previous year.

While we find this to be an encouraging step, SSA announced a new policy effective for TY 2002 wage reporting. Employers will receive a letter if they submit more than 10 W-2s that SSA could not process if those W-2s represent more than one-half of 1 percent of the W-2s reported.[5] As a result of this change, SSA estimates it will send 129,000 letters to employers, or about 820,000 fewer letters than in TY 2001. As with the earlier criteria, this change may overlook small employers or employers who submitted only a few records that SSA could not process. SSA attributed the change in policy to a business decision to balance improving the wage reporting process with using Agency resources effectively.

### Employee Verification Services

SSA is expanding its current EVS programs[6] to include an on-line service called the Social Security Number Verification Service (SSNVS). SSNVS is being piloted among a few employers, but SSA hopes it will encourage more employers to use SSA's name/SSN verification program for new employees. Our September 2002 report[7] noted that very few employers are using the current EVS system for registered users. This program uses diskettes and magnetic media rather than on-line processes. In the report, we stated that only 392 of approximately 6.5 million employers in the United States were using SSA's EVS during TYs 1999 to 2001. We also noted that SSA did not disclose pertinent information that could have assisted users. Specifically, SSA did not inform employers when a submitted SSN belonged to a deceased individual or when the SSN was issued for non-work purposes. SSA has stated it intends to modify both EVS and SSNVS to disclose the pertinent information to employers.

Our earlier report also determined that only 10 of the Top 100 employers with the largest number of suspended items registered for and used SSA's EVS during TYs 1999 to 2001. A review of the EVS registration list showed that the 10 employers signed up for the program in 1997 or later. The 10 employers represent just 3 percent of the employers that used EVS during a recent 3-year period, 1999-2001; however, they accounted for 25 percent or 13.5 million of the SSNs submitted to EVS. Three employers alone submitted over 11.8 million SSNs.

---

[5] Before this, SSA only sent letters to employers who submitted more than 10 W-2s that SSA could not process if those W-2s represented more than 10 percent of the W-2s reported.

[6] The purpose of the EVS program is to ensure employees' names and SSNs are valid before the employers' W-2s are submitted to SSA. The use of EVS is voluntary and can assist employers in eliminating common SSN reporting errors. Depending on the number of SSNs they want to verify at one time, employers can call an 800-number for 5 or fewer or submit a paper request of up to 50 names directly to a SSA field office. Employers who wish to verify 51 or more SSNs at once are encouraged to register for the EVS program.

[7] *The Social Security Administration's Employee Verification Service for Registered Employers* (A-03-02-22008), September 2002.

**No-Match Cert. Admin. Record  286**

Of the 10 employers registered to use EVS, only 9 were using it during our follow-up period. Of these 9 employers, our review determined that:

- 6 were still in the Top 100;
- 2 were no longer in the Top 100 but reported little or no earnings for at least 1 of the years in the follow-up period, so we could not determine their overall accuracy; and
- 1 was no longer in the Top 100 and had improved its wage reporting.

### Employer Service Liasion Officers

Since 1996, SSA's OPSOS has developed a national listing of employers who submit 100 or more suspended wage items. These lists are sent to regional ESLOs for follow-up contacts with the employers.[8] SSA does not direct the ESLOs to contact specific employers or follow up with the ESLOs regarding what contacts were made and the results of the contacts. For 2001, the number of employers on these lists ranged from 238 (Kansas City Region) to 3,826 (San Francisco Region)—see Table 1.

**Table 1: Employer Service Liaison Officer Contacts and Comments**

| Region | Employers with More than 100 Items in ESF for TY 2001 | Employers on Top 100 List Contacted by ESLO | Stated Mandatory Use of EVS May Improve Employer Wage Reporting | Stated IRS Penalties May Improve Employer Wage Reporting |
|---|---|---|---|---|
| Atlanta | 1,909 | 0 | -- | x |
| Boston | 303 | 1 | x | x |
| Chicago | NP | 9 | x | x |
| Dallas (1) | NP | 11 | x | x |
| Denver (1) | NP | 2 | x | x |
| Kansas City | 238 | 0 | -- | -- |
| New York | 787 | 7 | x | x |
| Philadelphia | 478 | 1 | -- | x |
| San Francisco | 3,826 | 23 | -- | -- |
| Seattle | 761 | 5 | x | x |
| **Totals** | **8,302** | **59** | **6** | **8** |

NP = Not Provided by ESLO.
Note1: One response was provided covering both the Dallas and Denver Regions.

All nine regional ESLOs responded to our questionnaire regarding employer contacts in their region.[9] All the responding ESLOs received a list from OPSOS showing employers in their region with 100 and more items in the ESF for TY 2001. Seven of the 9 ESLOs reported they contacted at least some of the Top 100 employers from our prior audit. These contacts were made by telephone, letter, and in person. In total, ESLOs

---

[8] SSA maintains ESLOs in each Region. The ESLOs' responsibilities include (1) answering employers' questions on wage report submissions; (2) encouraging employers to use SSA's various programs, such as EVS; (3) conducting wage-reporting seminars, in partnership with the IRS, for employers, payroll service providers, and payroll software companies; and (4) contacting employers with significant suspended wage items in their regions.

[9] Although SSA has 10 regions, there are 9 ESLOs. The Dallas and Denver regions share an ESLO.

contacted 59 of the Top 100 employers, including 25 of the 40 employers that were still in the Top 100 list as of TY 2000. One of the ESLOs who did not contact the Top 100 employers during this period stated he had contacted the employers in the past, but other workloads had proved more productive.

Another ESLO noted that the list OPSOS provided did not highlight the Top 100 employers from our earlier audit. When we spoke to OPSOS staff, they pointed out that ESLOs are not provided with information related to employer reporting trends, but rather each ESLO has discretion as to which employers they contact.

When asked for comments regarding ways to improve employer reporting, ESLOs commented that better coordination is needed between several Federal agencies, including SSA, the IRS, and the Bureau of Citizenship and Immigration Services. Furthermore, most of the ESLOs supported the mandatory use of EVS among employers and IRS penalties for submitting incorrect wage reports. Other ESLO comments included the following.

- Until employers can verify the name and SSN before hiring an employee, wage items will continue to go into suspense since the individual is on the payroll before the problem is detected.

- The problem often relates to the nature of the workforce, such as the widespread presence of illegal workers, which is not under SSA's control.

- Some employers may see the IRS penalty as a cost of doing business.

## COORDINATION WITH THE INTERNAL REVENUE SERVICE

SSA and the IRS are coordinating their efforts to identify problem employers, which will assist the IRS in assessing penalties against noncompliant employers. The Internal Revenue Code allows the agency to penalize an employer if it fails to file a complete and accurate wage reporting form.[10] The penalty is $50 per incorrect form, with a $250,000 yearly limit. For business with average receipts not more than $5 million, the limit is $100,000 yearly. [11]

In November 1998, SSA proposed that the IRS and SSA work together to develop employer incentives that could encourage improved wage reporting. In August 2000, SSA provided the IRS a list of the most egregious noncompliant employers for TYs 1997 and 1998 so the Agency could determine whether penalties should be assessed. The IRS did not assess penalties against the employers on the 1997 and 1998 lists since the statute of limitations expired before it could take action. The Treasury Inspector General for Tax Administration estimated that the IRS, if it had acted

---

[10] 26 U.S.C. § 6721 (2003).

[11] *See id.* The gross receipts test is met when, for any calendar year, the average annual gross receipts for the most recent 3 taxable years do not exceed $5 million. In addition, any reference to an entity includes a reference to any predecessor of that entity, and, the Internal Revenue Code allows for exceptions if the errors are due to reasonable cause.

timely, could have assessed penalties between $26.0 and $29.7 million against 93 employers for TY 1997 and an additional 98 employers for TY 1998.[12] Based on our analysis, we believe the same conditions existed for TYs 1999 and 2000, and a like amount of penalties could have been assessed for those years.

In February 2002, the IRS met again with SSA to develop a program for referring the problem employers. Using employer reporting data from TYs 1997 through 2000, the IRS stated it intended to do the following.

- Analyze and develop a list of the most egregiously noncompliant employers for TYs 1997 through 2000. This was to be completed within 120 days from the receipt of the 1999 and 2000 data from SSA.

- Develop a contact letter to notify the most egregiously noncompliant employers of their responsibility to file correct information returns. This letter was to be written within 60 days after receiving data from SSA.

- Take corrective actions when the facts and circumstances show the employer knowingly or willfully failed to comply with the requirements of section 6721 of the Internal Revenue Code. Corrective actions may include another letter, a telephone call or visit by an IRS representative, a proposed penalty assessment, and/or an examination.[13]

The first proposed penalties are scheduled for June 2004 for W-2s filed for TY 2002.

## PREVENTIVE CONTROLS AND ADDRESS STANDARIZATION SOFTWARE

SSA had not developed preventive controls to detect wage reporting problems and had instead removed some of the controls already in place. Furthermore, SSA had not taken steps to implement address standardization software to identify employers who report the same address for many employees.

### Preventive Controls

SSA had not established preventive controls to detect wage reporting errors and irregularities. In response to this recommendation in our original report, SSA stated it was exploring the feasibility of establishing an Earnings Suspense Management Information Database, which would allow the Agency to better monitor wage reporting errors and irregularities and more rapidly share information with the IRS. However, in its most recent response to our recommendation, SSA noted it had explored and implemented several innovations to improve the preventative controls established to detect wage reporting errors and irregularities, including:

---

[12] *The Internal Revenue Service Does Not Penalize Employers that File Wage and Tax Statements with Inaccurate Social Security Numbers* (Ref. Number 2002-30-156), Treasury Inspector General for Tax Administration, September 2002.

[13] *See id.*

- Increasing the threshold at which reports would be returned to employers from 10 percent of the wage report being correct to at least 50 percent of the wage report being correct – that is, containing correct name/SSN combinations. However, SSA noted this policy change had no payoff.
- Identifying the largest contributors to the ESF and providing the employer information to regional offices for discretionary contact. SSA noted the contacts have educated employers on the importance of correct reporting but added the Agency has seen little payoff.

Based on these experiences, SSA believed the expected return on investment did not justify the use of the software development resources that would be required for this project.

We believe the innovations listed above did not have a chance to come to fruition. For example, in our May 2001 Office of the Inspector General report,[14] we commented on the employer threshold and found that SSA's policies and procedures did not improve employer wage reporting as intended because they were not tracking key information. Among other findings, the prior report found SSA (1) had no management information system to identify chronic problem employers and (2) force processed[15] wage reports for the same employers for 2, and sometimes 3, consecutive years.

For TYs 1995 and earlier, SSA accepted magnetic media[16] if as few as 10 percent of the names and SSNs matched SSA's records. SSA increased the acceptance threshold to 30 percent for TY 1996 and to 50 percent for TY 1997 (with a maximum of 5,000 errors allowed). However, as a result of its determination that this threshold was not having its intended effect, SSA increased the acceptance threshold to 95 percent beginning in TY 2000, accepting wage reports with 95 percent of the name/SSN combinations incorrect. Only 5 percent of the items on a wage report would be correctly posted to an individual's earnings record, and the remaining 95 percent would be sent to the ESF.

In the May 2001 report, we disagreed with changing the threshold to 95 percent, stating that, by raising the wage reporting acceptance threshold to 95 percent and continuing to force process wage reports for the same employers, SSA had removed some preventative controls that were in place. We encouraged SSA to reconsider eliminating the 50-percent threshold until it had sufficient time to determine the impact this policy change will have on the ESF. We still believe a 50-percent threshold would be a more viable preventive control than a 95-percent threshold.

---

[14] *Force Processing of Magnetic Media Wage Reports with Validation Problems* (A-03-99-31001), May 2001.

[15] *See id.* SSA uses a procedure known as force processing to process employer wage reports that do not meet its acceptance standards. When force processing wage reports, SSA suspends a systems edit and notifies the employer it will force process a wage report one time only. Force processing of wage reports results in unmatched W-2s going directly to the ESF.

[16] Employers with 250 or more employees are required to use magnetic media (tape, diskette, or cartridge) when reporting wage information to SSA.

**No-Match Cert. Admin. Record  290**

We also believe improved management information related to employer reporting could focus ESLO contacts in the region and make their efforts more productive. SSA is establishing an Earnings Data Warehouse that can track employer-specific reporting trends.[17] This facility will be able to determine the percent of an employer's payroll that contains name and SSN mismatches. This information, combined with the ESLO efforts, could allow for better targeting of problem employers.

### Address Standardization Software

Our first report recommended that SSA run address standardization software as soon as practical after employers submit wage reports to identify employers that report the same address for many employees. SSA disagreed with this recommendation, stating it would review the feasibility of this recommendation. SSA later stated it had decided not to run address standardization software. SSA stated if the name/SSN on the wage report matched SSA's records, the address is immaterial; and if the item does not match SSA's records, the mismatch is the reporting problem. Furthermore, SSA noted that in many cases, especially in the agricultural workforce, a number of people may live at the same address. The Agency stated that this is often the case for a transient workforce where specific apartments or homes are provided as a temporary residence. As a result, SSA believes the potential return on investment does not appear to justify the developmental costs that would be incurred to implement this recommendation.

While we understand the Agency's position, we continue to believe duplicate mailing addresses on W-2s may be an indicator of SSN fraud. Our original report found that 94 of the 100 employers reported duplicate mailing addresses for 3 or more employees, involving almost 73,000 suspended W-2s and $194 million in suspended wages. In light of increasing concerns about SSN misuse in the U.S. economy, maintaining management information on address trends, or other similar trends, may assist SSA in detecting such SSN misuse and allow the Office of the Inspector General to investigate the more egregious situations.

---

[17] SSA Office of Systems staff said this facility should be able to track employer-specific trends by fall 2003.

# *Conclusions and Recommendations*

SSA has taken steps to implement two of the recommendations from our prior report. However, while SSA's actions have helped improve the wage reporting of some of the 100 employers, wage reporting problems still exist. In addition, we continue to believe establishing preventive controls and implementing address standardization software, or similar controls to detect potential SSN misuse, will help alleviate some of the wage reporting problems and protect the integrity of the SSN.

To ensure SSA can identify employer reporting trends and focus its efforts on the employers with the most significant problems, we continue to recommend that SSA establish preventive controls to detect wage reporting errors and irregularities, including a link between the new Earnings Data Warehouse and ESLO efforts.

## AGENCY COMMENTS

SSA agreed with our recommendation, stating the Earnings Data Warehouse will provide employer reporting trends in early 2004, and the ESLOs will have access to this data.

# *Appendices*

# Earlier Audit Findings Related to the Top 100 Employers

In our earlier audit,[1] we noted that 84 of the 100 employers experienced increases in suspended wage items over the 4-year period (1993 to 1996), including 27 employers with increases of 100 percent or more.

Patterns of reporting errors and irregularities exhibited by the 100 employers included the following.

- Ninety-six employers reported 109,360 unassigned Social Security numbers (SSN), numbers never issued by the Social Security Administration, representing about $298.5 million in suspended wages.

- Thirty-six employers reported 3,127 of the 109,360 unassigned SSNs as "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."

- Ninety-four employers reported duplicate mailing addresses for 3 or more employees, involving 72,770 suspended *Wage and Tax Statements* (Form W-2) or 21 percent of the 340,922 suspended wage items for these employers in 1996. Suspended wages involving duplicate addresses totaled about $193.7 million.

- Eighty-six employers reported 3 or more consecutively numbered SSNs involving 4,910 W-2s and $14.4 million in suspended wages.  We defined consecutive SSNs as those where the first six digits were identical.

- Sixty-nine employers reported 16,742 identical W-2s, representing $31.1 million in suspended wages, that were used 2 or more times by employees working for the same employer.

---

[1] *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items* (A-03-98-31009), September 1999.

*Follow-Up Review of Employers with the Most Suspended Wage Items (A-03-03-13026)*

# Status of Office of the Inspector General Recommendations Made in September 1999 Top 100 Report

**Recommendation 1:** Develop and implement a corrective action plan for the 100 employers and continue efforts to contact those employers responsible for large numbers of suspended wage items.

**Status:** The Social Security Administration (SSA) agreed and implemented the recommendation on October 2, 2001.

> SSA Response: SSA agreed that these employers should take corrective action. SSA is in its third year of contacting employers with 100 or more items in the suspense file. It plans to continue these efforts as a way of educating those employers on the importance of submitting accurate wage reports.

> SSA's payoff from these efforts has been that it has learned a lot about those who cause the most items to be placed in the suspense file. The most egregious offenders are not improving their name/number accuracy and are not interested in learning how to do so, although SSA recognizes that some employers are interested and appreciate the educational contacts it makes. SSA believes improvement will only come through some stronger action.

> In addition, a change has already been made that will be included in notices sent in February 2000 for Tax Year 1999. SSA is inserting a section in the notice informing employers about their responsibilities and employee rights. This has become necessary because SSA does not want employers to abuse the information sent them by releasing employees without giving them the opportunity to correct their records or explain why information may be incorrect.

**Recommendation 2:** Establish preventive controls to detect wage reporting errors and irregularities.

**Status:** SSA disagreed.

> SSA Response: SSA has explored and implemented several innovations to improve the preventative controls established to detect wage reporting errors and irregularities. The threshold at which reports would be returned was increased from 10 to 50 percent with no payoff to SSA. SSA has also identified the largest contributors to the suspense file and provided the employer information to its regional offices for discretionary contact. SSA's contacts have educated employers on the importance of correct reporting, but it has seen little payoff.

**No-Match Cert. Admin. Record  295**

Based on SSA's experiences, it believes the expected return on investment does not justify the use of the software development resources that would be required for this project.

**Recommendation 3:** Identify those employers who continually submit annual wage reports with large numbers and/or percentages of unassigned, identical, and/or consecutively numbered Social Security numbers (SSN).

**Status:** SSA agreed and administratively closed out the recommendation on September 5, 2000.

> SSA Response: Regional offices receive listings of those employers creating 100 or more suspense items and make discretionary contact. SSA also provides employers with educational notices when the number of errors in a report submittal exceed 10 percent.

**Recommendation 4:** Run address standardization software as soon as practical after employers submit their annual wage reports to identify employers who report the same address for many employees.

**Status:** SSA disagreed and closed this recommendation on December 31, 2000.

> SSA Response: SSA explored the feasibility of implementing this recommendation. The Office of the Inspector General stated that identifying employers who report the same address for numerous employees could point to a reporting problem. Operations existing processes already identify name/SSN mismatches. If the wage items in question match SSA's Numident and post to individual records on the Master Earnings File, the address reported by the employer is immaterial. Items that do not match the Numident and fall to suspense indicate a reporting problem. Through the processes already in place, SSA does send correspondence to the employers requesting that corrective action be taken.

**No-Match Cert. Admin. Record  296**

# Scope and Methodology

To meet our objective, we:

- Reviewed Social Security Administration (SSA) policies and procedures for maintaining individual earnings records.

- Reviewed prior SSA Office of the Inspector General and Treasury Inspector General for Tax Administration reports related to the Earnings Suspense File (ESF) and inaccurate wage reporting.

- Reviewed SSA's most recent actions related to recommendations in our September 1999 report, *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items,* and discussed SSA's employer follow-up actions with staff in the Office of Public Services and Operations Support.

- Contacted SSA's regional Employer Service Liaison Officers for information regarding employer contact and suspended wage items.

- Reviewed SSA's actions targeting employers who submit large numbers of suspended wage items to the ESF.

- Reviewed SSA's ESF activity for 1997 to 2000 for the original 100 employers with the most suspended wage items in 1993 to 1996.

- Created a new Top 100 employers list using the same criteria we used in the original Top 100 report. We identified all employers who contributed 200 or more wage items to the ESF in each of the 4 years in our follow-up period, 1997 to 2000. Using these data, we selected the 100 employers who had the most suspended wage items over the 4-year period. We then determined how many employers from the earlier audit were still on this new Top 100 listing and analyzed the reporting activity related to each of these 100 employers.

The following are some important factors regarding the methodology used in our follow-up review that need to be considered.

   ➢ These employers were identified using a specific methodology. This is not the only methodology one could use, but using auditor's judgment, we determined it was a useful way of identifying reporting trends.

   ➢ The list is based on wage items reported under an Employer Identification Number (EIN), and some employers report under multiple EINs. Hence, while the trends noted in the audit relate to the EIN, they do not

---

·necessarily give a complete picture of the employer. Furthermore, not all employers report their wages in the same way, so one company may report all of its operations under a single EIN and another may use multiple EINs. However, SSA's systems house the wage data under EINs and do not allow us to focus on individual employers. As a result, the audit is identifying the 100 EINs with the most suspended wage items and not necessarily the 100 employers with the most suspended wage items.

➢ Employers are allowed to switch their EINs for reporting. As a result, we found instances where wages were reported under different EINs over the 4-year period. Under our methodology, if a company switched EINs between 1993 and 1996, it may have failed to report over 200 items in a particular year under a particular EIN and therefore never have made the top 100 listing. However, if one were to look at the employer over the 4-year period rather than the EIN they might have been among the top 100 employers. The same reasoning holds true for our follow-up period, 1997 to 2000, when reviewing the reporting activity of the original top 100 employers.

➢ Some employers are on the list because of their employment volume rather than significant problems with their reporting accuracy. For example, some employers are reporting only 1 percent of their employees with name/Social Security number mismatches, but they are on the list because 1 percent of their total payroll is a large number. These employers may not have the same underlying problems as the smaller employer reporting as much as 85 percent of its payroll in error.

