United States Government Accountability Office

# GAO

## Report to Congressional Committees

February 2005

# SOCIAL SECURITY

# Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports



**G A O**

Accountability * Integrity * Reliability

GAO-05-154

No-Match Cert. Admin. Record 400



**G A O**
Accountability·Integrity·Reliability

# Highlights

Highlights of GAO-05-154, a report to
congressional committees

February 2005

# SOCIAL SECURITY

## Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports

## Why GAO Did This Study

Each year, the Social Security Administration (SSA) receives millions of employer-submitted earnings reports (Form W-2s) that it is unable to place in an individual Social Security record. If the Social Security number (SSN) and name on a W-2 do not match SSA's records, the W-2 is retained in the Earnings Suspense File (ESF). SSA's ability to match earnings reports is essential to calculating Social Security benefits. Because of concerns about the size of the ESF, GAO was asked to determine (1) how SSA processes workers' earnings reports, (2) the types of errors in ESF reports and the characteristics of employers whose reports are in the ESF, (3) how often earnings from repeatedly used SSNs have been reinstated and who receives the earnings from theses reports, and (4) what key factors contribute to ESF postings.

### What GAO Recommends

GAO recommends that the Commissioners of SSA and the Internal Revenue Service (IRS) and the Secretary of the Department of Homeland Security (DHS) work on several fronts to facilitate more accurate earnings reporting by employers, enhance verification systems, and institute effective data sharing to deter unauthorized work activity and ESF postings. SSA, IRS, and DHS agreed to consider our recommendations, provided clarifying information, and described initiatives planned or under way to enhance earnings reporting and worker verification.

www.gao.gov/cgi-bin/getrpt?GAO-05-154.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Barbara D. Bovbjerg at (202) 512-7215 or bovbjergbj@gao.gov.

## What GAO Found

Upon receiving over 250 million earnings reports annually from employers, SSA uses various processes to post such reports to workers' Social Security records. For reports in which worker names and SSNs exactly match SSA's information, the earnings are credited to the appropriate Social Security record. When SSA encounters earnings reports that do not match its records, SSA attempts to make a match through various automated processes. Such processes have allowed SSA to identify valid records for an average of 15 million reports annually. However, about 4 percent of the reports still remain unmatched and are retained in the ESF. SSA uses additional automated and manual processes to continue to identify valid records. The most recent data show that SSA posted ("reinstated") over 2 million earnings reports in the ESF to valid records from such processes.

Earnings reports in the ESF have serious data problems and are particularly likely to be submitted by certain categories of employers. Such problems include missing SSNs and employer use of the same SSN for more than one worker in the same tax year. Additional problems include missing surnames or names that include nonalphabetic characters. Forty-three percent of employers associated with earnings reports in the ESF are from only 5 of the 83 broad industry categories. Among these industry categories, a small portion of employers account for a disproportionate number of ESF reports.

SSA has reinstated a substantial number of earnings reports with SSNs that appear repeatedly in the ESF. We analyzed the most frequently occurring 295 SSNs, which appeared in ESF 1,000 times or more between tax years 1985 and 2000. Of the earnings reports associated with these SSNs, SSA reinstated 13.1 million to the records of about 11.7 million workers. Although most reinstatements were for U.S.-born workers, in recent years the percentage of reinstatements to foreign-born workers has markedly increased. Also increasing is the percentage of foreign-born workers that received reinstatements for earnings in years prior to receiving a valid SSN— a potential indicator of unauthorized employment.

Three major factors contribute to ESF postings. Under IRS regulations, employers must ask new hires to provide their name and SSN, but are not required to independently corroborate this information with SSA. DHS requires employers to visually inspect new workers' identity and work authorization documents, but employers do not have to verify these documents, and they can be easily counterfeited. Further, IRS regulations are minimal; IRS has no record of assessing a penalty for filing inaccurate earnings reports; and DHS enforcement efforts against employers who knowingly hire unauthorized workers has been limited in recent years because of shifting priorities following the events of September 11, 2001. Last, although SSA and DHS offer employers verification free of charge, these services are voluntary, have some limitations, and remain underutilized.

# Contents

**Letter**                                                                     1

    Results in Brief                                        2
    Background                                              5
    SSA Uses Electronic and Manual Processes to Match Earnings
        Reports to Appropriate Records   6
    ESF Earnings Reports Frequently Include Inaccurate and Missing
        Information                      11
    Earnings from Frequently Used SSNs Are Often Reinstated and
        Increasingly Belong to Foreign-Born Workers    17
    Several Key Factors Contribute to ESF Postings         21
    Conclusions                                            33
    Recommendations                                        35
    Agency Comments and Our Evaluation                     35

**Appendix I**       **Objectives, Scope, and Methodology**                     38

**Appendix II**      **Comments from the Social Security Administration**       40

**Appendix III**     **Comments from the Internal Revenue Service**             43

**Appendix IV**      **Comments from the Department of Homeland
Security**                                                                     45

**Appendix V**       **GAO Contacts and Staff Acknowledgments**                 47

    GAO Contacts                                           47
    Staff Acknowledgments                                  47

**Tables**

    Table 1: Number of Earnings Reports and Related Amounts in the
        ESF, by Decade                   6
    Table 2: Number of Earnings Reports with Initially Invalid Identity
        Information That SSA Corrected Via the Upfront
        Validation Routines (1998-2002)  8

**No-Match Cert. Admin. Record 402**

Table 3: Number of Earnings Reports That SSA Reinstated to Correct Records Using Selected Back-End Routines for Tax Year 2001 — 10

Table 4: Use of One SSN by an Employer for Multiple Workers on Earnings Reports in a Tax Year (1985-2000) — 13

Table 5: Employers with Earnings Reports in the ESF Using One SSN More than Once in a Tax Year (1985-2000) — 14

Table 6: Range of Number of Employers' Earnings Reports Recorded in the ESF, as of January 2003 (Tax Years 1985-2000) — 15

Table 7: Ranges of Unposted Earnings Associated with the 9.58 Million Items in the ESF under the 295 SSNs Analyzed — 17

Table 8: Percentage of Reinstatement Recipients Reviewed Who Were Foreign-Born, by Year — 19

Table 9: Analysis of Foreign-Born Persons Receiving Reinstatements from Repeatedly Used SSNs, Grouped by Countries of Birth — 20

Table 10: Percentage of Reinstatements to Foreign-Born Persons with Earnings before Receipt of SSN, by Year of Earnings — 21

**Figures**

Figure 1: Flowchart of SSA's Process for Posting Earnings Reports to Workers' Social Security Records — 7

Figure 2: Employers Reporting Earnings in the ESF, by Type of Business — 16

Figure 3: Employer Investigations and Notices of Intent to Fine Letters Issued, Fiscal Years 1992 to 2002 — 27

Figure 4: Investigative Work Years and Arrests of Unauthorized Workers, Fiscal Years 1999 to 2003 — 28

**No-Match Cert. Admin. Record  403**

## Abbreviations

| | |
|---|---|
| DHS | Department of Homeland Security |
| ESF | Earnings Suspense File |
| ESLO | Employer Service Liaison Officer |
| ICOR | Item Correction |
| IIRIRA | Illegal Immigration Reform and Immigrant Responsibility Act |
| IRCA | Immigration Reform and Control Act |
| IRS | Internal Revenue Service |
| MEF | Master Earnings File |
| OIG | Office of the Inspector General |
| PEBES | Personal Earnings and Benefit Estate Statements |
| SSA | Social Security Administration |
| SSN | Social Security number |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

GAO-05-154  Unidentified Earnings Reports

**No-Match Cert. Admin. Record  404**



**G A O**
Accountability * Integrity * Reliability

**United States Government Accountability Office**
**Washington, DC 20548**

February 4, 2005

The Honorable F. James Sensenbrenner, Jr.
Chairman
Committee on the Judiciary
House of Representatives

The Honorable Jim McCrery
Chairman
Subcommittee on Social Security
Committee on Ways and Means
House of Representatives

The Honorable E. Clay Shaw, Jr.
Committee on Ways and Means
House of Representatives

The Social Security Administration (SSA) manages benefit programs that cover nearly all working Americans. To carry out this responsibility, SSA must maintain records of workers' earnings because they are the basis for calculating benefits for workers and their dependents. Each year, SSA receives over 250 million earnings reports (Form W-2s). SSA posts earnings to its records based on the name and Social Security number (SSN) submitted with each earnings report. If the SSN or name does not match SSA's records, the reported earnings amount is placed in an Earnings Suspense File (ESF), where it remains until SSA obtains evidence to link the unidentified earnings to a valid SSN—a process termed "earnings reinstatement." Earnings reports with incorrect or incomplete information have been a long standing problem, and in 2002, SSA was unable to post to valid worker records almost 9 million reports representing $56 billion in earnings. In November 2004, SSA reported that the ESF contained a combined total of 246 million earnings records from all tax years back to the inception of the Social Security program (1937), representing about $463 billion in reported earnings. Because of your concerns about the size of the ESF, and the potentially negative consequences for benefit payments and tax administration associated with incorrect earnings records, you asked us to determine (1) how SSA processes workers' earnings reports, (2) the types of errors in ESF reports and the characteristics of employers whose reports are in the ESF, (3) how often earnings from repeatedly used SSNs have been reinstated

**No-Match Cert. Admin. Record  405**

and who receives the earnings from these reports, and (4) what key factors contribute to ESF postings.

To complete our work, we met with SSA officials to obtain information on the various electronic processes SSA uses to resolve errors and post earnings to worker records. We also visited a total of eight SSA field offices located in New York, New Jersey, Virginia, and California that had significant reinstatement activity to observe and document SSA's manual procedures for reviewing and validating evidence submitted by individuals seeking reinstated earnings. To determine the characteristics of ESF earnings and assess reinstatement activity, we obtained and analyzed an electronic copy of the ESF for tax years 1985 to 2000 (84.6 million records). As part of our analysis, we assessed the reliability of the ESF by reviewing recent SSA, Inspector General, and contractor reports; interviewing agency officials; and checking the databases for consistency. To analyze reinstatement of earnings reported under repeatedly used SSNs, we selected 295 SSNs that appeared most frequently in the ESF— each appeared 1,000 or more times. We tracked the number of reinstatements associated with these SSNs since the inception of the program and examined the characteristics of the workers whose earnings had been reinstated. We also documented the tools SSA makes available to employers to assist them in verifying SSNs, reviewed Internal Revenue Service (IRS) regulations requiring employers to solicit and document worker names and SSNs, and interviewed key officials responsible for enforcing those regulations. We also reviewed reports on the ESF prepared by SSA's Office of the Inspector General (OIG) and private contractors. Finally, we met with officials from the Department of Homeland Security (DHS) to document the agency's efforts to enforce laws that prohibit employers from knowingly hiring workers who are not authorized to work in the United States and to obtain information about DHS's worker verification service. Our work was conducted between October 2002 and December 2004 in accordance with generally accepted government auditing standards. (See app. I for more details about our methodology and scope.)

## Results in Brief

SSA uses various processes to post earnings reports to workers' Social Security records. For reports where worker names and SSNs exactly match SSA's information, the earnings reports are credited to the appropriate Social Security record. About 10 percent of initial submissions, however, do not match SSA's records, and the agency attempts to obtain a match through automated processes that it refers to as "validation routines." For each of these earnings reports, the agency

**No-Match Cert. Admin. Record  406**

conducts over 20 validation routines that address possible errors in worker names, such as spelling or in SSN numbering sequence. Such routines have allowed SSA to identify the correct SSN record and post an average of 15 million reports annually over the past 5 years. However, almost 9 million reports (about 4 percent of all reports) remain unmatched even after the above validation routines and are, therefore, placed in the ESF. Subsequently, SSA employs additional automated and manual routines, including requesting updated information from workers and employers to reconcile the earnings reports. Some of these processes take place in SSA field offices. For example, SSA field staff may interview workers seeking reinstatements, review the evidentiary documents submitted, and credit the reported earnings to their Social Security records. The most recent reinstatement data available show that for tax year 2001 earnings reports, SSA posted about 600,000 earnings reports from the ESF, representing about $4 billion in reported earnings. Other processes applied to a range of filing years have recently reinstated an additional 1.9 million reports.

Many of the earnings reports in the ESF that we examined have serious data problems and are particularly likely to be submitted by certain types of employers. Of the 84.6 million records placed in the ESF for tax years 1985-2000, about 9 million had all zeros (e.g., 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) in the SSN field. For 3.5 million records, employers used the same SSN to report earnings for multiple workers in a single tax year. About 1.4 million records had SSNs that had never been issued by SSA, and over 260,000 were missing a first name. Certain types of employers were most frequently associated with incorrect earnings reports. For example, limited data provided by SSA show that 43 percent of the employers with earnings reports in the ESF are from only 5 of the 83 broad industry categories, with "eating and drinking establishments" and "construction and special trades" being the top 2. A small portion of employers also account for a disproportionate number of ESF reports. For example, only about 8,900 employers— 0.2 percent of all employers with reports recorded in the ESF for tax years 1985-2000—submitted over 30 percent of the reports we analyzed.

SSA eventually reinstated a substantial number of earnings reports associated with SSNs that appeared repeatedly in the ESF; a growing number of reinstatements have been to the Social Security records of foreign-born workers. We analyzed 295 distinct SSNs that appeared in ESF 1,000 times or more between tax years 1985 and 2000. Of the earnings reports associated with these SSNs, SSA reinstated 13.1 million to the records of about 11.7 million individuals. Historically, most workers receiving reinstatements were U.S.-born males. However, in more recent

**No-Match Cert. Admin. Record  407**

years, the percentage of foreign-born workers receiving such reinstatements has markedly increased, from about 8 percent before 1986 to almost 21 percent in 2003. Workers born in Mexico, Canada, Germany, and Cuba represented nearly 40 percent of all foreign-born individuals receiving such reinstatements. Further, in 2003 about 47 percent of foreign-born workers with reinstatements from repeatedly used SSNs had earnings prior to actually receiving a valid SSN—a potential indicator of unauthorized employment.

Limited requirements for obtaining and reporting accurate worker names and SSNs, IRS enforcement weaknesses and limited DHS worksite enforcement efforts, and underutilization of employee verification systems create an environment in which false names and SSNs can be used for employment purposes, and in these cases earnings records frequently cannot be associated with the correct Social Security record. IRS requires employers to solicit newly hired workers' names and SSN information on IRS Form W-4 (Employee's Withholding Allowance Certificate) that workers must complete. However, employers rely primarily on workers to self-report this information, with no independent corroboration by employers. While DHS's employer reporting requirements are somewhat more demanding than IRS's, employers still rely primarily on visual inspections of documents demonstrating identity and work authorization, such as driver's licenses, Social Security cards, and immigration documents to establish identity and work authorization. Such documents can be easily counterfeited, and DHS lacks reasonable assurance that employers will detect individuals using them. Further, IRS's reporting requirements are minimal, and IRS has no record of ever assessing a penalty against an employer for filing inaccurate earnings reports. DHS enforcement activities and sanctions against employers who hire unauthorized workers are also limited. Following the events of September 11, 2001, DHS has focused its limited worksite enforcement efforts primarily on critical infrastructure facilities, such as airports and power plants, where unauthorized workers could pose security threats, rather than on industries most commonly associated with ESF postings. Further, although earnings reports may involve illegal work activity, DHS has not used data regularly supplied by SSA on potential unauthorized workers and their employers. Although both SSA and DHS offer employers free verification services, these services are voluntary, have some limitations, and remain underutilized.

We are recommending that the Commissioners of the Social Security Administration and the Internal Revenue Service and the Secretary of Homeland Security work collaboratively on several fronts to facilitate

**No-Match Cert. Admin. Record  408**

more accurate earnings reporting by employers, enhance existing electronic verification systems, and institute more effective data sharing to deter erroneous earnings postings and unauthorized SSN use.

SSA, IRS, and DHS generally agreed with our recommendations, provided additional clarifying information regarding their roles in the current process for soliciting and verifying worker information, and noted various initiatives that are either planned or under way to address our recommendations. Their comments are reproduced in appendixes II, III, and IV.

## Background

Social Security benefits are based on a worker's lifetime earnings in covered employment. As the agency responsible for issuing SSNs and paying retirement, survivors, and disability benefits to insured persons, SSA must have accurate records of every worker's earnings. Inaccurate earnings records can create benefit payment errors.

Through a process known as enumeration, SSA assigns a unique SSN to each individual who meets the requirements for one. Currently, SSNs are issued to most U.S. citizens at birth. They are also available to noncitizens lawfully admitted to the United States with permission to work. Lawfully admitted noncitizens may also qualify for an SSN for nonwork purposes when a federal, state, or local law requires that they have an SSN to obtain a particular public benefit or service. SSA must obtain documentary evidence from such applicants regarding their age, identity, U.S. citizenship, or lawful alien status, and if they were previously assigned an SSN. Thus, SSA maintains a historical record of each worker's annual earnings, which is identified by the worker's name and Social Security number.[1]

The earnings reporting process begins at the end of each calendar year, when employers submit reports of their workers' earnings to SSA on IRS Form W-2 (Wage and Tax Statement). To prepare the W-2, employers generally use certain information that workers provide on Form W-4, which is the document that determines the amount of federal income taxes that will be withheld from the worker's pay. If the SSN and name on

---

[1]SSA is also required to maintain earnings records for self-employed individuals and has a separate ESF for these submissions. We have focused only on employer-submitted earnings reports in this analysis.

**No-Match Cert. Admin. Record  409**

an earnings report submitted by the employer do not match information in SSA's Master Earnings File (MEF), the reported earnings are placed in the ESF, which is a repository for earnings reports for unidentified workers. The ESF is an online file that can be updated throughout the day by all SSA field offices and various centralized components, although the updates are performed via batch mode. Removal of earnings reports from the ESF occurs only when a report can be matched and posted to a worker's MEF record. This process is termed "reinstatement" by SSA. Thus, the number of reports in ESF on a given day fluctuates as earnings are reinstated to the correct Social Security records. Table 1 reflects the ESF reports remaining, listed by decade, corresponding to the tax year of earnings for which each report applied, since inception of the Social Security program.

**Table 1: Number of Earnings Reports and Related Amounts in the ESF, by Decade**

Dollars in billions

| Decade | Number of reports | Uncredited earnings |
|---|---|---|
| 1937-39[a] | 8,908,235 | $0.6 |
| 1940-49 | 19,764,525 | 2.0 |
| 1950-59 | 22,155,420 | 3.6 |
| 1960-69 | 28,294,126 | 6.7 |
| 1970-79 | 44,402,863 | 22.7 |
| 1980-89 | 41,928,484 | 77.3 |
| 1990-99 | 51,950,009 | 188.9 |
| 2000–02[a] | 28,339,912 | 161.0 |
| **Total** | **245,743,574** | **$462.8** |

Source: GAO analysis of SSA data.

[a]In November 2004, SSA provided us with a summary of the items in the ESF showing the number of earnings reports and their dollar amount remaining in the ESF by year of earnings. The data reflect only partial decade information for indicated years.

## SSA Uses Electronic and Manual Processes to Match Earnings Reports to Appropriate Records

SSA uses various processes to post reported workers' earnings to valid Social Security records. Generally, employers send SSA one W-2 each year that reports the annual earnings for each of their workers. Upon receipt of these earnings reports, SSA electronically validates whether it has established a Social Security record for the reported SSN and surname shown on the W-2. SSA does this by electronically matching the worker's surname and SSN on the W-2 to information in its number identification file (Numident) that contains demographic information about every SSN holder. When the SSN and the first seven characters of the surname are identical on the W-2 and the Numident file, SSA posts those earnings to the

**No-Match Cert. Admin. Record 410**

indicated record in its MEF. SSA is able to place about 90 percent of employer-submitted earnings reports received each year in an appropriate MEF record. (Fig. 1 shows SSA's process in more detail.)

**Figure 1: Flowchart of SSA's Process for Posting Earnings Reports to Workers' Social Security Records**



Source: GAO analysis and Art Explosion.

For the 10 percent of the reports that fail this initial validation test, SSA performs more than 20 of what it calls "front-end validation routines" that manipulate either the reported name or the SSN in a variety of ways to

**No-Match Cert. Admin. Record  411**

correct common reporting mistakes so that SSA can find an MEF record and prevent the posting of the earnings to the ESF. SSA's front-end routines identify Social Security records for about 60 percent of the reports that are initially categorized as mismatches each year. In manipulating worker information to find a valid record, the automated front-end routines assume either the SSN is correct and there is a problem in the reported name or vice versa. For example, one front-end routine for reported name errors tests whether the first name and the surname have been reversed on the employer-filed W-2. The name reversal routine compares the first name from SSA's Numident file with the surname on the W-2. If they are the same and the first initial for the middle and surname match the information on the W-2, then SSA assumes it has found the proper record and posts the earnings. Other front-end routines check whether digits in the SSN are transposed or inaccurate or whether the name on the report contains transposed or missing letters. Another front-end routine involves searching for reinstated items that in the past have included the same reporting error occurring in the current year's earnings report.

Over the past several years, such routines have allowed SSA to post an annual average of 15 million earnings reports to individual MEF records, rather than to the ESF. Table 2 summarizes the performance of these front-end routines for the past 5 reporting years. It shows that SSA found about 76 million valid records for reported earnings for tax years 1998 to 2002.

**Table 2: Number of Earnings Reports with Initially Invalid Identity Information That SSA Corrected Via the Upfront Validation Routines (1998-2002)**

| | Year earnings were processed | | | | | |
|---|---|---|---|---|---|---|
| | 1998 | 1999 | 2000 | 2001 | 2002[*] | Total |
| Millions of reports not initially matching SSA records | 23.9 | 25.8 | 28.4 | 24.4 | 21.9 | **124.4** |
| Millions of corrected reports | 15.9 | 16.7 | 17.6 | 13.6 | 12.0 | **75.8** |
| Percentage corrected | 66.4% | 64.7% | 62.1% | 56.0% | 54.8% | **61.0%** |

Source: GAO analysis of SSA data.

[*]Data as of November 2004.

If the front-end routines do not identify a valid record, SSA posts the earnings in the ESF. SSA subsequently performs what it calls "back-end" processes on the items, consisting of electronic and manual actions to match the earnings to a worker's MEF record. For one such process, SSA

**No-Match Cert. Admin. Record  412**

uses corrections of reported names and SSNs generated under IRS's automated routines. SSA then attempts to find the W-2 in the ESF and validate the corrected name and SSN that IRS provides against SSA's records; when both conditions are met, SSA accepts IRS's corrections and reinstates the item to the worker's record. Under another process, which SSA calls decentralized correspondence, or DECOR, SSA sends letters to addresses listed on each invalid W-2, seeking information to resolve the identity issue (or to the employer if the W-2 lacks a valid address). If the worker does not respond, SSA then sends a letter to the employer that filed the report soliciting assistance in resolving the problem. Other types of correspondence involve Young Child Earnings Records and Earnings After Death, for which SSA sends letters to employers and/or the persons whose SSNs appear on the reports; SSA automatically posts such earnings reports to the ESF because the persons named in the reports are, respectively, either (a) 6 years of age or younger (thus unlikely to have earnings through employment) or (b) have a date of death recorded on their Numident record for a year prior to the tax year for which earnings on Form W-2 have been reported. Upon receiving satisfactory documentation clarifying the earnings and linking them to the proper SSN, SSA reinstates earnings reports to the individuals' MEF record.

SSA also uses yet another process, known as FERRET, that compares worker addresses on the W-2 with addresses that IRS has from individual tax returns. In its Operation 30 routine, SSA staff compare ESF earnings reports with valid SSNs with information in the Numident record. Staff check whether nicknames, surname derivations, and other obvious mistakes in spelling might be the cause of the posting problem. Table 3 shows that in 2001 (the last year for which data were available), selected back-end routines reinstated almost 600,000 earnings reports totaling almost $4 billion.

**No-Match Cert. Admin. Record  413**

**Table 3: Number of Earnings Reports That SSA Reinstated to Correct Records Using Selected Back-End Routines for Tax Year 2001**

Dollars in millions

| Back-end reinstatement routine | Items reinstated | Earnings reinstated |
|---|---|---|
| IRS corrections (mismatch resolutions by IRS sent to SSA) | 398,307 | $2,608.7 |
| FERRET | 97,145 | 557.3 |
| W-2 corrections submitted by employers | 60,791 | 529.7 |
| Operation 30 | 29,661 | 202.2 |
| Correspondence routines | | |
|   DECOR | 2,980 | 20.6 |
|   Young child earnings records | 499 | 5.1 |
|   Earnings after death | 127 | 1.3 |
| **Total** | **589,510** | **$3,924.8** |

Source: SSA.

SSA has two other electronic back-end routines that have produced a large number of reinstatements. In a process called SWEEP, SSA periodically reruns ESF items through its records to determine whether updated information has been added to the Numident or whether newly developed validation routines might permit reinstatements. In 2003, SSA reinstated 123,741 items through SWEEP, covering tax years 1977-2001. GAP SWEEP is a newly developed routine that scans earnings records for valid SSNs in the ESF and assesses whether yearly gaps in earnings exist in the MEF record and might be linked to similar earnings in the ESF. [2] If a link can be made, SSA uses slightly less stringent name match rules; if the name can be validated, the item is reinstated. As of May 2003, SSA has reinstated through the GAP SWEEP routine over 1.5 million items (across all tax years back to 1937), representing $6.1 billion in earnings.

Still another back-end process involves a manual review of worker-submitted evidence and a check of automated data. Workers (and their dependents and survivors) may visit local SSA offices to have earnings

---

[2] For example, if a worker has no matched earnings report for 1995, but has matched earnings reports from the same employer for roughly the same level of earnings for 1994 and 1996, SSA will attempt to find a suspended earnings report with a different worker's name from that same employer that possibly could apply to the worker. If SSA finds a 1995 suspended earnings report that appears to be roughly parallel to the 1994 and 1996 matched earnings reports, SSA credits the 1995 report to the worker in question.

**No-Match Cert. Admin. Record  414**

reinstated through the Item Correction (ICOR) process. Individuals provide SSA staff with evidence, such as W-2s, earnings statements, and tax returns, to document earnings that are missing from their Social Security record. Upon receiving adequate proof that links an earnings report to the individual, SSA field staff manually reinstate the earnings, subject to an accuracy check by a peer or supervisor. SSA provided information indicating that in fiscal year 2003, field staff had made about 244,000 earnings reinstatements through the ICOR process.

Furthermore, each year SSA mails a Social Security statement to workers and former workers age 25 and over who are not yet receiving benefits.[3] The statement lists the amount of earnings posted to the person's Social Security record by year and encourages persons to contact SSA about any missing earnings. Such earnings might have been placed in the ESF because of a name or SSN mismatch. Reinstatements related to Social Security statements are included in the ICOR data discussed above.

## ESF Earnings Reports Frequently Include Inaccurate and Missing Information

Earnings reports in the ESF have serious data problems. Such data problems include missing SSNs or names, never issued numbers, and employer use of the same SSN to report earnings for multiple workers in a single tax year. In addition, a small portion of employers account for a disproportionate number of ESF reports, and employers in certain industry categories are more likely than others to submit reports with invalid worker identity information.

## ESF Reports Have Serious Data Problems

Out of the 84.6 million reports in the ESF for the 16 tax years that we examined (1985-2000), some of the more serious or obvious problems were that

- 8.9 million had all zeros in the SSN field[4] and
- 1.4 million had reported SSNs that were never issued.

---

[3] The Social Security Statements were formerly known as Personal Earnings and Benefit Estimate Statements (PEBES).

[4] SSA advises employers who file W-2s electronically to use all zeros in the SSN field when they do not have a number for their worker; employers who file paper W-2s are to record "applied for" in the SSN field of the W-2, which SSA then converts to all zeros.

**No-Match Cert. Admin. Record  415**

In addition, over 270,000 of the reports had various name problems. For example,

- 60,476 had no surname;

- 261,744 had no first name;

- 3,760 reports contained nonalphabetic characters in the name field, such as ?, /, %, <, &, *, @, even though SSA has developed automated routines to delete such characters from the name field.[5]

For the 16-year period we examined, we also found that some employers used one SSN to report earnings for more than one worker in a given tax year.[6] Table 4 depicts the number of times that employers used one SSN to report earnings of multiple workers in a tax year. For example, one case we found involved 10 W-2s in the ESF under one SSN for tax year 2000 from one employer. Each of the reports under the SSN had different names and different earnings, and together the earnings on the 10 reports totaled about $44,000. Table 4 shows that employers used one SSN in 10 different reports in a single tax year and did this 308 times over the 16- year period of analysis. These employer reports accounted for 3,080 W-2s with $4.7 million in earnings recorded in the ESF. Table 4 also shows that most employers using one SSN to report earnings for multiple workers did this for relatively few reports (from 2 to 9). However, there were a few employers who used one SSN for over 100 reports (128 separate occurrences—see shaded area of table 4). The most egregious case that we identified involved an employer who used one SSN for 2,580 different earnings reports in a tax year.

---

[5]SSA officials informed us that their systems no longer accept nonalphabetic characters.

[6]We excluded all ESF reports under the SSN 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 from this particular analysis. Because there were so many reports under this SSN, inclusion of related records would have greatly inflated the number of occurrences.

GAO-05-154  Unidentified Earnings Reports

No-Match Cert. Admin. Record  416

**Table 4: Use of One SSN by an Employer for Multiple Workers on Earnings Reports in a Tax Year (1985-2000)**

Dollars in millions

| Frequency of SSN use | Number of occurrences in a tax year | Total number of W-2s | Total unposted earnings |
|---|---|---|---|
| 2-9 | 1,665,970 | 3,456,746 | $10,275.1 |
| 10 | 308 | 3,080 | 4.7 |
| 11-50 | 1,596 | 30,731 | 31.8 |
| 51-100 | 134 | 9,090 | 10.7 |
| 101-150 | 51 | 6,227 | 6.1 |
| 151-200 | 27 | 4,596 | 3.3 |
| 201-250 | 13 | 2,874 | 1.8 |
| 251-300 | 7 | 1,899 | 5.2 |
| 301-400 | 13 | 4,413 | 2.4 |
| 401-500 | 9 | 3,966 | 3.4 |
| Over 500 | 8 | 6,876 | 4.8 |
| **Total** | **1,668,136** | **3,530,498** | **$10,349.4** |

Source: GAO analysis of ESF data.

Note: Data for the 128 instances of employers using the same SSN in a tax year to report the earnings of more than one worker under the same SSN over 100 times are highlighted.

*Column does not sum because of rounding.

Some employers exhibited a pattern of such errors year after year. Between 1985 and 2000, about 61,000 employers used one SSN for more than one worker in multiple tax years. Table 5 shows that most employers using one SSN to report earnings for multiple workers did this in a period ranging between 1 and 9 years. However, there were slightly over 1,000 employers who used one SSN to report the earnings of more than one worker in 10 or more of the 16 tax years that we analyzed (see shaded area of table 5). We found 43 employers did this every year of the entire 16-year period we analyzed.

**No-Match Cert. Admin. Record  417**

**Table 5: Employers with Earnings Reports in the ESF Using One SSN More than Once in a Tax Year (1985-2000)**

Dollars in millions

| Number of tax years | Number of employers using an SSN in a tax year more than once to report earnings | Number of W-2s filed by the employers using an SSN more than once in a tax year | Total uncredited earnings |
|---|---|---|---|
| 1 | 170,673 | 876,487 | $3,032.7 |
| 2-5 | 55,966 | 1,530,702 | 4,603.0 |
| 6-9 | 4,286 | 628,801 | 1,634.3 |
| 10 | 318 | 88,857 | 203.9 |
| 11 | 241 | 88,506 | 216.7 |
| 12 | 166 | 70,798 | 164.7 |
| 13 | 102 | 54,528 | 114.3 |
| 14 | 85 | 37,183 | 81.4 |
| 15 | 57 | 59,591 | 151.4 |
| 16 | 43 | 95,045 | 147.7 |
| **Total** | **231,937** | **3,530,498** | **$10,349.4[a]** |

Source: GAO analysis of ESF data.

Note: Data for the 1,012 employers who used the same SSN to report the earnings of more than one worker in 10 or more years are highlighted.

[a]Column does not sum because of rounding.

## A Few Employers and Certain Types of Industries Have a Disproportionate Number of Reports in the ESF

The majority of employers submitted a relatively small number of the total number of earnings reports in the ESF. For example, table 6 shows that 3.4 million employers had fewer than 10 reports for the period we analyzed. In contrast, while only about 8,900 employers (0.2 percent of all employers with reports recorded in the ESF for tax years 1985-2000) had 1,000 or more reports in the ESF, they accounted for over 30 percent of the total number of ESF reports (see shaded area of table 6).

GAO-05-154  Unidentified Earnings Reports

**No-Match Cert. Admin. Record  418**

**Table 6: Range of Number of Employers' Earnings Reports Recorded in the ESF, as of January 2003 (Tax Years 1985-2000)**

| Range of earnings reports in the ESF | Number of employers | | Number of earnings reports in ESF | |
|---|---|---|---|---|
| | Number | Percent | Number | Percent |
| 1-9 | 3,433,185 | 80.5 | 8,703,653 | 10.29 |
| 10 - 99 | 712,992 | 16.71 | 20,115,472 | 23.76 |
| 100 - 999 | 109,728 | 2.58 | 27,840,242 | 32.91 |
| 1,000 - 4,999 | 7,800 | 0.19 | 14,881,480 | 17.59 |
| 5,000 – 9,999 | 721 | 0.01 | 4,912,715 | 5.80 |
| 10,000 – 49,999 | 348 | 0.01 | 6,209,815 | 7.34 |
| 50,000 – 99,999 | 12 | 0.00 | 796,613 | 0.95 |
| 100,000 – 299,999 | 9 | 0.00 | 1,154,070 | 1.36 |
| Total | 4,264,795 | 100.0 | 84,614,100 | 100.0 |

Source: GAO analysis of ESF data.

Note: Data for the 8,890 employers with 1,000 or more reports in the ESF are highlighted.

One measure of employer reporting problems is to identify those that, year after year, submit reports that are posted to the ESF. For example, relatively few employers—about 24,000—had a report in each of the 16 years, accounting for a total of 14.6 million reports. Although those 24,000 employers represented only 0.5 percent of all employers, they had submitted about 17 percent of the total number of reports. In addition, we found that employers with a high number of reports in the ESF had a consistent pattern of misidentifying their workers on their annual earnings reports to SSA. For example, one employer averaged about 13,300 reports placed in the ESF per year over the period we analyzed, ranging from a low of 5,971 to a high of 33,448.

Finally, certain types of businesses appear to be disproportionately associated with earnings reports in the ESF. We obtained data from SSA that described the types of businesses for 1.8 of the 4.3 million employers with earnings reports in the ESF for the period examined. Figure 2 shows that of the 83 total broad industry categories, 5 of the categories alone accounted for 43 percent of these reports: eating and drinking establishments, construction and special trades, agricultural production-crops, business service organizations, and health service organizations. Our analysis of industry types may not be representative of all 4.3 million employers with reports in the ESF, because information on the industry categories for other 2.5 million employers was not available. However, it is

No-Match Cert. Admin. Record  419

consistent with an analysis reported by SSA's OIG. In September 1999, the OIG examined earnings reports from 100 employers with the most suspended wage items.[7] OIG reported that 67 percent of these employers were in industries that it categorized as services, restaurants, and agriculture. It also noted that SSA's experience is that employers who rely on a workforce consisting of relatively unskilled or migrant workers are the major source of suspended earnings reports.

**Figure 2: Employers Reporting Earnings in the ESF, by Type of Business**



Source: GAO analysis of SSA data.

Note: The total is based on 1.8 million employers with reported industrial codes.

---

[7]Social Security Administration, Office of the Inspector General, *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items* (September 1999).

**No-Match Cert. Admin. Record  420**

## Earnings from Frequently Used SSNs Are Often Reinstated and Increasingly Belong to Foreign-Born Workers

SSA successfully reinstates a substantial number of earnings reports associated with frequently used SSNs in the ESF. Overall, the majority of reinstated earnings we examined were posted to the Social Security records of U.S.-born workers. In recent years, however, the number of foreign-born workers receiving reinstatements from these SSNs has significantly grown. Further, our analysis of data indicates that the reinstated earnings for foreign-born workers may often relate to unauthorized employment.

To obtain information about reinstatements made to repeatedly used SSNs, we analyzed the 295 SSNs that appeared most frequently in the ESF for tax years 1985-2000. Each of these SSNs had 1,000 or more earnings records posted to them for these 16 tax years. Of the reports associated with these SSNs since 1937, SSA reinstated 13.1 million to the records of about 11.7 million individuals. Overall, the 295 SSNs have about 9.58 million reports for which the actual worker is still unidentified, representing about $14.5 billion in unposted earnings. Of these 9.58 million reports that remain in the ESF, about 8.9 million are under the all-zero SSN (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). The average unposted earnings associated with the 9.58 million reports were about $1,513. However, the range was wide. Table 7 shows that almost 25 percent of the reports had unposted earnings of $100 or less, and about 3 percent of the reports had unposted earnings over $10,000. About 84 percent of the reports had earnings of $2,000 or less.

