# OFFICE OF
# THE INSPECTOR GENERAL

## SOCIAL SECURITY ADMINISTRATION

### USEFULNESS OF DECENTRALIZED
### CORRESPONDENCE IN FOCUSING
### EMPLOYER-ASSISTANCE ACTIVITIES

**September 2005**          **A-03-05-25007**

# AUDIT REPORT



# Mission

We improve SSA programs and operations and protect them against fraud, waste, and abuse by conducting independent and objective audits, evaluations, and investigations. We provide timely, useful, and reliable information and advice to Administration officials, the Congress, and the public.

# Authority

The Inspector General Act created independent audit and investigative units, called the Office of Inspector General (OIG). The mission of the OIG, as spelled out in the Act, is to:

- Conduct and supervise independent and objective audits and investigations relating to agency programs and operations.
- Promote economy, effectiveness, and efficiency within the agency.
- Prevent and detect fraud, waste, and abuse in agency programs and operations.
- Review and make recommendations regarding existing and proposed legislation and regulations relating to agency programs and operations.
- Keep the agency head and the Congress fully and currently informed of problems in agency programs and operations.

To ensure objectivity, the IG Act empowers the IG with:

- Independence to determine what reviews to perform.
- Access to all information necessary for the reviews.
- Authority to publish findings and recommendations based on the reviews.

# Vision

By conducting independent and objective audits, investigations, and evaluations, we are agents of positive change striving for continuous improvement in the Social Security Administration's programs, operations, and management and in our own office.

# *Executive Summary*

## OBJECTIVE

Our objective was to determine whether employee addresses within the Social Security Administration's (SSA) Decentralized Correspondence (DECOR) file can provide useful information to strengthen the Agency's employer-assistance activities.

## BACKGROUND

The purpose of the DECOR process is to contact employees and employers to resolve Social Security number (SSN) and/or name discrepancies on reported earnings. Such earnings are posted to the Agency's Earnings Suspense File (ESF) until the discrepancies can be resolved. The DECOR letter provides the wage earner with information about the reported name/SSN and wage amount, and requests that the reported information be reviewed, verified or corrected where possible, and returned. While SSA sends most of the DECOR letters to employees, SSA also sends a letter to the employer when an employee's address is unavailable. SSA uses the replies to resolve the earnings discrepancies. For Tax Year (TY) 2002, SSA mailed approximately 9.5 million DECOR letters, relating to approximately $60.4 billion in wages, to employees and employers. Approximately 7.6 million of these letters were sent directly to employees.

## RESULTS OF REVIEW

Our review of the TY 2002 DECOR employee file indicates that employees living in 10 States represent 72 percent of the items in the file, even though these States represent about 48 percent of the national workforce. We also found inconsistencies in the volume of suspended wage items for particular States when compared to those States' share of the national workforce. For example, while the State of California has 11 percent of the Nation's workforce, it represents about 30 percent of the suspended items in the file.

Our audit also indicates that SSA's strategy for assisting employers with wage reporting problems may not sufficiently account for the diffusion of reporting problems throughout the country. The Agency aligns its Employer Service Liaison Officer (ESLO) activities on a regional basis, and identifies the employers located in each region by using the payroll address of each employer. However, an employer operating in multiple States may have its most significant problems in another part of the country. For example, we identified an employer with a payroll address in Texas being assisted by the Dallas-based ESLO, and yet the majority of the employees with suspended wage items resided in California under the jurisdiction of a different ESLO.

Finally, we found problematic national trends, including valid SSNs being misused hundreds of times in multiple States and the same employee address being used by thousands of individuals. In 11 cases, a valid SSN was used more than 400 times by various individuals during TY 2002. For instance, we found 1 case where a valid SSN belonging to a child was used to report 742 wage items by individuals residing in 42 different States. These trends should be of interest to SSA in its efforts to reduce the size of the ESF as well as protect the integrity of the SSN.

## CONCLUSION AND RECOMMENDATIONS

The DECOR employee file provides a useful profile of the employers submitting wage reports with name/SSN mismatches. By using the address information, the Agency's ESLOs can learn more about the specific problems of employers within their jurisdiction. Furthermore, by knowing specifically where DECOR letters are mailed, the Agency can better target its employer outreach efforts. Finally, potential SSN misuse and other trends can be proactively monitored by the Agency as it attempts to protect the integrity of the SSN.

To improve the focus of the Agency's employer-assistance activities and protect the integrity of the SSN and associated earnings postings, we recommend SSA:

- Consider using addresses in the DECOR employee file to enhance coordination among ESLOs when the employer wage reporting problems relate to multiple regions around the country.

- Consider using addresses in the DECOR employee file to identify relevant trends among employees with suspended wages and focus ESLO efforts.

- Review and correct the earnings record of the child noted in this report, as well as the earnings records related to the remaining 10 valid SSNs misused more than 400 times.

## AGENCY COMMENTS

SSA agreed with our recommendations. The full text of SSA's comments is included in Appendix G.

# *Table of Contents*

**Page**

**INTRODUCTION**................................................................................................1

**RESULTS OF REVIEW** ..................................................................................3

Suspended Wage Items by Employee Address .......................................3

Employer Service Liaison Officer's Coverage .........................................5

Other Trends Among the Suspended Wage Items.................................7

- Frequently Misused Social Security Numbers ...............................7

- Frequent Addresses .................................................................8

**CONCLUSIONS AND RECOMMENDATIONS**.................................................10

**APPENDICES**

**APPENDIX A** – Acronyms

**APPENDIX B** – Decentralized Correspondence Flowchart

**APPENDIX C** – Scope and Methodology

**APPENDIX D** – Ranking of States by Suspended Wage Items and State Workforce

**APPENDIX E** – Prior OIG Report Ranking of States by Total Suspended Wage Items

**APPENDIX F** – Additional Analysis on the Decentralized Correspondence Employer File

**APPENDIX G** – Agency Comments

**APPENDIX H** – OIG Contacts and Staff Acknowledgments

# *Introduction*

## OBJECTIVE

Our objective was to determine whether employee addresses within the Social Security Administration's (SSA) Decentralized Correspondence (DECOR) file can provide useful information to strengthen the Agency's employer-assistance activities.

## BACKGROUND

Title II of the Social Security Act requires that SSA maintain the reported earnings records of individuals.[1] SSA uses these reported earnings to determine whether an individual is entitled to receive retirement, survivors, disability and health insurance benefits and to calculate benefits. SSA validates the names and Social Security numbers (SSN) on the *Wage and Tax Statement* (Form W-2) against information in its records. Earnings containing names and/or SSNs that do not match SSA's records cannot be posted to an individual's earnings record in SSA's Master Earnings File (MEF).[2] Instead, these wages are placed in SSA's Earnings Suspense File (ESF)—a repository for unmatched wages. As of October 2004, the ESF had accumulated about $463 billion in wages and 246 million wage items for Tax Years (TY) 1937 through 2002 that could not be posted to individuals' earnings records. Accumulation over TYs 1993 through 2002 accounts for $322 billion of the $463 billion in suspended wages, or 70 percent.[3]

The purpose of the DECOR process is to contact employees and employers to resolve SSN and/or name discrepancies on wage items stored in the ESF. The letter provides the wage earner with information about the reported name/SSN and wage amount, and requests that the reported information be reviewed, verified or corrected where possible, and returned. While SSA sends most of the DECOR letters to employees,[4] SSA sends a letter to the employer when an employee's address is incomplete or incorrect.[5] SSA

---

[1] The Social Security Act § 205(c)(2)(A), 42 U.S.C. § 405(c)(2)(A).

[2] The MEF contains all earnings data reported by employers and self-employed individuals. The data is used to calculate the Social Security benefits due an individual with an earnings record.

[3] These numbers relate to wages reported by employers and not self-employment income. SSA maintains a separate ESF file for suspended self-employment income.

[4] SSA uses employee addresses reported on the W-2.

[5] SSA uses the employer address related to the Employer Identification Number (EIN) reported on the W-2. The EIN is a 9-digit number assigned by the Internal Revenue Service (IRS) to sole proprietors, corporations, partnerships, estates, trusts, and other entities for tax filing and reporting purposes. The employer address related to the EIN is provided by the IRS.

uses the responses to resolve the earnings discrepancies. For TY 2002,[6] SSA mailed approximately 9.5 million DECOR letters, relating to approximately $60.4 billion in wages, to employees and employers.[7] See appendices B and F for more background on the DECOR letters. Approximately 7.6 million DECOR letters were sent to employees and another 1.9 million letters were sent to employers (see Table 1). Furthermore, our analysis of the entire TY 2002 DECOR file showed there were about 884,000 specific employers in this file.

### Table 1: Breakout of the Tax Year 2002 DECOR File

| File Contents | Wage Items | Wages | Percent of Items Per File |
|---|---|---|---|
| Employee File | 7.6 million | $49.8 billion | 80 |
| Employer File | 1.9 million | $10.6 billion | 20 |
| Total | 9.5 million | $60.4 billion | 100 |

We analyzed the 9.5 million wage items contained in the TY 2002 DECOR file and determined that approximately 9 million (94 percent) of these wage items were related to TY 2002, while the remainder related to prior TYs. For example, approximately 264,000 wage items related to TY 2001 (see Table 2).

### Table 2: Reported Tax Years in the Entire DECOR File

| Tax Year | Number of Wage Items | Volume of Wages |
|---|---|---|
| 2002 | 8,992,179 | $57.6 billion |
| 2001 | 264,477 | $1.4 billion |
| 2000 | 130,689 | $.8 billion |
| 1978-1999 | 142,266 | $.6 billion |
| Blank | 278 | $.004 billion |
| Total | 9,529,889 | $60.4 billion |

Note: Blank indicates that there was no tax year associated with these wage items.

---

[6] Although the letters were mailed during Calendar Year (CY) 2003, the majority of these wage items related to TY 2002. As a result, we will refer to this file as a "TY 2002" file in this report. We reviewed the TY 2002 DECOR mailer file since that was the most recent file available at the time of our review.

[7] Our report does not discuss self-employment income nor the letters sent to individuals with suspended self-employment income. During CY 2003, SSA sent approximately 131,000 letters to individuals with suspended self-employment income.

# *Results of Review*

Our review of the TY 2002 DECOR employee file indicates that employees living in 10 States represent 72 percent of the items in the file, even though these States represent about 48 percent of the national workforce. We also found inconsistencies in the volume of suspended wage items for particular States when compared to those States' share of the national workforce. For example, while the State of California has 11 percent of the Nation's workforce, it represents about 30 percent of the suspended items in the file. Our audit also indicates that SSA's strategy for assisting employers with wage reporting problems may not sufficiently account for the diffusion of reporting problems throughout the country. The Agency aligns its Employer Service Liaison Officer (ESLO) activities on a regional basis using the payroll address of an employer. However, an employer operating in multiple States may have its most significant problems in another part of the country. For example, we identified an employer with a payroll address in Texas being assisted by the Dallas-based ESLO, and yet the majority of the employees with suspended wage items resided in California under the jurisdiction of a different ESLO. Finally, we found problematic national trends, including valid SSNs being misused hundreds of times in multiple States and the same employee address being used by thousands of individuals. In 11 cases, a valid SSN was used more than 400 times by various individuals during TY 2002. For instance, we found 1 case where a valid SSN belonging to a child was used to report 742 wage items by individuals residing in 42 different States. These trends should be of interest to SSA in its efforts to reduce the size of the ESF as well as protect the integrity of the SSN.

## SUSPENDED WAGE ITEMS BY EMPLOYEE ADDRESS

Our analysis identified the States with employees contributing the highest number of items to the DECOR employee file.[8] The top 10 States[9] accounted for 72 percent of the TY 2002 DECOR letters sent to employees even though they represent about 48 percent of the national workforce as shown in Table 3 (see Appendix D for a ranking of all 50 States and the District of Columbia). When we compared these 10 States to the top 10 States in terms of total workforce, we found inconsistencies in the volume of suspended wage items for particular States when compared to those States' share of the national workforce. For example, while the State of California has 11 percent of the Nation's workforce, it represents about 30 percent of the suspended items in the file. However, in the case of New York, the State had about half the expected proportion of

---

[8] This analysis was based on DECOR letters sent to employees in the 50 States plus the District of Columbia; or about 80 percent of all suspended wage items. We reviewed the DECOR employee file since it contained the employees' addresses. As we noted earlier, SSA will send a letter to an employer when it lacks a valid address for the employee. Since items in the DECOR employee file represent ESF wage items, our findings should directly correlate with the contents of the TY 2002 ESF. See Appendix F for more on the DECOR letters sent to employers.

[9] In our analysis of the 20 percent of DECOR notices sent to employer addresses we found that the same 10 States were predominant.

---

*Usefulness of DECOR in Focusing Employer-Assistance Activities (A-03-05-25007)*    *3*

suspended items when compared to its percent of the national workforce, and Georgia had the same suspended item and workforce percentages.

**Table 3:  Comparison of the Top Ten States Ranking
of Suspended Wages Items and National Workforce**
(Based on a Review of the Tax Year 2002 DECOR Employee File)

| States [1] | Ranking in Terms of Wage Items | Percent of DECOR Notices | Ranking in Terms of State Workforce | Percent of the National Workforce [2] |
|---|---|---|---|---|
| California | 1 | 29.7 | 1 | 11.0 |
| Texas | 2 | 9.6 | 2 | 7.0 |
| Florida | 3 | 6.8 | 4 | 5.7 |
| Illinois | 4 | 6.2 | 6 | 4.3 |
| New Jersey | 5 | 4.0 | 9 | 3.1 |
| New York | 6 | 3.4 | 3 | 6.6 |
| Arizona | 7 | 3.3 | 21 | 1.8 |
| North Carolina | 8 | 3.2 | 10 | 3.0 |
| Washington | 9 | 3.2 | 15 | 2.2 |
| Georgia | 10 | 3.0 | 11 | 3.0 |
| Totals | | 72.4% | | 47.7% |

Notes:  (1) Our analysis does not include DECOR letters sent to Guam, Puerto Rico, American Samoa, Virgin Islands, Marshall Islands, and overseas addresses related to the Armed Forces.  A total of 4,397 letters related to these locations.

(2) State workforce statistics were taken from *State Statistics*, Office of Policy, SSA, December 2003, http://mwww.ba.ssa.gov/policy/docs/quickfacts/state_stats/.

We also noticed differences in the State rankings in the DECOR employee file compared to the national workforce.  These differences could be attributed to a number of factors, including the type of industries predominant in each State as well the level of unauthorized work and SSN misuse.[10]  As we have noted in our earlier review of this area, the three industries contributing the highest number of items to the ESF include agriculture, restaurants and services.[11]  SSA has previously stated that many suspended items involve the agricultural industry, which has transient employees who

---

[10] For example, the State of Arizona's ranking in the DECOR employee notices was much higher than its ranking by State workforce.  According to a March 2005 report from the Pew Hispanic Center, *Estimates of the Size and Characteristics of the Undocumented Population*, Arizona is now among the States with the largest number of undocumented migrants (approximately 500,000 out of a 10 million undocumented migrant population for 2002 through 2004).  In addition, a February 2005 Federal Trade Commission report entitled, *National and State Trends in Fraud & Identity Theft*, lists the Phoenix-Mesa-Scottsdale area in Arizona as the number one major metropolitan statistical area in the United States for identity theft (out of 49 major metropolitan areas).

[11] SSA OIG, *Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001* (A-03-03-13048), October 2004.

may not have work-authorization from the Department of Homeland Security.[12]  Other high turnover industries, such as fast food, restaurants and other service industries, have similar profiles.  Frequent job and residential changes are not uncommon with members of these workforces.  These actions complicate name/SSN correction efforts when recontacts are necessary.

## EMPLOYER SERVICE LIAISON OFFICER'S COVERAGE

Some of the other trends we noticed in the DECOR employee file, such as the distribution of an employer's workers across multiple States, should be of interest to SSA in terms of understanding the source of wage items going into the ESF.  SSA provides assistance to employers through ESLOs located in 10 regions throughout the United States.  The ESLOs (1) answer employers' questions on wage reporting submissions; (2) encourage employers to use SSA's various programs, such as the Employee Verification Service; (3) conduct wage-reporting seminars, in partnership with the IRS; and (4) contact employers with significant suspended wage items in their regions.

Since 1996, SSA's Office of Public Service and Operations Support has developed a national listing of employers, who submit 100 or more suspended wage items.  The listing uses the employer's address related to the EIN to determine the relevant region.  These lists are sent to regional ESLOs for follow-up contacts with the employers.  SSA does not direct the ESLOs to contact specific employers or follow up with the ESLOs regarding what contacts were made and the results of the contacts.[13]

We reviewed the DECOR employer letters sent to five Texas-based employers highlighted in an earlier audit for having a large number of suspended wages items.[14]  We determined that three of the five employers had more than half of their employee problems fall outside Region VI,[15] thereby falling under the jurisdiction of another ESLO (see Table 4).  SSA sent 2,082 DECOR letters to employees of one these companies, of which 1,959 (or 90.1 percent) were sent to employees who resided outside of Region VI.  Again, this distribution of an employer's workforce problems may call for greater coordination between the ESLO in Region VI and other relevant ESLOs.

---

[12] SSA OIG, *Status of the Social Security Administration's Earnings Suspense File* (A-03-03-23038), November 2002.

[13] In our discussions with SSA staff we learned that some ESLO regions are still sending out large volumes of correspondence to employers asking them to correct their wage reports.  We were also told that a few years ago the ESLOs had a concerted effort to contact the employers with more than 100 items in suspense but the response rate from the employers was very low.

[14] SSA OIG, *Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001* (A-03-03-13048), October 2004.

[15] SSA's Region VI includes Arkansas, Louisiana, Oklahoma, New Mexico and Texas.

### Table 4: Review of Five Employers in Texas[1]
(Comparison of Payroll Address and Tax Year 2002 DECOR Employee File Address)

| Employer | Industry | Total Items in DECOR Employee File[2] | Total Items in Region VI | Total Items in Other Regions | Percent in Other Regions |
|----------|----------|------------------------|--------------------------|------------------------------|--------------------------|
| 1 | Services | 27,225 | 5,785 | 21,440 | 78.8 |
| 2 | Services | 13,327 | 5,458 | 7,869 | 59.1 |
| 3 | Services | 3,646 | 3,646 | 0 | 0 |
| 4 | Restaurant | 3,171 | 2,876 | 295 | 9.3 |
| 5 | Services | 2,082 | 206 | 1,876 | 90.1 |

Note: (1) These Texas-based employers were among the Top 100 employers in the United States during TYs 1997-2001. *See* SSA OIG, *Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001* (A-03-03-13048), October 2004.
(2) Our comparison is based on the suspended wage items in the DECOR employee file, where employee addresses were available. Each employer above had at least 83 percent of their overall suspended wage items in the employee file.

The above comparison indicates that an ESLO with a full understanding of the wage item distribution throughout the country could be in a better position to assist an employer and pinpoint potential weaknesses in its payroll process. For instance, employer #5 in Table 4 above with 90.1 percent of the letters mailed to employees who reside outside Region VI may want to know which States in particular have employees with mismatched names and SSNs. If the ESLO had the same information we used as part of this audit, he or she could share with this employer the fact that most of the problems relate to California-based employees (see Figure 1). We spoke to the Dallas Region ESLO about our findings and she stated that this employee information could assist her in her discussions with employers and/or other ESLOs around the country.

### Figure 1: Distribution of Employee Addresses
### Related to Texas-Based Employer #5 (from Table 4)



Note: The Other category includes 26 States with 72 or fewer items per State.

By using the employee address information, SSA can learn more about the suspended wage items than simply the employer's payroll address and determine those regions experiencing the highest volume of wage reporting problems. As a result, we believe that this DECOR information can assist ESLOs in targeting areas of the country in need

of additional education or special programs/pilots.  For example, SSA may want to schedule seminars on the Social Security Number Verification System (SSNVS)[16] in those areas of the country where employee mismatches are most frequent.

## OTHER TRENDS AMONG THE SUSPENDED WAGE ITEMS

We also reviewed the DECOR employee file for potential SSN misuse trends across the Nation.  We reviewed both multiple uses of the same SSN by different individuals and duplicate addresses.  These trends should be of interest to SSA in its efforts to ensure employees receive notice of wage reporting problems and protect the integrity of the SSN.

### Frequently Misused Social Security Numbers

In our analysis of the top 100 SSNs appearing most frequently within the DECOR employee file for the entire Nation we determined that 74 of these 100 SSNs were valid SSNs issued by SSA and used during TY 2002 by various individuals throughout the country to report over 21,000 wage items.[17]  Of these valid SSNs, 11 numbers were used more than 400 times.[18]

We profiled 1 of these 11 valid SSNs that appeared in the DECOR employee file and determined that there were 742 uses of this particular SSN reported by 716 employers for individuals residing in 42 different States.[19]  We reviewed SSA's systems and determined that the owner of this SSN is a child who was born in Mexico in September 1991.  Of the 742 wage items reported under this SSN, the State of California accounted for 450 wage items, or 61 percent.[20]  A further review of the ESF for TYs 1998 through 2001 showed that the child's SSN was used over 3,900 times.

We reviewed the child's earnings record to determine how many of the reported wage items may have been posted to his record in the MEF.  We determined that for TYs 1998 through 2003 (when the child was 7 through 12 years of age), there were 15 wage postings related to employers in the restaurant and manufacturing industries, with approximately $126,247 of total earnings posted to the child's record (see Table 5).

---

[16] SSNVS is an on-line service that enables employers and submitters to verify employee names and SSNs with information in SSA's records for the W-2 reporting purposes.

[17] The remaining 26 SSNs were invalid numbers such as 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.

[18] A review of the 11 numberholders' information indicates that 5 of the 11 were born outside of the United States, 5 were born in California, and 1 numberholder was born in Maryland.  Furthermore, the ages of these individuals in TY 2002 ranged from 1 to 65 years of age.

[19] These numbers only relate to the DECOR employee file where we can obtain an employee address. We found that this SSN had been used an additional 177 times in the DECOR employer file related to 168 employers.

[20] Within the State of California, individuals living in the city of Los Angeles used this SSN 159 times.

A review of the W-2s used to report these TY 1998 through 2003 posted wages indicate the earners lived in at least five different addresses within California during this period.[21]

### Table 5: Questionable Postings to Child's Earnings Record

| Tax Year | Age at Time of Posting | Number of Wage Postings | Total Annual Wages Posted |
|---|---|---|---|
| 1998 | 7 | 3 | $30,331 |
| 1999 | 8 | 3 | $25,728 |
| 2000 | 9 | 3 | $24,677 |
| 2001 | 10 | 2 | $31,140 |
| 2002 | 11 | 3 | $10,438 |
| 2003 | 12 | 1 | $3,933 |
| Totals | | 15 | $126,247 |

The above case, as well as the other SSNs used multiple times, represents ongoing SSN misuse within the economy that not only leads to an increase in the size of the ESF, but can also lead to erroneous postings within SSA's records and deterioration in the quality of information in SSA's MEF. In this case, the child's earnings record appears to have postings that will need to be corrected.[22] We referred the above case to SSA staff for additional review to determine if some of the wages need to be removed and placed into the ESF.

**Frequent Addresses**

We reviewed trends related to the most frequently used addresses within the TY 2002 DECOR employee file and determined that 6 of the top 10 most frequently used addresses were located in the State of Florida (see Table 6). In addition, all six of these Florida addresses related primarily to agricultural employers. The remaining four addresses represented the services industry. Of the 15,133 suspended wage items listed below, the State of Florida accounted for 11,122 wage items (or 73.5 percent), with corresponding wages totaling about $19.2 million. The address receiving the highest volume of DECOR letters (Address #1 in Table 6) was a "general delivery"[23] address located in a Florida city known for its farmlands and high population of farmworkers.

---

[21] In addition, some postings were under the same last name as the child, though it is possible the name relates to a family member.

[22] During the Annual Wage Reporting process, SSA checks the Numident for the reported SSN for the date of birth. If the date of birth indicates the numberholder is a child age 6 or younger, the earnings will be identified as a Young Children's Earnings Record item and placed into suspense.

[23] A "General Delivery" address is used when an individual wants his/her mail to be held at a Main Post Office for up to 30 days. The United States Postal Service's website notes that "This is also a great option if you don't have a permanent address."

---

**Table 6:  Frequency of Addresses in TY 2002 DECOR Employee File**

| Address | Location of Address | Industry | Wage Items in ESF (Per Address) | ESF Wages | Number of Employers | Type of Location |
|---|---|---|---|---|---|---|
| 1 | Florida | Agriculture | 3,748 | $2.9 million | 33 | General Delivery |
| 2 | Florida | Agriculture | 2,521 | $5.9 million | 11 | Post Office Box |
| 3 | Florida | Agriculture | 2,261 | $3.3 million | 107 | Post Office Box |
| 4 | Florida | Agriculture | 920 | $2.7 million | 8 | Post Office Box |
| 5 | Florida | Agriculture | 851 | $2.4 million | 4 | Employer Address |
| 6 | Florida | Agriculture | 821 | $1.9 million | 7 | Street Address |
| 7 | California | Services | 1,353 | $6.8 million | 8 | Employer Address |
| 8 | Georgia | Services | 933 | $1.8 million | 16 | Street Address |
| 9 | Tennessee | Services | 914 | $4.7 million | 254 | Employer Address |
| 10 | Kansas | Services | 811 | $4.4 million | 208 | Apartment Building |
| Total | | | 15,133 | $36.8 million | 656 | |

These frequently used addresses indicate that employees may not learn about their suspended earnings since the DECOR letters are being sent to (1) incomplete addresses (i.e. an address missing an apartment unit number), (2) employer addresses, and/or (3) general addresses.  For example, it is possible that some transient workers are using a "general delivery" address while working for a short time in a particular region of the country.

# *Conclusions and Recommendations*

The DECOR employee file provides a useful profile of the employers submitting wage reports with name/SSN mismatches. By using the address information, the Agency's ESLOs can learn more about the specific problems of employers within their jurisdiction. Furthermore, by knowing specifically where DECOR letters are mailed, the Agency can better target its employer outreach efforts. Finally, potential SSN misuse and other trends can be proactively monitored by the Agency as it attempts to protect the integrity of the SSN.

To improve the focus of the Agency's employer-assistance activities and protect the integrity of the SSN and associated earnings postings, we recommend SSA:

1. Consider using addresses in the DECOR employee file to enhance coordination among ESLOs when the employer wage reporting problems relate to multiple regions around the country.

2. Consider using addresses in the DECOR employee file to identify relevant trends among employees with suspended wages and focus ESLO efforts.

3. Review and correct the earnings record of the child noted in this report, as well as the earnings records related to the remaining 10 valid SSNs misused more than 400 times.

## AGENCY COMMENTS

SSA agreed with our recommendations. The full text of SSA's comments is included in Appendix G.

# *Appendices*

*Appendix A*

# Acronyms

| | |
|---|---|
| CY | Calendar Year |
| DECOR | Decentralized Correspondence |
| EDCOR | Educational Correspondence |
| EIN | Employer Identification Number |
| ESF | Earnings Suspense File |
| ESLO | Employer Service Liaison Officer |
| IRS | Internal Revenue Service |
| MEF | Master Earnings File |
| OIG | Office of the Inspector General |
| SSA | Social Security Administration |
| SSN | Social Security Number |
| SSNVS | Social Security Number Verification System |
| TY | Tax Year |
| U.S.C. | United States Code |
| WRPS | Wage Reporting Problem Service |

<u>Forms</u>

| | |
|---|---|
| Form W-2 | *Wage and Tax Statement* |

pace



## Appendix C

# Scope and Methodology

To meet our objective, we performed the following steps:

- Reviewed prior Social Security Administration (SSA) Office of the Inspector General reports related to the Earnings Suspense File (ESF) and inaccurate wage reporting.

- Reviewed applicable Federal laws and regulations, as well as SSA policies and procedures for maintaining individual earnings records and contacting employers with suspended wages.

- Visited the Wilkes-Barre Data Operations Center to perform a walk-through of the Decentralized Correspondence (DECOR) process and review available workload data to determine the overall effectiveness of the DECOR process. We also interviewed SSA staff during the walk-through process to gain a further understanding of the DECOR process.

- Obtained a copy of the DECOR mailer file from SSA related to wage reports submitted during the Tax Year (TY) 2002 reporting period.[1] This file contained 9,529,889 wage items, with a corresponding value of $60.4 billion dollars.[2]

- Analyzed the DECOR file to understand the trends among letters going to employees and employers. For example, we reviewed the employee file to (1) rank the States in terms of the volume of items in the file, (2) identify duplicate addresses and multiple uses of the same SSNs, and (3) determine where employees for specific employers actually resided.

- We obtained State workforce data from SSA's website, compared this workforce data with other sources, and discussed the reliability of these numbers with SSA staff.

- Obtained copies of *Wage and Tax Statements* (Form W-2) from SSA's Office of Central Operations to determine employee addresses for wage items that were not part of our TY 2002 DECOR employee file.

---

[1] Although the majority of the DECOR file related to TY 2002 wages, some wages related to earlier tax years were also reported to SSA during the same period and placed in this file. However, for the purposes of this report, we are referring to the DECOR file as a TY 2002 file.

[2] Earnings items identified as self-employment income for TY 2002 were not included in this population since self-employment data were contained in a separate file.

We found that DECOR data was sufficiently reliable to meet the objectives of our review. Our work was conducted at SSA's Data Operations Center in Wilkes-Barre, Pennsylvania and at SSA Headquarters in Baltimore, Maryland. The fieldwork was conducted between July 2004 and April 2005. The SSA entity responsible for the maintenance of the ESF is the Office of Central Operations within the Office of the Deputy Commissioner of Operations. Our review was conducted in accordance with generally accepted government auditing standards.

# Ranking of States by Suspended Wage Items and State Workforce

**Table D-1:  Comparison of States Ranking
of Suspended Wages Items and National Workforce**
(Based on a Review of the Tax Year 2002 DECOR Employee File)

| States and District of Columbia[1] | Ranking in Terms of Wage Items | Percent of DECOR Notices | Ranking in Terms of State Workforce [2] | Percent of the National Workforce |
|---|---|---|---|---|
| CALIFORNIA | 1 | 29.66 | 1 | 11.01 |
| TEXAS | 2 | 9.64 | 2 | 6.97 |
| FLORIDA | 3 | 6.80 | 4 | 5.68 |
| ILLINOIS | 4 | 6.18 | 6 | 4.33 |
| NEW JERSEY | 5 | 3.99 | 9 | 3.14 |
| NEW YORK | 6 | 3.40 | 3 | 6.55 |
| ARIZONA | 7 | 3.35 | 21 | 1.77 |
| NORTH CAROLINA | 8 | 3.24 | 10 | 2.96 |
| WASHINGTON | 9 | 3.19 | 15 | 2.17 |
| GEORGIA | 10 | 3.00 | 11 | 2.95 |
| COLORADO | 11 | 2.45 | 22 | 1.59 |
| OREGON | 12 | 1.92 | 28 | 1.25 |
| MASSACHUSETTS | 13 | 1.85 | 13 | 2.27 |
| VIRGINIA | 14 | 1.73 | 12 | 2.73 |
| NEVADA | 15 | 1.40 | 35 | 0.73 |
| INDIANA | 16 | 1.25 | 14 | 2.30 |
| TENNESSEE | 17 | 1.21 | 17 | 2.07 |
| MICHIGAN | 18 | 1.19 | 8 | 3.65 |
| MINNESOTA | 19 | 1.13 | 20 | 1.99 |
| MARYLAND | 20 | 1.04 | 19 | 2.05 |
| UTAH | 21 | 1.00 | 34 | 0.80 |
| SOUTH CAROLINA | 22 | 0.99 | 24 | 1.43 |
| WISCONSIN | 23 | 0.94 | 16 | 2.12 |
| PENNSYLVANIA | 24 | 0.90 | 5 | 4.44 |
| OHIO | 25 | 0.87 | 7 | 3.95 |
| CONNECTICUT | 26 | 0.83 | 27 | 1.29 |
| OKLAHOMA | 27 | 0.82 | 29 | 1.20 |
| KANSAS | 28 | 0.72 | 31 | 1.03 |
| ALABAMA | 29 | 0.66 | 23 | 1.49 |
| MISSOURI | 30 | 0.57 | 18 | 2.04 |
| KENTUCKY | 31 | 0.51 | 25 | 1.41 |

| States [1] | Ranking in Terms of Wage Items | Percent of DECOR Notices | Ranking in Terms of State Workforce [2] | Percent of the National Workforce |
|---|---|---|---|---|
| NEW MEXICO | 32 | 0.47 | 37 | 0.60 |
| IDAHO | 33 | 0.45 | 41 | 0.47 |
| ARKANSAS | 34 | 0.36 | 32 | 0.92 |
| RHODE ISLAND | 35 | 0.34 | 43 | 0.40 |
| MISSISSIPPI | 36 | 0.30 | 33 | 0.92 |
| IOWA | 37 | 0.28 | 30 | 1.12 |
| NEBRASKA | 38 | 0.27 | 36 | 0.67 |
| LOUISIANA | 39 | 0.27 | 26 | 1.40 |
| DELAWARE | 40 | 0.18 | 45 | 0.32 |
| DISTRICT OF COLUMBIA | 41 | 0.16 | 49 | 0.24 |
| NEW HAMPSHIRE | 42 | 0.14 | 39 | 0.51 |
| WYOMING | 43 | 0.07 | 51 | 0.20 |
| WEST VIRGINIA | 44 | 0.05 | 38 | 0.58 |
| HAWAII | 45 | 0.05 | 42 | 0.45 |
| MAINE | 46 | 0.04 | 40 | 0.48 |
| ALASKA | 47 | 0.04 | 50 | 0.24 |
| MONTANA | 48 | 0.04 | 44 | 0.34 |
| SOUTH DAKOTA | 49 | 0.03 | 46 | 0.30 |
| VERMONT | 50 | 0.02 | 47 | 0.25 |
| NORTH DAKOTA | 51 | 0.02 | 48 | 0.24 |
| Totals [3] | | 100.0% | | 100.0% |

Notes: (1) Our analysis does not include DECOR letters sent to Guam, Puerto Rico, American Samoa, Virgin Islands, Marshall Islands, and overseas addresses related to the Armed Forces. A total of 4,397 letters related to these locations.
(2) State workforce statistics were taken from *State Statistics*, Office of Policy, SSA, December 2003, http://mwww.ba.ssa.gov/policy/docs/quickfacts/state_stats/.
(3) Percentages may not add to 100 percent due to rounding.

# Prior OIG Report Ranking of States by Total Suspended Wage Items

In prior Office of the Inspector General (OIG) reports[1] we identified the 100 employers responsible for sending the most wage items to the Earnings Suspense File (ESF) during specific Tax Years (TY). We also identified the States represented by these employers, noting that this State address may relate more to payroll issues than the physical location where an employer does most of its business (see Table E-1). For example, in our October 2004 audit covering TYs 1997 to 2001, we stated that 54 of the 100 employers had registered addresses in 3 States – California, Texas, and Illinois – representing almost 1.5 million wage items and over $4.8 billion in wages during TYs 1997 to 2001. California, with 25 employers, had the highest number of Top 100 employers.

**Table E-1: Ranking of States in Terms of Top 100 Employers and Total Suspended Wage Items**

| State | Employers Per State | Ranking By Items | Total Suspended Wage Items | Total Suspended Wages |
|---|---|---|---|---|
| CALIFORNIA | 25 | 1 | 682,506 | $1,992,526,035 |
| TEXAS | 15 | 2 | 401,167 | $1,693,153,169 |
| ILLINOIS | 14 | 3 | 376,731 | $1,177,333,106 |
| FLORIDA | 4 | 4 | 165,594 | $420,648,214 |
| NEW YORK | 2 | 5 | 102,601 | $536,922,065 |
| KENTUCKY | 3 | 6 | 100,452 | $360,311,159 |
| OHIO | 4 | 7 | 90,780 | $323,966,821 |
| GEORGIA | 3 | 8 | 84,025 | $352,544,591 |
| MINNESOTA | 3 | 9 | 83,835 | $362,464,910 |
| MICHIGAN | 2 | 10 | 81,439 | $286,958,774 |
| NEW JERSEY | 3 | 11 | 77,993 | $169,914,341 |
| SOUTH CAROLINA | 2 | 12 | 68,731 | $285,456,146 |
| OKLAHOMA | 1 | 13 | 43,375 | $117,983,189 |
| TENNESSEE | 2 | 14 | 41,282 | $176,646,164 |
| NEW MEXICO | 1 | 15 | 36,455 | $147,551,907 |

---

[1] SSA OIG, *Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items* (A-03-98-31009), September 1999; *Follow-Up Review of Employers with the Most Suspended Wage Items* (A-03-03-13026), October 2003; and *Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001*(A-03-03-13048), October 2004.

| State | Employers Per State | Ranking By Items | Total Suspended Wage Items | Total Suspended Wages |
|---|---|---|---|---|
| KANSAS | 2 | 16 | 35,130 | $161,259,665 |
| WISCONSIN | 2 | 17 | 34,575 | $118,018,390 |
| WASHINGTON | 2 | 18 | 31,651 | $92,689,767 |
| ARIZONA | 2 | 19 | 29,867 | $47,460,216 |
| LOUISIANA | 1 | 20 | 25,175 | $92,689,698 |
| UTAH | 1 | 21 | 24,827 | $67,498,582 |
| ARKANSAS | 1 | 22 | 24,780 | $92,649,911 |
| NEBRASKA | 1 | 23 | 18,852 | $197,524,222 |
| IOWA | 1 | 24 | 18,311 | $112,317,486 |
| OREGON | 1 | 25 | 18,228 | $68,088,754 |
| COLORADO | 1 | 26 | 15,162 | $65,223,596 |
| NORTH CAROLNA | 1 | 27 | 14,838 | $51,128,279 |
| TOTALS | 100 | | 2,728,362 | $9,570,929,156 |

# Additional Analysis on the Decentralized Correspondence Employer File

We performed further analysis of the Decentralized Correspondence (DECOR) employer file to identify any problematic trends among the employers. In particular, we wanted to determine the volume of DECOR letters going to individual employers.

