# Employer Reporting Instructions & Information

**Social Security Online**
www.socialsecurity.gov

Home    Questions?    How to Contact Us    Search



## Employer Responsibilities When Hiring Foreign Workers

Employer Reporting
Instructions &
Information

Main Employer Reporting
Page

General W-2 Filing
Information

How To File

Where To File

Wage Reporting Software

Vendor List

Forms & Publications

Social Security Number
Verification

Developer Specifications

Employer Reconciliation
Process

Frequently Asked
Questions & Answers

Training Seminars

How to Reach Us

State & Local Government
Employers

Other Sites

International Agreements

Feedback

To strengthen homeland security in the aftermath of September 11th, Social Security has taken extra steps to ensure the integrity of Social Security numbers. The changes to the way Social Security assigns numbers and issues cards may cause a delay of several weeks or months in receiving a number. This fact sheet addresses employer responsibilities when hiring foreign workers (e.g., students or cultural exchange visitors) who have applied for and are waiting to receive a Social Security number and card. Note that the employee may work while the Social Security number application is being processed.

1. **What causes delays when foreign workers apply for Social Security numbers?**
   When foreign workers apply for Social Security numbers, SSA verifies their documents directly with the Department of Homeland Security (DHS). Most applications are verified immediately, but there can be delays. Social Security understands that this process may affect companies who hire foreign workers, but in the interest of homeland security, direct verification from DHS is vital to ensuring the integrity of the Social Security number.

2. **What are an employer's responsibilities when hiring foreign workers who don't have Social Security numbers**
   Advise workers that they are required to apply for a Social Security number and card. If a worker applied for but has not yet received a Social Security number, you should get the following information as complete as possible: The worker's full name, address, date of birth, place of birth, father's full name, mother's full maiden name, gender and the date he or she applied for a Social Security number.

3. **What if the worker doesn't have a Social Security number when wage reports (Forms W-2) are due to Social Security?**
   Paper Filers: If the worker applied for a card but didn't receive the number in time for filing, enter "Applied For" in Box d. (Reference: IRS Instructions for Forms W-2/W-3)

   Magnetic Tape/Diskette or Electronic Filers: If the worker applied for a card but didn't receive the number in time for filing, enter all zeros in the field for the Social Security number. (Reference: SSA's Magnetic Media Reporting and Electronic

**No-Match Cert. Admin. Record  734**

<u>Filing Format)</u>

Remember to ask the worker to tell you the number and the exact name printed on the card, when he or she receives it.

4. **My foreign worker received his or her Social Security number after I filed my wage report. What do I do?**
   When you receive the worker's Social Security number, file Form W-2c (Corrected Wage and Tax Statement), to show the worker's number. Click here for <u>instructions on filing W-2c's.</u>

   Reference: 26 CFR 31.6011

FIRSTGOV

<u>Privacy Policy</u> | <u>Accessibility Policy</u> | <u>Linking Policy</u> | <u>Site Map</u>

**No-Match Cert. Admin. Record  735**

# Employer Reporting Instructions & Information

Social Security Online

 **Critical Links**

**Employer Information Website Index**

Main Employer Reporting Page

General W-2 Filing Information

How To File

Where To File

Wage Reporting Software

Vendor List

Forms & Publications

Social Security Number Verification

Developer Specifications

Employer Reconciliation Process

Frequently Asked Questions & Answers

Training Seminars

How to Reach Us

State & Local Government Employers

Other Sites

International Agreements

Feedback

## Names and Social Security Numbers

Each year employers send to SSA Copy A of Forms W-2. SSA matches the name and Social Security number (SSN) on each W-2 against its database of all SSNs issued. When a match is found, the earnings information from the W-2 is recorded in the employee's lifelong earnings history.

The earnings history is the basis for determining an employee's future eligibility and benefit amount for SSA's retirement, disability, and survivors programs. That's why it is critical that each employee's name and SSN as shown on their Social Security card match your payroll records and year-end Forms W-2.

The Internal Revenue Service's Publication 15 (Circular E, Employer's Tax Guide) contains instructions for recording employees' names and SSNs. The tax guide states that after an employee is hired, you should ask to see his/her Social Security card. The employee is required to show you the card if it is available. You may, but are not required to, photocopy the card.

## How to Make the Critical Link

**Update Your Payroll Records** - Ask employees to verify their name and SSN before you close out your books and prepare Forms W-2. If a name has changed, continue to use the old name and tell the employee to contact Social Security to obtain an updated card. *Using a new name before the employee updates Social Security's records may prevent the posting of earnings.* Change your payroll records only when the employee obtains an updated Social Security card with the new name.

**Avoid These Common Errors** - Incorrect name or SSN; misspelled names; using nicknames or shortened names, using titles before or after the name; and name changes not reported to Social Security.

**Verify Names/SSNs with SSA** - You can use Social Security's free service to match employees' names and SSNs with Social Security's records at the time of hire or before you prepare and submit Forms W-2. There are three verification options. If you have:

**No-Match Cert. Admin. Record  736**

- Up to 5 Names/SSNs - They can be verified over the phone while you wait. Call 1-800-772-6270 and have available your Company Name and Employer Identification Number and the employee's full name, SSN, date of birth, and gender.

- Up to 50 Names/SSNs - Contact your Local Social Security Office.

- Over 50 Names/SSNs - They can be submitted on magnetic tape, cartridge, diskette, or paper. A simple registration process is required. See our Employee Verification Service Instructions for registration information, file format instructions, and more.

If you discover that an employee's SSN is incorrect, you should ask to see the employee's Social Security card to assure that the SSN and name are shown correctly in your payroll records. If the information matches, ask the employee to check with any Social Security Office to determine and correct the problem. Document the action you take to obtain the correct SSN and continue to report using the SSN given to you by the employee. If you get a corrected name and/or SSN from the employee after you filed Form W-2, submit a Form W-2c to make the correction.

## Helpful Hints

**Use the Correct Name Format**
Enter the name on Form W-2 as shown on the employee's Social Security card. Compound names no longer require a hyphen. Connect parts of a compound name with either a hyphen or a blank space. Do not join them into a single word. If an employee has a compound name, include all of the parts in the appropriate name field. For example, the name John R Smith-Jones: Enter Smith Jones in the last name field.

It's especially important to know the exact last name. If an employee provides a name with apparent compound or multiple last names, carefully question them to determine which name is the beginning of the surname and which (if any) is the middle name.

You can also call Social Security at 1-800-772-6270 to verify that the name and SSN match our records.

**Paper Forms W-2 Submitted to Social Security**
Do not show titles or academic degrees, such as Dr., RN, or Esq., at the beginning or end of the worker's name. Do not use Jr. or Sr. even if it's on the Social Security card. If the Social Security card contains a middle name, always complete the W-2 using just the middle initial (with no punctuation).

**No-Match Cert. Admin. Record  737**

**<u>MMREF</u> Formatted W-2 File Submitted to Social Security**
MMREF filers may enter a suffix, e.g., Jr., Sr., in location 62-65 of the Code RW, Employee Wage Record. The field for the middle name/initial is 15 spaces. You may enter either the middle initial or the full middle name. It is acceptable to use the MMREF format for employee copies of W-2s even though it may contain suffixes, middle names, etc. Paper instructions refer only to Copy A of the W-2 that is submitted to SSA.

## Use the Correct SSN
Enter the SSN shown on the employee's Social Security card. SSNs do not begin with an 8 or 9 and cannot be all 1's, 3's, or sequential (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).

If you hire someone who does not have a Social Security card, ask him/her to obtain one as soon as possible. If you've already submitted a W-2 when the employee obtains a card, complete and submit a Form W-2c to make the correction.

### Forms W-2 Submitted to Social Security on Paper
If you still don't have an SSN when your W-2 report is due, complete the SSN field by entering "Applied For" in Box "d" of the paper Form W-2.

### <u>MMREF</u> Formatted W-2 File Submitted to Social Security
If you still don't have an SSN when your W-2 report is due, complete the SSN field by entering all zeros (0) in locations 3-11 of the RW, Employee Wage Record. The paper W-2 you give to employees may have all zeros in block "d," Employee SSN.

SSA Publication 20-005, ICN# 437010
Revised July 2003

**No-Match Cert. Admin. Record 738**

Westlaw.

75 No. 6 INTERREL 203

Page 1

75 NO. 6 Interpreter Releases 203

**(Cite as: 75 NO. 6 Interpreter Releases 203)**

Interpreter Releases
February 9, 1998

**\*203** INS GENERAL COUNSEL DISCUSSES IMPORTANT SOCIAL SECURITY COMPLIANCE
ISSUES FOR I-9 PURPOSES

Copyright © 1998 Federal Publications Inc.

In a recent exchange of correspondence, the INS' Office of General Counsel discussed the responsibilities under INA §274A of an employer who has received information from the Social Security Administration (SSA) indicating that Forms W-2 filed by the employer show names or social security numbers (SSNs) of employees that do not agree with SSA records. Former INS General Counsel David A. Martin was responding to an inquiry from Atlanta, Georgia attorney Bruce R. Larson.

In his July 18, 1997 inquiry, Mr. Larson explained that one of his employer clients had received a letter from the SSA "reminding" the employer to show correct names and SSNs for its employees, as more than 10 percent of the W-2 forms the employer filed apparently showed names or numbers that did not match SSA records.

Mr. Larson stated that, apart from the SSA's concerns, his question more specifically is: what action, if any, is an employer obligated to take with respect to checking its I-9 recordkeeping and potentially undertaking new I-9 verifications for the cited employees in response to such a letter from the SSA? In other words, Mr. Larson asked, "does such a letter from the SSA constitute the type of information **\*204** which puts an employer on notice that the cited employees may be unauthorized workers, thereby imposing liability on the employer for 'knowingly continuing to employ an unauthorized worker' if it does not conduct I-9 reverification?"

Mr. Larson added that, absent some clear directive from the SSA, the regulations or case law, the employer is hesitant to pursue I-9 reverification for fear of violating the antidiscrimination rules. A related issue Mr. Larson raised is what the employer should do if, after the employee is informed of the SSN discrepancy, the employee provides a purportedly corrected/new SSN. Does the employer have the right to see the actual new card, asked Mr. Larson, or should it merely change the SSN in its W-2 reporting and recordkeeping based on the employee's word?

Other issues raised by Mr. Larson include: (1) how quickly an employer must act, if at all; (2) whether a cited employee should/must be suspended pending resolution of the SSN discrepancy; and, (3) if not suspended immediately, how much time the employee should be given before the employer conducts a new I-9 verification (if necessary) or terminates or suspends the employee.

In his December 23, 1997 response, Mr. Martin noted that there may be many legitimate reasons for a discrepancy between the name and SSN reported by an employee on the W-2 and/or I-9 and SSA records. He

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 No. 6 INTERREL 203                                                                                    Page 2

75 NO. 6 Interpreter Releases 203

**(Cite as: 75 NO. 6 Interpreter Releases 203)**

stated that the Service would not consider notice of this discrepancy from the SSA to an employer by itself to put the employer on notice that the employee is unauthorized to work, or to require reverification of documents or further inquiry as to the employee's work authorization.

Mr. Martin added, however, that whether an employer has been put on notice of an unauthorized employment situation is an individualized determination that depends on all the relevant facts, and noted that there may be specific situations in which an SSA notice of an SSN irregularity would either cause, or contribute to, such a determination.

In particular, Mr. Martin noted that the SSA had provided Mr. Larson's client employer the following information:
    A valid SSN must have a total of nine digits. The first three digits are referred to as the area, the next two as the group, and the last four as the serial. No SSNs with a 000 area number, or an area number in the 800 or 900 series, have been issued. Also, no SSNs with a 00 group or 0000 serial number have been issued.

Mr. Martin stated that an SSN containing an unissued area, group or serial number as described above, or a number of digits other than nine, is an invalid SSN. If an employee provides to an employer with knowledge of these facts an invalid SSN, he continued, it is possible that the INS could consider the employer's failure to follow up on this knowledge with further inquiry to constitute knowing employment of an unauthorized alien, should the employee turn out to be unauthorized to work.

Mr. Martin added that an employer that knows the above-quoted SSA information but employs an individual using a known invalid SSN conceivably could be subject to penalties not only under INA §274A, but to civil or even criminal penalties under §274C and Title 18 of the U.S. Code for document fraud or false attestations.

With regard to Mr. Larson's question about an employer's responsibility if it learns from its employee that the employee's name or SSN is different from that shown on the I-9, Mr. Martin counseled the following. Upon receipt of information from the employee indicating that information recorded on the I-9 is erroneous, the employer should correct it in a manner that shows the correct information without obliterating the formerly recorded information.

If the correction is to Section 1 of the I-9, the employee should also initial the correction, Mr. Martin advised. If the new information contradicts I-9 Section 2 information, such as the name or SSN number of the employee as shown on previously presented documentation, the employer may ask to see acceptable I-9 documentation showing the correct information to ensure accuracy, he added.

Mr. Martin noted that learning of a change to an employee's Social Security information does not by itself put the employer on notice that the employee is presently not work authorized. Indeed, he added, one scenario that has come to the attention of the INS on occasion is the following: An employee has been working under a false SSN. The employee subsequently becomes work authorized and obtains a legitimate SSN. Wishing to ensure that his earnings are credited, the employee tells his employer that his SSN has changed.

**\*205** Depending on the circumstances, Mr. Martin continued, this notification may put the employer on notice, not that the employee is unauthorized, but that the employee has committed fraud. Knowing false statements on the I-9, or the use of false documents to obtain employment, are felonies that are not excused by subsequent grants of work authorization or lawful status. An employer who suspects them, said Mr. Martin, may apply, in a nondiscriminatory manner, any policies it applies generally to suspected criminal conduct in the workplace, or to suspected false statements in employment documentation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**No-Match Cert. Admin. Record  740**

75 NO. 6 Interpreter Releases 203

**(Cite as: 75 NO. 6 Interpreter Releases 203)**

Mr. Martin instructed that if an employer determines that an employee has fraudulently executed the I-9, the employer should not continue to rely on that form as a verification of employment eligibility, and should require that the employee complete a new I-9 if the employer continues the employment (while retaining the original form for the designated period as evidence of compliance with the verification requirements at the time of hire). He added that criminal conduct involving the I-9 may be reported to the INS.

Mr. Martin emphasized that this does not mean that all changes to name or SSN information recorded on the Form I-9 mean that fraud has taken place, and added that each case must be considered on its particular facts. One "fact of general application," he noted, is that names may change for a variety of reasons, but SSNs do not change (although they may be recorded erroneously on forms). For this reason, he continued, a claimed change of SSN is arguably a situation that raises more of a red flag than a claimed change of name. He added that a change to an SSN that merely corrects a transcription error would be an unlikely indicator of fraud, but if an employee reports what is clearly an entirely different SSN from the one he or she previously has used, something is wrong.

Similarly, Mr. Martin said, receipt of information showing that an employee has been working under a completely different name reasonably raises questions about an employee's identity that are not raised by change of a last name due to marriage, correction of a middle initial, reconciliation of an incorrectly or differently recorded ethnic name, or other legitimate corrections.

In concluding, Mr. Martin suggested that Mr. Larson contact the Office of Special Counsel for Immigration-Related Unfair Employment Practices for specific advice relating to immigration-related discrimination concerns.

Both letters are reproduced in Appendix V of this Release.

Appendix V.
<Image in PDF format not available via Offline Print. View on westlaw.com.>

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Backgrounder

April 2002

## America's Identity Crisis
### Document Fraud Is Pervasive and Pernicious
By Marti Dinerstein

A U.S.-issued photo driver's license is the only identification anyone needs to board a domestic flight in America. Most states require driver's license applicants to present documents proving their identity and their status as legal state residents. However, some states do not. That is why hijackers were able to obtain driver's licenses or motor vehicle ID cards from Florida, New Jersey, and Virginia. It is reasonable to assume they showed them on September 11 to board the four planes they eventually used to kill more than 3,000 people in New York, Pennsylvania, and Washington, D.C. The horror of these acts shocked the public into the realization that the government has lost control over who is admitted to the United States and is often unable to find those who reside here illegally.

In 2002, the Census Bureau estimated that 8.7 million people resided in the United States illegally. The Immigration and Naturalization Service (INS) has estimated that approximately 40 percent of illegal immigrants are visa overstayers while 60 percent crossed our borders without permission. Although the majority of illegal immigrants wish us no harm and simply want a better life for themselves and their families, the stark reality is that their presence has spawned widespread document and identity fraud throughout the United States that threatens our ability to distinguish illegal aliens from U.S. citizens and legal foreign residents.

Once here, illegal immigrants must work to support themselves. The immense demand for documents "proving" the right to work in the United States has led to the exploitation of loopholes in laws and regulations at every level of government. The offices that provide original or duplicate copies of these documents suffer from overwork, underfunding, and severe systems inadequacies.

Production and distribution of false documents has become a large and sophisticated industry. A wide variety of documents are involved, ranging from baptismal certificates to INS-issued documents. However, three seemingly innocuous documents form the core of the crisis the United States now faces in ensuring that its personal identification documents and databases are secure. They are U.S. birth certificates, Social Security numbers (SSNs), and driver's licenses.

## U.S. Birth Certificates

In 1986 Congress passed the Immigration Reform and Control Act, a key element of which was sanctions against employers who hired illegal aliens. This act had the unintended consequence of accelerating the proliferation of counterfeit, stolen, and illegally obtained Social Security cards and driver's licenses, which are the most frequently provided documents used to demonstrate authorization to work in the United States. Birth certificates are one of many so-called "breeder" documents that are often used to obtain Social Security cards and driver's licenses.

Increasingly, illegal alien job seekers are choosing to buy counterfeit U.S. birth certificates or to obtain a copy of an authentic one using fraudulent means. It is well worth the effort. A false claim of U.S. citizenship bypasses the risk and high cost of submitting phony work authorization documents.

Birth certificate fraud occurs in three ways: a counterfeit certificate is created, an original certificate itself is altered, or a duplicate certificate is obtained by an imposter. Susan Martin, former Executive Director of the U.S. Commission on Immigration Reform, testified before a Congressional subcommittee in 1999 about why birth certificate fraud is so rampant. According to Ms. Martin, at the time the commission made its investigations, in addition to state registrars, there were about 7,000 local registrars issuing certified copies of birth certificates. The majority of requests for birth certificates were by mail and most were made for

---

*Marti Dinerstein (mdinerstein@earthlink.net) is President of Immigration Matters, a public policy analysis firm in New York.*

**Center for Immigration Studies**

administrative or legal purposes such as verifying age, citizenship, or parental relationship to obtain Social Security cards, passports, and driver's licenses.[1]

Requests for certified copies of birth certificates are handled either in person or by mail, the latter offering more opportunity for fraud. For instance, someone seeking a new identity can read a newspaper's obituary section, obtain the name and birth date of someone of similar age, and request a certified copy of that individual's birth certificate. However, that method requires a certain amount of patience and luck.

A far easier way now exists to take the first step in stealing someone's identity. State and local registrars are required by law to make birth and death records public, which has typically meant giving access to the physical records at government offices. Today, however, the risk exists that millions of these records could be obtained by anyone with an Internet connection.

## Lack of Data Privacy of Increasing Concern

Access to personal data contained in public records is of mounting concern to lawmakers and privacy experts. The reasons why are amply demonstrated by one example that occurred in December 2001 and was reported by CNETNews.com.[2] In the name of public disclosure, the Office of Health Information and Research of the California Department of Health Services sold the birth and death records of more than 24 million people who were born or died in the state between 1905 and 1995 to a private company for the sum of $1,500. The data included names, birth dates, birth locations, and mothers' maiden names, the latter of which is often used as a password verification by credit card companies, health insurers, and other providers of personal services. Following a blizzard of complaints from frantic state residents, the company voluntarily pulled the database. Pending new regulations to prevent similar situations in the future, California's governor temporarily suspended the sale of such records to private companies that intend to make them accessible via the Internet.[3]

In her 1999 Congressional testimony, Ms. Martin drew a distinction between the reliability of state and local records. She noted that most state vital record offices utilize unique paper and markings, seals, and other features to deter alteration or counterfeiting of birth certificates. But these controls have not been put in place by the estimated 7,000 local registrars. There currently is no mandated standard form for certified copies of birth certificates and no mandated national standard for issuance of birth certificates.

David Simcox, Chairman of the Center for Immigration Studies and an expert in the fields of identification and privacy, made similar points in his testimony to the House immigration subcommittee in 1999. He referenced the existence of a uniform model vital records statute drawn up by the National Center for Health Statistics (www.cdc.gov/nchs) and the National Association of Public Health Statistics and Information Systems (www.naphsis.org). But the uniform model is not binding on the states. Thus, our state-based system of vital records continues to suffer from a confusing morass of document formats, standards, and legal statutes.

Simcox called for tougher sanctions for fraud, alteration, and imposture in the use of vital records, now only a misdemeanor in most states.[4] That slap on the wrist, however, does not comport with the fact that purchasers and users of fraudulent documents are not **innocent victims but actively seek out and pay handsome sums to forgers or middlemen who can obtain them.**

## Recommendations to Reduce Birth Certificate Fraud

The fact that foreign nationals are illegally appropriating the identity of citizens by fraudulently obtaining U.S. birth certificates has been known for many years. The ways to stop it are also known. The U.S. Commission on Immigration Reform recommended in the mid-1990s a series of actions to reduce fraudulent access to birth certificates, including:

● Regulating requests for birth certificates through standardized application forms;

● Using a standard design and paper stock for certified copies of birth certificates;

● Making certified copies of birth certificates issued by states or state-controlled vital records offices the only forms accepted by federal agencies;

● Encouraging states to computerize birth records repositories; and

● Creating a computerized system to match interstate and intrastate birth and death records.

To those should be added:

● Prohibiting the display of vital state records online;

### Center for Immigration Studies

● Ensuring that only the lawful record holder receives a duplicate birth certificate valid for identification purposes. All other copies should carry an overprint saying "Not Valid for Identification" or other words to that effect.

● Enacting federal legislation raising the penalties for fraudulent use of state vital records documents.

Inaction on these recommendations has made it far easier for imposters to obtain a highly-prized identity document — a Social Security card.

## Social Security Numbers

James Huse, Jr., Inspector General of Social Security, appeared before the House Social Security Subcommittee on November 8, 2001 to discuss the prevention of identity theft by terrorists and criminals. Acknowledging that identity theft was a already a significant problem before September 11, he said that improperly obtained Social Security numbers (SSNs) were a factor in the terrorists' ability to assimilate themselves into our society. He repeated prior testimony and echoed warnings from previous reports that the most critical issue in preserving the integrity of Social Security numbers centers on the authentication of documents presented by the individual applying for a SSN or a replacement Social Security card.[5]

A SSN is needed to work in the United States. Undocumented immigrants and those with visas that do not permit employment have devised multiple ways to obtain a Social Security card fraudulently:

1) They can invent a SSN;

2) They can steal or borrow a Social Security card;

3) They can buy a counterfeit Social Security card;

4) They can obtain a valid Social Security card by using false evidentiary documents, such as counterfeit passports and INS papers;

5) They can obtain a valid Social Security card by using a fraudulently acquired U.S. birth certificate; or

6) They can fraudulently obtain a valid replacement Social Security card by stealing a person's identity.

Possibilities 4, 5, and 6 are the responsibility

of the Social Security Administration (SSA) to guard against. When an individual applies for an original SSN, they must provide acceptable documentary evidence of age, identity, and U.S. citizenship or lawful alien status. If applying for a replacement Social Security card, the applicant must provide evidence of identity and, if applicable, lawful alien status.

In a Congressional Reponse Report dated October 25, 2001 to the ranking minority member of the Senate Committee on Finance, Mr. Huse wrote that the SSA has taken many steps to safeguard the integrity of Social Security numbers. It provides employees with copies of a guide prepared by the INS that highlights what to look for when inspecting documents. Agency field offices also can compare information provided to them to an INS online database containing the alien registration number issued to all legal permanent resident aliens in the United States. Additionally, the SSA has developed a way to flag suspect or known fraudulent documents on its computer system so that they will be rejected if presented again. It also has installed sophisticated systems that can identify transactions with the greatest potential for fraud, such as sending ten or more Social Security cards to the same address within a six-month period.[6]

## Employers Prefer Ignorance

If illegal aliens invent a SSN, steal or borrow an authentic card, or buy a counterfeit one, most likely the SSA will not catch it without the aid of employers. But few employers seem inclined to offer that cooperation. The Employee Verification Service (EVS) is a mechanism for employers to match an individual's name and SSN with SSA records. There were 6.5 million U.S. employers in fiscal year 2000. Only 6,000 employers were registered users, and of those, only 211 used EVS. Employers complain that the feedback is not timely, and Mr. Huse acknowledged that SSA has not implemented its new online EVS as of October 2001. However, he also stated that a number of employers find the system to be "too helpful," exposing the fact that their employees are in the country illegally or holding visas that do not permit them to work. Employers who knowingly hire these people are subject to fines and penalties.

Each year employers report employee earnings to the SSA on IRS W-2 forms. If a report cannot be matched to a Social Security number, it cannot be credited to a worker's earnings record. Instead, it is posted to the Earnings Suspense File (ESF). In 1999, SSA auditors focused on 100 employers with the most

## Center for Immigration Studies

suspended wage items.[7] They found more than 109,000 phony SSNs. The SSA has no legal authority to levy fines and penalties against employers who repeatedly submit large numbers of wage reports with incorrect SSNs. They must rely on the IRS to do so, and audits have revealed this rarely happens.

## Mission Creep Expands
## Social Security's Responsibilities

Despite the Social Security Administration's efforts to reduce fraud, immigration and privacy experts believe that they have done too little, too late. There has been a historical reluctance on the part of the SSA to modify the mission it was assigned in 1935 when the Social Security Act was passed. At that time its only responsibilities were to record employee and employer contributions, compute benefits, and pay them out.

But beginning with the advent of computers in the 1960s, the use of the SSN, an existing unique identifying number, spread rapidly among government and industry. Despite the possibility of fraud, the SSA did not require applicants to prove identity, age, citizenship, or alien status until 1978, according to a 1998 piece by David Simcox in *The Social Contract*.[8] In 1983, Congress recognized the need for rudimentary counterfeit-resistant features for all new and replacement cards, but some 40 versions of the card are still in circulation. The SSA issues approximately six million new cards a year. The agency also issues close to 11 million replacement cards each year, ostensibly because of loss, damage, or name change.

## Congress Has Short Attention Span

In 1996, having passed both immigration reform and welfare reform bills, Congress ordered the SSA to develop a prototype of a counterfeit-resistant, tamper-proof Social Security card that provides individuals with "reliable proof of citizenship or legal resident alien" status. In doing so, Congress implicitly recognized the nation's need for such an identifier, and it explicitly recognized that SSNs were being used in fraudulent ways that could create heavy societal costs.

The SSA responded to Congress the next year by providing seven prototype cards that ranged widely in terms of their counterfeit resistance, cost, data content and capacity, and machine-readability. The estimated cost range was $5 to $10 billion. To date no action has been taken on that report. In his 1998 *Social Contract* piece, Simcox outlined in great detail how daunting an administrative task it would be to produce

and reissue new cards for the nearly 300 million current cardholders. He also raised the specter of how the multi-billion dollar project could be undermined by the same illegal immigrant advocacy forces at work today that would complain of "discrimination" and "selective application," thereby nullifying the entire effort.

The SSA also offered alternatives to a mass reissuance, one of which was to develop a secure new card but to issue it only when new and replacement cards were needed and when existing cardholders requested new benefits. A second option was to mandate states to include verification of Social Security numbers as part of their drivers' license and non-driver ID card issuance process. Driver's licenses already incorporate many of the counterfeit-resistant, tamper-proof features envisaged for the SSN. They are the most widely accepted identification used in the United States today. Americans understand the process-and are used to paying for it.

Whatever and whenever Congress chooses between and among the various options recommended to meet its own mandate to provide individuals with reliable proof of citizenship or legal resident alien status, certain improvements should be made to limit fraud in the current Social Security card system. In his cover letter to the October 21, 2001 report to the Senate Committee on Finance titled "Terrorist Misuse of Social Security Numbers," James Huse conveyed this chilling comment:

> *While SSA has implemented various programs to assist in the identification of SSN misuse, none are designed to uncover possible SSN misuse by noncitizens. Indeed, we can think of no program SSA could institute that would accomplish such a difficult mission. Certainly, room exists for SSA to improve its existing program and system controls to prevent the improper attainment of an SSN. However, once an individual obtains a SSN, either through proper or improper means, the agency has little ability to control the use of that number.*

## Recommendations to
## Reduce Social Security Fraud

Huse provided a list of recommendations to assist in the prevention and detection of individuals attempting to improperly obtain and misuse SSNs, including:

● Obtaining independent verification from the issuing agency (i.e., INS and the State Department) for all evidentiary documents submitted by noncitizens

## Center for Immigration Studies

before issuing an original SSN;

● Exploring the use of innovative technologies, such as biometrics, in the enumeration process;

● Expediting enhancements to the enumeration system that will identify and prevent the assignment of SSNs in certain suspect circumstances;

● Establishing a reasonable threshold for the number of replacement Social Security cards an individual may obtain during a year or over a lifetime;

● Procuring legislative authority to provide the SSA the tools to require chronic problem employers to use EVS and to sanction them if the IRS will not do so;

● Expanding the SSA's data-matching activities with other federal, state, and local government entities; and

● Enacting federal legislation raising the penalties for fraudulent use of SSNs and cards.

A SSN conveys legal legitimacy to its holder. The fraudulent acquisition of SSNs by foreign nationals illegally residing in the United States is a risk to homeland security. It facilitates terrorists' ability to get a job, drive a car, open a bank account, and meld unnoticed into the general populace. Further, its procurement and use by any illegal resident fosters disrespect for our government and its laws when they can be broken so easily and with such impunity.

For these reasons, we must erect more firewalls to prevent illegal aliens' misuse of this simple nine-digit number that has become a passkey to the American way of life. Possessing a genuine Social Security card, however obtained, greatly enhances the chances of receiving a valid driver's license, the most widely accepted identification within the United States.

## Driver's Licenses

A national debate has resumed on whether the United States needs a national identity card. But, whatever the merits, proponents and opponents agree that it would be a very long time before a totally new system could be operational. Until then, driver's licenses will continue to serve as our most widely accepted identity document. The bad news is that some current state driver's license laws, regulations, and procedures are rife with loopholes, subject to political pressure, and

breed a culture of corruption. The good news is that these problems are more easily and affordably corrected than the validation and systems-development issues required to safeguard the integrity of birth certificates and SSNs.

Driver's licenses can be obtained by individuals residing here illegally in three different ways:

1) Purchasing a counterfeit license or altering an exisiting one;

2) Obtaining a valid license by presenting fraudulent breeder documents and employing other illegal stratagems usually provided by middlemen; or

3) Exploiting loopholes that permit illegal aliens to legally obtain a valid driver's license.

The first is straightforward and simply another example of the widespread document fraud that has swept the country since the explosion of illegal residents began in the 1980s. But the other two are activities unique to the driver's license issuing process.

## Phony Breeder Documents Produce Valid Driver's Licenses

Criminal middlemen have discovered that helping people obtain licenses illegally is a lucrative business. These purveyors use techniques similar to drug dealers and human smugglers. The middlemen function as independent contractors with a penchant for secrecy. Many work only on the recommendation of someone they trust, reveal only their cell phone or beeper numbers, and speak in code. Eager to avoid attention and apprehension, they frequently change the locations in which they operate.

Middlemen bribe low-paid motor-vehicle clerks. They cultivate corrupt notaries and lawyers, and they identify the most lenient issuing centers. Their customers are knowing accomplices who initiate the process and willingly pay large sums for a license.

Prior to September 11, *The Bergen* (N.J.) *Record* undertook investigative reporting to document exactly how the process works. They found a thriving black market where illegal immigrants commonly pay $2,000 to brokers who guide them through the whole process.[9] If immigrants have not already fraudulently obtained their own breeder documents such as birth certificates, Social Security cards, and green cards, the middlemen jack up the price and obtain counterfeit ones for them. The brokers can even overcome the impediment

## Center for Immigration Studies

of getting a license for someone who does not know how to drive. They simply arrange for someone else to take the written and road tests. This is possible because although a photo is required to obtain a permit, no one bothers to match it to the person taking the test.

The plan is not always flawless. The scam can be discovered and arrests made. Illegal immigrants caught with fraudulent documents are usually charged with forgery, which in New Jersey is punishable by three to five years in state prison. However, the cases are often downgraded to disorderly person offenses. This response is not unique to New Jersey.

## Lax Law Enforcement Has Predictable Result

The trivialization of crimes committed by undocumented aliens is widespread in localities with high incidence of illegal residents, mostly because these populations are in a real sense part of the community. Local law enforcement and judicial officials are human beings who empathize with people trying to build a better life. Also, police often come under heavy criticism from immigrant advocates and the media for what is characterized as harsh treatment that causes hardship to immigrant families. But the end game of this leniency is a disinclination to punish any illegal resident that may be deported. We try to catch them at our borders. If we do not succeed, increasingly, they are given a free ride even if they break additional laws while here. The result is an illegal community equal to the population of 10 states.

So some illegal residents take the minimal risk of committing bribery, forgery, and other fraud to obtain driver's licenses. Others simply take advantage of loopholes in various states' identification requirements to receive driver's licenses. It has been reported that at least 13 of the 19 hijackers on September 11 were able to obtain valid licenses or non-driver ID cards from Florida, New Jersey, or Virginia.[10] That shocked all three states into taking action to tighten their procedures and resulted in a spate of media stories that revealed a hodgepodge of loosely enforced standards in other states as well.

All states require applicants to provide proof of identity but only approximately half require proof of state residency. The American Motor Vehicle Administrators Association estimates that as many as 200 forms are accepted. States distinguish between primary IDs in which they have a high degree of confidence and secondary IDs. Common primary IDs include a U.S. birth certificate, current license from another state, valid U.S. passport, military

identification, INS-issued "green card" that confers permanent residency status, or an I-94 form that indicates a visa holder's period of stay. Secondary ID sources cover a wide range of documents, including a Social Security card, credit card with signature, employer identification card, foreign driver's license, card verifying country of origin, baptismal certificate, family Bible record, and the flexibility for a motor vehicle supervisor to approve a multitude of additional secondary items. Counterfeit copies of many of these so-called identity documents may be purchased easily in immigrant neighborhoods.

Even though state motor vehicle departments may be too permissive in the identity documents used to establish an applicant's right to a license, they are usually victims of deceit and fraud by illegal immigrants. However, it is hard to explain or excuse the irrational and irresponsible administrative procedures adopted by many state motor vehicle departments in granting licenses. The most egregious of these are states that explicitly and openly permit foreign nationals residing in the United States illegally to obtain a valid driver's license. The policies of many other states facilitate the same end result, whether or not it was a deliberate decision. Examples are rife but it takes only a few to demonstrate the depth and danger of this practice.

## States Subvert U.S. Immigration Laws

In 2001, Tennessee had the dubious distinction of enacting a law thought to be the nation's most lenient for granting licenses to illegal immigrants. Officials cited public safety and the desire for more drivers to learn traffic laws as their motivation. The Chamber of Commerce backed the law as a way of attracting business. According to *The Boston Globe*, more than 30,000 immigrants swamped license testing centers in the first month after the law went into effect.[11] A supply of 17,000 Spanish-language driver's manuals ran out in eight days. Lines started forming at dawn and resulted in such overcrowding that a fire marshal cleared one station and a landlord yanked a lease at another. It was reported that as many as 60 percent of the applicants failed the written test-and got right back into line to try again.

*The Boston Globe* also reported that Georgia had similar lax requirements until their law was changed in 1996 after being deluged by applicants from all over the United States. After an extensive investigation, Georgia concluded that the lure to illegal immigrants was the chance to obtain valid identification not available in their state of residence. Subsequently the

## Center for Immigration Studies

law was changed to make explicit that only U.S. citizens or those with valid visas are eligible to hold driver's licenses. But now, six years later, Georgia's governor seems ready to reverse that reversal. In a public forum nine days after the September 11 terrorist attacks, he supported giving illegal immigrants a valid Georgia driver's license and predicted that would occur within 12 to 18 months. He defended his view based on the fact that Georgia's Hispanic population grew 300 percent in the 1990s and that Georgia's economy is dependent on the labor of Latinos.[12] Hispanic immigrant leaders have said getting licenses for illegal immigrants is among their top priorities.

North Carolina also has a reputation for laxity on verifying identity documents. A story in *The Miami Herald* said that 388,000 people hold North Carolina licenses with the Social Security number 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. Motor vehicle clerks enter that number if applicants do not provide another one. Apparently the identification problems are so severe and so well known that Florida's motor vehicle director recently took the extraordinary step of denying reciprocity to North Carolina license holders.[13] *The Charlotte Observer* reported that as of January 2002, North Carolina would require either a Social Security card or an IRS-issued taxpayer identification number.[14] However, the IRS has uncovered massive fraud by illegals' improper use of the latter and the document proof required to verify state residency does not meet high standards.

The three states where hijackers reportedly obtained licenses or motor vehicle IDs –– Florida, New Jersey, and Virginia –– also changed requirements after the attacks according to *The Miami Herald.*

## Recommendations to Reduce Driver's License Fraud

Obviously the September 11 attacks were a wake-up call to state officials and motor vehicle departments that a driver's license is a prized commodity to all illegal immigrants and a dangerous door opener in the hands of foreign terrorists. Clearly, these two groups are paying attention to the loopholes in the way states issue this key identity document. Many loopholes are easy to close but require the political will to do so. States could greatly improve the security of driver's licenses by adopting common sense procedures, such as:

● Improving the identification verification process by establishing designated licensing offices where employees would be trained to spot fraudulent documents and be equipped with the computer equipment necessary to check databases maintained by the SSA and INS. Non-permanent resident immigrants and visa holders would be required to use one of these offices.

● Eliminating some types of documentation that can be easily forged or abused, such as the I-94 visa form and the IRS taxpayer identification number.

● Stopping the common practice of issuing licenses to foreign nationals on a same-day basis, which makes it extremely difficult to properly check identity and residency documents.

● Tying license expirations to those indicated on visas and foreign passports instead of automatically granting the typical four-to-six year expiration period.

● Restricting the number of duplicate licenses issued to one individual to replace stolen or lost originals.

● Requiring that photo identification be shown at every stage of the licensing process and refusing to permit photographs that obscure individuals' faces.

● Increasing the penalties for obtaining a license through fraudulent means.

The simple fact is that if individual states do not take all necessary steps to deny driver's licenses to visa violators and illegal immigrants, millions of American citizens could be seriously inconvenienced — or worse. We have all benefited from a long-standing reciprocity policy that grants individuals moving from one state to another the courtesy of obtaining a new license without having to take another written or road test. In a highly unusual action in 2001, Florida rescinded this courtesy for North Carolina residents out of concern about the repercussions of putting licenses into the wrong hands. The Attorney General of South Carolina has similar concerns. He has asked U.S. Attorney General John Ashcroft to require additional photo identification for airline passengers with licenses from North Carolina, Tennessee, Utah, and Virginia, complaining that their loose standards put others at security risk from terrorists.[15] If more states disregard the legal status of residents, today's entire infrastructure of issuing driver's licenses — the most widely used identity card in the United States — could crumble.

Center for Immigration Studies

# Narrow Interests Must Yield to the Common Good

The creation of the Office of Homeland Security was an explicit recognition that we have been too complacent, thinking ourselves immune from being attacked on our own shores. Problems designated for priority attention include increased security at borders, airports, and other points of entry; programs and research to protect our public health system; and recognition of the vulnerabilities of energy facilities and transportation infrastructure.

The USA Patriot Act of 2001 has some provisions relating to how document fraud facilitated the terrorists' entry to and free movement within the United States. It provides new powers to detain suspected terrorists and exclude from entry aliens with known terrorist ties. The act also calls for expediting development of an integrated entry and exit data system for visa holders, implementation of a foreign student tracking system, a feasibility study on upgrading the FBI's fingerprint identification system to make it available to consular offices abroad and at U.S. ports of entry, and a feasibility study for giving airlines direct access to the names of suspected terrorists. But there is a disconnect between the significance of the proposed projects and the relative lack of urgency with which they would be completed.

## Inattention to Risk Management

American industry is much more responsible than the federal government in using technology to control risk and ensure quality control of their products. If the issuance of birth certificates, Social Security cards, and driver's licenses was a service offered by businesses, they would never tolerate the high level of fraud and attendant product unreliability, because they could not afford it. Profits are diminished by poor-quality products and customers vote with their feet. But, ironically, they would not be permitted to ignore it because the federal government would intervene. Regulatory agencies abound whose sole purpose is to ensure the safety and soundness of our banking and securities services, our transportation systems, and our telecommunications providers to name just a few. Private industry has been compelled to spend billions of dollars in systems development to meet the quality control standards required by these agencies. The events of September 11 showed all too clearly that it is past time for the government to do the same.

## Government Must Embrace Technology

The fraudulent use of key identity documents by illegal foreign residents is growing. There is no hope of containing this threat without the tools technology provides. Private industry has embraced technology and reaped the rewards in more product innovation, greater productivity, and enhanced risk control. Grandmothers with instant messaging can speed their advice along through e-mail. Al Qaeda operatives living in caves communicate via laptops. And yet, at every level of American government, public service employees do not have the tools they need to do their jobs effectively.

Too much of their work is still paper-based. Their computers and off-the-shelf software are outdated, Internet access often is not available, data management systems are woefully lacking, and their systems are not linked to other arms of government that have data and intelligence they need. This is certainly true for the government agencies with control over which foreign nationals enter the country, what they have legal status to do while here, and when they must leave. At the federal level these include the State Department, INS, SSA, and the FBI. At the state and local level, these include motor vehicle departments, birth certificate registrars, and local police.

Three identity documents — birth certificates, Social Security cards, and driver's licenses — are under assault by illegal immigrants and visa violators. The agencies responsible for these documents need increased funding to support technology enhancements and systems development. All need tamper-proof documents. All need more resources targeted to investigating, finding, and punishing those who commit fraud. All need to address and rectify certain practices specific to their responsibilities that either explicitly or implicitly encourage illicit activities.

Some of those actions could be accomplished quickly with little expenditure. Others carry price tags ranging from millions to billions of dollars and would require many years to complete. All are important. But in a situation where government funds are tight and solutions are needed quickly, which programs to enhance the safety of our identity credentials would produce the biggest benefit? What do we need most?

## Majority Favors a National ID Card

Opinion polls consistently reveal that a cross-section of American residents would say we need a national identity card. Immediately after September 11, a Pew Research Center poll found that 70 percent of those

8

## Center for Immigration Studies

surveyed favor such a card.[16] Gallup Polls taken in 1983, 1993, and 1995 consistently showed a majority of respondents favored such a card. When demographic subcategories were indicated, immigrants favored the card at a higher rate than native-born Americans.[17]

When this topic arose in the past, the opponents were predictable, including civil liberties advocates, libertarians, and data privacy specialists. Since the terrorist attacks, however, the ground has shifted. Alan Dershowitz, a Harvard Law School professor and one of country's most outspoken civil libertarians, wrote a much-quoted column in *The New York Times* saying that anonymity was not a freedom guaranteed by the Constitution. He argued that being asked for identification is already a daily occurrence and that fears of government intrusion could be allayed by clearly delineating the criteria under which a national identity card could be requested.[18]

However, opponents already have begun warning about the evils of big brother government. The White House has said such a card is not under consideration, and most elected officials have taken a low profile on the subject. There is no consensus on the need or desirability of a national identity card, much less the scope and uses of such a card. Indeed, to some people the very words "national identity card" conjure up images of Gestapo-like intimidation and an Orwellian society that inhibits personal freedoms. While legislative protections could eliminate both of these threats, intellectually honest debate on the subject is very difficult. While that debate should be initiated, Americans no longer have the luxury of waiting for a consensus to form at some far distant date.

## Watchwords: Pragmatism and Speed

There must be immediate action to protect lives and to prevent foreign nationals from acquiring the privileges of American citizenship through fraudulent means. The success of federal pilot projects already initiated and a state-sponsored proposal deserve serious consideration.

The vulnerability of the birth certificate issuance system allows aliens to appropriate the identity of U.S. citizens. In 1996, the U.S. Commission on Immigration Reform recommended a number of measures to remedy the abuses. All are important but two seem particularly relevant to the current crisis environment. The first requires only a simple change in operating procedures. Federal agencies should no longer accept copies of birth certificates from the local issuing agencies but require certified copies issued by state or state-controlled vital records offices.

The second is an urgently needed computerized system to match interstate and intrastate birth and death certificates. Following passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, the INS was designated lead agency on a federal-state-private sector working group to oversee this effort as well as others to raise standards for breeder documents. It appears that, more than five years later, little progress has been made. This is particularly unfortunate because the act recognized that pervasive identity fraud was threatening the integrity of our personal identity documents and authorized the granting of federal monies to stop it.

## Employee Verification Service: A Proven Success in Identifying Fraud

A high percentage of visa overstayers and illegal immigrants would leave the United States if they were unable to find jobs. Experience has shown that the Social Security Administration's Employee Verification Service (EVS) has been highly successful in identifying employees who provide a false SSN to their employer. The system is not widely used because employers complain it takes too long to get verification and because some employers wish to ignore the fact that illegal immigrants have been hired.

The SSA already has built and successfully piloted an online EVS. Resources should be committed immediately that would permit a phased rollout to any of the nation's 6.5 million employers who could use an online verification system. Use of the system should be mandated for certain employers, including those with a high incidence of IRS W-2 forms that cannot be matched to SSNs and those in industries, such as food processing and hospitality, known to hire large numbers of illegal immigrants. Stiff fines should be levied against employers with a record of consistent abuse and the SSA should contact and initiate an inquiry with anyone who submits a fraudulent SSN. Undocumented aliens with phony SSNs are culpable and already have at least three strikes against them — illegal residence in the United States; purchase, possession and use of fraudulent documents; and false statements to obtain employment.

## Driver's License Integrity Must Improve

The driver's license already is the most requested identity document in the country. But its integrity is suspect because of pervasive fraud in the breeder documents used to obtain it, the criminal involvement

9

## Center for Immigration Studies

of middlemen who facilitate the procurement process, and the extremely poor judgment of states willing to issue them to illegal aliens. Another complication is the crazy quilt of guidelines that vary widely by state.

Fortuitously, an effort is well underway that would counteract these weaknesses. The American Association of Motor Vehicle Administrators (AAMVA; www.aamva.org) is helping states develop national standards with respect to driver's licenses' appearance, data content, and security requirements.[19] Cards would be made more tamper-proof and would include a biometric identifier, such as a fingerprint or retinal scan. There would also be a uniform set of standards regarding the documents needed to prove identity, residency, and legal status of non-citizens. Identity documents would be verified electronically with INS, the SSA, the Bureau of Vital Statistics and, if necessary, the FBI. Similarly, to ensure that no individual holds more than one valid driver's license at a time, a computer link would give states access to each other's driver databases.

Looked at dispassionately, nothing being suggested should cause alarm. Driver license cards themselves would be made more secure, with an ability to match a unique, biometric identifier against a master file to be sure the card belonged to the person presenting it. States would agree on a uniform set of reliable proof of identity documents that would be matched against existing federal and state databases, again to verify that they were legitimately issued and belong to the person presenting them. Similarly, new and replacement license requests would be matched against the existing driver databases in all other states to prevent the illegal issuance of licenses from more than one state at a time. This is not big brother. This is using technology and plugging security loopholes. The AAMVA says that it will cost up to $100 million to implement these programs and is seeking funding and legislative support from both Congress and the states.[20]

This proposal should meet with receptivity from Congress, as it already recognized the need for new federal rules governing state issuance of commercial driver's licenses in the USA Patriot Act of 2001. Concerned that some of the terrorists had obtained commercial licenses to transport hazardous materials, Congress mandated that no commercial license be issued until the U.S. Attorney General conducted a background check on the individual. Specifically, Congress required a check of the relevant criminal history databases and, in the case of an alien, a determination of his or her legal status in the United States and, as appropriate, a check of international databases through Interpol-U.S. National Central

Bureau or other appropriate means.

This proposal also would give Congress an opportunity to revisit an important provision of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 that required states to use SSNs as proof of identity when issuing a driver's license. The act contained specific language that made clear the SSN need not be shown on the face of the license but that it was to be provided and its authenticity verified with the Social Security Administration.

In 1998, the National Highway Traffic Safety Administration issued a rule necessary to implement this provision of the new law. At the same time, a national debate was raging about the Clinton administration's proposal for universal health care, which included a recommendation that a unique health identification number be assigned to all Americans, which would make it easier for medical providers to gain access to a patient's medical history. Civil libertarians and states' rights critics lumped the two proposals together, raising the scourge of a national identity card that would be invasive of our privacy and subject to misuse.[21] In October 1998, they were successful in killing the driver's license provision by tacking language onto the omnibus bill authorizing 1999 federal spending.[22] The actual legislation (HR 4197) to block the federal requirement never moved out of committee; therefore, Congress never had an opportunity to give it thoughtful consideration.

### Security from Document Fraud Has Costs

Solving America's identity crisis will increase our security but will entail certain costs. It will be expensive to upgrade the technology tools government employees need and to modify and enhance databases so they can be shared by multiple government and law enforcement agencies. Changes in procedures may result in longer lines at motor vehicle bureaus.

Those who habitually employ illegal immigrants will have to kick their addiction and work instead to attract legal workers. Responsible employers must assume a new administrative task and verify the validity of their employees' SSNs. Those with valid concerns about privacy rights and the dangers of intrusive government must behave responsibly and not smear efforts to protect identity documents with the "national ID card" label. The mainstream media will need to differentiate between legal and illegal immigrants and report on the problems caused by the latter group while continuing to call attention to the hardships they face. Elected officials will need to resist the temptation to intervene when immigrant

10

## Center for Immigration Studies

constituencies call to complain about stricter law enforcement. And those charged with enforcing the law must do so, rather than turning a blind eye or reducing penalties out of sympathy at the plight of illegal immigrants seeking a better life.

Post-September 11, Americans recognize that there are people from other countries who hate the United States, and some of them are living here. Even though the vast majority of illegal immigrants wish Americans no harm, they are nonetheless doing harm by engaging in widespread document and identity fraud that threatens the ability to distinguish illegal aliens from U.S. citizens and legal foreign residents.

We can no longer tolerate the laissez-faire attitude that has been permitted with respect to vital identity credentials. While remaining a generous nation that annually welcomes a million legal immigrants and more than 30 million foreign visitors to our shores, the government must enforce immigration laws and demand the departure of people with no authorization to reside in the United States. For this to happen, Americans must resist the instinct to let sentiment overpower common sense and common purpose.

## End Notes

[1] Testimony of Susan Martin before the House Subcommittee on Immigration and Claims on July 22, 1999. http://www.house.gov/judiciary/mart0722.htm.

[2] Olsen, Stefanie. "Identity Crisis: Birth Records Online." *www.cnet.com*, December 3, 2001.

[3] Olsen, Stefanie. "Calif. Halts Birth-Record Sales to Web Sites," *www.cnet.com*, December 6, 2001.

[4] Testimony of David Simcox before the House Subcommittee on Immigration and Claims on July 22, 1999. http://www.house.gov/judiciary/simc0722.htm.

[5] Testimony of James G. Huse, Jr. before the House Ways and Means Subcommittee on Social Security on November 8, 2001. http://waysandmeans.house.gov/socsec/107cong/11-8-01/11-8huse.htm.

[6] Congressional Reponse Report. "Terrorist Misuse of Social Security Numbers," U.S. Congress. Senate. Finance Committee, October 25, 2001. http://www.ssa.gov/oig/adobepdf/A-08-02-32041.pdf

[7] http://www.ssa.gov/oig/auditpdf/98-31009.pdf; September 29, 1999.

[8] Simcox, David. "Secure, Uniform Social Security Card: A 'How to Do It' Study." *The Social Contract*, Winter 1998. http://www.thesocialcontract.com/cgi-bin/showarticle.pl?articleid=1004.

[9] Llorente, Elizabeth. "For Sale: N.J. Licenses." *The Bergen (N.J.) Record*, September 30, 2001.

[10] Barakat, Matthew. "Hijackers IDs Prompt Scrutiny." The Associated Press, October 9, 2001.

[11] Weyermann, D.F. "Driving Toward Residency in Tennessee: Road Test Lines Grow as License Rule Eased for Illegal Immigrants." *Boston Globe*, July 26, 2001.

[12] "Barnes Backs Licenses for Non-Citizens: Growing Number of Latinos Vital to Economy He Says." *Atlanta Journal-Constitution*, September 21, 2001.

[13] Morgan, Curtis. "Driver License Rules Get Stricter: Florida, Other States Seek to Thwart Terrorists." *Miami Herald*, November 18, 2001.

[14] Whitacre, Dianne. "New License Law Cuts Lines at DMV," *The Charlotte Observer*, November 9, 2001.

[15] Bixler, Mark. "License Debate Looms: Should Illegals Be Given State Driving Privileges?" *The Atlanta Journal-Constitution*, December 24, 2001.

[16] O'Harrow, Jr., Robert and Jonathan Krim. "National ID Card Gaining Support." *Washington Post*, Dec.17, 2001.

[17] Simcox, David. "Screening People Electronically: Technical Success, Political Failure." *The Social Contract*, 1998. http://www.thesocialcontract.com/cgi-bin/showarticle.pl?articleid=1003.

[18] Dershowitz, Alan. "Why Fear National ID Cards?" *The New York Times*, October 13, 2001.

[19] O'Harrow, Jr., Robert. "States Seek National ID Funds. Motor Vehicle Group Backs High-Tech Driver's Licenses." *Washington Post*, January 14, 2002.

[20] Lewis, Linda. Press release from AAMVA President and CEO, January 14, 2002.

[21] James, Frank. "ID-Number Proposals Raise Issue of Privacy." *The Chicago Tribune*, August 31, 1998.

[22] "National ID Proposal Blocked," *Congressional Quarterly*, October 16, 1998.

11

# Backgrounder

## America's Identity Crisis
### Document Fraud Is Pervasive and Pernicious

By Marti Dinerstein

A U.S.-issued photo driver's license is the only identification anyone needs to board a domestic flight in America. Most states require a driver's license applicants to present documents proving their identity and their status as legal state residents. However, some states do not. That is why hijackers were able to obtain driver's licenses or motor vehicle ID cards from Florida, New Jersey, and Virginia. It is reasonable to assume they showed them on September 11 to board the four planes they eventually used to kill more than 3,000 people in New York, Pennsylvania, and Washington, D.C. The horror of these acts shocked the public into the realization that the government has lost control over who is admitted to the United States and often is unable to find those who reside here illegally after they arrive.

Production and distribution of false documents has become a large and sophisticated industry. A wide variety of documents are involved, ranging from baptismal certificates to INS-issued documents. However, three seemingly innocuous documents form the core of the crisis the United States now faces in ensuring that its personal identification documents and databases are secure. They are U.S. birth certificates, Social Security numbers (SSNs), and driver's licenses.

Center for Immigration Studies
1522 K Street NW, Suite 820
Washington, DC 20005-1202
(202) 466-8185
center@cis.org
www.cis.org

3-02

NON-PROFIT
U.S. POSTAGE
PAID
PERMIT #6117
WASHINGTON, DC



No-Match Cert. Admin. Record 753

# Backgrounder

November 2002

## Giving Cover to Illegal Aliens
### IRS Tax ID Numbers Subvert Immigration Law
By Marti Dinerstein

Through its issuance of Individual Tax Identification Numbers (ITINs), the Internal Revenue Service (IRS) appears to be blind or indifferent to the reality that it has:

- created an official U.S. tax number that illegal aliens are using as identification, thereby making it easier for them to meld unnoticed into our society;

- endangered homeland security by issuing ITINs to illegal aliens, without adequately ensuring that they are denied to terrorists, criminals on the FBI database, and those under deportation notices;

- exceeded its traditional role as a tax receiver and processor by marketing the ITIN to illegal immigrant communities;

- failed to provide adequate safeguards to prevent illegal aliens from receiving tax benefits to which they are not entitled;

- subverted U.S. immigration laws by withholding information from the INS and SSA about fraudulent activity of illegal aliens;

- provided an ID vehicle that advocates hope will be used to "regularize" illegal aliens; and

- withheld from public review data that is relevant to determining the economic contribution of illegal aliens to U.S. society.

The events of September 11, 2001, were a wake-up call to the American people that something must be done to protect our core identity documents. They were shocked to learn that 18 of the 19 terrorists possessed either state-issued or counterfeit driver's licenses or ID cards and all 19 had obtained Social Security numbers (SSNs) — some real, some fake. The hijackers simply tapped into an enormous market for fraudulent documents that exists because nine million people have successfully breached our borders and now reside here illegally. Their presence has spawned widespread document and identity fraud that threatens our ability to distinguish illegal aliens from U.S. citizens and legal foreign residents.

This realization jolted Congress, many state legislatures, state motor vehicle departments, and the Social Security Administration into taking a variety of steps to protect the integrity of driver's licenses and Social Security cards — the two most widely used identity documents in the United States — from misappropriation by illegal residents. Much remains to be done, but real progress has been made.

Ironically, however, the IRS, a division of the Treasury Department, is simultaneously working to provide illegal aliens with a U.S. government-issued identity number that obviates the need for a Social Security number. It is called the Individual Taxpayer Identification Number (ITIN). Very little public information about these numbers has been made available, even though the IRS began issuing them in July 1996, and over 5,500,000 of them have been issued.

## SSA Attempts to Stem Fraud

Employers are required by law to verify that an employee has a valid SSN. The Social Security Administration has long been aware that millions of people living illegally in the United States have obtained SSNs fraudulently using a variety of means. It has systematically taken steps to limit the purposes for which an SSN can be issued and to better validate

*Marti Dinerstein is President of Immigration Matters, a public policy analysis firm in New York and is a fellow at the Center for Immigration Studies. She is the author of "No-Match" Social Security Administration's Crisis: Document Fraud is Pervasive and Pernicious."*

# Center for Immigration Studies

the underlying "breeder" documents presented to obtain a SSN. In May 2002, SSA announced a new initiative, a beneficial by-product of which has been to identify people working illegally in the United States. The program's purpose is to reduce the size and growth of what is known as the Earnings Suspense File (ESF).

When employers file annual withholding tax reports, SSA matches the report from the employer to the name, address, and SSN provided by an employee. So-called "mismatches" are posted to the ESF, which contains information on $327 billion in wages accrued between tax years 1937 and 1999. In 1999 alone, the ESF grew by 8.3 million W-2s and $39.4 billion in wages. A recent SSA report indicated that 96 per cent of ESF wages had been posted since 1970, about the time that an unprecedented number of illegal immigrants began arriving in the United States.[1]

This year SSA sent out over 750,000 letters to employers of approximately seven million workers whose names did not match the SSN provided.[2] Employees who cannot provide a credible reason for the mismatch either voluntarily seek employment elsewhere or are terminated. Unfortunately, the SSA has no legal authority to levy fines and penalties against either employees who fraudulently obtain a SSN or against employers who repeatedly submit large numbers of wage reports with incorrect SSNs. They must rely on the Internal Revenue Service (IRS) to do so, and audits have revealed this rarely happens.[3]

# The IRS Provides "Official" Identification to Illegal Aliens

The IRS's seeming lack of interest in protecting the integrity of the Social Security number from fraudulent use pales to insignificance, however, when faced with the reality that it is responsible for providing a backdoor way for millions of illegal aliens to receive a U.S. government-issued identity number. And it is doing so despite the fact that in 1999 the Treasury Department's Inspector General for Tax Administration said the decision by the IRS to issue these Individual Taxpayer Identification Numbers (ITINs) to illegal aliens "seems counter-productive to the Immigration and Naturalization Service (INS) mission to identify illegal aliens and prevent unlawful entry."[4]

Genesis of ITINs. The audit report referenced above said that a 1994 IRS investigation uncovered significant compliance problems "with the $80 billion an-

nual nonresident alien U.S. investment income." In response, the IRS created an ITIN for non-resident aliens in order to match information documents showing dividend, interest and other income earned by individuals to the tax returns they file. The IRS began issuing ITINs in July 1996.

Either at the program's inception or shortly thereafter, the IRS seems to have expanded the initial purpose of the ITIN by making a policy decision to issue it to resident aliens, including individuals residing illegally in the United States. The audit report referenced above questioned this policy to "legalize" illegal aliens.

Significant portions of the report were deemed to be so sensitive they were redacted from the public document, in part because it is felt that some information could be used to facilitate fraud by illegal aliens. Once an IRS report has been redacted, it stays that way. Therefore, the full text of the 1999 Inspector General for Tax Administration's report on ITINs is still not available for public review. No follow-up report was issued.

Illegals get undeserved tax benefits. The 1999 report appears to include extensive commentary on the ITIN applications of 340,000 illegal aliens, but most of it was redacted. The IRS's objective may be to collect tax revenue from the broadest base possible — a laudable goal. Ironically, however, this has resulted in the IRS ignoring illegals' presence in the United States. One of the reasons why illegals are issued ITINs is that IRS regulations determine resident alien status based on "substantial presence" in the United States, not legal residence. Thus, illegal aliens who file tax returns are treated in the same way as legal foreign residents and receive the same tax benefits, such as spousal exemptions, child and education tax credits. The one exception seems to be the Earned Income Tax Credit, which is available to legal permanent residents but which the IRS decided would not be available to illegal aliens.

Intended or not, it is clear that a significant number of illegal aliens are receiving the Earned Income Tax Credit. This is talked about quite openly by their advocates. Moreover, in its publications the IRS is signaling that this is a problem. One of three bullet points at the top of Form W-7 used to apply for an ITIN reads: "Receipt of an ITIN does not make you eligible to claim the earned income credit (EIC)."[5]

Further, a section describing the Earned Income Tax Credit on the IRS web site lists six rules that must be followed. "Rule 1. You Must Have a Valid

**No-Match Cert. Admin. Record  755**

# Center for Immigration Studies

Social Security Number (SSN). . .You cannot get the EIC if, instead of an SSN, you (or your spouse if filing a joint return) have an individual taxpayer identification number (ITIN). ITINs are issued by the Internal Revenue Service to noncitizens who cannot get an SSN."[6]

It is an unfortunate fact of life that U.S. citizens routinely claim tax deductions and credits to which they are not entitled. It is a cat and mouse game that presumably the IRS wins more often than not. However, there was language in the Inspector General's 1999 report implying that both "revenue protection issues" and "operational problems during the implementation" period resulted in the ITIN being vulnerable to fraud. It is possible that the IRS system was programmed in a way that makes it very difficult to prevent payment of the Earned Income Credit if a resident alien unauthorized to work in the United States claims it.

**IRS shields illegals from INS.** This same audit report said that issuing ITINs to illegal aliens may take on greater significance if the IRS were to come under the scrutiny of Congress. "Illegal alien presence in the United States is a congressional concern which is addressed by legislation in the Welfare Reform Act and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996."[7]

The Inspector General's audit also pointed out that the IRS has a policy of shielding illegal immigrants from exposure to the Immigration and Naturalization Service (INS), which appears to be in contravention of the express wishes of Congress. "The IRS provides disclosure protection to illegal alien applicants. The Congress has clearly stated how the federal government is to communicate between agencies concerning illegal aliens. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 . . . states that information concerning illegal alien status should be provided to the INS notwithstanding any other law." Subsequent exposition revealed that IRS management believed its own regulations guaranteed the confidentiality of tax return information and did not intend to share any returns with the INS.[8]

If that is still the position of the IRS, it is even more untenable today. The USA Patriot Act of 2001, passed overwhelmingly by Congress in response to the terrorist attacks on America, explicitly calls for greater information sharing among government agencies, law enforcement and the intelligence community.[9]

It is not clear if the IRS regulations regarding confidentiality relate specifically to divulging tax information, such as income, number of dependents, etc.,

or if they also forbid the IRS from sharing even the taxpayer's name and identification number with another government agency.

It also is unclear if copies (redacted or not) of the Inspector General's 1999 report were shared with Congressional committees responsible for oversight of the IRS. The report was addressed to the IRS Commissioner and noted that copies also were being sent to IRS managers affected by the report's recommendations. This distribution approach differs from that followed by the Inspector General for the Social Security Administration, who also addresses his reports to the Commissioner while simultaneously distributing copies to a long list of members of Congress whose committees presumably have oversight over SSA.

**IRS ignores fraudulent use of SSNs.** Illegal aliens have been warned by advocates not to use the ITIN when applying for employment, as it would expose their illegal status. All publications from both the IRS and the SSA say that an individual can have either an ITIN or an SSN, but not both. But since employees suffer no penalty for using fraudulent SSNs, they continue to do so. Similarly, since employers benefiting from cheap labor also suffer no penalty, they continue to hire illegal aliens without checking the validity of their SSNs. Once someone is hired, employers begin to withhold taxes.

It is believed that far more ITINs have been issued than annual tax returns filed and that illegal residents who file returns do so to claim refunds. If so, presumably they use the ITIN provided by the IRS as their identifier on the 1040 Form, attaching the W-2 form provided by their employer. The catch is that their fraudulently obtained SSNs appear on the W-2 forms. Illegal aliens can obtain a SSN in a variety of ways. They can make up a number, steal or borrow someone else's, buy a counterfeit Social Security card, or obtain a valid Social Security card fraudulently.[10] What is abundantly clear is that they are not entitled to it.

Knowing that the ITIN would not be necessary if the SSN were legitimate, apparently the IRS has been processing the returns anyway — ignoring this clear violation of its own rules. It could not be determined if there is a penalty attached to using both numbers simultaneously or if the IRS notifies the SSA about the possibility of a fraudulently obtained SSN. If the IRS does not do so, it would appear that the agency is undermining the integrity of Social Security numbers and U.S. immigration law and could be endangering homeland security.

3

## Center for Immigration Studies

## "For tax purposes only"?

One of three bullet points in the "Before you begin" section on the W-7 form to apply for an ITIN is the following message: "This number is for tax purposes only." That seems fairly straightforward. Yet, it is clear that advocates for illegal immigrants are aggressively pushing use of the ITIN as identification for many other purposes. The website of the National Employment Law Project (NELP), contains a section titled "How Can the ITIN be Used to Show Identity?": "There has been growing interest among immigrants and their advocates in using the ITIN as an alternative to the SSN. Indeed, many immigrant groups are successfully advocating for the use of identity documents other than a SSN in order to obtain drivers' licenses and consumer benefits." NELP goes into extensive detail explaining how illegal immigrants can get around using Social Security numbers.[11]

Numerous newspaper articles describe how the ITIN is being used to open banking accounts and, in some states, obtain driver's licenses.[12, 13, 14]

The most astonishing example is a news release from Fifth Third Bank, headquartered in Ohio. Announcing an initiative to better serve the unique needs of the Hispanic community, Bradlee F. Stamper, President and Chief Executive Officer proudly boasts: "Our first step — and it's a crucial one — is to start accepting new means of ID for persons otherwise shut out of the U.S. banking system. Starting now, Fifth Third will honor the Matricula Consular Card issued by the Government of Mexico and the Internal Revenue Service's Taxpayer Identification Number as legal identification for immigrants who lack proper identification to open savings and checking accounts."[15]

Matricula consular. Most media stories link the ITIN to the burgeoning use of the matricula consular, a photo ID being issued by the Mexican government to its citizens living illegally in the United States. The Mexican government has been lobbying state and local governments as well as banks to accept the matricula as official identification. But banks need an official U.S. tax number in order to open an interest-bearing account and, by implication, illegal aliens are not legally entitled to a Social Security number. So the Mexican government is pushing the ITIN as an acceptable alternative and, apparently, the IRS has raised no objection.

Other than noting on its own publications that the ITIN is "for tax purposes only", the IRS seemingly has made no effort to contact banks or their regulators

or state motor vehicle departments to let them know that the ITIN is not being authenticated in a way that makes it safe as identification. This omission endangers homeland security.

## No Risk for Illegals

Media stories and immigrant advocates contend that the IRS has embarked on an aggressive marketing effort to achieve widespread distribution of the ITIN within illegal immigrant communities.[16]

The *Chicago Tribune* reported on April 15, 2002, that the "IRS issued more than one million tax IDs last year, up 20 percent from 2000. The agency has issued 4.9 million IDs since it adopted the policy in 1996. [NOTE: As of October 2002, the IRS had issued over 5.5 million ITINs.] Officials presume that most have been issued to illegal aliens, although other people use the IDs as well, such as foreign businessmen working in the United States on short-term projects or foreign relatives still awaiting Social Security numbers. . . .This year, the Chicago IRS office and volunteers have issued thousands of ID numbers through workshops and office visits. Almost 300 immigrants, mainly from Mexico but also from the Middle East and Eastern Europe, pack a typical workshop. The agency is also increasing the number of tax preparers and banks authorized to process ID applications."[17]

Departure from traditional role. This activism seems a strange departure from the IRS's traditional passive role of receiver and processor of income tax returns. It is one thing for the IRS to interpret its regulations in a way that results in issuing ITINs to illegal aliens. But it is quite another matter to seek them out and cater to them, thereby making a mockery of U.S. immigration laws. It raises the question as to who authorized this policy and at what level it was approved.

The IRS has designated "acceptance agents" who are authorized to assist applicants in obtaining ITINs. IRS's website describes acceptance agencies as entities, such as colleges, financial institutions, accounting firms, etc. The "etc." is important because it is believed that some acceptance agents are touting the fact that the IRS will not share information with the INS.

This development was anticipated in the 1999 Inspector General's ITIN audit report, which recommended that: "The IRS needs to include Privacy Act notification on the Form W-7 application form. The Privacy Act notification provides the warning that information can be provided to the Department of Jus-

**No-Match Cert. Admin. Record  757**

# Center for Immigration Studies

tice within the parameters set by IRC 6103." IRS's management response to this recommendation was clear cut and affirmative. "A Privacy Act Notice will be added to Form W-7."[18] The estimated implementation date was August 31, 1999. As of September 2002, there was no Privacy Act notice on Form W-7.

The *Chicago Tribune* reported: "Despite growth in the tax IDs, experts say many immigrants will get the IDs only after assurances that immigration authorities will not be involved. . . . 'They think they will get deported,' said Salvador Gonzalez, director of the Midwest Tax Clinic, a Chicago non-profit agency that helps immigrants obtain the IDs. 'But now people are losing their fear, and I am very, very happy about this.'"[19]

Groups that advise advocacy organizations on legal issues also convey the same message, although more carefully couched. In a paragraph titled "What are the risks in applying for and using the ITIN?" the National Employment Law Project gives the following advice: "It is not in the IRS's tax collection interest to disclose information to the INS. Thus far, advocates have not learned of any specific situations where the IRS has shared information with the INS. However, there is no guarantee that IRS or a state agency would not share this information with the INS."[20]

## Delegating Authority to Third Parties

The Inspector General's report also warned that the IRS had put itself into a bind by permitting acceptance agents to function in a dual role, acting on the IRS's behalf as well as the illegal immigrant's. It said that the implementation of the acceptance agents program had gone beyond its regulatory purpose and their role in facilitating the ITIN application process should be re-examined.[21] The current IRS application procedures for becoming an acceptance agent indicate there are two categories — acceptance agents and certifying acceptance agents.

The regulations say: "The role of an acceptance agent is to facilitate the application process and issuance of TINs to alien individuals and foreign persons. An acceptance agent performs this duty by forwarding the completed Form W-7 (together with required documentary evidence) to the IRS."[22]

This contrasts with the significant authority delegated to a "certifying acceptance agent." "A certifying acceptance agent is a person that is authorized under the agreement with the IRS to submit a Form W-7 to the IRS on behalf of an applicant, without having to furnish supporting documentary evidence. In-

stead, when submitting a Form W-7 to the IRS, a certifying acceptance agent certifies to the IRS that it has reviewed the appropriate documentation evidencing the ITIN applicant's identity and alien status, and that it is maintaining a record of such documentation."[23] This situation seems somewhat akin to our embassy in Saudi Arabia delegating responsibility for visa interviews and document review to local travel agencies — a much-decried practice that has since been discontinued.

**Higher stakes.** Since the events of 9/11, the Social Security Administration has limited the purposes for which it will issue an SSN and has built more safeguards into authenticating the documents presented to obtain one. Over at the IRS, however, very little public information exists as to how carefully the agency or its acceptance agents authenticate the documents presented to obtain an ITIN. Perhaps they do not feel it is necessary to do so, because the IRS knowingly gives them to illegal aliens.

But the attacks of September 11th, coupled with evidence that Taxpayer Identification Numbers are being used as IDs to obtain driver's licenses and open bank accounts, raise the stakes considerably. Issues relating to benefit fraud pale beside those surrounding homeland security. It is not known if ITINs are easily available to citizens of countries that harbor terrorists or to resident aliens appearing on the FBI's criminal database or to the more than 300,000 aliens who absconded after being served with deportation notices.

Other agencies that provide ID documents, specifically the INS and SSA, have been operating in the glare of Congressional hearings to assure those documents are available only to citizens and legal aliens. It is difficult to understand why the IRS, the only agency that is knowingly offering an official government ID to illegal aliens, has escaped scrutiny.

## Amnesty for Illegals Who "Pay Taxes"?

Advocates contend that illegal immigrants work hard in jobs Americans will not take, pay taxes, contribute to society, and thus should be able to earn their way to legal status. This concept, euphemistically called "earned regularization," would create opportunities for illegal aliens to receive lawful permanent resident status by earning "credits" in a number of ways, including by paying taxes.

The withholding of taxes is involuntary. Federal, state, and local income taxes and Social Security

**No-Match Cert. Admin. Record  758**

taxes are withheld from paychecks by employers. Workers have no say in the matter. But taxes withheld are not necessarily taxes paid. The United States has a progressive income tax that applies very low tax rates to low-income households. In fact, millions of households pay no federal tax at all. It is believed that the vast majority of illegal residents who file a tax return using an ITIN get full or partial tax refunds because of the low level of their earnings. Indeed, some erroneously receive the Earned Income Credit, intended to supplement the income of the working poor. Thus, ironically, by issuing ITINs the IRS may actually be *reducing* the tax revenue received from illegal aliens.

Providing an amnesty of some sort to illegal aliens is opposed by a majority of Americans.[24] There has been little support to do so in the current session of Congress. However, the concept is still being pushed by illegal immigrant advocates, by the Mexican government, and by elected officials eager for political support from the large Hispanic community living in the United States.

The principal argument these advocates make on behalf of an amnesty is that illegal aliens pay taxes. It is true that taxes are withheld for many illegal aliens, but it is involuntary. Census data show that a high percentage of Hispanics earn very low wages. If illegal aliens were to be "regularized" and authorized to work in the United States, it is highly likely that they would pay little or no income tax. The IRS has important data relating to how many illegal aliens have been issued ITINs, how many have filed tax returns, and the net amount of tax that was paid after exemptions, credits, and refunds. This aggregated information needs to be made available to the public, so that if Congress ever debates the merits of another amnesty for illegal aliens, it can do so based on facts, not platitudes.

## IRS Blind to Risks

It appears that in 1996 the IRS decided to treat illegals as "resident aliens" based on their "substantial presence" in the U.S. That decision made illegal aliens eligible for ITINs. Presumably the IRS's goal was to maximize tax revenues, and it assumed — mistakenly — that the ITIN would be used for tax purposes only. Due to start-up operational problems and subsequent poor administration of the ITIN program, the IRS sustained self-inflicted wounds related to benefit fraud. But, inexplicably, the IRS seems not to have altered its ITIN policies in any meaningful way.

There are many ITIN-related problems that need to be addressed by IRS management and by the Congressional committees with oversight of tax and immigration matters. By far the most urgent issue relates to homeland security. It could be fixed overnight. It is essential that the use of ITINs be strictly limited to tax purposes only. The IRS, or perhaps the Treasury Department of which it is a part, should immediately issue a directive to that effect and widely disseminate it to other federal agencies, state and local governments and their associations, the American Association of Motor Vehicle Administrators, financial institutions' regulators and trade associations, and any other entities that are known to be accepting the ITIN as a form of identification.

September 11 taught us just how important it is to be able to distinguish American citizens and legal foreign residents and visitors from those who have no legal right to be in our country. No security measure is foolproof, but safer is safer. The American people have a right to expect that their government is systematically shutting down any impediments that threaten the integrity of our identity documents.

## End Notes

[1] Office of the Inspector General, Social Security Administration. "Recent Efforts to Reduce the Size and Growth of the Social Security Administration's Earnings Suspense File," p. 2. May 2002. http://www.ssa.gov/oig/ADOBEPDF/A-03-01-30035.pdf

[2] AILA Backgrounder on Social Security and Immigration. "Posted on AILA InfoNet at Document No. 38IP2004 (August 9, 2002)." http://www.aila.org contentViewer.aspx?bc=9,722,723,1480&st=38IP2004.

[3] "Recent Efforts to Reduce the Size and Growth of the Social Security Administration's Earnings Suspense File," op. cit., p. 7.

[4] Office of the Inspector General for Tax Administration. "The Internal Revenue Service's Individual Taxpayer Identification Number Program Was Not Implemented in Accordance with Internal Revenue Code Regulations," Executive Summary. September 1999. http://www.ustreas.gov/tigta/reports/094505fr.html

[5] Form W-7. Department of the Treasury, Internal Rev-

6

enue Service. "Application for IRS Individual Taxpayer Identification Number." http://www.irs.gov/pub/irs-pdf/fw7.pdf

[6] http://www.irs.gov/formspubs/page0,,id%3D12460,00.html

[7] "The Internal Revenue Service's Individual Taxpayer Identification Number Program Was Not Implemented in Accordance with Internal Revenue Code Regulations," op. cit.

[8] Ibid., p. 4.

[9] Jenks, Rosemary. "The USA Patriot Act of 2001: A Summary of the Anti-Terrorism Law's Immigration Related Provisions," CIS Backgrounder, December 2001. http://www.cis.org/articles/2001/back1501.html

[10] Dinerstein, Marti. "America's Identity Crisis: Document Fraud is Pervasive and Pernicious," CIS Backgrounder, April 2002. http://www.cis.org/articles/2002/back302.html

[11] "Immigrants and the Individual Tax Identification Number (ITIN): How Can the ITIN be Used to Show Identity?" p. 1. National Employment Law Project and National Immigration Law Center, revised May 2002. http://www.nelp.org/pub79.pdf

[12] Avila, Oscar. "Tax ID numbers open door wider for illegal immigrants," Chicago Tribune, April 15, 2002.

[13] Brewington, Kelly. "Banks' New Services Target Mexican Customers," The Sun Sentinel, July 8, 2002.

[14] Ingram, Carl. "Davis: Let immigrants drive. Policy: He supports licenses for work related travel while also safeguarding public security," Los Angeles Times, March 28, 2002.

[15] http://www.53.com/news/archive_2002.htm#040202b

[16] http://www.ilw.com/lawyers/immigdaily/letters/2002,0709-Dean.shtm

[17] "Tax ID numbers open door wider for illegal immigrants", op. cit.

[18] "The Internal Revenue Service's Individual Taxpayer Identification Number Program Was Not Implemented in Accordance with Internal Revenue Code Regulations," op. cit., p. 39.

[19] "Tax ID numbers open door wider for illegal immigrants," op. cit.

[20] "Immigrants and the Individual Tax Identification Number (ITIN): How Can the ITIN be Used to Show Identity?", op. cit., p. 3.

[21] "The Internal Revenue Service's Individual Taxpayer Identification Number Program Was Not Implemented in Accordance with Internal Revenue Code Regulations," op. cit., pp. 3, 10-12.

[22] Revenue Procedure 96-52, sec. 4.01. http://www.unclefed.com/Tax-Bulls/1996/RP96-52.PDF

[23] Revenue Procedure 96-52, op. cit.

[24] "Attitudes Toward Amnesty: Zogby Poll Examines Support Among Different Constituencies." Center for Immigration Studies Backgrounder, September 4, 2001. http://www.cis.org/articles/2001/back1201.html. See also: Saad, Lydia. "Americans Clearly Oppose Amnesty for Illegal Mexican Immigrants." Gallup News Service, Poll Analyses, September 6, 2001; and, "New Poll Finds That a Majority of Americans Oppose Illegal Amnesty and Favor Immigration Enforcement." Federation for American Immigration Reform, August 30, 2001. http://www.fairus.org/html/07469108.htm

Backgrounders are intended to spur public debate and promote the development of better policy. The views expressed are not necessarily those of the Center for Immigration Studies or its funders. They are available on line free of charge at http://www.cis.org

**No-Match Cert. Admin. Record  760**

# Backgrounder

## Giving Cover to Illegal Aliens
### IRS Tax ID Numbers Subvert Immigration Law

By Marti Dinerstein

Through its issuance of Individual Tax Identification Numbers (ITINs), the Internal Revenue Service (IRS) appears to be blind or indifferent to the reality that it has:

- created an official U.S. tax number that illegal aliens are using as identification, thereby making it easier for them to meld unnoticed into our society;

- endangered homeland security by issuing ITINs to illegal aliens, without adequately insuring that they are denied to terrorists, criminals on the FBI database and those under deportation notices;

- exceeded its traditional role as a tax receiver and processor by marketing the ITIN to illegal immigrant communities;

- failed to provide adequate safeguards to prevent illegal aliens from receiving tax benefits to which they are not entitled;

- subverted U.S. immigration laws by withholding information from the INS and SSA about fraudulent activity of illegal aliens;

- provided an ID vehicle that advocates hope will be used to "regularize" illegal aliens; and

- withheld from public review data that is relevant to determining the economic contribution of illegal aliens to U.S. society.

12-02

www.cis.org
center@cis.org
(202) 466-8185
Washington, DC 20005-1202
1522 K Street NW, Suite 820
Center for Immigration Studies



NON-PROFIT
U.S. POSTAGE
PAID
PERMIT #6117
WASHINGTON, DC

**No-Match Cert. Admin. Record 761**



2003 WL 1560595                                                                                  Page 1
2003 WL 1560595 (Immigr. Bus. News & Comment)
**(Cite as: 2003 WL 1560595 (Immigr. Bus. News & Comment))**

Immigration Business News and Comment
**\*1** April 1, 2003

**The News**
**Urgent Issues**

REVISIONS TO SSA "NO-MATCH" LETTER PROGRAM AND IMPACT ON EMPLOYERS

Austin T. Fragomen, Jr.
Steven C. Bell

Copyright © 2003 West Group

The Social Security Administration (SSA) has announced important changes to its "no-match" letter program. The agency uses a "no-match" letter to notify employers that some percentage of its work force does not have matching names and social security numbers. A record number of employers received such **letters** in 2002 as a result of the SSA's decision to expand the program by notifying all employers with at least one **mismatch.** While the expanded program led to much confusion and ill-considered terminations, the program did not achieve its primary goal as very few employers submitted corrected information to the agency. Accordingly, the agency has decided to revise its policies regarding the parameters for selecting employers in order to reduce the number of no-match letters issued. Other revisions to the program are designed to minimize the number of hasty terminations based on misinterpretations of the law and increase the number of responses with corrected information. This article discusses in detail the 2003 changes to the SSA no-match letter program and the impact of the changes on an employer's obligations to engage in follow-up activity under current immigration law and other federal law. Suggested strategies for employers that have received these no-match letters are also discussed.

**The SSA "no-match" letter program and the 2003 changes.** The SSA generates no-match letters when they receive social security information for an employee that does not match the agency's records. If a name or a social security number (SSN) on a W-2 form does not match the agency records, the social security earnings are retained in a suspense file while the SSA seeks to resolve the discrepancies. In recent years, such discrepancies have arisen with regard to 6-7 million workers annually and $280 billion have been deposited in the earnings suspense file. The agency's "no-match letter" program is designed to help reduce the earning suspense file. In recent years, the agency has expanded the program in an effort to clean up its SSN database in preparation for an internet-based SSN verification system that will be available to all employers in the United States.

The typical SSA no-match letter, titled "Employer Correction Request," generally explains that discrepancies exist between the SSA's database and employee information provided by the employer on the W-2 form, and requests that employers respond to the letter with corrections "within 60 days." A list of mismatched social security numbers (SSNs) is typically attached to the letter, along with information on making corrections.

Until recently, the SSA sent no-match letters only to employers who had discrepancies affecting 11 or more employees, or at least 10 percent of the employer's workforce. That policy resulted in about 40,000 no-match letters

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 1560595                                                                                           Page 2
2003 WL 1560595 (Immigr. Bus. News & Comment)
**(Cite as: 2003 WL 1560595 (Immigr. Bus. News & Comment))**

sent annually to employers. Under a policy planned in 2000 but implemented in 2002, no-match **letters** were sent to any employer with at least one employee **mismatch.** The result was that more than 900,000 no-match letters were sent in 2002; in other word, about one in eight employers in the country received a no-match letter. The letters covered approximately 7 million workers. This development was reported in 2002 IBNC-DAILY 73 (August 6, 2002). The expanded program and the absence of widely disseminated guidance from the INS caused confusion among employers regarding their obligations pursuant to the letter and, in many cases, had given rise to hasty and ill-considered termination of employees. The latest reports indicate that thousands of workers lost employment due to the effects of the expanded no-match letter program.

*2 The SSA is implementing changes to the no-match letter program that should lead to a substantial reduction in the number of no-match letters issued by the agency. Under the revised SSA policy, no-match letters will be sent only to those employers with more than 10 employees with mismatched information or for whom mismatched employees represented 1/2 of 1 percent of the W-2 forms filed by that employer with the SSA. The agency has stated that it expects to issue only about 130,000 no-match letters in 2003, or about 770,000 less than in 2002. The SSA explains that it is restructuring the method for calculating which employers should receive a no-match letter because few employers submitted corrected information to the SSA, and much of the information received still did not match the agency's database information.

Apart from changing the parameters as to which employers will be notified, the agency also announced that it will now issue a no-match letter to each no-match employee. Such letters will be sent about two to three weeks before issuing the no-match letter to the employer. If the agency does not have a valid address listed for a particular employee, it will mail the letter directly to the employer. Keep in mind that even if an employee corrects his or her SSN information in response to an SSA letter, employers will still receive a no-match letter listing that employee. The issuance of an employer no-match letter in these cases is not a statement on the validity of the information supplied by the employee. Instead, it is a function of the automated process of production of the employer no-match letters. As a result, the employer should first inquire of the employee as to whether he or she has already forwarded corrected information to the SSA in response to a no-match letter (see discussion below).

There are also several changes to the content of the no-match letter. Most notably, the SSA has removed a reference contained in the 2002 letter to a possible Internal Revenue Service (IRS) penalty for failure to supply accurate SSN information. The letter also states that the discrepancy does not constitute notice that an employee lacks a lawful immigration status. As in past years, the letter cautions employers against taking adverse actions against employees based solely on the no-match, and that taking such actions may violate state and federal law.

**Duty to inquire and document abuse: the gray area in "no-match" cases and** impact of 2003 changes. **Current regulations provide that an employer may be** penalized for hiring or continuing to employ an unauthorized worker if it has actual or "constructive" knowledge that an employee lacks work authorization. If a fact or condition raises a reasonable inference during the course of employment that a particular worker is unauthorized to work in the United States, an employer has a duty to investigate further. Failure to do so will render the employer liable for "hiring" violations under IRCA if it later turns out that the worker is in fact undocumented. On the other hand, the Office of Special Counsel (OSC), the Justice Department unit charged with enforcing IRCA's anti-discrimination provisions, has stated that an employer that inquires further into an employee's work authorization status may be engaging in document abuse if the circumstances do not raise a reasonable inference that an employee may be unauthorized. The most serious difficulties for employers arise in a number of gray areas in which a duty to inquire might be present under INS policies, but exercising that duty may lead to an actionable discrimination case. The employer must act with great caution to avoid potential fines and other penalties.

*3 One of these gray areas includes situations in which an employer receives an SSA no-match letter. As noted, the SSA letter cautions that the receipt of a no-match letter by itself does not provide a basis for taking adverse action against an employee, nor is it conclusive evidence that the individual is not eligible to work in the United States. The SSA has also stated that it does not independently notify the INS where employee social security information is inconsistent with SSA records. Guidance from the INS and the OSC also confirm that an employer should not deduce from such a letter that the employee is unauthorized to work.

On the other hand, the INS has suggested that an employer has an affirmative obligation to re-verify an employee's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

work authorization status when an employer's attempts at resolving the discrepancies raised in a no-match letter have failed. Failure to conduct reverification in these situations may lead to a finding of constructive knowledge that an employee lacked work authorization. The OSC has also stated that reverification when the discrepancies raised in the no-match letters cannot be resolved would not constitute document abuse.

The revisions to the program in 2003 do not substantially change the employer's obligations under **employer sanctions** law. Clearly, the SSA lacks authority to make any representations as to an employer's liabilities under federal immigration law, an area of law that is now within the jurisdiction of the new Homeland Security Agency (HSA). Within the HSA, the Bureau of Immigration and Customs Enforcement (BICE), an INS successor agency, is charged with enforcing **employer sanctions** law. While the prior INS opinions addressing an employer's legal obligations under immigration law are not binding on the new agency, it will certainly be used as a starting point by the new bureau. Moreover, with the emphasis on enforcement in the post-September 11th environment, it is unlikely that the new bureau will adopt more lenient policies than its predecessor with regard to the no-match letters. Until the new bureau issues its own guidance, therefore, the employer should adopt policies that conform to the latest INS pronouncements on the issue.

Furthermore, while references to IRS fines have been removed, the revised letter does not change the SSA's obligation under current law to provide the IRS with information on no-match W-2 forms nor does the amended letter prevent the IRS from issuing penalties when the name and SSN fail to match SSA records. The IRS is authorized by regulation to fine employers $50 for each incorrectly reported SSN and is planning to begin enforcing the regulation after it develops a program for imposing penalties. The IRS has previously indicated that it is considering fining employers for infractions that take place in 2002 and issuing the fines as early as 2004. The most current reports indicate that the agency is considering delaying penalties for an additional year, however. Until the new program is implemented, employers are still subject to current IRS rules that impose penalties for incorrect information submitted to the agency. The IRS will not fine an employer for incorrect information on the W-2 forms if they are based on a duly executed W-4 form and the employer has shown due diligence in trying to obtain the correct information. The failure to undertake follow-up activity when a no-match letter is received will bar an employer from raising the "due diligence" defense.

*4 In short, while the revised SSA policies should lead to fewer "no-match" letters being issued, the policies do not affect an employer's obligations under current **employer sanctions** law, anti-discrimination law, IRS regulations, or other federal or state law. Furthermore, it is unclear whether the number of employees referenced in the letters will drop significantly from the seven million mark covered by the 2002 letters. In fact, some experts argue that drop will be insignificant because the employers that receive no-match letters in 2003 will have the vast majority of discrepancies.

**Responding to no-match letter: a suggested strategy.** A suggested strategy for employers that have received these no-match letters follows. The strategy is based on SSA, INS, and OSC opinions addressing an employer's legal obligations under the INA and other federal law.

Step 1. Review information in **mismatch letter** to determine whether any of the social security numbers at issue are invalid. As noted, the INS has stated that, as a general matter, a no-match letter from the SSA does not, in and of itself, place an employer on notice that an employee is ineligible to work, or require the employer to conduct reverification of documents. The INS reasoned that there may be many legitimate reasons for a discrepancy between the name and SSN reported by the employee on the W-2 and SSA records. The discrepancies raised in a no-match letter, for example, may stem from typographical errors, changed names, or the use of compound last names. The agency cautioned, however, that there may be specific situations in which the no-match letter may lead to a duty to re-verify. The no-match letter informs an employer that the following numbers are invalid social security numbers: (1) numbers with more or less than nine digits, (2) numbers whose first three digits are 000 or are in the 800 or 900 series, (3) numbers whose middle two digits are 00, and (4) numbers whose last four digits are 0000. If any of the SSNs listed in the no-match letter involves such a number, the letter itself serves as notice to the employer that the employee has provided an invalid SSN. Accordingly, the employer must re-verify the employee's work eligibility in these situations. The failure to conduct re-verification in these circumstances could lead to a finding that the employer knowingly continued to employ an alien who lacked work authorization (if in fact the employee is undocumented).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 1560595                                                                          Page 4
2003 WL 1560595 (Immigr. Bus. News & Comment)
**(Cite as: 2003 WL 1560595 (Immigr. Bus. News & Comment))**

Step 2. Formulate and execute company policy regarding follow-up activity in all other cases. While immigration law does not require follow-up activity and the SSA lacks enforcement authority, the IRS may penalize employers for incorrect W-2s and the failure to conduct follow-up activity will bar an employer from raising the defense of due diligence. The SSA has no independent enforcement authority to address no-match issues. In addition, the INS has stated that immigration law does not require follow-up activity when a no-match letter is received unless the discrepancies raised in the letter relate to invalid SSNs as described above. Moreover, the SSA does not share mismatch information with the INS. In fact, the only information that the SSA shares with the INS is information relevant to investigations between the two agencies of such issues as fraudulent SSNs and information on earnings reported for SSNs assigned for non-work purposes (the SSA is required by law to share this information for annual review purposes). As noted, however, the SSA is required by law to provide the IRS with information on no-match W-2 forms and the IRS may penalize an employer when the name and SSN do not match SSA records (as discussed above). In addition, the failure to undertake follow-up activity when a no-match letter is received will bar an employer from raising the "due diligence" defense. An employer, therefore, must conduct some follow-up activity in these cases.

*5 The employer's policy with regard to no-match letters should be applied in a uniform manner to avoid allegations of discrimination. The employer should first attempt to reconcile its own records with those of the SSA by determining whether an internal administrative error or typo could have resulted in transmitting erroneous information to the agency. The employer may also contact the employee and request verification of their SSN for purposes of correcting the discrepancy. Information regarding alternative name spellings or name changes should also be solicited from the employee. As noted, an SSA no-match letter should have been sent to the employee and he or she may already taken action to correct the discrepancy.

NOTE: The SSA has begun a social security number verification system (SSNVS) to permit employers to electronically verify employee Social Security information; the program was the subject of a proposed rule and is currently in a test phase among a small number of volunteer employers. See 2002 IBNC-DAILY 74 (August 7, 2002). Once the SSNVS is fully operational, employers will be able to verify an employee's SSN via the internet. It is unlikely that the IRS will require employers to use the system, but it will be considered in determining whether the employer has exercised due diligence. Employers should guard against using the SSNVS database selectively. If the employer adopts a policy of using the SSNVS in response to no-match letters, the policy must be applied in a non-discriminatory manner.

Step 3. Make appropriate corrections to I-9 forms when follow-up activity reveals employee information was recorded erroneously or discrepancy relates to a legitimate name change. If the employer's follow-up activity reveals that the information was recorded erroneously or relates to a name change, the discrepancy should be corrected with the SSA, and the employee's Form I-9 should be updated as well. Specifically, the employee should be asked to cross out the incorrect SSN in Section 1 of the Form, enter the correct number, and initial and date the correction. If the employee previously provided a Social Security Card as a "List C" document during the initial verification process, the employer may again request the original card for review. The employer should then cross out the previous number in Section 2, enter the correct number listed in the card, and initial and date that correction. The employer should also complete and file IRS Form W-2C to re-assign previous income to the appropriate SSN. If the discrepancy relates to the employee's name, the employee should be asked to cross out the name listed in Section 1, enter the correct name, and initial and date the correction.

Step 4. Apply company policy when follow-up activity reveals fraud is involved. If, in the course of the employer's follow-up activity, the employee in question reveals that he or she previously provided a false number to secure employment, but since that time has become work authorized and can now provide a valid number, the employer should confer with their internal or external employment counsel regarding the company policy covering such a situation. Some companies have a policy to terminate any employee who admits to making any material misrepresentation during the hiring process. Other companies take a more liberal approach, allowing the employee to continue working, as he or she is now employment authorized. This is an acceptable policy, as long as the employer can demonstrate that it had no actual or constructive knowledge of the employee's unlawful status at the initial time of hire. If an employer determines that an employee has fraudulently executed Form I-9 but allows the employee to continue working, the employer should not rely on that form as a verification of employment eligibility,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**No-Match Cert. Admin. Record  765**

and should require that the employee complete a new Form I-9 (but retain the original form as evidence of compliance with the verification requirements at the time of hire). Remember that the employer should apply its policy in a nondiscriminatory manner.

 *6 The INS cautions that changes to name or SSN information recorded on the I-9 form do not necessarily mean that fraud is involved. As noted, name changes occur for a variety of reasons and the name may have been recorded incorrectly. Similarly, SSNs may be recorded erroneously on forms. On the other hand, SSNs assigned to individuals do not change, and, therefore, a claimed change of SSN is a situation that raises a red flag. Nonetheless, all such situations must be reviewed using common sense. A change to a SSN that merely corrects a transcription error (e.g., recording one or two digits erroneously) would be an unlikely indicator of fraud, but if an employee reports an entirely different SSN than the one he or she previously has used, fraud is likely involved. In these cases, the employer must inquire further as to the basis for issuance of the new SSN. Similarly, receipt of information showing that an employee has been working under a completely different name than his or her actual name reasonably raises questions about an employee's identity that are not raised by other legitimate corrections such as a change of a last name due to marriage, correction of a middle initial, reconciliation of an incorrectly or differently recorded ethnic name, etc. Again, the employer must inquire further as to the basis for the name change.

 Step 5. Conduct reverification when discrepancies cannot be resolved after follow-up activity. The INS has stated that an employer cannot ignore the consequences of any follow-up activity undertaken by the employer to resolve the discrepancies raised by an SSA no-match letter. If an employee provided a SSN that the SSA has identified as a mismatch, and such employee is unable to provide clarification or confirmation of the validity of the SSN within a reasonable period of time, this may give rise to an inference that the employee is not work authorized. In such circumstances, further review of the employee's employment eligibility is warranted and the employer may take appropriate steps (including termination of employment) if adequate documentation cannot be presented or the employee reveals that he or she is unauthorized for employment. Remember that any investigation into an employee's status in this regard must be conducted in a consistent, non-discriminatory manner.

 2003 WL 1560595 (Immigr. Bus. News & Comment)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



5 SCHOLAR 355
5 SCHOLAR 355
(Cite as: 5 SCHOLAR 355)

Page 1

**c**

Scholar: St. Mary's Law Review on Minority Issues
Spring 2003

**Comments**

**\*355** FIRE FIRST AND ASK QUESTIONS LATER: WHAT IS THE EFFECT OF THE SOCIAL
SECURITY ADMINISTRATION'S "MISMATCH LETTERS?"

Paul R. Penny, III [FNd1]

Copyright © 2003 The Scholar: St. Mary's Law Review on Minority Issues; Paul

R. Penny, III

I.      Introduction ............................................... 356

        A. Roadmap .......................................... 356

        B. The Problem ...................................... 356

II.     General Immigration Information .......................... 358

III.    A Brief History of Mismatch Letters ..................... 361

        A. Annual Wage Information .............................. 362

        B. Suspense Accounts ................................... 363

        C. The Mismatch Letter ................................. 363

        D. Policy Change ...................................... 364

IV.     Decisions, Decisions ...................................... 365

        A. Damned if You Do, Damned if You Don't ................ 365

        B. No Reprieve for the Unauthorized ................... 367

V.      Summary of the Immigration Reform and Control Act of 1986 .... 368

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A. The Purpose of IRCA ...................................... 368

B. Prohibitions ........................................... 369

C. The Verification Process ............................... 369

D. The Good Faith Defense: Merely a Rebuttable Presumption .. 370

E. Enforcement Powers .................................... 370

F. Violations ........................................... 372

G. "Good Faith" ......................................... 374

VI.    The Freedom of Information Act .......................... 376

A. The Statute .......................................... 376

B. The Decisions ........................................ 376

C. Why Social Security Numbers are Protected .............. 377

D. An Alternative for Employers ......................... 377

VII.   Course of Conduct When in Receipt of a Mismatch Letter ....... 378

A. Martin Letter ........................................ 378

B. Virtue Letter ........................................ 379

VIII.  Statutory Reform ..................................... 380

A. At the Time of Hire ................................. 380

B. Upon Receipt of a Mismatch Letter ................... 381

IX.    Conclusion .......................................... 382

*356 I. Introduction

A. Roadmap

   The purpose of this comment is to identify the potential for mistreatment of workers belonging to various ethnic groups in the United States workforce due to the recent proliferation of Social Security Administration "mismatch letters." Part II recognizes the ever-expanding number of foreign laborers toiling in the domestic economy. Part III provides an overview of mismatch letters. Part IV illustrates a cumbersome duality that faces employers: on one hand, employers are forbidden from employing undocumented workers, while, on the other hand, employers must not utilize discriminatory hiring practices. In Part V, the comprehensive federal immigration and employment statute, the Immigration Reform and Control Act of 1986 is examined. Part VI addresses the Freedom of Information Act ("FOIA") as a potential means for employers to determine the work authorization status of potential hires. Part VII consults professional advice for a course of conduct employers may pursue after receiving a mismatch letter. Lastly, Part VIII advocates legislation that would provide employers with concrete guidance when in receipt of a mismatch letter, thus protecting employees from possible retaliation.

B. The Problem

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5 SCHOLAR 355
**(Cite as: 5 SCHOLAR 355)**

American Hispanic communities are flourishing. According to Census projections, Hispanics will represent approximately 13% of the total United States population in 2003, accounting for some 36 million persons. [FN1] This increase is largely attributed to the influx of Mexican citizens *357 seeking opportunities in the American workplace. [FN2] In its 1997 Report to Congress, the U.S. Commission on Immigration Reform listed the "Top Ten Countries of Origin of Legal Immigrants:"

| | |
|---|---|
| Mexico | 159,731 |
| Philippines | 55,778 |
| India | 44,781 |
| Vietnam | 42,006 |
| Mainland China | 41,662 |
| Dominican Republic | 39,516 |
| Cuba | 26,415 |
| Ukraine | 21,051 |
| Russia | 19,646 |
| Jamaica | 19,029. [FN3] |

Although this information is dated, it illustrates the overwhelming abundance of Mexican immigrants assimilating to the United States. According to the data, there were approximately 185 percent more legal Mexican immigrants than legal Philipino immigrants, the second most numerous ethnic group entering the country. [FN4] This is largely due to wages, hours, and working conditions available from domestic employers which are far superior to those available south of the U.S. border. [FN5] Moreover, logic dictates that the numbers of undocumented immigrants will be even more heavily weighted toward Mexicans. This, primarily, is attributable to the convenience of the 2,000 mile border between northern Mexico and the southwest United States. [FN6]

The increasing population, both United States citizen and immigrant, means that American companies will be employing ever-growing numbers of Hispanic workers. As such, there is potential for distrust. An untrusting employer leads to two possible harms. First, potential hirees may be turned away by employers who are weary of violating the Immigration Reform and Control Act's (IRCA) provisions prohibiting the employment *358 of undocumented workers. This, could have a chilling effect that injures legitimate, law-abiding applicants who might be refused employment based solely on their name or skin color. Second, current employees might face capricious termination simply predicated upon the employer's receipt of a Social Security Administration (SSA) mismatch letter. [FN7]

In the end, will the American workforce see a reluctance to employ Hispanic laborers? Possibly. Will the net result of SSA mismatch letters cause widespread paranoia in human resource departments? Probably. Is it even remotely possible that the mismatch letters will save the floundering Social Security program by driving down operational costs? [FN8] Unlikely.

## II. General Immigration Information

The United States has long been lauded for its liberal immigration policies. [FN9] An idea deeply rooted in American history, the United States is a melting pot of diverse cultures and people. [FN10]

Immigration to the United States has created one of the world's most successful multiethnic nations. We believe these truths constitute the distinctive characteristics of American nationality:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5 SCHOLAR 355                                                                    Page 4
5 SCHOLAR 355
(Cite as: 5 SCHOLAR 355)

• American unity depends upon a widely-held belief in the principles and values embodied in the American Constitution and their fulfillment in practice: equal protection and justice under the law; freedom of speech and religion; and representative government;

• Lawfully admitted newcomers of any ancestral nationality - without regard to race, ethnicity, or religion - truly become Americans when they give allegiance to these principles and values;

**\*359** • Ethnic and religious diversity based on personal freedom is compatible with national unity; and

• The nation is strengthened when those who live in it communicate effectively with each other in English, even as many persons retain or acquire the ability to communicate in other languages.

As long as we live by these principles and help newcomers to learn and practice them, we will continue to be a nation that benefits from substantial but well-regulated immigration. We must pay attention to our core values, as we have tried to do in our recommendations throughout this report. Then, we will continue to realize the lofty goal of E Pluribus Unum. [FN11]

-- 1997 Report to Congress

According to the Bureau of the Census, the total population of the United States reached over 290 million in January, 2003. [FN12] The 2000 Census, which reported some 281 million Americans, reflects an increase of 32.7 million people from the prior Census. [FN13] The previous record increase occurred between the 1950 and 1960 decennial censuses, and is referred to as the "baby boom" increase of 28 million. [FN14] Under President Clinton's directive, a government task force determined immigration to account for approximately one-third of the U.S. population growth in 1994. [FN15]

In September 2000, the population of illegal immigrants in the United States was estimated to be as high as twelve million. [FN16] Furthermore, the average rate of illegal population increase is estimated at 275,000 or more, annually. [FN17] Thousands of undocumented aliens cross the border between Mexico and the United States on a daily basis. [FN18]

**\*360** Economic elements create both push and pull factors that draw immigrants, especially Mexican immigrants, into the United States. [FN19] One estimate predicts Hispanics to be the largest minority in the United States, accounting for some 98.2 million persons, or 24% of the population, by the year 2050. [FN20] Logically, the push factors are those which contribute to a person's desire to flee the country of their origin. Push factors might include: impoverished living conditions, high unemployment rates, volatile political regimes, overcrowding, and oppression. [FN21] By contrast, pull factors are perceived characteristics of a country that are appealing to immigrants. Pull factors making the United States workforce seem enticing may consist of the following: higher wages, improved benefits, possibility for education, political stability, and the existence of social service programs. [FN22] As long as economic inequalities exist between the United States and the immigrants' countries of origin, these push and pull effects will continue to flourish, regardless of domestic immigration policies. [FN23]

With the ever-increasing number of legal and illegal immigrants entering the United States on a daily basis, immigration questions are sure to remain in the limelight. It follows logically that these immigrants will seek out employment in order to sustain themselves in a capitalistic society. In fact, employment is considered the central reason that illegal aliens are attracted to the United States. [FN24]

As such, many Americans harbor resentment against migrant workers, adopting the notion that immigrants are usurping "American" jobs. [FN25] When faced with economic downturns, politicians blame illegal immigrants for "stealing" positions in the American workforce. [FN26] Many unemployed workers harbor deep-rooted antipathy against immigrants for occupying the jobs of "real" Americans. [FN27] Immigrant workers have even **\*361** been called pariahs, and labeled as a source of pain for American households. [FN28]

The question then is how will their respective employers handle their arrival? Immigrant workers, especially undocumented workers, are susceptible to discrimination because they are unlikely to report unfair labor practices. [FN29] Such practices might include paying decreased wages to undocumented workers, forcing them to work greater numbers of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

hours, or providing them with sub-standard working conditions. Undocumented workers might not report such unfair labor practices in fear of losing their jobs, or fear of deportation. [FN30] Even more problematic would be a policy whereby an employer terminates employees who are the subjects of mismatch letters, without providing a procedure for re-verification of work authorization. [FN31]

### III. A Brief History of Mismatch Letters

Social Security and welfare programs are common topics in political forums. Discussions often consider the fate of such programs, which naturally includes an inquiry into the financial forecast of Social Security considering the current taxation rates.

Social Security now takes in more in taxes than it pays out in benefits. The excess funds are credited to Social Security's trust funds, which are expected to grow to over $4 trillion before we need to use them to pay benefits. In 2017, we'll begin paying more in benefits than we collect in taxes. By 2041, the trust funds will be exhausted and the payroll taxes collected will be enough to pay only about 73 percent of benefits owed. We'll need to resolve long-range financial issues to make sure Social Security will provide a foundation of protection for future generations as it has done in the past. [FN32]

-- 2002 Social Security Statement

The following sections address policies and protocol for the Social Security Administration. The focus is on the recent decision to decrease the *362 threshold requirement prompting the issuance of mismatch letters. As a result, the number of employers receiving mismatch letters is on the rise. The receipt of a mismatch letter could adversely affect immigrant workers or ethnic employees to a greater extent than Anglo workers.

### A. Annual Wage Information

Every employer must annually submit Copy A of Internal Revenue Service (IRS) Form W-2 (W-2) to report wages earned and taxes withheld for each employee for the previous year. [FN33] Ideally, when the Social Security Administration receives the W-2 data, it automatically updates the wage credits to the respective employee's social security account. [FN34] Often, however, SSA is unable to post the W-2 earnings to any individual account because of inconsistencies between the worker's name, birthdate, or social security number (SSN). [FN35] When SSA is unable to post the W-2 earnings, a suspense account is created, and the reported wage information is held indefinitely pending verification. [FN36]

Legitimate reasons often exist for inaccurate or discrepant W-2 information. [FN37] Common reasons for erroneous filings include name changes (marriage), clerical error/transposed digit (either by employee or employer), or use of a non-Roman name. [FN38] The SSA claims the majority of mistakes are the result of human blunder and typographical errors, including changed or hyphenated last names such as compound, shortened, and women's names. [FN39]

### *363 B. Suspense Accounts

Suspense accounts become problematic for SSA because they are both costly and time consuming. [FN40] In 1999, approximately 216 million W-2s were submitted to SSA by some 6.5 million employers. [FN41] Roughly 88% of the total W-2 forms were submitted accurately. [FN42] SSA, however, is concerned with rectifying the mistakes made by the remaining 12% of employers who submit inaccurate W-2 information. [FN43]

Considering the bleak financial outlook already forecasted for social security programs, the Administration is seeking ways to lower operating costs. [FN44] Curtailing the need for suspense accounts is one way SSA claims costs can be reduced. [FN45] The SSA proposes that properly submitted wage reports cost less than 50 ¢ to post to an individual's earnings record. [FN46] Suspense accounts, however, cost an average of $300 to maintain while discrepancies are reconciled. [FN47] The SSA estimates that 212 million items were posted to suspense accounts between 1937 and 1999, with a total value of approximately $262 billion. [FN48]

### C. The Mismatch Letter

In 1993, the SSA began notifying employers of discrepant filings. [FN49] These letters, sometimes called "mismatch

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

letters" or "Code V letters" (because they contain the label Code V at the top), are considered to be educational correspondence to employers. [FN50] The SSA, then, must contend that by alerting employers of the problem and warning them of penalties the employers would take steps to ensure accuracy, and the SSA would ultimately save money. A very different result, however, is plausible: the employer may elect to terminate the employee without allowing adequate opportunity for the employee to rectify the situation. Such a *364 policy could prove destructive if employees were terminated because their skin color or name created suspicion as to their work authorization. Thus, in terms of social utility, the SSA's mismatch letters could do far more harm than good. If the SSA is able to save a few million dollars at the cost of furthering racially motivated or discriminatory employment practices, then a grave injustice would occur.

The mismatch letters come in a variety of forms, but all generally inform employers that a discrepancy exists and that a suspense account has been created for each employee whose SSN appears on the list provided in the letters. [FN51] While the notification may be necessary, the mismatch letters fall short by failing to provide lucid instructions for employers. The letters warn of potential fines, including possible criminal punishment, for knowledgeable employment of an unauthorized worker. [FN52] At the same time, the letters are also quick to mention the possibility of legal actions against employers, including suits for wrongful termination and discrimination, should the employer abruptly terminate the implicated employee because of the receipt of the mismatch letter. [FN53]

D. Policy Change

Since 1993, the SSA sent mismatch letters only to employers whose annual wage reports included mismatches between submitted information and SSA records for more than 10 % of the total employees reported by that particular employer. [FN54] Recently, the SSA announced a change in its policy for the threshold criteria for issuing mismatch letters. [FN55] Beginning *365 with the 2002 wage reports, the SSA will send mismatch letters to every employer who submits even one W-2 with incorrect information. [FN56] Consequently, while the Social Security Administration mailed roughly 110,000 mismatch letters in 2001, the SSA plans to send over 750,000 letters in 2002. [FN57] Thus, many employers will be receiving their first mismatch letters in the coming months. [FN58] As these employers are likely to be confused by the lack of direction found within the letters, the possibility exists that employees will pay the ultimate price due to unwarranted termination. [FN59]

IV. Decisions, Decisions

A. Damned if You Do, Damned if You Don't

As increasing numbers of employers receive their first Social Security Administration mismatch letters, they will be forced to make a difficult decision: fire or inquire. Either way, severe ramifications can ensue.

On the one hand, under IRCA employers face monetary penalties for the continued employment of undocumented workers. [FN60] If, after reviewing an employee's work authorization, the employer discovers a mistake has been made, the employer faces charges of actual or constructive notice. *366 As such, a renewed inquiry could open the employer to IRCA penalties. On the other hand, wrongful discharge of an authorized employee could yield an onslaught of employment law actions under Title VII or the Fair Labor Standards Act. [FN61] Either way, the employer faces possible repercussions. That being said, which avenue is the employer likely to pursue?

It is all too possible that the employers will elect to terminate the subjects of the mismatch letters instead of opening themselves to penalties. Negative media attention, the added awareness of foreign workers following the September 11 attacks, and the inability of undocumented workers to seek legal recourse are all strong factors which might contribute to a decision to terminate subjects of mismatch letters.

Employers are unlikely to willingly endure the stigma that attaches when the media reports unauthorized employment practices. [FN62] Although employment of unauthorized workers at home receives less media attention due to labor camps abroad ("sweatshops," for instance), companies are regularly burdened by campaigns alleging unfair labor practices. [FN63]

Considering the added attention regarding the status of foreign workers following the September 11 attacks, employers are more likely to take whatever action is necessary to avoid negative media publicity. [FN64] Furthermore, the tragedy of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

September 11 has created extreme tension *367 within both the Department of Justice and the Immigration and Naturalization Service (INS) concerning the procurement and use of false identification. [FN65]  In response to external pressures, employers might adopt a practice of immediate termination upon receipt of a mismatch letter. [FN66]  This, unfortunately, would be a blind acceptance of the notion that unauthorized workers lack the power to bring wrongful discharge claims, and employees would pay the price.

B. No Reprieve for the Unauthorized

In Egbuna v. Time-Life Libraries, Inc., [FN67] the United States Court of Appeals for the Fourth Circuit, held that an unauthorized employee had no cause of action against his former employer under Title VII of the Civil Rights Act of 1964 because the worker was not "qualified" for the position when he sought reemployment. [FN68]  Similarly, in Hoffman Plastic Compounds, Inc. v. Nat'l Labor Relations Board ("NLRB"), [FN69] the United States Supreme Court precluded the NLRB from awarding backpay to an undocumented alien who never obtained work authorization in the United States. [FN70]

In the Hoffman opinion, written by Chief Justice William Rehnquist, the Court announces that allowing unauthorized employees to recover would erode federal immigration policy and would both condone past violations and encourage future defiance. [FN71]  Yet such an idea is not necessarily exclusive of a benefit.  Herein is the potential for a positive direction in relation to mismatch letters: because IRCA focuses on the responsibilities of the employer to verify an applicant's work authorization, awarding backpay could be viewed as added incentive for the employer to fully comply with its duties under the statutory scheme.

While it is true that such a result might impliedly cause undocumented workers to continue to seek domestic employment, employers would have further motivation to screen applicants more carefully.  Following the Hoffman Plastic decision, in an inter-agency memorandum addressed to all Regional Directors, Officers-In-Charge and Resident Officers, the *368 NLRB General Counsel stated that a discriminatee is not entitled to reinstatement and backpay unless the INS determines the discriminatee to be lawfully present in the United States. [FN72]

Thus, following Egbuna and Hoffman Plastic, employers would not hesitate to terminate unauthorized employees because the employees have no avenue of recourse.  This presents potential for abuse.  The possibility exists that illegal workers will be recruited abroad by American employers, and then paid substandard wages. [FN73]  For example, in United States v. Tyson Foods, [FN74] the defendant faces charges of causing illegal aliens to be brought into the United States for the purpose of employment. [FN75]  Likewise, legitimate employees possessing authentic work documentation could face termination at the hand of an untrusting employer because of their ethnicity. [FN76]

V. Summary of the Immigration Reform and Control Act of 1986

A. The Purpose of IRCA

In a series of cases, courts have consistently held that Congress, in enacting IRCA, intended to halt the flood of undocumented aliens into the United States. [FN77]  In Etuk v. Slattery, [FN78] the United States Court of Appeals for the Second Circuit stated that Congress sought to stem the tide of undocumented aliens into the United States by enacting the elaborate verification scheme of IRCA. [FN79]  Furthermore, in United States v. Jackson, [FN80] the Unites States Court of Appeals for the Fifth Circuit explained that the passage of IRCA was aimed at reducing the number of illegal aliens from crossing the border. [FN81]  The Fifth Circuit proposed that IRCA *369 would reduce alien traffic by removing economic benefits associated with illegally coming to the United States. [FN82]

B. Prohibitions

Signed by President Reagan on November 6, 1986, the Immigration Reform and Control Act of 1986 [FN83] impacts the hiring procedures of all employers. [FN84]  When signing the Act, President Reagan referred to IRCA as "the most comprehensive reform of our immigration laws since 1952." [FN85]

IRCA specifically prohibits three employer activities:

No-Match Cert. Admin. Record  773

**(Cite as: 5 SCHOLAR 355)**

1. It is unlawful to knowingly hire, or recruit for a fee, an alien who is unauthorized to be employed in the United States;

2. It is unlawful to continue to employ an alien, knowing that the alien is unauthorized to work in the United States; or

3. To hire an individual for employment in the United States without complying with the employment verification system set up by the statute. [FN86]

C. The Verification Process

IRCA sets up an employment verification system under which all employers must execute a verification form (Form I-9) attesting, under penalty of perjury, that the hirer has verified, by examination, the requisite document or documents proving both identity and employment authorization. [FN87]  This verification process must be completed for all new employees hired after November 6, 1986, whether the hiree is a United States citizen or an alien. [FN88]  Employers are required to examine an employee's documentation and complete an I-9 Form within three business days of the hiring of an employee unless the length of employment is intended to be less than three business days, in which case the I-9 Form must be completed at the time of hire. [FN89]

*370 Form I-9 establishes three categories of documents that the employee may present to prove identity and/or work authorization. [FN90]  It is crucial that the decision of which documents to proffer rests strictly with the employee. [FN91]  The employer may not request or require any particular document, risking charges of document abuse should the employer do so. [FN92]  Documents in List A establish both the holder's identity and authorization to work in the United States, and include a certificate of naturalization and U.S. a Passport. [FN93]  Documents in List B only establish identity, and include a driver's license, a voter registration card, or a United States military draft card. [FN94]  Documents in List C establish work authorization alone, and might include a valid social security card or a birth certificate. [FN95]

D. The Good Faith Defense: Merely a Rebuttable Presumption

IRCA provides that an employer who has complied in good faith with the verification requirements has established an affirmative defense to an allegation that the person has knowingly hired an alien or continues to employ an alien that is not authorized to be employed in the United States. [FN96] This affirmative defense of good faith compliance with IRCA, however, is only a rebuttable presumption. [FN97]  The presumption is rebutted if the Immigration and Naturalization Service can establish, inter alia, that the verification documents did not "reasonably appear on their face to be genuine." [FN98]

E. Enforcement Powers

IRCA authorizes the Attorney General to investigate violations of the statute.  [FN99]  The duty to investigate such violations, though, has been assigned *371 to the INS. [FN100]  Persons charged with IRCA violations are entitled to notice and a hearing conducted by an administrative law judge (ALJ) in accordance with the Administrative Procedure Act. [FN101]

An ALJ may require violators of IRCA's employment provisions to pay civil money penalties, and may issue a cease and desist order requiring future compliance with the statute. [FN102]  A pattern or practice of employment violations may lead to criminal penalties. [FN103]  However, civil monetary penalties are the avenue generally sought. [FN104]

A failure to adhere to the employment verification system, referred to as a paperwork violation, will lead to only a civil money penalty, generally of a lesser amount than for an employment violation. [FN105]  Paperwork violations can arise from failure "to complete, correct, update, reverify, retain, or produce Form I-9." [FN106]  When determining the appropriate penalty for paperwork violations, an ALJ may consider: (1) the size of the employer's business; (2) the employer's good faith; (3) the seriousness of the violation; (4) whether the individual involved was an unlawful alien; and (5) whether the employer has a history of violations. [FN107]

*372 F. Violations

To violate IRCA an employer must knowingly hire for employment or knowingly continue to employ an unauthorized

**No-Match Cert. Admin. Record  774**

5 SCHOLAR 355
**(Cite as: 5 SCHOLAR 355)**

alien. [FN108] The general public often mistakenly characterizes IRCA as a strict liability statute, overlooking the fact that knowledge is required for violations. [FN109] One commentator theorizes that this misconception, above all others, results in violations of IRCA's antidiscrimination provision. [FN110]

Actual knowledge of the status of the unauthorized worker may be determined during an INS investigation by a statement given by the alien, or an admission by the employer or an informant. [FN111] Additionally, an agent's actual knowledge may be imputed to the employer's actual knowledge for the purposes of employer sanctions. [FN112]

More often, the "knowingly" provision has been subject to a constructive knowledge test. [FN113] In instances where the employer is willfully blind to circumstances that should have put the employer on notice that the employer may have hired or may have continued to employ an unauthorized alien, the knowledge element is satisfied. [FN114] No actual, specific knowledge is necessary. [FN115]

Constructive knowledge is defined as "knowledge imputed to a person who, through the exercise of reasonable care or because of position or skill, should have been aware of the fact." [FN116] The INS has signified that the determination of whether a particular employer has been put on notice of an employment situation in violation of IRCA is an individualized decision that must consider all relevant facts and circumstances. [FN117]

For example, in New El Rey Sausage Co. v. U.S. Immigration and Naturalization Service, [FN118] constructive knowledge was found where the INS *373 visited an employer's plant and obtained a list of employees. [FN119] The INS then notified the employer that certain employees were suspected of being unlawful aliens, and if their green cards matched the number listed in the INS letter to the employer, then they were either using fraudulent cards or cards belonging to someone else. [FN120] The employer did not take any corrective action other than to ask the named employees whether they were work authorized. [FN121] Seven of the nine listed employees left, but the remaining two insisted they were authorized to work. [FN122] The employer accepted their word, and continued to employ the remaining two without further inquiry. [FN123] In this case, the court found that when the INS had notified the employer of the suspected unlawful aliens, and stated that the employment of the suspected individuals should not be continued unless valid employment authorization could be provided, the employer was put on constructive notice. [FN124]

In Mester Mfg. Co. v. Immigration and Naturalization Serv., [FN125] constructive knowledge was also found when the INS, after visiting an employer to inspect paperwork, ran checks on the alien registration numbers of the workers, and unmasked improper or borrowed numbers. [FN126] The INS then hand-delivered a citation to the employer reciting the results of its investigation and instructed the employer to consider the listed employees to be unauthorized aliens unless valid documents could be presented. [FN127] The citation also stated that continued employment of undocumented aliens would result in fine proceedings. [FN128] Nevertheless, the employer in Mester continued to employ the unauthorized workers, and constructive knowledge was imputed. [FN129]

In Collins Food International, Inc. v. Immigration and Naturalization Service, [FN130] the employer's faulty inspection of a social security card at the time of hire was not found to be constructive knowledge of an employee's lack of work authorization. [FN131] The court stated that the reasonable man *374 standard should be used to emphasize that employers should accept documents which appear genuine on their face without requiring further investigation. [FN132] Furthermore, the Judiciary Committee Report in IRCA cautions employers against making "critical judgments" about the authenticity of prospective employees' documents. [FN133] Instead, employers may hire such individuals and ask that INS audit the documents. [FN134]

Employers should find little solace in Collins, though, as the mistake could still represent a paperwork violation resulting in civil penalties under IRCA. [FN135] Additionally, United States v. Haim, Co. [FN136] recites that a paperwork violation of IRCA resulting from failure to accurately verify a worker's employment authorization is not, in itself, sufficient to prove the scienter element for an IRCA violation. [FN137]

In addition to setting forth the limitations of the constructive knowledge test, Collins also provides employers with sound advice on compliance with IRCA. The court in Collins recommends that employers attempting to comply with IRCA are well advised not to examine an employee's work authorization documents until after an offer of employment is made. [FN138] The court recognized that an employer conducting pre-employment questioning concerning an applicant's national

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**No-Match Cert. Admin. Record  775**

origin, race or citizenship exposes the employer to charges of discrimination under Title VII of the Civil Rights Act of 1964 if he does not hire that applicant. [FN139]

G. "Good Faith"

The good faith of an employer is frequently contested. Proof of good faith compliance with the statute provides employers with an affirmative defense to IRCA's penalties. [FN140]

In United States v. Williams Produce, Inc., [FN141] the INS sent the employer a "Notice of Intent to Fine" resulting from numerous paperwork violations. [FN142] The INS intended to fine Williams $281,600 for the violations. [FN143] *375 According to the INS, the employer failed to properly complete I-9s for sixty-five employees, failed to prepare I-9s for 143 individuals, and failed to require that 231 employees properly complete their I-9s. [FN144] In terms of the employer's good faith, the ALJ noted that submission of I-9s, even though incomplete, indicated that the employer was aware of IRCA's requirements. [FN145] The employer argued that the hiring manager was a third generation resident of the county and knew most of the employees, thus negating his responsibility to verify their work authorizations. [FN146] Not surprisingly, the ALJ rejected this argument as evidence of the employer's good faith. [FN147]

Also, in United States v. Karnival Fashion, Inc., [FN148] good faith was contested because the employer successfully completed some I-9s but failed to complete or prepare others. [FN149] In Karnival, the ALJ held that the INS must prove an employer's lack of good faith beyond mere failure of compliance and must show some level of culpable behavior. [FN150] The ALJ admonished the holding in Williams Produce, stating that dismal I-9 compliance alone should not affect the civil money penalties imposed. [FN151]

Lack of good faith can also be found during an INS site survey. In United States v. Anchor Seafood Distribs., Inc., [FN152] an INS agent discovered thirty-two undocumented workers hiding in an office attic. [FN153] The employer was not allowed to assert good faith because, in the presence of the agent, the employer looked into the attic and stated that no unauthorized workers were hiding there. [FN154] The acts of the employer demonstrated a level of culpability that was clearly contradictory to an assertion of good faith on his part.

## *376 VI. The Freedom of Information Act

A. The Statute

The Freedom of Information Act (FOIA) was designed "to pierce the veil of administrative secrecy and to open agency actions to the light of public scrutiny." [FN155] The FOIA exposes government agencies to public examination, thus effectively destroying external barriers that breed distrust. [FN156]

Generally, each agency is required to publish its administrative procedures, including rules, available forms, and instructions. [FN157] Agency policies and procedures are first published in the Federal Register, and subsequently included in the Code of Federal Regulations. Policies adopted by an agency but not yet published in the Federal Register must be made available for public inspection and copying. [FN158] The FOIA, however, does not apply to all information held by a federal agency.

There are nine enumerated situations in which federal agencies are not required to disclose their secrets. [FN159] For example, an agency is not required to disclose information that is specifically barred from disclosure by another statute. [FN160] Federal income tax law provides that tax returns and return information are confidential and prohibits the disclosure of such information (including taxpayer identification number or SSN), except in narrowly defined circumstances. [FN161] Thus, an employer cannot simply obtain a list of all employee social security numbers in an attempt to verify work authorization.

B. The Decisions

Courts have regularly held that federal agencies are not required to disclose files containing information which would lead to a clearly unwarranted invasion of personal privacy if made public. [FN162] At a minimum, social security numbers are protected under this rule.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5 SCHOLAR 355
**(Cite as: 5 SCHOLAR 355)**

Two federal courts have found a clearly unwarranted invasion of privacy in the release of social security numbers. [FN163] In Sheet Metal Workers *377 Int'l Ass'n, Local Union No. 19 v. U.S. Dept. of Veterans Affairs, [FN164] the United States Court of Appeals for the Third Circuit held that the release of personal financial information, including social security numbers, constituted a clearly unwarranted invasion of privacy. [FN165] Also, in Greidinger v. Davis, [FN166] the Fourth Circuit found the required disclosure of voters' social security numbers to be an invasion of privacy. [FN167]

C. Why Social Security Numbers are Protected

Equipped with another person's social security number, an individual with compromised morals could obtain the other person's welfare benefits, social security benefits, or paychecks. [FN168] Additionally, social security numbers can be used to order new checks sent to a different address on checking and credit card accounts. [FN169] Current trends involving identity theft over the internet might further bolster the individual's right to protection of sensitive personal information, including social security numbers.

D. An Alternative for Employers

Because personal information, including the SSN, is prohibited from distribution to third parties, the SSA created the Employee Verification Service (EVS). [FN170] The SSA stated that the EVS was intended to be a free and secure internet service to facilitate easy employee verification. [FN171] The EVS allows employers to request that SSA verify the names, birthdates, and social security numbers of employees prior to submission of the annual W-2 Forms. [FN172] To protect the privacy of employees, the SSA does not divulge the requested information, but instead reviews data submitted by the employer for accuracy. [FN173] Thus, the employer gets a *378 simple "yes" or "no" as to the correctness of personnel records. Logically then, the EVS is useful for verifying company files, and possibly preventing the issuance of mismatch letters for inaccuracies. It does not, however, impinge on employee privacy rights because protected information is not simply handed out to any inquiring party.

The EVS strikes a balance between the rights of employers and the rights of employees. The privacy interests of employees are protected from outside intrusion into their personal records maintained by the Social Security Administration. Alternatively, employers are given an opportunity to maintain accurate company files, and prevent "mismatch" discrepancies from occurring.

VII. Course of Conduct When in Receipt of a Mismatch Letter

What actions, if any, should an employer take after receiving a mismatch letter? Although courts have not yet addressed the issue, the Immigration and Naturalization Service Office of General Counsel has provided some guidance.

A. Martin Letter

In his letter of December 23, 1997, then General Counsel David A. Martin begins by advising recipients that a mismatch letter alone does not put the employer on notice that the employee is unauthorized to work. [FN174] Constructive knowledge, he says, is an individualized determination that hinges upon all relevant facts. [FN175] Mr. Martin asserts that no social security numbers have been issued with 000, 800, or 900 areas (the first three digits in a social security number). [FN176] Thus, an employer should be alerted that a potential problem exists if a worker presents a social security number beginning with a zero, eight, or nine.

More importantly, Martin suggests that upon receipt of notification the employer solicit any useful information regarding the accuracy of company records from the employee. [FN177] If the employee determines that either the name or social security numbers are incorrect, Mr. Martin *379 suggests that the employer ask to see verification of the contradicted information. [FN178] Interestingly, though, there is no mention of potential for document abuse in this situation.

Mr. Martin also discusses the scenario where a previously unauthorized employee subsequently gains work authorization and notifies the employer of a SSN change. [FN179] Without any mention of adherence to company fraud policies, Martin reminds the reader that knowingly providing false statements on a Form I-9 or using false documents to obtain employment are felonies unexcused by later work authorization. [FN180]

**No-Match Cert. Admin. Record  777**

5 SCHOLAR 355
**(Cite as: 5 SCHOLAR 355)**

Ultimately, Martin's letter gives scant insight into the steps an employer should take to protect itself from IRCA violations. Instead, the letter fosters the underlying notion that document fraud is all-too-possible at the hiring stage. In doing so, Mr. Martin bolsters potential employers' fears, and in the end, may give rise to employment discrimination.

B. Virtue Letter

In another letter from the Immigration and Naturalization Service, then General Counsel Paul W. Virtue confronts the issue of employment discrimination. [FN181] In his letter of April 12, 1999, Mr. Virtue addresses Section 274B of the Immigration and Nationality Act, which, he claims, expresses the goal that citizens and aliens alike not lose employment opportunities unnecessarily. [FN182]

To counteract any fears of potential discrimination, Mr. Virtue reiterates that the mismatch letter, viewed alone, does not constitute actual notice of a lack of work authorization. [FN183] Directly adverse to this position, Virtue further emphasizes that an employer may not safely ignore the consequences of Social Security Administration discrepancies. [FN184]

Virtue explains that employer follow-up is crucial to alleviate potential liability. [FN185] He does admit, however, that the statute does not specifically require nor prohibit such follow-up investigation. [FN186] Perhaps detailed instruction on how an employer might lawfully conduct follow-up investigations **\*380** upon the receipt of a mismatch letter would help lessen the burdens placed on employers and employees alike.

VIII. Statutory Reform

The underlying problem simply revolves around a lack of information. The breakdown is not complex: (1) a comprehensive federal statute governs the responsibilities of employers concerning immigrant laborers; (2) the Immigration and Naturalization Service has the jurisdiction to investigate possible non-compliance; (3) for its own fiscal reasons, the Social Security Administration decided to drastically increase the recipient pool of its mismatch letters.

Viewed in a vacuum, each subpart is coherent and understandable. Yet, when synergy is added to the equation, the component parts total a bewildering beast. Virtually all inconsistencies can be resolved with Congressional action.

A. At the Time of Hire

As stated previously, IRCA presents a contradictory duality that yields incompatible results. On one hand, an employer is prohibited from employing unauthorized aliens. Conversely, if an employer refuses to hire or terminates an employee based on ethnic background, the employer could be liable for discriminatory employment practices. Amendments to the statute could illuminate a desired course of conduct, thus allowing employers to safely follow the proper formalities in compliance with IRCA. Not only would such an approach insulate employers from liability, but employees and applicants would also be protected from possible discriminatory hiring practices.

For example, Congress could require, as a matter of law, that employers photocopy all documents offered by an applicant purporting to prove employment status. This would help the employer prove that the document appeared genuine on its face, and could prevent possible penalty.

IRCA might also be amended to include a checklist of specific questions that a potential employer be allowed to ask of any applicant. These questions, when written by legislators, would be more likely to avoid any possibility of discrimination during the hiring process. Certainly, the questions would not be mandatory, but at least the employer would have a feel for what questions are permitted. If utilized, to avoid discrimination charges, the employer would have to ask all applicants the questions. Alternatively, a similar result might be achieved by publishing a list of questions that would, under no circumstances, be permissible without committing employment discrimination.

Furthermore, with the advancement of the EVS, employers could be statutorily required to participate in the service. Such a requirement **\*381** would force employers to verify that all information given by a potential hiree match SSA records prior to hiring. Such a rule seems less burdensome with every passing day given the increasing reliance upon electronic media for daily business operations. This assumes, though, that the SSA's records are accurate and up to date.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B. Upon Receipt of a Mismatch Letter

A separate plan of action needs to be formulated to address unlawful employment concerns arising after the date of hire. Though no such statutory structure currently exists, law firms dealing with employment law issues commonly create such plans for their corporate clients.

For example, a comprehensive plan might include:

1. Do Not Automatically Terminate an Employee After Receiving a Mismatch Letter: [FN187]  Receipt of the letter, alone, does not constitute the constructive knowledge required for an IRCA violation. [FN188]

2. Investigate: [FN189]  Check company records to ensure that no typographical or clerical errors exist. [FN190] Consult the EVS to verify which company records are inconsistent with SSA information.  Notify the employee of the problem.

3. Employees Verifies all Recorded Information as Correct: Possibly suggest that the employee contact the local Social Security office to correct the problem. [FN191]

4. Employee Admits to Providing False Information: Terminate the employee at once upon learning that the employee was never authorized for employment in the United States. [FN192]

5. New Information: Should the employee admit to previously providing false information, but has since obtained work authorization, terminate according to company policies, if any, regarding false information provided during the hire process. [FN193]  It is important to note that most companies exercise discretion: they do not always fire when false information has been provided in the application process.

6. Always Remain in Contact with the SSA: Maintain a continuous relationship with the SSA.  Ensure that all correspondence is recorded *382 in writing to avoid confusion, and to provide evidence that the employer worked diligently to resolve the situation.

Although such suggestions would not answer every question which may arise concerning mismatch letters, employers could at least rely on a concrete frame of reference.  If codified, such an outline could vastly diminish confusion within the employment sector, and would protect those employees who are legitimately authorized for work in the United States.

IX. Conclusion

As currently issued, the Social Security Administration's mismatch letters have the potential to do great harm.  Facing both monetary and criminal penalties, a misinformed employer could arbitrarily terminate employees on the basis of ethnicity, fearing that the employee lacked work authorization.  Such a result could undermine the trust relationship that exists between employer and employee.  Furthermore, it could lead to grave injustice through capricious termination, and could have a chilling effect on the willingness to hire ethnic workers.  At the heart of the problem is a lack of information. Congress, the SSA, or the INS could easily issue guidelines, or instructions, on how to handle the receipt of a mismatch letter.  The plan above is merely a skeleton of the components such experts might choose to include.

[FNd1]. Candidate for J.D., St. Mary's University School of Law, May 2004; B.A., English, University of Texas at Austin, 2000.  The author wishes to thank Nancy Penny for her guidance and editing prowess.  Also, Professors José Roberto Juarez, Jr., John W. Teeter, Jr., Lee J. Terán, and Robert L. Summers, Jr. for their assistance.

[FN1]. U.S. Census Bureau, U.S. Dep't. of Commerce, Projections of the Total Resident Population by 5-Year Age Groups, Race, and Hispanic Origin with Special Age Categories: Middle Series, 2001 to 2005, at http:// www.census.gov/population/projections/nation/summary/np-t4-b.txt (last visited Mar. 25, 2003) (providing annual population projections by age and race). Interestingly, for the 2000 Census, nearly half (48%) of Hispanics indicated that they were White.  U.S. Census Bureau, U.S. Dep't of Commerce, Population Profile of the United States: 2000 (Internet Release), at http:// www.census.gov/population/pop-profile/2000/chap02.pdf (last visited Mar. 25, 2003) (explaining the Census report's new category of choosing only one race to represent the person).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN2]. See Karen Fleshman, Abrazando Mexicanos: The United States Should Recognize Mexican Workers' Contributions to its Economy by Allowing Them to Work Legally, 18 N.Y.L. Sch. J. Hum. Rts. 237, 239 (2002).

[FN3]. U.S. Commission on Immigration Reform, Becoming an American: Immigration and Immigrant Policy, viii (1997).

[FN4]. Id.

[FN5]. See Fleshman, supra note 2, at 237.

[FN6]. JoAnne D. Spotts, U.S. Immigration Policy on the Southwest Border From Reagan Through Clinton, 1981-2001, 16 Geo. Immigr. L.J. 601, 601 (2002).

[FN7]. Although lacking a formal definition, a mismatch letter is generally sent by the SSA to alert employers that they may be illegally employing unauthorized workers. The letters are discussed in length in Part III, infra.

[FN8]. An argument can be made that mismatch letters can prevent the need for expensive "suspense accounts" to be created and maintained for individual taxpayers. This idea will be discussed in detail in Part III, infra.

[FN9]. Enid Trucios-Haynes, Temporary Workers and Future Immigration Policy Conflicts: Protecting U.S. Workers and Satisfying the Demand for Global Human Capital, 40 Brandeis L.J. 967, 970 (2002); James F. Smith, A Nation That Welcomes Immigrants? An Historical Examination of United States Immigration Policy, 1 U.C. Davis J. Int'l L. & Pol'y 227, 228 (1995).

[FN10]. William Booth, The Myth of the Melting Pot, Wash. Post, Feb. 22, 1998, at A1, available at 1998 WL 2469212.

[FN11]. Becoming an American, supra note 3, at iv-v.

[FN12]. U.S. Bureau of the Census, U.S. Department of Commerce, at http:// www.census.gov (last visited Mar. 25, 2003) (providing a real-time population counter for the United States, as estimated by the Census Bureau).

[FN13]. Anne H. Ehrlich & James Salzman, The Importance of Population Growth to Sustainability, 32 Envtl. L. Rep. 10559, *8 (2002), WL 32 ELR 10559; Population Profile of the United States, supra note 1, at 2-1.

[FN14]. See U.S. Bureau of the Census, Largest Census-to-Census Population Increase in U.S. History as Every State Gains, at http:// www.numbersusa.com/overpopulation/census.html (last visited Mar. 3, 2003).

[FN15]. President's Council on Sustainable Development, Population and Consumption Task Force Report 15 (1996).

[FN16]. Spotts, supra note 6, at 601, 602.

[FN17]. Id.

[FN18]. Id.

[FN19]. Fleshman, supra note 2, at 237-38.

[FN20]. Elizabeth M. Dunne, Comment, The Embarrassing Secret of Immigration Policy: Understanding Why Congress Should Enact an Enforcement Statute for Undocumented Workers, 49 Emory L.J. 623, 624 (2000).

[FN21]. Spotts, supra note 6, at 601, 602.

[FN22]. Id.

[FN23]. Lori A. Nessel, Undocumented Immigrants in the Workplace: The Fallacy of Labor Protection and the Need for

No-Match Cert. Admin. Record  780

Reform, 36 Harv. C.R.-C.L. L. Rev. 345, 358 (2001).

[FN24]. Nancy Humel Montwieler, The Immigration Reform Law of 1986: Analysis, Text, and Legislative History 31 (1987).

[FN25]. Dunne, supra note 20, at 631; Note, Racial Violence Against Asian Americans, 106 Harv. L. Rev. 1926, 1931 (1993); Jennifer A. Nemec, Comment, Yniguez v. Arizonans for Official English: Free Speech May Have Lost the Battle, But in the End it Will Win the War, 22 Md. J. Int'l L. & Trade 117, 118 (1998).

[FN26]. Dunne, supra note 20, at 631.

[FN27]. Racial Violence Against Asian Americans, supra note 25, at 1931.

[FN28]. Nemec, supra note 25, at 118.

[FN29]. Irene Zopoth Hudson & Susan Schenck, Note, America: Land of Opportunity or Exploitation?, 19 Hofstra Lab. & Emp. L.J. 351, 356 (2002).

[FN30]. Id.

[FN31]. David H. Nachman & Debi Debiak, An Imperfect Match, HRMag., Sept. 1, 2002, available at 2002 WL 7664718; SSA is Sending Out Mismatch Notices, NewsLine (Associated Landscape Contractors of Mass., S. Natick, Mass.), July/Aug. 2002, at 3, http://www.alcom.org/ALCM%20News%CC20JA%2002.pdf (last visited Apr. 7, 2003).

[FN32]. Social Security Administration, Your Social Security Statement 1 (2002).

[FN33]. J. Ira Burkemper, The "Mismatch Letter" Is in the Mail: The Social Security Administration Ramps Up Its Warnings to Employers, P 4 (2002), at http://www.entertheusa.com/publications/mismatch_letter.html (last visited Mar. 25, 2003).

[FN34]. Id.

[FN35]. Id.

[FN36]. Id.

[FN37]. Social Security "Mismatch" Letter a Trap for the Unwary Employer, What's New (Fisher & Phillips, L.L.P., Atlanta, Ga.), available at http:// www.laborlawyers.com/FSL5CS/important%20new%CC20legal%20developments/important% 20new%CC20legal%Clvelopments518.asp (last visited Mar. 25, 2003); Handling the Social Security "Mismatch Letter," Employer Advisor (Lane, Powell, Spears, Lubersky, L.L.P., Seattle, Wa.), Summer 2002, at http:// www.lanepowell.com/pressroom/newsletters/detail.asp?NLID=317&XNLTYPEID=3 (last visited Mar. 25, 2003).

[FN38]. Robert W. Karr, Jr., Social Security Number Mismatch Issues, Ross & Hardies Immigration Legal Update (Ross & Hardies, Chicago, Ill.), at http:// www2.rosshardies.com/publication.cfm?publication_id=224 (last visited Mar. 25, 2003). Although the source does not elaborate on the idea of "non-Roman" names, the author must be referencing names that automatically indicate an ethnic, or non-Anglo, ancestry.

[FN39]. Form I-9 and the Verification Process - Frequently Asked Questions (Jackson & Hertogs, San Francisco, Cal.), August 2002, at http://www.jackson-hertogs.com/jh/faq/8066.htm (last visited Mar. 25, 2003).

[FN40]. See Burkemper, supra note 33, at P 6-7.

[FN41]. Id. at P 5.

[FN42]. Id.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5 SCHOLAR 355                                                                    Page 16
5 SCHOLAR 355
**(Cite as: 5 SCHOLAR 355)**

[FN43]. See id. (indicating that 585,000 employers (9%) "submitted wage items with one to five errors," and 195,000 employers (3%) "reported six or more errors, and of those, only about 3,000 reported 200 or more errors").

[FN44]. See id. at P 6.

[FN45]. See id.

[FN46]. Id.

[FN47]. Id.

[FN48]. Id.

[FN49]. See id. at P 9.

[FN50]. See Letter from Social Security Administration to Employer Having Submitted Incorrect W-2 Form Wage Information, Retirement, Survivors' and Disability Insurance, Employer Correction Request, (Mar. 22, 2001) (providing a sample mismatch letter), available at http://www.shusterman.com/pdf/ssa-mismatch.pdf (last visited Mar. 25, 2003); Burkemper, supra note 33, at P 9.

[FN51]. See Loan T. Huynh & Ingrid N. Nyberg, Responding to the SSA's "No Match" Letters (Fredrikson & Byron, P.A., Minneapolis, Minn.), at http:// www.fredlaw.com/articles/employment/empl_0208_in.html (last visited Mar. 25, 2003).

[FN52]. 26 U.S.C. § 6674 (2002); 26 C.F.R. § 31.6011(b) (2002).

[FN53]. Burkemper, supra note 33, at P 9.

[FN54]. SSA Announces New Procedure for Issuing Mismatch Letters, Employment Law Bulletin (Bingham McHale, L.L.P., Indianapolis, Ind.), May 2002, available at http://www.binghammchale.com/pdf/May%20Employment%20Newsletter.pdf (last visited Mar. 25, 2003); Stephen W. Lyman et al., Social Security Administration Changes "Mismatch" Letter Policy (Hall, Render, Killian, Heath & Lyman, P.S.C., Indianapolis, Ind.), July 30, 2002, at http:// www.hallrender.com/articles/articles_details.asp?article_index=111 (last visited Mar. 25, 2003); Social Security Administration Institutes New Mismatch Letter Policy, Immigration Focus (Valentine Brown, L.L.C., Woodbury, N.J.) Apr. 2002, at http://www.valentinebrown.com/news/vb_0402.pdf (last visited Mar. 25, 2003); Stanley Mailman & Stephen Yale-Loehr, Social Security "Mismatch Letters" Jeopardize Jobs (True, Walsh & Miller, L.L.P., Ithaca, N.Y.), at http:// www.clubcyrus.com/twmlaw/site/new/ssmismatch.html (last visited Mar. 25, 2003); see Jose A. Olivieri, Social Security Mismatch Letters (Michael, Best & Friedrich, L.L.P., Milwaukee, Wis.), at http://www.mbf-law.com/pubs/articles/629.cfm (last visited Mar. 25, 2003).

[FN55]. Darby L. Duncan & Denise Rios, Avoiding Penalties When In Receipt of a Social Security Mismatch Letter, Employment, Labor and Benefits, (Holland & Knight, L.L.P.), June 2002, at http://www.hklaw.com/newsletters.asp?ID=292&Article=1647 (last visited Mar. 25, 2003); Hernan Rozemberg, Migrants Forced Out of Jobs, Ariz. Republic, July 6, 2002, available at http:// www.arizonarepublic.com/special03/articles/0706mismatch06.html (last visited Mar. 25, 2003); Social Security Administration Increases Issuance of "Mismatch" Letters, Human Resource & Labor News (The Associated General Contractors of America, Alexandria, Virginia), June 27, 2002, (on file with author); John F. Koryto & Michael E. Stroster, Social Security Administration Mismatch Letters to Increase, Employer's Immigration Law Update: Part I - Immigration After September 11 (Miller, Johnson, Snell & Cummiskey, P.L.C., Grand Rapids, Mich.), Summer 2002, at http://www.millerjohnson.com/db30/cgi-bin/pubs/PR%20ELU% CC20Summer%C02.pdf (last visited Mar. 25, 2003).

[FN56]. Employers Receive More Letters from Social Security Challenging Employees' Numbers, Immigration Advisory (Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Mass.), Summer 2002, available at http:// www.mintz.com/newspubs/Immigration/ImmAdv0602.pdf (last visited Mar. 25, 2003).

[FN57]. Carl Shusterman, Employers: SA "Mismatch" Letters - How to Respond?, Shusterman's Immigration Update, (Law Offices of Carl Shusterman, Los Angeles, Cal.), June 2002, at http://www.shusterman.com/jun02.html (last visited Mar. 25,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5 SCHOLAR 355                                                                 Page 17
5 SCHOLAR 355
**(Cite as: 5 SCHOLAR 355)**

2003).

[FN58]. A. Robert Degen, Employers With Inaccurate W-2s to Receive "Mismatch Letters" from Social Security Administration, Immigration and Employment Alert (Fox, Rothschild, O'Brien & Frankel, L.L.P., Philadelphia, Pa.), Aug. 2002, http://www.frof.com/PDFs/MismatchLetters_0802.pdf (last visited Mar. 25, 2003).

[FN59]. David Nachman & Debi Debiak, Social Security Mismatch Letters Are in the Mail, 169 New Jersey L.J. 120, P 1 (2002) available at http:// www.gghlaw.com/ssletter.pdf (last visited Mar. 28, 2003).

[FN60]. 8 U.S.C. § 1324a(e)(4) (2000).

[FN61]. See generally 42 U.S.C. § 2000e-2 (1990) (Title VII antidiscrimination provisions); 8 U.S.C. § 1324b(a) (2000) (INA antidiscrimination provisions); 29 U.S.C. § 211 (1998) (Fair Labor Standards Act data collection requirements); 29 U.S.C. § 215 (1998) (Fair Labor Standards Act prohibited acts).

[FN62]. U.S. v. Tyson Foods, Inc., 191 F. Supp. 2d 142, 143 (D.D.C. Mar. 5, 2002) (reciting a 36-count indictment for conspiracy to smuggle illegal workers to Tyson Foods processing facilities). See generally James Salzman, Beyond the Smokestack: Environmental Protection in the Service Economy, 30 Envtl. L. Rep. 10,856 (2000) (detailing boycotts of Wal-Mart, Kathy Lee Gifford, The Gap, Nike, Footlocker, and Woolworth); Eric Brazil, Official Salvadoran Report Says Its Factories are Brutal, May 11, 2001, at http:// www.sweatshopwatch.org/headlines/2001/elsalvador_may01.html (describing substandard labor conditions in El Salvadoran factories producing garments for The Gap, Nike, Liz Claiborne, and Kohl's) (last visited Mar. 28, 2003).

[FN63]. See generally Salzman, supra note 62, at 856 (detailing boycotts of Wal-Mart, Kathy Lee Gifford, The Gap, Nike, Footlocker, and Woolworth); Brazil, supra note 62 (describing substandard labor conditions in El Salvadoran factories producing garments for The Gap, Nike, Liz Claiborne, and Kohl's).

[FN64]. Burkemper, supra note 33, at P 2. Following the September 11, 2001 attacks, Americans have heightened awareness concerning illegal immigration, placing a renewed emphasis on federal immigration statutes designed to deter illegal immigration, such as IRCA. William G. Phelps, Validity, Construction, and Application of § 274(a)(1)(A)(iv) of Immigration and Nationality Act (8 U.S.C.S. § 1324(a)(1)(A)(iv)), Making it Unlawful to Induce or Encourage Alien to Come to, Enter, or Reside in United States, 137 A.L.R. Fed. 227, 227 (1997) (addressing the effects of statutory regulations that deterred illegal immigration prior to 1997).

[FN65]. Richard G. Vernon, Employer Obligations Under U.S. Immigration Law (Lerch, Early & Brewer, Bethesda, Md.), at http:// www.lerchearly.com/SummerNewsletter.pdf (last visited Mar. 28, 2003).

[FN66]. Nachman & Debiak, supra note 59.

[FN67]. 153 F.3d 184 (4th Cir. 1998) cert. denied, 525 U.S. 1142 (1999).

[FN68]. Egbuna v. Time-Life Libraries, Inc., 153 F.3d 184, 186 (4th Cir. 1988) cert. denied, 525 U.S. 1142 (1999).

[FN69]. 535 U.S. 137 (2002).

[FN70]. Hoffman Plastic Compounds, Inc. v. Nat'l Labor Relations Board, 535 U.S. 137, 150 (2002).

[FN71]. Id. at 150-51.

[FN72]. Memorandum from Rosemary M. Collyer, NRLB General Counsel, to all Regional Directors, Officers-In-Charge and Resident Officers (Sept. 1, 1988), available at 1988 WL 236182.

[FN73]. See generally U.S. v. Tyson Foods, Inc., 191 F. Supp. 2d 142, 143 (D.D.C. Mar. 5, 2002) (discussing a 36-count indictment for conspiracy to smuggle illegal aliens to work at Tyson Foods processing facilities).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN74]. 191 F. Supp. 2d 142 (2002).

[FN75]. Tyson Foods, 191 F. Supp. 2d at 144 (noting that the probation hearing is set for March 2003).

[FN76]. Authorized employees wrongly terminated would, however, be able to seek recourse from the employer under employment law theories.

[FN77]. Robert F. Koets, Validity, Construction, and Application of § 274A of Immigration and Nationality Act (8 U.S.C.S. § 1324A), Involving Unlawful Employment of Aliens, 130 A.L.R. Fed. 381, 400 (1996).

[FN78]. See 936 F.2d 1433 (2d Cir. 1991).

[FN79]. See id. at 1437 (reviewing INS procedures for replacing lost or stolen green cards).

[FN80]. 825 F.2d 853 (5th Cir. 1987).

[FN81]. United States v. Jackson, 825 F.2d 853, 864 n.6.

[FN82]. Id.

[FN83]. Immigration and Reform Control Act of 1986, Pub. L. No. 99-603, § 100 Stat. 3359 (1986) (codified in scattered sections of 8 U.S.C.).

[FN84]. Nancy-Jo Merritt & Joanne T. Stark, The Immigration Reform and Control Act of 1986: What Employers Need to Know, 22 Ariz. B.J. 6, 6 (1987).

[FN85]. Nicholas Laham, Ronald Reagan and the Politics of Immigration Reform 1 (2000).

[FN86]. 8 U.S.C. § 1324a(a)(1)-(2) (2002).

[FN87]. Id. § 1324a(b)(1)(A).

[FN88]. 8 C.F.R. § 274a.2(a) (2002).

[FN89]. Id. § 274a.2(b)(B)(iii).

[FN90]. Martha J. Schoonover & Marti Nell Hyland, Employment Authorization Regulations and I-9 Compliance, SF82 A.L.I.-A.B.A. 243, 249-50 (May 3, 2001), available at www.westlaw.com.

[FN91]. Id. at 249.

[FN92]. Id. at 254.

[FN93]. 8 C.F.R. § 274a.2(b)(1)(v)(A) (2002).

[FN94]. Id. § 274a.2(b)(1)(v)(B).

[FN95]. Id. § 274a.2(b)(1)(v)(C).

[FN96]. 8 U.S.C. § 1324a(a)(3) (2000).

[FN97]. See Collins Foods Int'l, Inc. v. United States Immigration and Naturalization Serv., 948 F.2d 549, 553 n.9 (9th Cir. 1991) (citing The House Judiciary Committee Report, H.R. Rep. No. 99-682, pt. 1 at 56-57 (1986)).

[FN98]. See id. (citing The House Judiciary Committee Report, H.R. Rep. No. 99-682 pt. 1, at 57 (1986)).

5 SCHOLAR 355                                                                                                    Page 19
5 SCHOLAR 355
**(Cite as: 5 SCHOLAR 355)**

[FN99]. 8 U.S.C. § 1324a(e) (2000); 8 U.S.C. § 1103(a) (2000).

[FN100]. 8 C.F.R. § 2.1 (2002); 8 C.F.R. § 100.2(a) (2002). Signed into law on November 25, 2002 by President George W. Bush, the Homeland Security Act of 2002 authorized the creation of the Department of Homeland Security (DHS), which completely subsumed the Immigration and Naturalization Service. See generally Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. The INS is abolished as an agency of the Department of Justice, and its duties are to be divided and assigned to new bureaus within the DHS. Leigh McCarthy, The Immigration Case of Michel Jalbert Teaches Larger Lessons, 18 Me. B.J. 18, 21, n.18 (2003). As of March 1, 2003 the INS was eliminated and replaced by three DHS bureaus. Austin T. Fragomen, Jr. & Steven C. Bell, INS Transitions to Department of Homeland Security, Immigr. Bus. News & Comment, Mar. 15, 2003, available at 2003 WL 1090283. "The Bureau of Citizenship and Immigration Services (BCIS) takes over the INS function of adjudicating applications for immigration benefits, including visa petitions, application to adjust or change status, and naturalization applications." Id. "The Bureau of Customs and Border Protection (BCBP) brings together the Border Patrol, INS inspections services, and Customs Service inspectors." Id. "The Bureau of Immigration and Customs Enforcement (BICE) brings together the enforcement and investigative arms of the INS, Customs Service, and the Federal Protective Service." Id. Because the author is unsure of exactly which DHS bureau will handle mismatch investigations at time of publication, INS will remain in the text of the comment.

[FN101]. See 5 U.S.C. § 554 (2000); 8 U.S.C. § 1324a(e)(3) (2000).

[FN102]. 8 U.S.C. § 1324a(e)(4) (2000).

[FN103]. Id. § 1324a(f).

[FN104]. Carl Shusterman, INS v. INC.: Immigration Laws Place Employers on the Defensive: A Delicate Balancing Act is Required, http:// www.shusterman.com/sanction.html (last visited Mar. 28, 2003).

[FN105]. Compare 8 U.S.C. § 1324a(e)(5) (2000), with 8 U.S.C. § 1324a(e)(4).

[FN106]. Schoonover & Hyland, supra note 90, at 261.

[FN107]. 8 C.F.R. § 274a.10(b)(2) (2002); INS Continues Enhanced Employer Sanctions Effort, 69 Inter. Rel. 253, 255-56 (1992).

[FN108]. 8 U.S.C. §§ 1324a(a)(1)-(2) (2000).

[FN109]. Andrew M. Strojny, IRCA's Antidiscrimination Provision: How it Works and Can it Be Used to Combat Anti-Immigrant Fears?, at http:// users.erols.com/astrojny/IRCAArt.htm (last visited Apr. 1, 2003).

[FN110]. Id.

[FN111]. Schoonover & Hyland, supra note 90, at 262.

[FN112]. Id.

[FN113]. See Mester Mfg. Co. v. Immigration and Naturalization Serv., 879 F.2d 561, 567 (9th Cir. 1989); New El Rey Sausage Co. v. U.S. Immigration and Naturalization Serv., 925 F.2d 1153, 1158 (9th Cir. 1991).

[FN114]. See Mester Mfg., 879 F.2d at 567; New El Rey Sausage, 925 F.2d at 1158.

[FN115]. See Mester Mfg., 879 F.2d at 567; New El Rey Sausage, 925 F.2d at 1158.

[FN116]. Black's Law Dictionary 359 (7th ed. 2000).

[FN117]. Social Security Administration Changes Its Policy Regarding the Issuance of "Mismatch Letters" (Masuda, Funai,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5 SCHOLAR 355
5 SCHOLAR 355
(Cite as: 5 SCHOLAR 355)

Page 20

Eifert & Mitchell, Ltd., Chicago, Ill.), August 2002, at http:// www.masudafunai.com/english/articles/information/08-28-2002.asp (last visited Apr. 1, 2003).

[FN118]. 925 F.2d 1153 (9th Cir. 1991).

[FN119]. New El Rey Sausage, 925 F.2d at 1155.

[FN120]. Id.

[FN121]. Id.

[FN122]. Id.

[FN123]. Id.

[FN124]. Id. at 1159.

[FN125]. 879 F.2d 561 (9th Cir. 1989).

[FN126]. See Mester Mfg. Co. v. Immigration and Naturalization Serv., 879 F.2d 561, 564, 569 (9th Cir. 1989).

[FN127]. See Mester Mfg., 879 F.2d at 564.

[FN128]. Id.

[FN129]. Id. at 567.

[FN130]. 948 F.2d 549 (9th Cir. 1991).

[FN131]. Collins Foods Int'l, Inc. v. United States Immigration and Naturalization Serv., 948 F.2d 549, 551 (9th Cir. 1991).

[FN132]. Collins Foods, 948 F.2d at 554.

[FN133]. H.R. Rep. No. 99-682 (Part 1), at 62 (1986), reprinted in 1986 U.S.C.C.A.N. 5649, 5665.

[FN134]. Id.

[FN135]. 8 U.S.C. § 1324a(e)(5) (2000).

[FN136]. OCAHO No. 96A00069, 1998 WL 745994, (Feb. 20, 1998).

[FN137]. Id. at *6.

[FN138]. Collins Foods Int'l, Inc. v. United States Immigration and Naturalization Serv., 948 F.2d 549, 552 (9th Cir. 1991).

[FN139]. 42 U.S.C. § 2001e (2003).

[FN140]. 8 U.S.C. § 1324a(a)(3) (2003).

[FN141]. OCAHO No. 93A00220, 1995 WL 265081 (Feb. 3, 1995).

[FN142]. United States v. Williams Produce, Inc., OCAHO No. 93A00220, 1995 WL 265081, at *1 (Feb. 3, 1995).

[FN143]. Id.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5 SCHOLAR 355
**(Cite as: 5 SCHOLAR 355)**

[FN144]. Id.

[FN145]. Id. at *6.

[FN146]. Id.

[FN147]. Id.

[FN148]. OCAHO No. 95A00014, 1995 WL 626234 (July 20, 1995).

[FN149]. United States v. Karnival Fashion, Inc., OCAHO No. 95A00014, 1995 WL 626234, at *2 (July 20, 1995).

[FN150]. Id.

[FN151]. Id. at *3.

[FN152]. OCAHO No. 94A00095, 1995 WL 474129 (May 5, 1995).

[FN153]. United States v. Anchor Seafood Distrib., Inc., OCAHO No. 94A00095, 1995 WL 474129, at *4 (May 5, 1995).

[FN154]. Id.

[FN155]. Dept. of Air Force v. Rose, 425 U.S. 352, 360-61 (1976).

[FN156]. Id.

[FN157]. 5 U.S.C. § § 552(a)(1)(A)-(E) (1995).

[FN158]. Id. § § 552(a)(2)(A)-(C).

[FN159]. Id. § § 552(b)(1)-(9).

[FN160]. Id. § 552(b)(3).

[FN161]. 26 U.S.C. § 6103(a) (2002).

[FN162]. 5 U.S.C. § 552(b)(6) (1995) (listing personnel and medical files as examples).

[FN163]. Transp. Info. Serv., Inc. v. Oklahoma, 970 P.2d 166, 174 (Okla. 1998) (holding, in a separate opinion by Okla. Supreme Court Chief Justice Kauger, that two federal courts found an invasion of privacy for the release of SSNs).

[FN164]. 135 F.3d 891 (3d Cir. 1998).

[FN165]. Sheet Metal Workers Int'l Ass'n, Local Union No. 19 v. United States Dept. of Veterans Affairs, 135 F.3d 891, 902-05 (3d Cir. 1998).

[FN166]. 988 F.2d 1344 (4th Cir. 1993).

[FN167]. Greidinger v. Davis, 988 F.2d 1344, 1354 (4th Cir. 1993).

[FN168]. Elizabeth Neuffer, Victims Urge Crackdown on Identity Theft, Boston Globe, July 9, 1991, at 13.

[FN169]. Michael Quint, Bank Robbers' Latest Weapon: Social Security Numbers, N.Y. Times, Sept. 27, 1992, at 7.

[FN170].    See    generally    Social    Security    Admin.,    Employee    Verification    Service    (2000),    available    at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://www.ssa.gov/employer/evs2000.html (last visited Apr. 1, 2003).

[FN171]. Social Security Administration Proposes New Verification Service for Employers, Immigration Law Update: July 29, 2002- August 12, 2002 (McCandlish Holton, P.C., Richmond, Va.), August 2002, at http://www.virtualmk.com/publications/Immigration/SSAproposes072902.pdf (last visited Apr. 1, 2003).

[FN172]. Social Security Admin., supra note 170, at 7.

[FN173]. Id. at 2, 5.

[FN174]. Letter from David A. Martin, then Immigration and Naturalization Service General Counsel, to Bruce R. Larson (Dec. 23, 1997), available at http://www.shusterman.com/pdf/ssa-martin97.pdf (last visited Apr. 1, 2003).

[FN175]. Id.

[FN176]. Id. "A valid SSN must have a total of nine digits. The first three digits are referred to as the area, the next two as the group, and the last four as the serial. No SSNs with a 000 area number, or an area number in the 800 or 900 series, have been issued. Also, no SSNs with a 00 group or 0000 serial number have been issues." Id.

[FN177]. Id.

[FN178]. Id.

[FN179]. Id.

[FN180]. Id.

[FN181]. Letter from Paul W. Virtue, then Immigration and Naturalization Service General Counsel, to undisclosed recipient (Apr. 12, 1999), available at http://www.shusterman.com/pdf/ins-ssa499.pdf (last visited Apr. 1, 2003).

[FN182]. Id.

[FN183]. Id.

[FN184]. Id.

[FN185]. Id.

[FN186]. Id.

[FN187]. Huynh & Nyberg, supra note 51.

[FN188]. Id.

[FN189]. Lyman et al., supra note 54.

[FN190]. Huynh & Nyberg, supra note 51.

[FN191]. Social Security "Mismatch" Letter a Trap for the Unwary Employer, supra note 37.

[FN192]. Huynh & Nyberg, supra note 51.

[FN193]. Id.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5 SCHOLAR 355
5 SCHOLAR 355
**(Cite as: 5 SCHOLAR 355)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Employee Verification Service (EVS)

## Verification of Names and Social Security Numbers



## Employer and Third-Party Submitter Instructions

**November 2002**
(Updated with 2004 Notice of Change)

**No-Match Cert. Admin. Record  790**

Social Security Administration
Office of Central Operations
300 North Greene Street, Baltimore, Maryland  21290-0300
Publication Number: 20-004, ICN: 437000
**1-800-772-6270**
Revision Date:  November 2002 (Updated with 2004 Notice of Change)

## Employee Verification Service
## 2004 Notice of Change

1. Paper listings should contain no more than 300 names and Social Security Numbers (SSNs) for verification.

2. A file format change has been made to the output record (File Social Security Sends to Employer) on page 12 of the EVS instruction booklet as follows:

   The output record is changed to include a death indicator in a one-position, alpha field (position 121) when the SSN verifies and the death may be disclosed. (Social Security statutes do not allow State death information to be disclosed.)

   The output file for EVS diskette users will now contain matches and mismatches. Prior to 2004, diskette users received only the name(s) and SSN(s) that did not verify.

# Employee Verification Service (EVS)

## Table of Contents

General Information  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

**Registration Information**
    Instructions  . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . .    2
    Registration Form  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3
    Federal Privacy Act Statement for Individual Employers  . . . .    4
    Federal Privacy Act Statement for Third-Party Submitters . . . .    5

**Paper Requirements and Mailing Instructions** . . . . . . . . . . . .    7

**Diskette Technical Requirements**  . . . . . . . . . . . . . . . . . . . . . . .    8

**Magnetic Tape/Cartridge Requirements**  . . . . . . . . .. . . . . . . . .    9

**File Format**  (Employer/Third-Party Submissions to Social Security) .    10

**File Format**  (SSA Results Returned to Employer/Third-Party)  . . .    12

**What To Do If A Social Security Number Fails To Verify** . . .    14


Appendix 1 (Diskette Mailing Form)
Appendix 2 (Magnetic Tape/Cartridge Mailing Form)

**No-Match Cert. Admin. Record  793**

# EVS General Information

This booklet contains instructions for <u>employers</u> and <u>third-party</u> submitters (accountants, service bureaus, etc.) to use the Social Security Administration's (SSA) Employee Verification Service (EVS).   This service matches your record of current or former employee names and Social Security numbers (SSN) with SSAs records.  It's ideal to use before you prepare and submit Forms W-2 (Wage and Tax Statements) to SSA.  Accurate name/SSN information on the W-2 allows us to properly credit your employees' earnings record, which will be important information in determining their social security benefits in the future.

EVS requests can be submitted at any time and generally take about 30 days to process.  There are several methods to choose from based on the number of employee names/SSNs that you want to verify:

**Up to 5 names/SSNs**
> Call our toll-free number for employers, 800-772-6270, or the general SSA number at 800-772-1213.  Both numbers are open for service weekdays from 7:00 a.m. to 7:00 p.m., Eastern Time.

**Up to 50 names/SSNs**
> Up to 50 names/SSNs can be submitted on paper to your local Social Security office.  Your local office will provide you with format and submission instructions.  Some offices accept faxed listings.  Check your local phone book or visit SSA online at www.socialsecurity.gov to find the office nearest you.

**Over 50 names/SSNs**
> A simple registration process is required for verification requests of more than 50 names/SSNs **or requests submitted on magnetic media** (regardless of how many items you want verified).  Just follow the registration instructions on page 2.  When SSA processes your registration form and signed privacy act statement, you'll be issued a Requester Identification Code needed to submit your data file or paper listing.
>
> Large verification requests are ideal for verifying an entire payroll database or if you hire more than 50 workers at a time.  Due to system limitations, we ask that magnetic tape or diskettes submissions contain no more than 250,000 items at a time.
>
> Media Accepted:   Paper, magnetic tape (9 track, ▯"), 3480/3490 cartridge, and 3½" diskettes. (SSA no longer accepts EVS requests on 5¼" diskettes.)

The remainder of this booklet provides registration information and formatting/submission instructions for requests of more than 50 names/SSNs.

1

**No-Match Cert. Admin. Record  794**

# EVS Registration Instructions

To register for EVS, both individual employers and third-party submitters should:

1. Complete the Registration Form found on page 3. The company address in block 2 should show a street address, city, state and ZIP code. A P.O. Box may be included in the address, but a **P.O. Box alone will not be accepted**.

   The registration form must be signed by a manager or authorized official of the company. The title of the signer **must** follow the signature.

2. There are two Federal privacy act statements included in this booklet - one for individual employers and one for third-party submitters. Sign and date the appropriate form.

3. Mail or fax both the registration form and privacy act statement to:

   > Social Security Administration
   > OCO, DES, EVS
   > 300 N. Greene Street, 5-E-10 North Building
   > Baltimore, Maryland 21290-0300
   > Fax (410) 966-3366 or (410) 966-9439

Once SSA has processed your registration request, we will mail you a Requester Identification Code. This code should be shown on your paper or in your magnetic media submission and on any EVS correspondence with SSA concerning a change in address, contact person or telephone number. EVS correspondence should be sent to the address or fax number shown above.

If you misplace your Requester Identification Code, call the EVS information line at (410) 965-7140.

No-Match Cert. Admin. Record  795

# EVS Registration Form

Complete this form, along with the appropriate privacy act statement (see pages 5 and 6) and mail or fax it to:

**Social Security Administration**
OCO, DES, EVS
5-E-10 North Building
300 N. Greene Street
Baltimore, Maryland 21290-0300
Fax (410) 966-3366 or (410) 966-9439

| |
|---|
| 1.  Name of Company |
| 2.  Company Street Address, City, State, Zip Code (P.O. Box alone is not acceptable) |
| 3.  EIN (Employer Identification Number)<br>     Provide primary EIN if your company uses more than one. |
| 4.  Contact Name and Telephone Number (include area code) |
| 5.  Fax number (if applicable) |
| 6.  How will you be submitting your data files for processing?<br><br>     __ 3½" Diskette       __ 3480 or 3490 Cartridge<br><br>     __ Paper            __ Magnetic Tape (Standard density 6250 BPI.<br>                        (If 1600 BPI is needed, check here ___.) |
| 7.  How many SSNs do you want to verify?  _____ |
| 8.  Are you a Third-Party submitter?   Yes ___    No ___ |
| 9.  Authorized Signature (Company Manager or Authorized Representative)<br>     _____<br>     Signature<br>     _____     _____<br>     Title                            Date |

3

**No-Match Cert. Admin. Record  796**

# EVS Federal Privacy Act Statement
## Individual Employers

EIN: __ __ - __ __ __ __ __ __ __

I understand that the Social Security Administration will verify Social Security Numbers (SSNs) solely to ensure that the records of my employees are correct for the purpose of my completing Internal Revenue Service Forms W-2 (Wage and Tax Statement).

I also understand that any information which I receive from records maintained by the Social Security Administration is governed by 5 USC 552a(I) of the Federal Privacy Act.  Under this Act, anyone who obtains this information under false pretenses, or uses it for a purpose other than that for which it was requested, may be punished by a fine or imprisonment or both.

Further, EVS information does not imply that you or your employee intentionally provided incorrect information about the employee's name or SSN.  It is not a basis, in and of itself, for you to take any adverse action against the employee.  EVS should **only** be used to verify workers currently employed or an entire payroll database.  Company  policy concerning the use of EVS should be applied consistently to all workers, e.g., if used for new hires, verify all new hires; if used to verify your data base, verify the entire data base.  Any employer that uses the information SSA provides regarding name/SSN verification as a pretext for taking adverse action against an employee may violate state or federal law and be subject to legal consequences.

Signature _____    Date_____

Name (Printed) _____    Title _____

4

# EVS Federal Privacy Act Statement
## Third-Party Submitters

The information on this page and your signature on the Federal privacy act statement on Page 6 serve as a formal agreement between your company and SSA. The agreement will govern the verification of employee SSNs for those employers who have executed wage reporting contracts with you. Under this agreement, the contracts between your organization and the employers must be available for inspection in the event that SSA should need to audit your records. EVS promotional material must also be available for review.

You can use a fee-based approach when offering EVS to your clients. However, caution should be taken. SSA offers services, like EVS, free of charge. Some companies in the private sector offer those same services for a fee and develop misleading brochures and advertisements. To discourage the use of misleading mailings about Social Security and Medicare, Congress enacted specific prohibitions in Section 312 of the Social Security Independence and Program Improvements Act of 1994 that broadened the existing deterrents. The prohibitions are codified at Title 42 of the U.S. Code, Section 1320b-10. You should ensure that you are aware of these legal provisions and conform to their requirements.

In a snapshot, you should:

- Be cautious <u>not</u> to suggest to your clients that this service is only available through you;

- Advise all customers that this service is available at no cost from SSA and that this service is not a unique or exclusive arrangement between SSA and your company; and

- Be sure not to give any impression when describing your EVS service to your clients that your company has an arrangement that allows direct access to SSA data bases, program software, etc.

To register, sign and date the statement found on Page 6 and send it along with your registration form to: Social Security Administration, OCO, DES, EVS, 300 N. Greene Street, 5-E-10 North Building, Baltimore, Maryland 21290-0300. Forms may also be faxed to: (410) 966-3366 or (410) 966-9439

5

# EVS Federal Privacy Act Statement
## Third-Party Submitters

EIN: __ __ - __ __ __ __ __ __ __

_____
Company Name

_____
Street Address

_____
City, State, Zip Code

The _____[1] certifies that it is authorized, under valid contracts with all outside employers of any individual for whom it will request Social Security number (SSN) verification, to handle annual wage reporting responsibilities with the Social Security Administration (SSA). The _____[1] hereby acknowledges that it is authorized, under this agreement, to request SSN verification from SSA only for the purpose of handling annual wage reporting responsibilities for these employers. The _____[1] understands that SSA agrees to verify SSNs solely to help ensure the accuracy of wage reporting.

The _____[1] also understands that information received from records maintained by SSA must be handled in accordance with the Privacy Act of 1974 (5 U.S.C. 552a). Under the terms of this Act, anyone who knowingly and willfully request or obtains from a Federal agency under false pretenses, any record concerning an individual or uses it for a purpose other than that for which it was requested, shall be subject to a criminal penalty (5 U.S.C. 552a(1)(3)). Misuse of a SSN also is a violation of the Social Security Act (42 U.S.C. 408).

Further, EVS information does not imply that you or your client intentionally provided incorrect information about the employee's name or SSN. It is not a basis, in and of itself, for your client to take any adverse action against an employee. EVS should only be used to verify workers currently employed or an entire payroll database. Your client's policy concerning the use of EVS should be applied consistently to all workers, e.g., if used for new hires, verify all new hires; if used to verify a client's data base, verify the entire data base. Any client/employer that uses the information SSA provides regarding name/SSN verification as a pretext for taking adverse action against an employee may violate state or federal law and be subject to legal consequences.

Signature _____    Date_____

Name (Printed) _____    Title _____

[1]  Enter Your Company's Name

No-Match Cert. Admin. Record  799

# Paper Requirements and Mailing Instructions

**NEW FOR 2004** → Social Security will accept paper listings of 50 to 300 names and SSNs for verification.

Follow these instructions for submitting paper listings to SSA for verification.

1. Complete and send the registration form and privacy act statement to SSA. When you receive your four-digit Requester Identification Code, you are ready to submit your paper listings.

   **Keep a copy of your privacy act statement.**  You will need to send a copy of the statement with each listing you want verified.

2. Format your listing to include the following data:

   > Social Security Number
   > Last Name, First Name, Middle Initial
   > Date of Birth (MMDDYYYY)
   > Gender Code (M-Male; F-Female)

   This listing may be formatted across a page in a columnar format, such as:

   | Social Security Number | Last Name | First Name | Middle Initial | Date of Birth | Gender |
   |---|---|---|---|---|---|
   | | | | | | |

3. Send the paper listing, your 4-digit Requester Identification Code and **a signed copy of your privacy act statement** to:

   > Social Security Administration
   > Wilkes-Barre Data Operations Center
   > P.O. Box 6500
   > Wilkes-Barre, PA 18767-6500

   **Do not send paper listings to Baltimore or your local office** with your registration form. Paper listings with 50 to 300 SSNs must be sent to the Wilkes-Barre address above.

Call the EVS information line, 410-965-7140, if you have questions or need additional information.

No-Match Cert. Admin. Record  800

# Diskette Technical Requirements

1. A 3½" diskette **must** contain the file EVSREQ2K.   (SSA no longer accepts EVS requests on 5¼" diskettes.)

2. The file name EVSREQ2K **must** be in the root directory.
   Do not use file extensions, i.e., .txt, .wpd when naming your file.

3. A diskette must contain only one file named EVSREQ2K.  Put multiple files on separate diskettes.  No files other than EVSREQ2K should be included on a diskette.

4. Oper ating System: All diskettes must be created using a MS-DOS operating system format.  SSA will not process any diskettes that are not MS-DOS compatible.  They will be returned to you.

   If you do not have a MS-DOS operating system, you may still be able to create MS-DOS compatible diskette files.  Some operating systems, e.g., UNIX, XENIX and APPLE may have a DOS shell that can be used to create these files.  Check your operating system manual.

5. Data must be recorded on 3½" diskettes using the text file f ormat.

6. Each record in a file **must** be 130 characters in length.  Data must be entered in each record in the exact positions shown in the layout.

7. Reports sent on MS-DOS 3½" double sided diskettes **must** be formatted to
       high density 1.44 megabytes; double density 720 kilobytes.

   Formatting diskettes to a density other than that specified above will prevent SSA from processing your report.

   **DO NOT COMPRESS DATA.  SSA CANNOT PROCESS SINGLE SIDED DISKETTES.**

8. Record delimiters are not to be us ed, i.e., do not place a comma or any other character after any field that would make it the end of the data field.

9. Complete the transmittal form found in Appendix 1 and send it along with your diskette to the address on the form.

8

**No-Match Cert. Admin. Record  801**

# Magnetic Tape/Cartridge Technical Requirements

Use the following specifications for submitting tapes or cartridges to Social Security:

| | | |
|---|---|---|
| Dataset Name | : | VATPR2K |
| Tape | : | Use 9 track, ⬚ inch magnetic tape or a 3480/3490 cartridge |
| Density | : | Use the density of 6250.  1600 can be requested in Block 6 of the Registration Form. |
| Recording Code | : | EBCDIC |
| Fixed Length Record | : | 130 characters |
| Blocking Factor | : | 200 preferred |
| Fixed block size | : | 26,000 recommended<br>Tapes with a block size other than 26,000 may cause a delay in processing. |
| Data | : | Unpacked  (The user control data field may be packed.)<br>Standard IBM OS Headers and Trailers, separated from data by tape marks.  If unable to do so, put two tape marks at the end of the file. |
| Internal Label<br>External Label: | : | Standard IBM or no label at all.<br>Prepare a label for the outside of your tape showing the following data: |

| | | |
|---|---|---|
| Dataset Name | : | VATPR2K |
| Requester ID Code: | | Unique 4-position code assigned by Social Security. |
| External Tape No : | | If you use one of the tapes provided by Social Security, <u>please peel off or obliterate Social Security's label and tape number or this tape may be erased and returned to stock unprocessed.</u> |

Mailing Instructions:   Complete the transmittal form found in Appendix 2 and send it, along with your tape or cartridge, to the address on the form.

**No-Match Cert. Admin. Record  802**

# File Format for Employer/Third-Party Submissions to SSA

**Tape/Cartridge Dataset Name:    VATPR2K**          **Diskette File Name:    EVSREQ2K**

SOCIAL SECURITY NUMBER
Must include all 9 digits including lead zeros. Position—1-9. Field Size—9. Field Type—Numeric. This field must be filled.

ENTRY CODE "TPV"
Must insert "TPV" in Position 10-12. Field Size—3. Field Type—Alpha. This field must be filled.

PROCESSING CODE 214
Must insert "214" in Position—13-15. Field Size—3. Field Type—Numeric. This field must be filled.

LAST NAME
Do not use hyphens, apostrophes, blanks, periods, suffixes (Jr.), or prefixes (Dr.). Must contain at least one character. Position—16-28. Field Size—13. Field Type—Alpha/Numeric. This field must be filled.

FIRST NAME
Do not use hyphens, apostrophes, blanks, periods, suffixes (Jr.), or prefixes (Dr.). Must contain at least one character. Position—29-38. Field Size—10. Field Type—Alpha/Numeric. This field must be filled.

MIDDLE NAME/INITIAL
Do NOT use hyphens, apostrophes, blanks, periods, suffixes (Jr.), or prefixes (Dr.). Must contain at least one character.  Position—39-45. Field Size—7. Field Type—Alpha/Numeric. This field is not required for verification.  They are required if the input SSN fails to verify and SSA searches for a different SSN.

DATE OF BIRTH (MMDDYYYY)
If unknown, leave blank. Position—46-53. Field Size—8. Field Type—Numeric. This field is not required for verification.

GENDER CODE
M=Male, F-Female, U=Unknown: Position—54. Field Size—1. Field Type—Alpha. This field is not required for verification. They are required if the input SSN fails to verify and SSA searches for a different SSN.

BLANKS
SSA use only. Position - 55-89. Field Size—35. Field Type—Blanks.

USER CONTROL DATA
Employer Use Only. Position - 90-103. Field Size - 14. Field Type – Alpha/Numeric.

No-Match Cert. Admin. Record  803

# File Format for Employer/Third-Party Submissions to SSA
## Continued

BLANKS
SSA use only.  Position - 104-123.  Field Size – 20.  Field Type – Blanks.

REQUESTER IDENTIFICATION CODE
Enter the Registration Code supplied by SSA during the registration process – see page 1.
Position—124-127.  Field Size—4.  Field Type—Alpha/Numeric.  This field must be filled.

MULTIPLE REQUEST INDICATOR – Employer use only.  Ideal for submitting multiple files at the same time.  Position—128-130.  Field Size—3.  Field Type—Numeric.  This field is not required for verification.

NOTE:  If a field marked "This field must be filled"  does not contain an entry, the item is automatically a non-verified record.

No-Match Cert. Admin. Record  804

# File Format for SSA's Return File to Employer/Third-Party

Tape Dataset Name        :    PUR.VATPV2K.J**xxxx**   (**xxxx** = Requester identification code)
Cartridge Dataset Name:    PUR3480/3490.VATPV2K.J**xxxx**
Diskette File Name       :    EVSVER2K

SOCIAL SECURITY NUMBER
Data identical to input provided by requester. Position—1-0. Field Size—9. Field Type—Numeric.

LAST NAME
Data identical to input provided by requester. Position—10-22. Field Size—13. Field Type—Alpha/Numeric.

FIRST NAME
Data identical to input provided by requester. Position—23-32. Field Size—10. Field Type—Alpha/Numeric.

MIDDLE NAME/INITIAL
Data identical to input provided by requester. Position—33-39. Field Size - 7. Field Type - Alpha/Numeric.

DATE OF BIRTH (MMDDYYYY)
Data identical to input provided by requester. Position—40-47. Field Size—8. Field Type—Numeric.

GENDER CODE
Data identical to input provided by requester: Position-48. Field Size-1. Field Type-Alpha.

BLANKS – SSA USE ONLY
Position—49-83. Field Size—35. Field Type—Not Applicable.

USER CONTROL DATA
Data identical to input provided by requester. Position—84-97. Field Size—14. Field Type—Alpha/Numeric.

VERIFICATION CODE
Blank = Verified.  For tape/cartridge/paper files, each SSN sent in file will be returned with a verification code. Position—98. Field Size—1. Field Type—Alpha/Numeric.
Blank means the record agrees with SSA's data file. For diskettes, only the SSNs that do not match will be returned to you.
1= SSN not in file (never issued to anyone).
2= Name and DOB match; gender code does not.
3= Name and gender code match; DOB does not.
4= Name matches, DOB and gender code do not.
5= Name does not match; DOB and gender code not checked.
* = Input SSN did not verify.  Social Security located and verified a different SSN shown in positions 112-120.

12

**No-Match Cert. Admin. Record  805**

# File Format for SSA's Return File to Employer/Third-Party
## Continued

PROCESSING CODE 214
Position - 99-101.  Field Size-3.  Field Type-Numeric.

REQUESTER IDENTIFICATION CODE
Position—102-105.  Field Size-4.  Field Type-Alpha/ Numeric.

MULTIPLE REQUEST INDICATOR
Data identical to input provided by requester: Position—106-108.  Field Size—3.  Field Type—Numeric.

BLANKS
Position—109-111.  Field Size—3.  Field Type—Not Applicable.

VERIFIED SSN LOCATED BY SSA
SSN located and verified on name, DOB and gender.  Position—112-120.  Field Size—9.  Field Type—Numeric.

DEATH INDICATOR
Position—121.  Field Size—1, Field Type—Alpha
Y = SSA records indicate that the number holder is deceased.
Blank—Default value.

BLANKS
Position—122-130.  Field Size—9.  Field Type—Not applicable.

13

No-Match Cert. Admin. Record  806

# What to Do If An SSN Fails To Verify

## Requests Submitted on Tape/Cartridge/Paper Listing

Each SSN sent in the file will be returned to you with a verification code. If the verification code is blank, the record agrees with SSA's data file. Please annotate your records that this SSN has been verified.

If the verification code is not blank, follow these steps:

1. Ask to see the employee's Social Security card to assure that the SSN and name were correctly shown on the file.

2. Check to see if you made a typographical error. If so, correct the data and resend to SSA in a subsequent file. Please resend only the corrected data.

3. If the SSN shown on the card and the file match, ask the employee to check with any Social Security Office or call 1-800-772-1213 to determine and correct the problem. Ask the employee to give you the corrected name or Social Security number for your payroll records.

## Requests Submitted on Diskette

Each SSN sent in the file will be returned to you with a verification code. If the verification code is blank, the record agrees with SSA's data file. (Prior to 2004, diskette users received only the name(s) and SSN(s) that did not verify.)

If the verification code is not blank, follow these steps:

1. Ask to see the employee's Social Security card to assure that the name and SSN were correctly shown on the file.

2. If an error was made on the file, correct your records and send the SSN and related data to SSA in a subsequent file.

3. If the Social Security card and the file match, ask the employee to check with any Social Security Office to determine and correct the problem.

14

**No-Match Cert. Admin. Record  807**

**Appendix 1**

# Diskette Only Mailing Form and Address

**Complete this form and mail it along with your diskette to:**

**Social Security Administration**
**OCO, DES, EVS**
**5-E-10 North Building**
**300 North Greene Street**
**Baltimore, MD 21290-0300**

1. Name and Address of Company -- Show street, city, state and zip code.

2. If media should be returned to an address other than above, indicate that address here.

3. Contact Name and Phone Number (include area code) -- Show the name and phone number of the person Social Security should contact regarding this diskette.

4. EVS Requester Identification Code -- This code was provided by Social Security during the registration process.

5. Number of Diskettes -- (3½" High Density).

6. Record Count -- Show the number of SSNs on the file.

7. Date Mailed

**Appendix 2**

# Magnetic Tape/Cartridge Mailing Form and Address

Complete this form and mail it along with your <u>magnetic tape/cartridge</u> to:

**Social Security Administration**
**OCO, DES, EVS, 5-E-10 North Building**
**300 North Greene Street**
**Baltimore, MD 21290-0300**

1. Name and Address of Company -- Show street, city, state and zip code.

2. If media should be returned to an address other than above, indicate that address here.

3. Contact Name and Phone Number (include area code) -- Show the name and phone number of the person Social Security should contact regarding this tape/cartridge.

4. EVS Requester ID Code -- This code was provided by Social Security during the registration process.

5. Volume Serial Number of Tape/Cartridge

6. Record Count -- Show the number of SSNs on the file.

7. Block size -- 26,000 is preferred

8. Date Mailed



### Immigration Employment Compliance Handbook
Austin T. Fragomen, Jr. and Steven C. Bell
**Database updated August 2004**

### Chapter 3. Key I-9 Issues
### II. I-9 Problems for Employers: When Further Inquiries Are Warranted

Table of Contents  Index

§ 3:12. STRATEGIES WHEN AN EMPLOYER RECEIVES SOCIAL SECURITY ADMINISTRATION "NO-MATCH" LETTER

Constructive knowledge issues are raised in situations in which an employer receives information from the Social Security Administration (SSA) that some percentage of its work force does not have matching names and Social Security numbers (a "no-match" letter). The SSA generates no-match letters when they receive Social Security information for an employee that does not match the agency's records. If a name or a Social Security number (SSN) on a W-2 form does not match the agency records, the Social Security earnings are retained in a suspense file while the SSA seeks to resolve the discrepancies. In recent years, such discrepancies have arisen with regard to 6-7 million workers annually and $420 billion has been deposited in the earnings suspense file. The agency's "no-match letter" program is designed to help reduce the earning suspense file. In recent years, the agency has expanded the program in an effort to clean up its SSN database in preparation for an internet-based SSN verification system that will be available to all employers in the United States. The typical SSA no-match letter, titled "Employer Correction Request," generally explains that discrepancies exist between the SSA's database and employee information provided by the employer on the W-2 form, and requests that employers respond to the letter with corrections "within 60 days." A list of mismatched Social Security numbers (SSNs) is typically attached to the letter, along with information on making corrections.

Until recently, the SSA sent no-match letters only to employers who had discrepancies affecting 11 or more employees, or at least 10 percent of the employer's workforce. That policy resulted in about 40,000 no-match letters sent annually to employers. Under a policy planned in 2000 but implemented in 2002, no-match **letters** were sent to any employer with at least one employee **mismatch**. The result was that more than 900,000 no-match letters were sent in 2002; in other words, about one in eight employers in the country received a no-match letter. The letters covered approximately seven million workers. The expanded program and the absence of widely disseminated guidance from the immigration authorities caused confusion among employers regarding their obligations pursuant to the letter and, in many cases, had given rise to hasty and ill-considered termination of employees. The latest reports indicate that thousands of workers lost employment due to the effects of the expanded no-match letter program.

While the expanded program led to much confusion and ill-considered terminations, the program did not achieve its primary goal as very few employers submitted corrected information to the agency. Accordingly, the agency decided to revise its policies regarding the parameters for selecting employers in order to reduce the number of no-match letters issued. Other revisions to the program were designed to minimize the number of hasty terminations based on misinterpretations of the law and increase the number of responses with corrected information. Under the revised SSA policy, no-match letters are sent only to those employers with more than 10 employees with mismatched information or for whom mismatched employees represented one half of one percent of the W-2 forms filed by that employer with the SSA. The agency has stated that it expects to issue only about 130,000 no-match letters in 2003 or about 770,000 less than in 2002. The agency stated that it sent 126,250 employer no-match letters in 2003, or about 770,000 less than in 2002. The SSA explains that it restructured the method for calculating which employers should receive a no-match letter beginning in 2003 because few employers submitted corrected information to the SSA, and much of the information received still did not match the agency's database information.

**No-Match Cert. Admin. Record  810**

**(Publication page references are not available for this document.)**

Apart from changing the parameters as to which employers are notified, the agency also announced that it would begin issuing a no-match letter to each no-match employee. Such letters are sent about two to three weeks before the no-match letter is sent to the employer. If the agency does not have a valid address listed for a particular employee, it mails the letter directly to the employer. About 9.5 million of these letters were sent to employees in 2003. Keep in mind that even if an employee corrects his or her SSN information in response to an SSA letter, employers are still sent a no-match letter listing that employee. The issuance of an employer no-match letter in these cases is not a statement on the validity of the information supplied by the employee. Instead, it is a function of the automated process of production of the employer no-match letters. As a result, the employer should first inquire of the employee as to whether he or she has already forwarded corrected information to the SSA in response to a no-match letter.

There are also several changes to the content of the no-match letter. Most notably, the SSA has removed a reference contained in the 2002 letter to a possible Internal Revenue Service (IRS) penalty for failure to supply accurate SSN information. The letter also states that the discrepancy does not constitute notice that an employee lacks a lawful immigration status. As in past years, the letter also cautions employers against taking adverse actions against employees based solely on the no-match, and that taking such actions may violate state and federal law.

**Duty to inquire and document abuse: the gray area in "no-match" cases and impact of 2003 changes.** As noted, the SSA letter cautions that the receipt of a no-match letter by itself does not provide a basis for taking adverse action against an employee, nor is it conclusive evidence that the individual is not eligible to work in the United States. The SSA has also stated that it does not independently notify the immigration enforcement bureau of situations where employee Social Security information is inconsistent with SSA records. Guidance from the INS (the prior immigration enforcement bureau) and the OSC also confirmed that an employer should not deduce from such a letter than the employee is unauthorized to work. On the other hand, the INS had suggested that an employer has an affirmative obligation to re-verify an employee's work authorization status when an employer's attempts at resolving the discrepancies raised in a no-match letter have failed. Failure to conduct reverification in these situations may lead to a finding of constructive knowledge that an employee lacked work authorization. The OSC has also stated that reverification when the discrepancies raised in the no-match letters cannot be resolved would not constitute document abuse.

The revisions to the program in 2003 do not substantially change the employer's obligations under **employer sanctions** law. Clearly, the SSA lacks authority to make any representations as to an employer's liabilities under federal immigration law, an area of law that is now within the jurisdiction of the Department of Homeland Security (DHS). Within the DHS, the U.S. Immigration and Customs Enforcement (ICE), an INS successor agency, is charged with enforcing **employer sanctions** law. While the prior INS opinions addressing an employer's legal obligations under immigration law are not binding on the new agency, it will certainly be used as a starting point by the new bureau. Moreover, with the emphasis on enforcement in the post-September 11th environment, it is unlikely that the new bureau will adopt more lenient policies than its predecessor with regard to the no-match letters. Until the new bureau issues its own guidance, therefore, the employer should adopt policies that conform to the latest INS pronouncements on the issue.

Furthermore, while references to IRS fines have been removed, the revised letter does not change the SSA's obligation under current law to provide the IRS with information on no-match W-2 forms nor does the amended letter prevent the IRS from issuing penalties when the name and SSN fail to match SSA records. The IRS is authorized by regulation to fine employers $50 for each incorrectly reported SSN up to a maximum of $250,000. However, penalties resulting from SSN mismatches on W-2 forms may be waived in certain circumstances where there is reasonable cause. In order to qualify for the waiver, the employer must establish that there were significant mitigating factors with respect to the failure or that the failure arose from events that were beyond the employer's control. In addition, the employer must show that it acted in a responsible manner before and after the failure occurred. Events beyond the filer's control include actions of another party, including the employee -- such as where the employer received a Social Security number from the employee, relied on the number in good faith, used the number on Form W-2, and received a penalty notice from the IRS notifying the employer that the Social Security number was incorrect. Significant mitigating factors can include the fact that the employer has a history of complying with reporting requirements.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(Publication page references are not available for this document.)**

Where there has been an SSN mismatch, the employer can demonstrate that it acted in a responsible manner by showing that it properly solicited the employee's SSN at the time the employee began work. No additional solicitations of the number are required unless the Internal Revenue Service sends a notice to the employer informing it of the mismatch. Upon receipt of the IRS notice, the employer may be required to make an annual solicitation for the correct Social Security number if its records contain the incorrect SSN at the time of the notice. The employer must solicit the employee's correct SSN by December 31 of the year in which the penalty notice was received; the solicitation may be made in person or by mail or telephone. The employer is not required to make the solicitation if there will be no reportable payments made to the employee in that year. The employer may be required to make a second annual solicitation if the employer receives another IRS mismatch notice in any subsequent year. The employer may rely on the SSN provided by the employee in response to the solicitation. If the employer receives yet another IRS notice of an SSN mismatch after making the two required solicitations, it is not required to make further solicitations. The employer's initial solicitation of the SSN upon the employee's commencement of work and the two subsequent annual solicitations in response to the mismatch notice will demonstrate that the employer acted in a reasonable manner before and after the failure to provide correct information, and will establish reasonable cause to grant the waiver of penalties. The failure to undertake follow-up activity when a no-match letter is received will bar an employer from raising the "due diligence" defense.

To summarize, while the revised SSA policies should lead to fewer "no-match" letters being issued, the policies do not affect an employer's obligations under current **employer sanctions** law, anti-discrimination law, IRS regulations, or other federal or state law.

A suggested strategy for employers that have received these no-match letters follows. The strategy is based on past SSA, INS, and OSC opinions addressing an employer's legal obligations under the INA and other federal law as discussed in Chapter 6, below.

• *Step 1. Review information in mismatch letter to determine whether any of the Social Security numbers at issue are invalid.* As noted, the INS has stated that, as a general matter, a no-match letter from the SSA does not, in and of itself, place an employer on notice that an employee is ineligible to work, or require the employer to conduct reverification of documents. The INS reasoned that there may be many legitimate reasons for a discrepancy between the name and SSN reported by the employee on the W-2 and SSA records. The discrepancies raised in a no-match letter, for example, may stem from typographical errors, changed names, or the use of compound last names. The agency cautioned, however, that there may be specific situations in which the no-match letter may lead to a duty to re-verify. The no-match letter informs an employer that the following numbers are invalid Social Security numbers: (1) numbers with more or less than nine digits; (2) numbers whose first three digits are 000 or are in the 800 or 900 series; (3) numbers whose middle two digits are 00; and (4) numbers whose last four digits are 0000. If any of the SSNs listed in the no-match letter involves such a number, the letter itself serves as notice to the employer that the employee has provided an invalid SSN. Accordingly, the employer must re-verify the employee's work eligibility in these situations. The failure to conduct re-verification in these circumstances could lead to a finding that the employer knowingly continued to employ an alien who lacked work authorization (if in fact the employee is undocumented).

• *Step 2. Formulate and execute company policy regarding follow-up activity in all other cases.* While immigration law does not require follow-up activity and the SSA lacks enforcement authority, the IRS may penalize employers for incorrect W-2s and the failure to conduct follow-up activity will bar an employer from obtaining a reasonable cause waiver. The SSA has no independent enforcement authority to address no-match issues. In addition, the INS had stated that immigration law does not require follow-up activity when a no-match letter is received unless the discrepancies raised in the letter relate to invalid SSNs as described above. Moreover, the SSA does not share **mismatch** information with immigration authorities. In fact, the only information that the SSA shares with the immigration enforcement agency is information relevant to investigations between the two agencies of such issues as fraudulent SSNs and information on earnings reported for SSNs assigned for nonwork purposes (the SSA is required by law to share this information for annual review purposes). The SSA is required by law, however, to provide the IRS with information on no-match W-2 forms and the IRS may penalize an employer when the name and SSN do not match SSA records (as discussed above). An employer, therefore, should conduct some follow-up activity after receiving an SSA no-match letter to resolve any discrepancies and avoid an IRS penalty

**No-Match Cert. Admin. Record  812**

notice. As discussed above, once an IRS penalty notice is issued, the employer is required under IRS regulations to undertake follow-up activity and the failure to do so will bar an employer from obtaining a "reasonable cause" waiver.

• The employer's policy with regard to no-match **letters** should be applied in a uniform manner to avoid allegations of discrimination. The employer should first attempt to reconcile its own records with those of the SSA by determining whether an internal administrative error or typo could have resulted in transmitting erroneous information to the agency. The employer may also contact the employee and request verification of their SSN for purposes of correcting the discrepancy. Information regarding alternative name spellings or name changes should also be solicited from the employee. As noted, an SSA no-match **letter** should have been sent to the employee and he or she may have already taken action to correct the discrepancy.

• *Step 3. Make appropriate corrections to I-9 forms when follow-up activity reveals employee information was recorded erroneously or discrepancy relates to a legitimate name change.* If the employer's follow-up activity reveals that the information was recorded erroneously or relates to a name change, the discrepancy should be corrected with the SSA, and the employee's Form *I-9* should be updated as well. Specifically, the employee should be asked to cross out the incorrect SSN in Section 1 of the Form, enter the correct number, and initial and date the correction. If the employee previously provided a Social Security card as a "List C" document during the initial verification process, the employer may again request the original card for review. The employer should then cross out the previous number in Section 2, enter the correct number listed in the card, and initial and date that correction. The employer should also complete and file IRS Form W-2C to re-assign previous income to the appropriate SSN. If the discrepancy relates to the employee's name, the employee should be asked to cross out the name listed in Section 1, enter the correct name, and initial and date the correction.

• *Step 4. Apply company policy when follow-up activity reveals fraud is involved.* If, in the course of the employer's follow-up activity, the employee in question reveals that he or she previously provided a false number to secure employment, but since that time has become work authorized and can now provide a valid number, the employer should confer with their internal or external employment counsel regarding the company policy covering such a situation. Some companies have a policy to terminate any employee who admits to making any material misrepresentation during the hiring process. OCAHO has recently upheld such a company policy. In a 2003 case, an ALJ held that an employer's use of a consistently applied honesty policy of terminating employees who fraudulently use Social Security numbers, or otherwise fail to provide truthful information on required forms and documents, does not violate IRCA's anti-discrimination provision. Other companies take a more liberal approach, allowing the employee to continue working, as he or she is now employment authorized. This is an acceptable policy, as long as the employer can demonstrate that it had no actual or constructive knowledge of the employee's unlawful status at the initial time of hire. If an employer determines that an employee has fraudulently executed Form *I-9* but allows the employee to continue working, the employer should not rely on that form as a verification of employment eligibility, and should require that the employee complete a new Form *I-9* (but retain the original form as evidence of compliance with the verification requirements at the time of hire). Remember that the employer should apply its policy in a nondiscriminatory manner.

• Employers should be cautioned that changes to name or SSN information recorded on the *I-9* form do not necessarily mean that fraud is involved. As noted, name changes occur for a variety of reasons and the name may have been recorded incorrectly. Similarly, SSNs may be recorded erroneously on forms. On the other hand, SSNs assigned to individuals do not change, and, therefore, a claimed change of SSN is a situation that raises a red flag. Nonetheless, all such situations must be reviewed using common sense. A change to an SSN that merely corrects a transcription error (e.g., recording one or two digits erroneously) would be an unlikely indicator of fraud, but if an employee reports an entirely different SSN than the one he or she previously has used, fraud is likely involved. In these cases, the employer must inquire further as to the basis for issuance of the new SSN. Similarly, receipt of information showing that an employee has been working under a completely different name than his or her actual name reasonably raises questions about an employee's identity that are not raised by other legitimate corrections such as a change of a last name due to marriage, correction of a middle initial, reconciliation of an incorrectly or differently recorded ethnic name, etc. Again, the employer must inquire further as to the basis for the name change.

• *Step 5. Conduct reverification when discrepancies cannot be resolved after follow-up activity.* The INS had taken the position that an employer cannot ignore the consequences of any follow-up activity undertaken by the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(Publication page references are not available for this document.)**

employer to resolve the discrepancies raised by an SSA no-match **letter**. If an employee provided an SSN that the SSA has identified as a **mismatch,** and such employee is unable to provide clarification or confirmation of the validity of the SSN within a reasonable period of time, this may give rise to an inference that the employee is not work authorized. In such circumstances, further review of the employee's employment eligibility is warranted and the employer may take appropriate steps (including termination of employment) if adequate documentation cannot be presented or the employee reveals that he or she is unauthorized for employment. Remember that any investigation into an employee's status in this regard must be conducted in a consistent and nondiscriminatory manner.

Copyright West, a Thomson business

IMECH § 3:12
END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**Immigration Employment Compliance Handbook**
Austin T. Fragomen, Jr. and Steven C. Bell
**Database updated August 2004**

**Chapter 6. Complaint Procedures and Administrative Proceedings**
**VIII. Selected Legal Issues**

<u>Table of Contents</u>  <u>Index</u>

## § 6:53. --SSA "NO-MATCH" LETTERS AND PRESENTATION OF NEW SOCIAL SECURITY NUMBERS

A question has arisen as to whether actual or constructive knowledge exists in situations in which an employer receives information from the Social Security Administration (SSA) that some percentage of its work force does not have matching names and Social Security numbers (a "no-match" letter). The SSA generates no-match letters when they receive Social Security information for an employee that does not match the agency's records. The typical SSA no-match letter, titled "Employer Correction Request," generally explains that discrepancies exist between the SSA's database and employee information provided by the employer on the W-2 form, and requests that employers respond to the letter with corrections "within 60 days." A list of mismatched Social Security numbers (SSNs) is typically attached to the letter, along with information on making corrections. Until recently, the SSA sent no-match letters only to employers who had discrepancies affecting 11 or more employees, or at least 10 percent of the employer's workforce. That policy resulted in about 40,000 no-match letters sent annually to employers. Under a policy planned in 2000 but implemented in 2002, no-match **letters** were sent to any employer with at least one employee **mismatch.** The result was that more than 900,000 no-match letters were sent in 2002; in other words, about one in eight employers in the country received a no-match letter. The letters covered approximately seven million workers. The expanded program and the absence of widely disseminated guidance from the immigration authorities caused confusion among employers regarding their obligations pursuant to the letter and, in many cases, had given rise to hasty and ill-considered termination of employees. The latest reports indicate that thousands of workers lost employment due to the effects of the expanded no-match letter program.

While the expanded program led to much confusion and ill-considered terminations, the program did not achieve its primary goal as very few employers submitted corrected information to the agency. Accordingly, the agency has decided to revise its policies regarding the parameters for selecting employers in order to reduce the number of no-match letters issued. Other revisions to the program are designed to minimize the number of hasty terminations based on misinterpretations of the law and increase the number of responses with corrected information. Under the revised SSA policy, no-match letters will be sent only to those employers with more than 10 employees with mismatched information or for whom mismatched employees represented one half of one percent of the W-2 forms filed by that employer with the SSA. The agency stated that it sent 126,250 employer no-match letters in 2003, or about 770,000 less than in 2002. There are also several changes to the content of the no-match letter. Most notably, the SSA has removed a reference contained in the 2002 letter to a possible Internal Revenue Service (IRS) penalty for failure to supply accurate SSN information. The letter also states that the discrepancy does not constitute notice that an employee lacks a lawful immigration status. As in past years, the letter also cautions employers against taking adverse actions against employees based solely on the no-match, and that taking such actions may violate state and federal law.

While the revised SSA policies should lead to fewer "no-match" letters being issued, the policies do not affect an employer's obligations under current **employer sanctions** law, anti-discrimination law, IRS regulations, or other federal or state law. Guidance from the INS (the ICE predecessor agency) and the OSC confirm that an employer should not deduce from such a letter that the employee is unauthorized to work. The INS had stated that immigration law does not require follow-up activity when a no-match letter is received unless the discrepancies raised in the letter relate to invalid SSNs (as described below). On the other hand, the INS stated that an employer has an affirmative obligation to re-verify an employee's work authorization status when an employer's attempts at resolving the discrepancies raised in a no-match letter have failed. Failure to conduct reverification in these situations may

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lead to a finding of constructive knowledge that an employee lacked work authorization. The OSC has also stated that reverification when the discrepancies raised in the no-match letters cannot be resolved would not constitute document abuse. In addition, while immigration law does not require follow-up activity and the SSA lacks enforcement authority, the IRS may penalize employers for incorrect W-2s and the failure to conduct follow-up activity will bar an employer from obtaining a reasonable cause waiver. The SSA is required by law to provide the IRS with information on no-match W-2 forms and the IRS may penalize an employer when the name and SSN do not match SSA records (as discussed below). Many employers, therefore, will conduct some follow-up activity after receiving an SSA no-match letter to resolve any discrepancies and avoid an IRS penalty notice. As noted, the follow-up activity may yield information that will raise an obligation to inquire further under **employer sanctions** law.

**Legacy INS guidance.** The INS had issued several opinions regarding an employer's legal obligations under **employer sanctions** law when an SSA no-match letter is received. As of March 1, 2003, however, the U.S. Immigration and Customs Enforcement (ICE) is charged with enforcing **employer sanctions** law. While the prior INS opinions addressing an employer's legal obligations under immigration law are not binding on the new agency, it will certainly be used as a starting point by the new bureau. Moreover, with the emphasis on enforcement in the post-September 11th environment, it is unlikely that the new bureau will adopt more lenient policies than its predecessor with regard to the no-match letters. Until the new bureau issues its own guidance, therefore, the employer should adopt policies that conform to the latest INS pronouncements on the issue.

The INS addressed the SSA no-match letter issue in a December 23, 1997 opinion letter issued by the INS General Counsel. The INS stated that a no-match letter from the SSA does not, in and of itself, place an employer on notice that an employee is ineligible to work, or require the employer to conduct reverification of documents. The INS explained that there may be many legitimate reasons for a discrepancy between the name and SSN reported by the employee on the W-2 and SSA records. The agency cautioned, however, that there may be specific situations in which the no-match letter may lead to a duty to re-verify. For example, the no-match informs an employer that the following numbers are invalid Social Security numbers: (1) numbers with more or less than nine digits; (2) numbers whose first three digits are 000 or are in the 800 or 900 series; (3) numbers whose middle two digits are 00; and (4) numbers whose last four digits are 0000. If any of the SSNs listed in the no-match letter involves such a number, the letter itself serves as notice to the employer that the employee has provided an invalid Social Security number. Accordingly, the failure to conduct re-verification in these circumstances could lead to a finding that the employer knowingly continued to employ an alien who lacked work authorization (if in fact the employee is undocumented).

The Service also addressed the employer's IRCA obligations if it learns that the employee's name or SSN is different from that shown on the Form I-9. The INS General Counsel stated that upon receipt of information from the employee indicating that any information recorded on Form I-9 is erroneous, the employer should correct it in a manner that shows the correct information without obliterating the formerly recorded information (e.g., draw a line through the incorrect information, record the correct information, and initial and date the correction). If the correction relates to Section 1 of the form, the employee should also initial the correction. If the new information contradicts information in Section 2 (e.g., the name or SSN of the employee as shown on previously presented documentation), the employer may request to see acceptable documentation showing the correct information in order to ensure accuracy.

The letter further asserts that a notification from an employee that his or her SSN has changed does not by itself put the employer on notice that the employee is presently not work authorized but the notification may put the employer on notice that the employee has committed fraud. A likely scenario is that the employee has been working under a false SSN, the employee subsequently becomes work authorized and obtains a legitimate SSN, and the employee informs his employer that his SSN has changed to ensure that his earnings are credited. The letter asserts that knowing false statements on the I-9 form or the use of false documents to obtain employment are felonies, and an employer that suspects them may apply, in a nondiscriminatory manner, any policies it applies generally to suspected criminal conduct in its workplace, or to suspected false statements in employment documentation. If an employer determines that an employee has fraudulently executed Form I-9, the employer should not rely on that form as a verification of employment eligibility, and should require that the employee complete a new Form I-9 if the employer continues the employment (but retain the original form as evidence of compliance with the verification

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

requirements at the time of hire).

The INS cautioned, however, that changes to name or SSN information recorded on the I-9 form do not necessarily mean that fraud is involved. The INS noted, for example, that name changes occur for a variety of reasons and the name may have been recorded incorrectly. Similarly, SSNs may be recorded erroneously on forms. On the other hand, SSNs assigned to individuals do not change, and, therefore, a claimed change of SSN is arguably a situation that raises more of a red flag than a claimed change of name. Nonetheless, all such situations must be reviewed using common sense. A change to a SSN that merely corrects a transcription error (e.g., recording one or two digits erroneously) would be an unlikely indicator of fraud, but if an employee reports an entirely different SSN than the one he or she previously has used, fraud is likely involved. Similarly, receipt of information showing that an employee has been working under a completely different name than his or her actual name reasonably raises questions about an employee's identity that are not raised by other legitimate corrections such as a change of a last name due to marriage, correction of a middle initial, reconciliation of an incorrectly or differently recorded ethnic name, etc.

The INS again addressed appropriate employer conduct in situations involving SSA no-match letters in a letter dated April 12, 1999, from the INS General Counsel. The letter rejected the position that in situations other than a reported discrepancy that relates to a misspelled name or transposed digits in the SSN, a SSA no-match letter would serve as actual or constructive notice that an employee is unauthorized to work in the United States, and, therefore, the employer has an obligation to re-verify the employee's work eligibility in these circumstances. The INS explained that it is not true that notice of a discrepancy constitutes notice of a lack of work authorization unless the error is clearly a minor typographical one. The agency noted, for example, that the no-match notice may result from a name change and such changes may occur for valid reasons.

The INS warned, however, that the employer should not assume that it may safely ignore the no-match letters. The agency noted, for example, that an employer may receive information from other sources, such as a tip from another employee, indicating that an employee is unauthorized. If the employer also receives a no-match letter relating to that employee, the notice is relevant in considering whether the circumstances rise to actual or constructive knowledge that an employee may be unauthorized to work. In these circumstances, the notice would support a finding that has constructive knowledge requiring an employer to inquire further into the employee's work authorization status.

The April 12 letter also reiterated that an employer cannot ignore the consequences of any follow-up activity undertaken by the employer to resolve the discrepancies raised by a SSA no-match letter. The letter states that "[w]hile this [follow-up] activity is not required by the INS . . ., the knowledge obtained by an employer through this process may have INA implications." For example, if the employee who is asked to explain the discrepancy states that he is an unauthorized worker, the employer would be liable for a hiring violation if employment is continued. Furthermore, if the employee reports a different name or SSN, the employer is required to undertake the steps set forth in the December 23, 1997 letter. Finally, if the employee is unable to adequately explain the discrepancy, the employer would be obligated to reverify the employee's work authorization status and take appropriate steps (including termination of employment) if adequate documentation cannot be presented.

The April 12 letter also clarified the statement in the earlier opinion that an employer could be held liable for a hiring violation if it continues to employ someone using a known invalid SSN, e.g., in Section 1 of the I-9 an employee lists a SSN with less or more than nine digits. While the employer is not the guarantor of the Section 1 information, the INS explains that the employer cannot ignore an invalid SSN used by an employee. In these circumstances, the employer must re-verify the employee's work authorization status and take appropriate steps described in the December 23, 1997 letter. Finally, the agency explained that the employer needs to inquire further into an employee's work authorization status whenever fraud is suspected regardless of the materiality of the misstatement. The INS reasoned that an I-9 form that contains a statement by an employee that was knowingly false when it was made is not a trustworthy document and, therefore, an employer discovering that a worker has lied on a Form I-9 about any fact is entitled to take reasonable steps (such as reverification) to ensure that the employee has not lied about his or her work authorization. Failure to do so may lead a finding that the employer knowingly continued to employ an unauthorized worker (if in fact the employee is not authorized).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**OSC and OCAHO guidance.** The Justice Department's Office of Special Counsel, in its part, has stated that reverification when attempts at resolving discrepancies raised in SSA no-match letters fail, would not constitute document abuse. In response to a December 16, 1993 letter from the California Farm Bureau Federation, the OSC Special Counsel stated ". . .an employer cannot deduce that its employee is not work authorized merely because it receives one of these notices from the Social Security Administration." The Special Counsel advised, however, that the employer must take reasonable steps to try and resolve the discrepancy between their records and those of the SSA, and if the employer receives information that the employee may be unauthorized to work in the United States (e.g., the discrepancy cannot be resolved), the employer would have an affirmative obligation to reverify and inquire further into the employee's status. Reverification in these circumstances, therefore, would not constitute document abuse.

Some companies have a policy to terminate any employee who admits to making any material misrepresentation during the hiring process, including employees fraudulently using Social Security numbers. OCAHO has recently upheld such a company policy. In a 2003 case, an ALJ held that an employer's use of a consistently applied honesty policy of terminating employees who fraudulently use Social Security numbers, or otherwise fail to provide truthful information on required forms and documents, does not violate IRCA's anti-discrimination provision. Simon v. Ingram Micro Inc., 9 OCAHO no. 1088 (2003). The employee alleged that the employer committed citizenship status discrimination and document abuse when it fired her for being unable to explain the difference between the Social Security number she originally submitted when she began working for the employer and the number she submitted when she later became a lawful permanent resident (LPR). The employer argued, however, that she was fired for dishonesty. Applying the traditional burden-shifting paradigm in employment discrimination cases, the ALJ first held that the complainant did not establish a prima facie case because she failed to show disparate treatment based on her protected citizenship status. Although the ALJ observed that the employer did not apply its honesty policy with absolute uniformity, he noted that there was no evidence to suggest any discriminatory motive and that the employer even tried to help the employee obtain the appropriate documentation to explain the discrepancy. Even if the complainant made a prima facie case, however, the ALJ held that the employer presented a legitimate, nondiscriminatory reason for firing her because the employer was justified in concluding that she had originally obtained work fraudulently, even though she was work-authorized now. The ALJ stated that firing an employee for falsifying employment information is a legitimate, nondiscriminatory reason. The ALJ observed that the complainant had notice of employer's policy for terminating employment for fraud and dishonesty because she signed the employment application and company handbook, which both stated the policy. By claiming that she was an LPR on her employment application and I-9, the ALJ found that she committed dishonest acts that violated the terms of her employment application, the handbook, the company's honesty policy, and U.S. law. Additionally, the ALJ found that the complainant failed to establish that employer's reasons for firing her were pretextual. The ALJ concluded that the employer could reasonably assume that the complainant fraudulently presented a Social Security number that did not belong to her. In addition to the difference in the numbers, a letter from the Social Security Administration (SSA) indicated that it had issued only one number to the complainant.

As for the employee's claim of document abuse, the ALJ held that she failed to allege or show that the employer requested the additional documentation from the SSA for the purpose of discriminating against her. The ALJ found that the employer had constructive knowledge that the complainant was fraudulently using a Social Security number because no other plausible explanation was given for the two different numbers she presented. The ALJ held that requesting information from an employee to see if there is any violation of its honesty policy is not illegal discrimination or document abuse. The ALJ characterized the complainant as having brought her claims with "unclean hands" because she sought relief for discrimination and document abuse, when she knowingly and intentionally worked without employment authorization for approximately five years. The ALJ found that she lied on her employment documents; specifically, that she signed the I-9 under penalty of perjury, knowing that the Social Security number and LPR alien number she provided on that form did not belong to her.

**IRS guidance on follow-up activity and reasonable cause waivers.** The SSA is required by law to provide the IRS with information on no-match W-2 forms and the IRS may penalize an employer when the name and SSN do not match SSA records. The IRS is authorized by regulation to fine employers $50 for each incorrectly reported SSN up to a maximum of $250,000. Penalties resulting from SSN mismatches on W-2 forms may be waived in certain circumstances where there is reasonable cause, however. In order to qualify for the waiver, the employer must establish that there were significant mitigating factors with respect to the failure or that the failure arose from events

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that were beyond the employer's control. In addition, the employer must show that it acted in a responsible manner before and after the failure occurred. Events beyond the filer's control include actions of another party, including the employee -- such as where the employer received a Social Security number from the employee, relied on the number in good faith, used the number on Form W-2, and received a penalty notice from the IRS notifying the employer that the Social Security number was incorrect. Significant mitigating factors can include the fact that the employer has a history of complying with reporting requirements.

In an opinion **letter** dated September 24, 2003, the IRS clarified that when there has been an SSN **mismatch,** the employer can demonstrate that it acted in a responsible manner by showing that it properly solicited the employee's SSN at the time the employee began work. No additional solicitations of the number are required unless the Internal Revenue Service sends a notice to the employer informing it of the mismatch. Upon receipt of the IRS notice, the employer may be required to make an annual solicitation for the correct Social Security number if its records contain the incorrect SSN at the time of the notice. The employer must solicit the employee's correct SSN by December 31 of the year in which the penalty notice was received; the solicitation may be made in person or by mail or telephone. The employer is not required to make the solicitation if there will be no reportable payments made to the employee in that year. The employer may be required to make a second annual solicitation if the employer receives another IRS mismatch notice in any subsequent year. The employer may rely on the SSN provided by the employee in response to the solicitation. If the employer receives yet another IRS notice of an SSN mismatch after making the two required solicitations, it is not required to make further solicitations. The employer's initial solicitation of the SSN upon the employee's commencement of work and the two subsequent annual solicitations in response to the mismatch notice will demonstrate that the employer acted in a reasonable manner before and after the failure to provide correct information, and will establish reasonable cause to grant the waiver of penalties.

As a practice matter, therefore, many employers conduct some follow-up activity after receiving an SSA no-match letter to resolve any discrepancies and avoid an IRS penalty notice. As noted, once an IRS penalty notice is issued, the employer is required under IRS regulations to undertake follow-up activity and the failure to do so will bar an employer from obtaining a "reasonable cause" waiver.

Copyright West, a Thomson business

IMECH § 6:53
END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# Immigration Daily

Find a Lawyer          More Options
State: All          Find

Immigration Daily: the news source for
legal professionals. Free! Join 14000+ readers

Enter your email address here:
Enter email address          Go!

**Home Page**

SEARCH  GO
Advanced search

< Back to current Issue of Immigration Daily          < Back to current Issue of Immigrant's Weekly

**IMMIGRANTS & EMPLOYERS**
Find a lawyer
For employers
Processing times
Immigration forms
Immigrant's Weekly
Immigration info
New to America
Chat with lawyers
Discussion board
Lawyers.com
Immigration Canada

**LAWYERS**
Immigration Daily
Archives
Classifieds
Seminars
Immigration books
Yellow pages
Processing times
Immigration forms
Immigration Canada

About ILW.COM
Testimonials
Non-profit

**SUBSCRIBE**
Enter email:
Immigration Daily
enter email  GO

Immigrants Weekly
enter email  GO

Share this page
Bookmark this page
Print this page
Find a Lawyer
State:
All
Find

The Immigration
Portal from the
leading immigration
law publisher - over
25000 pages of
free information!

## Use Of The Social Security Fraud Statute In The Battle Against Terrorism (42 U.S.C. § 408(a)(7)(A)-(C))
### by *John K. Webb*
### *Special Assistant US Attorney*
### *Central District of California and District of Arizona*

### I. Introduction

As unlikely as it might seem at first, a little-known felony fraud section of the Social Security Act (42 U.S.C. § 406, 1-189) (the "Act") has emerged as a highly effective weapon in the domestic war against terrorism. Since the terrorist events of September 11, prosecutors in some districts have used § 408(a)(7) of Title 42 to charge and detain individuals suspected of engaging in, or suborning, terrorist activities, and who have misused or misrepresented a social security account number ("SSN"). Specifically, under § 408(a)(7) of the Act, a person is subject to criminal penalties if he or she:

(1) willfully, knowingly, and with an intent to deceive uses a social security number on the basis of false information furnished to the SSA (408 (a)(7 )(A));

(2) falsely represents, with an intent to deceive, a number to be the social security number assigned to him or her or to another person (408(a)(7)(B )); or

(3) knowingly altered a social security card issued by the SSA, bought or sold a card that was, or was purported to be, a card so issued, counterfeited a social security card, or possessed a social security card or counterfeit social security card with an intent to sell or alter it (408( a)(7)(C )).

An individual who wrongfully uses or misrepresents a social security number can also face criminal penalties under 18 U.S.C. § 1001, which makes it a criminal offense to make false statements in any matter under the jurisdiction of any federal department or agency of the United States. Thus, in any instance where an individual has misused or misrepresented a social security number on a document presented to any federal department or agency, two separate felonies may be charged using 42 U.S.C. § 408(a)(7)(B) and 18 U.S.C. § 1001, respectively. Similarly, a person who uses or provides counterfeit social security number cards can be charged with violations of both 42 U.S.C. § 408(a)(7)(C) and 18 U.S.C. § 1028(a)(6) and (7), which prohibit the knowing transfer of stolen or false identification documents. The same misuse of social security numbers can be applied to other forms of fraud an d misrepresentation with respect to government documents, including false attestations and/or statements made to employers on I-9 forms for the purpose of satisfying a requirement of § 274A(b) of the Immigration and Nationality Act, 8 U.S.C. § 1324(b), and false statements made on applications for FAA security badges, passports, visas, or asylum applications. *See* 18 U.S.C. § 1546(b)(2) and (3).

A person convicted of a violation of § 408(a)(7) is guilty of a Class D felony, and will be fined or imprisoned for not more than five years, or both. Because most terrorist suspects have engaged in some form of SSN misuse, identity theft, or immigration fraud,

**No-Match Cert. Admin. Record  820**

Copyright
© 1999-2004
ILW.COM,
American
Immigration LLC.



SEARCH | GO

Advanced search

**Home Page**

prosecutors generally prefer charging social security number misuse under § 408(a)(7) (B). This section provides prosecutors with a reliable and convenient means of charging and detaining individuals suspected of terror-related activities.

## II. Rampant misuse of social security numbers among individuals living or operating illegally in the United States

Investigations by the FBI and other law enforcement agencies since September 11 have identified a large number of aliens living within the United States who are actively utilizing false identities supported by bogus documentation. In almost every instance, this includes the use of counterfeit or fraudulently issued social security numbers, or legitimately issued numbers that have been stolen from other individuals or issued illegally by a corrupt SSA employee. Fraudulent SSN 's are used to obtain drivers' licenses, to secure employment, to apply for loans and credit cards, and to live anonymously while avoiding detection by federal and state authorities. Sometimes the SSN's are completely fictitious, comprised of a random combination of familiar numbers. While these numbers are usually easily detected by law enforcement, they can be quickly and cheaply purchased on the black market and provide sufficient deception to secure the thief quick access to public services. Other times identity thieves adopt names and social security numbers culled from newspaper death notices, or from information lists found on the Internet. For example, some Internet hacker sites provide extensive lists of social security numbers, both legitimate and bogus, available to anyone with access to the sites. In addition, these Internet sites sometimes include corresponding names, addresses, dates of birth, telephone numbers, and credit card numbers of individuals. In one instance in 2001, the Office of the Inspector General/Social Security Administration ("OIG/SSA") investigated and prosecuted an individual who advertised several thousand valid social security numbers (with names) for purchase on eBay , with bids for each number starting at one dollar.

In some instances, a legitimate number (one actually issued by SSA) can be purchased from a black-market vendor who has stolen the number from an unsuspecting individual. When a legitimate social security number holder has his number stolen, she is usually unaware of the theft until her credit is destroyed or her identity is used criminally by the thief. A legitimate SSN, unless reported stolen, will allow the thief almost unlimited access to employment, credit cards, replacement social security cards, driver's license, and any other sensitive identity document available to a legitimate social security number holder.

It is not unusual for an alien to deceive SSA into issuing a valid social security number by filing applications containing false information supported by bogus identity documents. In order to secure a new or replacement social security number, SSA requires that an individual show proof of identity, including at least two identification documents such as a driver's license, U.S. passport, birth certificate, U.S. government or state employee ID card, school ID card, record, or report card, marriage or divorce record, military records, clinic, doctor, or hospital records, adoption records, or alien registration number. *See* SSA *Programs and Operations Manual* ("POMS ", §§ RM 00 203.100-400 (20 01). Library cards, vehicle registration, rental or lease agreements, credit cards, check cashing cards, bank deposit slips, telephone or utility bills, or any identification documents issued by a commercial firm are not considered identity documents and cannot be used to secure a social security number. *See* POMS § RM 00203.770.

Unfortunately, very well-crafted, false identification documents are available on the Internet and/or can be easily purchased on the black market. SSA frequently discovers and rejects applications for social security numbers that are supported by a combination of bogus identity documents, including a fake driver's license, counterfeit birth certificate, fake baptism certificate, or false INS alien registration number. However, some bogus documents are almost impossible to detect, and SSA sometimes issues social security numbers that are based on fraudulent representations. Once a new SSN has been issued, SSA has little ability to prevent fraud or misuse associated with the number, and the recipient is free to live, work, and travel freely within the United States until his illegal activities are discovered. In recent testimony be fore Congress , SSA Commissioner James B. Lockhart,

**No-Match Cert. Admin. Record  821**

III reported that an audit of social security numbers issued during 2001 revealed that 999 of 3,557 original SSN applications reviewed by the SSA/OIG were approved based on improper evidentiary documentation. (*See* Testimony of James B. Lockhart, III, U.S. Senate Committee On Finance, confirmation hearing for Deputy Commissioner of SSA, 11/1 5/01).

Legitimate social security numbers issued by corrupt SSA employees are the identity documents most prized by identity thieves and bring the most value on the black market. Newly issued social security numbers are almost impossible to detect and provide a legitimate cover for illegal activities and for aliens seeking to blend into American society. In the past five years, the SSA Inspector General has investigated fifty-five cases involving sixty-one SSA employees who have disclosed, sold, or released SSN in formation. (*See* Testimony of James B. Lockhart, III, U.S. Senate Committee On Finance, confirmation hearing for Deputy Commissioner of SSA, 11/15/01). Criminal allegations involving SSA employees include the processing of false social security number card applications, the selling of legitimate social security numbers, and the printing of counterfeit social security number cards. Forty-five cases have resulted in criminal convictions, approximately half of which resulted in incarceration of the corrupt employees. Until 9-11, a long-standing SSA policy allowed individuals to obtain up to fifty-two "replacement" social security cards during any one-year period. Prior to the events of September 11, audits by the SSA Inspector General had identified this policy of almost unlimited access to "replacement" social security cards as ripe for abuse, noting that during year 2000, 192 individuals obtained six or more replacement SSN cards. (*See* Testimony of James B. Lockhart, III, U.S. Senate Committee On Finance, confirmation hearing for Deputy Commissioner of SSA, 11/15/01).

### III. The statutory framework of 42 U.S.C. § 408(a)(7)(A)-(C)

In 1981, Congress amended the misdemeanor provisions of the Act, making Social Security fraud (including SSN misuse) a felony, punishable by five years in prison and a fine up to $5,000. (*See* 1981 Amendments. Pub. L. 97-123). The SSA felony fraud statute, cited as 42 U.S.C. § 408(a)(1)-(8), contains the Social Security Act's primary criminal provisions. The statute, set forth below in pertinent part, comprehensively spells out restraints on fraud by specifying requirements for disclosure of specific events, and by identifying facts that affect the right to payment of SSA benefits.

In general

Whoever -

(7) for the purpose of causing an increase in any payment authorized under this subchapter (or any other program financed in whole or in part from federal funds), or for the purpose of causing a payment under this subchapter (or any such other program) to be made when no payment is authorized thereunder, or for the purpose of obtaining (for himself or any other person) any payment or any other benefit to which he (or such other person) is not entitled, or for the purpose of obtaining anything of value from any person , **or for any other purpose** (emphasis added)

(A) willfully, knowingly, and with intent to deceive, uses a social security account number, assigned by the Commissioner of Social Security (in the exercise of the Commissioner's authority under § 405(c)(2)(A) of this title to establish and maintain records) on the basis of false information furnished to the Commissioner of Social Security by him or by any other person;

(B) with intent to deceive, falsely represents a number to be the social security account number assigned by the Commissioner of Social Security to him or to another person, when in fact such number is not the social security account number assigned by the Commissioner of Social Security to him or to such other person;

(C) knowingly alters a social security card issued by the Commissioner of Social Security, buys or sells a card that is, or purports to be, a card so issued, counterfeits a social security card, or possesses a social security card or counterfeit social security

card with intent to sell or alter it.

## IV. Legislative history of the fraud provisions of 42 U.S.C. § 408(a)

### A. The 1972 amendment

In 1972, misdemeanor fraud provisions were first added to the Act, designed by Congress for the sole purpose of preventing any person from obtaining federal benefits by using a fraudulent social security number. Specifically, the Act's 1972 fraud subsection forbade anyone from using a social security number to increase any payment or to obtain any improper payment or benefit under any federal program. (*See* Social Security Amendments of 1972, Pub.L. No. 92-603, sec. 130(a), 1972 U.S.C.C.A.N. 1548, 1586; *See also* H.R.CONF.REP. NO. 92-1605(1972) *reprinted in* 1972 U.S.C.C.A.N. 4989, 5370, 5373 (citing prevention of improper benefit payments as the sole purpose behind the new provisions)).

### B. The 1976 amendment

In 1976, the reach of the penalty was expanded substantially when the Act was amended to include not only those who sought unauthorized or excessive federal benefits, but also those who misuse d social security numbers **"for any other purpose."**(emphasis added). (*See* Tax Reform Act of 1976, Pub.L. No. 94-455, sec. 1211, 90 Stat. 1520, 1711 (1976); codified at 42 U.S.C. § 405(c)(2)(C)(i)) (the "1976 Act"). The House Conference Report to the 1976 Act spoke directly to the broadened statutory language, stating:

> [The Senate amendment] makes a misdemeanor the willful, knowing, and deceitful use of a social security number **for any purpose**. In addition, the Senate amendment changes the Privacy Act so that a State or political subdivision may use social security numbers for the purpose of establishing the identification of individuals affected by any tax, general public assistance, driver's license, and motor vehicle registration laws.

*See* H.R.CONF.REP. NO. 94-1515 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2897, 4030, 4118, 4 194-9 5.

In a particularly revealing and crucial portion of the legislative history, the 1976 report of the Senate Finance Committee also sought to explain the addition of the words "for any other purpose" to the Act:

> While the Social Security Act currently provides criminal penalties for the wrongful use of a social security number for the purpose of obtaining or increasing certain benefit payments, including social security benefits, there is no provision in the Code or in the Social Security Act relating to the use of a social security number for purposes unrelated to benefit payments. The committee believes **that social security numbers should not be wrongfully used for any purpose**. (Emphasis added).

*See* S.Rep. No. 94-93 8(l) (1976), *reprinted* in 1976 U.S.C.C.A.N. 3438, 3819.

This insightful look into legislative history demonstrates that Congress has unequivocally explained that the words "for any other purpose" mean precisely what they say. Courts have reached similar conclusions regarding the legislative intent behind the words "for any other purpose." *See United States v. Silva-Chavez*, 888 F.2d 14 81 (5th Cir. 1989).

### C. The 1981 amendment

In 1981, Congress again amended 42 U.S.C. § 408, changing the offense from a misdemeanor to a felony and adding the language **"or for the purpose of obtaining anything of value from any person"** before **"or for any other purpose."** (emphasis added). (*See* Omnibus Reconciliation Act, Pub.L. No. 97-123, sec. 4, 95 Stat. 1659, 1663-64 (1981)). While the House Conference Report accompanying the amendment offers no

**No-Match Cert. Admin. Record  823**

explanation of the reasons for the change (*see* H.R.CONF.REP. NO. 97- 409 (1981)) *reprinted in* 1981 U.S.C.C.A.N. 2681, 2687-88), the text of the amendment makes clear Congress' intent both to punish a broader range of acts and to impose a stiffer penalty. In summing up the prior law the House Conference Report stated:

> Criminal penalties are provided for: (1) knowingly and willfully using a social security number that was obtained with false information, (2) using someone else's social security number, or (3) unlawfully disclosing or compelling the disclosure of someone else's social security number.

*See* H.R.CONF.REP. NO.97-409(1981), *reprinted in* 1981 U.S.C.C.A.N. 2681, 2687.

## V. Charging decisions and elements of the crime: 42 U.S.C . § 408(a)(7)(A)-(C)

The felony provisions of 42 U.S.C. § 408(a)(7)(A)-(C) are particularly effective in charging cases where an individual has entered the country illegally, or has tried to manipulate the identification systems currently in place. The elements of proof for each subsection of § 408(a)(7) are more flexible than those required in 18 U.S.C. § 102 8, a better known identity theft statute, that also contains subsections dealing with the misuse of a social security number. What follows is a description of each of the three subsections of § 408(a)(7), including a breakdown of the elements necessary to prove a charge under each, and a brief suggestion of when and how each subsection should be charged.

In an effort to make the discussion of the charging elements more meaningful, a fact-driven case study has been provided at the end of this article. The case study is not necessary to an understanding of the subsections and elements of § 408(a)(7), but the factual description can provide helpful insight into applying the elements for the subsections set forth below. The case study involves an individual indicted, because of venue issues, in both the Central District of California and the District of Arizona.

### A. 42 U.S.C . § 408 (a)(7 )(A) provides, in pertinent part:

In general

Whoever -

(7) . . . . . for the purpose of obtaining anything of value from any person, **or for any other purpose** (emphasis added)

(A) willfully, knowingly, and with intent to deceive, uses a social security account number, assigned by the Commissioner of Social Security (in the exercise of the Commissioner's authority under § 405(c)(2) of this title to establish and maintain records) on the basis of false

information furnished to the Commissioner of Social Security by him or by any other person;

*Elements of the crime*

The elements required to prove a violation of § 408(a)(7)(A) are:

(1) willful and knowing use of a Social Security account number;

(2) with intent to deceive;

(3) based on false information furnished to the Commissioner of Social Security.

*See* 42 U.S.C. § 408(a)(7 )(A).

*When to charge?*

**No-Match Cert. Admin. Record  824**

Any fraudulent use o f a social security card obtained on the basis of false information supplied to SSA, and used deceitfully, is actionable and constitutes a felony for purposes of § 408(a)(7)(A). For example: a subject in the U.S. on a tourist visa secures a non-work SSN using his French passport. The subject then uses an alias to file a bogus application for asylum, resulting in INS approval and issuance of a green card and alien registration number. The subject then uses his new name and illegally procured INS documents to apply for a second social security number, thus completing the creation of a new identity. The subject then uses the second social security number to secure credit cards, open bank accounts, attend flight training, and make applications for employment as a pilot. The subject's use of the social security number is actionable because he used false and fraudulent documents (deceptively procured from the INS) to deceive SSA into issuing him a new social security number, and he may be charged with a felony under § 4 08(a)(7 )(A). *See United States v. Pryor, 32 F .3d 11 92 (7 th Cir. 1994)* (Defendant acted "willfully, knowingly, and with intent to deceive," in illegally using social security number obtained on basis of false information).

### B. 42 U.S.C . § 408 (a)(7 )(B) provides, in pertinent part:

In general Whoever -

(7) . . . . . for the purpose of obtaining anything of value from any person, **or for any other purpose** (emphasis added)

(B) with intent to deceive, falsely represents a number to be the social security account number assigned by the Commissioner of Social Security to him or to another person, when in fact such number is not the social security account number assigned by the Commissioner of Social Security to him or to such other person;

42 U.S.C. § 408(a)(7 )(B).

*Elements of the crime*

The elements required to prove a violation of 42 U.S.C. § 408(a)(7)(B) are:

(1) false representation of a Social Security account number;

(2) with intent to deceive;

(3) for any purpose.

*See United States v. Means*, 133 F.3d 444, 447 (6th Cir. 1998) (setting forth the elements for prosecution of a case under 42 U.S.C. § 408(a)(7)(B)). *See also United States v. McCormick*, 72 F.3d 1404, 1406 (9th Cir. 1995).

*Alternative elements*

The majority of jurisdictions apply the *Means* standard as set forth above. However, a few jurisdictions break down the language of § 408 (a)(7 )(B) to include a fourth element:

(1) for any purpose;

(2) with intent to deceive;

(3) represented a particular Social Security account number to be his;

(4) which representation is false.

*See United States v. O'Brien*, et. al., 878 F.2d 1546 (1st Cir. 1989).

**No-Match Cert. Admin. Record  825**

*When to charge?*

Subsection (B) is the most commonly charged subsection of § 408(a)(7) because of its broad application and straightforward elements of proof. It is typically charged whenever a subject has misrepresented a social security number to open a bank account; apply for a credit card; secure credit for a cell phone; rent or lease an apartment or car; apply for employment; or enroll in flight training. The charging standard, **"for any purpose,"** is broad and self-explanatory, and any false representation of a social security number, with an intent to deceive, is actionable conduct that may be charged as a felony under §408(a)(7) (B). *See United States v. Silva-Chavez*, 888 F.2d 1481 (5th Cir. 1989).

*Intent to deceive and the "use" vs. "possession" distinction*

Direct evidence is not always necessary in order to prove that a defendant intended to use a social security card or number for deceptive purposes. Mere possession of a social security card or number that does not belong to a defendant is sometimes sufficient to support a finding that the defendant intended to deceive. *United States v. Charles*, 949 F.Supp. 365 (D. VI 1996). In *Charles*, the government was unable to produce direct evidence that the defendant had actually applied for a driver's license using a false social security number, but conclude d that the jury could infer that the defendant received the social security card through false representations when the government's evidence showed that:

(1) the Police Department Licensing Section had printed defendant's license; and

(2) generally, in order to obtain such a license, an applicant must give a social security number to the licensing agent.

However, mere possession of false identity documents, including a false social security number, might not always be enough to convict. Some courts have held that the term "represent" connotes a positive action, not merely passive possession, and have thus reasoned that Congress, by using the term "represent," meant to proscribe the "use," not merely the "possession," of a false social security number. *United States v. McKnight*, 17 F.3d 1139, 1144 -45(8th Cir. 1994). However, the concurring opinions of two *McKnight* panel members under score that this is not a hard and fast rule: "We write separately to make explicit that possession of an identification card bearing a false social security number can, in some instances, provide a sufficient predicate for a jury to properly infer that a defendant falsely represented a social security number in violation of 42 U .S.C. § 408(a ) (7)(B )."*Id.* at 114 6; *see also Unite d State s v. Teitloff*, 55 F.3d 391, 394 (8th Cir. 1995) (court rejected defendant's contention that he did not technically "use" the social security number because the DMV computer system automatically provided that information when he supplied the other person's identification documents).

*When a defendant acts willfully and knowingly*

A defendant may be found to have acted willfully; knowingly, and with intent to deceive, even if the defendant did not intend to deceive federal officials when he presented them with documents containing a false social security number. *U.S. v. Pryor*, 32 F.3d 1192 (7th Cir. 1994) (defendant's driver's license had been suspended and he was found to be carrying false documents which he acknowledged that he planned to present if pulled over for a traffic violation).

*The "moral turpitude" exception*

The Ninth Circuit has held that an alien's use of a false social security number to further otherwise legal conduct is not a crime of "moral turpitude." *Beltran-Tirado v. Immigration and Naturalization Service*, 213 F.3d 1179, 1184 (9th Cir. 20 00). The significance of this decision lies in the impact such a conviction would have on the illegal alien's eligibility for inclusion on the Immigration and Nationality Act registry. *See* 8 U.S.C . 1259 . The registry

**No-Match Cert. Admin. Record  826**

statute was originally enacted by Congress in 1929 as a means to regularize the status of long-time illegal aliens residing in the United States, and has been updated periodically since. Under current registry provisions, conviction for a crime of moral turpitude would preclude an alien from eligibility because he would not be considered "of good moral character."

*"Otherwise legal behavior"*

In *Beltran-Tirado*, defendant lived under an assumed identity, using the name and social security number of the victim to obtain employment, marry twice, obtain a driver's license, credit cards, and a HUD loan. Beltran's earnings attracted the interest of the IRS, resulting in her arrest and conviction under 42 U.S.C. § 408(a)(7)(B) and 18 U.S.C. § 1546(b)(3). The INS moved to deport her , but the Ninth Circuit intervened to interpret the legislative history of 42 U.S.C. § 408 and carve out an exception to a conviction for a crime of moral turpitude by allowing the use of a false social security number to further "otherwise legal behavior." The *Beltran-Tirado* case appears consistent with an earlier decision by the Ninth Circuit in which the court concluded that "the crime of knowingly and willfully making any false, fictitious or fraudulent statements or representations to an agency of the United States is not a crime of moral turpitude because a jury could convict if it found that the defendant had knowingly, but without evil intent, made a false but not fraudulent statement." *Hirsch v. INS*, 308 F.2d 562, 567 (9th Cir. 1962).

*Sale of false or counterfeit Social Security cards is a crime of moral turpitude*

Another California federal court, citing *Beltran-Tirado* (n.8), held that the sale of false or counterfeit social security numbers is a crime that involves moral turpitude. *Souza v. Ashcroft*, 2001 WL 823816 (N.D. Cal.). The court distinguished between those who sell rather than use false or counterfeit social security cards ("persons convicted of the crime of selling false or counterfeit social security cards have, like persons convicted of the analogous crime of selling counterfeit green cards, committed a crime of moral turpitude") *Id.* at *3, and stated that Congress, in amending 42 U.S.C. § 408, specifically excluded from the exemption those who sell, rather than use, false or counterfeit social security cards. The reason for this distinction is apparent. Sale of false alien registry documents (green cards), as well as the crime of selling false or counterfeit social security cards, inherently involves a deliberate deception of the government and an impairment of its lawful functions.

*Multiple false representations and the rule against multiplicity*

When an individual makes multiple false representations by misrepresenting a social security number on multiple credit card applications, bank accounts, or federal documents relating to employment (I-9, W-4), each use or representation constitutes a separate offense. Each of the separate offenses is supportable by a different set of predicate facts, and is actionable under § 408(a)(7)(B). In addition, each use or representation on a federal form is actionable as a false statement under 18 U.S.C. § 1001, and can be charged as a separate offense also supportable by a different set of predicate facts. While charging multiple counts might not be desirable, doing so when separate predicate facts exist would not run afoul of the rule against multiplicity that prohibits the charging of a single offense in several counts. *United States v. Castaneda*, 9 F.3d 761, 765 (9th Cir. 1993) (holding that a defendant may properly be charged with committing the same offense more than once as long as each count depends on a different set of predicate facts); *see also United States v. Hurt*, 795 F.2 d 765, 7 74-75 (9th Cir. 1 986).

*Use of false Social Security on non-federal documents*

It is not necessary that the false use or representation of a social security number have a detrimental effect in some way on the government to be actionable. *See United States v. Holland*, 880 F.2d 1091 (9th Cir. 1989). Any use of a false social security number on non-federal documents is still actionable under § 408(a)(7)(B). For example, the subject in the case study used his falsely obtained SSN when completing multiple applications seeking employment as a pilot, and in applying for taxi permits with airport cab companies. Even

though the airline and cab company employment applications are not federal documents, the subject can still be charged under 408(a)(7)(B). Further, it is not necessary to prove that the defendant used a false social security number for payment, gain, or pecuniary value. *United States v. Silva-Chavez*, 888 F.2d 1481 (5th Cir. 198 9).

### C. 42 U.S.C . § 408 (a)(7 )(C) provides, in pertinent part:

In general Whoever -

(7) . . . . . for the purpose of obtaining anything of value from any person, **or for any other purpose** (emphasis added)

(C) knowingly alters a social security card issued by the Commissioner of Social Security, buys or sells a card that is, or purports to be, a card so issued, counterfeits a social security card, or possesses a social security card or counterfeit social security card with intent to sell or alter it.

*Elements of the crime*

The elements required to prove a violation of § 408 (a)(7 )(C) a re:

(1) knowingly alters a social security card; or

(2) counterfeits or possesses a social security card with intent to sell or alter it; or

(3) buys, or sells a social security card.

42 U.S.C. § 408(a)(7 )(C).

*When to charge?*

This subsection is typically charged when a subject has knowingly altered a social security card (usually to remove work restrictions from the face of the card), or has manufactured or counterfeited a card or cards for sale on the black market. This section can also be charged when an individual is discovered to have purchased a social security card for his own use or for resale. *Note* : Nothing in the case study supports a charge under 42 U.S .C. § 408 (a)(7)(C ).

*Altered or counterfeited cards*

In order to qualify as counterfeit, a social security card must include the name of the number holder and the social security number. *United States v. Gomes*, 969 F.2d 1290 (1st Cir. 1992) ("A bogus document is counterfeit if it is calculated to deceive an honest, sensible, and unsuspecting person of ordinary observation and care dealing with a person supposed to be upright and ho nest"). *Id.* at 1293. Conduct charged under §408 (a)(7 )(C) most commonly a rises from:

1) the printing or manufacture of counterfeit social security cards for resale on the black market; or

2) the altering of social security cards to remove work restrictions from the face of the card.

The altered and/or counterfeited cards are then used to secure false identification documents, open bank accounts, apply for credit cards, and to work, including employment in sensitive positions at airports, government facilities, and other locations requiring security clearances. To qualify as counterfeit, a bogus copy of a social security card does not have to be such a good imitation that it baffles an expert. *Gomes*, at 1294 (" . . the law does not criminalize only masterpieces").

**No-Match Cert. Admin. Record  828**

### D. Sentencing Guidelines for 42 U.S.C. § 408(a)(7)

Prosecutions under 42 U.S.C. § 408(a)(7) are governed under the U.S.SENTENCING GUIDELINES MANUAL, § 2B1.1 (2001), which covers basic economic offenses involving fraud or deceit (including false identity, theft, embezzlement, receipt of stolen property, and property destruction). The basic offense level is six, with offense levels increasing as the loss amount rises. For a first-time offender with no prior convictions, the minimum guideline range would be 0-6 months. This range is, however, subject to possible enhancements.

*Identity theft enhancement*

If the social security number misuse includes possession of any device-making equipment or counterfeit access device, or the unauthorized transfer or use of any unlawful means of identification, or possession of five or more means of identification unlawfully produced or obtained by some other means of identification, the offense level is enhanced by two levels. However, if the resulting level is lower than twelve, the guidelines require that the offense level be increased automatically to level twelve. *See* U.S. SENTENCING GUIDELINES MANUAL § 2B1.1(b)(9).

*Cross references with other guidelines*

If other offenses are charged in an indictment along with § 408(a)(7), their guidelines can be cross-referenced and applied (e.g., 18 U.S.C. § 1001, 18 U.S.C. § 1341, 18 U.S.C. § 1342, or 18 U.S.C. § 1343). These include crimes involving the theft of a firearm, destructive device, explosive material, or controlled substance (USSG §2D1.1); a crime involving unlawful possession, attempt or conspiracy (USSG §2D2.1); unlawful receipt, possession, or transportation of firearms or ammunition (U SSG § 2K1.3 ).

*Intended loss*

The offense level in cases involving social security number misuse and identity theft fraud is calculated by applying the guidelines and, if appropriate, by determining the amount of loss. U.S. SENTENCING GUIDELINES MANUAL § 2B1.1. In cases involving terrorism suspects, fraud losses can be generated in a number of ways, including credit card losses, bank loan fraud, or money laundering used to fund terrorist activities. Sometimes fraud losses are interrupted before the entire crime is completed, resulting in a real money loss of less than was otherwise intended. In such cases, if the loss the defendant was attempting to inflict can be determined, that figure should be used if it is greater than the actual loss. The fact that the fraudulent scheme was interrupted before its full loss was realized is of no importance. *United States v. Lorenzo*, 995 F.2d 1448, 1460 (9th Cir. 1993) (defendants held to higher intended loss for sentencing purposes, although they actually received a considerably smaller sum); *see also United States v. Robinson*, 94 F.3d 1325, 1328 (9th Cir. 1996) (holding intended loss appropriate measure in scheme interrupted by a government sting operation).

*Seriousness of offense and course of conduct*

Intentional use of a false social security number is not a trivial offense. *United States v. Sullivan*, 895 F.2d 1030 (5th Cir. 1990). For sentencing purposes, a court is not limited to the conduct comprising the offense of conviction. The court can also consider the entire course of conduct involving the defendant. *Id.* at 103 2; *see also United States v. Fulbright*, 804 F .2d 84 7 (5th Cir.1986). Where the conduct involving SSN misuse is particularly egregious, a court can impose an upward departure beyond the guideline range. *United States v. Scott*, 915 F.2d 774, 777 (1st Cir. 1990) (Where defendant fled prosecution and stole the identity of another person and obtained, through fraud, a dead man's SSN, driver's license, and birth certificate). Upward departure is also warranted when the defendant's prior conduct and criminal history suggests a similar propensity towards identity theft and social security frau d. *United States v. Myers*, 41 F.3d 53 1, 533 (9 th Cir. 199 4).

In considering the facts set out in the case study, a departure for egregious conduct is

**No-Match Cert. Admin. Record  829**

entirely warranted. A strong case can be made for similar departures in most cases involving subjects indicted for activities related to the terrorist events of September 11, and a request for upward departure should be strongly considered.

### E. Recent Indictments using § 408(a)(7)(B)

AUSAs in Arizona and Los Angeles have used § 408(a)(7)(B) as the principal charge in several indictments involving individuals on terror watch-lists, or who are individually suspected of 9/11 related activities . It is notable that all nineteen of the hijackers in the September 11 attacks had social security numbers, and thirteen hijackers had obtained them legally (See Testimony of Hon. James G. Huse, Jr., Inspector General, Office of the Inspector General, Social Security Administration, before the Subcommittee on Social Security of the House Committee on Ways and Means; hearing on Social Security Administration's response to September 11, 2001 terrorist attacks; dated November 1, 2001). Law enforcement agencies are still learning about the extent of their activities, but it should not surprise anyone that the hijackers, and their suspected accomplices, committed identity theft and used false SSN's to blend into American society while planning the September 11 attacks. In fact, subsequent investigation has shown that securing and using social security numbers was a critical element of the plans of the terrorists and their support cells. In Arizona, five individuals have already been indicted as a result of investigations related to the events of 9/11, and two have recently been convicted after jury trials. Prosecutors have charged these individuals with a variety of counts, including 42 U.S.C. §§ 408(a)(7)(A) and (B) (SSN misuse); 18 U.S.C. § 1001 (false statements on documents presented to SSA, INS, FAA); 18 U.S.C. § 1014 (false statement to federal banking institution); 18 U.S.C. § 1029 (access device fraud); 18 U.S.C. § 1546 (passport fraud and false attestation); 18 U.S.C. § 1621 (perjury); and 18 U.S.C. § 371 (conspiracy). In each instance, the individual was found to have attempted to use a false identity or SSN to secure some strategic benefit such as: a driver's license, FAA certificate, credit card, bank account, grant of asylum, or employment as a pilot. Similar charges have been used success fully by prosecutors in the Central District of California, Los Angeles, to secure indictments against individuals identified as having ties to the events of 9/11. Jurors in both jurisdictions have shown little tolerance for identity thieves.

### F. Securing search warrants using § 408(a)(7)(B)

Special Agents from OIG/SSA and the FBI have successfully asserted § 408(a)(7)(B) as statutory authority to secure a search warrant. In support of the search warrant, prosecutors attached an affidavit describing social security number misuse and setting out specific reasons for viewing SSN misuse as evidence of identity theft. By showing that the subject of the investigation used false information to create a second identity, prosecutors were able to establish probable cause that a "pilot's case" belonging to the subject contained more evidence of concealed identity and/or fraudulent activities. Based on a properly drawn affidavit describing violations of 42 U.S.C. § 408(a)(7)(B) and 18 U.S.C. § 1001, a federal magistrate signed a warrant allowing the agents to conduct a search of the subject's pilot's case. (a copy of the affidavit is available to AUSA's for review upon request). Information found in the pilot's case allowed prosecutors to secure initial indictment and superseding indictments. Neither the magistrate who issued the search warrant nor the judge who denied the subject's request for suppression and release at a subsequent detention hearing, found any problem with the probable cause or evidentiary support establishing a felony charge under § 408(a)(7)(B).

### VI. "Operation Safe Travel" and "Operation Tarmac"

In the weeks following September 11, a task force consisting of several federal agencies, including OIG/SSA, FBI, FAA, INS, DOT, U.S. Customs, and Homeland Security, initiated investigations designed to conduct audits of the social security numbers of security-badge holders at airports throughout the United States. This investigation, referred to as either "Operation Safe Travel" or "Operation Tarmac," (the names are interchangeable), was first initiated by SSA/OIG and INS at the Salt Lake City airport prior to the Winter Olympics. An audit of social security numbers at the airport

**No-Match Cert. Admin. Record  830**

revealed significant irregularities among holders of security badges with access to the tarmac and other sensitive areas of the airport. The investigation, labeled "Operation Tarmac," resulted in the indictment and arrest of sixty-nine individuals employed by private companies operating at the airport and providing services such as security screening, food services, aircraft fueling, cargo handling, cleaning/housekeeping services (inside the airport, the on-ramps leading to planes, and on the airplanes), airplane service and maintenance, and maintenance and construction in secure areas of the airport. Of the sixty-nine individuals indicted in the Operation Tarmac sweep, sixty-one individuals had Security Identification Display Area ("SIDA") badges that allowed them access to highly secure areas of the airport, including access to planes, runways, ramps leading to planes, and cargo areas. Three of those indicted were airport security screeners. The indictments charged violations of 42 U.S.C. §§ 408(a)(7)(B) and (C) (SSN misuse and using counterfeit or altered Social Security cards), 18 U.S.C. § 1001(a)(3) (false statements on government forms), and 18 U.S.C. § 1546(a)(3) (false statements on applications to INS). Other violations uncovered by the investigation included the use of false and counterfeit alien registration cards and numbers, making false representations about citizenship status to obtain employment and security badges, and making false statements to authorities about criminal history. All of those indicted were in the country illegally.

Since the initial sweep at the Salt Lake City airport, similar operations have been successfully undertaken at more than twenty airports in the United States, including Phoenix, Los Angeles, Miami, Boston, San Diego, Charlotte, Las Vegas, and San Francisco. These investigations have resulted in a significant number of indictments and arrests of individuals illegally living and operating under false identities in the United States, some of whom were fugitives from felony convictions. Each person indicted and arrested by agents involved in Operation Tarmac/Operation Safe Harbor possessed security badges with clearance to enter restricted and sensitive areas of each airport. Each person indicted was found to be using false identification documents, including false social security numbers. Particularly disturbing is the fact that, in Miami and Los Angeles, agents arrested individuals working as pilots and possessing false identification documents and bogus social security numbers. Further, agents arrested individuals during some sweeps who were employed as security screeners. In one particularly disturbing incident, an illegal used false identity documents to secure employment with an airline and to obtain a security badge allowing complete access to airport facilities. The subject failed to show up for work after obtaining the security badge, but the airline failed to cancel the badge. However, airport records show that the badge continued to be used to access the airport regularly. In each operation, the principal charge used to indict those using false identification documents was § 408(a)(7)(B).

The arrest of individuals utilizing false identities by Operation Tarmac/Operation Safe Harbor investigators has underscored the seriousness of the false identity problem faced by law enforcement and Homeland Security officials since the terrorist events of 9/11. In every airport security badge holder arrest, use of a false social security number proved to be the foundation block that supported the identity theft and enhanced the ease with which the individual was able to secure obscurity from law enforcement. It also helps explain why securing and using social security numbers was a critical element of the plans of the terrorists and their support cells in their preparation for the September 11 attacks. The indictments resulting from investigations implemented under Operation Safe Travel and Operation Tarmac also indicate the value and importance of using § 408(a)(7) as a tool for prosecuting such violations.

## VII. Case study

Subject entered the United States legally in 1992, holding a French passport and using a visa waiver based on his French citizenship. Subject had been a pilot for a small middle-eastern airline for several years before coming to the United States. Subject applied for and legally secured a non-work SSN from SSA by presenting his French passport and a student ID card from a flight training school as identification. Subject used the SSN to lease an apartment, open bank accounts, attend flight training schools, secure an FAA

**No-Match Cert. Admin. Record  831**

certificate, obtain a cellular phone account, apply for credit cards, and apply for federal and state program funds to pay for his flight training (he was not successful!). Subject demonstrated no known source of income, but traveled frequently abroad using his French passport and visa waiver to enter and leave the United States virtually unchallenged. In 1998 , using a variation of his true name, subject submitted an asylum application to the INS that contained material false statements and misrepresentations as to his identity, nationality, family, work history, and persecution at the hands of others. Subject also lied about his date of entry into the United States, representing that he had arrived by boat only four days before filing his asylum application. Based on his false statements and representations, INS granted subject's asylum application and issued him a green card an d alien registration number. Subject presented the green card and INS alien number to SSA and applied for a new SSN using the false name from his asylum papers . On his application for a new SSN, subject represented that he had never before applied for or received an SSN. Based on subject's false representations and presentation of legitimate documents from the INS, SSA issued a new SSN in the name shown in subject's asylum papers. Subject used the new SSN to establish a new identity and to apply for employment with numerous domestic airlines and air-freight carriers. During this time, subject continued to travel extensively abroad using his French passport and true identity. At times, subject carried a pilot's case and represented himself as a pilot, thereby gaining admittance into the cockpit jump-seat of passenger aircraft. He also opened bank accounts and applied for credit cards using his new SSN, and worked periodically as an airport cab driver using his new identity and SSN to secure airport access. Within thirty weeks of receiving his new SSN, subject applied for, and secured a replacement social security card and continued his flight training using a "simulator club" at a local aviation school. Subject is known to have trained on the flight simulator at the same time as two of the 9/11 hijackers and other individuals associated with the events of 9/11.

## VIII. Conclusion

The use of 42 U.S .C. § 4 08(a )(7)(A )-(C) to charge and detain suspects has already proven to be a particularly effective weapon in the domestic war against terrorism. Since September 11, prosecutors in several districts have used 42 U.S.C. § 408(a)(7) to indict individuals suspected of engaging in, or suborning, terrorist activities, and who have misused or misrepresented social security account numbers to secure positions at airports and other sensitive facilities. The elements of proof for each subsection of 42 U.S.C. § 408 (a)(7) are more flexible than those required by other felony statutes such as 18 U.S.C. § 1028 (identity theft). The ease of charging § 408(a)(7)(B) makes it an increasingly popular tool for prosecutors.

*[Editor's Note: This article was obtained from the United States Attorneys' Bulletin]*

## ABOUT THE AUTHOR

**John K. Webb** is a Special Assistant United States Attorney, and is responsible for prosecuting federal crimes involving identity theft and Social Security number misuse. He is the Identity Theft Coordinator for the United States Attorney's Office (USAO) in Los Angeles, and divides his time between the USAOs for the District of Arizona and the Central District of California. Since September 11, 2001, he has served as a member of the Joint Terrorism Task Forces for the District of Arizona and the Central District of California, where he has participated in the indictment and prosecution of individuals related to events of 9/11 as well as the planning and implementation of Operation Tarmac/Operation Safe Harbor in Phoenix and Los Angeles. Questions pertaining to in this article can be directed to SAUSA John K. Webb, 602-514-7544 (Phoenix) or 213-8 94-3518 (Los Angeles).

The opinions expressed in this article do not necessarily reflect the opinion of ILW.COM.

Copyright © 1999-2002 American Immigration LLC, ILW.COM

**Immigration Daily:** the news source for legal professionals. **Free!** Join 14000+ readers

Enter your email address here:
Enter email address | Go

Search for: Enter keyword(s) | Search | Advanced search

### Immigrants & Employers

- Find a lawyer
- For employers
- Processing times
- Immigration forms
- Immigrant's Weekly
- Immigration Info
- New to America
- Chat with lawyers
- Discussion board
- Lawyers.com
- Immigration Canada

### For Lawyers

- Immigration Daily
- Archives
- Classifieds
- Seminars
- Immigration books
- Yellow pages
- Processing times
- Immigration forms
- Immigration Canada

**About us** | **Testimonials** | **Non-profit**

### FIND A LAWYER                                              More options

State:          Specialty:          Language:
All             All                 All          Find

**Share this page** | **Bookmark this page** | **Print this page**

**The Immigration Portal from the leading immigration law publisher**
**Over 25000 pages of free information!**

© Copyright 1999-2004 American Immigration LLC, ILW.COM

Search for: Enter keyword(s) | Search | Advanced search

Case 3:07-cv-04472-CRB    Document 128-8    Filed 10/01/2007    Page 101 of 142

Westlaw.

IMECH §  6:53                                                          Page 1
Immigr. Empl. Compliance Handbook §  6:53

Immigration Employment Compliance Handbook
Database updated January 2006

Austin T. Fragomen, Jr. and Steven C. Bell
Chapter 6. Complaint Procedures and Administrative Proceedings
VIII. Selected Legal Issues

§  6:53. Constructive knowledge examples in employer sanction rules and
relationship to document abuse provision--SSA "no-match" letters and presentation
of new Social Security numbers

A question has arisen as to whether actual or constructive knowledge exists in
situations in which an employer receives information from the Social Security
Administration (SSA) that some percentage of its work force does not have matching
names and Social Security numbers (a "no-match" letter). The SSA generates no-match
letters when they receive Social Security information for an employee that does not
match the agency's records. The typical SSA no-match letter, titled "Employer
Correction Request," generally explains that discrepancies exist between the SSA's
database and employee information provided by the employer on the W-2 form, and
requests that employers respond to the letter with corrections "within 60 days." A
list of mismatched Social Security numbers (SSNs) is typically attached to the
letter, along with information on making corrections. Until recently, the SSA sent
no-match letters only to employers who had discrepancies affecting 11 or more
employees, or at least 10 percent of the employer's workforce. That policy resulted
in about 40,000 no-match letters sent annually to employers. Under a policy planned
in 2000 but implemented in 2002, no-match letters were sent to any employer with at
least one employee mismatch. The result was that more than 900,000 no-match letters
were sent in 2002; in other words, about one in eight employers in the country
received a no-match letter. The letters covered approximately seven million
workers. The expanded program and the absence of widely disseminated guidance from
the immigration authorities caused confusion among employers regarding their
obligations pursuant to the letter and, in many cases, had given rise to hasty and
ill-considered termination of employees. The latest reports indicate that thousands
of workers lost employment due to the effects of the expanded no-match letter
program.

While the expanded program led to much confusion and ill-considered
terminations, the program did not achieve its primary goal as very few employers
submitted corrected information to the agency. Accordingly, the agency decided
beginning in 2003 to revise its policies regarding the parameters for selecting
employers in order to reduce the number of no-match letters issued. Other revisions
to the program are designed to minimize the number of hasty terminations based on
misinterpretations of the law and increase the number of responses with corrected
information. Under the revised SSA policy, no-match letters are sent only to those
employers with more than 10 employees with mismatched information and for whom
mismatched employees represent more than one half of one percent (0.05%) of the W-2

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

forms filed by that employer with the SSA. The agency continues to apply this policy as of October 1, 2005. The agency has issued significantly less no-match letters to employers under the revised policy. For example, the agency issued only about 125,000 letters in 2003 or about 770,000 less than in 2002. There are also several changes to the content of the no-match letter. Most notably, the SSA has removed a reference contained in the 2002 letter to a possible Internal Revenue Service (IRS) penalty for failure to supply accurate SSN information. The letter also states that the discrepancy does not constitute notice that an employee lacks a lawful immigration status. As in past years, the letter also cautions employers against taking adverse actions against employees based solely on the no-match, and that taking such actions may violate state and federal law.

While the revised SSA policies should lead to fewer "no-match" letters being issued, the policies do not affect an employer's obligations under current employer sanctions law, anti-discrimination law, IRS regulations, or other federal or state law. Guidance from the INS (the ICE predecessor agency) and the OSC confirm that an employer should not deduce from such a letter that the employee is unauthorized to work. The INS had stated that immigration law does not require follow-up activity when a no-match letter is received unless the discrepancies raised in the letter relate to invalid SSNs (as described below). On the other hand, the INS stated that an employer has an affirmative obligation to re-verify an employee's work authorization status when an employer's attempts at resolving the discrepancies raised in a no-match letter have failed. Failure to conduct reverification in these situations may lead to a finding of constructive knowledge that an employee lacked work authorization. The OSC has also stated that reverification when the discrepancies raised in the no-match letters cannot be resolved would not constitute document abuse. In addition, while immigration law does not require follow-up activity and the SSA lacks enforcement authority, the IRS may penalize employers for incorrect W-2s and the failure to conduct follow-up activity will bar an employer from obtaining a reasonable cause waiver. The SSA is required by law to provide the IRS with information on no-match W-2 forms and the IRS may penalize an employer when the name and SSN do not match SSA records (as discussed below). Many employers, therefore, will conduct some follow-up activity after receiving an SSA no-match letter to resolve any discrepancies and avoid an IRS penalty notice. As noted, the follow-up activity may yield information that will raise an obligation to inquire further under employer sanctions law.

**Legacy INS guidance.** The INS had issued several opinions regarding an employer's legal obligations under employer sanctions law when an SSA no-match letter is received. As of March 1, 2003, however, the U.S. Immigration and Customs Enforcement (ICE) is charged with enforcing employer sanctions law. While the prior INS opinions addressing an employer's legal obligations under immigration law are not binding on the new agency, it will certainly be used as a starting point by the new bureau. Moreover, with the emphasis on enforcement in the post-September 11th environment, it is unlikely that the new bureau will adopt more lenient policies than its predecessor with regard to the no-match letters. Until the new bureau issues its own guidance, therefore, the employer should adopt policies that conform to the latest INS pronouncements on the issue.

The INS addressed the SSA no-match letter issue in a December 23, 1997 opinion letter issued by the INS General Counsel. The INS stated that a no-match letter from the SSA does not, in and of itself, place an employer on notice that an employee is ineligible to work, or require the employer to conduct reverification

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of documents. The INS explained that there may be many legitimate reasons for a discrepancy between the name and SSN reported by the employee on the W-2 and SSA records. The agency cautioned, however, that there may be specific situations in which the no-match letter may lead to a duty to re-verify. For example, the no-match letter informs an employer that the following numbers are invalid Social Security numbers: (1) numbers with more or less than nine digits; (2) numbers whose first three digits are 000 or are in the 800 or 900 series; (3) numbers whose middle two digits are 00; and (4) numbers whose last four digits are 0000. If any of the SSNs listed in the no-match letter involves such a number, the letter itself serves as notice to the employer that the employee has provided an invalid Social Security number. Accordingly, the failure to conduct re-verification in these circumstances could lead to a finding that the employer knowingly continued to employ an alien who lacked work authorization (if in fact the employee is undocumented).

The Service also addressed the employer's IRCA obligations if it learns that the employee's name or SSN is different from that shown on the Form I-9. The INS General Counsel stated that upon receipt of information from the employee indicating that any information recorded on Form I-9 is erroneous, the employer should correct it in a manner that shows the correct information without obliterating the formerly recorded information (e.g., draw a line through the incorrect information, record the correct information, and initial and date the correction). If the correction relates to Section 1 of the form, the employee should also initial the correction. If the new information contradicts information in Section 2 (e.g., the name or SSN of the employee as shown on previously presented documentation), the employer may request to see acceptable documentation showing the correct information in order to ensure accuracy.

The letter further asserts that a notification from an employee that his or her SSN has changed does not by itself put the employer on notice that the employee is presently not work authorized but the notification may put the employer on notice that the employee has committed fraud. A likely scenario is that the employee has been working under a false SSN, the employee subsequently becomes work authorized and obtains a legitimate SSN, and the employee informs his employer that his SSN has changed to ensure that his earnings are credited. The letter asserts that knowing false statements on the I-9 form or the use of false documents to obtain employment are felonies, and an employer that suspects them may apply, in a nondiscriminatory manner, any policies it applies generally to suspected criminal conduct in its workplace, or to suspected false statements in employment documentation. If an employer determines that an employee has fraudulently executed Form I-9, the employer should not rely on that form as a verification of employment eligibility, and should require that the employee complete a new Form I-9 if the employer continues the employment (but retain the original form as evidence of compliance with the verification requirements at the time of hire).

The INS cautioned, however, that changes to name or SSN information recorded on the I-9 form do not necessarily mean that fraud is involved. The INS noted, for example, that name changes occur for a variety of reasons and the name may have been recorded incorrectly. Similarly, SSNs may be recorded erroneously on forms. On the other hand, SSNs assigned to individuals do not change, and, therefore, a claimed change of SSN is arguably a situation that raises more of a red flag than a claimed change of name. Nonetheless, all such situations must be reviewed using common sense. A change to a SSN that merely corrects a transcription error (e.g., recording one or two digits erroneously) would be an unlikely indicator of fraud,

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-04472-CRB    Document 128-8    Filed 10/01/2007    Page 104 of 142

IMECH §  6:53                                                          Page 4
Immigr. Empl. Compliance Handbook §  6:53

but if an employee reports an entirely different SSN than the one he or she previously has used, fraud is likely involved. Similarly, receipt of information showing that an employee has been working under a completely different name than his or her actual name reasonably raises questions about an employee's identity that are not raised by other legitimate corrections such as a change of a last name due to marriage, correction of a middle initial, reconciliation of an incorrectly or differently recorded ethnic name, etc.

The INS again addressed appropriate employer conduct in situations involving SSA no-match letters in a letter dated April 12, 1999, from the INS General Counsel. The letter rejected the position that in situations other than a reported discrepancy that relates to a misspelled name or transposed digits in the SSN, a SSA no-match letter would serve as actual or constructive notice that an employee is unauthorized to work in the United States, and, therefore, the employer has an obligation to re-verify the employee's work eligibility in these circumstances. The INS explained that it is not true that notice of a discrepancy constitutes notice of a lack of work authorization unless the error is clearly a minor typographical one. The agency noted, for example, that the no-match notice may result from a name change and such changes may occur for valid reasons.

The INS warned, however, that the employer should not assume that it may safely ignore the no-match letters. The agency noted, for example, that an employer may receive information from other sources, such as a tip from another employee, indicating that an employee is unauthorized. If the employer also receives a no-match letter relating to that employee, the notice is relevant in considering whether the circumstances rise to actual or constructive knowledge that an employee may be unauthorized to work. In these circumstances, the notice would support a finding that has constructive knowledge requiring an employer to inquire further into the employee's work authorization status.

The April 12 letter also reiterated that an employer cannot ignore the consequences of any follow-up activity undertaken by the employer to resolve the discrepancies raised by a SSA no-match letter. The letter states that "[w]hile this [follow-up] activity is not required by the INS…, the knowledge obtained by an employer through this process may have INA implications." For example, if the employee who is asked to explain the discrepancy states that he is an unauthorized worker, the employer would be liable for a hiring violation if employment is continued. Furthermore, if the employee reports a different name or SSN, the employer is required to undertake the steps set forth in the December 23, 1997 letter. Finally, if the employee is unable to adequately explain the discrepancy, the employer would be obligated to reverify the employee's work authorization status and take appropriate steps (including termination of employment) if adequate documentation cannot be presented.

The April 12 letter also clarified the statement in the earlier opinion that an employer could be held liable for a hiring violation if it continues to employ someone using a known invalid SSN, e.g., in Section 1 of the I-9 an employee lists a SSN with less or more than nine digits. While the employer is not the guarantor of the Section 1 information, the INS explains that the employer cannot ignore an invalid SSN used by an employee. In these circumstances, the employer must re-verify the employee's work authorization status and take appropriate steps described in the December 23, 1997 letter. Finally, the agency explained that the employer needs to inquire further into an employee's work authorization status

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whenever fraud is suspected regardless of the materiality of the misstatement. The INS reasoned that an I-9 form that contains a statement by an employee that was knowingly false when it was made is not a trustworthy document and, therefore, an employer discovering that a worker has lied on a Form I-9 about any fact is entitled to take reasonable steps (such as reverification) to ensure that the employee has not lied about his or her work authorization. Failure to do so may lead a finding that the employer knowingly continued to employ an unauthorized worker (if in fact the employee is not authorized).

**OSC and OCAHO guidance.** The Justice Department's Office of Special Counsel, in its part, has stated that reverification when attempts at resolving discrepancies raised in SSA no-match letters fail, would not constitute document abuse. In response to a December 16, 1993 letter from the California Farm Bureau Federation, the OSC Special Counsel stated "...*an employer cannot deduce that its employee is not work authorized merely because it receives one of these notices from the Social Security Administration.*" The Special Counsel advised, however, that the employer must take reasonable steps to try and resolve the discrepancy between their records and those of the SSA, and if the employer receives information that the employee may be unauthorized to work in the United States (e.g., the discrepancy cannot be resolved), the employer would have an affirmative obligation to reverify and inquire further into the employee's status. Reverification in these circumstances, therefore, would not constitute document abuse.

Some companies have a policy to terminate any employee who admits to making any material misrepresentation during the hiring process, including employees fraudulently using Social Security numbers. OCAHO has recently upheld such a company policy. In a 2003 case, an ALJ held that an employer's use of a consistently applied honesty policy of terminating employees who fraudulently use Social Security numbers, or otherwise fail to provide truthful information on required forms and documents, does not violate IRCA's anti-discrimination provision. Simon v. Ingram Micro Inc., 9 OCAHO no. 1088 (2003). The employee alleged that the employer committed citizenship status discrimination and document abuse when it fired her for being unable to explain the difference between the Social Security number she originally submitted when she began working for the employer and the number she submitted when she later became a lawful permanent resident (LPR). The employer argued, however, that she was fired for dishonesty. Applying the traditional burden-shifting paradigm in employment discrimination cases, the ALJ first held that the complainant did not establish a prima facie case because she failed to show disparate treatment based on her protected citizenship status. Although the ALJ observed that the employer did not apply its honesty policy with absolute uniformity, he noted that there was no evidence to suggest any discriminatory motive and that the employer even tried to help the employee obtain the appropriate documentation to explain the discrepancy. Even if the complainant made a prima facie case, however, the ALJ held that the employer presented a legitimate, nondiscriminatory reason for firing her because the employer was justified in concluding that she had originally obtained work fraudulently, even though she was later work-authorized now. The ALJ stated that firing an employee for falsifying employment information is a legitimate, nondiscriminatory reason. The ALJ observed that the complainant had notice of employer's policy for terminating employment for fraud and dishonesty because she signed the employment application and company handbook, which both stated the policy. By claiming that she was an LPR on her employment application and I-9, the ALJ found that she committed dishonest acts that violated the terms of her employment application, the handbook, the

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-04472-CRB    Document 128-8    Filed 10/01/2007    Page 106 of 142

IMECH §   6:53                                                          Page 6
Immigr. Empl. Compliance Handbook §   6:53

company's honesty policy, and U.S. law. Additionally, the ALJ found that the complainant failed to establish that employer's reasons for firing her were pretextual. The ALJ concluded that the employer could reasonably assume that the complainant fraudulently presented a Social Security number that did not belong to her. In addition to the difference in the numbers, a letter from the Social Security Administration (SSA) indicated that it had issued only one number to the complainant.

As for the employee's claim of document abuse, the ALJ held that she failed to allege or show that the employer requested the additional documentation from the SSA for the purpose of discriminating against her. The ALJ found that the employer had constructive knowledge that the complainant was fraudulently using a Social Security number because no other plausible explanation was given for the two different numbers she presented. The ALJ held that requesting information from an employee to see if there is any violation of its honesty policy is not illegal discrimination or document abuse. The ALJ characterized the complainant as having brought her claims with "unclean hands" because she sought relief for discrimination and document abuse, when she knowingly and intentionally worked without employment authorization for approximately five years. The ALJ found that she lied on her employment documents; specifically, that she signed the I-9 under penalty of perjury, knowing that the Social Security number and LPR alien number she provided on that form did not belong to her.

**IRS guidance on follow-up activity and reasonable cause waivers.** The SSA is required by law to provide the IRS with information on no-match W-2 forms and the IRS may penalize an employer when the name and SSN do not match SSA records. The IRS is authorized by regulation to fine employers $50 for each incorrectly reported SSN up to a maximum of $250,000. Penalties resulting from SSN mismatches on W-2 forms may be waived in certain circumstances where there is reasonable cause, however. In order to qualify for the waiver, the employer must establish that there were significant mitigating factors with respect to the failure or that the failure arose from events that were beyond the employer's control. In addition, the employer must show that it acted in a responsible manner before and after the failure occurred. Events beyond the filer's control include actions of another party, including the employee — such as where the employer received a Social Security number from the employee, relied on the number in good faith, used the number on Form W-2, and received a penalty notice from the IRS notifying the employer that the Social Security number was incorrect. Significant mitigating factors can include the fact that the employer has a history of complying with reporting requirements.

In an opinion letter dated September 24, 2003, the IRS clarified that when there has been an SSN mismatch, the employer can demonstrate that it acted in a responsible manner by showing that it properly solicited the employee's SSN at the time the employee began work. No additional solicitations of the number are required unless the Internal Revenue Service sends a notice to the employer informing it of the mismatch. Upon receipt of the IRS notice, the employer may be required to make an annual solicitation for the correct Social Security number if its records contain the incorrect SSN at the time of the notice. The employer must solicit the employee's correct SSN by December 31 of the year in which the penalty notice was received; the solicitation may be made in person or by mail or telephone. The employer is not required to make the solicitation if there will be no reportable payments made to the employee in that year. The employer may be

©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

required to make a second annual solicitation if the employer receives another IRS
mismatch notice in any subsequent year. The employer may rely on the SSN provided
by the employee in response to the solicitation. If the employer receives yet
another IRS notice of an SSN mismatch after making the two required solicitations,
it is not required to make further solicitations. The employer's initial
solicitation of the SSN upon the employee's commencement of work and the two
subsequent annual solicitations in response to the mismatch notice will demonstrate
that the employer acted in a reasonable manner before and after the failure to
provide correct information, and will establish reasonable cause to grant the
waiver of penalties.

    As a practice matter, therefore, many employers conduct some follow-up activity
after receiving an SSA no-match letter to resolve any discrepancies and avoid an
IRS penalty notice. As noted, once an IRS penalty notice is issued, the employer is
required under IRS regulations to undertake follow-up activity and the failure to
do so will bar an employer from obtaining a "reasonable cause" waiver.

℗  2006 Thomson/West

IMECH §  6:53

END OF DOCUMENT

℗  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EWIC   Essential Worker Immigration Coalition

---

*June 12, 2006*

OVERVIEW OF DEPARTMENT OF HOMELAND SECURITY ("DHS") PROPOSED REGULATIONS ON
SAFE-HARBOR PROCEDURES FOR EMPLOYERS WHO RECEIVE A NO-MATCH LETTER

## Overview and Purpose of Proposed Regulations

The DHS is proposing regulations relating to the unlawful hiring or continuous employment of unauthorized aliens. These regulations clarify the legal obligations of an employer when s/he receives a no-match letter from the Social Security Administration ("SSA") or DHS and further explains the safe-harbor procedures that an employer can follow in order to limit or negate liability based upon the employer's knowledge that the alien was ineligible to work in the U.S. For an employer to be found liable for hiring or continuing to employ an alien who is unauthorized to work in the U.S., it must be established that the employer had knowledge, actual or constructive (that which can be fairly inferred), that the alien was not authorized to work. These proposed regulations provide examples regarding what would constitute a finding that the employer had constructive knowledge based upon the employer's failure to take *reasonable* steps to resolve DHS discrepancies and SSA no-match letters.

## Does the proposed regulation change the definition of "knowing" as defined by 8 C.F.R. 274a.1(l)(1)?

The proposed rule would amend what constitutes constructive knowledge in certain circumstances and states that, "[E]mployer's obligations under current law, which is that if the employer fails to take reasonable steps after receiving such information, and if the employee is in fact an unauthorized alien, the employer may be found to have had constructive knowledge of that fact." More specifically, the proposed regulations add two additional examples of what would constitute constructive knowledge, including: 1. written notice from SSA that the combination of name and SSN submitted for an employee does not match SSA records; and 2. written notice from DHS that the immigration status document, or employment authorization document ("EAD"), presented or referenced by the employee in completing Form I-9 was assigned to another person, or that there is no agency record that the document was assigned to anyone. Regarding the latter situation, DHS will take into account the totality of relevant circumstances when making a determination whether the employer had constructive knowledge that the alien was unauthorized to work.

## What safe-harbors procedures are discussed in the proposed regulations?

The regulations propose specific steps to be taken by the employer in defined periods of time that would constitute a "reasonable response" to a no-match letter by the employer or written notification from DHS. Taking such measures may allow the employer to avoid liability and mitigate or eliminate potential penalties against the employer.

No-Match Cert. Admin. Record 841

**What reasonable steps can an employer take in order avoid being found liable for hiring or continuing to employ an unauthorized alien?**

The proposed regulations have described three steps that an employer can take so to establish that s/he responded to an SSA or DHS written notification in a reasonable manner. They include:

1. "A reasonable employer would check its records promptly after receiving a no-match letter, to determine whether the discrepancy results from a typographical, transcribing, or similar clerical error in the employer's records or in its communications to the SSA or DHS." If such an error is determined, the employer should take action to correct the error and inform the necessary agencies to ensure that the name and number, as amended, matches the records. *It is important to note that the regulation states that it considers a response within 14 days from receipt of the no-match letter reasonable.*

2. If the employer's actions in step 1 above do not resolve the discrepancy, the employer should confirm the records on file with the employee, make any necessary corrections, inform the agencies involved and confirm that the information matches the agency's records. If the employee states that the information is correct, the employer should ask the employee to go to the local SSA office and resolve the matter personally. *The discrepancy will only be considered "resolved" if the employer follows up with SSA to confirm[1] the name and social security number match and with DHS to verify that the individual is authorized to work. Again, it is important to note that the regulation states that it considers a response within 14 days from receipt of the no-match letter reasonable.*

3. The regulations also state specific steps that an employer can take if the discrepancy is not resolved within 60 days from the receipt of the of the no-match letter. The regulation states that, "This procedure would verify (or fail to verify) the employee's identity and work authorization. If the described procedure is completed, and the employee is verified, then even if the employee is in fact an unauthorized alien, the employer will not be considered to have constructive knowledge."

If, after the employer has taken the necessary, "reasonable" steps to resolve any discrepancies and there is still no resolution, the employer should terminate the alien's employment or risk being found liable based on the employer's constructive knowledge that the alien was unauthorized.

**What is the procedure to verify the employee's identity and eligibility as described in the proposed regulation?**

The procedure for verifying those employees who there has been a no-match letter issued would include the employer and employee completing a new Form I-9 "using the same procedures as if the employee were newly hired [...] with some restrictions." These proposed restrictions

---

[1] Employers can verify SSN with SSA by calling 1-800-772-6270 weekdays from 7am to 7pm.

Essential Worker Immigration Coalition
1615 H Street, NW
Washington, DC 20062
(202) 463-5931 ● ewic@uschamber.com ● www.ewic.org

No-Match Cert. Admin. Record  842

include: 1. Employer would have a total of 63 days from receipt of the no-match letter to check the records, resolve discrepancies and complete a new I-9; 2. Employer cannot use the name or SSN that is subject of a no-match letter as evidence to prove, establish or verify an employee's identity, eligibility or both; and 3. No document without a photograph may be used to establish identity.    As noted in the proposed regulation, "Employers should apply these procedures uniformly to all of their employees having unresolved no-match indicators.  If they do not do so, they may violate applicable antidiscrimination laws."

**Conclusion**

The regulations have not yet been publicly posted and are therefore not yet open for comment. We expect that the regulations will be published early this week.  The above analysis should not be considered a substitute for reading the actual language of the regulation; rather the above is a summary of some of the main issues.  As EWIC learns more, we will keep you updated.

The Essential Worker Immigrant Coalition (EWIC) is a broad-based coalition of national businesses and trade associations from across the industry spectrum concerned with the shortage of both semi-skilled and unskilled ("essential worker") labor.  EWIC supports policies that facilitate the employment of essential workers by U.S. companies that are unable to find American workers. (www.ewic.org)  For more information, contact EWIC co-chairs John Gay at (202) 331-5912, Laura Reiff at (703) 749-1372 and/or Randy Johnson at (202) 463-5448.

Essential Worker Immigration Coalition
1615 H Street, NW
Washington, DC 20062
(202) 463-5931 ● ewic@uschamber.com ● www.ewic.org

No-Match Cert. Admin. Record  843

# Proposed Rules

**Federal Register**

Vol. 71, No. 114

Wednesday, June 14, 2006

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

---

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 274a**

**[ICE 2377–06; Docket No. ICEB–2006–0004]**

**RIN 1653–AA50**

**Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**

**AGENCY:** Bureau of Immigration and Customs Enforcement, Department of Homeland Security.

**ACTION:** Proposed rule.

**SUMMARY:** The Bureau of Immigration and Customs Enforcement proposes to amend the regulations relating to the unlawful hiring or continued employment of unauthorized aliens. The amended regulation describes the legal obligations of an employer, under current immigration law, when the employer receives a no-match letter from the Social Security Administration or the Department of Homeland Security. It also describes "safe-harbor" procedures that the employer can follow in response to such a letter and thereby be certain that DHS will not find that the employer had constructive knowledge that the employee referred to in the letter was an alien not authorized to work in the United States. The proposed rule adds two more examples of situations that may lead to a finding that an employer had such constructive knowledge to the current regulation's definition of "knowing." These additional examples involve an employer's failure to take reasonable steps in response to either of two events: (1) The employer receives written notice from the Social Security Administration (SSA) that the combination of name and social security account number submitted to SSA for an employee does not match agency records; or (2) the employer receives written notice from the Department of Homeland Security (DHS) that the immigration-status or employment-authorization documentation presented or referenced by the employee in completing Form

I–9 was not assigned to the employee according to DHS records. (Form I–9 is retained by the employer and made available to DHS investigators on request, such as during an audit.) The proposed rule also states that whether DHS will actually find that an employer had constructive knowledge that an employee was an unauthorized alien in a situation described in any of the regulation's examples will depend on the totality of relevant circumstances. The "safe-harbor" procedures include attempting to resolve the no-match and, if it cannot be resolved within a certain period of time, verifying again the employee's identity and employment authorization through a specified process.

**DATES:** Written comments must be submitted on or before August 14, 2006.

**ADDRESSES:** You may submit comments, identified by DHS Docket No. ICEB–2006–0004, by one of the following methods:

• Federal eRulemaking Portal: *http://www.regulations.gov.* Follow the instructions for submitting comments.

• E-mail: You may submit comments directly to ICE by email at *rfs.regs@dhs.gov.* Include docket number in the subject line of the message.

• Mail: Director, Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 2nd Floor, Washington, DC 20529, Contact Telephone Number (202) 272–8377. To ensure proper handling, please reference this DHS Docket No. ICEB–2006–0004 on your correspondence. This mailing address may also be used for paper, disk, or CD–ROM submissions.

• Hand Delivery/Courier: Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 2nd Floor, Washington, DC 20529, Contact Telephone Number (202) 272–8377.

**FOR FURTHER INFORMATION CONTACT:** Charles Wood, Regulatory Counsel, Office of the Principal Legal Advisor, Bureau of Immigration and Customs Enforcement, Department of Homeland Security, 425 I Street, NW., Washington, DC 20536. Contact Telephone Number (202) 514–2895.

**SUPPLEMENTARY INFORMATION:**

## I. Public Participation

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of the proposed rule. The Bureau of Immigration and Customs Enforcement (ICE) also invites comments that relate to the potential economic, environmental, or federalism effects of this proposed rule. Comments that will provide the most assistance to ICE in developing these procedures will reference a specific portion of the proposed rule, explain the reason for any recommended change, and include data, information, or authority that support such recommended change. ICE would be particularly interested in comments on the time limits described in the rule. Comments that will provide the most assistance to ICE will include specific factual support, including examples of circumstances under which it would be difficult for the commenting employer to resolve the issues raised in a no-match letter within the stated time frame.

*Instructions:* All submissions received must include the agency name and DHS docket No. ICEB–2006–0004 for this rulemaking. All comments received will be posted without change to *http://www.regulations.gov,* including any personal information provided. See **ADDRESSES** above for information on how to submit comments.

Docket: For access to the docket to read background documents or comments received, go to *http://www.regulations.gov.* Submitted comments may also be inspected at the office of the Director, Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 2nd Floor, Washington, DC 20529, Contact Telephone Number (202) 272–8377.

## II. Background

Employers annually send the Social Security Administration (SSA) millions of earnings reports (W–2 Forms) in which the combination of employee name and social security number (SSN) does not match SSA records. In some of these cases, SSA sends a letter that informs the employer of this fact. The letter is commonly referred to as a "no-match letter." There are many causes for such a no-match, including clerical

**No-Match Cert. Admin. Record 844**

error and name changes. But one of the causes is the submission of information for an alien who is not authorized to work in the United States and is using a false SSN or a SSN assigned to someone else. Such a letter may be one of the only indicators to an employer that one of its employees may be an unauthorized alien.

ICE sends a similar letter after it has inspected an employer's Employment Eligibility Verification forms (Forms I–9) and after unsuccessfully attempting to confirm, in agency records, that an immigration status document or employment authorization document presented or referenced by the employee in completing the Form I–9 was assigned to that person. (After a Form I–9 is completed by an employer and employee, it is retained by the employer and made available to DHS investigators on request, such as during an audit.)

This proposed regulation describes an employer's current obligations under the immigration laws, and its options for avoiding liability, after receiving a no-match letter from either SSA or DHS. The proposed regulation specifies the steps to be taken by the employer that will be considered by DHS to be a reasonable response to receiving a no-match letter—a response that will eliminate the possibility that DHS, when seeking civil money penalties against an employer, will allege, based on the totality of relevant circumstances, that an employer had constructive knowledge that it was employing an alien not authorized to work in the United States, in violation of section 274A(a)(2) of the Immigration and Nationality Act (INA), 8 U.S.C. 1324a(a)(2). This provision of the Act states:

It is unlawful for a person or other entity, after hiring an alien for employment in accordance with paragraph (1), to continue to employ the alien in the United States *knowing* the alien is (or has become) an unauthorized alien with respect to such employment. [Emphasis added.]

Both regulation and case law support the view that an employer can be in violation of section 274A(a)(2), 8 U.S.C. 1324a(a)(2) by having constructive rather than actual knowledge that an employee is unauthorized to work. A definition of "knowing" first appeared in the regulations on June 25, 1990 at 8 CFR 274a.1(l)(1). See 55 FR 25928. That definition stated:

The term "knowing" includes not only actual knowledge but also knowledge which may fairly be inferred through notice of certain facts and circumstances which would lead a person, through the exercise of reasonable care, to know about a certain condition.

As noted in the preamble to the original regulation, that definition, which is essentially the same as the definition adopted in this rule, is consistent with the Ninth Circuit's holding in *Mester Mfg. Co.* v. *INS*, 879 F.2d 561, 567 (9th Cir. 1989) (an employer who received information that some employees were suspected of having presented a false document to show work authorization was held to have had constructive knowledge of their unauthorized status when he failed to make any inquiries or take appropriate corrective action). The court cited its opinion in *United States* v. *Jewell*, 532 F.2d 697 (9th Cir.) (en banc), and explained its ruling in *Jewell* as follows: "deliberate failure to investigate suspicious circumstances imputes knowledge." 879 F.2d at 567. See also *New El Rey Sausage Co.* v. *INS*, 925 F.2d 1153, 1158 (9th Cir. 1991).

The regulatory language quoted above also begins the current regulatory definition of "knowing," which is still at 8 CFR 274a.1(l)(1). In the current definition, additional language follows this passage, describing situations that may involve constructive knowledge by the employer that an employee is an unauthorized alien. The Immigration and Naturalization Service added this language on August 23, 1991. See 56 FR 41767. The current definition contains an additional, concluding paragraph, which relates to foreign appearance or accent, and to the documents that may be requested by an employer as part of the verification system that must be used at the time of hiring, as required by INA section 274A(a)(1)(B), 8 U.S.C. 1324a(a)(1)(B). This paragraph will be described in greater detail below. The verification system referenced in this paragraph is described in INA section 274A(b), 8 U.S.C. 1324a(b).

## III. Proposed rule

The proposed rule would amend the definition of "knowing" in 8 CFR 274a.1(l)(1), in the portion relating to "constructive knowledge." First, it would add two more examples to the existing examples of information available to an employer indicating that an employee could be an alien who is not authorized to work in the United States. It also explicitly states the employer's obligations under current law, which is that if the employer fails to take reasonable steps after receiving such information, and if the employee is in fact an unauthorized alien, the employer may be found to have had constructive knowledge of that fact. The proposed rule would also state explicitly another implication of the employer's obligation under current law—whether an employer would be

found to have constructive knowledge in particular cases of the kind described in each of the examples (the ones in the current regulation and in the proposed regulation) depends on the "totality of relevant circumstances" present in the particular case.

The additional examples are:
(1) Written notice from SSA that the combination of name and SSN submitted for an employee does not match SSA records; and
(2) written notice from DHS that the immigration status document, or employment authorization document, presented or referenced by the employee in completing Form I–9 was assigned to another person, or that there is no agency record that the document was assigned to anyone.

The proposed regulation also describes more specifically the steps that an employer might take after receiving a no-match letter, steps that DHS considers reasonable. By taking these steps in a timely fashion, an employer would avoid the risk that DHS may find, based on the totality of circumstance present in the particular case, that the employer had constructive knowledge that the employee was not authorized to work in the United States. The steps that a reasonable employer may take include one or more of the following:

(I) A reasonable employer would check its records promptly after receiving a no-match letter, to determine whether the discrepancy results from a typographical, transcribing, or similar clerical error in the employer's records or in its communication to the SSA or DHS. If there is such an error, the employer would correct its records, inform the relevant agencies (in accordance with the letter's instructions, if any; otherwise in any reasonable way), and verify that the name and number, as corrected, match agency records—in other words, verify with the relevant agency that the discrepancy has been resolved—and make a record of the manner, date, and time of the verification. ICE would consider a reasonable employer to have acted promptly if the employer took such steps within 14 days of receipt of the no-match letter.

(II) If such actions do not resolve the discrepancy, the reasonable employer would promptly request the employee to confirm that the employer's records are correct. If they are not correct, the employer would take the actions needed to correct them, inform the relevant agencies (in accordance with the letter's instructions, if any; otherwise in any reasonable way), and verify the corrected records with the relevant

agency. If the records are correct according to the employee, the reasonable employer would ask the employee to pursue the matter personally with the relevant agency, such as by visiting a local SSA office, bringing original documents or certified copies required by SSA, which might include documents that prove age, identity, citizenship or alien status, and other relevant documents, such as proof of a name change, or by mailing these documents or certified copies to the SSA office, if permitted by SSA. ICE would consider a reasonable employer to have acted promptly if the employer took such steps within 14 days of receipt of the no-match letter. The proposed regulation provides that a discrepancy will be considered resolved only if the employer verifies with SSA or DHS, as the case may be, that the employee's name matches in SSA's records a number assigned to that name, and the number is valid for work or is valid for work with DHS authorization (and, with respect to the latter, verifies the authorization with DHS) or that DHS records indicate that the immigration status document or employment authorization document was assigned to the employee. In the case of a number from SSA, the valid number may be the number that was the subject of the no-match letter or a different number, for example a new number resulting from the employee's contacting SSA to resolve the discrepancy. Employers may verify a SSN with SSA by telephoning toll-free 1–800–772–6270, weekdays from 7 a.m. to 7 p.m. EST. See *http://www.ssa.gov/employer/ssnvadditional.htm.* For info on SSA's online verification procedure, see *http://www.ssa.gov/employer/ssnv.htm.* Employers should make a record of the manner, date, and time of any such verification, as SSA may not provide any documentation.

(III) The proposed regulation also describes a verification procedure that the employer may follow if the discrepancy is not resolved within 60 days of receipt of the no-match letter. This procedure would verify (or fail to verify) the employee's identity and work authorization. If the described procedure is completed, and the employee is verified, then even if the employee is in fact an unauthorized alien, the employer will not be considered to have constructive knowledge of that fact. Please note that, as stated in the "PUBLIC PARTICIPATION" section above, ICE is interested in receiving public comments on the time frames in this proposed regulation. That would include the 60-day period, and also possible alternatives, such as a 30-day or 90-day time frame. In determining the time frame to be included in the final rule, ICE will consider all comments received. As further stated in "PUBLIC PARTICIPATION," the comments that will provide the most assistance to ICE on this issue will include specific factual support, including examples of circumstances under which it would be difficult for the commenting employer to resolve the issues raised in a no-match letter within 60 days of receipt of the letter.

If the discrepancy referred to in the no-match letter is not resolved, and if the employee's identity and work authorization cannot be verified using a reasonable verification procedure, such as that described in the proposed rule (see below), then the employer must choose between taking action to terminate the employee or facing the risk that DHS may find that the employer had constructive knowledge that the employee was an unauthorized alien and therefore, by continuing to employ the alien, violated INA section 274A(a)(2), 8 U.S.C. 1324a(a)(2).

The procedure to verify the employee's identity and work authorization described in the proposed rule would involve the employer and employee completing a new Form I–9, Employment Eligibility Verification Form, using the same procedures as if the employee were newly hired, as described in 8 CFR 274a.2, with certain restrictions. The proposed rule identifies these restrictions:

(*1*) Under the proposed rule, both Section 1 ("Employee Information and Verification") and Section 2 ("Employer Review and Verification") would have to be completed within 63 days of receipt of the no-match letter. Therefore, if an employer tried to resolve the discrepancy described in the no-match letter for the full 60 days provided for in the proposed rule, it would have an additional 3 days to complete a new I–9. Under current regulations, three days are provided for the completion of the form after a new hire. 8 CFR 274a.2(b)(1)(ii).

(*2*) No document containing the SSN or alien number that is the subject of the no-match letter, and no receipt for an application for a replacement of such a document, may be used to establish employment authorization or identity or both.

(*3*) No document without a photograph may be used to establish identity (or both identity and employment authorization). (This is consistent with the documentary requirements of the Basic Pilot Program. *See http://uscis.gov/graphics/services/SAVE.htm.*)

Employers should apply these procedures uniformly to all of their employees having unresolved no-match indicators. If they do not do so, they may violate applicable anti-discrimination laws. In this regard, the proposed regulation also amends the last paragraph of the current definition of "knowing." The current rule provides, in relevant part, that—

Nothing in this definition should be interpreted as permitting an employer to request more or different documents than are required under section 274(b)[1] of the Act or to refuse to honor documents tendered that on their face reasonably appear to be genuine and to relate to the individual.

The proposed rule clarifies that this language applies to employers who receive no-match letters, but that employers who follow the safe harbor procedures set forth in this rule will not be found to have violated the provisions of 274B(a)(6) of the INA. This clarification is accomplished by adding the following language after "individual": ", except a document about which the employer has received a notice described in paragraph (l)(1)(iii) of this section and with respect to which the employer has received no verification as described in paragraph (l)(2)(i)(B) or (l)(2)(ii)(B) of this section.". Alternative documents that show work authorization are specified in 8 CFR 274a.2(b)(1)(v). Examples are a U.S. passport (unexpired or expired), a U.S. birth certificate, or any of several documents issued to lawful permanent resident aliens or to nonimmigrants with work authorization.

There may be other procedures a particular employer could follow in response to a no-match letter, procedures that would be considered reasonable by DHS and inconsistent with a finding that the employer had constructive knowledge that the employee was an unauthorized alien. But such a finding would depend on the totality of relevant circumstances. An employer that followed a procedure other than the "safe-harbor" procedures described in the regulation would face the risk that DHS may not agree.

It is important that employers understand that the proposed regulation describes the meaning of constructive knowledge and specifies "safe-harbor" procedures that employers could follow to avoid the risk of being found to have constructive knowledge that an employee is not authorized to work in the United States. The regulation would not preclude DHS from finding that an employer had actual knowledge that an employee was an unauthorized alien. An employer with actual knowledge

---

[1] Please note, this citation is inaccurate and should read "section 274A(b) of the Act." The proposed rule makes this correction.

that one of its employees is an unauthorized alien could not avoid liability by following the procedures described in the proposed regulation. The burden of proving actual knowledge would, however, be on the government. Finally, it is important that employers understand that the resolution of discrepancies in a no-match letter, or other information that an employee's Social Security Number presented to an employer matches the records for the employee held by the Social Security Administration, does not, in and of itself, demonstrate that the employee is authorized to work in the United States.

## IV. Regulatory Requirements

### A. Regulatory Flexibility Act

The Secretary of Homeland Security, in accordance with the Regulatory Flexibility Act, 5 U.S.C. 605(b), has reviewed this regulation and, by approving it, certifies that this rule would not have a significant economic impact on a substantial number of small entities. It does not affect small entities as that term is defined in 5 U.S.C. 601(6). This rule would describe when receipt by an employer of a no-match letter from the Social Security Administration or the Department of Homeland Security may result in a finding that the employer had constructive knowledge that it was employing an alien not authorized to work in the United States. The rule would also describe steps that DHS would consider a reasonable response by an employer to receipt of a no-match letter. The rule would not mandate any new burdens on the employer and would not impose any new or additional costs on the employer, but would merely add specific examples and a description of a "safe harbor" to an existing DHS regulation for purposes of enforcing the immigration laws and providing guidance to employers.

### B. Unfunded Mandates Reform Act of 1995

This rule would not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in one year, and it would not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### C. Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule would not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic or foreign markets.

### D. Executive Order 12866 (Regulatory Planning and Review)

This proposed rule is considered by the Department of Homeland Security (DHS) to be a "significant regulatory action" under Executive Order 12866. Under Executive Order 12866, a significant regulatory action is subject to an Office of Management and Budget (OMB) review and to the requirements of the Executive Order. The Executive Order defines "significant regulatory action" as one that is likely to result in a rule that may: (1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities; (2) create a serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights or obligations of recipients thereof; or (4) raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order. Because this rule would describe what specific steps an employer that has received a no-match letter could take that would eliminate the possibility that DHS would find that the employer had constructive knowledge that it is employing an unauthorized alien, this rule may raise novel policy issues.

### E. Executive Order 13132 (Federalism)

This rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### F. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### G. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting requirements inherent in a rule. This proposed rule would not impose any additional information collection burden or affect information currently collected by ICE.

## List of Subjects in 8 CFR Part 274a

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

Accordingly, part 274a of chapter I of title 8 of the Code of Federal Regulations is amended as follows:

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

1. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 8 CFR part 2.

2. Section 274a.1(l) is revised to read as follows:

### § 274a.1   Definitions.

\*    \*    \*    \*    \*

(l)(1) The term *knowing* includes having actual or constructive knowledge. Constructive knowledge is knowledge which may fairly be inferred through notice of certain facts and circumstances that would lead a person, through the exercise of reasonable care, to know about a certain condition. Examples of situations where the employer may, depending on the totality of relevant circumstances, have constructive knowledge that an employee is an unauthorized alien include, but are not limited to, situations where the employer:

(i) Fails to complete or improperly completes the Employment Eligibility Verification Form, I–9;

(ii) Acts with reckless and wanton disregard for the legal consequences of permitting another individual to introduce an unauthorized alien into its work force or to act on its behalf;

(iii) Fails to take reasonable steps after receiving information indicating that the employee may be an alien who is not employment authorized, such as—

(A) Labor Certification or an Application for Prospective Employer;

(B) Written notice from the Social Security Administration that the combination of name and social security account number submitted for the employee does not match Social Security Administration records; or

(C) Written notice from the Department of Homeland Security that the immigration status document or employment authorization document presented or referenced by the employee in completing Form I–9 was assigned to another person, or that there is no agency record that the document was assigned to any person.

(2)(i) An employer who receives the notice from SSA described in paragraph (l)(1)(iii)(B) of this section will not be deemed to have constructive knowledge that the employee is an unauthorized alien if—

(A) The employer takes reasonable steps, within 14 days, to attempt to resolve the discrepancy; such steps may include:

(*1*) Checking the employer's records promptly after receiving the notice, to determine whether the discrepancy results from a typographical, transcribing, or similar clerical error, and if so, correcting the error(s), informing the Social Security Administration of the correct information (in accordance with the letter's instructions, if any; otherwise in any reasonable way), verifying with the Social Security Administration that the employee's name and social security account number, as corrected, match in Social Security Administration records, and making a record of the manner, date, and time of such verification; and

(*2*) If no such error is found, promptly requesting the employee to confirm that the name and social security account number in the employer's records are correct—and, if they are correct according to the employee, requesting the employee to resolve the discrepancy with the Social Security Administration, such as by visiting a Social Security Administration office, bringing original documents or certified copies required by SSA, which might include documents that prove age, identity, and citizenship or alien status, and other documents that may be relevant, such as those that prove a name change, or, if the employee states that the employer's records are in error, taking the actions to correct, inform, verify, and make a record described in paragraph (l)(2)(i)(A)(1) of this section; and

(B) In the event that, within 60 days of receiving the notice, the employer does not verify with the Social Security Administration that the employee's name matches the employee's name in the Social Security Administration's records a number

assigned to that name and that the number is valid for work or is valid for work with DHS authorization (and, with respect to the latter, verify the authorization with DHS), the employer takes reasonable steps, within an additional 3 days, to verify the employee's employment authorization and identity, such as by following the verification procedure specified in paragraph (l)(2)(iii) of this section.

(ii) An employer who receives the notice from DHS described in paragraph (l)(1)(iii)(C) of this section will not be deemed to have constructive knowledge that the employee is an unauthorized alien if—

(A) The employer takes reasonable steps, within 14 days of receiving the notice, to attempt to resolve the question raised by DHS about the immigration status document or the employment authorization document; and

(B) In the event that, within 60 days of receiving the notice, the employer does not verify with DHS that the document was assigned to the employee, the employer takes reasonable steps, within an additional 3 days, to verify the employee's employment authorization and identity, such as by following the verification procedure specified in paragraph (l)(2)(iii) of this section.

(iii) The verification procedure referenced in paragraphs (l)(2)(i)(B) and (l)(2)(ii)(B) of this section is as follows:

(A) The employer completes a new Form I–9 for the employee, using the same procedures as if the employee were newly hired, as described in § 274a.2(a) and (b) of this part, except that—

(*1*) Both Section 1—"Employee Information and Verification"—and Section 2—"Employer Review and Verification"—of the new Form I–9 should be completed within 63 days of receiving the notice referred to in paragraph (l)(1)(iii)(B) or (C) of this section;

(*2*) No document containing the social security account number or alien number that is the subject of a written notice referred to in paragraph (l)(1)(iii)(B) or (C) of this section, and no receipt for an application for a replacement of such document, may be used to establish employment authorization or identity or both; and

(*3*) No document without a photograph may be used to establish identity or both identity and employment authorization; and

(B) The employer retains the new Form I–9 with the prior Form(s) I–9 for the same period and in the same manner as if the employee were newly hired at

the time the new Form I–9 is completed, as described in § 274a.2(b) of this part.

(3) Knowledge that an employee is unauthorized may not be inferred from an employee's foreign appearance or accent. Nothing in this definition should be interpreted as permitting an employer to request more or different documents than are required under section 274A(b) of the Act or to refuse to honor documents tendered that on their face reasonably appear to be genuine and to relate to the individual, except a document about which the employer has received a notice described in paragraph (l)(1)(iii) of this section and with respect to which the employer has received no verification as described in paragraph (l)(2)(i)(B) or (l)(2)(ii)(B) of this section.

Dated: June 8, 2006.

**Michael Chertoff,**

*Secretary.*

[FR Doc. E6–9303 Filed 6–13–06; 8:45 am]

**BILLING CODE 4410–10–P**

# NUCLEAR REGULATORY COMMISSION

## 10 CFR Part 35

**[Docket No. PRM–35–19]**

## William Stein III, M.D.; Receipt of Petition for Rulemaking

**AGENCY:** Nuclear Regulatory Commission.

**ACTION:** Petition for rulemaking; Notice of receipt.

**SUMMARY:** The Nuclear Regulatory Commission (NRC) has received and requests public comment on a petition for rulemaking filed by William Stein III, M.D. (petitioner). The petition has been docketed by the NRC and has been assigned Docket No. PRM–35–19. The petitioner is requesting that the NRC amend the regulations that govern medical use of byproduct material concerning training for parenteral administration of certain radioactive drugs used to treat cancer. The petitioner believes that these regulations do not adequately consider the training necessary for a class of physicians, namely medical oncologists and hematologists, to qualify as an Authorized User (AU) physician to administer these drugs. The petitioner requests that the regulations be amended to clearly codify an 80-hour training and experience requirement as appropriate and sufficient for physicians desiring to attain AU status for these unsealed byproduct materials.



1201 F, St, NW,  Suite 200,  Washington, DC  20004
(202)  554-9000

August 14, 2006

Hon. Michael Chertoff
Secretary
Department of Homeland Security
Bureau of Immigration and Customs Enforcement
Washington, DC 20528

RE:  PROPOSED RULE ON THE SAFE-HARBOR PROCEDURES FOR EMPLOYERS WHO RECEIVE A
NO-MATCH LETTER (DKT NO ICEB-2006-0004).

Dear Secretary Chertoff:

On behalf of the small-business owners represented by the National Federation of
Independent Business (NFIB), I am writing to offer comments on the Department of Homeland
Security (DHS) Bureau of Immigration and Customs Enforcement's (BICE) Proposed Rule on
the Safe-Harbor Procedures for Employers Who Receive a No-Match Letter, listed in the Federal
Register on June 14, 2006 (71 Fed. Reg. 34281). NFIB appreciates DHS's efforts to give
businesses guidance on how to handle no-match letters.

NFIB is the nation's largest small business advocacy organization, with offices in
Washington, D.C. and all 50 state capitals. NFIB serves the needs of small business on a broad
spectrum of issues. Ninety percent of NFIB members have fewer than 20 employees. The typical
NFIB member employs five workers and reports gross sales of around $350,000 per year.

Clarification of the employer's obligation upon receiving a no-match letter and the safe
harbor provided for in the proposed regulation is critical. This is particularly important given that
DHS now intends to utilize no-match information in their enforcement activities. These

**Comments by NFIB on the Proposed Rule with Request for Comment**    Page 2
**Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**
**August 14, 2006**

procedures are consistent with the suggested steps given by the Social Security Administration (SSA) on what to do when you receive a no-match letter.

When SSA began sending no-match letters to employers, businesses were told the intent was not enforcement of immigration laws but to correct any mistakes so that social security funds were properly allocated. There are many causes for such a no-match, including clerical error and name changes. Allowing SSA no-match data to be used by DHS for immigration enforcement might create anxiety for employers who are told that while unlawful to hire illegal workers it is also unlawful to scrutinize documents. Employers must accept documents if they "appear reasonably genuine on their face" or risk the threat of being faced with a discrimination lawsuit. This regulation will give our small employers who follow the law and verify their worker's identity and employment eligibility to the best of their ability a safe harbor from fines if appropriate action is taken upon receipt of a no-match letter.

Employers are obligated to take reasonable action when they have been notified they may have hired an illegal alien. The guidance put forth by this regulation is necessary because while the SSA has told employers that the receipt of a no-match does not mean that their employee is illegal, a substantial number of workers identified by no-match letters are undocumented immigrants who are unable to provide legitimate social security numbers. The proposed rule spells out steps to be taken to resolve the discrepancy. If that discrepancy cannot be resolved within 60 days, the regulation states that the employer must reverify the employee's identity and employment authorization or terminate the employee.

Because this proposed rule states that inaction after the receipt of a no-match constitutes knowingly employing an illegal worker, NFIB has concerns about the time frame given to resolve the issue. First, the regulation should specify whether the employer has 14 calendar days or 14 government working days. NFIB suggests that employers would need the time frame to be based on government working days because the resolution involves contacting either SSA or DHS.

**Comments by NFIB on the Proposed Rule with Request for Comment**    Page 3
**Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**
**August 14, 2006**

Another concern with the 60-day time frame is that employers only have 14 days to act. This leaves the employee with 46 days to follow-up with any action that needs to done on their part. If an employer participates in the Basic Pilot program an employee who receives a tentative nonconfirmation has only eight days to correct potential problems with SSA. It raises questions as to why employees get 46 days to correct problems with work authorization after a no-match letter and eight days with the Basic Pilot, the effort on behalf of the employee should the same in both instances. Additionally this time frame provides a new opportunity for illegal workers to game the system. This could be a problem for employers because they have to keep employees that have no intention of contacting SSA because they do not have legal work status. According to research by Center for Urban Economic Development at University of Illinois on the no-match program, few corrections are actually made because of these letters since most of the workers identified are not authorized to work. Allowing 46 days gives employees a chance to maintain employment with full knowledge that there will not be any corrections made with SSA or DHS. If the employer suspects that the employee is making no effort to resolve the no-match issue they have no choice but to wait out the remaining 46 days before terminating the employee and starting the hiring and training process, just simply prolonging the inevitable.

NFIB questions why employees cannot correct their information within the same time frame as employers. If a 60-day time frame is adopted, 30 days should be allowed for both the employer and the employee. If DHS intends to keep the employer deadline at 14 days then employees should be given that same deadline.

NFIB is also concerned that DHS will not be flexible with the 14-day deadline. Small businesses often have problems with rigid deadlines that do not allow the agency to evaluate why an employer might have missed the deadline. Thanks in part to the efforts of NFIB, the Occupational Safety and Health Administration allows small businesses to file appeals even if they missed a deadline because of a mistake or with a reasonable excuse. DHS allows themselves flexibility in the rules by stating that DHS will look at all the behaviors of the offending employers specifying that the safe harbor procedures cannot be used to avoid liability if the employer demonstrates they had knowledge their employee was an unauthorized alien. NFIB

**Comments by NFIB on the Proposed Rule with Request for Comment**       Page 4
**Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**
**August 14, 2006**

hopes that DHS will look at all the circumstances surrounding an employer who unknowing hired and illegal worker but inadvertently missed the 14-day deadline.

NFIB urges DHS to carefully consider the full impact the proposed rule will have on small business. By setting forth "options" for avoiding liability, the proposed rule has in effect created additional recordkeeping and other compliance requirements on a substantial number of small entities. Pursuant to the Regulatory Flexibility Act, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, NFIB requests that the agency carefully determine whether the proposed rule will have a significant economic impact.

NFIB appreciates the opportunity to provide comments on DHS's Proposed Rule on the Safe-Harbor Procedures for Employers Who Receive a No-Match Letter. Please do not hesitate to contact us if you have any questions.

Sincerely,

Dan Danner
Executive Vice President
Public Policy and Political

**From:** Cheryl Hall [mailto:chall@WGA.com]
**Sent:** Friday, August 11, 2006 6:37 PM
**To:** Regs, Rfs
**Cc:** Jasper Hempel; Jason Resnick
**Subject:** DHS Docket No. ICEB-2006-0004

Please see attached.

*Cheryl*

**Cheryl Hall**
Executive Administrative Assistant
Western Growers
PO Box 2130, Newport Beach, CA  92658
Phone: (949) 885-2258
Fax:  (949) 809-6258



August 11, 2006

**<u>VIA ELECTRONIC MAIL AND U.S. MAIL</u>**

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

> Re:    **Docket No. ICEB-2006-0004**
> **Safe Harbor Procedures for Employers Who Receive a No-Match Letter**
> **(FR 71:114, p. 34281)**

To Whom It May Concern:

Attached for your consideration are comments on the proposed regulations from Western Growers, an agricultural trade association that represents the California and Arizona fresh fruit, vegetable and nut industry.

Please contact me at (949) 863-1000 or at 17620 Fitch Street, Irvine, CA 92614 if you have any questions about our comments.

Sincerely,

Jasper E. Hempel
Executive Vice President,
General Counsel

COMMENTS OF

**WESTERN GROWERS**

In Response To

**DEPARTMENT OF HOMELAND SECURITY**

Proposed Regulation On

**Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**

**8 CFR Part 274a**

**[RIN 1653-AA50]**

**ICE 2377-06**

**DHS Docket No. ICEB-2006-0004**

**No-Match Cert. Admin. Record  855**

**Introduction**

Western Growers respectfully but strongly objects to adoption of the proposed so-called "safe-harbor procedure" regulation that imposes a constructive knowledge standard on employers who receive Social Security "No-Match" letters. Without Congress first enacting comprehensive immigration reform that contains and implements a workable and legal guest worker program, the proposed rule is potentially devastating and ruinous to California and Arizona fresh fruit, vegetable and nut growers, packers, shippers and processors.

In our opinion, the proposed rule is ill-conceived, puts California and Arizona farmers in further jeopardy of discrimination lawsuits, does not acknowledge that enhanced border security and enforcement is already resulting in labor and crop shortages and is irrationally punitive to the United States agricultural sector.

**Western Growers**

Western Growers is an agricultural trade association whose almost 3,000 members grow, pack and ship 90 percent of the fresh vegetables and nearly 70 percent of the fresh fruit and nuts grown in Arizona and California, about one-half of the nation's fresh produce. Western Growers members grow the best medicine in the world – fresh fruits, vegetables, and nuts.

Western Growers is a member of the Agricultural Coalition for Immigration Reform (ACIR) and the National Coalition of Agricultural Employers (NCAE). Both are large national coalitions of agricultural employers who support comprehensive immigration reform and who have filed separate, more legally oriented comments on the proposed regulations. Western Growers is also a signatory to those comments and those comments are incorporated herein. Western Growers will focus here on more general impacts of the proposed regulations on its members.

Western Growers, ACIR and NCAE strongly support AgJOBS, which is included in the Senate's Comprehensive Immigration Reform package, and reform of the H-2A temporary agricultural worker program which currently is inaccessible to most farmers in California and Arizona. We also support an earned adjustment of status for experienced agricultural workers currently employed in agriculture. These experienced farm workers are necessary to maintain current levels of agricultural production.

To help our members stay competitive in an increasingly fierce global marketplace, Western Growers provides a host of services on which our members rely, including representation in government affairs; communications and media relations; and international trade and transportation services, just to name a very few.

One of our services, for example, is offered by our affiliated Western Growers Assurance Trust (WGAT). WGAT is the largest provider of health benefits for the fresh produce industry offering a variety of health care, dental, vision service and life insurance plans to fresh produce farmers, their employees, and others affiliated with the agriculture industry. Today, more than 100,000 farm employees and their dependents receive employer sponsored health benefits through WGAT. For over 30 years WGAT has contracted directly with doctors, dentists, pharmacies and hospitals in Mexico to provide seasonal farmworkers with access to healthcare in Mexico. This benefit may be jeopardized if the proposed rule is implemented.

A Western Growers core belief is that the U.S. economy needs additional workers to do many of the jobs that U.S. workers will not do and especially in agriculture. It is beyond dispute that Americans do not raise their children to perform farm labor or otherwise work in the fields, vineyards, and orchards of our country's farms.

The reality is that Western Growers members just do not have enough agricultural workers today (See Crop and Labor Loss section below) and the adoption of the proposed regulation will only exacerbate the situation and drive more farmers out of business or out of the United States.

The simple fact is: our crops are going to be harvested by foreign workers. The only issue is whether or not the harvesting occurs in the United States where our economy will benefit from the 3.5 jobs created upstream and downstream for every farmworker job, or whether another country will reap those economic benefits.

Comprehensive immigration reform that contains a reliable, legal guest worker program must be established so that workers can come legally to our country and become legally employed in jobs where there are insufficient domestic workers to do the job. Until then, this proposed rule must not be adopted.

**Legal Impact on Arizona and California Fresh Produce Sector by Proposed Regulation**

Today, under the Immigration Reform and Control Act of 1986 [IRCA] and Illegal Immigration Reform and Immigrant Responsibility Act of 1996 [IIRIRA], if a prospective employee presents identity and work authorization documents that appear valid on their face, the agricultural employer must accept those documents without further investigation or risk being sued for discrimination and bias.

The proposed regulation puts too much responsibility on employers to

distinguish genuine identity papers, such as birth certificates and Social Security cards, from sophisticated forgeries readily available for nominal cost across the border.

Current immigration law requires the employer try to resolve a social security mismatch when a No-Match Letter is received. But, a U.S. Department of Justice regulation states the letter is not proof of illegality and that the employee cannot be fired solely because of a no-match letter. The proposed rule turns that regulation upside down.

In our opinion, the proposed regulation would create a presumption of illegal status when the employer gets a mismatch letter. If the employer doesn't resolve the mismatch in 60 days, the employer must fire the employee or risk prosecution for knowingly hiring an illegal immigrant.

Penalties for failing to resolve the mismatch include civil fines and criminal prosecution on either felony or misdemeanor charges, depending upon the frequency of violations by the employer.

But, if the regulation is passed, trying to resolve the mismatch also places Arizona and California farmers in the "Catch-22" situation of being sued for discrimination. The most recent example of this real dilemma can be found in the case of *Zamora v. Elite Logistics, Inc.*, (No. 4-3205) (10th Cir., June 6, 2006), in which the employer is required to go to trial because the employer tried to verify legal status of a Hispanic employee.

The proposed regulation affects all employers but it would have a most devastating effect on California and Arizona agriculture, where an estimated 50 to 80 percent of the workers who harvest fruit, vegetables and other crops are illegal immigrants. We hasten to add that our employers are not now knowingly hiring illegal immigrants because they do comply with IRCA and all other existing law.

In our opinion, mere adoption of this proposed regulation without a guest-worker program in place will immediately cut off any hope of our members hiring agricultural employees, putting agricultural employers out of business, forcing operations to Mexico and other foreign countries and thereby increasing our dependence on other countries for our food supply.

First passing and implementing comprehensive immigration reform that includes a reliable and legal guest worker program, where guest workers would be provided a counterfeit-proof ID card, in our opinion, solves the Social Security no-match issue far better than this proposed rule.

**Enforcement is Already Working:    Labor and Crop Shortages are Accelerating and Farmers Are Moving Out of Country Because of Failure of Immigration Reform and Labor Shortages**

Western Growers members are reporting labor shortages in increasing numbers throughout California and Arizona due in part to the ever tightening enforcement of the Southwest border. If our farmers cannot obtain an adequate labor supply, they will be forced to go out of business and sell their farms to developers, or alternatively, they will move their production to Mexico or other countries where those willing to do agricultural work are plentiful. The marketplace has dictated that production must be moved out of the United States where there is insufficient harvest labor.

Western Growers is currently conducting a member labor and crop loss survey. The partial responses initially reflect that California and Arizona Western Growers members have already incurred crop losses of $4,954,000 to date resulting from labor shortages caused by increased border enforcement and failure to enact immigration reform.

More alarming, perhaps, is the fact that the partial survey results show that WG members have moved 12,255 acres of high value fruit and vegetable production to Mexico over the past couple of years.  This means that additional tens to hundreds of millions dollar in crop value have moved to Mexico in addition to countless on and off- farm jobs.   The trend continues with a couple of members reporting that they plan to move 1400 acres to Mexico within the year. Anecdotal information from Yuma, Arizona shows that less vegetable acreage is being leased in the Yuma area than ever before with reports that acreage is being replaced in Mexico.

Consumers and, therefore, supermarkets and food service vendors demand a year round supply of the highest quality fresh fruits, nuts and vegetables. It is unacceptable for the producer to fail to deliver these products to market because of a shortage of harvest labor. If the supermarket or food service vendor cannot obtain domestically grown fresh produce when it needs it, they will buy that produce from Mexico, China, Chile or any other country that will provide that supply.

As we move crop production out of the United States and as we import more produce, the United States will become increasingly dependent on foreign nations for its food. We will then be as dependent on foreign food as we are now dependent on other countries for oil.

In our very strong opinion, maintaining a safe, healthy and abundant domestic supply of fresh fruits, nuts and vegetables is a national security imperative that cannot be ignored.  The proposed regulations, we believe, will hasten the departure to other countries of our domestically grown fresh fruits,

vegetables and nuts.

**Conclusion**

As stated at the outset, Western Growers respectfully but strongly objects to the adoption of the proposed regulations. Adoption of the proposed regulations now, we fervently believe, could put the Arizona and California fresh produce sector out of business, a result that no one wants - not the President, not the Department of Homeland Security, not Congress, not American consumers or Western Growers members.

Western Growers implores the Department of Homeland Security to not pursue the proposed regulations until comprehensive immigration reform that includes a guest worker program has been passed by Congress, signed by the President and regulations implementing comprehensive immigration reform have been adopted. Thank you for your consideration.

CHAMBER OF COMMERCE
OF THE
UNITED STATES OF AMERICA
1615 H STREET, N.W.
WASHINGTON, D.C. 20062
202/463-5422 · 202/463-5901 FAX

RANDEL K. JOHNSON
VICE PRESIDENT
LABOR, IMMIGRATION &
EMPLOYEE BENEFITS

ANGELO I. AMADOR
DIRECTOR
IMMIGRATION POLICY

August 14, 2006

**VIA ELECTRONIC MAIL**

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N.W., 2nd Floor
Washington, DC 20529

     **RE:**    **DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**

Dear Director:

    On behalf of the United States Chamber of Commerce ("Chamber") and the other groups listed below we would like to submit the following comments on the proposed rule cited above. The Chamber is the world's largest business federation, representing more than three million businesses of every size, sector, and region.

    The proposed rule would change existing regulations on how employers are expected to respond to "no-match letters" from the Social Security Administration ("SSA") or the Department of Homeland Security ("DHS"). This is being done at a time in which both houses of Congress have passed legislation that includes new employment eligibility systems and enforcement mechanisms. Thus, the Chamber requests that the regulation be withdrawn until Congress acts regarding comprehensive immigration reform. In the alternative, the Chamber asks for clarification regarding the substantive issues presented by the regulation as well as additional time for employers to conform to the new system and process. No-match letter and overall employment eligibility and verification standards include companies and organizations across a wide spectrum of businesses and industries.

    The Chamber understands several of the concerns expressed by DHS, however, we think that the proposed rule is untimely because it undermines the current legislative process. It also does not properly consider the economic ramifications of acting outside the Administration's own stated goal of enacting comprehensive immigration reform. This proposed rule only muddies the waters during this critical time of debate. The Chamber believes that new rules on employment verification should occur within the context of comprehensive immigration reform.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 2 of 8

We should let these discussions continue without adding new bureaucratic burdens on well-intentioned employers or penalizing needed hardworking immigrants.

I.    **Issues Addressed by the Proposed Regulation Should be Part of Comprehensive Immigration Reform Legislation.**

DHS should let Congress continue to move the immigration debate forward as a whole and not section out areas to regulate; a piecemeal approach is not prudent. Both the Senate (S. 2611) and House (H.R. 4437) bills currently pending include stringent employment eligibility and verification systems and strengthened interior enforcement procedures. They also significantly change an employer's responsibilities when verifying the identity and work authorization eligibility of its workforce. Each measure specifically addresses the case when an employer receives a no-match letter from the SSA or from DHS. It is important to let this ongoing, fruitful debate run its course without undermining it with regulations that may lead to duplicative and possibly contradictory proposals. The proposed regulation should only be enacted as part of comprehensive immigration reform. To advance an enforcement-only regulation independently—without a legalization program for current unauthorized workers and a guest worker program to address our future workforce needs—is short-sighted and not responsive to our nation's economic needs.

Should DHS go forward with the proposed regulation, we request that it takes into consideration the substantive issues presented below that are of great concern to the Chamber, its members, and the other groups listed at the end of these comments:

II.   **What constitutes receipt according to DHS? When Do Employers "Receive" No-Match Letters?**

The regulation does not state what happens in the instance where an SSA no-match letter goes directly to an employee at the employer's place of business. Is the employer considered to be on notice and have constructive knowledge? For this particular instance please outline what an employer should do to take advantage of the safe-harbor provision.

III.  **Constructive Knowledge and the Time Granted to an Employer to Take Reasonable Steps in Response to SSA No-match Letters and Written Notifications from DHS.**

*A. Constructive Knowledge Standard*

The proposed regulation would significantly increase the scope of constructive knowledge in certain circumstances. It states that "the employer's obligations under current law, which is that if the employer fails to take reasonable steps after receiving such information, and if the employee is in fact an unauthorized alien, the employer may be found to have had

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 3 of 8

constructive knowledge of that fact."[1]  The regulation defines what constitutes a "reasonable response" by an employer to a no-match letter and mandates specific steps to be taken by the employer within defined periods of time.  The regulation's preamble suggests that taking such measures may allow the employer to avoid liability and mitigate or eliminate potential penalties, but leaves much unanswered.

### B.  What Constitutes a Reasonable Response?

The proposal states that within 14 days of receipt of the no-match notice, an employer must attempt to resolve the discrepancy by checking its personnel and payroll records to determine whether the discrepancy results from a clerical error. If it is simply a clerical mistake, the employer is to contact SSA and administratively correct the information. If it is not clerical, the employer must approach the employee and confirm that the information that was provided by the employee to the employer is indeed accurate. If there was an inadvertent mistake when transmitting the information, the employer should correct immediately and inform SSA. If however, the employee says that initial information provided is accurate, the employer must direct the employee to the local SSA office where the employee has to resolve the issue.

After an employer has determined that a discrepancy is not from a clerical error on the part of the employer, the proposed regulation states that the "employer takes reasonable steps, within 14 days, to attempt to resolve the discrepancy; such steps may include: . . . if [the records] are correct according to the employee, requesting the employee to resolve the discrepancy with the Social Security Administration, such as by visiting a Social Security Administration office."[2] The regulation then goes on to state that if the discrepancy has not been resolved within 60 days, and if the employee's identity and work authorization cannot be verified at that time, then employers "must choose between taking action to terminate the employee or facing the risk that DHS may find that the employer had constructive knowledge the employee was an unauthorized alien."[3]  There are two main issues that arise from the above:

1.  These timeframes (14 days and 60 days) are not practical or fair.  Both large and small employers will be faced with challenges to meet this standard.  Large employers may receive several no-match letters at a time, which are likely to include hundreds of names. Particularly in decentralized operations, the necessary follow-up and personnel interviews will take significant man hours to accomplish.  As a result, it will be very difficult to resolve all of the letters in the prescribed time period.  Small businesses face even more hurdles to comply.  They often do not have a full-time administrative staff to address these issues in a 14-day timeframe.  Small business owners often have to run the business, oversee bookkeeping, supervise employees and perform multiple administrative duties.  Adding this clerical review and follow up with each employee will only add to these tasks.  The 14-day period is accordingly not reasonable and will be unduly

---

[1] See Safe-Harbor Procedures for Employers Who Receive a No-Match Letter, 71 Fed. Reg. 34,282 (2006) to be codified at 8 CFR 274a) (proposed June 14, 2006).
[2] Id. at 34,285.
[3] Id. at 34,283.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 4 of 8

burdensome for small employers as well. The allotted time by which an employer must respond to a no-match is not an adequate, nor a reasonable time-period for an employer to have to act. We therefore request that this be changed to a reasonable time frame standard, which would then acknowledge the difference in sophistication of the over seven million employers in the United States.

2. It is also unclear from the regulation as to what occurs between the 14-day and 60-day time period and request clarification on the issue. It is our assumption that the employer has 14-days to inform the employee of the discrepancy and determine whether it is a clerical mistake. Thereafter, the employer has 60-days, from the date of receipt of the letter or notice, to ensure and confirm that the discrepancy has been rectified. Thus, an employee has less than two months to work out a resolution if there is an error between themselves and the Social Security Administration, which might not be enough time. Finally, it is the Chamber's reading and understanding that as a matter of fairness and reasonableness, an employer can continue to employ an employee between the 14 and 60-day period, even if there is an unresolved discrepancy.

## IV.    Requirement to Fill Out New I-9 Forms.

As noted above, the proposed regulation requires that employers verify the employee's identity and work authorization within 60 days following notice of a discrepancy and that "the employer complete a new I-9 Form for the employee, using the same procedures as if the employee were newly hired."[4] This provision needs to be clarified for employers. Based on the proposed regulation, it seems that if there was simply a clerical error that is found within the 14-day window, the employer needs only to record that they spoke with SSA and it was worked out, but the employer does not need to complete a new I-9 Form for the employee that received a no-match. Also according to the regulation, if an employee could not resolve his or her issue with SSA regarding the no-match within 60 days, an employer may complete a new I-9 Form for that employee and continue to hire him or her as long as they do not use the disputed no-match documents to verify work authorization.

What is unclear is what an employer is to do if the employee does indeed resolve the no-match issue within the 60-day time period. Does the employer have to do a new I-9 Form to record the resolved social security number? It is the Chamber and the signatories' belief that requiring a new I-9 Form every time there is a discrepancy that must be corrected with the SSA would be a burdensome process for our employers, both financially and administratively. Oftentimes, large employers are informed of hundreds of no-matches on a monthly basis. These no-match letters are often the product of name changes for newly married or divorced employees who have not yet applied for a new social security card to reflect their new name. Having to enforce a blanket requirement that requires an employer and employee to fill out and complete new I-9 Forms for nearly every no-match would be unduly burdensome on the employer with minimal benefit to the government's interest.

---

[4] *See* Safe-Harbor, 71 Fed. Reg. at 34,283.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 5 of 8

Additionally, this process would create inconsistent results. For example, some employees change their names for any number of reasons and properly report this to the SSA. Therefore, these employees would not have a no-match, but the employee's name would be different from that listed on the original I-9 Form. This would require some employees who had a name change to fill out a new I-9 Form (those who initially forgot to report it to the SSA) but not others (those who had immediately reported their name change to the SSA). It would seem inconsistent to only require new I-9 Forms for some name changes but not others. Finally, we would like to caution DHS regarding the potential fallout from the implementation of this policy. It will create further incentives for fraud and misreporting. Employees required to fill out a new I-9 Form can simply provide new false information and documentation.

In the alternative, the employee should be required to provide documentation to the employer within a reasonable period of time, such as 120 days, establishing that the employee has corrected the discrepancy with the SSA. This additional time will allow for more accurate reporting. Otherwise, an employee may simply present new false documentation to the employer when filling out the new I-9 Form. This would not meet the objective sought by this additional requirement.

Finally, the actions an employer must take under the proposed regulation, when re-verification does not produce a satisfactory result, are vague. DHS needs to clearly state if it wants employers to terminate the employment relationship under such circumstances. Furthermore, if so, it must also state that employers should be indemnified from possible liability arising from the employee's termination in accordance with new protocol outlined in the regulation. For example, the proposed regulation states that if the "employee's identity and work authorization" is verified "even if the employee is in fact an unauthorized alien, the employer will not be considered to have constructive knowledge."[5] However, the proposed regulation is unclear as to what an employer should do when a potential United States citizen or work-authorized alien is not able to satisfy the verification requirements in the time periods allotted.

Again, the current legislative proposals specifically and clearly provide indemnification from liability to an employer who terminates an employee after following the appropriate protocol—another reason to wait for the legislative process to work. It is unclear whether a regulation could legally provide for such indemnification. Meanwhile, this proposed regulation definitely has the potential of catching even the best-intentioned employers in a new array of litigation due to a myriad of conflicting federal laws and regulations, such as those dealing with civil rights.

## V.      Totality of the Circumstances Standard.

One of the ways that an employer can be notified of a name discrepancy is through written notification from DHS. The proposed regulation explains that DHS will take into account the totality of relevant circumstances when making a determination whether the employer had constructive knowledge that the alien was unauthorized to work. It, therefore,

---

[5] See Safe-Harbor, 71 Fed. Reg. at 34,283.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 6 of 8

seems that receipt of notification alone is not absolutely determinative regarding whether an employer had constructive knowledge. Please provide clarification whether this reading is accurate.

Regarding the receipt of a SSA no-match letter, a comparable standard to that of the totality of the relevant circumstances is not applied. Determining whether an employer had constructive knowledge is not purely an objective finding and there should be a comparable standard included in the regulation. Imputation of constructive knowledge in all instances should depend on the totality of relevant circumstances. An example that highlights the importance of SSA taking into account the totality of the circumstances is as follows: It is common that after an immigrant enters the US they informally change their name so to "Americanize" it. More often than not the immigrant does not file for a legal name change and, as a result, this can trigger a no-match and the employee can be subsequently discharged by the employer. It is an instance like this when SSA should take into account the totality of the circumstances. That is what is reasonable and equitable and conforms to the standard used by DHS as noted in the proposed regulation.

## VI.   Accuracy and Effectiveness of the System.

As previously noted, one of the ways by which an employer can be put on notice is by receiving a written notification from DHS. Unlike SSA, DHS does not have a mechanism in place that regularly checks and reports mismatched immigration documents. Rather, DHS generally is made aware of mismatched immigration documents in the context of an I-9 Forms audit. As noted in the proposed regulation, if an employer receives a letter from DHS, s/he is expected to resolve the issue by "tak[ing] reasonable steps, within 14 days of receiving the notice, to attempt to resolve the question raised by DHS about the immigration status document or the employment authorization document."[6] However, DHS provides no specific guidance as to what those steps should be and what an employer should do to rectify the situation. We request that this process be outlined and explained and that time be provided for further comment.

In addition to the substantive issues addressed above, the proposed regulation would also adversely impact the U.S. economy and our country's national security.

## VII.   De-stabilizing Effect on the U.S. Economy.

It is estimated that annually 500,000 essential workers enter the U.S. to perform much needed labor without work authorization. Our economy not only absorbs these needed workers, but it depends on it for our current level of growth. There are currently an estimated 12 million unauthorized workers in the U.S. This proposed regulation will strip needed workers from employers without providing employers with an alternative legal channel by which to recruit to fill the gaps created by a combination of an aging workforce domestically, higher educational attainment by the domestic population, and a booming economy with full levels of employment.

---

[6] *See* Safe-Harbor, 71 Fed. Reg. at 34,285.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 7 of 8

It is well documented that about five percent of the total U.S. workforce has no work authorization. It could easily be deduced that an even smaller percentage of the total U.S. workforce is working with made up names and social security numbers. Nevertheless, this small percentage of essential workers is overrepresented in sectors of the economy and regions of the country where the gap between the availability of a domestic workforce and the jobs available is greater.

Increasing interior enforcement and strengthening the employment eligibility and verification system without a legalization program for current unauthorized workers and a guest worker program to address our future workforce needs would be detrimental to the U.S. economy and the stability of an essential workforce. This is precisely why the proposed regulation should be coupled with comprehensive immigration reform. Immigration reform must be comprehensive, not disjunctive.

**VIII.  Firing of Immigrant Workers and the Potential Growth of the Underground Economy.**

Another reality of this proposal is that if an employer receives a no-match letter, many employees will simply be fired because employers will not want to risk liability by taking unnecessary steps to remedy the situation on behalf of the employee. If terminated, those who lack work authorization will not simply leave the U.S. Rather, they will likely enter the underground workforce. This is yet one more reason why this proposal should be part and parcel of comprehensive immigration reform. As stated, we request that the regulation be held until Congress negotiates a House and Senate compromise—given that both houses of Congress have spoken of their desire to legislate in this field by passing proposals, which are quite similar in the area of worker employment eligibility and verification.

Furthermore, this proposed regulation addresses the employers who are trying to comply with the law but it does not address those underground employers who are completely non-compliant and do not complete the required I-9 Form and instead pay workers under the table. These indeed are the bad actor employers, yet the regulation gives them a free pass. By not addressing this real and thriving underground economy and only proposing increased regulations on those employers trying to act in accordance with the law, this regulation acts as an incentive for employers and employees to enter the underground economy. Workers in the black-market economy do not pay taxes and remain in the shadows and employers are not held accountable. Creating further incentives to thrive only within the underground economy is neither sound economic policy nor in our country's national security interest.

**IX.  The Fine Line Between Compliance and Violation.**

Out of fear of non-compliance with DHS's proposed regulation, employers might be extra vigilant in trying to verify an employee's identity and eligibility to work in the U.S. However, there is a fine line for the employer between ensuring that the workforce is legal and violating existing anti-discriminations laws. For example, should an employee present

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 8 of 8

documents other than a Social Security card when completing the I-9 Form and there is
subsequently a no-match letter issued. The employer then confronts the employee and request to
see the Social Security card. Clearly, this would present an issue regarding anti-discrimination
laws already in effect. The Chamber requests that DHS provide clarification on how an
employer should respond to such a situation.

### X.    Conclusion

As explained, the proposed regulations are misguided and will have an adverse effect on
the nation's economy and its overall national security. For the reasons stated above, the
Chamber urges DHS to withdraw this proposed regulation and to wait for Congress to finish its
work on comprehensive immigration reform, as the Administration continues to insist.

We greatly appreciate the excellent relationship we have developed with the DHS and
hope to continue to expand that relationship in the future as we work to address this important
issue.

Respectfully submitted,

Randel K. Johnson
Vice President
Labor, Immigration and Employee Benefits

Angelo I. Amador
Director
Immigration Policy

**Also on behalf of:**

Associated Builders and Contractors

Associated General Contractors of America

American Hotel & Lodging Association

American Seniors Housing Association

College and University Professional Association for Human Resources

Ingersoll Rand Company

National Association of Convenience Stores

Professional Landcare Network

Retail Industry Leaders Association

Tree Care Industry Association



# EWIC    Essential Worker Immigration Coalition

August 14, 2006

**VIA ELECTRONIC MAIL**

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N.W., 2nd Floor
Washington, DC 20529

> **RE:    DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**

Dear Director:

On behalf of the Essential Worker Immigration Coalition ("EWIC") we submit the following comments on the proposed rule cited above. EWIC is a broad-based coalition of national businesses and trade associations from across the industry spectrum concerned with the shortage of both semi-skilled and unskilled ("essential worker") labor.

The proposed rule would change existing regulations on how employers are expected to respond to "no-match letters" from the Social Security Administration ("SSA") or the Department of Homeland Security ("DHS"). This is being done at a time in which both houses of Congress have passed legislation that includes new employment eligibility systems and enforcement mechanisms. Thus, EWIC requests that the regulation be withdrawn until Congress acts regarding comprehensive immigration reform. In the alternative, EWIC asks for clarification regarding the substantive issues presented by the regulation as well as additional time for employers to conform to the new system and process. No-match letter and overall employment eligibility and verification standards include companies and organizations across a wide spectrum of businesses and industries.

EWIC understands several of the concerns expressed by DHS, however, we think that the proposed rule is untimely because it undermines the current legislative process. It also does not properly consider the economic ramifications of acting outside the Administration's own stated goal of enacting comprehensive immigration reform. This proposed rule only muddies the waters during this critical time of debate. EWIC believes that new rules on employment verification should occur within the context of comprehensive immigration reform. We should let these discussions continue without adding new bureaucratic burdens on well-intentioned employers or penalizing needed hardworking immigrants.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 2 of 7

**I.     Issues Addressed by the Proposed Regulation Should be Part of Comprehensive Immigration Reform Legislation.**

DHS should let Congress continue to move the immigration debate forward as a whole and not section out areas to regulate; a piecemeal approach is not prudent. Both the Senate (S. 2611) and House (H.R. 4437) bills currently pending include stringent employment eligibility and verification systems and strengthened interior enforcement procedures. They also significantly change an employer's responsibilities when verifying the identity and work authorization eligibility of its workforce. Each measure specifically addresses the case when an employer receives a no-match letter from the SSA or from DHS. It is important to let this ongoing, fruitful debate run its course without undermining it with regulations that may lead to duplicative and possibly contradictory proposals. The proposed regulation should only be enacted as part of comprehensive immigration reform. To advance an enforcement-only regulation independently—without a legalization program for current unauthorized workers and a guest worker program to address our future workforce needs—is short-sighted and not responsive to our nation's economic needs.

Should DHS go forward with the proposed regulation, we request that it takes into consideration the substantive issues presented below that are of great concern to EWIC:

**II.    What constitutes receipt according to DHS? When Do Employers "Receive" No-Match Letters?**

The regulation does not state what happens in the instance where an SSA no-match letter goes directly to an employee at the employer's place of business. Is the employer considered to be on notice and have constructive knowledge? For this particular instance please outline what an employer should do to take advantage of the safe-harbor provision.

**III.   Constructive Knowledge and the Time Granted to an Employer to Take Reasonable Steps in Response to SSA No-match Letters and Written Notifications from DHS.**

*A.  Constructive Knowledge Standard*

The proposed regulation would significantly increase the scope of constructive knowledge in certain circumstances. It states that "the employer's obligations under current law, which is that if the employer fails to take reasonable steps after receiving such information, and if the employee is in fact an unauthorized alien, the employer may be found to have had constructive knowledge of that fact."[1] The regulation defines what constitutes a "reasonable response" by an employer to a no-match letter and mandates specific steps to be taken by the employer within defined periods of time. The regulation's preamble suggests that taking such

---

[1] *See* Safe-Harbor Procedures for Employers Who Receive a No-Match Letter, 71 Fed. Reg. 34,282 (2006) to be codified at 8 CFR 274a) (proposed June 14, 2006).

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 3 of 7

measures may allow the employer to avoid liability and mitigate or eliminate potential penalties, but leaves much unanswered.

### B. What Constitutes a Reasonable Response?

The proposal states that within 14 days of receipt of the no-match notice, an employer must attempt to resolve the discrepancy by checking its personnel and payroll records to determine whether the discrepancy results from a clerical error. If it is simply a clerical mistake, the employer is to contact SSA and administratively correct the information. If it is not clerical, the employer must approach the employee and confirm that the information that was provided by the employee to the employer is indeed accurate. If there was an inadvertent mistake when transmitting the information, the employer should correct immediately and inform SSA. If however, the employee says that initial information provided is accurate, the employer must direct the employee to the local SSA office where the employee has to resolve the issue.

After an employer has determined that a discrepancy is not from a clerical error on the part of the employer, the proposed regulation states that the "employer takes reasonable steps, within 14 days, to attempt to resolve the discrepancy; such steps may include: . . . if [the records] are correct according to the employee, requesting the employee to resolve the discrepancy with the Social Security Administration, such as by visiting a Social Security Administration office."[2] The regulation then goes on to state that if the discrepancy has not been resolved within 60 days, and if the employee's identity and work authorization cannot be verified at that time, then employers "must choose between taking action to terminate the employee or facing the risk that DHS may find that the employer had constructive knowledge the employee was an unauthorized alien."[3]   There are two main issues that arise from the above:

1.  These timeframes (14 days and 60 days) are not practical or fair. Both large and small employers will be faced with challenges to meet this standard. Large employers may receive several no-match letters at a time, which are likely to include hundreds of names. Particularly in decentralized operations, the necessary follow-up and personnel interviews will take significant man hours to accomplish. As a result, it will be very difficult to resolve all of the letters in the prescribed time period. Small businesses face even more hurdles to comply. They often do not have a full-time administrative staff to address these issues in a 14-day timeframe. Small business owners often have to run the business, oversee bookkeeping, supervise employees and perform multiple administrative duties. Adding this clerical review and follow up with each employee will only add to these tasks. The 14-day period is accordingly not reasonable and will be unduly burdensome for small employers as well. The allotted time by which an employer must respond to a no-match is not an adequate, nor a reasonable time-period for an employer to have to act. We therefore request that this be changed to a reasonable time frame standard, which would then acknowledge the difference in sophistication of the over seven million employers in the United States.

---

[2] *Id.* at 34,285.
[3] *Id.* at 34,283.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 4 of 7

2.  It is also unclear from the regulation as to what occurs between the 14-day and 60-day
    time period and request clarification on the issue.  It is our assumption that the employer
    has 14-days to inform the employee of the discrepancy and determine whether it is a
    clerical mistake.  Thereafter, the employer has 60-days, from the date of receipt of the
    letter or notice, to ensure and confirm that the discrepancy has been rectified.  Thus, an
    employee has less than two months to work out a resolution if there is an error between
    themselves and the SSA, which might not be enough time.  Finally, it is EWIC's reading
    and understanding that as a matter of fairness and reasonableness, an employer can
    continue to employ an employee between the 14 and 60-day period, even if there is an
    unresolved discrepancy.

### IV.    Requirement to Fill Out New I-9 Forms.

As noted above, the proposed regulation requires that employers verify the employee's
identity and work authorization within 60-days following notice of a discrepancy and that "the
employer complete a new I-9 Form for the employee, using the same procedures as if the
employee were newly hired."[4]  This provision needs to be clarified for employers.  Based on the
proposed regulation, it seems that if there was simply a clerical error that is found within the 14-
day window, the employer needs only to record that they spoke with SSA and it was worked out,
but the employer does not need to complete a new I-9 Form for the employee that received a no-
match.  Also according to the regulation, if an employee could not resolve his or her issue with
SSA regarding the no-match within 60 days, an employer may complete a new I-9 Form for that
employee and continue to hire him or her as long as they do not use the disputed no-match
documents to verify work authorization.

What is unclear is what an employer is to do if the employee does indeed resolve the no-
match issue within the 60-day time period.  Does the employer have to do a new I-9 Form to
record the resolved social security number?  It is EWIC's belief that requiring a new I-9 Form
every time there is a discrepancy that must be corrected with the SSA would be a burdensome
process for our employers, both financially and administratively.  Oftentimes, large employers are
informed of hundreds of no-matches on a monthly basis.  These no-match letters are often the
product of name changes for newly married or divorced employees who have not yet applied for
a new social security card to reflect their new name.  Having to enforce a blanket requirement
that requires an employer and employee to fill out and complete new I-9 Forms for nearly every
no-match would be unduly burdensome on the employer with minimal benefit to the
government's interest.

Additionally, this process would create inconsistent results.  For example, some
employees change their names for any number of reasons and properly report this to the SSA.
Therefore, these employees would not have a no-match, but the employee's name would be
different from that listed on the original I-9 Form.  This would require some employees who had
a name change to fill out a new I-9 Form (those who initially forgot to report it to the SSA) but

---

[4] *See* Safe-Harbor, 71 Fed. Reg. at 34,283.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 5 of 7

not others (those who had immediately reported their name change to the SSA). It would seem inconsistent to only require new I-9 Forms for some name changes but not others. Finally, we would like to caution DHS regarding the potential fallout from the implementation of this policy. It will create further incentives for fraud and misreporting. Employees required to fill out a new I-9 Form can simply provide new false information and documentation.

In the alternative, the employee should be required to provide documentation to the employer within a reasonable period of time, such as 120 days, establishing that the employee has corrected the discrepancy with the SSA. This additional time will allow for more accurate reporting. Otherwise, an employee may simply present new false documentation to the employer when filling out the new I-9 Form. This would not meet the objective sought by this additional requirement.

## V.    Totality of the Circumstances Standard.

One of the ways that an employer can be notified of a name discrepancy is through written notification from DHS. The proposed regulation explains that DHS will take into account the totality of relevant circumstances when making a determination whether the employer had constructive knowledge that the alien was unauthorized to work. It, therefore, seems that receipt of notification alone is not absolutely determinative regarding whether an employer had constructive knowledge. Please provide clarification whether this reading is accurate.

Regarding the receipt of a SSA no-match letter, a comparable standard to that of the totality of the relevant circumstances is not applied. Determining whether an employer had constructive knowledge is not purely an objective finding and there should be a comparable standard included in the regulation. Imputation of constructive knowledge in all instances should depend on the totality of relevant circumstances. An example that highlights the importance of SSA taking into account the totality of the circumstances is as follows: It is common that after an immigrant enters the U.S. they informally change their name so to "Americanize" it. More often than not the immigrant does not file for a legal name change and, as a result, this can trigger a no-match and the employee can be subsequently discharged by the employer. It is an instance like this when SSA should take into account the totality of the circumstances. That is what is reasonable and equitable and conforms to the standard used by DHS as noted in the proposed regulation.

## VI.    Accuracy and Effectiveness of the System.

As previously noted, one of the ways by which an employer can be put on notice is by receiving a written notification from DHS. Unlike SSA, DHS does not have a mechanism in place that regularly checks and reports mismatched immigration documents. Rather, DHS generally is made aware of mismatched immigration documents in the context of an I-9 Forms audit. As noted in the proposed regulation, if an employer receives a letter from DHS, s/he is expected to resolve the issue by "tak[ing] reasonable steps, within 14 days of receiving the notice, to attempt to resolve the question raised by DHS about the immigration status document

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 6 of 7

or the employment authorization document."[5]  However, DHS provides no specific guidance as to what those steps should be and what an employer should do to rectify the situation.  <u>We request that this process be outlined and explained and that time be provided for further comment.</u>

In addition to the substantive issues addressed above, the proposed regulation would also adversely impact the U.S. economy and our country's national security.

**VII.    De-stabilizing Effect on the U.S. Economy.**

It is estimated that annually 500,000 essential workers enter the U.S. to perform much needed labor without work authorization.  Our economy not only absorbs these needed workers, but it depends on it for our current level of growth.  There are currently an estimated 12 million unauthorized workers in the U.S.  This proposed regulation will strip needed workers from employers without providing employers with an alternative legal channel by which to recruit to fill the gaps created by a combination of an aging workforce domestically, higher educational attainment by the domestic population, and a booming economy with full levels of employment.  It is well documented that about five percent of the total U.S. workforce has no work authorization.  It could easily be deduced that an even smaller percentage of the total U.S. workforce is working with made up names and social security numbers.  Nevertheless, this small percentage of essential workers is overrepresented in sectors of the economy and regions of the country where the gap between the availability of a domestic workforce and the jobs available is greater.

Increasing interior enforcement and strengthening the employment eligibility and verification system without a legalization program for current unauthorized workers and a guest worker program to address our future workforce needs would be detrimental to the U.S. economy and the stability of an essential workforce.  This is precisely why the proposed regulation should be coupled with comprehensive immigration reform.  Immigration reform must be comprehensive, not disjunctive.

**VIII.    Firing of Immigrant Workers and the Potential Growth of the Underground Economy.**

Another reality of this proposal is that if an employer receives a no-match letter, many employees will simply be fired because employers will not want to risk liability by taking unnecessary steps to remedy the situation on behalf of the employee.  If terminated, those who lack work authorization will not simply leave the U.S.  Rather, they will likely enter the underground workforce.  This is yet one more reason why this proposal should be part and parcel of comprehensive immigration reform.  As stated, we request that the regulation be held until Congress negotiates a House and Senate compromise—given that both houses of Congress have

---

[5] *See* Safe-Harbor, 71 Fed. Reg. at 34,285.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 7 of 7

spoken of their desire to legislate in this field by passing proposals, which are quite similar in the area of worker employment eligibility and verification.

Furthermore, this proposed regulation addresses the employers who are trying to comply with the law but it does not address those underground employers who are completely non-compliant and do not complete the required I-9 Form and instead pay workers under the table. These indeed are the bad actor employers, yet the regulation gives them a free pass. By not addressing this real and thriving underground economy and only proposing increased regulations on those employers trying to act in accordance with the law, this regulation acts as an incentive for employers and employees to enter the underground economy. Workers in the black-market economy do not pay taxes and remain in the shadows and employers are not held accountable. Creating further incentives to thrive only within the underground economy is neither sound economic policy nor in our country's national security interest.

### IX.     The Fine Line Between Compliance and Violation.

Out of fear of non-compliance with DHS's proposed regulation, employers might be extra vigilant in trying to verify an employee's identity and eligibility to work in the U.S. However, there is a fine line for the employer between ensuring that the workforce is legal and violating existing anti-discriminations laws. For example, should an employee present documents other than a Social Security card when completing the I-9 Form and there is subsequently a no-match letter issued. The employer then confronts the employee and request to see the Social Security card. Clearly, this would present an issue regarding anti-discrimination laws already in effect. EWIC requests that DHS provide clarification on how an employer should respond to such a situation.

### X.     Conclusion

As explained, the proposed regulations are misguided and will have an adverse effect on the nation's economy and its overall national security. For the reasons stated above, EWIC urges DHS to withdraw this proposed regulation and to wait for Congress to finish its work on comprehensive immigration reform, as the Administration continues to insist.

We greatly appreciate the strong relationship we have developed with the DHS and hope to continue to expand that relationship in the future as we work to address this important issue.

Respectfully submitted,

*Laura Foote Reiff*
Laura Foote Reiff
Co-Chair
EWIC