**From:** Robert Deasy [mailto:rdeasy@aila.org]
**Sent:** Monday, August 14, 2006 3:30 PM
**To:** Regs, Rfs
**Subject:** Comment on no-match reg final

Sir or Madam:

Attached please find the comment of the American Immigration Lawyers Association to the rule proposed by Immigration and Customs Enforcement "DHS Docket No. ICEB-2006-0004, Safe-Harbor Procedures for Employers Who Receive a No-Match Letter".

# American Immigration Lawyers Association

## 918 F Street, N.W.  Washington, D.C. 20004    (202) 216-2400

August 11, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N.W.
Washington, D.C. 20529

      VIA E-Mail:   rfs.regs@dhs.gov

Re:  DHS Docket No. ICEB-2006-0004, Safe-Harbor Procedures for Employers Who Receive a No-Match Letter

Dear Sir or Madam:

### Introduction

The American Immigration Lawyers Association ("AILA") hereby submits comments on the proposal of Immigration and Citizenship Enforcement ("ICE") to amend 8 C.F.R. § 274a.1 to change the application of the principles of constructive knowledge and establish safe-harbor procedures for employers who receive a no-match letter from the Social Security Administration ("SSA") and similar letters from ICE.  AILA is a voluntary bar association of approximately 10,000 attorneys and law professors practicing and teaching in the field of immigration and nationality law.  Our mission includes the advancement of the law pertaining to immigration and naturalization and the facilitation of justice in the field.

We appreciate the opportunity to comment on the proposed regulation and believe we are particularly well qualified to do so.  AILA members regularly assist foreign nationals in the process of applying for Social Security Numbers ("SSNs"), known as "alien enumeration."  Additionally, we customarily advise clients on I-9 employment verification and compliance and in responding to SSA no-match letters.  Further, through our SSA Liaison Committee, we enjoy a longstanding, positive and productive relationship with SSA and communicate regularly with that agency to resolve specific enumeration delays associated with discrepancies in federal databases.  Accordingly, we have developed a special expertise in understanding the procedural aspects of

Page 2

enumeration and the practical utility and limitations of the SSN as a worksite enforcement tool.

In sum, we believe that the SSN is ill suited to the sweeping worksite enforcement program proposed. SSA consistently states that there are many reasons for a no-match besides lack of work authorization. Moreover, there is great danger in basing worksite enforcement on a federal database that was not designed for this purpose and lacks even basic indicia of reliability, particularly when SSA has no established mechanisms for employers and employees to correct data discrepancies. We also believe that the proposal will promote discrimination and the termination of lawful employment if verification is not forthcoming within the safe harbor time limits, which is inevitable. This is particularly so in the current climate of increased criminal worksite enforcement. And, while the proposal gives employers little choice but to terminate employment, it provides no corresponding immunity from citizenship discrimination liability for good faith efforts to comply with the safe harbor provisions. Further, the proposal is premised on an overly broad interpretation of "constructive knowledge" that is patently inconsistent with the intent of Congress in enacting the Immigration Reform and Control Act of 1986 ("IRCA"). ICE should not implement its proposal without carefully consulting SSA, the Office of Special Counsel for Immigration Related Unfair Employment Practices ("OSC") and the Internal Revenue Service ("IRS"), which have given employers conflicting guidance on responding to a no-match letter.

If ICE chooses to proceed with its proposal, at a minimum, it should eliminate the two-step safe harbor provision (14 and 63 days), which is unnecessary and confusing, and replace it with a single time limit. Further, the 63-day time limit proposed is impractical and impossible to meet from a file review and information processing perspective and should be extended to not less than 123 days. Implementation of the proposal will cause many businesses to lose large segments of their workforce and threaten the very existence of operations. Therefore, a longer time limit also is necessary to allow employers to recruit replacements and manage staffing needs. Finally, we are confident based on our experience that the proposal will impose extraordinary costs and paperwork burdens on the private sector.

While our comments primarily address the limited utility of the no-match letter as an enforcement tool and recommend specific procedural modifications to the proposal, we wish to emphasize our strong belief that the proposal reflects unsound policy. We believe that worksite enforcement is key to securing our borders. However, it must be coupled with comprehensive immigration reforms that give essential workers meaningful avenues to lawful status. If not, a program like the no-match proposal standing alone will only drive our country's 12 million plus undocumented workers further underground and fuel the market for counterfeit identity documents, making it easier for true terrorists to go undetected. Moreover, the proposal is premature in light of pending legislation. It will have a dramatic and catastrophic effect on core industries and should await careful deliberation by both houses in Congress, which may result in yet another vastly different approach to employment verification. We also fear that the proposal will encourage unscrupulous employers to pay their workers "off the books" precisely to avoid potential

Page 3

liability. Therefore, it is highly likely that the proposal will have the unintended effect of causing large numbers of work authorized individuals to lose their jobs while many unauthorized employees will continue working.

### The SSN Is Not an Effective Worksite Enforcement Tool

SSA, which assigns and administers the SSN program, has emphatically and consistently stated that there are many reasons for a no-match other than lack of work authorization. SSA was established to administer the old age, survivors, and disability insurance program and the supplemental security income program.[1] To do so, it assigns a unique nine-digit SSN to each eligible individual and issues a Social Security card as evidence of the assignment. SSA maintains a record of the earnings reported for each person that has been assigned an SSN and identifies the record by that person's name and SSN.[2]

Pursuant to an agreement between SSA and the IRS, employers are required to report the taxable earnings of their workforce by filing annual wage reports with SSA on Form W-2 ("Wage and Tax Statement") and Form W-3 ("Transmittal of Income and Tax Statements"). A Form W-2 is filed for each employee and includes his name, SSN and annual wages, among other information. SSA uses the W-2 to maintain accurate earnings records and calculate Social Security benefits. It transmits this data to IRS and identifies employer-reporting errors for possible IRS penalty assessment action.[3] IRS uses the W-2 report to ensure that information submitted by taxpayers is properly processed in IRS records and to verify filing and reporting compliance with tax laws. SSA matches the "name/SSN" reported against its "Numident" file. If the name/SSN matches, the wage item is posted to the Master Earnings File for purposes of benefits administration. If the name/SSN does not match, the wage item is placed in SSA's Earnings Suspense File.

The SSN was never intended as an enforcement mechanism, and Congress did not give SSA enforcement authority. In fact, contrary to popular belief, neither the immigration statute nor the federal tax statute even requires an individual to possess an SSN to begin work. An employer is not required to inspect an employee's SSN Card, and both the IRS and SSA make provision for employers to file employment tax returns for employees that do not possess SSNs. *See, e.g.*, 26 CFR §31.6011 (b) – 2 (c) (3).

Moreover, as explained repeatedly in SSA policies and guidance to employers and employees, there are many legitimate reasons for a no-match, including spelling

---

[1] 42 USC §901.

[2] 20 CFR §422.103(a). *See generally* Purpose and Disclosure of the Social Security Number (SSN), Record Maintenance ("RM") 00201.001, SSA's Program Operations Manual System. RMs constitute a subchapter of SSA's Program Operations Manual System ("POMS") and can be found on SSA's website at http://policy.ssa.gov/poms.nsf/lnx.

[3] 20 CFR §422.114(a).

Page 4

mistakes, inversion of date order in date of birth, name changes due to marriage, divorce, and other reasons, and cultural differences in name order. SSA's Program Operations Manual System directs SSA Field Officers in responding to an inquiry from an employer who has received a no-match letter to "[r]emind the employer that *there are a number of reasons why the reported information does not match our records, such as transcription or typographic errors, incomplete or blank name/SSN or mane changes*." Records Maintenance ("RM") 01105.027, Handling Inquires Relating to SSA Letters on No-Match Names and Social Security Numbers (SSNs). It further directs Field Officers as follows:

- "You should tell the employer that a no-match between an employee's name and SSN **DOES NOT** mean that the employee lacks work authorization.
- You should also tell the employer that a no-match between an employee's name and SSN **DOES NOT** make any statement regarding a worker's immigration status."

Ibid. (emphasis in original). Therefore, SSA's own view indicates that its no-match data is not a predictable or reliable basis for a worksite enforcement program.

### The Regulation Should Not Take Effect until ICE Works with SSA to Establish Mechanisms for Employers and Employees to Correct Data Discrepancies

The problems that our members encounter on their clients' behalf with SSNs give us unique insight into the SSA processes implicated by the proposal and the issues related to conditioning employment authorization on federal databases, which are often fraught with error. We are extremely concerned about the accuracy of SSA's no-match data and the lack of an established mechanism for an employer or an employee to resolve a name/SSN mismatch with SSA in a timely fashion or at all. Such procedures should be worked out before the proposal is implemented, particularly in light of the many inquiries and correction requests that the regulation is expected to trigger

AILA spends considerable time and attention addressing delays in alien enumeration occasioned by errors and discrepancies in Department of Homeland Security ("DHS") databases. These delays occur routinely and can easily last six months or more. In most cases, the local SSA's inability to enumerate is based on its failure to verify immigration status by querying DHS's SAVE (Systematic Alien Verification of Entitlements) database or by mailing a hard copy G-845 request for verification. The databases used for verification are replete with error, which often can be impossible to correct. Indeed, reports over the last several years false-negative error rates as high 35% to 50% for foreign-born workers. Moreover, SSA's Earnings Suspense File reportedly contains *$519 billion,* illustrating the extent of data discrepancies in the SSA Numident database. *See* The Earnings Suspense File: Social Security's "Secret Stash," Consumer Affairs.com (Feb. 22, 2006).

Yet, the proposed regulation will force every employer in this country to use SSA no-match data to make termination decisions. This will result in hundreds of thousands of

cases where well meaning, intelligent, and diligent employers will perceive no choice but to terminate employees to avoid a finding of constructive knowledge, even if it turns out employment was authorized.

AILA has asked SSA for information on the procedures and time frames that it will use to correct data discrepancies and awaits a response. However, in light of our experience with SSA processing times and the deluge of inquiries expected from the regulation, the proposal should not be adopted until SSA agrees that its Numident database is sufficiently reliable for worksite enforcement and SSA establishes specific procedures and time frames for fielding inquiries and correcting errors.

<u>The Two-Step Safe Harbor Provision (14 and 63 Days) In the Proposal<br>Is Unnecessary and Confusing and Should be Replaced by a Single Time Limit</u>

The proposed regulation provides that an employer will reach safe-harbor if it checks its records and takes other action to obtain SSA verification within 14 days of receiving a no-match letter. It also provides safe harbor to the employer who reverifies work authorization and identity in a limited I-9-like procedure if the discrepancy is not resolved within 63 days. However, the relationship between these two periods is unclear, and the two-step approach should be replaced by a single time limit.

*The 14-Day Safe Harbor.* As proposed, Section 274a.1(l)(2)(i)(A)(i) would allow a defense to constructive knowledge if the employer attempts to resolve the discrepancy within 14 days by checking its records to determine whether the discrepancy results from a clerical error. The employer is to correct the error, inform SSA, verify with SSA that the corrected information matches SSA's records, and memorialize the verification. If the employer does not detect an error in this internal check, under proposed Section 274a.1(l)(2)(i)(A)(ii), it is required to ask the employee to confirm the accuracy of the information in the employer's records. If this doesn't resolve the discrepancy, the employer should ask the employee to visit an SSA office and present documentation necessary to resolve the discrepancy, receive corrected information from the employee, and then verify the new information directly with SSA.

*The 60-Day Safe Harbor.* Under the second step of the safe harbor provision, if, within 60 days of receiving notice, the employer does not verify with SSA a name/SSN match, it must take reasonable steps within 3 more days to verify work authorization and identity such as by conducting I-9 reverification. If the employee can provide sufficient documentation, the employer has reached a safe harbor.

While the two-step safe harbor gives clear guidance to employers at opposite ends of the continuum, the relationship between the two periods is vague and confusing for the many employers that fall in between. The preamble to the proposed regulation reviews the steps entailed in the 14 day safe harbor provision – from internal records check to verifying the correction with SSA – and states that "ICE would consider a reasonable employer to have acted promptly if the employer took such steps within 14 days of receipt of the no-match letter." Clearly, an employer who obtains SSA verification of

Page 6

data within 14 days -- an unlikely scenario -- gains safe-harbor. The employer that uses the limited I-9-like procedure to verify employment eligibility within 63 days also will achieve safe-harbor. However, the two-step safe harbor provision gives no guidance to employers who fall in between. For example, does an employer reach safe-harbor if it takes one or two actions listed in the proposed regulation within the 14-day period and then is actually able to verify with SSA 45 days after having received the no-match letter? It has not completed even a majority of the 14-day period actions within the 14-day time frame and has also not needed to use the I-9 verification because it verified with SSA. It seems likely that, if SSA verified the SSN/name combination at day 45, the employee must be an authorized worker, and a claim of constructive knowledge would be foreclosed. But the proposed regulation does not make this clear.

We believe there is no enforcement benefit to be gained from the 14-day time limit and that it should be eliminated. It is clearer and more effective to establish one time-period during which an employer may take any or all of the steps deemed reasonable under the regulation, either through verification with SSA or through the I-9 process. We would hope and expect employers to appreciate the importance of acting early on a no-match letter. However, if the goal of the regulation is to set an outer time limit for employers to verify work authorization, then the regulation should do just that. Moreover, the two-step process muddles the document-abuse immunities and obligations of the employer who conducts the I-9 reverification step anytime before 60 days from receiving the no-match letter.

<u>The Proposed Time Limits Are Impractical and Impossible to Meet from a<br>File Review and Information Processing Perspective and Should be Extended</u>

The 14 and 63-day time limits in the proposed regulation are impractical and unrealistic and should be replaced by a single 123-day time limit for employer compliance. Our conclusion is based on our collective experience advising clients who receive no-match letters and our conversations following issuance of the proposed regulation with employers and national and regional human resources associations. For the following reasons related to file review and employee notification, employers almost universally have extreme difficulty resolving mismatches within 63 days.

- The proposed limit of 63 days is neither sufficient nor reasonable for an employer to gather and review all the paperwork and take the other necessary steps to gain safe harbor. On receipt of the letter that could typically list hundreds of mismatches, an employer representative must identify the employees who are associated with mismatch items. To do so, the employer must start by gathering and comparing the SSNs in question against payroll records, which often will require a request for a report from a third-party preparer, such as ADP. The employer also must locate and gather W-4 and I-9 forms completed by the employees for purposes of comparing SSNs provided by the employees and copies of SSN cards, if any, in its records. This process can be particularly time-consuming for staffing agencies, manufacturing facilities, service industry establishments (restaurants, hotels, etc.), agricultural

Page 7

organizations, and numerous other industries characterized by high turnover rates, which we believe receive a large percentage of no-match letters.

- If the employer does find an error in its records, there is no procedure to effectively notify SSA and obtain verification of the correction in the time limit proposed. The preamble to the proposal states that an employer should notify the SSA of an error and verify that the name/SSN item match agency records. However, as noted, there is no established mechanism for an employer to notify the SSA of an error. Indeed, RM 01105.027 states that the employer "should **NOT** send any background document to SSA. If a Form W-2c is prepared, the employer should send only the Form W-2c (Corrected Wage and Tax Statement), with a covering Form W-3c transmittal with **NO** supporting documents attached. If correct information cannot be obtained and a Form W-2c cannot be prepared, the employer should retain the documentation and should **NOT** send copies to SSA." (Emphasis in original). This also underscores the importance of postponing implementation of the proposal until SSA establishes clear procedures.

- Employers also must schedule meetings with affected employees to confirm the correctness of information in the employer's records. If this does not resolve the issue, the employer must schedule additional meetings with employees to review identity documents that may resolve the discrepancy. However, it is likely that many of these documents, such as marriage certificates and birth certificates, may not be readily available, further extending the period needed to achieve safe harbor.

- The proposed time limit should be extended because there is no established mechanism for an employee to resolve a name/SSN mismatch with SSA in a timely fashion or at all. Under the proposal, if the name/SSN item is correct according to the employee, the employer should ask the employee to bring documentation to an SSA office to correct the error. However, even assuming the employee can locate the necessary documents, such as a marriage certificate, within a week, our experience from accompanying clients to local SSA offices teaches that it can be difficult to speak with an officer on a same-day basis and time-consuming to resolve discrepancies. SSA's own RM 01105.027 states that, under these circumstances, the employer "should give the employee a reasonable amount of time to rectify the situation with SSA. It may take *up to 2 weeks, and sometimes longer*, to get a new or replacement Social Security card." (Emphasis added). Indeed, even the I-9 "receipt rule" at 8 C.F.R. § 274a.2(b)(1(vi)(C) gives an employee 90 days to secure a replacement SSN card for I-9 purposes. Add to this the inevitable delays that SSA will face from thousands of inquiries and processing information corrections, and the 63-day deadline becomes totally unrealistic.

We provide the following typical scenarios to illustrate our point:

- ABC Inc. is a company with a fine-tuned I-9 compliance program and believes it has no undocumented workers among its 500 employees. ABC receives an SSA no-

Page 8

match letter regarding 75 SSNs on day one, which is a Wednesday.    An administrative employee opens the letter, which makes its way to the Human Resources ("HR") department by day two.

- By day three, the HR staff realizes the need for guidance on how to respond and looks up information in reference materials and calls an attorney and leaves a message.

- The weekend comes and on Monday, day six, ABC receives a call from an attorney. The attorney advises the HR representative to take the first steps required by the regulations to achieve safe-harbor.

- The HR representative contacts the company that handles ABC's payroll and asks it to run copies of the latest payroll documents, including the SSNs ABC has been using to for payroll reporting.

- On day eight, when the payroll company e-mails copies of the latest payroll, the HR representative cross-references the 75 SSNs on the no-match letter to the SSNs on the payroll report in search of the names of the affected employees.  However, given the high turnover in the company, this task takes several days.  She makes a list of the names and then looks up copies of W-4 Forms completed by the employees in question.  She also locates copies of the I-9 files for each of the identified employees.

- On day thirteen, following the weekend, the HR representative compares the documents for the 75 employees to the SSNs on the no-match letter.  She is looking for any discrepancy that might have caused the SSN to appear on the no-match letter (typographical errors, misspellings, or birth date errors).  She finds that 20 of the SSNs on the no-match letter were improperly transcribed from the W-4 Forms to payroll and then on the Form 941 payroll reports.  She leaves a message with the attorney asking what she should do with this information.

- The HR representative prepares a letter to SSA explaining the problems found with the 20 employees.  She sends the letter by return-receipt-requested to SSA so she has evidence that she made good faith efforts to comply with the safe-harbor requirements.  The weekend comes.

- On Tuesday, day fourteen, the HR representative calls the SSA verification telephone line but finds that she is unable to verify any corrections yet.

- ABC's outside counsel calls the HR representative on that same day, day 14, to ask her if she has taken all the steps laid-out in the regulation.  She explains what has happened.  The lawyer does not know from the regulation if ABC has achieved safe harbor because ABC cannot verify that 20 of the SSNs with internal problems match the data in SSA's records.

Page 9

- With respect to the 20 employees, the HR representative calls SSA's verification line but cannot obtain verification until SSA processes ABC's letter requesting a correction of SSN/name data.

- ABC also must address the SSNs on the no-match letter that appear accurate in company records. It has already taken ABC nine days to determine that it does not know why 55 of its employees' SSNs appear on the no-match letter. The company is very sensitive to what could happen legally or practically if it requests additional immigration-related documents from employees for whom I-9 verification was conducted at the time of hire. Therefore, on day ten, ABC's president, the HR representative, and a supervisor have a telephone call with their attorney to discuss how to ask for this information from employees without violating the anti-discrimination provisions of IRCA, how to request the information in a way to get maximum response in the shortest amount of time, whether to call in each employee or to send a memo to each one, and contingency planning for what would happen to ABC if all of the 55 employees did not report for work after learning of the inquiry, or worse, if more employees, hearing about the inquiry do not report. ABC decides to draft a memo to each of the 55 employees advising of the no-match letter and asking the employees to report to HR.

- On day 13, after the weekend, the lawyer and the company discuss the memo and then distribute it to the mailboxes of the 55 employees so they receive it on the morning of the 14th day.

- On day 14, the 55 employees in question receive the memo. They report to HR over the next few days but do not have in their possession the documents needed to resolve the discrepancy. Although some may be able to bring documents the next day, others need a week or more to locate or obtain the documents, such as a birth or marriage certificate.

- By day 20, 25 of the 55 employees produce documents that resolve the discrepancies. ABC's HR representative reviews them, discovers how the mistake occurred, drafts a letter to SSA and sends it return-receipt-requested. But, again, it could be weeks or months for SSA to process this information for employer verification, if at all. Meanwhile, according to the preamble, "the employer must choose between taking action to terminate the employee or facing the risk that DHS may find that the employer had constructive knowledge that the employee was an unauthorized alien and therefore, by continuing to employ the alien, violated [the] INA... ."

- Of the 30 employees for whom discrepancies have not been resolved either through ABC's internal records check or through documents presented by the individuals, pursuant to the proposed regulation, ABC asks them to resolve the discrepancy directly with SSA. The proposed regulation suggests that the employees should go in person to SSA or send documents. However, based on our experience, they will have difficulty speaking to an SSA officer and must make multiple visits and wait long periods. Our experience also suggests that it will take SSA much longer than 14

days to process a correction. We acknowledge that some employees will be able to resolve inconsistencies in data by presenting marriage certificates, name change documents, or name spelling problems. However, we see hundreds of cases, in our limited universe of applicants, where employees visit local SSA offices and SSA cannot resolve a problem within 30 days, or even as long as 90-120 days. Once the issue is resolved, according to the proposed regulation, SSA must update its records and the employer must verify the new correct information directly with SSA.

- At this moment in the hypothetical, there is no point in counting the days because in a serious number of cases of employment eligible workers the 14-day period is long over and the 63-day period could be over as well. Without being allowed to use a document with an SSN, it is unlikely that a person could verify employment with an I-9, even if they were eligible to work but for the SSA data discrepancies.

The hypothetical of ABC, Inc., assumes that the letter was properly and immediately routed to an established HR department with established procedures. However, small businesses without an HR department could have particular difficulty meeting the proposed deadlines. Indeed, a small firm facing a no-match letter with only four or five items could be significantly challenged by the proposed time limits. For these companies, employees in the accounting office usually serve as the company representatives checking social security numbers. These employees are also typically responsible for accounts receivable and payable, payroll, and numerous other necessary accounting functions. No-match letters that arrive at times of financial audits, end of quarter reports, or tax reports could be ignored or necessary business functions would have to be abandoned to comply with the proposed regulation. Many employers, particularly smaller firms, will not have a designated HR officer and will lack the experience and staff to complete the safe harbor steps within the periods proposed.

Delays due to vacations, lost documents, sickness, misunderstanding, and language barriers, among others, could further delay an employer's ability to comply with the proposed time limits. Changing just a few simple facts of this hypothetical makes ABC's plight more dramatic. What if the HR representative was on vacation for one week when the no match letter is received? What if it took four days for the decision-maker who first opened the letter to realize what this letter meant because she was in the middle of negotiating a very important new contract for the company? What if the company administering the payroll had a computer problem and couldn't send copies of the payroll for three days? Or, what if the company was not as aware of its obligations and options as we hope it would be and took a few more days to get each of these steps accomplished or did not get sound advice or have access to experts on how to handle the situation? Any of these typical, real-life wrinkles would clearly prevent ABC from reaching safe harbor within the proposed time frames.

<u>The Proposed Time Limits Are Impractical and Impossible to Meet
from a Staffing Management Perspective and Should be Extended</u>

Page 11

Although we believe it is a flawed way to do so, the proposed regulation admittedly will "smoke out" many unauthorized workers. While this is an important part of immigration reform, it also underscores the importance of giving employers adequate time to make preparations to be ready to replace affected workers, if need be, often in huge numbers. During the same period of time that an employer is attempting to investigate and resolve discrepancies, being conservative and needing to be ready for the possibility that most if not all of the workers will not be able to resolve the issue or provide new documents within 63 days, the company has to recruit for and train potential replacement workers. While this is happening, the morale of even the foreign national workers not listed in the no-match letters can be negatively affected and some, afraid that they will be next, resign, disappear or admit that they are undocumented preemptively, leading to even greater employee losses in a short period of time. For instance, a 60-employee company facing a 40 item no-match letter might be able to handle the paperwork challenge at the expense of much other business but could be shut down by the possible loss of almost an entire workforce (keeping in mind that the company followed all of the proper and thorough I-9 rules at the time of hire). Extending the regulatory time limit is necessary to allow employers to investigate mismatches and discharge IRCA obligations, and at the same time, to regroup in a way that avoids business closure and an undue impact on the economy. Companies with particularly high mismatch rates should be given the opportunity to remain in contact with the government with a schedule for resolving the issues, facility by facility, for example, and provide updated information on the progress along the way at regular intervals. For this reason, the time limit in the proposed regulation should not be less than 120 days.

<u>The Proposed Regulation Will Promote Discrimination<br>and Expose Diligent Employers to Liability for Citizenship Discrimination</u>

As noted, absent established procedures to correct no-match errors and the refinement of federal databases, the proposal will leave many employers no choice but to terminate the employment of individuals who, in fact, may be work authorized. This, of course, could be actionable under Section 274B of the Immigration and Nationality Act of 1952, as amended, which prohibits citizenship and national origin discrimination and document abuse, as well as under Title VII of the Civil Rights Act of 1964. However, while the proposed regulation unfairly puts employers squarely on the horns of a dilemma – whether to terminate employment or lose safe harbor – it gives them no corresponding immunity from liability for their good faith actions.

SSA's RM 01105.027 states:

> Unfortunately, some employers have improperly used the EDCOR (Code V – No-match letter) to take adverse action against their employees. Based on concerns voiced by various interest groups, the letter includes the following paragraphs:
> **IMPORTANT:** This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number. Nor does it make any statement about an employee's immigration status.

You should not use this letter to take any adverse action against an employee, such as laying off, suspending, firing, or discriminating against that individual, just because his or her Social Security number appears on the list. Doing so could, in fact, violate state and federal law and subject you to legal consequences."

Similarly, the OSC at its website states:

9. If an employee's name and SSN don't match SSA's records, doesn't that mean the employee is not authorized to work?

No. Just because there is a mismatch between your records and SSA's records, you should not assume that the employee lacks work authorization. There are many reasons for a mismatch to occur, including:

1. A name change (e.g., due to marriage, divorce or other reasons) after the SSN was issued;

2. A typing or printing error; and

3. An error based on cultural differences in how surnames are used.

You should not use the mismatch letter by itself as the reason for taking any adverse employment action against any employee. Doing so may put you in violation of the antidiscrimination provision of the immigration laws, the equal employment opportunity laws, or the labor laws. The General Counsel's office of the former INS, and OSC, have opinion letters that may assist you on this issue. Please call OSC for more information.

For the reasons stated above, employers could be forced as a practical matter to terminate workers who, in fact possess work authorization, in violation of law. In so doing, they risk a charge of unlawful discrimination by terminating employees who are not able to explain and resolve SSN/name discrepancies. *See LULAC v. Pasadena School Dist.*, 662 F. Supp. 443 (S.D. Tex. 1987) where a school district was required to reinstate unauthorized aliens eligible for legalization under IRCA to custodial positions they occupied prior to termination for providing district with false SSNs. Therefore, the regulation should not be implemented without a companion provision immunizing employers from citizenship discrimination liability for terminating employment when it has not been able to verify in accordance with the safe harbor provisions.

The proposed regulation also promotes document abuse and conflicts with existing law. In an effort to avoid potential citizenship and national origin discrimination through document abuse, the proposed regulations provide:

(3) Knowledge that an employee is unauthorized may not be inferred from an employee's foreign appearance or accent. Nothing in this definition should be

Page 13

interpreted as permitting an employer to request more or different documents than are required under section 274A(b) of the Act or to refuse to honor documents tendered that on their face reasonably appear to be genuine and to relate to the individual, except a document about which the employer has received a notice described in paragraph (l)(I)(iii) of this section and with respect to which the employer has received no verification as described in paragraph (l)(2)(i)(B) or (l)(2)(ii)(B) of this section.

However, this provision further complicates an already confusing area for employers.

INA §274B(a)(6), 8 U.S.C. §1324b(a)(6) provides:

Treatment of certain documentary practices as employment practices.—A person's or other entity's request, for purposes of satisfying the requirements of section 274A(b), for more or different documents than are required under such section or refusing to honor documents tendered that on their face reasonably appear to be genuine shall be treated as an unfair immigration-related employment practice if made for the purpose or with the intent of discriminating against an individual in violation of paragraph (1).

Contrary to the statutory prohibition, the proposed regulation requires the employer to refuse to honor a "document about which the employer has received a no-match notice." This places employers in a nearly impossible position. Under the statute, they must honor documents tendered (that reasonably appear genuine) but under the proposed regulations, they are required to reject specified documents. They cannot request more or different documents than required under section 274B(b) of the Act, and they cannot refuse to honor documents tendered that on their face reasonably appear to be genuine and to relate to the individual. However, the proposal would require them to refuse to honor some documents, specifically a "document about which the employer has received a no-match notice."

This proposed regulation will almost certainly lead to an increase in discrimination through document abuse. Such discrimination may arise in a number of ways that often seem innocuous to employers. For example, an employer engages in discrimination through document abuse by insisting that the employee provide an "INS issued card" evidencing continued employment authorization where the employee had other legally acceptable documents. Such action is illegal and contrary to the INA §274B(a)(6), 8 U.S.C. §1324b(a)(6). *U.S. v. Louis Padnos Iron & Metal Co.*, 3 OCAHO no. 414 (1992).

The Interpretation of Constructive Knowledge<br>In the Proposal Is Inconsistent with Congressional Intent

The ICE proposal pushes the concept of constructive knowledge far beyond the outer limits intended by Congress in enacting Section 274a, which prohibits the knowing employment of unauthorized workers. This is clear from the decision in *Collins Foods Int'l, Inc. V. U.S. INS*, 948 F. 2d 549, 544-45 (9th Cir. 1991), which struck down a finding of constructive knowledge. The court cautioned that the concept must be "sparingly

Page 14

applied" to avoid upsetting the delicate statutory balance to serve the goal of preventing unauthorized alien employment while avoiding discrimination against citizens and authorized aliens. It said:

> The doctrine of constructive knowledge has great potential to upset that balance, and it should not be expansively applied. The statute prohibits the hiring of an alien "*knowing* the alien is an unauthorized alien . . . with respect to such employment." 8 U.S.C. § 1324a(a)(1)(A) (emphasis added). Insofar as that prohibition refers to actual knowledge, as it appears to on its face, any employer can avoid the prohibited conduct with reasonable ease. When the scope of liability is expanded by the doctrine of constructive knowledge, the employer is subject to penalties for a range of undefined acts that may result in knowledge being imputed to him. To guard against unknowing violations, the employer may, again, avoid hiring anyone with an appearance of alienage. *To preserve Congress' intent in passing the employer sanctions provisions of IRCA, then, the doctrine of constructive knowledge must be sparingly applied.*

The proposal's broad reading of constructive knowledge is inconsistent with Congressional intent and improperly seeks to impose on the private sector the inherently governmental function of worksite enforcement.

### ICE Should Not Implement the Proposal
### until Coordinating with Other Interested Federal Agencies

In responding to a mismatch letter, employers must balance competing legal considerations and obligations to several different agencies, including DHS (to avoid employing unauthorized workers), IRS (to pay taxes using correct name/SSN items) and OSC (to avoid citizenship discrimination). For instance, IRS can impose a penalty for mismatches but has instructed that employers can avoid a penalty for reporting mismatched data by soliciting new W-4 Forms. OSC has instructed that employers should not terminate employment based on the mismatch letter. SSA has instructed employers to provide corrected information but not to terminate employment based on the letter. We believe that ICE should not implement the safe harbor proposal until it consults carefully with OSC, SSA, and IRS, which all have a stake in the outcome and have provided inconsistent guidance to employers. This is especially important given use of the no-match letter in criminal worksite enforcement.

### The Proposal Will Impose Extraordinary Costs
### and Paperwork Burdens on the Business Community

Based on our experience, the rule clearly will cost the private sector at least $100 million per year. First, the actual cost of extra manpower and lost productivity on the part of companies attempting to comply with the proposed regulation will far exceed $100 million annually. An HR representative with only 10% of the company's workforce on the no-match list would spend significant amounts of time attempting to resolve these discrepancies. Racing against the clock, the HR representative might have to drop all

Page 15

other more productive programs that could have been scheduled and must be abandoned and chalked up as lost opportunity costs.

Another hypothetical based on our experience illustrates the point. Increase the percentage of employees on the no-match letter at ABC Company to 30% or 40% and the lone HR representative would have 150 or 200 employees to usher through this procedure in 14 days. Or take a large company with 10,000 employees where only 2% or 5% of the employees are on a no-match list and the company must deal with these proposed procedures for 200 or 500 employees. Make it a 20,000-employee company and the numbers would be 400 or 1000. It would be truly impossible to reach the safe harbor without hiring experts.

The cost of recruiting, hiring, and training new replacement workers if workers leave voluntarily or if their employment is terminated based on this proposed regulation must also be factored into this equation. True, it may be said that employers never should have hired potentially undocumented workers in the first place. However, in our experience the vast majority of companies who employ undocumented workers do so unwittingly. Of course there are real and serious violators, and those employers should be stopped and punished. But we see well-meaning employers in our practices every day who follow every procedure to hire appropriately but could lose employees for all the reasons described herein if this proposed regulation is adopted.

The foregoing argument is also true for application of the Small Business regulatory Enforcement Fairness act of 1996. DHS should share its calculations in coming to the determination that this rule would not result in an annual effect on the economy of $100 million or more.

<u>Conclusion</u>

For the foregoing reasons, we believe the proposed regulation is unsound and premature as a matter of policy and practice. At a minimum, implementation should await the adoption of clear SSA procedures for the correction of no-match information and careful consultation with other federal agencies on its implications. Additionally, the two-step safe harbor should be replaced by a single 123 day time limit.

