ICEB-2006-0004-0092

Comment Info: =================
General Comment:See attached letter

No-Match Cert. Admin. Record  1093

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Washington, D.C. 20507

Office of
Legal Counsel

August 14, 2006

Mr. Richard A. Sloan
Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave., N.W., 2nd Floor
Washington, D.C. 20529

Re:    Proposed Rule: Safe-Harbor Procedures for Employers Who Receive a No-Match
       Letter (DHA Docket No. ICEB – 2006 - 0004)

Dear Director Sloan:

On behalf of the Equal Employment Opportunity Commission (EEOC or Commission), we are
submitting the following comment in response to the proposed rule published on June 14, 2006
(71 Fed. Reg. 34,281).  In the proposed rule, the Bureau of Immigration and Customs Enforce-
ment (ICE or the Bureau), Department of Homeland Security (DHS or the Department), solicited
public input about a set of procedures governing an employer's actions when the Social Security
Administration (SSA) or ICE send it a "no-match" letter.

As the proposed rule notes, a no-match letter from SSA advises an employer that a name and
social security number do not match SSA records.[1]  A no-match letter from ICE similarly advises
an employer that the Bureau was unable to confirm the validity of information concerning an
employee following an onsite audit of the employer's Employment Eligibility Verification (I-9)
forms.  In the preamble to the proposed rule, ICE requested comments on whether and, if so,
how to amend the "safe-harbor" provisions that allow an employer to respond to the no-match
letter, receive the appropriate verification of entitlement to work, and avoid being found to have
constructive knowledge that it was employing an unauthorized alien, even if the employee in fact
was not permitted to work in the U.S.[2]

---

[1] Employers annually send the SSA millions of earning reports (W-2 forms) in which employee names and social
security numbers do not match SSA records.  In some cases, SSA responds with a no-match letter.

[2] The proposed safe-harbor rule states that a reasonable employer should determine, within 14 days of receipt of a
no-match letter, whether a clerical error explains the discrepancy, correct the error, and advise the relevant agency.
If no such error is found, the employer should instruct the employee to confirm the correctness of the information
and, if the employee confirms, request that the employee resolve the matter directly with the relevant agency.  The
proposed rule states that this process should take no more than 60 days from receipt of the letter.  If the employee's
identity and work authorization is not verified, the employer must terminate the employee or potentially face
(footnoted continued)

Mr. Richard A. Sloan
Page 2

The EEOC is the federal agency responsible for enforcing all federal equal employment oppor-
tunity (EEO) laws[3] and further, is specifically charged with coordinating and leading the federal
government's effort to eradicate workplace discrimination.[4] Workers employed in the United
States are protected from employment discrimination regardless of citizenship or work authori-
zation status.[5] Citizenship requirements must be enforced evenhandedly and the employer must
avoid singling out an individual or group based on national origin.[6]

<u>Comments on the Proposed Rule</u>

The EEOC is concerned that absence of clear and explicit guidance in the safe-harbor procedure,
along with a 60-day time limit, may create circumstances in which employers have incentives to
take actions that violate Title VII and/or IRCA's applicable nondiscriminatory provisions.[7] The
safe-harbor procedure is designed to provide an employer with a defense in a case alleging con-
structive knowledge about employment of unauthorized aliens.[8] If the safe-harbor procedure
remains ambiguous, the EEOC is concerned that an employer, once found not to have complied

---

liability under section 274A(a)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1324a(a)(2). The proposed
rule provides the employer and employee three additional days to complete a new I-9 form.

[3] The EEO statutes are: Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; the Age
Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 et seq.; Titles I and V of the Americans
with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 et seq.; and the Equal Pay Act of 1963, 29 U.S.C
§ 206(d).

[4] Under Executive Order 12067, entitled "Providing for Coordination of Federal Equal Employment Opportunity
Programs," the EEOC coordinates federal equal employment opportunity regulations, practices, and policies. The
Executive Order is available on the EEOC web site at: <u>http://www.eeoc.gov/abouteeoc/35th/thelaw/eo-12067.html</u>.

[5] While federal law prohibits employers from employing individuals lacking work authorization, employers who
nonetheless employ undocumented workers are prohibited from discriminating against those workers. <u>See</u> EEOC
Compliance Manual, Section 13: National Origin Discrimination (2002), text at n.61, available at
<u>http://www.eeoc.gov/policy/docs/national-origin.html</u>.

[6] A citizenship requirement does not generally violate Title VII unless it results in disparate treatment of or impact
against the protected group. For example, an employer may not refuse to hire Egyptian citizens for certain positions
based on their lack of U.S. citizenship while hiring British citizens for the same positions. Although Title VII does
not prohibit citizenship requirements, the Immigration Reform and Control Act of 1986 (IRCA) prohibits employers
with four or more employees from discriminating because of citizenship status with respect to hiring, referral, or
discharge. 8 U.S.C. §§ 1324b(a), 1324b(a)(2)(A). IRCA's nondiscrimination requirements are enforced by the
Office of Special Counsel for Immigration-Related Unfair Employment Practices, Civil Rights Division, at the
Department of Justice.

[7] <u>Id.</u>

[8] According to the proposed rule, DHS may find that an employer has constructive knowledge that one of its
employees is unauthorized to work in the U.S. when: (1) employer receives a no-match letter; (2) checks and finds
no clerical errors; (3) requests the employee to confirm that its records are correct; (4) instructs the employee to
pursue the matter personally with the relevant agency; (5) the discrepancy is not resolved; and the (6) employer
chooses not to terminate the employee but permits the employee to remain in its employ.

Mr. Richard A. Sloan
Page 3

with the safe harbor process, may decide simply to terminate employees upon receipt of no-match letters for reasons that may violate Title VII's prohibition against national origin discrimination. The EEOC strongly believes that the "safe-harbor" procedure will only work when the Department adopts a thorough step-by-step procedure that allows employers to act affirmatively after receiving a no-match letter without exposing them to unwarranted liability under the EEO laws. The proposed rule, in our view, does not provide the necessary clarity.

For example, the proposed rule first assures the employer that following the described procedure "will" protect them against liability, but further states "such steps may include" a series of considerations.[9] The preamble to the safe-harbor proposal further states that "there may be other procedures a particular employer could follow" but "[a]n employer that follow[s] a procedure other than the 'safe-harbor' procedure described in the regulation would face the risk that DHS may not agree."[10] Use of terms such as "may" and "could" create uncertainty; and an employer uncertain about what "may" or must be done, could seek to remedy no-match letters by engaging in practices that discriminate against individuals based on their national origin.

The EEOC also is concerned that the 60-day time period within which the employee is responsible for resolving the issues raised in a no-match is insufficient and urges DHS to expand the time frame to, at a minimum, 90 days.[11] Employees seeking to resolve a no-match letter will need to collect, organize, deliver documentation, and perhaps meet with the relevant federal agency and/or seek legal advice while maintaining their regular work hours. Expanding the timeframe will better enable the employee to resolve discrepancies and minimize the possibility of termination.

Finally, the EEOC urges the Department to include a statement in either the preamble or the rule reminding employers that any employment practice adversely affecting employees on the basis of race/color, physical appearance, accent, religion, or any other foreign characteristic that potentially denotes immigrant status, may violate applicable anti-discrimination laws.[12]

---

[9] 71 Fed. Reg. at 34,285, Proposed Rule amending 8 C.F.R. § 274a.1(1)(2)(i)(A) (emphasis added).

[10] 71 Fed. Reg. at 34,283 (emphasis added).

[11] Id., Proposed Rule amending 8 C.F.R. Part 274a.1(1)(2)(i)(A)(2).

[12] An employer may violate IRCA and Title VII if it requests employment verification only for individuals of a particular national origin, or individuals who appear to look or sound foreign. The employer may also violate IRCA if it imposes citizenship requirements or give preferences to U.S. citizens in hiring or employment opportunities.

Mr. Richard A. Sloan
Page 4

If you have further questions or would like to discuss this matter, please feel free to call Carol R. Miaskoff, Assistant Legal Counsel, at 202-663-4645.

Sincerely,

/s/

Peggy R. Mastroianni
Associate Legal Counsel

/YJ

ICEB-2006-0004-0093

Comment Info: =================
General Comment:August 11, 2006


Honorable Michael Chertoff
Secretary
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

Re:     Docket No. ICEB-2006-0004
        Safe Harbor Procedures for Employers Who Receive a No-Match Letter
        (FR 71:114, p.34281)

Dear Secretary Chertoff,

I am writing to you to express our concerns about recent proposed rules
regarding ?no-match? letters being sent to employers.  The Nisei Farmers League
represents approximately one thousand farmers in addition to packers,
processors, dehydrators and farm labor contractors.  Out leadership and staff
maintain a close working relationship with local, state and federal agencies and
legislators to assure growers interests are adequately understood and defended.
As is the case with agricultural organizations throughout the U.S., Nisei members
receive mismatch letters with regularity and have been instructed to contact
affected employees to ensure that the information was reported accurately, and if
not, to make necessary corrections.  It is often hard to contact the workers
because they are seasonal and migrant, moving from one place to another.  Also
due to the Privacy Act warnings that accompany the letters tend to create
confusion as to the extent, if at all, employers can use the mismatch letters for
compliance with the employment eligibility verification obligations under federal
immigration law, for which purposes the Social Security card is a commonly used
authorization document.

While the agriculture industry sought opinion letters from the Department of
Homeland Security (formerly INS) and SSA regarding the legal consequences, if
any, of mismatch letters for immigration compliance purposes, there is no clear-
cut answer. We are told there are consequences under very complicated
circumstances and lawyers give us conflicting advice along with the agencies.
You acknowledged this fact during your oral testimony before the Senate Judiciary
Committee on October 18, 2005 on the issue of ?Comprehensive Immigration
Reform?, stating that employers are confused regarding the implications of Social
Security mismatch letters as they relate to immigration compliance.  The point
that I believe you were making was that the mismatch letter confusion is further
evidence that there is a need for immigration reform, of which the Social Security
card is a key component.

Given the uncertainty of employer obligations with regard to mismatch letter, the
intrusiveness of the attached questionnaire into the hiring process and the
compliance issues that it implies are of great concern to our growers, most of
whom are small employers without in-house compliance support.  They are
concerned that if they answer the questions that they somehow might be
admitting that they failed to comply with laws over which there is much confusion
and therefore be penalized harshly.

The Nisei Farmers League supports the effort of immigration reform with the hope
that Congress can pass a comprehensive bill that would address the SSA
mismatch issue that employers in agriculture are dealing with everyday.  Both the
House bill (HR 4432) and the Senate bill (S 2611) would deal with this matter.  The
mismatch letter issue must be part of the immigration effort and not a Department
Page 1

No-Match Cert. Admin. Record 1098

ICEB-2006-0004-0093

of Homeland Security issue only.  I am asking that you would please work with the agriculture industry on this issue and make it part of immigration reform.

Another issue that arises is the Substantial Legal and Jurisdictional Problems Warrant Deferral of the Proposed Rule.  Many of our growers in the Nisei Farmers League are very small and medium sized growers ranging from 1 acre of various fruits and vegetables on up.  These smaller growers only hire during harvesting, pruning and planting times which are very short periods of time.  Regardless of size, all employers do the same amount of paper work such as filling out the I-9s, W-4s, etc.  The smaller growers do not have the resources to hire office staff to run an office or a supervisor to run the farm.  Many of our growers do not have a very sophisticated office, for example, no computer, fax, etc.  Much of their paperwork is completed by hand and they do not have access to the ?internet? or other means of networking back and forth, they are limited technically.

Over the last 16 years, the Nisei Farmers League has worked closely with other agriculture groups on issues dealing with the SSA and IRS and in addition, we have had many workshops and meetings to help our members with both SSA and IRS issues.  I have attached a letter from the National Association of Agricultural Employers (NCAE) for your review that addresses major concerns in regards to the ?no-match? letters and the Substantial Legal and Jurisdictional Problems Warrant Deferral of the Proposed Rule.

In summary, as Congress is now seriously considering a possible comprehensive immigration reform plan, we hope that the SSA mismatch issue will be addressed and obligations of employers under the laws governing Social Security W-2 payments and employment authorization will be clarified.

Sincerely,


Manuel Cunha, Jr.
President

No-Match Cert. Admin. Record  1099

ICEB-2006-0004-0094

Comment Info: ================

General Comment:See attached comments by SEIU Local 1 to Proposed Regulation, Docket No.
ICEB-2006-0004

No-Match Cert. Admin. Record  1100

ICEB-2006-0004-0094

Comment Info: ==================

General Comment:See attached comments by SEIU Local 1 to Proposed Regulation, Docket No.
ICEB-2006-0004

No-Match Cert. Admin. Record  1101

<u>Via E-mail: rfs.regs@dhs.gov</u>

August 14, 2006

Director, Regulatory Management Division
US Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW  2nd Floor
Washington DC  20529

      Re:    Comments to DHS Proposed Regulations
             Docket No.  ICEB-2006-0004
             ICE 23-77-06
             RIN 1653-AA50
             71 Fed. Reg. 34281

Dear Sir or Madam:

The Service Employees International Union, Local 1, opposes implementation of the above regulations.  SEIU Local 1 represents nearly 40,000 members in Illinois, Wisconsin and parts of Missouri.  These members work in property services, holding positions such as janitors and security guards, among others.  In its capacity as representative, SEIU Local 1 has observed confusion with the social security no match program, and has assisted in resolving misunderstandings caused by the program.

In sum, SEIU Local 1 objects to the proposals issued by the DHS because such regulations would circumvent comprehensive immigration reform currently being considered by Congress.  The proposals likewise interfere with and contradict the policies of another administrative agency, the Social Security Administration.  Moreover, the regulations place too great a burden on private employers to enforce immigration law, and may harm workers currently authorized to work in the United States.  Last, the regulations are likely to increase discrimination against individuals based on their race or national origin.  SEIU Local 1 therefore requests that DHS decline to implement these regulations, and in particular, requests that DHS permit the legislative process to determine immigration policy and enforcement.

**I.**      **The Proposal Exceeds the Authority of the Department of Homeland Security**

While an administrative agency has authority to implement rules and regulations to assist in enforcing statutes, agencies exceed that authority by engaging in legislation.  <u>See</u> <u>Guardians Ass'n v. Civil Serv. Commission</u>, 463 U.S. 582 (1993); <u>Weiss v. United States</u>, 510 U.S. 163 (1994).  Indeed, the courts have consistently recognized limits on the ability of Congress to delegate authority to the Executive Branch <u>See, e.g.</u>, <u>Indus Union Dep't v. API</u>, 448 US 607 (1980).

Since the United States Congress is currently debating appropriate immigration reform, regulations that change the nation's current system of immigration laws could constitute legislation by an administrative agency. Such legislative action exceeds the agency's authority.

Moreover, the proposed regulations inappropriately interpret instructions from a different administrative agency, the Social Security Administration. The DHS regulations contradict the policies of the Social Security Administration regarding how to interpret a "no match" letter. Indeed, the SSA itself, and even former INS General Counsels, agree that social security numbers should not be used to determine work authorization or Immigration status, because there are many reasons why the computer records could be in error.[1] In fact, the SSA records usually contain no information about immigration status, or contain out of date information.[2] As discussed further below, the no-match letters now instruct Employers not to take adverse action against an employee because of a "no-match." The DHS would exceed its authority by requiring employers to rely upon documents prepared by the SSA for a purpose other than enforcing immigration law, and that specifically includes a warning to employers not to use the documents to determine an employees' work authorization status.

## II..    The Regulations May Harm Employers and Employees Without Achieving Their Intended Objectives

SEIU does not believe that the proposed DHS regulations will achieve the intended objective of reducing the number of undocumented workers in the United States and will instead end up hurting American citizens and other authorized workers as well as legitimate employers who are trying to comply with the law. This objective can be obtained only through comprehensive immigration reform such as that currently pending in Congress, since the millions of jobs these workers hold and the importance of their labor to the U.S. economy will not disappear by adoption of enforcement oriented proposals. The proposed DHS regulations will simply make the situation worse, not better.

The proposed regulations may serve as a disincentive to Employers to comply with immigration law. In representing low wages workers, we are often confronted with unscrupulous employers who erroneous classify their employees as independent contractors or who even treat their workers as sham franchisees. We even see situations were workers are paid "off the books" meaning that they are paid in cash with out any of the payroll taxes being paid or the tax withholdings being made that are required by law. By using these fraudulent schemes, employers avoid paying payroll taxes, unemployment insurance and social security payments on behalf of their workers. Since the workers have not been legally treated as "employees", these employers don't even need to go through the I-9 process with these workers, nor will they ever receive a no match letter from the SSA as they do not pay SSA taxes. These employers seek to employ undocumented workers because they are the workers who are less likely to speak up and demand that the employer comply with the law. These employers not only cheat their workers, but they cheat the government out of social security payments, unemployment taxes, wages

---

[1] Martin, David, INS General Counsel, Letter to Larson (12/23/1997) *published at* 75 No.6 Int. Releases 203 (1998), Westlaw 75No.6INTERREL 203; and SSA 2005 No Match letter.
[2] GAO, *Immigration Enforcement: Benefits and Limitations to Using Earnings Date to Identify Unauthorized Work*, July 11, 2006, GAO-06-814R at 8.

2

withholdings and so forth. Ironically, the result of these proposed regulations will be a significant loss of revenue for the government, revenue which the government sorely needs for its operation, including the enforcement of the immigration laws.

Since no social security taxes are paid on these workers, these employers never receive SSA no match letters. Therefore, as a practical matter, the employers that operate illegally in the low wage industries that are served by the immigrant workforce are not effected by the DHS proposed regulations and can continue to employ undocumented workers without running the risks that legitimate employers would run under the DHS proposed regulations.

These illegitimate employers thrive in the low wage industries where most immigrants work. Legitimate employers who pay employment taxes and who try to comply with the immigration laws must compete with these employers. There is always the temptation to take up their illegal ways in order to complete against them in these often very competitive industries. By imposing administrative burdens on the legitimate employers and not on the illegitimate employers and by subjecting legitimate employers to additional risks under the immigration laws not faced by these illegitimate employers, the DHS proposed regulations will have the unintended effect of creating incentives for legitimate employers to go underground and to misclassify their workers. The ironic result of this will be to increase employment opportunities for undocumented workers and to deprive the government of payroll taxes which it is owed under law.

Meanwhile, the DHS regulations would not serve their intended purpose of serving to better enforce immigration requirements. There is no reason to believe that by forcing terminations of employees based upon SSA no-match letters, that such employees will then voluntarily leave the United States. More likely, employees will find additional short terms employment until having a similar problem leading to termination with an additional employer. This in turn causes greater employee turnover, which naturally increases an employer's costs by eliminating the benefits of a stable work force. An underground economy is likely to result without any increased enforcement of immigration laws.

## III.    The Proposed Regulations Lack Any Workable Mechanism Prevent Error

It is well established that SSA records are frequently erroneous. For immigrants *who are work authorized*, SSA records are automatically able to verify the status of less than 50% of work-authorized non-citizens, as compared to 99.8% of native born citizens.[3] These numbers are significant in that they demonstrate that large numbers of legally authorized workers will be the subjects of erroneous SSA no match letters, and their jobs at risk if the employers, employees, and SSA do not promptly take actions to comply with the proposed regulations.

According to Census Data, there are roughly 145 million total workers in the U.S. workforce, of whom 125 million are native born citizens. There are approximately 7.8 million

---

[3] *Report to Congress on the Basic Pilot Program,* U.S. Citizenship and Immigration Service, June 2004; *see also,* GAO, *Immigration Enforcement: Benefits and Limitations to Using Earnings Date to Identify Unauthorized Work,* July 11, 2006, GAO-06-814R at 1 (SSA data "has drawbacks since they contain some erroneous information and information about hundreds of thousands or even millions of U.S. citizens and work authorized aliens.")

**No-Match Cert. Admin. Record 1104**

naturalized citizens in the work force, and 12 million non-citizen, immigrant workers. Approximately 7 million of those workers are unauthorized.

From these numbers, one can determine that approximately *300,000* native born workers (0.02%) will be *annually* subject to SSA no match letters, *even though they are native born citizens.* If they lose four hours of work to take care of this, and you assume an average wage of $14/hr, they will lose $16.8 million in wages. Of the approximately 5 million *work-authorized*, non-citizens, 50% will face problems clearing the SSA database, or *2.5 million annually*. Again, assuming an average wage of $14/hr, these work- authorized workers would lose $140 million in wages, assuming that they ultimately succeed and are not terminated . Each of these workers will have to spend many hours trying to straighten out the SSA records, solely to satisfy DHS regulations. If SSA cannot complete the process in the time line suggested by these regulations, many will lose their jobs, causing hardship to their families. There will also be a substantial disruption of the employers operations as employees take time off to correct the errors in SSA's data base. If you assume that one in ten of these workers will for one reason or another fail to resolve the no match problem within the time limits set, this means that 280,000 workers will unjustly lose their jobs because of these proposed regulations.

For those who do not successfully, and timely, complete this process, either through procrastination, frustration, agency delay/incompetence, they will have no effective remedy for their loss of employment, wages/benefits. The proposed regulations would set strict time limits in which no-match issues are resolved, but places no requirement, not could they, on the Social Security Administration. Nor do the proposed regulations make any allowance for problems caused by the SSA's inability to resolve any particular no-match issue. Since these regulations are promulgated by the DHS, they cannot set out a procedure for SSA to remedy erroneous decisions or to provide compensation for agency error for the approximately one quarter million workers who will be unjustifiably terminated if the proposed regulations are implemented. The Federal Tort Claims Act does not provide a remedy for agency records errors, particularly where the agency would argue that it did not require the employer to terminate. Likewise, employees would not have a viable remedy against their employers for termination when the employer justifies its conduct on the new regulations together with the SSA notice.

## IV.    The Proposal Shifts DHS Enforcement Costs And Burdens To Employers, Employees And The SSA, Rather Fixing The Broken System.

The proposed regulation places a great burden on the Social Security Administration. At a time when Congress is considering making major changes to immigration laws, DHS is proposing a regulation that improperly treats the SSA no match letter as a proxy for an INS notice that the worker lacks worker authorization. As the SSA no match letters demonstrate, they are no such thing. They specifically warn employers that they do not "make any statement about an employee's immigration status." And they warn against taking any adverse action against employees for receiving a "no match".

Congress is currently in the process of addressing immigration reform but instead of leaving it to Congress to determine what that appropriate reform would be, the proposed regulations requires millions of employers and employees to burden the SSA with inquiries and

No-Match Cert. Admin. Record  1105

visits, and demanding timely documentation of same, in order to satisfy DHS's misguided regulation. No where in the regulation is there any effort by DHS to address the actual size of the attempted cost-shifting to the SSA. Nor does the regulation contemplate the substantial burden being placed on the SSA.

Because the no match letters are distributed only in April and May each year, SSA will require a substantial seasonal staffing increase to accommodate the surge in inquiries during this 2-3 month period. This seasonality will require a large number of temporary hires to enable the agency to respond. In 2002, the SSA sent out 800,000 no match letters, to employers with at least 10 no match employees, or 0.5% of the employer's workforce. It is unknown whether SSA will in future years use a different standard for sending these letters. If DHS adopts its proposed regulation, it would discourage SSA from sending the letters more broadly so as to improve its own management of the SSA Trust Fund, as doing so would impose substantial secondary staffing effects on the agency to respond to hundreds of thousands on visits.

The DHS regulations and comments fail to address this tremendous burden the proposed regulations are placing on SSA. It is irresponsible for DHS to contemplate issuing these proposed regulations without a full assessment of how SSA is going to meet the burden being placed on it by the proposed regulations.

The Regulations would also greatly burden employers. When a worker shows up on a no match letter, the employer essentially has to reverify the worker's status, as they do at the beginning of employment with the I-9 process. DHS has made no assessment of the cost to employers in immigrant intensive industries of this new *annual* I-9 compliance obligation which will result from the proposed regulations. Instead of a one-time I-9 compliance burden, suddenly employers in immigrant dependent industries can expect to see I-9 compliance issues become an annual routine for a large segment of their workforce. Indeed, the regulation asserts that there will be no significant cost to small employers, but it is hard to see how anyone could contend that this administrative burden will be insubstantial for all employers, both small and large, in immigrant intensive industries.

The regulation also makes no effort to assess the costs imposed on citizens or authorized workers, as well as to their employers, of time away from work to try to straighten out SSA records, and obtain documentation that will satisfy their employers. As demonstrated above, the proposed regulations could easily cost employees legally entitled to work in the United States $156 million or more in lost wages and the substantial disruption to many employers' operations just to prove that there is an error in the SSA records.

Likewise, not addressed is the cost to the SSA in staff time and lost taxes, as well as the increase in unemployment compensation paid out to employees who are wrongly terminated. The cost to the government because of increased costs in responding to inquiries from legal employees who were placed in a no match letter because of an error as well as the loss of revenue from payroll taxes is likely to be very significant. Yet, DHS's proposed regulations fail to address these costs and lost revenue at all.

5

**V.    The Proposed Regulations Will Encourage Discrimination
Against Workers Legally Entitled To Work In The United States.**

The proposed regulation will result in expanded discrimination against workers with a
"foreign" appearance or accent, as well as those who seek to enforce their workplace rights to
fair treatment and a living wage.  Accepting SSA no-match letters proof that an employee does
not have work authorization will lead to discrimination in violation of the non-discrimination
clause in the Immigration Reform and Control Act.  See Collins Foods International v. INS, 948
F.2d 549, 554-55 (9th Cir, 1991).  Under existing laws and procedures, there is currently a high
level of discrimination against immigrant workers, whether they are legally authorized for
employment or not.  Despite existing protections, SEIU and other unions have often had to assist
workers whose employers deny them workers compensation, overtime pay, or interfere with their
right to form or join a union.  Such employers will often hide behind the excuse of immigration
law compliance to accomplish these ends.  This proposal will provide unscrupulous employers
an ***annual*** excuse for harassing, suspending and or terminating workers who lawfully seek to
enforce their rights.


**VI.   The Proposed Regulations Are Contrary To Unchallenged Ninth Circuit
Case law That Constructive Knowledge "Not Be Expansively Applied."**

The proposed regulation disrupt the proper balance struck by Congress in 1986 and
recognized by the INS/ICE, SSA, the courts and OCAHO for the last twenty years.  Because
these proposed regulations are clearly contrary to Congress' intent, they are beyond the authority
of DHS to issue.

The proposed regulations would expand the definition of constructive knowledge,
contrary to the only circuit court case construing that term in the INA 274A context.  When
Congress passed the Immigration Reform and Control Act in 1986, it "delicately balanced" the
employer sanctions provisions and protecting authorized workers from unlawful discrimination
because of their "foreign" appearance or accent.  "The doctrine of constructive knowledge has
great potential to upset that balance, and it should not be expansively applied." Collins Foods
International v. INS, 948 F.2d 549, 554-55 (9th Cir, 1991).  There have been no relevant changes
to this balance since 1986.

The law requires employers to accept documents proffered by the employee within three
days of hire.  There is no ongoing employer obligation to review the documents, unless a work
authorization document (List C) expires.  The employer must accept those documents that
reasonably appear on their face to be valid.  The statute does not require the employer to be a
document expert.  It is up to the employee to select the documents to submit, by selecting them
from the list on the back of the I-9 form.  The employer violates the anti-discrimination
provisions of the Act if it requires more or different documents than those required by the Act, or
for example, insists that it will only accept certain documents.

The INS in Collins Foods  had argued that the employer had constructive knowledge that
the employee was not authorized in that the employee's Social Security card was not the

6

example pictured in the INS Handbook for Employers. The Ninth Circuit however noted that the INS Employer Handbook only illustrated a few of the possible 16 iterations of SSA cards issued.

The Ninth Circuit expressly was concerned that "[w]hen the scope of liability is expanded by the doctrine of constructive knowledge" the employer may be subjected to penalties for undefined acts, and may avoid hiring anyone with an appearance of alienage." Id. The effect of the regulation would be to give unscrupulous employers but another justification for discriminatory conduct, and an annual one at that.

The proposed regulations are contrary to the clear holding of the Ninth Circuit in Collins Foods. There are no Circuits contrary, and indeed, several OCAHO decisions have followed the holding. The agency is without authority to adopt a regulation contrary to the statute.

## VII.    The Proposed Regulation Improperly Eliminates the Good Faith Defense For Millions Of Employers, Absent Timely Compliance With The Burdensome Regulation.

The proposed regulations are also contrary to the law as it has been interpreted and applied because it effectively eliminates the good faith defense which as always been an essential element of the statute. The statute provides that so long as the employer and employee properly complete the I-9 form at the outset of employment, the employer has a good faith defense to a knowing hire violation. 8 U.S.C. §1324a(b)(6)(A). The employer is not strictly liable for employing unauthorized workers; knowledge is required. The good faith defense is rebuttable if DHS can establish that the documents did not reasonably appear on their face to be valid or to relate to the individual. Collins Foods, supra at 552, n. 9.

Despite the clear language of the statute and controlling case law, DHS proposes to eliminate this presumption for millions of employers, unless the affected employers engage in an elaborate series of steps, within certain time frames, with the Social Security Administration.[4] For the millions of employers who annually received an SSA no match letter, those employers would be denied the good faith defense unless they could carry a burden of showing that they had complied with all the aspects of this proposed regulation, including its timelines. Yet DHS cannot require that the SSA is obligated to ensure that such timelines are met.

The proposed regulation erroneously treats letters from INS identifying unauthorized workers as the same as the SSA no match letters. In contrast to the INS notices to employers, the

---

[4] The procedures and time frames are proposed without any evidence that the SSA has the staff available to serve the seasonal surge of calls and visits that would occur every spring after the issuance of no match letters. The seasonal character of the project would make timely response by SSA even more difficult given the need to provide extra staff during the spring when response would be due.

Nor is there any indication whether SSA plans to send out no match letters to every employer with even a single no match employee, or only to those with more than 10 or 0.5% as in 2002 when it sent 800,000. In other years, SSA has used a different threshold. The threshold used will substantially change the total numbers, raising or lowering the burden on employers/employees/SSA accordingly.

**No-Match Cert. Admin. Record  1108**

SSA no match letters explicitly tell the employer that there could be many innocent reasons why the individuals name is listed, and that the letter does not inform the employer that the worker is not authorized for employment. Indeed, the SSA no match letters also warn the employer against any adverse personnel action, as such actions might violate anti-discrimination laws. Despite these significant differences with INS notices, which directly address whether the individual is work authorized, the proposed regulations treat the SSA letters as the functional equivalent.

The legal rationale proffered by the agency is that its regulation is consistent with Mester Mfg Co. v. INS, 879 F.2d 561 (9th Cir. 1989) and New El Rey Sausage Co. v. INS, 925 F.2d 1153 (9th Cir. 1991). Yet, the agency fails to address the more on point case of Collins Foods, which dealt with Social Security enumeration in the employer sanctions context. DHS fails to note that in Mester, the employer had been told by INS that the certain employees were "suspected unauthorized aliens." Collins Foods at 555. The Collins court distinguished its prior decisions in Mester and New El Rey Sausage, noting that in both cases the employer had been informed by INS that particular employees were suspected of being unauthorized.

In contrast, here the proposed regulation treats dissimilar situations as if they were the same, i.e. an SSA letter telling employers that there is a no match in a person's Social Security number is treated the same as an INS letter that states that employees are not authorized for employment based on the immigration documents presented. Notably, the INS did not appeal the narrow, constructive knowledge standard of Collins Foods. Now fifteen years later, with no intervening statutory change, nor contrary circuit or OCAHO decisions, the agency proposes to ignore the precedent, and dramatically limit the good faith affirmative defense of the statute for millions of employers.

Collins Foods has been repeatedly followed by ALJs in employer sanctions cases. See, e.g. USA v. American Terrazzo Corp., 6 OCAHO 828, 1995 WL 848945 (1995) ("the Circuit court has given clear warning that the doctrine of constructive knowledge must be sparingly applied"); Getahun v. Dupont Merck Pharmaceutical, 6 OCAHO 880, 1996 WL 570515 (1996)(constructive knowledge must be sparingly applied in illegal hire cases to minimize the risk of liability and burden of compliance on employers); USA v. AID Maintenance Company, 7 OCAHO, 1997 WL 1051451 (1997)(same).

The careful balancing by Congress of the statutory employer obligations are not subject to revision by the agency by regulation. This legislative balance was constructed in order to minimize the burden on the employer, as well as to protect employees from discriminatory documentation requirements. The substantial gutting of the good faith defense for employers will burden the process not only for employers, but necessarily for employees whose employers impose heightened and discriminatory documentation requirements. For this reason, the proposed regulations are contrary to law and therefore exceed the agency's authority in issuing regulations.

**Conclusion**

For all the above reasons, the Service Employees International Union, Local 1, respectfully requests that the Department of Homeland Security decline to adopt or implement the proposed regulations. The regulations are inappropriate given the role Congress is playing in deciding the approach to comprehensive immigration reform. DHS should not be instructing Employers on how to interpret correspondence from another administrative agency, the Social Security Administration. The regulations place a great burden on employers and will cause harm to numerous individuals authorized to work in the United States. A preferred approach is permit the legislative process to determine comprehensive reform.

SEIU Local 1 appreciates the DHS consideration of these comments in opposition to the regulations.


Sincerely,

Alexia Kulwiec
Chief Counsel

cc:     Dan Schlademan
        Laura Garza
        David Martino

**No-Match Cert. Admin. Record  1110**

ICEB-2006-0004-0095

Comment Info: ================

General Comment:Re: Safe-Harbor Procedures for Employers Who Receive a No-Match Letter


The on-line Social Security number verification [http://www.ssa.gov/employer/ssnv.htm] should be mandatory within 14 days of hire, so that employer's would have constructive knowledge within 14 days that any given employee is unauthorized to work.

