

A D V A N C I N G    E Q U A L I T Y

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave., NW, 2nd Floor
Washington, D.C. 20529

***Re:***    ***DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"***

Dear Sir or Madam:

The Asian American Justice Center (AAJC) and its affiliates – the Asian American Institute (Chicago), Asian Law Caucus (San Francisco), and the Asian Pacific American Legal Center of Southern California (Los Angeles) – join to submit the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

Founded in 1991, AAJC (formerly the National Asian Pacific American Legal Consortium) works to advance the human and civil rights of Asian Americans through advocacy, public policy, public education, and litigation. In accomplishing its mission, AAJC focuses its work to promote civic engagement, forge strong and safe communities, and create an inclusive society in communities on a local, regional, and national level. AAJC is one of the nation's leading experts on issues of importance to the Asian American community including: affirmative action, anti-Asian violence prevention/race relations, census, immigrant rights, immigration, language access, and voting rights. AAJC has been particularly active in immigrant rights and immigration issues since more than 60% of the 15 million Asian Americans and Pacific Islanders living in the US are immigrants.

AAJC is aware of the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States–immigrant and native-born alike.

As a result of this work, AAJC is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and

AFFILIATES: Asian Pacific American Legal Center in Los Angeles • Asian Law Caucus in San Francisco • Asian American Institute in Chicago

**No-Match Cert. Admin. Record 1237**

trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion, employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new legal obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" competitors who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform.** The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is _not_ indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for its own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administering the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Karen Narasaki, President and Executive Director
Asian American Justice Center
1140 Connecticut Avenue, NW, Suite 1200
Washington, DC 20036
Telephone: (202)296-2300
Fax: (202)296-2318



**SOCIETY FOR HUMAN RESOURCE MANAGEMENT**

August 14, 2006

Richard A. Sloan
Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security
111 Massachusetts Avenue, NW
2nd Floor
Washington, DC 20529

> Re:     Proposed Rule on Safe-Harbor Procedures for Employers Who Receive a No-
> Match Letter. 71 Fed. Reg. 34,281 (June 14, 2006)
> ICE 2377-06; Docket No. ICEB-2006-0004; RIN 1653-AA50

Dear Mr. Sloan:

The Society for Human Resource Management (SHRM) submits these comments to the U.S.
Department of Homeland Security ("the Department" or "DHS") in response to the proposed
rule on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter. This notice of
proposed rulemaking was published in the *Federal Register* on June 14, 2006. *See* 71 Fed. Reg.
34,281 (June 14, 2006).

SHRM is the world's largest association devoted to human resource management. Representing
more than 210,000 individual members, the Society's mission is to serve the needs of HR
professionals by providing the most essential and comprehensive resources available. As an
influential voice, the Society's mission is also to advance the human resource profession to
ensure that HR is recognized as an essential partner in developing and executing organizational
strategy. Founded in 1948, SHRM currently has more than 550 affiliated chapters within the
United States and members in more than 100 countries.

SHRM's membership comprises HR professionals who are responsible for administering their
employers' hiring policies, including the employment verification process. SHRM has taken a
multi-faceted approach to obtain feedback from its members on the proposed guidance for
employers who receive a no-match letter, and has incorporated our member feedback in these
comments.

1800 DUKE STREET
ALEXANDRIA, VA 22314-3499 USA
(703) 548-3440 FAX; (703) 836-0367 TDD: (703) 548-6999
WORLD WIDE WEB: HTTP://WWW.SHRM.ORG

**No-Match Cert. Admin. Record  1241**

Richard A. Sloan
August 14, 2006
Page 2

## DISCUSSION

SHRM appreciates the opportunity to comment on the safe-harbor procedures regarding no-match letters and recognizes the Department's efforts in issuing guidance. For quite some time, many HR professionals have, inquired about guidance from both DHS and SSA regarding what an employer should do when it receives a no-match letter. SHRM believes that the proposed regulations provide some guidance on the key issues; however, SHRM has some concerns regarding the proposed time periods and requests additional clarification on certain terms and provisions. In addition, SHRM has concerns as to how the proposed regulation will comport with the proposed legislation that Congress is currently addressing, which includes new procedures for the employment verification process.

The proposed regulations on the safe-harbor procedures provide that: (1) an employer must take "reasonable steps," within 14 days after receipt of a "no-match" letter; and (2) the employer must resolve the discrepancy within 60 days of receipt of the no-match letter. If the discrepancy has not been resolved within the suggested 60-day period, the employer must, within an additional three days, verify the employee's employment authorization and complete a new Form I-9. *See* 71 Fed. Reg. 34,285 (June 14, 2006).

SHRM appreciates the Department's efforts to ensure that employers are employing individuals who are authorized to work in the United States. SHRM realizes that in drafting the proposed guidelines, DHS had to consider the interests of employers, employees, the Social Security Administration, and other governmental entities. However, SHRM believes that the Department must provide guidance with reasonable and clear guidelines for HR professionals. Therefore, as discussed below, SHRM recommends that the Department: (1) increase the proposed period for an employer to take "reasonable steps" to a minimum of 60 days; and (2) permit the employer a minimum of 120 days to resolve any discrepancies after receiving a no-match letter. Furthermore, the Society recommends that the Department provide clarification on certain terms and provisions, and work closely with SSA to coordinate a seamless, uniform process for responding to no-match letters.

I.    **SHRM Recommends that the Department Provide an Employer a Minimum of 60 Days to Take "Reasonable Steps."**

The Department has proposed that after receiving a no-match letter, an employer must take certain "reasonable steps" within 14 days of receipt of the no-match letter. *See* 71 Fed. Reg. 34, 285 (June 14, 2006). The Department does not include a complete list of steps that would be deemed reasonable under the proposed rule. However, the Department states that the following steps would be considered reasonable. These include: (1) checking the employer's records for typographical or clerical errors; (2) informing SSA of the correct information; and (3) verifying that the employer's records of the employee's name and social security numbers match the records of SSA. SHRM recommends that the Department provide an illustrative list of examples of steps that would be considered "reasonable." SHRM members make a good-faith effort to ensure that their employees are authorized to work in the United States. Thus, it is imperative

Richard A. Sloan
August 14, 2006
Page 3

that HR professionals are aware of the procedures that they may follow in response to a no-match letter.

### A. SHRM's Concerns with the Proposed Time Period.

SHRM believes that the proposed 14-day period would not provide employers an adequate amount of time to notify the employee. An HR professional working for a large company may have operations or offices in many different geographical areas. If the HR professional receives a no-match letter, and the employee is located in another state, the HR professional must check the employee's records and track the employee in another location. Some SHRM members work for colleges and universities, where the faculty and other employees may not work during the entire calendar year. A professor may teach a course every other semester, and not be available if the employer receives the no-match letter during his "off" semester. Also, many colleges and universities operate with a reduced workforce during the summer months. Thus, even if the employer receives the no-match letter, the HR professional may not be able to immediately contact the employee if the employee is out of the office or on vacation.

There are other reasons that would affect an employer's ability to take reasonable steps in response to a no-match letter within the proposed 14-day period. As more employers implement flexible workplace policies, employees are more likely to telecommute. HR professionals will need additional time to contact employees who telecommute and are not physically present in the office on a daily basis. Thus, both the employer and employee may need additional time. In addition, SSA may send the no-match letter to a different division within the department that does not process the I-9 forms. For example, if SSA sends the letter to the payroll department, the payroll specialist will have to forward the information to the HR department. The forwarding of the no-match letter may add additional time to the process. Given the size and numerous locations of large employers as well as the possibility of an employee's absence from the office, SHRM recommends that the Department increase the time permitted for an employer to take reasonable steps pursuant to the safe-harbor provisions. Therefore, SHRM recommends that DHS grant an employer a *minimum* of 60 days from receipt of the no-match letter to take reasonable steps.

### B. The Department of Homeland Security's Coordination Efforts with the Social Security Administration.

The proposed rule also provides that when an employer verifies an employee's Social Security Number (SSN) with the Social Security Administration, "employers should make a record of the manner, date, and time of any such verification, as SSA may not provide documentation." *See* 71 Fed. Reg. 34,283 (June 14, 2006). SHRM recommends that SSA provide the employer with a confirmation and tracking number within the proposed timeframe for resolving the discrepancy. SHRM also recommends that SSA provide the employer with a sample notice and guidance for the employee to follow when the employee attempts to resolve the no-match discrepancy. SHRM realizes the importance of both SSA and DHS in ensuring that all employees are authorized to work in the United States. Thus, SHRM recommends that both agencies work

Richard A. Sloan
August 14, 2006
Page 4

together and develop a uniform process to confirm and track an employer's attempt to verify an
employer's SSN with SSA.

## II.    SHRM Recommends that the Department Establish a 120-day Period to Resolve Any Discrepancies After Receiving a No-Match Letter.

The Department has proposed a verification procedure that the employer may follow if the
discrepancy with the no-match letter is not resolved within 60 days of receipt of the no-match
letter. *See* 71 Fed. Reg. 34,285 (June 14, 2006). When an employer receives a no-match letter,
it takes time for a corporate entity to identify the issue, call in the employee and ask questions
regarding the no-match letter. Even if there is a simple error that must be corrected by SSA, the
proposed 60-day period would be inadequate for both SSA to respond and the employer to
resolve the discrepancy. Also, there may not be a local SSA office near the employer's location.
Furthermore, SSA may not provide the employer with a response within the proposed 60-day
period due to a backlog of inquiries, a shortage of staff, or other reasons beyond the employer's
control. Therefore, SHRM recommends that the Department provide an employer with a
minimum of 120 days to resolve any discrepancies after receiving a no-match letter. SHRM also
recommends that the Department provide clear language stating that where the employer has
contacted the appropriate government agency within the proposed timeframe, the employer will
not be held liable for external factors outside the employer's control. Such factors may include
an agency's failure to respond within the timeframe required under the safe-harbor rules. Thus,
SHRM recommends that DHS provide a an employer a minimum of 120 days to resolve any
discrepancies after receiving a no-match letter, and also address the employer's due diligence in
contacting SSA within the applicable time-period.

## III.    SHRM Recommends that the Department Clarify Whether the New Form I-9 is Optional.

The Department has also proposed guidelines if the discrepancy identified in the no-match letter
is not resolved within the proposed 60-day period. Specifically, DHS has proposed that if the
discrepancy is not resolved within the proposed 60-day period, and if the employee's identity
and work authorization cannot be verified after completing a new Form I-9, the employer has the
option of either terminating the employee or risk that DHS may find the employer in violation of
the federal immigration laws. *See* 71 Fed. Reg. 34,283 (June 14, 2006). SHRM recommends
that the Department clarify whether the completion of the new I-9 form is optional or mandatory
for an employer before the employer may terminate the employee. The Department also states
that "employers should apply these procedures uniformly to all of their employees having
unresolved no-match letters." The Department then indicates that employers that do not provide
uniform guidelines may be in violation of applicable anti-discrimination laws. SHRM
recommends that the Department provide clear guidance on what actions would constitute as a
violation of the "applicable anti-discrimination" laws. SHRM also recommends that the
Department coordinate the guidance regarding the discriminatory conduct with the other
agencies that have jurisdiction over the anti-discriminatory laws, including the Department of
Justice and the Equal Employment Opportunity Commission.

Richard A. Sloan
August 14, 2006
Page 5

### IV.    SHRM Recommends that the Department Clarify the Employee's Work Status During the Proposed Timeframes.

The proposed rule provides that an employer must take "reasonable steps" within 14 days of receipt of the no-match letter, and must resolve any discrepancies within 60 days of receipt of the no match letter. *See* 71 Fed. Reg. 34,285 (June 14, 2006). The proposed rule does not provide guidance on how the employer should handle the employee's work status between day 14 and day 60. SHRM recommends that the Department clearly state that: (1) an employee whose name is referenced on a no-match letter shall continue to work during the "discrepancy" period; and (2) DHS will not hold the employer liable for violating the federal immigration laws if the employer continues to employ the individual during this period. After the employer notifies the employee about the no-match letter, an employee may fail to return to work. SHRM recommends that the Department provide clear language that the employer shall have the option to terminate the employee within the discrepancy period. The option to terminate would apply in cases where an employee fails to return to work after the employer has notified the employee of the no-match letter, and the employee's absence violates the employer's attendance policy.

### V.    SHRM Recommends That the Department Clarify the Receipt Guidelines.

The proposed safe-harbor guidelines also describe an employer's obligations and its options for avoiding liability after the employer receives "information indicating that the employee may be an alien who is not employment authorized." *See* 71 Fed. Reg. 34,284 (June 14, 2006). However, the proposed rule does not define what constitutes as "receipt" of such information. Some SHRM members have received no-match letters that were addressed to the employee, not the employer. Although the employer may form a reasonable suspicion that the envelope from SSA contains a no-match letter, the employer cannot confirm the contents of the envelope if the mailing is addressed to the employee. Thus, SHRM recommends that the Department provide clear guidance on what constitutes receipt. Specifically, SHRM recommends that the Department clarify that the no-match letter must be addressed to the employer in order to meet the criteria for "receipt," or require that a copy of the no-match letter be sent to the employer.

Finally, some SHRM members participate in the Employment Verification System (EVS), where they submit a diskette to SSA each month with the names and Social Security Numbers for all newly hired employees and all employees who have notified their employers of a name change. Each month, SSA provides the employer with a list of any discrepancies from the information the employer provided through the EVS. SHRM members have requested guidance on whether the safe-harbor procedures regarding no-match letters would also apply to the receipt of EVS discrepancy information.

### VI.    Conclusion.

SHRM appreciates the opportunity to submit these comments on the proposed guidance for employers who receive a no-match letter. SHRM applauds the Department for proposing the guidelines. However, SHRM believes that in order to maximize the safe-harbor provisions, the Department of Homeland Security must work closely with the Social Security Administration to

Richard A. Sloan
August 14, 2006
Page 6

ensure that there is a single uniform process.  SHRM looks forward to working with both agencies to improve the guidance on safe-harbor procedures.

Respectfully submitted,

Michael P. Aitken
Director, Governmental Affairs
Society for Human Resource Management



**SEIU**

**Stronger Together**

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

RE:    DHS Docket No ICEB 2006-0004, 71 Fed. Reg. 34281
       (June 14, 2006), Safe Harbor Procedures for Employers
       Who Receive a No-Match Letter

Dear Sir/Madam:

ANDREW L. STERN
International President

ANNA BURGER
International Secretary-Treasurer

MARY KAY HENRY
Executive Vice President

GERRY HUDSON
Executive Vice President

ELISEO MEDINA
Executive Vice President

TOM WOODRUFF
Executive Vice President

The Service Employees International Union (SEIU) has 1.6 million members in the United States (and an additional 200,000 members in Canada). Our members work in the property services and health care industries and in the public sector. Many of our members are immigrant workers who work in low wage occupations such as janitors, security guards, home care aids and nursing home workers. SEIU has been a leading advocate for improving the lives of low wage workers and for comprehensive immigration reform.

SEIU has often been called upon to assist our members in responding to employer demands following SSA no match letters. Because of our experience with these letters over the past several years, we oppose the proposed regulations to the extent they imposes additional obligations on employers upon receipt of SSA no match letters and can cause loss of employment by and discrimination against workers legally entitled to work in the United States. The letters often are erroneous and are not easily corrected, and they are frequently the excuse for employer discrimination and harassment of immigrant workers.

The most fundamental reason why the regulation is misguided is that it erroneously treats the Social Security number as a proxy for immigration status. The SSA itself, and even former INS General Counsels, agree that such is not the case, because there are many reasons why the computer records could be in error.[1] In fact, the SSA records usually contain no information about immigration status, or contain out of date information.[2] Despite this, the proposed regulation would effectively make the employer sanctions regime a

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

1313 L Street, NW
Washington, DC 20005

202.898.3200
TDD: 202.898.3481
www.SEIU.org

---

[1] Martin, David, INS General Counsel, Letter to Larson (12/23/1997) *published at* 75 No.6 Int. Releases 203 (1998), Westlaw 75No.6INTERREL 203, attached hereto; and SSA 2005 No Match letter, attached hereto. Also attached are additional communications from IRS, INS, SSA and the EEOC setting forward this consistent and long-standing interpretation of no match letters.
[2] GAO, *Immigration Enforcement: Benefits and Limitations to Using Earnings Date to Identify Unauthorized Work*, July 11, 2006, GAO-06-814R at 8.

strict liability statute for the millions of employers who receive SSA no match letters, contrary to the plain language of the statute and the intent of Congress interpreted for the last 20 years. And the regulation would in effect make the I-9 process an annual process, rather than a one-time process, for millions of employers, which clearly was never intended by Congress when it established the I-9 process.

## I.    The Regulations Will Not Achieve Their Intend Objective

SEIU does not believe that the proposed DHS regulations will achieve the intended objective of reducing the number of undocumented workers in the United States and will instead end up hurting American citizens and other authorized workers as well as legitimate employers who are trying to comply with the law. We believe that this objective can be obtained only through comprehensive immigration reform such as that currently pending in Congress, since the millions of jobs these workers hold and the importance of their labor to the U.S. economy will not disappear by adoption of enforcement oriented proposals. The proposed DHS regulations will simply make the situation worse, not better.

### a.  The Proposed DHS Regulations Will Simply "Churn" The Workforce While Not Reducing The Number Of Undocumented Workers.

We simply are not aware of evidence that workers who are terminated because their employer believes that they are undocumented have in the past or will in the future leave the United States or even leave the workforce. Immigrant workers largely work in low wage industries. Because of poor pay and working conditions, employment opportunities in these industries are plentiful and the turnover rate is very high (particularly among non-union workers), often exceeding 100% in a year. Thus, workers move freely from job to job. The proposed regulations will only increase that turnover rate, to the detriment of not only the workers, but also their employers and the economy generally.

Since jobs are plentiful in low wage industries, turnover is very high and little skills or training are required for the jobs, workers in these industries who are terminated by one employer can simply walk across the street and work for another employer. There is no reason to believe that workers who are terminated because their name appeared on a SSA no match letter will be any different. Thus, the likely result of the proposed regulations, if implemented, will be to simply churn the workforce. Workers whose names appear on a no-match letter sent to employer A will simply go to work for employer B. When their name shows up on a no-match letter sent to employer B (probably a year later), they will go to work for employer C. In the meantime, workers who initially worked for employer C and who show up on a no-match letter to that employer will simply go to work for employer A and so on.

Thus, the likely practical effect of the proposed DHS regulations will be to churn the workforce in the low wage industries populated by immigrant workers but not to decrease the overall size of the undocumented worker workforce. This, of course, will drive up employment costs in these industries because of the rapid turnover of employees. It will not in any way aid in

the enforcement of the immigration laws. This problem can be solved, but only through comprehensive immigration reform and not by the interim step proposed the DHS.

### b. DHS Regulations Will Have The Effect Of Growing The Underground Economy At The Expense Of Legitimate Employers

In organizing low wages workers, we are often confronted with unscrupulous employers who erroneous classify their employees as independent contractors or who even treat their workers as sham franchisees. We even see situations were workers are paid "off the books" meaning that they are paid in cash with out any of the payroll taxes being paid or the tax withholdings being made that are required by law. By using these fraudulent schemes, employers avoid paying payroll taxes, unemployment insurance and social security payments on behalf of their workers. Since the workers have not been legally treated as "employees", these employers don't even need to go through the I-9 process with these workers, nor will they ever receive a no match letter from the SSA as they do not pay SSA taxes. These employers seek to employ undocumented workers because they are the workers who are less likely to speak up and demand that the employer comply with the law. These employers not only cheat their workers, but they cheat the government out of social security payments, unemployment taxes, wages withholdings and so forth. Ironically, the result of these proposed regulations will be a significant loss of revenue for the government, revenue which the government sorely needs for its operation, including the enforcement of the immigration laws.

Since no social security taxes are paid on these workers, these employers never receive SSA no match letters. Therefore, as a practical matter, the employers that operate illegally in the low wage industries that are served by the immigrant workforce are not effected by the DHS proposed regulations and can continue to employ undocumented workers without running the risks that legitimate employers would run under the DHS proposed regulations.

These illegitimate employers thrive in the low wage industries where most immigrants work. Legitimate employers who pay employment taxes and who try to comply with the immigration laws must compete with these employers. There is always the temptation to take up their illegal ways in order to complete against them in these often very competitive industries. By imposing administrative burdens on the legitimate employers and not on the illegitimate employers and by subjecting legitimate employers to additional risks under the immigration laws not faced by these illegitimate employers, the DHS proposed regulations will have the unintended effect of creating incentives for legitimate employers to go underground and to misclassify their workers. The ironic result of this will be to increase employment opportunities for undocumented workers and to deprive the government of payroll taxes which it is owned under law.

**II.     The Proposed Regulation Lacks Any Workable Mechanism To Insure Against Erroneous Termination, Or To Provide Remedies To The Substantial Number Of Workers Who Are Its Victims.**

No-Match Cert. Admin. Record  1249

It is well established that SSA records are frequently erroneous. For immigrants *who are work authorized*, SSA records are automatically able to verify the status of less than 50% of work-authorized non-citizens, as compared to 99.8% of native born citizens.[3] These numbers are significant in that they demonstrate that large numbers of legally authorized workers will be the subjects of erroneous SSA no match letters, and their jobs at risk if the employers, employees, and SSA do not promptly take actions to comply with the proposed regulations.

According to Census Data, there are roughly 145 million total workers in the U.S. workforce, of whom 125 million are native born citizens. There are approximately 7.8 million naturalized citizens in the work force, and 12 million non-citizen, immigrant workers. Approximately 7 million of those workers are unauthorized.

From these numbers, one can determine that approximately *300,000* native born workers (0.02%) will be *annually* subject to SSA no match letters, *even though they are native born citizens*. If they lose four hours of work to take care of this, and you assume an average wage of $14/hr, they will lose $16.8 million in wages. Of the approximately 5 million *work-authorized*, non-citizens, 50% will face problems clearing the SSA database, or *2.5 million annually*. Again, assuming an average wage of $14/hr, these work- authorized workers would lose $140 million in wages, assuming that they ultimately succeed and are not terminated . Each of these workers will have to spend many hours trying to straighten out the SSA records, solely to satisfy DHS regulations. If SSA cannot complete the process in the time line suggested by these regulations, many will lose their jobs, causing hardship to their families. There will also be a substantial disrupt of the employers operations as employees take time off to correct the errors in SSA's data base. If you assume that one in ten of these workers will for one reason or another fail to resolve the no match problem within the time limits set, this means that 280,000 workers will unjustly lose their jobs because of these proposed regulations.

For those who do not successfully, and timely, complete this process, either through procrastination, frustration, agency delay/incompetence, they will have no effective remedy for their loss of employment, wages/benefits. Since these regulations are promulgated by the DHS, they cannot set out a procedure for SSA to remedy erroneous decisions or to provide compensation for agency error for the approximately one quarter million workers who will be unjustifiably terminated if the proposed regulations are implemented. The Federal Tort Claims Act does not provide a remedy for agency records errors, particularly where the agency would argue that it did not require the employer to terminate. Likewise, employees would not have a viable remedy against their employers for termination when the employer justifies its conduct on the new regulations together with the SSA notice.

## III.    The Proposal Shifts DHS Enforcement Costs And Burdens To Employers, Employees And The SSA, Rather Fixing The Broken System.

---

[3] *Report to Congress on the Basic Pilot Program*, U.S. Citizenship and Immigration Service, June 2004; *see also*, GAO, *Immigration Enforcement: Benefits and Limitations to Using Earnings Date to Identify Unauthorized Work*, July 11, 2006, GAO-06-814R at 1 (SSA data "has drawbacks since they contain some erroneous information and information about hundreds of thousands or even millions of U.S. citizens and work authorized aliens.")

**No-Match Cert. Admin. Record  1250**

At a time when Congress is considering making major changes to immigration laws, DHS is proposing a regulation that improperly treats the SSA no match letter as a proxy for an INS notice that the worker lacks worker authorization. As the SSA no match letters demonstrate, they are no such thing. They specifically warn employers that they do not "make any statement about an employee's immigration status." And they warn against taking any adverse action.

Congress is currently in the process of addressing immigration reform but instead of leaving it to Congress to determine what that appropriate reform would be, the proposed regulations hijack the SSA no match letter system, requiring millions of employers and employees to burden the SSA with inquiries and visits, and demanding timely documentation of same, in order to satisfy DHS's misguided regulation. No where in the regulation is there any effort by DHS to address the actual size of the attempted cost-shifting to the SSA. Nor does the regulation contemplate the substantial burden being placed on the SSA.

Because the no match letters are distributed only in April and May each year, SSA will require a substantial seasonal staffing increase to accommodate the surge in inquiries during this 2-3 month period. This seasonality will require a large number of temporary hires to enable the agency to respond. In 2002, the SSA sent out 800,000 no match letters, to employers with at least 10 no match employees, or 0.5% of the employer's workforce. It is unknown whether SSA will in future years use a different standard for sending these letters. If DHS adopts its proposed regulation, it would discourage SSA from sending the letters more broadly so as to improve its own management of the SSA Trust Fund, as doing so would impose substantial secondary staffing effects on the agency to respond to hundreds of thousands on visits.

The DHS regulations and comments fail to address this tremendous burden the proposed regulations are placing on SSA. It it is irresponsible in our view for DHS to contemplate issuing these proposed regulations without a full assessment of how SSA is going to meet the burden being placed on it by the proposed regulations.

When a worker shows up on a no match letter, the employer essentially has to reverify the worker's status, as they do at the being of employment with the I-9 process. DHS has made no assessment of the cost to employers in immigrant intensive industries of this new *annual* I-9 compliance obligation which will result from the proposed regulations. Instead of a one-time I-9 compliance burden, suddenly employers in immigrant dependent industries can expect to see I-9 compliance issues become an annual routine for a large segment of their workforce. Indeed, the regulation asserts that there will be no significant cost to small employers, but it is hard to see how anyone could contend that this administrative burden will be insubstantial for all employers, both small and large, in immigrant intensive industries.

The regulation also makes no effort to assess the costs imposed on legal workers of time away from work to try to straighten out SSA records, and obtain documentation that will satisfy their employers. As demonstrated above, the proposed regulations could easily cost employees legally entitled to work in the United States $156 million or more in lost wages and the substantial disruption to many employers' operations just to prove that there is an error in the SSA records.

5

Likewise, not addressed is the cost to the SSA in staff time and lost taxes, as well as the increase in unemployment compensation paid out to employees who are wrongly terminated. The cost to the government because of increased costs in responding to inquiries from legal employees who were placed in a no match letter because of an error as well as the loss of revenue from payroll taxes is likely to be very significant. Yet, DHS's proposed regulations fail to address these costs and lost revenue at all.

## IV.    The Proposed Regulations Will Encourage Discrimination Against Workers Legally Entitled To Work In The United States.

The proposed regulation will result in expanded discrimination against workers with a "foreign" appearance or accent, as well as those who seek to enforce their workplace rights to fair treatment and a living wage. Under existing laws and procedures, there is currently a high level of discrimination against immigrant workers, whether they are legally authorized for employment or not. Despite existing protections, SEIU and other unions have often had to assist workers whose employers deny them workers compensation, overtime pay, or interfere with their right to form or join a union. Such employers will often hide behind the excuse of immigration law compliance to accomplish these ends. This proposal will provide unscrupulous employers an *annual* excuse for harassing, suspending and or terminating workers who lawfully seek to enforce their rights.

## V.    The Proposed Regulations Are Contrary To Unchallenged Ninth Circuit Case law That Constructive Knowledge "Not Be Expansively Applied," In Order To Avoid Interfering With The Nondiscrimination Goals Of The INA.

The proposed regulation disrupt the proper balance struck by Congress in 1986 and recognized by the INS/ICE, SSA, the courts and OCAHO for the last twenty years. Because these proposed regulations are clearly contrary to Congress' intent, they are beyond the authority of DHS to issue.

The proposed regulations are founded on an expanded definition of constructive knowledge, that is contrary to the only circuit court case construing that term in the INA 274A context. When Congress passed the Immigration Reform and Control Act in 1986, it "delicately balanced" the employer sanctions provisions and protecting authorized workers from unlawful discrimination because of their "foreign" appearance or accent. "The doctrine of constructive knowledge has great potential to upset that balance, and it should not be expansively applied." Collins Foods International v. INS, 948 F.2d 549, 554-55 (9th Cir, 1991). There have been no relevant changes to this balance since 1986.

The law requires employers to accept documents proffered by the employee within three days of hire. There is no ongoing employer obligation to review the documents, unless a work authorization document (List C) expires. The employer must accept those documents that reasonably appear on their face to be valid. The statute does not require the employer to be a document expert. It is up to the employee to select the documents to submit, by selecting them

6

from the list on the back of the I-9 form. The employer violates the anti-discrimination provisions of the Act if it requires more or different documents than those required by the Act, or for example, insists that it will only accept certain documents.

The INS in <u>Collins Foods</u> had argued that the employer had constructive knowledge that the employee was not authorized in that the employee's Social Security card was not the example pictured in the INS Handbook for Employers. The Ninth Circuit however noted that the INS Employer Handbook only illustrated a few of the possible 16 iterations of SSA cards issued.

The Ninth Circuit expressly was concerned that "[w]hen the scope of liability is expanded by the doctrine of constructive knowledge" the employer may be subjected to penalties for undefined acts, and may avoid hiring anyone with an appearance of alienage." <u>Id.</u> The effect of the regulation would be to give unscrupulous employers but another justification for discriminatory conduct, and an annual one at that.

The proposed regulations are contrary to the clear holding of the Ninth Circuit in <u>Collins Foods</u>. There are no Circuits contrary, and indeed, several OCAHO decisions have followed the holding. The agency is without authority to adopt a regulation contrary to the statute.

### VI. The Proposed Regulation Improperly Eliminates The Good Faith Defense For Millions Of Employers, Absent Timely Compliance With The Burdensome Regulation.

The proposed regulations are also contrary to the law as it has been interpreted and applied because it effectively eliminates the good faith defense which as always been an essential element of the statute. The statute provides that so long as the employer and employee properly complete the I-9 form at the outset of employment, the employer has a good faith defense to a knowing hire violation. 8 U.S.C. §1324a(b)(6)(A). The employer is not strictly liable for employing unauthorized workers; knowledge is required. The good faith defense is rebutable if DHS can establish that the documents did not reasonably appear on their face to be valid or to relate to the individual. <u>Collins Foods</u>, <u>supra</u> at 552, n. 9.

Despite the clear language of the statute and controlling case law, DHS proposes to eliminate this presumption for millions of employers, unless the affected employers engage in an elaborate series of steps, within certain time frames, with the Social Security Administration.[4]

---

[4] The procedures and time frames are proposed without any evidence that the SSA has the staff available to serve the seasonal surge of calls and visits that would occur every spring after the issuance of no match letters. The seasonal character of the project would make timely response by SSA even more difficult given the need to provide extra staff during the spring when response would be due.

Nor is there any indication whether SSA plans to send out no match letters to every employer with even a single no match employee, or only to those with more than 10 or 0.5% as in 2002 when it sent 800,000. In other years, SSA has used a different threshold. The threshold used will substantially change the total numbers, raising or lowering the burden on employers/employees/SSA accordingly.

**No-Match Cert. Admin. Record 1253**

For the millions of employers who annually received an SSA no match letter, those employers would be denied the good faith defense unless they could carry a burden of showing that they had complied with all the aspects of this proposed regulation, including its timelines.

The proposed regulation erroneously treats letters from INS identifying unauthorized workers as the same as the SSA no match letters. In contrast to the INS notices to employers, the SSA no match letters explicitly tell the employer that there could be many innocent reasons why the individuals name is listed, and that the letter does not inform the employer that the worker is not authorized for employment. Indeed, the SSA no match letters also warn the employer against any adverse personnel action, as such actions might violate anti-discrimination laws.[5] Despite these significant differences with INS notices, which directly address whether the individual is work authorized, the proposed regulations treat the SSA letters as the functional equivalent.

The legal rationale proffered by the agency is that its regulation is consistent with Mester Mfg Co. v. INS, 879 F.2d 561 (9th Cir. 1989) and New El Rey Sausage Co. v. INS, 925 F.2d 1153 (9th Cir. 1991). Apparently taking the view that ignoring the case law will make it go away, DHS completely fails to mention Collins Foods even though it dealt with Social Security enumeration in the employer sanctions context. The regulation fails to note that in Mester, the employer had been told by INS that the certain employees were "suspected unauthorized aliens." Collins Foods at 555. The Collins court distinguished its prior decisions in Mester and New El Rey Sausage, noting that in both cases the employer had been informed by INS that particular employees were suspected of being unauthorized.

In contrast, here the proposed regulation treats dissimilar situations as if they were the same, i.e. an SSA letter telling employers that there is a no match in a person's Social Security number is treated the same as an INS letter that states that employees are not authorized for employment based on the immigration documents presented. Notably, the INS did not appeal the narrow, constructive knowledge standard of Collins Foods. Now fifteen years later, with no intervening statutory change, nor contrary circuit or OCAHO decisions, the agency proposes to ignore the precedent, and dramatically limit the good faith affirmative defense of the statute for millions of employers.

Collins Foods has been repeatedly followed by the ALJ's in employer sanctions cases. See, e.g. USA v. American Terrazzo Corp., 6 OCAHO 828, 1995 WL 848945 (1995) ("the Circuit court has given clear warning that the doctrine of constructive knowledge must be sparingly applied"); Getahun v. Dupont Merck Pharmaceutical, 6 OCAHO 880, 1996 WL 570515 (1996)(constructive knowledge must be sparingly applied in illegal hire cases to minimize the risk of liability and burden of compliance on employers); USA v. AID Maintenance Company, 7 OCAHO, 1997 WL 1051451 (1997)(same).

The careful balancing by Congress of the statutory employer obligations are not subject to revision by the agency by regulation. This legislative balance was constructed in order to minimize the burden on the employer, as well as to protect employees from discriminatory documentation requirements. The substantial gutting of the good faith defense for employers

---

[5] A sample SSA no match letter from 2005 is attached.

will burden the process not only for employers, but necessarily for employees whose employers impose heightened and discriminatory documentation requirements. For this reason, the proposed regulations are contrary to law and therefore exceed the agency's authority in issuing regulations.

## VI.    DHS Should Defer To Congress Regarding Any Changes In The Immigration Laws

No one really disputes that the current immigration laws are outdated and in need of revision. Currently, Congress is considering a number of approaches that would significantly change the law. Rather than attempting to change the law through the administrative process, DHS should defer to Congress regarding how the law should be changed. Among the matters being considered by Congress is the manner in which employers are to verify the work status of their employees, the very area that DHS attempts to regulate through the proposed regulations. Changes in the immigration laws are under active consideration in Congress and significant changes are likely to be made in the very near future. Therefore, DHS should defer to Congress rather than to attempt to reform the current law through the administrative process, which, of course, we contend it does not have the authority to do.

