<u>Via E-mail: rfs.regs@dhs.gov</u>

August 14, 2006

Director, Regulatory Management Division
US Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW 2nd Floor
Washington DC 20529

     Re:  Comments to DHS Proposed Regulations
        Docket No. ICEB-2006-0004
        ICE 23-77-06
        RIN 1653-AA50
        71 Fed. Reg. 34281

Dear Sir or Madam:

   The Service Employees International Union, Local 1, opposes implementation of the above regulations. SEIU Local 1 represents nearly 40,000 members in Illinois, Wisconsin and parts of Missouri. These members work in property services, holding positions such as janitors and security guards, among others. In its capacity as representative, SEIU Local 1 has observed confusion with the social security no match program, and has assisted in resolving misunderstandings caused by the program.

   In sum, SEIU Local 1 objects to the proposals issued by the DHS because such regulations would circumvent comprehensive immigration reform currently being considered by Congress. The proposals likewise interfere with and contradict the policies of another administrative agency, the Social Security Administration. Moreover, the regulations place too great a burden on private employers to enforce immigration law, and may harm workers currently authorized to work in the United States. Last, the regulations are likely to increase discrimination against individuals based on their race or national origin. SEIU Local 1 therefore requests that DHS decline to implement these regulations, and in particular, requests that DHS permit the legislative process to determine immigration policy and enforcement.

**I.  The Proposal Exceeds the Authority of the Department of Homeland Security**

   While an administrative agency has authority to implement rules and regulations to assist in enforcing statutes, agencies exceed that authority by engaging in legislation. <u>See Guardians Ass'n v. Civil Serv. Commission</u>, 463 U.S. 582 (1993); <u>Weiss v. United States</u>, 510 U.S. 163 (1994). Indeed, the courts have consistently recognized limits on the ability of Congress to delegate authority to the Executive Branch <u>See, e.g.</u>, <u>Indus Union Dep't v. API</u>, 448 US 607 (1980).

Since the United States Congress is currently debating appropriate immigration reform, regulations that change the nation's current system of immigration laws could constitute legislation by an administrative agency. Such legislative action exceeds the agency's authority.

Moreover, the proposed regulations inappropriately interpret instructions from a different administrative agency, the Social Security Administration. The DHS regulations contradict the policies of the Social Security Administration regarding how to interpret a "no match" letter. Indeed, the SSA itself, and even former INS General Counsels, agree that social security numbers should not be used to determine work authorization or Immigration status, because there are many reasons why the computer records could be in error.[1] In fact, the SSA records usually contain no information about immigration status, or contain out of date information.[2] As discussed further below, the no-match letters now instruct Employers not to take adverse action against an employee because of a "no-match." The DHS would exceed its authority by requiring employers to rely upon documents prepared by the SSA for a purpose other than enforcing immigration law, and that specifically includes a warning to employers not to use the documents to determine an employees' work authorization status.

## II.. The Regulations May Harm Employers and Employees Without Achieving Their Intended Objectives

SEIU does not believe that the proposed DHS regulations will achieve the intended objective of reducing the number of undocumented workers in the United States and will instead end up hurting American citizens and other authorized workers as well as legitimate employers who are trying to comply with the law. This objective can be obtained only through comprehensive immigration reform such as that currently pending in Congress, since the millions of jobs these workers hold and the importance of their labor to the U.S. economy will not disappear by adoption of enforcement oriented proposals. The proposed DHS regulations will simply make the situation worse, not better.

The proposed regulations may serve as a disincentive to Employers to comply with immigration law. In representing low wages workers, we are often confronted with unscrupulous employers who erroneous classify their employees as independent contractors or who even treat their workers as sham franchisees. We even see situations were workers are paid "off the books" meaning that they are paid in cash with out any of the payroll taxes being paid or the tax withholdings being made that are required by law. By using these fraudulent schemes, employers avoid paying payroll taxes, unemployment insurance and social security payments on behalf of their workers. Since the workers have not been legally treated as "employees", these employers don't even need to go through the I-9 process with these workers, nor will they ever receive a no match letter from the SSA as they do not pay SSA taxes. These employers seek to employ undocumented workers because they are the workers who are less likely to speak up and demand that the employer comply with the law. These employers not only cheat their workers, but they cheat the government out of social security payments, unemployment taxes, wages

---

[1] Martin, David, INS General Counsel, Letter to Larson (12/23/1997) *published at* 75 No.6 Int. Releases 203 (1998), Westlaw 75No.6INTERREL 203; and SSA 2005 No Match letter.
[2] GAO, *Immigration Enforcement: Benefits and Limitations to Using Earnings Date to Identify Unauthorized Work*, July 11, 2006, GAO-06-814R at 8.

2

No-Match Cert. Admin. Record 1386

withholdings and so forth.  Ironically, the result of these proposed regulations will be a significant loss of revenue for the government, revenue which the government sorely needs for its operation, including the enforcement of the immigration laws.

Since no social security taxes are paid on these workers, these employers never receive SSA no match letters.  Therefore, as a practical matter, the employers that operate illegally in the low wage industries that are served by the immigrant workforce are not effected by the DHS proposed regulations and can continue to employ undocumented workers without running the risks that legitimate employers would run under the DHS proposed regulations.

These illegitimate employers thrive in the low wage industries where most immigrants work.  Legitimate employers who pay employment taxes and who try to comply with the immigration laws must compete with these employers.  There is always the temptation to take up their illegal ways in order to complete against them in these often very competitive industries. By imposing administrative burdens on the legitimate employers and not on the illegitimate employers and by subjecting legitimate employers to additional risks under the immigration laws not faced by these illegitimate employers, the DHS proposed regulations will have the unintended effect of creating incentives for legitimate employers to go underground and to misclassify their workers.  The ironic result of this will be to increase employment opportunities for undocumented workers and to deprive the government of payroll taxes which it is owed under law.

Meanwhile, the DHS regulations would not serve their intended purpose of serving to better enforce immigration requirements.  There is no reason to believe that by forcing terminations of employees based upon SSA no-match letters, that such employees will then voluntarily leave the United States.  More likely, employees will find additional short terms employment until having a similar problem leading to termination with an additional employer. This in turn causes greater employee turnover, which naturally increases an employer's costs by eliminating the benefits of a stable work force.  An underground economy is likely to result without any increased enforcement of immigration laws.

III.    **The Proposed Regulations Lack Any Workable Mechanism Prevent Error**

It is well established that SSA records are frequently erroneous.  For immigrants *who are work authorized*, SSA records are automatically able to verify the status of less than 50% of work-authorized non-citizens, as compared to 99.8% of native born citizens.[3]  These numbers are significant in that they demonstrate that large numbers of legally authorized workers will be the subjects of erroneous SSA no match letters, and their jobs at risk if the employers, employees, and SSA do not promptly take actions to comply with the proposed regulations.

According to Census Data, there are roughly 145 million total workers in the U.S. workforce, of whom 125 million are native born citizens.  There are approximately 7.8 million

---

[3] *Report to Congress on the Basic Pilot Program,* U.S. Citizenship and Immigration Service, June 2004; *see also,* GAO, *Immigration Enforcement:  Benefits and Limitations to Using Earnings Date to Identify Unauthorized Work,* July 11, 2006, GAO-06-814R at 1 (SSA data "has drawbacks since they contain some erroneous information and information about hundreds of thousands or even millions of U.S. citizens and work authorized aliens.")

**No-Match Cert. Admin. Record  1387**

naturalized citizens in the work force, and 12 million non-citizen, immigrant workers. Approximately 7 million of those workers are unauthorized.

From these numbers, one can determine that approximately *300,000* native born workers (0.02%) will be **annually** subject to SSA no match letters, *even though they are native born citizens*. If they lose four hours of work to take care of this, and you assume an average wage of $14/hr, they will lose $16.8 million in wages. Of the approximately 5 million *work-authorized*, non-citizens, 50% will face problems clearing the SSA database, or *2.5 million annually*. Again, assuming an average wage of $14/hr, these work- authorized workers would lose $140 million in wages, assuming that they ultimately succeed and are not terminated . Each of these workers will have to spend many hours trying to straighten out the SSA records, solely to satisfy DHS regulations. If SSA cannot complete the process in the time line suggested by these regulations, many will lose their jobs, causing hardship to their families. There will also be a substantial disruption of the employers operations as employees take time off to correct the errors in SSA's data base. If you assume that one in ten of these workers will for one reason or another fail to resolve the no match problem within the time limits set, this means that 280,000 workers will unjustly lose their jobs because of these proposed regulations.

For those who do not successfully, and timely, complete this process, either through procrastination, frustration, agency delay/incompetence, they will have no effective remedy for their loss of employment, wages/benefits. The proposed regulations would set strict time limits in which no-match issues be resolved, but places no requirement, not could they, on the Social Security Administration. Nor do the proposed regulations make any allowance for problems caused by the SSA's inability to resolve any particular no-match issue. Since these regulations are promulgated by the DHS, they cannot set out a procedure for SSA to remedy erroneous decisions or to provide compensation for agency error for the approximately one quarter million workers who will be unjustifiably terminated if the proposed regulations are implemented. The Federal Tort Claims Act does not provide a remedy for agency records errors, particularly where the agency would argue that it did not require the employer to terminate. Likewise, employees would not have a viable remedy against their employers for termination when the employer justifies its conduct on the new regulations together with the SSA notice.

## IV.    The Proposal Shifts DHS Enforcement Costs And Burdens To Employers, Employees And The SSA, Rather Fixing The Broken System.

The proposed regulation places a great burden on the Social Security Administration. At a time when Congress is considering making major changes to immigration laws, DHS is proposing a regulation that improperly treats the SSA no match letter as a proxy for an INS notice that the worker lacks worker authorization. As the SSA no match letters demonstrate, they are no such thing. They specifically warn employers that they do not "make any statement about an employee's immigration status." And they warn against taking any adverse action against employees for receiving a "no match".

Congress is currently in the process of addressing immigration reform but instead of leaving it to Congress to determine what that appropriate reform would be, the proposed regulations requires millions of employers and employees to burden the SSA with inquiries and

No-Match Cert. Admin. Record  1388

visits, and demanding timely documentation of same, in order to satisfy DHS's misguided regulation. No where in the regulation is there any effort by DHS to address the actual size of the attempted cost-shifting to the SSA. Nor does the regulation contemplate the substantial burden being placed on the SSA.

Because the no match letters are distributed only in April and May each year, SSA will require a substantial seasonal staffing increase to accommodate the surge in inquiries during this 2-3 month period. This seasonality will require a large number of temporary hires to enable the agency to respond. In 2002, the SSA sent out 800,000 no match letters, to employers with at least 10 no match employees, or 0.5% of the employer's workforce. It is unknown whether SSA will in future years use a different standard for sending these letters. If DHS adopts its proposed regulation, it would discourage SSA from sending the letters more broadly so as to improve its own management of the SSA Trust Fund, as doing so would impose substantial secondary staffing effects on the agency to respond to hundreds of thousands on visits.

The DHS regulations and comments fail to address this tremendous burden the proposed regulations are placing on SSA. It is irresponsible for DHS to contemplate issuing these proposed regulations without a full assessment of how SSA is going to meet the burden being placed on it by the proposed regulations.

The Regulations would also greatly burden employers. When a worker shows up on a no match letter, the employer essentially has to reverify the worker's status, as they do at the beginning of employment with the I-9 process. DHS has made no assessment of the cost to employers in immigrant intensive industries of this new *annual* I-9 compliance obligation which will result from the proposed regulations. Instead of a one-time I-9 compliance burden, suddenly employers in immigrant dependent industries can expect to see I-9 compliance issues become an annual routine for a large segment of their workforce. Indeed, the regulation asserts that there will be no significant cost to small employers, but it is hard to see how anyone could contend that this administrative burden will be insubstantial for all employers, both small and large, in immigrant intensive industries.

The regulation also makes no effort to assess the costs imposed on citizens or authorized workers, as well as to their employers, of time away from work to try to straighten out SSA records, and obtain documentation that will satisfy their employers. As demonstrated above, the proposed regulations could easily cost employees legally entitled to work in the United States $156 million or more in lost wages and the substantial disruption to many employers' operations just to prove that there is an error in the SSA records.

Likewise, not addressed is the cost to the SSA in staff time and lost taxes, as well as the increase in unemployment compensation paid out to employees who are wrongly terminated. The cost to the government because of increased costs in responding to inquiries from legal employees who were placed in a no match letter because of an error as well as the loss of revenue from payroll taxes is likely to be very significant. Yet, DHS's proposed regulations fail to address these costs and lost revenue at all.

No-Match Cert. Admin. Record  1389

**V.    The Proposed Regulations Will Encourage Discrimination
Against Workers Legally Entitled To Work In The United States.**

The proposed regulation will result in expanded discrimination against workers with a
"foreign" appearance or accent, as well as those who seek to enforce their workplace rights to
fair treatment and a living wage.  Accepting SSA no-match letters proof that an employees does
not have work authorization will lead to discrimination in violation of the non-discrimination
clause in the Immigration Reform and Control Act.  See Collins Foods International v. INS, 948
F.2d 549, 554-55 (9th Cir, 1991).  Under existing laws and procedures, there is currently a high
level of discrimination against immigrant workers, whether they are legally authorized for
employment or not.  Despite existing protections, SEIU and other unions have often had to assist
workers whose employers deny them workers compensation, overtime pay, or interfere with their
right to form or join a union.  Such employers will often hide behind the excuse of immigration
law compliance to accomplish these ends.  This proposal will provide unscrupulous employers
an *annual* excuse for harassing, suspending and or terminating workers who lawfully seek to
enforce their rights.

**VI.    The Proposed Regulations Are Contrary To Unchallenged Ninth Circuit
Case law That Constructive Knowledge "Not Be Expansively Applied."**

The proposed regulation disrupt the proper balance struck by Congress in 1986 and
recognized by the INS/ICE, SSA, the courts and OCAHO for the last twenty years.  Because
these proposed regulations are clearly contrary to Congress' intent, they are beyond the authority
of DHS to issue.

The proposed regulations would expand the definition of constructive knowledge,
contrary to the only circuit court case construing that term in the INA 274A context.  When
Congress passed the Immigration Reform and Control Act in 1986, it "delicately balanced" the
employer sanctions provisions and protecting authorized workers from unlawful discrimination
because of their "foreign" appearance or accent.  "The doctrine of constructive knowledge has
great potential to upset that balance, and it should not be expansively applied." Collins Foods
International v. INS, 948 F.2d 549, 554-55 (9th Cir, 1991).  There have been no relevant changes
to this balance since 1986.

The law requires employers to accept documents proffered by the employee within three
days of hire.  There is no ongoing employer obligation to review the documents, unless a work
authorization document (List C) expires.  The employer must accept those documents that
reasonably appear on their face to be valid.  The statute does not require the employer to be a
document expert.  It is up to the employee to select the documents to submit, by selecting them
from the list on the back of the I-9 form.  The employer violates the anti-discrimination
provisions of the Act if it requires more or different documents than those required by the Act, or
for example, insists that it will only accept certain documents.

The INS in Collins Foods  had argued that the employer had constructive knowledge that
the employee was not authorized in that the employee's Social Security card was not the

6

example pictured in the INS Handbook for Employers.  The Ninth Circuit however noted that the INS Employer Handbook only illustrated a few of the possible 16 iterations of SSA cards issued.

The Ninth Circuit expressly was concerned that "[w]hen the scope of liability is expanded by the doctrine of constructive knowledge" the employer may be subjected to penalties for undefined acts, and may avoid hiring anyone with an appearance of alienage."  Id.  The effect of the regulation would be to give unscrupulous employers but another justification for discriminatory conduct, and an annual one at that.

The proposed regulations are contrary to the clear holding of the Ninth Circuit in Collins Foods.  There are no Circuits contrary, and indeed, several OCAHO decisions have followed the holding.  The agency is without authority to adopt a regulation contrary to the statute.

VII.    **The Proposed Regulation Improperly Eliminates the Good Faith Defense For Millions Of Employers, Absent Timely Compliance With The Burdensome Regulation.**

The proposed regulations are also contrary to the law as it has been interpreted and applied because it effectively eliminates the good faith defense which as always been an essential element of the statute.  The statute provides that so long as the employer and employee properly complete the I-9 form at the outset of employment, the employer has a good faith defense to a knowing hire violation.  8 U.S.C. §1324a(b)(6)(A).  The employer is not strictly liable for employing unauthorized workers; knowledge is required.  The good faith defense is rebutable if DHS can establish that the documents did not reasonably appear on their face to be valid or to relate to the individual.  Collins Foods, supra at 552, n. 9.

Despite the clear language of the statute and controlling case law,  DHS proposes to eliminate this presumption for millions of employers, unless the affected employers engage in an elaborate series of steps, within certain time frames, with the Social Security Administration.[4]  For the millions of employers who annually received an SSA no match letter, those employers would be denied the good faith defense unless they could carry a burden of showing that they had complied with all the aspects of this proposed regulation, including its timelines.  Yet DHS cannot require that the SSA is obligated to ensure that such timelines are met.

The proposed regulation erroneously treats letters from INS identifying unauthorized workers as the same as the SSA no match letters.  In contrast to the INS notices to employers, the

---

[4] The procedures and time frames are proposed without any evidence that the SSA has the staff available to serve the seasonal surge of calls and visits that would occur every spring after the issuance of no match letters.  The seasonal character of the project would make timely response by SSA even more difficult given the need to provide extra staff during the spring when response would be due.

Nor is there any indication whether SSA plans to send out no match letters to every employer with even a single no match employee, or only to those with more than 10 or 0.5% as in 2002 when it sent 800,000.  In other years, SSA has used a different threshold. The threshold used will substantially change the total numbers, raising or lowering the burden on employers/employees/SSA accordingly.

**No-Match Cert. Admin. Record  1391**

SSA no match letters explicitly tell the employer that there could be many innocent reasons why the individuals name is listed, and that the letter does not inform the employer that the worker is not authorized for employment. Indeed, the SSA no match letters also warn the employer against any adverse personnel action, as such actions might violate anti-discrimination laws. Despite these significant differences with INS notices, which directly address whether the individual is work authorized, the proposed regulations treat the SSA letters as the functional equivalent.

The legal rationale proffered by the agency is that its regulation is consistent with Mester Mfg Co. v. INS, 879 F.2d 561 (9th Cir. 1989) and New El Rey Sausage Co. v. INS, 925 F.2d 1153 (9th Cir. 1991). Yet, the agency fails to address the more on point case of Collins Foods, which dealt with Social Security enumeration in the employer sanctions context. DHS fails to note that in Mester, the employer had been told by INS that the certain employees were "suspected unauthorized aliens." Collins Foods at 555. The Collins court distinguished its prior decisions in Mester and New El Rey Sausage, noting that in both cases the employer had been informed by INS that particular employees were suspected of being unauthorized.

In contrast, here the proposed regulation treats dissimilar situations as if they were the same, i.e. an SSA letter telling employers that there is a no match in a person's Social Security number is treated the same as an INS letter that states that employees are not authorized for employment based on the immigration documents presented. Notably, the INS did not appeal the narrow, constructive knowledge standard of Collins Foods. Now fifteen years later, with no intervening statutory change, nor contrary circuit or OCAHO decisions, the agency proposes to ignore the precedent, and dramatically limit the good faith affirmative defense of the statute for millions of employers.

Collins Foods has been repeatedly followed by ALJs in employer sanctions cases. See, e.g. USA v. American Terrazzo Corp., 6 OCAHO 828, 1995 WL 848945 (1995) ("the Circuit court has given clear warning that the doctrine of constructive knowledge must be sparingly applied"); Getahun v. Dupont Merck Pharmaceutical, 6 OCAHO 880, 1996 WL 570515 (1996)(constructive knowledge must be sparingly applied in illegal hire cases to minimize the risk of liability and burden of compliance on employers); USA v. AID Maintenance Company, 7 OCAHO, 1997 WL 1051451 (1997)(same).

The careful balancing by Congress of the statutory employer obligations are not subject to revision by the agency by regulation. This legislative balance was constructed in order to minimize the burden on the employer, as well as to protect employees from discriminatory documentation requirements. The substantial gutting of the good faith defense for employers will burden the process not only for employers, but necessarily for employees whose employers impose heightened and discriminatory documentation requirements. For this reason, the proposed regulations are contrary to law and therefore exceed the agency's authority in issuing regulations.

8

No-Match Cert. Admin. Record  1392

**Conclusion**

For all the above reasons, the Service Employees International Union, Local 1, respectfully requests that the Department of Homeland Security decline to adopt or implement the proposed regulations. The regulations are inappropriate given the role Congress is playing in deciding the approach to comprehensive immigration reform. DHS should not be instructing Employers on how to interpret correspondence from another administrative agency, the Social Security Administration. The regulations place a great burden on employers and will cause harm to numerous individuals authorized to work in the United States. A preferred approach is permit the legislative process to determine comprehensive reform.

SEIU Local 1 appreciates the DHS consideration of these comments in opposition to the regulations.


Sincerely,

Alexia Kulwiec
Chief Counsel

cc:      Dan Schlademan
         Laura Garza
`        David Martino

9

August 14, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW,^ 2nd Floor,
Washington, D.C. 20529

Re: DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures
for Employers Who Receive a No-Match Letter"/*

Dear Sir or Madam:

The Coalition for Humane Immigrant Rights of Los Angeles (hereinafter
CHIRLA) submits the following comments in response to the request for
public comment by the Department of Homeland Security (DHS), Bureau of
Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor
Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg.
34281 (June 14, 2006).

CHIRLA was formed in 1986 to advance the human and civil rights of
immigrants and refugees in Los Angeles; promote harmonious multi-ethnic
and multi-racial human relations; and through coalition-building,
advocacy, community education and organizing, empower immigrants and
their allies to build a more just society.**

CHIRLA has ample experience in dealing with the adverse impact that the
Social Security Administration's (SSA) no-match letters have had on all
workers in the United States—immigrant and native-born alike.

CHIRLA has historically organized in immigrant communities and advocated
on behalf of low income immigrant workers since our foundation. Low
income immigrant workers face many obstacles to a healthy work
environment including firings and layoffs due to no match letters. We
also receive calls from employers who are concerned about their
obligations after receiving such letters. Immigrant workers themselves
bear the brunt of ineffectual immigration policies and law and this
proposed regulation seems to pile on more of the same.

As a result of this work, CHIRLA is alarmed by and strongly opposed to
the implementation of the proposed "Safe-Harbor Procedures for Employers
Who Receive a No-Match Letter." Such a rule will magnify the adverse
impact that SSA no-match letters have had on workers' rights, and
trigger mass firings across the nation. These firings will be
unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, *_the rule
will have no impact on undocumented immigration_*. Our past experience
with no-match firings and workplace audits is very clear: the fired

workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

· *This proposed rule will harm _all_ workers regardless of immigration status.*

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—*_including U.S. citizens and authorized noncitizens_*—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.//

· *The proposed rule **will expand the unregulated underground cash economy.*

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the *_unregulated underground cash economy_* which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad"

employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

* *

· *This proposed rule is an end-**run around the legislative process. *

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of *_comprehensive immigration reform_.* The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

* *

· *The SSA no-match letter program is ill-suited as a tool for immigration enforcement.*

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is _not_ indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

· *The proposed rule is an **erosion of our privacy rights. *

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

· *The costs of implementing the proposed rule are prohibitive.*

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

· *The proposed rule is objectionable because compliance is impractical. *

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Angelica Salas

Coalition for Humane Immigrant Rights of Los Angeles - CHIRLA
2533 W. 3rd Street, Suite 101
Los Angeles, CA 90057
(213) 353-1333
(213) 353-1344
asalas@chirla.org

**From:** Anita Drummond [mailto:Drummond@abc.org]
**Sent:** Monday, August 14, 2006 5:37 PM
**To:** Regs, Rfs
**Cc:** Denise Gold; knottk@agc.org; jjohnsonbennett@masoncontractors.org; Hamilton, Jenna; Owen Tonkins; csilvertooth@nrca.net; Coulson@naphcc.org
**Subject:** DHS Docket No. ICEB-2006-0004

The following organizations are submitting the attached comments to the Department of Homeland Security:

Associated Builders and Contractors
Associated General Contractors of America
Mason Contractors Association of America
National Association of Homebuilders
National Association of Minority Contractors
National Roofing Contractors Association
Plumbing-Heating-Cooling Contractors Association

Anita Drummond, Esq.
Director of Legal and Regulatory Affairs
Associated Builders and Contractors, Inc.
4250 North Fairfax Drive, 9th Floor
Arlington, VA, 22203
(703) 812-2000
Fax (703) 812-8202
drummond@abc.org

**From:** Art Read [mailto:aread@friendsfw.org]
**Sent:** Monday, August 14, 2006 1:49 PM
**To:** Regs, Rfs
**Subject:** Comments on Docket No. ICEB-2006-0004 "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"

August 14, 2006

To:

      Director, Regulatory Management Division,
      U.S. Citizenship and Immigration Services,
      Department of Homeland Security,
      111 Massachusetts Avenue, NW, 2nd Floor,
      Washington, D.C.  20529

Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"

Attached please find:  Social Security_2006-08-14.pdf with comments from Friends of Farmworkers, Inc.

-----------------------------------------------
From:
Arthur N. Read
General Counsel
Friends of Farmworkers, Inc.
924 Cherry Street, 4th floor
Philadelphia, PA 19107-2411
Telephone:  (215) 733-0878 ext. 150
Fax:    (215) 733-0876
Email:  aread@friendsfw.org
Web:   http://www.Friendsfw.org/



**FRIENDS OF FARMWORKERS, INC.**
*Legal Services for Farmworkers*

924 Cherry Street, 4th floor
Philadelphia, PA 19107-2411
*E-mail: aread@friendsfw.org*

Telephone: (215) 733-0878
(800) 729-1607
Fax: (215) 733-0876
Direct: Arthur N. Read (215) 733-0878, ext. 150

August 14, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers
Who Receive a No-Match Letter"

Dear Sir or Madam:

Friends of Farmworkers, Inc. submits the following comments in response to the request for
public comment by the Department of Homeland Security (DHS), Bureau of Immigration and
Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who
Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

Friends of Farmworkers, Inc. is a legal service organization founded in 1975 which provides
assistance, representation, and education on legal rights to low wage farm workers, mushroom
workers, food processing workers, and workers from immigrant and migrant communities
throughout Pennsylvania, principally in matters related to their employment and housing.

Friends of Farmworkers has had significant experience in dealing with the adverse impact that
the Social Security Administration's (SSA) no-match letters have had on all workers in the
United States–immigrant and native-born alike.

It is our experience that many employer payroll records for individuals from Latin American
countries where the mother's last name is a part of the full name for individuals often have
inconsistencies in the names of workers. We are currently engaged in a federal class action
lawsuit on behalf of Mexican and Guatemalan workers lawfully employed as H-2B temporary
workers and have received discovery information from the employer and its recruiter in Mexico
for thousands of workers that demonstrate the frequent inaccuracy in these records. Our review
of those records further reflects that since the date of birth in Latin American most often is in the
format of month-date-year rather than date-month-year those payroll records frequently
inaccurately record the date of birth as well.

**No-Match Cert. Admin. Record  1400**

**Friends of Farmworkers, Inc.**
**August 14, 2006**
**Page** 2

We have encountered work places where social security no match letters have immediately jeopardized employment of large numbers of individuals from Latin American countries and would urge you to be very cautious in adopting regulations that encourage such practices when the no match might well be caused by complete innocent inconsistencies in records.

For several years we represented a union in the mushroom industry, where the union fought unsuccessfully for collective bargaining protections to prevent employers from discharge of worker because of social security no-match letters without a procedure for determining if the asserted problem was based upon erroneous facts or administrative problems which could be readily cured.

As a result of this experience, Friends of Farmworkers is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, the rule will have no impact on undocumented immigration. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

•    This proposed rule will harm all workers regardless of immigration status.

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—including U.S. citizens and authorized noncitizens—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to

**Friends of Farmworkers, Inc.**
**August 14, 2006**
**Page** 3

use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- The proposed rule will expand the unregulated underground cash economy.

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the unregulated underground cash economy which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- This proposed rule is an end-run around the legislative process.

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- The SSA no-match letter program is ill-suited as a tool for immigration enforcement.

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- The proposed rule is an erosion of our privacy rights.

**Friends of Farmworkers, Inc.**
**August 14, 2006**
**Page 4**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- The costs of implementing the proposed rule are prohibitive.

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- The proposed rule is objectionable because compliance is impractical.

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Very truly yours,

Arthur N. Read
General Counsel

**From:** Austin Perez [mailto:austinp@fb.org]
**Sent:** Monday, August 14, 2006 5:00 PM
**To:** Regs, Rfs
**Subject:** Docket No. ICEB--2006--0004: Proposed rule; Safe-Harbor Procedures for Employers Who Receive a No-Match Letter

This is a duplicate of comments submitted by Lauren Airey at 4:58 PM EST to ensure receipt. Please let me know if there are any questions.  -a

Austin Perez
Director, Congressional Relations
American Farm Bureau Federation

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
DHS Docket No. ICEB—2006—0004
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

> **Subject:  Proposed Rule; Safe-Harbor Procedures for Employers Who Receive a No-Match Letter, 71 Fed. Reg. 34281 (June 14, 2006)**

To Whom It May Concern:

The American Farm Bureau Federation (AFBF) appreciates the opportunity to offer the following comments on the above referenced proposed rule.

Under current law, it is illegal for a U.S. employer *knowingly* to hire or continue to employ a person who is not authorized to work in the United States (8 USC 1324a).  "Knowing" is a term defined in current regulations that goes beyond actual knowledge to include that "which may fairly be inferred through notice of certain facts and circumstances which would lead a person, through exercise of reasonable care, to know about a certain condition" or, in other words, to have  "constructive knowledge" (8 CFR 274a.1(l)).  The proposed rule would further define this second category or "constructive knowledge" to provide that employers would become subject to a finding upon failing to take reasonable steps after receiving written notice from either the Social Security Administration (SSA) or the Department of Homeland Security (DHS) that a wage report or document does not match agency records.  The rule also describes a set of "reasonable steps" employer may take to avoid a finding of constructive (but not actual) knowledge; employers following the outlined steps would obtain a "safe harbor" from prosecution over a finding of "constructive knowledge."

AFBF commends DHS for proposing a safe harbor for employers who do not knowingly employ unauthorized workers.  For more than a decade, the SSA "no-match" notice has raised questions about an employer's obligations under the employment authorization provisions of immigration law after that employer has taken all appropriate steps to verify employment eligibility.  U.S. agriculture has repeatedly requested guidance on whether and how an employer is to respond to such a notice without putting the employer in legal jeopardy due to the employer's obligation under anti-discrimination provisions of the same law (8 USC 1324b).  In part, this proposed rule represents an attempt to address those concerns and provide employers with guidelines in hiring and firing decisions.  We appreciate DHS efforts.  Unfortunately, there are a number of situations – many of which are unique to the agricultural sector – that may not have been fully considered during development of the safe harbor provisions.  With these comments, we identify such situations and strongly urge that the final regulation incorporate our recommended changes to ensure that the safe harbor provisions are equally available to all employers and all parts of agriculture.

**Apply the Safe Harbor to Seasonal Employers**

The proposed rule states that employers would be deemed not to have constructive knowledge and thus obtain a safe harbor from prosecution if the employers take the following steps in response to a no-match notice.  Upon receiving notice, employers would have 14 days to check records and report to SSA or DHS

regarding any necessary corrections or, if records cannot be corrected, to instruct the worker to go to the local SSA or DHS office to fix the problem. A Social Security mismatch would not be resolved until the employer has first verified the new information with SSA. If the employee does not return with new or corrected information within 60 days of the employer's receipt of the mismatch letter, the employer then has three days to complete a new Form I-9. When completing a new form, the employer would not be allowed to use documents containing the Social Security or alien identification number that was subject to the earlier no-match notice. At the same time, no document without a photograph could be used to establish identity or identity and employment authorization. (71 Fed. Reg. 34285.)

