August 9, 2006

**VIA HAND DELIVERY**

Director
Regulatory and Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave. NW
2nd Floor
Washington DC, 20529
rfs.regs@dhs.gov

RE:  DHS Docket No. ICEB-2006-0004

Dear Director:

The United Brotherhood of Carpenters and Joiners of America ("UBC") respectfully submits these comments regarding the proposed regulations on the Safe-Harbor Procedures for Employers Who Receive a No-Match Letter published in 71 Fed. Reg. 34281-85 on June 14, 2006.  The UBC is a labor organization representing over 500,000 men and women in North America's construction industry.

I.    Introduction

Implementation of any mechanism to verify employment eligibility of workers in the United States is an issue of great concern to the UBC.  Any such system may have considerable, even if unintended, consequences on our members and millions of other American workers in the construction industry.  The construction industry offers opportunities for law-abiding immigrants who come to our nation in search of the American Dream.  It also offers opportunities for unscrupulous labor brokers seeking to profit by an illicit black market in the labor of desperate workers who enter America illegally and are systematically exploited.  The UBC believes that DHS' proposed Safe Harbor rules governing how employers should respond to "No Match" letters from the Social Security Administration ("SSA") hamper the ability of honest, law-abiding immigrants to pursue opportunity in our industry while at the same time

1

**No-Match Cert. Admin. Record  1555**

increasing demand in our industry for the services of
unscrupulous labor brokers.

II.  DHS and SSA Must Improve the Integrity of Their Data
     Before Mandating Greater Reliance by Employers on it

Studies of DHS' immigration records (both paper and
electronic) that form the backbone of the current
employment verification system have repeatedly raised
concerns about the reliability of the data. As recently as
June of this year, the Government Accountability Office
warned of serious defects in DHS' newest employment
verification program--the "Basic Pilot Program." These
defects included the continuing inability to detect
identify fraud and long delays in entering data, which
resulted in inaccuracies and inconsistencies.[1]

GAO's findings confirm previous studies casting doubt on
the reliability of the data around which the current
employer verification system is built. For example, Temple
University reported that the system maintained a 1.4% false
non-confirmation rate.[2] Such an error rate applied to only
two million employees could result in 28,000 otherwise
eligible workers being denied employment due to erroneous
data. There is no reason to believe that the SSA's
databases are any more reliable. The flaws in the
agencies' databases are compounded by the fact that there
is no efficient way to reconcile conflicting data between
DHS and SSA. The databases are not synchronized. The
proposed rule's mandate that employers rely on such data to
take actions, including firing workers, in order to avail
themselves of a "Safe Harbor" from DHS prosecution is not
wise or just.

Simply put, forcing employers to make rapid decisions in
reliance on the flawed DHS and SSA databases is likely to
result in the sudden loss of employment for many workers
who are actually authorized to work in the United States.

---

[1] Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement
Efforts, GAO-06895T (June 19, 2006).
[2] Findings of the Basic Pilot Evaluation, Institute for Survey Research (Temple University) (June 2002).
See also Report to Congress on the Basic Pilot Program, Department of Homeland Security/U.S.
Citizenship and Immigration Services, June 2004.

2

No-Match Cert. Admin. Record  1556

Such "false negatives" have a serious impact on workers and the families of workers deprived of their jobs. They also harm employers who may lose valued employees or find it harder to hire new workers they need in a competitive labor market. To avoid these potential harms to lawful workers and honest employers, the UBC opposes implementation of the proposed rules.

III. <u>The Proposed Rule Encourages Identify Theft, Document Fraud, and "Blind" Reliance on Dishonest Labor Brokers</u>

Both the current approach to employer verification and this proposed rule rely upon systems and verification processes that have proven extremely vulnerable to identify theft and fraudulent documents.[3] The proposed rule lacks any mechanism to prevent the presentation of another counterfeit social security card or immigration document containing stolen identity information in response to a re-verification request. In the end, the re-verification will simply encourage people bent on evading the system to possess a greater number of fraudulent or stolen documents. It will drive even more business to the illicit trade in false and stolen identity information.

More importantly, the proposed regulations will give employers further incentives to insulate themselves from responsibility for verifying and now re-verifying workers by turning to labor brokers to provide a workforce. Rather than assume the additional obligations within the short time periods proposed by this regulation and the associated risks of criminal and civil sanctions, employers will have greater incentives under this rule to delegate verification responsibilities to middlemen. Employers will find it easier to use labor brokers and remain "willfully blind" as to the employment eligibility of a subcontracted workforce of exploited, illegal immigrants. It is well documented that the already pervasive use of such arrangements has over the last five to seven years exerted massive downward pressure on wages in the construction industry.[4] The

---

[3] U.S. House of Representatives Committee on Education and the Workforce, *Hearing: Lessons Learned from the Immigration Reform and Control Act of 1986* July 31, 2006 (Testimony of John Chakwin).
[4] Mike Hill, *Construction Pay is Dropping*, Herald Tribune.com, July 31, 2006 http://www.heraldtribune.com/apps/pbcs.dll/article?AID=/20060731/OPINION/607310414/1029. *See also,* Karina Gonzalez, *Moving North to Live in the South*, Chattanooga Times Free Press, August 7, 2006

No-Match Cert. Admin. Record  1557

government should not adopt policies that accelerate this
trend. Moreover, the transient nature of such subcontracted
workforces makes them harder for DHS or SSA to scrutinize.
Encouraging greater use of such arrangements is therefore
also contrary to more efficient and effective enforcement.

The UBC contends that any rule on employment verification
must provide a process that discourages employers from
utilizing unscrupulous labor brokers rather than
encouraging reliance on them.  This can be done by
requiring employers to be responsible for verifying any
independent contractors they employ, as well as workers
provided by subcontractors or labor brokers. But not even
this positive step should be taken until there are reliable
databases employers can count on in carrying out such a
responsibility.

IV.   CONCLUSION

The UBC supports a comprehensive review of the verification
system and the many flaws and loopholes that exist in it.
We agree with President Bush's statement in his Radio
Address of August 5, 2006 that "more effective tools to
verify the legal status of workers" are needed as a part of
comprehensive immigration reform.  We do not believe that
the proposed DHS Safe Harbor Regulation is such a tool.
Rather, it represents a one-dimensional, piece-meal attempt
to address an isolated problem in the system.  Such an
approach is counterproductive. It simply increases reliance
on other well-known loopholes in the system. President Bush
has eloquently explained why any legislative changes to
address flaws in the immigration system must be
comprehensive in nature. The UBC believes that the same
arguments apply to regulatory efforts to fix problems with
the employment verification system.

The proposed regulation will increase demand for fraudulent
documents, increase incidents of identify theft, and
encourage employers to evade their verification
responsibilities and the associated risks by increasing

---

http://www.tfponline.com/absolutenm/templates/content.aspx?articleid=2887&zoneid=83 (explaining how
American construction workers are being replaced by exploited immigrants who "accept arduous work with
poor safety condition and for less pay").

4

their reliance on unscrupulous labor brokers.  All of these
issues need to be addressed in a more comprehensive
regulation.  By issuing regulations that address one
narrow, isolated issue within the verification system, DHS
is not helping American workers, legal immigrants, illegal
immigrants or honest employers.

Respectfully,

Monte Byers
Chief of Staff
United Brotherhood of Carpenters and
Joiners of America

5



# MITCHELL SILBERBERG & KNUPP LLP

A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS



David S. Rugendorf
Partner
(310) 312-3118 Phone
(310) 231-8318 Fax
dsr@msk.com

July 17, 2006

**BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED)**

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW 2nd Floor
Washington D.C. 20529

Re:    Proposed Rule Change to 8 C.F.R. Part 274a - DHS Docket Number ICEB-2006-0004

Dear Director:

Thank you for providing the opportunity to comment on the proposed changes to Title 8 Code of Federal Regulations Part 274a, Control of Employment of Aliens, 71 Fed. Reg. 34281 (proposed June 14, 2006) (to be codified at 8 C.F.R. pt. 274a). Our comment describes problems associated with the 14 day time limit within which employers must act to assure "safe harbor" from a finding of constructive knowledge that the employer has hired or continues to employ an unauthorized worker.

Simply stated, this 14 day period does not give employers enough time to follow all of the safe harbor procedures laid out in the proposed rule. According to the proposed rule, within 14 days of a receiving a no-match letter, an employer would have to:

1.    Check its records to determine if the error is clerical or typographical.

2.    If there is a clerical error, the employer must correct the error and inform the Social Security Administration ("SSA") or Department of Homeland Security ("DHS") of the correct information in accordance with the letter's instructions.

3.    The employer would then have to verify with the appropriate agency that the employee's name and social security number now match the agency's records and make a record of the manner, date, and time of such verification.

4.    If the error is not clerical, the employer must ask the employee to verify that the employer's records are correct.

5.    If the employer's records are correct according to the employee, the employer must ask the employee to resolve the discrepancy with the Social Security Administration

11377 West Olympic Boulevard, Los Angeles, California  90064-1683
Phone (310) 312-2000    Fax (310) 312-3100    Website WWW.MSK.COM

No-Match Cert. Admin. Record  1566



### MITCHELL SILBERBERG & KNUPP LLP

Director, Regulatory Management Division
July 17, 2006
Page 2

personally by visiting an SSA office and bringing documents that prove citizenship status, name change, or other relevant information.

6.    If the employee states that the employer's records are not correct, the employer must take action to correct the records, inform the relevant agency according to the letter's instructions, and verify the corrected records with the relevant agency.

If the employer does not follow these steps within 14 days, it risks constructive knowledge liability under the proposed rule. Large employers, with many immigrant workers, could receive multiple no-match letters at a time and find the process difficult to keep up with. Smaller employers may not have sufficient staff to deal with the influx of no-match letters. Additional staff may be required just to keep up with the frantic pace of the procedures creating a burdensome obligation on employers. A 30 day or longer time period would give most employers enough time to effectively deal with the no-match letters.

In addition, most analogous federal and state regulations allow employers at least 30 days to reply to government information requests. In the Code of Federal Regulations, when an employer is required to send a report or information to an outside agency regarding an employee, the employer usually gets 30 days or more to do so. *See, e.g.,* 29 C.F.R. §§ 405.4, 520.409, 530.102, 1910.217 (requiring a report of employee injuries to OSHA within 30 days), 1910.1096.

Normally, federal regulations which give employers less than 30 days to act relate to the health and safety of the employees, which requires much more urgent attention on the part of the employer. *See, e.g.,* 10 C.F.R. § 850.24 (notifying employees of health and safety monitoring results); 29 C.F.R. §§ 1903.19, 1910.1001, 1910.1017 (notifying employees of health and safety monitoring results), 1910.1018 (notifying employees of health and safety monitoring results), 1910.1025 (notifying employees of health and safety monitoring results), 1910.1026 (notifying employees of health and safety monitoring results), 1910.1027 (notifying employees of health and safety monitoring results), 1910.1029 (notifying employees of health and safety monitoring results), 1910.1043, 1910.1044, 1910.1045, 1910.1047, 1910.1048, 1910.1050, 1910.1051, 1910.1052, 1910.1450, 1915.1001, 1926.62. Some health and safety regulations even allow 30 days to act. *See, e.g.,* 29 C.F.R. §§ 1910.95. Other instances where an employer must act in less than 30 days include situations where the employer is contesting some government ruling. *See, e.g.,* 29 C.F.R. §§ 825.403 (petition to agency regarding alleged violations), 1903.15.

Other federal law also provides time limits for employers to take certain actions. Employers get at least 30 days to provide written notice to election participants and information to a retirement plan sponsor. *See* 29 U.S.C. §§ 1082, 1399.

Additionally, states have their own labor codes which also provide 30 day or longer time limits for employers to act. In California, if an employee alleges a violation of the labor code, an employer has 33 days to cure the violation. Cal. Lab. Code § 2699.3. Also, employers normally have 30 days to make reports to outside agencies or employees after certain events. *See* Cal. Lab. Code §§ 511, 2809. Certain safe-harbor provisions in California allow an employer 30 days to act. *See* Cal. Lab. Code § 4658.6 (no liability for supplemental job displacement benefit if



MITCHELL SILBERBERG & KNUPP LLP

Director, Regulatory Management Division
July 17, 2006
Page 3

employer meets certain conditions within 30 days). Like the C.F.R., instances where an employer must act in less than 30 days typically have to do with protecting the employee's compensation or health. *See* Cal. Lab. Code §§ 98.2, 3715, 4603.4.

Based on traditional time limits in both federal and state regulations, employers expect to have 30 days to act in response to a government inquiry regarding employees. Employers expect that only actions which require urgency, such as protection of an employee's health and welfare, will require prompt action in less than 30 days.

Situations in which employers would have a particularly difficult time complying with the 14 day time limit include those where multiple no-match letters are received by an employer in a short time period. Even if an employer finds the time to check its records within a few days, the employer must find the time to contact the SSA or DHS according to the specific letter's instructions and inform them of new correct information if there was a typographical error. The employer would then have to verify that the employee's name and social security number now match the agency's records and record this verification. The rule gives no extra time to employers if they make a good faith attempt to correct a clerical error but for some reason their records still do not match the agency's records.

If after searching through its records, an employer finds that the error is not clerical, it must ask the employee to verify that the records are correct and to resolve the discrepancy with the SSA personally. Verification by the employee may take some time and not all employees' actions can be controlled by the employer. If the employee states that the records are incorrect the employer must start all over again and correct the records, inform the agency, and verify the corrected records. The employer gets no additional time for this under the proposed rule. With multiple no-match letters an employer would certainly become overwhelmed while trying to take all of these actions within 14 days. A 30 day or longer time limit would ease the pressure on the employer and make sure that all appropriate steps are taken to ensure accuracy.

In conclusion, the proposed rule's 14 day time limit does not allow enough time for employers to properly and thoroughly follow the safe harbor procedures laid out by the proposed rule. Employers typically expect to have at least 30 days to take action for situations that do not affect an employee's health and safety. A 30 day or longer time limit to take reasonable steps to avoid a constructive knowledge finding would allow employers adequate time to accurately follow the proposed rule's safe harbor procedures.

Respectfully submitted,

David S. Rugendorf
of
MITCHELL SILBERBERG & KNUPP LLP

August 2, 2006


Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave., NW, 2nd Floor
Washington, DC  20529

Reference: DHS Docket No. ICEB-2006-0004

To whom it may concern,
I am writing concerning the "No Match" letters that are sent to employers and
employees. I am very concerned that the proposed new regulations will have a chilling
effect on immigrant workers, both documented and undocumented.  It is unjust for the
Federal government to make such sweeping changes when at the same time asking for
Comprehensive Immigration Reform.

The regulations will burden employers and workers with the consistent errors already
present in the Social Security Administration's Basic Pilot program. Furthermore, it
would be unjust to implement a government mandated layoff of millions of immigrants
because of the federal government's inability to enact Comprehensive Immigration
Reform.  Immigrants, both documented and undocumented have been a key force in
the economic growth in the United States during the last several decades—should they
now be penalized for a broken system without systematic reform being enacted.

In addition, the economy will suffer due to employment instability in key industries in
agriculture, food processing and the service sector.

Finally, the new "Safe Harbor" procedures will create injustice in the workplace for
millions of immigrant workers, including hour and wage violations and more unsafe
workplaces. Immigrant workers will become even more invisible and without access to
basic workplace rights.

I would encourage the these regulations be dropped altogether in the hope that
Comprehensive Immigration Reform will be enacted.

Sincerely,

Dennis Sadowski
3245 Nagle Rd.
Avon, OH  44011-2059

# *Indiana Horticultural Society* , Inc.

*Serving Indiana's fruit industry*

Office of the Secretary
Dept. of Hort & L.A., Purdue University
625 Agricultural Mall Drive
West Lafayette, IN 47907-2010

August 25, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland security
111 Massachusetts Ave. NW, 2nd Floor
Washington, D.C. 20529

Re: enclosed letter, and reference DHS Docket No. ICOB 2006-0004

Dear Director:

The President of the Indiana Hort Society submitted the enclosed comments on the above referenced docket. The comment period ended on August 15. The comments were submitted by U. S. Mail postmarked August 2.. The envelope was returned as undeliverable. It is my guess that the envelope lacked the Docket number.

Is it possible that these comments could still be considered since they were originally submitted before the deadline?

Thank you for your consideration.

Yours sincerely,

Richard A. Hayden,
Secretary-Treasurer,
Indiana Horticultural Society

cc:    Tom Roney, President, IHS

# *Indiana Horticultural Society*, Inc.

*Indiana's fruit Growers*

Office of the Secretary
Dept. of Horticulture & Landscape Architecture
Purdue University
625 Agricultural Mall Drive
West Lafayette, IN 47907-2010

July 28, 2006

Director, Regulatory Management Div.
U. S. Citizenship & Immigration Services
Department of Homeland Security
111 Massachusetts Ave. NW, 2nd. Floor
Washington, D. C. 20529

Reference DHS Docket No. ICEB-2006-0004

To Whom It May Concern:

The Indiana Horticulture Society represents commercial fruit growers in the state of Indiana. Several of our members use migrant labor to harvest their crops as well as other work. Our membership has taken an active interest in the migrant labor issue as it has developed and has looked closely at the Safe-Harbor Procedures For Employers Who Receive A No-Match Letter.

While we appreciate the much needed guidance in this area, we feel the proposed rule is flawed in several areas as it relates to our member employers.

The time lines of 14, 60 and 63 days are not very realistic for a lot of us. Those hiring harvest labor typically have people working September and October of any year and then they are laid-off. The first correspondence from SSA or DHS is going to come after January 1st. of the following year, typically January thru March. These no-match employees are not going to be available until at best the next September. Even then, they may not be in our employ for a total of sixty (60) days.

If the worker in question is not a legal worker, they probably are aware of the no-match letter mailings and are not going back to the same employer anyway. The employer would be suspect of his documentation.

This is going to be a very difficult area for our member employers to deal with under the guidelines proposed in the rule. One suggestion has been that the time line clock only runs during those times when the employee is present. This would make it at least workable.

I'm sure you are aware that the employer is under heavy penalty for discrimination policy in this area and could not advance the time line to try to resolve the problem.

We hope you will take these comments into consideration as you finalize this rule.


Sincerely,

Thomas E. Roney, Pres
5717 N. 300 West
Greenfield, IN 46140
Tel. 317-326-2278



**WEDA**

August 9, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C.  20529

*Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

    **Women's Economic development Agency (WEDA)** submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

    The mission of Women's Economic Development Agency (WEDA) is to assist women in achieving economic independence through a holistic approach to business development and wealth building that encompasses classroom training, technical assistance, mentoring and access to pertinent resources.

    **Women's Economic development Agency (WEDA)** has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States–immigrant and native-born alike.

    As a result of this work, **Women's Economic development Agency (WEDA)** is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation.  These firings will be unnecessary, unjust, and potentially discriminatory.

    Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**.  Our past experience with no-match firings

and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform.** The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to

respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

*Carolina Ramón*
Carolina Ramón
Women's Economic Development Agency (WEDA)
Manager, Women's Business Programs
cramon@weda-atlanta.org

*Women's Economic Development Agency (WEDA)*
*659 Auburn Ave, NE. Suite 250*
*Atlanta.GA.30312*
*Phone: (678) 904 22 01 Fax:(678) 749 7008*
*www.weda-atlanta.org*



**Assembly**
**California Legislature**

**LELAND Y. YEE, Ph.D.**
SPEAKER PRO TEMPORE
ASSEMBLYMEMBER, TWELFTH DISTRICT

余胤良博士
加州眾議院執行議長

STATE CAPITOL
P.O. BOX 942849
SACRAMENTO, CA 94249-0012
(916) 319-2012
FAX (916) 319-2112
http://democrats.assembly.ca.gov/members/a12

STANDING COMMITTEES:
APPROPRIATIONS
BUSINESS AND PROFESSIONS
GOVERNMENTAL ORGANIZATION
JOBS, ECONOMIC DEVELOPMENT AND
THE ECONOMY

SELECT COMMITTEES:
CHAIR, CALIFORNIA'S FOREIGN
TRADE OFFICES
CHAIR, CHILDREN'S PHYSICAL AND
MENTAL WELL BEING IN DIVERSE
CALIFORNIA COMMUNITIES
AIRPORTS AND THE AIRLINE INDUSTRY
ASIAN TRADE
BRIDGING THE ACHIEVEMENT GAP
CALIFORNIA HORSE RACING INDUSTRY
COASTAL PROTECTION
EMERGING ISSUES IN CALIFORNIA
COMMUNITIES
ENVIRONMENTAL JUSTICE
EQUAL ACCESS TO PRESCHOOL
PROFESSIONAL SPORTS
RUNAWAY PRODUCTION
URBAN YOUTH

COMMISSION:
SAN FRANCISCO BAY CONSERVATION
AND DEVELOPMENT COMMISSION

August 14, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigrant Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

Re: "Safe Harbor Procedures for employers who receive a 'No-Match Letter'"

Dear Sir or Madam:

In response to the request by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement for public comment on the proposed "Safe Harbor Procedures for Employers Who Receive a No-Match Letter," I am urging the DHS to withdraw this proposed rule change.

As a public policy maker I understand the far reaching implications of such a broad reaching rule change. Working people throughout the nation and in California in particular, will likely lose their jobs or be forced into untenable employment options due to flawed data or mistaken identity.

Such a massive impact on employees in every industrial sector will have long term and lasting negative ramifications such as an increase in exploitation of immigrant workers regardless of immigration status, hindering the advancement of many workers into better paying jobs, an increase in the underground economy throughout the nation and, as a direct result, the loss of tax revenue and the public services those dollars support for all levels of government.

Moreover, however, I am concerned that the "No-Match Letter" rule will, by default, empower potentially abusive employers by providing a powerful tool for exploitation by essentially extending immigration enforcement duties to employers.

As a representative for a legislative district with a significant number of immigrants from nearly every corner of the globe, and I am concerned that the proposed rule may put those I represent at risk.

The "No Match Letter" is a flawed tool in the effort to reduce illegal immigration into the United States and I respectfully request that the DHS reconsider the implementation of this potentially devastating regulatory change.

Sincerely,

**LELAND Y. YEE, Ph.D.**
Speaker pro Tempore
California State Assembly

CC: Pilar Schiavo



**International Institute** Rhode Island

August 8, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:     DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

The International Institute Rhode Island submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The International Institute Rhode Island is an independent non-profit that has been serving immigrants and refugees, one family at a time, since 1921. We serve as a first-stop, full-service immigration referral center providing educational, legal, and social services to immigrants and refugees throughout Rhode Island and southeastern New England.

The International Institute Rhode Island has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States--immigrant and native-born alike.

As a result of this work, the International Institute Rhode Island is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

645 Elmwood Avenue, Providence, RI 02907 • www.iiri.org • tel 401.461.5940 • fax 401.467.5530

No-Match Cert. Admin. Record 1572

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**<u>including U.S. citizens and authorized noncitizens</u>**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **<u>unregulated underground cash economy</u>** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **<u>comprehensive immigration reform</u>**. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

No-Match Cert. Admin. Record  1573

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in

No-Match Cert. Admin. Record  1574

dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

William Shuey
International Institute Rhode Island
645 Elmwood Ave.
Providence, RI 02907
(401) 461-5940
Fax: (401) 467-6530
bshuey@iiri.org

No-Match Cert. Admin. Record  1575

# Indiana Horticultural Society, Inc.

### Indiana's fruit Growers

Office of the Secretary
Dept. of Horticulture & Landscape Architecture
Purdue University
625 Agricultural Mall Drive
West Lafayette, IN 47907-2010

July 28, 2006

Director, Regulatory Management Div.
U. S. Citizenship & Immigration Services
Department of Homeland Security
111 Massachusetts Ave. NW, 2nd. Floor
Washington, D. C. 20529

Reference DHS Docket No. ICEB-2006-0004

To Whom It May Concern:

The Indiana Horticulture Society represents commercial fruit growers in the state of Indiana. Several of our members use migrant labor to harvest their crops as well as other work. Our membership has taken an active interest in the migrant labor issue as it has developed and has looked closely at the Safe-Harbor Procedures For Employers Who Receive A No-Match Letter.

While we appreciate the much needed guidance in this area, we feel the proposed rule is flawed in several areas as it relates to our member employers.

The time lines of 14, 60 and 63 days are not very realistic for a lot of us. Those hiring harvest labor typically have people working September and October of any year and then they are laid-off. The first correspondence from SSA or DHS is going to come after January 1st. of the following year, typically January thru March. These no-match employees are not going to be available until at best the next September. Even then, they may not be in our employ for a total of sixty (60) days.

If the worker in question is not a legal worker, they probably are aware of the no-match letter mailings and are not going back to the same employer anyway. The employer would be suspect of his documentation.

This is going to be a very difficult area for our member employers to deal with under the guidelines proposed in the rule. One suggestion has been that the time line clock only runs during those times when the employee is present. This would make it at least workable.

I'm sure you are aware that the employer is under heavy penalty for discrimination policy in this area and could not advance the time line to try to resolve the problem.

We hope you will take these comments into consideration as you finalize this rule.

Sincerely,

Thomas E. Roney, Pres
5717 N. 300 West
Greenfield, IN 46140
Tel. 317-326-2278

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | Jennifer Lai [lai@nilc.org] |
| **Sent:** | Wednesday, August 16, 2006 9:31 AM |
| **To:** | 'Kochhar, Sangeeta' |
| **Cc:** | 'Tyler Moran (E-mail)'; munoz@nilc.org |
| **Subject:** | RE: DHS Docket No. ICEB-2006-0004 |
| **Attachments:** | SSA_No-Match_DHS_Docket_No._ICEB-2006-0004_FINAL.pdf |

Dear Sangeeta:

Attached is the revised comment with the corrected letterhead on page 1.  As you will see, the substance of the comment is the exact same as the comment that we posted twice on August 14, 2006.

Thank you <u>so</u> much for your help.

Best regards,

Jennifer

**Jennifer Lai**
(213) 639-3900, ext. 123
lai@nilc.org

*This e-mail message is intended only for the named recipient(s) above, and may contain confidential or privileged information.  If you receive this message in error, please notify the sender above immediately by reply e-mail and delete this email and any attachments without retaining a copy.*

**From:** Kochhar, Sangeeta [mailto:Sangeeta.Kochhar@dhs.gov]
**Sent:** Tuesday, August 15, 2006 10:49 AM
**To:** Marielena Hincapie
**Cc:** lai@nilc.org
**Subject:** RE: DHS Docket No. ICEB-2006-0004

comments received

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

     -----Original Message-----
     **From:** Marielena Hincapie [mailto:hincapie@nilc.org]
     **Sent:** Monday, August 14, 2006 8:11 PM
     **To:** Regs, Rfs; Ratana, Arden C; moran@nilc.org
     **Cc:** aavendan@aflcio.org; frank.clemente@changetowin.org; esolomon@iwj.org; tsmukler@iwj.org;
     sarita@jwj.org; mwaslin@nclr.org; newman@ndlon.org; pabloalvarado@ndlon.org; asugimori@nelp.org;
     emsellem@nelp.org; moran@nilc.org; friedland@nilc-dc.org; lai@nilc.org
     **Subject:** DHS Docket No. ICEB-2006-0004

9/26/2007

**No-Match Cert. Admin. Record  1578**

Dear Sir or Madam:

Attached is the Low-Wage Immigrant Worker Coalition's comment to <u>**DHS Docket No. ICEB-2006-0004**</u>.

Sincerely,

Marielena Hincapié

---

Marielena Hincapie, Esq.
Director of Programs
National Immigration Law Center
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA 90010

213-639-3900 x. 112
213-639-3911 (fax)
hincapie@nilc.org   |   www.nilc.org

---

The information contained in this e-mail message may be privileged, confidential, or otherwise legally protected from disclosure. It is also covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 et seq. If you are not the intended recipient of this message, you are informed that any retention, copying, distribution, and/or other use or dissemination of any portion of its contents is prohibited. If you believe you have received this e-mail message in error, please contact the sender immediately at hincapie@nilc.org or 213-639-3900, delete the message from any and all electronic files, and destroy all other copies as well. Thank you.

**No-Match Cert. Admin. Record  1579**

# Low-Wage Immigrant Worker Coalition

<u>VIA ELECTRONIC MAIL</u>

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

*Re:    DHS Docket No. ICEB-2006-0004, Comment Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

The National Immigration Law Center (NILC) submits the following comment on behalf of the Low-Wage Immigrant Worker (LWIW) Coalition in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE), on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 FR 34281 (June 14, 2006).

The LWIW Coalition is co-convened by NILC, the American Federation of Labor – Congress of Industrial Organizations (AFL-CIO), Change to Win (CtW), Interfaith Worker Justice (IWJ), Jobs with Justice, the National Council of La Raza (NCLR), the National Day Laborer Organizing Network (NDLON), and the National Employment Law Project (NELP).

The LWIW Coalition is our nation's broadest collaborative of advocates and organizers working to improve the living and working conditions of low-income and low-wage immigrant workers. The mission of the LWIW is to support this community of advocates by sharing strategies and resources at the local, state, and national levels.

The signatories to these comments have ample experience in dealing with the adverse impact that Social Security Administration's (SSA's) no-match letters have had on all workers, immigrant and native-born alike. Through our legal assistance programs and organizing campaigns, we have interacted with tens of thousands of low-wage workers and their families on matters related to no-match letters and other Social Security number (SSN) verification matters. We have assisted individual employees in correcting no-match discrepancies and educated both employers and employees on their responsibilities in responding to no-match letters through written materials, trainings, and technical assistance to a broad range of groups in the country.

---

American Federation of Labor – Congress of Industrial Organizations (AFL-CIO) ● Change to Win (CtW) ● Interfaith Worker Justice (IWJ) ● Jobs with Justice (JWJ) ● National Day Labor Organizing Network (NDLON) ● National Council of La Raza (NCLR) ● National Employment Law Project (NELP) ● National Immigration Law Center (NILC)

The LWIW Coalition has also worked closely with SSA through the years to improve language in no-match letters and to include warnings to employers against discriminatory and retaliatory conduct. Our advocacy includes ongoing monitoring of national origin and citizenship status discrimination cases as well as unfair labor practices arising from SSN verification and no-match matters reported to the U.S. Department of Justice Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC), the Equal Employment Opportunity Commission (EEOC), and the National Labor Relations Board (NLRB). Some of the co-conveners of the LWIW have also been engaged in litigation involving employer misuses of no-match information to interfere with workers' rights to organize and exercise their labor rights. Throughout our work, we have remained steadfast in our commitment to safeguard and advance the rights and best interests of low-wage workers, their families, and their communities.

As a result of this work, the LWIW Coalition is alarmed by and strongly opposed to the implementation of the "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that no-match letters have had on workers' rights and trigger massive, potentially unlawful firings of low-wage workers across the nation. Overly cautious employers will fire listed workers before workers have a chance to show they are on the list mistakenly. But despite the disruption it will cause, the rule does nothing to solve our immigration problems.

DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of workers in an isolated, punitive immigration "enforcement" scheme on the eve of enactment of comprehensive immigration reform intended to make our immigration system work again. In the absence of such reform, the proposed changes would only stir up dust.

The proposed rule is simply the wrong rule at the wrong time. Both the House and Senate have passed immigration bills that contain sweeping new worksite verification and enforcement regimes that impose a new electronic verification system on all employers. Implementing the rule before the conclusion of the immigration debate would add a new, unnecessary, and unhelpful set of major changes for employers to learn and implement on top of the ones that will be added just a short while later when the new legislated changes take effect.

Although the rule causes enormous upheavals in the workplace, the rule will have *no* impact on undocumented migration, which is the purported purpose of this proposal. Our experience with no-match firings and workplace audits is very clear: *the fired workers will not leave the country.* In the absence of comprehensive immigration reform that addresses the root causes of undocumented migration, they will simply find other more marginal jobs, most likely in the unregulated cash economy. Because of this, the proposed rule will result in growth of the underground economy, which in turn will result in substantial losses in state and federal tax revenues as well as unfair competition.

In addition to its enormous impact on workers and on our economy, this proposal should be withdrawn because the rule attempts to transform the SSA no-match program into an immigration enforcement tool when the SSA does not have the capacity to fulfill this objective through its database. Additionally, the rule erodes our privacy rights, raises due process concerns, and radically departs from existing case law and longstanding federal guidance in this

area. It provides no solution to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by workers, taxpayers, and businesses. The LWIW Coalition therefore urges DHS to withdraw this rule in its entirety.

Our concerns are set forth in full below.

**The Proposed Rule Harms All Workers Regardless of Immigration Status**

*Hundreds of Thousands—Possibly Millions—of Workers, Including U.S. Citizens and Work-Authorized Noncitizens, Will Face Massive Firings*

As an initial matter, the notion that SSA no-match letters indicate that an individual is not authorized to work in the United States is simply incorrect. SSA no-match letters are *not* reliable indicators of work authorization or immigration status. Instead, these letters simply indicate that there is a discrepancy between a worker's SSN and/or name on file with the SSA based on information reported by employers on Internal Revenue Service (IRS) Form W-2 (Wage and Tax Statement). There are numerous reasons for the discrepancies, *none of which have anything to do with the immigration status or work authorization of workers*. Many of these mismatches are based, instead, on simple human error (such as clerical data entry mistakes and misspellings by the employee, employer, or SSA) or life changes (such as name changes, marriages, and divorces). The proposed rule, however, is based on the faulty premise that SSA no-match letters are foolproof indicators of work authorization. Because this premise is flawed, there are several, disastrous consequences that would flow from implementation of the rule.

This proposed rule will trigger massive firings across the nation. Based on our experience over the years but in particular with SSA's policy in 2002 where the agency sent the no-match letter to almost one million employers, the LWIW Coalition anticipates that the proposed rule will prompt similar panic and confusion among employers. This is likely to result in employers precipitously and indiscriminately firing workers who appear on a no-match list before workers have a chance to show that they are on the list because of the simple human error or life changes described above. As a result, these mass no-match firings may include the terminations of thousands of work-authorized employees who routinely receive SSA no-match letters.

U.S. citizens, lawful permanent residents, and other work-authorized employees were among the estimated 100,000 workers who lost their jobs as a result of the approximately 800,000 no-match letters sent by SSA in 2002.[1] Job losses were most acute in low-wage industries such as agriculture, cleaning, construction, food service, and health care. For example, no-match firings devastated the workforce at Stanford Medical Center in Palo Alto, California, where 83 percent of workers on a no-match list lost their jobs.[2] Based on the severity of the 2002 job losses, the U.S. Chamber of Commerce declared an official labor shortage and urged SSA to change its policy.[3] Under pressure from the Chamber and employers, as well as enormous pressure from

---

[1] Mary Beth Sheridan, "Records Checks Displace Workers: Social Security Letters Cost Immigrants Jobs," *The Washington Post*, Aug. 2, 2002.

[2] "A Crackdown on Workers," *The San Francisco Chronicle*, Aug. 12, 2002.

[3] "*The Immigration Crisis,*" Cox News Service, Aug. 14, 2002.

**No-Match Cert. Admin. Record 1582**

civil, immigrant, and worker rights advocates across the country, SSA agreed to decrease the number of no-match letters.[4]

No-match firings across the nation continued into 2003, however. In August, Peco Foods, Inc. of Canton, Mississippi terminated about 200 workers in response to no-match letters.[5] That same year, Suncast, Inc., a Chicago-area outdoor garden product manufacturer, terminated over 100 employees in response to no-match letters.[6] By the end of 2003, a national survey conducted by the University of Illinois at Chicago's Center for Urban Economic Development determined that approximately 53.6 percent of employers responding to no-match letters terminated the listed workers.[7] Despite strong warnings to employers that appeared on the face of the letter, the study found that workers were summarily fired, often without any opportunity to correct the no-match discrepancies or any explanation of the no-match process.[8]

Documented examples of adverse employment actions against U.S. citizens and other work-authorized noncitizens include:

- Mr. Samuel Harris. In late summer of 2003, Mr. Samuel Harris,[9] an African American man in Virginia, was fired from his job because his employer received an SSA no-match letter regarding a discrepancy with respect to Mr. Harris's SSN. Mr. Harris, who is a U.S. citizen, went to the local SSA office to correct his information. Apparently, SSA had issued Mr. Harris a duplicate SSN that belonged to a deceased person. Although Mr. Harris was able to correct his information with SSA, his employer refused to continue to employ him, thinking that Mr. Harris was engaging in identity theft or similar wrongdoing. He was fired and out of work for several months and had to file an arbitration case to get his job back.[10]

- Mrs. Noelle Lopez. In July 2002, Mrs. Lopez, a worker from North Carolina, was injured on the job. While she was on leave, her employer notified her that it had received an SSA no-match letter for her. She corrected the discrepancy, which was based on a typographical error in the W-2 that her employer had filed with SSA. Weeks later, while still on leave for her injury, the employer asked Mrs. Lopez to reverify that she continued to be eligible to work in the United States because her work authorization had expired. She had employment authorization based on Temporary Status Program (TPS), and had already applied for a renewal, but the Immigration and Naturalization Service (INS) sent her an Employment

---

[4] Chirag Mehta, et al., *Social Security Administration's No-Match Letter Program: Implications for Immigration Enforcement and Workers' Rights* (Center for Urban Economic Development, University of Illinois at Chicago, Nov. 2003) at 7, available at http://www.uic.edu/cuppa/uiced/npublications/recent/SSAnomatchreport.pdf (hereinafter "Mehta"); *Basic Information Brief: SSA "No-Match" Letters* (NILC, Feb. 2005) (hereinafter "NILC Brief") at 2, available at http://www.nilc.org/immsemplymnt/SSA-NM_Pack/Basic_Info_Brief_No-Match_Ltrs-2-15-05.pdf.

[5] Peggy Matthews, "Plan to Round Up, Deport Illegals Angers Activists," *The Clarion-Ledger,* Aug. 12, 2003.

