## Khazaeli, Javad M

| | |
|---|---|
| **From:** | Julie Suarez [nyjsuarez@fb.org] |
| **Sent:** | Monday, August 14, 2006 6:14 PM |
| **To:** | Regs, Rfs |
| **Subject:** | [Docket No: ICEB-2006-0004];[FR Doc: E6-09303];[Page 34281-34285]; Immigration: Aliens— Unauthorized and unlawful hiring or continued employment; safe-harbor procedures for employees who receive a no-match letter |

**Attachments:** ICEcomments.doc

<<ICEcomments.doc>>

Julie C. Suarez
Manager of Governmental Relations
New York Farm Bureau
(518) 431-5607

**No-Match Cert. Admin. Record  1708**



New York Farm Bureau • 159 Wolf Road  P.O. Box 5330 • Albany, New York 12205 • (518) 436-8495  Fax: (518) 431-5656

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
DHS Docket No. ICEB—2006—0004
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

   **Subject:  Proposed Rule; Safe-Harbor Procedures for Employers Who Receive a No-Match
   Letter, 71 Fed. Reg. 34281 (June 14, 2006)**

Dear Assistant Secretary Myers:

The New York Farm Bureau, an affiliate organization of American Farm Bureau Federation,
respectfully wishes to concur with American Farm Bureau Federation's comments regarding the
above referenced proposed rule.  New York Farm Bureau is the state Farm Bureau organization in
New York State representing over 30,000 members primarily involved in the production of a diverse
array of agricultural crops.  Our primary agricultural commodity is dairy, followed closely by apples,
vegetables, equine, and the wine and grape industry.  New York has an extremely diverse farm sector
which relies on family labor, full-time, year round local help, and seasonal workers for the planting
and harvesting seasons.  While estimates vary widely, we have approximately 35,000 full time
workers in the agricultural industry, including farm family members, and upwards of 12,000 seasonal
workers.

After the latest iteration of immigration reform, in 1986, employers have increasingly turned to
seasonal migratory labor for harvest needs.  No longer does New York State have a population of
local workers, primarily students, retirees, etc., who are willing to work for a few short months of the
year.  New York State is not a heavily dependent H2a usage state, importing approximately 2,000
workers annually, because of the relative shortness of our need for seasonal labor and the expense of
housing.  Our employers for years have utilized either farm labor contractors or word of mouth,
faithfully completing the necessary I-9 forms and following the directives not to appear to
discriminate against employing an individual on the basis of the documents presented or their ethnic
origin or gender.  There is no question in our members minds that we want, need, and desire to
employ individuals who are legally authorized to be in this country, but the problem for years has
been that there is no consistent or reliable way to verify work authorization, and the H2a program
requirements are simply too burdensome for an average farmer – especially a smaller farmer – who
may want to employ ten people for two weeks to bring in a strawberry harvest.

Now, with the advent of the on-line verification system the process may be easier, but the requirement that the system must only be used after the hiring of an individual is particularly onerous for a small employer. An employer can easily spend over six hours hiring one person, between advertising, interviewing, and paperwork, only to find out after putting in a significant expenditure of time and money that the individual is not authorized to work in this country. Employers should be able to utilize the on-line verification system, consistently and without discrimination, for each and every applicant for a position prior to the interview or completion of paperwork, etc.

While New York Farm Bureau fully realizes that the Department of Homeland Security does not administer the on-line verification system, it is important that the perspective of small employers be realized and understood by the Department when imposing additional requirements on already burdened and time pressed employers. Specific to the proposed rule, New York Farm Bureau wishes to echo the following comments, also referenced by American Farm Bureau Federation:

1) The proposed time frames for employers to respond to receipt of a no-match or mis-match letter are far too short. In New York, our harvest season can go anywhere from a two week window for a crop like strawberries, to a four week window for a vinifera grape variety, to over two months for a large apple farm with several varieties. This short time frame for harvest, and also for planting, due to our climate and lack of year round growing degree days means that a fourteen day turnaround time for a farmer to respond to a letter by approaching the topic with an employee is quite simply unrealistic. Two weeks for a company with a full time human resources manager is probably adequate; however for farmers with their entire financial success for the year riding upon a short harvest season the time to worry about paperwork simply does not exist, no matter how important the issue. Our members recognize the critical nature of responding to notices from the Social Security Administration/Department of Homeland Security. However, if there is a two week harvest season for strawberries in all likelihood during those two weeks the farmer will put everything else, including personal and other business concerns, on hold to get the crop in, and New York Farm Bureau is extremely concerned that a farmer would be penalized for not responding in time due to the pressures of harvest.

2) The proposed time frames for employees to respond to the employer notifying them of a no-match or mis-match letter, and requesting either additional documentation or a visit to the local Social Security Administration office to rectify the problem are also too short. Again, during the harvest season it is unlikely a migratory or seasonal worker who depends upon a short period of employment to form the basis of their income for the whole year will take a day off to rectify the problem. This issue is of less concern to our members; however, the proposed rule is also vague about what an employer's responsibility is if the employee fails to acknowledge or take any action to resolve the issue. If, after two weeks, the employee has not acted due to concern for missing work, arranging transportation, etc., but promises to take care of the issue in another week or so what action then is the employer to take? Are employers at that point legally obligated to terminate employment if the employee simply does not act? If so, the Department of Homeland Security needs to be more specific in the proposed rule. It is unfair to subject an employer to a lawsuit alleging unfair termination or

discrimination in hiring/firing practices based on the vaguely worded and veiled threat of Department of Homeland Security action against employers who continue to employ an individual who is the subject of a mis-match letter. This is particularly true as the Social Security Administration's own guidance to employers in the mis-match letter states clearly that receipt of the letter is not meant to be a comment on the individual's immigration status and is not the basis for terminating the employee. With a very active legal services program in New York State, it is clear to us that without further and explicit guidance from the Department of Homeland Security our employers will have to weigh either possible violation of knowingly employing an illegal alien or the threat of litigation – and either choice could easily put a farm out of business in a moment.

3) It is not clear to our members completing an I-9 form that if a notice is given from the Social Security Administration that the number submitted on the W-2 does not match, but yet the employee did not provide the social security card as a document for the purposes of completion of the I-9 form, whether the same documents (i.e. a resident alien card) can be utilized to re-verify employment eligibility after 90 days. In other words, employers are not allowed to utilize the same documents that formed the basis of the mismatch letter, but if none of those documents were the actual subject of the mismatch letter what actions are appropriate for an employer to take for re-verification purposes?

Thank you for the opportunity for New York Farm Bureau to submit comments. In closing, I wish to reiterate that New York Farm Bureau agrees wholeheartedly with the more substantive comments on the proposed rule offered by American Farm Bureau Federation. However, in light of the considerably shorter growing degree days in New York State as compared to some of the larger agricultural states, New York Farm Bureau felt it advisable to emphasize the burdensome nature of a quick 14 day turnaround in response to a mis-match or no-match letter for employers in the midst of a busy harvest season.

Thank you for your consideration, and for the Department's willingness to consider issuing much needed clarifications to employers on this difficult issue. Please do not hesitate to contact me should you have any additional questions or concerns regarding New York Farm Bureau's comments on the proposed rule.

Sincerely,


John W. Lincoln, President
New York Farm Bureau

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Wiley, Kenya [kwiley@SHRM.org] |
| **Sent:** | Monday, August 14, 2006 5:53 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket No. ICEB-2006-0004 |
| **Attachments:** | SHRM Comments on No-Match Letters Final.pdf |

On behalf of the Society for Human Resource Management, I have attached comments regarding the matter referenced above.

Kenya N. Wiley, Esq.
Manager, Regulatory and Judicial Affairs
Society for Human Resource Management
1800 Duke Street
Alexandria, VA 22314-3499 USA
Phone: 703-535-6026
Fax: 703-535-6492
E-mail: kwiley@shrm.org
Web: www.shrm.org

**No-Match Cert. Admin. Record  1712**



August 14, 2006

Richard A. Sloan
Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security
111 Massachusetts Avenue, NW
2nd Floor
Washington, DC 20529

Re:    Proposed Rule on Safe-Harbor Procedures for Employers Who Receive a No-
       Match Letter. 71 Fed. Reg. 34,281 (June 14, 2006)
       ICE 2377-06; Docket No. ICEB-2006-0004; RIN 1653-AA50

Dear Mr. Sloan:

The Society for Human Resource Management (SHRM) submits these comments to the U.S.
Department of Homeland Security ("the Department" or "DHS") in response to the proposed
rule on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter. This notice of
proposed rulemaking was published in the *Federal Register* on June 14, 2006. *See* 71 Fed. Reg.
34,281 (June 14, 2006).

SHRM is the world's largest association devoted to human resource management. Representing
more than 210,000 individual members, the Society's mission is to serve the needs of HR
professionals by providing the most essential and comprehensive resources available. As an
influential voice, the Society's mission is also to advance the human resource profession to
ensure that HR is recognized as an essential partner in developing and executing organizational
strategy. Founded in 1948, SHRM currently has more than 550 affiliated chapters within the
United States and members in more than 100 countries.

SHRM's membership comprises HR professionals who are responsible for administering their
employers' hiring policies, including the employment verification process. SHRM has taken a
multi-faceted approach to obtain feedback from its members on the proposed guidance for
employers who receive a no-match letter, and has incorporated our member feedback in these
comments.

1800 Duke Street
Alexandria, VA 22314-3499 USA
(703) 548-3440 Fax; (703) 836-0367 TDD; (703) 548-6999
World Wide Web: http://www.shrm.org

Richard A. Sloan
August 14, 2006
Page 2

## DISCUSSION

SHRM appreciates the opportunity to comment on the safe-harbor procedures regarding no-match letters and recognizes the Department's efforts in issuing guidance. For quite some time, many HR professionals have, inquired about guidance from both DHS and SSA regarding what an employer should do when it receives a no-match letter. SHRM believes that the proposed regulations provide some guidance on the key issues; however, SHRM has some concerns regarding the proposed time periods and requests additional clarification on certain terms and provisions. In addition, SHRM has concerns as to how the proposed regulation will comport with the proposed legislation that Congress is currently addressing, which includes new procedures for the employment verification process:

The proposed regulations on the safe-harbor procedures provide that: (1) an employer must take "reasonable steps," within 14 days after receipt of a "no-match" letter; and (2) the employer must resolve the discrepancy within 60 days of receipt of the no-match letter. If the discrepancy has not been resolved within the suggested 60-day period, the employer must, within an additional three days, verify the employee's employment authorization and complete a new Form I-9. *See* 71 Fed. Reg. 34,285 (June 14, 2006).

SHRM appreciates the Department's efforts to ensure that employers are employing individuals who are authorized to work in the United States. SHRM realizes that in drafting the proposed guidelines, DHS had to consider the interests of employers, employees, the Social Security Administration, and other governmental entities. However, SHRM believes that the Department must provide guidance with reasonable and clear guidelines for HR professionals. Therefore, as discussed below, SHRM recommends that the Department: (1) increase the proposed period for an employer to take "reasonable steps" to a minimum of 60 days; and (2) permit the employer a minimum of 120 days to resolve any discrepancies after receiving a no-match letter. Furthermore, the Society recommends that the Department provide clarification on certain terms and provisions, and work closely with SSA to coordinate a seamless, uniform process for responding to no-match letters.

I.      **SHRM Recommends that the Department Provide an Employer a Minimum of 60 Days to Take "Reasonable Steps."**

The Department has proposed that after receiving a no-match letter, an employer must take certain "reasonable steps" within 14 days of receipt of the no-match letter. *See* 71 Fed. Reg. 34, 285 (June 14, 2006). The Department does not include a complete list of steps that would be deemed reasonable under the proposed rule. However, the Department states that the following steps would be considered reasonable. These include: (1) checking the employer's records for typographical or clerical errors; (2) informing SSA of the correct information; and (3) verifying that the employer's records of the employee's name and social security numbers match the records of SSA. SHRM recommends that the Department provide an illustrative list of examples of steps that would be considered "reasonable." SHRM members make a good-faith effort to ensure that their employees are authorized to work in the United States. Thus, it is imperative

Richard A. Sloan
August 14, 2006
Page 3

that HR professionals are aware of the procedures that they may follow in response to a no-match letter.

### A. SHRM's Concerns with the Proposed Time Period.

SHRM believes that the proposed 14-day period would not provide employers an adequate amount of time to notify the employee. An HR professional working for a large company may have operations or offices in many different geographical areas. If the HR professional receives a no-match letter, and the employee is located in another state, the HR professional must check the employee's records and track the employee in another location. Some SHRM members work for colleges and universities, where the faculty and other employees may not work during the entire calendar year. A professor may teach a course every other semester, and not be available if the employer receives the no-match letter during his "off" semester. Also, many colleges and universities operate with a reduced workforce during the summer months. Thus, even if the employer receives the no-match letter, the HR professional may not be able to immediately contact the employee if the employee is out of the office or on vacation.

There are other reasons that would affect an employer's ability to take reasonable steps in response to a no-match letter within the proposed 14-day period. As more employers implement flexible workplace policies, employees are more likely to telecommute. HR professionals will need additional time to contact employees who telecommute and are not physically present in the office on a daily basis. Thus, both the employer and employee may need additional time. In addition, SSA may send the no-match letter to a different division within the department that does not process the I-9 forms. For example, if SSA sends the letter to the payroll department, the payroll specialist will have to forward the information to the HR department. The forwarding of the no-match letter may add additional time to the process. Given the size and numerous locations of large employers as well as the possibility of an employee's absence from the office, SHRM recommends that the Department increase the time permitted for an employer to take reasonable steps pursuant to the safe-harbor provisions. Therefore, SHRM recommends that DHS grant an employer a *minimum* of 60 days from receipt of the no-match letter to take reasonable steps.

### B. The Department of Homeland Security's Coordination Efforts with the Social Security Administration.

The proposed rule also provides that when an employer verifies an employee's Social Security Number (SSN) with the Social Security Administration, "employers should make a record of the manner, date, and time of any such verification, as SSA may not provide documentation." *See* 71 Fed. Reg. 34,283 (June 14, 2006). SHRM recommends that SSA provide the employer with a confirmation and tracking number within the proposed timeframe for resolving the discrepancy. SHRM also recommends that SSA provide the employer with a sample notice and guidance for the employee to follow when the employee attempts to resolve the no-match discrepancy. SHRM realizes the importance of both SSA and DHS in ensuring that all employees are authorized to work in the United States. Thus, SHRM recommends that both agencies work

Richard A. Sloan
August 14, 2006
Page 4

together and develop a uniform process to confirm and track an employer's attempt to verify an employer's SSN with SSA.

II.     **SHRM Recommends that the Department Establish a 120-day Period to Resolve Any Discrepancies After Receiving a No-Match Letter.**

The Department has proposed a verification procedure that the employer may follow if the discrepancy with the no-match letter is not resolved within 60 days of receipt of the no-match letter. *See* 71 Fed. Reg. 34,285 (June 14, 2006). When an employer receives a no-match letter, it takes time for a corporate entity to identify the issue, call in the employee and ask questions regarding the no-match letter. Even if there is a simple error that must be corrected by SSA, the proposed 60-day period would be inadequate for both SSA to respond and the employer to resolve the discrepancy. Also, there may not be a local SSA office near the employer's location. Furthermore, SSA may not provide the employer with a response within the proposed 60-day period due to a backlog of inquiries, a shortage of staff, or other reasons beyond the employer's control. Therefore, SHRM recommends that the Department provide an employer with a minimum of 120 days to resolve any discrepancies after receiving a no-match letter. SHRM also recommends that the Department provide clear language stating that where the employer has contacted the appropriate government agency within the proposed timeframe, the employer will not be held liable for external factors outside the employer's control. Such factors may include an agency's failure to respond within the timeframe required under the safe-harbor rules. Thus, SHRM recommends that DHS provide a an employer a minimum of 120 days to resolve any discrepancies after receiving a no-match letter, and also address the employer's due diligence in contacting SSA within the applicable time-period.

III.    **SHRM Recommends that the Department Clarify Whether the New Form I-9 is Optional.**

The Department has also proposed guidelines if the discrepancy identified in the no-match letter is not resolved within the proposed 60-day period. Specifically, DHS has proposed that if the discrepancy is not resolved within the proposed 60-day period, and if the employee's identity and work authorization cannot be verified after completing a new Form I-9, the employer has the option of either terminating the employee or risk that DHS may find the employer in violation of the federal immigration laws. *See* 71 Fed. Reg. 34,283 (June 14, 2006). SHRM recommends that the Department clarify whether the completion of the new I-9 form is optional or mandatory for an employer before the employer may terminate the employee. The Department also states that "employers should apply these procedures uniformly to all of their employees having unresolved no-match letters." The Department then indicates that employers that do not provide uniform guidelines may be in violation of applicable anti-discrimination laws. SHRM recommends that the Department provide clear guidance on what actions would constitute as a violation of the "applicable anti-discrimination" laws. SHRM also recommends that the Department coordinate the guidance regarding the discriminatory conduct with the other agencies that have jurisdiction over the anti-discriminatory laws, including the Department of Justice and the Equal Employment Opportunity Commission.

Richard A. Sloan
August 14, 2006
Page 5

**IV.    SHRM Recommends that the Department Clarify the Employee's Work Status During the Proposed Timeframes.**

The proposed rule provides that an employer must take "reasonable steps" within 14 days of receipt of the no-match letter, and must resolve any discrepancies within 60 days of receipt of the no match letter. *See* 71 Fed. Reg. 34,285 (June 14, 2006). The proposed rule does not provide guidance on how the employer should handle the employee's work status between day 14 and day 60. SHRM recommends that the Department clearly state that: (1) an employee whose name is referenced on a no-match letter shall continue to work during the "discrepancy" period; and (2) DHS will not hold the employer liable for violating the federal immigration laws if the employer continues to employ the individual during this period. After the employer notifies the employee about the no-match letter, an employee may fail to return to work. SHRM recommends that the Department provide clear language that the employer shall have the option to terminate the employee within the discrepancy period. The option to terminate would apply in cases where an employee fails to return to work after the employer has notified the employee of the no-match letter, and the employee's absence violates the employer's attendance policy.

**V.    SHRM Recommends That the Department Clarify the Receipt Guidelines.**

The proposed safe-harbor guidelines also describe an employer's obligations and its options for avoiding liability after the employer receives "information indicating that the employee may be an alien who is not employment authorized." *See* 71 Fed. Reg. 34,284 (June 14, 2006). However, the proposed rule does not define what constitutes as "receipt" of such information. Some SHRM members have received no-match letters that were addressed to the employee, not the employer. Although the employer may form a reasonable suspicion that the envelope from SSA contains a no-match letter, the employer cannot confirm the contents of the envelope if the mailing is addressed to the employee. Thus, SHRM recommends that the Department provide clear guidance on what constitutes receipt. Specifically, SHRM recommends that the Department clarify that the no-match letter must be addressed to the employer in order to meet the criteria for "receipt," or require that a copy of the no-match letter be sent to the employer.

Finally, some SHRM members participate in the Employment Verification System (EVS), where they submit a diskette to SSA each month with the names and Social Security Numbers for all newly hired employees and all employees who have notified their employers of a name change. Each month, SSA provides the employer with a list of any discrepancies from the information the employer provided through the EVS. SHRM members have requested guidance on whether the safe-harbor procedures regarding no-match letters would also apply to the receipt of EVS discrepancy information.

**VI.    Conclusion.**

SHRM appreciates the opportunity to submit these comments on the proposed guidance for employers who receive a no-match letter. SHRM applauds the Department for proposing the guidelines. However, SHRM believes that in order to maximize the safe-harbor provisions, the Department of Homeland Security must work closely with the Social Security Administration to

Richard A. Sloan
August 14, 2006
Page 6

ensure that there is a single uniform process.  SHRM looks forward to working with both agencies to improve the guidance on safe-harbor procedures.

Respectfully submitted,

*Michael P. Aitken*

Michael P. Aitken
Director, Governmental Affairs
Society for Human Resource Management

**Khazaell, Javad M**

| | |
|---|---|
| **From:** | Fatima Carroll [fcarroll@ufcw.org] |
| **Sent:** | Monday, August 14, 2006 5:28 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 - Comments on Proposed SSANo-Match Safe-Harbor Procedures |

**Attachments:**     M02304300622676719800.pdf



M02304300622676
19800.pdf (178 ...

        Please disregard the previous e-mail.  See the attached PDF file for the
UFCW's comments on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter.

**No-Match Cert. Admin. Record  1719**



<u>VIA Email</u>

August 14, 2006

Mr. Richard Sloan, Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington DC  20529

Re:   **DHS Docket No. ICEB-2006-0004**
      **Comments: Proposed SSA No-Match Safe Harbor Procedures**

Dear Director Sloan:

As International President of the 1.4 million members of the United Food and Commercial Workers International Union (UFCW), I am compelled to comment on the Department of Homeland Security's proposed regulation which would radically change how an employer would be required to respond to the Social Security Administration's (SSA) issuance of no-match letters which contain notice of alleged discrepancies between employees' names and the Social Security Numbers (SSN) assigned to them in SSA records. The proposed regulation would create a new, dominant role for SSNs such that an unresolved discrepancy between an employee's name and SSN would call into question the employee's work authorization even when the employee has submitted documents in compliance with Form I-9 verification requirements at hire.

Under the current regulation, SSA issues no-match letters to employers when Agency records indicate that an employee's name does not match with the SSN recorded for that employee. The SSA endeavors to correctly match the name and SSN so that benefits can be allocated to the appropriate employee's retirement account. This is purely an administrative procedure to serve internal Agency purposes. The SSA letter thus informs employers that any discrepancy between an employee's name and SSN has no bearing on work authorization status or immigration status. Indeed, SSA has no enforcement authority with regard to employee work authorization status or immigration issues under the Immigration and Nationality Act.

**Joseph T. Hansen,** *International President*
**Anthony M. Perrone,** *International Secretary-Treasurer*

United Food & Commercial Workers International Union, CLC
1775 K Street, NW • Washington DC  20006-1598
Office (202) 223-3111 • Fax (202) 466-1562 • www.ufcw.org

Mr. Richard Sloan                                                    August 14, 2006

-2-

SSA's process of assigning and correcting SSNs is very error prone because of continuous formal and informal name configurations and changes among the hundreds of millions of people and the increasingly diverse cultures represented in the nation's population. Thus, adding or omitting a middle initial or a hyphen in a name will cause a no-match in SSA records. Additionally, changing names due to marriage or divorce will cause a no-match in SSA's records, as will a change in the order in which an individual's name is recorded in SSA records.

Examination of DHS's Basic Pilot Program, the government's only automated employment eligibility program, clearly demonstrates that the current database is greatly flawed and forecasts how the proposed regulation would multiply erroneous discharges of work authorized employees. The SSA database and that maintained by DHS are the underlying databases of the Basic Pilot Program. An independent evaluation of the Basic Pilot Program, published in 2002 and mandated by the law which created the program, found that 20 percent of properly work authorized employees are initially found not to be work authorized. Institute of Survey Research at Temple University (ISR) and Westat, Findings of the Basic Pilot Program Evaluation, June 2002, at 122-123. The independent evaluation stated that approximately one-third of employers using the pilot system reported that it is easy to make errors when entering information. The study also noted that a specific data entry problem is the difficulty of entering compound surnames, which is especially likely to arise with certain foreign-born employees and contribute to the much higher error rate among such employees. The ISR and Westat study found that when employers contacted the INS (now DHS) and SSA in an attempt to clarify data, the Agencies were often not very responsive or accessible, with 39 percent of employers reporting that SSA never or only sometimes returned their calls. ISR and Westat, Basic Pilot Evaluation Summary Report, January, 2002 at 18. The summary report recommended that the Basic Pilot Program not be expanded to a mandatory program until the SSA and DHS address the inaccuracies in their databases which, to date, the Agencies have failed to do.

Moreover, the Government Accountability Office (GAO) recently concluded that the Basic Pilot Program is not prepared to handle the abrupt increase in participation which would be required by a mandatory, nationwide program. Barbara D. Bovbjerg, Testimony Before the Subcommittee on Oversight, during Questions and Answers period. GAO specifically found that the program is riddled with delays in updating immigration records, false-negatives, and non-user friendly program software. Barbara D. Bovbjerg, Director, Education, Workforce, and Income Security Issues at GAO, Testimony Before the Subcommittee on Oversight of the House Committee on Ways and Means, February 16, 2006.

Mr. Richard Sloan                                              August 14, 2006

-3-

It is in this context that the proposed regulation would radically change the administrative focus of addressing alleged discrepancies and create a law enforcement purpose which is wholly absent under current law. The proposed regulation would require the employer to take certain steps, including ultimately firing an employee, if the employer is unable to resolve the no-match within 60 days. If the employer elects not to discharge employees after using other prescribed methods for resolving no-matches, the employer will risk that DHS will disagree that company procedures were reasonable. DHS may then prosecute the employer, alleging that it continued to employ an employee while having constructive notice that he/she was not work authorized.

The UFCW believes the proposed changes are profoundly ill-advised. Thus, the proposed regulation would provide that SSA's notice to an employer of a no-match discrepancy constitutes constructive notice that the subject employee is not work authorized unless the employer takes action prescribed by the proposed regulation. Under the proposed regulation, employers would be required to resolve the alleged discrepancy by checking their records to determine whether they accurately reported information to SSA, checking with employees to determine whether they accurately reported SSN information, and then verifying with SSA that employees' names match with the SSNs assigned to the names in the SSA database. If these checks fail to resolve the discrepancy, the employer must then complete a new Form I-9 or discharge the employee in order to comply with the safe harbor procedures which rebut the notion that the SSN is constructive notice of lack of work authorization.

In this way, the proposed regulation would appear to create a contradiction, as the employer would be required to reverify the employee's work authorization and identity even though the identity and authorization documents produced at hire have not been discredited. If the employee stands by his original verification documents in the face of the SSN discrepancy, the employer would be prompted to discharge him/her rather than risk the loss of the safe harbor protection.

Additionally, the proposed regulation prescribes that no document containing the SSN that is subject of the no-match letter may be used to establish identity or work authorization. This provision may create additional confusion for employers and employees, alike, because Form I-9, section one requests a SSN even if the document is not proffered for identity or work authorization. Here again, it is likely that an employer may refuse to accept that an employee has properly complied with Form I-9 verification requirements because of questions about the SSN.

The proposed regulation, therefore, would radically change the law regarding whether an employer has constructive knowledge of lack of work

Mr. Richard Sloan                                                    August 14, 2006

-4-

authorization. Under current law, the duty to reverify is triggered only when an employer has specific and detailed information of lack of work authorization. Thus, under long-standing case precedent, generalizations or minor discrepancies do not constitute constructive notice. <u>New El Rey Sausage Co. v. U.S. Immigration and Naturalization Service</u>, 925 F.2d 1153, 1158 (9th Cir. 1991). Rather, the law requires that employers act on specific and detailed information that the employment authorization documents are not valid. <u>Id.</u> (INS notified employer that employment authorization documents did not pertain to individuals who presented them).

The proposed regulation would discard long-standing precedent and cede to SSNs overriding weight in the employment verification process. If the proposed regulation becomes a final rule, employees risk loss of their livelihoods based on erroneous SSA records which, as shown above, have an extraordinary error rate in matching employees' SSNs with their names. This error rate can only be expected to increase if the DHS rushes to require greater employer use of such an error prone system as a deciding hire and retention tool.

The error rate will also likely increase because of the additional administrative burdens the proposed regulation will place upon the SSA system. In this respect, DHS's proposed regulation would impose upon SSA verification responsibilities which do not exist in SSA's current administrative scheme. The proposed regulation would provide only a 60-day time period within which both the employer and all its employees must resolve discrepancies. Specifically, the proposed regulation would require an employee to visit the SSA and mandate that the Agency review and confirm the employee's identity information. The proposed regulation also would require the employer to verify with the SSA that the employee's name matches the number assigned to that name in SSA records. Requiring SSA to react within such short time constraints to both employer and employee inquiries will cause it to confront additional problems in accurately processing updated data. Updated data may not be available for access when needed. Furthermore, employees and employers, alike, will have difficulty verifying contacts with SSA because it may not provide receipts confirming employee visits or documentation that employers have used the Agency's on-line verification system.

DHS's proposed regulation is further problematic because it radically alters the existing verification system at the same time that Congress is considering comprehensive immigration reform. Such isolated action will impede the coordination necessary to making an immigration package compatible with the proposed regulatory proposal. The change will also alter existing mandates without any evidence that SSNs will provide more accurate determinations of work authorization. To the contrary, the record of the accuracy of SSN no-match data suggests that the proposed mandate will only confuse and distort the work authorization process.

**No-Match Cert. Admin. Record  1723**

Mr. Richard Sloan                                            August 14, 2006

-5-

A couple of examples dramatically illustrate the confusion caused by alleged SSN discrepancies. In one instance, Seneca Foods, a major food processor, received a no-match letter which notified the employer of a discrepancy between the name and the recorded SSN of an employee who is a U.S. citizen. The problem was that the employee's name was hyphenated in employer records but did not contain hyphenation in SSA records. In another example involving the same employer, company records had recorded an employee's names in several different orders. In July 2006, following publication of the proposed regulation, a northeastern grocer precipitantly suspended dozens of employees in order to avoid any risk that alleged SSN discrepancies will be equated with the lack of work authorization.

In sum, the proposed regulation will mandate the use of a flawed procedural tool in determining continued work authorization, impose the use of a tool which is divorced from the effort to enact comprehensive immigration reform, and diminish the accuracy of a grossly inaccurate SSA record keeping system. This will subject great numbers of employees to unjustified disruptions in work, including firings.

The proposed regulation needs to better reflect the real world in which employers illegally dismiss employees because the government raises questions about their status, causing disruptions in work, job losses, and life-altering changes merely because of what amounts to administrative and clerical error.

I hope that these comments are helpful as you proceed to reform this process. Thank you for the opportunity to comment, and please feel free to contact us if you need additional information or have additional questions.

Very truly yours,

*Joseph T. Hansen*

International President

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | Anita Drummond [Drummond@abc.org] |
| **Sent:** | Monday, August 14, 2006 5:37 PM |
| **To:** | Regs, Rfs |
| **Cc:** | Denise Gold; knottk@agc.org; jjohnsonbennett@masoncontractors.org; Hamilton, Jenna; Owen Tonkins; csilvertooth@nrca.net; Coulson@naphcc.org |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |
| **Attachments:** | ConstructionEmployers.Cmt to DHS.Aug.14.2006.doc |

The following organizations are submitting the attached comments to the Department of Homeland Security:

Associated Builders and Contractors
Associated General Contractors of America
Mason Contractors Association of America
National Association of Homebuilders
National Association of Minority Contractors
National Roofing Contractors Association
Plumbing-Heating-Cooling Contractors Association


Anita Drummond, Esq.
Director of Legal and Regulatory Affairs
Associated Builders and Contractors, Inc.
4250 North Fairfax Drive, 9th Floor
Arlington, VA, 22203
(703) 812-2000
Fax (703) 812-8202
drummond@abc.org

**No-Match Cert. Admin. Record  1725**

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave. NW, 2nd Floor
Washington, D.C. 20529

        RE: RIN 1653-AA50; ICE 2377-06: Safe-Harbor Procedures for Employers Who
Receive a No-Match Letter

Dear Sir or Madam:

As employers in the construction industry, we are submitting comments to the Department of
Homeland Security (DHS) on a proposed rule for Safe-Harbor Procedures for Employers Who
Receive a No-Match Letter.

The construction industry contributes tremendously to the U.S. economy, representing more than
9 percent of the Gross Domestic Product and more than 12 percent of America's employers.
While the U.S. economy increased jobs over the last 12 years by 20 percent, construction grew
52 percent in the same period. Today, there are 7.2 million employees in the industry.
Construction growth isn't stopping. The Bureau of Labor Statistics reports that another 792,000
new construction jobs will be created between 2004 and 2014. These growth trends not only
demonstrate the tremendous value of the industry to the U.S. economy and American workers
but it also indicates that any government regulatory reforms must consider the practical impact
and the economic cost.

Our memberships include tens of thousands of construction employers that want to comply with
the law but are often uncertain about how to do so. Responding to a no-match letter has caused
particular confusion and concern, as recipient employers must be cognizant not only of
employment eligibility requirements but of antidiscrimination laws, document abuse laws, wage
reporting laws, and more. On top of these many legal mandates are the necessities of running a
business efficiently and of maintaining a sufficient workforce to meet the growing demand for
construction services. With that in mind, we commend DHS for attempting to provide
employers with better guidance on the proper response to a no-match letter and for establishing a
safe-harbor provision. However, we are concerned that the guidance set forth in the proposed
rule is inadequate, unclear, and impractical. The proposed rule would require employers and
employees to invest significant reliance on federal agencies to resolve the conflicts between
documents presented by employees and the records of federal agencies. However, the realities of
obtaining timely, accurate assistance and information to resolve "no match" letters from the
Social Security Administration (SSA) or DHS are a serious challenge.

Practical problems abound with reliance on no-match letters as an indicator of a person's
ineligibility to work. A mismatch can result from a number of reasons unrelated to employment
eligibility, such as typographical errors, transposed numbers, name changes

August 14, 2006
Director, Regulatory Management Division
Page 2 of 2

due to marriage or divorce, and other inadvertent mistakes. As simple as some of these errors are, identifying them and getting them corrected can take much longer than the 14-day and 60-day timeframes provided in the proposed rule. This is particularly true if the employer receives numerous no-match notices that must be handled at once and/or if the employer lacks dedicated administrative staff to handle the matter. More serious problems are inherent in the SSA's current system. The complete identity of individuals is difficult to record. For example, many individuals, such as those of Latino ethnicity, have more than three names. The SSA system is limited to three fields for recording names—not only are employers often using only a portion of an employee's name, but also they may be using a different part than that recorded with the SSA. For the construction industry, this challenge can be particular acute as nearly one-third of the construction workforce identifies themselves as Latino or Hispanic according to the Bureau of Labor Statistics.

However, the inherent difficulties of keeping records updated and accurate by a plethora of agencies is a foundational challenge. Agencies involved include not only the SSA and DHS, but additional agencies integral to accurate records are the Internal Revenue Service and state workforce agencies that report the Social Security numbers of new workers to the SSA. According to a July 11, 2006, Government Accountability Office (GAO) report, each source contains data that are incomplete and outdated. As industry employers, we are seriously concerned about forcing terminations on employees who are legitimate workers but who have been unable to obtain a bureaucratic solution.

Only when an agency is equipped with personnel and resources to correct errors in a timely manner can employers be assured of the continued employment of workers who have some discrepancy among their records. It is critical that these discrepancies be adequately addressed so eligible workers can work and employers are given the proper resources to fully comply with current law.

The construction industry is committed to full compliance with law while continuing to build the strength of the American economy with a viable and legal workforce. We appreciate the opportunity to comment. Questions regarding these comments may be directed to Anita Drummond at (703) 812-2000 or drummond@abc.org.

Sincerely,

Associated Builders and Contractors
Associated General Contractors of America
Mason Contractors Association of America
National Association of Homebuilders
National Association of Minority Contractors
National Roofing Contractors Association
Plumbing-Heating-Cooling Contractors Association

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Autumn Veazey [AVeazey@uffva.org] |
| **Sent:** | Monday, August 14, 2006 5:01 PM |
| **To:** | Regs, Rfs |
| **Cc:** | Angela Bezon; Robert Guenther |
| **Subject:** | United Fresh Fruit and Vegetable Association's comments regarding "No-Match" letters proposed rule, 71 Federal Register 34281 |

**Attachments:** nomatchrulecomments.doc

Please find attached United's comments regarding the DHS Proposed Rule on "No-Match" letters.  We are submitting an electronic version only.  Please contact me if you have any questions or concerns.  Thanks.

**Autumn L. Veazey**
**Director of Legislative Affairs, Associate Counsel**
**United Fresh Fruit & Vegetable Association**
**1901 Pennsylvania Ave. Suite 1100 NW**
**Washington, D.C.  20006**
**(202)303-3400**

**No-Match Cert. Admin. Record  1728**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | R. Craig Silvertooth [csilvertooth@nrca.net] |
| **Sent:** | Monday, August 14, 2006 5:03 PM |
| **To:** | Regs, Rfs |
| **Cc:** | Craig Brightup; William Good; R. Craig Silvertooth; Stephen M. Phillips |
| **Subject:** | DHS Docket No. ICEB-2006-2004 |
| **Importance:** | High |
| **Attachments:** | DHS No-Match Comments.doc |

Dear Director:

Please find attached NRCA's comments on DHS Docket No. ICEB-2006-2004.

Thank you,
Craig Silvertooth

R. Craig Silvertooth
Director of Federal Affairs
National Roofing Contractors Association
324 Fourth Street, N.E.
Washington, D.C. 20002
Tel: (202) 546-7584
Fax: (202) 546-9289

**No-Match Cert. Admin. Record  1729**

 **NATIONAL ROOFING CONTRACTORS ASSOCIATION**

Washington Office
324 Fourth Street, N.E.
Washington, D.C. 20002
202/546-7584
FAX: 202/546-9289
http://www.nrca.net

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N.W.
2nd Floor
Washington, D.C. 20529
*Sent via Electronic Mail*

**Re:    DHS Docket No. ICEB-2006-0004, regarding "Safe Harbor Procedures for Employers Who Receive a No-Match Letter"**

Dear Director:

On behalf of the National Roofing Contractors Association ("NRCA"), thank you for the opportunity to provide comments on the Department of Homeland Security's ("DHS") proposed rule cited above.

Established in 1886, NRCA is one of the construction industry's oldest trade associations and the voice of professional roofing contractors worldwide. NRCA is an association of roofing, roof deck, and waterproofing contractors; industry-related associate members, including manufacturers, distributors, architects, consultants, engineers, and city, state, and government agencies; and international members. NRCA has approximately 4,000 members from all 50 states and 54 countries and is affiliated with 105 local, state, regional and international roofing contractor associations.

**Background**

NRCA submits these comments in response to the June 14, 2006, *Federal Register* notice published by DHS, in which the Department proposes to alter existing regulations on how employers are expected to respond to "no-match letters" from the Social Security Administration ("SSA") or DHS.

DHS has signaled that it intends to prosecute employers for immigration violations through gaining greater access to the records of SSA and for failure of employers to terminate employees who are the subject of SSA "no-match" letters that are not resolved. The proposed regulation would, in effect, require employers to terminate workers who are the subject of SSA "no-match" letters if the discrepancy was not resolved within 60 days after the employer's receipt of the "no-match" letter.

When the information contained on a W-2 form does not match SSA's records, SSA issues "no-match" letters so that workers may be properly credited with Social Security earnings. SSA letters are not intended for immigration enforcement purposes, and SSA data currently is not shared with DHS. At the present time, federal immigration regulations do not require employers to take specific actions when receiving a SSA "no-match" letter.

While stating that whether an employer would be found to have constructive knowledge in particular cases depends on the "totality of the relevant circumstances," the regulation proposed by DHS on June 14, 2006, describes specific steps that an employer should take upon receipt of a SSA "no-match" letter or DHS communication to avoid a finding that the employer had constructive knowledge of employing an illegal alien. If the employer failed to follow the "safe-harbor" procedures prescribed in the proposed regulation and an employee, who was the subject of a "no-match" letter, was found to be an unauthorized alien, the employer may be found to have constructive knowledge of the employee's unauthorized status and would be liable for an immigration violation. NRCA understands that an employer may take the following steps to avoid a potential finding that it possessed constructive knowledge:

**(1)**   Upon receiving a no-match letter from SSA, the employer should check its records promptly to determine whether the discrepancy is due to a typographical, transcribing or similar clerical error in the employer's records or in its communication to SSA. If there is such an error, the employer would correct its records, inform SSA, verify that the corrected information resolves the issue with SSA, and make a record of the manner, date and time of the verification. The employer is to take these steps within 14 days of receipt of the "no-match" letter.