No-Match Cert. Admin. Record  298

## Appendix D

## Initial Top 100 Listing Highlighting Status in Follow-Up Period

| 1993-96 Ranking | State | Tax Year (TY) 1996 W-2s Reported | TY 1996 W-2s in ESF | TY 2000 W-2s Reported | TY 2000 W-2s in ESF | Present in 1997-2000 Top 100 Employers? | Reporting Accuracy | | Has the Reporting Accuracy Improved? |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | TY 1996 Percent of Reported W-2s in the Earnings Suspense File (ESF) | TY 2000 Percent of Reported W-2s in ESF | |
| 1 | CA | 331,348 | 7,621 | 358,238 | 3,938 | Yes | 2.30% | 1.10% | Yes |
| 2 | IL | 237,656 | 17,019 | 229,361 | 33,829 | Yes | 7.16% | 14.75% | No |
| 3 | FL | 236,139 | 13,577 | 209,921 | 20,367 | Yes | 5.75% | 9.70% | No |
| 4 | MI | 559,694 | 11,237 | 533,439 | 15,037 | Yes | 2.01% | 2.82% | No |
| 5 | SC | 98,020 | 9,594 | 103,641 | 11,006 | Yes | 9.79% | 10.62% | No |
| 6 | IL | 10,053 | 4,790 | 5,571 | 3,896 | Yes | 47.65% | 69.93% | No |
| 7 | GA | 51,465 | 6,536 | 46,416 | 11,472 | Yes | 12.70% | 24.72% | No |
| 8 | CA | 57,639 | 9,107 | 95,250 | 20,182 | Yes | 15.80% | 21.19% | No |
| 9 | CA | 20,356 | 6,290 | 0 | 0 | No | 30.90% | NA | Unknown |
| 10 | CA | 9,629 | 6,336 | 8,616 | 5,171 | Yes | 65.80% | 60.02% | Yes |
| 11 | DC | 278,819 | 9,421 | 0 | 0 | No | 3.38% | NA | Unknown |
| 12 | TX | 29,953 | 5,576 | 0 | 0 | No | 18.62% | NA | Unknown |
| 13 | OK | 215,189 | 6,456 | 254,990 | 11,527 | Yes | 3.00% | 4.52% | No |
| 14 | CA | 24,920 | 5,245 | 32,617 | 9,475 | Yes | 21.05% | 29.05% | No |
| 15 | GA | 26,982 | 4,559 | 11,012 | 5,183 | Yes | 16.90% | 47.07% | No |
| 16 | MI | 593,667 | 5,343 | 599,972 | 7,209 | Yes | 0.90% | 1.2% | No |
| 17 | IL | 9,027 | 659 | 10,494 | 7,500 | Yes | 7.30% | 71.47% | No |
| 18 | FL | 225,759 | 4,809 | 134 | 0 | No | 2.13% | 0.00% | Unknown |
| 19 | CA | 188,000 | 564 | 0 | 0 | No | 0.30% | NA | Unknown |
| 20 | CA | 224,099 | 4,814 | 4,712 | 15 | No | 2.15% | 0.32% | Unknown |

*Follow-Up Review of Employers with the Most Suspended Wage Items (A-03-03-13026)*

D-1

| 1993-96 Ranking | State | TY 1996 W-2s Reported | TY 1996 W-2s in ESF | TY 2000 W-2s Reported | TY 2000 W-2s in ESF | Present in 1997-2000 Top 100 Employers? | Reporting Accuracy | | Has the Reporting Accuracy Improved? |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | TY 1996 Percent of Reported W-2s in ESF | TY 2000 Percent of Reported W-2s in ESF | |
| 21 | CA | 80,038 | 4,242 | 0 | 0 | No | 5.30% | NA | Unknown |
| 22 | TX | 45,371 | 4,401 | 40,729 | 5,655 | Yes | 9.70% | 13.88% | No |
| 23 | CA | 94,608 | 5,551 | 146,911 | 12,919 | Yes | 5.87% | 8.79% | No |
| 24 | MA | 35,131 | 3,100 | 0 | 0 | No | 8.82% | NA | Unknown |
| 25 | CA | 5,971 | 4,039 | 8,297 | 6,495 | Yes | 67.64% | 78.28% | No |
| 26 | CA | 11,464 | 3,474 | 15,500 | 4,870 | Yes | 30.30% | 31.42% | No |
| 27 | IL | 6,807 | 3,604 | 0 | 0 | No | 52.95% | NA | Unknown |
| 28 | OR | 44,277 | 4,655 | 49,988 | 3,580 | Yes | 10.51% | 7.16% | Yes |
| 29 | CA | 4,216 | 2,783 | 2,052 | 1,350 | No | 66.01% | 65.79% | Yes |
| 30 | KY | 93,733 | 4,218 | 81,819 | 9,485 | Yes | 4.50% | 11.59% | No |
| 31 | KS | 29,804 | 3,143 | 99 | 26 | No | 10.55% | 26.26% | Unknown |
| 32 | NY | 11,030 | 2,386 | 9,726 | 2,514 | No | 21.63% | 25.85% | No |
| 33 | IL | 6,249 | 3,384 | 1,014 | 763 | Yes | 54.15% | 75.25% | No |
| 34 | AR | 578,903 | 3,216 | 0 | 0 | No | 0.56% | NA | Unknown |
| 35 | NC | 107,036 | 2,701 | 99,668 | 2,391 | No | 2.52% | 2.40% | Yes |
| 36 | TX | 39,144 | 3,569 | 24,546 | 1,276 | Yes | 9.12% | 5.20% | Yes |
| 37 | NY | 26,459 | 1,449 | 14,912 | 55 | No | 5.48% | 0.37% | Yes |
| 38 | TX | 8,256 | 2,633 | 6,076 | 2,402 | No | 31.89% | 39.53% | No |
| 39 | CA | 4,317 | 3,084 | 0 | 0 | No | 71.44% | NA | Unknown |
| 40 | KS | 155,893 | 2,879 | 136,577 | 8,555 | Yes | 1.85% | 6.26% | No |
| 41 | CA | 3,401 | 2,648 | 0 | 0 | No | 77.86% | NA | Unknown |
| 42 | CA | 4,748 | 2,713 | 57 | 0 | No | 57.14% | 0.00% | Unknown |
| 43 | AZ | 7,543 | 2,481 | 9,511 | 3,357 | Yes | 32.89% | 35.30% | No |
| 44 | IL | 7,386 | 2,721 | 8,148 | 162 | No | 36.84% | 1.99% | Yes |
| 45 | IL | 5,407 | 2,682 | 10,399 | 6,727 | Yes | 49.60% | 64.69% | No |
| 46 | CA | 64,356 | 2,439 | 0 | 0 | No | 3.79% | NA | Unknown |
| 47 | SC | 4,641 | 1,935 | 7,076 | 3,310 | No | 41.69% | 46.78% | No |
| 48 | CA | 3,658 | 2,798 | 2,864 | 4 | No | 76.49% | 0.14% | Yes |

*Follow-Up Review of Employers with the Most Suspended Wage Items (A-03-03-13026)*

D-2

| 1993-96 Ranking | State | TY 1996 W-2s Reported | TY 1996 W-2s in ESF | TY 2000 W-2s Reported | TY 2000 W-2s in ESF | Present in 1997-2000 Top 100 Employers? | Reporting Accuracy TY 1996 Percent of Reported W-2s in ESF | TY 2000 Percent of Reported W-2s in ESF | Has the Reporting Accuracy Improved? |
|---|---|---|---|---|---|---|---|---|---|
| 49 | WA | 3,841 | 2,027 | 3,527 | 2,128 | No | 52.77% | 60.33% | No |
| 50 | NY | 26,091 | 3,511 | | 0 | No | 13.46% | NA | Unknown |
| 51 | OH | 66,903 | 3,244 | 47,769 | 7,976 | Yes | 4.85% | 16.70% | No |
| 52 | TN | 93,011 | 1,973 | 51,458 | 1,403 | No | 2.12% | 2.73% | No |
| 53 | CA | 9,351 | 2,191 | | 0 | No | 23.43% | NA | Unknown |
| 54 | IL | 2,554 | 1,866 | 2,329 | 1,806 | No | 73.06% | 77.54% | No |
| 55 | FL | 5,085 | 2,603 | | 0 | No | 51.19% | NA | Unknown |
| 56 | FL | 1,977 | 952 | | 0 | No | 48.15% | NA | Unknown |
| 57 | CA | 11,019 | 2,485 | 14,921 | 4,790 | Yes | 22.55% | 32.10% | No |
| 58 | CA | 6,345 | 1,715 | 6,344 | 2,396 | No | 27.03% | 37.77% | No |
| 59 | CA | 6,639 | 2,722 | | 0 | No | 41.00% | NA | Unknown |
| 60 | OH | 37,573 | 2,928 | 35,772 | 7,061 | Yes | 7.79% | 19.74% | No |
| 61 | WA | 3,394 | 2,348 | 3,880 | 2,622 | No | 69.18% | 67.58% | Yes |
| 62 | FL | 3,824 | 1,028 | | 0 | No | 26.88% | NA | Unknown |
| 63 | IA | 5,132 | 2,330 | 6,473 | 4,126 | Yes | 45.40% | 63.74% | No |
| 64 | CA | 7,086 | 2,551 | 10,354 | 4,794 | Yes | 36.00% | 46.30% | No |
| 65 | CA | 17,730 | 3,617 | 15,661 | 5,089 | Yes | 20.40% | 32.49% | No |
| 66 | NY | 443,776 | 2,214 | 442,395 | 943 | No | 0.50% | 0.21% | Yes |
| 67 | TX | 2,958 | 1,692 | | 0 | No | 57.20% | NA | Unknown |
| 68 | CA | 2,990 | 1,944 | 3,252 | 2,234 | No | 65.02% | 68.70% | No |
| 69 | WA | 2,955 | 1,868 | 4,194 | 2,785 | Yes | 63.21% | 66.40% | No |
| 70 | TX | 14,767 | 1,611 | 12,359 | 1,554 | No | 10.91% | 12.57% | No |
| 71 | WA | 3,712 | 2,261 | 5,221 | 3,574 | Yes | 60.91% | 68.45% | No |
| 72 | CA | 7,159 | 2,125 | 685 | 133 | No | 29.68% | 19.42% | Unknown |
| 73 | NC | 32,368 | 2,576 | 27,271 | 3,375 | Yes | 7.96% | 12.38% | No |
| 74 | NJ | 9,614 | 1,692 | 9,583 | 1,776 | No | 17.60% | 18.53% | No |
| 75 | CA | 2,486 | 1,771 | 3,651 | 2,755 | No | 71.24% | 75.46% | No |
| 76 | MN | 280,056 | 2,261 | 407,714 | 7,458 | Yes | 0.81% | 1.83% | No |

*Follow-Up Review of Employers with the Most Suspended Wage Items (A-03-03-13026)*

D-3

| 1993-96 Ranking | State | TY 1996 W-2s Reported | TY 1996 W-2s in ESF | TY 2000 W-2s Reported | TY 2000 W-2s in ESF | Present in 1997-2000 Top 100 Employers? | Reporting Accuracy | | Has the Reporting Accuracy Improved? |
| | | | | | | | TY 1996 Percent of Reported W-2s in ESF | TY 2000 Percent of Reported W-2s in ESF | |
|---|---|---|---|---|---|---|---|---|---|
| 77 | UT | 57,373 | 3,245 | 91,086 | 5,222 | Yes | 5.66% | 5.73% | No |
| 78 | IL | 3,645 | 2,501 | 4,647 | 3,565 | Yes | 68.61% | 76.72% | No |
| 79 | CA | 3,084 | 2,098 | 3,810 | 2,919 | No | 68.03% | 76.61% | No |
| 80 | AL | 58,598 | 2,464 | 64,325 | 4,031 | Yes | 4.20% | 6.27% | No |
| 81 | CA | 2,749 | 2,326 | 3 | 0 | No | 84.60% | 0.00% | Unknown |
| 82 | CA | 2,746 | 1,870 | | 0 | No | 68.10% | NA | Unknown |
| 83 | TX | 20,661 | 4,191 | 32,282 | 8,931 | Yes | 20.28% | 27.67% | No |
| 84 | CA | 2,167 | 1,610 | 2,224 | 1,651 | No | 74.30% | 74.24% | Yes |
| 85 | CA | 6,735 | 1,842 | 5,603 | 1,818 | No | 27.35% | 32.45% | Yes |
| 86 | CA | 1,930 | 1,396 | 1,268 | 909 | No | 72.33% | 71.69% | Yes |
| 87 | TX | 377,808 | 1,660 | 343,106 | 1,480 | No | 0.44% | 0.43% | Yes |
| 88 | TX | 18,474 | 2,637 | 20,937 | 2,283 | No | 14.27% | 10.90% | Yes |
| 89 | FL | 4,589 | 2,249 | 3,424 | 2,237 | Yes | 49.01% | 65.33% | No |
| 90 | NC | 3,244 | 2,725 | 277 | 176 | No | 84.00% | 63.54% | Unknown |
| 91 | CA | 5,519 | 320 | 8,121 | 2,620 | No | 5.80% | 32.26% | No |
| 92 | NJ | 4,126 | 2,779 | 0 | 0 | No | 67.35% | 0.00% | Yes |
| 93 | FL | 16,033 | 1,378 | 41,772 | 2,286 | No | 8.59% | 5.47% | Yes |
| 94 | CA | 8,578 | 1,587 | 9,645 | 2,435 | No | 18.50% | 25.25% | No |
| 95 | NJ | 4,974 | 2,514 | 7 | 0 | No | 50.54% | 0.00% | Unknown |
| 96 | CA | 35,006 | 1,478 | 33,405 | 2,093 | No | 4.22% | 6.27% | No |
| 97 | CA | 1,699 | 1,347 | 2,555 | 2,177 | No | 79.30% | 85.21% | No |
| 98 | TX | 15,115 | 1,766 | 13,941 | 3,320 | No | 11.68% | 23.81% | No |
| 99 | IL | 50,135 | 2,509 | 54,303 | 689 | No | 5.00% | 1.27% | Yes |
| 100 | KS | 52,516 | 1,843 | 50,317 | 1,830 | No | 3.51% | 3.64% | No |
| **Totals** | | 6,738,264 | 340,922 | 5,085,385 | 365,153 | | | | |

**Note:** Some of the TY 1996 accuracy rates have been adjusted from the earlier audit to (1) show a more precise rate and (2) account for the most recent employer wage reporting information available in the Agency's systems.

*Follow-Up Review of Employers with the Most Suspended Wage Items (A-03-03-13026)*

D-4

# Agency Comments



# SOCIAL SECURITY

MEMORANDUM                                      32226-24-950

Date:    October 17, 2003                       Refer To: S1J-3

To:      James G. Huse, Jr.
         Inspector General

From:    Larry W. Dye   /s/
         Chief of Staff

Subject: Office of the Inspector General (OIG) Draft Report, "Follow-up Review of
         Employers with the Most Suspended Wage Items" (A-03-03-13026)--
         INFORMATION


         We appreciate OIG's efforts in conducting this follow-up review.  Our comments
         on the recommendations are attached.

         Please let us know if we can be of further assistance.  Staff questions can be
         referred to Janet Carbonara at extension 53568.

         Attachment:
         SSA Response

---

**No-Match Cert. Admin. Record  304**

**COMMENTS ON THE OFFICE OF THE INSPECTOR GENERAL (OIG) DRAFT REPORT, "FOLLOW-UP REVIEW OF EMPLOYERS WITH THE MOST SUSPENDED WAGE ITEMS" A-03-03-13026**

We appreciate the opportunity to comment on the draft report. As stated in this report, the Agency has, and continues to pursue activities that would remove items from the Earnings Suspense File (ESF) and promote prevention efforts. We have worked with the Internal Revenue Service (IRS) to encourage them to consider penalizing employers who continually have larger amounts or percentages of wage items placed in the ESF during wage and tax statement processing. To assist IRS in the analysis of this proposal, we provided IRS with a list of the Top 100 employers of wage items placed in the ESF based on both volume and percentage for tax years 1999 and 2000. In addition, we have worked with the Treasury Inspector General (IG) to further support this activity. Based on a Treasury IG report, the IRS is studying the effect of imposing penalties on the most egregious employers who place items in the ESF.

Below are our specific comments to the recommendation.

**Recommendation 1**

Establish preventive controls to detect wage reporting errors and irregularities, including a link between the new Earnings Data Warehouse and Employer Service Liaison Officer (ESLO) efforts.

**Comment**

We agree. Phase II of the Earnings Data Warehouse (EDW), scheduled for implementation in March 2004, will incorporate employer records (W-3's) with much of the associated detail. Phase II will have historical data from receipt year 1999 (tax year 1998) through the present receipt year data and will also have the data to identify employers who have, or had, incorrect name/SSN combinations.

Additionally, our ESLOs go through extensive efforts to assist employers in their wage reporting issues. ESLOs will have access to EDW through the Brio tool, an on-line analytical processing tool used to analyze data, and are able to perform ad-hoc queries on a larger number of data sources.

**No-Match Cert. Admin. Record  305**

*Appendix F*

# OIG Contacts and Staff Acknowledgments

## OIG Contacts

Walter Bayer, Director, (215) 597-4080

## Staff Acknowledgments

In addition to those named above:

Michael Thomson, Senior Auditor

Richard Devers, Senior Auditor

For additional copies of this report, please visit our web site at http://www.ssa.gov/oig or contact the Office of the Inspector General's Public Affairs Specialist at (410) 966-1375. Refer to Common Identification Number A-03-03-13026.

# DISTRIBUTION SCHEDULE

Commissioner of Social Security

Office of Management and Budget, Income Maintenance Branch

Chairman and Ranking Member, Committee on Ways and Means

Chief of Staff, Committee on Ways and Means

Chairman and Ranking Minority Member, Subcommittee on Social Security

Majority and Minority Staff Director, Subcommittee on Social Security

Chairman and Ranking Minority Member, Subcommittee on Human Resources

Chairman and Ranking Minority Member, Committee on Budget, House of Representatives

Chairman and Ranking Minority Member, Committee on Government Reform and Oversight

Chairman and Ranking Minority Member, Committee on Governmental Affairs

Chairman and Ranking Minority Member, Committee on Appropriations, House of Representatives

Chairman and Ranking Minority, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations,
   House of Representatives

Chairman and Ranking Minority Member, Committee on Appropriations, U.S. Senate

Chairman and Ranking Minority Member, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, U.S. Senate

Chairman and Ranking Minority Member, Committee on Finance

Chairman and Ranking Minority Member, Subcommittee on Social Security and Family Policy

Chairman and Ranking Minority Member, Senate Special Committee on Aging

Social Security Advisory Board

# Overview of the Office of the Inspector General

## Office of Audit

The Office of Audit (OA) conducts comprehensive financial and performance audits of the Social Security Administration's (SSA) programs and makes recommendations to ensure that program objectives are achieved effectively and efficiently. Financial audits, required by the Chief Financial Officers' Act of 1990, assess whether SSA's financial statements fairly present the Agency's financial position, results of operations and cash flow. Performance audits review the economy, efficiency and effectiveness of SSA's programs. OA also conducts short-term management and program evaluations focused on issues of concern to SSA, Congress and the general public. Evaluations often focus on identifying and recommending ways to prevent and minimize program fraud and inefficiency, rather than detecting problems after they occur.

## Office of Executive Operations

The Office of Executive Operations (OEO) supports the Office of the Inspector General (OIG) by providing information resource management; systems security; and the coordination of budget, procurement, telecommunications, facilities and equipment, and human resources. In addition, this office is the focal point for the OIG's strategic planning function and the development and implementation of performance measures required by the *Government Performance and Results Act*. OEO is also responsible for performing internal reviews to ensure that OIG offices nationwide hold themselves to the same rigorous standards that we expect from SSA, as well as conducting investigations of OIG employees, when necessary. Finally, OEO administers OIG's public affairs, media, and interagency activities, coordinates responses to Congressional requests for information, and also communicates OIG's planned and current activities and their results to the Commissioner and Congress.

## Office of Investigations

The Office of Investigations (OI) conducts and coordinates investigative activity related to fraud, waste, abuse, and mismanagement of SSA programs and operations. This includes wrongdoing by applicants, beneficiaries, contractors, physicians, interpreters, representative payees, third parties, and by SSA employees in the performance of their duties. OI also conducts joint investigations with other Federal, State, and local law enforcement agencies.

## Counsel to the Inspector General

The Counsel to the Inspector General provides legal advice and counsel to the Inspector General on various matters, including: 1) statutes, regulations, legislation, and policy directives governing the administration of SSA's programs; 2) investigative procedures and techniques; and 3) legal implications and conclusions to be drawn from audit and investigative material produced by the OIG. The Counsel's office also administers the civil monetary penalty program.

# Social Security Administration's No-Match Letter Program: Implications for Immigration Enforcement and Workers' Rights

Chirag Mehta

Center for Urban
Economic Development

Nik Theodore

Center for Urban
Economic Development

Marielena Hincapié

National Immigration
Law Center

November 2003

Center for Urban Economic Development
University of Illinois at Chicago

Center for Community
Change/National Campaign for Jobs
and Income Support

National Interfaith Committee for
Worker Justice

National Immigration Law Center

Jobs with Justice

This study is supported by grants from the Rockefeller Foundation and
Rosenberg Foundation.

## ACKNOWLEDGEMENTS

The partners in this study would like to acknowledge the following organizations for their research support:

American Friends Service Committee, TX
Association of Haitian Women, MA
Boston Jobs with Justice
California Committee on Occupational Safety and Health
Catholic Charities of Dallas
Catholic Charities, CA
Catholic Charities, NY
Catholic Legal Immigration Network
Centro Sin Fronteras, IL
Chicago ACORN
Chicago Interfaith Committee on Workers' Issues
Chicago Jobs with Justice
Chicago Workers' Center
El Centro Inc., Kansas City, KS
Equal Justice Center, TX
Greater Boston Legal Services
Hotel Employees and Restaurant Employees Local 1, IL
Hotel Employees and Restaurant Employees Local 450, IL
Indianapolis Jobs with Justice
Inmigrantes Latinos en Acción, TX
International Union of Operating Engineers Local 150, IL
Latino Organization of the Southwest, IL

Michigan Migrant Legal Services
Michigan Organizing Project
New Jersey Immigration Policy Network
New York Civic Participation Project
The New York Immigration Coalition
One World Community Health Center, NE
Programa Cielo, IL
SEIU Local 1, IL
SEIU Local 32BJ, NY
Service Employees International Union Local 790, CA
Somos un Pueblo Unido, NM
St. Pius V, IL
St. Sylvester, IL
Su Casa, OH
Sweatshop Watch, CA
UCLA Center for Labor Research and Education
United Electrical, Radio and Machine Workers of America, IL
United Food and Commercial Workers Local 1445, MA
United Food and Commercial Workers Local 1500, NY
UNNIR, IL
Voces de la Frontera, WI

We would like to thank the following individuals for their help in implementing the survey and conducting in-depth interviews with workers and employers: Katy Nuñez-Adler, Stephanie Alaimo, Jacobita Alonso, Elizabeth Ballesteros, Carolina Bank, Ken Barger, Maria Luisa Bautista, Tim Bell, Van Bensett, Rebecca Burwell, Jennie Busch, Gloria Bustamante, Rosi Carrasco, Ashley Carter, Josefina Castillo, Fr. Brendan Curran, Russ Davis, Ana Maria Diaz, Marc Doussard, Daniel Duberstein, Donya Fernandez, Mary Lee Fitzsimmons, Socorro Flores, Michael Flynn, Yolanda Gallo, Adda García, Anita Grabowski, Maricella Guadarrama, Sarita Gupta, Juana Guzman, Tiffany Heath, Karen Herrling, Angela

Jamison, Nathalia Jaramillo, Karen Leon, Melinda Lewis, Minsu Longiaru, Roberto Lopez, Emma Lozano, Martin Manteca, Vicky Mayster, Mary Beth Maxwell, Dan McMahon, Yvonne Montejano, Victor Narro, Christine Neumann-Ortiz, Mary Ochs, Jose Oliva, Veronica Ortiz, Eleuteria Rosales, Julien Ross, Gouri Sadhwani, Margaret Singer, Maureen Sullivan, Jose Torres, and Martin Unzueta.

We also would like to thank the following individuals for their comments on previous drafts of this report: Ron Baiman, Tim Bell, Josh Bernstein, Marc Doussard, Adda García, Sarita Gupta, Kimary Lee, Melinda Lewis, Nina Martin, Yvonne Montejano, Victor Narro, Joe Persky, Alicia Tanguma, and Svjetlana Tepavcevic.

Finally, we acknowledge the Rockefeller Foundation and Rosenberg Foundation for their financial assistance without which this study could not have been completed.

Additional copies of this report can be downloaded on-line from the Center for Urban Economic Development website at www.uic.edu/cuppa/uicued.