**Table 7: Ranges of Unposted Earnings Associated with the 9.58 Million Items in the ESF under the 295 SSNs Analyzed**

| Range of unposted earnings amounts | Number of reports | Percentage of reports |
|---|---|---|
| $100 or less | 2,270,019 | 23.7 |
| $100.01-$830 | 4,371,563 | 45.6 |
| $830.01-$2,000 | 1,400,315 | 14.6 |
| $2,000.01-$5,000 | 887,083 | 9.3 |
| $5,000.01-$10,000 | 376,258 | 3.9 |
| $10,000.01-$20,000 | 198,250 | 2.1 |
| $20,000.01-$30,000 | 42,557 | 0.4 |
| $30,000.01-$50,000 | 20,590 | 0.2 |
| Over $50,000 | 10,292 | 0.1 |
| **Total** | **9,576,927** | **99.9[a]** |

Source: GAO analysis of SSA ESF for tax years 1985-2000.

[a]The column does not sum to 100 percent because of rounding.

**No-Match Cert. Admin. Record  421**

Since 1937, SSA has made 13.1 million reinstatements of earnings from the 295 SSNs to 11.7 million different persons. SSA maintains limited data on the characteristics of persons who receive reinstatements. However, the data did allow us to document an individual worker's gender, birth date, and country of birth, as well as when his or her SSN was issued. Overall, about 59 percent of these recipients were male. About 10.5 million, or 90 percent, of all persons receiving the reinstatements were born in the United States. Males represented about 59 percent of the U.S.-born population also. For those who are still living (10 million), the median age of U.S.-born persons with reinstatements was 49 years old. The remaining 1.2 million persons were born in other countries, with Mexico being the predominant country of birth (about 26 percent of all foreign-born). About 62 percent of the reinstatements to foreign-born workers went to men. The median age of the foreign-born recipients of reinstated earnings who were still living was 53 years old.

The data show that U.S.-born workers are the primary recipients of reinstatements associated with the 295 SSNs we analyzed. However, when we examined reinstatement activity in later years, the percentage of foreign-born persons receiving such reinstatements has grown over time. For example, table 8 shows that in 1989 foreign-born recipients more than doubled from about 8 percent before 1986 and in 2003 grew to nearly 21 percent. This percentage is higher than the estimated 14 percent of foreign-born workers currently in the U.S. labor force.[8] Our analysis also shows foreign-born recipients of recent reinstatements from the 295 SSNs we analyzed are predominantly male—about 65 percent.

---

[8]U.S. Census Bureau, *Current Population Survey, Annual Social and Economic Supplement, 2003,* Table 1.7: Employment Status of the Civilian Population 16 Years and Over by Sex and by U.S. Citizenship Status: 2003.

**No-Match Cert. Admin. Record  422**

**Table 8: Percentage of Reinstatement Recipients Reviewed Who Were Foreign-Born, by Year**

| Year | Percentage of reinstatement recipients reviewed who were foreign-born |
|------|------------------------------------------------------------------------:|
| 1937-85 | 7.85 |
| 1986 | 10.63 |
| 1987 | 12.11 |
| 1988 | 13.87 |
| 1989 | 16.69 |
| 1990 | 18.43 |
| 1991 | 16.79 |
| 1992 | 19.17 |
| 1993 | 15.18 |
| 1994 | 23.15 |
| 1995 | 17.15 |
| 1996 | 19.39 |
| 1997 | 13.46 |
| 1998 | 17.36 |
| 1999 | 18.23 |
| 2000 | 16.94 |
| 2001 | 14.47 |
| 2002 | 18.12 |
| 2003 | 20.72 |

Source: GAO analysis of SSA data.

The top four countries of birth for workers who received reinstatements were Mexico, Canada, Germany, and Cuba. Workers from these four countries represented nearly 40 percent of all foreign-born individuals receiving reinstatements from the SSNs we analyzed. Table 9 shows the top 10 countries of birth for the foreign-born persons with reinstatements we analyzed.

**No-Match Cert. Admin. Record  423**

**Table 9: Analysis of Foreign-Born Persons Receiving Reinstatements from Repeatedly Used SSNs, Grouped by Countries of Birth**

| Country of birth | Number | Percent |
|---|---|---|
| Mexico | 293,973 | 25.58 |
| Canada | 55,452 | 4.82 |
| Germany | 54,005 | 4.70 |
| Cuba | 52,284 | 4.55 |
| United Kingdom | 43,714 | 3.80 |
| The Philippines | 43,390 | 3.78 |
| Italy | 39,750 | 3.46 |
| Japan | 30,144 | 2.62 |
| South Korea | 26,800 | 2.33 |
| Dominican Republic | 22,233 | 1.93 |
| All other countries | 487,581 | 42.42 |
| **Total** | **1,149,326** | **100.00** |

Source: GAO analysis of SSA data.

In addition to the growth in the percentage of foreign-born persons receiving reinstatements, the extent of probable unauthorized work related to such reinstatements has been growing.[9] In order for a person to legally work in the United States, he or she must have a valid SSN. Thus, any earnings reports filed for a tax year before a worker's valid SSN was actually issued by SSA are potential indicators of unauthorized employment. Data we analyzed show that historically about 7 percent of foreign-born workers with reinstatements from repeatedly used SSNs had earnings prior to SSN issuance.[10] However, when we examined reinstatement activity associated with more recent work years and earnings, the percentage of reinstatements to foreign-born persons with work activity prior to SSN issuance is significantly higher—an average of

---

[9]Because of concerns about not having the most recent citizenship data, SSA officials told us that it is difficult to use SSA's databases to definitively identify the extent of unauthorized work among the persons who received reinstatements. As a result, only an approximation can be made. While US citizens are automatically authorized to work, only foreign-born persons who meet certain criteria may work while in the United States. One way to assess the possible extent of unauthorized work among the foreign-born is to determine how many had earnings in a tax year preceding the year they received a SSN and became authorized to work. For example, we examined how many persons had earnings in tax year 1990 but received their Social Security card in tax year 1991 or later.

[10]This analysis includes reinstatements done between the inception of the program and 1985.

**No-Match Cert. Admin. Record  424**

about 32 percent of such reinstatements occurring between 1986-2003. (See table 10). Further, in some years, these reinstatements for potentially unauthorized work have been in excess of 50 percent of all reinstatements to foreign-born recipients.

**Table 10: Percentage of Reinstatements to Foreign-Born Persons with Earnings before Receipt of SSN, by Year of Earnings**

| Year of earnings | Percentage of reinstatements to foreign-born persons with earnings before receipt of SSN |
|---|---|
| 1937-85 | 6.55 |
| 1986 | 13.86 |
| 1987 | 14.61 |
| 1988 | 34.61 |
| 1989 | 49.00 |
| 1990 | 55.53 |
| 1991 | 40.52 |
| 1992 | 54.52 |
| 1993 | 48.94 |
| 1994 | 62.03 |
| 1995 | 54.56 |
| 1996 | 50.56 |
| 1997 | 49.83 |
| 1998 | 55.86 |
| 1999 | 52.44 |
| 2000 | 61.23 |
| 2001 | 56.09 |
| 2002 | 48.35 |
| 2003 | 47.03 |
| **Average over last 18 years** | **31.90** |

Source: GAO analysis of SSA data.

## Several Key Factors Contribute to ESF Postings

Current employer requirements for obtaining and reporting worker identity information create an environment in which inaccurate or false names and SSNs can be used for employment purposes, leading to difficulties associating reported earnings with the correct Social Security record. In addition, even though IRS can penalize employers for failing to file complete and correct information on Form W-2 and DHS can examine and penalize problem employers' hiring practices, enforcement efforts have been limited and may facilitate careless reporting. Finally, although

**No-Match Cert. Admin. Record  425**

employers have access to several systems to verify worker names, SSNs, and work authorization status, these systems have limitations and are underutilized.

## Current Requirements for Gathering and Reporting Worker Identity Information Are Limited

Both the IRS and DHS have requirements that employers must follow when gathering or reporting key information supplied by newly hired workers. IRS requires workers to complete an IRS Form W-4, which identifies workers for tax withholding purposes, and DHS requires workers and employers to complete a DHS Form I-9 (Employment Eligibility Verification Form) for identity and work authorization. IRS regulations permit employers to use information on the I-9 to identify workers. However, these requirements are limited and do not provide reasonable assurance that workers' names, SSNs, or work eligibility status will be accurately obtained and that earnings associated with these workers will be properly credited to valid Social Security records.

Under IRS regulations, employers rely primarily upon newly hired workers to self-report information, such as their name and SSN, and are not required to corroborate this information. This process involves new workers filling out Form W-4, which includes the worker's name, SSN, address, tax filing status (single or married), and number of tax exemptions claimed.[11] While workers must report their names and SSNs to employers, under current IRS regulations, they do not have to present their Social Security card for inspection when they are hired.[12] Also, the law does not require employers to independently corroborate the worker's name and SSN information with SSA. Workers that do not have an SSN, however, must submit evidence that they have applied for one, such as a letter from SSA. As currently implemented, IRS's limited requirements provide few safeguards to ensure that employers solicit and report accurate worker information. If examined by IRS, employers must simply show that they requested worker name and SSN information. Employers do not have to show that they attempted to corroborate this information with SSA. Lack of verification reduces the opportunity to detect worker misuse of SSNs and identity information and, ultimately, lead to earnings reports being placed in the ESF and possibly underpaid Social Security

---

[11] The W-4 can be modified whenever necessary to reflect changes, such as the number of claimed withholding exemptions, changes in a person's name, or filing status.

[12] IRS regulations require such workers to present their Social Security card at a later time. If workers do not comply, the regulations do not require any action against the workers.

**No-Match Cert. Admin. Record  426**

benefits. As our analysis shows, millions of reports that SSA receives each year from employers contain incomplete or incorrect information and cannot be posted to valid Social Security records.

DHS also requires employers to solicit key information from workers to prevent unauthorized employment. The 1986 Immigration Reform and Control Act (IRCA)[13] requires employers to verify the identity and work eligibility status of individuals hired after November 6, 1986, and prohibits employers from knowingly hiring or continuing to employ persons who are unauthorized to work in the United States. Form I-9 was created to obtain information from new workers so that their employers could verify the workers' eligibility for employment, so as to preclude the hiring of individuals not authorized to work in the United States. In the section of the Form I-9 that newly hired workers must complete, the form asks new workers to list their name, address, and SSN. (According to DHS, providing the SSN is actually optional for workers). Such workers also must provide employers with specific documents as proof of identity and work authorization.[14] These include state driver's licenses to establish identity, Social Security cards and birth certificates to establish work authorization, and various types of immigration documents to establish a person's identity and work status. If a furnished document appears to be genuine and appears to relate to the person presenting it, the employer must accept the document and record what was actually reviewed. Employers must also maintain a Form I-9 on file for 3 years from the date of hire or 1 year from the date of termination, whichever is longer.

While the IRCA requirement is more demanding than IRS's regulations, employers still rely primarily on visually examining numerous types of documents with no independent corroboration with the issuing agencies. Fraudulent identity and work authorization documents are widely available, can be of high quality, and are difficult to detect by employers who are not document experts. In prior work, we testified that DHS employer sanction data indicated that, between October 1996 and May 1998, about 50,000 unauthorized aliens had used 78,000 fraudulent

---

[13]Pub. L. 99-603, November 6, 1986.

[14]Employers must examine either 1 of 10 documents that both establish a person's identity and work authorization or 1 document from a list of 12 that establishes the person's identity and 1 document from a list of 7 that establishes his or her work authorization.

No-Match Cert. Admin. Record  427

documents to obtain employment.[15] In June 2002, we again testified that hundreds of thousands of unauthorized workers have used fraudulent documents to circumvent processes designed to prevent their hire.[16] Such documents would likely be associated with erroneous earnings reports later filed by employers and recorded in the ESF.

## Minimal IRS and DHS Enforcement Efforts May Foster Erroneous Reporting

Both IRS and DHS have authority to impose penalties on employers who fail to follow their regulations for obtaining and reporting key information for newly hired workers. However, IRS's requirements are so limited that employers are unlikely to be penalized. While DHS has a worksite enforcement program to address unauthorized employment, its resources devoted to such activities have been minimal in recent years. Thus, those employers who do not want to prepare accurate report information have little incentive to do so and failure to prepare accurate reports can contribute to ESF postings.

IRS has authority to assess penalties against employers who submit incomplete and inaccurate information on worker's W-2s, including SSNs. However, IRS may waive such penalties if reporting problems are due to "reasonable cause." For example, employers may demonstrate that a reporting error was due to events beyond their control—such as the worker provided false identity or SSN information. Employers must also demonstrate that they acted responsibly to avoid errors and correct them promptly. When employers are notified by IRS that a worker's reported SSN is incorrect, the employer must make up to two annual solicitations for the correct SSN. If the worker does not comply with the requests, IRS requires no further actions. The reasonable cause standard, however, does not apply if an employer acts with "intentional disregard." Intentional disregard applies, for example, when an employer knows or should know W-2 reporting requirements but demonstrates a pattern of ignoring them.

We recently reported that IRS's regulations for obtaining and verifying worker names and SSNs are so minimal that it is unlikely IRS would ever

---

[15]See GAO, *Illegal Aliens: Fraudulent Documents Undermining the Effectiveness of the Employment Verification System*, GAO/T-GGD/HEHS-99-175 (Washington, D.C.: July 22, 1999).

[16]See GAO, *Immigration Enforcement: Challenges to Implementing the INS Interior Enforcement Strategy*, GAO-02-861T (Washington, D.C.: June 19, 2002).

**No-Match Cert. Admin. Record  428**

penalize employers.[17] IRS's own analysis bears this point out. In 2003, IRS reported on a review of 78 employers it defined as egregious filers of earnings reports: those who filed either a high number or a high percentage of their reports with incorrect worker names and SSNs. The report that was prepared covered 50 (large and mid-sized businesses) of the 78 businesses IRS reviewed.[18] IRS's evaluation concluded that all of the employers had met the reasonable cause standard because events beyond their control had caused the errors. That is, the workers had provided employers with incorrect information. IRS also concluded that the employers acted responsibly under current regulations because they solicited names and SSNs from workers and obtained signed W-4s or I-9s. We are concerned, however, that although the employers met IRS's technical requirements for soliciting names and SSNs in these cases, there was no assurance that the information was accurate because they relied exclusively on worker-supplied information, with no independent corroboration with SSA or any other public or private data source. Thus, workers using fraudulent SSNs as identity information would go undetected.

The IRS report detailed specific actions that could improve the accuracy of earnings reports, such as requiring employers to review the Social Security card for prospective new workers and verify the SSN with SSA. In discussing this issue, IRS officials expressed concern that requiring the verification of names and SSNs may cause some employers to cease withholding taxes and reporting income from unauthorized workers, rather than risk losing such workers. Further, increased compliance would likely come at the expense of other compliance activities. The net effect of such a response would be a decrease in tax collections and compliance. IRS also expressed concern that worker verification systems do not always supply timely responses and that mandating such a system could pose an undue administrative burden on employers. Nevertheless, IRS agreed with our August 2004 report recommendation that it analyze options and consider how best to increase the accuracy of employer reporting. Such an effort would include re-examining its reasonable cause standard and penalty process.

---

[17] See GAO, *Tax Administration: IRS Needs to Consider Options for Revising Regulations to Increase the Accuracy of Social Security Numbers on Wage Statements*, GAO-04-712 (Washington D.C.: August 31, 2004).

[18] Internal Revenue Service, Large and Mid-Size Business Division, *The Form W-2 SSN/Name Mismatch Project* (Washington, D.C.: April 28, 2003).

GAO-05-154  Unidentified Earnings Reports

**No-Match Cert. Admin. Record  429**

DHS has primary responsibility for ensuring that employers verify the identity and work authorization status of newly hired workers, as required by IRCA and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996.[19] Under IRCA, employers are prohibited from hiring or continuing to employ a person not authorized to work in the United States, provided that the employer knows that the person is not authorized to work or has lost such authorization. Employers are also prohibited from hiring an individual for employment in the United States without verifying his or her employment eligibility via the Form I-9. A violation of either of these prohibited practices can subject an employer to civil monetary penalties. Employers engaging in a pattern or practice of knowingly hiring or continuing to employ unauthorized workers can be subject to fines and imprisonment.[20] However, over time, DHS has devoted limited and decreasing resources to general worksite enforcement. For example, the number of employer investigations and intent to fine notices have dropped substantially (see fig. 3). The number of work years devoted to worksite enforcement has also dramatically declined in the past 5 years, from 278 in 1999 to 105 in 2003, a decrease of 62 percent (see fig. 4).

---

[19] IIRIRA of 1996 was enacted within a larger piece of legislation, the Omnibus Consolidated Appropriations Act, 1997 (Pub. L. 104-208, Sept. 30, 1996).

[20] The Immigration and Nationality Act requires the Department of Labor to participate in conducting inspections of employers' compliance with the I-9 completion and maintenance requirements. DHS is solely responsible for imposing sanctions.

**No-Match Cert. Admin. Record  430**

**Figure 3: Employer Investigations and Notices of Intent to Fine Letters Issued, Fiscal Years 1992 to 2002**



Number of activities

Fiscal year

☐ Employer investigations

▨ Notices of intent to fine

Source: Information provided by U.S. Immigration and Customs Enforcement, DHS.

**No-Match Cert. Admin. Record  431**

**Figure 4: Investigative Work Years and Arrests of Unauthorized Workers, Fiscal Years 1999 to 2003**



Source: Information provided by U.S. Immigration and Customs Enforcement, DHS.

DHS officials noted several reasons for these declines, including a change in its enforcement strategy around 1999 because of limited resources to arrest and detain millions of unauthorized workers. Fining employers also came to be viewed as ineffective by DHS because the process could take more than a year. DHS began to place more emphasis on cooperative efforts such as auditing employer Form I-9s to identify unauthorized workers and conducting seminars on fraudulent documents and worker verification services. DHS also told us that the events of September 11, 2001 caused a substantial redirection of worksite enforcement activity toward unauthorized workers in critical infrastructure facilities, such as airports, power plants, and military bases.

DHS coordination with SSA to identify persons who do not have work authorization has been limited, despite a 1996 law requiring such activity. Section 414 of IIRIRA requires SSA to provide DHS with an annual listing of persons who have earnings but do not have SSNs authorizing them to work. For years, SSA has provided DHS with annual data on about

**No-Match Cert. Admin. Record  432**

575,000 such persons. The data include annual earnings amounts, worker names and addresses, and employer names and addresses as well. However, DHS reported that it has made little use of this information in its worksite enforcement efforts. In explaining why, DHS officials noted that the data came from SSA in an electronic format that was incompatible with their systems. They also noted that DHS records do not usually contain SSNs for aliens[21] and SSA's records do not contain the DHS identification number assigned to aliens, so it is difficult to match SSA's listing to DHS's records. In order to facilitate the use of the data, in 2004, DHS and SSA agreed on a new format that SSA is to use to report data to DHS. Also, DHS told us that it has recently begun to use a contractor to make the SSA data more usable and available for possible enforcement actions. While Congress developed this IIRIRA provision for reasons other than reducing ESF earnings postings, some additional level of DHS activity in this area might provide a deterrent against individuals who use invalid or false SSNs that contribute to ESF earnings reports.

## Voluntary Employee Verification Services Have Some Limitations and Are Underutilized

Employers do not widely use worker verification services offered by both SSA and DHS. These services provide a valuable opportunity to prevent many unintended or careless mistakes when hiring new workers and reporting worker earnings.[22] However, they have some limitations in detecting the misuse of another person's name and SSN, and they remain underutilized.

SSA began offering employers the ability to voluntarily verify the accuracy of worker-supplied SSNs and names to help them file more accurate annual earnings reports. SSA does not charge employers for this service, and over the years, it has developed several different verification methods to meet their needs. For example, employers may:

- Provide SSA with a magnetic tape or a diskette of their workers' names and SSNs. SSA will verify the names and SSNs for up to 250,000 workers at a time. According to SSA, it takes about 30 days for SSA to respond, after it receives the request. SSA data show that about 6,000 of the 6.5 million U.S. employers sent SSA over 53 million verification requests in 2003. For

---

[21]DHS officials told us that their systems now capture SSNs for resident aliens and other work-authorized aliens.  However, aliens not authorized to work do not receive an SSN upon admission to the United States and only obtain one after they are work authorized.

[22]Neither SSA nor DHS charge employers a fee to use this service.

No-Match Cert. Admin. Record  433

about 12 percent of the requests, SSA could not verify the worker's name and SSN.

- Call a toll-free 800 number to verify names and SSNs. SSA staff will immediately verify information for up to 5 workers at a time. In fiscal year 2003, SSA data show it received about 1.1 million calls from employers, but SSA does not track how many different employers used the service. SSA officials believe that a limited number of employers use the service. In fact, they believe that some larger employers with significant turnover have dedicated staff whose job is to call the 800 number throughout the day to bypass the 5-worker per call verification limit. Thus, these employers would represent a disproportionate number of calls to the service.

- Provide a hard-copy listing of workers' names and SSNs that can be faxed, mailed, or hand-delivered to local Social Security offices. SSA staff verify information for a maximum of 50 workers at a time. Response times are subject to office workloads; SSA stated that, generally, such response takes 1 to 2 weeks to process, but may take longer. Our visits to 8 SSA field offices indicated that at these offices very few employers utilize this method of verification.

SSA verifies the information received from employers by comparing it with information in its own records. SSA then advises the employer which worker names and SSNs do not match. While the service is an important tool to improve reporting accuracy, the information SSA cross-matches against varies depending upon the mode of verification employers select. For two of the methods (requests through the 800 number or at local offices), employers must provide SSA with a worker's name, SSN, date of birth, and gender. In contrast, verifications for SSA's most predominant mode of verification—electronic batch processing, do not include a match against workers' date of birth and gender. Although employers do not have to submit dates of birth and gender, SSA will match against those two pieces of information if employers voluntarily submit them. By not requiring a match against dates of birth for this verification mode, SSA exposes itself to potential fraud and identity theft. In particular, persons using the name and SSN of persons much younger or older than themselves for employment purposes would remain undetected, despite the verification process. In discussing this limitation, SSA staff responsible for the verification services acknowledged that the requirements should be consistent, especially at a time when identity theft is a growing problem and homeland security is a major concern. However, as of November 2004, there was no initiative under way at SSA to address this inconsistency.

No-Match Cert. Admin. Record  434

SSA's verification systems have other limitations. As previously noted, the response time varies among the different methods. Slow response times are a negative feature for businesses concerned about the competitive implications of using these systems. For example, some businesses fear that by using the service, they will give nonusing competitors an advantage in obtaining workers in a tight labor market. In an attempt to make verification more attractive to employers, SSA has been testing a Web-based system, which is designed to respond to employer requests within 24 hours.[23] Requests of up to 10 worker names and SSNs will be instantaneous. SSA expects that this verification method will become available in 2005.

DHS also operates a pilot program for employment eligibility confirmation in conjunction with SSA. To reduce employment of unauthorized alien workers, Congress required (in IIRIRA of 1996) that DHS develop and test three pilot programs to assist employers in verifying workers' identity and work eligibility status.[24] Accordingly, the Basic Pilot Program was developed and made available to employers in six states starting in 1997. The Basic Pilot requires participating employers to electronically verify the status of all newly hired workers within 3 days of hire. Verification requests are routed electronically to SSA to check the validity of the SSN, name, and date of birth provided by the worker and whether SSA has information indicating that the worker is a citizen or a noncitizen with permanent work authorization. If the submitted information matches SSA's records, SSA immediately transmits an employment authorization response via DHS to the employer. If SSA is unable to verify the SSN, name, date of birth, or work eligibility status, a tentative nonconfirmation response is transmitted to the employer. The employer must notify the worker of the tentative nonconfirmation and check the accuracy of the information originally submitted. If the employer finds errors in either the Form I-9 that was completed or the data entered into the Basic Pilot system, the employer should resubmit the verification request with corrected data. If no such errors are found, however, the employer must advise the worker to visit an SSA field office within 8 federal workdays

---

[23]SSA's Web-based system under development is called the Social Security Number Verification System.

[24]On March 1, 2003, those functions performed by the Immigration and Naturalization Service related to monitoring individuals entering the United States and verifying work authorization were transferred to DHS.

**No-Match Cert. Admin. Record  435**

from the date of the response to resolve any discrepancies in his or her SSA record.

If SSA is able to verify the SSN, name, and date of birth of a newly hired noncitizen, but is unable to verify the work eligibility status, it electronically refers the query to DHS, for a check against DHS's automated records. If DHS confirms that the person is work authorized, the employer is immediately notified. If DHS cannot verify work authorization status for the submitted name and SSN, the query is referred to DHS field office "status verifiers" for additional research. According to DHS, responses for queries referred to the status verifiers generally occur within 24 hours. When the record searches cannot verify work authorization, DHS sends a tentative nonconfirmation response to the employer. If workers wish to contest such a response from DHS, they must call a toll-free telephone number provided by DHS within 8 federal workdays from the date of the response to resolve any discrepancies in their DHS record. If employment authorization cannot be verified, employers may terminate employment.

A 2002 study of the Basic Pilot found that work authorization for queried workers was never resolved in about 13 percent of queried cases.[25] In most of these cases, the workers never contested the tentative nonconfirmation response. However, like SSA's verification service, the Basic Pilot has not been widely utilized. As of June 2004, about 2,500 of 2.1 million eligible businesses operating in the pilot states have actually registered to participate. Those participants made about 365,000 initial verification requests over a 2-year test period. The study also identified some problems with the pilot, such as erroneous nonconfirmation rates and program software that was not user friendly. In July 2004, DHS reported on actions being taken to address these weaknesses. These actions included improving federal data base accuracy to expedite data entry on persons entering the country as well as updating changes in immigrant work authorization status, switching to a Web-based verification system, providing better training for employers, and monitoring participating businesses.

---

[25]Institute for Survey Research/Temple University and Westat, *Findings of the Basic Pilot Program Evaluation* (Washington, D.C.: June 2002).

**No-Match Cert. Admin. Record  436**

In 2003, Congress required DHS to expand the verification service to all 50 states by December 2004.[26] The Basic Pilot Program became available to employers in all 50 states on December 20, 2004. Furthermore, to improve its effectiveness and increase participation, DHS recently converted the program to a Web-based system, which became available on July 6, 2004. While DHS staff recognize its potential value in identifying unauthorized workers, they noted that by law, employers cannot be charged for this service and that the agency lacks sufficient funds to operate a system that would be used extensively. DHS officials did not have operational cost data for the verification service. However, in June 2002, contractors that studied the program for DHS estimated that federal costs to make verification of work eligibility and identity mandatory would be about $159 million annually.

## Conclusions

Despite the various tools used by SSA to aid in the proper crediting of worker earnings, the number of earnings reports in the ESF is substantial. Having effective policies and processes for verifying key SSN, identity, and work authorization information for the nation's workforce is critical to SSA, which is tasked with accurately paying retirement, survivors, and disability benefits. Sound verification processes are also critical to the administration of tax and immigration laws. However, at present, employers have few requirements to accurately identify their workers and file accurate and complete earnings reports. In fact, millions of earnings reports are submitted each year with erroneous or missing SSN and name information, and the same employers often file substantial numbers of such reports year after year, creating administrative problems for SSA and IRS and the possibility that Social Security benefits to such workers will not be accurately calculated.

Under current IRS reporting requirements, employers who chronically and willfully file inaccurate earnings information will likely never be deemed noncompliant or penalized. We acknowledge IRS's concern that more stringent employer reporting and verification requirements could have tax compliance implications and pose additional administrative burdens on the many employers who are already attempting to fulfill their reporting obligations. Although IRS's regulations meet statutory requirements, we are concerned that its current requirements are so minimal that even the

---

[26]The Basic Pilot Program Extension and Expansion Act of 2003 (Pub. L. 108-156, December 3, 2003).

**No-Match Cert. Admin. Record  437**

employers with a long standing history of chronically filing reports with critical errors are never sanctioned. In accordance with our prior recommendation, IRS is currently examining options for strengthening employer requirements for soliciting and verifying worker names and SSNs and developing a formal penalty program. As this effort progresses, SSA's ESF data could be valuable to IRS in developing criteria as to what employer reporting patterns and activities constitute "intentional disregard" and improve IRS's ability to target and penalize problem employers.

At present, it is also unlikely that DHS will take enforcement action against employers and workers who submit inaccurate information to SSA to conceal unauthorized work activity. We recognize that in the post-September 11 environment, DHS enforcement resources have been needed in critical infrastructure industries and that data-sharing initiatives with SSA have thus received less priority in recent years. However, it is important that some level of coordination be reestablished to best leverage SSA's data on potential unauthorized work activity and DHS staff resources to target the most egregious employers.

Finally, any effort to verify worker-supplied identification and work authorization information warrants a thorough and accurate process. SSA currently offers several options for employers who choose to verify worker-provided information and has continually sought to upgrade its services. However, for the predominant mode of verification—electronic batch file—employers are not required to submit employee dates of birth for verification against SSA's records. Thus, persons using the names and SSNs of persons much older or younger than themselves to seek employment would not be detected under current processes. This represents a critical flaw in SSA's service. DHS's Basic Pilot Program offers another option for addressing an important element affecting ESF postings—individuals who are not authorized to work in the United States. However, DHS officials believe they will likely experience capacity problems in the future if significantly more employers begin using the service, in part because of the number of cases requiring manual intervention to verify employment status. Accordingly, it is crucial that any deliberations pertaining to strengthening employer verification requirements include an informed discussion among the affected federal agencies as to the systems requirements and safeguards necessary to ensure the integrity, timeliness, and efficiency of the verification service.

**No-Match Cert. Admin. Record  438**

## Recommendations

To better ensure that workers are accurately identified on Form W-2s necessary for the efficient administration of Social Security and tax laws, we recommend that the Commissioner of the Internal Revenue Service

- Coordinate its ongoing effort to reassess employer requirements for soliciting and verifying worker names and SSNs with SSA. This could include utilizing SSA's ESF data to identify employer reporting patterns and activities that could constitute intentional disregard and using such data to develop criteria to better target and penalize only those employers who chronically submit inaccurate earnings reports or requiring such employers to verify worker identity information with SSA.

- Ensure the development of any new reasonable cause requirements occurs in consultation with SSA and DHS, which operate employee verification services. Such consultation could facilitate systems improvements to ensure the integrity, timeliness, and efficiency of existing verification services.

We recommend that the Commissioner of the Social Security Administration

- require employers seeking verifications, via SSA's electronic batch process, to submit the workers' dates of birth, for matching against SSA's records.

We recommend that the Secretary of the Department of Homeland Security

- take steps to determine how DHS can best use SSA-supplied data on potential illegal work activity and specific industries associated most frequently with such activity to support its worksite enforcement efforts.

## Agency Comments and Our Evaluation

We obtained written comments on a draft of this report from the Commissioners of SSA and IRS and the Department of Homeland Security. The comments have been reproduced in appendixes II, III and IV. Each agency also provided additional technical comments, which have been incorporated in the report as appropriate.

SSA noted that it is continuing to assist the employer community in verifying worker information and welcomed the opportunity to work with IRS and DHS to improve verification operations. The agency also reiterated its commitment to continued outreach to employers and other

**No-Match Cert. Admin. Record  439**

federal agencies, as well as to facilitate accurate reporting via its Employer 800 number service and Employer Service Liaison Officers (ESLOs) located in each region. SSA agreed to investigate further our recommendation that it should require employers who use the electronic batch process to submit workers' dates of birth for matching against its records. However, SSA noted that such a requirement could create additional burdens for the employer community and workload increases for SSA staff responsible for investigating mismatches. We acknowledge SSA's concerns in this area. However, given the volume of verification requests processed through SSA's batch process each year, and the potential vulnerabilities associated with not matching against workers' dates of birth, we continue to believe prompt action is needed. Addressing our recommendation would also make SSA's batch verification process consistent with the agency's other modes of verification, whereby workers' dates of birth are a required element for matching against SSA's records.

In its comments, IRS acknowledged that employers' submission of earnings reports with inaccurate SSNs increases the quantity of suspense file postings, although it expressed the view that these mismatches stem from inaccurate or incomplete information provided by workers. The agency also noted that it is currently conducting compliance checks in coordination with SSA on those employers with the most egregious cases of reporting incomplete or inaccurate worker SSNs to SSA. Accordingly, IRS agreed with our recommendation that it work closely with SSA in its ongoing efforts to reassess current employer requirements for soliciting and verifying worker names and SSNs. IRS also concurred with our recommendation that the agency ensure that the development of any new reasonable cause requirements occurs in consultation with SSA and DHS, which operate worker verification services.

DHS noted that while its general worksite enforcement program has had decreasing resources recently, since September 11 DHS has refocused its enforcement activities on removing unauthorized workers employed in critical infrastructure facilities. Such enforcement activities have resulted in removing over 5,000 unauthorized workers who were employed in industry categories that have been the historical targets of traditional worksite enforcement operations—food service, janitorial, agriculture, and construction, among others, but employed in critical infrastructure facilities. Therefore, DHS contends that although there is a decrease in the number of criminal cases and civil fines, there is still a significant effort under way to remove unauthorized workers. DHS also explained that although it will take the necessary steps to determine the best use of the

**No-Match Cert. Admin. Record  440**

annual SSA-provided listing of persons with earnings who lack work authorization, there are various impediments to accomplishing this task. Regarding DHS's comments, we have summarized both the reasons for DHS's switch in enforcement priorities and the impediments to using the SSA-provided listing. We acknowledge DHS's current efforts to determine how it can best use the listing and we support cost effective ways by which the listing might identify illegal work activity and specific industries associated most frequently with such activity, to further worksite enforcement efforts.

As agreed with your offices, unless you publicly announce its contents earlier, we plan no further distribution of this report until 30 days after its issue date. At that time, we will send copies of this report to the Commissioner of the Social Security Administration, the Commissioner of the Internal Revenue Service, and the Secretary of the Department of Homeland Security, the Director of the Office of Management and Budget, appropriate congressional committees, and other interested parties. In addition, the report will be available at no charge on GAO's Web site at http://www.gao.gov/.

If you have any questions concerning this report, please contact me at (202) 512-7215 or Dan Bertoni at (202) 512-5988. Other major contributors are listed in appendix V.

Barbara D. Bovbjerg
Director, Education, Workforce, and
   Income Security Issues

**No-Match Cert. Admin. Record 441**

# Appendix I: Objectives, Scope, and Methodology

To obtain information describing the various electronic processes that the Social Security Administration (SSA) uses to post earnings reports to worker records and resolve errors in reported worker names and Social Security Numbers (SSN), we reviewed numerous SSA Office of the Inspector General, GAO, and contractor reports on the Earnings Suspense File (ESF). We met with SSA officials who manage the earnings posting process and examined SSA's Program Operations Manual System to identify and document processes and procedures for posting earnings to and reinstating earnings from the ESF. We reviewed information from SSA that described the various validation routines it uses in attempting to find valid matches of names and SSNs for earnings reports that do not initially match its records. We obtained management data on the number of earnings reports that these routines either posted to its records or reinstated from the ESF. We also visited.eight SSA field offices located in New York, New Jersey, Virginia, and California that processed significant numbers of earnings reinstatements in 2003 to discuss their reinstatement activities and document procedures for reviewing and validating evidence submitted by individuals seeking to have earnings reinstated from the ESF.

To determine the characteristics of earnings posted in the ESF, we obtained and analyzed an electronic copy of the ESF for tax years 1985 to 2000. We selected these years because they covered (1) a substantial period of time and (2) postings to and reinstatements from the ESF that occurred after legislation enacted in 1986 granted amnesty to unauthorized immigrants. Further, during this period, SSA also enhanced its earnings records in a way that provided more detailed information about reinstated earnings. The earnings records that we examined covered only reports on current wages, including reports that were filed late. The ESF contained 84.6 million records that met our criteria at the time we obtained the file in January 2003; these records were submitted by a total of 4.3 million different employers. The file we obtained contained information reporting employer's identification number, the reported worker's name and SSN on the invalid earnings report, the amount of unposted earnings, and the tax year of the report. From SSA, we were able to obtain Standard Industrial Classification codes for 1.8 million of the employers who had earnings in the ESF to identify the types of employers who had filed the earnings reports that we analyzed. (Because of confidentiality requirements, we were unable to arrange for timely access to similar codes for about 2.5 million employers in the file from the Census Bureau, which controls this information).

To analyze the reinstatement of earnings reported under repeatedly used SSNs, we first examined the ESF to identify the frequency that each SSN

**No-Match Cert. Admin. Record  442**

appeared for tax years 1985 to 2000. On the basis of our examination, we
selected SSNs that appeared most frequently in the ESF for our
reinstatement analysis. Specifically, we selected 295 SSNs that had
1,000 or more reports in the ESF for the tax years analyzed. Overall, the
295 SSNs had about 9.6 million earnings reports representing about
$14.5 billion in unposted earnings still in the ESF at the time that we
received a copy of the file. We then obtained a complete copy of SSA's
earnings reinstatement file that contained over 142 million records across
all SSNs that had received reinstatements to identify the reinstatements
made from these 295 reported SSNs. By comparing the 295 SSNs with data
in the reinstatement file, we identified that over the years SSA had
reinstated about 13.1 million earnings reports from these 295 SSNs to
11.7 million individuals. For the 11.7 million individuals, we obtained
selected information from SSA's Numident, Master Earnings File, and
Master Beneficiary Records. This information allowed us to identify the
valid Social Security record that received each reinstated earnings report
and obtain demographic information about each valid record holder
receiving the reinstatement, such as age, gender, date when the person's
SSN was issued, and place of birth.