## VOLUME OF NOTICES MAILED TO INDIVIDUAL EMPLOYERS

We reviewed 5,164 employers listed in the DECOR employer file that had 200 or more items combined in both the Employer and Employee DECOR files. Our review indicates that some employers have a significant volume of wage items with an incomplete/incorrect address. As a result, the Social Security Administration (SSA) has mailed individual employers thousands of pieces of mail. For example, SSA mailed 95 employers more than 1,000 letters each (see Table F-1). One employer, a staffing company with a payroll address in the State of New York, received 13,954 letters from SSA.[1]

### Table F-1: Volume of DECOR Letters Mailed to Employers
(Among Employers with 200 or More Items in Suspense and at Least 1 Item in the DECOR Employer File)

| Number of DECOR Letters Per Employer | Number of Employers | Total Number of DECOR Letters Mailed | Associated Wages |
|---|---|---|---|
| Greater than 1,001 | 95 | 184,876 | $770 million |
| 501 up to 1,000 | 204 | 138,357 | 510 million |
| 101 up to 500 | 1,411 | 300,664 | 1,150 million |
| 1 to 100 | 3,454 | 153,322 | 797 million |
| **Total** | **5,164** | **777,219** | **$3,227 million** |

While the percent of employers receiving a large volume of letters is small, these employers represent a large number of the letters being mailed. Furthermore, these incorrect addresses also represent a missed opportunity to contact wage earners.

---

[1] We contacted the Employer Service Liaison Officer for Region II (New York) and determined that this employer is currently participating in the Social Security Number Verification System (SSNVS) program. SSNVS is an on-line service that enables employers and submitters to verify employee names and SSNs with information in SSA's records for the W-2 reporting purposes. SSNVS was first piloted in March 2003 and was made available to the entire nation in June 2005.

# DOUBLE NOTIFICATION OF SUSPENDED WAGE ITEMS

In addition to the DECOR letters, SSA also sends educational correspondence (EDCOR) to employers who submit W-2s containing name and/or Social Security number (SSN) information that does not agree with SSA's records. EDCOR notices list up to 500 SSNs but do not provide names. SSA requests that employers file corrected W-2(s) to correct the error(s). As a result, employers may receive both DECOR and EDCOR letters from SSA. Criteria for sending these notices are shown in Table F-2.

### Table F-2: SSA's Criteria for Sending EDCOR Notices

| | |
|---|---|
| **2003** and later years *(Tax Year 2002 and later)* | Notices were sent to employers who submitted a wage report containing more than 10 W-2s that SSA could not process, and the mismatched forms represented more than .5 percent of the total W-2s in the report. |
| **2002** *(Tax Year 2001)* | Notices were sent to employers who submitted a wage report where the name and/or SSN on even one W-2 did not agree with SSA's records. (The decision to send a letter to every employer with even one "no match" was made in May 2000.) |
| **2001** and prior years *(Tax Year 2000 and prior)* | Notices were sent to employers who submitted a wage report containing more than 10 W-2s that SSA could not process, and the mismatched forms represented more than 10 percent of the total W-2s in the report. |

We identified the 10 employers who received the highest volume of notices related to the entire TY 2002 DECOR file and found that all 10 would have also received an EDCOR notice from SSA. As a result, the staffing company we mentioned earlier would receive 13,955 letters from SSA – 13,954 DECOR notices and 1 EDCOR notice.[2] Our July 2002 audit of the DECOR process recommended that SSA review methods for eliminating this duplication.[3] We made this recommendation at a time when SSA was sending EDCOR notices to every employer, regardless of the number of wage items in suspense. SSA has since restricted its EDCOR notices to a specific threshold (as shown in Table F-2). Nonetheless, our current review still indicates that an opportunity may exist to reduce some of the duplication.

---

[2] The EDCOR notice would only disclose 500 specific SSNs with no additional identifying information. However, SSA does have the ability to provide all of the data related to the suspended wages if the employer contacts the local Employer Service Liaison Officer.

[3] SSA OIG, *Effectiveness of the Social Security Administration's Decentralized Correspondence Process* (A-03-01-11034), July 2002.

_**Appendix G**_

# Agency Comments



# SOCIAL SECURITY

MEMORANDUM

Date:      September 23, 2005                                    Refer To: S1J-3

To:        Patrick P. O'Carroll, Jr.
           Inspector General

From:      Larry W. Dye /s/
           Chief of Staff

Subject:   Office of the Inspector General (OIG) Draft Report, "Usefulness of Decentralized
           Correspondence in Focusing Employer-Assistance Activities" Revised Agency Response
           (A-03-05-25007)--INFORMATION

           We appreciate OIG's concern related to our previous comments to the subject report. We have
           reevaluated our response and have attached our revised comments on the draft report's
           recommendations. Please disregard our previous response.

           Please let me know if you have any questions. Staff inquiries may be directed to
           Candace Skurnik, Director, Audit Management and Liaison Staff, at extension 54636.

           Attachment:
           SSA Response

**No-Match Cert. Admin. Record  597**

<u>COMMENTS ON THE OFFICE OF THE INSPECTOR GENERAL'S (OIG) DRAFT
REPORT, "USEFULNESS OF DECENTRALIZED CORRESPONDENCE (DECOR) IN
FOCUSING EMPLOYER-ASSISTANCE ACTIVITIES" (A-03-05-25007)</u>

Thank you for the opportunity to review and provide comments on this draft report. The Social
Security Administration (SSA) shares OIG's concern about wage reports with name/Social
Security number (SSN) mismatches. The SSA Employer Services Liaison Officers (ESLO)
perform an important service educating the employer community to improve the wage reporting
process.

While SSA has the ESLOs contact employers who have 100 items or more in suspense each tax
year, SSA does not have any enforcement or sanction authority to apply against those employers.
This authority resides with the Internal Revenue Service (IRS). We defer to the IRS with regard
to the effectiveness of employer sanctions.

Additionally, concerning the finding of incomplete or outdated addresses for employees, the
report should note that the Agency only has the ability to send DECOR notices to the address
that is provided by the employer via the wage and tax statement (Form W-2).

**Recommendation 1**

Consider using addresses in the DECOR employee file to enhance coordination among ESLOs
when the employer wage reporting problems relate to multiple regions around the country.

**Comment**

We agree to consider using addresses in the DECOR employee file as a means to enhance
coordination among ESLOs when employer wage reporting problems relate to multiple regions
around the country. While the DECOR addresses point to common geographic areas that are a
work source for those mismatched individuals, the wage reporting problem, and the employer's
responsibility set by IRS for accurate wage reporting, rests at the location that administers
employee intake procedures and payroll, regardless of where the employee resides. Coordination
among ESLOs has been in place to provide support in determining the wage reporting
administrative location of an employer.

To assist the ESLOs in coordinating employer wage reporting problems, SSA implemented the
Wage Reporting Problem Service (WRPS) nationally in 2003. The WRPS coordinates the
efforts of ESLOs in reporting and resolving wage reporting problems throughout the country. If
an employer in a particular State has a wage reporting problem for a given year, that information
is captured on the WRPS and is available for ESLOs in all SSA regions to view for status.
ESLOs also have the ability of transferring employer wage problems to another ESLO whose
region has jurisdiction of that employer. The WRPS accepts referrals of potential wage reporting
problems from SSA employees in the SSA field offices, teleservice centers, processing service
centers, and regional offices. WRPS sends the referral to the ESLO in the regional office that
services the postal zip code of that employer.

DECOR is a national effort rather than a geographically-based effort. Employers are advised to
contact the ESLO parallel to their payroll/tax or human resource office(s) for assistance with

DECOR and, in addition, to learn how to verify employee taxpayer identification information (name and SSN) to prevent suspense items. The example cited on page 3 of the draft report of the Dallas contact where the employees worked in California but the employer is headquartered in Texas, occurs commonly in all regions. Large corporations do not confine themselves to SSA's regional boundaries; however, the place where the employee worked is not material when mailing DECOR notices.

## Recommendation 2

Consider using addresses in the DECOR employee file to identify relevant trends among employees with suspended wages and focus ESLO efforts.

## Comment

We agree to consider using addresses in the DECOR employee file as means to identify trends among employees and employers. Employee address information in itself will not help focus ESLO outreach efforts since the appropriate contact is with the employer who submits the wage reports. A more effective approach is ESLO review of the Earnings Suspense File to identify employers who have reporting problems that need to be addressed. ESLO experience has been that educational outreach is not a strong motivator for change with employers who have found their current wage reporting methods meet their needs without fear of any retribution.

Additionally, the DECOR file currently does not provide the functionality required to support the recommended analysis. Implementation of this recommendation will likely require the development of data mining and analytical tools to provide trend analyses to the ESLOs. This would require a new initiative to be considered in conjunction with other wage-related software development initiatives and prioritized for submission to the Agency's Information Advisory Board accordingly.

In the meantime, the ESLOs will continue to work with problem reporters, promoting the use of existing tools including Electronic Wage Reporting, AccuWage and Social Security Number Verification Service to facilitate improved reporting.

Recommendation 3

Review and correct the earnings record of the child noted in this report, as well as the earnings records related to the remaining 10 valid SSNs misused more than 400 times.

Comment

We agree. We are taking the necessary corrective actions on the records with problems identified by OIG.

[SSA also provided a technical comment which has been addressed, where appropriate, in this report.]

*Appendix H*

# OIG Contacts and Staff Acknowledgments

## *OIG Contacts*

Walter Bayer, Director, Philadelphia Audit Division, (215) 597-4080

Cylinda McCloud-Keal, Audit Manager, (215) 597-0572

## *Acknowledgments*

In addition to those named above:

Frank Trzaska, Auditor-in-Charge

Rich Devers, Information Technology Specialist

Annette DeRito, Writer/Editor

For additional copies of this report, please visit our web site at
www.socialsecurity.gov/oig or contact the Office of the Inspector General's Public
Affairs Specialist at (410) 965-3218.  Refer to Common Identification Number
A-03-05-25007.

## DISTRIBUTION SCHEDULE

Commissioner of Social Security

Office of Management and Budget, Income Maintenance Branch

Chairman and Ranking Member, Committee on Ways and Means

Chief of Staff, Committee on Ways and Means

Chairman and Ranking Minority Member, Subcommittee on Social Security

Majority and Minority Staff Director, Subcommittee on Social Security

Chairman and Ranking Minority Member, Subcommittee on Human Resources

Chairman and Ranking Minority Member, Committee on Budget, House of Representatives

Chairman and Ranking Minority Member, Committee on Government Reform and Oversight

Chairman and Ranking Minority Member, Committee on Governmental Affairs

Chairman and Ranking Minority Member, Committee on Appropriations, House of Representatives

Chairman and Ranking Minority, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, House of Representatives

Chairman and Ranking Minority Member, Committee on Appropriations, U.S. Senate

Chairman and Ranking Minority Member, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, U.S. Senate

Chairman and Ranking Minority Member, Committee on Finance

Chairman and Ranking Minority Member, Subcommittee on Social Security and Family Policy

Chairman and Ranking Minority Member, Senate Special Committee on Aging

Social Security Advisory Board

# Overview of the Office of the Inspector General

The Office of the Inspector General (OIG) is comprised of our Office of Investigations (OI), Office of Audit (OA), Office of the Chief Counsel to the Inspector General (OCCIG), and Office of Executive Operations (OEO). To ensure compliance with policies and procedures, internal controls, and professional standards, we also have a comprehensive Professional Responsibility and Quality Assurance program.

## Office of Audit

OA conducts and/or supervises financial and performance audits of the Social Security Administration's (SSA) programs and operations and makes recommendations to ensure program objectives are achieved effectively and efficiently. Financial audits assess whether SSA's financial statements fairly present SSA's financial position, results of operations, and cash flow. Performance audits review the economy, efficiency, and effectiveness of SSA's programs and operations. OA also conducts short-term management and program evaluations and projects on issues of concern to SSA, Congress, and the general public.

## Office of Investigations

OI conducts and coordinates investigative activity related to fraud, waste, abuse, and mismanagement in SSA programs and operations. This includes wrongdoing by applicants, beneficiaries, contractors, third parties, or SSA employees performing their official duties. This office serves as OIG liaison to the Department of Justice on all matters relating to the investigations of SSA programs and personnel. OI also conducts joint investigations with other Federal, State, and local law enforcement agencies.

## Office of the Chief Counsel to the Inspector General

OCCIG provides independent legal advice and counsel to the IG on various matters, including statutes, regulations, legislation, and policy directives. OCCIG also advises the IG on investigative procedures and techniques, as well as on legal implications and conclusions to be drawn from audit and investigative material. Finally, OCCIG administers the Civil Monetary Penalty program.

## Office of Executive Operations

OEO supports OIG by providing information resource management and systems security. OEO also coordinates OIG's budget, procurement, telecommunications, facilities, and human resources. In addition, OEO is the focal point for OIG's strategic planning function and the development and implementation of performance measures required by the Government Performance and Results Act of 1993.

United States Government Accountability Office

# GAO

Testimony before the Subcommittees on
Social Security and on Oversight,
Committee on Ways and Means,
House of Representatives

For Release on Delivery
Expected at 10:00 a.m. EST
Thursday, February 16, 2006

# SOCIAL SECURITY NUMBERS

## Coordinated Approach to SSN Data Could Help Reduce Unauthorized Work

Statement of Barbara D. Bovbjerg, Director
Education, Workforce, and Income Security Issues



G A O
Accountability ★ Integrity ★ Reliability

No-Match Cert. Admin. Record  603



G A O
Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-06-458T, a report to the Chairmen, Subcommittees on Social Security and on Oversight, Committee on Ways and Means, House of Representatives

**February 16, 2006**

# SOCIAL SECURITY NUMBERS

# Coordinated Approach to SSN Data Could Help Reduce Unauthorized Work

## Why GAO Did This Study

To lawfully work in the United States, individuals must have a valid Social Security number (SSN) and, if they are not citizens, authorization to work from the Department of Homeland Security (DHS). Noncitizens seeking work must provide both an SSN and evidence of work authorization to their employer. Yet individuals without these required authorizations have gained employment with false information. How these instances of unauthorized work can be identified or prevented challenges the federal agencies involved.

The subcommittees asked GAO to discuss how federal agencies can better share reported earnings data to identify unauthorized work. Specifically, this testimony addresses two issues: (1) the Social Security data that could help identify unauthorized employment and (2) coordination among certain federal agencies to improve the accuracy and usefulness of such data.

## What GAO Found

The Social Security Administration (SSA) has two types of data that could be useful to reducing unauthorized work—individual Social Security records and earnings reports. Individual Social Security records, which include name, date of birth, and SSN, are used by SSA to provide verification services to employers wishing to assure themselves that the names and SSNs of their workers match SSA's records. SSA also uses Social Security records in a work authorization verification system developed by DHS called the Basic Pilot that offers electronic verification of worker status. These services are voluntary, and none are widely used by employers. SSA's earnings records provide additional information, which could be used as an enforcement tool to identify unauthorized work. Currently, SSA uses such records to produce two relevant files based on earnings records, which are the Nonwork Alien File and the Earnings Suspense File (ESF). The Nonwork Alien File contains earnings information posted to SSNs issued for nonwork purposes, suggesting that these individuals are working without authorization. The ESF contains earnings reports for which SSA is unable to match the name and SSN of the worker, suggesting employer error, SSN misuse, or unauthorized work activity. In addition, we have reported that the ESF, which contained roughly 250 million records as of December 2004, appears to include an increasing number of records associated with probable unauthorized work, but because of statutory constraints, the ESF is not available to DHS as an enforcement tool.

Improving the usefulness of SSA data could help identify unauthorized work and ensure that limited enforcement resources are targeted effectively. Ensuring that the most useful data are available requires close coordination among the three federal agencies involved in collecting and using the data— SSA, the Internal Revenue Service (IRS), and DHS. We have previously recommended that IRS work with DHS and SSA as it considers strengthening its employer wage reporting regulations, as such action could improve the accuracy of reported wage data, and that DHS, with SSA, determine how best to use such wage data to identify potential illegal work activity. Efforts to improve data will only make a difference, however, if agencies work together to improve employer reporting and ensure they can conduct effective worksite enforcement programs.

www.gao.gov/cgi-bin/getrpt?-GAO-06-458T.
To view the full product, including the scope and methodology, click on the link above. For more information, contact Barbara Bovbjerg at (202) 512-7215 or bovbjergb@gao.gov.

**No-Match Cert. Admin. Record 604**

Messrs. Chairmen and Members of the Subcommittees:

I am pleased to be here today to discuss Social Security numbers (SSNs) and their use in preventing and detecting unauthorized work. To lawfully work in the United States, individuals must have a valid SSN and, if they are not citizens, authorization to work from the Department of Homeland Security (DHS). Noncitizens seeking work are required to provide both an SSN and evidence of work authorization to their employers. Yet individuals without these required authorizations can gain employment with false information. How these instances of unauthorized work can be identified or prevented challenges the federal agencies involved.

In prior GAO work on these issues, we have reported on the use of Social Security Administration (SSA) data for identity and employment eligibility verification. Although SSA's verification systems have improved, use of SSA information in worksite enforcement continues to be challenging. Today I will discuss two issues: (1) the Social Security data that could help identify some unauthorized employment and (2) coordination among SSA, DHS, and the Internal Revenue Service (IRS) to improve the accuracy and usefulness of such data.

My statement is based primarily on prior GAO work on these topics.[1] We are presently conducting additional work for these subcommittees examining the use of SSA data for detecting unauthorized work. To determine how SSA and DHS are coordinating to improve earnings data, we conducted interviews with officials from SSA, the SSA Office of the Inspector General, and DHS. In addition, we obtained and reviewed data from SSA on individuals who had reported earnings under a nonwork SSN, and we reviewed other documentation provided to us by these agencies. We began this review in October 2005 in accordance with generally accepted government auditing standards, and our work is ongoing.

In summary, SSA has two types of data that could be useful for addressing unauthorized work— Social Security records for individuals and earnings

---

[1]GAO, *Social Security: Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports*, GAO-05-154 (Washington, D.C.: February 2005); GAO, *Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts*, GAO-05-813 (Washington, D.C.: August 2005); and GAO, *Tax Administration: IRS Needs to Consider Options for Revising Regulations to Increase the Accuracy of Social Security Numbers on Wage Statements*, GAO-04-712 (Washington, D.C: August 2004)

GAO-06-458T

**No-Match Cert. Admin. Record  605**

reports. Individual Social Security records include name, date of birth, and SSN, among other things. SSA uses these data to provide SSN verification services free of charge to employers wishing to assure themselves that the names and SSNs that their workers provided match SSA's records. SSA also uses Social Security records in a work authorization verification system called the Basic Pilot program developed by DHS, which offers electronic verification of worker status. These systems are voluntary and not widely used by employers. SSA's earnings records provide a different sort of information that could be used for identifying unauthorized work. SSA uses such records to produce two relevant files. SSA's Nonwork Alien File contains earnings reports that are posted to SSNs that were issued for nonwork purposes, which suggests individuals are working without DHS work authorization. By law, SSA provides nonwork alien information to DHS annually, and our ongoing work for you suggests that a number of these records are associated with people who became work authorized some time after receiving their nonwork SSNs. A second file of interest, the Earnings Suspense File (ESF), contains earnings reports in which the name and SSN do not match SSA's records.[2] We have reported that this file, which contained 246 million records as of November 2004, appears to include an increasing number of records associated with unauthorized work.[3]

Improving the usefulness of SSA data could help identify some unauthorized work and ensure that limited enforcement resources are targeted effectively. Ensuring that the most useful data are available requires close coordination among the three federal agencies involved in collecting and using the data—SSA, IRS, and DHS. We have previously recommended that IRS work with DHS and SSA as it considers strengthening its employer wage reporting regulations, as such action could improve the accuracy of reported wage data, and that DHS, with SSA, determine how best to use such wage data to identify potential illegal work activity.

## Background

The Social Security Act of 1935 authorized the SSA to establish a record-keeping system to help manage the Social Security program and resulted in the creation of the SSN. SSA uses the SSN as a means to track workers' earnings and eligibility for Social Security benefits. Through a process

---

[2] SSA receives tax records of employee earnings from employers via the IRS's Form W-2 (Wage and Tax Statement).

[3] GAO-05-154

**No-Match Cert. Admin. Record  606**

known as enumeration, each eligible person receives a unique number, which SSA uses for recording workers' employment history and Social Security benefits. SSNs are routinely issued to U.S. citizens, and they are also available to noncitizens lawfully admitted to the United States with permission to work. Lawfully admitted noncitizens who lack DHS work authorization may qualify for an SSN for nonwork purposes when a federal, state, or local law requires that they have an SSN to obtain a particular welfare benefit or service. In this case, the Social Security card notes that the SSN is "Not Valid for Employment."[4] As of 2003, SSA had assigned slightly more than 7 million nonwork SSNs. Over the years, SSA has tightened the requirements for assigning nonwork SSNs.

In 1986, Congress passed the Immigration Reform and Control Act (IRCA), which made it illegal for individuals and entities to knowingly hire and continue to employ unauthorized workers. The act established a two-pronged approach for helping to limit the employment of unauthorized workers: (1) an employment verification process through which employers are to verify newly hired workers' employment eligibility and (2) a sanctions program for fining employers who do not comply with the act. Under the employment verification process, workers and employers must complete the Employment Eligibility Verification Form (Form I-9) to certify that the workers are authorized to work in the United States. Those employers who do not follow the verification process can be sanctioned.

## SSA Individual Records and Earnings Reports Can Identify Some Unauthorized Work

SSA has two types of data useful to identifying unauthorized work—individual Social Security records and earnings reports. Its individual records, which include name, date of birth, and SSN, among other things, can be used to verify that a worker is providing the SSN that was assigned to a person of that name. These records are used in verification services that are available free of charge to employers on a voluntary basis. SSA's earnings reports could also be used to identify some unauthorized work by reporting noncitizens who may have worked without authorization and employers who have a history of providing SSN/name combinations that do not match SSA records.

---

[4] Cards issued prior to 1982 do not contain this notation.

**No-Match Cert. Admin. Record  607**

## SSA Records Provide Verification Services to Improve Wage Data

SSA uses individual Social Security records in its Employee Verification Service (EVS) and the Web-based SSN Verification Service (SSNVS), which employers can use to assure themselves that the names and SSNs of their workers match SSA's records. The services, designed to ensure accurate employer wage reporting, are offered free of charge. Employer use is voluntary. Although these systems only confirm whether submitted names and SSNs match, they could help employers identify workers who provide an SSN with fictitious information.

Over the years, SSA has developed several different verification methods under EVS. For example, employers may submit lists of workers' names and SSNs by mail on a variety of media, such as magnetic tapes or diskettes. Alternatively, employers may call a toll-free number or present a hard-copy list via fax, mail, or hand delivery to a local SSA office. SSA verifies the information received from employers by comparing it with information in its own records. SSA then advises the employer whether worker names and SSNs match. EVS offers the benefit of verifying name and SSN combinations for a company's entire payroll. However, the system would not be able to detect a worker's misuse of another person's name and SSN as long as the name and SSN matched. Employers do not widely use this service.

In an attempt to make verification more attractive to employers, in 2005, SSA implemented the Web-based SSNVS. It is designed to respond to employer requests within 24 hours. Requests of up to 10 worker names and SSNs can be verified instantaneously. Larger requests of up to 250,000 names can be submitted in a batch file, and SSA will provide results by the next business day. While this new system is attracting more employer interest, it is still not widely used.

SSA also uses its records in a work eligibility verification system developed by DHS called the Basic Pilot, which offers electronic verification of work authorization for newly hired workers.[5] Use of this program by employers is also voluntary, and the service has been available

---

[5] The Basic Pilot program was authorized in 1996 through the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which required that the Attorney General, (now DHS) develop and test three pilot programs to assist employers in verifying workers' identity and work eligibility. The Basic Pilot program was developed and made available to employers in six states starting in 1997. In 2003, Congress required DHS to expand the verification service to all 50 states by December 2004, and DHS met that requirement. To improve its effectiveness and increase participation, DHS converted the program to a Web-based system in July 2004.

GAO-06-458T

**No-Match Cert. Admin. Record 608**

nationwide only since December 2004. Employers who agree to participate must electronically verify the status of all newly hired workers within 3 days of hire, using information that a new hire is required to provide. Under this program, an employer electronically sends worker data through DHS to SSA to check the validity of the SSN, name, date of birth, and citizenship provided by the worker. SSA records are used to confirm information on citizens. For noncitizens, SSA confirms SSN, name, and date of birth, then refers the request to DHS to verify work authorization status against DHS's automated records.[6] If DHS cannot verify work authorization status for the submitted name and SSN electronically, the query is referred to a DHS field office for additional research by immigration status verifiers. If SSA is unable to verify the SSN, name, and date of birth or DHS record searches cannot verify work authorization, a tentative nonconfirmation response is transmitted to the employer. After checking the accuracy of the information and resubmitting the information, if necessary, the employer must advise the worker of the finding and refer him or her to either DHS or SSA to correct the problem. During this time, employers are not to take any adverse actions against those workers related to verification, such as limiting their work assignments or pay. When workers do not contest their tentative nonconfirmations within the allotted time, the Basic Pilot program issues a final nonconfirmation. Employers are required to either immediately terminate employment or notify DHS of their continued employment.

Like SSA's verification services, the Basic Pilot is voluntary and is not widely utilized. As of January 2006, about 5,500 businesses nationwide had registered to participate, although a significantly smaller number of these are active users.[7] Active participants have made about 4.7 million initial verification requests over a 5-year period (981,000 requests were made in fiscal year 2005). DHS reported on actions taken to address weaknesses in the program that had been identified during the early years of the program. They included delays in updating immigration records, erroneous nonconfirmations, and program software that was not user friendly. We subsequently reported on additional challenges, specifically, the capacity constraints of the system, its inability to detect identity fraud, and the fact

---

[6] The DHS data are maintained by the U.S. Citizenship and Immigration Service, (USCIS).

[7] This indicates the number of businesses that have signed memorandums of understanding with DHS and is not indicative of the number of active participants.

GAO-06-458T

No-Match Cert. Admin. Record  609

that the program is limited to verifying work authorization of newly hired workers.[8]

## SSA Earnings Data May Be Used to Identify Some Unauthorized Work

SSA's earnings records can also provide information on unauthorized work. There are two sets of data that are relevant to unauthorized work. The first set, the Nonwork Alien File, contains earnings reports for SSNs that were issued for nonwork purposes. The second set, the Earnings Suspense File, contains earnings reports in which the name and SSN do not match. Both could help identify some unauthorized work.

### SSA's Nonwork Alien File

SSA is required by law to provide its Nonwork Alien File to DHS since it suggests a group of people who are in the United States legally but may be working without authorization.[9] Since 1998, SSA has provided DHS annual data on over half a million persons with earnings listed under nonwork SSNs. The file includes annual earnings amounts, worker names and addresses, and employer names and addresses as well.

DHS has found this file to be of little use to enforcement activities, however. According to DHS officials, the file is currently not an effective tool for worksite enforcement due in part to inaccuracies in the data and the absence of some information that would help the department efficiently target its enforcement.[10]

In fact, because SSA only updates work authorization status at the request of the SSN holder, individuals in the file may now be U.S. citizens or otherwise legal workers who simply have not updated their status with SSA. Our ongoing work in this area suggests that a number of these records are indeed associated with people who later permission to work from DHS. SSA policy is to update work authorization status when the SSN holder informs the agency of the status change and provides supporting documentation.[11] Unless the individual informs SSA directly of

---

[8] GAO-05-813.

[9] IIRIRA, Section 414.

[10] In prior years, DHS officials cited an inability to access the file, because SSA sent the data to them via a computer mainframe cartridge that was incompatible with DHS's systems. SSA now supplies the file in a format that is accessible to DHS agents.

[11] Individuals are not required to update such changes with SSA, although since 2002 the agency has encouraged them to do so. SSA will remove the nonwork notation from the SSN and reissue a card to individuals who were originally assigned a nonwork SSN if the individual provides SSA documentation of a change in the individual's work status by DHS.

No-Match Cert. Admin. Record  610

the status change, SSA's enumeration records will continue to show the person as unauthorized to work and will record his or her earnings to the Nonwork Alien File. Currently, the extent to which such noncitizens are included in the file is unknown, but SSA and DHS officials have both acknowledged that the file may include a number of people who are currently authorized to work.

DHS officials said that the file would be of greater value if it contained DHS's identifying numbers—referred to as alien registration numbers. According to DHS officials, because persons in the file do not have an identifier in common use by both agencies, they cannot automatically be matched with DHS records. As a result, DHS officials told us that they use names and birth dates to match the records, which can result in mismatches because names can change and numbers in birth dates may be transposed. SSA officials have said that generally they do not collect alien registration numbers from noncitizens. Collecting the alien registration number and providing it in the Nonwork Alien File is possible, they stated, but would require modifications to SSA's information systems and procedures. They also noted that SSA would only be able to collect the alien registration number when noncitizens are assigned an SSN or when such an individual updates his or her record. As part of its procedures, SSA is required to verify the immigration status of noncitizens before assigning them an SSN, which requires using alien registration numbers.[12] However, some noncitizens, such as those who have temporary visas, (e.g. students) may not have an alien registration number. In these cases, SSA would not be able to include the number in the Nonwork Alien File.

The time it takes SSA to validate earnings reports and convey the Nonwork Alien File to DHS also makes the file less effective for worksite enforcement. When SSA finishes its various processes to ensure that the file includes the appropriate data, the reported earnings can be up to 2 years old. By that time, many of the noncitizens included in the file may have changed employers, relocated, or changed their immigration status,

---

[12] To do this, SSA field office staff use the alien registration number, in part, to query DHS's records, through DHS's Systematic Alien Verification for Entitlements (SAVE) program, which provides certain DHS data online regarding aliens with such numbers. In addition, SSA field office staff is instructed to ask noncitizens to present their immigration and identity documents, which contain their alien registration numbers for verification.

No-Match Cert. Admin. Record 611

resulting in out-of-date data on individuals or ineffective leads for DHS agents.[13]

A DHS official told us that if the Nonwork Alien File were to contain industry codes for the reporting employers, DHS could target those in industries considered critical for homeland security purposes, which would be consistent with DHS's mission and enforcement priorities. Having information about the industries the employers are in would help them better link the data to areas of high enforcement priority, such as airports, power plants, and military bases.

**Earnings Suspense File**

Another SSA earnings file, referred to as the Earnings Suspense File, contains earnings reports in which the name and SSN do not match SSA's records, suggesting employer or worker error or, potentially, identity theft and unauthorized work. We have reported that this file, which contained 246 million records as of November 2004, appears to include an increasing number of records associated with unauthorized work. SSA's Office of the Inspector General has used the ESF to identify employers who have a history of providing names and SSNs that do not match.

When SSA encounters earnings reports with names and SSNs that do not match, it makes various attempts to correct them using over twenty automated processes. However, about 4 percent of all earnings reports still remain unmatched and are electronically placed in the ESF, where SSA uses additional automated and manual processes to continue to identify valid records. Forty-three percent of employers associated with earnings reports in the ESF are from only 5 of the 83 broad industry categories, with eating and drinking establishments and construction being the top categories. A small portion of employers also account for a disproportionate number of ESF reports. For example, only about 8,900 employers—0.2 percent of all employers with reports recorded in the ESF for tax years 1985-2000—submitted over 30 percent of the reports we analyzed.[14]

---

[13] Under the current process, SSA receives wage information from employers annually. Once the earnings reports are received, SSA will ensure the validity of the reported information before sending it to DHS. As a result, DHS receives the data 1 to 2 years after the earnings occur. For example, SSA officials told us that SSA received earnings from employers based on tax year 2004 in early 2005. After receipt, SSA electronically validated such information throughout the summer and fall of that year, and sent all reported earnings associated with a nonwork SSN to DHS in January 2006.

[14] GAO-05-154.

No-Match Cert. Admin. Record  612

Our past work has documented that individuals who worked prior to obtaining work authorization are a growing source of the unmatched earnings reports in the ESF that are later reinstated to a worker's account. Once workers obtain a valid SSN, they can provide SSA evidence of prior earnings reports representing unauthorized employment prior to receiving their SSN. Such earnings reports can then be used to determine a worker's eligibility for benefits.[15]

DHS officials believe that the ESF could be useful for targeting its limited worksite enforcement resources. For example, they could use the ESF to identify employers who provide large numbers of invalid SSNs or names and SSNs that do not match. They told us that these employers may knowingly hire unauthorized workers with no SSN or fraudulent SSNs and that employers who are knowingly reporting incorrect information about their workers might also be involved in illegal activities involving unauthorized workers.

However, it is not clear that the ESF, which is much larger than the Nonwork Alien File, would be manageable or allow for targeted enforcement. The ESF contains hundreds of millions of records, many unrelated to unauthorized work, making it difficult to use for targeting limited resources. While the ESF may help identify some of the most egregious employers of unauthorized workers, in terms of poor earnings reporting, its focus is not on unauthorized workers. Our work has shown that most of the reinstatements from the file belong to U.S.-born citizens, not to unauthorized workers.[16] In addition, because the ESF contains privileged taxpayer data, SSA cannot share this information with DHS without specific legislative authorization.[17] SSA's Office of the Inspector General has recommended that SSA seek legislative authority to share this data with DHS, but SSA responded that it is beyond the agency's purview to advance legislation to amend the Internal Revenue Code in order to

---

[15] GAO-05-154.

[16] GAO-05-154.

[17] Internal Revenue Code Section 6103 provides that tax returns and return information are confidential and may not be disclosed by IRS and others having access to the information, with certain specific exceptions. Because the confidentiality of tax data is considered crucial to voluntary compliance, if agencies want to establish new efforts to use taxpayer information, executive branch policy calls for a business case to support sharing tax data.

GAO-06-458T

No-Match Cert. Admin. Record  613

allow DHS access to tax return information.[18] IRS officials have also expressed concern that sharing this data could decrease tax collections and compliance.[19] We are examining the usefulness of SSA data to DHS for these subcommittees, and will consider ESF issues as part of this work.

## Closer Coordination by SSA, IRS, and DHS Could Improve Usefulness of SSA Earnings Data

Improving the usefulness of the data could help ensure that limited enforcement resources are targeted effectively. SSA data could help identify areas of unauthorized work, but closer collaboration among SSA, IRS, and DHS can help to ensure that the most useful data are available in a form that can be used efficiently for enforcement.

Under the current data-sharing arrangement, DHS officials believe the agency would have to invest significant resources to determine whether employers it targets are really hiring persons who are not work authorized. DHS has stated that determining which nonwork SSN holders are now authorized to work may not be cost-effective and would pull resources from other national security-related initiatives.[20] Neither SSA nor DHS is able to easily and quickly update work status because they lack a common identifier for their records. Updating status without a common identifier may not be practical because different spellings or name variations confound large-scale matching efforts. For example, an August 2005 report from the SSA's Office of the Inspector General highlights a substantial proportion of cases in which names were inconsistent between SSA and DHS.[21] In at least six reports in recent years, SSA's Office of the Inspector General has recommended or mentioned prior recommendations that SSA

---

[18] Social Security Administration, Office of the Inspector General, *Social Security Number Misuse in the Service, Restaurant, and Agriculture Industries*, A-08-05-25023 (Baltimore, Maryland: April 2005); and *Obstacles to Reducing Social Security Number Misuse in the Agriculture Industry*, A-08-99-41004 (Baltimore, Maryland: January 2001).

[19] GAO-05-154.

[20] GAO-05-154.

[21] Social Security Administration, Office of the Inspector General, *Reported Earnings Prior to the Issuance of a Social Security Number*, A-03-04-14037 (Baltimore, Maryland: August 2005).

GAO-06-458T

No-Match Cert. Admin. Record  614

work with DHS to update information about work authorization.[22] SSA officials maintain that it is their policy to make changes to the Social Security record only if the SSN holder initiates the changes and provides evidentiary documents from DHS. SSA further states that a "resolution of the discrepant information between DHS and SSA would require more than a simple verification."[23]

Despite the many problems with the data, there are steps that could be taken to improve them. For example, the employers who submit the most earnings reports for nonwork SSNs might be good candidates for outreach and education about verifying work eligibility. SSA's Office of the Inspector General officials suggested that DHS send letters to employers of persons with nonwork SSNs. These letters could encourage persons listed as having nonwork SSNs, who are now authorized to work, to update their records. The ESF also has the potential to provide useful information to DHS, but this information has protected tax status. Although some of the same difficulties that pertain to the Nonwork Alien File could also affect the usefulness of the ESF to DHS enforcement efforts, if these challenges could be overcome, authorizing transmittal of at least some of the ESF information to DHS might be warranted.

Producing accurate, useful data will require substantial continued effort on the part of SSA, DHS, and the IRS: these efforts will be of little value, however, if the data are not used for enforcement and to stimulate changes in employer and employee behavior. We have reported previously that the IRS program of employer penalties is weak, because of limited requirements on employers to verify and report accurate worker names and SSNs; we have recommended that IRS consider strengthening employer requirements, a course that could over time improve the accuracy of wage data reported to SSA.[24] We have also reported that,

---

[22]Social Security Administration, Office of the Inspector General, *Social Security Administration Benefits Related to Unauthorized Work*, A-03-03-23053 (Baltimore, Maryland: March 2003); *Profile of the Social Security Administration's Non-Work Alien File*, A-14-03-23071 (Baltimore, Maryland: September 2003); *Reported Earnings Prior to the Issuance of a Social Security Number*, A-03-04-14037 (Baltimore, Maryland: August 2005); *Unauthorized Work Social Security Numbers at the Department of Defense*, A-03-05-25127 (Baltimore, Maryland: September 2005); *Impact of Nonimmigrants Who Continue Working after Their Immigration Status Expires*, A-08-05-15073 (Baltimore, Maryland: September 2005); and *Work Activity for Social Security Numbers Assigned for Nonwork Purposes in the State of Utah*, A-14-01-11048 (Baltimore, Maryland: March 2002).

[23]SSA, OIG, A-03-04-14037; A-03-05-25127.

[24]GAO-04-712.