Sincerely,

AMERICAN IMMIGRATION LAWYERS ASSOCIATION

**From:** Fred Tsao [mailto:ftsao@icirr.org]
**Sent:** Monday, August 14, 2006 12:22 PM
**To:** Regs, Rfs
**Subject:** docket #ICEB-2006-0004

August 14, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:*     *DHS Docket No. ICEB-2006-0004*
          *Safe-Harbor Procedures for Employers Who Receive a No-Match Letter*

Greetings:

The Illinois Coalition for Immigrant and Refugee Rights (ICIRR), a coalition of 130 member organizations throughout the state of Illinois, submits the following comments regarding the proposed rule published by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

ICIRR is dedicated to promote the rights of immigrants and refugees to full and equal participation in the civic, cultural, social, and political life of our diverse society. In partnership with our member organizations, the Coalition educates and organizes immigrant and refugee communities to assert their rights; promotes citizenship and civic participation; monitors, analyzes, and advocates on immigrant-related issues; and, informs the general public about the contributions of immigrants and refugees. ICIRR has been advocating specifically for the rights of undocumented immigrants, including playing lead roles in the pro-immigrant mobilizations in Chicago that drew hundreds of thousands of people on March 10 and May 1 and leading lobbying delegations to Washington in February and May in support of comprehensive immigration reform legislation that would legalize millions of undocumented workers.

ICIRR and our member organizations have received dozens of inquiries from individuals and businesses regarding no-match letters issued by the Social Security Administration. ICIRR staff have counseled workers and employers on the implications of these letters, and worked with organizing efforts to support and seek reinstatement for workers who were fired as a result of no-match letters sent to their employers.

ICIRR strongly opposes the proposed rule primarily due to its certain effect on undocumented workers. Many sectors of the economy rely on immigrant workers, and particularly undocumented workers. In the Chicago area, the accommodation and food services industry, the administrative, support and waste management industry, and manufacturing all rely heavily on undocumented workers, according to a 2004 report by Roosevelt University. Without these workers, these sectors of the economy would contract. The demand for these workers will only increase as the fast-growing industries expand.

Because of the continuing reliance of our economy on undocumented workers, the "safe-harbor" provisions would have dire consequences for workers and employers alike. Employers who want to comply will almost certainly discharge workers for whom SSA reports a no-match. Without these workers, or adequate numbers of authorized workers to replace them, these employers will need to cut back on their capacity, leaving orders unfilled, contracts unfulfilled, and jobs undone. The workers themselves would become further marginalized; rather than leave the US, they will seek out employers who would be willing to hire them on a cash basis or other compensation (if any).

Indeed, many reputable employers facing no-match situations, rather than stop functioning, may choose to disregard the law and retain these workers. They may convert these workers into "contractors," or simply start paying them in cash or otherwise "off the books." This result would deny federal coffers of millions of dollars of tax revenue, and increase the likelihood that immigrant workers will face wage and hour abuses and other exploitation.

Stepped-up enforcement of employer sanctions makes no sense without a more comprehensive fix to the immigration system. Our nation should not criminalize immigrant workers or the employers who hire them without giving both the chance to bring themselves within the law. This means at very least changes to our immigration laws that will give undocumented a chance at legal status, allow them to work legally and bring them out of shadows. Without this broader context of reform, the "safe harbor" provisions will not work, and indeed will only drive workers and employers further underground.

Undocumented immigrants are not the only workers who would be affected by the "safe harbor" rule. US citizens and other authorized workers could also turn up on no-match letters, due to name changes and errors. These workers could also lose their jobs if employers indiscriminately fire workers for whom SSA reports a no-match. Also, many unscrupulous employers use no-match letters as an excuse to break up labor organizing drives or otherwise intimidate both immigrant and native workers from filing grievances and pursuing improved conditions. This result makes conditions worse for all workers, regardless of their status.

For all these reasons, ICIRR strongly opposes the Department of Homeland Security's proposed "safe harbor" provisions, which will harm millions of undocumented and legal workers, thousands of employers, and potentially our national economy. We urge DHS to withdraw this ill-conceived proposal. Thank you for your consideration.

Respectfully submitted

Fred Tsao
Policy Director
Illinois Coalition for Immigrant and Refugee Rights
36 S. Wabash, suite 1425
Chicago IL 60603
312 332-7360 x13
312 332-7044 fax
ftsao@icirr.org

ICEB-2006-0004-0087

Comment Info: =================

General Comment:Attached please find the comments from the National Club Association on the
proposed rule titled:  RE: DHS Docket No. ICEB-2006-0004 ? Rulemaking
Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match
Letter.

No-Match Cert. Admin. Record  894



August 10, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

**RE:     DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**

These comments represent the views of the National Club Association (NCA), a 501(c)(6) trade association representing approximately 1,000 private social and recreational facilities across the United States. A majority of these clubs are organized under section 501(c)(7) of the internal revenue code. Private clubs are social and recreational organizations; as such, they strive to offer a board array of services to their members, similar to their counterparts in the hospitality industry. Providing such services is a labor-intensive endeavor. As with many employers, NCA members across the country are finding it increasingly difficult to find qualified workers for a variety of jobs that pay well above minimum wage. Increasingly, the club community is relying on visa-based workers to fill peak or seasonal employment needs. NCA, as a member of the Essential Worker Immigration Coalition (EWIC), strongly supports legislation that would strengthen and secure America's borders and also secure access to needed workers.

In its role as the trade association for private clubs, NCA publishes material to assist our members in complying with a host of federal regulations, including how to handle issues related to the I-9 process and, more recently, how to respond to Social Security no-match letters. In response to the proposed notice of rulemaking, NCA surveyed its members to gauge their input and comment on the impact the proposed rule could have on their operations. These comments reflect the feedback they provided.

Proposed Regulation is Premature

The 109th Congress has already acted on immigration legislation. The bills passed by the Senate and House of Representatives diverge in their policy recommendations, and the prospects for resolution in conference seem remote. Both pieces of legislation contemplate significant changes in requirements related to an employer's responsibilities in verifying worker status. When enacted, these reforms will establish new standards under which employers must operate when verifying an employee's identity and eligibility to work. The legislation currently contemplated will specifically address how employers are to respond to a no-match letter issued by the Social Security Administration (SSA) or from the Department of Homeland Security (DHS). NCA believes that the ongoing debate in the legislature should be allowed to reach fruition before an administrative "solution" is imposed. NCA members believe that the proposed regulation should only be enacted as part of a comprehensive package of immigration reform measures, specifically increasing appropriate visa-based programs (e.g. H2-B) and the adoption of a guest worker or similar program.

An "Enforcement Only" Policy Will Aggravate Existing Problems

The proposal encompassed in DHS Docket No. ICEB-2006-0004 should be considered as part of a comprehensive immigration reform package. Imposing an enforcement-only regime, without a guest worker and earned legalization program, will not work. Each year some 500,000 essential skilled workers enter the United States to perform much needed labor. The U.S. economy not only absorbs these needed workers, but it depends on them as part of its work force. There is much discussion about the estimated 12 million undocumented workers currently in the U.S. As proposed the regulation would strip workers from employers without providing those employers an alternate legal channel by which to recruit a replacement workforce. This will be detrimental to the U.S. economy, as within roughly 64 days of implementation, up to 12 million currently employed persons could be terminated from their jobs. The potential economic dislocations and impact to the U.S. economy could be unprecedented.

Another reality of this proposal is that if an employer receives a no-match letter, many employees will simply be fired. The regulation, if implemented, could have the perverse effect of actually driving many of the estimated 12 million "undocumented" workers into an underground economy. This is yet one more reason why this proposal should be part and parcel of comprehensive reform.

Clarification of Procedures May Be Helpful

The regulation, as proposed, would clarify the scope and application of constructive knowledge in certain situations, which is commendable. It states "[E]mployer's obligations under current law, which is that if the employer fails to take reasonable steps after receiving such information, and if the employee is in fact an unauthorized alien, the employer may be found to have had constructive knowledge of that fact." The proposal also defines a "reasonable response" to a no match letter by an employer. It proposes

specific steps be taken by the employer, within defined periods of time. Such measures may allow the employer to avoid liability and mitigate or eliminate potential penalties. The proposal provides the employer with a 14-day period to resolve the no-match letter from receipt of the no-match notice, by checking personnel and payroll records to determine whether the discrepancy results from a clerical error. If it is simply a clerical mistake, the employer is to contact SSA and administratively correct the information. If it is not clerical, the employer must approach the employee and confirm that the information that was provided by the employee to the employer is indeed accurate. If there was an inadvertent mistake when transposing the information, the employer should correct it immediately and inform SSA. If, however, the employee says that initial information provided is accurate, the employer must direct the employee to the local SSA office where the employee has to resolve the issue.

## Timeline for Employer Compliance Is Unduly Burdensome and Unrealistic

Though 14 days may sound reasonable in theory, as a practical matter, the allotted time by which an employer must respond to a no-match notice is neither an adequate nor reasonable time-period for an employer to act. On this matter, 60 percent of the respondents to NCA's questionnaire indicated that 14 days would not be enough time to adequately address these issues. In fact, our members expressed concern that the 14-day period would not only impose an undue burden on human resources staff, but also on the general operations of the club facility. Like many small-scale employers, private clubs often do not have the full-time administrative staff needed to address these issues in a 14-day timeframe. Small employers and member owned clubs often have to run the operation, oversee bookkeeping, supervise its employees and perform administrative duties. For these reasons, the 14-day period is not reasonable and will be unduly burdensome for employers. Therefore, we join with other employer groups in requesting that this be changed to a 45-day standard.

## Notification Procedures are Inconsistent

One of the ways in which an employer can be notified of a no-match situation is through written notification from DHS. The proposed regulation explains that DHS will take into account the totality of relevant circumstances when making a determination whether the employer had constructive knowledge that the alien was unauthorized to work. There is however no comparable standard to which the SSA would be held. SSA should also be required to take into consideration all of the facts surrounding the situation and thereby take into account the totality of the circumstances.

As noted above, one of the ways an employer can be put on notice is by receiving a written notification by DHS. Unlike SSA, DHS does not have a mechanism in place that regularly checks and reports mismatched immigration documents. Rather, DHS usually is made aware of mismatched immigration documents in the context of an audit. As noted

in the proposed regulation, if an employer receives a letter from DHS, they are expected to resolve the issue by "taking reasonable steps to resolve the question raised by DHS about the immigration status document or EAD." However, DHS provides no specific guidance as to what those steps should be and what an employer should do to rectify the situation. We request that this process be outlined and clarified.

<u>Failure to Address "Underground Economy"</u>

This proposed regulation addresses the employers who are trying to comply with the law, but it does not address those underground employers who do not comply with the law, do not fill out Form I-9, pay cash off the books, and are "bad-actor employers". By not addressing this true underground economy and only proposing increased regulations on those employers trying to act in accordance with the law, an incentive is created for employers and employees alike to revert to working in the underground economy. The workers in the black market economy do not pay taxes and are in hiding. This is not sound economic policy nor is it in our country's national security interest.

<u>Conclusion</u>

On balance, the National Club Association and its members find this proposal to be premature and possibly harmful to the ongoing operation of small employers across the country. Although the clarified procedures in handling a no-match letter are welcome, moving forward the regulations implementation, without accompanying legislative reforms to the immigration process, would disrupt the economy, as millions of workers would be forced out of jobs within a short period of time. Imposing new requirements on employers who are diligently applying current employment verification processes, while ignoring the underground economic issues, will have the effect of exacerbating the latter while hurting the very businesses who are doing right under current law. We request that the regulation be held until Congress negotiates the House and Senate bills during conference and acts accordingly.

Sincerely,

Andrew S. Fortin
Vice-President, Legal/Government Relations
National Club Association

**From:** JEANNE GERACI [mailto:jmgeraci@sbcglobal.net]
**Sent:** Tuesday, August 15, 2006 3:14 PM
**To:** Regs, Rfs
**Subject:** DHS Docket No. ICEB-2006-0004


Director, Regulatory Management Division                               August 9, 2006
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529
RE: DHS Docket No. ICEB-2006-0004

Voces de la Frontera is a Worker Center that assists low wage workers in southern
Wisconsin. During our five years in existence we have advised and educated hundreds of
workers and their employers regarding problems with Social Security numbers. There is a
great deal of ignorance on the part of employers and workers regarding how to deal with
SSA No Match notification letters. There is an assumption that if  worker is an immigrant
and there is a problem with their SSA number that if automatically means the worker has a
false number. Some employers have engaged in discrimination against immigrant workers
especially Latino workers. **The proposed change in the rule will only serve to aggravate
this situation even further.** Many workers will be unjustly fired because of computer
errors, changes in last names or misspellings of names or other circumstances. Further,
Latino and other immigrant workers will be more likely subject to discrimination especially
smaller employers who do not have human resources personnel and who will not want to
bother with the new burdens placed on them by this proposed rule. The proposed rule
modifies the regulations by expanding the list of scenarios that may lead to a finding by the
agency that the employer had "constructive knowledge" that an employee was not
authorized to work and consequently, by continuing to hire the employee, subject the
employer to criminal and civil penalties. The rule includes a "safe harbor" provision that
imposes many new legal obligations employers must follow to avoid new liabilities.
Voces de la Frontera supports a comprehensive approach to immigration reform to fixing
what we know to be a broker and outdated immigration system. Therefore, we feel that
enforcement only measures such as is the case with the proposed rule, are **not** an effective
solution to our current problems. The proposed rule reflects a sweeping enforcement
measure that ignores the economic realities that drive illegal migration, undermines the
current legislative proposals seeking to combine worksite enforcement with a regulated
worker program, contradicts the President's own goal to enact comprehensive immigration
reform, and penalizes millions of well-intention employers and hardworking immigrants.
The House and the Senate have both passed immigration bills with provisions for a
modernized employer verification program as well as hefty penalties for U.S. employers and
workers who fail to comply with this program. Implementing the proposed rule before the
conclusion of the immigration debate undermines the legislative process and could result in
conflicting or duplicative plans. Comprehensive immigration reform is needed and the
legislative process is working towards that. The proposed rule should not be considered
apart from this ongoing process to enact comprehensive reform.

The Department of Homeland Security's own supplemental materials to this rule state "[i]n order to fix the problem of illegal immigration and secure our borders a comprehensive solution is required. All elements of this problem must be addressed together, including the creation of a temporary worker program." This proposed rule directly contradicts this statement as it proposes an isolated enforcement measure which fails to address the other key components that DHS itself recognizes as necessary for a workable solution. The rule should be rejected in its current form and only considered as part of a comprehensive and practical solution.

Many of the country's 11 million undocumented workers will be fired as a result of an employer receiving a no-match letter under the proposed rule. These immigrants will not pack up and leave but rather be driven further underground and into the black market where they will be paid off the books, hurting the US economy and taxpayers. The only realistic way to address the millions of undocumented in this country is through an earned legalization program combined with the other elements needed for a practical fix to our broken immigration system.

There are legitimate concerns that thousands of authorized workers will be fired because of inaccurate data in the immigration and social security databases. In addition, there are a number of legitimate reasons for many mismatches including name changes, marriage, divorce and misspellings. This too will result in wrongful terminations. The modified definition of "constructive notice" raises legal questions which will likely result in costly litigation.

Based on the foregoing reasons, we request that the Department of Homeland Security to withdraw this rule.

Sincerely,

Christine Neumann Ortiz
Executive Director
Voces de la Frontera

August 6, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue NW
2nd Floor
Washington D.C. 20529

Re: DHS Docket No. ICEB-2006-0004

My remarks and recommendations to the proposed amendments of the
regulations, relating to the unlawful hiring or continued employment of
unauthorized aliens, are a product of my experiences in the public construction
process over a period of twenty-five years.

While the changes you propose may reduce the hiring of illegal immigrants by
employers in the agricultural business it is my opinion that they will have
minimal, if any, effect on the hiring practices of contractors and subcontractors
installing work for public construction projects.

It is a widespread and common practice for prime contractors and their
subcontractors to use immigrants, both legal and illegal, to perform some work of
their public construction contracts. The reason immigrants are employed is so
that these contractors may extort windfall, unwarranted and excessive amounts
of monies from the public contracts by not paying their workers the wages
required by applicable Labor Laws. Some claim that illegal immigrants file fewer
complaints against the contractors who are exploiting them than do legal
immigrants.  While most likely true, legal immigrants grievances are also rare.
The reason is simply that, despite being paid less than required by Labor Laws,
the construction business is still the best paying job in town, particularly if the
workers are unskilled or semi-skilled. These immigrants are also aware that if
they weren't willing to accept lesser monies they wouldn't be working.

Be assured that the prime contractors and subcontractors who employ illegal
immigrants and pay them less than Prevailing Wages are quite aware they are
violating public laws but are more than willing to take risks in order to enjoy the
spoils of their corruption. They have few apprehensions that their indiscretions
will be detected. Most often they are not. The few that are apprehended most
often receive minimal penalties. Labor Law violations will generally result in the
necessity for them to make payments of monies to the exploited workers and, as a
rule their company will be disbarred from submitting bids for public construction
contracts for a set number of years. Oftentimes the monies repaid will be only a
fraction of the amount of monies stolen and, if their company is debarred, they
will have already set up a new company that will allow them to continue their
gouging of the public purse.  The current penalties for employing illegal
immigrants are even less severe and will, in no way, deter these scheming and

disreputable contractors from enjoying the gratuitous monies available to them from the exploitation of a business – public construction- that annually commits public monies in excess of $ 150 billion.

It does not need to be that way!

While violating Labor Laws is usually a misdemeanor, the contractors typically attempt to cover up their infractions by falsifying business and payroll records and submitting false filings and, as a result, commit felonies. Indomitable investigators coupled with aggressive prosecutors are capable of developing enough evidence that will enable them to also charge these contractors with a variety of other infractions that almost always accompany labor law violations including tax evasion, extortion, larceny, corruption, bribery, perjury, and a variety of frauds.

Unfortunately few contractors violating Labor Laws are ever prosecuted for these more severe crimes. The easy way out and the least time consuming for public prosecutors is to make a deal – have the contractor payback some money and be debarred and then close the case. To the corrupt contractors the penalties are quite lenient and rather than serve as deterrents are simply considered to be the cost of doing business.

While it might be a reach convicting employers for tax evasion, extortion, larceny, corruption and bribery, solely on the fact that they intentionally hire illegal immigrants - prosecuting them for false filings, falsified business records, fraud and perjury is quite feasible particularly if the proposed regulations include employer obligations that, if not complied with, would provide ample evidence to charge them with the falsification of documents and submittals, perjury and fraud.

Two employer obligations are recommended for inclusion in the proposed regulations–

1. Employers should be required to verify the legality of all intended employees by requiring them to send the names and Social Security Numbers of intended employees to the Social Security Administration for verification before they begin work.
2. Employers should be required to keep a copy of the documents that were provided by the employee for completion of the Employment Eligibility Verification form, Form I-9.

<u>Social Security Number Verification</u>
The Social Security Administration offers employers very easy and timely means for verifying employee Social Security Numbers. Employers, in fact, are able to verify SSNs over the internet. Up to ten names and SSNs can be verified immediately while larger numbers can be verified within one government business day. With such a convenient and uncomplicated process there is no

reason why every employer should not be required to verify the name/SNN of every employee and retain a copy of the results received from the Social Security Administration in the employees' personnel files.

After completion of Form W-4, but before employment begins, the employee's name and Social Security Number should be sent to the Social Security Administration for confirmation.

Employment Eligibility Verification (Form I-9)

The instructions for completion of the I-9 form state in Section 2 that

"Employers must record: 1) document title; 2) issuing authority; 3) document number; 4) expiration date, if any; 5) the date employment begins. Employers must sign and date the certification. Employees must present original documents. Employer may, but are not required to photocopy the document(s) presented. "

On this form the employer attests, under penalty of perjury, that the documents appear to be genuine. It would seem that it could be very difficult to prove that an employer, who intentionally hires illegal immigrants, committed perjury if you do not have the copies of the "documents" deemed "to appear to be genuine" available so that a judgment can be made of the rationality the employer's decision.

The statement "Employers may, but are not required to photocopy the documents presented" of Section 2-Employer – of the Instructions for the I-9 form should be amended to state *"Employers are required to photocopy the documents presented and place the copies in the employee's personnel file."*

The personnel file of each employee, if these recommendations were accepted, would include a copy of the Form W-4, a completed Employment Eligibility Verification form (Form I-9) with attachments and verification from the Social Security Administration as to the validity of the employee's Name and Social Security Number.

Employers who desire to hire only legal immigrants should be less apprehensive if they verified name/SSN submittals before commencing employment. The Federal government should consider preparing a manual that would assist these employers to evaluate the authenticity of the various documents that immigrants can submit in response to Employment Eligibility Verification Form (I-9).

Many employers, who would normally intend to employ illegal immigrants, will refrain from this practice, if required to comply with the recommendations specified above.

There will, of course, be other employers who will not discontinue their intentional employment of illegal immigrants simply because they feel that the

financial benefits that can be derived from their deceitfulness are worth the risks they take.

Some of these employers will not only persist in their use of illegal immigrants but will continue to list them in their payroll records and documents, including their invalid Social Security Numbers. It would be an easy task to detect their infractions even with minimal oversight.

Other employers will continue to employ illegal immigrants but will simply not list them in their business and payroll records and will not issue them wage statements, pay checks, and W-2 Statements. Wages will be paid in cash and off the books. Fortunately there are, in public construction, sufficient analytical processes available that will readily identify those contractors who conceal employees by not including them in their payroll records and reports and other business documents.

I appreciate having been given an opportunity to submit recommendations for these regulations directed to the concern over the employment of illegal immigrants.

Sincerely,


John Peek
111 Bethlehem Pike

Philadelphia, PA 19118

Email tockwotton@yahoo.com

No-Match Cert. Admin. Record  904

# THE GIBBONS LAW FIRM

Suite 300, Union Plaza<br>
333 Washington Avenue North<br>
Minneapolis, Minnesota  55401<br>
Telephone:    (612) 349-2755<br>
Facsimile:  (612) 349-2760

September 1, 2006

**_VIA E-MAIL:  rfs.regs@dhs.gov_**

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, DC  20529

Re:  DHS Docket No. ICEB-2006-0004

Dear Director:

This correspondence is written in response to the Department of Homeland Security's Proposed Rules regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" that were published on June 14, 2006 in the Federal Register, Volume 71, Number 114 (the "Proposed Rules").  The Proposed Rules describe "more specifically the steps that an employer might take after receiving a no-match letter, steps that the DHS considers reasonable" and that allegedly would provide a "safe-harbor" from being deemed as having constructive knowledge that their employee is an undocumented worker.  Because the Proposed Rules in many circumstances will compel employers to retain persons in their employ regardless of having committed employment fraud, will compel employers to become a party to fraud being committed on third parties,  the proposed rules, as currently written, are flawed.

Objectionable Proposed Regulation:

> If the employer confirms with the affected employee within 14 days of receipt of the No-Match Notification that its records of the employee's name and Social Security number are correct, the employer is to ask the employee to pursue

Director, Regulatory Management Division
9/1/2006
Page 2 of 4

correcting the record discrepancy with the Social Security Administration. "A discrepancy will be considered resolved only if the employer verifies with SSA or DHS…that the employee's name matches in SSA's records a number assigned to that name, and the number is valid for work or is valid for work with DHS authorization…or that DHS records indicate that the immigration status document or employment authorization document was assigned to the employee." "*In the case of a number from SSA, the valid number may be the number that was the subject of the no-match letter or a different number, for example a new number resulting from the employee's contact SSA to resolve the discrepancy,*" so long as the employer verifies the new number by telephoning SSA "*as SSA may not provide any documentation.*"

\*\*\*\*

The producedure to to verify the employee's identity and work authorization described in the proposed rule would involve the employer and the emplo6yee completing a new Form I-9…, using the same procedures *as if the employee were newly hired…*

Realistic Application:

Several years ago, I represented an employer who received a SSA no-match letter regarding a significant number of long-term employees.  In response to the employer's notification to employees of the SSA discrepancy, a number of employees contended that they had obtained new social security numbers and/or names over the period of one weekend and without any supporting documentation.  Because the employer had photocopied the identity and work authorization documents presented by employees at the commencement of their employment and the employees could not present any documentation of a lawful change in their SS number and/or name, the employees were terminated.

In response to the terminations, grievances were filed, an arbitration occurred and a federal district court action was commenced, at considerable cost to both the employer and the union.  Essentially, the employer opposed continuing the employment of persons who misrepresented their identity and/or work authority at the commencement of their employment and in violation of the Immigration and Reform Act of 1986 and the employer's personnel policies. The employer did not want to become a party to fraud on the IRS, by just completing a new Form I-9 and pretending that the employee was a new hire, without going back and correcting its past income reports, which the employees opposed. The employer did not want to become a party to fraud on the SSA and/or the CIS by agreeing to change its employment records, where the employee was not notifying the agencies of his/her presence in the US and prior work history.   The employer did not want to become a party to fraud on its insurance and benefit providers,

Director, Regulatory Management Division
9/1/2006
Page 3 of 4

and risk having these benefits terminated, by merely agreeing to changing the names of current employees and/or their dependents to "new" employee names and/or SSNs and by waiving new qualification periods.  The employer did not want to become a party to fraud on health care providers and/or other providers of services and/or credit by issuing new insurance and employee identification with "new" names and/or SSNs, which thereby could prevent collection efforts of those providers against current employees, using new identities.  The employer also did not want to apply its personnel policies in favor of persons listed on the no-match notification as compared to other personnel who were terminated for violations from misrepresenting their identities to obtain employment for purposes of avoiding tax liabilities, child support, insurance for minors and/or spousal support obligations.   Employers are also concerned about creating additional grievances from co-workers who would otherwise be promoted in seniority and/or who had to complete a 90-day period before receiving employer provided benefits when allegedly "new" employees are added to the roster when former names and/or SSNs were used.

During the adversarial proceedings in the above matter, it was repeatedly rumored that employees had paid significant funds in order to obtain new "verifiable" SS numbers via the black market, albeit that the SS numbers had never been lawfully issued to the persons presenting them to the employer in response to the no-match notification.

<u>Employment Fraud & The Hoffman Plastic Compounds Decision:</u>

The proposed rules as written abrogates the holding of the U.S. Supreme Court in <u>Hoffman Plastic Compounds, Inc. v. NLRB</u>, 535 U.S. 137 (2002).   There, the court acknowledged that the Immigration Reform and Control Act of 1986 (the "IRCA") "makes it a crime for an unauthorized alien to subvert the employer verification system by tendering fraudulent documents," and that the IRCA "prohibits aliens from using or attempting to use "any forged, counterfeit, altered, or falsely made document" or "any document lawfully issued to or with respect to a person other than the possessor" for purposes of obtaining employment in the United States."  The Supreme Court expressly concluded that "Congress has expressly made it criminally punishable for an alien to obtain employment with false documents"  and that obtaining employment in this regard amounts to "criminal fraud."

The Proposed Rules, as written, give approval to employees' misrepresentation of work authority and/or identity in order to obtain employment, provided that they are listed on a no-match letter. The Proposed Rules also give approval to the employees to go out and obtain a "new and verifiable" social security number, but with no documentation that it has been lawfully issued to them and to continue their employment notwithstanding the fraudulent consequences it may cause to third parties and/or until the next annual no-match notification is issued.   The employer should not be compelled to have to merely accept a new number that is verifiable with the SSA, to be barred from enforcing its personnel policies requiring discipline, including termination for falsifying information.

Director, Regulatory Management Division
9/1/2006
Page 4 of 4

and/or to become a party to fraud on third parties, which may include the SSA, and/or risk jeopardizing insurance and benefit coverage for its Company and its employees due to the content of the Proposed Rules.

**ICE IMAGE PROGRAM**: Late last month, recognizing the "presence of undocumented workers who have secured jobs by fraudulent means, including presentation of false documents, completion of fraudulent benefit applications and theft of identities," U.S. Immigration and Customs Enforcement (ICE) announced that in order "to combat unlawful employment and reduce vulnerabilities that help illegal aliens gain such employment, the Department of Homeland Security (DHS) recently introduced the ICE Mutual Agreement between Government and Employers (IMAGE) program. The goal is to assist employers in targeted sectors to develop a more secure and stable workforce and to enhance fraudulent document awareness through education and training." Forcing employers to comply with the steps outlined in the Proposed Rules is directly in contradiction with this recent announcement by ICE.

In conclusion, by allowing employees identified by no-match notifications to merely produce a "new verifiable" SSN without supporting documentation of a legal name change and/or a lawfully issued new number and to continue their employment places employers in an untenable and unworkable situation. It is this writer's opinion that the rules as written and with the application as stated herein will "unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA" as previously recognized by the Supreme Court in Hoffman. Moreover, it will "encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations" as well as the commission of fraud on innocent third parties.

Thank you for the opportunity to provide written comment to the DHS Proposed Rules.

Sincerely,

//S//

Kristen Paulson Gibbons
kpgibbons@officenters.com

Re:    **DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"**

Dear Sir or Madam:

Farmworker Justice submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

Adrienne DerVartanian
Staff Attorney/Policy Analyst
Farmworker Justice
1010 Vermont Ave., NW, Suite 915
Washington, DC 20005
Tel. (202) 783-2628, ext. 204
Fax (202) 783-2561
www.fwjustice.org

25 years of service to farmworkers



**FARMWORKER
JUSTICE**
—25 YEARS OF SERVICE—

August 11, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

*Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for
Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

  Farmworker Justice submits the following comments in response to the request
for public comment by the Department of Homeland Security (DHS), Bureau of
Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures
for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

  Farmworker Justice's mission is to empower farmworkers to improve their wages
and working conditions, labor and immigration policy, health and safety, and access to
justice through litigation, advocacy, education and coalition-building. Farmworker
Justice plays a major role in policy debates and implementation of immigration and labor
policy affecting agricultural workers.

  Farmworker Justice is familiar with the adverse impact that the Social Security
Administration's (SSA) no-match letters have had on all workers in the United States–
immigrant and native-born alike. The Social Security Administration's (SSA) database
has proven to be error prone, harming all workers, regardless of their immigration status
or country of origin. The experience of a packing house worker in the Midwest
highlights the errors inherent in the database. A worker with lawful permanent resident
status was hired but then immediately fired after a no-match result was received from the
telephone SSNVS. As it turns out, the no-match result was erroneous. Although the

1010 Vermont Ave., NW, Suite 915 • Washington, DC 20005
(202) 783-2628 • (202) 783-2561 fax • email: fj@nclr.org • www.farmworkerjustice.org

worker was eventually offered the opportunity to work again, by that time she had lost the welfare-to-work transportation benefit that would have allowed her to take the job as she was unable to drive.

As a result of such experiences, Farmworker Justice is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule would magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings would be unnecessary, unjust, and potentially discriminatory.

Although it would cause enormous upheavals in the workplace, **the rule would have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers would not leave the country. They would simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule would result in growth of this underground economy. It also represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

**This proposed rule would harm <u>all</u> workers regardless of immigration status.**

The rule could result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers could fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and frequently "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of agricultural workers— **including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

**The proposed rule would expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new legal obligations would increase

**No-Match Cert. Admin. Record  911**

pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers would be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

### This proposed rule is an end-run around the legislative process.

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform**. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Worksite enforcement mechanisms must be accompanied by an opportunity for undocumented workers to earn lawful permanent resident status.

There is an immigration crisis in agriculture. According to the latest National Agricultural Workers Survey (NAWS), conducted by the U.S. Department of Labor based on data from 2001-2002, the majority of farmworkers lack work authorization. The solution to this crisis is comprehensive immigration reform that includes an opportunity for undocumented workers to earn permanent legal immigration status. The opportunity for undocumented workers to earn legal immigration status would help create a stable supply of farm labor in the United States, guaranteeing our food security. Imposing immigration enforcement mechanisms without offering opportunities for workers to come out of the shadows and apply for legal immigrant status would push workers further underground and would not resolve the immigration crisis.

Implementing the proposed regulations at this time would be an end-run around the legislative process. Agricultural workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

### The SSA no-match letter program is ill-suited as a tool for immigration enforcement.

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers would presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

3

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically would alter the definition of "constructive knowledge" and would make a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

### The costs of implementing the proposed rule would be prohibitive.

If the proposed rule is to be carried out as envisioned, DHS and SSA would need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that would derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it also would have a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program would be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

### The proposed rule is objectionable because compliance would be impractical.

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." Further, the notice fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer. Many agricultural workers live in rural areas far from an SSA office making it difficult for these workers to reach an SSA office within the limited time frame, particularly given the rigorous demands of the farm labor season.

### Conclusion

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands of agricultural workers, or the food security and agricultural industry of our nation, because of a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all

these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,


**BRUCE GOLDSTEIN**
**EXECUTIVE DIRECTOR**
**FARMWORKER JUSTICE**

---

1010 Vermont Ave., NW, Suite 915 • Washington, DC 20005
(202) 783-2628 • (202) 783-2561 fax • email: fj@nclr.org • www.farmworkerjustice.org

No-Match Cert. Admin. Record  914

**From:** Eric Gutierrez [mailto:egutierrez@MALDEF.org]
**Sent:** Monday, August 14, 2006 4:09 PM
**To:** Regs, Rfs
**Subject:** DHS Docket No. ICEB-2006-0004

To Whom It May Concern:

Please see the attached correspondence regarding DHS Docket No. ICEB-2006-0004.  If you have any questions, feel free to contact me directly.

Sincerely,

Eric M. Gutiérrez

**Eric M. Gutiérrez**
Legislative Staff Attorney
MALDEF
1717 K Street, NW, Suite 311
Washington, D.C. 20036
Phone: (202) 293-2828, ext. 14
Cell: (202) 841-5224
Fax: (202) 293-2849
egutierrez@maldef.org



# MALDEF

**Mexican American Legal Defense and Educational Fund**

**Washington, D.C.**
**Regional Office**
1717 K Street, NW
Suite 311
Washington, DC 20006
*Tel:* 202.293.2828
*Fax:* 202.293.2849

**National Headquarters**
**Los Angeles**
**Regional Office**
634 S. Spring Street
Los Angeles, CA 90014
*Tel:* 213.629.2512
*Fax:* 213.629.0266

**Atlanta**
**Regional Office**
41 Marietta Street
Suite 1000
Atlanta, GA 30303
*Tel:* 678.559.1071
*Fax:* 678.559.1079

**Chicago**
**Regional Office**
188 W. Randolph Street
Suite 1405
Chicago, IL 60601
*Tel:* 312.782.1422
*Fax:* 312.782.1428

**San Antonio**
**Regional Office**
140 E. Houston Street
Suite 300
San Antonio, TX 78205
*Tel:* 210.224.5476
*Fax:* 210.224.5382

**Sacramento**
**Satellite Office**
926 J Street
Suite 422
Sacramento, CA 95814
*Tel:* 916.443.7531
*Fax:* 916.443.1541

**Houston**
**Program Office**
Ripley House
4410 Navigation
Suite 229
Houston, TX 77011
*Tel:* 713.315-6404
*Fax:* 713.315-6404

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

**Via Electronic Mail to rfs.regs@dhs.gov**

August 14, 2006

*Re: Comments to Notice of Proposed Rulemaking "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" (DHS Docket No. ICEB-2006-0004)*

Dear Sir or Madam:

 The Mexican American Legal Defense and Educational Fund (MALDEF) urges the Department of Homeland Security to withdraw its notice of a proposed rule regarding "Safe Harbor Procedures for Employers who Receive a No-Match Letter," published in the Federal Register on June 14, 2006. MALDEF is a national non-profit civil rights organization that protects and promotes the civil rights of Latinos through advocacy, community education and outreach, and, when necessary, through the legal system.