Some of the other commenters on this proposed rule complain that it would propose onerous burdens on businesses of all sizes. This seems like a bunch of nonsense.  You check the social security numbers on-line and if there is a no-match, the employee should provide other documentation to prove that s/he is legally authorized to work.  It's that simple.  Sure, the other documentation the employee might provide could be a fraudulent Green Card, but then we can come up with other rules to deal with that, and maybe a national i.d. card with on-line verification since no card is tamper-proof.

Page 1

ICEB-2006-0004-0096

Comment Info: ================

General Comment:Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW
2nd Floor
Washington, DC  20529

Re:    DHS Docket No. ICEB-2006-0004

On behalf of over 2,000 members, the San Francisco Chamber of Commerce is
asking for an extension to the comment period regarding Docket No. ICEB-2006-
0004, so that we may be able to circulate the information regarding the No Match
Letter to our members.

Only late last week was this new Homeland Security rule brought to our attention,
and the actual impacts of this ruling is still unknown.

We are, and will continue to be, in touch with the San Francisco mayor's office
and other local organizations regarding this issue.

Lauralee B. Markus
Director, Public Policy
San Francisco Chamber of Commerce
235 Montgomery Street, 12th Floor
San Francisco, CA 94104-2803
P 415.352-8844
C 415.794-1604
F 415.392.4520
E lmarkus@sfchamber.com

No-Match Cert. Admin. Record  1112

ICEB-2006-0004-0097

Comment Info: =================

General Comment:August 14, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services,
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

Re: DHS Docket No. ICEB-2006-0004: Comments on Proposed Rule, ?Safe-Harbor
Procedures for Employers Who Receive a No-Match Letter,? published at 71 Fed.
Reg. 34281 (June 14, 2006).

Dear Sir of Madam:

On behalf of Fragomen, Del Rey, Bernsen & Loewy, LLP (Fragomen), the
undersigned respectfully submits the instant comments to the above-captioned
proposed regulation.   Fragomen is the world?s largest immigration law firm with 27
offices in Americas, Asia Pacific, and Europe.  It also is a leader in the area of
employer sanctions and worksite enforcement, and assists some of the largest
corporations in the United States to comply with our nation?s immigration laws at
the worksite.  Fragomen therefore is uniquely qualified to provide insight on this
topic, and is grateful for the opportunity to do so.

First and foremost, Fragomen would like to commend the Department of
Homeland Security (DHS), and specifically, the Bureau of Immigration and
Customs Enforcement, (ICE), for recognizing the need to provide greater certainty
to employers who want to obey the law but are caught in an uncertain policy.  As
part of an overall effort to promote greater information sharing, Fragomen supports
a policy that would provide a safe-harbor to law-abiding employers who often are
caught in the dilemma of risking employer sanctions on one hand, and allegations
of civil rights on the other, while not having the tools to achieve certainty in
employment eligibility verification.

Fragomen sincerely believes that the instant comment would help ICE achieve this
objective, and further pledges its continuous cooperation with ICE and other
governmental entities to create an optimal worksite enforcement scheme.

1.  The proposed rule must provide opportunity for employers to take action within
the allotted time:

The proposed regulation provides that an employer who takes certain actions
within fourteen days to reconcile a mismatch notice from Social Security
Administration (SSA) or immigration authorities would not be deemed as having
constructive knowledge that an employee is unauthorized to work.  By implication,
any employer who fails to take such prescribed actions could be deemed as
having constructive knowledge of the illegal employment.

Though the proposed rule seems to require only that the employer to begin the
process of clarifying the discrepancy within fourteen days of receiving notice, ICE
must clarify whether the receipt means actual receipt or presumed receipt, and
how the employer is to demonstrate when exactly the employer received
notification from DHS or SSA. For some larger corporations, delivering the
government?s letter to the appropriate human resources department may take
several days.  For some educational institutions, the human resources
departments are not even staffed during the summer months.  As such, the
regulation should clarify that the fourteen-day clock would not begin until the
appropriate human resources staff actually receives the government?s letter.

Page 1

No-Match Cert. Admin. Record  1113

ICEB-2006-0004-0097

The proposed regulation states that the employer must take ?reasonable steps . . . within [fourteen] days to resolve the discrepancy.? However, language elsewhere in the proposed rule seem to suggest that within the fourteen-day period, the employer must, at a minimum, check the employer?s own records for obvious typographical errors, and correct them with the SSA or DHS.  If there is no error in the employer?s records, the employer then must approach the employee to confirm name, Social Security number, or other immigration-based information.

The regulation also must address what happens when the employer acts in good faith to resolve the discrepancy, but the governmental agencies are not able to provide a response within fourteen days of the employer?s receipt of the notice. The regulation must clearly set forth where the employer?s obligation starts and ends within the fourteen-day period.  Fragomen suggests that the employer?s obligation should be limited to checking the employer?s own records, and initiating an inquiry with either the DHS or the SSA.  Likewise, where no error is apparent and the employer must ask the employee for clarification, the employer?s obligation must end at asking the employee for clarification, and not necessarily receiving any useful information from the employee whose lawful status is in question.

2. The government must clean-up its own databases:

In order for this new safe-harbor approach to work, the government?s databases must be much more accurate than the current system.  Otherwise, the instances for error would be far too high and the burden on employer to resolve each and every ?no-match? letter would be far too heavy.  This is especially true for information contained in the immigration databases.  Under the current system, a foreign national who arrives at a port of entry hands to an immigration inspector a form I-94, a handwritten form containing the foreign national?s visa status. Information on the I-94 is then entered manually into one database that U.S. Customs and Border Protection (CBP) maintains.  The same information would then be uploaded to yet another system, where Social Security and other federal and state agencies, such as a motor vehicle administration, would access to determine eligibility.  Frequently, the information would be wrong or out of date.  If
an employer is required to follow up on each instance of mismatched information, then the government should be required to improve the accuracy of its databases so as to reduce the employers? burden of having to correct the government?s mistake.

3. The employer must have the option of not verifying the same worker by repeating the I-9 process:

The proposed regulatory language provides that an employer could avoid the presumption of constructive knowledge if, after trying unsuccessfully for sixty days

to resolve the mismatch, that the employer repeats the same verification process by completing a new form I-9.  The preamble suggests that this is an extra step that employer may take to demonstrate lack of constructive knowledge.  The preamble further suggests that employers may take action other than the procedure described in the proposed regulations.  Of course, employers who opt for a different course of action would do so at the risk of ICE finding such actions

to be insufficient for the safe harbor.

The regulatory language must be clearer so as to not create another mandatory procedural hurdle before the employer may terminate an unauthorized employee. In fact, both the preamble and the proposed regulation itself should state simply that if the employee?s status could not be verified in sixty days, the employer may terminate the employee in question absent compelling evidence supporting work authorization.  Indeed, in the event of compelling reasons why the employer should not terminate such employee even after sixty days, such as slow agency response or independent evidence that the employee is in fact legal, then the
Page 2

No-Match Cert. Admin. Record  1114

ICEB-2006-0004-0097

appropriate next step is for the regulation to permit extending the sixty days to facilitate confirmation when the delay is due to government unresponsiveness. The current regulatory language is unclear and may create inadvertently an expectation or even right of action on the part of an employee for a new I-9 process. The regulation must state unequivocally that re-verification through a new

I-9 is optional, and that it is only warranted when there is compelling evidence that
the additional documentation the employee provides would establish work authorization, such as a U.S. passport.

In addition, the re-verification through new I-9 approach would create substantial record- keeping burdens, especially for larger employers. Whatever record keeping is required under current law, the additional I-9 would double all of the administrative burdens for the companies. As such, repeating the I-9 process should not be included as part of an employer?s required acts unless there are compelling reasons for doing so, as determined in a case-by-case basis.

The irony of requiring the repeat of the I-9 process is that the I-9 system, as currently constituted, is unreliable and is the reason why the instant regulations are necessary in the first place. The paper-driven verification on Form I-9 does little to verify identity or work authorization, but leaves ample opportunity for exposing law-abiding employers to penalties due to inadvertent paperwork error. Meanwhile, lawbreakers blatantly violate the law by hiring off-the-books and the immigration authorities can do little to stop them.

We thank the Department of Homeland Security for this opportunity to submit comments on the proposed rule and would be happy to provide any additional information necessary to facilitate a workable final rule resulting from this safe harbor proposed rule.

Respectfully Submitted,

FRAGOMEN, DEL REY, BERNSEN & LOEWY, LLP.

No-Match Cert. Admin. Record 1115

ICEB-2006-0004-0098

Comment Info: ================

General Comment:August 14, 2006

Director,
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW 2nd Floor
Washington, DC 29529

Re: Docket No. ICEB-2006-0004

The National Center for Transgender Equality (NCTE) respectfully submits these
comments on the rule proposed by the Department of Homeland Security regarding
safe-harbor procedures for employers who receive a no-match letter.

The system of no-match letters, and the timelines proposed for the system, will
cause unnecessary harm outside a realm of reasonableness in an equitable society
for transgender people.

Background

The existing policies are difficult for transgender people and have caused
adverse employment actions and the proposed rules will make it worse.

?Transgender? is an umbrella term encompassing: pre-operative, post-operative,
and non-operative transsexual people; cross-dressers; feminine men and masculine
women; and more generally, anyone whose gender identity or expression differs
from conventional expectations of masculinity or femininity.  For the purposes
of these comments, we use ?transgender? to refer to people who transition from
being a man to a woman, or vice versa with or without surgery or other medical
modification.  A transsexual person is an individual who is born one sex but who
has the psychological identity of the other sex and who lives his or her life as
the other sex. Some transsexual people undergo medical treatment to alter their
bodies to match their psychological identification.

While no complete census of transsexual people in the United States currently
exists, reasonable estimates range as high as .5% (one half of one percent) of
the population.

Currently, SSA sends a gender no-match letter to an employer when an employee?s
gender data submitted to the agency does not match SSA records. Under existing
procedures, when verifying an employee?s Social Security number via telephone,
an employer must provide the employee?s gender. When employers send employees?
W-2 data to the SSA electronically, they are permitted to include gender on an
optional basis. Only when gender is included either mandatorily over the phone
or optionally in an electronic submission, does the SSA compare an employee?s
gender to that listed in its records.

Discussion

The new safe-harbor procedures proposed by the Department of Homeland Security
will cause transgender people a myriad of problems and exacerbate an already
serious medical privacy invasion of many employees? medical privacy. In order
for the employee verification system to be efficient and equitable;
1) Gender must be completely removed (even as an optional field) from the
information used to verify employees;
2) Timeline changes need to be instituted for persons who have a legal name change;
3) The proposed process for providing updated information about an employee with
mismatched information is poorly worded and could lead to confusion;

Page 1

No-Match Cert. Admin. Record  1116

ICEB-2006-0004-0098

4) The anti-discrimination aspects of the proposed procedure need to be strengthened to protect transgender people from adverse employment action.

1.      Gender no-match letters are an invasion of private and privileged medical information.

NCTE acknowledges the importance of confirming that the Social Security number an employee is using is one that belongs to the employee and authorizes the employee to work. Avoiding fraud and ensuring that every person receives the Social Security funds deposited into their account are important features of this program. These comments do not challenge this aspect of the practice.

However, comparing records of a person?s gender is both unnecessary and a dangerous invasion of medical privacy. The practice is unnecessary because no employer is currently required to submit information to the SSA about the gender of individual employees. Some large employers submit this information on an optional basis when electronically submitting their W-2 data to the SSA electronically. Only then does the SSA confirm an employee?s gender. If confirming gender was thought to be necessary, every employee?s gender would need to be confirmed. Since employees do not disclose their gender to their employer in an official federal form (neither sex nor gender are fields on the W-2 or I-9), the gender sent by the employers is often the result of an employer?s guess or assumption about an employee?s gender. Gender no-match letters thus raise serious concerns about compliance with federal medical privacy laws and constitutional guarantees of privacy.

Before a change can be made to a person?s gender marker in their SSA account, they must provide proof that they have had surgery as a part of their transition. Therefore any employer who receives a gender no-match letter for a transgender employee will learn the employee?s surgical status. The disclosure of such status reveals privileged medical information. Employers and the SSA should not exchange private medical information of this nature.

Furthermore, not every transgender employee discloses their transgender status to their employer. If an employer receives a gender no-match letter, the transgender employee is left with no option but to disclose their status. Such disclosure has often led to on-the-job discrimination, including termination. It also forces an employee to disclose their transgender status, which is often a medical condition that an employee should be able to disclose or not depending on their own choice.

For these reasons, federal policy should be unified so that no employer reports the gender of any employee to the SSA or DHS. Comparing records of a person?s gender is not necessary to determine citizenship or work-eligibility status; this is confirmed by the fact that gender information is not routinely solicited, as previously noted.

Solution: NCTE suggests that the governmental bodies that receive information from employers not accept or process information about the employee?s gender.

2. The time limits impose a heavy and unfair burden on transgender people.

The proposed rules outline a strict 60-day period in which all mismatched information must be rectified by the employer, employee and SSA/DHS. In December 2005, the SSA began to require proof of a court effectuated name change (including names changed through marriage and adoption) before an individual employee?s SSA records would be updated. This policy applies even in states that continue to recognize common law name changes. However, in many of those states employees can get state issued identification in their new name, even without court recognition of that change. For these employees, the proposed time limit is insufficient to go to court and effectuate a change.

For any person, transgender or otherwise, who makes a voluntary and legal name
Page 2

No-Match Cert. Admin. Record  1117

ICEB-2006-0004-0098

change, the process is tedious out of necessity and can take a long time. Even if the legal process of name change doesn?t require the full 60-day time period, an individual needs to make the changes with a number of different organizations, and SSA is only one of them. If not allowed enough time to effect a name change on all relevant government and employment documentation, a person could have a legal name that is different from the one that SSA has on record and could have trouble securing or maintaining employment.

In order to reduce the amount of harm and privacy invasion, individual employees must be allowed sufficient time for legal name change with all relevant documentation. We have spoken with attorneys in California and Texas who handle name changes for transgender clients, and they believe that in California, as much as ninety days would be required and in Texas, as much as 120 days.

Solution: NCTE suggests that DHS extend the time period for rectification of information by employer, employee and SSA/DHS. If at all possible, SSA/DHS should allow a flexible time frame for people who are making or who have made a legal name change to get all the necessary documentation changes made. At the very least, DHS should allow a time period of 90-120 days.

3.  Proposed process for providing updated information about an employee with mismatched information is poorly worded and could lead to confusion.

The language in the existing proposal regarding rectifying mismatches is unclear. This language, in particular, will lead to confusion. ?(2) No document containing the SSN or alien number that is the subject of the no-match letter, and no receipt for an application for a replacement of such a document, may be used to establish employment authorization or identity or both .?

Clearly, what the Department intends with this language is that any employee whose initial SSA number is submitted incorrectly must provide their employer and/or the SSA with a new, accurate number. Resubmitting the same number, when the submitted number and not other information is what created the mismatch, is not allowed.

As written, the current language could be interpreted to require all employees with mismatched information to submit a different number even if the problem was in regards to their name or gender. Persons with a changed name or gender are still the same person and have the same SSN.

Solution: The rule should be written clearly to define for whom and under what circumstances the original SSN cannot be used again. NCTE also suggests that accommodations be expressly written into the no-match letter procedures allowing for differences in identification requirements and timelines for rectification for people who have gone through legal name changes.

4.     The anti-discrimination aspects of the proposed procedure need to be strengthened to protect transgender people from adverse employment action.

NCTE applauds the protection afforded to persons with a foreign appearance or accent and appreciates that employers cannot require additional documentation from people because of these characteristics. Despite these protections, though, transgender people are still at a significant risk for being mistreated based on their appearance and the possible divergence between their current appearance and the picture on their identification documents.

Employers should be proscribed from requiring additional or special documentation from employees simply because of gender nonconformity or appearance of being transgender.

Solution: NCTE suggests that explicit protection for persons whose name or appearance is gender non-conforming be included in the proposed rule. This could be done by simply expanding the language regarding foreign appearance or accent .
Page 3

No-Match Cert. Admin. Record  1118

ICEB-2006-0004-0098

Conclusion: NCTE believes that these new timelines will impose a large burden on the transgender community that is completely unjustifiable. It is our position that at a minimum gender should be removed, even as an optional field, from any compulsory verification of employees and should not be transmitted to or accepted by the DHS/SSA. Without these changes, this rule and the timelines proposed will put transgender employees at greater risk of adverse employment actions or bias simply because they are transgender or do not conform to narrow societal standards of gender.

Respectfully submitted,

Mara Keisling
Executive Director
National Center for Transgender Equality
1325 Massachusetts Ave. NW Suite 700
Washington, DC 20005
202-903-0112

Page 4

No-Match Cert. Admin. Record 1119

NATIONAL CENTER for
TRANSGENDER EQUALITY

August 14, 2006

Director,
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW 2nd Floor
Washington, DC 29529

Re: Docket No. ICEB-2006-0004

The National Center for Transgender Equality (NCTE) respectfully submits these comments on the rule proposed by the Department of Homeland Security regarding safe-harbor procedures for employers who receive a no-match letter.

The system of no-match letters, and the timelines proposed for the system, will cause unnecessary harm outside a realm of reasonableness in an equitable society for transgender people.

**Background**

The existing policies are difficult for transgender people and have caused adverse employment actions and the proposed rules will make it worse.

"Transgender" is an umbrella term encompassing: pre-operative, post-operative, and non-operative transsexual people; cross-dressers; feminine men and masculine women; and more generally, anyone whose gender identity or expression differs from conventional expectations of masculinity or femininity.[1] For the purposes of these comments, we use "transgender" to refer to people who transition from being a man to a woman, or vice versa with or without surgery or other medical modification. A transsexual person is an individual who is born one sex but who has the psychological identity of the other sex and who lives his or her life as the other sex. Some transsexual people undergo medical treatment to alter their bodies to match their psychological identification.

While no complete census of transsexual people in the United States currently exists, reasonable estimates range as high as .5% (one half of one percent) of the population.[2]

Currently, SSA sends a gender no-match letter to an employer when an employee's gender data submitted to the agency does not match SSA records. Under existing procedures, when verifying an employee's Social Security number via telephone, an employer must provide the employee's gender. When employers send employees' W-2 data to the SSA electronically, they are permitted to include gender on an optional basis. Only when gender is included either mandatorily over the phone or optionally in an electronic submission, does the SSA compare an employee's gender to that listed in its records.

**Discussion**

The new safe-harbor procedures proposed by the Department of Homeland Security will cause transgender people a myriad of problems and exacerbate an already serious medical privacy invasion of many employees' medical privacy. In order for the employee verification system to be efficient and equitable;
  1) Gender must be completely removed (even as an optional field) from the information used to verify employees;

---

[1] Transgender Law and Policy Institute, (www.transgenderlaw.org.)
[2] Lynn Conway, University of Michigan, Ann Arbor, MI, (http://ai.eecs.umich.edu/people/conway/TS/TSprevalence.html)

**No-Match Cert. Admin. Record  1120**

2) Timeline changes need to be instituted for persons who have a legal name change;
3) The proposed process for providing updated information about an employee with mismatched information is poorly worded and could lead to confusion;
4) The anti-discrimination aspects of the proposed procedure need to be strengthened to protect transgender people from adverse employment action.

## 1.  Gender no-match letters are an invasion of private and privileged medical information.

NCTE acknowledges the importance of confirming that the Social Security number an employee is using is one that belongs to the employee and authorizes the employee to work. Avoiding fraud and ensuring that every person receives the Social Security funds deposited into their account are important features of this program. These comments do not challenge this aspect of the practice.

However, comparing records of a person's gender is both unnecessary and a dangerous invasion of medical privacy. The practice is unnecessary because no employer is currently *required* to submit information to the SSA about the gender of individual employees. Some large employers submit this information on an optional basis when electronically submitting their W-2 data to the SSA electronically. Only then does the SSA confirm an employee's gender. If confirming gender was thought to be necessary, every employee's gender would need to be confirmed. Since employees do not disclose their gender to their employer in an official federal form (neither sex nor gender are fields on the W-2 or I-9), the gender sent by the employers is often the result of an employer's guess or assumption about an employee's gender. Gender no-match letters thus raise serious concerns about compliance with federal medical privacy laws and constitutional guarantees of privacy.

Before a change can be made to a person's gender marker in their SSA account, they must provide proof that they have had surgery as a part of their transition. Therefore any employer who receives a gender no-match letter for a transgender employee will learn the employee's surgical status. The disclosure of such status reveals privileged medical information. Employers and the SSA should not exchange private medical information of this nature.

Furthermore, not every transgender employee discloses their transgender status to their employer. If an employer receives a gender no-match letter, the transgender employee is left with no option but to disclose their status. Such disclosure has often led to on-the-job discrimination, including termination. It also forces an employee to disclose their transgender status, which is often a medical condition that an employee should be able to disclose or not depending on their own choice.

For these reasons, federal policy should be unified so that no employer reports the gender of any employee to the SSA or DHS. Comparing records of a person's gender is not necessary to determine citizenship or work-eligibility status; this is confirmed by the fact that gender information is not routinely solicited, as previously noted.

Solution: NCTE suggests that the governmental bodies that receive information from employers not accept or process information about the employee's gender.

## 2. The time limits impose a heavy and unfair burden on transgender people.

The proposed rules outline a strict 60-day period in which all mismatched information must be rectified by the employer, employee and SSA/DHS. In December 2005, the SSA began to require proof of a court effectuated name change (including names changed through marriage and adoption) before an individual employee's SSA records would be updated. This policy applies even in states that continue to recognize common law name changes. However, in many of those states employees can get state issued identification in their new name, even without court recognition of that change. For these employees, the proposed time limit is insufficient to go to court and effectuate a change.

For any person, transgender or otherwise, who makes a voluntary and legal name change, the process is tedious out of necessity and can take a long time. Even if the legal process of name change doesn't require the full 60-day time period, an individual needs to make the changes with a number of different organizations, and SSA is only one of them. If not allowed enough time to effect a name change on all

relevant government and employment documentation, a person could have a legal name that is different from the one that SSA has on record and could have trouble securing or maintaining employment.

In order to reduce the amount of harm and privacy invasion, individual employees must be allowed sufficient time for legal name change with all relevant documentation. We have spoken with attorneys in California and Texas who handle name changes for transgender clients, and they believe that in California, as much as ninety days would be required and in Texas, as much as 120 days.

Solution: NCTE suggests that DHS extend the time period for rectification of information by employer, employee and SSA/DHS. If at all possible, SSA/DHS should allow a flexible time frame for people who are making or who have made a legal name change to get all the necessary documentation changes made. At the very least, DHS should allow a time period of 90-120 days.

**3. Proposed process for providing updated information about an employee with mismatched information is poorly worded and could lead to confusion.**

The language in the existing proposal regarding rectifying mismatches is unclear. This language, in particular, will lead to confusion. "(2) No document containing the SSN or alien number that is the subject of the no-match letter, and no receipt for an application for a replacement of such a document, may be used to establish employment authorization or identity or both[3]."

Clearly, what the Department intends with this language is that any employee whose initial SSA number is submitted incorrectly must provide their employer and/or the SSA with a new, accurate number. Resubmitting the same number, when the submitted number *and not other information* is what created the mismatch, is not allowed.

As written, the current language could be interpreted to require all employees with mismatched information to submit a different number even if the problem was in regards to their name or gender. Persons with a changed name or gender are still the same person and have the same SSN.

Solution: The rule should be written clearly to define for whom and under what circumstances the original SSN cannot be used again. NCTE also suggests that accommodations be expressly written into the no-match letter procedures allowing for differences in identification requirements and timelines for rectification for people who have gone through legal name changes.

**4. The anti-discrimination aspects of the proposed procedure need to be strengthened to protect transgender people from adverse employment action.**

NCTE applauds the protection afforded to persons with a foreign appearance or accent and appreciates that employers cannot require additional documentation from people because of these characteristics. Despite these protections, though, transgender people are still at a significant risk for being mistreated based on their appearance and the possible divergence between their current appearance and the picture on their identification documents.

Employers should be proscribed from requiring additional or special documentation from employees simply because of gender nonconformity or appearance of being transgender.

Solution: NCTE suggests that explicit protection for persons whose name or appearance is gender non-conforming be included in the proposed rule. This could be done by simply expanding the language regarding foreign appearance or accent[4].

Conclusion: NCTE believes that these new timelines will impose a large burden on the transgender community that is completely unjustifiable. It is our position that *at a minimum* gender should be removed, even as an optional field, from any compulsory verification of employees and should not be transmitted to or

---

[3] Safe-Harbor Procedures for Employers Who Receive a No-Match Letter, 71 Fed. Reg. 34281 at 34283 (proposed June 14, 2006) (to be codified at 8 C.F.R. pt. 274a).
[4] Safe-Harbor Procedures for Employers Who Receive a No-Match Letter, 71 Fed. Reg. 34281 at 34285 (proposed June 14, 2006) (to be codified at 8 C.F.R. pt. 274a).

accepted by the DHS/SSA. Without these changes, this rule and the timelines proposed will put transgender employees at greater risk of adverse employment actions or bias simply because they are transgender or do not conform to narrow societal standards of gender.

Respectfully submitted,

Mara Keisling
Executive Director
National Center for Transgender Equality
1325 Massachusetts Ave. NW Suite 700
Washington, DC 20005
202-903-0112

 # CAUSA 

August 10, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:*    *DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

CAUSA submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

CAUSA is Oregon's statewide immigrant rights coalition. CAUSA is a statewide, grassroots coalition based in the Latino community. Our mission is to defend and advance the rights and well being of immigrant workers and families in Oregon as we counter the growing anti-immigrant agenda in our state by coordinating with our regional and national allies to further immigrant rights throughout the United States.

CAUSA has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States–immigrant and native-born alike.

As a result of this work, CAUSA is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

---

1460 Capitol St NE ● Salem, OR 97303 ● tel (503) 763-1694 ● fax (503) 399-1183 ●
oregoncausa@yahoo.com

TNG / CWA – 32035

**No-Match Cert. Admin. Record  1124**

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform**. The House and

the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits

**No-Match Cert. Admin. Record  1126**

rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Aeryca Steinbauer, Coordinator
CAUSA
1460 Captitol St NE
Salem, OR 97301
503-982-0243 ext. 213
aeryca@pcun.org

**MIRA**

## MASSACHUSETTS IMMIGRANT & REFUGEE ADVOCACY COALITION

105 Chauncy Street, 9th Floor, Boston, MA  02111 • Voice & TTY (617) 350-5480 • Fax (617) 350-5499 • http://www.miracoalition.org

August 4, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C.  20529

Re:     *DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

The Massachusetts Immigrant and Refugee Advocacy Coalition (MIRA) respectfully submits the following comments to the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

MIRA is a multi-ethnic, multiracial coalition that actively involves hundreds of grassroots immigrant organizations, legal service providers, labor unions, religious organizations, human service agencies, and human rights groups in cooperative efforts.  We represent over 100 organizations across the state of Massachusetts, and have strong partnerships with agencies, business and leaders across New England.

MIRA's mission is to protect and promote the rights and opportunities of immigrants and refugees in Massachusetts.  In partnership with its members, MIRA advances this mission through education, training, leadership development, organizing, policy analysis and advocacy.  Our membership serves low-income refugees and immigrants from around the world.

After numerous discussions with our membership and key stakeholders, we urge DHS to withdraw this proposed rule in its entirety.

The proposed rule will magnify the adverse impact that Social Security Administration (SSA) no-match letters have had on workers' rights, and trigger mass firings across the nation.  These firings will be unnecessary, unjust, and potentially discriminatory.

Even though it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**.  Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country.  They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Therefore, the proposed rule will result in growth of this underground economy.  It will also erode our privacy rights, and it represents an end-run around the federal legislative process.  As further explained in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool.

**This proposed rule will harm all workers regardless of immigration status.**
The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion, employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with the SSA. The SSA database is notoriously inaccurate, and often "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and work-authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigation against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to obstruct labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem, and lead to the further exploitation of all workers.

**The proposed rule will expand the unregulated underground cash economy.**
"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

**The proposed rule is an end-run around the legislative process.**
The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform.** The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

**The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**
This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Furthermore, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

**The proposed rule is an erosion of our privacy rights.**
 DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

**The costs of implementing the proposed rule are prohibitive.**
 If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law.

**The proposed rule is objectionable because compliance is impractical.**
The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In conclusion, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter."

The proposed rule is simply the wrong rule at the wrong time. DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses.

For the reasons outlined above, and on behalf of over a hundred organizations in Massachusetts, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Ali Noorani
Executive Director

Eva A. Millona
Policy Director

# American Federation of Labor and Congress of Industrial Organizations



815 Sixteenth Street, N.W.
Washington, D.C. 20006
(202) 637-5000
www.aflcio.org

**EXECUTIVE COUNCIL**

JOHN J. SWEENEY
PRESIDENT

RICHARD L. TRUMKA
SECRETARY-TREASURER

LINDA CHAVEZ-THOMPSON
EXECUTIVE VICE PRESIDENT

| | | | |
|---|---|---|---|
| Gerald W. McEntee | Gene Upshaw | Michael Sacco | Frank Hurt |
| Patricia Friend | Michael Goodwin | William Lucy | Leon Lynch |
| Robert A. Scardelletti | John M. Bowers | R. Thomas Buffenbarger | Elizabeth Bunn |
| Michael J. Sullivan | Capt. Duane Woerth | Harold Schaitberger | Edwin D. Hill |
| Joseph J. Hunt | Cheryl Johnson, R.N. | Clyde Rivers | Cecil Roberts |
| Edward C. Sullivan | William Burrus | Leo W. Gerard | Melissa Gilbert |
| Edward J. McElroy Jr. | Ron Gettelfinger | James Williams | John J. Flynn |
| Baxter M. Atkinson | John Gage | William H. Young | Nat LaCour |
| Vincent Giblin | William Hite | Michael T. O'Brien | Andrea E. Brooks |
| Larry Cohen | Warren George | Gregory J. Junemann | Laura Rico |
| Thomas C. Short | Robbie Sparks | Nancy Wohlforth | Paul C. Thompson |

August 14, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

**Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"**

Dear Sir or Madam:

The American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The AFL-CIO represents 53 unions and nearly 9 million workers nationwide. Our mission is to improve the lives of working families—to bring economic justice to the workplace and social justice to our nation by enabling working people to have a voice on the job, in government, in a changing global economy and in their communities.

The AFL-CIO has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States—immigrant and native-born alike.

As a result of this work, the AFL-CIO is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm _all_ workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

    This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

    Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

    DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

    If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

   The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

   In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,



Ana Avendaño
Associate General Counsel and
Director, Immigrant Worker Program
AFL-CIO
815 Sixteenth St. N.W.
Washington, D.C. 20006
202-637-3949 (phone)
202-637-5323 (fax)
aavendan@aflcio.org (email)

# CALIFORNIA RURAL LEGAL ASSISTANCE, Inc.

**Central Office**
631 Howard St., #300
San Francisco, CA 94105
Telephone 415.777.2752
Fax 415.543.2752
www.crla.org

José R. Padilla
*Executive Director*

Luis C. Jaramillo
*Deputy Director*

Ralph Santiago Abascal
*General Counsel*
(1934-1997)

William G. Hoerger
Ilene J. Jacobs
Michael M. Meuter
Cynthia L. Rice
*Directors of Litigation, Advocacy,
and Training*

**Regional Offices**

Arvin
Coachella
Delano
El Centro
Fresno
Gilroy
Madera
Marysville
Modesto
Monterey
Oceanside
Oxnard
Paso Robles
Salinas
San Luis Obispo
Santa Barbara
Santa Cruz
Santa Maria
Santa Rosa
Stockton
Watsonville

🖥 LSC

August 11, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C.  20529

Re:     DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor
Procedures for Employers Who Receive a No-Match Letter"

Dear Director:

California Rural Legal Assistance and California Rural Legal Assistance
Foundation submit the following comments in response to the request for
public comment by the Department of Homeland Security (DHS), Bureau of
Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor
Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg.
34281 (June 14, 2006).

California Rural Legal Assistance, Inc., is a non-profit legal services
organization funded in part by grants from the Legal Services Corporation.
We have 20 offices located in rural California serving the farmworker
community and low wage workers in cities like Coachella,  Fresno, Stockton,
Modesto and Santa Rosa. We provide a full range of legal services and
regularly represent farmworkers and others in wage and hour cases and in
proceedings before state and federal social service agencies.  California Rural
Legal Assistance Foundation is a non-profit organization which represents the
interests of California farmworkers through legislative and regulatory
advocacy and by providing legal services in the areas of immigration and labor
rights.

Our organizations represent farmworkers and other low wage workers
throughout rural California. In our 40 years of advocacy we have encountered
thousands of cases where employers, social service agencies, the California
Employment Development Department and the Social Security Administration
have provided or inputted inaccurate information into the Social Security
Administration's data base that has affected workers' rights.  Legal residents

Director, Regulatory Management Division,
August 11, 2006
Page 2

and citizens have had to spend months and even years correcting records maintained at various
agencies. These errors are caused by mis-spellings, juxtaposition of letters or numbers, cultural
differences in writing dates or surnames and, in some cases, deliberate false reporting by
employers.

The proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." rule
will magnify the adverse impact that SSA no-match letters have had on workers' rights, and
promote firings and further exploitation of workers that will affect low wage workers irrespective
of their immigration status.

California is struggling to effectively control the underground economy that includes agriculture,
janitorial work, garment, landscaping and the hospitality industry. As legitimate employers push
workers out, unscrupulous employers hire them, cutting their costs by ignoring immigration laws
and labor laws. The No-Match Safe-Harbor provisions encourage, rather than discourage, this
shift of the workforce  We therefore join in the comments submitted by other low wage worker
advocates and urge DHS to withdraw this proposed rule in its entirety based on the following
concerns:

          This proposed rule will harm all workers regardless of immigration status.