## CONCLUSION

SEIU strongly recommends that DHS not adopt the proposed regulation and defer to Congress to address the issue any changes in the immigration laws that are to be made. The proposed regulations are ill conceived and based on a fundamental misunderstanding of the limitations of the SSA no match letters.

They will be ineffective in reaching their objective and counterproductive in reducing illegal immigration. At the same time, they place a substantial burden on employers, lawful American workers and the SAA. They are likely to cause an increase in the turnover rate for immigrant dependent employers and will create incentives for employers to work immigrant workers "off the books" or to misclassify them as independent contractors so as to avoid the regulations, to the detriment of all workers and the economy. They will also encourage discrimination against lawful workers who are ethnic appearing or have foreign accents.

They likewise fail to take into account the burden placed on SSA and whether SSA can realistically meet that burden and the costs to employers and legal workers of compliance. The proposed regulations offer no remedy for the large number of legal employees who will likely to be terminated erroneously as a result of agency error or slow response. They will impose substantial costs on native born and authorized workers and their employers, as well as interfering with the SSA's fundamental mission.

Finally, the proposed regulations are contrary to the current immigration law as it has been interpreted and applied for 20 years. The proposed regulations attempt to upset the delicate balance intended by Congress in enforcing the law. They also effectively negate the good faith

No-Match Cert. Admin. Record  1255

defense, an integral part of the current law. Therefore, they are beyond the power of DHS in issuing regulations.

Accordingly, we request that the proposed regulations not be issued and that Congress be left to enact appropriate changes in the law.


Respectfully submitted,

Judith A. Scott
General Counsel, SEIU

Orrin Baird
Associate General Counsel, SEIU

Robert Gibbs
Gibbs Houston Pauw
Counsel to SEIU

No-Match Cert. Admin. Record  1256

Social Security Administration
# Retirement, Survivors and Disability Insurance
Employer Correction Request

CODE V

Office of Central Operations
300 N. Greene Street
Baltimore, MD 21290-0300
Date:  March 24, 2005
EIN:

Establishment Number:          MRN:  4C

### Why You Are Getting This Letter

Some employee names and Social Security numbers that you reported on the Wage and Tax Statements (Forms W-2) for tax year 2004 do not agree with our records. We need corrected information from you so that we can credit your employees' earnings to their Social Security records. It is important because these records can determine if someone is entitled to Social Security retirement, disability and survivors benefits, and how much he or she can receive. If the information you report to us is incorrect, your employee may not get benefits he or she is due.

There are several common reasons why the information reported to us does not agree with our records, including:

- Errors were made in spelling an employee's name or listing the Social Security number;

- An employee did not report a name change following a marriage or divorce; and

- The name or Social Security number was incomplete or left blank on the W-2 report sent to the Social Security Administration.

IMPORTANT: This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number. Nor does it make any statement about an employee's immigration status.

See Next Page

Visit our website at www.socialsecurity.gov

No-Match Cert. Admin. Record  1257



**If You Have Any Questions**

If you have any questions, please call us toll-free at 1-800-772-6270 between 7 a.m. and 7 p.m., Eastern time, Monday through Friday. We can answer most questions over the phone. You can also write us at the address shown on the first page of this letter. If you call, please have this letter with you. It will help us answer your questions. Also, general program information is available from our website at www.socialsecurity.gov/employer.

W. Burnell Hurt
Associate Commissioner for
Central Operations

Visit our website at www.socialsecurity.gov



# How To Correct Social Security Numbers (SSNs)

Complete Forms W-2c (Corrected Wage and Tax Statement) for each of the Social Security numbers (SSNs) listed that you are able to correct. You only need to prepare Forms W-2c for the names or SSNs for which you have corrected information. If an employee does not provide corrected information or no longer works for you and you are unable to contact him/her, document your records with the information you relied on in completing the W-2 or the efforts you made to contact your former employee. Retain this information in your files; do not send it to the Social Security Administration (SSA). You should provide all corrections as soon as possible.

You also need to file a Form W-3c (Transmittal of Corrected Wage and Tax Statements) whenever you file Forms W-2c.

Please follow the guidelines below when preparing Forms W-2c.

- Refer to the Internal Revenue Service (IRS) filing requirements in its publication, "Instructions for Forms W-2c and W-3c", at the IRS website at www.irs.gov or call 1-800-829-3676 to request a copy.

- Compare your employment records to the Forms W-2 you reported for the SSNs included on the attached list.

- If your employment records and Forms W-2 do not match, prepare Forms W-2c with the corrected information from your employment records. (Do not send copies of proofs of identity or other documents in addition to, or in place of, the Forms W-2c.)

- If your employment records and Forms W-2 match, ask your employee to check his/her Social Security card and to inform you of any name or SSN difference between your records and his/her card. If your employment records are incorrect, correct your records.

- If your records match the information on the employee's Social Security card, have the employee contact any Social Security office to resolve the issue. Tell the employee that once he/she has visited the Social Security office he/she should inform you of any changes and you should correct your records accordingly.

- SSA may also send the employee a notice regarding this issue. You should discuss with the employee any changes you make to your employment records.

- If you file your Form W-2c corrections electronically or on magnetic media, call SSA at 1-800-772-6270 to request a copy of the "Magnetic Media Reporting and Electronic Filing of W-2c Information (MMREF-2)" or you can download the MMREF-2 at SSA's website, www.socialsecurity.gov/employer.

Visit our website at www.socialsecurity.gov



# Tips on Annual Wage Report Filing

## Why Accurate Names and SSNs are Important

Accurate names and SSNs are important to you and your employees for several reasons. We use the name and SSN to maintain a record of personal earnings for each of your employees. Generally, we are not able to give an employee credit for his or her earnings unless the name and SSN reported on the Form W-2 agree with our records. It is most important that these records are correct since we later use them to decide if the individual can receive Social Security benefit payments and the amount of any payments due.

## Filing Tips To Ensure Accuracy

Before you file your next annual wage report, please make sure your employment records and the Forms W-2 you report have your employees' correct names and SSNs. Use the tips below to ensure accuracy.

- We encourage you to use SSA's Employee Verification Service (EVS) prior to submitting Forms W-2 to SSA for processing. EVS is a free, convenient and secure method for employers to verify that employee names and SSNs match SSA's records. EVS is not to be used to screen job applicants. A negative EVS response makes no statement about your employee's immigration status. Visit our website at www.socialsecurity.gov/employer and select SSN Verification or call toll-free 1-800-772-6270 for further details.

- Ask your employees to check their latest Forms W-2 against their Social Security cards and to inform you of any name or SSN differences on the two. If the Form W-2 is incorrect, correct your records and prepare a Form W-2c. If the card is incorrect, advise the employee to request a corrected card from the nearest Social Security office. *800-889-3676 -forms*

- Remind your employees near the end of each year to report to Social Security name changes due to marriage, divorce, or other reasons.

- Ask each new employee to check his or her Social Security card and inform you of the name and SSN exactly as shown on the card. (While the employee must furnish the SSN to you, the employee is not required to show the Social Security card. But, seeing the card will help ensure that all records are correct.)

- Direct those who do not have SSNs or cards to contact their nearest Social Security office.

- Ensure that the SSNs you report are valid. A valid SSN must have a total of nine digits. The first three digits are referred to as the area, the next two as the group, and the last four as the serial. No SSNs with a 000 area number, or an area number in the 800 or 900 series, have been issued. Also, no SSNs with a 00 group or 0000 serial number have been issued.

Visit our website at www.socialsecurity.gov



# LITTLER MENDELSON

Direct Dial Number
(404) 888-1728)

July 18. 1997

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Dea D. Carpenter, Esquire
Associate General Counsel
Chief - Employer Sanctions & Civil Document Fraud Division
Office of General Counsel
Immigration and Naturalization Service
U.S. Department of Justice
425 I Street, N.W.
Washington. D.C.  20536

RE:  I-9 Compliance Inquiry
LM File No:  ROPAAA.1001

Dear Ms. Carpenter:

I am writing to request your guidance on an I-9/employer sanctions compliance matter.

One of my clients received a letter from the Social Security Administration (copy attached) identified as a "reminder" for the employer to show correct names and social security numbers for its employees when more than 10% of the W-2 forms the employer filed showed names or numbers that do not match Social Security Administration records.

Apart from the Social Security Administration's concerns, my question more specifically is: what action, if any, is an employer obligated to take with respect to checking its I-9 recordkeeping and potentially undertaking new I-9 verifications for the cited employees in response to such a letter from the Social Security Administration? Otherwise stated, does such a letter from the Social Security Administration constitute the type of information which puts an employer on notice that the cited employees may be unauthorized workers, thereby imposing liability on the employer for "knowingly continuing to employee an unauthorized worker" if it does not conduct I-9 reverification?

1100 Penchtree Street, N.E.. Suite 1000. Atlanta, Georgia 30509-4520. Tel: 404-817-0990. Fax: 404-817-9898. www.Littler.com

No-Match Cert. Admin. Record  1261

Dea D. Carpenter. Esquire
July 18. 1997
Page - 2 -



LITTLER MENDELSON

You will note that the Social Security Administration letter gives no direction to the employer about anything having to do with I-9 compliance. The applicable federal regulations on I-9 compliance are silent about this factual scenario. and I have been unable to identify any administrative case law from OCAHO which deals with this situation.

Absent some clear directive from the Social Security Administration, the regulations or case law, the employer is hesitant to pursue I-9 reverification for fear of violating the antidiscrimination rules. (In fact, all of the employees cited in the Social Security Administration letter are Hispanic.) Moreover, experience has shown that the naming conventions used in the Spanish-speaking world often account for confusion over names in our Anglo society, with perhaps three or four name variations being possible for one individual — which clearly could explain at least some of the record discrepancies at the Social Security Administration.

A related issue is what should the employer do if, after the employee is informed of the Social Security number discrepancy, the employee later comes forward with a supposedly corrected/new social security number; does the employer have the right to see the actual new card or should it merely change the social security number in its W-2 reporting and recordkeeping based on the employee's say so? Should the employer conduct a new I-9 verification? Does it matter whether the employee did or did not use the original (apparently erroneous) social security card as a Section 2 verification document on the I-9 form? (Also remember, the employee would have filled in his social security number in Section 1 even if the card was not used as a Section 2 verification document.)

Other issues include how quickly an employer must act, if at all; whether a cited employee should/must be suspended (leave without pay, etc.) pending resolution of the social security number discrepancy and, if not suspended immediately, how much time the employee should be given before conducting a new I-9 verification (if necessary) or else terminating/suspending the employee?

Thank you for considering this complex and confusing situation. and I look forward to receiving your guidance in due course.

Sincerely,

*Bruce R. Larson*

Bruce R. Larson

BRL:cs
Enclosure



Immigration and Naturalization Service

---

Office of the General Counsel

425 I Street, N.W
Washington, D.C. 20536

HQCOU 90/10.10-C

Bruce R. Larson, Esq.
Littler Mendelson
1100 Peachtree St., N.E.
Suite 2000
Atlanta, GA 30309-4520

DEC 2 3 1997

Dear Mr. Larson:

Thank you for your letter asking about the responsibilities under section 274A of the Immigration and Nationality Act (INA) of an employer who has received information from the Social Security Administration (SSA) indicating that Forms W-2 filed by the employer show names or Social Security numbers (SSNs) of employees that do not agree with SSA records. Although we are unable to provide you with legal advice specific to your client. we are able to make some general observations which may be helpful to you.

As you correctly note, there may be many legitimate reasons for a discrepancy between the name and SSN reported by an employee on the W-2 and/or Form I-9 and SSA records. We would not consider notice of this discrepancy from SSA to an employer by itself to put the employer on notice that the employee is unauthorized to work, or to require reverification of documents or further inquiry as to the employee's work authorization. Whether an employer has been put on notice of an unauthorized employment situation is, however, an individualized determination that depends on all the relevant facts, and there may be specific situations in which SSA notice of an SSN irregularity would either cause, or contribute to, such a determination.

In particular, we note that SSA has provided to your client employer the following information:

**A valid SSN must have a total of nine digits. The first three digits are referred to as the area, the next two as the group, and the last four as the serial. No SSNs with a 000 area number, or an area number in the 800 or 900 series, have been issued. Also, no SSNs with a 00 group or 0000 serial number have been issued.**

An SSN containing an unissued area, group or serial number as described above, or a number of digits other than nine, is an invalid SSN. If an employee provides to an employer with knowledge of these facts an invalid SSN (either in section 1 of the Form I-9 or on a Social Security card presented to the employer and recorded in section 2), it is possible that the INS

could consider a failure to follow up on this knowledge with further inquiry to constitute knowing employment of an unauthorized alien, should the employee turn out to be unauthorized to work. An employer that knows the above quoted SSA information but employs an individual using a known invalid SSN conceivably could be subject to penalties not only under section 274A of the INA, but to civil or even criminal penalties under section 274C of the INA and Title 18 of the U.S. Code for document fraud or false attestations.

Your letter raises the question of an employer's responsibilities if it learns from its employee that the employee's name or SSN is different from that shown on the Form I-9. Upon receipt of information from the employee indicating that any information recorded on the employee's Form I-9 is erroneous, the employer should correct it in a manner that shows the correct information without obliterating the formerly recorded information. For example, a way to do this is to draw a single line through the incorrect information, record the correct information in the nearest available space on the Form I-9, and initial and date the correction. If the correction is to section 1 of the Form I-9, the employee should also initial the correction. If the new information contradicts Form I-9 section 2 information, such as the name or SSN of the employee as shown on previously presented documentation, the employer may request to see acceptable Form I-9 documentation showing the correct information in order to ensure accuracy. These corrections will protect the employee as well as the employer by ensuring that INS or other federal officers authorized to inspect the Form I-9 will receive up-to-date and accurate information regarding the employee.

Learning of a change to an employee's Social Security information does not by itself put the employer on notice that the employee is presently not work authorized. Indeed, one scenario that has come to the attention of the INS on occasion is the following: An employee has been working under a false SSN. The employee subsequently becomes work authorized and obtains a legitimate SSN. Wishing to ensure that his earnings are credited, the employee tells his employer that his SSN has changed. Depending on the circumstances, this notification may put the employer on notice not that the employee is unauthorized, but that the employee has committed fraud. Knowing false statements on the Form I-9, or the use of false documents to obtain employment, are felonies that are not excused by subsequent grants of work authorization or lawful status. An employer who suspects them may apply, in a nondiscriminatory manner, any policies it applies generally to suspected criminal conduct in its workplace, or to suspected false statements in employment documentation. If an employer determines that an employee has fraudulently executed the Form I-9, the employer should not continue to rely on that form as a verification of employment eligibility, and should require that the employee complete a new Form I-9 if the employer continues the employment (while retaining the original form for the designated period as evidence of compliance with the verification requirements at the time of hire). Criminal conduct involving the Form I-9 may be reported to the INS.

We strongly emphasize that this does not mean that all changes to name or SSN information recorded on the Form I-9 mean that fraud has taken place. Each such case should be considered on its particular facts. One fact of general application is that names may change for a variety of reasons, but SSNs do not change (although they may be recorded erroneously on forms). For this reason, a claimed change of SSN is arguably a situation that raises more of a red flag than a

claimed change of name. Of course, all such situations should be reviewed in the light of common sense. A change to an SSN that merely corrects a transcription error, such as recording one or two digits erroneously, would be an unlikely indicator of fraud, but if an employee reports what is clearly an entirely different SSN than the one he or she previously has used, something is wrong. Similarly, receipt of information showing that an employee has been working under a completely different name than his or her actual name reasonably raises questions about an employee's identity that are not raised by change of a last name due to marriage, correction of a middle initial, reconciliation of an incorrectly or differently recorded ethnic name, or other legitimate corrections.

This information relates to an employer's responsibilities under section 274A of the INA. For specific advice relating to immigration-related discrimination concerns, we recommend that you contact the Office of Special Counsel for Immigration-Related Unfair Employment Practices within the Civil Rights Division of the Department of Justice.

I hope this information is helpful. If you have any further questions, please contact Dea Carpenter, Associate General Counsel, at (202) 514-2895.

Very truly yours,

David A. Martin
General Counsel



U.S. Department of Justice
Immigration and Naturalization Service

HQCOU 90/10.15-C

Office of the General Counsel                      425 I Street NW
                                                   Washington, DC 20536

                                                   APR 12 1999

Dear

    Thank you for your letter of June 1, 1998, posing questions about our letter of December 23, 1997 to an attorney regarding employers' responsibilities under section 274A of the Immigration and Nationality Act (INA) with respect to information on Social Security numbers. Please accept our apologies for the delay.

    Our letter stated that notice from the Social Security Administration (SSA) to an employer notifying it of a discrepancy between wage reporting information and SSA records with respect to an employee does not, by itself, put an employer on notice that the employee is not authorized to work. We explained that because there are a number of reasons why there might be such a discrepancy that do not relate to a lack of work authorization, and because actual or constructive knowledge of unauthorized status is a case-by-case determination, we would not consider notice from SSA of a discrepancy, without more, to constitute actual or constructive notice of unauthorized status. Your letter takes the position that in situations other than a reported discrepancy that "clearly relates to a misspelled name or transposed digits in the SSN," the report would constitute not only constructive, but actual knowledge of unauthorized status, given that the employee necessarily used a Social Security card as proof of employment eligibility. You also suggest that, in light of section 274A's goal of preventing the employment of unauthorized aliens, the employer should "assume an irregularity in this situation" and require new documentation confirming employment eligibility and/or suspend the employee until the situation has been resolved.

    We disagree. Section 274A does indeed serve the important goal of deterring illegal immigration by reducing opportunities for unauthorized employment, but the statute, in conjunction with section 274B, couples this goal with appropriate concern that U.S. citizens or noncitizen nationals, lawful permanent resident aliens and other work-authorized aliens not lose

No-Match Cert. Admin. Record  1266

employment opportunities unnecessarily as a result of section 274A. It is simply not true that notice of a discrepancy with SSA records is actual notice of a lack of work authorization unless the error is clearly a minor typographical one. For example, consider the hypothetical case of employee Pat Smith, whose W-2 is a mismatch because SSA records indicate that the SSN pertains to Patricia Jones. That is an entirely different name, but in our hypothetical is explained by the fact that Ms. Jones has become Mrs. Smith but has neglected to report that change to SSA. Does notice of this discrepancy by itself immediately put the employer on actual notice that Mrs. Smith is an unauthorized alien, as you suggest, and therefore put it in violation of section 274A if it does not immediately suspend her? It does not. Furthermore, your assumption that an employee about whom SSA has reported a discrepancy necessarily has used a Social Security card as proof of work authorization is incorrect. The Social Security number may be written in section 1 of the Form I-9, but the employee may have presented a List A document, or a List C document other than a Social Security card in conjunction with a List B document.

We emphasize that although it is incorrect to assume that an SSA discrepancy necessarily indicates unauthorized status, it would be equally incorrect for an employer to assume that in all cases it may safely ignore any possible INA relevance or consequences of SSA discrepancies. For example, perhaps an employer receives information from some other source (such as a tip from another employee) indicating that an employee is unauthorized, and also receives notice from SSA that the employee's SSN does not match. In considering whether the totality of the circumstances rises to actual or constructive knowledge, the SSA notice is a relevant fact that would support a conclusion that it does. This is the type of situation we had in mind when we said in our December 23, 1997 letter that although an SSA notice of discrepancy standing alone does not itself put the employer on notice of unauthorized status, there may be situations in which such notice would cause or contribute to a determination that the employer has been put on notice.

In addition, an employer should not ignore the consequences of the follow-up activity it should perform in response to an SSA notice in order to reconcile its records for SSA purposes, such as verifying names and SSNs by examining Social Security cards. While this activity is not required by the INA (nor is it prohibited by it), the knowledge obtained by an employer through this process may have INA implications. For example, consider the case of an employee who, when asked to show his Social Security card for SSA reconciliation purposes, states that he is an unauthorized alien and does not have one. If that employee's employment is continued, the employer has violated section 274A. There is no safe harbor for such information just because it was learned as a result of non-INA-related business activity. As explained in our December 23, 1997 letter, if the employer learns reliable information that contradicts the Form I-9, such as a different Social Security number or name, the Form I-9 should be corrected in a non-destructive manner and, if the contradiction is with section 2 information, the employer should review acceptable Form I-9 documentation showing the correct information. Furthermore, if an employee has been given the opportunity for wage reporting purposes to explain and reconcile a reported discrepancy with SSA records, and has failed to do so satisfactorily, that is an entirely different situation from an initial SSA notice standing alone. The INS would be much more likely at that point to consider that employer to have violated section 274A if it continues the employment without taking appropriate steps to reverify work authorization, and the employee is in fact unauthorized.

Page 3

Your letter also asks for clarification of our previous statement that an employer could be held liable for knowingly employing an unauthorized alien if it hires someone using a known invalid SSN. Again, let us consider a fact pattern: An employer knows (as all employers reasonably should) that all SSNs have 9 digits. An employee provides an SSN (either in section 1 or section 2 of the Form I-9) that has only 6 digits. If that employee is unauthorized, the INS may charge that employer with the knowing hire of an unauthorized alien. Further, the employer attests under penalty of perjury in section 2 of the Form I-9 that "to the best of my knowledge the employee is eligible to work in the United States." If, in fact, to the best of the employer's knowledge the employee is using an invalid SSN, that is a false attestation.

Your letter questions why the employer may be liable "for the employee's failure to record the SSN correctly," when it is the employee rather than the employer who declares under penalty of perjury that the information in section 1 of the Form I-9 is correct. It is true that the employer is not the guarantor of the section 1 information supplied by the employee and is not required to investigate its truthfulness, but the employer's certification in section 2 that to the best of its knowledge the employee is work authorized (as well as potential liability for aiding and abetting an employee's perjury), means that it cannot knowingly condone a false section 1. If the employer knows at the time of hire that section 1 information is incorrect, it cannot execute the section 2 certification. In the scenario in the preceding paragraph, the employer may be liable under section 274A not because the SSN is incorrect, but because it knew that it was incorrect and accepted it anyway.

This information pertains as well to your question about our statement that an employer should not rely on a Form I-9 as a verification of employment eligibility if the employer determines that the employee has fraudulently executed it. You point out that a false statement on the Form I-9 (for example, a false date of birth) may have "nothing to do with the individual's right to work." Our prior letter used the term "fraudulently" advisedly, according to its common-law meaning of a material misrepresentation upon which the recipient of the misrepresentation detrimentally relies. There may be circumstances in which an employee's false statement on the Form I-9 is unrelated to the purpose of the Form – verification of authorization to work – and therefore would not be "fraudulent." However, employers should exercise caution about drawing that conclusion, as all the information on the Form I-9 is there for a reason. For example – using the examples you mention, lies about age or address – the false statement would be entirely material to the purpose of the Form I-9 if it was made to reconcile the section 1 information with the age or address shown in false documents presented for section 2. As a general matter, a Form I-9 that contains a statement by an employee that was knowingly false when it was made is not a trustworthy document. We believe that an employer who discovers that its employee has lied on a Form I-9 about any fact is fully entitled to take reasonable steps (such as a reverification) to ensure that the employee has not also lied about his or her work authorization or anything else on the form, and that if it continues the employment without doing so, it is taking a risk that it may be held liable if in fact the employee is not authorized.

Page 4

You state that the Internal Revenue Service issues to aliens who lack employment authorization but who need to file tax returns "Individual Taxpayer Identification Numbers ('ITINs') that resemble SSNs with respect to numbers and order of digits, but begin with a '9,'" and that in cases where an authorized worker has not received an SSN "the worker would expect to record the ITIN in section 1 of the I-9 form." That would be incorrect. No number other than a Social Security account number should be recorded in the designated space in section 1 of the Form I-9. Social Security numbers do not begin with a "9" and, except in extremely rare situations as individually determined by SSA on a case-by-case basis for extraordinary and compelling reasons, they do not change; an individual's SSN is his or her number for life.

I hope this information is useful. If we may be of assistance in the future, please let us know.

Sincerely,

Paul W. Virtue
General Counsel

No-Match Cert. Admin. Record  1269

SSA/IRS

# Reporter

**Social Security Administration**

**Internal Revenue Service**

**Inside this Issue...**

More Volunteers Eligible for EFTPS
page 2

New Lower Rates Determine the Cost of Employer-Provided Group-Term Life Insurance
page 2

The Social Security Statement—A Message for Employees
page 3

Census Takers Needed for Census 2000
page 4

DOJ Advises Tax Credit and Deduction Help to Businesses Comply with the ADA
page 4



Department of the Treasury
Internal Revenue Service

www.irs.ustreas.gov

Publication 1693 (Rev 9-99)
Catalog Number 15050W

Social Security Administration
www.ssa.gov/employer

**Fall 1999**

A Newsletter for Employers

## Employers Who Offer Employees Cafeteria Benefit Plans Must Report Them to the IRS

If you are an employer that maintains a cafeteria or flexible benefit plan for your employees, you must file an information return for each year. Employers must file Form 5500, Annual Return/Report of Employee Benefit Plan, with Schedule F to meet this requirement. No exceptions exist for filing Form 5500 for cafeteria plans.

Also, state agencies, governmental agencies, and Indian tribes are required to file Form 5500 for cafeteria plans even though they may be exempt under the Employee Retirement Income Security Act of 1974 (ERISA) from filing Form 5600 for pension benefit and welfare benefit plans.

This is how a cafeteria plan works. Section 125 of the Internal Revenue Code (Code) makes it possible for employers to offer their employees a choice between cash and a variety of nontaxable benefits known as "qualified benefits". A qualified benefit is a benefit that does not defer compensation and which is excludable from an employee's gross income under a specific provision of the Code.

These qualified benefits include health care, vision and dental care, group-term life insurance, disability, adoption assistance, and certain other benefits. Employers may offer flexible spending accounts to employees that provide coverage under which specified, incurred expenses may be reimbursed. These include health flexible spending accounts for expenses not reimbursed under any other health plan and dependent care assistance programs.

An employer's contribution to a cafeteria plan is usually made as a result of a salary reduction agreement between the    continued on pg. 4

continued on pg. 4

### Notice of SSN Mismatch Not Basis for Adverse Action

Social Security notifies employers when reported employee names or Social Security numbers (SSN) don't match Social Security's records. It's important to understand that a mismatch doesn't necessarily mean the worker is using someone else's Social Security number or that the worker is an undocumented immigrant.

Some employers may take action against an employee based on the information in the notices. The notice of a mismatched name or number in an employer's wage report does not imply that the employee intentionally provided incorrect information and should not be a basis for adverse action against the employee. If an employer transfers, lays off, terminates or otherwise takes action against an employee based on information contained in the notice, the employer may violate the laws of the United States and be subject to prosecution or other legal consequences.

If a notice of a mismatched Social Security number is received from Social Security, the employer should check the records for a mistake in the reported number or worker's name. It could be something as simple as an inverted    continued on pg. 4

continued on pg. 4

Fall 1999

SSA/IRS

## More Volunteers Eligible for EFTPS!

The Electronic Federal Tax Payment System (EFTPS) continues to offer all taxpayers an easy way to pay their Federal taxes, and those benefits are compelling more and more taxpayers to use the system. Over 2.4 million taxpayers have enrolled in EFTPS, and that includes more than one million volunteers!

Beginning January 1, 2000, the threshold requiring the use of EFTPS will be changed from $50,000 to $200,000. The regulation for the new $200,000 threshold applies to the total deposits made in 1998. This means that businesses must consider deposits of all types of taxes (such as employment, excise or corporate income tax) made during 1998 to determine if they are required to use EFTPS. Between July 1, 1999, through December 31, 1999, the IRS will waive penalties for required taxpayers that deposited $200,000 or less in calendar year 1998, and do not use EFTPS.



The threshold change reduces the number of taxpayers required to use EFTPS and provide options for small businesses to comply with the tax rules and regulations. The Treasury Department encourages business taxpayers to learn more about EFTPS and to experience the ease and convenience of electronic payments. Taxpayers currently using the system tell us they are very pleased with the accuracy and speed of EFTPS.

To join the millions of taxpayers already enjoying the benefits of EFTPS, please call EFTPS Customer Service at 800-945-8400 or 800-555-4477 to receive an enrollment form or additional information. IRS

## SSA Eliminates 8" and 5¼" Diskettes for AWR Filing

SSA will no longer accept annual wage reports (Forms W-3/W-2) filed on 5¼-inch diskettes effective tax year 2000 (for W-2s due in calendar year 2001). SSA previously announced the elimination of 8-inch diskettes beginning tax year 1999. Both the 5¼ and 8 inch diskettes are being eliminated to simplify the diskette reporting process and achieve a more efficient program for SSA, employers and the payroll community.

Alternative methods of filing include electronically via SSA's Online Wage Reporting Service (OWRS), ½ inch magnetic tape, 3480 cartridge or 3490 cartridge. SSA

## New Lower Rates Determine the Cost of Employer-Provided Group-Term Life Insurance

Many employees will pay less social security and Medicare tax under new rules that apply to group-term life insurance. Beginning July 1, 1999, new rates go into effect to determine the cost of employer-provided group-term life insurance of more than $50,000. For most group plans, the first $50,000 of coverage is excluded from social security and Medicare tax for each employee per year. IRS regulations provide a table showing the cost per thousand dollars of coverage of group-term life insurance of more than $50,000 paid by the employer.

Employers may treat the costs as paid at any time or period, but they must be treated as paid at least once per year. The rates for costs treated as paid after June 30, 1999, and for prior periods are found in Table A.

Until January 1, 2000, you may treat the new "Under 25" and "25 to 29" brackets as one "Under 30" bracket with a rate of .06.

Note: The change in rates may result in group-term coverage provided under some employee-pay-all plans that previously was not taxable to become subject to the



SSA/IRS

# The Social Security Statement–
# A Message for Employees

In October 1999, SSA will begin mailing the Social Security Statement (formerly known as the Personal Earnings and Benefit Estimate Statement) to all workers age 25 and older (about 125 million) who are not already receiving monthly Social Security benefits.

Employers and payroll organizations have suggested that SSA prepare an "employee message" that could be distributed in advance of the October 1999 mailings. The message would explain the upcoming mailing and potentially minimize calls or questions to payroll offices once the mailings begin. The following sample message is for your use. It's suitable for reproduction in company newsletters, bulletin boards, paycheck stuffer, etc.

### Your Social Security Statement: The Futures in Your Hands

In October 1999, the Social Security Administration will begin mailing Social Security Statements (formerly known as the Personal Earnings and Benefit Estimate Statement) to all workers age 25 and older (about 125 million) who are not already receiving monthly Social Security benefits.

You can expect to receive your Statement each year about three months before your birth month. For example, if your birthday falls in February, you can expect to receive your Social Security Statement in November.

The 4-page Social Security Statement is intended to help you plan your financial future by providing estimates of the monthly Social Security retirement, disability and survivors benefits you and your family could be eligible to receive now and in the future. The Statement will remind you that Social Security is the foundation on which to build a more secure future.

The information in the Social Security Statement also will provide you with an easy way to determine whether your earnings (or self-employment income) are accurately reported and recorded on your Social Security record. Making sure the name and Social Security Number your employer has on record matches your Social Security card is the best way to ensure earnings will be accurately posted. That's important because the amount of your future benefits will be continued on pg. 4

same rules of taxation as employer-financed group-term plans. However, a special transitional rule allows you to use, until January 1, 2003, the old rates for determining whether coverage under your employee-pay-all plan is subject to taxation.

For more information See IRS Reg 1.79-1 and Publication 535, *Business Expenses.*

For IRS tax forms, publications and more, contact IRS' Web site at http://irs.ustreas.gov. **IRS**

**Table A**

**Cost Per Thousand Dollars of Coverage of Group-Term Life Insurance Over $50,000 Paid by the Employer**

| 5-year Age Bracket | Cost Per $1,000 of Coverage Per Month | |
|---|---|---|
| | new table effective 7/1/99 | old table prior to 7/1/99 |
| Under 25 | 0.05 | — |
| 25 to 29 | (Under 30) | .06 |
| 30 to 34 | .06 | .09 |
| 35 to 39 | .09 | .11 |
| 40 to 44 | .10 | .17 |
| 45 to 49 | .15 | .29 |
| 50 to 54 | .23 | .48 |
| 55 to 59 | .43 | .75 |
| 60 to 64 | .66 | 1.17 |
| 65 to 69 | 1.27 | 2.10 |
| 70 and above | 2.06 | 3.76 |



Fall 1999

# Census Takers Needed for Census 2000

The Bureau of the Census is currently recruiting nationally for people to help conduct Census 2000. Census takers, earning $6 to $15 an hour, will work approximately six to eight weeks.

You can apply if...

- You are 18 years or older.
- You can work evenings and weekends.
- You take a written test of basic skills.
- You agree not to engage in any partisan political activity within 24 hours of performing work.

- Males age 18 or older, born after Dec. 31, 1959, must be registered with selective service.

Even though preference is given to U.S. citizens, qualified non-citizens may be considered if enough qualified citizens are not available. If you, or people you know, are interested in applying for a position with the Census Bureau or would like more information, call the toll-free number, 1-888-325-7733. **SSA**

## DOJ Advises Tax Credit and Deduction to Help Businesses Comply with the ADA

All businesses, regardless of size, must comply with the Americans with Disabilities Act (ADA).

Small businesses may use a tax credit of up to $5,000 a year to offset half the cost of: altering facilities, purchasing equipment, providing Braille or a sign language interpreter, or other modifications to improve accessibility for customers or employees.

All businesses may take a deduction of up to $15,000 a year to offset the cost of altering facilities to improve accessibility.

To learn about the ADA and order a free ADA Tax Incentive Packet, call the ADA Information Line at 800-514-0301 (voice) or 800-514-0383 (TTY) or access the ADA Home Page at www.usdoj.gov/crt/ada/adahom1.htm. **IRS**

## Cafeteria Benefit
continued from pg.1

employer and the employee. The employee agrees to contribute a portion of his or her salary on a before-tax basis to pay for the qualified benefits. Since salary reduction contributions are not actually or constructively received by the participant, the contributions are not considered wages for federal income tax purposes. In addition, those sums generally are not subject to Federal Insurance Contribution Act and Federal Unemployment Tax Act taxes.

A salary reduction agreement is sufficient to satisfy the "cash" requirement of a cafeteria plan. Thus, a cafeteria plan needs only to offer a choice between one qualified benefit and salary reduction. **IRS**

## Social Security Statement
continued from pg.3

based on your Social Security earnings record. The Statement will tell you how to correct inaccurately recorded earnings.

In addition to helping plan your retirement, these are other ways to use your Social Security Statement:

- Plan your financial security for today and tomorrow by knowing the amounts of Social Security benefits that could be available to you and your family if you become disabled.

- Determine whether you have sufficient insurance to protect your survivors if you die.

- See how your potential Social Security benefits fit in with your investments and savings.

For more information about Social Security benefits, call or visit your local Social Security office, call this toll-free number, 1-800-772-1213, or visit this Web site: www.ssa.gov. **SSA**

## SSN Mismatch
continued from pg.1

number or a failure to report a name change.