Our reading of the proposed regulation is that each step would need to be followed as spelled out in the rule in order for the employer to become eligible for the safe harbor. This is important because while DHS acknowledges that there may be other reasonable steps that could lead to a safe harbor, the employer, in following procedures other than the ones outlined in the rule, could "face the risk that DHS may not agree" (71 Fed. Reg. 34283). The practical effect of this approach could have a significant detrimental effect on seasonal employers and effectively vitiate the protections of the safe harbor for a large segment of agriculture. <u>One set of employers should not be given the certainty of a prescribed safe harbor while another is forced to define one on a case-by-case basis with DHS approval; seasonal employers should not be denied the benefit of safe harbor provisions just because their business is seasonal in nature.</u>

There are several situations, in which an agricultural employer may not be able to take all of the required steps to obtain the safe harbor, including:

1) <u>Single season workers</u>. While timing will vary with crop, season, and other criteria, seasonal farmers (in the Midwest, for example) generally submit wage reports to the IRS (Forms W-2) in February for employees who were employed during the previous harvest season and, in most instances, are no longer employed. Should a report on such an employe generate an SSA no-match notice, such a notice in all likelihood would not be sent to an employer until late winter or the following spring – well over a year since the individual was employed. In many instances, such employees do not return to the original place of employment. For those who do, depending on crop and nature of work, such employees would not be re-hired until 14, 60, or 63 days after the employer has received the notice. Further, many farm workers may "follow the crops" by migrating from state to state, and these workers may not permanently reside locally. Few such workers leave forwarding information since the prevailing practice is to terminate, not layoff, the worker between seasons. While the employer could meet the safe harbor requirement to check his or her records, the employer would not be able to meet the other requirements. The employer would not be able to reach employees despite making every reasonable effort. We strongly believe that these employers should not be denied the safe harbor for reasons that are beyond employer control. *Recommendation: We urge DHS to clarify in the final rule that the safe harbor extends to employers who, in addition to meeting the requirement to check records, can document attempts to reach a former employee who is the subject of a no-match notice.*

2) <u>Off-season workers</u>. As stated in 1) above, some workers listed on a previous no-match notice may not be re-hired until 14, 60, or 63 days after the employer has received the notice. Few farm workers leave forwarding information and therefore may not be reachable off-season. *Recommendation: If an employee who is subject to a previous no-match notice returns in a following season, we would recommend that the clock start ticking on the first day of re-hire after receipt of the notice. For off-season workers who fail to return in a subsequent season, we would offer the same recommendation as stated in 1) above.*

2

3) <u>Short season workers</u>. The duration of a season may vary widely across the United States depending on crop and location. For example, in the state of Washington, approximately 75,000 migrant and seasonal workers are employed each year on small family-owned farms; many of these workers are employed for periods as short as two weeks. Under these circumstances, an employer may be able to check records, ask the employee to confirm those records and in the event there are no errors, instruct the employee to follow up with SSA or DHS all within 14 days. But, if the employee migrates from crop to crop, there may not be an opportunity for the employee to resolve the issue with SSA or DHS within the 60 days prescribed by the rule. Once the employee has moved on, there would not be an opportunity for the employer to take the next step, which is to complete a new Form I-9. *Recommendation: The 14-, 60-, and 63-day periods should toll only while the employee is employed with the employer. For example, if the employee moved on to the next crop on day 15, the clock would stop. Upon re-hire in the next season, the clock would re-start and the employee would have 45 days (for a total of 60 days) in which to follow up with DHS or SSA and report any corrections to the employer. Again, for short season workers who fail to return in a subsequent season, we would offer the same recommendation as stated in 1) above.*

All of the above examples pertain to situations in which an employer is not able to follow every one of the necessary steps to obtain the safe harbor. The reverse situation could also occur: The employer follows every step outlined in the regulation but the no-match issue is not resolved.

1) <u>Wage Report Mismatch</u>. For I-9 Form purposes, an employee may provide documents that do not contain a Social Security or alien identification number – a birth certificate and driver's license with a photograph, for example. But because the employer has submitted a Form W-2, the employer may receive a no-match notice from the SSA if there are sufficient numbers of mismatches. It is not clear from the proposed rule whether the employer could simply re-use the same documents on the new Form I-9 in this instance. It is also not clear whether the employer would be held liable if the employee writes in Section 1 of the new form a Social Security number that is the subject of a notice but does not provide a Social Security card. *Recommendation: DHS should clarify whether an employer would be deemed to have constructive knowledge under these circumstances; if so, DHS should specify the employer's legal obligations under immigration law including the anti-discrimination provisions (8 USC 1324b).*

2) <u>Multiple Season Mismatches</u>. An employer may take every step outlined in the proposed rule, up to and including completing a new I-9 Form, yet receive a no-match notice next season. During a two-week harvest when producers are working nearly round the clock to harvest a perishable crop in a short time-frame when every day is precious, it may be difficult for larger seasonal employers (e.g., 500-750 employees) to keep track of every one of the returning employees. Even if the employer recognizes and can keep track of every single worker, the rule does not appear to preclude the employer from obtaining the safe harbor if the employee keeps responding with new information to each document request. For example, an employee might provide one Social Security card the first year which triggers a no-match notice the following year, provide another Social Security card in the second year in response to the original notice which cannot be verified with SSA in 60 days and then provide yet a third Social Security card for the new I-9 Form between day 61 and day 63. *Recommendation: DHS should clarify whether an employer under these circumstances could still obtain the safe harbor from a constructive knowledge finding. If so, DHS should clarify whether it would deem such employer as having actual knowledge of the worker's unauthorized status.*

3

Many farmers hire and pay an independent contractor to provide workers during the season, with the understanding that the contractor will be the employer for all purposes, including employment eligibility verification. Yet the Department of Labor could determine that both the farmer and the contractor are "joint employers" under the Fair Labor Standards Act (29 USC 201 *et seq.*) or the Migrant and Seasonal Agricultural Worker Protection Act (29 USC 1801 *et seq.*). However, it is not clear from the rule whether the farmer or the contractor would have to obtain the safe harbor to avoid prosecution. *Recommendation: DHS should clarify the employer's obligations under immigration law relative to the agricultural joint employment standards.*

Some seasonal agricultural employers hire non-immigrants with a temporary work authorization (e.g., under the H-2a program) or immigrants with permanent work authorization. The proposed rule expressly identifies a "labor certification or application for prospective employer" as information that could prompt a constructive knowledge finding. But while the rule would describe the steps for an employer to take upon receipt of written notice from SSA or DHS over a wage report or document, it does not include any steps for a labor certification. An employer should not be denied the certainty of a prescribed safe harbor just because the employer hires a worker requiring a labor certification. *Recommendation: DHS should specify a safe harbor for employers of workers requiring a permanent or temporary labor certification.*

### Apply the Safe Harbor to Hiring Decisions

In the notice of proposed rulemaking, DHS expressly states that following the safe harbor requirements "will eliminate the possibility that DHS … will allege, based on the totality of relevant circumstances, that an employer had constructive knowledge that it was employing an alien not authorized to work in the Unites States" (71 Fed. Reg. 34282). However, it is not clear whether the safe harbor would also apply to hiring decisions.

As outlined above, there are several reasons why an employer would be prevented from meeting all of the steps necessary to obtain the safe harbor. A good example is when the worker quits: some employees, when confronted with the no-match notice, will quit without offering a reason. The employer would have checked his or her records and found no errors, meeting the first step. He or she may be asking the employee to confirm records or instructing the employee to follow up with SSA or DHS, which is the second step. Nevertheless, the employee would fail to respond within 60 days (the third requirement), and the employer would not be able to comply with the final requirement to fill out a new I-9 Form within 63 days.

While we are confident that DHS would not prosecute this employer for continuing to employ the worker (after all, the employee quit in this instance), there is still a question as to whether the employer's receipt of the no-match letter would still be grounds for a finding that the employer had constructive knowledge of hiring an unauthorized worker. A reasonable person might infer from the worker quitting that the worker is avoiding detection as an unauthorized worker.

However, we do not believe a constructive knowledge finding can or should be imputed to an employer merely based on the fact that the employer has received a no-match notice. Because the worker did not offer a reason for quitting, the employer could not have actual knowledge that the worker quit to avoid detection. And if the employer had properly completed the Form I-9, the employer would not have reason to suspect that the employee was not employment eligible.

*Recommendation: We recommend that DHS clarify that the safe harbor would apply to previous hiring decisions under these circumstances.*

4

**Extend the 14- and 60-Day Deadlines**

Under the proposed rule, upon receiving notice employers would have 14 days to check records and report back to SSA or DHS or instruct the worker to follow up directly with SSA or DHS. If the employee does not return with corrected information within 60 days, the employer would then have three days to complete a new Form I-9. (71 Fed. Reg. 34285.)

In the agricultural sector, more than 90 percent of operations are family owned and operated. The size of the operation may vary from a single hired worker up to 500 or more workers. Some operate year round while others plant, cultivate or harvest during seasons that may range from as few as two weeks to as many as 48 weeks a year. For example, in Washington, where there are approximately 75,000 seasonal and migrant workers employed each year on small family farms, many are employed for periods as short as two weeks. At a typical operation, one office person will hire more than 100 workers at one time.

On the farm, the grower's spouse often constitutes the "Human Resources Department" and the spouse may not work full time. Access to a computer or to a local branch of SSA or DHS may be limited in more remote areas of the country. Mail may not be processed at a frequency greater than once a week or the notice might arrive when the grower is off-season, on vacation or at a trade conference. While employers with a dedicated H.R. department and staff may be able to check and correct records or notify the employee within 14 days, not every agricultural employer would be able to do so. *Recommendation: We recommend extending the timeframe for the first deadline (in which an employer must check, correct or inform) to at least 30 days.*

Similarly, 60 days may be too short a time period for farm workers to comply with the second requirement (to respond with new or corrected information). On a grape farm in New York state, for instance, the workers are working nearly round-the-clock for about two months in the spring and about three months solid in the fall between harvest, crushing, fermenting, and subsequent "cellaring." Asking them to take a long time out to drive to the nearest SSA office may not be completely practical. *Recommendation: DHS should extend the second deadline to at least 90 days.*

**Address Discrimination Issues**

The current regulatory definition of "knowingly" includes the following provision:

> "Nothing in this definition should be interpreted as permitting an employer to request more or different documents than are required under [8 USC 1324a(b)] or to refuse to honor documents tendered that on their face reasonably appear to be genuine and to relate to the individual." 8 CFR 274a.1(l)(2).

In the proposed rule, DHS adds a clause to this provision to exclude documents that are subject to a no-match notice: ", except a document about which the employer has received a notice described in paragraph (l)(1)(iii) of this section and with respect to which the employer has received no verification as described in paragraph (l)(2)(i)(B) or (l)(2)(ii)(B)." The proposed rule would not address the anti-discrimination provisions under Title VII of the 1964 Civil Rights Act ("Title VII") (42 USC 2000e-2).

AFBF applauds DHS for attempting to provide employers with some certainty in their hiring and firing decisions, beyond the limited protection afforded by completing an I-9 Form. Under current law, an employer who is not sufficiently aggressive in examining documents would run the risk of violating the employment authorization provisions of immigration law (8 USC 1324a). But, by being too aggressive, the same employer would run the risk of violating the anti-discrimination provisions in the same law, and

5

there have been more growers charged with discrimination under the immigration law than with employer sanctions. Excluding no-match documents from anti-discrimination provisions would make it much easier for employers to meet the employer authorization provisions.

*However, AFBF strongly urges DHS to make whatever changes to the proposed rule necessary to ensure the rule will not lead to additional discrimination lawsuits under Title VII.* For decades, agriculture has been plagued with nuisance suits, the purpose of which has been not necessarily to win on the merits but to outspend the grower so as to make an example for the wider agricultural community. If the legal and social costs are high enough, farmers will settle instead. The questionable tactics of these lawyers have been well documented in Rael Jean Isaac's Harvest of Injustice (please see http://www.nlpc.org/harvest.asp). For a more recent example, please see *Malacara v. Garber* (5th Cir. December 9, 2003) (LSC-funded lawyers sued a 70-year-old Ohio vegetable farmer under a Federal law that did not even apply to small family farmers; the farmer won in lower court and at appeal but it cost him more than $100,000 of his hard-earned money to prove the complaint lacked merit.). If history is any indication, we would expect activist attorneys to test the boundaries of the proposed rule in court, and agricultural employers are the most likely test subjects; agriculture should not have to pay additional legal expenses because the proposed rule fails to address considerable legal issues.

There also may be legal arguments against the rule in its proposed form.

For example, the Tenth Circuit Court of Appeals in *Zamora v. Elite Logistics, Inc.* (10th Cir. June 6, 2006) recently reversed a lower court decision for the employer and let a Title VII national- origin claim go to a jury. The employer was acting on a tip he could have received from DHS (i.e., an employee was using a Social Security number for I-9 Form purposes that another had used multiple times in another state). He responded by taking precisely the step required to qualify for the safe harbor (i.e., the employer requested another document). The safe harbor would not protect employers from Title VII. And all some lawyers need is an argument, not even a strong one, to compel growers to settle. If DHS does not adequately address these issues, it will defeat the purpose of the proposed rule, which is to facilitate compliance with 8 USC 1324a.

**Clarify whether name or number trigger constructive knowledge finding**

Employers would be subject to a constructive knowledge finding if failing to take reasonable steps upon receiving written notice from SSA that the "combination" of name and Social Security number does not match agency records. But SSA has sent several forms of the no-match letter in the past; one takes the form of a simple list of numbers with no corresponding identifying names. If the employer receives this form of the letter, one could not conclude that the name also mismatches agency records. It appears that both the name and the number must not match to become subject to the rule. *Recommendation: DHS should clarify precisely what is meant by a "combination" mismatch.*

**Apply the Final Rule Prospectively**

The proposed rule does not stipulate when the regulation would apply to employers. Given the many resource and other issues that are unique to agriculture, we would not support applying the rule on a retroactive basis. *Recommendation: DHS should apply the rule prospectively from its effective date.*

**Delay the Final Rule Pending Congressional Efforts**

Both the U.S. Senate and House of Representatives have approved separate legislation (S. 2611 and H.R. 4437) that would address many of the same issues addressed in this proposed rule and reform of this part of the law is a high priority for the Administration. Thus, it is possible that there may be new law

6

respecting exactly these matters before the end of the year. Farmers do not want to be in position of having to change their operating procedures twice – once to accommodate this proposed rule and once again to accommodate a subsequent rule prompted by a new immigration law. Employers require certainty in Federal regulations in order to continue to grow and thrive.

While we recognize that employers need not use the safe harbor, if employees are not able to present documents consistent with the proposed rule, employers will be compelled to terminate those workers or risk a constructive knowledge finding and prosecution. AFBF has conducted an extensive economic study of the immigration impacts on agriculture. The study shows that of all the sectors of the U.S. economy, domestic agricultural production could be most severely and disproportionately affected on the order of $5 to $9 billion annually if labor restrictions take effect before growers have access to an adequate legal workforce. Federal surveys suggest that between a high percentage of agriculture's hired workforce may lack proper documentation, and we have already mechanized to a large extent. We would somehow have to replace those workers at a time when few Americans have shown a willing to take farm jobs. The impact of this proposed rule could be devastating, prompting many farmers to raise their prices at a time when the United States is opening its produce markets to significant foreign competition under North and Central American Free Trade Agreements.

*Recommendation: We strongly urge DHS to postpone further action on a final regulation until Congress acts on this issue.*

**Conclusion**

AFBF appreciates the opportunity to comment on this proposed rule and would be happy to assist you in any way we can. Please feel free to contact me or Austin Perez at 202-406-3669 (austinp@fb.org) if you have any questions or require additional information.

Sincerely,


Mark Maslyn
Executive Director
Public Policy


V:\stm\labor-immigration06.814

No-Match Cert. Admin. Record  1411

**From:** Barry Bedwell [mailto:bbedwell@cgtfl.com]
**Sent:** Monday, August 14, 2006 11:58 AM
**To:** Regs, Rfs
**Cc:** Gabrielle Kirkland
**Subject:** Comments in re: Social Security Mismatch

August 14, 2006

<u>VIA ELECTRONIC MAIL</u>

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

Re:     Docket No. ICEB-2006-0004
        **Safe Harbor Procedures for Employers Who Receive a No-Match Letter**
        **(FR 71:114, p. 34281)**

To Whom It May Concern:

On behalf of the membership of the California Grape and Tree Fruit League, a voluntary public policy association that represents by volume approximately eighty-five percent of the fresh table grape and deciduous tree fruit production in the state, we would like to state our serious concern for the current proposal dealing with mismatched social security numbers. We respectfully request that you reference, in its entirety, the comments filed by the National Council of Agricultural Employers (NCAE) which accurately represents the views of our membership. Thank you for this opportunity to comment and please do not hesitate to contact us should you have any questions.

*Barry J. Bedwell*
President
**California Grape & Tree Fruit League**
(559) 226-6330 office
(559)222-8326 fax
(559)288-7022 cell
bbedwell@cgtfl.com
www.cgtfl.com

**From:** Bob Bacon [mailto:BBacon@tasconcrete.com]
**Sent:** Friday, August 11, 2006 11:28 AM
**To:** Regs, Rfs
**Subject:** DHS proposed regulation on homeland security - Docket No. ICEB-2006-004

August 11, 2006

Director Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue N.W. 2nd Floor
Washington, D.C. 20529

Re:  New proposed rules regarding Employee Verification Procedures
     DHS Docket No. ICEB-2006-004

Dear Director:

Our company performs commercial concrete construction work in and around the Houston and Dallas-Ft Worth metropolitan area.  We appreciate the opportunity to comment on the proposed rules regarding Employee Verification Procedures.  We believe strongly that immigration laws should be followed and enforced.  We also believe that the responsibilities placed on employers to assist in the enforcement of these laws should be fair, reasonable and not unduly burdensome.

We recently learned of the new proposed rule changes and are trying to assess the impact of those changes on our company and its ability to both comply with the new rules within the timelines set out in the rules and at the same time perform the work required under our contractual obligations. Many other companies in our area are also just beginning to review the rules as well and to assess their impact.

At this time, we respectfully request that the Department of Homeland Security extend the time for comment on the rules by 120 days in order for companies such as ourselves to adequately comment on the rules.  We have been operating under the current rules for the past 20 years and to allow only a 60 day window to comment is insufficient to allow careful and thoughtful review. In addition, both the Senate and the House of Representatives have passed legislation dealing with this subject which will likely impact any proposed or existing rules.

Regarding the proposed rules, and having a limited amount of time to thoroughly review the rules, we would make the following preliminary observations:

1) 14 days may be sufficient to respond to a SSA no-match regarding a single social security number, but it is grossly insufficient to respond to a large number on no-match letters or a long list.

2) Deciding on how and whether to compensate employees for time to go to the social security administration is also an issue to be resolved.  Margins continue to be thin in our business, and employees have little time to spare on their own.  Large numbers of employees doing this all at the same time would be intrusive and expensive.

3) Rechecking files for large numbers of no-match letters can take many weeks. Once it is determined that there is no error on our part, it can take several more weeks to prepare and distribute letters to the 150 or more job sites where any one of our 900 employees could be working. Then, there is the question of how long the wait would be for each to get in to see the SSA and how long it might take SSA to check or correct its records. Limiting the time for this whole process to 60 days is likely to result in hundreds of thousands, if not millions, of terminations throughout the nation, rightly or wrongly. In addition, more administrative people would need to be hired to handle the rush involved in this whole process. In the meantime, companies would be in somewhat of a state of limbo regarding new business while waiting to find out how many no-match employees would be able to resolve the problem.

4) Implementation of the proposed rule is likely to cause immediate and massive labor shortages, far beyond the severe labor shortages that exist today. Numerous defaults on existing construction contracts -- all which were entered into under the current rules – will follow throughout the construction industry. Many businesses will find themselves with a large percentage of their workforce unable to obtain proper documentation in the allowed time period so will be forced to default on contracts, close their doors, and/or raid other companies for properly documented workers. New construction will grind to a hault throughout much of the nation with the entire construction industry in disarray and unable to take on new business.

Our company respectfully requests that you extend the time allowed for comment on the proposed rules. Alternatively, we would ask that you consider our preliminary comments on the proposed rules and make changes to these rules.

Sincerely,

Bob Bacon

Executive Vice President,
TAS Commercial Concrete Construction, L.P.

**From:** Eugene-Springfield Solidarity Network [mailto:essn@efn.org]
**Sent:** Friday, August 11, 2006 2:21 PM
**To:** Regs, Rfs
**Subject:** Docket_No._ICEB-2006-0004

Please find our comments regarding Docket_No._ICEB-2006-0004 in the attached document.

---
Eugene-Springfield Solidarity Network/ Jobs with Justice
PO Box 10272
Eugene, OR  97440
phone: (541) 736-9041
email: essn@efn.org
http://www.solidaritynetwork.org



EUGENE-SPRINGFIELD

SOLIDARITY NETWORK

August 11, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:* ***DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"***

Dear Sir or Madam:

The Eugene/Springfield Solidarity Network/Jobs with Justice submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The Eugene/Springfield Solidarity Network/Jobs with Justice is a non-profit organization advocating for the rights of working people. We work to protect the economic rights of all working people, especially the right to a decent standard of living, the right to a stable job and the right to organize. We are very concerned about the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States–immigrant and native-born alike.

The Eugene/Springfield Solidarity Network/Jobs with Justice is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We

Eugene-Springfield Solidarity Network/ Jobs with Justice     essn@efn.org
PO Box 10272, Eugene OR 97440     (541) 736-9041     www.solidaritynetwork.org

**No-Match Cert. Admin. Record 1416**

therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform.** The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration

Eugene-Springfield Solidarity Network/ Jobs with Justice     essn@efn.org
PO Box 10272, Eugene OR 97440     (541) 736-9041     www.solidaritynetwork.org

**No-Match Cert. Admin. Record  1417**

status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all

Eugene-Springfield Solidarity Network/ Jobs with Justice          essn@efn.org
PO Box 10272, Eugene OR  97440          (541) 736-9041          www.solidaritynetwork.org

**No-Match Cert. Admin. Record  1418**

these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,


Claire Syrett
Organizer



Eugene-Springfield Solidarity Network/ Jobs with Justice          essn@efn.org
PO Box 10272, Eugene OR  97440          (541) 736-9041          www.solidaritynetwork.org

**No-Match Cert. Admin. Record  1419**

**From:** Carole Angel [mailto:cangel@legalmomentum.org]
**Sent:** Monday, August 14, 2006 4:48 PM
**To:** Regs, Rfs
**Cc:** Leslye Orloff; Carole Angel
**Subject:** DHS Docket No. ICEB-2006-0004
**Importance:** High

Comments to Notice of Proposed Rulemaking, "Safe Harbor Procedures for Employers Who Receive a No-Match Letter," DHS Docket No. ICE B-2006-0004

Dear Sir or Madame:

Legal Momentum submits the **attached comments** to the proposed rule published on June 14, 2006 by the Bureau of Immigration and Customs Enforcement of the Department of Homeland Security, "Safe Harbor Procedures for Employers Who Receive a No-Match Letter," **DHS Docket No. ICEB-2006-0004.** The proposed rule would make changes in existing regulations regarding the way employers respond to mismatch letters from the Social Security Administration or the Department of Homeland Security.

Sincerely,

Carole Angel

**Carole Angel**
Staff Attorney
Immigrant Women Program
Legal Momentum: Advancing Women's Rights
1522 K St., NW, Suite 550
Washington, D.C. 20005
Tel:  202-326-0041
Fax: 202-589-0511
cangel@legalmomentum.org



**LEGAL**
**momentum**
Advancing Women's Rights

Director, Regulatory Management Division
U.S. Citizenship and Immigration Service
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

Re: Comments to Notice of Proposed Rulemaking, "Safe Harbor Procedures for Employers
Who Receive a No-Match Letter," DHS Docket No. ICE B-2006-0004

Dear Sir or Madame:

Legal Momentum submits the following comments to the proposed rule published on June 14,
2006 by the Bureau of Immigration and Customs Enforcement of the Department of
Homeland Security, "Safe Harbor Procedures for Employers Who Receive a No-Match
Letter," **DHS Docket No. ICE B-2006-0004.** The proposed rule would make changes in
existing regulations regarding the way employers respond to mismatch letters from the Social
Security Administration or the Department of Homeland Security.

Legal Momentum supplies legal analysis and co-chairs the National Network to End Violence
Against Immigrant Women, a group comprised of over 3,000 professionals nationwide
including police, sheriffs, district attorneys, district attorneys, probation officers, prosecutors,
health providers, churches, rape crisis centers, domestic violence shelters, mental health
professionals, child protective services workers, and immigrant rights' groups. The Network's
members are all joined by a common purpose – working towards the eradication of all forms
of violence perpetrated against immigrant women and children including domestic violence,
sexual assault, human trafficking and stalking. We are submitting these comments on our own
behalf.

In 1994 Congress enacted the Violence Against Women Act (VAWA), the first federal law
devoted to eradicating domestic violence. In VAWA, Congress created special immigration
relief for undocumented victims of family violence so that they could self-petition for
permanent residency without having to rely on the batterers' sponsorship. In VAWA 2000
Congress augmented these protections by creating new visas for victims of sexual assault,
trafficking or other violent crimes. These new visas were granted on the condition that
victims assist law enforcement in criminal investigations or prosecutions. Building on the
two previous versions of VAWA, in 2005 Congress extended immigration relief to greater
numbers of victims and expanded the scope of services available to undocumented victims by

Legal Momentum is the new name of NOW Legal Defense and Education Fund
1522 K Street, NW Suite 550 Washington, DC 20005 Tel 202.326.0040 Fax 202.589.0511 www.legalmomentum.org
**No-Match Cert. Admin. Record 1421**

eliminating some of the major obstacles immigrant crime survivors face in achieving safety and legal immigration status.

With the enactment of VAWA 2005, Congress demonstrated its desire that victims of sexual assault, trafficking, domestic violence and other crimes be protected yet these proposed regulations could have the opposite affect. Many of the victims who qualify for relief under VAWA will be swept up by this proposed regulation and will be prevented from accessing the relief Congress had intended for them. Many of these victims may be deported under this regulation while they are still in the process of accessing the relief or before they may know that they are eligible for relief. Clearly this is not what Congress intended.

Furthermore, many undocumented victims of domestic violence lack lawful papers and work authorization precisely because the batterer has refused to sponsor them for permanent residency. Spouses and children of U.S. citizens and permanent residents are entitled to seek permanent residency if the U.S. citizen or permanent resident submits an immigration application on their behalf. However, many abusive U.S. citizens or permanent residents intentionally refuse to file immigration applications so that they can hold the threat of deportation over the victim's head and prevent them from working. Economic independence is critical to a victim's ability to leave the abusive situation. The proposed rule gives the control back to the perpetrator, undermining the intent of Congress and working against the administration of justice.

Comprehensive immigration reform is critical to provide a pathway to legalization and economic independence for the approximately 3 million undocumented women and 1.7 million undocumented children in the U.S. These women are filling essential gaps in the labor market while enduring workplace exploitation, sexual harassment, low wages and poor working conditions. These women are also filling essential gaps in U.S, family life by working as our children's nannies, our elderly parents' caregivers and our gardeners. And these women live in the shadows of U.S. society where many are subject to violent crimes inside and outside their homes. Yet they cannot report these crimes to the police for fear of being deported. While forced to live in the shadows of society, these women remain physically separated from their children and family members living abroad. Others, desperate to be reunited with their families in the U.S, are risking their lives by being smuggled into the U.S.

We believe that a better way to regulate in this area is to wait for Congress to enact comprehensive immigration reform legislation later this year. Bills that have passed both houses of Congress are currently before a conference committee. President Bush, White House officials and Department of Homeland Security officials have all endorsed comprehensive immigration reform. But by promulgating piece-meal immigration regulation in the absence of a broader bill, the Department of Homeland Security may foreclose options for a more comprehensive approach and complicate the job of Congress. Even worse, the new regulations could produce needless duplication and confusion were Congress to take a different approach to the subject of employer verification.

Based on the foregoing reasons, we request that the Department of Homeland Security withdraw this proposed rule and await the enactment of comprehensive immigration legislation.

Respectfully submitted,

/S/

Leslye E. Orloff
Associate Vice President and Director, Immigrant Women Program
Legal Momentum

Legal Momentum is the new name of NOW Legal Defense and Education Fund
1522 K Street, NW Suite 550 Washington, DC 20005 Tel 202.326.0040 Fax 202.589.0511 www.legalmomentum.org

No-Match Cert. Admin. Record 1423

**From:** R. Craig Silvertooth [mailto:csilvertooth@nrca.net]
**Sent:** Monday, August 14, 2006 5:03 PM
**To:** Regs, Rfs
**Cc:** Craig Brightup; William Good; R. Craig Silvertooth; Stephen M. Phillips
**Subject:** DHS Docket No. ICEB-2006-2004
**Importance:** High

Dear Director:

Please find attached NRCA's comments on DHS Docket No. ICEB-2006-2004.

Thank you,
Craig Silvertooth

R. Craig Silvertooth
Director of Federal Affairs
National Roofing Contractors Association
324 Fourth Street, N.E.
Washington, D.C. 20002
Tel: (202) 546-7584
Fax: (202) 546-9289



NATIONAL
ROOFING
CONTRACTORS
ASSOCIATION

Washington Office
324 Fourth Street, N.E.
Washington, D.C. 20002
202/546-7584
FAX: 202/546-9289
http://www.nrca.net

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N.W.
2nd Floor
Washington, D.C. 20529
*Sent via Electronic Mail*

Re:    DHS Docket No. ICEB-2006-0004, regarding "Safe Harbor Procedures for Employers Who Receive a No-Match Letter"

Dear Director:

On behalf of the National Roofing Contractors Association ("NRCA"), thank you for the opportunity to provide comments on the Department of Homeland Security's ("DHS") proposed rule cited above.

Established in 1886, NRCA is one of the construction industry's oldest trade associations and the voice of professional roofing contractors worldwide. NRCA is an association of roofing, roof deck, and waterproofing contractors; industry-related associate members, including manufacturers, distributors, architects, consultants, engineers, and city, state, and government agencies; and international members. NRCA has approximately 4,000 members from all 50 states and 54 countries and is affiliated with 105 local, state, regional and international roofing contractor associations.

**Background**

NRCA submits these comments in response to the June 14, 2006, *Federal Register* notice published by DHS, in which the Department proposes to alter existing regulations on how employers are expected to respond to "no-match letters" from the Social Security Administration ("SSA") or DHS.

DHS has signaled that it intends to prosecute employers for immigration violations through gaining greater access to the records of SSA and for failure of employers to terminate employees who are the subject of SSA "no-match" letters that are not resolved. The proposed regulation would, in effect, require employers to terminate workers who are the subject of SSA "no-match" letters if the discrepancy was not resolved within 60 days after the employer's receipt of the "no-match" letter.

When the information contained on a W-2 form does not match SSA's records, SSA issues "no-match" letters so that workers may be properly credited with Social Security earnings. SSA letters are not intended for immigration enforcement purposes, and SSA data currently is not shared with DHS. At the present time, federal immigration regulations do not require employers to take specific actions when receiving a SSA "no-match" letter.

While stating that whether an employer would be found to have constructive knowledge in particular cases depends on the "totality of the relevant circumstances," the regulation proposed by DHS on June 14, 2006, describes specific steps that an employer should take upon receipt of a SSA "no-match" letter or DHS communication to avoid a finding that the employer had constructive knowledge of employing an illegal alien. If the employer failed to follow the "safe-harbor" procedures prescribed in the proposed regulation and an employee, who was the subject of a "no-match" letter, was found to be an unauthorized alien, the employer may be found to have constructive knowledge of the employee's unauthorized status and would be liable for an immigration violation. NRCA understands that an employer may take the following steps to avoid a potential finding that it possessed constructive knowledge:

> (1)   Upon receiving a no-match letter from SSA, the employer should check its records promptly to determine whether the discrepancy is due to a typographical, transcribing or similar clerical error in the employer's records or in its communication to SSA. If there is such an error, the employer would correct its records, inform SSA, verify that the corrected information resolves the issue with SSA, and make a record of the manner, date and time of the verification. The employer is to take these steps within 14 days of receipt of the "no-match" letter.

> (2)   If step (1) above does not resolve the discrepancy, the employer is to request the employee to confirm that the employee's records are correct. If correction is required, the employer would make the correction, inform SSA, verify the corrected records with SSA; the employer should also make a record of the manner, date and time of any such verification as SSA may not provide any documentation. If the employee states that the employer's records are correct, the employer is to request the employee to resolve the discrepancy directly with SSA. Again, the employer is to take these steps within 14 days of receipt of the "no-match" letter.

> (3)   Within 60 days of receipt of the "no-match" letter, the employer is to verify with SSA that the employee's name and Social Security Number ("SSN") matches SSA's records. If the employer has not verified with SSA that the discrepancy has been resolved, but the employee maintains he is authorized to

2

No-Match Cert. Admin. Record  1426

work, the employer must, within no more than a total of 63 days after receiving the "no-match" letter, re-verify the employee's identity and work authorization by following a modified version of the I-9 procedure. No document containing the SSN that was the subject of the "no-match" letter can be used, and no document without a photograph may be used to establish identity.

(4)   If the discrepancy in the "no-match" letter is not resolved within 60 days, and if the employee's identify and work authorization cannot be verified as prescribed in step (3) above, then, according to the DHS proposal, the employer must choose between terminating the employee or facing the risk that DHS may find that the employer had constructive knowledge that the employee was an unauthorized alien, and the employer violated the law by continuing to employ the individual.

The proposed regulation acknowledges that there may be other procedures an employer could follow in response to a "no-match" letter that DHS might consider reasonable depending upon the totality of relevant circumstances. However, DHS warns that an employer who follows a procedure other than the safe-harbor procedures described in the proposed regulation would face the risk that DHS may not agree. Employers are to follow the procedures in the regulations uniformly to all employees who are the subject of "no-match" letters; otherwise, DHS cautions, the employer may violate applicable anti-discrimination laws.

**Concerns with the DHS Proposal**

NRCA is concerned about the negative impact this proposal may have on the association's members. NRCA and its members are committed to full compliance with the law and have long advocated a comprehensive overhaul of our nation's immigration system. But for the reasons outlined below, we believe this proposed regulation is the wrong rule at the wrong time.

**I.  Proposed Regulation Usurps the Legislative Process**

NRCA strongly believes the underlying issue DHS aims to address should be handled through the legislative process. Further, we are of the opinion that the timing of the proposed rule is premature, as both chambers of Congress have passed immigration reform legislation within the last year that includes new employment eligibility systems and enforcement mechanisms. It is important to note that both the Senate bill (S. 2611) and the House bill (H.R. 4437) specifically address employer obligations in those instances when an employer receives a "no-match" letter from the SSA or DHS.