[6] Stephanie Blozen, "Latinos Start Boycott Against Batavia Firms," *The Chicago Tribune,* Aug. 12, 2003.

[7] Mehta, *supra* note 4, at 13.

[8] *Id.* at 15.

[9] All individual worker names have been changed to protect their identities, but the names of workers and employers drawn from media sources are reproduced here as published.

[10] NILC Brief, *supra* note 4, at 4.

---

Authorization Document (EAD) with someone else's picture.  Although she was able to straighten this problem out, when her doctor told her she could go back to work, the employer denied her a job because she had "too many immigration problems."[11]

The proposed rule only exacerbates this risk of unnecessary and unjust firings.  Past experience indicates that, rather than navigating a complex series of steps and timetables to a "safe-harbor," panicked and confused employers will simply fire all workers whose names appear on the no-match list.  The employer confusion across U.S. worksites is already detectable.

- <u>Mr. James Heggen.</u>  Shortly after DHS issued the proposed rule, an employer in Massachusetts refused to hire Mr. Heggen, a lawful permanent resident of the United States, for a permanent clerical position due to a typographical error on his Social Security card. Mr. Heggen's name appears as "Heggen" on his alien registration card or "green card," but on his Social Security card, his name is spelled "Hegen"—with one less "g."  Based on this missing "g," the employer denied Mr. Heggen a permanent position, claiming that it had to be *more careful in these times.*  Mr. Heggen is Black and was born in the United Kingdom. His parents immigrated to the U.K. from the Caribbean.  Together, the family immigrated to the United States when Mr. Heggen was a child.  Because he and his parents received their permanent immigration documents decades ago, Mr. Heggen cannot file for a correction of his Social Security card locally, and, therefore, not quickly.  Correcting this minor Social Security discrepancy could take several months.  Frustrated after being denied this permanent position, Mr. Heggen contacted a local community-based legal services organization for assistance.  This organization immediately sent a letter to the employer, setting forth the potential illegality of the employer's actions.  Subsequently, the employer hired Mr. Heggen on a temporary basis.  The week of August 7, 2006, after additional consultation with the organization, the employer hired Mr. Heggen for the permanent position.[12]

Recent media accounts of the proposed rule reveal that employers are already contemplating massive no-match firings as a response to the new rule.  A construction company president told the *Tampa Tribune,* after attending a seminar for employers on the proposed rule, that some of his company's workers "won't be working for us in the future" if the rule is implemented and that he had great concern about "filling those spots."[13]  *The Ledger* of Lakeland, Florida, reported that while the proposed rule may lead to penalties for employers, "workers, in turn, would lose their jobs," an effect which for Florida's largest growers' organization amounts to a "threat to national security."[14]  An employment attorney representing several large employers reported to the *Washington Post* that, "From a practical standpoint, [the proposed rule] will have the effect [of employers] having to terminate employees.  It will be devastating to many

---

[11] *Id.*

[12] Telephone interviews with Ingrid Nava, Employment Unit, Greater Boston Legal Services, Boston, Mass., July 28, 2006, and Aug. 10, 2006.

[13] Lindsay Peterson, "Proposal Targets Illegal Immigration," *The Tampa Tribune,* June 15, 2006.

[14] Kevin Bouffard, "Proposal May Pinch Growers," *The [Lakeland, FL] Ledger,* July 11, 2006, available at http://www.theledger.com/apps/pbcs.dll/article?AID=/20060711/NEWS/607110399/1004.

**No-Match Cert. Admin. Record  1584**

industries if people comply with it."[15]  The proposed rule thus has placed the livelihoods of hundreds of thousands—possibly millions—of workers and their families on the line.

*The Proposed Rule Will Result in Increased Citizenship Status, National Origin, and Racial Discrimination*

The proposed rule creates two sets of potential employment discrimination: discriminatory firings and discriminatory refusal to hire.  A disproportionate number of names on no-match lists are "foreign-sounding" names of newcomers to the United States, and many SSA letters are sent to employers with large numbers of newcomers in their workforces.  Employers who believe they will face business disruption due to the letters have an incentive to prefer employees they think are less likely to receive the letters.  Employers may also choose to simply dismiss employees who appear or sound foreign.  These discriminatory employment actions would run afoul of federal and state antidiscrimination laws and other worker protections and lead to costly and protracted wrongful termination litigation.

Employment discrimination against authorized noncitizen workers—particularly against Latinos, Latinas, and Asians—was rampant after the passage of the 1986 Immigration Reform and Control Act (IRCA).  A 1990 U.S. General Accounting Office (GAO) study reported a pattern of discrimination that resulted solely from employer sanctions, including discrimination on the basis of foreign accents or appearance and preferences of certain authorized workers over others.  In fact, the GAO estimated that an average of 19 percent of employers—almost one in five—participated in one or more discriminatory practices as a result of the 1986 law.  These results were confirmed by nearly a dozen studies conducted locally during the 1990s by human rights commissions and other organizations, which also found significant discrimination resulting from the implementation of employer sanctions.[16]

Employment discrimination has also increased since SSA began sending close to a million no-match letters in 2002.  The number of immigration-related unfair employment referrals and investigations fielded by OSC has risen dramatically.  From 1994 to 2000, OSC conducted only 20 investigations into firings stemming from employers that fired workers based on SSN verification matters.  From 2001 to 2003, OSC opened 29 investigations.  Three of the investigations opened after 2001 resulted in settlements favorable to workers, and ten investigations were open as of 2003.[17]  Although recent statistics are unavailable, OSC recognized in its April 2005 quarterly newsletter that OSC "staff members frequently provide assistance to workers" who face adverse employment actions by employers based on the no-match letters.[18]

---

[15] Cindy Skrycki, "DHS Wants Workers, Papers to Match," *The Washington Post,* July 11, 2006 (quoting Monte B. Lake, an employment and immigration attorney).

[16] *Immigration Reform: Employer Sanctions and the Question of Discrimination*, GGD-90-62 (GAO, Mar. 29, 1990), available at http://archive.gao.gov/d24t8/140974.pdf.

[17] Mehta, *supra* note 4, at 25.

[18] *OSC Update* (OSC, U.S. Department of Justice, Civil Rights Division, Apr. 2004) at 2.

*The Proposed Rule Will Result in Increased Employer Retaliation Against Workers Who Exercise Their Workplace Rights*

The proposed rule also places all workers at a higher risk of employer retaliation for labor organizing and raising complaints about worksite conditions. Unscrupulous employers already use the SSA no-match letter to stymie organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- <u>North Carolina</u>. In July 2006, during a heated legal battle over recent union election results, at least 24 Latino immigrant workers at a modular building construction company were suspended without pay because they were listed on a no-match letter. All 24 had voted to unionize. Many of the 24 have also initiated race and sex-based discrimination charges against their employer with the EEOC. A former supervisor at the company reported to the press: "These workers have been used and abused. As supervisors, we were told we needed production and to crack the whip to get it. We were told not to worry because these workers are just wetbacks and have no legal rights." A large group of African American workers have also filed complaints against this company with the EEOC. To protest the no-match firings, workers walked out on the day the firings took place. The workers and their union are also contemplating race and sex-based discrimination class action lawsuits.[19]

- <u>California</u>. In 2006, after months of intensive organizing, a group of nursing home workers, mainly immigrant Latina workers, marched to their manager's office to announce that they had joined together as a union in order to improve wages and working conditions and would seek formal recognition for their union under federal labor law. That afternoon, a head manager called one of leaders of the march into the office, pulled out a photocopy of that worker's Social Security card, wrote "NO GOOD" in bold letters across the photocopy, and suspended the leader without pay. Angered by management's action, the workers from the morning march crowded back into the manager's office and demanded reinstatement for their suspended colleague, denouncing management's action as a blatant anti-union tactic. Caught off guard, the manager immediately reinstated the suspended union leader. While these workers were successful, other workers have not been able to mobilize as effectively against manipulation of SSN verification issues by employers.[20]

- <u>Oregon</u>. In 2006, a Latina immigrant worker had been working as a housekeeper at an assisted living center. When it came time for her to qualify for health insurance and other benefits, the employer produced an SSA no-match letter. The worker suspects that the

---

[19] Telephone interview with Homer Marmalejo, United Brotherhood of Carpenters and Joiners of America, organizer, Aug. 8, 2006; *see also* Bob Shiles, "Roger Carter Suspends More Than 20 Undocumented Workers," *Kinston [NC] Free Press*, July 19, 2006.

[20] Interview with Guadalupe Palma, Service Employees International Union, Long Term Care Division, Coordinator III, in Los Angeles, CA, Aug. 1, 2006.

No-Match Cert. Admin. Record  1586

employer had received the letter earlier, but held it just before the benefits would have kicked in.[21]

- <u>Oregon</u>. In 2003, an employer in Oregon approached a group of workers who had complained about violations of their minimum wage and overtime rights, alleging that it had just received an SSA no-match list. The employer was requiring the workers to reverify their immigration status, and would not provide a copy of the letter to workers. Interestingly, this was *before* SSA began sending no-match letters to employers in March 2003.[22]

- <u>New York</u>. In 2002, a group of immigrant workers in New York went on strike to protest against poor working conditions. After receiving a no-match letter that the employer had initially ignored, the employer decided to use the no-match letter as a basis to reverify the immigration status of workers involved in the strike.[23]

If immigrant workers cannot enforce labor laws or organize under existing labor laws, it is less likely that native workers can assert these rights. The proposed rule thus poses enormous challenges for all low-wage workers. All workers face an increased risk of firings, retaliation, and abuse. U.S. citizens and authorized noncitizen workers could lose their jobs in discriminatory firings. Hundreds of thousands—possibly millions—of working families could be harmed, and therefore DHS should suspend this proposed rule immediately.

**Although the Proposed Rule Will Cause Enormous Upheavals in the Workplace, the Rule Has *No* Impact on Undocumented Immigration and Will Only Expand the Unregulated Underground Cash Economy**

Our experience with SSA no-match firings and workplace audits in the context of our current broken immigration system is clear: *the fired workers will not leave the country*. They will simply find other more marginal jobs, most likely outside of the traditional economy and "off the books" in the unregulated underground cash economy. Moreover, although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new obligations will increase pressure on "good" employers to take employees off the books, which also leads to growth of the underground economy. Expansion of the underground economy results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers. This result is nearly inevitable for any "crackdown" on workers and employers that is not accompanied by serious and practical reforms of the underlying immigration system.

*No-Match Firings Will Not Decrease the Number of Undocumented Workers in the United States*

Based on our recent experience under the current broken immigration system, high levels of SSA no-match firings will *not* drive undocumented workers and their families away from the United

---

[21] Brent Hunsberger, "Crackdown Coming on Bogus Papers," *The Oregonian,* June 25, 2006.

[22] NILC Brief, *supra* note 4, at 5.

[23] *Id.* at 4.

**No-Match Cert. Admin. Record  1587**

States. Instead, these workers immediately accept the next available low-wage job, even if it is off the books, out of sheer economic necessity, given the levels of poverty at which they and their families and communities must survive.[24]  When poverty is combined with an employer demand for below-market wage rates and an absence of government enforcement of labor protections in low-wage industries, undocumented workers will almost certainly remain in the United States even after a no-match firing.  The vast majority will reenter the labor force in unreported, cash-based employment relationships where they face further exploitation and abuse. Economists describe this effect as "churning" or unproductive turnover.[25]  The SSA no-match program has been criticized for creating "policy-induced churning in local labor markets as workers are either fired or quit their jobs only to join the overcrowded pool of workers vying for positions in traditional immigrant occupations."[26]  Fired workers do *not* simply leave the United States.

Undocumented workers constitute a large and growing segment of the workforce in the nation as a whole.  The share of these workers in industries such as agriculture, cleaning, construction, food service, and other low-wage occupations is approximately three times the share of native workers in these types of jobs.[27]  On any given day in our nation, more than 250,000 undocumented immigrants work as janitors, 350,000 work as housekeepers and maids, and 300,000 are groundskeepers.[28]  In the aggregate, such workers are an integral part of the U.S. economy, constituting a full 5 percent of the civilian labor force or 7.2 million workers.[29]

Unscrupulous employers have long taken advantage of the availability and reduced cost of undocumented immigrant labor in both the traditional economy and in the underground economy.  Undocumented workers are more likely to earn below minimum wage (two-thirds of undocumented workers earn below minimum wage compared to one-third of all workers).[30] IRCA's failed employer sanctions regime, along with the lack of government enforcement of labor protections in low-wage industries, has given free rein to unscrupulous employers.  Such

---

[24] It has been estimated that nearly half of all immigrant workers are low-income, defined as earning less than 200 percent of the minimum wage.  Randy Capps, et al., *A Profile of the Low-Wage Immigrant Workforce* (The Urban Institute, Nov. 2003) at 2, available at http://www.urban.org/UploadedPDF/310880_lowwage_immig_wkfc.pdf. Fifty-six percent of all young children of immigrants live in poverty; sixty-four percent of foreign-born children of immigrants live in low-income families.  In immigrant families where both parents work, 24 percent of children live in poverty compared to 11 percent of the children of native workers.  Randy Capps, et. al, *Health and Well-Being of Young Children of Immigrants* (The Urban Institute, Feb. 2005) at 2, available at http://www.urban.org/UploadedPDF/311182_immigrant_families_5.pdf.

[25] *See* Avner Ahituv and Robert I. Lerman, *Job Turnover, Wage Rates, and Marital Stability: How Are They Related?* (The Urban Institute, Nov. 2004) at 5, available at http://www.urban.org/publications/411148.html (distinguishing "churning" and unproductive turnover from worker mobility).

[26] Mehta, *supra* note 4, at 18.

[27] Jeffrey S. Passel, *Unauthorized Migrants: Numbers and Characteristics: Basic Briefing Prepared for Task Force on Immigration and America's Future* (Pew Hispanic Center, June 2005) at 26–28, available at http://pewhispanic.org/reports/report.php?ReportID=46.

[28] Jeffrey S. Passel, *Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Pew Hispanic Center, Mar. 2006) at 11–12 (hereinafter "Passel"), available at http://pewhispanic.org/files/reports/61.pdf.

[29] *Id.* at 9.

[30] Jeffrey S. Passel, et al., *Undocumented Immigrants: Facts and Figures* (The Urban Institute, Jan. 2004) at 2, available at http://www.urban.org/url.cfm?ID=1000587.

---

employers routinely manipulate immigration law into a tool that sharpens wage differentials between undocumented and documented low-wage workers and suppresses wages for all. Even legitimate employers have admitted to the temptation to engage in similar practices or risk going out of business.[31] In recent years, Department of Justice (DOJ) and DHS officials have finally begun to recognize these wage differentials and the harm caused by an economic system that produces lower wages based on differences in immigration status.[32]

Increasingly, there is evidence demonstrating that raising the wages and working conditions of low-wage workers will actually reduce undocumented immigration by making the existing workforce relatively more attractive to employers.[33] Closing the wage differentials between differently work-authorized individuals and ensuring that all low-wage workers—current and future, documented and undocumented—have similar levels of mobility and enjoy full labor protections are the more effective ways to prevent undocumented immigration to the United States and to hold exploitative corporations accountable. A structural demand for undocumented labor can be reduced only by building a strong floor underneath all workers.

Poorly-conceived, punitive enforcement-only schemes like the proposed rule will force millions into the underground economy. The proposed rule will not decrease the numbers of undocumented workers in the United States, nor will it decrease their levels of employment. It will only decrease wage levels and deepen wage differentials based on immigration status, creating even more economic incentive for employers to hire undocumented workers. Accordingly, DHS should suspend this proposed rule and work with Congress and the Administration to pass comprehensive immigration reform that will address the underlying issue of undocumented migration.

*The Imposition of New Legal Obligations on Millions of Employers Will Push Them into the Underground Economy*

Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new and onerous set of legal obligations on millions of employers. The rule essentially deputizes employers as *de facto* immigration enforcement officers.

The proposed example of what constitutes "constructive knowledge," at Section 274a.1(l)(1)(iii)(B) of the proposed rule, is not the employer's *receipt* of a no-match letter, but

---

[31] K. M. Donato, et al., "Stemming the Tide? Assessing the Deterrent Effects of the Immigration Reform and Control Act," *Demography* 29 (2005) at 139–58.

[32] In the prosecution of Tyson Foods for the hiring of undocumented workers, assistant U.S. Attorney John P. MacCoon stated: "This trial is about corporate greed. . . . It's about what happens when a corrupt corporate culture makes the bottom line the all-consuming priority." Sherri Day, "Prosecutors in Smuggling Case against Tyson Contend Trial Is about Corporate Greed," *The New York Times*, Feb. 6, 2003. In the Tyson Foods case, the government hinged its $140 million pre-indictment settlement demand against defendant Tyson Foods on a novel "wage suppression" theory. The government claimed that Tyson Foods had reaped enormous profits by recruiting undocumented workers into its ranks and paying them at below-market wage rates. In his authorization of trial for the case, DHS Secretary Chertoff fully endorsed the DOJ's attempts to recover "suppressed wages." Thomas Green, et al., "Deputizing—and Then Prosecuting—America's Businesses in the Fight against Illegal Immigration," *Amer. Crim. L. R.*, June 22, 2006, at 5, 7.

[33] Ivan Light, "How L.A. Kept Out a Million Migrants," *The Los Angeles Times*, Apr. 16, 2006.

No-Match Cert. Admin. Record  1589

the employer's *failure to act* after receiving a no-match letter. By defining the "failure to take reasonable steps" upon receipt of a no-match letter as creating constructive knowledge, the proposed regulation makes it necessary for a law-abiding employer to take some action in response to a no-match letter. Therefore, as set forth in Sections 274a.1(l)(2)(i) and 274a.1(1)(2)(iii) of the proposed rule, an employer who receives a no-match letter is essentially forced to apply due diligence to a series of complicated steps that demonstrate correction of each "no-match" discrepancy. If the employer fails to resolve the correction in the allotted time, the employer faces a finding that it had constructive knowledge of hiring an undocumented worker. This finding could be used against the employer in a federal prosecution that could result in civil and criminal penalties. This is a radical change from the longstanding position that the various federal agencies implicated in this SSA no-match issue have taken.

Employers who wish to avoid loss of profits and productivity while minimizing exposure to the heightened risk of federal immigration liability under the proposed rule will be forced into one of three no-match evasion strategies:

First, employers will take their businesses off the books and into the underground economy. For one thing, keeping workers off the books means avoiding government scrutiny and additional no-match letters. For another, there are immediate financial incentives for employers to keep workers off the books. The proposed rule thus has a perverse effect of targeting and punishing "good" employers who keep good records and want to stay on the books. These good employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records and who consequently will not be reached by the new rule.

Second, employers will intentionally misclassify their employees as "independent contractors" as a means of evading this responsibility.

Finally, employers will engage in subcontracting schemes by interposing intermediary labor contractors between themselves and their employees, pretending their workers are employees of these sham contractors and exposing workers to marginal, fly-by-night employment practices by middlemen.

*Growth of the Underground Economy Results in Massive Losses to State and Federal Coffers and Unfair Competition*

A policy that results in more employers choosing to keep their employees off the books or intentionally misclassifying employees is harmful to state and federal government coffers and creates unfair competition against "good" employers. Certain employers will see a clear and immediate economic advantage to taking their employees off the books. At a minimum, they will reduce their payroll costs by an average of 8 percent by ceasing to pay costs for federal legally required benefits, including Social Security, Medicare, unemployment insurance and workers' compensation.[34] For employers who, as a policy or due to a collective bargaining agreement, provide other benefits, such as life, health or disability insurance, paid leave, or retirement and savings benefits, the potential total savings could add up to an average of 29.9

---

[34] *Employer Costs for Employee Compensation* (U.S. Department of Labor Bureau of Labor Statistics, Mar. 2006), available at http://www.bls.gov/news.release/ecec.nr0.htm.

percent of total payroll costs.[35] This means massive losses to state and federal coffers and a competitive advantage over employers who are not cutting these costs.

The projected loss in federal tax revenues ranges from $19 million to $1.9 billion annually. This range is derived from the following figures: In June 2006, the total U.S. labor force was estimated at 144.4 million workers.[36] As set forth above, about 7.2 million undocumented workers were employed in March 2006, accounting for a full 5 percent of the civilian labor force.[37] International accounting and consulting firm Price Waterhouse Coopers has projected that over 5 million U.S. workers would be misclassified as independent contractors (to avoid paying legally required benefits) in 2005 and that the federal tax revenue losses due to misclassification in 2004 would be $4.7 billion.[38]

Based on this projection and these worker population estimates, if only one-third of all undocumented workers or at least two million workers, or 1.4 percent of all U.S. workers, were to be pushed off the books as a result of the proposed regulation, the loss to federal coffers would be approximately $1.9 billion in one year. Alternatively, making a conservative assumption that 100,000 workers are pushed off the books as a result of the proposed regulation, the loss to federal coffers would be approximately $19 million annually.

The losses to the Unemployment Insurance (UI) trust fund alone ranges from $277 million to $13.8 million per year. This range is derived from the following figures: A study for the U.S. Department of Labor estimating the impact of employee misclassification on the UI trust fund alone was computed for the period from 1990–1998.[39] Assuming a 1 percent level of misclassification, the study determined that the loss would be an annual average of $198 million to the UI trust fund alone.

Based on this study for the DOL, assuming that at least 2 million workers were to be pushed off the books as a result of the proposed regulation, the impact on the UI trust fund alone would be an average of over $277 million annually. Alternatively, assuming that only 100,000 workers, or .07 percent of the workforce, are pushed off the books (the estimated number that lost their jobs due to no-match letters in 2002), the impact on the UI trust fund alone would be $13.8 million per year.

Employers who go off the books will experience an enormous net savings in taxes, which will create a competitive advantage for them over employers whose payroll-related expenses are

---

[35] *Id.*

[36] *Employment Situation Summary* (U.S. Department of Labor Bureau of Labor Statistics, July 2006), available at http://www.bls.gov/news.release/empsit.nr0.htm.

[37] Passel, *supra* note 28, at 11–12.

[38] *Projection of the Loss in Federal Tax Revenues Due to Misclassification of Workers* (Coopers and Lybrand, now Price Waterhouse Coopers, for Coalition for Fair Worker Classification, June 1994) at 5, available at http://www.carpenters.org/misclassification/State and Other Research Studies/Coopers-Lybrand--Projection of Loss of Federal Rev Due to Missclassification.pdf.

[39] *Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs* (Planmatics, Inc. for U.S. Department of Labor Employment and Training Administration, Feb. 2000) at 87, available at http://wdr.doleta.gov/owsdrr/00-5/00-5.pdf.

higher because they are playing by the rules. A report prepared for the U.S. Department of Labor observed: "[C]ost considerations and aggressive competition are twin pressures that induce an employer to engage in behavior that creates an inequitable playing field in the business community for employers who correctly classify their employees and pay taxes."[40]

The State of California even developed a joint-agency strike force to address abuses created in the underground economy. This strike force has observed the impact of this employer behavior on "good" employers: "[W]hen businesses operate in the underground economy, they gain an unfair competitive advantage over businesses that comply with various business laws. This causes unfair competition in the marketplace and forces law-abiding businesses to pay higher taxes and expenses."[41] When the desire to avoid government scrutiny is combined with the immediate economic savings from avoiding payment of taxes and employer-provided benefits, some employers will see a clear competitive advantage in taking their workforce underground. The implementation of this proposed rule thus disadvantages those employers who play by the rules.

### DHS Should Suspend The Proposed Rule Because the SSA No-Match Program Is Ill-Suited As an Immigration Enforcement Tool

*The SSA No-Match Program Cannot Meet the Needs and Objectives of Immigration Enforcement Because the SSA Database Is Not an Immigration Database*

Each year employers send IRS Forms W-2 to SSA indicating their employees' annual earnings. SSA matches each worker's name and SSN to the Numerical Identification File (NUMIDENT), which is SSA's primary database of SSN holders.[42]

NUMIDENT is *not* an immigration database and is made up of information collected from applications for initial or replacement SSNs.[43] The database contains only limited and incomplete immigration information.[44]

---

[40] *Id.*

[41] *2003 Annual Report: California Joint Enforcement Strike Force on the Underground Economy* (Employment Development Department, State of California, June 30, 2004) at 3, available at http://www.edd.ca.gov/taxrep/txueo03.pdf; *see also* Francois Carerre, et al., *The Social and Economic Costs of Employee Misclassification in Construction* (Construction Policy Research Center at Harvard Law School and Harvard School of Public Health, Dec. 2004), at 7 (noting that "[m]isclassification creates challenges for compliant employers because it creates an uneven 'playing field.' Employers who respect the law and classify employees appropriately have a higher wage bill and can get underbid by contractors that do not comply and have lower costs.").

[42] *Report to Congress on the Basic Pilot Program* (U.S. Citizenship and Immigration Services, June 2004) (hereinafter "USCIS Report") at 2.

[43] Kevin Jernigan, "Eligible to Work? Experiments in Verifying Work Authorization," *Migration Policy Institute Insight,* Nov. 2005 (hereinafter "Jernigan") at 3.

[44] The database "contains information on name, date of birth, and citizenship status of persons issued Social Security cards, which enables SSA to confirm work authorization for U.S. citizens and some noncitizens who are permanently work authorized." USCIS Report, *supra* note 42, at 2. SSA collects immigration status information only on those persons who are work-authorized incident to status, such as lawful permanent residents, asylees, and refugees. *Id.* at 4.

---

Even the limited immigration status information in NUMIDENT regularly becomes inaccurate because it is *not* automatically updated when a worker's immigration status or work authorization changes.[45] NUMIDENT is particularly inaccurate with respect to work-authorized noncitizens in its use with the Basic Pilot Program. According to U.S. Citizenship and Immigration Services (USCIS), work authorization for more than 50 percent of the cases of noncitizens could not be electronically confirmed by NUMIDENT, compared with 0.2 percent for native-born citizens.[46]

If there is a match of the SSN and the first seven letters of the surname between NUMIDENT and the W-2, the earnings are posted to the individual worker's Master Earnings Record. About 10 percent of submissions *cannot* be matched. SSA then does more than 20 "front-end validation routines," which are automated processes that manipulate names and SSNs to correct mistakes and find a correct match.[47] These "front-end validations" do *not* involve collection or use of immigration data.

If a valid record cannot be identified, SSA posts the earnings to its Earnings Suspense File (ESF). The ESF contains earnings reports with names and SSNs that do not match SSA records. SSA then performs "back-end" processes to try to match the earnings. SSA's "back-end" processes do not involve collection or use of immigration data.

The SSA back-end processes include using corrections generated through IRS processes. The back-end processes also include generating SSA no-match letters to employees and employers.[48] No-match letters are just one of the "back-end" processes that SSA regularly uses to ensure that earnings are properly attributed to workers. These letters are sent by SSA to inform employers and employees that the worker is not getting proper credit for their earnings due to a discrepancy.

*Immigration Status or Lack of Immigration Status Cannot Be Presumed from Posting to the ESF*

The ESF contains hundreds of millions of records, and a "significant number of earnings reports in the ESF still belong to U.S. citizens and work-authorized noncitizens."[49] The percentage of ESF records belonging to unauthorized workers is entirely unknown. The majority of reinstatements (matching to a worker's Master Earnings Record) are still made to U.S.-born citizens.[50] ESF records do not in any way indicate immigration status. The information in ESF

---

[44] The SSN application form itself focuses on noncitizens' work authorization rather than immigration status. *See* Form SS-5 (May 2005), available at http://www.ssa.gov/online/ss-5.pdf.

[45] Jernigan, *supra* note 43, at 12.

[46] USCIS Report, *supra* note 42, at 4–5.

[47] *Social Security, Better Coordination Among Federal Agencies Could Reduce Unidentified Earnings Reports*, GAO-05-154 (GAO, Feb. 2005) (hereinafter "GAO Feb. 2005") at 7–8.

[48] *Id.*

[49] *Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work*, GAO-06-814R (GAO, July 11, 2006) (hereinafter "GAO July 2006") at 8.

[50] *Id.; see also* GAO Feb. 2005, *supra* note 47, at 18.

No-Match Cert. Admin. Record  1593

consists of the worker's name, SSN, employer's identification number, and the earnings amount.[51]

The ESF simply consists of information on workers whose records do not match SSA records, for reasons that include errors or obsolete data, lack of an SSN, missing first or last names, or use of nonalphabetic characters.[52]  The lack of an SSN is a particularly instructive example of an innocent basis for inclusion in the ESF that is frequently and wrongly cited as a basis for determining lack of work authorization.  Both the SSA and the IRS advise employers to use all zeros or to write in *"applied for"* when the worker has applied for but not yet received an SSN.[53]

SSA no-match letters are therefore *not* reliable indicators of work authorization or immigration status.  There is no way to accurately determine whether a SSA no-match letter is the result of typographical error, out-of-date information, or some other legitimate reason, let alone to determine an illegitimate reason.[54]  The SSA itself has repeatedly recognized that its no-match letter does not indicate immigration status or lack of authorization to work.  The current no-match letter explicitly states that a worker's identification in the letter "makes no statement" about his or her immigration status.[55]  The SSA database simply does not have the capacity to meet the needs and objectives of an immigration enforcement program.  Because of these limitations, this proposal will only result in an adverse impact on workers and our economy, including the increased discrimination and abuse of workers described above.  DHS should therefore suspend this rule.

### The Rule Modification Would Give DHS Indirect Access to Tax Information It Cannot Access Directly

DHS should also suspend this proposed rule because it attempts to indirectly access sensitive tax information that is protected by federal law.  Specifically, Section 6103 of the Internal Revenue Code protects the confidentiality of taxpayer returns and taxpayer information and provides only limited exceptions to the sharing of personal identifying data.  This confidentiality is deemed essential to voluntary tax compliance.  The GAO has explicitly recognized that the ESF includes "sensitive taxpayer information that is protected by various laws and regulations" and that statutory authority would be required to provide DHS access.[56]

---

[51] GAO July 2006, *supra* note 49, at 8.

[52] *Id.; see also* GAO Feb. 2005, *supra* note 47, at 11–12.

[53] GAO Feb. 2005, *supra* note 47, at 11, n. 4.

[54] In testimony last month before the House Committee on Ways and Means, the Commissioner of Social Security emphasized that the source of SSA's database information is the Form W-2, and "there is no citizenship or immigration status information on that document."  *See* Statement of The Honorable Jo Anne B. Barnhart, Commissioner, Social Security Administration, *Testimony Before the House Committee on Ways and Means* (July 26, 2006), available at http://waysandmeans.house.gov/hearings.asp?formmode=view&id=5172.

[55] Letter, Hurt, Assoc. Comm. for Central Op. SSA (Oct. 9, 2004) (hereinafter "Hurt Letter").

[56] GAO July 2006, *supra* note 49, at 8.

No statutory authority currently exists to provide DHS with access to this information.[57] As a result, DHS cannot presently obtain no-match information directly from SSA.

SSA no-match letters to employers frequently include taxpayer identity and return information. This rule allows DHS to commandeer the information contained in no-match letters and therefore allows DHS to circumvent the tax code's confidentiality restrictions. DHS should not be permitted to do by rule change what it cannot do without additional statutory authority.

Breaching the confidentiality of tax records would have the counterproductive result of discouraging tax compliance. Moreover, it would encourage employers and workers alike to enter the underground economy and not pay into our tax and Social Security systems.

**The Proposed Rule Dramatically Alters the Definition of "Constructive Knowledge" and Makes a Stark Departure from Existing Case Law and Longstanding Federal Guidance on No-Match Letters**

As an evidentiary matter, an employer's receipt of an SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule alters the definition of constructive knowledge and makes a stark departure from existing case law and longstanding federal guidance in this area.

In the seminal *Collins Food Intn'l v. I.N.S* case, the Ninth Circuit cautioned against the expansion of the doctrine of constructive knowledge: "IRCA . . . is delicately balanced to serve the goal of preventing unauthorized alien employment while avoiding discrimination against citizens and authorized aliens. The doctrine of constructive knowledge has great potential to upset that balance, and it should not be expansively applied." 948 F.2d 549, 554-555 (9th Cir. 1991).

Accordingly, the court instructed that "[a] finding of constructive knowledge requires "willful blindness" and "to expand the concept of constructive knowledge . . . would not serve the intent of Congress, and is certainly not required by [IRCA]." *Id.* at 555.

Contrary to DHS's assertions in the supplemental text, the proposed regulation would extend the definition of "constructive knowledge" well beyond the holdings in *Collins* and in *Mester Manufacturing Co. v. INS*, 879 F.2d 561 (9th Cir. 1989), and other constructive knowledge cases arising under the employer sanctions provision of the Immigration and Nationality Act, 8 U.S.C. § 1324a.

Indeed, the supplemental text misrepresents *Mester* by stating that the employer in that case merely received some evidence that the employee was not authorized to work. This is simply incorrect, and significantly downplays the type of information received by the employer, and relied upon by the court in its decision. In *Mester*, the court held that an employer had constructive knowledge of a worker's unlawful status when it received information directly *from*

---

[57] In contrast, such authority exists with respect to the Nonwork Alien File, which includes information about workers who are working though they have been issued nonwork SSNs.

**No-Match Cert. Admin. Record  1595**

*the INS* that an employee was an "illegal alien" but did not terminate the employee for two weeks. *Id.* at 567–68.

Consistent with *Mester*, cases have found constructive knowledge only where the employer has been provided specific information from a source knowledgeable about a worker's immigration status, where the employer failed to complete the Form I-9 (coupled with other suspicious circumstances), or in egregious circumstances. *See U.S. v. Jonel, Inc.* 1998 WL 804705 (OCAHO), *14 (Labor Department notice to employer that workers were unauthorized constituted constructive knowledge); *New El Ray Sausage Co. v. I.N.S.,* 925 F.2d 1153, 1157 (9th Cir. 1991) (INS gave employer "specific and detailed information" that it was employing undocumented workers); *U.S. v. American McNair,* 1 OCAHO 285 (1991) (employee failure to present any work authorization documents and notification of employer that he was ineligible for amnesty constituted constructive knowledge); *U.S. v. Fragale,* 1999 U.S. Dist. LEXIS 12616 (E.D. Pa. 1999) (constructive knowledge when human resources manager and foreperson in charge of hiring told employer that a large percentage of workforce was undocumented, and employer had received notice from INS that some workers were undocumented).

Moreover, in its attempt to convert the SSA no-match letter into a method of verifying immigration status or authorization to work, the proposed rule directly contravenes longstanding federal guidance from SSA, OSC, and former INS General Counsel.

SSA's position on no-match letters and immigration enforcement is set forth in clear terms on the face of the letter itself. The letter provides the following warning to employers:

> IMPORTANT: This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number. Nor does it make a statement about an employee's immigration status.[58]

For years, INS General Counsel has instructed employers along identical lines:

> If the document or documents presented to verify work authorization appear on their face to be genuine and to reasonably relate to the individual, the subsequent receipt of the SSA letter mentioned above does *not* impose any affirmative duty upon the employer to investigate further into an employee's eligibility to work in the United States. In addition, the receipt of this SSA letter by the employer, *without more*, would *not* be sufficient to establish constructive knowledge on the part of the employer regarding the employment eligibility of the named employee.[59]

---

[58] Hurt Letter, *supra* note 55.

[59] Letter, Virtue, Acting Gen. Coun. INS, HQ 274A (Feb. 17, 1994) (emphasis added); for reference, the LWIW Coalition has attached this letter as Exhibit 1 to this comment.

OSC has also provided similar guidance:

> The receipt of a no-match letter, standing alone, does not indicate to an employer that he or she need question the genuineness of documents or information previously presented to complete an INS Form I-9.[60]

This proposed regulation thus turns established federal guidance on no-match letters on its head. At the very least, the proposal will result in conflicting guidance from multiple federal agencies and cause employer and employee confusion.

### The Costs of Implementing the Proposed Rule are Prohibitive

If the proposed rule is to be carried out as envisioned, the government will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. Employer confusion is already evident from high number of questions submitted employers in their comments opposing the rule. In particular, many employers have submitted questions regarding the rule's unrealistic and unreasonable timetables for compliance.

Therefore, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA ultimately has to respond to the inevitable increase in employer (and employee) inquiries about this confusing rule. The actual costs of the current SSA no-match letter program are already substantial.[61] The actual costs of administrating a new program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law.

### The Procedure to be Followed Under the Proposed Rule When an Employer Receives Notice from DHS Denies Employees Due Process of Law

Section 274a.1(l)(1)(iii)(C) of the proposed rule includes the following as a circumstance that would amount to constructive knowledge where the employer "[f]ails to take reasonable steps after receiving information indicating that the employee may be an alien who is not employment authorized, such as . . . [w]ritten notice from the Department of Homeland Security that the immigration status document or employment authorization document presented or referenced by the employee in completing Form I-9 was assigned to another person, or that there is no agency record that the document was assigned to any person."

---

[60] Letter, Sarah DeCosse, Sr. Tr. Atty OSC (Apr. 1, 2004).

[61] See Mehta, *supra* note 4, at 7, n. 2 (noting that SSA's current attempts to reduce the ESF through no-match letters have cost U.S. taxpayers the following amounts: "$5.4 million to send notices to every individual whose name and SSN do not match SSA's records; $600,000 to send 944,000 notices to all employers who submitted wage reports with at least one item posted to the ESF; more than $200,000 for system maintenance and cyclical changes; and an average of $9.00 for each call to SSA's national toll free telephone number generated by the notices. SSA estimates that the agency received about 100,000 inquiries throughout 2002 regarding the TY 2001 letter.").

No-Match Cert. Admin. Record  1597

Under Section 274a.1(l)(2)(iii), an employer who receives such a notice will not be deemed to have constructive knowledge of the employee's unauthorized status if the employer takes reasonable steps to resolve the question raised by DHS and, if the employer does not verify with DHS that the document was assigned to the employee, the employer completes a new I-9. The employee cannot use the alien registration number, or "A-number," that is the subject of the written notice from DHS.