**(2)**   If step (1) above does not resolve the discrepancy, the employer is to request the employee to confirm that the employer's records are correct. If correction is required, the employer would make the correction, inform SSA, verify the corrected records with SSA; the employer should also make a record of the manner, date and time of any such verification as SSA may not provide any documentation. If the employee states that the employer's records are correct, the employer is to request the employee to resolve the discrepancy directly with SSA. Again, the employer is to take these steps within 14 days of receipt of the "no-match" letter.

**(3)**   Within 60 days of receipt of the "no-match" letter, the employer is to verify with SSA that the employee's name and Social Security Number ("SSN") matches SSA's records. If the employer has not verified with SSA that the discrepancy has been resolved, but the employee maintains he is authorized to

2

work, the employer must, within no more than a total of 63 days after receiving the "no-match" letter, re-verify the employee's identity and work authorization by following a modified version of the I-9 procedure. No document containing the SSN that was the subject of the "no-match" letter can be used, and no document without a photograph may be used to establish identity.

**(4)**    If the discrepancy in the "no-match" letter is not resolved within 60 days, and if the employee's identify and work authorization cannot be verified as prescribed in step (3) above, then, according to the DHS proposal, the employer must choose between terminating the employee or facing the risk that DHS may find that the employer had constructive knowledge that the employee was an unauthorized alien, and the employer violated the law by continuing to employ the individual.

The proposed regulation acknowledges that there may be other procedures an employer could follow in response to a "no-match" letter that DHS might consider reasonable depending upon the totality of relevant circumstances. However, DHS warns that an employer who follows a procedure other than the safe-harbor procedures described in the proposed regulation would face the risk that DHS may not agree. Employers are to follow the procedures in the regulations uniformly to all employees who are the subject of "no-match" letters; otherwise, DHS cautions, the employer may violate applicable anti-discrimination laws.

**Concerns with the DHS Proposal**

NRCA is concerned about the negative impact this proposal may have on the association's members. NRCA and its members are committed to full compliance with the law and have long advocated a comprehensive overhaul of our nation's immigration system. But for the reasons outlined below, we believe this proposed regulation is the wrong rule at the wrong time.

**I.  Proposed Regulation Usurps the Legislative Process**

NRCA strongly believes the underlying issue DHS aims to address should be handled through the legislative process. Further, we are of the opinion that the timing of the proposed rule is premature, as both chambers of Congress have passed immigration reform legislation within the last year that includes new employment eligibility systems and enforcement mechanisms. It is important to note that both the Senate bill (S. 2611) and the House bill (H.R. 4437) specifically address employer obligations in those instances when an employer receives a "no-match" letter from the SSA or DHS.

Given the two chambers presently are attempting to reconcile the differences between the pieces of legislation, and the White House is actively engaged in helping Congress fashion a comprehensive package acceptable to both chambers, NRCA urges DHS to withdraw the proposed regulation until the legislative process has run its course. The probable disruption to the economy and lives of those workers fueling the nation's economic growth suggests that the

3

disadvantages of DHS moving in piecemeal fashion before Congress has acted grossly outweigh any perceived benefits of penalizing employers who are forced to contend with our nation's dysfunctional immigration system. Short of that, NRCA requests that DHS give careful consideration to the concerns outlined below.

## II.  Accuracy of SSA Records

The SSA database is notoriously inaccurate. Frequently, "no-match" notices result from name changes and clerical errors, such as transposed numbers or other honest mistakes. For the construction industry, and specifically the roofing sector, the mismatch problem is exceptionally severe as workers who identify themselves as being Latino or Hispanic represent fully one-third of the construction workforce. Name-matching problems with SSA are common among this community due to multiple surnames of individuals, rather than the traditional first-middle-last name pattern of most native-born Americans. According to a July 11, 2006, Government Accountability Office ("GAO") report, the SSA database contains incomplete and outdated data. NRCA and its members are deeply concerned with the prospect of terminating employees who are legitimately authorized to work, but who have been unable to obtain a resolution within the allotted 60-day period due to corrupt data. It is particularly troubling, given that the GAO has confirmed that the database, which DHS suggests should be used to determine work eligibility, is rife with inaccurate data.

## III.  Insufficient Resolution Timeline

The proposed timeframes in the June 14 proposal are impractical. The 14-day and 60-day periods are not viable timeframes in which to rectify data problems simply due to the problems attendant to erroneous and incomplete records in the SSA system. Assuming an employer, after receiving a "no-match" notice, informs the employee of a discrepancy within the 14-day period, the employer is allotted 60 days, from the date of receipt, to verify with SSA that the discrepancy has been resolved. Accordingly, an employee who is the subject of a "no-match" letter would have less than two months to resolve any errors with SSA. Presumably, the employer would be forced into a situation of having to terminate a worker's employment, even if the employee had not yet exhausted the appeals process. It is not clear that the 60-day time period is an adequate amount of time in the current enforcement environment, let alone in a new era in which DHS ramps up efforts to identify the estimated 12 million undocumented immigrants in the U.S. economy. There is every reason to believe SSA's resources and infrastructure will be stretched beyond capacity if DHS moves forward with this proposal, and regrettably, honest employers and lawfully-employed workers will be harmed in the process.

Though 14 days may sound reasonable in theory, as a practical matter, the allotted time by which an employer must respond to a "no-match" is not a reasonable period of time. Both large and small employers will be severely challenged to meet this standard. Large employers may receive several "no-match" letters simultaneously -- each containing multiple names, magnifying the difficulty of resolving all of the discrepancies within the prescribed timeframe. Regarding smaller firms, they often do not have a full-time administrative staff to address these issues.

4

Small business owners often have to run the business, oversee bookkeeping, supervise its employees and perform administrative duties. The construction industry would be particularly hard hit by this requirement, as most firms are small and operate outside of a conventional office environment. Employers in the construction industry spend the bulk of their time at job sites, not an office; they are frequently not even near a computer, let alone hard copies of their employment records. For these reasons, the 14-day period for the initial response is unreasonable and will be unduly burdensome for employers. NRCA therefore requests that this requirement be amended to a 45-day period.

## IV.  Small Business Disproportionately Burdened

For the reasons noted above, this proposal will impact small business negatively and disproportionately. The average construction company is a small business, with a lean administrative staff and the bulk of its workforce (including management) outside of the home office. But aside from the administrative hardship this proposal would present small business, smaller firms can ill afford shocks to the size of their labor forces, whereas a larger firm possesses a stronger capacity for absorbing such disruptions. This is especially true in construction. Our industry operates under unique demands such as weather restrictions, performance and bonding requirements in contracts, and strict timetables for delivery of the construction product and service. Absorbing labor shortages in the middle of projects is potentially disastrous for small construction companies, as failure to meet timetables can result in non-payment by the building owner or general contractor. Further, worker shortages disproportionately impact smaller construction companies because it jeopardizes their ability to bid for future contracts. NRCA requests that DHS carefully consider the economic and administrative dislocation for small business.

## V.  Solvency of the Proposal and Growth of the Underground Economy

The fundamental test of sound policy is for the problem being addressed to be solved. But the proposed regulation will have no discernible impact on undocumented immigration and actually threatens to exacerbate the problems attendant to illegal immigration. NRCA believes the DHS proposal will fail this simple test for three reasons.

First, those undocumented workers faced with the prospect of termination will simply enter the unregulated, underground cash economy and end up working in marginal jobs with poorer working conditions. Workers in the underground economy do not pay taxes and are in a deeper state of anonymity than those undocumented immigrants working under the stewardship of legitimate employers. Second, the proposed regulation targets the wrong employers. It addresses employers who are attempting to comply with the law, but it fails to address those underground employers who do not comply with the law, do not fill out Form I-9, pay cash off the books and can be fairly characterized as "bad actor" employers. And third, by not addressing this true underground economy and only proposing increased regulations on those employers trying to act in accordance with the law, there is an unintended incentive created for employers to revert to working in the underground economy. Otherwise honest employers may choose not

5

to follow the safe-harbor procedures outlined in the proposed regulation. Faced with the prospect of closing their doors, many employers may decide to take a different approach after considering the totality of the circumstances. There will be instances in which employers opt for an informed business decision, rather than electing to adhere to the "safe harbor" guidance. This is not sound economic policy, nor is it in America's national security interest to push people deeper into the shadows.

The consequences of such a policy failure are staggering. As employers and employees go "off the books," billions of dollars will be lost in federal, state and local tax revenues. Unfair competitive practices will flourish as those employers straining under the new system lose market share to those employers who increasingly work off the books. And exploitation of workers by unscrupulous employers will rise, as those employers will take advantage of the daily fear of apprehension and deportation by undocumented immigrants.

## VI.  DHS Should Focus Enforcement on "Bad Actors"

DHS should focus its limited resources on firms that employ undocumented workers in large numbers and build the practice into their business models. By concentrating its attention on employers that have demonstrated a pattern of deliberately skirting the law, DHS would channel scarce resources more efficiently than it would by proceeding with enforcement actions against firms receiving few "no-match" notices. NRCA urges DHS to consider establishing a threshold of "no-match" hits before an employer is targeted for enforcement. For instance, DHS could create a safe harbor for companies with fewer than 10 "no-match" letters in any given calendar year. Such a policy would signal a sensitivity for the small business community by helping level the playing field for companies with fewer employees and administrative resources.

## VII.  Firing of Workers

An unfortunate, yet certain, consequence of the DHS proposal is that if an employer receives a "no-match" letter, many employees will simply be fired. Given the complexity of the proposed rule, many employers will make a "business decision" to endure the economic disruption associated with losing a valued employee, rather than risk legal liability by attempting to remedy the "no-match" notice. Out of caution, panic and confusion surrounding the intricacies of the rule, and unfortunately ethnic profiling as well, many employers will select the safe legal route by shedding the potential legal liability associated with workers who are the subject of "no-match" notices. Once again, the integrity of the SSA database comes into play, as U.S. citizens and legally-authorized immigrants will undoubtedly face termination. Unquestionably, wrongful terminations are not DHS' intent, but DHS should bear in mind its culpability in such terminations should it proceed with the rule.

6

## VIII.  Proposal Threatens to Damage the U.S. Economy

The proposed regulations fail to account for the economic and social realities that U.S. employers confront – current domestic demographic trends, coupled with inadequate channels for legal immigration, present the business community with a chronic shortage of available workers.

Put simply, America faces a demographic time bomb.  The native-born workforce is growing older and will soon begin to contract.  According to United Nations estimates released in February 2005, the fertility rate in the U.S. is projected to fall below "replacement" level by 2015, declining to 1.9 children per couple.  Meanwhile, two incompatible trends are emerging. First, the labor force continues to age.  The U.S. Department of Labor's Bureau of Labor Statistics ("BLS") projects the annual growth rate of the 55-and-older group to grow at four times the rate of the overall labor force the next decade.  This group will cycle out of the labor force at escalating rates.  By contrast, the annual growth rate of the 16-to-54 year age group will be more or less flat.  Second, the U.S. economy keeps generating high labor demand at the lower rungs of the occupational ladder.  BLS reports that 98 percent of projected employment growth between 2002 and 2012 will be in industries characterized by jobs that do not require high levels of education.  Construction is one of these industries.  BLS also expects employment in all occupations to rise by 21 million jobs between 2002 and 2012.  But because of changing demographics and worker retirements, there will be 56 million job openings during the decade, or an average 2.6 job openings for each net additional job.

Exacerbating these disturbing trends by imposing additional hardships on employers struggling to provide the products and services Americans demand will jeopardize many of the foundation industries in the U.S. economy.  Construction is one of these industries, representing more than 9 percent of the Gross Domestic Product and more than 12 percent of America's employers.  Over the last decade, construction employment grew 52 percent.  By comparison, overall employment growth was 20 percent during the same period.  Today, there are 7.2 million employees in the industry, and BLS reports that another 792,000 new construction jobs will be created between 2004 and 2014.  BLS also projects the roofing industry alone will need 70,000 new workers during the next decade just to keep pace with the demand for professional roofing services. These growth trends underscore the importance of DHS taking into account the economic costs of this proposal.

## Conclusion

NRCA urges DHS to withdraw this proposal and allow Congress to finish the work it has begun. Though DHS intends to focus on one narrow aspect of its enforcement portfolio, the implications of DHS moving forward with the proposed rule is much broader.  The economic and national security needs of America will not be advanced if DHS proceeds.  Millions of workers in the U.S. economy – authorized and unauthorized – will see their livelihoods jeopardized.  At the same time, the proposal will damage national security and stretch scarce enforcement dollars further, as workers descend deeper into the shadows.

NRCA appreciates the opportunity to submit these comments and thanks DHS in advance for giving careful consideration to the views of the U.S. business community on this important subject.

Respectfully submitted,

R. Craig Silvertooth
Director of Federal Affairs

8



United Fresh Fruit &
Vegetable Association

August 14, 2006

**VIA ELECTRONIC MAIL**

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

     Re:    **Docket No. ICEB-2006-0004**
             **Safe Harbor Procedures for Employers Who Receive a No-Match**
             **Letter**
             **(FR 71:114, p.34281)**

To Whom It May Concern:

On behalf of our organization, we would like to express the growing concern among our members over the Bureau of Immigration and Customs Enforcement, Department of Homeland Security's ("DHS") Proposed Rule regarding "no-match" letters published in the Federal Register on June 14, 2006 (71 *Federal Register* 34281). In lieu of submitting redundant comments, we hereby incorporate by reference, in its entirety, the comments filed by the National Council of Agricultural Employers ("NCAE").

United Fresh Fruit and Vegetable Association (United) is the leading, national trade group representing member growers, shippers, packers, processors, marketers and distributors of fresh produce in the United States. United members provide the leadership to shape business, trade and public policies that drive our industry. Working with thousands of industry members, United provides a fair and balanced forum to promote business solutions; helps build strong partnerships among all segments of the industry, promotes increased produce consumption; and provides scientific and technical expertise essential to competing effectively in today's marketplace. United is actively engaged in both the legislative and regulatory process, with a goal of promoting comprehensive immigration reform, including proposals that would ensure American agriculture a legal workforce. Therefore, United and its membership will be affected by the above-referenced Proposed Rule, and we respectfully request that you consider the comments referenced and submitted by the NCAE.

                                        Sincerely,

                                        Robert Guenther

**No-Match Cert. Admin. Record  1738**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Austin Perez [austinp@fb.org] |
| **Sent:** | Monday, August 14, 2006 5:00 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket No. ICEB–2006–0004: Proposed rule; Safe-Harbor Procedures for Employers Who Receive a No-Match Letter |

**Attachments:** labor-immigration06.814.doc

This is a duplicate of comments submitted by Lauren Airey at 4:58 PM EST to ensure receipt.  Please let me know if there are any questions.  -a

Austin Perez
Director, Congressional Relations
American Farm Bureau Federation
202-406-3669 (Direct)

**No-Match Cert. Admin. Record  1739**

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
DHS Docket No. ICEB—2006—0004
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

Subject:  **Proposed Rule; Safe-Harbor Procedures for Employers Who Receive a No-Match
Letter, 71 <u>Fed. Reg.</u> 34281 (June 14, 2006)**

To Whom It May Concern:

The American Farm Bureau Federation (AFBF) appreciates the opportunity to offer the following
comments on the above referenced proposed rule.

Under current law, it is illegal for a U.S. employer *knowingly* to hire or continue to employ a person who
is not authorized to work in the United States (8 USC 1324a).  "Knowing" is a term defined in current
regulations that goes beyond actual knowledge to include that "which may fairly be inferred through
notice of certain facts and circumstances which would lead a person, through exercise of reasonable care,
to know about a certain condition" or, in other words, to have  "constructive knowledge" (8 CFR
274a.1(l)).  The proposed rule would further define this second category or "constructive knowledge" to
provide that employers would become subject to a finding upon failing to take reasonable steps after
receiving written notice from either the Social Security Administration (SSA) or the Department of
Homeland Security (DHS) that a wage report or document does not match such agency records.  The rule also
describes a set of "reasonable steps" employer may take to avoid a finding of constructive (but not actual)
knowledge; employers following the outlined steps would obtain a "safe harbor" from prosecution over a
finding of "constructive knowledge."

AFBF commends DHS for proposing a safe harbor for employers who do not knowingly employ
unauthorized workers.  For more than a decade, the SSA "no-match" notice has raised questions about an
employer's obligations under the employment authorization provisions of immigration law after that
employer has taken all appropriate steps to verify employment eligibility.  U.S. agriculture has repeatedly
requested guidance on whether and how an employer is to respond to such a notice without putting the
employer in legal jeopardy due to the employer's obligation under anti-discrimination provisions of the
same law (8 USC 1324b).  In part, this proposed rule represents an attempt to address those concerns and
provide employers with guidelines in hiring and firing decisions.  We appreciate DHS efforts.
Unfortunately, there are a number of situations – many of which are unique to the agricultural sector –
that may not have been fully considered during development of the safe harbor provisions.  With these
comments, we identify such situations and strongly urge that the final regulation incorporate our
recommended changes to ensure that the safe harbor provisions are equally available to all employers and
all parts of agriculture.

**Apply the Safe Harbor to Seasonal Employers**

The proposed rule states that employers would be deemed not to have constructive knowledge and thus
obtain a safe harbor from prosecution if the employers take the following steps in response to a no-match
notice.  Upon receiving notice, employers would have 14 days to check records and report to SSA or DHS

regarding any necessary corrections or, if records cannot be corrected, to instruct the worker to go to the local SSA or DHS office to fix the problem. · A Social Security mismatch would not be resolved until the employer has first verified the new information with SSA. If the employee does not return with new or corrected information within 60 days of the employer's receipt of the mismatch letter, the employer then has three days to complete a new Form I-9. When completing a new form, the employer would not be allowed to use documents containing the Social Security or alien identification number that was subject to the earlier no-match notice. At the same time, no document without a photograph could be used to establish identity or identity and employment authorization. (71 Fed. Reg. 34285.)

Our reading of the proposed regulation is that each step would need to be followed as spelled out in the rule in order for the employer to become eligible for the safe harbor. This is important because while DHS acknowledges that there may be other reasonable steps that could lead to a safe harbor, the employer, in following procedures other than the ones outlined in the rule, could "face the risk that DHS may not agree" (71 Fed. Reg. 34283). The practical effect of this approach could have a significant detrimental effect on seasonal employers and effectively vitiate the protections of the safe harbor for a large segment of agriculture. <u>One set of employers should not be given the certainty of a prescribed safe harbor while another is forced to define one on a case-by-case basis with DHS approval; seasonal employers should not be denied the benefit of safe harbor provisions just because their business is seasonal in nature.</u>

There are several situations, in which an agricultural employer may not be able to take all of the required steps to obtain the safe harbor, including:

1) <u>Single season workers</u>. While timing will vary with crop, season, and other criteria, seasonal farmers (in the Midwest, for example) generally submit wage reports to the IRS (Forms W-2) in February for employees who were employed during the previous harvest season and, in most instances, are no longer employed. Should a report on such an employe generate an SSA no-match notice, such a notice in all likelihood would not be sent to an employer until late winter or the following spring – well over a year since the individual was employed. In many instances, such employees do not return to the original place of employment. For those who do, depending on crop and nature of work, such employees would not be re-hired until 14, 60, or 63 days after the employer has received the notice. Further, many farm workers may "follow the crops" by migrating from state to state, and these workers may not permanently reside locally. Few such workers leave forwarding information since the prevailing practice is to terminate, not layoff, the worker between seasons. While the employer could meet the safe harbor requirement to check his or her records, the employer would not be able to meet the other requirements. The employer would not be able to reach employees despite making every reasonable effort. We strongly believe that these employers should not be denied the safe harbor for reasons that are beyond employer control. *Recommendation: We urge DHS to clarify in the final rule that the safe harbor extends to employers who, in addition to meeting the requirement to check records, can document attempts to reach a former employee who is the subject of a no-match notice.*

2) <u>Off-season workers</u>. As stated in 1) above, some workers listed on a previous no-match notice may not be re-hired until 14, 60, or 63 days after the employer has received the notice. Few farm workers leave forwarding information and therefore may not be reachable off-season. *Recommendation: If an employee who is subject to a previous no-match notice returns in a following season, we would recommend that the clock start ticking on the first day of re-hire after receipt of the notice. For off-season workers who fail to return in a subsequent season, we would offer the same recommendation as stated in 1) above.*

2

**No-Match Cert. Admin. Record  1741**

3) <u>Short season workers</u>. The duration of a season may vary widely across the United States depending on crop and location. For example, in the state of Washington, approximately 75,000 migrant and seasonal workers are employed each year on small family-owned farms; many of these workers are employed for periods as short as two weeks. Under these circumstances, an employer may be able to check records, ask the employee to confirm those records and in the event there are no errors, instruct the employee to follow up with SSA or DHS all within 14 days. But, if the employee migrates from crop to crop, there may not be an opportunity for the employee to resolve the issue with SSA or DHS within the 60 days prescribed by the rule. Once the employee has moved on, there would not be an opportunity for the employer to take the next step, which is to complete a new Form I-9. *Recommendation: The 14-, 60-, and 63-day periods should toll only while the employee is employed with the employer. For example, if the employee moved on to the next crop on day 15, the clock would stop. Upon re-hire in the next season, the clock would re-start and the employee would have 45 days (for a total of 60 days) in which to follow up with DHS or SSA and report any corrections to the employer. Again, for short season workers who fail to return in a subsequent season, we would offer the same recommendation as stated in 1) above.*

All of the above examples pertain to situations in which an employer is not able to follow every one of the necessary steps to obtain the safe harbor. The reverse situation could also occur: The employer follows every step outlined in the regulation but the no-match issue is not resolved.

1) <u>Wage Report Mismatch</u>. For I-9 Form purposes, an employee may provide documents that do not contain a Social Security or alien identification number – a birth certificate and driver's license with a photograph, for example. But because the employer has submitted a Form W-2, the employer may receive a no-match notice from the SSA if there are sufficient numbers of mismatches. It is not clear from the proposed rule whether the employer could simply re-use the same documents on the new Form I-9 in this instance. It is also not clear whether the employer would be held liable if the employee writes in Section 1 of the new form a Social Security number that is the subject of a notice but does not provide a Social Security card. *Recommendation: DHS should clarify whether an employer would be deemed to have constructive knowledge under these circumstances; if so, DHS should specify the employer's legal obligations under immigration law including the anti-discrimination provisions (8 USC 1324b).*

2) <u>Multiple Season Mismatches</u>. An employer may take every step outlined in the proposed rule, up to and including completing a new I-9 Form, yet receive a no-match notice next season. During a two-week harvest when producers are working nearly round the clock to harvest a perishable crop in a short time-frame when every day is precious, it may be difficult for larger seasonal employers (e.g., 500-750 employees) to keep track of every one of the returning employees. Even if the employer recognizes and can keep track of every single worker, the rule does not appear to preclude the employer from obtaining the safe harbor if the employee keeps responding with new information to each document request. For example, an employee might provide one Social Security card the first year which triggers a no-match notice the following year, provide another Social Security card in the second year in response to the original notice which cannot be verified with SSA in 60 days and then provide yet a third Social Security card for the new I-9 Form between day 61 and day 63. *Recommendation: DHS should clarify whether an employer under these circumstances could still obtain the safe harbor from a constructive knowledge finding. If so, DHS should clarify whether it would deem such employer as having actual knowledge of the worker's unauthorized status.*

3

Many farmers hire and pay an independent contractor to provide workers during the season, with the understanding that the contractor will be the employer for all purposes, including employment eligibility verification. Yet the Department of Labor could determine that both the farmer and the contractor are "joint employers" under the Fair Labor Standards Act (29 USC 201 *et seq.*) or the Migrant and Seasonal Agricultural Worker Protection Act (29 USC 1801 *et seq.*). However, it is not clear from the rule whether the farmer or the contractor would have to obtain the safe harbor to avoid prosecution. *Recommendation: DHS should clarify the employer's obligations under immigration law relative to the agricultural joint employment standards.*

Some seasonal agricultural employers hire non-immigrants with a temporary work authorization (e.g., under the H-2a program) or immigrants with permanent work authorization. The proposed rule expressly identifies a "labor certification or application for prospective employer" as information that could prompt a constructive knowledge finding. But while the rule would describe the steps for an employer to take upon receipt of written notice from SSA or DHS over a wage report or document, it does not include any steps for a labor certification. An employer should not be denied the certainty of a prescribed safe harbor just because the employer hires a worker requiring a labor certification. *Recommendation: DHS should specify a safe harbor for employers of workers requiring a permanent or temporary labor certification.*

## Apply the Safe Harbor to Hiring Decisions

In the notice of proposed rulemaking, DHS expressly states that following the safe harbor requirements "will eliminate the possibility that DHS … will allege, based on the totality of relevant circumstances, that an employer had constructive knowledge that it was employing an alien not authorized to work in the Unites States" (71 Fed. Reg. 34282). However, it is not clear whether the safe harbor would also apply to hiring decisions.

As outlined above, there are several reasons why an employer would be prevented from meeting all of the steps necessary to obtain the safe harbor. A good example is when the worker quits: some employees, when confronted with the no-match notice, will quit without offering a reason. The employer would have checked his or her records and found no errors, meeting the first step. He or she may be asking the employee to confirm records or instructing the employee to follow up with SSA or DHS, which is the second step. Nevertheless, the employee would fail to respond within 60 days (the third requirement), and the employer would not be able to comply with the final requirement to fill out a new I-9 Form within 63 days.

While we are confident that DHS would not prosecute this employer for continuing to employ the worker (after all, the employee quit in this instance), there is still a question as to whether the employer's receipt of the no-match letter would still be grounds for a finding that the employer had constructive knowledge of hiring an unauthorized worker. A reasonable person might infer from the worker quitting that the worker is avoiding detection as an unauthorized worker.

However, we do not believe a constructive knowledge finding can or should be imputed to an employer merely based on the fact that the employer has received a no-match notice. Because the worker did not offer a reason for quitting, the employer could not have actual knowledge that the worker quit to avoid detection. And if the employer had properly completed the Form I-9, the employer would not have reason to suspect that the employee was not employment eligible.

*Recommendation: We recommend that DHS clarify that the safe harbor would apply to previous hiring decisions under these circumstances.*

4

**Extend the 14- and 60-Day Deadlines**

Under the proposed rule, upon receiving notice employers would have 14 days to check records and report back to SSA or DHS or instruct the worker to follow up directly with SSA or DHS. If the employee does not return with corrected information within 60 days, the employer would then have three days to complete a new Form I-9. (71 Fed. Reg. 34285.)

In the agricultural sector, more than 90 percent of operations are family owned and operated. The size of the operation may vary from a single hired worker up to 500 or more workers. Some operate year round while others plant, cultivate or harvest during seasons that may range from as few as two weeks to as many as 48 weeks a year. For example, in Washington, where there are approximately 75,000 seasonal and migrant workers employed each year on small family farms, many are employed for periods as short as two weeks. At a typical operation, one office person will hire more than 100 workers at one time.

On the farm, the grower's spouse often constitutes the "Human Resources Department" and the spouse may not work full time. Access to a computer or to a local branch of SSA or DHS may be limited in more remote areas of the country. Mail may not be processed at a frequency greater than once a week or the notice might arrive when the grower is off-season, on vacation or at a trade conference. While employers with a dedicated H.R. department and staff may be able to check and correct records or notify the employee within 14 days, not every agricultural employer would be able to do so. *Recommendation: We recommend extending the timeframe for the first deadline (in which an employer must check, correct or inform) to at least 30 days.*

Similarly, 60 days may be too short a time period for farm workers to comply with the second requirement (to respond with new or corrected information). On a grape farm in New York state, for instance, the workers are working nearly round-the-clock for about two months in the spring and about three months solid in the fall between harvest, crushing, fermenting, and subsequent "cellaring." Asking them to take a long time out to drive to the nearest SSA office may not be completely practical. *Recommendation: DHS should extend the second deadline to at least 90 days.*

**Address Discrimination Issues**

The current regulatory definition of "knowingly" includes the following provision:

> "Nothing in this definition should be interpreted as permitting an employer to request more or different documents than are required under [8 USC 1324a(b)] or to refuse to honor documents tendered that on their face reasonably appear to be genuine and to relate to the individual." 8 CFR 274a.1(l)(2).

In the proposed rule, DHS adds a clause to this provision to exclude documents that are subject to a no-match notice: ", except a document about which the employer has received a notice described in paragraph (l)(1)(iii) of this section and with respect to which the employer has received no verification as described in paragraph (l)(2)(i)(B) or (l)(2)(ii)(B)." The proposed rule would not address the anti-discrimination provisions under Title VII of the 1964 Civil Rights Act ("Title VII") (42 USC 2000e-2).

AFBF applauds DHS for attempting to provide employers with some certainty in their hiring and firing decisions, beyond the limited protection afforded by completing an I-9 Form. Under current law, an employer who is not sufficiently aggressive in examining documents would run the risk of violating the employment authorization provisions of immigration law (8 USC 1324a). But, by being too aggressive, the same employer would run the risk of violating the anti-discrimination provisions in the same law, and

5

there have been more growers charged with discrimination under the immigration law than with employer sanctions. Excluding no-match documents from anti-discrimination provisions would make it much easier for employers to meet the employer authorization provisions.

*However, AFBF strongly urges DHS to make whatever changes to the proposed rule necessary to ensure the rule will not lead to additional discrimination lawsuits under Title VII.* For decades, agriculture has been plagued with nuisance suits, the purpose of which has been not necessarily to win on the merits but to outspend the grower so as to make an example for the wider agricultural community. If the legal and social costs are high enough, farmers will settle instead. The questionable tactics of these lawyers have been well documented in Rael Jean Isaac's <u>Harvest of Injustice</u> (please see http://www.nlpc.org/harvest.asp). For a more recent example, please see *Malacara v. Garber* (5th Cir. December 9, 2003) (LSC-funded lawyers sued a 70-year-old Ohio vegetable farmer under a Federal law that did not even apply to small family farmers; the farmer won in lower court and at appeal but it cost him more than $100,000 of his hard-earned money to prove the complaint lacked merit.). <u>If history is any indication, we would expect activist attorneys to test the boundaries of the proposed rule in court, and agricultural employers are the most likely test subjects; agriculture should not have to pay additional legal expenses because the proposed rule fails to address considerable legal issues.</u>

There also may be legal arguments against the rule in its proposed form.

For example, the Tenth Circuit Court of Appeals in *Zamora v. Elite Logistics, Inc.* (10th Cir. June 6, 2006) recently reversed a lower court decision for the employer and let a Title VII national- origin claim go to a jury. The employer was acting on a tip he could have received from DHS (i.e., an employee was using a Social Security number for I-9 Form purposes that another had used multiple times in another state). He responded by taking precisely the step required to qualify for the safe harbor (i.e., the employer requested another document). The safe harbor would not protect employers from Title VII. And all some lawyers need is an argument, not even a strong one, to compel growers to settle. If DHS does not adequately address these issues, it will defeat the purpose of the proposed rule, which is to facilitate compliance with 8 USC 1324a.

### Clarify whether name or number trigger constructive knowledge finding

Employers would be subject to a constructive knowledge finding if failing to take reasonable steps upon receiving written notice from SSA that the "combination" of name and Social Security number does not match agency records. But SSA has sent several forms of the no-match letter in the past; one takes the form of a simple list of numbers with no corresponding identifying names. If the employer receives this form of the letter, one could not conclude that the name also mismatches agency records. It appears that both the name and the number must not match to become subject to the rule. *Recommendation: DHS should clarify precisely what is meant by a "combination" mismatch.*

### Apply the Final Rule Prospectively

The proposed rule does not stipulate when the regulation would apply to employers. Given the many resource and other issues that are unique to agriculture, we would not support applying the rule on a retroactive basis. *Recommendation: DHS should apply the rule prospectively from its effective date.*

### Delay the Final Rule Pending Congressional Efforts

Both the U.S. Senate and House of Representatives have approved separate legislation (S. 2611 and H.R. 4437) that would address many of the same issues addressed in this proposed rule and reform of this part of the law is a high priority for the Administration. Thus, it is possible that there may be new law

**No-Match Cert. Admin. Record  1745**

respecting exactly these matters before the end of the year. Farmers do not want to be in position of having to change their operating procedures twice – once to accommodate this proposed rule and once again to accommodate a subsequent rule prompted by a new immigration law. Employers require certainty in Federal regulations in order to continue to grow and thrive.

While we recognize that employers need not use the safe harbor, if employees are not able to present documents consistent with the proposed rule, employers will be compelled to terminate those workers or risk a constructive knowledge finding and prosecution. AFBF has conducted an extensive economic study of the immigration impacts on agriculture. The study shows that of all the sectors of the U.S. economy, domestic agricultural production could be most severely and disproportionately affected on the order of $5 to $9 billion annually if labor restrictions take effect before growers have access to an adequate legal workforce. Federal surveys suggest that between a high percentage of agriculture's hired workforce may lack proper documentation, and we have already mechanized to a large extent. We would somehow have to replace those workers at a time when few Americans have shown a willing to take farm jobs. The impact of this proposed rule could be devastating, prompting many farmers to raise their prices at a time when the United States is opening its produce markets to significant foreign competition under North and Central American Free Trade Agreements.

*Recommendation: We strongly urge DHS to postpone further action on a final regulation until Congress acts on this issue.*

**Conclusion**

AFBF appreciates the opportunity to comment on this proposed rule and would be happy to assist you in any way we can. Please feel free to contact me or Austin Perez at 202-406-3669 (austinp@fb.org) if you have any questions or require additional information.

Sincerely,


Mark Maslyn
Executive Director
Public Policy


V:\stm\labor-immigration06.814

No-Match Cert. Admin. Record  1746

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Inzero, Gail V. (SC) [inzerobg@jacksonlewis.com] |
| **Sent:** | Monday, August 14, 2006 4:59 PM |
| **To:** | Regs, Rfs |
| **Cc:** | Christy Marr; spretanik@chickenusa.org; George Watts; Lauderdale, Chris (SC); Wylie, David R. (SC); Bowers, Carol N. (SC) |
| **Subject:** | Comments re: DHS Docket No. ICEB-2006-0004 |
| **Attachments:** | Ltr to U.S. Citizenship Immigration Services 8-14-06 - FINAL.doc |

<<Ltr to U.S. Citizenship Immigration Services 8-14-06 - FINAL.doc>>

**Gail Inzero**

Legal Assistant to Ingrid Blackwelder Erwin

Edwin G. Foulke, Jr. and D. Christopher Lauderdale

**jackson lewis** LLP

One Liberty Square

55 Beattie Place, Suite 800

Greenville, South Carolina 29601

Telephone: (864) 232-7000

Facsimile: (864) 235-1381

E-mail: inzerobg@jacksonlewis.com

Representing management exclusively in workplace law and related litigation.

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

**No-Match Cert. Admin. Record  1747**





August 14, 2006

Director of Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, Northwest, 2nd Floor
Washington, DC 20529

Re:     DHS Docket No. ICEB-2006-0004

Dear Sir or Madam:

The National Chicken Council and the National Turkey Federation jointly submit the following comments on the Proposed Regulation entitled "Safe-Harbor Procedures for Employees who Receive a No-Match Letter" 71 Fed. Reg. 34281 (June 14, 2006). The National Chicken Council (NCC) represents integrated chicken producer-processors, the companies that produce, process and market chickens. Member companies of the NCC account for approximately 95% of the chicken sold in the United States. The National Turkey Federation is the advocate for all segments of the U. S. Turkey Industry, and its membership represents nearly 100% of the turkey sold in the United States.

While we believe that the best course of action would be to enact such reforms as a part of comprehensive immigration reform legislation we commend the efforts of the Bureau of Immigration and Customs Enforcement to clarify what it deems to be an appropriate response upon the receipt of social security mismatch letters. We are very concerned, however, that the prescribed procedures will be practically impossible to implement within the timelines established by the proposed regulation.

### THE FOURTEEN DAY DEADLINE
### WILL NOT BE ACHIEVABLE IN MOST CIRCUMSTANCES

Under the Proposed Regulations an employer is required to take the following steps within 14 days of receipt of the mismatch letter in order to take advantage of the Regulation's safe harbor provisions:

- The employer must review its own records to determine whether the apparent mismatch was a result of a clerical error.

- If the letter is a result of a clerical error the employer is required to inform relevant agencies of that clerical error and verify that, as corrected, the name and number match the agency's records.

**No-Match Cert. Admin. Record  1748**

Director of Regulatory Management Division
U.S. Citizenship and Immigration Services
September 26, 2007
Page 2

- If the discrepancy cannot be resolved as a clerical error the employer is required to consult with the employee in question and to obtain confirmation that the information is correct. If the information is determined, as a result of this consultation, to be incorrect, the employer is then responsible for correcting its records and informing relevant agencies of the correction as well as verifying that the information, as corrected, conforms to that maintained by the agency.

- If, after consulting with the employer, the employee maintains that the information in the employer's files is correct then the employer must instruct the employee to pursue the issue directly with the Social Security Administration.

For several reasons we are very concerned that a 14 day timeline is impractical and will render the safe harbor provisions established by the Regulation illusory for many employers. These reasons include the following:

- The 14 day limit applies regardless of the number of apparent mismatches which an employer must resolve. Many employers in our industries employ tens of thousands of individuals in multiple facilities and in numerous locations. Mismatch letters typically do not identify individuals by locations where they reportedly work and it is not a generally feasible to resolve discrepancies as required by the regulations within a 14 day period. Even 20-30 such discrepancies among tens of thousands of employees would be difficult to resolve within a 14 day period where the individuals involved are employed in multiple locations.

- Language barriers in industries that employ a significant number of individuals for whom English is a second language or non-English-speaking individuals will further complicate the consultation required within 14 days of receipt of a mismatch letter. As a result, employers who must consult with such individuals will encounter significant practical difficulties in completing the steps required by the Regulations within 14 days.

- Compliance with the Regulation's safe harbor provisions will also be complicated by cultural differences. For example, different cultural conventions regarding adopting a spouse's name following marriage or naming children, which may be unfamiliar both to employers and to the Social Security Administration, will result in a higher number of mismatch letters for workers who have such cultural backgrounds. Regardless of their immigration status, individuals which employ customs related to names that are different than those that prevail in English-speaking cultures will therefore be disproportionately affected by these regulations. In many circumstances 14 days will not be a sufficient amount of time to resolve these issues.

- The Regulations do not take into account that, within any 14 day period, employees may be on vacation or otherwise be involved in a leave of absence which would prevent an employer from carrying out the steps required.

- Our member's experience with the Social Security Administration makes clear that obtaining the required verifications will generally be impossible within the deadline. The regulation does not address circumstances in which such verification has been requested, but not obtained, within 14 days. The failure or inability of the Social Security Administration to complete such verification should not result in loss of the safe harbor option.

- Employers with large numbers of employees will frequently receive mismatch letters as a result of individuals with common names. Such names may be common both in English or in other languages. To resolve discrepancies involving individuals with such common names may often require more than 14 days. This is particularly true where multiple facilities are involved.