Please direct questions or requests for further information to:

Chirag Mehta
Research Associate
Center for Urban Economic
Development
University of Illinois at Chicago
Ph: 312-355-0744
Email: cmehta3@uic.edu

Nik Theodore
Director
Center for Urban Economic
Development
University of Illinois at Chicago
Ph: 312-996-8378
Email: theodore@uic.edu

Marielena Hincapié
Staff Attorney
National Immigration Law Center
405 14th Street, Suite 1400
Oakland, CA 94612
Ph: (510) 663-8282 ext. 305
Email: hincapie@nilc.org

Project# 490

# TABLE OF CONTENTS

**Executive Summary** ................................................................................. i

**Introduction** ........................................................................................... 1

**The SSA No-Match Letter Program and Its Impact on the ESF** ....................... 5
Employer no-match letters .......................................................................... 6
No-match letters are unlikely to generate corrections in SSN information ............ 7

**Employer No-Match Letter Program and Immigration Enforcement** ............... 13
Employers often indiscriminately fire workers with unmatched SSNs ................ 13
Employers use letters to undermine workers' rights ...................................... 16
Firings do not remove undocumented immigrants from the labor market ........... 18
Employers retain undocumented immigrants ............................................... 19
Some employers use no-match letters to take advantage of workers .................. 23
Indiscriminate firings impact authorized workers ........................................ 25
Using SSA no-match letters as immigration enforcement tools replicates
ineffectiveness of IRCA's employer sanctions provisions ............................... 27
No-match letters are inappropriate as an immigration enforcement tool ............ 30

**Policy Recommendations** ....................................................................... 32
The no-match letter program ..................................................................... 32
On-line verification system ....................................................................... 33
Comprehensive immigration reform ............................................................ 34

Appendix A: Sample No-match Letter Sent to Employers .............................. 36

Appendix B: Methodology .......................................................................... 42

Appendix C: Summary of SSA ESF Correction Programs .............................. 47

Appendix D: SSA No-Match Letter Sent to New Mexico Employer .................. 49

References .............................................................................................. 50

# EXECUTIVE SUMMARY

The U.S. Social Security Administration (SSA) began its employer "no-match letter" program to help properly allocate the billions of dollars of contributions collected from workers with incorrectly filed Social Security numbers (SSNs). Under the program, SSA sends letters to employers every year that identify the Social Security numbers of employees who do not match names or numbers in SSA's records. The goal of the no-match letter program is to reduce the size of the Earnings Suspense File (ESF), which holds unallocated funds collected from workers whose SSN filed on their W-2s does not match names in SSA's database.

Although they were not designed as a mechanism of immigration enforcement, employer no-match letters inadvertently have become *de facto* immigration enforcement tools. Employers have fired thousands of workers identified in no-match letters, assuming that they are undocumented immigrants. In addition, many workers identified in the letters have quit their jobs out of concern that immigration authorities may raid their workplace. Further evidence indicates that many employers have used the letters to undermine workers' right to organize and to cut pay and benefits.

This study, conducted by the Center for Urban Economic Development at the University of Illinois at Chicago and immigrant rights organizations, assesses the wide-ranging impacts of SSA's no-match letter program on local labor markets and immigration enforcement efforts. The findings are based on the results of the No-Match Letter Survey of 921 workers who were identified in no-match letters sent to 342 employers in 18 states. The survey was conducted between June 1 and September 15, 2003. Among the major findings of this study are the following:

## 1. No-match letters have been ineffective in reducing the size of the ESF

The fact that most workers with unmatched SSNs are undocumented immigrants has confounded SSA's efforts to mitigate growth of the ESF through the no-match letter program.

- When compared to other means SSA uses to correct unmatched names and SSNs, audits by SSA's Office of Inspector General (OIG) indicate that no-match letters account for 2 percent or less of total corrections.

- A substantial number of workers with wage items in the ESF are undocumented immigrants who, because they are unable to obtain a legitimate SSN, will be unable to provide corrected information.

## 2. No-match letters have inadvertently encouraged employers to fire workers with unmatched SSNs

Even with clear guidance from SSA stating that employers should not take adverse actions against any employee who is identified in a no-match letter, employers mistakenly perceive no-match letters to be a matter of immigration enforcement. Left to interpret the letters without a clear understanding of immigration laws, employers frequently take adverse actions against identified workers without actual or constructive knowledge of their immigration status.

i

- Thirty-four percent of workers who were fired reported that their employer failed to grant them an opportunity to correct their SSN.

- No-match letters frequently list authorized workers, placing them at risk of wrongful termination.

### 3. The no-match letter program has encouraged some employers to take advantage of workers with unmatched SSNs

Employers often use the information in no-match letters to take advantage of workers by undermining their right to organize or by cutting wages and benefits.

- Twenty-five percent of workers reported their employers fired them in retaliation for complaining about inadequate worksite conditions.

- Twenty-one percent of workers listed in no-match letters reported their employer fired them in retaliation for union activity.

- Many workers reported that while their employers retained them despite incorrect SSNs, their wages were reduced or their benefits were cut.

### 4. No-match letters are ill-suited as immigration enforcement tools

Rather than removing undocumented immigrants from labor markets, the no-match letter program has catalyzed a policy-induced churning in local labor markets as workers either are fired or quit their jobs only to join the overcrowded pool of workers vying for positions in traditional immigrant occupations. Furthermore, the no-match letter program does not substantially deter employers from retaining or hiring undocumented immigrants. Twenty-three percent of employers retained workers with unmatched SSNs who failed to correct their information with the SSA.

### 5. Policy recommendations

Given the fruitless performance and negative consequences of the no-match letter program, SSA should end the program and consider alternative tools for reducing the size of the ESF. Furthermore, the findings call into question efforts that rely on employers to verify or correct workers' SSNs including SSA's pilot electronic SSN verification system.

Comprehensive immigration reform is necessary to halt growth in the ESF, and more importantly, to reconcile employers' demand for workers, immigrants' needs for employment, and U.S. immigration policy. Comprehensive immigration reform must include a plan for how to provide legal status to current and future immigrants who will, despite border-enforcement measures and employer sanctions, find a job with or without a valid Social Security number.

## INTRODUCTION

We come here to work and these companies have grown on our cheap labor....
They always knew that we didn't have documents, I don't understand why they are
doing this to us.

> Comments by a worker after being fired for having an unmatched Social Security
> number (Interview #1 2003).

This problem is not caused by Target. The federal government has put Target and
many other employers in a very uncomfortable situation.

> Representative of Target Corporation commenting on the company's dilemma in
> responding to the Social Security Administration's no-match letter (quoted in Hamill
> 2003).

Each year, the Social Security Administration (SSA) posts billions of dollars
to the Earnings Suspense File (ESF) because employee names and Social Security
numbers (SSNs) on wage filings do not match records in SSA databases. The ESF,
which contains Social Security contributions made by workers, grew dramatically
during the 1990s, and by July 2002, stood at $374 billion (SSA OIG 2003). There are
several reasons why workers' SSNs may not match records in SSA's databases. In
some cases, a clerical error, such as the misspelling of a person's name or the
transposition of numbers in the SSN, results in a mismatch on an employee's record.
In other cases, workers have submitted an invalid SSN because they are
undocumented immigrants who do not have proper employment authorization.

In its effort to reduce the size of the ESF and to properly allocate
contributions to workers' accounts, SSA sends "no-match" letters to employers as
part of its Educational Correspondence program. Under this program, when SSA
detects a mismatched name and SSN on a filed wage report, a letter is mailed to
notify the employer of the problem (see Appendix A for a copy of a no-match letter
sent to employers in 2003). SSA assumes that most of the earnings in the ESF
belong to workers with valid SSNs, and therefore simple notification would allow
employers and workers to quickly correct the problem.

1

However, no-match letters erroneously have come to be seen as a tool of immigration enforcement. The widespread perception that the employer no-match letter program[1] is a component of an integrated immigration control effort has caused the program to have a series of harmful labor market effects. Anecdotal evidence suggests that employers, after receiving no-match letters, have fired thousands of workers assuming they are undocumented immigrants who have used false SSNs to obtain employment. Employers fear that retaining these workers might place them in violation of federal immigration laws. Firings have become commonplace and are indicative of the way in which many employers respond to the letters when workers with unmatched SSNs are on their payroll. For example, in 2003, Peco Foods Inc. of Canton, Mississippi fired 200 workers who were identified in a no-match letter (Matthews 2003); Suncast Inc., a Chicago-area outdoor garden product manufacturer, dismissed more than 100 workers because they did not correct their information before the expiration of a company-imposed 30-day deadline (Bolzen 2003); and PartyLite Gifts, a candle manufacturer near Chicago, fired 25 workers who were identified in a no-match letter (Bolzen 2003).

Many workers also assume that the letter has been sent as a matter of immigration enforcement. Employers have complained that when they notify employees of the need to correct their SSN, workers often quit rather than risk being caught by immigration authorities and deported. Employers find this unexpected turnover disruptive to their staffing and workflow. Many employers, averse to such disruptions, may choose to retain workers with unmatched SSNs despite the risk.

Workers' rights advocates and business organizations have requested that SSA discontinue sending no-match letters to employers on the grounds that the letters confuse employers and have resulted in thousands of unnecessary job separations. For its part, SSA contends that it must continue the program to meet its

---

[1] SSA also sends no-match letters to workers to their places of residence. In this study, all references to SSA's no-match letter program relate only to letters SSA sends to employers.

2

congressionally mandated obligation to slow the growth of the ESF.  To its credit, SSA has taken concrete steps to make it clear to employers that the no-match letter is not being sent as part of an immigration enforcement effort.  SSA recently included the following language in the 2003 letter to further clarify this issue for employers:

> IMPORTANT: This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security Number.  Nor does it make any statement about the employee's immigration status.

However, despite these efforts, there is scant evidence that employers' misconceptions about the connection between no-match letters and immigration enforcement have improved.

Employer no-match letters inescapably have become *de facto* immigration enforcement tools.  While Immigration and Customs Enforcement (ICE) (formerly part of the enforcement division of the Immigration and Naturalization Service) receives headlines for highly publicized raids on employers, as they did when approximately 300 workers in 16 states were detained for allegedly working without legal status for Wal-Mart Inc. and its subcontractors, the no-match letter program has quietly resulted in the removal of perhaps *tens of thousands* of workers from their jobs.  A crucial difference between these efforts is that when ICE raids workplaces, there is a policy and legal framework that directs those actions.  The no-match letter program, on the other hand, is not a sanctioned immigration enforcement program, a point that is almost entirely lost on employers.  Upon receipt of a letter, employers unilaterally determine whether workers are undocumented immigrants.  The actions employers take against these workers vary based on their workforce needs and their (often faulty) understanding both of complex immigration laws and of the no-match letter program.

This report examines the wide-ranging impacts of employer no-match letters on the ESF, local labor markets, and immigration enforcement using a survey of 921 workers employed by 342 companies in 18 states who were identified in no-match

3

letters sent to their employers (hereafter referred to as the No-Match Letter Survey). These data are supplemented by in-depth interviews with 26 workers, discussions with a small group of employers, and publicly available data.

In this report, case studies and quotes are drawn from interviews with workers and employers. To protect their privacy, the names used to identify these individuals are not their own. However, names of workers and employers drawn from media sources and other publications are reproduced here as published.

4

## THE SSA NO-MATCH LETTER PROGRAM AND ITS IMPACT ON THE ESF

Under Title II of the Social Security Act, SSA is required to maintain records of the wages paid by employers.  At the end of each tax year (TY), employers report employees' earnings to SSA and the Internal Revenue Service (IRS) through the Wage and Tax Statement (IRS Form W-2).  SSA then posts reported earnings for every employee to an earnings record in the Master Earnings File which is used to determine an individual's eligibility for, as well as the amount of, their retirement, disability, or survivor benefits.  In instances where SSA cannot match an employee's SSN and name as reported on the W-2, the worker's earnings are posted to the ESF.

SSA's campaign to reduce the size of the ESF is a response to its staggering growth in recent years.  As of July 2002, the ESF contained some 236 million wage items totaling approximately $374 billion, representing unaccounted for wages reported for TY 1937 through TY 2000 (SSA OIG 2002).  In TY 2000 alone, SSA posted 9.6 million items and $49 billion in wages to the ESF, a nearly seven-fold increase during the decade (SSA OIG 2003).

Table 1: Growth in the Earnings Suspense File

| Tax year | Total items in suspense as of July 2002 | Total wages in suspense as of July 2002 |
|---|---|---|
| 1990 | 3,497,285 | $ 9,286,663,303 |
| 1991 | 3,360,453 | $ 9,819,241,451 |
| 1992 | 3,932,560 | $ 11,426,894,284 |
| 1993 | 4,791,851 | $ 14,757,140,537 |
| 1994 | 5,095,635 | $ 16,260,016,741 |
| 1995 | 5,529,921 | $ 18,657,123,092 |
| 1996 | 6,118,639 | $ 22,295,985,657 |
| 1997 | 6,506,174 | $ 26,222,918,498 |
| 1998 | 7,136,668 | $ 31,280,270,975 |
| 1999 | 8,332,253 | $ 39,026,283,645 |
| 2000 | 9,596,161 | $ 49,398,030,726 |

Source: SSA OIG 2002.

5

Figure 1: Growth of ESF, 1990 - 2000



Source: SSA OIG 2002.

**Employer no-match letters**

     Prior to 2002, SSA sent letters only to employers if they submitted 10 or more unmatched SSNs and the wages earned by workers with unmatched SSNs represented more than 10 percent of payroll (SSA OIG 2002). Under these criteria, SSA sent between 40,000 and 110,000 letters annually to employers. SSA dramatically increased its use of no-match letters in 2002 by sending notices to all employers filing wage reports resulting in one or more unmatched SSNs. In 2002, SSA mailed letters to approximately 950,000 employers, each listing up to 500 unmatched SSNs (SSA OIG 2002).

     There are a number of reasons an employee's SSN as reported on their W-2 might trigger a no-match letter. Among workers who have authorization to work, the most common reasons include: (1) an error in the spelling of an employee's name or in the SSN; (2) an unreported name change following a marriage or divorce; and (3) an incomplete or missing name on the W-2. Immigrants are more likely to be identified in no-match letters because they often use compound, maternal or paternal last names; have commonly misspelled names; and often inconsistently spell their

6

names on various legal documents. Finally, workers who once worked without authorization but have since obtained legal status and a valid SSN, yet continue working under the old SSN for fear of losing their job, might also trigger a no-match letter.

Citing cost factors and the relative ineffectiveness of no-match letters in correcting erroneous information, SSA curtailed the number of letters sent in 2003.[2] SSA sent no-match letters only to those employers with 10 or more unmatched SSNs that accounted for at least one-half of 1 percent of the total number of wage items the employer reported in TY 2002. With these thresholds in place, SSA estimates it will mail 130,000 no-match letters in 2003.[3]

### No-match letters are unlikely to generate corrections in SSN information

Data from the No-Match Letter Survey and other evidence suggest that, for several reasons, the no-match letter program will not produce a substantial number of corrections to wage items in the ESF. First, when compared to other tools SSA uses to correct unmatched names and SSNs, SSA's own audits indicate that employer no-match letters account for only a minimal percentage of total corrections (Table 2). Of the various mechanisms used, the most effective method of correcting mismatches is the Single Select Process (see Appendix C for a description of each program). In TY 1998, for example, this process was responsible for 61 percent of all corrections. The Educational Correspondence (EDCOR) program that primarily involves the mailing of no-match letters to employers, on the other hand, was responsible for just 2 percent or less of all corrections.

---

[2] SSA estimates that administrative costs incurred in TY 2001 in attempting to correct no-matches and reduce the ESF include (SSA OIG 2000): $5.4 million to send notices to every individual whose name and SSN do not match SSA's records; $600,000 to send 944,000 notices to all employers who submitted wage reports with at least one item posted to the ESF; more than $200,000 for system maintenance and cyclical changes; and an average of $9.00 for each call to SSA's national toll free telephone number generated by the notices. SSA estimates the agency received about 100,000 inquiries throughout 2002 regarding the TY 2001 letter.

[3] As of September 26, 2003, SSA had mailed 98.5 percent (124,000) of the letters slated to be mailed in TY 2002.

Table 2: SSA Processes for Addressing the ESF

| SSA process | % of total corrections attributed to process |
|---|---|
| Single Select Process | 61% |
| Prior Reinstate Process | 17% |
| Decentralized Correspondence (DECOR) Process | 8% |
| IRS Reinstatement Process | 8% |
| Item Correction | 2% |
| Operation 30 | 2% |
| Other (including the no-match letter program) | 2% |

Source: SSA OIG 2002.

Second, a substantial number of workers with wage items in the ESF are undocumented immigrants who, because they are unable to obtain a legitimate SSN, will be unable to provide corrected information.[4] SSA cannot credit undocumented immigrants with wages earned under false SSNs until workers obtain a valid SSN, at which time the worker must file to have his or her earnings record amended. To many workers whose employers have received a no-match letter, this point is obvious. One undocumented immigrant interviewed for this study remarked, "Don't they [SSA] know that most of us are undocumented? They must know that the information will never be corrected until they give us valid Social Security numbers" (Interview #2 2003).

There appears to be a relationship between increases in undocumented immigration and increases in the ESF. The dramatic growth of the ESF has coincided with rising levels of undocumented immigration (Figures 2 and 3). Because undocumented immigrants are barred from drawing on the Social Security contributions they make, earnings levels in the ESF continue to climb.

---

[4] A recent evaluation of the SSA's Tactical Plan for addressing the growth of the ESF indicates that SSA is aware that "industries hiring transient employees who may not have work authorization from the Immigration and Naturalization Service may account for a major portion of ESF wage items" (SSA OIG 2000).

Figure 2: Flow of undocumented Mexican immigrants to the U.S., 1946-1998



Source: NAID 2003.

Figure 3: Annual suspended earnings, 1946-2000



Source: SSA OIG 2003.

Providing further evidence of the relationship between growth of the ESF and growth in the undocumented population, Table 3 demonstrates that the distribution of no-match letters across states closely matches the distribution of undocumented immigrants by state.

9

Table 3: Distribution of employer no-match letters in 2003 across states versus distribution of undocumented immigrants

| State | # of employer no-match letters mailed as of 7/12/03 | # of undocumented persons residing in state (in thousands) |
|---|---|---|
| California | 28,935 | 2,209 |
| Texas | 10,853 | 1,041 |
| Florida | 6,123 | 337 |
| Illinois | 5,612 | 432 |
| New York | 5,091 | 489 |
| New Jersey | 4,154 | 221 |
| Washington | 4,043 | 136 |
| North Carolina | 3,956 | 206 |
| Arizona | 3,675 | 283 |
| Georgia | 3,654 | 228 |
| Colorado | 3,102 | 144 |
| Oregon | 2,459 | 90 |
| Massachusetts | 2,141 | 87 |
| Virginia | 1,901 | 103 |
| Michigan | 1,742 | 70 |
| Nevada | 1,541 | 101 |
| Maryland | 1,525 | 56 |
| Tennessee | 1,486 | 46 |
| Utah | 1,409 | 65 |
| South Carolina | 1,333 | 36 |
| Indiana | 1,278 | 45 |
| Wisconsin | 1,268 | 41 |
| Pennsylvania | 1,247 | 49 |
| Oklahoma | 1,216 | 46 |
| Ohio | 1,212 | 40 |
| Minnesota | 1,180 | 60 |
| Connecticut | 1,097 | 39 |

Sources: SSA 2003 and U.S. INS 2003.

SSA officials are aware that no-match letters are not generating a substantial number of corrections to wage items in the ESF. SSA's own figures indicate that throughout the 1990s, the number of wage items in the ESF increased markedly – despite stepped up efforts to improve the no-match letter program's effectiveness. Commenting on the inability of the program to substantially reduce the size of the ESF, an SSA spokesperson explained that the agency scaled back the scope of the program in 2003 because the expanded program in 2002 "yielded a substantially low

10

number" of corrected records (quoted in Malone 2003).  SSA also concedes rising contributions from unauthorized workers prevent the agency from slowing the growth of the ESF.  A recent evaluation conducted by SSA's Office of the Inspector General reported that agency officials believe that "illegal aliens" account for a large part of the growth of the ESF:  "SSA suspects that employers in certain high turnover industries compound the problem because they may knowingly hire illegal aliens with fraudulent identification ..." (SSA OIG 2000).

Although no-match letters have failed to generate a substantial number of corrected wage items in the ESF, there is an on-going debate over whether to use employer no-match letters to achieve immigration enforcement goals.  Some policymakers and special interest groups contend that the letters have had the unintended, though desirable, effect of removing undocumented immigrants from their jobs.  They insist that this is reason enough to continue sending no-match letters to employers.

For all intents and purposes, employer no-match letters have assumed a prominent role as *de facto immigration enforcement instruments*, raising several concerns for policymakers.  The primary concern is that these letters are not part of a coherent immigration enforcement effort and, therefore, employers by default set their own standards for compliance based on their understanding of complex immigration rules.  Even with clear guidance from SSA stating that employers should not take adverse actions against any employee who is identified in a no-match letter, employers inconsistently apply their own standards for compliance and frequently take adverse actions against identified workers whom they assume are undocumented immigrants.

A related concern is that, while perhaps sharing general standards of compliance, employers may only selectively comply with those standards.  In many cases, employers knowingly hire undocumented immigrants and therefore knowingly are out of compliance with immigration laws.  Despite receiving no-match letters,

11

**No-Match Cert. Admin. Record  325**

which they too perceive as being part of an immigration enforcement effort, these employers decide to retain workers identified in the letters, despite the perceived risks of doing so. In still other cases, employers use the information provided in the letters to take advantage of undocumented immigrants by lowering their wages, cutting their benefits, and undermining their right to organize.

The next section explores whether SSA's no-match letter program has served as a successful immigration enforcement tool by examining both the program's track record in deterring employers from hiring undocumented immigrants and its impact on workers' rights.

12

# EMPLOYER NO-MATCH LETTER PROGRAM AND IMMIGRATION ENFORCEMENT

The previous section showed that the no-match letter program has been ineffective in lowering the number of unmatched wage items in the ESF. This section demonstrates that the no-match letter program is an inappropriate and ineffective immigration enforcement tool because:

- it operates outside the parameters of immigration enforcement – SSA's mandate is to administer the benefits under its purview, not to engage in immigration enforcement – leading to unlawful and indiscriminate firing of workers identified in no-match letters;

- the program exerts little influence over a broad segment of employers that will continue to employ workers with unmatched SSNs to meet their workforce needs;

- it places excessive leverage in the hands of employers that choose to use the no-match letters to extract wage concessions from workers, cut workers' benefits, and undermine workers' rights.

This section presents findings from the No-Match Letter Survey, a survey of a non-random sample of 921 workers representing the actions of 342 employers in 18 states. Additional data were obtained through in-depth interviews with 26 workers in seven states. While the evidence presented here is substantial and the findings are indicative of the experiences of workers affected by employer no-match letters, because the survey is based on a non-random sample, summary statistics should be treated as illustrative rather than statistically representative (see Appendix B for a description of the survey methodology).

## Employers often indiscriminately fire workers with unmatched SSNs

Responses to the No-Match Letter Survey indicate that in many, and perhaps most, cases (53.6 percent) employers responded to the receipt of a no-match letter by discharging the listed workers (Table 3). A small share of these employers re-hired the dismissed workers at a later date. Given that over half of employers identified in the survey discharged workers with unmatched SSNs, the 950,000 letters sent to

13

employers in 2002 have likely resulted in the termination of employment for tens of thousands of workers.

Table 3: Frequency of employers' responses to receipt of SSA no-match letter

| Action | % of employers taking such action against at least one worker (n=315) |
|---|---|
| fired workers without expectation of re-hiring | 41.3% |
| fired workers with expectations of re-hiring | 6.3% |
| fired workers and re-hired workers later | 3.8% |
| fired workers and re-hired them later without benefits | 2.2% |
| employer did not fire workers, but they lost seniority | 0.6% |
| no action and employer did not threaten to take action | 22.9% |
| workers quit before employer took action | 14.6% |
| other action | 5.1% |
| none of the above | 6.7% |

Percentages exceed 100 percent because some employers with multiple workers with unmatched SSNs took more than one course of action.

Employers have discharged workers despite SSA's guidance that such action may be unwarranted and, in some cases, unlawful.[5]  SSA's clearly stated position is that an employer should not take actions against any employee because of a no-match letter.  In the 2003 letter, for example, the agency advises employers that, because the letters in many cases do not signal unlawful employment, "[y]ou should not use this letter to take any adverse action against an employee just because his or her Social Security number appears on the list, such as laying off, suspending, firing or discriminating against that individual.  Doing so could, in fact, violate state or federal law and subject you to legal consequences."[6]

---

[5] There is evidence that suggests not all regional offices of SSA are properly guiding employers on the relationship between issues raised by no-match letters and issues related to immigration enforcement. One employer in New Mexico shared with advocates a letter he received from an SSA regional office in Colorado notifying the employer that the agency discovered one employee had a fraudulent SSN. The letter instructed the employer that it "cannot legally employ him/her until he/she received the proper work authorization from Immigration and Naturalization Service."  See Appendix D for a copy of the letter.