To identify factors that contribute to ESF postings, we examined
provisions of law that authorize (1) penalties for employers who file
earnings reports with inaccurate SSNs and hire workers who are not
authorized to work in the United States and (2) the disclosure of
information on persons with nonwork SSNs to the Department of
Homeland Security (DHS). We met with Internal Revenue Service (IRS)
and DHS officials and obtained available enforcement data on the use of
these penalties. We did not, however, evaluate their specific enforcement
efforts. We analyzed information about worker verification tools that SSA
offers to assist employers to report their workers' earnings and DHS offers
to identify their workers' eligibility status under immigration laws. We also
reviewed a detailed contractor study covering DHS's implementation of
the Basic Pilot Program. To assess the reliability of databases used, we
reviewed reports provided by SSA and its Office of the Inspector General,
which contained recent assessments of these databases. We also
interviewed knowledgeable agency officials to further document the
reliability of these databases. In addition, we checked the data for internal
logic, consistency, and reasonableness. We determined that all the
databases were sufficiently reliable for purposes of our review.

Our work was conducted between October 2002 and December 2004 in
accordance with generally accepted government auditing standards.

**No-Match Cert. Admin. Record  443**

# Appendix II: Comments from the Social Security Administration



## SOCIAL SECURITY
The Commissioner
January 14, 2005

Ms. Barbara Bovbjerg
Director, Education, Workforce and
    Income Security Issues
U.S. Government Accountability Office
Washington, D.C. 20548

Dear Ms. Bovbjerg:

Thank you for the opportunity to review and comment on the draft report, "Social Security: Better Coordination Among Federal Agencies Could Reduce Unidentified Earnings Reports" (GAO-05-154).

Our response and technical comments to the draft report are enclosed. If your staff has questions about the comments, they may contact Candace Skurnik, Director, Audit Management and Liaison Staff, at (410) 965-4636.

Sincerely,

Jo Anne B. Barnhart

Enclosure

SOCIAL SECURITY ADMINISTRATION    BALTIMORE MD 21235-0001

No-Match Cert. Admin. Record  444

### COMMENTS ON THE GOVERNMENT ACCOUNTABILITY OFFICE (GAO) DRAFT REPORT, "SOCIAL SECURITY: BETTER COORDINATION AMONG FEDERAL AGENCIES COULD REDUCE UNIDENTIFIED EARNINGS REPORTS" GAO-05-154

We appreciate the opportunity to comment on the draft report. The Agency has, and continues to pursue, activities that would assist the employer community in verification of name/Social Security number (SSN) prior to reporting end of the year wage information. We have various publications and services available to the public such as the Employer Guide, Fact Sheets, Employer Verification Service (EVS) Booklet, Online FAQs and Electronic Newletters (W-2 News), along with having Employer Service Liaison Officers (ESLO) in each Region, and an Employer 800 Number service to assist in providing accurate wage reporting information to the employer community. One of the many duties of the ESLOs in each Region is to contact employers within their regions who have a large number of items in the Earnings Suspense File (ESF) to assist them in correcting those items and to help avoid future name/SSN problems. We are also always evaluating the needs of the employer community in an effort to ensure we are able to provide them the necessary tools to report correct name/SSN information.

As noted in the "Highlights," we agree that the Social Security Administration (SSA), Internal Revenue Service (IRS) and the Department of Homeland Security (DHS) should work to facilitate more accurate earnings reporting by employers, enhance existing electronic verification systems, and institute effective data sharing practices to deter unauthorized work activity and ESF earnings postings. We welcome the opportunity to work with IRS and DHS to achieve common goals of improving verification operations.

We appreciate GAO recognizing that SSA successfully posts 90 percent of all employer-submitted earnings records to the Master Earnings File (MEF) each tax year (TY). SSA then uses more than 20 automated front-end validation routines, for the remaining 10 percent, to correct common reporting mistakes enabling SSA to post earnings information to an individual's record. These processes allow SSA to post an annual average of approximately 15 million earnings records to the MEF each tax year with only 4 percent going to the ESF for later operational back-end routines. As GAO notes, in TY 2001, SSA successfully reinstated an additional 600,000 earnings records, using back-end routines, from the ESF to the MEF, representing about $4 billion in reported earnings.

SSA is involved with outreach to the employer community and many other Federal agencies. For example, each year SSA and the IRS jointly sponsor the National Payroll Reporting Forum where Federal agencies and the business community meet to identify, discuss and resolve common wage and tax reporting issues. The Commissioner is a keynote speaker at this year's National Payroll Reporting Forum. Other participating agencies include: U.S. Citizenship and Immigration Services, the Department of Labor, and the Administration for Children and Families. The event is attended by employers,

No-Match Cert. Admin. Record 445

2

payroll professionals, wage and tax submitters and others interested in the latest changes for the upcoming wage and tax season, electronic filing, social security number verification, and more. SSA has held the forum since 1991, and last year's event was SSA's largest with over 400 attendees. Many attendees commented that "this is the best forum ever," which was reflected in the forum evaluations as 80 percent indicated that "the agenda met their expectations," and 83 percent said they "plan to attend next year."

Our response to the specific recommendation for SSA and technical comments are below.

**Recommendation**

Require employers seeking verifications, via SSA's electronic batch process, to submit the workers' dates of birth, for matching against SSA's records.

**Comment**

We agree to investigate this recommendation further to determine its impact on SSA's operation and the employer community.

The primary reason for completing these verifications is for more accurate wage reporting. The date of birth is not included on an employee's W-2 and, therefore, is not needed for wage reporting purposes. Currently, the date of birth field is available for the employers' optional input. Changing the date of birth field from optional to mandatory could have an impact and place a burden on the employer community by increasing the amount of incorrect name and SSN mismatches, as well as SSA's field offices to investigate the mismatch and correct the information in our system of records if necessary. Programming changes will be needed to make the date of birth mandatory if the Agency decides to take this course of action and will need to be considered as part of the Agency's prioritization process.

No-Match Cert. Admin. Record  446

# Appendix III: Comments from the Internal Revenue Service



**DEPARTMENT OF THE TREASURY**
**INTERNAL REVENUE SERVICE**
**WASHINGTON, D.C. 20224**

COMMISSIONER                                                January 21, 2005

Ms. Barbara D. Bovbjerg
Director, Education, Workforce,
  and Income Security Issues
United States Government Accountability Office
Washington, DC 20548

Dear Ms. Bovbjerg:

Thank you for the opportunity to respond to your draft report titled, "Social
Security:  Better Coordination Among Federal Agencies Could Reduce
Unidentified Earnings Reports", (GAO-05-154).  We agree that invalid
name/Social Security Number (SSN) combinations cause potential problems with
regard to Social Security Administration's (SSA) Earnings Suspense File (ESF).

By statute, SSA, the Internal Revenue Service (IRS), and Department of
Homeland Security (DHS) each fulfill separate roles within the Federal
Government.  SSA advances the economic security of United States citizens
through retirement and disability programs.  IRS administers and enforces the
nation's revenue laws.  DHS leads efforts to ensure the security of the United
States homeland and its citizens, including protection of the nation's borders.
Despite these separate roles, the three agencies interact with each other, as
necessary, to fulfill their respective roles and as authorized by law.

Your report recommends that the IRS further coordinate its ongoing efforts to
reassess employer requirements for soliciting and verifying worker names and
SSNs with SSA, including utilizing SSA's ESF data.  I agree with this
recommendation.  This information should be shared between the two agencies
to the extent permissible by law.  For tax administration purposes, employers
must show they attempted to solicit correct numbers from employees upon
notification by IRS that an identifying number is incorrect.  However, there is no
statutory authority requiring employers to corroborate this information with SSA
or IRS.

In coordination with SSA, we are currently conducting compliance checks on
those employers with the most egregious cases of reporting incomplete or
inaccurate employee SSNs to SSA.  Upon completion of these checks, we will
analyze the results and formulate strategies to address the mismatch issues
identified in the report.  This should enable us to identify employers, employer
reporting patterns and activities that could constitute an intentional disregard of
the tax rules and regulations.

**No-Match Cert. Admin. Record  447**

2

In your report, you state that limited enforcement may contribute to employers' reporting errors. The report also describes SSA's extensive efforts to match and reinstate unidentified earnings. These efforts demonstrate that unmatchable earnings are not usually due to employer errors. The IRS does penalize employers who do not solicit information or fail to use information received from employees. However, the problems that result in ESF postings do not appear to be errors in solicitation or reporting but rather stem from inaccurate or incomplete information provided by the employee.

When Forms W-2 contain invalid name/SSN combinations, IRS can impose a fine unless the employer qualifies for a "reasonable cause" waiver. The reasonable cause waiver prevents employers from being held as guarantors of the accuracy of information for which they serve as mere transmitter. To qualify for a waiver, an employer must show due diligence in attempting to solicit an accurate SSN and soliciting again upon learning that the SSN provided is inaccurate.

We also concur with your recommendation to coordinate with other potentially impacted agencies on possible changes to the reasonable cause requirements. Working with these agencies at the outset will enable us to design and implement changes to the penalty structure without impeding their respective missions. As previously stated, we have worked with SSA to identify the most egregious filers of W-2s with mismatched identification numbers and we are conducting compliance checks on these employers. Any changes to the current system which might potentially lead to more accurate information reporting may also have a negative effect, particularly on tax administration. They must, therefore, be very carefully considered.

If you have any questions, please contact me or Steve Burgess, Director, Examination, Small Business/Self-Employed Division, at (202) 283-2170.

Sincerely,

Mark W. Everson

No-Match Cert. Admin. Record  448

# Appendix IV: Comments from the Department of Homeland Security



U.S. Department of Homeland Security
Washington, DC 20528

**Homeland Security**

January 26, 2005

Ms. Barbara Bovbjerg
Director, Education, Workforce, and
    Income Security Issues
U.S. Government Accountability Office
Washington, DC 20548

Re: Draft Report GAO-05-154: SOCIAL SECURITY: Better Coordination Among
Federal Agencies Could Reduce Unidentified Earnings Reports (GAO Job Code 130193)

Dear Ms. Bovbjerg:

Thank you for the opportunity to review and comment on the subject draft report. We are
providing general comments for your use in preparing the final report and have submitted
technical comments under separate cover.

On pages 23 and 25 of the report, respectively, the Government Accountability Office
(GAO) opines: "While DHS has a worksite enforcement program to address unauthorized
employment, its resources devoted to such activities have been minimal in recent years"
and, "However, over time, DHS has devoted limited and decreasing resources to general
worksite enforcement."

We wish to point out, however, that post-September 11, 2001, there has been ongoing
progress in worksite enforcement efforts. U.S. Immigration and Customs Enforcement
(ICE) worksite enforcement activities have focused on removing (through arrest or
termination of employment) unauthorized workers employed in critical infrastructure
facilities such as airports, military bases, nuclear power generation plants, seaports, etc.
These Critical Infrastructure Protection (CIP) operations are generally cooperative
endeavors with employers and security officials, and are not generally predicated on
suspected employer violations. Since September 11, 2001, CIP operations have resulted
in the identification and removal of over 5,000 unauthorized workers. These workers,
although employed at infrastructure sites, were in occupational groups and industries that
have been the historical targets of traditional worksite enforcement operations—food
service, janitorial, agriculture, construction, etc. These operations, while classified as
CIP, still resulted in the removal of unauthorized workers. The difference is they are
normally done in conjunction with, and often at the request of, the governmental entities
controlling security at critical installations. Therefore, although there is a decrease in the
number of criminal cases and civil fines, there is still a significant effort underway to
remove unauthorized workers.

www.dhs.gov

**No-Match Cert. Admin. Record  449**

Appendix IV: Comments from the Department
of Homeland Security

2

With respect to recommendations, GAO has proposed that the Department of Homeland Security (DHS) take steps to determine how to best use Social Security Administration (SSA) supplied data on potential illegal work activity and specific industries associated most frequently with such activity to support its worksite enforcement efforts. The recommendation and the actions planned or being taken to address this issue are described below.

ICE will take the necessary steps to determine the best utilization of the Non-Work Alien (NWA) data, but there are significant technical, procedural and funding impediments to accomplishing this:

- NWA file information is cumulative (going back 38 years). This data contains annual earnings report information pertaining to approximately 574,000 individual Social Security numbers and many pertain to persons who have become United States citizens or legal resident aliens since obtaining non-work Social Security cards as non-work authorized aliens. Determining which of the NWA cardholders are now legal workers could prove to be a cost-ineffective undertaking that would pull resources from other national security-related initiatives.
- NWA files information would have far greater value to ICE as an enforcement tool if the files contained the Alien Registration Numbers (or admission numbers) of the (NWA-SSA) cardholder. Although this corrective action has been suggested to SSA, to date it has not been implemented.
- The SSA mainframe computer cartridge containing the NWA file information is incompatible with ICE computer hardware/software systems. Opening and viewing the data will require the services of an outside contractor and funding to procure these services.
- When technical difficulties are overcome, and the data in the computer cartridge can be viewed, NWA information can be used as a tool to develop leads using analytical software, enforcement indices, and data sets.

We thank you again for the opportunity to provide comments on this draft report and look forward to working with you on future homeland security issues.

Sincerely,

*Steven J. Pecinovsky*

Steven J. Pecinovsky
Acting Director
Departmental GAO/OIG Liaison

**No-Match Cert. Admin. Record  450**

# Appendix V: GAO Contacts and Staff Acknowledgments

| | |
|---|---|
| **GAO Contacts** | Barbara Bovbjerg, (202) 512-7215<br>Daniel Bertoni, (202) 512-5988 |
| **Staff Acknowledgments** | In addition to those named above, the following team members made key contributions to this report throughout all aspects of its development: William Staab and Paul Wright. In addition, Jean Cook, Gerard Grant, Luann Moy, Daniel Schwimer, Vanessa Taylor, and Wayne Turowski made contributions to this report. |

No-Match Cert. Admin. Record  451

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| Order by Mail or Phone | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice: (202) 512-6000<br>　　　　　　　　　　TDD:  (202) 512-2537<br>　　　　　　　　　　Fax:   (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

PRINTED ON  RECYCLED PAPER

# OFFICE OF
# THE INSPECTOR GENERAL

## SOCIAL SECURITY ADMINISTRATION

**SOCIAL SECURITY NUMBER MISUSE
IN THE SERVICE,
RESTAURANT, AND
AGRICULTURE INDUSTRIES**

**APRIL 2005**          **A-08-05-25023**

# AUDIT REPORT



# Mission

We improve SSA programs and operations and protect them against fraud, waste, and abuse by conducting independent and objective audits, evaluations, and investigations.  We provide timely, useful, and reliable information and advice to Administration officials, the Congress, and the public.

# Authority

The Inspector General Act created independent audit and investigative units, called the Office of Inspector General (OIG).  The mission of the OIG, as spelled out in the Act, is to:

- Conduct and supervise independent and objective audits and investigations relating to agency programs and operations.
- Promote economy, effectiveness, and efficiency within the agency.
- Prevent and detect fraud, waste, and abuse in agency programs and operations.
- Review and make recommendations regarding existing and proposed legislation and regulations relating to agency programs and operations.
- Keep the agency head and the Congress fully and currently informed of problems in agency programs and operations.

To ensure objectivity, the IG Act empowers the IG with:

- Independence to determine what reviews to perform.
- Access to all information necessary for the reviews.
- Authority to publish findings and recommendations based on the reviews.

# Vision

By conducting independent and objective audits, investigations, and evaluations, we are agents of positive change striving for continuous improvement in the Social Security Administration's programs, operations, and management and in our own office.



## SOCIAL SECURITY

MEMORANDUM

Date: April 29, 2005                                            Refer To:

To:  The Commissioner

From: Inspector General

Subject: Social Security Number Misuse in the Service, Restaurant, and Agriculture Industries
(A-08-05-25023)


## OBJECTIVE

Our objective was to assess the potential for misuse of Social Security numbers (SSN) in the service, restaurant, and agriculture industries.[1]

## BACKGROUND

Because SSA calculates future benefit payments based on the earnings an individual has accumulated over his or her lifetime, accuracy in recording those earnings is critical. SSA's ability to do so, however, greatly depends on employers and employees correctly reporting names and SSNs on Forms W-2, *Wage and Tax Statement*. SSA uses automated edits to match employees' names and SSNs with Agency records to ensure earnings are properly credited to the Master Earnings File. SSA places wage items that fail to match name and SSN records into its Earnings Suspense File (ESF).[2] As of October 2004, the ESF had accumulated about $463 billion in wages and 246 million wage items for Tax Years (TY) 1937 through 2002.[3]

In January 2001, we issued a Management Advisory Report, *Obstacles to Reducing Social Security Number Misuse in the Agriculture Industry* (A-08-99-41004), in which we assessed the potential for SSN misuse in the agriculture industry. The wage information in the previous report covered TYs 1996 through 1998. In the 2001 report, we determined that agriculture employers submitted thousands of wage items for which the employee's name and/or SSN did not match SSA records, resulting in millions of

---

[1] For purposes of this review, we use the term "SSN misuse" throughout this report to refer to situations in which individuals used SSNs not issued to them by SSA to obtain employment. Furthermore, we define the service industry as being comprised of temporary labor and cleaning services employers.

[2] A wage item is an individual employee report prepared by employers on a Form W-2 after the close of the calendar year that shows wages paid and taxes withheld during the prior calendar year.

[3] TY 2002 data was not available when we began our analysis of ESF data for TYs 1999 through 2001.

Page 2 - The Commissioner

dollars in suspended wages. Because of continuing congressional interest in the ESF and employers who continually have wage items going into the ESF, we elected to conduct a review that not only addressed employers in the agriculture[4] industry but included employers in the service and restaurant industries as well.[5]

To accomplish our objective, we obtained ESF data for TYs 1999 through 2001. This data represents the most complete tax data available at the start of our audit, given the inherent lag in posting annual wage information. We then identified the 100 employers in each of the service, restaurant, and agriculture industries who contributed the most wage items to the ESF for the 3-year period.[6] For the 300 employers selected, we analyzed ESF data to identify reporting irregularities, such as SSNs that SSA either had never issued or assigned to another individual. We also contacted selected employers and industry associations to obtain information on their experiences with employees who provided names and/or SSNs that did not match SSA's records. See Appendix B for additional information on our scope and methodology.

## RESULTS OF REVIEW

Based on our analysis of ESF data and interviews with employers and industry associations, we believe SSN misuse in the service, restaurant, and agriculture industries is widespread. For example, for TYs 1999 through 2001, the 300 employers we reviewed submitted over 2.7 million wage items for which the employee's name and/or SSN did not match SSA records. These wage items represented $9.6 billion in suspended earnings over the 3-year period. In total, 14 percent of the wage items submitted by these 300 employers did not match names/SSNs contained in SSA files. For the 100 agriculture employers, about 48 percent of the wage items they submitted failed to match SSA records.

We identified various types of reporting irregularities, such as invalid, unassigned and duplicate SSNs and SSNs belonging to young children and deceased individuals. While we recognize there are legitimate reasons why a worker's name and SSN may not match SSA files, such as a legal name change, we believe the magnitude of incorrect wage reporting is indicative of SSN misuse. Employers and industry association representatives acknowledged that unauthorized noncitizens contribute to SSN misuse.[7]

---

[4] In our January 2001 report, we reviewed ESF data for 20 agriculture employers in California and Florida for TYs 1996 through 1998. In the current audit, we focused on the 100 agriculture employers nationwide who contributed the most wage items to the ESF for TYs 1999 through 2001.

[5] SSA statistics show these three industries account for approximately one-half of all wage items in the ESF.

[6] While we recognize that some employers may report wages under more than one employer identification number, we did not combine ESF wage items posted under multiple employer identification numbers to determine the 100 employers in each industry.

[7] We use the term "unauthorized noncitizens" when referring to individuals who do not have permission from DHS to work in the United States but who are working—regardless of whether they entered the country legally or illegally.

Page 3 - The Commissioner

To its credit, SSA recognizes the impact SSN misuse has on its programs, including growth of the ESF, and has taken steps to reduce such activity. However, SSA's ability to combat SSN misuse is hampered because employers do not routinely use the Agency's Employee Verification Service (EVS) and we are not aware of instances where IRS has imposed existing civil penalties against employers who submit inaccurate wage reports. Furthermore, privacy and disclosure issues (that is, the inability to routinely share information regarding employers who filed large numbers or percentages of wage statements with inaccurate SSNs) have limited collaborative efforts between SSA and DHS.

## SSN MISUSE IN THE SERVICE, RESTAURANT, AND AGRICULTURE INDUSTRIES IS WIDESPREAD

Over 2.7 million (14 percent) of the 19.2 million wage items submitted by the 300 employers we reviewed did not match SSA records and were posted to the ESF, as shown in Table 1.

**Table 1:** Percentage of Wage Items Posted to the ESF for TYs 1999-2001

| Industry | Number of W-2s Submitted | Number of ESF Items | Percent of W-2s Posted to the ESF | Median[8] Employer Percentage | Range of Employer Percentages Low | High |
|---|---|---|---|---|---|---|
| Service | 8,920,746 | 1,132,070 | 13 | 30 | 1 | 93 |
| Restaurant | 9,061,420 | 1,026,620 | 11 | 15 | 2 | 70 |
| Agriculture | 1,264,716 | 602,075 | 48 | 68 | 3 | 85 |
| Totals | 19,246,882 | 2,760,765 | 14 | 32 | 1 | 93 |

The percentage of wage items posted to the ESF over the 3-year period ranged from a low of 11 percent for the restaurant industry to a high of about 48 percent for the agriculture industry. Moreover, 263 (88 percent) of the 300 employers experienced increases in the percentage of suspended wage items from TYs 1999 through 2001.[9] The 37 employers who did not experience a percentage increase still contributed over 244,000 wage items and over $793 million to the ESF over the 3-year period.

---

[8] We calculated the median percentage for each industry by arranging the individual employer percentages in numerical order and averaging the two middle employers' percentages.

[9] An increase or decrease in suspended wage items for a particular employer could occur for a number of reasons, including a change in the number of employees or even the volume of items moved from the ESF to wage earners' records.

Page 4 - The Commissioner

## Types of Reporting Irregularities

During our review of ESF data for these 300 employers, we identified various types of reporting irregularities that we believe indicate SSN misuse.  These irregularities include large numbers of invalid, unassigned, and duplicate SSNs and SSNs belonging to young children and deceased individuals (see Appendix C).[10]  Our analysis showed the following.

- SSA had never assigned about 680,000 (25 percent) of the reported SSNs.  Over 48,000 of these SSNs were not valid because they did not fall within the ranges of numbers SSA has authorized for use.

- The remaining 2 million (75 percent) SSNs were numbers SSA had assigned to someone else.  About 9,500 of these SSNs belonged to young children, and about 5,400 belonged to deceased individuals.

Additional analysis of the ESF data showed that these employers submitted over 16,000 duplicate SSNs during each year of our audit period—meaning multiple employees used the same SSN to work for one employer.  One restaurant employer submitted over 4,100 duplicate SSNs in TY 2001.  That same year, an agriculture employer submitted over 900 duplicate SSNs, and an employer in the service industry submitted over 2,100.

While we recognize there are legitimate reasons why a worker's name and SSN may not match SSA's files, such as a name change, we believe the nature and extent of the reporting irregularities discussed above, and shown in Appendix C, indicate SSN misuse.

## Unauthorized Noncitizen Workforce Is a Contributor to SSN Misuse

Several of the employers and industry associations we contacted acknowledged that unauthorized noncitizens contribute to SSN misuse.  For example, one employer told us his restaurants and many others would be forced to close if they did not hire unauthorized noncitizens.  A temporary labor service employer acknowledged that some of his former employees were unauthorized noncitizens who used invalid, unassigned, and deceased individuals' SSNs.  Furthermore, the president of a large growers' association stated that farm labor contractors employ a large number of unauthorized noncitizens.

During our previous review of SSN misuse in the agriculture industry, SSA senior staff acknowledged the agriculture industry is the largest contributor to the ESF, and the intentional misuse of SSNs by unauthorized noncitizens has been a major contributor to

---

[10] We reviewed the alerts for deceased individuals in our August 2002 audit *Effectiveness of the Social Security Administration's Earnings After Death Process* (A-03-01-11035).  We found both indications of SSN misuse as well as opportunities for SSA to educate employers on the proper reporting of wages after an employee's death.

Page 5 - The Commissioner

the ESF's growth.[11]  SSA senior staff told us employers hire unauthorized workers because there is nothing to prevent them from doing so.  That is, employers know SSA has no legal authority to levy fines and penalties, and they are not concerned about potential IRS sanctions.

In a March 2001 report, SSA noted that many suspended wage items involve the agriculture industry, which has transient employees who may not have work authorizations from DHS.[12]  Other high turnover industries, such as restaurants and temporary service employers, have similar profiles.[13]  In an August 2004 report, the Government Accountability Office (GAO) noted that Treasury's Inspector General for Tax Administration estimated that, in TY 2000, over 250,000 illegal aliens had wage statements with invalid SSNs.[14]

## OBSTACLES HINDER SSA INITIATIVES TO REDUCE ITS VULNERABILITY TO SSN MISUSE

Despite a number of initiatives to reduce SSA's vulnerability to SSN misuse, significant obstacles remain.  SSA's ability to combat SSN misuse is hampered because employers do not routinely use EVS and we are not aware of instances where IRS has imposed existing civil penalties against employers who submit inaccurate wage reports.  Furthermore, privacy and disclosure issues have limited collaborative efforts between SSA and DHS.

---

[11] *Obstacles to Reducing Social Security Number Misuse in the Agriculture Industry* (A-08-99-41004), January 2001.

[12] *SSA Key Initiative Plan and Schedule: Reduce Earnings Suspense File* (KI #46), March 15, 2001.

[13] *Management Advisory Report: Review of Service Industry Employer with Wage Reporting Problems* (A-03-00-10022), September 2001.

[14] *Tax Administration: IRS Needs to Consider Options for Revising Regulations to Increase the Accuracy of Social Security Numbers on Wage Statements* (GAO-04-712), August 2004.

Page 6 - The Commissioner

## SSA Outreach to Employers

SSA has initiated several efforts to educate employers about the importance of accurate wage reporting. SSA assists employers in verifying employees' names and SSNs through EVS. Employers can verify up to 5 names/SSNs by calling a toll-free telephone number, or they can fax up to 50 names/SSNs directly to an SSA field office. Employers who need to verify more than 50 names/SSNs can do so by submitting a list of the names/SSNs to SSA, using a process called EVS for registered users. In addition, SSA initiated the Social Security Number Verification Service (SSNVS) as a pilot project in March 2002. This on-line service allows a small number of pre-selected employers to verify employees' names/SSNs using their personal computers.[15] SSA senior staff told us the Agency plans to make SSNVS available to all employers in 2005.

SSA also provides assistance to employers through its Employer Service Liaison Officers (ESLO). SSA provides ESLOs in each of its regions nationwide to (1) answer employers' questions on wage reporting submissions; (2) encourage employers to use SSA's various programs, such as EVS; (3) conduct wage-reporting seminars, in partnership with the IRS; and (4) contact employers with significant suspended wage items in their regions.

To further assist SSA management in monitoring employer wage reporting, the Agency is developing an Earnings Data Warehouse to provide trend information on employer wage reporting. Knowing employer reporting trends could assist ESLOs in focusing their outreach efforts.[16]

## Employers Do Not Routinely Use EVS

SSA made EVS available to employers to assist them in verifying employee names and SSNs with SSA records, thus reducing the incidents of incorrect wage reporting. However, six of the nine employers we interviewed did not routinely use EVS. Some employers stated they did not do so because SSA takes too long to respond to their requests. One employer told us he does not use EVS because SSA does not require that he do so. The six employers who stated they did not routinely use EVS experienced increases in the percentage of suspended wage items for TYs 1999 through 2001. In our September 2002 audit of the EVS system, we noted

---

[15] Under SSNVS, an employer can either key in up to 10 names/SSNs at a time for immediate verification or submit a file containing the names/SSNs. The maximum number of SSNs allowed per file is 250,000. SSA provides a response to the employer the next business day.

[16] In our October 2004 report, *Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001* (A-03-03-13048), we recommended SSA track employer trends in the Earnings Data Warehouse, such as increases in the volume of wage items in suspense as well as the percent of an employer's payroll in the ESF.

Page 7 - The Commissioner

that, of the 6.5 million employers in the United States, only 392 employers/third-party payroll companies used the EVS for registered users process between Calendar Years 1999 to 2001.[17]

We believe EVS is a useful tool for employers who are committed to improving the accuracy of their wage reporting. For example, a temporary staffing company who began using EVS in 2001 and SSNVS in 2003 experienced a significant decrease in the percentage of suspended wage items. The employer's Director of Human Resources stated his company sent out directives to its corporate offices nationwide instructing them not to refer individuals who did not have a valid SSN to a client company. Further, he told us his company places posters in its corporate offices (in various languages) to inform prospective employees that the company verifies applicants' names/SSNs before referral to a client company. The Director believes his company will continue to experience decreases in the number of suspended wage items because of its use of SSNVS and its commitment to only refer individuals who have valid SSNs.

**The IRS Does Not Generally Penalize Employers**

Because SSA has no legal authority to levy fines and penalties against employers who submit inaccurate wage reports, it relies on the IRS to enforce penalties for inaccurate wage reporting.[18] In our January 2001 report on the agriculture industry (see Appendix D), we noted that SSA senior staff did not believe employers had an incentive to submit accurate annual wage reports because the IRS rarely enforced existing penalties. SSA staff believed applying penalties would have a rippling effect on employers who consistently misreported wage information and serve as a deterrent to SSN misuse. Furthermore, SSA senior staff told us the Agency could provide the IRS with sufficient evidence to show an employer knew or should have known its employees' SSNs were incorrect. For example, a reasonable person should recognize it is not feasible for hundreds of workers to have the same or consecutively numbered SSNs.

In our January 2001 report, we also noted that SSA and the IRS held discussions to explore the enforcement of an existing penalty provision ($50 per error) for employers who repeatedly submit erroneous name and/or SSN information. To implement the penalty, SSA and the IRS agreed the Agencies must (1) jointly define the circumstances for applying penalties, (2) identify information needed from SSA for the IRS to support applying penalties, and (3) develop the proposed data flow and procedures to be followed.

According to an August 2004 GAO report, the IRS can identify and penalize employers who file wage statements with inaccurate SSNs but does not have a dedicated compliance program for doing so.[19] Additionally, GAO reported that IRS regulations

---

[17] *The Social Security Administration's Employee Verification Service for Registered Employers,* (A-03-02-22008), September 2002.

[18] Internal Revenue Code Section 6721.

[19] *Tax Administration: IRS Needs to Consider Options for Revising Regulations to Increase the Accuracy of Social Security Numbers on Wage Statements* (GAO-04-712), August 2004.

Page 8 - The Commissioner

permit the IRS to waive potential penalties if employers demonstrate a "reasonable cause" for the waiver.[20]  In its report, GAO opined that the IRS' criteria for meeting the waiver are such that few, if any, employers are likely to be penalized for submitting inaccurate SSNs.  In fact, GAO reported that the IRS could not provide any record that it had penalized an employer for inaccurate wage reporting.  GAO also noted that IRS officials said they would consider changes, including requiring that employers verify SSNs provided by employees, as part of the "egregious" employer study.[21]  Furthermore, GAO stated that, because the IRS believes some portion of inaccurate SSNs on wage statements is attributable to illegal aliens using invalid SSNs, it would likely consider the views of other potentially affected Federal agencies before changing its penalty program.

In our October 2004 report on employers with the most items in the ESF,[22] we noted that the IRS reviewed the employee records at 78 "egregious" employers to determine whether penalties should be assessed.  Of the 78 employers, 50 were large employers with a high number of ESF items, and the other 28 employers were smaller companies with 93 percent or more of their payroll going into the ESF.  In all 78 cases the IRS did not see penalty potential because the employers (1) used the information from the IRS Form W-4 (*Employee's Withholding Allowance Certificate*) to prepare the W-2 and (2) attempted to correct the W-2 information when SSA notified them that the information did not match Agency records.

We acknowledge SSA's efforts in working with the IRS to improve employer wage reporting.  However, until the IRS requires that egregious employers verify employees' SSNs and holds them accountable for their actions through an effective employer penalty program, we do not believe employer wage reporting will significantly improve.  We believe SSA could assist the IRS in its efforts to apply penalties by providing them with sufficient evidence to show an employer knew, or should have known, its employees' SSNs were incorrect.  Because SSA relies on the IRS to enforce penalties for inaccurate wage reporting, we will provide Treasury's Inspector General for Tax Administration with a copy of this report under separate cover.

---

[20] The Tax Reform Act of 1986 (Public Law 99-514), the Omnibus Budget Reconciliation Act of 1989 (Public Law 101-239), and Internal Revenue Code Section 6724(a) authorizes a "reasonable cause waiver."  To qualify for a "reasonable cause waiver," employers must be able to demonstrate they solicited an SSN from each employee one to three times, depending on the circumstances, and that they used this information to complete the wage statements.

[21] For the purpose of this report, we defined "egregious" employers as those who filed large numbers or percentages of wage statements with inaccurate SSNs repeatedly over several years.  On March 10, 2004, Mark E. Everson, Commissioner of the IRS, presented testimony (*Individual Taxpayer Identification Numbers and Social Security Number Matching*) before the House Ways and Means Subcommittee on Oversight and Subcommittee on Social Security regarding IRS' study of "egregious employers."

[22] *Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001* (A-03-03-13048), October 2004.

Page 9 - The Commissioner

**Limited Collaboration Between SSA and DHS**

In our January 2001 report regarding SSN misuse in the agriculture industry, we reported that SSA and Immigration and Naturalization Service (INS)[23] senior staff told us collaboration between the two agencies had been limited. Although SSA recognized that unauthorized noncitizens contributed to SSN misuse and ESF growth, the Agency determined it could not share specific information with the INS regarding employers who experience high name and SSN error rates because of privacy and disclosure laws.

We recommended that SSA (1) collaborate with the INS to develop a better understanding of the extent immigration issues contribute to SSN misuse and growth of the ESF and (2) reevaluate its application of existing disclosure laws or seek legislative authority to remove barriers that would allow the Agency to share information regarding chronic problem employers with INS. SSA disagreed and stated its interpretation of privacy and disclosure issues is accurately applied and continues to provide sufficient authority to share information with other agencies in situations that are consistent with the purpose of the Social Security programs and SSA's disclosure policies.

Although SSA continues to coordinate with DHS on immigration issues, it does not routinely share information regarding egregious employers who submit inaccurate SSNs. In our opinion, any serious plan to address SSN misuse and growth of the ESF must allow SSA to share such information with DHS. We recognize SSA has no control over immigration policy; however, we are concerned that social, political, and economic issues associated with the enforcement of immigration laws impact SSA's ability to address SSN misuse. We believe SSA, Congress and other relevant stakeholders must recognize that, until the issue of SSN misuse by unauthorized noncitizens is addressed, the ESF will continue to grow. Accordingly, we encourage SSA to further this dialogue and attempt to negotiate a coordinated strategy. Because we believe intentional misuse of SSNs by unauthorized noncitizens has been a major contributor to the ESF's growth, we will provide a copy if this report under separate cover to the DHS Inspector General.

## CONCLUSION AND RECOMMENDATIONS

We believe SSN misuse within the service, restaurant, and agriculture industries results in millions of dollars in wages that SSA cannot post to workers' earnings records. We recognize no single agency can adequately combat this problem. However, given the large number and/or percentage of wage statements employers submitted with inaccurate SSNs and the nature of the reporting irregularities, we believe SSA should take additional measures to ensure SSN integrity.

In previous reports, we made recommendations to help reduce the growth of the ESF. The report titles are listed in Appendix D. We continue to support the recommendations made in these reports and encourage SSA to continue its initiative to collaborate with

---

[23] On March 1, 2003, the responsibility for providing immigration-related services and benefits was transferred from INS to the U.S. Citizenship and Immigration Services, a bureau of DHS.

Page 10 - The Commissioner

DHS to develop a better understanding of the extent that immigration issues contribute to SSN misuse and growth of the ESF. Furthermore, we continue to believe SSA should seek legislative authority to remove barriers that would allow the Agency to share information regarding chronic problem employers with DHS. In addition to the previously suggested actions, we recommend that SSA:

1. Continue to collaborate with IRS regarding wage reporting issues, including assisting the IRS in its development of an effective employer penalty program.

2. Encourage IRS to require employers who file large numbers or percentages of wage statements with inaccurate SSNs to verify employees' SSNs.