GAO-06-458T

No-Match Cert. Admin. Record  615

consistent with DHS's primary mission in the post-September 11 environment, DHS enforcement resources have focused mainly on critical infrastructure industries in preference to general worksite enforcement.[25] In such circumstances, coordination to leverage usable and useful SSA data is essential to ensure that limited DHS worksite enforcement resources are targeted effectively.

## Concluding Observations

The federal government likely can make use of information it already has to better support enforcement of immigration, work authorization and tax laws. The Earnings Suspense and the Nonwork Alien files have potential, but even the best information will not make a difference if the relevant federal agencies do not have credible enforcement programs. In fact, sharing earnings data to identify potential unauthorized workers could unnecessarily disclose sensitive taxpayer information if the data are not utilized by enforcement programs. To address unauthorized work more meaningfully, IRS, DHS and SSA need to work together to improve employer reporting, develop more usable and useful data sets for suspicious earnings reports, and better target limited enforcement resources. We look forward to contributing to this endeavor as we continue to conduct our work on using SSA data to help reduce unauthorized work.

This concludes my prepared statement. I will be happy to answer any questions you may have.

## Contacts and Acknowledgments

For questions regarding this testimony, please call Barbara Bovbjerg at (202) 512-7215. Other key contributors to this statement were Blake Ainsworth, Assistant Director; Lara Laufer, Analyst-in-Charge; Beverly Crawford; Susan Bernstein; Michael Brostek; Rebecca Gambler; Jason Holsclaw; Daniel Schwimer; Richard Stana; Vanessa Taylor; Walter Vance; and Paul Wright.

---

[25] GAO-05-813 and GAO, *Immigration Enforcement: Challenges to Implementing the INS Interior Enforcement Strategy*, GAO-02-861T. (Washington, D.C.: June 19, 2002)

No-Match Cert. Admin. Record  616

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice:  (202) 512-6000<br>TDD:  (202) 512-2537<br>Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

PRINTED ON ♻ RECYCLED PAPER

United States Government Accountability Office

# GAO

Testimony

Before the Subcommittee on Immigration, Border Security, and Citizenship, Committee on the Judiciary, U.S. Senate

For Release on Delivery
Expected at 2:00 p.m. EDT
Monday, June 19, 2006

# IMMIGRATION ENFORCEMENT

## Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts

Statement of Richard M. Stana, Director
Homeland Security and Justice



G A O

Accountability ★ Integrity ★ Reliability

No-Match Cert. Admin. Record  619

**G A O**
Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-06-895T, a testimony before the Subcommittee on Immigration, Border Security, and Citizenship, Committee on the Judiciary, U.S. Senate

**June 19, 2006**

# IMMIGRATION ENFORCEMENT

## Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts

## Why GAO Did This Study

The opportunity for employment is one of the most important magnets attracting illegal immigrants to the United States. The Immigration Reform and Control Act (IRCA) of 1986 established an employment eligibility verification process and a sanctions program for fining employers for noncompliance. Few modifications have been made to the verification process and sanctions program since 1986, and immigration experts state that a more reliable verification process and a strengthened worksite enforcement capacity are needed to help deter illegal immigration. This testimony is based on GAO's August 2005 report on the employment verification process and worksite enforcement efforts. In this testimony, GAO provides observations on (1) the current employment verification process and (2) U.S. Immigration and Customs Enforcement's (ICE) priorities and resources for the worksite enforcement program and the challenges it faces in implementing that program.

### What GAO Recommends

We recommended that the Department of Homeland Security (DHS) set time frames for completing its review of the Form I-9 and that U.S. Citizenship and Immigration Services in DHS assess the costs and feasibility of addressing Basic Pilot Program weaknesses. DHS agreed with these recommendations and is taking steps to assess the pilot program's weaknesses.

www.gao.gov/cgi-bin/getrpt?GAO-06-895T.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Richard M. Stana at (202) 512-8777 or stanar@gao.gov.

## What GAO Found

The current employment verification (Form I-9) process is based on employers' review of documents presented by new employees to prove their identity and work eligibility. On the Form I-9, employers certify that they have reviewed documents presented by their employees and that the documents appear genuine and relate to the individual presenting the documents. However, document fraud (use of counterfeit documents) and identity fraud (fraudulent use of valid documents or information belonging to others) have undermined the employment verification process by making it difficult for employers who want to comply with the process to ensure they hire only authorized workers and easier for unscrupulous employers to knowingly hire unauthorized workers with little fear of sanction. In addition, the large number and variety of documents acceptable for proving work eligibility has hindered employer verification efforts. In 1998, the former Immigration and Naturalization Service (INS), now part of DHS, proposed revising the Form I-9 process, particularly to reduce the number of acceptable work eligibility documents, but DHS has not yet finalized the proposal. The Basic Pilot Program, a voluntary program through which participating employers electronically verify employees' work eligibility, shows promise to enhance the current employment verification process, help reduce document fraud, and assist ICE in better targeting its worksite enforcement efforts. Yet, several weaknesses in the pilot program's implementation, such as its inability to detect identity fraud and DHS delays in entering data into its databases, could adversely affect increased use of the pilot program, if not addressed.

The worksite enforcement program has been a relatively low priority under both INS and ICE. Consistent with the DHS mission to combat terrorism, after September 11, 2001, INS and then ICE focused worksite enforcement efforts mainly on detecting and removing unauthorized workers from critical infrastructure sites. Since fiscal year 1999, the numbers of employer notices of intent to fine and administrative worksite arrests have generally declined. According to ICE, this decline is due to various factors, such as the prevalence of document fraud that makes it difficult to prove employer violations. ICE officials told us that the agency has previously experienced difficulties in proving employer violations and setting and collecting fine amounts that meaningfully deter employers from knowingly hiring unauthorized workers. In April 2006, ICE announced a new interior enforcement strategy to target employers who knowingly hire unauthorized workers by bringing criminal charges against them, and ICE has reported increases in the number of criminal arrests and indictments since fiscal year 2004. However, it is too early to tell what effect, if any, this new strategy will have on enhancing worksite enforcement efforts and identifying unauthorized workers and their employers.

Mr. Chairman and Members of the Subcommittee:

I appreciate the opportunity to be here today to participate in this hearing on immigration enforcement at the workplace. As we and others have reported in the past, the opportunity for employment is one of the most important magnets attracting unauthorized immigrants to the United States. To help address this magnet, in 1986 Congress passed the Immigration Reform and Control Act (IRCA),[1] which made it illegal for individuals and entities to knowingly hire, continue to employ, or recruit or refer for a fee unauthorized workers. The act established a two-pronged approach for helping to limit the employment of unauthorized workers: (1) an employment verification process through which employers verify all newly hired employees' work eligibility and (2) a sanctions program for fining employers who do not comply with the act. Efforts to enforce these sanctions are referred to as worksite enforcement and are conducted by U.S. Immigration and Customs Enforcement (ICE).

As the U.S. Commission on Immigration Reform reported, immigration contributes to the U.S. national economy by providing workers for certain labor-intensive industries and contributing to the economic revitalization of some communities.[2] Yet, the commission also noted that immigration, particularly illegal immigration, can have adverse consequences by helping to depress wages for low-skilled workers and creating net fiscal costs for state and local governments. Following the passage of IRCA, the U.S. Commission on Immigration Reform and various immigration experts have concluded that deterring illegal immigration requires, among other things, strategies that focus on disrupting the ability of illegal immigrants to gain employment through a more reliable employment eligibility verification process and a more robust worksite enforcement capacity. In particular, the commission report and other studies have found that the single most important step that could be taken to reduce unlawful migration is the development of a more effective system for verifying work authorization. In the nearly 20 years since passage of IRCA, the employment eligibility verification process and worksite enforcement program have remained largely unchanged. Moreover, in previous work, we reported that employers of unauthorized aliens faced little likelihood that the

---

[1] Pub. L. No. 99-603, 8 U.S.C. 1324a et seq.

[2] U.S. Commission on Immigration Reform, *Becoming an American: Immigration and Immigrant Policy* (Washington, D.C: September 1997).

GAO-06-895T

**No-Match Cert. Admin. Record  621**

Immigration and Naturalization Service (INS)[3] would investigate, fine, or criminally prosecute them, a circumstance that provides little disincentive for employers who want to circumvent the law.[4] The legislative proposals currently under consideration would revise the current employment verification process and the employer sanctions program.

My testimony today is based on our August 2005 report to Congress on the employment verification process and ICE's worksite enforcement program.[5] Specifically, I will discuss our observations on (1) the current employment verification process and (2) ICE's priorities and resources for the worksite enforcement program and the challenges it has faced in implementing that program.

To address these objectives, we reviewed federal laws and information obtained from ICE, U.S. Citizenship and Immigration Services (USCIS), and Social Security Administration (SSA) officials in headquarters and selected field locations. We examined regulations, guidance, past GAO reports, and other studies on the employment verification process and the worksite enforcement program. We also analyzed the results and examined the methodology of an independent evaluation of the Basic Pilot Program, an automated system through which employers electronically check employees' work eligibility information against information in Department of Homeland Security (DHS) and SSA databases, conducted by the Institute for Survey Research at Temple University and Westat in June 2004.[6] Furthermore, we analyzed data on employer use of the Basic Pilot Program and on worksite enforcement and assessed the data reliability by reviewing them for accuracy and completeness, interviewing agency officials knowledgeable about the data, and examining documentation on how the data are entered, categorized, and verified in

---

[3]In March 2003, INS was merged into the Department of Homeland Security, and its immigration functions were divided between U.S. Citizenship and Immigration Services, U.S. Immigration and Customs Enforcement, and U.S. Customs and Border Protection. U.S. Immigration and Customs Enforcement is responsible for managing and implementing the worksite enforcement program.

[4]GAO, *Illegal Aliens: Significant Obstacles to Reducing Unauthorized Alien Employment Exist*, GAO/GGD-99-33 (Washington, D.C.: Apr. 2, 1999).

[5]GAO, *Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts*, GAO-05-813 (Washington, D.C.: Aug. 31, 2005).

[6]Institute for Survey Research and Westat, *Findings of the Basic Pilot Program Evaluation* (Washington, D.C.: June 2004).

GAO-06-895T

No-Match Cert. Admin. Record  622

the databases. We determined that the independent evaluation and these data were sufficiently reliable for the purposes of our review. We conducted the work reflected in this statement from September 2004 through July 2005 in accordance with generally accepted government auditing standards.

## Summary

The employment verification process is primarily based on employers' review of work eligibility documents presented by new employees, but various weaknesses, such as the process' vulnerability to fraud, have undermined this process. Employers certify that they have reviewed documents presented by their employees and that the documents appear genuine and relate to the individual presenting the documents. However, document fraud (use of counterfeit documents) and identity fraud (fraudulent use of valid documents or information belonging to others) have made it difficult for employers who want to comply with the employment verification process to ensure that they hire only authorized workers and have made it easier for unscrupulous employers to knowingly hire unauthorized workers with little fear of sanction. In addition, the large number and variety of documents acceptable for proving work eligibility have hindered employers' verification efforts. In 1998, the former INS proposed revising the verification process and reducing the number of acceptable work eligibility documents; that proposal was never acted upon. DHS, however, at the direction of Congress, introduced the Basic Pilot Program, an automated system for employers to electronically check employees' work eligibility information with information in DHS and SSA databases, that may enhance this process. This program shows promise to help reduce document fraud and assist ICE in better targeting its worksite enforcement efforts. Yet, a number of weaknesses in the pilot program's implementation, including its inability to detect identity fraud and DHS delays in entering data into its databases, could adversely affect increased use of the pilot program, if not addressed. In addition, USCIS officials told us the current Basic Pilot Program may not be able to complete timely verifications if the number of employers using the program significantly increased.  About 8,600 employers have registered to use the Basic Pilot Program, and a smaller number of these employers are active users.

Under both INS and ICE, worksite enforcement has been a relatively low priority. Consistent with the DHS mission to combat terrorism, after September 11, 2001, INS and then ICE focused worksite enforcement resources mainly on identifying and removing unauthorized workers from critical infrastructure sites, such as airports and nuclear power plants, to help address vulnerabilities at those sites.  In fiscal year 1999, INS devoted

**No-Match Cert. Admin. Record  623**

about 240 full-time equivalents (or about 9 percent of its total investigative agent work-years) to worksite enforcement, while in fiscal year 2003 it devoted about 90 full-time equivalents[7] (or about 4 percent of total agent work-years). Furthermore, between fiscal years 1999 and 2003 the number of notices of intent to fine issued to employers for knowingly hiring unauthorized workers or improperly completing employment verification forms and the number of administrative worksite arrests generally declined. ICE has attributed this decline to various factors, including the widespread use of counterfeit documents that make it difficult for ICE agents to prove that employers knowingly hired unauthorized workers. In addition, INS and ICE have faced difficulties in setting and collecting fine amounts from employers and in detaining unauthorized workers arrested at worksites. In April 2006 ICE announced a new interior enforcement strategy as part of the Secure Border Initiative. Under this strategy, ICE plans to target employers who knowingly employ unauthorized workers by bringing criminal charges against them. While ICE has taken some steps to address difficulties it has faced in implementing worksite enforcement efforts and has announced a new interior enforcement strategy, it is too early to tell what effect, if any, these steps will have on identifying the millions of unauthorized workers and the employers who hired them.

In our August 2005 report, we recommended that DHS establish specific time frames for completing its review of the Form I-9 process to help strengthen the current employment verification process. We also recommended that USCIS include an assessment of the feasibility and costs of addressing the Basic Pilot Program's weaknesses in its evaluation of the program. DHS agreed with our recommendations and plans to include information on addressing the pilot program's weaknesses in the evaluation.

## Background

IRCA provided for sanctions against employers who do not follow the employment verification (Form I-9) process. Employers who fail to properly complete, retain, or present for inspection a Form I-9 may face civil or administrative fines ranging from $110 to $1,100 for each employee for whom the form was not properly completed, retained, or presented. Employers who knowingly hire or continue to employ unauthorized aliens may be fined from $275 to $11,000 for each employee, depending on whether the violation is a first or subsequent offense. Employers who

---

[7] One full-time equivalent is equal to one work-year or 2,080 non-overtime hours.

**No-Match Cert. Admin. Record  624**

engage in a pattern or practice of knowingly hiring or continuing to employ unauthorized aliens are subject to criminal penalties consisting of fines up to $3,000 per unauthorized employee and up to 6 months imprisonment for the entire pattern or practice.

## Basic Pilot Program Employment Verification Process

The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA)[8] of 1996 required INS and SSA to operate three voluntary pilot programs to test electronic means for employers to verify an employee's eligibility to work, one of which was the Basic Pilot Program.[9] The Basic Pilot Program was designed to test whether pilot verification procedures could improve the existing employment verification process by reducing (1) false claims of U.S. citizenship and document fraud; (2) discrimination against employees; (3) violations of civil liberties and privacy; and (4) the burden on employers to verify employees' work eligibility.

The Basic Pilot Program provides participating employers with an electronic method to verify their employees' work eligibility. Employers may participate voluntarily in the Basic Pilot Program, but are still required to complete Forms I-9[10] for all newly hired employees in accordance with IRCA. After completing the forms, these employers query the pilot program's automated system by entering employee information provided on the forms, such as name and social security number, into the pilot Web site within 3 days of the employees' hire date. The pilot program then electronically matches that information against information in SSA and, if necessary, DHS databases to determine whether the employee is eligible to work, as shown in figure 1. The Basic Pilot Program electronically notifies employers whether their employees' work authorization was confirmed. Those queries that the DHS automated check cannot confirm are referred to DHS immigration status verifiers

---

[8] 8 U.S.C. 1324a(b). IIRIRA was enacted within a larger piece of legislation, the Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208.

[9] The other two pilot programs mandated by IIRIRA—the Citizen Attestation Verification Pilot Program and the Machine-Readable Document Pilot Program—were discontinued in 2003 due to technical difficulties and unintended consequences identified in evaluations of the programs. See Institute for Survey Research and Westat, *Findings of the Citizen Attestation Verification Pilot Program Evaluation* (Washington, D.C.: April 2003) and Institute for Survey Research and Westat, *Findings of the Machine-Readable Document Pilot Program Evaluation* (Washington, D.C.: May 2003).

[10] The Form I-9 is completed by employers in verifying the work eligibility of all newly hired employees.

GAO-06-895T

**No-Match Cert. Admin. Record  625**

who check employee information against information in other DHS databases.

**Figure 1: Basic Pilot Program Verification Process**



Source: GAO analysis based on USCIS information.

In cases when the pilot system cannot confirm an employee's work

GAO-06-895T

No-Match Cert. Admin. Record  626

authorization status either through the automatic check or the check by an immigration status verifier, the system issues the employer a tentative nonconfirmation of the employee's work authorization status. In this case, the employers must notify the affected employees of the finding, and the employees have the right to contest their tentative nonconfirmations by contacting SSA or USCIS to resolve any inaccuracies in their records within 8 days. During this time, employers may not take any adverse actions against those employees, such as limiting their work assignments or pay. Employers are required to either immediately terminate the employment, or notify DHS of the continued employment, of workers who do not successfully contest the tentative nonconfirmation and those who the pilot program finds are not work-authorized.

# Various Weaknesses Have Undermined the Employment Verification Process, but Opportunities Exist to Enhance It

## Current Employment Verification Process Is Based on Employers' Review of Documents

In 1986, IRCA established the employment verification process based on employers' review of documents presented by employees to prove identity and work eligibility. On the Form I-9, employees must attest that they are U.S. citizens, lawfully admitted permanent residents, or aliens authorized to work in the United States. Employers must then certify that they have reviewed the documents presented by their employees to establish identity and work eligibility and that the documents appear genuine and relate to the individual presenting them. In making their certifications, employers are expected to judge whether the documents presented are obviously counterfeit or fraudulent. Employers are deemed in compliance with IRCA if they have followed the Form I-9 process, including when an unauthorized alien presents fraudulent documents that appear genuine.

## Form I-9 Process Is Vulnerable to Document and Identity Fraud

Since passage of IRCA in 1986, document and identity fraud have made it difficult for employers who want to comply with the employment verification process to ensure they hire only authorized workers. In its 1997 report to Congress, the Commission on Immigration Reform noted that the widespread availability of false documents made it easy for

**No-Match Cert. Admin. Record 627**

unauthorized aliens to obtain jobs in the United States. In past work, we reported that large numbers of unauthorized aliens have used false documents or fraudulently used valid documents belonging to others to acquire employment, including at critical infrastructure sites like airports and nuclear power plants.[11] In addition, although studies have shown that the majority of employers comply with IRCA and try to hire only authorized workers, some employers knowingly hire unauthorized workers, often to exploit the workers' low cost labor. For example, the Commission on Immigration Reform reported that employers who knowingly hired illegal aliens often avoided sanctions by going through the motions of compliance while accepting false documents. Likewise, in 1999 we concluded that those employers who do want to comply with IRCA can intentionally hire unauthorized workers under the guise of having complied with the employment verification requirements by claiming that unauthorized workers presented false documents to obtain employment.[12]

## The Number and Variety of Acceptable Documents Hinders Employer Verification Efforts

The large number and variety of documents that are acceptable for proving work eligibility have complicated employer verification efforts under IRCA. Following the passage of IRCA in 1986, employees could present 29 different documents to establish their identity and/or work eligibility. In a 1997 interim rule, INS reduced the number of acceptable work eligibility documents from 29 to 27.[13] The interim rule implemented changes to the list of acceptable work eligibility documents mandated by IIRIRA and was intended to serve as a temporary measure until INS issued final regulations on modifications to the Form I-9. In 1998, INS proposed a further reduction in the number of acceptable work eligibility documents to 14, but did not finalize the proposed rule.

Since the passage of IRCA, various studies have addressed the need to reduce the number of acceptable work eligibility documents to make the employment verification process simpler and more secure. For example, we previously reported that the multiplicity of work eligibility documents contributed to (1) employer uncertainty about how to comply with the

---

[11]GAO/GGD-99-33, and GAO, *Overstay Tracking: A Key Component of Homeland Security and a Layered Defense*, GAO-04-82 (Washington, D.C.: May 21, 2004).

[12]GAO/GGD-99-33.

[13]Eight of these documents establish both identity and employment eligibility (e.g., U.S. passport or permanent resident card); 12 documents establish identity only (e.g., driver's license); and 7 documents establish employment eligibility only (e.g., social security card).

**No-Match Cert. Admin. Record  628**

employment verification requirements and (2) discrimination against authorized workers.[14] In 1998, INS noted that, when IRCA was first passed, a long inclusive list of acceptable work eligibility documents was allowed for the Form I-9 to help ensure that all persons who were eligible to work could easily meet the requirements, but as early as 1990, there had been evidence that some employers found the list confusing.

According to DHS officials, the department is assessing possible revisions to the Form I-9 process, including reducing the number of acceptable work eligibility documents, but has not established a target time frame for completing this assessment and issuing regulations on Form I-9 changes. DHS released an updated version of the Form I-9 in May 2005 that changed references from INS to DHS but did not modify the list of acceptable work eligibility documents on the Form I-9 to reflect changes made to the list by the 1997 interim rule. Moreover, DHS recently issued interim regulations on the use of electronic Forms I-9, which provide guidance to employers on electronically signing and storing Forms I-9.[15]

## The Basic Pilot Program Shows Promise to Enhance Employment Verification, but Current Weaknesses Could Undermine Increased Use

Various immigration experts have noted that the most important step that could be taken to reduce illegal immigration is the development of a more effective system for verifying work authorization. In particular, the Commission on Immigration Reform concluded that the most promising option for verifying work authorization was a computerized registry based on employers' electronic verification of an employee's social security number with records on work authorization for aliens. The Basic Pilot Program, which is currently available on a voluntary basis to all employers in the United States, operates in a similar way to the computerized registry recommended by the commission, and shows promise to enhance employment verification and worksite enforcement efforts. Only a small portion—about 8,600 as of June 2006—of the approximately 5.6 million

---

[14]GAO, *Immigration Reform: Employer Sanctions and the Question of Discrimination,* GAO/GGD-90-62 (Washington, D.C.: Mar. 29, 1990).

[15]In October 2004, Congress authorized the electronic Form I-9 to be implemented by the end of April 2005. See Pub. L. No. 108-390.

**No-Match Cert. Admin. Record  629**

employer firms nationwide have registered to use the pilot program, and about 4,300 employers are active users.[16]

The Basic Pilot Program enhances the ability of participating employers to reliably verify their employees' work eligibility and assists participating employers with identification of false documents used to obtain employment by comparing employees' Form I-9 information with information in SSA and DHS databases. If newly hired employees present counterfeit documents, the pilot program would not confirm the employees' work eligibility because their employees' Form I-9 information, such as the false name or social security number, would not match SSA and DHS database information when queried through the Basic Pilot Program.

Although ICE has no direct role in monitoring employer use of the Basic Pilot Program and does not have direct access to program information, which is maintained by USCIS, ICE officials told us that program data could indicate cases in which employers do not follow program requirements and therefore would help the agency better target its worksite enforcement efforts toward those employers. For example, the Basic Pilot Program's confirmation of numerous queries of the same social security number could indicate that a social security number is being used fraudulently or that an unscrupulous employer is knowingly hiring unauthorized workers by accepting the same social security number for multiple employees. ICE officials noted that, in a few cases, they have requested and received pilot program data from USCIS on specific employers who participate in the program and are under ICE investigation. However, USCIS officials told us that they have concerns about providing ICE broader access to Basic Pilot Program information because it could create a disincentive for employers to participate in the program, as employers may believe that they are more likely to be targeted for a worksite enforcement investigation as a result of program participation. According to ICE officials, mandatory employer participation in the Basic

---

[16]The approximately 8,600 employers who registered to use the Basic Pilot Program do not reflect the number of worksites or individual business establishments using the program. The about 5.6 million firms in the United States was the number of firms in 2002, which is the most current data available. Under the Basic Pilot Program, one employer may have multiple worksites that use the pilot program. For example, a hotel chain could have multiple individual hotels using the Basic Pilot Program, but the hotel chain would represent one employer using the pilot program. A firm is a business organization consisting of one or more domestic establishments in the same state and industry that were specified under common ownership or control.

GAO-06-895T

**No-Match Cert. Admin. Record  630**

Pilot Program would eliminate the concern about sharing data and could help ICE better target its worksite enforcement efforts on employers who try to evade using the program. Moreover, these officials told us that mandatory use of an automated system like the pilot program, could limit the ability of employers who knowingly hired unauthorized workers to claim that the workers presented false documents to obtain employment, which could assist ICE agents in proving employer violations of IRCA.

Although the Basic Pilot Program may enhance the employment verification process and a mandatory program could assist ICE in targeting its worksite enforcement efforts, weaknesses exist in the current program. For example, the current Basic Pilot Program cannot help employers detect identity fraud. If an unauthorized worker presents valid documentation that belongs to another person authorized to work, the Basic Pilot Program would likely find the worker to be work-authorized. Similarly, if an employee presents counterfeit documentation that contains valid information and appears authentic, the pilot program may verify the employee as work-authorized. DHS officials told us that the department is currently considering possible ways to enhance the Basic Pilot Program to help it detect cases of identity fraud, for example, by providing a digitized photograph associated with employment authorization information presented by an employee.

Delays in the entry of information on arrivals and employment authorization into DHS databases can lengthen the pilot program verification process for some secondary verifications. Although the majority of pilot program queries entered by employers are confirmed via the automated SSA and DHS verification checks, about 15 percent of queries authorized by DHS required secondary verifications by immigration status verifiers in fiscal year 2004.[17] According to USCIS, cases referred for secondary verification are typically resolved within 24 hours, but a small number of cases take longer, sometimes up to 2 weeks, due to, among other things, delays in entry of data on employees who received employment authorization documents generated by a computer and

---

[17]In fiscal year 2004, only about 8 percent of total Basic Pilot Program queries were referred to DHS for verification. Of these queries referred to DHS for verification, about 85 percent were confirmed via the DHS automated verification check.

No-Match Cert. Admin. Record  631

camera that are not directly linked to DHS databases.[18] Secondary verifications lengthen the time needed to complete the employment verification process and could harm employees because employers might reduce those employees' pay or restrict training or work assignments, which are prohibited under pilot program requirements, while waiting for verification of their work eligibility.[19] DHS has taken steps to increase the timeliness and accuracy of information entered into databases used as part of the Basic Pilot Program and reports, for example, that data on new immigrants are now typically available for verification within 10 to 12 days of an immigrant's arrival in the United States while, previously, the information was not available for up to 6 to 9 months after arrival.[20]

Furthermore, employer noncompliance with Basic Pilot Program requirements may adversely affect employees queried through the program. The Temple University Institute for Survey Research and Westat evaluation of the Basic Pilot Program concluded that the majority of employers surveyed appeared to be in compliance with Basic Pilot Program procedures. However the evaluation and our review found evidence of some noncompliance with these procedures, such as those that prohibit screening job applicants or limiting of employees' work assignments or pay while contesting tentative nonconfirmations. The Basic Pilot Program provides a variety of reports that may help USCIS determine whether employers follow program requirements, but USCIS officials told us that their efforts to review employers' use of the pilot program have been limited by lack of staff available to oversee and examine employer use of the program.

According to USCIS officials, due to the growth in other USCIS verification programs, current USCIS staff may not be able to complete timely secondary verifications if the number of employers using the program significantly increased. In particular, these officials said that if a significant number of new employers registered for the program or if the

---

[18]Information on employment authorization documents generated through this process is electronically sent to USCIS headquarters for entry, but is sometimes lost or not entered into databases in a timely manner. By contrast, employment authorization documents issued at USCIS service centers are produced via computers that are used to update data in USCIS databases, which USCIS officials told us represent the majority of employment authorization documents currently issued by USCIS.

[19]Institute for Survey Research and Westat.

[20]DHS, *Report to Congress on the Basic Pilot Program* (Washington, D.C.: June 2004).

No-Match Cert. Admin. Record  632

program were mandatory for all employers, additional staff would be needed to maintain timely secondary verifications. USCIS has approximately 38 Immigration Status Verifiers allocated for completing Basic Pilot Program secondary verifications, and these verifiers reported that they are able to complete the majority of manual verification checks within their target time frame of 24 hours. However, USCIS officials said that the agency has serious concerns about its ability to complete timely verifications if the number of Basic Pilot Program users greatly increased.

# Competing Priorities and Implementation Challenges Have Hindered Worksite Enforcement Efforts

## Worksite Enforcement Has Been a Relatively Low Priority

Worksite enforcement is one of various immigration enforcement programs that competes for resources and among INS and ICE responsibilities, and worksite enforcement has been a relatively low priority. For example, in the 1999 INS Interior Enforcement Strategy, the strategy to block and remove employers' access to undocumented workers was the fifth of five interior enforcement priorities.[21] In that same year, we reported that, relative to other enforcement programs in INS, worksite enforcement received a small portion of INS's staffing and enforcement budget and that the number of employer investigations INS conducted each year covered only a fraction of the number of employers who may have employed unauthorized aliens.[22]

In keeping with the primary mission of DHS to combat terrorism, after September 11, 2001, INS and then ICE focused investigative resources primarily on national security cases. In particular, INS and then ICE focused available resources for worksite enforcement on identifying and removing unauthorized workers from critical infrastructure sites, such as airports and nuclear power plants, to help reduce vulnerabilities at those sites. We previously reported that, if critical infrastructure-related businesses were to be compromised by terrorists, this would pose a

---

[21]INS, *Interior Enforcement Strategy* (Washington, D.C.: Jan. 1999).

[22]GAO/GGD-99-33.

No-Match Cert. Admin. Record  633

serious threat to domestic security. According to ICE, the agency adopted this focus on critical infrastructure protection because the fact that unauthorized workers can obtain employment at critical infrastructure sites indicates that there are vulnerabilities in those sites' hiring and screening practices, and unauthorized workers employed at those sites are vulnerable to exploitation by terrorists, smugglers, traffickers, and other criminals. ICE has inspected Forms I-9 and employer records at hundreds of critical infrastructure sites, including at about 200 airports as part of Operation Tarmac and at more than 50 nuclear power plants as part of Operation Glow Worm.[23] More recently, ICE announced conducting worksite enforcement operations at other critical infrastructure sites, including at an airport, chemical plants, and a water and power facility.

Since fiscal year 1999, INS and ICE have dedicated a relatively small portion of overall agent resources to the worksite enforcement program. As shown in figure 2, in fiscal year 1999 INS allocated about 240 full-time equivalents to worksite enforcement efforts, while in fiscal year 2003, ICE allocated about 90 full-time equivalents. Between fiscal years 1999 and 2003, the percentage of agent work-years spent on worksite enforcement efforts generally decreased from about 9 percent to about 4 percent.[24]

---

[23]Operations Tarmac and Glow Worm were ICE initiatives to detect and remove unauthorized workers from airports and nuclear power plants, respectively.

[24]More recent data on investigative agent work-years cannot be shared publicly.

No-Match Cert. Admin. Record  634

Figure 2: Investigative Agent Work-years Spent on Worksite Enforcement Efforts and Agent Work-years Spent on Other Investigative Areas for Each Fiscal Year from 1999 through 2003



Source: GAO analysis of INS case management data.

Although worksite enforcement has been a low priority relative to other programs, ICE has proposed increasing agent resources for the worksite enforcement program. For example, in its fiscal year 2007 budget submission, ICE requested funding for 206 additional positions for worksite enforcement. Yet, at this point, it is unclear what impact, if any, these additional resources would have on worksite enforcement efforts.

GAO-06-895T

No-Match Cert. Admin. Record  635

**ICE Attributes Decline in Numbers of Employer Fine Notices and Worksite Arrests to Document Fraud and Resource Allocation Decisions**

The number of notices of intent to fine issued to employers as well as the number of unauthorized workers arrested at worksites have generally declined.[25] Between fiscal years 1999 and 2004, the number of notices of intent to fine issued to employers for improperly completing Forms I-9 or knowingly hiring unauthorized workers generally decreased from 417 to 3. (See fig. 3.)

**Figure 3: Number of Notices of Intent to Fine Issued to Employers for Each Fiscal Year from 1999 through 2004**



Source: GAO analysis of INS and ICE case management data.

The number of unauthorized workers arrested during worksite enforcement operations has also declined since fiscal year 1999. As shown in figure 4, the number of worksite arrests for administrative violations of immigration law, such as for violating the terms of a visa, declined by about 84 percent from 2,849 in fiscal year 1999 to 445 in fiscal year 2003.

---

[25]If warranted as a result of a worksite enforcement operation, ICE may issue a notice of intent to fine to an employer that specifies the amount of the fine ICE is seeking to collect from the employer. This amount may be reduced after negotiations between ICE attorneys and the employer.

No-Match Cert. Admin. Record  636

**Figure 4: Number of Administrative Worksite Enforcement Arrests for Each Fiscal Year from 1999 through 2003**



Source: GAO analysis of INS case management data.

ICE attributes the decline in the number of notices of intent to fine issued to employers and number of administrative worksite arrests to various factors including the widespread availability and use of counterfeit documents and the allocation of resources to other priorities. Various studies have shown that the availability and use of fraudulent documents have made it difficult for ICE agents to prove that employers knowingly hired unauthorized workers. ICE officials also told us that employers who agents suspect of knowingly hiring unauthorized workers can claim that they were unaware that their workers presented false documents at the time of hire, making it difficult for agents to prove that the employer willfully violated IRCA.

In addition, according to ICE, the allocation of INS and ICE resources to other priorities has contributed to the decline in the number of notices of intent to fine and worksite arrests. For example, INS focused its worksite enforcement resources on egregious violators who were linked to other criminal violations, like smuggling, fraud or worksite exploitation, and de-emphasized administrative employer cases and fines. Furthermore, ICE investigative resources were redirected from worksite enforcement activities to criminal alien cases, which consumed more investigative hours by the late 1990s than any other enforcement activity. After

No-Match Cert. Admin. Record  637

September 11, 2001, INS and ICE focused investigative resources on national security cases, and in particular, focused worksite enforcement efforts on critical infrastructure protection, which is consistent with DHS's primary mission to combat terrorism. According to ICE, the redirection of resources from other enforcement programs to perform national security-related investigations resulted in fewer resources for traditional program areas like fraud and noncritical infrastructure worksite enforcement. Additionally, some ICE field representatives, as well as immigration experts, noted that the focus on critical infrastructure protection does not address the majority of worksites in industries that have traditionally provided the magnet of jobs attracting illegal aliens to the United States.

As part of the Secure Border Initiative, in April 2006 ICE announced a new interior enforcement strategy to target employers of unauthorized aliens, immigration violators, and criminal networks. Under this strategy, ICE plans to target employers who knowingly employ unauthorized workers by bringing criminal charges against them. ICE has reported increases in the numbers of criminal arrests, indictments, and convictions between fiscal years 2004 and 2005 as a result of these efforts.[26] Between fiscal years 2004 and 2005, ICE reported that the number of criminal arrests increased from 160 to 165. Furthermore, in fiscal year 2005 ICE reported that the number of criminal indictments and convictions were 140 and 127, respectively, and in fiscal year 2004 the number of indictments and convictions were 67 and 46, respectively. In addition, ICE reported arresting 980 individuals on administrative immigration violations in fiscal year 2005 as a result of its worksite enforcement efforts.

---

[26]Data from fiscal years 2004 and 2005 cannot be compared with data for previous fiscal years because the way INS agents entered data on investigations into the INS case management system differs from the way ICE agents enter such data into the ICE system. Following the creation of ICE in March 2003, the case management system used to enter and maintain information on immigration investigations changed. With the establishment of ICE, agents began using the legacy U.S. Customs Service's case management system, called the Treasury Enforcement Communications System, for entering and maintaining information on investigations, including worksite enforcement operations. Prior to the creation of ICE, the former INS entered and maintained information on investigative activities in the Performance Analysis System, which captured information on immigration investigations differently than the Treasury Enforcement Communications System.

GAO-06-895T

No-Match Cert. Admin. Record  638

## INS and ICE Have Faced Difficulties in Setting Fine Amounts and in Detaining Unauthorized Workers, but Have Taken Steps to Address Difficulties

INS and ICE have faced difficulties in setting and collecting fine amounts that meaningfully deter employers from knowingly hiring unauthorized workers and in detaining unauthorized workers arrested at worksites. ICE officials told us that because fine amounts are so low, the fines do not provide a meaningful deterrent. These officials also said that when agents could prove that an employer knowingly hired an unauthorized worker and issued a notice of intent to fine, the fine amounts agents recommended were often negotiated down in value during discussion between agency attorneys and employers. The amount of mitigated fines may be, in the opinion of some ICE officials, so low that they believe that employers view the fines as a cost of doing business, making the fines an ineffective deterrent for employers who attempt to circumvent IRCA. According to ICE, the agency mitigates employer fine amounts because doing so may be a more efficient use of government resources than pursuing employers who contest or ignore fines, which could be more costly to the government than the fine amount sought.

An ICE official told us that use of civil settlements and criminal charges instead of pursuit of administrative fines, specifically in regard to noncritical infrastructure employers, could be a more efficient use of investigative resources. In 2005, ICE settled a worksite enforcement case with a large company without going through the administrative fine process. As part of the settlement, the company agreed to pay $11 million and company contractors agreed to pay $4 million in forfeitures—more than an administrative fine amount ever issued against an employer for ICE violations. ICE officials also said that use of civil settlements could help ensure employers' future compliance by including in the settlements a requirement to entire into compliance agreements, such as the Basic Pilot Program. In addition, as part of ICE's new interior enforcement strategy, the agency plans to bring criminal charges against employers who knowingly hire unauthorized workers, rather than using administrative fines to sanction employers. The practice of using civil settlements and criminal charges against employers is in the early stages of implementation; therefore, the extent to which it may help limit the employment of unauthorized workers is not yet known.