 As an organization committed to ensuring fair working conditions for Latinos, MALDEF believes the proposed rule will serve to facilitate unlawful harassment and termination of hardworking employees, at least some of whom are legally authorized to work in the United States. The proposed rule provides that employers who receive a Social Security Administration (SSA) "no-match" letter (stating that information submitted for an employee does not match SSA records) may be deemed to have "constructive knowledge" that an employee is unauthorized to work. The proposed rule then sets out "safe harbor" procedures that an employer must follow to avoid a finding of constructive knowledge; if an employer is unable to resolve the no-match, the employer must either terminate the employee or risk liability under the Immigration and Nationality Act (INA).

 Although current SSA no-match notices direct employers against taking adverse action against employees, many workers are still subjected to unlawful employment practices on the basis of such letters – which often arise out of innocent errors or discrepancies. In our work representing Latino workers, both immigrant and native-born, we have seen all too many instances of national origin discrimination, harassment, and wrongful termination based on erroneous "no-match" notices. We believe strongly that enactment of the proposed rule would only escalate and exacerbate such unlawful conduct, with a disproportionate impact upon Latino

workers and their families and without regard for the detailed requirements the proposed rule places on employers.

In addition, we have grave concerns that the proposed rule would provide opportunities for unscrupulous employers to retaliate against workers who assert labor rights or engage in protected union or civil rights activities, by using no-match notices as pretexts for firings or other wrongful practices. The low-wage workers who are most in need of these protections are particularly vulnerable to exploitation; the proposed rule lacks adequate safeguards against such misuse of SSA no-match letters.

Finally, as an organization committed to a comprehensive, fair and humane approach to immigration reform, MALDEF also objects to the timing of the Department's proposed rule. It undermines legislative efforts to repair our broken immigration system and secure our borders. Both the House and the Senate have passed immigration measures that contain worksite enforcement and employment verification mechanisms. The proposed rule would subject workers to needless risk of adverse job actions, while subverting a legislative process that is already well underway. Its enactment, without comprehensive immigration reform in place, would be disruptive and counterproductive; unauthorized workers would simply seek out other workplaces, as occurred following INS' unsuccessful Operation Vanguard.

MALDEF urges the department to withdraw the proposed rule and consult more widely with congressional, business, labor, civil rights and community stakeholders to ameliorate its wide-reaching and potentially destructive effects. If you have any questions or require any additional information related to these comments, please contact me at MALDEF's Washington, DC office, at (202) 293-2828 ext. 15.

Sincerely,

Shaheena Ahmad Simons
Acting D.C. Regional Counsel
Mexican American Legal Defense and Educational Fund

2

To Whom It May Concern:

I write to address the proposed safe harbor procedures for employers who receive No Match letters. In particular, I write to address what I perceive to be two related deficiencies: (1) the proposed rule does not address the circumstance where an employer who has filled completed I-9's and responded appropriately to SSA no match letters in the past receives recurring letters regarding the same employees, where such employees produce new or different documents each year which appear facially valid; and (2) the proposed reverification process does not provide guidance to employers who receive SSA no match letters on an employee who complied with I-9 requirements at his or her initial hiring by producing a document that does not contain the information that is the subject of the no match letters.


**Background**

I represent employers who have hired large numbers of workers whose names ultimately appear on Social Security no match letters. As evidenced by ICE's recent enforcement efforts, there are employers who knowingly hire large numbers of workers who are undocumented, and such employers are either indifferent to I-9 requirements altogether, or they ignore SSA no match letters such that an inference arises that they know the workers are undocumented.

While there are such egregious employers in the US, there are also thousands of employers in the United States who comply in all respects with I-9 rules but due to the nature of their particular industry, the prohibition which has existed until recently against using the Social Security 800 number as a screening tool, and the rampantly availability of fraudulent documents to workers who want them, these law-abiding employers unwittingly hire large numbers of undocumented workers. Further, given anti-discrimination rules which prohibit employers from preferring certain types of documents over others, it is a simple reality that many employers in the United States find themselves in situations where the majority of their workers produce fraudulent Resident Alien Cards to prove identity and work authorization at the I-9 stage.

Until ICE's recent enforcement initiative, employers were advised repeatedly by Social Security and the Office of Special Counsel that it is unlawful to assume that a person who appears on a SSA mismatch letter is undocumented. Instead, the employer has been required to give the employee an opportunity to resolve the problem and if he or she was able to do so and produce a new card, then it is appropriate (and perhaps even required, under the view of Office of Special Counsel) to continue to employee the individual. Employers are vexed by the re-appearance of the named individuals in subsequent years' SSA no match letters. ICE press releases have pointed to employers whose workers appeared on such lists year after year but take no action, and in the view of ICE, such employers "have to know" that the workers are undocumented. For the employer who ignores the issue, ICE's conclusion is correct. However, many employers who have large numbers of employees who appear on the no match list and have tried to comply with the

law now find themselves in a terrible situation: they have retained employees on their payroll who were previously the subject of a SSA mismatch letter, and now they reappear. An employer who fails to terminate the employee runs the risk of having constructive knowledge of the workers' undocumented status. Yet in past years, these same employers were advised that they could not, lawfully, simply terminate employees whose names appeared on the SSA mismatch list, and so they have kept the employees on the payroll. I now hear repeatedly from employers that they must choose between shutting down their business or run the risk of fines or jail time, when they have, to this point, complied with the law. Indeed, their compliance with the law as it was interpreted by SSA in the past - - do not assume that a worker who appears on the list is undocumented; to do so risks a finding of unlawful discrimination; instead, accept his or her new social security number - - has placed their business in peril.

**The proposed safe harbor does not address the issue of recurring no match letters for persons who use certain List A documents for I-9 purposes**

Under the proposed regulation, an employer who attempts without success to verify an employee's valid Social Security number has the option of reverifying the employee's employment eligibility. Under the proposed rule, "[N]o document containing the social security account number . . . that is the subject of a written notice . . . may be used to establish employment authorization or identity or both; and no document without a photograph may be used to establish identity or both identity and employment authorization."

What, then, of the employee who produces a Resident Alien Card at the initial I-9 stage, and is the subject of recurring SSA no match notices? What if the employee claims that his number is correct and that it is a Social Security error? At each reverification stage, may the employee re-produce his same Resident Alien Card which establishes both identity and work authorization? Is there any legal basis for the employer to refuse to accept the Resident Alien Card? Anti-discrimination and document abuse rules indicate that the employer must continue to accept that card. The safe harbor rules would appear to allow such an employer to continue employing indefinitely an employee whose name continually shows up on the list, simply by going through the exercise year after year of recording information on the same Resident Alien Card.

The safe harbor rules need to address how an employer deals with employees who appear on the list repeatedly.

Thank you for considering this comment.

Charles R Baesler, Jr
Stoll Keenon Ogden PLLC
300 West Vine Street
Suite 2100
Lexington KY 40507

phone: (859) 231-3944
fax:     (859) 246-3644
**www.skofirm.com**

PLEASE NOTE:  Every person who is not a US citizen (unless in A or G status) must
report address changes to the USCIS within 10 days or less using Form AR-11 found at
the following link: http://uscis.gov/graphics/formsfee/forms/ar-11.htm

# American Federation of Labor and Congress of Industrial Organizations



815 Sixteenth Street, N.W.
Washington, D.C. 20006
(202) 637-5000
www.aflcio.org

**EXECUTIVE COUNCIL**

**JOHN J. SWEENEY**
PRESIDENT

**RICHARD L. TRUMKA**
SECRETARY-TREASURER

**LINDA CHAVEZ-THOMPSON**
EXECUTIVE VICE PRESIDENT

Gerald W. McEntee
Patricia Friend
Robert A. Scardelletti
Michael J. Sullivan
Joseph J. Hunt
Edward C. Sullivan
Edward J. McElroy Jr.
Baxter M. Atkinson
Vincent Giblin
Larry Cohen
Thomas C. Short

Gene Upshaw
Michael Goodwin
John M. Bowers
Capt. Duane Woerth
Cheryl Johnson, R.N.
William Burrus
Ron Gettelfinger
John Gage
William Hite
Warren George
Robbie Sparks

Michael Sacco
William Lucy
R. Thomas Buffenbarger
Harold Schaitberger
Clyde Rivers
Leo W. Gerard
James Williams
William H. Young
Michael T. O'Brien
Gregory J. Junemann
Nancy Wohlforth

Frank Hurt
Leon Lynch
Elizabeth Bunn
Edwin D. Hill
Cecil Roberts
Melissa Gilbert
John J. Flynn
Nat LaCour
Andrea E. Brooks
Laura Rico
Paul C. Thompson

August 14, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

**Re:    *DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"***

Dear Sir or Madam:

The American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The AFL-CIO represents 53 unions and nearly 9 million workers nationwide. Our mission is to improve the lives of working families—to bring economic justice to the workplace and social justice to our nation by enabling working people to have a voice on the job, in government, in a changing global economy and in their communities.

The AFL-CIO has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States–immigrant and native-born alike.

As a result of this work, the AFL-CIO is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Ana Avendaño
Associate General Counsel and
Director, Immigrant Worker Program
AFL-CIO
815 Sixteenth St. N.W.
Washington, D.C. 20006
202-637-3949 (phone)
202-637-5323 (fax)
aavendan@aflcio.org (email)

# Low-Wage Immigrant Worker Coalition

VIA ELECTRONIC MAIL

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

*Re:*    ***DHS Docket No. ICEB-2006-0004, Comment Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"***

Dear Sir or Madam:

The National Immigration Law Center (NILC) submits the following comment on behalf of the Low-Wage Immigrant Worker (LWIW) Coalition in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE), on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 FR 34281 (June 14, 2006).

The LWIW Coalition is co-convened by NILC, the American Federation of Labor – Congress of Industrial Organizations (AFL-CIO), Change to Win (CtW), Interfaith Worker Justice (IWJ), Jobs with Justice, the National Council of La Raza (NCLR), the National Day Laborer Organizing Network (NDLON), and the National Employment Law Project (NELP).

The LWIW Coalition is our nation's broadest collaborative of advocates and organizers working to improve the living and working conditions of low-income and low-wage immigrant workers. The mission of the LWIW is to support this community of advocates by sharing strategies and resources at the local, state, and national levels.

The signatories to these comments have ample experience in dealing with the adverse impact that Social Security Administration's (SSA's) no-match letters have had on all workers, immigrant and native-born alike. Through our legal assistance programs and organizing campaigns, we have interacted with tens of thousands of low-wage workers and their families on matters related to no-match letters and other Social Security number (SSN) verification matters. We have assisted individual employees in correcting no-match discrepancies and educated both employers and employees on their responsibilities in responding to no-match letters through written materials, trainings, and technical assistance to a broad range of groups in the country.

---

American Federation of Labor – Congress of Industrial Organizations (ALF-CIO) ● Interfaith Worker Justice (IWJ) ● Jobs with Justice (JWJ) ● National Day Labor Organizing Network (NDLON) ● National Council of La Raza (NCLR) ● National Employment Law Project (NELP) ● National Immigration Law Center (NILC)

The LWIW Coalition has also worked closely with SSA through the years to improve language in no-match letters and to include warnings to employers against discriminatory and retaliatory conduct. Our advocacy includes ongoing monitoring of national origin and citizenship status discrimination cases as well as unfair labor practices arising from SSN verification and no-match matters reported to the U.S. Department of Justice Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC), the Equal Employment Opportunity Commission (EEOC), and the National Labor Relations Board (NLRB). Some of the co-conveners of the LWIW have also been engaged in litigation involving employer misuses of no-match information to interfere with workers' rights to organize and exercise their labor rights. Throughout our work, we have remained steadfast in our commitment to safeguard and advance the rights and best interests of low-wage workers, their families, and their communities.

As a result of this work, the LWIW Coalition is alarmed by and strongly opposed to the implementation of the "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that no-match letters have had on workers' rights and trigger massive, potentially unlawful firings of low-wage workers across the nation. Overly cautious employers will fire listed workers before workers have a chance to show they are on the list mistakenly. But despite the disruption it will cause, the rule does nothing to solve our immigration problems.

DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of workers in an isolated, punitive immigration "enforcement" scheme on the eve of enactment of comprehensive immigration reform intended to make our immigration system work again. In the absence of such reform, the proposed changes would only stir up dust.

The proposed rule is simply the wrong rule at the wrong time. Both the House and Senate have passed immigration bills that contain sweeping new worksite verification and enforcement regimes that impose a new electronic verification system on all employers. Implementing the rule before the conclusion of the immigration debate would add a new, unnecessary, and unhelpful set of major changes for employers to learn and implement on top of the ones that will be added just a short while later when the new legislated changes take effect.

Although the rule causes enormous upheavals in the workplace, the rule will have *no* impact on undocumented migration, which is the purported purpose of this proposal. Our experience with no-match firings and workplace audits is very clear: *the fired workers will not leave the country*. In the absence of comprehensive immigration reform that addresses the root causes of undocumented migration, they will simply find other more marginal jobs, most likely in the unregulated cash economy. Because of this, the proposed rule will result in growth of the underground economy, which in turn will result in substantial losses in state and federal tax revenues as well as unfair competition.

In addition to its enormous impact on workers and on our economy, this proposal should be withdrawn because the rule attempts to transform the SSA no-match program into an immigration enforcement tool when the SSA does not have the capacity to fulfill this objective through its database. Additionally, the rule erodes our privacy rights, raises due process concerns, and radically departs from existing case law and longstanding federal guidance in this

No-Match Cert. Admin. Record  926

area. It provides no solution to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by workers, taxpayers, and businesses. The LWIW Coalition therefore urges DHS to withdraw this rule in its entirety.

Our concerns are set forth in full below.

**The Proposed Rule Harms All Workers Regardless of Immigration Status**

*Hundreds of Thousands—Possibly Millions—of Workers, Including U.S. Citizens and Work-Authorized Noncitizens, Will Face Massive Firings*

As an initial matter, the notion that SSA no-match letters indicate that an individual is not authorized to work in the United States is simply incorrect. SSA no-match letters are *not* reliable indicators of work authorization or immigration status. Instead, these letters simply indicate that there is a discrepancy between a worker's SSN and/or name on file with the SSA based on information reported by employers on Internal Revenue Service (IRS) Form W-2 (Wage and Tax Statement). There are numerous reasons for the discrepancies, *none of which have anything to do with the immigration status or work authorization of workers*. Many of these mismatches are based, instead, on simple human error (such as clerical data entry mistakes and misspellings by the employee, employer, or SSA) or life changes (such as name changes, marriages, and divorces). The proposed rule, however, is based on the faulty premise that SSA no-match letters are foolproof indicators of work authorization. Because this premise is flawed, there are several, disastrous consequences that would flow from implementation of the rule.

This proposed rule will trigger massive firings across the nation. Based on our experience over the years but in particular with SSA's policy in 2002 where the agency sent the no-match letter to almost one million employers, the LWIW Coalition anticipates that the proposed rule will prompt similar panic and confusion among employers. This is likely to result in employers precipitously and indiscriminately firing workers who appear on a no-match list before workers have a chance to show that they are on the list because of the simple human error or life changes described above. As a result, these mass no-match firings may include the terminations of thousands of work-authorized employees who routinely receive SSA no-match letters.

U.S. citizens, lawful permanent residents, and other work-authorized employees were among the estimated 100,000 workers who lost their jobs as a result of the approximately 800,000 no-match letters sent by SSA in 2002.[1] Job losses were most acute in low-wage industries such as agriculture, cleaning, construction, food service, and health care. For example, no-match firings devastated the workforce at Stanford Medical Center in Palo Alto, California, where 83 percent of workers on a no-match list lost their jobs.[2] Based on the severity of the 2002 job losses, the U.S. Chamber of Commerce declared an official labor shortage and urged SSA to change its policy.[3] Under pressure from the Chamber and employers, as well as enormous pressure from

---

[1] Mary Beth Sheridan, "Records Checks Displace Workers: Social Security Letters Cost Immigrants Jobs," *The Washington Post*, Aug. 2, 2002.

[2] "A Crackdown on Workers," *The San Francisco Chronicle*, Aug. 12, 2002.

[3] "*The Immigration Crisis,*" Cox News Service, Aug. 14, 2002.

No-Match Cert. Admin. Record  927

civil, immigrant, and worker rights advocates across the country, SSA agreed to decrease the number of no-match letters.[4]

No-match firings across the nation continued into 2003, however. In August, Peco Foods, Inc. of Canton, Mississippi terminated about 200 workers in response to no-match letters.[5] That same year, Suncast, Inc., a Chicago-area outdoor garden product manufacturer, terminated over 100 employees in response to no-match letters.[6] By the end of 2003, a national survey conducted by the University of Illinois at Chicago's Center for Urban Economic Development determined that approximately 53.6 percent of employers responding to no-match letters terminated the listed workers.[7] Despite strong warnings to employers that appeared on the face of the letter, the study found that workers were summarily fired, often without any opportunity to correct the no-match discrepancies or any explanation of the no-match process.[8]

Documented examples of adverse employment actions against U.S. citizens and other work-authorized noncitizens include:

- Mr. Samuel Harris.  In late summer of 2003, Mr. Samuel Harris,[9] an African American man in Virginia, was fired from his job because his employer received an SSA no-match letter regarding a discrepancy with respect to Mr. Harris's SSN. Mr. Harris, who is a U.S. citizen, went to the local SSA office to correct his information. Apparently, SSA had issued Mr. Harris a duplicate SSN that belonged to a deceased person. Although Mr. Harris was able to correct his information with SSA, his employer refused to continue to employ him, thinking that Mr. Harris was engaging in identity theft or similar wrongdoing. He was fired and out of work for several months and had to file an arbitration case to get his job back.[10]

- Mrs. Noelle Lopez.  In July 2002, Mrs. Lopez, a worker from North Carolina, was injured on the job. While she was on leave, her employer notified her that it had received an SSA no-match letter for her. She corrected the discrepancy, which was based on a typographical error in the W-2 that her employer had filed with SSA. Weeks later, while still on leave for her injury, the employer asked Mrs. Lopez to reverify that she continued to be eligible to work in the United States because her work authorization had expired. She had employment authorization based on Temporary Status Program (TPS), and had already applied for a renewal, but the Immigration and Naturalization Service (INS) sent her an Employment

---

[4] Chirag Mehta, et al., *Social Security Administration's No-Match Letter Program: Implications for Immigration Enforcement and Workers' Rights* (Center for Urban Economic Development, University of Illinois at Chicago, Nov. 2003) at 7, available at http://www.uic.edu/cuppa/uicued/npublications/recent/SSAnomatchreport.pdf (hereinafter "Mehta"); *Basic Information Brief: SSA "No-Match" Letters* (NILC, Feb. 2005) (hereinafter "NILC Brief") at 2, available at http://www.nilc.org/immsemplymnt/SSA-NM_Pack/Basic_Info_Brief_No-Match_Ltrs-2-15-05.pdf.

[5] Peggy Matthews, "Plan to Round Up, Deport Illegals Angers Activists," *The Clarion-Ledger,* Aug. 12, 2003.

[6] Stephanie Blozen, "Latinos Start Boycott Against Batavia Firms," *The Chicago Tribune,* Aug. 12, 2003.

[7] Mehta, *supra* note 4, at 13.

[8] *Id.* at 15.

[9] All individual worker names have been changed to protect their identities, but the names of workers and employers drawn from media sources are reproduced here as published.

[10] NILC Brief, *supra* note 4, at 4.

Authorization Document (EAD) with someone else's picture. Although she was able to straighten this problem out, when her doctor told her she could go back to work, the employer denied her a job because she had "too many immigration problems."[11]

The proposed rule only exacerbates this risk of unnecessary and unjust firings. Past experience indicates that, rather than navigating a complex series of steps and timetables to a "safe-harbor," panicked and confused employers will simply fire all workers whose names appear on the no-match list. The employer confusion across U.S. worksites is already detectable.

- Mr. James Heggen. Shortly after DHS issued the proposed rule, an employer in Massachusetts refused to hire Mr. Heggen, a lawful permanent resident of the United States, for a permanent clerical position due to a typographical error on his Social Security card. Mr. Heggen's name appears as "Heggen" on his alien registration card or "green card," but on his Social Security card, his name is spelled "Hegen"—with one less "g." Based on this missing "g," the employer denied Mr. Heggen a permanent position, claiming that it had to be *more careful in these times*. Mr. Heggen is Black and was born in the United Kingdom. His parents immigrated to the U.K. from the Caribbean. Together, the family immigrated to the United States when Mr. Heggen was a child. Because he and his parents received their permanent immigration documents decades ago, Mr. Heggen cannot file for a correction of his Social Security card locally, and, therefore, not quickly. Correcting this minor Social Security discrepancy could take several months. Frustrated after being denied this permanent position, Mr. Heggen contacted a local community-based legal services organization for assistance. This organization immediately sent a letter to the employer, setting forth the potential illegality of the employer's actions. Subsequently, the employer hired Mr. Heggen on a temporary basis. The week of August 7, 2006, after additional consultation with the organization, the employer hired Mr. Heggen for the permanent position.[12]

Recent media accounts of the proposed rule reveal that employers are already contemplating massive no-match firings as a response to the new rule. A construction company president told the *Tampa Tribune,* after attending a seminar for employers on the proposed rule, that some of his company's workers "won't be working for us in the future" if the rule is implemented and that he had great concern about "filling those spots."[13] *The Ledger* of Lakeland, Florida, reported that while the proposed rule may lead to penalties for employers, "workers, in turn, would lose their jobs," an effect which for Florida's largest growers' organization amounts to a "threat to national security."[14] An employment attorney representing several large employers reported to the *Washington Post* that, "From a practical standpoint, [the proposed rule] will have the effect [of employers] having to terminate employees. It will be devastating to many

---

[11] *Id.*

[12] Telephone interviews with Ingrid Nava, Employment Unit, Greater Boston Legal Services, Boston, Mass., July 28, 2006, and Aug. 10, 2006.

[13] Lindsay Peterson, "Proposal Targets Illegal Immigration," *The Tampa Tribune,* June 15, 2006.

[14] Kevin Bouffard, "Proposal May Pinch Growers," *The [Lakeland, FL] Ledger,* July 11, 2006, available at http://www.theledger.com/apps/pbcs.dll/article?AID=/20060711/NEWS/607110399/1004.

industries if people comply with it."[15]  The proposed rule thus has placed the livelihoods of hundreds of thousands—possibly millions—of workers and their families on the line.

*The Proposed Rule Will Result in Increased Citizenship Status, National Origin, and Racial Discrimination*

The proposed rule creates two sets of potential employment discrimination:  discriminatory firings and discriminatory refusal to hire.  A disproportionate number of names on no-match lists are "foreign-sounding" names of newcomers to the United States, and many SSA letters are sent to employers with large numbers of newcomers in their workforces.  Employers who believe they will face business disruption due to the letters have an incentive to prefer employees they think are less likely to receive the letters.  Employers may also choose to simply dismiss employees who appear or sound foreign.  These discriminatory employment actions would run afoul of federal and state antidiscrimination laws and other worker protections and lead to costly and protracted wrongful termination litigation.

Employment discrimination against authorized noncitizen workers—particularly against Latinos, Latinas, and Asians—was rampant after the passage of the 1986 Immigration Reform and Control Act (IRCA).  A 1990 U.S. General Accounting Office (GAO) study reported a pattern of discrimination that resulted solely from employer sanctions, including discrimination on the basis of foreign accents or appearance and preferences of certain authorized workers over others.  In fact, the GAO estimated that an average of 19 percent of employers—almost one in five—participated in one or more discriminatory practices as a result of the 1986 law.  These results were confirmed by nearly a dozen studies conducted locally during the 1990s by human rights commissions and other organizations, which also found significant discrimination resulting from the implementation of employer sanctions.[16]

Employment discrimination has also increased since SSA began sending close to a million no-match letters in 2002.  The number of immigration-related unfair employment referrals and investigations fielded by OSC has risen dramatically.  From 1994 to 2000, OSC conducted only 20 investigations into firings stemming from employers that fired workers based on SSN verification matters.  From 2001 to 2003, OSC opened 29 investigations.  Three of the investigations opened after 2001 resulted in settlements favorable to workers, and ten investigations were open as of 2003.[17]  Although recent statistics are unavailable, OSC recognized in its April 2005 quarterly newsletter that OSC "staff members frequently provide assistance to workers" who face adverse employment actions by employers based on the no-match letters.[18]

---

[15] Cindy Skrycki, "DHS Wants Workers, Papers to Match," *The Washington Post,* July 11, 2006 (quoting Monte B. Lake, an employment and immigration attorney).

[16] *Immigration Reform: Employer Sanctions and the Question of Discrimination*, GGD-90-62 (GAO, Mar. 29, 1990), available at http://archive.gao.gov/d24t8/140974.pdf.

[17] Mehta, *supra* note 4, at 25.

[18] *OSC Update* (OSC, U.S. Department of Justice, Civil Rights Division, Apr. 2004) at 2.

*The Proposed Rule Will Result in Increased Employer Retaliation Against Workers Who Exercise Their Workplace Rights*

The proposed rule also places all workers at a higher risk of employer retaliation for labor organizing and raising complaints about worksite conditions. Unscrupulous employers already use the SSA no-match letter to stymie organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- <u>North Carolina</u>. In July 2006, during a heated legal battle over recent union election results, at least 24 Latino immigrant workers at a modular building construction company were suspended without pay because they were listed on a no-match letter. All 24 had voted to unionize. Many of the 24 have also initiated race and sex-based discrimination charges against their employer with the EEOC. A former supervisor at the company reported to the press: "These workers have been used and abused. As supervisors, we were told we needed production and to crack the whip to get it. We were told not to worry because these workers are just wetbacks and have no legal rights." A large group of African American workers have also filed complaints against this company with the EEOC. To protest the no-match firings, workers walked out on the day the firings took place. The workers and their union are also contemplating race and sex-based discrimination class action lawsuits.[19]

- <u>California</u>. In 2006, after months of intensive organizing, a group of nursing home workers, mainly immigrant Latina workers, marched to their manager's office to announce that they had joined together as a union in order to improve wages and working conditions and would seek formal recognition for their union under federal labor law. That afternoon, a head manager called one of leaders of the march into the office, pulled out a photocopy of that worker's Social Security card, wrote "NO GOOD" in bold letters across the photocopy, and suspended the leader without pay. Angered by management's action, the workers from the morning march crowded back into the manager's office and demanded reinstatement for their suspended colleague, denouncing management's action as a blatant anti-union tactic. Caught off guard, the manager immediately reinstated the suspended union leader. While these workers were successful, other workers have not been able to mobilize as effectively against manipulation of SSN verification issues by employers.[20]

- <u>Oregon</u>. In 2006, a Latina immigrant worker had been working as a housekeeper at an assisted living center. When it came time for her to qualify for health insurance and other benefits, the employer produced an SSA no-match letter. The worker suspects that the

---

[19] Telephone interview with Homer Marmalejo, United Brotherhood of Carpenters and Joiners of America, organizer, Aug. 8, 2006; *see also* Bob Shiles, "Roger Carter Suspends More Than 20 Undocumented Workers," *Kinston [NC] Free Press,* July 19, 2006.

[20] Interview with Guadalupe Palma, Service Employees International Union, Long Term Care Division, Coordinator III, in Los Angeles, CA, Aug. 1, 2006.

employer had received the letter earlier, but held it just before the benefits would have kicked in.[21]

- Oregon. In 2003, an employer in Oregon approached a group of workers who had complained about violations of their minimum wage and overtime rights, alleging that it had just received an SSA no-match list. The employer was requiring the workers to reverify their immigration status, and would not provide a copy of the letter to workers. Interestingly, this was *before* SSA began sending no-match letters to employers in March 2003.[22]

- New York. In 2002, a group of immigrant workers in New York went on strike to protest against poor working conditions. After receiving a no-match letter that the employer had initially ignored, the employer decided to use the no-match letter as a basis to reverify the immigration status of workers involved in the strike.[23]

If immigrant workers cannot enforce labor laws or organize under existing labor laws, it is less likely that native workers can assert these rights. The proposed rule thus poses enormous challenges for all low-wage workers. All workers face an increased risk of firings, retaliation, and abuse. U.S. citizens and authorized noncitizen workers could lose their jobs in discriminatory firings. Hundreds of thousands—possibly millions—of working families could be harmed, and therefore DHS should suspend this proposed rule immediately.

**Although the Proposed Rule Will Cause Enormous Upheavals in the Workplace, the Rule Has *No* Impact on Undocumented Immigration and Will Only Expand the Unregulated Underground Cash Economy**

Our experience with SSA no-match firings and workplace audits in the context of our current broken immigration system is clear: *the fired workers will not leave the country*. They will simply find other more marginal jobs, most likely outside of the traditional economy and "off the books" in the unregulated underground cash economy. Moreover, although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new obligations will increase pressure on "good" employers to take employees off the books, which also leads to growth of the underground economy. Expansion of the underground economy results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers. This result is nearly inevitable for any "crackdown" on workers and employers that is not accompanied by serious and practical reforms of the underlying immigration system.

*No-Match Firings Will Not Decrease the Number of Undocumented Workers in the United States*

Based on our recent experience under the current broken immigration system, high levels of SSA no-match firings will *not* drive undocumented workers and their families away from the United

---

[21] Brent Hunsberger, "Crackdown Coming on Bogus Papers," *The Oregonian*, June 25, 2006.

[22] NILC Brief, *supra* note 4, at 5.

[23] *Id.* at 4.

No-Match Cert. Admin. Record  932

States. Instead, these workers immediately accept the next available low-wage job, even if it is off the books, out of sheer economic necessity, given the levels of poverty at which they and their families and communities must survive.[24] When poverty is combined with an employer demand for below-market wage rates and an absence of government enforcement of labor protections in low-wage industries, undocumented workers will almost certainly remain in the United States even after a no-match firing. The vast majority will reenter the labor force in unreported, cash-based employment relationships where they face further exploitation and abuse. Economists describe this effect as "churning" or unproductive turnover.[25] The SSA no-match program has been criticized for creating "policy-induced churning in local labor markets as workers are either fired or quit their jobs only to join the overcrowded pool of workers vying for positions in traditional immigrant occupations."[26] Fired workers do *not* simply leave the United States.

Undocumented workers constitute a large and growing segment of the workforce in the nation as a whole. The share of these workers in industries such as agriculture, cleaning, construction, food service, and other low-wage occupations is approximately three times the share of native workers in these types of jobs.[27] On any given day in our nation, more than 250,000 undocumented immigrants work as janitors, 350,000 work as housekeepers and maids, and 300,000 are groundskeepers.[28] In the aggregate, such workers are an integral part of the U.S. economy, constituting a full 5 percent of the civilian labor force or 7.2 million workers.[29]

Unscrupulous employers have long taken advantage of the availability and reduced cost of undocumented immigrant labor in both the traditional economy and in the underground economy. Undocumented workers are more likely to earn below minimum wage (two-thirds of undocumented workers earn below minimum wage compared to one-third of all workers).[30] IRCA's failed employer sanctions regime, along with the lack of government enforcement of labor protections in low-wage industries, has given free rein to unscrupulous employers. Such

---

[24] It has been estimated that nearly half of all immigrant workers are low-income, defined as earning less than 200 percent of the minimum wage. Randy Capps, et al., *A Profile of the Low-Wage Immigrant Workforce* (The Urban Institute, Nov. 2003) at 2, available at http://www.urban.org/UploadedPDF/310880_lowwage_immig_wkfc.pdf. Fifty-six percent of all young children of immigrants live in poverty; sixty-four percent of foreign-born children of immigrants live in low-income families. In immigrant families where both parents work, 24 percent of children live in poverty compared to 11 percent of the children of native workers. Randy Capps, et. al, *Health and Well-Being of Young Children of Immigrants* (The Urban Institute, Feb. 2005) at 2, available at http://www.urban.org/UploadedPDF/311182_immigrant_families_5.pdf.

[25] *See* Avner Ahituv and Robert I. Lerman, *Job Turnover, Wage Rates, and Marital Stability: How Are They Related?* (The Urban Institute, Nov. 2004) at 5, available at http://www.urban.org/publications/411148.html (distinguishing "churning" and unproductive turnover from worker mobility).

[26] Mehta, *supra* note 4, at 18.

[27] Jeffrey S. Passel, *Unauthorized Migrants: Numbers and Characteristics: Basic Briefing Prepared for Task Force on Immigration and America's Future* (Pew Hispanic Center, June 2005) at 26–28, available at http://pewhispanic.org/reports/report.php?ReportID=46.

[28] Jeffrey S. Passel, *Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Pew Hispanic Center, Mar. 2006) at 11–12 (hereinafter "Passel"), available at http://pewhispanic.org/files/reports/61.pdf.

[29] *Id.* at 9.