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of
caution, panic, and confusion employers will fire workers who receive an SSA no-match letter
before workers have a chance to correct their records with SSA. The SSA database is
notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical
errors. Hundreds of thousands of workers-including U.S. citizens and authorized
noncitizens-could lose their jobs. Such firings may run afoul of federal and state
anti-discrimination laws and other worker protections, and lead to costly and protracted
litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing
campaigns and to retaliate against workers who have been injured on the job or complain of
unpaid wages or other labor violations. In documented cases (including arbitration decisions)
from across the country, employers initially ignored SSA no-match letters, and then decided to
use them as a pretext to fire workers who participated in efforts to improve working conditions
and wages. The proposed rule would only exacerbate this problem. In one recent example,
litigated by CRLA, an employer admitted underpaying workers but attempted to have the court
take judicial notice of a no match letter claiming that it proved that the worker was not who he
claimed to be. Although CRLA prevailed on the evidentiary question, this is typical of the mis-
use of such letters.

Director, Regulatory Management Division,
August 11, 2006
Page 3

### The proposed rule will expand the unregulated underground cash economy.

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the unregulated underground cash economy which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers. CRLA has vast experience with such "off the books" wage payment schemes. For years, we have represented a large number of workers who were paid under such schemes. Workers paid "off the books" are much more likely not to receive the pay due them under federal and state law; and to have their employers pocket tax and social security withholdings.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

### The SSA no-match letter program is ill-suited as a tool for immigration enforcement.

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

### The proposed rule is an erosion of privacy rights.

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS

Director, Regulatory Management Division,
August 11, 2006
Page 4

to end-run these privacy protections and commandeer personal information in the SSA database
for their own purposes.

<u>The costs of implementing the proposed rule are prohibitive.</u>

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive
investment in employer and worker education programs in order to combat the rampant panic and
confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables
for compliance that will derail its implementation. Further, although this rule purports to make
changes to how DHS interprets these letters, it has a significant impact on the way in which SSA
has to respond to the inevitable increase in employer and worker inquiries about this confusing
rule. The actual costs of administrating the program will be astronomical for SSA, an agency
whose limited resources should go towards administering Social Security benefits rather than
enforcing immigration law. The proposed rule should therefore be withdrawn.

<u>The proposed rule is objectionable because compliance is impractical.</u>

The proposed rule does not provide clear guidance on what an employer who receives a DHS
notice is supposed to do though it purports to provide a "safe-harbor." While the notice
procedure protects the employer, it fails to provide a mechanism for an employee to access and
correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in
dealing with DHS and does not account for the numerous bureaucratic steps that employees must
go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled
"Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is
simply the wrong rule at the wrong time. The Department of Homeland Security should not risk
the livelihoods of hundreds of thousands-possibly millions-of U.S. workers in a poorly conceived
immigration enforcement attempt on the eve of comprehensive immigration reform. The
proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented
workers and is far outweighed by the exorbitant implementation costs that will be borne by
taxpayers, workers, and businesses. For all these reasons, we request that the Department of
Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Cynthia L. Rice
California Rural Legal Assistance, Inc.

Mark S. Schacht
California Rural Legal Assistance Foundation

August 2, 2006


Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave., NW, 2nd Floor
Washington, DC   20529

Reference: DHS Docket No. ICEB-2006-0004

To whom it may concern,
I am writing concerning the "No Match" letters that are sent to employers and
employees. I am very concerned that the proposed new regulations will have a chilling
effect on immigrant workers, both documented and undocumented.  It is unjust for the
Federal government to make such sweeping changes when at the same time asking for
Comprehensive Immigration Reform.

The regulations will burden employers and workers with the consistent errors already
present in the Social Security Administration's Basic Pilot program. Furthermore, it
would be unjust to implement a government mandated layoff of millions of immigrants
because of the federal government's inability to enact Comprehensive Immigration
Reform. Immigrants, both documented and undocumented have been a key force in
the economic growth in the United States during the last several decades—should they
now be penalized for a broken system without systematic reform being enacted.

In addition, the economy will suffer due to employment instability in key industries in
agriculture, food processing and the service sector.

Finally, the new "Safe Harbor" procedures will create injustice in the workplace for
millions of immigrant workers, including hour and wage violations and more unsafe
workplaces. Immigrant workers will become even more invisible and without access to
basic workplace rights.

I would encourage the these regulations be dropped altogether in the hope that
Comprehensive Immigration Reform will be enacted.

Sincerely,

*Dennis Sadowski*

Dennis Sadowski
3245 Nagle Rd.
Avon, OH  44011-2059

# NATIONAL IMMIGRATION PROJECT

of the NATIONAL LAWYERS GUILD

**Board of Directors**

Barbara Hines, Chair
  Austin, TX

Rogelio Nuñez, Treasurer
  Harlingen, TX

Susan Alva
  Los Angeles, CA

Robin Bronen
  Anchorage, AK

Susana De León
  Minneapolis, MN

Rosemary Esparza
  Venice, CA

Linton Joaquin
  Los Angeles, CA

Christina Kleiser
  Knoxville, TN

Michael Maggio
  Washington, DC

Chinwe Obianwu
  Atlanta, GA

Sonia Parras Konrad
  Des Moines, IA

Judy Rabinovitz
  New York, NY

Rebecca Sharpless
  Miami, FL

Marc Van Der Hout
  San Francisco, CA

**Staff**

Ellen Kemp
  Coordinator/
  Legal Worker

Dan Kesselbrenner
  Director

Ki Kim
  Communications &
  Development

Toy Lim
  Office Manager

Ana Manigat
  Administrative
  Assistant

Malik Ndaula
  Soros Justice Fellow

Paromita Shah
  Associate Director

August 11, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

Re:    **DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).**

Dear Director:

The National Immigration Project of the National Lawyers Guild (National Immigration Project) submits the following comments in response to the above-referenced proposed regulation. The National Immigration Project is a not-for-profit corporation that publishes materials, sponsors training sessions, and provides technical assistance on immigration and nationality law. The National Immigration Project has a long history of involvement in protecting the rights of non-citizen workers in the U.S.

Our specific comments follow below.

**DHS lacks authority to regulate SSA "No-Match" letters because Congress conferred exclusive authority to the SSA to administer all aspects of the worker retirement benefit program.**

An agency cannot promulgate regulations that are inconsistent with the will of Congress.  Congress intended the Social Security Administration to have exclusive authority to regulate all matters relating to social security.  Insofar as the proposed regulations tread impermissibly on the exclusive province of the Social Security Administration, they exceed the scope of DHS' lawful authority.

Section 901 of Title 42 United States Code provides that the Social Security Administration is an independent agency of the United States government. Congress conferred expansive and exclusive authority to the Social Security Administration over all matters related to the various programs it administers.  For example, 42 USC § 901(b) provides that:

14 Beacon Street, Suite 602, Boston, Massachusetts 02108
617-227-9727 ◆ 617-227-5495 fax
www.nationalimmigrationproject.org

No-Match Cere Admin. Record  1140

It shall be the duty of the Administration to administer the old-age, survivors, and disability insurance program under subchapter II of this chapter and the supplemental security income program under subchapter XVI of this chapter.

Congress developed an elaborate and detailed scheme to administer all aspects of the worker retirement program commonly known as "social security." The proposed regulation impinges on Congress' plain intent to confer exclusive authority to the Social Security Administration to regulate matters relating to social security eligibility and social security wages. Reading the Social Security Act as a whole makes manifest that DHS lacks the authority to promulgate regulations that interpret letters sent out by the Social Security Administration or any other matter that touches on social security eligibility. This authority is inconsistent with the intent that Congress expressed in the overall legislative scheme. Justice O'Connor writes, "Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *ETSI Pipeline Project v. Missouri*, 484 U.S. 495 (1988), quoted in *FDA v. Brown & Williamson Tobacco Corporation*.

Congress spoke directly to the Social Security Administration's exclusive authority in this area in SSA-specific legislation that has been enacted subsequent to the enactment of the INA.[1] To the extent that the SSA has exclusive authority in this area, DHS does not have any. Based on the same logic, the Supreme Court found that the Food and Drug Administration (FDA) lacked the authority to regulate tobacco products. *FDA v. Brown & Williamson Tobacco Corporation*, 529 U.S. 120 (2000). Congress' SSA-specific legislation effectively demonstrates that the Department of Homeland Security's agencies have no authority to promulgate regulations that take away the authority of the Social Security Administration to attach significance to its own correspondence. The Department of Homeland Security simply lacks the authority to regulate SSA documents.

**ICE has chronic data management problems.**
Even if DHS is deemed to have authority to regulate this issue, the agency has demonstrated alarming incompetence in managing data. The Bureau of Immigration and Customs Enforcement has a long history of trouble handling data. Over the years, ICE and its predecessor have struggled to process, maintain, and manage information. This is a chronic problem. As recently as June 2006 the Government Accountability Office criticized DHS' data entry in the new employment verification program.[2]

The government itself has recognized these problems. Since 1995, the Government Accountability Office (previously the General Accounting Office) has been reporting on data collection and management problems in the Immigration and Naturalization Service (INS) and its successor agency, including INS' problematic overstay estimation methods.[3] The GAO chronicled more generally immigration statistics that are "lacking, misleading, or otherwise

---

[1] The Social Security Protection Act of 2004, for instance.
[2] U.S. Government Accountability Office, "Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts," June 19, 2006.
[3] U.S. General Accounting Office, "Illegal Immigration: INS Overstay Estimation Methods Needed," September 26, 1995.

No-Match Cert. Admin. Record 1141

inadequate."[4] INS difficulties included obsolete hardware, incompatible and non-interoperable information systems, and uneven system security capabilities.[5] In a 1997 report to Congress, Justice Department Inspector General Michael Bromwhich expressed concern about "the integrity of the data . . . and the training and abilities of INS employees who will be responsible for maintaining these systems and recording the transactions that constitute the systems' databases."[6] INS had a long-standing history of using antiquated, inaccurate databases.[7]

In response, the Immigration and Naturalization Service Data Management Improvement Act, HR 4489, was introduced in Congress.[8] Prompted by the events of September 11, 2001, Congress passed the Enhanced Border Security and Visa Entry Reform Act of 2002, which mandated the integration of immigration systems and databases, as well as the integration of data systems and databases that contain federal law enforcement and intelligence information.[9] The legislation set 2003 as the original deadline. Congress extended the deadline until 2005 for full integration.[10]

In 2004, a year after the INS was split up and transferred from the Department of Justice to the Department of Homeland Security, the GAO found that the new Immigration and Customs Enforcement agency was not handling data any better than INS ever had. The GAO found that while ICE was in the process of updating its case management system, it still "lack[ed] complete, accurate and readily available information" and "d[id] not have the capability to record information."[11] Moreover, the GAO found significant data management problems in the new US-VISIT program, established to collect, maintain, and share information on selected foreign nationals.[12]

More recently, in 2005, the GAO concluded that all of DHS "continues to face operational and management challenges that it inherited from its component legacy agencies."[13] These challenges include the development of a department-wide framework for managing information, specifically in the context of immigration law enforcement and the provision of immigration services.

---

[4] In a 2005 status update to this report, GAO found that the "underlying data quality issue" had not been fixed, although the office had provided "substantial guidance in how this recommendation could be fulfilled." U.S. General Accounting Office, "Immigration Statistics: Information Gaps, Quality Issues Limit Utility of Federal Data to Policymakers," July 31, 1998.

[5] U.S. Government Accountability Office, "Information Technology: Immigration and Customs Enforcement Is Beginning to Address Infrastructure Modernization Program Weaknesses but Key Improvements Still Needed," July 2006.

[6] "Despite a deluge of resources, the Immigration and Naturalization Service's management systems don't deliver," Government Executive, February 1, 1999.

[7] Congressional Research Service, "Immigration Enforcement Within the United States," April 6, 2006.

[8] H.R. 4489, Immigration and Naturalization Service Data Management Improvement Act of 2000, Smith (R), Texas.

[9] Id.

[10] Shruti Daté, "Congress extends deadline for INS data system," Government Computer News, May 24, 2000.

[11] U.S. General Accounting Office, "Immigration Enforcement: Better Data and Controls Are Needed to Assure Consistency with the Supreme Court Decision on Long-Term Alien Detention," May 27, 2004.

[12] U.S. General Accounting Office, "Homeland Security: First Phase of Visitor and Immigration Status Program Operating, but Improvements Needed," May 2004.

[13] Id. at note 2.

3

These problems continue. This year the GAO reiterated these concerns, finding "DHS delays in entering data into its databases" in the context of the new employment verification and worksite enforcement program.[14] Moreover, the problems are widespread, affecting all three of the new agencies created out of INS. In the 2006 Annual Report to Congress, the Citizenship and Immigration Services Ombudsman addressed information technology issues, acknowledging intrinsic flaws in the USCIS information management systems, which do not permit adequate case tracking and reporting and fail to connect USCIS and other agencies, including ICE and CBP.[15] He noted the "questionable accuracy" of the information within the systems. In an email interview with CNET News.com, USCIS chief information officer Tarrazzia Martin wrote: "The state of USCIS' current systems prevents it from implementing key initiatives, and has only allowed for incremental change."[16]

A broad range of organizations have recognized the serious limitations of DHS' data collection.[17] Government auditors concur that ICE's databases are notoriously inaccurate. Too much is at stake in the context of employment authorization to place additional requirements on an agency with such a demonstrated record of inadequate data maintenance. This agency is simply not ready to implement a new program so dependent on data management. "No-Match" findings are certain to occur because of name changes and clerical errors. Hundreds of thousands of workers—including U.S. citizens and authorized non-citizens—could lose their jobs as a result. Given ICE and its predecessors' track record in this area, as well as the importance of the regulation to workers in the United States, ICE cannot be trusted to maintain and manage a database that has so much significance for U.S. workers.

**Immigration status changes.**
Immigration status is not static data. It changes both individually and en masse. Thousands of people can have rights conferred on them at once, as when particular foreign nationals are granted temporary protected status. As noted above, ICE has chronic trouble managing data. The nature of the data makes it particularly difficult to collect and maintain.

ICE has already proved that it is not equipped to handle a new program reliant on data management. Since 2003, schools and student-exchange programs have been required to use the internet-based Foreign Student and Exchange Visitor Information System (SEVIS) to store and track personal information about foreign students before, during, and after their stay in the U.S. But university administrators have complained that SEVIS frequently loses data, that it cannot handle large batches of information submitted at once, and that it does not provide real-time access to records. Worse yet, ICE computer problems once caused student visa holders to be jailed overnight or barred from entering the U.S.[18] In a recent report, GAO found that many of these glitches had not been resolved.[19]

---

[14] U.S. Government Accountability Office, "Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts," June 19, 2006.
[15] Citizenship and Immigration Services Ombudsman, Annual Report to Congress, June 2006.
[16] Declan McCullagh, "Aging computers hobble Homeland Security," CNET News.com, December 15, 2005.
[17] Electronic Privacy Information Center, "US-VISIT Rolls Out the Unwelcome Mat," July 2005; Federation for American Immigration Reform, "House Immigration Subcommittee Oversight Hearing on Electronic Technology Border Control," October 11, 2001.
[18] Id. at note 14.
[19] U.S. General Accounting Office, "Homeland Security: Performance of Information System to Monitor Foreign Students and Exchange Visitors Has Improved, but Issues Remain," June 2004.

4

No-Match Cert. Admin. Record  1143

National Immigration Project Comments re. DHS Proposed Regulations (71 Fed. Reg. 34281)

Another computer malfunction stranded thousands of airline passengers at U.S. border checkpoints last August when a DHS computer crashed, shutting down the government's main immigration database in Virginia.[20]

ICE is already over-burdened with programs that rely on its faulty information and poor data management. The agency has indicated that it is unable to handle the current data flow.[21] This regulation would further strain an already stressed system.

**The proposed regulation violates the constitutional right to due process.**
The regulation is unconstitutional because it does not respect the due process rights of people now present in the U.S. The Due Process clause of the Fifth Amendment protects the rights of all persons present in our country, not just United States citizens. The Supreme Court recognized long ago that the Due Process clause of the Fifth Amendment protects non-citizens, even those who are deportable or unlawfully present in the United States. *Yamataya v. Fisher*, 189 U.S. 86 (1903). The Court has repeated this holding again and again. *Plyler v. Doe*, 457 U.S. 202 (1982); *Mathews v. Diaz*, 426 U.S. 67 (1976). As the Court stated in *Plyler*, "[w]e have clearly held that the Fifth Amendment protects [even] aliens whose presence in this country is unlawful." 457 U.S. at 210.

The U.S. government has a strong interest in regulating workers within its borders. However, this interest must be balanced with the affected person's interest and the risk of erroneous deprivation. *Matthews v. Elridge*, 424 U.S. 319 (1976). In this case the risk of erroneous deprivation is extremely high, and affected persons have a strong interest in the proposed legislation. This regulation is likely to result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion, employers will fire workers who receive a no-match letter, before workers have a chance to correct their records. Again, hundreds of thousands of workers—including U.S. citizens and authorized non-citizens—will be affected.

**Conclusion**
We strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." For the reasons listed above, the Department of Homeland Security should withdraw the proposed regulation.

Thank you for considering our views on this matter.

Respectfully,

Fiona McKinnon
Haywood Burns Fellow

Dan Kesselbrenner
Director

---

[20] Id. at note 14.
[21] U.S. Government Accountability Office, "Information Technology: Immigration and Customs Enforcement Is Beginning to Address Infrastructure Modernization Program Weaknesses but Key Improvements Still Needed," July 27, 2006.

5

**No-Match Cert. Admin. Record  1144**

**Office of the Mayor**
City & County of San Francisco



**Gavin Newsom**

AUG 1 4 2006

August 11, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW
2nd Floor
Washington, DC 20529

Re:    DHS Docket No. ICEB-2006-0004

To Whom It May Concern:

On behalf of the City and County of San Francisco, I respectfully submit comments on the Department of Homeland Security's (DHS) proposed rule on use of Social Security Administration (SSA) "no-match" letters to enforce immigration law. San Francisco is deeply concerned about the adverse impact that this proposed rule would have on employees, employers, service delivery, and the economy of our city.

San Francisco is a city of immigrants. Nearly one in three San Franciscans was born in another country. Immigrant San Franciscans contribute to several key industries in San Francisco, including hotels and restaurants, construction, health care, and janitorial services. These industries, the people they serve, and San Francisco's thriving economy would be jeopardized by the loss of immigrant jobs in the wake of fear and confusion caused by the new and unclear enforcement measures in this rule.

**First, we believe that SSA no-match letters are not an appropriate tool for enforcement of immigration law.** There are a variety of reasons why an employee working lawfully in the United States would mistakenly receive an SSA no-match letter. Common explanations include clerical errors and workers changing their names for marriage or other reasons. Spanish surnames that include both the mother's and father's last name often cause confusion, as do different conventions for writing dates using the day before the month. Many immigrant surnames are common and widely used, leading to confusion in government record keeping. We believe that SSA cannot accurately report the immigration status of people in its database, and that SSA's information should therefore not be used to enforce immigration law.

**Second, the rule would create burdensome, inappropriate, and unclear new requirements for employers** by forcing them to act as agents of the federal government to enforce immigration law. The new rule would require multiple contacts between

No-Match Cert. Admin. Record 1145

employers, employees, and SSA, as well as new paperwork and documentation requirements, some of which are not clearly defined in the proposed rule.

**Third, this new rule could lead to a large number of law-abiding workers losing their jobs** due to employers misunderstanding the rule, or not wishing to abide by it, and simply terminating any workers who are the subject of a no-match letter, regardless of their true immigration status. In addition to the crisis created for those workers, this situation would place increased burden on City resources, as those unemployed workers are forced into an underground economy where they no longer pay payroll tax to the City and may also be in need of increased City services as a result of their unemployment. Frightened workers who have lost their jobs as a result of the federal no-match letter may be less willing to cooperate with law enforcement or to seek medical treatment, which would have a negative impact on public safety and public health.

**Finally, we believe that workers who are subject to a no-match letter may be more vulnerable to abuse** from unscrupulous employers who could use the letter to retaliate against employees for unrelated purposes, or extract employee concessions on wages or working conditions.

San Francisco was founded and made great by immigrants. Since the time of the Gold Rush, immigrants have come to San Francisco from every country around the world, opening businesses, creating jobs, paying taxes, taking leadership in government, and rebuilding this City after the 1906 and 1989 earthquakes. We strongly oppose this proposed rule, and urge the Department of Homeland Security to withdraw it.

Sincerely,

Gavin Newsom
Mayor

2

No-Match Cert. Admin. Record  1146



**FOOD MARKETING INSTITUTE**

655 15TH STREET, N.W., SEVENTH FLOOR
WASHINGTON, D.C. 20005-5701
TELEPHONE: 202/452-8444
FAX: 202/429-4519
E-MAIL: FMI@FMI.ORG
WEBSITE: WWW.FMI.ORG

August 14, 2006

Regulatory Management Division
U.S Citizen and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue NW., 2nd Floor
Washington DC 20529

**Re:   Safe-Harbor Procedures for Employers Who Receive a No-Match
Letter; DHS Docket No. ICEB-2006-0004**

Dear Sir or Madam,

The Food Marketing Institute (FMI)[1] is pleased to submit these comments in
response to the Bureau of Immigration and Customs Enforcement (ICE) proposed
amended regulation describing an employer's obligations when the employer receives a
no-match letter from the Social Security Administration (SSA) or the Department of
Homeland Security (DHS). 71 Fed. Reg. 34281 (June 14, 2006).

At the outset it is important to note that FMI's members are committed to hiring
and employing only authorized workers and to complying fully with the law and the
regulations in this regard. Indeed, our members annually submit and retain millions of
W-2 forms for employees and I-9s for newly hired workers. The proposed amended
regulation describes safe harbor procedures that an employer can follow when it receives
a letter from SSA or ICE indicating that the combination of social security number and
employee name submitted does not match agency records. By following these
procedures the employer can be certain that it will not be found to have had constructive
knowledge that the employee is an alien not authorized to work in the U.S.

We believe that the proposed regulation can help to provide more certainty for
employers. However, the proposal does raise issues that need clarification. FMI
members, like most employers, do receive "no-match" letters. Most, but not all, of these
letters are caused by clerical errors or name changes. The proposed regulation needs
modification as described below to ensure that it does not impose new burdens on
employers to correct these types of errors. Our comments follow below by issue.

---

[1]     The Food Marketing Institute (FMI) conducts programs in research, education, industry relations
and public affairs on behalf of its 1,500 member companies — food retailers and wholesalers — in the
United States and around the world. FMI's U.S. members operate approximately 26,000 retail food stores
with a combined annual sales volume of $340 billion — three-quarters of all retail food store sales in the
United States. FMI's retail membership is composed of large multi-store chains, regional firms and
independent supermarkets. Its international membership includes 200 companies from 50 countries.

U.S. Citizen and Immigration Services
August 14, 2006
Page 2

**A.      The Employer Must Receive the No-Match Letter**

Proposed Section 274a.1(1)(l)(iii)(B) defines information indicating that the employee may be an alien who is not authorized to work, in part as:

> Written notice from the Social Security Administration that the combination of name and social security account number submitted for the employee does not match Social Security Administration records.

At least one of our members reports that there have been times when a group of employees has received letters from the SSA all on the same day. The employer itself has received no such letter, and the letter is addressed to the employee not the employer. In these circumstances, the employer has not "received" the letter from SSA and in many cases it would not have knowledge that those letters have been sent to the employee. The regulation should explicitly state that a letter must be sent to, and be received by, the employer for it to be considered a "no-match" letter.

**B.      Employment Verification System Notice of Discrepancy and Notification to SSA of Corrections**

Some of our members participate in the Employment Verification System (EVS) wherein they submit a disk to the SSA every month with the names and Social Security Numbers for all newly hired employees and employees who have changed their names. Each month, they receive back from the SSA a list of any discrepancies from the information they provided.

We believe that this list should not be considered a "no-match" letter. If it is, employers would confront serious practical problems in attempting to comply with the regulation. For example, Proposed Section 274a.1(l)(2)(i)(A)(*I*) requires employers to check:

> ...the employer's records promptly after receiving the notice, to determine whether the discrepancy results from a typographical, transcribing, or similar clerical error, and if so, correcting the error(s), informing the Social Security Administration of the correct information (in accordance with the letter's instructions, if any; otherwise in any reasonable way), . . .

If an employer has been notified of a discrepancy through EVS (rather than a No-Match letter), there is no obvious procedure for the employer to correct the error using the EVS system. If employers are required to report this correction through EVS, the regulation should specify the process to be used and provide reasonable alternatives for correcting the information. In addition, as described below, the time frames provided in the regulation would need to be modified to accommodate the EVS process.

**C.      14 Day and 60 Day Time Periods**

Proposed Section 274a.1(l)(2)(i)(A) requires an employer to take certain steps within 14 days to attempt to resolve a discrepancy. First, the employer should check its own records to see if there is a clerical error. If no such error is found, additional steps

**No-Match Cert. Admin. Record  1148**

U.S. Citizen and Immigration Services
August 14, 2006
Page 3

should be taken, such as asking the employee to confirm his or her name and social security number.  If the employee's name and social security number are correct, the employer may ask the employee to resolve the discrepancy with the Social Security Administration.

If the discrepancy still has not been resolved within 60 days and if the employee's identity and work authorization cannot be verified at that time, the employer then "...must choose between taking action to terminate the employee or facing the risk that DHS may find that the employer had constructive knowledge the employee was an unauthorized alien . . ."

While this section of the proposed regulation is not completely clear, it appears that the employer will have 14 days to inform the employee that he or she must address the discrepancy and then the employer has 60 days subsequent to the 14 days to check to make sure the employee has resolved the discrepancy.  If the 60 days begins to run from the time the letter is first received by the employer, the employee in many cases will not have enough time to resolve the problem.

These time frames are especially ambitious, and likely unworkable, if the EVS notice is considered a "no-match" letter.  Therefore, we urge that the initial 14 day period be extended to at least one month and the 60 day time period be extended to 120 days to allow for more reasonable periods to accomplish the goal of clarifying reported discrepancies.

**D.    Requirement to Fill Out New I-9s**

Proposed Section CFR 274a.1(l)(2)(iii)(A) requires that an employer verify the employee's identity and work authorization within 60 days following notice of a discrepancy by having the employer complete a "... new Form I-9 for the employee, using the same procedures as if the employee were newly hired."

Requiring a new I-9 every time there is a discrepancy that must be corrected would not accomplish the intended goal of verifying the employee's identity.  Instead, the employee should be required to present documentation from the SSA within 60 days showing that the discrepancy has been resolved.  Otherwise, the employee would be able to present new false documentation to the employer when filling out the new I-9 and no real verification of identity would have occurred.

Moreover, requiring employers to fill out new I-9s for these discrepancies would be burdensome for several reasons.  Large employers that use EVS are informed of hundreds of mismatches every month, the majority of which deal with name changes for female employees who are either recently married or divorced and failed to apply for a new social security card.  Requiring employers to fill out new I-9s for every mismatch in this situation require a significant amount of work on the part of the employer, with no corresponding benefit to the government. Additionally, this process would create inconsistent results.  For example, some employees change their names and properly report this to the SSA.  Therefore, these employees would not have a mismatch, but the

U.S. Citizen and Immigration Services
August 14, 2006
Page 4

employee's name would be different from that listed on the original I-9. So this would require some employees who had a name change to fill out a new I-9 (those who initially forgot to report it to the SSA) but not others (those who had immediately reported their name change to the SSA). It would seem inconsistent to only require new I-9s for some name changes but not others.

E.    **Constructive Notice**

There is additional language in the Notice that requires further discussion.

Finally, it is important that employers understand that the resolution of discrepancies in a no-match letter, or other information that an employee's SSN presented to an employer matches the records for the employee held in the SSA, does not, in and of itself, demonstrate that the employee is authorized to work in the United States.

71 Fed. Reg. at 34284. While this statement may be accurate, we are unclear as to how this would affect the issue of constructive knowledge, which is the subject of this rulemaking. The only means employers have to verify the information provided by the employee is to contact the SSA to see if the information is a match. If, in order to complete the I-9, an applicant presents a drivers license or state ID along with a social security card, an employer is not required to request any other documentation. Section 1 of the I-9 form requires the applicant to attest that he or she is a US citizen or to provide the applicant's permanent resident alien number or the alien authorization to work number. Unless the employee was using this document for Section 2 as verification, the employer would not see the actual document and is not required to do anything more.

*    *    *

In conclusion, our industry is committed to employing only authorized workers. We appreciate the intent of the proposed amendments to the regulation to provide clear safe harbors so employers can be certain they will not be found to have constructive knowledge that they have hired an unauthorized worker. We urge that the proposed regulation be modified and clarified as discussed above to make it as effective and as practical as possible. We appreciate your consideration of our comments.

Sincerely,

George R. Green
GENERAL COUNSEL TO FMI
Law Offices of George R. Green
12105 Reach Way
Potomac, MD 20854

# NCLR
## NATIONAL COUNCIL OF LA RAZA

National Office
Raul Yzaguirre Building
1126 16th Street, N.W.
Washington, DC 20036
Phone: 202.785.1670
Fax: 202.776.1792
www.nclr.org

**Janet Murguia,** President
August 11, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

*Re:     DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for
         Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

The National Council of La Raza (NCLR) submits the following comments in response to the request of the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) for public comment on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The National Council of La Raza (NCLR) – the largest national Hispanic civil rights and advocacy organization in the United States – works to improve opportunities for Hispanic Americans. Through its network of nearly 300 affiliated community-based organizations (CBOs), NCLR reaches millions of Hispanics each year in 41 states, Puerto Rico, and the District of Columbia. NCLR is also a convener of the Low-Wage Immigrant Worker Coalition, a nationwide coalition of labor unions, civil rights organizations, immigrant rights organizations, and others concerned with the rights of low-wage immigrant workers in the U.S.

NCLR has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States – immigrant and native-born alike. Since implementation of employer sanctions in the late 1980s, the Latino community is particularly cognizant of workplace discrimination against persons who look or sound "foreign" or have a "foreign" surname. Some employers demand that certain workers show additional or "better" documents beyond what is required by law -- often asking for immigration documents from U.S. citizens whom they perceive to be immigrants. Other employers implement unlawful "citizen only" policies. A congressionally-mandated Government Accountability Office (GAO) report found a widespread pattern of discrimination resulting solely from employer sanctions, reporting substantial discrimination on the basis of foreign accent or appearance, or preference of certain authorized workers over others.
The SSA no-match letters have added another layer to the impact of employer sanctions as unscrupulous employers now have another tool with which to discriminate and retaliate against workers who try to improve working conditions. Furthermore, legal resident and U.S. citizen Latinos are more likely to endure the harmful impact of the no-match letters. As a result, NCLR has worked with SSA in the past to identify problems with the no-match letters, re-draft the

**Regional Offices:** Atlanta, Georgia • Chicago, Illinois • Los Angeles, California • New York, New York
Phoenix, Arizona • Sacramento, California • San Antonio, Texas • San Juan, Puerto Rico
LA RAZA: The Hispanic People of the New World

**No-Match Cert. Admin. Record  1151**

content of the letters employers receive, propose redress policies for workers who are negatively affected, and otherwise ameliorate the potential harm done by SSA no-match letter policies.

As a result of our history with workplace discrimination and SSA no-match letters, NCLR is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will not resolve the problem of undocumented immigration.** Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. Comprehensive immigration reform is necessary to fix the nation's broken immigration system and ensure that workers have proper authorization to work in the U.S.

As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers – **including U.S. citizens and authorized noncitizens** – could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor-organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule punishes law-abiding employers.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new legal obligations will increase pressure on businesses to go "off the books," thereby promoting the unregulated, underground cash economy, potentially resulting in billion-dollar losses in federal, state, and local tax revenues; unfair competition; and further exploitation and abuse of all workers by unscrupulous employers.

2

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage when competing with "bad" employers who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **Comprehensive immigration reform is the solution.**

NCLR strongly feels that comprehensive immigration reform that includes an earned legalization for undocumented workers is the only practical and realistic solution to our current immigration problem. Enforcement alone will not work, and the SSA no-match letters are not an effective way of resolving the problem of undocumented labor. Moreover, the proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool, but the SSA database does not have the capacity to fulfill this objective. In addition to being error-prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of an SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to bypass these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

3

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable as it does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In conclusion, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands – possibly millions – of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Janet Murguía
President and CEO

4



August 11, 2006

## VIA ELECTRONIC MAIL AND U.S. MAIL

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

> Re:    Docket No. ICEB-2006-0004
>        Safe Harbor Procedures for Employers Who Receive a No-
>        Match Letter
>        (FR 71:114, p. 34281)

To Whom It May Concern:

Attached for your consideration are comments on the proposed regulations from Western Growers, an agricultural trade association that represents the California and Arizona fresh fruit, vegetable and nut industry.

Please contact me at (949) 863-1000 or at 17620 Fitch Street, Irvine, CA 92614 if you have any questions about our comments.

Sincerely,

Jasper E. Hempel
Executive Vice President,
General Counsel

Mailing Address: P.O. Box 2130 • Newport Beach, CA 92658 • Street Address: 17620 Fitch Street, Irvine, CA 92614
T: 949-863-1000 F: 949-863-9028  Internet: www.wga.com

No-Match Cert. Admin. Record  1155

COMMENTS OF

**WESTERN GROWERS**

In Response To

**DEPARTMENT OF HOMELAND SECURITY**

Proposed Regulation On

**Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**

**8 CFR Part 274a**

**[RIN 1653-AA50]**

**ICE 2377-06**

**DHS Docket No. ICEB-2006-0004**

**No-Match Cert. Admin. Record  1156**

**Introduction**

Western Growers respectfully but strongly objects to adoption of the proposed so-called "safe-harbor procedure" regulation that imposes a constructive knowledge standard on employers who receive Social Security "No-Match" letters.   Without Congress first enacting comprehensive immigration reform that contains and implements a workable and legal guest worker program, the proposed rule is potentially devastating and ruinous to California and Arizona fresh fruit, vegetable and nut growers, packers, shippers and processors.