Social Security suggests that the best way to prevent problems is to verify employee records and W-2s for accuracy when filing the annual wage reports:

- Ask employees to check the name and number on their W-2s with their Social Security card.
- Remind employees to report name changes to Social Security; and
- Ask to see a new employee's Social Security card to record the name and number exactly as shown on the card.

In this way, you can avoid the need to divert time and resources to the problem of fixing erroneous Social Security numbers.

This issue should not be confused with the ongoing pilot in several states in which SSA will verify the Social Security number and work status of a job applicant upon request from an employer. The pilot involves new hires while the mismatch problem involves current employees whose mismatched Social Security numbers or names show up in the employer's wage reports to Social Security. **SSA**



Civil Rights Division

Special Counsel for Immigration Related
Unfair Employment Practices - CRT
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

April 3, 2004

By First Class Mail
Ana Avendaño Denier
Associate General Counsel
American Federation of Labor and Congress
of Industrial Organizations
815 16th St. NW
Washington, D.C. 20005

Re: Social Security No-Match Letters

Dear Ms. Avendaño Denier:

This letter addresses your request for guidance concerning appropriate employer action upon receipt of a Social Security no-match letter. In particular, this letter addresses whether the validity of an employee's completed employment eligibility verification form (INS Form I-9) is called into question when the employer receives a Social Security no-match letter.

The receipt of a no-match letter, standing alone, does not indicate to an employer that he or she need question the genuineness of documents or information previously presented to complete an INS Form I-9. This applies equally to the situation where the employee presents a Social Security card to establish employment eligibility under List C of the INS Form I-9. The General Counsel's office of the former Immigration and Naturalization Service has stated, in a number of earlier opinion letters, that receipt of the no-match letter, standing alone, does not place the employer on notice of an employee's unauthorized status or "require reverification of documents or further inquiry as to the employee's work authorization." See December 23, 1997, letter from David A. Martin, General Counsel. Actual or constructive knowledge of undocumented status is a case-by-case determination and depends upon the individual circumstances and totality of the circumstances before the employer, including any admission by an employee that he or she is undocumented, information learned from other sources, or follow-up activity in response to the receipt of the no-match letter.

Both the former INS General Counsel's office and the Social Security Administration have noted that there are many reasons for issuance of a no-match letter, including errors made in spelling an employee's name or the recording of the Social Security number, and the failure to report a name change after marriage or divorce, among other reasons. Further, the Social

No-Match Cert. Admin. Record 1274

Security Administration states clearly that a no-match letter makes no statement about an employee's immigration status.

An employer's decision to terminate an employee based solely upon the receipt of a no-match letter may constitute citizenship status or national origin discrimination, or unfair documentary practices, in violation of the anti-discrimination provision of the Immigration and Nationality Act, 8 U.S.C. § 1324b, which is enforced by the Office of Special Counsel for Immigration-Related Unfair Employment Practices ("Office of Special Counsel") of the Civil Rights Division of the U.S. Department of Justice.

I hope this information is useful. If the Office of Special Counsel may be of assistance in the future, please let us know.

Sincerely,

Sarah DeCosse
Senior Trial Attorney
Office of Special Counsel for
    Immigration-Related Unfair
    Employment Practices

August 11, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

Re:   DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"

Dear Sir or Madam:

The City of Santa Fe Immigration Committee submits the following comments regarding the Department of Homeland Security's proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter."

The Immigration Committee was established by the Santa Fe City Council in 2001 to monitor the human rights status of immigrants in this community. In the last five years, this Committee has received numerous complaints from employees and employers about the impact of Social Security Administration no-match letters. In some cases, employers have been confused as to what the letters imply about the eligibility of their employees to work in this country. In other cases, workers have complained that employers have utilized the letters to retaliate against them, fire them, or impede collective bargaining negotiations. These letters have been disruptive for working families, unions, and for business owners in Santa Fe.

In an attempt to educate workers and employers about the true nature of the SSA no-match letter program and the legal limitations regarding work eligibility re-verification, the Santa Fe City Council passed a resolution on July 26, 2006, declaring a policy of non-discrimination upon receipt of a no-match letter. Given the City's efforts to mitigate the current impact of the no-match program, the Immigration Committee is very alarmed and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule would magnify the adverse consequences that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory for all workers, regardless of immigration status.

We know that the SSA database is known to be inaccurate and out-of-date, and often times "no-matches" occur because of name changes and clerical errors. Out of caution, panic, and confusion employers will fire workers who receive a no-match letter before workers have a chance to correct their records with SSA. Some employers could easily use the letters to undermine labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations.

The DHS rule would also be imposing a new set of legal obligations on employers. These new obligations will increase pressure on businesses to go "off the books," thereby promoting the unregulated underground cash economy which results in significant losses in federal, state, and local tax revenues. The proposed rule would have the effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

**No-Match Cert. Admin. Record  1276**

Any worksite immigration enforcement proposal of this magnitude should happen in the context of comprehensive immigration reform enacted by Congress. Immigrant workers and employers should not be subjected to this unprecedented enforcement while the current law is still under debate and reformulation.

Immigrants play a vital role in the social, cultural and economic life of this city. We are deeply concerned about the potential negative impact this rule would have on Santa Fe's working families, as well as our local economy. We therefore request that the Department of Homeland Security withdraw this proposed rule in its entirety. Thank you for taking this into consideration.

Respectfully submitted,
City of Santa Fe Immigration Committee
PO Box 909 Santa Fe, NM  87504
Tel. (505) 955-6949
Fax (505) 955-6401

María Cristina López, Chairperson
Betty Jean Shinas, Vice-Chairperson
María Bueno de Herrera
Matt Davis
Jewel Cabeza de Baca
Marcela Díaz
Elizabeth Hemmer
Erwin López
Erik Mason
Erwin Rivera

Cc: Mayor of the City Santa Fe David Coss

August 11, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

***Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for
Employers Who Receive a No-Match Letter"***

Dear Sir or Madam:

The National Council of La Raza (NCLR) submits the following comments in response to the
request of the Department of Homeland Security (DHS), Bureau of Immigration and Customs
Enforcement (ICE) for public comment on the proposed "Safe-Harbor Procedures for Employers
Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The National Council of La Raza (NCLR) – the largest national Hispanic civil rights and
advocacy organization in the United States – works to improve opportunities for Hispanic
Americans. Through its network of nearly 300 affiliated community-based organizations
(CBOs), NCLR reaches millions of Hispanics each year in 41 states, Puerto Rico, and the
District of Columbia. NCLR is also a convener of the Low-Wage Immigrant Worker Coalition,
a nationwide coalition of labor unions, civil rights organizations, immigrant rights organizations,
and others concerned with the rights of low-wage immigrant workers in the U.S.

NCLR has ample experience in dealing with the adverse impact that the Social Security
Administration's (SSA) no-match letters have had on all workers in the United States –
immigrant and native-born alike. Since implementation of employer sanctions in the late 1980s,
the Latino community is particularly cognizant of workplace discrimination against persons who
look or sound "foreign" or have a "foreign" surname. Some employers demand that certain
workers show additional or "better" documents beyond what is required by law – often asking
for immigration documents from U.S. citizens whom they perceive to be immigrants. Other
employers implement unlawful "citizen only" policies. A congressionally-mandated
Government Accountability Office (GAO) report found a widespread pattern of discrimination
resulting solely from employer sanctions, reporting substantial discrimination on the basis of
foreign accent or appearance, or preference of certain authorized workers over others.

**No-Match Cert. Admin. Record  1278**

The SSA no-match letters have added another layer to the impact of employer sanctions as unscrupulous employers now have another tool with which to discriminate and retaliate against workers who try to improve working conditions. Furthermore, legal resident and U.S. citizen Latinos are more likely to endure the harmful impact of the no-match letters. As a result, NCLR has worked with SSA in the past to identify problems with the no-match letters, re-draft the content of the letters employers receive, propose redress policies for workers who are negatively affected, and otherwise ameliorate the potential harm done by SSA no-match letter policies.

As a result of our history with workplace discrimination and SSA no-match letters, NCLR is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will not resolve the problem of undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. Comprehensive immigration reform is necessary to fix the nation's broken immigration system and ensure that workers have proper authorization to work in the U.S.

As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers – **including U.S. citizens and authorized noncitizens** – could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor-organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule punishes law-abiding employers.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on

**No-Match Cert. Admin. Record  1279**

millions of employers. These new legal obligations will increase pressure on businesses to go "off the books," thereby promoting the unregulated, underground cash economy, potentially resulting in billion-dollar losses in federal, state, and local tax revenues; unfair competition; and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage when competing with "bad" employers who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **Comprehensive immigration reform is the solution.**

NCLR strongly feels that comprehensive immigration reform that includes an earned legalization for undocumented workers is the only practical and realistic solution to our current immigration problem. Enforcement alone will not work, and the SSA no-match letters are not an effective way of resolving the problem of undocumented labor. Moreover, the proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool, but the SSA database does not have the capacity to fulfill this objective. In addition to being error-prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of an SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS

**No-Match Cert. Admin. Record  1280**

to bypass these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable as it does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In conclusion, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands -- possibly millions – of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Janet Murguía
President and CEO

Page 4 of 4



**OREGON**
**ASSOCIATION OF**
**NURSERIES**

29751
SW Town Center
Loop W

Wilsonville, OR
97070

Phone
503.682.5089

Toll-Free
1.800.342.6401

Fax
503.682.5099

Web
www.oan.org

August 10, 2006

Director, Regulatory Management Division
US Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

Re:     DHS Docket No. ICEB-2006-0004

Dear Director:

On behalf of Oregon's nursery industry, it is our pleasure to submit
written comments to the DHS proposed rules as printed in the
*Federal Register*, Vol. 71, No. 114 on Wednesday, June 14, 2006.
We appreciate the department's interest in seeking "safe harbor"
clarifications rather than new employer obligations. We welcome
guidance to ensure the long term viability of the nursery industry's
labor force.

Agriculture, the US Chamber of Commerce, and other business
groups have joined together to work with DHS on a solution for "no-
match" Social Security Numbers and liability concerns for
employers. We have concerns that the proposed rule's timing is not
in concert with other large pieces of legislation – primarily
Immigration Reform – that would enable the entire "system" to
work. As you are aware, agriculture is labor intensive and growers
have been operating under a law that is dysfunctional and provides
no viable means of obtaining a stable legal workforce.

Several elements should be considered before action is taken by
DHS on a "no-match" rule:
- The rule must result in a significant reduction of acceptable
  employment authorization documents--preferably a single
  social security-type document.
- The option of telephonic or computer-based verification
  should be retained.
- The verification database should not be universally
  implemented prematurely nor applied retroactively in order
  to enable it to adjust to the tremendous demands to be
  imposed upon it.

- The rule should clarify the verification responsibilities of recruiters, referrers, independent contractors and entities using their services and avoid needless duplication effort.
- In the event of a system malfunction, employers should not be required to make daily inquiries as to employment eligibility.
- New lawful discrimination prohibitions imposed by the verification system should be set forth clearly in the rule.

The bottom line concern for our industry is the interruption of a productive workforce and an unwieldy and cumbersome verification process that takes growers out of the field and into an office. Any prospective verification process should be gradually phased in over a number of years. The safe harbor elements listed in the rule needs to encompass the reality of agricultural hiring practices and not be construed to a narrow definition of a contractor-subcontractor relationship.

**Oregon Association of Nurseries advice to our growers**

As you are undoubtedly aware, employers must walk a very thin line upon receipt of a no-match letter. On one hand, they have a legal obligation to hire and maintain a legal work force. On the other hand, they have a legal obligation not to discriminate based on race or national origin. If DHS intends to step up enforcement in this area, employers must have a clear pathway to avoid legal liability without jeopardizing their workforce.

Currently, we recommend that employers proceed cautiously when receiving a no-match letter. Employers have an obligation to take reasonable action to address the letter. The nursery association takes seriously the comments made by the Director of the Department of Homeland Security, stating that the department intends to step up enforcement in this area.
Employers receiving no-match letters need to examine their own records to be sure that such a letter is not a result of a clerical mistake made when filling out paperwork at the time of hire. If that information was accurately recorded, we ask the employee to resolve the discrepancy with the Social Security Administration. Employers must give an employee a reasonable amount of time to resolve the difference; generally 30 to 60 days is our rule of thumb. We encourage employers to offer the employee time off from work to resolve the issue. If an employee fails to resolve the discrepancy within the time allotted, and cannot provide a good reason for failing to do so, we encourage the employer to contact an immigration lawyer for further advice.

**Conclusion**

Over the past 20 years, agriculture has utilized a nondiscriminatory and effective process of determining the employment eligibility of new hires. The OAN has been in regular contact with the American Nursery & Landscape Association regarding the outcome of this proposed rule, but the larger issue is immigration reform.

It is our view that the no-match rule only works as a component of comprehensive immigration reform. Electronic verification could and should receive the support of agriculture if it is predictable, if it is simple to use and if it is coupled with avenues and means to obtain legal

workers when there is an insufficient domestic workforce. If "no-match" letters were used as a weapon and placed growers in a legal and operational predicament, the result would be that Oregon and national agriculture would face an untenable labor situation.

**The Oregon Association of Nurseries**

As the Director of Government Relations for the Oregon Association of Nurseries, based in Wilsonville, Ore., I submit these comments on behalf of more than 1,500 wholesale growers, retailers, landscapers and suppliers. Oregon's nursery and greenhouse industry is the state's largest agricultural sector. Annual surveys conducted by the Oregon Agricultural Statistics Service consistently show the nursery/greenhouse industry leads all other sectors of Oregon agriculture in sales, payroll and full-time employees. Oregon trails only California and Florida in nursery production and accounts for 15 percent of all U.S. nursery crops.

Other key facts about the Oregon nursery industry:
- Oregon is the nation's largest "exporter" of nursery stock. Over $600 million worth of nursery and greenhouse product — about three-quarters of all production — is sold outside the state.
- Wholesale sales of nursery/greenhouse material were $844 million in 2004, and when combined with Oregon's Christmas tree sector, we generate close to $1 billion in annual sales at the farm gate.
- Oregon's nurseries account for just slightly more than 1 percent of all agricultural land in Oregon, yet produce more than 20 percent of all agricultural sales.
- Oregon is No. 1 in the US in the production of shade trees, coniferous evergreens and Christmas trees; No. 2 among all states in the production of deciduous flowering trees and other broadleaf evergreens; and No. 3 in the production of deciduous shrubs, other ornamentals and fruit and nut plants.

I hope I provided you a useful snapshot of the opportunities and challenges that face nursery growers in Oregon and the Pacific Northwest. Please feel free to call upon Oregon's nursery industry as a partner and resource

Sincerely,

Jeff Stone, Director of Government Relations
Oregon Association of Nurseries



# INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO

202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators·
Wallcovers· Drywall
Finishers·
Painters· Decorators· Scenic
Artists· Designers· Civil
Service
Workers· Shipyard Workers·
Maintenance
Workers· Building
Cleaners· Metal Polishers·
Metalizers· Public Employees·
Clerical Workers· Professional
Employees· Security Guards·
Safety Engineers· Bridge
Painters· Riggers· Tank
Painters·
Marine Painters· Containment
Workers· Waterblasters·
Vacuum Cleaners· Sign
Painters· Sign and Display
Workers· Bill
Posters· Convention
and Show Decorators and
Builders· Paint Makers·
Glaziers· Architectural Metal
And Glass
Workers· Sandblasters
· Lead Abatement Workers·
Floorlaying and Decorative
Coverings
Workers· Journeyman
And Apprentice Commercial,
Industrial, Highway,
Residential
Construction Workers

ONE AGENDA

*VIA EMAIL*

August 9, 2006

Director
Regulatory and Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave. NW, 2nd Floor
Washington DC, 20529
rfs.regs@dhs.gov

RE:    DHS Docket No. ICEB-2006-0004

Dear Director:

The International Union of Painters and Allied Trades ("IUPAT") respectfully submits the following comments in response to DHS Docket No. ICEB-2006-0004 concerning Safe-Harbor Procedures for Employers Who Receive a No-Match Letter. IUPAT is an ethnically diverse labor organization representing workers in the United States and Canada in the Finishing Industry. IUPAT works closely with its signatory contractors, developers, and construction users to train workers with the skills needed to perform difficult jobs safely, and efficiently. As an advocate for workers, our contractors and America's construction industry, IUPAT is concerned about and interested in the proposed rulemaking issued by the Department of Homeland Security ("DHS") on June 14, 2006. IUPAT supports efforts to protect our nation and enhance the integrity of our immigration system. IUPAT does not, however, believe that this proposed rule accomplishes these goals. Furthermore, IUPAT is concerned about the burden the proposed rule may place on honest workers and contractors and the unintended consequences it may have on the quality of America's construction industry workforce.

## I.    Introduction

Current law makes it unlawful for an employer to hire or continue to employ an employee "knowing [the employee] is (or has become) an unauthorized alien with respect to such employment." 8 U.S.C. § 1324a(a)(2). An employer may violate the law even if it lacks actual knowledge that the employee is an unauthorized alien, so long as the employer has "constructive" knowledge of the worker's unlawful status. 8 C.F.R.  § 274a.1(l)(1). Constructive knowledge may arise if an employer does not investigate suspicious circumstances which would make a reasonable employer question the integrity or veracity of work eligibility information provided by an employee.



INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO, CLC

202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators ·
Wallcovers · Drywall Finishers ·
Painters · Decorators · Scenic
Artists · Designers · Civil Service
Workers · Shipyard Workers ·
Maintenance Workers · Building
Cleaners · Metal Polishers ·
Metalizers · Public Employees ·
Clerical Workers · Professional
Employees · Security Guards ·
Safety Engineers · Bridge
Painters · Riggers · Tank
Painters ·
Marine Painters · Containment
Workers · Waterblasters ·
Vacuum Cleaners · Sign
Painters · Sign and Display
Workers · Bill
Posters · Convention
and Show Decorators and
Builders · Paint Makers ·
Glaziers · Architectural Metal
And Glass
Workers · Sandblasters
· Lead Abatement Workers ·
Floorlaying and Decorative
Coverings
Workers · Journeyman
And Apprentice Commercial,
Industrial, Highway, Residential
Construction Workers

ONE AGENDA

Existing DHS regulations provide illustrations of circumstances that may give rise to constructive knowledge on the part of an employer. The regulations proposed by DHS June 14, 2006 would add receipt of a DHS or Social Security Administration ("SSA") no-match letter to the list of examples giving rise to any employer having constructive knowledge. The proposed rule also directs employers to follow specific procedures and timelines when they receive no-match letters. If the recommended procedures are followed, employers are eligible for a "safe harbor" from DHS or SSA prosecution (and, as practical matter, some degree of insulation from wrongful termination lawsuits) if it is later determined that the employee at issue is out of status.

As we understand them, the recommended procedures mandate that:

1. Within 14 days of receiving the no-match letter, the employer must determine whether the discrepancy is the result of a clerical error, such as a typographical or transcription error, in its records. If it is a clerical error, the employer must verify that the corrected name and social security number match the SSA's or DHS's records; correct the error with the SSA or DHS per the instructions in the no-match letter; and record the method, date, and time of the verification and correction. The employer should also update its records to prevent a re-occurrence. All of these steps must be completed within 60 days of the employer's receipt of the no-match letter.

2. If the discrepancy is not the result of a clerical error, the employer must ask the employee to verify that the employer's records are correct. This request must be made within 14 days of the employer's receipt of the no-match letter. If the records are incorrect, the employer must verify that the corrected name and social security number match the SSA's or DHS's records; correct the error with the SSA or DHS per the instructions in the no-match letter or in another reasonable manner; and record the manner, date, and time of the verification and correction. The employer should also update its records to prevent a re-occurrence of the issue. All of these steps must be completed within 60 days of the employer's receipt of the no-match letter.

3. If the employee indicates that the employer's records are correct, then the employer should ask the employee to resolve the discrepancy by contacting the SSA or DHS directly. The employee may be given up to 60 days from receipt of the no-match letter in which to correct the discrepancy. Within 3 additional days (i.e., within 63 days after the employer received the no-match letter), the employer must verify that the employee has in fact

**No-Match Cert. Admin. Record  1286**

INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO, CLC



202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators ·
Wallcovers · Drywall Finishers ·
Painters · Decorators · Scenic
Artists · Designers · Civil Service
Workers · Shipyard Workers ·
Maintenance Workers · Building
Cleaners · Metal Polishers ·
Metalizers · Public Employees ·
Clerical Workers · Professional
Employees · Security Guards ·
Safety Engineers · Bridge
Painters · Riggers · Tank Painters ·
Marine Painters · Containment
Workers · Waterblasters ·
Vacuum Cleaners · Sign
Painters · Sign and Display
Workers · Bill
Posters · Convention
and Show Decorators and
Builders · Paint Makers ·
Glaziers · Architectural Metal
And Glass Workers · Sandblasters
· Lead Abatement Workers ·
Floorlaying and Decorative
Coverings Workers · Journeyman
And Apprentice Commercial,
Industrial, Highway, Residential
Construction Workers

ONE AGENDA

resolved the discrepancy. The employer may accomplish this verification in any reasonable manner, but the proposed regulations set forth a procedure that, if followed, would provide the employer a safe harbor from liability.

4.   If the employer is unable to resolve the discrepancy within 60 days of receiving a no-match letter, or the employer needs to verify that the employee resolved the discrepancy directly with DHS or SSA, the employer must, within 63 days of receiving the no-match letter, complete a new I-9 Form for the employee as if the employee was newly hired. In completing the new I-9 Form, however, the employer may only accept documents containing a photograph of the employee and may not accept any documents containing the social security or alien number that was the subject of the no-match letter. If the employer cannot verify the employee's authorization to work through this process, the employer must terminate the employee or risk being found to have knowingly employed an unauthorized alien. If the employer can provide appropriate documentation, the employer may continue to employ the employee and, if the employee later turns out to be an unauthorized alien, the employer will not be held to have constructive knowledge of the employee's status. Following this "safe harbor" procedure protects employers from liability for unknowingly employing unauthorized aliens. It should also provide an employer with a solid defense to a wrongful or discriminatory discharge claim by an employee who is terminated as a result of a no-match letter.

These procedures constitute a significant burden on employers and failure to follow them may result in serious penalties.

II.   The Proposed Rule Places an Undue Burden on Small and Medium Sized Employers Without any Corresponding Improvement in the Verification Process

Many of IUPAT's signatory contractors are small and medium-sized businesses that usually do not have large administrative staffs. The principals of these enterprises work around the clock to draft bids, meet deadlines for projects, manage employees and address other responsibilities associated with running a successful small business. The proposed procedures will impose considerable administrative burdens on these modest operations as DHS plans to make increasing use of no-match letters to target enforcement efforts.[1]   Already

---

[1] U.S. House of Representatives Committee on Education and the Workforce, *Hearing: Lessons Learned from the Immigration Reform and Control Act of 1986* July 31, 2006 (Testimony of

INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES

202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators ·
Wallcovers · Drywall
Finishers ·
Painters · Decorators · Scenic
Artists · Designers · Civil
Service
Workers · Shipyard Workers ·
Maintenance
Workers · Building
Cleaners · Metal Polishers ·
Metalizers · Public Employees ·
Clerical Workers · Professional
Employees · Security Guards ·
Safety Engineers · Bridge
Painters · Riggers · Tank
Painters ·
Marine Painters · Containment
Workers · Waterblasters ·
Vacuum Cleaners · Sign
Painters · Sign and Display
Workers · Bill
Posters · Convention
and Show Decorators and
Builders · Paint Makers ·
Glaziers · Architectural Metal
And Glass
Workers · Sandblasters
· Lead Abatement Workers ·
Floorlaying and Decorative
Coverings
Workers · Journeyman
And Apprentice Commercial,
Industrial, Highway,
Residential
Construction Workers

ONE AGENDA

overburdened small employers will have to divert resources from running their businesses in order to meet very specific timelines for each worker they are required to re-verify. If they lose track of a single cases involving a no-match letter, it may result in criminal prosecution on the basis of "constructive" knowledge of a worker's immigration status. Such a heavy burden cannot be justified in light of the well-documented flaws in the DHS and SSA databases from which no-match letters are derived.

Studies of DHS' immigration records (both paper and electronic) that form the backbone of the current employment verification system have repeatedly raised concerns about the reliability of the data. As recently as June of this year, the Government Accountability Office warned of serious defects in DHS' newest employment verification program–the "Basic Pilot Program." These defects included the continuing inability to detect identify fraud and long delays in entering data, which resulted in inaccuracies and inconsistencies.[2] Similar problems exist with the SSA's databases. The flaws in the agencies' databases are compounded by the fact that there is no easy way to reconcile conflicting data between DHS and SSA.

The burden associated with forcing employers to undertake burdensome, detailed re-verification procedures cannot be justified when the re-verification process is triggered by and dependent on flawed government databases. Requiring employers to make fast decisions about hiring and firing workers on the basis of such inaccurate data is also likely to result in the sudden loss of employment for many workers who may actually be authorized to work in the United States. Such "false negatives" have a serious impact on workers (and the families of workers) deprived of their jobs. They also deprive employers of valued workers they depend upon to finish projects in a proper and timely manner. All this at a time when the construction industry is experiencing great difficulty in recruiting and retaining skilled, trained labor. In short, DHS should not institute a second set of employee verification procedures until it can guarantee the reliability of the databases used in this re-verification process.

If, however, DHS nevertheless proceeds with imposing this re-verification process, it should greatly increase the length of time workers and employers have to address issues that may be raised by no-match letters. IUPAT believes that the 60 day period used in the proposed rulemaking should be extended to at least 120 days. This longer period will create a realistic possibility that time consuming processes (such as reconciling discrepancies between DHS and SSA files and databases) can be accomplished before an employer is required to take action. DHS's timelines need to recognize the challenges that DHS

---

DHS Immigration Agent John Chakwin discussing desire of DHS enforcement personnel to make greater use of "No-Match" Letters to target immigration enforcement).
[2] Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts, GAO-06895T (June 19, 2006).

INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO, CLC

202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators ·
Wallcovers · Drywall
Finishers ·
Painters · Decorators · Scenic
Artists · Designers · Civil
Service
Workers · Shipyard Workers ·
Maintenance
Workers · Building
Cleaners · Metal Polishers ·
Metalizers · Public Employees ·
Clerical Workers · Professional
Employees · Security Guards ·
Safety Engineers · Bridge
Painters · Riggers · Tank
Painters ·
Marine Painters · Containment
Workers · Waterblasters ·
Vacuum Cleaners · Sign
Painters · Sign and Display
Workers · Bill
Posters · Convention
and Show Decorators and
Builders · Paint Makers ·
Glaziers · Architectural Metal
And Glass
Workers · Sandblasters
· Lead Abatement Workers ·
Floorlaying and Decorative
Coverings
Workers · Journeyman
And Apprentice Commercial,
Industrial, Highway,
Residential
Construction Workers

ONE AGENDA

and SSA will face in responding to the potentially much larger volume of inquiries the proposed "Safe-Harbor" is likely to produce.

III.    DHS' Proposed Rule Will Encourage Document Fraud and Greater Use of Employment Arrangements that Lower Wages in the Construction Industry.

Both the current approach to employer verification and this proposed rule rely upon systems and verification processes that have proven extremely vulnerable to identify theft and fraudulent documents.[3] The re-verification proposed by DHS will simply encourage desperate immigrants and the unethical labor brokers who profit from their work to possess larger quantities of fake or stolen documents.

More importantly, the detailed and burdensome procedures the proposed regulations place on employers will provide employers with more compelling reasons to insulate themselves from responsibility for employment verification by turning to labor brokers or classifying workers as "independent contractors." Rather than assume the additional obligations within the short time periods proposed by this regulation and the associated risks of criminal and civil sanctions, employers will have greater incentives under this rule to delegate verification responsibilities to middlemen or to workers themselves. Employers will find it easier to use labor brokers or classify workers as self-employed, independent contractors and remain "willfully blind" as to the employment eligibility of the exploited, illegal immigrants who usually accept such arrangements. It is well documented that the already pervasive use of such arrangements deprives the government of tax revenue and exerts massive downward pressure on wages in the construction industry.[4] The government should not adopt policies that accelerate these trends. Doing so will make it increasingly difficult for people lawfully entitled to work in our country and honest employers to remain in the construction industry.

IV.    Conclusion

Simply put, DHS cannot effectively amend the employee verification process without also closing the massive loopholes created by unscrupulous labor brokers, the misclassification of workers, and the large market in false and stolen identity documents. Furthermore, DHS should not impose heavy burdens and tight timelines on employers when doing so results in no corresponding improvements to the integrity of the verification process. The proposed rule will simply drive more people to gaps in the system. It will force employers to expend

---

[3] U.S. House of Representatives Committee on Education and the Workforce, *Hearing: Lessons Learned from the Immigration Reform and Control Act of 1986* July 31, 2006 (Testimony of John Chakwin).
[4] *Projection of the Loss in Federal Tax Revenues Due to Misclassification of Workers*, Coopers & Lybrand (1994); Planmatics, Inc., *Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs* (February 2000).



INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO, CLC

substantial resources on an unreliable verification process. For all of these reasons, the proposed rule should not be implemented. If, despite the concerns raised by IUPAT, however, the rule is finalized, it must at least provide more realistic timelines to allow employers, employees and government agencies to address issues raised by no-match letters.

Respectfully Submitted,

Michael Monroe
Administrator
Government Affairs

William McDevitt
Fund Administrator
Labor Management
  Cooperation Initiative

sjb/iupat 1937
f/GA-A-Z-Legislation-Safe Harbor

202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators ·
Wallcovers · Drywall
Finishers ·
Painters · Decorators · Scenic
Artists · Designers · Civil
Service
Workers · Shipyard Workers ·
Maintenance
Workers · Building
Cleaners · Metal Polishers ·
Metalizers · Public Employees ·
Clerical Workers · Professional
Employees · Security Guards ·
Safety Engineers · Bridge
Painters · Riggers · Tank
Painters ·
Marine Painters · Containment
Workers · Waterblasters ·
Vacuum Cleaners · Sign
Painters · Sign and Display
Workers · Bill
Posters · Convention
and Show Decorators and
Builders · Paint Makers ·
Glaziers · Architectural Metal
And Glass
Workers · Sandblasters
· Lead Abatement Workers ·
Floorlaying and Decorative
Coverings
Workers · Journeyman
And Apprentice Commercial,
Industrial, Highway,
Residential
Construction Workers

ONE AGENDA

Legal Department

Richard G. McCracken, International Counsel

Bruce Raynor, General President
John W. Wilhelm, President/Hospitality Industry

# UNITEHERE!

595 Market Street, Suite 1400
San Francisco, CA 94105
Tel (415) 597-7200
Fax (415) 597-7201

Director, Regulatory Management Division
U.S. Citizenship & Immigration Services
Department of Homeland Security
111 Massachusetts Ave., NW, 2d Floor
Washington, D.C.  20529

> Re:      Comments on the regulation proposed by the Department of
> Homeland Security regarding "Safe-Harbor Procedures for
> Employers Who Receive a No-Match Letter"
> DHS Docket No. ICEB-2006-0004

Dear Director:

This letter provides UNITE HERE International Union's comments on the regulation proposed by the Department of Homeland Security regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." UNITE HERE represents approximately 450,000 workers, many of whom are immigrants, in the food service, laundry, hotel, gaming, textile and retail distribution industries. As we explain below, Subsections 274a.1(l)(1)(iii)(B), 274a.1(l)(2)(i)(A)(1-2) and 274a.1(l)(2)(iii) of the proposed regulation should not be adopted because the Department of Homeland Security lacks authority either to limit the documents that may be used in the I-9 process or to require employers to use the Social Security Administration's telephone hotline to verify corrected social security numbers.

## A.    The Department of Homeland Security lacks authority to limit the documents that may be used to satisfy the I-9 verification requirement

Section 274a.1(l)(2)(iii) of the proposed regulation restricts the documents that may be used to satisfy the I-9 requirement to documents bearing a photograph and not containing the social security number that appeared on the no-match letter. The Department of Homeland Security does not have authority to limit the documents that can be used.

**No-Match Cert. Admin. Record  1291**

Director, Regulatory Management Division
August 11, 2006
Page 2

The Immigration Reform and Control Act sets out what documents may be used to satisfy the I-9 requirements, and includes documents without photographs and that bear a social security number. 8 U.S.C. § 1324a(b)(1)(C, D). Importantly, the statute gives the Attorney General authority to expand, by regulation, the statutory list of documents that may be used to satisfy the I-9 requirements, 8 U.S.C. § 1324a(b)(B)(ii), (C)(ii), and (D)(ii), and also to restrict, by regulation, the use of documents listed in the statute if the Attorney General finds that such a document "does not reasonably establish such authorization or identity or is being used fraudulently to an unacceptable degree." 8 U.S.C. § 1324a(b)(E). The Attorney General's statutory authority to establish which documents may be used to satisfy the I-9 requirement was not transferred to the Department of Homeland Security. 8 U.S.C. § 1103(a) (transferring functions to the Secretary of Homeland Security "except insofar as the Act or such laws [relating to the immigration and naturalization of aliens] relate to the powers, functions, and duties conferred upon the President, Attorney General . . . .")

**B.     The Department of Homeland Security lacks authority to require employers to verify corrected social security numbers**

Section 274a.1(l)(2)(i)(A)(1) and (2) of the proposed regulation requires employers to verify corrected social security numbers with the SSA. The description of the proposed regulation published in the Federal Register states that the SSA's telephone hotline should be used to conduct this verification. 71 Fed. Reg. 34281, 34283 (June 14, 2006). This is a second area where the proposed regulation oversteps the Department of Homeland Security's authority.

By statute, the President is authorized to monitor and evaluate whether the I-9 system "provides a secure system to determine employment eligibility in the United States," to "examine the suitability of existing Federal and State identification systems for use for this purpose," 8 U.S.C. § 1324a(d)(1)(A), and to implement changes in the I-9 system. 8 U.S.C. § 1324a(d)(1)(B). However, the President may not make such changes without complying with certain procedural requirements. The President must give at least sixty days notice (depending on the magnitude of the change) to House and Senate Committees on the Judiciary about changes to the system and a written report regarding the proposed change. 8 U.S.C. § 1324a(d)(3)(A). In making changes, the President must also take into account the results of voluntary pilot projects, such as the Basic Pilot Project. 8 U.S.C. § 1324a(d)(1)(B). The Basic Pilot Project requires participating employers to use the same SSA telephone hotline to verify employees' social security

No-Match Cert. Admin. Record  1292

Director, Regulatory Management Division
August 11, 2006
Page 3

numbers that the proposed regulation advises no-match letter recipients to use.  Thus, the
verification system that the proposed regulation imposes on no-match letter recipients
replicates the Basic Pilot Project in substantial part.  The Department of Homeland
Security may not usurp the President's authority to make changes to the I-9 system and
skirt the procedural prerequisites to incorporating the SSA telephone verification process
into the I-9 system.