Given the two chambers presently are attempting to reconcile the differences between the pieces of legislation, and the White House is actively engaged in helping Congress fashion a comprehensive package acceptable to both chambers, NRCA urges DHS to withdraw the proposed regulation until the legislative process has run its course. The probable disruption to the economy and lives of those workers fueling the nation's economic growth suggests that the

**No-Match Cert. Admin. Record  1427**

disadvantages of DHS moving in piecemeal fashion before Congress has acted grossly outweigh any perceived benefits of penalizing employers who are forced to contend with our nation's dysfunctional immigration system. Short of that, NRCA requests that DHS give careful consideration to the concerns outlined below.

## II.  Accuracy of SSA Records

The SSA database is notoriously inaccurate. Frequently, "no-match" notices result from name changes and clerical errors, such as transposed numbers or other honest mistakes. For the construction industry, and specifically the roofing sector, the mismatch problem is exceptionally severe as workers who identify themselves as being Latino or Hispanic represent fully one-third of the construction workforce. Name-matching problems with SSA are common among this community due to multiple surnames of individuals, rather than the traditional first-middle-last name pattern of most native-born Americans. According to a July 11, 2006, Government Accountability Office ("GAO") report, the SSA database contains incomplete and outdated data. NRCA and its members are deeply concerned with the prospect of terminating employees who are legitimately authorized to work, but who have been unable to obtain a resolution within the allotted 60-day period due to corrupt data. It is particularly troubling, given that the GAO has confirmed that the database, which DHS suggests should be used to determine work eligibility, is rife with inaccurate data.

## III.  Insufficient Resolution Timeline

The proposed timeframes in the June 14 proposal are impractical. The 14-day and 60-day periods are not viable timeframes in which to rectify data problems simply due to the problems attendant to erroneous and incomplete records in the SSA system. Assuming an employer, after receiving a "no-match" notice, informs the employee of a discrepancy within the 14-day period, the employer is allotted 60 days, from the date of receipt, to verify with SSA that the discrepancy has been resolved. Accordingly, an employee who is the subject of a "no-match" letter would have less than two months to resolve any errors with SSA. Presumably, the employer would be forced into a situation of having to terminate a worker's employment, even if the employee had not yet exhausted the appeals process. It is not clear that the 60-day time period is an adequate amount of time in the current enforcement environment, let alone in a new era in which DHS ramps up efforts to identify the estimated 12 million undocumented immigrants in the U.S. economy. There is every reason to believe SSA's resources and infrastructure will be stretched beyond capacity if DHS moves forward with this proposal, and regrettably, honest employers and lawfully-employed workers will be harmed in the process.

Though 14 days may sound reasonable in theory, as a practical matter, the allotted time by which an employer must respond to a "no-match" is not a reasonable period of time. Both large and small employers will be severely challenged to meet this standard. Large employers may receive several "no-match" letters simultaneously – each containing multiple names, magnifying the difficulty of resolving all of the discrepancies within the prescribed timeframe. Regarding smaller firms, they often do not have a full-time administrative staff to address these issues.

4

Small business owners often have to run the business, oversee bookkeeping, supervise its employees and perform administrative duties. The construction industry would be particularly hard hit by this requirement, as most firms are small and operate outside of a conventional office environment. Employers in the construction industry spend the bulk of their time at job sites, not an office; they are frequently not even near a computer, let alone hard copies of their employment records. For these reasons, the 14-day period for the initial response is unreasonable and will be unduly burdensome for employers. NRCA therefore requests that this requirement be amended to a 45-day period.

## IV.  Small Business Disproportionately Burdened

For the reasons noted above, this proposal will impact small business negatively and disproportionately. The average construction company is a small business, with a lean administrative staff and the bulk of its workforce (including management) outside of the home office. But aside from the administrative hardship this proposal would present small business, smaller firms can ill afford shocks to the size of their labor forces, whereas a larger firm possesses a stronger capacity for absorbing such disruptions. This is especially true in construction. Our industry operates under unique demands such as weather restrictions, performance and bonding requirements in contracts, and strict timetables for delivery of the construction product and service. Absorbing labor shortages in the middle of projects is potentially disastrous for small construction companies, as failure to meet timetables can result in non-payment by the building owner or general contractor. Further, worker shortages disproportionately impact smaller construction companies because it jeopardizes their ability to bid for future contracts. NRCA requests that DHS carefully consider the economic and administrative dislocation for small business.

## V.  Solvency of the Proposal and Growth of the Underground Economy

The fundamental test of sound policy is for the problem being addressed to be solved. But the proposed regulation will have no discernible impact on undocumented immigration and actually threatens to exacerbate the problems attendant to illegal immigration. NRCA believes the DHS proposal will fail this simple test for three reasons.

First, those undocumented workers faced with the prospect of termination will simply enter the unregulated, underground cash economy and end up working in marginal jobs with poorer working conditions. Workers in the underground economy do not pay taxes and are in a deeper state of anonymity than those undocumented immigrants working under the stewardship of legitimate employers. Second, the proposed regulation targets the wrong employers. It addresses employers who are attempting to comply with the law, but it fails to address those underground employers who do not comply with the law, do not fill out Form I-9, pay cash off the books and can be fairly characterized as "bad actor" employers. And third, by not addressing this true underground economy and only proposing increased regulations on those employers trying to act in accordance with the law, there is an unintended incentive created for employers to revert to working in the underground economy. Otherwise honest employers may choose not

5

to follow the safe-harbor procedures outlined in the proposed regulation. Faced with the prospect of closing their doors, many employers may decide to take a different approach after considering the totality of the circumstances. There will be instances in which employers opt for an informed business decision, rather than electing to adhere to the "safe harbor" guidance. This is not sound economic policy, nor is it in America's national security interest to push people deeper into the shadows.

The consequences of such a policy failure are staggering. As employers and employees go "off the books," billions of dollars will be lost in federal, state and local tax revenues. Unfair competitive practices will flourish as those employers straining under the new system lose market share to those employers who increasingly work off the books. And exploitation of workers by unscrupulous employers will rise, as those employers will take advantage of the daily fear of apprehension and deportation by undocumented immigrants.


## VI. DHS Should Focus Enforcement on "Bad Actors"

DHS should focus its limited resources on firms that employ undocumented workers in large numbers and build the practice into their business models. By concentrating its attention on employers that have demonstrated a pattern of deliberately skirting the law, DHS would channel scarce resources more efficiently than it would by proceeding with enforcement actions against firms receiving few "no-match" notices. NRCA urges DHS to consider establishing a threshold of "no-match" hits before an employer is targeted for enforcement. For instance, DHS could create a safe harbor for companies with fewer than 10 "no-match" letters in any given calendar year. Such a policy would signal a sensitivity for the small business community by helping level the playing field for companies with fewer employees and administrative resources.


## VII. Firing of Workers

An unfortunate, yet certain, consequence of the DHS proposal is that if an employer receives a "no-match" letter, many employees will simply be fired. Given the complexity of the proposed rule, many employers will make a "business decision" to endure the economic disruption associated with losing a valued employee, rather than risk legal liability by attempting to remedy the "no-match" notice. Out of caution, panic and confusion surrounding the intricacies of the rule, and unfortunately ethnic profiling as well, many employers will select the safe legal route by shedding the potential legal liability associated with workers who are the subject of "no-match" notices. Once again, the integrity of the SSA database comes into play, as U.S. citizens and legally-authorized immigrants will undoubtedly face termination. Unquestionably, wrongful terminations are not DHS' intent, but DHS should bear in mind its culpability in such terminations should it proceed with the rule.

6

No-Match Cert. Admin. Record  1430

## VIII.   Proposal Threatens to Damage the U.S. Economy

The proposed regulations fail to account for the economic and social realities that U.S. employers confront – current domestic demographic trends, coupled with inadequate channels for legal immigration, present the business community with a chronic shortage of available workers.

Put simply, America faces a demographic time bomb. The native-born workforce is growing older and will soon begin to contract. According to United Nations estimates released in February 2005, the fertility rate in the U.S. is projected to fall below "replacement" level by 2015, declining to 1.9 children per couple. Meanwhile, two incompatible trends are emerging. First, the labor force continues to age. The U.S. Department of Labor's Bureau of Labor Statistics ("BLS") projects the annual growth rate of the 55-and-older group to grow at four times the rate of the overall labor force the next decade. This group will cycle out of the labor force at escalating rates. By contrast, the annual growth rate of the 16-to-54 year age group will be more or less flat. Second, the U.S. economy keeps generating high labor demand at the lower rungs of the occupational ladder. BLS reports that 98 percent of projected employment growth between 2002 and 2012 will be in industries characterized by jobs that do not require high levels of education. Construction is one of these industries. BLS also expects employment in all occupations to rise by 21 million jobs between 2002 and 2012. But because of changing demographics and worker retirements, there will be 56 million job openings during the decade, or an average 2.6 job openings for each net additional job.

Exacerbating these disturbing trends by imposing additional hardships on employers struggling to provide the products and services Americans demand will jeopardize many of the foundation industries in the U.S. economy. Construction is one of these industries, representing more than 9 percent of the Gross Domestic Product and more than 12 percent of America's employers. Over the last decade, construction employment grew 52 percent. By comparison, overall employment growth was 20 percent during the same period. Today, there are 7.2 million employees in the industry, and BLS reports that another 792,000 new construction jobs will be created between 2004 and 2014. BLS also projects the roofing industry alone will need 70,000 new workers during the next decade just to keep pace with the demand for professional roofing services. These growth trends underscore the importance of DHS taking into account the economic costs of this proposal.

## Conclusion

NRCA urges DHS to withdraw this proposal and allow Congress to finish the work it has begun. Though DHS intends to focus on one narrow aspect of its enforcement portfolio, the implications of DHS moving forward with the proposed rule is much broader. The economic and national security needs of America will not be advanced if DHS proceeds. Millions of workers in the U.S. economy – authorized and unauthorized – will see their livelihoods jeopardized. At the same time, the proposal will damage national security and stretch scarce enforcement dollars further, as workers descend deeper into the shadows.

**No-Match Cert. Admin. Record  1431**

NRCA appreciates the opportunity to submit these comments and thanks DHS in advance for giving careful consideration to the views of the U.S. business community on this important subject.

Respectfully submitted,

R. Craig Silvertooth
Director of Federal Affairs

8

**From:** cgrenewald@yahoo.com [mailto:cgrenewald@yahoo.com]
**Sent:** Saturday, August 12, 2006 10:26 AM
**To:** Regs, Rfs
**Subject:** Docket ICEB-2006-0004

Secretary Michael Chertoff
U.S. Department of Homeland Security
Washington, DC 20528

Dear Secretary Chertoff,

I oppose the regulations proposed by DHS concerning the Social
Security Administration's (SSA) "no-match" letters and, in
particular, support the comments submitted by National
Immigration Law Center (NILC) on behalf of the Low Wage
Immigrant Worker (LWIW) coalition.

The SSA no-match letters were never designed to enforce
immigration laws. The out-of-date and unreliable SSA database is
notoriously inaccurate and, as described in the NILC/LWIW
comments, the no-match letters have been abused and have worked
untold hardship on workers and their families. These effects
will only be exaggerated by the proposed regulations.

As proposed, these regulations would hurt everyone -- all
workers regardless of immigration status, our state and local
governments, our federal government, and our economy. They
should not be adopted and Congress should instead be allowed to
reach a comprehensive consensus on immigration reform.


Sincerely,

Elizabeth McDonough
2706 Jefferson Drive
Alexandria, Virginia 22303

**From:** llbalosangeles@aol.com [mailto:llbalosangeles@aol.com]
**Sent:** Monday, August 14, 2006 8:02 PM
**To:** Regs, Rfs
**Subject:** DHS Docket No. ICEB-2006-0004 Comments Regarding Safe Harbor Procedures for Employers Who Receive a No-Match Letter

**LATINA LAWYERS BAR ASSOCIATION**
**P.O. Box 86488**
**Los Angeles, CA 90086**

August 14, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:*    *DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

  **LATINA LAWYERS BAR ASSOCIATION** submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

  **LATINA LAWYERS BAR ASSOCIATION** is an organization committed to address the issues of women and girls. The goals of this organization are to promote the advancement of our members within the legal community and the advancement of Latina women and girls in our communities.

  **LATINA LAWYERS BAR ASSOCIATION** has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States–immigrant and native-born alike.

  As a result of this work, **LATINA LAWYERS BAR ASSOCIATION** is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

  Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**<u>including U.S. citizens and authorized noncitizens</u>**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

**The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **<u>unregulated underground cash economy</u>** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

**This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **<u>comprehensive immigration reform</u>**. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

**The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of

undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses.  For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Guadalupe Palma, Esq., Trustee
Latina Lawyers Bar Association
PO Box 86488
Los Angeles, CA 90086-0488
llbalosangeles@aol.com

**From:** Coleman, Jim [mailto:JColeman@constangy.com]
**Sent:** Friday, August 11, 2006 12:10 PM
**To:** Regs, Rfs
**Subject:** Docket No. ICEB-2006-0004

Attached are the comments of the National Council of Chain Restaurants, which are being submitted for filing in the above-referenced rulemaking proceeding. The Council appreciates this opportunity to comment on the proposed regulations.

*James M. Coleman*
**Constangy, Brooks & Smith, LLC**
4100 Monument Corner Drive
Suite 520
Fairfax, Virginia 22030
571-522-6100 - telephone
571-522-6101 - facsimile
www.constangy.com



**NATIONAL COUNCIL OF CHAIN RESTAURANTS**
of the ➤ National Retail Federation

Bureau of Immigration and Customs Enforcement

8 CFR Part 274a

[RIN 1653-AA50]

ICE 2377-06

U.S. Department of Homeland Security

DHS Docket No. ICEB – 2006-0004

Comments of the National Council of Chain Restaurants

August 11, 2006

The National Council of Chain Restaurants, a division of the National Retail Federation, (hereinafter the "Council"), submits the following comments regarding the Notice of Proposed Rulemaking published by the Department of Homeland Security, Bureau of Immigration and Customs Enforcement (hereinafter the "DHS"), concerning safe-harbor procedures for employers who receive so-called "no-match" letters.

I.    NATIONAL COUNCIL OF CHAIN RESTAURANTS

The Council is a national trade industry group representing the interests of nearly forty of the nation's largest multi-unit, multi-state chain restaurant companies. Collectively, these companies own and operate in excess of 50,000 restaurant facilities. Additionally, through franchise and licensing agreements, another 70,000 facilities are operated under their trademarks. In the aggregate, the Council's member companies and their franchisees employ in excess of 2.8 million individuals.

Liberty Place ♦ 325 7th Street, NW, Suite 1100 ♦ Washington, DC 20004 ♦ (202) 626-8183 ♦ (202) 626-8185 ♦ www.nccr.net

## II.    INTRODUCTION

As employers, the member companies of the Council have strived to comply with the employment verification requirements since their enactment in 1986. From the beginning, the employment verification requirements have disproportionately impacted the restaurant industry for three different reasons. First, the restaurant industry is an extremely labor intensive industry. Second, the employee turnover rate is generally high within the industry because the industry employs so many young, part-time and seasonal employees. These two factors combine to create an exceedingly high number of hiring transactions, and more than most other industries. Obviously, each hiring transaction triggers the employment verification process. Thus, the greater the number of transactions, the greater the impact of the employment verification requirements. The third factor that causes a disproportionate impact results from the fact that the industry is the employer of choice for so many young, first-time job holders. A high percentage of the workforce is composed of teenagers, many of whom are entering the workforce for the first time. These young individuals entering the workforce for the first time are the least likely people to possess the necessary documentation to comply with the employment verification requirements, not because they are illegal or otherwise lack authorization for lawful employment, but simply because they have not yet reached the point in their lives where they have had a need to obtain and carry the type of documentation, such as a social security card, that is necessary for employment verification purposes. All of these characteristics of the industry combine to create additional difficulties, beyond those of an ordinary employer, with regard to compliance with the employment verification requirements.

## III.    COMMENTS

First and foremost, the Council strongly supports clarifications concerning employer's obligations to ensure that their employees are authorized to work in the United States. However, bills currently working their way through Congress will likely bring about significant changes relating to an employer's responsibilities for verifying its workforce. Both the House and the Senate have proposed that investigation of SSA no-match information become a mandatory recordkeeping function, subject

No-Match Cert. Admin. Record  1440

to fines and penalties for paperwork and knowing hire violations for failure to comply. Should such legislative proposals become law, they would supersede the proposed regulation. Given the time and expense that employers will spend to comply with the proposed regulations, the Council recommends that these proposed regulations be suspended until Congress finishes its work so that employers are not forced to change policies and procedures unnecessarily. The new bills notwithstanding, there are certain provisions of the proposed regulations that could be improved and/or clarified. Thus, the following comments will focus on those provisions.

      a.    Time Periods

      As mentioned above, many Council members employ tens of thousands of workers and have high rates of turnover. At any given time, many Council members will be investigating the circumstances of and working on corrective action related to hundreds of no-match letters. Many of these employers have thousands of employment locations throughout the country but maintain centralized personnel departments that would be responsible for following the steps set forth in the proposed regulation. It is likely that the no-match letters will take most of, if not the entire 14 days to get to the personnel departments before the verification process can begin. The regulations are not clear as to what constitutes receipt by the employer. As noted above, many days, and often weeks may pass before the no-match letter finds its way to the appropriate employer official. Once the no-match letter does reach the correct official, the review process, which cannot be automated, must be done by individual personnel file review. Thus, the 14-day time frame is not reasonable. Moreover, the 60-day time period is insufficient to allow an employee to schedule time to meet with the appropriate agency office during normal business hours, which will often conflict with the employee's work hours. Additionally, SSA and DHS are very busy and processing times have historically been long. As such, these short time frames will likely cause many Council members and other larger employers to miss opportunities to take advantage of the proposed safe harbor, or cause legitimate employees to lose their jobs because they could not obtain proper authorization documents for re-verification within the 60-day period. The Council recommends that the 14-day period be extended to

- 3 -

45 days, that the 60-day period be extended to 90 days and that that regulations be clarified to establish a measure for what constitutes receipt of the no-match letter by the employer. These time periods more reasonably reflect the realities of the administrative processing time periods of large employers and processing times of the agencies charged with processing the changes.

      b.     Employees on Leave

The proposed regulations do not address a grace period that should be allowed if an employee is on an authorized leave of absence due to FMLA, workers compensation, USERRA, pregnancy, ADA, etc. The Council recommends that the proposed regulations be clarified to include the employer's duties in this regard. The Council recommends that the proposed time periods be tolled until an employee returns from any period of leave.

      c.     Retroactive Application

The proposed regulations do not address whether they would be applicable to no-match letters received before the effective date of the proposed regulations. The Council recommends that the proposed regulations be clarified to establish that they apply only to no-match letters received 60 days after the effective date of any final regulations. This will allow employers time to develop record keeping procedures sufficient to meet the proposed standards.

      d.     Terminated Employees

The regulations should be clarified as to the employer's responsibility, if any, if it receives a no-match letter on an employee who is no longer employed when the letter is received. Similarly, the regulations should clarify the employer's responsibility, if any, if the employee voluntarily terminates after the employer requests that the employee resolve the discrepancy with the appropriate agency. The Council recommends that an employer's obligations and liability relative to no-match letters and the DHS notices cease upon the termination of the subject employee.

      e.     Completing New I-9 Forms

The Council understands the proposed regulations to require employers to complete new I-9 forms when an employee was unable to resolve discrepancies within the 60-day period.

- 4 -

However, the proposed regulations should clarify whether a new I-9 form should be completed to comport with any corrected information that may result from an employer and employee review for clerical errors, or from the employee resolving an error with DHS or SSA.

IV.    CONCLUSION

The Council believes that current Congressional action may supersede these proposed regulations and that DHS should suspend its rulemaking until Congressional action on the bills with related provisions is complete.  If the DHS goes forward with its rulemaking, certain improvements and clarifications in the proposed regulations are in order, as outlined herein, to resolve some ambiguities and achieve a fairer application of the statutory provisions.  For these reasons, the Council urges the DHS to give careful consideration to the foregoing comments.

Respectfully submitted,

James M. Coleman
General Counsel

- 5 -

No-Match Cert. Admin. Record  1443

**From:** Fiona McKinnon [mailto:mckinnon@virginia.edu]
**Sent:** Friday, August 11, 2006 5:27 PM
**To:** Regs, Rfs
**Cc:** dan@nationalimmigrationproject.org
**Subject:** DHS Proposed Regulations (71 Fed. Reg. 34281)


Please find attached the National Immigration
Project of the National Lawyers Guild comments
to DHS Proposed Regulations (71 Fed. Reg.
34281). Thank you for considering our comments.

Fiona McKinnon
Haywood Burns Fellow

# NATIONAL IMMIGRATION PROJECT
### of the NATIONAL LAWYERS GUILD

**Board of Directors**

Barbara Hines, Chair
  Austin, TX

Rogelio Nuñez, Treasurer
  Harlingen, TX

Susan Alva
  Los Angeles, CA

Robin Bronen
  Anchorage, AK

Susana De León
  Minneapolis, MN

Rosemary Esparza
  Venice, CA

Linton Joaquin
  Los Angeles, CA

Christina Kleiser
  Knoxville, TN

Michael Maggio
  Washington, DC

Chinwe Obianwu
  Atlanta, GA

Sonia Parras Konrad
  Des Moines, IA

Judy Rabinovitz
  New York, NY

Rebecca Sharpless
  Miami, FL

Marc Van Der Hout
  San Francisco, CA

**Staff**

Ellen Kemp
  Coordinator/
  Legal Worker

Dan Kesselbrenner
  Director

Ki Kim
  Communications &
  Development

Toy Lim
  Office Manager

Ana Manigat
  Administrative
  Assistant

Malik Ndaula
  Soros Justice Fellow

Paromita Shah
  Associate Director

August 11, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

**Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).**

Dear Director:

The National Immigration Project of the National Lawyers Guild (National Immigration Project) submits the following comments in response to the above-referenced proposed regulation. The National Immigration Project is a not-for-profit corporation that publishes materials, sponsors training sessions, and provides technical assistance on immigration and nationality law. The National Immigration Project has a long history of involvement in protecting the rights of non-citizen workers in the U.S.

Our specific comments follow below.

**DHS lacks authority to regulate SSA "No-Match" letters because Congress conferred exclusive authority to the SSA to administer all aspects of the worker retirement benefit program.**
An agency cannot promulgate regulations that are inconsistent with the will of Congress. Congress intended the Social Security Administration to have exclusive authority to regulate all matters relating to social security. Insofar as the proposed regulations tread impermissibly on the exclusive province of the Social Security Administration, they exceed the scope of DHS' lawful authority.

Section 901 of Title 42 United States Code provides that the Social Security Administration is an independent agency of the United States government. Congress conferred expansive and exclusive authority to the Social Security Administration over all matters related to the various programs it administers. For example, 42 USC § 901(b) provides that:

14 Beacon Street, Suite 602, Boston, Massachusetts 02108
617-227-9727 ♦ 617-227-5495 fax
www.nationalimmigrationproject.org

No-Match Cert. Admin. Record  1445

> It shall be the duty of the Administration to administer the old-age, survivors, and disability insurance program under subchapter II of this chapter and the supplemental security income program under subchapter XVI of this chapter.

Congress developed an elaborate and detailed scheme to administer all aspects of the worker retirement program commonly known as "social security." The proposed regulation impinges on Congress' plain intent to confer exclusive authority to the Social Security Administration to regulate matters relating to social security eligibility and social security wages. Reading the Social Security Act as a whole makes manifest that DHS lacks the authority to promulgate regulations that interpret letters sent out by the Social Security Administration or any other matter that touches on social security eligibility. This authority is inconsistent with the intent that Congress expressed in the overall legislative scheme. Justice O'Connor writes, "Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *ETSI Pipeline Project v. Missouri*, 484 U.S. 495 (1988), quoted in *FDA v. Brown & Williamson Tobacco Corporation.*

Congress spoke directly to the Social Security Administration's exclusive authority in this area in SSA-specific legislation that has been enacted subsequent to the enactment of the INA.[1] To the extent that the SSA has exclusive authority in this area, DHS does not have any. Based on the same logic, the Supreme Court found that the Food and Drug Administration (FDA) lacked the authority to regulate tobacco products. *FDA v. Brown & Williamson Tobacco Corporation*, 529 U.S. 120 (2000). Congress' SSA-specific legislation effectively demonstrates that the Department of Homeland Security's agencies have no authority to promulgate regulations that take away the authority of the Social Security Administration to attach significance to its own correspondence. The Department of Homeland Security simply lacks the authority to regulate SSA documents.

**ICE has chronic data management problems.**
Even if DHS is deemed to have authority to regulate this issue, the agency has demonstrated alarming incompetence in managing data. The Bureau of Immigration and Customs Enforcement has a long history of trouble handling data. Over the years, ICE and its predecessor have struggled to process, maintain, and manage information. This is a chronic problem. As recently as June 2006 the Government Accountability Office criticized DHS' data entry in the new employment verification program.[2]

The government itself has recognized these problems. Since 1995, the Government Accountability Office (previously the General Accounting Office) has been reporting on data collection and management problems in the Immigration and Naturalization Service (INS) and its successor agency, including INS' problematic overstay estimation methods.[3] The GAO chronicled more generally immigration statistics that are "lacking, misleading, or otherwise

---

[1] The Social Security Protection Act of 2004, for instance.
[2] U.S. Government Accountability Office, "Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts," June 19, 2006.
[3] U.S. General Accounting Office, "Illegal Immigration: INS Overstay Estimation Methods Needed," September 26, 1995.

2

National Immigration Project Comments re. DHS Proposed Regulations (71 Fed. Reg. 34281)

inadequate."[4] INS difficulties included obsolete hardware, incompatible and non-interoperable information systems, and uneven system security capabilities.[5] In a 1997 report to Congress, Justice Department Inspector General Michael Bromwhich expressed concern about "the integrity of the data . . . and the training and abilities of INS employees who will be responsible for maintaining these systems and recording the transactions that constitute the systems' databases."[6] INS had a long-standing history of using antiquated, inaccurate databases.[7]

In response, the Immigration and Naturalization Service Data Management Improvement Act, HR 4489, was introduced in Congress.[8] Prompted by the events of September 11, 2001, Congress passed the Enhanced Border Security and Visa Entry Reform Act of 2002, which mandated the integration of immigration systems and databases, as well as the integration of data systems and databases that contain federal law enforcement and intelligence information.[9] The legislation set 2003 as the original deadline. Congress extended the deadline until 2005 for full integration.[10]

In 2004, a year after the INS was split up and transferred from the Department of Justice to the Department of Homeland Security, the GAO found that the new Immigration and Customs Enforcement agency was not handling data any better than INS ever had. The GAO found that while ICE was in the process of updating its case management system, it still "lack[ed] complete, accurate and readily available information" and "d[id] not have the capability to record information."[11] Moreover, the GAO found significant data management problems in the new US-VISIT program, established to collect, maintain, and share information on selected foreign nationals.[12]

More recently, in 2005, the GAO concluded that all of DHS "continues to face operational and management challenges that it inherited from its component legacy agencies."[13] These challenges include the development of a department-wide framework for managing information, specifically in the context of immigration law enforcement and the provision of immigration services.

---

[4] In a 2005 status update to this report, GAO found that the "underlying data quality issue" had not been fixed, although the office had provided "substantial guidance in how this recommendation could be fulfilled." U.S. General Accounting Office, "Immigration Statistics: Information Gaps, Quality Issues Limit Utility of Federal Data to Policymakers," July 31, 1998.

[5] U.S. Government Accountability Office, "Information Technology: Immigration and Customs Enforcement Is Beginning to Address Infrastructure Modernization Program Weaknesses but Key Improvements Still Needed," July 2006.

[6] "Despite a deluge of resources, the Immigration and Naturalization Service's management systems don't deliver," Government Executive, February 1, 1999.

[7] Congressional Research Service, "Immigration Enforcement Within the United States," April 6, 2006.

[8] H.R. 4489, Immigration and Naturalization Service Data Management Improvement Act of 2000, Smith (R), Texas.

[9] Id.

[10] Shruti Daté, "Congress extends deadline for INS data system," Government Computer News, May 24, 2000.

[11] U.S. General Accounting Office, "Immigration Enforcement: Better Data and Controls Are Needed to Assure Consistency with the Supreme Court Decision on Long-Term Alien Detention," May 27, 2004.

[12] U.S. General Accounting Office, "Homeland Security: First Phase of Visitor and Immigration Status Program Operating, but Improvements Needed," May 2004.

[13] Id. at note 2.

3

No-Match Cert. Admin. Record  1447

These problems continue. This year the GAO reiterated these concerns, finding "DHS delays in entering data into its databases" in the context of the new employment verification and worksite enforcement program.[14] Moreover, the problems are widespread, affecting all three of the new agencies created out of INS. In the 2006 Annual Report to Congress, the Citizenship and Immigration Services Ombudsman addressed information technology issues, acknowledging intrinsic flaws in the USCIS information management systems, which do not permit adequate case tracking and reporting and fail to connect USCIS and other agencies, including ICE and CBP.[15] He noted the "questionable accuracy" of the information within the systems. In an email interview with CNET News.com, USCIS chief information officer Tarrazzia Martin wrote: "The state of USCIS' current systems prevents it from implementing key initiatives, and has only allowed for incremental change."[16]

A broad range of organizations have recognized the serious limitations of DHS' data collection.[17] Government auditors concur that ICE's databases are notoriously inaccurate. Too much is at stake in the context of employment authorization to place additional requirements on an agency with such a demonstrated record of inadequate data maintenance. This agency is simply not ready to implement a new program so dependent on data management. "No-Match" findings are certain to occur because of name changes and clerical errors. Hundreds of thousands of workers—including U.S. citizens and authorized non-citizens—could lose their jobs as a result. Given ICE and its predecessors' track record in this area, as well as the importance of the regulation to workers in the United States, ICE cannot be trusted to maintain and manage a database that has so much significance for U.S. workers.

**Immigration status changes.**
Immigration status is not static data. It changes both individually and en masse. Thousands of people can have rights conferred on them at once, as when particular foreign nationals are granted temporary protected status. As noted above, ICE has chronic trouble managing data. The nature of the data makes it particularly difficult to collect and maintain.

ICE has already proved that it is not equipped to handle a new program reliant on data management. Since 2003, schools and student-exchange programs have been required to use the internet-based Foreign Student and Exchange Visitor Information System (SEVIS) to store and track personal information about foreign students before, during, and after their stay in the U.S. But university administrators have complained that SEVIS frequently loses data, that it cannot handle large batches of information submitted at once, and that it does not provide real-time access to records. Worse yet, ICE computer problems once caused student visa holders to be jailed overnight or barred from entering the U.S.[18] In a recent report, GAO found that many of these glitches had not been resolved.[19]

[14] U.S. Government Accountability Office, "Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts," June 19, 2006.
[15] Citizenship and Immigration Services Ombudsman, Annual Report to Congress, June 2006.
[16] Declan McCullagh, "Aging computers hobble Homeland Security," CNET News.com, December 15, 2005.
[17] Electronic Privacy Information Center, "US-VISIT Rolls Out the Unwelcome Mat," July 2005; Federation for American Immigration Reform, "House Immigration Subcommittee Oversight Hearing on Electronic Technology Border Control," October 11, 2001.
[18] Id. at note 14.
[19] U.S. General Accounting Office, "Homeland Security: Performance of Information System to Monitor Foreign Students and Exchange Visitors Has Improved, but Issues Remain," June 2004.

No-Match Cert. Admin. Record 1448

Another computer malfunction stranded thousands of airline passengers at U.S. border checkpoints last August when a DHS computer crashed, shutting down the government's main immigration database in Virginia.[20]

ICE is already over-burdened with programs that rely on its faulty information and poor data management. The agency has indicated that it is unable to handle the current data flow.[21] This regulation would further strain an already stressed system.

**The proposed regulation violates the constitutional right to due process.**
The regulation is unconstitutional because it does not respect the due process rights of people now present in the U.S. The Due Process clause of the Fifth Amendment protects the rights of all persons present in our country, not just United States citizens. The Supreme Court recognized long ago that the Due Process clause of the Fifth Amendment protects non-citizens, even those who are deportable or unlawfully present in the United States. *Yamataya v. Fisher*, 189 U.S. 86 (1903). The Court has repeated this holding again and again. *Plyler v. Doe*, 457 U.S. 202 (1982); *Mathews v. Diaz*, 426 U.S. 67 (1976). As the Court stated in *Plyler*, "[w]e have clearly held that the Fifth Amendment protects [even] aliens whose presence in this country is unlawful." 457 U.S. at 210.

The U.S. government has a strong interest in regulating workers within its borders. However, this interest must be balanced with the affected person's interest and the risk of erroneous deprivation. *Matthews v. Elridge,* 424 U.S. 319 (1976). In this case the risk of erroneous deprivation is extremely high, and affected persons have a strong interest in the proposed legislation. This regulation is likely to result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion, employers will fire workers who receive a no-match letter, before workers have a chance to correct their records. Again, hundreds of thousands of workers—including U.S. citizens and authorized non-citizens—will be affected.

**Conclusion**
We strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." For the reasons listed above, the Department of Homeland Security should withdraw the proposed regulation.

Thank you for considering our views on this matter.

Respectfully,

Fiona McKinnon                    Dan Kesselbrenner
Haywood Burns Fellow              Director

---

[20] Id. at note 14.
[21] U.S. Government Accountability Office, "Information Technology: Immigration and Customs Enforcement Is Beginning to Address Infrastructure Modernization Program Weaknesses but Key Improvements Still Needed," July 27, 2006.