While this procedure may protect the employer, it entirely leaves out any possibility for the *employee* to have access to his or her DHS immigration file and any opportunity to correct errors in the file that would lead to DHS providing erroneous information to the employer. This access and an assured opportunity to correct errors in immigration records are critical because immigrants do not have easy, automatic, timely access to their immigration records, and immigration records are error-prone.

For years, government agencies have criticized the quality and accuracy of immigration records.[62] Problems with immigration records have continued even after the dissolution of the INS and the creation of new immigration agencies in DHS. The information technology environment at USCIS has been criticized as inefficient, and USCIS continues to rely on manual and paper-based processes.[63] As an example of how DHS records and processes go awry, in December 2005 DHS had to "recall more than 60,000 green cards because a computer glitch miscalculated immigrants' residency start dates."[64] USCIS sent letters instructing immigrants to mail their cards back. Unfortunately, USCIS sent the letters to many immigrants whose green card "resident since" dates were actually correct. USCIS then advised community-based organizations working with immigrants that its information technology staff was working to determine who received the mailing in error and that USCIS intended to send out a second letter to all individuals who received the initial letter in error.

Moreover, under current law, immigrants have access to their immigration files (both "alien files" and Border Patrol requests) only by filing Freedom of Information Act (FOIA) requests. FOIA requests for files must be made in writing and mailed to a central location, at the National Records Center in Missouri.[65] This means that immigrants who need access to their files to determine the nature of the erroneous information and then to correct this information as envisioned under Section 274a.1(l)(iii)(C) of the proposed rule are dependent on FOIA procedures which are not designed for this purpose. The lengthy and unpredictable timetables and cumbersome process for the FOIA process make it difficult for immigrants to both obtain their files and then correct mistaken information within Section 274a.1(2)(ii)'s compliance period.

The proposed rule thus raises critical due process concerns for immigrants. It fails to guarantee adequate access and an assured opportunity to immigrants who wish to correct errors in their

---

[62] *INS Data:The Track Record* (NILC, 2003), available at http://www.nilc.org/immlawpolicy/misc/INS data accuracy.pdf.

[63] *USCIS Faces Challenges in Modernizing Information Technology,* OIG-04-41 (DHS, Office of Inspector General, Sept. 2005), available at http://www.dhs.gov/interweb/assetlibrary/OIG_05-41_Sep05.pdf.

[64] Solomon Moore, "Green Cards Recalled Because of Glitch," *The Los Angeles Times,* Dec. 6, 2005.

[65] *See* USCIS, *Freedom of Information and Privacy Acts,* http://www.uscis.gov/graphics/aboutus/foia/index.htm.

immigration records.  It creates penalties for employees when their immigration status or documents cannot be confirmed.  It does not, however, set any time period for DHS to respond to immigrants' requests to review their files, nor does it place any obligation on DHS to correct immigrants' records in a timely fashion.

### The Proposed Rule May Exceed DHS's Authority

*DHS May Not Have Authority to Restrict the List of Acceptable Documents for the Reverification Process*

The proposed rule would create an exception to the list of documents that can be used to reverify the worker's employment authorization and identification as part of the I-9 requirement.  But it appears that DHS may lack the ability to impose such restrictions.  According to the INA, only the Attorney General has authority to promulgate regulations restricting the list of acceptable documents. 8 U.S.C. § 1324a(b)(1)(E).  According to the statute, the Attorney General may only restrict the list of acceptable documents if he "finds, by regulation that any [of the listed documents] does not reliably establish [employment] authorization or identity or is being used fraudulently to an unacceptable degree." *Id.*  Importantly, this power of the Attorney General was not transferred to the DHS upon its creation and the dissolution of the former Immigration and Nationality Service. 8 U.S.C. § 1103(a) (transferring powers under the INA to the Secretary of the DHS, *except* those that "relate to the powers, functions, and duties conferred upon" "the Attorney General," among others) (emphasis added).   There is no indication in 8 U.S.C. § 1324a(b)(1)(E) and accompanying notes that the provision was ever amended to transfer the AG's authority to promulgate regulations to the DHS.

Despite this express statutory rule exclusively vesting the ability to restrict the congressionally approved list of I-9 documents to the Attorney General, Section 274a.1(l)(2)(iii) of the proposed rule would give DHS the power to restrict which documents are acceptable in the reverification process.  According to that section, only documents bearing a photograph and *not* containing the SSN that triggered the no-match letter will satisfy the reverification requirement under the I-9 process. *Id.*  Under current law, however, documents lacking photographs and those that include Social Security numbers are acceptable—even if the SSN triggers a no-match letter. 8 U.S.C. § 1324a(b)(1)(C), (D).  Therefore, the proposed rule may inappropriately usurp the Attorney General's exclusive power to alter the congressionally created list of approved documents for reverification of a worker's status under the I-9 process and should be rejected.[66]

### RECOMMENDATION

In sum, we strongly oppose the Department of Homeland Security's proposed regulation.  DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of workers in an isolated, punitive immigration "enforcement" scheme on the eve of enactment of *comprehensive immigration reform.*  Although the rule will cause enormous upheavals in the workplace, the rule will have *no* impact on undocumented migration, which is the purported purpose of this

---

[66] The proposed rule may also violate INA Section 274A(d)(3), which requires notice by the President to the House and Senate Judiciary Committees before changes are made to the employment eligibility verification system.  We do not know whether the President has provided such notice to the appropriate committees.

proposal. Our experience with no-match firings and workplace audits is very clear: *the fired workers will not leave the United States*. In the absence of comprehensive immigration reform that addresses the root causes of undocumented migration, they will simply find other more marginal jobs, most likely in the underground economy. Because of this, the proposed rule will result in growth of the underground economy, which results in substantial losses in state and federal tax revenues as well as unfair competition. The proposed rule is simply the wrong rule at the wrong time. It provides no solution to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by workers, taxpayers, and businesses. For all these reasons, we recommend that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,

**The Low-Wage Immigrant Worker (LWIW) Coalition**

**Co-Convened By:**

American Federation of Labor – Congress of Industrial Organizations (AFL-CIO)
Change to Win (CtW)
Interfaith Worker Justice (IWJ)
Jobs with Justice
National Council of La Raza (NCLR)
National Day Laborer Organizing Network (NDLON)
National Employment Law Project (NELP)
National Immigration Law Center (NILC)

**Contact:**

Marielena Hincapié, Esq.
Director of Programs
National Immigration Law Center
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA 90010
Phone: 213-639-3900
Fax: 213-639-3911
www.nilc.org

# EXHIBIT 1

### To DHS Docket No. ICEB-2006-0004;
### Comment Regarding "Safe Harbor Procedures for
### Employers Who Receive a No-Match Letter"

### Submitted by:
### The Low-Wage Immigrant Worker (LWIW) Coalition

### Date:
### Monday, August 14, 2006

Immigration and Naturalization Service

HQ 274A

Office of the General Counsel                425 Eye Street N.W.
                                             Washington, D.C. 20536

FEB 17 1994

Mr. Carl G. Borden
California Farm Bureau Federation
Office of the General Counsel
1601 Exposition Boulevard, FB3
Sacramento, CA  95815-5318

Dear Mr. Borden:

This letter is in response to your correspondence dated August
11, 1993, concerning the receipt of a letter from the Social
Security Administration (SSA).  The SSA letter in question
informs an employer that the social security number of an
employee does not agree with SSA records.  Specifically, you ask
whether an employer who receives this letter from SSA can
continue to rely on the employment eligibility documents
presented by that employee, assuming the documents appear on
their face to be genuine and to relate to the employee?

If the document or documents presented to verify work
authorization appear on their face to be genuine and to
reasonably relate to the individual, the subsequent receipt of
the SSA letter mentioned above does not impose any affirmative
duty upon the employer to investigate further into an employee's
eligibility to work in the United States.  In addition, the
receipt of this SSA letter by an employer, without more, would
not be sufficient to establish constructive knowledge on the part
of the employer regarding the employment eligibility of the named
employee.  As you correctly note in your correspondence, this
letter from SSA could be prompted by a number of different
reasons having nothing to do with an employee's eligibility to
work in the United States.

The answer provided above specifically applies to a situation
where the employer receives such a letter from SSA and the
employer has no additional evidence that an employee may not be
work authorized.  It should be noted, however, that if an employer
receives notice from the Immigration and Naturalization Service
(INS) that a social security card or other document presented to
establish work authorization is not valid, the employer does have
a duty to inquire further to ensure that the individual is
authorized to work in the United States before the employer can
continue to employ that individual.  In addition, while an
employer has no affirmative duty to inquire into an employee's

employment eligibility based solely upon receipt of a letter from
SSA, if for some reason the employer discovers evidence that an
employee may not be authorized to work in the United States, the
employer must inquire further to verify the employment
eligibility of that employee. If the employer is unable to
verify work authorization, the employer cannot continue to employ
that individual.

It should be noted that telephonic inquiries from employers
regarding the employment authorization of employees will not be
honored by INS.[1] However, if an employer suspects fraud, as it
relates to INS documents, the employer may ask INS to physically
examine the documents.

I hope that the above information is helpful to you. If you have
any further questions, please contact Michael C. McGoings,
Associate General Counsel at (202) 514-2895.

Sincerely,

for Paul W. Virtue
Acting General Counsel

---

[1]    (The only exception is where the written consent of that
individual has been obtained.)  See Salinas-Pena v. INS, No. 86-
1033-DA (D.Oregon, March 16, 1988).

- 2 -

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Vincent A. Eng [veng@AdvancingEquality.org] |
| **Sent:** | Tuesday, August 15, 2006 8:55 AM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |
| **Attachments:** | SSA_No_Match.pdf |

Greetings. Attached please find our comments regarding DHS Docket No. ICEB-2006-0004.

**Asian American Justice Center**
**(Formerly National Asian Pacific American Legal Consortium)**

Vincent A. Eng
Deputy Director
1140 Connecticut Avenue, N.W.
Suite 1200
Washington, DC 20036
Phone: (202) 296-2300, x121 Facsimile: (202) 296-2318
URL: http://www.advancingequality.org

**No-Match Cert. Admin. Record  1604**



ADVANCING EQUALITY

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave., NW, 2nd Floor
Washington, D.C. 20529

*Re:*    ***DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"***

Dear Sir or Madam:

The Asian American Justice Center (AAJC) and its affiliates – the Asian American Institute (Chicago), Asian Law Caucus (San Francisco), and the Asian Pacific American Legal Center of Southern California (Los Angeles) – join to submit the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

Founded in 1991, AAJC (formerly the National Asian Pacific American Legal Consortium) works to advance the human and civil rights of Asian Americans through advocacy, public policy, public education, and litigation. In accomplishing its mission, AAJC focuses its work to promote civic engagement, forge strong and safe communities, and create an inclusive society in communities on a local, regional, and national level. AAJC is one of the nation's leading experts on issues of importance to the Asian American community including: affirmative action, anti-Asian violence prevention/race relations, census, immigrant rights, immigration, language access, and voting rights. AAJC has been particularly active in immigrant rights and immigration issues since more than 60% of the 15 million Asian Americans and Pacific Islanders living in the US are immigrants.

AAJC is aware of the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States–immigrant and native-born alike.

As a result of this work, AAJC is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and

---

1140 Connecticut Ave. NW, Suite 1200, Washington, D.C. 20036 • T 202.296.2300 • F 202.296.2318 • www.advancingequality.org

AFFILIATES: Asian Pacific American Legal Center in Los Angeles • Asian Law Caucus in San Francisco • Asian American Institute in Chicago

**No-Match Cert. Admin. Record  1605**

trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm _all_ workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion, employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new legal obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" competitors who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform**. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for its own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administering the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Karen Narasaki, President and Executive Director
Asian American Justice Center
1140 Connecticut Avenue, NW, Suite 1200
Washington, DC 20036
Telephone: (202)296-2300
Fax: (202)296-2318

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | Marielena Hincapie [hincapie@nilc.org] |
| **Sent:** | Tuesday, August 15, 2006 11:23 AM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |
| **Importance:** | High |
| **Attachments:** | DHS Docket No ICEB-2006-0004 Long Comments_FINAL.pdf |

This message was sent yesterday to this email address and as well as Arden Ratana. We received confirmation that it was received by Arden Ratana, but I wanted to make sure it was delivered to this address as well.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Dear Sir or Madam:

Attached is the Low-Wage Immigrant Worker Coalition's comment to **DHS Docket No. ICEB-2006-0004**.

Sincerely,

Marielena Hincapié

Marielena Hincapie, Esq.
Director of Programs
National Immigration Law Center
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA 90010

213-639-3900 x. 112
213-639-3911 (fax)
hincapie@nilc.org    |    www.nilc.org

The information contained in this e-mail message may be privileged, confidential, or otherwise legally protected from disclosure. It is also covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 et seq. If you are not the intended recipient of this message, you are informed that any retention, copying, distribution, and/or other use or dissemination of any portion of its contents is prohibited. If you believe you have received this e-mail message in error, please contact the sender immediately at hincapie@nilc.org or 213-639-3900, delete the message from any and all electronic files, and destroy all other copies as well. Thank you.

**No-Match Cert. Admin. Record  1609**

# Low-Wage Immigrant Worker Coalition

**VIA ELECTRONIC MAIL**

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

*Re:    DHS Docket No. ICEB-2006-0004, Comment Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

The National Immigration Law Center (NILC) submits the following comment on behalf of the Low-Wage Immigrant Worker (LWIW) Coalition in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE), on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 FR 34281 (June 14, 2006).

The LWIW Coalition is co-convened by NILC, the American Federation of Labor – Congress of Industrial Organizations (AFL-CIO), Change to Win (CtW), Interfaith Worker Justice (IWJ), Jobs with Justice, the National Council of La Raza (NCLR), the National Day Laborer Organizing Network (NDLON), and the National Employment Law Project (NELP).

The LWIW Coalition is our nation's broadest collaborative of advocates and organizers working to improve the living and working conditions of low-income and low-wage immigrant workers. The mission of the LWIW is to support this community of advocates by sharing strategies and resources at the local, state, and national levels.

The signatories to these comments have ample experience in dealing with the adverse impact that Social Security Administration's (SSA's) no-match letters have had on all workers, immigrant and native-born alike. Through our legal assistance programs and organizing campaigns, we have interacted with tens of thousands of low-wage workers and their families on matters related to no-match letters and other Social Security number (SSN) verification matters. We have assisted individual employees in correcting no-match discrepancies and educated both employers and employees on their responsibilities in responding to no-match letters through written materials, trainings, and technical assistance to a broad range of groups in the country.

---

American Federation of Labor – Congress of Industrial Organizations (ALF-CIO) ● Interfaith Worker Justice (IWJ)
● Jobs with Justice (JWJ) ● National Day Labor Organizing Network (NDLON) ● National Council of La Raza
(NCLR) ● National Employment Law Project (NELP) ● National Immigration Law Center (NILC)

**No-Match Cert. Admin. Record  1610**

The LWIW Coalition has also worked closely with SSA through the years to improve language in no-match letters and to include warnings to employers against discriminatory and retaliatory conduct. Our advocacy includes ongoing monitoring of national origin and citizenship status discrimination cases as well as unfair labor practices arising from SSN verification and no-match matters reported to the U.S. Department of Justice Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC), the Equal Employment Opportunity Commission (EEOC), and the National Labor Relations Board (NLRB). Some of the co-conveners of the LWIW have also been engaged in litigation involving employer misuses of no-match information to interfere with workers' rights to organize and exercise their labor rights. Throughout our work, we have remained steadfast in our commitment to safeguard and advance the rights and best interests of low-wage workers, their families, and their communities.

As a result of this work, the LWIW Coalition is alarmed by and strongly opposed to the implementation of the "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that no-match letters have had on workers' rights and trigger massive, potentially unlawful firings of low-wage workers across the nation. Overly cautious employers will fire listed workers before workers have a chance to show they are on the list mistakenly. But despite the disruption it will cause, the rule does nothing to solve our immigration problems.

DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of workers in an isolated, punitive immigration "enforcement" scheme on the eve of enactment of comprehensive immigration reform intended to make our immigration system work again. In the absence of such reform, the proposed changes would only stir up dust.

The proposed rule is simply the wrong rule at the wrong time. Both the House and Senate have passed immigration bills that contain sweeping new worksite verification and enforcement regimes that impose a new electronic verification system on all employers. Implementing the rule before the conclusion of the immigration debate would add a new, unnecessary, and unhelpful set of major changes for employers to learn and implement on top of the ones that will be added just a short while later when the new legislated changes take effect.

Although the rule causes enormous upheavals in the workplace, the rule will have *no* impact on undocumented migration, which is the purported purpose of this proposal. Our experience with no-match firings and workplace audits is very clear: *the fired workers will not leave the country*. In the absence of comprehensive immigration reform that addresses the root causes of undocumented migration, they will simply find other more marginal jobs, most likely in the unregulated cash economy. Because of this, the proposed rule will result in growth of the underground economy, which in turn will result in substantial losses in state and federal tax revenues as well as unfair competition.

In addition to its enormous impact on workers and on our economy, this proposal should be withdrawn because the rule attempts to transform the SSA no-match program into an immigration enforcement tool when the SSA does not have the capacity to fulfill this objective through its database. Additionally, the rule erodes our privacy rights, raises due process concerns, and radically departs from existing case law and longstanding federal guidance in this

area. It provides no solution to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by workers, taxpayers, and businesses. The LWIW Coalition therefore urges DHS to withdraw this rule in its entirety.

Our concerns are set forth in full below.

**The Proposed Rule Harms All Workers Regardless of Immigration Status**

*Hundreds of Thousands—Possibly Millions—of Workers, Including U.S. Citizens and Work-Authorized Noncitizens, Will Face Massive Firings*

As an initial matter, the notion that SSA no-match letters indicate that an individual is not authorized to work in the United States is simply incorrect. SSA no-match letters are *not* reliable indicators of work authorization or immigration status. Instead, these letters simply indicate that there is a discrepancy between a worker's SSN and/or name on file with the SSA based on information reported by employers on Internal Revenue Service (IRS) Form W-2 (Wage and Tax Statement). There are numerous reasons for the discrepancies, *none of which have anything to do with the immigration status or work authorization of workers*. Many of these mismatches are based, instead, on simple human error (such as clerical data entry mistakes and misspellings by the employee, employer, or SSA) or life changes (such as name changes, marriages, and divorces). The proposed rule, however, is based on the faulty premise that SSA no-match letters are foolproof indicators of work authorization. Because this premise is flawed, there are several, disastrous consequences that would flow from implementation of the rule.

This proposed rule will trigger massive firings across the nation. Based on our experience over the years but in particular with SSA's policy in 2002 where the agency sent the no-match letter to almost one million employers, the LWIW Coalition anticipates that the proposed rule will prompt similar panic and confusion among employers. This is likely to result in employers precipitously and indiscriminately firing workers who appear on a no-match list before workers have a chance to show that they are on the list because of the simple human error or life changes described above. As a result, these mass no-match firings may include the terminations of thousands of work-authorized employees who routinely receive SSA no-match letters.

U.S. citizens, lawful permanent residents, and other work-authorized employees were among the estimated 100,000 workers who lost their jobs as a result of the approximately 800,000 no-match letters sent by SSA in 2002.[1] Job losses were most acute in low-wage industries such as agriculture, cleaning, construction, food service, and health care. For example, no-match firings devastated the workforce at Stanford Medical Center in Palo Alto, California, where 83 percent of workers on a no-match list lost their jobs.[2] Based on the severity of the 2002 job losses, the U.S. Chamber of Commerce declared an official labor shortage and urged SSA to change its policy.[3] Under pressure from the Chamber and employers, as well as enormous pressure from

---

[1] Mary Beth Sheridan, "Records Checks Displace Workers: Social Security Letters Cost Immigrants Jobs," *The Washington Post*, Aug. 2, 2002.

[2] "A Crackdown on Workers," *The San Francisco Chronicle*, Aug. 12, 2002.

[3] "*The Immigration Crisis,*" Cox News Service, Aug. 14, 2002.

civil, immigrant, and worker rights advocates across the country, SSA agreed to decrease the number of no-match letters.[4]

No-match firings across the nation continued into 2003, however. In August, Peco Foods, Inc. of Canton, Mississippi terminated about 200 workers in response to no-match letters.[5] That same year, Suncast, Inc., a Chicago-area outdoor garden product manufacturer, terminated over 100 employees in response to no-match letters.[6] By the end of 2003, a national survey conducted by the University of Illinois at Chicago's Center for Urban Economic Development determined that approximately 53.6 percent of employers responding to no-match letters terminated the listed workers.[7] Despite strong warnings to employers that appeared on the face of the letter, the study found that workers were summarily fired, often without any opportunity to correct the no-match discrepancies or any explanation of the no-match process.[8]

Documented examples of adverse employment actions against U.S. citizens and other work-authorized noncitizens include:

- <u>Mr. Samuel Harris</u>. In late summer of 2003, Mr. Samuel Harris,[9] an African American man in Virginia, was fired from his job because his employer received an SSA no-match letter regarding a discrepancy with respect to Mr. Harris's SSN. Mr. Harris, who is a U.S. citizen, went to the local SSA office to correct his information. Apparently, SSA had issued Mr. Harris a duplicate SSN that belonged to a deceased person. Although Mr. Harris was able to correct his information with SSA, his employer refused to continue to employ him, thinking that Mr. Harris was engaging in identity theft or similar wrongdoing. He was fired and out of work for several months and had to file an arbitration case to get his job back.[10]

- <u>Mrs. Noelle Lopez</u>. In July 2002, Mrs. Lopez, a worker from North Carolina, was injured on the job. While she was on leave, her employer notified her that it had received an SSA no-match letter for her. She corrected the discrepancy, which was based on a typographical error in the W-2 that her employer had filed with SSA. Weeks later, while still on leave for her injury, the employer asked Mrs. Lopez to reverify that she continued to be eligible to work in the United States because her work authorization had expired. She had employment authorization based on Temporary Status Program (TPS), and had already applied for a renewal, but the Immigration and Naturalization Service (INS) sent her an Employment

---

[4] Chirag Mehta, et al., *Social Security Administration's No-Match Letter Program: Implications for Immigration Enforcement and Workers' Rights* (Center for Urban Economic Development, University of Illinois at Chicago, Nov. 2003) at 7, available at http://www.uic.edu/cuppa/uiced/npublications/recent/SSAnomatchreport.pdf (hereinafter "Mehta"); *Basic Information Brief: SSA "No-Match" Letters* (NILC, Feb. 2005) (hereinafter "NILC Brief") at 2, available at http://www.nilc.org/immsemplymnt/SSA-NM_Pack/Basic_Info_Brief_No-Match_Ltrs-2-15-05.pdf.

[5] Peggy Matthews, "Plan to Round Up, Deport Illegals Angers Activists," *The Clarion-Ledger*, Aug. 12, 2003.

[6] Stephanie Blozen, "Latinos Start Boycott Against Batavia Firms," *The Chicago Tribune*, Aug. 12, 2003.

[7] Mehta, *supra* note 4, at 13.

[8] *Id.* at 15.

[9] All individual worker names have been changed to protect their identities, but the names of workers and employers drawn from media sources are reproduced here as published.

[10] NILC Brief, *supra* note 4, at 4.

---

Authorization Document (EAD) with someone else's picture. Although she was able to straighten this problem out, when her doctor told her she could go back to work, the employer denied her a job because she had "too many immigration problems."[11]

The proposed rule only exacerbates this risk of unnecessary and unjust firings. Past experience indicates that, rather than navigating a complex series of steps and timetables to a "safe-harbor," panicked and confused employers will simply fire all workers whose names appear on the no-match list. The employer confusion across U.S. worksites is already detectable.

- Mr. James Heggen. Shortly after DHS issued the proposed rule, an employer in Massachusetts refused to hire Mr. Heggen, a lawful permanent resident of the United States, for a permanent clerical position due to a typographical error on his Social Security card. Mr. Heggen's name appears as "Heggen" on his alien registration card or "green card," but on his Social Security card, his name is spelled "Hegen"—with one less "g." Based on this missing "g," the employer denied Mr. Heggen a permanent position, claiming that it had to be *more careful in these times*. Mr. Heggen is Black and was born in the United Kingdom. His parents immigrated to the U.K. from the Caribbean. Together, the family immigrated to the United States when Mr. Heggen was a child. Because he and his parents received their permanent immigration documents decades ago, Mr. Heggen cannot file for a correction of his Social Security card locally, and, therefore, not quickly. Correcting this minor Social Security discrepancy could take several months. Frustrated after being denied this permanent position, Mr. Heggen contacted a local community-based legal services organization for assistance. This organization immediately sent a letter to the employer, setting forth the potential illegality of the employer's actions. Subsequently, the employer hired Mr. Heggen on a temporary basis. The week of August 7, 2006, after additional consultation with the organization, the employer hired Mr. Heggen for the permanent position.[12]

Recent media accounts of the proposed rule reveal that employers are already contemplating massive no-match firings as a response to the new rule. A construction company president told the *Tampa Tribune,* after attending a seminar for employers on the proposed rule, that some of his company's workers "won't be working for us in the future" if the rule is implemented and that he had great concern about "filling those spots."[13] *The Ledger* of Lakeland, Florida, reported that while the proposed rule may lead to penalties for employers, "workers, in turn, would lose their jobs," an effect which for Florida's largest growers' organization amounts to a "threat to national security."[14] An employment attorney representing several large employers reported to the *Washington Post* that, "From a practical standpoint, [the proposed rule] will have the effect [of employers] having to terminate employees. It will be devastating to many

---

[11] *Id.*

[12] Telephone interviews with Ingrid Nava, Employment Unit, Greater Boston Legal Services, Boston, Mass., July 28, 2006, and Aug. 10, 2006.

[13] Lindsay Peterson, "Proposal Targets Illegal Immigration," *The Tampa Tribune,* June 15, 2006.

[14] Kevin Bouffard, "Proposal May Pinch Growers," *The [Lakeland, FL] Ledger,* July 11, 2006, available at http://www.theledger.com/apps/pbcs.dll/article?AID=/20060711/NEWS/607110399/1004.

industries if people comply with it."[15]  The proposed rule thus has placed the livelihoods of hundreds of thousands—possibly millions—of workers and their families on the line.

*The Proposed Rule Will Result in Increased Citizenship Status, National Origin, and Racial Discrimination*

The proposed rule creates two sets of potential employment discrimination: discriminatory firings and discriminatory refusal to hire.  A disproportionate number of names on no-match lists are "foreign-sounding" names of newcomers to the United States, and many SSA letters are sent to employers with large numbers of newcomers in their workforces.  Employers who believe they will face business disruption due to the letters have an incentive to prefer employees they think are less likely to receive the letters.  Employers may also choose to simply dismiss employees who appear or sound foreign.  These discriminatory employment actions would run afoul of federal and state antidiscrimination laws and other worker protections and lead to costly and protracted wrongful termination litigation.

Employment discrimination against authorized noncitizen workers—particularly against Latinos, Latinas, and Asians—was rampant after the passage of the 1986 Immigration Reform and Control Act (IRCA).  A 1990 U.S. General Accounting Office (GAO) study reported a pattern of discrimination that resulted solely from employer sanctions, including discrimination on the basis of foreign accents or appearance and preferences of certain authorized workers over others.  In fact, the GAO estimated that an average of 19 percent of employers—almost one in five—participated in one or more discriminatory practices as a result of the 1986 law.  These results were confirmed by nearly a dozen studies conducted locally during the 1990s by human rights commissions and other organizations, which also found significant discrimination resulting from the implementation of employer sanctions.[16]

Employment discrimination has also increased since SSA began sending close to a million no-match letters in 2002.  The number of immigration-related unfair employment referrals and investigations fielded by OSC has risen dramatically.  From 1994 to 2000, OSC conducted only 20 investigations into firings stemming from employers that fired workers based on SSN verification matters.  From 2001 to 2003, OSC opened 29 investigations.  Three of the investigations opened after 2001 resulted in settlements favorable to workers, and ten investigations were open as of 2003.[17]  Although recent statistics are unavailable, OSC recognized in its April 2005 quarterly newsletter that OSC "staff members frequently provide assistance to workers" who face adverse employment actions by employers based on the no-match letters.[18]

---

[15] Cindy Skrycki, "DHS Wants Workers, Papers to Match," *The Washington Post,* July 11, 2006 (quoting Monte B. Lake, an employment and immigration attorney).

[16] *Immigration Reform: Employer Sanctions and the Question of Discrimination*, GGD-90-62 (GAO, Mar. 29, 1990), available at http://archive.gao.gov/d24t8/140974.pdf.

[17] Mehta, *supra* note 4, at 25.

[18] *OSC Update* (OSC, U.S. Department of Justice, Civil Rights Division, Apr. 2004) at 2.

*The Proposed Rule Will Result in Increased Employer Retaliation Against Workers Who Exercise Their Workplace Rights*

The proposed rule also places all workers at a higher risk of employer retaliation for labor organizing and raising complaints about worksite conditions. Unscrupulous employers already use the SSA no-match letter to stymie organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- North Carolina. In July 2006, during a heated legal battle over recent union election results, at least 24 Latino immigrant workers at a modular building construction company were suspended without pay because they were listed on a no-match letter. All 24 had voted to unionize. Many of the 24 have also initiated race and sex-based discrimination charges against their employer with the EEOC. A former supervisor at the company reported to the press: "These workers have been used and abused. As supervisors, we were told we needed production and to crack the whip to get it. We were told not to worry because these workers are just wetbacks and have no legal rights." A large group of African American workers have also filed complaints against this company with the EEOC. To protest the no-match firings, workers walked out on the day the firings took place. The workers and their union are also contemplating race and sex-based discrimination class action lawsuits.[19]

- California. In 2006, after months of intensive organizing, a group of nursing home workers, mainly immigrant Latina workers, marched to their manager's office to announce that they had joined together as a union in order to improve wages and working conditions and would seek formal recognition for their union under federal labor law. That afternoon, a head manager called one of leaders of the march into the office, pulled out a photocopy of that worker's Social Security card, wrote "NO GOOD" in bold letters across the photocopy, and suspended the leader without pay. Angered by management's action, the workers from the morning march crowded back into the manager's office and demanded reinstatement for their suspended colleague, denouncing management's action as a blatant anti-union tactic. Caught off guard, the manager immediately reinstated the suspended union leader. While these workers were successful, other workers have not been able to mobilize as effectively against manipulation of SSN verification issues by employers.[20]

- Oregon. In 2006, a Latina immigrant worker had been working as a housekeeper at an assisted living center. When it came time for her to qualify for health insurance and other benefits, the employer produced an SSA no-match letter. The worker suspects that the

---

[19] Telephone interview with Homer Marmalejo, United Brotherhood of Carpenters and Joiners of America, organizer, Aug. 8, 2006; *see also* Bob Shiles, "Roger Carter Suspends More Than 20 Undocumented Workers," *Kinston [NC] Free Press*, July 19, 2006.

[20] Interview with Guadalupe Palma, Service Employees International Union, Long Term Care Division, Coordinator III, in Los Angeles, CA, Aug. 1, 2006.

employer had received the letter earlier, but held it just before the benefits would have kicked in.[21]

- <u>Oregon</u>. In 2003, an employer in Oregon approached a group of workers who had complained about violations of their minimum wage and overtime rights, alleging that it had just received an SSA no-match list. The employer was requiring the workers to reverify their immigration status, and would not provide a copy of the letter to workers. Interestingly, this was *before* SSA began sending no-match letters to employers in March 2003.[22]

- <u>New York</u>. In 2002, a group of immigrant workers in New York went on strike to protest against poor working conditions. After receiving a no-match letter that the employer had initially ignored, the employer decided to use the no-match letter as a basis to reverify the immigration status of workers involved in the strike.[23]

If immigrant workers cannot enforce labor laws or organize under existing labor laws, it is less likely that native workers can assert these rights. The proposed rule thus poses enormous challenges for all low-wage workers. All workers face an increased risk of firings, retaliation, and abuse. U.S. citizens and authorized noncitizen workers could lose their jobs in discriminatory firings. Hundreds of thousands—possibly millions—of working families could be harmed, and therefore DHS should suspend this proposed rule immediately.

**Although the Proposed Rule Will Cause Enormous Upheavals in the Workplace, the Rule Has *No* Impact on Undocumented Immigration and Will Only Expand the Unregulated Underground Cash Economy**

Our experience with SSA no-match firings and workplace audits in the context of our current broken immigration system is clear: *the fired workers will not leave the country.* They will simply find other more marginal jobs, most likely outside of the traditional economy and "off the books" in the unregulated underground cash economy. Moreover, although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new obligations will increase pressure on "good" employers to take employees off the books, which also leads to growth of the underground economy. Expansion of the underground economy results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers. This result is nearly inevitable for any "crackdown" on workers and employers that is not accompanied by serious and practical reforms of the underlying immigration system.

*No-Match Firings Will Not Decrease the Number of Undocumented Workers in the United States*

Based on our recent experience under the current broken immigration system, high levels of SSA no-match firings will *not* drive undocumented workers and their families away from the United

---

[21] Brent Hunsberger, "Crackdown Coming on Bogus Papers," *The Oregonian,* June 25, 2006.

[22] NILC Brief, *supra* note 4, at 5.

[23] *Id.* at 4.

**No-Match Cert. Admin. Record 1617**

States. Instead, these workers immediately accept the next available low-wage job, even if it is off the books, out of sheer economic necessity, given the levels of poverty at which they and their families and communities must survive.[24] When poverty is combined with an employer demand for below-market wage rates and an absence of government enforcement of labor protections in low-wage industries, undocumented workers will almost certainly remain in the United States even after a no-match firing. The vast majority will reenter the labor force in unreported, cash-based employment relationships where they face further exploitation and abuse. Economists describe this effect as "churning" or unproductive turnover.[25] The SSA no-match program has been criticized for creating "policy-induced churning in local labor markets as workers are either fired or quit their jobs only to join the overcrowded pool of workers vying for positions in traditional immigrant occupations."[26] Fired workers do *not* simply leave the United States.

Undocumented workers constitute a large and growing segment of the workforce in the nation as a whole. The share of these workers in industries such as agriculture, cleaning, construction, food service, and other low-wage occupations is approximately three times the share of native workers in these types of jobs.[27] On any given day in our nation, more than 250,000 undocumented immigrants work as janitors, 350,000 work as housekeepers and maids, and 300,000 are groundskeepers.[28] In the aggregate, such workers are an integral part of the U.S. economy, constituting a full 5 percent of the civilian labor force or 7.2 million workers.[29]

Unscrupulous employers have long taken advantage of the availability and reduced cost of undocumented immigrant labor in both the traditional economy and in the underground economy. Undocumented workers are more likely to earn below minimum wage (two-thirds of undocumented workers earn below minimum wage compared to one-third of all workers).[30] IRCA's failed employer sanctions regime, along with the lack of government enforcement of labor protections in low-wage industries, has given free rein to unscrupulous employers. Such

---

[24] It has been estimated that nearly half of all immigrant workers are low-income, defined as earning less than 200 percent of the minimum wage. Randy Capps, et al., *A Profile of the Low-Wage Immigrant Workforce* (The Urban Institute, Nov. 2003) at 2, available at http://www.urban.org/UploadedPDF/310880_lowwage_immig_wkfc.pdf. Fifty-six percent of all young children of immigrants live in poverty; sixty-four percent of foreign-born children of immigrants live in low-income families. In immigrant families where both parents work, 24 percent of children live in poverty compared to 11 percent of the children of native workers. Randy Capps, et. al, *Health and Well-Being of Young Children of Immigrants* (The Urban Institute, Feb. 2005) at 2, available at http://www.urban.org/UploadedPDF/311182_immigrant_families_5.pdf.

[25] *See* Avner Ahituv and Robert I. Lerman, *Job Turnover, Wage Rates, and Marital Stability: How Are They Related?* (The Urban Institute, Nov. 2004) at 5, available at http://www.urban.org/publications/411148.html (distinguishing "churning" and unproductive turnover from worker mobility).

[26] Mehta, *supra* note 4, at 18.

[27] Jeffrey S. Passel, *Unauthorized Migrants: Numbers and Characteristics: Basic Briefing Prepared for Task Force on Immigration and America's Future* (Pew Hispanic Center, June 2005) at 26–28, available at http://pewhispanic.org/reports/report.php?ReportID=46.

[28] Jeffrey S. Passel, *Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Pew Hispanic Center, Mar. 2006) at 11–12 (hereinafter "Passel"), available at http://pewhispanic.org/files/reports/61.pdf.

[29] *Id.* at 9.

[30] Jeffrey S. Passel, et al., *Undocumented Immigrants: Facts and Figures* (The Urban Institute, Jan. 2004) at 2, available at http://www.urban.org/url.cfm?ID=1000587.

No-Match Cert. Admin. Record  1618

employers routinely manipulate immigration law into a tool that sharpens wage differentials between undocumented and documented low-wage workers and suppresses wages for all. Even legitimate employers have admitted to the temptation to engage in similar practices or risk going out of business.[31] In recent years, Department of Justice (DOJ) and DHS officials have finally begun to recognize these wage differentials and the harm caused by an economic system that produces lower wages based on differences in immigration status.[32]

Increasingly, there is evidence demonstrating that raising the wages and working conditions of low-wage workers will actually reduce undocumented immigration by making the existing workforce relatively more attractive to employers.[33] Closing the wage differentials between differently work-authorized individuals and ensuring that all low-wage workers—current and future, documented and undocumented—have similar levels of mobility and enjoy full labor protections are the more effective ways to prevent undocumented immigration to the United States and to hold exploitative corporations accountable. A structural demand for undocumented labor can be reduced only by building a strong floor underneath all workers.