### THE SIXTY DAY DEADLINE

Employers faced with a mismatch letter regarding any individual employee will be naturally concerned that any action they take is fully appropriate under applicable law. This requires ensuring not only that all obligations under the Immigration Reform and Control Act, as amended, are met but also ensuring that any decision to terminate an employee is consistent with applicable collective bargaining agreements, federal anti-discrimination laws and where applicable, state law. As noted in the Notice of Proposed Rulemaking "[e]mployers should apply these procedures uniformly to all of their employees having unresolved no-match indicators. If they do not do so, they may violate applicable anti-discrimination laws." Additionally, employers will be concerned with obtaining all relevant facts and fully understanding the circumstances in order to ensure fairness to individual employees. The cultural and language challenges discussed above will make this process more difficult. As a result, 60 days will frequently not allow sufficient time for employers to resolve issues raised by mismatch letters and ensure compliance with all applicable laws and regulations. As a result of the inadequate time frame prescribed by the current proposed Regulation many employers could be charged with constructive knowledge where such an inference is wholly unwarranted.

For the foregoing reasons we believe strongly that both the 14-day deadline and the 60-day deadline set forth in the regulations should be revised to allow sufficient time to complete the actions set forth therein. Extending these deadlines will not compromise any of the objectives that the agency seeks to achieve with the proposed rule.

Director of Regulatory Management Division
U.S. Citizenship and Immigration Services
September 26, 2007
Page 4

Alice Johnson, D.V.M.

President, National Turkey Federation

George Watts

President, National Chicken Council

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | Lauren Airey [laurena@fb.org] |
| **Sent:** | Monday, August 14, 2006 4:58 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Comments RE: DHS Docket No. ICEB-2006-0004 |

**Attachments:** labor-immigration06.814.pdf

Please see attached PDF document.

*Lauren Airey*
*Public Policy Assistant*
*American Farm Bureau Federation*
*600 Maryland Ave. SW Suite 1000W*
*Washington, DC 20024*
*Phone. 202-406-3696*
*Fax. 202-406-3606*
*laurena@fb.org*

**No-Match Cert. Admin. Record  1752**



**AMERICAN FARM BUREAU FEDERATION®**

600 Maryland Avenue S.W. • Suite 800 • Washington, DC • 20024 • (202)406-3600 • fax (202)406-3604 • www.fb.org

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
DHS Docket No. ICEB—2006—0004
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

**Subject: Proposed Rule; Safe-Harbor Procedures for Employers Who Receive a No-Match Letter, 71 <u>Fed. Reg.</u> 34281 (June 14, 2006)**

To Whom It May Concern:

The American Farm Bureau Federation (AFBF) appreciates the opportunity to offer the following comments on the above referenced proposed rule.

Under current law, it is illegal for a U.S. employer *knowingly* to hire or continue to employ a person who is not authorized to work in the United States (8 USC 1324a). "Knowing" is a term defined in current regulations that goes beyond actual knowledge to include that "which may fairly be inferred through notice of certain facts and circumstances which would lead a person, through exercise of reasonable care, to know about a certain condition" or, in other words, to have "constructive knowledge" (8 CFR 274a.1(l)). The proposed rule would further define this second category or "constructive knowledge" to provide that employers would become subject to a finding upon failing to take reasonable steps after receiving written notice from either the Social Security Administration (SSA) or the Department of Homeland Security (DHS) that a wage report or document does not match agency records. The rule also describes a set of "reasonable steps" employer may take to avoid a finding of constructive (but not actual) knowledge; employers following the outlined steps would obtain a "safe harbor" from prosecution over a finding of "constructive knowledge."

AFBF commends DHS for proposing a safe harbor for employers who do not knowingly employ unauthorized workers. For more than a decade, the SSA "no-match" notice has raised questions about an employer's obligations under the employment authorization provisions of immigration law after that employer has taken all appropriate steps to verify employment eligibility. U.S. agriculture has repeatedly requested guidance on whether and how an employer is to respond to such a notice without putting the employer in legal jeopardy due to the employer's obligation under anti-discrimination provisions of the same law (8 USC 1324b). In part, this proposed rule represents an attempt to address those concerns and provide employers with guidelines in hiring and firing decisions. We appreciate DHS efforts. Unfortunately, there are a number of situations – many of which are unique to the agricultural sector – that may not have been fully considered during development of the safe harbor provisions. With these comments, we identify such situations and strongly urge that the final regulation incorporate our recommended changes to ensure that the safe harbor provisions are equally available to all employers and all parts of agriculture.

**No-Match Cert. Admin. Record 1753**

**Apply the Safe Harbor to Seasonal Employers**

The proposed rule states that employers would be deemed not to have constructive knowledge and thus obtain a safe harbor from prosecution if the employers take the following steps in response to a no-match notice. Upon receiving notice, employers would have 14 days to check records and report to SSA or DHS regarding any necessary corrections or, if records cannot be corrected, to instruct the worker to go to the local SSA or DHS office to fix the problem. A Social Security mismatch would not be resolved until the employer has first verified the new information with SSA. If the employee does not return with new or corrected information within 60 days of the employer's receipt of the mismatch letter, the employer then has three days to complete a new Form I-9. When completing a new form, the employer would not be allowed to use documents containing the Social Security or alien identification number that was subject to the earlier no-match notice. At the same time, no document without a photograph could be used to establish identity or identity and employment authorization. (71 Fed. Reg. 34285.)

Our reading of the proposed regulation is that each step would need to be followed as spelled out in the rule in order for the employer to become eligible for the safe harbor. This is important because while DHS acknowledges that there may be other reasonable steps that could lead to a safe harbor, the employer, in following procedures other than the ones outlined in the rule, could "face the risk that DHS may not agree" (71 Fed. Reg. 34283). The practical effect of this approach could have a significant detrimental effect on seasonal employers and effectively vitiate the protections of the safe harbor for a large segment of agriculture. <u>One set of employers should not be given the certainty of a prescribed safe harbor while another is forced to define one on a case-by-case basis with DHS approval; seasonal employers should not be denied the benefit of safe harbor provisions just because their business is seasonal in nature.</u>

There are several situations, in which an agricultural employer may not be able to take all of the required steps to obtain the safe harbor, including:

1) <u>Single season workers.</u> While timing will vary with crop, season, and other criteria, seasonal farmers (in the Midwest, for example) generally submit wage reports to the IRS (Forms W-2) in February for employees who were employed during the previous harvest season and, in most instances, are no longer employed. Should a report on such an employe generate an SSA no-match notice, such a notice in all likelihood would not be sent to an employer until late winter or the following spring – well over a year since the individual was employed. In many instances, such employees do not return to the original place of employment. For those who do, depending on crop and nature of work, such employees would not be re-hired until 14, 60, or 63 days after the employer has received the notice. Further, many farm workers may "follow the crops" by migrating from state to state, and these workers may not permanently reside locally. Few such workers leave forwarding information since the prevailing practice is to terminate, not layoff, the worker between seasons. While the employer could meet the safe harbor requirement to check his or her records, the employer would not be able to meet the other requirements. The employer would not be able to reach employees despite making every reasonable effort. We strongly believe that these employers should not be denied the safe harbor for reasons that are beyond employer control. *Recommendation: We urge DHS to clarify in the final rule that the safe harbor extends to employers who, in addition to meeting the requirement to check records, can document attempts to reach a former employee who is the subject of a no-match notice.*

2) <u>Off-season workers.</u> As stated in 1) above, some workers listed on a previous no-match notice may not be re-hired until 14, 60, or 63 days after the employer has received the notice. Few farm workers leave forwarding information and therefore may not be reachable off-season.

2

*Recommendation: If an employee who is subject to a previous no-match notice returns in a following season, we would recommend that the clock start ticking on the first day of re-hire after receipt of the notice. For off-season workers who fail to return in a subsequent season, we would offer the same recommendation as stated in 1) above.*

3) <u>Short season workers</u>. The duration of a season may vary widely across the United States depending on crop and location. For example, in the state of Washington, approximately 75,000 migrant and seasonal workers are employed each year on small family-owned farms; many of these workers are employed for periods as short as two weeks. Under these circumstances, an employer may be able to check records, ask the employee to confirm those records and in the event there are no errors, instruct the employee to follow up with SSA or DHS all within 14 days. But, if the employee migrates from crop to crop, there may not be an opportunity for the employee to resolve the issue with SSA or DHS within the 60 days prescribed by the rule. Once the employee has moved on, there would not be an opportunity for the employer to take the next step, which is to complete a new Form I-9. *Recommendation: The 14-, 60-, and 63-day periods should toll only while the employee is employed with the employer. For example, if the employee moved on to the next crop on day 15, the clock would stop. Upon re-hire in the next season, the clock would re-start and the employee would have 45 days (for a total of 60 days) in which to follow up with DHS or SSA and report any corrections to the employer. Again, for short season workers who fail to return in a subsequent season, we would offer the same recommendation as stated in 1) above.*

All of the above examples pertain to situations in which an employer is not able to follow every one of the necessary steps to obtain the safe harbor. The reverse situation could also occur: The employer follows every step outlined in the regulation but the no-match issue is not resolved.

1) <u>Wage Report Mismatch</u>. For I-9 Form purposes, an employee may provide documents that do not contain a Social Security or alien identification number – a birth certificate and driver's license with a photograph, for example. But because the employer has submitted a Form W-2, the employer may receive a no-match notice from the SSA if there are sufficient numbers of mismatches. It is not clear from the proposed rule whether the employer could simply re-use the same documents on the new Form I-9 in this instance. It is also not clear whether the employer would be held liable if the employee writes in Section 1 of the new form a Social Security number that is the subject of a notice but does not provide a Social Security card. *Recommendation: DHS should clarify whether an employer would be deemed to have constructive knowledge under these circumstances; if so, DHS should specify the employer's legal obligations under immigration law including the anti-discrimination provisions (8 USC 1324b).*

2) <u>Multiple Season Mismatches</u>. An employer may take every step outlined in the proposed rule, up to and including completing a new I-9 Form, yet receive a no-match notice next season. During a two-week harvest when producers are working nearly round the clock to harvest a perishable crop in a short time-frame when every day is precious, it may be difficult for larger seasonal employers (e.g., 500-750 employees) to keep track of every one of the returning employees. Even if the employer recognizes and can keep track of every single worker, the rule does not appear to preclude the employer from obtaining the safe harbor if the employee keeps responding with new information to each document request. For example, an employee might provide one Social Security card the first year which triggers a no-match notice the following year, provide another Social Security card in the second year in response to the original notice which cannot be verified with SSA in 60 days and then provide yet a third Social Security card for the new I-9 Form between day 61 and day 63. *Recommendation: DHS should clarify whether an employer*

3

*under these circumstances could still obtain the safe harbor from a constructive knowledge finding. If so, DHS should clarify whether it would deem such employer as having actual knowledge of the worker's unauthorized status.*

Many farmers hire and pay an independent contractor to provide workers during the season, with the understanding that the contractor will be the employer for all purposes, including employment eligibility verification. Yet the Department of Labor could determine that both the farmer and the contractor are "joint employers" under the Fair Labor Standards Act (29 USC 201 *et seq.*) or the Migrant and Seasonal Agricultural Worker Protection Act (29 USC 1801 *et seq.*). However, it is not clear from the rule whether the farmer or the contractor would have to obtain the safe harbor to avoid prosecution. *Recommendation: DHS should clarify the employer's obligations under immigration law relative to the agricultural joint employment standards.*

Some seasonal agricultural employers hire non-immigrants with a temporary work authorization (e.g., under the H-2a program) or immigrants with permanent work authorization. The proposed rule expressly identifies a "labor certification or application for prospective employer" as information that could prompt a constructive knowledge finding. But while the rule would describe the steps for an employer to take upon receipt of written notice from SSA or DHS over a wage report or document, it does not include any steps for a labor certification. An employer should not be denied the certainty of a prescribed safe harbor just because the employer hires a worker requiring a labor certification. *Recommendation: DHS should specify a safe harbor for employers of workers requiring a permanent or temporary labor certification.*

**Apply the Safe Harbor to Hiring Decisions**

In the notice of proposed rulemaking, DHS expressly states that following the safe harbor requirements "will eliminate the possibility that DHS … will allege, based on the totality of relevant circumstances, that an employer had constructive knowledge that it was employing an alien not authorized to work in the Unites States" (71 <u>Fed. Reg.</u> 34282). However, it is not clear whether the safe harbor would also apply to hiring decisions.

As outlined above, there are several reasons why an employer would be prevented from meeting all of the steps necessary to obtain the safe harbor. A good example is when the worker quits: some employees, when confronted with the no-match notice, will quit without offering a reason. The employer would have checked his or her records and found no errors, meeting the first step. He or she may be asking the employee to confirm records or instructing the employee to follow up with SSA or DHS, which is the second step. Nevertheless, the employee would fail to respond within 60 days (the third requirement), and the employer would not be able to comply with the final requirement to fill out a new I-9 Form within 63 days.

While we are confident that DHS would not prosecute this employer for <u>continuing to employ</u> the worker (after all, the employee quit in this instance), there is still a question as to whether the employer's receipt of the no-match letter would still be grounds for a finding that the employer had constructive knowledge of <u>hiring</u> an unauthorized worker. A reasonable person might infer from the worker quitting that the worker is avoiding detection as an unauthorized worker.

However, we do not believe a constructive knowledge finding can or should be imputed to an employer merely based on the fact that the employer has received a no-match notice. Because the worker did not offer a reason for quitting, the employer could not have actual knowledge that the worker quit to avoid detection. And if the employer had properly completed the Form I-9, the employer would not have reason to suspect that the employee was not employment eligible.

**No-Match Cert. Admin. Record  1756**

*Recommendation: We recommend that DHS clarify that the safe harbor would apply to previous hiring decisions under these circumstances.*

## Extend the 14- and 60-Day Deadlines

Under the proposed rule, upon receiving notice employers would have 14 days to check records and report back to SSA or DHS or instruct the worker to follow up directly with SSA or DHS. If the employee does not return with corrected information within 60 days, the employer would then have three days to complete a new Form I-9. (71 Fed. Reg. 34285.)

In the agricultural sector, more than 90 percent of operations are family owned and operated. The size of the operation may vary from a single hired worker up to 500 or more workers. Some operate year round while others plant, cultivate or harvest during seasons that may range from as few as two weeks to as many as 48 weeks a year. For example, in Washington, where there are approximately 75,000 seasonal and migrant workers employed each year on small family farms, many are employed for periods as short as two weeks. At a typical operation, one office person will hire more than 100 workers at one time.

On the farm, the grower's spouse often constitutes the "Human Resources Department" and the spouse may not work full time. Access to a computer or to a local branch of SSA or DHS may be limited in more remote areas of the country. Mail may not be processed at a frequency greater than once a week or the notice might arrive when the grower is off-season, on vacation or at a trade conference. While employers with a dedicated H.R. department and staff may be able to check and correct records or notify the employee within 14 days, not every agricultural employer would be able to do so. *Recommendation: We recommend extending the timeframe for the first deadline (in which an employer must check, correct or inform) to at least 30 days.*

Similarly, 60 days may be too short a time period for farm workers to comply with the second requirement (to respond with new or corrected information). On a grape farm in New York state, for instance, the workers are working nearly round-the-clock for about two months in the spring and about three months solid in the fall between harvest, crushing, fermenting, and subsequent "cellaring." Asking them to take a long time out to drive to the nearest SSA office may not be completely practical. *Recommendation: DHS should extend the second deadline to at least 90 days.*

## Address Discrimination Issues

The current regulatory definition of "knowingly" includes the following provision:

> "Nothing in this definition should be interpreted as permitting an employer to request more or different documents than are required under [8 USC 1324a(b)] or to refuse to honor documents tendered that on their face reasonably appear to be genuine and to relate to the individual." 8 CFR 274a.1(l)(2).

In the proposed rule, DHS adds a clause to this provision to exclude documents that are subject to a no-match notice: ", except a document about which the employer has received a notice described in paragraph (l)(1)(iii) of this section and with respect to which the employer has received no verification as described in paragraph (l)(2)(i)(B) or (l)(2)(ii)(B)." The proposed rule would not address the anti-discrimination provisions under Title VII of the 1964 Civil Rights Act ("Title VII") (42 USC 2000e-2).

5

AFBF applauds DHS for attempting to provide employers with some certainty in their hiring and firing decisions, beyond the limited protection afforded by completing an I-9 Form. Under current law, an employer who is not sufficiently aggressive in examining documents would run the risk of violating the employment authorization provisions of immigration law (8 USC 1324a). But, by being too aggressive, the same employer would run the risk of violating the anti-discrimination provisions in the same law, and there have been more growers charged with discrimination under the immigration law than with employer sanctions. Excluding no-match documents from anti-discrimination provisions would make it much easier for employers to meet the employer authorization provisions.

*However, AFBF strongly urges DHS to make whatever changes to the proposed rule necessary to ensure the rule will not lead to additional discrimination lawsuits under Title VII.* For decades, agriculture has been plagued with nuisance suits, the purpose of which has been not necessarily to win on the merits but to outspend the grower so as to make an example for the wider agricultural community. If the legal and social costs are high enough, farmers will settle instead. The questionable tactics of these lawyers have been well documented in Rael Jean Isaac's Harvest of Injustice (please see http://www.nlpc.org/harvest.asp). For a more recent example, please see *Malacara v. Garber* (5th Cir. December 9, 2003) (LSC-funded lawyers sued a 70-year-old Ohio vegetable farmer under a Federal law that did not even apply to small family farmers; the farmer won in lower court and at appeal but it cost him more than $100,000 of his hard-earned money to prove the complaint lacked merit.). If history is any indication, we would expect activist attorneys to test the boundaries of the proposed rule in court, and agricultural employers are the most likely test subjects; agriculture should not have to pay additional legal expenses because the proposed rule fails to address considerable legal issues.

There also may be legal arguments against the rule in its proposed form.

For example, the Tenth Circuit Court of Appeals in *Zamora v. Elite Logistics, Inc.* (10th Cir. June 6, 2006) recently reversed a lower court decision for the employer and let a Title VII national- origin claim go to a jury. The employer was acting on a tip he could have received from DHS (i.e., an employee was using a Social Security number for I-9 Form purposes that another had used multiple times in another state). He responded by taking precisely the step required to qualify for the safe harbor (i.e., the employer requested another document). The safe harbor would not protect employers from Title VII. And all some lawyers need is an argument, not even a strong one, to compel growers to settle. If DHS does not adequately address these issues, it will defeat the purpose of the proposed rule, which is to facilitate compliance with 8 USC 1324a.

**Clarify whether name or number trigger constructive knowledge finding**

Employers would be subject to a constructive knowledge finding if failing to take reasonable steps upon receiving written notice from SSA that the "combination" of name and Social Security number does not match agency records. But SSA has sent several forms of the no-match letter in the past; one takes the form of a simple list of numbers with no corresponding identifying names. If the employer receives this form of the letter, one could not conclude that the name also mismatches agency records. It appears that both the name and the number must not match to become subject to the rule. *Recommendation: DHS should clarify precisely what is meant by a "combination" mismatch.*

**Apply the Final Rule Prospectively**

The proposed rule does not stipulate when the regulation would apply to employers. Given the many resource and other issues that are unique to agriculture, we would not support applying the rule on a retroactive basis. *Recommendation: DHS should apply the rule prospectively from its effective date.*

6

**Delay the Final Rule Pending Congressional Efforts**

Both the U.S. Senate and House of Representatives have approved separate legislation (S. 2611 and H.R. 4437) that would address many of the same issues addressed in this proposed rule and reform of this part of the law is a high priority for the Administration. Thus, it is possible that there may be new law respecting exactly these matters before the end of the year. Farmers do not want to be in position of having to change their operating procedures twice – once to accommodate this proposed rule and once again to accommodate a subsequent rule prompted by a new immigration law. Employers require certainty in Federal regulations in order to continue to grow and thrive.

While we recognize that employers need not use the safe harbor, if employees are not able to present documents consistent with the proposed rule, employers will be compelled to terminate those workers or risk a constructive knowledge finding and prosecution. AFBF has conducted an extensive economic study of the immigration impacts on agriculture. The study shows that of all the sectors of the U.S. economy, domestic agricultural production could be most severely and disproportionately affected on the order of $5 to $9 billion annually if labor restrictions take effect before growers have access to an adequate legal workforce. Federal surveys suggest that between a high percentage of agriculture's hired workforce may lack proper documentation, and we have already mechanized to a large extent. We would somehow have to replace those workers at a time when few Americans have shown a willing to take farm jobs. The impact of this proposed rule could be devastating, prompting many farmers to raise their prices at a time when the United States is opening its produce markets to significant foreign competition under North and Central American Free Trade Agreements.

*Recommendation: We strongly urge DHS to postpone further action on a final regulation until Congress acts on this issue.*

**Conclusion**

AFBF appreciates the opportunity to comment on this proposed rule and would be happy to assist you in any way we can. Please feel free to contact me or Austin Perez at 202-406-3669 (austinp@fb.org) if you have any questions or require additional information.

Sincerely,

Mark Maslyn
Executive Director
Public Policy

7

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Carole Angel [cangel@legalmomentum.org] |
| **Sent:** | Monday, August 14, 2006 4:48 PM |
| **To:** | Regs, Rfs |
| **Cc:** | Leslye Orloff; Carole Angel |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |
| **Importance:** | High |

**Attachments:** DHS Docket No. ICEB-2006-0004[FinalComments].doc

Comments to Notice of Proposed Rulemaking, "Safe Harbor Procedures for Employers Who Receive a No-Match Letter," DHS Docket No. ICE B-2006-0004

Dear Sir or Madame:

Legal Momentum submits the **attached comments** to the proposed rule published on June 14, 2006 by the Bureau of Immigration and Customs Enforcement of the Department of Homeland Security, "Safe Harbor Procedures for Employers Who Receive a No-Match Letter," **DHS Docket No. ICE B-2006-0004.** The proposed rule would make changes in existing regulations regarding the way employers respond to mismatch letters from the Social Security Administration or the Department of Homeland Security.

Sincerely,

Carole Angel

**Carole Angel**
Staff Attorney
Immigrant Women Program
Legal Momentum: Advancing Women's Rights
1522 K St., NW, Suite 550
Washington, D.C. 20005
Tel:  202-326-0041
Fax: 202-589-0511
cangel@legalmomentum.org

**No-Match Cert. Admin. Record  1760**



**LEGAL**
**momentum**
Advancing Women's Rights

Director, Regulatory Management Division
U.S. Citizenship and Immigration Service
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

Re: Comments to Notice of Proposed Rulemaking, "Safe Harbor Procedures for Employers Who Receive a No-Match Letter," DHS Docket No. ICE B-2006-0004

Dear Sir or Madame:

Legal Momentum submits the following comments to the proposed rule published on June 14, 2006 by the Bureau of Immigration and Customs Enforcement of the Department of Homeland Security, "Safe Harbor Procedures for Employers Who Receive a No-Match Letter," **DHS Docket No. ICE B-2006-0004.** The proposed rule would make changes in existing regulations regarding the way employers respond to mismatch letters from the Social Security Administration or the Department of Homeland Security.

Legal Momentum supplies legal analysis and co-chairs the National Network to End Violence Against Immigrant Women, a group comprised of over 3,000 professionals nationwide including police, sheriffs, district attorneys, district attorneys, probation officers, prosecutors, health providers, churches, rape crisis centers, domestic violence shelters, mental health professionals, child protective services workers, and immigrant rights' groups. The Network's members are all joined by a common purpose – working towards the eradication of all forms of violence perpetrated against immigrant women and children including domestic violence, sexual assault, human trafficking and stalking. We are submitting these comments on our own behalf.

In 1994 Congress enacted the Violence Against Women Act (VAWA), the first federal law devoted to eradicating domestic violence. In VAWA, Congress created special immigration relief for undocumented victims of family violence so that they could self-petition for permanent residency without having to rely on the batterers' sponsorship. In VAWA 2000 Congress augmented these protections by creating new visas for victims of sexual assault, trafficking or other violent crimes. These new visas were granted on the condition that victims assist law enforcement in criminal investigations or prosecutions. Building on the two previous versions of VAWA, in 2005 Congress extended immigration relief to greater numbers of victims and expanded the scope of services available to undocumented victims by

Legal Momentum is the new name of NOW Legal Defense and Education Fund
1522 K Street, NW Suite 550 Washington, DC 20005 Tel 202.326.0040 Fax 202.589.0511 www.legalmomentum.org

**No-Match Cert. Admin. Record 1761**

eliminating some of the major obstacles immigrant crime survivors face in achieving safety and legal immigration status.

With the enactment of VAWA 2005, Congress demonstrated its desire that victims of sexual assault, trafficking, domestic violence and other crimes be protected yet these proposed regulations could have the opposite affect. Many of the victims who qualify for relief under VAWA will be swept up by this proposed regulation and will be prevented from accessing the relief Congress had intended for them. Many of these victims may be deported under this regulation while they are still in the process of accessing the relief or before they may know that they are eligible for relief. Clearly this is not what Congress intended.

Furthermore, many undocumented victims of domestic violence lack lawful papers and work authorization precisely because the batterer has refused to sponsor them for permanent residency. Spouses and children of U.S. citizens and permanent residents are entitled to seek permanent residency if the U.S. citizen or permanent resident submits an immigration application on their behalf. However, many abusive U.S. citizens or permanent residents intentionally refuse to file immigration applications so that they can hold the threat of deportation over the victim's head and prevent them from working. Economic independence is critical to a victim's ability to leave the abusive situation. The proposed rule gives the control back to the perpetrator, undermining the intent of Congress and working against the administration of justice.

Comprehensive immigration reform is critical to provide a pathway to legalization and economic independence for the approximately 3 million undocumented women and 1.7 million undocumented children in the U.S. These women are filling essential gaps in the labor market while enduring workplace exploitation, sexual harassment, low wages and poor working conditions. These women are also filling essential gaps in U.S, family life by working as our children's nannies, our elderly parents' caregivers and our gardeners. And these women live in the shadows of U.S. society where many are subject to violent crimes inside and outside their homes. Yet they cannot report these crimes to the police for fear of being deported. While forced to live in the shadows of society, these women remain physically separated from their children and family members living abroad. Others, desperate to be reunited with their families in the U.S, are risking their lives by being smuggled into the U.S.

We believe that a better way to regulate in this area is to wait for Congress to enact comprehensive immigration reform legislation later this year. Bills that have passed both houses of Congress are currently before a conference committee. President Bush, White House officials and Department of Homeland Security officials have all endorsed comprehensive immigration reform. But by promulgating piece-meal immigration regulation in the absence of a broader bill, the Department of Homeland Security may foreclose options for a more comprehensive approach and complicate the job of Congress. Even worse, the new regulations could produce needless duplication and confusion were Congress to take a different approach to the subject of employer verification.

Based on the foregoing reasons, we request that the Department of Homeland Security withdraw this proposed rule and await the enactment of comprehensive immigration legislation.

Legal Momentum Is the new name of NOW Legal Defense and Education Fund

1522 K Street, NW Suite 550 Washington, DC 20005 Tel 202.326.0040 Fax 202.589.0511 www.legalmomentum.org

Respectfully submitted,

/S/

Leslye E. Orloff
Associate Vice President and Director, Immigrant Women Program
Legal Momentum

Legal Momentum is the new name of NOW Legal Defense and Education Fund
1522 K Street, NW Suite 550 Washington, DC 20005 Tel 202.326.0040 Fax 202.589.0511 www.legalmomentum.org

No-Match Cert. Admin. Record 1763

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Orrin Baird [bairdo@SEIU.ORG] |
| **Sent:** | Monday, August 14, 2006 4:45 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket # ICEB-2006-0004 |
| **Attachments:** | SEIU Comments DHS Dkt #IICED-2006-0004.pdf |

Attached please find the comments of the Service Employees International Union (SEIU).

Orrin Baird
Service Employees International Union
1313 L. Street, N.W.
Washington, D.C. 20005
Tel: 202-898-3452
Fax: 202-898-3323
bairdo@seiu.org

**No-Match Cert. Admin. Record  1764**



**Stronger Together**

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

RE:    DHS Docket No ICEB 2006-0004, 71 Fed. Reg. 34281
       (June 14, 2006), Safe Harbor Procedures for Employers
       Who Receive a No-Match Letter

Dear Sir/Madam:

ANDREW L. STERN
International President

ANNA BURGER
International Secretary-Treasurer

MARY KAY HENRY
Executive Vice President

GERRY HUDSON
Executive Vice President

ELISEO MEDINA
Executive Vice President

TOM WOODRUFF
Executive Vice President

The Service Employees International Union (SEIU) has 1.6 million members in the United States (and an additional 200,000 members in Canada). Our members work in the property services and health care industries and in the public sector. Many of our members are immigrant workers who work in low wage occupations such as janitors, security guards, home care aids and nursing home workers. SEIU has been a leading advocate for improving the lives of low wage workers and for comprehensive immigration reform.

SEIU has often been called upon to assist our members in responding to employer demands following SSA no match letters. Because of our experience with these letters over the past several years, we oppose the proposed regulations to the extent they imposes additional obligations on employers upon receipt of SSA no match letters and can cause loss of employment by and discrimination against workers legally entitled to work in the United States. The letters often are erroneous and are not easily corrected, and they are frequently the excuse for employer discrimination and harassment of immigrant workers.

The most fundamental reason why the regulation is misguided is that it erroneously treats the Social Security number as a proxy for immigration status. The SSA itself, and even former INS General Counsels, agree that such is not the case, because there are many reasons why the computer records could be in error.[1] In fact, the SSA records usually contain no information about immigration status, or contain out of date information.[2] Despite this, the proposed regulation would effectively make the employer sanctions regime a

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

1313 L Street, NW
Washington, DC 20005

202.898.3200
TDD: 202.898.3481
www.SEIU.org

---

[1] Martin, David, INS General Counsel, Letter to Larson (12/23/1997) *published at* 75 No.6 Int. Releases 203 (1998), Westlaw 75No.6INTERREL 203, attached hereto; and SSA 2005 No Match letter, attached hereto. Also attached are additional communications from IRS, INS, SSA and the EEOC setting forward this consistent and long-standing interpretation of no match letters.
[2] GAO, *Immigration Enforcement: Benefits and Limitations to Using Earnings Date to Identify Unauthorized Work*, July 11, 2006, GAO-06-814R at 8.

strict liability statute for the millions of employers who receive SSA no match letters, contrary to the plain language of the statute and the intent of Congress interpreted for the last 20 years. And the regulation would in effect make the I-9 process an annual process, rather than a one-time process, for millions of employers, which clearly was never intended by Congress when it established the I-9 process.

I.    **The Regulations Will Not Achieve Their Intend Objective**

SEIU does not believe that the proposed DHS regulations will achieve the intended objective of reducing the number of undocumented workers in the United States and will instead end up hurting American citizens and other authorized workers as well as legitimate employers who are trying to comply with the law. We believe that this objective can be obtained only through comprehensive immigration reform such as that currently pending in Congress, since the millions of jobs these workers hold and the importance of their labor to the U.S. economy will not disappear by adoption of enforcement oriented proposals. The proposed DHS regulations will simply make the situation worse, not better.

a.  **The Proposed DHS Regulations Will Simply "Churn" The
       Workforce While Not Reducing The Number Of Undocumented Workers.**

We simply are not aware of evidence that workers who are terminated because their employer believes that they are undocumented have in the past or will in the future leave the United States or even leave the workforce. Immigrant workers largely work in low wage industries. Because of poor pay and working conditions, employment opportunities in these industries are plentiful and the turnover rate is very high (particularly among non-union workers), often exceeding 100% in a year. Thus, workers move freely from job to job. The proposed regulations will only increase that turnover rate, to the detriment of not only the workers, but also their employers and the economy generally.

Since jobs are plentiful in low wage industries, turnover is very high and little skills or training are required for the jobs, workers in these industries who are terminated by one employer can simply walk across the street and work for another employer. There is no reason to believe that workers who are terminated because their name appeared on a SSA no match letter will be any different. Thus, the likely result of the proposed regulations, if implemented, will be to simply churn the workforce. Workers whose names appear on a no-match letter sent to employer A will simply go to work for employer B. When their name shows up on a no-match letter sent to employer B (probably a year later), they will go to work for employer C. In the meantime, workers who initially worked for employer C and who show up on a no-match letter to that employer will simply go to work for employer A and so on.

Thus, the likely practical effect of the proposed DHS regulations will be to churn the workforce in the low wage industries populated by immigrant workers but not to decrease the overall size of the undocumented worker workforce. This, of course, will drive up employment costs in these industries because of the rapid turnover of employees. It will not in any way aid in

the enforcement of the immigration laws. This problem can be solved, but only through comprehensive immigration reform and not by the interim step proposed the DHS.

### b. DHS Regulations Will Have The Effect Of Growing The Underground Economy At The Expense Of Legitimate Employers

In organizing low wages workers, we are often confronted with unscrupulous employers who erroneous classify their employees as independent contractors or who even treat their workers as sham franchisees. We even see situations were workers are paid "off the books" meaning that they are paid in cash with out any of the payroll taxes being paid or the tax withholdings being made that are required by law. By using these fraudulent schemes, employers avoid paying payroll taxes, unemployment insurance and social security payments on behalf of their workers. Since the workers have not been legally treated as "employees", these employers don't even need to go through the I-9 process with these workers, nor will they ever receive a no match letter from the SSA as they do not pay SSA taxes. These employers seek to employ undocumented workers because they are the workers who are less likely to speak up and demand that the employer comply with the law. These employers not only cheat their workers, but they cheat the government out of social security payments, unemployment taxes, wages withholdings and so forth. Ironically, the result of these proposed regulations will be a significant loss of revenue for the government, revenue which the government sorely needs for its operation, including the enforcement of the immigration laws.

Since no social security taxes are paid on these workers, these employers never receive SSA no match letters. Therefore, as a practical matter, the employers that operate illegally in the low wage industries that are served by the immigrant workforce are not effected by the DHS proposed regulations and can continue to employ undocumented workers without running the risks that legitimate employers would run under the DHS proposed regulations.

These illegitimate employers thrive in the low wage industries where most immigrants work. Legitimate employers who pay employment taxes and who try to comply with the immigration laws must compete with these employers. There is always the temptation to take up their illegal ways in order to complete against them in these often very competitive industries. By imposing administrative burdens on the legitimate employers and not on the illegitimate employers and by subjecting legitimate employers to additional risks under the immigration laws not faced by these illegitimate employers, the DHS proposed regulations will have the unintended effect of creating incentives for legitimate employers to go underground and to misclassify their workers. The ironic result of this will be to increase employment opportunities for undocumented workers and to deprive the government of payroll taxes which it is owned under law.


### II.    The Proposed Regulation Lacks Any Workable Mechanism To Insure Against Erroneous Termination, Or To Provide Remedies To The Substantial Number Of Workers Who Are Its Victims.

3

It is well established that SSA records are frequently erroneous. For immigrants *who are work authorized*, SSA records are automatically able to verify the status of less than 50% of work-authorized non-citizens, as compared to 99.8% of native born citizens.[3] These numbers are significant in that they demonstrate that large numbers of legally authorized workers will be the subjects of erroneous SSA no match letters, and their jobs at risk if the employers, employees, and SSA do not promptly take actions to comply with the proposed regulations.

According to Census Data, there are roughly 145 million total workers in the U.S. workforce, of whom 125 million are native born citizens. There are approximately 7.8 million naturalized citizens in the work force, and 12 million non-citizen, immigrant workers. Approximately 7 million of those workers are unauthorized.

From these numbers, one can determine that approximately *300,000* native born workers (0.02%) will be *annually* subject to SSA no match letters, *even though they are native born citizens*. If they lose four hours of work to take care of this, and you assume an average wage of $14/hr, they will lose $16.8 million in wages. Of the approximately 5 million *work-authorized*, non-citizens, 50% will face problems clearing the SSA database, or *2.5 million annually*. Again, assuming an average wage of $14/hr, these work- authorized workers would lose $140 million in wages, assuming that they ultimately succeed and are not terminated . Each of these workers will have to spend many hours trying to straighten out the SSA records, solely to satisfy DHS regulations. If SSA cannot complete the process in the time line suggested by these regulations, many will lose their jobs, causing hardship to their families. There will also be a substantial disrupt of the employers operations as employees take time off to correct the errors in SSA's data base. If you assume that one in ten of these workers will for one reason or another fail to resolve the no match problem within the time limits set, this means that 280,000 workers will unjustly lose their jobs because of these proposed regulations.

For those who do not successfully, and timely, complete this process, either through procrastination, frustration, agency delay/incompetence, they will have no effective remedy for their loss of employment, wages/benefits. Since these regulations are promulgated by the DHS, they cannot set out a procedure for SSA to remedy erroneous decisions or to provide compensation for agency error for the approximately one quarter million workers who will be unjustifiably terminated if the proposed regulations are implemented. The Federal Tort Claims Act does not provide a remedy for agency records errors, particularly where the agency would argue that it did not require the employer to terminate. Likewise, employees would not have a viable remedy against their employers for termination when the employer justifies its conduct on the new regulations together with the SSA notice.

## III.    The Proposal Shifts DHS Enforcement Costs And Burdens To Employers, Employees And The SSA, Rather Fixing The Broken System.

---

[3] *Report to Congress on the Basic Pilot Program,* U.S. Citizenship and Immigration Service, June 2004; *see also,* GAO, *Immigration Enforcement: Benefits and Limitations to Using Earnings Date to Identify Unauthorized Work,* July 11, 2006, GAO-06-814R at 1 (SSA data "has drawbacks since they contain some erroneous information and information about hundreds of thousands or even millions of U.S. citizens and work authorized aliens.")

4

At a time when Congress is considering making major changes to immigration laws, DHS is proposing a regulation that improperly treats the SSA no match letter as a proxy for an INS notice that the worker lacks worker authorization. As the SSA no match letters demonstrate, they are no such thing. They specifically warn employers that they do not "make any statement about an employee's immigration status." And they warn against taking any adverse action.

Congress is currently in the process of addressing immigration reform but instead of leaving it to Congress to determine what that appropriate reform would be, the proposed regulations hijack the SSA no match letter system, requiring millions of employers and employees to burden the SSA with inquiries and visits, and demanding timely documentation of same, in order to satisfy DHS's misguided regulation. No where in the regulation is there any effort by DHS to address the actual size of the attempted cost-shifting to the SSA. Nor does the regulation contemplate the substantial burden being placed on the SSA.

Because the no match letters are distributed only in April and May each year, SSA will require a substantial seasonal staffing increase to accommodate the surge in inquiries during this 2-3 month period. This seasonality will require a large number of temporary hires to enable the agency to respond. In 2002, the SSA sent out 800,000 no match letters, to employers with at least 10 no match employees, or 0.5% of the employer's workforce. It is unknown whether SSA will in future years use a different standard for sending these letters. If DHS adopts its proposed regulation, it would discourage SSA from sending the letters more broadly so as to improve its own management of the SSA Trust Fund, as doing so would impose substantial secondary staffing effects on the agency to respond to hundreds of thousands on visits.

The DHS regulations and comments fail to address this tremendous burden the proposed regulations are placing on SSA. It it is irresponsible in our view for DHS to contemplate issuing these proposed regulations without a full assessment of how SSA is going to meet the burden being placed on it by the proposed regulations.