[6] Employers may be subject to liability under a range of employment and labor laws including, but not limited to, Title VII of the Civil Rights Act, Americans with Disabilities Act, Fair Labor Standards Act, Occupational Safety and Health Act, and the National Labor Relations Act.

14

In many instances, despite clear instructions in the letter, employers either indiscriminately fire workers with unmatched SSNs or they give them unreasonably short deadlines to correct their information. It appears most of the employers that decide to fire workers do so without first re-verifying their immigration status. Of the employers that discharged workers and did not re-hire them, 58 percent (n=108) never requested that workers provide proof of authorization (e.g., green card, work permit) to re-verify their immigration status. It is reasonable to assume that in most of these cases, employers do not have constructive knowledge about workers' immigration status and fire them based on the assumption that they are undocumented immigrants. Additionally, 34 percent of workers (weighted n=139) who were fired reported that their employer failed to grant them an opportunity to correct their SSN. Of those who reported they were allowed to make corrections, workers were only given a median of 15 days (weighted n=166) to make the necessary changes – an insufficient period of time for workers to communicate with SSA and receive corrected information.[7]

Additional support for the conclusion that a substantial number of employers do not provide workers sufficient opportunities to correct discrepancies in their Social Security information comes from an outside evaluation of the Basic Pilot, an employment eligibility verification pilot program operated by SSA and Citizenship and Immigration Services (CIS), conducted by the Institute for Survey Research at Temple University and Westat, Inc. (U.S. DOJ INS 2002). The Basic Pilot allows employers to electronically verify the employment authorization of newly hired workers.[8] The evaluation found that participating employers did not inform 73

---

[7] For workers who are indeed authorized to work, correcting their information (such as the spelling of their name) might mean they will also have to go to the Citizenship and Immigration Services (CIS) (formerly part of the service division of the Immigration and Naturalization Service) to correct the source documents before being able to correct their records with SSA, which will undoubtedly take more than 15 days.

[8] The Basic Pilot was authorized under the Illegal Immigration Reform and Individual Responsibility Act of 1996 (IIRIRA) (Pub. L. No. 104-208), which also required that this independent evaluation of the pilot program be conducted.

No-Match Cert. Admin. Record  329

percent of employees who had problems with their work authorization, thus precluding them from correcting their information.

**Employers use letters to undermine workers' rights**

Rather than a sincere effort to comply with immigration laws, some employers have used no-match letters to justify the firing of workers in retaliation for supporting union organizing campaigns or for complaining about poor working conditions. The No-Match Letter Survey found that 21 percent (weighted n=135) of workers reported their employer permanently fired them in retaliation for their union activity. Additionally, 25 percent (weighted n=132) of workers reported that employers fired them in retaliation for complaining about inadequate worksite conditions.

Dan McMahon, Field Director of Organizing for the Chicago and Northeast Illinois District Council of Carpenters, explained how some employers in the residential construction industry hypocritically use the no-match letter to their advantage: "The contractors that are hiring undocumented workers, they get the no-match letter and they ignore it, that's unless the workers try to organize and then [the no-match letter] magically appears" (Interview McMahon 2003).

---

**Employers use no-match letters to undermine workers' right to organize**

*The following is a transcript of testimony presented by a supermarket worker from Los Angeles, California in 2003 at a hearing on the impact of the SSA's no-match letters (UCLA Center for Labor Research and Education 2003).*

I'm a market worker and member of the worker's union. I'm moved by everything that's happening here. It's really sad what's happening to our communities, to all these people.

We were organizing an independent union in the market, in our workplace. We had small resources, so we decided to start organizing ourselves. It was really good because we were overworked, underpaid, abused; so we decided to organize ourselves into a union. We went to election, actually, and we were unsuccessful, but that doesn't discourage workers. We continued to organize and, last year, October 1st, the market fired sixty workers, all immigrants. All these workers were really brave workers. After that, we all believed that this was something that was unjust, for all of us.

The management used these letters only against those workers who were pro-union workers and not those workers who were pro-company workers. But after the suspension of 60 workers, we decided to continue organizing, and we have been organizing ourselves since then. This program doesn't discourage other workers or myself, and we know that we have to continue fighting because this is just an injustice that we face and that many others face around the country. I just think it is really sad. But even though these situations are really sad, I believe they are really good. These situations are motivating people, creating new leaders, and this situation is a favor to the labor movement in the United States.

---

A case referred to the National Labor Relations Board's (NLRB) General Counsel for advice illustrates how employers that might otherwise ignore a no-match letter might be tempted to use it punitively to undermine union organizing drives. In *Personal Optics a/k/a Style Eyes of California* (Case 21-CA-34087 2001), the employer allegedly used information provided in the 2000 no-match letter to fire 45 workers who had invalid SSNs, most of whom were supporting a union organizing drive. While the NLRB General Counsel advised that the union's case for charging the employer with unfair labor practices was weak and recommended dismissing the charge, the General Counsel suggested that the employer's anti-union animus may have been a motivating factor in its decision to fire the workers with unmatched SSNs:

> The timing of the terminations, and the Employer's inconsistent responses to the 2000 and 1998 no-match letters, are suspicious. It took the Employer three months after receiving the 2000 no-match letter to conduct its audit, and the Employer terminated employees with SSN discrepancies soon after employees began visibly supporting the Union and only about a week after the Union filed the representation petition. In contrast, the Employer's 1998 investigation, which occurred in the absence of union activity, took only two weeks and the Employer failed to terminate all employees who actually had invalid SSNs (NLRB 2001).

The case of *Tuv Taam Corp* demonstrates how some employers inappropriately use the implication that workers identified in no-match letters are undocumented immigrants to justify illegal behavior. The employer argued that firing workers striking against unfair labor practices (ULP) was not itself a ULP because the workers were undocumented immigrants (340 NLRB No. 86). The employer based its determination of the workers' immigration status on a no-match letter it received months after firing the workers. Finding no merit in this defense, the NLRB ruled that immigration status has "no bearing on whether [the company] did, in fact, commit the unfair labor practices of which it has been accused" (340 NLRB No. 86). It ruled that the employer committed a ULP by firing the workers and it indicated that it did not consider a no-match letter to be, on its own, "legally cognizable evidence regarding the immigration status of [the fired workers]" (340 NLRB No. 86).

**Firings do not remove undocumented immigrants from the labor market**

Further demonstrating that the no-match letter program has little potential as a viable immigration enforcement tool, even when employers discharge workers who have unmatched SSNs, many workers find their way back into the labor market, sometimes returning to the same employer. This is not to imply that the labor market effects of no-match letters are inconsequential or benign. The no-match letter program has catalyzed a policy-induced churning in local labor markets as workers either are fired or quit their jobs only to join the overcrowded pool of workers vying for positions in traditional immigrant occupations. The demand for undocumented immigrants, which seems to have taken on the characteristic of a structural demand for unauthorized workers to fill jobs at below-market wage rates, remains strong. This means that displaced workers can be re-employed quickly, particularly if they are willing to tolerate low pay and inferior working conditions. The no-match letter program is unable to deter the re-employment of undocumented immigrants, at least until the next round of letters is mailed to employers and the process of churning starts anew.

Fueling the growth of the contingent labor market, employers often replace workers with unmatched SSNs with workers supplied by temp agencies because staffing agencies, as the employer of record, bear the legal responsibility for ensuring that workers dispatched to job sites have authorization to work. One factory worker who was fired because of an unmatched SSN explained that his employer explicitly instructed he and other workers who lost their jobs to go to a particular temp agency where they would be assigned to their original jobs, but at half the hourly wage and without the fringe benefits they received when they were employed directly by the company (Interview #4 2003).

Perhaps more destructive to the wages and working conditions in local labor markets is that, in the search for alternative employment, many workers with unmatched SSNs will be driven deeper into the underground economy where

employer preferences for hiring undocumented workers on a no-questions-asked basis is strongest. This has the effect of swelling the ranks of the underground economy where cash payments are common and wage and hour as well as health and safety violations are the norm.  Moreover, this segment of the economy lies beyond the reach of government regulatory institutions and, therefore, predatory employment practices largely go unchecked.  These ramifications of no-match letters are serious and represent highly damaging distortions to the operations of local labor markets.

### Employers retain undocumented immigrants

The experience of discharged workers suggests that employers' desires to comply with immigration laws are not the principal factor influencing decisions regarding how to handle the problem of unmatched SSNs.  Rather, employers' decisions are based on how they weigh the costs and benefits of compliance with federal immigration laws.  Scrupulous employers that are risk averse may be quick to fire employees identified in a no-match letter, especially if they have large numbers of workers with unmatched SSNs on their payroll and if they have ready access to a pool of replacement workers.  Unscrupulous employers also may attempt to realize benefits from firing workers who are attempting to organize collective bargaining units.  On the other hand, some employers, while concerned about employing undocumented immigrants, may also incur significant lost revenues if discharging workers seriously disrupts the operation of their businesses.  In such cases, employers often decide to run the risks associated with retaining workers they assume are unauthorized.

> **Employers hesitate to fire skilled workers**
>
> Carlos first received notice from his employer, a large Chicago-area beverage distributor, that he was named in a no-match letter in the summer of 2003 (Interview #9 2003).  His employer explained that Carlos and 12 other workers would have 30 days to correct their SSN information or else they would lose their jobs.
>
> On the day of the deadline, the workers decided to go to work as if the deadline did not exist because they did not believe the employer would actually fire them.  After all, the employer had already extended the deadline once before.
>
> The workers were correct.  Their supervisors did not protest when the workers punched in and went to work.  According to Carlos, most of the supervisors welcomed their return.  Many supervisors and managers indicated that they needed the workers because they could not find replacements.  One supervisor said, "We really need you anyway... If you guys want to keep your job, I don't care."  Carlos has five years with the company working as a forklift driver.  He explains that you cannot hire a guy off the street to do his job.  Carlos drove a forklift and earned $11 per hour.  Most of the 13 workers named in the no-match letter were skilled workers like Carlos.

Many employers retain workers with unmatched SSNs, sometimes with knowledge that the workers do not have proper work authorization. Data from the No-Match Letter Survey indicate that 23 percent of employers (n=315) did not fire or threaten to fire workers with unmatched SSNs (Table 3). Furthermore, among the subset of workers whose employers never threatened to fire them (all of whom are undocumented immigrants), approximately one-third (weighted n=46) were asked for a green card to re-verify their immigration status. In these cases, employers likely knew their workers with unmatched SSNs were undocumented immigrants, but chose to continue employing them anyway. The evaluation of the Basic Pilot by Temple University and Westat offers additional evidence that a large percentage of employers continue employing workers even if their SSN or immigration documents are incorrect. Forty-four percent of the employees whose authorization to work could not be confirmed were still working for the same employer six months after receiving a final non-confirmation from the Basic Pilot program (U.S. DOJ INS 2002).

Employers are likely to retain workers with unmatched SSNs when the costs associated with firing employees outweigh their assessment of the risk of being penalized for retaining unauthorized workers. Workers interviewed for this study who were able to keep their jobs despite being identified in a no-match letter believe their employers chose not to fire them because doing so would unnecessarily disrupt the operation of the business. One worker, a skilled shipping clerk who operates a forklift and other machinery, said his employer extended the deadline for correcting his information twice for a total of two months because his supervisor was on leave at the time the no-match letter arrived and the identified worker was the only one who could do the job (Interview #4 2003). Another skilled worker employed at a small family-owned business making custom furniture reported that her employer reluctantly fired her only to re-hire her later, even though it knew she was an undocumented immigrant, because the company could not find anyone to replace her (Interview #5 2003).

While undocumented immigrants are popularly perceived as unskilled workers who are easily replaceable, the fact that many employers retain unauthorized workers suggests that many companies depend on these workers. Mike Flynn, Executive Director of Su Casa, a community organization in Cincinnati, has been working with employers to devise strategies to address the disruptions created by no-match letters. He says "there are many employers that say they are willing to pay to sponsor their employees to get them legal," because they need these workers and the skills they bring to the job. Flynn continues:

> There will always be unscrupulous employers that will take advantage of undocumented [immigrant] workers. But there are many decent employers that are caught in between their economic reality and what they think is the law. Employers see a talented workforce in the area and what they want is to stabilize this workforce. They want to be able to use all of their skills (Interview Flynn 2003).

The economic reality for many employers is that they rely on undocumented immigrants and cannot easily replace these workers without disrupting operations. This is a prime motivating factor that guides employers' decisions regarding how to respond to employer no-match letters. An attorney representing construction firms in North Carolina explained the situation confronting his clients this way:

---

**No-match letters put employers between a "rock and hard-place"**

Mike is an owner of a small business that runs a packaging company in Ohio (Interview #10 2003). When he received the no-match letter from SSA, he didn't know what to do. At first, he told the workers to get the information corrected and that they shouldn't come back to work until they had it corrected. At first, he thought that this was simply a clerical error that had to be fixed. Indeed, some of the unmatched SSNs were the result of clerical errors. But after some workers quit because they couldn't fix their information, Mike came to the conclusion that many were receiving the "no-match" letter because they were undocumented immigrants.

Mike's new concern was that he might have violated the law by hiring undocumented immigrants. The company followed the I-9 process as required by law, but he says that it is impossible to know in 100 percent of all cases whether the workers are undocumented.

He didn't want to fire workers partly because he couldn't afford to lose his skilled workforce. His clients are mainly blue chip companies with specialized needs. Because his company packages food and medical products, it has to meet FDA regulations. Therefore, workers receive comprehensive training and it is important that they keep their workers to avoid additional training costs and gaps in production. But Mike was also worried about violating IRCA's anti-discrimination laws. In his words, he was "between a rock and a hard-place."

This entire experience has led Mike to believe that the real solution is legalization. He knows that there are thousands of new immigrants in Ohio who are willing to work hard and they have skills. In his opinion, it's in the best interest of employers and workers that they be legalized.

---

21

I've had clients get no-match letters with as many as 99 employees listed out of a couple hundred total …. But even if it's just 25 percent, that could be devastating. It might not cause the company to close, but with respect to completing a project, it could be disastrous (quoted in Parker 2002).

Sometimes employers, in their attempt to continue employing workers with unmatched SSNs while at the same time demonstrating compliance with immigration laws, will go so far as to ask workers to obtain new (fraudulent) SSNs and return to work. One factory worker explained that his employer was flush with work at the time it received a no-match letter (Interview #6 2003). The factory was operating seven days a week and some employees were working 12-hour days. When the letter arrived, company officials asked workers to obtain new documents so they could keep working. Despite the fact that workers did not provide the employer with new documents, the company decided to continue their employment.

Employers are obliged to notify workers of problems with their SSN, yet some do little else to ensure that workers correct their information if the companies consider them essential employees. One worker who is employed at a plastics company in Chicago, explained that she and 30 other workers were recently notified by the company that they were listed on a no-match letter (Interview #7 2003). All of the workers are skilled supervisors, quality control experts, and machine operators who earn more than $11 per hour. The company has experienced very little turnover and

---

**Employers rely on skilled workers, regardless of their status**

Patricia was working for a small family-owned business for four years doing specialized work making designer furniture by hand when her employer notified her that it had received a no-match letter indicating her SSN was incorrect (Interview #5 2003). The owner asked her if she was working legally and Patricia told them that she was working with an SSN that was not her own. Initially, the employer told her not to worry and that they would help her get a new SSN. She and her employer had a strong working relationship and they needed her expertise, and so they were willing to help her, Patricia believes. At the time, she was earning $13 per hour. She started at $10 per hour and learned the job fast. The person that she replaced just didn't know how to do the job, so her employer was happy to have her and was serious about trying to keep her.

A short while after her talk with the owner about her SSN, she was told that she couldn't stay on the job because her number was incorrect. She thinks that the owners' accountants or lawyers advised them to terminate her employment.

Patricia spent the next month unemployed. The bills went unpaid and it put a lot of stress on her husband and two small children. Eventually, she found minimum-wage work, but that didn't last for more than a week.

A short while later, the employer that fired her called her back to the job because they couldn't find anyone to replace her. They told her not to worry about her social security number and that she should just come back to work.

---

the workforce is quite established.  After a company-imposed deadline passed, the employer declined to take action, and all of the workers remain on the job.

### Some employers use no-match letters to take advantage of workers

There are employers that, despite the risk of retaining potentially unauthorized workers, use no-match letters to take advantage of undocumented immigrants by reducing their pay or cutting their benefits.  Several cases illustrate the problem associated with providing no-match information to unscrupulous employers.

An employer in Wisconsin asked workers named in a no-match letter to provide a new SSN if they wished to retain their jobs.  Indeed, workers who presented new, fraudulent documents were allowed to continue working for the company.  However, their hourly wages were reduced from $9.72 to the starting wage of $7.35 and they lost their healthcare benefits and vacation time (Interview #8 2003).  In Chicago, a worker with an unmatched SSN working for medium-sized manufacturer found herself in a similar situation.  She explained, "I was told by the human resource manager that if I quit before I was laid off, I could come back to work three weeks later without a problem, but at six dollars per hour, not the twelve that I am making now" (quoted in Jacobo 2003).  In some cases, employers go so far as to supply workers with fraudulent identification—for a price.  In Indiana, local police are currently investigating a supervisor at one company for allegedly having provided

---

**Employers retaliate against workers for seeking information about their rights**

When Cristina's employer received a no-match letter in the summer of 2003, it gave her until the end of the month to correct her Social Security number or else she would be discharged (Interview #11, 2003).  Cristina worked as a machine operator at a Chicago-based mailing service earning $8 per hour.  She was one of 64 workers with unmatched SSNs identified in the letter.

But before the deadline, the company abruptly fired 17 of the workers, including Cristina.  Cristina believes that the employer singled out these 17 workers because they collectively sought assistance from a legal assistance organization.  They had received advice from the organization and presented the company with a letter from informing the employer of their obligations and of the workers' rights.  In her opinion, the firing was a form of retaliation for going to an outside organization for assistance and for standing up for their rights.

Cristina finds the whole issue unfair.  "All of these immigrants are paying taxes.  Also, many of these immigrants are doing work that native-born workers won't do. Many have kids that were born here. But the workers don't have any rights."

fraudulent identification to employees with unmatched SSNs. In exchange for the identification, the supervisor kept workers' first 10 paychecks (Toth 2003).

Authorized workers also are not immune to employers seeking advantage over workers identified in no-match letters. Juan Morales, a baker working for a supermarket in California, was on medical leave when he was fired from his job because he had an unmatched SSN. Despite the fact he is legally authorized to work, the company fired him while he was on medical leave recovering from injuries sustained when a 300 pound rack of ice cream fell on him. While difficult to prove, Juan is certain that the company fired him because of his injuries. "I am a risk. I am injured. If they take me back and I get injured again, I will be more expensive to them than I already am," explains Morales (Interview 2003). Another authorized worker from North Carolina, also on medical leave, was fired from her hotel job because she had an unmatched SSN. In this instance, according to an advocate working on her case, the employer attempted to deny her workers' compensation benefits by arguing before North Carolina's Industrial Commission that she was not entitled to benefits because she was an unauthorized worker (Interview Duberstein 2003). The Commission, however, turned down the request and she later was reinstated.

Michael Wilson, a U.S.-born citizen from Virginia and a union steward in his employers' vehicle maintenance division for nine years, was fired in 2003 because his employer believed he committed document fraud when it was discovered his SSN was incorrect (Interview Wilson 2003). Despite the fact that Michael received corrected documents from SSA within three weeks of being notified by his employer that his SSN did not match, his employer still maintained that Michael committed document fraud and he was terminated. After being out of work and without pay for four months, a panel reviewing his grievance found the employer's case to be without merit and reinstated Michael with full back pay. Michael is still uncertain why his employer was so earnest about firing him even though it was obvious that the problem with his SSN was SSA's mistake and it was easily resolved. When

asked what can be done to prevent employers from using no-match letters to take advantage of workers, he explains, "There needs to be more accountability built into the system; impose penalties against employers that take [unnecessary] adverse action against employees that are identified in these letters" (Interview Wilson 2003).

**Indiscriminate firings impact authorized workers**

When employers indiscriminately fire workers with unmatched SSNs—34 percent (weighted n=139) of fired workers reported that they were never given an opportunity to correct their information – it raises concerns that workers who are authorized to work may be unfairly terminated if they are listed in no-match letters. Authorized workers who are Latin American immigrants are particularly vulnerable because employers may assume they are undocumented because of their national origin. Results from the No-Match Letter Survey suggest that the no-match letter program has led to the firing of authorized workers – possibly an unavoidable outcome of the program given that employers often assume workers identified in the letters are not authorized to work. The survey found that of the 28 workers reporting they had authorization to work, nine were fired (of which only one was reinstated).

---

**Employment-related national-origin discrimination cases on the rise**

An indicator that employer no-match letters might be contributing to an increase in national-origin discrimination is the rise in number of immigration-related unfair employment referrals and investigations fielded by the U.S. Department of Justice Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC).

For example, the number of OSC investigations into terminations stemming from SSN verification matters is on the rise. From 1994 to 2000, OSC conducted just 20 investigations into matters related to employers that fired workers upon verifying their SSNs. From 2001 through 2003, OSC opened 29 investigations. Three of the investigations opened after 2001 resulted in out-of-court settlements in favor of the charging parties and 10 investigations remain open. It is important to note that OSC only has jurisdiction to take complaints of citizenship or national origin discrimination, and therefore investigate, from "protected individuals" which includes U.S. citizens, certain lawful permanent residents, refugees, and individuals granted asylum. OSC can also take complaints alleging document discrimination (document abuse) from any person who is authorized to work.

Figure: Number of OSC Investigations into Employee Terminations Resulting from SSN Verification, March 1994 to August 2003



Source: U.S. DOJ OSC 2003

The evaluation of the Basic Pilot provides further insights into the problems that authorized workers face as a result of the no-match letter program. The Basic Pilot operates much like employer no-match letters except that the intent of Basic Pilot is to confirm at the point of hire whether new employees are authorized to work in the U.S. When employers submit (electronically or telephonically) SSNs of newly hired employees into the Basic Pilot and SSNs do not match records in SSA's database, employers are notified that SSA cannot confirm the validity or correctness of the employee's SSN. When the Basic Pilot issues this "tentative non-confirmation" of a worker's SSN, it is analogous to SSA sending employers a no-match letter. The Basic Pilot is problematic because it frequently is unable to confirm SSNs belonging to a substantial number of authorized workers. The Temple University and Westat study indicates that the Basic Pilot failed to initially confirm the work authorization status of 22 percent of employees who were in fact authorized to work, in part because SSA's database contains inaccurate information (authors' calculation based on U.S. DOJ, INS 2002).

Many newly hired employees whose work authorization status was tentatively unconfirmed by the Basic Pilot experienced some form of adverse action by their employer (U.S. DOJ, INS 2002). For example, among workers whose SSNs were initially unconfirmed:

- 28 percent reported that the pilot employer withdrew the job offer (implying that they were not even given an opportunity to resolve the problem and possibly that the employer used the Basic Pilot as a pre-employment screening tool which is prohibited); and

- 45 percent reported they were not allowed to continue working while correcting their records, had their pay cut, or had their job training delayed despite the prohibition that employers take adverse action against employees who are contesting the tentative non-confirmation or who are attempting to correct their information.