## AGENCY COMMENTS AND OIG RESPONSE

We believe SSA's response and planned actions adequately address Recommendation 1. However, we believe SSA's response to Recommendation 2 does not effectively address our concern that employers who consistently submit erroneous or incorrect wage reports are not required to verify employees' SSNs.

SSA disagreed with Recommendation 2. SSA stated it will continue to offer and encourage all employers to use the free verification services for wage reporting. Furthermore, SSA stated it will defer to IRS as to whether specific employers should be required to use the verification services. While we acknowledge the IRS governs the wage reporting process, we continue to believe SSA should encourage the IRS to require employers who file large numbers or percentages of wage statements with inaccurate SSNs to verify employees' SSNs. As discussed in the report, the IRS is considering requiring egregious employers to verify employees' SSNs.

We did not intend to suggest that small companies who may occasionally submit a high percentage of incorrect wage reports should be required to verify employee's SSNs. Rather, our intent was to encourage SSA to urge the IRS to require larger employers

Page 11 - The Commissioner

who consistently submit erroneous or incorrect wage reports to verify employee' SSNs. Until the IRS requires chronic problem employers to verify employees' SSNs and holds them accountable for their actions, we do not believe employer wage reporting will significantly improve. Accordingly, we encourage SSA to reconsider its response to Recommendation 2.

SSA also provided technical comments that we considered and incorporated, where appropriate. The full text of SSA's comments is included in Appendix E.

Patrick P. O'Carroll, Jr.

# *Appendices*

APPENDIX A – Acronyms

APPENDIX B – Scope and Methodology

APPENDIX C – Analysis of Employers' Earnings Suspense File Wage Items for Tax
Years 1999-2001

APPENDIX D – Prior Office of the Inspector General and Government Accountability
Office Reports

APPENDIX E – Agency Comments

APPENDIX F – OIG Contacts and Staff Acknowledgments

*Appendix A*

# Acronyms

| | |
|---|---|
| DHS | Department of Homeland Security |
| ESF | Earnings Suspense File |
| ESLO | Employer Service Liaison Officer |
| EVS | Employee Verification Service |
| GAO | Government Accountability Office |
| INS | Immigration and Naturalization Service |
| IRS | Internal Revenue Service |
| SSA | Social Security Administration |
| SSN | Social Security Number |
| SSNVS | Social Security Number Verification Service |
| TY | Tax Year |

# Scope and Methodology

To accomplish our objective, we performed the following steps.

- Reviewed Social Security Administration (SSA) policies and procedures and applicable federal laws and regulations regarding employer wage reporting.

- Obtained Earnings Suspense File (ESF) data for Tax Years (TY) 1999 through 2001 for all employers with at least 200 mismatched wage items.

- Identified the top 100 employers in the service, restaurant, and agriculture industries (total of 300 employers) who contributed the most wages to the ESF for the 3-year period.

- Calculated error rates for each employer by dividing the number of ESF wage items by the total number of W-2s submitted by the employer for each year and for the combined years.

- Contacted nine employers and five industry associations to obtain information on their experiences with employees who provide names/Social Security numbers (SSN) that do not match SSA's records. We limited our selection to employers and industry associations in California and Florida because these States account for a significant portion of the wage items posted to the ESF for the review period.

- Analyzed ESF data for each of the 300 employers. Specifically, we categorized the ESF wage items for each of the 3 years to include the following reporting irregularities: unassigned, invalid and duplicate SSNs and SSNs belonging to young children (under age 13) and deceased individuals.

- Reviewed prior SSA Office of the Inspector General and Government Accountability Office reports. See Appendix D for a list of the reports.

The SSA entity reviewed was the Office of Public Services and Operations Support under the Deputy Commissioner for Operations and the Office of Earnings, Enumeration and Administrative Systems under the Deputy Commissioner for Systems. This audit did not include an evaluation of SSA's internal controls over the wage reporting process, nor did we attempt to establish the reliability or accuracy of the wage data. However, we determined that ESF data are sufficiently reliable during a prior review.[1] We conducted our audit from May through September 2004 in accordance with generally accepted government auditing standards.

---

[1] *Performance Measure Review: Reliability of the Data Used to Measure the Accuracy of Earnings Posted* (A-03-00-10004), May 2001.

# Analysis of Employers' Earnings Suspense File Wage Items for Tax Years 1999-2001

| Types of Reporting Irregularities | Industry | | | |
|---|---|---|---|---|
| | Service | Restaurant | Agriculture | Totals |
| Social Security Numbers (SSN) with All Zeros or with Zeros as the Area, Group or Serial Numbers | 7,715 | 9,936 | 12,618 | 30,269 |
| SSNs with All 9's | 14 | 1,155 | 58 | 1,227 |
| SSNs with Area Number 666 | 289 | 228 | 264 | 781 |
| SSNs with Area Numbers 773-999 | 4,997 | 9,294 | 1,263 | 15,554 |
| Unassigned SSNs[1] | 285,071 | 222,600 | 124,212 | 631,883 |
| Valid SSNs Assigned to Young Children[2] | 4,675 | 2,510 | 2,284 | 9,469 |
| Valid SSNs Assigned to Deceased Individuals | 2,749 | 1,549 | 1,054 | 5,352 |
| Other Valid SSNs with Name Mismatches | 826,560 | 779,348 | 460,322 | 2,066,230 |
| Totals | 1,132,070 | 1,026,620 | 602,075 | 2,760,765 |

---

[1] This category includes SSNs that the Social Security Administration (SSA) has never assigned.

[2] This category includes SSNs that SSA assigned to children under age 13.

# Prior Office of the Inspector General and Government Accountability Office Reports

| Report Identification Number | Report Title | Date Issued |
|---|---|---|
| A-03-03-13048 | *Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001* | October 2004 |
| GAO-04-712 | *Tax Administration: Internal Revenue Service Needs to Consider Options for Revising Regulations to Increase the Accuracy of Social Security Numbers on Wage Statements* | August 2004 |
| A-03-03-13026 | *Follow-Up Review of Employers with the Most Suspended Wage Items* | October 2003 |
| A-03-02-22008 | *The Social Security Administration's Employee Verification Service for Registered Employers* | September 2002 |
| A-03-01-11035 | *Effectiveness of the Social Security Administration's Earnings After Death Process* | August 2002 |
| A-03-01-30035 | *Management Advisory Report: Recent Efforts to Reduce the Size and Growth of the Social Security Administration's Earnings Suspense File* | May 2002 |
| A-03-00-10022 | *Management Advisory Report: Review of Service Industry Employer with Wage Reporting Problems* | September 2001 |
| A-03-00-10004 | *Performance Measure Review: Reliability of the Data Used to Measure the Accuracy of Earnings Posted* | May 2001 |
| A-08-99-41004 | *Obstacles to Reducing Social Security Number Misuse in the Agricultural Industry* | January 2001 |
| A-03-97-31003 | *The Social Security Administration's Earnings Suspense File Tactical Plan and Efforts to Reduce the File's Growth and Size* | February 2000 |
| A-03-98-31009 | *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items* | September 1999 |

## *Appendix E*

# Agency Comments



# SOCIAL SECURITY

MEMORANDUM                                            34124-24-1253

Date:     April 12, 2005
                                                  Refer To: S1J-3

To:       Patrick P. O'Carroll, Jr.
          Inspector General

From:     Larry W. Dye      /s/
          Chief of Staff

Subject:  Office of Inspector General (OIG) Draft Report, "Social Security Number Misuse in the Service, Restaurant, and Agriculture Industries" (A-08-05-25023)--INFORMATION

We appreciate OIG's efforts in conducting this review. Our comments to the recommendations are attached.

Please let us know if we can be of further assistance. Staff questions may be referred to Candace Skurnik, Director of the Audit Management and Liaison Staff, at extension 54636.

Attachment:
SSA Response

E-1

## COMMENTS ON THE OFFICE OF INSPECTOR GENERAL (OIG) DRAFT REPORT, "SOCIAL SECURITY NUMBER MISUSE IN THE SERVICE, RESTAURANT, AND AGRICULTURE INDUSTRIES" (A-08-05-25023)

Thank you for the opportunity to review and comment on the draft report. We note that the Inspector General (IG) believes the Social Security Administration (SSA) should seek legislative authority to remove barriers that would allow the Agency to share information regarding chronic problems with the Department of Homeland Security (DHS), as mentioned in the OIG's 2001 report, "Obstacles to Reducing Social Security Number Misuse in the Agriculture Industry." The IG correctly notes that currently there are privacy and disclosure laws that prohibit SSA from sharing such tax return information with agencies other than the Internal Revenue Service (IRS).

SSA will continue to work with IRS regarding wage reporting issues; however, it is beyond our purview to advance legislation to amend the Internal Revenue Code in order to allow DHS access to tax return information.

Recommendation 1

SSA should continue to collaborate with IRS regarding wage reporting issues, including assisting the IRS in its development of an effective employer penalty program.

Comment

We agree. SSA will continue to collaborate with IRS regarding wage reporting issues, including assisting IRS in its efforts to improve the employer penalty program (if and when IRS chooses to modify its existing program).

SSA has had an interagency effort in place with IRS since 2004 to collaborate on issues of mutual concern. Since SSA has no legal authority to levy fines and penalties for inaccurate wage reporting, we must rely on IRS to do so.

We continue to encourage IRS to require employers who file large numbers of wage statements with inaccurate Social Security numbers (SSNs) to verify employees' SSNs by using SSA's Employee Verification Service (EVS). We believe that this process will improve the accuracy of our earnings records and limit the growth of the Earnings Suspense File.

Recommendation 2

SSA should encourage IRS to require employers who file large numbers or percentages of wage statements with inaccurate SSNs to verify employees' SSNs.

No-Match Cert. Admin. Record  473

<u>Comment</u>

We disagree. Both SSA and IRS struggle with the issue of wage statements with inaccurate SSNs. In many cases, the employers are simply reporting the best information they have in their records. Furthermore, in the selected industries, turnover is very high and employment is for only short periods of time. Many of these workers move on to other jobs prior to the employer recognizing the inaccurate information. SSA's verification services are valuable tools for improving wage reporting and SSA will continue to offer and encourage all employers to use the free verification services for wage reporting purposes. However, since the wage reporting process is ultimately governed by IRS, we defer to IRS as to whether specific employers should be required to use the verification services.

**No-Match Cert. Admin. Record  474**

*Appendix F*

# OIG Contacts and Staff Acknowledgments

*OIG Contacts*

Kimberly A. Byrd, Director, (205) 801-1605

Jeff Pounds, Audit Manager, (205) 801-1606

*Acknowledgments*

In addition to those named above:

Cliff McMillan, Senior Auditor

Susan Phillips, Auditor

Kim Beauchamp, Writer-Editor

For additional copies of this report, please visit our web site at www.ssa.gov/oig or contact the Office of the Inspector General's Public Affairs Specialist at (410) 965-3218. Refer to Common Identification Number A-08-05-25023.

## DISTRIBUTION SCHEDULE

Commissioner of Social Security

Office of Management and Budget, Income Maintenance Branch

Chairman and Ranking Member, Committee on Ways and Means

Chief of Staff, Committee on Ways and Means

Chairman and Ranking Minority Member, Subcommittee on Social Security

Majority and Minority Staff Director, Subcommittee on Social Security

Chairman and Ranking Minority Member, Subcommittee on Human Resources

Chairman and Ranking Minority Member, Committee on Budget, House of Representatives

Chairman and Ranking Minority Member, Committee on Government Reform and Oversight

Chairman and Ranking Minority Member, Committee on Governmental Affairs

Chairman and Ranking Minority Member, Committee on Appropriations, House of Representatives

Chairman and Ranking Minority, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations,
   House of Representatives

Chairman and Ranking Minority Member, Committee on Appropriations, U.S. Senate

Chairman and Ranking Minority Member, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, U.S. Senate

Chairman and Ranking Minority Member, Committee on Finance

Chairman and Ranking Minority Member, Subcommittee on Social Security and Family Policy

Chairman and Ranking Minority Member, Senate Special Committee on Aging

Social Security Advisory Board

# Overview of the Office of the Inspector General

The Office of the Inspector General (OIG) is comprised of our Office of Investigations (OI), Office of Audit (OA), Office of the Chief Counsel to the Inspector General (OCCIG), and Office of Executive Operations (OEO). To ensure compliance with policies and procedures, internal controls, and professional standards, we also have a comprehensive Professional Responsibility and Quality Assurance program.

## Office of Audit

OA conducts and/or supervises financial and performance audits of the Social Security Administration's (SSA) programs and operations and makes recommendations to ensure program objectives are achieved effectively and efficiently. Financial audits assess whether SSA's financial statements fairly present SSA's financial position, results of operations, and cash flow. Performance audits review the economy, efficiency, and effectiveness of SSA's programs and operations. OA also conducts short-term management and program evaluations and projects on issues of concern to SSA, Congress, and the general public.

## Office of Investigations

OI conducts and coordinates investigative activity related to fraud, waste, abuse, and mismanagement in SSA programs and operations. This includes wrongdoing by applicants, beneficiaries, contractors, third parties, or SSA employees performing their official duties. This office serves as OIG liaison to the Department of Justice on all matters relating to the investigations of SSA programs and personnel. OI also conducts joint investigations with other Federal, State, and local law enforcement agencies.

## Office of the Chief Counsel to the Inspector General

OCCIG provides independent legal advice and counsel to the IG on various matters, including statutes, regulations, legislation, and policy directives. OCCIG also advises the IG on investigative procedures and techniques, as well as on legal implications and conclusions to be drawn from audit and investigative material. Finally, OCCIG administers the Civil Monetary Penalty program.

## Office of Executive Operations

OEO supports OIG by providing information resource management and systems security. OEO also coordinates OIG's budget, procurement, telecommunications, facilities, and human resources. In addition, OEO is the focal point for OIG's strategic planning function and the development and implementation of performance measures required by the Government Performance and Results Act of 1993.

Order Code RL32004

# CRS Report for Congress

Received through the CRS Web

# Social Security Benefits for Noncitizens: Current Policy and Legislation

**Updated May 11, 2005**

Dawn Nuschler
Specialist in Social Legislation
Domestic Social Policy Division

Alison Siskin
Analyst in Social Legislation
Domestic Social Policy Division

No-Match Cert Admin Record  478

# Social Security Benefits for Noncitizens: Current Policy and Legislation

## Summary

Concerns about the number of unauthorized (illegal) aliens residing in the United States and the recently signed totalization agreement with Mexico have fostered considerable interest in the eligibility of noncitizens for U.S. Social Security benefits. The Social Security program provides monthly cash benefits to qualified retired and disabled workers, their dependents, and survivors. Generally, a worker must have 10 years of Social Security-covered employment to be eligible for retirement benefits (less time is required for disability and survivor benefits). Most jobs in the United States are covered under Social Security. Noncitizens (aliens) who work in Social Security-covered employment must pay Social Security payroll taxes, including those who are in the United States working temporarily and those working in the United States without authorization. There are some exceptions. Generally, the work of aliens who are citizens of a country with which the United States has a "totalization agreement," coordinating the payment of Social Security taxes and benefits for workers who divide their careers between two countries, is not covered if they work in the United States for less than five years. In addition, by statute, the work of aliens under certain visa categories is not covered by Social Security.

The Social Security Protection Act of 2004 (P.L. 108-203) requires an alien whose application for benefits is based on a Social Security Number (SSN) issued January 1, 2004, or later to have work authorization at the time an SSN is assigned, or at any later time, to gain insured status under the Social Security program. Aliens whose applications are based on SSNs issued before January 1, 2004, have all Social Security-covered earnings counted toward insured status, regardless of their work authorization status. In addition, the Social Security Act prohibits the payment of benefits to aliens in the United States who are not "lawfully present," but under certain circumstances, alien workers and dependents/survivors may receive benefits while residing outside the United States (including benefits based on unauthorized work). H.R. 98 would create a new system for employers to ascertain if an alien has work authorization.

On June 29, 2004, the United States and Mexico signed a totalization agreement, the effects of which depend on the specific terms and language of the agreement, which has not been transmitted to Congress for review or otherwise made publicly available. Currently, since Mexico meets the "social insurance country" definition, a Mexican *worker* may receive U.S. Social Security benefits outside the United States. Family members of the Mexican worker must have lived in the United States for at least five years to receive benefits in Mexico, but typically under a totalization agreement, this requirement is waived allowing the payment of benefits to alien *dependents and survivors* who have never lived in the United States. The Social Security Administration reports that the projected cost of the agreement would average $105 million annually over the first five years. In September 2003, the Government Accountability Office reported that "the cost of a totalization agreement with Mexico is highly uncertain" because of the large number of unauthorized immigrants from Mexico estimated to be living in the United States. This report will be updated as legislative activity occurs or other events warrant.

## Contents

Current Policy .................................................... 1
    Background ................................................. 1
    Social Security-Covered Employment ........................... 1
    Social Security Payment Rules ................................. 3
        Social Security Protection Act of 2004 ...................... 3
        Special Payment Rules for Noncitizens ..................... 4
        Legislative History of Payment Rules for Noncitizens ............. 7
    Tax Treatment of Social Security Benefits ......................... 8
    Totalization Agreements ....................................... 9

Issues ........................................................... 12
    Perceived Disparate Treatment Under Social Security and
        Immigration Law ...................................... 12
    Totalization Agreement with Mexico ........................... 12
        General Accounting Office Study ......................... 14
        SSA Comment on the GAO Report ....................... 16
    No-Match Letters ........................................... 18

Legislation in the 109th Congress ................................... 19
    H.R. 98: "Illegal Immigration Enforcement and Social Security
        Protection Act of 2005" ................................. 19
    H.R. 858: "Social Security for Americans Only Act of 2005" .......... 20
    H.R. 1438: "No Social Security For Illegal Immigrants Act of 2005" .... 21

Appendix A:  Exception Countries ................................... 22
    Social Insurance or Pension System Countries ..................... 22
    Treaty Obligation Countries .................................. 22
    Totalization Agreement Countries .............................. 23

Appendix B:  Definition of "Lawfully Present" ......................... 24

## List of Tables

Table 1.  Exceptions to the Alien Nonpayment Provision for Workers
    and Dependents/Survivors ....................................... 5
Table 2.  Additional Residency Requirement for Alien Dependents/Survivors
    Outside the United States ....................................... 6
Table 3.  Exceptions to the Additional Residency Requirement for
    Alien Dependents/Survivors Outside the United States ................ 6

# Social Security Benefits for Noncitizens: Current Policy and Legislation

## Current Policy

### Background

The Social Security program provides monthly cash benefits to retired and disabled workers and their dependents, and to the survivors of deceased workers.[1] To qualify for benefits, workers (whether citizens or noncitizens)[2] must work in Social Security covered jobs for a specified period of time. Generally, workers need 40 quarters of coverage (QCs) to become "insured" for benefits (fewer QCs are needed for disability and survivor benefits, depending on the worker's age). In 2004, a worker earns one QC for each $900 in earnings, up to a maximum of 4 QCs for the year (annual earnings of $3,600 or more).

### Social Security-Covered Employment

The Social Security program is financed primarily by mandatory payroll taxes levied on wages and self-employment income. Most jobs in the United States are covered under Social Security (about 96% of the work force is required to pay Social Security payroll taxes). In 2004, Social Security-covered workers and their employers each pay 6.2% of earnings up to $87,900 (this amount is indexed to average wage growth). The self-employed pay 12.4% on net self-employment income up to $87,900, and they may deduct one-half of payroll taxes from federal income taxes. The following workers are exempt from Social Security payroll taxes:

- **State and local government workers** who participate in alternative retirement systems,
- **Election workers** who earn $1,200 or less per year,
- **Ministers** who elect not to be covered, and members of certain religious sects,
- **Federal workers** hired before 1984,

---

[1] The Social Security program is administered by the Social Security Administration (SSA). SSA also administers the Supplemental Security Income (SSI) program, a *means-tested* entitlement program. Eligibility requirements for noncitizens differ under Social Security and SSI. For more information on noncitizen eligibility for SSI, see CRS Report RL31114, *Noncitizen Eligibility for Major Federal Public Assistance Programs: Policies and Legislation*, by Ruth Ellen Wasem and Joe Richardson.

[2] An *alien* is "any person not a citizen or national of the United States" and is synonymous with *noncitizen*. Aliens/Noncitizens includes those who are legally present and those who are in violation of the Immigration and Nationality Act (INA).

CRS-2

- **College students** who work at their academic institutions,
- **Household workers** who earn less than $1,400 per year, or for those under age 18, for whom household work is not their principal occupation, and
- **Self-employed workers** who have annual net earnings below $400.

In 2002, an estimated 11.3 million noncitizens were in the U.S. labor force comprising approximately 7.9% of the labor force.[3] Aliens who work in Social Security-covered employment must pay Social Security payroll taxes, including those who are in the United States working temporarily and those who may be working in the United States without authorization.[4] There are some exceptions. Generally, the work of aliens who are citizens of a country with which the United States has a "totalization agreement" (see below) is not covered by Social Security if they work in the United States for less than five years. In addition, by statute, the work of aliens under certain visa categories (such as H-2A agricultural workers, F and M students)[5] is not covered by Social Security.

Currently, there are no official published data on the amount of money paid into the Social Security system by aliens, either legal or unauthorized. An alien may be authorized to be in the United States, but not authorized to work. Thus, an alien without employment authorization is not technically an illegal alien.[6] The Social Security Administration (SSA) maintains an "earnings suspense file" that contains an estimated $421 billion in wage credits that cannot be allocated to names and Social Security Numbers (SSNs) in SSA's database.[7] Although some use the earnings suspense file to estimate contributions to Social Security by alien workers,

---

[3] Calculations performed by the Congressional Research Service (CRS) using the average of the monthly Current Population Surveys (CPS's) for 2002. The CPS does not include a variable on immigration status.

[4] For Social Security payroll taxes to be withheld from wages, a worker must provide a Social Security Number (SSN) to his/her employer. An alien who is working in the United States without authorization (1) may have an SSN because he/she worked in the United States legally and then fell out of status; or (2) may have obtained an SSN fraudulently.

[5] Most of these nonimmigrant visa categories are defined in §101(a)(15) of the INA. These visa categories are commonly referred to by the letter and numeral that denotes their subsection in §101(a)(15), e.g., B-2 tourists, E-2 treaty investors, F-1 foreign students, H-1B temporary professional workers, J-1 cultural exchange participants, or S-4 terrorist informants.

[6] For example, an alien present in the United States on a B-2 tourist visa may remain in the United States for six months, but is not legally permitted to work. In addition, the spouses of most temporary noncitizen workers do not have employment authorization. For more information on which categories of noncitizen are entitled to work in the United States, see CRS Report RL31381, *U.S. Immigration Policy on Temporary Admissions*, by Ruth Ellen Wasem.

[7] Annually, SSA reviews W-2 forms and credits Social Security earnings to workers. If a name or SSN on a W-2 wage form does not match SSA's records, the earnings credits go into an earnings suspense file while SSA attempts to reconcile the discrepancy. The figure shown here represents the amount in the earnings suspense file through the year 2001, as of Oct. 31, 2003.

**No-Match Cert. Admin. Record  482**

CRS-3

the mismatched information may be due to clerical errors (such as a name misspelled on a form or an individual's failure to report a new married name to SSA) or to aliens who are working in the United States illegally with fraudulent Social Security Numbers. There is no reliable estimate of the amount of money in the earnings suspense file that is attributable to aliens working in the United States illegally.

## Social Security Payment Rules

Workers become *eligible* for Social Security benefits when they meet the insured status and age requirements specified in the Social Security Act.[8] They become *entitled* to benefits when they have met all of the eligibility requirements and filed an application for benefits. Because Social Security is an *earned* entitlement program, there are few restrictions on benefit payments once a worker becomes entitled to benefits. The Social Security Act does prohibit the payment of benefits to: individuals residing in certain countries;[9] individuals confined to a jail, prison, or certain other public institutions for commission of a crime; most individuals removed from the United States (i.e., deported);[10] aliens residing in the United States unlawfully; and, in some cases, aliens residing outside the United States for more than six months at a time.

**Social Security Protection Act of 2004.** On March 2, 2004, the President signed into law the Social Security Protection Act of 2004 (P.L. 108-203, H.R. 743). Among other changes, P.L. 108-203 restricts the payment of Social Security benefits (retirement, survivors, and disability benefits) to certain noncitizens who file an application for benefits based on an SSN assigned on or after January 1, 2004. Specifically, a noncitizen who files an application for benefits based on an SSN assigned *on or after* January 1, 2004, is required to have work authorization at the time an SSN is assigned, or at some later time, to gain insured status under the Social Security program. If the individual had work authorization at some point, all of his/her Social Security-covered earnings would count toward insured status. If the individual *never* had authorization to work in the United States, none of his/her earnings would count toward insured status and Security benefits would not be payable on his/her work record (i.e., benefits would not be payable to the worker or to the worker's family).[11]

---

[8] In the case of disability benefits, a worker is eligible for benefits when he/she has met insured status requirements and established a period of disability.

[9] U.S. Treasury Department regulations or Social Security restrictions prohibit payments to individuals living in Cuba, Democratic Kampuchea (formerly Cambodia), North Korea, Vietnam and areas in the former Soviet Union (excluding Armenia, Estonia, Latvia, Lithuania, and Russia).

[10] One exception is aliens who are removed on status violations (i.e., aliens who are removed from the United States because they are illegally present, not because they have committed a crime).

[11] Before enactment of P.L. 108-203, all Social Security-covered earnings would count toward insured status regardless of an alien's work authorization status.

CRS-4

A noncitizen who files an application for benefits based on an SSN assigned *before* January 1, 2004, is not subject to the work authorization requirement under P.L. 108-203. All of the individual's Social Security-covered earnings would count toward insured status, regardless of his/her work authorization status. The new law provides exceptions to the work authorization requirement for certain noncitizens, however, it is not clear how many individuals potentially could come under the exception. Regulations, which will provide additional information on the implementation of this provision, have not yet been issued.[12]

**Special Payment Rules for Noncitizens.** Section 202(y) of the Social Security Act requires noncitizens in the United States to be "lawfully present" to receive benefits.[13] If a noncitizen is entitled to benefits, but does not meet the lawful presence requirement, his/her benefits are suspended. In such cases, a noncitizen may receive benefits while residing outside the United States (including benefits based on work performed in the United States without authorization) if he/she meets one of the exceptions to the "*alien nonpayment provision*" under Section 202(t) of the Social Security Act. Under the alien nonpayment provision, a noncitizen's benefits are suspended if he/she remains outside the United States[14] for more than six consecutive months,[15] unless one of several broad exceptions is met. For example, an alien may receive benefits outside the United States if he/she is a citizen of a country that has a social insurance or pension system that pays benefits to eligible U.S. citizens residing outside that country (a "social insurance country"), or if he/she is a citizen or resident of a country with which the United States has a totalization agreement (see **Table 1**). If an alien does not meet one of the exceptions to the alien nonpayment provision, his/her benefits are suspended beginning with the seventh month of absence and are not resumed until he/she returns to the United States lawfully for a full calendar month.

In addition, to receive payments outside the United States, alien *dependents and survivors* must have lived in the United States for at least five years previously (lawfully or unlawfully), and the family relationship to the worker must have existed during that time (see **Table 2**). The law provides several broad exceptions to the five-year U.S. residency requirement for alien dependents and survivors. For example, an alien is exempt from the five-year U.S. residency requirement if he/she

---

[12] For information on P.L. 108-203, see CRS Report RL32089, *The Social Security Protection Act of 2004 (H.R. 743)*.

[13] The definition of "lawfully present" is provided in **Appendix B**. The lawful presence requirement was added by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (P.L. 104-193) and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (P.L. 104-208). For more information, see "Legislative History of Payment Rules for Noncitizens" below.

[14] "Outside the United States" means outside the territorial boundaries of the 50 States, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, Guam, the Northern Mariana Islands, and American Samoa.

[15] The six-month period of absence begins with the first full calendar month following the period in which the individual has been outside the United States for more than 30 consecutive days. If the individual returns to the United States for any part of a day during the 30-day period, the 30-day period starts over.

No-Match Cert. Admin. Record 484

CRS-5

is a citizen of a "treaty obligation" country (i.e., if nonpayment would be contrary to a treaty between the United States and the individual's country of citizenship), or if he/she is a citizen or resident of a country with which the United States has a totalization agreement (see **Table 3**).

### Table 1.  Exceptions to the Alien Nonpayment Provision for Workers and Dependents/Survivors

An alien's benefits are suspended if he/she is outside the United States for more than six consecutive months, unless one of the following exceptions is met:

the individual is a citizen of a country that has a social insurance or pension system under which benefits are paid to eligible U.S. citizens who reside outside that country  (for example, Brazil, Finland, Mexico, Philippines and Turkey) (see **Appendix A** for a complete list of countries)

the individual is entitled to benefits on the earnings record of a worker who lived in  the United States for at least 10 years or earned at least 40 quarters of coverage under  the U.S. Social Security system (exception does not apply if the individual is a citizen of a country that does not provide social insurance or pension system payments to eligible U.S. citizens who reside outside that country)

the individual is entitled to benefits on the earnings record of a worker who had  railroad employment covered by Social Security

the individual is outside the United States while in the active military or naval service of the United States

the individual is entitled to benefits on the earnings record of a worker who died while in the U.S. military service or as a result of a service-connected disease or injury

the nonpayment of benefits would be contrary to a treaty obligation of the United States in effect as of August 1, 1956 (i.e., the individual is a citizen of a treaty obligation country) (see **Appendix A** for a list of countries)

the individual is a citizen or resident of a country with which the United States has a totalization agreement (see **Appendix A** for a list of countries)

the individual was eligible for Social Security benefits as of December 1956

**Source:**  Section 202(t) of the Social Security Act.

CRS-6

## Table 2.  Additional Residency Requirement for Alien Dependents/Survivors Outside the United States

In addition to the requirements in **Table 1**, to receive payments outside the United States, an alien dependent/survivor must have lived in the United States for at least five years (lawfully or unlawfully) under one of the following circumstances:

A **spouse, divorced spouse, widow(er), surviving divorced spouse, or surviving divorced mother or father:**

> must have resided in the United States for at least five years and the spousal   relationship to the worker must have existed during that time

A **child:**

> must have resided in the United States for at least five years as the child of the worker; *or*

> the worker and the child's other parent (if any) each must have either resided in the United States for at least five years or died while residing in the United States

An **adopted child:**

> must have been adopted in the United States; *and*

> lived in the United States with the worker; *and*

> received at least half of his or her support from the worker in the year before the worker's entitlement or death

Source:  Section 202(t) of the Social Security Act.

## Table 3.  Exceptions to the Additional Residency Requirement for Alien Dependents/Survivors Outside the United States

An alien dependent/survivor living outside the United States is not subject to the five-year U.S. residency requirement if one of the following exceptions is met:

> the individual was eligible for Social Security benefits before January 1, 1985

> the individual is entitled to benefits on the earnings record of a worker who died while in the U.S. military service or as a result of a service-connected disease or injury

> the nonpayment of benefits would be contrary to a treaty obligation of the United States in effect as of August 1, 1956 (i.e., the individual is a citizen of a treaty obligation country) (see list of countries in **Appendix A**)

> the individual is a citizen or resident of a country with which the United States has a totalization agreement, unless otherwise specified in the agreement (see list of  countries in **Appendix A**)

Source:  Section 202(t) of the Social Security Act.

Note:  Aliens who live abroad may not receive payments in countries to which the U.S. Treasury Department is prohibited from mailing benefit checks.  See *Your Payments While You Are Outside the United States* (updated April 2004) on the SSA website at [http://www.ssa.gov/pubs/10137.html].

CRS-7

**Legislative History of Payment Rules for Noncitizens.** When the Social Security program began paying benefits in 1940, there were no restrictions on benefit payments to noncitizens. In 1956, amid concerns that noncitizens were working in the United States for relatively short periods and returning to their native countries where they and their family members would collect benefits for many years, Congress enacted restrictions on benefits for alien *workers* living abroad (restrictions did not apply to alien dependents and survivors). The Social Security Amendments of 1956 (P.L. 84-880) required noncitizens to reside in the United States to receive benefits and suspended benefits if the recipient remained outside the United States for more than six consecutive months, with broad exceptions (see **Table 1**).

In 1983, Congress placed restrictions on benefit payments to alien *dependents and survivors* living abroad. The Social Security Amendments of 1983 (P.L. 98-21) made dependents and survivors subject to the same residency requirement as workers (described above) and further required that they (or their parents, in the case of a child's benefit) must have lived in the United States for at least five years, with broad exceptions (see **Tables 2** and **3**).

Several factors led to the enactment of tighter restrictions on benefit payments to alien dependents and survivors living abroad in 1983, including the large number of dependents that were being added to the benefit rolls (in some cases under fraudulent circumstances) after workers had returned to their native country and become entitled to benefits, and difficulties associated with monitoring the continued eligibility of recipients living abroad.

At the time, the General Accounting Office (GAO, now named the Government Accountability Office) estimated that, of the 164,000 dependents living abroad in 1981, 56,000 were added to the benefit rolls after the worker became entitled to benefits. Of that number, an estimated 51,000 (or 91%) were noncitizens.[16] Two years earlier, the Social Security Commissioner stated that SSA investigators had found evidence that some recipients living abroad were faking marriages and adoptions and failing to report deaths in order to "cheat the system." At the time, the commissioner stated that such problems were particularly acute in Greece, Italy, Mexico and the Philippines where large numbers of beneficiaries were residing. He stated further that, in some countries, "there is a kind of industry built up of so-called claims-fixers who, for a percentage of the benefit, will work to ensure that somebody gets the maximum benefit they can possibly get out of the system."[17]

In 1996, Congress enacted tighter restrictions on the payment of Social Security benefits to aliens residing in the United States. The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA)[18] prohibited the payment of Social Security benefits to aliens in the United States who are not lawfully present,

---

[16] General Accounting Office, *Issues Concerning Social Security Benefits Paid to Aliens*, GAO/HRD-83-32, Mar. 24, 1983.

[17] CRS Issue Brief IB82001, *Social Security: Alien Beneficiaries*, by David Koitz (archived; available from Dawn Nuschler or Alison Siskin on request).

[18] P.L. 104-193, § 401(b)(2).

No-Match Cert. Admin. Record  487

CRS-8

unless nonpayment would be contrary to a totalization agreement or Section 202(t) of the Social Security Act (the alien nonpayment provision).[19] This provision became effective for applications filed on or after September 1, 1996. Subsequently, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996[20] added Section 202(y) to the Social Security Act. Section 202(y) of the act, which became effective for applications filed on or after December 1, 1996, states:

> Notwithstanding any other provision of law, no monthly benefit under [Title II of the Social Security Act] shall be payable to any alien in the United States for any month during which such alien is not lawfully present in the United States as determined by the Attorney General.

## Tax Treatment of Social Security Benefits

Noncitizens who reside outside the United States are subject to different rules regarding federal income tax treatment of Social Security benefits. U.S. citizens and resident aliens[21] pay federal income tax on a portion of their benefit if their income exceeds specified thresholds. Specifically, they pay federal income tax on up to 50% of their benefit if their modified adjusted gross income (adjusted gross income (AGI) plus tax-exempt interest income plus 50% of Social Security benefits) is more than $25,000 but no more than $34,000 for a single person, or more than $32,000 but no more than $44,000 for a married couple filing jointly. They pay federal income tax on up to 85% of their benefit if their modified AGI is more than $34,000 for a single person or more than $44,000 for a married couple filing jointly. These thresholds do not apply to married couples who live together and file separate returns. Currently, about one-third of Social Security recipients pay federal income tax on their benefits.

---

[19] Also, under PRWORA, federal agencies that administer "federal public benefits" are required to report to the Department of Homeland Security (DHS) information on any alien that is known to be unlawfully present in the United States. (P.L. 104-193, §404). Nonetheless, this requirement does not apply to SSA with respect to Title II of the Social Security Act (Old-Age, Survivors and Disability Insurance Program). *Federal Register*, vol. 65, no. 189, Sept. 28, 2000, pp. 58301-58302.

[20] P.L. 104-208, § 503(a).

[21] Resident alien is a term used in tax law. An alien is considered to be a U.S. resident for income tax purposes if he/she (1) is a lawful permanent resident of the United States. at any time during the calendar year; (2) meets the requirements of the "substantial presence" test; or (3) makes the first-year election under 26 U.S.C. § 7701(b)(4) and 26 C.F.R. § 301.7701(b)-4(c)(3). An alien individual meets the substantial presence test if: (1) the alien is present in the United States for at least 31 days during the calendar year and (2) the sum of the number of days on which such individual was present in the U.S. during the current year and the two preceding calendar years (when multiplied by the applicable multiplier — one-third for the current year, one-third for the first preceding year, and one-sixth for the second preceding year) equals or exceeds 183 days. Even though an alien individual otherwise meets the requirements of the substantial presence test, there are circumstances when an alien will not be considered a resident of the United States. An alien who does not qualify under either of these tests will be treated as a nonresident alien for purposes of the income tax. [26 U.S.C. § 7701(b)].