The former INS also faced difficulties in collecting fine amounts from employers, but collection efforts have improved. We previously reported that the former INS faced difficulties in collecting fine amounts from employers for a number of reasons, including that employers went out of

No-Match Cert. Admin. Record  639

business, moved, or declared bankruptcy.[27] In 1998, INS created the Debt Management Center to centralize the collections process, and the center is now responsible for collecting fines ICE issued against employers for violations of IRCA, among other things. The ICE Debt Management Center has succeeded in collecting the full amount of final fines on most of the invoices issued to employers between fiscal years 1999 and 2004.[28]

In addition, ICE's Office of Detention and Removal has limited detention space, and unauthorized workers detained during worksite enforcement investigations have been a low priority for that space.[29] In 2004, the Under Secretary for Border and Transportation Security sent a memo to the Commissioner of U.S. Customs and Border Protection and the Assistant Secretary for ICE outlining the priorities for the detention of aliens. According to the memo, aliens who are subjects of national security investigations were among those groups of aliens given the highest priority for detention, while those arrested as a result of worksite enforcement investigations were to be given the lowest priority. ICE officials stated that the lack of sufficient detention space has limited the effectiveness of worksite enforcement efforts. For example, they said that if investigative agents arrest unauthorized aliens at worksites, the aliens would likely be released because the Office of Detention and Removal detention centers do not have sufficient space to house the aliens and they may re-enter the workforce, in some cases returning to the worksites from where they were originally arrested. Congress has provided funds to the Office of Detention and Removal for additional bed spaces. Yet, given competing priorities for detention space, the effect, if any, these additional bed spaces will have on ICE's priority given to workers detained as a result of worksite enforcement operations cannot currently be determined.

---

[27]GAO/GGD-99-33.

[28]The Debt Management Center issues invoices to employers for collecting fine amounts. According to ICE, multiple invoices can be issued for each final order for an employer fine, as a payment plan is typically established for employers as part of the final order for the fine amount.

[29]The Office of Detention and Removal is primarily responsible for identifying and removing criminal aliens from the United States. The office is also responsible for managing ICE's space for detaining aliens.

No-Match Cert. Admin. Record  640

## Concluding Observations

Efforts to reduce the employment of unauthorized workers in the United States necessitate a strong employment eligibility verification process and a credible worksite enforcement program to ensure that employers meet verification requirements. The current employment verification process has not fundamentally changed since its establishment in 1986, and ongoing weaknesses have undermined its effectiveness. Although DHS and the former INS have been contemplating changes to the Form I-9 since 1997, DHS has not yet issued final regulations on these changes, and it has not yet established a definitive time frame for completing the assessment. We recommended that DHS set a target time frame for completing this assessment and issuing final regulations to strengthen the current employment verification process and make it simpler and more secure. Furthermore, the Basic Pilot Program shows promise for enhancing the employment verification process and reducing document fraud if implemented on a much larger scale. However, current weaknesses in pilot program implementation would have to be fully addressed to help ensure the efficient and effective operation of an expanded or mandatory pilot program, or a similar automated employment verification program, and the cost of additional resources would be a consideration. USCIS is currently evaluating the Basic Pilot Program to include, as we have recommended, information on addressing the program's weaknesses to assist USCIS and Congress in addressing possible future use of the Basic Pilot Program.

Even with a strengthened employment verification process, a credible worksite enforcement program would be needed because no verification system is foolproof and not all employers may want to comply with IRCA. ICE's focus of its enforcement resources on critical infrastructure protection since September 11, 2001, is consistent with the DHS mission to combat terrorism by detecting and mitigating vulnerabilities to terrorist attacks at critical infrastructure sites which, if exploited, could pose serious threats to domestic security. This focus on critical infrastructure protection, though, generally has not addressed noncritical infrastructure employers' noncompliance with IRCA. As a result, employers, particularly those not located at or near critical infrastructure sites, who attempted to circumvent IRCA have faced less of a likelihood that ICE would investigate them for failing to comply with the current employment verification process or for knowingly hiring unauthorized workers. ICE is taking some steps to address difficulties it has faced in its worksite enforcement efforts, but it is too early to tell whether these steps will improve the effectiveness of the worksite enforcement program and help ICE identify the millions of unauthorized workers and the employers who hired them.

GAO-06-895T

**No-Match Cert. Admin. Record  641**

This concludes my prepared statement. I would be pleased to answer any questions you and the Subcommittee Members may have.

## GAO Contact and Staff Acknowledgments

For further information about this testimony, please contact Richard Stana at 202-512-8777.

Other key contributors to this statement were Frances Cook, Michelle Cooper, Orlando Copeland, Michele Fejfar, Rebecca Gambler, Kathryn Godfrey, Eden C. Savino, and Robert E. White.

GAO-06-895T

No-Match Cert. Admin. Record  642

# Related GAO Products

*Social Security Numbers: Coordinated Approach to SSN Data Could Help Reduce Unauthorized Work.* GAO-06-458T. February 16, 2006.

*Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts.* GAO-05-813. August 31, 2005.

*Immigration Enforcement: Preliminary Observations on Employment Verification and Worksite Enforcement Efforts.* GAO-05-822T. June 21, 2006.

*Social Security: Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports.* GAO-05-154. February 4, 2005.

*Immigration Enforcement: DHS Has Incorporated Immigration Enforcement Objectives and Is Addressing Future Planning Requirements.* GAO-05-66. October 8, 2004.

*Overstay Tracking: A Key Component of Homeland Security and a Layered Defense.* GAO-04-82. May 21, 2004.

*Homeland Security: Challenges to Implementing the Immigration Interior Enforcement Strategy.* GAO-03-660T. April 10, 2003.

*Identity Fraud: Prevalence and Links to Alien Illegal Activities.* GAO-02-830T. June 25, 2002.

*Illegal Aliens: Significant Obstacles to Reducing Unauthorized Alien Employment Exist.* GAO/GGD-99-33. April 2, 1999.

*Immigration Reform: Employer Sanctions and the Question of Discrimination.* GAO/GGD-90-62. March 29, 1990.

(440528)

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice:  (202) 512-6000<br> TDD:  (202) 512-2537<br> Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

PRINTED ON ♻ RECYCLED PAPER



**G A O**
Accountability • Integrity • Reliability

United States Government Accountability Office
Washington, DC 20548

July 11, 2006

The Honorable Jim McCrery
Chairman
Subcommittee on Social Security
Committee on Ways and Means
House of Representatives

The Honorable Jim Ramstad
Chairman
Subcommittee on Oversight
Committee on Ways and Means
House of Representatives

Subject: Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work

To lawfully work in the United States, individuals must provide identification and evidence of work authorization to their employers. Individuals who are not U.S. citizens must have authorization to work from the Department of Homeland Security (DHS). Yet individuals without these required authorizations can gain employment using fraudulent documents containing fictitious information or information that belongs to someone else or by being hired by an employer who does not follow the law. In prior GAO work on these issues, we have reported that Social Security Administration (SSA) and Internal Revenue Service (IRS) data can be useful for identity and employment eligibility verification as well as to facilitate more effective worksite enforcement. However, the use of these data has drawbacks since they contain some erroneous information and information about hundreds of thousands or even millions of U.S. citizens and work-authorized aliens. Because the confidentiality of tax data is considered crucial to voluntary taxpayer compliance, IRS is restricted under Section 6103 of the Internal Revenue Code from sharing taxpayer information with third parties except in very limited circumstances. Currently, IRS is not authorized to share taxpayers' information for worksite enforcement efforts. However, SSA is authorized to provide DHS a specific data file that contains information compiled from employer earnings reports and SSA data.

The House and the Senate are considering legislation to reform immigration laws and strengthen enforcement. As part of these deliberations, there are proposals to share earnings data with DHS for worksite enforcement. To better understand how such data could be used, the Subcommittees on Social Security and on Oversight of the House Ways and Means Committee requested that we assess DHS's use of the data it already receives from SSA and determine what changes or improvements could be made to effectively use earnings data for enforcement.

**GAO-06-814R DHS Use of Earnings Data**

In summary, sharing earnings data has the potential to assist DHS in detecting unauthorized work and enforcing immigration laws. However, DHS has not yet fully determined how it would use earnings data in a program of general worksite enforcement. As policymakers consider providing DHS additional earnings data, they should also consider how DHS would use these data and how DHS would safeguard taxpayer information. To address the subcommittees' request, we describe the earnings data that might be useful to DHS in its worksite enforcement efforts, highlighting both the benefits and the limitations associated with each source of data.

We built on prior GAO work, as cited in the attached briefing, and gathered additional information from SSA, IRS, DHS, and the Department of Health and Human Services (HHS). To determine what information is most useful to DHS and how it could be used effectively, we interviewed agency officials to obtain their perspectives on the potential benefits and limitations of using various data that provide information on unauthorized workers. We examined five datasets: SSA's Nonwork Alien File, SSA's Earnings Suspense File, HHS's National Directory of New Hires, information on income tax returns reporting wage income filed using Individual Taxpayer Identification Numbers, and DHS's current electronic employment eligibility verification program transaction data. We used this information and our analyses of the datasets to assess what specific sources could provide the most useful information consistent with DHS's needs and priorities. We assessed the barriers DHS might face in using the data as an effective tool for worksite enforcement given DHS's limited worksite enforcement resources. Because of time constraints, we did not determine the amount of additional resources DHS would have to invest in order to make these sources useful. Further, although we interviewed knowledgeable officials about the contents of these files, we did not determine the extent to which these databases actually contain information about unauthorized work. For more detailed information about our scope and methodology, see the appendix. We performed our work between October 2005 and June 2006 in accordance with generally accepted government auditing standards.

We are sending copies of this briefing to the Secretary of Homeland Security, the Commissioner of Social Security, the Commissioner of Internal Revenue, the Secretary of Health and Human Services, and other interested parties. Copies will also be made available to others upon request. In addition, the report will be available at no charge on GAO's Web site at http://www.gao.gov. Please contact us at the numbers shown below if you or your staff have any questions about this report. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this briefing.

Sincerely yours,

Barbara D. Bovbjerg
Director, Education, Workforce, and Income Security Issues
(202) 512-7215
bovbjergb@gao.gov

Richard M. Stana
Director, Homeland Security and Justice Issues
(202) 512-8777
stanar@gao.gov

Michael Brostek
Director, Tax Issues
Strategic Issues Team
(202) 512-9110
brostekm@gao.gov

Enclosure

(130528)

**No-Match Cert. Admin. Record 647**

**Briefing for Congressional Staff**                                **Page 1**

# IMMIGRATION ENFORCEMENT:

## Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work

### Why GAO Did This Study

In our prior work, we have reported that certain earnings data collected by the Social Security Administration (SSA) and the Internal Revenue Service (IRS) from employers could be useful to the Department of Homeland Security (DHS) for identifying unauthorized work. The House and Senate are considering legislation to reform immigration laws and strengthen their enforcement. There are proposals to allow DHS access to earnings data to identify unauthorized workers. To better understand how such data could be used, the House Ways and Means Subcommittee on Social Security and the Subcommittee on Oversight requested that we review how DHS uses earnings data that it already receives from SSA and consider changes or improvements that could be made.

To address the subcommittees' request, we describe the earnings data that might be useful to DHS in its worksite enforcement efforts, highlighting both the benefits and the limitations associated with each source of data.

### Agency Comments

We provided a copy of this briefing to the Social Security Administration, the Internal Revenue Service, the Department of Homeland Security, and the Department of Health and Human Services. All four agencies provided technical comments, which we have incorporated as appropriate.

### Summary

Access to earnings data maintained by the Social Security Administration and by the Internal Revenue Service could help the Department of Homeland Security target the limited resources it has for worksite enforcement. A variety of databases could help identify potential unauthorized work. Each affords information about a segment of the unauthorized workforce.

**Table 1: Key Characteristics of Data Sources**

| Source | Description |
|---|---|
| Social Security Administration | **Nonwork Alien File** <br> This file contains earnings and demographic data for over 500,000 individuals who earned income using Social Security numbers (SSN) issued for nonwork purposes. DHS has estimated that about one-third are work authorized. |
| Social Security Administration | **Earnings Suspense File (ESF)** <br> This file contains earnings reports with names and SSNs that do not match SSA's records. Employers submitting large numbers of unmatched reports may suggest employment of unauthorized workers. However, the file includes much information about citizens, including records that are the result of errors, in addition to persons using false SSNs or SSNs belonging to others, or persons for whom the employer has no SSN. About 8 million to 11 million records are added annually, but the number of unauthorized workers is not known. |
| Department of Health and Human Services | **National Directory of New Hires (NDNH)** <br> This file contains up-to-date reports on new hires and quarterly wages on almost all workers, including U.S. citizens, for child support enforcement purposes. Over 500 million quarterly wage records and over 60 million new hire reports are entered yearly. NDNH contains only records with names and SSNs that match SSA's records. Names and SSNs that do not match are maintained separately. |
| Internal Revenue Service | **Individual Taxpayer Identification Numbers (ITINs) with Wage Income** <br> IRS could identify taxpayers who filed tax returns using an ITIN and had wage income. To be issued an ITIN, an individual must be ineligible for an SSN. About 530,000 ITIN holders submitted tax returns with wage income in 2001. IRS officials believe that almost all returns filed with ITINs claiming wages are from unauthorized workers. |
| Department of Homeland Security | **Electronic Employment Eligibility Verification Transaction Data** <br> DHS maintains transaction records of employment eligibility verification queries electronically submitted by participating employers. Under the voluntary Basic Pilot program, employers made over 900,000 queries in fiscal year 2005. If made mandatory, these data could potentially be used for worksite enforcement. |

Although there is potential benefit to sharing the information contained in these data sources, they include sensitive personal information, protected by various laws and regulations, such as the Privacy Act and the Internal Revenue Code. To be useful, each would require additional time and resources. In addition, none of the data sources is comprehensive. Each has limitations. Some limitations are shared; others are unique to the source.

### Briefing Structure

| | | |
|---|---|---|
| **Background** | pages | 2-3 |
| **DHS's Needs and Priorities** | page | 4 |
| **Privacy Legislation** | page | 5 |
| **Potential Earnings Data Sources** | page | 6 |
|   Nonwork Alien File | page | 7 |
|   Earnings Suspense File | page | 8 |
|   National Directory of New Hires | page | 9 |
|   Individual Taxpayer Identification Numbers with Wage Income | page | 10 |
|   Electronic Employment Eligibility Verification Transaction Data | page | 11 |
| **Concluding Observations** | page | 12 |
| **Appendix:** Scope, Methodology, and Limitations | page | 13 |

No-Match Cert. Admin. Record. 648

# Background

## Figure 1: Flow of Earnings Data Collection



To verify employment eligibility, workers must provide

- Proof of Identity
- Proof of U.S. citizenship or work authorization

Employers gather information about workers using

- I-9 Employment Eligibility Verification
- W-4 Employee's Withholding Allowance Certificate

Employers report name, SSN, and address upon hire and wages on a quarterly basis to designated state agencies

- Quarterly Wage Reports
- W-4 Data

→ State Workforce Agency

→ State Directory of New Hires

→ National Directory of New Hires

At year end, employers send

- W-2 Wage and Tax Statement

→ SSA

worker sends

- IRS 1040 US Individual Income Tax Return
- W-2 copy

→ IRS

Sources: GAO and Art Explosion.

Note: State workforce agencies also supply information on unemployment insurance to NDNH.

## Background

To lawfully work in the United States, individuals are required to provide identification and evidence of work authorization to their employers. Individuals who are not U.S. citizens must have authorization to work from DHS. Information about work authorization is gathered using DHS's Employment Eligibility Verification Form I-9, which requires that employers verify the identity and employment eligibility of newly hired workers. DHS is testing electronic employment verification through its statutorily mandated Basic Pilot program, a voluntary program through which participating employers electronically verify newly hired employees' work eligibility by checking information maintained in SSA and DHS databases. As of June 2006, about 9,300 employers have registered to use the Basic Pilot. Pending immigration reform legislation would require mandatory participation in this program for all employers.

Employers are also obligated to gather and report information about their workers to state and federal agencies upon hiring them and periodically thereafter. This information is used to administer tax and social security programs and to enforce child support laws. Information gathered for tax withholding purposes is collected on the IRS Form W-4, Employee's Withholding Allowance Certificate. Information on wages paid to workers is reported to the SSA annually on the IRS's Form W-2, Wage and Tax Statement. Some of this information is also collected for the National Directory of New Hires (NDNH), which was created by Congress to assist in establishing and enforcing child support orders. Within 20 days after hiring a new worker, employers are required to report the name, SSN, and address provided on the W-4 to a designated state agency that maintains a state directory of new hires. The state, in turn, is required to report this information to the National Directory within 3 days of entry into the state directory. Employers also submit quarterly wage statements to state workforce agencies, and this information is added to the NDNH. Periodic statements on persons who have applied for or received unemployment benefits are also supplied to the National Directory by state workforce agencies. The Office of Child Support Enforcement at the U.S. Department of Health and Human Services maintains this directory, and SSA's National Computer Center houses it.

At the end of the calendar year, employers report wages to SSA using Form W-2, and individuals file their income tax returns with IRS using IRS Form 1040, US Individual Income Tax Return. IRS requires a unique taxpayer identification number, such as an SSN, to process any tax return or tax-related document. In certain limited situations, SSA issues SSNs to noncitizens for nonwork purposes. A 1996 law requires SSA to provide DHS an annual electronic file listing persons who have earnings but who were issued an SSN for nonwork purposes. Noncitizens that are not eligible to obtain an SSN but require a taxpayer identification number for tax-processing purposes may obtain Individual Taxpayer Identification Numbers (ITINs) from IRS. Although precise data have not been compiled, Treasury's Office of the Inspector General has estimated that hundreds of thousands of ITINs have been issued to noncitizens who may not be authorized to work but subsequently earn wage income.

# Background

As SSA posts earnings to workers' Social Security records through various automated processes, reports with names and SSNs that do not match SSA's records and cannot be identified are placed in the Earnings Suspense File (ESF), remaining there until they can be linked to a valid SSN and name. In the past, we have noted that a small percentage of employers were responsible for a disproportionate percentage of the unidentified earnings reports. Some records are posted to the ESF when, for example, employers use the same SSN for multiple workers in a single tax year, submit invalid SSNs, or submit incomplete information.  Employers are instructed to enter all zeros for the SSN if the worker has applied for a card but the number is not received in time for filing. These records, if not changed later, would also be posted to the ESF.

**Figure 2: Earnings Data Collection and Reporting**



Sources: GAO and Art Explosion.

* Electronic employment eligibility verification is currently operating as the Basic Pilot program, which is voluntary for employers, but under immigration reform bills under consideration, it could become mandatory.

# DHS's Needs and Priorities

## Past DHS Enforcement Efforts

We have reported that consistent with DHS's mission to combat terrorism, after September 11, 2001, the department focused its worksite enforcement resources on removing unauthorized workers from critical infrastructure sectors. As a result, worksite enforcement for noncritical infrastructure has been a relatively low priority for DHS. For example, the number of administrative worksite arrests declined from 2,849 in fiscal year 1999 to 445 in fiscal year 2003. Between fiscal years 1999 and 2003, the percentage of agent work-years spent on worksite enforcement efforts generally decreased from about 9 percent to about 4 percent.

Although SSA was required by law to provide DHS with an annual listing of persons who have earnings but who have an SSN issued for nonwork purposes, DHS has so far made little use of this information for worksite enforcement. According to DHS officials, until 2005 the data came from SSA in an electronic format that was incompatible with their systems. Although DHS has overcome the technical impediments, DHS officials remain concerned that these earnings data are outdated and that many listed individuals may have become work authorized. In addition, officials said that this source may not help DHS agents prove that employers knowingly hired unauthorized workers because all of the individuals in the file have valid name and SSN combinations.

## DHS's Current Goals and Enforcement Priorities

While DHS's worksite enforcement efforts continue to focus mainly on detecting unauthorized workers in critical infrastructure sectors, in April 2006, DHS announced a new interior enforcement strategy to complement border security efforts. This strategy expands efforts to target employers of unauthorized workers, immigration violators, and criminal networks that support illegal immigration and bring criminal charges against them, rather than relying on penalizing these employers through use of administrative monetary fines. According to DHS, for 2005 DHS increased its worksite enforcement efforts, with criminal worksite arrests increasing from 160 in 2004 to 176 in 2005, and the number of criminal convictions increasing from 87 to 160 over the same time period.

DHS has proposed increasing agent and support resources by 206 positions for all of its worksite enforcement efforts in 2007 to increase investigations of employers who hire significant numbers of unauthorized workers. To help target such employers and help address SSN abuses that allow unauthorized workers to illegally obtain employment, DHS has requested new statutory authority to access additional earnings data from SSA. Various immigration reform proposals would provide additional resources for enforcement. The immigration reform bill that the Senate passed in May 2006 provides DHS with access to some earnings data for worksite enforcement purposes.

## DHS's Current Data Needs

According to DHS officials, they have not yet fully determined what their future data needs under a mandatory electronic employment eligibility verification system might be. Regardless of whether or not electronic verification becomes mandatory, DHS officials said that access to a list of employers who submit large numbers of inaccurate records could be helpful. This list would include certain employers who have been sent letters indicating that names and SSNs on earnings reports could not be matched to SSA records. DHS officials believe that these data could provide investigative leads on employers who may be engaged in illegal employment activities. In addition, because this dataset includes employers who have been notified of such mismatches, it may help agents demonstrate that employers have knowingly continued to employ unauthorized workers, although they have been apprised of such mismatches.

DHS officials also told us that they have been analyzing earnings information that DHS already receives to determine how this information might best be used. For example, DHS is attempting to match the information with other databases that contain information on criminal noncitizens. However, they have not determined how useful the data might be and are continuing to further explore their potential usefulness.

# Privacy Legislation

## Privacy-Related Legislation

- **The Privacy Act of 1974** regulates the government's use of information by limiting the collection, disclosure, and use of personal information maintained in agencies' systems of records.

- **Internal Revenue Code Section 6103,** as amended by the Tax Reform Act of 1976, governs sharing of taxpayer information. The law provides that tax returns and taxpayer information are confidential and may not be disclosed or shared except under limited circumstances.

- **The Computer Matching and Privacy Protection Act of 1988** protects personal information by requiring agencies to enter into written agreements, referred to as matching agreements, when they share information protected by the Privacy Act of 1974 for the purpose of conducting computer matches.

- **The E-Government Act of 2002** strives to enhance protection for personal information in government information systems or information collections by requiring that agencies conduct privacy impact assessments.

## Related GAO Reports

*Privacy: Key Challenges Facing Federal Agencies.* GAO-06-777T. Washington, D.C.: May 17, 2006.

*Personal Information: Agency and Reseller Adherence to Key Privacy Principles.* GAO-06-421. Washington, D.C.: April 4, 2006.

## Data-Sharing Concerns

Advances in information technology make it easier than ever for the federal government to obtain and process personal information about citizens and resident noncitizens in many ways and for many purposes. Federal agencies are increasingly using data sharing to help verify data provided by applicants for government programs or benefits, or to make eligibility decisions. In some cases, data sharing is required by statute. Although such data-sharing arrangements can be useful, several laws and regulations govern the collection, use, and sharing of individuals' taxpayer identifying information. These laws combine to protect sensitive taxpayer identifying data but also provide a structure that allows data to be shared in certain limited instances.

Increased data-sharing could provide DHS with detailed information to use in conducting worksite enforcement. Specifically, various forms of earnings data may provide leads to assist DHS in identifying unauthorized workers or companies participating in fraudulent employment practices. For example, in 1996 Congress required SSA to share certain earnings information with DHS. These arrangements have both benefits and drawbacks. For example, we have reported IRS's concerns that additional disclosure of information in its files could affect taxpayers' willingness to voluntarily comply with laws. Specifically, IRS officials have expressed concerns that if information on unauthorized workers is shared with DHS, some unauthorized workers may move into underground jobs and avoid their tax obligations.

As one of the largest repositories of personal information, IRS is often at the center of concerns over the sharing of sensitive personal identifying data. Because the confidentiality of tax data is considered crucial to voluntary taxpayer compliance, IRS is restricted under Section 6103 of the Internal Revenue Code from sharing taxpayer information with third parties, including other government agencies, except in very limited circumstances. Currently, IRS is not authorized to share taxpayers' information for worksite enforcement efforts. However, SSA is authorized to provide DHS a specific data file that contains certain information compiled from employer earnings reports and SSA data. A statutory exemption to Section 6103 would be required for DHS to obtain broad access to taxpayer information.

Some privacy advocates have expressed concern that expanded sharing of some data may conflict with fundamental privacy principles contained in the Privacy Act, specifically that data acquired for one purpose may not be used for a different purpose without public notification or an individual's consent.

# Potential Earnings Data Sources

## Potential Data Sources

**Nonwork Alien File**
Earnings reports for Social Security numbers issued for nonwork purposes.

**Earnings Suspense File**
Earnings reports with names and SSNs that do not match SSA's records.

**National Directory of New Hires**
Employer reports of all new hires and quarterly wages to state directories of new hires and state workforce agencies.

**Individual Taxpayer Identification Numbers with Earnings from Wages**
Information from tax returns submitted by taxpayers who were not authorized to obtain an SSN, were issued an ITIN, and reported earnings from wages.

**Electronic Employment Eligibility Verification Transaction Data**
Employment eligibility verification queries submitted by employers.

## Overview of Earnings Data Sources

While each data source can provide useful leads for detecting unauthorized work, each source affords information on only a segment of this population. There are various ways in which unauthorized workers obtain employment without the proper documentation, including

- using a nonwork SSN for work or working after authorization expires;
- making up an SSN or using another individual's SSN but not the corresponding name;
- using another person's valid name and SSN combination;
- working for cash without an SSN; or
- using an ITIN as an SSN.

As figure 3 shows, each data source can reveal different types of unauthorized work (shown inside the shaded area), but none is comprehensive. A portion of unauthorized work, such as work done using someone else's valid name and SSN combination (identity theft) or unreported work, is not easily detected using these data.



**Figure 3: Availability of Data on Unauthorized Work in Selected Data Sources**

Sources: GAO and Art Explosion.
Note: Sizes of circles are not to scale. The chart includes instances of both identity theft and the fraudulent use of invalid name/SSN combinations. The use of someone else's valid name and SSN combination (with or without permission) is referred to as identity theft. While other databases may contain earnings information for persons using some information belonging to others, such fraudulent use is easier to detect in these databases because the records may contain someone else's name or SSN, but not both together.

Because these earnings data were not developed to identify unauthorized work, they often lack key enforcement information. As a result, each source contains data that are incomplete or outdated. The information in the files can also be misleading. The mere fact that an earnings report appears in one of these files is not necessarily indicative that an unauthorized worker is associated with the report. Additional investigation would be required to determine whether unauthorized work actually occurred.

# Potential Earnings Data Sources

## Features

**Description**
Earnings reports for persons issued SSNs for nonwork purposes.

**Responsible Agency**
SSA.

**Information Sources**
Employer reports (W-2) and income tax returns (1040) for self-employed are supplemented with demographic information on each SSN holder.

**Persons Included**
Persons issued nonwork SSNs, who have reported earnings. Includes some persons who are authorized to work but have not changed their work status in SSA's records.

**Information Included**
Worker's name, SSN, address, other identifying information; employer, employer identification number, employer's address, earnings amounts.

**Size**
Over 500,000 unique SSNs per year.

**Time Frame**
Provided yearly to DHS about 13 months after end of the tax year.

## Related GAO Reports

*Social Security Numbers: Coordinated Approach to SSN Data Could Help Reduce Unauthorized Work.* GAO-06-458T. Washington, D.C.: February 16, 2006.

*Social Security: Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports.* GAO-05-154. Washington, D.C.: February 4, 2005.

*Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts.* GAO-05-813. Washington, D.C.: August 31, 2005.

## Nonwork Alien File

SSA's Nonwork Alien File can be used to identify persons who have SSNs that were issued for nonwork purposes but have earnings. Since 1982, when SSA began issuing cards indicating they are not valid for employment, SSA has issued over 7 million individuals an SSN for nonwork purposes, and over 500,000 of these persons have earnings posted in the file each year. Since 2002, the number of SSNs issued for nonwork purposes has fallen to 15,000 per year. Although SSA is required by a 1996 statute to provide DHS access to this file annually, DHS has so far made limited use of this information. DHS officials told us they did not have the ability to read the information until 2005 and they are uncertain the data are useful for law enforcement purposes. Because some of SSA's information on immigration status is outdated, the file currently includes a significant number of individuals who received work authorization but have not corrected their SSA record. If supplemented with more up-to-date information on immigration status from DHS, the Nonwork Alien File could be made more useful for worksite enforcement purposes.

**Potential Benefits**
- The file is narrowly targeted. It includes information about workers who have been issued nonwork SSNs but are working.
- DHS could focus on employers with large numbers of records or on individual workers.
- The file is produced using records from one tax year, which allows DHS to focus on persons working in the most recent tax year.
- SSA has statutory authority to share this information with DHS.

**Potential Limitations**
- Immigration status is not up to date, as work authorization status of many listed individuals may have changed since obtaining their nonwork SSNs. On the basis of two samples—one random, one judgmental—and transaction data from the electronic employment eligibility verification system, DHS has estimated that approximately one-third of the persons in the file have become work authorized. Updating immigration status in the SSA database is challenging because of the lack of a common identifier between SSA and DHS databases.
- Form W-2 data filed with SSA and Form 1040-series returns filed with IRS are generally not submitted until after the close of the year, and undergo another year of processing before being shared with DHS.
- DHS officials believe that this source may not help prove that employers knowingly hired unauthorized workers because the individuals in the file have valid name and SSN combinations.
- The file would not include workers using fictitious SSNs or name and SSN combinations that do not match SSA's data because the file was created to identify only persons known to have been issued nonwork numbers.
- Employers' addresses from W-2 reports cannot always be used to determine whether certain individuals are working at specific worksites or to identify suspicious patterns based on worksites, as addresses are not necessarily worksite specific. DHS officials acknowledged this limitation, but still believed that use could be made of these data.
- Includes sensitive taxpayer information—1996 statue provides DHS access to this file annually.

**No-Match Cert. Admin. Record  654**

# Potential Earnings Data Sources

## Features

### Description
Earnings reports with names and SSNs that do not match SSA's records.

### Responsible Agency
SSA.

### Information Source
Employer reports (W-2).

### Persons Included
Persons whose names are inconsistent with SSA's records due to errors or obsolete data; persons using false SSNs or SSNs belonging to others with an incorrect name; and persons for whom the employer has no SSN.

### Information Included
Worker's name, SSN; employer's identification number, and earnings amount.

### Size
255 million records as of 2005. In recent years, 8 million to 11 million new records have been added per year.

### Time Frame
Cumulative from 1937. Processing is finished 21-22 months after the end of the tax year.

## Related GAO Reports

*Social Security: Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports.* GAO-05-154. Washington, D.C.: February 4, 2005.

*Tax Administration: IRS Needs to Consider Options for Revising Regulations to Increase the Accuracy of Social Security Numbers on Wage Statements.* GAO-04-712. Washington, D.C: August 31, 2004.

## Earnings Suspense File

SSA's Earnings Suspense File is a large, cumulative file that could be used to identify employers who consistently submit large numbers or percentages of invalid name and SSN combinations, an indication that they may be disregarding laws. Because, by definition, the records in the file cannot be assigned to an individual's Social Security record, the portion of these earnings that represent unauthorized work is unknown. Reinstatements, which are previously unidentified records from the ESF that are later credited or "reinstated" to an individual's Social Security record, provide some indication of the types of persons whose records are in the ESF. The number of reinstatements to probable unauthorized workers is growing, but our prior work has shown that most reinstatements are still made to U.S.-born citizens. This is an indication that a significant number of earnings reports in the ESF still belong to U.S. citizens and work-authorized noncitizens. DHS is seeking access to a list of employers sent "no match" letters indicating a certain number of names and SSNs on earnings reports submitted could not be matched to SSA records. In one of many efforts to match earnings information to individual records, SSA sends letters to employers who submit a wage report containing more than 10 Forms W-2 that SSA cannot process and in which the mismatches represent more than 0.5 percent of the total Forms W-2 in the employer's submitted wage report.

### Potential Benefits
* Could allow DHS to focus on employers who appear most likely to be disregarding the laws—records in the ESF could be the result of SSN misuse or unauthorized work activities, such as hiring persons with no SSN, fictitious SSNs, or SSN and name combinations that do not match SSA's records.
* Provides historical information—allows DHS to focus on employers who repeatedly submit large numbers of unmatched reports year after year.

### Potential Limitations
* Does not contain information about immigration status.
* Contains information about many U.S. citizens as well as noncitizens—the overall percentage of unauthorized workers is unknown.
* Contains information on persons whose information does not match SSA's records, sometimes for unintentional reasons.
* Employers are instructed to submit earnings reports using all zeros if an individual's SSN is not available.
* Employers' addresses are not included once the earnings report is posted to the ESF, but could potentially be added.
* Listing employers by number of records in file could be misleading. For example, an employer with 35 different employer identification numbers in more than 10 states may appear lower on a list of employers by number of records in the file than an employer with fewer identification numbers.
* Includes sensitive taxpayer information that is protected by various laws and regulations—requires statutory authority to provide DHS access.

**No-Match Cert. Admin. Record  655**

# Potential Earnings Data Sources

## Features

### Description
Employers report all new hires and quarterly wages to state new hire directories and workforce agencies.

### Responsible Agency
Office of Child Support Enforcement, Department of Health and Human Services.

### Information Sources
W-4 information, quarterly wage reports, and state unemployment insurance records.

### Persons Included
Persons whose name and SSN match SSA's records.

### Information Included
Worker's name, SSN, address; employer, employer's identification number, address; quarterly wages unemployment insurance receipt.

### Size
Over 500 million quarterly wage reports and over 60 million new hire reports annually.

### Time Frame
Updated continuously—earnings reports added quarterly.

## Related GAO Reports

*Improper Payments: Federal and State Coordination Needed to Report National Improper Payment Estimates on Federal Programs.* GAO-06-347. Washington, D.C.: April 14, 2006.

*Disability Insurance: SSA Should Strengthen Its Efforts to Detect and Prevent Overpayments.* GAO-04-929. Washington, D.C.: September 10, 2004.

*Unemployment Insurance: Increased Focus on Program Integrity Could Reduce Billions in Overpayments.* GAO-02-697. Washington, D.C.: July 12, 2002.

## National Directory of New Hires

The Department of Health and Human Services' National Directory of New Hires contains more up-to-date employment information than the other data sources and could be used to supplement the Nonwork Alien File by providing more recent earnings and employment information. However, because it does not contain information on work authorization status, supplemental information would be required to make the NDNH useful for identifying unauthorized work. SSA's records contain information related to citizenship and work authorization status, but we have previously reported that SSA's information on work authorization status is not up to date. Since its creation, Congress has authorized use of NDNH data by certain other federal and state agencies for specific purposes other than child support. For example, the Department of Education uses the data to locate persons delinquent in their student loan payments. State workforce agencies have access to determine whether unemployment insurance beneficiaries are working. IRS has access to the NDNH to verify a claim of employment in a tax return and to verify claims for the Earned Income Tax Credit. SSA has access to help it administer its Supplemental Security Insurance and Old-Age, Survivors, and Disability Insurance programs.

### Potential Benefits
- The database includes employer reports of hiring, if the name and SSN match SSA's records, and wages paid to most workers. Names and SSNs that do not match SSA's records are maintained in a separate file, similar to SSA's ESF.
- The database includes information that is much more current than information in other databases—earnings based on quarterly wage files, which may be only a few months old.

### Potential Limitations
- Does not contain information about immigration status and cannot be used alone for immigration enforcement purposes. The file would need supplemental data to be useful for identifying unauthorized work, but supplementing data with up-to-date DHS immigration status would be challenging. SSA's work authorization data could be added, but these data are not up-to-date.
- Employers' addresses from W-4 records cannot always be used to determine whether certain individuals are working at specific worksites or to identify suspicious patterns based on worksite, as addresses are not necessarily worksite specific. Although DHS has not seen the NDNH data, DHS officials acknowledged this limitation of employer addresses in general and believed that use could be made of earnings data containing employers' addresses.
- Includes sensitive information that is protected by statute—requires statutory authority to provide DHS access.

**No-Match Cert. Admin. Record  656**

# Potential Earnings Data Sources

## Features

**Description**
Information from tax returns submitted by ITIN holders with reported wages.

**Responsible Agency**
IRS.

**Information Source**
Annual income tax returns.

**Persons Included**
Persons who have been issued an ITIN and submit a tax return claiming wage income.

**Information Included**
Worker's name, address, and earnings in the last tax year.

**Size**
About 530,000 in tax year 2001.

**Time Frame**
Yearly income tax returns. Initial processing is finished 6 months after the end of the tax year.

## Related GAO Reports

*Internal Revenue Service: Individual Taxpayer Identification Numbers Can Be Improperly Obtained and Used.* GAO-04-529T. Washington, D.C.: March 10, 2004.

*Tax Administration: IRS Needs to Consider Options for Revising Regulations to Increase the Accuracy of Social Security Numbers on Wage Statements.* GAO-04-712. Washington, D.C: August 31, 2004.

*Taxpayer Information: Options Exist to Enable Data Sharing between IRS and USCIS, but Each Presents Challenges.* GAO-06-100. Washington, D.C.: October 11, 2005.

## Individual Taxpayer Identification Numbers with Wage Income

Income tax returns filed using Individual Taxpayer Identification Numbers that report wage income could provide a targeted list of unauthorized workers. Although precise data have not been compiled, hundreds of thousands of aliens with ITINs earn wage income. In March 2004, we reported that IRS and the Treasury Inspector General for Tax Administration have concluded that most of the taxpayers who file tax returns with ITINs are unauthorized workers. Because such a list could be compiled only from individual income tax returns, using this information for enforcement could provide a disincentive to comply with income tax filing requirements.

**Table 2: Characteristics of Tax Returns Filed Using ITINs and Reporting Wages**

| Category | Tax year 2000 | Tax year 2001 | % change |
|---|---|---|---|
| Individual income tax returns (Form 1040) | 353,000 | 530,000 | 50% |
| Paper filed Forms 1040 | 309,000 | 444,000 | 44% |
| Electronically filed[a] Forms 1040 | 44,000 | 86,000 | 95% |

Source: Treasury Inspector General for Tax Administration

[a] According to IRS officials, IRS does not accept Forms 1040 filed electronically if the SSN on the W-2 does not match the SSN on the 1040 (in this case, the ITIN on the 1040). The Treasury Inspector General for Tax Administration reported that some individuals and tax preparation programs were replacing the SSN on the W-2 with the ITIN.