[30] Jeffrey S. Passel, et al., *Undocumented Immigrants: Facts and Figures* (The Urban Institute, Jan. 2004) at 2, available at http://www.urban.org/url.cfm?ID=1000587.

employers routinely manipulate immigration law into a tool that sharpens wage differentials between undocumented and documented low-wage workers and suppresses wages for all. Even legitimate employers have admitted to the temptation to engage in similar practices or risk going out of business.[31]  In recent years, Department of Justice (DOJ) and DHS officials have finally begun to recognize these wage differentials and the harm caused by an economic system that produces lower wages based on differences in immigration status.[32]

Increasingly, there is evidence demonstrating that raising the wages and working conditions of low-wage workers will actually reduce undocumented immigration by making the existing workforce relatively more attractive to employers.[33]  Closing the wage differentials between differently work-authorized individuals and ensuring that all low-wage workers—current and future, documented and undocumented—have similar levels of mobility and enjoy full labor protections are the more effective ways to prevent undocumented immigration to the United States and to hold exploitative corporations accountable.  A structural demand for undocumented labor can be reduced only by building a strong floor underneath all workers.

Poorly-conceived, punitive enforcement-only schemes like the proposed rule will force millions into the underground economy.  The proposed rule will not decrease the numbers of undocumented workers in the United States, nor will it decrease their levels of employment.  It will only decrease wage levels and deepen wage differentials based on immigration status, creating even more economic incentive for employers to hire undocumented workers.  Accordingly, DHS should suspend this proposed rule and work with Congress and the Administration to pass comprehensive immigration reform that will address the underlying issue of undocumented migration.

*The Imposition of New Legal Obligations on Millions of Employers Will Push Them into the Underground Economy*

Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new and onerous set of legal obligations on millions of employers.  The rule essentially deputizes employers as *de facto* immigration enforcement officers.

The proposed example of what constitutes "constructive knowledge," at Section 274a.1(l)(1)(iii)(B) of the proposed rule, is not the employer's *receipt* of a no-match letter, but

---

[31] K. M. Donato, et al., "Stemming the Tide? Assessing the Deterrent Effects of the Immigration Reform and Control Act," *Demography* 29 (2005) at 139–58.

[32] In the prosecution of Tyson Foods for the hiring of undocumented workers, assistant U.S. Attorney John P. MacCoon stated: "This trial is about corporate greed. . . . It's about what happens when a corrupt corporate culture makes the bottom line the all-consuming priority."  Sherri Day, "Prosecutors in Smuggling Case against Tyson Contend Trial Is about Corporate Greed," *The New York Times,* Feb. 6, 2003.  In the Tyson Foods case, the government hinged its $140 million pre-indictment settlement demand against defendant Tyson Foods on a novel "wage suppression" theory.  The government claimed that Tyson Foods had reaped enormous profits by recruiting undocumented workers into its ranks and paying them at below-market wage rates.  In his authorization of trial for the case, DHS Secretary Chertoff fully endorsed the DOJ's attempts to recover "suppressed wages."  Thomas Green, et al., "Deputizing—and Then Prosecuting—America's Businesses in the Fight against Illegal Immigration," *Amer. Crim. L. R.,* June 22, 2006, at 5, 7.

[33] Ivan Light, "How L.A. Kept Out a Million Migrants," *The Los Angeles Times,* Apr. 16, 2006.

---

**No-Match Cert. Admin. Record  934**

the employer's *failure to act* after receiving a no-match letter. By defining the "failure to take reasonable steps" upon receipt of a no-match letter as creating constructive knowledge, the proposed regulation makes it necessary for a law-abiding employer to take some action in response to a no-match letter. Therefore, as set forth in Sections 274a.1(l)(2)(i) and 274a.1(1)(2)(iii) of the proposed rule, an employer who receives a no-match letter is essentially forced to apply due diligence to a series of complicated steps that demonstrate correction of each "no-match" discrepancy. If the employer fails to resolve the correction in the allotted time, the employer faces a finding that it had constructive knowledge of hiring an undocumented worker. This finding could be used against the employer in a federal prosecution that could result in civil and criminal penalties. This is a radical change from the longstanding position that the various federal agencies implicated in this SSA no-match issue have taken.

Employers who wish to avoid loss of profits and productivity while minimizing exposure to the heightened risk of federal immigration liability under the proposed rule will be forced into one of three no-match evasion strategies:

First, employers will take their businesses off the books and into the underground economy. For one thing, keeping workers off the books means avoiding government scrutiny and additional no-match letters. For another, there are immediate financial incentives for employers to keep workers off the books. The proposed rule thus has a perverse effect of targeting and punishing "good" employers who keep good records and want to stay on the books. These good employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records and who consequently will not be reached by the new rule.

Second, employers will intentionally misclassify their employees as "independent contractors" as a means of evading this responsibility.

Finally, employers will engage in subcontracting schemes by interposing intermediary labor contractors between themselves and their employees, pretending their workers are employees of these sham contractors and exposing workers to marginal, fly-by-night employment practices by middlemen.

*Growth of the Underground Economy Results in Massive Losses to State and Federal Coffers and Unfair Competition*

A policy that results in more employers choosing to keep their employees off the books or intentionally misclassifying employees is harmful to state and federal government coffers and creates unfair competition against "good" employers. Certain employers will see a clear and immediate economic advantage to taking their employees off the books. At a minimum, they will reduce their payroll costs by an average of 8 percent by ceasing to pay costs for federal legally required benefits, including Social Security, Medicare, unemployment insurance and workers' compensation.[34] For employers who, as a policy or due to a collective bargaining agreement, provide other benefits, such as life, health or disability insurance, paid leave, or retirement and savings benefits, the potential total savings could add up to an average of 29.9

---

[34] *Employer Costs for Employee Compensation* (U.S. Department of Labor Bureau of Labor Statistics, Mar. 2006), available at http://www.bls.gov/news.release/ecec.nr0.htm.

percent of total payroll costs.[35]  This means massive losses to state and federal coffers and a competitive advantage over employers who are not cutting these costs.

The projected loss in federal tax revenues ranges from $19 million to $1.9 billion annually.  This range is derived from the following figures:  In June 2006, the total U.S. labor force was estimated at 144.4 million workers.[36]  As set forth above, about 7.2 million undocumented workers were employed in March 2006, accounting for a full 5 percent of the civilian labor force.[37]  International accounting and consulting firm Price Waterhouse Coopers has projected that over 5 million U.S. workers would be misclassified as independent contractors (to avoid paying legally required benefits) in 2005 and that the federal tax revenue losses due to misclassification in 2004 would be $4.7 billion.[38]

Based on this projection and these worker population estimates, if only one-third of all undocumented workers or at least two million workers, or 1.4 percent of all U.S. workers, were to be pushed off the books as a result of the proposed regulation, the loss to federal coffers would be approximately $1.9 billion in one year.  Alternatively, making a conservative assumption that 100,000 workers are pushed off the books as a result of the proposed regulation, the loss to federal coffers would be approximately $19 million annually.

The losses to the Unemployment Insurance (UI) trust fund alone ranges from $277 million to $13.8 million per year.  This range is derived from the following figures:  A study for the U.S. Department of Labor estimating the impact of employee misclassification on the UI trust fund alone was computed for the period from 1990–1998.[39]  Assuming a 1 percent level of misclassification, the study determined that the loss would be an annual average of $198 million to the UI trust fund alone.

Based on this study for the DOL, assuming that at least 2 million workers were to be pushed off the books as a result of the proposed regulation, the impact on the UI trust fund alone would be an average of over $277 million annually.  Alternatively, assuming that only 100,000 workers, or .07 percent of the workforce, are pushed off the books (the estimated number that lost their jobs due to no-match letters in 2002), the impact on the UI trust fund alone would be $13.8 million per year.

Employers who go off the books will experience an enormous net savings in taxes, which will create a competitive advantage for them over employers whose payroll-related expenses are

---

[35] *Id.*

[36] *Employment Situation Summary* (U.S. Department of Labor Bureau of Labor Statistics, July 2006), available at http://www.bls.gov/news.release/empsit.nr0.htm.

[37] Passel, *supra* note 28, at 11–12.

[38] *Projection of the Loss in Federal Tax Revenues Due to Misclassification of Workers* (Coopers and Lybrand, now Price Waterhouse Coopers, for Coalition for Fair Worker Classification, June 1994) at 5, available at http://www.carpenters.org/misclassification/State and Other Research Studies/Coopers-Lybrand--Projection of Loss of Federal Rev Due to Missclassification.pdf.

[39] *Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs* (Planmatics, Inc. for U.S. Department of Labor Employment and Training Administration, Feb. 2000) at 87, available at http://wdr.doleta.gov/owsdrr/00-5/00-5.pdf.

higher because they are playing by the rules. A report prepared for the U.S. Department of Labor observed: "[C]ost considerations and aggressive competition are twin pressures that induce an employer to engage in behavior that creates an inequitable playing field in the business community for employers who correctly classify their employees and pay taxes."[40]

The State of California even developed a joint-agency strike force to address abuses created in the underground economy. This strike force has observed the impact of this employer behavior on "good" employers: "[W]hen businesses operate in the underground economy, they gain an unfair competitive advantage over businesses that comply with various business laws. This causes unfair competition in the marketplace and forces law-abiding businesses to pay higher taxes and expenses."[41]  When the desire to avoid government scrutiny is combined with the immediate economic savings from avoiding payment of taxes and employer-provided benefits, some employers will see a clear competitive advantage in taking their workforce underground. The implementation of this proposed rule thus disadvantages those employers who play by the rules.

### DHS Should Suspend The Proposed Rule Because the SSA No-Match Program Is Ill-Suited As an Immigration Enforcement Tool

*The SSA No-Match Program Cannot Meet the Needs and Objectives of Immigration Enforcement Because the SSA Database Is Not an Immigration Database*

Each year employers send IRS Forms W-2 to SSA indicating their employees' annual earnings. SSA matches each worker's name and SSN to the Numerical Identification File (NUMIDENT), which is SSA's primary database of SSN holders.[42]

NUMIDENT is *not* an immigration database and is made up of information collected from applications for initial or replacement SSNs.[43]  The database contains only limited and incomplete immigration information.[44]

---

[40] *Id.*

[41] *2003 Annual Report: California Joint Enforcement Strike Force on the Underground Economy* (Employment Development Department, State of California, June 30, 2004) at 3, available at
http://www.edd.ca.gov/taxrep/txueo03.pdf; *see also* Francois Carerre, et al., *The Social and Economic Costs of Employee Misclassification in Construction* (Construction Policy Research Center at Harvard Law School and Harvard School of Public Health, Dec. 2004), at 7 (noting that "[m]isclassification creates challenges for compliant employers because it creates an uneven 'playing field.'  Employers who respect the law and classify employees appropriately have a higher wage bill and can get underbid by contractors that do not comply and have lower costs.").

[42] *Report to Congress on the Basic Pilot Program* (U.S. Citizenship and Immigration Services, June 2004) (hereinafter "USCIS Report") at 2.

[43] Kevin Jernigan, "Eligible to Work? Experiments in Verifying Work Authorization," *Migration Policy Institute Insight,* Nov. 2005 (hereinafter "Jernigan") at 3.

[44] The database "contains information on name, date of birth, and citizenship status of persons issued Social Security cards, which enables SSA to confirm work authorization for U.S. citizens and some noncitizens who are permanently work authorized." USCIS Report, *supra* note 42, at 2.  SSA collects immigration status information only on those persons who are work-authorized incident to status, such as lawful permanent residents, asylees, and refugees. *Id.* at 4.

---

No-Match Cert. Admin. Record  937

Even the limited immigration status information in NUMIDENT regularly becomes inaccurate because it is *not* automatically updated when a worker's immigration status or work authorization changes.[45]  NUMIDENT is particularly inaccurate with respect to work-authorized noncitizens in its use with the Basic Pilot Program.  According to U.S. Citizenship and Immigration Services (USCIS), work authorization for more than 50 percent of the cases of noncitizens could not be electronically confirmed by NUMIDENT, compared with 0.2 percent for native-born citizens.[46]

If there is a match of the SSN and the first seven letters of the surname between NUMIDENT and the W-2, the earnings are posted to the individual worker's Master Earnings Record.  About 10 percent of submissions *cannot* be matched.  SSA then does more than 20 "front-end validation routines," which are automated processes that manipulate names and SSNs to correct mistakes and find a correct match.[47]  These "front-end validations" do *not* involve collection or use of immigration data.

If a valid record cannot be identified, SSA posts the earnings to its Earnings Suspense File (ESF).  The ESF contains earnings reports with names and SSNs that do not match SSA records.  SSA then performs "back-end" processes to try to match the earnings.  SSA's "back-end" processes do not involve collection or use of immigration data.

The SSA back-end processes include using corrections generated through IRS processes.  The back-end processes also include generating SSA no-match letters to employees and employers.[48]  No-match letters are just one of the "back-end" processes that SSA regularly uses to ensure that earnings are properly attributed to workers. These letters are sent by SSA to inform employers and employees that the worker is not getting proper credit for their earnings due to a discrepancy.

*Immigration Status or Lack of Immigration Status Cannot Be Presumed from Posting to the ESF*

The ESF contains hundreds of millions of records, and a "significant number of earnings reports in the ESF still belong to U.S. citizens and work-authorized noncitizens."[49]  The percentage of ESF records belonging to unauthorized workers is entirely unknown.   The majority of reinstatements (matching to a worker's Master Earnings Record) are still made to U.S.-born citizens.[50]  ESF records do not in any way indicate immigration status.  The information in ESF

---

[44] The SSN application form itself focuses on noncitizens' work authorization rather than immigration status. *See* Form SS-5 (May 2005), available at http://www.ssa.gov/online/ss-5.pdf.

[45] Jernigan, *supra* note 43, at 12.

[46] USCIS Report, *supra* note 42, at 4–5.

[47] *Social Security, Better Coordination Among Federal Agencies Could Reduce Unidentified Earnings Reports*, GAO-05-154 (GAO, Feb. 2005) (hereinafter "GAO Feb. 2005") at 7–8.

[48] *Id.*

[49] *Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work*, GAO-06-814R (GAO, July 11, 2006) (hereinafter "GAO July 2006") at 8.

[50] *Id.; see also* GAO Feb. 2005, *supra* note 47, at 18.

**No-Match Cert. Admin. Record  938**

consists of the worker's name, SSN, employer's identification number, and the earnings amount.[51]

The ESF simply consists of information on workers whose records do not match SSA records, for reasons that include errors or obsolete data, lack of an SSN, missing first or last names, or use of nonalphabetic characters.[52]  The lack of an SSN is a particularly instructive example of an innocent basis for inclusion in the ESF that is frequently and wrongly cited as a basis for determining lack of work authorization.  Both the SSA and the IRS advise employers to use all zeros or to write in *"applied for"* when the worker has applied for but not yet received an SSN.[53]

SSA no-match letters are therefore *not* reliable indicators of work authorization or immigration status.  There is no way to accurately determine whether a SSA no-match letter is the result of typographical error, out-of-date information, or some other legitimate reason, let alone to determine an illegitimate reason.[54]  The SSA itself has repeatedly recognized that its no-match letter does not indicate immigration status or lack of authorization to work.  The current no-match letter explicitly states that a worker's identification in the letter "makes no statement" about his or her immigration status.[55]  The SSA database simply does not have the capacity to meet the needs and objectives of an immigration enforcement program.  Because of these limitations, this proposal will only result in an adverse impact on workers and our economy, including the increased discrimination and abuse of workers described above.  DHS should therefore suspend this rule.

## The Rule Modification Would Give DHS Indirect Access to Tax Information It Cannot Access Directly

DHS should also suspend this proposed rule because it attempts to indirectly access sensitive tax information that is protected by federal law.  Specifically, Section 6103 of the Internal Revenue Code protects the confidentiality of taxpayer returns and taxpayer information and provides only limited exceptions to the sharing of personal identifying data.  This confidentiality is deemed essential to voluntary tax compliance.  The GAO has explicitly recognized that the ESF includes "sensitive taxpayer information that is protected by various laws and regulations" and that statutory authority would be required to provide DHS access.[56]

---

[51] GAO July 2006, *supra* note 49, at 8.

[52] *Id.; see also* GAO Feb. 2005, *supra* note 47, at 11–12.

[53] GAO Feb. 2005, *supra* note 47, at 11, n. 4.

[54] In testimony last month before the House Committee on Ways and Means, the Commissioner of Social Security emphasized that the source of SSA's database information is the Form W-2, and "there is no citizenship or immigration status information on that document."  *See* Statement of The Honorable Jo Anne B. Barnhart, Commissioner, Social Security Administration, *Testimony Before the House Committee on Ways and Means* (July 26, 2006), available at http://waysandmeans.house.gov/hearings.asp?formmode=view&id=5172.

[55] Letter, Hurt, Assoc. Comm. for Central Op. SSA (Oct. 9, 2004) (hereinafter "Hurt Letter").

[56] GAO July 2006, *supra* note 49, at 8.

**No-Match Cert. Admin. Record  939**

No statutory authority currently exists to provide DHS with access to this information.[57] As a result, DHS cannot presently obtain no-match information directly from SSA.

SSA no-match letters to employers frequently include taxpayer identity and return information. This rule allows DHS to commandeer the information contained in no-match letters and therefore allows DHS to circumvent the tax code's confidentiality restrictions. DHS should not be permitted to do by rule change what it cannot do without additional statutory authority.

Breaching the confidentiality of tax records would have the counterproductive result of discouraging tax compliance. Moreover, it would encourage employers and workers alike to enter the underground economy and not pay into our tax and Social Security systems.

**The Proposed Rule Dramatically Alters the Definition of "Constructive Knowledge" and Makes a Stark Departure from Existing Case Law and Longstanding Federal Guidance on No-Match Letters**

As an evidentiary matter, an employer's receipt of an SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule alters the definition of constructive knowledge and makes a stark departure from existing case law and longstanding federal guidance in this area.

In the seminal *Collins Food Intn'l v. I.N.S* case, the Ninth Circuit cautioned against the expansion of the doctrine of constructive knowledge: "IRCA . . . is delicately balanced to serve the goal of preventing unauthorized alien employment while avoiding discrimination against citizens and authorized aliens. The doctrine of constructive knowledge has great potential to upset that balance, and it should not be expansively applied." 948 F.2d 549, 554-555 (9th Cir. 1991).

Accordingly, the court instructed that "[a] finding of constructive knowledge requires "willful blindness" and "to expand the concept of constructive knowledge . . . would not serve the intent of Congress, and is certainly not required by [IRCA]." *Id.* at 555.

Contrary to DHS's assertions in the supplemental text, the proposed regulation would extend the definition of "constructive knowledge" well beyond the holdings in *Collins* and in *Mester Manufacturing Co. v. INS*, 879 F.2d 561 (9th Cir. 1989), and other constructive knowledge cases arising under the employer sanctions provision of the Immigration and Nationality Act, 8 U.S.C. § 1324a.

Indeed, the supplemental text misrepresents *Mester* by stating that the employer in that case merely received some evidence that the employee was not authorized to work. This is simply incorrect, and significantly downplays the type of information received by the employer, and relied upon by the court in its decision. In *Mester*, the court held that an employer had constructive knowledge of a worker's unlawful status when it received information directly *from*

---

[57] In contrast, such authority exists with respect to the Nonwork Alien File, which includes information about workers who are working though they have been issued nonwork SSNs.

**No-Match Cert. Admin. Record 940**

*the INS* that an employee was an "illegal alien" but did not terminate the employee for two weeks. *Id.* at 567–68.

Consistent with *Mester*, cases have found constructive knowledge only where the employer has been provided specific information from a source knowledgeable about a worker's immigration status, where the employer failed to complete the Form I-9 (coupled with other suspicious circumstances), or in egregious circumstances. *See U.S. v. Jonel, Inc.* 1998 WL 804705 (OCAHO), *14 (Labor Department notice to employer that workers were unauthorized constituted constructive knowledge); *New El Ray Sausage Co. v. I.N.S.,* 925 F.2d 1153, 1157 (9th Cir. 1991) (INS gave employer "specific and detailed information" that it was employing undocumented workers); *U.S. v. American McNair,* 1OCAHO 285 (1991) (employee failure to present any work authorization documents and notification of employer that he was ineligible for amnesty constituted constructive knowledge); *U.S. v. Fragale,* 1999 U.S. Dist. LEXIS 12616 (E.D. Pa. 1999) (constructive knowledge when human resources manager and foreperson in charge of hiring told employer that a large percentage of workforce was undocumented, and employer had received notice from INS that some workers were undocumented).

Moreover, in its attempt to convert the SSA no-match letter into a method of verifying immigration status or authorization to work, the proposed rule directly contravenes longstanding federal guidance from SSA, OSC, and former INS General Counsel.

SSA's position on no-match letters and immigration enforcement is set forth in clear terms on the face of the letter itself. The letter provides the following warning to employers:

> IMPORTANT: This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number. Nor does it make a statement about an employee's immigration status.[58]

For years, INS General Counsel has instructed employers along identical lines:

> If the document or documents presented to verify work authorization appear on their face to be genuine and to reasonably relate to the individual, the subsequent receipt of the SSA letter mentioned above does *not* impose any affirmative duty upon the employer to investigate further into an employee's eligibility to work in the United States. In addition, the receipt of this SSA letter by the employer, *without more,* would *not* be sufficient to establish constructive knowledge on the part of the employer regarding the employment eligibility of the named employee.[59]

---

[58] Hurt Letter, *supra* note 55.

[59] Letter, Virtue, Acting Gen. Coun. INS, HQ 274A (Feb. 17, 1994) (emphasis added); for reference, the LWIW Coalition has attached this letter as Exhibit 1 to this comment.

OSC has also provided similar guidance:

> The receipt of a no-match letter, standing alone, does not indicate to an employer
> that he or she need question the genuineness of documents or information
> previously presented to complete an INS Form I-9.[60]

This proposed regulation thus turns established federal guidance on no-match letters on its head.
At the very least, the proposal will result in conflicting guidance from multiple federal agencies
and cause employer and employee confusion.

**The Costs of Implementing the Proposed Rule are Prohibitive**

If the proposed rule is to be carried out as envisioned, the government will need to make a
massive investment in employer and worker education programs in order to combat the rampant
panic and confusion that is almost certain to follow. Employer confusion is already evident from
high number of questions submitted employers in their comments opposing the rule. In
particular, many employers have submitted questions regarding the rule's unrealistic and
unreasonable timetables for compliance.

Therefore, although this rule purports to make changes to how DHS interprets these letters, it has
a significant impact on the way in which SSA ultimately has to respond to the inevitable increase
in employer (and employee) inquiries about this confusing rule. The actual costs of the current
SSA no-match letter program are already substantial.[61] The actual costs of administrating a new
program will be astronomical for SSA, an agency whose limited resources should go towards
administering Social Security benefits rather than enforcing immigration law.

**The Procedure to be Followed Under the Proposed Rule When an Employer Receives
Notice from DHS Denies Employees Due Process of Law**

Section 274a.1(l)(1)(iii)(C) of the proposed rule includes the following as a circumstance that
would amount to constructive knowledge where the employer "[f]ails to take reasonable steps
after receiving information indicating that the employee may be an alien who is not employment
authorized, such as . . . [w]ritten notice from the Department of Homeland Security that the
immigration status document or employment authorization document presented or referenced by
the employee in completing Form I-9 was assigned to another person, or that there is no agency
record that the document was assigned to any person."

---

[60] Letter, Sarah DeCosse, Sr. Tr. Atty OSC (Apr. 1, 2004).

[61] *See* Mehta, *supra* note 4, at 7, n. 2 (noting that SSA's current attempts to reduce the ESF through no-match letters
have cost U.S. taxpayers the following amounts: "$5.4 million to send notices to every individual whose name and
SSN do not match SSA's records; $600,000 to send 944,000 notices to all employers who submitted wage reports
with at least one item posted to the ESF; more than $200,000 for system maintenance and cyclical changes; and an
average of $9.00 for each call to SSA's national toll free telephone number generated by the notices. SSA estimates
that the agency received about 100,000 inquiries throughout 2002 regarding the TY 2001 letter.").

**No-Match Cert. Admin. Record  942**

Under Section 274a.1(l)(2)(iii), an employer who receives such a notice will not be deemed to have constructive knowledge of the employee's unauthorized status if the employer takes reasonable steps to resolve the question raised by DHS and, if the employer does not verify with DHS that the document was assigned to the employee, the employer completes a new I-9. The employee cannot use the alien registration number, or "A-number," that is the subject of the written notice from DHS.

While this procedure may protect the employer, it entirely leaves out any possibility for the *employee* to have access to his or her DHS immigration file and any opportunity to correct errors in the file that would lead to DHS providing erroneous information to the employer. This access and an assured opportunity to correct errors in immigration records are critical because immigrants do not have easy, automatic, timely access to their immigration records, and immigration records are error-prone.

For years, government agencies have criticized the quality and accuracy of immigration records.[62] Problems with immigration records have continued even after the dissolution of the INS and the creation of new immigration agencies in DHS. The information technology environment at USCIS has been criticized as inefficient, and USCIS continues to rely on manual and paper-based processes.[63] As an example of how DHS records and processes go awry, in December 2005 DHS had to "recall more than 60,000 green cards because a computer glitch miscalculated immigrants' residency start dates."[64] USCIS sent letters instructing immigrants to mail their cards back. Unfortunately, USCIS sent the letters to many immigrants whose green card "resident since" dates were actually correct. USCIS then advised community-based organizations working with immigrants that its information technology staff was working to determine who received the mailing in error and that USCIS intended to send out a second letter to all individuals who received the initial letter in error.

Moreover, under current law, immigrants have access to their immigration files (both "alien files" and Border Patrol requests) only by filing Freedom of Information Act (FOIA) requests. FOIA requests for files must be made in writing and mailed to a central location, at the National Records Center in Missouri.[65] This means that immigrants who need access to their files to determine the nature of the erroneous information and then to correct this information as envisioned under Section 274a.1(l)(iii)(C) of the proposed rule are dependent on FOIA procedures which are not designed for this purpose. The lengthy and unpredictable timetables and cumbersome process for the FOIA process make it difficult for immigrants to both obtain their files and then correct mistaken information within Section 274a.1(2)(ii)'s compliance period.

The proposed rule thus raises critical due process concerns for immigrants. It fails to guarantee adequate access and an assured opportunity to immigrants who wish to correct errors in their

---

[62] *INS Data:The Track Record* (NILC, 2003), available at http://www.nilc.org/immlawpolicy/misc/INS data accuracy.pdf.

[63] *USCIS Faces Challenges in Modernizing Information Technology*, OIG-04-41 (DHS, Office of Inspector General, Sept. 2005), available at http://www.dhs.gov/interweb/assetlibrary/OIG_05-41_Sep05.pdf.

[64] Solomon Moore, "Green Cards Recalled Because of Glitch," *The Los Angeles Times*, Dec. 6, 2005.

[65] *See* USCIS, *Freedom of Information and Privacy Acts*, http://www.uscis.gov/graphics/aboutus/foia/index.htm.

immigration records. It creates penalties for employees when their immigration status or documents cannot be confirmed. It does not, however, set any time period for DHS to respond to immigrants' requests to review their files, nor does it place any obligation on DHS to correct immigrants' records in a timely fashion.

### The Proposed Rule May Exceed DHS's Authority

*DHS May Not Have Authority to Restrict the List of Acceptable Documents for the Reverification Process*

The proposed rule would create an exception to the list of documents that can be used to reverify the worker's employment authorization and identification as part of the I-9 requirement. But it appears that DHS may lack the ability to impose such restrictions. According to the INA, only the Attorney General has authority to promulgate regulations restricting the list of acceptable documents. 8 U.S.C. § 1324a(b)(1)(E). According to the statute, the Attorney General may only restrict the list of acceptable documents if he "finds, by regulation that any [of the listed documents] does not reliably establish [employment] authorization or identity or is being used fraudulently to an unacceptable degree." *Id.* Importantly, this power of the Attorney General was not transferred to the DHS upon its creation and the dissolution of the former Immigration and Nationality Service. 8 U.S.C. § 1103(a) (transferring powers under the INA to the Secretary of the DHS, *except* those that "relate to the powers, functions, and duties conferred upon" "the Attorney General," among others) (emphasis added). There is no indication in 8 U.S.C. § 1324a(b)(1)(E) and accompanying notes that the provision was ever amended to transfer the AG's authority to promulgate regulations to the DHS.

Despite this express statutory rule exclusively vesting the ability to restrict the congressionally approved list of I-9 documents to the Attorney General, Section 274a.1(l)(2)(iii) of the proposed rule would give DHS the power to restrict which documents are acceptable in the reverification process. According to that section, only documents bearing a photograph and *not* containing the SSN that triggered the no-match letter will satisfy the reverification requirement under the I-9 process. *Id.* Under current law, however, documents lacking photographs and those that include Social Security numbers are acceptable—even if the SSN triggers a no-match letter. 8 U.S.C. § 1324a(b)(1)(C), (D). Therefore, the proposed rule may inappropriately usurp the Attorney General's exclusive power to alter the congressionally created list of approved documents for reverification of a worker's status under the I-9 process and should be rejected.[66]

### RECOMMENDATION

In sum, we strongly oppose the Department of Homeland Security's proposed regulation. DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of workers in an isolated, punitive immigration "enforcement" scheme on the eve of enactment of *comprehensive immigration reform.* Although the rule will cause enormous upheavals in the workplace, the rule will have *no* impact on undocumented migration, which is the purported purpose of this

---

[66] The proposed rule may also violate INA Section 274A(d)(3), which requires notice by the President to the House and Senate Judiciary Committees before changes are made to the employment eligibility verification system. We do not know whether the President has provided such notice to the appropriate committees.

proposal. Our experience with no-match firings and workplace audits is very clear: *the fired workers will not leave the United States.* In the absence of comprehensive immigration reform that addresses the root causes of undocumented migration, they will simply find other more marginal jobs, most likely in the underground economy. Because of this, the proposed rule will result in growth of the underground economy, which results in substantial losses in state and federal tax revenues as well as unfair competition. The proposed rule is simply the wrong rule at the wrong time. It provides no solution to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by workers, taxpayers, and businesses. For all these reasons, we recommend that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

**The Low-Wage Immigrant Worker (LWIW) Coalition**

**Co-Convened By:**

American Federation of Labor – Congress of Industrial Organizations (AFL-CIO)
Change to Win (CtW)
Interfaith Worker Justice (IWJ)
Jobs with Justice
National Council of La Raza (NCLR)
National Day Laborer Organizing Network (NDLON)
National Employment Law Project (NELP)
National Immigration Law Center (NILC)

**Contact:**

Marielena Hincapié, Esq.
Director of Programs
National Immigration Law Center
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA  90010
Phone: 213-639-3900
Fax: 213-639-3911
www.nilc.org

# EXHIBIT 1

### To DHS Docket No. ICEB-2006-0004:
### Comment Regarding "Safe Harbor Procedures for Employers Who Receive a No-Match Letter"

### Submitted by:
### The Low-Wage Immigrant Worker (LWIW) Coalition

### Date:
### Monday, August 14, 2006

No-Match Cert. Admin. Record  946

Immigration and Naturalization Service

HQ 274A

Office of the General Counsel                                   425 Eye Street N.W.
                                                               Washington, D.C. 20536

FEB 1 7 1994

Mr. Carl G. Borden
California Farm Bureau Federation
Office of the General Counsel
1601 Exposition Boulevard, FB3
Sacramento, Ca. 95815-5318

Dear Mr. Borden:

This letter is in response to your correspondence dated August
11, 1993, concerning the receipt of a letter from the Social
Security Administration (SSA). The SSA letter in question
informs an employer that the social security number of an
employee does not agree with SSA records. Specifically, you ask
whether an employer who receives this letter from SSA can
continue to rely on the employment eligibility documents
presented by that employee, assuming the documents appear on
their face to be genuine and to relate to the employee?

If the document or documents presented to verify work
authorization appear on their face to be genuine and to
reasonably relate to the individual, the subsequent receipt of
the SSA letter mentioned above does not impose any affirmative
duty upon the employer to investigate further into an employee's
eligibility to work in the United States. In addition, the
receipt of this SSA letter by an employer, without more, would
not be sufficient to establish constructive knowledge on the part
of the employer regarding the employment eligibility of the named
employee. As you correctly note in your correspondence, this
letter from SSA could be prompted by a number of different
reasons having nothing to do with an employee's eligibility to
work in the United States.

The answer provided above specifically applies to a situation
where the employer receives such a letter from SSA and the
employer has no additional evidence that an employee may not be
work authorized. It should be noted, however, that if an employer
receives notice from the Immigration and Naturalization Service
(INS) that a social security card or other document presented to
establish work authorization is not valid, the employer does have
a duty to inquire further to ensure that the individual is
authorized to work in the United States before the employer can
continue to employ that individual. In addition, while an
employer has no affirmative duty to inquire into an employee's

**No-Match Cert. Admin. Record 947**

employment eligibility based solely upon receipt of a letter from SSA, if for some reason the employer discovers evidence that an employee may not be authorized to work in the United States, the employer must inquire further to verify the employment eligibility of that employee. If the employer is unable to verify work authorization, the employer cannot continue to employ that individual.

It should be noted that telephonic inquiries from employers regarding the employment authorization of employees will not be honored by INS.[1]  However, if an employer suspects fraud, as it relates to INS documents, the employer may ask INS to physically examine the documents.

I hope that the above information is helpful to you.  If you have any further questions, please contact Michael C. McGoings, Associate General Counsel at (202) 514-2895.

Sincerely,

*Michael J. Creppy*

for Paul W. Virtue
Acting General Counsel

---

[1]  (The only exception is where the written consent of that individual has been obtained.)  See Salinas-Pena v. INS, No. 86-1033-DA (D.Oregon, March 16, 1988).

- 2 -

ICEB-2006-0004-0002

Comment Info: =================

General Comment:I am opposed to this proposed regulation. The last thing the government should be
doing is causing difficulties for immigrants who want to work or to the small businesses that employ them.  The onus should not nbe on the employers to do all this checking and verifications in order to avoid fines. If the government wants to
deport these people, then they know where they work and can do so.  The employers should not be forced to act as government agents.  They should not be given extra obligations beyond checking for some type of paperwork.  The government can contact the employees directly to advise that their paperwork does not match social security numbers. And they do so.  Interestingly, this notification letter states that it is not immigration-related.  Since when is the Social Security Administration in charge of checking for legal immigrant status? They make money from these illegal immigrants and don't pay out anything.  Why should they risk a loss of income by pressuring employers to fire employees without perfect paperwork?  Let the immigration-related governmental departments to their job.  My only chance of ever getting a Social Security check in 30 years is

if people keep feeding into the system --- illegal or not, I deserve my turn to retire.