In our opinion, the proposed rule is ill-conceived, puts California and Arizona farmers in further jeopardy of discrimination lawsuits, does not acknowledge that enhanced border security and enforcement is already resulting in labor and crop shortages and is irrationally punitive to the United States agricultural sector.

**Western Growers**

Western Growers is an agricultural trade association whose almost 3,000 members grow, pack and ship 90 percent of the fresh vegetables and nearly 70 percent of the fresh fruit and nuts grown in Arizona and California, about one-half of the nation's fresh produce. Western Growers members grow the best medicine in the world – fresh fruits, vegetables, and nuts.

Western Growers is a member of the Agricultural Coalition for Immigration Reform (ACIR) and the National Coalition of Agricultural Employers (NCAE). Both are large national coalitions of agricultural employers who support comprehensive immigration reform and who have filed separate, more legally oriented comments on the proposed regulations.  Western Growers is also a signatory to those comments and those comments are incorporated herein. Western Growers will focus here on more general impacts of the proposed regulations on its members.

Western Growers, ACIR and NCAE strongly support AgJOBS, which is included in the Senate's Comprehensive Immigration Reform package, and reform of the H-2A temporary agricultural worker program which currently is inaccessible to most farmers in California and Arizona. We also support an earned adjustment of status for experienced agricultural workers currently employed in agriculture. These experienced farm workers are necessary to maintain current levels of agricultural production.

To help our members stay competitive in an increasingly fierce global marketplace, Western Growers provides a host of services on which our members rely, including representation in government affairs; communications and media relations; and international trade and transportation services, just to name a very few.

One of our services, for example, is offered by our affiliated Western Growers Assurance Trust (WGAT). WGAT is the largest provider of health benefits for the fresh produce industry offering a variety of health care, dental, vision service and life insurance plans to fresh produce farmers, their employees, and others affiliated with the agriculture industry. Today, more than 100,000 farm employees and their dependents receive employer sponsored health benefits through WGAT. For over 30 years WGAT has contracted directly with doctors, dentists, pharmacies and hospitals in Mexico to provide seasonal farmworkers with access to healthcare in Mexico. This benefit may be jeopardized if the proposed rule is implemented.

A Western Growers core belief is that the U.S. economy needs additional workers to do many of the jobs that U.S. workers will not do and especially in agriculture. It is beyond dispute that Americans do not raise their children to perform farm labor or otherwise work in the fields, vineyards, and orchards of our country's farms.

The reality is that Western Growers members just do not have enough agricultural workers today (See Crop and Labor Loss section below) and the adoption of the proposed regulation will only exacerbate the situation and drive more farmers out of business or out of the United States.

The simple fact is: our crops are going to be harvested by foreign workers. The only issue is whether or not the harvesting occurs in the United States where our economy will benefit from the 3.5 jobs created upstream and downstream for every farmworker job, or whether another country will reap those economic benefits.

Comprehensive immigration reform that contains a reliable, legal guest worker program must be established so that workers can come legally to our country and become legally employed in jobs where there are insufficient domestic workers to do the job. Until then, this proposed rule must not be adopted.

**Legal Impact on Arizona and California Fresh Produce Sector by Proposed Regulation**

Today, under the Immigration Reform and Control Act of 1986 [IRCA] and Illegal Immigration Reform and Immigrant Responsibility Act of 1996 [IIRIRA], if a prospective employee presents identity and work authorization documents that appear valid on their face, the agricultural employer must accept those documents without further investigation or risk being sued for discrimination and bias.

The proposed regulation puts too much responsibility on employers to

distinguish genuine identity papers, such as birth certificates and Social Security cards, from sophisticated forgeries readily available for nominal cost across the border.

Current immigration law requires the employer try to resolve a social security mismatch when a No-Match Letter is received. But, a U.S. Department of Justice regulation states the letter is not proof of illegality and that the employee cannot be fired solely because of a no-match letter. The proposed rule turns that regulation upside down.

In our opinion, the proposed regulation would create a presumption of illegal status when the employer gets a mismatch letter. If the employer doesn't resolve the mismatch in 60 days, the employer must fire the employee or risk prosecution for knowingly hiring an illegal immigrant.

Penalties for failing to resolve the mismatch include civil fines and criminal prosecution on either felony or misdemeanor charges, depending upon the frequency of violations by the employer.

But, if the regulation is passed, trying to resolve the mismatch also places Arizona and California farmers in the "Catch-22" situation of being sued for discrimination.  The most recent example of this real dilemma can be found in the case of *Zamora v. Elite Logistics, Inc.*, (No. 4-3205) (10th Cir., June 6, 2006), in which the employer is required to go to trial because the employer tried to verify legal status of a Hispanic employee.

The proposed regulation affects all employers but it would have a most devastating effect on California and Arizona agriculture, where an estimated 50 to 80 percent of the workers who harvest fruit, vegetables and other crops are illegal immigrants. We hasten to add that our employers are not now knowingly hiring illegal immigrants because they do comply with IRCA and all other existing law.

In our opinion, mere adoption of this proposed regulation without a guest-worker program in place will immediately cut off any hope of our members hiring agricultural employees, putting agricultural employers out of business, forcing operations to Mexico and other foreign countries and thereby increasing our dependence on other countries for our food supply.

First passing and implementing comprehensive immigration reform that includes a reliable and legal guest worker program, where guest workers would be provided a counterfeit-proof ID card, in our opinion, solves the Social Security no-match issue far better than this proposed rule.

**Enforcement is Already Working:    Labor and Crop Shortages are Accelerating and Farmers Are Moving Out of Country Because of  Failure of Immigration Reform and Labor Shortages**

Western Growers members are reporting labor shortages in increasing numbers throughout California and Arizona due in part to the ever tightening enforcement of the Southwest border. If our farmers cannot obtain an adequate labor supply, they will be forced to go out of business and sell their farms to developers, or alternatively, they will move their production to Mexico or other countries where those willing to do agricultural work are plentiful. The marketplace has dictated that production must be moved out of the United States where there is insufficient harvest labor.

Western Growers is currently conducting a member labor and crop loss survey. The partial responses initially reflect that California and Arizona Western Growers members have already incurred crop losses of $4,954,000 to date resulting from labor shortages caused by increased border enforcement and failure to enact immigration reform.

More alarming, perhaps, is the fact that the partial survey results show that WG members have moved 12,255 acres of high value fruit and vegetable production to Mexico over the past couple of years.  This means that additional tens to hundreds of millions dollar in crop value have moved to Mexico in addition to countless on and off- farm jobs.   The trend continues with a couple of members reporting that they plan to move 1400 acres to Mexico within the year. Anecdotal information from Yuma, Arizona shows that less vegetable acreage is being leased in the Yuma area than ever before with reports that acreage is being replaced in Mexico.

Consumers and, therefore, supermarkets and food service vendors demand a year round supply of the highest quality fresh fruits, nuts and vegetables. It is unacceptable for the producer to fail to deliver these products to market because of a shortage of harvest labor. If the supermarket or food service vendor cannot obtain domestically grown fresh produce when it needs it, they will buy that produce from Mexico, China, Chile or any other country that will provide that supply.

As we move crop production out of the United States and as we import more produce, the United States will become increasingly dependent on foreign nations for its food. We will then be as dependent on foreign food as we are now dependent on other countries for oil.

In our very strong opinion, maintaining a safe, healthy and abundant domestic supply of fresh fruits, nuts and vegetables is a national security imperative that cannot be ignored.  The proposed regulations, we believe, will hasten the departure to other countries of our domestically grown fresh fruits,

vegetables and nuts.

**Conclusion**

As stated at the outset, Western Growers respectfully but strongly objects to the adoption of the proposed regulations. Adoption of the proposed regulations now, we fervently believe, could put the Arizona and California fresh produce sector out of business, a result that no one wants - not the President, not the Department of Homeland Security, not Congress, not American consumers or Western Growers members.

Western Growers implores the Department of Homeland Security to not pursue the proposed regulations until comprehensive immigration reform that includes a guest worker program has been passed by Congress, signed by the President and regulations implementing comprehensive immigration reform have been adopted. Thank you for your consideration.



NATIONAL
IMMIGRATION
LAW CENTER
www.nilc.org

BOARD OF DIRECTORS
Iris Gomez
Chair
Massachusetts Law
Reform Institute

Cynthia Lange
Secretary
Fragomen, Del Rey,
Bernsen & Loewy, PC

Allen Erenbaum
Treasurer
Mayer, Brown,
Rowe & Maw

Richard Boswell
University of California
Hastings College of Law

Muzaffar Chishti
Immigration Policy
Institute at
New York University
School of Law

Lucas Guttentag
American Civil
Liberties Union,
Immigrants'
Rights Project

Michele Lord
Lord Ross

Linda Wong
Community Development
Technologies Center,
L.A. Manufacturing
Network Initiative

Organizations listed for
identification purposes only

EXECUTIVE DIRECTOR
Linton Joaquin

LOS ANGELES
(HEADQUARTERS)
3435 Wilshire Boulevard
Suite 2850
Los Angeles, CA 90010
213 639-3900
fax 213 639-3911

WASHINGTON, DC
1101 14th Street, NW
Suite 410
Washington, DC 20005
202 216-0261
fax 202 216-0266

OAKLAND
405 14th Street
Suite 1400
Oakland, CA 94612
510 663-8282
fax 510 663-2028

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

**Re:**    *DHS Docket No. ICEB-2006-0004, Comment Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

To Whom It May Concern:

Attached are: (1) a hard photocopy of the comment prepared by the Low-Wage Immigrant Worker (LWIW) Coalition regarding **DHS Docket No. ICEB-2006-0004** and submitted via electronic mail on August 14, 2006; and (2) a document confirming the date and time of submission.

Please contact me with questions.

Sincerely,

Jennifer Lai

**Jennifer Lai**
Employment Policy Attorney
National Immigration Law Center
3435 Wilshire Blvd.
Suite 2850
Los Angeles, CA 90010
Voice: (213) 639-3900, ext. 123
Fax: (213) 639-3911
lai@nilc.org

# Marielena Hincapie

**From:** Marielena Hincapie [hincapie@nilc.org]
**Sent:** Monday, August 14, 2006 5:11 PM
**To:** 'rfs.regs@dhs.gov'; 'Arden.Ratana@dhs.gov'; moran@nilc.org
**Cc:** 'aavendan@aflcio.org'; 'frank.clemente@changetowin.org'; 'esolomon@iwj.org'; 'tsmukler@iwj.org'; 'sarita@jwj.org'; 'mwaslin@nclr.org'; 'newman@ndlon.org'; 'pabloalvarado@ndlon.org'; 'asugimori@nelp.org'; 'emsellem@nelp.org'; moran@nilc.org; friedland@nilc-dc.org; lai@nilc.org
**Subject:** DHS Docket No. ICEB-2006-0004

Dear Sir or Madam:

Attached is the Low-Wage Immigrant Worker Coalition's comment to **DHS Docket No. ICEB-2006-0004**.

Sincerely,

Marielena Hincapié

Marielena Hincapie, Esq.
Director of Programs
National Immigration Law Center
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA 90010

213-639-3900 x. 112
213-639-3911 (fax)
hincapie@nilc.org   |   www.nilc.org

The information contained in this e-mail message may be privileged, confidential, or otherwise legally protected from disclosure.  It is also covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 et seq.  If you are not the intended recipient of this message, you are informed that any retention, copying, distribution, and/or other use or dissemination of any portion of its contents is prohibited.  If you believe you have received this e-mail message in error, please contact the sender immediately at hincapie@nilc.org or 213-639-3900, delete the message from any and all electronic files, and destroy all other copies as well.  Thank you.

8/14/2006

No-Match Cert. Admin. Record  1163

# Low-Wage Immigrant Worker Coalition

<u>VIA ELECTRONIC MAIL</u>

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

*Re:    DHS Docket No. ICEB-2006-0004, Comment Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

The National Immigration Law Center (NILC) submits the following comment on behalf of the Low-Wage Immigrant Worker (LWIW) Coalition in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE), on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 FR 34281 (June 14, 2006).

The LWIW Coalition is co-convened by NILC, the American Federation of Labor – Congress of Industrial Organizations (AFL-CIO), Change to Win (CtW), Interfaith Worker Justice (IWJ), Jobs with Justice, the National Council of La Raza (NCLR), the National Day Laborer Organizing Network (NDLON), and the National Employment Law Project (NELP).

The LWIW Coalition is our nation's broadest collaborative of advocates and organizers working to improve the living and working conditions of low-income and low-wage immigrant workers. The mission of the LWIW is to support this community of advocates by sharing strategies and resources at the local, state, and national levels.

The signatories to these comments have ample experience in dealing with the adverse impact that Social Security Administration's (SSA's) no-match letters have had on all workers, immigrant and native-born alike. Through our legal assistance programs and organizing campaigns, we have interacted with tens of thousands of low-wage workers and their families on matters related to no-match letters and other Social Security number (SSN) verification matters. We have assisted individual employees in correcting no-match discrepancies and educated both employers and employees on their responsibilities in responding to no-match letters through written materials, trainings, and technical assistance to a broad range of groups in the country.

---

American Federation of Labor – Congress of Industrial Organizations (ALF-CIO) ● Interfaith Worker Justice (IWJ) ● Jobs with Justice (JWJ) ● National Day Labor Organizing Network (NDLON) ● National Council of La Raza (NCLR) ● National Employment Law Project (NELP) ● National Immigration Law Center (NILC)

**No-Match Cert. Admin. Record  1164**

Low-Wage Immigrant Worker Coalition                                              8/14/2006

The LWIW Coalition has also worked closely with SSA through the years to improve language in no-match letters and to include warnings to employers against discriminatory and retaliatory conduct. Our advocacy includes ongoing monitoring of national origin and citizenship status discrimination cases as well as unfair labor practices arising from SSN verification and no-match matters reported to the U.S. Department of Justice Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC), the Equal Employment Opportunity Commission (EEOC), and the National Labor Relations Board (NLRB). Some of the co-conveners of the LWIW have also been engaged in litigation involving employer misuses of no-match information to interfere with workers' rights to organize and exercise their labor rights. Throughout our work, we have remained steadfast in our commitment to safeguard and advance the rights and best interests of low-wage workers, their families, and their communities.

As a result of this work, the LWIW Coalition is alarmed by and strongly opposed to the implementation of the "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that no-match letters have had on workers' rights and trigger massive, potentially unlawful firings of low-wage workers across the nation. Overly cautious employers will fire listed workers before workers have a chance to show they are on the list mistakenly. But despite the disruption it will cause, the rule does nothing to solve our immigration problems.

DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of workers in an isolated, punitive immigration "enforcement" scheme on the eve of enactment of comprehensive immigration reform intended to make our immigration system work again. In the absence of such reform, the proposed changes would only stir up dust.

The proposed rule is simply the wrong rule at the wrong time. Both the House and Senate have passed immigration bills that contain sweeping new worksite verification and enforcement regimes that impose a new electronic verification system on all employers. Implementing the rule before the conclusion of the immigration debate would add a new, unnecessary, and unhelpful set of major changes for employers to learn and implement on top of the ones that will be added just a short while later when the new legislated changes take effect.

Although the rule causes enormous upheavals in the workplace, the rule will have *no* impact on undocumented migration, which is the purported purpose of this proposal. Our experience with no-match firings and workplace audits is very clear: *the fired workers will not leave the country.* In the absence of comprehensive immigration reform that addresses the root causes of undocumented migration, they will simply find other more marginal jobs, most likely in the unregulated cash economy. Because of this, the proposed rule will result in growth of the underground economy, which in turn will result in substantial losses in state and federal tax revenues as well as unfair competition.

In addition to its enormous impact on workers and on our economy, this proposal should be withdrawn because the rule attempts to transform the SSA no-match program into an immigration enforcement tool when the SSA does not have the capacity to fulfill this objective through its database. Additionally, the rule erodes our privacy rights, raises due process concerns, and radically departs from existing case law and longstanding federal guidance in this

No-Match Cert. Admin. Record  1165

area.  It provides no solution to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by workers, taxpayers, and businesses.  The LWIW Coalition therefore urges DHS to withdraw this rule in its entirety.

Our concerns are set forth in full below.

## The Proposed Rule Harms All Workers Regardless of Immigration Status

*Hundreds of Thousands—Possibly Millions—of Workers, Including U.S. Citizens and Work-Authorized Noncitizens, Will Face Massive Firings*

As an initial matter, the notion that SSA no-match letters indicate that an individual is not authorized to work in the United States is simply incorrect.  SSA no-match letters are *not* reliable indicators of work authorization or immigration status.  Instead, these letters simply indicate that there is a discrepancy between a worker's SSN and/or name on file with the SSA based on information reported by employers on Internal Revenue Service (IRS) Form W-2 (Wage and Tax Statement).  There are numerous reasons for the discrepancies, *none of which have anything to do with the immigration status or work authorization of workers*.  Many of these mismatches are based, instead, on simple human error (such as clerical data entry mistakes and misspellings by the employee, employer, or SSA) or life changes (such as name changes, marriages, and divorces).  The proposed rule, however, is based on the faulty premise that SSA no-match letters are foolproof indicators of work authorization.  Because this premise is flawed, there are several, disastrous consequences that would flow from implementation of the rule.

This proposed rule will trigger massive firings across the nation.  Based on our experience over the years but in particular with SSA's policy in 2002 where the agency sent the no-match letter to almost one million employers, the LWIW Coalition anticipates that the proposed rule will prompt similar panic and confusion among employers.  This is likely to result in employers precipitously and indiscriminately firing workers who appear on a no-match list before workers have a chance to show that they are on the list because of the simple human error or life changes described above.  As a result, these mass no-match firings may include the terminations of thousands of work-authorized employees who routinely receive SSA no-match letters.

U.S. citizens, lawful permanent residents, and other work-authorized employees were among the estimated 100,000 workers who lost their jobs as a result of the approximately 800,000 no-match letters sent by SSA in 2002.[1]  Job losses were most acute in low-wage industries such as agriculture, cleaning, construction, food service, and health care.  For example, no-match firings devastated the workforce at Stanford Medical Center in Palo Alto, California, where 83 percent of workers on a no-match list lost their jobs.[2]  Based on the severity of the 2002 job losses, the U.S. Chamber of Commerce declared an official labor shortage and urged SSA to change its policy.[3]  Under pressure from the Chamber and employers, as well as enormous pressure from

---

[1] Mary Beth Sheridan, "Records Checks Displace Workers: Social Security Letters Cost Immigrants Jobs," *The Washington Post*, Aug. 2, 2002.

[2] "A Crackdown on Workers," *The San Francisco Chronicle*, Aug. 12, 2002.

[3] *"The Immigration Crisis,"* Cox News Service, Aug. 14, 2002.

civil, immigrant, and worker rights advocates across the country, SSA agreed to decrease the number of no-match letters.[4]

No-match firings across the nation continued into 2003, however. In August, Peco Foods, Inc. of Canton, Mississippi terminated about 200 workers in response to no-match letters.[5] That same year, Suncast, Inc., a Chicago-area outdoor garden product manufacturer, terminated over 100 employees in response to no-match letters.[6] By the end of 2003, a national survey conducted by the University of Illinois at Chicago's Center for Urban Economic Development determined that approximately 53.6 percent of employers responding to no-match letters terminated the listed workers.[7] Despite strong warnings to employers that appeared on the face of the letter, the study found that workers were summarily fired, often without any opportunity to correct the no-match discrepancies or any explanation of the no-match process.[8]

Documented examples of adverse employment actions against U.S. citizens and other work-authorized noncitizens include:

- <u>Mr. Samuel Harris</u>. In late summer of 2003, Mr. Samuel Harris,[9] an African American man in Virginia, was fired from his job because his employer received an SSA no-match letter regarding a discrepancy with respect to Mr. Harris's SSN. Mr. Harris, who is a U.S. citizen, went to the local SSA office to correct his information. Apparently, SSA had issued Mr. Harris a duplicate SSN that belonged to a deceased person. Although Mr. Harris was able to correct his information with SSA, his employer refused to continue to employ him, thinking that Mr. Harris was engaging in identity theft or similar wrongdoing. He was fired and out of work for several months and had to file an arbitration case to get his job back.[10]

- <u>Mrs. Noelle Lopez</u>. In July 2002, Mrs. Lopez, a worker from North Carolina, was injured on the job. While she was on leave, her employer notified her that it had received an SSA no-match letter for her. She corrected the discrepancy, which was based on a typographical error in the W-2 that her employer had filed with SSA. Weeks later, while still on leave for her injury, the employer asked Mrs. Lopez to reverify that she continued to be eligible to work in the United States because her work authorization had expired. She had employment authorization based on Temporary Status Program (TPS), and had already applied for a renewal, but the Immigration and Naturalization Service (INS) sent her an Employment

---

[4] Chirag Mehta, et al., *Social Security Administration's No-Match Letter Program: Implications for Immigration Enforcement and Workers' Rights* (Center for Urban Economic Development, University of Illinois at Chicago, Nov. 2003) at 7, available at http://www.uic.edu/cuppa/uicued/npublications/recent/SSAnomatchreport.pdf (hereinafter "Mehta"); *Basic Information Brief: SSA "No-Match" Letters* (NILC, Feb. 2005) (hereinafter "NILC Brief") at 2, available at http://www.nilc.org/immsemplymnt/SSA-NM_Pack/Basic_Info_Brief_No-Match_Ltrs-2-15-05.pdf.

[5] Peggy Matthews, "Plan to Round Up, Deport Illegals Angers Activists," *The Clarion-Ledger*, Aug. 12, 2003.

[6] Stephanie Blozen, "Latinos Start Boycott Against Batavia Firms," *The Chicago Tribune*, Aug. 12, 2003.

[7] Mehta, *supra* note 4, at 13.

[8] *Id.* at 15.

[9] All individual worker names have been changed to protect their identities, but the names of workers and employers drawn from media sources are reproduced here as published.

[10] NILC Brief, *supra* note 4, at 4.

---

Authorization Document (EAD) with someone else's picture. Although she was able to straighten this problem out, when her doctor told her she could go back to work, the employer denied her a job because she had "too many immigration problems."[11]

The proposed rule only exacerbates this risk of unnecessary and unjust firings. Past experience indicates that, rather than navigating a complex series of steps and timetables to a "safe-harbor," panicked and confused employers will simply fire all workers whose names appear on the no-match list. The employer confusion across U.S. worksites is already detectable.

- <u>Mr. James Heggen</u>. Shortly after DHS issued the proposed rule, an employer in Massachusetts refused to hire Mr. Heggen, a lawful permanent resident of the United States, for a permanent clerical position due to a typographical error on his Social Security card. Mr. Heggen's name appears as "Heggen" on his alien registration card or "green card," but on his Social Security card, his name is spelled "Hegen"—with one less "g." Based on this missing "g," the employer denied Mr. Heggen a permanent position, claiming that it had to be *more careful in these times*. Mr. Heggen is Black and was born in the United Kingdom. His parents immigrated to the U.K. from the Caribbean. Together, the family immigrated to the United States when Mr. Heggen was a child. Because he and his parents received their permanent immigration documents decades ago, Mr. Heggen cannot file for a correction of his Social Security card locally, and, therefore, not quickly. Correcting this minor Social Security discrepancy could take several months. Frustrated after being denied this permanent position, Mr. Heggen contacted a local community-based legal services organization for assistance. This organization immediately sent a letter to the employer, setting forth the potential illegality of the employer's actions. Subsequently, the employer hired Mr. Heggen on a temporary basis. The week of August 7, 2006, after additional consultation with the organization, the employer hired Mr. Heggen for the permanent position.[12]

Recent media accounts of the proposed rule reveal that employers are already contemplating massive no-match firings as a response to the new rule. A construction company president told the *Tampa Tribune*, after attending a seminar for employers on the proposed rule, that some of his company's workers "won't be working for us in the future" if the rule is implemented and that he had great concern about "filling those spots."[13] *The Ledger* of Lakeland, Florida, reported that while the proposed rule may lead to penalties for employers, "workers, in turn, would lose their jobs," an effect which for Florida's largest growers' organization amounts to a "threat to national security."[14] An employment attorney representing several large employers reported to the *Washington Post* that, "From a practical standpoint, [the proposed rule] will have the effect [of employers] having to terminate employees. It will be devastating to many

---

[11] *Id.*

[12] Telephone interviews with Ingrid Nava, Employment Unit, Greater Boston Legal Services, Boston, Mass., July 28, 2006, and Aug. 10, 2006.

[13] Lindsay Peterson, "Proposal Targets Illegal Immigration," *The Tampa Tribune*, June 15, 2006.

[14] Kevin Bouffard, "Proposal May Pinch Growers," *The [Lakeland, FL] Ledger*, July 11, 2006, available at http://www.theledger.com/apps/pbcs.dll/article?AID=/20060711/NEWS/607110399/1004.

industries if people comply with it."[15]  The proposed rule thus has placed the livelihoods of hundreds of thousands—possibly millions—of workers and their families on the line.

*The Proposed Rule Will Result in Increased Citizenship Status, National Origin, and Racial Discrimination*

The proposed rule creates two sets of potential employment discrimination: discriminatory firings and discriminatory refusal to hire.  A disproportionate number of names on no-match lists are "foreign-sounding" names of newcomers to the United States, and many SSA letters are sent to employers with large numbers of newcomers in their workforces.  Employers who believe they will face business disruption due to the letters have an incentive to prefer employees they think are less likely to receive the letters.  Employers may also choose to simply dismiss employees who appear or sound foreign.  These discriminatory employment actions would run afoul of federal and state antidiscrimination laws and other worker protections and lead to costly and protracted wrongful termination litigation.

Employment discrimination against authorized noncitizen workers—particularly against Latinos, Latinas, and Asians—was rampant after the passage of the 1986 Immigration Reform and Control Act (IRCA).  A 1990 U.S. General Accounting Office (GAO) study reported a pattern of discrimination that resulted solely from employer sanctions, including discrimination on the basis of foreign accents or appearance and preferences of certain authorized workers over others.  In fact, the GAO estimated that an average of 19 percent of employers—almost one in five—participated in one or more discriminatory practices as a result of the 1986 law.  These results were confirmed by nearly a dozen studies conducted locally during the 1990s by human rights commissions and other organizations, which also found significant discrimination resulting from the implementation of employer sanctions.[16]

Employment discrimination has also increased since SSA began sending close to a million no-match letters in 2002.  The number of immigration-related unfair employment referrals and investigations fielded by OSC has risen dramatically.  From 1994 to 2000, OSC conducted only 20 investigations into firings stemming from employers that fired workers based on SSN verification matters.  From 2001 to 2003, OSC opened 29 investigations.  Three of the investigations opened after 2001 resulted in settlements favorable to workers, and ten investigations were open as of 2003.[17]  Although recent statistics are unavailable, OSC recognized in its April 2005 quarterly newsletter that OSC "staff members frequently provide assistance to workers" who face adverse employment actions by employers based on the no-match letters.[18]

---

[15] Cindy Skrzycki, "DHS Wants Workers, Papers to Match," *The Washington Post,* July 11, 2006 (quoting Monte B. Lake, an employment and immigration attorney).
[16] *Immigration Reform: Employer Sanctions and the Question of Discrimination,* GGD-90-62 (GAO, Mar. 29, 1990), available at http://archive.gao.gov/d24t8/140974.pdf.
[17] Mehta, *supra* note 4, at 25.
[18] *OSC Update* (OSC, U.S. Department of Justice, Civil Rights Division, Apr. 2004) at 2.

Low-Wage Immigrant Worker Coalition                                    8/14/2006

*The Proposed Rule Will Result in Increased Employer Retaliation Against Workers Who*
*Exercise Their Workplace Rights*

The proposed rule also places all workers at a higher risk of employer retaliation for labor
organizing and raising complaints about worksite conditions. Unscrupulous employers already
use the SSA no-match letter to stymie organizing campaigns and to retaliate against workers who
have been injured on the job or complain of unpaid wages or other labor violations. In
documented cases (including arbitration decisions) from across the country, employers initially
ignored SSA no-match letters and then decided to use them as a pretext to fire workers who
participated in efforts to improve working conditions and wages. The proposed rule would only
exacerbate this problem.

- North Carolina. In July 2006, during a heated legal battle over recent union election results,
  at least 24 Latino immigrant workers at a modular building construction company were
  suspended without pay because they were listed on a no-match letter. All 24 had voted to
  unionize. Many of the 24 have also initiated race and sex-based discrimination charges
  against their employer with the EEOC. A former supervisor at the company reported to the
  press: "These workers have been used and abused. As supervisors, we were told we needed
  production and to crack the whip to get it. We were told not to worry because these workers
  are just wetbacks and have no legal rights." A large group of African American workers
  have also filed complaints against this company with the EEOC. To protest the no-match
  firings, workers walked out on the day the firings took place. The workers and their union
  are also contemplating race and sex-based discrimination class action lawsuits.[19]

- California. In 2006, after months of intensive organizing, a group of nursing home workers,
  mainly immigrant Latina workers, marched to their manager's office to announce that they
  had joined together as a union in order to improve wages and working conditions and would
  seek formal recognition for their union under federal labor law. That afternoon, a head
  manager called one of leaders of the march into the office, pulled out a photocopy of that
  worker's Social Security card, wrote "NO GOOD" in bold letters across the photocopy, and
  suspended the leader without pay. Angered by management's action, the workers from the
  morning march crowded back into the manager's office and demanded reinstatement for their
  suspended colleague, denouncing management's action as a blatant anti-union tactic. Caught
  off guard, the manager immediately reinstated the suspended union leader. While these
  workers were successful, other workers have not been able to mobilize as effectively against
  manipulation of SSN verification issues by employers.[20]

- Oregon. In 2006, a Latina immigrant worker had been working as a housekeeper at an
  assisted living center. When it came time for her to qualify for health insurance and other
  benefits, the employer produced an SSA no-match letter. The worker suspects that the

---

[19] Telephone interview with Homer Marmalejo, United Brotherhood of Carpenters and Joiners of America,
organizer, Aug. 8, 2006; *see also* Bob Shiles, "Roger Carter Suspends More Than 20 Undocumented Workers,"
*Kinston [NC] Free Press*, July 19, 2006.
[20] Interview with Guadalupe Palma, Service Employees International Union, Long Term Care Division, Coordinator
III, in Los Angeles, CA, Aug. 1, 2006.

- 7 -

**No-Match Cert. Admin. Record  1170**

employer had received the letter earlier, but held it just before the benefits would have kicked in.[21]

- <u>Oregon</u>. In 2003, an employer in Oregon approached a group of workers who had complained about violations of their minimum wage and overtime rights, alleging that it had just received an SSA no-match list. The employer was requiring the workers to reverify their immigration status, and would not provide a copy of the letter to workers. Interestingly, this was *before* SSA began sending no-match letters to employers in March 2003.[22]

- <u>New York</u>. In 2002, a group of immigrant workers in New York went on strike to protest against poor working conditions. After receiving a no-match letter that the employer had initially ignored, the employer decided to use the no-match letter as a basis to reverify the immigration status of workers involved in the strike.[23]

If immigrant workers cannot enforce labor laws or organize under existing labor laws, it is less likely that native workers can assert these rights. The proposed rule thus poses enormous challenges for all low-wage workers. All workers face an increased risk of firings, retaliation, and abuse. U.S. citizens and authorized noncitizen workers could lose their jobs in discriminatory firings. Hundreds of thousands—possibly millions—of working families could be harmed, and therefore DHS should suspend this proposed rule immediately.

**Although the Proposed Rule Will Cause Enormous Upheavals in the Workplace, the Rule Has *No* Impact on Undocumented Immigration and Will Only Expand the Unregulated Underground Cash Economy**

Our experience with SSA no-match firings and workplace audits in the context of our current broken immigration system is clear: *the fired workers will not leave the country*. They will simply find other more marginal jobs, most likely outside of the traditional economy and "off the books" in the unregulated underground cash economy. Moreover, although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new obligations will increase pressure on "good" employers to take employees off the books, which also leads to growth of the underground economy. Expansion of the underground economy results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers. This result is nearly inevitable for any "crackdown" on workers and employers that is not accompanied by serious and practical reforms of the underlying immigration system.

*No-Match Firings Will Not Decrease the Number of Undocumented Workers in the United States*

Based on our recent experience under the current broken immigration system, high levels of SSA no-match firings will *not* drive undocumented workers and their families away from the United

---

[21] Brent Hunsberger, "Crackdown Coming on Bogus Papers," *The Oregonian*, June 25, 2006.
[22] NILC Brief, *supra* note 4, at 5.
[23] *Id.* at 4.

States.  Instead, these workers immediately accept the next available low-wage job, even if it is off the books, out of sheer economic necessity, given the levels of poverty at which they and their families and communities must survive.[24]  When poverty is combined with an employer demand for below-market wage rates and an absence of government enforcement of labor protections in low-wage industries, undocumented workers will almost certainly remain in the United States even after a no-match firing.  The vast majority will reenter the labor force in unreported, cash-based employment relationships where they face further exploitation and abuse.  Economists describe this effect as "churning" or unproductive turnover.[25]  The SSA no-match program has been criticized for creating "policy-induced churning in local labor markets as workers are either fired or quit their jobs only to join the overcrowded pool of workers vying for positions in traditional immigrant occupations."[26]  Fired workers do *not* simply leave the United States.