**C.    The proposed regulation imposes new obligations on employers that
    receive no-match letters**

    The drafters of proposed regulation attempt to avoid these limits on the
Department of Homeland Security's authority by characterizing the proposed regulation
as clarifying employers' existing obligations rather than creating new duties, and by
labeling the steps that no-match letter recipients are advised to take as creating a "safe-
harbor" rather than imposing a new, mandatory obligation on such employers.  These
characterizations are inaccurate.

    The proposed example of what constitutes constructive knowledge, at Section
274a.1(l)(1)(iii)(B), is not the employer's *receipt* of a no-match letter, but the employer's
*failure to act* after receiving a no-match letter.  By defining the "failure to take reasonable
steps" upon receipt of a no-match letter as creating constructive knowledge, the proposed
regulation makes it mandatory that an employer take some action in response to a no-
match letter.  Under the proposed regulation, if an employer receives a no-match letter
and does nothing, the employer has constructive knowledge that the named employees are
undocumented.

    This obligation that a no-match letter recipient take some action to verify the
named employees' authorization to work is a change to existing law.  No employer has
ever been convicted of knowingly continuing to hire undocumented immigrants because
the employer failed to take action upon receipt of a no-match letter.  An opinion letter
issued by the INS's Office of General Counsel in 1999 states that receipt of a no-match
letter does not create constructive knowledge and described employers' obligations to
follow-up on no-match letters as "for SSA purposes" and "not required by the INA."
Paul W. Virtue, HQCOU 90/10.15-C (April 12, 1999).

Director, Regulatory Management Division
August 11, 2006
Page 4

  The Department of Homeland Security's explanation of the proposed regulation relies on the Ninth Circuit's decisions in Mester Mfg. Co. v. INS, 879 F.2d 567 (9th Cir. 1989) and New El Rey Sausage Co. v. INS, 925 F.2d 1153 (9th Cir. 1991) for the proposition that a deliberate failure to investigate suspicious circumstances imputes knowledge. However, the Ninth Circuit has narrowly construed Mester Manufacturing and New El Rey Sausage to cases "in which the fact in question is *highly probable* but [the employer] consciously avoids enlightenment." Collins Foods Int'l, Inc. v. U.S. INS, 948 F.2d 549, 555 n.17 (9th Cir. 1991) (quoting United States v. Jewell, 532 F.2d 687, 698 (9th Cir. 1976)) (emphasis added). This is because "IRCA . . . is delicately balanced to serve the goal of preventing unauthorized alien employment while avoiding discrimination against citizens and authorized aliens. The doctrine of constructive knowledge has great potential to upset that balance, and it should not be expansively applied. . . . To preserve Congress' intent in passing the employer sanctions provisions of IRCA, then, the doctrine of constructive knowledge must be sparingly applied." Id. at 554-55. Receipt of a no-match letter does not make it "highly probable" that the named employees are undocumented. As the comments published with the proposed regulation acknowledge, "[t]here are many causes for such a no-match, including clerical error and name changes." 71 Fed. Reg. at 34281-82. Moreover, the proposed regulation applies to all employees named on a no-match letter, even if the employee did not use a social security card to verify her authorization to work in the United States.[1]

  In sum, Subsections 274a.1(l)(1)(iii)(B), 274a.1(l)(2)(i)(A)(1-2) and 274a.1(l)(2)(iii) of the proposed regulation should not be adopted because they exceed the Department of Homeland Security's authority.

        Very truly yours,

        Kristin L. Martin

KLM:rr

50/C:\DCB\KLM\UNITE08-11 Comments on DHS proposed regs.wpd
8/11/2006/13:23:06 UNITE 3200

---

 [1] In contrast, in Mester Manufacturing and New El Rey Sausage, it was found to be "highly probable" that the employees were undocumented because the INS notified their employers that the employees had used invalid immigration documents to verify their authorizations to work in the United States.



NATIONAL
COUNCIL OF
AGRICULTURAL
EMPLOYERS

August 14, 2006

<u>**VIA ELECTRONIC MAIL AND U.S. MAIL**</u>

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

>    Re:    **Docket No. ICEB-2006-0004**
>            **Safe Harbor Procedures for Employers Who Receive a No-Match Letter**
>            **(FR 71:114, p. 34281)**

To Whom It May Concern:

The National Council of Agricultural Employers ("NCAE") and the undersigned agricultural organizations hereby submit these comments on the Bureau of Immigration and Customs Enforcement, Department of Homeland Security's ("DHS") Proposed Rule regarding "no-match" letters published in the *Federal Register* on June 14, 2006 (71 *Federal Register* 34281).

NCAE is a national association based in Washington, D.C. that represents growers and agricultural organizations on agricultural labor, employment and immigration issues. Formed as a non-profit organization in 1964, NCAE represents the agricultural industry's interests before Congress and federal agencies on critical farm labor and immigration issues. NCAE's membership includes agricultural employers with operations in all 50 states that hire the vast majority of the national labor-intensive agricultural workforce.

NCAE represents the interests of the agricultural industry nationally on federal public policy issues with respect to immigration, and NCAE was actively engaged in the legislative and regulatory process that preceded and followed the enactment of the Immigration Reform and Control Act of 1986 and Illegal Immigration Reform and Immigrant Responsibility Act of 1996. Currently, it is actively engaged in promoting comprehensive immigration reform, including proposals that would ensure American agriculture a legal workforce. Because NCAE members employ a largely alien workforce, they regularly face confusing, "Catch-22"-type situations regarding no-match letters. Thus, NCAE and its membership have an interest in, and would be affected by, the above-referenced Proposed Rule. Following are NCAE's comments to the DHS Proposed Rule.

---

**No-Match Cert. Admin. Record 1295**

Docket No. ICEB-2006-0004
August 14, 2006
Page 2 of 14

## Overview and Recommendation

Federal law governing the employment of persons authorized to work in the U.S. is broken. The employer sanctions provisions of the Immigration Reform And Control Act of 1986 ("IRCA") that attempted to eliminate the job magnet for undocumented aliens failed because Congress did not provide a means by which employers effectively could screen out fraudulent documents.[1] IRCA also failed to provide legal channels through a workable guest worker program by which employers could obtain legal alien workers when U.S. workers were unavailable. Ironically, IRCA was successful in one regard. It provided an effective anti-discrimination provision that subjected vigilant employers to litigation if they did not comply with the complex hiring provisions of the new employer sanctions law.

In 1996, Congress again failed to take steps to make employers sanctions work. While it enacted a pilot electronic verification program in order to screen out fraudulent employment authorization documents through the use of Social Security Administration ("SSA") and Immigration and Nationality Services ("INS") databases, the program was voluntary in nature. Moreover, Congress again failed to provide workable guest worker programs and legal avenues for employers to obtain alien workers when shortages of U.S. workers existed.

In the midst of congressional failure to stem the flow of illegal workers, SSA began issuing SSA mismatch letters on a regular basis in approximately 1993. In communications to employers, the SSA indicated to employers that no-match letters were limited to correction of Social Security accounts for the benefit of workers without any reference to immigration-related requirements of the letters. Given the failures of Congress to enact legislation that effectively controls undocumented workers, the SSA mismatch letter has evolved to the point where it has now become the centerpiece of employer sanctions enforcement, as evidenced by DHS' proposed no-match rule. NCAE believes the use of the SSA no-match letter for immigration purposes is premature and represents an unwise approach from both a legal and practical perspective.

NCAE believes that there is a distinction between a SSA no-match letter and a no-match letter issued by DHS after an audit of an employer's I-9 Forms and related documents. Clearly, DHS has the legal authority to inform employers of no-matches based on DHS' review of its own databases and to undertake compliance action based upon the employer's alleged constructive knowledge if the employer fails to take corrective action after receiving notice from DHS. The comments in this letter generally relate to the Proposed Rule's inclusion of SSA no-match letters.

## The Experience of Agricultural Employers with No-Match Letters

For over ten years, agricultural employers have received Social Security mismatch letters. The subject of mismatch letters presents extremely confusing legal and practical issues for

---

[1] 8 U.S.C. § 1324a.

Docket No. ICEB-2006-0004
August 14, 2006
Page 3 of 14

employers, particularly agricultural employers, who employ a large number of aliens.
Immigration and employment lawyers are not in agreement as to whether mismatch letters
impose immigration compliance obligations. Moreover, government officials and private sector
attorneys often reach vastly different conclusions on this subject. Disagreement and confusion
are rampant and well-intended employers are left without a clear understanding of their
compliance responsibilities.

NCAE members have had substantial concerns regarding whether mismatch letters put
them on notice that they may be in violation of the employment authorization provisions of the
immigration law, since the Social Security card is one of the most commonly used employment
authorization documents. Some lawyers have taken the position that the federal Privacy Act
prohibits the use of no-match letters by employers for immigration purposes. Given the high
level of confusion surrounding mismatch letters, it is imperative that "bright line" rules be
provided to employers regarding their legitimate obligations.

To the extent that the Proposed Rule attempts to clarify the process regarding mismatch
letters, DHS' efforts should be commended. As described more fully below, however, NCAE
submits that the Proposed Rule is plagued by substantial legal, jurisdictional and practical
problems that can only be fixed through legislation. At a minimum, consideration of the
Proposed Rule should be deferred until Congress completes its work on comprehensive
immigration reform.

**No-Match Letter Policy Changes Should Be Made Through the Legislative Process**

NCAE submits that the Proposed Rule is premature, inasmuch as Congress is in the
process of attempting to pass comprehensive immigration reform that should address the SSA
no-match issue. The House of Representatives has passed a worksite enforcement bill (H.R.
4437) and the Senate (S. 2611) a comprehensive bill that includes enforcement, guest worker,
earned adjustment of status provisions for businesses, as well as the Agricultural Job
Opportunities, Benefits, and Security Act ("AgJOBS") H-2A reform and earned adjustment
provisions for agricultural employers. These bills address both employer sanctions provisions,
and to a lesser extent, SSA responsibilities. NCAE believes that it is preferable for Congress,
through legislation, to address the interrelationship between the SSA mismatch issue,
immigration compliance and national origin and citizenship status discrimination lawsuits in
order to provide employers a "bright line" for compliance.

As discussed more fully below, a regulatory proposal cannot effectively address the
conflicting compliance challenges posed by the SSA no-match issue. DHS' well-intended but
piecemeal approach would lead to extraordinary confusion and litigation by worker rights
organizations and others challenging employer refusals to hire and terminations based on the
proposed no-match rule. This would ultimately increase employers' administrative challenges
and exposure to liability. Accordingly, it is critical that Congress address the SSA no-match
issue in the context of comprehensive immigration reform. NCAE members, who strive to

Docket No. ICEB-2006-0004
August 14, 2006
Page 4 of 14

comply with conflicting compliance obligations in the immigration and employment realms, would benefit tremendously from the "bright line" guidance of comprehensive legislative reform.

**Substantial Legal and Jurisdictional Problems Warrant Deferral of the Proposed Rule**

*Federal Privacy Act Issues*

SSA has encouraged employers to verify the Social Security numbers of persons they employ and to use its Employee Verification Service ("EVS") in doing so. SSA makes clear in its written communications to employers that the Federal Privacy Act[2] prohibits the use of the information received from SSA regarding employee names and Social Security numbers "for a purpose other than that for which it was requested" and that persons who violate this prohibition are subject to fines and imprisonment. SSA communications also indicate that SSA will verify the names and numbers of applicants or employees to ensure that the records are correct solely for the purpose of my completing Internal Revenue Service ("IRS") Forms W-2 (Wage and Tax Statement).[3] There is no reference to any purpose related to immigration compliance, notwithstanding the fact that the Social Security card is one of the most commonly used work authorization documents.

According to DHS Secretary Michael Chertoff, DHS is seeking to implement a regulation designed to provide employers with "the necessary tools to increase the likelihood that they are [only] employing" authorized workers, and also will help DHS identify employers acting in blatant disregard of immigration laws.[4] While NCAE supports the Secretary's desire to ensure compliance with our immigration laws, over which he has jurisdiction, there nonetheless is concern regarding the agency's ability to do through use of SSA no-match letters or information that SSA otherwise provides to employers regarding the validity of Social Security number information.

The privacy protections attending the Social Security card are so important that other federal agencies, such as DHS, are not permitted to have access to such information. This is recognized in this year's Senate-passed immigration reform legislation, S. 2611, Title III, Section 301(e)(1). The Senate bill authorizes SSA to disclose to DHS, upon written request by the Secretary of Homeland Security, the identity of employers who submit more than 100 "mismatches" or more than 10 duplicate Social Security numbers. Without such legislative authorization, the Privacy Act would prohibit disclosure of such information.

---

[2] 8 U.S.C. § 552a(I).

[3] *See, e.g.*, "Employee Verification Service (EVS) Verification of Names and Social Security Numbers," November 2002 (Updated in 2006), page 4, Social Security Administration, ICN: 43700.

[4] *See* DHS Press Release available at http://www.dhs.gov/dhspublic/display?them=43&content=5684&print=true.

Docket No. ICEB-2006-0004
August 14, 2006
Page 5 of 14

Given the warnings provided to employers by SSA regarding the Privacy Act limitations on the usage of SSA no-match information, as well as the limitations on access to such information imposed on other government agencies, NCAE is concerned the DHS' Proposed Rule ignores these limitations and ultimately will result in litigation. Rather than achieving the clarity and regulatory guidance in this complex area that employers seek, it is likely that it would have the opposite effect by fostering lawsuits and further adding to the confusion that exists in the employer community.

NCAE's concerns in this regard are highlighted by the fact that SSA publications regarding no-match letters inform employees that a no-match letter "does not make any statement about an employee's immigration status and is not a basis, in and of itself, for taking any adverse action against an employee. Doing so could subject you to anti-discrimination or labor law sanctions."[5]

*Discrimination Lawsuits*

The Proposed Rule also cannot eliminate through the regulatory process potential discrimination lawsuits that employers that comply with the rule may face based on the provisions of other federal laws. The anti-discrimination provisions of Title VII of the Civil Rights Act of 1964[6] ("Title VII") and the anti-discrimination provisions of IRCA,[7] as well as State anti-discrimination laws, pose a real threat to employers that terminate or refuse to hire workers based on SSA no-match letters. DHS' Proposed Rule will force employers to refuse to hire or to terminate job applicants and employees if, after following the compliance procedures, the documents that they provided cannot be verified under the SSA or DHS databases. It is precisely because of these types of adverse employment decisions in the context of the employment verification process that employers have been sued for discrimination.

Discrimination actions under IRCA are particularly troublesome to agricultural employers, who are put in a "Catch-22" position by conflicting obligations. By way of explanation, two essential components of IRCA are employers' obligation to comply with the employment eligibility requirements of the law and face sanctions if they do not, and provisions prohibiting unfair immigration-related employment practices based on citizenship status and national origin. After the enactment of IRCA, agricultural organizations throughout the U.S. conducted extensive compliance programs for employers, informing them of their obligations under these new laws. Such programs sometimes were conducted with the participation of lawyers from the then Immigration and Naturalization Service and the Department of Justice's Office of Special Counsel for Immigration Related Unfair Employment Practices ("OSC").

---

[5] "Employer Reporting Instructions & Information, Social Security Number Verification, Restrictions on Using SSNVS," 2005, Social Security Online, www.ssa.gov/employer/ssnvrestrict.htm

[6] 42 U.S.C. § 2000e-2.

[7] 8 U.S.C. § 1324b.

Docket No. ICEB-2006-0004
August 14, 2006
Page 6 of 14

Unfortunately, lawyers from these agencies with very distinct missions often would not agree as to what employer compliance obligations were, given the tension created by one component that encouraged vigilant review of work eligibility documents and another that stressed that employers face discrimination charges if they were too aggressive in evaluating the documents presented during the work authorization process.

The result of these competing provisions of the law was a lack of compliance clarity for the employer community and exposure to discrimination lawsuits and government actions. During the past 20 years, more agricultural employers have been charged with discrimination under IRCA for being overly zealous in complying with the employment eligibility requirements, than employers charged with violating the employer sanctions provisions. Well-intended employers have been caught in the jaws of an IRCA Catch-22 situation as a result.

NCAE recognizes that DHS' proposed safe harbor provision of the Proposed Rule is intended to insulate employers from liability related to employment eligibility compliance; however, as a DHS-issued rule, it lacks the authority to provide similar protection against discrimination lawsuits brought under Title VII of the Civil Rights Act or the unfair immigration-related employment practice provisions of IRCA and other federal and state laws. NCAE questions whether the Proposed Rule's mere statement that employers that follow the Proposed Rule will be protected from liability under 274B(a)(6) of the INA, the anti-discrimination provision of IRCA that is enforced by the Office of Special Counsel within the Department of Justice, will in fact protect employers from suits under that provision.

Several examples illustrate the dangers employers would face from following the Proposed Rule with regard to federal discrimination law. A decision recently issued by the U. S. Court of Appeals for the Tenth Circuit in *Zamora v. Elite Logistics, Inc.,* (No. 04-3205) (10th Cir. June 6, 2006), highlights the treacherous path employers tread when they engage in post-hiring verification of Social Security cards of employees, once the validity of the card has been called into question. The court in *Zamora* reversed a grant summary judgment for the employer in a Title VII discrimination claim based on race or national origin. The case involved circumstances in which an employer followed up on information it received in auditing its I-9 Forms that the plaintiff, who had satisfied the employment verification requirements when initially hired, had a Social Security number that had been used by another person on three different occasions in another state. The employer's effort to verify the validity of plaintiff's Social Security card and the alleged facts that stemmed therefrom resulted in an allegation of discrimination, which the Court of Appeals held needed to be determined by a trier of fact. As has been the case with IRCA's sanctions and anti-discrimination provisions, the Social Security mismatch problem highlighted by *Zamora* retains the "damned if you do and damned if you don't" dilemma that employers face.

An arbitration decision also highlights the potential problem for employers faced with termination decisions with workforces governed by collective bargaining agreements requiring just cause for termination. In *Hotel Employees and Restaurant Employees Union, Local 2 v.*

Docket No. ICEB-2006-0004
August 14, 2006
Page 7 of 14

*San Francisco Central Travelodge Joint Venture*, in a decision dated May 3, 2000, an Arbitrator found that seven unionized housekeeping employees who were discharged for failing to correct mismatched Social Security information were not discharged for just cause and, therefore, the employer was in violation of the governing collective bargaining agreement. The employer had offered the employees several chances over two years to provide the correct information, but finally discharged the employees due to their failure to comply with the employer's reasonable rules, a violation recognized as just cause in the collective bargaining agreement. In particular, the employer believed that it could be found to have constructive knowledge of the employees' unauthorized work status and could therefore face severe penalties from the SSA, the (former) INS and the IRS.

However, the Arbitrator ordered the employees reinstated and made whole for their lost wages and benefits. The parties settled this case during subsequent litigation in federal court, with the employer agreeing to pay the employees $50,000 in back pay and to provide conditional reinstatement. *San Francisco Central Travelodge Joint Venture v. Hotel Employees and Restaurant Employees Union, Local 2,* No. C-01-1371 (N.D. Cal. Apr. 6, 2001). The employer paid dearly in this case despite significant efforts to comply with the law in a scenario that would likely remain unchanged, and maybe made even more confusing, under the Proposed Rule.

### Discrimination Charges When Employers Attempt to Use the H-2A Temporary and Seasonal Alien Agricultural Worker Program

To make matters worse, it is the experience of NCAE members and many agricultural employers that state and federal departments of labor often discourage attempts to verify Social Security names and numbers under SSA's EVS prior to hiring and during employment. For users of the H-2A temporary and seasonal alien agricultural worker program,[8] this problem is intensified by the fact that the local state workforce agencies are required to actively refer qualified domestic workers to H-2A employers prior to the departure of the certified H-2A workers from their home country. Few, if any, state workforce agencies use the authority conferred under IRCA to verify the legal status of the workers they refer and provide certification of employment eligibility to the employer to whom the worker is referred.[9]

Instead, H-2A employers are often flooded with illegal workers by the state workforce agencies, and employers must risk a discrimination lawsuit by refusing to hire or terminating an illegal worker in order to avoid violating immigration law. NCAE members have had state workforce agencies refer so-called "U.S. workers" in response to an H-2A labor certification application, only to be audited later by INS and be told that "U.S. workers" referred by the state were illegal aliens. To avoid this problem, some employers have participated in SSA's EVS system, attempting to verify the validity of the Social Security cards provided by state agency referrals. Efforts to verify all applicants' work eligibility through the EVS has been used by the

---

[8] *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a).

[9] 8 U.S.C. § 1324a(a)(5).

Docket No. ICEB-2006-0004
August 14, 2006
Page 8 of 14

U.S. Department of Labor ("USDOL") as the basis to deny an employer's application to participate in the H-2A program, alleging that use of the EVS system discriminates against U.S. workers. H-2A employers have had to litigate this issue in order to hire legal alien workers.[10]

In a related troubling example, a federal court in Washington State recently granted class action status to a lawsuit by farm workers claiming they were unlawfully denied jobs or fired because a farm labor contractor and two farms it represented preferred legally admitted H-2A workers over U.S. workers in violation of federal and state law." *Perez-Farias v. Global Horizons Inc.*, No. CV-05-3061-FVS (E.D. Wash July 28, 2006). The court rejected the defendants' argument that any class certified by the court should exclude at least 264 potential class members who had provided the contractor with Social Security numbers that did not match federal government records. The contractor maintained that it acted legally because it discharged such individuals if they could not correct the mismatch within 30 days, assuming that they were illegal. The court rejected this argument, holding that the mismatch of employee names and Social Security account numbers could occur for reasons having nothing to do with immigration status.

In essence, the a consequence of the federal court's decision is that an employer that assumed that it complied with the safe harbor provisions of the Proposed Rule by using SSA's EVS system to consistently check the Social Security number provided by each applicant for employment referred by the state, could be subject to a lawsuit by so-called "U.S. workers" allegedly discriminated against through the use of the mismatch process. DHS' safe harbor provision would provide no protection under those circumstances, even though the employer's actions fully comported with the purpose and intent of the Proposed Rule.

The examples discussed above demonstrate that only a comprehensive legislative solution can effectively clarify an employer's obligations under federal immigration and employment law. Piecemeal clarification attempts, though commendable, would only complicate an extremely confusing area through litigation challenging the Proposed Rule that likely would ensue. There is no doubt that mismatch letters put employers in an untenable position regarding immigration law compliance and add to their anxiety about the legal status of their workers. Adopting the Proposed Rule would impose another set of obligations on employers without providing employers protection from the omnipresent threat of discrimination lawsuits and Privacy Act challenges to the Proposed Rule. Worse yet, the Proposed Rule might even mislead employers into believing that they are protected from discrimination lawsuits if their conduct qualifies for the safe harbor provision. As a foreseeable consequence, unsuspecting employers would be subject to increased litigation and government actions even though they were acting in full compliance with DHS' new mismatch policy.

This dilemma underscores the importance of delaying consideration of the Proposed Rule until Congress passes comprehensive immigration reform. NCAE recommends that DHS

---

[10] *See, e.g., Global Horizons, Inc. (Valley Fruit Orchards) v. U.S. Dept. of Labor*, 2005-TLC-00009 (June 1, 2005).

Docket No. ICEB-2006-0004
August 14, 2006
Page 9 of 14

and the Bush Administration insist that Congress produce comprehensive immigration reform legislation that resolves all of the problems presented by the Proposed Rule. This could be achieved by a telephonic and electronic verification system that would eventually require all employers to verify through DHS the employment eligibility of all hires. A tamper-proof and biometric Social Security card could be the centerpiece of this system. If a Social Security card and/or specified alien employment authorization documents were required of all applicants, employers that failed to comply with the verification system's requirements would be subject to compliance actions by DHS and subject to penalties.

If an effective mandatory verification system that checked documents against the databases of SSA and DHS were enacted, there would be no need for the Proposed Rule because applicants would be screened out of the hiring process at the outset and the no-match problem would be substantially eliminated. Consequently, another component of comprehensive immigration reform should be to clarify that for purposes of reporting employee Social Security wages and taxes, the SSA no-match issue should remain exclusively a matter under the jurisdiction of SSA and the IRS to ensure that information is accurately reported so that individual accounts are properly credited. Legislation should clarify that SSA no-matches are not an immigration compliance issue. Current Privacy Act protections of SSA no-match data should remain.

**Practical Problems with the Proposed Rule**

Under the Proposed Rule, an employer would have between 14 and 60 days, depending on the circumstances, to verify the legitimacy of an employee's documents. If an employer could not do so at the end of the 60-day period, it would be required to have the employee complete a new Form I-9 within 3 days without using the document, be it an SSN or alien work authorization document, that could not be verified. If the employee could not provide alternative work authorization and identity documents to complete a new Form I-9, the employer would have to terminate the employee or face potential liability.

*A Final Rule Should Have Prospective Application*

The Proposed Rule does not indicate when it would be effective. Many NCAE members are small employers with limited administrative staff. It would be a tremendous burden for such employers to have to follow the procedural steps set forth in the Proposed Rule on a retroactive basis. Should DHS decide to issue a final rule, it should clarify that it would have prospective application only to those no-match letters received after the date the rule becomes final.

*The Highly Seasonal Nature of Agricultural Employment Must Be Accommodated*

Compliance with the Proposed Rule would be difficult for many agricultural employers. Most of NCAE's members employ a large number of seasonal workers. Migrant agricultural workers move frequently to maintain continuous employment. They may work only several days

Docket No. ICEB-2006-0004
August 14, 2006
Page 10 of 14

to a number of months for an employer and then move on to another employer for another brief period of employment. Following up on employee mismatches could be extremely problematic. Due to the very short seasons of many agricultural operations, an employee may not be employed at the time an employer receives a no-match letter. This is especially true of SSA no-match letters which many employers receive in the late Winter or early Spring of the year when many seasonal employees are not employed. Under such circumstances it would be impossible within a short period of time for an employer to communicate with a former employee listed in a no-match letter in order to satisfy the 14 day requirement under the Proposed Rule. Former workers seldom leave forwarding telephone numbers where they can be contacted. Moreover, once the season is over, farm workers typically are terminated, rather than put into lay-off status until the next season. Most are not in employee status at the time their former agricultural employers receive a no-match letter.

In these scenarios, an employer could send a letter to an employee's forwarding address if one is provided, but there is no guaranteed method to ensure that the employee receives and replies to the no-match letter. Many employers would not have the opportunity to have a face to face discussion with the mismatched employee to resolve the issue. This puts employers in a bind in that they could lose the benefit of the safe harbor provision because of the nature of the work and workforce, despite good faith compliance efforts.

Although NCAE submits that the Proposed Rule should be deferred pending comprehensive legislative reform, should the rule be adopted, NCAE requests that DHS take into account the unique circumstances of seasonal agricultural employment and migrant workforce issues. An employer of seasonal workers should be able to satisfy its obligations under the Proposed Rule and benefit from a safe harbor protection if it can establish that the worker was not employed during the 14 to 60 day window of correction following the receipt of the no-match letter and that the employer sent a letter to the last known mailing address of the worker, if one were provided, requesting that the Social Security records be corrected. If a forwarding address were not provided, the proposed rule should be inapplicable to the employer, unless, as discussed below, the worker seeks reemployment at a later time.

If employees listed on a no-match letter the prior season return the following season, the Proposed Rule should be applicable at the time of rehire. The applicant should be required within the applicable timeframes under the Proposed Rule to establish their employment eligibility before being hired. In this case, the safe harbor provision would apply if proper verification could be made at the time. If the employer could prove that a migrant or seasonal employee left employment of his or her own volition prior to resolution of the work eligibility issue during the 14 to 60 day timeframe, the safe harbor should apply.

*The 14-Day Correction Window Should Be Expanded for Employers of Seasonal Workers*

Many agricultural employers are small and do not have personnel departments. Because many are seasonal businesses, their workforces expand from a small year' round work force to a

Docket No. ICEB-2006-0004
August 14, 2006
Page 11 of 14

large seasonal work force for a few critical production and harvest periods during the year. The hiring and employment eligibility verification of a large number of newly hired seasonal workers, coupled with the potential obligation imposed under DHS' proposed rule to verify the status of a person who was listed on a no-match letter during a prior year of employment would impose a significant administrative challenge to many small employers.

Consequently, NCAE recommends that DHS expand the proposed window of verification of 14 days to 60 days to 30 to 60 days. The expansion from 14 to 30 days would allow small employers the opportunity to cope with their initial employment eligibility duties, as well as the newly proposed no-match responsibilities.

> *Joint Employment Relationships that Characterize Seasonal Agricultural Employment Must Be Accommodated*

The Proposed Rule does not address the thorny issue of joint employment relationship with respect to employers' obligations under the Proposed Rule. In other words, where a grower pays an independent contractor to provide workers for a limited duration, who has the responsibility under the Proposed Rule to comply with the no-match procedures in order to obtain the safe harbor provision—the independent contractor or the grower?

In the agricultural context, agricultural entities frequently pay a farm labor contractor ("FLC"), as an independent contractor, a fee to provide workers for a limited duration, with the express understanding that the FLC is the employer for all purposes, including employment eligibility verification. As with most independent contractor relationships, there is no "bright line" as to whether an independent contractor relationship exists between the employer and FLC. The joint employer principles set forth under the federal Fair Labor Standards Act[11] and the federal Migrant and Seasonal Agricultural Worker Protection Act,[12] that govern employment law obligations in seasonal agricultural work are broader than traditional independent contractor rules. For example, a grower that believed that the FLC was an independent contractor and employer responsible for I-9 Form completion may nonetheless found to be the joint employer for other purposes.

NCAE recommends that the Proposed Rule should clarify that the existing definition of the term "independent contractor" contained in DHS' current regulations, with a minor modification, is determinative of compliance responsibilities under the procedures forth in the Proposed Rule.[13] NCAE suggests that the existing definition of "independent contractor" in DHS' regulations be modified to emphasize that great weight will be placed on the fact that an entity completed the I-9 Form as part of the employment eligibility verification process in

---

[11] 29 U.S.C. §§ 201 *et seq.*

[12] 29 U.S.C. §§ 1801 *et seq.*

[13] 8 C.F.R. § 274a.1(j).

Docket No. ICEB-2006-0004
August 14, 2006
Page 12 of 14

determining which entity is responsible for complying with the no-match verification procedures set forth in the Proposed Rule.

## Adverse Consequences of Implementing the Proposed Rule Without Comprehensive Legislative Immigration Reform

*Decimation of the Labor-Intensive Agricultural Workforce Without a Viable Legal Means of Replacing It*

If the Proposed Rule takes effect before Congress enacts comprehensive reform legislation, including provisions similar to the AgJOBS agricultural guest worker and earned adjustment of status provisions contained in S. 2611, it likely will have a devastating effect on labor-intensive American agriculture. Understanding the agricultural labor context at issue here is critical to reaching this conclusion. It is well-established that the U.S. agricultural workforce has become increasingly populated by foreign workers who lack proper work authorization.

Shortly after the passage of IRCA in 1986, the USDOL began conducting yearly National Agricultural Worker Surveys ("NAWS"). Among other questions, the survey asked seasonal agricultural workers each year whether they were authorized to work in the U.S. In the last year the NAWS survey was conducted, during fiscal year 1997-98, 52% of seasonal agricultural workers admitted they were unauthorized. A straight line extrapolation to 2005 of the statistics from 1989 through 1998 suggests the percentage of U.S. farm workers who are unauthorized to work in 2005 was 76%. Most experts agree that the statistics based on self identification in the NAWS survey are likely very conservative, thus the actual figure is probably much higher. Further, labor intensive agriculture not only faces a shortage of legal workers, it has for the past several years also been experiencing actual shortages of workers. During the past several years there have been shortages in the lettuce and vegetable harvests in border areas in Arizona and California. During the past year and currently, agricultural growers in a number of crops on the West Coast are facing shortages of labor. Other states from coast to coast are reporting labor shortages in a number of crops.

American labor intensive agriculture is predominantly undocumented not because agricultural employers ignore the law but because the current law is dysfunctional and provides no viable means of screening out fraudulently documented workers and obtaining legal agricultural workers. Because the current H-2A temporary and seasonal alien agricultural worker program is severely flawed and largely unworkable, a reformed program is contained in the Senate bill, S. 2611, along with earned adjustment of status provisions.

*Recycling Undocumented Workers and Punishing Law Abiding Employers to the Benefit of Those That Are Unscrupulous*

The fact that the increasingly limited labor supply is largely undocumented poses substantial problems to the agricultural industry. The Proposed Rule would exacerbate these

Docket No. ICEB-2006-0004
August 14, 2006
Page 13 of 14

problems, at least for those employers who complied with the rule. Meanwhile, unscrupulous employers would benefit from ignoring the Proposed Rule. Several negative consequences – many of them wholly unintended – would arise if the Proposed Rule were implemented.

Law-abiding employers would likely lose a significant part of their workforces under the Proposed Rule. A result of the Proposed Rule's procedures is that a substantial number of workers would not return to work once the employer has placed the burden upon them to verify their work authorization because they would be unable to do so. Good employers would be devastated by losing employees *en masse*. As an unintended consequence, the employees who quit after being confronted with a no-match situation they could not resolve would simply recycle themselves to work for a new employer.

Employers who have lost most of their workforce would need to hire new employees, many of whom would end up as no-match employees down the road, continuing a cycle that the Proposed Rule never intended to put in motion. Meanwhile, the same undocumented employees would merely move to a new employer and subsequently put that employer in the untenable position of needing to confront no-matches at the peril of losing its workforce. In this regard, the Proposed Rule punishes good employers and aggravates problems that only a comprehensive legislative solution can remedy.

As discussed in detail above, law-abiding employers who follow the Proposed Rule would put themselves at risk of being subject to discrimination lawsuits and adverse government actions. The safe harbor provision would not protect employers from expensive, time-consuming and frustrating litigation to defend discrimination charges. This ultimately would prove counterproductive to employer compliance with the provisions of the Proposed Rule.

**Summary**

Unless the issues raised by the Proposed Rule are resolved legislatively in an immigration reform package that provides "bright line" guidance and protection for employers regarding work authorization compliance, SSA no-match compliance and protections against discrimination charges, the Proposed Rule will only aggravate the dysfunctional legal framework that attempts to govern the flow of undocumented workers into the U.S. It will heighten the lack of respect for the legal system among U.S. employers that are being asked to be the mainstay of immigration law enforcement in this country. The Proposed Rule, though well-intended, "jumps the gun" by taking the issue out of Congress' hands, where it belongs.

For the foregoing reasons, NCAE submits that consideration of the Proposed Rule should be deferred pending enactment of comprehensive legislative reform. Should DHS decide to finalize and adopt the Proposed Rule, NCAE respectfully requests that its concerns and suggestions described above be addressed by the final rule. NCAE appreciates the opportunity to comment on this Proposed Rule.