5

National Immigration Project Comments re. DHS Proposed Regulations (71 Fed. Reg. 34281)

Cc:    Secretary Michael Chertoff, U.S. Department of Homeland Security
Director Eduardo Aguirre, U.S. Citizenship and Immigration Services
Assistant Secretary Michael Garcia, Immigration and Customs Enforcement

6

No-Match Cert. Admin. Record  1450

**From:** AxDeath@hotmail.com [mailto:AxDeath@hotmail.com]
**Sent:** Friday, August 11, 2006 6:27 PM
**To:** Regs, Rfs
**Subject:** (compliment) Re: "Safe-Harbor Procedures for Emplyrs Who Receive a No-Match" [Docket ICEB-2006-0004]

Secretary Michael Chertoff
U.S. Department of Homeland Security
Washington, DC 20528

Dear Secretary Chertoff,

I applaud the regulations proposed by DHS concerning the Social Security Administration's (SSA) "no-match" letters and.

Immigration reform is top priority here in southern california. The number of tax dollars and jobs lost to illegal immigrants is staggering and detrimental to the health of our nation, our economy, and our nations people.

I'm not against legal immigration, but immigration must be regulated for a reason, and for that reason illegal immigration must be halted and brought to a stand still where ever possible. Thank you for taking the first steps towards a brighter tomorrow.

Sincerely,

James Foreman
S parker st
Orange, California 92868

**From:** Jane H. Fast [mailto:jhfast@sbcglobal.net]
**Sent:** Thursday, August 10, 2006 10:28 AM
**To:** Regs, Rfs
**Subject:** Docket_No._ICEB-2006-0004

Sir/Madam:

For many years I haves served the Hispanic community in a volunteer organization "Grupo Latinoamericano". Many of my efforts were to assist those whose information was erroneously entered in the Social Security Administration's data base. They were being penalized with interest charges for back taxes which took as long as 2 years per case to correct.

And there were the cases where educational programs were denied to children because they did not have a Social Security card.

Fines were levied against companies who hired Hispanics whether they were correctly documented or not. And no training was/is provided for the persons in charge of hiring so they can analyze whether the documents are legitimate or not.

There is no easy solution to these concerns. Therefore, a all-inclusive threat of punishment of the employers will simply fill the courts with appeals and embitter the public's attitude about our judicial system.

The SSA "no-match" letter is far from the solution. Do NOT pass this legislation. Work for a more equitable answer.

Sincerely,
Jane H. Fast
Yes, there were cases of illegal use of identification but

**From:** Jim Kyger [mailto:jkyger@piagatf.org]
**Sent:** Monday, August 14, 2006 12:40 PM
**To:** Regs, Rfs
**Subject:** DHS Docket No. ICEB-2006-0004 comments by PIA

Please find the attached that includes comments on the above cited proposed rule.

Please let me know that you successfully received the attached.


Jim

*(Please note my new address, phone and fax below.)*

Jim Kyger, SPHR, CCP
Director, Human Relations
Printing Industries of America (Washington Office)
601 13th Street, NW
Suite 360N
Washington, DC 20005-3807
202-730-7968
FAX 202-730-7987
JKyger@piagatf.org
www.gain.net

# Printing Industries of America, Inc.

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave., NW
2nd Floor
Washington, D.C. 20529

Ref: DHS Docket No. ICEB-2006-0004

Below are comments and suggestions on DHS Docket No. ICEB-2006-0004.

Section 274a.2 (a)(2): In the mid 1990s, the list of acceptable documents under List A was changed with both additions and deletions, see Appendix A. Currently, CIS only gives notice to the public of this list of updated documents on its web site. If a request is made to CIS for hard copy of Form I-9, no notice of the update list of acceptable documents is provided. For example, I requested Form I-9 this July from the agency's forms request line (800-870-3676) and received the enclosed Form I-9 (see Exhibit A). It contained no notice that the documents under List A have been revised. For reasons listed below, *the list of acceptable documents for Employment Eligibility and Identity should be revised.*

Section 274a.2 (b)(1)(i)(A): This section should be clarified stating that even if employees require translation and assistance in the completion of Form I-9, they must still sign and date Form I-9 in Section 1. Currently, the proposed language is vague in this regard.

## Call for Issuance of Final Regulation for Revision of Form I-9
On February 2, 1998, the Immigration and Nationalization Service issued a proposed rule in the Federal Register (Vol. 63, No. 21, pp 5287-5314) to revise Form I-9 by eliminating certain documents that were acceptable for Employment Verification and Identity. To date, this proposed rule remains in regulatory limbo, despite brief mentions in press releases and a few web page notices. For example:

- In an agency Press Release dated June 21, 2005, USCIS stated, "DHS is currently in the process of making substantive changes to the Form I-9 in connection with previous rulemakings and plans to introduce a new Form I-9 at the end of this

**No-Match Cert. Admin. Record  1454**

process." However, as part of the "Regulatory Plan" issued in the Federal Register on October 31, 2005 (Vol. 70, No. 209), neither the USCIS, or the Department of Homeland Security, have any official plans for finalizing this regulation (i.e., no indication that the agency plans on issuing final regulations is mentioned).

USCIS currently does a poor job in consistently notifying employers and the public that the list of acceptable documents for Employment Eligibility and Identity on the 1991 version for Form I-9 is out of date.   For example:

- Only the USCIS web site and two USCIS Employer Informational Bulletins (101 and 102) provide practical notification to employers that the list of acceptable documents under List A of Form I-9 has been revised. We know of no other agency efforts to educate employers and the public that the list of acceptable documents has been revised.
- Despite the regulatory revision of documents permissible for determination of Employment Eligibility and Identity, the USCIS does not enforce the rule of law of its regulation. We know of no cases where the agency has taken action against an employer or employee for using a document that is technically no longer acceptable under the list of documents in Form I-9. In addition, at the American Payroll Association (APA) conference in the spring of 2005, two DHS officials said that the agency was not excercising any enforcement if unacceptable documents under List A of Form I-9 were used. The following appears on page 7 of an APA newsletter from June 10, 2005 where the DHS officials were interviewed.

**"Eligibility documents listed on Form I-9**
**"Q.** The current Form I-9 and the *Handbook for Employers* were last revised in 1991. Some eligibility documents that appear on the form are technically no longer acceptable. If I hired an employee and accepted one of those documents, would I be in jeopardy with respect to ICE enforcement actions.

**"A.** My guess is that later this year you're going to see a new I-9, a new handbook, and new regulations. In the meantime, you can use the old I-9. If you accept somebody as work eligible based on a document that technically is no longer OK, you're in no jeopardy."

(See Exhibit B for portions of the APA newsletter mentioned above.)

**Conclusion**
PIA/GATF fully supports ICE's efforts in the current proposed regulation to resolve issues related to Social Security "no match" letters. However, employers, the government, and general public would also be well served if the DHS also revised Form I-9 to be consistent with or similar to with its proposal in 1998 and in compliance with existing regulatory requirements for documents of Employment Eligibility and Identity. The quote above from DHS officials in the APA newsletter regarding no enforcement if

an employer accepts documents for Employment Eligibility and Identity that are no longer valid gives us serious concern for the overall enforcement of our nation's immigration laws. Employers are still given outdated Form I-9's through the mail, without any notice that some forms on List A are no longer acceptable. Also, it is plausible to believe that a majority of employers are currently using Form I-9 without the updated list of acceptable documents under List A. These employers could be employing illegal workers in good faith who are using counterfeit documents that are not even valid under existing law. This is not the intent of current immigration law.

## Counterfeiting

Congress stated in the legislative history of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) that counterfeiting of many of the documents in the Form I-9 list is of great concern, stating:

*The number of permissible documents has long been subject to criticism. The INS published a proposed regulation in 1993 (with a supplement published on June 22, 1995) to reduce the number of documents from 29 to 16. This proposal, however, does not reflect the consensus of opinion that documents should be reduced ever further, and that documents that are easily counterfeited should be eliminated entirely (See H.R. Rep. No. 104-469, at 404-05 (1996).))*

Since document counterfeiting has long been established as a problem in this arena and since document counterfeiting remains a problem today, we have great concern that 1) the agency is not enforcing the law where documents are no longer acceptable, and 2) that the agency has no official plans, as stated in the "Regulatory Plan" (from October 31, 2005 Federal Register), to update the List of acceptable documents to establish Employment Eligibility and Identity, and the rest of Form I-9.

If DHS does issue a revised Form I-9, as suggested above, then we suggest that the agency also revise the Handbook for Employers (M-274, revised 11/21/91). In addition, the agency should use the "citizen/national" breakout designation that it used in its re-branded version of Form I-9, (Rev. 05/31/05)N. That is, separate boxes for the employee to designate if he/she is "A citizen of the United States" or "A national of the United States". This separate designation will give USCIS and ICE investigators more useful information during an investigation at an employer's premises. It is unclear why USCIS issued two versions ("N" and "Y") of Form I-9 on May 31, 2005. Form Y combined the designation of citizen and national, like the earlier version of Form I-9.

Sincerely,

Jim Kyger, SPHR, CCP
Director of Human Relations

Enclosures

## Appendix A

The following changes have already been made to 8 CFR 274a.2.

The documents were ruled no longer acceptable under "List A" on page 3 of Form I-9 (Federal Register, September 30, 1997, pp. 51001 – 51006).

- Certificate of United States Citizenship (Form N-560 and N-561);
- Certificate of Naturalization (Form N-550 and N-570);
- Re-entry Permit (Form I-327);
- Refugee Travel Document (Form I-571).

The following document was ruled to be no longer acceptable under "List A" on page 3 of Form I-9 (Federal Register, July 19, 1996, pp. 37673-37675).

- Alien Registration Receipt Card Form I-151

The above documents do not meet the Attorney General's three conditions for documents to be contained in List A of Form I-9.  The three conditions are as follows:

1. Bear a photograph and personal identification information;
2. Constitute evidence of employment authorization; and
3. Contain "security features to make it resistant to tempering, counterfeiting, and fraudulent use."

The following document was ruled to be acceptable under "List A" on Form I-9 (Federal Register, September 4, 1996, pp. 46534-46537).

- Employment Authorization Document, Form I-766

**Exhibit A**



**First Class Mail**

DEPARTMENT OF HOMELAND SECURITY
EASTERN FORMS CENTER
POST OFFICE BOX 567
WILLISTON, VT 05485-0567

DO NOT MAIL APPLICATIONS TO THIS ADDRESS

I-9
GHB
JIM KYGER
601 13TH ST. NW STE 360N
WASHINGTON DC 20005-3849

Department of Homeland Security
U.S. Citizenship and Immigration Services

OMB No. 1615-0047; Expires 03/31/07

## Employment Eligibility Verification

## INSTRUCTIONS
### PLEASE READ ALL INSTRUCTIONS CAREFULLY BEFORE COMPLETING THIS FORM.

**Anti-Discrimination Notice.** It is illegal to discriminate against any individual (other than an alien not authorized to work in the U.S.) in hiring, discharging, or recruiting or referring for a fee because of that individual's national origin or citizenship status. It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1 - Employee.** All employees, citizens and noncitizens, hired after November 6, 1986, must complete Section 1 of this form at the time of hire, which is the actual beginning of employment. **The employer is responsible for ensuring that Section 1 is timely and properly completed.**

**Preparer/Translator Certification.** The Preparer/Translator Certification must be completed if Section 1 is prepared by a person other than the employee. A preparer/translator may be used only when the employee is unable to complete Section 1 on his/her own. However, the employee must still sign Section 1 personally.

**Section 2 - Employer.** For the purpose of completing this form, the term "employer" includes those recruiters and referrers for a fee who are agricultural associations, agricultural employers or farm labor contractors.

Employers must complete Section 2 by examining evidence of identity and employment eligibility within three (3) business days of the date employment begins. If employees are authorized to work, but are unable to present the required document(s) within three business days, they must present a receipt for the application of the document(s) within three business days and the actual document(s) within ninety (90) days. However, if employers hire individuals for a duration of less than three business days, Section 2 must be completed at the time employment begins. Employers must record: 1) document title; 2) issuing authority; 3) document number, 4) expiration date, if any; and 5) the date employment begins. Employers must sign and date the certification. Employees must present original documents. Employers may, but are not required to, photocopy the document(s) presented. These photocopies may only be used for the verification process and must be retained with the I-9. However, **employers are still responsible for completing the I-9.**

**Section 3 - Updating and Reverification.** Employers must complete Section 3 when updating and/or reverifying the I-9. Employers must reverify employment eligibility of their employees on or before the expiration date recorded in  Section 1. Employers CANNOT specify which document(s) they will accept from an employee.

- If an employee's name has changed at the time this form is being updated/reverified, complete Block A.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee is still eligible to be employed on the same basis as previously indicated on this form (updating), complete Block B and the signature block.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee's work authorization has expired or if a current employee's work authorization is about to expire (reverification), complete Block B and:

- examine any document that reflects that the employee is authorized to work in the U.S. (see List A or C),

- record the document title, document number and expiration date (if any) in Block C, and

- complete the signature block.

**Photocopying and Retaining Form I-9.** A blank I-9 may be reproduced, provided both sides are copied. The instructions must be available to all employees completing this form. Employers must retain completed I-9s for three (3) years after the date of hire or one (1) year after the date employment ends, whichever is later.

**For more detailed information, you may refer to the Department of Homeland Security (DHS) Handbook for Employers, (Form M-274). You may obtain the handbook at your local U.S. Citizenship and Immigration Services (USCIS) office.**

**Privacy Act Notice.** The authority for collecting this information is the Immigration Reform and Control Act of 1986, Pub. L. 99-603 (8 USC 1324a).

This information is for employers to verify the eligibility of individuals for employment to preclude the unlawful hiring, or recruiting or referring for a fee, of aliens who are not authorized to work in the United States.

This information will be used by employers as a record of their basis for determining eligibility of an employee to work in the United States. The form will be kept by the employer and made available for inspection by officials of the U.S. Immigration and Customs Enforcement, Department of Labor and Office of Special Counsel for Immigration Related Unfair Employment Practices.

Submission of the information required in this form is voluntary. However, an individual may not begin employment unless this form is completed, since employers are subject to civil or criminal penalties if they do not comply with the Immigration Reform and Control Act of 1986.

**Reporting Burden.** We try to create forms and instructions that are accurate, can be easily understood and which impose the least possible burden on you to provide us with information. Often this is difficult because some immigration laws are very complex. Accordingly, the reporting burden for this collection of information is computed as follows: 1) learning about this form, 5 minutes; 2) completing the form, 5 minutes; and 3) assembling and filing (recordkeeping) the form, 5 minutes, for an average of 15 minutes per response. If you have comments regarding the accuracy of this burden estimate, or suggestions for making this form simpler, you can write to U.S. Citizenship and Immigration Services, Regulatory Management Division, 111 Massachusetts Avenue, N.W., Washington, DC 20529.  OMB No. 1615-0047.

**NOTE:** This is the 1991 edition of the Form I-9 that has been rebranded with a current printing date to reflect the recent transition from the INS to DHS and its components.

### EMPLOYERS MUST RETAIN COMPLETED FORM I-9
### PLEASE DO NOT MAIL COMPLETED FORM I-9 TO ICE OR USCIS

Form I-9 (Rev. 05/31/05)Y

No-Match Cert. Admin. Record  1459

Department of Homeland Security
U.S. Citizenship and Immigration Services

OMB No. 1615-0047; Expires 03/31/07
**Employment Eligibility Verification**

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. **ANTI-DISCRIMINATION NOTICE:** It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins.

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|
| Address (Street Name and Number) | | Apt. # | Date of Birth (month/day/year) |
| City | State | Zip Code | Social Security # |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
☐ A citizen or national of the United States
☐ A Lawful Permanent Resident (Alien #) A _____
☐ An alien authorized to work until ___/___/___
(Alien # or Admission #) _____

| Employee's Signature | Date (month/day/year) |
|---|---|

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Preparer's/Translator's Signature | Print Name |
|---|---|
| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C, as listed on the reverse of this form, and record the title, number and expiration date, if any, of the document(s).

| | List A | OR | List B | AND | List C |
|---|---|---|---|---|---|
| Document title: | | | | | |
| Issuing authority: | | | | | |
| Document #: | | | | | |
| Expiration Date (if any): ___/___/___ | | | | | |
| Document #: | | | | | |
| Expiration Date (if any): ___/___/___ | | | | | |

**CERTIFICATION - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (month/day/year) ___/___/___ and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment.)**

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|
| Business or Organization Name | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |

**Section 3. Updating and Reverification.** To be completed and signed by employer.

| A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable) |
|---|---|

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

Document Title: _____  Document #: _____  Expiration Date (if any): ___/___/___

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|

NOTE: This is the 1991 edition of the Form I-9 that has been rebranded with a current printing date to reflect the recent transition from the INS to DHS and its components.

Form I-9 (Rev. 05/31/05) Y Page 2

**No-Match Cert. Admin. Record  1460**

## LISTS OF ACCEPTABLE DOCUMENTS

| LIST A | | LIST B | | LIST C |
|---|---|---|---|---|
| Documents that Establish Both Identity and Employment Eligibility | OR | Documents that Establish Identity | AND | Documents that Establish Employment Eligibility |

**LIST A — Documents that Establish Both Identity and Employment Eligibility**

1. U.S. Passport (unexpired or expired)

2. Certificate of U.S. Citizenship (Form N-560 or N-561)

3. Certificate of Naturalization (Form N-550 or N-570)

4. Unexpired foreign passport, with I-551 stamp or attached Form I-94 indicating unexpired employment authorization

5. Permanent Resident Card or Alien Registration Receipt Card with photograph (Form I-151 or I-551)

6. Unexpired Temporary Resident Card (Form I-688)

7. Unexpired Employment Authorization Card (Form I-688A)

8. Unexpired Reentry Permit (Form I-327)

9. Unexpired Refugee Travel Document (Form I-571)

10. Unexpired Employment Authorization Document issued by DHS that contains a photograph (Form I-688B)

**OR**

**LIST B — Documents that Establish Identity**

1. Driver's license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address

2. ID card issued by federal, state or local government agencies or entities, provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address

3. School ID card with a photograph

4. Voter's registration card

5. U.S. Military card or draft record

6. Military dependent's ID card

7. U.S. Coast Guard Merchant Mariner Card

8. Native American tribal document

9. Driver's license issued by a Canadian government authority

**For persons under age 18 who are unable to present a document listed above:**

10. School record or report card

11. Clinic, doctor or hospital record

12. Day-care or nursery school record

**AND**

**LIST C — Documents that Establish Employment Eligibility**

1. U.S. social security card issued by the Social Security Administration (other than a card stating it is not valid for employment)

2. Certification of Birth Abroad issued by the Department of State (Form FS-545 or Form DS-1350)

3. Original or certified copy of a birth certificate issued by a state, county, municipal authority or outlying possession of the United States bearing an official seal

4. Native American tribal document

5. U.S. Citizen ID Card (Form I-197)

6. ID Card for use of Resident Citizen in the United States (Form I-179)

7. Unexpired employment authorization document issued by DHS (other than those listed under List A)

Illustrations of many of these documents appear in Part 8 of the Handbook for Employers (M-274)

No-Match Cert. Admin. Record  1461

**Exhibit B**



# PAYROLL CURRENTLY

The Biweekly Payroll Compliance Publication Of The American Payroll Association

Volume 13          Issue # 12          June 10, 2005

## SSA Chooses National Payroll Reporting Forum to Announce Internet SSN Verification Is Now Available to All Employers

In her address to more than 450 attendees at the Social Security Administration's National Payroll Reporting Forum on June 2, SSA Commissioner Jo Anne Barnhart enthusiastically announced that all employers now have the capability to almost instantaneously determine whether an employee's name and social security number match information in SSA's database, which goes a long way toward ensuring that correct names and SSNs appear on employees' Forms W-2.

In announcing the rollout, Commissioner Barnhart noted that 96% of participants in the pilot for the Social Security Number Verification Service (SSNVS) who responded to a survey rated it "excellent" or "very good" and that more than 70% rated it higher than other similar federal government programs. She hoped that the ease of use and quick response time of the new system would significantly reduce the number of SSN verification phone calls made to SSA, which numbered more than one million in 2004.

In other developments at the day-long conference, IRS personnel provided a glimpse of their "Vision Draft" of the redesigned Form 940 for 2006 and discussed their new procedures for identifying underwithheld employees now that employers no longer have to submit questionable Forms W-4 to the Service, while a representative from the Office of Child Support Enforcement discussed the latest developments in moving the child support withholding process toward a paperless environment. SSNVS promises real-time SSN verification

In providing the details of the formal rollout of SSNVS beyond its successful pilot to all employers and third-party processors, Chuck Liptz, SSA's Director of Employer Wage Reporting and Relations Staff, said that employers can now submit up to 10 employee names and SSNs through the Internet to SSA and get immediate results. While this is a very effective method for verifying the information provided by newly hired employees, Liptz also said that employers looking to verify large numbers of employees (e.g., before W-2s are filed) can upload batch files of up to 250,000 names and SSNs and usually receive the results by the next business day.

To use SSNVS, the person who is going to use the system on behalf of an employer must register with SSA's Business Services Online. During the registration process, the individual will choose a password, while a PIN will be displayed on the screen. At this point, the individual will log in at the BSO home page and choose *Verify Social Security Numbers Online* as one of the BSO services that will be used. Because the employer must approve the individual's role as a user of SSNVS, SSA will mail an activation code to the employer, which the individual user must obtain before

being allowed access to SSNVS.

Once an individual sends employee information to SSA for verification through SSNVS, the results generally will contain entries only for those employees whose information does not match SSA's records. However, the results will also show whether any of the submitted employee information matches that of a person who is shown to be deceased in SSA's records.

**SSA plans further expansion of BSO services**

By 2010, SSA hopes to receive 94% of all Forms W-2 from employers over the Internet and is well on the way toward achieving that goal, according to Marti Eckert, Director for Organizational Services and Application Development, with 76% filed electronically for tax year 2004 as of May 28, 2005. To move closer to the ultimate goal, Eckert announced several enhancements being planned for SSA's Business Services Online for the tax year 2005 filing season. These include:

- making W-2-related services available on December 19, 2005, for tax year 2005;
- increasing the number of W-2 Online submissions that can be sent to 50 (20 W-2s in each submission);
- implementing a "save" feature for W-2c Online; and
- implementing household employer registration changes to make the process easier.

**IRS redesigns Form 940, explains new W-4 policy**

After a year spent examining and questioning the need for every line and data item on Form 940 (Employer's Annual Federal Unemployment (FUTA) Tax Return) over the last year, Lisa

### Inside this issue...

Forum on Federal Payroll Issues, Part 2 ......................................... 2

IRS Announces Quarterly Interest Rates ........................................ 5

DOL Wage & Hour Division Roundup ............................................ 7

State and Local News: Indiana - tax amnesty Maryland - paycards Utah - license and bond requirements ........................................ 8

No-Match Cert. Admin. Record  1462

JUNE 10, 2005 • ISSUE # 12                                    PAYROLL CURRENTLY

thing to do is to have an agreement with the employee about what pay period(s) the advance will be repaid from and how it will be paid back. I recommend that you have this agreement in writing, though federal law does not require it. Many states have rules for advances, and will only allow you to deduct under certain circumstances. For instance, in some states (including California), you have to have written permission from the employee to make any deduction other than a required deduction. If you do not have written permission, you face penalties if you deduct from an employee's wages.

Another issue involves the employee who leaves your employment and hasn't paid back the advance or returned the tools in his possession. If the employee wants to keep these tools or equipment, then you need to have some sort of agreement with him that this is the case. If you deduct the value of these things from a paycheck, you could create a minimum wage or overtime violation, depending upon the cost.

You make the minimum wage/overtime determinations based on the gross pay, not the net pay. If, after making the deduction, the employee's gross pay is higher than the minimum wage, under federal law it's all right if their net pay goes down to zero if you have an agreement in writing. Remember that you have to look at state rules as well as the federal rules, however.

**U.S. Immigration and Customs Enforcement**
*Role of agency*
Q. Over the past couple of years, the former INS and its immigration enforcement and services roles have migrated to the new Department of Homeland Security and two new agencies – U.S. Citizenship and Immigration Services and U.S. Immigration and Customs Enforcement. Can you tell us about this significant organizational change, the mission of these new agencies, how they work together, and their plans to reach out to build strong working relationships with the employer community?

A. In March 2003, the Homeland Security Act dismantled the legacy INS.

The INS was divided into three parts. One part is now called Customs and Border Protection, which essentially is the old Border Patrol and the inspectors that you see at the airport. A second part of INS is now Citizenship and Immigration Services. They handle the service side – naturalization, adjustment of status, work authorization, etc. A third part of the former INS is now Immigration and Customs Enforcement. We are the investigative arm of the Department of Homeland Security.

In the immigration arena, we handle everything from national security-related investigations to work-site investigations and detention and removal of aliens. We also handle what used to be called customs investigations – investigations involving illegal imports and exports.

In terms of work-site enforcement, ICE's mission right now, with limited resources, is focused on critical infrastructure – power plants, airports, nuclear facilities, and the like. We make sure that the workers in these facilities are authorized to work.

In terms of outreach to employers, ICE is working on setting up partnerships with employers, trying to help them find the best way to hire an authorized work force. We are looking at providing training in how to spot fraudulent documents. Later this year, we hope to be able to give more specifics on how employers can partner up with DHS.
*Form I-9 electronic signatures, electronic storage*
Q. Employers are eagerly awaiting final regulations on collecting electronic signatures on Form I-9 and storing those forms electronically. Can you tell us when the Department of Homeland Security may issue these final rules, and can you provide some high-level insight on what their content may be?

A. Until recently, employers were required to keep paper or microfilm or microfiche copies of all Forms I-9. These forms must be kept for three years from the date of hire or one year from the date of termination, whichever is later. In October, the President signed legislation permitting electronic storage and electronic signatures on these forms (see PAYROLL CURRENTLY, Issue No. 23, Vol. 12).

Since then, we've been working on implementing regulations. We are still working on them, even though the law went into effect on April 29. Because the regulation is not out yet, we have posted interim guidance on our Web site (see www.ice.gov/graphics/news/factsheets/I-9employment.htm).

The guidance gives you an idea of what the regulation will look like. We want to make the rules as easy as possible for employers to comply with. What we don't want is to put out a very specific regulation that will constantly need to be updated and that will force employers to use specific technology.

The interim guidance is fairly broad. It describes the information you must capture, namely the information that's on the I-9 form. Exactly how you do it, for the most part, we're leaving up to you so long as you use a system that allows you to produce document trails, audit trails, etc. We hope to have the regulation itself very soon.
*Basic Pilot Program*
Q. Can you summarize the Basic Pilot Program for employment eligibility verification, its recent nationwide expansion, and how it may evolve in the future?

A. The Basic Pilot Program was created by Congress in 1996. It's an automated system with a link between SSA records and immigration records. It's on the Internet. You log on to a Web site, get a password, take an online tutorial, and sign a Memorandum of Understanding saying you'll use the system according to the rules and won't discriminate. Then, at the point of hire, you enter I-9 information, and in the vast majority of cases you get an instantaneous return – either a verification of employment eligibility or a non-confirmation of employment eligibility.

It's a very simple system – a red light, green light type of thing. It also provides an audit trail. For example, if there is a problem, it will print out a letter to the employee, and he can take that letter to SSA or CIS to resolve the problem. The information the employee provides will be entered into the system, so that when the employee returns to you and you log on to the Web site again

PAYROLL CURRENTLY                    JUNE 10, 2005 · ISSUE # 12

using your unique password, you will see that the problem was resolved.

The Basic Pilot was available to employers in five states up until a year ago. Now, however, Congress has expanded it to employers in all states. Everybody is eligible. To find out more about it, go to http://uscis.gov (click on "Employer Information" and "Employment Verification Pilot Programs").

*Work-site enforcement actions*

**Q.** Your recent and highly-publicized audit of a major retailer and the number of illegal workers discovered in their stores has many employers concerned. Should we expect to see more work-site enforcement actions by ICE? How can I ensure I'm in compliance with immigration laws and protect my company from enforcement actions, especially if I hire independent contractors who hire their own employees?

**A.** Yes, you can expect to see more of these audits. We do them routinely, but not usually to companies that large. That case was two or three years in the making.

How can you protect yourself? Simple due diligence. For example, download the I-9 *Handbook for Employers* from our Web site (http:// uscis.gov/graphics/lawsregs/handbook/ hand_emp.pdf) and read it. When you're filling out Forms I-9, pay attention to the employment eligibility documents you're given. You're legally authorized, if you choose, to make copies of those documents. You can also use the Basic Pilot Program I described. It's a very good tool.

Make sure that the people you hire as independent contractors are performing the same due diligence in verifying the identity and employment eligibility of the workers they hire.

*Where and how long to keep Form I-9*

**Q.** Is it OK to keep the I-9 in the employee's regular personnel file? How long am I supposed to keep it?

**A.** There's nothing in the law prohibiting an employer from keeping

the I-9 in the employee's personnel file. (Note: The APA advises you not to keep it in the personnel file but in a separate I-9 file, so that any audits remain narrowly focused.)

*I-9 audit criteria*

**Q.** If I choose to electronically collect and store Form I-9 information, am I more likely to be chosen for an audit by Immigration and Customs Enforcement?

**A.** The short answer to that is no, you are not. The electronic I-9 will facilitate an easier inspection process if an employer is asked for I-9s. But the inspection itself will still be based on intelligence, the type of industry, or other law enforcement factors.

*Eligibility documents listed on Form I-9*

**Q.** The current Form I-9 and the *Handbook for Employers* were last revised in 1991. Some eligibility documents that appear on the form are technically no longer acceptable. If I hired an employee and accepted one of those documents, would I be in jeopardy with respect to ICE enforcement actions?

**A.** My guess is that later this year you're going to see a new I-9, a new handbook, and new regulations. In the meantime, you can use the old I-9. If you accept somebody as work eligible based on a document that technically is no longer OK, you're in no jeopardy.

*Photocopying I-9 documents*

**Q.** Am I allowed to photocopy the identity and work authorization documents that a new worker presents with Form I-9 and keep those copies with the form itself? Do you recommend this? What if an employee objects?

**A.** The law specifically allows you to copy documents that a worker presents for I-9 purposes. It doesn't require it, so you can but you don't have to.

There's always been a debate about whether you should make a copy of these documents. Company lawyers sometimes say, don't make copies because if somebody accepted the

wrong document, it'll be evidence and the company might be fined.

On the other hand, there are some pretty good reasons to do it. It provides the employer with a postaudit capability. A lot of the employers that we prosecute give the authority to hire and fire and fill out and certify the I-9 to one person or two people. When authority is that centralized, it can be difficult to postaudit what's going on. It can also be difficult for the company to internally review what's going on.

Another reason to photocopy I-9 documents is that it demonstrates to an investigator who says, let me see your I-9's, that you actually did see the documents. Also, if you're participating in the Basic Pilot program, having a copy of the documents in front of you means there's a greater likelihood that you're going to get the social security number right.

If an employee voices an objection, the employer can still go ahead and make the photocopies.

*I-9 process in a satellite office*

**Q.** How should I handle the preparation of Form I-9 for a new employee who is working alone in a satellite office? There is no one else there to review the employment eligibility documents. Could the new employee fax me copies of the documents? Could I have asked to see the documents at the in-person employment interview and have prepared a tentative I-9 for this employee when he or she was a prospective employee?

**A.** You have to look at the original documents. This means you can't have a fax sent for review. Also, you can't do the review in advance because you can't ask to see the documents before the person is hired.

One way to handle the situation you're describing is to use a notary in the city where the satellite office is located to review the documents. Or you can have the employee send the documents to you overnight for review. **HK**

## DOL Wage & Hour Division Roundup

The U.S. Department of Labor's Wage & Hour Division recently concluded the following enforcement

actions:

• Hertz Local Edition Corp., headquartered in Park Ridge, NJ,

has agreed to pay $320,088 in back overtime wages to 834 assistant branch managers. A nationwide

**From:** Inzero, Gail V. (SC) [mailto:inzerobg@jacksonlewis.com]
**Sent:** Monday, August 14, 2006 4:59 PM
**To:** Regs, Rfs
**Cc:** Christy Marr; spretanik@chickenusa.org; George Watts; Lauderdale, Chris (SC); Wylie, David R. (SC); Bowers, Carol N. (SC)
**Subject:** Comments re: DHS Docket No. ICEB-2006-0004


<<Ltr to U.S. Citizenship Immigration Services 8-14-06 - FINAL.doc>>

**Gail Inzero**

Legal Assistant to Ingrid Blackwelder Erwin

Edwin G. Foulke, Jr. and D. Christopher Lauderdale

**jackson lewis** LLP

One Liberty Square

55 Beattie Place, Suite 800

Greenville, South Carolina 29601

Telephone: (864) 232-7000

Facsimile: (864) 235-1381

E-mail: inzerobg@jacksonlewis.com

 

August 14, 2006

Director of Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, Northwest, 2nd Floor
Washington, DC  20529

Re:    DHS Docket No. ICEB-2006-0004

Dear Sir or Madam:

The National Chicken Council and the National Turkey Federation jointly submit the following comments on the Proposed Regulation entitled "Safe-Harbor Procedures for Employees who Receive a No-Match Letter" 71 Fed. Reg. 34281 (June 14, 2006). The National Chicken Council (NCC) represents integrated chicken producer-processors, the companies that produce, process and market chickens. Member companies of the NCC account for approximately 95% of the chicken sold in the United States. The National Turkey Federation is the advocate for all segments of the U. S. Turkey Industry, and its membership represents nearly 100% of the turkey sold in the United States.