Poorly-conceived, punitive enforcement-only schemes like the proposed rule will force millions into the underground economy. The proposed rule will not decrease the numbers of undocumented workers in the United States, nor will it decrease their levels of employment. It will only decrease wage levels and deepen wage differentials based on immigration status, creating even more economic incentive for employers to hire undocumented workers. Accordingly, DHS should suspend this proposed rule and work with Congress and the Administration to pass comprehensive immigration reform that will address the underlying issue of undocumented migration.

*The Imposition of New Legal Obligations on Millions of Employers Will Push Them into the Underground Economy*

Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new and onerous set of legal obligations on millions of employers. The rule essentially deputizes employers as *de facto* immigration enforcement officers.

The proposed example of what constitutes "constructive knowledge," at Section 274a.1(l)(1)(iii)(B) of the proposed rule, is not the employer's *receipt* of a no-match letter, but

---

[31] K. M. Donato, et al., "Stemming the Tide? Assessing the Deterrent Effects of the Immigration Reform and Control Act," *Demography* 29 (2005) at 139–58.

[32] In the prosecution of Tyson Foods for the hiring of undocumented workers, assistant U.S. Attorney John P. MacCoon stated: "This trial is about corporate greed. . . . It's about what happens when a corrupt corporate culture makes the bottom line the all-consuming priority." Sherri Day, "Prosecutors in Smuggling Case against Tyson Contend Trial Is about Corporate Greed," *The New York Times*, Feb. 6, 2003. In the Tyson Foods case, the government hinged its $140 million pre-indictment settlement demand against defendant Tyson Foods on a novel "wage suppression" theory. The government claimed that Tyson Foods had reaped enormous profits by recruiting undocumented workers into its ranks and paying them at below-market wage rates. In his authorization of trial for the case, DHS Secretary Chertoff fully endorsed the DOJ's attempts to recover "suppressed wages." Thomas Green, et al., "Deputizing—and Then Prosecuting—America's Businesses in the Fight against Illegal Immigration," *Amer. Crim. L. R.*, June 22, 2006, at 5, 7.

[33] Ivan Light, "How L.A. Kept Out a Million Migrants," *The Los Angeles Times*, Apr. 16, 2006.

---

the employer's *failure to act* after receiving a no-match letter. By defining the "failure to take reasonable steps" upon receipt of a no-match letter as creating constructive knowledge, the proposed regulation makes it necessary for a law-abiding employer to take some action in response to a no-match letter. Therefore, as set forth in Sections 274a.1(l)(2)(i) and 274a.1(1)(2)(iii) of the proposed rule, an employer who receives a no-match letter is essentially forced to apply due diligence to a series of complicated steps that demonstrate correction of each "no-match" discrepancy. If the employer fails to resolve the correction in the allotted time, the employer faces a finding that it had constructive knowledge of hiring an undocumented worker. This finding could be used against the employer in a federal prosecution that could result in civil and criminal penalties. This is a radical change from the longstanding position that the various federal agencies implicated in this SSA no-match issue have taken.

Employers who wish to avoid loss of profits and productivity while minimizing exposure to the heightened risk of federal immigration liability under the proposed rule will be forced into one of three no-match evasion strategies:

First, employers will take their businesses off the books and into the underground economy. For one thing, keeping workers off the books means avoiding government scrutiny and additional no-match letters. For another, there are immediate financial incentives for employers to keep workers off the books. The proposed rule thus has a perverse effect of targeting and punishing "good" employers who keep good records and want to stay on the books. These good employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records and who consequently will not be reached by the new rule.

Second, employers will intentionally misclassify their employees as "independent contractors" as a means of evading this responsibility.

Finally, employers will engage in subcontracting schemes by interposing intermediary labor contractors between themselves and their employees, pretending their workers are employees of these sham contractors and exposing workers to marginal, fly-by-night employment practices by middlemen.

*Growth of the Underground Economy Results in Massive Losses to State and Federal Coffers and Unfair Competition*

A policy that results in more employers choosing to keep their employees off the books or intentionally misclassifying employees is harmful to state and federal government coffers and creates unfair competition against "good" employers. Certain employers will see a clear and immediate economic advantage to taking their employees off the books. At a minimum, they will reduce their payroll costs by an average of 8 percent by ceasing to pay costs for federal legally required benefits, including Social Security, Medicare, unemployment insurance and workers' compensation.[34] For employers who, as a policy or due to a collective bargaining agreement, provide other benefits, such as life, health or disability insurance, paid leave, or retirement and savings benefits, the potential total savings could add up to an average of 29.9

---

[34] *Employer Costs for Employee Compensation* (U.S. Department of Labor Bureau of Labor Statistics, Mar. 2006), available at http://www.bls.gov/news.release/ecec.nr0.htm.

No-Match Cert. Admin. Record  1620

percent of total payroll costs.[35]  This means massive losses to state and federal coffers and a competitive advantage over employers who are not cutting these costs.

The projected loss in federal tax revenues ranges from $19 million to $1.9 billion annually.  This range is derived from the following figures:  In June 2006, the total U.S. labor force was estimated at 144.4 million workers.[36]  As set forth above, about 7.2 million undocumented workers were employed in March 2006, accounting for a full 5 percent of the civilian labor force.[37]  International accounting and consulting firm Price Waterhouse Coopers has projected that over 5 million U.S. workers would be misclassified as independent contractors (to avoid paying legally required benefits) in 2005 and that the federal tax revenue losses due to misclassification in 2004 would be $4.7 billion.[38]

Based on this projection and these worker population estimates, if only one-third of all undocumented workers or at least two million workers, or 1.4 percent of all U.S. workers, were to be pushed off the books as a result of the proposed regulation, the loss to federal coffers would be approximately $1.9 billion in one year.  Alternatively, making a conservative assumption that 100,000 workers are pushed off the books as a result of the proposed regulation, the loss to federal coffers would be approximately $19 million annually.

The losses to the Unemployment Insurance (UI) trust fund alone ranges from $277 million to $13.8 million per year.  This range is derived from the following figures:  A study for the U.S. Department of Labor estimating the impact of employee misclassification on the UI trust fund alone was computed for the period from 1990–1998.[39]  Assuming a 1 percent level of misclassification, the study determined that the loss would be an annual average of $198 million to the UI trust fund alone.

Based on this study for the DOL, assuming that at least 2 million workers were to be pushed off the books as a result of the proposed regulation, the impact on the UI trust fund alone would be an average of over $277 million annually.  Alternatively, assuming that only 100,000 workers, or .07 percent of the workforce, are pushed off the books (the estimated number that lost their jobs due to no-match letters in 2002), the impact on the UI trust fund alone would be $13.8 million per year.

Employers who go off the books will experience an enormous net savings in taxes, which will create a competitive advantage for them over employers whose payroll-related expenses are

---

[35] *Id.*

[36] *Employment Situation Summary* (U.S. Department of Labor Bureau of Labor Statistics, July 2006), available at http://www.bls.gov/news.release/empsit.nr0.htm.

[37] Passel, *supra* note 28, at 11–12.

[38] *Projection of the Loss in Federal Tax Revenues Due to Misclassification of Workers* (Coopers and Lybrand, now Price Waterhouse Coopers, for Coalition for Fair Worker Classification, June 1994) at 5, available at http://www.carpenters.org/misclassification/State and Other Research Studies/Coopers-Lybrand--Projection of Loss of Federal Rev Due to Missclassification.pdf.

[39] *Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs* (Planmatics, Inc. for U.S. Department of Labor Employment and Training Administration, Feb. 2000) at 87, available at http://wdr.doleta.gov/owsdrr/00-5/00-5.pdf.

No-Match Cert. Admin. Record  1621

higher because they are playing by the rules. A report prepared for the U.S. Department of Labor observed: "[C]ost considerations and aggressive competition are twin pressures that induce an employer to engage in behavior that creates an inequitable playing field in the business community for employers who correctly classify their employees and pay taxes."[40]

The State of California even developed a joint-agency strike force to address abuses created in the underground economy. This strike force has observed the impact of this employer behavior on "good" employers: "[W]hen businesses operate in the underground economy, they gain an unfair competitive advantage over businesses that comply with various business laws. This causes unfair competition in the marketplace and forces law-abiding businesses to pay higher taxes and expenses."[41] When the desire to avoid government scrutiny is combined with the immediate economic savings from avoiding payment of taxes and employer-provided benefits, some employers will see a clear competitive advantage in taking their workforce underground. The implementation of this proposed rule thus disadvantages those employers who play by the rules.

**DHS Should Suspend The Proposed Rule Because the SSA No-Match Program Is Ill-Suited As an Immigration Enforcement Tool**

*The SSA No-Match Program Cannot Meet the Needs and Objectives of Immigration Enforcement Because the SSA Database Is Not an Immigration Database*

Each year employers send IRS Forms W-2 to SSA indicating their employees' annual earnings. SSA matches each worker's name and SSN to the Numerical Identification File (NUMIDENT), which is SSA's primary database of SSN holders.[42]

NUMIDENT is *not* an immigration database and is made up of information collected from applications for initial or replacement SSNs.[43] The database contains only limited and incomplete immigration information.[44]

---

[40] *Id.*

[41] *2003 Annual Report: California Joint Enforcement Strike Force on the Underground Economy* (Employment Development Department, State of California, June 30, 2004) at 3, available at http://www.edd.ca.gov/taxrep/txueo03.pdf; *see also* Francois Carerre, et al., *The Social and Economic Costs of Employee Misclassification in Construction* (Construction Policy Research Center at Harvard Law School and Harvard School of Public Health, Dec. 2004), at 7 (noting that "[m]isclassification creates challenges for compliant employers because it creates an uneven 'playing field.' Employers who respect the law and classify employees appropriately have a higher wage bill and can get underbid by contractors that do not comply and have lower costs.").

[42] *Report to Congress on the Basic Pilot Program* (U.S. Citizenship and Immigration Services, June 2004) (hereinafter "USCIS Report") at 2.

[43] Kevin Jernigan, "Eligible to Work? Experiments in Verifying Work Authorization," *Migration Policy Institute Insight*, Nov. 2005 (hereinafter "Jernigan") at 3.

[44] The database "contains information on name, date of birth, and citizenship status of persons issued Social Security cards, which enables SSA to confirm work authorization for U.S. citizens and some noncitizens who are permanently work authorized." USCIS Report, *supra* note 42, at 2. SSA collects immigration status information only on those persons who are work-authorized incident to status, such as lawful permanent residents, asylees, and refugees. *Id.* at 4.

---

Even the limited immigration status information in NUMIDENT regularly becomes inaccurate because it is *not* automatically updated when a worker's immigration status or work authorization changes.[45] NUMIDENT is particularly inaccurate with respect to work-authorized noncitizens in its use with the Basic Pilot Program. According to U.S. Citizenship and Immigration Services (USCIS), work authorization for more than 50 percent of the cases of noncitizens could not be electronically confirmed by NUMIDENT, compared with 0.2 percent for native-born citizens.[46]

If there is a match of the SSN and the first seven letters of the surname between NUMIDENT and the W-2, the earnings are posted to the individual worker's Master Earnings Record. About 10 percent of submissions *cannot* be matched. SSA then does more than 20 "front-end validation routines," which are automated processes that manipulate names and SSNs to correct mistakes and find a correct match.[47] These "front-end validations" do *not* involve collection or use of immigration data.

If a valid record cannot be identified, SSA posts the earnings to its Earnings Suspense File (ESF). The ESF contains earnings reports with names and SSNs that do not match SSA records. SSA then performs "back-end" processes to try to match the earnings. SSA's "back-end" processes do not involve collection or use of immigration data.

The SSA back-end processes include using corrections generated through IRS processes. The back-end processes also include generating SSA no-match letters to employees and employers.[48] No-match letters are just one of the "back-end" processes that SSA regularly uses to ensure that earnings are properly attributed to workers. These letters are sent by SSA to inform employers and employees that the worker is not getting proper credit for their earnings due to a discrepancy.

*Immigration Status or Lack of Immigration Status Cannot Be Presumed from Posting to the ESF*

The ESF contains hundreds of millions of records, and a "significant number of earnings reports in the ESF still belong to U.S. citizens and work-authorized noncitizens."[49] The percentage of ESF records belonging to unauthorized workers is entirely unknown. The majority of reinstatements (matching to a worker's Master Earnings Record) are still made to U.S.-born citizens.[50] ESF records do not in any way indicate immigration status. The information in ESF

---

[44] The SSN application form itself focuses on noncitizens' work authorization rather than immigration status. *See* Form SS-5 (May 2005), available at http://www.ssa.gov/online/ss-5.pdf.

[45] Jernigan, *supra* note 43, at 12.

[46] USCIS Report, *supra* note 42, at 4–5.

[47] *Social Security, Better Coordination Among Federal Agencies Could Reduce Unidentified Earnings Reports*, GAO-05-154 (GAO, Feb. 2005) (hereinafter "GAO Feb. 2005") at 7–8.

[48] *Id.*

[49] *Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work*, GAO-06-814R (GAO, July 11, 2006) (hereinafter "GAO July 2006") at 8.

[50] *Id.; see also* GAO Feb. 2005, *supra* note 47, at 18.

No-Match Cert. Admin. Record  1623

consists of the worker's name, SSN, employer's identification number, and the earnings amount.[51]

The ESF simply consists of information on workers whose records do not match SSA records, for reasons that include errors or obsolete data, lack of an SSN, missing first or last names, or use of nonalphabetic characters.[52]  The lack of an SSN is a particularly instructive example of an innocent basis for inclusion in the ESF that is frequently and wrongly cited as a basis for determining lack of work authorization.  Both the SSA and the IRS advise employers to use all zeros or to write in *"applied for"* when the worker has applied for but not yet received an SSN.[53]

SSA no-match letters are therefore *not* reliable indicators of work authorization or immigration status.  There is no way to accurately determine whether a SSA no-match letter is the result of typographical error, out-of-date information, or some other legitimate reason, let alone to determine an illegitimate reason.[54]  The SSA itself has repeatedly recognized that its no-match letter does not indicate immigration status or lack of authorization to work.  The current no-match letter explicitly states that a worker's identification in the letter "makes no statement" about his or her immigration status.[55]  The SSA database simply does not have the capacity to meet the needs and objectives of an immigration enforcement program.  Because of these limitations, this proposal will only result in an adverse impact on workers and our economy, including the increased discrimination and abuse of workers described above.  DHS should therefore suspend this rule.

**The Rule Modification Would Give DHS Indirect Access to Tax Information It Cannot Access Directly**

DHS should also suspend this proposed rule because it attempts to indirectly access sensitive tax information that is protected by federal law.  Specifically, Section 6103 of the Internal Revenue Code protects the confidentiality of taxpayer returns and taxpayer information and provides only limited exceptions to the sharing of personal identifying data.  This confidentiality is deemed essential to voluntary tax compliance.  The GAO has explicitly recognized that the ESF includes "sensitive taxpayer information that is protected by various laws and regulations" and that statutory authority would be required to provide DHS access.[56]

---

[51] GAO July 2006, *supra* note 49, at 8.

[52] *Id.; see also* GAO Feb. 2005, *supra* note 47, at 11–12.

[53] GAO Feb. 2005, *supra* note 47, at 11, n. 4.

[54] In testimony last month before the House Committee on Ways and Means, the Commissioner of Social Security emphasized that the source of SSA's database information is the Form W-2, and "there is no citizenship or immigration status information on that document."  *See* Statement of The Honorable Jo Anne B. Barnhart, Commissioner, Social Security Administration, *Testimony Before the House Committee on Ways and Means* (July 26, 2006), available at http://waysandmeans.house.gov/hearings.asp?formmode=view&id=5172.

[55] Letter, Hurt, Assoc. Comm. for Central Op. SSA (Oct. 9, 2004) (hereinafter "Hurt Letter").

[56] GAO July 2006, *supra* note 49, at 8.

---

No statutory authority currently exists to provide DHS with access to this information.[57] As a result, DHS cannot presently obtain no-match information directly from SSA.

SSA no-match letters to employers frequently include taxpayer identity and return information. This rule allows DHS to commandeer the information contained in no-match letters and therefore allows DHS to circumvent the tax code's confidentiality restrictions. DHS should not be permitted to do by rule change what it cannot do without additional statutory authority.

Breaching the confidentiality of tax records would have the counterproductive result of discouraging tax compliance. Moreover, it would encourage employers and workers alike to enter the underground economy and not pay into our tax and Social Security systems.

**The Proposed Rule Dramatically Alters the Definition of "Constructive Knowledge" and Makes a Stark Departure from Existing Case Law and Longstanding Federal Guidance on No-Match Letters**

As an evidentiary matter, an employer's receipt of an SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule alters the definition of constructive knowledge and makes a stark departure from existing case law and longstanding federal guidance in this area.

In the seminal *Collins Food Intn'l v. I.N.S* case, the Ninth Circuit cautioned against the expansion of the doctrine of constructive knowledge: "IRCA . . . is delicately balanced to serve the goal of preventing unauthorized alien employment while avoiding discrimination against citizens and authorized aliens. The doctrine of constructive knowledge has great potential to upset that balance, and it should not be expansively applied." 948 F.2d 549, 554-555 (9th Cir. 1991).

Accordingly, the court instructed that "[a] finding of constructive knowledge requires "willful blindness" and "to expand the concept of constructive knowledge . . . would not serve the intent of Congress, and is certainly not required by [IRCA]." *Id.* at 555.

Contrary to DHS's assertions in the supplemental text, the proposed regulation would extend the definition of "constructive knowledge" well beyond the holdings in *Collins* and in *Mester Manufacturing Co. v. INS*, 879 F.2d 561 (9th Cir. 1989), and other constructive knowledge cases arising under the employer sanctions provision of the Immigration and Nationality Act, 8 U.S.C. § 1324a.

Indeed, the supplemental text misrepresents *Mester* by stating that the employer in that case merely received some evidence that the employee was not authorized to work. This is simply incorrect, and significantly downplays the type of information received by the employer, and relied upon by the court in its decision. In *Mester*, the court held that an employer had constructive knowledge of a worker's unlawful status when it received information directly *from*

---

[57] In contrast, such authority exists with respect to the Nonwork Alien File, which includes information about workers who are working though they have been issued nonwork SSNs.

No-Match Cert. Admin. Record  1625

*the INS* that an employee was an "illegal alien" but did not terminate the employee for two weeks. *Id.* at 567–68.

Consistent with *Mester*, cases have found constructive knowledge only where the employer has been provided specific information from a source knowledgeable about a worker's immigration status, where the employer failed to complete the Form I-9 (coupled with other suspicious circumstances), or in egregious circumstances. *See U.S. v. Jonel, Inc.* 1998 WL 804705 (OCAHO), *14 (Labor Department notice to employer that workers were unauthorized constituted constructive knowledge); *New El Ray Sausage Co. v. I.N.S.,* 925 F.2d 1153, 1157 (9th Cir. 1991) (INS gave employer "specific and detailed information" that it was employing undocumented workers); *U.S. v. American McNair*, 1OCAHO 285 (1991) (employee failure to present any work authorization documents and notification of employer that he was ineligible for amnesty constituted constructive knowledge); *U.S. v. Fragale*, 1999 U.S. Dist. LEXIS 12616 (E.D. Pa. 1999) (constructive knowledge when human resources manager and foreperson in charge of hiring told employer that a large percentage of workforce was undocumented, and employer had received notice from INS that some workers were undocumented).

Moreover, in its attempt to convert the SSA no-match letter into a method of verifying immigration status or authorization to work, the proposed rule directly contravenes longstanding federal guidance from SSA, OSC, and former INS General Counsel.

SSA's position on no-match letters and immigration enforcement is set forth in clear terms on the face of the letter itself. The letter provides the following warning to employers:

> IMPORTANT: This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number. Nor does it make a statement about an employee's immigration status.[58]

For years, INS General Counsel has instructed employers along identical lines:

> If the document or documents presented to verify work authorization appear on their face to be genuine and to reasonably relate to the individual, the subsequent receipt of the SSA letter mentioned above does *not* impose any affirmative duty upon the employer to investigate further into an employee's eligibility to work in the United States. In addition, the receipt of this SSA letter by the employer, *without more*, would *not* be sufficient to establish constructive knowledge on the part of the employer regarding the employment eligibility of the named employee.[59]

---

[58] Hurt Letter, *supra* note 55.

[59] Letter, Virtue, Acting Gen. Coun. INS, HQ 274A (Feb. 17, 1994) (emphasis added); for reference, the LWIW Coalition has attached this letter as Exhibit 1 to this comment.

OSC has also provided similar guidance:

> The receipt of a no-match letter, standing alone, does not indicate to an employer that he or she need question the genuineness of documents or information previously presented to complete an INS Form I-9.[60]

This proposed regulation thus turns established federal guidance on no-match letters on its head. At the very least, the proposal will result in conflicting guidance from multiple federal agencies and cause employer and employee confusion.

**The Costs of Implementing the Proposed Rule are Prohibitive**

If the proposed rule is to be carried out as envisioned, the government will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. Employer confusion is already evident from high number of questions submitted employers in their comments opposing the rule. In particular, many employers have submitted questions regarding the rule's unrealistic and unreasonable timetables for compliance.

Therefore, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA ultimately has to respond to the inevitable increase in employer (and employee) inquiries about this confusing rule. The actual costs of the current SSA no-match letter program are already substantial.[61] The actual costs of administrating a new program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law.

**The Procedure to be Followed Under the Proposed Rule When an Employer Receives Notice from DHS Denies Employees Due Process of Law**

Section 274a.1(l)(1)(iii)(C) of the proposed rule includes the following as a circumstance that would amount to constructive knowledge where the employer "[f]ails to take reasonable steps after receiving information indicating that the employee may be an alien who is not employment authorized, such as . . . [w]ritten notice from the Department of Homeland Security that the immigration status document or employment authorization document presented or referenced by the employee in completing Form I-9 was assigned to another person, or that there is no agency record that the document was assigned to any person."

---

[60] Letter, Sarah DeCosse, Sr. Tr. Atty OSC (Apr. 1, 2004).

[61] *See* Mehta, *supra* note 4, at 7, n. 2 (noting that SSA's current attempts to reduce the ESF through no-match letters have cost U.S. taxpayers the following amounts: "$5.4 million to send notices to every individual whose name and SSN do not match SSA's records; $600,000 to send 944,000 notices to all employers who submitted wage reports with at least one item posted to the ESF; more than $200,000 for system maintenance and cyclical changes; and an average of $9.00 for each call to SSA's national toll free telephone number generated by the notices. SSA estimates that the agency received about 100,000 inquiries throughout 2002 regarding the TY 2001 letter.").

No-Match Cert. Admin. Record  1627

Under Section 274a.1(l)(2)(iii), an employer who receives such a notice will not be deemed to have constructive knowledge of the employee's unauthorized status if the employer takes reasonable steps to resolve the question raised by DHS and, if the employer does not verify with DHS that the document was assigned to the employee, the employer completes a new I-9. The employee cannot use the alien registration number, or "A-number," that is the subject of the written notice from DHS.

While this procedure may protect the employer, it entirely leaves out any possibility for the *employee* to have access to his or her DHS immigration file and any opportunity to correct errors in the file that would lead to DHS providing erroneous information to the employer. This access and an assured opportunity to correct errors in immigration records are critical because immigrants do not have easy, automatic, timely access to their immigration records, and immigration records are error-prone.

For years, government agencies have criticized the quality and accuracy of immigration records.[62] Problems with immigration records have continued even after the dissolution of the INS and the creation of new immigration agencies in DHS. The information technology environment at USCIS has been criticized as inefficient, and USCIS continues to rely on manual and paper-based processes.[63] As an example of how DHS records and processes go awry, in December 2005 DHS had to "recall more than 60,000 green cards because a computer glitch miscalculated immigrants' residency start dates."[64] USCIS sent letters instructing immigrants to mail their cards back. Unfortunately, USCIS sent the letters to many immigrants whose green card "resident since" dates were actually correct. USCIS then advised community-based organizations working with immigrants that its information technology staff was working to determine who received the mailing in error and that USCIS intended to send out a second letter to all individuals who received the initial letter in error.

Moreover, under current law, immigrants have access to their immigration files (both "alien files" and Border Patrol requests) only by filing Freedom of Information Act (FOIA) requests. FOIA requests for files must be made in writing and mailed to a central location, at the National Records Center in Missouri.[65] This means that immigrants who need access to their files to determine the nature of the erroneous information and then to correct this information as envisioned under Section 274a.1(l)(iii)(C) of the proposed rule are dependent on FOIA procedures which are not designed for this purpose. The lengthy and unpredictable timetables and cumbersome process for the FOIA process make it difficult for immigrants to both obtain their files and then correct mistaken information within Section 274a.1(2)(ii)'s compliance period.

The proposed rule thus raises critical due process concerns for immigrants. It fails to guarantee adequate access and an assured opportunity to immigrants who wish to correct errors in their

---

[62] *INS Data:The Track Record* (NILC, 2003), available at http://www.nilc.org/immlawpolicy/misc/INS data accuracy.pdf.

[63] *USCIS Faces Challenges in Modernizing Information Technology*, OIG-04-41 (DHS, Office of Inspector General, Sept. 2005), available at http://www.dhs.gov/interweb/assetlibrary/OIG_05-41_Sep05.pdf.

[64] Solomon Moore, "Green Cards Recalled Because of Glitch," *The Los Angeles Times*, Dec. 6, 2005.

[65] *See* USCIS, *Freedom of Information and Privacy Acts*, http://www.uscis.gov/graphics/aboutus/foia/index.htm.

No-Match Cert. Admin. Record  1628

immigration records. It creates penalties for employees when their immigration status or documents cannot be confirmed. It does not, however, set any time period for DHS to respond to immigrants' requests to review their files, nor does it place any obligation on DHS to correct immigrants' records in a timely fashion.

### The Proposed Rule May Exceed DHS's Authority

*DHS May Not Have Authority to Restrict the List of Acceptable Documents for the Reverification Process*

The proposed rule would create an exception to the list of documents that can be used to reverify the worker's employment authorization and identification as part of the I-9 requirement. But it appears that DHS may lack the ability to impose such restrictions. According to the INA, only the Attorney General has authority to promulgate regulations restricting the list of acceptable documents. 8 U.S.C. § 1324a(b)(1)(E). According to the statute, the Attorney General may only restrict the list of acceptable documents if he "finds, by regulation that any [of the listed documents] does not reliably establish [employment] authorization or identity or is being used fraudulently to an unacceptable degree." *Id.* Importantly, this power of the Attorney General was not transferred to the DHS upon its creation and the dissolution of the former Immigration and Nationality Service. 8 U.S.C. § 1103(a) (transferring powers under the INA to the Secretary of the DHS, *except* those that "relate to the powers, functions, and duties conferred upon" "the Attorney General," among others) (emphasis added). There is no indication in 8 U.S.C. § 1324a(b)(1)(E) and accompanying notes that the provision was ever amended to transfer the AG's authority to promulgate regulations to the DHS.

Despite this express statutory rule exclusively vesting the ability to restrict the congressionally approved list of I-9 documents to the Attorney General, Section 274a.1(l)(2)(iii) of the proposed rule would give DHS the power to restrict which documents are acceptable in the reverification process. According to that section, only documents bearing a photograph and *not* containing the SSN that triggered the no-match letter will satisfy the reverification requirement under the I-9 process. *Id.* Under current law, however, documents lacking photographs and those that include Social Security numbers are acceptable—even if the SSN triggers a no-match letter. 8 U.S.C. § 1324a(b)(1)(C), (D). Therefore, the proposed rule may inappropriately usurp the Attorney General's exclusive power to alter the congressionally created list of approved documents for reverification of a worker's status under the I-9 process and should be rejected.[66]

### RECOMMENDATION

In sum, we strongly oppose the Department of Homeland Security's proposed regulation. DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of workers in an isolated, punitive immigration "enforcement" scheme on the eve of enactment of *comprehensive immigration reform.* Although the rule will cause enormous upheavals in the workplace, the rule will have *no* impact on undocumented migration, which is the purported purpose of this

---

[66] The proposed rule may also violate INA Section 274A(d)(3), which requires notice by the President to the House and Senate Judiciary Committees before changes are made to the employment eligibility verification system. We do not know whether the President has provided such notice to the appropriate committees.

proposal. Our experience with no-match firings and workplace audits is very clear: *the fired workers will not leave the United States*. In the absence of comprehensive immigration reform that addresses the root causes of undocumented migration, they will simply find other more marginal jobs, most likely in the underground economy. Because of this, the proposed rule will result in growth of the underground economy, which results in substantial losses in state and federal tax revenues as well as unfair competition. The proposed rule is simply the wrong rule at the wrong time. It provides no solution to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by workers, taxpayers, and businesses. For all these reasons, we recommend that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

**The Low-Wage Immigrant Worker (LWIW) Coalition**

**Co-Convened By:**

American Federation of Labor – Congress of Industrial Organizations (AFL-CIO)
Change to Win (CtW)
Interfaith Worker Justice (IWJ)
Jobs with Justice
National Council of La Raza (NCLR)
National Day Laborer Organizing Network (NDLON)
National Employment Law Project (NELP)
National Immigration Law Center (NILC)

**Contact:**

Marielena Hincapié, Esq.
Director of Programs
National Immigration Law Center
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA  90010
Phone: 213-639-3900
Fax: 213-639-3911
www.nilc.org

# EXHIBIT 1

**To DHS Docket No. ICEB-2006-0004;**
Comment Regarding "Safe Harbor Procedures for
Employers Who Receive a No-Match Letter"

**Submitted by:**
The Low-Wage Immigrant Worker (LWIW) Coalition

**Date:**
Monday, August 14, 2006



Immigration and Naturalization Service

HQ 274A

Office of the General Counsel                    425 Eye Street N.W.
                                                Washington, D.C. 20536

FEB 17 1994

Mr. Carl G. Borden
California Farm Bureau Federation
Office of the General Counsel
1601 Exposition Boulevard, FB3
Sacramento, CA 95815-5318

Dear Mr. Borden:

This letter is in response to your correspondence dated August
11, 1993, concerning the receipt of a letter from the Social
Security Administration (SSA). The SSA letter in question
informs an employer that the social security number of an
employee does not agree with SSA records. Specifically, you ask
whether an employer who receives this letter from SSA can
continue to rely on the employment eligibility documents
presented by that employee, assuming the documents appear on
their face to be genuine and to relate to the employee?

If the document or documents presented to verify work
authorization appear on their face to be genuine and to
reasonably relate to the individual, the subsequent receipt of
the SSA letter mentioned above does not impose any affirmative
duty upon the employer to investigate further into an employee's
eligibility to work in the United States. In addition, the
receipt of this SSA letter by an employer, without more, would
not be sufficient to establish constructive knowledge on the part
of the employer regarding the employment eligibility of the named
employee. As you correctly note in your correspondence, this
letter from SSA could be prompted by a number of different
reasons having nothing to do with an employee's eligibility to
work in the United States.

The answer provided above specifically applies to a situation
where the employer receives such a letter from SSA and the
employer has no additional evidence that an employee may not be
work authorized. It should be noted, however, that if an employer
receives notice from the Immigration and Naturalization Service
(INS) that a social security card or other document presented to
establish work authorization is not valid, the employer does have
a duty to inquire further to ensure that the individual is
authorized to work in the United States before the employer can
continue to employ that individual. In addition, while an
employer has no affirmative duty to inquire into an employee's

No-Match Cert. Admin. Record 1632

employment eligibility based solely upon receipt of a letter from
SSA, if for some reason the employer discovers evidence that an
employee may not be authorized to work in the United States, the
employer must inquire further to verify the employment
eligibility of that employee.  If the employer is unable to
verify work authorization, the employer cannot continue to employ
that individual.

It should be noted that telephonic inquiries from employers
regarding the employment authorization of employees will not be
honored by INS.[1]  However, if an employer suspects fraud, as it
relates to INS documents, the employer may ask INS to physically
examine the documents.

I hope that the above information is helpful to you.  If you have
any further questions, please contact Michael C. McGoings,
Associate General Counsel at (202) 514-2895.

Sincerely,

for Paul W. Virtue
Acting General Counsel

---

[1]  (The only exception is where the written consent of that
individual has been obtained.)  See Salinas-Pena v. INS, No. 86-
1033-DA (D.Oregon, March 16, 1988).

- 2 -

**Khazaeli, Javad M**

| From: | Peter Schey [pschey@centerforhumanrights.org] |
|---|---|
| Sent: | Tuesday, August 15, 2006 2:58 AM |
| To: | Regs, Rfs |
| Subject: | DHS Docket Number ICEB-2006-0004 |
| Importance: | High |
| Attachments: | 08-14-06 SSA No Match CommentLtr[1].doc; 08-14-06 SSA No Match CommentLtr[1].pdf |

Attached in MSWord and PDF formats please find written comments provided by the Center for Human Rights and Constitutional Law. The Federal Register notice states that comments must be submitted by August 14, 2006. These comments are being submitted from Hawaii on August 14, 2006.

Thank you.

## *Peter A. Schey*

**President**
**Center for Human Rights and Constitutional Law**
**256 S. Occidental Blvd.**
**Los Angeles, Ca. 90057**
**Telephone: (213) 388-8693 ext. 104**
**Facsimile: (213) 386-9484**
**Electronic mail: <pschey@centerforhumanrights.org>**
**www.centerforhumanrights.org <http://www.centerforhumanrights.org>**

NOTICE
This message is intended for the use of the individual or entity to which it
is addressed and may contain information that is privileged, confidential
and exempt from disclosure under applicable law.  If the reader of this
message is not the intended recipient or the employee or agent responsible
for delivering this message to the intended recipient, you are hereby
notified that any dissemination, distribution or copying of this
communication is strictly prohibited.  If you have received this
communication in error, please notify us immediately by reply or by
telephone (call us collect at (213) 388-8693 ext. 103) and immediately delete this message and all its
attachments.

**No-Match Cert. Admin. Record  1634**

**CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW**
256 SOUTH OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
www.centerforhumanrights.org

August 15, 2006

*Via email to rfs.regs@dhs.gov*

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

**Re:**     *DHS Docket No. ICEB-2006-0004, Comments to Notice of Proposed Rulemaking Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

The *Center for Human Rights and Constitutional Law* submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The *Center for Human Rights and Constitutional Law* is a California non-profit corporation founded in 1980 that has as its primary mission the provision of technical support, information services, and training to free legal services programs, community-based organizations, and pro-bono lawyers providing legal services to low-income populations, including migrants, children, and indigenous peoples. As part of this work, the Center has served as lead counsel in numerous major class action cases brought in the U.S. courts on behalf of millions of migrants and other minorities. A partial list of the Center's major successful cases include: *Plyler v. Doe*, 457 U.S. 202 (1982), *Reno v. Catholic Social Services*, 509 U.S. 43 (1993), *Reno v. Flores*, 507 U.S. 292 (1993), *League of United Latin American Citizens v. Wilson*, 131 F.3d 1297 (9th Cir. 1997). In addition to its collaboration with other legal services providers and community-based organizations in protecting and promoting the rights of migrants through the state and federal courts, the Center also engages in a wide range of training programs and provides technical support in complex cases to legal services programs and community-based organizations throughout California and other states in the United States with high concentrations of immigrant populations.

Director, Regulatory Management Division, USCIS
August 15, 2006
Page 2

*The Center for Human Rights and Constitutional Law* is alarmed by and opposes adoption of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule modifies current regulations by creating additional, unfair, and irrational circumstances under which an employer may be deemed to have "constructive knowledge" of an employee's lack of employment authorization. This "constructive knowledge" coupled with continued employment of the employee would subject the employer to criminal and civil penalties. The proposed rule also outlines "safe harbor" procedures that employers may follow in order to avoid criminal and civil liabilities.

The proposed rule will magnify the adverse impact that SSA no-match letters already have on workers' rights, and trigger unnecessary, unjust and potentially discriminatory mass terminations across the nation. The proposed rule also undermines the legislative process and will result in the erosion of privacy rights. Moreover, as almost all migration experts agree, **the rule will have no meansurable impact on undocumented immigration**. It is highly unlikely that fired workers will leave the country. Terminated workers, even if undocumented, will simply seek out and accept more marginal jobs, most likely in the unregulated underground cash economy. The proposed rule will simply drive undocumented workers deeper underground, where they will continue to be employed in more exploitable jobs. The proposed rule will also erode our privacy rights and it represents an end-run around the federal legislative process.

We therefore urge DHS to withdraw this proposed rule in its entirety based on the following concerns:

**This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The proposed rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, or confusion, many employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. It is widely understood that the SSA database is inaccurate, and often "no-matches" occur because of name changes, clerical errors, etc. Hundreds of thousands of workers—**<u>including U.S. citizens and authorized noncitizens</u>**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted individual or class action lawsuits against employers for wrongful terminations.

**The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new legal obligations will increase pressure on businesses to go "off the books," thereby promoting and encouraging an unregulated underground cash economy, which results in potentially billion-dollar losses in federal,

Director, Regulatory Management Division, USCIS
August 15, 2006
Page 3

state, and local tax revenues, unfair competition, and further exploitation and abuse of
workers by unscrupulous employers.

**The proposed rule undermines the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration reform. The House and the
Senate have both passed bills that contain worksite enforcement mechanisms.
Implementing the proposed regulations at this time irrationally ignore and could
undermine that process. Immigrant workers should not be subjected to unnecessary,
unjust, and potentially discriminatory mass firings while the current law is clearly under
debate and reformulation.

**The SSA no-match letter program is a faulty tool for immigration
enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an
immigration enforcement tool when the SSA database does not have the capacity or
accuracy to fulfill this objective. In addition to being error prone, the database does not
contain complete information about a worker's immigration status or employment
authorization. In fact, the database contains information about both U.S. citizens and
work-authorized noncitizens, who employers will presume to be undocumented simply
because they appear on a no-match list. A no-match letter is not indicative of
immigration status, and explicitly states on its face that a worker's identification in the
letter does not make a statement about his or her immigration status.