When a worker shows up on a no match letter, the employer essentially has to reverify the worker's status, as they do at the being of employment with the I-9 process. DHS has made no assessment of the cost to employers in immigrant intensive industries of this new *annual* I-9 compliance obligation which will result from the proposed regulations. Instead of a one-time I-9 compliance burden, suddenly employers in immigrant dependent industries can expect to see I-9 compliance issues become an annual routine for a large segment of their workforce. Indeed, the regulation asserts that there will be no significant cost to small employers, but it is hard to see how anyone could contend that this administrative burden will be insubstantial for all employers, both small and large, in immigrant intensive industries.

The regulation also makes no effort to assess the costs imposed on legal workers of time away from work to try to straighten out SSA records, and obtain documentation that will satisfy their employers. As demonstrated above, the proposed regulations could easily cost employees legally entitled to work in the United States $156 million or more in lost wages and the substantial disruption to many employers' operations just to prove that there is an error in the SSA records.

5

Likewise, not addressed is the cost to the SSA in staff time and lost taxes, as well as the increase in unemployment compensation paid out to employees who are wrongly terminated. The cost to the government because of increased costs in responding to inquiries from legal employees who were placed in a no match letter because of an error as well as the loss of revenue from payroll taxes is likely to be very significant. Yet, DHS's proposed regulations fail to address these costs and lost revenue at all.

**IV.     The Proposed Regulations Will Encourage Discrimination Against Workers Legally Entitled To Work In The United States.**

The proposed regulation will result in expanded discrimination against workers with a "foreign" appearance or accent, as well as those who seek to enforce their workplace rights to fair treatment and a living wage. Under existing laws and procedures, there is currently a high level of discrimination against immigrant workers, whether they are legally authorized for employment or not. Despite existing protections, SEIU and other unions have often had to assist workers whose employers deny them workers compensation, overtime pay, or interfere with their right to form or join a union. Such employers will often hide behind the excuse of immigration law compliance to accomplish these ends. This proposal will provide unscrupulous employers an *annual* excuse for harassing, suspending and or terminating workers who lawfully seek to enforce their rights.

**V.     The Proposed Regulations Are Contrary To Unchallenged Ninth Circuit Case law That Constructive Knowledge "Not Be Expansively Applied," In Order To Avoid Interfering With The Nondiscrimination Goals Of The INA.**

The proposed regulation disrupt the proper balance struck by Congress in 1986 and recognized by the INS/ICE, SSA, the courts and OCAHO for the last twenty years. Because these proposed regulations are clearly contrary to Congress' intent, they are beyond the authority of DHS to issue.

The proposed regulations are founded on an expanded definition of constructive knowledge, that is contrary to the only circuit court case construing that term in the INA 274A context. When Congress passed the Immigration Reform and Control Act in 1986, it "delicately balanced" the employer sanctions provisions and protecting authorized workers from unlawful discrimination because of their "foreign" appearance or accent. "The doctrine of constructive knowledge has great potential to upset that balance, and it should not be expansively applied." Collins Foods International v. INS, 948 F.2d 549, 554-55 (9th Cir, 1991). There have been no relevant changes to this balance since 1986.

The law requires employers to accept documents proffered by the employee within three days of hire. There is no ongoing employer obligation to review the documents, unless a work authorization document (List C) expires. The employer must accept those documents that reasonably appear on their face to be valid. The statute does not require the employer to be a document expert. It is up to the employee to select the documents to submit, by selecting them

6

from the list on the back of the I-9 form. The employer violates the anti-discrimination provisions of the Act if it requires more or different documents than those required by the Act, or for example, insists that it will only accept certain documents.

The INS in Collins Foods had argued that the employer had constructive knowledge that the employee was not authorized in that the employee's Social Security card was not the example pictured in the INS Handbook for Employers. The Ninth Circuit however noted that the INS Employer Handbook only illustrated a few of the possible 16 iterations of SSA cards issued.

The Ninth Circuit expressly was concerned that "[w]hen the scope of liability is expanded by the doctrine of constructive knowledge" the employer may be subjected to penalties for undefined acts, and may avoid hiring anyone with an appearance of alienage." Id. The effect of the regulation would be to give unscrupulous employers but another justification for discriminatory conduct, and an annual one at that.

The proposed regulations are contrary to the clear holding of the Ninth Circuit in Collins Foods. There are no Circuits contrary, and indeed, several OCAHO decisions have followed the holding. The agency is without authority to adopt a regulation contrary to the statute.

## VI.    The Proposed Regulation Improperly Eliminates The Good Faith Defense For Millions Of Employers, Absent Timely Compliance With The Burdensome Regulation.

The proposed regulations are also contrary to the law as it has been interpreted and applied because it effectively eliminates the good faith defense which as always been an essential element of the statute. The statute provides that so long as the employer and employee properly complete the I-9 form at the outset of employment, the employer has a good faith defense to a knowing hire violation. 8 U.S.C. §1324a(b)(6)(A). The employer is not strictly liable for employing unauthorized workers; knowledge is required. The good faith defense is rebutable if DHS can establish that the documents did not reasonably appear on their face to be valid or to relate to the individual. Collins Foods, supra at 552, n. 9.

Despite the clear language of the statute and controlling case law, DHS proposes to eliminate this presumption for millions of employers, unless the affected employers engage in an elaborate series of steps, within certain time frames, with the Social Security Administration.[4]

---

[4] The procedures and time frames are proposed without any evidence that the SSA has the staff available to serve the seasonal surge of calls and visits that would occur every spring after the issuance of no match letters. The seasonal character of the project would make timely response by SSA even more difficult given the need to provide extra staff during the spring when response would be due.

Nor is there any indication whether SSA plans to send out no match letters to every employer with even a single no match employee, or only to those with more than 10 or 0.5% as in 2002 when it sent 800,000. In other years, SSA has used a different threshold. The threshold used will substantially change the total numbers, raising or lowering the burden on employers/employees/SSA accordingly.

7

For the millions of employers who annually received an SSA no match letter, those employers would be denied the good faith defense unless they could carry a burden of showing that they had complied with all the aspects of this proposed regulation, including its timelines.

The proposed regulation erroneously treats letters from INS identifying unauthorized workers as the same as the SSA no match letters. In contrast to the INS notices to employers, the SSA no match letters explicitly tell the employer that there could be many innocent reasons why the individuals name is listed, and that the letter does not inform the employer that the worker is not authorized for employment. Indeed, the SSA no match letters also warn the employer against any adverse personnel action, as such actions might violate anti-discrimination laws.[5] Despite these significant differences with INS notices, which directly address whether the individual is work authorized, the proposed regulations treat the SSA letters as the functional equivalent.

The legal rationale proffered by the agency is that its regulation is consistent with Mester Mfg Co. v. INS, 879 F.2d 561 (9th Cir. 1989) and New El Rey Sausage Co. v. INS, 925 F.2d 1153 (9th Cir. 1991). Apparently taking the view that ignoring the case law will make it go away, DHS completely fails to mention Collins Foods even though it dealt with Social Security enumeration in the employer sanctions context. The regulation fails to note that in Mester, the employer had been told by INS that the certain employees were "suspected unauthorized aliens." Collins Foods at 555. The Collins court distinguished its prior decisions in Mester and New El Rey Sausage, noting that in both cases the employer had been informed by INS that particular employees were suspected of being unauthorized.

In contrast, here the proposed regulation treats dissimilar situations as if they were the same, i.e. an SSA letter telling employers that there is a no match in a person's Social Security number is treated the same as an INS letter that states that employees are not authorized for employment based on the immigration documents presented. Notably, the INS did not appeal the narrow, constructive knowledge standard of Collins Foods. Now fifteen years later, with no intervening statutory change, nor contrary circuit or OCAHO decisions, the agency proposes to ignore the precedent, and dramatically limit the good faith affirmative defense of the statute for millions of employers.

Collins Foods has been repeatedly followed by the ALJ's in employer sanctions cases. See, e.g. USA v. American Terrazzo Corp., 6 OCAHO 828, 1995 WL 848945 (1995) ("the Circuit court has given clear warning that the doctrine of constructive knowledge must be sparingly applied"); Getahun v. Dupont Merck Pharmaceutical, 6 OCAHO 880, 1996 WL 570515 (1996)(constructive knowledge must be sparingly applied in illegal hire cases to minimize the risk of liability and burden of compliance on employers); USA v. AID Maintenance Company, 7 OCAHO, 1997 WL 1051451 (1997)(same).

The careful balancing by Congress of the statutory employer obligations are not subject to revision by the agency by regulation. This legislative balance was constructed in order to minimize the burden on the employer, as well as to protect employees from discriminatory documentation requirements. The substantial gutting of the good faith defense for employers

---

[5] A sample SSA no match letter from 2005 is attached.

No-Match Cert. Admin. Record  1772

will burden the process not only for employers, but necessarily for employees whose employers impose heightened and discriminatory documentation requirements. For this reason, the proposed regulations are contrary to law and therefore exceed the agency's authority in issuing regulations.

## VI.     DHS Should Defer To Congress Regarding Any Changes In The Immigration Laws

No one really disputes that the current immigration laws are outdated and in need of revision. Currently, Congress is considering a number of approaches that would significantly change the law. Rather than attempting to change the law through the administrative process, DHS should defer to Congress regarding how the law should be changed. Among the matters being considered by Congress is the manner in which employers are to verify the work status of their employees, the very area that DHS attempts to regulate through the proposed regulations. Changes in the immigration laws are under active consideration in Congress and significant changes are likely to be made in the very near future. Therefore, DHS should defer to Congress rather than to attempt to reform the current law through the administrative process, which, of course, we contend it does not have the authority to do.

## CONCLUSION

SEIU strongly recommends that DHS not adopt the proposed regulation and defer to Congress to address the issue any changes in the immigration laws that are to be made. The proposed regulations are ill conceived and based on a fundamental misunderstanding of the limitations of the SSA no match letters.

They will be ineffective in reaching their objective and counterproductive in reducing illegal immigration. At the same time, they place a substantial burden on employers, lawful American workers and the SAA. They are likely to cause an increase in the turnover rate for immigrant dependent employers and will create incentives for employers to work immigrant workers "off the books" or to misclassify them as independent contractors so as to avoid the regulations, to the detriment of all workers and the economy. They will also encourage discrimination against lawful workers who are ethnic appearing or have foreign accents.

They likewise fail to take into account the burden placed on SSA and whether SSA can realistically meet that burden and the costs to employers and legal workers of compliance. The proposed regulations offer no remedy for the large number of legal employees who will likely to be terminated erroneously as a result of agency error or slow response. They will impose substantial costs on native born and authorized workers and their employers, as well as interfering with the SSA's fundamental mission.

Finally, the proposed regulations are contrary to the current immigration law as it has been interpreted and applied for 20 years. The proposed regulations attempt to upset the delicate balance intended by Congress in enforcing the law. They also effectively negate the good faith

No-Match Cert. Admin. Record  1773

defense, an integral part of the current law. Therefore, they are beyond the power of DHS in issuing regulations.

Accordingly, we request that the proposed regulations not be issued and that Congress be left to enact appropriate changes in the law.


Respectfully submitted,

Judith A. Scott
General Counsel, SEIU

Orrin Baird
Associate General Counsel, SEIU

Robert Gibbs
Gibbs Houston Pauw
Counsel to SEIU

No-Match Cert. Admin. Record  1774

# Social Security Administration
## Retirement, Survivors and Disability Insurance
Employer Correction Request

CODE V

Office of Central Operations
300 N. Greene Street
Baltimore, MD 21290-0300

Date: March 24, 2005
EIN:

Establishment Number:                    MRN: 4C

### Why You Are Getting This Letter

Some employee names and Social Security numbers that you reported on the Wage and Tax Statements (Forms W-2) for tax year 2004 do not agree with our records. We need corrected information from you so that we can credit your employees' earnings to their Social Security records. It is important because these records can determine if someone is entitled to Social Security retirement, disability and survivors benefits, and how much he or she can receive. If the information you report to us is incorrect, your employee may not get benefits he or she is due.

There are several common reasons why the information reported to us does not agree with our records, including:

- Errors were made in spelling an employee's name or listing the Social Security number;

- An employee did not report a name change following a marriage or divorce; and

- The name or Social Security number was incomplete or left blank on the W-2 report sent to the Social Security Administration.

IMPORTANT: This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number. Nor does it make any statement about an employee's immigration status.

### See Next Page

Visit our website at www.socialsecurity.gov

No-Match Cert. Admin. Record  1775

Page 3 of 8    

**If You Have Any Questions**

If you have any questions, please call us toll-free at 1-800-772-6270 between
7 a.m. and 7 p.m., Eastern time, Monday through Friday. We can answer most
questions over the phone. You can also write us at the address shown on the
first page of this letter. If you call, please have this letter with you. It will help
us answer your questions. Also, general program information is available from
our website at www.socialsecurity.gov/employer.

W. Burnell Hurt
Associate Commissioner for
Central Operations

Visit our website at www.socialsecurity.gov

No-Match Cert. Admin. Record  1776

# How To Correct Social Security Numbers (SSNs)

Complete Forms W-2c (Corrected Wage and Tax Statement) for each of the Social Security numbers (SSNs) listed that you are able to correct. You only need to prepare Forms W-2c for the names or SSNs for which you have corrected information. If an employee does not provide corrected information or no longer works for you and you are unable to contact him/her, document your records with the information you relied on in completing the W-2 or the efforts you made to contact your former employee. Retain this information in your files; do not send it to the Social Security Administration (SSA). You should provide all corrections as soon as possible.

You also need to file a Form W-3c (Transmittal of Corrected Wage and Tax Statements) whenever you file Forms W-2c.

Please follow the guidelines below when preparing Forms W-2c.

- Refer to the Internal Revenue Service (IRS) filing requirements in its publication, "Instructions for Forms W-2c and W-3c", at the IRS website at www.irs.gov or call 1-800-829-3676 to request a copy.

- Compare your employment records to the Forms W-2 you reported for the SSNs included on the attached list.

- If your employment records and Forms W-2 do not match, prepare Forms W-2c with the corrected information from your employment records. (Do not send copies of proofs of identity or other documents in addition to, or in place of, the Forms W-2c.)

- If your employment records and Forms W-2 match, ask your employee to check his/her Social Security card and to inform you of any name or SSN difference between your records and his/her card. If your employment records are incorrect, correct your records.

- If your records match the information on the employee's Social Security card, have the employee contact any Social Security office to resolve the issue. Tell the employee that once he/she has visited the Social Security office he/she should inform you of any changes and you should correct your records accordingly.

- SSA may also send the employee a notice regarding this issue. You should discuss with the employee any changes you make to your employment records.

- If you file your Form W-2c corrections electronically or on magnetic media, call SSA at 1-800-772-6270 to request a copy of the "Magnetic Media Reporting and Electronic Filing of W-2c Information (MMREF-2)" or you can download the MMREF-2 at SSA's website, www.socialsecurity.gov/employer.

Visit our website at www.socialsecurity.gov



# Tips on Annual Wage Report Filing

**Why Accurate Names and SSNs are Important**

Accurate names and SSNs are important to you and your employees for several reasons. We use the name and SSN to maintain a record of personal earnings for each of your employees. Generally, we are not able to give an employee credit for his or her earnings unless the name and SSN reported on the Form W-2 agree with our records. It is most important that these records are correct since we later use them to decide if the individual can receive Social Security benefit payments and the amount of any payments due.

**Filing Tips To Ensure Accuracy**

Before you file your next annual wage report, please make sure your employment records and the Forms W-2 you report have your employees' correct names and SSNs. Use the tips below to ensure accuracy.

- We encourage you to use SSA's Employee Verification Service (EVS) prior to submitting Forms W-2 to SSA for processing. EVS is a free, convenient and secure method for employers to verify that employee names and SSNs match SSA's records. EVS is not to be used to screen job applicants. A negative EVS response makes no statement about your employee's immigration status. Visit our website at www.socialsecurity.gov/employer and select SSN Verification or call toll-free 1-800-772-6270 for further details.

- Ask your employees to check their latest Forms W-2 against their Social Security cards and to inform you of any name or SSN differences on the two. If the Form W-2 is incorrect, correct your records and prepare a Form W-2c. If the card is incorrect, advise the employee to request a corrected card from the nearest Social Security office. 800-889-3676 -forms

- Remind your employees near the end of each year to report to Social Security name changes due to marriage, divorce, or other reasons.

- Ask each new employee to check his or her Social Security card and inform you of the name and SSN exactly as shown on the card. (While the employee must furnish the SSN to you, the employee is not required to show the Social Security card. But, seeing the card will help ensure that all records are correct.)

- Direct those who do not have SSNs or cards to contact their nearest Social Security office.

- Ensure that the SSNs you report are valid. A valid SSN must have a total of nine digits. The first three digits are referred to as the area, the next two as the group, and the last four as the serial. No SSNs with a 000 area number, or an area number in the 800 or 900 series, have been issued. Also, no SSNs with a 00 group or 0000 serial number have been issued.

Visit our website at www.socialsecurity.gov

No-Match Cert. Admin. Record  1778



LITTLER MENDELSON

Direct Dial Number
(404) 888-1728)

July 18. 1997

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Dea D. Carpenter, Esquire
Associate General Counsel
Chief - Employer Sanctions & Civil Document Fraud Division
Office of General Counsel
Immigration and Naturalization Service
U.S. Department of Justice
425 I Street, N.W.
Washington. D.C.  20536

RE:  I-9 Compliance Inquiry
<u>LM File No:  ROPAAA.1001</u>

Dear Ms. Carpenter:

I am writing to request your guidance on an I-9/employer sanctions compliance
matter.

One of my clients received a letter from the Social Security Administration (copy
attached) identified as a "reminder" for the employer to show correct names and social
security numbers for its employees when more than 10% of the W-2 forms the employer
filed showed names or numbers that do not match Social Security Administration records.

Apart from the Social Security Administration's concerns, my question more
specifically is: what action, if any, is an employer obligated to take with respect to
checking its I-9 recordkeeping and potentially undertaking new I-9 verifications for the
cited employees in response to such a letter from the Social Security Administration?
Otherwise stated, does such a letter from the Social Security Administration constitute the
type of information which puts an employer on notice that the cited employees may be
unauthorized workers, thereby imposing liability on the employer for "knowingly
continuing to employee an unauthorized worker" if it does not conduct I-9 reverification?

No-Match Cert. Admin. Record  1779

Dea D. Carpenter. Esquire
July 18. 1997
Page - 2 -


LITTLER MENDELSON

You will note that the Social Security Administration letter gives no direction to the employer about anything having to do with I-9 compliance. The applicable federal regulations on I-9 compliance are silent about this factual scenario. and I have been unable to identify any administrative case law from OCAHO which deals with this situation.

Absent some clear directive from the Social Security Administration, the regulations or case law, the employer is hesitant to pursue I-9 reverification for fear of violating the antidiscrimination rules. (In fact. all of the employees cited in the Social Security Administration letter are Hispanic.) Moreover, experience has shown that the naming conventions used in the Spanish-speaking world often account for confusion over names in our Anglo society, with perhaps three or four name variations being possible for one individual — which clearly could explain at least some of the record discrepancies at the Social Security Administration.

A related issue is what should the employer do if, after the employee is informed of the Social Security number discrepancy, the employee later comes forward with a supposedly corrected/new social security number; does the employer have the right to see the actual new card or should it merely change the social security number in its W-2 reporting and recordkeeping based on the employee's say so? Should the employer conduct a new I-9 verification? Does it matter whether the employee did or did not use the original (apparently erroneous) social security card as a Section 2 verification document on the I-9 form? (Also remember. the employee would have filled in his social security number in Section 1 even if the card was not used as a Section 2 verification document.)

Other issues include how quickly an employer must act, if at all; whether a cited employee should/must be suspended (leave without pay, etc.) pending resolution of the social security number discrepancy and. if not suspended immediately, how much time the employee should be given before conducting a new I-9 verification (if necessary) or else terminating/suspending the employee?

Thank you for considering this complex and confusing situation. and I look forward to receiving your guidance in due course.

Sincerely,

Bruce R. Larson

BRL:cs
Enclosure



Immigration and Naturalization Service

Office of the General Counsel

425 I Street, N.W
Washington, D.C. 20536

HQCOU 90/10.10-C

Bruce R. Larson, Esq.
Littler Mendelson
1100 Peachtree St., N.E.
Suite 2000
Atlanta, GA 30309-4520

DEC 23 1997

Dear Mr. Larson:

Thank you for your letter asking about the responsibilities under section 274A of the Immigration and Nationality Act (INA) of an employer who has received information from the Social Security Administration (SSA) indicating that Forms W-2 filed by the employer show names or Social Security numbers (SSNs) of employees that do not agree with SSA records. Although we are unable to provide you with legal advice specific to your client, we are able to make some general observations which may be helpful to you.

As you correctly note, there may be many legitimate reasons for a discrepancy between the name and SSN reported by an employee on the W-2 and/or Form I-9 and SSA records. We would not consider notice of this discrepancy from SSA to an employer by itself to put the employer on notice that the employee is unauthorized to work, or to require reverification of documents or further inquiry as to the employee's work authorization. Whether an employer has been put on notice of an unauthorized employment situation is, however, an individualized determination that depends on all the relevant facts, and there may be specific situations in which SSA notice of an SSN irregularity would either cause, or contribute to, such a determination.

In particular, we note that SSA has provided to your client employer the following information:

**A valid SSN must have a total of nine digits. The first three digits are referred to as the area, the next two as the group, and the last four as the serial. No SSNs with a 000 area number, or an area number in the 800 or 900 series, have been issued. Also, no SSNs with a 00 group or 0000 serial number have been issued.**

An SSN containing an unissued area, group or serial number as described above, or a number of digits other than nine, is an invalid SSN. If an employee provides to an employer with knowledge of these facts an invalid SSN (either in section 1 of the Form I-9 or on a Social Security card presented to the employer and recorded in section 2), it is possible that the INS

could consider a failure to follow up on this knowledge with further inquiry to constitute knowing employment of an unauthorized alien, should the employee turn out to be unauthorized to work. An employer that knows the above quoted SSA information but employs an individual using a known invalid SSN conceivably could be subject to penalties not only under section 274A of the INA, but to civil or even criminal penalties under section 274C of the INA and Title 18 of the U.S. Code for document fraud or false attestations.

Your letter raises the question of an employer's responsibilities if it learns from its employee that the employee's name or SSN is different from that shown on the Form I-9. Upon receipt of information from the employee indicating that any information recorded on the employee's Form I-9 is erroneous, the employer should correct it in a manner that shows the correct information without obliterating the formerly recorded information. For example, a way to do this is to draw a single line through the incorrect information, record the correct information in the nearest available space on the Form I-9, and initial and date the correction. If the correction is to section 1 of the Form I-9, the employee should also initial the correction. If the new information contradicts Form I-9 section 2 information, such as the name or SSN of the employee as shown on previously presented documentation, the employer may request to see acceptable Form I-9 documentation showing the correct information in order to ensure accuracy. These corrections will protect the employee as well as the employer by ensuring that INS or other federal officers authorized to inspect the Form I-9 will receive up-to-date and accurate information regarding the employee.

Learning of a change to an employee's Social Security information does not by itself put the employer on notice that the employee is presently not work authorized. Indeed, one scenario that has come to the attention of the INS on occasion is the following: An employee has been working under a false SSN. The employee subsequently becomes work authorized and obtains a legitimate SSN. Wishing to ensure that his earnings are credited, the employee tells his employer that his SSN has changed. Depending on the circumstances, this notification may put the employer on notice not that the employee is unauthorized, but that the employee has committed fraud. Knowing false statements on the Form I-9, or the use of false documents to obtain employment, are felonies that are not excused by subsequent grants of work authorization or lawful status. An employer who suspects them may apply, in a nondiscriminatory manner, any policies it applies generally to suspected criminal conduct in its workplace, or to suspected false statements in employment documentation. If an employer determines that an employee has fraudulently executed the Form I-9, the employer should not continue to rely on that form as a verification of employment eligibility, and should require that the employee complete a new Form I-9 if the employer continues the employment (while retaining the original form for the designated period as evidence of compliance with the verification requirements at the time of hire). Criminal conduct involving the Form I-9 may be reported to the INS.

We strongly emphasize that this does not mean that all changes to name or SSN information recorded on the Form I-9 mean that fraud has taken place. Each such case should be considered on its particular facts. One fact of general application is that names may change for a variety of reasons, but SSNs do not change (although they may be recorded erroneously on forms). For this reason, a claimed change of SSN is arguably a situation that raises more of a red flag than a

claimed change of name. Of course, all such situations should be reviewed in the light of common sense. A change to an SSN that merely corrects a transcription error, such as recording one or two digits erroneously, would be an unlikely indicator of fraud, but if an employee reports what is clearly an entirely different SSN than the one he or she previously has used, something is wrong. Similarly, receipt of information showing that an employee has been working under a completely different name than his or her actual name reasonably raises questions about an employee's identity that are not raised by change of a last name due to marriage, correction of a middle initial, reconciliation of an incorrectly or differently recorded ethnic name, or other legitimate corrections.

This information relates to an employer's responsibilities under section 274A of the INA. For specific advice relating to immigration-related discrimination concerns, we recommend that you contact the Office of Special Counsel for Immigration-Related Unfair Employment Practices within the Civil Rights Division of the Department of Justice.

I hope this information is helpful. If you have any further questions, please contact Dea Carpenter, Associate General Counsel, at (202) 514-2895.

Very truly yours,

David A. Martin
General Counsel



U.S. Department of Justice
Immigration and Naturalization Service

HQCOU 90/10.15-C

Office of the General Counsel                    425 I Street NW
                                                 Washington, DC 20536

                                                      APR 1 2 1999

Dear

    Thank you for your letter of June 1, 1998, posing questions about our letter of December 23, 1997 to an attorney regarding employers' responsibilities under section 274A of the Immigration and Nationality Act (INA) with respect to information on Social Security numbers. Please accept our apologies for the delay.

    Our letter stated that notice from the Social Security Administration (SSA) to an employer notifying it of a discrepancy between wage reporting information and SSA records with respect to an employee does not, by itself, put an employer on notice that the employee is not authorized to work. We explained that because there are a number of reasons why there might be such a discrepancy that do not relate to a lack of work authorization, and because actual or constructive knowledge of unauthorized status is a case-by-case determination, we would not consider notice from SSA of a discrepancy, without more, to constitute actual or constructive notice of unauthorized status. Your letter takes the position that in situations other than a reported discrepancy that "clearly relates to a misspelled name or transposed digits in the SSN," the report would constitute not only constructive, but actual knowledge of unauthorized status, given that the employee necessarily used a Social Security card as proof of employment eligibility. You also suggest that, in light of section 274A's goal of preventing the employment of unauthorized aliens, the employer should "assume an irregularity in this situation" and require new documentation confirming employment eligibility and/or suspend the employee until the situation has been resolved.

    We disagree. Section 274A does indeed serve the important goal of deterring illegal immigration by reducing opportunities for unauthorized employment, but the statute, in conjunction with section 274B, couples this goal with appropriate concern that U.S. citizens or noncitizen nationals, lawful permanent resident aliens and other work-authorized aliens not lose

employment opportunities unnecessarily as a result of section 274A. It is simply not true that notice of a discrepancy with SSA records is actual notice of a lack of work authorization unless the error is clearly a minor typographical one. For example, consider the hypothetical case of employee Pat Smith, whose W-2 is a mismatch because SSA records indicate that the SSN pertains to Patricia Jones. That is an entirely different name, but in our hypothetical is explained by the fact that Ms. Jones has become Mrs. Smith but has neglected to report that change to SSA. Does notice of this discrepancy by itself immediately put the employer on actual notice that Mrs. Smith is an unauthorized alien, as you suggest, and therefore put it in violation of section 274A if it does not immediately suspend her? It does not. Furthermore, your assumption that an employee about whom SSA has reported a discrepancy necessarily has used a Social Security card as proof of work authorization is incorrect. The Social Security number may be written in section 1 of the Form I-9, but the employee may have presented a List A document, or a List C document other than a Social Security card in conjunction with a List B document.

We emphasize that although it is incorrect to assume that an SSA discrepancy necessarily indicates unauthorized status, it would be equally incorrect for an employer to assume that in all cases it may safely ignore any possible INA relevance or consequences of SSA discrepancies. For example, perhaps an employer receives information from some other source (such as a tip from another employee) indicating that an employee is unauthorized, and also receives notice from SSA that the employee's SSN does not match. In considering whether the totality of the circumstances rises to actual or constructive knowledge, the SSA notice is a relevant fact that would support a conclusion that it does. This is the type of situation we had in mind when we said in our December 23, 1997 letter that although an SSA notice of discrepancy standing alone does not itself put the employer on notice of unauthorized status, there may be situations in which such notice would cause or contribute to a determination that the employer has been put on notice.

In addition, an employer should not ignore the consequences of the follow-up activity it should perform in response to an SSA notice in order to reconcile its records for SSA purposes, such as verifying names and SSNs by examining Social Security cards. While this activity is not required by the INA (nor is it prohibited by it), the knowledge obtained by an employer through this process may have INA implications. For example, consider the case of an employee who, when asked to show his Social Security card for SSA reconciliation purposes, states that he is an unauthorized alien and does not have one. If that employee's employment is continued, the employer has violated section 274A. There is no safe harbor for such information just because it was learned as a result of non-INA-related business activity. As explained in our December 23, 1997 letter, if the employer learns reliable information that contradicts the Form I-9, such as a different Social Security number or name, the Form I-9 should be corrected in a non-destructive manner and, if the contradiction is with section 2 information, the employer should review acceptable Form I-9 documentation showing the correct information. [Furthermore, if an employee has been given the opportunity for wage reporting purposes to explain and reconcile a reported discrepancy with SSA records, and has failed to do so satisfactorily, that is an entirely different situation from an initial SSA notice standing alone.] The INS would be much more likely at that point to consider that employer to have violated section 274A if it continues the employment without taking appropriate steps to reverify work authorization, and the employee is in fact unauthorized.

Page 3

Your letter also asks for clarification of our previous statement that an employer could be held liable for knowingly employing an unauthorized alien if it hires someone using a known invalid SSN. Again, let us consider a fact pattern: An employer knows (as all employers reasonably should) that all SSNs have 9 digits. An employee provides an SSN (either in section 1 or section 2 of the Form I-9) that has only 6 digits. If that employee is unauthorized, the INS may charge that employer with the knowing hire of an unauthorized alien. Further, the employer attests under penalty of perjury in section 2 of the Form I-9 that "to the best of my knowledge the employee is eligible to work in the United States." If, in fact, to the best of the employer's knowledge the employee is using an invalid SSN, that is a false attestation.

Your letter questions why the employer may be liable "for the employee's failure to record the SSN correctly," when it is the employee rather than the employer who declares under penalty of perjury that the information in section 1 of the Form I-9 is correct. It is true that the employer is not the guarantor of the section 1 information supplied by the employee and is not required to investigate its truthfulness, but the employer's certification in section 2 that to the best of its knowledge the employee is work authorized (as well as potential liability for aiding and abetting an employee's perjury), means that it cannot knowingly condone a false section 1. If the employer knows at the time of hire that section 1 information is incorrect, it cannot execute the section 2 certification. In the scenario in the preceding paragraph, the employer may be liable under section 274A not because the SSN is incorrect, but because it knew that it was incorrect and accepted it anyway.

This information pertains as well to your question about our statement that an employer should not rely on a Form I-9 as a verification of employment eligibility if the employer determines that the employee has fraudulently executed it. You point out that a false statement on the Form I-9 (for example, a false date of birth) may have "nothing to do with the individual's right to work." Our prior letter used the term "fraudulently" advisedly, according to its common-law meaning of a material misrepresentation upon which the recipient of the misrepresentation detrimentally relies. There may be circumstances in which an employee's false statement on the Form I-9 is unrelated to the purpose of the Form – verification of authorization to work – and therefore would not be "fraudulent." However, employers should exercise caution about drawing that conclusion, as all the information on the Form I-9 is there for a reason. For example – using the examples you mention, lies about age or address – the false statement would be entirely material to the purpose of the Form I-9 if it was made to reconcile the section 1 information with the age or address shown in false documents presented for section 2. As a general matter, a Form I-9 that contains a statement by an employee that was knowingly false when it was made is not a trustworthy document. We believe that an employer who discovers that its employee has lied on a Form I-9 about any fact is fully entitled to take reasonable steps (such as a reverification) to ensure that the employee has not also lied about his or her work authorization or anything else on the form, and that if it continues the employment without doing so, it is taking a risk that it may be held liable if in fact the employee is not authorized.

No-Match Cert. Admin. Record  1786

Page 4

You state that the Internal Revenue Service issues to aliens who lack employment authorization but who need to file tax returns "Individual Taxpayer Identification Numbers ('ITINs') that resemble SSNs with respect to numbers and order of digits, but begin with a '9,'" and that in cases where an authorized worker has not received an SSN "the worker would expect to record the ITIN in section 1 of the I-9 form." That would be incorrect. No number other than a Social Security account number should be recorded in the designated space in section 1 of the Form I-9. Social Security numbers do not begin with a "9" and, except in extremely rare situations as individually determined by SSA on a case-by-case basis for extraordinary and compelling reasons, they do not change; an individual's SSN is his or her number for life.

I hope this information is useful. If we may be of assistance in the future, please let us know.

Sincerely,

Paul W. Virtue
General Counsel



**SSA/IRS**

**Social Security Administration**

**Internal Revenue Service**

# Reporter

**Fall 1999**

A Newsletter
for Employers

**Inside this Issue...**

More Volunteers Eligible for EFTPS
page 2

New Lower Rates Determine the Cost of Employer-Provided Group-Term Life Insurance
page 2

The Social Security Statement—A Message for Employees
page 3

Census Takers Needed for Census 2000
page 4

DOJ Advises Tax Credit and Deduction Help to Businesses Comply with the ADA
page 4



**IRS**

Department of the Treasury
Internal Revenue Service

www.irs.ustreas.gov

Publication 1693 (Rev 9-99)
Catalog Number 15060V

Social Security Administration
www.ssa.gov/employer

## Employers Who Offer Employees Cafeteria Benefit Plans Must Report Them to the IRS

If you are an employer that maintains a cafeteria or flexible benefit plan for your employees, you must file an information return for each year. Employers must file Form 5500, Annual Return/Report of Employee Benefit Plan, with Schedule F to meet this requirement. No exceptions exist for filing Form 5500 for cafeteria plans.

Also, state agencies, governmental agencies, and Indian tribes are required to file Form 5500 for cafeteria plans even though they may be exempt under the Employee Retirement Income Security Act of 1974 (ERISA) from filing Form 5500 for pension benefit and welfare benefit plans.

This is how a cafeteria plan works. Section 125 of the Internal Revenue Code (Code) makes it possible for employers to offer their employees a choice between cash and a variety of nontaxable benefits known as "qualified benefits". A qualified benefit is a benefit that does not defer compensation and which is excludable from an employee's gross income under a specific provision of the Code.

These qualified benefits include health care, vision and dental care, group-term life insurance, disability, adoption assistance, and certain other benefits. Employers may offer flexible spending accounts to employees that provide coverage under which specified, incurred expenses may be reimbursed. These include health flexible spending accounts for expenses not reimbursed under any other health plan and dependent care assistance programs.

An employer's contribution to a cafeteria plan is usually made as a result of a salary reduction agreement between the continued on pg. 4

### Notice of SSN Mismatch Not Basis for Adverse Action

Social Security notifies employers when reported employee names or Social Security numbers (SSN) don't match Social Security's records. It's important to understand that a mismatch doesn't necessarily mean the worker is using someone else's Social Security number or that the worker is an undocumented immigrant.

Some employers may take action against an employee based on the information in the notices. The notice of a mismatched name or number in an employer's wage report does not imply that the employee intentionally provided incorrect information and should not be a basis for adverse action against the employee. If an employer transfers, lays off, terminates or otherwise takes action against an employee based on information contained in the notice, the employer may violate the laws of the United States and be subject to prosecution or other legal consequences.

If a notice of a mismatched Social Security number is received from Social Security, the employer should check the records for a mistake in the reported number or worker's name. It could be something as simple as an inverted     continued on pg. 4

SSA/IRS                                                                                    Fall 1999

## More Volunteers Eligible for EFTPS!

The Electronic Federal Tax Payment System (EFTPS) continues to offer all taxpayers an easy way to pay their Federal taxes, and those benefits are compelling more and more taxpayers to use the system. Over 2.4 million taxpayers have enrolled in EFTPS, and that includes more than one million volunteers!

Beginning January 1, 2000, the threshold requiring the use of EFTPS will be changed from $50,000 to $200,000. The regulation for the new $200,000 threshold applies to the total deposits made in 1998. This means that businesses must consider deposits of all types of taxes (such as employment, excise or corporate income tax) made during 1998 to determine if they are required to use EFTPS. Between July 1, 1999, through December 31, 1999, the IRS will waive penalties for required taxpayers that deposited $200,000 or less in calendar year 1998, and do not use EFTPS.



The threshold change reduces the number of taxpayers required to use EFTPS and provide options for small businesses to comply with the tax rules and regulations. The Treasury Department encourages business taxpayers to learn more about EFTPS and to experience the ease and convenience of electronic payments. Taxpayers currently using the system tell us they are very pleased with the accuracy and speed of EFTPS.

To join the millions of taxpayers already enjoying the benefits of EFTPS, please call EFTPS Customer Service at 800-945-8400 or 800-555-4477 to receive an enrollment form or additional information. IRS

## SSA Eliminates 8" and 5¼" Diskettes for AWR Filing

SSA will no longer accept annual wage reports (Forms W-3/W-2) filed on 5¼-inch diskettes effective tax year 2000 (for W-2s due in calendar year 2001). SSA previously announced the elimination of 8-inch diskettes beginning tax year 1999. Both the 5¼ and 8 inch diskettes are being eliminated to simplify the diskette reporting process and achieve a more efficient program for SSA, employers and the payroll community.

Alternative methods of filing include electronically via SSA's Online Wage Reporting Service (OWRS), ½ inch magnetic tape, 3480 cartridge or 3490 cartridge. SSA

## New Lower Rates Determine the Cost of Employer-Provided Group-Term Life Insurance

Many employees will pay less social security and Medicare tax under new rules that apply to group-term life insurance. Beginning July 1, 1999, new rates go into effect to determine the cost of employer-provided group-term life insurance of more than $50,000. For most group plans, the first $50,000 of coverage is excluded from social security and Medicare tax for each employee per year. IRS regulations provide a table showing the cost per thousand dollars of coverage of group-term life insurance of more than $50,000 paid by the employer.

Employers may treat the costs as paid at any time or period, but they must be treated as paid at least once per year. The rates for costs treated as paid after June 30, 1999, and for prior periods are found in Table A.

Until January 1, 2000, you may treat the new "Under 25" and "25 to 29" brackets as one "Under 30" bracket with a rate of .06.

Note: The change in rates may result in group-term coverage provided under some employee-pay-all plans that previously was not taxable to become subject to the

Fall 1999    SSA/IRS

# The Social Security Statement–
# A Message for Employees

In October 1999, SSA will begin mailing the Social Security Statement (formerly known as the Personal Earnings and Benefit Estimate Statement) to all workers age 25 and older (about 125 million) who are not already receiving monthly Social Security benefits.

Employers and payroll organizations have suggested that SSA prepare an "employee message" that could be distributed in advance of the October 1999 mailings. The message would explain the upcoming mailing and potentially minimize calls or questions to payroll offices once the mailings begin. The following sample message is for your use. It's suitable for reproduction in company newsletters, bulletin boards, paycheck stuffers, etc.