The inability of the SSA's no-match letter program and the Basic Pilot to consistently confirm the SSNs of authorized workers should be anticipated. Reporting errors on the part of employers or workers and errors in SSA's own

databases are to be expected and when these errors occur, SSA may be unable to confirm that authorized workers have a valid SSN. However, the negative consequences for these human errors can be substantial, particularly for authorized workers who are Latin American. Employers have come to see the no-match letter as a signal that workers identified in the letter are undocumented, especially if they are of Latin American origin. This employer attitude is perhaps irreversible given the public prominence the no-match letter program has achieved. In this environment the impact of errors on authorized workers becomes magnified.

**Using SSA no-match letters as immigration enforcement tools replicates ineffectiveness of IRCA's employer sanctions provisions**

The ineffectiveness of no-match letters as immigration enforcement tools is predictable given what is known about employers' behavior in the context of employer sanctions under the Immigration Reform and Control Act of 1986 (IRCA).[9] Employer sanctions and the I-9 process established under IRCA were intended to prevent employers from *knowingly* hiring undocumented immigrants under the assumption that penalties would substantially reduce employer demand for unauthorized workers. The I-9 process was instituted to help employers discern at the point of hire whether workers are authorized to work. However, the I-9 process and employer sanctions have decisively failed to diminish the flow of undocumented immigrants into U.S. labor markets. Furthermore, there is evidence that these policies have generated their own labor market imperfections, such as reducing earnings for all Latin American immigrants and other workers who "appear" to be undocumented immigrants, as well as the significant narrowing of job opportunities for these workers (Dávila et al. 1998; Massey et al. 2002).

Most accounts of the failure of IRCA to reduce the demand for unauthorized immigrants cite the minimal risks associated with violating the Act and the lack of enforcement of employer sanctions for hiring unauthorized workers. Since the passage of IRCA, the emphasis has been on removing undocumented immigrants

---

[9] Pub. L. No. 99-603.

from the labor market, rather than punishing the employers that hire them. As Alexander Aleinikoff (2000),[10] senior associate at the International Migration Policy Program at the Carnegie Endowment for International Peace, explained:

> In its early years enforcing the law, the INS focused on educating employers about their new responsibilities to check documents. In the 1990s, the agency shifted its emphasis to removing undocumented workers found through "audits" of employer records. In some local offices, novel arrangements with employers permitted them to terminate undocumented employees over time while they recruited lawful replacement workers. ...[F]or the most part, the agency was satisfied when the employer fired the unauthorized immigrant—leaving the employee free to seek work elsewhere.

Massey, Durand, and Malone (2002) contend that the federal government's commitment to enforcing employer sanctions has been, at best, weak.

> After IRCA's initial authorization of new funds for the Department of Labor to undertake work-site inspections, internal enforcement of U.S. immigration laws was quietly but steadily reduced. In 1999, only 2 percent of the INS budget was devoted to the enforcement of employer sanctions, only one-fifth of their time was devoted to work-site enforcement, yielding only 340 full-time person-equivalents to monitor all jobs in the United States.

The lax enforcement of employer sanctions also is responsible for encouraging unscrupulous employers to continue hiring undocumented immigrants, but at lower rates of compensation and in poorer working conditions as a way to compensate for the risks associated with employer sanctions (Massey et al. 2002). Even Latino immigrants with legal status experience wage penalties that some studies suggest are the basis of wage discrimination against "at-risk" workers, or workers who appear to be undocumented immigrants (Cobb-Clark et al. 1995; Bansak and Raphael 1998; Mehta et al. 2002). Prior to IRCA and the advent of employer sanctions, studies found little if any wage penalty for working without legal status (Phillips and Massey 1999). IRCA-initiated employer sanctions established penalties against employers for knowingly hiring undocumented immigrants thereby creating a financial risk for

---

[10] Mr. Aleinikoff served as General Counsel for the Immigration and Naturalization Service (INS) from 1994 to mid-1995, and then as Executive Associate Commissioner for Program until January 1997.

hiring these workers.  Subsequently, employers paid at-risk workers less than workers who either had legal documents or were assumed to have legal status.

On the other hand, some employers simply ceased hiring or were overly cautious in hiring workers who they thought might be undocumented immigrants because they were "foreign sounding" or "foreign looking."  The U.S. General Accounting Office found that nearly one in five employers admitted to some form of discriminatory treatment on the basis of national origin or citizenship following the passage of IRCA (U.S. GAO 1990).  The outcome was an increased crowding of at-risk workers—or in other words, Latin American immigrant workers—into a narrow band of mostly low-wage occupations and industries.

These characterizations of the approach to enforcing employer sanctions and their effect on employer behavior and workers' employment prospects is strikingly similar to what has been observed under the no-match letter program.  As is the case with IRCA's employer sanctions, the risk of IRS penalties[11] has encouraged many employers to close the door on workers with unmatched SSNs.  Moreover, just as employers disregard penalties under IRCA and continue to employ undocumented immigrants, employers continue to retain workers with unmatched SSNs, even when they are aware the workers are undocumented.  For these employers, the benefits – which include hiring at below-market wages and employing a flexible workforce – outweigh the risk of penalties.  Some employers go further, using the leverage created by the no-match letter to undermine workers' rights and to suppress wages and other forms of compensation.

---

[11] Although employers have been concerned about the potential of IRS fines that were referenced in previous versions of the employer no-match letter, the IRS has recently issued guidance stating that an SSA no-match letter will not trigger such a penalty. The IRS went on to explain that only the IRS could notify an employer of its intent to fine the employer based on having filed an incorrect taxpayer identification number (which is an SSN for employees), but that employers can claim that it relied in good faith on the information provided by the employee. Such a "safe harbor" provision would allow an employer to have any potential fine waived (Dobbins 2003).

### No-match letters are inappropriate as an immigration enforcement tool

Despite employers' troubling conflict of interest in responding to SSA's no-match letters, some immigration control advocates continue to argue that the letters ought to be used as a tool for enforcing immigration laws that prohibit employers from employing undocumented workers. The no-match letter program, they argue, has had the desired, albeit unintended, effect of weeding out undocumented immigrants from the labor market. Dan Stein, Executive Director of the Federation for American Immigration Reform (FAIR), one of the leading national organizations calling for reducing immigration, offered this complaint after SSA scaled back its no-match letter program in 2003: "It's aggravating beyond belief that the Social Security Administration isn't waking up to its responsibility to be part of the federal government's immigration enforcement arm" (quoted in Sheridan 2003). David Ray, another spokesperson for FAIR, added, "These letters serve as a huge deterrent. … If people think they can live the good life as illegal immigrants, there is no incentive to play by the rules" (quoted in Avila and Franklin 2002).

However, this investigation has revealed that there are several reasons why immigration authorities and policymakers should view with skepticism the use of employer no-match letters as immigration enforcement tools. First, employers have a conflict of interest in fairly meeting their obligations to SSA. This investigation has found that employers' decisions regarding how to respond to no-match letters are driven more by the perception of the costs and benefits associated with firing or retaining workers with unmatched SSNs than with their legal obligations (which, in any event, seem to be poorly understood). Therefore, a substantial number of employers will continue to hire and retain undocumented immigrants, even when they are fully aware workers lack legal status. Furthermore, unscrupulous employers may use no-match letters to take advantage of workers' vulnerable position, undermining their rights and reducing their compensation.

Second, any immigration enforcement tool must ensure that employers do not violate workers' rights in their efforts to comply with the law. In the process of

responding to no-match letters, many employers have undermined workers' employment rights. Firing workers without constructive knowledge of their lack of immigration status, which must be arrived at on a case-by-case basis, is the most discernible violation of these rights. However, in their haste to remove undocumented immigrants from their worksites, employers have systematically undermined other aspects of the employment eligibility rights of workers such as re-verifying their legal status. The violation of these rights not only is detrimental to undocumented immigrants but also to authorized workers who are discharged when employers assume everyone listed in the no-match letter is undocumented.

Third, it is highly unlikely that the no-match letter program could be more successful than IRCA and its employer sanctions provisions in limiting the employment of undocumented immigrants. Workers with unmatched SSNs who were fired or quit in response to being identified in a no-match letter likely have found employment elsewhere. Many workers interviewed for this study reported that they found new employment in a matter of days or weeks, either with another "mainstream" employer, in the underground economy, or through a temporary staffing agency. The no-match letter program, although responsible for disrupting local labor markets, has not prevented employers from hiring undocumented immigrants. A partnership with ICE to use SSA's database of names and addresses of persons with unmatched SSNs as an immigration enforcement tool would likely produce similar outcomes.

Given the dismal performance and harmful consequences of the no-match letter program, SSA should consider alternative tools for meeting its objectives. Furthermore, the outcomes of this program indicate that solutions to issues related to immigration enforcement should be addressed by the relevant agencies, namely the U.S. Immigration and Customs Enforcement, not the Social Security Administration.

**No-Match Cert. Admin. Record  345**

## POLICY RECOMMENDATIONS

This investigation has shown that SSA's no-match letter program has been futile at accomplishing its stated goal of generating substantial numbers of corrections of unmatched wage items and thereby reducing the ESF. In addition, the program has proven ineffective and inappropriate as an immigration enforcement tool and has generated a host of negative labor market outcomes for workers with unmatched SSNs, including:

- the termination of employment without the opportunity to correct SSN information;
- retaliation by employers for labor organizing or raising complaints about worksite conditions; and
- reduction of wage and non-wage compensation.

The remainder of this study provides policy recommendations to eliminate some of the negative consequences associated with no-match letters.

### The no-match letter program

SSA should focus its efforts on mailing no-match letters only to workers at their home address, and suspend correspondence to employers. SSA should address the growth of the ESF using the other mechanisms that have proven

---

**SSA no-match letter program puts workers at risk, and their families under stress**

Isabel has worked for five years at the factory where she is presently employed as a janitor (Interview #2 2003). During the summer of 2002, her employer notified her and 100 other workers that they had SSNs that were unmatched. All 100 workers decided they wanted to address this problem together. They sought help from their union that is trying to get them work permits. Isabel also approached a local immigrant rights organization for help. With help from their union and community organizations, the workers have been able to prevent the company, at least in the short term from firing any workers.

Isabel thinks that despite their success in delaying any action, she is afraid for her job. The whole experience, she says, has taken a psychological toll on her and the other workers. Everyone works in fear. There are rumors that ICE is going to come in and raid the factory. Twenty workers have already quit because they feared being caught by immigration authorities.

Isabel's family also feels the effects of this problem because they depend on Isabel's income for survival. Before her current job, she worked two to three jobs at once just to make ends meet. She also has health benefits through the company, life insurance and vacation that she most certainly will not be able to find elsewhere.

When asked whether these troubles make her feel like going back to Mexico, Isabel responds and says, "I am here as a matter of necessity. I must stay and face these challenges. This isn't half of what I've suffered. Nobody wanted to rent me a home when I first immigrated. I was living in garages."

to be considerably more effective in crediting earnings in the ESF to workers with valid SSNs.

**On-line verification system**

Implementation of the Social Security Number Verification Service (SSNVS) may exacerbate the problems workers are experiencing because of no-match letters. The SSNVS currently operates as a pilot Internet-based system that enables a select group of 100 registered employers to determine the veracity of employees' SSNs. Although SSA may view SSNVS merely as an extension of the no-match letter program, the accessibility of electronic SSN information creates additional, unique problems. The impact of the Basic Pilot on newly hired employees provides the best insights into how an expanded SSNVS would operate. Without fixing errors in SSA's databases, the SSNVS most likely will replicate the failure of the Basic Pilot to accurately and consistently provide initial confirmation of SSNs belonging to authorized workers. SSA should treat such errors as unacceptable because, as this study and the evaluation of the Basic Pilot have demonstrated, employers frequently take adverse actions against workers with SSNs that SSA suggests may be invalid— even when explicitly advised by the agency not to do so.

Second, without the proper safeguards and penalties on employers for improper use of the system, the SSNVS likely will reproduce discriminatory problems encountered by workers as a result of the Basic Pilot and the no-match letter program. The Basic Pilot has encouraged employers to pre-screen employees who are more frequently foreign born (U.S. DOJ INS 2002). Employer no-match letters have led employers to assume that workers with unmatched SSNs are undocumented immigrants resulting in thousands of indiscriminate firings. SSA does not have mechanisms in place to ensure that employers do not use the SSNVS to selectively scrutinize workers' information based on their national origin.

Auditors correctly recommend that the Basic Pilot should not be expanded without making several enhancements. The same recommendation should apply to

33

the SSNVS.  SSA should not expand the SSNVS until it has improved the accuracy of data in the system and has developed mechanisms to prevent employers from:

- abusing the system to retaliate against workers;
- selectively pre-screening workers based on their national origin;
- invading workers' privacy; and
- taking adverse actions against workers without giving them sufficient opportunities to correct their SSN information.

**Comprehensive immigration reform**

The operation of the no-match letter program reveals many of the contradictory and destructive impacts of current U.S. immigration policy.  Although SSA did not design the program to be an immigration control effort, it nonetheless has thrust the agency into the arena of immigration enforcement.  It is not surprising that the no-match letter program has failed here.  Complex push and pull factors fuel the growth of undocumented immigration, factors with which the program cannot contend.  Even 17 years of employer sanctions under IRCA have been unable to deter employers from hiring undocumented immigrants.

Halting the growth of the ESF requires comprehensive immigration policy reform.  Millions of undocumented immigrants are working in the U.S. and many more will emigrate because there are employers that will hire them, despite the risks.  Immigration policy has to face up to this reality.  Removing undocumented immigrants from U.S. labor markets is impossible and undesirable.  The Urban Institute estimates that there currently are 5.2 million undocumented immigrants in the U.S. (Capps et al. 2003).  Most studies on undocumented immigrants suggest that a narrow band of occupations in the service and manufacturing sectors are highly dependent on the labor of undocumented immigrants.

Given these realities, immigration reform should include legalization of the current workforce.  Legalization accomplishes at least two objectives.  First, for SSA's purposes, legalization would allow SSA to post wage items in the ESF to accounts of presently undocumented immigrants.  If an undocumented immigrant

has worked in the U.S. using an invalid SSN (that is, if SSN never issued a valid SSN), the worker may request that their earnings from prior work performed under an invalid SSN be redirected from the ESF into their valid earnings record (SSA OIG 2003). However, if undocumented workers are not given valid SSNs, their earnings may permanently sit in the ESF.

Second, legalization helps achieve the more important objective of reconciling employers' demand for workers, immigrants' needs for employment, and U.S. immigration policy. Comprehensive immigration reform must include a plan for how to provide legal status to current and future immigrants who will, despite stepped up border-enforcement measures and employer sanctions, find a job with or without a valid Social Security number.

---

### APPENDIX A: SAMPLE NO-MATCH LETTER SENT TO EMPLOYERS

## Social Security Administration
## Retirement, Survivors and Disability Insurance
**Employer Correction Request**                                    **CODE V**

Office of Central Operations
300 N. Greene Street
Baltimore, MD 21290-0300

Date: July 17, 2003
EIN: 18-1084740

..........................................................................

**Establishment Number: HART     MRN: 21898500028     WFID: 402015-01**

**Why You Are Getting This Letter**

Some employee names and Social Security numbers that you reported on the Wage and Tax Statements (Forms W-2) for tax year 2002 do not agree with our records. We need corrected information from you so that we can credit your employees' earnings to their Social Security record. It's important because these records can determine if someone is entitled to Social Security retirement, disability and survivors benefits, and how much he or she can receive. If the information you report to us is incorrect, your employee may not get benefits he or she is due.

There are several reasons why the information reported to us doesn't agree with our records, including:

- Errors were made in spelling an employee's name or listing the Social Security number

- An employee did not report a name change following a marriage or divorce

- The name or Social Security number information were incomplete or left blank on the W-2 report sent to the Social Security Administration

**IMPORTANT:** This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number. Nor does it make any statement about an employee's immigration status.

See Next Page

Visit our website at http:.www.ssa.gov

36

13-1084740

You should not use this letter to take any adverse action against an employee just because his or her Social Security number appears on the list, such as laying off, suspending, firing, or discriminating against that individual. Doing so could, in fact, violate state or federal law and subject you to legal consequences.

For Spanish-speaking individuals: Esta carta y los documentos adjuntos proveen información sobre las acciones que debe tomar para corregir algunos de los nombres y números de Seguro Social que usted informó en la Declaración de Retención de Salarios (formulario W-2, "Wage and Tax Statement", en inglés) de sus empleados. Si usted necesita una traducción de esta carta, por favor, llámenos al número de teléfono gratis, 1-800-772-1213, de 7:00 a.m. a 7:00 p.m. hora del este.

Esta carta no implica que usted ni su empleado intencionadamente proveyó información incorrecta sobre el nombre o número de Seguro Social del empleado. Esto no es una razón, de por sí, para que usted tome ninguna acción adversa en contra del empleado, tal como suspensión, despedida o discriminación del individuo que aparece en la lista. Cualquier empleador que usa la información en esta carta para justificar una acción adversa en contra de un empleado puede violar la ley estatal o federal y estar sujeto a consecuencias legales. Además, esta carta no hace ninguna declaración sobre el estado de inmigración de su empleado.

## What You Should Do

It would be a great help to us if you could respond within 60 days with the information that you are able to correct so that the Social Security Administration can maintain an accurate earnings record for each employee and make sure your employees get the benefits they are due.

We have attached some materials to help you:

- A list of the Social Security numbers that do not match our records. (If the list shows you have "MORE" Social Security numbers to correct than listed, please call us at 1-800-772-6270 for assistance.)
- Instructions on "How To Correct Social Security Numbers".
- Tips on "Annual Wage Report Filing" for the future.

Visit our website at http://www.ssa.gov

37

13-1084740

**If You Have Any Questions**

If you have any questions, please call us toll-free at 1-800-772-6270 between 7:00 a.m. and 7:00 p.m., Eastern time, Monday through Friday. We can answer most questions over the phone. You can also write us at the address shown on the first page of this letter. If you do call, please have this letter with you. It will help us answer your questions. Also, general program information is available from our website at http://www.ssa.gov/employer.

W. Burnell Hurt
Associate Commissioner for
    Central Operations

Visit our website at http://www.ssa.gov

13-1084740                                    Page 4 of 8

### SOCIAL SECURITY NUMBERS THAT DO NOT MATCH OUR RECORDS

| | | | |
|---|---|---|---|
| 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 | 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 | 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 | 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 |
| 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 | 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 | 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 | 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 |
| 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 | 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 | 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 | |

Visit our website at http://www.ssa.gov

**No-Match Cert. Admin. Record  353**

# How To Correct SSNs

Complete Forms W-2c (Corrected Wage and Tax Statement) for each of the SSNs listed that you are able to correct. You also need to file a Form W-3c (Transmittal of Corrected Wage and Tax Statements) whenever you file Forms W-2c. You don't need to prepare Forms W-2c for all the SSNs that you reported. If an employee does not provide corrected information or no longer works for you and you are unable to contact him/her, document your records with the information you relied on in completing the W-2 or the efforts you made to contact your former employee. Retain this information in your files; do not send it to SSA. You should provide all corrections as soon as possible. Please follow the guidelines below before preparing Forms W-2c.

You also need to file a Form W-3c (Transmittal of Corrected Wage and Tax Statements) whenever you file Forms W-2c.

- Compare your employment records to the Forms W-2 you reported for the SSNs included on the attached list.

- If your employment records and Forms W-2 do not match, prepare Forms W-2c with the corrected information from your employment records. (Do not send copies of proofs of identity or other documents in addition to, or in place of, the Forms W-2c.)

- If your employment records and Forms W-2 match, ask your employee to check his/her Social Security card and to inform you of any name or SSN difference between your records and his/her card. If your employment records are incorrect, correct your records.

- If your records match the information on the employee's Social Security card, have the employee contact any Social Security office to resolve the issue. Tell the employee that once he/she has visited the Social Security office he/she should inform you of any changes and correct your records accordingly.

- SSA may also send the employee a notice regarding this issue. You should discuss with the employee any changes you make to your employment records.

- If you wish to file your Form W-2c corrections electronically or on magnetic media, call SSA at 1-800-772-6270 to request a copy of the "Magnetic Media Reporting and Electronic Filing of W-2c Information (MMREF-2)".

- We suggest using AccuW2C to identify possible "Magnetic Media Reporting and Electronic Filing of W-2c Information (MMREF-2)" formatting errors. You can download AccuW2C from the Internet at:

  http://www.ssa.gov/employer/accuwage

Visit our website at http://www.ssa.gov

13-1084740

- If you wish to file paper Forms W-2c, you can get them from the Internal Revenue Service. Paper Forms W-2c should be sent to the following address:

  Social Security Administration
  Data Operations Center
  Attention: W-2c Process
  P.O. Box 3333
  Wilkes-Barre, Pennsylvania 18767-3333

Visit our website at http://www.ssa.gov

## APPENDIX B: METHODOLOGY

### 1. Worker survey

The sampling methodology used for this study was designed to maximize the response rate within the population of workers identified in employer no-match letters. Given the sensitive nature of this study, the survey was implemented through community-based organizations, community colleges, social service providers, and churches that have established relationships with undocumented immigrants and other low-wage earning workers who are characteristic of workers identified in no-match letters.

The University of Illinois at Chicago Center for Urban Economic Development (UIC-CUED) recruited organizations identified through the partners in this study—Center for Community Change/National Campaign for Jobs and Income Support, National Immigration Law Center, National Interfaith Committee for Worker Justice, and Jobs with Justice. A letter requesting participation was sent to all member organizations. To augment the list of organizations volunteering to participate in response to the recruitment letter, UIC-CUED recruited additional organizations based on the demographic make-up of their constituents and their geographical location. The intent here was to ensure that workers were recruited through a wide range of sources so as to minimize bias associated with geography and surveying through organizations. In total, 41 organizations in 18 states participated in the survey. Participating organizations are located in the following states: California, Connecticut, Illinois, Indiana, Kansas, Massachusetts, Michigan, Mississippi, Missouri, Nebraska, New Jersey, New Mexico, New York, North Carolina, Ohio, Texas, Washington, and Wisconsin.

Once organizations were selected as survey sites, UIC-CUED trained staff from local organizations to recruit their members, constituents, and clients for participation in the survey. Trained interviewers approached all of their members, clients, or constituents from June 1st through September 15th, 2003 to request voluntary participation in the survey. Potential respondents were read a description

of the project and then given the opportunity to stop or to continue with the survey. Only volunteers whose employers had notified them that they were identified in a no-match letter after January 1st 2001 were allowed to participate. The survey was designed in English and translated into Spanish, Polish, and Portuguese.

<u>Statistical implications of non-random sampling</u>

The sample produced for this study is a non-random sample. One potential implication of the sampling technique is that workers who have experienced an adverse action by their employer might be more likely to respond to the survey than workers who were unaffected. To limit the self-selection bias in the sample to the greatest extent possible, organizations recruited participants in neutral locations such as churches, classrooms, and social service agencies where workers congregate for reasons other than to seek assistance for employment-related problems. No substantial variation in the frequency of adverse action taken by employers and the method of recruitment of research subjects was found. Moreover, variation in union status, occupation and industry generated no substantial variation in the frequency of reports of adverse action taken by employers against workers with unmatched SSNs.

<u>Weighting respondents</u>

Respondents employed by the same company almost always will experience the same action by the employer (known as cluster bias). Cluster bias affects the outcome of several statistics including the frequency of employers' actions against workers identified in no-match letters. For example, if one company employed all 921 respondents and the company fired all 921 respondents for being identified in the no-match letter, it would be meaningless to report that out of 921 respondents, 100 percent were fired because they all worked for the same company. To account for employer cluster bias, each respondent was assigned a weight. The weight equals *1/total number of workers working for the same employer*. Weighting statistics influenced by employer cluster bias in this way to minimize cluster bias means, for example, that the responses of 20 workers employed by the same company are given the same weight as the response of 1 worker who is the sole respondent from a given

company. Frequency distributions and averages were weighted for the following statistics:

- Share of workers given an opportunity to correct their information;

- Median number of days workers were given to correct their information;

- Share of workers indicating employers used the letters to retaliate against them for union activity or for complaining about worksite conditions.