CRS-9

Noncitizens who live outside the United States pay federal income tax on their benefits without regard to these thresholds. Section 871 of the Internal Revenue Code imposes a 30% rate of tax withholding on the U.S. income of noncitizens who live outside the country (unless a lower rate is established by treaty) because there is no practical way for the U.S. government to determine the income of such persons. Under the withholding, noncitizens who reside outside the United States pay 30% of the maximum taxable amount of Social Security benefits (85%) in federal income taxes. For example, the tax withholding on an annual Social Security benefit of $12,000 would be $3,060 [($12,000 x 0.85) x 0.30].[22]

## Totalization Agreements

As shown in **Tables 1 and 3**, alien workers and alien dependents/survivors may receive payments while living outside the United States if they are a citizen or resident of a country with which the United States has a totalization agreement.[23] Section 233 of the Social Security Act authorizes the President to enter into a totalization agreement with a foreign country to coordinate the collection of payroll taxes and the payment of benefits under each country's Social Security system for workers who split their careers between the two countries. For example, without a totalization agreement, an individual who is sent by a U.S. company to work in a foreign country (and his or her employer) must contribute to the Social Security systems in both countries, resulting in dual Social Security coverage and taxation based on the same earnings. With one exception (Italy), totalization agreements allow workers (and their employers) to contribute only to the foreign system if the worker is employed in that country for five or more years, or only to the U.S. system if the worker is employed in that country for less than five years.

Totalization agreements also allow workers who divide their careers between the two countries to combine earnings credits under both systems to qualify for benefits if they lack sufficient coverage under either system.[24] While a worker may combine earnings credits to *qualify* for benefits under one or both systems, his/her benefit is prorated to reflect only the number of years the worker paid into each system. The same treatment applies to foreign workers in the United States.

Totalization agreements are subject to congressional review. Section 233(e) of the Social Security Act requires the President to submit to Congress the text of the agreement and a report on (1) the estimated number of individuals who would be

---

[22] For more information on the taxation of noncitizens, see CRS Report RS21732, *Federal Taxation of Aliens Working in the United States*, by Erika Lunder.

[23] Social Security regulations (20 C.F.R. § 404.1928) specify that a totalization agreement "may provide that a person entitled to benefits under title II of the Social Security Act may receive those benefits while residing in the foreign country party to the agreement, regardless of the alien non-payment provision."

[24] This applies to Social Security retirement and disability benefits. Generally, a minimum of 40 quarters of coverage (QCs) is required to qualify for Social Security retirement benefits. Fewer QCs are required to qualify for disability benefits, depending on the worker's age at the onset of the disability. In some cases, a worker may qualify for disability benefits with a minimum of six QCs.

CRS-10

affected by the agreement and (2) the estimated financial impact of the agreement on programs established by the Social Security Act. Section 233(e)(2) of the Social Security Act specifies that a totalization agreement automatically goes into effect unless the House of Representatives or the Senate adopts a resolution of disapproval within 60 session days of the agreement's transmittal to Congress.

It should be noted that the provision of Section 233(e)(2) that allows for the rejection of a totalization agreement upon adoption of a resolution of disapproval by either House of Congress is an unconstitutional legislative veto. This conclusion is compelled by the holding in *INS v. Chadha*, where the Supreme Court struck down a provision in the Immigration and Nationality Act that gave either House of Congress the authority to overrule deportation decisions made by the Attorney General.[25] The Court declared that a legislative veto constitutes an exercise of legislative power, as its use has "the purpose and effect of altering the legal rights, duties, and relations of persons ... outside the legislative branch."[26] Accordingly, the Court invalidated the disapproval mechanism, holding that Congress may exercise its legislative authority only "in accord with a single, finely wrought and exhaustively considered procedure," namely bicameral passage and presentation to the President.[27] Given that the disapproval mechanism in Section 233(e)(2) authorizes the exercise of legislative authority outside the strictures of bicameralism and presentment, it is likewise unconstitutional.[28]

Congress has never rejected a totalization agreement. As a result, the fact that the mechanism under Section 233(e)(2) is unconstitutional has not been an issue. Congressional utilization of the mechanism in Section 233(e)(2) to reject a totalization agreement could give rise to a judicial challenge, potentially resulting in an invalidation of the disapproval mechanism and a determination that the agreement is effective. Specifically, in considering the effect of the unconstitutional disapproval mechanism, a reviewing court would consider whether the remainder of Section 233 is valid, or whether the entire statute must be nullified. The Supreme Court has held that "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid

---

[25] 462 U.S. 919 (1983). Shortly after its decision in *Chadha*, the Court without opinion and with one dissent summarily affirmed lower court opinions that had struck down a two-House legislative veto provision of the Federal Trade Commission Improvements Act, 15 U.S.C. § 57a-1. See *United States Senate v. Federal Trade Commission*, 463 U.S. 1216 (1983); *United States House of Representatives v. Federal Trade Commission*, 463 U.S. 1216 (1983).

[26] *Chadha*, 462 U.S. at 952.

[27] 462 U.S. at 951.

[28] The unconstitutionality of legislative veto provisions is noted at 42 U.S.C. §433 (codifying §233), where it is further stated that the provisions of §233(e) are similar to those struck down in *INS v. Chadha*. For a consideration of bicameralism and presentment requirements generally, see CRS Report RL30249, *The Separation of Powers Doctrine: An Overview of Its Application and Rationale*, by T.J. Halstead.

No-Match Cert. Admin. Record 490

CRS-11

part may be dropped if what is left is a fully operative law."[29]   In *Westcott v. Califano*, the court noted that "the existence of a broad severability clause in the Social Security Act reflects the Congressional wish that judicial interpretation of the act leave as much of the statute intact as possible."[30]   The existence of this severability clause, coupled with the fact that the operative provisions of Section 233 would remain fully functional absent the disapproval mechanism in Subsection (e)(2), gives rise to the likelihood that a reviewing court would invalidate any attempt to utilize the disapproval mechanism, while giving effect to an otherwise properly executed totalization agreement.[31]

Since 1978, the United States has entered into totalization agreements with 20 countries (the effective date for each agreement is shown in **Appendix A**):

Australia, Austria, Belgium, Canada, Chile, Finland, France, Germany, Greece, Ireland, Italy, South Korea, Luxembourg, the Netherlands, Norway, Portugal, Spain, Sweden, Switzerland, and the United Kingdom.

In addition, the United States has signed totalization agreements with Japan (February 19, 2004) and Mexico (June 29, 2004).  Once an agreement is signed, it is sent to the Secretary of State and then to the President for review.  The President may then transmit the agreement to Congress for review.  The agreement with Japan was transmitted to Congress on November 17, 2004, and according to CRS calculations, the 60 session days for congressional action expired on April 26, 2005.  The agreement with Mexico has not been transmitted to Congress, and, reportedly, is still undergoing review at SSA.

While the specific terms of each totalization agreement may differ, the provisions of a totalization agreement must be consistent with the Social Security Act.  Section 233(c)(4) of the Social Security Act states: "any such agreement may contain other provisions which are not inconsistent with the other provisions of [Title II of the Social Security Act] and which the President deems appropriate to carry out

---

[29] *Buckley v. Valeo*, 424 U.S. 1, 108 (1976) (quoting *Champlin Refining Co. v. Corporation Commission*, 286 U.S. 210, 234 [1932]).

[30] 460 F.Supp 737 (D. Mass 1978).  In *Califano*, the court was referring to 42 U.S.C. § 1303, which states: "[i]f any provision of this chapter, or the application thereof to any person or circumstance, is held invalid, the remainder of the chapter, and the application of such provision to other persons or circumstances shall not be affected thereby."

[31] In light of the Court's holding in *Chadha*, it is apparent that any congressional action taken to restrict or control executive authority to enter into totalization agreements, or to invalidate any such agreements, must be accomplished through bicameral passage and presentment to the President.  Accordingly, congressional options in this regard would appear to be limited to imposing additional requirements on the adoption of totalization agreements, restricting authority to enter into such agreements unless approved by both Congress and the President on a case by case basis, or to pass a law disapproving a particular agreement before or after it is finalized.  See *Chadha*, 462 U.S. at 951.  Information on legal issues regarding section 233(e)(2) of the Social Security Act provided by T.J. Halstead, CRS Legislative Attorney.

CRS-12

the purposes of this section." Currently, about $15 million is paid each month to about 94,000 recipients under totalization agreements.[32]

# Issues

## Perceived Disparate Treatment Under Social Security and Immigration Law

Some believe there is somewhat of a disconnect between how the Social Security and immigration rules affect unauthorized aliens. Basically, immigration policies are designed to discourage and punish those unauthorized to work in the United States. On the other hand, under Social Security rules there are certain circumstances when an unauthorized alien can collect Social Security benefits. As a result of this perceived inconsistency, some oppose paying Social Security benefits to such aliens arguing that aliens who violate immigration law should not be rewarded by receiving Social Security benefits. Others contend that aliens who work in Social Security-covered employment (i.e., had payroll taxes withheld from their earnings) should be eligible for benefits whether or not they had employment authorization.

## Totalization Agreement with Mexico

On June 29, 2004, the Social Security Administration announced that a totalization agreement with Mexico had been signed by U.S. and Mexican government officials. In a press release and summary document, SSA reports that the agreement would save 3,000 U.S. workers and their employers approximately $140 million in Mexican payroll taxes over the first five years of the agreement. In addition, SSA reports that the projected cost to the U.S. Social Security system would average $105 million annually over the first five years.[33] To date, the totalization agreement with Mexico has not been transmitted to Congress for review or otherwise made publicly available.

In regard to recent legislative activity related to the totalization agreement with Mexico, Representative Goode offered an amendment to the FY2005 Labor, Health and Human Services and Education appropriations bill during full Committee markup on July 14, 2004, that would prohibit the use of funds appropriated under the bill to implement the totalization agreement with Mexico signed on June 29, 2004, or any date thereafter. The amendment failed by a vote of 20-36. On July 15, 2004, Representative Collins introduced a resolution of disapproval (H.Res. 720) to reject

---

[32] In Dec. 2002, the average monthly benefit paid under totalization agreements was $191 for retired workers and $345 for disabled workers. SSA, *Social Security Bulletin, Annual Statistical Supplement 2003*, table 5.M1.

[33] The SSA press release and summary document may be accessed online at SSA's website at [http://www.ssa.gov/pressoffice/pr/USandMexico-pr-alt.htm].

CRS-13

the totalization agreement with Mexico signed on June 29, 2004, as provided for under Section 233(e)(2) of the Social Security Act (discussed above).[34]

The announcement of the agreement with Mexico has revived a debate which began in December 2002, when reports in the media indicated negotiations were underway on 2:59 PM a potential totalization agreement between the United States and Mexico.[35]  Among the approximately 5.5 million Mexican-born workers in the U.S. labor force in 2002, approximately 4.2 million (76%) were noncitizens[36] and 1.3 million (24%) were naturalized citizens.[37]  The effects of the totalization agreement with Mexico signed on June 29, 2004, depend on the specific terms and language of the agreement (as noted above, the agreement has not been publicly released). However, unless otherwise specified in the agreement, the totalization agreement with Mexico would waive the five-year U.S. residency requirement for alien dependents and survivors to receive benefits outside the United States (see **Tables 2 and 3**).  Under current law, an alien *worker* entitled to Social Security benefits (based on work performed with or without authorization in the United States) may receive benefits outside the United States if he/she is a citizen of Mexico, because Mexico meets the definition of a "social insurance country."  An alien *dependent or survivor* entitled to Social Security benefits may receive benefits outside the U.S. only if he/she lived in the United States for at least five years previously (and the family relationship on which benefits are based existed during that time), unless he/she meets one of several exceptions.  Generally, a totalization agreement with Mexico would allow alien dependents and survivors in Mexico who have never lived in the United States to receive Social Security benefits outside the United States.

Some observers express concern that, although Section 202(y) of the Social Security Act prohibits the payment of benefits to aliens in the United States who are not lawfully present, a totalization agreement with Mexico could allow unauthorized aliens to receive payments in the United States, depending on how the agreement is written.[38]  They contend that a totalization agreement with Mexico may be used as a *de facto* way to legalize unauthorized aliens and assert that the question remains unresolved until the exact language of the agreement becomes available.  Still others express concern that a totalization agreement with Mexico could provide an incentive for unauthorized workers from Mexico to come to the United States.  In addition, given the Social Security system's long-range financing problems, some question the feasibility of adding a potentially large number of recipients to the rolls in the absence of structural reform.

---

[34] H.Res. 720 had 29 co-sponsors at the end of the 108th Congress.

[35] See, for example, Jonathan Weisman, "U.S. Social Security May Reach Mexico," *Washington Post*, Dec. 19, 2002, p. A1.

[36] As discussed above, "noncitizen"s include aliens who are legally present, as well as those who are unauthorized.  The Current Population Survey (CPS) does not include a variable on immigration status.

[37] Calculations performed by CRS using the average of the monthly CPSs for 2002.

[38] None of the 20 totalization agreements currently in effect make such provision.

No-Match Cert. Admin. Record  493

CRS-14

Others argue that an agreement (that excludes payments to unauthorized aliens in the United States) could be beneficial to the United States and that the cost could be reasonable.[39]  They argue that there could be substantial savings for certain U.S. workers and employers by removing the burden of double taxation.  For example, without a totalization agreement, U.S. citizens and legal permanent residents (LPRs)[40] sent by U.S. companies to work in Mexico must contribute to both the U.S. and Mexican Social Security systems.  Moreover, some workers may not qualify for U.S. or Mexican Social Security benefits because they do not have enough earnings credits under either system.  In addition, proponents of totalization agreements argue that such agreements remove financial barriers to multinational companies and their employees working in foreign countries.

**General Accounting Office Study.**  In February 2003, the House Committee on Ways and Means and the House Committee on the Judiciary asked the General Accounting Office (GAO)[41] to provide information to Congress on the possible effects of a totalization agreement with Mexico.  In a press release dated February 24, 2003, House Ways and Means Social Security Subcommittee Chairman E. Clay Shaw, Jr., and House Judiciary Committee Chairman F. James Sensenbrenner, Jr., expressed particular interest in the potential impact of an agreement with Mexico on the Social Security trust funds, given the large number of noncitizens who may be working in the United States without authorization.  According to the press release, the committee asked specifically for information on the potential effects of an agreement on workers, beneficiaries, service delivery by the SSA, program finances, immigration and illegal work by noncitizens.

In September 2003, GAO presented its findings before the House Committee on the Judiciary, Subcommittee on Immigration, Border Security, and Claims at a hearing titled *Should There Be a Totalization Agreement with Mexico?*[42] and shortly afterward released its report to Congress — *Social Security: Proposed Totalization Agreement with Mexico Presents Unique Challenges*.[43]  Among the advantages associated with totalization agreements, GAO notes that they foster international commerce, protect benefits for workers who divide their careers between the United States and a foreign country, allow multinational companies and their employees to avoid paying dual Social Security taxes on the same earnings, and enhance diplomatic relations.  GAO also notes that, because such agreements represent a cost

---

[39] Joel Mowbray, "Illegal but Paid?  The Question of Social Security for Mexicans," *National Review*, Jan. 27, 2003, pp. 22-23.

[40] Foreign nationals may be admitted to the United States temporarily or may come to live permanently.  Those admitted on a permanent basis are known as immigrants or legal permanent residents.

[41] Since this study was published, the General Accounting Office has been renamed the Government Accountability Office.

[42] The Sept. 11, 2003 hearing document (Serial No. 47) may be accessed online at [http://judiciary.house.gov/media/pdfs/printers/108th/89298.PDF].

[43] The Sept. 11, 2003 testimony (GAO-03-1035T) may be accessed online at [http://www.gao.gov/new.items/d031035t.pdf].  The Sept. 30, 2003 GAO report (GAO-03-993) may be accessed at [http://www.gao.gov/new.items/d03993.pdf].

CRS-15

to the U.S. Social Security system, associated risks should be assessed and mitigated during the negotiation process. Overall, GAO found that the procedures followed by SSA in the development of the totalization agreement with Mexico (and all other agreements) are not well documented.  GAO goes on to state: "... SSA provided no information showing that it assessed the reliability of Mexican earnings data and the internal controls in place to ensure the integrity of information that SSA will rely on to pay Social Security benefits."[44]  Records on which SSA would rely to determine a worker's (and family members') initial and continued eligibility for benefits include birth, death and marriage records.

In addition, GAO found that a totalization agreement with Mexico would increase the number of Mexican workers and their family members eligible for Social Security benefits for two reasons. First, Mexican workers who otherwise would not have enough earnings credits to qualify for benefits in the United States could combine U.S. and Mexican credits to qualify for a partial U.S. Social Security benefit.  Second, more family members in Mexico would qualify for U.S. Social Security benefits because a totalization agreement generally exempts dependents and survivors residing outside the United States from the five-year U.S. residency requirement.

In terms of the potential cost of a totalization agreement with Mexico, GAO evaluated a March 2003 cost estimate prepared by SSA's Office of the Chief Actuary.  SSA projects that an agreement with Mexico would cost $78 million in the first year and $650 million (constant 2002 dollars) by 2050.  The cost estimate assumes an initial increase of 50,000 new beneficiaries in Mexico based on the number of persons (U.S. citizens and others) in Mexico currently receiving U.S. Social Security benefits and projects that the number of additional beneficiaries under the agreement would increase to 300,000 over time.  SSA projects that the totalization agreement with Mexico would have a negligible effect on the long-range actuarial balance of the Social Security trust funds.[45]

GAO found that "the cost of a totalization agreement with Mexico is highly uncertain," even more so than for previous agreements, because of the large number of unauthorized immigrants from Mexico estimated to be living in the United States.  According to GAO's assessment, the base used for the number of initial new beneficiaries in Mexico under a totalization agreement (50,000) does not take into account the "estimated millions of current and former unauthorized workers and family members from Mexico and appears small in comparison with those estimates."[46]  Furthermore, GAO points out that the cost estimate does not take into account the potential change in behavior by Mexican citizens under a totalization

---

[44] GAO-03-1035T, p. 2.

[45] SSA's Mar. 2003 cost estimate of a totalization agreement with Mexico (and GAO's evaluation) do not incorporate the effects of P.L. 108-203 (discussed above). However, SSA has stated that the cost estimate is still appropriate following enactment of the work authorization requirement in P.L. 108-203.  To clarify, SSA projects that an additional 50,000 workers and an additional 17,000 dependents and survivors would receive totalized benefits under the agreement by the end of the first five years.

[46] GAO-03-1035T, p. 2.

CRS-16

agreement. GAO notes that an agreement could provide an additional incentive for
unauthorized workers from Mexico to come to the United States.

In regard to the number of unauthorized immigrants from Mexico currently
living in the United States, GAO cites a range of estimates. For example, the Pew
Hispanic Center estimates the number to be between 3.4 and 5.7 million, while the
Urban Institute estimates the number to be more than 4 million. The federal
government estimates that there are about 5 million unauthorized immigrants from
Mexico living in the United States (as of January 2000) and that the number is
expected to increase by 240,000 each year. According to federal government
statistics, unauthorized immigrants from Mexico make up an estimated 69% of
unauthorized immigrants in the United States. By comparison, the number of
unauthorized U.S. immigrants from all of the other totalization countries combined
is estimated at less than 3%.

In regard to the potential number of former unauthorized workers who have
returned to Mexico, GAO points out that fewer than one-third of immigrants from
Mexico stay in the United States for more than 10 years, the minimum number of
years of Social Security-covered earnings generally needed to qualify for Social
Security retirement benefits. Given the limited information regarding the age, work
history, Social Security coverage and number of dependents of these former
unauthorized workers, the potential cost of a totalization agreement with Mexico is
considered even more difficult to predict.

As mentioned previously, the SSA cost estimate shows that a totalization
agreement with Mexico would have a negligible effect on the long-range actuarial
balance of the Social Security trust funds. However, a sensitivity analysis performed
by SSA at GAO's request shows that a 25% or more increase in the number of initial
new beneficiaries (i.e., 13,000 or more above the base estimate of 50,000) would
result in a measurable impact on the long-range actuarial balance of the trust funds.
GAO found that error rates in estimating the number of initial new beneficiaries
under previous totalization agreements often exceeded 25%. Based on the large
number of unauthorized workers from Mexico in the United States, GAO considers
the estimated cost of a totalization agreement with Mexico more uncertain than cost
estimates for previous agreements. In its report, GAO states that "a totalization
agreement with Mexico is both qualitatively and quantitatively different than any
other agreement signed to date."[47]

**SSA Comment on the GAO Report.** The Social Security Commissioner
and SSA's Office of the Chief Actuary provided written comments on a draft of the
GAO report. SSA disagreed with the GAO evaluation on a number of issues.[48]
Specifically, in regard to SSA's estimate of the number of persons who initially
would receive totalized benefits under the agreement (50,000), SSA maintains that
the estimate is "based on the best available data and includes potential benefits for

---

[47] GAO-03-993, p. 17.

[48] The full text of SSA's comments are provided in Appendix II of the GAO report.

No-Match Cert. Admin. Record  496

CRS-17

both documented and undocumented workers in the U.S. in the past."[49] Furthermore, SSA notes that the unprecedented six-fold increase in this number (300,000 by 2050) takes into account recent increases in immigration and visas. SSA's response includes (but is not limited to) the following:

- Not all unauthorized Mexican workers work in Social Security-covered jobs. Those who are employed on an unofficial basis (i.e., paid cash in the "underground economy") do not qualify for benefits (with or without a totalization agreement) because their earnings are not reported for Social Security purposes. SSA notes that the percentage of unauthorized workers who could become eligible for benefits is more limited than GAO suggests, because GAO does not include this group of workers in their discussion.

- GAO found that SSA's proxy for the number of individuals who initially would receive totalized benefits under the agreement (i.e., the number of Social Security recipients currently living in Mexico) seems low and bears no direct relationship to the estimated number of current and former unauthorized Mexican workers in the United States and their family members. SSA maintains that this is a reasonable proxy and points out that the 50,000 Social Security recipients currently living in Mexico include Mexican citizens who qualified for benefits based on unauthorized work in the United States.

- GAO points out that the agreement could provide an additional incentive for unauthorized Mexican workers to come to the U.S. In SSA's view, this type of behavioral effect would be very small. SSA contends that most Mexican citizens who come to the U.S. to work without authorization are young and more likely to be motivated by current earnings than the prospect of future Social Security retirement benefits.

- In evaluating whether the number of Social Security recipients currently living in Mexico is a reasonable proxy for the number of individuals who initially would receive totalized benefits under an agreement with Mexico, SSA used comparison data for Canada, a country with which the U.S. has had a totalization agreement for 20 years, because it too is a NAFTA trading partner and shares a border with the U.S. By applying the same ratio of totalized to non-totalized (fully insured) Canadian beneficiaries to the number of current non-totalized Mexican beneficiaries, SSA came up with an estimate of 37,000 initial new beneficiaries under the agreement and determined that the 50,000 proxy was reasonable. According to GAO, such comparisons between Canada and Mexico are problematic because of the much higher estimates of illegal immigration from Mexico. While SSA acknowledges the large number of unauthorized Mexican citizens estimated to be in the U.S., it contends that these individuals tend to be young and would become eligible for totalized benefits well into the future. SSA

---

[49] GAO-03-993, p. 27.

No-Match Cert. Admin. Record  497

CRS-18

    points out that the purpose of the Canada/Mexico comparison is to provide a current estimate of totalized beneficiaries under an agreement with Mexico.

- GAO states that error rates associated with SSA's projections of new beneficiaries under previous agreements frequently have exceeded 25%. SSA acknowledges that for six of the 11 agreements that became effective between 1985 and 1994, the number of individuals receiving totalized benefits in the fifth year after implementation exceeded their estimates. SSA further points out, however, that estimates for recent agreements have been high. For example, SSA overestimated the number of individuals receiving totalized benefits for the four agreements that became effective between 1992 and 1994. Overall, for the 11 agreements, SSA estimates that their projections have been within 3% of the actual number.

## No-Match Letters

    Over the past few years, a policy change at SSA which substantially increased the number of "no-match" letters sent to employers has received much attention because of the impact on unauthorized aliens. In 1993, SSA began sending no-match letters to employers to inform them of a discrepancy between a W-2 form and SSA's records. Importantly, as discussed above, receipt of a no-match letter does not imply that the employee is using a fraudulent SSN; the discrepancy could be the result of a clerical error. For tax years 1993 through 2000, an employer received no-match letters only if 10 or more employees had discrepancies and the number of employees with mismatches equaled at least 10% of the employer's workforce.[50]

    For the 2001 tax year, SSA implemented a new policy of sending no-match letters to every employer with at least one employee with discrepancies on their W-2. For tax year 2000,[51] SSA sent out approximately 110,000 no-match letters[52] compared to approximately 950,000 for tax year 2001.[53] Employers are not required to respond to or act on the letters; however, under the INA employers are subject to penalties for hiring or retaining unauthorized alien workers.[54] Additionally, the Internal Revenue Service can penalize employers for providing incorrect information on wage forms (W-2's).[55]

    SSA sent the letters to make sure that workers would be properly credited with their earnings, and to combat identity fraud. Due to the controversy surrounding the

---

[50] "Social Security No-Match Letter," *Interpreter Releases*, vol. 80, Apr. 7, 2003, pp. 508-509.

[51] No-match letters for tax year 2000 are sent in calendar year 2001.

[52] "Social Security No-Match Letter," *Interpreter Releases*, vol. 80, Apr. 7, 2003, p. 508.

[53] Mary Beth Sheridan, "Social Security Scales Back Worker Inquiries," *Washington Post*, June 18, 2003, p. A6. No-match letters for tax year 2001 are sent in calendar year 2002.

[54] INA § 274A.

[55] 26 U.S.C. § 6647.

CRS-19

increase in the number of no-match letters issued, for tax year 2002, SSA is sending no-match letters only if 10 or more employees have discrepancies and the number of employees with mismatches equal at least 0.5% of the employer's workforce. As of June 2003, SSA has sent out 110,000 no-match letters for tax year 2002.

Some argue that SSA should not reduce the number of no-match letters which are sent to employers. They contend that SSA should coordinate with other agencies to locate unauthorized alien workers, and that no-match letters can be a tool to help reduce the unauthorized population in the United States. Additionally, the no-match letters may help employers who do not know that the employees' documents are fraudulent but would be liable if they were caught employing unauthorized aliens.

Others contend that SSA has no immigration-related enforcement powers, and it is not SSA's job to enforce laws. In addition, immigration advocates contend that tens of thousands of immigration aliens left their jobs or were fired as a result of the letters.[56] They argue that no-match letters do little to combat unlawful employment as those who use false documents simply find employment in another company, increasing the risk of workplace exploitation. Additionally, they contend that some firms may have experienced a loss of revenue caused by worker shortages or by terminated employees who do not have employment authorization moving to competitors. The letters also raised concerns that employers were discriminating based on alienage (i.e., that an employer who received a no-match letter for a noncitizen would fire the noncitizen worker without ascertaining if they have employment authorization).

# Legislation in the 109th Congress

## H.R. 98:  "Illegal Immigration Enforcement and Social Security Protection Act of 2005"

Introduced by Representative David Dreier on January 4, 2005, H.R. 98 would mandate that social security cards include encrypted machine-readable electronic identification strips, and a recent digitized photograph of the individual to whom the card is issued. The bill would require that the strip be developed in consultation with the Secretary of Homeland Security, and that the Department of Homeland Security (DHS) be notified when an alien is issued a number. The bill would create an Employment Eligibility Database (EED) in DHS containing information on aliens authorized to work in the United States for the purpose verifying that an alien applicant for a job has work authorization. The bill would mandate that the identification strip on the Social Security card be designed so that employers could use the strip to gain access to the EED (through a phone verification system or a card-reader system). Additionally, the would mandate that the Secretary of DHS provide safeguards to protect the confidentiality of the information in the EED.

---

[56] Sheridan, "Social Security Scales Back Worker Inquiries."

CRS-20

The bill would require that SSA begin issuing Social Security cards with the electronic identification strips and that DHS create the EED within two years after the bill is enacted, and at that time any new alien hired would have to be vetted though the EED. The bill would create added civil penalties for any employer who knowingly hires an unauthorized alien or fails to verify the alien's employment authorization using the EED.[57] The bill would also create criminal penalties for any employer who knowingly hires an unauthorized alien or fails to verify the alien's employment authorization using the EED.[58]

Eliminating job opportunities for unauthorized aliens may help reduce unauthorized migration, as most unauthorized aliens are coming to the United States for better economic opportunities. In addition, having an easily accessible verification system would reduce the responsibility of employers to make a judgement on whether an applicant's documents are valid or fraudulent. Nonetheless, the two year time period to create the EED and the new Social Security cards may not allow enough time to develop and implement the system. Furthermore, because the requirement to check aliens in the EED would only apply to newly hired aliens, unauthorized aliens who are already working may be subjected to exploitation as they would unable to leave their jobs to find another since they do not have the new Social Security card with electronic strip. Lastly, as with any database, the success of the program could be dependent on the accuracy of the data contained in the EED.

## H.R. 858: "Social Security for Americans Only Act of 2005"

H.R. 853, introduced by Representative Ron Paul on February 16, 2005, would prohibit earnings paid to noncitizens after December 31, 2005, from being credited for benefit computation purposes. Thus, *all* noncitizens — those working legally and illegally in the United States — will not become eligible for Social Security benefits unless they have insured status as of December 31, 2005 (or are to obtain U.S. citizenship and earn additional earnings credits under Social Security).[59]

H.R. 853 would also terminated all existing "totalization" agreements between the United States and foreign countries. The bill would authorize new "international" agreements for the purpose of "resolving questions of entitlement to, and participation in, the Social Security system established by [Title II of the Social Security Act] and the Social Security system of such foreign country." These international agreements would have been required to take into account the limitations on crediting earnings paid to noncitizens beginning in 2006, as specified in the legislation.

---

[57] Under the bill, the civil penalty would not exceed $50,000 for each violation plus the amount that it cost the Federal government, in coordination with state and local law enforcement, to remove the alien from the United States.

[58] Under the bill, the employer could be fined or imprisoned for up to five years, or both.

[59] A similar bill (H.R. 489) was introduced by Rep. Paul in the 108th Congress.

CRS-21

H.R. 853 could have significant implications for the financial status of the Social Security system and for workers and their families in terms of eligibility and benefit levels. Much of the effect would depended on details that are not specified in the legislation, such as if those who are unable to receive Social Security benefits would continue to pay the payroll tax. In addition, it is not clear if other countries would prohibit U.S. citizens who had worked in the foreign country and paid into that country's Social Security system from receiving benefits.

## H.R. 1438: "No Social Security For Illegal Immigrants Act of 2005"

H.R. 1438, introduced by Representative Dana Rohrabacher on March 17, 2005, would exclude earnings of noncitizens not legally authorized to work in the United States from being credited under Social Security (i.e., such earnings would not have been counted for benefit computation purposes).[60] The exclusion would apply to all such wages and self-employment income earned *before, on or after* the date of enactment. The bill would require the Commissioner of Social Security to recompute benefits to the extent necessary to carry out such amendments.

Because H.R. 1438 would prevent aliens from gaining eligibility for Social Security benefits based on unauthorized work in the United States, it can be argued that the bill would prevent individuals who violate immigration law from being "rewarded" for their improper behavior, and that potential eligibility for Social Security benefits (for themselves and their family members) makes illegal migration more attractive.[61] Others contended that, because Social Security is an earned entitlement, workers who pay into the system should receive benefits regardless of their immigration status.[62] Like H.R. 858 (discussed above), H.R. 1438 could have a significant impact on the financial status of the Social Security system and on individuals, including current recipients. Much of the effect would depend on details that are unspecified in the legislation.

---

[60] As discussed above, an alien may be authorized to be in the United States, but not authorized to work.

[61] Testimony of Matthew James Reindl, Stylecraft Interiors Inc., before the Subcommittee on Immigration, Border Security, and Claims of the Committee on the Judiciary, U.S. House of Representatives, *New Jobs in Recession and Recovery: Who Are Getting Them and Who Are Not?* hearing, 109th Congress, 2nd Sess. (May 4, 2005), at [http://judiciary.house.gov/media/pdfs/reindl050405.pdf].

[62] A similar bill (H.R. 1631) was introduced in the 108th Congress.

**No-Match Cert. Admin. Record  501**

CRS-22

# Appendix A:  Exception Countries

The following country lists, which are subject to change periodically, are taken from the *Code of Federal Regulations* (C.F.R., revised through April 1, 2002) and the Social Security Administration's International Program web page.

## Social Insurance or Pension System Countries

The following countries meet the "social insurance or pension system" exception in Section 202(t)(2) of the Social Security Act:

Antigua and Barbuda, Argentina, Austria, Bahamas, Barbados, Belgium, Belize, Bolivia, Brazil, Burkina Faso (formerly Upper Volta), Canada, Chile, Colombia, Costa Rica, Cyprus, Czechoslovakia, Denmark, Dominica, Dominican Republic, Ecuador, El Salvador, Finland, France, Gabon, Grenada, Guatemala, Guyana, Iceland, Ivory Coast, Jamaica, Liechtenstein, Luxembourg, Malta, Mexico, Monaco, Netherlands, Nicaragua, Norway, Panama, Peru, Philippines, Poland, Portugal, San Marino, Spain, St. Christopher and Nevis, St. Lucia, Sweden, Switzerland, Trinidad and Tobago, Trust Territory of the Pacific Islands (Micronesia), Turkey, United Kingdom, Western Samoa, Yugoslavia, Zaire (20 C.F.R. § 404.463)

## Treaty Obligation Countries

The following countries meet the "treaty obligation" exception in Section 202(t)(3) of the Social Security Act:

Germany, Greece, Ireland, Israel, Italy, Japan, Netherlands*
(20 C.F.R. § 404.463)

*Treaties between the United States and the Netherlands preclude the application of residency requirements for noncitizens with respect to monthly survivor benefits only.

No-Match Cert. Admin. Record  502

CRS-23

## Totalization Agreement Countries

The following countries meet the "totalization agreement" exception in Section 202(t)(11)(E) of the Social Security Act. The effective date is shown for each agreement.

| | |
|---|---|
| Australia | October 1, 2002 |
| Austria | November 1, 1991 |
| Belgium | July 1, 1984 |
| Canada | August 1, 1984 |
| Chile | December 1, 2001 |
| Finland | November 1, 1992 |
| France | July 1, 1988 |
| Germany | December 1, 1979 |
| Greece | September 1, 1994 |
| Ireland | September 1, 1993 |
| Italy | November 1, 1978 |
| South Korea | April 1, 2001 |
| Luxembourg | November 1, 1993 |
| Netherlands | November 1, 1990 |
| Norway | July 1, 1984 |
| Portugal | August 1, 1989 |
| Spain | April 1, 1988 |
| Sweden | January 1, 1987 |
| Switzerland | November 1, 1980 |
| United Kingdom | 1985/1988* |

* Provisions that eliminate double taxation became effective January 1, 1985; provisions that allow persons to use work in both countries to qualify for benefits became effective January 1, 1988.

**Note:** Agreements with Austria, Belgium, Germany, Sweden and Switzerland permit the individual to receive benefits as a dependent or survivor while a *resident* in those countries only if the worker is a U.S. citizen or a citizen of the country of residence.

A description and the complete text of each agreement are available on SSA's website at [http://www.ssa.gov/international/agreement_descriptions.html].

CRS-24

# Appendix B: Definition of "Lawfully Present"

The following is the definition of the term "lawfully present" aliens for purposes of applying for Title II Social Security benefits under P.L. 104-193 (the Personal Responsibility and Welfare Reform Act) as defined in 8 C.F.R. § 103.12.

An alien who is lawfully present in the United States includes:

(1) A "qualified alien" as defined by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA);[63]

(2) An alien who has been inspected and admitted to the United States and who has not violated the terms of his status;

(3) An alien who has been paroled[64] into the United States pursuant to Section 212(d)(5) of the act for less than one year, except: (i) Aliens paroled for deferred inspection or pending exclusion proceedings under Section 236(a) of the act; and (ii) Aliens paroled into the United States for prosecution pursuant to 8 C.F.R. § 212.5(b)(3);

(4) An alien who belongs to one of the following classes of aliens permitted to remain in the United States because the Attorney General has decided for humanitarian or other public policy reasons not to initiate deportation or exclusion proceedings or enforce departure: (i) Aliens currently in temporary resident status

---

[63] PRWORA created the term "qualified alien," a term which does not exist in immigration law, to encompass the different categories of noncitizens who were not prohibited by PRWORA from receiving federal public benefits. Qualified aliens (noted in P.L. 104-193 § 431; 8 U.S.C. § 1641) are defined as:

(1) Legal Permanent Residents (an alien admitted for lawful permanent residence (LPRs));
(2) refugees (an alien who is admitted to the United States under § 207 of the Immigration and Nationality Act (INA));
(3) asylees (an alien who is granted asylum under INA § 208);
(4) an alien who is paroled into the United States (under INA § 212(d)(5)) for a period of at least one year;
(5) an alien whose deportation is being withheld on the basis of prospective persecution (under INA § 243(h) or § 241(b)(3));
(6) an alien granted conditional entry pursuant to INA § 203(a)(7) as in effect prior to April 1, 1980; and
(7) Cuban/Haitian entrants (as defined by P.L. 96-422).