### Potential Benefits
- ITINs are issued only to individuals unable to obtain an SSN, but who need a taxpayer identification number for tax purposes. Such persons are generally not eligible to work in the United States.
- Although estimates are not precise, the Treasury Inspector General for Tax Administration has concluded that hundreds of thousands of tax returns filed with ITINs each year likely involve unauthorized workers.
- IRS officials believe that almost all ITIN holders whose wages are reported on Form W-2 are improperly using fabricated SSNs or SSNs belonging to other people.

### Potential Limitations
- IRS does not regularly generate a listing of ITIN holders with earnings.
- Data are not current, as information is derived from income tax returns.
- Information on employer names and addresses is not readily available to be included, as these items are not collected during processing of tax returns. If employer addresses were collected, these cannot always be used to target specific worksites, as addresses are not necessarily worksite specific. Although DHS has not seen the ITIN data, DHS officials acknowledged this limitation of employer addresses in general, and believed that use could be made of employer addresses.
- Offers information on the segment of the unauthorized workforce that files tax returns. Confidentiality of tax data is considered to be fundamental to taxpayers' willingness to report their tax obligations accurately. To the extent that ITIN holders become aware of greater sharing of information by IRS with other agencies, some of them may move into underground jobs and avoid their tax obligations.
- Includes sensitive taxpayer information that is protected by various laws and regulations—requires statutory authority to provide DHS access.

# Potential Earnings Data Sources

## Features

**Description**
Employment eligibility verification queries submitted by participating employers.

**Responsible Agencies**
DHS and SSA.

**Information Source**
Employer submissions based on information from Form I-9.

**Persons included**
Currently, persons whose employers participated in the Basic Pilot program. If the program becomes mandatory, all workers whose employers are required to participate.

**Information Included**
Worker's name, SSN, date of birth, citizenship status, hire date, Alien Number (if applicable), employer, and status of query.

**Size**
As of June 2006, about 9,300 employers have registered for the program, and those employers who actively used the program submitted over 900,000 queries in fiscal year 2005. If it became mandatory, 5 million to 6 million employers would be required to participate.

**Time Frame**
Employer submissions are ongoing
*Immigration Enforcement:*

## Related GAO Reports

*Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts.* GAO-05-813. Washington, D.C.: August 31, 2005.

*Immigration Enforcement: Preliminary Observations on Employment Verification and Worksite Enforcement Efforts.* GAO-05-822T. Washington, D.C.: June 21, 2005.

## Electronic Employment Eligibility Verification Transaction Data

Transaction data from employer queries of an electronic employment eligibility verification system could be mined for patterns suggesting unauthorized work. Under the current voluntary Basic Pilot program, transaction data are rarely shared with enforcement agents. If the program remains voluntary and the data are used for worksite enforcement purposes, U.S. Citizenship and Immigration Services officials are concerned that such use could create a disincentive for employers to participate. If electronic verification becomes mandatory, the transaction data could provide more comprehensive information that is potentially more useful for worksite enforcement.

**Potential Benefits**
- Patterns suggesting unauthorized work could be detected in employer queries. For example, employers submitting the same name and SSN multiple times or many employers submitting the same name and SSN.
- Use of transaction data could limit the ability of employers who knowingly hired unauthorized workers to claim that the workers presented false documents to obtain employment, assisting DHS's Immigration and Customs Enforcement agents in proving that employers knowingly hired unauthorized workers.

**Potential Limitations**
- Although the potential impact of mandatory electronic employment eligibility verification on identity fraud is not clear, as it becomes more difficult for undocumented workers to find work without a name and SSN that match DHS's and SSA's records, there could be an increase in identity fraud.
- To ensure that all employers have registered to use the mandatory system, DHS would need a listing of all employers. One version of proposed legislation requires that SSA provide DHS a listing of all employers who have not registered to participate in electronic employment eligibility verification but have submitted earnings reports.
- Investigative resources are needed to follow up on worksite leads, and these resources may not be available in appropriate numbers once electronic verification becomes mandatory.
- Query patterns that appear to suggest unauthorized work can be misleading. For example, one suggestion for using the Basic Pilot transaction data was to detect potential cases of identity fraud by investigating instances suggesting fraudulent use of SSNs. One pattern that suggests unauthorized work is the submission of the same SSN by multiple employers. However, there might be valid reasons, including one person holding multiple part-time jobs at the same time or one person holding multiple jobs sequentially—like a transient construction worker. SSA officials gave us examples of longshoremen or construction workers bringing in stacks of W-2s for 1 year when applying for retirement benefits. DHS officials acknowledged this limitation, but stated that they would likely use the data only when the number of multiple uses was significant. This limitation could also be resolved by requiring workers to provide additional information to establish identity.

# Concluding Observations

**Concluding Observations**

It is DHS's responsibility to enforce the nation's immigration laws. SSA, IRS, HHS, and DHS collect a wealth of earnings data, work authorization data, or both that could be mined to help detect unauthorized work and enforce immigration laws. These data are potentially useful whether or not immigration reform is enacted. If mandatory electronic employment verification is enacted, earnings data may be useful to determine whether employers are complying with verification requirements. Each data source presents both benefits and limitations, and their usefulness to DHS is not yet entirely clear. DHS officials believe that information from the Earnings Suspense File might be more useful for identifying employers of unauthorized workers than the information it currently receives, but no one data source provides a full picture of unauthorized work.

While our prior work notes the benefits of earnings information for detecting unauthorized work, additional disclosure of earnings information should be carefully weighed against the various drawbacks—especially privacy considerations. All of the data sources have information that could potentially provide false leads. IRS has expressed concerns that additional disclosure of sensitive taxpayer data could affect taxpayers' willingness to voluntarily comply with tax laws. All of the files contain sensitive personal information, including information on U.S. citizens. Providing earnings data to DHS could involve divulging information about hundreds of thousands or even millions of U.S. citizens and work-authorized aliens.

Data-sharing has potential to assist DHS in detecting unauthorized work and enforcing immigration laws, but as Congress considers providing DHS additional earnings data, it might consider how DHS will use particular data elements in a program of general worksite enforcement. Specifically, policymakers might also usefully consider the following questions:

- What information does DHS believe would be most useful?
- How would DHS use these data in a program of general worksite enforcement?
- What steps would DHS take to safeguard personal information and protect it from misuse?
- Would DHS require entire earnings files or could SSA or IRS provide some limited, well-defined subset of information from the files?
- Is information from one file sufficient, or would information from multiple files provide more comprehensive information?
- Would it be beneficial to provide the information on a trial basis for evaluation purposes?
- Given its limited resources, how useful might data with high potential for false leads be to DHS?
- Do the benefits of identifying potential unauthorized workers outweigh the costs of potentially decreased employer compliance with reporting requirements and loss of privacy for U.S. citizens?
- To what extent, if any, would additional data sharing be needed if mandatory electronic employment verification is enacted?

# Appendix

## Contributors

If you have any questions concerning this briefing, please call Barbara Bovbjerg, Director, Education, Workforce, and Income Security Issues, at (202) 512-7215; Michael Brostek, Director, Tax Issues, Strategic Issues Team, (202) 512-9110; or Richard Stana, Director, Homeland Security and Justice Issues, at (202) 512-8777.

Other key contributors to this report were Blake Ainsworth, Lara Laufer, Jeff Bernstein, Susan Bernstein, Rebecca Gambler, and Paul Wright.

## Scope and Methodology

To provide information about potential uses of earnings data in DHS's worksite enforcement efforts, we gathered information from SSA, IRS, DHS, HHS, and past GAO work on the datasets that might provide information on employers hiring unauthorized workers. Building on work by the SSA Office of the Inspector General and DHS, we assessed past and potential uses of these datasets. To determine what information is most useful to DHS, we interviewed DHS officials to understand what they hoped to obtain from various files and how this information would serve enforcement priorities. We also obtained SSA's and IRS's perspectives on the feasibility of various options. We used this information and our analyses of the datasets to assess what specific sources would provide the most useful information consistent with DHS's needs and priorities. To understand how DHS could use the data effectively, we interviewed DHS officials about their experiences with files they have access to, the barriers DHS might face in using other files, and specific technical or resource requirements that may help or hinder this effort. We also discussed what, if anything, could be done to change either the process for sharing earnings data or the specific content of the file itself to make it a more effective tool for DHS's enforcement priorities and limited worksite enforcement resources. To understand how statutory prohibitions on sharing sensitive taxpayer information are appropriately addressed, we worked with our counsel and relevant agency counsel.

We examined five datasets: SSA's Nonwork Alien File, SSA's Earnings Suspense File, HHS's National Directory of New Hires, IRS's information on income tax returns reporting wage income filed using Individual Taxpayer Identification Numbers, and DHS's current electronic employment eligibility verification program transaction data—collected in the voluntary Basic Pilot program. We used prior GAO work, reviewed technical documents, and interviewed agency officials about these files' technical content and the feasibility of using this information to target enforcement.

Because of time constraints, we did not determine the amount of additional time and resources DHS would have to invest in order to make these sources useful. Further, we did not determine the extent to which these databases actually contain information about unauthorized work. However, we interviewed knowledgeable officials about the contents of these files.

We performed our work between October 2005 and June 2006 in accordance with generally accepted government auditing standards.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice:  (202) 512-6000<br>TDD:  (202) 512-2537<br>Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

PRINTED ON ♲ RECYCLED PAPER

**No-Match Cert. Admin. Record  661**

Department of Homeland Security
U.S. Citizenship and Immigration Services

OMB No. 1615-0047; Expires 03/31/07

**Employment Eligibility Verification**

## INSTRUCTIONS
### PLEASE READ ALL INSTRUCTIONS CAREFULLY BEFORE COMPLETING THIS FORM.

**Anti-Discrimination Notice.** It is illegal to discriminate against any individual (other than an alien not authorized to work in the U.S.) in hiring, discharging, or recruiting or referring for a fee because of that individual's national origin or citizenship status. It is illegal to discriminate against work eligible individuals. Employers **CANNOT** specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

### Section 1- Employee.
All employees, citizens and noncitizens, hired after November 6, 1986, must complete Section 1 of this form at the time of hire, which is the actual beginning of employment. **The employer is responsible for ensuring that Section 1 is timely and properly completed.**

**Preparer/Translator Certification.** The Preparer/Translator Certification must be completed if Section 1 is prepared by a person other than the employee. A preparer/translator may be used only when the employee is unable to complete Section 1 on his/her own. However, the employee must still sign Section 1 personally.

### Section 2 - Employer.
For the purpose of completing this form, the term "employer" includes those recruiters and referrers for a fee who are agricultural associations, agricultural employers or farm labor contractors.

Employers must complete Section 2 by examining evidence of identity and employment eligibility within three (3) business days of the date employment begins. If employees are authorized to work, but are unable to present the required document(s) within three business days, they must present a receipt for the application of the document(s) within three business days and the actual document(s) within ninety (90) days. However, if employers hire individuals for a duration of less than three business days, Section 2 must be completed at the time employment begins. **Employers must record: 1)** document title; **2)** issuing authority; **3)** document number, **4)** expiration date, if any; and **5)** the date employment begins. Employers must sign and date the certification. Employees must present original documents. Employers may, but are not required to, photocopy the document(s) presented. These photocopies may only be used for the verification process and must be retained with the I-9. **However, employers are still responsible for completing the I-9.**

### Section 3 - Updating and Reverification.
Employers must complete Section 3 when updating and/or reverifying the I-9. Employers must reverify employment eligibility of their employees on or before the expiration date recorded in   Section 1. Employers **CANNOT** specify which document(s)  they will accept from an employee.

- If an employee's name has changed at the time this form is being updated/reverified, complete Block A.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee is still eligible to be employed on the same basis as previously indicated on this form (updating), complete Block B and the signature block.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee's work authorization has expired or if a  current employee's work authorization is about to expire (reverification), complete Block B and:

- examine any document that reflects that the employee is authorized to work in the U.S. (see List A **or** C),

- record the document title, document number and expiration date (if any) in Block C, and

- complete the signature block.

**Photocopying and Retaining Form I-9.** A blank I-9 may be reproduced, provided both sides are copied. The Instructions must be available to all employees completing this form. Employers must retain completed I-9s for three (3) years after the date of hire or one (1) year after the date employment ends, whichever is later.

**For more detailed information, you may refer to the Department of Homeland Security (DHS) Handbook for Employers, (Form M-274). You may obtain the handbook at your local U.S. Citizenship and Immigration Services (USCIS) office.**

**Privacy Act Notice.** The authority for collecting this information is the Immigration Reform and Control Act of 1986, Pub. L. 99-603 (8 USC 1324a).

This information is for employers to verify the eligibility of individuals for employment to preclude the unlawful hiring, or recruiting or referring for a fee, of aliens who are not authorized to work in the United States.

This information will be used by employers as a record of their basis for determining eligibility of an employee to work in the United States. The form will be kept by the employer and made available for inspection by officials of the U.S. Immigration and Customs Enforcement, Department of Labor and Office of Special Counsel for Immigration Related Unfair Employment Practices.

Submission of the information required in this form is voluntary. However, an individual may not begin employment unless this form is completed, since employers are subject to civil or criminal penalties if they do not comply with the Immigration Reform and Control Act of 1986.

**Reporting Burden.** We try to create forms and instructions that are accurate, can be easily understood and which impose the least possible burden on you to provide us with information. Often this is difficult because some immigration laws are very complex. Accordingly, the reporting burden for this collection of information is computed as follows: **1)** learning about this form,  5 minutes; **2)** completing the form, 5 minutes; and **3)** assembling and filing (recordkeeping) the form, 5 minutes, for an average of 15 minutes per response. If you have comments regarding the accuracy of this burden estimate, or suggestions for making this form simpler, you can write to U.S. Citizenship and Immigration Services, Regulatory Management Division, 111 Massachuetts Avenue, N.W., Washington, DC 20529. OMB No. 1615-0047.

**NOTE:** This is the 1991 edition of the Form I-9 that has been rebranded with a current printing date to reflect the recent transition from the INS to DHS and its components.

Department of Homeland Security
U.S. Citizenship and Immigration Services

OMB No. 1615-0047; Expires 03/31/07

# Employment Eligibility Verification

**Please read instructions carefully before completing this form. The instructions must be available during completion of this form. ANTI-DISCRIMINATION NOTICE: It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.**

## Section 1. Employee Information and Verification. To be completed and signed by employee at the time employment begins.

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|

| Address (Street Name and Number) | Apt. # | Date of Birth (month/day/year) |
|---|---|---|

| City | State | Zip Code | Social Security # |
|---|---|---|---|

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
- ☐ A citizen or national of the United States
- ☐ A Lawful Permanent Resident (Alien #) A _____
- ☐ An alien authorized to work until _____

(Alien # or Admission #)

| Employee's Signature | Date (month/day/year) |
|---|---|

**Preparer and/or Translator Certification.** *(To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.*

| Preparer's/Translator's Signature | Print Name |
|---|---|

| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|

## Section 2. Employer Review and Verification. To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C, as listed on the reverse of this form, and record the title, number and expiration date, if any, of the document(s).

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: _____ | | _____ | | _____ |
| Issuing authority: _____ | | _____ | | _____ |
| Document #: _____ | | _____ | | _____ |
| Expiration Date (if any): _____ | | _____ | | _____ |
| Document #: _____ | | _____ | | |
| Expiration Date (if any): _____ | | _____ | | |

**CERTIFICATION - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on** *(month/day/year)* _____ **and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment.)**

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|

| Business or Organization Name | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|---|

## Section 3. Updating and Reverification. To be completed and signed by employer.

| A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable) |
|---|---|

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

Document Title: _____    Document #: _____    Expiration Date (if any): _____

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|

**NOTE:** This is the 1991 edition of the Form I-9 that has been rebranded with a current printing date to reflect the recent transition of the INS to DHS and its components.

Form I-9 (Rev. 05/31/05)Y Page 2

No-Match Cert. Admin. Record  663

## LISTS OF ACCEPTABLE DOCUMENTS

| LIST A | | LIST B | | LIST C |
|---|---|---|---|---|
| **Documents that Establish Both Identity and Employment Eligibility** | **OR** | **Documents that Establish Identity** | **AND** | **Documents that Establish Employment Eligibility** |

**LIST A** — Documents that Establish Both Identity and Employment Eligibility

1. U.S. Passport (unexpired or expired)

2. Certificate of U.S. Citizenship (Form N-560 or N-561)

3. Certificate of Naturalization (Form N-550 or N-570)

4. Unexpired foreign passport, with I-551 stamp or attached Form I-94 indicating unexpired employment authorization

5. Permanent Resident Card or Alien Registration Receipt Card with photograph (Form I-151 or I-551)

6. Unexpired Temporary Resident Card (Form I-688)

7. Unexpired Employment Authorization Card (Form I-688A)

8. Unexpired Reentry Permit (Form I-327)

9. Unexpired Refugee Travel Document (Form I-571)

10. Unexpired Employment Authorization Document issued by DHS that contains a photograph (Form I-688B)

**OR**

**LIST B** — Documents that Establish Identity

1. Driver's license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address

2. ID card issued by federal, state or local government agencies or entities, provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address

3. School ID card with a photograph

4. Voter's registration card

5. U.S. Military card or draft record

6. Military dependent's ID card

7. U.S. Coast Guard Merchant Mariner Card

8. Native American tribal document

9. Driver's license issued by a Canadian government authority

**For persons under age 18 who are unable to present a document listed above:**

10. School record or report card

11. Clinic, doctor or hospital record

12. Day-care or nursery school record

**AND**

**LIST C** — Documents that Establish Employment Eligibility

1. U.S. social security card issued by the Social Security Administration (other than a card stating it is not valid for employment)

2. Certification of Birth Abroad issued by the Department of State (Form FS-545 or Form DS-1350)

3. Original or certified copy of a birth certificate issued by a state, county, municipal authority or outlying possession of the United States bearing an official seal

4. Native American tribal document

5. U.S. Citizen ID Card (Form I-197)

6. ID Card for use of Resident Citizen in the United States (Form I-179)

7. Unexpired employment authorization document issued by DHS (other than those listed under List A)

**Illustrations of many of these documents appear in Part 8 of the Handbook for Employers (M-274)**

No-Match Cert. Admin. Record  664

**OFFICE OF BUSINESS LIAISON**

**U.S. DEPARTMENT OF HOMELAND SECURITY**
U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| | |
|---|---|
| Employer Information Bulletin 102 <br><br> The I-9 Process In A Nutshell <br><br> March 16, 2005 | EBISS: (800) 357-2099 <br> NCSC: (800) 375-5283 <br> TDD: (800) 767-1833 <br> Fax: (202) 272-1865 <br> Order Forms: (800) 870-3676 <br> Website: www.uscis.gov |

> The following is not intended to be legal advice pertaining to your situation and should not be construed as such. The information provided is intended merely as a general overview with regard to the subject matter covered.

# THE I-9 PROCESS IN A NUTSHELL

## Purpose

- This bulletin supplements the 1991 version of the "Handbook for Employers" (Form M-274) and the 1991 version of the I-9 instructions and form, which may both be downloaded from the U.S. Citizenship and Immigration Services web site.
- This bulletin provides employers with basic guidance for compliance with requirements to complete, update, and retain I-9 forms for all employees, whether US citizens or non-citizens.
- **NOTE:** The "receipt rule" described in this bulletin is the most up-to-date receipt rule. The receipt rule stated in the Form I-9 instructions and the "Handbook for Employers" (Form M-274) is **NOT** the current rule. See Receipt Rule below.

## Introduction to Worksite Enforcement and Employment Eligibility Verification

The 1986 Immigration Reform and Control Act ("IRCA") sought to control illegal migration by eliminating employment opportunity as a key incentive for unauthorized persons to come to the US. IRCA's core prohibition is against the hire or continued employment in the US of an alien whom the employer knows is unauthorized for the employment. IRCA makes all US employers responsible for verifying through a specific process the identity and work authorization or eligibility of all individuals, whether U.S. citizens or not, hired after November 6, 1986. To implement this, employers are required to complete Employment Eligibility Verification Forms I-9 for all employees. An employer's obligation to review documents is not triggered until a person has been hired, whereupon the new employee is entitled to submit a document or combination of documents of his choice **(from List A or a combination of a List B and List C document on the reverse side of the I-9 form)** to verify his identity and work eligibility.

**Hired** = Actual commencement of employment of an employee for wages or other remuneration. The employee must complete Section 1 of the I-9 Form by the date of hire (i.e. no later than the date on which employment services start). (See Completing the I-9 Form below.)

## Protection from Discrimination[1]

IRCA also prohibits employers with 4 or more employees from discriminating against any person (other than an unauthorized alien) in hiring, discharging, or recruiting or referring for a fee because of a person's national origin or, in the case of a citizen or protected individual, citizenship status. Employers with 15 or more employees may not discriminate against any person on the basis of national origin in hiring, discharge, recruitment, assignment, compensation, or other terms and conditions of employment. The I-9 process may not be used to pre-screen employees for hiring. Furthermore, an employer may not demand more or different documents than an employee chooses to present, provided that the documents presented are acceptable under the I-9 requirements. An employer may not demand documents issued by the Department of Homeland Security **(formerly the Immigration and Naturalization Service)** in lieu of other acceptable document(s) from List(s) A or B and C and may not consider the fact that work authorization documents have future expiration dates as cause not to hire or to terminate.

---

[1] The Office of Special Counsel for Immigration Related Unfair Employment Practices ("OSC") investigates charges of job discrimination related to an individual's immigration status or national origin. It also investigates charges of document abuse discrimination--when employers request more or different documents than are required to verify employment eligibility and identity, reject reasonably genuine-looking documents or specify certain documents over others. All work-authorized individuals are protected from document abuse. OSC can be accessed via the Internet at http://www.usdoj.gov/crt/osc/htm/aboutosc.htm.

## Changes effective after 11/91 Publication of Form I-9 and "Handbook for Employers"[2]

**FORM I-151:** Form I-151 has been withdrawn from circulation and is no longer a valid List A document.[3]

**FORM I-766:** Form I-766 was introduced in January 1997 as an Employment Authorization Document (EAD). It should be recorded on the I-9 Form under List A. A previous version of the EAD is the Form I-688B, which continues to be an acceptable List A document. (See Employer Information Bulletin 104.)

**FORM I-551:** The **Permanent Resident Card** (new version of Form I-551) was introduced in 1990 as documentation issued to lawful permanent residents of the US. Older versions of Form I-551 remain valid until expiration, if any. The Form I-551 should be recorded on the I-9 Form under List A. On the back of the Form I-9, it is listed under List A #5 as an Alien Registration Receipt Card. (See Employer Information Bulletin 104.)

**REMOVED DOCUMENTS FROM I-9 LIST:** *Effective September 30, 1997* via interim rule published at 62 Fed. Reg. 51001-51006, the following documents were removed from the list of acceptable identity and work authorization documents (listed on the 11/91 version of the Form I-9) to comply with the *Illegal Immigration Reform and Alien Responsibility Act of 1996 (IIRIRA)*: Certificate of US Citizenship (**List A #2**), Certificate of Naturalization (**List A #3**), Unexpired Reentry Permit (**List A #8**), and Unexpired Refugee Travel Document (**List A #9**). In addition, the acceptability of an unexpired foreign passport with Form I-94 indicating unexpired work authorization (List A #4) was made more limiting. Such combination of documents is only acceptable where the individual is employment authorized incident to status for a specific employer.

**RECEIPT RULE:** Originally effective September 30, 1997, amended by interim rule of *February 9, 1999*; the rule explaining when receipts may be used in lieu of original documents in the I-9 process (*receipt rule[4]*) now provides that:

- If an individual's document has been lost, **stolen**, or **damaged**, then he/she can present a receipt for the application for a replacement document. The replacement document needs to be presented to the employer within 90 days of hire or, in the case of reverification, the date employment authorization expires.
- If the individual presents as a receipt, the arrival portion of the Form I-94 containing an unexpired temporary I-551 stamp (indicating temporary evidence of permanent resident status) and photograph of the individual, such document satisfies the I-9 documentation presentation requirement until the expiration date on the Form I-94. If no expiration date is indicated, an employer may accept the receipt for one year from the issue date of the I-94 Form.
- Form I-94 with a refugee admission stamp is acceptable as a receipt for 90 days, within which time the employee must present an unrestricted Social Security card together with a List B identity document, or an Employment Authorization Document (Form I-688B or I-766). To indicate refugee status, the stamp may include a reference to Section 207 of the Immigration and Nationality Act (INA) rather than use the words "refugee."

## THE I-9 PROCESS

### General

Employers are responsible for the completion and retention of Forms I-9 for all employees, regardless of citizenship or national origin, hired for employment in the United States. An employee is any individual compensated for services or labor by an employer, whether by payment in the form of wages or other remuneration (such as goods or services such as food and lodging).

### For whom is a Form I-9 unnecessary?

- Employees hired before November 6, 1986, and continuously employed by the same employer;
- Individuals performing casual employment who provide domestic service in a private home that is sporadic, irregular or intermittent;
- Independent contractors (see Employer Information Bulletin 110);
- Workers provided to employers by individuals or entities providing contract services, such as temporary agencies (in such cases, the contracting party is the employer for I-9 purposes)

**Note:**

- An employer is not permitted under the law to contract for the labor of an individual whom he knows is not authorized for employment. Employers who violate this prohibition may be subject to civil and criminal penalties.
- Employers are not permitted to request more or different documents than are required or to refuse to honor documents tendered that on their face reasonably appear to be genuine and to relate to the individual presenting the document.

---

[2] These changes are not reflected on the current 1991 version of the I-9 Form, its instructions or the "Handbook for Employers" since the changes occurred after 1991.

[3] To replace their "green cards", holders of Form I-151 Alien Registration Receipt Card must submit a completed Form I-90 along with the current filing fee to their local District Office. (To download I-90 go to www.uscis.gov.)

[4] For more information on the receipt rule request Employer Information Bulletin 107; see more on Receipt Rule below.

**No-Match Cert. Admin. Record  666**

## Retention of I-9 Records

An employer must retain the I-9 form of each employee **either** for three (3) years after the date of hire **or** for one (1) year after employment is terminated, **whichever is later.** All current employees, therefore, must have I-9's on file with the employer. Upon request, all Forms I-9 subject to the retention requirement must be made available to an authorized official of the Department of Homeland Security, Department of Labor, and/or the Office of Special Counsel for Unfair Immigration-Related Employment Practices of the Department of Justice.

**Examples for terminated employees:**

      **Step one:  Identify hire date and add 3-years = [date A]**
        1.  11/01/93 + 3 years = 11/01/96      or     03/27/99 + 3 years = 03/27/02

      **Step two:  Identify termination date and add 1 year = [date B]**
        1.  07/05/94 + 1 year = 07/05/95      or     05/19/03 + 1 year = 05/19/04

      **Step three: Compare date [A] and [B]**
        1.  Compare 11/01/96 and 07/05/95
        2.  Compare 03/27/02 and 05/19/04

      **Step four: Determine the later date [A] or [B] in each case.  The later of the two becomes the retention date for the corresponding Form I-9.**

      **Example results:**
        1.  11/01/96 is later than 07/05/95, so 11/01/96 is the retention date for this terminated employee's I-9.
        2.  05/19/04 is later than 03/27/02, so 05/19/04 is the retention date for this terminated employee's I-9.

## Missing I-9 Forms

An employer who discovers that an I-9 form is not on file for a given employee should request the employee to complete section 1 of an I-9 form immediately and submit documentation as required in Section 2. The new form should be dated when completed--**never post-dated**[5]. When an employee does not provide acceptable documentation, the employer must terminate employment of risk being subject to penalties for "knowingly" continuing to employ an unauthorized worker if the individual is not in fact authorized to work.

## Discovering an Unauthorized Employee

An employer who discovers that an employee has been working without authorization should reverify work authorization by allowing such an employee another opportunity to present acceptable documentation and complete a new I-9. However, employers should be aware that if it knows or should have known that an employee is unauthorized to work in the United, they may be subject to serious penalties for "knowingly continuing to employ" an unauthorized worker.

## Successive Employers and Reorganizations

Employers that acquire a business as a result of a corporate reorganization, merger, or sale of stock or assets, and retain the predecessor's employees are not required to complete new I-9's for those employees and may rely on the I-9s completed by the predecessor employer if the employees are continuing in employment, and they have a reasonable expectation of employment at all times. However, the successor employer will be held responsible if the predecessor's I-9s are deficient or defective.

---

[5] Employers may provide an explanatory annotation to an untimely-completed Form I-9.

No-Match Cert. Admin. Record  667

# COMPLETING THE I-9 FORM

There are three sections of the Form I-9. The employee must complete Section 1. The employer must complete sections 2 and 3. The employer is required to ensure that all sections of the Form I-9 are timely and properly completed. **The Form I-9 is available in ENGLISH ONLY.**

## SECTION 1: EMPLOYEE INFORMATION AND VERIFICATION
### Responsibility of the Employer

Employers must ensure that Section 1 is completed by the employee upon **date of hire** (i.e. 1st day of paid work). The signature and attestation under penalty of perjury portions of Section 1 are very important, and employers should take special care to ensure that employees complete these in full. Although employers are held responsible for deficiencies of information in Section 1 (i.e. where required information is not provided by the employee), they may not require employees to produce documents to verify Section 1 information.

*NOTE: An employee's signature and attestation of status under penalty of perjury are particularly important.* If a given employee refuses to provide his/her signature or attestation, there is no reason for the employer to proceed to complete Section 2, and the employer should not continue to employ the individual.

*NOTE:* An employee may not be able to provide a social security number if the Social Security administration has not yet issued the individual a social security card.[6] This information block is optional. Therefore, an employer cannot require an employee to complete it.

### Responsibility of the Employee

Employees need to provide the information requested in Section 1. In particular, they must attest to their status by checking the applicable box indicating that they are:
- Citizen/national of the United States (*top box*),
- Lawful permanent resident with a "green card" (*middle box*), or
- Alien authorized to work in the United States until a specified date (*bottom box*).

Employees **must sign and date** this Section of the Form I-9 when completed.

Note: Employers should remind employees of format conventions such as providing dates in the format of month/day/year, since date formats in their countries of origin may have a different order.

Note: **Certain aliens, such as asylees and refugees, are work authorized incident to their status and may not have an expiration date to fill-in for the bottom box of the attestation block in Section 1.**

### Responsibility of Translator or Preparer

If used by the employee to fill out Section 1, translators or prepares must also sign, date, and provide requested information in the Preparer/Translator Certification Block at the bottom of Section 1. Employers themselves must fill in and sign this block if they have assisted employees with Section 1.

---

[6] Some local Social Security Administration offices will give the individual their social security number upon request before the actual social security card is issued.

4

No-Match Cert. Admin. Record 668

## SECTION 2: EMPLOYER REVIEW AND VERIFICATION

- The second part of the form requires the employer to list the documents that were produced by the worker to verify his or her identity and employment eligibility. There are three groups of documents that a worker may use for this purpose. The documents that can be presented by employees are listed on the reverse side of the Form I-9.[7] A worker may choose to provide a List A document (which establishes both identity and work authorization), or he/she may choose to provide one List B document (which establishes identity) and one List C document (which establishes work eligibility). Documentation must be rejected if it is expired, with two exceptions: the U.S. passport (a List A document) and all List B documents. Employers who fail to complete the Form I-9 or who hire or continue to employ workers they know are unauthorized to work in the United States may be subject to civil and, in certain cases, criminal penalties. See Employer Information Bulletin 111.
- Employers cannot refuse to hire an individual because the individual's document has an expiration date.

**Original Documents Only** - The employer or employer's representative/agent[8] must *personally*[9] review *original* document(s) that demonstrate an employee's identity and eligibility to work in the US.[10] Photocopies, or numbers representing original documents, are not acceptable. Exception: List C, #3, a certified copy of a birth certificate issued by a state, county, municipal authority or outlying possession of the US bearing an official seal is acceptable. All identifying information, including the document title, the issuing authority, the document number, and/or the expiration date (if applicable) must be provided in full.

**RECEIPT RULE:** Employees who do not possess the required documentation when employment begins **may not submit receipts showing that they have applied for initial applications for documents or for applications for extension of documents.** An employer may only accept receipts for:

- A **replacement document** in lieu of the required document if a document was *lost, stolen, or damaged*. The replacement document must be presented within 90 days of the hire or, in the case or reverification; the date employment authorization expires.
- The individual presents as a receipt, the arrival portion of the Form I-94 containing an unexpired temporary I-551 ADIT stamp (indicating temporary evidence of permanent resident status) and photograph of the individual, until the expiration date. If no expiration date is indicated, an employer may accept the receipt for one year from the issue date of the I-94 form. The "green card" itself should be presented at the expiration date on the Form I-94.
- Someone granted refugee status will be issued a Form I-94 containing a refugee admission stamp. The employer can accept this as a receipt as long as the employee presents: 1) the departure portion of Form I-94 containing an unexpired refugee admission stamp, which is designated for purposes of this section as a receipt for the Form I-766, Form I-688B, or a social security card that contains no employment restrictions; and 2) within 90-days of the hire, or in the case of reverification, the date employment authorization expires, presents an unexpired Form I-766 or From I-688B, or a social security card that contains no employment restrictions together with a document described under List B. This type of receipt is sufficient to evidence both identity and employment authorization for the 90-day receipt validity period.

**Common example:** An EAD (Form I-688B or I-766) is generally valid as evidence of work authorization for one year. The EAD may be renewed by the submission of a new application to the U.S. Citizenship and Immigration Services. Accordingly, a receipt acknowledging such an application is unacceptable.

**Note:** A receipt is never acceptable for employment lasting less than 3 working days.

**Source of Confusion:**
(1) Social Security Cards: Please request Employer Information Bulletin 112.
(2) Multiple entries for document #'s and expiration dates must be filled out only where an employee has presented more than one document under one List (e.g., an unexpired passport with an unexpired I-94; unexpired passport with an unexpired I-94 and Form I-20 endorsed by the Designated School Official). All document numbers and expiration dates must be recorded.
(3) List A or B documents from which the bearer cannot be identified are never acceptable even if unexpired.
(4) Unexpired foreign passport containing an unexpired I-551 stamp. This constitutes temporary evidence of permanent resident status and must be reverified at the time the stamp expires; it does not constitute a receipt. The actual Form I-551, or "green card," should not be reverified even if it contains an expiration date.

---

[7] See "Changes effective after 11/91 Publication of Form I-9 and *Handbook for Employers*" on page two for changes.
[8] Employers may not use agents to shield themselves from responsibility.
[9] Employers with remote hires may designate agents such as notaries public, attorneys, or other trusted individuals to exercise the Section 2 review of documents on their behalf. An employer is bound by the actions of such agent. What is key is that whoever fills out section 2 of the I-9 must personally review the employee's document(s).
[10] **Anti-Discrimination Warning:** Employers are not permitted to require a particular document(s) or combination of documents. The employer must accept any document from List A or combination of documents from Lists B and C, at the employee's discretion. Likewise, employers may neither require nor accept any more documentation than the minimum necessary to substantiate identity and work eligibility.

5

No-Match Cert. Admin. Record  669

## Standards of Review[11]

The employer must review and accept documents that reasonably appear to be genuine and to relate to the person presenting them (e.g., the name on the Social Security card should be compared to the name on the state driver's permit and the photo on the driver's permit compared to the appearance of the person who presented the documents). Employers may reject documents it they do not reasonably appear to be genuine and ask employees who present questionable documentation for other documentation that satisfy the I-9 requirements. Employees who are unable to present acceptable documents should be terminated. Employers who choose to retain such employees may be subject to penalties for improper completion of the form or for "knowingly continuing to employ" unauthorized workers if such workers are in fact unauthorized.

**Note:** Employers should be alert for signs of fraud, such as a social security card that contains more than nine digits or that begins with "000."

## Signature and Date: Employers

Employers are required to sign and date the bottom of Section 2 and provide all requested information in the **CERTIFICATION** portion.

**Note:** *The personal attestation and signature of the employer are extremely important.* The person who actually reviews original documents — whether that person is the employer, or an agent of the employer, such as a provider of contract services to the employer-- must sign and date the I-9 form.

## SECTION 3: UPDATING AND REVERIFICATION[12]

**Reverification requirement:** Employers are required to reverify employment eligibility. When an employee's employment authorization (indicated in Section 1) or evidence of employment authorization recorded in Section 2 has expired. An employer may also reverify employment authorization, in lieu of completing a new I-9, when an employee is rehired within three years of the date that the I-9 was originally completed and the employee's work authorization or evidence of work authorization has expired. The reverification requirement does not apply to the U.S. passport or "green card" (Form I-551). Note that temporary evidence of permanent resident status in the form of an unexpired foreign passport containing a temporary I-551 ADIT stamp is subject to the reverification requirement.

**IMPORTANT:** Most employers find it useful to institute a system that reminds them automatically, in advance, that a given employee's authorization document will expire. Advance warning assists both employees and employers, since early notice will usually allow employees time to renew the authorization prior to the expiration date and avoid penalties to employers for continuing to employ unauthorized workers. Enough advance warning is important so the employee can apply for and receive replacement documents in time to maintain uninterrupted employment.

## Reverification Process

No later than the date that employment authorization or employment authorization documentation expires, employers must reverify employment authorization on Section 3 of the I-9, or by completing a new I-9 form to be attached to the original I-9. To reverify expired status (Section 1) and/or expired work authorization document(s) (Section 2), an employee may present any currently valid List A or List C document. **Remember:** Receipts showing that the employee has applied for an extension of an expired employment authorization document is not an acceptable. (See Receipt Rule.)

**Note:** Employees are not required to present, for reverification purposes, a new version of the same document that was presented to satisfy Section 2 but subsequently expired. Any document or combination of documents that would be acceptable to demonstrate work eligibility/authorization under Section 2 may be presented for reverification purposes. It is the employee's choice as to which document to present.

---

[11] See Employer Information Bulletin 103.
[12] See Employer Information Bulletin 107.