No-Match Cert. Admin. Record  949

ICEB-2006-0004-0003

Comment Info: ================

General Comment:It is way past time to put some teeth into the existing law that makes it illegal to
hire an illegal / undocumented worker.  Employers need to be held accountable to hire legitimate workers and thereby ensure legal wages and taxes are paid.

Undocumented employees are a huge drain on the U.S. system; they:  (1) take jobs that are not rightfully theirs to hold, (2) take less than legal wages that drags
down wages for everybody else, (3) do not pay taxes, and (4) accept "free" medical and social services they did not earn.

This bill is a good start to holding employers accountable.

No-Match Cert. Admin. Record  950

ICEB-2006-0004-0004

Comment Info: =================

General Comment:How has this happened? When did the Constitutional responsibility to protect this
nation?s borders shift from the Federal Government to private citizens?

Wouldn?t it make much more sense to require Federal, State and County government agencies (the welfare agencies and the Dept of Labor, for example) to communicate with one another on Social Security numbers and names that don?t match? We?re already paying PLENTY of tax dollars to all of these organizations ? let them earn it!!

Don?t take the money of private citizens and then turn around and expect them to do the job they?ve already paid you for!!


Melissa Milligan, Private Citizen ? Oops! I mean, Immigration Officer (??)

No-Match Cert. Admin. Record  951

ICEB-2006-0004-0005

Comment Info: =================

General Comment:The Department of Homeland Security (DHS) is significantly underestimating the
number of no match letters distributed by the Social Security Administration (SSA).  For mid and large size businesses the SSA annually identifies tens of thousands of employees with a name and number mismatch with the data submitted to the agency.  As noted in the proposed regulations, illegal aliens are only a portion of this no match notification.  The additional burden of the proposed

regulation will have a significant economic impact to many organizations due to the labor involved researching the data submitted, communicating to the employees in question, following up with the employees in question, and finally manually verifying with the SSA of any revised information received from those employees in question.

The proposed timing provided for responding to and rectifying no match letters is woefully inadequate.  Fourteen days is not enough time to open, review, and research potentially thousands of mismatch letters from the SSA.  Some organizations will have to devote a full time staff on a task of this magnitude for a
minimum of ninety days with an additional minimum of ninety to one-hundred-eighty days needed to communicate with employees and re-verify with the SSA, depending upon both the size of the organization and the number of no match letters received.

Compounding this problem is the SSA admittedly has a low level of accuracy of the data they house, which further creates a burden for employees in correcting the SSA's database.  Furthermore, the proposed regulations leave no guidance as to employees who are unable to timely rectify the reported inaccuracy.

A significant amount of the mismatch letters will be due to marriage, divorce and cultural norms, but some are a direct result of the SSA's inaccurate data.  The DHS wisely advises employers to treat all employees equally; in practice, this will prove to be difficult.  As there is no penalty for a mismatch resulting from a person's name changing, employers will have little incentive to terminate the employment of these employees.  However, with names of questionable origin, for example Hispanic, Eastern European, and Middle Eastern, employers will have little choice but to terminate employment for these individuals when the discrepancies are not resolved within the given timeframes.  As employment litigation becomes evermore prevalent in our society, there will be an increased number of claims of discrimination, both of a disparate treatment and disparate impact nature, based on national origin; a number already on the rise.  The subsequent litigation will potentially cost employers hundreds of millions of dollars
on an annual basis in both defense and settlement costs, the real possibility of which should not be minimized.

Worthy of note is the IRS's current safe harbor provision for mismatch letters from the SSA requires employers to notify the employee in question and requesting them to address the matter as expediently as possible with the potential for employer penalties only upon the same employee being subject to a mismatch letter the following year.  In fact, the matter was proven to be so burdensome for most employers, combined with the IRS?s findings of the most egregious violators researched met even the most stringent IRS safe harbor provisions, they have yet to impose penalties on employers for this issue.

Finally, with the proposed immigration legislation on the horizon requiring electronic verification of employment eligibility the proposed regulations create an

additional unnecessary and, will soon be, redundant burden on employers.

Page 1

**No-Match Cert. Admin. Record  952**

ICEB-2006-0004-0005

In summary, the proposed regulation will have a significant economic impact on a vast number of employers due to the additional labor necessary to meet the safe harbor provision, along with the proposed timeframes being unrealistic making it impossible for many employers to comply, the proposed should not be formally implemented within the regulations.  There will be an additional level of scrutiny invariably placed upon minorities resulting in increased litigation, all of which prompted from an admittedly inaccurate database, resulting in a dramatic increase in employment discrimination litigation.  With the legislation currently pending, these additional requirements will pose unnecessary additional burdens resulting in both civil and criminal consequences to employers everywhere.

Page 2

**No-Match Cert. Admin. Record  953**

ICEB-2006-0004-0006

Comment Info: =================

General Comment:The only problem I see with these new rules is the completion of the new I-9 after
63 days.  If the employee presents new documentation that does not include the disputed social security number, what would we use as the employees social security number?  If the employee maintains that the original social security number is valid, how would we report their wages?  Would we get a new letter each year and be stuck in an endless loop?  These are questions that do not seem to be addressed in the new rules.

Page 1

No-Match Cert. Admin. Record  954

-----Original Message-----
**From: Vinson, Scott [mailto:VinsonS@nccr.net]**
**Sent: Thursday, June 22, 2006 3:25 PM**
**To: rfs.regs@dhs.gov**
**Subject: DHS Docket No. ICEB-2006-0004**

**To Whom it May Concern:**

**Please see attached letter regarding request for extension of comment period.**

**Sincerely,**

**M.** Scott Vinson



NATIONAL COUNCIL OF CHAIN RESTAURANTS
of the ⟩National Retail Federation

June 22, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

RE:     **DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter – Request for 120-Day Extension of Comment Period**

Dear Director:

The National Council of Chain Restaurants (the "Council") is a national trade industry group representing the interests of approximately forty of the nation's largest multi-unit, multi-state chain restaurant companies. Collectively, these companies own and operate in excess of 50,000 restaurant facilities. Additionally, through franchise and licensing agreements, another 70,000 facilities are operated under their trademarks. In the aggregate, the Council's member companies and their franchisees employ in excess of 2.8 million individuals.

The Council respectfully requests that the 60-day public comment period currently established in the above-referenced rulemaking proceeding, to expire August 14, 2006, be extended by an additional 120 days. The reason for this request is to allow time for Congress to act on comprehensive immigration reform. Both the House and Senate have already passed major immigration legislation, and in the coming months a conference committee will work to resolve differences between the two bills. While it is not known at this time what the specifics of a final compromise legislative package might be, it is clear that there will almost certainly be significant and comprehensive legislative reform of the immigration laws.

With such potentially significant changes to the immigration laws on the immediate horizon, the Council respectfully suggests that the Department of Homeland Security should extend the comment period on this rulemaking proceeding to allow the legislative process to be completed. Employer obligations under the immigration laws will surely change as a result of Congressional action, and this has a great potential to change employer obligations that may be triggered upon receipt of a no-match letter from the Social Security Administration or the Department of Homeland Security. This, in turn, would likely have significant impact on the establishment of "safe-harbor" procedures that employers can follow in responding to receipt of such letters.

For these reasons, it appears premature to establish safe-harbor criteria that will likely have to be changed very quickly based on changed employer obligations under comprehensive reform of the immigration laws. The administrative burdens associated with such rapid changes, not to

DHS Letter
June 22, 2006
Page Two

mention the confusion that would be created, are sufficient justification to extend the comment period on this rulemaking proceeding to allow time for the Congressional process to be completed.

The Council respectfully requests an early decision on whether the comment period will be extended, because in the absence of an announced early decision, substantive comments will have to be prepared and filed.

Thank you for your time and attention to this very important matter.

Respectfully submitted,

M. Scott Vinson
Vice President, Government Relations

cc:    Charles Wood
       Regulatory Counsel
       Office of the Principal Legal Advisor
       Bureau of Immigration and Customs Enforcement
       Department of Homeland Security
       425 Eye Street, NW
       Washington, DC 20536

ICEB-2006-0004-0008

Comment Info: ================

General Comment:Re: DHS Docket # ICEB 2006-0004
I am writing in support of the proposed no-match program proposed by the
Department of Homeland Security.  Employers must be held accountable for
hiring and retaining illegal aliens after notification of discrepancies in social
security records.  The law prohibiting the Social Security Adminstration from
sharing files of no-match records with Homeland Security is unreasonable to the
large majority of citizens.  Please give the DHS the tools to perform the duties
expected of it.  We are tired of a small number of politicans, adminstrators, and
noisemakers with personal agendas preventing the security efforts and
enforcement of our INS statutes.  We will no longer vote for any politican who
does not support these efforts by DHS.

Thank you.

No-Match Cert. Admin. Record  958

From: millerna@GTLAW.com [mailto:millerna@GTLAW.com]On Behalf Of REIFFL@GTLAW.com
Sent: Wednesday, June 28, 2006 5:18 PM
To: Regs, Rfs
Subject: DHS Docket No. ICEB-2006-0004 - Letter Requesting Additional Time to Comment


Please see attached letter.

Regards,

Laura, John & Randy

# Laura Foote Reiff

Co-Chair
Essential Worker Immigration Coalition
1750 Tysons Blvd., Suite 1200
McLean, Virginia 22102
703-749-1372
703-714-8372- Direct Computer Fax
Reiffl@gtlaw.com

# EWIC   Essential Worker Immigration Coalition

June 28, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N. W., 2nd Floor
Washington, DC 20529

RE:    **DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter – Request for 120-Day Extension of Comment Period**

Dear Director:

This letter is in response to the above-referenced notice of proposed rulemaking published on June 14, 2006. As the Essential Workers Immigration Coalition, we are writing to respectfully request that the 60-day public comment period for the proposed regulation referenced above be extended for an additional 120 days, for a total comment period of 180 days. In order to thoughtfully and adequately respond to the proposed regulation, we ask that additional time be allotted to review and analyze the provisions and the real impact it will have on the business community at large; 60 days is simply an inadequate amount of time to comment responsibly.

Both Chambers of Congress have already passed drastically differing versions of immigration legislation and we now await conference. In addition to the proposed regulation, both the Senate and House bills propose significant changes relating to an employer's responsibilities when verifying its workforce. These forthcoming reform measures will set new standards under which employers must operate regarding the verification of an employee's work authorization eligibility and identity and will specifically address the case when an employer receives a no-match letter from the Social Security Administration or from the Department of Homeland Security. While the specifics of a lasting comprehensive piece of legislation remain unclear, it seems apparent that broad and sweeping changes to the nation's immigration laws are imminent and necessary. It is important to let this ongoing, fruitful debate run its course without competing and duplicative proposals.

Essential Worker Immigration Coalition
1615 H Street, NW
Washington, DC 20062
(202) 463-5931 ● ewic@uschamber.com ● www.ewic.org

**No-Match Cert. Admin. Record  960**

Therefore, for the reasons stated above, an extension of the comment period for the rulemaking process is needed not only to avoid unnecessary confusion and hardship for employers, but also to intelligently comment on the proposal that would have such a wide-spread impact to all employers and employees.

The business community looks forward to a timely decision on this important matter in order to adequately prepare and file the appropriate comments.

Sincerely,

The Essential Workers Immigration Coalition

No-Match Cert. Admin. Record  961

ICEB-2006-0004-0011

Comment Info: ================

General Comment:WE NEED TO CONTROL THE ILLEGALS
IF NOT THEY WILL DRAIN OUR ECONOMY INTO THE SAME STATE AS
MEXICO IS IN NOW
IN TOTAL SUPPORT OF THE DOCKET ICEB-2006-0004

No-Match Cert. Admin. Record  962

ICEB-2006-0004-0012

Comment Info: ==================

General Comment:I support the new rules as proposed by the DHS. I for one am tired of supporting
any person or group of people who knowingly enter the Untied States without proper documentation. Our hospitals are going belly up due to unpaid E.R. visits. Granted they are not all illegals. Millions of dollars are spent every year in counties, states and by the federal govenment paying for health care & schools. Businesses, and government agencies printing drivers tests, voter registration material and forms that come home from schools in other than english. Laws are currently on the
books for many of the proposed laws up and coming. Groups say we are racist, this is
not the case. Any person who enters the U.S. without proper paperwork is illegal regardless of the color of the skin. Lets enforce current laws, and keep our social security numbers out of the hands of illegals. The government loses that paperwork enough, we don't need illegals using our numbers to destroy americans lives.

Page 1

No-Match Cert. Admin. Record 963

ICEB-2006-0004-0013

Comment Info: ================

General Comment:I disagree with Mr Rachelson's comments and espeically his reasoning for opposing
this proposed regulation.  The problem of illegal immigration has grown too large for the
Federal Government to resolve using only ICE and associated agencies to pursue the
illegals individually.  The employer, whether a large multi-national corporation or a mom-
and-pop operation, need to assume responsibility to ensure those they hire are legally
entitled to be employed in the United States.  Nearly everyone who hires an illegal to
work for them either knows or highly suspects it when they hire the illegal.  Most do it
because of the cheap labor.  Their cheap labor is costing the American citizen greatly -
higher taxes, lower wages, lower quality of medical care, education, police and fire
response, higher crime, etc.  The quality of life for the middle class American is being
degraded greatly impacted by the influx of illegals.  It has to stop!  Requiring employers
to take responsibility to ensure employees are legally entitled to work in the United
States will create minimal increase in adminstrative costs for the checking.  They may
have to pay higher wages since they can not pay "slave" wages to someone here illegal.  As to Mr Rachelson's comment on wanting to have the illegals pay into SS so
he can draw - how selfish!

Page 1

No-Match Cert. Admin. Record  964

ICEB-2006-0004-0014

Comment Info: =================

General Comment:I think we should start enforcing existing laws and also insist that employers
IMMEDIATELY dismiss anybody if their SS does not match their name..  The
word illegal means just that and such if they want services from us or if they want
to work here, they should submit correct current SS numbers and those who don't
have that should be deported and/or denied work or entry to school, various
services.  It is not fair to those who have been paying into social security their
whole life to have those that don't belong rob honest citizens--the government
should do a better job of protecting their law-abiding citizens.

No-Match Cert. Admin. Record  965

This is a good start for a broken immigration system. If there are big penalties for employers who hire illegals, they will stop hiring illegals. If they go "off the books" or if the illegal goes underground, their situation (life) will not be as pleasant and they will eventually go home. The safe harbor rule is good and gives the employer a chance to do what is right, without penalty.

The IRS should also get involved by denying the law-breaking employer his income tax deduction for any illegal employee's wages. After all, that employer also has to submit a W-2 or a W-9 and then a 1099 form. The IRS should be able to catch the "no-match" illegal using these documents and then also turn the information over to Homeland Security and to Immigration Department.

Thank you, Pres. Bush for doing what our senate would not do.

Claudia C. Loomis

I favor implementing ICEB-2006-0004. This will help eliminate the job magnet that causes millions of people to cross our border to work here. I know that illegal work in many other industries besides agriculture, such as construction and fast food, which deprives our own citizens of job opportunities. Besides, each illegal that works here costs taxpayers a tremendous amount of money in other expenses such as medical, housing, food stamps, schooling for their children, etc. It is not fair that we taxpayers have to subsidize cheap labor for employers.

Thank you

ICEB-2006-0004-0017

Comment Info: =================

General Comment:please pass this law for employers to enforce no match regulations of hiring/firing
if social security numbers don't check out. there is so much fraud and identity theft going on,we need to stop this. if employers are responsible to make sure these numbers match and people are who they say they are there will be less of a magnet for illegals who do take jobs others will do especially teens.let it hit in the
place it hurts most, in their pocketbooks!

Page 1

**No-Match Cert. Admin. Record  968**

ICEB-2006-0004-0018

Comment Info: ==================
General Comment:This is a much needed rule.Please enact and enforce.

No-Match Cert. Admin. Record  969

Re:  Proposed Rule SSA Mismatch

We are concerned about the inappropriate timing of this proposed rule.  It is a beauracratic
effort to accomplish nothing.

All the money, heartache, and turmoil that this would cause is such a waste.  Spend your time
and money getting I D cards for all qualified undocumented  people and send the rest back home.

A good guestworker program will solve all the other immigration problems.

Sincerely

Arlene Frelk
N 11011 US Hwy 12
Merrillan, Wi 54754
715 333 2661

Dear Director, Regulatory Management Division:

Thank you for providing the public with the opportunity to submit comments in response to your proposed rule "Safe Harbor Provisions for Employers Who Receive a No-Match Letter", as published in Volume 71, No. 114 of the Federal Register (Wednesday, June 14th, 2006).

My comments may be from a slightly unique perspective, in that I was formerly an Assistant District Counsel for the INS in Houston, Texas and am now in private practice representing employers ranging from mom-and-pop operations to Fortune 100 companies. As Assistant District Counsel, I participated in numerous worksite compliance efforts and know first-hand about the laxity allowed by the current system. I remember one case where my INS investigators raided a local car wash and found copies of the documents submitted with the I-9s. Among them was a fake Resident Alien Card where the worker had literally taken a strip of paper, written his own name in block letters, and glued it right over the name imprinted on the card. He did the same for his date of birth. The employer accepted it. It was a shocking lesson in how weak the worksite compliance rules are.

The profusion of Social Security no-match letters in the past few years likewise indicates a fundamental weakness in the rules for I-9 compliance enforcement. Part of the problem, in my view, is that your predecessor agency chose to ignore most of the serious work authorization issues raised by the no-match letters as if the problem would somehow go away on its own. Of course it won't go away without a clearly-drawn line showing when employers must go further in examining immigration documents, and reasonable time limits for doing so. I am pleased to see your agency work towards this goal.

I am skeptical of whether the 14 day period is enough, particularly in the case of larger employers where the chain of command, which is not so different from your own, can lead to delay in documents getting into the right hands. By the time a mismatch letter makes it to the correct individual who can take action, 14 days may well have already passed. Also if the mismatch letter is received during a holiday period the 14-day period is effectively much shorter because in many cases both the employer's human resources personnel and the SSA hotline employees may be unavailable. Therefore, I respectfully urge you to consider altering this time period to 15 business days rather than 14 days. If this seems too long a period, consider that employers who act with reckless disregard let months go by without taking action. A safe harbor provision that reached to 15 business days would, in my view, convey goodwill towards employers who want to do the right thing, but whose internal systems may not be able to accommodate a 14-day turnaround for all of the steps you outline in the proposed rule. It would also eliminate from the dockets cases in which the brightline safe harbor did not apply but employer did the best it could under the circumstances to comply. Again, the reckless violators tend to do nothing at all so whether the period is 14 days or 15 business days, they would still be

subject to criminal prosecution. This change would simply accommodate business realities better without creating a loophole.

Secondly, there is a typo in the definition at 8 CFR 274a.1(L)(1)(iii)(A), which states simply "Labor Certification or an Application for Prospective Employer." I think what you are trying to convey is that if the employer is asked to fill out a labor certification for one of its employees, that is in and of itself information indicating that the alien may not be authorized to work. I disagree that this belongs in the same category as the mismatch letters or your agency's notices. Many employers pursue labor certification for persons who are currently authorized to work, but who do not have permanent employment authorization. There is no specific document I am aware of entitled "Labor Certification" or "Application for Prospective Employer", so more precise terminology would be very helpful. In any event, this situation is far too common in reasonable cases to be included on this list. If the employer signs a labor certification for an employee who claims to already be a lawful permanent resident, that is a good example of information conveying there's a problem. However, based on my experience only, that is almost never the case-- most labor certifications are filed by employers on behalf of their nonimmigrant employees, or else on behalf of prospective employees.

My third constructive comment is that the safe harbor provision becomes too complex and unwieldly at subsection (2)(i)(A)(2) (describing what the employee should take with them to the Social Security Administration). This provision can be easily construed so that employers feel they need to be responsible for figuring out exactly which documents the employee needs to take to remedy the mismatch. Although this is a safe harbor provision rather than a requirement per se, the typical employer will regard it as a requirement because they want to do the right thing. This is too great a burden to add to employers' plates and seems unnecessary. Another issue is that this provision could cause the employer to get involved in personal details surrounding the employee's name change that are not the employer's business and might violate privacy laws. This provision does not seem necessary. I have been told on several occasions by Social Security Administration officials that they can very easily resolve most mismatch issues in a few minutes. Thus, the employer should only need to tell the employee to take care of it and then follow up with the employee within a set period of time (60 days is reasonable) to see what the result is. The SSA can easily tell the employee which specific documents they need to resolve a mismatch. By simplifying this component of the proposed rule it would relieve the burden for employers, eliminate potential privacy issues, and also make the safe harbor provision easier to follow and administer.

I close by commending your agency for taking the initiative here. We have to confront the reality before us and cannot continue to pretend it doesn't exist. Clarity of the law is in everyone's best interest. Therefore, with just a small amount of tweaking, I am hopeful this regulation will be an aid to employers who wish to do the right thing, and to your agency in doing its job fairly and in good faith.

Respectfully submitted,

**F. Brian Graham**
Board Certified, Immigration & Nationality Law,
Texas Board of Legal Specialization

**W**INSTEAD

401 Congress Avenue
Suite 2100
Austin, Texas  78701
Direct: (512) 370-2814
Fax:  (512) 370-2850
www.winstead.com
 bgraham@winstead.com

As an employee of a staffing industry, temporary labor company, I just
wanted to send comments with respect to the high turnover ratios we
experience and how it can impact the fulfillment of these "safe harbor"
procedures.

The attempting to resolve the no-match and/or attempting to re-verify
the information with the employee is often impossible since the
employee in question is no longer employed by our company and the last
known address/phone number is not valid for receiving communication.

Similar to the new procedures that exist with the IRS and its effort to
prevent employees from claiming an invalid exemption from the
withholding of federal income taxes, I would recommend an additional
"safe harbor" procedure for a company to be able to submit information
back to DHS that the employee has been terminated and no further follow
up action can be accomplished.  This procedure would be less time-
consuming for the employer, would allow the employer to not be
concluded to have "constructive knowledge" and would provide DHS with
more timely information on the employee.

This e-mail message is for the sole use of the intended recipient(s)
and may contain confidential and privileged information. Any
unauthorized review, use, disclosure or distribution is prohibited. If
you are not the intended recipient, please contact the sender by reply
e-mail and destroy all copies of the original message.

Robert J. Calabro, CPA
Director of Taxes
Randstad USA
631-694-7528 (tel)
631-694-7469 (fax)
rob.calabro@us.randstad.com

Know, Serve and Trust

I would like to comment on DHS Docket No. ICEB 2006-0004.

First let me say that I am a 54 years old male. I am a retired Social Worker after having worked in deep south Texas ( 5 miles from the Mexico/Texas border) for 30 years. I worked with a population that was made up of about 95% Hispanic and my work peers were about 99% Hispanic. My wife is Hispanic and we have been married 17 years. I frequently go to Mexico for pleasure. I have a good understanding of the Mexican people and their needs as they come from Mexico to pursue a better life in the U.S.

Now as to my comment: many of the people I worked with and for were hard working people. They always wanted to do follow the law.  I believe I speak for many people who would say that the IRS should send " no match" letters to the Department of Homeland Security when there is a "no match" at IRS. If someone is breaking the law, let's try to identify them and proceed as the law dictates. It only seems logical to have a process in place that could potentially determine whether someone is are an illegal alien. It seems to me after having been in upper administration in a Texas Department state agency and helping to set local policy for 14 years, rules and guidelines could be put in place to ensure peoples rights are not violated when IRS sends a " no match" letter to Homeland Security.
The only reason I could see where one would not want to send a " no match" letter to Homeland Security would be if we are not really serious about identifying undocumented aliens and one would just like to talk about security but doesn't really want to take action.

Thanks you

**PLANET**
Professional Landcare Network

July 6, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N. W., 2nd Floor
Washington, DC 20529

RE:   **DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter – Request for 120-Day Extension of Comment Period**

Dear Director:

This letter is in response to the above-referenced notice of proposed rulemaking published on June 14, 2006. I am writing to request that the 60-day public comment period for the proposed regulation referenced above be extended for an additional 120 days, for a total comment period of 180 days. In order for our association and industry to respond to the proposed regulation, **during our busiest time of the year,** I ask that additional time be allotted to review and analyze the provisions and the real impact it will have on our industry; 60 days is simply an inadequate amount of time to comment responsibly.

Congress has already passed two very different versions of immigration legislation and we now have to await conference. Both the Senate and House bills propose significant changes relating to an employer's responsibilities when verifying its workforce. The resulting compromise will likely set new standards under which employers must operate regarding the verification of an employee's work authorization eligibility and identity and will specifically address the case when an employer receives a no-match letter from the Social Security Administration or from the Department of Homeland Security.

For the reasons stated above, an extension of the comment period for the rulemaking process is needed not only to avoid unnecessary confusion and hardship for our industry, but also to be able to comment on the proposal that would have such a wide-spread impact.

Sincerely,

*Thomas J. Delaney*

Thomas J. Delaney
Director of Government Affairs

No-Match Cert. Admin. Record  976

ICEB-2006-0004-0024

Comment Info: =================

General Comment:Thnak you for finally adding some deterrent power to the alerady exising laws. The
letters that our staff currently receive regarding mismatched numbers are not taken very seriously.  Some staff have received the smae letter regarding a mismatched number for 4 or more years in a row.

I am more concerned for the victims - those whose numbers are obtained flasely and used for employment pruposes.

- bdh

No-Match Cert. Admin. Record  977

 **Essential Worker Immigration Coalition**

June 28, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N. W., 2nd Floor
Washington, DC 20529

> **RE: DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter – Request for 120-Day Extension of Comment Period**

Dear Director:

This letter is in response to the above-referenced notice of proposed rulemaking published on June 14, 2006. As the Essential Workers Immigration Coalition, we are writing to respectfully request that the 60-day public comment period for the proposed regulation referenced above be extended for an additional 120 days, for a total comment period of 180 days. In order to thoughtfully and adequately respond to the proposed regulation, we ask that additional time be allotted to review and analyze the provisions and the real impact it will have on the business community at large; 60 days is simply an inadequate amount of time to comment responsibly.

Both Chambers of Congress have already passed drastically differing versions of immigration legislation and we now await conference. In addition to the proposed regulation, both the Senate and House bills propose significant changes relating to an employer's responsibilities when verifying its workforce. These forthcoming reform measures will set new standards under which employers must operate regarding the verification of an employee's work authorization eligibility and identity and will specifically address the case when an employer receives a no-match letter from the Social Security Administration or from the Department of Homeland Security. While the specifics of a lasting comprehensive piece of legislation remain unclear, it seems apparent that broad and sweeping changes to the nation's immigration laws are imminent and necessary. It is important to let this ongoing, fruitful debate run its course without competing and duplicative proposals.

Therefore, for the reasons stated above, an extension of the comment period for the rulemaking process is needed not only to avoid unnecessary confusion and hardship for employers, but also to intelligently comment on the proposal that would have such a wide-spread impact to all employers and employees.

The business community looks forward to a timely decision on this important matter in order to adequately prepare and file the appropriate comments.

Sincerely,

The Essential Workers Immigration Coalition

**No-Match Cert. Admin. Record  979**

I am in support of this proposal. As long as employers are not held accountable for hiring people who are not authorized to work in this country, people from other countries will continue to come here illegally and wages will continue to be depressed and citizens will have a more difficult time finding work. Drying up jobs and benefits such as welfare and educational benefits are the best solutions for reducing illegal entry into the U.S.
Rebecca Hicks

Before the DHS imposes more regulations on employers it would be nice if they updated the I-9 form. You state in your proposed regulation that the employer should make sure that the document the employee is presenting is on the current list of acceptable documents. The DHS has made changes to this list but has failed to actually update the I-9 form itself. The DHS has to do its job properly if you expect the employers to comply. How difficult is it to update a form?

Theresa Thomas
Human Resources Manager

In handling the "No-Match" letters from Social Security, there were four items listed in the list of what to do when one of the "No-Match" letters are received by the employer. The fourth item is to verify the accuracy of all documentation received proving legal authorization to work in the United States. What exactly is an employer expected to do? Contact all agencies that issue documents to verify the accuracy of the documents?

If an employer has already contacted Social Security and had already been told that the employer needs to have the employee contact the local Social Security office, and the employer has sent the employee a letter telling the employee that the Social Security Administration has failed to verify the social security number and name submitted by the employee and requests that the employee contact SSA and then return to employer with the results of such contact, is that not enough action for the employer? If the employee does not contact SSA, what is an employer to do? The Social Security Administration web site states that adverse actions can not be taken against an employee because there name and social security number do not pass verification. So the employer is in the middle. Possibly getting in trouble if the employee is fired because the number isn't verified, yet in trouble with the Dept. of Homeland Security if they employed someone who isn't legal to work in this country because the social security number didn't verify and the employer received the "No-Match" letter.

I'm confused and feel the employer is going to have a problem no matter the action or inaction. Some agency is going to fine or penalize the employer.

Denise Venezuela

_____

Denise Venezuela, CQA
Certified QuickBooks ProAdvisor
Program Member
Croce & Company, Accountancy Corporation
501 West Weber Avenue, Suite 500
Stockton, California 95203
Telephone (209) 943-2222 – Facsimile (209) 943-2220
e-mail: dvenezuela@croceco.com

_____

This message may contain information that is confidential and/or privileged under law, and is intended for use by the indicated addressee only. If you are not the intended addressee, (a) any disclosure, reproduction, distribution, or action you take because of it is strictly prohibited; (b) please return the complete message to the sender; and (c) this message is not a solicitation for purchase or sale or an agreement of any kind whatsoever that binds the sender.

We are required by Internal Revenue Service Circular 230 to inform you that unless otherwise expressly indicated, any federal tax advice contained in this communication, including attachments and enclosures, is not intended or written to be used, and may not be used, for the purpose of (i) avoiding tax-related penalties under Internal Revenue Code or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

Department of Homeland Security

Docket Number   ICEB-2006-2004

This rule provides no alternative workforce to replace those who are found to be unauthorized to work. A solution would be to authorize those who want to work by requiring them to stay within the Agricultural Industry for their stay in the US.  We need a "workable solution" to the problem.  If this is not implemented carefully it would likely deplete enough of the labor force to severly damage many businesses.

Alan J. Kraemer

President
Kraemer's Nursery, INC.

This email is intended solely for the use of the individual to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law.  If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us at administrator@kraemersnursery.com thank you.



The Association of Senior Human Resource Executives

July 12, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N. W., 2nd Floor
Washington, DC 20529

RE:     DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter – Request for 120-Day Extension of Comment Period

Dear Director:

On behalf of the HR Policy Association, I am writing to urge you to consider extending the comment period for the proposed regulation discussed in the above-referenced notice, published on June 14, 2006, for an additional 120 days. We propose replacing the current period of 60 days with a total comment period of 180 days.

HR Policy Association is a public policy advocacy organization representing the senior human resource executives of over 260 leading employers doing business in the United States. Collectively, our members employ over 12 percent of the U.S. private sector workforce or some 19 million Americans. As the top human resource officials of these companies, our members recognize that a sensible immigration policy is absolutely essential to our nation's ability to remain competitive in the global marketplace.

An extended comment period is necessary because a careful study of the potential impact of this proposed regulation on both business operations and employees will require much more than 60 days to complete. With such an extension, the Department of Homeland Security can also expect to receive more helpful responses to the proposed regulation.

The comment period should also be extended due to the current situation in Congress concerning immigration reform. Both the Senate and the House recently passed immigration legislation that will soon be considered in conference. Although the bills differ greatly in many different respects, they both propose to substantially modify the employer's responsibilities in the employment eligibility verification process. According to both proposals, the Social Security Administration (SSA) no-match letter will be replaced by an all-inclusive confirmation process headed by DHS, which would provide specific avenues of response for every confirmation stage. Although the legislation is not in final form, it is clear that it will involve a complete overhaul of the current employment verification procedure. Clearly, it makes sense to wait to see whether this overhaul is completed before considering significant changes in the current procedures.

Thank you for considering this proposal for a 120-day extension of the comment period for the proposed regulation on SSA no-match letters. If you have questions regarding our concerns, please feel free to contact me.

Sincerely,

/S/

Daniel V. Yager
Senior Vice President & General Counsel

**No-Match Cert. Admin. Record  984**

Currently, we are not required to submit I-9 forms, only to have them on file. How is it then that there would be the opportunity for a no match letter to be sent, given that this information is not submitted? Is this arising due to the proposed online submission/storage?

Lisa Parmelee
Executive Assistant
Construction Laborers Trust Funds for Southern California
Collection Office
4401 Santa Anita Avenue
Suite 201
El Monte, CA 91731
(626) 258-9044 x101
(626) 258-9094 (fax)
www.cltf.com

# Low-Wage Immigrant Worker Coalition

July 12, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N. W., 2nd Floor
Washington, DC 20529

**RE:** **DHS Docket No. ICEB–2006-0004 – Rulemaking Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter – Request for 120-Day Extension of Comment Period**

Dear Director:

This letter is in response to the above-referenced notice of proposed rulemaking published on June 14, 2006. As the undersigned 143 groups & 6 individuals, we are writing to respectfully request that the 60-day public comment period for the proposed regulation referenced above be extended for an additional 120 days, for a total comment period of 180 days. The proposed regulation represents a fundamental change in the significance of no-match letters from the Social Security Administration and would have serious implications in workplaces around the country. It is essential that we take the time to carefully analyze the impact of the proposed regulation on the communities we serve and represent and provide thoughtful comments; a 60-day period is insufficient for us to do this.

Moreover, we would like to express our concern about the timing of the proposed regulation. Congress is currently in the process of considering the approach it will take to immigration reform. Each of the two houses has passed its own, very different version of immigration reform legislation. While the two bills are very different, each contains worksite enforcement mechanisms. Any worksite enforcement proposal should not happen outside of the context of comprehensive immigration reform. The proposed regulation would be just that: a third worksite enforcement proposal completely separate from any comprehensive approach. The timing of the proposed regulation simply adds unnecessary confusion to an already-complex situation.

For the reasons expressed above, we urge you to extend the period for public comment in order for us to provide thoughtful and well-informed comments.