Undocumented workers constitute a large and growing segment of the workforce in the nation as a whole.  The share of these workers in industries such as agriculture, cleaning, construction, food service, and other low-wage occupations is approximately three times the share of native workers in these types of jobs.[27]  On any given day in our nation, more than 250,000 undocumented immigrants work as janitors, 350,000 work as housekeepers and maids, and 300,000 are groundskeepers.[28]  In the aggregate, such workers are an integral part of the U.S. economy, constituting a full 5 percent of the civilian labor force or 7.2 million workers.[29]

Unscrupulous employers have long taken advantage of the availability and reduced cost of undocumented immigrant labor in both the traditional economy and in the underground economy.  Undocumented workers are more likely to earn below minimum wage (two-thirds of undocumented workers earn below minimum wage compared to one-third of all workers).[30]  IRCA's failed employer sanctions regime, along with the lack of government enforcement of labor protections in low-wage industries, has given free rein to unscrupulous employers.  Such

---

[24] It has been estimated that nearly half of all immigrant workers are low-income, defined as earning less than 200 percent of the minimum wage.  Randy Capps, et al., *A Profile of the Low-Wage Immigrant Workforce* (The Urban Institute, Nov. 2003) at 2, available at http://www.urban.org/UploadedPDF/310880_lowwage_immig_wkfc.pdf. Fifty-six percent of all young children of immigrants live in poverty; sixty-four percent of foreign-born children of immigrants live in low-income families.  In immigrant families where both parents work, 24 percent of children live in poverty compared to 11 percent of the children of native workers.  Randy Capps, et. al, *Health and Well-Being of Young Children of Immigrants* (The Urban Institute, Feb. 2005) at 2, available at http://www.urban.org/UploadedPDF/311182_immigrant_families_5.pdf.

[25] *See* Avner Ahituv and Robert I. Lerman, *Job Turnover, Wage Rates, and Marital Stability: How Are They Related?* (The Urban Institute, Nov. 2004) at 5, available at http://www.urban.org/publications/411148.html (distinguishing "churning" and unproductive turnover from worker mobility).

[26] Mehta, *supra* note 4, at 18.

[27] Jeffrey S. Passel, *Unauthorized Migrants: Numbers and Characteristics: Basic Briefing Prepared for Task Force on Immigration and America's Future* (Pew Hispanic Center, June 2005) at 26–28, available at http://pewhispanic.org/reports/report.php?ReportID=46.

[28] Jeffrey S. Passel, *Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Pew Hispanic Center, Mar. 2006) at 11–12 (hereinafter "Passel"), available at http://pewhispanic.org/files/reports/61.pdf.

[29] *Id.* at 9.

[30] Jeffrey S. Passel, et al., *Undocumented Immigrants: Facts and Figures* (The Urban Institute, Jan. 2004) at 2, available at http://www.urban.org/url.cfm?ID=1000587.

No-Match Cert. Admin. Record  1172

employers routinely manipulate immigration law into a tool that sharpens wage differentials between undocumented and documented low-wage workers and suppresses wages for all. Even legitimate employers have admitted to the temptation to engage in similar practices or risk going out of business.[31] In recent years, Department of Justice (DOJ) and DHS officials have finally begun to recognize these wage differentials and the harm caused by an economic system that produces lower wages based on differences in immigration status.[32]

Increasingly, there is evidence demonstrating that raising the wages and working conditions of low-wage workers will actually reduce undocumented immigration by making the existing workforce relatively more attractive to employers.[33] Closing the wage differentials between differently work-authorized individuals and ensuring that all low-wage workers—current and future, documented and undocumented—have similar levels of mobility and enjoy full labor protections are the more effective ways to prevent undocumented immigration to the United States and to hold exploitative corporations accountable. A structural demand for undocumented labor can be reduced only by building a strong floor underneath all workers.

Poorly-conceived, punitive enforcement-only schemes like the proposed rule will force millions into the underground economy. The proposed rule will not decrease the numbers of undocumented workers in the United States, nor will it decrease their levels of employment. It will only decrease wage levels and deepen wage differentials based on immigration status, creating even more economic incentive for employers to hire undocumented workers. Accordingly, DHS should suspend this proposed rule and work with Congress and the Administration to pass comprehensive immigration reform that will address the underlying issue of undocumented migration.

*The Imposition of New Legal Obligations on Millions of Employers Will Push Them into the Underground Economy*

Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new and onerous set of legal obligations on millions of employers. The rule essentially deputizes employers as *de facto* immigration enforcement officers.

The proposed example of what constitutes "constructive knowledge," at Section 274a.1(l)(1)(iii)(B) of the proposed rule, is not the employer's *receipt* of a no-match letter, but

---

[31] K. M. Donato, et al., "Stemming the Tide? Assessing the Deterrent Effects of the Immigration Reform and Control Act," *Demography* 29 (2005) at 139–58.

[32] In the prosecution of Tyson Foods for the hiring of undocumented workers, assistant U.S. Attorney John P. MacCoon stated: "This trial is about corporate greed. . . . It's about what happens when a corrupt corporate culture makes the bottom line the all-consuming priority." Sherri Day, "Prosecutors in Smuggling Case against Tyson Contend Trial Is about Corporate Greed," *The New York Times*, Feb. 6, 2003. In the Tyson Foods case, the government hinged its $140 million pre-indictment settlement demand against defendant Tyson Foods on a novel "wage suppression" theory. The government claimed that Tyson Foods had reaped enormous profits by recruiting undocumented workers into its ranks and paying them at below-market wage rates. In his authorization of trial for the case, DHS Secretary Chertoff fully endorsed the DOJ's attempts to recover "suppressed wages." Thomas Green, et al., "Deputizing—and Then Prosecuting—America's Businesses in the Fight against Illegal Immigration," *Amer. Crim. L. R.*, June 22, 2006, at 5, 7.

[33] Ivan Light, "How L.A. Kept Out a Million Migrants," *The Los Angeles Times*, Apr. 16, 2006.

---

- 10 -

No-Match Cert. Admin. Record  1173

the employer's *failure to act* after receiving a no-match letter. By defining the "failure to take reasonable steps" upon receipt of a no-match letter as creating constructive knowledge, the proposed regulation makes it necessary for a law-abiding employer to take some action in response to a no-match letter. Therefore, as set forth in Sections 274a.1(l)(2)(i) and 274a.1(1)(2)(iii) of the proposed rule, an employer who receives a no-match letter is essentially forced to apply due diligence to a series of complicated steps that demonstrate correction of each "no-match" discrepancy. If the employer fails to resolve the correction in the allotted time, the employer faces a finding that it had constructive knowledge of hiring an undocumented worker. This finding could be used against the employer in a federal prosecution that could result in civil and criminal penalties. This is a radical change from the longstanding position that the various federal agencies implicated in this SSA no-match issue have taken.

Employers who wish to avoid loss of profits and productivity while minimizing exposure to the heightened risk of federal immigration liability under the proposed rule will be forced into one of three no-match evasion strategies:

First, employers will take their businesses off the books and into the underground economy. For one thing, keeping workers off the books means avoiding government scrutiny and additional no-match letters. For another, there are immediate financial incentives for employers to keep workers off the books. The proposed rule thus has a perverse effect of targeting and punishing "good" employers who keep good records and want to stay on the books. These good employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records and who consequently will not be reached by the new rule.

Second, employers will intentionally misclassify their employees as "independent contractors" as a means of evading this responsibility.

Finally, employers will engage in subcontracting schemes by interposing intermediary labor contractors between themselves and their employees, pretending their workers are employees of these sham contractors and exposing workers to marginal, fly-by-night employment practices by middlemen.

*Growth of the Underground Economy Results in Massive Losses to State and Federal Coffers and Unfair Competition*

A policy that results in more employers choosing to keep their employees off the books or intentionally misclassifying employees is harmful to state and federal government coffers and creates unfair competition against "good" employers. Certain employers will see a clear and immediate economic advantage to taking their employees off the books. At a minimum, they will reduce their payroll costs by an average of 8 percent by ceasing to pay costs for federal legally required benefits, including Social Security, Medicare, unemployment insurance and workers' compensation.[34] For employers who, as a policy or due to a collective bargaining agreement, provide other benefits, such as life, health or disability insurance, paid leave, or retirement and savings benefits, the potential total savings could add up to an average of 29.9

---

[34] *Employer Costs for Employee Compensation* (U.S. Department of Labor Bureau of Labor Statistics, Mar. 2006), available at http://www.bls.gov/news.release/ecec.nr0.htm.

No-Match Cert. Admin. Record  1174

percent of total payroll costs.[35] This means massive losses to state and federal coffers and a competitive advantage over employers who are not cutting these costs.

The projected loss in federal tax revenues ranges from $19 million to $1.9 billion annually. This range is derived from the following figures: In June 2006, the total U.S. labor force was estimated at 144.4 million workers.[36] As set forth above, about 7.2 million undocumented workers were employed in March 2006, accounting for a full 5 percent of the civilian labor force.[37] International accounting and consulting firm Price Waterhouse Coopers has projected that over 5 million U.S. workers would be misclassified as independent contractors (to avoid paying legally required benefits) in 2005 and that the federal tax revenue losses due to misclassification in 2004 would be $4.7 billion.[38]

Based on this projection and these worker population estimates, if only one-third of all undocumented workers or at least two million workers, or 1.4 percent of all U.S. workers, were to be pushed off the books as a result of the proposed regulation, the loss to federal coffers would be approximately $1.9 billion in one year. Alternatively, making a conservative assumption that 100,000 workers are pushed off the books as a result of the proposed regulation, the loss to federal coffers would be approximately $19 million annually.

The losses to the Unemployment Insurance (UI) trust fund alone ranges from $277 million to $13.8 million per year. This range is derived from the following figures: A study for the U.S. Department of Labor estimating the impact of employee misclassification on the UI trust fund alone was computed for the period from 1990–1998.[39] Assuming a 1 percent level of misclassification, the study determined that the loss would be an annual average of $198 million to the UI trust fund alone.

Based on this study for the DOL, assuming that at least 2 million workers were to be pushed off the books as a result of the proposed regulation, the impact on the UI trust fund alone would be an average of over $277 million annually. Alternatively, assuming that only 100,000 workers, or .07 percent of the workforce, are pushed off the books (the estimated number that lost their jobs due to no-match letters in 2002), the impact on the UI trust fund alone would be $13.8 million per year.

Employers who go off the books will experience an enormous net savings in taxes, which will create a competitive advantage for them over employers whose payroll-related expenses are

---

[35] *Id.*

[36] *Employment Situation Summary* (U.S. Department of Labor Bureau of Labor Statistics, July 2006), available at http://www.bls.gov/news.release/empsit.nr0.htm.

[37] Passel, *supra* note 28, at 11–12.

[38] *Projection of the Loss in Federal Tax Revenues Due to Misclassification of Workers* (Coopers and Lybrand, now Price Waterhouse Coopers, for Coalition for Fair Worker Classification, June 1994) at 5, available at http://www.carpenters.org/misclassification/State and Other Research Studies/Coopers-Lybrand--Projection of Loss of Federal Rev Due to Missclassification.pdf.

[39] *Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs* (Planmatics, Inc. for U.S. Department of Labor Employment and Training Administration, Feb. 2000) at 87, available at http://wdr.doleta.gov/owsdrr/00-5/00-5.pdf.

higher because they are playing by the rules. A report prepared for the U.S. Department of Labor observed: "[C]ost considerations and aggressive competition are twin pressures that induce an employer to engage in behavior that creates an inequitable playing field in the business community for employers who correctly classify their employees and pay taxes."[40]

The State of California even developed a joint-agency strike force to address abuses created in the underground economy. This strike force has observed the impact of this employer behavior on "good" employers: "[W]hen businesses operate in the underground economy, they gain an unfair competitive advantage over businesses that comply with various business laws. This causes unfair competition in the marketplace and forces law-abiding businesses to pay higher taxes and expenses."[41] When the desire to avoid government scrutiny is combined with the immediate economic savings from avoiding payment of taxes and employer-provided benefits, some employers will see a clear competitive advantage in taking their workforce underground. The implementation of this proposed rule thus disadvantages those employers who play by the rules.

**DHS Should Suspend The Proposed Rule Because the SSA No-Match Program Is Ill-Suited As an Immigration Enforcement Tool**

*The SSA No-Match Program Cannot Meet the Needs and Objectives of Immigration Enforcement Because the SSA Database Is Not an Immigration Database*

Each year employers send IRS Forms W-2 to SSA indicating their employees' annual earnings. SSA matches each worker's name and SSN to the Numerical Identification File (NUMIDENT), which is SSA's primary database of SSN holders.[42]

NUMIDENT is *not* an immigration database and is made up of information collected from applications for initial or replacement SSNs.[43] The database contains only limited and incomplete immigration information.[44]

---

[40] *Id.*

[41] *2003 Annual Report: California Joint Enforcement Strike Force on the Underground Economy* (Employment Development Department, State of California, June 30, 2004) at 3, available at http://www.edd.ca.gov/taxrep/txueo03.pdf; *see also* François Carerre, et al., *The Social and Economic Costs of Employee Misclassification in Construction* (Construction Policy Research Center at Harvard Law School and Harvard School of Public Health, Dec. 2004), at 7 (noting that "[m]isclassification creates challenges for compliant employers because it creates an uneven 'playing field.' Employers who respect the law and classify employees appropriately have a higher wage bill and can get underbid by contractors that do not comply and have lower costs.").

[42] *Report to Congress on the Basic Pilot Program* (U.S. Citizenship and Immigration Services, June 2004) (hereinafter "USCIS Report") at 2.

[43] Kevin Jernigan, "Eligible to Work? Experiments in Verifying Work Authorization," *Migration Policy Institute Insight,* Nov. 2005 (hereinafter "Jernigan") at 3.

[44] The database "contains information on name, date of birth, and citizenship status of persons issued Social Security cards, which enables SSA to confirm work authorization for U.S. citizens and some noncitizens who are permanently work authorized." USCIS Report, *supra note* 42, at 2. SSA collects immigration status information only on those persons who are work-authorized incident to status, such as lawful permanent residents, asylees, and refugees. *Id.* at 4.

---

**No-Match Cert. Admin. Record  1176**

Even the limited immigration status information in NUMIDENT regularly becomes inaccurate because it is *not* automatically updated when a worker's immigration status or work authorization changes.[45]  NUMIDENT is particularly inaccurate with respect to work-authorized noncitizens in its use with the Basic Pilot Program.  According to U.S. Citizenship and Immigration Services (USCIS), work authorization for more than 50 percent of the cases of noncitizens could not be electronically confirmed by NUMIDENT, compared with 0.2 percent for native-born citizens.[46]

If there is a match of the SSN and the first seven letters of the surname between NUMIDENT and the W-2, the earnings are posted to the individual worker's Master Earnings Record.  About 10 percent of submissions *cannot* be matched.  SSA then does more than 20 "front-end validation routines," which are automated processes that manipulate names and SSNs to correct mistakes and find a correct match.[47]  These "front-end validations" do *not* involve collection or use of immigration data.

If a valid record cannot be identified, SSA posts the earnings to its Earnings Suspense File (ESF).  The ESF contains earnings reports with names and SSNs that do not match SSA records.  SSA then performs "back-end" processes to try to match the earnings.  SSA's "back-end" processes do not involve collection or use of immigration data.

The SSA back-end processes include using corrections generated through IRS processes.  The back-end processes also include generating SSA no-match letters to employees and employers.[48]  No-match letters are just one of the "back-end" processes that SSA regularly uses to ensure that earnings are properly attributed to workers.  These letters are sent by SSA to inform employers and employees that the worker is not getting proper credit for their earnings due to a discrepancy.

*Immigration Status or Lack of Immigration Status Cannot Be Presumed from Posting to the ESF*

The ESF contains hundreds of millions of records, and a "significant number of earnings reports in the ESF still belong to U.S. citizens and work-authorized noncitizens."[49]  The percentage of ESF records belonging to unauthorized workers is entirely unknown.  The majority of reinstatements (matching to a worker's Master Earnings Record) are still made to U.S.-born citizens.[50]  ESF records do not in any way indicate immigration status.  The information in ESF

---

[44] The SSN application form itself focuses on noncitizens' work authorization rather than immigration status. *See* Form SS-5 (May 2005), available at http://www.ssa.gov/online/ss-5.pdf.

[45] Jernigan, *supra* note 43, at 12.

[46] USCIS Report, *supra* note 42, at 4–5.

[47] *Social Security, Better Coordination Among Federal Agencies Could Reduce Unidentified Earnings Reports,* GAO-05-154 (GAO, Feb. 2005) (hereinafter "GAO Feb. 2005") at 7–8.

[48] *Id.*

[49] *Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work,* GAO-06-814R (GAO, July 11, 2006) (hereinafter "GAO July 2006") at 8.

[50] *Id.; see also* GAO Feb. 2005, *supra* note 47, at 18.

No-Match Cert. Admin. Record  1177

consists of the worker's name, SSN, employer's identification number, and the earnings amount.[51]

The ESF simply consists of information on workers whose records do not match SSA records, for reasons that include errors or obsolete data, lack of an SSN, missing first or last names, or use of nonalphabetic characters.[52] The lack of an SSN is a particularly instructive example of an innocent basis for inclusion in the ESF that is frequently and wrongly cited as a basis for determining lack of work authorization. Both the SSA and the IRS advise employers to use all zeros or to write in *"applied for"* when the worker has applied for but not yet received an SSN.[53]

SSA no-match letters are therefore *not* reliable indicators of work authorization or immigration status. There is no way to accurately determine whether a SSA no-match letter is the result of typographical error, out-of-date information, or some other legitimate reason, let alone to determine an illegitimate reason.[54] The SSA itself has repeatedly recognized that its no-match letter does not indicate immigration status or lack of authorization to work. The current no-match letter explicitly states that a worker's identification in the letter "makes no statement" about his or her immigration status.[55] The SSA database simply does not have the capacity to meet the needs and objectives of an immigration enforcement program. Because of these limitations, this proposal will only result in an adverse impact on workers and our economy, including the increased discrimination and abuse of workers described above. DHS should therefore suspend this rule.

## The Rule Modification Would Give DHS Indirect Access to Tax Information It Cannot Access Directly

DHS should also suspend this proposed rule because it attempts to indirectly access sensitive tax information that is protected by federal law. Specifically, Section 6103 of the Internal Revenue Code protects the confidentiality of taxpayer returns and taxpayer information and provides only limited exceptions to the sharing of personal identifying data. This confidentiality is deemed essential to voluntary tax compliance. The GAO has explicitly recognized that the ESF includes "sensitive taxpayer information that is protected by various laws and regulations" and that statutory authority would be required to provide DHS access.[56]

---

[51] GAO July 2006, *supra* note 49, at 8.

[52] *Id.; see also* GAO Feb. 2005, *supra* note 47, at 11–12.

[53] GAO Feb. 2005, *supra* note 47, at 11, n. 4.

[54] In testimony last month before the House Committee on Ways and Means, the Commissioner of Social Security emphasized that the source of SSA's database information is the Form W-2, and "there is no citizenship or immigration status information on that document." *See* Statement of The Honorable Jo Anne B. Barnhart, Commissioner, Social Security Administration, *Testimony Before the House Committee on Ways and Means* (July 26, 2006), available at http://waysandmeans.house.gov/hearings.asp?formmode=view&id=5172.

[55] Letter, Hurt, Assoc. Comm. for Central Op. SSA (Oct. 9, 2004) (hereinafter "Hurt Letter").

[56] GAO July 2006, *supra* note 49, at 8.

No-Match Cert. Admin. Record  1178

No statutory authority currently exists to provide DHS with access to this information.[57] As a result, DHS cannot presently obtain no-match information directly from SSA.

SSA no-match letters to employers frequently include taxpayer identity and return information. This rule allows DHS to commandeer the information contained in no-match letters and therefore allows DHS to circumvent the tax code's confidentiality restrictions. DHS should not be permitted to do by rule change what it cannot do without additional statutory authority.

Breaching the confidentiality of tax records would have the counterproductive result of discouraging tax compliance. Moreover, it would encourage employers and workers alike to enter the underground economy and not pay into our tax and Social Security systems.

**The Proposed Rule Dramatically Alters the Definition of "Constructive Knowledge" and Makes a Stark Departure from Existing Case Law and Longstanding Federal Guidance on No-Match Letters**

As an evidentiary matter, an employer's receipt of an SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule alters the definition of constructive knowledge and makes a stark departure from existing case law and longstanding federal guidance in this area.

In the seminal *Collins Food Intn'l v. I.N.S.* case, the Ninth Circuit cautioned against the expansion of the doctrine of constructive knowledge: "IRCA . . . is delicately balanced to serve the goal of preventing unauthorized alien employment while avoiding discrimination against citizens and authorized aliens. The doctrine of constructive knowledge has great potential to upset that balance, and it should not be expansively applied." 948 F.2d 549, 554-555 (9th Cir. 1991).

Accordingly, the court instructed that "[a] finding of constructive knowledge requires "willful blindness" and "to expand the concept of constructive knowledge . . . would not serve the intent of Congress, and is certainly not required by [IRCA]." *Id.* at 555.

Contrary to DHS's assertions in the supplemental text, the proposed regulation would extend the definition of "constructive knowledge" well beyond the holdings in *Collins* and in *Mester Manufacturing Co. v. INS*, 879 F.2d 561 (9th Cir. 1989), and other constructive knowledge cases arising under the employer sanctions provision of the Immigration and Nationality Act, 8 U.S.C. § 1324a.

Indeed, the supplemental text misrepresents *Mester* by stating that the employer in that case merely received some evidence that the employee was not authorized to work. This is simply incorrect, and significantly downplays the type of information received by the employer, and relied upon by the court in its decision. In *Mester*, the court held that an employer had constructive knowledge of a worker's unlawful status when it received information directly *from*

---

[57] In contrast, such authority exists with respect to the Nonwork Alien File, which includes information about workers who are working though they have been issued nonwork SSNs.

No-Match Cert. Admin. Record  1179

*the INS* that an employee was an "illegal alien" but did not terminate the employee for two weeks. *Id.* at 567-68.

Consistent with *Mester*, cases have found constructive knowledge only where the employer has been provided specific information from a source knowledgeable about a worker's immigration status, where the employer failed to complete the Form I-9 (coupled with other suspicious circumstances), or in egregious circumstances. *See U.S. v. Jonel, Inc.* 1998 WL 804705 (OCAHO), *14 (Labor Department notice to employer that workers were unauthorized constituted constructive knowledge); *New El Ray Sausage Co. v. I.N.S.,* 925 F.2d 1153, 1157 (9th Cir. 1991) (INS gave employer "specific and detailed information" that it was employing undocumented workers); *U.S. v. American McNair,* 1OCAHO 285 (1991) (employee failure to present any work authorization documents and notification of employer that he was ineligible for amnesty constituted constructive knowledge); *U.S. v. Fragale,* 1999 U.S. Dist. LEXIS 12616 (E.D. Pa. 1999) (constructive knowledge when human resources manager and foreperson in charge of hiring told employer that a large percentage of workforce was undocumented, and employer had received notice from INS that some workers were undocumented).

Moreover, in its attempt to convert the SSA no-match letter into a method of verifying immigration status or authorization to work, the proposed rule directly contravenes longstanding federal guidance from SSA, OSC, and former INS General Counsel.

SSA's position on no-match letters and immigration enforcement is set forth in clear terms on the face of the letter itself. The letter provides the following warning to employers:

> IMPORTANT: This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number. Nor does it make a statement about an employee's immigration status.[58]

For years, INS General Counsel has instructed employers along identical lines:

> If the document or documents presented to verify work authorization appear on their face to be genuine and to reasonably relate to the individual, the subsequent receipt of the SSA letter mentioned above does *not* impose any affirmative duty upon the employer to investigate further into an employee's eligibility to work in the United States. In addition, the receipt of this SSA letter by the employer, *without more,* would *not* be sufficient to establish constructive knowledge on the part of the employer regarding the employment eligibility of the named employee.[59]

---

[58] Hurt Letter, *supra* note 55.

[59] Letter, Virtue, Acting Gen. Coun. INS, HQ 274A (Feb. 17, 1994) (emphasis added); for reference, the LWIW Coalition has attached this letter as Exhibit 1 to this comment.

No-Match Cert. Admin. Record  1180

OSC has also provided similar guidance:

> The receipt of a no-match letter, standing alone, does not indicate to an employer that he or she need question the genuineness of documents or information previously presented to complete an INS Form I-9.[60]

This proposed regulation thus turns established federal guidance on no-match letters on its head. At the very least, the proposal will result in conflicting guidance from multiple federal agencies and cause employer and employee confusion.

**The Costs of Implementing the Proposed Rule are Prohibitive**

If the proposed rule is to be carried out as envisioned, the government will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. Employer confusion is already evident from high number of questions submitted employers in their comments opposing the rule. In particular, many employers have submitted questions regarding the rule's unrealistic and unreasonable timetables for compliance.

Therefore, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA ultimately has to respond to the inevitable increase in employer (and employee) inquiries about this confusing rule. The actual costs of the current SSA no-match letter program are already substantial.[61] The actual costs of administrating a new program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law.

**The Procedure to be Followed Under the Proposed Rule When an Employer Receives Notice from DHS Denies Employees Due Process of Law**

Section 274a.1(l)(1)(iii)(C) of the proposed rule includes the following as a circumstance that would amount to constructive knowledge where the employer "[f]ails to take reasonable steps after receiving information indicating that the employee may be an alien who is not employment authorized, such as . . . [w]ritten notice from the Department of Homeland Security that the immigration status document or employment authorization document presented or referenced by the employee in completing Form I-9 was assigned to another person, or that there is no agency record that the document was assigned to any person."

---

[60] Letter, Sarah DeCosse, Sr. Tr. Atty OSC (Apr. 1, 2004).

[61] *See* Mehta, *supra* note 4, at 7, n. 2 (noting that SSA's current attempts to reduce the ESF through no-match letters have cost U.S. taxpayers the following amounts: "$5.4 million to send notices to every individual whose name and SSN do not match SSA's records; $600,000 to send 944,000 notices to all employers who submitted wage reports with at least one item posted to the ESF; more than $200,000 for system maintenance and cyclical changes; and an average of $9.00 for each call to SSA's national toll free telephone number generated by the notices. SSA estimates that the agency received about 100,000 inquiries throughout 2002 regarding the TY 2001 letter.").

No-Match Cert. Admin. Record 1181

Under Section 274a.1(l)(2)(iii), an employer who receives such a notice will not be deemed to have constructive knowledge of the employee's unauthorized status if the employer takes reasonable steps to resolve the question raised by DHS and, if the employer does not verify with DHS that the document was assigned to the employee, the employer completes a new I-9. The employee cannot use the alien registration number, or "A-number," that is the subject of the written notice from DHS.

While this procedure may protect the employer, it entirely leaves out any possibility for the *employee* to have access to his or her DHS immigration file and any opportunity to correct errors in the file that would lead to DHS providing erroneous information to the employer. This access and an assured opportunity to correct errors in immigration records are critical because immigrants do not have easy, automatic, timely access to their immigration records, and immigration records are error-prone.

For years, government agencies have criticized the quality and accuracy of immigration records.[62] Problems with immigration records have continued even after the dissolution of the INS and the creation of new immigration agencies in DHS. The information technology environment at USCIS has been criticized as inefficient, and USCIS continues to rely on manual and paper-based processes.[63] As an example of how DHS records and processes go awry, in December 2005 DHS had to "recall more than 60,000 green cards because a computer glitch miscalculated immigrants' residency start dates."[64] USCIS sent letters instructing immigrants to mail their cards back. Unfortunately, USCIS sent the letters to many immigrants whose green card "resident since" dates were actually correct. USCIS then advised community-based organizations working with immigrants that its information technology staff was working to determine who received the mailing in error and that USCIS intended to send out a second letter to all individuals who received the initial letter in error.

Moreover, under current law, immigrants have access to their immigration files (both "alien files" and Border Patrol requests) only by filing Freedom of Information Act (FOIA) requests. FOIA requests for files must be made in writing and mailed to a central location, at the National Records Center in Missouri.[65] This means that immigrants who need access to their files to determine the nature of the erroneous information and then to correct this information as envisioned under Section 274a.1(l)(iii)(C) of the proposed rule are dependent on FOIA procedures which are not designed for this purpose. The lengthy and unpredictable timetables and cumbersome process for the FOIA process make it difficult for immigrants to both obtain their files and then correct mistaken information within Section 274a.1(2)(ii)'s compliance period.

The proposed rule thus raises critical due process concerns for immigrants. It fails to guarantee adequate access and an assured opportunity to immigrants who wish to correct errors in their

---

[62] *INS Data:The Track Record* (NILC, 2003), available at http://www.nilc.org/immlawpolicy/misc/INS data accuracy.pdf.

[63] *USCIS Faces Challenges in Modernizing Information Technology*, OIG-04-41 (DHS, Office of Inspector General, Sept. 2005), available at http://www.dhs.gov/interweb/assetlibrary/OIG_05-41_Sep05.pdf.

[64] Solomon Moore, "Green Cards Recalled Because of Glitch," *The Los Angeles Times*, Dec. 6, 2005.

[65] *See* USCIS, *Freedom of Information and Privacy Acts*, http://www.uscis.gov/graphics/aboutus/foia/index.htm.

immigration records. It creates penalties for employees when their immigration status or documents cannot be confirmed. It does not, however, set any time period for DHS to respond to immigrants' requests to review their files, nor does it place any obligation on DHS to correct immigrants' records in a timely fashion.

## The Proposed Rule May Exceed DHS's Authority

*DHS May Not Have Authority to Restrict the List of Acceptable Documents for the Reverification Process*

The proposed rule would create an exception to the list of documents that can be used to reverify the worker's employment authorization and identification as part of the I-9 requirement. But it appears that DHS may lack the ability to impose such restrictions. According to the INA, only the Attorney General has authority to promulgate regulations restricting the list of acceptable documents. 8 U.S.C. § 1324a(b)(1)(E). According to the statute, the Attorney General may only restrict the list of acceptable documents if he "finds, by regulation that any [of the listed documents] does not reliably establish [employment] authorization or identity or is being used fraudulently to an unacceptable degree." *Id.* Importantly, this power of the Attorney General was not transferred to the DHS upon its creation and the dissolution of the former Immigration and Nationality Service. 8 U.S.C. § 1103(a) (transferring powers under the INA to the Secretary of the DHS, *except* those that "relate to the powers, functions, and duties conferred upon" "the Attorney General," among others) (emphasis added). There is no indication in 8 U.S.C. § 1324a(b)(1)(E) and accompanying notes that the provision was ever amended to transfer the AG's authority to promulgate regulations to the DHS.

Despite this express statutory rule exclusively vesting the ability to restrict the congressionally approved list of I-9 documents to the Attorney General, Section 274a.1(l)(2)(iii) of the proposed rule would give DHS the power to restrict which documents are acceptable in the reverification process. According to that section, only documents bearing a photograph and *not* containing the SSN that triggered the no-match letter will satisfy the reverification requirement under the I-9 process. *Id.* Under current law, however, documents lacking photographs and those that include Social Security numbers are acceptable—even if the SSN triggers a no-match letter. 8 U.S.C. § 1324a(b)(1)(C), (D). Therefore, the proposed rule may inappropriately usurp the Attorney General's exclusive power to alter the congressionally created list of approved documents for reverification of a worker's status under the I-9 process and should be rejected.[66]

## RECOMMENDATION

In sum, we strongly oppose the Department of Homeland Security's proposed regulation. DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of workers in an isolated, punitive immigration "enforcement" scheme on the eve of enactment of *comprehensive immigration reform*. Although the rule will cause enormous upheavals in the workplace, the rule will have *no* impact on undocumented migration, which is the purported purpose of this

---

[66] The proposed rule may also violate INA Section 274A(d)(3), which requires notice by the President to the House and Senate Judiciary Committees before changes are made to the employment eligibility verification system. We do not know whether the President has provided such notice to the appropriate committees.

No-Match Cert. Admin. Record  1183

proposal. Our experience with no-match firings and workplace audits is very clear: *the fired workers will not leave the United States.* In the absence of comprehensive immigration reform that addresses the root causes of undocumented migration, they will simply find other more marginal jobs, most likely in the underground economy. Because of this, the proposed rule will result in growth of the underground economy, which results in substantial losses in state and federal tax revenues as well as unfair competition. The proposed rule is simply the wrong rule at the wrong time. It provides no solution to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by workers, taxpayers, and businesses. For all these reasons, we recommend that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,

**The Low-Wage Immigrant Worker (LWIW) Coalition**

**Co-Convened By:**

American Federation of Labor – Congress of Industrial Organizations (AFL-CIO)
Change to Win (CtW)
Interfaith Worker Justice (IWJ)
Jobs with Justice
National Council of La Raza (NCLR)
National Day Laborer Organizing Network (NDLON)
National Employment Law Project (NELP)
National Immigration Law Center (NILC)

**Contact:**


Marielena Hincapié, Esq.
Director of Programs
National Immigration Law Center
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA 90010
Phone: 213-639-3900
Fax: 213-639-3911
www.nilc.org

No-Match Cert. Admin. Record 1184

Immigration and Naturalization Service

HQ 274A

Office of the General Counsel                  425 Eye Street N.W.
                                               Washington, D.C. 20536

FEB 17 1994

Mr. Carl G. Borden
California Farm Bureau Federation
Office of the General Counsel
1601 Exposition Boulevard, FB3
Sacramento, CA 95815-5318

Dear Mr. Borden:

This letter is in response to your correspondence dated August 11, 1993, concerning the receipt of a letter from the Social Security Administration (SSA). The SSA letter in question informs an employer that the social security number of an employee does not agree with SSA records. Specifically, you ask whether an employer who receives this letter from SSA can continue to rely on the employment eligibility documents presented by that employee, assuming the documents appear on their face to be genuine and to relate to the employee?