Docket No. ICEB-2006-0004
August 14, 2006
Page 14 of 14

Sincerely yours,

Sharon M. Hughes, CAE
Executive Vice President
National Council of Agricultural Employers


Angelica Nurseries
Agricultural Affiliates
California Avocado Commission
California Farm Bureau Federation
Florida Citrus Mutual
Florida Citrus Packers
Florida Fruit and Vegetable Association
New England Apple Council
Ohio Farm Bureau
U.S. Apple Association
Wasco County Fruit and Produce League
Washington Growers League
Western Growers



**CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW**
256 SOUTH OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
www.centerforhumanrights.org

August 15, 2006

*Via email to rfs.regs@dhs.gov*

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:    DHS Docket No. ICEB-2006-0004, Comments to Notice of Proposed
Rulemaking Regarding "Safe-Harbor Procedures for Employers Who Receive a
No-Match Letter"*

Dear Sir or Madam:

   *The Center for Human Rights and Constitutional Law* submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

   *The Center for Human Rights and Constitutional Law* is a California non-profit corporation founded in 1980 that has as its primary mission the provision of technical support, information services, and training to free legal services programs, community-based organizations, and pro-bono lawyers providing legal services to low-income populations, including migrants, children, and indigenous peoples. As part of this work, the Center has served as lead counsel in numerous major class action cases brought in the U.S. courts on behalf of millions of migrants and other minorities. A partial list of the Center's major successful cases include: *Plyler v. Doe*, 457 U.S. 202 (1982), *Reno v. Catholic Social Services*, 509 U.S. 43 (1993), *Reno v. Flores*, 507 U.S. 292 (1993), *League of United Latin American Citizens v. Wilson*, 131 F.3d 1297 (9th Cir. 1997). In addition to its collaboration with other legal services providers and community-based organizations in protecting and promoting the rights of migrants through the state and federal courts, the Center also engages in a wide range of training programs and provides technical support in complex cases to legal services programs and community-based organizations throughout California and other states in the United States with high concentrations of immigrant populations.

Director, Regulatory Management Division, USCIS
August 15, 2006
Page 2

*The Center for Human Rights and Constitutional Law* is alarmed by and opposes adoption of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule modifies current regulations by creating additional, unfair, and irrational circumstances under which an employer may be deemed to have "constructive knowledge" of an employee's lack of employment authorization. This "constructive knowledge" coupled with continued employment of the employee would subject the employer to criminal and civil penalties. The proposed rule also outlines "safe harbor" procedures that employers may follow in order to avoid criminal and civil liabilities.

The proposed rule will magnify the adverse impact that SSA no-match letters already have on workers' rights, and trigger unnecessary, unjust and potentially discriminatory mass terminations across the nation. The proposed rule also undermines the legislative process and will result in the erosion of privacy rights. Moreover, as almost all migration experts agree, **the rule will have no measurable impact on undocumented immigration**. It is highly unlikely that fired workers will leave the country. Terminated workers, even if undocumented, will simply seek out and accept more marginal jobs, most likely in the unregulated underground cash economy. The proposed rule will simply drive undocumented workers deeper undergound, where they will continue to be employed in more exploitable jobs. The proposed rule will also erode our privacy rights and it represents an end-run around the federal legislative process.

We therefore urge DHS to withdraw this proposed rule in its entirety based on the following concerns:

**This proposed rule will harm __all__ workers regardless of immigration status.**

The proposed rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, or confusion, many employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. It is widely understood that the SSA database is inaccurate, and often "no-matches" occur because of name changes, clerical errors, etc. Hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted individual or class action lawsuits against employers for wrongful terminations.

**The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new legal obligations will increase pressure on businesses to go "off the books," thereby promoting and encouraging an unregulated underground cash economy, which results in potentially billion-dollar losses in federal,

Director, Regulatory Management Division, USCIS
August 15, 2006
Page 3

state, and local tax revenues, unfair competition, and further exploitation and abuse of workers by unscrupulous employers.

### The proposed rule undermines the legislative process.

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time irrationally ignore and could undermine that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

### The SSA no-match letter program is a faulty tool for immigration enforcement.

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity or accuracy to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. In fact, the database contains information about both U.S. citizens and work-authorized noncitizens, who employers will presume to be undocumented simply because they appear on a no-match list. A no-match letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

An employer's receipt of a SSA no-match letter therefore, by itself, does not constitute "constructive knowledge" of immigration status under current law. The only thing a "no match" letter may indicate is that SSA has not matched a name provided by an employer with its records. This is hardly the same thing as knowledge of a person's immigration status or right to be employed.

The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

### The proposed rule threatens an erosion of privacy rights.

DHS is currently barred from direct access to the SSA database by laws protecting privacy and tax confidentiality. These laws were enacted to protect sensitive and personal information, and to ensure and encourage compliance with tax laws. The proposed rule threatens to substantially undermine these privacy protections.

Director, Regulatory Management Division, USCIS
August 15, 2006
Page 4

**The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance.

Further, although this rule purports to make changes to how DHS interprets no-match letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about the rule. The actual cost of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law.

**The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is entirely unreasonable and does not account for the numerous bureaucratic steps that employees must go through to correct their records with various agencies and with their employer.

For the reasons stated above, we oppose the Department of Homeland Security's proposed regulation. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. We request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Peter Schey
Executive Director & President
Center for Human Rights and Constitutional Law



# Idaho Community Action Network

1311 West Jefferson Street ~ Boise, ID 83702 ~ (208) 385-9146 ~ Fax (208) 336-0997
1151 Oakley ~ Burley, ID 83318 ~ (208) 678-1708 ~ Fax (208) 678-4313

August 7, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:* ***DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"***

Dear Sir or Madam:

Idaho Community Action Network (ICAN) submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

Idaho Community Action Network (ICAN) was founded in January 1999 through a merger of Idaho Citizens' Network (a grassroots group voicing concerns of low-income families) and Idaho Hunger Action Council (a group advocating for low-income families and running a statewide food program). ICAN uses grassroots organizing, direct action, civic participation and other strategies to impact the decisions of powerful public and private bodies – and promote economic, racial, and social justice in the long-term.

ICAN is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an

immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**<u>including U.S. citizens and authorized noncitizens</u>**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **<u>unregulated underground cash economy</u>** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **<u>comprehensive immigration reform</u>**. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

LeeAnn Hall
Executive Director

New England Apple Council Inc.
7 Main St.
Goffstown, NH, 03045

VIA ELECTRONIC MAIL AND OVERNIGHT EXPRESS

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

RE:   Docket No. ICEB-2006-0004
      Safe Harbor Procedures for Employers Who Receive a No-Match Letter
      (FR 71:114, p. 34281)

Gentlemen:

    The New England Apple Council (NEAC) submits the following comments on the Department of Homeland Security's Proposed Rule regarding "no-match" letters published in the Federal Register on June 14, 2006. (71 Federal Register 34218)

    NEAC is a grower owned non profit association based in Goffstown, NH. NEAC has 200 farmer members located in all six New England States. Our members are some of the longest users of foreign labor recruited under various LEGAL programs administered by the Department of Labor and USCIS formerly INS. Some of our members have used LEGAL seasonal foreign workers since 1945.

    We were deeply involved in the use of foreign workers prior to the passage of IRCA in 1986. We saw a large increase in usage of H2A workers in the years following its passage (IRCA). Since the early 1990's the usage of H2A workers has decreased by our members at the same time that production has remained constant. The Department of Labor is responsible for the increased use of domestic non H2A workers through referrals from Florida and Puerto Rico. Many of those referrals as well as the friends and family who followed fall into the Social Security "no-match" category. Our members have followed up and notified workers with no-match numbers, only to have them replaced, the workers, by new ones. Our growers have not used the electronic verification program for two reasons.
First, the data base is very far from perfect. Legal workers with newly issued Social Security numbers are seldom included in the data base, and H2A workers are not included by law in the Social Security system.
Secondly, the Office of Special Council for Immigration Related Unfair Employment Practices has been very active in perusing employers under the Anti Discrimination provisions of the Civil Rights Act of 1964 and the Anti Discrimination provisions of

IRCA. To treat domestic employees differently than H2A employees could be considered discrimination, and as I stated H2A employees are not included in the Social Security System, and would always come up as a no-match.

Our advice to our employers has always been upon receipt of a no-match letter to advise the worker to correct the problem, to continue employment, or in most cases to be rehired. (Because of the seasonal nature of the jobs) If they do this and provide corrected numbers or names, the workers, continue or are rehired. If there is a second no-match letter on the same individual he or she is permanently discharged.

At the present time there is no reliable, efficient, system to check all employees through Social Security number verification. Until that is in place your agency should postpone the Proposed Rule. Congress should act on the Social Security "no-match" problem before this rule is implemented.

As a part of our statement we incorporate by reference in its entirety the comments of the Nation Council of Agricultural Employers (NCAE).

Sincerely Yours,

Joseph Young Executive Director

August 9 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

Re:   DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for
Employers Who Receive a No-Match Letter"

Dear Sir or Madam:

The Farm Labor Organizing Committee AFL-CIO submits the following comments in
response to the request for public comment by the Department of Homeland Security
(DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-
Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281
(June 14, 2006).

The Farm Labor Organizing Committee (FLOC) is a labor union of agricultural workers
in the eastern U.S. Our 15,000 membership is all Latino and many are immigrant
workers. We also represent thousands of immigrant families in our local communities
throughout the Midwest and South, and are further united with local, regional, and
national coalitions of immigrant organizations. In additional, we have a network of some
10,000 supporters in our regions and across the U.S. We have been addressing
immigration issues for almost a decade because many laws and regulations impose undue
hardships on our workers, families, and communities. We are also highly concerned that
much of the current political debate about immigration is based on hate and
discrimination, and does not reflect the high ideals upon which our society was founded.
In this debate, we have seen much of the worst of who we can be, rather than the best.

Most important, we believe that current policies and the political debate do not address
the *causes* of migration, and until the causes are examined and resolved there will be no
long-term solution to the issue.

A primary example is the adverse impact that the Social Security Administration's (SSA)
no-match letters have had on all workers in the United States, whether immigrant or
native-born. We have witnessed these letters being used to intimidate and exploit
workers, and to deny them their labor rights. This practice is being used to violate the
*human rights* of workers, contrary to the U.S. international obligations and to our own
civil rights laws.

FLOC is strongly opposed to the implementation of the proposed "Safe-Harbor
Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify
the adverse impact that SSA no-match letters have had on workers' rights, and trigger
mass firings across the nation. These firings will be unnecessary, unjust, and potentially

discriminatory. Our objections are based on the Social Security program being used outside its jurisdiction as a tool for immigration enforcement, as evidenced by the proposed DHS rules. Since the basic causes of migration are not addressed, the impact will be to simply punish those people who are already suffering even more. There are a number of serious consequences to the stability of our society that must be considered.

One consequence which concerns us is that measures which put vast numbers of people out of work will further the mass movements of protest that began after the harsh provisions in H.R. 4437.

Another consequence is that it will be detrimental to our national and local economies. Production will be disrupted by enormous upheavals in the workplace, millions of consumers will cease to support local businesses, and millions of taxpayers will cease to sustain government services and functions. It will also expand an unregulated underground economy, as masses of fired workers move into cash-based activities.

We are also concerned that the proposed rules will erode our working and privacy rights, and by further marginalizing a huge population can lead to alienation, social disruption, and crime.

At the same time, the rules will little impact on undocumented immigration. Past experience with no-match firings and workplace audits makes it clear that fired workers will not leave the country. Where can they go to support their families? Again, the *causes* of migration are not addressed.

Basically, the administrative rules represent an end-run around the democratic legislative process. The SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety, based on the following concerns:

• This proposed rule will harm all workers regardless of immigration status.

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—including U.S. citizens and authorized noncitizens—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to

improve working conditions and wages. The proposed rule would only exacerbate this problem.

- The proposed rule will expand the unregulated underground cash economy.

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the unregulated underground cash economy which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- This proposed rule is an end-run around the legislative process.

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- The SSA no-match letter program is ill-suited as a tool for immigration enforcement.

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- The proposed rule is an erosion of our privacy rights.

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- The costs of implementing the proposed rule are prohibitive.

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- The proposed rule is objectionable because compliance is impractical.

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

- The proposed rule puts the whole economy and society at risk.

The proposed rule will have serious economic and social consequences that will jeopardize the stability and well-being of our whole society. Will undermine economic production and sales, and create a vast underground economy. It will promote racism and discrimination, and create alienation and resentment among millions, potentially leading to social disruption and disintegration.

We must also consider the international consequences, and millions of immigrants report back to their relatives and compatriots that America stands for government-sanctioned hate, racism, and discrimination.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation,

entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule ignores the underlying *causes* of migration, and will result in creating outcomes detrimental to the long-term well-being of the whole society. The Department of Homeland Security should not risk the livelihoods of millions of U.S. workers in a poorly conceived administrative attempt at immigration enforcement which is doomed to fail in its intended purpose, particularly as our elected representatives consider comprehensive immigration reform. The proposed rule provides no solution whatsoever to the exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,


Kenneth Barger
Farm Labor Organizing Committee, AFL-CIO
1221 Broadway Street
Toledo, Ohio 43609
419-243-3456

FairfaxCountyPrivacyCouncil.org

14 August 2006

**SUBJECT:  Comment on Proposed rule:  DHS Docket No. ICEB-2006-0004
("Safe-Harbor Procedures for Employers Who Receive a No Match Letter")**

I.  <u>Executive Summary of Recommendation</u>:  **The Fairfax County
Privacy Council ("FCPC") urges modification of this proposed rule to
eliminate any reference to a Social Security Number ("SSN") "no match"
letter.  In the alternative, FCPC urges that the proposed safe harbor
procedures for SSN no match letters be applicable only to situations in
which an employee identified in an SSN no match letter had originally
certified work authorization on INS Form I-9 <u>with</u> a Social Security Card on
INS Form I-9.  Additionally, the requirements that subsequent verification of
I-9s must include use of a photo-ID and without any document containing
the non-matched SSN should be rescinded as onerous and
unconstitutionally invasive.**

II.  <u>Introduction</u>:  The proposed rule as applied to SSN no match letters is
unworkable in part because the rule dangerously conflates the protocols of work
authorization verification with assignment and disclosure of an Taxpayer ID
numbers  by employees to employers.  Neither the Social Security Act,
Immigration Reform and Control Act, the Internal Revenue Code, nor any other
federal law requires any person to have or use an SSN to live or work in the
United States.  Some important facts and authorities include:

A.  Pursuant to Section 7 of the Federal Privacy Act, federal
Department of Homeland Security ("DHS") instructs employers that in regard to
the SSN block on INS Form I-9, "This information block is optional. Therefore, an
employer cannot require an employee to complete it." DHS Employer Information
Bulletin 102 dated 15 March 2005,
http://uscis.gov/graphics/services/employerinfo/EIB102.pdf.  See e.g., **_EEOC v.
Information Systems Consulting, Inc_**., US District Court, Dallas, TX (1992)
(the federal Department of Justice (for the federal Equal Employment Opportunity
Commission) filed a complaint _against_ an employer in Texas who had refused to
hire an individual who would not disclose an SSN. The complaint was styled as a
discrimination action.  The case soon turned in favor of the employee, and the
court's consent decree ordered that "The defendant ... shall be **permanently
enjoined from terminating an employee or refusing to hire an individual for
failure to provide a social security number** [emphasis added].... the defendant
shall request, pursuant to Section 6724 of the Internal Revenue Service Code
{sic}, 26 USC 6724, a waiver of any penalties that may be imposed for failing to

include an employee social security number on forms and documents submitted to the IRS.");

       B.  Employers are required to report employee Taxpayer Identification Numbers as "unknown" if the employee does not disclose a Taxpayer Identification Number (TIN), such as an SSN or Individual Taxpayer Identification Number ("ITIN"), on IRS Form W4.  26CFR31.6011(b)-2(c)(4).

       C.  If an employee voluntarily discloses an SSN to the employer on IRS Form W-4, but communicates to the employer that her Social Security Card is "not available," employers must accept and report to the IRS the employee's SSN disclosure on IRS Form W-4.  26CFR31.6011(b)-2(b).

       D.  No federal law now exists requiring, or authorizing, employers to discharge employees for failure to disclose a TIN or for failure to rectify a name-TIN mismatch reported to the employer by the IRS.  Employers can avoid IRS penalties regarding TIN reporting by communicating their due diligence to the IRS in following 26CFR31.6011(b)-2.  In fact, as the Social Security administration warns employers: "A mismatch does not make any statement about an employee's immigration status and is not a basis, in and of itself, for taking any adverse action against an employee. Doing so could subject you to anti-discrimination or labor law sanctions."  Employer Reporting Instructions & Information," http://www.ssa.gov/employer/ssnvspamphlet.htm.

       E.  Federal, state, and local government agencies may NOT withhold any right, benefit or privilege from any person refusing to disclose her SSN unless the agency is authorized to do so by a specific federal statute.  *Selective Service v. Minn. Public Int. Res. Gp.*, 468 U.S. 841 (1984)(federal statutory authorization required to collect Social Security numbers).  Furthermore, a meaningful Section 7(b) warning is required each and every time time an agency elicits a person's disclosure of an SSN.  *E.g.*, *Doe v. Sharp*, 491 F. Supp. 346, 347-50 (D. Mass. 1980) (Section 7(b) creates affirmative duty for agencies to inform applicant of uses to be made of social security numbers -- "after-the-fact explanations" not sufficient); *Greater Cleveland Welfare Rights Org. v. Bauer*, 462 F. Supp. 1313, 1319-21 (N.D. Ohio 1978).  A violation of citizen SSN privacy rights under Section 7 can be construed as a felony.  42 USC 408.

III.  Discussion:

       A.  Failure to Reconcile Statutory Reality on SSNs:  The proposed rule fails to reconcile the fact that Congress has never required workers to obtain assignment of and disclose SSNs to employers upon penalty of dismissal.  The Department proposes by this rule to, without adequate notice to employees who have previously disclosed SSNs to employees on IRS Form W-4, and in violation of the letter and spirit of Section 7 of the Federal Privacy Act, require SSN

assignment and correct SSN disclosure by workers subject to SSN no match letters under penalty of loss of employment. Yet under the rule, any employee who fails or refuses to initially disclose an SSN to his employer escapes employer scrutiny as no SSN no match letter would be issued. And an employee who DOES disclose an unmatched SSN would receive scrutiny even if he did not verify work authorization with a Social Security Card on INS Form I-9.

B. ID Gridlock:  The Social Security Administration ("SSA") and many state agencies have tightened their identification protocols such that Americans find themselves in ID gridlock, unable to obtain a new ID from one agency because he needs another from another agency, etc., such that many Americans find themselves in ID gridlock which is difficult if not impossible to unscramble without significant time, assistance, and resources.As admitted in the summary of the proposed rule, many Americans receive no match letters even though they are work authorized. These Americans would still be subject to potentially impossible task of getting their papers in order within a few short weeks.  The proposed rule's various re-verification protocols with the SSA  and INS Form I-9 are onerous because they require the worker and employer to negotiate with federal and state agencies to "get their papers in order" within 63 days even if traveling away on business or perhaps on military deployment away from the civilian employer.

C. Unnecessary restriction on use of documents containing SSNs: The proposed rule bars use of documents containing SSNs in regard to INS Form I-9 re-verification by SSN no match letter recipients.  The effect of this bar will be significantly onerous to persons whose only identity document (i.e., driver's license) may contain the person's non-matched SSN

D. Unnecessary and burdensome demand for photo-ID re-verification:  The proposed rule requires use of photo ID in regard to INS Form I-9 re-verification by SSN no match letter recipients.  Yet this might be simply impossible for the worker to accomplish, especially given that his SSN containing driver's license is apparently also off limits for re-verification.  Recall that had the worker refused to disclose his SSN to the employer, that no match letter would have been issued, and no re-verification would be taking place.  Finally, the photo registration demand is both unrealistic and an unconstitutional invasion of privacy and religious freedom. *Jensen v. Quaring*, 472 U.S. 478 (1985)(affirming the 10th Circuit's quashing of mandatory photo registration for driver's licensing).  Surely the Constitutional right to work triggers as much or more Constitutional scrutiny than the common right to drive automobiles.  See also *Lake v. Perdue*, Superior Court of Fulton County, State of Georgia, Case No. 2006-CV-119207 (striking down photo-voter requirements); *Common Cause/Georgia League of Women Voters of Georgia, Inc. v. Billups,* 2006 WL 2089771 (N.D. Ga. 2006)(quashing enforcement of photo voter law; motion for stay of order to quash unanimously denied by 11th Circuit).

IV. <u>Conclusion</u>:  The proposed rule regarding employer safe harbor procedures upon receipt of SSN no match letters is unworkable, burdensome, and exceeds the statutory authority of the department.  Innocent American workers and employers will be victimized without any notice by processed they cannot control.

V. <u>Recommendation</u>:  The proposed rule should be modified to eliminate any reference to a Social Security Number ("SSN") "no match" letter.  In the alternative, FCPC urges that the proposed safe harbor procedures for SSN no match letters be applicable only to situations in which an employee identified in an SSN no match letter certified work authorization on INS Form I-9 **with** a Social Security Card.  Employer verification that the original INS Form I-9 was completed without a Social Security Card would thus suffice to meet safe harbor standards.  Additionally, the requirements that any subsequent verification of I-9s must include use of a photo-ID and without any document containing the non-matched SSN should be rescinded as unnecessary, onerous, and unconstitutionally invasive.

Sincerely,


Mike Stollenwerk
Chairman
Fairfax County Privacy Council
Fairfax County, Virginia

<u>VIA ELECTRONIC MAIL</u>

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

      **Re:**    **Docket No. ICEB-2006-0004**
               **Safe Harbor Procedures for Employers Who Receive a No-Match Letter**
               **(FR 71:114, p. 34281)**

To Whom It May Concern:

      Cayuga Marketing LLC hereby submits its comments on the Bureau of Immigration and Customs Enforcement, Department of Homeland Security's ("DHS") Proposed Rule regarding "no-match" letters published in the *Federal Register* on June 14, 2006 (71 *Federal Register* 34281). Cayuga Marketing LLC incorporates by reference, in entirety, the comments filed by the National Council of Agricultural Employers.

      Cayuga Marketing LLC consists of 28 dairy farm businesses located in the Central New York area.    Cayuga Marketing's mission is to: contribute to the long term sustainability of the U.S. Dairy Industry, increase farm profitability through increased returns on milk, lower the cost of production through cost effective inputs and provide services that bring value to Cayuga Marketing farm businesses.

      Cayuga Marketing has a 17-year history of working together to market our milk. Collectively we employ over 420 people and pay over 12.5 million dollars in salaries and payroll taxes. We are the responsible stewards of 21,000 cows and 36,000 acres of prime farmland.  We contribute 1.5 million dollars in property taxes.  Our gross product sales amount to 94 million dollars which adds 235 million dollars to the local economy.

Kathy Barrett

Projects Director
Cayuga Marketing LLC
kbarrett@flare.net
phone/fax 315 585-6415
790 Lerch Road
Geneva, NY 14456

No-Match Cert. Admin. Record  1329

 **American Council on International Personnel**
1212 New York Avenue, NW, Suite 800
Washington, DC 20005
• 202-371-6789 • Fax 202-371-5524 • www.acip.com

August 11, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services,
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

Via Electronic Mail

**Re:    DHS Docket No. ICEB-2006-0004: Comments on Proposed Rule, "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," published at 71 Fed. Reg. 34281-34285 (June 14, 2006)**

Dear Director:

The American Council on International Personnel (ACIP) is pleased to submit the following comments in response to the above referenced proposed rule (the "Proposed Rule"), , issued by the Department of Homeland Security's (DHS) Bureau of Immigration and Customs Enforcement (ICE). The Proposed Rule seeks to establish safe-harbor procedures for employers to follow in response to either of two events: (1) if the employer receives written notice from the Social Security Administration (SSA) that the combination of name and social security number submitted to SSA for an employee does not match agency records; or (2) if the employer receives written notice from DHS that the immigration-status or employment-authorization documentation presented or referenced by the employee in completing Form I-9 was not assigned to the employee.

By way of quick background, ACIP is an organization comprised of nearly 200 corporate and institutional members with an interest in the movement of personnel across national borders. Each of our members employs at least 1,000 employees worldwide, and, in total, ACIP members employ millions of United States citizens and foreign nationals in all industries throughout the United States. ACIP sponsors seminars and produces publications aimed at educating human resource and legal professionals on compliance with immigration laws, while working with Congress and the Executive Branch to facilitate the movement of international personnel.

ACIP members exercise extraordinary care to ensure their hiring and employment practices are in accordance with the law. Our members are committed to working with the government to establish reasonable safe harbor provisions. Examples of ACIP's

**No-Match Cert. Admin. Record  1330**

focus on compliance include: ACIP has received grants from the Department of Justice's Office of Special Counsel to educate employers on I-9 compliance, and ACIP provides training specifically on IRCA (Immigration Reform Control Act) compliance. Additionally, ACIP has previously advised our members of their affirmative obligation to correct deficiencies identified in no-match letters, including a review of I-9 records if the situation warrants. Some members report being frustrated in this effort by employees who are informed by labor unions or counsel that they should not cooperate.   ACIP welcomes this clarification of employer obligations in response to a no-match letter. We are concerned, however, that the timeframes established by this proposed rule are unrealistic and will undermine rather than support the government's enforcement efforts. We also seek clarification of certain of these obligations which, as currently drafted, are confusing and onerous for employers. Finally, we seek assurance that employers will not be liable for adverse employment actions, such as termination, taken in reliance upon government information.

In the preamble to the proposed rule, ICE stated, "Comments that will provide the most assistance to ICE in developing these procedures will reference a specific portion of the proposed rule, explain the reason for any recommended change, and include data, information, or authority that support such recommended change."  As such, we have included relevant portions of the proposed rule with our corresponding comments following each provision.

## 1. Seek Clarification on Situations Leading to a Finding of Constructive Knowledge

Proposed regulatory language (emphasis added):

8 CFR 274a.1(l)(1) The term knowing includes having actual or constructive knowledge. **Constructive knowledge** is knowledge which may fairly be inferred through notice of certain facts and circumstances that would lead a person, through the exercise of reasonable care, to know about a certain condition. Examples of situations where the employer may, depending on the totality of relevant circumstances, have constructive knowledge that an employee is an unauthorized alien include, but are not limited to, situations where the employer:
  (i) Fails to complete or improperly completes the Employment Eligibility Verification Form, I-9;
  (ii) Acts with reckless and wanton disregard for the legal consequences of permitting another individual to introduce an unauthorized alien into its work force or to act on its behalf;
  (iii) Fails to take reasonable steps after receiving information indicating that the employee may be an alien who is not employment authorized, such as--
    (A) Labor Certification or an Application for Prospective Employer;****

ACIP's Comments:

8 CFR 274a.1(l)(1)(iii)(A) of the proposed rule, states that an employer may be deemed to have constructive knowledge that an employee is an unauthorized alien if the employer fails to take reasonable steps after receiving information indicating that the employee may be an alien who is not employment authorized, such as a labor

certification or an Application for Prospective Employer. ACIP understands the concept of constructive knowledge under current law. We are concerned, however, that the examples provided in this proposed rule, including the provision that is already in the current regulation, confuse this issue. A labor certification alone does not indicate that an employee is not authorized to work. Many foreign nationals legally reside and work in the United States while their labor certification is pending. For example, the foreign national may be working in the US in H-1B status. If a labor certification potentially gives rise to constructive knowledge, what steps should an employer take to ensure they are in compliance? Along the same lines, ACIP would like clarification on what is meant by an Application for Prospective Employer? We assume this may refer to an application filed with the U.S. Citizenship and Immigration Service for immigrant status. Again, however, such form alone does not indicate work authorization status. Given the importance of these new obligations on employers, ACIP would like to suggest that ICE issue a new proposed rule to clarify proposed section 274a.1(l)(1)(iii). In the alternative, ICE should delete these examples.

**2. Proposed Time Frames and Record Keeping Requirements are Unreasonable**

Proposed regulatory language (emphasis added):

8 CFR 274a.1(l)(2)(i) An employer who receives the notice from SSA described in paragraph (l)(1)(iii)(B) of this section will not be deemed to have constructive knowledge that the employee is an unauthorized alien if--

(A) The employer takes reasonable steps, <u>within 14 days</u>, to attempt to resolve the discrepancy; such steps may include:

(1) <u>Checking the employer's records</u> promptly after receiving the notice, to determine whether the discrepancy results from a typographical, transcribing, or similar clerical error, and if so, correcting the error(s), <u>informing the Social Security Administration</u> of the correct information (in accordance with the letter's instructions, if any; otherwise in any reasonable way), <u>verifying with the Social Security Administration</u> that the employee's name and social security account number, as corrected, match in Social Security Administration records, <u>and making a record of the manner, date, and time of such verification</u>; and

(2) If no such error is found, promptly <u>requesting the employee to confirm</u> that the name and social security account number in the employer's records are correct--and, if they are correct according to the employee, <u>requesting the employee to resolve the discrepancy</u> with the Social Security Administration, such as by visiting a Social Security Administration office, bringing original documents or certified copies required by SSA, which might include documents that prove age, identity, and citizenship or alien status, and other documents that may be relevant, such as those that prove a name change, or, if the employee states that the employer's records are in error, <u>taking the actions to correct, inform, verify, and make a record</u> described in paragraph (l)(2)(i)(A)(1) of this section; and

\*\*\*\*\*

8 CFR 274a.1(l)(2)(ii) An employer who receives the notice from DHS described in paragraph (l)(1)(iii)(C) of this section will not be deemed to have constructive knowledge that the employee is an unauthorized alien if–

> (A) The employer takes reasonable steps, <u>within 14 days</u> of receiving the notice, to attempt to resolve the question raised by DHS about the immigration status document or the employment authorization document; and
>
> (B) In the event that, <u>within 60 days of receiving the notice</u>, the employer does not verify with DHS that the document was assigned to the employee, the employer takes reasonable steps, <u>within an additional 3 days</u>, to verify the employee's employment authorization and identity, such as by following the verification procedure specified in paragraph (l)(2)(iii) of this section.

ACIP's Comments:

ACIP believes that both the 14 day and 60 day requirements are unreasonably short periods of time for these types of obligation. We would like to address several particular issues in this regard:

First, the regulation does not specify when the 14 day clock starts. Does it start the day the Social Security Administration mails the letter as evidenced by the postmark or by the date on the letter? These dates often vary by several days as the letter wends its way through the SSA mail process. Furthermore, the U.S. postal service often takes up to a week to deliver business mail. ACIP would like to propose that the clock start on the day the letter reaches the employer rather than on the date it leaves SSA.

Second, a 14 day timeframe is too short in many employment situations for the letter to even reach the right person. For large employers with multiple locations and hundreds of mailstops, letters are often misdirected either because the mailing address is not clear or because the government mails the letter to the wrong department or office. Once delivered to the employer, it often takes some time to redirect the letter to the appropriate personnel. For example, SSA could send the letter to the payroll office which then needs to forward the letter to the human resources department, which then must route the letter internally to the person(s) responsible for record maintenance. Sometimes, such activities are housed at local offices dispersed throughout the United States. Delays in routing a letter are exacerbated by holidays and vacations. Colleges and universities would experience another problem in complying with this 14 day requirement because their payroll offices close at the end of each semester and for several months over the summer. In these situations, 2 months could easily pass before the letter reaches the right office.

ACIP would like to propose that rather than a strict timeframe for action that instead employers be required to show that they acted within a reasonable timeframe upon receipt of the letter. What is reasonable will vary with the particular employment situation and the facts of each case. At minimum, ACIP believes that 60 days, after the correct person receives the letter, would be a reasonable timeframe for employers to initiate (but not necessarily complete) certain activities. In the alternative, we propose that ICE and SSA establish a procedure whereby employers can designate an official to receive no-match correspondence, or that the letter be sent to counsel in the manner of

other legal correspondence, so that we can better assure that information is delivered to the employer and acted upon in a timely manner.

As we will explain in more detail below, we believe the employer should only be held accountable for actions within the employer's control and should not be held to timeframes where the government itself might be the cause of delays in problem resolution. Similarly, the regulation does not account for the instance where an SSA no-match letter goes directly to an employee at the employer's place of business. For this situation, ACIP requests that any final rule clarify what actions an employer should do to take advantage of the safe-harbor provision.

Third, ACIP would like additional clarification on the employer's obligation during the 14 day period for activities beyond the employer's control. What action should an employer take if it takes the Social Security Administration longer than 14 days to verify any new corrected information? As written, the proposed rule seems to require the employer to document, within 14 days, the verification they receive in communicating with the SSA – even though the employer has no control over SSA's response time. Along the same lines, is the employer's obligation merely to request the employee to resolve the issue? How should an employer respond if an employee is unable or unwilling to take all the required steps within 14 days? Can an employer terminate an employee at this point? ACIP recommends that the final rule make clear that the employer is only responsible for taking steps within the employer's control.

Fourth, ACIP would like clarification of the time frame for the employee's activities. The preamble suggests that the employee's actions must also be completed within 14 days of receipt of the no-match letter. If the employer cannot resolve the situation within 14 days, the employer must request the employee take additional steps to resolve the issue. Does the employee receive an additional 14 days if the employer used the original 14 days? ACIP believes the employer should have enough time, at least 60 days, to attempt to resolve any discrepancy. In the event the employer cannot solve the problem, ACIP recommends the employee be given an additional 60 days to resolve the problem. It is our experience that most employees will act upon this expeditiously, but this additional time will accommodate employees who are unable to immediately contact SSA due to pressing work or family concerns.

Fifth, in relation to the requirement that the employer take reasonable steps within 14 days to attempt to resolve any question raised by DHS about the immigration status document or the employment authorization document, ACIP would like ICE to provide examples of what those steps might involve. For example, will DHS create a separate avenue for employers to follow in the event they receive such a notice from DHS?

Sixth, ACIP also has concerns over the record-keeping requirements. Why must an employer maintain record of the manner, date and time it verified with the appropriate agency that a discrepancy has been resolved? The act of verifying with the appropriate agency that the matter has been resolved should be sufficient. Extensive record-keeping requirements of this nature impose significant costs on employers who must allocate personnel and storage space to create and maintain these records. Finally, in relation to such record-keeping requirements, ACIP is concerned that ICE remains silent on the period for which such records be maintained. Will it be a specific period of

time measured from the date of resolution or will an employer be asked to retain the record for a period of time consistent with other I-9 records or by some other complicated formula based on the employee's dates of employment?

## 3. Seek Clarification on 60 Day Requirement

Proposed regulatory language (emphasis added):

8 CFR 274a.1(l)(2)(i)(B) In the event that, within 60 days of receiving the notice, the employer does not verify with the Social Security Administration that the employee's name matches in the Social Security Administration's records a number assigned to that name and that the number is valid for work or is valid for work with DHS authorization (and, with respect to the latter, verify the authorization with DHS), the employer takes reasonable steps, within an additional 3 days, to verify the employee's employment authorization and identity, such as by following the verification procedure specified in paragraph (l)(2)(iii) of this section.