While we believe that the best course of action would be to enact such reforms as a part of comprehensive immigration reform legislation we commend the efforts of the Bureau of Immigration and Customs Enforcement to clarify what it deems to be an appropriate response upon the receipt of social security mismatch letters. We are very concerned, however, that the prescribed procedures will be practically impossible to implement within the timelines established by the proposed regulation.

## THE FOURTEEN DAY DEADLINE
## WILL NOT BE ACHIEVABLE IN MOST CIRCUMSTANCES

Under the Proposed Regulations an employer is required to take the following steps within 14 days of receipt of the mismatch letter in order to take advantage of the Regulation's safe harbor provisions:

- The employer must review its own records to determine whether the apparent mismatch was a result of a clerical error.

- If the letter is a result of a clerical error the employer is required to inform relevant agencies of that clerical error and verify that, as corrected, the name and number match the agency's records.

**No-Match Cert. Admin. Record  1466**

- If the discrepancy cannot be resolved as a clerical error the employer is required to consult with the employee in question and to obtain confirmation that the information is correct. If the information is determined, as a result of this consultation, to be incorrect, the employer is then responsible for correcting its records and informing relevant agencies of the correction as well as verifying that the information, as corrected, conforms to that maintained by the agency.

- If, after consulting with the employer, the employee maintains that the information in the employer's files is correct then the employer must instruct the employee to pursue the issue directly with the Social Security Administration.

For several reasons we are very concerned that a 14 day timeline is impractical and will render the safe harbor provisions established by the Regulation illusory for many employers. These reasons include the following:

- The 14 day limit applies regardless of the number of apparent mismatches which an employer must resolve. Many employers in our industries employ tens of thousands of individuals in multiple facilities and in numerous locations. Mismatch letters typically do not identify individuals by locations where they reportedly work and it is not a generally feasible to resolve discrepancies as required by the regulations within a 14 day period. Even 20-30 such discrepancies among tens of thousands of employees would be difficult to resolve within a 14 day period where the individuals involved are employed in multiple locations.

- Language barriers in industries that employ a significant number of individuals for whom English is a second language or non-English-speaking individuals will further complicate the consultation required within 14 days of receipt of a mismatch letter. As a result, employers who must consult with such individuals will encounter significant practical difficulties in completing the steps required by the Regulations within 14 days.

- Compliance with the Regulation's safe harbor provisions will also be complicated by cultural differences. For example, different cultural conventions regarding adopting a spouse's name following marriage or naming children, which may be unfamiliar both to employers and to the Social Security Administration, will result in a higher number of mismatch letters for workers who have such cultural backgrounds. Regardless of their immigration status, individuals from cultures which employ customs related to names that are different than those that prevail in English-speaking cultures will therefore be disproportionately affected by these regulations. In many circumstances 14 days will not be a sufficient amount of time to resolve these issues.

- The Regulations do not take into account that, within any 14 day period, employees may be on vacation or otherwise be involved in a leave of absence which would prevent an employer from carrying out the steps required.

- Our member's experience with the Social Security Administration makes clear that obtaining the required verifications will generally be impossible within the deadline. The regulation does not address circumstances in which such verification has been requested, but not obtained, within 14 days. The failure or inability of the Social Security Administration to complete such verification should not result in loss of the safe harbor option.

- Employers with large numbers of employees will frequently receive mismatch letters as a result of individuals with common names. Such names may be common both in English or in other languages. To resolve discrepancies involving individuals with such common names may often require more than 14 days. This is particularly true where multiple facilities are involved.

## THE SIXTY DAY DEADLINE

Employers faced with a mismatch letter regarding any individual employee will be naturally concerned that any action they take is fully appropriate under applicable law. This requires ensuring not only that all obligations under the Immigration Reform and Control Act, as amended, are met but also ensuring that any decision to terminate an employee is consistent with applicable collective bargaining agreements, federal anti-discrimination laws and where applicable, state law. As noted in the Notice of Proposed Rulemaking "[e]mployers should apply these procedures uniformly to all of their employees having unresolved no-match indicators. If they do not do so, they may violate applicable anti-discrimination laws." Additionally, employers will be concerned with obtaining all relevant facts and fully understanding the circumstances in order to ensure fairness to individual employees. The cultural and language challenges discussed above will make this process more difficult. As a result, 60 days will frequently not allow sufficient time for employers to resolve issues raised by mismatch letters and ensure compliance with all applicable laws and regulations. As a result of the inadequate time frame prescribed by the current proposed Regulation many employers could be charged with constructive knowledge where such an inference is wholly unwarranted.

For the foregoing reasons we believe strongly that both the 14-day deadline and the 60-day deadline set forth in the regulations should be revised to allow sufficient time to complete the actions set forth therein. Extending these deadlines will not compromise any of the objectives that the agency seeks to achieve with the proposed rule.

Alice Johnson, D.V.M.

President, National Turkey Federation

George Watts

President, National Chicken Council



New York Farm Bureau • 159 Wolf Road  P.O. Box 5330 • Albany, New York 12205 • (518) 436-8495  Fax: (518) 431-5656

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
DHS Docket No. ICEB—2006—0004
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

     **Subject:  Proposed Rule; Safe-Harbor Procedures for Employers Who Receive a No-Match
     Letter, 71 <u>Fed. Reg.</u> 34281 (June 14, 2006)**

Dear Assistant Secretary Myers:

The New York Farm Bureau, an affiliate organization of American Farm Bureau Federation,
respectfully wishes to concur with American Farm Bureau Federation's comments regarding the
above referenced proposed rule.  New York Farm Bureau is the state Farm Bureau organization in
New York State representing over 30,000 members primarily involved in the production of a diverse
array of agricultural crops.  Our primary agricultural commodity is dairy, followed closely by apples,
vegetables, equine, and the wine and grape industry.  New York has an extremely diverse farm sector
which relies on family labor, full-time, year round local help, and seasonal workers for the planting
and harvesting seasons.  While estimates vary widely, we have approximately 35,000 full time
workers in the agricultural industry, including farm family members, and upwards of 12,000 seasonal
workers.

After the latest iteration of immigration reform, in 1986, employers have increasingly turned to
seasonal migratory labor for harvest needs.  No longer does New York State have a population of
local workers, primarily students, retirees, etc., who are willing to work for a few short months of the
year.  New York State is not a heavily dependent H2a usage state, importing approximately 2,000
workers annually, because of the relative shortness of our need for seasonal labor and the expense of
housing.  Our employers for years have utilized either farm labor contractors or word of mouth,
faithfully completing the necessary I-9 forms and following the directives not to appear to
discriminate against employing an individual on the basis of the documents presented or their ethnic
origin or gender.  There is no question in our members minds that we want, need, and desire to
employ individuals who are legally authorized to be in this country, but the problem for years has
been that there is no consistent or reliable way to verify work authorization, and the H2a program
requirements are simply too burdensome for an average farmer – especially a smaller farmer – who
may want to employ ten people for two weeks to bring in a strawberry harvest.

Now, with the advent of the on-line verification system the process may be easier, but the requirement that the system must only be used after the hiring of an individual is particularly onerous for a small employer. An employer can easily spend over six hours hiring one person, between advertising, interviewing, and paperwork, only to find out after putting in a significant expenditure of time and money that the individual is not authorized to work in this country. Employers should be able to utilize the on-line verification system, consistently and without discrimination, for each and every applicant for a position prior to the interview or completion of paperwork, etc.

While New York Farm Bureau fully realizes that the Department of Homeland Security does not administer the on-line verification system, it is important that the perspective of small employers be realized and understood by the Department when imposing additional requirements on already burdened and time pressed employers. Specific to the proposed rule, New York Farm Bureau wishes to echo the following comments, also referenced by American Farm Bureau Federation:

1) The proposed time frames for employers to respond to receipt of a no-match or mis-match letter are far too short. In New York, our harvest season can go anywhere from a two week window for a crop like strawberries, to a four week window for a vinifera grape variety, to over two months for a large apple farm with several varieties. This short time frame for harvest, and also for planting, due to our climate and lack of year round growing degree days means that a fourteen day turnaround time for a farmer to respond to a letter by approaching the topic with an employee is quite simply unrealistic. Two weeks for a company with a full time human resources manager is probably adequate; however for farmers with their entire financial success for the year riding upon a short harvest season the time to worry about paperwork simply does not exist, no matter how important the issue. Our members recognize the critical nature of responding to notices from the Social Security Administration/Department of Homeland Security. However, if there is a two week harvest season for strawberries in all likelihood during those two weeks the farmer will put everything else, including personal and other business concerns, on hold to get the crop in, and New York Farm Bureau is extremely concerned that a farmer would be penalized for not responding in time due to the pressures of harvest.

2) The proposed time frames for employees to respond to the employer notifying them of a no-match or mis-match letter, and requesting either additional documentation or a visit to the local Social Security Administration office to rectify the problem are also too short. Again, during the harvest season it is unlikely a migratory or seasonal worker who depends upon a short period of employment to form the basis of their income for the whole year will take a day off to rectify the problem. This issue is of less concern to our members; however, the proposed rule is also vague about what an employer's responsibility is if the employee fails to acknowledge or take any action to resolve the issue. If, after two weeks, the employee has not acted due to concern for missing work, arranging transportation, etc., but promises to take care of the issue in another week or so what action then is the employer to take? Are employers at that point legally obligated to terminate employment if the employee simply does not act? If so, the Department of Homeland Security needs to be more specific in the proposed rule. It is unfair to subject an employer to a lawsuit alleging unfair termination or

discrimination in hiring/firing practices based on the vaguely worded and veiled threat of Department of Homeland Security action against employers who continue to employ an individual who is the subject of a mis-match letter. This is particularly true as the Social Security Administration's own guidance to employers in the mis-match letter states clearly that receipt of the letter is not meant to be a comment on the individual's immigration status and is not the basis for terminating the employee. With a very active legal services program in New York State, it is clear to us that without further and explicit guidance from the Department of Homeland Security our employers will have to weigh either possible violation of knowingly employing an illegal alien or the threat of litigation – and either choice could easily put a farm out of business in a moment.

3) It is not clear to our members completing an I-9 form that if a notice is given from the Social Security Administration that the number submitted on the W-2 does not match, but yet the employee did not provide the social security card as a document for the purposes of completion of the I-9 form, whether the same documents (i.e. a resident alien card) can be utilized to re-verify employment eligibility after 90 days. In other words, employers are not allowed to utilize the same documents that formed the basis of the mismatch letter, but if none of those documents were the actual subject of the mismatch letter what actions are appropriate for an employer to take for re-verification purposes?

Thank you for the opportunity for New York Farm Bureau to submit comments. In closing, I wish to reiterate that New York Farm Bureau agrees wholeheartedly with the more substantive comments on the proposed rule offered by American Farm Bureau Federation. However, in light of the considerably shorter growing degree days in New York State as compared to some of the larger agricultural states, New York Farm Bureau felt it advisable to emphasize the burdensome nature of a quick 14 day turnaround in response to a mis-match or no-match letter for employers in the midst of a busy harvest season.

Thank you for your consideration, and for the Department's willingness to consider issuing much needed clarifications to employers on this difficult issue. Please do not hesitate to contact me should you have any additional questions or concerns regarding New York Farm Bureau's comments on the proposed rule.

Sincerely,


John W. Lincoln, President
New York Farm Bureau

**From:** Karen Cone [mailto:karen_cone@toc.org]
**Sent:** Tuesday, August 08, 2006 5:49 PM
**To:** Regs, Rfs
**Subject:** DHS Docket No. ICEB-2006-0004

Please see attached comments regarding Docket No. ICEB-2006-0004


Sent on behalf of Joseph Brislin, General Council

TOC Management Services
6825 SW Sandburg Street
Tigard, OR  97223



6825 SW Sandburg St.
Tigard, OR 97223
503-620-1710

Director Regulatory Management Division
US Citizenship and Immigration Services
Department Homeland Security
111 Massachusetts Avenue NW, 2nd. Floor
Washington, DC 20529

Director:                                    Re: DHS Docket No ICEB 2006-0004

On behalf of its member companies, TOC Management Services is submitting comments to the
proposed regulations on procedures for employers who receive a "no-match letter" from the
Social Security Administration (SSA) or the Department of Homeland Security (DHS).

TOC Management Services (TOC) is an employers' association that provides human resource
solutions to more than 500 member companies located in five western states. Approximately 70
percent of TOC's member companies are in the forest products industry and the rest are engaged
in manufacturing or other industries.

TOC frequently receives calls from member companies with questions about the process of
determining the authenticity of documents submitted by employees and applicants for the Form
I-9. The proposed regulations to create a safe-harbor will be helpful to employers. However, a
number of issues should be clarified in the final regulations to better assist employers in
complying with the law. The issues needing clarification and proposed solutions are presented
below.

## The 14-day time limit
Many companies have large workforces in multiple operations throughout several states but
process payroll and human resources from one central location. For these companies, the 14-day
time limit may not be sufficient to determine if either an administrative or typographical error
has occurred or if further investigation is required. The companies may need more than 14 days
to  contact the employee and obtain the proper verification — especially if holidays, vacation or
leaves of absence occur.

## <u>Recommendation for the 14 day period</u>
The 14 days be increased to 21 days.

## The 14-day and 63-day limits should be clarified as applied to nonworking employees.
The proposed regulations begin with a very broad "totality of the circumstances" standard for
determining whether an employer had actual or constructive knowledge that an employee was
not authorized to work. Nonetheless, the proposed regulations then narrow the broad "totality"
standard to the three steps an employer should take within specific 14- and 63-day time limits
commencing from the date the employer receives the SSA or DHS no-match letter. The three

steps and the 14- and 63-day time limits may be appropriate for an employee who is currently working. However, the proposed regulations do not provide any guidance for situations where an employee is on a leave of absence or is not currently working. Such a dilemma can occur when the employee is on a leave of absence with a legally protected right to return to work under any federal or state law, including the federal Family and Medical Leave Act (FMLA), Uniformed Services Employment and Reemployment Rights Act (USERRA), Americans with Disabilities Act (ADA), Pregnancy Discrimination Act, state workers' compensation laws, state leave laws that overlap with FMLA or provide leave for other reasons (e.g., California's leave for a volunteer fire fighter can be extensive for wildfires). The terms of a labor agreement or employment contract can also provide for leaves of absences.

An example: an employee is on a leave of absence under the FMLA when the employer receives the no-match letter from the SSA or DHS. In this situation, TOC believes that the final regulations should clarify when an employer should take the three steps and when the 14- and 63-day time limits start to run.

## Recommendation for leaves of absence

TOC recommends that if the employer receives a no-match letter when its employee is not actively working, the regulations should provide that the three-step process and the 14- and 63-day periods should begin when the employee returns to work. In many cases, it would be difficult or insensitive for the employer to contact an employee on a leave of absence. Using FMLA leave as an example, consider an employee who takes a 12-week FMLA leave to care for a parent who is living in another state and is dying of cancer. The employer may not know how to contact the employee and it would also be insensitive to do so.

## Employees who periodically work for an employer

In some industries, an employee only works periodically for a particular employer. For example, assigning workers from a hiring hall is a common practice in the building trades. An employer can receive an SSA no-match letter for a person who is not currently working for that employer because the building project is completed and the person has returned to the hiring hall. However, the hiring hall may refer the person to the employer who received the no-match letter at a later date.

Many industries hire seasonal employees for retail sales, food processing, timber harvesting, reforestation, forest fire fighting, hotel and restaurant, etc. Here, an employee may not be working for an employer when a SSA no-match letter or DHS inquiry arrives but the person retains the right to return to work for the employer who received the letter during the next season. Where the person is no longer a current employee but may return to employment with the employer who received the no-match letter at a later date, the regulations should clarify how the safe harbor procedures applies to an employer in these circumstances.

## Recommendation for employees who periodically work for the employer

When an employer receives an SSA or DHS no-match letter for a person who is not currently employed but has a right to return to employment at a later date, the regulations should provide that the employer must respond to the SSA letter or DHS inquiry by indicating that the person is no longer working for the employer. However, if the person is recalled or reassigned to work for

the employer at a later date, the employer should begin the three-step procedure within the 14- and 63-day time allowed commencing on the date the person reports back to work.

## Joint employers

Many employers have a temporary employment agency provide employees for a trial or probationary period that typically lasts from 30 to 120 days. During the trial period, the person is employed by the temp agency but actually works for the client company so they are joint employers.

Generally, the temp agency provides the payroll function for the employee and the agency will receive the no-match letter. The final regulations need to clarify which entity has the responsibility to commence the three-proposed steps when a joint employment relationship exists.

### Recommendation for joint employers

When the temp agency receives a no-match letter, it should be the agency's duty to notify and keep the client employer appraised of the developments during the 14- and 63-day period. Because the agency is the actual employer, it has the responsibility to terminate the person if the proper SSA or alien number is not obtained and to inform the client employer why the person can no longer be referred to the client company.

## Coordination with other enforcement agencies

The three-step verification procedure to obtain the safe harbor status may result in an employee's termination if he or she does not provide a verified SSA within the 63-day period. Agencies other than DHS enforce federal and state nondiscrimination laws. Will the EEOC, Department of Labor's OFCCP, and the state civil rights agencies agree with the DHS safe harbor regulation that the employment termination was not discriminatory when the employer followed the three steps and the person failed to produce verification within the 63 days?

If there is no coordination among the various enforcement agencies, the employer may be in a difficult situation on day 63. If the employee is terminated when the DHS rules are followed, the employer may face a potential discrimination change. If the employer allows the employee to work on day 64, the DHS rules are violated and the employer faces a DHS sanction but won't face potential discrimination charges. The employer should not be placed in this no-win situation by attempting to comply with the DHS rules.

### Recommendation on coordination with other enforcement agencies

DHS must coordinate with the federal and state civil rights and employment enforcement agencies and obtain agreement that when the DHS time limits and procedures are followed in good faith by the employer, it will also grant a safe harbor for the employer from a discrimination charge if the employee is terminated for not providing a valid SSA within the 63- day time limit.

Very Truly Yours,

Joseph Brislin
TOC General Council

**From:** chamuraq@aol.com [mailto:chamuraq@aol.com]
**Sent:** Sunday, August 13, 2006 5:49 PM
**To:** Regs, Rfs
**Subject:** Docket No. ICEB-2006-0004: Stop using SSA "No Match" letters

Office of Regulatory Counsel Charles Wood
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

Dear Office of Regulatory Counsel Wood,

The Department of Homeland Security (DHS) has issued proposed
immigration rules that would have a disastrous effect on all
workers and our economy.
Under the proposed rule, employers could be held liable for
violating immigration law if they continue to employ workers who
receive notification that the name and social security number
they gave their employer does not match the Social Security
Administration's (SSA) records (otherwise known as an SSA
"no-match" letter) - despite the numerous legitimate reasons for
a "no match."

This may prompt panicked employers to fire thousands of workers
before workers have a chance to resolve the discrepancy.

My humble opinion foresees to the benefit of this great nation
for the DHS to stop this rule! This ill-intended rule would,
definitely:

(1) Promote an increase in the existing discrimination tactics
and unsettling abuses, plus provoke unlawful mass firings that
will harm all workers;

(2) Instigate an underground economy that punishes "good"
employers who play by the rules, yet provides more incentive to
employers whom benefit from the exploitation of undocumented
workers;

(3) Reinforce the reality that the SSA "no-match" letter is
ill-suited as a worksite enforcement tool.

Kindly join me in support for a comprehensive immigration
reform, as the only way to create a workable solution.

Sincerely,

Raquel Gonzalez
15263 Hesperian Blvd Spc 21
San Leandro, California 94578
cc:
Ms Sharon Cornu

# NICE  <u>New Immigrant Community</u>
<u>Empowerment</u>

AUGUST 10, 2001

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:*    *DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for*
     *Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

NEW IMMIGRANT COMMUNITY EMPOWERMENT (NICE) submits the
following comments in response to the request for public comment by the Department of
Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on
the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter,"
71 Fed. Reg. 34281 (June 14, 2006).

New Immigrant Community Empowerment (NICE) is a cross-cultural, non-profit
organization that uses organizing, advocacy, and public education to ensure that new
immigrants are active, informed, and influential in civic, governmental and public affairs.
Central to NICE's mission is challenging the access gap between recent immigrant
communities and government, seeking systemic solutions to improving immigrants'
voting rights, full language access, health care, and workplace protections under local,
state and federal laws.

NICE has ample experience in dealing with the adverse impact that the Social
Security Administration's (SSA) no-match letters have had on all workers in the United
States—immigrant and native-born alike.

As a result of this work, NICE is alarmed by and strongly opposed to the
implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a
No-Match Letter."   Such a rule will magnify the adverse impact that SSA no-match
letters have had on workers' rights, and trigger mass firings across the nation.  These
firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have
no impact on undocumented immigration** .  Our past experience with no-match firings
and workplace audits is very clear: the fired workers will not leave the country.  They
will simply find other more marginal jobs, most likely in the unregulated underground
cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers— **including U.S. citizens and authorized non-citizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end- run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform**. The House and the Senate have both passed bills that contain worksite enforcement mechanisms.

Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective.   In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized non-citizens who employers will presume to be undocumented simply because they appear on a no-match list.   The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law.   The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality .   These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws.   This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow.   The proposed rule also contains unrealistic timetables for compliance that will derail its implementation.  Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule.   The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law.   The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

**REBECA GAMEZ**
**NICE (NEW IMMIGRANT COMMUNITY EMPOWERMENT)**
**37-41, 77TH STREET, JACKSON HEIGHTS, NY 11372**
**718-205-8796**
**REBECA.GAMEZ@GMAIL.COM**
--
Rebeca Gamez-Djokic
ESL and Workers' Rights Coordinator

New Immigrant Community Empowerment
71-34 Roosevelt Avenue, Lower Level
Jackson Heights, NY 11372
www.nynice.org

Phone: (718) 205 8796
Fax: (718) 505 7130
rebeca.gamez@gmail.com

**From:** Regan Cooper [mailto:piccpa@yahoo.com]
**Sent:** Monday, August 14, 2006 3:48 PM
**To:** Regs, Rfs
**Subject:** DHS Docket No. ICEB-2006-0004 Comments on "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"

Dear Sir or Madam,

Attached please find our comments on DHS Docket No. ICEB-2006-0004 Comments on "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter", submitted by the Pennsylvania Immigration and Citizenship Coalition.

Thank you for your attention.

Sincerely,


*Regan Cooper*

*Executive Director*
*Pennsylvania Immigration and Citizenship Coalition*
*Advocating for Immigrants, Migrants and Refugees*

*PICC*
*2100 Arch Street, 7th Floor*
*Philadelphia, PA 19103*
*Phone: (215) 832-0809*
*Fax: (215) 832-0919*

# Pennsylvania Immigration and Citizenship Coalition
# PICC

2100 Arch Street · 7th Floor · Philadelphia, PA 19103
Phone: (215) 832-0809   Fax: (215) 832-0919   Email: piccpa@yahoo.com

**Member organizations include:**

African Cultural Alliance of North America (ACANA)
Alzheimer's Association, Delaware Valley Chapter
American Immigration Lawyers Association (Philadelphia Chapter)
Arab American Community Development Corporation
Archdiocese of Philadelphia, Office for Pastoral Care for Refugees and Migrants
Asian Americans United
Cambodian Association
Camden Center for Law and Social Justice
Catholic Social Services, Archdiocese of Philadelphia, Immigration Program
Ceiba
Center for Advocacy for the Rights and Interest of the Elderly (CARIE)
Center for Literacy
Child Care Information Services of Philadelphia County
Children's Crisis Treatment Center West African Refugee Assistance Program Project Tamaa
Community Legal Services
Concilio
Congreso de Latinos Unidos
Friends of Farmworkers
Friendship House
HIAS and Council Migration Service of Philadelphia
Juish Center
Jewish Educational and Vocational Services, Center for New Americans
Jewish Labor Committee
Jobs With Justice (Philadelphia area)
Juntos
Liberty Center for Survivors of Torture
Lutheran Children and Family Services
Maternity Care Coalition
Maternal and Child Health Consortium of Chester County
Nationalities Service Center
Pennsylvania Immigration Resource Center
Pennsylvania Institutional Law Project
Philadelphia Citizens for Children and Youth
Philadelphia Corporation for Aging
Philadelphia Volunteers for the Indigent Program
PRIME - Ecumenical Commitment to Refugees
Project SHINE, Center for Intergenerational Learning, Temple University
School District of Philadelphia, Office of Language Access Services and Community Outreach
SeniorLAW Center
Service Employees International Union, (SEIU) State Council
SEIU, 32 BJ, District 36
Southeast Asian Mutual Assistance Associations Coalition (SEAMAAC)
United Communities South Philadelphia
Victim/Witness Services of South Philadelphia
Welcoming Center for New Pennsylvanians
YMCA Education and Technology Center

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C.  20529
rfs.regs@dhs.gov

August 14, 2006

Re: Comments on DHS Docket No. ICEB-2006-0004

Dear Sir or Madam:

The Pennsylvania Immigration and Citizenship Coalition submits the following comment to the proposed rule published on June 14, 2006 by the Bureau of Immigration and Customs Enforcement, of the Department of Homeland Security, "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" DHS Docket No. ICEB-2006-0004.  The proposed rule would change existing regulations regarding how employers respond to mismatch letters from the Social Security Administration ("SSA") or the Department of Homeland Security ("DHS").

PICC is a coalition of 50 member organizations in eastern Pennsylvania.  Our membership includes legal and social service providers, community associations, unions, faith communities and individuals.  We provide education and training, and we advocate for policies that welcome and sustain immigrants, migrants and refugees in our state.  Our worker rights committee has experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States—immigrant and native-born alike.

The proposed rule expands the list of scenarios that may lead to the agency finding that an employer had "constructive knowledge" that an employee was not authorized to work and consequently, subject the employer to criminal and civil penalties if they continue to hire/employ the worker.  The rule also includes a "safe harbor" provision which creates a numerous new legal obligations a U.S. employer must follow to avoid liability.

We are writing to express strong concerns that the proposed policy will result in widespread confusion and mass firings of legal, work authorized immigrants and US citizens, in addition to driving the undocumented further

**No-Match Cert. Admin. Record  1483**

Pennsylvania Immigration and Citizenship Coalition
August 31, 2006
Page 2

underground. The proposed rule is poorly timed and ill-conceived. In light of the objections detailed below we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

- **The SSA no-match letter program is not designed for immigration enforcement.**

The SSA database does not have the capacity to serve as an immigration enforcement tool. The database has numerous errors, and does not contain complete information about a worker's immigration status or employment authorization. The database contains information about both U.S. citizens and work-authorized noncitizens who will appear on the no-match list for a variety of reasons including name changes, marriage, divorce and misspellings, leading employers to presume them undocumented.

- **The proposed rule may spark lawsuits and legal challenges**

Confused or cautious employers may fire workers who receive an SSA no-match letter before the workers have a chance to correct their records with SSA. The well-known inaccuracies of the SSA database could cause hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—to lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and may lead to costly and protracted litigations against employers for wrongful terminations.

The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area - despite the fact that the SSA no-match letter provides no evidence of immigration status and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status. This modified definition of "constructive notice" raises legal questions which will likely result in costly litigation.

- **The proposed rule undermines privacy rights**

Under current laws protecting our privacy and tax confidentiality, DHS is currently barred from direct access to the SSA database. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. The proposed rule would be an administrative end-run around legislative protections.

- **Implementation costs are prohibitive, and many fall on SSA.**

While the proposed rule would to make changes to how DHS interprets these letters, it will also have a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the

Pennsylvania Immigration and Citizenship Coalition
August 31, 2006
Page 3

program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law.

- **Compliance is impractical, and the onus is on individual employees**

While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Additionally, the 60-day time period for compliance is unreasonable and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

- **The proposed rule will not discourage undocumented immigration; rather it will drive more workers and businesses underground, away from labor laws and protections.**

Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy. Because of this, the proposed rule will result in growth of this underground economy.

The new legal obligations that the proposed rule imposes on millions of employers will increase pressure on businesses to go "off the books," thereby promoting the unregulated underground cash economy which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **This proposed rule disregards the current legislative process.**

Any worksite immigration enforcement proposal should happen in the context of <u>comprehensive immigration reform</u>. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Any rules put into place now will have to be changed upon enactment of these new laws. Implementing the proposed regulations at this time would be a costly, confusing and unnecessary process for employers and workers, as well as staff at both agencies. Workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

Pennsylvania Immigration and Citizenship Coalition
August 31, 2006
Page 4


For all of these reasons, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule does not provide a solution to the hiring and exploitation of undocumented workers. Any potential benefit is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses.

Given the weight and number of objections, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,



Regan Cooper, MSS, MLSP
Executive Director

Pennsylvania Immigration and Citizenship Coalition
2100 Arch Street, 7th Floor
Philadelphia, PA 19103
(215) 832-0809
Fax: (215) 832-0919
piccpa@yahoo.com

**From:** Selden, David [mailto:DSelden@stinsonmoheck.com]
**Sent:** Monday, August 14, 2006 10:38 PM
**To:** Regs, Rfs
**Subject:** DHS Docket No. ICEB-2006-004

Attached are comments on the above-referenced proposed rule-making.

A hard copy has also been mailed to you. If there are any problems with the receipt of the attached, please contact us.

Thank you very much.

David A. Selden
Stinson Morrison Hecker LLP
1850 N. Central Ave., Ste. 2100
Phoenix, AZ 85004
602-212-8566 (w)
602-702-0974 (c)
480-985-2613 (h)
602-240-6925 (f)
dselden@stinsonmoheck.com



STINSON

MORRISON

HECKER LLP

Julie A. Pace
Sharon M. Jutila
David A. Selden

602-397-9871
www.stinsonmoheck.com

1850 North Central Avenue
Suite 2100
Phoenix, AZ 85004-4584
*Tel* (602) 279-1600
*Fax* (602) 240-6925

Via U.S. Mail and via email to:  rfs.regs@dhs.gov

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW
2nd Floor
Washington D.C, 20529

    Re:    DHS Docket No. ICEB-2006-0004

Dear Director:

    We are providing the following comments regarding the proposed regulations on the Safe-Harbor Procedures for Employers Who Receive a No-Match Letter.  Our law firm represents employers in Arizona and elsewhere who endeavor to comply with the various laws and regulations regarding hiring practices, including anti-discrimination and immigration employment eligibility verification procedures.   The regulatory burden on employers is already severe, and the proposed regulations would significantly add to that burden.  They would be detrimental to the health of businesses, both large and small, particularly in areas such as Arizona in view of the available labor force in the Southwest, would be detrimental to consumers, and would be detrimental to the health of the economy.

    Clients of our law firm who would be negatively impacted by the proposed regulations include businesses involved in a broad spectrum of industries, including manufacturing, retail, construction, agriculture, restaurants, lodging, service industries, health care, and more.  The cost of operating businesses in those industries are vital to the economic health and growth of this state.  Industries who will be particularly burdened by the proposed regulations comprise major segments of our economy.  In some industries, such as manufacturing, regulations that add costs to businesses have the effect of causing manufacturing operations and jobs to be relocated to other countries.  In other industries, such as hospitality and construction, the jobs will stay in

KANSAS CITY

OVERLAND PARK

WICHITA

WASHINGTON, D.C.

PHOENIX

ST. LOUIS

OMAHA

JEFFERSON CITY

DB03/775567 0015/7006850.2

**No-Match Cert. Admin. Record  1488**

Director, Regulatory Management Division
August 14, 2006
Page 2

America and are not susceptible to being relocated to foreign countries, but increasing the costs of doing business may curtail employment levels, decrease service levels, reduce profits, and increase costs for consumers.

It is critical that we promote efficiency and economy in the administrative process of selecting, screening and hiring workers. Measures that impose additional costs, delays, are unworkable or that pose the unfair risk of punitive actions against employers are contrary to the public policy interests mentioned above. The proposed regulations will be a significant burden on employers of labor in Arizona.    The Department of Homeland Security should not to go forward with its current proposed regulations, but instead work with other agencies and branches of the government to adopt a comprehensive and workable solution to the immigration-related employment issue.

The proposed regulations would be impractical in practice and would impose a significant and costly new burden on employers that is not currently required by any law or government agency.  The mandatory verification process of Social Security numbers (SSNs) by the Social Security Administration (SSA) or the Department of Homeland Security (DHS) in response to no-match notifications would inflict an intolerable administrative burden on employers, without solving any immigration issues.  Many of our clients have been following what they believe is a multi-step response that conscientious, responsible and reasonable employers should take when faced with the receipt of a no-match letter from the Social Security Administration, based on extensive research done related to the safe-harbor provision in the Internal Revenue Service's regulations related to incorrect submission of information on the W-2 forms.  Yet, the proposed rules do not appear to leave room for alternative reasonable procedural safe harbors to be utilized that do not use the Social Security Number Verification Service (SSNVS) provided by the Social Security Administration or the DHS's Basic Pilot Program.

As a result, our comments will focus on the following item in the proposed rules:

1.    Mandating a safe harbor only through the use of the SSNVS or DHS Basic Pilot Program is incompatible with the purpose and capabilities of the SSA system;

2.    The proposed 14-day time period for a response to the receipt of a SSA no-match letter is unreasonable and unrealistic;

3.    The proposed 63-day time period for a response to try to cure an on-going discrepancy is insufficient and unfair in some cases;

4.    The proposed regulations would impose significant additional burdens and costs to employers;

DB03/775567 0015/7006850.2

**No-Match Cert. Admin. Record  1489**

Director, Regulatory Management Division
August 14, 2006
Page 3

5.    DHS is exceeding the scope of its legal authority in promulgating the regulations, as it is taking actions inconsistent with other federal agencies, and this matter should be determined through the legislative process; and

6.    The resolution of the system lies not in promulgating unworkable regulations, but by a complete overhaul of the immigration system.