An employer's receipt of a SSA no-match letter therefore, by itself, does not
constitute "constructive knowledge" of immigration status under current law. The only
thing a "no match" letter may indicate is that SSA has not matched a name provided by
an employer with its records. This is hardly the same thing as knowledge of a person's
immigration status or right to be employed.

The proposed rule dramatically alters the definition of "constructive knowledge"
and makes a stark departure from existing case law and long-standing federal guidance in
this area despite the fact that the SSA no-match letter provides no evidence of
immigration status.

**The proposed rule threatens an erosion of privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting
privacy and tax confidentiality. These laws were enacted to protect sensitive and
personal information, and to ensure and encourage compliance with tax laws. The
proposed rule threatens to substantially undermine these privacy protections.

Director, Regulatory Management Division, USCIS
August 15, 2006
Page 4

**The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant confusion that is almost certain to follow.  The proposed rule also contains unrealistic timetables for compliance.

Further, although this rule purports to make changes to how DHS interprets no-match letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about the rule. The actual cost of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law.

**The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records.  Moreover, the 60-day time period for compliance is entirely unreasonable and does not account for the numerous bureaucratic steps that employees must go through to correct their records with various agencies and with their employer.

For the reasons stated above, we oppose the Department of Homeland Security's proposed regulation. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. We request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Peter Schey
Executive Director & President
Center for Human Rights and Constitutional Law

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Selden, David [DSelden@stinsonmoheck.com] |
| **Sent:** | Monday, August 14, 2006 10:38 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-004 |
| **Attachments:** | DHS Docket No. ICEB-2006-004.pdf |

Attached are comments on the above-referenced proposed rule-making.

A hard copy has also been mailed to you.  If there are any problems with the receipt of the attached, please contact us.

Thank you very much.

David A. Selden
Stinson Morrison Hecker LLP
1850 N. Central Ave., Ste. 2100
Phoenix, AZ 85004
602-212-8566 (w)
602-702-0974 (c)
480-985-2613 (h)
602-240-6925 (f)
dselden@stinsonmoheck.com

This communication is from a law firm and may contain confidential and/or privileged information. If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

**No-Match Cert. Admin. Record  1639**



STINSON

MORRISON

HECKER LLP

Julie A. Pace
Sharon M. Jutila
David A. Selden

602-397-9871
www.stinsonmoheck.com

1850 North Central Avenue
Suite 2100
Phoenix, AZ 85004-4584
*Tel* (602) 279-1600
*Fax* (602) 240-6925

Via U.S. Mail and via email to: rfs.regs@dhs.gov

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW
2nd Floor
Washington D.C, 20529

Re:    DHS Docket No. ICEB-2006-0004

Dear Director:

We are providing the following comments regarding the proposed regulations on the Safe-Harbor Procedures for Employers Who Receive a No-Match Letter. Our law firm represents employers in Arizona and elsewhere who endeavor to comply with the various laws and regulations regarding hiring practices, including anti-discrimination and immigration employment eligibility verification procedures. The regulatory burden on employers is already severe, and the proposed regulations would significantly add to that burden. They would be detrimental to the health of businesses, both large and small, particularly in areas such as Arizona in view of the available labor force in the Southwest, would be detrimental to consumers, and would be detrimental to the health of the economy.

Clients of our law firm who would be negatively impacted by the proposed regulations include businesses involved in a broad spectrum of industries, including manufacturing, retail, construction, agriculture, restaurants, lodging, service industries, health care, and more. The cost of operating businesses in those industries are vital to the economic health and growth of this state. Industries who will be particularly burdened by the proposed regulations comprise major segments of our economy. In some industries, such as manufacturing, regulations that add costs to businesses have the effect of causing manufacturing operations and jobs to be relocated to other countries. In other industries, such as hospitality and construction, the jobs will stay in

KANSAS CITY

OVERLAND PARK

WICHITA

WASHINGTON, D.C.

PHOENIX

ST. LOUIS

OMAHA

JEFFERSON CITY

DB03/775567 0015/7006850 2

**No-Match Cert. Admin. Record 1640**

Director, Regulatory Management Division
August 14, 2006
Page 2

America and are not susceptible to being relocated to foreign countries, but increasing the costs of doing business may curtail employment levels, decrease service levels, reduce profits, and increase costs for consumers.

It is critical that we promote efficiency and economy in the administrative process of selecting, screening and hiring workers. Measures that impose additional costs, delays, are unworkable or that pose the unfair risk of punitive actions against employers are contrary to the public policy interests mentioned above. The proposed regulations will be a significant burden on employers of labor in Arizona. The Department of Homeland Security should not to go forward with its current proposed regulations, but instead work with other agencies and branches of the government to adopt a comprehensive and workable solution to the immigration-related employment issue.

The proposed regulations would be impractical in practice and would impose a significant and costly new burden on employers that is not currently required by any law or government agency. The mandatory verification process of Social Security numbers (SSNs) by the Social Security Administration (SSA) or the Department of Homeland Security (DHS) in response to no-match notifications would inflict an intolerable administrative burden on employers, without solving any immigration issues. Many of our clients have been following what they believe is a multi-step response that conscientious, responsible and reasonable employers should take when faced with the receipt of a no-match letter from the Social Security Administration, based on extensive research done related to the safe-harbor provision in the Internal Revenue Service's regulations related to incorrect submission of information on the W-2 forms. Yet, the proposed rules do not appear to leave room for alternative reasonable procedural safe harbors to be utilized that do not use the Social Security Number Verification Service (SSNVS) provided by the Social Security Administration or the DHS's Basic Pilot Program.

As a result, our comments will focus on the following item in the proposed rules:

1.    Mandating a safe harbor only through the use of the SSNVS or DHS Basic Pilot Program is incompatible with the purpose and capabilities of the SSA system;

2.    The proposed 14-day time period for a response to the receipt of a SSA no-match letter is unreasonable and unrealistic;

3.    The proposed 63-day time period for a response to try to cure an on-going discrepancy is insufficient and unfair in some cases;

4.    The proposed regulations would impose significant additional burdens and costs to employers;

DB03/775567.0015/7006850.2

Director, Regulatory Management Division
August 14, 2006
Page 3

5.  DHS is exceeding the scope of its legal authority in promulgating the regulations, as it is taking actions inconsistent with other federal agencies, and this matter should be determined through the legislative process; and

6.  The resolution of the system lies not in promulgating unworkable regulations, but by a complete overhaul of the immigration system.

## I.   MANDATING A SAFE HARBOR ONLY THROUGH THE USE OF THE SSNVS OR DHS BASIC PILOT PROGRAM IS INCOMPATIBLE WITH THE PURPOSE AND CAPABILITIES OF THE SSA SYSTEM.

It is fundamentally incompatible with the purposes of the SSA to mandate use the SSNVS as a safe harbor for the purposes of the DHS imposition of penalties against employers for allegedly knowingly employing an unauthorized worker.  The SSNVS was never intended to be used as a punitive measure against either employees or employers, which is what the proposed regulations would create and mandate.  By mandating that the only way a discrepancy of a no-match letter by the SSA will be resolved is through the use of the SSNVS, DHS would transform a system meant to allocate earnings into a faulty immigration status tool for DHS.

The inherently flawed system of relying on a federally issued card that is so easily forged is the fundamental problem as high quality fraudulent documents are common and are difficult, if not impossible, to detect by employers, who are not required to be document experts. *"Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports," Report to Congressional Committees by U.S. Government Accountability Office, February 2005.*  But to attempt to transfer to the employer the burden of resolving such a wide-spread governmental problem as document abuse and the broken United States immigration system is to imprison innocent employers in a quagmire from which there is no escape.

The proposed rules would merely create a never-ending circle of reverification of the employee's authorization to work each time a no-match letter was received by the employer as many of the SSA no-matches are never resolved.  According to the GAO report, 13 percent of queried cases in a 2002 study of the Basic Pilot related to work authorization were never resolved.  Moreover, the GAO stated in its Report that a June 2002 study placed the cost of bringing the Pilot Program on line as a mandatory verification system for work eligibility and identity at approximately $159 million annually.

**No-Match Cert. Admin. Record  1642**

Director, Regulatory Management Division
August 14, 2006
Page 4

**A.**    **Why Does SSA Send No-Match Letters to Employers in the First Place and What Does It Mean for Employers?**

The SSA and IRS have entered into an agreement in order to more effectively and efficiently process employee wage reports (W-2's). 20 C.F.R. § 422.114(a). Under the agreement, the IRS, through the Internal Revenue Code, instructs employers to file annual wage reports with the SSA. The SSA then processes all of the W-2's submitted by the employer in order to update the employees' SSA earnings records and IRS tax records. If there is an error in the form, SSA identifies those errors to facilitate the IRS assessment of a penalty and to correct any reporting errors. 20 C.F.R. § 422.114(a). If a report has 90 percent or more of the returns with errors consisting of no SSNs or incorrect employee names or SSNs, SSA will return the report to the employer to correct the errors and resubmit within the specified time frames in the regulations. 20 C.F.R. § 422.114(c); 20 C.F.R. § 422.120(b).

If an employer sends in a report that contains an employee's wages but with a different name or SSN than shown in SSA's records, SSA will write the employee at the address shown on the wage report and request the missing or corrected information. 20 C.F.R. § 422.120(a). These are the individual mismatch letters that an employee may receive. If the wage report does not show an employee address or has an incomplete address, the SSA will write the employer and request the missing or corrected employee information. 20 C.F.R. § 422.120(a). Thus, SSA has the authority to contact the employee and the employer to request the correct information.

The SSA informs the IRS of all wage reports filed without employee SSNs so that the IRS may determine whether to assess penalties for erroneous filings under 26 U.S.C. § 6721 of the Internal Revenue Code. 20 C.F.R. § 422.120(a). The major problem for SSA with incorrect employee information is that the earning cannot be identified and properly credited toward the correct employee earnings record. 20 C.F.R. § 422.120(a). According to United States Government Accountability Office, as of February 4, 2005 there was approximately $463 billion in reported earnings in the Earnings Suspense File (ESF) that date back to the inception of the Social Security program in 1937. *"Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports,"* Report to Congressional Committees by U.S. Government Accountability Office, February 2005.

1.    **The Use of the Social Security Number Verification Service Is Completely Optional and a No-Match Can Not Be Used for Immigration Purposes.**

A starting premise for the discussion of the proposed regulations is the fact that the use of the SSNVS is completely optional for employers and, again, the SSA only "encourages" the use of the system. Moreover, the SSA emphatically states that a negative response from the system does not make any statement about the employee's immigration status. *"Tips on Annual Wage Report Filing,"* SSA, 20-3526895. This is the starting point for any discussion of whether or not the proposed regulations

Director, Regulatory Management Division
August 14, 2006
Page 5

imposing constructive knowledge on an employer for the mere receipt of a no-match letter is either reasonable or justified and whether or not the proposed "reasonable steps" are in fact reasonable.

      2.     **A Social Security No-Match Letter Does Not Make any Statement about an Employee's Immigration Status and an Employer Can Not Fire an Employee Subject to a No-Match Letter.**

The SSA also makes it perfectly clear that receiving a no-match letter regarding an employee "does not make any statement about an employee's immigration status." *Employer Correction Request, SSA Code V Letter.* In addition, the no-match letter specifically states that the employer should not use the letter to take any adverse action against an employee "such as laying off, suspending, firing, or discriminating against that individual, just because his or her Social Security number appears on the list." (emphasis added). The letter further warns that to do so will subject the employer to legal consequences under state or Federal law. This is the message repeated by the SSA in all of its materials, including its website, guidance, handbooks, and questions & answers to the SSNVS and no-match letters. The SSA provides 60 days for an employer to provide a response that will help correct the earnings records.

The no-match letters issued by SSA are not meant to be punitive notices, but rather are to be "educational correspondence to the employer," according to SSA Press Officer Mark Lassiter. *"DHS to Release Proposed Rules on Proper Response to No-Match Letters,"* BNA Daily Labor Report, No. 112, June 12, 2006. Further, according to SSA's Lassiter, the approach to correct the wrong information on the W-2 form is to **"work with the employee."** (emphasis added). Thus, the no-match letter is not a basis for assuming that the employee is not authorized to work, and it is not a resolution to the issue to simply rely on the SSNVS for a match. Instead, employers are to work through the no-match issue directly with the employee, which employers have been doing, as is discussed below under the proposed alternative reasonable steps.

      3.     **A No-Match by the SSNVS Is Not Evidence of the Employee's Immigration Status, and an Employer Can Not Fire an Employee Subject to a No-Match.**

The SSNVS Handbook issued by the SSA also emphatically states the following:

> *If you rely only on the verification information Social Security provides to justify adverse action against a worker, you may violate State or Federal law and be subject to legal consequences.*

DB03/775567.0015/7006850.2

Director, Regulatory Management Division
August 14, 2006
Page 6

The SSNVS Handbook also makes it perfectly clear a no-match response by the system "does not make any statement about an employee's immigration status," and that the no-match response, "in and of itself," is not a basis to take any adverse action against an employee "such as laying off, suspending, firing, or discriminating against the employee."

Thus, while the SSA will not allow the use the no-match as a basis for the employer assuming that an employee is not authorized to work, DHS proposes to use such a no-match as evidence that an employer knowingly employed an individual who was not authorized to work. This fundamental inconsistency between the purposes of the two agencies is reason enough not to include the SSA no-match as a basis for imposing constructive knowledge on an employer under the proposed regulations.

> **B.** **The Purported Reasonable Steps in the Proposed Regulations Are Not Reasonable Because a No-Match by the SSA Was Never Meant to be Used as an Immigration Enforcement Tool.**

It appears that there has been a lack of foresight in how the proposed rules will actually work in practice. As written, there are several gaps that can not be overcome without additional provisions included in the proposed rules and, even with additions, the lack of understanding of what is included with a no-match letter precludes the proposed regulations from being a workable system for imposing constructive knowledge on the employer under the IRCA.

> **1.** **SSA Does Not Provide Employee Names to Match the Social Security Numbers Listed in a No-Match Letter.**

First, the proposed regulations start from an inaccurate perception on the part of DHS, as it assumes that the SSA provides enough information to determine whether or not there was a clerical error made with the employee's name and SSN. But, alas, the SSA no-match letters do not provide any information other than a raw list of SSNs. There are no employee names provided **at all** with the group no-match letters. Thus, there is nothing to match the SSN against besides determining whether or not there is a current employee using one of the reported SSNs. Once that is determined, the employer simply has a list of employee names that match the provided SSNs. The employer does not know what name the SSA has attached to the SSN.

As a result, the only way to determine whether or not there is a discrepancy is to ask the employee directly if there is any error in the employee's name and the employee's SSN (as reported on the W-4 Form, which is the basis for the W-2 reporting) and to match the W-4 information against the W-2 information submitted by the employer. But discussing the issue directly with the employee automatically takes an employer to the second step of the "reasonable steps" laid out in the proposed regulations. It should be noted that this is the step that the SSA states that employers should immediately take, addressing the issue <u>directly</u> with the employee, not resorting to the use of the SSNVS.

**No-Match Cert. Admin. Record  1645**

Director, Regulatory Management Division
August 14, 2006
Page 7

2. **Errors May Result in the SSNVS from Reasons Other than Typographical or Clerical Errors.**

Second, the proposed regulations assume that the submission of correct information on the employee will result in a match under the SSNVS if there had been a typographical error or other error in the employer information. That is not true. There are several reasons that there are no-match results for employees, including issues such as the basic inability of the system to comprehend and accurately capture the Spanish surnames of many authorized workers. In addition, many times there are simply errors on the part of the SSA that are not the fault of the employees. Thus, even if a clerical error is corrected, there may still be a no-match generated on the corrected information.

As an example, Julie A. Pace, a signatory to this letter, is herself a no-match in the SSNVS. She has received individual no-match letters. She has not changed employment, has not changed her name, and has not changed anything else as reported on her W-2 or on her Social Security card. However, she is categorized as a no-match. She has spent hours and hours on hold on the telephone with the SSA in an attempt to fix the error. To date, it has not been resolved and her earnings since 2005 remain unallocated. We provide this example to show that when a natural-born United States citizen who speaks English as a first language and is a member of the State Bar of Arizona is having issues and problems with resolving her no-match status with the SSA, such problems will not be easily resolved for individuals with less education, who may have limited English-language ability, and may not be a natural-born citizen.

3. **The I-9 Reverification Process of the Proposed Rules Will Result in a Never-Ending Loop of No-Match and I-9 Reverification.**

Third, there is no provision in the proposed rule that addresses when the employee has presented what he or she insists is correct information as to name and SSN but there is still a no-match with the SSNVS. We will assume that this will result in (l)(2)(i)(B) becoming applicable and mandating that the employer must reverify the I-9 form for the employee without allowing the use of the Social Security card as a list C document.

The problem with this part of the proposed regulation is that the employee may have originally shown the employer a document other than a Social Security card as part of the I-9 process in the first place. As a result, during the I-9 reverification process proposed in (l)(2)(iii) of the proposed rule, the employee is free to show a list A document that establishes both identity and authorization to work but still report the employee's "incorrect" name and SSN in Section 1. This will result in another no-match letter being generated by the SSA during the next submission of the W-2's by the employer, which will result in the employer again going through the entire process once again, only to redo yet another I-9 with the employee's list A document. Thus, there will be a perpetual loop of a futile process set up due to the plain and simple fact that the no-match system of the SSA is not meant to be used for immigration enforcement

DB03/775567.0015/7006850.2

**No-Match Cert. Admin. Record  1646**

Director, Regulatory Management Division
August 14, 2006
Page 8

purposes. Employers and their administrative hiring personnel should be allowed to devote their time to productive work that generates jobs and serves customers, not doing endless paperwork mandated by government regulations. The proposed regulations would treat employers like gerbils in a cage, running fruitlessly in a wheel of recurring and never-ending I-9 reverifications of SSA mismatches.

C. **DHS Should Adopt a Proposed Alternative to Reasonable Steps That Employers May Take to Resolve the Discrepancy in the Combination of Name and Social Security Number.**

As discussed above, the proposed regulations do not state what should occur if the "corrected" information relating to an employee's SSN still does not match when submitted to the SSNVS. This will be the scenario for a large percentage of the individuals on a no-match list due to the inherent problems with the use of Spanish surnames (which include multiple names depending on the situation being addressed) and the basic reporting difficulties in the Social Security system.

Thus, because the SSA no-match letters are derived from the IRS regulations in the first place, DHS should adopt the procedures under the IRS regulations for an alternative reasonable steps that an employer may take to resolve the no-match discrepancy. The GAO Report also references these procedures as evidence that an employer acted responsibly to avoid errors in the submission of information on the worker's W-2 and took actions to correct any errors that were brought to the employer's attention.

1. **Initial Solicitation by Employer of Correct Employee Name and Social Security Number Through Use of W-4 and W-9.**

First, the filer (i.e., the employer) must make an initial solicitation of the appropriate information at the time the relationship is established with the person required to provide the filer with the appropriate information (in this case the employee). 26 C.F.R. § 301.6724-1(f)(1)(i). Solicitation means a request by the filer for the correct information from the person required to provide the information. 26 C.F.R. § 301.6724-1(e)(1). In this case, the employer would be required to solicit from the employee at the beginning of the employment relationship the employee's name and SSN. This is the information required for the employer to file the W-2 with the IRS/SSA.

Many employers have been accomplishing this initial solicitation by training their hiring personnel to obtain a complete and accurate W-4 and W-9 from the employee. The GAO Report references that the IRS has not been enforcing penalties against employers when they solicit names and SSNs from workers and obtain signed W-4s or I-9s as "the employers acted responsibly under the current regulations." Many companies have gone one step further by requesting a signed W-9 from the employee that verifies under penalty of perjury that both the employee's name and SSN are correct. This is an alternative reasonable step considering that the no-match from the

Director, Regulatory Management Division
August 14, 2006
Page 9

SSNVS is not to be used to as a basis for taking an adverse action against an employee and is _specifically_ not to be used to infer anything regarding the employee's immigration status.

The IRS regulations state that no other solicitation is required unless the employer receives a notice that employee information is incorrect. 26 C.F.R. § 301.6724-1(f)(1)(i).

2.    **Annual Solicitation of Employee Name and Social Security Number in Response to No-Match Letter from SSA.**

Only when the employer is notified that the employee information submitted to the SSA is incorrect must the employer take additional steps regarding the information submitted on the W-2s. The information is incorrect if at the time of the notification the name and number combination on the account matches the name and number combination on the notice from the IRS/SSA. 26 C.F.R. § 301.6724-1(f)(1)(ii). Thus, when a no-match letter is sent by the SSA, the employer must take the reasonable steps outlined in the regulations. The regulations state that the filer must undertake an annual solicitation of the person to obtain the correct information (26 C.F.R. § 301.6724-1(f)(1)(ii)), namely SSN and name for an employee. The annual solicitation must be made by December 31 of the year in which the employer receives the notification or if the notification is received in December, by January 31 of the following year. 26 C.F.R. § 301.6724-1(f)(1)(ii). If the filer receives a second notice from IRS/SSA regarding incorrect information for the same name and number combination, the employer must again send out an annual solicitation for that year. 26 C.F.R. § 301.6724-1(f)(1)(ii).

Some employers have been undertaking even greater measures than called for in the regulations. In response to a no-match letter, some employers have been soliciting the correct information via a letter that contains the required information included in the IRS regulations and that specifically requests that the employee provide a new W-4 and W-9 to reconfirm that the information provided to the employer is correct. In addition, in order to ensure that the information reported on the employer's W-2 is the most correct and current information possible, the employee is once again solicited to provide the correct name and SSN by providing the employer with another signed W-4 and W-9 in December of the year in which the no-match letter was received.

If the employee again shows up on a no-match list the following year, the employer again follows the same solicitation steps to ensure that twice during that year the employee is asked to submit correct information for the submission of the next year's W-2. Thus, some employers are already taking steps to ensure that they are promptly responding to the no-match letters. However, it would be against the employer's obligations as stated by the SSA to fire an employee merely for having a no-match, as that could be construed as being discriminatory.

**No-Match Cert. Admin. Record  1648**

Director, Regulatory Management Division
August 14, 2006
Page 10

a.    Explanation of the IRS Annual Solicitation Requirements.

If the filer (employer) is notified of the incorrect information pursuant to 26 U.S.C. §6721 through the use of IRS penalty notice number 972CG, the filer must take specific steps to make the annual solicitation. 26 C.F.R. § 301.6724-1(f)(3); IRS publication 1586 "Reasonable Cause Regulations and Requirements for Missing and Incorrect Name/TINs." The annual solicitation may be made by mail or by person. 26 C.F.R. § 301.6724-1(f)(3).

A mail solicitation must include three items: (1) a letter informing the person that he must provide the correct information **and** that he is subject to a $50 penalty imposed by the IRS under 26 U.S.C. § 6723 if he fails to furnish the correct information; (2) a Form W-9 on which the person must provide his correct information; and (3) a return envelope for the person to return the Form W-9 to the filer, which may be, but is not required to be, postage pre-paid. 26 C.F.R. § 301.6724-1(e)(2)(i).

The annual solicitation may be made by phone if the solicitation procedure is reasonably designed and carried out in a manner that is conducive to obtaining the information. The annual solicitation by telephone must satisfy five requirements: (1) each person with a missing or incorrect information must be called and an adult member of the household must be reached; (2) the information must be requested; (3) information is provided during the call that the person with the missing or incorrect information is subject to a $50 penalty imposed by the IRS under 26 U.S.C. § 6723 if he or she fails to furnish the information; (4) a contemporaneous record is maintained showing the solicitation was properly made; and (5) the contemporaneous record is provided to the IRS on request. 26 C.F.R. § 301.6724-1(e)(2)(ii).

3.    **The I-9 Reverification Process of the Proposed Rules Will Result in a Never-Ending Loop of No-Match and I-9 Reverification.**

Employers who have followed the IRS regulations related to soliciting correct information for submission of its W-2's should not be forced to assume the additional administrative paperwork step of reverifying the employee's I-9, for the reasons explained above. Moreover, during the I-9 reverification proposed in (l)(2)(iii) of the proposed rule, the employee is free to show a list A document that establishes both identity and authorization to work but still reports the employee's "incorrect" name and SSN in Section 1 because there is still a no-match discrepancy. This will result in another no-match letter being generated by the SSA during the next submission of W-2s by the employer, which will result in the employer again going through the entire process once again only to redo yet another I-9 with the employee's list A document. Thus, the proposed rule would impose upon employers the perpetual loop of a futile process set up due to the plain and simple fact that the no-match system of the SSA is not meant to be used for immigration enforcement purposes.

**No-Match Cert. Admin. Record  1649**

Director, Regulatory Management Division
August 14, 2006
Page 11

**II.     THE PROPOSED 14-DAY TIME PERIOD FOR A RESPONSE TO THE
         RECEIPT OF A SSA NO-MATCH LETTER IS UNREASONABLE AND
         UNREALISTIC.**

As has been mentioned, an employer does not receive the names that correspond
with the list of SSNs on the no-match letter. Depending on the number of SSNs on the
list and the manner in which the employer's records are kept, it may take well longer
than 14 days to compile a list of those employees who need to have their files reviewed
to determine whether or not the information on the W-4 was the information submitted
on the W-2 (which is what the SSA requires) because the employer has no way of
knowing what name is in the SSA system as a match to the SSN.

Thus, to require that an employer takes the "reasonable steps" outlined in the
proposed rule within 14 days is not workable. Some employers may have over 500
SSN on the list to match against employee files. If an employer does not have a system
that allows the employer to pull up an employee file based on a SSN, it could take the
employer a month to match 500+ SSNs to the correct employee names. The employer
will then need to match the information in the employee files related to the W-4 to the
submitted information on the W-2 to make sure there was no error in the submission.
This will take additional time depending on the number of employees on the list.

This does not even take into account the additional time then needed to contact
the employees should the information on the employee's W-4 match the submitted W-2
information for the employee. Depending on the location of the employees and the
number of employees involved, this process could take well more than the 14 days
called for in the proposed regulations.

At a minimum, a 30-day time frame for the taking of the reasonable alternative
steps would be a more realistic time frame for accomplishing all of the necessary steps
as 14 days is simply not sufficient or reasonable.

**III.    THE PROPOSED 63-DAY TIME PERIOD FOR A RESPONSE TO TRY
         TO CURE AN ON-GOING DISCREPANCY IS INSUFFICIENT AND
         UNFAIR IN SOME CASES.**

If an employee needs to correct a problem with the SSA, the process may take
far more than 60 days to resolve. As an mentioned above, Julie A. Pace, a signatory to
this letter, is herself a no-match in the SSNVS and has been attempting to resolve her
no-match issues with the SSA. She did not change employment, her name, and or
anything else as reported on her W-2 or on her Social Security card during the time
frame she appeared on the no-match list. However, she is categorized as a no-match
with the SSA. She has spent hours and hours on hold with the SSA in an attempt to fix
the error. To date, it has not been resolved and her earnings since 2005 remain
unallocated.

**No-Match Cert. Admin. Record  1650**

Director, Regulatory Management Division
August 14, 2006
Page 12

We provide this example to show that a natural-born United States citizen who speaks English as a first language and is an attorney, is nevertheless having issues and problems with resolving her no-match status with the SSA. It will be an even greater problem to resolve for individuals who may have a limited education, may not speak English well, and may not be a natural-born citizen. To issue regulations that assume that such issues will be resolved within 60 days is unrealistic. To think that such situations will be resolved at all is also overly optimistic, but the wheels of bureaucracy are not swift, and 60 days is far too short of a time frame for most employees to resolve such issues. A 90-day time frame would be more realistic for an employee to attempt to resolve any issues with the SSA with extensions available if the employee is attempting to resolve the situation.

Moreover, given the situation that Ms. Pace herself finds herself in, it is a flaw in the system to refuse to allow the employee to use a Social Security card as a valid document in the I-9 reverification process merely because it appears as a no-match. Many employees will find themselves in a situation where it is not due to their error that they appear on the no-match list, but DHS would penalize them for the error. Finally, as has been repeatedly stated, the SSNVS and the Social Security card were never meant to be an immigration enforcement document or control. To attempt now to use the process as such is a misuse and distortion of the SSA system and the proposed regulations will never be workable or fair to those being treated unjustly by the DHS.

Therefore, regardless of the time allowed under this portion of the proposed regulations, there is still the irresolvable problem of the mere fact that the I-9 reverification process is destined to become an overwhelming process for employers. As long as the only no-match that the employer receives is from the SSA, the employer could wind up reverifying the same employee over and over again if the employee shows the employer a valid list A document during the I-9 reverification process. This problem would only be averted if and when the DHS also informed the employer that the alien number that was the subject of a written notice by DHS can not be used during the I-9 verification process, thereby eliminating the employee's use of both a Social Security card and a permanent alien resident card or temporary employment authorization card. Thus, the only situation that will present a stop to the never ending loop of I-9 reverification is a written notice by both the DHS and the SSA.

## IV.    THE PROPOSED REGULATIONS WOULD IMPOSE SIGNIFICANT ADDITIONAL BURDENS AND COSTS TO EMPLOYERS.

The misguided nature of DHS's proposed regulation is glaringly exposed by DHS's startlingly and blatantly mistaken statement that the proposed "rule would not mandate any new burdens on the employer and would not impose any new or additional costs on the employer." The fact that DHS made such a statement reflects that it has not seriously analyzed the reality of how the proposed rule would be implemented in practice. If the time frames in the regulations are adopted, it is a real possibility that an employer would need to outsource the matching of the information between its records and the list of SSNs or hire additional staff in order to meet the 14-day time frame.

**No-Match Cert. Admin. Record  1651**

Director, Regulatory Management Division
August 14, 2006
Page 13

Furthermore, redoing the I-9d for every employee on the no-match list will take a significant amount of time for employers who have 500+ employees on the no-match list. This in and of itself is a financial burden to many employers.

The I-9s are now currently done once during the employment relationship, at the time of the initial hiring. The proposed regulations now contemplate an I-9 verification process for what could be a massive number employees (in the hundreds) that must be accomplished by the 63rd day after the employer receives a no-match notice. The regulations provide 60 days for the employer to verify the no-match with the SSA, presumably providing the employee time to straighten out any issue with the SSA. Thus, within 3 days of the expiration of those 60 days, the employer would need to fill out a new I-9 form on the employee as though the employee were a new hire. This could be a massive undertaking for the employer, depending on the number of employees on the no-match list that are still current and will need to have the I-9 reverified.

The fact that DHS has not factored in the administrative and economic burdens for employers from the proposed procedures in the regulations confirms that the DHS does not have a basic and fundamental understanding of what the proposed regulations will actually entail in the "real" world in which employers operate and do business day in and day out.

V.    **DHS IS EXCEEDING THE SCOPE OF ITS LEGAL AUTHORITY IN PROMULGATING THE REGULATIONS, AS IT IS TAKING ACTIONS INCONSISTENT WITH OTHER FEDERAL AGENCIES, AND THIS MATTER SHOULD BE DETERMINED THROUGH THE LEGISLATIVE PROCESS.**

DHS is acting in excess of its legal authority and promulgating regulations that utilize procedures dependent upon the Social Security Administration for purposes that the Social Security Administration explicitly states their procedure should not be used. Congress has never authorized the SSA and IRS processes to be used for immigration compliance, and indeed SSA specifically directs employers not to use its mismatch letters for purposes of determining employee eligibility to work in this country. It is bad policy, bad administration, and contrary to legal authority for one agency of the government to utilize a bureaucratic procedure of another agency of the government for purposes that the other agency directs that its procedure should not be used. DHS is thus placing employers in an untenable position of either acting in a manner consistent with DHS or acting in a manner consistent with SSA. In addition, employers would be forced to walk a tightrope between compliance with the anti-discrimination provision of the Immigration Reform and Control Act and Title VII of the Civil Rights Act of 1964, plus numerous state laws, and taking action that DHS's proposed regulations encourage them to take.

Clearly, DHS's piecemeal regulations are not the answer. DHS's actions conflict with and do not satisfactorily take into account the other laws and regulations

**No-Match Cert. Admin. Record  1652**

Director, Regulatory Management Division
August 14, 2006
Page 14

applicable to the situation. The subject of employer immigration compliance demands a comprehensive and workable solution, not a piecemeal regulation by only one of the agencies involved. Rather than going forward with its proposed regulation, DHS should work cooperatively with other agencies of the federal government and the Congress to seek a comprehensive, workable solution to employee eligibility verification.

## VI.    THE    RESOLUTION    OF    THE    SYSTEM    LIES    NOT    IN PROMULGATING UNWORKABLE REGULATIONS, BUT BY A COMPLETE OVERHAUL OF THE IMMIGRATION SYSTEM.

Congress is currently wrestling with a comprehensive legislative solution to the immigration morass in which this nation finds itself. To have agencies piecemeal implementing regulations on a piecemeal basis is both detrimental to that process and imposes on employers more onerous paperwork and enforcement hurdles than are justified. Employers are not the source or the solution to the immigration problem but are merely caught in the middle of essentially incompatible requirements, as is demonstrated by the concerns discussed in these comments.

The DHS is corrupting and co-opting the SSA system in a manner that the no-match system was never meant to be used. Despite DHS's repeated insistence that the ability to share information between the two agencies should be considered, the SSA and Congress have both disagreed. Until this information sharing is legislatively mandated, the DHS should not be allowed to use the SSA as a tool to penalize employers and increase an employer's obligations under the IRCA.

We appreciate DHS's consideration of these views and urge DHS to reexamine going forward with the proposed regulations. DHS should instead pursue the process of working with other federal agencies, Congress, and employers to seek a comprehensive solution to the employment immigration compliance issues. At a minimum, DHS should revise the proposed rules in a manner consistent with the comments submitted above.

Sincerely,

**STINSON MORRISON HECKER** LLP

*David A. Selden*

Julie A. Pace
David A. Selden
Sharon M. Jutila

**No-Match Cert. Admin. Record  1653**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Kristen Paulson Gibbons [kpgibbons@officenters.com] |
| **Sent:** | Tuesday, August 15, 2006 12:54 AM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-004 |
| **Attachments:** | Ltr-CIS re Interim Rules SSA No Match.doc; kpgibbons.vcf |

Please review the enclosed correspondence attached as a document and set forth in full below.  Thank you.  KP Gibbons

## THE GIBBONS LAW FIRM

---

Suite 300, Union Plaza

333 Washington Avenue North

Minneapolis, Minnesota  55401

Telephone:     (612) 349-2755

Facsimile:  (612) 349-2760

August 14, 2006

**VIA E-MAIL:  rfs.regs@dhs.gov**

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, DC  20529

Re:  DHS Docket No. ICEB-2006-0004

Dear Director:

**No-Match Cert. Admin. Record  1654**

This correspondence is written in response to the Department of Homeland Security's Proposed Rules regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" that were published on June 14, 2006 in the Federal Register, Volume 71, Number 114 (the "Proposed Rules"). The Proposed Rules describe "more specifically the steps that an employer might take after receiving a no-match letter, steps that the DHS considers reasonable" and that allegedly would provide a "safe-harbor" from being deemed as having constructive knowledge that their employee is an undocumented worker. Because the Proposed Rules in many circumstances will compel employers to retain persons in their employ regardless of having committed employment fraud, will compel employers to become a party to fraud being committed on third parties, the proposed rules, as currently written, are flawed.

<u>Objectionable Proposed Regulation</u>:

If the employer confirms with the affected employee within 14 days of receipt of the No-Match Notification that its records of the employee's name and Social Security number are correct, the employer is to ask the employee to pursue correcting the record discrepancy with the Social Security Administration. "A discrepancy will be considered resolved only if the employer verifies with SSA or DHS…that the employee's name matches in SSA's records a number assigned to that name, and the number is valid for work or is valid for work with DHS authorization…or that DHS records indicate that the immigration status document or employment authorization document was assigned to the employee." "***In the case of a number from SSA, the valid number may be the number that was the subject of the no-match letter <u>or a different number</u>, <u>for example a new number</u> resulting from the employee's contact SSA to resolve the discrepancy,***" so long as the employer verifies the new number by telephoning SSA ***"as SSA may not provide any documentation."***

\*\*\*\*

The producedure to to verify the employee's identity and work authorization described in the proposed rule would involve the employer and the emplo6yee completing a new Form I-9…, using the same procedures ***as if the employee were newly hired…***

<u>Realistic Application</u>:

Several years ago, I represented an employer who received a SSA no-match letter regarding a significant number of long-term employees. In response to the employer's notification to employees of the SSA discrepancy, a number of employees contended that they had obtained new social security numbers and/or names over the period of one weekend and without any supporting documentation. Because the employer had photocopied the identity and work authorization documents presented by employees at the commencement of their employment and the employees could not present any documentation of a lawful change in their SS number and/or name, the employees were terminated.

In response to the terminations, grievances were filed, an arbitration occurred and a federal district court action was commenced, at considerable cost to both the employer and the union. Essentially, the employer opposed continuing the employment of persons who misrepresented their identity and/or work authority at the commencement of their employment and in violation

**No-Match Cert. Admin. Record 1655**

of the Immigration and Reform Act of 1986 and the employer's personnel policies. The employer did not want to become a party to fraud on the IRS, by just completing a new Form I-9 and pretending that the employee was a new hire, without going back and correcting its past income reports, which the employees opposed. The employer did not want to become a party to fraud on the SSA and/or the CIS by agreeing to change its employment records, where the employee was not notifying the agencies of his/her presence in the US and prior work history. The employer did not want to become a party to fraud on its insurance and benefit providers, and risk having these benefits terminated, by merely agreeing to changing the names of current employees and/or their dependents to "new" employee names and/or SSNs and by waiving new qualification periods. The employer did not want to become a party to fraud on health care providers and/or other providers of services and/or credit by issuing new insurance and employee identification with "new" names and/or SSNs, which thereby could prevent collection efforts of those providers against current employees, using new identities. The employer also did not want to apply its personnel policies in favor of persons listed on the no-match notification as compared to other personnel who were terminated for violations from misrepresenting their identities to obtain employment for purposes of avoiding tax liabilities, child support, insurance for minors and/or spousal support obligations. Employers are also concerned about creating additional grievances from co-workers who would otherwise be promoted in seniority and/or who had to complete a 90-day period before receiving employer provided benefits when allegedly "new" employees are added to the roster when former names and/or SSNs were used.