## Your Social Security Statement: The Futures In Your Hands

In October 1999, the Social Security Administration will begin mailing Social Security Statements (formerly known as the Personal Earnings and Benefit Estimate Statement) to all workers age 25 and older (about 125 million) who are not already receiving monthly Social Security benefits.

You can expect to receive your Statement each year about three months before your birth month. For example, if your birthday falls in February, you can expect to receive your Social Security Statement in November.

The 4-page Social Security Statement is intended to help you plan your financial future by providing estimates of the monthly Social Security retirement, disability and survivors benefits you and your family could be eligible to receive now and in the future. The Statement will remind you that Social Security is the foundation on which to build a more secure future.

The information in the Social Security Statement also will provide you with an easy way to determine whether your earnings (or self-employment income) are accurately reported and recorded on your Social Security record. Making sure the name and Social Security Number your employer has on record matches your Social Security card is the best way to ensure earnings will be accurately posted. That's important because the amount of your future benefits will be continued on pg. 4

same rules of taxation as employer-financed group-term plans. However, a special transitional rule allows you to use, until January 1, 2003, the old rates for determining whether coverage under your employee-pay-all plan is subject to taxation.

For more information See IRS Reg 1.79-1 and Publication 535, *Business Expenses.*

For IRS tax forms, publications and more, contact IRS' Web site at http://irs.ustreas.gov.  IRS

## Table A
**Cost Per Thousand Dollars of Coverage of Group-Term Life Insurance Over $50,000 Paid by the Employer**

| 5-year Age Bracket | Cost Per $1,000 of Coverage Per Month | |
|---|---|---|
| | new table *effective 7/1/99* | old table *prior to 7/1/99* |
| Under 25 | 0.05 | — |
| 25 to 29 | (Under 30) .08 | |
| 30 to 34 | .08 | .09 |
| 35 to 39 | .09 | .11 |
| 40 to 44 | .10 | .17 |
| 45 to 49 | .15 | .29 |
| 50 to 54 | .23 | .48 |
| 55 to 59 | .43 | .75 |
| 60 to 64 | .66 | 1.17 |
| 65 to 69 | 1.27 | 2.10 |
| 70 and above | 2.06 | 3.76 |

No-Match Cert. Admin. Record  1790

SSA/IRS                                                                Fall 1999

# Census Takers Needed for Census 2000

The Bureau of the Census is currently recruiting nationally for people to help conduct Census 2000. Census takers, earning $6 to $15 an hour, will work approximately six to eight weeks.

You can apply if...

- You are 18 years or older.
- You can work evenings and weekends.
- You take a written test of basic skills.
- You agree not to engage in any partisan political activity within 24 hours of performing work.

- Males age 18 or older, born after Dec. 31, 1959, must be registered with selective service.

Even though preference is given to U.S. citizens, qualified non-citizens may be considered if enough qualified citizens are not available. If you, or people you know, are interested in applying for a position with the Census Bureau or would like more information, call the toll-free number, 1-888-325-7733.  SSA

## DOJ Advises Tax Credit and Deduction to Help Businesses Comply with the ADA

All businesses, regardless of size, must comply with the Americans with Disabilities Act (ADA).

Small businesses may use a tax credit of up to $5,000 a year to offset half the cost of altering facilities, purchasing equipment providing Braille or a sign language interpreter, or other modifications to improve accessibility for customers or employees.

All businesses may take a deduction of up to $15,000 a year to offset the cost of altering facilities to improve accessibility.

To learn about the ADA and order a free ADA Tax Incentive Packet, call the ADA Information Line at 800-514-0301 (voice) or 800-514-0383 (TTY) or access the ADA Home Page at www.usdoj.gov/crt/ada/adahom1.htm.  IRS

## Cafeteria Benefit
continued from pg. 1

employer and the employee. The employee agrees to contribute a portion of his or her salary on a before-tax basis to pay for the qualified benefits. Since salary reduction contributions are not actually or constructively received by the participant, the contributions are not considered wages for federal income tax purposes. In addition, those sums generally are not subject to Federal Insurance Contribution Act and Federal Unemployment Tax Act taxes.

A salary reduction agreement is sufficient to satisfy the "cash" requirement of a cafeteria plan. Thus, a cafeteria plan needs only to offer a choice between one qualified benefit and salary reduction.  IRS

## Social Security Statement
continued from pg. 3

based on your Social Security earnings record. The Statement will tell you how to correct inaccurately recorded earnings.

In addition to helping plan your retirement, these are other ways to use your Social Security Statement:

- Plan your financial security for today and tomorrow by knowing the amounts of Social Security benefits that could be available to you and your family if you become disabled.
- Determine whether you have sufficient insurance to protect your survivors if you die.
- See how your potential Social Security benefits fit in with your investments and savings.

For more information about Social Security benefits, call or visit your local Social Security office, call this toll-free number, 1-800-772-1213, or visit this Web site: www.ssa.gov.  SSA

## SSN Mismatch
continued from pg. 1

number or a failure to report a name change.

Social Security suggests that the best way to prevent problems is to verify employee records and W-2s for accuracy when filing the annual wage reports:

- Ask employees to check the name and number on their W-2s with their Social Security card;
- Remind employees to report name changes to Social Security; and
- Ask to see a new employee's Social Security card to record the name and number exactly as shown on the card.

In this way, you can avoid the need to divert time and resources to the problem of fixing erroneous Social Security numbers.

This issue should not be confused with the ongoing pilot in several states in which SSA will verify the Social Security number and work status of a job applicant upon request from an employer. The pilot involves new hires while the mismatch problem involves current employees whose mismatched Social Security numbers or names show up in the employer's wage reports to Social Security.  SSA



Civil Rights Division

Special Counsel for Immigration Related
Unfair Employment Practices - CRT
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

April 3, 2004

By First Class Mail
Ana Avendaño Denier
Associate General Counsel
American Federation of Labor and Congress
   of Industrial Organizations
815 16th St. NW
Washington, D.C. 20006

Re:  Social Security No-Match Letter

Dear Ms. Avendaño Denier:

This letter addresses your request for guidance concerning appropriate employer action upon receipt of a Social Security no-match letter.  In particular, this letter addresses whether the validity of an employee's completed employment eligibility verification form (INS Form I-9) is called into question when the employer receives a Social Security no-match letter.

The receipt of a no-match letter, standing alone, does not indicate to an employer that he or she need question the genuineness of documents or information previously presented to complete an INS Form I-9.  This applies equally to the situation where the employee presents a Social Security card to establish employment eligibility under List C of the INS Form I-9.  The General Counsel's office of the former Immigration and Naturalization Service has stated, in a number of earlier opinion letters, that receipt of the no-match letter, standing alone, does not place the employer on notice of an employee's unauthorized status or "require reverification of documents or further inquiry as to the employee's work authorization."  See December 23, 1997, letter from David A. Martin, General Counsel.  Actual or constructive knowledge of undocumented status is a case-by-case determination and depends upon the individual circumstances and totality of the circumstances before the employer, including any admission by an employee that he or she is undocumented, information learned from other sources, or follow-up activity in response to the receipt of the no-match letter.

Both the former INS General Counsel's office and the Social Security Administration have noted that there are many reasons for issuance of a no-match letter, including errors made in spelling an employee's name or the recording of the Social Security number, and the failure to report a name change after marriage or divorce, among other reasons.  Further, the Social

Security Administration states clearly that a no-match letter makes no statement about an employee's immigration status.

An employer's decision to terminate an employee based solely upon the receipt of a no-match letter may constitute citizenship status or national origin discrimination, or unfair documentary practices, in violation of the anti-discrimination provision of the Immigration and Nationality Act, 8 U.S.C. § 1324b, which is enforced by the Office of Special Counsel for Immigration-Related Unfair Employment Practices ("Office of Special Counsel") of the Civil Rights Division of the U.S. Department of Justice.

I hope this information is useful. If the Office of Special Counsel may be of assistance in the future, please let us know.

Sincerely,

Sarah DeCoss
Senior Trial Attorney
Office of Special Counsel for
        Immigration-Related Unfair
        Employment Practices

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | NCAE: Michael Kerr [Kerr@NCAEonline.org] |
| **Sent:** | Monday, August 14, 2006 4:45 PM |
| **To:** | Regs, Rfs |
| **Cc:** | Sharon M. Hughes |
| **Subject:** | Comments on Docket No. ICEB-2006-0004 |
| **Attachments:** | NCAE Comments on DHS Mismatch Proposed Rule1.pdf |

Attached are the National Council of Agricultural Employers "Comments on DHS Mismatch Proposed Rule 1."

If you encounter any problems with this attachment, please do not hesitate to contact me.

Very truly yours,

*If you do not wish to receive email from NCAE please respond to this message with REMOVE in the subject line.*

******************************
Michael W. Kerr
Government Affairs Assistant
National Council of Agricultural Employers
1112 16th Street NW, Suite 920
Washington, DC 20036
p: (202) 728-0300
f: (202) 728-0303
Website: www.NCAEonline.org
Email:    Kerr@NCAEonline.org


******************************

**No-Match Cert. Admin. Record  1794**



## NATIONAL COUNCIL OF AGRICULTURAL EMPLOYERS

August 14, 2006

<u>**VIA ELECTRONIC MAIL AND U.S. MAIL**</u>

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

      **Re:**    **Docket No. ICEB-2006-0004**
              **Safe Harbor Procedures for Employers Who Receive a No-Match Letter**
              **(FR 71:114, p. 34281)**

To Whom It May Concern:

      The National Council of Agricultural Employers ("NCAE") and the undersigned agricultural organizations hereby submit these comments on the Bureau of Immigration and Customs Enforcement, Department of Homeland Security's ("DHS") Proposed Rule regarding "no-match" letters published in the *Federal Register* on June 14, 2006 (71 *Federal Register* 34281).

      NCAE is a national association based in Washington, D.C. that represents growers and agricultural organizations on agricultural labor, employment and immigration issues. Formed as a non-profit organization in 1964, NCAE represents the agricultural industry's interests before Congress and federal agencies on critical farm labor and immigration issues. NCAE's membership includes agricultural employers with operations in all 50 states that hire the vast majority of the national labor-intensive agricultural workforce.

      NCAE represents the interests of the agricultural industry nationally on federal public policy issues with respect to immigration, and NCAE was actively engaged in the legislative and regulatory process that preceded and followed the enactment of the Immigration Reform and Control Act of 1986 and Illegal Immigration Reform and Immigrant Responsibility Act of 1996. Currently, it is actively engaged in promoting comprehensive immigration reform, including proposals that would ensure American agriculture a legal workforce. Because NCAE members employ a largely alien workforce, they regularly face confusing, "Catch-22"-type situations regarding no-match letters. Thus, NCAE and its membership have an interest in, and would be affected by, the above-referenced Proposed Rule. Following are NCAE's comments to the DHS Proposed Rule.

**No-Match Cert. Admin. Record  1795**

Docket No. ICEB-2006-0004
August 14, 2006
Page 2 of 14

## Overview and Recommendation

Federal law governing the employment of persons authorized to work in the U.S. is broken. The employer sanctions provisions of the Immigration Reform And Control Act of 1986 ("IRCA") that attempted to eliminate the job magnet for undocumented aliens failed because Congress did not provide a means by which employers effectively could screen out fraudulent documents.[1] IRCA also failed to provide legal channels through a workable guest worker program by which employers could obtain legal alien workers when U.S. workers were unavailable. Ironically, IRCA was successful in one regard. It provided an effective anti-discrimination provision that subjected vigilant employers to litigation if they did not comply with the complex hiring provisions of the new employer sanctions law.

In 1996, Congress again failed to take steps to make employers sanctions work. While it enacted a pilot electronic verification program in order to screen out fraudulent employment authorization documents through the use of Social Security Administration ("SSA") and Immigration and Nationality Services ("INS") databases, the program was voluntary in nature. Moreover, Congress again failed to provide workable guest worker programs and legal avenues for employers to obtain alien workers when shortages of U.S. workers existed.

In the midst of congressional failure to stem the flow of illegal workers, SSA began issuing SSA mismatch letters on a regular basis in approximately 1993. In communications to employers, the SSA indicated to employers that no-match letters were limited to correction of Social Security accounts for the benefit of workers without any reference to immigration-related requirements of the letters. Given the failures of Congress to enact legislation that effectively controls undocumented workers, the SSA mismatch letter has evolved to the point where it has now become the centerpiece of employer sanctions enforcement, as evidenced by DHS' proposed no-match rule. NCAE believes the use of the SSA no-match letter for immigration purposes is premature and represents an unwise approach from both a legal and practical perspective.

NCAE believes that there is a distinction between a SSA no-match letter and a no-match letter issued by DHS after an audit of an employer's I-9 Forms and related documents. Clearly, DHS has the legal authority to inform employers of no-matches based on DHS' review of its own databases and to undertake compliance action based upon the employer's alleged constructive knowledge if the employer fails to take corrective action after receiving notice from DHS. The comments in this letter generally relate to the Proposed Rule's inclusion of SSA no-match letters.

## The Experience of Agricultural Employers with No-Match Letters

For over ten years, agricultural employers have received Social Security mismatch letters. The subject of mismatch letters presents extremely confusing legal and practical issues for

---

[1] 8 U.S.C. § 1324a.

Docket No. ICEB-2006-0004
August 14, 2006
Page 3 of 14

employers, particularly agricultural employers, who employ a large number of aliens. Immigration and employment lawyers are not in agreement as to whether mismatch letters impose immigration compliance obligations. Moreover, government officials and private sector attorneys often reach vastly different conclusions on this subject. Disagreement and confusion are rampant and well-intended employers are left without a clear understanding of their compliance responsibilities.

NCAE members have had substantial concerns regarding whether mismatch letters put them on notice that they may be in violation of the employment authorization provisions of the immigration law, since the Social Security card is one of the most commonly used employment authorization documents. Some lawyers have taken the position that the federal Privacy Act prohibits the use of no-match letters by employers for immigration purposes. Given the high level of confusion surrounding mismatch letters, it is imperative that "bright line" rules be provided to employers regarding their legitimate obligations.

To the extent that the Proposed Rule attempts to clarify the process regarding mismatch letters, DHS' efforts should be commended. As described more fully below, however, NCAE submits that the Proposed Rule is plagued by substantial legal, jurisdictional and practical problems that can only be fixed through legislation. At a minimum, consideration of the Proposed Rule should be deferred until Congress completes its work on comprehensive immigration reform.

**No-Match Letter Policy Changes Should Be Made Through the Legislative Process**

NCAE submits that the Proposed Rule is premature, inasmuch as Congress is in the process of attempting to pass comprehensive immigration reform that should address the SSA no-match issue. The House of Representatives has passed a worksite enforcement bill (H.R. 4437) and the Senate (S. 2611) a comprehensive bill that includes enforcement, guest worker, earned adjustment of status provisions for businesses, as well as the Agricultural Job Opportunities, Benefits, and Security Act ("AgJOBS") H-2A reform and earned adjustment provisions for agricultural employers. These bills address both employer sanctions provisions, and to a lesser extent, SSA responsibilities. NCAE believes that it is preferable for Congress, through legislation, to address the interrelationship between the SSA mismatch issue, immigration compliance and national origin and citizenship status discrimination lawsuits in order to provide employers a "bright line" for compliance.

As discussed more fully below, a regulatory proposal cannot effectively address the conflicting compliance challenges posed by the SSA no-match issue. DHS' well-intended but piecemeal approach would lead to extraordinary confusion and litigation by worker rights organizations and others challenging employer refusals to hire and terminations based on the proposed no-match rule. This would ultimately increase employers' administrative challenges and exposure to liability. Accordingly, it is critical that Congress address the SSA no-match issue in the context of comprehensive immigration reform. NCAE members, who strive to

Docket No. ICEB-2006-0004
August 14, 2006
Page 4 of 14

comply with conflicting compliance obligations in the immigration and employment realms, would benefit tremendously from the "bright line" guidance of comprehensive legislative reform.

**Substantial Legal and Jurisdictional Problems Warrant Deferral of the Proposed Rule**

*Federal Privacy Act Issues*

SSA has encouraged employers to verify the Social Security numbers of persons they employ and to use its Employee Verification Service ("EVS") in doing so. SSA makes clear in its written communications to employers that the Federal Privacy Act[2] prohibits the use of the information received from SSA regarding employee names and Social Security numbers "for a purpose other than that for which it was requested" and that persons who violate this prohibition are subject to fines and imprisonment. SSA communications also indicate that SSA will verify the names and numbers of applicants or employees to ensure that the records are correct solely for the purpose of my completing Internal Revenue Service ("IRS") Forms W-2 (Wage and Tax Statement).[3] There is no reference to any purpose related to immigration compliance, notwithstanding the fact that the Social Security card is one of the most commonly used work authorization documents.

According to DHS Secretary Michael Chertoff, DHS is seeking to implement a regulation designed to provide employers with "the necessary tools to increase the likelihood that they are [only] employing" authorized workers, and also will help DHS identify employers acting in blatant disregard of immigration laws.[4] While NCAE supports the Secretary's desire to ensure compliance with our immigration laws, over which he has jurisdiction, there nonetheless is concern regarding the agency's ability to do through use of SSA no-match letters or information that SSA otherwise provides to employers regarding the validity of Social Security number information.

The privacy protections attending the Social Security card are so important that other federal agencies, such as DHS, are not permitted to have access to such information. This is recognized in this year's Senate-passed immigration reform legislation, S. 2611, Title III, Section 301(e)(1). The Senate bill authorizes SSA to disclose to DHS, upon written request by the Secretary of Homeland Security, the identity of employers who submit more than 100 "mismatches" or more than 10 duplicate Social Security numbers. Without such legislative authorization, the Privacy Act would prohibit disclosure of such information.

---

[2] 8 U.S.C. § 552a(I).

[3] *See, e.g.*, "Employee Verification Service (EVS) Verification of Names and Social Security Numbers," November 2002 (Updated in 2006), page 4, Social Security Administration, ICN: 43700.

[4] *See* DHS Press Release available at http://www.dhs.gov/dhspublic/display?them=43&content=5684&print=true.

Docket No. ICEB-2006-0004
August 14, 2006
Page 5 of 14

Given the warnings provided to employers by SSA regarding the Privacy Act limitations on the usage of SSA no-match information, as well as the limitations on access to such information imposed on other government agencies, NCAE is concerned the DHS' Proposed Rule ignores these limitations and ultimately will result in litigation. Rather than achieving the clarity and regulatory guidance in this complex area that employers seek, it is likely that it would have the opposite effect by fostering lawsuits and further adding to the confusion that exists in the employer community.

NCAE's concerns in this regard are highlighted by the fact that SSA publications regarding no-match letters inform employees that a no-match letter "does not make any statement about an employee's immigration status and is not a basis, in and of itself, for taking any adverse action against an employee. Doing so could subject you to anti-discrimination or labor law sanctions."[5]

*Discrimination Lawsuits*

The Proposed Rule also cannot eliminate through the regulatory process potential discrimination lawsuits that employers that comply with the rule may face based on the provisions of other federal laws. The anti-discrimination provisions of Title VII of the Civil Rights Act of 1964[6] ("Title VII") and the anti-discrimination provisions of IRCA,[7] as well as State anti-discrimination laws, pose a real threat to employers that terminate or refuse to hire workers based on SSA no-match letters. DHS' Proposed Rule will force employers to refuse to hire or to terminate job applicants and employees if, after following the compliance procedures, the documents that they provided cannot be verified under the SSA or DHS databases. It is precisely because of these types of adverse employment decisions in the context of the employment verification process that employers have been sued for discrimination.

Discrimination actions under IRCA are particularly troublesome to agricultural employers, who are put in a "Catch-22" position by conflicting obligations. By way of explanation, two essential components of IRCA are employers' obligation to comply with the employment eligibility requirements of the law and face sanctions if they do not, and provisions prohibiting unfair immigration-related employment practices based on citizenship status and national origin. After the enactment of IRCA, agricultural organizations throughout the U.S. conducted extensive compliance programs for employers, informing them of their obligations under these new laws. Such programs sometimes were conducted with the participation of lawyers from the then Immigration and Naturalization Service and the Department of Justice's Office of Special Counsel for Immigration Related Unfair Employment Practices ("OSC").

---

[5] "Employer Reporting Instructions & Information, Social Security Number Verification, Restrictions on Using SSNVS," 2005, Social Security Online, www.ssa.gov/employer/ssnvrestrict.htm

[6] 42 U.S.C. § 2000e-2.

[7] 8 U.S.C. § 1324b.

Docket No. ICEB-2006-0004
August 14, 2006
Page 6 of 14

Unfortunately, lawyers from these agencies with very distinct missions often would not agree as to what employer compliance obligations were, given the tension created by one component that encouraged vigilant review of work eligibility documents and another that stressed that employers face discrimination charges if they were too aggressive in evaluating the documents presented during the work authorization process.

The result of these competing provisions of the law was a lack of compliance clarity for the employer community and exposure to discrimination lawsuits and government actions. During the past 20 years, more agricultural employers have been charged with discrimination under IRCA for being overly zealous in complying with the employment eligibility requirements, than employers charged with violating the employer sanctions provisions. Well-intended employers have been caught in the jaws of an IRCA Catch-22 situation as a result.

NCAE recognizes that DHS' proposed safe harbor provision of the Proposed Rule is intended to insulate employers from liability related to employment eligibility compliance; however, as a DHS-issued rule, it lacks the authority to provide similar protection against discrimination lawsuits brought under Title VII of the Civil Rights Act or the unfair immigration-related employment practice provisions of IRCA and other federal and state laws. NCAE questions whether the Proposed Rule's mere statement that employers that follow the Proposed Rule will be protected from liability under 274B(a)(6) of the INA, the anti-discrimination provision of IRCA that is enforced by the Office of Special Counsel within the Department of Justice, will in fact protect employers from suits under that provision.

Several examples illustrate the dangers employers would face from following the Proposed Rule with regard to federal discrimination law. A decision recently issued by the U. S. Court of Appeals for the Tenth Circuit in *Zamora v. Elite Logistics, Inc.,* (No. 04-3205) (10th Cir. June 6, 2006), highlights the treacherous path employers tread when they engage in post-hiring verification of Social Security cards of employees, once the validity of the card has been called into question. The court in *Zamora* reversed a grant summary judgment for the employer in a Title VII discrimination claim based on race or national origin. The case involved circumstances in which an employer followed up on information it received in auditing its I-9 Forms that the plaintiff, who had satisfied the employment verification requirements when initially hired, had a Social Security number that had been used by another person on three different occasions in another state. The employer's effort to verify the validity of plaintiff's Social Security card and the alleged facts that stemmed therefrom resulted in an allegation of discrimination, which the Court of Appeals held needed to be determined by a trier of fact. As has been the case with IRCA's sanctions and anti-discrimination provisions, the Social Security mismatch problem highlighted by *Zamora* retains the "damned if you do and damned if you don't" dilemma that employers face.

An arbitration decision also highlights the potential problem for employers faced with termination decisions with workforces governed by collective bargaining agreements requiring just cause for termination. In *Hotel Employees and Restaurant Employees Union, Local 2 v.*

Docket No. ICEB-2006-0004
August 14, 2006
Page 7 of 14

*San Francisco Central Travelodge Joint Venture*, in a decision dated May 3, 2000, an Arbitrator found that seven unionized housekeeping employees who were discharged for failing to correct mismatched Social Security information were not discharged for just cause and, therefore, the employer was in violation of the governing collective bargaining agreement.  The employer had offered the employees several chances over two years to provide the correct information, but finally discharged the employees due to their failure to comply with the employer's reasonable rules, a violation recognized as just cause in the collective bargaining agreement.  In particular, the employer believed that it could be found to have constructive knowledge of the employees' unauthorized work status and could therefore face severe penalties from the SSA, the (former) INS and the IRS.

However, the Arbitrator ordered the employees reinstated and made whole for their lost wages and benefits.  The parties settled this case during subsequent litigation in federal court, with the employer agreeing to pay the employees $50,000 in back pay and to provide conditional reinstatement.  *San Francisco Central Travelodge Joint Venture v. Hotel Employees and Restaurant Employees Union, Local 2,* No. C-01-1371 (N.D. Cal. Apr. 6, 2001).  The employer paid dearly in this case despite significant efforts to comply with the law in a scenario that would likely remain unchanged, and maybe made even more confusing, under the Proposed Rule.

### Discrimination Charges When Employers Attempt to Use the H-2A Temporary and Seasonal Alien Agricultural Worker Program

To make matters worse, it is the experience of NCAE members and many agricultural employers that state and federal departments of labor often discourage attempts to verify Social Security names and numbers under SSA's EVS prior to hiring and during employment.  For users of the H-2A temporary and seasonal alien agricultural worker program,[8] this problem is intensified by the fact that the local state workforce agencies are required to actively refer qualified domestic workers to H-2A employers prior to the departure of the certified H-2A workers from their home country.  Few, if any, state workforce agencies use the authority conferred under IRCA to verify the legal status of the workers they refer and provide certification of employment eligibility to the employer to whom the worker is referred.[9]

Instead, H-2A employers are often flooded with illegal workers by the state workforce agencies, and employers must risk a discrimination lawsuit by refusing to hire or terminating an illegal worker in order to avoid violating immigration law.  NCAE members have had state workforce agencies refer so-called "U.S. workers" in response to an H-2A labor certification application, only to be audited later by INS and be told that "U.S. workers" referred by the state were illegal aliens.  To avoid this problem, some employers have participated in SSA's EVS system, attempting to verify the validity of the Social Security cards provided by state agency referrals. Efforts to verify all applicants' work eligibility through the EVS has been used by the

---

[8] *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a).

[9] 8 U.S.C. § 1324a(a)(5).

Docket No. ICEB-2006-0004
August 14, 2006
Page 8 of 14

U.S. Department of Labor ("USDOL") as the basis to deny an employer's application to participate in the H-2A program, alleging that use of the EVS system discriminates against U.S. workers. H-2A employers have had to litigate this issue in order to hire legal alien workers.[10]

In a related troubling example, a federal court in Washington State recently granted class action status to a lawsuit by farm workers claiming they were unlawfully denied jobs or fired because a farm labor contractor and two farms it represented preferred legally admitted H-2A workers over U.S. workers in violation of federal and state law." *Perez-Farias v. Global Horizons Inc.*, No. CV-05-3061-FVS (E.D. Wash July 28, 2006). The court rejected the defendants' argument that any class certified by the court should exclude at least 264 potential class members who had provided the contractor with Social Security numbers that did not match federal government records. The contractor maintained that it acted legally because it discharged such individuals if they could not correct the mismatch within 30 days, assuming that they were illegal. The court rejected this argument, holding that the mismatch of employee names and Social Security account numbers could occur for reasons having nothing to do with immigration status.

In essence, the a consequence of the federal court's decision is that an employer that assumed that it complied with the safe harbor provisions of the Proposed Rule by using SSA's EVS system to consistently check the Social Security number provided by each applicant for employment referred by the state, could be subject to a lawsuit by so-called "U.S. workers" allegedly discriminated against through the use of the mismatch process. DHS' safe harbor provision would provide no protection under those circumstances, even though the employer's actions fully comported with the purpose and intent of the Proposed Rule.

The examples discussed above demonstrate that only a comprehensive legislative solution can effectively clarify an employer's obligations under federal immigration and employment law. Piecemeal clarification attempts, though commendable, would only complicate an extremely confusing area through litigation challenging the Proposed Rule that likely would ensue. There is no doubt that mismatch letters put employers in an untenable position regarding immigration law compliance and add to their anxiety about the legal status of their workers. Adopting the Proposed Rule would impose another set of obligations on employers without providing employers protection from the omnipresent threat of discrimination lawsuits and Privacy Act challenges to the Proposed Rule. Worse yet, the Proposed Rule might even mislead employers into believing that they are protected from discrimination lawsuits if their conduct qualifies for the safe harbor provision. As a foreseeable consequence, unsuspecting employers would be subject to increased litigation and government actions even though they were acting in full compliance with DHS' new mismatch policy.

This dilemma underscores the importance of delaying consideration of the Proposed Rule until Congress passes comprehensive immigration reform. NCAE recommends that DHS

---

[10] *See, e.g., Global Horizons, Inc. (Valley Fruit Orchards) v. U.S. Dept. of Labor*, 2005-TLC-00009 (June 1, 2005).

Docket No. ICEB-2006-0004
August 14, 2006
Page 9 of 14

and the Bush Administration insist that Congress produce comprehensive immigration reform legislation that resolves all of the problems presented by the Proposed Rule. This could be achieved by a telephonic and electronic verification system that would eventually require all employers to verify through DHS the employment eligibility of all hires. A tamper-proof and biometric Social Security card could be the centerpiece of this system. If a Social Security card and/or specified alien employment authorization documents were required of all applicants, employers that failed to comply with the verification system's requirements would be subject to compliance actions by DHS and subject to penalties.

If an effective mandatory verification system that checked documents against the databases of SSA and DHS were enacted, there would be no need for the Proposed Rule because applicants would be screened out of the hiring process at the outset and the no-match problem would be substantially eliminated. Consequently, another component of comprehensive immigration reform should be to clarify that for purposes of reporting employee Social Security wages and taxes, the SSA no-match issue should remain exclusively a matter under the jurisdiction of SSA and the IRS to ensure that information is accurately reported so that individual accounts are properly credited. Legislation should clarify that SSA no-matches are not an immigration compliance issue. Current Privacy Act protections of SSA no-match data should remain.

**Practical Problems with the Proposed Rule**

Under the Proposed Rule, an employer would have between 14 and 60 days, depending on the circumstances, to verify the legitimacy of an employee's documents. If an employer could not do so at the end of the 60-day period, it would be required to have the employee complete a new Form I-9 within 3 days without using the document, be it an SSN or alien work authorization document, that could not be verified. If the employee could not provide alternative work authorization and identity documents to complete a new Form I-9, the employer would have to terminate the employee or face potential liability.

*A Final Rule Should Have Prospective Application*

The Proposed Rule does not indicate when it would be effective. Many NCAE members are small employers with limited administrative staff. It would be a tremendous burden for such employers to have to follow the procedural steps set forth in the Proposed Rule on a retroactive basis. Should DHS decide to issue a final rule, it should clarify that it would have prospective application only to those no-match letters received after the date the rule becomes final.

*The Highly Seasonal Nature of Agricultural Employment Must Be Accommodated*

Compliance with the Proposed Rule would be difficult for many agricultural employers. Most of NCAE's members employ a large number of seasonal workers. Migrant agricultural workers move frequently to maintain continuous employment. They may work only several days

Docket No. ICEB-2006-0004
August 14, 2006
Page 10 of 14

to a number of months for an employer and then move on to another employer for another brief period of employment. Following up on employee mismatches could be extremely problematic. Due to the very short seasons of many agricultural operations, an employee may not be employed at the time an employer receives a no-match letter. This is especially true of SSA no-match letters which many employers receive in the late Winter or early Spring of the year when many seasonal employees are not employed. Under such circumstances it would be impossible within a short period of time for an employer to communicate with a former employee listed in a no-match letter in order to satisfy the 14 day requirement under the Proposed Rule. Former workers seldom leave forwarding telephone numbers where they can be contacted. Moreover, once the season is over, farm workers typically are terminated, rather than put into lay-off status until the next season. Most are not in employee status at the time their former agricultural employers receive a no-match letter.

In these scenarios, an employer could send a letter to an employee's forwarding address if one is provided, but there is no guaranteed method to ensure that the employee receives and replies to the no-match letter. Many employers would not have the opportunity to have a face to face discussion with the mismatched employee to resolve the issue. This puts employers in a bind in that they could lose the benefit of the safe harbor provision because of the nature of the work and workforce, despite good faith compliance efforts.

Although NCAE submits that the Proposed Rule should be deferred pending comprehensive legislative reform, should the rule be adopted, NCAE requests that DHS take into account the unique circumstances of seasonal agricultural employment and migrant workforce issues. An employer of seasonal workers should be able to satisfy its obligations under the Proposed Rule and benefit from a safe harbor protection if it can establish that the worker was not employed during the 14 to 60 day window of correction following the receipt of the no-match letter and that the employer sent a letter to the last known mailing address of the worker, if one were provided, requesting that the Social Security records be corrected. If a forwarding address were not provided, the proposed rule should be inapplicable to the employer, unless, as discussed below, the worker seeks reemployment at a later time.

If employees listed on a no-match letter the prior season return the following season, the Proposed Rule should be applicable at the time of rehire. The applicant should be required within the applicable timeframes under the Proposed Rule to establish their employment eligibility before being hired. In this case, the safe harbor provision would apply if proper verification could be made at the time. If the employer could prove that a migrant or seasonal employee left employment of his or her own volition prior to resolution of the work eligibility issue during the 14 to 60 day timeframe, the safe harbor should apply.

*The 14-Day Correction Window Should Be Expanded for Employers of Seasonal Workers*

Many agricultural employers are small and do not have personnel departments. Because many are seasonal businesses, their workforces expand from a small year' round work force to a

Docket No. ICEB-2006-0004
August 14, 2006
Page 11 of 14

large seasonal work force for a few critical production and harvest periods during the year.  The hiring and employment eligibility verification of a large number of newly hired seasonal workers, coupled with the potential obligation imposed under DHS' proposed rule to verify the status of a person who was listed on a no-match letter during a prior year of employment would impose a significant administrative challenge to many small employers.

Consequently, NCAE recommends that DHS expand the proposed window of verification of 14 days to 60 days to 30 to 60 days.  The expansion from 14 to 30 days would allow small employers the opportunity to cope with their initial employment eligibility duties, as well as the newly proposed no-match responsibilities.

*Joint Employment Relationships that Characterize Seasonal Agricultural Employment Must Be Accommodated*

The Proposed Rule does not address the thorny issue of joint employment relationship with respect to employers' obligations under the Proposed Rule.  In other words, where a grower pays an independent contractor to provide workers for a limited duration, who has the responsibility under the Proposed Rule to comply with the no-match procedures in order to obtain the safe harbor provision—the independent contractor or the grower?

In the agricultural context, agricultural entities frequently pay a farm labor contractor ("FLC"), as an independent contractor, a fee to provide workers for a limited duration, with the express understanding that the FLC is the employer for all purposes, including employment eligibility verification.  As with most independent contractor relationships, there is no "bright line" as to whether an independent contractor relationship exists between the employer and FLC.  The joint employer principles set forth under the federal Fair Labor Standards Act[11] and the federal Migrant and Seasonal Agricultural Worker Protection Act,[12] that govern employment law obligations in seasonal agricultural work are broader than traditional independent contractor rules.  For example, a grower that believed that the FLC was an independent contractor and employer responsible for I-9 Form completion may nonetheless found to be the joint employer for other purposes.

NCAE recommends that the Proposed Rule should clarify that the existing definition of the term "independent contractor" contained in DHS' current regulations, with a minor modification, is determinative of compliance responsibilities under the procedures forth in the Proposed Rule.[13]  NCAE suggests that the existing definition of "independent contractor" in DHS' regulations be modified to emphasize that great weight will be placed on the fact that an entity completed the I-9 Form as part of the employment eligibility verification process in

---

[11] 29 U.S.C. §§ 201 *et seq.*

[12] 29 U.S.C. §§ 1801 *et seq.*

[13] 8 C.F.R. § 274a.1(j).

Docket No. ICEB-2006-0004
August 14, 2006
Page 12 of 14

determining which entity is responsible for complying with the no-match verification procedures set forth in the Proposed Rule.

**Adverse Consequences of Implementing the Proposed Rule Without Comprehensive Legislative Immigration Reform**

*Decimation of the Labor-Intensive Agricultural Workforce Without a Viable Legal Means of Replacing It*

If the Proposed Rule takes effect before Congress enacts comprehensive reform legislation, including provisions similar to the AgJOBS agricultural guest worker and earned adjustment of status provisions contained in S. 2611, it likely will have a devastating effect on labor-intensive American agriculture. Understanding the agricultural labor context at issue here is critical to reaching this conclusion. It is well-established that the U.S. agricultural workforce has become increasingly populated by foreign workers who lack proper work authorization.

Shortly after the passage of IRCA in 1986, the USDOL began conducting yearly National Agricultural Worker Surveys ("NAWS"). Among other questions, the survey asked seasonal agricultural workers each year whether they were authorized to work in the U.S. In the last year the NAWS survey was conducted, during fiscal year 1997-98, 52% of seasonal agricultural workers admitted they were unauthorized. A straight line extrapolation to 2005 of the statistics from 1989 through 1998 suggests the percentage of U.S. farm workers who are unauthorized to work in 2005 was 76%. Most experts agree that the statistics based on self identification in the NAWS survey are likely very conservative, thus the actual figure is probably much higher. Further, labor intensive agriculture not only faces a shortage of legal workers, it has for the past several years also been experiencing actual shortages of workers. During the past several years there have been shortages in the lettuce and vegetable harvests in border areas in Arizona and California. During the past year and currently, agricultural growers in a number of crops on the West Coast are facing shortages of labor. Other states from coast to coast are reporting labor shortages in a number of crops.

American labor intensive agriculture is predominantly undocumented not because agricultural employers ignore the law but because the current law is dysfunctional and provides no viable means of screening out fraudulently documented workers and obtaining legal agricultural workers. Because the current H-2A temporary and seasonal alien agricultural worker program is severely flawed and largely unworkable, a reformed program is contained in the Senate bill, S. 2611, along with earned adjustment of status provisions.

*Recycling Undocumented Workers and Punishing Law Abiding Employers to the Benefit of Those That Are Unscrupulous*

The fact that the increasingly limited labor supply is largely undocumented poses substantial problems to the agricultural industry. The Proposed Rule would exacerbate these

Docket No. ICEB-2006-0004
August 14, 2006
Page 13 of 14

problems, at least for those employers who complied with the rule. Meanwhile, unscrupulous employers would benefit from ignoring the Proposed Rule. Several negative consequences – many of them wholly unintended – would arise if the Proposed Rule were implemented.

Law-abiding employers would likely lose a significant part of their workforces under the Proposed Rule. A result of the Proposed Rule's procedures is that a substantial number of workers would not return to work once the employer has placed the burden upon them to verify their work authorization because they would be unable to do so. Good employers would be devastated by losing employees *en masse*. As an unintended consequence, the employees who quit after being confronted with a no-match situation they could not resolve would simply recycle themselves to work for a new employer.

Employers who have lost most of their workforce would need to hire new employees, many of whom would end up as no-match employees down the road, continuing a cycle that the Proposed Rule never intended to put in motion. Meanwhile, the same undocumented employees would merely move to a new employer and subsequently put that employer in the untenable position of needing to confront no-matches at the peril of losing its workforce. In this regard, the Proposed Rule punishes good employers and aggravates problems that only a comprehensive legislative solution can remedy.

As discussed in detail above, law-abiding employers who follow the Proposed Rule would put themselves at risk of being subject to discrimination lawsuits and adverse government actions. The safe harbor provision would not protect employers from expensive, time-consuming and frustrating litigation to defend discrimination charges. This ultimately would prove counterproductive to employer compliance with the provisions of the Proposed Rule.

**Summary**

Unless the issues raised by the Proposed Rule are resolved legislatively in an immigration reform package that provides "bright line" guidance and protection for employers regarding work authorization compliance, SSA no-match compliance and protections against discrimination charges, the Proposed Rule will only aggravate the dysfunctional legal framework that attempts to govern the flow of undocumented workers into the U.S. It will heighten the lack of respect for the legal system among U.S. employers that are being asked to be the mainstay of immigration law enforcement in this country. The Proposed Rule, though well-intended, "jumps the gun" by taking the issue out of Congress' hands, where it belongs.