The following tables summarize the demographic characteristics of the sample generated from the No-Match Letter Survey.

Table B1: Sample Characteristics – Gender

| Gender | Percent of sample (n=804) |
|---|---|
| Male | 53.4 |
| Female | 46.6 |

Table B2: Sample Characteristics – State distribution of workers

| State | Frequency | Percent |
|---|---|---|
| Illinois | 456 | 49.5 |
| Texas | 127 | 13.8 |
| California | 88 | 9.6 |
| Wisconsin | 61 | 6.6 |
| Massachusetts | 58 | 6.3 |
| Indiana | 32 | 3.5 |
| Kansas | 27 | 2.9 |
| Ohio | 21 | 2.3 |
| Nebraska | 17 | 1.8 |
| North Carolina | 10 | 1.1 |
| New Mexico | 6 | 0.7 |
| Mississippi | 5 | 0.5 |
| New York | 5 | 0.5 |
| Other | 3 | 0.3 |
| Connecticut | 1 | 0.1 |
| Michigan | 1 | 0.1 |
| Missouri | 1 | 0.1 |
| New Jersey | 1 | 0.1 |
| Washington | 1 | 0.1 |

Table B3: Sample Characteristics – State distribution of employers

| State | Number of employers | Percent of total employers |
|---|---|---|
| California | 62 | 17.6% |
| Connecticut | 1 | 0.3% |
| Illinois | 53 | 15.0% |
| Indiana | 29 | 8.2% |
| Kansas | 26 | 7.4% |
| Massachusetts | 48 | 13.6% |
| Michigan | 1 | 0.3% |
| Missouri | 1 | 0.3% |
| Mississippi | 2 | 0.6% |
| North Carolina | 3 | 0.8% |
| Nebraska | 15 | 4.2% |
| New Jersey | 1 | 0.3% |
| New Mexico | 3 | 0.8% |
| New York | 5 | 1.4% |
| Ohio | 17 | 4.8% |
| Texas | 54 | 15.3% |
| Washington | 1 | 0.3% |
| Wisconsin | 29 | 8.2% |
| Unknown | 2 | 0.6% |

Table B4: Sample Characteristics -- Industry distribution

| Industry | Frequency | Percent (weighted n=312) |
|---|---|---|
| manufacturing | 62 | 19.8 |
| restaurant and/or bar | 41 | 13.2 |
| retail store | 35 | 11.3 |
| other | 30 | 9.5 |
| warehouse/distribution | 28 | 9 |
| janitorial | 22 | 7 |
| temp agency | 18 | 5.9 |
| hotel | 18 | 5.8 |
| construction | 17 | 5.6 |
| health care | 11 | 3.6 |
| transportation | 10 | 3 |
| farming/agriculture | 6 | 2.1 |
| private home cleaning | 3 | 1 |
| child care | 3 | 1 |
| school/educational institution | 3 | 1 |
| don't know | 3 | 1 |
| security | 1 | 0.2 |

No-Match Cert. Admin. Record  359

Table B5: Sample Characteristics – Occupational distribution

| Occupation | Frequency | Percent (weighted n=207) |
|---|---|---|
| production occupations | 59 | 28.4 |
| transportation and material moving occupations | 40 | 19.6 |
| building and grounds cleaning and maintenance occupations | 40 | 19.1 |
| food preparation and serving related occupations | 25 | 11.9 |
| sales and related occupations | 16 | 7.7 |
| construction and extraction occupations | 13 | 6.3 |
| office and administrative support occupations | 5 | 2.4 |
| healthcare support occupations | 3 | 1.4 |
| personal care and service occupations | 3 | 1.4 |
| farming, fishing and forestry occupations | 1 | 0.6 |
| education, training, and library occupations | 1 | 0.5 |
| installation, maintenance, and repair occupations | 1 | 0.5 |
| healthcare practitioners and technical occupations | 0 | 0.1 |

Table B6: Sample Characteristics – National origin

| Country/Region | Frequency | Percent (n=736) |
|---|---|---|
| Mexico | 622 | 84.5 |
| Brazil | 31 | 4.2 |
| Guatemala | 25 | 3.4 |
| Central America | 16 | 2.2 |
| Peru | 11 | 1.5 |
| El Salvador | 10 | 1.4 |
| Colombia | 5 | 0.7 |
| Ecuador | 4 | 0.5 |
| Honduras | 4 | 0.5 |
| South America | 3 | 0.4 |
| Bolivia | 2 | 0.3 |
| Argentina | 1 | 0.1 |
| Dominican Republic | 1 | 0.1 |
| Fiji | 1 | 0.1 |

## 2. Worker and employer interviews

Organizations participating in this study also recruited respondents for in-depth interviews. The goal of the interviews was to gain a more nuanced understanding of the circumstances influencing employers' actions against workers identified in no-match letters. Organizations in one state also recruited employers to be interviewed for this study. Interviews were conducted with the guarantee of confidentiality for all who volunteered.

46

## APPENDIX C: SUMMARY OF SSA ESF CORRECTION PROGRAMS

SSA primarily attempts to correct wage items in the ESF through four methods. The following is a description of each method and the extent to which that method leads to corrections (SSA OIG 2002a).

*The Single Select process accounted for 61 percent of corrections.* This process assumes the worker's name is correct and that the SSN is incorrect. SSA then compares the worker's name against records in its Numident database, which contains all valid SSNs. If Numident shows only one SSN that matches the name, then SSA corrects the SSN and posts the worker's earnings appropriately.

*The IRS Reinstatement process accounted for 8 percent of corrections.* The IRS conducts a similar process to correct mismatches and provides SSA with a file containing items it has resolved so that SSA can locate the workers to whom the suspended items should be credited.

*The DECOR process accounted for 8 percent of corrections.* Once items are placed in the ESF, SSA generates letters, which are sent to employees at their home address. However, if SSA does not have an address for the worker or if it is incomplete on the W-2, the notice is sent to the employer. In TY 2000, SSA sent approximately 9.5 million DECOR notices (also known as "employee no-match letters"). Of the letters sent to employees, 40 percent are returned as undeliverable. The letters sent to employees with earnings recorded in the ESF include a response form the employee can use to report corrected information to the agency. Similarly, the letters sent to employers are regard an individual employee with earnings recorded in the ESF and includes a response form the employer can use to report corrected information to the SSA.

SSA reviews responses to the DECOR letter and, if the information matches its records, the earnings are properly posted to the individual's earnings record. If an individual does not respond, his or her information then goes through an additional

process called FERRET, through which an address file for this person is created. Then the worker's name or parts of it are compared against IRS data.

***The EDCOR process accounted for at most 2 percent of corrections.*** EDCOR includes the employer no-match letter program that SSA began in 1994 to notify businesses that the reports they filed contained information that did not match the agency's records. The stated purpose for sending these no-match letters to employers is to ensure that employers and employees have an opportunity to correct the information in order for workers to receive proper credit for their earnings.

# APPENDIX D: SSA NO-MATCH LETTER SENT TO NEW MEXICO EMPLOYER



**SOCIAL SECURITY ADMINISTRATION**

201 W. 8ᵗʰ St Suite 700
Pueblo, CO 81003
Phone: (719) 545-9248
Fax:    (719) 542-2948
August 6, 2003



NM

Dear Sir/Madam:

We have been advised that your company has reported wages for ███████ under the Social Security number of ███████ You are hereby advised that this number does not belong to your employee and any documentation received from him/her that indicates otherwise is fraudulent. You are requested to immediately stop submitting wage reports for this person under above Social Security number. You should also correct all of your payroll and tax records.

According to our records, your employee does not have a valid SSN as we believe him/her to be an undocumented alien. Due to this fact, your company and any other company cannot legally employ him/her until he/she receives the proper work authorization from Immigration and Naturalization Service (INS). Any questions regarding this matter should be directed to _Leslie Montoya at (719) 545-3052 ext. _213.

Thank you,

Leslie Montoya

## REFERENCES

Aleinikoff, A. (2000). "Illegal Employers." *The American Prospect.* December 4.

Avila, Oscar and Franklin, Stephen (2002). "Social Security notices put jobs in jeopardy," *Chicago Tribune*, June 4.

Bansak, C. and Raphael, S. (1998) "Immigration Reform and the Earnings of Latino Workers: Do Employer Sanctions Cause Discrimination?" Discussion Paper 98-20, *University of California San Diego, Department of Economics.*

Bolzen, S. (2003). "Latinos start boycott against Batavia firms," *Chicago Tribune*, August 12.

Brown, R. (2003). "Many fired Peco workers leaving," *The Clarion-Ledger* (Jackson, MS), August 17.

Capps, R., Fix, M., Passel, J.S., Ost, J., and Perez-Lopez, D. (2003). *Immigrant Families and Workers: A Profile of the Low-Wage Immigrant Workforce.* Washington: The Urban Institute.

Cobb-Clark, D. A., Shields, C. R. and Lowell, L. B. (1995) "Immigration Reform: The Effects of Employer Sanctions and Legalization on Wages," *Journal of Labor Economics* 13(3): 472-98.

Dávila, A., Pagán, J. A., and Grau, M. V. (1998). "The Impact of IRCA on the Job Opportunities and Earnings of Mexican-American and Hispanic-American Workers." *International Migration Review* 32(1): 79-95.

Dobbins, Thomas (2003). Letter to Michael O' Neill, Chairman, and Ms. Connie Davis, Information Reporting Program Advisory Committee, Wage and Investment Subgroup.  Department of the Treasury, Internal Revenue Service.  September 24.

Hamill, S.D. (2003). "Firings are protested at Vernon Hills Store," *Chicago Tribune*, January 21.

Jacobo, B. (2003). "Between a rock and a hard place; workers laid-off after getting no-match letters have few options," *El Conquistador-Northwest/Aurora Edition*, June 13.

Malone, J. (2003). "Social Security Agency sharply reduces effort to validate cards," *Cox News Service*, June 11.

Massey, D.S., Durand, J., and Malone, N.J. (2002). *Beyond Smoke and Mirrors: Mexican Immigration in an Era of Economic Integration.* New York: Russell Sage Foundation.

Matthews, P. (2003). "Plan to round up, deport illegals angers activists," *The Clarion-Ledger* (Jackson, MS), August 12.

**No-Match Cert. Admin. Record  364**

Mehta, C., Theodore, N., Mora, I., and Wade, J. (2002). *Chicago's Undocumented Immigrants: An Analysis of Wages, Working Conditions and Economic Contributions.* Chicago: Center for Urban Economic Development, University of Illinois at Chicago.

NLRB [National Labor Relations Board] (2001). *Personal Optics a/k/a Style Eyes of California* Case 21-CA-34087.

NLRB [National Labor Relations Board] (2003). *Tuv Taam Corp.* 340 NLRB No. 86.

NAID [North American Integration and Development Center], School of Public Policy and Social Research, UCLA (2003). Downloaded from http://naid.sppsr.ucla.edu/tables.PDF. October 31, 2003.

Parker, L. (2002). "Social Security campaign costs immigrants their jobs," *USA Today*, August 9.

Phillips, J.A. and Massey, D.S. (1999) "The New Labor Market: Immigrants and Wages After IRCA," *Demography* 36(2): 233-46.

Sheridan, Mary Beth (2003). "Social Security Scales Back Worker Inquiries; Agency Contacted Employers When False Data Were Used but Got Little Response," *Washington Post*, June 18.

SSA [Social Security Administration] (2003). EDCOR Notice Count by State For Receipt Year 2003, as of 07/12/2003, response to FOIA request.

SSA OIG [Social Security Administration, Office of the Inspector General] (1999). *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items* (A-03098-31009). September.

SSA OIG [Social Security Administration, Office of the Inspector General] (2000). Evaluation Report: The Social Security Administration's Earnings Suspense File Tactical Plan and Efforts to Reduce the File's Growth and Size (A-03-97-31003). February.

SSA OIG [Social Security Administration, Office of the Inspector General] (2002). *Congressional Response Report: Status of the Social Security Administration's Earnings Suspense File* (A-03-03-23038). November.

SSA OIG [Social Security Administration, Office of the Inspector General] (2003). *Congressional Response Report: Social Security Administration Benefits Related to Unauthorized Work* (A-03-03-23053), March 18.

Toth, S. (2003). "Employer's actions may discourage deception; data verified with Social Security," *South Bend Tribune*, July 28.

51

UCLA Center for Labor Research and Education (2003). Transcript of worker's testimony to officials from the San Francisco Region of the Social Security Administration. May.

U.S. DOJ, INS [Department of Justice, Immigration and Naturalization Service] (2002). INS Basic Pilot Evaluation Summary Report. Prepared by the Institute for Survey Research, Temple University, Washington D.C., and Westat, Rockville, MD.

U.S. DOJ [Department of Justice, Civil Rights Division, Office of Special Counsel] (2003). Response to Freedom of Information Act request.

U.S. Immigration and Naturalization Service, Office of Policy and Planning (2003). "Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000." Downloaded from http://uscis.gov/graphics/shared/aboutus/statistics/Ill_Report_1211.pdf November 3, 2003.

**Interviews**

#1 (2003). Chicago, August.

#2 (2003). Texas, August.

#3 (2003). Chicago, September.

#4 (2003). Chicago, July.

#5 (2003). Chicago, August.

#6 (2003). Chicago, September.

#7 (2003). Chicago, September.

#8 (2003). Wisconsin, July.

#9 (2003). Chicago, September.

#10 (2003). Ohio, September.

#11 (2003). Chicago, September.

Flynn, Michael (2003). Executive Director, Su Casa, September.

McMahon, Dan (2003). Field Director of Organizing for the Chicago and Northeast Illinois District Council of Carpenters, September.

Morales, Juan (2003). Worker, October.

Duberstein, John (2003). Americorps member and Program Coordinator, Centro de Acción Latino, October.

Wilson, Michael (2003). Worker, October.

52

# OFFICE OF
# THE INSPECTOR GENERAL

## SOCIAL SECURITY ADMINISTRATION

### EMPLOYERS WITH THE MOST
### SUSPENDED WAGE ITEMS IN THE
### 5-YEAR PERIOD 1997 THROUGH 2001

**October 2004**     A-03-03-13048

# AUDIT REPORT



## Mission

We improve SSA programs and operations and protect them against fraud, waste, and abuse by conducting independent and objective audits, evaluations, and investigations.  We provide timely, useful, and reliable information and advice to Administration officials, the Congress, and the public.

## Authority

The Inspector General Act created independent audit and investigative units, called the Office of Inspector General (OIG).  The mission of the OIG, as spelled out in the Act, is to:

- O  Conduct and supervise independent and objective audits and investigations relating to agency programs and operations.
- O  Promote economy, effectiveness, and efficiency within the agency.
- O  Prevent and detect fraud, waste, and abuse in agency programs and operations.
- O  Review and make recommendations regarding existing and proposed legislation and regulations relating to agency programs and operations.
- O  Keep the agency head and the Congress fully and currently informed of problems in agency programs and operations.

To ensure objectivity, the IG Act empowers the IG with:

- O  Independence to determine what reviews to perform.
- O  Access to all information necessary for the reviews.
- O  Authority to publish findings and recommendations based on the reviews.

## Vision

By conducting independent and objective audits, investigations, and evaluations, we are agents of positive change striving for continuous improvement in the Social Security Administration's programs, operations, and management and in our own office.



# SOCIAL SECURITY

MEMORANDUM

Date: October 26, 2004                                    Refer To:

To: The Commissioner

From: Acting Inspector General

Subject: Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001 (A-03-03-13048)

## OBJECTIVE

Our objectives were to (1) identify the 100 employers responsible for sending the most wage items to the Earnings Suspense File (ESF) in the 5-year period 1997 through 2001 and (2) identify patterns of errors and irregularities in wage reporting or other reasons for the large number of ESF items for the 100 employers during that time period.

## BACKGROUND

The Social Security Administration (SSA) is responsible for maintaining accurate individual earnings records. Employers annually report their employees' earnings on a *Wage and Tax Statement* (Form W-2). When an employee's name and/or Social Security number (SSN) does not match SSA's records, the reported wages cannot be posted to an individual's earnings record and are recorded in the ESF. SSA attempts to match the earnings recorded in the ESF to the individual who earned them, and if successful, post the earnings to the Master Earnings File (MEF).[1] Wages in the ESF can affect an individual's Social Security benefits. Earnings posted to the MEF are used by SSA to determine eligibility for retirement, survivors, disability, and health insurance benefits and to calculate benefit amounts. If earnings are not properly posted to an individual's earnings record, the person will not receive credit for them. As of October 2003, the ESF accumulated about $421 billion in wages and 244 million wage items for Tax Years (TY) 1937 through 2001. The 5-year period in our review represents approximately $200 billion in accumulated wages and about 41 million wage items.

---

[1] The MEF contains all earnings data reported by employers and self-employed individuals. This data is used to calculate the Social Security benefits due an individual with an earnings record.

Page 2 – The Commissioner

This is our third report related to employers responsible for sending the most wage items to the ESF. Our September 1999 audit reviewed wage items submitted to the ESF during TYs 1993 to 1996.[2] Our October 2003 audit assessed the status of the employers we identified in the 1999 audit.[3] See Appendix B for more information on these earlier audits.

Our audit did not include an evaluation of SSA's internal controls over the wage reporting process, nor did we attempt to establish the reliability or accuracy of the wage data. When appropriate, we used the same methodology used in our prior related audits. We provide information on our scope and methodology in Appendix C. The entity audited was SSA's Office of Public Services and Operations Support (OPSOS) under the Deputy Commissioner of Operations and the Office of Earnings, Enumeration and Administrative Systems under the Deputy Commissioner of Systems. We conducted our audit in Baltimore, Maryland and the Office of Audit in Philadelphia, Pennsylvania between August 2003 and March 2004. We conducted our audit in accordance with generally accepted government auditing standards.

## RESULTS OF REVIEW

Our review found that a small number of identifiable employers account for a disproportionate number of ESF items and wages. The 100 employers identified in our audit were responsible for approximately 7 percent of the total ESF items and about 5 percent of the total ESF wages during the 5-year review period. These 100 employers were mainly in three industries: services, restaurants, and agriculture. We also found that the majority of the employers experienced an increase in suspended wages over the 5-year period. In addition, 20 of the 100 employers had more than 60 percent of their reported wage items in the ESF. Furthermore, a review of more than 5,600 employers showed that 37 percent had at least 60 percent of their TY 2001 wage items in the ESF. The Agency has recently developed the Earnings Data Warehouse (EDW), which should assist SSA personnel in identifying problem employers.

### TOP 100 EMPLOYERS FOR TAX YEARS 1997 TO 2001

Our review identified the 100 employers responsible for the most wage items in the ESF for TYs 1997 to 2001. These 100 employers, hereinafter called the "Top 100," account for a disproportionate share of the growth of the ESF. Although about 6.5 million employers annually file wage reports, these Top 100 employers were responsible for approximately 7 percent (2.7 million) of the ESF wage items and about 5 percent ($9.6 billion) of the ESF wages for TYs 1997 to 2001 (see Appendix D). We reviewed the wage reporting trends of these Top 100 employers to determine (1) the industries and States represented by these employers, (2) reporting trends over the 5-year period,

---

[2] SSA OIG, *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items* (A-03-98-31000), September 1999.

[3] SSA OIG, *Follow-up Review of Employers with the Most Suspended Wage Items* (A-03-03-13026), October 2003.

Page 3 – The Commissioner

(3) the percent of their reported wages going into suspense, and (4) the types of errors reported by employers.

## Industries and States Represented by Top 100 Employers

Our analysis of the Top 100 employers by industry determined that the highest contributors of items to the ESF were concentrated in three industries:  services, restaurants, and agriculture.  We found that 95 of the Top 100 employers were in 1 of these 3 industries, representing 2.6 million wage items and over $9.1 billion in wages over the 5-year review period.  Forty-three of the Top 100 employers were in the service industry,[4] 32 were in the restaurant industry, and 20 employers were in the agriculture industry.[5]  Four of the remaining employers were in the hotel/retail industry, and one was a State agency.  See Figure 1 for grouping by industry.

### Figure 1: Top 100 Employers by Industry
(TYs 1997 to 2001)



| ■ Services | ■ Restaurants | ☐ Agriculture |
|---|---|---|
| ■ Hotel/Retail | ☐ State/Local Agency | |

The Top 100 employers were registered with the Internal Revenue Service in 27 States.[6]  This address may relate more to payroll issues than the physical location where an employer does most of its business.[7]  We found that 54 of the 100 employers had registered addresses in three States – California, Texas, and Illinois – representing

---

[4] See our report on the service industry in *Management Advisory Report: Review of Service Industry Employer with Wage Reporting Problems* (A-03-00-10022), September 2001.

[5] See our report on the agriculture industry in *Obstacles to Reducing Social Security Number Misuse in the Agriculture Industry* (A-08-99-41004), January 2001.

[6] We used the employer mailing address related to the Employer Identification Number (EIN).  The EIN is a 9-digit number assigned by the IRS to sole proprietors, corporations, partnerships, estates, trusts, and other entities for tax filing and reporting purposes.

[7] For example, an employer may have a New York address associated with the EIN but have operations in all 50 States.

Page 4 – The Commissioner

almost 1.5 million wage items and over $4.8 billion in wages during TYs 1997 to 2001. These 54 employers were responsible for over 3.5 percent of the wage items and 2.4 percent of the wages sent to the ESF by all employers reporting wages in our audit period. California had the highest number of Top 100 employers, with 25 employers representing about 683,000 wage items and approximately $2 billion in wages during our audit period. See Appendix E for an alphabetical listing of Top 100 employers by State.

**Increase in Suspended Wage Items**

Our review of the Top 100 employer data also found that the average increase in suspended wage items between TYs 1997 and 2001 was approximately 69 percent. An increase or decrease in suspended wage items for a particular employer could occur for a number of reasons, including a change in the number of employees or even the volume of items moved from the ESF to wage earners' records. Overall, we found that 14 employers showed a decrease in the number of wage items reported between TYs 1997 and 2001. However, 86 of the 100 Top employers showed an increase in suspended wage items (see Figure 2). Six employers experienced an increase of 400 percent or more during this timeframe. For example, a Texas employer in the service industry experienced a 1,300 percent increase in suspended wage items over the 5 years. While the employer's payroll also increased during this period, from about 9,000 in FY 1997 to approximately 66,000 in TY 2001 (a 633 percent increase), the increase in suspended items was at a greater rate.



Figure 2: Changes in Suspended Wage Items Among Top 100 Employers (Tax Years 1997-2001)

Page 5 – The Commissioner

**Percent of Wage Items Sent to the Earnings Suspense File**

On average, about 8 percent of the wage items reported by the Top 100 employers during TYs 1997 to 2001 were posted to the ESF.  However, 20 of the 100 employers each had over 60 percent of their reported wage items in the ESF.  Figure 3 summarizes the percent of reported wage items in the ESF among the Top 100 employers.



**Figure 3: Percent of Top 100 Employer Wage Items in the Earnings Suspense File (Tax Years 1997-2001)**

This high level of suspended wages could relate to a number of scenarios, including problems with the wage reporting software or a workforce using fraudulent documents.  In a March 2001 paper,[8] SSA noted that many suspended items involve the agricultural industry, which has transient employees who may not have work authorizations from the Department of Homeland Security.  Other high turnover industries, such as restaurants and other service industries, have similar profiles.  Frequent job and residential changes are common with members of these workforces.

Of the 20 employers with more than 60 percent of their wages in suspense, 14 employers were in the agriculture industry, with the remainder from the service industry.  In the case of the employer with the worst accuracy, SSA suspended 89 percent of the TY 2001 wage items submitted by an agricultural employer located in Florida.[9]  This represented 6,709 of the 7,497 wage items submitted by this employer.  Furthermore, these suspended wage items represented about 82 percent of the $28.5 million in wages reported by this employer in TY 2001.