For a discussion of the different categories of noncitizens, see CRS Report RS20916, *Immigration and Naturalization Fundamentals*, by Ruth Ellen Wasem. Additionally, victims of trafficking (T-visa holders) are treated as refugees for the purpose of receiving benefits.

[64] "Parole" is a term in immigration law which means that the alien has been granted temporary permission to enter and be present in the United States. Parole does not constitute formal admission to the United States and parolees are required to leave when the parole expires, or if eligible, to be admitted in a lawful status.

No-Match Cert. Admin. Record  504

CRS-25

pursuant to Section 210 or 245A of the INA; (ii) Aliens currently under Temporary Protected Status (TPS);[65] (iii) Cuban-Haitian entrants, as defined in Section 202(b) P.L. 99-603, as amended; (iv) Family Unity beneficiaries pursuant to Section 301 of P.L. 101-649, as amended; (v) Aliens currently under Deferred Enforced Departure (DED); (vi) Aliens currently in deferred action status pursuant to Service Operations Instructions at OI 242.1(a)(22); (vii) Aliens who are the spouse or child of a United States citizen whose visa petition has been approved and who have a pending application for adjustment of status;

(5)  Applicants for asylum and applicants for withholding of removal under Section 241(b)(3) of the act or under the Convention Against Torture who have been granted employment authorization, and such applicants under the age of 14 who have had an application pending for at least 180 days.

An alien may not be deemed to be lawfully present solely on the basis of the Service's decision not to, or failure to, issue an Order to Show Cause or solely on the basis of the Service's decision not to, or failure to, enforce an outstanding order of deportation or exclusion.

---

[65] For more information on TPS, see CRS Report RS20844, *Temporary Protected Status: Current Immigration Policy and Issues*, by Ruth Ellen Wasem.

**No-Match Cert. Admin. Record  505**

United States Government Accountability Office

# GAO

## Report to Congressional Requesters

August 2005

# IMMIGRATION ENFORCEMENT

# Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts



**G A O**
Accountability ★ Integrity ★ Reliability

No-Match Cert. Admin. Record 506



**GAO**
Accountability • Integrity • Reliability

# Highlights

Highlights of GAO-05-813, a report to congressional requesters

August 2005

# IMMIGRATION ENFORCEMENT

## Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts

## Why GAO Did This Study

The opportunity for employment is one of the most important magnets attracting illegal immigrants to the United States. Immigration experts state that strategies to deter illegal immigration require both a reliable employment eligibility verification process and a worksite enforcement capacity to ensure that employers comply with immigration-related employment laws. This report examines (1) the current employment verification (Form I-9) process and challenges, if any, facing verification; and (2) the priorities and resources of U.S. Immigration and Customs Enforcement's (ICE) worksite enforcement program and any challenges in implementing the program.

## What GAO Recommends

GAO recommends that the Secretary of Homeland Security set a target time frame for completing the department's review of the Form I-9 process and issuing final regulations on the process, assess the feasibility and costs of addressing the Basic Pilot Program's current weaknesses, and establish additional output goals and measures and set a target time frame for developing outcome goals and measures for the worksite enforcement program. In written comments on a draft of this report, DHS agreed with our recommendations.

www.gao.gov/cgi-bin/getrpt?GAO-05-813.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Richard M. Stana at (202) 512-8777 or stanar@gao.gov.

## What GAO Found

The current employment verification process is based on employers' review of documents presented by new employees to prove their identity and work eligibility. On the Form I-9, employers certify that they have reviewed employees' documents and that the documents appear genuine and relate to the individual presenting them. However, various studies have shown that document fraud (use of counterfeit documents) and identity fraud (fraudulent use of valid documents or information belonging to others) have made it difficult for employers who want to comply with the employment verification process to hire only authorized workers and easier for unscrupulous employers to knowingly hire unauthorized workers. The large number and variety of documents acceptable for proving work eligibility have also hindered verification efforts. In 1997, the former Immigration and Naturalization Service (INS), now part of the Department of Homeland Security (DHS), issued an interim rule on a reduction in the number of acceptable work eligibility documents and, in 1998, proposed a further reduction, but this proposal has not yet been finalized. DHS is currently reviewing the list of acceptable work eligibility documents, but has not established a target time frame for completing this review. The Basic Pilot Program, a voluntary program through which participating employers electronically verify employees' work eligibility, has potential to help enhance the verification process and substantially reduce document fraud. Yet, current weaknesses in the program, such as the inability of the program to detect identity fraud, DHS delays in entering data into its databases, and some employer noncompliance with pilot program requirements could, if not addressed, have a significant impact on the program's success. Furthermore, U.S. Citizenship and Immigration Services officials stated that the current Basic Pilot Program may not be able to complete timely verifications if the number of employers using the program significantly increased.

Worksite enforcement is one of various immigration enforcement programs that compete for resources and, under the former INS and now under ICE, worksite enforcement has been a relatively low priority. Consistent with DHS's mission to combat terrorism, after September 11, 2001, INS and then ICE focused worksite enforcement resources mainly on removing unauthorized workers from critical infrastructure sites to help address those sites' vulnerabilities. Since fiscal year 1999, the numbers of employer notices of intent to fine and administrative worksite arrests have generally declined, according to ICE, due to various factors such as document fraud, which makes it difficult to prove employer violations. ICE has not yet developed outcome goals and measures for its worksite enforcement program, which, given limited resources and competing priorities for those resources, may hinder ICE's efforts to determine resources needed for the program.

# Contents

**Letter**                                                                                          1

    Results in Brief                                                            5
    Background                                                                  8
    Various Weaknesses Have Undermined the Employment
      Verification Process, but the Basic Pilot Program Shows
      Potential to Enhance the Process                                 14
    Competing Priorities and Lack of Outcome Goals and Measures
      May Hinder Worksite Enforcement Efforts                          30
    Conclusions                                                                42
    Recommendations for Executive Action                                       44
    Agency Comments                                                            44

**Appendix I**          **Employment Eligibility Verification Form (Form I-9)**        46

**Appendix II**         **Scope and Methodology**                                     49

**Appendix III**        **Information on the Electronic Form I-9**                     54

**Appendix IV**         **Data on Employer Participation in and Use of the
                        Basic Pilot Program**                                         55

**Appendix V**          **Comments from the Department of Homeland
                        Security**                                                    57

**Appendix VI**         **GAO Contact and Staff Acknowledgments**                     59

**Figures**

    Figure 1: Basic Pilot Program Verification Process                         12
    Figure 2: Number of Queries Authorized by DHS through the
      Automated Check and the Immigration Status Verifier
      Check                                                            26

**No-Match Cert. Admin. Record 508**

Figure 3: Investigative Agent Work-years Spent on Worksite
          Enforcement Efforts and Agent Work-years Spent on
          Other Investigative Areas for Each Fiscal Year from 1999
          through 2003                                                    33
Figure 4: Number of Notices of Intent to Fine Issued to Employers
          for Each Fiscal Year from 1999 through 2004                    35
Figure 5: Number of Worksite Enforcement Arrests for Each Fiscal
          Year from 1999 through 2003                                    36
Figure 6: Number of Basic Pilot Program Queries Run by
          Participating Employers for Each Fiscal Year from 2000
          through 2004                                                    55
Figure 7: Number of Basic Pilot Program Queries that Resulted in
          Employment Authorizations for Each Fiscal Year from
          2000 through 2004                                               56

**Abbreviations**

| | |
|---|---|
| DHS | Department of Homeland Security |
| ICE | U.S. Immigration and Customs Enforcement |
| IIRIRA | Illegal Immigration Reform and Immigrant Responsibility Act |
| INS | U.S. Immigration and Naturalization Service |
| IRCA | Immigration Reform and Control Act |
| SSA | Social Security Administration |
| USCIS | U.S. Citizenship and Immigration Services |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

**No-Match Cert. Admin. Record  509**



**United States Government Accountability Office**
**Washington, DC 20548**

August 31, 2005

The Honorable Jim Sensenbrenner, Jr.
Chairman
Committee on the Judiciary
House of Representatives

The Honorable John N. Hostettler
Chairman
Subcommittee on Immigration, Border Security, and Claims
Committee on the Judiciary
House of Representatives

According to the final report of the U.S. Commission on Immigration
Reform, immigration contributes to the U.S. national economy by helping
to keep viable segments of certain labor-intensive industries, expand
foreign trade, provide valuable language and cultural expertise to U.S.
companies, and contribute to the economic revitalization of some
communities.[1] Yet, the commission also noted that immigration,
particularly illegal immigration, has adverse consequences, such as
helping to depress wages for low-skilled workers and creating net fiscal
costs for state and local governments. Aliens, including temporary foreign
workers, legally enter and reside in the United States through a variety of
channels, such as immigration and work visa programs, but aliens also
illegally enter or overstay visas and reside in the United States. The former
U.S. Immigration and Naturalization Service (INS) estimated that about
7 million unauthorized aliens resided in the United States by January 2000,
and other organizations estimated that the unauthorized alien population
was about 10 million in 2004.[2]

---

[1]U.S. Commission on Immigration Reform, *Becoming an American: Immigration and
Immigrant Policy* (Washington, D.C: September 1997).

[2]In March 2003, the Immigration and Naturalization Service was merged into the
Department of Homeland Security. The service's immigration functions were divided
between U.S. Citizenship and Immigration Services, U.S. Immigration and Customs
Enforcement, and U.S. Customs and Border Protection. U.S. Immigration and Customs
Enforcement is responsible for managing and implementing the worksite enforcement
program.

**No-Match Cert. Admin. Record  510**

The opportunity for employment is one of the most important magnets attracting illegal aliens to the United States. To help reduce the attraction of this magnet, in 1986 Congress passed the Immigration Reform and Control Act (IRCA),[3] which made it illegal for individuals and entities to knowingly hire, continue to employ, or recruit or refer for a fee unauthorized workers. The act established a two-pronged approach for helping to limit the employment of unauthorized workers: (1) an employment verification process through which employers verify newly hired employees' work eligibility and (2) a sanctions program for fining employers who do not comply with the act. Under the employment verification process, employees and employers must complete the Employment Eligibility Verification Form (Form I-9) to certify that the employees are authorized to work in the United States.[4] Those employers who do not follow the verification process can be sanctioned for knowingly hiring, continuing to employ, or recruiting or referring for a fee unauthorized workers or for improperly completing Forms I-9. Efforts to enforce these sanctions are referred to as worksite enforcement.

In the nearly 20 years since the passage of IRCA, the employment eligibility verification process and worksite enforcement program have remained largely unchanged. Following the passage of the act, the U.S. Commission on Immigration Reform and various immigration experts concluded that deterring illegal immigration requires, among other things, strategies that focus on disrupting the ability of illegal aliens to gain employment through a more reliable employment eligibility verification process and a more robust worksite enforcement capacity. In particular, the commission report and other studies have found that the single most important step that could be taken to reduce unlawful migration is the development of a more effective system for verifying work authorization. Yet in the 8 years since the commission's final report, few substantial enhancements have been applied to the employment verification process, and the approach continues to rely on the Form I-9, a procedure of which the commission was roundly critical because of its vulnerability to fraud and potential to cause discrimination. Moreover, in previous work, we reported that employers of unauthorized aliens faced little likelihood that INS would investigate, fine, or criminally prosecute them, a circumstance

---

[3]P.L. 99-603, 8 U.S.C. 1324a et seq.

[4]See appendix I for a copy of the Form I-9.

GAO-05-813  Immigration Enforcement
**No-Match Cert. Admin. Record  511**

that provides little disincentive for employers who want to circumvent the law.[5]

You asked us to review the federal government's policies and programs aimed at enforcing immigration laws in the workplace. This report addresses the following questions: (1) How does the current employment verification process function and what are the challenges facing verification? (2) What are the priorities and resources of U.S. Immigration and Customs Enforcement's (ICE) worksite enforcement program and what challenges, if any, has the agency faced in implementing the program?

To address these objectives, we interviewed officials from the Department of Homeland Security's (DHS) U.S. Citizenship and Immigration Services (USCIS) and ICE, and officials from the Social Security Administration (SSA) in headquarters and selected field locations. We obtained from them information on the Form I-9 process and the Basic Pilot Program, a voluntary program through which participating employers verify employees' work eligibility by electronically checking information on employees' Forms I-9 with information in SSA and DHS databases. We analyzed information from these agencies, as well as related laws and regulations, to determine how the current Form I-9 process functions, identify any challenges in the current Form I-9 process, and examine DHS plans to modify the process. We also interviewed representatives of 23 employers;[6] 12 employer, employee, and advocacy groups;[7] and

---

[5]GAO, *Illegal Aliens: Significant Obstacles to Reducing Unauthorized Alien Employment Exist*, GAO/GGD-99-33 (Washington, D.C.: Apr. 2, 1999).

[6]One of the 23 employers we interviewed did not participate in the Basic Pilot Program. As a result, when we discuss the views of employers on the Basic Pilot Program, we refer to the views of the 22 employers we interviewed that participated in the program. The 23 employers we interviewed were located in the following states: California, Illinois, Michigan, New Jersey, New York, and Texas. They were part of the following industries: meatpacking, transportation, health care, landscaping, manufacturing, accommodation, food services, agriculture, janitorial and maintenance, temporary employment, critical infrastructure, local government, and newspaper. According to Department of Labor data, there were about 5.6 million employer firms in the United States in 2002. The most current data available on the number of employers in the United States were from 2002.

[7]We interviewed officials from 9 employer and employee associations in the following industries: construction, agriculture, accommodation, food services, retail, health care, and meat. We interviewed officials from three advocacy groups that represent a range of views on immigration-related issues.

6 immigration experts[8] to obtain their views on the Form I-9 process and the Basic Pilot Program. We selected the employers to interview based on a mix of criteria, such as the number of employers' pilot program queries and geographic location. We selected the employer, employee, and advocacy groups to interview based on a mix of criteria, such as industry representation and range of views on immigration issues. In addition, we examined USCIS and SSA guidance, instructions, and agreements for the Basic Pilot Program and the results and methodology of an independent evaluation of the program completed by the Institute for Survey Research at Temple University and Westat in June 2002.[9] We analyzed data on employer participation in and use of the Basic Pilot Program to determine how participation and use have changed since fiscal year 2000. We assessed the reliability of these data by reviewing them for accuracy and completeness, interviewing agency officials knowledgeable about the data, and examining documentation on how the data are entered, categorized, and verified in the databases. We determined that the independent evaluation and these data were sufficiently reliable for the purposes of our review.

To obtain information on the worksite enforcement program priorities and resources, we interviewed officials from ICE, the SSA Office of the Inspector General, the Department of Labor, the Federal Bureau of Investigation, and the Office of Special Counsel for Immigration-Related Unfair Unemployment Practices. We also interviewed officials from 12 of the 26 ICE Special Agent in Charge field offices[10] and 4 U.S. Attorney's Offices[11] that were located in the same areas as 4 of the field offices we visited. We selected the 12 field offices based on a mix of criteria, such as number of investigations conducted by field offices, number of

---

[8]The 6 immigration experts we interviewed have a range of views on immigration-related issues.

[9]Institute for Survey Research and Westat, *Findings of the Basic Pilot Program Evaluation* (Washington, D.C.: June 2002).

[10]We met with officials from the following 8 field offices: Los Angeles and San Diego, California; Chicago, Illinois; Detroit, Michigan; Newark, New Jersey; New York City, New York; and Houston and San Antonio, Texas. We spoke with officials from the following 4 field offices over the telephone: Denver, Colorado; Miami, Florida; Buffalo, New York; and Seattle, Washington.

[11]We met with officials from the following 3 U.S. Attorney's Offices: the Southern District of New York U.S. Attorney's Office; the Southern District of Texas U.S. Attorney's Office; and the Western District of Texas U.S. Attorney's Office. We spoke with the Southern District of California U.S. Attorney's Office over the telephone.

investigators in each field office, and geographic location. We analyzed ICE headquarters and field office guidance, memos, and other documents on worksite enforcement to evaluate ICE's priorities for and management of worksite enforcement efforts. In addition, we analyzed ICE data on worksite enforcement and assessed the data reliability by reviewing data for accuracy and completeness, interviewing agency officials knowledgeable about the data, and examining documentation on how the data are entered, categorized, and verified in the databases. We determined that these data were sufficiently reliable for the purposes of our review. For more detailed information on our scope and methodology, see appendix II. We conducted our work from September 2004 through July 2005 in accordance with generally accepted government auditing standards.

## Results in Brief

The employment verification process is primarily based on employers' review of their new employees' work eligibility documents, but various weaknesses, such as the process' vulnerability to fraud, have undermined this process. Employers certify on the Form I-9 that they have reviewed documents presented by their employees and that the documents appear genuine and relate to the individual presenting them. However, various studies have shown that document fraud (use of counterfeit documents) and identity fraud (fraudulent use of valid documents or information belonging to others) have made it difficult for employers who want to comply with the employment verification process to ensure that they hire only authorized workers and have made it easier for unscrupulous employers to knowingly hire unauthorized workers. The large number and variety of documents included in the list of acceptable documents for proving work eligibility have also undermined the process. We have previously reported on federal government efforts to reduce the number of acceptable work eligibility documents and make the remaining acceptable documents more secure. In 1997, the former INS issued an interim rule on reductions in the number of acceptable work eligibility documents and, in 1998, proposed a further reduction. However, DHS has not yet finalized the proposal, and the 1997 interim rule remains in effect. Although department officials told us that the agency is currently assessing modifications to the list of acceptable work eligibility documents, the department has not established a target time frame for completing this assessment and issuing final regulations on the list of acceptable documents. In addition, the Basic Pilot Program has potential to enhance this process and help to significantly reduce document fraud. According to ICE officials, access to Basic Pilot Program information could help the agency better target its worksite enforcement efforts at those employers

**No-Match Cert. Admin. Record  514**

who do not follow program requirements. If the program is expanded, however, several current weaknesses in the program, including its inability to detect identity fraud, DHS delays in entering data into its databases that may lengthen the pilot program verification process, and some employer noncompliance with pilot program requirements intended to protect employees from discriminatory practices, could become more significant and adversely affect a greater number of employers and employees, if not addressed. Additionally, USCIS officials told us that the current Basic Pilot Program may not be able to complete timely verifications of work eligibility if the number of employers using the program were to significantly increase, primarily because of limited program funding and the growth in other verification programs. These officials said that USCIS is planning to fund an evaluation of the Basic Pilot Program to assess, among other things, the program's current costs, any improvements in DHS data accuracy, and employers' compliance with program requirements. Although the results of this evaluation should help provide information on the pilot program's weaknesses, without information on the feasibility and costs of addressing those weaknesses, USCIS and Congress cannot effectively assess possibilities for future implementation of the program, including increased program usage.

Worksite enforcement is one of various immigration enforcement programs that compete for resources and, under the former INS and now under ICE, worksite enforcement has been a relatively low priority. Consistent with the DHS mission to combat terrorism, after September 11, 2001, INS and then ICE focused worksite enforcement resources mainly on identifying and removing unauthorized workers from critical infrastructure sites, such as airports and nuclear power plants, to help address vulnerabilities at those sites. We previously reported that if businesses at such sites were to be compromised by terrorists, this would pose a threat to domestic security.[12] In fiscal year 1999, INS devoted about 9 percent of its agent investigative work-years to worksite enforcement, and in fiscal year 2003 ICE devoted about 4 percent, although ICE has proposed increasing resources for worksite enforcement. The number of notices of intent to fine issued to employers for knowingly hiring unauthorized workers or improperly completing Forms I-9 and the number of administrative worksite arrests have also generally declined. For

---

[12]GAO, *Immigration Enforcement: DHS Has Incorporated Immigration Enforcement Objectives and Is Addressing Future Planning Requirements*, GAO-05-66 (Washington, D.C.: Oct. 8, 2004).

**No-Match Cert. Admin. Record  515**

example, the number of notices of intent to fine generally decreased from 417 in fiscal year 1999 to 3 in fiscal year 2004. ICE has attributed this decline to various factors including the widespread use of counterfeit documents that make it difficult for ICE agents to prove that employers knowingly hired unauthorized workers. In addition, INS and ICE have faced difficulties in setting and collecting fine amounts from employers and in detaining unauthorized workers arrested at worksites. According to ICE, pursuit of civil settlements with employers rather than administrative fines could help address some of the difficulties faced in the fines process, but it is too early to tell what effect, if any, use of civil settlements will have on worksite enforcement efforts. Furthermore, although ICE has identified two output measures for the worksite enforcement program, these measures address only two elements of the program. Without additional output goals and measures for the worksite enforcement program, ICE's ability to effectively determine resources needed for the program may be hindered, especially given ICE's limited resources and competing priorities for those resources. Although ICE is developing outcome goals and measures for the worksite enforcement program, until it finalizes these goals and measures, the agency may not be able to effectively evaluate the results of program efforts.

To strengthen the current employment verification process, we are recommending that the Secretary of Homeland Security set a specific time frame for completing the department's review of the Form I-9 process, including an assessment of the possibility of reducing the number of acceptable work eligibility documents, and issuing final regulations on changes to the Form I-9 process and an updated Form I-9. To assist Congress and USCIS in assessing the possibility of increased or mandatory use of the Basic Pilot Program, we are recommending that the Secretary of Homeland Security direct the Director of USCIS to include, in the planned evaluation of the Basic Pilot Program, an assessment of the feasibility and costs of addressing the Basic Pilot Program's current weaknesses, including its inability to detect identity fraud, delays in entry of employment authorization information into databases, and employer noncompliance with program procedures, and resources that would be needed to support increased or mandatory use of the program. To help evaluate the results of worksite enforcement program efforts and determine resource levels needed for the program, we are recommending that the Secretary of Homeland Security direct the Assistant Secretary for ICE to establish additional output goals and measures for the worksite enforcement program, and set a target time frame for completing the assessment and development of outcome goals and measures for the

**No-Match Cert. Admin. Record  516**

program. In commenting on a draft of this report, DHS agreed with the recommendations.

## Background

IRCA provided for sanctions against employers who do not follow the employment verification (Form I-9) process. Employers who fail to properly complete, retain, or present for inspection a Form I-9 may face civil or administrative fines ranging from $110 to $1,100 for each employee for whom the form was not properly completed, retained, or presented.[13] The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996 limited employer liability for certain technical violations of Form I-9 paperwork requirements.[14] According to the act, a person or entity is considered to have complied with the employment verification process if the person or entity made a good faith attempt to properly complete the Form I-9.[15] Employers who knowingly hire or continue to employ unauthorized aliens may be fined from $275 to $11,000 for each employee, depending on whether the violation is a first or subsequent offense. Employers who engage in a pattern or practice of knowingly hiring or continuing to employ unauthorized aliens are subject to criminal penalties consisting of fines up to $3,000 per unauthorized employee and up to 6 months imprisonment for the entire pattern or practice.

ICE is primarily responsible for enforcing the employer sanction provisions of IRCA as well as many other immigration-related laws. ICE has approximately 5,000 investigative agents in 26 Office of Investigations field offices that are headed by special agents in charge. ICE's Worksite Enforcement/Critical Infrastructure Unit oversees programs to protect U.S. critical infrastructure, including military, economic, industrial, and transportation infrastructure, and manages the agency's worksite

---

[13] In 1999, the Department of Justice increased the amounts of the civil penalties from those established in IRCA to the current levels to reflect a ten percent adjustment for inflation. 8 C.F.R. § 274a.10(b). Under the Federal Civil Monetary Penalties Inflation Adjustment Act of 1990, as amended, federal agencies are to make regular adjustments for inflation of civil monetary penalties that they are charged with enforcing. 28 U.S.C. 2461 note.

[14] 8 U.S.C. 1324a(b). IIRIRA of 1996 was enacted within a larger piece of legislation, the Omnibus Consolidated Appropriations Act, 1997, P.L. 104-208.

[15] According to IIRIRA, a person or entity with certain Form I-9 paperwork violations must be informed of the violation and provided with a period of not less than 10 business days to correct the violations. If the person or entity does not correct the violations within the specified time period, the person or entity would not be considered to have made a good faith attempt to comply with the Form I-9 requirement.

**No-Match Cert. Admin. Record 517**

enforcement efforts. Prior to the creation of ICE in March 2003, INS enforced IRCA and other immigration-related laws.

## Basic Pilot Program Employment Verification Process

IIRIRA required INS to operate three voluntary pilot programs to test electronic means for employers to verify an employee's eligibility to work: the Basic Pilot Program, the Citizen Attestation Verification Pilot Program, and the Machine-Readable Document Pilot Program. The three pilot programs were to test whether pilot verification procedures could improve the existing Form I-9 process by reducing (1) document fraud and false claims of U.S. citizenship, (2) discrimination against employees, (3) violations of civil liberties and privacy, and (4) the burden on employers to verify employees' work eligibility. IIRIRA established the three pilot programs to be in effect for 4 years, but Congress extended authorization for the pilots for an additional 2 years in 2002 and for another 5 years in 2003.[16] Congress also mandated DHS to expand the Basic Pilot Program to employers in all 50 states by December 2004, which DHS did.[17] DHS terminated the Citizen Attestation Verification Pilot Program and the Machine-Readable Document Pilot Program in 2003 because of technical difficulties and unintended consequences, such as

---

[16]Basic Pilot Extension Act of 2001, P.L. 107-128 and Basic Pilot Program Extension and Expansion Act of 2003, P.L. 108-156.

[17]P.L. 108-156. IIRIRA required the INS to initially operate the Basic Pilot Program in at least five of the seven states with the highest estimated population of undocumented aliens in the United States. In 1997, INS began offering participation in the Basic Pilot Program to employers in California, Florida, Illinois, New York, and Texas. In 1999, INS began offering participation in the Basic Pilot Program to employers in Nebraska because, at the time, INS was conducting an initiative in the state, called Operation Vanguard, to help the meatpacking and processing industry gain and maintain a legal workforce.

No-Match Cert. Admin. Record  518

increased fraud and discrimination, identified in evaluations of the programs.[18]

The Basic Pilot Program is a part of USCIS's Systematic Alien Verification for Entitlements Program, which provides a variety of verification services for federal, state, and local government agencies. USCIS estimates that there are more than 150,000 federal, state, and local agency users that verify immigration status through the Systematic Alien Verification for Entitlements Program. In fiscal year 2004, about 2,300 employers actively used the Basic Pilot Program within the Systematic Alien Verification for Entitlements Program.

The Basic Pilot Program provides participating employers with an electronic method to verify their employees' work eligibility. Employers may participate voluntarily in the Basic Pilot Program but are still required to complete Forms I-9 for all newly hired employees in accordance with IRCA. After completing the forms, these employers query the pilot program's automated system by entering employee information provided on the forms, such as name and Social Security number, into the pilot Web site within 3 days of the employees' hire date. The pilot program then electronically matches that information against information in SSA and, if necessary, DHS databases to determine whether the employee is eligible to work, as shown in figure 1. The Basic Pilot Program electronically notifies employers whether their employees' work authorization was

---

[18]Under the Citizen Attestation Verification Pilot Program, only the status of newly hired employees attesting to being work-authorized noncitizens was electronically checked against information in INS databases. The evaluation of this pilot program identified several problems, including inherent discrimination against work-authorized noncitizens and the lack of strong safeguards against fraudulent citizenship attestions. The evaluation stated that individuals who attested to being citizens did not need to show documents proving their citizen status, and the individuals' information was not queried through the pilot program. The Machine-Readable Document Pilot Program was initiated only in Iowa because Iowa was the sole state at the start of the pilot program issuing driver's licenses and identification cards that included machine-readable information needed for completing the Form I-9 (e.g., name, date of birth, Social Security number). In evaluating this pilot program, the Institute for Survey Research and Westat found that the program had a number of technical and procedural problems, such as card reader difficulties in reading the driver's licenses and Iowa's no longer requiring the Social Security number as the driver's license number. This change in Iowa's requirements resulted in the inability of employers to use the readers on driver's licenses without Social Security numbers. See Institute for Survey Research and Westat, *Findings of the Citizen Attestation Verification Pilot Program Evaluation* (Washington, D.C.: April 2003) and Institute for Survey Research and Westat, *Findings of the Machine-Readable Document Pilot Program Evaluation* (Washington, D.C.: May 2003).

**No-Match Cert. Admin. Record  519**

confirmed. Those queries that the DHS automated check cannot confirm the pilot refers to USCIS staff, called immigration status verifiers, who check employee information against information in other DHS databases.

**No-Match Cert. Admin. Record  520**

**Figure 1: Basic Pilot Program Verification Process**



Source: GAO analysis based on USCIS information.

In cases when the pilot system cannot confirm an employee's work authorization status either through the automatic check or the check by an immigration status verifier, the system issues the employer a tentative

**No-Match Cert. Admin. Record  521**

nonconfirmation of the employee's work authorization status. In this case, the employers must notify the affected employees of the finding, and the employees have the right to contest their tentative nonconfirmations within 8 working days by contacting SSA or USCIS to resolve any inaccuracies in their records.[19] During this time, employers may not take any adverse actions against those employees, such as limiting their work assignments or pay. When employees do not contest their tentative nonconfirmations within the allotted time, the Basic Pilot Program issues a final nonconfirmation for the employees. Employers are required to either immediately terminate or notify DHS of the continued employment of workers who do not successfully contest the tentative nonconfirmation and those who the pilot program finds are not work-authorized.

## Recent Proposals Related to Employment Verification and Worksite Enforcement

There is ongoing congressional consideration about employment verification and worksite enforcement efforts, and various initiatives have been proposed related to these issues, including possible new temporary worker programs. Since January 2004, the current administration has discussed the possibility of initiating a guest worker program in which foreign workers would be granted status for employment in the United States for a specified period of time. Similarly, some recent legislative proposals would provide a means for foreign workers to obtain temporary employment and possible permanent residency or citizenship at a later date. Other initiatives propose revising visa programs to increase the number of foreign workers legally admitted to the United States. In addition, legislative proposals have addressed methods for enhancing employment verification and worksite enforcement efforts. For example, one proposal would make use of the Basic Pilot Program mandatory for all employers, and another would increase the fine amounts for employers who knowingly hire unauthorized workers. These initiatives reflect

---

[19]In February 2005 we reported that verification services, like the Basic Pilot Program, provide a valuable opportunity to prevent many unintended or careless mistakes when hiring new workers and reporting worker earnings. In particular, we concluded that the Basic Pilot Program provides an option for addressing the problem of unauthorized workers' earnings posted to the Earnings Suspense File, which occurs when individuals' names or Social Security numbers in wage reports do not match SSA records. According to SSA officials, when individuals contest SSA tentative nonconfirmations, SSA can update the individuals' information in the SSA database when, for example, individuals provide information on name changes or correct inaccurate birthdates. SSA officials said that such updates may help prevent wage reporting problems and the posting of individuals' wage information to the Earnings Suspense File. GAO, *Social Security: Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports*, GAO-05-154 (Washington, D.C.: Feb. 4, 2005).

**No-Match Cert. Admin. Record  522**

differing perspectives on employment verification and worksite enforcement and touch on a variety of related issues, such as the number of foreign workers, if any, needed in the United States, the economic impact of illegal aliens residing in the country, and policy decisions on ways to address the millions of illegal aliens in the United States.

## Various Weaknesses Have Undermined the Employment Verification Process, but the Basic Pilot Program Shows Potential to Enhance the Process

The current employment verification process relies on employers' review of work eligibility documents to determine whether employees are authorized to work, but the process has several weaknesses. Document and identity fraud have hindered employers' efforts to reliably verify employees' work eligibility under the Form I-9 process. In addition, the large number and variety of documents acceptable for proving work eligibility have undermined the process. We have previously reported on the need to reduce the number of acceptable work eligibility documents and to improve the integrity of the documents.[20] The Basic Pilot Program, as a voluntary, automated verification program, offers a mechanism with potential to enhance the employment verification process by reducing document fraud. ICE officials said that access to Basic Pilot Program information could help the agency better target its worksite enforcement efforts by identifying employers who do not follow program requirements. However, existing weaknesses in the program, such as the inability of the program to detect identity fraud, delays in entering data into DHS databases, and some employer noncompliance with pilot program requirements, could become more significant and additional resources could be needed if employer participation in the program greatly increased or was made mandatory.

## Current Employment Verification Process Based on Employers' Review of Documents

In 1986, IRCA established the employment verification process based on employers' review of documents presented by employees to prove identity and work eligibility. Under the process, employers must request that newly hired employees present a document or documents that confirm employees' identity and work eligibility. On the Form I-9, employees must attest that they are U.S. citizens, lawfully admitted permanent residents, or aliens authorized to work in the United States. Employers must then certify that they have reviewed the documents presented by their employees to establish identity and work eligibility and that the

---

[20]GAO, *Immigration Reform: Employer Sanctions and the Question of Discrimination,* GAO/GGD-90-62, (Washington, D.C.: Mar. 29, 1990) and GAO/GGD-99-33.

**No-Match Cert. Admin. Record  523**

documents appear genuine and relate to the individual presenting them. In making their certifications, employers are expected to judge whether the documents presented are deemed obviously counterfeit. Employers are deemed in compliance with IRCA if they have followed the verification procedures, including instances when an unauthorized alien may have presented fraudulent documents that appeared genuine. In addition, on the Form I-9, employers are required to reverify the employment eligibility of individuals whose work authorization has expired, such as aliens with temporary work authorization, to determine whether the individuals are authorized to continue to work.

## Document and Identity Fraud Have Undermined the Form I-9 Process

Since the passage of IRCA in 1986, document fraud (use of counterfeit documents) and identity fraud (fraudulent use of valid documents or information belonging to others) have made it difficult for employers who want to comply with IRCA to ensure that they employ only authorized workers through the current verification and reverification processes. In its 1997 report to Congress, the U.S. Commission on Immigration Reform noted that the widespread availability of false documents made it easy for unauthorized aliens to obtain jobs in the United States. In 1999, we reported that large numbers of unauthorized aliens have either fraudulently used valid documents that belong to others or presented counterfeit documents as evidence of employment eligibility.[21] Furthermore, in 2004 we reported that unauthorized workers were able to use false documents to illegally gain entry to secure areas of critical infrastructure sites, such as airports, nuclear power plants, and military bases.[22] Representatives from some of the employers and employer associations we interviewed for this review indicated that, in cases where employees present documents that employers suspect of being counterfeit, employers may not request that these employees present other documents proving their work eligibility because the employees could claim that employers are discriminating against them. To help protect against discriminatory hiring practices, such as employers requesting specific documents from foreign-looking or sounding employees, employers are prohibited under IRCA from requesting that new employees present specific documents from among the list of acceptable documents to prove their identity and work eligibility.

---

[21] GAO/GGD-99-33.

[22] GAO, *Overstay Tracking: A Key Component of Homeland Security and a Layered Defense*, GAO-04-82 (Washington, D.C.: May 21, 2004).

**No-Match Cert. Admin. Record 524**

Although studies suggest that the majority of employers comply with IRCA and try to hire only authorized workers, the studies have also noted that some employers knowingly hire unauthorized workers, often to exploit the workers' low cost labor.[23] In 1997, the U.S. Commission on Immigration Reform reported that the minority of employers who knowingly hired illegal aliens avoided sanctions by going through the motions of compliance while accepting false documents. Likewise, in 1999 we concluded that those employers who do not want to comply with IRCA can intentionally hire unauthorized aliens under the guise of having complied with the employment verification requirements by claiming that unauthorized workers presented false documents to obtain employment.[24]

## Large Number and Variety of Acceptable Documents Have Hindered Employer Verification Efforts

The large number and variety of documents that are acceptable for proving work eligibility have also complicated employer verification efforts under IRCA. Following passage of IRCA in 1986, employees could present any of 29 different documents to establish their identity and/or work eligibility. In a 1997 interim rule, INS reduced the number of acceptable work eligibility documents from 29 to 27. Eight of these documents establish both identity and employment eligibility (e.g., U.S. passport or permanent resident card); 12 documents establish identity only (e.g., driver's license); and 7 documents establish employment eligibility only (e.g., Social Security card without the legend "Not Valid for Employment").[25] The interim rule implemented changes to the list of acceptable work eligibility documents mandated by IIRIRA and was intended to serve as a temporary measure until INS issued final rules on modifications to the Form I-9. In 1998, INS proposed a further reduction in the number of acceptable work eligibility documents to 14 but did not finalize the proposed rule.

Since the passage of IRCA, various studies have addressed the need to reduce the number of acceptable work eligibility documents to make the employment verification process simpler and more secure. In 1990, we reported that the multiplicity of work eligibility documents contributed to (1) employer uncertainty about how to comply with the employment

---

[23]There are no current reliable data available on the number or percentage of employers who seek to comply with IRCA and those who attempt to circumvent it.

[24]GAO/GGD-99-33.

[25]See appendix I for the complete list of acceptable work eligibility documents.