6

## Where Reverification is *not* Required

Permanent Resident Cards (also known as Alien Registration Receipt cards, Forms I-551, Resident Alien Cards, Permanent Resident Cards, or "Green Cards") are issued to lawful permanent residents[13] and conditional resident and should not be reverified when the cards expire. Temporary evidence of permanent resident status in the form of a temporary I-551 stamp in an unexpired foreign passport is subject to reverification. This is because of the temporary nature of this document. Likewise, List B documents need not be reverified when they expire. In fact, List B documents are acceptable when initially shown, even when expired.

## Rehires

Employers may reverify information of an employee rehired within 3 years of the date of the initial execution of the Form I-9 as an alternative to completing a new Form I-9. If the rehire's basis of employment eligibility, as listed on the retained I-9, remains the same, the employer must update the previously completed I-9. If the basis of work eligibility has expired, the employer must reverify. To update or reverify on the previously completed I-9, employers must complete Section 3 items A (name), B (date of rehire), and C (new documentation) in full, as applicable. In this section, as in Section 2, it is important that the person who actually examines the documents on behalf of the employer personally sign and date the attestation provision at the bottom of the form.

**To update:** Employers should record the date of rehire, sign and date Section 3 of the previously completed I-9 or complete a new I-9.

**To reverify:** Employers should record the date of rehire, record the document title, number, and expiration date (if any) of documentation presented to reverify expired work authorization or work authorization documentation, sign, and date Section 3 of the previously completed I-9. A new Form I-9 may be chosen to be completed instead.

**Note:** Documentation for reverification purposes may be the renewed version of the originally presented document or any other acceptable document from List A or List C that demonstrates current work eligibility/authorization. List B documents do not need to be updated or reverified, even if expired.

## Other Issues

### Copying of Documentation

- An employer may, but is not required to, copy a document (front and back) presented by an individual solely for the purpose of complying with the I-9 verification requirements. If such a copy is made, it must be retained with the Form I-9. The copying of any such document and retention of the copy does not relieve the employer from the requirement to fully complete Section 2 of the Form I-9. If employers choose to keep copies of I-9 documentation, then it should be done for all employees, and the copies should be attached to the related I-9. Employers should not copy the documents only of individuals of certain national origin or citizenship status. To do so may constitute unlawful discrimination under section 274B of the Immigration and Nationality Act.

### Interim Employment Authorization

- Also note, except in the case of an initial application for employment authorization in the case of an applicant for asylum and certain applicants for adjustment of status, the Department of Homeland Security is required to adjudicate applications for employment authorization on Form I-765 within 90 days from the date of receipt of the application by the U.S. Citizenship and Immigration Services. Failure to complete the adjudication within 90 days will result in the grant of an employment authorization document for a period not to exceed 240 days. Such authorization shall be subject to any conditions noted on the employment authorization document. However, if the application is denied prior to the expiration date of the interim employment authorization, the interim employment authorization document granted under this section shall automatically terminate as of the date of the adjudication and denial. See 8 C.F.R. 274a.13(d) at www.uscis.gov. In order to receive this interim employment authorization document, the individual needs to go to a local U.S. Citizenship and Immigration Services office. If the local office refuses to issue an interim employment authorization document, please contact the Office of Business Liaison.

### How to Document Extensions of Stay for Certain Nonimmigrants Continuing Employment with the Same Employer

- The following nonimmigrants with pending applications to extend their stay are automatically authorized to continue employment with the same employer for a period not to exceed 240 days beginning on the date of the expiration of the authorized period of stay: A-3s, E-1s, E-2s, G-5s, H-1s, H-2As, H-2Bs, H-3s, Is, J-1s, L-1s, O-1s, O-2s, P-1s, P-2s, P-3s, aliens having a religious occupation pursuant to 8 C.F.R. 214.2(r), and TNs. To document this extension of employment authorization on the Form I-9, any occupation pursuant to 8 C.F.R. 214.2(r), and TNs. To document this extension of employment authorization on the Form I-9, any expiration date noted in Sections 1 and 2 should be updated to clearly reflect this extension. The update should be initialed and dated.

---

[13] Expired cards must be renewed sot that cardholders will have valid evidence of their status and registration for new employment, for travel outside the US, and to obtain certain other benefits.

7

No-Match Cert. Admin. Record  671

**OFFICE OF BUSINESS LIAISON**

**U.S. DEPARTMENT OF HOMELAND SECURITY**
U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| | |
|---|---|
| Employer Information Bulletin 101<br><br>**Basic Information about the Form I-9**<br><br>March 16, 2005 | EBISS:  (800) 357-2099<br>NCSC:  (800) 375-5283<br>TDD:  (800) 767-1833<br>Fax:       (202) 272-1865<br>Order Forms: (800) 870-3676<br>Website:  www.uscis.gov |

> The following is not intended to be legal advice pertaining to your situation and should not be construed as such.
> The information provided is intended merely as a general overview with regard to the subject matter covered.

# GENERAL INFORMATION ABOUT THE FORM I-9

**What is Form I-9?**
Form I-9 is the Employment Eligibility Verification Form issued by the Department of Homeland Security, U.S. Citizenship and Immigration Services. By law all US employers are responsible for completion and retention of Forms I-9 for **all** US citizen as well as non-citizen employees it has hired for employment in the US after November 6, 1986. This process, which includes an employee's attestation of work authorization and an employer's review of documents presented by that employee to demonstrate identity and work authorization, is the means by which US employers document that they have verified whether a newly hired employee is eligible to work in the US. The employee and employer both must provide information and signatures as indicated on the form.

**How do I obtain the Form I-9?**
Copies of the Form I-9 can be ordered at **(800) 870-3676**. They may also be downloaded from the U.S. Citizenship and Immigration Services Internet website at http://www.uscis.gov.

**How do I administer the Form I-9 process?**
Instructions accompany the Form I-9. Additionally, the "Handbook for Employers", Form M-274, is another available resource. Detailed information about the employment eligibility verification process also appears in the Employer Information Bulletins (EIB 101-112).

**Can I verify an employee's work authorization?**
ONLY officially registered participants in the Department of Homeland Security's automated verification system pilot projects are permitted to verify the work authorization of a newly hired employee. Questions about participation in the Department of Homeland Security verification pilot programs may be directed to the Department of Homeland Security, SAVE Program at (202) 514-2317 or (888) 464-4218. For more information see Employer Information Bulletin 103.

**Where do I send the Form I-9?**
The employer must retain the Form I-9 for each employee either for three years after the date of hire or for one year after employment is terminated, whichever is later. (See Employer Information Bulletin 102).

**Can I reproduce Form I-9?**
Employers are permitted to electronically generate the Form I-9, provided that the resulting form is legible, the content and sequence of the data elements and instructions match those on the official Department of Homeland Security document (Form I-9, revised 11/21/91, OMB No. 1111-0136) and the paper is of retention quality. Copies of the Form I-9 may be reproduced in either double-sided or single-sided format.

**Can I store Forms I-9 electronically?**
Currently, the only storage options are hard copy or microfiche or microfilm.

**Are changes anticipated in the Form I-9?**
Changes in the Form I-9 are expected in late 2005 or early 2006, including a reduction in the number of documents that can be submitted by new employees to demonstrate their employment eligibility. (The interim rule of September 30, 1997, reduced the number of documents that are acceptable for the I-9; however these changes are not reflected on the Form I-9. See 8 C.F.R. 274a.2(b)(1)(v) for the most up to date list of acceptable documents.)

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB No. 1115-0136

## Employment Eligibility Verification

# INSTRUCTIONS
### PLEASE READ ALL INSTRUCTIONS CAREFULLY BEFORE COMPLETING THIS FORM.

**Anti-Discrimination Notice.** It is illegal to discriminate against any individual (other than an alien not authorized to work in the U.S.) in hiring, discharging, or recruiting or referring for a fee because of that individual's national origin or citizenship status. It is illegal to discriminate against work eligible individuals. Employers **CANNOT** specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

## Section 1 - Employee. All employees, citizens and noncitizens, hired after November 6, 1986, must complete Section 1 of this form at the time of hire, which is the actual beginning of employment. **The employer is responsible for ensuring that Section 1 is timely and properly completed.**

**Preparer/Translator Certification.** The Preparer/Translator Certification must be completed if Section 1 is prepared by a person other than the employee. A preparer/translator may be used only when the employee is unable to complete Section 1 on his/her own. However, the employee must still sign Section 1.

## Section 2 - Employer. For the purpose of completing this form, the term "employer" includes those recruiters and referrers for a fee who are agricultural associations, agricultural employers or farm labor contractors.

Employers must complete Section 2 by examining evidence of identity and employment eligibility within three (3) business days of the date employment begins. If employees are authorized to work, but are unable to present the required document(s) within three business days, they must present a receipt for the application of the document(s) within three business days and the actual document(s) within ninety (90) days. However, if employers hire individuals for a duration of less than three business days, Section 2 must be completed at the time employment begins. **Employers must record: 1)** document title; **2)** issuing authority; **3)** document number, **4)** expiration date, if any; and **5)** the date employment begins. Employers must sign and date the certification. Employees must present original documents. Employers may, but are not required to, photocopy the document(s) presented. These photocopies may only be used for the verification process and must be retained with the I-9. **However, employers are still responsible for completing the I-9.**

## Section 3 - Updating and Reverification. Employers must complete Section 3 when updating and/or reverifying the I-9. Employers must reverify employment eligibility of their employees on or before the expiration date recorded in Section 1. Employers **CANNOT** specify which document(s) they will accept from an employee.

- If an employee's name has changed at the time this form is being updated/ reverified, complete Block A.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee is still eligible to be employed on the same basis as previously indicated on this form (updating), complete Block B and the signature block.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee's work authorization has expired or if a current employee's work authorization is about to expire (reverification), complete Block B and:
  - examine any document that reflects that the employee is authorized to work in the U.S. (see List A or C),
  - record the document title, document number and expiration date (if any) in Block C, and complete the signature block.

**Photocopying and Retaining Form I-9.** A blank I-9 may be reproduced, provided both sides are copied. The Instructions must be available to all employees completing this form. Employers must retain completed I-9s for three (3) years after the date of hire or one (1) year after the date employment ends, whichever is later.

For more detailed information, you may refer to the INS Handbook for Employers, (Form M-274). You may obtain the handbook at your local INS office.

**Privacy Act Notice.** The authority for collecting this information is the Immigration Reform and Control Act of 1986, Pub. L. 99-603 (8 USC 1324a).

This information is for employers to verify the eligibility of individuals for employment to preclude the unlawful hiring, or recruiting or referring for a fee, of aliens who are not authorized to work in the United States.

This information will be used by employers as a record of their basis for determining eligibility of an employee to work in the United States. The form will be kept by the employer and made available for inspection by officials of the U.S. Immigration and Naturalization Service, the Department of Labor and the Office of Special Counsel for Immigration Related Unfair Employment Practices.

Submission of the information required in this form is voluntary. However, an individual may not begin employment unless this form is completed, since employers are subject to civil or criminal penalties if they do not comply with the Immigration Reform and Control Act of 1986.

**Reporting Burden.** We try to create forms and instructions that are accurate, can be easily understood and which impose the least possible burden on you to provide us with information. Often this is difficult because some immigration laws are very complex. Accordingly, the reporting burden for this collection of information is computed as follows: 1) learning about this form, 5 minutes; 2) completing the form, 5 minutes; and 3) assembling and filing (recordkeeping) the form, 5 minutes, for an average of 15 minutes per response. If you have comments regarding the accuracy of this burden estimate, or suggestions for making this form simpler, you can write to the Immigration and Naturalization Service, HQPDI, 425 I Street, N.W., Room 4034, Washington, DC 20536. OMB No. 1115-0136.

**EMPLOYERS MUST RETAIN COMPLETED FORM I-9**
**PLEASE DO NOT MAIL COMPLETED FORM I-9 TO INS**

Form I-9 (Rev. 11-21-91)N

U.S. Department of Justice
Immigration and Naturalization Service

OMB No. 1115-0136

# Employment Eligibility Verification

**Please read instructions carefully before completing this form.  The instructions must be available during completion of this form.  ANTI-DISCRIMINATION NOTICE:  It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee.  The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.**

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins.

| Print Name:   Last | First | Middle Initial | Maiden Name |
|---|---|---|---|

| Address (Street Name and Number) | Apt. # | Date of Birth (month/day/year) |
|---|---|---|

| City | State | Zip Code | Social Security # |
|---|---|---|---|

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
- [ ] A citizen or national of the United States
- [ ] A Lawful Permanent Resident (Alien # A_____
- [ ] An alien authorized to work until ___/___/___
      (Alien # or Admission #)_____

Employee's Signature

Date (month/day/year)

**Preparer and/or Translator Certification.**  *(To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.*

| Preparer's/Translator's Signature | Print Name |
|---|---|

| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C, as listed on the reverse of this form, and record the title, number and expiration date, if any, of the document(s)

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title:_____ | | _____ | | _____ |
| Issuing authority:_____ | | _____ | | _____ |
| Document #:_____ | | _____ | | _____ |
| Expiration Date (if any):___/___/___ | | ___/___/___ | | ___/___/___ |
| Document #:_____ | | | | |
| Expiration Date (if any):___/___/___ | | | | |

**CERTIFICATION** - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on  *(month/day/year)*  ___/___/___  and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment.)

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|

| Business or Organization Name | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|---|

**Section 3. Updating and Reverification.** To be completed and signed by employer.

| A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable) |
|---|---|

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

Document Title:_____     Document #:_____     Expiration Date (if any):___/___/___

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|

No-Match Cert. Admin. Record 674

Form I-9 (Rev. 11-21-91)N Page 2

## LISTS OF ACCEPTABLE DOCUMENTS

| **LIST A** | | **LIST B** | | **LIST C** |
|---|---|---|---|---|
| Documents that Establish Both Identity and Employment Eligibility | **OR** | Documents that Establish Identity | **AND** | Documents that Establish Employment Eligibility |

**LIST A — Documents that Establish Both Identity and Employment Eligibility**

1. U.S. Passport (unexpired or expired)

2. Certificate of U.S. Citizenship (INS Form N-560 or N-561)

3. Certificate of Naturalization (INS Form N-550 or N-570)

4. Unexpired foreign passport, with I-551 stamp or attached INS Form I-94 indicating unexpired employment authorization

5. Permanent Resident Card or Alien Registration Receipt Card with photograph (INS Form I-151 or I-551)

6. Unexpired Temporary Resident Card (INS Form I-688)

7. Unexpired Employment Authorization Card (INS Form I-688A)

8. Unexpired Reentry Permit (INS Form I-327)

9. Unexpired Refugee Travel Document (INS Form I-571)

10. Unexpired Employment Authorization Document issued by the INS which contains a photograph (INS Form I-688B)

**OR**

**LIST B — Documents that Establish Identity**

1. Driver's license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address

2. ID card issued by federal, state or local government agencies or entities, provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address

3. School ID card with a photograph

4. Voter's registration card

5. U.S. Military card or draft record

6. Military dependent's ID card

7. U.S. Coast Guard Merchant Mariner Card

8. Native American tribal document

9. Driver's license issued by a Canadian government authority

**For persons under age 18 who are unable to present a document listed above:**

10. School record or report card

11. Clinic, doctor or hospital record

12. Day-care or nursery school record

**AND**

**LIST C — Documents that Establish Employment Eligibility**

1. U.S. social security card issued by the Social Security Administration (other than a card stating it is not valid for employment)

2. Certification of Birth Abroad issued by the Department of State (Form FS-545 or Form DS-1350)

3. Original or certified copy of a birth certificate issued by a state, county, municipal authority or outlying possession of the United States bearing an official seal

4. Native American tribal document

5. U.S. Citizen ID Card (INS Form I-197)

6. ID Card for use of Resident Citizen in the United States (INS Form I-179)

7. Unexpired employment authorization document issued by the INS (other than those listed under List A)

Illustrations of many of these documents appear in Part 8 of the Handbook for Employers (M-274)

# LISTS OF ACCEPTABLE DOCUMENTS

| LIST A<br>Documents that Establish Both Identity and Employment Eligibility | OR | LIST B<br>Documents that Establish Identity | AND | LIST C<br>Documents that Establish Employment Eligibility |
|---|---|---|---|---|
| 1. U.S. Passport (unexpired or expired) | | 1. Driver's license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address | | 1. U.S. social security card issued by the Social Security Administration (other than a card stating it is not valid for employment) |
| 2. Certificate of U.S. Citizenship (INS Form N-560 or N-561) | | | | |
| 3. Certificate of Naturalization (INS Form N-550 or N-570) | | 2. ID card issued by federal, state or local government agencies or entities, provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address | | 2. Certification of Birth Abroad issued by the Department of State (Form FS-545 or Form DS-1350) |
| 4. Unexpired foreign passport, with I-551 stamp or attached INS Form I-94 indicating unexpired employment authorization | | | | |
| 5. Permanent Resident Card or Alien Registration Receipt Card with photograph (INS Form I-151 or I-551) | | 3. School ID card with a photograph | | 3. Original or certified copy of a birth certificate issued by a state, county, municipal authority or outlying possession of the United States bearing an official seal |
| 6. Unexpired Temporary Resident Card (INS Form I-688) | | 4. Voter's registration card | | |
| 7. Unexpired Employment Authorization Card (INS Form I-688A) | | 5. U.S. Military card or draft record | | |
| | | 6. Military dependent's ID card | | 4. Native American tribal document |
| 8. Unexpired Reentry Permit (INS Form I-327) | | 7. U.S. Coast Guard Merchant Mariner Card | | 5. U.S. Citizen ID Card (INS Form I-197) |
| 9. Unexpired Refugee Travel Document (INS Form I-571) | | 8. Native American tribal document | | |
| | | 9. Driver's license issued by a Canadian government authority | | 6. ID Card for use of Resident Citizen in the United States (INS Form I-179) |
| 10. Unexpired Employment Authorization Document issued by the INS which contains a photograph (INS Form I-688B) | | For persons under age 18 who are unable to present a document listed above: | | |
| | | 10. School record or report card | | 7. Unexpired employment authorization document issued by the INS (other than those listed under List A) |
| | | 11. Clinic, doctor or hospital record | | |
| | | 12. Day-care or nursery school record | | |

Illustrations of many of these documents appear in Part 8 of the Handbook for Employers (M-274)

No-Match Cert. Admin. Record  676

**OFFICE OF BUSINESS LIAISON**

**U.S. DEPARTMENT OF HOMELAND SECURITY**
U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| | |
|---|---|
| Employer Information Bulletin 111 | EBISS: (800) 357-2099 |
| | NCSC: (800) 375-5283 |
| Penalties for Prohibited Practices | TDD: (800) 767-1833 |
| | Fax: (202) 272-1865 |
| March 16, 2005 | Order Forms: (800) 870-3676 |
| | Website: www.uscis.gov |

The following is not intended to be legal advice pertaining to your situation and should not be construed as such. The information provided is intended merely as a general overview with regard to the subject matter covered.

# EMPLOYER SANCTIONS

## CIVIL MONEY PENALTIES[1]

The Department of Homeland Security, U.S. Immigration and Customs Enforcement (ICE) is authorized to conduct investigations to determine whether employers have violated the prohibitions against knowingly employing unauthorized aliens and failing to properly complete, present or retain the Employment Eligibility Verification form (Form I-9) for newly hired individuals. If ICE believes that violations have occurred, ICE may issue a Warning Notice, a Technical or Procedural Failures Letter notifying the employer of technical or procedural failures in need of correction, or a Notice of Intent to Fine (NIF). In cases where a NIF is issued, employers may request a hearing within 30 days of service of the NIF to contest the NIF before an Administrative Law Judge of the Office of the Chief Administrative Hearing Officer (OCAHO), Executive Office for Immigration Review, U.S. Department of Justice. Hearing requests must be in writing and filed with the ICE office designated in the NIF. If a hearing is not requested within the 30-day period, ICE will issue a Final Order to cease and desist and to pay a civil money penalty. Once a Final Order is issued, the penalty is unappealable. If a hearing is requested, ICE will file a complaint with OCAHO to begin the administrative hearing process which may end in settlement, dismissal, or a Final Order for civil money penalties.

## Hiring or Continuing to Employ Unauthorized Alien(s)

An employer found to have knowingly hired, recruited or referred for a fee, or continued to employ, an unauthorized alien for employment in the United States shall be subject to an order to cease and desist from the unlawful behavior and to pay a civil fine. An employer can be fined $250 - $2,000 per unauthorized alien with respect to whom the **First offense**[2] occurred before September 29, 1999, and not less than $275 and not exceeding $2,200, for each unauthorized alien with respect to whom the offense occurred on or after September 29, 1999. An employer can be fined from $2,000 - $5,000 per unauthorized alien for a **Second offense** that occurred before September 29,1999, and between $2,200 - $5,500 if occurred on or after September 29, 1999. An employer can be fined from $3,000 - $10,000 per unauthorized alien for each **Third or Subsequent offense** that occurred before September 29, 1999, and between $3,300 - $11,000 if occurred on or after September 29, 1999.

These penalties are not limited to employees for whom employers complete and retain I-9 files, but also cover employers' use of contract personnel known to them to be unauthorized to work in the United States. If an employer can demonstrate compliance with Form I-9 requirements, a **good faith defense** with respect to a charge of knowingly hiring an unauthorized alien will have been established unless the government can prove otherwise.

---

[1] The penalties described in this bulletin cover offenses occurring on or after September 29, 1999.

[2] In determining the level of the money penalties that will be imposed, a finding of more than one violation in the course of a single proceeding or determination will be counted as a single offense. However, a single offense will include penalties for each unauthorized alien who is determined to have been knowingly hired, recruited, or referred for a fee.

**No-Match Cert. Admin. Record  677**

## Failure to Comply with Form I-9 Requirements

Employers who fail to properly complete, retain, and/or present Forms I-9 for inspection as required by law may be subject to a civil penalty for violations occurring on or after September 29, 1999 from $110 - $1,100 per employee whose Form I-9 is not properly completed, retained, and/or presented. For violations occurring before September 29, 1999, civil penalties range from $100 to $1,000. In determining the amount of the civil penalty, the following factors are considered: size of the business of the employer being charged; the good faith of the employer; the seriousness of the violation; whether or not the individual was an unauthorized alien; and the history of previous violations of the employer.

## Requiring Indemnification

Employers found to have required a bond or indemnity from an employee against liability under the employer sanctions laws may be fined $1,000 for each violation before September 29, 1999, and $1,100 per violation on or after September 29, 1999, and ordered to make restitution to the person required to pay the indemnity. If that person cannot be located, payment is made to the U.S. Treasury.

## CRIMINAL PENALTIES

### *Engaging in a Pattern or Practice of Knowingly Hiring or Continuing to Employ Unauthorized Aliens*

Employers convicted of having engaged in a pattern or practice of knowingly hiring unauthorized aliens or continuing to employ aliens knowing that they are or have become unauthorized to work in the United States, after November 6, 1986, (e.g. expiration of work authorization), may be fined up to $3,000 per unauthorized employee and/or face up to 6 months of imprisonment.

### *Engaging in Fraud or False Statements, or Otherwise Misusing Visas, Immigration Permits, and Identity Documents*

Persons who knowingly use fraudulent identification documents, identity documents that were issued to persons other than themselves, or false attestations for the purpose of satisfying the employment eligibility verification requirements, may be fined and/or imprisoned for up to 5 years.

## CIVIL DOCUMENT FRAUD

It is unlawful for any person or entity knowingly to engage in any of the following activities:

- Forge, counterfeit, alter, or falsely make any document for the purpose of satisfying a requirement of the Immigration and Nationality Act (INA) or to obtain a benefit under the INA;
- Use, attempt to use, posses, obtain, accept, or receive or to provide any forged, counterfeit, altered or falsely made document for the purpose of satisfying a requirement of the INA or to obtain a benefit under the INA;
- Use or attempt to use or to provide any document lawfully issued to a person other than the possessor, including a deceased individual for the purpose of satisfying a requirement of the INA or to obtain a benefit under the INA;
- Accept or receive or to provide any document lawfully issued to or with respect to a person other than the possessor for the purpose of complying with the employment eligibility verification requirements or obtaining a benefit under the INA;
- Prepare, file, or assist another in preparing or filing, any application for benefits under the INA, or any document required under the INA, or any document submitted in connection with such application or document, with knowledge or in reckless disregard of the fact that such application or document was falsely made or, in whole or in part, does not relate to the person on whose behalf it was or is being submitted; or
- Present before boarding a common carrier for the purpose of coming to the United States a document which relates to the alien's eligibility to enter the United States, and to fail to present such document to an immigration officer upon arrival at a United States port of entry.

2

**No-Match Cert. Admin. Record  678**

If an investigation reveals that an individual has committed or participated in any of the acts listed above, **the U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement** may issue a Notice of Intent to Fine (NIF). Within 60 days of the NIF, the person or entity that receives the NIF may make a written request for a hearing submitted to the appropriate ICE office or face an unappealable Final Order to pay a civil penalty, **per fraudulent document or proscribed activity**, in the amount of: $250 - $2,000 or, if on or after September 29, 1999, $275 - $2,200, for the first offense; and $2,000 - $5,000, or, if on or after September 29, 1999, $2,200 - $5,500, for each subsequent offense. For an individual who is not a U.S. citizen, waiver of a 274C hearing will result in the issuance of a final order and removal from the United States.

## UNLAWFUL DISCRIMINATION

If an Office of Special Counsel for Unfair Employment-Related Discrimination (OSC) or Equal Employment Opportunity Commission (EEOC) investigation reveals employment discrimination covered by the Immigration and Nationality Act, the employer will be ordered to cease the prohibited practice and may be ordered to take one or more of the following steps:

- Hire or reinstate, with or without back pay, individuals directly injured by the discrimination;
- Lift any restrictions on an employee's assignments, work shifts, or movements;
- Post notices to employees about their rights and about employers' obligations;
- Educate all personnel involved in hiring and in complying with the employer sanctions and anti-discrimination laws;
- Remove a false performance review or false warning from an employee's personnel file.

Employers may also be ordered to pay civil monetary penalties of $250 - $2,000 per individual discriminated against for the **first offense**, $2,000 - $5,000 per individual discriminated against for the **second offense**, $3,000 - $10,000 per individual discriminated against for **subsequent offenses**.

## <u>DOCUMENT ABUSE</u>

Where employers are found to have requested more or different documents than an employee has chosen to present from List A or Lists B and C, they may be fined $100 - $1,000 for each individual determined to have suffered such *document abuse*.

The Department of Justice, Civil Rights Division, Office of Special Counsel for Immigration-Related Unfair Employment Practices can be reached on an employer hotline at (800) 255-8155 and on an employee hotline at (800) 255-7688 or via web at http://www.usdoj.gov/crt/osc.

3

**No-Match Cert. Admin. Record  679**

Social Security Administration
# Retirement, Survivors and Disability Insurance
Employer Correction Request                    CODE V

Office of Central Operations
300 N. Greene Street
Baltimore, MD 21290-0300
                    Date:
                    EIN:

EMPLOYER'S NAME
STREET ADDRESS
CITY, STATE  ZIP

Establishment Number:          MRN:              WFID:

**Why You Are Getting This Letter**

Some employee names and Social Security numbers that you reported on the Wage and Tax Statements (Forms W-2) for tax year 2004 do not agree with our records.  We need corrected information from you so that we can credit your employees' earnings to their Social Security records.  It is important because these records can determine if someone is entitled to Social Security retirement, disability and survivors benefits, and how much he or she can receive.  If the information you report to us is incorrect, your employee may not get benefits he or she is due.

There are several common reasons why the information reported to us does not agree with our records, including:

- Errors were made in spelling an employee's name or listing the Social Security number;

- An employee did not report a name change following a marriage or divorce; and

- The name or Social Security number was incomplete or left blank on the Form W-2 report sent to the Social Security Administration.

**IMPORTANT**:  This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number.  Nor does it make any statement about an employee's immigration status.

See Next Page

Visit our website at www.socialsecurity.gov

**No-Match Cert. Admin. Record  680**

99-9999999

You should not use this letter to take any adverse action against an employee, such as laying off, suspending, firing, or discriminating against that individual, just because his or her Social Security number appears on the list. Doing so could, in fact, violate State or Federal law and subject you to legal consequences.

**For Spanish-speaking individuals: Esta carta y los documentos adjuntos proveen información sobre las acciones que usted debe tomar para corregir algunos de los nombres y números de Seguro Social que informó en los Comprobantes de Retribuciones e Impuestos (formularios W-2, "Wage and Tax Statement", en inglés) de sus empleados. Si usted necesita una traducción de esta carta, por favor llámenos al número de teléfono gratis, 1-800-772-1213, de 7 a.m. a 7 p.m. de lunes a viernes.**

**Esta carta no implica que usted ni su empleado intencionalmente proveyeron información incorrecta al gobierno sobre el nombre o número de Seguro Social del empleado. Tampoco hace ninguna declaración sobre el estado de inmigración de su empleado.**

**Usted no debe usar esta carta para tomar una acción adversa contra el empleado, tal como suspenderlo, despedirlo o discriminar contra el individuo, simplemente porque su número de Seguro Social aparece en la lista. Cualquier empleador que haga esto se encuentra en violación de la ley estatal o federal, y está sujeto a enfrentar consecuencias legales.**

## What You Should Do

It would be a great help to us if you could respond within 60 days with the information that you are able to correct so that the Social Security Administration can maintain an accurate earnings record for each employee and make sure your employees get the benefits they are due.

We have attached some materials to help you:

- A list of the Social Security numbers that do not match our records. (If the list shows you have "MORE" Social Security numbers to correct than listed, please call us at 1-800-772-6270 for assistance.)
- Instructions on "How To Correct Social Security Numbers."
- Tips on "Annual Wage Report Filing" for the future.

Visit our website at www.socialsecurity.gov

99-9999999

**If You Have Any Questions**

If you have any questions, please call us toll-free at 1-800-772-6270 between 7 a.m. and 7 p.m., Eastern time, Monday through Friday.  We can answer most questions over the phone.  You can also write us at the address shown on the first page of this letter.  If you call, please have this letter with you. It will help us answer your questions. Also, general program information is available from our website at www.socialsecurity.gov/employer.


Carolyn L. Simmons
Associate Commissioner for
  Central Operations


Visit our website at www.socialsecurity.gov

99-9999999

## SOCIAL SECURITY NUMBERS THAT DO NOT MATCH OUR RECORDS

| | | | |
|---|---|---|---|
| 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 | 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 | 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 | 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 |
| 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 | 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 | 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 | 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 |
| 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 | 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 | 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 | 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 |
| 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 | 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 | 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 | 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 |
| 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 | 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 | 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 | 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 |
| 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 | 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 | 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 | 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 |
| 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 | 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 | 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 | 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 |
| 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 | 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 | 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 | 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 |
| 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 | 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 | 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 | 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 |
| 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 | 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 | 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 | 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 |
| 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 | 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 | 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 | 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 |
| 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 | 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 | 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 | 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 |

Visit our website at www.socialsecurity.gov

99-9999999

# How To Correct Social Security Numbers (SSNs)

Complete Forms W-2c (Corrected Wage and Tax Statement) for each of the Social Security numbers (SSNs) listed that you are able to correct. You only need to prepare Forms W-2c for the names or SSNs for which you have corrected information. If an employee does not provide corrected information or no longer works for you and you are unable to contact him/her, document your records with the information you relied on in completing the Form W-2 or the efforts you made to contact your former employee. Retain this information in your files; do not send it to the Social Security Administration (SSA.) You should provide all corrections as soon as possible.

You also need to file a Form W-3c (Transmittal of Corrected Wage and Tax Statements) whenever you file Forms W-2c.

Please follow the guidelines below when preparing Forms W-2c.

- Refer to the Internal Revenue Service (IRS) filing requirements in its publication, "Instructions for Forms W-2c and W-3c," at the IRS website http://www.irs.gov or call 1-800-829-3676 to request a copy.

- Compare your employment records to the Forms W-2 you reported for the SSNs included on the attached list.

- If your employment records and Forms W-2 do not match, prepare Forms W-2c with the corrected information from your employment records. (Do not send copies of proofs of identity or other documents in addition to, or in place of, the Forms W-2c.)

- If your employment records and Forms W-2 match, ask your employee to check his/her Social Security card and to inform you of any name or SSN difference between your records and his/her card. If your employment records are incorrect, correct your records.

- If your records match the information on the employee's Social Security card, have the employee contact any Social Security office to resolve the issue. Tell the employee that once he/she has visited the Social Security office he/she should inform you of any changes and you should correct your records accordingly.

- SSA may also send the employee a notice regarding this issue. You should discuss with the employee any changes you make to your employment records.

- If you file your Form W-2c corrections electronically or on magnetic media, call SSA at 1-800-772-6270 to request a copy of the "Magnetic Media Reporting and Electronic Filing of W-2c Information (MMREF-2)" or you can download the MMREF-2 at SSA's website, www.socialsecurity/employer.

Visit our website at www.socialsecurity.gov

99-9999999

- You may also file your Form W-2c corrections using W-2c Online. W-2c Online is one of several Business Services Online (BSO) Internet services for businesses and employers who exchange information with the Social Security Administration.

To begin using BSO, you must complete a one-time registration process. To register, go to www.socialsecurity.gov/bso/bsowelcome.htm.

- We suggest using AccuW2C to identify possible MMREF-2 formatting errors. You can download AccuW2C from the Internet at:

  www.socialsecurity.gov/employer/accuwage

- If you file paper Forms W-2c, you can get them from the Internal Revenue Service. Paper Forms W-2c should be sent to one of the following addresses:

  If you use the **U.S. Postal Service**, send the forms to:
  Social Security Administration
  Data Operations Center
  Attention: W-2c Process
  P.O. Box 3333
  Wilkes-Barre, Pennsylvania 18767-3333

  If you use a **carrier other than the U.S. Postal Service**, send the forms to:
  Social Security Administration
  Data Operations Center
  Attn: W-2c Process
  1150 E. Mountain Drive
  Wilkes-Barre, PA  18702-7997

Visit our website at www.socialsecurity.gov

99-9999999

# Tips on Annual Wage Report Filing

## Why Accurate Names and SSNs are Important

Accurate names and SSNs are important to you and your employees for several reasons. We use the name and SSN to maintain a record of personal earnings for each of your employees. Generally, we are not able to give an employee credit for his or her earnings unless the name and SSN reported on the Form W-2 agree with our records. It is most important that these records are correct since we later use them to decide if the individual can receive Social Security benefit payments and the amount of any payments due.

## Filing Tips To Ensure Accuracy

Before you file your next annual wage report, please make sure your employment records and the Forms W-2 you report have your employees' correct names and SSNs. Use the tips below to ensure accuracy.

- We encourage you to use SSA's Employee Verification Service (EVS) prior to submitting Forms W-2 to SSA for processing. EVS is a free, convenient and secure method for employers to verify that employee names and SSNs match SSA's records. EVS is not to be used to screen job applicants. A negative EVS response makes no statement about your employee's immigration status. Visit our website at www.socialsecurity.gov/employer and select SSN Verification or call toll-free 1-800-772-6270 for further details.

- Ask your employees to check their latest Forms W-2 against their Social Security cards and to inform you of any name or SSN differences on the two. If the Form W-2 is incorrect, correct your records and prepare a Form W-2c. If the card is incorrect, advise the employee to request a corrected card from the nearest Social Security office.

- Remind your employees near the end of each year to report to Social Security name changes due to marriage, divorce, or other reasons.

- Ask each new employee to check his or her Social Security card and inform you of the name and SSN exactly as shown on the card. (While the employee must furnish the SSN to you, the employee is not required to show the Social Security card. But, seeing the card will help ensure that all records are correct.)

- Direct those who do not have SSNs or cards to contact their nearest Social Security office.

- Ensure that the SSNs you report are valid. A valid SSN must have a total of nine digits. The first three digits are referred to as the area, the next two as the group, and the last four as the serial. No SSNs with a 000 area number, or an area number in the 800 or 900 series, have been issued. Also, no SSNs with a 00 group or 0000 serial number have been issued.

Visit our website at www.socialsecurity.gov

99-9999999

- If you file electronically or on magnetic media, be sure that all of your employees' names are correctly entered in the appropriate fields of the Code RW "Employee Wage Record."

  For more information see SSA Publication "Magnetic Media Reporting and Electronic Filing (MMREF-1)."

- If you file on paper, be sure to enter your employees' names on the Forms W-2 as follows: first name, middle initial, and last name exactly as shown on their Social Security cards.

  See IRS Publication 393, "Federal Employment Tax Forms."  SSA Publication 31-011, "Software Specifications and Edits for Annual Wage Reporting" can be obtained through SSA's website or by contacting the SSA Employer 800 Number.

For IRS forms or publications, call 1-800-TAX-FORM (829-3676), or visit IRS' website at http://www.irs.gov.

For SSA forms or publications, call SSA's Employer 800 Number, 1-800-772-6270, or visit SSA's website at www.socialsecurity.gov/employer.

Visit our website at www.socialsecurity.gov

No-Match Cert. Admin. Record  687

Form Approved
OMB No. 0960-0508

Social Security Administration

# Retirement, Survivors, and Disability Insurance

Request for Employee Information

Social Security Administration
Data Operations Center
P.O. Box 39
Wilkes-Barre, PA 18767-0039

Date:

Sequence Number:

Employer Number:

We need more information so that we can give you credit for your earnings from the company and for the year shown below. We cannot put these earnings on your Social Security record until the name and Social Security number reported to us match our records. Unless this problem is corrected, you may not get retirement, disability, survivors or other benefits that you are due.

**Company Name:**
**Employee's Name:**
**Social Security Number:**
**Reported Earnings:**
**Tax Year:**

## THIS IS WHAT YOU NEED TO DO

1. If your Social Security card does not show your correct name or Social Security number, or if you have lost your Social Security card, please call our toll-free number, 1-800-772-1213, or contact your local Social Security office.

2. Compare the information shown above to your FormW-2(s) and your Social Security card.

- If the name and number shown on the Social Security card **agree exactly** with the information shown above, contact your local Social Security office so that we can find out why our records do not match what was reported for you by your employer. Do not mail this letter back to us.