Sincerely,

Marielena Hincapié, Esq.
Director of Programs
National Immigration Law Center

American Federation of Labor – Congress of Industrial Organizations (ALF-CIO) ● Interfaith Worker Justice (IWJ) ● Jobs with Justice (JWJ) ● National Day Labor Organizing Network (NDLON) ● National Council of La Raza (NCLR) ● National Employment Law Project (NELP) ● National Immigration Law Center (NILC)

On behalf of:

Organizations

- ¿Oiste?
- 9to5 Poverty Network Initiative
- ACORN
- American Friends Service Comittee, Project Voice
- American Immigration Lawyers Association
- Argus Ventures, LLC
- Asian American Justice Center
- Asian Law Alliance
- Asian Pacific American Legal Center
- Northshore Bank
- BARCA, Inc.
- Blue Diamond
- Boy Scouts of America
- Canadian Union of Postal Worlers local 810
- CARECEN
- CASAS MEX USA
- Catholic Charities
- Catholic Charities, Migration and Refugee Services
- Saints Peter and Paul Roman Catholic Church
- CCHA
- Center for Civil Justice
- Centro Hispano, Inc.
- Centro Legal de la Raza
- Centro de Amigos
- Change to Win
- Chicago Workers Collaborative
- Catholic Legal Immigration Network, Inc. (CLINIC)
- Coalition for Humane Immigrant Rights of Los Angeles (CHIRLA)
- Coalition for Justice in the Maquiladoras
- Community Health Center, Inc.
- Community Occupational Health Project
- Democratic Organization of Troy Township

- Diocese of Las Cruces
- Diocese of Providence
- Dominican Sisters Ministry of Presence
- El CENTRO de Igualdad y Derechos
- El Centro, Inc.
- El Puente Project
- Employee Rights Center
- Enlace Comunitario
- Faith Community for Worker Justice
- Farm Labor Organizing Committee
- Farmworker Justice
- Federacion de Oaxaqueños del Medio Oeste usa
- Flores & Reyes, Attorneys
- Florida Immigrant Advocacy Center
- Garibay Tax Services
- Global Exchange
- Global Family Legal Services
- Greater Kansas City Fair Trade Coalition
- Guatemala Solidarity Committee Boston
- Hate Free Zone Washington
- Herzfeld & Piotrowski LLP
- Highlander Research and Education Center
- HOPE Teens
- Housing Resources Inc.
- Humphrey & Whidden Insurance Agency, Inc.
- Idaho Community Action Network
- Illinois Coalition for Immigrant and Refugee Rights
- Immaculate Heart Community
- Immigrant Legal Resource Center
- Interfaith Worker Justice
- International Institute Rhode Island
- Jewish Community Action
- Jobs With Justice
- Johnson County Immigrants Coalition

- Justice for Immigrants Coalition of Indiana
- Kent State University
- Korean American Resource and Cultural Center (KRCC)
- Korean Resource Center (KRC)
- Koreatown Immigrant Workers Alliance
- L&P Community Services
- La Causa, Inc.
- La Comunidad, Inc.
- La Familia Latina Unida Campaign
- La Raza Centro Legal
- La Union del Pueblo Entero
- La Voz Libre
- Laborers Latino Caucus
- Latino Faculty Staff
- Latinos United/Unidos of Michigan
- Law Center for Families
- Labor Council for Latin American Advancement (LCLAA)
- Legal Aid Services of Oregon
- Legal Assistance Foundation of Metropolitan Chicago
- League of United Latin American Citizens (LULAC)
- March 10th Committee
- MCTF-Maintenance Cooperation Trust Fund
- Mexican American Legal Defense and Educational Fund
- MFY Legal Services, Inc.
- Mi Casa Mortgage
- Mid America Bank
- Miembro de la Familia Latina Unida
- Milwaukee Renaissance
- MIRA Coalition
- National Immigration Project of the National Lawyers Guild
- National Korean American Service & Education Consortium (NAKASEC)
- National Latino Peace Officers Association, Wisconsin
- National Lawyers Guild
- National Council of La Raza (NCLR)
- Neighborhood Legal Services of Los Angeles County
- New Mexico Conference of Churches
- North Shore Bank
- Our Savior Lutheran Church
- Peace Action WI
- Pipe Organs/Golden Ponds Farm
- Racine Coalition for Peace and Justice
- Saint Anne Catholic Church
- Scalambrino & Arnoff, LLP
- Schwartz, Steinsapir, Dohrmann & Sommers
- Service Employees International Union (SEIU)
- Service Employees International Union (SEIU) Local 1877
- San Francisco Labor Council, Support Training Employment (SFLC STEP) Program
- Sheet Metal Workers International Association (SMWIA)
- Somos Un Pueblo Unido
- Southern California Coalition for Occupational Safety & Health
- Southern Poverty Law Center, Immigrant Justice Project
- SouthWest Organizing Project
- Sr. Bernard Hispanic community
- Students for Peace and Justice, Maimi University
- Sugar Law Center
- SW Creations Collaborative
- SW IA Latino Resource Center
- Teamsters Local 284
- The Cross Border Network for Justice & Solidarity
- The New York Immigration Coalition
- The Perinatal Council
- UCLA School of Law Student
- UE Local 1421
- UE Western Region

No-Match Cert. Admin. Record  988

Low Wage Immigrant Worker Coalition                                    7/19/2006

- United Network for Immigrants and
  Refugee Rights (UNIRR)
- UNITE HERE
- UNITE HERE Local 17
- UNITE HERE Local 2
- United Electrical, Radio & Machine
  Workers of America (UE)
- United Farm Workers
- United Food and Commercial
  Workers International Union
- University Leadership Initiative
- UNM Law and Society
- US bank

- Voces de la Frontera
- Wahstenaw County Workers Center
- Zig Zag Young Women's Resource
  Centre Inc.

Individuals
- Annie Beaman
- Katie Bjorkman
- Francisco Castillo
- Lisa Fuelleman
- Ann Mathews
- Vane Nava

No-Match Cert. Admin. Record  989

Proposed Rule states that DHS would consider that a reasonable employer would have acted promptly if they took steps within 14 days of receipt of the no-match letter.

I submit to you that this is not a reasonable time and that you should clarify the term "took steps"

1. The social security numbers that are included in the letter are not attached to our employees names

2. the SS numbers are in no order

3. the numbers must be scanned or manually entered in the spreadsheet  then matched with the company data base in order to determine which employees used the particular number.

4. the payroll clerk or other administrative person must then verify the information was keyed properly. This involves manually reviewing each employee's w-4 against the system

This administrative person has a regular job and keeping up with her regular duties while completing steps 1 thru 4 time consuming.

Then letters must be prepared and distributed to employees who work in multiple states.

In some companies an interpreter must communicate or translate this information.


It is not just a matter of having an employee who has nothing else to do to whip something out in two weeks.

*Kristy L. Blackman*
*HR manager, private employer*

ICEB-2006-0004-0034

Comment Info: ==================

General Comment:Thank you for the clearification; it is much needed.
Under Proposed rule (I)  The 14 days to take action after reciept of a no-match
letter sholud be 21 days. In business it is not uncommon to be under periods of
extra heavy work loads that last for longer than 21 days. The 21 days is a much
more reasonable time to get started on the process.

(III)  60 days to reslove a non-match letter is not long enough. My experience with
the SSA leads me to conclude this is not enough time to reslove the matter,
especially when it involves individuals with the same names. Futhermore, the
employee plays a bigger role in getting the mis-match resloved. Therefore, giving
the employee ample time to to work around family and work schedules is
necessary. Although 90 days is not enough time to deal with the matter to the
satisfaction of making a decision which may require me to fire someone, 90 days is
a much better time frame than the proposed 60 days. I would vote for 120 days, if
that were a possibility.

My reasoning is my experience. It takes that long to get the process completed
thoroughly and fairly.  Before I can be comfotable with letting any employee go, I
must have the situations completely reviewed and resloved. Being forced to act too
soon and make a unlawful choice is worse than waiting to long and facing an INA
violation. Grant us the time we need to be sure of the difficult decision we may be
forced to make.

The balance of the docket seems reasonable.

ICEB-2006-0004-0034

Comment Info: ================

General Comment:Thank you for the clearification; it is much needed.
Under Proposed rule (I)  The 14 days to take action after reciept of a no-match
letter sholud be 21 days. In business it is not uncommon to be under periods of
extra heavy work loads that last for longer than 21 days. The 21 days is a much
more reasonable time to get started on the process.

(III)  60 days to reslove a non-match letter is not long enough. My experience with
the SSA leads me to conclude this is not enough time to reslove the matter,
especially when it involves individuals with the same names. Futhermore, the
employee plays a bigger role in getting the mis-match resloved. Therefore, giving
the employee ample time to to work around family and work schedules is
necessary. Although 90 days is not enough time to deal with the matter to the
satisfaction of making a decision which may require me to fire someone, 90 days is
a much better time frame than the proposed 60 days. I would vote for 120 days, if
that were a possibility.

My reasoning is my experience. It takes that long to get the process completed
thoroughly and fairly.  Before I can be comfotable with letting any employee go, I
must have the situations completely reviewed and resloved. Being forced to act too
soon and make a unlawful choice is worse than waiting to long and facing an INA
violation. Grant us the time we need to be sure of the difficult decision we may be
forced to make.

The balance of the docket seems reasonable.

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

Please oppose the proposed regulations on Social Security
Administration "no-match" letters. The Social Security
Administration database is known to be chock full of errors and
thus no-match letters are a poor way to weed out workers who
lack legal authorization to work.

We need to increase the legal options by which employers can be
matched with workers. Penalizing employers for hiring
undocumented workers, without first reforming the immigration
system to permit sufficient visas to meet labor demands, is just
a recipe for more illegal behavior pushed further underground.

Please reject the proposed resolutions.


Sincerely,

Nancy Powers
201 W. Park Ave.
Tallahassee, Florida 32312

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I am a registered voter and urge you to reject the proposed regulations concerning the Social Security Administration's (SSA) "no-match" letters.

These new regulations will result in a harmful impact to ALL workers regardless of immigration status. Using such a notoriously inaccurate and out of date system like the SSA database means that workers could face termination by panicked employers before they can prove they are on the list mistakenly. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. "Bad employers" could also use the letters to intimidate, threaten, or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone -- all workers regardless of immigration status, our state and local governments, our federal government, and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution.


Sincerely,

Cynthia Mark
13 George St
Cambridge, Massachusetts 02140-1716

Director, Department of Homeland Security


Dear Director, Department of Homeland Security,

I join with other citizens and business, labor, immigration and
privacy groups in saying no to the proposed regulations
concerning the Social Security Administration's (SSA) "no-match"
letters.

I HAVE WORKED WITH AND STUDIED IMMIGRANT WORKERS AND THEIR
EMPLOYERS FOR YEARS. PASSING THE PROPOSED REGULATIONS ON THE SSA
NO-MATCH LETTER WILL INCREASE IDENTITY THEFT BY FORCING
UNDOCUMENTED WORKERS TO PRESENT REAL SSNS TO THEIR EMPLOYERS.
THIS UNINTENDED CONSEQUENCE MUST BE SERIOUSLY DISCUSSED AND
ADDRESSED BY ANY CHANGE IN LEGISLATION.


In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.


These proposed regulations hurt everyone -- all workers
regardless of immigration status, our state and local
governments, our federal government, and our economy. I urge you
not to enact these new regulations and allow Congress to reach a
comprehensive immigration reform solution.


Sincerely,

Angela Stuesse
1411 Gracy Farms Lane #67
Austin, Texas 78758

```
-----Original Message-----
From: oasisacj@yahoo.com [mailto:oasisacj@yahoo.com]
Sent: Tuesday, July 25, 2006 10:01 AM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]
```

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I join with other citizens and business, labor, immigration and
privacy groups in saying no to the proposed regulations
concerning the Social Security Administration's (SSA) "no-match"
letters.

These new regulations will result in a harmful impact to ALL
workers regardless of immigration status. Using such a
notoriously inaccurate and out of date system like the SSA
database means that workers could face termination by panicked
employers before they can prove they are on the list mistakenly.
This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. "Bad employers"
could also use the letters to intimidate, threaten, or
discriminate against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone -- all workers
regardless of immigration status, our state and local
governments, our federal government, and our economy. I urge you
not to enact these new regulations and allow Congress to reach a
comprehensive immigration reform solution.

Sincerely,

Margarita Martin
1465 Hwy 29N
Lot G-21
Athens, Georgia 30601

-----Original Message-----
From: gryall@cwnet.com [mailto:gryall@cwnet.com]
Sent: Monday, July 24, 2006 11:59 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I join with other citizens and business, labor, immigration and
privacy groups in saying no to the proposed regulations
concerning the Social Security Administration's (SSA) "no-match"
letters.

These new regulations will result in a harmful impact to ALL
workers regardless of immigration status. Using such a
notoriously inaccurate and out of date system like the SSA
database means that workers could face termination by panicked
employers before they can prove they are on the list mistakenly.
This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. "Bad employers"
could also use the letters to intimidate, threaten, or
discriminate against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone -- all workers
regardless of immigration status, our state and local
governments, our federal government, and our economy. I urge you
not to enact these new regulations and allow Congress to reach a
comprehensive immigration reform solution.


Sincerely,

Gail Ryall
1065 Westward Way
Sacramento, California 95833

-----Original Message-----
From: heftyk@seiu1199p.org [mailto:heftyk@seiu1199p.org]
Sent: Tuesday, July 25, 2006 11:39 AM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I join with other citizens and business, labor, immigration and
privacy groups in saying no to the proposed regulations
concerning the Social Security Administration's (SSA) "no-match"
letters.

These new regulations will result in a harmful impact to ALL
workers regardless of immigration status. Using such a
notoriously inaccurate and out of date system like the SSA
database means that workers could face termination by panicked
employers before they can prove they are on the list mistakenly.
This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. "Bad employers"
could also use the letters to intimidate, threaten, or
discriminate against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone -- all workers
regardless of immigration status, our state and local
governments, our federal government, and our economy. I urge you
not to enact these new regulations and allow Congress to reach a
comprehensive immigration reform solution.


Sincerely,

Kevin Hefty
401 Reading Ave
West Reading, Pennsylvania 19611

-----Original Message-----
From: maile@austinenglish.org [mailto:maile@austinenglish.org]
Sent: Friday, July 28, 2006 11:17 AM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket ICEB-2006-0004]


Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I am writing to you to express my opposition to the Social Security Administration's workplace enforcement proposal, and to share my suggestions for a more appropriate plan.

If the SSA database had a better track record, I would be more willing to consider its use in the workplace. However, given its inaccurate performance in pilot locations, we cannot be confident that it will root out those employees using fraudulent documents. How many legal, loyal employees would have to be fired before improvements are made to the database?

Furthermore, I fear that the system would end up rewarding unscrupulous employers "flying under the radar," and disproportionately punish good employers who do claim all of their employees.

I would support discussion of a no-match enforcement proposal under two conditions. First of all, changes need to be made to improve accuracy. Second, introduction of the enforcement process should be part of the comprehensive immigration reform timeline. Employers and workers will have to adjust to many changes if the House and Senate manage to reconcile their guest worker bills; no-match letter enforcement carries its own set of challenges that policymakers need to anticipate and provide for before putting them into action.

Please don't support an enforcement plan that is not yet ready for national implementation. The country is starting to make headway in what can be a divisive and far-reaching struggle. Please put worksite enforcement in its appropriate place within the context of comprehensive immigration reform.


Sincerely,

Maile Broccoli-Hickey
1503 Sunset Lane
Austin, Texas 78704

-----Original Message-----
From: sherylmunozbergman@hotmail.com
[mailto:sherylmunozbergman@hotmail.com]
Sent: Friday, July 28, 2006 1:56 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]


Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I oppose the proposed regulations concerning the Social Security
Administration's (SSA) "no-match" letters.

These new regulations will result in a harmful impact to ALL
workers regardless of immigration status. Using such a
notoriously inaccurate and out of date system like the SSA
database means that workers could face termination by panicked
employers before they can prove they are on the list mistakenly.
This would lead to thousands of unlawful mass firings.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone -- all workers
regardless of immigration status, our state and local
governments, our federal government, and our economy. I urge you
not to enact these new regulations and allow Congress to reach a
comprehensive immigration reform solution.


Sincerely,

Sheryl Munoz-Bergman
2600 Middlefield Rd
Redwood City, California 94063

-----Original Message-----
From: pahatch@aol.com [mailto:pahatch@aol.com]
Sent: Friday, July 28, 2006 3:14 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket ICEB-2006-0004]


Director, Department of Homeland Security


Dear Director, Department of Homeland Security,

As an individual who has spent the past 25 years working with immigrants in both public and private agencies, I have seen firsthand the harm that has been done to immigrants who had valid work authorization, when, through no fault of their own, their employer received a SSA mismatch letter. Even without a new law, too many employers precipitously dismiss the worker without providing an opportunity to rectify the mismatch. The massive dismissals that would be likely under the proposed law could devastate not just individual workers and their families, but entire immigrant communities and the economy of many local jurisdictions.

I join with other citizens and business, labor, immigration and privacy groups in saying no to the proposed regulations concerning the Social Security Administration's (SSA) "no-match" letters.

These new regulations will result in a harmful impact to ALL workers regardless of immigration status. Using such a notoriously inaccurate and out of date system like the SSA database means that workers could face termination by panicked employers before they can prove they are on the list mistakenly. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. "Bad employers" could also use the letters to intimidate, threaten, or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that

**No-Match Cert. Admin. Record  1001**

contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone -- all workers
regardless of immigration status, our state and local
governments, our federal government, and our economy. I urge you
not to enact these new regulations and instead allow Congress to
reach a comprehensive immigration reform solution.


Sincerely,

Patricia Hatch
9690 Basket Ring Road
Columbia, Maryland 21045

No-Match Cert. Admin. Record  1002

No-Match Cert. Admin. Record  1003

-----Original Message-----
From: rsichta@terremark.com [mailto:rsichta@terremark.com]
Sent: Friday, July 28, 2006 11:51 AM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]


Director, Department of Homeland Security


Dear Director, Department of Homeland Security,

Please grow up. Your approach to ferreting out illegal aliens is
clearly harmful to anyone with a conscience. Shame on you for
being part of such a despicable process.

Your actions neither make the world safer nor do they enhance
anyone's freedom, nor do the attack the root cause of the
problem the purport to address. They do, however, proffer an
atmosphere in which neighbors spy on neighbors. A people who
claim to be world leaders on the subject of democracy can do
better. Criminalizing good citizens is neither just nor
democratic.

Again, shame on you. And double shame if you claim to live by
religious principles.



Sincerely,

Bob Sichta
8901 SW 212 Terrace
Miami, Florida 33189

ICEB-2006-0004-0046

Comment Info: =================

General Comment:Please see the attached letter

No-Match Cert. Admin. Record  1005

July 27, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N. W., 2nd Floor
Washington, DC 20529

**RE:     DHS Docket No. ICEB-2006-0004 Safe-Harbor Procedures for Employers
         Who Receive a No-Match Letter**

Dear Director:

As requested in the Public Participation section of the Proposed Rules, I am
commenting on the time limits described in the rule. I believe a 60-day period granted to
employers after they receive a no-match letter from the Social Security Administration is
a sufficient time frame to resolve discrepancy issues involving social security accounts.
The recommendation is based on fact that the general public has much greater access to
the Social Security Administration offices throughout the United States than those
dealing with immigration-related employment issues.

However, when the issue involves resolving discrepancies involving immigration-
status or employment-authorization documentation presented or referred to while
completing Form I-9, such as a work authorization or a permanent resident card, I would
recommend providing employers at least a 90-day period to verify employee's identity
and employment authorization. The basis for this recommendation is that from the
moment an individual submits an application for employment authorization, it takes the
U.S. Citizenship and Immigration Services in average between 30 and 90 days to
acknowledge the fact of receiving the application and schedule appropriate procedures.
Due to limited locations of regional U.S. Citizenship and Immigration Services offices,
interviews and verification of biometric data have to be scheduled well in advance. Under
these circumstances, it is unreasonable to expect that the employee who failed to apply
for a renewal employment authorization card within the time frame recommended by the
U. S. Citizenship and Immigration Services (90 days prior to expiration) will be able to
produce a renewed card within the 60-day time frame.

The same holds true for conditional residents of the U.S. who obtained their
resident status through marriage to a U.S. citizen or a permanent resident and were issued
a conditional permanent resident card, often referred to as a "green card." For various
reasons, some employees fail to apply to remove the conditions on his or her residence in
a timely manner. One of the factors that may contribute to a problem is that both
'conditional' and 'permanent' green cards are named "Permanent Resident Card".

Director, Regulatory Management Division
July 27, 2006
Page 2


     However, on a conditional green card there is an expiration period of two year listed on its face, which is the only indication of its conditionality. Needless to say, lack of explicit wording on the card leaves the issue open to interpretation of general public and, as a result, employees don't always apply for a renewal card within the time frame recommended by the U.S. Citizenship and Immigration Services.


     Sincerely,

     Elvira Alexander

ICEB-2006-0004-0047

Comment Info: ==================

General Comment:With respect to subsection (l)(2)(iii)(A)(2), which addresses the documents that an
employer may accept when asking an employee to complete the I-9 process after receiving a No-Match letter, I would suggest explicitly stating that the employer cannot accept another social security card, or at least cannot accept one in the absence of an affidavit from the social security adminstration attesting that the new number belongs the employee.  To do otherwise merely encourages the employee to obtain a second fraudulent social security card.  Moverover adding a similar affidavit requirement for the remaining I-9 documents would also go a long way towards ensuring that the employee isn't simply replacing one fraudulent document with another.

No-Match Cert. Admin. Record  1008

```
-----Original Message-----
From: tbrown878@wi.rr.com [mailto:tbrown878@wi.rr.com]
Sent: Sunday, July 30, 2006 7:50 AM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]
```

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I am appalled that the DHS continues to brand all immigrants as
terrorists. I join with other citizens and business, labor,
immigration and privacy groups in saying no to the proposed
regulations concerning the Social Security Administration's
(SSA) "no-match" letters.

These new regulations will result in a harmful impact to ALL
workers regardless of immigration status. Using such a
notoriously inaccurate and out of date system like the SSA
database means that workers could face termination by panicked
employers before they can prove they are on the list mistakenly.
This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. "Bad employers"
could also use the letters to intimidate, threaten, or
discriminate against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone -- all workers
regardless of immigration status, our state and local
governments, our federal government, and our economy. I urge you
not to enact these new regulations and allow Congress to reach a
comprehensive immigration reform solution.

**No-Match Cert. Admin. Record 1009**

Sincerely,

Tim Brown
4830 Bluebird Lane
Racine, Wisconsin 53406

-----Original Message-----
From: edgetoedge@netscape.com [mailto:edgetoedge@netscape.com]
Sent: Sunday, July 30, 2006 1:02 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket ICEB-2006-0004]


Director, Department of Homeland Security


Dear Director, Department of Homeland Security,

Hello, Are you guys there. Don't you realize that you have to change both sides of the equation. If "illegals" are working and abiding by our rules, give them a SS#, let them pay their fair way. Give them an avenue to become legal through the employer. Make the business a part of the system. Make businesses responsible for submitting a SS# for everyone on their payroll. This would save the government money.

EVERYONE WINS!!!! The government wins TWO ways. They get the new tax dollars, business must pay everyone a fair wage and the government, now can keep track of all of these people, you are so wanting to keep track of. Your rule as it stands now only drove those people deeper into hiding.

Hell, you could even make labor expenses 105% tax-deductible and business owners would think twice about laying off employees.

I join with other citizens and business, labor, immigration and privacy groups in saying no to the proposed regulations concerning the Social Security Administration's (SSA) "no-match" letters.

These new regulations will result in a harmful impact to ALL workers regardless of immigration status. Using such a notoriously inaccurate and out of date system like the SSA database means that workers could face termination by panicked employers before they can prove they are on the list mistakenly. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. "Bad employers" could also use the letters to intimidate, threaten, or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match

**No-Match Cert. Admin. Record  1011**

letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone -- all workers
regardless of immigration status, our state and local
governments, our federal government, and our economy. I urge you
not to enact these new regulations and allow Congress to reach a
comprehensive immigration reform solution.


Sincerely,

tracy tenwalde
4439 Watkins Road SW
Pataskala, Ohio 43062

No-Match Cert. Admin. Record  1013

**From:** Frost, David [mailto:David.Frost@dhs.gov]
**Sent:** Monday, July 31, 2006 4:37 PM
**To:** Tarragon, Stephen R; Sloan, Richard A
**Cc:** Terrell, Arnella
**Subject:** EWIC meeting/SSA No Match

Dear Colleagues:

I was trying to get this item placed in the docket for the Safe Harbor/No-Match rule, and have not had any luck thus far.  Would you be able to see to it that this is placed in the docket for the No-Match rule?

Thanks very much; please let me know if there are any problems.

Regards,

David

*David Morgan Frost*
Attorney, Rules & Legislation
Department of Homeland Security
(202) 282-8940

**Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**
**Docket No. ICEB-2006-0004**
**Meeting with Essential Worker Immigration Coalition (EWIC)**
**800 Connecticut Ave., NW, Washington, DC**
**June 20, 2006, 9:30 a.m. – 10:30 a.m.**

The meeting was opened by Assistant Secretary Stewart Baker, who advised those in attendance that the meeting was being held to allow those present to provide comments to DHS with regard to the "No-Match" rule which had been published in the Federal Register on June 14, 2006. Baker stated that comments made would be summarized and the summary placed in the public docket; he also recommended that persons submit comments in writing for DHS' consideration.

Laura Reiff, representing EWIC, stated that many of the participants were particularly interested in the pending Title III immigration reform legislation and that the business community was particularly concerned with the timing of this rule.

Alison Reardon of the Service Employees International Union stated that the rule would impact employers who are paying employees appropriately, but not employers who surreptitiously pay employees not reflected on an actual payroll. Reardon further queried what DHS was doing by way of enforcement activities against those employers who were paying employees "under the table."

Baker responded that DHS continues (and will continue) aggressively to enforce the law against such employers. Assistant Secretary Al Martinez-Fonts added that, in fact, the question of employers who pay employees "under the table" was a separate issue from that addressed by the instant rule.

Reiff stated that EWIC took issue with the notion that employers who receive no-match letters are "committing fraud," and suggested that employers would generally resolve the issue without the need of prompting from DHS. She further stated that the rule should only be part of a more comprehensive reform package, and that, should it become effective in the next 60 days, it would only add to the crisis presented by the inadequate supply of essential workers.

Marielena Hincapie (by telephone) of the National Immigration Law Center (NILC) suggested that the rule could push employers into firing workers from their payrolls and compelling them to go "underground."

Josh Bernstein, also of NILC, suggested that the rule tries to create a "bright line" for employers; however, according to Bernstein, after two decades under the current system, employers generally do not have bright lines and merely do their best. Thus, under the current rule, employers may misread the safe-harbor procedures to require that they wait 60 days and, at the end of that time period, simply fire the employee in question.

Bernstein also suggested that many legitimate employees might simply quit rather than attempt to resolve the problem.

Baker suggested that an authorized employee would be less likely to quit, as it would be to his advantage to resolve the issue. Indeed, an authorized employee would wish to be credited with the social security taxes he had paid; accordingly, it would seem unlikely that such an employee would simply quit his job.

Another person in attendance argued that the timing of the rule (if it becomes final prior to a comprehensive immigration reform package) could be a problem. She stated that there are many undocumented people working in jobs and that the administration had recognized that they were not all going to leave the country. She suggested that the correct course of action (and the one consistent with Administration policy) would be to find a way for the people in question to work legally. Accordingly, she argued, by attempting to enforce the current law against employers who knowingly continue to employ unauthorized aliens, DHS would be carrying out a policy in conflict with that established by the White House.

Reardon stated that the rule would likely cause firings of workers who, although unauthorized, were currently on payrolls, paying taxes and contributing to society. Once fired, these workers would be pushed into a cash economy.

Reiff again stated that EWIC wanted to see comprehensive reform legislation before the rule goes into effect.

Baker stated that the timing of the legislation was not in DHS' hands, but that comments received would be taken into account with regard to the timing of the regulation.

Tim Sparapani of the American Civil Liberties Union stated that the regulation would have serious consequences for people who are prevented from working as a result of errors in federal databases. Sparapani urged DHS to adopt a prompt process for resolving errors and providing prompt redress. He asserted that the Federal Tort Claims Act, which could take up to two years, was completely inadequate as a remedy, as an error could leave an individual out of work for an extended period of time.

Baker stated that DHS did not believe that additional remedies (outside those prescribed in the law) were necessary or appropriate under the present rule.

Bernstein expressed concerns about implementation of the regulation and stated that DHS' record of implementing Congressional mandates had not been good. Taking up the point raised by Sparapani, Bernstein asked what mechanisms DHS would create in order to be held accountable for any errors resulting in harm to employees through implementation of the rule.

Baker stated that DHS did not wish to "lawyer up" the regulation and that it was anticipated that any such injuries to employees authorized to work would be extremely

No-Match Cert. Admin. Record  1016

rare. Baker further opined that additional remedies added to the regulation would be unlikely to help in any case.

The meeting was adjourned at approximately 10:30 a.m.

The following persons signed an attendance sheet that was circulated at the beginning of the meeting:

| Name | Office |
| --- | --- |
| David M. Frost | DHS |
| Josh Bernstein | National Immigration Law Center |
| Tim Sparapani | ACLU |
| Dan Brown | Immigration and Customs Enforcement (ICE) |
| John Connolly | ICE |
| Matthew Allen | ICE |
| Joe Maher | DHS |
| Nader Baroukh | DHS |
| Stewart Verdery | Mehlman Vogel Castagnetti, Inc. |
| Christina DeConcini | National Immigration Forum |
| Crystal Williams | American Immigration Lawyers Association (AILA) |
| Fred Feinstein | Service Employees International Union (SEIU) |
| Alison Reardon | SEIU |
| Beverly Cenname | DHS |
| Marshall Fitz | AILA |
| Laura Reiff | EWIC (Greenberg, Traurig) |
| Al Martinez-Fonts | DHS |
| Stewart Baker | DHS |
| Angelo Amador | U.S. Chamber of Commerce (USCC) |
| Kelly Hunt | USCC |
| Caroline Hunter | White House |
| Astrid Schmidt | Greenberg, Traurig |

No-Match Cert. Admin. Record  1017

**Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**
**Docket No. ICEB-2006-0004**
**Meeting with Essential Worker Immigration Coalition (EWIC)**
**800 Connecticut Ave., NW, Washington, DC**
**June 20, 2006, 9:30 a.m. – 10:30 a.m.**

The meeting was opened by Assistant Secretary Stewart Baker, who advised those in attendance that the meeting was being held to allow those present to provide comments to DHS with regard to the "No-Match" rule which had been published in the Federal Register on June 14, 2006. Baker stated that comments made would be summarized and the summary placed in the public docket; he also recommended that persons submit comments in writing for DHS' consideration.

Laura Reiff, representing EWIC, stated that many of the participants were particularly interested in the pending Title III immigration reform legislation and that the business community was particularly concerned with the timing of this rule.

Alison Reardon of the Service Employees International Union stated that the rule would impact employers who are paying employees appropriately, but not employers who surreptitiously pay employees not reflected on an actual payroll. Reardon further queried what DHS was doing by way of enforcement activities against those employers who were paying employees "under the table."

Baker responded that DHS continues (and will continue) aggressively to enforce the law against such employers. Assistant Secretary Al Martinez-Fonts added that, in fact, the question of employers who pay employees "under the table" was a separate issue from that addressed by the instant rule.

Reiff stated that EWIC took issue with the notion that employers who receive no-match letters are "committing fraud," and suggested that employers would generally resolve the issue without the need of prompting from DHS. She further stated that the rule should only be part of a more comprehensive reform package, and that, should it become effective in the next 60 days, it would only add to the crisis presented by the inadequate supply of essential workers.

Marielena Hincapie (by telephone) of the National Immigration Law Center (NILC) suggested that the rule could push employers into firing workers from their payrolls and compelling them to go "underground."

Josh Bernstein, also of NILC, suggested that the rule tries to create a "bright line" for employers; however, according to Bernstein, after two decades under the current system, employers generally do not have bright lines and merely do their best. Thus, under the current rule, employers may misread the safe-harbor procedures to require that they wait 60 days and, at the end of that time period, simply fire the employee in question.

Bernstein also suggested that many legitimate employees might simply quit rather than attempt to resolve the problem.

Baker suggested that an authorized employee would be less likely to quit, as it would be to his advantage to resolve the issue. Indeed, an authorized employee would wish to be credited with the social security taxes he had paid; accordingly, it would seem unlikely that such an employee would simply quit his job.

Another person in attendance argued that the timing of the rule (if it becomes final prior to a comprehensive immigration reform package) could be a problem. She stated that there are many undocumented people working in jobs and that the administration had recognized that they were not all going to leave the country. She suggested that the correct course of action (and the one consistent with Administration policy) would be to find a way for the people in question to work legally. Accordingly, she argued, by attempting to enforce the current law against employers who knowingly continue to employ unauthorized aliens, DHS would be carrying out a policy in conflict with that established by the White House.

Reardon stated that the rule would likely cause firings of workers who, although unauthorized, were currently on payrolls, paying taxes and contributing to society. Once fired, these workers would be pushed into a cash economy.

Reiff again stated that EWIC wanted to see comprehensive reform legislation before the rule goes into effect.

Baker stated that the timing of the legislation was not in DHS' hands, but that comments received would be taken into account with regard to the timing of the regulation.

Tim Sparapani of the American Civil Liberties Union stated that the regulation would have serious consequences for people who are prevented from working as a result of errors in federal databases. Sparapani urged DHS to adopt a prompt process for resolving errors and providing prompt redress. He asserted that the Federal Tort Claims Act, which could take up to two years, was completely inadequate as a remedy, as an error could leave an individual out of work for an extended period of time.

Baker stated that DHS did not believe that additional remedies (outside those prescribed in the law) were necessary or appropriate under the present rule.

Bernstein expressed concerns about implementation of the regulation and stated that DHS' record of implementing Congressional mandates had not been good. Taking up the point raised by Sparapani, Bernstein asked what mechanisms DHS would create in order to be held accountable for any errors resulting in harm to employees through implementation of the rule.

Baker stated that DHS did not wish to "lawyer up" the regulation and that it was anticipated that any such injuries to employees authorized to work would be extremely

**No-Match Cert. Admin. Record  1019**

rare. Baker further opined that additional remedies added to the regulation would be unlikely to help in any case.