If the document or documents presented to verify work authorization appear on their face to be genuine and to reasonably relate to the individual, the subsequent receipt of the SSA letter mentioned above does not impose any affirmative duty upon the employer to investigate further into an employee's eligibility to work in the United States. In addition, the receipt of this SSA letter by an employer, without more, would not be sufficient to establish constructive knowledge on the part of the employer regarding the employment eligibility of the named employee. As you correctly note in your correspondence, this letter from SSA could be prompted by a number of different reasons having nothing to do with an employee's eligibility to work in the United States.

The answer provided above specifically applies to a situation where the employer receives such a letter from SSA and the employer has no additional evidence that an employee may not be work authorized. It should be noted, however, that if an employer receives notice from the Immigration and Naturalization Service (INS) that a social security card or other document presented to establish work authorization is not valid, the employer does have a duty to inquire further to ensure that the individual is authorized to work in the United States before the employer can continue to employ that individual. In addition, while an employer has no affirmative duty to inquire into an employee's

employment eligibility based solely upon receipt of a letter from SSA, if for some reason the employer discovers evidence that an employee may not be authorized to work in the United States, the employer must inquire further to verify the employment eligibility of that employee.  If the employer is unable to verify work authorization, the employer cannot continue to employ that individual.

It should be noted that telephonic inquiries from employers regarding the employment authorization of employees will not be honored by INS.[1]  However, if an employer suspects fraud, as it relates to INS documents, the employer may ask INS to physically examine the documents.

I hope that the above information is helpful to you.  If you have any further questions, please contact Michael C. McGoings, Associate General Counsel at (202) 514-2895.

Sincerely,

for Paul W. Virtue
Acting General Counsel

---

[1]    (The only exception is where the written consent of that individual has been obtained.)  See Salinas-Pena v. INS, No. 86-1033-DA (D.Oregon, March 16, 1988).

- 2 -

New England Apple Council Inc.
7 Main St.
Goffstown, NH, 03045

VIA ELECTRONIC MAIL AND OVERNIGHT EXPRESS

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

RE:    Docket No. ICEB-2006-0004
       Safe Harbor Procedures for Employers Who Receive a No-Match Letter
       (FR 71:114, p. 34281)

Gentlemen:

     The New England Apple Council (NEAC) submits the following comments on the
Department of Homeland Security's Proposed Rule regarding "no-match" letters
published in the Federal Register on June 14, 2006. (71 Federal Register 34218)

     NEAC is a grower owned non profit association based in Goffstown, NH. NEAC
has 200 farmer members located in all six New England States. Our members are some of
the longest users of foreign labor recruited under various LEGAL programs administered
by the Department of Labor and USCIS formerly INS. Some of our members have used
LEGAL seasonal foreign workers since 1945.

     We were deeply involved in the use of foreign workers prior to the passage of IRCA
in 1986. We saw a large increase in usage of H2A workers in the years following its
passage (IRCA). Since the early 1990's the usage of H2A workers has decreased by our
members at the same time that production has remained constant. The Department of
Labor is responsible for the increased use of domestic non H2A workers through referrals
from Florida and Puerto Rico. Many of those referrals as well as the friends and family
who followed fall into the Social Security "no-match" category. Our members have
followed up and notified workers with no-match numbers, only to have them replaced,
the workers, by new ones. Our growers have not used the electronic verification program
for two reasons.
First, the data base is very far from perfect. Legal workers with newly issued Social
Security numbers are seldom included in the data base, and H2A workers are not
included by law in the Social Security system.
Secondly, the Office of Special Council for Immigration Related Unfair Employment
Practices has been very active in perusing employers under the Anti Discrimination
provisions of the Civil Rights Act of 1964 and the Anti Discrimination provisions of

IRCA. To treat domestic employees differently than H2A employees could be considered discrimination, and as I stated H2A employees are not included in the Social Security System, and would always come up as a no-match.

Our advice to our employers has always been upon receipt of a no-match letter to advise the worker to correct the problem, to continue employment, or in most cases to be rehired. (Because of the seasonal nature of the jobs) If they do this and provide corrected numbers or names, the workers, continue or are rehired. If there is a second no-match letter on the same individual he or she is permanently discharged.

At the present time there is no reliable, efficient, system to check all employees through Social Security number verification. Until that is in place your agency should postpone the Proposed Rule. Congress should act on the Social Security "no-match" problem before this rule is implemented.

As a part of our statement we incorporate by reference in its entirety the comments of the Nation Council of Agricultural Employers (NCAE).

Sincerely Yours,

Joseph Young Executive Director



SHRM
Government Affairs Department
1800 Duke Street
Alexandria, VA  22314-3499
(703) 535-6028
FAX (703) 535-6492
http://www.shrm.org/government

# SHRM GOVERNMENT AFFAIRS
## FAX Cover Sheet

**ATTENTION:**     Richard A. Sloan

**FAX NUMBER:**     202-272-8352

**DATE:**          August 14, 2006

**NUMBER OF PAGES:**     6

| | |
|---|---|
| ☐ | Mike Aitken - Director, Governmental Affairs (703) 535-6027 |
| ☑ | Kenya N. Wiley, Esq. - Manager, Regulatory and Judicial Affairs (703) 535-6026 |
| ☐ | Anita Edison - Coordinator, Governmental Affairs (703) 535-6028 |
| ☐ | Lisa Horn - Manager, Health Care Legislation (703) 535-6352 |
| ☐ | Kathleen A. Coulombe - Specialist, State Affairs |

ICE 2377-06; Docket No. ICEB-2006-0004
RIN 1653-AA50

No-Match Cert. Admin. Record  1189



August 14, 2006

Richard A. Sloan
Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security
111 Massachusetts Avenue, NW
2nd Floor
Washington, DC 20529

> Re:    Proposed Rule on Safe-Harbor Procedures for Employers Who Receive a No-
>        Match Letter. 71 Fed. Reg. 34,281 (June 14, 2006)
>        ICE 2377-06; Docket No. ICEB-2006-0004; RIN 1653-AA50

Dear Mr. Sloan:

The Society for Human Resource Management (SHRM) submits these comments to the U.S.
Department of Homeland Security ("the Department" or "DHS") in response to the proposed
rule on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter. This notice of
proposed rulemaking was published in the *Federal Register* on June 14, 2006. *See* 71 Fed. Reg.
34,281 (June 14, 2006).

SHRM is the world's largest association devoted to human resource management. Representing
more than 210,000 individual members, the Society's mission is to serve the needs of HR
professionals by providing the most essential and comprehensive resources available. As an
influential voice, the Society's mission is also to advance the human resource profession to
ensure that HR is recognized as an essential partner in developing and executing organizational
strategy. Founded in 1948, SHRM currently has more than 550 affiliated chapters within the
United States and members in more than 100 countries.

SHRM's membership comprises HR professionals who are responsible for administering their
employers' hiring policies, including the employment verification process. SHRM has taken a
multi-faceted approach to obtain feedback from its members on the proposed guidance for
employers who receive a no-match letter, and has incorporated our member feedback in these
comments.

1800 DUKE STREET
ALEXANDRIA, VA 22314-3499 USA
(703) 548-3440 FAX; (703) 836-0367 TDD; (703) 548-6999
WORLD WIDE WEB: HTTP://WWW.SHRM.ORG

No-Match Cert. Admin. Record  1190

Richard A. Sloan
August 14, 2006
Page 2

**DISCUSSION**

SHRM appreciates the opportunity to comment on the safe-harbor procedures regarding no-match letters and recognizes the Department's efforts in issuing guidance. For quite some time, many HR professionals have, inquired about guidance from both DHS and SSA regarding what an employer should do when it receives a no-match letter. SHRM believes that the proposed regulations provide some guidance on the key issues; however, SHRM has some concerns regarding the proposed time periods and requests additional clarification on certain terms and provisions. In addition, SHRM has concerns as to how the proposed regulation will comport with the proposed legislation that Congress is currently addressing, which includes new procedures for the employment verification process.

The proposed regulations on the safe-harbor procedures provide that: (1) an employer must take "reasonable steps," within 14 days after receipt of a "no-match" letter; and (2) the employer must resolve the discrepancy within 60 days of receipt of the no-match letter. If the discrepancy has not been resolved within the suggested 60-day period, the employer must, within an additional three days, verify the employee's employment authorization and complete a new Form I-9. *See* 71 Fed. Reg. 34,285 (June 14, 2006).

SHRM appreciates the Department's efforts to ensure that employers are employing individuals who are authorized to work in the United States. SHRM realizes that in drafting the proposed guidelines, DHS had to consider the interests of employers, employees, the Social Security Administration, and other governmental entities. However, SHRM believes that the Department must provide guidance with reasonable and clear guidelines for HR professionals. Therefore, as discussed below, SHRM recommends that the Department: (1) increase the proposed period for an employer to take "reasonable steps" to a minimum of 60 days; and (2) permit the employer a minimum of 120 days to resolve any discrepancies after receiving a no-match letter. Furthermore, the Society recommends that the Department provide clarification on certain terms and provisions, and work closely with SSA to coordinate a seamless, uniform process for responding to no-match letters.

I.    **SHRM Recommends that the Department Provide an Employer a Minimum of 60 Days to Take "Reasonable Steps."**

The Department has proposed that after receiving a no-match letter, an employer must take certain "reasonable steps" within 14 days of receipt of the no-match letter. *See* 71 Fed. Reg. 34, 285 (June 14, 2006). The Department does not include a complete list of steps that would be deemed reasonable under the proposed rule. However, the Department states that the following steps would be considered reasonable. These include: (1) checking the employer's records for typographical or clerical errors; (2) informing SSA of the correct information; and (3) verifying that the employer's records of the employee's name and social security numbers match the records of SSA. SHRM recommends that the Department provide an illustrative list of examples of steps that would be considered "reasonable." SHRM members make a good-faith effort to ensure that their employees are authorized to work in the United States. Thus, it is imperative

Richard A. Sloan
August 14, 2006
Page 3

that HR professionals are aware of the procedures that they may follow in response to a no-match letter.

### A. SHRM's Concerns with the Proposed Time Period.

SHRM believes that the proposed 14-day period would not provide employers an adequate amount of time to notify the employee. An HR professional working for a large company may have operations or offices in many different geographical areas. If the HR professional receives a no-match letter, and the employee is located in another state, the HR professional must check the employee's records and track the employee in another location. Some SHRM members work for colleges and universities, where the faculty and other employees may not work during the entire calendar year. A professor may teach a course every other semester, and not be available if the employer receives the no-match letter during his "off" semester. Also, many colleges and universities operate with a reduced workforce during the summer months. Thus, even if the employer receives the no-match letter, the HR professional may not be able to immediately contact the employee if the employee is out of the office or on vacation.

There are other reasons that would affect an employer's ability to take reasonable steps in response to a no-match letter within the proposed 14-day period. As more employers implement flexible workplace policies, employees are more likely to telecommute. HR professionals will need additional time to contact employees who telecommute and are not physically present in the office on a daily basis. Thus, both the employer and employee may need additional time. In addition, SSA may send the no-match letter to a different division within the department that does not process the I-9 forms. For example, if SSA sends the letter to the payroll department, the payroll specialist will have to forward the information to the HR department. The forwarding of the no-match letter may add additional time to the process. Given the size and numerous locations of large employers as well as the possibility of an employee's absence from the office, SHRM recommends that the Department increase the time permitted for an employer to take reasonable steps pursuant to the safe-harbor provisions. Therefore, SHRM recommends that DHS grant an employer a *minimum* of 60 days from receipt of the no-match letter to take reasonable steps.

### B. The Department of Homeland Security's Coordination Efforts with the Social Security Administration.

The proposed rule also provides that when an employer verifies an employee's Social Security Number (SSN) with the Social Security Administration, "employers should make a record of the manner, date, and time of any such verification, as SSA may not provide documentation." *See* 71 Fed. Reg. 34,283 (June 14, 2006). SHRM recommends that SSA provide the employer with a confirmation and tracking number within the proposed timeframe for resolving the discrepancy. SHRM also recommends that SSA provide the employer with a sample notice and guidance for the employee to follow when the employee attempts to resolve the no-match discrepancy. SHRM realizes the importance of both SSA and DHS in ensuring that all employees are authorized to work in the United States. Thus, SHRM recommends that both agencies work

Richard A. Sloan
August 14, 2006
Page 4

together and develop a uniform process to confirm and track an employer's attempt to verify an
employer's SSN with SSA.

**II.     SHRM Recommends that the Department Establish a 120-day Period to
Resolve Any Discrepancies After Receiving a No-Match Letter.**

The Department has proposed a verification procedure that the employer may follow if the
discrepancy with the no-match letter is not resolved within 60 days of receipt of the no-match
letter. *See* 71 Fed. Reg. 34,285 (June 14, 2006). When an employer receives a no-match letter,
it takes time for a corporate entity to identify the issue, call in the employee and ask questions
regarding the no-match letter. Even if there is a simple error that must be corrected by SSA, the
proposed 60-day period would be inadequate for SSA to respond and the employer to
resolve the discrepancy. Also, there may not be a local SSA office near the employer's location.
Furthermore, SSA may not provide the employer with a response within the proposed 60-day
period due to a backlog of inquiries, a shortage of staff, or other reasons beyond the employer's
control. Therefore, SHRM recommends that the Department provide an employer with a
minimum of 120 days to resolve any discrepancies after receiving a no-match letter. SHRM also
recommends that the Department provide clear language stating that where the employer has
contacted the appropriate government agency within the proposed timeframe, the employer will
not be held liable for external factors outside the employer's control. Such factors may include
an agency's failure to respond within the timeframe required under the safe-harbor rules. Thus,
SHRM recommends that DHS provide a an employer a minimum of 120 days to resolve any
discrepancies after receiving a no-match letter, and also address the employer's due diligence in
contacting SSA within the applicable time-period.

**III.    SHRM Recommends that the Department Clarify Whether the New Form I-9
is Optional.**

The Department has also proposed guidelines if the discrepancy identified in the no-match letter
is not resolved within the proposed 60-day period. Specifically, DHS has proposed that if the
discrepancy is not resolved within the proposed 60-day period, and if the employee's identity
and work authorization cannot be verified after completing a new Form I-9, the employer has the
option of either terminating the employee or risk that DHS may find the employer in violation of
the federal immigration laws. *See* 71 Fed. Reg. 34,283 (June 14, 2006). SHRM recommends
that the Department clarify whether the completion of the new I-9 form is optional or mandatory
for an employer before the employer may terminate the employee. The Department also states
that "employers should apply these procedures uniformly to all of their employees having
unresolved no-match letters." The Department then indicates that employers that do not provide
uniform guidelines may be in violation of applicable anti-discrimination laws. SHRM
recommends that the Department provide clear guidance on what actions would constitute as a
violation of the "applicable anti-discrimination" laws. SHRM also recommends that the
Department coordinate the guidance regarding the discriminatory conduct with the other
agencies that have jurisdiction over the anti-discriminatory laws, including the Department of
Justice and the Equal Employment Opportunity Commission.

Richard A. Sloan
August 14, 2006
Page 5

### IV.    SHRM Recommends that the Department Clarify the Employee's Work Status During the Proposed Timeframes.

The proposed rule provides that an employer must take "reasonable steps" within 14 days of receipt of the no-match letter, and must resolve any discrepancies within 60 days of receipt of the no match letter. *See* 71 Fed. Reg. 34,285 (June 14, 2006). The proposed rule does not provide guidance on how the employer should handle the employee's work status between day 14 and day 60. SHRM recommends that the Department clearly state that: (1) an employee whose name is referenced on a no-match letter shall continue to work during the "discrepancy" period; and (2) DHS will not hold the employer liable for violating the federal immigration laws if the employer continues to employ the individual during this period. After the employer notifies the employee about the no-match letter, an employee may fail to return to work. SHRM recommends that the Department provide clear language that the employer shall have the option to terminate the employee within the discrepancy period. The option to terminate would apply in cases where an employee fails to return to work after the employer has notified the employee of the no-match letter, and the employee's absence violates the employer's attendance policy.

### V.    SHRM Recommends That the Department Clarify the Receipt Guidelines.

The proposed safe-harbor guidelines also describe an employer's obligations and its options for avoiding liability after the employer receives "information indicating that the employee may be an alien who is not employment authorized." *See* 71 Fed. Reg. 34,284 (June 14, 2006). However, the proposed rule does not define what constitutes as "receipt" of such information. Some SHRM members have received no-match letters that were addressed to the employee, not the employer. Although the employer may form a reasonable suspicion that the envelope from SSA contains a no-match letter, the employer cannot confirm the contents of the envelope if the mailing is addressed to the employee. Thus, SHRM recommends that the Department provide clear guidance on what constitutes receipt. Specifically, SHRM recommends that the Department clarify that the no-match letter must be addressed to the employer in order to meet the criteria for "receipt," or require that a copy of the no-match letter be sent to the employer.

Finally, some SHRM members participate in the Employment Verification System (EVS), where they submit a diskette to SSA each month with the names and Social Security Numbers for all newly hired employees and all employees who have notified their employers of a name change. Each month, SSA provides the employer with a list of any discrepancies from the information the employer provided through the EVS. SHRM members have requested guidance on whether the safe-harbor procedures regarding no-match letters would also apply to the receipt of EVS discrepancy information.

### VI.    Conclusion.

SHRM appreciates the opportunity to submit these comments on the proposed guidance for employers who receive a no-match letter. SHRM applauds the Department for proposing the guidelines. However, SHRM believes that in order to maximize the safe-harbor provisions, the Department of Homeland Security must work closely with the Social Security Administration to

Richard A. Sloan
August 14, 2006
Page 6

ensure that there is a single uniform process.  SHRM looks forward to working with both
agencies to improve the guidance on safe-harbor procedures.

Respectfully submitted,

*[signature]*

Michael P. Aitken
Director, Governmental Affairs
Society for Human Resource Management

No-Match Cert. Admin. Record  1195

# MITCHELL SILBERBERG & KNUPP LLP

A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

## MS&K

David S. Rugendorf
Partner
(310) 312-3118 Phone
(310) 231-8318 Fax
dsr@msk.com

July 17, 2006

BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED)

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW 2nd Floor
Washington D.C. 20529

Re:    Proposed Rule Change to 8 C.F.R. Part 274a - DHS Docket Number ICEB-2006-0004

Dear Director:

Thank you for providing the opportunity to comment on the proposed changes to Title 8 Code of Federal Regulations Part 274a, Control of Employment of Aliens, 71 Fed. Reg. 34281 (proposed June 14, 2006) (to be codified at 8 C.F.R. pt. 274a). Our comment describes problems associated with the 14 day time limit within which employers must act to assure "safe harbor" from a finding of constructive knowledge that the employer has hired or continues to employ an unauthorized worker.

Simply stated, this 14 day period does not give employers enough time to follow all of the safe harbor procedures laid out in the proposed rule. According to the proposed rule, within 14 days of a receiving a no-match letter, an employer would have to:

1.    Check its records to determine if the error is clerical or typographical.

2.    If there is a clerical error, the employer must correct the error and inform the Social Security Administration ("SSA") or Department of Homeland Security ("DHS") of the correct information in accordance with the letter's instructions.

3.    The employer would then have to verify with the appropriate agency that the employee's name and social security number now match the agency's records and make a record of the manner, date, and time of such verification.

4.    If the error is not clerical, the employer must ask the employee to verify that the employer's records are correct.

5.    If the employer's records are correct according to the employee, the employer must ask the employee to resolve the discrepancy with the Social Security Administration

11377 West Olympic Boulevard, Los Angeles, California  90064-1683
Phone: (310) 312-2000  Fax: (310) 312-3100  Website: WWW.MSK.COM

No-Match Cert. Admin. Record  1156

MITCHELL SILBERBERG & KNUPP LLP

Director, Regulatory Management Division
July 17, 2006
Page 2

        personally by visiting an SSA office and bringing documents that prove citizenship status, name change, or other relevant information.

6.     If the employee states that the employer's records are not correct, the employer must take action to correct the records, inform the relevant agency according to the letter's instructions, and verify the corrected records with the relevant agency.

If the employer does not follow these steps within 14 days, it risks constructive knowledge liability under the proposed rule. Large employers, with many immigrant workers, could receive multiple no-match letters at a time and find the process difficult to keep up with. Smaller employers may not have sufficient staff to deal with the influx of no-match letters. Additional staff may be required just to keep up with the frantic pace of the procedures creating a burdensome obligation on employers. A 30 day or longer time period would give most employers enough time to effectively deal with the no-match letters.

       In addition, most analogous federal and state regulations allow employers at least 30 days to reply to government information requests. In the Code of Federal Regulations, when an employer is required to send a report or information to an outside agency regarding an employee, the employer usually gets 30 days or more to do so. *See, e.g.,* 29 C.F.R. §§ 405.4, 520.409, 530.102, 1910.217 (requiring a report of employee injuries to OSHA within 30 days), 1910.1096.

       Normally, federal regulations which give employers less than 30 days to act relate to the health and safety of the employees, which requires much more urgent attention on the part of the employer. *See, e.g.,* 10 C.F.R. § 850.24 (notifying employees of health and safety monitoring results); 29 C.F.R. §§ 1903.19, 1910.1001, 1910.1017 (notifying employees of health and safety monitoring results), 1910.1018 (notifying employees of health and safety monitoring results), 1910.1025 (notifying employees of health and safety monitoring results), 1910.1026 (notifying employees of health and safety monitoring results), 1910.1027 (notifying employees of health and safety monitoring results), 1910.1029 (notifying employees of health and safety monitoring results), 1910.1043, 1910.1044, 1910.1045, 1910.1047, 1910.1048, 1910.1050, 1910.1051, 1910.1052, 1910.1450, 1915.1001, 1926.62. Some health and safety regulations even allow 30 days to act. *See, e.g.,* 29 C.F.R. §§ 1910.95. Other instances where an employer must act in less than 30 days include situations where the employer is contesting some government ruling. *See, e.g.,* 29 C.F.R. §§ 825.403 (petition to agency regarding alleged violations), 1903.15.

       Other federal law also provides time limits for employers to take certain actions. Employers get at least 30 days to provide written notice to election participants and information to a retirement plan sponsor. *See* 29 U.S.C. §§ 1082, 1399.

       Additionally, states have their own labor codes which also provide 30 day or longer time limits for employers to act. In California, if an employee alleges a violation of the labor code, an employer has 33 days to cure the violation. Cal. Lab. Code § 2699.3. Also, employers normally have 30 days to make reports to outside agencies or employees after certain events. *See* Cal. Lab. Code §§ 511, 2809. Certain safe-harbor provisions in California allow an employer 30 days to act. *See* Cal. Lab. Code § 4658.6 (no liability for supplemental job displacement benefit if

**No-Match Cert. Admin. Record 1197**

MITCHELL SILBERBERG & KNUPP LLP

Director, Regulatory Management Division
July 17, 2006
Page 3

employer meets certain conditions within 30 days). Like the C.F.R., instances where an employer must act in less than 30 days typically have to do with protecting the employee's compensation or health. *See* Cal. Lab. Code §§ 98.2, 3715, 4603.4.

Based on traditional time limits in both federal and state regulations, employers expect to have 30 days to act in response to a government inquiry regarding employees. Employers expect that only actions which require urgency, such as protection of an employee's health and welfare, will require prompt action in less than 30 days.

Situations in which employers would have a particularly difficult time complying with the 14 day time limit include those where multiple no-match letters are received by an employer in a short time period. Even if an employer finds the time to check its records within a few days, the employer must find the time to contact the SSA or DHS according to the specific letter's instructions and inform them of new correct information if there was a typographical error. The employer would then have to verify that the employee's name and social security number now match the agency's records and record this verification. The rule gives no extra time to employers if they make a good faith attempt to correct a clerical error but for some reason their records still do not match the agency's records.

If after searching through its records, an employer finds that the error is not clerical, it must ask the employee to verify that the records are correct and to resolve the discrepancy with the SSA personally. Verification by the employee may take some time and not all employees' actions can be controlled by the employer. If the employee states that the records are incorrect the employer must start all over again and correct the records, inform the agency, and verify the corrected records. The employer gets no additional time for this under the proposed rule. With multiple no-match letters an employer would certainly become overwhelmed while trying to take all of these actions within 14 days. A 30 day or longer time limit would ease the pressure on the employer and make sure that all appropriate steps are taken to ensure accuracy.

In conclusion, the proposed rule's 14 day time limit does not allow enough time for employers to properly and thoroughly follow the safe harbor procedures laid out by the proposed rule. Employers typically expect to have at least 30 days to take action for situations that do not affect an employee's health and safety. A 30 day or longer time limit to take reasonable steps to avoid a constructive knowledge finding would allow employers adequate time to accurately follow the proposed rule's safe harbor procedures.

Respectfully submitted,

David S. Rugendorf
of
MITCHELL SILBERBERG & KNUPP LLP

1023015.2/26751-00010

**No-Match Cert. Admin. Record  1198**

RE:  DHS Docket No. ICEB - 2006 - 0004

August 10, 2006

Director, Regulatory Management Division

U.S. Citizenship and Immigration Services

Department of Homeland Security

111 Massachusetts Avenue, NW, 2nd Floor

Washington, D.C. 20529

We urge you to reject the proposed rule "Safe Harbor for Procedures for Employers" who receive a no match letter from the SSA. We further urge you to comply with the goal of President Bush who stressed on July 31, "we must have comprehensive immigration reform". He said that "the best way to enforce the border is to have a rational way for people -who are doing jobs that Americans aren't doing- to come to this country ...as part of comprehensive reform."

We need immigrant labor. We also need to have an overhaul of the present immigration system – a comprehensive reform -which will include a reform of our admissions system, and effective, targeted enforcement measures. We need a realistic solution for the undocumented population now living in the U.S, many of whom have provided the invaluable, irreplaceable labor that has fueled the economy of this nation for years.

Your mission is to serve the security and well being of this nation. Our economic reality is a vital part of a secure and healthy nation. The fabric of this nation is of one piece. The security of all of those who today are laboring in our fields and factories affects the security of us all.

Please be true to your mission to look to the good of our nation, and support the challenge of a comprehensive immigration reform. Reject this one more isolated rule which would set in motion years of red tape and paper work, but wouldn't touch the real needs in our nation's broken immigration system.

Thank you for your attention to this matter,

*Pat Sullivan*

Pat Sullivan

P.O. Box 309
Houston, Ms 38851



# LABORERS' INTERNATIONAL UNION OF NORTH AMERICA

August 11, 2006

TERENCE M. O'SULLIVAN
*General President*

ARMAND E. SABITONI
*General Secretary-Treasurer*

*Vice Presidents:*

VERE O. HAYNES

MIKE QUEVEDO, JR.

TERRENCE M. HEALY

RAYMOND M. POCINO

EDWARD M. SMITH
*Assistant to the
General President*

JAMES C. HALE

JOSEPH S. MANCINELLI

ROCCO DAVIS
*Special Assistant to the
General President*

VINCENT R. MASINO

DENNIS L. MARTIRE

MANO FREY

ROBERT E. RICHARDSON

JOSE A. MORENO

JOHN F. HEGARTY

MICHAEL S. BEARSE
*General Counsel*

HEADQUARTERS:
905 16th Street, NW
Washington, DC
20006-1765
(202) 737-8320
Fax: (202) 737-2754

**VIA E-MAIL**

Director, Regulatory and Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave., N.W., 2nd Floor
Washington DC, 20529
Rfs.regs@dhs.gov

RE:    DHS Docket No. ICEB-2006-0004

Dear Director:

The Laborers' International Union of North America (LIUNA) respectfully submits these comments regarding the proposed regulations on the "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" published in 71 Fed. Reg. 34281-85 on June 14, 2006.

LIUNA is deeply concerned that the Department of Homeland Security (DHS) is issuing these regulations as a piece meal effort to beef up verification of employment authorization without the benefit of broader immigration reform and a more efficient structure. Unfortunately, LIUNA has ample experience in dealing with such problems under the current treatment of I-9s and the Social Security Administration's (SSA) No-Match letters.

LIUNA has an abiding interest in the federal government's efforts to implement procedures for verifying workers' employment authorization. Workers founded LIUNA in 1903, and since that time the union has grown to more than 700,000 members by helping workers achieve better wages, good benefits and safer jobsites. LIUNA is one of the fastest-growing unions in North America. LIUNA Laborers work in a broad array of industries, but the majority work in the construction industry, building everything from skyscrapers to tunnels, factories to water treatment plants. Laborers also make buildings safe by removing hazardous materials like asbestos and lead. LIUNA supports comprehensive immigration reform and believes that the current dialogue in Congress is the appropriate venue to address the immigration crisis. Employee verification is only one facet of a complex situation that must be addressed as a whole, rather than piece meal.

# Strong, Proud, United

Director, Regulatory and Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
August 11, 2006
Page 2

It is our view that the proposed regulations would dramatically increase the administrative burden on employers – especially smaller construction contractors. The burdens imposed by the proposed regulations, and thus the incentives to avoid them, are magnified by a very inefficient verification system. When combined with the significantly enhanced risks of failure to comply with the re-verification procedures, we believe many more employers will opt to avoid compliance altogether by removing their workers from their payrolls. The very employers who receive the highest rates of No-Match letters, particularly construction contractors, will be driven to join many of their more ruthless competitors in exploiting the existing underground labor market.

The result will do little to stem the use of unauthorized labor while doing grave injustice to workers in our industry and serious injury to our society. Accordingly, we request that DHS withdraw these proposed regulations in their entirety to await consideration of the issues as part of an overall immigration reform.

**The Proposed Regulations Rely On Databases that
Are Unreliable and Will Lead to Unnecessary Hardships.**

The defects in the existing immigration and SSA databases make the current employment verification system inaccurate and ineffective. The resulting errors cause confusion that imposes economic hardship on workers otherwise qualified and available to perform work.

The current system relies on multiple DHS immigration databases that do not communicate with one another and frequently contain inaccurate or conflicting information regarding the legal status of an individual. Data error and identity theft result in false negatives that deny authorized workers employment and allow unscrupulous employers to accept documents with information obtained through identity theft and document fraud. The current SSA databases that form the basis for the "No-Match" letters that are issued to employers and are the subject of this regulation suffer from the same defects.

Reviews of DHS's immigration records, both paper and electronic, have repeatedly raised concerns about the accuracy and maintenance of such data. In 1996, the "Basic Pilot Program"— viewed by DHS as its most sophisticated and automated verification tool — was established to enable employers on a voluntary basis to check the Social Security and alien identification numbers of new hires against Social Security Administration (SSA) and the then Immigration and Naturalization Service's (INS) records. A subsequent

Director, Regulatory and Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
August 11, 2006
Page 3

Temple University report demonstrated the system maintained a 1.4% false non-confirmation rate. While this is a seemingly small percentage, such an error rate applied to only 1 million employees would result in 14,000 otherwise eligible workers being denied employment due to erroneous data. There is no reason to believe that the SSA's databases are any more reliable.

The problem with the quality of the data in DHS and SSA databases used to generate immigration notices or SSA "No-Match" letters is compounded by the continuing lack of internal and external connectivity of these multiple databases. This lack of coordination requires queries of multiple databases and resource intensive efforts to resolve conflicts between inconsistent data on a worker's status.

The proposed rule's reliance on such flawed data increases the number of No-Match letters and thus the burden on employers to respond. This will increase the incentives for employers to implement schemes to move their employees off of their payrolls or to short-circuit the process by firing employees immediately. Implementing the proposed rule while employers and employees are forced to rely on the currently flawed DHS and SSA databases is likely to result in the sudden loss of employment for many workers who are actually authorized to work in the United States. Such "false negatives" have a serious impact on workers and the families of workers deprived of their jobs. They also harm employers who may lose valued employees or find it harder to hire new workers they need in a competitive labor market. Employers and workers will also waste a great deal of time and resources trying to satisfy the enhanced employer verification requirements based on systems known to have flawed data. Such burdens on workers, employers and our economy should not be imposed until DHS and SSA demonstrate that they have markedly improved the integrity of their paper and electronic immigration records.

We support efforts to address the shortcomings of the employment verification process so that it is an accurate tool to determine employment eligibility and to protect our nation. However, the harm that can reasonably be anticipated from the proposed rule's mandate that employers increase their reliance on flawed databases is further exacerbated in the construction industry, where short-term projects are common. Construction employers who require speedy hiring and firing decisions in order to man short-term projects can not be expected to reliably depend on information from flawed DHS and SSA databases. National security is not advanced by rulemakings that increase reliance on flawed systems. This is especially true when the proposed regulation's re-verification process

---

[1] Findings of the Basic Pilot Evaluation, Institute for Survey Research (Temple University) (June 2002). *See also* Report to Congress on the Basic Pilot Program, Department of Homeland Security/U.S. Citizenship and Immigration Services, June 2004.

Director, Regulatory and Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
August 11, 2006
Page 4

does nothing to stem the ability of unscrupulous contractors to avoid the regulatory
system altogether.

**The Proposed Regulations Do Nothing to Prevent Employer**
**Avoidance Schemes and Would Therefore Exacerbate the**
**Already Widespread Exploitation of Off-the-Payroll Labor.**

In many low-wage industries and in construction in particular, contractors are classifying
large numbers of their workers as "Independent Contractors" or paying them "off the
books." Employers of low-income workers frequently misclassify their employees as
Independent Contractors, either by giving them an IRS Form 1099 instead of a W-2, or
by paying them in cash.   This tactic not only saves the employer significant amounts in
taxes (including payroll, workers' compensation, and unemployment compensation
taxes), it also lets them off the hook for complying with employment regulations, worker
protection laws and the need to bargain with unions.  Predictably, this underground labor
market is already flourishing in the very labor markets, such as construction, that use
unauthorized immigrant labor and which would be the intended target of the proposed
regulations.[2]

It is a simple fact that employers can reduce the cost of doing business through
circumventing compliance with federal and state labor and workplace legislation.  In a
study prepared for the U.S. Department of Labor, researchers found that one important
factor that "drives misclassification is the effort by employers to avoid the costs
associated with . . . the regulations and reporting procedures that go along with having
employees.  Understanding and complying with all the labor laws and worker protection
laws is often beyond the capabilities of many small businesses."[3]

The DHS now proposes to add to these incentives the significant additional incentive of
avoiding a particularly cumbersome and risky administrative burden of responding to the
No-Match letters.  Plainly, moving workers off the payroll would avoid the burdens and
risks imposed by the instant proposed regulations.  Businesses that employ Independent

---

[2]   While the precise magnitude of the problem is difficult to assess, it is plainly huge.  For example,
   estimates for misclassification of construction workers in Massachusetts in 2001-03 range from 14-24%
   of the workforce.  Bernard and Herricks, "The Social and Economic Cost of Employee Misclassification
   in Construction," A Report of the Construction Policy Research Center at Harvard Law School/Harvard
   School of Public Health (2004), pp. 1-2.