\*\*\*\*\*

8 CFR 274a.1(l)(2)(ii)(B) In the event that, within 60 days of receiving the notice, the employer does not verify with DHS that the document was assigned to the employee, the employer takes reasonable steps, within an additional 3 days, to verify the employee's employment authorization and identity, such as by following the verification procedure specified in paragraph (l)(2)(iii) of this section.

ACIP's Comments:

ACIP suggests that any final rule make clear which steps must be completed within 14 days, and which steps must be completed within 60 days. Under the proposed language, there seems to be a gap in which tasks ICE expects employers to complete within 14 days, and which tasks must be completed within the 60 day timeframe. We request clarification on what occurs between the 14-day and 60-day time period. As far as we can tell, the employer has 14-days to inform the employee of the discrepancy and determine whether it is a clerical mistake. Then, it seems the employer has 60-days, from the date of receipt of the letter or notice, to ensure and confirm that the discrepancy has been rectified. We are unclear about the time in between the 14 days and the 60 days. For example, ACIP believes but would like to clarify that an employer can continue to employ an employee between the 14 and 60-day period, even if there is an unresolved discrepancy.

## 4. Seek Clarification on Whether the New I-9 (After Waiting 60 Days) Is Optional

Proposed regulatory language (emphasis added):

8 CFR 274a.1(l)(2)(iii) The verification procedure referenced in paragraphs (l)(2)(i)(B) and (l)(2)(ii)(B) of this section is as follows:

(A) The employer completes a new Form I-9 for the employee, using the same procedures as if the employee were newly hired, as described in Sec. 274a.2(a) and (b) of this part, except that--

(1) Both Section 1--``Employee Information and Verification''--and Section 2--``Employer Review and Verification''--of the new Form I-9 should be completed within 63 days of receiving the notice referred to in paragraph (l)(1)(iii)(B) or (C) of this section;

(2) No document containing the social security account number or alien number that is the subject of a written notice referred to in paragraph (l)(1)(iii)(B) or (C) of this section, and no receipt for an application for a replacement of such document, may be used to establish employment authorization or identity or both; and

(3) No document without a photograph may be used to establish identity or both identity and employment authorization; and

(B) The employer retains the new Form I-9 with the prior Form(s) I-9 for the same period and in the same manner as if the employee were newly hired at the time the new Form I-9 is completed, as described in Sec. 274a.2(b) of this part.

ACIP's Comments:

The proposed regulatory language provides an employer safe harbor protection *if* the employer re-verifies the employee by repeating the same I-9 process completed upon initial hire. The preamble suggests that this is an extra step that employers *may* take to demonstrate lack of constructive knowledge. The preamble further suggests that employers may take action other than the procedure described in the proposed regulations. Of course, employers who opt for a different course of action would do so at the risk of ICE finding such actions to be insufficient for the safe harbor.

The regulatory language must be clearer so as to not create another mandatory procedural hurdle before the employer may terminate an authorized employee. In fact, both the preamble and the proposed regulation itself should state simply that if the employee's status cannot be verified in 60 days, the employer may terminate the employee in question absent compelling evidence to do otherwise. Indeed, in the event of compelling reasons why the employer should not terminate such employee even after 60 days, such as slow agency response or independent evidence that the employee is in fact legal, then the appropriate next step is for the regulation to permit extending the 60 days to facilitate confirmation of the employee's work authorization or identity. The current regulatory language is unclear and may inadvertently create an expectation or even right of action on the part of an employee for a new I-9 process. The regulation must state unequivocally that re-verification through a new I-9 is *optional,* and that it is only warranted when there is compelling evidence that the additional documentation the employee provides would establish work authorization or identity, such as a U.S. passport.

The irony of requiring the repeat of the I-9 process is that the I-9 system, as currently constituted, is unreliable and is the reason why new regulations are necessary in the first place. The paper-driven verification on Form I-9 does attempts to verify identity or work authorization, but leaves ample opportunity for exposing law-abiding employers to

penalties due to inadvertent paperwork error.  Meanwhile, lawbreakers blatantly violate the law by hiring off-the-books and the immigration authorities can do little to stop them.

**5.  New I-9 Retention Period Would Create Administrative Burden**

Proposed regulatory language (emphasis added):

8 CFR 274a.1(I)(2)(iii) The verification procedure referenced in paragraphs (I)(2)(i)(B) and (I)(2)(ii)(B) of this section is as follows:

****

> (B) The employer retains the new Form I-9 with the prior Form(s) I-9 for the <u>same period</u> and in the same manner as if the employee were newly hired at the time the new Form I-9 is completed, as described in Sec. 274a.2(b) of this part.

ACIP's Comments:

ACIP is concerned that ICE may intend that the employer manage a wholly new I-9 retention period in instances where completion of a new I-9 is warranted.  Is the employer required to maintain the new I-9 for the longer of three years beyond completion or one year beyond termination regardless of the required retention associated with the originally completed I-9? Must the employer retain both the original I-9 and new I-9 for the longer of three years beyond completion or one year beyond termination, thereby requiring that employers develop systems that accommodate and track I-9 based on multiple event dates??  If so, this requirement would create an administrative burden on employers who already have systems to track maintenance requirements based on the date of initial hire.

Overall, ACIP would like to suggest that the regulatory language itself, not just the preamble language, in any final rule clarify that the regulation is providing examples, but that employers may take other steps to show they acted reasonably and timely looking at the 'totality of the circumstances.'  We thank the Department of Homeland Security for this opportunity to submit comments on the proposed rule and would be happy to provide any additional information necessary to facilitate a workable final rule resulting from this safe harbor proposed rule.


Sincerely,


Lynn Shotwell
Executive Director



## AMERICAN FARM BUREAU FEDERATION®

600 Maryland Avenue S.W. • Suite 800 • Washington, DC • 20024 • (202)406-3600 • fax (202)406-3604 • www.fb.org

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
DHS Docket No. ICEB—2006—0004
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

**Subject: Proposed Rule; Safe-Harbor Procedures for Employers Who Receive a No-Match Letter, 71 Fed. Reg. 34281 (June 14, 2006)**

To Whom It May Concern:

The American Farm Bureau Federation (AFBF) appreciates the opportunity to offer the following comments on the above referenced proposed rule.

Under current law, it is illegal for a U.S. employer *knowingly* to hire or continue to employ a person who is not authorized to work in the United States (8 USC 1324a). "Knowing" is a term defined in current regulations that goes beyond actual knowledge to include that "which may fairly be inferred through notice of certain facts and circumstances which would lead a person, through exercise of reasonable care, to know about a certain condition" or, in other words, to have "constructive knowledge" (8 CFR 274a.1(l)). The proposed rule would further define this second category or "constructive knowledge" to provide that employers would become subject to a finding upon failing to take reasonable steps after receiving written notice from either the Social Security Administration (SSA) or the Department of Homeland Security (DHS) that a wage report or document does not match agency records. The rule also describes a set of "reasonable steps" employer may take to avoid a finding of constructive (but not actual) knowledge; employers following the outlined steps would obtain a "safe harbor" from prosecution over a finding of "constructive knowledge."

AFBF commends DHS for proposing a safe harbor for employers who do not knowingly employ unauthorized workers. For more than a decade, the SSA "no-match" notice has raised questions about an employer's obligations under the employment authorization provisions of immigration law after that employer has taken all appropriate steps to verify employment eligibility. U.S. agriculture has repeatedly requested guidance on whether and how an employer is to respond to such a notice without putting the employer in legal jeopardy due to the employer's obligation under anti-discrimination provisions of the same law (8 USC 1324b). In part, this proposed rule represents an attempt to address those concerns and provide employers with guidelines in hiring and firing decisions. We appreciate DHS efforts. Unfortunately, there are a number of situations – many of which are unique to the agricultural sector – that may not have been fully considered during development of the safe harbor provisions. With these comments, we identify such situations and strongly urge that the final regulation incorporate our recommended changes to ensure that the safe harbor provisions are equally available to all employers and all parts of agriculture.

**No-Match Cert. Admin. Record  1338**

**Apply the Safe Harbor to Seasonal Employers**

The proposed rule states that employers would be deemed not to have constructive knowledge and thus obtain a safe harbor from prosecution if the employers take the following steps in response to a no-match notice. Upon receiving notice, employers would have 14 days to check records and report to SSA or DHS regarding any necessary corrections or, if records cannot be corrected, to instruct the worker to go to the local SSA or DHS office to fix the problem. A Social Security mismatch would not be resolved until the employer has first verified the new information with SSA. If the employee does not return with new or corrected information within 60 days of the employer's receipt of the mismatch letter, the employer then has three days to complete a new Form I-9. When completing a new form, the employer would not be allowed to use documents containing the Social Security or alien identification number that was subject to the earlier no-match notice. At the same time, no document without a photograph could be used to establish identity or identity and employment authorization. (71 Fed. Reg. 34285.)

Our reading of the proposed regulation is that each step would need to be followed as spelled out in the rule in order for the employer to become eligible for the safe harbor. This is important because while DHS acknowledges that there may be other reasonable steps that could lead to a safe harbor, the employer, in following procedures other than the ones outlined in the rule, could "face the risk that DHS may not agree" (71 Fed. Reg. 34283). The practical effect of this approach could have a significant detrimental effect on seasonal employers and effectively vitiate the protections of the safe harbor for a large segment of agriculture. One set of employers should not be given the certainty of a prescribed safe harbor while another is forced to define one on a case-by-case basis with DHS approval; seasonal employers should not be denied the benefit of safe harbor provisions just because their business is seasonal in nature.

There are several situations, in which an agricultural employer may not be able to take all of the required steps to obtain the safe harbor, including:

1) Single season workers. While timing will vary with crop, season, and other criteria, seasonal farmers (in the Midwest, for example) generally submit wage reports to the IRS (Forms W-2) in February for employees who were employed during the previous harvest season and, in most instances, are no longer employed. Should a report on such an employee generate an SSA no-match notice, such a notice in all likelihood would not be sent to an employer until late winter or the following spring – well over a year since the individual was employed. In many instances, such employees do not return to the original place of employment. For those who do, depending on crop and nature of work, such employees would not be re-hired until 14, 60, or 63 days after the employer has received the notice. Further, many farm workers may "follow the crops" by migrating from state to state, and these workers may not permanently reside locally. Few such workers leave forwarding information since the prevailing practice is to terminate, not layoff, the worker between seasons. While the employer could meet the safe harbor requirement to check his or her records, the employer would not be able to meet the other requirements. The employer would not be able to reach employees despite making every reasonable effort. We strongly believe that these employers should not be denied the safe harbor for reasons that are beyond employer control. *Recommendation: We urge DHS to clarify in the final rule that the safe harbor extends to employers who, in addition to meeting the requirement to check records, can document attempts to reach a former employee who is the subject of a no-match notice.*

2) Off-season workers. As stated in 1) above, some workers listed on a previous no-match notice may not be re-hired until 14, 60, or 63 days after the employer has received the notice. Few farm workers leave forwarding information and therefore may not be reachable off-season.

2

**No-Match Cert. Admin. Record  1339**

*Recommendation: If an employee who is subject to a previous no-match notice returns in a following season, we would recommend that the clock start ticking on the first day of re-hire after receipt of the notice. For off-season workers who fail to return in a subsequent season, we would offer the same recommendation as stated in 1) above.*

3) <u>Short season workers</u>. The duration of a season may vary widely across the United States depending on crop and location. For example, in the state of Washington, approximately 75,000 migrant and seasonal workers are employed each year on small family-owned farms; many of these workers are employed for periods as short as two weeks. Under these circumstances, an employer may be able to check records, ask the employee to confirm those records and in the event there are no errors, instruct the employee to follow up with SSA or DHS all within 14 days. But, if the employee migrates from crop to crop, there may not be an opportunity for the employee to resolve the issue with SSA or DHS within the 60 days prescribed by the rule. Once the employee has moved on, there would not be an opportunity for the employer to take the next step, which is to complete a new Form I-9. *Recommendation: The 14-, 60-, and 63-day periods should toll only while the employee is employed with the employer. For example, if the employee moved on to the next crop on day 15, the clock would stop. Upon re-hire in the next season, the clock would re-start and the employee would have 45 days (for a total of 60 days) in which to follow up with DHS or SSA and report any corrections to the employer. Again, for short season workers who fail to return in a subsequent season, we would offer the same recommendation as stated in 1) above.*

All of the above examples pertain to situations in which an employer is not able to follow every one of the necessary steps to obtain the safe harbor. The reverse situation could also occur: The employer follows every step outlined in the regulation but the no-match issue is not resolved.

1) <u>Wage Report Mismatch</u>. For I-9 Form purposes, an employee may provide documents that do not contain a Social Security or alien identification number – a birth certificate and driver's license with a photograph, for example. But because the employer has submitted a Form W-2, the employer may receive a no-match notice from the SSA if there are sufficient numbers of mismatches. It is not clear from the proposed rule whether the employer could simply re-use the same documents on the new Form I-9 in this instance. It is also not clear whether the employer would be held liable if the employee writes in Section 1 of the new form a Social Security number that is the subject of a notice but does not provide a Social Security card. *Recommendation: DHS should clarify whether an employer would be deemed to have constructive knowledge under these circumstances; if so, DHS should specify the employer's legal obligations under immigration law including the anti-discrimination provisions (8 USC 1324b).*

2) <u>Multiple Season Mismatches</u>. An employer may take every step outlined in the proposed rule, up to and including completing a new I-9 Form, yet receive a no-match notice next season. During a two-week harvest when producers are working nearly round the clock to harvest a perishable crop in a short time-frame when every day is precious, it may be difficult for larger seasonal employers (e.g., 500-750 employees) to keep track of every one of the returning employees. Even if the employer recognizes and can keep track of every single worker, the rule does not appear to preclude the employer from obtaining the safe harbor if the employee keeps responding with new information to each document request. For example, an employee might provide one Social Security card the first year which triggers a no-match notice the following year, provide another Social Security card in the second year in response to the original notice which cannot be verified with SSA in 60 days and then provide yet a third Social Security card for the new I-9 Form between day 61 and day 63. *Recommendation: DHS should clarify whether an employer*

3

*under these circumstances could still obtain the safe harbor from a constructive knowledge finding. If so, DHS should clarify whether it would deem such employer as having actual knowledge of the worker's unauthorized status.*

Many farmers hire and pay an independent contractor to provide workers during the season, with the understanding that the contractor will be the employer for all purposes, including employment eligibility verification. Yet the Department of Labor could determine that both the farmer and the contractor are "joint employers" under the Fair Labor Standards Act (29 USC 201 *et seq.*) or the Migrant and Seasonal Agricultural Worker Protection Act (29 USC 1801 *et seq.*). However, it is not clear from the rule whether the farmer or the contractor would have to obtain the safe harbor to avoid prosecution. *Recommendation: DHS should clarify the employer's obligations under immigration law relative to the agricultural joint employment standards.*

Some seasonal agricultural employers hire non-immigrants with a temporary work authorization (e.g., under the H-2a program) or immigrants with permanent work authorization. The proposed rule expressly identifies a "labor certification or application for prospective employer" as information that could prompt a constructive knowledge finding. But while the rule would describe the steps for an employer to take upon receipt of written notice from SSA or DHS over a wage report or document, it does not include any steps for a labor certification. An employer should not be denied the certainty of a prescribed safe harbor just because the employer hires a worker requiring a labor certification. *Recommendation: DHS should specify a safe harbor for employers of workers requiring a permanent or temporary labor certification.*

**Apply the Safe Harbor to Hiring Decisions**

In the notice of proposed rulemaking, DHS expressly states that following the safe harbor requirements "will eliminate the possibility that DHS … will allege, based on the totality of relevant circumstances, that an employer had constructive knowledge that it was employing an alien not authorized to work in the Unites States" (71 <u>Fed. Reg.</u> 34282). However, it is not clear whether the safe harbor would also apply to hiring decisions.

As outlined above, there are several reasons why an employer would be prevented from meeting all of the steps necessary to obtain the safe harbor. A good example is when the worker quits: some employees, when confronted with the no-match notice, will quit without offering a reason. The employer would have checked his or her records and found no errors, meeting the first step. He or she may be asking the employee to confirm records or instructing the employee to follow up with SSA or DHS, which is the second step. Nevertheless, the employee would fail to respond within 60 days (the third requirement), and the employer would not be able to comply with the final requirement to fill out a new I-9 Form within 63 days.

While we are confident that DHS would not prosecute this employer for <u>continuing to employ</u> the worker (after all, the employee quit in this instance), there is still a question as to whether the employer's receipt of the no-match letter would still be grounds for a finding that the employer had constructive knowledge of <u>hiring</u> an unauthorized worker. A reasonable person might infer from the worker quitting that the worker is avoiding detection as an unauthorized worker.

However, we do not believe a constructive knowledge finding can or should be imputed to an employer merely based on the fact that the employer has received a no-match notice. Because the worker did not offer a reason for quitting, the employer could not have actual knowledge that the worker quit to avoid detection. And if the employer had properly completed the Form I-9, the employer would not have reason to suspect that the employee was not employment eligible.

4

*Recommendation: We recommend that DHS clarify that the safe harbor would apply to previous hiring decisions under these circumstances.*

## Extend the 14- and 60-Day Deadlines

Under the proposed rule, upon receiving notice employers would have 14 days to check records and report back to SSA or DHS or instruct the worker to follow up directly with SSA or DHS. If the employee does not return with corrected information within 60 days, the employer would then have three days to complete a new Form I-9. (71 Fed. Reg. 34285.)

In the agricultural sector, more than 90 percent of operations are family owned and operated. The size of the operation may vary from a single hired worker up to 500 or more workers. Some operate year round while others plant, cultivate or harvest during seasons that may range from as few as two weeks to as many as 48 weeks a year. For example, in Washington, where there are approximately 75,000 seasonal and migrant workers employed each year on small family farms, many are employed for periods as short as two weeks. At a typical operation, one office person will hire more than 100 workers at one time.

On the farm, the grower's spouse often constitutes the "Human Resources Department" and the spouse may not work full time. Access to a computer or to a local branch of SSA or DHS may be limited in more remote areas of the country. Mail may not be processed at a frequency greater than once a week or the notice might arrive when the grower is off-season, on vacation or at a trade conference. While employers with a dedicated H.R. department and staff may be able to check and correct records or notify the employee within 14 days, not every agricultural employer would be able to do so. *Recommendation: We recommend extending the timeframe for the first deadline (in which an employer must check, correct or inform) to at least 30 days.*

Similarly, 60 days may be too short a time period for farm workers to comply with the second requirement (to respond with new or corrected information). On a grape farm in New York state, for instance, the workers are working nearly round-the-clock for about two months in the spring and about three months solid in the fall between harvest, crushing, fermenting, and subsequent "cellaring." Asking them to take a long time out to drive to the nearest SSA office may not be completely practical. *Recommendation: DHS should extend the second deadline to at least 90 days.*

## Address Discrimination Issues

The current regulatory definition of "knowingly" includes the following provision:

> "Nothing in this definition should be interpreted as permitting an employer to request more or different documents than are required under [8 USC 1324a(b)] or to refuse to honor documents tendered that on their face reasonably appear to be genuine and to relate to the individual." 8 CFR 274a.1(l)(2).

In the proposed rule, DHS adds a clause to this provision to exclude documents that are subject to a no-match notice: ", except a document about which the employer has received a notice described in paragraph (l)(1)(iii) of this section and with respect to which the employer has received no verification as described in paragraph (l)(2)(i)(B) or (l)(2)(ii)(B)." The proposed rule would not address the anti-discrimination provisions under Title VII of the 1964 Civil Rights Act ("Title VII") (42 USC 2000e-2).

**No-Match Cert. Admin. Record  1342**

AFBF applauds DHS for attempting to provide employers with some certainty in their hiring and firing decisions, beyond the limited protection afforded by completing an I-9 Form. Under current law, an employer who is not sufficiently aggressive in examining documents would run the risk of violating the employment authorization provisions of immigration law (8 USC 1324a). But, by being too aggressive, the same employer would run the risk of violating the anti-discrimination provisions in the same law, and there have been more growers charged with discrimination under the immigration law than with employer sanctions. Excluding no-match documents from anti-discrimination provisions would make it much easier for employers to meet the employer authorization provisions.

*However, AFBF strongly urges DHS to make whatever changes to the proposed rule necessary to ensure the rule will not lead to additional discrimination lawsuits under Title VII.* For decades, agriculture has been plagued with nuisance suits, the purpose of which has been not necessarily to win on the merits but to outspend the grower so as to make an example for the wider agricultural community. If the legal and social costs are high enough, farmers will settle instead. The questionable tactics of these lawyers have been well documented in Rael Jean Isaac's Harvest of Injustice (please see http://www.nlpc.org/harvest.asp). For a more recent example, please see *Malacara v. Garber* (5th Cir. December 9, 2003) (LSC-funded lawyers sued a 70-year-old Ohio vegetable farmer under a Federal law that did not even apply to small family farmers; the farmer won in lower court and at appeal but it cost him more than $100,000 of his hard-earned money to prove the complaint lacked merit.). <u>If history is any indication, we would expect activist attorneys to test the boundaries of the proposed rule in court, and agricultural employers are the most likely test subjects; agriculture should not have to pay additional legal expenses because the proposed rule fails to address considerable legal issues.</u>

There also may be legal arguments against the rule in its proposed form.

For example, the Tenth Circuit Court of Appeals in *Zamora v. Elite Logistics, Inc.* (10th Cir. June 6, 2006) recently reversed a lower court decision for the employer and let a Title VII national- origin claim go to a jury. The employer was acting on a tip he could have received from DHS (i.e., an employee was using a Social Security number for I-9 Form purposes that another had used multiple times in another state). He responded by taking precisely the step required to qualify for the safe harbor (i.e., the employer requested another document). The safe harbor would not protect employers from Title VII. And all some lawyers need is an argument, not even a strong one, to compel growers to settle. If DHS does not adequately address these issues, it will defeat the purpose of the proposed rule, which is to facilitate compliance with 8 USC 1324a.

**Clarify whether name or number trigger constructive knowledge finding**

Employers would be subject to a constructive knowledge finding if failing to take reasonable steps upon receiving written notice from SSA that the "combination" of name and Social Security number does not match agency records. But SSA has sent several forms of the no-match letter in the past; one takes the form of a simple list of numbers with no corresponding identifying names. If the employer receives this form of the letter, one could not conclude that the name also mismatches agency records. It appears that both the name and the number must not match to become subject to the rule. *Recommendation: DHS should clarify precisely what is meant by a "combination" mismatch.*

**Apply the Final Rule Prospectively**

The proposed rule does not stipulate when the regulation would apply to employers. Given the many resource and other issues that are unique to agriculture, we would not support applying the rule on a retroactive basis. *Recommendation: DHS should apply the rule prospectively from its effective date.*

**No-Match Cert. Admin. Record  1343**

**Delay the Final Rule Pending Congressional Efforts**

Both the U.S. Senate and House of Representatives have approved separate legislation (S. 2611 and H.R. 4437) that would address many of the same issues addressed in this proposed rule and reform of this part of the law is a high priority for the Administration. Thus, it is possible that there may be new law respecting exactly these matters before the end of the year. Farmers do not want to be in position of having to change their operating procedures twice – once to accommodate this proposed rule and once again to accommodate a subsequent rule prompted by a new immigration law. Employers require certainty in Federal regulations in order to continue to grow and thrive.

While we recognize that employers need not use the safe harbor, if employees are not able to present documents consistent with the proposed rule, employers will be compelled to terminate those workers or risk a constructive knowledge finding and prosecution. AFBF has conducted an extensive economic study of the immigration impacts on agriculture. The study shows that of all the sectors of the U.S. economy, domestic agricultural production could be most severely and disproportionately affected on the order of $5 to $9 billion annually if labor restrictions take effect before growers have access to an adequate legal workforce. Federal surveys suggest that between a high percentage of agriculture's hired workforce may lack proper documentation, and we have already mechanized to a large extent. We would somehow have to replace those workers at a time when few Americans have shown a willing to take farm jobs. The impact of this proposed rule could be devastating, prompting many farmers to raise their prices at a time when the United States is opening its produce markets to significant foreign competition under North and Central American Free Trade Agreements.

*Recommendation: We strongly urge DHS to postpone further action on a final regulation until Congress acts on this issue.*

**Conclusion**

AFBF appreciates the opportunity to comment on this proposed rule and would be happy to assist you in any way we can. Please feel free to contact me or Austin Perez at 202-406-3669 (austinp@fb.org) if you have any questions or require additional information.

Sincerely,

Mark Maslyn
Executive Director
Public Policy

No-Match Cert. Admin. Record  1344



## CATHOLIC LEGAL IMMIGRATION NETWORK, INC.

**NATIONAL OFFICE**

McCormick Pavilion • 415 Michigan Avenue, NE • Suite 150 • Washington, DC 20017 • Tel: 202.635.2556 • Fax: 202.635.2649 • Website: www.cliniclegal.org

**FIELD OFFICES**
c/o Catholic Charities
126 Desplaines
Chicago, IL 60661
Tel: 312.612.6712
Fax: 312.559.9209

2400 E. Yandell Street
Suite B
El Paso, TX 79903
Tel: 915.544.6000
Fax: 915.544.6011

12 Irving Street
Framingham, MA 01702
Tel: 508.820.4302
Fax: 508.820.0407

1672 W. Avenue J
Suite 207-A
Lancaster, CA 93534
Tel: 661.729.5546
Fax: 661.729.5547

1530 James M. Wood Blvd.
Box 15095
Los Angeles, CA 90015
Tel: 213.251.3505
Fax: 213.487.0986

501 NE 1st Avenue
Suite 200
Miami, FL 33132
Tel: 305.789.9907
Fax: 305.789.9936

FDR Station
P.O. Box 1390
New York, NY 10150-1390
Tel: 212.826.6251
Fax: 212. 826.6254

564 Market Street
Suite 416
San Francisco, CA 94104
Tel: 415.362.8677
Fax: 415.394.8696

August 10, 2006

Direct, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2ⁿᵈ Floor
Washington, DC 20529

**RE: DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"**

Dear Sir or Madam:

The Catholic Legal Immigration Network, Inc. (CLINIC) submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employees Who Receive a No-Match Letter" at 71 Fed. Reg. 34281 (June 14, 2006).

### CLINIC's Experience of SSA No-Match Letters

CLINIC, a subsidiary of the U.S. Conference of Catholic Bishops (USCCB), supports a national network of community-based immigration programs. The network includes 156 affiliated immigration programs, which have 255 field offices in 48 states. The network employs roughly 1,200 attorneys and "accredited" paralegals who, in turn, serve 400,000 low-income immigrants each year. CLINIC and its network serve the most vulnerable migrants such as refugees, asylum seekers, detainees, families in need of reunification, laborers in the workplace, victims of domestic violence, and survivors of human trafficking. The CLINIC network represents low-income immigrants without reference to their race, religion, ethnic group, or other distinguishing characteristic.

The CLINIC network has had ample experience of the adverse impact on U.S. workers – including work-authorized immigrants and U.S. citizens -- of the Social Security Administration's (SSA's) no-match letters. Every year CLINIC responds to severe problems caused by no-match letters in numerous cases that are brought to its attention by its member agencies, immigrant workers, and employers. These include unjustified terminations, job resignations by persons who are authorized to work, and exploitation of workers. The proposed rule will magnify the adverse impact of SSA no-match letters on workers' rights.

Additionally, the rule will have a limited impact at best on undocumented immigration. In CLINIC's experience, fired workers do not leave the country. Instead, they find more marginal jobs, often in the unregulated and dangerous underground economy.

The proposed rule will also erode privacy rights, circumvent the legislative process, and inappropriately transform SSA no-match letters into an immigration enforcement tool.

*CLINIC is a tax-exempt subsidiary of the United States Conference of Catholic Bishops*

**CATHOLIC LEGAL
IMMIGRATION
NETWORK, INC.**

NATIONAL OFFICE

McCormick Pavilion • 415 Michigan Avenue, NE • Suite 150 • Washington, DC 20017 • Tel: 202.635.2556 • Fax: 202.635.2649 • Website: www.cliniclegal.org

**FIELD OFFICES**
c/o Catholic Charities
126 Desplaines
Chicago, IL 60661
Tel: 312.612.6712
Fax: 312.559.9209

2400 E. Yandell Street
Suite B
El Paso, TX 79903
Tel: 915.544.6000
Fax: 915.544.6011

12 Irving Street
Framingham, MA 01702
Tel: 508.820.4302
Fax: 508.820.0407

1672 W. Avenue J
Suite 207-A
Lancaster, CA 93534
Tel: 661.729.5546
Fax: 661.729.5547

1530 James M. Wood Blvd.
Box 15095
Los Angeles, CA 90015
Tel: 213.251.3505
Fax: 213.487.0986

501 NE 1st Avenue
Suite 200
Miami, FL 33132
Tel: 305.789.9907
Fax: 305.789.9936

FDR Station
P.O. Box 1390
New York, NY 10150-1390
Tel: 212.826.6251
Fax: 212. 826.6254

564 Market Street
Suite 416
San Francisco, CA 94104
Tel: 415.362.8677
Fax: 415.394.8696

### This proposed rule would harm workers regardless of immigration status.

CLINIC fears that many employers will fire workers due to SSA no-match letters before these workers have a chance to correct their records. The SSA database is inaccurate, and "no-matches" often occur because of name changes and clerical errors. Under this rule, hundreds of thousands of workers—including U.S. citizens and authorized noncitizens—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigation for wrongful terminations.

Unscrupulous employers use the SSA no-match letter to stymie labor organizing and to retaliate against workers who have been injured on the job or who complain of unpaid wages or other labor violations. In some cases (including arbitration decisions), employers have used no-match letters as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would exacerbate this problem.

### The proposed rule could expand the underground economy.

Although the proposed rule purports to provide employers with guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new legal obligations may lead some businesses to go "off the books," resulting in lost revenue, unfair competition, and further exploitation of workers. The proposed rule could have the perverse effect of punishing employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage in relation to those unscrupulous employers who will simply disregard the new rule.

### The proposed rule addresses an issue in pending legislation.

The proposed rule is badly timed. The House and the Senate have both passed bills that contain work-site enforcement mechanisms. DHS should wait for the legislative process to run its course and then revisit whether it should act on this issue.

### SSA no-match letters should not be used for immigration enforcement.

The proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool. Yet the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about workers' immigration status or employment authorization. The database contains information about both U.S. citizens and work-authorized non-citizens, many of whom will be presumed to be undocumented simply because they appear on a no-match list. As the text of the "no-match" letter states, the letter was never intended to speak to immigration status. It does not constitute "constructive knowledge" of immigration status under the law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area.

**No-Match Cert. Admin. Record 1346**

CATHOLIC LEGAL
IMMIGRATION
NETWORK, INC.

NATIONAL OFFICE

McCormick Pavilion • 415 Michigan Avenue, NE • Suite 150 • Washington, DC 20017 • Tel: 202.635.2556 • Fax: 202.635.2649 • Website: www.cliniclegal.org

FIELD OFFICES
c/o Catholic Charities
126 Desplaines
Chicago, IL 60661
Tel: 312.612.6712
Fax: 312.559.9209

2400 E. Yandell Street
Suite B
El Paso, TX 79903
Tel: 915.544.6000
Fax: 915.544.6011

12 Irving Street
Framingham, MA 01702
Tel: 508.820.4302
Fax: 508.820.0407

1672 W. Avenue J
Suite 207-A
Lancaster, CA 93534
Tel: 661.729.5546
Fax: 661.729.5547

1530 James M. Wood Blvd.
Box 15095
Los Angeles, CA 90015
Tel: 213.251.3505
Fax: 213.487.0986

501 NE 1st Avenue
Suite 200
Miami, FL 33132
Tel: 305.789.9907
Fax: 305.789.9936

FDR Station
P.O. Box 1390
New York, NY 10150-1390
Tel: 212.826.6251
Fax: 212. 826.6254

564 Market Street
Suite 416
San Francisco, CA 94104
Tel: 415.362.8677
Fax: 415.394.8696

**The proposed rule erodes privacy rights.**

DHS is barred from direct access to the SSA database by laws protecting privacy and confidentiality. These laws protect sensitive and personal information, and aim to ensure compliance with tax laws. These privacy protections will be eroded by using personal and private information in the SSA database for immigration enforcement purposes.

**The costs of implementing the proposed rule will be prohibitive.**

If the proposed rule were implemented, DHS and SSA would need to make a massive investment in employer and worker education programs in order to combat the confusion that would almost certainly follow. The proposed rule also contains unrealistic timetables for compliance. SSA will need to respond to the inevitable increase in employer and worker inquiries about the rule. The actual costs of administrating the program will be high. SSA's limited resources should go towards administering Social Security benefits, rather than enforcing immigration law.

**The proposed rule makes compliance impractical.**

While the rule protects the employer through a "safe harbor," it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

**DHS should reconsider the proposed rule.**

DHS should not risk the livelihoods of U.S. workers with a poorly conceived immigration enforcement measure that will invariably lead to the firing and exploitation of U.S. workers. We respectfully request that DHS withdraw this proposed rule.

CLINIC appreciates your consideration of these views.