I.    <u>**MANDATING A SAFE HARBOR ONLY THROUGH THE USE OF THE SSNVS OR DHS BASIC PILOT PROGRAM IS INCOMPATIBLE WITH THE PURPOSE AND CAPABILITIES OF THE SSA SYSTEM.**</u>

It is fundamentally incompatible with the purposes of the SSA to mandate use the SSNVS as a safe harbor for the purposes of the DHS imposition of penalties against employers for allegedly knowingly employing an unauthorized worker. The SSNVS was never intended to be used as a punitive measure against either employees or employers, which is what the proposed regulations would create and mandate. By mandating that the <u>only</u> way a discrepancy of a no-match letter by the SSA will be resolved is through the use of the SSNVS, DHS would transform a system meant to allocate earnings into a faulty immigration status tool for DHS.

The inherently flawed system of relying on a federally issued card that is so easily forged is the fundamental problem as high quality fraudulent documents are common and are difficult, if not impossible, to detect by employers, who are not required to be document experts. *"Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports," Report to Congressional Committees by U.S. Government Accountability Office, February 2005.* But to attempt to transfer to the employer the burden of resolving such a wide-spread governmental problem as document abuse and the broken United States immigration system is to imprison innocent employers in a quagmire from which there is no escape.

The proposed rules would merely create a never-ending circle of reverification of the employee's authorization to work each time a no-match letter was received by the employer as many of the SSA no-matches are never resolved. According to the GAO report, 13 percent of queried cases in a 2002 study of the Basic Pilot related to work authorization were never resolved. Moreover, the GAO stated in its Report that a June 2002 study placed the cost of bringing the Pilot Program on line as a mandatory verification system for work eligibility and identity at approximately $159 million annually.

**No-Match Cert. Admin. Record  1490**

Director, Regulatory Management Division
August 14, 2006
Page 4

A.   **Why Does SSA Send No-Match Letters to Employers in the First
     Place and What Does It Mean for Employers?**

The SSA and IRS have entered into an agreement in order to more effectively
and efficiently process employee wage reports (W-2's). 20 C.F.R. § 422.114(a). Under
the agreement, the IRS, through the Internal Revenue Code, instructs employers to file
annual wage reports with the SSA. The SSA then processes all of the W-2's submitted
by the employer in order to update the employees' SSA earnings records and IRS tax
records. If there is an error in the form, SSA identifies those errors to facilitate the IRS
assessment of a penalty and to correct any reporting errors. 20 C.F.R. § 422.114(a). If
a report has 90 percent or more of the returns with errors consisting of no SSNs or
incorrect employee names or SSNs, SSA will return the report to the employer to
correct the errors and resubmit within the specified time frames in the regulations. 20
C.F.R. § 422.114(c); 20 C.F.R. § 422.120(b).

If an employer sends in a report that contains an employee's wages but with a
different name or SSN than shown in SSA's records, SSA will write the employee at the
address shown on the wage report and request the missing or corrected information. 20
C.F.R. § 422.120(a). These are the individual mismatch letters that an employee may
receive. If the wage report does not show an employee address or has an incomplete
address, the SSA will write the employer and request the missing or corrected employee
information. 20 C.F.R. § 422.120(a). Thus, SSA has the authority to contact the
employee and the employer to request the corrected information.

The SSA informs the IRS of all wage reports filed without employee SSNs so
that the IRS may determine whether to assess penalties for erroneous filings under 26
U.S.C. § 6721 of the Internal Revenue Code. 20 C.F.R. § 422.120(a). The major
problem for SSA with incorrect employee information is that the earning cannot be
identified and properly credited toward the correct employee earnings record. 20 C.F.R.
§ 422.120(a). According to United States Government Accountability Office, as of
February 4, 2005 there was approximately $463 billion in reported earnings in the
Earnings Suspense File (ESF) that date back to the inception of the Social Security
program in 1937. *"Better Coordination among Federal Agencies Could Reduce
Unidentified Earnings Reports," Report to Congressional Committees by U.S.
Government Accountability Office, February 2005.*

1.   **The Use of the Social Security Number Verification Service Is
     Completely Optional and a No-Match Can Not Be Used for
     Immigration Purposes.**

A starting premise for the discussion of the proposed regulations is the fact that
the use of the SSNVS is completely optional for employers and, again, the SSA only
"encourages" the use of the system. Moreover, the SSA emphatically states that a
negative response from the system does not make any statement about the employee's
immigration status. *"Tips on Annual Wage Report Filing," SSA, 20-3526895.* This is
the starting point for any discussion of whether or not the proposed regulations

DB03/775567 0015/7006850.2

**No-Match Cert. Admin. Record  1491**

Director, Regulatory Management Division
August 14, 2006
Page 5

imposing constructive knowledge on an employer for the mere receipt of a no-match letter is either reasonable or justified and whether or not the proposed "reasonable steps" are in fact reasonable.

> 2.    **A Social Security No-Match Letter Does Not Make any Statement about an Employee's Immigration Status and an Employer Can Not Fire an Employee Subject to a No-Match Letter.**

The SSA also makes it perfectly clear that receiving a no-match letter regarding an employee "does not make any statement about an employee's immigration status." *Employer Correction Request, SSA Code V Letter.* In addition, the no-match letter specifically states that the employer should not use the letter to take any adverse action against an employee "such as laying off, suspending, firing, or discriminating against that individual, just because his or her Social Security number appears on the list." (emphasis added). The letter further warns that to do so will subject the employer to legal consequences under state or Federal law. This is the message repeated by the SSA in all of its materials, including its website, guidance, handbooks, and questions & answers to the SSNVS and no-match letters. The SSA provides 60 days for an employer to provide a response that will help correct the earnings records.

The no-match letters issued by SSA are not meant to be punitive notices, but rather are to be "educational correspondence to the employer," according to SSA Press Officer Mark Lassiter. *"DHS to Release Proposed Rules on Proper Response to No-Match Letters,"* BNA Daily Labor Report, No. 112, June 12, 2006. Further, according to SSA's Lassiter, the approach to correct the wrong information on the W-2 form is to **"work with the employee."** (emphasis added). Thus, the no-match letter is not a basis for assuming that the employee is not authorized to work, and it is not a resolution to the issue to simply rely on the SSNVS for a match. Instead, employers are to work through the no-match issue directly with the employee, which employers have been doing, as is discussed below under the proposed alternative reasonable steps.

> 3.    **A No-Match by the SSNVS Is Not Evidence of the Employee's Immigration Status, and an Employer Can Not Fire an Employee Subject to a No-Match.**

The SSNVS Handbook issued by the SSA also emphatically states the following:

> *If you rely only on the verification information Social Security provides to justify adverse action against a worker, you may violate State or Federal law and be subject to legal consequences.*

DB03/775567 0015/7006850.2

Director, Regulatory Management Division
August 14, 2006
Page 6

The SSNVS Handbook also makes it perfectly clear a no-match response by the system "does not make any statement about an employee's immigration status," and that the no-match response, "in and of itself," is not a basis to take any adverse action against an employee "such as laying off, suspending, firing, or discriminating against the employee."

Thus, while the SSA will not allow the use the no-match as a basis for the employer assuming that an employee is not authorized to work, DHS proposes to use such a no-match as evidence that an employer knowingly employed an individual who was not authorized to work. This fundamental inconsistency between the purposes of the two agencies is reason enough not to include the SSA no-match as a basis for imposing constructive knowledge on an employer under the proposed regulations.

B.    **The Purported Reasonable Steps in the Proposed Regulations Are Not Reasonable Because a No-Match by the SSA Was Never Meant to be Used as an Immigration Enforcement Tool.**

It appears that there has been a lack of foresight in how the proposed rules will actually work in practice. As written, there are several gaps that can not be overcome without additional provisions included in the proposed rules and, even with additions, the lack of understanding of what is included with a no-match letter precludes the proposed regulations from being a workable system for imposing constructive knowledge on the employer under the IRCA.

1.    **SSA Does Not Provide Employee Names to Match the Social Security Numbers Listed in a No-Match Letter.**

First, the proposed regulations start from an inaccurate perception on the part of DHS, as it assumes that the SSA provides enough information to determine whether or not there was a clerical error made with the employee's name and SSN. But, alas, the SSA no-match letters do not provide any information other than a raw list of SSNs. There are no employee names provided at all with the group no-match letters. Thus, there is nothing to match the SSN against besides determining whether or not there is a current employee using one of the reported SSNs. Once that is determined, the employer simply has a list of employee names that match the provided SSNs. The employer does not know what name the SSA has attached to the SSN.

As a result, the only way to determine whether or not there is a discrepancy is to ask the employee directly if there is any error in the employee's name and the employee's SSN (as reported on the W-4 Form, which is the basis for the W-2 reporting) and to match the W-4 information against the W-2 information submitted by the employer. But discussing the issue directly with the employee automatically takes an employer to the second step of the "reasonable steps" laid out in the proposed regulations. It should be noted that this is the step that the SSA states that employers should immediately take, addressing the issue _directly_ with the employee, not resorting to the use of the SSNVS.

Director, Regulatory Management Division
August 14, 2006
Page 7

2.    **Errors May Result in the SSNVS from Reasons Other than Typographical or Clerical Errors.**

Second, the proposed regulations assume that the submission of correct information on the employee will result in a match under the SSNVS if there had been a typographical error or other error in the employer information. That is not true. There are several reasons that there are no-match results for employees, including issues such as the basic inability of the system to comprehend and accurately capture the Spanish surnames of many authorized workers. In addition, many times there are simply errors on the part of the SSA that are not the fault of the employees. Thus, even if a clerical error is corrected, there may still be a no-match generated on the corrected information.

As an example, Julie A. Pace, a signatory to this letter, is herself a no-match in the SSNVS. She has received individual no-match letters. She has not changed employment, has not changed her name, and has not changed anything else as reported on her W-2 or on her Social Security card. However, she is categorized as a no-match. She has spent hours and hours on hold on the telephone with the SSA in an attempt to fix the error. To date, it has not been resolved and her earnings since 2005 remain unallocated. We provide this example to show that when a natural-born United States citizen who speaks English as a first language and is a member of the State Bar of Arizona is having issues and problems with resolving her no-match status with the SSA, such problems will not be easily resolved for individuals with less education, who may have limited English-language ability, and may not be a natural-born citizen.

3.    **The I-9 Reverification Process of the Proposed Rules Will Result in a Never-Ending Loop of No-Match and I-9 Reverification.**

Third, there is no provision in the proposed rule that addresses when the employee has presented what he or she insists is correct information as to name and SSN but there is still a no-match with the SSNVS. We will assume that this will result in (l)(2)(i)(B) becoming applicable and mandating that the employer must reverify the I-9 form for the employee without allowing the use of the Social Security card as a list C document.

The problem with this part of the proposed regulation is that the employee may have originally shown the employer a document other than a Social Security card as part of the I-9 process in the first place. As a result, during the I-9 reverification process proposed in (l)(2)(iii) of the proposed rule, the employee is free to show a list A document that establishes both identity and authorization to work but still report the employee's "incorrect" name and SSN in Section 1. This will result in another no-match letter being generated by the SSA during the next submission of the W-2's by the employer, which will result in the employer again going through the entire process once again, only to redo yet another I-9 with the employee's list A document. Thus, there will be a perpetual loop of a futile process set up due to the plain and simple fact that the no-match system of the SSA is not meant to be used for immigration enforcement

**No-Match Cert. Admin. Record  1494**

Director, Regulatory Management Division
August 14, 2006
Page 8

purposes. Employers and their administrative hiring personnel should be allowed to devote their time to productive work that generates jobs and serves customers, not doing endless paperwork mandated by government regulations. The proposed regulations would treat employers like gerbils in a cage, running fruitlessly in a wheel of recurring and never-ending I-9 reverifications of SSA mismatches.

C.    **DHS Should Adopt a Proposed Alternative to Reasonable Steps That Employers May Take to Resolve the Discrepancy in the Combination of Name and Social Security Number.**

As discussed above, the proposed regulations do not state what should occur if the "corrected" information relating to an employee's SSN still does not match when submitted to the SSNVS. This will be the scenario for a large percentage of the individuals on a no-match list due to the inherent problems with the use of Spanish surnames (which include multiple names depending on the situation being addressed) and the basic reporting difficulties in the Social Security system.

Thus, because the SSA no-match letters are derived from the IRS regulations in the first place, DHS should adopt the procedures under the IRS regulations for an alternative reasonable steps that an employer may take to resolve the no-match discrepancy. The GAO Report also references these procedures as evidence that an employer acted responsibly to avoid errors in the submission of information on the worker's W-2 and took actions to correct any errors that were brought to the employer's attention.

1.    **Initial Solicitation by Employer of Correct Employee Name and Social Security Number Through Use of W-4 and W-9.**

First, the filer (i.e., the employer) must make an initial solicitation of the appropriate information at the time the relationship is established with the person required to provide the filer with the appropriate information (in this case the employee). 26 C.F.R. § 301.6724-1(f)(1)(i). Solicitation means a request by the filer for the correct information from the person required to provide the information. 26 C.F.R. § 301.6724-1(e)(1). In this case, the employer would be required to solicit from the employee at the beginning of the employment relationship the employee's name and SSN. This is the information required for the employer to file the W-2 with the IRS/SSA.

Many employers have been accomplishing this initial solicitation by training their hiring personnel to obtain a complete and accurate W-4 and W-9 from the employee. The GAO Report references that the IRS has not been enforcing penalties against employers when they solicit names and SSNs from workers and obtain signed W-4s or I-9s as "the employers acted responsibly under the current regulations." Many companies have gone one step further by requesting a signed W-9 from the employee that verifies under penalty of perjury that both the employee's name and SSN are correct. This is an alternative reasonable step considering that the no-match from the

Director, Regulatory Management Division
August 14, 2006
Page 9

SSNVS is not to be used to as a basis for taking an adverse action against an employee and is _specifically_ not to be used to infer anything regarding the employee's immigration status.

The IRS regulations state that no other solicitation is required unless the employer receives a notice that employee information is incorrect. 26 C.F.R. § 301.6724-1(f)(1)(i).

2.      **Annual Solicitation of Employee Name and Social Security Number in Response to No-Match Letter from SSA.**

Only when the employer is notified that the employee information submitted to the SSA is incorrect must the employer take additional steps regarding the information submitted on the W-2s. The information is incorrect if at the time of the notification the name and number combination on the account matches the name and number combination on the notice from the IRS/SSA. 26 C.F.R. § 301.6724-1(f)(1)(ii). Thus, when a no-match letter is sent by the SSA, the employer must take the reasonable steps outlined in the regulations. The regulations state that the filer must undertake an annual solicitation of the person to obtain the correct information (26 C.F.R. § 301.6724-1(f)(1)(ii)), namely SSN and name for an employee. The annual solicitation must be made by December 31 of the year in which the employer receives the notification or if the notification is received in December, by January 31 of the following year. 26 C.F.R. § 301.6724-1(f)(1)(ii). If the filer receives a second notice from IRS/SSA regarding incorrect information for the same name and number combination, the employer must again send out an annual solicitation for that year. 26 C.F.R. § 301.6724-1(f)(1)(ii).

Some employers have been undertaking even greater measures than called for in the regulations. In response to a no-match letter, some employers have been soliciting the correct information via a letter that contains the required information included in the IRS regulations and that specifically requests that the employee provide a new W-4 and W-9 to reconfirm that the information provided to the employer is correct. In addition, in order to ensure that the information reported on the employer's W-2 is the most correct and current information possible, the employee is once again solicited to provide the correct name and SSN by providing the employer with another signed W-4 and W-9 in December of the year in which the no-match letter was received.

If the employee again shows up on a no-match list the following year, the employer again follows the same solicitation steps to ensure that twice during that year the employee is asked to submit correct information for the submission of the next year's W-2. Thus, some employers are already taking steps to ensure that they are promptly responding to the no-match letters. However, it would be against the employer's obligations as stated by the SSA to fire an employee merely for having a no-match, as that could be construed as being discriminatory.

**No-Match Cert. Admin. Record  1496**

Director, Regulatory Management Division
August 14, 2006
Page 10

a.    Explanation of the IRS Annual Solicitation Requirements.

If the filer (employer) is notified of the incorrect information pursuant to 26 U.S.C. §6721 through the use of IRS penalty notice number 972CG, the filer must take specific steps to make the annual solicitation.  26 C.F.R. § 301.6724-1(f)(3); IRS publication 1586 "Reasonable Cause Regulations and Requirements for Missing and Incorrect Name/TINs." The annual solicitation may be made by mail or by person. 26 C.F.R. § 301.6724-1(f)(3).

A mail solicitation must include three items: (1)a letter informing the person that he must provide the correct information **and** that he is subject to a $50 penalty imposed by the IRS under 26 U.S.C. § 6723 if he fails to furnish the correct information;  (2) a Form W-9 on which the person must provide his correct information; and (3) a return envelope for the person to return the Form W-9 to the filer, which may be, but is not required to be, postage pre-paid. 26 C.F.R. § 301.6724-1(e)(2)(i).

The annual solicitation may be made by phone if the solicitation procedure is reasonably designed and carried out in a manner that is conducive to obtaining the information.  The annual solicitation by telephone must satisfy five requirements: (1) each person with a missing or incorrect information must be called and an adult member of the household must be reached; (2) the information must be requested; (3) information is provided during the call that the person with the missing or incorrect information is subject to a $50 penalty imposed by the IRS under 26 U.S.C. § 6723 if he or she fails to furnish the information; (4) a contemporaneous record is maintained showing the solicitation was properly made; and (5) the contemporaneous record is provided to the IRS on request. 26 C.F.R. § 301.6724-1(e)(2)(ii).

3.    **The I-9 Reverification Process of the Proposed Rules Will Result in a Never-Ending Loop of No-Match and I-9 Reverification.**

Employers who have followed the IRS regulations related to soliciting correct information for submission of its W-2's should not be forced to assume the additional administrative paperwork step of reverifying the employee's I-9, for the reasons explained above.  Moreover, during the I-9 reverification proposed in (l)(2)(iii) of the proposed rule, the employee is free to show a list A document that establishes both identity and authorization to work but still reports the employee's "incorrect" name and SSN in Section 1 because there is still a no-match discrepancy.  This will result in another no-match letter being generated by the SSA during the next submission of W-2s by the employer, which will result in the employer again going through the entire process once again only to redo yet another I-9 with the employee's list A document. Thus, the proposed rule would impose upon employers the perpetual loop of a futile process set up due to the plain and simple fact that the no-match system of the SSA is not meant to be used for immigration enforcement purposes.

**No-Match Cert. Admin. Record  1497**

Director, Regulatory Management Division
August 14, 2006
Page 11

## II. THE PROPOSED 14-DAY TIME PERIOD FOR A RESPONSE TO THE RECEIPT OF A SSA NO-MATCH LETTER IS UNREASONABLE AND UNREALISTIC.

As has been mentioned, an employer does not receive the names that correspond with the list of SSNs on the no-match letter. Depending on the number of SSNs on the list and the manner in which the employer's records are kept, it may take well longer than 14 days to compile a list of those employees who need to have their files reviewed to determine whether or not the information on the W-4 was the information submitted on the W-2 (which is what the SSA requires) because the employer has no way of knowing what name is in the SSA system as a match to the SSN.

Thus, to require that an employer takes the "reasonable steps" outlined in the proposed rule within 14 days is not workable. Some employers may have over 500 SSN on the list to match against employee files. If an employer does not have a system that allows the employer to pull up an employee file based on a SSN, it could take the employer a month to match 500+ SSNs to the correct employee names. The employer will then need to match the information in the employee files related to the W-4 to the submitted information on the W-2 to make sure there was no error in the submission. This will take additional time depending on the number of employees on the list.

This does not even take into account the additional time then needed to contact the employees should the information on the employee's W-4 match the submitted W-2 information for the employee. Depending on the location of the employees and the number of employees involved, this process could take well more than the 14 days called for in the proposed regulations.

At a minimum, a 30-day time frame for the taking of the reasonable alternative steps would be a more realistic time frame for accomplishing all of the necessary steps as 14 days is simply not sufficient or reasonable.

## III. THE PROPOSED 63-DAY TIME PERIOD FOR A RESPONSE TO TRY TO CURE AN ON-GOING DISCREPANCY IS INSUFFICIENT AND UNFAIR IN SOME CASES.

If an employee needs to correct a problem with the SSA, the process may take far more than 60 days to resolve. As an mentioned above, Julie A. Pace, a signatory to this letter, is herself a no-match in the SSNVS and has been attempting to resolve her no-match issues with the SSA. She did not change employment, her name, and or anything else as reported on her W-2 or on her Social Security card during the time frame she appeared on the no-match list. However, she is categorized as a no-match with the SSA. She has spent hours and hours on hold with the SSA in an attempt to fix the error. To date, it has not been resolved and her earnings since 2005 remain unallocated.

Director, Regulatory Management Division
August 14, 2006
Page 12

We provide this example to show that a natural-born United States citizen who speaks English as a first language and is an attorney, is nevertheless having issues and problems with resolving her no-match status with the SSA. It will be an even greater problem to resolve for individuals who may have a limited education, may not speak English well, and may not be a natural-born citizen. To issue regulations that assume that such issues will be resolved within 60 days is unrealistic. To think that such situations will be resolved at all is also overly optimistic, but the wheels of bureaucracy are not swift, and 60 days is far too short of a time frame for most employees to resolve such issues. A 90-day time frame would be more realistic for an employee to attempt to resolve any issues with the SSA with extensions available if the employee is attempting to resolve the situation.

Moreover, given the situation that Ms. Pace herself finds herself in, it is a flaw in the system to refuse to allow the employee to use a Social Security card as a valid document in the I-9 reverification process merely because it appears as a no-match. Many employees will find themselves in a situation where it is not due to their error that they appear on the no-match list, but DHS would penalize them for the error. Finally, as has been repeatedly stated, the SSNVS and the Social Security card were never meant to be an immigration enforcement document or control. To attempt now to use the process as such is a misuse and distortion of the SSA system and the proposed regulations will never be workable or fair to those being treated unjustly by the DHS.

Therefore, regardless of the time allowed under this portion of the proposed regulations, there is still the irresolvable problem of the mere fact that the I-9 reverification process is destined to become an overwhelming process for employers. As long as the only no-match that the employer receives is from the SSA, the employer could wind up reverifying the same employee over and over again if the employee shows the employer a valid list A document during the I-9 reverification process. This problem would only be averted if and when the DHS also informed the employer that the alien number that was the subject of a written notice by DHS can not be used during the I-9 verification process, thereby eliminating the employee's use of both a Social Security card and a permanent alien resident card or temporary employment authorization card. Thus, the only situation that will present a stop to the never ending loop of I-9 reverification is a written notice by both the DHS and the SSA.

## IV.   THE PROPOSED REGULATIONS WOULD IMPOSE SIGNIFICANT ADDITIONAL BURDENS AND COSTS TO EMPLOYERS.

The misguided nature of DHS's proposed regulation is glaringly exposed by DHS's startlingly and blatantly mistaken statement that the proposed "rule would not mandate any new burdens on the employer and would not impose any new or additional costs on the employer." The fact that DHS made such a statement reflects that it has not seriously analyzed the reality of how the proposed rule would be implemented in practice. If the time frames in the regulations are adopted, it is a real possibility that an employer would need to outsource the matching of the information between its records and the list of SSNs or hire additional staff in order to meet the 14-day time frame.

DB03/775567.0015/7006850.2

Director, Regulatory Management Division
August 14, 2006
Page 13

Furthermore, redoing the I-9d for every employee on the no-match list will take a significant amount of time for employers who have 500+ employees on the no-match list. This in and of itself is a financial burden to many employers.

The I-9s are now currently done once during the employment relationship, at the time of the initial hiring. The proposed regulations now contemplate an I-9 verification process for what could be a massive number employees (in the hundreds) that must be accomplished by the 63rd day after the employer receives a no-match notice. The regulations provide 60 days for the employer to verify the no-match with the SSA, presumably providing the employee time to straighten out any issue with the SSA. Thus, within 3 days of the expiration of those 60 days, the employer would need to fill out a new I-9 form on the employee as though the employee were a new hire. This could be a massive undertaking for the employer, depending on the number of employees on the no-match list that are still current and will need to have the I-9 reverified.

The fact that DHS has not factored in the administrative and economic burdens for employers from the proposed procedures in the regulations confirms that the DHS does not have a basic and fundamental understanding of what the proposed regulations will actually entail in the "real" world in which employers operate and do business day in and day out.

V.    **DHS IS EXCEEDING THE SCOPE OF ITS LEGAL AUTHORITY IN PROMULGATING THE REGULATIONS, AS IT IS TAKING ACTIONS INCONSISTENT WITH OTHER FEDERAL AGENCIES, AND THIS MATTER SHOULD BE DETERMINED THROUGH THE LEGISLATIVE PROCESS.**

DHS is acting in excess of its legal authority and promulgating regulations that utilize procedures dependent upon the Social Security Administration for purposes that the Social Security Administration explicitly states their procedure should not be used. Congress has never authorized the SSA and IRS processes to be used for immigration compliance, and indeed SSA specifically directs employers not to use its mismatch letters for purposes of determining employee eligibility to work in this country. It is bad policy, bad administration, and contrary to legal authority for one agency of the government to utilize a bureaucratic procedure of another agency of the government for purposes that the other agency directs that its procedure should not be used. DHS is thus placing employers in an untenable position of either acting in a manner consistent with DHS or acting in a manner consistent with SSA. In addition, employers would be forced to walk a tightrope between compliance with the anti-discrimination provision of the Immigration Reform and Control Act and Title VII of the Civil Rights Act of 1964, plus numerous state laws, and taking action that DHS's proposed regulations encourage them to take.

Clearly, DHS's piecemeal regulations are not the answer. DHS's actions conflict with and do not satisfactorily take into account the other laws and regulations

**No-Match Cert. Admin. Record 1500**

Director, Regulatory Management Division
August 14, 2006
Page 14

applicable to the situation. The subject of employer immigration compliance demands a comprehensive and workable solution, not a piecemeal regulation by only one of the agencies involved. Rather than going forward with its proposed regulation, DHS should work cooperatively with other agencies of the federal government and the Congress to seek a comprehensive, workable solution to employee eligibility verification.

## VI.  THE RESOLUTION OF THE SYSTEM LIES NOT IN PROMULGATING UNWORKABLE REGULATIONS, BUT BY A COMPLETE OVERHAUL OF THE IMMIGRATION SYSTEM.

Congress is currently wrestling with a comprehensive legislative solution to the immigration morass in which this nation finds itself. To have agencies piecemeal implementing regulations on a piecemeal basis is both detrimental to that process and imposes on employers more onerous paperwork and enforcement hurdles than are justified. Employers are not the source or the solution to the immigration problem but are merely caught in the middle of essentially incompatible requirements, as is demonstrated by the concerns discussed in these comments.

The DHS is corrupting and co-opting the SSA system in a manner that the no-match system was never meant to be used. Despite DHS's repeated insistence that the ability to share information between the two agencies should be considered, the SSA and Congress have both disagreed. Until this information sharing is legislatively mandated, the DHS should not be allowed to use the SSA as a tool to penalize employers and increase an employer's obligations under the IRCA.

We appreciate DHS's consideration of these views and urge DHS to reexamine going forward with the proposed regulations. DHS should instead pursue the process of working with other federal agencies, Congress, and employers to seek a comprehensive solution to the employment immigration compliance issues. At a minimum, DHS should revise the proposed rules in a manner consistent with the comments submitted above.

Sincerely,

**STINSON MORRISON HECKER** LLP

David A. Selden

Julie A. Pace
David A. Selden
Sharon M. Jutila

**No-Match Cert. Admin. Record  1501**

**From:** Somos Un Pueblo Unido [mailto:somos@rt66.com]
**Sent:** Monday, August 14, 2006 4:24 PM
**To:** Regs, Rfs
**Subject:** Docket No. ICEB-2006-0004

August 14, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for
Employers Who Receive a No-Match Letter"

Dear Sir or Madam:

Somos Un Pueblo Unido (Somos) is a human rights organization based in Santa
Fe, New Mexico. We have a membership of approximately 700 immigrants and
allies from business, labor and faith communities.  We strongly oppose
proposed federal regulations concerning the Social Security Administration's
(SSA) "no-match" letters.

We have already seen an adverse effect of the SSA "no-match letter" program
in New Mexico.  Workers and employers have been confused about what the
letters indicate about immigration status and eligibility to work. Despite
educating the community about the true intent of these letters, which is to
notify citizens and non-citizen that they will not be properly credited with
their social security earnings, several workers have been unjustly
disciplined, terminated, or retaliated against.

The proposed regulations will only exacerbate these problems and result in a
harmful impact to ALL workers regardless of immigration status.  They will
create massive confusion in the workplace and result in widespread firings
of immigrant workers.  This will not only affect the immediate income of
immigrant families, most with US citizen children, but it will also have a
severe impact on our local economy.

We know that the SSA did not create this program to enforce federal
immigration laws.  Nor is it prepared with updated and correct social
security records.  This nation and our leaders are currently engaged in an
important debate about the future of our immigration policies.  DHS's attempt
to enact enforcements provisions at the regulatory level with such
far-reaching policy implications is irresponsible.
The proposal hurts everyone -- all workers regardless of immigration status,
our state and local governments, our federal government, and our economy.
Somos urges you not to enact these new regulations and allow Congress to
reach a comprehensive immigration reform solution.

Sincerely,
Socorro Ríos
Chairperson, Somos Un Pueblo Unido

**From:** Rich A Hudgins [mailto:rhudgins@calpeach.com]
**Sent:** Friday, August 11, 2006 4:39 PM
**To:** Regs, Rfs
**Subject:** Comments on Proposed Rule

Attached is the file containing our comments on the proposed rule regarding "no-match" letters.

Please contact me if you are unable to open this file. Thank you.

Rich Hudgins



2300 RIVER PLAZA DRIVE / SUITE 110
SACRAMENTO, CA 95833
TELEPHONE: 916 / 925-9131
FAX 916 / 925-9030

# California Canning Peach Association

August 11, 1006

Director Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave, N.W., 2nd Floor
Washington, DC 20529

**VIA ELECTRONIC MAIL AND U.S. MAIL**

**Re: Docket No. ICEB-2006-0004**
**Safe Harbor Procedures for Employers**
**Who Receive a No-Match Letter**
**(FR 71:114, p 34281)**

To Whom It May Concern:

The California Canning Peach Association hereby submits its comments on the Bureau of Immigration and Customs Enforcement, Department of Homeland Security's Proposed Rule regarding "no-match" letters published in the Federal Register on June 14, 2006.

The California Canning Peach Association is a grower-owned bargaining and marketing cooperative. Our 600 grower members produce nearly 80% of the nation's canned peach supply. Our average grower farms approx. 40 acres of cling peaches which is very labor-intensive process. We rely on seasonal workers to prune trees in the winter, to thin fruit in the spring, and to harvest the fruit during the summer. Simply put, we must have access to a legal and stable workforce to stay in business.

As a result, we would have an interest in, and would be affected by the above-referenced Proposed Rule. We would incorporate by reference, in their entirety, the comments on the Proposed Rule submitted by the National Council of Agricultural Employers. We also concur with the concept of deferring any action on this matter pending enactment of comprehensive immigration reform by Congress.

Thank you for your attention to this matter.

Sincerely yours,

Rich Hudgins
President & CEO



**From:** Sherwin Siy [mailto:siy@epic.org]
**Sent:** Friday, August 11, 2006 4:16 PM
**To:** Regs, Rfs
**Subject:** Docket No. ICEB-2006-0004; Comments of EPIC

Attached please find the comments of the Electronic Privacy
Information Center on the proposed rulemaking regarding safe-harbor
procedures for employers who receive a no-match letter (Docket No.
ICEB-2006-0004).

Sincerely,
Sherwin Siy
Staff Counsel
Electronic Privacy Information Center
202-483-1140 ext. 110

DEPARTMENT OF HOMELAND SECURITY


Amendments to 8 CFR Part 27a

Docket No. ICEB-2006-0004

Notice of Proposed Rule Making

---

## COMMENTS OF THE ELECTRONIC PRIVACY INFORMATION CENTER

By notice published on June 14, 2006, the Department of Homeland Security

("DHS") requested public comments on its intent to adopt amendments to Part 274a of

Title 8 of the United States Code of Federal Regulations.[1] The amendments would

change the system relating to the unlawful hiring or continued employment of aliens not

authorized to work in the United States. The amendments describe the legal obligation of

an employer upon receipt of a no-match letter from the Social Security Administration or

the DHS. The amendments also provide a "safe-harbor" that would protect the employer

against DHS action if the employer follows the procedures described in the amendments.

Pursuant to this notice, the Electronic Privacy Information Center  ("EPIC") submits

these comments to address the substantial privacy issues and burdens placed on

employees by these amendments.


EPIC has a well-documented interest in the use and abuse of Social Security

numbers as a means of identification and authentication.[2] On March 16, 2006, EPIC

testified before the U.S. House of Representatives Committee on Ways and Means about

---

[1] Safe Harbor Procedures for Employers Who Receive a No-match Letter, 71 Fed. Reg. 34,281 (Jun. 14, 2006) (to be codified at 8 C.F.R. pt. 274a).
[2] EPIC, Social Security Numbers, http://www.epic.org/privacy/ssn/.