During the adversarial proceedings in the above matter, it was repeatedly rumored that employees had paid significant funds in order to obtain new "verifiable" SS numbers via the black market, albeit that the SS numbers had never been lawfully issued to the persons presenting them to the employer in response to the no-match notification.

Employment Fraud & The Hoffman Plastic Compounds Decision:

The proposed rules as written abrogates the holding of the U.S. Supreme Court in Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137 (2002). There, the court acknowledged that the Immigration Reform and Control Act of 1986 (the "IRCA") "makes it a crime for an unauthorized alien to subvert the employer verification system by tendering fraudulent documents," and that the IRCA "prohibits aliens from using or attempting to use "any forged, counterfeit, altered, or falsely made document" or "any document lawfully issued to or with respect to a person other than the possessor" for purposes of obtaining employment in the United States." The Supreme Court expressly concluded that "Congress has expressly made it criminally punishable for an alien to obtain employment with false documents" and that obtaining employment in this regard amounts to "criminal fraud."

The Proposed Rules, as written, give approval to employees' misrepresentation of work authority and/or identity in order to obtain employment, provided that they are listed on a no-match letter. The Proposed Rules also give approval to the employees to go out and obtain a "new and verifiable" social security number, but with no documentation that it has been lawfully issued to them and to continue their employment notwithstanding the fraudulent consequences it may cause to third parties and/or until the next annual no-match notification is issued. The employer should not be compelled to have to merely accept a new number that is verifiable with the SSA, to be barred from enforcing its personnel policies requiring discipline, including termination for falsifying information. and/or to become a party to fraud on third parties, which may include the SSA, and/or risk jeopardizing insurance and benefit coverage for its Company and its employees due to the content of the Proposed Rules.

**No-Match Cert. Admin. Record  1656**

ICE IMAGE PROGRAM: Late last month, recognizing the "presence of undocumented workers who have secured jobs by fraudulent means, including presentation of false documents, completion of fraudulent benefit applications and theft of identities," U.S. Immigration and Customs Enforcement (ICE) announced that in order "to combat unlawful employment and reduce vulnerabilities that help illegal aliens gain such employment, the Department of Homeland Security (DHS) recently introduced the ICE Mutual Agreement between Government and Employers (IMAGE) program. The goal is to assist employers in targeted sectors to develop a more secure and stable workforce and to enhance fraudulent document awareness through education and training." Forcing employers to comply with the steps outlined in the Proposed Rules is directly in contradiction with this recent announcement by ICE.

In conclusion, by allowing employees identified by no-match notifications to merely produce a "new verifiable" SSN without supporting documentation of a legal name change and/or a lawfully issued new number and to continue their employment places employers in an untenable and unworkable situation.  It is this writer's opinion that the rules as written and with the application as stated herein will "unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA" as previously recognized by the Supreme Court in Hoffman. Moreover, it will "encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations" as well as the commission of fraud on innocent third parties.

Thank you for the opportunity to provide written comment to the DHS Proposed Rules.

Sincerely,

//S//

Kristen Paulson Gibbons
kpgibbons@officenters.com

--
·
**THE GIBBONS LAW FIRM**
*Employment, Immigration & Litigation Law*
Suite 300, Union Plaza
333 Washington Avenue North
Minneapolis, Minnesota  55401
Telephone:  (612) 349-2755
Facsimile:  (612) 349-2760

NOTICE: Electronic messages can be misdirected, intercepted, forwarded, altered and/or viewed by unintended parties. The Gibbons Law Firm can not and does not guarantee the

**No-Match Cert. Admin. Record  1657**

confidentiality of messages sent over the Internet. If you are not the intended recipient, please immediately notify the sender by reply e-mail and then delete this e-mail and any attachments. Thank you.

No-Match Cert. Admin. Record  1658

# THE GIBBONS LAW FIRM

Suite 300, Union Plaza
333 Washington Avenue North
Minneapolis, Minnesota 55401
Telephone:    (612) 349-2755
Facsimile:  (612) 349-2760

September 26, 2007

***VIA E-MAIL:  rfs.regs@dhs.gov***

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, DC  20529

Re:  DHS Docket No. ICEB-2006-0004

Dear Director:

This correspondence is written in response to the Department of Homeland Security's Proposed Rules regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" that were published on June 14, 2006 in the Federal Register, Volume 71, Number 114 (the "Proposed Rules").  The Proposed Rules describe "more specifically the steps that an employer might take after receiving a no-match letter, steps that the DHS considers reasonable" and that allegedly would provide a "safe-harbor" from being deemed as having constructive knowledge that their employee is an undocumented worker.  Because the Proposed Rules in many circumstances will compel employers to retain persons in their employ regardless of having committed employment fraud, will compel employers to become a party to fraud being committed on third parties,  the proposed rules, as currently written, are flawed.

Objectionable Proposed Regulation:

If the employer confirms with the affected employee within 14 days of receipt of the No-Match Notification that its records of the employee's name and Social Security number are correct, the employer is to ask the employee to pursue

Director, Regulatory Management Division
9/26/2007
Page 2 of 4

correcting the record discrepancy with the Social Security Administration. "A discrepancy will be considered resolved only if the employer verifies with SSA or DHS…that the employee's name matches in SSA's records a number assigned to that name, and the number is valid for work or is valid for work with DHS authorization…or that DHS records indicate that the immigration status document or employment authorization document was assigned to the employee." "*In the case of a number from SSA, the valid number may be the number that was the subject of the no-match letter <u>or a different number, for example a new number</u> resulting from the employee's contact SSA to resolve the discrepancy,"* so long as the employer verifies the new number by telephoning SSA "*as SSA may not provide any documentation.*"

\*\*\*\*

The producedure to to verify the employee's identity and work authorization described in the proposed rule would involve the employer and the emplo6yee completing a new Form I-9…, using the same procedures *as if the employee were newly hired…*

<u>Realistic Application:</u>

Several years ago, I represented an employer who received a SSA no-match letter regarding a significant number of long-term employees. In response to the employer's notification to employees of the SSA discrepancy, a number of employees contended that they had obtained new social security numbers and/or names over the period of one weekend and without any supporting documentation. Because the employer had photocopied the identity and work authorization documents presented by employees at the commencement of their employment and the employees could not present any documentation of a lawful change in their SS number and/or name, the employees were terminated.

In response to the terminations, grievances were filed, an arbitration occurred and a federal district court action was commenced, at considerable cost to both the employer and the union. Essentially, the employer opposed continuing the employment of persons who misrepresented their identity and/or work authority at the commencement of their employment and in violation of the Immigration and Reform Act of 1986 and the employer's personnel policies. The employer did not want to become a party to fraud on the IRS, by just completing a new Form I-9 and pretending that the employee was a new hire, without going back and correcting its past income reports, which the employees opposed. The employer did not want to become a party to fraud on the SSA and/or the CIS by agreeing to change its employment records, where the employee was not notifying the agencies of his/her presence in the US and prior work history. The employer did not want to become a party to fraud on its insurance and benefit providers,

Director, Regulatory Management Division
9/26/2007
Page 3 of 4

and risk having these benefits terminated, by merely agreeing to changing the names of current employees and/or their dependents to "new" employee names and/or SSNs and by waiving new qualification periods. The employer did not want to become a party to fraud on health care providers and/or other providers of services and/or credit by issuing new insurance and employee identification with "new" names and/or SSNs, which thereby could prevent collection efforts of those providers against current employees, using new identities. The employer also did not want to apply its personnel policies in favor of persons listed on the no-match notification as compared to other personnel who were terminated for violations from misrepresenting their identities to obtain employment for purposes of avoiding tax liabilities, child support, insurance for minors and/or spousal support obligations. Employers are also concerned about creating additional grievances from co-workers who would otherwise be promoted in seniority and/or who had to complete a 90-day period before receiving employer provided benefits when allegedly "new" employees are added to the roster when former names and/or SSNs were used.

During the adversarial proceedings in the above matter, it was repeatedly rumored that employees had paid significant funds in order to obtain new "verifiable" SS numbers via the black market, albeit that the SS numbers had never been lawfully issued to the persons presenting them to the employer in response to the no-match notification.

<u>Employment Fraud & The Hoffman Plastic Compounds Decision</u>:

The proposed rules as written abrogates the holding of the U.S. Supreme Court in <u>Hoffman Plastic Compounds, Inc. v. NLRB</u>, 535 U.S. 137 (2002). There, the court acknowledged that the Immigration Reform and Control Act of 1986 (the "IRCA") "makes it a crime for an unauthorized alien to subvert the employer verification system by tendering fraudulent documents," and that the IRCA "prohibits aliens from using or attempting to use "any forged, counterfeit, altered, or falsely made document" or "any document lawfully issued to or with respect to a person other than the possessor" for purposes of obtaining employment in the United States." The Supreme Court expressly concluded that "Congress has expressly made it criminally punishable for an alien to obtain employment with false documents" and that obtaining employment in this regard amounts to "criminal fraud."

The Proposed Rules, as written, give approval to employees' misrepresentation of work authority and/or identity in order to obtain employment, provided that they are listed on a no-match letter. The Proposed Rules also give approval to the employees to go out and obtain a "new and verifiable" social security number, but with no documentation that it has been lawfully issued to them and to continue their employment notwithstanding the fraudulent consequences it may cause to third parties and/or until the next annual no-match notification is issued. The employer should not be compelled to have to merely accept a new number that is verifiable with the SSA, to be barred from enforcing its personnel policies requiring discipline, including termination for falsifying information.

Director, Regulatory Management Division
9/26/2007
Page 4 of 4

and/or to become a party to fraud on third parties, which may include the SSA, and/or risk jeopardizing insurance and benefit coverage for its Company and its employees due to the content of the Proposed Rules.

**ICE IMAGE PROGRAM**:  Late last month, recognizing the "presence of undocumented workers who have secured jobs by fraudulent means, including presentation of false documents, completion of fraudulent benefit applications and theft of identities," U.S. Immigration and Customs Enforcement (ICE) announced that in order "to combat unlawful employment and reduce vulnerabilities that help illegal aliens gain such employment, the Department of Homeland Security (DHS) recently introduced the ICE Mutual Agreement between Government and Employers (IMAGE) program. The goal is to assist employers in targeted sectors to develop a more secure and stable workforce and to enhance fraudulent document awareness through education and training." Forcing employers to comply with the steps outlined in the Proposed Rules is directly in contradiction with this recent announcement by ICE.

In conclusion, by allowing employees identified by no-match notifications to merely produce a "new verifiable" SSN without supporting documentation of a legal name change and/or a lawfully issued new number and to continue their employment places employers in an untenable and unworkable situation.  It is this writer's opinion that the rules as written and with the application as stated herein will "unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA" as previously recognized by the Supreme Court in <u>Hoffman</u>. Moreover, it will "encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations" as well as the commission of fraud on innocent third parties.

Thank you for the opportunity to provide written comment to the DHS Proposed Rules.

Sincerely,

//S//

Kristen Paulson Gibbons
_kpgibbons@officenters.com_

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Anita Drummond [Drummond@abc.org] |
| **Sent:** | Monday, August 14, 2006 8:56 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket No. ICEB-2006-0004-ABC Comments |
| **Attachments:** | ABC Cmts to DHS Proposed Rule Aug.14.2006.doc; ConstructionEmployers.Cmt to DHS.Aug.14.2006.doc |

Please find attached the extended comments of Associated Builders and Contractors and a letter from a group of construction employers as an addendum.

Anita Drummond, Esq.
Director of Legal and Regulatory Affairs
Associated Builders and Contractors, Inc.
4250 North Fairfax Drive, 9th Floor
Arlington, VA, 22203
(703) 812-2000
Fax (703) 812-8202
drummond@abc.org

**No-Match Cert. Admin. Record  1663**



August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave. NW, 2nd Floor
Washington, D.C. 20529

        RE: RIN 1653-AA50; ICE 2377-06: Safe-Harbor Procedures for Employers Who
        Receive a No-Match Letter

Dear Sir or Madam:

Associated Builders and Contractors, Inc. (ABC) respectfully submits these comments in
response the proposed rulemaking by the U.S. Citizenship and Immigration Services.

ABC and its members are committed to compliance with all federal, state and local laws,
including those regulated by the U.S. Department of Homeland Security. ABC is a national trade
association representing more than 23,000 construction contractors and related firms in the
United States.

<u>The Construction Industry</u>

The construction industry is a vital part of the American economy. Construction growth
significantly outpaced national gross domestic productivity growth over the last 12 years,
increasing 137 percent while the GDP increased about 88 percent in the same period.[1] Today,
the annual value of construction is worth more than $1.16 trillion, representing more than 9
percent of the national GDP.

---

[1] As of January 2006, construction spending for the prior 12 months was $1,163,427,000,000.
U.S. Census Bureau, Construction Spending  http://www.census.gov/const/C30/total.pdf In
1993, the value was $491,033,000,000. U.S. Census Bureau, Annual Value of Construction Put
in Place http://www.census.gov/const/www/c30index.html The 1993 4th quarter reported GDP
was $6,800,200,000,000. The 2005 4th quarter reported GDP was $12,760,400,000,000. Bureau
of Economic Analysis, U.S. Department of Commerce. Current-dollar and Real Gross Domestic
Product http://www.bea.gov/bea/dn/gdplev.xls

Comments of Associated Builders and Contractors, Inc.
August 14, 2006
Page 2 of 7

Of the nation's 5.6 million employer firms, more than 12 percent are construction firms.[2] Construction continues to outpace other industry sectors in employment growth over the last 12 years in the United States. In 1993, construction firms employed 4,779,000 people. Today, there are 7,227,000 employees in the industry. The growth of 2,498,000 represents a 52.27 percent increase.[3] The construction employment increase far outpaces overall U.S. employment growth in the same period of only 20 percent.[4] In addition, the construction industry included 2,239,310 self-employed individuals in 2003, which is 12 percent of all self-employed individuals.[5]

The Bureau of Labor Statistics reports that another 792,000 new construction jobs will be created between 2004 and 2014. Construction is expected to add 792,000 new jobs between 2004 and 2014.[6] The BLS also estimates that construction and extraction occupations will have a net replacement rate of 19.9 in the same time period where new workers must be brought into the construction occupations.[7]

---

[2] Major Industries by NAICs Codes: Private Employer Firms, Establishments, Employment, and Annual Payroll by Firm Size, 1998-2001, U.S. Small Business Administration based on data provided by U.S. Census Bureau, Statistics of U.S. Businesses. http://www.sba.gov/advo/research/us_tot_mi_n.pdf

[3] Bureau of Labor Statistics, U.S. Department of Labor, Employees on nonfarm payrolls by major industry sector historical. ftp://ftp.bls.gov/pub/suppl/empsit.ceseeb1.txt

[4] According to the Bureau of Labor Statistics, in 1993, employment in the United States was 110,844. In 2005, employment was projected to be 133,463,000. *Ibid.*

[5] U.S. Small Business Administration, Office of Advocacy, from data provided by U.S. Census Bureau, Nonemployer Statistics, Nonemployers Firms and Receipts by Industry, 2002, 2003 ftp://ftp.bls.gov/pub/suppl/empsit.ceseeb1.txt
[6] "Employment by major industry division, 1994, 2004, and projected 2014" U.S. Department of Labor, Bureau of Labor Statistics, Office of Occupational Statistics and Employment Projections. http://www.bls.gov/emp/empmajorindustry.pdf
[7] Occupational Projections and Training Data, 2004-05 Edition, U.S. Department of Labor, Bureau of Labor Statistics. http://www.bls.gov/emp/optd/home.htm Net replacement rate for construction is specifically referenced on page 179. Note that individuals who change jobs but remain in the same occupation –often referred to as turnover – are not included in the count of net replacements (see page 161).http://www.bls.gov/emp/optd/optd005.pdf . Note: This demand is in addition to the stress of turnover where employees are changing jobs but remain in the same occupation. In construction, worker turnover can vary between 6.9 percent and 4.2 percent a month, according to the Bureau of Labor Statistics. Source U.S. Department of Labor's Bureau of Labor Statistics Job Openings and Labor Turnover Survey. Obtain data from 2001 to 2005 by selection "Total separations rate, construction JTS230000000TSR" on http://data.bls.gov/cgi-bin/surveymost?jt

**No-Match Cert. Admin. Record  1665**

Comments of Associated Builders and Contractors, Inc.
August 14, 2006
Page 3 of 7

These growth trends not only demonstrate the tremendous value of the industry to the U.S. economy and American workers but it also indicates that any government regulatory reforms that allow construction to attract, train and retain workers will advance benefits and reduce costs to the United States in its purchase of construction.

The construction industry's health is reliant upon its ability to complete projects on time and within budget. Such demands require long term planning and reliance on a steady, strong workforce. The output of construction is heavily reliant on labor, where it can represent as much as 50 percent of a specialty trade contractor's costs. Critically, in the last three years, the construction industry has seen serious fluctuations in materials costs, including steel, cement, and cooper, and energy prices, affecting the market and the U.S. economy's growth.

The market would be negatively affected further by terminations triggered by the proposed rule because of its impact on work stoppages and subsequently the construction surety bond market. Importantly, the Federal government, other public buyers and increasingly many private construction owners require performance insurance on construction projects.[8] Surety companies are already skeptical about the rising energy cost and price escalations of materials, and they report that workforce shortages are the contractors' number one concern about performance.[9] Over the last decade, surety bond providers have consolidated and reinsurers have left the construction marketplace.[10] These trends combined with the 2005 weather-related claims have continued to keep the availability of insurance limited for performance and payment bonds.[11] Importantly, the largest projects, such as those conducted by the Federal government valued at more than $500 million, are the most likely to face the biggest challenge obtaining required insurance.[12] While the surety industry has recently stabilized, another blow to the construction sector could threaten the portfolio of insurers if contractors are unable to perform due to further workforce shortages. If contractors cannot obtain surety bonds, America's buildings, commercial facilities bridges, roads and other infrastructures cannot be built.

<u>Statutory Authority</u>

The DHS is required under the Regulatory Flexibility Act[13] and Paperwork Reduction Act[14] to conduct an analysis of the proposed rule to substantiate any determination that a waiver from

---

[8] 2006 Surety Market Report (June 5, 2006), S3, S12
www.enr.construction.com/resources/special
[9] Comments of Steve Cory, President, National Association of Surety Bond Producers, 2006 Surety Market Report (June 5, 2006), S8 www.enr.construction.com/resources/special
[10] Grant Thornton LLP's 2005 Surety Credit Survey for Construction Contractors, http://enr.construction.com/resources/special/archives/2005/surety.asp
[11] Comments of Thomas Kunkel, President & CEO, St. Paul Travelers Bon and Terry Lukow, Executive Vice President & CEO St. Paul Travelers Bond, Construction Services 2006 Surety Market Report (June 5, 2006), S11 www.enr.construction.com/resources/special
[12] 2006 Surety Market Report (June 5, 2006), S8, S12.
www.enr.construction.com/resources/special
[13] 5 U.S.C. Sec 601 *et seq.*

**No-Match Cert. Admin. Record  1666**

Comments of Associated Builders and Contractors, Inc.
August 14, 2006
Page 4 of 7

these administrative statutes is appropriate. The substantial and blatant dismissal of these statutes for serious consideration is sufficient to challenge this regulation.[15]

The DHS's claim that the rule would not have a significant impact on a substantial number of small entities is not supported. First, a substantial number of small businesses and other small entities, including nonprofit organizations, are affected by the regulation in that each will now be subjected to it. In the construction industry, most employers are small by the Small Business Administration's definition.[16] Assuredly, other industries significantly affected by this rulemaking, including restaurants, agriculture, and health services, are overwhelmingly small businesses or nonprofits. Importantly, any nonprofit, such as hospitals and nursing homes, is also classified as a small entity under the Regulatory Flexibility Act and will be regulated by the rule.

Second, the rule will have a significant impact in that any firm receiving notice of a no-match notice from either the SSA or the DHS will be automatically subjected to overcoming a presumption of knowledge if it cannot resolve discrepancies in a timeframe, established by this rule, and continues to employ a worker.  The DHS proposal to establish that an employer "knowingly" employs an employee who is an unauthorized alien unless overcoming the presumption with no-match notice is a significant new rule.

The claim that the rule would not mandate any new burdens is countered by the content of the rule, including:

- The creation of a timeframe of 14 days to respond to a notice from the Social Security Administration or the Department of Homeland Security regarding discrepancies in employment documents;

- Creation of a 60-day window to resolve a no-match discrepancy;

- The requirement for a new information collection request for an additional I-9 Form; and

- The presumption of "knowledge" with a no-match notice that creates tremendous burden on employers, including susceptibility to wrongful termination claims or criminal charges from DHS.

Furthermore, the DHS is proposing to regulate in an area that is already regulated by the Social Security Administration, and *it is unclear where the DHS derives authority* to set such a

---

[14] 44 U.S.C. Sec. 3501 *et seq*.
[15] Federal Register, Vol. 71, page 34284 (June 14, 2006)
[16] http://www.sba.gov/size/indexguide.html   General building and heavy construction contractors have a size standard of $31 million in average annual receipts.  Special trade construction contractors have a size standard of $13 million.  The size standard for Land Subdivision is $6.5 million in average annual receipts.  The size standard for Dredging is $18.5 million in average annual receipts.

Comments of Associated Builders and Contractors, Inc.
August 14, 2006
Page 5 of 7

deadline, for all practical purposes, for responding and rectifying discrepancies among SSA documents.

Importantly, this proposed regulation potentially overlaps and conflicts with a host of other laws, and under the Regulatory Flexibility Act, the agency has an obligation to review those conflicts.[17] At a minimum, the agency should refer to the regulation of this area by the Social Security Administration, Internal Revenue Service and the Department of Justice's Office of Special Counsel for Immigration-Related Unfair Employment Practices. For instance, an employer receives the following notice from SSA on a no-match letter: "This letter does not imply that you or your employee intentionally gave the government the wrong information about the employee's name or Social Security number. *Nor does it make any statement about an employee's immigration status* [emphasis added]."

This proposed rule places the employer in the position of terminating an employee if a Federal agency is unable to resolve a discrepancy in a relatively short time. Further, employers' fear of retribution by the DHS under the proposed Part 274a may outweigh the obligations under 274b that prohibits discrimination. Termination can easily subject an employer to wrongful termination suits under Federal and State laws.[18] According to a 2005 report by the General Accountability Office (GAO), the SSA field staff made about 244,000 earnings reinstatements through the item correction process (ICOR) when individual workers pursued corrections in Fiscal Year 2003.[19] However, the DHS has provided no information about the time required to rectify such case-by-case corrections, which is inherently critical information for determining the impact of this rule on small entities. The web of laws regulating employment is wholly omitted by the DHS in the proposed rule and demands a thorough analysis with the coordination of other Federal agencies and, if possible, state workforce authorities. Such analyses would be part of proper compliance with the Regulatory Flexibility Act and Paperwork Reduction Act.

SSA Notices

The SSA has a history of evaluating matches between IRS records and SSA records that is captured and managed in the Earnings Suspense file. The GAO emphasized in a July 2006 briefing for congressional staff concerns that the SSA Earnings Suspense File that generates the data for no-match letters does not contain information about immigration status and contains information about many U.S. citizens.[20] This critical issue implies U.S. citizens and others authorized to work could be caught up in terminations where an agency is unable to resolve document discrepancies in a timely manner.

---

[17] 5 U.S.C. Sec 603(a)(5)
[18] *See e.g., Zamora v. Elite Logistics, Inc.* (No. 04-3205) (10th Cir., 2006)
[19] *Social Security: Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports*, Government Accountability Office, Feb. 2005, GAO-05-154, page 11.
[20] *Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work*, Government Accountability Office, July 11, 2006, GAO-06-814R, page 8.

**No-Match Cert. Admin. Record  1668**

Comments of Associated Builders and Contractors, Inc.
August 14, 2006
Page 6 of 7

The SSA dedicates resources to resolving discrepancies and "reinstating" earnings. Of the 11.7 million individuals who have had their earnings reinstated over the years, 1.2 million were of Mexican birth, and increasingly foreign-born individuals are the subject of these mismatches that are eventually resolved, representing 21 percent in recent years.[21] What does this mean for correcting these document discrepancies? Employees eligible to work could be terminated if a bureaucracy of any type is unable to timely resolve errors in the data. When 2.4 million of the Hispanic or Latino population identify themselves as construction employees,[22] the DHS must be certain that its requirements do not unnecessarily hinder a legitimate worker's ability to remain employed in the industry. While most of construction's workforce is made up of American citizens, construction depends heavily on legal foreign-born workers, and the threat of unjustified terminations under the proposed rule is significant.

In addition to no-match letter, the language would also trigger notices for any employer who voluntarily participates in the SSA's Employee Verification Service or Social Security Number Verification Service.[23] The process of responding to an employer requests for verification on a large number of workers is about 30 days, and of the 53 million verification requests in 2003, 12 percent could not be verified. [24] The extra burden created by the DHS proposed rule will further stifle employers' willingness to rely on Federal agency resources to obtain confirmation of employee data. Although every effort can be made in good faith to obtain confirmation from the SSA, the employer will now be subject to a new requirement for a timely resolution of discrepancies in 60 days or be subject a presumption of "knowingly" employing an unauthorized worker, despite the fact the SSA identified mismatch does not address eligibility to work.

DHS Notices

The proposed rule makes it unclear what type of notices would trigger this rule; however, the track record of DHS notices and ability to resolve discrepancies is rocky and employers may be forced to terminate eligible workers.

Implicitly employers voluntarily using the Basic Pilot may be the first to be caught by the new regulation trap. Problems with the rate of accuracy of DHS worker eligibility data have been

---

[21] *Social Security: Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports*, Government Accountability Office, Feb. 2005, GAO-05-154, page 18.
[22] U.S. Bureau of Labor Statistics, Household Data Annual Averages, Employed persons by occupation, race, Hispanic or Latino ethnicity, and sex (2004 and 2005) http://www.bls.gov/cps/cpsaat10.pdf
[23] Proposed 8 CRF 274a.1(l)(1)(iii)(B) "Written notice from the Social Security Administration that the combination of name and social security account number submitted for the employee does not match Social Security Administration records;" *Federal Register*, Vol. 71, page 34384-85 (June 14, 2006).
[24] *Social Security: Better Coordination among Federal Agencies Could Reduce Unidentified Earnings Reports*, Government Accountability Office, Feb. 2005, GAO-05-154, page 30.

Comments of Associated Builders and Contractors, Inc.
August 14, 2006
Page 7 of 7

documented, including false-negatives which are an overwhelming concern.[25] The DHS has reportedly improved the accuracy of data used to verify employment eligibility for the Basic Pilot but the ability of the USCIS to expand that ability with the demands of more employers is very uncertain.[26]

Of particular concern, the USCIS has a hand full headquarters staff members for administering the employment verification program and investigating "secondary verifications" when employers are unable to obtain confirmation or receive a notice.[27] If employers are receiving notices, as Basic Pilot participants, as part of a new mandate from Congress, or for some other reasons, *how has the DHS demonstrated its ability to timely respond and resolve discrepancies in employees' documents to avoid unjustified terminations?*

DHS indicates in its Talking Points, issued June 9, 2006, "The proposed rule outlines clear steps that employers can take in reaction to receiving 'no-match' letters." However, this blanket claim comes without regard to the overlapping agencies' authority and laws over employers. Further, DHS has not demonstrated its own ability to resolve discrepancies in documents in a timely, accurate manner either by its past performance or by new resources or plans.

Associated Builders and Contractors urges the DHS to forego this rulemaking at this time or to phase it in when resources are adequate at DHS and other Federal agencies. In addition to the comments submitted here, ABC is signatory to the comments submitted on behalf of construction employers on August 14, 2006 and attached here for reference and those submitted on behalf of the U.S. Chamber of Commerce and the undersigned organizations.

Thank you for the opportunity to comment.

Sincerely,

Anita Drummond, Esq.
Director of Legal and Regulatory Affairs

cc:    Office of Information and Regulatory Affairs, Office of Management and Budget
       Office of Advocacy, U.S. Small Business Administration

---

[25] Institute for Survey Research at Temple University (ISR) and Westat, Findings of the Basic Pilot Program Evaluation, June 2002, Washington, D.C. at 81-88,.

[26] *Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts*, General Accountability Office, Aug. 2005, GAO-05-813, page 24-25.

[27] "[USCIS] noted that there are currently 15 USCIS headquarters staff members responsible for administering USCIS verification programs, including the Basic Pilot Program." *Ibid* page 27. "USCIS has approximately 38 Immigration Status Verifiers allocated for completing Basic Pilot secondary verifications. *Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts*, Testimony of General Accountability Office, June 19, 2006, GAO-06-895T, page 13.

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave. NW, 2nd Floor
Washington, D.C. 20529

    RE: RIN 1653-AA50; ICE 2377-06: Safe-Harbor Procedures for Employers Who
    Receive a No-Match Letter

Dear Sir or Madam:

As employers in the construction industry, we are submitting comments to the Department of
Homeland Security (DHS) on a proposed rule for Safe-Harbor Procedures for Employers Who
Receive a No-Match Letter.

The construction industry contributes tremendously to the U.S. economy, representing more than
9 percent of the Gross Domestic Product and more than 12 percent of America's employers.
While the U.S. economy increased jobs over the last 12 years by 20 percent, construction grew
52 percent in the same period. Today, there are 7.2 million employees in the industry.
Construction growth isn't stopping. The Bureau of Labor Statistics reports that another 792,000
new construction jobs will be created between 2004 and 2014. These growth trends not only
demonstrate the tremendous value of the industry to the U.S. economy and American workers
but it also indicates that any government regulatory reforms must consider the practical impact
and the economic cost.

Our memberships include tens of thousands of construction employers that want to comply with
the law but are often uncertain about how to do so. Responding to a no-match letter has caused
particular confusion and concern, as recipient employers must be cognizant not only of
employment eligibility requirements but of antidiscrimination laws, document abuse laws, wage
reporting laws, and more. On top of these many legal mandates are the necessities of running a
business efficiently and of maintaining a sufficient workforce to meet the growing demand for
construction services. With that in mind, we commend DHS for attempting to provide
employers with better guidance on the proper response to a no-match letter and for establishing a
safe-harbor provision. However, we are concerned that the guidance set forth in the proposed
rule is inadequate, unclear, and impractical. The proposed rule would require employers and
employees to invest significant reliance on federal agencies to resolve the conflicts between
documents presented by employees and the records of federal agencies. However, the realities of
obtaining timely, accurate assistance and information to resolve "no match" letters from the
Social Security Administration (SSA) or DHS are a serious challenge.

Practical problems abound with reliance on no-match letters as an indicator of a person's
ineligibility to work. A mismatch can result from a number of reasons unrelated to employment
eligibility, such as typographical errors, transposed numbers, name changes

August 14, 2006
Director, Regulatory Management Division
Page 2 of 2

due to marriage or divorce, and other inadvertent mistakes. As simple as some of these errors are, identifying them and getting them corrected can take much longer than the 14-day and 60-day timeframes provided in the proposed rule. This is particularly true if the employer receives numerous no-match notices that must be handled at once and/or if the employer lacks dedicated administrative staff to handle the matter. More serious problems are inherent in the SSA's current system. The complete identity of individuals is difficult to record. For example, many individuals, such as those of Latino ethnicity, have more than three names. The SSA system is limited to three fields for recording names—not only are employers often using only a portion of an employee's name, but also they may be using a different part than that recorded with the SSA. For the construction industry, this challenge can be particular acute as nearly one-third of the construction workforce identifies themselves as Latino or Hispanic according to the Bureau of Labor Statistics.

However, the inherent difficulties of keeping records updated and accurate by a plethora of agencies is a foundational challenge. Agencies involved include not only the SSA and DHS, but additional agencies integral to accurate records are the Internal Revenue Service and state workforce agencies that report the Social Security numbers of new workers to the SSA. According to a July 11, 2006, Government Accountability Office (GAO) report, each source contains data that are incomplete and outdated. As industry employers, we are seriously concerned about forcing terminations on employees who are legitimate workers but who have been unable to obtain a bureaucratic solution.

Only when an agency is equipped with personnel and resources to correct errors in a timely manner can employers be assured of the continued employment of workers who have some discrepancy among their records. It is critical that these discrepancies be adequately addressed so eligible workers can work and employers are given the proper resources to fully comply with current law.

The construction industry is committed to full compliance with law while continuing to build the strength of the American economy with a viable and legal workforce. We appreciate the opportunity to comment. Questions regarding these comments may be directed to Anita Drummond at (703) 812-2000 or drummond@abc.org.

Sincerely,

Associated Builders and Contractors
Associated General Contractors of America
Mason Contractors Association of America
National Association of Homebuilders
National Association of Minority Contractors
National Roofing Contractors Association
Plumbing-Heating-Cooling Contractors Association

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | Marielena Hincapie [hincapie@nilc.org] |
| **Sent:** | Monday, August 14, 2006 8:11 PM |
| **To:** | Regs, Rfs; Ratana, Arden C; moran@nilc.org |
| **Cc:** | aavendan@aflcio.org; frank.clemente@changetowin.org; esolomon@iwj.org; tsmukler@iwj.org; sarita@jwj.org; mwaslin@nclr.org; newman@ndlon.org; pabloalvarado@ndlon.org; asugimori@nelp.org; emsellem@nelp.org; moran@nilc.org; friedland@nilc-dc.org; lai@nilc.org |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |
| **Attachments:** | DHS Docket No ICEB-2006-0004 Long Comments_FINAL.pdf |

Dear Sir or Madam:

Attached is the Low-Wage Immigrant Worker Coalition's comment to **DHS Docket No. ICEB-2006-0004**.

Sincerely,

Marielena Hincapié

---

Marielena Hincapie, Esq.
Director of Programs
National Immigration Law Center
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA 90010

213-639-3900 x. 112
213-639-3911 (fax)
hincapie@nilc.org   |   www.nilc.org

---

The information contained in this e-mail message may be privileged, confidential, or otherwise legally protected from disclosure. It is also covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 et seq. If you are not the intended recipient of this message, you are informed that any retention, copying, distribution, and/or other use or dissemination of any portion of its contents is prohibited. If you believe you have received this e-mail message in error, please contact the sender immediately at hincapie@nilc.org or 213-639-3900, delete the message from any and all electronic files, and destroy all other copies as well. Thank you.

**No-Match Cert. Admin. Record  1673**

# Low-Wage Immigrant Worker Coalition

<u>**VIA ELECTRONIC MAIL**</u>

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

*Re:*    ***DHS Docket No. ICEB-2006-0004, Comment Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"***

Dear Sir or Madam:

The National Immigration Law Center (NILC) submits the following comment on behalf of the Low-Wage Immigrant Worker (LWIW) Coalition in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE), on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 FR 34281 (June 14, 2006).

The LWIW Coalition is co-convened by NILC, the American Federation of Labor – Congress of Industrial Organizations (AFL-CIO), Change to Win (CtW), Interfaith Worker Justice (IWJ), Jobs with Justice, the National Council of La Raza (NCLR), the National Day Laborer Organizing Network (NDLON), and the National Employment Law Project (NELP).

The LWIW Coalition is our nation's broadest collaborative of advocates and organizers working to improve the living and working conditions of low-income and low-wage immigrant workers. The mission of the LWIW is to support this community of advocates by sharing strategies and resources at the local, state, and national levels.

The signatories to these comments have ample experience in dealing with the adverse impact that Social Security Administration's (SSA's) no-match letters have had on all workers, immigrant and native-born alike. Through our legal assistance programs and organizing campaigns, we have interacted with tens of thousands of low-wage workers and their families on matters related to no-match letters and other Social Security number (SSN) verification matters. We have assisted individual employees in correcting no-match discrepancies and educated both employers and employees on their responsibilities in responding to no-match letters through written materials, trainings, and technical assistance to a broad range of groups in the country.

---

American Federation of Labor – Congress of Industrial Organizations (ALF-CIO) ● Interfaith Worker Justice (IWJ)
● Jobs with Justice (JWJ) ● National Day Labor Organizing Network (NDLON) ● National Council of La Raza
(NCLR) ● National Employment Law Project (NELP) ● National Immigration Law Center (NILC)

The LWIW Coalition has also worked closely with SSA through the years to improve language in no-match letters and to include warnings to employers against discriminatory and retaliatory conduct. Our advocacy includes ongoing monitoring of national origin and citizenship status discrimination cases as well as unfair labor practices arising from SSN verification and no-match matters reported to the U.S. Department of Justice Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC), the Equal Employment Opportunity Commission (EEOC), and the National Labor Relations Board (NLRB). Some of the co-conveners of the LWIW have also been engaged in litigation involving employer misuses of no-match information to interfere with workers' rights to organize and exercise their labor rights. Throughout our work, we have remained steadfast in our commitment to safeguard and advance the rights and best interests of low-wage workers, their families, and their communities.

As a result of this work, the LWIW Coalition is alarmed by and strongly opposed to the implementation of the "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that no-match letters have had on workers' rights and trigger massive, potentially unlawful firings of low-wage workers across the nation. Overly cautious employers will fire listed workers before workers have a chance to show they are on the list mistakenly. But despite the disruption it will cause, the rule does nothing to solve our immigration problems.

DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of workers in an isolated, punitive immigration "enforcement" scheme on the eve of enactment of comprehensive immigration reform intended to make our immigration system work again. In the absence of such reform, the proposed changes would only stir up dust.

The proposed rule is simply the wrong rule at the wrong time. Both the House and Senate have passed immigration bills that contain sweeping new worksite verification and enforcement regimes that impose a new electronic verification system on all employers. Implementing the rule before the conclusion of the immigration debate would add a new, unnecessary, and unhelpful set of major changes for employers to learn and implement on top of the ones that will be added just a short while later when the new legislated changes take effect.

Although the rule causes enormous upheavals in the workplace, the rule will have *no* impact on undocumented migration, which is the purported purpose of this proposal. Our experience with no-match firings and workplace audits is very clear: *the fired workers will not leave the country*. In the absence of comprehensive immigration reform that addresses the root causes of undocumented migration, they will simply find other more marginal jobs, most likely in the unregulated cash economy. Because of this, the proposed rule will result in growth of the underground economy, which in turn will result in substantial losses in state and federal tax revenues as well as unfair competition.

In addition to its enormous impact on workers and on our economy, this proposal should be withdrawn because the rule attempts to transform the SSA no-match program into an immigration enforcement tool when the SSA does not have the capacity to fulfill this objective through its database. Additionally, the rule erodes our privacy rights, raises due process concerns, and radically departs from existing case law and longstanding federal guidance in this

No-Match Cert. Admin. Record  1675

area. It provides no solution to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by workers, taxpayers, and businesses. The LWIW Coalition therefore urges DHS to withdraw this rule in its entirety.

Our concerns are set forth in full below.

### The Proposed Rule Harms All Workers Regardless of Immigration Status

*Hundreds of Thousands—Possibly Millions—of Workers, Including U.S. Citizens and Work-Authorized Noncitizens, Will Face Massive Firings*

As an initial matter, the notion that SSA no-match letters indicate that an individual is not authorized to work in the United States is simply incorrect. SSA no-match letters are *not* reliable indicators of work authorization or immigration status. Instead, these letters simply indicate that there is a discrepancy between a worker's SSN and/or name on file with the SSA based on information reported by employers on Internal Revenue Service (IRS) Form W-2 (Wage and Tax Statement). There are numerous reasons for the discrepancies, *none of which have anything to do with the immigration status or work authorization of workers*. Many of these mismatches are based, instead, on simple human error (such as clerical data entry mistakes and misspellings by the employee, employer, or SSA) or life changes (such as name changes, marriages, and divorces). The proposed rule, however, is based on the faulty premise that SSA no-match letters are foolproof indicators of work authorization. Because this premise is flawed, there are several, disastrous consequences that would flow from implementation of the rule.

This proposed rule will trigger massive firings across the nation. Based on our experience over the years but in particular with SSA's policy in 2002 where the agency sent the no-match letter to almost one million employers, the LWIW Coalition anticipates that the proposed rule will prompt similar panic and confusion among employers. This is likely to result in employers precipitously and indiscriminately firing workers who appear on a no-match list before workers have a chance to show that they are on the list because of the simple human error or life changes described above. As a result, these mass no-match firings may include the terminations of thousands of work-authorized employees who routinely receive SSA no-match letters.

U.S. citizens, lawful permanent residents, and other work-authorized employees were among the estimated 100,000 workers who lost their jobs as a result of the approximately 800,000 no-match letters sent by SSA in 2002.[1] Job losses were most acute in low-wage industries such as agriculture, cleaning, construction, food service, and health care. For example, no-match firings devastated the workforce at Stanford Medical Center in Palo Alto, California, where 83 percent of workers on a no-match list lost their jobs.[2] Based on the severity of the 2002 job losses, the U.S. Chamber of Commerce declared an official labor shortage and urged SSA to change its policy.[3] Under pressure from the Chamber and employers, as well as enormous pressure from

---

[1] Mary Beth Sheridan, "Records Checks Displace Workers: Social Security Letters Cost Immigrants Jobs," *The Washington Post*, Aug. 2, 2002.

[2] "A Crackdown on Workers," *The San Francisco Chronicle*, Aug. 12, 2002.

[3] "*The Immigration Crisis,*" Cox News Service, Aug. 14, 2002.

No-Match Cert. Admin. Record  1676

civil, immigrant, and worker rights advocates across the country, SSA agreed to decrease the number of no-match letters.[4]

No-match firings across the nation continued into 2003, however. In August, Peco Foods, Inc. of Canton, Mississippi terminated about 200 workers in response to no-match letters.[5] That same year, Suncast, Inc., a Chicago-area outdoor garden product manufacturer, terminated over 100 employees in response to no-match letters.[6] By the end of 2003, a national survey conducted by the University of Illinois at Chicago's Center for Urban Economic Development determined that approximately 53.6 percent of employers responding to no-match letters terminated the listed workers.[7] Despite strong warnings to employers that appeared on the face of the letter, the study found that workers were summarily fired, often without any opportunity to correct the no-match discrepancies or any explanation of the no-match process.[8]

Documented examples of adverse employment actions against U.S. citizens and other work-authorized noncitizens include:

- Mr. Samuel Harris. In late summer of 2003, Mr. Samuel Harris,[9] an African American man in Virginia, was fired from his job because his employer received an SSA no-match letter regarding a discrepancy with respect to Mr. Harris's SSN. Mr. Harris, who is a U.S. citizen, went to the local SSA office to correct his information. Apparently, SSA had issued Mr. Harris a duplicate SSN that belonged to a deceased person. Although Mr. Harris was able to correct his information with SSA, his employer refused to continue to employ him, thinking that Mr. Harris was engaging in identity theft or similar wrongdoing. He was fired and out of work for several months and had to file an arbitration case to get his job back.[10]

- Mrs. Noelle Lopez. In July 2002, Mrs. Lopez, a worker from North Carolina, was injured on the job. While she was on leave, her employer notified her that it had received an SSA no-match letter for her. She corrected the discrepancy, which was based on a typographical error in the W-2 that her employer had filed with SSA. Weeks later, while still on leave for her injury, the employer asked Mrs. Lopez to reverify that she continued to be eligible to work in the United States because her work authorization had expired. She had employment authorization based on Temporary Status Program (TPS), and had already applied for a renewal, but the Immigration and Naturalization Service (INS) sent her an Employment

---

[4] Chirag Mehta, et al., *Social Security Administration's No-Match Letter Program: Implications for Immigration Enforcement and Workers' Rights* (Center for Urban Economic Development, University of Illinois at Chicago, Nov. 2003) at 7, available at http://www.uic.edu/cuppa/uicued/npublications/recent/SSAnomatchreport.pdf (hereinafter "Mehta"); *Basic Information Brief: SSA "No-Match" Letters* (NILC, Feb. 2005) (hereinafter "NILC Brief") at 2, available at http://www.nilc.org/immsemplymnt/SSA-NM_Pack/Basic_Info_Brief_No-Match_Ltrs-2-15-05.pdf.

[5] Peggy Matthews, "Plan to Round Up, Deport Illegals Angers Activists," *The Clarion-Ledger*, Aug. 12, 2003.

[6] Stephanie Blozen, "Latinos Start Boycott Against Batavia Firms," *The Chicago Tribune*, Aug. 12, 2003.

[7] Mehta, *supra* note 4, at 13.

[8] *Id.* at 15.

[9] All individual worker names have been changed to protect their identities, but the names of workers and employers drawn from media sources are reproduced here as published.

[10] NILC Brief, *supra* note 4, at 4.

---

Authorization Document (EAD) with someone else's picture. Although she was able to straighten this problem out, when her doctor told her she could go back to work, the employer denied her a job because she had "too many immigration problems."[11]

The proposed rule only exacerbates this risk of unnecessary and unjust firings. Past experience indicates that, rather than navigating a complex series of steps and timetables to a "safe-harbor," panicked and confused employers will simply fire all workers whose names appear on the no-match list. The employer confusion across U.S. worksites is already detectable.

- Mr. James Heggen. Shortly after DHS issued the proposed rule, an employer in Massachusetts refused to hire Mr. Heggen, a lawful permanent resident of the United States, for a permanent clerical position due to a typographical error on his Social Security card. Mr. Heggen's name appears as "Heggen" on his alien registration card or "green card," but on his Social Security card, his name is spelled "Hegen"—with one less "g." Based on this missing "g," the employer denied Mr. Heggen a permanent position, claiming that it had to be *more careful in these times*. Mr. Heggen is Black and was born in the United Kingdom. His parents immigrated to the U.K. from the Caribbean. Together, the family immigrated to the United States when Mr. Heggen was a child. Because he and his parents received their permanent immigration documents decades ago, Mr. Heggen cannot file for a correction of his Social Security card locally, and, therefore, not quickly. Correcting this minor Social Security discrepancy could take several months. Frustrated after being denied this permanent position, Mr. Heggen contacted a local community-based legal services organization for assistance. This organization immediately sent a letter to the employer, setting forth the potential illegality of the employer's actions. Subsequently, the employer hired Mr. Heggen on a temporary basis. The week of August 7, 2006, after additional consultation with the organization, the employer hired Mr. Heggen for the permanent position.[12]

Recent media accounts of the proposed rule reveal that employers are already contemplating massive no-match firings as a response to the new rule. A construction company president told the *Tampa Tribune,* after attending a seminar for employers on the proposed rule, that some of his company's workers "won't be working for us in the future" if the rule is implemented and that he had great concern about "filling those spots."[13] *The Ledger* of Lakeland, Florida, reported that while the proposed rule may lead to penalties for employers, "workers, in turn, would lose their jobs," an effect which for Florida's largest growers' organization amounts to a "threat to national security."[14] An employment attorney representing several large employers reported to the *Washington Post* that, "From a practical standpoint, [the proposed rule] will have the effect [of employers] having to terminate employees. It will be devastating to many

---

[11] *Id.*

[12] Telephone interviews with Ingrid Nava, Employment Unit, Greater Boston Legal Services, Boston, Mass., July 28, 2006, and Aug. 10, 2006.

[13] Lindsay Peterson, "Proposal Targets Illegal Immigration," *The Tampa Tribune,* June 15, 2006.

[14] Kevin Bouffard, "Proposal May Pinch Growers," *The [Lakeland, FL] Ledger,* July 11, 2006, available at http://www.theledger.com/apps/pbcs.dll/article?AID=/20060711/NEWS/607110399/1004.

No-Match Cert. Admin. Record 1678

industries if people comply with it."[15] The proposed rule thus has placed the livelihoods of hundreds of thousands—possibly millions—of workers and their families on the line.

*The Proposed Rule Will Result in Increased Citizenship Status, National Origin, and Racial Discrimination*

The proposed rule creates two sets of potential employment discrimination: discriminatory firings and discriminatory refusal to hire. A disproportionate number of names on no-match lists are "foreign-sounding" names of newcomers to the United States, and many SSA letters are sent to employers with large numbers of newcomers in their workforces. Employers who believe they will face business disruption due to the letters have an incentive to prefer employees they think are less likely to receive the letters. Employers may also choose to simply dismiss employees who appear or sound foreign. These discriminatory employment actions would run afoul of federal and state antidiscrimination laws and other worker protections and lead to costly and protracted wrongful termination litigation.

Employment discrimination against authorized noncitizen workers—particularly against Latinos, Latinas, and Asians—was rampant after the passage of the 1986 Immigration Reform and Control Act (IRCA). A 1990 U.S. General Accounting Office (GAO) study reported a pattern of discrimination that resulted solely from employer sanctions, including discrimination on the basis of foreign accents or appearance and preferences of certain authorized workers over others. In fact, the GAO estimated that an average of 19 percent of employers—almost one in five—participated in one or more discriminatory practices as a result of the 1986 law. These results were confirmed by nearly a dozen studies conducted locally during the 1990s by human rights commissions and other organizations, which also found significant discrimination resulting from the implementation of employer sanctions.[16]

Employment discrimination has also increased since SSA began sending close to a million no-match letters in 2002. The number of immigration-related unfair employment referrals and investigations fielded by OSC has risen dramatically. From 1994 to 2000, OSC conducted only 20 investigations into firings stemming from employers that fired workers based on SSN verification matters. From 2001 to 2003, OSC opened 29 investigations. Three of the investigations opened after 2001 resulted in settlements favorable to workers, and ten investigations were open as of 2003.[17] Although recent statistics are unavailable, OSC recognized in its April 2005 quarterly newsletter that OSC "staff members frequently provide assistance to workers" who face adverse employment actions by employers based on the no-match letters.[18]

---

[15] Cindy Skrycki, "DHS Wants Workers, Papers to Match," *The Washington Post*, July 11, 2006 (quoting Monte B. Lake, an employment and immigration attorney).

[16] *Immigration Reform: Employer Sanctions and the Question of Discrimination*, GGD-90-62 (GAO, Mar. 29, 1990), available at http://archive.gao.gov/d24t8/140974.pdf.

[17] Mehta, *supra* note 4, at 25.

[18] *OSC Update* (OSC, U.S. Department of Justice, Civil Rights Division, Apr. 2004) at 2.

No-Match Cert. Admin. Record  1679

*The Proposed Rule Will Result in Increased Employer Retaliation Against Workers Who Exercise Their Workplace Rights*

The proposed rule also places all workers at a higher risk of employer retaliation for labor organizing and raising complaints about worksite conditions. Unscrupulous employers already use the SSA no-match letter to stymie organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- <u>North Carolina</u>. In July 2006, during a heated legal battle over recent union election results, at least 24 Latino immigrant workers at a modular building construction company were suspended without pay because they were listed on a no-match letter. All 24 had voted to unionize. Many of the 24 have also initiated race and sex-based discrimination charges against their employer with the EEOC. A former supervisor at the company reported to the press: "These workers have been used and abused. As supervisors, we were told we needed production and to crack the whip to get it. We were told not to worry because these workers are just wetbacks and have no legal rights." A large group of African American workers have also filed complaints against this company with the EEOC. To protest the no-match firings, workers walked out on the day the firings took place. The workers and their union are also contemplating race and sex-based discrimination class action lawsuits.[19]

- <u>California</u>. In 2006, after months of intensive organizing, a group of nursing home workers, mainly immigrant Latina workers, marched to their manager's office to announce that they had joined together as a union in order to improve wages and working conditions and would seek formal recognition for their union under federal labor law. That afternoon, a head manager called one of leaders of the march into the office, pulled out a photocopy of that worker's Social Security card, wrote "NO GOOD" in bold letters across the photocopy, and suspended the leader without pay. Angered by management's action, the workers from the morning march crowded back into the manager's office and demanded reinstatement for their suspended colleague, denouncing management's action as a blatant anti-union tactic. Caught off guard, the manager immediately reinstated the suspended union leader. While these workers were successful, other workers have not been able to mobilize as effectively against manipulation of SSN verification issues by employers.[20]

- <u>Oregon</u>. In 2006, a Latina immigrant worker had been working as a housekeeper at an assisted living center. When it came time for her to qualify for health insurance and other benefits, the employer produced an SSA no-match letter. The worker suspects that the

---

[19] Telephone interview with Homer Marmalejo, United Brotherhood of Carpenters and Joiners of America, organizer, Aug. 8, 2006; *see also* Bob Shiles, "Roger Carter Suspends More Than 20 Undocumented Workers," *Kinston [NC] Free Press,* July 19, 2006.

[20] Interview with Guadalupe Palma, Service Employees International Union, Long Term Care Division, Coordinator III, in Los Angeles, CA, Aug. 1, 2006.

No-Match Cert. Admin. Record  1680

employer had received the letter earlier, but held it just before the benefits would have kicked in.[21]

- Oregon. In 2003, an employer in Oregon approached a group of workers who had complained about violations of their minimum wage and overtime rights, alleging that it had just received an SSA no-match list. The employer was requiring the workers to reverify their immigration status, and would not provide a copy of the letter to workers. Interestingly, this was *before* SSA began sending no-match letters to employers in March 2003.[22]

- New York. In 2002, a group of immigrant workers in New York went on strike to protest against poor working conditions. After receiving a no-match letter that the employer had initially ignored, the employer decided to use the no-match letter as a basis to reverify the immigration status of workers involved in the strike.[23]

If immigrant workers cannot enforce labor laws or organize under existing labor laws, it is less likely that native workers can assert these rights. The proposed rule thus poses enormous challenges for all low-wage workers. All workers face an increased risk of firings, retaliation, and abuse. U.S. citizens and authorized noncitizen workers could lose their jobs in discriminatory firings. Hundreds of thousands—possibly millions—of working families could be harmed, and therefore DHS should suspend this proposed rule immediately.

**Although the Proposed Rule Will Cause Enormous Upheavals in the Workplace, the Rule Has *No* Impact on Undocumented Immigration and Will Only Expand the Unregulated Underground Cash Economy**

Our experience with SSA no-match firings and workplace audits in the context of our current broken immigration system is clear: *the fired workers will not leave the country*. They will simply find other more marginal jobs, most likely outside of the traditional economy and "off the books" in the unregulated underground cash economy. Moreover, although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new obligations will increase pressure on "good" employers to take employees off the books, which also leads to growth of the underground economy. Expansion of the underground economy results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers. This result is nearly inevitable for any "crackdown" on workers and employers that is not accompanied by serious and practical reforms of the underlying immigration system.

*No-Match Firings Will Not Decrease the Number of Undocumented Workers in the United States*

Based on our recent experience under the current broken immigration system, high levels of SSA no-match firings will *not* drive undocumented workers and their families away from the United

---

[21] Brent Hunsberger, "Crackdown Coming on Bogus Papers," *The Oregonian*, June 25, 2006.

[22] NILC Brief, *supra* note 4, at 5.

[23] *Id.* at 4.

No-Match Cert. Admin. Record 1681

States. Instead, these workers immediately accept the next available low-wage job, even if it is off the books, out of sheer economic necessity, given the levels of poverty at which they and their families and communities must survive.[24] When poverty is combined with an employer demand for below-market wage rates and an absence of government enforcement of labor protections in low-wage industries, undocumented workers will almost certainly remain in the United States even after a no-match firing. The vast majority will reenter the labor force in unreported, cash-based employment relationships where they face further exploitation and abuse. Economists describe this effect as "churning" or unproductive turnover.[25] The SSA no-match program has been criticized for creating "policy-induced churning in local labor markets as workers are either fired or quit their jobs only to join the overcrowded pool of workers vying for positions in traditional immigrant occupations."[26] Fired workers do *not* simply leave the United States.

Undocumented workers constitute a large and growing segment of the workforce in the nation as a whole. The share of these workers in industries such as agriculture, cleaning, construction, food service, and other low-wage occupations is approximately three times the share of native workers in these types of jobs.[27] On any given day in our nation, more than 250,000 undocumented immigrants work as janitors, 350,000 work as housekeepers and maids, and 300,000 are groundskeepers.[28] In the aggregate, such workers are an integral part of the U.S. economy, constituting a full 5 percent of the civilian labor force or 7.2 million workers.[29]

Unscrupulous employers have long taken advantage of the availability and reduced cost of undocumented immigrant labor in both the traditional economy and in the underground economy. Undocumented workers are more likely to earn below minimum wage (two-thirds of undocumented workers earn below minimum wage compared to one-third of all workers).[30] IRCA's failed employer sanctions regime, along with the lack of government enforcement of labor protections in low-wage industries, has given free rein to unscrupulous employers. Such

---

[24] It has been estimated that nearly half of all immigrant workers are low-income, defined as earning less than 200 percent of the minimum wage. Randy Capps, et al., *A Profile of the Low-Wage Immigrant Workforce* (The Urban Institute, Nov. 2003) at 2, available at http://www.urban.org/UploadedPDF/310880_lowwage_immig_wkfc.pdf. Fifty-six percent of all young children of immigrants live in poverty; sixty-four percent of foreign-born children of immigrants live in low-income families. In immigrant families where both parents work, 24 percent of children live in poverty compared to 11 percent of the children of native workers. Randy Capps, et. al, *Health and Well-Being of Young Children of Immigrants* (The Urban Institute, Feb. 2005) at 2, available at http://www.urban.org/UploadedPDF/311182_immigrant_families_5.pdf.

[25] *See* Avner Ahituv and Robert I. Lerman, *Job Turnover, Wage Rates, and Marital Stability: How Are They Related?* (The Urban Institute, Nov. 2004) at 5, available at http://www.urban.org/publications/411148.html (distinguishing "churning" and unproductive turnover from worker mobility).

[26] Mehta, *supra* note 4, at 18.

[27] Jeffrey S. Passel, *Unauthorized Migrants: Numbers and Characteristics: Basic Briefing Prepared for Task Force on Immigration and America's Future* (Pew Hispanic Center, June 2005) at 26–28, available at http://pewhispanic.org/reports/report.php?ReportID=46.

[28] Jeffrey S. Passel, *Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Pew Hispanic Center, Mar. 2006) at 11–12 (hereinafter "Passel"), available at http://pewhispanic.org/files/reports/61.pdf.

[29] *Id.* at 9.

[30] Jeffrey S. Passel, et al., *Undocumented Immigrants: Facts and Figures* (The Urban Institute, Jan. 2004) at 2, available at http://www.urban.org/url.cfm?ID=1000587.

employers routinely manipulate immigration law into a tool that sharpens wage differentials between undocumented and documented low-wage workers and suppresses wages for all. Even legitimate employers have admitted to the temptation to engage in similar practices or risk going out of business.[31] In recent years, Department of Justice (DOJ) and DHS officials have finally begun to recognize these wage differentials and the harm caused by an economic system that produces lower wages based on differences in immigration status.[32]

Increasingly, there is evidence demonstrating that raising the wages and working conditions of low-wage workers will actually reduce undocumented immigration by making the existing workforce relatively more attractive to employers.[33] Closing the wage differentials between differently work-authorized individuals and ensuring that all low-wage workers—current and future, documented and undocumented—have similar levels of mobility and enjoy full labor protections are the more effective ways to prevent undocumented immigration to the United States and to hold exploitative corporations accountable. A structural demand for undocumented labor can be reduced only by building a strong floor underneath all workers.

Poorly-conceived, punitive enforcement-only schemes like the proposed rule will force millions into the underground economy. The proposed rule will not decrease the numbers of undocumented workers in the United States, nor will it decrease their levels of employment. It will only decrease wage levels and deepen wage differentials based on immigration status, creating even more economic incentive for employers to hire undocumented workers. Accordingly, DHS should suspend this proposed rule and work with Congress and the Administration to pass comprehensive immigration reform that will address the underlying issue of undocumented migration.

*The Imposition of New Legal Obligations on Millions of Employers Will Push Them into the Underground Economy*

Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new and onerous set of legal obligations on millions of employers. The rule essentially deputizes employers as *de facto* immigration enforcement officers.

The proposed example of what constitutes "constructive knowledge," at Section 274a.1(l)(1)(iii)(B) of the proposed rule, is not the employer's *receipt* of a no-match letter, but

---

[31] K. M. Donato, et al., "Stemming the Tide? Assessing the Deterrent Effects of the Immigration Reform and Control Act," *Demography* 29 (2005) at 139–58.

[32] In the prosecution of Tyson Foods for the hiring of undocumented workers, assistant U.S. Attorney John P. MacCoon stated: "This trial is about corporate greed. . . . It's about what happens when a corrupt corporate culture makes the bottom line the all-consuming priority." Sherri Day, "Prosecutors in Smuggling Case against Tyson Contend Trial Is about Corporate Greed," *The New York Times*, Feb. 6, 2003. In the Tyson Foods case, the government hinged its $140 million pre-indictment settlement demand against defendant Tyson Foods on a novel "wage suppression" theory. The government claimed that Tyson Foods had reaped enormous profits by recruiting undocumented workers into its ranks and paying them at below-market wage rates. In his authorization of trial for the case, DHS Secretary Chertoff fully endorsed the DOJ's attempts to recover "suppressed wages." Thomas Green, et al., "Deputizing—and Then Prosecuting—America's Businesses in the Fight against Illegal Immigration," *Amer. Crim. L. R.,* June 22, 2006, at 5, 7.

[33] Ivan Light, "How L.A. Kept Out a Million Migrants," *The Los Angeles Times,* Apr. 16, 2006.

---

the employer's *failure to act* after receiving a no-match letter. By defining the "failure to take reasonable steps" upon receipt of a no-match letter as creating constructive knowledge, the proposed regulation makes it necessary for a law-abiding employer to take some action in response to a no-match letter. Therefore, as set forth in Sections 274a.1(l)(2)(i) and 274a.1(1)(2)(iii) of the proposed rule, an employer who receives a no-match letter is essentially forced to apply due diligence to a series of complicated steps that demonstrate correction of each "no-match" discrepancy. If the employer fails to resolve the correction in the allotted time, the employer faces a finding that it had constructive knowledge of hiring an undocumented worker. This finding could be used against the employer in a federal prosecution that could result in civil and criminal penalties. This is a radical change from the longstanding position that the various federal agencies implicated in this SSA no-match issue have taken.

Employers who wish to avoid loss of profits and productivity while minimizing exposure to the heightened risk of federal immigration liability under the proposed rule will be forced into one of three no-match evasion strategies:

First, employers will take their businesses off the books and into the underground economy. For one thing, keeping workers off the books means avoiding government scrutiny and additional no-match letters. For another, there are immediate financial incentives for employers to keep workers off the books. The proposed rule thus has a perverse effect of targeting and punishing "good" employers who keep good records and want to stay on the books. These good employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records and who consequently will not be reached by the new rule.

Second, employers will intentionally misclassify their employees as "independent contractors" as a means of evading this responsibility.

Finally, employers will engage in subcontracting schemes by interposing intermediary labor contractors between themselves and their employees, pretending their workers are employees of these sham contractors and exposing workers to marginal, fly-by-night employment practices by middlemen.

*Growth of the Underground Economy Results in Massive Losses to State and Federal Coffers and Unfair Competition*

A policy that results in more employers choosing to keep their employees off the books or intentionally misclassifying employees is harmful to state and federal government coffers and creates unfair competition against "good" employers. Certain employers will see a clear and immediate economic advantage to taking their employees off the books. At a minimum, they will reduce their payroll costs by an average of 8 percent by ceasing to pay costs for federal legally required benefits, including Social Security, Medicare, unemployment insurance and workers' compensation.[34] For employers who, as a policy or due to a collective bargaining agreement, provide other benefits, such as life, health or disability insurance, paid leave, or retirement and savings benefits, the potential total savings could add up to an average of 29.9

---

[34] *Employer Costs for Employee Compensation* (U.S. Department of Labor Bureau of Labor Statistics, Mar. 2006), available at http://www.bls.gov/news.release/ecec.nr0.htm.

No-Match Cert. Admin. Record  1684

percent of total payroll costs.[35]  This means massive losses to state and federal coffers and a competitive advantage over employers who are not cutting these costs.

The projected loss in federal tax revenues ranges from $19 million to $1.9 billion annually.  This range is derived from the following figures:  In June 2006, the total U.S. labor force was estimated at 144.4 million workers.[36]  As set forth above, about 7.2 million undocumented workers were employed in March 2006, accounting for a full 5 percent of the civilian labor force.[37]  International accounting and consulting firm Price Waterhouse Coopers has projected that over 5 million U.S. workers would be misclassified as independent contractors (to avoid paying legally required benefits) in 2005 and that the federal tax revenue losses due to misclassification in 2004 would be $4.7 billion.[38]

Based on this projection and these worker population estimates, if only one-third of all undocumented workers or at least two million workers, or 1.4 percent of all U.S. workers, were to be pushed off the books as a result of the proposed regulation, the loss to federal coffers would be approximately $1.9 billion in one year.  Alternatively, making a conservative assumption that 100,000 workers are pushed off the books as a result of the proposed regulation, the loss to federal coffers would be approximately $19 million annually.

The losses to the Unemployment Insurance (UI) trust fund alone ranges from $277 million to $13.8 million per year.  This range is derived from the following figures:  A study for the U.S. Department of Labor estimating the impact of employee misclassification on the UI trust fund alone was computed for the period from 1990–1998.[39]  Assuming a 1 percent level of misclassification, the study determined that the loss would be an annual average of $198 million to the UI trust fund alone.

Based on this study for the DOL, assuming that at least 2 million workers were to be pushed off the books as a result of the proposed regulation, the impact on the UI trust fund alone would be an average of over $277 million annually.  Alternatively, assuming that only 100,000 workers, or .07 percent of the workforce, are pushed off the books (the estimated number that lost their jobs due to no-match letters in 2002), the impact on the UI trust fund alone would be $13.8 million per year.

Employers who go off the books will experience an enormous net savings in taxes, which will create a competitive advantage for them over employers whose payroll-related expenses are

---

[35] *Id.*

[36] *Employment Situation Summary* (U.S. Department of Labor Bureau of Labor Statistics, July 2006), available at http://www.bls.gov/news.release/empsit.nr0.htm.

[37] Passel, *supra* note 28, at 11–12.

[38] *Projection of the Loss in Federal Tax Revenues Due to Misclassification of Workers* (Coopers and Lybrand, now Price Waterhouse Coopers, for Coalition for Fair Worker Classification, June 1994) at 5, available at http://www.carpenters.org/misclassification/State and Other Research Studies/Coopers-Lybrand--Projection of Loss of Federal Rev Due to Missclassification.pdf.

[39] *Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs* (Planmatics, Inc. for U.S. Department of Labor Employment and Training Administration, Feb. 2000) at 87, available at http://wdr.doleta.gov/owsdrr/00-5/00-5.pdf.

No-Match Cert. Admin. Record  1685

higher because they are playing by the rules. A report prepared for the U.S. Department of Labor observed: "[C]ost considerations and aggressive competition are twin pressures that induce an employer to engage in behavior that creates an inequitable playing field in the business community for employers who correctly classify their employees and pay taxes."[40]

The State of California even developed a joint-agency strike force to address abuses created in the underground economy. This strike force has observed the impact of this employer behavior on "good" employers: "[W]hen businesses operate in the underground economy, they gain an unfair competitive advantage over businesses that comply with various business laws. This causes unfair competition in the marketplace and forces law-abiding businesses to pay higher taxes and expenses."[41] When the desire to avoid government scrutiny is combined with the immediate economic savings from avoiding payment of taxes and employer-provided benefits, some employers will see a clear competitive advantage in taking their workforce underground. The implementation of this proposed rule thus disadvantages those employers who play by the rules.

**DHS Should Suspend The Proposed Rule Because the SSA No-Match Program Is Ill-Suited As an Immigration Enforcement Tool**

*The SSA No-Match Program Cannot Meet the Needs and Objectives of Immigration Enforcement Because the SSA Database Is Not an Immigration Database*

Each year employers send IRS Forms W-2 to SSA indicating their employees' annual earnings. SSA matches each worker's name and SSN to the Numerical Identification File (NUMIDENT), which is SSA's primary database of SSN holders.[42]

NUMIDENT is *not* an immigration database and is made up of information collected from applications for initial or replacement SSNs.[43] The database contains only limited and incomplete immigration information.[44]

---

[40] *Id.*

[41] *2003 Annual Report: California Joint Enforcement Strike Force on the Underground Economy* (Employment Development Department, State of California, June 30, 2004) at 3, available at http://www.edd.ca.gov/taxrep/txueo03.pdf; see *also* Francois Carerre, et al., *The Social and Economic Costs of Employee Misclassification in Construction* (Construction Policy Research Center at Harvard Law School and Harvard School of Public Health, Dec. 2004), at 7 (noting that "[m]isclassification creates challenges for compliant employers because it creates an uneven 'playing field.' Employers who respect the law and classify employees appropriately have a higher wage bill and can get underbid by contractors that do not comply and have lower costs.").

[42] *Report to Congress on the Basic Pilot Program* (U.S. Citizenship and Immigration Services, June 2004) (hereinafter "USCIS Report") at 2.

[43] Kevin Jernigan, "Eligible to Work? Experiments in Verifying Work Authorization," *Migration Policy Institute Insight,* Nov. 2005 (hereinafter "Jernigan") at 3.

[44] The database "contains information on name, date of birth, and citizenship status of persons issued Social Security cards, which enables SSA to confirm work authorization for U.S. citizens and some noncitizens who are permanently work authorized." USCIS Report, *supra* note 42, at 2. SSA collects immigration status information only on those persons who are work-authorized incident to status, such as lawful permanent residents, asylees, and refugees. *Id.* at 4.

---

**No-Match Cert. Admin. Record  1686**

Even the limited immigration status information in NUMIDENT regularly becomes inaccurate because it is *not* automatically updated when a worker's immigration status or work authorization changes.[45] NUMIDENT is particularly inaccurate with respect to work-authorized noncitizens in its use with the Basic Pilot Program. According to U.S. Citizenship and Immigration Services (USCIS), work authorization for more than 50 percent of the cases of noncitizens could not be electronically confirmed by NUMIDENT, compared with 0.2 percent for native-born citizens.[46]

If there is a match of the SSN and the first seven letters of the surname between NUMIDENT and the W-2, the earnings are posted to the individual worker's Master Earnings Record. About 10 percent of submissions *cannot* be matched. SSA then does more than 20 "front-end validation routines," which are automated processes that manipulate names and SSNs to correct mistakes and find a correct match.[47] These "front-end validations" do *not* involve collection or use of immigration data.

If a valid record cannot be identified, SSA posts the earnings to its Earnings Suspense File (ESF). The ESF contains earnings reports with names and SSNs that do not match SSA records. SSA then performs "back-end" processes to try to match the earnings. SSA's "back-end" processes do not involve collection or use of immigration data.

The SSA back-end processes include using corrections generated through IRS processes. The back-end processes also include generating SSA no-match letters to employees and employers.[48] No-match letters are just one of the "back-end" processes that SSA regularly uses to ensure that earnings are properly attributed to workers. These letters are sent by SSA to inform employers and employees that the worker is not getting proper credit for their earnings due to a discrepancy.

*Immigration Status or Lack of Immigration Status Cannot Be Presumed from Posting to the ESF*

The ESF contains hundreds of millions of records, and a "significant number of earnings reports in the ESF still belong to U.S. citizens and work-authorized noncitizens."[49] The percentage of ESF records belonging to unauthorized workers is entirely unknown. The majority of reinstatements (matching to a worker's Master Earnings Record) are still made to U.S.-born citizens.[50] ESF records do not in any way indicate immigration status. The information in ESF

---

[44] The SSN application form itself focuses on noncitizens' work authorization rather than immigration status. *See* Form SS-5 (May 2005), available at http://www.ssa.gov/online/ss-5.pdf.

[45] Jernigan, *supra* note 43, at 12.

[46] USCIS Report, *supra* note 42, at 4–5.

[47] *Social Security, Better Coordination Among Federal Agencies Could Reduce Unidentified Earnings Reports*, GAO-05-154 (GAO, Feb. 2005) (hereinafter "GAO Feb. 2005") at 7–8.

[48] *Id.*

[49] *Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work*, GAO-06-814R (GAO, July 11, 2006) (hereinafter "GAO July 2006") at 8.

[50] *Id.; see also* GAO Feb. 2005, *supra* note 47, at 18.

No-Match Cert. Admin. Record  1687

consists of the worker's name, SSN, employer's identification number, and the earnings amount.[51]

The ESF simply consists of information on workers whose records do not match SSA records, for reasons that include errors or obsolete data, lack of an SSN, missing first or last names, or use of nonalphabetic characters.[52]  The lack of an SSN is a particularly instructive example of an innocent basis for inclusion in the ESF that is frequently and wrongly cited as a basis for determining lack of work authorization.  Both the SSA and the IRS advise employers to use all zeros or to write in *"applied for"* when the worker has applied for but not yet received an SSN.[53]

SSA no-match letters are therefore *not* reliable indicators of work authorization or immigration status.  There is no way to accurately determine whether a SSA no-match letter is the result of typographical error, out-of-date information, or some other legitimate reason, let alone to determine an illegitimate reason.[54]  The SSA itself has repeatedly recognized that its no-match letter does not indicate immigration status or lack of authorization to work.  The current no-match letter explicitly states that a worker's identification in the letter "makes no statement" about his or her immigration status.[55]  The SSA database simply does not have the capacity to meet the needs and objectives of an immigration enforcement program.  Because of these limitations, this proposal will only result in an adverse impact on workers and our economy, including the increased discrimination and abuse of workers described above.  DHS should therefore suspend this rule.

## The Rule Modification Would Give DHS Indirect Access to Tax Information It Cannot Access Directly

DHS should also suspend this proposed rule because it attempts to indirectly access sensitive tax information that is protected by federal law.  Specifically, Section 6103 of the Internal Revenue Code protects the confidentiality of taxpayer returns and taxpayer information and provides only limited exceptions to the sharing of personal identifying data.  This confidentiality is deemed essential to voluntary tax compliance.  The GAO has explicitly recognized that the ESF includes "sensitive taxpayer information that is protected by various laws and regulations" and that statutory authority would be required to provide DHS access.[56]

---

[51] GAO July 2006, *supra* note 49, at 8.

[52] *Id.; see also* GAO Feb. 2005, *supra* note 47, at 11–12.

[53] GAO Feb. 2005, *supra* note 47, at 11, n. 4.

[54] In testimony last month before the House Committee on Ways and Means, the Commissioner of Social Security emphasized that the source of SSA's database information is the Form W-2, and "there is no citizenship or immigration status information on that document." *See* Statement of The Honorable Jo Anne B. Barnhart, Commissioner, Social Security Administration, *Testimony Before the House Committee on Ways and Means* (July 26, 2006), available at http://waysandmeans.house.gov/hearings.asp?formmode=view&id=5172.

[55] Letter, Hurt, Assoc. Comm. for Central Op. SSA (Oct. 9, 2004) (hereinafter "Hurt Letter").

[56] GAO July 2006, *supra* note 49, at 8.

No-Match Cert. Admin. Record  1688

No statutory authority currently exists to provide DHS with access to this information.[57]  As a result, DHS cannot presently obtain no-match information directly from SSA.