For the foregoing reasons, NCAE submits that consideration of the Proposed Rule should be deferred pending enactment of comprehensive legislative reform. Should DHS decide to finalize and adopt the Proposed Rule, NCAE respectfully requests that its concerns and suggestions described above be addressed by the final rule. NCAE appreciates the opportunity to comment on this Proposed Rule.

Docket No. ICEB-2006-0004
August 14, 2006
Page 14 of 14

Sincerely yours,

Sharon M. Hughes, CAE
Executive Vice President
National Council of Agricultural Employers


Angelica Nurseries
Agricultural Affiliates
California Avocado Commission
California Farm Bureau Federation
Florida Citrus Mutual
Florida Citrus Packers
Florida Fruit and Vegetable Association
New England Apple Council
Ohio Farm Bureau
U.S. Apple Association
Wasco County Fruit and Produce League
Washington Growers League
Western Growers

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Marquez, Sonia [SMarquez@gbls.org] |
| **Sent:** | Monday, August 14, 2006 4:39 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket Number ICEB-2006-0004 |
| **Attachments:** | DOC00040.pdf |

Attached please find my comments in response to the proposed regulation entitled:  Safe Harbor Procedures for Employers Who Receive a No Match Letter, Docket Number ICEB-2006-0004.

Thank you.


Sonia Marquez
Personnel Director
Greater Boston Legal Services



GREATER BOSTON
      LEGAL SERVICES
            ...and justice for all

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N.W., 2nd Floor
Washington, DC 20529

**Re:DHS Docket No. ICEB-2006-0004: Safe Harbor Procedures for Employers Who Receive A No-Match Letter**

Dear Sir/Madam:

I am writing to you as a Personnel Director in an organization of 120 employees and over 100 legal interns, volunteer and otherwise, who join our organization at various times throughout the year. As you may be aware, GBLS submitted comments on behalf of our clients about the proposed Regulation. I write separately because it is critical that you also hear from our agency as an employer potentially directly affected by the regulation.

First, although our attorneys have explained the provisions and proposed steps in the regulation, it is very difficult to truly ascertain the impact it will have in our procedures. But I can tell you that given the work of our office and our reputation in the community as a civil rights advocate, I am extremely concerned about ensuring that no adverse action is taken against an employee without a thorough review of the laws protecting that employee. I also hope that you can also appreciate that our office is constantly busy, and that having to institute additional protocols to ensure compliance with any new employment related regulation as well as the existing employment related laws will take us additional time and resources. Our attorneys and support staff are union members protected by an employment contract. The regulation may require some amendments and modification to the contract and that is another matter we will have to review.

As I also understand that there is no single reliable government system in place to truly verify someone's authorization to work, I strongly agree with those who request that the implementation of this regulation be delayed to carefully consider its impact. It also seems to me that the ongoing Congressional efforts to enact a comprehensive immigration reform is the most sensible vehicle to test the present proposal.

Respectfully submitted,

Sonia Marquez
Personnel Director

No-Match Cert. Admin. Record 1616

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Therressa Ivey [tivey@ufcw.org] |
| **Sent:** | Monday, August 14, 2006 4:35 PM |
| **To:** | Regs, Rfs |
| **Cc:** | Jo Deutsch; Michael Wilson; Renee Bowser |
| **Subject:** | DHS Docket No. ICEB-206-0004 |

**Attachments:**        M0960485062267361500.pdf; Therressa Ivey.vcf

 

M09604850622673  Therressa Ivey.vcf
61500.pdf (172 ...      (589 B)

```
        Dear Director Richard Sloan:

Attached, as a PDF file, are the UFCW's comments on Safe-Harbor Procedures for Employers
Who Receive a No-Match Letter.

Attachment

Terri Ivey
Legal Department
UFCW   - ext. 1450
```

1

AUG-14-06  15:59  FROM—                                          T-640  P.001/005  F-806



**VIA Email**

August 14, 2006

Mr. Richard Sloan, Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington DC  20529

Re:   DHS Docket No. ICEB-206-0004
      <u>Comments: Proposed SSA No-Match Safe Harbor Procedures</u>

Dear Director Sloan:

As International President of the 1.4 million members of the United Food and Commercial Workers International Union (UFCW), I am compelled to comment on the Department of Homeland Security's proposed regulation which would radically change how an employer would be required to respond to the Social Security Administration's (SSA) issuance of no-match letters which contain notice of alleged discrepancies between employees' names and the Social Security Numbers (SSN) assigned to them in SSA records. The proposed regulation would create a new, dominant role for SSNs such that an unresolved discrepancy between an employee's name and SSN would call into question the employee's work authorization even when the employee has submitted documents in compliance with Form I-9 verification requirements at hire.

Under the current regulation, SSA issues no-match letters to employers when Agency records indicate that an employee's name does not match with the SSN recorded for that employee. The SSA endeavors to correctly match the name and SSN so that benefits can be allocated to the appropriate employee's retirement account. This is purely an administrative procedure to serve internal Agency purposes. The SSA letter thus informs employers that any discrepancy between an employee's name and SSN has no bearing on work authorization status or immigration status. Indeed, SSA has no enforcement authority with regard to employee work authorization status or immigration issues under the Immigration and Nationality Act.

**Joseph T. Hansen,** *International President*
**Anthony M. Perrone,** *International Secretary-Treasurer*

United Food & Commercial Workers International Union, CLC
1775 K Street, NW  •  Washington DC  20006-1598
Office (202) 223-3111  •  Fax (202) 466-1562  •  www.ufcw.org

Mr. Richard Sloan                                                    August 14, 2006

-2-

        SSA's process of assigning and correcting SSNs is very error prone because of continuous formal and informal name configurations and changes among the hundreds of millions of people and the increasingly diverse cultures represented in the nation's population.  Thus, adding or omitting a middle initial or a hyphen in a name will cause a no-match in SSA records.  Additionally, changing names due to marriage or divorce will cause a no-match in SSA's records, as will a change in the order in which an individual's name is recorded in SSA records.

        Examination of DHS's Basic Pilot Program, the government's only automated employment eligibility program, clearly demonstrates that the current database is greatly flawed and forecasts how the proposed regulation would multiply erroneous discharges of work authorized employees.  The SSA database and that maintained by DHS are the underlying databases of the Basic Pilot Program.  An independent evaluation of the Basic Pilot Program, published in 2002 and mandated by the law which created the program, found that 20 percent of properly work authorized employees are initially found not to be work authorized.  Institute of Survey Research at Temple University (ISR) and Westat, Findings of the Basic Pilot Program Evaluation, June 2002, at 122-123.  The independent evaluation stated that approximately one-third of employers using the pilot system reported that it is easy to make errors when entering information.  The study also noted that a specific data entry problem is the difficulty of entering compound surnames, which is especially likely to arise with certain foreign-born employees and contribute to the much higher error rate among such employees.  The ISR and Westat study found that when employers contacted the INS (now DHS) and SSA in an attempt to clarify data, the Agencies were often not very responsive or accessible, with 39 percent of employers reporting that SSA never or only sometimes returned their calls.  ISR and Westat, Basic Pilot Evaluation Summary Report, January, 2002 at 18.  The summary report recommended that the Basic Pilot Program not be expanded to a mandatory program until the SSA and DHS address the inaccuracies in their databases which, to date, the Agencies have failed to do.

        Moreover, the Government Accountability Office (GAO) recently concluded that the Basic Pilot Program is not prepared to handle the abrupt increase in participation which would be required by a mandatory, nationwide program.  Barbara D. Bovbjerg, Testimony Before the Subcommittee on Oversight, during Questions and Answers period.  GAO specifically found that the program is riddled with delays in updating immigration records, false-negatives, and non-user friendly program software.  Barbara D. Bovbjerg, Director, Education, Workforce, and Income Security Issues at GAO, Testimony Before the Subcommittee on Oversight of the House Committee on Ways and Means, February 16, 2006.

**No-Match Cert. Admin. Record  1813**

Mr. Richard Sloan                                                August 14, 2006

-3-

It is in this context that the proposed regulation would radically change the administrative focus of addressing alleged discrepancies and create a law enforcement purpose which is wholly absent under current law. The proposed regulation would require the employer to take certain steps, including ultimately firing an employee, if the employer is unable to resolve the no-match within 60 days. If the employer elects not to discharge employees after using other prescribed methods for resolving no-matches, the employer will risk that DHS will disagree that company procedures were reasonable. DHS may then prosecute the employer, alleging that it continued to employ an employee while having constructive notice that he/she was not work authorized.

The UFCW believes the proposed changes are profoundly ill-advised. Thus, the proposed regulation would provide that SSA's notice to an employer of a no-match discrepancy constitutes constructive notice that the subject employee is not work authorized unless the employer takes action prescribed by the proposed regulation. Under the proposed regulation, employers would be required to resolve the alleged discrepancy by checking their records to determine whether they accurately reported information to SSA, checking with employees to determine whether they accurately reported SSN information, and then verifying with SSA that employees' names match with the SSNs assigned to the names in the SSA database. If these checks fail to resolve the discrepancy, the employer must then complete a new Form I-9 or discharge the employee in order to comply with the safe harbor procedures which rebut the notion that the SSN is constructive notice of lack of work authorization.

In this way, the proposed regulation would appear to create a contradiction, as the employer would be required to reverify the employee's work authorization and identity even though the identity and authorization documents produced at hire have not been discredited. If the employee stands by his original verification documents in the face of the SSN discrepancy, the employer would be prompted to discharge him/her rather than risk the loss of the safe harbor protection.

Additionally, the proposed regulation prescribes that no document containing the SSN that is subject of the no-match letter may be used to establish identity or work authorization. This provision may create additional confusion for employers and employees, alike, because Form I-9, section one requests a SSN even if the document is not proffered for identity or work authorization. Here again, it is likely that an employer may refuse to accept that an employee has properly complied with Form I-9 verification requirements because of questions about the SSN.

The proposed regulation, therefore, would radically change the law regarding whether an employer has constructive knowledge of lack of work

Mr. Richard Sloan                                                    August 14, 2006

-4-

authorization.   Under current law, the duty to reverify is triggered only when an
employer has specific and detailed information of lack of work authorization.  Thus,
under long-standing case precedent, generalizations or minor discrepancies do not
constitute constructive notice.  <u>New El Rey Sausage Co. v. U.S. Immigration and
Naturalization Service</u>, 925 F.2d 1153, 1158 (9th Cir. 1991).  Rather, the law requires
that employers act on specific and detailed information that the employment
authorization documents are not valid.  <u>Id.</u> (INS notified employer that employment
authorization documents did not pertain to individuals who presented them).

     The proposed regulation would discard long-standing precedent and
cede to SSNs overriding weight in the employment verification process.  If the
proposed regulation becomes a final rule, employees risk loss of their livelihoods
based on erroneous SSA records which, as shown above, have an extraordinary
error rate in matching employees' SSNs with their names.  This error rate can only be
expected to increase if the DHS rushes to require greater employer use of such an
error prone system as a deciding hire and retention tool.

     The error rate will also likely increase because of the additional
administrative burdens the proposed regulation will place upon the SSA system.  In
this respect, DHS's proposed regulation would impose upon SSA verification
responsibilities which do not exist in SSA's current administrative scheme.  The
proposed regulation would provide only a 60-day time period within which both the
employer and all its employees must resolve discrepancies.  Specifically, the
proposed regulation would require an employee to visit the SSA and mandate that
the Agency review and confirm the employee's identity information.  The proposed
regulation also would require the employer to verify with the SSA that the employee's
name matches the number assigned to that name in SSA records.  Requiring SSA to
react within such short time constraints to both employer and employee inquiries will
cause it to confront additional problems in accurately processing updated data.
Updated data may not be available for access when needed.   Furthermore,
employees and employers, alike, will have difficulty verifying contacts with SSA
because it may not provide receipts confirming employee visits or documentation that
employers have used the Agency's on-line verification system.

     DHS's proposed regulation is further problematic because it radically
alters the existing verification system at the same time that Congress is considering
comprehensive immigration reform.  Such isolated action will impede the coordination
necessary to making an immigration package compatible with the proposed
regulatory proposal.   The change will also alter existing mandates without any
evidence that SSNs will provide more accurate determinations of work authorization.
To the contrary, the record of the accuracy of SSN no-match data suggests that the
proposed mandate will only confuse and distort the work authorization process.

Mr. Richard Sloan                                                    August 14, 2006

-5-

A couple of examples dramatically illustrate the confusion caused by alleged SSN discrepancies.  In one instance, Seneca Foods, a major food processor, received a no-match letter which notified the employer of a discrepancy between the name and the recorded SSN of an employee who is a U.S. citizen.  The problem was that the employee's name was hyphenated in employer records but did not contain hyphenation in SSA records.   In another example involving the same employer, company records had recorded an employee's names in several different orders.  In July 2006, following publication of the proposed regulation, a northeastern grocer precipitantly suspended dozens of employees in order to avoid any risk that alleged SSN discrepancies will be equated with the lack of work authorization.

In sum, the proposed regulation will mandate the use of a flawed procedural tool in determining continued work authorization, impose the use of a tool which is divorced from the effort to enact comprehensive immigration reform, and diminish the accuracy of a grossly inaccurate SSA record keeping system.  This will subject great numbers of employees to unjustified disruptions in work, including firings.

The proposed regulation needs to better reflect the real world in which employers illegally dismiss employees because the government raises questions about their status, causing disruptions in work, job losses, and life-altering changes merely because of what amounts to administrative and clerical error.

I hope that these comments are helpful as you proceed to reform this process.  Thank you for the opportunity to comment, and please feel free to contact us if you need additional information or have additional questions.

Very truly yours,

*Joseph T. Hansen*

International President

**Khazaeli, Javad M**

**From:**          Bill Balek [bill@issa.com]
**Sent:**          Monday, August 14, 2006 4:25 PM
**To:**            Regs, Rfs
**Subject:**       Docket No. ICEB-2006-0004

**Attachments:**   ISSA Comments 8.14.06.pdf



ISSA Comments
8.14.06.pdf (954...

                   To Whom It May Concern:

Kindly find attached a copy of the comments submitted by ISSA on the subject of Docket No.
ICEB-2006-0004, Safe-Harbor Procedures for Employers Who Receive a No-Match Letter.

Thank you in advance for your consideration.

Sincerely,
William C. Balek
Director of Legislative Affairs
ISSA

1



ISSA®
7373 N. Lincoln Ave., Lincolnwood, IL 60712-1799 USA
800-225-4772 (North America) or 847-982-0800 • Fax: 847-982-1012
E-mail: info@issa.com • Website: www.issa.com

**BOARD OF DIRECTORS**
**President**
BOBBY COHEN
Daycon Products Co., Inc.
16001 Trade Zone Ave.
Upper Marlboro, MD 20774-8795
301-218-1000 E-mail: robert.cohan@daycon.com
**Vice President/President Elect**
KYLE OGDEN
Carroll Company
2900 W. Kingsley Road
Garland, TX 75041-2311
972-278-1304 E-mail: kogden@carrollco.com
**International Director/**
**Immediate Past President**
MATTIE CHINKS
Avmor Ltd.
950 Michelin St.
Laval, QC H7L 5C1 CANADA
450-629-6074 E-mail: mchinks@avmor.com
**Secretary**
FRITZ GAST
P.B. Gast & Sons Co.
1515 Madison, S.E.
Box 7349
Grand Rapids, MI 49610-7349
616-245-0770 E-mail: fritzg@pbgast.com
**Treasurer**
SCOTT JARDEN
The Butlen Companies, Inc.
1640 Delmar Dr., Box 37
Folcroft, PA 19032-0037
215-724-8100 E-mail: sjarden@butlenamx.com
**European Board Chair**
ANNE-MARIE SAMSON
Euro Steam
195 Impasse le Passeron
Le Poical
Trans en Proven 83720 FRANCE
33-494-077-043 E-mail: eurosteam@wanadoo.fr
**Mexico Board Chair**
MAURICIO CHICO CAÑEDO
Distribuidora Lava Tap, S.A. de C.V.
Calzada de los Aguilas #1205
Col. San Clemente
Mexico City, D.F. 01740 MEXICO
52-55-5635-5400 E-mail: mauricio@lavatap.com
**Director Canada**
KAREN FERRIS
Equipment Canada
3535 Laird Rd., Unit 16
Mississauga, ON L5L 5Y7 CANADA
905-607-0068 E-mail: karan@cleanpigs.com
**Great Lakes Director**
ROBERT S. ROBINSON SR.
Kalvao, Inc.
401 S. 3rd St.
Hamilton, OH 45011-3236
513-887-4600 E-mail: rsrobinson@kavac.com
**Manufacturer Representatives' Director**
JEFFREY A. STONE
Access Group Southern California
912 W. 10th St.
Azusa, CA 91702-1936
626-815-4200
E-mail: jstone@accessgroupaca.com
**Middle Atlantic Director**
LISA M. WITOMSKI
T. Frank McCall's, Inc.
601 Madison St.
Chester, PA 19013-6026
610-876-9245 E-mail: lisa@tfrankmccalls.com
**North Central Director**
TED STARK III
Dalco Enterprises, Inc.
300 Fifth Ave., N.W.
New Brighton, MN 55112-3232
651-604-2688 E-mail: ted.stark@dalcoonline.com
**Northeast Director**
JON SCOLES
Scoles Floorshine Industries
Box 2303
Farmingdale, NJ 07727-2303
732-681-4545 E-mail: jscoles1@aol.com
**Pacific Northwest Director**
LYDIA WORK
American Paper Converting
1660 Heritage St.
Woodland, WA 98674-9581
360-225-0488
E-mail: lwork@americanpaperco.com
**Pacific Southwest Director**
TRAVIS BRADY
Brady Industries, Inc.
4175 S. Arville St.
Las Vegas, NV 89103-3736
702-876-3990
E-mail: tbrady@bradyindustries.com
**South Central Director**
GLENN O. STOUDT
Rochester Midland International
Temp Address: 2424 Broadway St.
New Orleans, LA 70125
504-866-1040 E-mail: gitstoudt@aol.com
**Southeast Director**
RICHARD L. RONES
Americo Manufacturing Co., Inc.
Box 10000
Acworth, GA 30101-9000
770-974-7000 E-mail: rrones@americomfg.com
**Executive Director**
JOHN P. GARFINKEL
E-mail: jpg@issa.com

August 11, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington DC 20529

RE:  DHS Docket No. ICEB-2006-0004—Rulemaking Proceedings on
Safe-Harbor Procedures for Employers Who Receive a No-Match Letter

Dear Director:

ISSA greatly appreciates this opportunity to submit our association's
comments on the subject of the Department of Homeland Security's
Proposed Rule regarding Safe Harbor Procedures for Employers Who
Receive a No-Match Letter (Docket No. ICEB-2006-0004).

ISSA is a trade association that represents the institutional and industrial
cleaning industry.  Our association represents over 5,000 manufacturer,
distributor, building service contractor and in-house service provider
members worldwide.  In the aggregate, ISSA member companies employ
hundreds of thousands of workers.  As such, ISSA and its members are
concerned with the implications raised by the proposed rule and the
ultimate impact it would have on their work place operations.

ISSA supports comprehensive immigration reform that includes effective
and targeted enforcement measures that are combined with a reform of our
admissions system, and a realistic solution for the undocumented
population.  However, it is critical that any immigration reform refrain
from unduly burdening employers with worker verification systems that
are under funded or unworkable.

Our association stands in opposition to the Proposed Safe-Harbor Rule and
urges DHS to suspend action on this matter because it undermines the
current legislative proposals that seek to comprehensively address
immigration reform, contradicts the Administration's goal of enacting a
comprehensive solution to our immigration system, and would otherwise
place unreasonable burdens and penalties upon well-intended employers
who operate in good faith.

1

**Proposed Rule Undermines the Legislative Process**

Stated simply, the Proposed Safe-Harbor Rule is the "wrong rule at the wrong time."

The U.S. House of Representatives and Senate have both passed immigration bills that would make significant changes related to an employer's responsibilities when verifying it's workforce, as well as include substantial penalties for employers and workers who fail to comply. These forthcoming reform measures will set new standards under which employers must operate regarding the verification of an employee's work authorization and identity and will specifically address situations where an employer receives a no-match letter from the Social Security Administration or from the Department of Homeland Security. While the specifics of immigration reform legislation remain unclear at this time, it is apparent that comprehensive reform to our nation's immigration laws is not only imminent but necessary as well.

Consideration and adoption of the proposed rule before the conclusion of the congressional dialogue regarding immigration reform undermines the legislative process.

Furthermore it is likely to result in conflicting and perhaps duplicative requirements for employers, resulting in additional unnecessary burdens and costs. It simply defies common sense to propose and adopt a rule that establishes significant burdens and responsibilities for employers, that is likely to be rendered obsolete by the legislative process in the coming months. Under the proposed rule, employers will be required to implement certain procedures that impose certain burdens and costs. However, once immigration reform legislation is enacted into law, employers will once again be required to implement a whole new set of procedures related to the employee verification process.

For this reason alone, we urge DHS to suspend this rulemaking until the legislative process has run its course. Comprehensive immigration reform is needed and the legislative process is working towards that goal.

**Proposed Rule Contradicts the Administration's Goal of Comprehensive Immigration Reform**

The Proposed Safe Harbor rule stands in direct contradiction of the Bush Administration's stated goal of achieving comprehensive immigration reform. President Bush, White House officials and the Department of Homeland Security have all endorsed comprehensive immigration reform. In fact, in a document released by DHS's press office titled Talking Points and Q & A's (June 9, 2006), the Department states, "In order to fix the problem of illegal immigration and secure our borders, a comprehensive solution is required. All elements of this problem must be addressed together, including the creation of a temporary worker program."

2

**No-Match Cert. Admin. Record  1819**

While we concur with the DHS statement, the proposed rule directly contradicts this statement because it proposes an isolated attempt to address a single issue (no-match letters) that has significant enforcement implications, but which fails to address the other key components of immigration reform that DHS itself recognizes as necessary for a workable and effective solution to the nation's immigration woes. The proposed rulemaking should therefore be rejected in its current form, and only considered as part of a comprehensive immigration reform package.

**SSA No-Match Letters Are Inappropriate as a Tool for Immigration Enforcement**

The proposed rule inappropriately attempts to transform the Social Security Administration's no-match letter into an immigration enforcement tool for which it is ill suited. By DHS's own admission, there are many reasons for such a no-match, including clerical error and name change. Other no-match letters are issued because of marriage or divorce. Others are generated due to SSA's own inaccurate data. In addition, SSA's database does not contain complete information about a worker's immigration status or employment authorization. In effect the SSA no-match letter is not indicative of immigration status, and explicitly states so on its face.

Therefore, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not and should not constitute constructive knowledge of immigration status under current law. The proposed rule dramatically alters the definition of constructive knowledge and makes a stark departure from existing case law and long-standing federal policy in this area in spite of the fact that the SSA no-match letter provides no evidence of immigration status.

**The Proposed Rule Creates An Untenable Situation for Employers**

As drafted, the proposed rule creates an untenable situation for employers. On the one hand, employers who follow the safe harbor provisions of the proposed rule risk criminal prosecution by DHS if they do not fire an employee for whom the employer is unable to resolve the discrepancy referenced in the no-match letter, and if the employee's identity and work authorization cannot be verified. On the other hand, should an employer fire such an employee, the employer runs the risk of being sued civilly for wrongful discharge.

Thus, the proposed rule creates the proverbial "damned if you do, damned if you don't" situation for employers. A regulation that places employers in such a precarious situation is simply bad public policy. The very fact that the proposed rule would subject employers to such potential liability one way or the other speaks to the need for this issue to be addressed in the context of comprehensive legislative reform, and not addressed in such a piece meal fashion as reflected in the proposed rule.

3

**No-Match Cert. Admin. Record  1820**

**The Proposed Rule Will Not Have an Impact on Undocumented Workers**

In addition to placing employers in an untenable situation, the proposed rule will have no measurable impact on undocumented immigration. Past experience with no-match firings and workplace audits indicate that fired workers do not leave the country. Rather such terminated employees tend to simply find other more marginal jobs, most likely in the unregulated underground cash economy. Therefore, the proposed rule will foster growth of this underground economy.

Although the proposed rule purports to provide employers with a "safe harbor", DHS is in fact imposing a new set of legal obligations that will have the perverse effect of punishing employers who make a good faith effort to verify employees' authorization to work and otherwise follow the proposed safe harbor provisions. In this regard the proposed rule will in fact promote the growth in the unregulated underground cash economy that results in potentially billion-dollar losses in federal, state, and local tax revenues.

The proposed rule also would have the effect of punishing "good" employers who keep good records and want to stay on the books. Stated simply, these "good" employers will be put at a competitive disadvantage compared to "bad" employers because the latter pays in cash and does not keep records, and who consequently will not be affected by the proposed rule.

**Proposed Safe-Harbor Rule Unreasonably Burdens Employers**

As drafted the Proposed Safe-Harbor Rule will have an unreasonable economic impact on ISSA member companies because of the time and labor that will be needed to research the received no-match letters, communicating to the employees in question, following up with such employees as required by the proposal, verifying with SSA or DHS any revised information received from those employees, and / or completing a new Form I-9.

Moreover, the timelines provided in the proposal for responding to and otherwise rectifying no-match letters is inadequate. Fourteen days is not enough time to open, review, and research mismatch letters from the SSA or DHS. For some companies, such mismatch letters may involve hundreds if not thousands of potential employees necessitating that companies devote full time staff to this task for significant periods of time.

Moreover, the 60-day time period for verifying the employee's name matches the number assigned to the name is an unreasonable time period for dealing with DHS or SSA. It simply does not take into account the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employees.

Compounding this burden is the fact that SSA database has a reputation for being inaccurate in many cases, which further creates a burden for employers in correcting

4

SSA's database.  Furthermore, the proposed regulations provide no guidance to employees who are unable to timely rectify the reported inaccuracy.

**Conclusion**

For all of the aforementioned reasons, ISSA strongly opposes the Proposed Safe-Harbor Rule and urges DHS to withdraw the proposed rule in its entirety.

Respectfully Submitted,

William C. Balek
Director of Legislative Affairs
ISSA
800-225-4772
bill@issa.com

5

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Eric Gutierrez [egutierrez@MALDEF.org] |
| **Sent:** | Monday, August 14, 2006 4:09 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |
| **Attachments:** | MALDEF DHS ICEB-2006-0004.pdf |

To Whom It May Concern:

Please see the attached correspondence regarding DHS Docket No. ICEB-2006-0004. If you have any questions, feel free to contact me directly.

Sincerely,

Eric M. Gutiérrez

**Eric M. Gutiérrez**
Legislative Staff Attorney
MALDEF
1717 K Street, NW, Suite 311
Washington, D.C. 20036
Phone: (202) 293-2828, ext. 14
Cell: (202) 841-5224
Fax: (202) 293-2849
egutierrez@maldef.org

**No-Match Cert. Admin. Record  1823**

# MALDEF
### Mexican American Legal Defense and Educational Fund

**Washington, D.C.**
**Regional Office**
1717 K Street, NW
Suite 311
Washington, DC 20036
Tel: 202.293.2828
Fax: 202.293.2849

**National Headquarters**
Los Angeles
**Regional Office**
634 S. Spring Street
Los Angeles, CA 90014
Tel: 213.629.2512
Fax: 213.629.0266

**Atlanta**
**Regional Office**
41 Marietta Street
Suite 1000
Atlanta, GA 30303
Tel: 678.559.1071
Fax: 678.559.1079

**Chicago**
**Regional Office**
188 W. Randolph Street
Suite 1405
Chicago, IL 60601
Tel: 312.782.1422
Fax: 312.782.1428

**San Antonio**
**Regional Office**
140 E. Houston Street
Suite 300
San Antonio, TX 78205
Tel: 210.224.5476
Fax: 210.224.5382

**Sacramento**
**Satellite Office**
928 J Street
Suite 422
Sacramento, CA 95814
Tel: 916.443.7531
Fax: 916.443.1541

**Houston**
**Program Office**
Ripley House
4410 Navigation
Suite 229
Houston, TX 77011
Tel: 713.315.8404
Fax: 713.315.8404

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C.  20529

**Via Electronic Mail to rfs.regs@dhs.gov**

August 14, 2006

Re: *Comments to Notice of Proposed Rulemaking "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" (DHS Docket No. ICEB-2006-0004)*

Dear Sir or Madam:

The Mexican American Legal Defense and Educational Fund (MALDEF) urges the Department of Homeland Security to withdraw its notice of a proposed rule regarding "Safe Harbor Procedures for Employers who Receive a No-Match Letter," published in the Federal Register on June 14, 2006. MALDEF is a national non-profit civil rights organization that protects and promotes the civil rights of Latinos through advocacy, community education and outreach, and, when necessary, through the legal system.

As an organization committed to ensuring fair working conditions for Latinos, MALDEF believes the proposed rule will serve to facilitate unlawful harassment and termination of hardworking employees, at least some of whom are legally authorized to work in the United States. The proposed rule provides that employers who receive a Social Security Administration (SSA) "no-match" letter (stating that information submitted for an employee does not match SSA records) may be deemed to have "constructive knowledge" that an employee is unauthorized to work. The proposed rule then sets out "safe harbor" procedures that an employer must follow to avoid a finding of constructive knowledge; if an employer is unable to resolve the no-match, the employer must either terminate the employee or risk liability under the Immigration and Nationality Act (INA).

Although current SSA no-match notices direct employers against taking adverse action against employees, many workers are still subjected to unlawful employment practices on the basis of such letters – which often arise out of innocent errors or discrepancies. In our work representing Latino workers, both immigrant and native-born, we have seen all too many instances of national origin discrimination, harassment, and wrongful termination based on erroneous "no-match" notices. We believe strongly that enactment of the proposed rule would only escalate and exacerbate such unlawful conduct, with a disproportionate impact upon Latino

*Celebrating Our 36th Anniversary*
*Protecting and Promoting Latino Civil Rights*
www.maldef.org

**No-Match Cert. Admin. Record  1824**

workers and their families and without regard for the detailed requirements the proposed rule places on employers.

In addition, we have grave concerns that the proposed rule would provide opportunities for unscrupulous employers to retaliate against workers who assert labor rights or engage in protected union or civil rights activities, by using no-match notices as pretexts for firings or other wrongful practices. The low-wage workers who are most in need of these protections are particularly vulnerable to exploitation; the proposed rule lacks adequate safeguards against such misuse of SSA no-match letters.

Finally, as an organization committed to a comprehensive, fair and humane approach to immigration reform, MALDEF also objects to the timing of the Department's proposed rule. It undermines legislative efforts to repair our broken immigration system and secure our borders. Both the House and the Senate have passed immigration measures that contain worksite enforcement and employment verification mechanisms. The proposed rule would subject workers to needless risk of adverse job actions, while subverting a legislative process that is already well underway. Its enactment, without comprehensive immigration reform in place, would be disruptive and counterproductive; unauthorized workers would simply seek out other workplaces, as occurred following INS' unsuccessful Operation Vanguard.

MALDEF urges the department to withdraw the proposed rule and consult more widely with congressional, business, labor, civil rights and community stakeholders to ameliorate its wide-reaching and potentially destructive effects. If you have any questions or require any additional information related to these comments, please contact me at MALDEF's Washington, DC office, at (202) 293-2828 ext. 15.


Sincerely,

S. Aul Sais

Shaheena Ahmad Simons
Acting D.C. Regional Counsel
Mexican American Legal Defense and Educational Fund

2

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Arevalo, Luz [larevalo@gbls.org] |
| **Sent:** | Monday, August 14, 2006 3:54 PM |
| **To:** | Regs, Rfs |
| **Cc:** | Marquez, Sonia |
| **Subject:** | ICEB-2006-0004 |
| **Attachments:** | comments 81406.doc |

Dear Sir/Madam:

Attached are our comments in response to the proposed regulation entitled, Safe Harbor Procedures for Employers Who Receive a No Match Letter, Docket Number ICEB-2006-0004

Thank you,

Luz Arevalo, Esq.

**No-Match Cert. Admin. Record  1826**



GREATER BOSTON
LEGAL SERVICES
*...and justice for all*

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N.W., 2nd Floor
Washington, DC 20529

**Re: DHS Docket No. ICEB-2006-0004: Safe Harbor Procedures for Employers Who Receive A
No-Match Letter**

Dear Sir/Madam:

The present comments are submitted on behalf of our clients, Centro Presente and the
Brazilian Immigrant Center. Centro Presente is a member-driven, state-wide Latin American
immigrant organization that strives to give its members voice and build community power
through the integration of community organizing, leadership development and basic services to
its immigrant members.  Brazilian Immigrant Center is a community-based organization working
to empower Brazilians in the Greater Boston Area around issues of access to education,
workplace rights and immigration.  These organizations have a common mission to assist low
income, predominantly immigrant, working families. Based on their collective knowledge and
our experience assisting clients affected by the No-Match Letter program and/or who need to
correct government-issued documents, we urge the Department of Homeland Security (DHS) not
to implement the proposed regulation ICEB 2006-0004 ("the Regulation").

The main objections to the Regulation are (1) that it explicitly turns an administrative tool
of the Social Security Administration (SSA) into an immigration enforcement device of the
Department of Homeland Security to the detriment of all workers.  Unless DHS is ready to
provide employers with a reliable means to truly and accurately verify "employment
authorization" status, we submit that the regulatory process is not appropriate to define a
criminal act and to, in effect, amend a federal statute.  The message of the Regulation is that an

Department of Homeland Security
August 14, 2006
Page 2

employer may face criminal liability by simply keeping employed a worker who is in the process
of resolving a no-match situation with SSA beyond 63 days. This is a drastic measure, made the
more objectionable by its attempt via regulation to amend and strip away the statutory
protections against discriminatory document abuse.[1] An important lesson from the 1986
Immigration Reform and Control Act was that employers facing sanctions will be more likely to
discriminate, whether intentionally or unintentionally. For this reason, DHS should strengthen,
not undermine via regulation, the anti-discrimination protections related to the employment of
immigrants.[2] We believe that the DHS immigration enforcement function is more effectively
executed by supporting Congressional efforts in drafting a comprehensive immigration reform
bill.

In our experience, the no-match letter has led to abuse and discrimination because it
incorrectly is perceived as an immigration enforcement tool. Under the Regulation, the
perception becomes reality. For employers, it creates a real fear that merely receiving a no-
match letter and failing to take any action will risk severe criminal penalties. From the
employee's perspective, the Regulation hands employers a ready-made pretext for taking adverse
action while stripping away at their statutory protections, without the benefit of the legislative
process.

The Regulation increases the tension between the prohibition against hiring unauthorized
workers and the much needed protection against discrimination based on national origin. This
added tension is often resolved against the worker and will inevitably lead to more
discriminatory and other illegal practices that harm all workers regardless of immigration status.
The harm far outweighs any potential benefit to using this information for immigration
enforcement, especially since the SSA data does not contain any immigration information.
Because of this concern, we suggest first that DHS not implement the Regulation. But if DHS
decides to implement it, at the very least it should provide guidance to alert that an employer

---

[1] The Unfair Immigration-Related Employment Practices Act, 8 U.S.C. 1324b, makes an unlawful practice for an
employer to request "more or different documents than are required ... or by refusing to honor documents tendered
that on their face reasonably appear to be genuine" if made with the intent to discriminate. The Regulation adopts
this language verbatim but adds an exception if the document is one "about which the employer has received a
notice" such as a no-match letter.
[2] See note 1.

No-Match Cert. Admin. Record  1828

Department of Homeland Security
August 14, 2006
Page 3

who automatically dismisses a worker after the 63 day regulatory period may unwittingly face legal liability under other statutes. See attached Appendix.

(2) The Regulation also raises serious privacy issues regarding sensitive taxpayers' information. Pursuant to the Regulation, the mandated data-gathering an employer would have to engage in after receiving the no-match letter may conflict with legal prohibitions currently in the Internal Revenue Code. We discuss each concern in more detail below.

**Turning the SSA No-Match Letters Into Explicit Immigration Enforcement Weapon Will Harm All Employees, Immigrants and Non-Immigrants.**

<u>Given The Ineffectiveness Of The SSA Data And The Potential Harm Created By The Regulation, It Should Not Be Adopted Without The Benefit Of The Legislative Process.</u>

A proposal of such sweeping changes as those in the Regulation will be best served by the benefit of the legislative process. Although the U.S. Congress is currently wrestling with the best way to improve immigration enforcement, this Regulation is being proposed completely outside that process, without the benefit of full consideration for its impact on other laws. The legislative process seems the more appropriate given that the General Accounting Office itself has warned about the little value the SSA database provides as an immigration enforcement tool. Among the reasons cited for its ineffectiveness, it includes:[3]

- It does not contain information about immigration status and it includes information about citizens and non-citizens;
- The reasons for the non-match may be unintentional such as typographical errors,[4] changes in marriage status, transposed names, etc.;
- The SSA data may be inaccurate and will not match accurate taxpayer's data;

---

[3] U.S. Government Accountability Office Briefing for Congressional Staff, *Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work*, July 11, 2006.
[4] It has been documented that this is most common among foreign Asian and Latino names. For example, the author's last name, Arevalo, is often written and automatically corrected by MS Word to "Arvalo." Also, one of our client's last name is Duque, but the name was incorrectly written on the child's U.S. birth certificate as "Duke," and the client was unable to process his tax returns for two years in a row. In addition, it has taken him over a year to get the name changed in the birth certificate, even before he applies for a new Social Security card for his child.

**No-Match Cert. Admin. Record  1829**

Department of Homeland Security
August 14, 2006
Page 4

- Employers are instructed to submit earnings reports using all zeros if an individuals Social Security number is not available.

The legislative process is also the most appropriate path when creating an additional means by which the government may prove an element of a criminal offense, namely the "knowledge" required to prosecute an employer for violating the law. What clearly transpires from the GAO report is that a given employer may employ a worker unable to demonstrate work authorization yet legally authorized to work. But an employer concerned with "appearing" guilty is not likely to dwell in the nuances of what constitutes knowledge versus constructive knowledge or the difference between objective circumstances and subjective beliefs under the Model Penal Code.[5] Under the present anti-immigrant climate where pro-worker advocacy is viewed as not supportive of government action to enforce immigration laws, the employer will continue to get caught in the middle without the benefit of the educative process that is part of the legislative process.

<u>The Regulation Will Create More Incentive To Skirt Labor, Employment And Immigration Law And Will Create More Risk Of Unlawful Discriminatory Practices.</u>

The expressed purpose of the current SSA no-match letter was to ensure accuracy in posting workers' earnings. Where the automatic verification of W-2 earnings against its database reveals a discrepancy, the SSA places the unclaimed payments into an Earnings Suspense Fund. Under pressure to reduce the size of the fund, the SSA began in 1993 to send no-match letter to employer with the expectation that the records would be corrected and the earnings correctly posted. However, the no-match letters have not achieved this goal. In 2005, the SSA database contained over 255 million records and a growing balance of $519 billion in unclaimed earnings.[6] A national survey revealed that the no-match letters account for 2% or less of actual corrections.[7] Contrary to what some may believe, this does not indicate that most

---

[5] The Model Penal Code, Section 2.02(7) provides that knowledge of a fact is established "if a person is aware of a high probability of its existence, unless her actually believes it does not exist."
[6] Martin H. Bosworth, *The Earnings Suspense File: Social Security's "Secret Stash*," Feb. 22, 2006, ConsumerAffairs.Com.
[7] Chirag Mehat, Nick Theodore, and Marielena Hincapie, Social Security Administration's No-Match Letter Program: Implications for Immigration Enforcement and Workers' Rights, Center for Urban Economic

Department of Homeland Security
August 14, 2006
Page 5

employees with a mismatch are unauthorized to work.  A 2004 DHS report to Congress notes that the SSA's database was able to verify the status of less than 50% of work-authorized non-citizens.[8]

Despite its original purpose, employers initially perceived the letters as immigration-enforcement documents and thus engaged in illegal discrimination and retaliation, sometimes mistakenly and sometimes intentionally.  For example,  in the early 2000's employers' reaction to the letter was to suddenly reject employee's I-9 documents and to fire or take other adverse actions against the employee in violation of the Immigration Reform and Control Act (IRCA).[9]  Amongst the most nefarious of employers, the receipt of the letter was turned in a manipulative pretext for retaliating against employees who tried to enforce their workplace rights.  One example our office witnessed of this abuse regards a case involving a number of female employees who filed sexual harassment complaints with the EEOC.  During the course of the investigation, the employer fired the workers because it had received SSA no-match letters that had been kept in their files for months.  The female workers were not even aware of the existence of the letters until they brought the EEOC complaint.