---

[8] SSA, *SSA Key Initiative Plan and Schedule: Reduce Earnings Suspense File (KI #46),* March 15, 2001.

[9] We also reviewed the TY 2002 wages reported by this employer, the last year this suspended data was available in SSA's systems, and found that SSA suspended 89 percent of the TY 2002 wage items.

Page 6 – The Commissioner

**Types of Wage Reporting Errors**

Of the wage items reported by the Top 100 employers in TY 2001, approximately 622,000 were posted to the ESF. About 159,000 wage items (26 percent) were reported using unassigned SSNs. Unassigned SSNs have not been issued by SSA, and are referred to as impossible numbers. For example, SSA does not issue SSNs that begin with the number "8" or "9." The remaining 74 percent of the ESF items were reported with legitimate SSNs that could not be associated with the name of the Numberholder on SSA's records.

We looked at other trends, such as duplicate SSNs, as well as potential Individual Taxpayer Identification Numbers (ITIN),[10] to see what other types of errors may have been introduced. We found some items that met this criterion. For example, 18,896 SSNs were used 2 or more times at the same employer.[11] We acknowledge that an employer might issue more than one W-2 to an employee in a given year. Also, we found 1,078 cases where the suspended wage item had a number very similar to an ITIN.[12]

## REPORTING ACCURACY AMONG OTHER EMPLOYERS

We also analyzed the wage reporting of all employers with 200 or more wage items in the ESF for TY 2001. In TY 2001, about 6.5 million employers filed wage reports, with approximately 730,000 employers reporting at least one wage item later posted to the ESF. We identified 5,689 employers meeting the 200 or more suspended wage items criteria. These 5,689 employers submitted about 4 million suspended wage items and over $17.2 billion in suspended wages. Although the 5,689 employers meeting our criteria were a very small percentage of both groups (.1 percent of the 6.5 million employers and .8 percent of the 730,000 employers submitting at least one suspended item), they contributed over 41 percent of the wage items and about 30 percent of the wages posted to the ESF for TY 2001.

Our analysis of the employer data also determined that 2,118 of the 5,689 employers (37 percent) had at least 60 percent of their reported wage items posted to the ESF. We provide a breakout of the reporting results of all 5,689 employers in Figure 4.

---

[10] A 1997 memorandum of understating between SSA and the IRS agreed that ITINs would begin with the number "9." An ITIN is a 9-digit number assigned by the IRS to a non-citizen who needs a tax identification number for tax purposes, but is not eligible to be issued an SSN.

[11] Approximately 11,000 of these 18,896 duplicate SSNs were from one employer, a restaurant industry employer located in Kentucky. It appears the employer reversed approximately 5,500 earnings postings, causing both positive and negative wage entries for the same employees.

[12] For more information on reporting trends in the ESF, see our earlier reports, including the *Congressional Response Report: Status of the Earnings Suspense File* (A-03-03-23038), November 2002, as well as reports cited in Appendix H.

Page 7 – The Commissioner



**Figure 4: Percent of 5,689 Employers' Wage Items
in the Earnings Suspense File
(Tax Year 2001 )**

Legend:
- ■ 80 Percent and Above
- ■ 60 to 79 Percent
- ☐ 40 to 59 Percent
- ☐ 20 to 39 Percent
- ■ Under 20 Percent

As noted earlier, these reporting accuracy problems can occur for a variety of reasons. However, regardless of the cause, the employees will not get credit for their earnings. A New Jersey labor service employer had 96 percent of its reported TY 2001 wage items, or 2,177 wage items, posted to the ESF. These suspended items represented over $6.8 million in wages that went to the ESF. Another service industry employer, a security guard service in California, had almost 49 percent of its reported wage items posted to the ESF in TY 2001. This employer reported 8,902 wage items, of which 4,321 did not match SSA's records and were posted to SSA's ESF. As a result, this employer posted more than $27 million in wages to the ESF.

## SSA CORRECTIVE ACTIONS

Our analysis of reporting trends would assist SSA's Employer Service Liaison Officers (ESLO) in resolving wage-reporting problems.[13] SSA maintains ESLOs in SSA regions throughout the United States to: (1) answer employers' questions on wage reporting submissions; (2) encourage employers to use SSA's various programs, such as the Employee Verification Service; (3) conduct wage-reporting seminars, in partnership with the IRS, for employers, payroll service providers and payroll software companies; and (4) contact employers with significant suspended wage items in their regions. As we noted in our October 2003 audit,[14] each year the OPSOS develops a national listing of

---

[13] The ESLOs are under the jurisdiction of individual Regional Commissioners, and their job duties vary from region to region. In addition, some ESLOs have wage reporting liaisons to assist them. For example, the Atlanta ESLO office has 11 staff members to assist employers with W-2 filing questions, while the Philadelphia ESLO office consists of one staff member.

[14] SSA OIG, *Follow-up Review of Employers with the Most Suspended Wage Items* (A-03-03-13026), October 2003.

Page 8 – The Commissioner

employers who submit 100 or more suspended wage items. These lists are sent to regional ESLOs for follow-up contacts with the employers. SSA does not direct the ESLOs to contact specific employers or follow-up with the ESLOs regarding what contacts were made and the results of the contacts. Nor does OPSOS provide the ESLOs with a listing showing the percent of an employer's payroll posted to the ESF.

Our analysis provides a number of additional ways to review the reporting trends of employers, including changes in the volume of wage items in suspense as well as the percent of an employer's payroll in the ESF. If the ESLOs knew the reporting trends for the employers in their region, it could assist them in focusing their outreach efforts. SSA is developing an EDW, which could provide such statistics to the ESLOs, as well as other useful data. Among other things, the EDW was designed to provide management with trend data on employer wage reporting (see Appendix F). Hence, the EDW should be able to produce a listing of employers showing their wage reporting accuracy.

Employer reporting trends could also be useful to the IRS were it to assess penalties on employers submitting inaccurate names/SSNs in their wage reports.[15] In fact, in August 2002 SSA provided a listing to the IRS of all the employers with more than 100 items in the ESF, and sorted this list by the number of items in suspense as well as percent of payroll in suspense. For more information on the IRS efforts to assess penalties on employers, see Appendix G.

## CONCLUSIONS AND RECOMMENDATIONS

SSA needs to maintain continued diligence to slow the growth of the ESF. Many of the largest contributors to the ESF are identifiable within SSA's systems, repeatedly submit inaccurate wage reports, and are in specific industries such as services, restaurants, and agriculture. Directing assistance efforts at the employers with the more significant reporting problems would best use the ESLO's limited resources. SSA's EDW, when fully functional, should be a useful tool in analyzing and resolving wage reporting problems. SSA can develop more meaningful statistics for ESLOs once the EDW is fully functional.

We recommend that SSA:

1. Create centralized EDW reports, after considering ESLO input, that assist ESLOs with identifying problematic employer reporting trends, such as increases in the volume of wage items in suspense as well as the percent of an employer's payroll in the ESF.

---

[15] The Internal Revenue Code, 26 U.S.C. § 6721 (2003), allows the agency to penalize employers if they fail to file complete and accurate wage reporting forms. The penalty is $50 per incorrect form, with maximum penalties according to the size of an employer.

Page 9 – The Commissioner

2. Ensure ESLOs consider employer reporting trends created by EDW as part of their criteria in identifying employers for assistance through periodic monitoring from Headquarters.

## AGENCY COMMENTS

The Agency agreed partially with our first recommendation, stating that it would work with individual ESLOs in determining their reporting needs and requirements including the method of delivery. The Agency stated that the EDW can identify employers with large numbers of ESF items or larger percentages of W-2 data on the ESF. However, identifying the percentage of an individual employer's payroll in the ESF would require systems modifications to the Annual Wage Reporting (AWR) system. These modifications require approval by the Agency's Information Technology Advisory Board.

The Agency also partially agreed with our second recommendation, agreeing to use the EDW when identifying employers requiring wage reporting assistance. In addition, the Agency will continue working with the regional ESLOs in addressing the Agency's ESF goals, but will not directly monitor the ESLOs efforts from Headquarters.

## OIG RESPONSE

In regards to our first recommendation, we appreciate that the Agency will work with individual ESLOs in determining their reporting needs and requirements, including the method of delivery. Regarding the systems modifications required to identify specific employer reporting accuracy rates, we feel these modifications would be productive and should be considered. Having the AWR system identify problematic employer trends and sharing this information with the EDW would put useful data in the hands of the EDW customers. One of the stated goals of the EDW is that it will allow users to access different views of earnings data, including analyzing wage reporting data received by SSA.

In reference to our second recommendation, we agree that the EDW will be useful in identifying employers with wage reporting problems. The Agency expects the EDW to provide historical and trend earnings data to support SSA's business needs, and assist SSA in providing quality service to customers. In view of the varying staffing levels and different job duties of the regional ESLOs, we still believe Headquarters should monitor ESLO efforts in this area to ensure employer trends are being considered in their outreach efforts. In addition, such monitoring could assist the various ESLOs to share best practices and other useful information.

Patrick P. O'Carroll, Jr.

# *Appendices*

**APPENDIX A** – Acronyms

**APPENDIX B** – Background on Earlier Audit Findings

**APPENDIX C** – Scope and Methodology

**APPENDIX D** – Top 100 Employers for Tax Years 1997 to 2001– Earnings Suspense File Wage Items

**APPENDIX E** – Alphabetical Listing of Top 100 Employers by State

**APPENDIX F** – Earnings Data Warehouse

**APPENDIX G** – Status of Internal Revenue Service Efforts to Monitor Employers

**APPENDIX H** – Prior Office of the Inspector General Reports

**APPENDIX I** – Agency Comments

**APPENDIX J** – OIG Contacts and Staff Acknowledgments

*Appendix A*

# Acronyms

| | |
|---|---|
| EDW | Earnings Data Warehouse |
| EIN | Employer Identification Number |
| ESF | Earnings Suspense File |
| ESLO | Employer Service Liaison Officer |
| ITIN | Individual Taxpayer Identification Number |
| IRS | Internal Revenue Service |
| MEF | Master Earnings File |
| OIG | Office of the Inspector General |
| OPSOS | Office of Public Services and Operations Support |
| SSA | Social Security Administration |
| SSN | Social Security Number |
| TIGTA | Treasury Inspector General for Tax Administration |
| TY | Tax Year |
| U.S.C. | United States Code |

**Forms:**

| | |
|---|---|
| W-2 | *Wage and Tax Statement* |
| W-4 | *Employee's Withholding Allowance Certificate* |

*Appendix B*

# Background on Earlier Audit Findings

## TOP 100 AUDIT FINDINGS, SEPTEMBER 1999

In our September 1999 audit,[1] we noted that 84 of the 100 employers experienced increases in suspended wage items over the 4-year period, Tax Years (TY) 1993 to 1996, including 27 employers with increases of 100 percent or more.

Patterns of reporting errors and irregularities exhibited by the 100 employers included the following.

- Ninety-six employers reported 109,360 Social Security numbers (SSN) never issued by the Social Security Administration representing about $298.5 million in suspended wages.

- Thirty-six employers reported 3,127 of the 109,360 unassigned SSNs as "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."

- Ninety-four employers reported duplicate mailing addresses for 3 or more employees, involving 72,770 suspended *Wage and Tax Statements* (Form W-2) or 21 percent of the 340,922 suspended wage items for these employers in 1996. Suspended wages involving duplicate addresses totaled about $193.7 million.

- Eighty-six employers reported 3 or more consecutively numbered SSNs involving 4,910 W-2s and $14.4 million in suspended wages. We defined consecutive SSNs as those where the first six digits were identical.

- Sixty-nine employers reported 16,742 identical W-2s, representing $31.1 million in suspended wages, that were used 2 or more times by employees working for the same employer.

---

[1] SSA OIG, *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items* (A-03-98-31000), September 1999.

**No-Match Cert. Admin. Record  380**

## TOP 100 FOLLOW-UP AUDIT FINDINGS, OCTOBER 2003

Our 2003 Office of the Inspector General follow-up audit analyzed the wage reporting of the original Top 100 employers for TYs 1997 to 2000.[2]  We found that of the original 100 employers identified in the prior review, 40 were still among the Top 100 employers with the most suspended wage items and the remaining 60 were not.  Of the 60 employers no longer on the Top 100 listing, 14 had increased wage reporting accuracy, 19 had decreased wage reporting accuracy, and the remaining 27 employers did not have sufficient wage items in the follow-up period to calculate their reporting accuracy.  We found that some of the employers no longer on the Top 100 list were reporting their wages under different Employer Identification Numbers.[3]  In addition, it is possible that some of these employers were no longer in business.

---

[2] SSA OIG, *Follow-Up Review of Employers with the Most Suspended Wage Items* (A-03-03-13026), October 2003.

[3] The Employer Identification Number is a 9-digit number assigned by the Internal Revenue Service to sole proprietors, corporations, partnerships, estates, trusts, and other entities for tax filing and reporting purposes.

*Appendix C*

---

# Scope and Methodology

To meet our objectives, we performed the following steps.

- Reviewed prior Social Security Administration (SSA) Office of the Inspector General and Treasury Inspector General for Tax Administration reports and other materials related to the Earnings Suspense File (ESF) and inaccurate wage reporting.

- Reviewed SSA policies and procedures for maintaining individual earnings records and contacting employers with suspended wages.

- Created a new Top 100 list of employers using the same criteria used in our two prior Top 100 reports. We identified all employers who contributed 200 or more wage items to the ESF in each of the 5 years in our review, Tax Years (TYs) 1997 to 2001. We found 1,565 employers met this criterion. Using this data, we selected the 100 employers who had the most suspended wage items in our 5-year review period. We then obtained the total dollar amounts associated with the suspended wage items. Finally, we obtained the total number of 1) wage items and 2) wages reported by these 100 employers for the 5-year review period.

- Identified the total number of employers with 200 or more ESF items for only TY 2001 and obtained similar data for these firms. There were 5,689 employers meeting this criterion.

- For both employer groups above, calculated the percentages of reported 1) wage items and 2) wages posted to the ESF for each of the employers. For the Top 100 employers, we also identified the number of assigned and unassigned Social Security numbers (SSN) reported in TY 2001, and other wage reporting trends and irregularities.

- Reviewed available information pertaining to SSA's Earnings Data Warehouse (EDW) and interviewed SSA employees involved in administrating the EDW.

- The following are some important factors regarding the methodology used in our review that need to be considered:

  ➢ The list is based on wage items reported under an Employer Identification Number (EIN), and some employers report under multiple EINs. Hence, while the trends noted in the audit relate to the EIN, they do not necessarily give a complete picture of the employer. However, SSA's systems maintain the wage data under EINs and do not allow us to focus on individual employers. As a

**No-Match Cert. Admin. Record  382**

result, the audit is identifying the 100 EINs with the most suspended wage items and not necessarily the 100 employers with the most suspended wage items.

➢ Employers are allowed to switch their EINs for wage reporting. As a result, we found instances where wages were reported under different EINs over the 5-year period. If a company switched EINs between 1997 and 2001, it may have failed to report over 200 items in a particular year under a specific EIN and, therefore, never have made the Top 100 employer listing.

➢ Some employers are on the list because of their employment volume rather than significant problems with their reporting accuracy. For example, some employers are reporting only 1 percent of their employees with name/SSN mismatches, but they are on the list because 1 percent of their total payroll is a large number. These employers may not have the same underlying problems as a smaller employer reporting as much as 85 percent of its payroll in error.

• Our audit did not include an evaluation of SSA's internal controls over the wage reporting process. The purpose of our review was to determine how SSA used the wage reporting data the Agency had accumulated. We did not focus our efforts on the collection of wage reporting data, nor did we attempt to establish the reliability or accuracy of such data. In prior audits, we reviewed the completeness and accuracy of the ESF postings,[1] and tested that accuracy of ESF data that was reinstated to correct earnings records.[2]

---

[1] SSA OIG, *Reliability of the Data Used to Measure the Accuracy of Earnings Posted* (A-03-00-10004), May 2001.

[2] SSA OIG, *Effectiveness of the Social Security Administration's Decentralized Correspondence Process* (A-03-01-11034), June 2002, and SSA OIG, *Effectiveness of the Social Security Administration's Earnings After Death Process* (A-03-01-11035), August 2002.

**No-Match Cert. Admin. Record  383**

## Appendix D

# Top 100 Employers for Tax Years 1997 to 2001– Earnings Suspense File Wage Items

| RANK | STATE | TAX YEARS (TY) 1997-2001 EARNINGS SUSPENSE FILE (ESF) WAGE ITEMS | | | TYs 1997-2001 ESF WAGES | | |
|---|---|---|---|---|---|---|---|
| | | SUSPENDED WAGE ITEMS | REPORTED WAGE ITEMS | SUSPENDED ITEMS AS PERCENT REPORTED ITEMS | SUSPENDED WAGES | REPORTED WAGES | SUSPENDED WAGES AS A PERCENT OF REPORTED WAGES |
| 1 | IL | 131,991 | 1,130,180 | 11.68% | $524,933,538 | $5,454,058,505 | 9.62% |
| 2 | TX | 108,302 | 737,716 | 14.68% | $532,964,026 | $3,059,859,452 | 17.42% |
| 3 | FL | 106,073 | 379,741 | 27.93% | $249,952,871 | $860,746,129 | 29.04% |
| 4 | NY | 86,243 | 1,041,002 | 8.28% | $467,508,085 | $4,405,111,915 | 10.61% |
| 5 | CA | 76,857 | 373,784 | 20.56% | $358,907,957 | $1,962,480,891 | 18.29% |
| 6 | CA | 66,103 | 1,028,743 | 6.43% | $130,438,417 | $2,078,211,324 | 6.28% |
| 7 | MI | 56,705 | 3,012,716 | 1.88% | $176,089,925 | $13,343,514,290 | 1.32% |
| 8 | KY | 50,455 | 564,788 | 8.93% | $226,043,907 | $2,540,935,442 | 8.90% |
| 9 | CA | 50,027 | 659,162 | 7.59% | $178,083,256 | $1,769,734,446 | 10.06% |
| 10 | SC | 49,158 | 446,794 | 11.00% | $220,172,981 | $1,824,878,432 | 12.07% |
| 11 | GA | 45,749 | 232,441 | 19.68% | $151,314,908 | $1,207,707,941 | 12.53% |
| 12 | OK | 43,375 | 1,227,614 | 3.53% | $117,983,189 | $2,592,833,629 | 4.55% |
| 13 | CA | 39,171 | 49,978 | 78.38% | $80,219,973 | $113,496,931 | 70.68% |
| 14 | NJ | 37,302 | 73,236 | 50.93% | $50,626,511 | $94,771,503 | 53.42% |
| 15 | CA | 36,458 | 141,088 | 25.84% | $178,514,463 | $685,649,213 | 26.04% |
| 16 | NM | 36,455 | 425,714 | 8.56% | $147,551,907 | $2,007,214,843 | 7.35% |
| 17 | MN | 36,438 | 211,025 | 17.27% | $134,093,065 | $877,849,500 | 15.28% |
| 18 | KY | 36,002 | 738,765 | 4.87% | $67,310,457 | $1,953,214,169 | 3.45% |

D-1

**No-Match Cert. Admin. Record  384**

| RANK | STATE | TYs 1997-2001 ESF WAGE ITEMS | | | TYs 1997-2001 ESF WAGES | | |
|---|---|---|---|---|---|---|---|
| | | SUSPENDED WAGE ITEMS | REPORTED WAGE ITEMS | SUSPENDED ITEMS AS PERCENT REPORTED ITEMS | SUSPENDED WAGES | REPORTED WAGES | SUSPENDED WAGES AS A PERCENT OF REPORTED WAGES |
| 19 | CA | 34,521 | 91,383 | 37.78% | $74,307,690 | $225,371,469 | 32.97% |
| 20 | CA | 33,016 | 44,430 | 74.48% | $50,000,341 | $84,465,712 | 59.20% |
| 21 | TX | 32,808 | 172,585 | 19.01% | $156,643,844 | $1,067,378,798 | 14.68% |
| 22 | IL | 32,264 | 49,180 | 65.60% | $85,954,651 | $121,477,291 | 70.76% |
| 23 | TX | 32,189 | 125,629 | 25.62% | $165,256,150 | $775,225,403 | 21.32% |
| 24 | CA | 31,171 | 55,967 | 55.70% | $54,497,262 | $119,982,663 | 45.42% |
| 25 | OH | 30,592 | 249,481 | 12.26% | $127,561,745 | $1,185,613,393 | 10.76% |
| 26 | OH | 28,317 | 181,790 | 15.58% | $108,638,471 | $796,052,266 | 13.65% |
| 27 | TX | 27,691 | 151,985 | 18.22% | $128,225,077 | $892,156,521 | 14.37% |
| 28 | NJ | 27,477 | 57,264 | 47.98% | $32,499,346 | $65,336,355 | 49.74% |
| 29 | CA | 27,283 | 39,100 | 69.78% | $27,833,987 | $43,537,978 | 63.93% |
| 30 | IL | 27,229 | 48,157 | 56.54% | $42,931,023 | $64,346,640 | 66.72% |
| 31 | CA | 27,018 | 44,170 | 61.17% | $38,311,364 | $77,903,387 | 49.18% |
| 32 | IL | 26,765 | 45,128 | 59.31% | $46,234,639 | $72,645,670 | 63.64% |
| 33 | TX | 25,327 | 97,525 | 25.97% | $59,367,779 | $241,128,563 | 24.62% |
| 34 | TN | 25,300 | 572,229 | 4.42% | $106,005,077 | $2,325,217,499 | 4.56% |
| 35 | MN | 25,292 | 1,851,420 | 1.37% | $134,128,618 | $13,050,799,269 | 1.03% |
| 36 | LA | 25,175 | 164,887 | 15.27% | $92,689,698 | $1,386,988,524 | 6.68% |
| 37 | UT | 24,827 | 435,698 | 5.70% | $67,498,582 | $897,669,216 | 7.52% |
| 38 | AR | 24,780 | 5,402,408 | 0.46% | $92,649,911 | $66,317,739,626 | 0.14% |
| 39 | MI | 24,734 | 2,923,056 | 0.85% | $110,868,849 | $19,303,859,259 | 0.57% |
| 40 | TX | 24,363 | 203,148 | 11.99% | $69,517,833 | $709,268,403 | 9.80% |
| 41 | FL | 24,071 | 36,100 | 66.68% | $71,614,446 | $162,686,812 | 44.02% |
| 42 | MN | 22,105 | 77,466 | 28.54% | $94,243,226 | $358,551,597 | 26.28% |
| 43 | TX | 22,039 | 125,792 | 17.52% | $33,503,735 | $171,666,996 | 19.52% |
| 44 | IL | 22,016 | 63,342 | 34.76% | $51,471,182 | $106,569,395 | 48.30% |
| 45 | KS | 21,843 | 96,681 | 22.59% | $113,278,658 | $583,765,393 | 19.40% |
| 46 | CA | 21,840 | 1,704,612 | 1.28% | $56,996,483 | $4,939,817,412 | 1.15% |
| 47 | FL | 21,565 | 26,589 | 81.10% | $58,506,183 | $81,369,797 | 71.90% |