No-Match Cert. Admin. Record  525

verification requirements and (2) discrimination against authorized workers.[26] A 1992 report prepared by the Senate Committee on the Judiciary noted that the first step to simplifying the employment verification process was to reduce the current list of acceptable work eligibility documents and make them more counterfeit-proof.[27] In 1998, INS noted that, when IRCA was first passed, a long, inclusive list of acceptable work eligibility documents was allowed for the Form I-9 to help ensure that all persons who were eligible to work could easily meet the requirements, but as early as 1990, there had been evidence that some employers found the list confusing. In 1999 we reported that various studies of IRCA's employment verification process advocated that the number of documents that employees can use to demonstrate employment eligibility should be reduced to make the employment verification process more secure and easier to understand.[28]

Additionally, some of the employers, employer associations, and immigration experts we interviewed for this review told us that the large number of documents acceptable for proving work eligibility and the fact that the Form I-9 has not been updated have impeded employer efforts to verify employment eligibility. Representatives from three employer associations said that member employers have expressed concerns that the Form I-9 has not been updated to reflect changes in the list of acceptable work eligibility documents, causing confusion among some employers regarding which documents are acceptable. In addition, among the 23 employers we interviewed, 5 discussed the need to update the Form I-9 to reflect revisions to the list of acceptable work eligibility documents. Two of these employers told us that they manually edit the Form I-9 to reflect the changes in the list of acceptable work eligibility documents.

DHS officials told us that the department is assessing possible revisions to the Form I-9 process, including revisions to the number of acceptable work eligibility documents, but has not established a target time frame for

---

[26]GAO/GGD-90-62.

[27]U.S. Senate, Committee on the Judiciary, Subcommittee on Immigration and Refugee Affairs, *Options for an Improved Employment Verification System* (Washington, D.C.: Sept. 23, 1992).

[28]GAO/GGD-99-33.

No-Match Cert. Admin. Record  526

completing this assessment.[29] They said that the *Handbook for Employers*, which provides guidance for completing the Form I-9, would also need to be updated. In May 2005, DHS released an updated version of the Form I-9 that changed references from INS to DHS but did not modify the list of acceptable work eligibility documents on the Form I-9 to reflect changes made to the list by the 1997 interim rule. In the absence of final regulations and an updated Form I-9 and handbook, employers, employees, and other stakeholders may not clearly understand the Form I-9 process, particularly which documents are acceptable for proving work eligibility.

## Proposals Have Been Made to Improve Document Integrity

We have previously reported on efforts to enhance the integrity of acceptable work eligibility documents, which could help reduce document fraud and make the employment verification process more secure, especially if the number of acceptable documents was reduced. For example, in 1999 we reported that INS had taken steps to increase the integrity of immigration documents, such as by issuing new employment authorization documents with visible security features like holograms and by issuing permanent resident cards with digital photographs and fingerprint images.[30] We noted that, although INS enhanced the integrity of its documents, unauthorized aliens could present non-INS documents, such as Social Security cards, to employers to prove work eligibility. In 1998, we reported on estimates of costs associated with alternative proposals for SSA issuance of enhanced Social Security cards.[31] We are currently reviewing SSA efforts to enhance the integrity of Social Security cards and how enhanced cards might strengthen the employment verification process and plan to report on these issues next year.

In addition, we have previously reported on the possible use of biometrics in verification and identification processes—such as those used at U.S. ports of entry.[32] Biometrics covers a wide range of technologies that can be

---

[29]In addition to developing a rule on the reduction of the number of acceptable work eligibility documents, DHS is also developing regulations on the electronic Form I-9, which employers were authorized to use beginning at the end of April 2005. See appendix III for more information on the electronic Form I-9.

[30]GAO/GGD-99-33.

[31]GAO, *Social Security: Mass Issuance of Counterfeit-Resistant Cards Expensive, but Alternatives Exist*, GAO/HEHS-98-170 (Washington, D.C.: Aug. 20, 1998).

[32]GAO, *Technology Assessment: Using Biometrics for Border Security*, GAO-03-174 (Washington, D.C.: Nov. 15, 2002).

No-Match Cert. Admin. Record 527

used to verify identity by measuring and analyzing human characteristics.[33] Biometrics can theoretically be very effective personal identifiers because the characteristics they measure are thought to be distinct to each person. Because they are tightly bound to an individual, biometrics are more reliable, cannot be forgotten, and are less easily lost, stolen, or guessed. While biometrics may show promise in enhancing verification and identification processes, we have also reported on the trade-offs for using biometric indicators, such as concerns regarding the protections under current law for biometric data, the absence of clear criteria governing data sharing, and infrastructure processes such as the binding of an identity to the biometric data. We reported that while a biometric placed on a token, such as a passport or visa, cannot necessarily link a person to his or her identity, it can reduce the potential for an individual to assume multiple identities. We also reported that although federal agencies are required by statute to provide security protections for information collected and maintained by or for the agency commensurate with the risk and magnitude of harm that would result from unauthorized disclosure, disruption, modification, or destruction of the information, poor information security is a widespread federal problem with potentially severe consequences. In reporting on the possible use of biometrics in verification and identification processes, we identified several examples of such risks associated with using biometric data.[34]

Recent laws and legislative proposals have addressed possible ways to enhance the integrity of documents and strengthen the employment verification process. The Real ID Act of 2005 mandated that states must meet minimum standards in developing and issuing driver's licenses before federal government authorities can accept state driver's licenses as identification for official purposes.[35] These standards include (1) adding physical security features to prevent counterfeiting and tampering, (2) including common machine-readable technology on driver's licenses, and (3) requiring driver's license applicants to provide evidence of their dates of birth and Social Security numbers. The Intelligence Reform and Terrorism Prevention Act of 2004 required SSA to form a task force to, among other things, establish standards for safeguarding Social Security

---

[33]GAO, *Information Security: Challenges in Using Biometrics*, GAO-03-1137T (Washington, D.C.: Sept. 9, 2003).

[34]GAO-03-174.

[35]P.L. 109-13, 49 U.S.C. 30301 note.

GAO-05-813  Immigration Enforcement
**No-Match Cert. Admin. Record  528**

cards from counterfeiting, tampering, alteration, and theft.[36] In addition to these laws, various legislative proposals address possible ways to make identity and work eligibility documents more secure and to enhance the employment verification process. For example, one recent proposal would mandate that individuals can present only machine-readable, counterfeit and tamper-resistant Social Security cards to obtain employment. According to the proposal, these machine-readable cards would allow employers to check employees' work authorization status against information maintained in an employment eligibility database.[37] These laws and proposals differ in the extent to which they address issues related to enhancing employment verification through electronic means, such as the availability and accessibility of machine-readable technology and the security and privacy of information maintained on documents and in databases.

## Basic Pilot Program Shows Promise in Enhancing Employment Verification, but Current Weaknesses Could Undermine Increased Use

### Basic Pilot Program May Help Employers Reliably Verify Work Eligibility and Decrease Document Fraud

Various immigration experts have noted that the most important step that could be taken to reduce unlawful migration is the development of a more effective system for verifying work authorization. In particular, the U.S. Commission on Immigration Reform concluded that the most promising option for verifying work authorization was a computerized registry based on employers' electronic verification of an employee's Social Security number with records on work authorization for aliens. The Basic Pilot Program, which is currently available on a voluntary basis to all employers in the United States, operates in a similar way to the computerized registry recommended by the commission. Yet only a small portion—about 2,300

---

[36]P.L. 108-458.

[37]Illegal Immigration Enforcement and Social Security Protection Act of 2005, H.R. 98, 109th Cong.

**No-Match Cert. Admin. Record  529**

in fiscal year 2004—of the approximately 5.6 million employer firms nationwide actively used the pilot program.[38]

The Basic Pilot Program assists employers in detecting document fraud by helping to eliminate employer guesswork as to whether information contained on work eligibility documents presented by employees is authentic or counterfeit. If newly hired employees present counterfeit documents containing false information, the pilot program would not confirm the employees' work eligibility because the employees' Form I-9 information, such as a false name or Social Security number, would not match SSA and DHS database information when queried through the Basic Pilot Program. In the evaluation of the Basic Pilot Program, the Institute for Survey Research at Temple University and Westat found that the program appeared to reduce unauthorized employment arising from employee presentation of counterfeit or altered documents containing false information. Twenty of the 22 employers we interviewed who participated in the Basic Pilot Program indicated that the program helps them to reliably verify newly hired employees' work authorization status.

**ICE Sees Additional Benefit in Access to Basic Pilot Program Data**

ICE has no direct role in monitoring employer use of the Basic Pilot Program and does not have direct access to program information, which is maintained by USCIS. ICE officials noted that, in a few cases, they have requested and received pilot program data from USCIS on specific employers who participate in the program and are under ICE investigation. ICE officials told us that program data could indicate cases in which employers do not follow program requirements and therefore would help ICE better target its worksite enforcement efforts toward those employers. For example, the Basic Pilot Program's confirmation of numerous queries of the same Social Security number could indicate that the Social Security

---

[38]The number of employers who actively used the program in fiscal year 2004 includes a small number of employers who switched between two versions of the program and, as a result, were counted twice as active users. USCIS is not able to easily determine which employers were counted twice. In addition, the approximately 2,300 employers who actively used the pilot program in fiscal year 2004 do not reflect the number of worksites or individual business establishments using the program. In 2002, the most recent year for which data are available, there were approximately 5.6 million firms in the United States. Under the Basic Pilot Program, one employer may have multiple worksites that use the pilot program. For example, a hotel chain could have multiple individual hotels using the Basic Pilot Program. This hotel chain would represent one employer using the pilot program. A firm is a business organization consisting of one or more domestic establishments in the same state and industry that were specified under common ownership or control. See appendix IV for data on employer participation and use of the Basic Pilot Program.

**No-Match Cert. Admin. Record  530**

number is being used fraudulently or that an unscrupulous employer is knowingly hiring unauthorized workers by accepting the same Social Security number for multiple employees. However, USCIS stated that they have concerns about providing ICE with broader access to Basic Pilot Program information for the worksite enforcement program. USCIS officials said that, if ICE has access to pilot program information for worksite enforcement purposes, that access might create a disincentive for employers to participate in this voluntary program and could be used for purposes other than identifying potentially unscrupulous employers. These officials stated that employers may be less likely to join or participate in the program because the employers may believe that they are more likely to be targeted for a worksite enforcement investigation as a result of program participation.

ICE suggested that there could be possible benefits to their worksite enforcement efforts if employers were required to participate in a mandatory automated verification program like the Basic Pilot Program. ICE officials said that a mandatory automated verification system could help ICE focus worksite enforcement efforts on employers who try to evade using the program. They also stated that a mandatory system like the pilot program could limit the ability of employers who knowingly hired unauthorized workers to claim that the workers presented false documents to obtain employment, assisting ICE agents in proving employer violations of IRCA. Officials from 7 of the 12 Special Agent in Charge field offices we interviewed suggested that a mandatory Basic Pilot Program could help them better target their worksite enforcement efforts.

## Basic Pilot Program Does Not Help Employers Detect Identity Fraud in Verifying Employees' Work Eligibility

Although an automated verification program like the Basic Pilot Program has potential to enhance the employment verification process and help employers detect use of counterfeit documents, the program cannot currently help employers detect identity fraud. In 2002 we reported that, although not specifically or comprehensively quantifiable, the prevalence of identity fraud seemed to be increasing, a development that may affect employers' ability to reliably verify employment eligibility.[39] If an unauthorized worker presents valid documentation that belongs to another person authorized to work, the Basic Pilot Program may find the worker to be work-authorized. Similarly, if an employee presents counterfeit documentation that contains valid information and appears

---

[39] GAO, *Identity Theft: Prevalence and Cost Appear to Be Growing*, GAO-02-363 (Washington, D.C.: Mar. 1, 2002).

**No-Match Cert. Admin. Record  531**

authentic, the Basic Pilot Program may verify the employee as work-authorized. DHS officials told us that the department is currently considering possible ways to enhance the Basic Pilot Program to help it detect cases of identity fraud, for example, by modifying the program to provide a digitized photograph associated with employment authorization information presented by an employee. Yet, DHS cannot fully assess possible ways to modify the Basic Pilot Program to address identity fraud in the absence of data on the costs and feasibility of implementing such modifications.

In addition, the Basic Pilot Program does not assist employers in verifying the work authorization status of employees whose status requires reverification and therefore does not help employers detect document or identity fraud in the reverification process. Employers currently may not use the Basic Pilot Program to re-verify the employment eligibility of individuals whose work authorization has expired, and employers agree not to use the pilot program for reverification when registering to participate in the program. Therefore, participating employers cannot fully use the Basic Pilot Program to verify the work authorization status of all employees for whom verification, including reverification, is required under the Form I-9 process. According to one USCIS official, the pilot program does not face any technological or other limitations that would prevent the program from being used for reverification purposes, if such use was required or allowed as part of the pilot program.

**Delays in Data Entry May Lengthen the Pilot Program Verification Process**

Another current weakness in the Basic Pilot Program that could affect the program's success if use increased or was made mandatory is delays in the entry of information on immigrants' and nonimmigrants' arrivals and employment authorization into DHS databases. Although the majority of pilot program queries entered by participating employers are confirmed via the automated SSA and DHS verification checks, about 15 percent of queries authorized by DHS required manual verification by immigration status verifiers in fiscal year 2004.[49] According to USCIS, immigration status verifiers typically resolve cases referred to them for verification within 24 hours, but a small number of cases take longer. For example, nine employers we interviewed reported that a small number of

---

[49]In fiscal year 2004, about 10 percent of total Basic Pilot Program queries were referred to DHS for verification. Of these queries referred to DHS for verification, about 85 percent were confirmed via the DHS automated check.

**No-Match Cert. Admin. Record 532**

immigration status verifier verifications took longer than 24 hours to resolve, with a few verifications taking as long as 2 weeks to resolve.

Immigration status verifiers reported that the primary reason for queries to require verification by them is because of delays in entry of employment authorization information into DHS databases. USCIS officials told us that those verifications that take longer than a few days to resolve are generally caused by delays in the entry of data on employees who received employment authorization documents generated by a computer and camera that are not directly linked to DHS databases, such as those used at ports of entry for refugees and at USCIS field offices. They said that information on the employment authorization documents generated through this process is electronically sent to USCIS headquarters for entry but is sometimes lost or not entered into databases in a timely manner. By contrast, employment authorization documents issued at USCIS service centers are produced via computers that are used to update data in USCIS databases, which USCIS officials told us represent the majority of employment authorization documents currently issued by USCIS. The Temple University Institute for Survey Research and Westat found that verifications that require immigration status verifiers' review lengthen the time needed to complete the employment verification process. In addition, among the 22 employers we interviewed, 7 reported that they may experience some losses in work time, training, or money for background checks and physicals when employees contest tentative nonconfirmations.

USCIS has taken steps to increase the timeliness and accuracy of information entered into databases used as part of the Basic Pilot Program. In June 2004, USCIS reported that, among other improvements, it had started work to expedite data entry for new lawful permanent residents and arriving nonimmigrants and to improve data entry for changes in work authorization status.[41] For example, USCIS said that it has worked to reduce the time in which data are available for Basic Pilot Program verifications by expediting submission of data on newly arrived immigrants and nonimmigrants from ports of entry and field offices to USCIS service centers for data entry. The agency reported that, as a result of its efforts, data on new immigrants are now typically available for verification within 10 to 12 days of an immigrant's arrival in the United States while previously, the information was not available for up to 6 to 9 months after arrival. Moreover, USCIS reported it has worked to

---

[41]DHS, *Report to Congress on the Basic Pilot Program* (Washington, D.C.: June 2004).

**No-Match Cert. Admin. Record 533**

increase the timeliness and availability of temporary work authorization information in its databases by increasing the number of employment authorization documents issued by service centers as compared with the number of documents issued through computers not directly linked to DHS databases. The department reported that, while in 1999 less than half of all employment authorization documents were issued by service centers, over three-quarters of the cards are now issued through service centers. USCIS officials told us that the agency has continued these efforts to improve the timeliness and accuracy of information entered into DHS databases and noted that the agency is currently planning to fund another evaluation of the Basic Pilot Program that will include a review of the accuracy of DHS database information.

Furthermore, analysis of the Basic Pilot Program database indicates that the timeliness and accuracy of the DHS automated checks against the Basic Pilot Program database have improved. In fiscal year 2004, about 10 percent of all queries were referred to DHS for verification. Among those queries authorized by DHS, the percentage of queries verified by the DHS automated check increased from about 67 percent in fiscal year 2000 to about 85 percent in fiscal year 2004, as shown in figure 2.

**No-Match Cert. Admin. Record  534**



Figure 2: Number of Queries Authorized by DHS through the Automated Check and the Immigration Status Verifier Check

Source: GAO analysis of USCIS data.

Note: Data have been rounded to the nearest hundred.

Although USCIS has taken some steps to improve the timeliness and accuracy of information entered into databases used as part of the Basic Pilot Program and plans to review the accuracy of database information as part of its planned evaluation of the pilot program, USCIS cannot effectively assess future use of the pilot program, including possible increased program usage, without information on the costs and feasibility of ways to further reduce delays in the entry of information into DHS databases.

**Employer Noncompliance with Pilot Program Procedures May Adversely Affect Employees**

Another factor that may reduce the effectiveness of the pilot program if usage is increased or made mandatory is employer noncompliance with Basic Pilot Program requirements. These requirements are intended to safeguard employees queried through the program from such harm as discrimination or reduced training and pay. The Temple University

Institute for Survey Research and Westat evaluation of the Basic Pilot Program concluded that the majority of employers surveyed appeared to be in compliance with Basic Pilot Program procedures. However, the evaluation found evidence of some noncompliance with these procedures that specifically prohibit screening job applicants and taking actions that adversely affect employees while they are contesting tentative nonconfirmations, such as limiting employees' work assignments or pay. For example, 30 percent of the employers surveyed for the evaluation reported restricting work assignments while employees contested tentative nonconfirmations, a practice that is prohibited under the Basic Pilot Program. Of the 22 employers we interviewed who participate in the pilot, 7 reported using the Basic Pilot Program in a way that did not conform with pilot program procedures, including using the pilot program to screen job applicants before offering jobs to the applicants.

The Basic Pilot Program provides a variety of reports that may help USCIS determine whether employers follow program requirements. For example, these reports could help USCIS identify employers who do not appear to refer employees contesting tentative nonconfirmations to SSA or DHS, which is required under pilot program procedures. USCIS could then follow up to determine if such employers are following pilot procedures that require employers to refer all employees with tentative nonconfirmations to SSA or DHS. USCIS officials told us that efforts to review employers' use of the pilot program have been limited by lack of staff available to oversee and examine employer use of the program, and they noted that there are currently 15 USCIS headquarters staff members responsible for administering USCIS verification programs, including the Basic Pilot Program. The officials said that, as part of the next evaluation of the pilot program, USCIS plans to assess the extent to which employers follow pilot program requirements and procedures, such as employer adherence to requirements to notify employees of tentative nonconfirmations. However, without information on the costs and feasibility of routinely reviewing employers' use of the pilot program, USCIS cannot fully determine possible ways to regularly examine employer use of the program and therefore the extent to which employers comply with pilot program requirements.

**Current Program May Not Complete Timely Verifications if Use Greatly Increased**

According to USCIS officials, due to the growth in other USCIS verification programs, current USCIS staff may not be able to complete timely verifications if the number of employers using the Basic Pilot Program were to significantly increase. In particular, these officials said that if a significant number of new employers registered for the program or if the program were mandatory for all employers or a segment of

**No-Match Cert. Admin. Record  536**

employers, additional resources would be needed to maintain timely verifications, given the growth in other verification programs. For example, the REAL ID Act of 2005[42] mandated that states must meet minimum standards in issuing driver's licenses and nondriver identification cards, including verifying the immigration status of all noncitizen applicants, before federal government authorities can accept the licenses and cards for official purposes beginning in 2008. Currently, USCIS has approximately 38 immigration status verifiers available for completing Basic Pilot Program verifications, and these verifiers reported that they are able to complete the majority of current required checks within their target time frame of 24 hours.[43] However, USCIS officials said that because of the growth in other verification programs that would increase the number of verifications that require checks by immigration status verifiers, the agency has serious concerns about its ability to complete timely verifications if the number of Basic Pilot Program users greatly increased.

USCIS officials also stated that the agency lacks funding to further expand the Basic Pilot Program. The Basic Pilot Program and other verification programs have been funded by fees USCIS receives from applicants for adjudication of immigration and citizenship benefits. USCIS allocated about $3.5 million from its fee accounts for all of its verification programs, including the Basic Pilot Program, in fiscal year 2005.[44] USCIS officials said that this allocation included a $500,000 increase for additional employee verifications by employers using the Basic Pilot Program. However, these officials told us that current funding levels allocated for USCIS verification programs would not be sufficient to cover costs associated with mandatory use of the Basic Pilot Program for all employers, should this be adopted. In 2004, we reported that USCIS fees were not sufficient to fully

---

[42]P.L. 109-13, codified at 49 U.S.C. 30301.

[43]Other immigration status verifiers are dedicated to completing manual verifications for other USCIS verification programs.

[44]According to USCIS, in fiscal year 2005, the agency allocated about $475,000 to reimburse SSA for Basic Pilot Program query costs and about $337,500 for employer query costs. In addition, USCIS estimated about $7 million in annual costs for verifications by immigration status verifiers.

No-Match Cert. Admin. Record  537

fund the agency's operations but noted that cost data were insufficient to determine the full extent of the funding shortfall.[45]

The Temple University Institute for Survey Research and Westat estimated a range of costs associated with expanding the dial-up version of the pilot program,[46] including costs for making the program mandatory for a selected group of employers, like employers with more than 10 employees, and making the program mandatory for all employers, regardless of the number of employees. The report estimated that a mandatory dial-up version of the pilot program for all employers would cost the federal government, employers, and employees about $11.7 billion total per year, with employers bearing most of the costs.[47] USCIS has worked with participating employers to switch them to the Web-based version of the program and discontinued the dial-up version in June 2005. The Temple University Institute for Survey Research and Westat did not estimate costs for a mandatory Web-based version, although they noted that operating costs associated with such a program would be less than for the dial-up version because employer computer maintenance and telephone costs would be lower. As part of the next evaluation of the pilot program, USCIS plans to assess the costs and potential time frames associated with making the Web-based version mandatory for all employers or specific segments of employers. Given the growth in other USCIS verification programs, USCIS cannot effectively assess potential costs for making the Web-based version of the Basic Pilot Program mandatory without information on other possible resources needed for the program, such as staff needed for conducting manual verifications.

---

[45]GAO, *Immigration Application Fees: Current Fees Are Not Sufficient to Fund U.S. Citizenship and Immigration Services' Operations*, GAO-04-309R (Washington, D.C.: Jan. 5, 2004). In April 2004, USCIS raised its fees for immigration benefit applications.

[46]Under the dial-up version of the Basic Pilot Program, employers installed pilot program software directly onto a computer and used a dedicated telephone line to access the pilot system.

[47]The Institute for Survey Research and Westat estimated that the contractor who runs the Basic Pilot Program charged $0.28 per query. They estimated that it cost about $6 to resolve each query that required review by immigration status verifiers.

**No-Match Cert. Admin. Record  538**

## Competing Priorities and Lack of Outcome Goals and Measures May Hinder Worksite Enforcement Efforts

The worksite enforcement program is one of various ICE immigration enforcement programs, and has been a relatively low priority. Since fiscal year 1999, the number of notices of intent to fine issued to employers for violations of IRCA and the number of administrative worksite arrests have declined, which, according to ICE, are due to various factors, such as the widespread use of counterfeit documents that make it difficult for ICE agents to prove employer violations. INS and ICE have also faced difficulties in setting and collecting meaningful fine amounts and in detaining unauthorized workers arrested at worksites. In addition, ICE has not yet developed outcome goals and measures for the worksite enforcement program, making it difficult for ICE and Congress to assess program performance and determine resource levels for the program.

## Worksite Enforcement Has Been a Relatively Low Priority for ICE, but ICE Has Proposed Additional Resources for the Program

Worksite enforcement is one of various immigration enforcement programs formerly managed by INS and now managed by ICE, and competes for resources with these other program areas, such as alien smuggling and fraud. Among INS and ICE responsibilities, worksite enforcement has been a relatively low priority. For example, in the 1999 INS Interior Enforcement Strategy, the strategy to block and remove employers' access to undocumented workers was the fifth of five interior enforcement priorities.[48] In this same year, we reported that, relative to other enforcement programs in INS, worksite enforcement received a small portion of INS's staffing and enforcement budget. We noted that the number of employer investigations INS was able to conduct each year covered only a fraction of the estimated number of employers who may have hired unauthorized aliens.[49]

In keeping with the primary mission of DHS to combat terrorism, after September 11, 2001, INS and then ICE focused investigative resources primarily on national security cases, such as investigations of aliens in the United States who may have overstayed their authorized time periods for being in the country and the National Security Entry and Exit Registration System; on participation in Joint Terrorism Task Forces;[50] and on critical

---

[48]INS, *Interior Enforcement Strategy* (Washington, D.C.: January 1999).

[49]GAO/GGD-99-33.

[50]The National Security Entry and Exit Registration System domestic registration required selected groups of aliens from a number of countries to register with immigration authorities between November 2002 and April 2003. Joint Terrorism Task Forces are multi-agency investigative teams composed of federal, state, and local agencies that work jointly with other nonmember agencies to investigate terrorism matters.

**No-Match Cert. Admin. Record 539**

infrastructure protection. In particular, INS and then ICE focused available resources for worksite enforcement mainly on identifying and removing unauthorized workers from critical infrastructure sites, such as airports and nuclear power plants, to help reduce vulnerabilities at those sites. In 2004, we reported that, if critical infrastructure-related businesses were to be compromised by terrorists, this would pose a serious threat to domestic security.[51] In 2003, we testified that, given ICE's limited resources, it needs to ensure that it targets those industries where employment of illegal aliens poses the greatest potential risk to national security.[52] According to ICE officials, the agency adopted this focus on critical infrastructure protection because the fact that unauthorized workers can obtain employment at critical infrastructure sites indicates that there are vulnerabilities in those sites' hiring and screening practices, and unauthorized workers employed at those sites are vulnerable to exploitation by terrorists, smugglers, traffickers, or other criminals.

Consistent with these priorities, in 2003 ICE headquarters issued a memo requiring field offices to request approval from ICE headquarters prior to opening any worksite enforcement investigation not related to the protection of critical infrastructure sites, such as investigations of farms and restaurants. ICE officials told us that the purpose of this memo was to help ensure that field offices focused worksite enforcement efforts on critical infrastructure protection operations. Field office representatives told us that noncritical infrastructure worksite enforcement was one of the few investigative areas for which offices had to request approval from ICE headquarters to open an investigation. According to ICE, the agency recently issued a memo delegating authority to approve noncritical infrastructure worksite enforcement cases to field offices' Special Agents in Charge. Eight of the 12 offices we interviewed told us that worksite enforcement was not an office priority unless the worksite enforcement case related to critical infrastructure protection. ICE has inspected Forms I-9 and employer records at hundreds of critical infrastructure sites as of March 2005. For example, as part of Operation Tarmac, ICE conducted investigations at nearly 200 airports nationwide and, as part of Operation Glow Worm, conducted investigations at more than 50 nuclear power

---

[51]GAO-05-66.

[52]GAO, *Homeland Security: Challenges to Implementing the Immigration Interior Enforcement Strategy*, GAO-03-660T (Washington, D.C.: Apr. 10, 2003).

**No-Match Cert. Admin. Record 540**

plants as of March 2005.[53] Between October 2004 and the beginning of May 2005, about 77 percent of the worksite enforcement cases opened by ICE were related to critical infrastructure protection.[54]

Since fiscal year 1999, INS and ICE have dedicated a relatively small portion of overall agent resources to the worksite enforcement program. As shown in figure 3, in fiscal year 1999, INS allocated about 240 full-time equivalents to worksite enforcement efforts, while in fiscal year 2003, ICE allocated about 90 full-time equivalents.[55] Between fiscal years 1999 and 2003, the percentage of agent work-years spent on worksite enforcement efforts generally decreased from about 9 percent to about 4 percent.

[53]Operations Tarmac and Glow Worm were ICE initiatives to detect and remove unauthorized workers from airports and nuclear power plants, respectively.

[54]Data are not available on the number of critical infrastructure and noncritical infrastructure worksite enforcement cases ICE opened prior to fiscal year 2005 because before fiscal year 2005, ICE's case management system did not distinguish between the two case types.

[55]One full-time equivalent is equal to one work-year or 2,080 nonovertime hours.

No-Match Cert. Admin. Record  541



Figure 3: Investigative Agent Work-years Spent on Worksite Enforcement Efforts and Agent Work-years Spent on Other Investigative Areas for Each Fiscal Year from 1999 through 2003

Source: GAO analysis of INS case management data.

Although worksite enforcement may remain a low priority relative to other programs, ICE has proposed increasing agent resources for the worksite enforcement program by adding staff to its headquarters' worksite enforcement unit,[56] which was comprised of three staff members as of July 2005, and hiring additional worksite enforcement staff for field offices. In particular, ICE plans to use the $5 million provided for fiscal year 2005 by a congressional conference report for the worksite enforcement program to fund additional headquarters positions for the worksite enforcement unit.[57] In its fiscal year 2006 budget submission, ICE requested funding for 117 compliance officers, 20 additional investigative agents, and

---

[56]ICE headquarters' worksite enforcement unit is responsible for managing the agency's worksite enforcement program.

[57]H.R. Conf. Rep. 108-774 (2004) accompanying the Department of Homeland Security Appropriations Act, 2005, P.L. 108-334.

No-Match Cert. Admin. Record  542

6 additional program managers for worksite enforcement. ICE has proposed hiring these compliance officers to conduct the administrative elements of worksite enforcement cases, such as the inspection of Forms I-9 and other employment records. ICE officials said that these officers would pass cases involving potential criminal violations to investigative agents for review. ICE officials told us that the agency would use the compliance officers only for worksite enforcement efforts. According to ICE, compliance enforcement officers are less costly than investigative agents. ICE estimates that each investigative agent would cost the agency approximately $167,000 to $176,000 in fiscal year 2006, while one compliance enforcement officer would cost about $76,000. At this point, it is unclear what impact, if any, these additional resources would have on worksite enforcement efforts.

## ICE Attributes Decline in Numbers of Employer Fine Notices and Worksite Arrests to Document Fraud and Resource Allocation Decisions

The number of notices of intent to fine issued to employers as well as the number of unauthorized workers arrested at worksites have generally declined. Between fiscal years 1999 and 2004, the number of notices of intent to fine issued to employers for improperly completing Forms I-9 or knowingly hiring unauthorized workers generally decreased from 417 to 3.[58] (See figure 4.)

---

[58]ICE worksite enforcement investigations can span several fiscal years. For example, ICE can open an investigation in one fiscal year, but may not complete the case, including issuing a notice of intent to fine, if warranted, for several fiscal years. In addition, after ICE issues a notice of intent to fine, employers may negotiate with ICE attorneys to set a final amount for the fine. Therefore, ICE could issue a notice of intent to fine in one fiscal year, but not issue the final order for the fine until the following fiscal year.

**No-Match Cert. Admin. Record  543**

**Figure 4: Number of Notices of Intent to Fine Issued to Employers for Each Fiscal Year from 1999 through 2004**



Notices of intent to fine

Source: GAO analysis of INS and ICE case management data.

The number of unauthorized workers arrested during worksite enforcement operations has also declined since fiscal year 1999. As shown in figure 5, the number of administrative worksite arrests declined by about 84 percent from 2,849 in fiscal year 1999 to 445 in fiscal year 2003.

No-Match Cert. Admin. Record  544

**Figure 5: Number of Worksite Enforcement Arrests for Each Fiscal Year from 1999 through 2003**



Source: GAO analysis of INS case management data.

According to ICE records, worksite enforcement criminal arrests totaled 159 in fiscal year 2004 and 81 in the period from October 2004 through April 2005.[60]

ICE attributes the decline in the number of notices of intent to fine issued to employers and number of administrative worksite arrests to various factors including the widespread availability and use of counterfeit

---

[60]These data on worksite enforcement criminal arrests for fiscal years 2004 and 2005 do not include data on the number of worksite enforcement administrative arrests for those fiscal years. Fiscal year 2004 and 2005 data cannot be compared with data for previous fiscal years because the way INS agents entered data on investigative work-years into the INS case management system differs from the way ICE agents enter such data into the ICE system. Following the creation of ICE in March 2003, the case management system used to enter and maintain information on immigration investigations changed. With the establishment of ICE, agents began using the legacy U.S. Customs Service's case management system, called the Treasury Enforcement Communications System, for entering and maintaining information on investigations, including worksite enforcement operations. Prior to the creation of ICE, the former INS entered and maintained information on investigative activities in the Performance Analysis System, which captured information on immigration investigations differently than the Treasury Enforcement Communications System.

**No-Match Cert. Admin. Record 545**

documents and the allocation of resources to other priorities. Various studies have shown that the availability and use of fraudulent documents have made it difficult for ICE agents to prove that employers knowingly hire unauthorized workers. For example, in previous work we reported that the prevalence of document fraud made it difficult for INS to prove that an employer knowingly hired an unauthorized alien.[60] In 1996, the Department of Justice Office of the Inspector General reported that the proliferation of cheap fraudulent documents made it possible for the unscrupulous employer to avoid being held accountable for hiring illegal aliens.[61] ICE officials told us that employers who agents suspect of knowingly hiring unauthorized workers can claim that they were unaware that their workers presented false documents at the time of hire, making it difficult for agents to prove that the employer willfully violated IRCA. In commenting on a draft of this report, ICE also noted that the IIRIRA provision that limited employer liability for certain Form I-9 paperwork violations affects ICE's ability to substantiate employer charges for knowingly hiring unauthorized workers and, therefore, the number of notices of intent to fine that ICE issues. This provision came into effect in 1996, so it is unclear what effect, if any, the provision had on the decline in the number of notices of intent to fine issued between fiscal years 1999 and 2004.

In addition, according to ICE, the allocation of INS and ICE resources to other priorities has contributed to the decline in the numbers of notices of intent to fine and worksite arrests. For example, INS focused its worksite enforcement resources on egregious employer violators who were linked to other criminal violations like smuggling, fraud, or worker exploitation, and de-emphasized administrative employer cases and fines. Furthermore, INS investigative resources were redirected from worksite enforcement activities to criminal alien cases, which consumed more investigative hours by the late 1990s than any other enforcement activity. After September 11, 2001, INS and ICE focused investigative resources on national security cases and, in particular, focused worksite enforcement efforts on critical infrastructure protection, which is consistent with DHS's primary mission to combat terrorism. According to ICE, the redirection of

---

[60]GAO/GGD-99-33 and GAO, *Identity Fraud: Prevalence and Links to Alien Illegal Activities*, GAO-02-830T (Washington, D.C.: June 25, 2002).

[61]Department of Justice, Office of the Inspector General, *Immigration and Naturalization Service Efforts to Combat Harboring and Employing Illegal Aliens in Sweatshops*, I-96-08 (Washington, D.C.: May 1996).

No-Match Cert. Admin. Record  546

resources from other enforcement programs to perform national security-related investigations resulted in fewer resources for traditional program areas like fraud and noncritical infrastructure worksite enforcement. Additionally, some ICE field representatives, as well as immigration experts we interviewed, noted that the focus on critical infrastructure protection does not address the majority of worksites in industries that have traditionally provided the magnet of jobs attracting illegal aliens to the United States.

## INS and ICE Have Faced Difficulties in Setting Fine Amounts and in Detaining Unauthorized Workers, but Have Taken Steps to Address Difficulties

INS and ICE have faced difficulties in setting and collecting final fine amounts that meaningfully deter employers from knowingly hiring unauthorized workers and in detaining unauthorized workers arrested at worksites. ICE officials told us that because fine amounts are so low, the fines do not provide a meaningful deterrent. These officials also said that when agents could prove that an employer knowingly hired an unauthorized worker and issued a notice of intent to fine, the fine amounts agents recommended were often negotiated down in value during discussions between agency attorneys and employers. The amount of mitigated fines may be, in the opinion of some ICE officials, so low that they believe that employers view the fines as a cost of doing business, making the fines an ineffective deterrent for employers who attempt to circumvent IRCA. ICE officials at 11 of the 12 field offices at which we interviewed staff said that they experienced instances in which fine amounts were mitigated down in value. According to ICE, the agency mitigates employer fine amounts because doing so may be a more efficient use of government resources than pursuing employers who contest or ignore fines, which could be more costly to the government than the fine amount sought. Recently, ICE settled a worksite enforcement case with a large company without going through the administrative fine process. As part of the settlement, the company agreed to pay $11 million and company contractors agreed to pay $4 million in forfeitures—more than any administrative fine amount ever issued against an employer for IRCA violations, according to ICE.