- If the name and number shown on the Social Security card **do not agree** with the information shown above, fill in the requested information on the reverse side of this letter, and mail it to us in the enclosed envelope. If you have been using an incorrect name or Social Security number, or your employer has been reporting earnings for you under an incorrect name or Social Security number, you must also correct this information with your employer.

**IMPORTANT: THE FACT THAT YOU HAVE RECEIVED THIS LETTER DOES NOT, IN AND OF ITSELF, ALLOW YOUR EMPLOYER TO CHANGE YOUR JOB, LAY YOU OFF, FIRE YOU OR TAKE OTHER ACTION AGAINST YOU. IF YOU THINK YOUR EMPLOYER IS DISCRIMINATING AGAINST YOU BECAUSE YOUR NAME AND SOCIAL SECURITY NUMBER DO NOT MATCH OUR RECORDS, SEE THE ATTACHED INFORMATION ON IMPORTANT PROTECTIONS OF YOUR RIGHTS.**

**For Spanish-speaking individuals:** Esta carta contiene información importante. Vea la página 3 para más detalles.

**Please See Reverse**

**No-Match Cert. Admin. Record  688**

3365-05

Most problems with names and Social Security numbers that do not match our records are the result of mistakes and do not involve intentional fraud. We want to work with you and your employer to correct your earnings record and to make sure that you receive credit for all of your work under the Social Security program.

Please fill out the following form if the name and number shown on your Social Security card do not agree with the information on page one of this letter. Please take this action now to make sure you receive any retirement, disability, survivors or other benefits owed to you.

**For Spanish-speaking individuals: Esta carta pide información sobre las ganancias que su empleador informó por usted. Si usted necesita una traducción de esta carta, por favor llámenos al número de teléfono gratis, 1-800-772-1213, de 7 a.m. a 7 p.m. de lunes a viernes.**

## REQUEST FOR EMPLOYEE INFORMATION

1. Name shown on your Social Security card (Please Print--Use Black Ink or #2 Pencil):

First              M.I.                     Last

2. Social Security number on your card: ☐☐☐ – ☐☐ – ☐☐☐☐

3. Does the **amount** of reported earnings on the front of this letter match any Form W-2 you received for the tax year shown?  ☐ Yes    ☐ No (Explain)

4. Have you ever used another name?  ☐ No    ☐ Yes (Give other names used)

First              M.I.                     Last

5. Daytime phone number where you can be reached _ _ _ _ – _ _ _ – _ _ _ _

**NOTE: Do NOT send a copy, or original, of a Form W-2c with this letter.**

See Next Page

3365-05           **No-Match Cert. Admin. Record 689**

3365-05

## KEEP THIS PAGE--IT INCLUDES IMPORTANT INFORMATION

- Your employer may not take action against you based on this letter.
  If you think that any action against you is related to labor union activities or union organizing activities, you may contact the National Labor Relations Board (NLRB), an agency of the U.S. government (www.nlrb.gov). Check your local directory for the nearest NLRB office in your area.

- If you think that any action against you is related to your race, color, sex, religion, national origin, age or disability, you may call the Equal Employment Opportunity Commission (EEOC) toll-free at 1-800-669-4000, or 1-800-669-6820 (TDD for the deaf or hard of hearing), or visit the website at www.eeoc.gov.

- If you have questions or concerns about unfair practices by your employer that may be related to your national origin or citizenship status, you may call the Office of Special Counsel for Immigration-Related Unfair Employment Practices toll-free at 1-800-255-7688, or 1-800-237-2515 (TDD for the deaf or hard of hearing). Within the Washington, D.C., metropolitan area, call 202-616-5594.

*Please See Reverse*

### For Spanish-speaking individuals:
## GUARDE ESTA CARTA-CONTIENE INFORMACIÓN IMPORTANTE
**Su empleador no puede tomar acción en su contra basándose en esta carta.**

- Si usted piensa que cualquier acción en su contra está relacionada con las actividades del sindicato de trabajadores, usted puede ponerse en contacto con la Junta Nacional de Relaciones del Trabajo (NLRB, siglas en inglés), una agencia del gobierno de los Estados Unidos (www.nlrb.gov). Busque la oficina más cercana de la Junta Nacional de Relaciones del Trabajo en su directorio local.
- Si usted piensa que cualquier acción en su contra está relacionada con su raza, color, sexo, religión, origen nacional, edad o incapacidad, puede llamar gratis a la Comisión de Igualdad de Oportunidades de Empleo (EEOC, siglas en inglés) al 1-800-669-4000 ó 1-800-669-6820 (TDD para las personas sordas o con problemas auditivos), o visitar www.eeoc.gov en el Internet (sólo disponible en inglés).
- Si usted tiene preguntas o dudas sobre prácticas injustas por parte de su empleador, que pueden estar relacionadas con su origen nacional o estado legal, puede llamar gratis a la Oficina del Consejero Especial para Prácticas de Empleo Injustas Relacionadas a la Condición de Inmigrante al 1-800-255-7688 ó 1-800-237-2515 (TDD para las personas sordas o con problemas auditivos). Dentro del área metropolitana de Washington, D.C., llame al (202) 616-5594.

El hecho de que usted haya recibido esta carta no constituye una razón, de por sí, para que su empleador lo cambie de trabajo, suspenda, despida o tome alguna acción adversa en su contra.

**Vea al dorso**

No-Match Cert. Admin. Record  690

3365-05

If you have any questions, you may call us toll free at 1-800-772-1213. We can answer most questions over the phone. You can also write or visit any Social Security office. If you do call or visit an office, please have this letter with you. The office that serves your area is located at:

If you need an interpreter to conduct Social Security business, we will supply one on request, free of charge. If you want us to supply the interpreter, please call 1-800-772-1213 before you come to the office and tell us what language you prefer to speak.

**Si usted necesita un intérprete para tramitar sus asuntos con el Seguro Social, le podemos proveer uno, libre de costo. Si usted desea que proveamos un intérprete, por favor llame al 1-800-772-1213 antes de venir a la oficina y díganos en que idioma prefiere hablar.**

Carolyn L. Simmons
Associate Commissioner for
Central Operations

Enclosure:
Envelope

## THE PRIVACY ACT

Section 205(a) of the Social Security Act allows us to ask for the information on this letter. The information you give us will be used to give you credit for earnings reported. You do not have to give us this information. However, without the information we may not be able to give you credit for wages earned. We may give this information to the Internal Revenue Service for tax purposes or to the Department of Justice for investigating and prosecuting violations of the Social Security Act.

We may also use the information you give us when we match records by computer. Matching programs compare our records with those of other Federal, State or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government. The law allows us to do this even if you do not agree to it. Explanations about these and other reasons why information you provide us may be used or given out are available in Social Security offices. If you want to learn more about this, contact any Social Security office.

## PAPERWORK REDUCTION ACT STATEMENT

This information collection meets the clearance requirements of 44 U.S.C. section 3507, as amended by section 2 of the **Paperwork Reduction Act of 1995**. You are not required to answer these questions unless we display a valid Office of Management and Budget control number. We estimate that it will take you about 10 minutes to read the instructions, gather the necessary facts, and answer the questions.

**No-Match Cert. Admin. Record  691**

4002-05

Form Approved
OMB No. 0960-0508

Social Security Administration

# Retirement, Survivors, and Disability Insurance

Request for Employer Information

Social Security Administration
Data Operations Center
P.O. Box 39
Wilkes-Barre, PA 18767-0039

Date:

Sequence Number:

Employer Number:

We are writing to you about your Wage and Tax Statement (W-2) or Corrected Wage and Tax Statement (W-2c) for the employee shown below. Please complete the information on the back of this letter and return it to us promptly. We cannot put these earnings on the employee's Social Security record until the name and Social Security number you reported agree with our records.

**Employee's Name:**
**Social Security Number:**
**Reported Earnings:**
**Tax Year:**

The reasons the reported information does not agree with our records may include, but are not limited to:

- Typographical errors
- Incomplete or blank name reported
- Incomplete or blank Social Security Number (SSN) reported
- Name changes

This letter does not imply that you or your employee intentionally provided incorrect information about the employee's name or SSN. It is not a basis, in and of itself, for you to take any adverse action against the employee, such as laying off, suspending, firing, or discriminating against the individual. Any employer that uses the information in this letter to justify taking adverse action against an employee may violate state or Federal law and be subject to legal consequences. Moreover, this letter makes no statement about your employee's immigration status.

**For Spanish-speaking individuals: Esta carta no implica que usted ni su empleado intencionalmente proveyeron información incorrecta sobre el nombre o número de Seguro Social del empleado. El hecho de que usted haya recibido esta carta no constituye una razón, de por sí, para que usted tome alguna acción adversa contra el empleado, tal como suspenderlo, despedirlo o discriminar contra el individuo. Cualquier empleador que use la información en esta carta para justificar una acción adversa contra un empleado puede encontrarse en violación de la ley estatal o federal, y estar sujeto a enfrentar consecuencias legales. Además, esta carta no hace ninguna declaración sobre el estado de inmigración de su empleado.**

**Esta carta pide información sobre las ganancias que usted informó por su número de teléfono gratis, 1-800-772-1213, de 7 a.m. a 7 p.m. de lunes a viernes.**

Please See Reverse

No-Match Cert. Admin. Record  692

4002-05

## REQUEST FOR EMPLOYER INFORMATION (Please Print-- Use Black Ink or #2 Pencil)

1. Name shown on the employee's Social Security card:

[   ] FIRST   [M.I.]   [   ] LAST

2. Social Security number on the employee's card: [  ] – [  ] – [   ]

3. Do the earnings reported belong to this employee? [ ] Yes   [ ] No (Explain)

_____

4. Has the employee ever used another name? [ ] No   [ ] Yes  (Give other names used)

[   ] FIRST   [M.I.]   [   ] LAST

5. Does the employee still work for you? [ ] Yes   [ ] No   (Give full last known address)

[   ] ADDRESS

[   ] CITY   [ ] STATE   [   ]- [ ] ZIP

6. Daytime phone number where you can be reached  — — — - — — — - — —

_____

## THIS IS WHAT YOU NEED TO DO

1. Compare the information shown above to your employment records.

2. If the records match, ask the employee to give you the name and Social Security number exactly as it appears on the employee's Social Security card. (While the employee must furnish the SSN to you, the employee is not required to show you the Social Security card. But, seeing the card will help ensure that all records are correct.)

3. If the employee's Social Security card does not show the employee's correct name or Social Security number, or if the employee needs to report a name change or replace a lost Social Security card, have the employee contact any Social Security office.

4. If you or the employee have been using an incorrect name or Social Security number, you must correct it.

5. Fill in the information above and return this letter in the enclosed envelope. (Do not attach a Form W-2c to this letter.)

If you have any questions, you may call us toll-free at 1-800-772-6270 from 7 a.m. to 7 p.m., Monday through Friday, Eastern time. If you call an office, please have this letter with you. It will help us to answer your questions.

Enclosure:
Envelope

Carolyn L. Simmons
Associate Commissioner for
Central Operations

**No-Match Cert. Admin. Record  693**

4002-05

## DO NOT RETURN THIS PAGE

## POINTERS FOR CORRECT REPORTING

1) The Internal Revenue code requires an employer to include each employee's Social Security number when filing returns, such as the W-2 Wage and Tax Statements. The employer identification number must also appear on such returns.
2) Ask for the employee's Social Security number and explain that the law requires the employee to give the number although (s)he may be ineligible for benefits.
3) Include the middle initial if shown on the employee's Social Security card. Format: John C. Smith.

## THE PRIVACY ACT

Section 205(a) of the Social Security Act allows us to ask for the information on this letter. The information you give us will be used to give the employee credit for the correct amount of wages. You do not have to complete this letter. However, if you do not, we cannot give the employee credit for the correct amount of wages. We may give this information to the Internal Revenue Service for tax administration purposes or to the Department of Justice for investigating and prosecuting violations of the Social Security Act.

We may also use the information you give us when we match records by computer. Matching programs compare our records with those of other Federal, State or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government. The law allows us to do this even if you do not agree to it. Explanations about these and other reasons why information you provide us may be used or given out are available in Social Security offices. If you want to learn more about this, contact any Social Security office.

## PAPERWORK REDUCTION ACT STATEMENT

This information collection meets the clearance requirements of 44 U.S.C. section 3507, as amended by section 2 of the **Paperwork Reduction Act of 1995**. You are not required to answer these questions unless we display a valid Office of Management and Budget control number. We estimate that it will take you about 10 minutes to read the instructions, gather the necessary facts, and answer the questions.

**No-Match Cert. Admin. Record  694**

**[Model Letter for Employers Following Record Check with SSA]**



**U.S. Department of Justice**
Immigration and Naturalization Service

File Number
Date

Name of Company Official
Company Name
Company Address

Dear Sir/Madam:

On **[Insert date of inspection]** officers of the Immigration and Naturalization Service (INS) conducted an inspection of **[Insert name of employer]** to determine compliance with Section 274A of the Immigration and Nationality Act. During that inspection, the requirements of the law were discussed and Forms I-9 were inspected.

As part of its inspection process, the INS asked the Social Security Administration (SSA) to confirm information regarding employees who attested in section 1 of the Form I-9 that they are citizens or nationals of the United States (or who did not check any of the three boxes regarding citizenship or immigration status). The INS attempted to confirm that [1] the Social Security number (SSN) recorded in section 1 and/or section 2 of the Form I-9 is a valid SSN; [2] the SSN was assigned to an individual with the same identifying information (name and date of birth) as your employee; and [3] SSA records do not indicate that the employee's current Social Security card is a restricted one intended for the use of aliens who require INS employment authorization in order to work legally.

This letter is to inform you that our check of SSA records was unable to confirm Form I-9 information with respect to the following individual(s) who attested to U.S. citizenship or nationality in section 1 of the Form I-9, or who did not check one of the three boxes relating to citizenship or immigration status (employers who do not ensure that section 1 is completely filled out may be subject to a civil money penalty):

1.    **No SSA record of assignment of the SSN recorded on Form I-9:**

<u>Name</u>                    <u>Date of Birth</u>              <u>SSN</u>

**2.     SSN assigned to individual with different name and/or date of birth than that recorded on Form I-9:**

Name                         Date of Birth               SSN

**3.     SSA records indicate that individual is an alien requiring INS work authorization who has been issued a restricted social security card:**

Name                         Date of Birth               SSN

The fact that there is a discrepancy between SSA records and the Form I-9 does not necessarily mean that the employee is not work authorized. There are a number of legitimate reasons why a discrepancy could exist. We seek your assistance and cooperation in resolving this discrepancy. However, an employer who continues to employ an individual after receiving notice of a discrepancy that calls into question the accuracy of the Form I-9 as evidencing work authorization potentially may be subject to a civil money penalty for knowingly continuing to employ an unauthorized alien if the employer does not resolve the discrepancy and if the individual is not work authorized.

Therefore, the INS strongly recommends that you take the following steps immediately to resolve this situation:
(1) review the Form I-9 to ensure that the section 1 attestation regarding citizenship or immigration status has been completed;
(2) confirm with the employee that the employee's name, date of birth, SSN, and citizenship or immigration status as recorded in section 1 of the Form I-9 are correct and up-to-date;
(3) make all necessary corrections to the Form I-9 in a nondestructive manner (for example, by drawing a single line through the incorrect information, recording the correct information in the nearest available space on the Form I-9, and having the employee initial and date the correction, or by executing a new Form I-9 while retaining the old one); and
(4) review documentation that meets the requirements for section 2 of the Form I-9 and that is consistent with the section 1 information as confirmed by the employee.

If you or the employee feel this letter is in error or have any questions, you or the employee may call **[Insert name and title of INS point of contact]** at **[Insert phone number]**. In addition, the SSA office serving your area can assist you if you have any questions about SSA's requirements governing the accurate reporting of correct names and SSNs for wage and tax purposes, or assist your employee if he or she needs to update or correct SSA records pertaining to the employee (for example, if the employee has not reported to SSA his or her naturalization or legal change of name). Your employees may call 1-800-772-1213 if they have any questions or to find the location of the nearest SSA office.

Sincerely,

**[Insert name and title of INS official in charge]**

# Handbook  for  Employers

## Instructions for Completing Form I-9

### *(Employment Eligibility Verification Form)*



If you have questions after reviewing this Handbook, please contact your local INS office at the address found in the back of this Handbook. Direct your letter to the attention of the *Employer Relations Offices.*
**DO NOT CONTACT THE INTERNAL REVENUE SERVICE (IRS)**

**No-Match Cert. Admin. Record  697**

**U. S. Department of Justice**
Immigration and Naturalization Service



To United States Employers:

Thank you for your cooperation and assistance. For the past five years, you have worked with us to implement the employment eligibility verification and employer sanctions provisions of the Immigration Reform and Control Act of 1986. Your teamwork has made the law a success, ensuring fairness in applying the law and preserving jobs for those who are legally eligible to work -- citizens and nationals and aliens authorized to work in the United States.

Based on comments and suggestions received from the public and our experience in these first years, we have revised the *Employment Eligibility Verification Form* (I-9) and expanded this *Handbook for Employers*. We have sought to simplify and clarify.

This Handbook provides a step-by-step explanation of what you as an employer must do to meet your responsibilities under the law.     It also explains the responsibilities and rights of employees in the hiring and verification process. We have included additional illustrations of documents that may be used to establish identity and employment eligibility.   The Handbook also provides expanded information about how to avoid employment discrimination based on citizenship or national origin.

The Immigration and Naturalization Service thanks you for your compliance with these requirements, now an established part of our nation's laws. We are counting on your continued cooperation.

*signature*

Gene McNary
Commissioner
Immigration and Naturalization Service

# Contents

## This Handbook is divided into eight (8) parts:

- **Part 1** - Why Employers Must Verify Employment Eligibility of New Employees.
  See Page 1

- **Part 2** - When You Must Complete the Form I-9.
  See Page 3

- **Part 3** - How to Complete the Form I-9.
  See Page 3

- **Part 4** - Unlawful Discrimination.
  See Page 8

- **Part 5** - Penalties for Prohibited Practices.
  See Page 9

- **Part 6** - Instructions for Recruiters and Referrers for a Fee.
  See Page 11

- **Part 7** - Some Questions You May Have About the Form I-9.
  See Page 12

- **Part 8** - Acceptable Documents for Verifying Employment Eligibility.
  See Page 20

This Handbook includes two copies of the Form I-9. At the back, you will also find a list of INS offices for you to contact if you need more information.

### United States Department of Justice
*Immigration and Naturalization Service*

November 1991

# Part One

## Why Employers Must Verify Employment Eligibility of New Employees

In recent years, Congress has worked to reform our nation's immigration laws. These reforms, the result of a bipartisan effort, preserve our tradition of legal immigration while closing the door to illegal entry. The employer sanctions provisions, found at Section 274A of the Immigration and Nationality Act, were added by the Immigration Reform and Control Act of 1986 (IRCA). These provisions further changed with the passage of the Immigration Act of 1990. References to "the Act" in this Handbook refer to the Immigration and Nationality Act, as amended.

Employment is often the magnet that attracts persons to come to or stay in the United States illegally. The purpose of the employer sanctions law is to remove this magnet by requiring employers to hire only persons who may legally work here: citizens and nationals of the United States and aliens authorized to work. To comply with the law, you must verify the identity and employment eligibility of anyone you hire, and complete and retain a Form I-9 like the one contained in this Handbook.

In addition, the law obliges you not to discriminate against individuals on the basis of national origin or citizenship, or to require more or different documents from a particular individual. (See Part 4.)

This law has been strongly supported by the public. Employers have joined, and continue to join, the effort to protect our heritage of legal immigration. This cooperation has made jobs available to American citizens and to aliens who are authorized to work in our country. In addition to being the law, it is good business practice for you to verify the identity and employment eligibility of your workers. The law deserves your support.

The Form I-9 was developed for verifying that persons are eligible to work in the United States. You should have completed a Form I-9 for everyone you have hired after November 6, 1986. The law requires you as an employer to:

- Ensure that your employees fill out Section 1 of the Form I-9 when they start to work;

**No-Match Cert. Admin. Record  699**

2

- Review document(s) establishing each employee's identity and eligibility to work;

- Properly complete Section 2 of the Form I-9;

- Retain the Form I-9 for 3 years after the date the person begins work or 1 year after the person's employment is terminated, **whichever is later**; and

- Make the Form I-9 available for inspection to an officer of the Immigration and Naturalization Service (INS), the Department of Labor (DOL), or the Office of Special Counsel for Immigration Related Unfair Employment Practices (OSC) upon request. You will be given at least 3 days advance notice.

  **NOTE:** *This does not preclude the INS, the DOL, or the OSC from obtaining warrants based on probable cause for entry onto the premises of suspected violators without advance notice.*

If you are an agricultural association, agricultural employer, or farm labor contractor who employs people, or recruits or refers people for a fee, these requirements apply to you. (See Part 6.)

If you employ anyone for domestic work in your private home on a regular basis (such as every week), these requirements apply to you.

If you are self-employed, you do not need to complete a Form I-9 on yourself unless you are also an employee of a business entity, such as a corporation or partnership, in which case the business entity is required to complete a Form I-9 on you.

The instructions in this Handbook will help you assess your responsibilities for completing the form and complying with the law.

## New Developments In the Law

### The Immigration Act of 1990

On November 29, 1990, the President signed into law the Immigration Act of 1990 which amended the Immigration and Nationality Act. You should be aware of several provisions in this new law which affect your responsibilities as an employer.

New Anti-Discrimination Provisions

For the purpose of satisfying the employment eligibility verification requirements, an employer cannot request that an employee present more or different documents than are required. Also, an employer cannot refuse to honor documents which on their face reasonably appear to be genuine and to relate to the person presenting them. The new law makes these actions unfair immigration-related employment practices. (See Part 4.)

New Document Fraud Provisions

Under the new law, it is unlawful for anyone knowingly to engage in any of the following activities for the purpose of satisfying a requirement of the Act:

- To forge, counterfeit, alter, or falsely make any document;

- To use, attempt to use, possess, obtain, accept, or receive any forged, counterfeit, altered, or falsely made document;

- To use or attempt to use any document lawfully issued to a person other than the possessor (including a deceased individual); or

- To accept or receive any document lawfully issued to a person other than the possessor (including a deceased individual) for the purpose of complying with the employment eligibility verification requirements. (See Part 5.)

## Where to Get the Form I-9

Two copies of the Form I-9 are included in this Handbook. If you need more forms, you can photocopy or print the forms, provided both sides are reproduced. The Instructions page must also be made available to both you and the employee during the completion of the form. You may obtain a limited number of copies from the INS or you may order them in bulk from the Superintendent of Documents at the following address:

Superintendent of Documents
U.S. Government Printing Office
Washington, D.C. 20402

# Part Two

## When You Must Complete the Form I-9

Every time you hire any person to perform labor or services in return for wages or other remuneration, you must complete the Form I-9. This requirement applies to everyone hired after November 6, 1986.

Ensure that the employee fully completes **Section I** of the form at the time of the hire -- **when the employee begins work.**

Review the employee's document(s) and fully complete **Section 2** of the form **within 3 business days** of the hire.

**If you hire a person for less than 3 business days, Sections 1 and 2 of the Form I-9 must be fully completed at the time of the hire -- when the employee begins work.**

You **DO NOT** need to complete a Form I-9 for:

- Persons hired before November 7, 1986, who are continuing in their employment and have a reasonable expectation of employment at all times;

- Persons you employ for casual domestic work in a private home on a **sporadic, irregular,** or **intermittent** basis;

- Persons who are independent contractors; or

- Persons who provide labor to you who are employed by a contractor providing contract services (e.g., employee leasing).

   **NOTE:** *You cannot contract for the labor of an alien if you know the alien is not authorized to work in the United States.*

# Part Three

## How to Complete the Form I-9

### Section 1

- Have your employees complete Section 1 at the time of the hire -- when they begin to work -- by filling in the correct information and signing and dating the form.

- If your employees cannot complete Section 1 by themselves or if they need the form translated, someone may assist them. The preparer or translator must read the form to the employee, assist him or her in completing Section 1, and have the employee sign or mark the form in the appropriate place. The preparer or translator must then complete the Preparer/Translator Certification block on the Form I-9.

- You are responsible for reviewing and ensuring that your employees fully and properly complete Section 1.

### Section 2

- Employees must present to you an original document or documents that establish identity and employment eligibility within 3 business days of the date employment begins. Some documents establish **both** identity and employment eligibility (List A). Other documents establish **identity only** (List B) or **employment eligibility only** (List C). Employees can choose which document(s) they want to present from the lists of acceptable documents. These lists appear in Part 8 of this Handbook and on the back of the Form I-9.

- You must examine the original document or documents presented by the employee and then fully complete Section 2 of the Form I-9. You must examine one document from List A **or** one from List B and one from List C. Record the title, issuing authority, number, and expiration date (if any) of the document(s); fill in the date of hire and correct information in the certification block; and sign and date the Form I-9. You **must** accept any document(s) (from List A) or combination of documents (one from List B **and** one from List C) presented by the individual which reasonably appear on their face to be genuine and to relate to the person presenting them. You may not specify which document(s) an employee must present.

4

It employees are unable to present the required document(s) within 3 business days of the date employment begins, they must present a **receipt** for the application for the document(s) within 3 business days. The employees **must** have indicated, by having checked an appropriate box in Section 1, that they are already eligible to be employed in the United States. When they provide you with a receipt showing that they have applied for a document evidencing that eligibility, you should record the document title in Section 2 of the Form I-9 and write the word "receipt" and any document number in the "Document #" space. The employee must present the actual document within 90 days of the date employment begins. At that time, you should cross out the word "receipt" and any accompanying document number, insert the number from the actual document presented, and initial and date the change.

- You must retain the Form I-9 for 3 years after the date employment begins or 1 year after the person's employment is terminated, **whichever is later.**

## Future Expiration Dates

Future expiration dates may appear on the Form I-9 or on the employment authorization documents of aliens, including, among others, permanent residents, temporary residents, and refugees. INS includes expiration dates even on documents issued to aliens with permanent work authorization. The existence of a future expiration date:

- Does not preclude continuous employment authorization;

- Does not mean that subsequent employment authorization will not be granted; and

- Should not be considered in determining whether the alien is qualified for a particular position.

Consideration of a future employment authorization expiration date in determining whether an alien is qualified for a particular job may constitute employment discrimination. (See Part 4.) You will, however, need to reverify the employee's eligibility to work when any expiration date on the Form I-9 is reached.

## Reverifying Employment Authorization for Current Employees

When an employee's work authorization expires, you must reverify his or her employment eligibility. You may use Section 3 of the Form I-9 or, if Section 3 has already been used for a previous reverification or update, use a new Form I-9. If you use a new form, you should write the employee's name in Section 1, complete Section 3, and retain the new form with the original. The employee must present a document that shows either an extension of the employee's initial employment authorization or now work authorization. If the employee cannot provide you with proof of current work authorization, you cannot continue to employ that person.

**To maintain continuous employment eligibility, an employee with temporary work authorization should apply for new work authorization** at least 90 days **before the current expiration date.** If the Service fails to adjudicate the application for employment authorization within 90 days, then the employee will be authorized for employment on Form I-688B for a period not to exceed 240 days.

*You must reverify on* **the Form I-9** *not later* **than** *the date the employee's* **work** *authorization expires.*

## Reverifying or Updating Employment Authorization for Rehired Employees

When you rehire an employee, you must ensure that he or she is still authorized to work. You may do this by completing a new Form I-9 or you may reverify or update the original form by completing Section 3.

If you rehire an employee who has previously completed a Form I-9, you may **reverify** on the employee's original Form I-9 (or on a new Form I-9 if Section 3 of the original has already been used) if:

- You rehire the employee within 3 years of the initial date of hire; and

- The employee's previous grant of work authorization has expired but he or she is currently eligible to work on a **different** basis or under a **new** grant of work authorization than when the original Form I-9 was completed.

To reverify, you must:

- Record the date of rehire;

- Record the document title, number, and expiration date (if any) of any document(s) presented;

- Sign and date Section 3; and

- If you are reverifying on a new form, write the employee's name in Section 1.

If you rehire an employee who has previously completed a Form I-9, you may **update** on the employee's original Form I-9 or on a new Form I-9 if:

- You rehire the employee within 3 years of the initial date of hire; and

- The employee is still eligible to work on the **same** basis as when the original Form I-9 was completed.

To update, you must:

- Record the date of rehire;

- Sign and date Section 3; and

- If you are updating on a new form, write the employee's name in Section 1.

In all of the situations described above with respect to rehired employees, you always have the option of completing Sections 1 and 2 of a new Form I-9 instead of completing Section 3.

### Minors (Individuals Under Age 18)

If a minor – a person under the age of 18 – cannot present a List A document or an **identity** document from List B, the Form I-9 should be completed in the following way:

- A parent or legal guardian must complete Section 1 and write "Individual under age 18" in the space for the employee's signature;

- The parent or legal guardian must complete the "Preparer/Translator Certification" block;

- You should write "Individual under age 18" in Section 2, List B, in the space after the words "Document #"; and

- The minor must present a List C document showing his or her employment eligibility. You should record the required information in the appropriate space in Section 2.

### Handicapped Employees (Special Placement)

If a person with a handicap, who is placed in a job by a nonprofit organization or as part of a rehabilitation program, cannot present a List A document or an **identity** document from List B, the Form I-9 should be completed in the following way:

- A representative of the nonprofit organization, or a parent or a legal guardian, must complete Section 1 and write "Special Placement" in the space for the employee's signature;

- The representative, parent, or legal guardian must complete the "Preparer/Translator Certification" block;

- You should write "Special Placement" in Section 2, List B, in the space after the words "Document #"; and

- The handicapped employee must present a List C document showing his or her employment eligibility. You should record the required information in the appropriate space in Section 2.

6

**Section 1 - To be completed by the EMPLOYEE**

**STEP 1**
Fill in the personal information.

**STEP 2**
Check the box for work eligibility.
Fill in other information if
applicable.

**STEP 3**
Read, sign, and date.

**STEP 4**
*(Preparer/Translator only)*
Read, fill in information, sign, and
date.





**Section 2 - To be completed by the EMPLOYER**

**STEP 5**
Examine the document(s) and fill
in the document title, issuing
authority, number, and expiration
date (if any) in the space
provided.

**STEP 6**
Read, fill in information (including
the date employment begins in
the certification), sign, and date.




**Section 3 - To be completed by the EMPLOYER**

**STEP 7**
Fill in the new name and/or date
of rehire (if applicable).

**STEP 8**
Examine the document(s) and fill
in the document title, number,
and expiration date (if any) in the
space provided.

**STEP 9**
Read, sign, and date.




7

Part Three of this Handbook gives instructions for completing the Form I-9 for minors and handicapped individuals who are unable to present a List A document or a List B (**identity**) document. This example shows a completed Form I-9 in which a parent has attested to a minor employee's identity.

**Section 1.** To be completed by the **PARENT, LEGAL GUARDIAN, OR REPRESENTATIVE OF THE NONPROFIT ORGANIZATION**

**STEP 1**
Fill in the personal information.

**STEP 2**
Check the box for work eligibility. Fill in other information as required.

**STEP 3**
Read, then write "Individual under age 18" in the space for the employee's signature.

**STEP 4**
(Preparer/Translator)
Read, fill in information, sign, and date.



**Section 2 -** To be completed by the **EMPLOYER**

**STEP 5**
Examine a List C document establishing employment eligibility. Fill in the document title, issuing authority, number, and expiration date (if any) in the space provided. Under List B, write "Individual under age 18" in the space provided for "Document #."

**STEP 6**
Read, fill in information, sign, and date.



No-Match Cert. Admin. Record  705

8

# Part Four

## Unlawful Discrimination

### General Provisions

The Immigration and Nationality Act, as amended, and Title VII of the Civil Rights Act of 1964, as amended, prohibit employment discrimination. Employers with 4 or more employees are prohibited from discriminating against any person (other than an unauthorized alien) in hiring, discharging, or recruiting or referring for a fee because of a person's national origin, or in the case of a citizen or protected individual, because of a person's citizenship status. Employers with 15 or more employees may not discriminate against any person on the basis of national origin in hiring, discharge, recruitment, assignment, compensation, or other terms and conditions of employment.

**NOTE:**        *For the definition of a "protected individual," see Question #41 on Page 18 of this Handbook.*

In practice, this means that employers must treat all employees the same when completing the Form I-9. Employers cannot set different employment eligibility verification standards or require that different documents be presented by different groups of employees.        Employees can choose which documents they want to present from the lists of acceptable documents. An employer cannot request that an employee  present more or  different documents that are required or refuse to honor documents which on their face reasonably appear to be genuine and to relate to the person presenting them. An employer cannot refuse to accept a document, or refuse to hire an individual, because a document has a future expiration date. For example, temporary resident aliens have registration cards and persons granted asylum have INS work authorization documents that will expire, but they are ordinarily granted extensions of their employment authorization and they are protected by law from discrimination.

Generally, employers who have 4 or more employees cannot limit jobs to United States citizens to the exclusion of authorized aliens. Such a limitation may only be applied to a specific position when required by law, regulation, or executive order; when required by a Federal, state, or local government contract; or when the Attorney General determines that United States citizenship is essential for doing business with an agency or department of the Federal, state, or local government.

On an individual basis, an employer may legally prefer a United States citizen or national over an **equally** qualified alien to fill a specific position. **However, an employer may not adopt a  blanket policy of always preferring a qualified citizen over a qualified alien.**

Verification of identity and employment eligibility is not required until an individual actually starts work. The Form I-9 should be completed at the same point in the employment process for all employees. Different procedures should not be established based on an individual's appearance, name, accent, or other factors.

### Procedures for Filing Complaints

Discrimination charges may be filed by an individual who believes he or she is the victim of employment discrimination, a person acting on behalf of such an individual, or an INS officer who has reason to believe that discrimination has occurred.

Charges of national origin discrimination against employers with 4 to 14 employees, and all charges of citizenship status discrimination against employers with 4 or more employees, should be filed with the Office of Special Counsel for Immigration Related Unfair Employment Practices (OSC) within the Department of Justice.

Discrimination charges must be filed with the OSC within 180 days of the discriminatory act. Upon receipt of a discrimination charge, the OSC will notify the employer within 10 days that the charges have been filed and that an investigation will be conducted. If the  OSC has not filed a  complaint with an administrative law judge within 120 days of receiving a charge of discrimination, it will notify the person making the charge of its determination not to file a complaint. The person making the charge (other than an INS officer)  may  file a  complaint with an administrative law judge within 90 days after receiving the notice from the OSC. In addition, the OSC may still file a complaint within this 90-day period. The administrative law judge will conduct a hearing and issue a decision.

An employer is prohibited from taking retaliatory action against a person who has filed a charge of discrimination or who was a witness or otherwise participated in the investigation of another person's complaint. Such retaliatory action is a violation of the Act's anti -discrimination provision and of Title VII.

Additional Information

For more information about immigration-related discrimination, contact the Office of Special Counsel for Immigration Related Unfair Employment Practices, P.O. Box 65490, Washington, D.C., 20035-5490, or call 1-800-255-7688 or for the hearing impaired TDD 1-800-237-2515. In Washington, D.C., call (202) 653-8121 or TDD (202) 296-0168.

For more information on Title VII and policies and procedures of the Equal Employment Opportunity Commission, call 1-800-USA-EEOC.

# Part Five

## Penalties for Prohibited Practices

### A. UNLAWFUL EMPLOYMENT

#### 1. Civil Penalties

If an investigation reveals that an employer has knowingly hired or knowingly continued to employ an unauthorized alien, or has failed to comply with the employment eligibility verification requirements, with respect to employees hired after November 6, 1986, the INS may take action. When the INS intends to impose penalties, a Notice of Intent to Fine (NIF) is issued. Employers who receive a NIF may request a hearing before an administrative law judge. If a request for a hearing is not received within 30 days, the penalty will be imposed and a Final Order will be issued. When a Final Order is issued, the penalty is final and unappealable.

- Hiring or continuing to employ unauthorized aliens

  Employers determined to have knowingly hired unauthorized aliens (or to be continuing to employ aliens knowing that they are or have become unauthorized to work in the United States) may be ordered to cease and desist from such activity, and pay a civil money penalty as follows:

  - First Offense. Not less than $250 and not more than $2,000 for each unauthorized alien;

  - Second Offense. Not less than $2,000 and not more than $5,000 for each unauthorized alien; or

  - Subsequent Offenses. Not less than $3,000 and not more than $10,000 for each unauthorized alien.

  After November 6, 1986, if an employer uses a contract, subcontract, or exchange entered into, renegotiated, or extended, to obtain the labor of an alien and knows the alien is not authorized to work in the United States, the employer will be considered to have knowingly hired an unauthorized alien. The employer will be subject to the penalties set forth above.

10

- Failing to comply with the Form I-9 requirements

Employers who fail to properly complete, retain, and/or make available for inspection Forms I-9 as required by law may face civil money penalties of not less than $100 and not more than $1,000 for each employee for whom the Form I-9 was not properly completed, retained, and/or made available.

- Requiring indemnification

Employers found to have required a bond or indemnity from an employee against liability under the employer sanctions laws may be ordered to pay a civil money penalty of $1,000 for each violation and to make restitution, either to the person who was required to pay the indemnity, or, if that person cannot be located, to the United States Treasury.

- Good faith defense

If an employer can show that he or she has complied with the Form I-9 requirements, then the employer has established a "good faith" defense with respect to a charge of knowingly hiring an unauthorized alien, unless the government can show that the employer had actual knowledge of the unauthorized status of the employee.

2. Criminal Penalties

- Engaging in a pattern or practice of knowingly hiring or continuing to employ unauthorized aliens

Persons or entities who are convicted of having engaged in a pattern or practice of knowingly hiring unauthorized aliens (or continuing to employ aliens knowing that they are or have become unauthorized to work in the United States) after November 6, 1986, may face fines of up to $3,000 per employee and/or 6 months imprisonment.

- Engaging in fraud or false statements, or otherwise misusing visas, immigration permits, and identity documents

People who use fraudulent identification or employment eligibility documents, or documents that were lawfully issued to another person, or who make a false statement or attestation for purposes of satisfying the employment eligibility verification requirements, may be fined, or imprisoned for up to 5 years, or both.