The meeting was adjourned at approximately 10:30 a.m.

The following persons signed an attendance sheet that was circulated at the beginning of the meeting:

| Name | Office |
|------|--------|
| David M. Frost | DHS |
| Josh Bernstein | National Immigration Law Center |
| Tim Sparapani | ACLU |
| Dan Brown | Immigration and Customs Enforcement (ICE) |
| John Connolly | ICE |
| Matthew Allen | ICE |
| Joe Maher | DHS |
| Nader Baroukh | DHS |
| Stewart Verdery | Mehlman Vogel Castagnetti, Inc. |
| Christina DeConcini | National Immigration Forum |
| Crystal Williams | American Immigration Lawyers Association (AILA) |
| Fred Feinstein | Service Employees International Union (SEIU) |
| Alison Reardon | SEIU |
| Beverly Cenname | DHS |
| Marshall Fitz | AILA |
| Laura Reiff | EWIC (Greenberg, Traurig) |
| Al Martinez-Fonts | DHS |
| Stewart Baker | DHS |
| Angelo Amador | U.S. Chamber of Commerce (USCC) |
| Kelly Hunt | USCC |
| Caroline Hunter | White House |
| Astrid Schmidt | Greenberg, Traurig |

No-Match Cert. Admin. Record 1020

-----Original Message-----
From: hillary@lrcl.org [mailto:hillary@lrcl.org]
Sent: Tuesday, August 01, 2006 3:08 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket ICEB-2006-0004]


Director, Department of Homeland Security


Dear Director, Department of Homeland Security,

I am a worker's rights attorney. I represent many immigrant workers at La Raza Centro Legal, a non-profit legal organization in San Francisco, California. Everyday, I see workers who are not paid the wages they earn, are injured in the workplace without compensation, and are threatened by employers based on their perceived immigration status. The proposed regulations concerning the Social Security Administration's (SSA) "no-match" letters will only worsen the widespread exploitation of vulnerable workers.

These new regulations will result in a harmful impact to ALL workers regardless of immigration status. Using such a notoriously inaccurate and out of date system like the SSA database means that workers could face termination by panicked employers before they can prove they are on the list mistakenly. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. "Bad employers" could also use the letters to intimidate, threaten, or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone -- all workers regardless of immigration status, our state and local governments, our federal government, and our economy. I urge you

not to enact these new regulations and allow Congress to reach a
comprehensive immigration reform solution.


Sincerely,

Hillary Ronen
474 Valencia Street Suite 295
San Francisco, California 94103

-----Original Message-----
From: flyg0002@umn.edu [mailto:flyg0002@umn.edu]
Sent: Tuesday, August 01, 2006 1:16 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket ICEB-2006-0004]


Director, Department of Homeland Security


Dear Director, Department of Homeland Security,

I am opposed to using the Social Security Administration's (SSA) "no-match" letters to enforce employment laws.

Using such an inaccurate and out of date system like the SSA database means that workers could face termination by panicked employers before they can prove they are on the list mistakenly. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. "Bad employers" could also use the letters to intimidate, threaten, or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone -- all workers regardless of immigration status, our state and local governments, our federal government, and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution.


Sincerely,

Tovah Flygare
1819 Girard Ave. S
Mpls., Minnesota 55403

```
-----Original Message-----
From: henry@norr.com [mailto:henry@norr.com]
Sent: Tuesday, August 01, 2006 3:43 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]
```

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I oppose the proposed regulations concerning the Social Security Administration's (SSA) "no-match" letters.

These new regulations will result in a harmful impact to ALL workers regardless of immigration status. Using such a notoriously inaccurate and out of date system like the SSA database means that workers could face termination by panicked employers before they can prove they are on the list mistakenly. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. "Bad employers" could also use the letters to intimidate, threaten, or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone -- all workers regardless of immigration status, our state and local governments, our federal government, and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution.

Sincerely,

Henry Norr

1701 Channing Way
Berkeley, California 94703

```
-----Original Message-----
From: handknit@gmail.com [mailto:handknit@gmail.com]
Sent: Wednesday, August 02, 2006 10:58 AM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]


Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

As a proud American citizen and voter I urge you to say no to
the proposed regulations concerning the Social Security
Administration's (SSA) "no-match" letters. Piecemeal solutions
like this are not the answer. Comprehensive reform that
addresses our economy's real needs is the solution.


Sincerely,

Rachel Dornhelm
987 Vermont St #3
Oakland, California 94610
```

```
-----Original Message-----
From: catl@asianlawcaucus.org [mailto:catl@asianlawcaucus.org]
Sent: Wednesday, August 02, 2006 2:03 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]
```

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

It is with much support I send this letter, as a fighter for worker's rights as well as immigrant rights. Many immigrants in this country are work harder than usual, fearful of loosing any of the low wages they often earn. The proposal of this new law exacerbates this fear, and will inevitably put America further at danger when immigrants have to find alternate--even dangerous--modes of survival.

I join with other citizens and business, labor, immigration and privacy groups in saying no to the proposed regulations concerning the Social Security Administration's (SSA) "no-match" letters.

These new regulations will result in a harmful impact to ALL workers regardless of immigration status. Using such a notoriously inaccurate and out of date system like the SSA database means that workers could face termination by panicked employers before they can prove they are on the list mistakenly. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. "Bad employers" could also use the letters to intimidate, threaten, or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone -- all workers regardless of immigration status, our state and local governments, our federal government, and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution.

Sincerely,

cat le
939 market street
san francisco, California 94103

-----Original Message-----
From: dloeb@igc.org [mailto:dloeb@igc.org]
Sent: Wednesday, August 02, 2006 12:58 AM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I would like to add my voice to thoses of other citizens and
business, labor, immigration and privacy groups who are very
concerned about the Social Security Administration's (SSA)
proposed regulations regarding "no-match" letters as a way to
detect so-called "illegal" immigrants.

These new regulations may well cause harm to ALL workers
regardless of immigration status. Using such an inaccurate and
outdated system like the SSA database means that workers could
face termination by employers who feel that firing a legal
worker on mistaken evidence would be better than taking the risk
of the penalties for having a no-match employee. Of course,
proving that an employee is in fact legal could prove extremely
time consuming, something an employer isnt likely to take on.
The result could be thousands of unlawful firings.

With these new regulations, some employers may actually decide
to go "off the books," promoting the creation of an underground
economy and defeating a primary goal of immigration reform.
"Good" employers who follow the rules would be targeted and
punished while "bad" employers who don't keep records and avoid
taxes will not be reached by the new regulations. "Bad
employers" could also use the letters to intimidate, threaten,
or discriminate against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

Most importantly, any worksite immigration enforcement proposal
should be untaken in the context of a comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time is unnecessary and would
complicate the transition to the new system.

As the director of a small business, I have enough government
directives and regulations to follow. For the sake of my
business and our workers, and thousands of other in our shoes, I
urge you not to enact these new regulations and allow Congress
to reach a comprehensive immigration reform solution.

Sincerely,
David Loeb
1328 6th ST
BERKELEY, California 94710

-----Original Message-----
From: ewu@directv.com [mailto:ewu@directv.com]
Sent: Wednesday, August 02, 2006 4:03 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket ICEB-2006-0004]

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I join with other citizens and business, labor, immigration and privacy groups in saying no to the proposed regulations concerning the Social Security Administration's (SSA) "no-match" letters.

These new regulations will result in a harmful impact to ALL workers regardless of immigration status. Using such a notoriously inaccurate and out of date system like the SSA database means that workers could face termination by panicked employers before they can prove they are on the list mistakenly. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. "Bad employers" could also use the letters to intimidate, threaten, or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone -- all workers regardless of immigration status, our state and local governments, our federal government, and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution.

These regulations are not just unjust; they are economically irresponsible. Employers should not be held responsible. These regulations may induce sudden cuts in the workforce, harm productivity, and eventually hinder the growth of our economy into a downward spiral. We need to do more due diligence in handling these matters. Immigration reform is not the employers responsibility, it is the government's.

Sincerely,
Elizabeth Wu
1950 Rodney Dr. #105
Los Angeles, California 90027

**No-Match Cert. Admin. Record  1030**

```
-----Original Message-----
From: eloisa@acnj.org [mailto:eloisa@acnj.org]
Sent: Thursday, August 03, 2006 12:27 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]
```

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I join with other citizens and business, labor, immigration and
privacy groups in saying no to the proposed regulations
concerning the Social Security Administration's (SSA) "no-match"
letters.

BE SMART the DON'T KEEP YOUR EYES OFF THE BIG PICTURE

These new regulations will result in a harmful impact to ALL
workers regardless of immigration status. Using such a
notoriously inaccurate and out of date system like the SSA
database means that workers could face termination by panicked
employers before they can prove they are on the list mistakenly.
This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform.

BE SMART the DON'T KEEP YOUR EYES OFF THE BIG PICTURE

"Good" employers who follow the rules would be targeted and
punished while "bad" employers who pay in cash and do not keep
records will not be reached by the new regulations. "Bad
employers" could also use the letters to intimidate, threaten,
or discriminate against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone -- all workers
regardless of immigration status, our state and local
governments, our federal government, and our economy. I urge you

not to enact these new regulations and allow Congress to reach a
comprehensive immigration reform solution.


Sincerely,

Eloisa Hernandez-Ramos
305 Keene Street
Perth Amboy, New Jersey 08861

```
----Original Message-----
From: susan_guare@yahoo.com [mailto:susan_guare@yahoo.com]
Sent: Thursday, August 03, 2006 4:44 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]
```

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I join with other citizens and business, labor, immigration and
privacy groups in saying no to the proposed regulations
concerning the Social Security Administration's (SSA) "no-match"
letters.

These new regulations will result in a harmful impact to ALL
workers regardless of immigration status. Most of us,
law-abiding American citizens, have at one time or another
recieved letters questioning some status; I myself recieved one
recently asking why I had cancelled my auto insurance, when I
had done no such thing!

Farmworkers, forestry workers, and minimum wage workers cannot
afford to lose even a day's pay, if an employer should panic and
suspend or fire a worker due to a "no-match" letter. And some
employers may feel increased pressure to go "off the books,"
promoting an underground economy and defeating a primary goal of
immigration reform.

Sincerely,

Susan Guare
39 James Street
Bangor, Maine 04401

**From:** hje1@cornell.edu [mailto:hje1@cornell.edu]
**Sent:** Thursday, August 03, 2006 2:31 PM
**To:** Regs, Rfs
**Subject:** Reject Proposed Worksite Enforcement Regulations [Docket ICEB-2006-0004]

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

As one who has worked for 35 years with both domestic and immigrant farm labor, I am acutely aware of the terrible vulnerability of farmworkers in the work place.

I join with other citizens and business, labor, immigration and privacy groups in saying no to the proposed regulations concerning the Social Security Administration's (SSA) "no-match" letters.

These new regulations will result in a harmful impact to ALL workers regardless of immigration status. Using such a notoriously inaccurate and out of date system like the SSA database means that workers could face termination by panicked employers before they can prove they are on the list mistakenly. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. "Bad employers" could also use the letters to intimidate, threaten, or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone -- all workers regardless of immigration status, our state and local governments, our federal government, and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution.


Sincerely,

Herbert Engman
120 Warren Road
Ithaca, New York 14850

No-Match Cert. Admin. Record  1035

-----Original Message-----
From: jsherman12@aol.com [mailto:jsherman12@aol.com]
Sent: Monday, August 07, 2006 1:31 PM
To: Regs, Rfs
Subject: eject new Bush administration immigration regulations

Director Department of Homeland Security

Dear Director Homeland Security,

I join with other citizens and business, labor,immigration and
privacy groups in saying "no" to the proposed regulations
concerning the Social Security Administration (SSA) "no-match"
letters.

These new regulations will result in a harmful impact on all
workers regardless of immigration status. Using such a
notoriously inaccurate and out-of-date system like the SSA
database means workers could face termination by panicked
employers before they can prove they are mistakenly on the list.
This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. Bad employers could
also use the letters to intimidate, threaten or iscriminate
against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone--all workers regardless
of immigration status, our state and local governments, our
federal government and our economy. I urge you not to enact
these new regulations and allow Congress to reach a
comprehensive immigration reform solution, including the
historic bipartisan AgJobs proposal negotiated by the United
Farm Workers and growers that is within the bill passed by the
U.S. Senate.

Sincerely,

Jocelyn Sherman
2550 N Hollywood Way, Suite 400
Burbank, California 91203

-----Original Message-----
**From:** Sivaprasad, Shoba [mailto:ssivaprasad@immigrationforum.org]
**Sent:** Monday, August 07, 2006 12:13 PM
**To:** Regs, Rfs
**Cc:** Sivaprasad, Shoba
**Subject:** DHS Docket No. ICEB-2006-0004 - Comment by National Immigration Forum
**Importance:** High

Dear Sir or Madam: Attached and pasted below is the National Immigration Forum's comment to DHS Docket No. ICEB-2006-0004.


Sincerely, SSW

**Shoba Sivaprasad Wadhia, Esq.**

Senior Policy Associate/Counsel

National Immigration Forum

August 7, 2006

Via e-mail: rfs.regs@dhs.gov

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

**Re: Comments to Notice of Proposed Rulemaking "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" DHS Docket No. ICEB-2006-0004**

Dear Sir or Madam:

The National Immigration Forum submits the following comment to the proposed rule published on June 14, 2006 by the Bureau of Immigration and Customs Enforcement, of the Department of Homeland Security, "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" DHS Docket No. ICEB-2006-0004. The proposed rule would change existing regulations regarding how employers respond to mismatch letters from the Social Security Administration ("SSA") or the Department of Homeland Security ("DHS").

The National Immigration Forum is one of the nation's premier immigration policy organizations, whose mission is to embrace and uphold America's tradition as a nation of immigrants. The Forum supports a comprehensive solution to our immigration problems which includes effective and targeted enforcement measures that are combined with a reform of our admissions system, and a realistic solution for the undocumented population living in the U.S. This combination is paramount to fixing our broken immigration system.

By contrast, the proposed rule reflects a sweeping enforcement measure that ignores the economic realities that drive illegal migration, undermines the current legislative proposals seeking to combine worksite enforcement with a regulated worker program, contradicts the Administration's own goal to enact comprehensive immigration reform, and penalizes millions of well-intention employers and hardworking immigrants.

*Summary of the Rule*
The proposed rule modifies the regulations by expanding the list of scenarios that may lead to a finding by the agency that the employer had "constructive knowledge" that an employee was not authorized to work and consequently, by continuing to hire the employee, subject the employer to criminal and civil penalties.[1] The rule includes a "safe harbor" provision that imposes many new legal obligations a U.S. employer must follow to avoid liability.

---

[1] The additional scenarios include when the employer receives 1) "written notice from the SSA that the combination of name and SSN submitted for an employee does not match SSA records" and 2)

1

**No-Match Cert. Admin. Record 1038**

The Forum expresses the following concerns:

**We Must Have Comprehensive Immigration Reform**
Our broken immigration system is a complex problem that calls for a comprehensive, practical and workable solution. We have implemented piecemeal enforcement measures for 20 years and have ample evidence that this has not solved the problem. This proposal is more of the same, another isolated enforcement measure that generates a sound bite but no solution. The proposal separates hardworking immigrants from U.S. employers without creating a legal structure that matches our economic realities and the need for adequate legal channels to meet our economy's labor needs. Only through a combination of robust enforcement measures, a regulated worker program, increased family visas, and an earned path to legal status for the millions of undocumented immigrants living and working in the United States can we fix this problem for good. The proposed rule should only be considered in the context of comprehensive immigration reform.

**Undermines the Legislative Process**
The House and the Senate have both passed immigration bills. Both bills contain proposals for a modernized employer verification program as well as hefty penalties for U.S. employers and workers who fail to comply with this program. Implementing the proposed rule before the conclusion of the immigration debate undermines the legislative process and could result in conflicting or duplicative plans. Comprehensive immigration reform is needed and the legislative process is working towards that. The proposed rule should not be considered apart from this ongoing process to enact comprehensive reform.

**Contradicts the Administration's Goal to Enact Comprehensive Immigration Reform**
The proposal contradicts the Administration's goal to have comprehensive immigration as it punishes hardworking immigrants and employers who hire them, without recognizing that we need to create alternative legal channels to allow willing workers to work legally for employers who cannot find American workers to meet their labor needs. President Bush, White House officials and Department of Homeland Security officials have all endorsed comprehensive immigration reform. As recently as July 31, President Bush again stressed that, "we must have comprehensive immigration reform" emphasizing that, "the best way to enforce the border is to have a rational way for people who are doing jobs Americans aren't doing to come to this country ...as part of comprehensive reform."[2]

DHS's own supplemental materials to this rule state "[i]n order to fix the problem of illegal immigration and secure our borders a comprehensive solution is required. All elements of this problem must be addressed together, including the creation of a temporary worker program."[3] This proposed rule directly contradicts this statement as it proposes an isolated

---

"written notice from DHS that the immigration status document, or employment authorization document presented or referenced by the employee in completing Forum I-9 was assigned to another person or that there is not agency record that the document was assigned to anyone."
[2] *President Bush Discusses the Economy in Florida U.S. Coast Guard Integrated Support Command Port of Miami, Miami,* Florida, July 31, 2006
[3] *Press Office,* U.S. Department of Homeland Security, *Talking Points and Q&A's,* SS No-Match Rule, June 9, 2006

2

**No-Match Cert. Admin. Record  1039**

enforcement measure which fails to address the other key components that DHS itself recognizes as necessary for a workable solution. The rule should be rejected in its current form and only considered as part of a comprehensive and practical solution, as championed by the Administration time and time again.

**Will Result in Massive Firings and Drive U.S. Employers and Hardworking Immigrants Further Underground**

Many of the country's 12 million undocumented workers will be fired as a result of an employer receiving a no-match letter under the proposed rule. These immigrants will not pack up and leave but rather be driven further underground and into the black market where they will be paid off the books, hurting the US economy and taxpayers. The only realistic way to address the millions of undocumented in this country is through an earned legalization program combined with the other elements needed for a practical fix to our broken immigration system.

**Additional Concerns**

There are legitimate concerns that thousands of authorized workers will be fired because of inaccurate data in the immigration and social security databases. In addition, there are a number of legitimate reasons for many mismatches including name changes, marriage, divorce and misspellings. This too will result in wrongful firings. Moreover, the modified definition of "constructive notice" raises legal questions which will likely result in costly litigation. Finally, the "safe harbor" provision spelled out by the proposed rule would be overly burdensome on the employer and more importantly, does not provide a solution for the millions of immigrants seeking to work legally in the U.S.

Based on the foregoing reasons, we request that the Department of Homeland Security withdraw this rule and only revisit it in the context of comprehensive immigration reform .

Respectfully submitted,

National Immigration Forum
50 F Street NW, Suite 300
Washington, DC 20001
Phone: (202) 383-5991
Fax: (202) 347-0058
www.immigrationforum.org

Contact: Shoba Sivaprasad Wadhia, Esq., Senior Policy Associate/Counsel

-----Original Message-----
From: jdoug@ix.netcom.com [mailto:jdoug@ix.netcom.com]
Sent: Friday, August 04, 2006 2:58 AM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket ICEB-2006-0004]

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I DO NOT THINK that Americans should put the burden of one person's "criminality" on another: employers are not police. The real crime is to steal these poor people's FICA.

I join with other citizens and business, labor, immigration and privacy groups in saying no to the proposed regulations concerning the Social Security Administration's (SSA) "no-match" letters.

These new regulations will result in a harmful impact to ALL workers regardless of immigration status. Using such a notoriously inaccurate and out of date system like the SSA database means that workers could face termination by panicked employers before they can prove they are on the list mistakenly. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. "Bad employers" could also use the letters to intimidate, threaten, or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone -- all workers regardless of immigration status, our state and local governments, our federal government, and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution.


Sincerely,

J. Doug Ohmans
905 E. 7th St.
Pueblo, Colorado 81001

-----Original Message-----
From: jludwick@viclink.com [mailto:jludwick@viclink.com]
Sent: Friday, August 04, 2006 12:16 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]


Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I urge you to stop the flow of illegal aliens into our country.
Illegal aliens are competing for the jobs of American citizens
and as a result wages and working conditions are being
deminished.

Please require all businesses to screen out illegal aliens from
being hired. The Social Security Administration (SSA) "no-match"
letters are a good start.

These new regulations will result in a positive impact to ALL
workers regardless of immigration status.


Sincerely,

Jim Ludwick
7500 SW Lebold Rd
McMinnville, Oregon 97128

-----Original Message-----
From: lyndaw@mediaweavers.com [mailto:lyndaw@mediaweavers.com]
Sent: Monday, August 07, 2006 5:18 PM
To: Regs, Rfs
Subject: Stop proposed new Bush administration immigration regulations


Director Department of Homeland Security

Dear Director Homeland Security,

I join with other citizens and business, labor,immigration and
privacy groups in saying "no" to the proposed regulations
concerning the Social Security Administration (SSA) "no-match"
letters.

These new regulations will result in a harmful impact on all
workers regardless of immigration status. Using such a
notoriously inaccurate and out-of-date system like the SSA
database means workers could face termination by panicked
employers before they can prove they are mistakenly on the list.
This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. Bad employers could
also use the letters to intimidate, threaten or discriminate
against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite enforcement enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone--all workers regardless
of immigration status, our state and local governments, our
federal government and our economy. I urge you not to enact
these new regulations and allow Congress to reach a
comprehensive immigration reform solution, including the
historic bipartisan AgJobs proposal negotiated by the United
Farm Workers and growers that is within the bill passed by the
U.S. Senate.

Sincerely,

Lynda Winslow
1442A Walnut Street
#373
Berkeley, California 94702

-----Original Message-----
From: wpeltz@nycap.rr.com [mailto:wpeltz@nycap.rr.com]
Sent: Monday, August 07, 2006 9:09 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket ICEB-2006-0004]


Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I join with other citizens and business, labor, immigration and privacy groups in opposing the proposed regulations concerning the Social Security Administration's (SSA) "no-match" letters.

These new regulations will result in a harmful impact to ALL workers regardless of immigration status. Using such a notoriously inaccurate and out of date system like the SSA database means that workers could face termination by panicked employers before they can prove they are on the list mistakenly. This would lead to thousands of unlawful mass firings.

There are many other likely unintended harmful consequences.

Worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform, which is still unclear.

These proposed regulations are likely to hurt everyone -- all workers regardless of immigration status, our state and local governments, our federal government, and our economy.

I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution.


Sincerely,

William Peltz
109 Grove Ave.
Albany, New York 12208-3120

-----Original Message-----
From: starbix@hotmail.com [mailto:starbix@hotmail.com]
Sent: Monday, August 07, 2006 5:58 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]


Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I'm writing to oppose the proposed regulations concerning the
Social Security Administration's (SSA) "no-match" letters.

The regulations as proposed could negatively impact ALL workers
regardless of immigration status. Using such a notoriously
inaccurate and out of date system like the SSA database means
that workers could face termination by panicked employers before
they can prove they are on the list mistakenly. This would lead
to thousands of mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. "Bad employers"
could also use the letters to intimidate, threaten, or
discriminate against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, I urge DHS to wait for Congress to pass immigration
reform legislation before taking action.

These proposed regulations hurt everyone -- all workers
regardless of immigration status, our state and local
governments, our federal government, and our economy. I urge you
not to enact these new regulations and allow Congress to reach a
comprehensive immigration reform solution.


Sincerely,

Rolando Palacios
29 E. Madison, Suite 910
Chicago, Illinois 60602

Director Department of Homeland Security

Dear Director Homeland Security,

I join with other citizens and business, labor, immigration and privacy groups in saying "no" to the proposed regulations concerning the Social Security Administration (SSA) "no-match" letters.

These new regulations will result in a harmful impact on all workers regardless of immigration status. Using such a notoriously inaccurate and out-of-date system like the SSA database means workers could face termination by panicked employers before they can prove they are mistakenly on the list. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. Bad employers could also use the letters to intimidate, threaten or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone--all workers regardless of immigration status, our state and local governments, our federal government and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution, including the historic bipartisan AgJobs proposal negotiated by the United Farm Workers and growers that is within the bill passed by the U.S. Senate.

Sincerely,

Onofre Antonio Abarca
560 Thomas L. Berkley Way
Oakland, California 94612

Director Department of Homeland Security


Dear Director Homeland Security,

I join with other citizens and business, labor,immigration and privacy groups in saying "no" to the proposed regulations concerning the Social Security Administration (SSA) "no-match" letters.

These new regulations will result in a harmful impact on all workers regardless of immigration status. Using such a notoriously inaccurate and out-of-date system like the SSA database means workers could face termination by panicked employers before they can prove they are mistakenly on the list. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. Bad employers could also use the letters to intimidate, threaten or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone--all workers regardless of immigration status, our state and local governments, our federal government and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution, including the historic bipartisan AgJobs proposal negotiated by the United Farm Workers and growers that is within the bill passed by the U.S. Senate.



Sincerely,

**No-Match Cert. Admin. Record  1049**

Virginia Johnson
14769 Lunsford Rd.
Morning View, Kentucky 41063

No-Match Cert. Admin. Record  1050

Director Department of Homeland Security

Dear Director Homeland Security,

I join with other citizens and business, labor, immigration and privacy groups in saying "no" to the proposed regulations concerning the Social Security Administration (SSA) "no-match" letters.

These new regulations will result in a harmful impact on all workers regardless of immigration status. Using such a notoriously inaccurate and out-of-date system like the SSA database means workers could face termination by panicked employers before they can prove they are mistakenly on the list. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. Bad employers could also use the letters to intimidate, threaten or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone--all workers regardless of immigration status, our state and local governments, our federal government and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution, including the historic bipartisan AgJobs proposal negotiated by the United Farm Workers and growers that is within the bill passed by the U.S. Senate.

Sincerely,

Debbie Anderson
736 McDaniel St
Sun City Center, Florida 33573

Director Department of Homeland Security

Dear Director Homeland Security,

I join with other citizens and business, labor,immigration and privacy groups in saying "no" to the proposed regulations concerning the Social Security Administration (SSA) "no-match" letters.

These new regulations will result in a harmful impact on all workers regardless of immigration status. Using such a notoriously inaccurate and out-of-date system like the SSA database means workers could face termination by panicked employers before they can prove they are mistakenly on the list. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. Bad employers could also use the letters to intimidate, threaten or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone--all workers regardless of immigration status, our state and local governments, our federal government and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution, including the historic bipartisan AgJobs proposal negotiated by the United Farm Workers and growers that is within the bill passed by the U.S. Senate.

Sincerely,

mary nella gonzales
1820 hughes lane
bakersfield, California 93304

Director Department of Homeland Security

Dear Director Homeland Security,

I join with other citizens and business, labor,immigration and privacy groups in saying "no" to the proposed regulations concerning the Social Security Administration (SSA) "no-match" letters.

These new regulations will result in a harmful impact on all workers regardless of immigration status. Using such a notoriously inaccurate and out-of-date system like the SSA database means workers could face termination by panicked employers before they can prove they are mistakenly on the list. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. Bad employers could also use the letters to intimidate, threaten or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone--all workers regardless of immigration status, our state and local governments, our federal government and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution, including the historic bipartisan AgJobs proposal negotiated by the United Farm Workers and growers that is within the bill passed by the U.S. Senate.

Sincerely,

Veronica Villasenor
1463 D Street
Hayward, California 94541

-----Original Message-----
From: nancydahlberg@earthlink.net [mailto:nancydahlberg@earthlink.net]
Sent: Monday, August 07, 2006 5:01 PM
To: Regs, Rfs
Subject: Reject new Bush administration immigration regulations


Director Department of Homeland Security

Dear Director Homeland Security,

I say "no" to the proposed regulations concerning the Social
Security Administration (SSA) "no-match" letters.

The government's purpose when it issues SSA no-match letters is
not meant to police the immigration status of workers but are
meant to be used to credit retirement earnings for workers.
These proposed regulations inappropriately transform harmless
no-match letters into tools of immigration law enforcement.

Besides, using the notoriously inaccurate and out-of-date system
like the SSA database means workers could face termination by
panicked employers before they can prove they are mistakenly on
the list. This would lead to thousands of unlawful mass firings.


In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

I urge you not to enact these new regulations but to allow
Congress to reach a comprehensive immigration reform solution,
including the historic bipartisan AgJobs proposal negotiated by
the United Farm Workers and growers that is within the bill
passed by the U.S. Senate.


Sincerely,

Nancy Dahlberg
1757 NW 59th St., #301
Seattle, Washington 98107

No-Match Cert. Admin. Record  1058

-----Original Message-----
From: ceolsen@execpc.com [mailto:ceolsen@execpc.com]
Sent: Tuesday, August 08, 2006 10:13 AM
To: Regs, Rfs
Subject: Reject new Bush Jr. regime immigration regulations

Director Department of Homeland Security

Dear Director Homeland Security,

I join with other citizens and business, labor,immigration and
privacy groups in saying "no" to the proposed regulations
concerning the Social Security Administration (SSA) "no-match"
letters.

These new regulations would have a harmful impact on all workers
regardless of immigration status. Using such a notoriously
inaccurate and out-of-date system like the SSA database means
workers could face termination by panicked employers before they
can prove they are mistakenly on the list. This would lead to
thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. Bad employers could
also use the letters to intimidate, threaten or discriminate
against workers.

The USA government's purpose, when it issues SSA no-match
letters, has never been to police the immigration status of
workers. Instead of being used to credit retirement earnings for
workers, these proposed regulations inappropriately transform
harmless no-match letters into tools of immigration law
enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone: all workers regardless
of immigration status, state and local governments, the federal
government and the economy. I urge you not to enact these new
regulations and allow teh USA Congress to reach a comprehensive
immigration reform solution, including the historic bipartisan
AgJobs proposal negotiated by the United Farm Workers and
growers that is within the bill passed by the USA Senate.


Sincerely,

Corey E. Olsen
W334S724 Cushing Park Rd.
Delafield, Wisconsin 53018

```
-----Original Message-----
From: dancinggiraffe@yahoo.com [mailto:dancinggiraffe@yahoo.com]
Sent: Monday, August 07, 2006 4:54 PM
To: Regs, Rfs
Subject: Reject new immigration regulations
```

Director Department of Homeland Security

Dear Director Homeland Security,

I join with other citizens and business, labor,immigration and privacy groups in saying "no" to the proposed regulations concerning the Social Security Administration (SSA) "no-match" letters.

These new regulations will result in a harmful impact on all workers regardless of immigration status. Using such a notoriously inaccurate and out-of-date system like the SSA database means workers could face termination by panicked employers before they can prove they are mistakenly on the list. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. Bad employers could also use the letters to intimidate, threaten or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone--all workers regardless of immigration status, our state and local governments, our federal government and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution, including the historic bipartisan AgJobs proposal negotiated by the United Farm Workers and growers that is within the bill passed by the U.S. Senate.

Thanks for listening.

Sincerely,

Deborah J Brooks
453 Holly Park Cir
San Francisco, California 94110

-----Original Message-----
From: lawrencesmith2@hotmail.com [mailto:lawrencesmith2@hotmail.com]
Sent: Monday, August 07, 2006 7:47 PM
To: Regs, Rfs
Subject: Reject new Bush administration immigration regulations!

Director Department of Homeland Security

Dear Director Homeland Security,

I join with other citisens and business, labour,immigration and
privacy groups in saying "no" to the proposed regulations
concerning the Social Security Administration (SSA) "no-match"
letters.

These new regulations will result in a harmful impact on all
workers regardless of immigration status. Using such a
notoriously inaccurate and out-of-date system like the SSA
database means workers could face termination by panicked
employers before they can prove they are mistakenly on the list.
This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. Bad employers could
also use the letters to intimidate, threaten or discriminate
against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone--all workers regardless
of immigration status, our state and local governments, our
federal government and our economy. I urge you not to enact
these new regulations and allow Congress to reach a
comprehensive immigration reform solution, including the
historic bipartisan AgJobs proposal negotiated by the United
Farm Workers and growers that is within the bill passed by the
U.S. Senate.

"For I was hungry and you gave me no food; I was thirsty and you
gave me no drink; I was a stranger, and you did not take me in,
naked and you did not clothe me, sick and in prison and you did
not visit me. Then they also will answer him, saying, 'Lord,
when did we see you hungry or thirsty or a stranger or naked or
sick or in prison, and did not minister to you?' Then will he
answer them, saying, 'Assuredly, I say to you, inasmuch as you
did not do it to one of the least of these, you did not do it to
me." (Matthew 25:42-45)

Contained within every evil(greedy profiteering republican) act
are the seeds of its own destruction. Adhere to the teachings of
Jesus, as contained in The Urantia Book, or else suffer the
consequences. It IS that simple. TRUTH has been spoken to power,
Peace will prevail. Buck Fush!

SUPPORT U.S. TROOPS, AND GLOBAL PEACE AND ECONOMIC STABILITY, AS
WELL AS ECOLOGICAL SUSTAINABILITY... IMPEACH BUSH AND CHENEY
NOW!


Sincerely,

Lawrence Smith, BA
123 A St
Saint Simons Island, Georgia 31522

-----Original Message-----
From: marien.a.levy@gmail.com [mailto:marien.a.levy@gmail.com]
Sent: Tuesday, August 08, 2006 10:09 AM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket ICEB-2006-0004]

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I join with other citizens and with business, labor, immigration and privacy groups in saying 'No' to the proposed regulations concerning the Social Security Administration's (SSA) "no-match" letters.

These new regulations will result in a harmful impact to ALL workers regardless of immigration status.
Using such a notoriously inaccurate and out of date system as the SSA database means that workers could face termination by panicked employers before they can prove that their "no-match" letter was sent mistakenly. This would lead to thousands of unlawful mass firings, many for reasons like post-divorce name changes ... reasons entirely separate from immigration status.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. "Bad employers" could also use the letters to intimidate, threaten, or discriminate against workers, furthering the negative impact that this proposal will have on human rights.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone -- business owners, all workers regardless of immigration status, our state and local governments, our federal government, and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution.