[3]   Planmatics, Inc., "Independent Contractors:  Prevalence and Implications for Unemployment Insurance
   Programs," (2000) p. 27 (available at http://wdr.doleta.gov/research/FullText_Documents/op%5F05%
   2D00%2Epdf).

Director, Regulatory and Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
August 11, 2006
Page 5

Contractors do not submit W-2s and do not pay social security taxes to the SSA, and do not receive No-Match letters." Certainly, some workers are legitimately classified as Independent Contractors, but the misclassification of workers is widespread in many industries, including construction. Any additional payroll administrative burdens on construction contractors will only add to this burgeoning problem.

This problem of driving employers out of the employment relationship is not insoluble and does not mean that employer verification can not be part of an effective immigration policy. It does mean that the proposed regulations should not be imposed piece-meal, without provision for reducing false-positive No-Match letters, and disincentives for employers simply to move their workers off their payrolls. Accordingly, it is our view that the proposed regulations will fail in the goal of improving employment verification of suspected unauthorized immigrants. Instead, it will serve to drive even more employers to avoid compliance by exploiting more of their low-wage workers through off-the-payroll arrangements.

**Conclusion**

LIUNA believes a comprehensive review of the verification system and the many flaws and loopholes that exist in it may be very productive. However, piece-meal attempts to patch isolated components of the system are actually counterproductive because they will encourage increased avoidance of the system. Reforming the verification system short of a comprehensive overhaul may actually do more harm to workers, employers, our economy and America's security than the status quo. We respectfully but strongly urge that implementation of this proposed rule be delayed until a more comprehensive approach to employee verification is formulated by DHS or the Congress.

Sincerely yours,

TERENCE M. O'SULLIVAN
General President

mb



**1199P**

**SEIU**®

Service Employees International Union District 1199P, CTW, CLC

# Pennsylvania's Health Care Union

**Thomas V. De Bruin**
President

**Neal Bisno**
Secretary-Treasurer

**Kim Patterson**
Executive Vice President

**Jesse Wilderman**
Executive Vice President

**Stephanie Haynes**
Health Systems Vice President

**Kevin Hefty**
Long Term Care Vice President

**Teresa Marcavage**
State Sector Vice President

**Patty Ludwikowski**
Vice President

**Matthew Yarnell**
Vice President

**Executive Board**
Eddie Abreu
Robert Armstrong
Deborah Bonn
Barbara Booth
Margie Butler
Ruth Cheslaw
Hope Cook
Etta Corman
Denise Cox
Darlene Davis
Kay Fisher
Jocelyn Furko
Dawn Futrell
Kay Good
Bonnie Gould
Linda Graham
Christine Hassleman
Patrice Hlad
Wanda King
Helen Noel
Maria Razanauskas
Lori Reinhart
Sheri Rowles
Wendell Royster
Kathy Shaner
Donna Skrbin
Shirley Steel
Cathy Stoddart
Evelyn Thoroughgood
Michele Uhranowsky
Ruth Visintainer
Colleen Wichrowski
Scott Young
John Ziegler

**VIA FIRST CLASS MAIL**

August 1, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
**Department of Homeland Security**
111 Massachusetts Avenue, NW - 2nd Floor
Washington, DC 20529

**RE:    Proposed Regulations Regarding Social Security No-Match Letters
       (Docket No. ICEB-2006-0004)**

To Whom It May Concern:

As President of SEIU District 1199P, I am writing to express our union's opposition to the Department of Homeland Security's proposed regulations regarding Social Security No-Match letters. District 1199P of the Service Employee's International Union (SEIU) represents 20,000 health care workers in the Commonwealth of Pennsylvania.

Health care facilities across the country are facing severe staffing shortages. There are not enough caregivers available to staff our hospitals and nursing homes at levels that ensure every patient receives consistent, high-quality care.

These proposed regulations could seriously exacerbate this crisis. We are concerned that many nurses and other health care workers with legal immigration status could wrongfully lose their jobs due to something as simple as a clerical error. The regulations place an undue burden on employers and employees to correct what might be errors in SSA records. The 63-day window for reconciling discrepancies could also prove to be too restrictive if the SSA is not able to handle the additional demand and workload.

Lastly, with comprehensive immigration reform measures currently working their way through Congress, we feel that the enactment of these regulations would be premature. The bills under consideration in Congress contain numerous enforcement strengthening measures. DHS should wait until a comprehensive immigration reform measure is passed through Congress before revising these regulations.

Sincerely,

*Thomas V. DeB*

Thomas V. De Bruin
President

TVD:ccm

cc:    File (3)

www.seiu1199p.org      **1500 N. 2nd Street, Harrisburg, PA 17102      800-252-3894      717-238-3030      FAX:717-238-8354**

No-Match Cert. Admin. Record  1205



**JEWISH**

**COMMUNITY**

**ACTION**

2375

UNIVERSITY

AVENUE WEST

SUITE 150

SAINT PAUL

MINNESOTA

55114-1633

PHONE (651)

632-2184

FAX (651)

632-2188

INTERNET WWW.

JEWISH

COMMUNITY

ACTION.ORG

August 4, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for
Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

Jewish Community Action (JCA) submits the following comments in response to the
request for public comment by the Department of Homeland Security (DHS), Bureau of
Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for
Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

Jewish Community Action is a ten year old organization bringing together Jews from
diverse parts of the Twin Cities Jewish community to understand and take action on social and
economic justice issues. We have been working on issues related to immigrant rights for more
than six years, often as part of broad-based coalitions. Key members of our organization are
immigration attorneys who specialize in federal immigration and labor law.

JCA has ample experience in dealing with the adverse impact that the Social Security
Administration's (SSA) no-match letters have had on all workers in the United States—
immigrant and native-born alike. Attorneys who are members of JCA have shared stories of the
impact on workers in Minnesota and beyond.

As a result of this work, JCA is alarmed by and strongly opposed to the implementation
of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter."
Such a rule will magnify the adverse impact that SSA no-match letters have had on workers'
rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and
potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no
impact on undocumented immigration.** Our past experience with no-match firings and
workplace audits is very clear: the fired workers will not leave the country. They will simply
find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy.
It will also erode our privacy rights, and it represents an end-run around the federal legislative
process. As set forth in detail below, the SSA no-match program is simply ill-suited as an
immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its
entirety based on these concerns which are summarized as follows:



**Community
Solutions Fund**

WINNER OF THE FORD FOUNDATION'S LEADERSHIP FOR A CHANGING WORLD AWARD, 2005

No-Match Cert. Admin. Record 1206



- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform.** The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Vic Rosenthal,
Executive Director

**No-Match Cert. Admin. Record  1208**

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

As a proud American citizen and voter I urge you to say no to
the proposed regulations concerning the Social Security
Administration's (SSA) "no-match" letters. Piecemeal solutions
like this are not the answer. Comprehensive reform that
addresses our economy's real needs is the solution.

Sincerely,

Rachel Dornhelm
987 Vermont St #3
Oakland, California 94610

Director Department of Homeland Security

Dear Director Homeland Security,

I have concerns about the proposed regulations involving the
Social Security Administration's "no-match" letters.

The current I-9 regulations have only been halfheartedly
enforced to verify the legal ability of an individual to work in
the United States. Relying on a potentially inaccurate and
out-of-date system like the SSA database may not be the best way
to go.

Regulations should be examined that require all employers and
employees to adhere to: a consistent standard of documents to be
utilized; procedural due process; appropriate retention
parameters; and increased law enforcement where warranted.

I urge you to consider these concerns when examining new
regulations. Thank you.

Sincerely,

Charles Barragan
23 Liberty
San Francisco, California 94110

From: khalid butt [khalid_butt1@hotmail.com]
Sent: Wednesday, August 16, 2006 8:31 AM
To: Regs, Rfs
Subject: plz reply on my e-mail address for confirmation that you have
got my mail

Honourable Director
Immigration and Citizenship

Repected sir,
with due regards a wish to draw your attention to the matter that my Green
Card has expired on 05-22-2005 (Green Card# A-091544304).

the reason for the overstay has been sent in detail to the Honourable Mary
Ann Gantner District Director  New York District Office 26 Federal Plaza
N.Y.

in this regard I paid a visit to the American Embassy on 07-10-2006. A local
employee attended me, he didnot even go through my papers but took away my
expired green card. i requested him to atleast give it in writing that he
has received my green card he only mentioned on the blue slip which was
taken from the desk of the American Embassy. i again requested him to
minutely check my papers and thereafter he should give his decision but he
didnot care for that at all.

i wrote a letter to the Honourable Consular General of America in Pakistan,
in return  i received the instruction in the letter.

all these letters and complete ppaers of my medical and other documents in
detail have been sent to
the District Director 26 Federal Plaza for pursual and further necessary
action is required under the law of the USA. I am in favour of doing the
work under the guidelines of the Law of the Land.

in the end it is most respectfully stated that the care may please be
examined in accordance with the Law of the Country. I will be very grateful
to you if the details regarding the fees payment and other requirements
needed in accordance be sent to me in detail i will abide by all the rules
and regulations.

the love and respect for America and the people of that country will always
remain in my heart with respect.


thanks
looking forward

Khalid Ali Butt
Secretary
Govt Of Pakistan
Central Board Of Film Censors
793-A Allama Iqbal Town
Lahore
Pakistan

Office Ph# 92-42-7847299
Res Ph#92-42-5724523,5744646,5033016
Mobile# 92-300-2535257

# Low-Wage Immigrant Worker Coalition

<u>**VIA ELECTRONIC MAIL**</u>

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C.  20529

***Re:    DHS Docket No. ICEB-2006-0004, Comment Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"***

Dear Sir or Madam:

The National Immigration Law Center (NILC) submits the following comment on behalf of the Low-Wage Immigrant Worker (LWIW) Coalition in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE), on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 FR 34281 (June 14, 2006).

The LWIW Coalition is co-convened by NILC, the American Federation of Labor – Congress of Industrial Organizations (AFL-CIO), Change to Win (CtW), Interfaith Worker Justice (IWJ), Jobs with Justice, the National Council of La Raza (NCLR), the National Day Laborer Organizing Network (NDLON), and the National Employment Law Project (NELP).

The LWIW Coalition is our nation's broadest collaborative of advocates and organizers working to improve the living and working conditions of low-income and low-wage immigrant workers. The mission of the LWIW is to support this community of advocates by sharing strategies and resources at the local, state, and national levels.

The signatories to these comments have ample experience in dealing with the adverse impact that Social Security Administration's (SSA's) no-match letters have had on all workers, immigrant and native-born alike.  Through our legal assistance programs and organizing campaigns, we have interacted with tens of thousands of low-wage workers and their families on matters related to no-match letters and other Social Security number (SSN) verification matters.  We have assisted individual employees in correcting no-match discrepancies and educated both employers and employees on their responsibilities in responding to no-match letters through written materials, trainings, and technical assistance to a broad range of groups in the country.

American Federation of Labor – Congress of Industrial Organizations (ALF-CIO) ● Interfaith Worker Justice (IWJ) ● Jobs with Justice (JWJ) ● National Day Labor Organizing Network (NDLON) ● National Council of La Raza (NCLR) ● National Employment Law Project (NELP) ● National Immigration Law Center (NILC)

**No-Match Cert. Admin. Record  1213**

The LWIW Coalition has also worked closely with SSA through the years to improve language in no-match letters and to include warnings to employers against discriminatory and retaliatory conduct. Our advocacy includes ongoing monitoring of national origin and citizenship status discrimination cases as well as unfair labor practices arising from SSN verification and no-match matters reported to the U.S. Department of Justice Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC), the Equal Employment Opportunity Commission (EEOC), and the National Labor Relations Board (NLRB). Some of the co-conveners of the LWIW have also been engaged in litigation involving employer misuses of no-match information to interfere with workers' rights to organize and exercise their labor rights. Throughout our work, we have remained steadfast in our commitment to safeguard and advance the rights and best interests of low-wage workers, their families, and their communities.

As a result of this work, the LWIW Coalition is alarmed by and strongly opposed to the implementation of the "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that no-match letters have had on workers' rights and trigger massive, potentially unlawful firings of low-wage workers across the nation. Overly cautious employers will fire listed workers before workers have a chance to show they are on the list mistakenly. But despite the disruption it will cause, the rule does nothing to solve our immigration problems.

DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of workers in an isolated, punitive immigration "enforcement" scheme on the eve of enactment of comprehensive immigration reform intended to make our immigration system work again. In the absence of such reform, the proposed changes would only stir up dust.

The proposed rule is simply the wrong rule at the wrong time. Both the House and Senate have passed immigration bills that contain sweeping new worksite verification and enforcement regimes that impose a new electronic verification system on all employers. Implementing the rule before the conclusion of the immigration debate would add a new, unnecessary, and unhelpful set of major changes for employers to learn and implement on top of the ones that will be added just a short while later when the new legislated changes take effect.

Although the rule causes enormous upheavals in the workplace, the rule will have *no* impact on undocumented migration, which is the purported purpose of this proposal. Our experience with no-match firings and workplace audits is very clear: *the fired workers will not leave the country.* In the absence of comprehensive immigration reform that addresses the root causes of undocumented migration, they will simply find other more marginal jobs, most likely in the unregulated cash economy. Because of this, the proposed rule will result in growth of the underground economy, which in turn will result in substantial losses in state and federal tax revenues as well as unfair competition.

In addition to its enormous impact on workers and on our economy, this proposal should be withdrawn because the rule attempts to transform the SSA no-match program into an immigration enforcement tool when the SSA does not have the capacity to fulfill this objective through its database. Additionally, the rule erodes our privacy rights, raises due process concerns, and radically departs from existing case law and longstanding federal guidance in this

area. It provides no solution to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by workers, taxpayers, and businesses. The LWIW Coalition therefore urges DHS to withdraw this rule in its entirety.

Our concerns are set forth in full below.

**The Proposed Rule Harms All Workers Regardless of Immigration Status**

*Hundreds of Thousands—Possibly Millions—of Workers, Including U.S. Citizens and Work-Authorized Noncitizens, Will Face Massive Firings*

As an initial matter, the notion that SSA no-match letters indicate that an individual is not authorized to work in the United States is simply incorrect. SSA no-match letters are *not* reliable indicators of work authorization or immigration status. Instead, these letters simply indicate that there is a discrepancy between a worker's SSN and/or name on file with the SSA based on information reported by employers on Internal Revenue Service (IRS) Form W-2 (Wage and Tax Statement). There are numerous reasons for the discrepancies, *none of which have anything to do with the immigration status or work authorization of workers*. Many of these mismatches are based, instead, on simple human error (such as clerical data entry mistakes and misspellings by the employee, employer, or SSA) or life changes (such as name changes, marriages, and divorces). The proposed rule, however, is based on the faulty premise that SSA no-match letters are foolproof indicators of work authorization. Because this premise is flawed, there are several, disastrous consequences that would flow from implementation of the rule.

This proposed rule will trigger massive firings across the nation. Based on our experience over the years but in particular with SSA's policy in 2002 where the agency sent the no-match letter to almost one million employers, the LWIW Coalition anticipates that the proposed rule will prompt similar panic and confusion among employers. This is likely to result in employers precipitously and indiscriminately firing workers who appear on a no-match list before workers have a chance to show that they are on the list because of the simple human error or life changes described above. As a result, these mass no-match firings may include the terminations of thousands of work-authorized employees who routinely receive SSA no-match letters.

U.S. citizens, lawful permanent residents, and other work-authorized employees were among the estimated 100,000 workers who lost their jobs as a result of the approximately 800,000 no-match letters sent by SSA in 2002.[1] Job losses were most acute in low-wage industries such as agriculture, cleaning, construction, food service, and health care. For example, no-match firings devastated the workforce at Stanford Medical Center in Palo Alto, California, where 83 percent of workers on a no-match list lost their jobs.[2] Based on the severity of the 2002 job losses, the U.S. Chamber of Commerce declared an official labor shortage and urged SSA to change its policy.[3] Under pressure from the Chamber and employers, as well as enormous pressure from

---

[1] Mary Beth Sheridan, "Records Checks Displace Workers: Social Security Letters Cost Immigrants Jobs," *The Washington Post*, Aug. 2, 2002.

[2] "A Crackdown on Workers," *The San Francisco Chronicle,* Aug. 12, 2002.

[3] *"The Immigration Crisis,"* Cox News Service, Aug. 14, 2002.

civil, immigrant, and worker rights advocates across the country, SSA agreed to decrease the number of no-match letters.[4]

No-match firings across the nation continued into 2003, however. In August, Peco Foods, Inc. of Canton, Mississippi terminated about 200 workers in response to no-match letters.[5] That same year, Suncast, Inc., a Chicago-area outdoor garden product manufacturer, terminated over 100 employees in response to no-match letters.[6] By the end of 2003, a national survey conducted by the University of Illinois at Chicago's Center for Urban Economic Development determined that approximately 53.6 percent of employers responding to no-match letters terminated the listed workers.[7] Despite strong warnings to employers that appeared on the face of the letter, the study found that workers were summarily fired, often without any opportunity to correct the no-match discrepancies or any explanation of the no-match process.[8]

Documented examples of adverse employment actions against U.S. citizens and other work-authorized noncitizens include:

- Mr. Samuel Harris. In late summer of 2003, Mr. Samuel Harris,[9] an African American man in Virginia, was fired from his job because his employer received an SSA no-match letter regarding a discrepancy with respect to Mr. Harris's SSN. Mr. Harris, who is a U.S. citizen, went to the local SSA office to correct his information. Apparently, SSA had issued Mr. Harris a duplicate SSN that belonged to a deceased person. Although Mr. Harris was able to correct his information with SSA, his employer refused to continue to employ him, thinking that Mr. Harris was engaging in identity theft or similar wrongdoing. He was fired and out of work for several months and had to file an arbitration case to get his job back.[10]

- Mrs. Noelle Lopez. In July 2002, Mrs. Lopez, a worker from North Carolina, was injured on the job. While she was on leave, her employer notified her that it had received an SSA no-match letter for her. She corrected the discrepancy, which was based on a typographical error in the W-2 that her employer had filed with SSA. Weeks later, while still on leave for her injury, the employer asked Mrs. Lopez to reverify that she continued to be eligible to work in the United States because her work authorization had expired. She had employment authorization based on Temporary Status Program (TPS), and had already applied for a renewal, but the Immigration and Naturalization Service (INS) sent her an Employment

---

[4] Chirag Mehta, et al., *Social Security Administration's No-Match Letter Program: Implications for Immigration Enforcement and Workers' Rights* (Center for Urban Economic Development, University of Illinois at Chicago, Nov. 2003) at 7, available at http://www.uic.edu/cuppa/uicued/npublications/recent/SSAnomatchreport.pdf (hereinafter "Mehta"); *Basic Information Brief: SSA "No-Match" Letters* (NILC, Feb. 2005) (hereinafter "NILC Brief") at 2, available at http://www.nilc.org/immsemplymnt/SSA-NM_Pack/Basic_Info_Brief_No-Match_Ltrs-2-15-05.pdf.

[5] Peggy Matthews, "Plan to Round Up, Deport Illegals Angers Activists," *The Clarion-Ledger*, Aug. 12, 2003.

[6] Stephanie Blozen, "Latinos Start Boycott Against Batavia Firms," *The Chicago Tribune*, Aug. 12, 2003.

[7] Mehta, *supra* note 4, at 13.

[8] *Id.* at 15.

[9] All individual worker names have been changed to protect their identities, but the names of workers and employers drawn from media sources are reproduced here as published.

[10] NILC Brief, *supra* note 4, at 4.

Authorization Document (EAD) with someone else's picture. Although she was able to straighten this problem out, when her doctor told her she could go back to work, the employer denied her a job because she had "too many immigration problems."[11]

The proposed rule only exacerbates this risk of unnecessary and unjust firings. Past experience indicates that, rather than navigating a complex series of steps and timetables to a "safe-harbor," panicked and confused employers will simply fire all workers whose names appear on the no-match list. The employer confusion across U.S. worksites is already detectable.

- Mr. James Heggen. Shortly after DHS issued the proposed rule, an employer in Massachusetts refused to hire Mr. Heggen, a lawful permanent resident of the United States, for a permanent clerical position due to a typographical error on his Social Security card. Mr. Heggen's name appears as "Heggen" on his alien registration card or "green card," but on his Social Security card, his name is spelled "Hegen"—with one less "g." Based on this missing "g," the employer denied Mr. Heggen a permanent position, claiming that it had to be *more careful in these times.* Mr. Heggen is Black and was born in the United Kingdom. His parents immigrated to the U.K. from the Caribbean. Together, the family immigrated to the United States when Mr. Heggen was a child. Because he and his parents received their permanent immigration documents decades ago, Mr. Heggen cannot file for a correction of his Social Security card locally, and, therefore, not quickly. Correcting this minor Social Security discrepancy could take several months. Frustrated after being denied this permanent position, Mr. Heggen contacted a local community-based legal services organization for assistance. This organization immediately sent a letter to the employer, setting forth the potential illegality of the employer's actions. Subsequently, the employer hired Mr. Heggen on a temporary basis. The week of August 7, 2006, after additional consultation with the organization, the employer hired Mr. Heggen for the permanent position.[12]

Recent media accounts of the proposed rule reveal that employers are already contemplating massive no-match firings as a response to the new rule. A construction company president told the *Tampa Tribune,* after attending a seminar for employers on the proposed rule, that some of his company's workers "won't be working for us in the future" if the rule is implemented and that he had great concern about "filling those spots."[13] *The Ledger* of Lakeland, Florida, reported that while the proposed rule may lead to penalties for employers, "workers, in turn, would lose their jobs," an effect which for Florida's largest growers' organization amounts to a "threat to national security."[14] An employment attorney representing several large employers reported to the *Washington Post* that, "From a practical standpoint, [the proposed rule] will have the effect [of employers] having to terminate employees. It will be devastating to many

---

[11] *Id.*

[12] Telephone interviews with Ingrid Nava, Employment Unit, Greater Boston Legal Services, Boston, Mass., July 28, 2006, and Aug. 10, 2006.

[13] Lindsay Peterson, "Proposal Targets Illegal Immigration," *The Tampa Tribune,* June 15, 2006.

[14] Kevin Bouffard, "Proposal May Pinch Growers," *The [Lakeland, FL] Ledger,* July 11, 2006, available at http://www.theledger.com/apps/pbcs.dll/article?AID=/20060711/NEWS/607110399/1004.

industries if people comply with it."[15]  The proposed rule thus has placed the livelihoods of hundreds of thousands—possibly millions—of workers and their families on the line.

*The Proposed Rule Will Result in Increased Citizenship Status, National Origin, and Racial Discrimination*

The proposed rule creates two sets of potential employment discrimination:  discriminatory firings and discriminatory refusal to hire.  A disproportionate number of names on no-match lists are "foreign-sounding" names of newcomers to the United States, and many SSA letters are sent to employers with large numbers of newcomers in their workforces.  Employers who believe they will face business disruption due to the letters have an incentive to prefer employees they think are less likely to receive the letters.  Employers may also choose to simply dismiss employees who appear or sound foreign.  These discriminatory employment actions would run afoul of federal and state antidiscrimination laws and other worker protections and lead to costly and protracted wrongful termination litigation.

Employment discrimination against authorized noncitizen workers—particularly against Latinos, Latinas, and Asians—was rampant after the passage of the 1986 Immigration Reform and Control Act (IRCA).  A 1990 U.S. General Accounting Office (GAO) study reported a pattern of discrimination that resulted solely from employer sanctions, including discrimination on the basis of foreign accents or appearance and preferences of certain authorized workers over others.  In fact, the GAO estimated that an average of 19 percent of employers—almost one in five—participated in one or more discriminatory practices as a result of the 1986 law.  These results were confirmed by nearly a dozen studies conducted locally during the 1990s by human rights commissions and other organizations, which also found significant discrimination resulting from the implementation of employer sanctions.[16]

Employment discrimination has also increased since SSA began sending close to a million no-match letters in 2002.  The number of immigration-related unfair employment referrals and investigations fielded by OSC has risen dramatically.  From 1994 to 2000, OSC conducted only 20 investigations into firings stemming from employers that fired workers based on SSN verification matters.  From 2001 to 2003, OSC opened 29 investigations.  Three of the investigations opened after 2001 resulted in settlements favorable to workers, and ten investigations were open as of 2003.[17]  Although recent statistics are unavailable, OSC recognized in its April 2005 quarterly newsletter that OSC "staff members frequently provide assistance to workers" who face adverse employment actions by employers based on the no-match letters.[18]

---

[15] Cindy Skrycki, "DHS Wants Workers, Papers to Match," *The Washington Post,* July 11, 2006 (quoting Monte B. Lake, an employment and immigration attorney).

[16] *Immigration Reform: Employer Sanctions and the Question of Discrimination*, GGD-90-62 (GAO, Mar. 29, 1990), available at http://archive.gao.gov/d24t8/140974.pdf.

[17] Mehta, *supra* note 4, at 25.

[18] *OSC Update* (OSC, U.S. Department of Justice, Civil Rights Division, Apr. 2004) at 2.

*The Proposed Rule Will Result in Increased Employer Retaliation Against Workers Who*
*Exercise Their Workplace Rights*

The proposed rule also places all workers at a higher risk of employer retaliation for labor
organizing and raising complaints about worksite conditions. Unscrupulous employers already
use the SSA no-match letter to stymie organizing campaigns and to retaliate against workers who
have been injured on the job or complain of unpaid wages or other labor violations. In
documented cases (including arbitration decisions) from across the country, employers initially
ignored SSA no-match letters and then decided to use them as a pretext to fire workers who
participated in efforts to improve working conditions and wages. The proposed rule would only
exacerbate this problem.

- North Carolina. In July 2006, during a heated legal battle over recent union election results,
  at least 24 Latino immigrant workers at a modular building construction company were
  suspended without pay because they were listed on a no-match letter. All 24 had voted to
  unionize. Many of the 24 have also initiated race and sex-based discrimination charges
  against their employer with the EEOC. A former supervisor at the company reported to the
  press: "These workers have been used and abused. As supervisors, we were told we needed
  production and to crack the whip to get it. We were told not to worry because these workers
  are just wetbacks and have no legal rights." A large group of African American workers
  have also filed complaints against this company with the EEOC. To protest the no-match
  firings, workers walked out on the day the firings took place. The workers and their union
  are also contemplating race and sex-based discrimination class action lawsuits.[19]

- California. In 2006, after months of intensive organizing, a group of nursing home workers,
  mainly immigrant Latina workers, marched to their manager's office to announce that they
  had joined together as a union in order to improve wages and working conditions and would
  seek formal recognition for their union under federal labor law. That afternoon, a head
  manager called one of leaders of the march into the office, pulled out a photocopy of that
  worker's Social Security card, wrote "NO GOOD" in bold letters across the photocopy, and
  suspended the leader without pay. Angered by management's action, the workers from the
  morning march crowded back into the manager's office and demanded reinstatement for their
  suspended colleague, denouncing management's action as a blatant anti-union tactic. Caught
  off guard, the manager immediately reinstated the suspended union leader. While these
  workers were successful, other workers have not been able to mobilize as effectively against
  manipulation of SSN verification issues by employers.[20]

- Oregon. In 2006, a Latina immigrant worker had been working as a housekeeper at an
  assisted living center. When it came time for her to qualify for health insurance and other
  benefits, the employer produced an SSA no-match letter. The worker suspects that the

---

[19] Telephone interview with Homer Marmalejo, United Brotherhood of Carpenters and Joiners of America,
organizer, Aug. 8, 2006; *see also* Bob Shiles, "Roger Carter Suspends More Than 20 Undocumented Workers,"
*Kinston [NC] Free Press,* July 19, 2006.

[20] Interview with Guadalupe Palma, Service Employees International Union, Long Term Care Division, Coordinator
III, in Los Angeles, CA, Aug. 1, 2006.

employer had received the letter earlier, but held it just before the benefits would have kicked in.[21]

- Oregon. In 2003, an employer in Oregon approached a group of workers who had complained about violations of their minimum wage and overtime rights, alleging that it had just received an SSA no-match list. The employer was requiring the workers to reverify their immigration status, and would not provide a copy of the letter to workers. Interestingly, this was *before* SSA began sending no-match letters to employers in March 2003.[22]

- New York. In 2002, a group of immigrant workers in New York went on strike to protest against poor working conditions. After receiving a no-match letter that the employer had initially ignored, the employer decided to use the no-match letter as a basis to reverify the immigration status of workers involved in the strike.[23]

If immigrant workers cannot enforce labor laws or organize under existing labor laws, it is less likely that native workers can assert these rights. The proposed rule thus poses enormous challenges for all low-wage workers. All workers face an increased risk of firings, retaliation, and abuse. U.S. citizens and authorized noncitizen workers could lose their jobs in discriminatory firings. Hundreds of thousands—possibly millions—of working families could be harmed, and therefore DHS should suspend this proposed rule immediately.

**Although the Proposed Rule Will Cause Enormous Upheavals in the Workplace, the Rule Has *No* Impact on Undocumented Immigration and Will Only Expand the Unregulated Underground Cash Economy**

Our experience with SSA no-match firings and workplace audits in the context of our current broken immigration system is clear: *the fired workers will not leave the country*. They will simply find other more marginal jobs, most likely outside of the traditional economy and "off the books" in the unregulated underground cash economy. Moreover, although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new obligations will increase pressure on "good" employers to take employees off the books, which also leads to growth of the underground economy. Expansion of the underground economy results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers. This result is nearly inevitable for any "crackdown" on workers and employers that is not accompanied by serious and practical reforms of the underlying immigration system.

*No-Match Firings Will Not Decrease the Number of Undocumented Workers in the United States*

Based on our recent experience under the current broken immigration system, high levels of SSA no-match firings will *not* drive undocumented workers and their families away from the United

---

[21] Brent Hunsberger, "Crackdown Coming on Bogus Papers," *The Oregonian,* June 25, 2006.
[22] NILC Brief, *supra* note 4, at 5.
[23] *Id.* at 4.

**No-Match Cert. Admin. Record  1220**

States. Instead, these workers immediately accept the next available low-wage job, even if it is off the books, out of sheer economic necessity, given the levels of poverty at which they and their families and communities must survive.[24] When poverty is combined with an employer demand for below-market wage rates and an absence of government enforcement of labor protections in low-wage industries, undocumented workers will almost certainly remain in the United States even after a no-match firing. The vast majority will reenter the labor force in unreported, cash-based employment relationships where they face further exploitation and abuse. Economists describe this effect as "churning" or unproductive turnover.[25] The SSA no-match program has been criticized for creating "policy-induced churning in local labor markets as workers are either fired or quit their jobs only to join the overcrowded pool of workers vying for positions in traditional immigrant occupations."[26] Fired workers do *not* simply leave the United States.

Undocumented workers constitute a large and growing segment of the workforce in the nation as a whole. The share of these workers in industries such as agriculture, cleaning, construction, food service, and other low-wage occupations is approximately three times the share of native workers in these types of jobs.[27] On any given day in our nation, more than 250,000 undocumented immigrants work as janitors, 350,000 work as housekeepers and maids, and 300,000 are groundskeepers.[28] In the aggregate, such workers are an integral part of the U.S. economy, constituting a full 5 percent of the civilian labor force or 7.2 million workers.[29]

Unscrupulous employers have long taken advantage of the availability and reduced cost of undocumented immigrant labor in both the traditional economy and in the underground economy. Undocumented workers are more likely to earn below minimum wage (two-thirds of undocumented workers earn below minimum wage compared to one-third of all workers).[30] IRCA's failed employer sanctions regime, along with the lack of government enforcement of labor protections in low-wage industries, has given free rein to unscrupulous employers. Such

---

[24] It has been estimated that nearly half of all immigrant workers are low-income, defined as earning less than 200 percent of the minimum wage. Randy Capps, et al., *A Profile of the Low-Wage Immigrant Workforce* (The Urban Institute, Nov. 2003) at 2, available at http://www.urban.org/UploadedPDF/310880_lowwage_immig_wkfc.pdf. Fifty-six percent of all young children of immigrants live in poverty; sixty-four percent of foreign-born children of immigrants live in low-income families. In immigrant families where both parents work, 24 percent of children live in poverty compared to 11 percent of the children of native workers. Randy Capps, et. al, *Health and Well-Being of Young Children of Immigrants* (The Urban Institute, Feb. 2005) at 2, available at http://www.urban.org/UploadedPDF/311182_immigrant_families_5.pdf.

[25] *See* Avner Ahituv and Robert I. Lerman, *Job Turnover, Wage Rates, and Marital Stability: How Are They Related?* (The Urban Institute, Nov. 2004) at 5, available at http://www.urban.org/publications/411148.html (distinguishing "churning" and unproductive turnover from worker mobility).

[26] Mehta, *supra* note 4, at 18.

[27] Jeffrey S. Passel, *Unauthorized Migrants: Numbers and Characteristics: Basic Briefing Prepared for Task Force on Immigration and America's Future* (Pew Hispanic Center, June 2005) at 26–28, available at http://pewhispanic.org/reports/report.php?ReportID=46.