Sincerely,

Donald Kerwin
Executive Director, CLINIC



ISSA®
The Experts
on Cleaning and Maintenance

ISSA®
7373 N. Lincoln Ave., Lincolnwood, IL 60712-1799 USA
800-225-4772 (North America) or 847-982-0800 • Fax: 847-982-1012
E-mail: info@issa.com • Website: www.issa.com

BOARD OF DIRECTORS
President
BOBBY COHEN
Daycon Products Co., Inc.
16001 Trade Zone Ave.
Upper Marlboro, MD 20774-8795
301-218-1000 E-mail: robert.cohen@daycon.com
Vice President/President Elect
KYLE OGDEN
Carroll Company
2900 W. Kingsley Road
Garland, TX 75041-2311
972-278-1304 E-mail: kogden@carrollco.com
International Director/
Immediate Past President
MATTIE CHINKS
Avmor Ltd.
950 Michelin St.
Laval, QC H7L 5C1 CANADA
450-629-9074 E-mail: mchinks@avmor.com
Secretary
FRITZ GAST
P.B. Gast & Sons Co.
1515 Madison, S.E.
Box 7349
Grand Rapids, MI 49510-7349
616-245-0574 E-mail: fritzg@pbgast.com
Treasurer
SCOTT JARDEN
The Bullen Companies, Inc.
1640 Delmar Dr., Box 37
Folcroft, PA 19032-0037
215-724-6100 E-mail: sjarden@bullenastx.com
European Board Chair
ANNE-MARIE SAMSON
Euro Steam
195 Impasse le Paseroun
Le Petcaj
Trans en Proven 83720 FRANCE
33-494-677-043 E-mail: eurosteam@wanadoo.fr
Mexico Board Chair
MAURICIO CHICO CAÑEDO
Distribudora Luxa Tap, S.A. de C.V.
Calzada de las Aguilas #1205
Col. San Clemente
Mexico City, D.F. 01740 MEXICO
52-55-5635-6400 E-mail: mauricio@luxatap.com
Director Canada
KAREN FERRIS
Enzipmani Canada
3535 Laird Rd., Unit 16
Mississauga, ON L5L 5Y7 CANADA
905-607-0069
E-mail: kmran@canadnpigs.com
Great Lakes Director
ROBERT S. ROBINSON SR.
Kaivao, Inc.
401 S. 3rd St.
Hamilton, OH 45011-3236
513-887-4600 E-mail: rsrobinson@kaivao.com
Manufacturer Representatives' Director
JEFFREY A. STONE
Access Group Southern California
912 W. 10th St.
Azusa, CA 91702-1936
626-815-3400
E-mail: jstone@accessgroupaca.com
Middle Atlantic Director
LISA M. WITOMSKI
T. Frank Mc Call's, Inc.
601 Madison St.
Chester, PA 19013-5028
610-876-9245 E-mail: lisa@tfrankmccalls.com
North Central Director
TED STARK III
Dalco Enterprises, Inc.
300 Fifth Ave. NW
New Brighton, MN 55112-3232
651-504-2865 E-mail: ted.stark@dalcoonline.com
Northeast Director
JON SCOLES
Scoles Floorshine Industries
Box 2305
Farmingdale, NJ 07727-2305
732-681-4545 E-mail: jscoles1@aol.com
Pacific Northwest Director
LYDIA WORK
American Paper Converting
1680 Naragas St.
Woodland, WA 98574-9581
360-225-0488
E-mail: lwork@americanpaperco.com
Pacific Southwest Director
TRAVIS BRADY
Brady Industries, Inc.
4175 S. Arville St.
Las Vegas, NV 89103-3736
702-876-3990
E-mail: tbrady@bradyindustries.com
South Central Director
GLENN O. STOUDT
Rochester Midland International
Temp Address: 2424 Broadway St.
New Orleans, LA 70125
504-866-1040 E-mail: glnstoudt@aol.com
Southeast Director
RICHARD L. RONES
Americo Manufacturing Co., Inc.
Box 10000
Acworth, GA 30101-9000
770-974-7000 E-mail: rrones@americomfg.com
Executive Director
JOHN P. GARFINKEL
E-mail: jpg@issa.com

August 11, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington DC 20529

RE:  DHS Docket No. ICEB-2006-0004—Rulemaking Proceedings on
Safe-Harbor Procedures for Employers Who Receive a No-Match Letter

Dear Director:

ISSA greatly appreciates this opportunity to submit our association's
comments on the subject of the Department of Homeland Security's
Proposed Rule regarding Safe Harbor Procedures for Employers Who
Receive a No-Match Letter (Docket No. ICEB-2006-0004).

ISSA is a trade association that represents the institutional and industrial
cleaning industry.  Our association represents over 5,000 manufacturer,
distributor, building service contractor and in-house service provider
members worldwide.  In the aggregate, ISSA member companies employ
hundreds of thousands of workers.  As such, ISSA and its members are
concerned with the implications raised by the proposed rule and the
ultimate impact it would have on their work place operations.

ISSA supports comprehensive immigration reform that includes effective
and targeted enforcement measures that are combined with a reform of our
admissions system, and a realistic solution for the undocumented
population.  However, it is critical that any immigration reform refrain
from unduly burdening employers with worker verification systems that
are under funded or unworkable.

Our association stands in opposition to the Proposed Safe-Harbor Rule and
urges DHS to suspend action on this matter because it undermines the
current legislative proposals that seek to comprehensively address
immigration reform, contradicts the Administration's goal of enacting a
comprehensive solution to our immigration system, and would otherwise
place unreasonable burdens and penalties upon well-intended employers
who operate in good faith.

1

**Proposed Rule Undermines the Legislative Process**

Stated simply, the Proposed Safe-Harbor Rule is the "wrong rule at the wrong time."

The U.S. House of Representatives and Senate have both passed immigration bills that would make significant changes related to an employer's responsibilities when verifying it's workforce, as well as include substantial penalties for employers and workers who fail to comply. These forthcoming reform measures will set new standards under which employers must operate regarding the verification of an employee's work authorization and identity and will specifically address situations where an employer receives a no-match letter from the Social Security Administration or from the Department of Homeland Security. While the specifics of immigration reform legislation remain unclear at this time, it is apparent that comprehensive reform to our nation's immigration laws is not only imminent but necessary as well.

Consideration and adoption of the proposed rule before the conclusion of the congressional dialogue regarding immigration reform undermines the legislative process.

Furthermore it is likely to result in conflicting and perhaps duplicative requirements for employers, resulting in additional unnecessary burdens and costs. It simply defies common sense to propose and adopt a rule that establishes significant burdens and responsibilities for employers, that is likely to be rendered obsolete by the legislative process in the coming months. Under the proposed rule, employers will be required to implement certain procedures that impose certain burdens and costs. However, once immigration reform legislation is enacted into law, employers will once again be required to implement a whole new set of procedures related to the employee verification process.

For this reason alone, we urge DHS to suspend this rulemaking until the legislative process has run its course. Comprehensive immigration reform is needed and the legislative process is working towards that goal.

**Proposed Rule Contradicts the Administration's Goal of Comprehensive Immigration Reform**

The Proposed Safe Harbor rule stands in direct contradiction of the Bush Administration's stated goal of achieving comprehensive immigration reform. President Bush, White House officials and the Department of Homeland Security have all endorsed comprehensive immigration reform. In fact, in a document released by DHS's press office titled Talking Points and Q & A's (June 9, 2006), the Department states, "In order to fix the problem of illegal immigration and secure our borders, a comprehensive solution is required. All elements of this problem must be addressed together, including the creation of a temporary worker program."

2

While we concur with the DHS statement, the proposed rule directly contradicts this statement because it proposes an isolated attempt to address a single issue (no-match letters) that has significant enforcement implications, but which fails to address the other key components of immigration reform that DHS itself recognizes as necessary for a workable and effective solution to the nation's immigration woes. The proposed rulemaking should therefore be rejected in its current form, and only considered as part of a comprehensive immigration reform package.

**SSA No-Match Letters Are Inappropriate as a Tool for Immigration Enforcement**

The proposed rule inappropriately attempts to transform the Social Security Administration's no-match letter into an immigration enforcement tool for which it is ill suited. By DHS's own admission, there are many reasons for such a no-match, including clerical error and name change. Other no-match letters are issued because of marriage or divorce. Others are generated due to SSA's own inaccurate data. In addition, SSA's database does not contain complete information about a worker's immigration status or employment authorization. In effect the SSA no-match letter is not indicative of immigration status, and explicitly states so on its face.

Therefore, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not and should not constitute constructive knowledge of immigration status under current law. The proposed rule dramatically alters the definition of constructive knowledge and makes a stark departure from existing case law and long-standing federal policy in this area in spite of the fact that the SSA no-match letter provides no evidence of immigration status.

**The Proposed Rule Creates An Untenable Situation for Employers**

As drafted, the proposed rule creates an untenable situation for employers. On the one hand, employers who follow the safe harbor provisions of the proposed rule risk criminal prosecution by DHS if they do not fire an employee for whom the employer is unable to resolve the discrepancy referenced in the no-match letter, and if the employee's identity and work authorization cannot be verified. On the other hand, should an employer fire such an employee, the employer runs the risk of being sued civilly for wrongful discharge.

Thus, the proposed rule creates the proverbial "damned if you do, damned if you don't" situation for employers. A regulation that places employers in such a precarious situation is simply bad public policy. The very fact that the proposed rule would subject employers to such potential liability one way or the other speaks to the need for this issue to be addressed in the context of comprehensive legislative reform, and not addressed in such a piece meal fashion as reflected in the proposed rule.

**No-Match Cert. Admin. Record  1350**

**The Proposed Rule Will Not Have an Impact on Undocumented Workers**

In addition to placing employers in an untenable situation, the proposed rule will have no measurable impact on undocumented immigration. Past experience with no-match firings and workplace audits indicate that fired workers do not leave the country. Rather such terminated employees tend to simply find other more marginal jobs, most likely in the unregulated underground cash economy. Therefore, the proposed rule will foster growth of this underground economy.

Although the proposed rule purports to provide employers with a "safe harbor", DHS is in fact imposing a new set of legal obligations that will have the perverse effect of punishing employers who make a good faith effort to verify employees' authorization to work and otherwise follow the proposed safe harbor provisions. In this regard the proposed rule will in fact promote the growth in the unregulated underground cash economy that results in potentially billion-dollar losses in federal, state, and local tax revenues.

The proposed rule also would have the effect of punishing "good" employers who keep good records and want to stay on the books. Stated simply, these "good" employers will be put at a competitive disadvantage compared to "bad" employers because the latter pays in cash and does not keep records, and who consequently will not be affected by the proposed rule.

**Proposed Safe-Harbor Rule Unreasonably Burdens Employers**

As drafted the Proposed Safe-Harbor Rule will have an unreasonable economic impact on ISSA member companies because of the time and labor that will be needed to research the received no-match letters, communicating to the employees in question, following up with such employees as required by the proposal, verifying with SSA or DHS any revised information received from those employees, and / or completing a new Form I-9.

Moreover, the timelines provided in the proposal for responding to and otherwise rectifying no-match letters is inadequate. Fourteen days is not enough time to open, review, and research mismatch letters from the SSA or DHS. For some companies, such mismatch letters may involve hundreds if not thousands of potential employees necessitating that companies devote full time staff to this task for significant periods of time.

Moreover, the 60-day time period for verifying the employee's name matches the number assigned to the name is an unreasonable time period for dealing with DHS or SSA. It simply does not take into account the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employees.

Compounding this burden is the fact that SSA database has a reputation for being inaccurate in many cases, which further creates a burden for employers in correcting

4

SSA's database.  Furthermore, the proposed regulations provide no guidance to employees who are unable to timely rectify the reported inaccuracy.

**Conclusion**

For all of the aforementioned reasons, ISSA strongly opposes the Proposed Safe-Harbor Rule and urges DHS to withdraw the proposed rule in its entirety.

Respectfully Submitted,

William C. Balek
Director of Legislative Affairs
ISSA
800-225-4772
bill@issa.com

5



a project of Jobs with Justice

# St. Louis Area Immigrant Rights Action Task Force

- African Refugee Service
- African Mutual Assistance Association of Missouri
- American Friends Service Committee-St. Louis
- Congolese Community of St. Louis
- Coalition of Black Trade Unionists
- Human Rights Action Service
- Focus Saint Louis
- Granite City Immigration Project
- Islamic Community Center
- Immigration Project-Eastern Missouri Legal Services
- Interfaith Legal Services for Immigrants
- Korezappa – Concerned Haitians and Friends
- Liberian Association
- Labor Council for Latin American Advancement
- Manos Unidas
- Service Employees International Union, Local #1
- Student-Worker Alliance of Washington University
- UNITE-HERE, Midwest Region

August 13, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

The Immigrant Rights Action Task Force (IRATF), a project of St. Louis Jobs With Justice, submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The IRATF is a coalition of organizations and agencies that brings leaders in the varied immigrant communities together to find common areas of interest in regard to public policy and then determining how best we can work to have such policy implemented. Worker rights and comprehensive immigration reform are two such areas to which we have given considerable attention.

As a result of this work, the IRATF has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States--immigrant and native-born alike.

The IRATF is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Joan Suarez, Convenor
Immigrant Rights Action Task Force
Jobs With Justice
2725 Clifton Avenue
St. Louis, Missouri 63139
314-644-0466
immigrantrights@stl-iwi.org

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

**Re: DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"**

Dear Sir or Madam:

The Washtenaw County Workers' Center submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The Washtenaw County Workers' Center (WCWC) is a not-for-profit, membership-based organization that works primarily in Ann Arbor and Ypsilanti, Michigan. Its members consist of workers, students, academics, attorneys, and representatives of local community and religious organizations, among others.  The WCWC is committed to empowering low-wage and immigrant workers to improve their working and living conditions. The WCWC holds worker rights trainings which teach workers and community members about basic labor rights, conducts ESL classes with a focus on labor and immigration rights, and advocates for individual members facing workplace problems. Additionally, the WCWC works to document and fight discriminatory practices as part of its mission to create unity among low-wage workers.

The Washtenaw County Workers' Center has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States – immigrant and native-born alike.  We have seen how even under the current system where employers are specifically instructed not to take adverse action against employees for having received a "no-match" letter, many employers simply fire these employees outright without giving workers a chance to correct the error.  One can only imagine the even more widespread and unjust firings that would occur under the proposed rules.   The Washtenaw County Workers' Center has also witnessed first-hand no-match letters' harmful effects on the collective bargaining rights of all workers.  In one instance, an employer fired an entire group of workers attempting to unionize an automotive supply factory in metro Detroit, supposedly because it had received an SSA "no-match" letter.  Unfortunately, it was impossible to corroborate whether this was the case, due to the fact that the employer had never offered the workers an opportunity to correct the "no-match" and had never even provided a copy of the "no-match" letter it had allegedly received.  The experience illustrates how easily unscrupulous employers will be able to take advantage of the proposed rules to use "no-match" letters or the mere allegation of having received them as a convenient pretext to undermine all workers' fundamental labor rights.  In this particular case, as in many others, the fired workers were a mixture of immigrants and naturalized citizens.

Such situations are very alarming and we believe that the proposed procedures regarding no-matches will only encourage such abuses in the workplace. The Washtenaw County Workers' Center is therefore strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, the rule will have no impact on deterring undocumented immigration. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will actually result in *growth* of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm all workers regardless of immigration status.**
  The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized non-citizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

  Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**
  "Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

  The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage

compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**
  The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of <u>comprehensive immigration reform.</u> The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**
  This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized non-citizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

  Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**
  DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**
  If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,
Julia Malette & Minsu Longiaru
Washtenaw County Workers' Center
118 Tyler, Residential College
701 E. University Ave.
Ann Arbor, MI 48109
734-474-7107
contactwcwc@wokercenter.org



August 14, 2006


Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
Second Floor
111 Massachusetts Avenue, N.W.
Washington, D.C. 20529

**Re:  DHS Docket No. ICEB-2006-0004; Rulemaking Proceedings on
Safe-Harbor Procedures for Employers Who Receive a No-Match Request**

Dear Sir or Madam:

The American Subcontractors Association, Inc. (ASA) is a national trade association representing more than 5,000 construction subcontractors, specialty contractors and suppliers. ASA members work in virtually all of the construction trades and on virtually every type of horizontal and vertical construction. The average annual volume of ASA members is approximately $8 million. Sixty-nine percent of ASA members employ fewer than 100 employees; 31 percent employ 100 or more employees. ASA has great interest in any rules that impose new duties or responsibilities on its members with respect to their employees and prospective employees.

Legislation is pending in the U.S. Congress that proposes significant changes relating to employer responsibilities with respect to verifying the identities and eligibility to work of employees and prospective employees. Both the House-passed and Senate-passed bills include specific provisions that address the responsibilities of an employer that receives a no-match letter from the Social Security Administration or the Department of Homeland Security.  It is important to let this debate run its course without competing and duplicative regulatory proposals.  ASA believes that the referenced proposals are premature and strongly recommends that DHS wait until the Congressional debate concludes, or at least until the end of the 109th Congress, before it considers changes in the current rules governing employer verification of employees.

The proposed rule would require employers to dramatically change the processes and procedures they have had in effect for 20 years. Following are ASA's comments on specific aspects of the proposals.

AMERICAN SUBCONTRACTORS ASSOCIATION, INC.
1004 Duke Street, Alexandria, VA  22314-3588
Phone: (703) 684-3450 Fax: (703) 836-3482
email: ASAOffice@asa-hq.com

ASA Comments
DHS Docket No. ICEB-2006-0004
Page 2 of 3

- The proposed regulation would amend the scope of constructive knowledge in certain circumstances and states that "[E]mployer's obligations under current law, which is that if the employer fails to take reasonable steps after receiving such information, and if the employee is in fact an unauthorized alien, the employer may be found to have had constructive knowledge of that fact." The regulation defines what constitutes a "reasonable response" by an employer to a no-match letter and proposes specific steps to be taken by the employer, within defined periods of time. Taking such measures may allow the employer to avoid liability and mitigate or eliminate potential penalties. The proposal states that an employer should attempt to resolve the discrepancy within 14 days.

  Although 14 days may sound reasonable, this is not a reasonable time period in which to act. This will create significant challenges for both large and small employers. Employers in the construction industry, for example, hire large numbers of workers at the beginning of a project in a short period of time. They may receive several no-match letters at a time. It would be very difficult to resolve all of the letters in the prescribed time period. This becomes especially acute for smaller employers, like many ASA members. They usually do not have full-time administrative staff to address these issues in a 14-day timeframe. Small business owners must often run all aspects of the business, including the bookkeeping, employee supervision and training, as well as perform the administrative responsibilities.

  ASA does not believe that the 14-day time period is reasonable. On the contrary, it will be unduly burdensome for employers and "have a significant economic impact on a substantial number of small entities," in violation of the Regulatory Flexibility Act. The DHS assertion that this proposal would not mandate any new burdens or have a significant economic impact on small entities is not supported by any facts or data in the proposal and is unrealistic.

- One of the ways that an employer can be notified of a no-match is through written notification from DHS. The proposal explains that DHS will take into account the totality of relevant circumstances when making a determination whether the employer had constructive knowledge that the alien was unauthorized to work. However, there is no comparable standard for the Social Security Administration (SSA). SSA should also be required to take into consideration all of the facts surrounding the situation and take into account the totality of the circumstances.

- As noted above, one of the ways by which an employer can be put on notice is by receiving a written notification from DHS. Unlike SSA, DHS does not have a mechanism in place that regularly checks and reports mismatched immigration documents. Rather, DHS usually is made aware of mismatched immigration documents in the context of an audit. As noted in the proposed regulation, if an employer receives a letter from DHS, s/he is expected to resolve the issue by "taking reasonable steps to resolve the question raised by DHS about the immigration status document or EAD." However, DHS provides no specific guidance as to what those steps should be and what an employer should do to rectify the situation. ASA believes that DHS should specify and explain this process before this proposal moves forward.

ASA Comments
DHS Docket No. ICEB-2006-0004
Page 3 of 3

- The DHS proposal fails to recognize the reality of the hiring and initial employment process, particularly in the construction industry. In the first 60 days of employment the employer has often made a substantial investment in new employees in the form of pre-employment screening, new hire paperwork, training (formal and on-the-job), issuance of personal protective equipment and preparation for inclusion in benefit programs. Subcontractors usually work in coordination with other contractors on construction projects. The absence of even one or two employees while they attempt to "pursue the matter" of employment eligibility can seriously impact productivity and construction schedules.

Furthermore, in the real world work environment if an employer receives a no-match letter, many employees will not "confirm that the employer's records are correct" or "pursue the matter personally with the relevant agency." They will either stop reporting for work or put the employer in the position of having to terminate them for failure to provide the documents and verification required by the proposal. This could expose the employer to liability for alleged discrimination. The DHS "solution" to this dilemma is to advise that "then the employer must choose between taking action to terminate the employee or facing the risk that DHS may find that the employer had constructive knowledge that the employee was an unauthorized alien and therefore, by continuing to employ the alien, violated INA section 274A(a)(2), 8 U.S.C. 1324a(a)(2)."

It is also very disruptive, and potentially very expensive, to small employers like many ASA members. Employees who stop reporting for work or must be terminated for failure to comply with this proposal must be replaced, delaying work and exposing employers to liquidated damages penalties or termination for nonperformance. This could have a significant effect on these businesses and the economy. The proposal does not address these potential impacts. ASA does not believe that DHS's characterization of the proposal as not a major rule as defined by the Small Business Regulatory Enforcement Act is supported by the proposal or realistic.

ASA appreciates the opportunity to comment on this proposal. Please include these comments in the record of DHS proceedings on this matter. If you have any questions about these comments, please feel free to contact the undersigned.

Sincerely,

§¨©ᵃ

William A. Isokait
Senior Director & Counsel for
Government & Industry Relations

**No-Match Cert. Admin. Record  1361**



**AMERICAN HORSE COUNCIL**

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

**Re:    Docket No. ICEB-2006-0004**
        **Safe Harbor Procedures for Employers Who Receive a No-Match Letter (FR 71:114, p. 34281)**

To Whom It May Concern:

The American Horse Council is concerned with the Bureau of Immigration and Customs Enforcement, Department of Homeland Security's ("DHS") Proposed Rule regarding "no-match" letters published in the *Federal Register* on June 14, 2006 (71 *Federal Register* 34281). We would like to incorporate by reference, in entirety, the comments filed by the National Council of Agricultural Employers.

The American Horse Council represents 185 equine organizations in Washington, DC before Congress and the federal regulatory agencies. These organizations include breed registries, national and state breeders associations, state horse councils, recreational associations, organizations representing horsemen, horse shows, recreational riders, rodeos and numerous other equine related stakeholders. These organizations include several hundred thousand individual horse owners of all breeds and disciplines and industry service providers involved in virtually every facet of the horse world.

Sincerely,

James J. Hickey, Jr.
President

I saw an article where Homeland Security sends "match letters" to employers, sometimes requiring the records of an employer to agree with Social Security records of an employee.

When a person is hired, all the employer has to go on is the Real ID, which is usually the person's driver license. The gender of a state driver license does not always agree with the gender on a person's Social Security record (such as Alabama).

An employer has only the Real ID to use since it shows gender and the Social Security card does not show gender. It seems reasonable that the identity of an employee for the purpose of employment will be based entirely on the Real ID, which does not always agree with the Social Security record. Like I said, Alabama's driver license does not.

As you should know, the Social Security Administration is very careful about properly indicating the proper gender of a person, requiring sufficient documentation.

**From:** John Farner [mailto:jfarner@anla.org]
**Sent:** Monday, August 14, 2006 1:55 PM
**To:** Regs, Rfs
**Subject:** Comments regarding Docket No. ICEB-2006-0004 (FR 71:114, p. 34281) - Safe Harbor Procedures for Employers Who Receive a No-Match Letter

Attached, please find the American Nursery and Landscape Association's comments regarding the Safe Harbor Procedures for Employers Who Receive a No-Match Letter proposed rule as well as supporting documentation.

Thank you.

John Farner

_____
*John R. Farner, Jr.*
Director of Legislative Relations
American Nursery and Landscape Association
1000 Vermont Avenue, Suite 300
Washington, DC  20005
Phone: 202-741-4843 (direct)
Cell: 202-436-6639
Fax: 202-789-1893
jfarner@anla.org



**American Nursery &
Landscape Association**

1000 Vermont Ave, NW. Suite 300, Washington, DC 20005-3922
Tel: 202/ 789-2900 .Fax: 202/ 789-1893

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

RE:    **Docket No. ICEB-2006-0004 (FR 71:114, p. 34281)**
       **Safe Harbor Procedures for Employers Who Receive a No-Match Letter**

To Whom It May Concern:

The American Nursery & Landscape Association (ANLA) and the National Christmas Tree
Association (NCTA) appreciate the opportunity to comment on Docket No. ICEB-2006-0004,
the Department of Homeland Security-Bureau of Immigration and Customs Enforcement's
proposed rule regarding Social Security "no-match" letters.  ANLA is the national trade
organization representing the U.S. nursery and landscape industry.  ANLA, formed in 1875,
represents nursery and greenhouse crop growers, landscape design and installation professionals,
independent garden retailers, horticultural distributors, and industry suppliers.  The National
Christmas Tree Association (NCTA) is comprised of 2000 members and 35 state associations
involved in the production and sale of real Christmas trees in all 50 states.  These entities
collectively comprise what is commonly referred to as the "green industry".  Nationally, the
green industry generates annual economic output estimated at over $147 billion.

The green industry has a major stake in the Social Security no-match proposed rule, because a
significant portion of the workforce is comprised of immigrant workers.  Furthermore, ANLA is
a leader in efforts to secure comprehensive immigration reform.  ANLA co-chairs the
Agriculture Coalition for Immigration Reform, and serves on the steering committee of the
Essential Worker Immigration Coalition.  This experience gives our association a broad platform
from which to view developments such as this proposed rule.

ANLA and NCTA believe it would be unwise and unduly harmful for the Agency to proceed
with this rulemaking in the absence of Congressional action on the issue of comprehensive
immigration reform.  Efforts are already well underway to enact reform, and we believe that the
intent of this rule cannot be carried out given the array of policy and jurisdictional conflicts and
complications that surround the issue.  Legislative action will be necessary to resolve many of
these conflicts.  We believe that proceeding with this rule in the absence of legislative action will
cause serious and in some cases irreversible damage to the American economy, and needless
hardship to employers and the workforce.  The Agency should set aside this rulemaking until
Congress acts.

ANLA/NCTA Comments on Docket No. ICEB-2006-0004
August 14, 2006
Page 2

It should be obvious to any observer that America's immigration system is badly broken.  Efforts to reform the system in 1986 and 1996 were incomplete at best, and in our view had major flaws.  The 1986 Immigration Reform and Control Act (IRCA) provided a legalization mechanism that was of some benefit to the industry; indeed, many employees who legalized under the provisions of IRCA remain employed in the industry even today.  Most who have remained have attained important supervisory or highly skilled positions.

However, IRCA failed to implement a longer-term solution to accommodate future flows of workers needed to meet America's changing economic needs.  Therefore, it failed to adequately address the factors that have drawn successive waves of economic migrants to enter the U.S. outside of existing but woefully inadequate and constrained legal channels.  Secondly, IRCA contained enforcement mechanisms.  Among them, IRCA sought to impose employer sanctions, but in hindsight those sanctions mostly succeeded in spawning a market in fraudulent documents, and discrimination litigation against employers who were too picky in reviewing or specifying documents.

In 1996 Congress revisited enforcement issues, and among other actions, it established the Basic Pilot employment eligibility verification system.  Yet again, Congress failed to streamline and expand available legal channels for essential workers to enter safely, contribute, and return to their sending countries.  The existing H-2A agricultural guest worker program is excessively bureaucratic, often unaffordable, and highly litigious.  The service industry's H-2B program functions somewhat better, but is subject to a highly unrealistic and artificially low cap on admissions of 66,000 per year.

In the broadest context, scholars have documented that our government's approach to addressing the illegal immigration challenge over the last 20 years has not only failed, it has had the opposite of its intended effect[1].  In essence, this proposed rulemaking represents a similar piecemeal response that, if finalized outside of a more comprehensive view and approach, will have similar unintended consequences.

**Views of the Green Industry Relative to No-Match Letters**

The following comments address green industry employers' experience and views relative to Social Security Administration (SSA) no-match letters, specifically those issued by SSA as opposed to letters that may be issued by the Department of Homeland Security (DHS) in response to employer I-9 audits.  We also wish to incorporate by reference, in their entirety, the comments filed by the National Council of Agricultural Employers (NCAE), an umbrella organization representing a wide array of employer interests specifically on employment law issues.  ANLA serves on the board of directors and executive committee of NCAE.

---

[1] *Backfire at the Border – Why Enforcement Without Legalization Cannot Stop Illegal Immigration.*  Douglas S. Massey, Princeton University, for the Cato Institute.  June, 2005.

ANLA/NCTA Comments on Docket No. ICEB-2006-0004
August 14, 2006
Page 3

In the early 1990's, some green industry employers began receiving no-match letters from the Social Security Administration.  When such letters first began to be issued, they were received sporadically, and often long enough after the fact that many of the employees whose information was referenced in the letters were no longer employed.  Making matters more confusing, ever since the letters first began to be issued, and to the present, employment law experts have issued varied and often conflicting advice as to the significance of no-match letters and how employers should respond to them.  This reality has left well-intended and law-abiding employers in a difficult and confusing, if not untenable, compliance posture.

To the extent that DHS intends to eliminate confusion and create clear, "bright line" standards for employers, ANLA and NCTA appreciate the intent.  Employers would like clarity and certainty.  However, given the current muddle of legal and jurisdictional issues at play, including Privacy Act implications and discrimination concerns, we believe that legislative reforms that holistically address these fundamental issues and conflicts must occur before a final rule regarding an SSA no-match final rule is issued by DHS.

We have especially deep concerns over the proposed rule's implications relating to potential discrimination lawsuits.  Over 20 years, we have watched as more employers have been caught up in discrimination suits than enforcement actions alleging a failure to meet their obligations to verify employment eligibility.  The anti-discrimination provisions of Title VII of the Civil Rights Act of 1964 and the anti-discrimination provisions of IRCA, as well as state anti-discrimination laws, pose a real threat to employers that terminate or refuse to hire workers based on SSA no-match letters.   This proposed rule will force employers to refuse to hire or to terminate job applicants and employees if, after following the compliance procedures, the documents that they provided cannot be verified under the SSA or DHS databases.

It is precisely because of these types of adverse employment decisions in the context of the employment verification process that employers have been sued for discrimination.  Again, the comments of NCAE go into further detail – including citing specific legal decisions that support our contentions.  This rulemaking risks worsening employers' exposure to the potentially conflicting obligations that well-intended employers face when verifying employment eligibility and avoiding discrimination claims.

The proposed safe harbor provision would not protect employers from expensive, time-consuming and frustrating litigation to defend against discrimination charges.  This ultimately would prove counterproductive to employer compliance with the provisions of the proposed rule.

**Green Industry Employers Will Face Special Compliance Challenges**

Compliance with the proposed rule would be difficult for many green industry employers.  Most in the green industry employ a large number of seasonal workers, consistent with the peak seasons (the growing season, the landscape planting and maintenance seasons, and for Christmas trees the fall harvest season).  Seasonality results in major hiring in narrow timeframes.  Also, in some instances, workers performing highly seasonal or specialized tasks may move several times

ANLA/NCTA Comments on Docket No. ICEB-2006-0004
August 14, 2006
Page 4

among employers to maintain continuous employment. In both cases, following up on employee mismatches within rigorous time frames that coincide with peak production periods could be extremely problematic.

Furthermore, given the seasonal dynamic common in much green industry employment, an employee may not be employed at the time an employer receives a no-match letter. Under such circumstances it would be impossible within a short period of time for an employer to communicate with a former employee listed in a no-match letter in order to satisfy the 14 day requirement under the proposed rule. Former workers seldom leave forwarding telephone numbers where they can be contacted. Some workers may not be in employee status at the time their former employers receive a no-match letter.

In such scenarios, an employer could send a letter to an employee's forwarding address if one is provided, but there is no guaranteed method to ensure that the employee receives and replies to the no-match letter. Many employers would not have the opportunity to have a face to face discussion with the mismatched employee to resolve the issue. This puts employers in a bind in that they could lose the benefit of the safe harbor provision because of the nature of the work and workforce, despite good faith compliance efforts.

The "law of unintended consequences" would become the law of the land if this proposed rule is implemented in the absence of a comprehensive approach to immigration reform. The fact that the limited labor supply available to the green industry is largely undocumented poses substantial problems. The proposed rule would exacerbate these problems, at least for the majority of employers who endeavor to comply with the rule. Meanwhile, unscrupulous employers would benefit, at least for the foreseeable future. Negative consequences – many of them wholly unintended – would arise if the proposed rule were implemented now.

Well-intended employers who are meeting their obligations under current law would likely lose a significant part of their workforce if the proposed rule is finalized. It is likely that a substantial number of workers would not return to work once the employer has placed the burden upon them to verify their work authorization because they would be unable to do so. Good employers would be devastated by losing many employees, potentially at critical peak-demand times. It is likely that employees who quit after being confronted with a no-match situation they could not resolve would simply go to work for a new employer.

Employers who have lost most of their workforce would need to hire new employees, many of whom would end up as no-match employees down the road, continuing a cycle that the proposed rule never intended to put in motion. Meanwhile, the same undocumented employees would merely move to a new employer and subsequently put that employer in the untenable position of needing to confront no-matches at the peril of losing its workforce. Many would eventually end up in the "underground economy." In this regard, the proposed rule punishes good employers and aggravates problems that only a comprehensive legislative solution can remedy.

ANLA/NCTA Comments on Docket No. ICEB-2006-0004
August 14, 2006
Page 5

If the proposed rule takes effect before Congress enacts comprehensive immigration reform legislation, including provisions similar to the AgJOBS agricultural guest worker and earned adjustment of status provisions contained in S. 2611, and similar provisions for service industry employers, it will have a devastating effect on the green industry. From the industry's perspective, needed reforms would overhaul the H-2A guest worker program, address the unrealistic H-2B program cap on admissions, and provide a workable solution for obtaining year-round workers to fill jobs for which insufficient American workers can be found. Also important is a mechanism for retaining trained, trusted, and experienced but unauthorized workers employed in our industries. Because America's immigration system has been broken for so long, many of these workers have attained "key employee" status and their loss would devastate businesses across America. A comprehensive legislative solution should allow these workers to earn legal status subject to strict conditions.

As has been documented by various academics and the U.S. Chamber of Commerce, approaching the no-match situation in isolation could have devastating economic consequences for the United States[2]. According to such sources, it is estimated that annually 500,000 essential workers enter the U.S. without work authorization to perform much needed labor. There is no realistic way for most of them to enter legally. Our economy not only absorbs these needed workers, but it depends on them for our current level of growth. It is estimated that there is currently at least 7 to 8 million unauthorized workers in the U.S. This proposed regulation would in effect strip needed workers from law-abiding employers without providing employers with an alternative legal channel by which to recruit to fill the gaps created by a combination of an aging workforce domestically, higher educational attainment by the domestic population, and a booming economy with full levels of employment.

It is also well documented that about five percent of the total U.S. workforce has no work authorization. This workforce falls disproportionately within agriculture, where government statistics and private estimates suggest that upwards of 75% of the labor force sustaining the sector lacks work authorization.

Increasing interior enforcement and strengthening the employment eligibility and verification system without at the same time creating the tools for employers to actually access an adequate legal workforce would be devastating to the American economy generally, and American agriculture specifically. The law of unintended consequences may also occur – in this case, driving this workforce into the underground economy, where they may be paid cash under the table and cease to contribute payroll taxes including Social Security contributions.

Practically speaking, off shoring offers some possibilities for industries that can produce abroad, but no serious and informed person would suggest that off shoring key elements of our economy – especially our food production – is truly in the national interest. Moreover, agricultural labor experts have documented that for each farmworker job in the American agricultural economy,

---

[2] See *Economic Growth and Immigration – Bridging the Demographic Divide*. American Immigration Law Foundation, November, 2005.

**No-Match Cert. Admin. Record  1369**

ANLA/NCTA Comments on Docket No. ICEB-2006-0004
August 14, 2006
Page 6

three to four off-farm jobs are supported in the upstream and downstream economy. Most of these jobs would be lost if the U.S. government approaches this challenge in a piecemeal rather than comprehensive fashion.

**Compliance Assistance for Employers**

Recently, the DHS has launched a program to equip employers with "best practices" based approaches to avoiding hiring unauthorized workers. We appreciate the intent of this outreach effort, yet we wish to note the glaring disconnect between the real world and the notion that employers can make this problem go away by employing "best practices." As stated previously, at present, it is estimated that more than 70% of the agricultural labor force lacks work authorization. Percentages are lower, but still high, in many sectors of the service economy including landscape installation and maintenance. Employers are hiring any and every applicant that shows up with documents that appear genuine. If they were truly able to screen out the unauthorized workers, they would not have a workforce. Demographic trends and employment preferences shape this reality.