EPIC Comments                                1                Department of Homeland Security
No-Match Safe Harbor                                          Docket No. ICEB-2006-0004

**No-Match Cert. Admin. Record  1506**

the high-risk issues associated with using the Social Security Number as an identifier and an employment verification tool.[3] In April 2006, EPIC published a report on the expansion of the Basic Pilot Program, which uses SSNs to verify employee identity and citizenship.[4] Social Security numbers have become a classic example of "mission creep," where a program designed for a specific, limited purpose has been transformed for additional, unintended purposes, sometimes with disastrous results. Recent efforts to expand employment verification programs based upon SSN identification could amplify existing problems by stretching the uses of the SSN even further beyond their original purpose, putting employees' jobs at additional risk.

## Introduction

The proposed rules, which would amend the current regulatory definition of "knowledge", shift the burden of employment eligibility verification to employees and have significant privacy implications. EPIC strongly urges that DHS reject this proposal, which could easily expose citizens to a system with a high probability for error and risk. However, if DHS does accept the proposal, EPIC recommends that the time frame delineated for obtaining verification following receipt of a no-match letter be extended. Further, EPIC recommends that DHS create clear guidelines for employer use of this system to prevent prescreening use for discriminatory hiring practices.

The Immigration Reform and Control Act of 1986 (IRCA) made it illegal for employers to "knowingly" employ unauthorized workers, and Basic Pilot grew out of the

---

3 Social Security Number High-Risk Issues: Hearing Before the Subcomm. On Social Security of the H. Comm. on Ways and Means, 109 Cong. (statement of Marc Rotenberg, Executive Director, EPIC), available at http://www.epic.org/privacy/ssn/mar_16test.pdf.
4 Expansion of Basic Pilot Would Steer Employment Verification Toward Disaster, Spotlight on Surveillance (EPIC April 2006), http://www.epic.org/privacy/surveillance/spotlight/0406/default.html.

EPIC Comments                          2              Department of Homeland Security
No-Match Safe Harbor                                  Docket No. ICEB-2006-0004

**No-Match Cert. Admin. Record  1507**

requirement for work-eligibility verification.[5] A new employee is required to fill out an Employment Eligibility Verification form or I-9, which requires ID.[6] Employers do not need to verify the authenticity of the ID documents, but they do need to keep a copy of them on file.[7] The documents must merely pass a good-faith test: Do they look real? If the documents reasonably appear to be genuine and related to the employee, the employer must accept these as valid. If they do not appear reasonably genuine or related to the employee, the employer must reject the employee and may contact USCIS for assistance.

    If an employee originally submitted fraudulent documents, but subsequently obtained valid documentation, the employer is not required to terminate. If the employer discovers that the documents are not valid, the employer must question the employee and provide time for the employee to rectify the situation and fill out a new I-9 form. The current laws do not provide a specified time frame for this process. If an employee is found to be unauthorized, the employer must terminate her employment. Employers who do not end employment of unauthorized workers or who knowingly hire unauthorized workers may be fined up to $11,000 for each ineligible employee.[8]

    Title 8, Part 274a of the Code of Federal Regulations sets out employer requirements for hiring and employment purposes using the I-9 process. Currently, section 274a.1 provides the definitions for use in this part. The amendments proposed would specifically affect paragraph (l) of this section, which defines "knowing" as it relates to the employer's knowledge of an employee's or potential employee's ineligibility

---

5 8 U.S.C. § 1324a et seq (1986).
6 Illegal Immigration Reform and Immigrant Responsibility Act, 8 U.S.C. §1324a(b) (1996) (hereinafter "IRIRA").
7 IRIRA, supra.
8 Id.

to work. The current definition includes not only actual but constructive knowledge and provides three examples in which constructive knowledge may be found, if the employer:

- Fails to complete or improperly completes the Employment Eligibility Verification Form I-9;

- Has access to information that would indicate that the alien is not authorized to work, such as Labor Certification and/or an application for Prospective Employer; or

- Acts with reckless and wanton disregard for the legal consequences of permitting another individual to introduce an unauthorized alien into its work force or to act on its behalf.

Helpfully, the definition also specifies that knowledge may not be inferred from an employee's foreign appearance or accent. Further, this section does not permit employers to request additional or different documentation. [9]

The proposed rules would amend the definition of "knowledge" in the current regulations. The amendments would create a "safe harbor" for employers that comply with the prescribed procedures, insulating them from DHS prosecution. However, the amendments shift the burden of verification and correction to employees by imposing unrealistic time frames and obligating the employee to effect any changes necessary due to system error. An additional burden falls on employees who are unable to obtain verification within the required time frame, by limiting the list of acceptable

---

[9] 8 C.F.R. pt. 274a.1(l)

EPIC Comments                   4          Department of Homeland Security
No-Match Safe Harbor                           Docket No. ICEB-2006-0004

No-Match Cert. Admin. Record  1509

identification and eligibility documents that may be used for submitting a mandatory, second I-9 form.

## I.     The Proposed 60-Day Time Restriction is Insufficient for Employees to Resolve Discrepancies with the SSA and the DHS

The current regulations do not provide any specific steps for an employer to take once he or she discovers that the documents presented by the employee may not be valid.[10] EPIC appreciates that the proposed amendments set out specific time frames for the verification process. However, the sixty-day period is insufficient time for employers and employees to make the necessary corrections.

The amended regulations allow for a sixty-day period for the verification process from the day that the employer receives notice of a no-match.[11] This includes fourteen days in which the employer must check its own records for clerical errors or similar mishaps.[12] If no error is found, the employer must question the employee as to the accuracy of the recorded information. If there is no clerical error, the employee must then correct the error via the SSA or USCIS offices within sixty days of the employer's receipt of no-match notification.[13]

Sixty days is unlikely to be a realistic time frame for obtaining corrections and replacement documents from already overburdened and backlogged agencies. The time allotted must include the number of days the SSA and DHS offices will take to process a verification request and provide a response.

---

[10] 71 Fed. Reg. 34,281.
[11] 71 Fed. Reg. 34,285 § (l)(2)(i)(B).
[12] 71 Fed. Reg. 34,285 § (l)(2)(i)(A).
[13] 71 Fed. Reg. 34,285 § (l)(2)(i).

EPIC Comments                              5           Department of Homeland Security
No-Match Safe Harbor                                   Docket No. ICEB-2006-0004

The problems associated with the limited time frame proposal are particularly troubling for non-citizen employees. Non-citizens are subject to a two-tiered process for verification. First the SSA verifies that the number is valid and related to the employee; then SSA verifies with DHS that the number is valid for work in the United States.[14] This two-step process will make it difficult for non-citizen employees to obtain any necessary corrections and/or replacement documents within the allotted sixty days. For non-citizens, this may be a time-consuming task. To obtain a corrected Social Security card, non-citizens must provide documents proving immigration status, work eligibility, identity and, where relevant, proof of legal name change.[15] If there is a discrepancy with the non-citizen's DHS records, a considerable amount of time would be expended in processing the changes in the SSA record, in addition to the time required to first resolve the DHS record.

In the case of such discrepancies, employees could be faced with a time frame of only a few days in which to obtain authorized employment eligibility verification. As a result, many employees will have to undergo the additional verification procedure specified for circumstances in which the verification was not obtained within the sixty days. This process requires the employee and the employer to submit a new Form I-9. This new Form I-9 requires that the employee establish his or her identity and employment authorization using documents that do not contain Social Security numbers

---

[14] 71 Fed. Reg. 34,285 § (l)(2)(i)(B).

[15] This identity requirement is satisfied by such DHS documents as Form I-551, I-94 with unexpired foreign passport or work permit card (I-766 or I-688B). The immigration status requirement is satisfied by the I-94 document, Arrival/Departure Record. Additionally, non-citizen students must also show either their I-20 Certificate of Eligibility for Nonimmigrant Student Status or DS-2019 Certificate of Eligibility for Exchange Visitor Status. *See* Social Security Administration, *Evidence Requirements*, http://www.socialsecurity.gov/ss5doc/ (last visited Aug. 11, 2006).

or alien numbers.[16]  Because the rules specify that employers must complete this form within three days following the failure to obtain verification, employees subjected to this process will have little time to provide the necessary documentation. The onus falls to the employee to secure these documents in advance.

EPIC recommends that before adopting these rules, the DHS conduct a study of the average time it takes for both citizen and non-citizen employees to verify both Social Security numbers and DHS work authorization. This study should include an assessment of data entry errors and delays, and should also include processing time for DHS and SSA.

## II.     The proposed system shifts the burden of fixing database errors to the employees

The proposed amendments specifically state that employers should direct their employees who are the subject of no match letters to contact the SSA or DHS offices to obtain verification of employment eligibility. However, studies have shown that these agencies are not consistently responsive. An evaluation of the Basic Pilot Program, which created a web-based verification system, found that 39 percent of employers reported that SSA either never or "only sometimes" returned their calls. The evaluation also noted that 43 percent of employers reported the same problem for communications with the

---

[16] This effectively reduces the list of acceptable I-9 documents that establish identity &/or employment eligibility for non-citizens. Therefore, the only documents an employee could provide would be: an unexpired foreign passport with an attached Form I-94 indicating unexpired employment authorization; driver's license; and Certification of Birth Abroad issued by the Department of State. Form I-688 Unexpired Temporary Resident Card and Form I-688A Unexpired Employment Authorization Card have been cancelled.  *See* Citizenship and Immigration http://www.uscis.gov/graphics/formsfee/forms/i-695.htm.

**No-Match Cert. Admin. Record  1512**

Immigration and Naturalization Services.[17] Additionally, one in eight verification submissions were never resolved, indicating a high level of non-responsiveness.

It is unreasonable to place the entire burden of seeking correction of records on employees without adequately addressing this problem within the administration. EPIC recommends that the regulations also require that agencies respond within a reasonable time period, which should be significantly less than the time period allotted for verification in order to provide an opportunity for reconsideration and appeal. The rules should clearly allow for employees to receive extensions on deadlines based upon delays within the agencies. EPIC also recommends that the regulations require the agencies to publish annual reports, or include in their annual reports, the disposition of no match verification as initiated by the employee.

## III.    No-match letters may affect an individual's employability.

The proposed rules set out very specific requirements for employers to meet, but only in the context of meeting the standards for a qualified immunity from DHS action. Neither the rules nor the proposed amendments address any requirements for employers in relation to their treatment of the employee. Although the SSA indicates that these letters "are not a basis, in of themselves, for taking any adverse action against an employee,"[18] employers have little incentive to continue employment of an individual stigmatized by a potential error. This would have a disparate impact on minorities as they

---

[17] H. Small Business Comm. Subcomm. on Workforce, Empowerment, and Government Programs, Jun. 27, 2006, (Prepared Remarks of Angelo Amador, Director of Immigration Policy, U.S. Chamber of Commerce), *available at* http://wwwc.house.gov/smbiz/hearings/databaseDrivenHearingsSystem/displayTestimony.asp?hearingIdDateFormat=060627a&testimonyId=565.

[18] SOCIAL SECURITY ADMINISTRATION, OFFICE OF INCOME SECURITY PROGRAMS, EMPLOYER'S GUIDE TO FILING TIMELY AND ACCURATE W-2 WAGE REPORTS 29 (Apr. 2004), *available at* http://www.ssa.gov/employer/guidewebnew.doc.

EPIC Comments                                    8            Department of Homeland Security
No-Match Safe Harbor                                          Docket No. ICEB-2006-0004

are more likely to appear "foreign," falsely signaling to the employer a higher probability of final no match. This situation might also lead to pre-emptive discrimination on the part of employers, who might be less likely to consider those seeking employment who are new citizens, documented non-citizen workers, minorities, or members of other groups commonly perceived to be potential no-matches for employment eligibility.

EPIC recommends that the proposed amendments add a section on the rights of employees and prospective employees. This section should guarantee the employee or prospective employee be free from adverse action, such as termination, suspension or denial of employment because of the no-match status pending final confirmation of a no-match. Additionally, the section should include specific information on an appeals process that an employee or prospective employee may take if the SSA erroneously provides a final no-match confirmation. Finally, the rights of employees and perspective employees should include the opportunity to recover lost wages and attorney fees.[19] Further, the regulations should include a provision guaranteeing the pending status investigation shall remain confidential; the employer shall not disclose such information to any one other than the employee who is the subject of the record, except as necessary for the processing of employment paperwork.

## IV.    This system of no match letters is prone to errors, as evidenced by similar programs.

The proposed regulations create an employment eligibility verification system dependent on government-controlled databases. As previous programs have demonstrated and Justice Sandra Day O'Connor noted, it is not reasonable "to rely on a recordkeeping

---

[19] Amador Remarks, *supra* note 17.

system that has no mechanism to ensure its accuracy over time."[20] Databases have been shown to yield inaccurate results and delayed entry of information and updates.

Government databases have historically displayed "extremely high" error rates.[21] When applied to a large number of individuals, even small error rates can have adverse effects on millions. In testimony before a subcommittee of the U.S. House of Representatives, Angelo Amador, Director of Immigration Policy at the U.S. Chamber of Commerce, emphasized that even a one percent error rate "would translate into the improper disqualification of about 1.4 million potential workers." Further, Mr. Amador offered several examples of government database error rates:

> [E]rror rates for Internal Revenue Service data and programs are typically in the range of 10-20%. A General Accountability Office ("GAO") study on databases used for alien employment verification, pre-Basic Pilot, found that 20% of a sample of Immigration and Naturalization Services ("INS") data on aliens was incomplete and 11% of the files contained information that was erroneous. The National Law Journal reported approximately ten years ago that files on 50,000 Guatemalan and Salvadoran aliens regularly contained the first, middle, and surnames in the wrong field. This is still a common occurrence today because Hispanics tend to have compound names and the first part of the last name is routinely written as the middle name. . . . Even Social Security files have been found to contain error rates in 5-20% of cases.[22]

Two prime examples of recent problems with database-focused programs are the Basic Pilot program, which specifically applies to employment eligibility verification, and the No-Fly lists, which produced letters prohibiting access to flying on commercial

---

20 Arizona v. Evans, 514 U.S. 1, 17 (1995) (O'Connor, J., concurring).
21 Amador Remarks, *supra* note 17.
22 *Id.*

airlines in much the same way the no-match letters prohibit employment with private businesses.

*A. Basic Pilot Program*

The Basic Pilot Program, which was created in 1999 and expanded in 2004, set up a web-based application for employers to use on a voluntary basis to verify employment eligibility. This program relies on SSA and DHS databases. There have been noted problems with the system, including a high error rate, the inability to detect identity fraud, the slow response of the agencies upon which the program depends, and the noncompliance of employers.[23] Expanding and formalizing Basic Pilot, as the proposed regulations set out to do, places even more burdens on a system ill-equipped to handle the lighter load of a pilot program.

In 2005, the General Accounting Office issued a report identifying several problems with the application of the Basic Pilot Program. For instance, delays in updating records and data entry hindered expedient verifications and corrections. The GAO report found that delays in data entry and processing resulted in the need to run queries manually.[24]

> "Although the majority of pilot program queries entered by participating employers are confirmed via the automated SSA and DHS verification checks, about 15 percent of queries authorized by DHS required manual verification by immigration status verifiers in fiscal year 2004. According to USCIS, immigration status verifiers typically resolve cases referred to them for verification within 24 hours, but a small number of cases take longer. For example, nine employers we interviewed reported that a small

---

23 U.S. Gen. Accounting Office, Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts 5 (2005).
24 GAO Report at 23.

> number of immigration status verifier verifications took longer than 24 hours to resolve, with a few verifications taking as long as 2 weeks to resolve."[25]

Slow updates to name change and status change cause errors that result in erroneous no-match letters. Studies have shown the error rate for Basic Pilot to be 20 percent.[26] These errors disparately affect persons of Hispanic descent because they often have compound names, which prove difficult for the database.[27] In addition to these errors, another problem with Basic Pilot is a lack of consistent quality control. A study completed by Temple University found that one in eight verification submissions were never resolved.[28]

*B. No Fly List*

The proposed regulations effectively set up a "no work" list, similar to the "no fly" list maintained by the Transportation Security Administration (TSA), which is now part of the Department of Homeland Security and authorized by law to maintain watch lists of names of individuals suspected of posing "a risk of air piracy or terrorism or a threat to airline or passenger safety." While initially denying to the media that such a list existed, the TSA finally acknowledged its existence in October 2002.[29]

Documents obtained by EPIC, evidenced a hundred complaints filed by irate passengers who felt they had been incorrectly identified for additional security or were

---

25 GAO Report at 22-23.

26 Amador Remarks, *supra* note 17.

27 *Id.*

28 Institute for Survey Research and Westat, *Findings of the Basic Pilot Program Evaluation* (U.S. Dep't of Justice 2002), http://www.uscis.gov/graphics/aboutus/repsstudies/piloteval/PilotEvalComplete.htm.

29 EPIC, Documents Show Errors in TSA's "No Fly" and "Selectee" Watch Lists, http://www.epic.org/privacy/airtravel/foia/watchlist_foia_analysis.html (last visited Aug. 3, 2006).

| EPIC Comments | 12 | Department of Homeland Security |
|---|---|---|
| No-Match Safe Harbor | | Docket No. ICEB-2006-0004 |

denied boarding.[30] The complaints describe the bureaucratic maze passengers find themselves in if they happen to be mistaken for individuals on the lists. In one case, where a passenger was flagged by the first generation Computer Assisted Passenger Pre-Screening System (CAPPS) as a 'risk' who should be subject to additional screening, the TSA stated that airlines are responsible for the administration of the system.[31] Accordingly, the TSA directed the passenger to contact the airline to resolve the issue. In another case, a local FBI office in New Jersey, at the behest of Congressman Bill Pascrell, requested that the TSA remove a woman from the list because she was flagged due to her name's similarity to that of a wanted Australian man.[32] In an e-mail dated July 2002, an FBI counter-terrorism officer acknowledged that different airlines have different procedures when the passenger's name is similar to one on the list.[33] The example of the no fly and selectee lists can illustrate the immense problems that will surface when private companies are deputized to enforce federal regulations.  However, in the case of employment verification, an even larger number of individuals and businesses are affected.

The error rates inherent in large databases dealing with data culled from a variety of sources will almost certainly surface in the employment verification context.  At best, these errors will cost numerous individuals the time necessary to correct records. However, they may also cost employees their much-needed jobs and wages.

---

[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*

**V.    Using the SSN as employment verification is not one of the original purposes of the SSN and poses serious privacy risks.**

The Social Security Number (SSN) was created in 1936 as a nine-digit account number assigned by the Secretary of Health and Human Services for the purpose of administering the Social Security laws. SSNs were first intended for use exclusively by the federal government as a means of tracking earnings to determine the amount of Social Security taxes to credit to each worker's account. Over time, however, SSNs were permitted to be used for purposes unrelated to the administration of the Social Security system. For example, in 1961 Congress authorized the Internal Revenue Service to use SSNs as taxpayer identification numbers.[34]

In passing the Privacy Act of 1974, Congress was specifically reacting to and rejecting calls for the creation of a similar idea, a one-stop "federal data center" for personal information. A 1977 report issued as a result of the Privacy Act highlighted the dangers and transfers of power from individuals to the government that occur with centralization of personal information.[35]

It is because the SSN is used as both identifier and authenticator that identity theft has increased in incidence and prevalence. Because the SSN is relied upon so heavily by business, it is the personal identifier that impostors seek in order to commit crime. Congress' goal in addressing identity theft and privacy should seek to limit availability of the SSN generally and to induce businesses to rely upon alternative identifiers.[36] EPIC

---

[34] H. Subcomm. on Social Security, H. Comm. on Ways and Means, May 11, 2000 (Statement of Marc Rotenberg, Executive Director, EPIC), *available at* http://www.epic.org/privacy/ssn/testimony_0500.html.
[35] Privacy Prot. Study Comm'n, *Personal Privacy in an Information Society: The Report of the Privacy Protection Study Commission* (1977), available at http://www.epic.org/privacy/ppsc1977report/c1.htm.
[36] Letter from Chris Jay Hoofnagle, Associate Director, EPIC, & Ed Mierzwinski, Consumer Program Director, Nat'l Assoc. of State PIRGs, U.S. PIRG, to Clay Shaw, H. Comm. on Ways and Means,

**No-Match Cert. Admin. Record  1519**

recommends that use of the SSN be eliminated in the employment eligibility verification process. Instead, each person would be issued an employee identification number, entirely distinct from the SSN. One example would be a number format that included a "checksum" – a formula that allows one to immediately verify whether the number has a proper form. Credit card numbers already are issued in this fashion so that they cannot be guessed or faked easily.[37] This would curb the widespread use of SSNs that has significantly contributed to identity theft.

## Conclusion

These proposed amendments would continue employees' exposure to a system with a high probability for error and risk. EPIC urges DHS to reject this proposal and create a more secure system for employment eligibility verification. However, if DHS does continue this practice, EPIC recommends that the time frame delineated for obtaining verification following receipt of a no-match letter be studied and extended to provide adequate time for the most complex case – a non-citizen employee who is identified as having discrepancies in both his SSA and DHS records. Further, EPIC recommends that DHS create clear guidelines for employers' use of this system to prevent prescreening use for discriminatory hiring practices. This should be addressed in the form of rights guaranteed to employees. However, EPIC strongly recommends that DHS reconsider the use of Social Security numbers as a verification and identification tool.

Respectfully Submitted,

---

Subcomm. on Social Security, July 2, 2006, *available at* http://www.epic.org/privacy/ssn/ssnanswers7.2.04.html.
[37] *Id.*

EPIC Comments                          15            Department of Homeland Security
No-Match Safe Harbor                                 Docket No. ICEB-2006-0004

**No-Match Cert. Admin. Record  1520**

Courtney Anne Barclay
Sunni Yuen
IPIOP Clerks

Sherwin Siy
Staff Counsel

**From:** Marquez, Sonia [mailto:SMarquez@gbls.org]
**Sent:** Monday, August 14, 2006 4:39 PM
**To:** Regs, Rfs
**Subject:** Docket Number ICEB-2006-0004

Attached please find my comments in response to the proposed regulation entitled: Safe Harbor Procedures for Employers Who Receive a No Match Letter, Docket Number ICEB-2006-0004.

Thank you.


Sonia Marquez
Personnel Director
Greater Boston Legal Services

**From:** Tobi Hill-Meyer [mailto:nodesignation@gmail.com]
**Sent:** Tuesday, August 08, 2006 7:44 PM
**To:** Regs, Rfs
**Subject:** DHS Docket No. ICEB-2006-0004

Legitimate mismatches are common.

It can be incredibly burdonsome, as well as lead to the distribution
of confidential medical information in order to deal with the
aftermath of revealed "mis-matches"  I can think of about 5 or 6
"mis-matches" in my records alone.  Due to my hyphenated name, several
databases have decided that I am not "Tobi Hill-Meyer," but instead
"Meyer T. Hill," "Tobi Meyer," Tobi Hill," and "Meyer Hill."  All of
which have appeared in my financial records, employment records, and
other records despite my attempts to prevent it.

Additionally, I have recently changed my name.  It would be easy for
one agency to not have updated their information and spark a "No
Match."

Finally, I am transgender.  Different agencies have different rules
for how to document my gender, and my gender will often legally change
when I cross state lines.  It is regretably impossible to match all my
records due to these incompatible policies.

Despite the legitimacy of my records, having to deal with my employer
recieving a "No Match" letter would be onerous, burdonesome, reveal
confidential medical information, and put my job in risk.  Please put
extreme limits on the "No Match" program, or elliminate it entirely.

--Tobi Hill-Meyer

**From:** Ricardo Flores [mailto:floresr@publicjustice.org]
**Sent:** Thursday, August 10, 2006 3:08 PM
**To:** Regs, Rfs
**Subject:** Docket_No._ICEB-2006-0004

Attached are my comments on your proposed rule regarding SSA "No-Match Letters."  Thank you for your consideration.

**Ricardo A. Flores, Public Policy Director**

Public Justice Center

500 East Lexington Street

Baltimore, Maryland 21202

**410-625-9409 ext. 224**

**240-388-1561 cell**

**410-625-9423 fax**

floresr@publicjustice.org

www.publicjustice.org

The Public Justice Center is a non-partisan 501(c)(3) organization and does not support or oppose elected officials, candidates or political parties.



**P**ublic
**J**ustice
**C**enter

500 East Lexington Street
Baltimore, Maryland 21202
(410) 625-9409
fax (410) 625-9423
www.publicjustice.org

**PRESIDENT**
Joy Sakamoto-Wengel, Esquire
Office of the Attorney General

**VICE PRESIDENT**
Toro J. Adachi, M.D., F.A.C.O.G.
Adachi Medical Associates

**TREASURER**
Gregory Hemingway, CPA
University of Maryland Medical System

**SECRETARY**
Professor Michael Pinard
University of Maryland School of Law

Edward M. Buxbaum, Esquire
Whiteford, Taylor & Preston, LLP

Paul S. Caiola, Esquire
Gallagher, Evelius & Jones, LLP

Professor Douglas L. Colbert
University of Maryland School of Law

Robert E. Funk, Jr., Esquire

Professor Michele E. Gilman
University of Baltimore School of Law

Richard S. Gordon, Esquire
Quinn, Gordon, Wolf, Chtd.

Gladine Harvey

Dennis C. Hayes, Esquire
NAACP

**Professor**
F. Michael Higginbotham
University of Baltimore School of Law

Dennis A. López, MPH
Public Health Consultant

Anthony W. McCarthy
WEAA/WTTR

Keith D. Milligan
Law Offices of Peter G. Angelos, P.C.

Frank J. O'Donnell, S.M., Esquire
Maristas Community

Patrick I. Okolo III, MD, MPH
Sinai Hospital

Nancy E. Paige, Esquire
Office of Administrative Hearings

Professor Jamin Raskin
American University Washington
College of Law

Sheila K. Sachs, Esquire
Gordon, Feinblatt, Rothman, Hoffberger &
Hollander, LLC

John P. Sarbanes, Esquire
Venable, LLP

Lenel Srochi-Meyerhoff

Michael K. Wasno
Maxxcal Communications Federal

Christine Webber, Esquire
Cohen, Milstein, Hausfeld &
Toll, P.L.L.C.

Janice L. Wilson

**Executive Director**
John Nethercut, Esquire

AUGUST 10, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C.  20529

*Re:*  **DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"**

Dear Sir or Madam:

The Public Justice Center submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The Public Justice Center is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

- This proposed rule will harm all workers regardless of immigration status.

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations.

- The proposed rule will expand the unregulated underground cash economy.

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new obligations will increase pressure on businesses to go "off the books," thereby promoting the unregulated underground cash economy which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- This proposed rule is an end-run around the legislative process.

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- The SSA no-match letter program is ill-suited as a tool for immigration enforcement.

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

- The costs of implementing the proposed rule are prohibitive.

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- The proposed rule is objectionable because compliance is impractical.

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

For all of the above reasons, we request that the Department of Homeland Security withdraw the proposed rule in its entirety.

Respectfully submitted,

*Ricardo A. Flores*

Public Policy Director
Public Justice Center
500 East Lexington Street
Baltimore, Maryland 21202
410-625-9409 ext. 224
410-625-9423 fax
floresr@publicjustice.org

**From:** Rob Roy [mailto:rob-vcaa@pacbell.net]
**Sent:** Monday, August 14, 2006 2:03 PM
**To:** Regs, Rfs
**Subject:** DHS Social Security No-Match Propsed Rules

Ventura County Agricultural Association is a non-profit trade association which represents the interests of over 150 major agricultural businesses located in Ventura County, California. These members will be directly impacted by the proposed rules and our Association has many concerns for the potential liability of our members attributable to the currently proposed rules. We respectfully incorporate by reference, in their entirety, the comments filed today by the National Council of Agricultural Employers, as though fully set forth herein, as the comments of our agricultural trade association on the proposed rules.

Respectfully submitted,
Robert P. Roy
President and General Counsel.



716 Commercial SE  *  P.O. Box 25444  *  Albuquerque NM  87125
Phone: (505) 242-8284  *  Fax: (505) 242-8327

American Subcontractors Association (ASA)
1004 Duke Street
Alexandria VA  22314-3588
Reference: DHS Docket No ICEB-2006-004
Phone: 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   Fax: 703-836-3482
E Mail: asaoffice@asa-hq.com
August 14, 2006

To Whom It May Concern:

    As I read the article on the proposed regulation change on the definition of
"knowing" as it is related to unauthorized aliens in the United States, all I could think
about is all the extra information the government is now trying to make companies
responsible for compiling.  Starting in 1986, companies started having to fill out and keep
track of employee information on I-9 forms.  We were given lists of acceptable and
unacceptable documents that we were allowed to use for completing the I-9 Form.  We
were also informed that we could not pick and chose which documents that we would
accept from an individual in completing the I-9 Form.  We were informed that we had to
fill out the new I-9 form for each new employee that was hired.

    We are also required to call the Social Security Administration to verify that the
Social Security Number and Name the employee furnished to us at time of hire match.
Again we were informed that we could not fire an individual who was already hired if
their Social Security Number and Name did not match.  We also cannot get this
information in advance of hiring an individual at our company.  We could be sued for
discrimination.

    To protect our company, even though it is not required, we instituted a policy of
making copies of all information given to us at the time of hire. This policy has come in
handy when we have received the SSA - No Match letters.  I go to the I-9 File folder and
pull that specific employee's information to make sure that the information I gave the
SSA is both correct and accurate on my end.  If it is, I inform the employee in question to
go down to the SSA and get a correct Social Security Number.  If there is a problem with
the Social Security Number and the employee name not matching, our company would
give the employee in question time off during SSA business hours to go and rectify the
problem.  However we would not pay them for this time off.

**No-Match Cert. Admin. Record  1529**

I do not feel that 14 days is sufficient time to correct No Match letters. The SSA starts counting days from the day they send out the request for information. If the No Match letter is mailed during peak mail periods such as when companies mailing out W-2's and tax forms, there could be a delay in a company receiving this information. This would make it hard for the payroll clerk to have the time to properly research the information in the 14 days allotted. I would suggest 20 to 30 days would be more reasonable. Giving a company 60 days to review, complete, and fix all the necessary paperwork for an employee with incorrect information is also unreasonable. If the employee were out on vacation, sick leave, or on Family Leave, the payroll clerk would not be able to talk to the individual until they got back.

The proposal of having an employee bring in completely new documentation after 60 days if the problem with the old Social Security Card cannot be resolved does not eliminate the problem. We would just have to start all over with the paper work using a different name. It takes approximately 2 hrs to fill out the necessary paperwork and make the necessary copies when our company sets up a new employee. We also have to fill out and send the New Mexico State New Hire Reporting Form. This will add approximately another hour of time to get all necessary paper work completed and ready to mail to the correct authorities.

The financial impact on our company is harder to estimate. If we have to fire and hire a new employee, it could cost us potentially $2,500.00 per employee. We are a small company and these new rules would impact our delivery schedules and work load tremendously.

I do not see in any of these proposed changes how the employer will be protected if the employee is no longer at this place of employment. Or with Discrimination or Wrongful Termination suits when we have to let an employee go because of these proposed changes. The government already makes us responsible for many things: filling out I-9 Forms properly, calling to check on Social Security Numbers and Name matches, and documenting the information of whom you talked to, date and time of call in case our company needs prove we called. New Hire Documents so that they can track when new employees are hired. We do this because if the employee owes child support, back child support, garnishments from other settlements the various agencies can collect. The government is adding additional burdens of paperwork to the employer. There is no set safe recourse for the employer to take if the employee refuses or cannot produce the correct documentation.

Sincerely yours,

Robin E Stone-May
Payroll Administrator
ForgeMaster Iron

**From:** Ruth Clark [mailto:RClark@tindallfoster.com]
**Sent:** Friday, August 11, 2006 6:04 PM
**To:** Regs, Rfs
**Subject:** DHS Docket No.ICEB-2006-0004

Dear Sir or Madam:

Attached, please find our comments to the proposed rule regarding safe-harbor procedures for employers who receive a no-match letter.

In Kind Regards,

Ruth Clark
Law Clerk
Tindall & Foster, P.C.
600 Travis St, Suite 2800
Houston, TX 77002-3094
Phone: (713) 229-0636, ext. 1114
RClark@tindallfoster.com

HARRY L. TINDALL*
CHARLES C. FOSTER**
ROBERT F. LOUGHRAN**
ANGELA G. PENCE*
MAGALI S. CANDLER**
KAREN KATZ FELDMAN**
LEIGH N. GANCHAN**
H. RICHARD SINDELAR III*
MATTHEW G. THOMPSON
KRISTEN T. BURKE
ANGELIQUE MONTANO
ANDREW G. THORLEY
CAMILLE WHITWORTH
DELISA J. FUTCH
J. JAY STRIMEL
CORINA M. FARIAS
JENNIFER A. SALOMON
MAGGIE MURPHY
JARRED J. SLATER
MARK S. CROSS
RYAN C. CHARGOIS

# TINDALL & FOSTER, P.C.

### ATTORNEYS AT LAW
600 TRAVIS STREET, SUITE 2800
HOUSTON, TEXAS 77002-3094
TELEPHONE: (713) 229-8733
FAX: (713) 228-1303
www.tindallfoster.com

BOARD CERTIFIED–TEXAS BOARD
OF LEGAL SPECIALIZATION

*FAMILY LAW

** IMMIGRATION & NATIONALITY LAW

*OF COUNSEL

AUSTIN OFFICE
100 CONGRESS AVENUE, SUITE 1300
AUSTIN, TX 78701-2751
TELEPHONE: (512) 476-9473
FAX: (512) 494-8066
www.tindallfoster.com

August 10, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N.W. 2nd Floor
Washington, D.C. 20529

RE:     Comments to Proposed Rule
        DHS Docket No. ICEB-2006-0004

Dear Sir or Madam:

In response to the Department of Homeland Security's request for comments to its proposed rule entitled "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," we submit the following comments:

Section 1:

The proposed rule places an undue burden on an employer to verify with the relevant agency that the discrepancy has been resolved. While the proposed rule does provide a phone number to verify a Social Security Number with the Social Security Administration, it does not provide contact information for the employer to verify information with the Department of Homeland Security. In addition, the employer cannot control if the relevant agency fails to respond to its request for verification in a timely manner.