SSA no-match letters to employers frequently include taxpayer identity and return information.  This rule allows DHS to commandeer the information contained in no-match letters and therefore allows DHS to circumvent the tax code's confidentiality restrictions.  DHS should not be permitted to do by rule change what it cannot do without additional statutory authority.

Breaching the confidentiality of tax records would have the counterproductive result of discouraging tax compliance.  Moreover, it would encourage employers and workers alike to enter the underground economy and not pay into our tax and Social Security systems.

**The Proposed Rule Dramatically Alters the Definition of "Constructive Knowledge" and Makes a Stark Departure from Existing Case Law and Longstanding Federal Guidance on No-Match Letters**

As an evidentiary matter, an employer's receipt of an SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law.  The proposed rule alters the definition of constructive knowledge of immigration and makes a stark departure from existing case law and longstanding federal guidance in this area.

In the seminal *Collins Food Intn'l v. I.N.S* case, the Ninth Circuit cautioned against the expansion of the doctrine of constructive knowledge: "IRCA . . . is delicately balanced to serve the goal of preventing unauthorized alien employment while avoiding discrimination against citizens and authorized aliens.  The doctrine of constructive knowledge has great potential to upset that balance, and it should not be expansively applied."  948 F.2d 549, 554-555 (9th Cir. 1991).

Accordingly, the court instructed that "[a] finding of constructive knowledge requires "willful blindness" and "to expand the concept of constructive knowledge . . . would not serve the intent of Congress, and is certainly not required by [IRCA]." *Id.* at 555.

Contrary to DHS's assertions in the supplemental text, the proposed regulation would extend the definition of "constructive knowledge" well beyond the holdings in *Collins* and in *Mester Manufacturing Co. v. INS*, 879 F.2d 561 (9th Cir. 1989), and other constructive knowledge cases arising under the employer sanctions provision of the Immigration and Nationality Act, 8 U.S.C. § 1324a.

Indeed, the supplemental text misrepresents *Mester* by stating that the employer in that case merely received some evidence that the employee was not authorized to work.  This is simply incorrect, and significantly downplays the type of information received by the employer, and relied upon by the court in its decision.  In *Mester*, the court held that an employer had constructive knowledge of a worker's unlawful status when it received information directly *from*

---

[57] In contrast, such authority exists with respect to the Nonwork Alien File, which includes information about workers who are working though they have been issued nonwork SSNs.

*the INS* that an employee was an "illegal alien" but did not terminate the employee for two weeks. *Id.* at 567–68.

Consistent with *Mester*, cases have found constructive knowledge only where the employer has been provided specific information from a source knowledgeable about a worker's immigration status, where the employer failed to complete the Form I-9 (coupled with other suspicious circumstances), or in egregious circumstances. *See U.S. v. Jonel, Inc.* 1998 WL 804705 (OCAHO), *14 (Labor Department notice to employer that workers were unauthorized constituted constructive knowledge); *New El Ray Sausage Co. v. I.N.S.,* 925 F.2d 1153, 1157 (9th Cir. 1991) (INS gave employer "specific and detailed information" that it was employing undocumented workers); *U.S. v. American McNair,* 1 OCAHO 285 (1991) (employee failure to present any work authorization documents and notification of employer that he was ineligible for amnesty constituted constructive knowledge); *U.S. v. Fragale,* 1999 U.S. Dist. LEXIS 12616 (E.D. Pa. 1999) (constructive knowledge when human resources manager and foreperson in charge of hiring told employer that a large percentage of workforce was undocumented, and employer had received notice from INS that some workers were undocumented).

Moreover, in its attempt to convert the SSA no-match letter into a method of verifying immigration status or authorization to work, the proposed rule directly contravenes longstanding federal guidance from SSA, OSC, and former INS General Counsel.

SSA's position on no-match letters and immigration enforcement is set forth in clear terms on the face of the letter itself. The letter provides the following warning to employers:

> IMPORTANT: This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number. Nor does it make a statement about an employee's immigration status.[58]

For years, INS General Counsel has instructed employers along identical lines:

> If the document or documents presented to verify work authorization appear on their face to be genuine and to reasonably relate to the individual, the subsequent receipt of the SSA letter mentioned above does *not* impose any affirmative duty upon the employer to investigate further into an employee's eligibility to work in the United States. In addition, the receipt of this SSA letter by the employer, *without more*, would *not* be sufficient to establish constructive knowledge on the part of the employer regarding the employment eligibility of the named employee.[59]

---

[58] Hurt Letter, *supra* note 55.

[59] Letter, Virtue, Acting Gen. Coun. INS, HQ 274A (Feb. 17, 1994) (emphasis added); for reference, the LWIW Coalition has attached this letter as Exhibit 1 to this comment.

OSC has also provided similar guidance:

> The receipt of a no-match letter, standing alone, does not indicate to an employer
> that he or she need question the genuineness of documents or information
> previously presented to complete an INS Form I-9.[60]

This proposed regulation thus turns established federal guidance on no-match letters on its head.
At the very least, the proposal will result in conflicting guidance from multiple federal agencies
and cause employer and employee confusion.

**The Costs of Implementing the Proposed Rule are Prohibitive**

If the proposed rule is to be carried out as envisioned, the government will need to make a
massive investment in employer and worker education programs in order to combat the rampant
panic and confusion that is almost certain to follow. Employer confusion is already evident from
high number of questions submitted employers in their comments opposing the rule. In
particular, many employers have submitted questions regarding the rule's unrealistic and
unreasonable timetables for compliance.

Therefore, although this rule purports to make changes to how DHS interprets these letters, it has
a significant impact on the way in which SSA ultimately has to respond to the inevitable increase
in employer (and employee) inquiries about this confusing rule. The actual costs of the current
SSA no-match letter program are already substantial.[61] The actual costs of administrating a new
program will be astronomical for SSA, an agency whose limited resources should go towards
administering Social Security benefits rather than enforcing immigration law.

**The Procedure to be Followed Under the Proposed Rule When an Employer Receives
Notice from DHS Denies Employees Due Process of Law**

Section 274a.1(l)(1)(iii)(C) of the proposed rule includes the following as a circumstance that
would amount to constructive knowledge where the employer "[f]ails to take reasonable steps
after receiving information indicating that the employee may be an alien who is not employment
authorized, such as . . . [w]ritten notice from the Department of Homeland Security that the
immigration status document or employment authorization document presented or referenced by
the employee in completing Form I-9 was assigned to another person, or that there is no agency
record that the document was assigned to any person."

---

[60] Letter, Sarah DeCosse, Sr. Tr. Atty OSC (Apr. 1, 2004).

[61] *See* Mehta, *supra* note 4, at 7, n. 2 (noting that SSA's current attempts to reduce the ESF through no-match letters
have cost U.S. taxpayers the following amounts: "$5.4 million to send notices to every individual whose name and
SSN do not match SSA's records; $600,000 to send 944,000 notices to all employers who submitted wage reports
with at least one item posted to the ESF; more than $200,000 for system maintenance and cyclical changes; and an
average of $9.00 for each call to SSA's national toll free telephone number generated by the notices. SSA estimates
that the agency received about 100,000 inquiries throughout 2002 regarding the TY 2001 letter.").

**No-Match Cert. Admin. Record  1691**

Under Section 274a.1(l)(2)(iii), an employer who receives such a notice will not be deemed to have constructive knowledge of the employee's unauthorized status if the employer takes reasonable steps to resolve the question raised by DHS and, if the employer does not verify with DHS that the document was assigned to the employee, the employer completes a new I-9. The employee cannot use the alien registration number, or "A-number," that is the subject of the written notice from DHS.

While this procedure may protect the employer, it entirely leaves out any possibility for the *employee* to have access to his or her DHS immigration file and any opportunity to correct errors in the file that would lead to DHS providing erroneous information to the employer. This access and an assured opportunity to correct errors in immigration records are critical because immigrants do not have easy, automatic, timely access to their immigration records, and immigration records are error-prone.

For years, government agencies have criticized the quality and accuracy of immigration records.[62] Problems with immigration records have continued even after the dissolution of the INS and the creation of new immigration agencies in DHS. The information technology environment at USCIS has been criticized as inefficient, and USCIS continues to rely on manual and paper-based processes.[63] As an example of how DHS records and processes go awry, in December 2005 DHS had to "recall more than 60,000 green cards because a computer glitch miscalculated immigrants' residency start dates."[64] USCIS sent letters instructing immigrants to mail their cards back. Unfortunately, USCIS sent the letters to many immigrants whose green card "resident since" dates were actually correct. USCIS then advised community-based organizations working with immigrants that its information technology staff was working to determine who received the mailing in error and that USCIS intended to send out a second letter to all individuals who received the initial letter in error.

Moreover, under current law, immigrants have access to their immigration files (both "alien files" and Border Patrol requests) only by filing Freedom of Information Act (FOIA) requests. FOIA requests for files must be made in writing and mailed to a central location, at the National Records Center in Missouri.[65] This means that immigrants who need access to their files to determine the nature of the erroneous information and then to correct this information as envisioned under Section 274a.1(l)(iii)(C) of the proposed rule are dependent on FOIA procedures which are not designed for this purpose. The lengthy and unpredictable timetables and cumbersome process for the FOIA process make it difficult for immigrants to both obtain their files and then correct mistaken information within Section 274a.1(2)(ii)'s compliance period.

The proposed rule thus raises critical due process concerns for immigrants. It fails to guarantee adequate access and an assured opportunity to immigrants who wish to correct errors in their

---

[62] *INS Data: The Track Record* (NILC, 2003), available at http://www.nilc.org/immlawpolicy/misc/INS data accuracy.pdf.

[63] *USCIS Faces Challenges in Modernizing Information Technology,* OIG-04-41 (DHS, Office of Inspector General, Sept. 2005), available at http://www.dhs.gov/interweb/assetlibrary/OIG_05-41_Sep05.pdf.

[64] Solomon Moore, "Green Cards Recalled Because of Glitch," *The Los Angeles Times,* Dec. 6, 2005.

[65] *See* USCIS, *Freedom of Information and Privacy Acts,* http://www.uscis.gov/graphics/aboutus/foia/index.htm.

No-Match Cert. Admin. Record  1692

immigration records. It creates penalties for employees when their immigration status or documents cannot be confirmed. It does not, however, set any time period for DHS to respond to immigrants' requests to review their files, nor does it place any obligation on DHS to correct immigrants' records in a timely fashion.

### The Proposed Rule May Exceed DHS's Authority

*DHS May Not Have Authority to Restrict the List of Acceptable Documents for the Reverification Process*

The proposed rule would create an exception to the list of documents that can be used to reverify the worker's employment authorization and identification as part of the I-9 requirement. But it appears that DHS may lack the ability to impose such restrictions. According to the INA, only the Attorney General has authority to promulgate regulations restricting the list of acceptable documents. 8 U.S.C. § 1324a(b)(1)(E). According to the statute, the Attorney General may only restrict the list of acceptable documents if he "finds, by regulation that any [of the listed documents] does not reliably establish [employment] authorization or identity or is being used fraudulently to an unacceptable degree." *Id.* Importantly, this power of the Attorney General was not transferred to the DHS upon its creation and the dissolution of the former Immigration and Nationality Service. 8 U.S.C. § 1103(a) (transferring powers under the INA to the Secretary of the DHS, *except* those that "relate to the powers, functions, and duties conferred upon" "the Attorney General," among others) (emphasis added). There is no indication in 8 U.S.C. § 1324a(b)(1)(E) and accompanying notes that the provision was ever amended to transfer the AG's authority to promulgate regulations to the DHS.

Despite this express statutory rule exclusively vesting the ability to restrict the congressionally approved list of I-9 documents to the Attorney General, Section 274a.1(l)(2)(iii) of the proposed rule would give DHS the power to restrict which documents are acceptable in the reverification process. According to that section, only documents bearing a photograph and *not* containing the SSN that triggered the no-match letter will satisfy the reverification requirement under the I-9 process. *Id.* Under current law, however, documents lacking photographs and those that include Social Security numbers are acceptable—even if the SSN triggers a no-match letter. 8 U.S.C. § 1324a(b)(1)(C), (D). Therefore, the proposed rule may inappropriately usurp the Attorney General's exclusive power to alter the congressionally created list of approved documents for reverification of a worker's status under the I-9 process and should be rejected.[66]

### RECOMMENDATION

In sum, we strongly oppose the Department of Homeland Security's proposed regulation. DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of workers in an isolated, punitive immigration "enforcement" scheme on the eve of enactment of *comprehensive immigration reform*. Although the rule will cause enormous upheavals in the workplace, the rule will have *no* impact on undocumented migration, which is the purported purpose of this

---

[66] The proposed rule may also violate INA Section 274A(d)(3), which requires notice by the President to the House and Senate Judiciary Committees before changes are made to the employment eligibility verification system. We do not know whether the President has provided such notice to the appropriate committees.

proposal. Our experience with no-match firings and workplace audits is very clear: *the fired workers will not leave the United States.* In the absence of comprehensive immigration reform that addresses the root causes of undocumented migration, they will simply find other more marginal jobs, most likely in the underground economy. Because of this, the proposed rule will result in growth of the underground economy, which results in substantial losses in state and federal tax revenues as well as unfair competition. The proposed rule is simply the wrong rule at the wrong time. It provides no solution to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by workers, taxpayers, and businesses. For all these reasons, we recommend that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

**The Low-Wage Immigrant Worker (LWIW) Coalition**

**Co-Convened By:**

American Federation of Labor – Congress of Industrial Organizations (AFL-CIO)
Change to Win (CtW)
Interfaith Worker Justice (IWJ)
Jobs with Justice
National Council of La Raza (NCLR)
National Day Laborer Organizing Network (NDLON)
National Employment Law Project (NELP)
National Immigration Law Center (NILC)

**Contact:**

Marielena Hincapié, Esq.
Director of Programs
National Immigration Law Center
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA 90010
Phone: 213-639-3900
Fax: 213-639-3911
www.nilc.org

# EXHIBIT 1

### To DHS Docket No. ICEB-2006-0004;
**Comment Regarding "Safe Harbor Procedures for
Employers Who Receive a No-Match Letter"**

### Submitted by:
**The Low-Wage Immigrant Worker (LWIW) Coalition**

### Date:
**Monday, August 14, 2006**

**No-Match Cert. Admin. Record  1695**

Immigration and Naturalization Service

HQ 274A

Office of the General Counsel

425 Eye Street N.W.
Washington, D.C. 20536

FEB 17 1994

Mr. Carl G. Borden
California Farm Bureau Federation
Office of the General Counsel
1601 Exposition Boulevard, FB3
Sacramento, CA 95815-5318

Dear Mr. Borden:

This letter is in response to your correspondence dated August 11, 1993, concerning the receipt of a letter from the Social Security Administration (SSA). The SSA letter in question informs an employer that the social security number of an employee does not agree with SSA records. Specifically, you ask whether an employer who receives this letter from SSA can continue to rely on the employment eligibility documents presented by that employee, assuming the documents appear on their face to be genuine and to relate to the employee?

If the document or documents presented to verify work authorization appear on their face to be genuine and to reasonably relate to the individual, the subsequent receipt of the SSA letter mentioned above does not impose any affirmative duty upon the employer to investigate further into an employee's eligibility to work in the United States. In addition, the receipt of this SSA letter by an employer, without more, would not be sufficient to establish constructive knowledge on the part of the employer regarding the employment eligibility of the named employee. As you correctly note in your correspondence, this letter from SSA could be prompted by a number of different reasons having nothing to do with an employee's eligibility to work in the United States.

The answer provided above specifically applies to a situation where the employer receives such a letter from SSA and the employer has no additional evidence that an employee may not be work authorized. It should be noted, however, that if an employer receives notice from the Immigration and Naturalization Service (INS) that a social security card or other document presented to establish work authorization is not valid, the employer does have a duty to inquire further to ensure that the individual is authorized to work in the United States before the employer can continue to employ that individual. In addition, while an employer has no affirmative duty to inquire into an employee's

**No-Match Cert. Admin. Record 1696**

employment eligibility based solely upon receipt of a letter from SSA, if for some reason the employer discovers evidence that an employee may not be authorized to work in the United States, the employer must inquire further to verify the employment eligibility of that employee.  If the employer is unable to verify work authorization, the employer cannot continue to employ that individual.

It should be noted that telephonic inquiries from employers regarding the employment authorization of employees will not be honored by INS.[1]  However, if an employer suspects fraud, as it relates to INS documents, the employer may ask INS to physically examine the documents.

I hope that the above information is helpful to you.  If you have any further questions, please contact Michael C. McGoings, Associate General Counsel at (202) 514-2895.

Sincerely,

for Paul W. Virtue
Acting General Counsel

---

[1]    (The only exception is where the written consent of that individual has been obtained.)  See Salinas-Pena v. INS, No. 86-1033-DA (D.Oregon, March 16, 1988).

- 2 -

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Alexia [kulwieca@seiu1.org] |
| **Sent:** | Monday, August 14, 2006 6:46 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket No. ICEB-2006-0004 |
| **Attachments:** | SEIU Local 1 Comments - Docket No. ICEB-2006-0004.doc |

**No-Match Cert. Admin. Record  1698**

<u>**Via E-mail: rfs.regs@dhs.gov**</u>

August 14, 2006

Director, Regulatory Management Division
US Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW 2nd Floor
Washington DC 20529

      Re:     Comments to DHS Proposed Regulations
              Docket No.  ICEB-2006-0004
              ICE 23-77-06
              RIN 1653-AA50
              71 Fed. Reg. 34281

Dear Sir or Madam:

      The Service Employees International Union, Local 1, opposes implementation of the above regulations.  SEIU Local 1 represents nearly 40,000 members in Illinois, Wisconsin and parts of Missouri.  These members work in property services, holding positions such as janitors and security guards, among others.  In its capacity as representative, SEIU Local 1 has observed confusion with the social security no match program, and has assisted in resolving misunderstandings caused by the program.

      In sum, SEIU Local 1 objects to the proposals issued by the DHS because such regulations would circumvent comprehensive immigration reform currently being considered by Congress.  The proposals likewise interfere with and contradict the policies of another administrative agency, the Social Security Administration.  Moreover, the regulations place too great a burden on private employers to enforce immigration law, and may harm workers currently authorized to work in the United States.  Last, the regulations are likely to increase discrimination against individuals based on their race or national origin.  SEIU Local 1 therefore requests that DHS decline to implement these regulations, and in particular, requests that DHS permit the legislative process to determine immigration policy and enforcement.

**I.     The Proposal Exceeds the Authority of the Department of Homeland Security**

      While an administrative agency has authority to implement rules and regulations to assist in enforcing statutes, agencies exceed that authority by engaging in legislation.  <u>See</u> <u>Guardians Ass'n v. Civil Serv. Commission</u>, 463 U.S. 582 (1993); <u>Weiss v. United States</u>, 510 U.S. 163 (1994).  Indeed, the courts have consistently recognized limits on the ability of Congress to delegate authority to the Executive Branch <u>See, e.g.</u>, <u>Indus Union Dep't v. API</u>, 448 US 607 (1980).

Since the United States Congress is currently debating appropriate immigration reform, regulations that change the nation's current system of immigration laws could constitute legislation by an administrative agency. Such legislative action exceeds the agency's authority.

Moreover, the proposed regulations inappropriately interpret instructions from a different administrative agency, the Social Security Administration. The DHS regulations contradict the policies of the Social Security Administration regarding how to interpret a "no match" letter. Indeed, the SSA itself, and even former INS General Counsels, agree that social security numbers should not be used to determine work authorization or Immigration status, because there are many reasons why the computer records could be in error.[1] In fact, the SSA records usually contain no information about immigration status, or contain out of date information.[2] As discussed further below, the no-match letters now instruct Employers not to take adverse action against an employee because of a "no-match." The DHS would exceed its authority by requiring employers to rely upon documents prepared by the SSA for a purpose other than enforcing immigration law, and that specifically includes a warning to employers not to use the documents to determine an employees' work authorization status.

## II.. The Regulations May Harm Employers and Employees Without Achieving Their Intended Objectives

SEIU does not believe that the proposed DHS regulations will achieve the intended objective of reducing the number of undocumented workers in the United States and will instead end up hurting American citizens and other authorized workers as well as legitimate employers who are trying to comply with the law. This objective can be obtained only through comprehensive immigration reform such as that currently pending in Congress, since the millions of jobs these workers hold and the importance of their labor to the U.S. economy will not disappear by adoption of enforcement oriented proposals. The proposed DHS regulations will simply make the situation worse, not better.

The proposed regulations may serve as a disincentive to Employers to comply with immigration law. In representing low wages workers, we are often confronted with unscrupulous employers who erroneously classify their employees as independent contractors or who even treat their workers as sham franchisees. We even see situations were workers are paid "off the books" meaning that they are paid in cash with out any of the payroll taxes being paid or the tax withholdings being made that are required by law. By using these fraudulent schemes, employers avoid paying payroll taxes, unemployment insurance and social security payments on behalf of their workers. Since the workers have not been legally treated as "employees", these employers don't even need to go through the I-9 process with these workers, nor will they ever receive a no match letter from the SSA as they do not pay SSA taxes. These employers seek to employ undocumented workers because they are the workers who are less likely to speak up and demand that the employer comply with the law. These employers not only cheat their workers, but they cheat the government out of social security payments, unemployment taxes, wages

---

[1] Martin, David, INS General Counsel, Letter to Larson (12/23/1997) *published at* 75 No.6 Int. Releases 203 (1998), Westlaw 75No.6INTERREL 203; and SSA 2005 No Match letter.
[2] GAO, *Immigration Enforcement: Benefits and Limitations to Using Earnings Date to Identify Unauthorized Work*, July 11, 2006, GAO-06-814R at 8.

2

withholdings and so forth. Ironically, the result of these proposed regulations will be a significant loss of revenue for the government, revenue which the government sorely needs for its operation, including the enforcement of the immigration laws.

Since no social security taxes are paid on these workers, these employers never receive SSA no match letters. Therefore, as a practical matter, the employers that operate illegally in the low wage industries that are served by the immigrant workforce are not effected by the DHS proposed regulations and can continue to employ undocumented workers without running the risks that legitimate employers would run under the DHS proposed regulations.

These illegitimate employers thrive in the low wage industries where most immigrants work. Legitimate employers who pay employment taxes and who try to comply with the immigration laws must compete with these employers. There is always the temptation to take up their illegal ways in order to complete against them in these often very competitive industries. By imposing administrative burdens on the legitimate employers and not on the illegitimate employers and by subjecting legitimate employers to additional risks under the immigration laws not faced by these illegitimate employers, the DHS proposed regulations will have the unintended effect of creating incentives for legitimate employers to go underground and to misclassify their workers. The ironic result of this will be to increase employment opportunities for undocumented workers and to deprive the government of payroll taxes which it is owed under law.

Meanwhile, the DHS regulations would not serve their intended purpose of serving to better enforce immigration requirements. There is no reason to believe that by forcing terminations of employees based upon SSA no-match letters, that such employees will then voluntarily leave the United States. More likely, employees will find additional short terms employment until having a similar problem leading to termination with an additional employer. This in turn causes greater employee turnover, which naturally increases an employer's costs by eliminating the benefits of a stable work force. An underground economy is likely to result without any increased enforcement of immigration laws.

## III.    The Proposed Regulations Lack Any Workable Mechanism Prevent Error

It is well established that SSA records are frequently erroneous. For immigrants *who are work authorized*, SSA records are automatically able to verify the status of less than 50% of work-authorized non-citizens, as compared to 99.8% of native born citizens.[3] These numbers are significant in that they demonstrate that large numbers of legally authorized workers will be the subjects of erroneous SSA no match letters, and their jobs at risk if the employers, employees, and SSA do not promptly take actions to comply with the proposed regulations.

According to Census Data, there are roughly 145 million total workers in the U.S. workforce, of whom 125 million are native born citizens. There are approximately 7.8 million

---

[3] *Report to Congress on the Basic Pilot Program*, U.S. Citizenship and Immigration Service, June 2004; *see also*, GAO, *Immigration Enforcement: Benefits and Limitations to Using Earnings Date to Identify Unauthorized Work*, July 11, 2006, GAO-06-814R at 1 (SSA data "has drawbacks since they contain some erroneous information and information about hundreds of thousands or even millions of U.S. citizens and work authorized aliens.")

3

naturalized citizens in the work force, and 12 million non-citizen, immigrant workers. Approximately 7 million of those workers are unauthorized.

From these numbers, one can determine that approximately *300,000* native born workers (0.02%) will be *annually* subject to SSA no match letters, *even though they are native born citizens*. If they lose four hours of work to take care of this, and you assume an average wage of $14/hr, they will lose $16.8 million in wages. Of the approximately 5 million *work-authorized*, non-citizens, 50% will face problems clearing the SSA database, or *2.5 million annually*. Again, assuming an average wage of $14/hr, these work- authorized workers would lose $140 million in wages, assuming that they ultimately succeed and are not terminated . Each of these workers will have to spend many hours trying to straighten out the SSA records, solely to satisfy DHS regulations. If SSA cannot complete the process in the time line suggested by these regulations, many will lose their jobs, causing hardship to their families. There will also be a substantial disruption of the employers operations as employees take time off to correct the errors in SSA's data base. If you assume that one in ten of these workers will for one reason or another fail to resolve the no match problem within the time limits set, this means that 280,000 workers will unjustly lose their jobs because of these proposed regulations.

For those who do not successfully, and timely, complete this process, either through procrastination, frustration, agency delay/incompetence, they will have no effective remedy for their loss of employment, wages/benefits. The proposed regulations would set strict time limits in which no-match issues be resolved, but places no requirement, not could they, on the Social Security Administration. Nor do the proposed regulations make any allowance for problems caused by the SSA's inability to resolve any particular no-match issue. Since these regulations are promulgated by the DHS, they cannot set out a procedure for SSA to remedy erroneous decisions or to provide compensation for agency error for the approximately one quarter million workers who will be unjustifiably terminated if the proposed regulations are implemented. The Federal Tort Claims Act does not provide a remedy for agency records errors, particularly where the agency would argue that it did not require the employer to terminate. Likewise, employees would not have a viable remedy against their employers for termination when the employer justifies its conduct on the new regulations together with the SSA notice.

## IV.    The Proposal Shifts DHS Enforcement Costs And Burdens To Employers, Employees And The SSA, Rather Fixing The Broken System.

The proposed regulation places a great burden on the Social Security Administration. At a time when Congress is considering making major changes to immigration laws, DHS is proposing a regulation that improperly treats the SSA no match letter as a proxy for an INS notice that the worker lacks worker authorization. As the SSA no match letters demonstrate, they are no such thing. They specifically warn employers that they do not "make any statement about an employee's immigration status." And they warn against taking any adverse action against employees for receiving a "no match".

Congress is currently in the process of addressing immigration reform but instead of leaving it to Congress to determine what that appropriate reform would be, the proposed regulations requires millions of employers and employees to burden the SSA with inquiries and

4

visits, and demanding timely documentation of same, in order to satisfy DHS's misguided regulation. No where in the regulation is there any effort by DHS to address the actual size of the attempted cost-shifting to the SSA. Nor does the regulation contemplate the substantial burden being placed on the SSA.

Because the no match letters are distributed only in April and May each year, SSA will require a substantial seasonal staffing increase to accommodate the surge in inquiries during this 2-3 month period. This seasonality will require a large number of temporary hires to enable the agency to respond. In 2002, the SSA sent out 800,000 no match letters, to employers with at least 10 no match employees, or 0.5% of the employer's workforce. It is unknown whether SSA will in future years use a different standard for sending these letters. If DHS adopts its proposed regulation, it would discourage SSA from sending the letters more broadly so as to improve its own management of the SSA Trust Fund, as doing so would impose substantial secondary staffing effects on the agency to respond to hundreds of thousands on visits.

The DHS regulations and comments fail to address this tremendous burden the proposed regulations are placing on SSA. It is irresponsible for DHS to contemplate issuing these proposed regulations without a full assessment of how SSA is going to meet the burden being placed on it by the proposed regulations.

The Regulations would also greatly burden employers. When a worker shows up on a no match letter, the employer essentially has to reverify the worker's status, as they do at the beginning of employment with the I-9 process. DHS has made no assessment of the cost to employers in immigrant intensive industries of this new *annual* I-9 compliance obligation which will result from the proposed regulations. Instead of a one-time I-9 compliance burden, suddenly employers in immigrant dependent industries can expect to see I-9 compliance issues become an annual routine for a large segment of their workforce. Indeed, the regulation asserts that there will be no significant cost to small employers, but it is hard to see how anyone could contend that this administrative burden will be insubstantial for all employers, both small and large, in immigrant intensive industries.

The regulation also makes no effort to assess the costs imposed on citizens or authorized workers, as well as to their employers, of time away from work to try to straighten out SSA records, and obtain documentation that will satisfy their employers. As demonstrated above, the proposed regulations could easily cost employees legally entitled to work in the United States $156 million or more in lost wages and the substantial disruption to many employers' operations just to prove that there is an error in the SSA records.

Likewise, not addressed is the cost to the SSA in staff time and lost taxes, as well as the increase in unemployment compensation paid out to employees who are wrongly terminated. The cost to the government because of increased costs in responding to inquiries from legal employees who were placed in a no match letter because of an error as well as the loss of revenue from payroll taxes is likely to be very significant. Yet, DHS's proposed regulations fail to address these costs and lost revenue at all.

**No-Match Cert. Admin. Record  1703**

**V.    The Proposed Regulations Will Encourage Discrimination
Against Workers Legally Entitled To Work In The United States.**

The proposed regulation will result in expanded discrimination against workers with a
"foreign" appearance or accent, as well as those who seek to enforce their workplace rights to
fair treatment and a living wage.  Accepting SSA no-match letters proof that an employees does
not have work authorization will lead to discrimination in violation of the non-discrimination
clause in the Immigration Reform and Control Act.  See Collins Foods International v. INS, 948
F.2d 549, 554-55 (9th Cir, 1991).  Under existing laws and procedures, there is currently a high
level of discrimination against immigrant workers, whether they are legally authorized for
employment or not.  Despite existing protections, SEIU and other unions have often had to assist
workers whose employers deny them workers compensation, overtime pay, or interfere with their
right to form or join a union.  Such employers will often hide behind the excuse of immigration
law compliance to accomplish these ends.  This proposal will provide unscrupulous employers
an ***annual*** excuse for harassing, suspending and or terminating workers who lawfully seek to
enforce their rights.

**VI.    The Proposed Regulations Are Contrary To Unchallenged Ninth Circuit
Case law That Constructive Knowledge "Not Be Expansively Applied."**

The proposed regulation disrupt the proper balance struck by Congress in 1986 and
recognized by the INS/ICE, SSA, the courts and OCAHO for the last twenty years.  Because
these proposed regulations are clearly contrary to Congress' intent, they are beyond the authority
of DHS to issue.

The proposed regulations would expand the definition of constructive knowledge,
contrary to the only circuit court case construing that term in the INA 274A context.  When
Congress passed the Immigration Reform and Control Act in 1986, it "delicately balanced" the
employer sanctions provisions and protecting authorized workers from unlawful discrimination
because of their "foreign" appearance or accent.  "The doctrine of constructive knowledge has
great potential to upset that balance, and it should not be expansively applied." Collins Foods
International v. INS, 948 F.2d 549, 554-55 (9th Cir, 1991).  There have been no relevant changes
to this balance since 1986.

The law requires employers to accept documents proffered by the employee within three
days of hire.  There is no ongoing employer obligation to review the documents, unless a work
authorization document (List C) expires.  The employer must accept those documents that
reasonably appear on their face to be valid.  The statute does not require the employer to be a
document expert.  It is up to the employee to select the documents to submit, by selecting them
from the list on the back of the I-9 form.  The employer violates the anti-discrimination
provisions of the Act if it requires more or different documents than those required by the Act, or
for example, insists that it will only accept certain documents.

The INS in Collins Foods had argued that the employer had constructive knowledge that
the employee was not authorized in that the employee's Social Security card was not the

6

**No-Match Cert. Admin. Record  1704**

example pictured in the INS Handbook for Employers. The Ninth Circuit however noted that the INS Employer Handbook only illustrated a few of the possible 16 iterations of SSA cards issued.

The Ninth Circuit expressly was concerned that "[w]hen the scope of liability is expanded by the doctrine of constructive knowledge" the employer may be subjected to penalties for undefined acts, and may avoid hiring anyone with an appearance of alienage." Id. The effect of the regulation would be to give unscrupulous employers but another justification for discriminatory conduct, and an annual one at that.

The proposed regulations are contrary to the clear holding of the Ninth Circuit in Collins Foods. There are no Circuits contrary, and indeed, several OCAHO decisions have followed the holding. The agency is without authority to adopt a regulation contrary to the statute.

## VII.   The Proposed Regulation Improperly Eliminates the Good Faith Defense For Millions Of Employers, Absent Timely Compliance With The Burdensome Regulation.

The proposed regulations are also contrary to the law as it has been interpreted and applied because it effectively eliminates the good faith defense which as always been an essential element of the statute. The statute provides that so long as the employer and employee properly complete the I-9 form at the outset of employment, the employer has a good faith defense to a knowing hire violation. 8 U.S.C. §1324a(b)(6)(A). The employer is not strictly liable for employing unauthorized workers; knowledge is required. The good faith defense is rebutable if DHS can establish that the documents did not reasonably appear on their face to be valid or to relate to the individual. Collins Foods, supra at 552, n. 9.

Despite the clear language of the statute and controlling case law,  DHS proposes to eliminate this presumption for millions of employers, unless the affected employers engage in an elaborate series of steps, within certain time frames, with the Social Security Administration.[4] For the millions of employers who annually received an SSA no match letter, those employers would be denied the good faith defense unless they could carry a burden of showing that they had complied with all the aspects of this proposed regulation, including its timelines. Yet DHS cannot require that the SSA is obligated to ensure that such timelines are met.

The proposed regulation erroneously treats letters from INS identifying unauthorized workers as the same as the SSA no match letters. In contrast to the INS notices to employers, the

---

[4] The procedures and time frames are proposed without any evidence that the SSA has the staff available to serve the seasonal surge of calls and visits that would occur every spring after the issuance of no match letters. The seasonal character of the project would make timely response by SSA even more difficult given the need to provide extra staff during the spring when response would be due.

Nor is there any indication whether SSA plans to send out no match letters to every employer with even a single no match employee, or only to those with more than 10 or 0.5% as in 2002 when it sent 800,000. In other years, SSA has used a different threshold. The threshold used will substantially change the total numbers, raising or lowering the burden on employers/employees/SSA accordingly.

7

SSA no match letters explicitly tell the employer that there could be many innocent reasons why the individuals name is listed, and that the letter does not inform the employer that the worker is not authorized for employment. Indeed, the SSA no match letters also warn the employer against any adverse personnel action, as such actions might violate anti-discrimination laws. Despite these significant differences with INS notices, which directly address whether the individual is work authorized, the proposed regulations treat the SSA letters as the functional equivalent.

The legal rationale proffered by the agency is that its regulation is consistent with Mester Mfg Co. v. INS, 879 F.2d 561 (9th Cir. 1989) and New El Rey Sausage Co. v. INS, 925 F.2d 1153 (9th Cir. 1991). Yet, the agency fails to address the more on point case of Collins Foods, which dealt with Social Security enumeration in the employer sanctions context. DHS fails to note that in Mester, the employer had been told by INS that the certain employees were "suspected unauthorized aliens." Collins Foods at 555. The Collins court distinguished its prior decisions in Mester and New El Rey Sausage, noting that in both cases the employer had been informed by INS that particular employees were suspected of being unauthorized.

In contrast, here the proposed regulation treats dissimilar situations as if they were the same, i.e. an SSA letter telling employers that there is a no match in a person's Social Security number is treated the same as an INS letter that states that employees are not authorized for employment based on the immigration documents presented. Notably, the INS did not appeal the narrow, constructive knowledge standard of Collins Foods. Now fifteen years later, with no intervening statutory change, nor contrary circuit or OCAHO decisions, the agency proposes to ignore the precedent, and dramatically limit the good faith affirmative defense of the statute for millions of employers.

Collins Foods has been repeatedly followed by ALJs in employer sanctions cases. See, e.g. USA v. American Terrazzo Corp., 6 OCAHO 828, 1995 WL 848945 (1995) ("the Circuit court has given clear warning that the doctrine of constructive knowledge must be sparingly applied"); Getahun v. Dupont Merck Pharmaceutical, 6 OCAHO 880, 1996 WL 570515 (1996)(constructive knowledge must be sparingly applied in illegal hire cases to minimize the risk of liability and burden of compliance on employers); USA v. AID Maintenance Company, 7 OCAHO, 1997 WL 1051451 (1997)(same).

The careful balancing by Congress of the statutory employer obligations are not subject to revision by the agency by regulation. This legislative balance was constructed in order to minimize the burden on the employer, as well as to protect employees from discriminatory documentation requirements. The substantial gutting of the good faith defense for employers will burden the process not only for employers, but necessarily for employees whose employers impose heightened and discriminatory documentation requirements. For this reason, the proposed regulations are contrary to law and therefore exceed the agency's authority in issuing regulations.

8

## Conclusion

For all the above reasons, the Service Employees International Union, Local 1, respectfully requests that the Department of Homeland Security decline to adopt or implement the proposed regulations. The regulations are inappropriate given the role Congress is playing in deciding the approach to comprehensive immigration reform. DHS should not be instructing Employers on how to interpret correspondence from another administrative agency, the Social Security Administration. The regulations place a great burden on employers and will cause harm to numerous individuals authorized to work in the United States. A preferred approach is permit the legislative process to determine comprehensive reform.

SEIU Local 1 appreciates the DHS consideration of these comments in opposition to the regulations.


Sincerely,

Alexia Kulwiec
Chief Counsel

cc:     Dan Schlademan
        Laura Garza
        David Martino

9