The specified time limitations are unrealistic for many real-life circumstances.  A legal mandate to act within 60 days only exacerbates the employer's pressure to simply fire the worker.  For example, one client of ours who had a typographical error on his Social Security card, which therefore did not match his green card, was denied employment until he could show he had corrected this Social Security Card.  Unfortunately, because he had immigrated to the U.S. when he was eight years old and had the documents issued then, approximately 15 years before the time of the incident, the time-lapse meant he could no process his paperwork locally or quickly even though he was a legal permanent resident.  The expected time to receive his new Social Security card is three to six months.  Another one of our clients attempted on her own to switch her transposed middle and last names with the Social Security Administration and was

---

Development, University of Illinois at Chicago, November 2003, available at http://www.uic.cuppa/uicued/nplublication/recent/SSAnomatchreport.pdf.
[8] *DHS Report to Congress on the Basic Pilot Program*, U.S. Citizenship and Immigration Service, June 2004.
[9] See e.g., *US Check Leads to Wave of Firings- Social Security Numbers at Issue*, by Cindy Rodriguez, The Boston Globe, March 18, 2003, reporting mass firings in Illinois, Massachusetts, California and Florida; *Many Fired Peco Workers Leaving*, The Marion –Ledger,, by Riva Brown, Aug. 17, 2003 reporting the dismissal of 200 workers from a Mississippi plant; *Workers Say Firings Are Unjust, U.S. Told Firm Social Security Data Didn't Match*, The Chicago Tribune by Rick Jervis, July 27, 2003, describing the firings of over 100 workers in the Chicago area.

Department of Homeland Security
August 14, 2006
Page 6

sent several times back and forth between the CIS and the SSA, for well over three months, causing her distress and loss of wages for the time off she took from work.

And though the Regulation refers to reasonable employers who will orderly follow the timeline provided, for many employers, the new rule will tilt the balance against the worker, when making a decision between facing the government's fine and/or criminal sanctions versus a potential employee lawsuit for discrimination. In addition, employers may simply refuse employment to immigrant workers to obviate the obligations created by the Regulation even if it means risking charges of discrimination. In our experience, even those employers who want to do the right thing are still cautious and, if confused, decide against keeping a "suspect" employee than risking a fine.

We fully agree with the already expressed sentiments that one foreseeable consequence of the Regulation will be an increase in the number of workers who provide services "off the books," and expand the unregulated underground cash economy,[10] as this was the result of the enacted employer sanctions in the Immigration Reform and Control Act of 1986.

**Using The No-Match Program To Enforce Immigration Laws Risks Violation Of Non-Disclosure Provisions In The Internal Revenue Code.**

The immigration debate seems to be fueling DHS efforts to more aggressively enforce IRCA, and the No-Match program as amended by the Regulation effectively forces employers to identify suspect unauthorized workers and fire them. During a public interview, Jerrod Agen, a DHS spokesman, discussing the proposed legal standard for establishing that an employer has "constructive knowledge" of violating the law by hiring an unauthorized worker, openly admitted that the DHS intends to use "[employers'] inaction to build a case against the employer."[11] DHS Secretary, Michael Chertoff agreed that the purpose of the Regulation is to

---

[10] Statement of Bill Beardall on Behalf of the Equal Justice Center and the National Immigration Law Center to the House Committee on Education and the Workforce Subcommittee on Employer-Employee Relations, Monday July 31, 2006.
[11] Cindy Gonzalez, *Employers of Illegal Immigrants Face Tighter Hiring Rules*, Omaha World-Herald, Nebraska, July 10, 2006.

Department of Homeland Security
August 14, 2006
Page 7

strengthen enforcement immigration efforts. In acknowledging that some limitations exist, he said "what we can't do, we should work with Congress to accomplish."[12]

DHS is no doubt aware of the enforcement gap between the employer's ability to dismiss the worker and the DHS' ability to remove the same worker. Increasing DHS access to the SSA database may help breach the enforcement gap, or at least provide it with a starting point in "building a case" not only against an employer for sanctions, but also against the worker for removal. Not surprisingly, DHS has sought access to workers' earnings data for worksite immigration enforcement.

Putting aside the described inaccuracies of the SSA data, access by DHS to SSA data would erode all taxpayers' existing and critical legal protection of their sensitive information. SSA earnings data are generated from workers' Forms W-4, from which W-2 and other earning records get generated, all of which contain privileged taxpayer information not subject to disclosure to other than the Internal Revenue Service, as provided by Internal Revenue Code Sections 6103, 6104 and 6110. These confidentiality provisions ensure taxpayers' confidence in the tax system, based entirely on voluntary compliance. The National Taxpayer Advocate has warned that even "compelling policy considerations in the areas of national security and terrorist activity" should diminish the "real danger that [access expansion] may significantly erode taxpayer privacy," what she describes as a "congressionally mandated cornerstone of U.S. tax administration."[13]

We echo the Taxpayer Advocate's concerns and urged DHS to review the Internal Revenue Code as well as existing privacy laws that protect employees' sensitive information.

**Conclusion**

Any effort to expand immigration enforcement in the workplace must be carefully considered given the criminal nature of the enforcement statutes and must be accompanied by strong employee protections. The Regulation makes sweeping changes that if carried out without guidance will harm all workers. Proposals that address the issues raised by this

---

[12] Nachman & Associates, Immigration and Nationality Law, *Social Security No-Match Letter Porcess Gets An Overhaul*, New Jersey, June 12, 2006, available at http://www.visaserve.com/CM/Newsletter/Social-Security-No-Match-Letter-Process.asp.
[13] 2003 National Taxpayer Advocate Report to Congress, available at www.irs.gov.

Department of Homeland Security
August 14, 2006
Page 8

Regulation should be tested in the legislative process as part of a comprehensive immigration reform effort.  In our view, it will only harm workers because it uses SSA database that has proven unreliable.  The DHS would best carry its mandate to enforce immigration laws by endorsing a comprehensive immigration policy that encourages the present undocumented workforce to meet the economic need for workers and to freely, openly an accurately report their earnings and claim their benefits. In this way, the DHS will free resources to target real threats to the country's safety.

Respectfully submitted,

*Luz Arevalo     Ingrid Nava     Audrey Richardson*

_____

Luz A. Arevalo, Esq.
Ingrid Nava, Esq.
Audrey Richardson, Esq.

Department of Homeland Security
August 14, 2006
Page 9

**Appendix**

**[Suggested Draft] Guide For Employers In Receipt Of A *Social Security Administration No-Match Letter* Who Are Contemplating Dismissing The Employee After The Suggested 63 Day Period**

Employers concerned about the legal steps they must follow to prevent a charge of employing a worker with "constructive knowledge" that the employee is unauthorized to work must consider a number of statutory provisions that protect employees from unlawful dismissal. The following is a list of questions employers may want to review before firing the employee subject of a no-match letter.  Whether an employer reviews this list or not before making a decision, it is recommended that no decision be taken without consulting with legal counsel.

Questions:

1.  Do you know that the employee is unauthorized to work? 8 U.S.C. § 1324(a)

2.  Have you implemented uniform provisions for all employees when dealing with a no-match letter and its timeline provisions? 8 U.S.C. §1324b(a)

3.  Has the employee filed a complaint with the EEOC? 42 U.S.C. § 2000e-2(Title VII); 29 U.S.C. §§ 621-624 (Age Discrimination in Employment Act); or the Office of Special Counsel? 8 U.S.C. § 1324b(a)(6); or any state agency that enforces state anti-discrimination laws?

4.  Is the employee involved in a union organizing effort? 29 U.S.C. § 158(a)(3)

5.  Is the employee involved in a protected "concerted activity"? 29 U.S.C. § 158(a)(3)

6.  Has the employee filed a complaint with the Occupational Safety and Health federal or state agency that enforces health and safety laws? 29 U.S.C. 651 et seq.

7.  Has the worker filed a wage and hour complaint with the Department of Labor or any state agency entrusted with the enforcement of state wage and hour statutes? 8 U.S.C. § 215(a)(3)

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Regan Cooper [piccpa@yahoo.com] |
| **Sent:** | Monday, August 14, 2006 3:48 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 Comments on "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" |

**Attachments:** 3176846596-SSA_NoMatch_Comments DHS Docket No. ICEB-2006-0004.doc

Dear Sir or Madam,

Attached please find our comments on DHS Docket No. ICEB-2006-0004 Comments on "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter", submitted by the Pennsylvania Immigration and Citizenship Coalition.

Thank you for your attention.

Sincerely,


*Regan Cooper*

*Executive Director*
*Pennsylvania Immigration and Citizenship Coalition*
*Advocating for Immigrants, Migrants and Refugees*

*PICC*
*2100 Arch Street, 7th Floor*
*Philadelphia, PA 19103*
*Phone: (215) 832-0809*
*Fax: (215) 832-0919*

**No-Match Cert. Admin. Record  1836**

# Pennsylvania Immigration and Citizenship Coalition
# PICC

2100 Arch Street · 7th Floor · Philadelphia, PA 19103
Phone: (215) 832-0809   Fax: (215) 832-0919  Email: piccpa@yahoo.com

Member organizations include:

African Cultural Alliance of North America (ACANA)
Alzheimer's Association, Delaware Valley Chapter
American Immigration Lawyers Association (Philadelphia Chapter)
Arab American Community Development Corporation
Archdiocese of Philadelphia, Office for Pastoral Care for Refugees and Migrants
Asian Americans United
Cambodian Association
Camden Center for Law and Social Justice
Catholic Social Services, Archdiocese of Philadelphia, Immigration Program
Ceiba
Center for Advocacy for the Rights and Interest of the Elderly (CARIE)
Center for Literacy
Child Care Information Services of Philadelphia County
Children's Crisis Treatment Center West African Refugee Assistance Program Project Tamaa
Community Legal Services
Concilio
Congreso de Latinos Unidos
Friends of Farmworkers
Friendship House
HIAS and Council Migration Service of Philadelphia
Juisohn Center
Jewish Educational and Vocational Services, Center for New Americans
Jewish Labor Committee
Jobs With Justice (Philadelphia area)
Juntos
Liberty Center for Survivors of Torture
Lutheran Children and Family Services
Maternity Care Coalition
Maternal and Child Health Consortium of Chester County
Nationalities Service Center
Pennsylvania Immigration Resource Center
Pennsylvania Institutional Law Project
Philadelphia Citizens for Children and Youth
Philadelphia Corporation for Aging
Philadelphia Volunteers for the Indigent Program
PRIME - Ecumenical Commitment to Refugees
Project SHINE, Center for Intergenerational Learning, Temple University
School District of Philadelphia, Office of Language Access Services and Community Outreach
SeniorLAW Center
Service Employees International Union, (SEIU) State Council
SEIU, 32 BJ, District 36
Southeast Asian Mutual Assistance Associations Coalition (SEAMAAC)
United Communities South Philadelphia
Victim/Witness Services of South Philadelphia
Welcoming Center for New Pennsylvanians
YMCA Education and Technology Center

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529
rfs.regs@dhs.gov

August 14, 2006

Re: Comments on DHS Docket No. ICEB-2006-0004

Dear Sir or Madam:

The Pennsylvania Immigration and Citizenship Coalition submits the following comment to the proposed rule published on June 14, 2006 by the Bureau of Immigration and Customs Enforcement, of the Department of Homeland Security, "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" DHS Docket No. ICEB-2006-0004. The proposed rule would change existing regulations regarding how employers respond to mismatch letters from the Social Security Administration ("SSA") or the Department of Homeland Security ("DHS").

PICC is a coalition of 50 member organizations in eastern Pennsylvania. Our membership includes legal and social service providers, community associations, unions, faith communities and individuals. We provide education and training, and we advocate for policies that welcome and sustain immigrants, migrants and refugees in our state. Our worker rights committee has experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States—immigrant and native-born alike.

The proposed rule expands the list of scenarios that may lead to the agency finding that an employer had "constructive knowledge" that an employee was not authorized to work and consequently, subject the employer to criminal and civil penalties if they continue to hire/employ the worker. The rule also includes a "safe harbor" provision which creates a numerous new legal obligations a U.S. employer must follow to avoid liability.

We are writing to express strong concerns that the proposed policy will result in widespread confusion and mass firings of legal, work authorized immigrants and US citizens, in addition to driving the undocumented further

Pennsylvania Immigration and Citizenship Coalition
September 26, 2007
Page 2

underground. The proposed rule is poorly timed and ill-conceived. In light of the objections detailed below we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

- **The SSA no-match letter program is not designed for immigration enforcement.**

The SSA database does not have the capacity to serve as an immigration enforcement tool. The database has numerous errors, and does not contain complete information about a worker's immigration status or employment authorization. The database contains information about both U.S. citizens and work-authorized noncitizens who will appear on the no-match list for a variety of reasons including name changes, marriage, divorce and misspellings, leading employers to presume them undocumented.

- **The proposed rule may spark lawsuits and legal challenges**

Confused or cautious employers may fire workers who receive an SSA no-match letter before the workers have a chance to correct their records with SSA. The well-known inaccuracies of the SSA database could cause hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—to lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and may lead to costly and protracted litigations against employers for wrongful terminations.

The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area - despite the fact that the SSA no-match letter provides no evidence of immigration status and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status. This modified definition of "constructive notice" raises legal questions which will likely result in costly litigation.

- **The proposed rule undermines privacy rights**

Under current laws protecting our privacy and tax confidentiality, DHS is currently barred from direct access to the SSA database. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. The proposed rule would be an administrative end-run around legislative protections.

- **Implementation costs are prohibitive, and many fall on SSA.**

While the proposed rule would to make changes to how DHS interprets these letters, it will also have a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the

Pennsylvania Immigration and Citizenship Coalition
September 26, 2007
Page 3

program will be astronomical for SSA, an agency whose limited resources should go towards
administering Social Security benefits rather than enforcing immigration law.

- **Compliance is impractical, and the onus is on individual employees**

While the notice procedure protects the employer, it fails to provide a mechanism for an
employee to access and correct DHS records.  Additionally, the 60-day time period for
compliance is unreasonable and does not account for the numerous bureaucratic steps that
employees must go through to correct their records with the various agencies and with their
employer.

- **The proposed rule will not discourage undocumented immigration; rather it will
drive more workers and businesses underground, away from labor laws and
protections.**

Our past experience with no-match firings and workplace audits is very clear: the fired workers
will not leave the country.  They will simply find other more marginal jobs, most likely in the
unregulated underground cash economy.  Because of this, the proposed rule will result in growth
of this underground economy.

The new legal obligations that the proposed rule imposes on millions of employers will increase
pressure on businesses to go "off the books," thereby promoting the unregulated underground
cash economy which results in potentially billion-dollar losses in federal, state, and local tax
revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous
employers.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing
campaigns and to retaliate against workers who have been injured on the job or complain of
unpaid wages or other labor violations.  In documented cases (including arbitration decisions)
from across the country, employers initially ignored SSA no-match letters, and then decided to
use them as a pretext to fire workers who participated in efforts to improve working conditions
and wages.  The proposed rule would only exacerbate this problem.

- **This proposed rule disregards the current legislative process.**

Any worksite immigration enforcement proposal should happen in the context of
**comprehensive immigration reform**.  The House and the Senate have both passed bills that
contain worksite enforcement mechanisms.  Any rules put into place now will have to be
changed upon enactment of these new laws.  Implementing the proposed regulations at this time
would be a costly, confusing and unnecessary process for employers and workers, as well as staff
at both agencies.  Workers should not be subjected to unnecessary, unjust, and potentially
discriminatory mass firings while the current law is clearly under debate and reformulation.

Pennsylvania Immigration and Citizenship Coalition
September 26, 2007
Page 4


For all of these reasons, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule does not provide a solution to the hiring and exploitation of undocumented workers. Any potential benefit is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses.

Given the weight and number of objections, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,



Regan Cooper, MSS, MLSP
Executive Director

Pennsylvania Immigration and Citizenship Coalition
2100 Arch Street, 7th Floor
Philadelphia, PA 19103
(215) 832-0809
Fax: (215) 832-0919
piccpa@yahoo.com

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Smith, Robert (CoBank) [SMITHB@cobank.com] |
| **Sent:** | Monday, August 14, 2006 3:41 PM |
| **To:** | Regs, Rfs |
| **Subject:** | ICEB-2006-0004 - Comments |
| **Attachments:** | Farm Labor - DHS rule ltr 8-06.doc |

Attached are comments on ICEB 2006-0004 – DHS proposed regulations on Social Security No-Match Letters.

Thank you,

**No-Match Cert. Admin. Record  1841**

Northeast Farm Credit Regional Council
67 Hunt Street, Suite 3
Agawam, MA  01001

*** VIA EMAIL ***
rfs.regs@dhs.gov

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

Subject:  DHS Docket No. ICEB-2006-0004 -- Department of Homeland Security Regulations on Social Security No-Match Letters RIN 1653-AA50

To Whom It May Concern:

I am writing on behalf the Northeast Farm Credit Regional Council to express concerns on proposed regulations relating to employers who receive no-match letters from the Social Security Administration. The Northeast Farm Credit Regional Council is supportive of the comments submitted by the National Council of Agricultural Employers on this proposed rule. This proposed rule is a piecemeal approach to address a concern that requires action by Congress through passage of comprehensive immigration reform legislation.

The Northeast Farm Credit Regional Council represents the Farm Credit institutions that serve farmers throughout the Northeast. These Farm Credit cooperatives serve 16,000 farms in the states of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York and New Jersey.

The DHS proposed rule will impact not only on large businesses, but on many small and mid-sized businesses, including farms that do not have personnel and human resource offices to easily take actions to address issues in a no-match or mismatch situation. Furthermore, farmers must harvest and plant crops during certain time periods – failure to do so jeopardize the existence of the farm business. A farmer involved in a typical planting and harvesting cycle can not simply stop what they are doing to spend hours or days to present new documentation on an employee.  The alternative of terminating an experienced employee, because of misinformation, creates a different hardship. The reality is that this rule will place significant additional burdens on thousands of farm businesses of all size – most are family farm operations with limited resources to work with large bureaucracies.

Director, Regulatory Management Division
Page 2
August 14, 2006


Farmers desire to employ a legal workforce and have for years urged Congress to approve a workable guest worker and adjustment to legal status program. We urge the Department of Homeland Security to work with Congress to establish a comprehensive approach to address the issues of border security and immigration reform and defer further consideration of this proposed rule until a comprehensive immigration reform approach is approved by Congress.

Sincerely,


Robert A. Smith
Vice President for Governmental Relations

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | schmidta@gtlaw.com |
| **Sent:** | Monday, August 14, 2006 3:39 PM |
| **To:** | Regs, Rfs |
| **Cc:** | REIFFL@GTLAW.com; Schmidta@gtlaw.com |
| **Subject:** | DHS Docket No. ICEB-2006-0004 - Comments |
| **Attachments:** | 14ZV701_.DOC |

**Attached please find comments being submitted in response to DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter submitted on behalf of the Essential Worker Immigration Coalition ("EWIC").**

**Thank you.**

*Laura Foote Reiff*

Co-Chair, Essential Worker Immigration Coalition
703.749.1372

---

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, please send an email to postmaster@gtlaw.com.

---

**No-Match Cert. Admin. Record  1844**



# EWIC  Essential Worker Immigration Coalition

August 14, 2006

**VIA ELECTRONIC MAIL**

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N.W., 2nd Floor
Washington, DC 20529

> **RE:    DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor
> Procedures for Employers Who Receive a No-Match Letter**

Dear Director:

On behalf of the Essential Worker Immigration Coalition ("EWIC") we submit the following comments on the proposed rule cited above. EWIC is a broad-based coalition of national businesses and trade associations from across the industry spectrum concerned with the shortage of both semi-skilled and unskilled ("essential worker") labor.

The proposed rule would change existing regulations on how employers are expected to respond to "no-match letters" from the Social Security Administration ("SSA") or the Department of Homeland Security ("DHS"). This is being done at a time in which both houses of Congress have passed legislation that includes new employment eligibility systems and enforcement mechanisms. Thus, EWIC requests that the regulation be withdrawn until Congress acts regarding comprehensive immigration reform. In the alternative, EWIC asks for clarification regarding the substantive issues presented by the regulation as well as additional time for employers to conform to the new system and process. No-match letter and overall employment eligibility and verification standards include companies and organizations across a wide spectrum of businesses and industries.

EWIC understands several of the concerns expressed by DHS, however, we think that the proposed rule is untimely because it undermines the current legislative process. It also does not properly consider the economic ramifications of acting outside the Administration's own stated goal of enacting comprehensive immigration reform. This proposed rule only muddies the waters during this critical time of debate. EWIC believes that new rules on employment verification should occur within the context of comprehensive immigration reform. We should let these discussions continue without adding new bureaucratic burdens on well-intentioned employers or penalizing needed hardworking immigrants.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 2 of 7

I.     **Issues Addressed by the Proposed Regulation Should be Part of Comprehensive Immigration Reform Legislation.**

DHS should let Congress continue to move the immigration debate forward as a whole and not section out areas to regulate; a piecemeal approach is not prudent. Both the Senate (S. 2611) and House (H.R. 4437) bills currently pending include stringent employment eligibility and verification systems and strengthened interior enforcement procedures. They also significantly change an employer's responsibilities when verifying the identity and work authorization eligibility of its workforce. Each measure specifically addresses the case when an employer receives a no-match letter from the SSA or from DHS. It is important to let this ongoing, fruitful debate run its course without undermining it with regulations that may lead to duplicative and possibly contradictory proposals. The proposed regulation should only be enacted as part of comprehensive immigration reform. To advance an enforcement-only regulation independently—without a legalization program for current unauthorized workers and a guest worker program to address our future workforce needs—is short-sighted and not responsive to our nation's economic needs.

Should DHS go forward with the proposed regulation, we request that it takes into consideration the substantive issues presented below that are of great concern to EWIC:

II.    **What constitutes receipt according to DHS? When Do Employers "Receive" No-Match Letters?**

The regulation does not state what happens in the instance where an SSA no-match letter goes directly to an employee at the employer's place of business. Is the employer considered to be on notice and have constructive knowledge? For this particular instance please outline what an employer should do to take advantage of the safe-harbor provision.

III.   **Constructive Knowledge and the Time Granted to an Employer to Take Reasonable Steps in Response to SSA No-match Letters and Written Notifications from DHS.**

A. *Constructive Knowledge Standard*

The proposed regulation would significantly increase the scope of constructive knowledge in certain circumstances. It states that "the employer's obligations under current law, which is that if the employer fails to take reasonable steps after receiving such information, and if the employee is in fact an unauthorized alien, the employer may be found to have constructive knowledge of that fact."[1] The regulation defines what constitutes a "reasonable response" by an employer to a no-match letter and mandates specific steps to be taken by the employer within defined periods of time. The regulation's preamble suggests that taking such

---

[1] *See* Safe-Harbor Procedures for Employers Who Receive a No-Match Letter, 71 Fed. Reg. 34,282 (2006) to be codified at 8 CFR 274a) (proposed June 14, 2006).

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 3 of 7

measures may allow the employer to avoid liability and mitigate or eliminate potential penalties, but leaves much unanswered.

### B.  What Constitutes a Reasonable Response?

The proposal states that within 14 days of receipt of the no-match notice, an employer must attempt to resolve the discrepancy by checking its personnel and payroll records to determine whether the discrepancy results from a clerical error. If it is simply a clerical mistake, the employer is to contact SSA and administratively correct the information. If it is not clerical, the employer must approach the employee and confirm that the information that was provided by the employee to the employer is indeed accurate. If there was an inadvertent mistake when transmitting the information, the employer should correct immediately and inform SSA. If however, the employee says that initial information provided is accurate, the employer must direct the employee to the local SSA office where the employee has to resolve the issue.

After an employer has determined that a discrepancy is not from a clerical error on the part of the employer, the proposed regulation states that the "employer takes reasonable steps, within 14 days, to attempt to resolve the discrepancy; such steps may include: . . . if [the records] are correct according to the employee, requesting the employee to resolve the discrepancy with the Social Security Administration, such as by visiting a Social Security Administration office."[2] The regulation then goes on to state that if the discrepancy has not been resolved within 60 days, and if the employee's identity and work authorization cannot be verified at that time, then employers "must choose between taking action to terminate the employee or facing the risk that DHS may find that the employer had constructive knowledge the employee was an unauthorized alien."[3]   There are two main issues that arise from the above:

1.  These timeframes (14 days and 60 days) are not practical or fair.  Both large and small employers will be faced with challenges to meet this standard.  Large employers may receive several no-match letters at a time, which are likely to include hundreds of names. Particularly in decentralized operations, the necessary follow-up and personnel interviews will take significant man hours to accomplish.  As a result, it will be very difficult to resolve all of the letters in the prescribed time period.  Small businesses face even more hurdles to comply.  They often do not have a full-time administrative staff to address these issues in a 14-day timeframe.  Small business owners often have to run the business, oversee bookkeeping, supervise employees and perform multiple administrative duties.  Adding this clerical review and follow up with each employee will only add to these tasks.  The 14-day period is accordingly not reasonable and will be unduly burdensome for small employers as well.  The allotted time by which an employer must respond to a no-match is not an adequate, nor a reasonable time-period for an employer to have to act.  We therefore request that this be changed to a reasonable time frame standard, which would then acknowledge the difference in sophistication of the over seven million employers in the United States.

---

[2] *Id.* at 34,285.
[3] *Id.* at 34,283.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 4 of 7

2. It is also unclear from the regulation as to what occurs between the 14-day and 60-day time period and request clarification on the issue. It is our assumption that the employer has 14-days to inform the employee of the discrepancy and determine whether it is a clerical mistake. Thereafter, the employer has 60-days, from the date of receipt of the letter or notice, to ensure and confirm that the discrepancy has been rectified. Thus, an employee has less than two months to work out a resolution if there is an error between themselves and the SSA, which might not be enough time. Finally, it is EWIC's reading and understanding that as a matter of fairness and reasonableness, an employer can continue to employ an employee between the 14 and 60-day period, even if there is an unresolved discrepancy.

## IV.    Requirement to Fill Out New I-9 Forms.

As noted above, the proposed regulation requires that employers verify the employee's identity and work authorization within 60-days following notice of a discrepancy and that "the employer complete a new I-9 Form for the employee, using the same procedures as if the employee were newly hired."[4] This provision needs to be clarified for employers. Based on the proposed regulation, it seems that if there was simply a clerical error that is found within the 14-day window, the employer needs only to record that they spoke with SSA and it was worked out, but the employer does not need to complete a new I-9 Form for the employee that received a no-match. Also according to the regulation, if an employee could not resolve his or her issue with SSA regarding the no-match within 60 days, an employer may complete a new I-9 Form for that employee and continue to hire him or her as long as they do not use the disputed no-match documents to verify work authorization.

What is unclear is what an employer is to do if the employee does indeed resolve the no-match issue within the 60-day time period. Does the employer have to do a new I-9 Form to record the resolved social security number? It is EWIC's belief that requiring a new I-9 Form every time there is a discrepancy that must be corrected with the SSA would be a burdensome process for our employers, both financially and administratively. Oftentimes, large employers are informed of hundreds of no-matches on a monthly basis. These no-match letters are often the product of name changes for newly married or divorced employees who have not yet applied for a new social security card to reflect their new name. Having to enforce a blanket requirement that requires an employer and employee to fill out and complete new I-9 Forms for nearly every no-match would be unduly burdensome on the employer with minimal benefit to the government's interest.

Additionally, this process would create inconsistent results. For example, some employees change their names for any number of reasons and properly report this to the SSA. Therefore, these employees would not have a no-match, but the employee's name would be different from that listed on the original I-9 Form. This would require some employees who had a name change to fill out a new I-9 Form (those who initially forgot to report it to the SSA) but

---

[4] *See* Safe-Harbor, 71 Fed. Reg. at 34,283.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 5 of 7

not others (those who had immediately reported their name change to the SSA). It would seem inconsistent to only require new I-9 Forms for some name changes but not others. Finally, we would like to caution DHS regarding the potential fallout from the implementation of this policy. It will create further incentives for fraud and misreporting. Employees required to fill out a new I-9 Form can simply provide new false information and documentation.

In the alternative, the employee should be required to provide documentation to the employer within a reasonable period of time, such as 120 days, establishing that the employee has corrected the discrepancy with the SSA. This additional time will allow for more accurate reporting. Otherwise, an employee may simply present new false documentation to the employer when filling out the new I-9 Form. This would not meet the objective sought by this additional requirement.

## V.     Totality of the Circumstances Standard.

One of the ways that an employer can be notified of a name discrepancy is through written notification from DHS. The proposed regulation explains that DHS will take into account the totality of relevant circumstances when making a determination whether the employer had constructive knowledge that the alien was unauthorized to work. It, therefore, seems that receipt of notification alone is not absolutely determinative regarding whether an employer had constructive knowledge. Please provide clarification whether this reading is accurate.

Regarding the receipt of a SSA no-match letter, a comparable standard to that of the totality of the relevant circumstances is not applied. Determining whether an employer had constructive knowledge is not purely an objective finding and there should be a comparable standard included in the regulation. Imputation of constructive knowledge in all instances should depend on the totality of relevant circumstances. An example that highlights the importance of SSA taking into account the totality of the circumstances is as follows: It is common that after an immigrant enters the U.S. they informally change their name so to "Americanize" it. More often than not the immigrant does not file for a legal name change and, as a result, this can trigger a no-match and the employee can be subsequently discharged by the employer. It is an instance like this when SSA should take into account the totality of the circumstances. That is what is reasonable and equitable and conforms to the standard used by DHS as noted in the proposed regulation.

## VI.     Accuracy and Effectiveness of the System.

As previously noted, one of the ways by which an employer can be put on notice is by receiving a written notification from DHS. Unlike SSA, DHS does not have a mechanism in place that regularly checks and reports mismatched immigration documents. Rather, DHS generally is made aware of mismatched immigration documents in the context of an I-9 Forms audit. As noted in the proposed regulation, if an employer receives a letter from DHS, s/he is expected to resolve the issue by "tak[ing] reasonable steps, within 14 days of receiving the notice, to attempt to resolve the question raised by DHS about the immigration status document

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 6 of 7

or the employment authorization document."[5]  However, DHS provides no specific guidance as to what those steps should be and what an employer should do to rectify the situation.  We request that this process be outlined and explained and that time be provided for further comment.

In addition to the substantive issues addressed above, the proposed regulation would also adversely impact the U.S. economy and our country's national security.

**VII.    De-stabilizing Effect on the U.S. Economy.**

It is estimated that annually 500,000 essential workers enter the U.S. to perform much needed labor without work authorization.  Our economy not only absorbs these needed workers, but it depends on it for our current level of growth.  There are currently an estimated 12 million unauthorized workers in the U.S.  This proposed regulation will strip needed workers from employers without providing employers with an alternative legal channel by which to recruit to fill the gaps created by a combination of an aging workforce domestically, higher educational attainment by the domestic population, and a booming economy with full levels of employment. It is well documented that about five percent of the total U.S. workforce has no work authorization.  It could easily be deduced that an even smaller percentage of the total U.S. workforce is working with made up names and social security numbers.  Nevertheless, this small percentage of essential workers is overrepresented in sectors of the economy and regions of the country where the gap between the availability of a domestic workforce and the jobs available is greater.

Increasing interior enforcement and strengthening the employment eligibility and verification system without a legalization program for current unauthorized workers and a guest worker program to address our future workforce needs would be detrimental to the U.S. economy and the stability of an essential workforce.  This is precisely why the proposed regulation should be coupled with comprehensive immigration reform.  Immigration reform must be comprehensive, not disjunctive.

**VIII.    Firing of Immigrant Workers and the Potential Growth of the Underground Economy.**

Another reality of this proposal is that if an employer receives a no-match letter, many employees will simply be fired because employers will not want to risk liability by taking unnecessary steps to remedy the situation on behalf of the employee.  If terminated, those who lack work authorization will not simply leave the U.S.  Rather, they will likely enter the underground workforce.  This is yet one more reason why this proposal should be part and parcel of comprehensive immigration reform.  As stated, we request that the regulation be held until Congress negotiates a House and Senate compromise—given that both houses of Congress have

---

[5] *See* Safe-Harbor, 71 Fed. Reg. at 34,285.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 7 of 7

spoken of their desire to legislate in this field by passing proposals, which are quite similar in the area of worker employment eligibility and verification.

Furthermore, this proposed regulation addresses the employers who are trying to comply with the law but it does not address those underground employers who are completely non-compliant and do not complete the required I-9 Form and instead pay workers under the table. These indeed are the bad actor employers, yet the regulation gives them a free pass. By not addressing this real and thriving underground economy and only proposing increased regulations on those employers trying to act in accordance with the law, this regulation acts as an incentive for employers and employees to enter the underground economy. Workers in the black-market economy do not pay taxes and remain in the shadows and employers are not held accountable. Creating further incentives to thrive only within the underground economy is neither sound economic policy nor in our country's national security interest.

## IX.    The Fine Line Between Compliance and Violation.

Out of fear of non-compliance with DHS's proposed regulation, employers might be extra vigilant in trying to verify an employee's identity and eligibility to work in the U.S. However, there is a fine line for the employer between ensuring that the workforce is legal and violating existing anti-discriminations laws. For example, should an employee present documents other than a Social Security card when completing the I-9 Form and there is subsequently a no-match letter issued. The employer then confronts the employee and request to see the Social Security card. Clearly, this would present an issue regarding anti-discrimination laws already in effect. EWIC requests that DHS provide clarification on how an employer should respond to such a situation.

## X.    Conclusion

As explained, the proposed regulations are misguided and will have an adverse effect on the nation's economy and its overall national security. For the reasons stated above, EWIC urges DHS to withdraw this proposed regulation and to wait for Congress to finish its work on comprehensive immigration reform, as the Administration continues to insist.

We greatly appreciate the strong relationship we have developed with the DHS and hope to continue to expand that relationship in the future as we work to address this important issue.

Respectfully submitted,

*Laura Foote Reiff*
Laura Foote Reiff
Co-Chair
EWIC

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Robert Deasy [rdeasy@aila.org] |
| **Sent:** | Monday, August 14, 2006 3:30 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Comment on no-match reg final |
| **Attachments:** | Comment on no-match reg final.doc |

Sir or Madam:

Attached please find the comment of the American Immigration Lawyers Association to the rule proposed by Immigration and Customs Enforcement "DHS Docket No. ICEB-2006-0004, Safe-Harbor Procedures for Employers Who Receive a No-Match Letter".

**No-Match Cert. Admin. Record  1852**

# American Immigration Lawyers Association

## 918 F Street, N.W.  Washington, D.C. 20004    (202) 216-2400

August 11, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N.W.
Washington, D.C. 20529

      VIA E-Mail:   rfs.regs@dhs.gov

Re:  DHS Docket No. ICEB-2006-0004, Safe-Harbor Procedures for Employers Who Receive a No-Match Letter

Dear Sir or Madam:

### Introduction

The American Immigration Lawyers Association ("AILA") hereby submits comments on the proposal of Immigration and Citizenship Enforcement ("ICE") to amend 8 C.F.R. § 274a.1 to change the application of the principles of constructive knowledge and establish safe-harbor procedures for employers who receive a no-match letter from the Social Security Administration ("SSA") and similar letters from ICE.   AILA is a voluntary bar association of approximately 10,000 attorneys and law professors practicing and teaching in the field of immigration and nationality law.   Our mission includes the advancement of the law pertaining to immigration and naturalization and the facilitation of justice in the field.

We appreciate the opportunity to comment on the proposed regulation and believe we are particularly well qualified to do so.  AILA members regularly assist foreign nationals in the process of applying for Social Security Numbers ("SSNs"), known as "alien enumeration."    Additionally, we customarily advise clients on I-9 employment verification and compliance and in responding to SSA no-match letters.  Further, through our SSA Liaison Committee, we enjoy a longstanding, positive and productive relationship with SSA and communicate regularly with that agency to resolve specific enumeration delays associated with discrepancies in federal databases.  Accordingly, we have developed a special expertise in understanding the procedural aspects of

Page 2

enumeration and the practical utility and limitations of the SSN as a worksite enforcement tool.

In sum, we believe that the SSN is ill suited to the sweeping worksite enforcement program proposed. SSA consistently states that there are many reasons for a no-match besides lack of work authorization. Moreover, there is great danger in basing worksite enforcement on a federal database that was not designed for this purpose and lacks even basic indicia of reliability, particularly when SSA has no established mechanisms for employers and employees to correct data discrepancies. We also believe that the proposal will promote discrimination and the termination of lawful employment if verification is not forthcoming within the safe harbor time limits, which is inevitable. This is particularly so in the current climate of increased criminal worksite enforcement. And, while the proposal gives employers little choice but to terminate employment, it provides no corresponding immunity from citizenship discrimination liability for good faith efforts to comply with the safe harbor provisions. Further, the proposal is premised on an overly broad interpretation of "constructive knowledge" that is patently inconsistent with the intent of Congress in enacting the Immigration Reform and Control Act of 1986 ("IRCA"). ICE should not implement its proposal without carefully consulting SSA, the Office of Special Counsel for Immigration Related Unfair Employment Practices ("OSC") and the Internal Revenue Service ("IRS"), which have given employers conflicting guidance on responding to a no-match letter.

If ICE chooses to proceed with its proposal, at a minimum, it should eliminate the two-step safe harbor provision (14 and 63 days), which is unnecessary and confusing, and replace it with a single time limit. Further, the 63-day time limit proposed is impractical and impossible to meet from a file review and information processing perspective and should be extended to not less than 123 days. Implementation of the proposal will cause many businesses to lose large segments of their workforce and threaten the very existence of operations. Therefore, a longer time limit also is necessary to allow employers to recruit replacements and manage staffing needs. Finally, we are confident based on our experience that the proposal will impose extraordinary costs and paperwork burdens on the private sector.

While our comments primarily address the limited utility of the no-match letter as an enforcement tool and recommend specific procedural modifications to the proposal, we wish to emphasize our strong belief that the proposal reflects unsound policy. We believe that worksite enforcement is key to securing our borders. However, it must be coupled with comprehensive immigration reforms that give essential workers meaningful avenues to lawful status. If not, a program like the no-match proposal standing alone will only drive our country's 12 million plus undocumented workers further underground and fuel the market for counterfeit identity documents, making it easier for true terrorists to go undetected. Moreover, the proposal is premature in light of pending legislation. It will have a dramatic and catastrophic effect on core industries and should await careful deliberation by both houses in Congress, which may result in yet another vastly different approach to employment verification. We also fear that the proposal will encourage unscrupulous employers to pay their workers "off the books" precisely to avoid potential

Page 3

liability. Therefore, it is highly likely that the proposal will have the unintended effect of causing large numbers of work authorized individuals to lose their jobs while many unauthorized employees will continue working.