D-2

| | | TYs 1997-2001 ESF WAGE ITEMS | | | TYs 1997-2001 ESF WAGES | | |
|---|---|---|---|---|---|---|---|
| RANK | STATE | SUSPENDED WAGE ITEMS | REPORTED WAGE ITEMS | SUSPENDED ITEMS AS PERCENT REPORTED ITEMS | SUSPENDED WAGES | REPORTED WAGES | SUSPENDED WAGES AS A PERCENT OF REPORTED WAGES |
| 48 | CA | 21,434 | 69,801 | 30.71% | $86,028,370 | $297,523,822 | 28.91% |
| 49 | WI | 21,338 | 306,933 | 6.95% | $76,072,109 | $1,266,839,399 | 6.00% |
| 50 | CA | 21,131 | 28,495 | 74.16% | $29,708,493 | $43,729,831 | 67.94% |
| 51 | CA | 20,942 | 31,441 | 66.61% | $30,295,464 | $50,710,962 | 59.74% |
| 52 | GA | 20,793 | 52,766 | 39.41% | $113,532,115 | $440,624,450 | 25.77% |
| 53 | IL | 20,743 | 28,784 | 72.06% | $43,087,003 | $51,785,583 | 83.20% |
| 54 | CA | 20,538 | 48,062 | 42.73% | $104,880,153 | $341,597,132 | 30.70% |
| 55 | TX | 20,074 | 40,643 | 49.39% | $33,209,528 | $52,444,376 | 63.32% |
| 56 | SC | 19,573 | 325,503 | 6.01% | $65,283,165 | $890,684,834 | 7.33% |
| 57 | CA | 19,230 | 29,618 | 64.93% | $53,804,244 | $93,379,479 | 57.62% |
| 58 | CA | 19,193 | 68,891 | 27.86% | $95,525,517 | $338,892,248 | 28.19% |
| 59 | NE | 18,852 | 572,610 | 3.29% | $197,524,222 | $10,190,535,407 | 1.94% |
| 60 | IA | 18,311 | 29,810 | 61.43% | $112,317,486 | $190,915,072 | 58.83% |
| 61 | TX | 18,231 | 224,823 | 8.11% | $88,328,269 | $550,553,331 | 16.04% |
| 62 | OR | 18,228 | 249,328 | 7.31% | $88,088,754 | $1,206,511,726 | 5.64% |
| 63 | IL | 17,619 | 75,934 | 23.20% | $106,111,838 | $512,961,361 | 20.69% |
| 64 | WA | 17,560 | 26,511 | 66.24% | $30,271,870 | $57,705,452 | 52.46% |
| 65 | GA | 17,483 | 186,864 | 9.36% | $87,697,567 | $699,192,720 | 12.54% |
| 66 | OH | 17,208 | 29,244 | 58.84% | $31,554,686 | $45,284,480 | 69.68% |
| 67 | TX | 17,173 | 189,580 | 9.06% | $88,591,505 | $821,726,171 | 10.78% |
| 68 | CA | 17,084 | 22,202 | 76.95% | $37,128,171 | $55,914,654 | 66.40% |
| 69 | CA | 17,075 | 52,010 | 32.83% | $70,441,404 | $224,983,732 | 31.31% |
| 70 | CA | 16,627 | 289,309 | 5.75% | $46,958,992 | $795,669,604 | 5.90% |
| 71 | TX | 16,378 | 97,089 | 16.87% | $178,348,327 | $1,299,143,399 | 13.73% |
| 72 | NY | 16,358 | 575,812 | 2.84% | $69,413,980 | $4,207,135,059 | 1.65% |
| 73 | IL | 16,036 | 22,196 | 72.25% | $28,469,976 | $37,691,291 | 75.53% |
| 74 | AZ | 15,983 | 44,092 | 36.25% | $26,651,514 | $74,839,982 | 35.61% |
| 75 | TN | 15,982 | 300,603 | 5.32% | $70,641,087 | $1,133,336,167 | 6.23% |
| 76 | TX | 15,368 | 88,829 | 17.30% | $43,302,291 | $191,461,709 | 22.62% |
| 77 | CO | 15,162 | 136,473 | 11.11% | $65,223,596 | $609,410,678 | 10.70% |

D-3

| RANK | STATE | TYs 1997-2001 ESF WAGE ITEMS | | | TYs 1997-2001 ESF WAGES | | |
|---|---|---|---|---|---|---|---|
| | | SUSPENDED WAGE ITEMS | REPORTED WAGE ITEMS | SUSPENDED ITEMS AS PERCENT REPORTED ITEMS | SUSPENDED WAGES | REPORTED WAGES | SUSPENDED WAGES AS A PERCENT OF REPORTED WAGES |
| 78 | NC | 14,838 | 142,574 | 10.41% | $51,128,279 | $444,079,652 | 11.51% |
| 79 | IL | 14,837 | 169,216 | 8.77% | $45,186,039 | $332,182,151 | 13.60% |
| 80 | OH | 14,663 | 363,370 | 4.04% | $56,211,919 | $1,420,890,805 | 3.96% |
| 81 | TX | 14,427 | 57,732 | 24.99% | $32,085,397 | $194,829,259 | 16.47% |
| 82 | WA | 14,091 | 19,188 | 73.44% | $62,417,898 | $95,377,435 | 65.44% |
| 83 | IL | 14,084 | 151,718 | 9.28% | $42,230,961 | $454,119,213 | 9.30% |
| 84 | KY | 13,995 | 99,378 | 14.08% | $66,956,795 | $403,722,642 | 16.58% |
| 85 | FL | 13,885 | 226,478 | 6.13% | $40,574,714 | $1,035,839,885 | 3.92% |
| 86 | AZ | 13,884 | 47,377 | 29.31% | $20,808,702 | $87,733,844 | 23.72% |
| 87 | IL | 13,783 | 17,701 | 77.87% | $39,330,630 | $51,017,775 | 77.09% |
| 88 | TX | 13,557 | 70,838 | 19.14% | $47,308,192 | $423,719,604 | 11.16% |
| 89 | CA | 13,300 | 17,865 | 74.45% | $14,288,211 | $20,433,897 | 69.92% |
| 90 | KS | 13,287 | 66,128 | 20.09% | $47,981,007 | $333,377,827 | 14.39% |
| 91 | IL | 13,276 | 23,847 | 55.67% | $27,571,231 | $43,950,856 | 62.73% |
| 92 | CA | 13,247 | 30,304 | 43.71% | $61,045,644 | $179,984,258 | 33.92% |
| 93 | TX | 13,240 | 332,336 | 3.98% | $36,501,214 | $834,034,845 | 4.38% |
| 94 | WI | 13,237 | 1,175,323 | 1.13% | $41,946,282 | $3,752,404,573 | 1.12% |
| 95 | NJ | 13,214 | 242,652 | 5.45% | $86,788,484 | $2,865,070,097 | 3.03% |
| 96 | CA | 13,184 | 67,266 | 19.60% | $91,567,382 | $463,255,984 | 19.77% |
| 97 | IL | 13,137 | 20,457 | 64.22% | $21,518,488 | $38,221,253 | 56.30% |
| 98 | CA | 13,063 | 17,704 | 73.79% | $29,606,997 | $45,380,211 | 65.24% |
| 99 | CA | 12,993 | 22,988 | 56.52% | $13,135,799 | $32,267,508 | 40.71% |
| 100 | IL | 12,951 | 301,071 | 4.30% | $72,301,907 | $2,553,107,310 | 2.83% |
| Totals | | 2,728,362 | 35,539,356 | 7.68% | $9,570,929,156 | $205,939,044,856 | 4.65% |

D-4

*Appendix E*

# Alphabetical Listing Top 100 Employers by State

| State | Number of Employers | Total Suspended Wage Items | Total Suspended Wages |
|---|---|---|---|
| ARIZONA | 2 | 29,867 | $47,460,216 |
| ARKANSAS | 1 | 24,780 | $92,649,911 |
| CALIFORNIA | 25 | 682,506 | $1,992,526,035 |
| COLORADO | 1 | 15,162 | $65,223,596 |
| FLORIDA | 4 | 165,594 | $420,648,214 |
| GEORGIA | 3 | 84,025 | $352,544,591 |
| ILLINOIS | 14 | 376,731 | $1,177,333,106 |
| IOWA | 1 | 18,311 | $112,317,486 |
| KANSAS | 2 | 35,130 | $161,259,665 |
| KENTUCKY | 3 | 100,452 | $360,311,159 |
| LOUISIANA | 1 | 25,175 | $92,689,698 |
| MICHIGAN | 2 | 81,439 | $286,958,774 |
| MINNESOTA | 3 | 83,835 | $362,464,910 |
| NORTH CAROLNA | 1 | 14,838 | $51,128,279 |
| NEBRASKA | 1 | 18,852 | $197,524,222 |
| NEW JERSEY | 3 | 77,993 | $169,914,341 |
| NEW MEXICO | 1 | 36,455 | $147,551,907 |
| NEW YORK | 2 | 102,601 | $536,922,065 |
| OHIO | 4 | 90,780 | $323,966,821 |
| OKLAHOMA | 1 | 43,375 | $117,983,189 |
| OREGON | 1 | 18,228 | $68,088,754 |
| SOUTH CAROLINA | 2 | 68,731 | $285,456,146 |
| TENNESSEE | 2 | 41,282 | $176,646,164 |
| TEXAS | 15 | 401,167 | $1,693,153,169 |
| UTAH | 1 | 24,827 | $67,498,582 |
| WASHINGTON | 2 | 31,651 | $92,689,767 |
| WISCONSIN | 2 | 34,575 | $118,018,390 |
| **TOTALS** | **100** | **2,728,362** | **$9,570,929,156** |

**Note:** For each of the Top 100 employers, we used the employer mailing address related to the Employer Identification Number (EIN). The EIN is a 9-digit number assigned by the IRS to sole proprietors, corporations, partnerships, estates, trusts, and other entities for tax filing and reporting purposes. This address may relate more to payroll issues than the physical location where an employer does most of its business.

_____
*Appendix F*

# Earnings Data Warehouse

The Social Security Administration (SSA) has developed the Earnings Data Warehouse (EDW), a management information system to assist tracking employer wage reporting. Users include the following SSA components:

- Office of Central Operations;
- Wilkes-Barre Data Operations Center;
- Deputy Commissioner for Finance, Assessment and Management; and
- Employer Service Liaison Officers.

The EDW is a relational database system using online processing tools to access different views of earnings data.  The EDW provides historical and trend data to assist components:

- Analyze corrective actions and errors;
- Analyze wage reporting data received by SSA;
- Support the electronic filing initiative, marketing efforts, and outreach programs; and
- Manage their workload.

The management information data stored in the EDW is based on the detailed data housed in the Earnings Management Information Operations Data Store.

The EDW is being implemented in two phases.  Currently, EDW is in phase one, which is the submission level.  At this level, EDW contains information about the companies that submit data such as the number of *Wage and Tax Statements* (Form W-2).  The next phase, the employer level, is expected to be available in 2004 and will contain information from Tax Year 1998 forward.  The employer level will contain additional information about the individual employers, including addresses, the type of media used to report earnings information, incorrect Social Security numbers (SSN), invalid SSNs, young children's earnings,[1] earnings after death,[2] and various statistical data.

_____

[1] Young children's earnings are earnings reported to SSA under an SSN where SSA's records indicate the Numberholder of the SSN is a child age 6 or younger.  These earnings are placed in the Earning Suspense File (ESF) and investigated by SSA.

[2] Earnings after death are earnings reported to SSA for an SSN where the Numberholder is deceased according to SSA's records.  These earnings are placed in the ESF and investigated by SSA.  Our August 2002 audit report *Effectiveness of SSA's Earnings After Death Process* (A-03-01-11035) contains more information on this subject.

# Status of Internal Revenue Service Efforts to Monitor Employers

Title II of the Social Security Act requires the Social Security Administration (SSA) to maintain records of wages employers pay to employees, but does not give SSA the authority to enforce accurate wage reporting. The Internal Revenue Service (IRS) has that authority through its power to levy monetary penalties. The Internal Revenue Code allows the Agency to penalize an employer if it fails to file a complete and accurate wage reporting form.[1] The penalty is $50 per incorrect form, with a $250,000 annual limit. For businesses with average receipts of not more than $5 million, the limit is $100,000 yearly.[2] To date, the IRS has yet to assess monetary penalties against employers filing inaccurate *Wage and Tax Statements* (Form W-2).[3]

In recent congressional testimony, the IRS Commissioner noted that his Agency reviewed the records of employers who had submitted a large number of wage items to SSA's Earnings Suspense File (ESF).[4] In his testimony, the Commissioner stated that employers are required to exercise due diligence in collecting an employee's Social Security number (SSN) and obtaining information from an employee on an *Employee's Withholding Allowance Certificate* (Form W-4). Employers can, but are not required to, ask for proof of the SSN reported on form W-4 and validate the SSN using SSA's Employee Verification Service (EVS).[5]

The IRS also conducted compliance checks of 78 employers. These 78 employers were selected from a list of employers provided by SSA that had the highest volume

---

[1] 26 U.S.C. § 6721 (2003).

[2] See id. The gross receipts test is met when, for any calendar year, the average annual gross receipts for the most recent 3 taxable years do not exceed $5 million. In addition, any reference to an entity includes a reference to any predecessor of that entity, and, the Internal Revenue Code allows for exceptions if the errors are due to reasonable cause.

[3] The Treasury Inspector General for Tax Administration (TIGTA) estimated that the IRS could have assessed penalties between $26.0 million and $29.7 million against 93 employers in TY 1997 and an additional 98 employers in TY 1998. For more information on TIGTA's September 2002 audit report, see *The Internal Revenue Service Does Not Penalize Employers that File Wage and Tax Statements with Inaccurate Social Security Numbers* (Ref. Number 2002-30-156).

[4] *Individual Taxpayer Identification Numbers and Social Security Number Matching* Prepared Testimony of Mark E. Evers, Commissioner of Internal Revenue, before the House Ways and Means Subcommittee on Oversight and Subcommittee on Social Security, March 10, 2004.

[5] EVS is a voluntary service designed to ensure that employees' names and SSNs are valid before the employees' W-2s are submitted to SSA. Our September 2002 audit report *The Social Security Administration's Employee Verification Service for Registered Employers* (A-03-02-22008) provides detailed information on the EVS process.

G-1

and/or highest percentage of W-2s that did not match SSA's records.  Of these 78 employers, 50 were large employers with a high number of ESF items.  The IRS concluded all 50 of these employers had programs and processes for obtaining information for Forms W-4 and using the information in preparing individuals' W-2s. These employers also had processes in place for re-soliciting required information upon receipt of a no-match letter from SSA.  Based on the IRS's analysis, no penalty potential was identified for these 50 employers.[6]

The remaining 28 of the 78 employers were smaller companies, generally issuing less than 1,000 W-2s but with error rates of 93 percent and above.  The IRS analysis showed that these employers frequently used day labor and had high employee turnover.  Like the larger employers, the smaller companies obtained W-4s, used the W-4 information to prepare W-2s, and attempted to correct information upon receipt of a no-match letter from SSA.  The IRS analysis concluded that there was no potential for penalties for these employers.[7]

---

[6] *Individual Taxpayer Identification Numbers and Social Security Number Matching* Prepared Testimony of Mark E. Evers, Commissioner of Internal Revenue, before the House Ways and Means Subcommittee on Oversight and Subcommittee on Social Security, March 10, 2004.

[7] Ibid.

G-2

**No-Match Cert. Admin. Record  391**

*Appendix H*

# Prior Office of the Inspector General Reports

**Social Security Administration, Office of the Inspector General
Reports Related to the Earnings Suspense File**

| Common Identification Number | Report Title | Date Issued |
|---|---|---|
| A-03-02-22076 | *Utility of Older Reinstated Wages from the Earning Suspense File* | December 2003 |
| A-03-03-13026 | *Follow-up Review of Employers with the Most Suspended Wage Items* | October 2003 |
| A-03-03-24048 | *Congressional Response Report: Use and Misuse of the Social Security Number* | August 2003 |
| A-03-03-13017 | *Congressional Response Report: Review of the Social Security Number Feedback Pilot Project* | April 2003 |
| A-03-03-23038 | *Congressional Response Report: Status of the Social Security Administration's Earnings Suspense File* | November 2002 |
| A-03-02-22008 | *The Social Security Administration's Employee Verification Service for Registered Employers* | September 2002 |
| A-03-01-11035 | *Effectiveness of the Social Security Administration's Earnings After Death Process* | August 2002 |
| A-03-01-11034 | *Effectiveness of the Social Security Administration's Decentralized Correspondence Process* | July 2002 |
| A-03-01-30035 | *Management Advisory Report: Recent Efforts to Reduce the Size and Growth of the Social Security Administration's Earnings Suspense File* | May 2002 |
| A-03-00-10022 | *Management Advisory Report: Review of Service Industry Employer with Wage Reporting Problems* | September 2001 |
| A-03-99-31001 | *Force Processing of Magnetic Media Wage Reports with Validation Problems* | May 2001 |
| A-08-99-41004 | *Obstacles to Reducing Social Security Number Misuse in the Agricultural Industry* | January 2001 |
| A-03-97-31003 | *The Social Security Administration's Earning Suspense Tactical Plan and Efforts to Reduce the File's Growth and Size* | February 2000 |
| A-03-98-31009 | *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items* | September 1999 |

**Appendix I**

# Agency Comments



## SOCIAL SECURITY

MEMORANDUM                                                    33240-24-1137

Date:    October 14, 2004                                    Refer To: S1J-3

To:      Patrick P. O'Carroll, Jr.
         Acting Inspector General

From:    Larry W. Dye  /s/
         Chief of Staff

Subject: Office of the Inspector General (OIG) Draft Report, "Employers with the Most
         Suspended Wage Items in the 5-Year Period 1997 through 2001" (A-03-03-13048)--
         INFORMATION

      We appreciate OIG's efforts in conducting this review.  Our comments to the
recommendations are attached.

      Please let us know if we can be of further assistance.  Staff questions may be referred
to Candace Skurnik at extension 54636.

Attachment:
SSA Response

I-1

**No-Match Cert. Admin. Record  394**

**COMMENTS ON THE OFFICE OF THE INSPECTOR GENERAL (OIG) DRAFT
REPORT, "EMPLOYERS WITH THE MOST SUSPENDED WAGE ITEMS IN THE
5-YEAR PERIOD 1997 THROUGH 2001" A-03-03-13048**

We appreciate the opportunity to comment on the draft report. For some time now, we have
been engaged in a variety of activities geared to reducing the growth and size of the Earnings
Suspense File (ESF). As the ESF continues to grow in both real and relative terms, we maintain
a focus on educating employers about proper wage reporting techniques through our Employer
Service Liaison Officers (ESLO) in each region. In the past, we have been commended for our
efforts in reducing the size and growth of the ESF (*OIG Congressional Response Report, "Status
of Social Security Administration's Earnings Suspense File" A-03-03-23038*).

Our comments to the recommendations and technical comments to the report are below.

**Recommendation 1**

Create centralized Earnings Data Warehouse (EDW) reports, after considering ESLO input, that
assist ESLOs with identifying problematic employer reporting trends, such as increases in the
volume of wage items in suspense as well as the percent of an employer's payroll in the ESF.

**Comment**

We partially agree. We will work with each ESLO in determining their individual reporting
needs and requirements, including the method of delivery.

EDW currently has the report capabilities to identify employers with large numbers of items on
the ESF or larger percentages of W-2 data on the ESF. As for identifying specific employer
payroll percentage calculations of incorrect wage items as compared to correct wage items, the
Annual Wage Reporting (AWR) system, which is the source of the Earnings Management
Information Operational Data Store (EMODS) and EDW data, would have to pass on the total
number of accurate W2's posted to the Master Earnings File. AWR currently does not provide
this information and would require systems modifications to allow EMODS to calculate this
measure, and would require approval for resources from the Agency's Information Technology
Advisory Board.

**Recommendation 2**

Ensure ESLOs consider employer reporting trends created by EDW as part of their criteria in
identifying employers for assistance through periodic monitoring from Headquarters.

**Comment**

We partially agree. We will utilize the EDW to identify those employers who are determined to
need our assistance in the wage reporting arena. The ESLOs in each region will continue to
provide the employer community with wage reporting educational seminars and any needed
individual attention. In addition, we will continue to partner with the regional ESLOs in

**No-Match Cert. Admin. Record  395**

monitoring and implementing changes to address the Agency's ESF goals, but not directly monitor the ESLOs from Headquarters.

[In addition to the items listed above, SSA also provided technical comments which have been addressed, where appropriate, in this report.]

*Appendix J*

# OIG Contacts and Staff Acknowledgments

### OIG Contacts

Walter Bayer, Director, Mid-Atlantic Audit Division, (215) 597-4080

Cylinda McCloud-Keal, Audit Manager, (215) 597-0572

### Acknowledgments

In addition to those named above:

Michael Thomson, Auditor-in-Charge

Richard Devers, Computer Specialist

For additional copies of this report, please visit our web site at
www.socialsecurity.gov/oig or contact the Office of the Inspector General's Public
Affairs Specialist at (410) 965-3218.  Refer to Common Identification Number
A-03-03-13048.

# DISTRIBUTION SCHEDULE

Commissioner of Social Security

Office of Management and Budget, Income Maintenance Branch

Chairman and Ranking Member, Committee on Ways and Means

Chief of Staff, Committee on Ways and Means

Chairman and Ranking Minority Member, Subcommittee on Social Security

Majority and Minority Staff Director, Subcommittee on Social Security

Chairman and Ranking Minority Member, Subcommittee on Human Resources

Chairman and Ranking Minority Member, Committee on Budget, House of Representatives

Chairman and Ranking Minority Member, Committee on Government Reform and Oversight

Chairman and Ranking Minority Member, Committee on Governmental Affairs

Chairman and Ranking Minority Member, Committee on Appropriations, House of Representatives

Chairman and Ranking Minority, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, House of Representatives

Chairman and Ranking Minority Member, Committee on Appropriations, U.S. Senate

Chairman and Ranking Minority Member, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, U.S. Senate

Chairman and Ranking Minority Member, Committee on Finance

Chairman and Ranking Minority Member, Subcommittee on Social Security and Family Policy

Chairman and Ranking Minority Member, Senate Special Committee on Aging

Social Security Advisory Board

# Overview of the Office of the Inspector General

The Office of the Inspector General (OIG) is comprised of our Office of Investigations (OI), Office of Audit (OA), Office of the Chief Counsel to the Inspector General (OCCIG), and Office of Executive Operations (OEO). To ensure compliance with policies and procedures, internal controls, and professional standards, we also have a comprehensive Professional Responsibility and Quality Assurance program.

## Office of Audit

OA conducts and/or supervises financial and performance audits of the Social Security Administration's (SSA) programs and operations and makes recommendations to ensure program objectives are achieved effectively and efficiently. Financial audits assess whether SSA's financial statements fairly present SSA's financial position, results of operations, and cash flow. Performance audits review the economy, efficiency, and effectiveness of SSA's programs and operations. OA also conducts short-term management and program evaluations and projects on issues of concern to SSA, Congress, and the general public.

## Office of Investigations

OI conducts and coordinates investigative activity related to fraud, waste, abuse, and mismanagement in SSA programs and operations. This includes wrongdoing by applicants, beneficiaries, contractors, third parties, or SSA employees performing their official duties. This office serves as OIG liaison to the Department of Justice on all matters relating to the investigations of SSA programs and personnel. OI also conducts joint investigations with other Federal, State, and local law enforcement agencies.

## Office of the Chief Counsel to the Inspector General

OCCIG provides independent legal advice and counsel to the IG on various matters, including statutes, regulations, legislation, and policy directives. OCCIG also advises the IG on investigative procedures and techniques, as well as on legal implications and conclusions to be drawn from audit and investigative material. Finally, OCCIG administers the Civil Monetary Penalty program.

## Office of Executive Operations

OEO supports OIG by providing information resource management and systems security. OEO also coordinates OIG's budget, procurement, telecommunications, facilities, and human resources. In addition, OEO is the focal point for OIG's strategic planning function and the development and implementation of performance measures required by the Government Performance and Results Act of 1993.