One ICE official said that use of such civil settlements instead of pursuit of administrative fines, specifically in regard to investigations of noncritical infrastructure employers, could be a more efficient use of investigative resources. ICE officials also said that use of civil settlements could help ensure employers' future compliance by including in the settlements a requirement to enter into compliance agreements, such as the Basic Pilot Program. ICE recently employed this strategy in its $15 million settlement with the large company. As part of the settlement, the company agreed to

**No-Match Cert. Admin. Record 547**

enter into a compliance program with ICE. Other compliance agreements with employers could involve mandatory participation in the Basic Pilot Program. Additionally, ICE officials said that the agency has proposed working with employers who are not the subjects of worksite enforcement investigations to help them ensure compliance with IRCA through enhanced education and partnerships. In April 2005, ICE issued its interim strategic plan, which, as part of its objective on identifying critical industries for worksite enforcement operations, included an approach for partnering with businesses to help them comply with IRCA.[62] This partnership program, called the ICE Mutual Agreement between Government and Employers, is intended to provide employers with training and best practices for complying with IRCA. In addition to implementing this partnership program, ICE plans to promote expanded use of the Basic Pilot Program to help encourage employers in critical industries to strengthen their ability to verify employees' work eligibility. The practice of civil settlements with employers and joint compliance programs are in the early stages of implementation; therefore the extent to which they may address the difficulties faced in setting fine amounts that provide a meaningful deterrent is not yet known.

The former INS also faced difficulties in collecting total fine amounts from employers, but collection efforts have improved. We previously reported that the former INS faced difficulties in collecting total fine amounts from employers for a number of reasons including that employers went out of business, moved, or declared bankruptcy.[63] In 1996, the Department of Justice Office of the Inspector General reported that the deterrent effect of civil fines on sweatshop operators was adversely affected by collection difficulties and noted that INS had no national system for billing, tracking, and collecting employer fines. In 1998, INS created the Debt Management Center to centralize the collections process, and the center is now responsible for collecting fines ICE issued against employers for violations of IRCA and providing other collection services for ICE and USCIS. The

---

[62]ICE's objective for identifying critical industries for worksite enforcement operations included the following five elements: (1) identify and remove unauthorized workers from critical industries; (2) implement and expand an ICE-employer partnership program to enhance employer compliance, training, and information sharing; (3) investigate criminal employers linked to smuggling, trafficking, worker exploitation, and other criminal violations; (4) revitalize employer sanctions to provide financial deterrence; and (5) promote use of employment eligibility verification technology, like the Basic Pilot Program. See ICE, *Interim Strategic Plan* (Washington, D.C.: April 2005).

[63]GAO/GGD-99-33.

**No-Match Cert. Admin. Record  548**

ICE Debt Management Center has collected total amounts on most of the invoices issued to employers for final fine amounts between fiscal years 1999 and 2004—about 94 percent as of the end of June 2005.[64]

In addition, ICE's Office of Detention and Removal has limited detention space, and unauthorized workers detained during worksite enforcement investigations are a low priority for that space.[65] In 2004, the Under Secretary for Border and Transportation Security sent a memo to the Commissioner of U.S. Customs and Border Protection and the Assistant Secretary for ICE outlining the priorities for the detention of aliens. According to this memo, aliens who are subjects of national security investigations were among those groups of aliens given the highest priority for detention, while aliens arrested as a result of worksite enforcement investigations were among those groups of aliens given the lowest priority. Officials in 8 of the 12 field offices we interviewed told us that lack of sufficient detention space has limited the effectiveness of worksite enforcement efforts. For example, ICE officials stated that if investigative agents arrest unauthorized aliens at worksites, the aliens would likely be released because the Office of Detention and Removal detention centers do not have sufficient space to house the aliens. Field office representatives said that offices can expend a large amount of resources to arrest unauthorized aliens at worksites and that these aliens would likely be released and may re-enter the workforce, in some cases returning to the worksites from where they were originally arrested. As a result, the use of resources to arrest unauthorized aliens at worksites may be unproductive. A congressional conference report for fiscal year 2005 provided funds to the Office of Detention and Removal for an additional 1,950 bed spaces.[66] Given competing priorities for detention space, the effect, if any, these additional bed spaces will have on ICE's priority given to workers detained as a result of worksite enforcement operations cannot currently be determined.

---

[64]The Debt Management Center issues invoices to employers for collecting fine amounts. According to ICE, multiple invoices can be issued for each final order for an employer fine, as a payment plan is typically established for employers as part of the final order for the fine amount.

[65]The Office of Detention and Removal is primarily responsible for identifying and removing criminal aliens from the United States. The office is also responsible for managing ICE's space for detaining aliens.

[66]H.R. Con. Rep. 109-72 (2005) accompanying the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, P.L. 109-13.

No-Match Cert. Admin. Record  549

## ICE Has Not Yet Developed Outcome Goals and Measures for Worksite Enforcement

Given ICE's limited resources and competing priorities for those resources, ICE's lack of performance goals and measures for the worksite enforcement program may hinder the agency's ability to effectively determine and allocate resources for the program. Performance goals and measures are intended to provide Congress and agency management with the information to systematically assess a program's strengths, weaknesses, and performance. A performance goal is the target level of performance—either output or outcome—expressed as a tangible, measurable objective against which actual achievement will be compared. A performance measure can be defined as an indicator, statistic, or metric used to gauge program performance and may typically include outputs and outcomes. Outputs provide status information about an initiative or program in terms of completing an action in a specified time frame. Outcomes show results or outcomes related to an initiative or program in terms of its effectiveness, efficiency, or impact. Outputs should support or lead to outcomes and, for each outcome goal, there are typically several output goals. Outputs and outcomes together help agencies determine and report on products or services provided through a program and the results of those products or services.

ICE lacks output goals and measures necessary to inform its resource allocation decisions. Output goals and measures are an essential management tool in managing programs for results. They help provide the information that agencies need to aid in determining resources for a program and whether they are using program resources efficiently and effectively. ICE officials told us that the agency does not plan to focus on developing and using output goals and measures for worksite enforcement, such as the number of cases initiated or number of worksite arrests made, because they believe that such goals and measures do not adequately indicate ICE's level of effort for worksite enforcement. Therefore, the ICE officials said that ICE plans to focus on developing outcome goals and measures for the program that better reflect the program's effect. Yet in its fiscal year 2006 budget request, ICE identified two output measures for its worksite enforcement program: a 20 percent increase in the number of administrative worksite case completions and criminal employer case presentations made to the U.S. Attorney's Office in fiscal year 2007 and a 30 percent increase in these two indicators in fiscal year 2008. Although these two measures would provide a general indication of ICE's level of worksite enforcement activity, these measures alone would not allow ICE or Congress to effectively determine resources needed for the worksite enforcement program because these indicators address only two elements of the worksite enforcement program and do not address other program elements, such as critical infrastructure

**No-Match Cert. Admin. Record 550**

protection. Furthermore, in July 2005 the Secretary of Homeland Security discussed the need for DHS, of which ICE is a part, to be an effective steward of its resources. Without additional output goals and measures for worksite enforcement, ICE's ability to effectively determine and allocate worksite enforcement resources needed to meet program goals, especially given other agency priorities for resources, and to fully assess whether the agency is using those resources effectively and efficiently in implementing the program may be hindered.

In addition, ICE lacks outcome goals and measures that may hinder its ability to effectively assess the results of its worksite enforcement program efforts, including critical infrastructure protection efforts. Outcome measures provide agencies with an assessment of the results of a program activity or policy compared to its intended purposes. ICE officials told us that the agency plans to develop outcome goals and measures for its worksite enforcement program, but it has not yet developed these goals and measures. As a first step, ICE officials told us that field offices conducted baseline threat-level assessments in August and September 2004 to help identify regional risks, such as risks to critical infrastructure sites. These officials stated that an action plan will be developed to address these risks. Field office agents will then measure how well a particular threat has been addressed by measuring the impact of ICE's investigative activities on deterring threats or decreasing vulnerabilities to national security. ICE has not yet established target time frames for developing worksite enforcement program outcome goals and measures and, without these goals and measures, ICE may not be able to effectively assess the results of program efforts. For example, until ICE fully develops outcome goals and measures, it may not be able to completely determine the extent to which its critical infrastructure protection efforts have resulted in the elimination of unauthorized workers' access to secure areas of critical infrastructure sites, one possible goal that ICE may use for its worksite enforcement program.

## Conclusions

Efforts to reduce the employment of unauthorized workers in the United States necessitate a strong employment eligibility verification process and a credible worksite enforcement program to help ensure that employers are meeting verification requirements. The current Form I-9 employment verification process has not fundamentally changed since its establishment in 1986, and ongoing weaknesses in the process have undermined its effectiveness. Although DHS and the former INS have been assessing changes in the process since 1997, DHS has not yet issued final regulations on these changes, and it has not established a definitive time frame for

**No-Match Cert. Admin. Record 551**

completing the assessment. Completion of this assessment and issuance of final regulations should strengthen the current employment verification process and make it simpler and more secure. Furthermore, the Basic Pilot Program, or a similar automated verification system, if implemented on a much larger scale, shows promise for enhancing the employment verification process and reducing document fraud. However, current weaknesses in pilot program implementation would have to be fully addressed to help ensure the efficient and effective operation of an expanded or mandatory pilot program, or a similar automated employment verification program, and the cost of additional resources would be a consideration. Although USCIS plans to review current pilot program weaknesses, additional information on the costs and feasibility of addressing these weaknesses is needed to assist USCIS and Congress in assessing possible future use of the Basic Pilot Program, including increased program usage.

Even with a strengthened employment verification process, a credible worksite enforcement program is needed because no verification process is foolproof and not all employers may want to comply with the law. ICE's focus on critical infrastructure protection since September 11, 2001 is consistent with the DHS mission to combat terrorism by detecting and mitigating vulnerabilities to terrorist attacks at critical infrastructure sites which, if exploited, could pose serious threats to domestic security. This focus on critical infrastructure protection, though, generally does not address noncritical infrastructure employers' noncompliance with IRCA. As a result, employers, particularly those not located at or near critical infrastructure sites, who attempt to circumvent IRCA face less of a likelihood that ICE will investigate them for failing to comply with the current employment verification process or knowingly hiring unauthorized workers. ICE is taking some steps to address difficulties it has faced in its worksite enforcement efforts, but it is too early to tell whether these steps will improve the effectiveness of the worksite enforcement program. In addition, given ICE's limited resources and competing priorities for those resources, additional output goals and measures are needed to help ICE track the progress of its worksite enforcement efforts, effectively determine the resources needed to meet worksite enforcement program goals, and ensure that program resources are used efficiently and effectively. Moreover, a target time frame for developing outcome goals and measures is needed to assist Congress and ICE in determining whether the worksite enforcement program, including critical infrastructure protection, is achieving its desired outcomes.

## Recommendations for Executive Action

To strengthen the current employment verification process, we recommend that the Secretary of Homeland Security take the following action:

- set a specific time frame for completing the department's review of the Form I-9 process, including an assessment of the possibility of reducing the number of acceptable work eligibility documents, and issuing final regulations on changes to the Form I-9 process and an updated Form I-9.

To assist Congress and USCIS in assessing the possibility of increased or mandatory use of the Basic Pilot Program, we recommend that the Secretary of Homeland Security direct the Director of USCIS to take the following action:

- include, in the planned evaluation of the Basic Pilot Program, an assessment of the feasibility and costs of addressing the Basic Pilot Program's current weaknesses, including its inability to detect identity fraud in the verification and reverification processes, delays in entry of new arrival and employment authorization information into DHS databases, and employer noncompliance with program procedures, and resources needed to support any increased or mandatory use of the program.

To assist Congress and ICE in determining the resources needed for the worksite enforcement program and to help ensure the efficient and effective use of program resources, we recommend that the Secretary of Homeland Security direct the Assistant Secretary for ICE to take the following two actions:

- establish additional output goals and measures for the worksite enforcement program to clearly indicate the target level of ICE worksite enforcement activity and the resources needed to implement the program, and

- set a specific time frame for completing the assessment and development of outcome goals and measures for the worksite enforcement program to provide a target level of performance for worksite enforcement efforts and measures to assess the extent to which program results have met program goals.

## Agency Comments

We requested comments on this report from the Secretary of Homeland Security. In its response, DHS agreed with our recommendations. DHS's

comments are reprinted in Appendix V. DHS also provided technical comments, which we considered and incorporated where appropriate. We also received technical comments from SSA, which we considered and incorporated where appropriate.

As arranged with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days after the date of this report. At that time, we will send copies of this report to the Secretary of Homeland Security, the Secretary of Labor, the Attorney General, the Commissioner of the Social Security Administration, the Director of the Office of Management and Budget, and appropriate congressional committees. We will also make copies available to others upon request. In addition, the report will be available at no charge on GAO's Web site at http://www.gao.gov.

If you or your staff have any questions regarding this report, please contact me at (202) 512-8777 or stanar@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this report are listed in appendix VI.

Richard M. Stana
Director, Homeland Security
    and Justice Issues

**No-Match Cert. Admin. Record  554**

# Appendix I: Employment Eligibility Verification Form (Form I-9)

OMB No. 1615-0047; Expires 03/31/07

**Employment Eligibility Verification**

## INSTRUCTIONS

PLEASE READ ALL INSTRUCTIONS CAREFULLY BEFORE COMPLETING THIS FORM.

**Anti-Discrimination Notice.** It is illegal to discriminate against any individual (other than an alien not authorized to work in the U.S.) in hiring, discharging, or recruiting or referring for a fee because of that individual's national origin or citizenship status. It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1 - Employee.** All employees, citizens and noncitizens, hired after November 6, 1986, must complete Section 1 of this form at the time of hire, which is the actual beginning of employment. The employer is responsible for ensuring that Section 1 is timely and properly completed.

**Preparer/Translator Certification.** The Preparer/Translator Certification must be completed if Section 1 is prepared by a person other than the employee. A preparer/translator may be used only when the employee is unable to complete Section 1 on his/her own. However, the employee must still sign Section 1 personally.

**Section 2 - Employer.** For the purpose of completing this form, the term "employer" includes those recruiters and referrers for a fee who are agricultural associations, agricultural employers or farm labor contractors.

Employers must complete Section 2 by examining evidence of identity and employment eligibility within three (3) business days of the date employment begins. If employees are authorized to work, but are unable to present the required document(s) within three business days, they must present a receipt for the application of the document(s) within three business days and the actual document(s) within ninety (90) days. However, if employers hire individuals for a duration of less than three business days, Section 2 must be completed at the time employment begins. Employers must record: 1) document title; 2) issuing authority; 3) document number, 4) expiration date, if any; and 5) the date employment begins. Employers must sign and date the certification. Employees must present original documents. Employers may, but are not required to, photocopy the document(s) presented. These photocopies may only be used for the verification process and must be retained with the I-9. However, employers are still responsible for completing the I-9.

**Section 3 - Updating and Reverification.** Employers must complete Section 3 when updating and/or reverifying the I-9. Employers must reverify employment eligibility of their employees on or before the expiration date recorded in Section 1. Employers CANNOT specify which document(s) they will accept from an employee.

- If an employee's name has changed at the time this form is being updated/reverified, complete Block A.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee is still eligible to be employed on the same basis as previously indicated on this form (updating), complete Block B and the signature block.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee's work authorization has expired or if a current employee's work authorization is about to expire (reverification), complete Block B and:

- examine any document that reflects that the employee is authorized to work in the U.S. (see List A or C),

- record the document title, document number and expiration date (if any) in Block C, and

- complete the signature block.

**Photocopying and Retaining Form I-9.** A blank I-9 may be reproduced, provided both sides are copied. The instructions must be available to all employees completing this form. Employers must retain completed I-9s for three (3) years after the date of hire or one (1) year after the date employment ends, whichever is later.

**For more detailed information, you may refer to the Department of Homeland Security (DHS) Handbook for Employers, (Form M-274).** You may obtain the handbook at your local U.S. Citizenship and Immigration Services (USCIS) office.

**Privacy Act Notice.** The authority for collecting this information is the Immigration Reform and Control Act of 1986, Pub. L. 99-603 (8 USC 1324a).

This information is for employers to verify the eligibility of individuals for employment to preclude the unlawful hiring, or recruiting or referring for a fee, of aliens who are not authorized to work in the United States.

This information will be used by employers as a record of their basis for determining eligibility of an employee to work in the United States. The form will be kept by the employer and made available for inspection by officials of the U.S. Immigration and Customs Enforcement, Department of Labor and Office of Special Counsel for Immigration Related Unfair Employment Practices.

Submission of the information required in this form is voluntary. However, an individual may not begin employment unless this form is completed, since employers are subject to civil or criminal penalties if they do not comply with the Immigration Reform and Control Act of 1986.

**Reporting Burden.** We try to create forms and instructions that are accurate, can be easily understood and which impose the least possible burden on you to provide us with information. Often this is difficult because some immigration laws are very complex. Accordingly, the reporting burden for this collection of information is computed as follows: 1) learning about this form, 5 minutes; 2) completing the form, 5 minutes; and 3) assembling and filing (recordkeeping) the form, 5 minutes, for an average of 15 minutes per response. If you have comments regarding the accuracy of this burden estimate, or suggestions for making this form simpler, you can write to U.S. Citizenship and Immigration Services, Regulatory Management Division, 111 Massachusetts Avenue, N.W., Washington, DC 20529. OMB No. 1615-0047.

**NOTE:** This is the 1991 edition of the Form I-9 that has been rebranded with a current printing date to reflect the recent transition from the INS to DHS and its components.

**EMPLOYERS MUST RETAIN COMPLETED FORM I-9**
**PLEASE DO NOT MAIL COMPLETED FORM I-9 TO ICE OR USCIS**

Form I-9 (Rev. 05/31/05)Y

Appendix I: Employment Eligibility
Verification Form (Form I-9)

---

Department of Homeland Security
U.S. Citizenship and Immigration Services

OMB No. 1615-0047; Expires 03/31/07

## Employment Eligibility Verification

**Please read instructions carefully before completing this form. The instructions must be available during completion of this form. ANTI-DISCRIMINATION NOTICE: It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.**

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins.

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|

| Address (Street Name and Number) | Apt. # | Date of Birth (month/day/year) |
|---|---|---|

| City | State | Zip Code | Social Security # |
|---|---|---|---|

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
☐ A citizen or national of the United States
☐ A Lawful Permanent Resident (Alien #) A _____
☐ An alien authorized to work until ___/___/___
(Alien # or Admission #)

| Employee's Signature | Date (month/day/year) |
|---|---|

**Preparer and/or Translator Certification.** *(To be completed and signed if Section 1 is prepared by a person other than the employee.)* I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Preparer's/Translator's Signature | Print Name |
|---|---|

| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C, as listed on the reverse of this form, and record the title, number and expiration date, if any, of the document(s).

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: | | | | |
| Issuing authority: | | | | |
| Document #: | | | | |
| Expiration Date (if any): ___/___/___ | | ___/___/___ | | ___/___/___ |
| Document #: | | | | |
| Expiration Date (if any): ___/___/___ | | | | |

**CERTIFICATION - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on** (month/day/year) ___/___/___ **and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment.)**

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|

| Business or Organization Name | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|---|

**Section 3. Updating and Reverification.** To be completed and signed by employer.

| A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable) |
|---|---|

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

Document Title: _____  Document #: _____  Expiration Date (if any): ___/___/___

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|

NOTE: This is the 1991 edition of the Form I-9 that has been rebranded with a current printing date to reflect the recent transition from the INS to DHS and its components.

Form I-9 (Rev. 05/31/05)Y Page 2

---

GAO-05-813 Immigration Enforcement

**No-Match Cert. Admin. Record 556**

Appendix I: Employment Eligibility
Verification Form (Form I-9)

## LISTS OF ACCEPTABLE DOCUMENTS

| LIST A | | LIST B | | LIST C |
|---|---|---|---|---|
| Documents that Establish Both Identity and Employment Eligibility | **OR** | Documents that Establish Identity | **AND** | Documents that Establish Employment Eligibility |

| LIST A | LIST B | LIST C |
|---|---|---|
| 1. U.S. Passport (unexpired or expired) | 1. Driver's license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address | 1. U.S. social security card issued by the Social Security Administration (other than a card stating it is not valid for employment) |
| 2. Certificate of U.S. Citizenship (Form N-560 or N-561) | | |
| 3. Certificate of Naturalization (Form N-550 or N-570) | 2. ID card issued by federal, state or local government agencies or entities, provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address | 2. Certification of Birth Abroad issued by the Department of State (Form FS-545 or Form DS-1350) |
| 4. Unexpired foreign passport, with I-551 stamp or attached Form I-94 indicating unexpired employment authorization | | |
| 5. Permanent Resident Card or Alien Registration Receipt Card with photograph (Form I-151 or I-551) | 3. School ID card with a photograph | 3. Original or certified copy of a birth certificate issued by a state, county, municipal authority or outlying possession of the United States bearing an official seal |
| | 4. Voter's registration card | |
| 6. Unexpired Temporary Resident Card (Form I-688) | 5. U.S. Military card or draft record | |
| 7. Unexpired Employment Authorization Card (Form I-688A) | 6. Military dependent's ID card | 4. Native American tribal document |
| | 7. U.S. Coast Guard Merchant Mariner Card | |
| 8. Unexpired Reentry Permit (Form I-327) | 8. Native American tribal document | 5. U.S. Citizen ID Card (Form I-197) |
| | 9. Driver's license issued by a Canadian government authority | |
| 9. Unexpired Refugee Travel Document (Form I-571) | **For persons under age 18 who are unable to present a document listed above:** | 6. ID Card for use of Resident Citizen in the United States (Form I-179) |
| 10. Unexpired Employment Authorization Document issued by DHS that contains a photograph (Form I-688B) | 10. School record or report card | 7. Unexpired employment authorization document issued by DHS (other than those listed under List A) |
| | 11. Clinic, doctor or hospital record | |
| | 12. Day-care or nursery school record | |

**Illustrations of many of these documents appear in Part 8 of the Handbook for Employers (M-274)**

Form I-9 (Rev. 05/31/05)Y Page 3

**No-Match Cert. Admin. Record  557**

# Appendix II: Scope and Methodology

To determine how the employment eligibility verification (Form I-9) process functions, we examined laws related to the employment verification process, including the Immigration Reform and Control Act of 1986 and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996; federal regulations on the Form I-9 process; and former U.S. Immigration and Naturalization Service (INS) guidance on the Form I-9, such as the *Handbook for Employers*, which provides instructions for completing the form. We evaluated this information to identify the Form I-9 requirements, including employer and employee responsibilities for completing the form, and challenges to meeting those requirements. We examined our past reports and other studies, such as the 1997 U.S. Commission on Immigration Reform Report to Congress, to obtain further information on the employment verification process. We analyzed former INS plans for addressing Form I-9 challenges, including its plans to modify the list of acceptable work eligibility documents. We also examined U.S. Immigration and Customs Enforcement's (ICE) interim guidelines on the electronic Forms I-9 to determine what guidance, if any, they provide to employers using the electronic form.

To determine challenges to the Form I-9 process and obtain information on the Basic Pilot Program, we also interviewed and obtained information from U.S. Citizenship and Immigration Services (USCIS), ICE, and Social Security Administration (SSA) officials. In addition, we interviewed representatives of 23 employers; 12 employer, employee, and advocacy groups; and 6 immigration experts to obtain their views on employment verification and worksite enforcement.[1] We selected the employers to interview based on a mix of the following criteria: the total number of Basic Pilot Program queries; the total number or percentage of pilot program queries that resulted in authorized employment, tentative nonconfirmations, and final nonconfirmations; geographic proximity to the ICE field offices we visited; previous records of being sanctioned for Form I-9 violations; and industry categorization. The 23 employers we interviewed were located in the following states: California, Illinois, Michigan, New Jersey, New York, and Texas. The 23 employers were also part of the following industries: meat processing, transportation, health care, landscaping, manufacturing, accommodation, food services, agriculture, janitorial and maintenance, temporary employment, critical infrastructure, local government, and newspaper.

---

[1]According to Department of Labor data, there were about 5.6 million employer firms in the United States in 2002, the year for which the most current data are available.

No-Match Cert. Admin. Record 558

One of the employers we interviewed did not participate in the Basic Pilot Program. As a result, when we discuss employers' views on the Basic Pilot Program, we refer to the views of the 22 employers we interviewed who participated in the Basic Pilot Program.

We selected the 9 employer and employee associations with which to meet based on a mix of criteria, including industry categorization, gross output by industry in 2002, number of paid employees by industry in 2002, and estimates of the number of illegal immigrants employed by industry.[2] We interviewed officials from employer and employee associations in the following industries: construction, agriculture, accommodation, food services, retail, health care, and meat. We selected the 3 advocacy groups to interview based on the groups' interest in issues related to employment verification and worksite enforcement efforts and interviewed officials from advocacy groups that represent a range of views on these issues. We selected the 6 immigration experts to interview based on the experts' range of views on immigration issues. We analyzed information from these agencies, employers, groups, and experts to determine their views on the Form I-9 process and difficulties in verifying work eligibility through the process. We used information obtained from employers, employer and employee associations, and advocacy groups only as anecdotal examples, as information from these entities cannot be generalized to all employers and groups in the United States.

Furthermore, we evaluated information from USCIS and SSA on the Basic Pilot Program, including the Basic Pilot Program user's manual and memorandum of understanding for employers, to determine how the pilot program functions and how it might assist participating employers in reliably verifying employees' work eligibility and in detecting counterfeit documents. We analyzed this information to determine ongoing challenges in implementing the Basic Pilot Program and ways these challenges could affect increased or mandatory use of the pilot program. We did not evaluate security measures in place for the Basic Pilot Program or the program's vulnerability to security risks. To identify pilot program challenges, we examined the findings and methodology of the evaluation of the Basic Pilot Program completed by the Institute for Survey Research at Temple University and Westat in June 2002. In addition, we analyzed

---

[2]At the time of selection, 2002 data on gross output by industry from the Bureau of Economic Analysis, Department of Commerce were the most current data available. Also, the most recent data available on the total number of paid employees by industry from the U.S. Census Bureau, Department of Commerce were from 2002.

No-Match Cert. Admin. Record  559

data on employer participation in and use of the Basic Pilot Program, including data on Basic Pilot Program employment authorizations, to determine how participation and use have changed since fiscal year 2000. We assessed the reliability of these data by reviewing them for accuracy and completeness, interviewing agency officials knowledgeable about the data, and examining documentation on how the data are entered, categorized, and verified in the databases. We determined that the independent evaluation and these data were sufficiently reliable for the purposes of our review.

To obtain information on the implementation of the worksite enforcement program, we interviewed officials from ICE, the SSA Office of the Inspector General, the Department of Labor, the Federal Bureau of Investigation, and the Office of Special Counsel for Immigration-Related Unfair Unemployment Practices. We also interviewed officials from 12 of the 26 ICE Special Agent in Charge field offices. We met with officials from the following 8 field offices: Los Angeles and San Diego, California; Chicago, Illinois; Detroit, Michigan; Newark, New Jersey; New York City, New York; and Houston and San Antonio, Texas. We spoke with officials from the following 4 field offices over the telephone: Denver, Colorado; Miami, Florida; Buffalo, New York; and Seattle, Washington. We selected the 12 field offices based on a mix of the following criteria: the number of investigators in each field office in fiscal year 2003, the number of investigations conducted by each field office in fiscal year 2003,[3] the estimated number of undocumented immigrants in the state in which each field office was located, the number of sanctions issued to employers as a result of closed cases located in the same city as the field office between calendar years 1986 and 2000,[4] the number of critical infrastructure operations in which the field office participated from October 2001 through April 2004, the number of employers located in the same city as the field office that participated in the Basic Pilot Program, and geographic area. We also interviewed officials from 4 U.S. Attorney's Offices that were located in the same areas as 4 of the field offices we visited. We met with officials from the following 3 U.S. Attorney's Offices:

---

[3]At the time of selection, the most current data available on the number of investigators in each field office and the number of investigations conducted by each field office were from fiscal year 2003.

[4]At the time of selection, the most current data available on the number of sanctions issued to employers located in the same city as the field offices were from calendar years 1986 through 2000.

No-Match Cert. Admin. Record  560

the Southern District of New York U.S. Attorney's Office; the Southern District of Texas U.S. Attorney's Office; and the Western District of Texas U.S. Attorney's Office. We spoke with the Southern District of California U.S. Attorney's Office over the telephone. We used information obtained from the field offices only as anecdotal examples, as information from these entities cannot be generalized to all field offices in the United States.

We analyzed ICE headquarters and field office guidance, memos, and other documents on worksite enforcement to evaluate ICE's priorities for and management of worksite enforcement efforts and to identify any challenges in program implementation. We analyzed ICE's April 2005 Interim Strategic Plan to determine ICE's strategy for its worksite enforcement program. We also examined former INS guidance and strategies and other studies, such as reports from the Department of Justice Office of the Inspector General, to determine how worksite enforcement priorities, implementation, and challenges have evolved.

In addition, we separately analyzed ICE and INS data on the worksite enforcement program and assessed their validity and reliability by reviewing them for accuracy and completeness, interviewing agency officials knowledgeable about the data, and examining documentation on how the data are entered, categorized, and verified in the databases. We determined that the data from each agency were sufficiently reliable for the purposes of our review. However, we could not compare the INS and ICE data because, following the creation of ICE in March 2003, the case management system used to enter and maintain information on immigration investigations changed. With the establishment of ICE, agents began using the legacy U.S. Customs Service's case management system, called the Treasury Enforcement Communications System, for entering and maintaining information on investigations, including worksite enforcement operations. Prior to the creation of ICE, the former INS entered and maintained information on investigative activities in the Performance Analysis System, which captured information on immigration investigations differently than the Treasury Enforcement Communications System.

Additionally, ICE officials indicated that, in a few cases, the INS and ICE data did not completely account for all worksite enforcement operations results. ICE officials told us that agents use judgment in categorizing cases entered into both systems and there are a limited number of instances in which agents did not appropriately categorize cases. For example, ICE officials told us that, in reviewing worksite enforcement cases in the ICE

No-Match Cert. Admin. Record 561

system for fiscal year 2004, they found a few cases that agents inappropriately categorized as worksite enforcement.

To determine the investigative agent work-years, or full-time equivalents, that INS spent on the worksite enforcement program for each fiscal year from 1999 through 2003, we divided the total hours INS reported spending on employer investigations by the total hours spent on all investigations, including agent hours spent on leave, training, and other administrative and noninvestigative work. We then multiplied this result by 2,080 hours, which constitute one work-year, to determine the number of work-years spent on worksite enforcement.

We conducted our work from September 2004 through July 2005 in accordance with generally accepted government auditing standards.

**No-Match Cert. Admin. Record  562**

# Appendix III: Information on the Electronic Form I-9

In October 2004, Congress authorized the electronic Form I-9 to be implemented by the end of April 2005.[1] ICE has provided interim guidelines for using electronic Forms I-9, until the agency issues final regulations on their use. The interim guidelines specify that employers will have options for completing, signing, storing, and presenting for inspection electronic Forms I-9. For example, the guidelines note that employers may choose to complete Forms I-9 on paper and store the forms electronically or they may choose to both electronically complete and store Forms I-9. The guidelines also state that electronic signatures could be generated through various technologies such as electronic signature pads, personal identification numbers, biometrics, and dialog boxes. The guidelines also state that employers could use electronic storage systems to retain Forms I-9 that include quality assurance steps to prevent and detect the unauthorized creation, addition, alteration, deletion, or deterioration of electronically stored data. In addition, employers may consider an electronic storage system that includes an indexing system and ability to reproduce legible and readable hard copies of electronically stored forms.

---

[1] P.L. 108-390.

**No-Match Cert. Admin. Record  563**

# Appendix IV: Data on Employer Participation in and Use of the Basic Pilot Program

Employer participation in and use of the Basic Pilot Program has generally increased. Between fiscal years 2002 and 2004, the number of employers actively using the Basic Pilot Program increased from 1,205 to 2,305. In addition, as shown in figure 6, the number of total queries processed through the Basic Pilot Program has generally increased since fiscal year 2000.

**Figure 6: Number of Basic Pilot Program Queries Run by Participating Employers for Each Fiscal Year from 2000 through 2004**



Source: GAO analysis of data from U.S. Citizenship and Immigration Services.

Note: Data have been rounded to the nearest thousand.

As shown in figure 7, the majority of Basic Pilot Program queries that resulted in employment authorizations for each fiscal year from 2000 through 2004 were issued by SSA.

GAO-05-813 Immigration Enforcement

**No-Match Cert. Admin. Record 564**

Appendix IV: Data on Employer Participation
in and Use of the Basic Pilot Program

**Figure 7: Number of Basic Pilot Program Queries that Resulted in Employment Authorizations for Each Fiscal Year from 2000 through 2004**



Source: GAO analysis of data from U.S. Citizenship and Immigration Services.

Note: Data have been rounded to the nearest hundred.

No-Match Cert. Admin. Record  565

# Appendix V: Comments from the Department of Homeland Security



U.S. Department of Homeland Security
Washington, DC 20528

**Homeland Security**

August 26, 2005

Richard M. Stana
Director, Homeland Security
and Justice Issues
Government Accountability Office
Washington, DC 20548

Dear Mr. Stana:

　　Re: Draft Report GAO-05-813, Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts.

Thank you for the opportunity to review the draft report. The following represents the Departmental response to the recommendations contained in the draft report.

**Recommendation:** To strengthen the current employment verification process, GAO recommends the Secretary of Homeland Security take the following Action:

- Set a specific timeframe for completing the department's review of the Form I-9 process, including an assessment of the possibility of reducing the number of acceptable work eligibility documents, and issuing final regulations on changes to the Form I-9 process and an updated Form I-9.

**Response:** Concur. The Department's Immigration and Customs Enforcement (ICE) agrees that a timeframe should be established to assess the possibility of reducing the number of acceptable work eligibility documents for the I-9 Form.

**Recommendation:** To assist Congress and U.S. Citizenship and Immigration Services (USCIS) in assessing the possibility of increased or mandatory use of the Basic Pilot Program, GAO recommends the Secretary of Homeland Security direct the Director of USCIS to take the following action:

- Include, in the planned evaluation of the Basic Pilot Program, an assessment of the feasibility and costs of addressing the Basic Pilot Program's current weaknesses, including its inability to detect identity fraud in the verification and re-verification processes, delays in entry of new arrival and employment authorization information into DHS databases, employer noncompliance with program procedures, and resources needed to support any increased or mandatory use of the program.

**Response:** Generally Concur. The Basic Pilot Program has the potential to enhance the verification process and substantially reduce document fraud. The testing of alternative pilots and

www.dhs.gov

GAO-05-813 Immigration Enforcement
**No-Match Cert. Admin. Record  566**

continuous improvements to the Basic Pilot has collectively made a step toward developing workable alternatives to enhance the employment verification process. Furthermore, it has been important to test and evaluate alternative employment verification systems before creating an expensive new mandatory national employment verification system. USCIS concurs with GAO's recommendation concerning USCIS' upcoming evaluation of the Basic Pilot Program. The evaluation, which will begin in the fall of 2005, will evaluate the new Web-based access method to determine the extent to which it resolves the deficiencies found in the computer and modem access method evaluated earlier. The assessment also will address why some employers appear to have more problems following proper pilot procedures than others. In addition, the evaluation will address the feasibility and cost accuracy of the pertinent databases.

**Recommendation:** To assist Congress and ICE in determining the resources needed for the worksite enforcement program and to help ensure the efficient and effective use of program resources, GAO recommends the Secretary of Homeland Security direct the Assistant Secretary for ICE to take the following two actions:

- Establish additional output goals and measures for the worksite enforcement program to clearly indicate the target level of ICE worksite enforcement activity and the resources needed to implement the program, and

- Set a specific timeframe for completing the assessment and development of outcome goals and measures for the worksite enforcement program to provide a target level of performance for worksite enforcement efforts and measures to assess the extent to which program results have met program goals.

**Response:** Concur. ICE Office of Investigations will proceed with the recommendation to establish additional goals and measures for the worksite enforcement program to more clearly indicate ICE's target level of activity, based on current resources and mandates. The established goals and measures also will address the needed resources to implement the program and achieve the target level of activity. The Office of Investigations will establish a timeframe for completing the assessment and development of outcome goals and measures for the worksite enforcement program.

We thank you again for the opportunity to review the report and provide comments.

Sincerely,

Steven J. Pecinovsky
Director
Departmental GAO/OIG Liaison Office

**No-Match Cert. Admin. Record 567**

# Appendix VI: GAO Contact and Staff Acknowledgments

| GAO Contact | Richard M. Stana (202) 512-8777 |
|---|---|
| **Staff Acknowledgments** | In addition to the contact named above, Orlando Copeland, Michele Fejfar, Ann H. Finley, Rebecca Gambler, Kathryn Godfrey, Charles Michael Johnson, Eden C. Savino, and Robert E. White made key contributions to this report. |

No-Match Cert. Admin. Record 568

| GAO's Mission | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|

**Obtaining Copies of GAO Reports and Testimony**

The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates."

**Order by Mail or Phone**

The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:

U.S. Government Accountability Office
441 G Street NW, Room LM
Washington, D.C. 20548

To order by Phone:  Voice:  (202) 512-6000
                    TDD:    (202) 512-2537
                    Fax:    (202) 512-6061

**To Report Fraud, Waste, and Abuse in Federal Programs**

Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470

**Congressional Relations**

Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400
U.S. Government Accountability Office, 441 G Street NW, Room 7125
Washington, D.C. 20548

**Public Affairs**

Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800
U.S. Government Accountability Office, 441 G Street NW, Room 7149
Washington, D.C. 20548