## B. UNLAWFUL DISCRIMINATION

If an investigation reveals that an employer has engaged in unfair immigration-related employment practices under the Act, the OSC or the EEOC may take action. An employer will be ordered to stop the prohibited practice and may be ordered to take one or more of the following steps:

- Hire or reinstate, with or without back pay, individuals directly injured by the discrimination;

- Lift any restrictions on an employee's assignments, work shifts, or movements;

- Post notices to employees about their rights and about employers' obligations;

- Educate all personnel involved in hiring and in complying with the employer sanctions and anti-discrimination laws about the requirements of these laws; and/or

- Remove a false performance review or false warning from an employee's personnel file.

Employers may also be ordered to pay a civil money penalty as follows:

- First Offense. Not less than $250 and not more than $2,000 for each individual discriminated against;

- Second Offense. Not less than $2,000 and not more than $5,000 for each individual discriminated against;

- Subsequent Offenses. Not less than $3,000 and not more than $10,000 for each individual discriminated against; or

- Unlawful Request for More or Different Documents. Not less than $100 and not more than $1,000 for each individual discriminated against.

Employers may also be ordered to keep certain records regarding the hiring of applicants and employees. If a court decides that the losing party's claim has no reasonable basis in fact or law, the court may award attorneys' fees to prevailing parties other than the United States.

## C. CIVIL DOCUMENT FRAUD

If an investigation reveals that an individual has knowingly committed or participated in acts relating to document fraud (see Part 1), the INS may take action. When the INS intends to impose penalties, a Notice of Intent to Fine (NIF) is issued. Persons who receive a NIF may request a hearing before an administrative law judge. If a request for a hearing is not received within 30 days, the penalty will be imposed and a Final Order will be issued. When a Final Order is issued, this penalty is final and unappealable.

Individuals may be ordered to pay a civil money penalty as follows:

- <u>First Offense</u>. Not less than $250 and not more than $2,000 for each fraudulent document used, accepted, or created and each instance of use, acceptance, or creation; or

- <u>Subsequent Offenses</u>. Not less than $2,000 and not more than $5,000 for each fraudulent document used, accepted, or created and each instance of use, acceptance, or creation.

# Part Six

## Instructions for Recruiters and Referrers for a Fee

Under the Immigration and Nationality Act, as amended by the Immigration Act of 1990, it is unlawful for an agricultural association, agricultural employer, or farm labor contractor to hire, or to recruit or refer for a fee, an individual for employment in the United States without complying with the employment eligibility verification requirements. This provision applies to those agricultural associations, agricultural employers, and farm labor contractors who **recruit** persons for a fee and those who **refer** persons or provide documents or information about persons to employers in return for a fee.

**This limited class of recruiters and referrers for a fee must complete the Form I-9 when a person they refer is hired.** The Form I-9 must be fully completed within 3 business days of the date employment begins, or, in the case of an individual hired for less than 3 business days, at the time employment begins.

Recruiters and referrers for a fee may designate agents, such as national associations or employers, to complete the verification procedures on their behalf. If the employer is designated as the agent, the employer should provide the recruiter or referrer with a photocopy of the Form I-9. However, recruiters and referrers are still responsible for compliance with the law and may be found liable for violations of the law.

Recruiters and referrers for a fee must retain the Form I-9 for 3 years after the date the referred individual was hired by the employer. They must also make available Forms I-9 for inspection to an INS, DOL, or OSC officer after 3 days (72 hours) advance notice.

*NOTE: This does not preclude the INS, the DOL, or the OSC from obtaining warrants based on probable cause for entry onto the premises of suspected violators without advance notice.*

The penalties for failing to comply with the Form I-9 requirements and for requiring indemnification, as described in Part 5, apply to this limited class of recruiters and referrers for a fee.

*NOTE: All recruiters and referrers for a fee are still liable for knowingly recruiting or referring for a fee aliens not authorized to work in the United States.*

12

# Part Seven

## Some Questions You May Have About the Form I-9

Questions About the Verification Process

1. **Q.** **Do citizens and nationals of the United States need to prove they are eligible to work?**

   **A.** Yes. While citizens and nationals of the United States are automatically eligible for employment, they too must present the required documents and complete an I-9. Citizens of the United States include persons born in Puerto Rico, Guam, the Virgin Islands, and the Northern Mariana Islands. Nationals of the United States include persons born in American Samoa, including Swains Island.

2. **Q.** **Do I need to complete an I-9 for everyone who applies for a job with my company?**

   **A.** No. You need to complete I-9s only for people you actually hire. For purposes of this law, a person is "hired" when he or she begins to work for you.

3. **Q.** **If someone accepts a job with my company but will not start work for a month, can I complete the I-9 when the employee accepts the job?**

   **A.** Yes. The law requires that you complete the I-9 only when the person actually begins working. However, you may complete the form earlier, as long as you complete the form at the same point in the employment process for all employees.

4. **Q.** **I understand that I must complete an I-9 for anyone I hire to perform labor or services in return for wages or other remuneration. What is "remuneration"?**

   **A.** Remuneration is anything of value given in exchange for labor or services rendered by an employee, including food and lodging.

5. **Q.** **Do I need to fill out an I-9 for independent contractors or their employees?**

   **A.** No. For example, if you contract with a construction company to perform renovations on your building, you do not have to complete I-9s for that company's employees. The construction company is responsible for completing the I-9s for its own employees. However, you must not knowingly use contract labor to circumvent the law against hiring unauthorized aliens.

6. **Q.** **What should I do if the person I hire is unable to provide the required documents within 3 business days of the date employment begins?**

   **A.** If an employee is unable to present the required document or documents within 3 business days of the date employment begins, the employee must produce a receipt showing that he or she has applied for the document. In addition, the employee must present the actual document to you within 90 days of the hire. The employee **must** have indicated on or before the time employment began, by having checked an appropriate box in Section 1, that he or she is already eligible to be employed in the United States.

   **NOTE:** *Employees hired for less than 3 business days must produce the actual document(s) and the I-9 must be fully completed at the time employment begins.*

7. **Q.** **Can I fire an employee who fails to produce the required documents within 3 business days?**

   **A.** Yes. You can terminate an employee who fails to produce the required document or documents, or a receipt for a document, within 3 business days of the date employment begins. However, you must apply these practices uniformly to all employees. If an employee has presented a receipt for a document, he or she must produce the actual document within 90 days of the date employment begins.

13

**8. Q.** **What happens if I properly complete a Form I-9 and INS discovers that my employee Is not actually authorized to work?**

**A.** You cannot be charged with a verification violation. You will also have a good faith defense against the imposition of employer sanctions penalties for knowingly hiring an unauthorized alien, unless the government can show you had actual knowledge of the unauthorized status of the employee, if you have done the following:

· Ensured that employees fully and properly completed Section 1 of the I-9 at the time employment began;

· Reviewed the required documents which should have reasonably appeared to have been genuine and to have related to the person presenting them;

· Fully and properly completed Section 2 of the I-9, and signed and dated the employer certification;

· Retained the I-9 for the required period of time; and

· Made the I-9 available upon request to an INS, DOL, or OSC officer.

<u>Questions About Documents</u>

**9. Q.** **May I specify which documents I will accept for verification?**

**A.** No. The employee can choose which document(s) he or she wants to present from the lists of acceptable documents. You must accept any document (from List A) or combination of documents (one from List B and one from List C) listed on the I-9 and found in Part 8 of this Handbook which reasonably appear on their face to be genuine and to relate to the person presenting them. To do otherwise could be an unfair immigration-related employment practice. Individuals who look and/or sound foreign must not be treated differently in the hiring or verification process.

**10. Q.** **If an employee writes down an Alien Number or Admission Number when completing Section 1 of the I-9, can I ask to see a document with that number?**

**A.** No. Although it is your responsibility as an employer to ensure that your employees fully complete Section 1 at the time employment begins, there is no requirement that employees present **any** document to complete this section.

When you complete Section 2, you may not ask to see a document with the employee's Alien Number or Admission Number or otherwise specify which document(s) an employee may present.

**11. Q.** **What is my responsibility concerning the authenticity of document(s) presented to me?**

**A.** You must examine the document(s) and, if they reasonably appear on their face to be genuine and to relate to the person presenting them, you must accept them. To do otherwise could be an unfair immigration-related employment practice. If the document(s) do not reasonably appear on their face to be genuine or to relate to the person presenting them, you must not accept them.

**12. Q.** **Why are certain documents listed in both List B and List C? If these documents are evidence of both identity and employment eligibility, why aren't they found in List A?**

**A.** Three documents can be found in both List B and List C- the U.S. Citizen ID Card and the ID Card for use of Resident Citizen in the U.S. -- acceptable as ID Cards in List B — and a Native American tribal document. Although these documents are evidence of both identity and employment eligibility, they are not found in List A because List A documents are limited to those designated by Congress in the law. An employee can establish both identity and employment eligibility by presenting one of these documents. You should record the document title, issuing authority, number, and expiration date (if any) for that document in the appropriate spaces for **both list B and List C.**

**No-Match Cert. Admin. Record  711**

14

13. Q. **Why is a Canadian driver's license acceptable as a List B document and not a Mexican driver's license?**

A. The United States-Canada Free-Trade Agreement and other reciprocal agreements between these 2 countries form the basis for accepting a Canadian driver's license as a List B identity document. No such reciprocal agreements currently exist between the United States and Mexico that would allow or permit the use of a Mexican driver's license as a List B identity document.

14. 0. **May I accept an expired document?**

A. You may accept an expired United States Passport. You may also accept an expired document from List B to establish identity. However, the document must reasonably appear on its face to be genuine and to relate to the person presenting it. You cannot accept any other expired documents.

15. Q. **How can I tell if an INS-issued document has expired?**

A. Some INS-issued documents, such as previous versions of the Alien Registration Receipt Card (I-151 and I-551), do not have expiration dates and are valid indefinitely. However, the 1989 revised version of the Alien Registration Receipt Card (I-551), which is rose-colored with computer readable data on the back, features a 2-year or 10-year expiration date. Other INS issued documents, such as the Temporary Resident Card (I-688) and the Employment Authorization Card (I-688A or I-688B) also have expiration dates. These dates can be found either on the face of the document or on a sticker attached to the back of the document.

16. Q. **Some people are presenting me with Social Security Cards that have been laminated. May I accept such cards as evidence of employment eligibility?**

A. You may not accept a laminated Social Security Card as evidence of employment eligibility if the card states on the back "not valid if laminated." Lamination of such cards renders them invalid. Metal or plastic reproductions of Social Security Cards are not acceptable.

17. Q. **Some people are presenting me with printouts from the Social Security Administration with their name, Social Security Number, date of birth, and their parents' names. May I accept such printouts in place of a Social Security Card as evidence of employment eligibility?**

A. No. Only a person's official Social Security Card is acceptable.

18. Q. **What should I do if persons present Social Security Cards marked "NOT VALID FOR EMPLOYMENT," but state they are now authorized to work?**

A. You should ask them to provide another document to establish their employment eligibility, since such Social Security Cards do not establish this.

19. Q. **What should I do if one of my employees tells me that his or her Social Security Number is invalid?**

A. You should tell the employee to get a proper Social Security Number by completing a Form SS-5. This form is available from the Social Security Administration. You do not need to amend your employment tax returns. However, when the employee gives you the new number, you should file a Form W-2C with the Social Security Administration for the years in which you reported income and withholding under the incorrect number. You will not be penalized or fined for the years during which you reported employees under incorrect numbers.

You should also be aware that any Social Security Number starting with a "9" is not a valid Social Security Number. Employees who are using such numbers should be instructed to get a proper Social Security Number using a Form SS-5.

20. Q. **May I accept a photocopy of a document presented by an employee?**

A. No. Employees must present original documents. The **only** exception is that an employee may present a **certified** copy of a birth certificate.

**No-Match Cert. Admin. Record  712**

**21. Q.** I noticed on the Form I-9 that under List A there are 2 spaces for document numbers and expiration dates. Does this mean I have to see 2 List A documents?

**A.** No. One of the documents found in List A is an unexpired foreign passport with an attached INS Form I-94. The Form I-9 provides space for you to record the document number and expiration date for both the passport and the INS Form I-94.

**22. Q.** When I review an employee's identity and employment eligibility documents, should I make copies of them?

**A.** The law does not require you to photocopy documents. However, if you wish to make photocopies, you should do so for **all** employees, and you should retain each photocopy with the I-9. Photocopies must not be used for any other purpose. Photocopying documents does not relieve you of your obligation to fully complete Section 2 of the I-9 nor is it an acceptable substitute for proper completion of the I-9 in general.

**NOTE 1:** *Although a Certificate of Naturalization (INS Forms N-550 and N-570) provides across the face of the document that it may not be copied, such certificates **may be copied** in this limited situation.*

**NOTE 2:** *Copies of documents retained by Federal government employers must be kept separately from an employee's official personnel folder.*

### Questions About Completing and Retaining the Form I-9

**23. Q.** When do I fill out the I-9 if I hire someone for less than 3 business days?

**A.** You must complete **both** Sections 1 and 2 of the I-9 at the time of the hire. This means the I-9 must be fully completed when the person starts to work.

**24. Q.** What should I do if I rehire a person who previously filled out an I-9?

**A.** You do not need to complete a new I-9 if you rehire the person within 3 years of the date that the I-9 was originally completed, and the employee is still eligible to work. You should review the previously completed I-9, and if the employee's work authorization has not expired, note the date of rehire in the Updating and Reverification Section on the I-9 (Section 3), and sign in the appropriate space. If the employee's work authorization has expired, you also need to examine a document that reflects that the employee is authorized to work in the U.S., and record the document title, number, and expiration date (if any) in Section 3.

**25. Q.** What should I do if I need to update or reverify an I-9 for an employee who filled out an earlier version of the form?

**A.** You may line through any outdated information and initial and date any updated information. You may also choose, instead, to complete a new I-9.

**26. Q.** Do I need to complete a new I-9 when one of my employees is promoted within my company or transfers to another company office at a different location?

**A.** No. You do not need to complete a new I-9 for such promoted or transferred employees.

16

**27. Q.  What do I do when an employee's work authorization expires?**

A.  You will need to reverify on the I-9 in order to continue to employ the person. Reverification must occur not later than the date that work authorization expires. The employee must present a document that shows either an extension of the employee's initial employment authorization or new work authorization. You must review this document and, if it reasonably appears on its face to be genuine and to relate to the person presenting it, record the document title, number, and expiration date (if any), in the Updating and Reverification Section on the I-9 (Section 3), and sign in the appropriate space. You may want to establish a calendar call-up system for employees whose employment authorization will expire in the future.

*NOTE: You cannot refuse to accept a document because it has a future expiration date. You **must** accept any document (from List A or List C) listed on the I-9 and in Part 8 of this Handbook which on its face reasonably appears to be genuine and to relate to the person presenting it. To do otherwise could be an unfair immigration-related employment practice.*

**28. Q.  Can I avoid reverifying the I-9s by not hiring persons whose employment authorization has an expiration date?**

A.  You **cannot** refuse to hire persons solely because their employment authorization is temporary. The existence of a future expiration date does not preclude continuous employment authorization for an employee and does not mean that subsequent employment authorization will not be granted. In addition, consideration of a future employment authorization expiration date in determining whether an alien is qualified for a particular job could be an unfair immigration-related employment practice.

**29. Q.  As an employer, do I have to fill out all the I-9s myself?**

A.  No. You may designate someone to fill out the I-9s for you, such as a personnel officer, foreman, agent, or anyone else acting in your interest. However, you are still liable for any violations of the employer sanctions laws.

**30. Q.  Can I contract with someone to complete the I-9s for my business?**

A.  Yes. You can contract with another person or business to verify employees' identity and work eligibility and to complete the I-9s for you. However, you are still responsible for the contractor's actions and are liable for any violations of the employer sanctions laws.

**31. Q.  As an employer, can I negotiate my responsibility to complete the I-9s in a collective bargaining agreement with a union?**

A.  Yes. However, you are still liable for any violations of the employer sanctions laws. If the agreement is for a multi-employer bargaining unit, certain rules apply. The association must track the employee's hire and termination dates each time the employee is hired or terminated by an employer in the multi-employer association.

**32. Q.  What are the requirements for retaining the I-9?**

A.  If you are an employer, you must retain the I-9 for 3 years after the date employment begins or 1 year after the date the person's employment is terminated, whichever is later. If you are an agricultural association, agricultural employer, or farm labor contractor, you must retain the I-9 for 3 years after the date employment begins for persons you recruit or refer for a fee.

**33. Q.  Will I get any advance notice if an INS, DOL, or OSC officer wishes to inspect my I-9s?**

A.  Yes. The officer will give you at least 3 days (72 hours) advance notice before the inspection. If it is more convenient for you, you may waive the 3-day notice. You may also request an extension of time in which to produce the I-9s. The INS, DOL, or OSC officer will not need to show you a subpoena or a warrant at the time of the inspection.

*NOTE: This does not preclude the INS, the DOL, or the OSC from obtaining warrants based on probable cause for entry onto the premises of suspected violators without advance notice.*

Failure to provide the I-9s for inspection is a violation of the employer sanctions laws and could result in the imposition of civil money penalties.

**34. Q.  Do I have to complete an I-9 for Canadians who entered the United States under the Free Trade Agreement?**

A.  Yes. You must complete an I-9 for all employees. Canadians must show identity and employment eligibility documents just like all other employees.

**35. Q.  If I acquire a business, can I rely on the I-9s completed by the previous owner/employer?**

A.  Yes. However, you also accept full responsibility and liability for all I-9s completed by the previous employer relating to individuals who are continuing in their employment.

**36. Q.  If I am a recruiter or referrer for a fee, do I have to fill out I-9s on persons whom I recruit or refer?**

A.  No, with three exceptions. Agricultural associations, agricultural employers, and farm labor contractors are still required to complete I-9s on all individuals who are recruited or referred for a fee. However, **all** recruiters and referrers for a fee must still complete I-9s for **their own employees** hired after November 6, 1986. Also, **all** recruiters and referrers for a fee are still liable for knowingly recruiting or referring for a fee aliens not authorized to work in the United States.

**37. Q.  Can I complete Section 1 of the I-9 for an employee?**

A.  *Yes.* You may help an employee who needs assistance in completing Section 1 of the I-9. However, you must also complete the "Prepare/Translator Certification" block. The employee must still sign the certification block in Section 1.

**38. Q.  If I am a business entity (corporation, partnership, etc.), do I have to fill out I-9s on my employees?**

A.  Yes, you must complete I-9s for all of your employees, including yourself.

18

**39. Q.** I have heard that some state employment agencies can certify that people they refer are eligible to work. Is that true?

**A.** Yes. State employment agencies may elect to provide persons they refer with a certification of employment eligibility. If one of these agencies refers potential employees to you with a job order or other appropriate referral form, and the agency sends you a certification within 21 business days of the referral, you do not have to check documents or complete an I-9 if you hire that person. However, you must review the certification to ensure that it relates to the person hired and observe the person sign the certification. You must also retain the certification as you would an I-9 and make it available for inspection, if requested. You should check with your state employment agency to see if it provides this service and become familiar with its certification document.

<u>Questions About Avoiding Discrimination</u>

**40. Q.** How can I avoid discriminating against certain employees while still complying with this law?

**A.** You can avoid discriminating against certain employees and still comply with the law by applying the employment eligibility verification procedures of this law to all newly hired employees and by hiring without respect to the national origin or citizenship status of those persons authorized to work in the United States. To request to see identity and employment eligibility documents only from persons of a particular origin, or from persons who appear or sound foreign, is a violation of the employer sanctions laws and may also be a violation of Title VII of the Civil Rights Act of 1964. You should not discharge present employees, refuse to hire new employees, or otherwise discriminate on the basis of foreign appearance, accent, language, or name.

**41. Q.** I know that the Act prohibits discrimination on the basis of citizenship status against "protected individuals." Who are protected individuals?

**A.** Protected individuals include citizens or nationals of the United States, lawful permanent residents, temporary residents, and persons granted refugee or asylee status. The term does not include aliens in one of those classes who fail to make a timely application for naturalization after they become eligible.

**42. Q.** Can I be charged with discrimination if I contact the INS about a document presented to me that does not reasonably appear to be genuine and relate to the person presenting it?

**A.** No. The anti-discrimination provisions of the Act only apply to the hiring and discharging of individuals. While you are not legally required to inform the INS of such situations, you may do so if you choose to.

## Questions About Employees Hired Before November 6, 1986

43. Q.   **Does this law apply to my employees if I hired them before November 7, 1986?**

A.   No. You are not required to complete I-9s for employees hired before November 7, 1986. However, if you choose to complete I-9s for these employees, you should do so for all your current employees hired before November 7, 1986.

   *NOTE: This "grandfather" status does not apply to seasonal employees, or to employees who change employers within a multi-employer association.*

44. Q.   **What if an employee was hired before November 7, 1986, but has taken an approved leave of absence?**

A.   You do not need to complete an I-9 for that employee if the employee is continuing in his or her employment and has a reasonable expectation of employment at all times. However, if that employee has quit or been terminated, or is an alien who has been removed from the United States, you will need to complete an I-9 for that employee.

45. Q.   **Will I be subject to employer sanctions penalties if an employee I hired before November 7, 1986, is an illegal alien?**

A.   No. You will not be subject to employer sanctions penalties for retaining an illegal alien in your workforce if the alien was hired before November 7, 1986. However, the fact that an illegal alien was on your payroll before November 7, 1986, does not give him or her any right to remain in the United States. Unless the alien obtains permission from the INS to remain in the United States, he or she is subject to apprehension and removal.

## Questions About Federal Income Tax Obligations

46. Q.   **What advice should I give to my employees applying to legalize their status concerning their Federal income tax obligations?**

A.   You can advise employees that when they apply to INS for permanent resident status, they will be given an IRS publication explaining requirements for filing Form W-4 or W-4A to insure correct withholding of tax records (if an invalid social security number was used) and other guidelines relating to tax benefits.

47. Q.   **What advice should I give to newly-hired employees who ask about their Federal income tax obligations?**

A.   First, you can tell them it is important to have a valid social security number and to properly complete a W-4 or W-4A so that the employer can withhold the proper amount for income tax. Second, you can encourage employees to apply for social security numbers for their dependent children who will be five years old or older by the end of the year. Since 1987, such numbers have been required to be provided for dependents claimed on tax returns.

20

# Part Eight

## Acceptable Documents for Verifying Employment Eligibility

The following documents have been designated for determining employment eligibility by the Act.    A person must present a document or documents that establish identity and employment eligibility. A comprehensive list of acceptable documents can be found on the next page of this Handbook and on the back of the Form I-9. Samples of many of the acceptable documents appear on the following pages.

To establish **both identity and employment eligibility**, a person can present a passport, an Alien Registration Receipt Card, or one of the other documents from List A.

If a person does not present a document from List A, he or she must present one document from List B which establishes identity and one document from List C which establishes employment eligibility.

To establish **identity only**, a person must present a document from List B, such as a state-issued driver's license, a state-issued identification card, or one of the other documents listed.

To establish **employment eligibility only**, a person must present a document from List C, such as a Social Security Card, a United States birth certificate, or one of the other documents listed.

If a person is unable to present the required document(s) within 3 business days of the date employment begins, he or she must present (within 3 business days) a receipt showing that he or she has applied for the document. The person then must present the actual document within 90 days of the date employment begins. The person must have indicated on or before the time employment began, by having checked an appropriate box in Section 1, that he or she is already eligible to be employed in the United States.

## LIST A
### Documents That Establish Both Identity and Employment Eligibility

- United States Passport (unexpired or expired)

- Certificate of United States Citizenship (INS Form N-560 or N-561)

- Certificate of Naturalization (INS Form N-550 or N-570)

- Unexpired foreign passport which:

  - contains an unexpired stamp which reads "Processed for I-551. Temporary Evidence of Lawful Admission for permanent residence. Valid until _____ Employment authorized;" or

  - has attached to it a Form I-94 bearing the same name as the passport and containing an employment authorization stamp, so long as the period of endorsement has not yet expired, and the proposed employment is not in conflict with any restrictions or limitations identified on the Form I-94.

  *NOTE: For more detailed information concerning the Form I-94, see page 23 of this Handbook.*

- Alien Registration Receipt Card (INS Form I-151 or I-551) provided that it contains a photograph of the bearer

- Unexpired Temporary Resident Card (INS Form I-688)

- Unexpired Employment Authorization Card (INS Form I-688A)

- Unexpired reentry permit (INS Form I-327)

- Unexpired Refugee Travel document (INS Form I-571)

- Unexpired Employment Authorization Document issued by the INS which contains a photograph (INS Form I-688B)

21

## LIST B
### Documents That Establish Identity

For individuals 18 years of age or older:

- Driver's license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address
- ID card issued by federal, state, or local government agencies or entities provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address (including U.S. Citizen ID Card [INS Form I-1971 and ID Card for use of Resident Citizen in the U.S. [INS Form I-1791)
- School identification card with a photograph
- Voter's registration card
- United States military card or draft record
- Military dependent's identification card
- United States Coast Guard Merchant Mariner Card
- Native American tribal document
- Driver's license issued by a Canadian government authority

For individuals under the age of 18 who are unable to present one of the documents listed above:

- School record or report card
- Clinic, doctor, or hospital record
- Day-care or nursery school record

## LIST C
### Documents That Establish Employment Eligibility

- U.S. Social Security Number Card other than one which has printed on its face "NOT VALID FOR EMPLOYMENT"

  *NOTE: This must be a card issued by the Social Security Administration, a facsimile (such as a metal or plastic reproduction) is not an acceptable document.*

- Certification of Birth Abroad issued by the Department of State (Form FS-545 or Form DS-1350)
- Original or certified copy of a birth certificate issued by a state, county, municipal authority, or outlying possession of the United States bearing an official seal
- Native American tribal document
- U.S. Citizen ID Card (INS Form I-197)
- ID Card for Use of Resident Citizen in the U.S. (INS Form I-179)
- Unexpired employment authorization document issued by the INS

22

---

## Document List A
### Documents That Establish Both Identity and Employment Eligibility

The following illustrations in this handbook do not necessarily reflect the actual size of the documents.

**United States Passport**

Issued by the Department of State to United States citizens and nationals.



**Certificate of United States Citizenship
N-560 or N-561**

Issued by INS to individuals who: 1) derived citizenship through parental naturalization; 2) acquired citizenship at birth abroad through a United States parent or parents, or 3) acquired citizenship through application by United States citizen adoptive parent(s); and who, pursuant to section 341 of the Act, have applied for a certificate of citizenship.



**Certificate of Naturalization
N-550 or N-570**

Issued by INS to naturalized United States citizens.



**Certificate of Naturalization
N-550**

Issued by INS to naturalized United States citizens who file for naturalization after October 1, 1991.



23

---

## Unexpired Foreign Passport with I-551 Stamp



### I-94 Arrival/Departure Record

Arrival-departure record issued by INS to nonimmigrant aliens. An individual in possession of the departure portion of this document may only be employed if the document bears an "employment authorization" stamp **or** employment incident to the nonimmigrant classification is authorized with a specific employer (i.e. A-1, A-2, A-3, C-2, C-3, E-1, E-2, G-1, G-2, G-3, G-4, G-5, H-1A, H-1B, H-2A, H-2B, H-3, I, L-1, O-1, O-2, P-1, P-2, P-3, Q, NATO 1-7 and TC). The expiration date is noted on the Form I-94.

24

---

### Alien Registration Receipt Card I-151

Issued by INS prior to June 1978, to lawful permanent resident aliens, There are numerous versions of this card because it was periodically revised. Although this card is no longer issued, it is valid indefinitely. This card is also commonly referred to as a "green card" although most versions were blue.

 

### Alien Registration Receipt Card (Resident Alien Card) I-551

Issued by INS after March 1977, to lawful permanent resident aliens. Although this card is no longer issued, it is valid indefinitely, This card is commonly referred to as a "green card" and is the replacement for the Form I-151, This version is white with a blue logo.

 

### Alien Registration Receipt Card (Conditional Resident Alien Card) I-551

Issued by INS after January 1987, to conditional permanent resident aliens such as alien spouses of United States citizens or lawful permanent resident aliens. It is similar to the 1-551 issued to permanent resident aliens. Although this card is no longer issued, it is valid for 2 years from the date of admission or adjustment. The expiration date is stated on the back of the card. This version is white with a blue logo.

 

### Alien Registration Receipt Card (Resident Alien Card) I-551

Currently issued by INS since 1989 to both conditional and lawful permanent resident aliens. Although it is similar to the previously issued I-551s, this card is valid only for a limited period of time -- 2 years from the date of admission or adjustment for conditional permanent resident aliens and 10 years from issuance for lawful permanent resident aliens. The expiration date is stated on the front of the card. This version is rose-colored with a blue logo.

 

## Temporary Resident Card I-688

Issued by INS to aliens granted temporary resident status under the Legalization or Special Agricultural Worker program. It is valid until the expiration date stated on the face-of the card or on the sticker(s) placed on the back of the card.




## Employment Authorization Card I-688A

Issued by INS to applicants for temporary resident status after their interview for Legalization or Special Agricultural Worker status. It is valid until the expiration date stated on the face of the card or on the sticker(s) placed on the back of the card.



26

---

## Employment Authorization Card I-688B

Issued by INS to aliens granted temporary employment authorization in the U.S. The expiration date is noted on the face of the card.



## Unexpired Re-Entry Permit I-327

Issued by INS to lawful permanent resident aliens before they leave the United States for a 1-2 year period.



## Unexpired Refugee Travel Document I-571

Issued by INS to aliens who have been granted refugee status.  The expiration date is stated on page four (4).





28

---

# Document List B
## Documents That Establish Identity Only

The following illustrations in this handbook do not necessarily reflect the actual size of the documents.

### Sample Driver's License

A driver's license issued by any state or outlying possession of the United States (including the District of Columbia, Puerto Rico, the Virgin Islands, Guam, the Northern Mariana Islands, and American Samoa) or by a Canadian government authority is acceptable if it contains a photograph or other identifying information such as name, date of birth, sex, height, color of eyes, and address.




### Sample State Identification Card

An identification card issued by any state (including the District of Columbia, Puerto Rico, the Virgin Islands, Guam, and the Northern Mariana Islands) or by a local government is acceptable if it contains a photograph or other identifying information such as name, date of birth, sex, height, color of eyes, and address.



See List C for ID cards issued by INS.

29

# Document List C
## Documents That Establish Employment Eligibility Only

The following illustrations in this handbook do not necessarily reflect the actual size of the documents.

**Social Security Card** (other than one stating "NOT VALID FOR EMPLOYMENT" metal or plastic reproductions, or certain laminated cards.) There are many versions of this card.



**Certifications of Birth Issued by the Department of State**

### FS-545
Issued by U.S. embassies and consulates overseas to United States citizens born abroad.

### DS-1350
Issued by the U.S. Department of State to United States citizens born abroad.





No-Match Cert. Admin. Record  727

30

---

## Sample Birth Certificates



United States Citizen Identification Card I-197
Issued by INS to United States citizens. Although INS no longer issues this card, it is valid indefinitely.




Identification Card for Use of Resident Citizen in the United States I-179
Issued by INS to United States citizens who are residents of the United States. Although INS no longer issues this card, it is valid indefinitely.




**No-Match Cert. Admin. Record  728**

31

## I-20 ID Card Accompanied by a Form I-94

The Form I-94 for F-1 nonimmigrant students must be accompanied by an I-20 Student ID endorsed with employment authorization by the Designated School Official for off-campus employment or curriculum practical training. INS will issue Form I-688B (Employment Authorization Document) to all students (F-1 and M-1) authorized for a post-completion practical training period.



## Form I-20 Student ID (Reverse)

Endorsement by Designated School Official for Employment Authorization.

32

---

**IAP-66 Accompanied by a Form I-94**

Nonimmigrant exchange visitors (J-1) must have an I-94 accompanied by an unexpired IAP-66, specifying the sponsor and issued by the United States Information Agency (USIA). (J-1 students working outside the program indicated on the IAP-66 also need a letter from their responsible school officer.)



33

# REMEMBER:

* Hiring employees without complying with the employment eligibility verification requirements is a violation of the employer sanctions laws.

* This law requires employees hired after NOVEMBER 6, 1986 to present documentation that establishes identity and employment eligibility, and employers to record this information on Forms I-9.

* Employers may not discriminate against employees on the basis of national origin or citizenship status.

**How to Obtain More Information:**    If you have questions after reviewing this handbook, you may obtain information from one of the following local INS offices.  Direct your letter to the attention of the *Employer and Labor Relations Officer.*

**ALABAMA**
77 Forsyth St. S.W., Rm. G-85
Atlanta, GA 30303

**ALASKA**
620 East 10th Ave. Suite 102
Anchorage, AK 99501

**ARIZONA**
2035 N- Central Ave.
Phoenix, AZ 85004

**ARKANSAS**
701 Loyola Ave., Rm. T-8005
New Orleans, LA 70113

**CALIFORNIA**
300 N. Los Angeles St.
Los Angeles, CA 90012

880 Front St.
San Diego, CA 92188

630 Sansome St.
San Francisco, CA 94111-2280

**COLORADO**
4730 Paris St. Albrook Center
Denver, CO 86239-2804

**CONNECTICUT**
JFK Federal Building
Government Center
Boston, MA 02203

**DELAWARE**
1600 Callowhill St.
Philadelphia, PA 19130

**DISTRICT OF COLUMBIA**
4420 N. Fairfax Dr.
Arlington, VA 22203

**FLORIDA**
7880 Biscayne Blvd.
Miami, FL 33138

**GEORGIA**
77 Forsyth St. S.W., Rm. G-85
Atlanta, GA 30303

**GUAM**
595 Ala Moana Blvd.
Honolulu, HI 96813

**HAWAII**
595 Ala Moana Blvd.
Honolulu, HI 96813

**IDAHO**
900 N. Montana Ave.
Helena, MT 59601

**ILLINOIS**
10 W. Jackson Blvd., Rm. 533
Chicago, IL 60604

**INDIANA**
10 W. Jackson Blvd., Rm. 533
Chicago, IL 60604

**IOWA**
3736 S. 132nd St.
Omaha, NE 68144

**KANSAS**
9747 N. Conant Ave.
Kansas City, MO 64153

**KENTUCKY**
701 Loyola Ave., Rm. T-8005
New Orleans, LA 70113

**LOUISIANA**
701 Loyola Ave., Rm. T-8005
New Orleans, LA 70113

**MAINE**
739 Warren Ave.
Portland, ME 04103

**MARYLAND**
530 Caton Center Dr., Bldg. D, Suite M
Baltimore, MD 21227

**MASSACHUSETTS**
JFK Federal Building
Government Center
Boston, MA 02203

**MICHIGAN**
Federal Building, 333 Mt. Elliott St.
Detroit, MI 48207

**MINNESOTA**
2901 Metro Dr. Suite 100
Bloomington, MN 55425

**MISSISSIPPI**
701 Loyola Ave. Rm. T-8005
New Orleans, LA 70113

**MISSOURI**
9747 N. Conant Ave.
Kansas City, MO 64153

**MONTANA**
900 N. Montana Ave.
Helena, MT 59601

**NEBRASKA**
3736 S. 132nd St.
Omaha, NE 68114

**NEVADA**
2035 N. Central Ave.
Phoenix, AZ 85004

**NEW HAMPSHIRE**
JFK Federal Building
Government Center
Boston, MA 02203

**NEW JERSEY**
Federal Building, 970 Broad St.
Newark, NJ 07102

**NEW MEXICO**
343 U.S. Courthouse, P.O. Box 9398
El Paso, TX 79984

**NEW YORK**
68 Court St.
Buffalo, NY 14202

26 Federal Plaza
New York, NY 10278

**NORTH CAROLINA**
77 Forsyth St. S.W., Rm. G-85
Atlanta, GA 30303

**NORTH DAKOTA**
2901 Metro Dr. Suite 100
Bloomington, MN 55425

**OHIO**
1240 E. 9th St., Room 1917
Cleveland, OH 44199

**OKLAHOMA**
4149 Highline Blvd., #300
Oklahoma City, OK 73108

**OREGON**
511 N.W. Broadway
Portland, OR 97209

**PENNSYLVANIA**
1600 Callowhill St.
Philadelphia, PA 19130

**PUERTO RICO**
P.O. Box 365068
San Juan, PR 00936

**RHODE ISLAND**
JFK Federal Building
Government Center
Boston, MA 02203

**SOUTH CAROLINA**
Room 110 Federal Building
334 Meeting St.
Charleston, SC 29403

**SOUTH DAKOTA**
2901 Metro Dr Suite 100
Bloomington, MN 55425

**TENNESSEE**
701 Loyola Ave., Rm. T-8005
New Orleans, LA 70113

**TEXAS**
8101 N. Stemmons Freeway
Dallas, TX 75247

P.O. Box 9398
El Paso, TX 79984

805 No. T St.
Harlingen, TX 78550

509 N. Belt
Houston, TX 77080

727 E. Durango Suite A301
San Antonio, TX 78206

**UTAH**
4730 Paris St. Albrook Center
Denver, CO 86239-2804

**VERMONT**
739 Warren Ave.
Portland, ME 04103

**VIRGINIA**
4420 N. Fairfax Dr.
Arlington, VA 22203

**VIRGIN ISLANDS**
PO Box 610, Charlotte Amilie
St. Thomas, VI 00801

Po Box 1270, Kingshill, Christiansted
St. Croix, VI 00850

**WASHINGTON**
815 Airport Way South
Seattle, WA 98134

**WEST VIRGINIA**
1600 Callowhill St.
Philadelphia, PA 19130

**WISCONSIN**
10 W. Jackson Blvd-, Rm. 533
Chicago, IL 60604

**WYOMING**
4730 Paris St. Albrook Center
Denver, CO 86239-2804

☆ U.S. GOVERNMENT PRINTING OFFICE: 1995 400-799/40538

If you have questions after reviewing this Handbook, please contact your local INS office at the address found in the back of this Handbook. Direct your letter to the attention of the Employer *Relations Officer*

**DO NOT CONTACT THE INTERNAL REVENUE SERVICE (IRS)**



ISBN 0-16-048040-X

9 780160 480409

9 0000