Sincerely,

Marien Levy
666 Cady Hill Rd
Perkinsville, Vermont 05151

| **Northwest Federation of Community Organizations** *Taking Action, Making Change* | | |
|---|---|---|
| 1265 S. Main St, Ste # 305 **Seattle, WA 98144** | | **Phone: 206-568-5400 Fax: 206-568-5444 www.nwfco.org** |

August 7, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:*    *DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

The Northwest Federation of Community Organzialions (NWFCO) submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The Northwest Federation of Community Organizations is a regional network of four grassroots organizations: Idaho Community Action Network (ICAN), Montana People's Action (MPA), Oregon Action (OA), and Washington Citizen Action (WCA). NWFCO's mission is to achieve systemic change by building strong state affiliate organizations and by executing national and regional campaigns that advance economic, racial, and social justice.

NWFCO is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**<u>including U.S. citizens and authorized noncitizens</u>**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **<u>unregulated underground cash economy</u>** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed.  Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform**.  The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process.  Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective.  In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list.  The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law.  The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality.  These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws.  This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow.  The proposed rule also contains unrealistic timetables for compliance that will derail its implementation.  Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule.  The actual costs of administrating the program will be astronomical for SSA, an

agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

LeeAnn Hall
Executive Director

ICEB-2006-0004-0083

Comment Info: ================

General Comment:Please see attached comments in PDF format.  I do not have a scanner to scan in
my signature onto the document but have  inserted an /S/ at the signature line
to indicate my signature.

No-Match Cert. Admin. Record  1068



309 Cumberland Avenue, Suite 201
P.O. 17917, Portland, ME 04112
207-780-1593 • fax: 207-699-2313
info@ilapmaine.org • www.ilapmaine.org

August 10, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529                                                    <u>By Priority Mail</u>

**Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"**

Dear Sir or Madam:

The Immigrant Legal Advocacy Project (ILAP) submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

ILAP is Maine's only nonprofit provider of free and low-fee immigration law and related legal assistance to low-income Mainers. We serve between 1500 and 2000 low-income Maine immigrants annually, and their U.S. citizen family members. ILAP has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on immigrant workers and their U.S. citizen family members in Maine.

As a result of our work, ILAP is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:



**No-Match Cert. Admin. Record 1069**

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform.** The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens

who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution

whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses.  For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Sincerely,

/S/

Beth Stickney, Esq.
Executive Director

Director Department of Homeland Security

Dear Director Homeland Security,

I have concerns about the proposed regulations involving the
Social Security Administration's "no-match" letters.

The current I-9 regulations have only been halfheartedly
enforced to verify the legal ability of an individual to work in
the United States. Relying on a potentially inaccurate and
out-of-date system like the SSA database may not be the best way
to go.

Regulations should be examined that require all employers and
employees to adhere to: a consistent standard of documents to be
utilized; procedural due process; appropriate retention
parameters; and increased law enforcement where warranted.

I urge you to consider these concerns when examining new
regulations. Thank you.

Sincerely,

Charles Barragan
23 Liberty
San Francisco, California 94110

ICEB-2006-0004-0086

Comment Info: ===============

General Comment:Primary concern with the rule is can property managers still effectively manage in
a prudent and workable manner in such specified instances?

The Department of Homeland Security program for verification should match the Social Security Administration?s call-in program or be implemented in another time-efficient electronic format.   Waiting for letters to go back and forth in the U.S. Mail is unacceptable with today's technology.

No-Match Cert. Admin. Record  1074

Gail Duke, CPM®
Senior Vice President
Institute of Real Estate Management
430 North Michigan Avenue
Chicago, IL 60611

August 10, 2006

Department of Homeland Security
8 CFR Part 274a
ICE 2377-06; Docket No. ICEB-2006-0004
RIN 1653-AA50

Electronic Filing to: www.regulations.org

**Subject: Safe Harbor Procedures For Employers Who Receive A No-Match Letter**

To Whom It May Concern:

As a Senior Vice President of the Institute of Real Estate Management (IREM®), I am representing IREM in responding to the request for comments on the proposed changes to the regulations relating to the unlawful hiring or continued employment of unauthorized aliens contained in the document cited above.  My comments are limited to concerns raised by IREM members.  I have also included a very brief overview of IREM and the number of properties managed by our members for your information.

**Overview of Institute of Real Estate Management**
The Institute of Real Estate Management (IREM®) has been the source for education, resources, information and membership for real estate management professionals for more than 70 years. An affiliate of the NATIONAL ASSOCIATION OF REALTORS®, IREM is the only professional real estate management association serving both the multi-family and commercial real estate sectors. With 82 U.S. chapters, eight international chapters and several other partnerships around the globe, IREM is an international organization that serves as an advocate on issues affecting the real estate management industry.

Membership includes more than 18,000 individual members and 525 corporate members.  IREM promotes ethical real estate management practices through its credentialed membership programs, including the Certified Property Manager® (CPM®) designation, the Accredited Residential Manager® (ARM®) certification, the Accredited Commercial Manager certification and the Accredited Management Organization® (AMO®) accreditation.  These esteemed designations certify competence and professionalism for those engaged in real estate management.  In addition, IREM offers Associate, Student and Academic membership status.

Collectively, IREM Members manage more than 6.5 billion square feet of commercial space and 13 million residential units, totaling over $848.2 billion in real estate assets. IREM Members are employed by some of the most prestigious real estate firms in the world and nearly 70% hold

**No-Match Cert. Admin. Record  1075**

upper-level management positions. Due to their professionalism and vast experience, property owners and investors worldwide continually seek out the management services of IREM Members.

**Comments**
Members of IREM stated their primary concern with the rule is can property managers still effectively manage in a prudent and workable manner in such specified instances?

The Department of Homeland Security program for verification should match the Social Security Administration's call-in program or be implemented in another time-efficient electronic format. Waiting for letters to go back and forth in the U.S. Mail is unacceptable with today's technology.

Please contact Charles Achilles, IREM Vice President for Legislation, at 312-329-6020 or cachille@irem.org, if you need further information or clarification.

Sincerely,


Gail Duke, CPM
IREM Senior Vice President

ICEB-2006-0004-0088

Comment Info: =================

General Comment:LEGAL AID SERVICES OF OREGON strongly opposes the implementation of the
proposed ?Safe-Harbor Procedures for Employers Who Receive a No-Match
Letter.?

No-Match Cert. Admin. Record  1077

# Legal Aid Services of Oregon
## Hillsboro Regional Office

| | |
|---|---|
| **230 NE Second Avenue, Suite A**<br>**Hillsboro, Oregon 97124-3089** | **Telephone**  (503) 648-7163<br>**Facsimile**   (503) 648-0513<br>**Toll-Free**   1-888-245-4091 |

August 11, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

**Re:**      *DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir/Madam:

The Farmworker Program of **LEGAL AID SERVICES OF OREGON (LASO)** submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

LASO is a non-profit legal aid organization that provides free legal assistance to low-income clients. LASO's Farmworker Program specializes in providing assistance to the state's 175,000 migrant and seasonal farm, nursery, forestry, and food processing workers in matters relating to employment, health and safety in the workplace and labor camps, taxes, and consumer law.

LASO's concern about the proposed rule stems from our history of work with migrant and seasonal farmworkers across the state of Oregon. Our experience with our client community – immigrant and US-born farmworkers and their families – has shown us the adverse impact of Social Security Administration's (SSA) no-match letters.

As a result of this experience, **LEGAL AID SERVICES OF OREGON strongly opposes** the **implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter."** Such a rule will increase the adverse impact that SSA no-match letters have had on workers, and will trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although the proposed rule will cause enormous upheavals in the workplace, it will have no impact on undocumented immigration. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We urge DHS to withdraw this proposed rule in its entirety based on these concerns, as summarized here:

**No-Match Cert. Admin. Record  1078**

**(1)  The proposed rule will harm <u>all</u> workers regardless of immigration status.**

The proposed rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion, employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA.  The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors.   Most of our farmworker clients are from Mexico or have Mexican ancestry.  Their surnames are Spanish and are frequently misspelled. Moreover, many people from Mexico have two surnames – which governmental and non-governmental agencies and institutions, among others, commonly confuse: the surnames are frequently written in the wrong order, they sometimes are hyphenated and sometimes are not.  Errors and inconsistencies abound.  Moreover, many of our farmworker clients live in labor camps, where they have problems accessing phones, faxes, mail, and transportation.  In addition, most have limited English language skills.  Therefore, correcting a no-match error would be extremely difficult for them, especially in the short time period proposed.  In sum, hundreds of thousands of workers—<u>including U.S. citizens and noncitizens authorized to work in the US, like our clients</u>—could lose their jobs.  Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Moreover, unscrupulous employers already use the SSA no-match letter to thwart labor organization's efforts and to retaliate against workers who have been injured on the job or who complain of unpaid wages or other labor violations.  In documented cases (including arbitration decisions) from across the country, employers have initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages.  The proposed rule would only exacerbate this problem.

**(2)  The proposed rule will expand the unregulated underground cash economy and will reward employers who violate the law.**

The term "safe-harbor" for employers is a misnomer.  Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers.  These new legal obligations will increase pressure on businesses to go "off the books," thereby promoting the <u>unregulated underground cash economy</u> which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

Significantly, the proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books.  These "good" employers will be put at a disadvantage as compared to "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

**(3)  The proposed rule circumvents the legislative process.**

The proposed rule is badly timed.  Any worksite immigration enforcement proposal should happen in the context of <u>comprehensive immigration reform</u>.  The House and the Senate have both passed bills that contain worksite enforcement mechanisms.  Implementing the proposed regulations at this time would be an end-run around that process.  Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

Page 2 of 4

**(4)  The SSA no-match letter program is a poor tool for immigration enforcement and alters current law and federal guidance in this area.**

The proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective.  In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization.  Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list.  The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law.  By dramatically altering the existing  definition of "constructive knowledge," the proposed rule makes a stark departure from existing case law and long-standing federal guidance in this area – despite the fact that the SSA no-match letter provides no evidence of immigration status.

**(5)  The proposed rule is an erosion of privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality.  These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws.   The proposed rule permits DHS to sidestep these privacy protections and commandeer personal information in the SSA database for their own purposes.

**(6)  The costs of implementing the proposed rule are prohibitively high.**

If the proposed rule is carried out, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat widespread panic and confusion that will almost certainly follow the promulgation of the rule.  In addition, the proposed rule contains unrealistic timetables for compliance that will derail its implementation.  Further, although the proposed rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule.  The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law.  The proposed rule should therefore be withdrawn.

**(7)  The proposed rule is objectionable because compliance is impractical.**

Even though the proposed rule purports to provide a "safe-harbor," it does not provide clear guidance as to the action an employer should take upon receiving a DHS notice.   While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records.  Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not provide enough time for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.  As stated above, many of our clients are farmworkers who live in labor camps where they have minimal, if any, access to telephone, fax, and mail services.  Moreover, many of the farmworkers lack transportation and have limited English language skills.

In sum, Legal Aid Services of Oregon strongly opposes the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter."

**No-Match Cert. Admin. Record  1080**

Simply stated, the proposed rule is the wrong rule at the wrong time.  The Department of Homeland Security should not put at risk the livelihoods of hundreds of thousands—possibly millions—of workers in a poorly-conceived immigration enforcement attempt, on the eve of comprehensive immigration reform.  The proposed rule provides no solution to the hiring and exploitation of undocumented workers and will be astronomically expensive to implement.  The burden of these costs will be borne by taxpayers, workers, and businesses.  For all of these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,

**LEGAL AID SERVICES OF OREGON**
**Molly Graver, Attorney**
**Farmworker Program**
**230 NE 2nd Ave, Suite A**
**tel (503) 648-7163**
**fax (503) 648-0513**
**molly.graver@lasoregon.org**

No-Match Cert. Admin. Record  1081

ICEB-2006-0004-0089

Comment Info: =================

General Comment:Enclosed are comments submitted by the Building Service Contractors Association International in response to the request for public comments related to Docket ID ICEB-2006-0004.

Sincerely,

Michael Zolandz, Esq.
Government Affairs Counsel

No-Match Cert. Admin. Record  1082



# Building Service Contractors Association International

10201 Lee Highway • Suite 225 • Fairfax, VA 22030 • 703-359-7090 & 800-368-3414 • Fax 703-352-0493 • www.bscai.org

**President Emeritus**
James E. Purcell, CBSE

**OFFICERS**
**President**
Donald Feldsger, Sr., CBSE
FMI Services Group, Inc.
Charleston, SC

**President-elect**
John S. Ezzo, CBSE
New Image Building Services
Mt. Clemens, MI

**Vice President**
Ernest Clark, Jr., CBSE
Mister Kleen Maintenance Co.
Alexandria, VA

**Treasurer**
Stanley Doobin
Harvard Maintenance, Inc.
New York, NY

**Immediate Past President**
Greg Littlefield
Professional Facilities Management
Montgomery, AL

**2007 DIRECTORS**
LeRoy Dock, CBSE
Gail Service Industries, Inc.
Bethesda, MD

Steve Garcia, CBSE
SMI Facility Services, Inc.
Albuquerque, NM

J. Todd Hopkins, CBSE
Office Pride, Inc.
Gulf Breeze, FL

Mario Levesseur, CBSE
Empire Maintenance Industries
St. Laurent, Quebec
CANADA

**2008 DIRECTORS**
Dan Keeter, CBSE
Enviro-Clean Services, Inc.
Holland, MI

Maurice Lesperance
Fiima Kleen
Branford, Ontario
CANADA

Mitchell M. Murch, II, CBSE
Mich Murch's Maintenance
Management Company
St. Louis, MO

Steve Seulhard, CBSE
Cross Gate Services, Inc.
Brentwood, TN

**2009 DIRECTORS**
Mark Klein
Sunshine Cleaning Systems, Inc.
Ft. Lauderdale, FL

Thomas Kruse
Scioto Services LLC
Marysville, OH

Sally Schopmeyer
Maintenance, Inc.
Dallas, TX

Terry Woodley, CBSE
Woodley Building Maintenance, Inc.
Kansas City, MO

**PARTNER ASSOCIATION DIRECTORS**
Sean Rohan
Capitol Association of Building
Service Contractors
Owings Mills, MD

Roman Chaziel
Illinois Association of Building
Maintenance Contractors
Des Plaines, IL

Mike Farnam
Pacific Association of Building
Service Contractors
Fontana, CA

**Executive Vice President**
Carol A. Dean

August 11, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N. W., 2nd Floor
Washington, DC 20529

**RE: DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**

Dear Director:

This letter is in response to the above-referenced notice of proposed rulemaking published on June 14, 2006. The Building Service Contractors Association International (BSCAI) is the leading trade association and certification body for the building services industry. Our more than 2,000 members include many companies that employ thousands of workers nationally, as well as a significant number of entrepreneurial, family-run businesses. BSCAI's members provide cleaning, facility maintenance, security, and a host of related services to public and private-sector property owners across the country, in both commercial and residential settings. Employees in our industry work in sports arenas, airports, federal and state buildings, and large and small commercial offices across the country, with many of our member companies operating in multiple states, with a large percentage of the work occurring after the close of business. As an association, BSCAI has been consistently supportive and engaged in efforts to improve immigration policy while ensuring that we employ and legal and well-trained workforce.

The proposed changes to the existing "no-match" process, including the proposed "safe harbor" protocols and deadlines, would impose a tremendous burden on employers in our industry far in excess of any potential benefits achieved by the new process. For large employers, the new safe harbor provisions and deadlines do not provide a feasible amount of time for properly communicating issues with employees, reviewing appropriate internal records, and communicating effectively and accurately with federal agencies in the event information is inaccurate or needs to be corrected in some other fashion. For small employers, the compliance burden is even more pronounced, as the resources required to properly comply with the proposed safe harbor require considerable personnel resources unavailable to many smaller and mid-size employers. Additionally, the proposed safe harbor involves an extremely narrow range of potential corrective actions by employers, many of which do not reflect the reality of available DHS and Social Security Administration field offices to handle inquiries on a timely basis.

As contractors, the vast majority of our employees work outside of the office at our clients' facilities or job sites. Additionally, given the nature of our workforce, many employees work a second job during the day. While our members have developed mechanisms for coordinating communication, reaching employees to resolve personnel issues is a significant challenge, as administrative and human resources personnel typically do not work in the evening -- which is precisely the time of day in which most of our employees are engaged in their jobs at building sites.



# Building Service Contractors Association International

10201 Lee Highway • Suite 225 • Fairfax, VA 22030 • 703-359-7090 & 800-368-3414 • Fax 703-352-0493 • www.bscai.org

President Emeritus
James E. Purcell, CBSE

OFFICERS
President
Donald Pottieger, Sr., CBSE
FMI Services Group, Inc.
Charleston, SC

President-elect
John S. Ezze, CBSE
New Image Building Services
Mt. Clemens, MI

Vice President
Ernest Clark, Jr., CBSE
Meier Kleen Maintenance Co.
Alexandria, VA

Treasurer
Stanley Doobin
Harvard Maintenance, Inc.
New York, NY

Immediate Past President
Greg Littlefield
Professional Facilities Management
Montgomery, AL

2007 DIRECTORS
LeRoy Dock, CBSE
Gail Service Industries, Inc.
Bethesda, MD

Steve Garcia, CBSE
SMI Facility Services, Inc.
Albuquerque, NM

J. Todd Hopkins, CBSE
Office Pride, Inc.
Gulf Breeze, FL

Mario Levasseur, CBSE
Empire Maintenance Industries
St. Laurent, Quebec
CANADA

2008 DIRECTORS
Dan Koster, CBSE
Enviro-Clean Services, Inc.
Holland, MI

Maurice Lesperance
Päms Kleen
Brantford, Ontario
CANADA

Mitchell M. Murch, II, CBSE
Mitch Murch's Maintenance
Management Company
St. Louis, MO

Steve Southard, CBSE
Cross Gate Services, Inc.
Brentwood, TN

2009 DIRECTORS
Mark Klein
Sunshine Cleaning Systems, Inc.
Ft. Lauderdale, FL

Thomas Kruse
Scioto Services LLC
Maysville, OH

Sally Schopmeyer
Maintenance, Inc.
Dallas, TX

Terry Woodley, CBSE
Woodley Building Maintenance, Inc.
Kansas City, MO

PARTNER ASSOCIATION DIRECTORS
Sean Rahan
Capitol Association of Building
Service Contractors
Owings Mills, MD

Roman Chmiel
Illinois Association of Building
Maintenance Contractors
Des Plaines, IL

Mike Farnam
Pacific Association of Building
Service Contractors
Fontana, CA

Executive Vice President
Carol A. Dean

Given the sensitive nature of the issues involved, communicating with employees by mail or other means other than in-person communication is not only difficult, but raises privacy concerns. Rather than a 63 day period in which to take corrective action, it is our view that 123 days would provide a far more reasonable period of time.

Adding to BSCAI's concerns over the proposed rule is that the current approach does nothing to address the existing inaccuracies in the Social Security Administration's database. Many of our members conduct background checks or utilize other means to verify an employee's social security number and authorization to work in the U.S. prior to hiring, but nevertheless receive no-match letters on those very same employees. By modifying the existing standard of care for employers in the context of "constructive knowledge," the proposed rule is likely to impose new burdens, and potentially penalize employers who take reasonable steps to verify workers' information as part of the hiring process.

To that end, BSCAI would strongly recommend that the Social Security Administration provide employers with efficient and direct access to the SSA database in order to verify employee data. Creating new safe harbor and changing the constructive notice framework without providing some improved mechanism for employers to comply with the law shifts the burden almost entirely onto employers and their employees, in stark contrast to the existing shared burdens and the approach adopted by revised Immigration reform legislation supported by the Administration.

BSCAI is committed to promoting a level playing field and fair business amongst competitors, and agrees that cracking down on the hiring of undocumented workers is in the best interest of all parties. Our concerns with the proposed rule are that the burdens far outweigh the potential benefit, and that the proposal does nothing to provide assistance to employers in complying with the new rule or existing law.

Sincerely,

*Donald L. Pottieger Sr. CBSE*

Donald Pottieger, Sr., CBSE
President
Building Service Contractors Association International

**No-Match Cert. Admin. Record 1084**

July 27, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N. W., 2nd Floor
Washington, DC 20529

**RE:**     **DHS Docket No. ICEB-2006-0004 Safe-Harbor Procedures for Employers
Who Receive a No-Match Letter**

Dear Director:

As requested in the Public Participation section of the Proposed Rules, I am
commenting on the time limits described in the rule. I believe a 60-day period granted to
employers after they receive a no-match letter from the Social Security Administration is
a sufficient time frame to resolve discrepancy issues involving social security accounts.
This is based on fact that the general public has much greater access to the Social
Security Administration offices throughout the United States than those dealing with
immigration-related employment issues.

However, when the issue involves resolving discrepancies concerning
immigration-status or employment-authorization documentation presented or referred to
while completing Form I-9, such as a work authorization or a permanent resident card, I
would recommend providing employers at least a 90-day period to verify employee's
identity or employment eligibility. This recommendation is based on the fact that from
the moment an individual submits an application for employment authorization, it takes
the U.S. Citizenship and Immigration Services between 30 and 90 days to acknowledge
receiving the application and additional time to schedule appropriate procedures. Due to
limited locations of regional U.S. Citizenship and Immigration Services offices,
interviews and verification of biometric data have to be scheduled well in advance. Under
these circumstances, it is unreasonable to expect that an employee who failed to apply for
a renewal employment authorization card within the time frame recommended by the U.
S. Citizenship and Immigration Services (90 days prior to expiration) will be able to
produce a renewed card within the 60-day time frame.

The same holds true for conditional residents of the U.S. who obtained their
resident status through marriage to a U.S. citizen or a permanent resident and were issued
a *conditional* permanent resident card, often referred to as a "green card." For various
reasons, some employees fail to apply to remove the conditions on his or her residence in
a timely manner. One of the factors that may contribute to a problem is that both
'conditional' and 'permanent' green cards are named "Permanent Resident Card".

**No-Match Cert. Admin. Record  1085**

Director, Regulatory Management Division
July 27, 2006
Page 2


However, on a conditional green card there is an expiration period of two years listed on its face, which is the only indication of its conditionality. Needless to say, lack of explicit wording on the card leaves the issue open to interpretation by the general public and, as a result, employees don't always apply for a renewal card within the time frame recommended by the U.S. Citizenship and Immigration Services. Therefore, I propose a period of not less than 90 days to be a more reasonable time frame for this part of the proposal.


Sincerely,

*Elvira Alexander*

Elvira Alexander

ICEB-2006-0004-0091

Comment Info: =================
General Comment:August 14, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW
2nd Floor
Washington, DC 20529

RE:    DHS Docket No. ICEB-2006-0004
Safe-Harbor Procedures for Employers Who Receive a No-Match Letter
Comments of the American Hotel & Lodging Association

Dear Director:

On behalf of the American Hotel & Lodging Association (AH&LA), we appreciate
the opportunity to file these comments with U.S. Citizenship and Immigration
Services (USCIS) in response to the proposed rule on procedures in response to
proposed regulations on no-match letter procedures published in the Federal
Register on June 14, 2006.

AH&LA is a 96-year-old dual membership association of state and city partner
lodging associations throughout the United States with some 10,000 property
members nationwide, representing more than 1.4 million guest rooms and over 1.1
million employees in the United States.  Our industry's annual sales exceed $93
billion and our yearly payroll exceeds $20 billion. AH&LA's membership ranges
from the smallest independent properties to the largest convention hotels.  Every
hotel or motel in our country is unique due to factors that include size, type,
location, services offered, clientele, ownership, and status as an independent or
chain affiliate.  In fact, there is a high degree of franchising and independent
ownership in our industry.

Our members greatly appreciate the efforts of USCIS to provide a greater degree
of certainty and guidance in the treatment of ?no-match? letters.  However, we
believe that the implementation of this regulation at this time will cause economic
disruption and increased confusion in handling no-match letters.

AH&LA believes that regulations affecting the treatment of no-match letters should
be issued as part of the enactment of immigration reform legislation.  Bills to
reform our immigration laws have been passed by both the House (H.R. 4437) and
Senate (S. 2611).  Both of these include provisions that address the treatment of
no-match letters by employers.  If implemented, the proposed regulations could
very well be superseded by statute in a very short period of time.  For employers
who have had to contend with the existing process, this would prove to be
problematic in the extreme.  Although the current system is vague and apparently
contradictory from an employer?s perspective, it is established.  Having to satisfy
new regulations briefly and then adjust procedures again to comply with a new law
will cause significant uncertainty and anxiety among employers and employees
alike.

In addition, the debate on immigration reform has been highly publicized.  Our
members are aware that changes affecting employment procedures and no-match
letters have been passed by the House and Senate.  This has exposed hoteliers
to two different policies on no-match letters in addition to the existing policy.
The
proposed rules represent a fourth policy.  Many employers will be bewildered by
the amount of conflicting information they receive on this already confusing issue.
Page 1

ICEB-2006-0004-0091

We have concerns with the proposed regulation itself as well. The proposed rule states that certain actions to resolve a discrepancy noted by a no-match letter must occur within 14 days of receipt of the letter. Actions include checking clerical records, verifying information with the employee whose record is in question, and having the employee resolve the discrepancy with either the Social Security Administration (SSA) or Department of Homeland Security (DHS). The proposed rule does not specify how the employer would prove that these actions were taken in order to be considered ?reasonable.? An employer could ask an employee to resolve the discrepancy, but if the employee did not attempt to do so, it is unclear what the U.S. Bureau of Immigration and Customs Enforcement (ICE) would consider sufficient evidence that the request was indeed made by the employer of the employee within the specified time frame.

Further, 14 days is an unreasonable period of time to perform the actions as noted in the proposed regulation. Many no-match letters may be received by employers with a large numbers of employees. The number of discrepancies to reconcile, track and take action upon may overwhelm the available personnel assigned to those tasks. Alternatively, smaller employers may not have dedicated staff for personnel matters. In this case, the employer would have to perform these new mandated actions in addition to the other duties required by their position. In both
instances, additional time is required.

The proposed regulation allows only 60 days for a discrepancy to be resolved by the questioning federal entity. If the discrepancy is not resolved by that entity within 60 days, the explanatory section of the proposed rule in the Federal Register states: ??the employer must choose between taking action to terminate the employee or [face] the risk that DHS may find that the employer had constructive knowledge that the employee was an unauthorized alien??

A 60-day turnaround time from a federal agency on a routine basis is optimistic. A 60-day turnaround to correct a discrepancy in paperwork when the processing system will most likely be overwhelmed by the heavy volume of requests is unrealistic.

In noting that an employer must terminate the employee due to a lack of resolution by the federal government, the proposed regulation places the employer in jeopardy of legal actions by the terminated employee. In addition, the explanatory section states explicitly that an unresolved discrepancy is virtual proof
that the employee is an unauthorized alien. However, the Social Security Administration specifically states that employers ?not use the [Social Security Number Verification Service] to take punitive action against an employee whose name and Social Security number do not match Social Security's records? and that ?a mismatch does not make any statement about an employee's immigration status and is not a basis, in and of itself, for taking any adverse action against an
employee. Doing so could subject [the employer] to anti-discrimination or labor law sanctions.?

If possible, the regulation should shield the employer from all liability in taking actions as mandated by the regulation. Most likely, this is not possible and such changes would be required by law. If no change in law were enacted, the employer in some cases will either be subject to legal actions by SSA and/or DHS on the one hand or the U.S. Department of Justice and/or the U.S. Department of Labor on the other if the employer abides by the proposed regulation and the employee in question challenges those actions. That situation would be highly counterproductive and unacceptable. This is another reason to wait for immigration reform legislation to be enacted before new regulations are issued.

The proposed regulation is silent on its compatibility with the Systematic Alien
Page 2

No-Match Cert. Admin. Record 1088

ICEB-2006-0004-0091

Verification for Entitlements (SAVE) Program. How would the proposed regulation affect employers who participate in the SAVE Program?  If an employer has screened a new employee through SAVE and confirmed that the employee is eligible to work in the U.S., what is the employer?s obligation if the employer receives a no-match letter on a SAVE-screened employee?  Is that circumstance even possible?

As we have noted, the proposed regulations will greatly increase confusion and uncertainty among employers.  We believe that issuing regulations prior to the enactment of immigration reform legislation is premature.

Please feel free to contact Shawn McBurney, Vice President of Governmental Affairs at (202) 289-3123 if you have any questions.

Respectfully submitted,

Joseph McInerney
President and Chief Executive Officer


Marlene Colucci
Executive Vice President for Public Policy

No-Match Cert. Admin. Record  1089



American
Hotel & Lodging
Association

1201 New York Avenue, NW · #800 · Washington, DC 20005
Tel. 202-289-3120 · Fax 202-289-3185 · www.ahla.com

August 14, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW
2ⁿᵈ Floor
Washington, DC 20529

RE:    **DHS Docket No. ICEB-2006-0004**
       **Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**
       **Comments of the American Hotel & Lodging Association**

Dear Director:

On behalf of the American Hotel & Lodging Association (AH&LA), we appreciate the opportunity to file these comments with U.S. Citizenship and Immigration Services (USCIS) in response to the proposed rule on procedures in response to proposed regulations on no-match letter procedures published in the *Federal Register* on June 14, 2006.

AH&LA is a 96-year-old dual membership association of state and city partner lodging associations throughout the United States with some 10,000 property members nationwide, representing more than 1.4 million guest rooms and over 1.1 million employees in the United States. Our industry's annual sales exceed $93 billion and our yearly payroll exceeds $20 billion. AH&LA's membership ranges from the smallest independent properties to the largest convention hotels. Every hotel or motel in our country is unique due to factors that include size, type, location, services offered, clientele, ownership, and status as an independent or chain affiliate. In fact, there is a high degree of franchising and independent ownership in our industry.

Our members greatly appreciate the efforts of USCIS to provide a greater degree of certainty and guidance in the treatment of "no-match" letters. However, we believe that the implementation of this regulation at this time will cause economic disruption and increased confusion in handling no-match letters.

AH&LA believes that regulations affecting the treatment of no-match letters should be issued as part of the enactment of immigration reform legislation. Bills to reform our immigration laws have been passed by both the House (H.R. 4437) and Senate (S. 2611). Both of these include provisions that address the treatment of no-match letters by employers. If implemented, the proposed regulations could very well be superseded by statute in a very short period of time. For employers who have had to contend with the existing process, this would prove to be problematic in the extreme. Although the current system is vague and apparently contradictory from an employer's perspective, it is established. Having to satisfy new regulations briefly and then adjust procedures again to comply with a new law will cause significant uncertainty and anxiety among employers and employees alike.

**No-Match Cert. Admin. Record  1090**

In addition, the debate on immigration reform has been highly publicized. Our members are aware that changes affecting employment procedures and no-match letters have been passed by the House and Senate. This has exposed hoteliers to two different policies on no-match letters in addition to the existing policy. The proposed rules represent a fourth policy. Many employers will be bewildered by the amount of conflicting information they receive on this already confusing issue.

We have concerns with the proposed regulation itself as well. The proposed rule states that certain actions to resolve a discrepancy noted by a no-match letter must occur within 14 days of receipt of the letter. Actions include checking clerical records, verifying information with the employee whose record is in question, and having the employee resolve the discrepancy with either the Social Security Administration (SSA) or Department of Homeland Security (DHS). The proposed rule does not specify how the employer would prove that these actions were taken in order to be considered "reasonable." An employer could ask an employee to resolve the discrepancy, but if the employee did not attempt to do so, it is unclear what the U.S. Bureau of Immigration and Customs Enforcement (ICE) would consider sufficient evidence that the request was indeed made by the employer of the employee within the specified time frame.

Further, 14 days is an unreasonable period of time to perform the actions as noted in the proposed regulation. Many no-match letters may be received by employers with a large numbers of employees. The number of discrepancies to reconcile, track and take action upon may overwhelm the available personnel assigned to those tasks. Alternatively, smaller employers may not have dedicated staff for personnel matters. In this case, the employer would have to perform these new mandated actions in addition to the other duties required by their position. In both instances, additional time is required.

The proposed regulation allows only 60 days for a discrepancy to be resolved by the questioning federal entity. If the discrepancy is not resolved by that entity within 60 days, the explanatory section of the proposed rule in the Federal Register states: "...the employer must choose between taking action to terminate the employee or [face] the risk that DHS may find that the employer had constructive knowledge that the employee was an unauthorized alien..."

A 60-day turnaround time from a federal agency on a routine basis is optimistic. A 60-day turnaround to correct a discrepancy in paperwork when the processing system will most likely be overwhelmed by the heavy volume of requests is unrealistic.

In noting that an employer must terminate the employee due to a lack of resolution by the federal government, the proposed regulation places the employer in jeopardy of legal actions by the terminated employee. In addition, the explanatory section states explicitly that an unresolved discrepancy is virtual proof that the employee is an unauthorized alien. However, the Social Security Administration specifically states that employers "not use the [Social Security Number Verification Service] to take punitive action against an employee whose name and Social Security number do not match Social Security's records" and that "a mismatch does not make any statement about an employee's immigration status and is not a basis, in and of itself, for taking any adverse action against an employee. Doing so could subject [the employer] to anti-discrimination or labor law sanctions."

If possible, the regulation should shield the employer from all liability in taking actions as mandated by the regulation. Most likely, this is not possible and such changes would be required by law. If no change in law were enacted, the employer in some cases will either be subject to legal actions by SSA and/or DHS on the one hand or the U.S. Department of Justice and/or the U.S. Department of Labor on the other if the employer abides by the proposed regulation and the employee in question challenges those actions. That situation would be highly counterproductive and unacceptable. This is another reason to wait for immigration reform legislation to be enacted before new regulations are issued.

The proposed regulation is silent on its compatibility with the Systematic Alien Verification for Entitlements (SAVE) Program. How would the proposed regulation affect employers who participate in the SAVE Program? If an employer has screened a new employee through SAVE and confirmed that the employee is eligible to work in the U.S., what is the employer's obligation if the employer receives a no-match letter on a SAVE-screened employee? Is that circumstance even possible?

As we have noted, the proposed regulations will greatly increase confusion and uncertainty among employers. We believe that issuing regulations prior to the enactment of immigration reform legislation is premature.

Please feel free to contact Shawn McBurney, Vice President of Governmental Affairs at (202) 289-3123 if you have any questions.

Respectfully submitted,

Joseph McInerney
President and Chief Executive Officer

Marlene Colucci
Executive Vice President for Public Policy