[28] Jeffrey S. Passel, *Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Pew Hispanic Center, Mar. 2006) at 11–12 (hereinafter "Passel"), available at http://pewhispanic.org/files/reports/61.pdf.

[29] *Id.* at 9.

[30] Jeffrey S. Passel, et al., *Undocumented Immigrants: Facts and Figures* (The Urban Institute, Jan. 2004) at 2, available at http://www.urban.org/url.cfm?ID=1000587.

employers routinely manipulate immigration law into a tool that sharpens wage differentials between undocumented and documented low-wage workers and suppresses wages for all. Even legitimate employers have admitted to the temptation to engage in similar practices or risk going out of business.[31] In recent years, Department of Justice (DOJ) and DHS officials have finally begun to recognize these wage differentials and the harm caused by an economic system that produces lower wages based on differences in immigration status.[32]

Increasingly, there is evidence demonstrating that raising the wages and working conditions of low-wage workers will actually reduce undocumented immigration by making the existing workforce relatively more attractive to employers.[33] Closing the wage differentials between differently work-authorized individuals and ensuring that all low-wage workers—current and future, documented and undocumented—have similar levels of mobility and enjoy full labor protections are the more effective ways to prevent undocumented immigration to the United States and to hold exploitative corporations accountable. A structural demand for undocumented labor can be reduced only by building a strong floor underneath all workers.

Poorly-conceived, punitive enforcement-only schemes like the proposed rule will force millions into the underground economy. The proposed rule will not decrease the numbers of undocumented workers in the United States, nor will it decrease their levels of employment. It will only decrease wage levels and deepen wage differentials based on immigration status, creating even more economic incentive for employers to hire undocumented workers. Accordingly, DHS should suspend this proposed rule and work with Congress and the Administration to pass comprehensive immigration reform that will address the underlying issue of undocumented migration.

*The Imposition of New Legal Obligations on Millions of Employers Will Push Them into the Underground Economy*

Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new and onerous set of legal obligations on millions of employers. The rule essentially deputizes employers as *de facto* immigration enforcement officers.

The proposed example of what constitutes "constructive knowledge," at Section 274a.1(l)(1)(iii)(B) of the proposed rule, is not the employer's *receipt* of a no-match letter, but

---

[31] K. M. Donato, et al., "Stemming the Tide? Assessing the Deterrent Effects of the Immigration Reform and Control Act," *Demography* 29 (2005) at 139–58.

[32] In the prosecution of Tyson Foods for the hiring of undocumented workers, assistant U.S. Attorney John P. MacCoon stated: "This trial is about corporate greed. . . . It's about what happens when a corrupt corporate culture makes the bottom line the all-consuming priority." Sherri Day, "Prosecutors in Smuggling Case against Tyson Contend Trial Is about Corporate Greed," *The New York Times*, Feb. 6, 2003. In the Tyson Foods case, the government hinged its $140 million pre-indictment settlement demand against defendant Tyson Foods on a novel "wage suppression" theory. The government claimed that Tyson Foods had reaped enormous profits by recruiting undocumented workers into its ranks and paying them at below-market wage rates. In his authorization of trial for the case, DHS Secretary Chertoff fully endorsed the DOJ's attempts to recover "suppressed wages." Thomas Green, et al., "Deputizing—and Then Prosecuting—America's Businesses in the Fight against Illegal Immigration," *Amer. Crim. L. R.*, June 22, 2006, at 5, 7.

[33] Ivan Light, "How L.A. Kept Out a Million Migrants," *The Los Angeles Times*, Apr. 16, 2006.

No-Match Cert. Admin. Record  1222

the employer's *failure to act* after receiving a no-match letter. By defining the "failure to take reasonable steps" upon receipt of a no-match letter as creating constructive knowledge, the proposed regulation makes it necessary for a law-abiding employer to take some action in response to a no-match letter. Therefore, as set forth in Sections 274a.1(l)(2)(i) and 274a.1(1)(2)(iii) of the proposed rule, an employer who receives a no-match letter is essentially forced to apply due diligence to a series of complicated steps that demonstrate correction of each "no-match" discrepancy. If the employer fails to resolve the correction in the allotted time, the employer faces a finding that it had constructive knowledge of hiring an undocumented worker. This finding could be used against the employer in a federal prosecution that could result in civil and criminal penalties. This is a radical change from the longstanding position that the various federal agencies implicated in this SSA no-match issue have taken.

Employers who wish to avoid loss of profits and productivity while minimizing exposure to the heightened risk of federal immigration liability under the proposed rule will be forced into one of three no-match evasion strategies:

First, employers will take their businesses off the books and into the underground economy. For one thing, keeping workers off the books means avoiding government scrutiny and additional no-match letters. For another, there are immediate financial incentives for employers to keep workers off the books. The proposed rule thus has a perverse effect of targeting and punishing "good" employers who keep good records and want to stay on the books. These good employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records and who consequently will not be reached by the new rule.

Second, employers will intentionally misclassify their employees as "independent contractors" as a means of evading this responsibility.

Finally, employers will engage in subcontracting schemes by interposing intermediary labor contractors between themselves and their employees, pretending their workers are employees of these sham contractors and exposing workers to marginal, fly-by-night employment practices by middlemen.

*Growth of the Underground Economy Results in Massive Losses to State and Federal Coffers and Unfair Competition*

A policy that results in more employers choosing to keep their employees off the books or intentionally misclassifying employees is harmful to state and federal government coffers and creates unfair competition against "good" employers. Certain employers will see a clear and immediate economic advantage to taking their employees off the books. At a minimum, they will reduce their payroll costs by an average of 8 percent by ceasing to pay costs for federal legally required benefits, including Social Security, Medicare, unemployment insurance and workers' compensation.[34] For employers who, as a policy or due to a collective bargaining agreement, provide other benefits, such as life, health or disability insurance, paid leave, or retirement and savings benefits, the potential total savings could add up to an average of 29.9

---

[34] *Employer Costs for Employee Compensation* (U.S. Department of Labor Bureau of Labor Statistics, Mar. 2006), available at http://www.bls.gov/news.release/ecec.nr0.htm.

percent of total payroll costs.[35]  This means massive losses to state and federal coffers and a competitive advantage over employers who are not cutting these costs.

The projected loss in federal tax revenues ranges from $19 million to $1.9 billion annually.  This range is derived from the following figures:  In June 2006, the total U.S. labor force was estimated at 144.4 million workers.[36]  As set forth above, about 7.2 million undocumented workers were employed in March 2006, accounting for a full 5 percent of the civilian labor force.[37]  International accounting and consulting firm Price Waterhouse Coopers has projected that over 5 million U.S. workers would be misclassified as independent contractors (to avoid paying legally required benefits) in 2005 and that the federal tax revenue losses due to misclassification in 2004 would be $4.7 billion.[38]

Based on this projection and these worker population estimates, if only one-third of all undocumented workers or at least two million workers, or 1.4 percent of all U.S. workers, were to be pushed off the books as a result of the proposed regulation, the loss to federal coffers would be approximately $1.9 billion in one year.  Alternatively, making a conservative assumption that 100,000 workers are pushed off the books as a result of the proposed regulation, the loss to federal coffers would be approximately $19 million annually.

The losses to the Unemployment Insurance (UI) trust fund alone ranges from $277 million to $13.8 million per year.  This range is derived from the following figures:  A study for the U.S. Department of Labor estimating the impact of employee misclassification on the UI trust fund alone was computed for the period from 1990–1998.[39]  Assuming a 1 percent level of misclassification, the study determined that the loss would be an annual average of $198 million to the UI trust fund alone.

Based on this study for the DOL, assuming that at least 2 million workers were to be pushed off the books as a result of the proposed regulation, the impact on the UI trust fund alone would be an average of over $277 million annually.  Alternatively, assuming that only 100,000 workers, or .07 percent of the workforce, are pushed off the books (the estimated number that lost their jobs due to no-match letters in 2002), the impact on the UI trust fund alone would be $13.8 million per year.

Employers who go off the books will experience an enormous net savings in taxes, which will create a competitive advantage for them over employers whose payroll-related expenses are

---

[35] *Id.*

[36] *Employment Situation Summary* (U.S. Department of Labor Bureau of Labor Statistics, July 2006), available at http://www.bls.gov/news.release/empsit.nr0.htm.

[37] Passel, *supra* note 28, at 11–12.

[38] *Projection of the Loss in Federal Tax Revenues Due to Misclassification of Workers* (Coopers and Lybrand, now Price Waterhouse Coopers, for Coalition for Fair Worker Classification, June 1994) at 5, available at http://www.carpenters.org/misclassification/State and Other Research Studies/Coopers-Lybrand--Projection of Loss of Federal Rev Due to Missclassification.pdf.

[39] *Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs* (Planmatics, Inc. for U.S. Department of Labor Employment and Training Administration, Feb. 2000) at 87, available at http://wdr.doleta.gov/owsdrr/00-5/00-5.pdf.

No-Match Cert. Admin. Record  1224

higher because they are playing by the rules. A report prepared for the U.S. Department of Labor observed: "[C]ost considerations and aggressive competition are twin pressures that induce an employer to engage in behavior that creates an inequitable playing field in the business community for employers who correctly classify their employees and pay taxes."[40]

The State of California even developed a joint-agency strike force to address abuses created in the underground economy. This strike force has observed the impact of this employer behavior on "good" employers: "[W]hen businesses operate in the underground economy, they gain an unfair competitive advantage over businesses that comply with various business laws. This causes unfair competition in the marketplace and forces law-abiding businesses to pay higher taxes and expenses."[41] When the desire to avoid government scrutiny is combined with the immediate economic savings from avoiding payment of taxes and employer-provided benefits, some employers will see a clear competitive advantage in taking their workforce underground. The implementation of this proposed rule thus disadvantages those employers who play by the rules.

**DHS Should Suspend The Proposed Rule Because the SSA No-Match Program Is Ill-Suited As an Immigration Enforcement Tool**

*The SSA No-Match Program Cannot Meet the Needs and Objectives of Immigration Enforcement Because the SSA Database Is Not an Immigration Database*

Each year employers send IRS Forms W-2 to SSA indicating their employees' annual earnings. SSA matches each worker's name and SSN to the Numerical Identification File (NUMIDENT), which is SSA's primary database of SSN holders.[42]

NUMIDENT is *not* an immigration database and is made up of information collected from applications for initial or replacement SSNs.[43] The database contains only limited and incomplete immigration information.[44]

---

[40] *Id.*

[41] *2003 Annual Report: California Joint Enforcement Strike Force on the Underground Economy* (Employment Development Department, State of California, June 30, 2004) at 3, available at http://www.edd.ca.gov/taxrep/txueo03.pdf; *see also* Francois Carerre, et al., *The Social and Economic Costs of Employee Misclassification in Construction* (Construction Policy Research Center at Harvard Law School and Harvard School of Public Health, Dec. 2004), at 7 (noting that "[m]isclassification creates challenges for compliant employers because it creates an uneven 'playing field.' Employers who respect the law and classify employees appropriately have a higher wage bill and can get underbid by contractors that do not comply and have lower costs.").

[42] *Report to Congress on the Basic Pilot Program* (U.S. Citizenship and Immigration Services, June 2004) (hereinafter "USCIS Report") at 2.

[43] Kevin Jernigan, "Eligible to Work? Experiments in Verifying Work Authorization," *Migration Policy Institute Insight,* Nov. 2005 (hereinafter "Jernigan") at 3.

[44] The database "contains information on name, date of birth, and citizenship status of persons issued Social Security cards, which enables SSA to confirm work authorization for U.S. citizens and some noncitizens who are permanently work authorized." USCIS Report, *supra* note 42, at 2. SSA collects immigration status information only on those persons who are work-authorized incident to status, such as lawful permanent residents, asylees, and refugees. *Id.* at 4.

**No-Match Cert. Admin. Record  1225**

Even the limited immigration status information in NUMIDENT regularly becomes inaccurate because it is *not* automatically updated when a worker's immigration status or work authorization changes.[45]  NUMIDENT is particularly inaccurate with respect to work-authorized noncitizens in its use with the Basic Pilot Program.  According to U.S. Citizenship and Immigration Services (USCIS), work authorization for more than 50 percent of the cases of noncitizens could not be electronically confirmed by NUMIDENT, compared with 0.2 percent for native-born citizens.[46]

If there is a match of the SSN and the first seven letters of the surname between NUMIDENT and the W-2, the earnings are posted to the individual worker's Master Earnings Record.  About 10 percent of submissions *cannot* be matched.  SSA then does more than 20 "front-end validation routines," which are automated processes that manipulate names and SSNs to correct mistakes and find a correct match.[47]  These "front-end validations" do *not* involve collection or use of immigration data.

If a valid record cannot be identified, SSA posts the earnings to its Earnings Suspense File (ESF).  The ESF contains earnings reports with names and SSNs that do not match SSA records.  SSA then performs "back-end" processes to try to match the earnings.  SSA's "back-end" processes do not involve collection or use of immigration data.

The SSA back-end processes include using corrections generated through IRS processes.  The back-end processes also include generating SSA no-match letters to employees and employers.[48]  No-match letters are just one of the "back-end" processes that SSA regularly uses to ensure that earnings are properly attributed to workers.  These letters are sent by SSA to inform employers and employees that the worker is not getting proper credit for their earnings due to a discrepancy.

*Immigration Status or Lack of Immigration Status Cannot Be Presumed from Posting to the ESF*

The ESF contains hundreds of millions of records, and a "significant number of earnings reports in the ESF still belong to U.S. citizens and work-authorized noncitizens."[49]  The percentage of ESF records belonging to unauthorized workers is entirely unknown.  The majority of reinstatements (matching to a worker's Master Earnings Record) are still made to U.S.-born citizens.[50]  ESF records do not in any way indicate immigration status.  The information in ESF

---

[44] The SSN application form itself focuses on noncitizens' work authorization rather than immigration status.  *See* Form SS-5 (May 2005), available at http://www.ssa.gov/online/ss-5.pdf.

[45] Jernigan, *supra* note 43, at 12.

[46] USCIS Report, *supra* note 42, at 4–5.

[47] *Social Security, Better Coordination Among Federal Agencies Could Reduce Unidentified Earnings Reports*, GAO-05-154 (GAO, Feb. 2005) (hereinafter "GAO Feb. 2005") at 7–8.

[48] *Id.*

[49] *Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work*, GAO-06-814R (GAO, July 11, 2006) (hereinafter "GAO July 2006") at 8.

[50] *Id.; see also* GAO Feb. 2005, *supra* note 47, at 18.

No-Match Cert. Admin. Record  1226

consists of the worker's name, SSN, employer's identification number, and the earnings amount.[51]

The ESF simply consists of information on workers whose records do not match SSA records, for reasons that include errors or obsolete data, lack of an SSN, missing first or last names, or use of nonalphabetic characters.[52] The lack of an SSN is a particularly instructive example of an innocent basis for inclusion in the ESF that is frequently and wrongly cited as a basis for determining lack of work authorization. Both the SSA and the IRS advise employers to use all zeros or to write in "*applied for*" when the worker has applied for but not yet received an SSN.[53]

SSA no-match letters are therefore *not* reliable indicators of work authorization or immigration status. There is no way to accurately determine whether a SSA no-match letter is the result of typographical error, out-of-date information, or some other legitimate reason, let alone to determine an illegitimate reason.[54] The SSA itself has repeatedly recognized that its no-match letter does not indicate immigration status or lack of authorization to work. The current no-match letter explicitly states that a worker's identification in the letter "makes no statement" about his or her immigration status.[55] The SSA database simply does not have the capacity to meet the needs and objectives of an immigration enforcement program. Because of these limitations, this proposal will only result in an adverse impact on workers and our economy, including the increased discrimination and abuse of workers described above. DHS should therefore suspend this rule.

**The Rule Modification Would Give DHS Indirect Access to Tax Information It Cannot Access Directly**

DHS should also suspend this proposed rule because it attempts to indirectly access sensitive tax information that is protected by federal law. Specifically, Section 6103 of the Internal Revenue Code protects the confidentiality of taxpayer returns and taxpayer information and provides only limited exceptions to the sharing of personal identifying data. This confidentiality is deemed essential to voluntary tax compliance. The GAO has explicitly recognized that the ESF includes "sensitive taxpayer information that is protected by various laws and regulations" and that statutory authority would be required to provide DHS access.[56]

---

[51] GAO July 2006, *supra* note 49, at 8.

[52] *Id.; see also* GAO Feb. 2005, *supra* note 47, at 11–12.

[53] GAO Feb. 2005, *supra* note 47, at 11, n. 4.

[54] In testimony last month before the House Committee on Ways and Means, the Commissioner of Social Security emphasized that the source of SSA's database information is the Form W-2, and "there is no citizenship or immigration status information on that document." *See* Statement of The Honorable Jo Anne B. Barnhart, Commissioner, Social Security Administration, *Testimony Before the House Committee on Ways and Means* (July 26, 2006), available at http://waysandmeans.house.gov/hearings.asp?formmode=view&id=5172.

[55] Letter, Hurt, Assoc. Comm. for Central Op. SSA (Oct. 9, 2004) (hereinafter "Hurt Letter").

[56] GAO July 2006, *supra* note 49, at 8.

No-Match Cert. Admin. Record  1227

No statutory authority currently exists to provide DHS with access to this information.[57]  As a result, DHS cannot presently obtain no-match information directly from SSA.

SSA no-match letters to employers frequently include taxpayer identity and return information. This rule allows DHS to commandeer the information contained in no-match letters and therefore allows DHS to circumvent the tax code's confidentiality restrictions.  DHS should not be permitted to do by rule change what it cannot do without additional statutory authority.

Breaching the confidentiality of tax records would have the counterproductive result of discouraging tax compliance.  Moreover, it would encourage employers and workers alike to enter the underground economy and not pay into our tax and Social Security systems.

**The Proposed Rule Dramatically Alters the Definition of "Constructive Knowledge" and Makes a Stark Departure from Existing Case Law and Longstanding Federal Guidance on No-Match Letters**

As an evidentiary matter, an employer's receipt of an SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law.  The proposed rule alters the definition of constructive knowledge and makes a stark departure from existing case law and longstanding federal guidance in this area.

In the seminal *Collins Food Intn'l v. I.N.S* case, the Ninth Circuit cautioned against the expansion of the doctrine of constructive knowledge: "IRCA . . . is delicately balanced to serve the goal of preventing unauthorized alien employment while avoiding discrimination against citizens and authorized aliens.  The doctrine of constructive knowledge has great potential to upset that balance, and it should not be expansively applied."  948 F.2d 549, 554-555 (9th Cir. 1991).

Accordingly, the court instructed that "[a] finding of constructive knowledge requires "willful blindness" and "to expand the concept of constructive knowledge . . . would not serve the intent of Congress, and is certainly not required by [IRCA]." *Id.* at 555.

Contrary to DHS's assertions in the supplemental text, the proposed regulation would extend the definition of "constructive knowledge" well beyond the holdings in *Collins* and in *Mester Manufacturing Co. v. INS*, 879 F.2d 561 (9th Cir. 1989), and other constructive knowledge cases arising under the employer sanctions provision of the Immigration and Nationality Act, 8 U.S.C. § 1324a.

Indeed, the supplemental text misrepresents *Mester* by stating that the employer in that case merely received some evidence that the employee was not authorized to work.  This is simply incorrect, and significantly downplays the type of information received by the employer, and relied upon by the court in its decision.  In *Mester*, the court held that an employer had constructive knowledge of a worker's unlawful status when it received information directly *from*

---

[57] In contrast, such authority exists with respect to the Nonwork Alien File, which includes information about workers who are working though they have been issued nonwork SSNs.

*the INS* that an employee was an "illegal alien" but did not terminate the employee for two weeks. *Id.* at 567–68.

Consistent with *Mester*, cases have found constructive knowledge only where the employer has been provided specific information from a source knowledgeable about a worker's immigration status, where the employer failed to complete the Form I-9 (coupled with other suspicious circumstances), or in egregious circumstances. *See U.S. v. Jonel, Inc.* 1998 WL 804705 (OCAHO), *14 (Labor Department notice to employer that workers were unauthorized constituted constructive knowledge); *New El Ray Sausage Co. v. I.N.S.,* 925 F.2d 1153, 1157 (9th Cir. 1991) (INS gave employer "specific and detailed information" that it was employing undocumented workers); *U.S. v. American McNair,* 1 OCAHO 285 (1991) (employee failure to present any work authorization documents and notification of employer that he was ineligible for amnesty constituted constructive knowledge); *U.S. v. Fragale,* 1999 U.S. Dist. LEXIS 12616 (E.D. Pa. 1999) (constructive knowledge when human resources manager and foreperson in charge of hiring told employer that a large percentage of workforce was undocumented, and employer had received notice from INS that some workers were undocumented).

Moreover, in its attempt to convert the SSA no-match letter into a method of verifying immigration status or authorization to work, the proposed rule directly contravenes longstanding federal guidance from SSA, OSC, and former INS General Counsel.

SSA's position on no-match letters and immigration enforcement is set forth in clear terms on the face of the letter itself. The letter provides the following warning to employers:

> IMPORTANT: This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number. Nor does it make a statement about an employee's immigration status.[58]

For years, INS General Counsel has instructed employers along identical lines:

> If the document or documents presented to verify work authorization appear on their face to be genuine and to reasonably relate to the individual, the subsequent receipt of the SSA letter mentioned above does *not* impose any affirmative duty upon the employer to investigate further into an employee's eligibility to work in the United States. In addition, the receipt of this SSA letter by the employer, *without more*, would *not* be sufficient to establish constructive knowledge on the part of the employer regarding the employment eligibility of the named employee.[59]

---

[58] Hurt Letter, *supra* note 55.

[59] Letter, Virtue, Acting Gen. Coun. INS, HQ 274A (Feb. 17, 1994) (emphasis added); for reference, the LWIW Coalition has attached this letter as Exhibit 1 to this comment.

OSC has also provided similar guidance:

> The receipt of a no-match letter, standing alone, does not indicate to an employer that he or she need question the genuineness of documents or information previously presented to complete an INS Form I-9.[60]

This proposed regulation thus turns established federal guidance on no-match letters on its head. At the very least, the proposal will result in conflicting guidance from multiple federal agencies and cause employer and employee confusion.

**The Costs of Implementing the Proposed Rule are Prohibitive**

If the proposed rule is to be carried out as envisioned, the government will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. Employer confusion is already evident from high number of questions submitted employers in their comments opposing the rule. In particular, many employers have submitted questions regarding the rule's unrealistic and unreasonable timetables for compliance.

Therefore, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA ultimately has to respond to the inevitable increase in employer (and employee) inquiries about this confusing rule. The actual costs of the current SSA no-match letter program are already substantial.[61] The actual costs of administrating a new program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law.

**The Procedure to be Followed Under the Proposed Rule When an Employer Receives Notice from DHS Denies Employees Due Process of Law**

Section 274a.1(l)(1)(iii)(C) of the proposed rule includes the following as a circumstance that would amount to constructive knowledge where the employer "[f]ails to take reasonable steps after receiving information indicating that the employee may be an alien who is not employment authorized, such as . . . [w]ritten notice from the Department of Homeland Security that the immigration status document or employment authorization document presented or referenced by the employee in completing Form I-9 was assigned to another person, or that there is no agency record that the document was assigned to any person."

---

[60] Letter, Sarah DeCosse, Sr. Tr. Atty OSC (Apr. 1, 2004).

[61] See Mehta, *supra* note 4, at 7, n. 2 (noting that SSA's current attempts to reduce the ESF through no-match letters have cost U.S. taxpayers the following amounts: "$5.4 million to send notices to every individual whose name and SSN do not match SSA's records; $600,000 to send 944,000 notices to all employers who submitted wage reports with at least one item posted to the ESF; more than $200,000 for system maintenance and cyclical changes; and an average of $9.00 for each call to SSA's national toll free telephone number generated by the notices. SSA estimates that the agency received about 100,000 inquiries throughout 2002 regarding the TY 2001 letter.").

No-Match Cert. Admin. Record  1230

Under Section 274a.1(l)(2)(iii), an employer who receives such a notice will not be deemed to have constructive knowledge of the employee's unauthorized status if the employer takes reasonable steps to resolve the question raised by DHS and, if the employer does not verify with DHS that the document was assigned to the employee, the employer completes a new I-9. The employee cannot use the alien registration number, or "A-number," that is the subject of the written notice from DHS.

While this procedure may protect the employer, it entirely leaves out any possibility for the *employee* to have access to his or her DHS immigration file and any opportunity to correct errors in the file that would lead to DHS providing erroneous information to the employer. This access and an assured opportunity to correct errors in immigration records are critical because immigrants do not have easy, automatic, timely access to their immigration records, and immigration records are error-prone.

For years, government agencies have criticized the quality and accuracy of immigration records.[62] Problems with immigration records have continued even after the dissolution of the INS and the creation of new immigration agencies in DHS. The information technology environment at USCIS has been criticized as inefficient, and USCIS continues to rely on manual and paper-based processes.[63] As an example of how DHS records and processes go awry, in December 2005 DHS had to "recall more than 60,000 green cards because a computer glitch miscalculated immigrants' residency start dates."[64] USCIS sent letters instructing immigrants to mail their cards back. Unfortunately, USCIS sent the letters to many immigrants whose green card "resident since" dates were actually correct. USCIS then advised community-based organizations working with immigrants that its information technology staff was working to determine who received the mailing in error and that USCIS intended to send out a second letter to all individuals who received the initial letter in error.

Moreover, under current law, immigrants have access to their immigration files (both "alien files" and Border Patrol requests) only by filing Freedom of Information Act (FOIA) requests. FOIA requests for files must be made in writing and mailed to a central location, at the National Records Center in Missouri.[65] This means that immigrants who need access to their files to determine the nature of the erroneous information and then to correct this information as envisioned under Section 274a.1(l)(iii)(C) of the proposed rule are dependent on FOIA procedures which are not designed for this purpose. The lengthy and unpredictable timetables and cumbersome process for the FOIA process make it difficult for immigrants to both obtain their files and then correct mistaken information within Section 274a.1(2)(ii)'s compliance period.

The proposed rule thus raises critical due process concerns for immigrants. It fails to guarantee adequate access and an assured opportunity to immigrants who wish to correct errors in their

---

[62] *INS Data: The Track Record* (NILC, 2003), available at http://www.nilc.org/immlawpolicy/misc/INS data accuracy.pdf.

[63] *USCIS Faces Challenges in Modernizing Information Technology,* OIG-04-41 (DHS, Office of Inspector General, Sept. 2005), available at http://www.dhs.gov/interweb/assetlibrary/OIG_05-41_Sep05.pdf.

[64] Solomon Moore, "Green Cards Recalled Because of Glitch," *The Los Angeles Times,* Dec. 6, 2005.

[65] *See* USCIS, *Freedom of Information and Privacy Acts,* http://www.uscis.gov/graphics/aboutus/foia/index.htm.

No-Match Cert. Admin. Record  1231

immigration records. It creates penalties for employees when their immigration status or documents cannot be confirmed. It does not, however, set any time period for DHS to respond to immigrants' requests to review their files, nor does it place any obligation on DHS to correct immigrants' records in a timely fashion.

### The Proposed Rule May Exceed DHS's Authority

*DHS May Not Have Authority to Restrict the List of Acceptable Documents for the Reverification Process*

The proposed rule would create an exception to the list of documents that can be used to reverify the worker's employment authorization and identification as part of the I-9 requirement. But it appears that DHS may lack the ability to impose such restrictions. According to the INA, only the Attorney General has authority to promulgate regulations restricting the list of acceptable documents. 8 U.S.C. § 1324a(b)(1)(E). According to the statute, the Attorney General may only restrict the list of acceptable documents if he "finds, by regulation that any [of the listed documents] does not reliably establish [employment] authorization or identity or is being used fraudulently to an unacceptable degree." *Id.* Importantly, this power of the Attorney General was not transferred to the DHS upon its creation and the dissolution of the former Immigration and Nationality Service. 8 U.S.C. § 1103(a) (transferring powers under the INA to the Secretary of the DHS, *except* those that "relate to the powers, functions, and duties conferred upon" "the Attorney General," among others) (emphasis added). There is no indication in 8 U.S.C. § 1324a(b)(1)(E) and accompanying notes that the provision was ever amended to transfer the AG's authority to promulgate regulations to the DHS.

Despite this express statutory rule exclusively vesting the ability to restrict the congressionally approved list of I-9 documents to the Attorney General, Section 274a.1(l)(2)(iii) of the proposed rule would give DHS the power to restrict which documents are acceptable in the reverification process. According to that section, only documents bearing a photograph and *not* containing the SSN that triggered the no-match letter will satisfy the reverification requirement under the I-9 process. *Id.* Under current law, however, documents lacking photographs and those that include Social Security numbers are acceptable—even if the SSN triggers a no-match letter. 8 U.S.C. § 1324a(b)(1)(C), (D). Therefore, the proposed rule may inappropriately usurp the Attorney General's exclusive power to alter the congressionally created list of approved documents for reverification of a worker's status under the I-9 process and should be rejected.[66]

### RECOMMENDATION

In sum, we strongly oppose the Department of Homeland Security's proposed regulation. DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of workers in an isolated, punitive immigration "enforcement" scheme on the eve of enactment of *comprehensive immigration reform*. Although the rule will cause enormous upheavals in the workplace, the rule will have *no* impact on undocumented migration, which is the purported purpose of this

---

[66] The proposed rule may also violate INA Section 274A(d)(3), which requires notice by the President to the House and Senate Judiciary Committees before changes are made to the employment eligibility verification system. We do not know whether the President has provided such notice to the appropriate committees.

proposal. Our experience with no-match firings and workplace audits is very clear: *the fired workers will not leave the United States.* In the absence of comprehensive immigration reform that addresses the root causes of undocumented migration, they will simply find other more marginal jobs, most likely in the underground economy. Because of this, the proposed rule will result in growth of the underground economy, which results in substantial losses in state and federal tax revenues as well as unfair competition. The proposed rule is simply the wrong rule at the wrong time. It provides no solution to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by workers, taxpayers, and businesses. For all these reasons, we recommend that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,

**The Low-Wage Immigrant Worker (LWIW) Coalition**

**Co-Convened By:**

American Federation of Labor – Congress of Industrial Organizations (AFL-CIO)
Change to Win (CtW)
Interfaith Worker Justice (IWJ)
Jobs with Justice
National Council of La Raza (NCLR)
National Day Laborer Organizing Network (NDLON)
National Employment Law Project (NELP)
National Immigration Law Center (NILC)

**Contact:**


Marielena Hincapié, Esq.
Director of Programs
National Immigration Law Center
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA  90010
Phone: 213-639-3900
Fax: 213-639-3911
www.nilc.org

# EXHIBIT 1

### To DHS Docket No. ICEB-2006-0004:
### Comment Regarding "Safe Harbor Procedures for
### Employers Who Receive a No-Match Letter"

### Submitted by:
**The Low-Wage Immigrant Worker (LWIW) Coalition**

### Date:
**Monday, August 14, 2006**

Immigration and Naturalization Service

HQ 274A

Office of the General Counsel                425 Eye Street N.W.
                                             Washington, D.C. 20536

FEB 1 7 1994

Mr. Carl G. Borden
California Farm Bureau Federation
Office of the General Counsel
1601 Exposition Boulevard, FB3
Sacramento, CA 95815-5318

Dear Mr. Borden:

This letter is in response to your correspondence dated August
11, 1993, concerning the receipt of a letter from the Social
Security Administration (SSA). The SSA letter in question
informs an employer that the social security number of an
employee does not agree with SSA records. Specifically, you ask
whether an employer who receives this letter from SSA can
continue to rely on the employment eligibility documents
presented by that employee, assuming the documents appear on
their face to be genuine and to relate to the employee?

If the document or documents presented to verify work
authorization appear on their face to be genuine and to
reasonably relate to the individual, the subsequent receipt of
the SSA letter mentioned above does not impose any affirmative
duty upon the employer to investigate further into an employee's
eligibility to work in the United States. In addition, the
receipt of this SSA letter by an employer, without more, would
not be sufficient to establish constructive knowledge on the part
of the employer regarding the employment eligibility of the named
employee. As you correctly note in your correspondence, this
letter from SSA could be prompted by a number of different
reasons having nothing to do with an employee's eligibility to
work in the United States.

The answer provided above specifically applies to a situation
where the employer receives such a letter from SSA and the
employer has no additional evidence that an employee may not be
work authorized. It should be noted, however, that if an employer
receives notice from the Immigration and Naturalization Service
(INS) that a social security card or other document presented to
establish work authorization is not valid, the employer does have
a duty to inquire further to ensure that the individual is
authorized to work in the United States before the employer can
continue to employ that individual. In addition, while an
employer has no affirmative duty to inquire into an employee's

employment eligibility based solely upon receipt of a letter from
SSA, if for some reason the employer discovers evidence that an
employee may not be authorized to work in the United States, the
employer must inquire further to verify the employment
eligibility of that employee.   If the employer is unable to
verify work authorization, the employer cannot continue to employ
that individual.

It should be noted that telephonic inquiries from employers
regarding the employment authorization of employees will not be
honored by INS.[1]  However, if an employer suspects fraud, as it
relates to INS documents, the employer may ask INS to physically
examine the documents.

I hope that the above information is helpful to you.  If you have
any further questions, please contact Michael C. McGoings,
Associate General Counsel at (202) 514-2895.

Sincerely,


*Michael J. Creppy*
for Paul W. Virtue
Acting General Counsel

---

    [1]  (The only exception is where the written consent of that
individual has been obtained.)   See Salinas-Pena v. INS, No. 86-
1033-DA (D.Oregon, March 16, 1988).

- 2 -

No-Match Cert. Admin. Record 1236