It is naïve to assume that simply equipping employers with best practices will resolve the challenges at hand. Where are employers to go when they cannot find enough workers? The existing legal channels are either hobbled by bureaucracy or artificially capped.

The only real solution will be a comprehensive approach to immigration reform, one that pairs employer verification obligations with the creation or expansion of realistic legal channels. Monte B. Lake, Esq., legal counsel to ANLA and the Agriculture Coalition for Immigration Reform, recently testified before a House Small Business subcommittee on the issue of electronic employment eligibility verification. His testimony describes the elements of a cohesive, constructive and comprehensive approach to this issue. It also addresses the issue of the use of Social Security information, and how to create a system that features the clarity and "bright lines" that would be helpful to employers. Lake's testimony is attached for reference.

For all these reasons, the proposed regulation should follow enactment of comprehensive immigration reform, not ride ahead of Congressional action. Thank you for carefully considering the views of ANLA and NCTA.

Sincerely,

Robert J. Dolibois, CAE
Executive Vice President

Craig J. Regelbrugge
Senior Director of Government Relations

**No-Match Cert. Admin. Record  1370**



## AGRICULTURE COALITION FOR IMMIGRATION REFORM

**Statement of Monte B. Lake**
**on behalf of the Agriculture Coalition for Immigration Reform, National Council of**
**Agricultural Employers and American Nursery and Landscape Association**

**before the**

**Subcommittee on Workforce, Empowerment and Government Programs of the House**
**Committee on Small Business**

**June 27, 2006**

Madame Chair Musgrave and members of the Subcommittee:

I appreciate the opportunity to testify on behalf of the Agriculture Coalition for Immigration Reform, referred to as ACIR, and its national co-chair organizational leaders, the American Nursery and Landscape Association (ANLA) and National Council of Agricultural Employers (NCAE). ACIR is a coalition of over 150 state, regional and national agricultural organizations and commodity groups, representing thousands of employers and formed six years ago for the purpose of promoting comprehensive immigration reform as it relates to agricultural employers.

ANLA and NCAE were also actively engaged in the legislative and regulatory process that produced the Immigration Reform and Control Act of 1986 and Illegal Immigration Reform and Immigrant Responsibility Act of 1996. A substantial number of the members of ACIR, ANLA and NCAE are small family farming, ranching and nursery businesses that would be directly and seriously affected by the reform legislation currently being considered by Congress. These organizations are uniquely situated to provide meaningful comments and insights into issues concerning immigration policy and how it affects the employment practices of its members' businesses, and the availability of an adequate agricultural labor supply.

My name is Monte B. Lake. I am a partner in the labor and employment law firm of McGuiness Norris & Williams, LLP in Washington, D.C. In addition to serving as employment and immigration law counsel to ACIR, ANLA and NCAE, I have represented a number of small businesses engaged in agricultural and horticultural operations throughout the United States in their efforts to comply with the requirements of federal immigration and employment law over the past 20 years. In addition, I served as counsel to and was actively engaged in the legislative

**No-Match Cert. Admin. Record  1371**

and regulatory processes surrounding the adoption of the Immigration Reform and Control Act of 1986 (IRCA) and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA).

In summary, my testimony here today will focus on the enforcement and employment eligibility verification provisions of Title VII of H.R. 4437, the immigration bill passed by the House of Representatives on December 16, 2005 and their anticipated impact on agricultural employers, a substantial number of which are small family-run businesses. American agriculture over the past 20 years has supported a simple, effective and nondiscriminatory process of determining the employment eligibility of new hires. Today, similar to when IIRIRA was being considered 10 years ago, American agriculture would support electronic verification of employment eligibility, as long as the process is simple, manageable, provides a bright line of compliance responsibilities and is coupled with a viable means of obtaining legal workers when there is an insufficient domestic workforce.

My comments on Title VII of H.R. 4437 are made in the context of the failures of IRCA and IIRIRA and the so-called Social Security mismatch problem that has complicated the already difficult, and confusing employer compliance challenges imposed by these laws. After 20 years of experience with ineffective and frustrating employment eligibility verification laws, it is time for Congress to get it right. "Getting it right" means eliminating fraudulent documents through an effective telephonic and electronic verification system but also implementing a simple and user-friendly system that accommodates the practical day to day realities of the hiring process necessarily used by many employers.

It also is imperative that Congress understand that immigration reform must not be limited to an effective employment eligibility verification system that removes the so-called "job magnet" and increased worksite enforcement. Without comprehensive immigration reform that, in addition to eliminating the job magnet that attracts undocumented workers, also includes substantial reform of the H-2A temporary and seasonal agricultural worker program and a means by which experienced agricultural workers may earn legal status, American labor intensive agriculture and related service sectors including landscape installation and maintenance will face a labor catastrophe. As noted later in my testimony, American labor intensive agriculture is predominantly undocumented—not because farmers and ranchers ignore the law—but because the current law is dysfunctional and provides no viable means of obtaining legal agricultural workers. The continued economic viability of U.S. agriculture and related sectors are at stake. We urge this Committee to support efforts to address the immigration problem in a comprehensive manner.

**Lessons from IRCA and IIRIRA**

Two essential components of IRCA are employers' obligation to comply with the employment eligibility requirements of the law and face sanctions if they do not, and provisions prohibiting unfair immigration-related employment practices based on citizenship status and national origin. The employer sanctions provisions require employers to provide employees a menu of some 29 different document combinations set forth on the I-9 Form provided by the Department of Homeland Security (DHS) from which applicants can attempt to establish their

**No-Match Cert. Admin. Record  1372**

identity and work authorization. Employers have an obligation to view the documents offered by applicants and make a judgment as to whether they reasonably appear genuine on their face. Court decisions interpreting the facial genuineness of document standard have found it to be a minimal standard that does not require employers to be forensic document experts.

The experience of the employers we have represented over the past 20 years since IRCA's enactment shows that employers are easily confused by the large number of documents that may evidence work eligibility, with many of the documents being unusual or of limited validity, putting employers in a position of uncertainty as to their legality. The small employers we represent strongly favor a limitation on the number of acceptable employment eligibility documents in order to make compliance simpler and less confusing.

The anti-discrimination provisions of IRCA represent a well-intended attempt to prevent employers from assuming that persons of particular ancestry or ethnic backgrounds are likely to be illegal aliens and thus refrain from hiring them. After the enactment of IRCA, agricultural organizations throughout the U.S. conducted extensive compliance programs for employers, informing them of their obligations under these new laws. Such programs often were conducted with the participation of lawyers from the then Immigration and Naturalization Service (INS) and the Department of Justice's Office of Special Counsel for Immigration Related Unfair Employment Practices (OSC). Unfortunately, lawyers from these agencies with very distinct missions often would not agree as to what employer compliance obligations were, given the tension created by one component that encouraged vigilant review of work eligibility documents and another that stressed that employers face discrimination charges if they were too aggressive in evaluating the documents presented during the work authorization process.

The result of these competing provisions of the law was a lack of compliance clarity for the employer community. During the past 20 years we have represented more employers who were charged with discrimination under IRCA for being overly zealous in complying with the employment eligibility requirements, than employers charged with violating the employer sanctions provisions. The specifying of certain documents or requesting more than the minimal amount of documents was treated by OSC as document abuse and a *per se* violation of the antidiscrimination provisions under what it interpreted as a strict liability standard. This resulted in a high level of frustration from well- intended employers caught in the jaws of an IRCA vice that they viewed as inherently contradictory.

In 1996, Congress again turned its attention to immigration reform and attempted to address some of the above-described employer concerns created by IRCA. Under IIRIRA, the so-called document abuse provisions that resulted in numerous discrimination complaints against well-intended employers were modified to clarify that document specification or over-documentation required a showing of discriminatory intent, rather than establishing a strict liability standard. This was a positive development. IIRIRA also amended IRCA to require a reduction in the number of documents acceptable for completion of the I-9 Form. On September 30, 1997, the INS issued an interim rule stating that it intended to implement a new document reduction program and revise the I-9 Form and provide guidance to employers.[1] Until a final rule was issued, employers were informed that they could continue to use the current I-9

---

[1] 62 Fed. Reg. 51,001 (Sept. 30, 1997).

No-Match Cert. Admin. Record  1373

Form (edition 11/21/91) and documents listed on it as acceptable without being subjected to liability. Today, nearly 10 years later, a final rule and revised I-9 Form still have not been issued.

IIRIRA also established the pilot electronic employment eligibility verification programs. H.R. 4437 would make the basic pilot program mandatory and universal and my testimony later addresses the features of this legislation.

**The Social Security Mismatch Problem**

For over ten years, agricultural employers, like many others, have received so-called Social Security mismatch letters. These letters are sent by the Social Security Administration (SSA) after employers file the Form W-2 tax and wage information and SSA determines that the names and Social Security numbers (SSN) do not match or that the SSN is invalid. Employers are required to inform employees of the problem and correct any mistakes that resulted in the mismatch. Explanatory materials sent to employers regarding the mismatch problem have stated that the Federal Privacy Act (5 U.S.C. §552a(I)) prohibits the use of the information received from SSA records "for purposes other than that to which it was requested" and that persons who violate this prohibition are subject to fines and imprisonment. The purpose for which the letters are sent is to ensure that SSA wage information is accurately reported to the benefit of the worker.

The employers that we represent have had great concern regarding whether the mismatch letters put them on notice that they may be in violation of the employment authorization provisions of the immigration law, since the Social Security card is one of the most commonly used employment authorization documents. The Privacy Act provisions referenced above suggest that use of the letters for immigration purposes is inappropriate; however, opinion letters issued by INS indicate that under certain circumstances, mismatch letters could provide evidence of constructive knowledge that an employee was in undocumented status in violation of IRCA. Immigration and employment lawyers are not in agreement as to whether mismatch letters impose immigration compliance obligations. There is no doubt, however, that mismatch letters put employers in another untenable position regarding immigration law compliance and add to their anxiety about the legal status of their workers.

On June 14, 2006 DHS issued a proposed rule that states its position that employers that receive SSA mismatch letters may be shown to have constructive knowledge that an employee referred to in the letter is not authorized to work in the U.S. The rule states that an employer that fails to take reasonable steps to follow up on written notice from SSA regarding the validity of an SSN or DHS regarding employment authorization may be liable under immigration law. It also provides a set of procedures that, if followed by the employer, may provide a safe harbor from liability. Under the proposed rule, an employer would have between 14 and 60 days, depending on the circumstances, to verify the legitimacy of an employee's documents, and if an employer could not do so during the required period, it would have to terminate the employee or face potential liability.

4

**No-Match Cert. Admin. Record  1374**

While DHS' rule is welcome to the extent that it provides clarity and a bright line for compliance steps, it does not eliminate the potential for the employer to be sued for discrimination. A decision recently issued by the U. S. Court of Appeals for the Tenth Circuit in *Zamora v. Elite Logistics, Inc.,* (No. 04-3205) (10th Cir. June 6, 2006), illustrates the treacherous path employers tread when they engage in post-hiring verification of Social Security cards of employees, once the validity of the card has been called into question. The court in *Zamora* reversed a grant summary judgment for the employer in a Title VII discrimination claim based on race or national origin. The case involved circumstances in which an employer followed up on information it received in auditing its I-9 Forms that the plaintiff, who had satisfied the employment verification requirements when initially hired, had a Social Security number that had been used by another person on three different occasions in another state. The employer's effort to verify the validity of plaintiff's Social Security card and the alleged facts that stemmed therefrom resulted in an allegation of discrimination, which the Court of Appeals held needed to be determined by a trier of fact. As has been the case with IRCA's sanctions and antidiscrimination provisions, the Social Security mismatch problem retains the "damned if you do and damned if you don't" dilemma that employers face.

**Does Title VII of H.R. 4437 Correct the Employment Eligibility Verification Problems of IRCA, IIRIRA and the Social Security Mismatch Process or Create New Ones?**

The problems associated with IRCA, IIRIRA and Social Security mismatch letters provide a clear set of standards against which to measure the improvements that Title VII of H.R. 4437 seeks to achieve. Employers will measure the merits of any reformed employment eligibility verification system based on the answers to the following questions:

1. Does the legislation screen out unauthorized persons in a manner that simplifies the hiring process with a minimum of administrative burdens for employers?

2. Does the legislation provide employers clear-cut compliance standards, that if complied with, do not put employers at risk of unlawfully discriminating?

3. Does the legislation impose reasonable penalties upon employers that do not comply with its employment eligibility verification provisions?

4. Does the legislation eliminate the existing confusion with regard to Social Security mismatch letters?

5. Does the legislation provide a viable means for employers to obtain legal workers, in addition to containing a telephonic and electronic employment verification system?

**1. Does the legislation screen out unauthorized persons in a manner that simplifies the hiring process with a minimum of administrative burdens for employers?**

ACIR members support the mandatory and universal employment verification system concept that is incorporated in H.R. 4437 in the context of comprehensive reform. Part of the appeal of its verification approach is that it has the capacity to simplify and bring certainty to the

**No-Match Cert. Admin. Record  1375**

hiring process and, for the first time, effectively screen out unauthorized workers who have relied upon fraudulent documents in the past.

> *The Legislation Must Result in A Significant Reduction of Acceptable Employment Authorization Documents, Preferably a Single Social Security-type Document*

While Title VII of H.R. 4437 does not directly reduce the number of documents that may be used to establish identity or employment authorization, section 707 mandates that the Commissioner of Social Security, Secretary of DHS and Attorney General evaluate within 9 months of enactment, the viability of establishing a durable plastic Social Security card with an encrypted machine-readable electronic identification strip with a digital photograph for use as a single employment authorization and identity document. The study would include an assessment of the use of such a card to verify employment eligibility through a unified document database.

ACIR supports the establishment of a single card for purposes of employment verification. It would simplify the hiring process and eliminate the confusion that often accompanies the current process. Moreover, it would help eliminate the problem of document abuse (requesting more or different documents than are required) in violation of IRCA's antidiscrimination provisions that we previously have described. H.R. 4437 would be improved if it provided an alternative means of document reduction if the mandated study concludes that technology or administrative challenges preclude the adoption of a new Social Security card to be the exclusive employment authorization document in the near future.

> *The Option of Telephonic or Computer-based Verification Should be Retained*

Many small agricultural and small business employers do not have traditional offices. Their businesses often are located in remote rural areas where internet services may not be readily available. Some do not use computers in their businesses. Thus, it is important that the option of telephonic, as opposed to computer-only verification, be available. The House bill allows and should retain this option.

> *The Verification Database Should Not be Universally Implemented Prematurely Nor Applied Retroactively In Order to Enable It to Adjust to the Tremendous Demands to Be Imposed Upon It.*

ACIR members are concerned about the capacity of a universal and mandatory verification system to handle within a relatively short timeframe the tremendous volume of employer, recruiter and referrer verification requests mandated by the legislation. The timeframes established by H.R. 4407 are ambitious. All employers, recruiters and referrers must use the new verification system to determine the employment eligibility of new hires two years after enactment. Previously hired employees who were hired under the old visual document inspection system must be reverified under the electronic system within 6 years of enactment, unless they are a governmental entity or private employer engaged in business on a military base, nuclear facility, airport or other critical infrastructure, in which case retroactive verification must occur within 3 years after enactment. Entities may voluntarily use the system to reverify employees 2 years after enactment.

**No-Match Cert. Admin. Record  1376**

Our comments are not intended to criticize the intent of H.R. 4437 to ensure that all entities involved in facilitating employment have responsibility for ensuring that only persons who are work authorized obtain employment. We simply want to ensure that the new employment verification system database is not unnecessarily and prematurely overburdened by the demands placed upon it by recruiters, referrers and employers to the extent that it cannot handle the demand and fails to serve its intended purpose. We believe that a 2 year implementation date for prospective hires and retroactive reverification after 6 years may place unmanageable demands upon the system, resulting, among other things, in employers, recruiters and referrers being unable to obtain verification of employment eligibility within the 3 days of a person's hiring. Small employers are fearful that such a result will impose upon employers extensive verification follow-up that will place unreasonable time demands upon what otherwise was intended to be a simple process.

We have several recommendations that we believe would address these potential problems. To address the verification system's capacity to handle the burdens imposed upon it, we recommend that it be phased in gradually. Larger employers are more equipped to deal with the challenges of the new system and should be subject to it first. Smaller employers, which in many instances are least prepared, should be covered after several years. We believe the approach taken in H.R. 19, introduced by Representative Calvert, is a reasonable one that anticipates this problem and would phase in prospective verification over a number years. Under H.R. 19, the largest employers would be subject to the system one year after enactment and the smallest employers seven years later, with a new group, based on the decreasing number of employees, phased in each year in between. The value of such an approach is that the most sophisticated employers would use the system first and the database system would be allowed to gradually accommodate expanded usage through a seven year phase-in. We also believe that the Calvert bill wisely does not impose a retroactive reverification obligation, implicitly recognizing the challenges such a burden involving millions of additional workers would impose on the system. Retroactive verification is arguably unnecessary anyway given the rate of employment change, especially in industries like agriculture. We recommend that retroactive verification be excluded from the proposed legislation.

**2. Does the legislation provide employers clear-cut compliance standards, that if complied with, do not put employers at risk of unlawfully discriminating?**

*Legislation Should Clarify the Verification Responsibilities of Recruiters, Referrers, Independent Contractors and Entities Using Their Services and Avoid Needless Duplication of Effort*

H.R. 4437 mandates verification at many points in the employment process and may require needless duplication. This is potentially problematic because of the sheer volume of

7

inputs it would require into the verification systems database.[2]  The bill does not address directly whether the entity to whom the person is referred after recruitment has the additional obligation to verify the referred worker.  This presents a significant practical compliance problem in the agricultural context where agricultural entities pay a farm labor contractor (FLC), as an independent contractor, a fee to provide workers for a limited duration, with the express understanding that the FLC is the employer for all purposes, including employment eligibility verification.  As with most independent contractor relationships, there is no bright line as to whether an independent contractor relationship exists, and under joint employer principles set forth under the federal Fair Labor Standards Act and Migrant and Seasonal Agricultural Worker Protection Act, a grower who believed the FLC was an independent contractor responsible for I-9 completion may nonetheless found to be the joint employer.  In an abundance of caution, the grower may feel compelled to reverify the worker, even if the recruiter/referrer FLC already has done so.

H.R. 4437 does not clearly set forth principles that address these complex circumstances.  While section 706 of the bill provides a safe harbor for contractors who use subcontractors, the language of this provision appears to be narrowly limited to contractor-subcontractor relationships, rather than entities, such as those in agriculture, that are not contractors but often use contractors, more so than subcontractors.  At a minimum, we suggest that this language  be clarified to address these circumstances.

As a result of the uncertainty surrounding this issue, in an abundance of caution, many farmers and ranchers likely would reverify the workers recruited and referred to them by an FLC to avoid an alleged violation of the employer sanctions provisions.  This will result in at least three problems:  1)  farmers and ranchers would undergo additional paperwork and compliance responsibilities already assumed by recruiters and referrers; 2) in doing so, they would undercut their otherwise legitimate claim of not being the employer, exposing them to other unanticipated liability; and 3) the government database would be burdened with duplicative verification requests.

We recommend that the language of any proposal be clarified to address the ambiguity in verification obligations between recruiters and referrers that are contractors and the entities to whom they provide workers.  We believe that if the recruiter and referrer can provide documentation that it has satisfied its verification obligations, that the entity for whom the

---

[2]  In agriculture, many employers rely upon farm labor contractors (FLCs) to supply seasonal workers during peak periods of need.  Typically, FLCs will call potential workers, who may be located hundreds of miles away, and recruit them for an agricultural job.  The bill requires that an attempt must be made to determine the employment eligibility of the worker within 3 days of this recruitment contact through entering information into the government's database and documenting on an I-9 Form or its equivalent the pertinent information.  Because H.R. 4437 still requires the employer and recruiter or referrer to make a visual inspection of the documents provided, determine that the identity of the person presenting the documents is who he/she purports to be, and observe the person sign the document verifying the truthfulness of the information provided, all recruitment necessarily must be face to face.  Given the mobility of the agricultural workforce, in which many migrant workers move seasonally throughout the U.S. from crop to crop, this imposes practical challenges that may indirectly disrupt the current farm labor system.  At a minimum, the components of the current regulation that allow recruiters and referrers to designate agents to complete the employment procedures on their behalf, including notaries, associations or employer, should be incorporated into any new law.  8 C.F.R. § 274a.2(b)(iv).

No-Match Cert. Admin. Record  1378

workers provide services should not have to duplicate the verification obligation. This would provide compliance clarity and avoid unnecessarily burdening the verification system's database.

*In the Event of a System Malfunction, Employers Should Not Be Required to Make Daily Inquiries as to Employment Eligibility*

Section 702 of the bill provides special provisions in the event of a system malfunction and would appear to require employers to make daily inquiries of the system until it registers no nonresponses. For many small employers with limited human resource personnel who hire many seasonal workers on a daily basis, this provision would be a real compliance headache. Not only would employers have to verify each day's new hires, but in addition, would have to continue to seek on a daily basis verification of previous hires for whom the employer could not access the system. We suggest that a reasonable timeframe, such as seven to ten business days after the system failed to give a response, be allowed for employers to verify backlogged verification requests. Otherwise, small employers would become overwhelmed by the administrative burdens and face potential unintentional compliance problems.

*New Unlawful Discrimination Prohibitions Imposed by the Verification System Should be Set Forth Clearly in the Legislation*

As previously discussed in my testimony, a major problem with IRCA was the confusion it created for employers trying to comply with the verification procedures while avoiding discrimination. H.R. 4437 does not amend the non-discrimination provisions of existing law at the same time that it changes the verification procedures. Section 702 of the bill, however, does require in the design and operation of the verification system that the Secretary of Homeland Security provide reasonable safeguards against the system's resulting in unlawful discriminatory practices based on national origin or citizenship status. While we strongly support a system that is designed to avoid unlawful discrimination, employer obligations in that regard should be expressly stated, rather that implied through an implementation directive to the Secretary. To the extent that H.R. 4437's telephonic and electronic verification system potentially creates new types of discrimination, the bill should amend IRCA's nondiscrimination provisions (8 U.S.C. § 1324b) to provide applicants, employees, and employers a clear statement of any new rights and obligations.

**3. Does the legislation impose reasonable penalties upon employers that do not comply with its employment eligibility verification procedures?**

Section 706 of H.R. 4437 greatly increases the penalties that would be imposed upon employers that are found to have failed to comply with the verification standards by hiring or continuing to employ undocumented workers. ACIR members are especially concerned about the tremendous increase in penalties for paperwork violations. Employers that fail to properly complete the employment eligibility form, such as the current I-9 Form, would face fines of between $1,000 and $25,000 per form. This compares with fines of between $100 and $1,000 under current law for the same violation. Because the document creation and retention obligations apply to every hire, even small employers that have few year-round employees, but

**No-Match Cert. Admin. Record  1379**

that may hire hundreds of seasonal employees for a short period, could be crippled and put out of business by this provision.

The fine would apply with respect to every form completely improperly or not retained for the proper period, even if the violation was inadvertent. In our experience with employer compliance under current law, many well-intended employers unintentionally commit minor paper work violations during the completion of the I-9 Form. While H.R. 4437 has small employer mitigation provisions, the size of the paperwork fines, nonetheless, could be beyond the means of small employers to pay and could ultimately force them out of business.

While ACIR certainly believes that employers who violate the law should be punished, it believes that the punishment should be reasonable and fit the crime. Its members believe that the fines that H.R. 4437 imposes for minor paperwork violations are too extreme and would be unnecessarily punitive for small employers.

**4. Does the legislation eliminate the existing confusion with regard to Social Security mismatch letters?**

We have described the uncertainty and conflicts that exist between various federal statutes that directly or indirectly embrace the Social Security mismatch issue. The newly proposed DHS rule clearly would incorporate the mismatch problem into an employer immigration compliance problem. Enactment of the employment verification procedures of H.R. 4437 would make the proposed rule unnecessary. Because the Social Security card is a central component of the new verification system and presumably fraudulent Social Security numbers will be screened out by the system, employers that hire persons regardless of the nonverification of the card would be subject to employer sanctions. If the verification system works as anticipated, the mismatch issue should be substantially reduced.

Mandatory use of the Social Security Administration's database prior to employment of persons places the issue of a card's validity directly in the employment context. This is a direct and more appropriate way to address the issue than the indirect Social Security mismatch approach that is more directly related to ensuring that tax payments are appropriately credited. This is especially true if the study required by H.R. 4437 results in adoption of a new Social Security card that is the sole employment authorization document, similar to the approach taken in H.R. 98 introduced by Representative Dreier.

We recommend that the Social Security mismatch issue be addressed in the legislation to clarify that employers that receive such letters still have an obligation under the Internal Revenue Code (IRS) to correct any errors in reporting and remain subject to penalties under the IRS Code if they fail to comply. Any additional employer obligations related to the Social Security card as an employment document should be limited to the verification obligations set forth in new legislation. This would have several advantages. It would separate tax and immigration compliance responsibilities, eliminating overlapping obligations and confusion. It also would reduce the chances of discrimination resulting from employer confusion with regard to mismatch letters as described earlier in my testimony in the recent *Zamora* decision.

10

**No-Match Cert. Admin. Record 1380**

**5.  Does the legislation provide a viable means for employers to obtain legal workers, in addition to containing a telephonic and electronic employment verification system?**

ACIR supports the concept of mandatory electronic employment verification as long as the criteria we have described are part of it.  The most indispensable part of such a system is its linkage to a viable means of obtaining legal workers in the event that the verification system effectively screens out a sizeable portion of those who apply for agricultural jobs.  ACIR members, representing a substantial portion American labor intensive agriculture, anticipate that a verification system such as proposed in H.R. 4437, would screen out a majority of the agricultural workforce.  Currently, there is no effective way to replace them.  Consequently, it is imperative that any mandatory electronic verification system be accompanied by measures that will allow agricultural employers to obtain legal workers.

The U.S. agricultural work force has become increasingly populated by foreign workers who lack proper work authorization.  The U.S. Department of Labor's National Agricultural Worker Survey (NAWS) reported in its 1998-99 survey that 52 percent of seasonal agricultural workers working in the U S. self-identified as not authorized to work in the U.S.  This was an increase from 37 percent in the previous survey only three years earlier, and from only about 12 percent a decade earlier.  More than 70 percent of the new seasonal agricultural labor force entrants in the NAWS survey self identified as not authorized to work.  Most experts agree that the statistics based on self identification in the NAWS survey are likely very conservative.  Evidence based on DHS audits and verification of Social Security cards by the Social Security Administration often results in 60 to 80 percent or more of workers' documents being determined to be invalid or not pertaining to the person who presented them.

These statistics do not evidence employer disregard for the current employment verification standards, as employers must accept documents offered by applicants that appear genuine on their face.  Unfortunately, the ease with which persons may obtain fraudulent documents that appear legitimate fosters this problem.  Yet, employers who refuse to accept such documents risk facing discrimination charges.

The only program agriculture has to obtain legal foreign workers was enacted as the H-2 program in the Immigration and Nationality Act of 1952.  In 1956 Congress attempted to streamline the program and redesignated it H-2A.  Because of the difficulties in using the program, less than two percent of the seasonal agricultural workforce is brought in through the program.

The H-2A program has been used principally on the east coast in fruit, vegetables, and tobacco.  The program's structure and requirements evolved from government-to-government treaty programs which preceded it.  Over the years the program has become beleaguered with regulations promulgated by the Department of Labor and adverse legal decisions generated by opponents of the program.  Both have rendered it unworkable and uneconomic for many agricultural employers who face labor shortages.  The program is characterized by government delays in approving grower applications that adversely affect the harvest of perishable crops; a costly non-market based wage rate set annually by the Department of Labor called the adverse effect wage rate; and costly and burdensome litigation.  Now that government policy threatens to

**No-Match Cert. Admin. Record  1381**

eliminate the illegal alien work force, many growers are caught between an unworkable and uneconomical H-2A program and the prospect of insufficient labor to operate their businesses.

Opponents of a viable agricultural worker program suggest there are other ways to address the problem that would result from the removal of the illegal alien agricultural work force than the legal admission of alien agricultural workers. One approach that is suggested is that agricultural employers should be "left to compete in the labor market just like other employers have to do". There are several observations one must make about this "solution". No informed person seriously contends that wages, benefits and working conditions in seasonal agricultural jobs can be raised sufficiently to attract workers away from their permanent nonagricultural jobs in the numbers needed to replace the illegal alien agricultural work force and maintain the economic competitiveness of U.S. producers.

Seasonal farm jobs have attributes which make them inherently uncompetitive with nonfarm work. First and foremost is that they are seasonal. Secondly, many seasonal farm jobs are located in rural areas away from centers of population. Furthermore, to extend the period of employment, workers must work at several such jobs in different areas. That is, they must become migrants. It is highly unlikely that many U.S. workers would be willing to become migrant farm workers at any wage, or that, as a matter of public policy, we would want to encourage them to do so. In fact, the U.S. government has spent billions of dollars over the past several decades attempting to settle domestic workers out of the migratory stream. The success of these efforts is one of the factors that has led to the expansion in illegal alien employment. In addition to seasonality and migrancy, most farm jobs are subject to the vicissitudes of weather, and require physical strength and stamina. Thus it is highly unlikely that a significant domestic worker response would result even from substantial increases in wages and benefits for seasonal farm work.

Nonagricultural employers have some options for responding to domestic labor shortages that agricultural employers do not have. Many nonagricultural employers can "foreign source" the labor intensive components of their product or service without losing the good jobs. Since agricultural production is tied to the land, the labor intensive functions of the agricultural production process cannot be foreign-sourced. We cannot, for example, send the harvesting process or the thinning process overseas. Either the entire product is grown, harvested, transported and in many cases initially processed in the U.S., or all these functions are done somewhere else, even though only one or two steps in the production process may be highly labor intensive. When the product is grown, harvested, transported and processed somewhere else, *all* the jobs associated with these functions are exported, not just the seasonal field jobs. These are the so-called "upstream" and "downstream" jobs that support, and are created by, agricultural production. U.S. Department of Agriculture studies indicate that there are about 3.1 such upstream and downstream jobs for every on-farm job. Most of these upstream and downstream jobs are "good" jobs, *i.e.,* permanent, average or better paying jobs held by citizens and permanent residents. Thus, we would be exporting about three times as many jobs of U.S. citizens and permanent residents as we would farm jobs if we shut off access to alien agricultural workers.

12

No-Match Cert. Admin. Record  1382

Another suggestion has been that recruitment of welfare recipients and the unemployed could replace the illegal aliens. In the late 1990's growers in the San Joaquin Valley of California tried to augment their labor supply by recruiting welfare recipients and the unemployed. They worked with the California welfare agencies and employment development departments in an effort to recruit the rural unemployed. The extensive efforts of two government agencies and agricultural employers resulted in few former welfare recipients and unemployed persons moving into jobs on farms.. The study found that the preponderance of those on the welfare rolls were single mothers with young children. Many were not physically capable of doing farm work, did not have transportation into the rural areas and were occupied with the care of young children.

The unemployed also make, at best, a marginal contribution to the hired farm work force. Relatively high unemployment rates in some rural agricultural counties are often cited as evidence of an available labor supply or even of a farm worker surplus. First it should be noted that labor markets with a heavy presence of seasonal agriculture will always have higher unemployment rates than labor markets with a higher proportion of year round employment. By the very nature of the fact that farm work is seasonal, many seasonal farm workers spend a portion of the year unemployed. Second, unemployed workers tend to share the same values as employed workers. They prefer permanent employment which is not physically demanding and takes place in an inside environment. They share an aversion to migrancy, and often have transportation and other limitations that restrict their access to jobs. The coexistence of unemployed workers and employers with labor shortages in the same labor markets means only that we have a system that enables workers to exercise choices.

Many welfare recipients and unemployed workers cannot or will not do agricultural work. It is reasonable to expect an alien worker program to have a credible mechanism to assure that domestic workers who are willing and able to do farm work have first access to agricultural jobs, and that aliens do not displace U.S. workers. It is not reasonable to expect or insist that welfare and unemployment rolls fall to zero as a condition for the admission of alien workers.

A third alternative to alien workers often suggested is to replace labor with technology, including mechanization. This argument holds that if agricultural employers were denied access to alien labor they would have an incentive to develop mechanization to replace the alien labor. Alternatively, it is argued that the availability of alien labor retards mechanization and growth in worker productivity.

The argument that availability of alien labor creates a disincentive for mechanization is belied by the history of the past two decades. From 1980 to 2000, the output of labor intensive agricultural commodities has risen dramatically while hired agricultural employment has declined. The only way this could have happened is as a result of significant agricultural labor productivity increases. Yet, this was also the period of perhaps the greatest influx of illegal alien farm workers in our history.

It does not appear that there has been a great deal of increase in agricultural mechanization in fruit and vegetable farming since a spasm of innovation and development in the 1960's and 1970's. Indeed, some of the mechanization developed during that period, specifically

13

mechanical apple harvesters, have proven to be uneconomical in the long term because of tree damage as well as fruit damage.

But productivity increases can result from many different factors, of which mechanization is only one. Smaller fruit trees, which require less ladder climbing, trellised trees, and changes in the way trees or vines are pruned are also technological developments which improve labor productivity. The switch from boxes and small containers to bulk bins and pallets in the field has significantly improved labor productivity of some harvesting activities. Use of production techniques and crop varieties that increase yields also improves field labor productivity by making harvesting and other operations more efficient. These appear to be the techniques that farmers have used to achieve the large productivity increases obtained in the 1980's and 1990's.

At the same time as labor intensive agriculture faces a shortage of legal workers, it has for the past several years also been experiencing actual shortages of workers. During the past several years there have been shortages in the lettuce and vegetable harvests in border areas in Arizona and California. During the past year and currently, growers in a number of crops on the West coast are facing shortages of labor. Other states from coast to coast are reporting labor shortages in a number of crops. Actual labor shortages coupled with shortages of legal workers and the prospect of enforcement only legislation as proposed by the House of Representatives in H.R. 4437, represents the "perfect storm" for labor intensive agriculture. Its future is at risk.

American agriculture has devoted the past ten years to seeking access to a workable agricultural worker program through H-2A and other reforms. Through ACIR and other organizations, it has supported workable employment verification systems as a component of such reforms. If, however, Congress now decides to impose an enforcement only or enforcement first approach to immigration reform, with electronic verification as a key element, without addressing the needs of American agriculture for a reformed worker program, the result will be catastrophic. A system that excludes an anticipated 70 percent of the agricultural workforce without also providing a legal means of replacing it represents a formula for the demise of labor intensive agriculture in this country.

ACIR strongly encourages this Subcommittee to consider not only the necessary components of a workable employment verification system, but the concomitant need for legislation to provide agriculture a viable means of retaining its experienced workforce and obtaining a legal workforce in the future.

Thank you very much for the opportunity to share our views.

14