It is unreasonable for an employer to check its records, correct its records (if there is an error), inform the relevant agency, and verify that the name and number, as corrected, match agency records- within 14 days of the receipt of the no-match letter. This is an unreasonable time frame, particularly in cases where the no-match letter references a large number of employees. We propose that 90 days is a more reasonable time frame.

Section 2:

The proposed rule places an undue burden on an employer to verify with the relevant agency that the discrepancy has been resolved. While the proposed rule does provide a phone number to verify a Social Security Number with the Social Security Administration, it does not provide contact information for the employer to verify information with the Department of Homeland Security. In addition, the employer cannot control if the relevant agency fails to respond to its request for verification in a timely manner.

It is unreasonable to expect the employer to take such steps within 14 days of receipt of the no-match letter. In addition, the employer may not be able to verify the information with the relevant agencies in such a short time frame. We propose that 90 days is a more reasonable time frame.

Section 3:

It is unreasonable to expect the employer to review its own records, follow-up with its employees, verify records with the relevant agencies, and complete a new Form I-9 within 63 days of receipt of the no-match letter. We propose that 123 days is a more reasonable time frame.

The proposed reasonable verification procedure does not solve the problem of unauthorized immigrants providing false documentation to employers. In fact, this proposed procedure encourages more fraud by unauthorized workers. Undocumented workers will simply provide a different Social Security Number or Alien Number every year, and the employer will continue to receive no-match letters from the Government. This plan does not create a solution, it merely delays dealing with the problem for one more year.

Thank you very much for providing us with an opportunity to submit comments to this proposed rule.

Sincerely,

Charles C. Foster

**From:** Sheila Gleeson [mailto:shella@ciic-usa.org]
**Sent:** Friday, August 11, 2006 5:30 PM
**To:** Regs, Rfs
**Subject:** DHS Docket No. ICEB-2006-0004 comments from the CIIC

August 11, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

Re:     DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"

Dear Sir or Madam:

The Coalition of Irish Immigration Centers submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The Coalition of Irish Immigration Centers is a national umbrella organization that represents Irish organizations throughout the United States. Our members provide a range of direct services to immigrants including: visa and citizenship information and social services information, referral and support. We support comprehensive immigration reform as the only effective way to resolve the myriad of problems with the current immigration system. We believe effective and targeted enforcement measures combined with a reform of our admissions system, and a real solution for the undocumented population living in the U.S is the way to move forward.

Irish immigration centers across the country have had ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States. The proposed changes will result in further problems and increased numbers of immigrants being fired by employers who have receive a No-Match Letter. In our experience there are legitimate reasons for many mismatches including name changes, marriage, divorce and misspellings. If the proposed rule changes are implemented the result will be more wrongful firings. The "safe harbor" provision in the proposed rule would be overly burdensome for employers and does not provide a solution for the millions of immigrants seeking to work legally in the U.S.

As a result of this experience the Coalition of Irish Immigration Centers is concerned about and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter."  Such a rule will magnify the negative impact that SSA no-match letters have had on workers' rights, and could result in mass firings across the nation.  We believe that while it will cause major problems in the workplace and harm all workers regardless of their immigration status it will have no impact on the issue of uncommented immigration. The SSA no-match program is ill-suited as an immigration enforcement tool.  We therefore urge DHS to withdraw this proposed rule in its entirety.

Respectfully submitted,

Sheila Gleeson
Executive Director
Coalition of Irish Immigration Centers
551 Washington Street, Suite 4
Boston, MA 02135
Tel: 617-987-0193
Fax: 617-987-0193
sheila@ciic-usa.org

**From:** IHM [mailto:houst-ms@ayrix.net]
**Sent:** Thursday, August 10, 2006 11:06 AM
**To:** Regs, Rfs
**Subject:** DHS Docket No. ICEB 2006 - 0004

We urge you to reject the proposed rule "Safe Harbor for Procedures for Employers" who receive a no match letter from the SSA. We further urge you to comply with the goal of President Bush who stressed on July 31, "we must have comprehensive immigration reform". He said that "the best way to enforce the border is to have a rational way for people -who are doing jobs that Americans aren't doing- to come to this country ...as part of comprehensive reform."

We need immigrant labor. We also need to have an overhaul of the present immigration system – a comprehensive reform -which will include a reform of our admissions system, and effective, targeted enforcement measures. We need a realistic solution for the undocumented population now living in the U.S, many of whom have provided the invaluable, irreplaceable labor that has fueled the economy of this nation for years.

Your mission is to serve the security and well being of this nation. Our economic reality is a vital part of a secure and healthy nation. The fabric of this nation is of one piece. The security of all of those who today are laboring in our fields and factories affects the security of us all.

Please be true to your mission to look to the good of our nation, and support the challenge of a comprehensive immigration reform. Reject this one more isolated rule which would set in motion years of red tape and paper work, but wouldn't touch the real needs in our nation's broken immigration system.

Thank you for your attention to this matter,

Sheila Griffin
Rosemary Empen

**From:** Therressa Ivey [mailto:tivey@ufcw.org]
**Sent:** Monday, August 14, 2006 4:35 PM
**To:** Regs, Rfs
**Cc:** Jo Deutsch; Michael Wilson; Renee Bowser
**Subject:** DHS Docket No. ICEB-206-0004

Dear Director Richard Sloan:

Attached, as a PDF file, are the UFCW's comments on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter.

Attachment

Terri Ivey
Legal Department
UFCW  - ext. 1450



**VIA Email**

August 14, 2006

Mr. Richard Sloan, Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington DC 20529

Re:   DHS Docket No. ICEB-206-0004
      <u>Comments: Proposed SSA No-Match Safe Harbor Procedures</u>

Dear Director Sloan:

As International President of the 1.4 million members of the United Food and Commercial Workers International Union (UFCW), I am compelled to comment on the Department of Homeland Security's proposed regulation which would radically change how an employer would be required to respond to the Social Security Administration's (SSA) issuance of no-match letters which contain notice of alleged discrepancies between employees' names and the Social Security Numbers (SSN) assigned to them in SSA records. The proposed regulation would create a new, dominant role for SSNs such that an unresolved discrepancy between an employee's name and SSN would call into question the employee's work authorization even when the employee has submitted documents in compliance with Form I-9 verification requirements at hire.

Under the current regulation, SSA issues no-match letters to employers when Agency records indicate that an employee's name does not match with the SSN recorded for that employee. The SSA endeavors to correctly match the name and SSN so that benefits can be allocated to the appropriate employee's retirement account. This is purely an administrative procedure to serve internal Agency purposes. The SSA letter thus informs employers that any discrepancy between an employee's name and SSN has no bearing on work authorization status or immigration status. Indeed, SSA has no enforcement authority with regard to employee work authorization status or immigration issues under the Immigration and Nationality Act.

**Joseph T. Hansen,** *International President*
**Anthony M. Perrone,** *International Secretary-Treasurer*
◄◄◄►

United Food & Commercial Workers International Union, CLC
1775 K Street, NW • Washington DC 20006-1598
Office (202) 223-3111 • Fax (202) 466-1562 • www.ufcw.org

Mr. Richard Sloan                                                    August 14, 2006

-2-

SSA's process of assigning and correcting SSNs is very error prone because of continuous formal and informal name configurations and changes among the hundreds of millions of people and the increasingly diverse cultures represented in the nation's population. Thus, adding or omitting a middle initial or a hyphen in a name will cause a no-match in SSA records. Additionally, changing names due to marriage or divorce will cause a no-match in SSA's records, as will a change in the order in which an individual's name is recorded in SSA records.

Examination of DHS's Basic Pilot Program, the government's only automated employment eligibility program, clearly demonstrates that the current database is greatly flawed and forecasts how the proposed regulation would multiply erroneous discharges of work authorized employees. The SSA database and that maintained by DHS are the underlying databases of the Basic Pilot Program. An independent evaluation of the Basic Pilot Program, published in 2002 and mandated by the law which created the program, found that 20 percent of properly work authorized employees are initially found not to be work authorized. Institute of Survey Research at Temple University (ISR) and Westat, Findings of the Basic Pilot Program Evaluation, June 2002, at 122-123. The independent evaluation stated that approximately one-third of employers using the pilot system reported that it is easy to make errors when entering information. The study also noted that a specific data entry problem is the difficulty of entering compound surnames, which is especially likely to arise with certain foreign-born employees and contribute to the much higher error rate among such employees. The ISR and Westat study found that when employers contacted the INS (now DHS) and SSA in an attempt to clarify data, the Agencies were often not very responsive or accessible, with 39 percent of employers reporting that SSA never or only sometimes returned their calls. ISR and Westat, Basic Pilot Evaluation Summary Report, January, 2002 at 18. The summary report recommended that the Basic Pilot Program not be expanded to a mandatory program until the SSA and DHS address the inaccuracies in their databases which, to date, the Agencies have failed to do.

Moreover, the Government Accountability Office (GAO) recently concluded that the Basic Pilot Program is not prepared to handle the abrupt increase in participation which would be required by a mandatory, nationwide program. Barbara D. Bovbjerg, Testimony Before the Subcommittee on Oversight, during Questions and Answers period. GAO specifically found that the program is riddled with delays in updating immigration records, false-negatives, and non-user friendly program software. Barbara D. Bovbjerg, Director, Education, Workforce, and Income Security Issues at GAO, Testimony Before the Subcommittee on Oversight of the House Committee on Ways and Means, February 16, 2006.

Mr. Richard Sloan                                            August 14, 2006

-3-

It is in this context that the proposed regulation would radically change the administrative focus of addressing alleged discrepancies and create a law enforcement purpose which is wholly absent under current law. The proposed regulation would require the employer to take certain steps, including ultimately firing an employee, if the employer is unable to resolve the no-match within 60 days. If the employer elects not to discharge employees after using other prescribed methods for resolving no-matches, the employer will risk that DHS will disagree that company procedures were reasonable. DHS may then prosecute the employer, alleging that it continued to employ an employee while having constructive notice that he/she was not work authorized.

The UFCW believes the proposed changes are profoundly ill-advised. Thus, the proposed regulation would provide that SSA's notice to an employer of a no-match discrepancy constitutes constructive notice that the subject employee is not work authorized unless the employer takes action prescribed by the proposed regulation. Under the proposed regulation, employers would be required to resolve the alleged discrepancy by checking their records to determine whether they accurately reported information to SSA, checking with employees to determine whether they accurately reported SSN information, and then verifying with SSA that employees' names match with the SSNs assigned to the names in the SSA database. If these checks fail to resolve the discrepancy, the employer must then complete a new Form I-9 or discharge the employee in order to comply with the safe harbor procedures which rebut the notion that the SSN is constructive notice of lack of work authorization.

In this way, the proposed regulation would appear to create a contradiction, as the employer would be required to reverify the employee's work authorization and identity even though the identity and authorization documents produced at hire have not been discredited. If the employee stands by his original verification documents in the face of the SSN discrepancy, the employer would be prompted to discharge him/her rather than risk the loss of the safe harbor protection.

Additionally, the proposed regulation prescribes that no document containing the SSN that is subject of the no-match letter may be used to establish identity or work authorization. This provision may create additional confusion for employers and employees, alike, because Form I-9, section one requests a SSN even if the document is not proffered for identity or work authorization. Here again, it is likely that an employer may refuse to accept that an employee has properly complied with Form I-9 verification requirements because of questions about the SSN.

The proposed regulation, therefore, would radically change the law regarding whether an employer has constructive knowledge of lack of work

Mr. Richard Sloan                                              August 14, 2006

-4-

authorization. Under current law, the duty to reverify is triggered only when an employer has specific and detailed information of lack of work authorization. Thus, under long-standing case precedent, generalizations or minor discrepancies do not constitute constructive notice. New El Rey Sausage Co. v. U.S. Immigration and Naturalization Service, 925 F.2d 1153, 1158 (9th Cir. 1991). Rather, the law requires that employers act on specific and detailed information that the employment authorization documents are not valid. Id. (INS notified employer that employment authorization documents did not pertain to individuals who presented them).

The proposed regulation would discard long-standing precedent and cede to SSNs overriding weight in the employment verification process. If the proposed regulation becomes a final rule, employees risk loss of their livelihoods based on erroneous SSA records which, as shown above, have an extraordinary error rate in matching employees' SSNs with their names. This error rate can only be expected to increase if the DHS rushes to require greater employer use of such an error prone system as a deciding hire and retention tool.

The error rate will also likely increase because of the additional administrative burdens the proposed regulation will place upon the SSA system. In this respect, DHS's proposed regulation would impose upon SSA verification responsibilities which do not exist in SSA's current administrative scheme. The proposed regulation would provide only a 60-day time period within which both the employer and all its employees must resolve discrepancies. Specifically, the proposed regulation would require an employee to visit the SSA and mandate that the Agency review and confirm the employee's identity information. The proposed regulation also would require the employer to verify with the SSA that the employee's name matches the number assigned to that name in SSA records. Requiring SSA to react within such short time constraints to both employer and employee inquiries will cause it to confront additional problems in accurately processing updated data. Updated data may not be available for access when needed. Furthermore, employees and employers, alike, will have difficulty verifying contacts with SSA because it may not provide receipts confirming employee visits or documentation that employers have used the Agency's on-line verification system.

DHS's proposed regulation is further problematic because it radically alters the existing verification system at the same time that Congress is considering comprehensive immigration reform. Such isolated action will impede the coordination necessary to making an immigration package compatible with the proposed regulatory proposal. The change will also alter existing mandates without any evidence that SSNs will provide more accurate determinations of work authorization. To the contrary, the record of the accuracy of SSN no-match data suggests that the proposed mandate will only confuse and distort the work authorization process.

**No-Match Cert. Admin. Record  1541**

AUG-14-06    16:54    FROM-                                                T-640   P.006/006   F-806

Mr. Richard Sloan                                                    August 14, 2006

-5-

A couple of examples dramatically illustrate the confusion caused by alleged SSN discrepancies. In one instance, Seneca Foods, a major food processor, received a no-match letter which notified the employer of a discrepancy between the name and the recorded SSN of an employee who is a U.S. citizen. The problem was that the employee's name was hyphenated in employer records but did not contain hyphenation in SSA records. In another example involving the same employer, company records had recorded an employee's names in several different orders. In July 2006, following publication of the proposed regulation, a northeastern grocer precipitantly suspended dozens of employees in order to avoid any risk that alleged SSN discrepancies will be equated with the lack of work authorization.

In sum, the proposed regulation will mandate the use of a flawed procedural tool in determining continued work authorization, impose the use of a tool which is divorced from the effort to enact comprehensive immigration reform, and diminish the accuracy of a grossly inaccurate SSA record keeping system. This will subject great numbers of employees to unjustified disruptions in work, including firings.

The proposed regulation needs to better reflect the real world in which employers illegally dismiss employees because the government raises questions about their status, causing disruptions in work, job losses, and life-altering changes merely because of what amounts to administrative and clerical error.

I hope that these comments are helpful as you proceed to reform this process. Thank you for the opportunity to comment, and please feel free to contact us if you need additional information or have additional questions.

Very truly yours,

*Joseph G. Hansen*

International President

**From:** Toby Malara [mailto:tmalara@americanstaffing.net]
**Sent:** Monday, August 14, 2006 12:46 PM
**To:** Regs, Rfs
**Subject:** DHS Docket No. ICEB-2006-004

Toby Malara, Esq.
Government Affairs Counsel
American Staffing Association
277 S. Washington St., Suite 200
Alexandria, VA 22314-3675
703-253-2020
703-253-2027 direct
703-253-2053 fax
tmalara@americanstaffing.net
*americanstaffing.net*

The American Staffing Association is the voice of the U.S. staffing industry. Along with affiliated chapters in most states, ASA promotes the interests of the industry through legal and legislative advocacy, public relations, education, and the establishment of high standards of ethical conduct.

# American Staffing Association

Director, Regulatory Management Division
U.S. Citizenship & Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW
2nd Floor
Washington, DC 20529

      Re:    DHS Docket No. ICEB-2006-0004

    The American Staffing Association (ASA) submits the following comments to the Notice published in the *Federal Register* on June 14, 2006, regarding Social Security No-match or Mismatch Letters. In seeking comments concerning Social Security No-Match Letters, ICE was particularly interested in comments on the propriety of time frames proposed in the rule.

    ASA is the voice of the U.S. staffing industry. Along with its affiliated chapters, ASA promotes the interests of the industry through legal and legislative advocacy, public relations, education, and the establishment of high standards of ethical conduct. ASA has been promoting flexible employment opportunities since its founding in 1966. ASA members provide a wide range of employment-related services and solutions, including temporary and contract staffing, recruiting and permanent placement, outsourcing, training, and human resource consulting. Member companies operate more than 15,000 offices across the nation and account for more than 85% of U.S. staffing industry sales.

    ASA is uniquely situated to evaluate the impact of the Proposed Rule on the Staffing Industry, which has grown exponentially over the last few decades specifically because it offers flexible employment opportunities. The growth of this industry should not be adversely impacted by these regulations, which presume that all employees work at the same site as the employer. This is not the case in the Staffing Industry and that fact greatly impacts what steps are "reasonable" or what constitutes a "safe harbor" for an employer to follow when it receives a No-Match Letter.

    In summary, the Proposed Rule aims to elaborate on the definition of "knowing," in terms of what will constitute constructive knowledge for purposes of determining a violation under the Immigration Reform Control Act. This provision states:

> It is unlawful for a person or other entity, after hiring an alien for employment in accordance with paragraph (1) to **continue to employ the alien** in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment.

8 U.S.C. § 1324a(a)(2) (emphasis added). The Proposed Rule amends the definition of "knowing" found in the regulations at 8 CFR § 274a.1(l) by adding that in determining whether or not an employer had  knowledge or constructive knowledge, the Immigration Service will

American Staffing Association
DHS Docket No. ICEB-2006-0004
August 11, 2006
Page 2

look to the "totality of relevant circumstances," but will also presume constructive knowledge in a few specific instances, including when an employer receives a Social Security No-Match Letter.[1]

**GENERAL CONCERNS**

ASA supports in concept the "totality of the relevant circumstances" test adopted in the proposed rule in evaluating what steps would be reasonable for an employer to take upon receipt of a Social Security No-Match Letter. The key concern is that the "relevant circumstances" must take into account the distinctions between direct hire employers and staffing or contract labor employment firms.

For example, the Proposed Rule presupposes that all employees are physically located at the exact same location where the employer would "receive" notification of the No-Match letter. "Receipt" is not defined in the Proposed Rule. For an employer with a single location, the No-Match letter would be sent to the employer's only address. The "received" date is still unclear because many employers do not date stamp all mail as it comes in the door. This problem is compounded for staffing firms that have multiple office locations. Some large firms may have hundreds of offices nationwide. In such cases, the No-Match letter may very realistically be sent to a company headquarters address based on a centralized payroll system. That notice could be several states or time zones away from the office responsible for placing the employee, and still several states more away from where the employee is actually working.

The Proposed Rule also presumes that everyone listed in the No-Match letter is still a current employee. Although this is also a concern for direct hire employers, it is even more of an issue for staffing or contract labor, which by definition, employs people for far shorter terms. Given that No-Match letters are usually only sent once per year,[2] it is very likely that many individuals identified in such a letter would no longer be employed. ASA wants to make clear that if an employer receives a No-Match letter from the Social Security Administration or notification from the Department of Homeland Security relating to an alien that is <u>NO LONGER EMPLOYED</u>, then it would be "reasonable" for an employer NOT to follow the steps outlined in the Proposed Rule because the employer is NOT "continuing to employ" the individual, as prohibited by the statute.

---

[1] For purposes of this comment, ASA recognizes that the Proposed Rule adds two examples of instances when an employer may receive information that will result in constructive knowledge unless it takes "reasonable steps" under the safe-harbor guidance. When an employer receives: (1) a No-Match letter from the Social Security Administration; OR (2) notification from the Department of Homeland Security in the context of an I-9 Audit that an employee's employment authorization document presented for I-9 purposes does not match agency records for that employee. Given the relative infrequency of I-9 Audits, as compared to receipt of Social Security No-Match letters, this comment will reference only the No-Match context, but all of ASA's comments apply equally in both contexts.

[2] Because of the unique nature of the temporary and contract staffing relationship discussed in these comments and the time staffing firms will require to do the appropriate amount of due diligence investigation on each mismatch, it may be wise for the Social Security Administration to consider issuing No-Match Letters more frequently than once per year. Given the size of some national employers, it may be even more difficult to respond to all of the research inquiries within the very short time periods stated in the Proposed Rule if the request is only sent once per year.

---

No-Match Cert. Admin. Record 1545

American Staffing Association
DHS Docket No. ICEB-2006-0004
August 11, 2006
Page 3

Finally, the Proposed Rule references a variety of time periods in terms of "days," rather than "business days." ASA is assuming that the Rule intended ALL time periods to reflect business days and just failed to specify it as such. The Proposed Rule references current regulations, which require that I-9's must be completed within three days after a new hire, citing 8 CFR § 274a.2(b)(1)(ii). However, this provision actually states three "business days." Therefore, all of the time periods referenced in the Proposed Rule should be amended to reflect the business day distinction.

## PARTICULAR CONCERNS

The proposed amendment to the regulatory definition of "knowing" includes a new subsection 8 CFR § 274a.1(1)(iii)(C) that outlines the safe harbor "reasonable" steps that an employer can undertake to avoid a finding of constructive knowledge, given receipt of a Social Security No-Match letter relating to a particular individual.

1. In subsection (A)(1), the Service has outlined a 14 day window from "receipt" of the mismatch letter in which an employer must: (1) determine if there is an error in its own records; (2) if so, it must notify the agency as required in the letter; (3) and verify with the agency that the new information is a match.

   - ASA notes that it could easily take 7-14 days just for such a letter to be routed from a company's headquarters in Boston, for example, to the particular branch office responsible for the placement of the employee in Florida so that I-9 documentation can be reviewed. This still does not take into account the time it would take to obtain verification with the Agency that the corrected number is a match.
   - ASA recommends that this time period be 45 days, but no less than 30 days.

2. Subsection (A)(2) requires that if the employer's records are correct, then the employer must notify the employee of the discrepancy and if the employee confirms that the number is accurate, require the employee to resolve any discrepancy directly with the Agency. All of this must be accomplished within the same 14 day window.

   - Direct hire employers may not have a problem with this 14 day time frame, if all that is required is walking down the hall to speak to the employee. Staffing firms, on the other hand, frequently have employees who are physically located several states away and can move from state to state in very short periods of time. Therefore, it would be extremely difficult for staffing firms to comply with this requirement. As explained above, it could take 30 days just to have the paperwork passed to the appropriate office, complete the research in the employee records and then track down the employee and have that person check his or her records. Only when the employee confirms that the number is accurate can the employer advise the employee to resolve it with the agency.

American Staffing Association
DHS Docket No. ICEB-2006-0004
August 11, 2006
Page 4

- ASA again recommends a 45 day time period, but not less than 30 days.
- ASA would also like to confirm that the employer's obligation is to advise the employee to notify the agency and resolve the discrepancy. The employer should not be obligated to transport the employee or document what particular steps the employee took to resolve the discrepancy.

3. Subsection (B) requires that if 60 days have passed from "receipt" and the employee has not been able to present written documentation from the agency of the correction, then the employer must complete a new I-9 form within three days, without accepting any documents referencing the disputed social security number.

- Because ASA believes that it could take a staffing firm up to 45 days just to complete the first few steps, we do not believe that it is reasonable to assume that an employee could resolve a dispute with a federal agency in only 15 days. The time period allocated must be realistic. The Social Security Administration frequently takes 2-4 weeks just to issue a number, let alone research an error in its own system. To further compound the problem, because of frequent assignment changes common in the staffing industry, an employee may start an inquiry with a Social Security office in Oregon, but then move to Texas, which requires follow up through a different office. This also takes a lot more time.
- ASA recommends that this time period be not less than 90 days, which is consistent with the existing "receipt rule" in the I-9 regulations.

## CONCLUSION

ASA supports ICE's effort to provide employers with guidance and a safe harbor for dealing with receipt of No-Match Social Security Letters. ASA requests that the agency incorporate the changes suggested here, which reflect the unique characteristics of temporary and contract staffing.

Respectfully submitted,

AMERICAN STAFFING ASSOCIATION

Edward A. Lenz
Senior Vice President and General Counsel

*YES!!*

# I Say ~~NO~~ to the Department of Homeland Security's Proposed Regulations of the Social Security Administration's (SSA) "No-Match" Letters!

Re: Docket ICEB-2006-0004

Dear Director,

*YES!!*

I join with other citizens and business, labor, immigration and privacy groups in saying ~~no~~ to the proposed regulations concerning Social Security Administration "no-match" letters.

These new regulations will result in a harmful impact to ALL workers regardless of immigration status. Using a notoriously inaccurate and out-of-date system like the SSA database means that workers could face termination by panicked employers before they can prove they are on the list mistakenly. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. "Bad" employers could also use the letters to intimidate, threaten, or discriminate against workers.

The government's purpose in issuing SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The U.S. House and Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone—all workers regardless of immigration status, our state and local governments, our federal government, and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution.

Sincerely,

Name _M. Chen_

Address _660 Camino Campana_

_Santa Barbara CA 93111_

# I Say NO to New Immigration Enforcement Measures that Block Comprehensive Immigration Reform

**The Department of Homeland Security's Proposed Regulations:**

☐ Will lead to discrimination, abuse, and unlawful mass firings that will harm all workers

☐ Will promote an underground economy that punishes "good" employers who play by the rules while actually providing more incentive to employers who continue to exploit undocumented workers

☐ Ignore the reality that comprehensive immigration reform in Congress is the only way to create a workable worksite enforcement solution.

These proposed regulations hurt everyone—all workers regardless of immigration status, state and local governments, our federal government, and our economy. I urge you not to enact these proposed regulations and allow Congress to reach a comprehensive immigration reform solution.

Director Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529



# Filipinos for Affirmative Action

**FAA**

310 8th Street, Suite 306
Oakland, CA 94607
510/465-9876

31289 Union City Blvd.
Suite 104
Union City, CA 94587
510/487-8552

**AUGUST 2, 2006**

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

Re:  *DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for*
*Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

Filipinos for Affirmative Action joins other citizens and business, labor, immigration and privacy groups in saying no to the proposed regulations concerning the Social Security Administration's (SSA) "no-match" letters. FAA is a 32-year old organization whose mission is to build a strong and empowered Filipino community by organizing constituents, developing leaders, providing services, and advocating for policies that promote social and economic justice and equity.

These new regulations will result in a harmful impact to ALL workers regardless of immigration status. Using such a notoriously inaccurate and out of date system like the SSA database means that workers could face termination by panicked employers before they can prove they are on the list mistakenly. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. "Bad employers" could also use the letters to intimidate, threaten, or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone — all workers regardless of immigration status, our state and local governments, our federal government, and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution.

Respectfully submitted,

**CHRISTOPHER PUNONGBAYAN**
**ADVOCACY DIRECTOR**


*Board of Directors: Weveline Aragon • Robert Bronn • Ray Golmenar • Charina Garcia •*
*Eileen Hamilton-Bonla • Trina Villanueva • Ronald Pineda • Agnes Brones • Ben Rosko • Executive Director: Lillian Galedo*

 A United Way Agency

**No-Match Cert. Admin. Record  1550**



# AFSCME ®

**American Federation of State, County and Municipal Employees, AFL-CIO**

Gerald W. McEntee
President

William Lucy
Secretary-Treasurer

Vice Presidents

Ronald C. Alexander
Columbus, OH

Ken Allen
Portland, OR

Henry L. Bayer
Chicago, IL

Peter J. Benner
St. Paul, MN

George Boncoraglio
New York, NY

Anthony Caso
Boston, MA

Jan Corderman
Des Moines, IA

Greg Devereux
Olympia, WA

Danny Donohue
Albany, NY

David R. Fillman
Harrisburg, PA

Michael Fox
Harrisburg, PA

Albert Garrett
Detroit, MI

Raglan George, Jr.
New York, NY

Alice Goff
Los Angeles, CA

Sherryl Gordon
Trenton, NJ

Salvatore Luciano
New Britain, CT

Roberta Lynch
Chicago, IL

Glenard S. Middleton Sr.
Baltimore, MD

Patricia A. Moss
Worthington, OH

Michael D. Murphy
Madison, WI

Henry Nicholas
Philadelphia, PA

Russell K. Okata
Honolulu, HI

Eliot Orriz-Lopez
San Juan, PR

George E. Popyack
Oakland, CA

Greg Powell
Austin, TX

Jose E. Reyes
New York, NY

Eddie Rodriguez
New York, NY

1625 L Street, N.W., Washington, D.C. 20036-5687
Telephone: (202) 429-1000
Fax: (202) 429-1293
TDD: (202) 659-0446
Website: http://www.afscme.org

August 1, 2006

Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security (DHS)
111 Massachusetts Avenue, NW 2nd floor
Washington, DC 20529

**Re:  DHS Docket No. ICEB-2006-0004**

Dear Sir or Madam:

    I am submitting these comments on behalf of the 1.4 million members of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO.  AFSCME represents public sector, health care and child care workers.  AFSCME and our affiliates also employ thousands of workers.  We have grave concerns about the provisions in the proposed rules for "Safe Harbor Procedures for Employers Who Receive a No-Match Letter" and urge you to withdraw these regulations for the reasons listed below.

    The original intent of the SSA no-match pilot programs was to address the large number of payroll deductions not credited to a valid social security number.  SSA no-match letters were never intended to be a vehicle for immigration law enforcement and are ill-suited to be such a vehicle.

    The Social Security Administration (SSA) and DHS databases are frequently inaccurate.  If the proposed regulations are implemented, many authorized workers will be unjustly fired while employers will use the no-match letter to retaliate against and intimidate undocumented workers. The proposed rules will cause enormous problems both for workers and employers but will have no impact on undocumented workers. The experience with no-match firings and workplace audits is very clear:  the fired workers will not leave the country.  They will simply find other more marginal jobs, most likely in the unregulated cash economy.

    Thus, the proposed rule will result in growth of the underground economy.  It will also erode our privacy rights, and it represents an end-run around the federal legislative process.  As explained below, the SSA no-match program is simply not an effective immigration enforcement tool.  We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized below.

**No-Match Cert. Admin. Record  1551**

August 1, 2006
Page 2

<u>This proposed rule will harm all workers regardless of immigration status.</u>

The rule will cause unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion, employers will fire workers who receive an SSA no-match letter before they have a chance to correct their records with SSA. The SSA database is frequently inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers, including U.S. citizens and authorized non-citizens, could lose their jobs. These firings may violate federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to interfere with labor organizing campaigns, retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a reason to fire workers who participated in efforts to improve working conditions. The proposed rule would only exacerbate this problem.

<u>The proposed rule will expand the unregulated underground cash economy.</u>

DHS is imposing a new set of legal obligations on millions of employers. This will increase pressure on businesses to go "off the books," thereby promoting the unregulated cash underground economy which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

<u>The timing is bad because Congress is in the midst of immigration reform.</u>

The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is under debate and probably will be changed. The proposed rule would cause a disruptive change in an immigration system that is already flawed. Any worksite immigration enforcement proposal should happen in the context of comprehensive federal immigration reform.

**No-Match Cert. Admin. Record  1552**

August 1, 2006
Page 3

### The SSA no-match letter program is not an effective tool for immigration enforcement.

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement mechanism when the SSA database does not have the capacity to fulfill this objective. The database has many errors and does not contain complete information about a worker's immigration status or employment authorization. Additionally, the database contains sensitive information about both U.S. citizens and authorized noncitizens. The letter does not address immigration status, and explicitly states that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, under current law, an employer's receipt of a SSA no-match letter does not constitute "constructive knowledge" of immigration status. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area.

### The proposed rule would erode privacy rights.

DHS is currently barred from direct access to the SSA's database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and use personal information in the SSA database for their own purposes.

### The proposed rule is impossible to implement, and therefore should be withdrawn.

The need for costly and burdensome employer and worker education programs, internal inconsistencies between this proposed rule with long-standing federal policy on no-match letters, federal and state employment and labor laws, and unrealistic timetables for compliance will implementation difficult if not impossible. Therefore, the proposed rule should be withdrawn.

### The proposed rule is objectionable because it applies to both SSA no-match letters and DHS notice letters.

While the proposed DHS notice procedure protects the employer, it fails to provide a mechanism for an employee to have access to and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS.

In short, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter," published in the *Federal Register* on June 14, 2006. The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands — possibly millions — of U.S. workers in a poorly-conceived immigration enforcement attempt on the eve of comprehensive immigration reform. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

**No-Match Cert. Admin. Record  1553**

August 1, 2006
Page 4


      We appreciate the opportunity to submit comments on these proposed regulations

                      Very truly yours,

                      Kerry Korpi
                      Director
                      Department of Research and
                      Collective Bargaining Services


KK:CP:gam

No-Match Cert. Admin. Record  1554