<u>The SSN Is Not an Effective Worksite Enforcement Tool</u>

SSA, which assigns and administers the SSN program, has emphatically and consistently stated that there are many reasons for a no-match other than lack of work authorization. SSA was established to administer the old age, survivors, and disability insurance program and the supplemental security income program.[1]  To do so, it assigns a unique nine-digit SSN to each eligible individual and issues a Social Security card as evidence of the assignment.  SSA maintains a record of the earnings reported for each person that has been assigned an SSN and identifies the record by that person's name and SSN.[2]

Pursuant to an agreement between SSA and the IRS, employers are required to report the taxable earnings of their workforce by filing annual wage reports with SSA on Form W-2 ("Wage and Tax Statement") and Form W-3 ("Transmittal of Income and Tax Statements").  A Form W-2 is filed for each employee and includes his name, SSN and annual wages, among other information.  SSA uses the W-2 to maintain accurate earnings records and calculate Social Security benefits.  It transmits this data to IRS and identifies employer-reporting errors for possible IRS penalty assessment action.[3]  IRS uses the W-2 report to ensure that information submitted by taxpayers is properly processed in IRS records and to verify filing and reporting compliance with tax laws.  SSA matches the "name/SSN" reported against its "Numident" file.  If the name/SSN matches, the wage item is posted to the Master Earnings File for purposes of benefits administration.  If the name/SSN does not match, the wage item is placed in SSA's Earnings Suspense File.

The SSN was never intended as an enforcement mechanism, and Congress did not give SSA enforcement authority.  In fact, contrary to popular belief, neither the immigration statute nor the federal tax statute even requires an individual to possess an SSN to begin work.  An employer is not required to inspect an employee's SSN Card, and both the IRS and SSA make provision for employers to file employment tax returns for employees that do not possess SSNs.  *See, e.g.*, 26 CFR §31.6011 (b) – 2 (c) (3).

Moreover, as explained repeatedly in SSA policies and guidance to employers and employees, there are many legitimate reasons for a no-match, including spelling

---

[1] 42 USC §901.

[2] 20 CFR §422.103(a).  *See generally* Purpose and Disclosure of the Social Security Number (SSN), Record Maintenance ("RM") 00201.001, SSA's Program Operations Manual System.  RMs constitute a subchapter of SSA's Program Operations Manual System ("POMS") and can be found on SSA's website at http://policy.ssa.gov/poms.nsf/lnx.

[3] 20 CFR §422.114(a).

mistakes, inversion of date order in date of birth, name changes due to marriage, divorce, and other reasons, and cultural differences in name order. SSA's Program Operations Manual System directs SSA Field Officers in responding to an inquiry from an employer who has received a no-match letter to "[r]emind the employer that *there are a number of reasons why the reported information does not match our records, such as transcription or typographic errors, incomplete or blank name/SSN or mane changes.*" Records Maintenance ("RM") 01105.027, Handling Inquires Relating to SSA Letters on No-Match Names and Social Security Numbers (SSNs). It further directs Field Officers as follows:

- "You should tell the employer that a no-match between an employee's name and SSN **DOES NOT** mean that the employee lacks work authorization.
- You should also tell the employer that a no-match between an employee's name and SSN **DOES NOT** make any statement regarding a worker's immigration status."

Ibid. (emphasis in original). Therefore, SSA's own view indicates that its no-match data is not a predictable or reliable basis for a worksite enforcement program.

<u>The Regulation Should Not Take Effect until ICE Works with SSA</u>
<u>to Establish Mechanisms for Employers and Employees to Correct Data Discrepancies</u>

The problems that our members encounter on their clients' behalf with SSNs give us unique insight into the SSA processes implicated by the proposal and the issues related to conditioning employment authorization on federal databases, which are often fraught with error. We are extremely concerned about the accuracy of SSA's no-match data and the lack of an established mechanism for an employer or an employee to resolve a name/SSN mismatch with SSA in a timely fashion or at all. Such procedures should be worked out before the proposal is implemented, particularly in light of the many inquiries and correction requests that the regulation is expected to trigger

AILA spends considerable time and attention addressing delays in alien enumeration occasioned by errors and discrepancies in Department of Homeland Security ("DHS") databases. These delays occur routinely and can easily last six months or more. In most cases, the local SSA's inability to enumerate is based on its failure to verify immigration status by querying DHS's SAVE (Systematic Alien Verification of Entitlements) database or by mailing a hard copy G-845 request for verification. The databases used for verification are replete with error, which often can be impossible to correct. Indeed, reports over the last several years false-negative error rates as high 35% to 50% for foreign-born workers. Moreover, SSA's Earnings Suspense File reportedly contains *$519 billion,* illustrating the extent of data discrepancies in the SSA Numident database. *See* The Earnings Suspense File: Social Security's "Secret Stash," Consumer Affairs.com (Feb. 22, 2006).

Yet, the proposed regulation will force every employer in this country to use SSA no-match data to make termination decisions. This will result in hundreds of thousands of

Page 5

cases where well meaning, intelligent, and diligent employers will perceive no choice but to terminate employees to avoid a finding of constructive knowledge, even if it turns out employment was authorized.

AILA has asked SSA for information on the procedures and time frames that it will use to correct data discrepancies and awaits a response. However, in light of our experience with SSA processing times and the deluge of inquiries expected from the regulation, the proposal should not be adopted until SSA agrees that its Numident database is sufficiently reliable for worksite enforcement and SSA establishes specific procedures and time frames for fielding inquiries and correcting errors.

<u>The Two-Step Safe Harbor Provision (14 and 63 Days) In the Proposal</u>
<u>Is Unnecessary and Confusing and Should be Replaced by a Single Time Limit</u>

The proposed regulation provides that an employer will reach safe-harbor if it checks its records and takes other action to obtain SSA verification within 14 days of receiving a no-match letter. It also provides safe harbor to the employer who reverifies work authorization and identity in a limited I-9-like procedure if the discrepancy is not resolved within 63 days. However, the relationship between these two periods is unclear, and the two-step approach should be replaced by a single time limit.

*The 14-Day Safe Harbor.* As proposed, Section 274a.1(l)(2)(i)(A)(i) would allow a defense to constructive knowledge if the employer attempts to resolve the discrepancy within 14 days by checking its records to determine whether the discrepancy results from a clerical error. The employer is to correct the error, inform SSA, verify with SSA that the corrected information matches SSA's records, and memorialize the verification. If the employer does not detect an error in this internal check, under proposed Section 274a.1(l)(2)(i)(A)(ii), it is required to ask the employee to confirm the accuracy of the information in the employer's records. If this doesn't resolve the discrepancy, the employer should ask the employee to visit an SSA office and present documentation necessary to resolve the discrepancy, receive corrected information from the employee, and then verify the new information directly with SSA.

*The 60-Day Safe Harbor.* Under the second step of the safe harbor provision, if, within 60 days of receiving notice, the employer does not verify with SSA a name/SSN match, it must take reasonable steps within 3 more days to verify work authorization and identity such as by conducting I-9 reverification. If the employee can provide sufficient documentation, the employer has reached a safe harbor.

While the two-step safe harbor gives clear guidance to employers at opposite ends of the continuum, the relationship between the two periods is vague and confusing for the many employers that fall in between. The preamble to the proposed regulation reviews the steps entailed in the 14 day safe harbor provision – from internal records check to verifying the correction with SSA – and states that "ICE would consider a reasonable employer to have acted promptly if the employer took such steps within 14 days of receipt of the no-match letter." Clearly, an employer who obtains SSA verification of

Page 6

data within 14 days -- an unlikely scenario -- gains safe-harbor. The employer that uses the limited I-9-like procedure to verify employment eligibility within 63 days also will achieve safe-harbor. However, the two-step safe harbor provision gives no guidance to employers who fall in between. For example, does an employer reach safe-harbor if it takes one or two actions listed in the proposed regulation within the 14-day period and then is actually able to verify with SSA 45 days after having received the no-match letter? It has not completed even a majority of the 14-day period actions within the 14-day time frame and has also not needed to use the I-9 verification because it verified with SSA. It seems likely that, if SSA verified the SSN/name combination at day 45, the employee must be an authorized worker, and a claim of constructive knowledge would be foreclosed. But the proposed regulation does not make this clear.

We believe there is no enforcement benefit to be gained from the 14-day time limit and that it should be eliminated. It is clearer and more effective to establish one time-period during which an employer may take any or all of the steps deemed reasonable under the regulation, either through verification with SSA or through the I-9 process. We would hope and expect employers to appreciate the importance of acting early on a no-match letter. However, if the goal of the regulation is to set an outer time limit for employers to verify work authorization, then the regulation should do just that. Moreover, the two-step process muddles the document-abuse immunities and obligations of the employer who conducts the I-9 reverification step anytime before 60 days from receiving the no-match letter.

<u>The Proposed Time Limits Are Impractical and Impossible to Meet from a</u>
<u>File Review and Information Processing Perspective and Should be Extended</u>

The 14 and 63-day time limits in the proposed regulation are impractical and unrealistic and should be replaced by a single 123-day time limit for employer compliance. Our conclusion is based on our collective experience advising clients who receive no-match letters and our conversations following issuance of the proposed regulation with employers and national and regional human resources associations. For the following reasons related to file review and employee notification, employers almost universally have extreme difficulty resolving mismatches within 63 days.

- The proposed limit of 63 days is neither sufficient nor reasonable for an employer to gather and review all the paperwork and take the other necessary steps to gain safe harbor. On receipt of the letter that could typically list hundreds of mismatches, an employer representative must identify the employees who are associated with mismatch items. To do so, the employer must start by gathering and comparing the SSNs in question against payroll records, which often will require a request for a report from a third-party preparer, such as ADP. The employer also must locate and gather W-4 and I-9 forms completed by the employees for purposes of comparing SSNs provided by the employees and copies of SSN cards, if any, in its records. This process can be particularly time-consuming for staffing agencies, manufacturing facilities, service industry establishments (restaurants, hotels, etc.), agricultural

Page 7

organizations, and numerous other industries characterized by high turnover rates, which we believe receive a large percentage of no-match letters.

- If the employer does find an error in its records, there is no procedure to effectively notify SSA and obtain verification of the correction in the time limit proposed. The preamble to the proposal states that an employer should notify the SSA of an error and verify that the name/SSN item match agency records. However, as noted, there is no established mechanism for an employer to notify the SSA of an error. Indeed, RM 01105.027 states that the employer "should **NOT** send any background document to SSA. If a Form W-2c is prepared, the employer should send only the Form W-2c (Corrected Wage and Tax Statement), with a covering Form W-3c transmittal with **NO** supporting documents attached. If correct information cannot be obtained and a Form W-2c cannot be prepared, the employer should retain the documentation and should **NOT** send copies to SSA." (Emphasis in original). This also underscores the importance of postponing implementation of the proposal until SSA establishes clear procedures.

- Employers also must schedule meetings with affected employees to confirm the correctness of information in the employer's records. If this does not resolve the issue, the employer must schedule additional meetings with employees to review identity documents that may resolve the discrepancy. However, it is likely that many of these documents, such as marriage certificates and birth certificates, may not be readily available, further extending the period needed to achieve safe harbor.

- The proposed time limit should be extended because there is no established mechanism for an employee to resolve a name/SSN mismatch with SSA in a timely fashion or at all. Under the proposal, if the name/SSN item is correct according to the employee, the employer should ask the employee to bring documentation to an SSA office to correct the error. However, even assuming the employee can locate the necessary documents, such as a marriage certificate, within a week, our experience from accompanying clients to local SSA offices teaches that it can be difficult to speak with an officer on a same-day basis and time-consuming to resolve discrepancies. SSA's own RM 01105.027 states that, under these circumstances, the employer "should give the employee a reasonable amount of time to rectify the situation with SSA. It may take *up to 2 weeks, and sometimes longer*, to get a new or replacement Social Security card." (Emphasis added). Indeed, even the I-9 "receipt rule" at 8 C.F.R. § 274a.2(b)(1(vi)(C) gives an employee 90 days to secure a replacement SSN card for I-9 purposes. Add to this the inevitable delays that SSA will face from thousands of inquiries and processing information corrections, and the 63-day deadline becomes totally unrealistic.

We provide the following typical scenarios to illustrate our point:

- ABC Inc. is a company with a fine-tuned I-9 compliance program and believes it has no undocumented workers among its 500 employees. ABC receives an SSA no-

Page 8

match letter regarding 75 SSNs on day one, which is a Wednesday. An administrative employee opens the letter, which makes its way to the Human Resources ("HR") department by day two.

- By day three, the HR staff realizes the need for guidance on how to respond and looks up information in reference materials and calls an attorney and leaves a message.

- The weekend comes and on Monday, day six, ABC receives a call from an attorney. The attorney advises the HR representative to take the first steps required by the regulations to achieve safe-harbor.

- The HR representative contacts the company that handles ABC's payroll and asks it to run copies of the latest payroll documents, including the SSNs ABC has been using to for payroll reporting.

- On day eight, when the payroll company e-mails copies of the latest payroll, the HR representative cross-references the 75 SSNs on the no-match letter to the SSNs on the payroll report in search of the names of the affected employees. However, given the high turnover in the company, this task takes several days. She makes a list of the names and then looks up copies of W-4 Forms completed by the employees in question. She also locates copies of the I-9 files for each of the identified employees.

- On day thirteen, following the weekend, the HR representative compares the documents for the 75 employees to the SSNs on the no-match letter. She is looking for any discrepancy that might have caused the SSN to appear on the no-match letter (typographical errors, misspellings, or birth date errors). She finds that 20 of the SSNs on the no-match letter were improperly transcribed from the W-4 Forms to payroll and then on the Form 941 payroll reports. She leaves a message with the attorney asking what she should do with this information.

- The HR representative prepares a letter to SSA explaining the problems found with the 20 employees. She sends the letter by return-receipt-requested to SSA so she has evidence that she made good faith efforts to comply with the safe-harbor requirements. The weekend comes.

- On Tuesday, day fourteen, the HR representative calls the SSA verification telephone line but finds that she is unable to verify any corrections yet.

- ABC's outside counsel calls the HR representative on that same day, day 14, to ask her if she has taken all the steps laid-out in the regulation. She explains what has happened. The lawyer does not know from the regulation if ABC has achieved safe harbor because ABC cannot verify that 20 of the SSNs with internal problems match the data in SSA's records.

Page 9

- With respect to the 20 employees, the HR representative calls SSA's verification line but cannot obtain verification until SSA processes ABC's letter requesting a correction of SSN/name data.

- ABC also must address the SSNs on the no-match letter that appear accurate in company records. It has already taken ABC nine days to determine that it does not know why 55 of its employees' SSNs appear on the no-match letter. The company is very sensitive to what could happen legally or practically if it requests additional immigration-related documents from employees for whom I-9 verification was conducted at the time of hire. Therefore, on day ten, ABC's president, the HR representative, and a supervisor have a telephone call with their attorney to discuss how to ask for this information from employees without violating the anti-discrimination provisions of IRCA, how to request the information in a way to get maximum response in the shortest amount of time, whether to call in each employee or to send a memo to each one, and contingency planning for what would happen to ABC if all of the 55 employees did not report for work after learning of the inquiry, or worse, if more employees, hearing about the inquiry do not report. ABC decides to draft a memo to each of the 55 employees advising of the no-match letter and asking the employees to report to HR.

- On day 13, after the weekend, the lawyer and the company discuss the memo and then distribute it to the mailboxes of the 55 employees so they receive it on the morning of the 14th day.

- On day 14, the 55 employees in question receive the memo. They report to HR over the next few days but do not have in their possession the documents needed to resolve the discrepancy. Although some may be able to bring documents the next day, others need a week or more to locate or obtain the documents, such as a birth or marriage certificate.

- By day 20, 25 of the 55 employees produce documents that resolve the discrepancies. ABC's HR representative reviews them, discovers how the mistake occurred, drafts a letter to SSA and sends it return-receipt-requested. But, again, it could be weeks or months for SSA to process this information for employer verification, if at all. Meanwhile, according to the preamble, "the employer must choose between taking action to terminate the employee or facing the risk that DHS may find that the employer had constructive knowledge that the employee was an unauthorized alien and therefore, by continuing to employ the alien, violated [the] INA... ."

- Of the 30 employees for whom discrepancies have not been resolved either through ABC's internal records check or through documents presented by the individuals, pursuant to the proposed regulation, ABC asks them to resolve the discrepancy directly with SSA. The proposed regulation suggests that the employees should go in person to SSA or send documents. However, based on our experience, they will have difficulty speaking to an SSA officer and must make multiple visits and wait long periods. Our experience also suggests that it will take SSA much longer than 14

Page 10

days to process a correction. We acknowledge that some employees will be able to resolve inconsistencies in data by presenting marriage certificates, name change documents, or name spelling problems. However, we see hundreds of cases, in our limited universe of applicants, where employees visit local SSA offices and SSA cannot resolve a problem within 30 days, or even as long as 90-120 days. Once the issue is resolved, according to the proposed regulation, SSA must update its records and the employer must verify the new correct information directly with SSA.

- At this moment in the hypothetical, there is no point in counting the days because in a serious number of cases of employment eligible workers the 14-day period is long over and the 63-day period could be over as well. Without being allowed to use a document with an SSN, it is unlikely that a person could verify employment with an I-9, even if they were eligible to work but for the SSA data discrepancies.

The hypothetical of ABC, Inc., assumes that the letter was properly and immediately routed to an established HR department with established procedures. However, small businesses without an HR department could have particular difficulty meeting the proposed deadlines. Indeed, a small firm facing a no-match letter with only four or five items could be significantly challenged by the proposed time limits. For these companies, employees in the accounting office usually serve as the company representatives checking social security numbers. These employees are also typically responsible for accounts receivable and payable, payroll, and numerous other necessary accounting functions. No-match letters that arrive at times of financial audits, end of quarter reports, or tax reports could be ignored or necessary business functions would have to be abandoned to comply with the proposed regulation. Many employers, particularly smaller firms, will not have a designated HR officer and will lack the experience and staff to complete the safe harbor steps within the periods proposed.

Delays due to vacations, lost documents, sickness, misunderstanding, and language barriers, among others, could further delay an employer's ability to comply with the proposed time limits. Changing just a few simple facts of this hypothetical makes ABC's plight more dramatic. What if the HR representative was on vacation for one week when the no match letter is received? What if it took four days for the decision-maker who first opened the letter to realize what this letter meant because she was in the middle of negotiating a very important new contract for the company? What if the company administering the payroll had a computer problem and couldn't send copies of the payroll for three days? Or, what if the company was not as aware of its obligations and options as we hope it would be and took a few more days to get each of these steps accomplished or did not get sound advice or have access to experts on how to handle the situation? Any of these typical, real-life wrinkles would clearly prevent ABC from reaching safe harbor within the proposed time frames.

<u>The Proposed Time Limits Are Impractical and Impossible to Meet</u>
<u>from a Staffing Management Perspective and Should be Extended</u>

Page 11

Although we believe it is a flawed way to do so, the proposed regulation admittedly will "smoke out" many unauthorized workers. While this is an important part of immigration reform, it also underscores the importance of giving employers adequate time to make preparations to be ready to replace affected workers, if need be, often in huge numbers. During the same period of time that an employer is attempting to investigate and resolve discrepancies, being conservative and needing to be ready for the possibility that most if not all of the workers will not be able to resolve the issue or provide new documents within 63 days, the company has to recruit for and train potential replacement workers. While this is happening, the morale of even the foreign national workers not listed in the no-match letters can be negatively affected and some, afraid that they will be next, resign, disappear or admit that they are undocumented preemptively, leading to even greater employee losses in a short period of time. For instance, a 60-employee company facing a 40 item no-match letter might be able to handle the paperwork challenge at the expense of much other business but could be shut down by the possible loss of almost an entire workforce (keeping in mind that the company followed all of the proper and thorough I-9 rules at the time of hire). Extending the regulatory time limit is necessary to allow employers to investigate mismatches and discharge IRCA obligations, and at the same time, to regroup in a way that avoids business closure and an undue impact on the economy. Companies with particularly high mismatch rates should be given the opportunity to remain in contact with the government with a schedule for resolving the issues, facility by facility, for example, and provide updated information on the progress along the way at regular intervals. For this reason, the time limit in the proposed regulation should not be less than 120 days.

### The Proposed Regulation Will Promote Discrimination and Expose Diligent Employers to Liability for Citizenship Discrimination

As noted, absent established procedures to correct no-match errors and the refinement of federal databases, the proposal will leave many employers no choice but to terminate the employment of individuals who, in fact, may be work authorized. This, of course, could be actionable under Section 274B of the Immigration and Nationality Act of 1952, as amended, which prohibits citizenship and national origin discrimination and document abuse, as well as under Title VII of the Civil Rights Act of 1964. However, while the proposed regulation unfairly puts employers squarely on the horns of a dilemma – whether to terminate employment or lose safe harbor – it gives them no corresponding immunity from liability for their good faith actions.

SSA's RM 01105.027 states:

Unfortunately, some employers have improperly used the EDCOR (Code V – No-match letter) to take adverse action against their employees. Based on concerns voiced by various interest groups, the letter includes the following paragraphs:

**IMPORTANT:** This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number. Nor does it make any statement about an employee's immigration status.

Page 12

> You should not use this letter to take any adverse action against an employee, such as laying off, suspending, firing, or discriminating against that individual, just because his or her Social Security number appears on the list. Doing so could, in fact, violate state and federal law and subject you to legal consequences."

Similarly, the OSC at its website states:

> 9. If an employee's name and SSN don't match SSA's records, doesn't that mean the employee is not authorized to work?

> No. Just because there is a mismatch between your records and SSA's records, you should not assume that the employee lacks work authorization. There are many reasons for a mismatch to occur, including:

> 1. A name change (e.g., due to marriage, divorce or other reasons) after the SSN was issued;

> 2. A typing or printing error; and

> 3. An error based on cultural differences in how surnames are used.

> You should not use the mismatch letter by itself as the reason for taking any adverse employment action against any employee. Doing so may put you in violation of the antidiscrimination provision of the immigration laws, the equal employment opportunity laws, or the labor laws. The General Counsel's office of the former INS, and OSC, have opinion letters that may assist you on this issue. Please call OSC for more information.

For the reasons stated above, employers could be forced as a practical matter to terminate workers who, in fact possess work authorization, in violation of law. In so doing, they risk a charge of unlawful discrimination by terminating employees who are not able to explain and resolve SSN/name discrepancies. *See LULAC v. Pasadena School Dist.*, 662 F. Supp. 443 (S.D. Tex. 1987) where a school district was required to reinstate unauthorized aliens eligible for legalization under IRCA to custodial positions they occupied prior to termination for providing district with false SSNs. Therefore, the regulation should not be implemented without a companion provision immunizing employers from citizenship discrimination liability for terminating employment when it has not been able to verify in accordance with the safe harbor provisions.

The proposed regulation also promotes document abuse and conflicts with existing law. In an effort to avoid potential citizenship and national origin discrimination through document abuse, the proposed regulations provide:

> (3) Knowledge that an employee is unauthorized may not be inferred from an employee's foreign appearance or accent. Nothing in this definition should be

Page 13

interpreted as permitting an employer to request more or different documents than are required under section 274A(b) of the Act or to refuse to honor documents tendered that on their face reasonably appear to be genuine and to relate to the individual, except a document about which the employer has received a notice described in paragraph (l)(I)(iii) of this section and with respect to which the employer has received no verification as described in paragraph (l)(2)(i)(B) or (l)(2)(ii)(B) of this section.

However, this provision further complicates an already confusing area for employers.

INA §274B(a)(6), 8 U.S.C. §1324b(a)(6) provides:

> Treatment of certain documentary practices as employment practices.—A person's or other entity's request, for purposes of satisfying the requirements of section 274A(b), for more or different documents than are required under such section or refusing to honor documents tendered that on their face reasonably appear to be genuine shall be treated as an unfair immigration-related employment practice if made for the purpose or with the intent of discriminating against an individual in violation of paragraph (1).

Contrary to the statutory prohibition, the proposed regulation requires the employer to refuse to honor a "document about which the employer has received a no-match notice." This places employers in a nearly impossible position. Under the statute, they must honor documents tendered (that reasonably appear genuine) but under the proposed regulations, they are required to reject specified documents. They cannot request more or different documents than required under section 274A(b) of the Act, and they cannot refuse to honor documents tendered that on their face reasonably appear to be genuine and to relate to the individual. However, the proposal would require them to refuse to honor some documents, specifically a "document about which the employer has received a no-match notice."

This proposed regulation will almost certainly lead to an increase in discrimination through document abuse. Such discrimination may arise in a number of ways that often seem innocuous to employers. For example, an employer engages in discrimination through document abuse by insisting that the employee provide an "INS issued card" evidencing continued employment authorization where the employee had other legally acceptable documents. Such action is illegal and contrary to the INA §274B(a)(6), 8 U.S.C. §1324b(a)(6). *U.S. v. Louis Padnos Iron & Metal Co.*, 3 OCAHO no. 414 (1992).

The Interpretation of Constructive Knowledge
In the Proposal Is Inconsistent with Congressional Intent

The ICE proposal pushes the concept of constructive knowledge far beyond the outer limits intended by Congress in enacting Section 274a, which prohibits the knowing employment of unauthorized workers. This is clear from the decision in *Collins Foods Int'l, Inc. V. U.S. INS*, 948 F. 2d 549, 544-45 (9th Cir. 1991), which struck down a finding of constructive knowledge. The court cautioned that the concept must be "sparingly

Page 14

applied" to avoid upsetting the delicate statutory balance to serve the goal of preventing unauthorized alien employment while avoiding discrimination against citizens and authorized aliens. It said:

> The doctrine of constructive knowledge has great potential to upset that balance, and it should not be expansively applied. The statute prohibits the hiring of an alien "*knowing* the alien is an unauthorized alien . . . with respect to such employment." 8 U.S.C. § 1324a(a)(1)(A) (emphasis added). Insofar as that prohibition refers to actual knowledge, as it appears to on its face, any employer can avoid the prohibited conduct with reasonable ease. When the scope of liability is expanded by the doctrine of constructive knowledge, the employer is subject to penalties for a range of undefined acts that may result in knowledge being imputed to him. To guard against unknowing violations, the employer may, again, avoid hiring anyone with an appearance of alienage. *To preserve Congress' intent in passing the employer sanctions provisions of IRCA, then, the doctrine of constructive knowledge must be sparingly applied.*

The proposal's broad reading of constructive knowledge is inconsistent with Congressional intent and improperly seeks to impose on the private sector the inherently governmental function of worksite enforcement.

### ICE Should Not Implement the Proposal
### until Coordinating with Other Interested Federal Agencies

In responding to a mismatch letter, employers must balance competing legal considerations and obligations to several different agencies, including DHS (to avoid employing unauthorized workers), IRS (to pay taxes using correct name/SSN items) and OSC (to avoid citizenship discrimination). For instance, IRS can impose a penalty for mismatches but has instructed that employers can avoid a penalty for reporting mismatched data by soliciting new W-4 Forms. OSC has instructed that employers should not terminate employment based on the mismatch letter. SSA has instructed employers to provide corrected information but not to terminate employment based on the letter. We believe that ICE should not implement the safe harbor proposal until it consults carefully with OSC, SSA, and IRS, which all have a stake in the outcome and have provided inconsistent guidance to employers. This is especially important given use of the no-match letter in criminal worksite enforcement.

### The Proposal Will Impose Extraordinary Costs
### and Paperwork Burdens on the Business Community

Based on our experience, the rule clearly will cost the private sector at least $100 million per year. First, the actual cost of extra manpower and lost productivity on the part of companies attempting to comply with the proposed regulation will far exceed $100 million annually. An HR representative with only 10% of the company's workforce on the no-match list would spend significant amounts of time attempting to resolve these discrepancies. Racing against the clock, the HR representative might have to drop all

Page 15

other more productive programs that could have been scheduled and must be abandoned and chalked up as lost opportunity costs.

Another hypothetical based on our experience illustrates the point. Increase the percentage of employees on the no-match letter at ABC Company to 30% or 40% and the lone HR representative would have 150 or 200 employees to usher through this procedure in 14 days. Or take a large company with 10,000 employees where only 2% or 5% of the employees are on a no-match list and the company must deal with these proposed procedures for 200 or 500 employees. Make it a 20,000-employee company and the numbers would be 400 or 1000. It would be truly impossible to reach the safe harbor without hiring experts.

The cost of recruiting, hiring, and training new replacement workers if workers leave voluntarily or if their employment is terminated based on this proposed regulation must also be factored into this equation. True, it may be said that employers never should have hired potentially undocumented workers in the first place. However, in our experience the vast majority of companies who employ undocumented workers do so unwittingly. Of course there are real and serious violators, and those employers should be stopped and punished. But we see well-meaning employers in our practices every day who follow every procedure to hire appropriately but could lose employees for all the reasons described herein if this proposed regulation is adopted.

The foregoing argument is also true for application of the Small Business regulatory Enforcement Fairness act of 1996. DHS should share its calculations in coming to the determination that this rule would not result in an annual effect on the economy of $100 million or more.

Conclusion

For the foregoing reasons, we believe the proposed regulation is unsound and premature as a matter of policy and practice. At a minimum, implementation should await the adoption of clear SSA procedures for the correction of no-match information and careful consultation with other federal agencies on its implications. Additionally, the two-step safe harbor should be replaced by a single 123 day time limit.


Sincerely,


AMERICAN IMMIGRATION LAWYERS ASSOCIATION

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Mike Gempler [mgempler@growersleague.org] |
| **Sent:** | Monday, August 14, 2006 3:22 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Comments on Docket No. ICEB-2006-0004 |
| **Attachments:** | DHS mismatch prop regs WGL comments 8-14-06.doc |



## WASHINGTON GROWERS LEAGUE

406 West Chestnut ~ Yakima, WA 98902 ~ Phone 509-575-6315 ~ Fax 509-452-4834 ~ E-mail: info@growersleague.org

August 14, 2006

<u>**VIA ELECTRONIC MAIL AND U.S. MAIL**</u>

Director, Regulatory Management Division
**U.S. Citizenship and Immigration Services**
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

> Re:  **Docket No. ICEB-2006-0004**
> **Safe Harbor Procedures for Employers Who Receive a No-Match Letter**
> **(FR 71:114, p. 34281)**

To Whom It May Concern:

The Washington Growers League ("WGL") hereby submits its comments on the Bureau of Immigration and Customs Enforcement, Department of Homeland Security's ("DHS") Proposed Rule regarding "no-match" letters published in the *Federal Register* on June 14, 2006 (71 *Federal Register* 34281).

WGL is a statewide, voluntary membership, non-profit association based in Yakima, Washington, which represents growers, packers and food processors in Washington State on agricultural labor, employment and immigration issues.

The Washington Growers League fully endorses and adopts as its own position the comments submitted by the National Council of Agricultural Employers ("NCAE") on this matter. NCAE represents the interests of the agricultural industry nationally on federal public policy with respect to immigration, and

**No-Match Cert. Admin. Record  1868**

was actively engaged in the legislative and regulatory process that produced the Immigration Reform and Control Act of 1986 and Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

WGL strongly agrees with the NCAE position that unless the issues raised by the Proposed Rule are resolved legislatively in an immigration reform package that provides "bright line" guidance and protection for employers regarding work authorization compliance, SSA no-match compliance and protections against discrimination charges, the Proposed Rule will only aggravate the dysfunctional legal framework that attempts to govern the flow of undocumented workers into the U.S.

WGL also urges that consideration of the Proposed Rule be deferred pending enactment of comprehensive legislative reform.  Should DHS decide to finalize and adopt the Proposed Rule, WGL respectfully requests that the concerns and suggestions put forth by the National Council of Agricultural Employers in their comments be addressed by the final rule.

The Washington Growers League appreciates the opportunity to comment on this Proposed Rule.


Sincerely,



Michael Gempler
Executive Director

**No-Match Cert. Admin. Record  1869**



**WASHINGTON GROWERS LEAGUE**

406 West Chestnut ~ Yakima, WA 98902 ~ Phone 509-575-6315 ~ Fax 509-452-4834 ~ E-mail: info@growersleague.org

August 14, 2006

**VIA ELECTRONIC MAIL AND U.S. MAIL**

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

  **Re:** **Docket No. ICEB-2006-0004**
     **Safe Harbor Procedures for Employers Who Receive a No-Match Letter**
     **(FR 71:114, p. 34281)**

To Whom It May Concern:

The Washington Growers League ("WGL") hereby submits its comments on the Bureau of Immigration and Customs Enforcement, Department of Homeland Security's ("DHS") Proposed Rule regarding "no-match" letters published in the *Federal Register* on June 14, 2006 (71 *Federal Register* 34281).

WGL is a statewide, voluntary membership, non-profit association based in Yakima, Washington, which represents growers, packers and food processors in Washington State on agricultural labor, employment and immigration issues.

The Washington Growers League fully endorses and adopts as its own position the comments submitted by the National Council of Agricultural Employers ("NCAE") on this matter. NCAE represents the interests of the agricultural industry nationally on federal public policy with respect to immigration, and was actively engaged in the legislative and regulatory process that produced the Immigration Reform and Control Act of 1986 and Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

WGL strongly agrees with the NCAE position that unless the issues raised by the Proposed Rule are resolved legislatively in an immigration reform package that provides "bright line" guidance and protection for employers regarding work authorization compliance, SSA no-match compliance and protections against discrimination charges, the Proposed Rule will only aggravate the dysfunctional legal framework that attempts to govern the flow of undocumented workers into the U.S.

Docket No. ICEB-2006-0004
August 14, 2006
Page 2 of 2


WGL also urges that consideration of the Proposed Rule be deferred pending enactment of comprehensive legislative reform.  Should DHS decide to finalize and adopt the Proposed Rule, WGL respectfully requests that the concerns and suggestions put forth by the National Council of Agricultural Employers in their comments be addressed by the final rule.

The Washington Growers League appreciates the opportunity to comment on this Proposed Rule.


Sincerely,



Michael Gempler
Executive Director

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Mirna Torres [MTORRES@cliniclegal.org] |
| **Sent:** | Monday, August 14, 2006 3:11 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |
| **Attachments:** | safeharborprocnomatch.pdf |

**VIA E-MAIL:  rfs.regs@dhs.gov**

August 10, 2006

Direct, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC  20529

**RE:  DHS Docket No.  ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"**

Dear Sir or Madam:

The Catholic Legal Immigration Network, Inc. (CLINIC) submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employees Who Receive a No-Match Letter" at 71 Fed. Reg. 34281 (June 14, 2006).

**CLINIC's Experience of SSA No-Match Letters**

CLINIC, a subsidiary of the U.S. Conference of Catholic Bishops (USCCB), supports a national network of community-based immigration programs.  The network includes 156 affiliated immigration programs, which have 255 field offices in 48 states.  The network employs roughly 1,200 attorneys and "accredited" paralegals who, in turn, serve 400,000 low-income immigrants each year.  CLINIC and its network serve the most vulnerable migrants such as refugees, asylum seekers, detainees, families in need of reunification, laborers in the workplace, victims of domestic violence, and survivors of human trafficking.  The CLINIC network represents low-income immigrants without reference to their race, religion, ethnic group, or other distinguishing characteristic.

The CLINIC network has had ample experience of the adverse impact on U.S. workers – including work-authorized immigrants and U.S. citizens -- of the Social Security Administration's (SSA's) no-match letters. Every year CLINIC responds to severe problems caused by no-match letters in numerous cases that are brought to its attention by its member agencies, immigrant workers, and employers.  These include unjustified terminations, job resignations by persons who are authorized to work, and exploitation of workers.  The proposed rule will magnify the adverse impact of SSA no-match letters on workers' rights.

Additionally, the rule will have a limited impact at best on undocumented immigration.  In CLINIC's experience, fired workers do not leave the country.  Instead, they find more marginal jobs, often in the unregulated and dangerous underground economy.

The proposed rule will also erode privacy rights, circumvent the legislative process, and inappropriately transform SSA no-match letters into an immigration enforcement tool.

**No-Match Cert. Admin. Record  1872**

**This proposed rule would harm workers regardless of immigration status.**

CLINIC fears that many employers will fire workers due to SSA no-match letters before these workers have a chance to correct their records. The SSA database is inaccurate, and "no-matches" often occur because of name changes and clerical errors. Under this rule, hundreds of thousands of workers—including U.S. citizens and authorized noncitizens—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigation for wrongful terminations.

Unscrupulous employers use the SSA no-match letter to stymie labor organizing and to retaliate against workers who have been injured on the job or who complain of unpaid wages or other labor violations. In some cases (including arbitration decisions), employers have used no-match letters as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would exacerbate this problem.

**The proposed rule could expand the underground economy.**

Although the proposed rule purports to provide employers with guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new legal obligations may lead some businesses to go "off the books," resulting in lost revenue, unfair competition, and further exploitation of workers. The proposed rule could have the perverse effect of punishing employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage in relation to those unscrupulous employers who will simply disregard the new rule.

**The proposed rule addresses an issue in pending legislation.**

The proposed rule is badly timed. The House and the Senate have both passed bills that contain work-site enforcement mechanisms. DHS should wait for the legislative process to run its course and then revisit whether it should act on this issue.

**SSA no-match letters should not be used for immigration enforcement.**

The proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool. Yet the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about workers' immigration status or employment authorization. The database contains information about both U.S. citizens and work-authorized non-citizens, many of whom will be presumed to be undocumented simply because they appear on a no-match list. As the text of the "no-match" letter states, the letter was never intended to speak to immigration status. It does not constitute "constructive knowledge" of immigration status under the law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area.

**The proposed rule erodes privacy rights.**

DHS is barred from direct access to the SSA database by laws protecting privacy and confidentiality. These laws protect sensitive and personal information, and aim to ensure compliance with tax laws. These privacy protections will be eroded by using personal and private information in the SSA database for immigration enforcement purposes.

**The costs of implementing the proposed rule will be prohibitive.**

If the proposed rule were implemented, DHS and SSA would need to make a massive investment in employer and worker education programs in order to combat the confusion that would almost certainly follow. The proposed rule also contains unrealistic timetables for compliance. SSA will need to respond to the inevitable increase in employer and worker inquiries about the rule. The actual costs of administrating the program will be high. SSA's limited resources should go towards administering Social Security benefits, rather than enforcing immigration law.

**No-Match Cert. Admin. Record  1873**

**The proposed rule makes compliance impractical.**

While the rule protects the employer through a "safe harbor," it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

**DHS should reconsider the proposed rule.**

DHS should not risk the livelihoods of U.S. workers with a poorly conceived immigration enforcement measure that will invariably lead to the firing and exploitation of U.S. workers. We respectfully request that DHS withdraw this proposed rule.

CLINIC appreciates your consideration of these views.

Sincerely,

Donald Kerwin
Executive Director, CLINIC


*Mirna R. Torres*
Director of Legalization & Advocacy
Catholic Legal Immigration Network, Inc. (CLINIC)
415 Michigan Avenue, NE, Suite 150
Washington, DC 20017
Tel: 202.756.5550
Fax: 202.635.2649
mtorres@cliniclegal.org
www.cliniclegal.org

**No-Match Cert. Admin. Record 1874**