

# CATHOLIC LEGAL IMMIGRATION NETWORK, INC.

NATIONAL OFFICE

McCormick Pavilion • 415 Michigan Avenue, NE • Suite 150 • Washington, DC 20017 • Tel: 202.635.2556 • Fax: 202.635.2649 • Website: www.cliniclegal.org

**FIELD OFFICES**
c/o Catholic Charities
126 Desplaines
Chicago, IL 60661
Tel: 312.612.6712
Fax: 312.559.9209

2400 E. Yandell Street
Suite B
El Paso, TX 79903
Tel: 915.544.6000
Fax: 915.544.6011

12 Irving Street
Framingham, MA 01702
Tel: 508.820.4302
Fax: 508.820.0407

1672 W. Avenue J
Suite 207-A
Lancaster, CA 93534
Tel: 661.729.5546
Fax: 661.729.5547

1530 James M. Wood Blvd.
Box 15095
Los Angeles, CA 90015
Tel: 213.251.3505
Fax: 213.487.0986

501 NE 1st Avenue
Suite 200
Miami, FL 33132
Tel: 305.789.9907
Fax: 305.789.9936

FDR Station
P.O. Box 1390
New York, NY 10150-1390
Tel: 212.826.6251
Fax: 212. 826.6254

564 Market Street
Suite 416
San Francisco, CA 94104
Tel: 415.362.8677
Fax: 415.394.8696

August 10, 2006

Direct, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

**RE: DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"**

Dear Sir or Madam:

The Catholic Legal Immigration Network, Inc. (CLINIC) submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employees Who Receive a No-Match Letter" at 71 Fed. Reg. 34281 (June 14, 2006).

### CLINIC's Experience of SSA No-Match Letters

CLINIC, a subsidiary of the U.S. Conference of Catholic Bishops (USCCB), supports a national network of community-based immigration programs. The network includes 156 affiliated immigration programs, which have 255 field offices in 48 states. The network employs roughly 1,200 attorneys and "accredited" paralegals who, in turn, serve 400,000 low-income immigrants each year. CLINIC and its network serve the most vulnerable migrants such as refugees, asylum seekers, detainees, families in need of reunification, laborers in the workplace, victims of domestic violence, and survivors of human trafficking. The CLINIC network represents low-income immigrants without reference to their race, religion, ethnic group, or other distinguishing characteristic.

The CLINIC network has had ample experience of the adverse impact on U.S. workers – including work-authorized immigrants and U.S. citizens -- of the Social Security Administration's (SSA's) no-match letters. Every year CLINIC responds to severe problems caused by no-match letters in numerous cases that are brought to its attention by its member agencies, immigrant workers, and employers. These include unjustified terminations, job resignations by persons who are authorized to work, and exploitation of workers. The proposed rule will magnify the adverse impact of SSA no-match letters on workers' rights.

Additionally, the rule will have a limited impact at best on undocumented immigration. In CLINIC's experience, fired workers do not leave the country. Instead, they find more marginal jobs, often in the unregulated and dangerous underground economy.

The proposed rule will also erode privacy rights, circumvent the legislative process, and inappropriately transform SSA no-match letters into an immigration enforcement tool.

*CLINIC is a tax-exempt subsidiary of the United States Conference of Catholic Bishops*

**No-Match Cert. Admin. Record  1875**

**CATHOLIC LEGAL IMMIGRATION NETWORK, INC.**

NATIONAL OFFICE

McCormick Pavilion • 415 Michigan Avenue, NE • Suite 150 • Washington, DC 20017 • Tel: 202.635.2556 • Fax: 202.635.2649 • Website: www.cliniclegal.org

**FIELD OFFICES**
c/o Catholic Charities
126 Desplaines
Chicago, IL 60661
Tel: 312.612.6712
Fax: 312.559.9209

2400 E. Yandell Street
Suite B
El Paso, TX 79903
Tel: 915.544.6000
Fax: 915.544.6011

12 Irving Street
Framingham, MA 01702
Tel: 508.820.4302
Fax: 508.820.0407

1672 W. Avenue J
Suite 207-A
Lancaster, CA 93534
Tel: 661.729.5546
Fax: 661.729.5547

1530 James M. Wood Blvd.
Box 15095
Los Angeles, CA 90015
Tel: 213.251.3505
Fax: 213.487.0986

501 NE 1st Avenue
Suite 200
Miami, FL 33132
Tel: 305.789.9907
Fax: 305.789.9936

FDR Station
P.O. Box 1390
New York, NY 10150-1390
Tel: 212.826.6251
Fax: 212. 826.6254

564 Market Street
Suite 416
San Francisco, CA 94104
Tel: 415.362.8677
Fax: 415.394.8696

**This proposed rule would harm workers regardless of immigration status.**

CLINIC fears that many employers will fire workers due to SSA no-match letters before these workers have a chance to correct their records. The SSA database is inaccurate, and "no-matches" often occur because of name changes and clerical errors. Under this rule, hundreds of thousands of workers—including U.S. citizens and authorized noncitizens—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigation for wrongful terminations.

Unscrupulous employers use the SSA no-match letter to stymie labor organizing and to retaliate against workers who have been injured on the job or who complain of unpaid wages or other labor violations. In some cases (including arbitration decisions), employers have used no-match letters as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would exacerbate this problem.

**The proposed rule could expand the underground economy.**

Although the proposed rule purports to provide employers with guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new legal obligations may lead some businesses to go "off the books," resulting in lost revenue, unfair competition, and further exploitation of workers. The proposed rule could have the perverse effect of punishing employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage in relation to those unscrupulous employers who will simply disregard the new rule.

**The proposed rule addresses an issue in pending legislation.**

The proposed rule is badly timed. The House and the Senate have both passed bills that contain work-site enforcement mechanisms. DHS should wait for the legislative process to run its course and then revisit whether it should act on this issue.

**SSA no-match letters should not be used for immigration enforcement.**

The proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool. Yet the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about workers' immigration status or employment authorization. The database contains information about both U.S. citizens and work-authorized non-citizens, many of whom will be presumed to be undocumented simply because they appear on a no-match list. As the text of the "no-match" letter states, the letter was never intended to speak to immigration status. It does not constitute "constructive knowledge" of immigration status under the law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area.

**No-Match Cert. Admin. Record  1876**



CATHOLIC LEGAL
IMMIGRATION
NETWORK, INC.

NATIONAL OFFICE

McCormick Pavilion • 415 Michigan Avenue, NE • Suite 150 • Washington, DC 20017 • Tel: 202.635.2556 • Fax: 202.635.2649 • Website: www.cliniclegal.org

**FIELD OFFICES**
c/o Catholic Charities
126 Desplaines
Chicago, IL 60661
Tel: 312.612.6712
Fax: 312.559.9209

2400 E. Yandell Street
Suite B
El Paso, TX 79903
Tel: 915.544.6000
Fax: 915.544.6011

12 Irving Street
Framingham, MA 01702
Tel: 508.820.4302
Fax: 508.820.0407

1672 W. Avenue J
Suite 207-A
Lancaster, CA 93534
Tel: 661.729.5546
Fax: 661.729.5547

1530 James M. Wood Blvd.
Box 15095
Los Angeles, CA 90015
Tel: 213.251.3505
Fax: 213.487.0986

501 NE 1st Avenue
Suite 200
Miami, FL 33132
Tel: 305.789.9907
Fax: 305.789.9936

FDR Station
P.O. Box 1390
New York, NY 10150-1390
Tel: 212.826.6251
Fax: 212. 826.6254

564 Market Street
Suite 416
San Francisco, CA 94104
Tel: 415.362.8677
Fax: 415.394.8696

**The proposed rule erodes privacy rights.**

DHS is barred from direct access to the SSA database by laws protecting privacy and confidentiality. These laws protect sensitive and personal information, and aim to ensure compliance with tax laws. These privacy protections will be eroded by using personal and private information in the SSA database for immigration enforcement purposes.

**The costs of implementing the proposed rule will be prohibitive.**

If the proposed rule were implemented, DHS and SSA would need to make a massive investment in employer and worker education programs in order to combat the confusion that would almost certainly follow. The proposed rule also contains unrealistic timetables for compliance. SSA will need to respond to the inevitable increase in employer and worker inquiries about the rule. The actual costs of administrating the program will be high. SSA's limited resources should go towards administering Social Security benefits, rather than enforcing immigration law.

**The proposed rule makes compliance impractical.**

While the rule protects the employer through a "safe harbor," it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

**DHS should reconsider the proposed rule.**

DHS should not risk the livelihoods of U.S. workers with a poorly conceived immigration enforcement measure that will invariably lead to the firing and exploitation of U.S. workers. We respectfully request that DHS withdraw this proposed rule.

CLINIC appreciates your consideration of these views.

Sincerely,

Donald Kerwin
Executive Director, CLINIC

*CLINIC is a tax-exempt subsidiary of the United States Conference of Catholic Bishops*

3

**Khazaeli, Javad M**

**From:**       Keely Sewell [sewell@mackenzielawfirm.com]
**Sent:**       Monday, August 14, 2006 3:05 PM
**To:**         Regs, Rfs
**Subject:**    DHS Docket#: ICEB-2006-0004

**Attachments:**    proposed comment.doc



proposed
comment.doc (21 KB

Director, Regulatory Management Division U.S. Citizenship & Immigration
Services:

Please find attached the proposed comment on Safe Harbor procedures for employers who
receive a no match letter.  Thank you for your attention to this letter.

1

No-Match Cert. Admin. Record  1878

The MacKenzie Law Firm

Docket # ICEB-2006-0004

I respectfully submit that a 60-day time limit is not appropriate for reconciliation of SSA or DHS records with an employee's records. The agency should consider instead a 90-120 day time limit.

Because the proposed guidelines essentially suggest as the best option that an employer terminate an employee who cannot resolve the issues presented in a no-match letter, the 60-day time limit is not appropriate. Depriving an individual of their ability to provide for themselves and their families is a major step. By requiring employers to terminate workers who cannot, within 60 days, show documentation or else face the possibility of criminal charges for knowingly employing an illegal alien boils down to government deprivation of a right guaranteed by the liberty provision of the due process clause of the 14th amendment. While in this case due process may be met by giving the worker time to resolve the discrepancies, sixty days does not rise to the level of adequate protection. I propose that a 90-120 day time frame is more in keeping with the serious consequences that may result

Since employers often use no-match letters in an adversarial manner to work around laws protecting workers' rights, and many employers take adverse action against the employee in a misguided belief that they are complying with the no-match letter, the 60-day time limit is inadequate to protect workers. While the letters state explicitly that the employer should not take adverse action against an employee based on the letter, often this does happen. Since reinstatement of the employer is not necessarily required after the 60-day time limit has been reached[1] more time must be given to the employee, not only to show documentation but also to fight any adverse action which has occurred due to the receipt of the no match letter.

---

[1] Anica v. Wal-Mart Stores, Inc. et al., (Wash. App.2004) 84 P.3d 1231, Hoffman Plastic Compounds, Inc. v. Nat'l Labor Relations Bd., 535 U.S. 137, 140 (2002).

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Dendas, Michael [mdendas@USChamber.com] |
| **Sent:** | Monday, August 14, 2006 3:05 PM |
| **To:** | Regs, Rfs |
| **Cc:** | Amador, Angelo |
| **Subject:** | U.S. Chamber Comments; Doc. # ICEB-2006-0004-0001 |
| **Attachments:** | DHS No-Match Proposed Rule Comments 8-14-06.pdf |

**Michael W. Dendas**

Staff
Labor, Immigration, Employee Benefits
**U.S. Chamber of Commerce**
(202) 463-5621
mdendas@uschamber.com

**No-Match Cert. Admin. Record  1880**

CHAMBER OF COMMERCE
OF THE
UNITED STATES OF AMERICA
1615 H Street, N.W.
Washington, D.C. 20062
202/463-5422 · 202/463-5901 Fax

RANDEL K. JOHNSON
Vice President
Labor, Immigration &
Employee Benefits

ANGELO I. AMADOR
Director
Immigration Policy

August 14, 2006

**VIA ELECTRONIC MAIL**

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N.W., 2nd Floor
Washington, DC 20529

RE:    **DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor
       Procedures for Employers Who Receive a No-Match Letter**

Dear Director:

On behalf of the United States Chamber of Commerce ("Chamber") and the other groups
listed below we would like to submit the following comments on the proposed rule cited above.
The Chamber is the world's largest business federation, representing more than three million
businesses of every size, sector, and region.

The proposed rule would change existing regulations on how employers are expected to
respond to "no-match letters" from the Social Security Administration ("SSA") or the
Department of Homeland Security ("DHS"). This is being done at a time in which both houses
of Congress have passed legislation that includes new employment eligibility systems and
enforcement mechanisms. Thus, the Chamber requests that the regulation be withdrawn until
Congress acts regarding comprehensive immigration reform. In the alternative, the Chamber
asks for clarification regarding the substantive issues presented by the regulation as well as
additional time for employers to conform to the new system and process. No-match letter and
overall employment eligibility and verification standards include companies and organizations
across a wide spectrum of businesses and industries.

The Chamber understands several of the concerns expressed by DHS, however, we think
that the proposed rule is untimely because it undermines the current legislative process. It also
does not properly consider the economic ramifications of acting outside the Administration's
own stated goal of enacting comprehensive immigration reform. This proposed rule only
muddies the waters during this critical time of debate. The Chamber believes that new rules on
employment verification should occur within the context of comprehensive immigration reform.

**No-Match Cert. Admin. Record  1881**

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 2 of 8

We should let these discussions continue without adding new bureaucratic burdens on well-intentioned employers or penalizing needed hardworking immigrants.

I.      **Issues Addressed by the Proposed Regulation Should be Part of Comprehensive Immigration Reform Legislation.**

DHS should let Congress continue to move the immigration debate forward as a whole and not section out areas to regulate; a piecemeal approach is not prudent. Both the Senate (S. 2611) and House (H.R. 4437) bills currently pending include stringent employment eligibility and verification systems and strengthened interior enforcement procedures. They also significantly change an employer's responsibilities when verifying the identity and work authorization eligibility of its workforce. Each measure specifically addresses the case when an employer receives a no-match letter from the SSA or from DHS. It is important to let this ongoing, fruitful debate run its course without undermining it with regulations that may lead to duplicative and possibly contradictory proposals. The proposed regulation should only be enacted as part of comprehensive immigration reform. To advance an enforcement-only regulation independently—without a legalization program for current unauthorized workers and a guest worker program to address our future workforce needs—is short-sighted and not responsive to our nation's economic needs.

<u>Should DHS go forward with the proposed regulation, we request that it takes into consideration the substantive issues presented below that are of great concern to the Chamber, its members, and the other groups listed at the end of these comments:</u>

II.     **What constitutes receipt according to DHS? When Do Employers "Receive" No-Match Letters?**

The regulation does not state what happens in the instance where an SSA no-match letter goes directly to an employee at the employer's place of business. Is the employer considered to be on notice and have constructive knowledge? For this particular instance please outline what an employer should do to take advantage of the safe-harbor provision.

III.   **Constructive Knowledge and the Time Granted to an Employer to Take Reasonable Steps in Response to SSA No-match Letters and Written Notifications from DHS.**

     *A.  Constructive Knowledge Standard*

The proposed regulation would significantly increase the scope of constructive knowledge in certain circumstances. It states that "the employer's obligations under current law, which is that if the employer fails to take reasonable steps after receiving such information, and if the employee is in fact an unauthorized alien, the employer may be found to have had

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 3 of 8

constructive knowledge of that fact."[1]  The regulation defines what constitutes a "reasonable response" by an employer to a no-match letter and mandates specific steps to be taken by the employer within defined periods of time.  The regulation's preamble suggests that taking such measures may allow the employer to avoid liability and mitigate or eliminate potential penalties, but leaves much unanswered.

### B.  What Constitutes a Reasonable Response?

The proposal states that within 14 days of receipt of the no-match notice, an employer must attempt to resolve the discrepancy by checking its personnel and payroll records to determine whether the discrepancy results from a clerical error. If it is simply a clerical mistake, the employer is to contact SSA and administratively correct the information. If it is not clerical, the employer must approach the employee and confirm that the information that was provided by the employee to the employer is indeed accurate. If there was an inadvertent mistake when transmitting the information, the employer should correct immediately and inform SSA. If however, the employee says that initial information provided is accurate, the employer must direct the employee to the local SSA office where the employee has to resolve the issue.

After an employer has determined that a discrepancy is not from a clerical error on the part of the employer, the proposed regulation states that the "employer takes reasonable steps, within 14 days, to attempt to resolve the discrepancy; such steps may include: . . . if [the records] are correct according to the employee, requesting the employee to resolve the discrepancy with the Social Security Administration, such as by visiting a Social Security Administration office."[2] The regulation then goes on to state that if the discrepancy has not been resolved within 60 days, and if the employee's identity and work authorization cannot be verified at that time, then employers "must choose between taking action to terminate the employee or facing the risk that DHS may find that the employer had constructive knowledge the employee was an unauthorized alien."[3]  There are two main issues that arise from the above:

1.  These timeframes (14 days and 60 days) are not practical or fair.  Both large and small employers will be faced with challenges to meet this standard.  Large employers may receive several no-match letters at a time, which are likely to include hundreds of names. Particularly in decentralized operations, the necessary follow-up and personnel interviews will take significant man hours to accomplish. As a result, it will be very difficult to resolve all of the letters in the prescribed time period.  Small businesses face even more hurdles to comply.  They often do not have a full-time administrative staff to address these issues in a 14-day timeframe.  Small business owners often have to run the business, oversee bookkeeping, supervise employees and perform multiple administrative duties.  Adding this clerical review and follow up with each employee will only add to these tasks.  The 14-day period is accordingly not reasonable and will be unduly

---

[1] *See* Safe-Harbor Procedures for Employers Who Receive a No-Match Letter, 71 Fed. Reg. 34,282 (2006) to be codified at 8 CFR 274a) (proposed June 14, 2006).
[2] *Id*. at 34,285.
[3] *Id*. at 34,283.

burdensome for small employers as well. The allotted time by which an employer must respond to a no-match is not an adequate, nor a reasonable time-period for an employer to have to act. We therefore request that this be changed to a reasonable time frame standard, which would then acknowledge the difference in sophistication of the over seven million employers in the United States.

2. It is also unclear from the regulation as to what occurs between the 14-day and 60-day time period and request clarification on the issue. It is our assumption that the employer has 14-days to inform the employee of the discrepancy and determine whether it is a clerical mistake. Thereafter, the employer has 60-days, from the date of receipt of the letter or notice, to ensure and confirm that the discrepancy has been rectified. Thus, an employee has less than two months to work out a resolution if there is an error between themselves and the Social Security Administration, which might not be enough time. Finally, it is the Chamber's reading and understanding that as a matter of fairness and reasonableness, an employer can continue to employ an employee between the 14 and 60-day period, even if there is an unresolved discrepancy.

## IV.    Requirement to Fill Out New I-9 Forms.

As noted above, the proposed regulation requires that employers verify the employee's identity and work authorization within 60 days following notice of a discrepancy and that "the employer complete a new I-9 Form for the employee, using the same procedures as if the employee were newly hired."[4] This provision needs to be clarified for employers. Based on the proposed regulation, it seems that if there was simply a clerical error that is found within the 14-day window, the employer needs only to record that they spoke with SSA and it was worked out, but the employer does not need to complete a new I-9 Form for the employee that received a no-match. Also according to the regulation, if an employee could not resolve his or her issue with SSA regarding the no-match within 60 days, an employer may complete a new I-9 Form for that employee and continue to hire him or her as long as they do not use the disputed no-match documents to verify work authorization.

What is unclear is what an employer is to do if the employee does indeed resolve the no-match issue within the 60-day time period. Does the employer have to do a new I-9 Form to record the resolved social security number? It is the Chamber and the signatories' belief that requiring a new I-9 Form every time there is a discrepancy that must be corrected with the SSA would be a burdensome process for our employers, both financially and administratively. Oftentimes, large employers are informed of hundreds of no-matches on a monthly basis. These no-match letters are often the product of name changes for newly married or divorced employees who have not yet applied for a new social security card to reflect their new name. Having to enforce a blanket requirement that requires an employer and employee to fill out and complete new I-9 Forms for nearly every no-match would be unduly burdensome on the employer with minimal benefit to the government's interest.

---

[4] *See* Safe-Harbor, 71 Fed. Reg. at 34,283.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 5 of 8

Additionally, this process would create inconsistent results. For example, some employees change their names for any number of reasons and properly report this to the SSA. Therefore, these employees would not have a no-match, but the employee's name would be different from that listed on the original I-9 Form. This would require some employees who had a name change to fill out a new I-9 Form (those who initially forgot to report it to the SSA) but not others (those who had immediately reported their name change to the SSA). It would seem inconsistent to only require new I-9 Forms for some name changes but not others. Finally, we would like to caution DHS regarding the potential fallout from the implementation of this policy. It will create further incentives for fraud and misreporting. Employees required to fill out a new I-9 Form can simply provide new false information and documentation.

In the alternative, the employee should be required to provide documentation to the employer within a reasonable period of time, such as 120 days, establishing that the employee has corrected the discrepancy with the SSA. This additional time will allow for more accurate reporting. Otherwise, an employee may simply present new false documentation to the employer when filling out the new I-9 Form. This would not meet the objective sought by this additional requirement.

Finally, the actions an employer must take under the proposed regulation, when re-verification does not produce a satisfactory result, are vague. DHS needs to clearly state if it wants employers to terminate the employment relationship under such circumstances. Furthermore, if so, it must also state that employers should be indemnified from possible liability arising from the employee's termination in accordance with new protocol outlined in the regulation. For example, the proposed regulation states that if the "employee's identity and work authorization" is verified "even if the employee is in fact an unauthorized alien, the employer will not be considered to have constructive knowledge."[5] However, the proposed regulation is unclear as to what an employer should do when a potential United States citizen or work-authorized alien is not able to satisfy the verification requirements in the time periods allotted.

Again, the current legislative proposals specifically and clearly provide indemnification from liability to an employer who terminates an employee after following the appropriate protocol—another reason to wait for the legislative process to work. It is unclear whether a regulation could legally provide for such indemnification. Meanwhile, this proposed regulation definitely has the potential of catching even the best-intentioned employers in a new array of litigation due to a myriad of conflicting federal laws and regulations, such as those dealing with civil rights.

## V.    Totality of the Circumstances Standard.

One of the ways that an employer can be notified of a name discrepancy is through written notification from DHS. The proposed regulation explains that DHS will take into account the totality of relevant circumstances when making a determination whether the employer had constructive knowledge that the alien was unauthorized to work. It, therefore,

---

[5] *See* Safe-Harbor, 71 Fed. Reg. at 34,283.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 6 of 8

seems that receipt of notification alone is not absolutely determinative regarding whether an employer had constructive knowledge. Please provide clarification whether this reading is accurate.

Regarding the receipt of a SSA no-match letter, a comparable standard to that of the totality of the relevant circumstances is not applied. Determining whether an employer had constructive knowledge is not purely an objective finding and there should be a comparable standard included in the regulation. Imputation of constructive knowledge in all instances should depend on the totality of relevant circumstances. An example that highlights the importance of SSA taking into account the totality of the circumstances is as follows: It is common that after an immigrant enters the US they informally change their name so to "Americanize" it. More often than not the immigrant does not file for a legal name change and, as a result, this can trigger a no-match and the employee can be subsequently discharged by the employer. It is an instance like this when SSA should take into account the totality of the circumstances. That is what is reasonable and equitable and conforms to the standard used by DHS as noted in the proposed regulation.

## VI.    Accuracy and Effectiveness of the System.

As previously noted, one of the ways by which an employer can be put on notice is by receiving a written notification from DHS. Unlike SSA, DHS does not have a mechanism in place that regularly checks and reports mismatched immigration documents. Rather, DHS generally is made aware of mismatched immigration documents in the context of an I-9 Forms audit. As noted in the proposed regulation, if an employer receives a letter from DHS, s/he is expected to resolve the issue by "tak[ing] reasonable steps, within 14 days of receiving the notice, to attempt to resolve the question raised by DHS about the immigration status document or the employment authorization document."[6] However, DHS provides no specific guidance as to what those steps should be and what an employer should do to rectify the situation. We request that this process be outlined and explained and that time be provided for further comment.

In addition to the substantive issues addressed above, the proposed regulation would also adversely impact the U.S. economy and our country's national security.

## VII.    De-stabilizing Effect on the U.S. Economy.

It is estimated that annually 500,000 essential workers enter the U.S. to perform much needed labor without work authorization. Our economy not only absorbs these needed workers, but it depends on it for our current level of growth. There are currently an estimated 12 million unauthorized workers in the U.S. This proposed regulation will strip needed workers from employers without providing employers with an alternative legal channel by which to recruit to fill the gaps created by a combination of an aging workforce domestically, higher educational attainment by the domestic population, and a booming economy with full levels of employment.

---

[6] *See* Safe-Harbor, 71 Fed. Reg. at 34,285.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 7 of 8

It is well documented that about five percent of the total U.S. workforce has no work authorization. It could easily be deduced that an even smaller percentage of the total U.S. workforce is working with made up names and social security numbers. Nevertheless, this small percentage of essential workers is overrepresented in sectors of the economy and regions of the country where the gap between the availability of a domestic workforce and the jobs available is greater.

Increasing interior enforcement and strengthening the employment eligibility and verification system without a legalization program for current unauthorized workers and a guest worker program to address our future workforce needs would be detrimental to the U.S. economy and the stability of an essential workforce. This is precisely why the proposed regulation should be coupled with comprehensive immigration reform. Immigration reform must be comprehensive, not disjunctive.

**VIII.    Firing of Immigrant Workers and the Potential Growth of the Underground Economy.**

Another reality of this proposal is that if an employer receives a no-match letter, many employees will simply be fired because employers will not want to risk liability by taking unnecessary steps to remedy the situation on behalf of the employee. If terminated, those who lack work authorization will not simply leave the U.S. Rather, they will likely enter the underground workforce. This is yet one more reason why this proposal should be part and parcel of comprehensive immigration reform. As stated, we request that the regulation be held until Congress negotiates a House and Senate compromise—given that both houses of Congress have spoken of their desire to legislate in this field by passing proposals, which are quite similar in the area of worker employment eligibility and verification.

Furthermore, this proposed regulation addresses the employers who are trying to comply with the law but it does not address those underground employers who are completely non-compliant and do not complete the required I-9 Form and instead pay workers under the table. These indeed are the bad actor employers, yet the regulation gives them a free pass. By not addressing this real and thriving underground economy and only proposing increased regulations on those employers trying to act in accordance with the law, this regulation acts as an incentive for employers and employees to enter the underground economy. Workers in the black-market economy do not pay taxes and remain in the shadows and employers are not held accountable. Creating further incentives to thrive only within the underground economy is neither sound economic policy nor in our country's national security interest.

**IX.    The Fine Line Between Compliance and Violation.**

Out of fear of non-compliance with DHS's proposed regulation, employers might be extra vigilant in trying to verify an employee's identity and eligibility to work in the U.S. However, there is a fine line for the employer between ensuring that the workforce is legal and violating existing anti-discriminations laws. For example, should an employee present

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 8 of 8

documents other than a Social Security card when completing the I-9 Form and there is subsequently a no-match letter issued.  The employer then confronts the employee and request to see the Social Security card.  Clearly, this would present an issue regarding anti-discrimination laws already in effect.  The Chamber requests that DHS provide clarification on how an employer should respond to such a situation.

### X.    Conclusion

As explained, the proposed regulations are misguided and will have an adverse effect on the nation's economy and its overall national security.  For the reasons stated above, the Chamber urges DHS to withdraw this proposed regulation and to wait for Congress to finish its work on comprehensive immigration reform, as the Administration continues to insist.

We greatly appreciate the excellent relationship we have developed with the DHS and hope to continue to expand that relationship in the future as we work to address this important issue.

Respectfully submitted,

Randel K. Johnson
Vice President
Labor, Immigration and Employee Benefits

Angelo I. Amador
Director
Immigration Policy

**Also on behalf of:**

Associated Builders and Contractors

Associated General Contractors of America

American Hotel & Lodging Association

American Seniors Housing Association

College and University Professional Association for Human Resources

Ingersoll Rand Company

National Association of Convenience Stores

Professional Landcare Network

Retail Industry Leaders Association

Tree Care Industry Association

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | Dendas, Michael [mdendas@USChamber.com] |
| **Sent:** | Monday, August 14, 2006 3:07 PM |
| **To:** | Regs, Rfs |
| **Subject:** | U.S. Chamber Comments; Doc. # ICEB-2006-0004-0001 |
| **Attachments:** | DHS No-Match Proposed Rule Comments 8-14-06.pdf |

**Michael W. Dendas**

Staff
Labor, Immigration, Employee Benefits
**U.S. Chamber of Commerce**
(202) 463-5621
mdendas@uschamber.com

**No-Match Cert. Admin. Record  1889**

CHAMBER OF COMMERCE
OF THE
UNITED STATES OF AMERICA
1615 H STREET, N.W.
WASHINGTON, D.C. 20062
202/463-5422 · 202/463-5901 FAX

RANDEL K. JOHNSON
VICE PRESIDENT
LABOR, IMMIGRATION &
EMPLOYEE BENEFITS

ANGELO I. AMADOR
DIRECTOR
IMMIGRATION POLICY

August 14, 2006

**VIA ELECTRONIC MAIL**

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N.W., 2nd Floor
Washington, DC 20529

> RE:     **DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**

Dear Director:

On behalf of the United States Chamber of Commerce ("Chamber") and the other groups listed below we would like to submit the following comments on the proposed rule cited above. The Chamber is the world's largest business federation, representing more than three million businesses of every size, sector, and region.

The proposed rule would change existing regulations on how employers are expected to respond to "no-match letters" from the Social Security Administration ("SSA") or the Department of Homeland Security ("DHS"). This is being done at a time in which both houses of Congress have passed legislation that includes new employment eligibility systems and enforcement mechanisms. Thus, the Chamber requests that the regulation be withdrawn until Congress acts regarding comprehensive immigration reform. In the alternative, the Chamber asks for clarification regarding the substantive issues presented by the regulation as well as additional time for employers to conform to the new system and process. No-match letter and overall employment eligibility and verification standards include companies and organizations across a wide spectrum of businesses and industries.

The Chamber understands several of the concerns expressed by DHS, however, we think that the proposed rule is untimely because it undermines the current legislative process. It also does not properly consider the economic ramifications of acting outside the Administration's own stated goal of enacting comprehensive immigration reform. This proposed rule only muddies the waters during this critical time of debate. The Chamber believes that new rules on employment verification should occur within the context of comprehensive immigration reform.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 2 of 8

We should let these discussions continue without adding new bureaucratic burdens on well-intentioned employers or penalizing needed hardworking immigrants.

**I.    Issues Addressed by the Proposed Regulation Should be Part of Comprehensive Immigration Reform Legislation.**

DHS should let Congress continue to move the immigration debate forward as a whole and not section out areas to regulate; a piecemeal approach is not prudent. Both the Senate (S. 2611) and House (H.R. 4437) bills currently pending include stringent employment eligibility and verification systems and strengthened interior enforcement procedures.  They also significantly change an employer's responsibilities when verifying the identity and work authorization eligibility of its workforce.  Each measure specifically addresses the case when an employer receives a no-match letter from the SSA or from DHS.  It is important to let this ongoing, fruitful debate run its course without undermining it with regulations that may lead to duplicative and possibly contradictory proposals.  The proposed regulation should only be enacted as part of comprehensive immigration reform.  To advance an enforcement-only regulation independently—without a legalization program for current unauthorized workers and a guest worker program to address our future workforce needs—is short-sighted and not responsive to our nation's economic needs.

Should DHS go forward with the proposed regulation, we request that it takes into consideration the substantive issues presented below that are of great concern to the Chamber, its members, and the other groups listed at the end of these comments:

**II.   What constitutes receipt according to DHS? When Do Employers "Receive" No-Match Letters?**

The regulation does not state what happens in the instance where an SSA no-match letter goes directly to an employee at the employer's place of business.  Is the employer considered to be on notice and have constructive knowledge?  For this particular instance please outline what an employer should do to take advantage of the safe-harbor provision.

**III.  Constructive Knowledge and the Time Granted to an Employer to Take Reasonable Steps in Response to SSA No-match Letters and Written Notifications from DHS.**

*A.   Constructive Knowledge Standard*

The proposed regulation would significantly increase the scope of constructive knowledge in certain circumstances.  It states that "the employer's obligations under current law, which is that if the employer fails to take reasonable steps after receiving such information, and if the employee is in fact an unauthorized alien, the employer may be found to have had

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 3 of 8

constructive knowledge of that fact."[1]  The regulation defines what constitutes a "reasonable response" by an employer to a no-match letter and mandates specific steps to be taken by the employer within defined periods of time.  The regulation's preamble suggests that taking such measures may allow the employer to avoid liability and mitigate or eliminate potential penalties, but leaves much unanswered.

### B.  What Constitutes a Reasonable Response?

The proposal states that within 14 days of receipt of the no-match notice, an employer must attempt to resolve the discrepancy by checking its personnel and payroll records to determine whether the discrepancy results from a clerical error. If it is simply a clerical mistake, the employer is to contact SSA and administratively correct the information. If it is not clerical, the employer must approach the employee and confirm that the information that was provided by the employee to the employer is indeed accurate. If there was an inadvertent mistake when transmitting the information, the employer should correct immediately and inform SSA. If however, the employee says that initial information provided is accurate, the employer must direct the employee to the local SSA office where the employee has to resolve the issue.

After an employer has determined that a discrepancy is not from a clerical error on the part of the employer, the proposed regulation states that the "employer takes reasonable steps, within 14 days, to attempt to resolve the discrepancy; such steps may include: . . . if [the records] are correct according to the employee, requesting the employee to resolve the discrepancy with the Social Security Administration, such as by visiting a Social Security Administration office."[2] The regulation then goes on to state that if the discrepancy has not been resolved within 60 days, and if the employee's identity and work authorization cannot be verified at that time, then employers "must choose between taking action to terminate the employee or facing the risk that DHS may find that the employer had constructive knowledge the employee was an unauthorized alien."[3]  There are two main issues that arise from the above:

1.  These timeframes (14 days and 60 days) are not practical or fair.  Both large and small employers will be faced with challenges to meet this standard.  Large employers may receive several no-match letters at a time, which are likely to include hundreds of names. Particularly in decentralized operations, the necessary follow-up and personnel interviews will take significant man hours to accomplish.  As a result, it will be very difficult to resolve all of the letters in the prescribed time period.  Small businesses face even more hurdles to comply.  They often do not have a full-time administrative staff to address these issues in a 14-day timeframe.  Small business owners often have to run the business, oversee bookkeeping, supervise employees and perform multiple administrative duties.  Adding this clerical review and follow up with each employee will only add to these tasks.  The 14-day period is accordingly not reasonable and will be unduly

---

[1] *See* Safe-Harbor Procedures for Employers Who Receive a No-Match Letter, 71 Fed. Reg. 34,282 (2006) to be codified at 8 CFR 274a) (proposed June 14, 2006).
[2] *Id.* at 34,285.
[3] *Id.* at 34,283.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 4 of 8

burdensome for small employers as well. The allotted time by which an employer must respond to a no-match is not an adequate, nor a reasonable time-period for an employer to have to act. We therefore request that this be changed to a reasonable time frame standard, which would then acknowledge the difference in sophistication of the over seven million employers in the United States.

2. It is also unclear from the regulation as to what occurs between the 14-day and 60-day time period and request clarification on the issue. It is our assumption that the employer has 14-days to inform the employee of the discrepancy and determine whether it is a clerical mistake. Thereafter, the employer has 60-days, from the date of receipt of the letter or notice, to ensure and confirm that the discrepancy has been rectified. Thus, an employee has less than two months to work out a resolution if there is an error between themselves and the Social Security Administration, which might not be enough time. Finally, it is the Chamber's reading and understanding that as a matter of fairness and reasonableness, an employer can continue to employ an employee between the 14 and 60-day period, even if there is an unresolved discrepancy.

IV.    **Requirement to Fill Out New I-9 Forms.**

As noted above, the proposed regulation requires that employers verify the employee's identity and work authorization within 60 days following notice of a discrepancy and that "the employer complete a new I-9 Form for the employee, using the same procedures as if the employee were newly hired."[4] This provision needs to be clarified for employers. Based on the proposed regulation, it seems that if there was simply a clerical error that is found within the 14-day window, the employer needs only to record that they spoke with SSA and it was worked out, but the employer does not need to complete a new I-9 Form for the employee that received a no-match. Also according to the regulation, if an employee could not resolve his or her issue with SSA regarding the no-match within 60 days, an employer may complete a new I-9 Form for that employee and continue to hire him or her as long as they do not use the disputed no-match documents to verify work authorization.

What is unclear is what an employer is to do if the employee does indeed resolve the no-match issue within the 60-day time period. Does the employer have to do a new I-9 Form to record the resolved social security number? It is the Chamber and the signatories' belief that requiring a new I-9 Form every time there is a discrepancy that must be corrected with the SSA would be a burdensome process for our employers, both financially and administratively. Oftentimes, large employers are informed of hundreds of no-matches on a monthly basis. These no-match letters are often the product of name changes for newly married or divorced employees who have not yet applied for a new social security card to reflect their new name. Having to enforce a blanket requirement that requires an employer and employee to fill out and complete new I-9 Forms for nearly every no-match would be unduly burdensome on the employer with minimal benefit to the government's interest.

---

[4] *See* Safe-Harbor, 71 Fed. Reg. at 34,283.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 5 of 8

Additionally, this process would create inconsistent results.  For example, some employees change their names for any number of reasons and properly report this to the SSA.  Therefore, these employees would not have a no-match, but the employee's name would be different from that listed on the original I-9 Form.  This would require some employees who had a name change to fill out a new I-9 Form (those who initially forgot to report it to the SSA) but not others (those who had immediately reported their name change to the SSA).  It would seem inconsistent to only require new I-9 Forms for some name changes but not others.  Finally, we would like to caution DHS regarding the potential fallout from the implementation of this policy.  It will create further incentives for fraud and misreporting.  Employees required to fill out a new I-9 Form can simply provide new false information and documentation.

In the alternative, the employee should be required to provide documentation to the employer within a reasonable period of time, such as 120 days, establishing that the employee has corrected the discrepancy with the SSA.  This additional time will allow for more accurate reporting.  Otherwise, an employee may simply present new false documentation to the employer when filling out the new I-9 Form.  This would not meet the objective sought by this additional requirement.

Finally, the actions an employer must take under the proposed regulation, when re-verification does not produce a satisfactory result, are vague.  DHS needs to clearly state if it wants employers to terminate the employment relationship under such circumstances.  Furthermore, if so, it must also state that employers should be indemnified from possible liability arising from the employee's termination in accordance with new protocol outlined in the regulation.  For example, the proposed regulation states that if the "employee's identity and work authorization" is verified "even if the employee is in fact an unauthorized alien, the employer will not be considered to have constructive knowledge."[5]  However, the proposed regulation is unclear as to what an employer should do when a potential United States citizen or work-authorized alien is not able to satisfy the verification requirements in the time periods allotted.

Again, the current legislative proposals specifically and clearly provide indemnification from liability to an employer who terminates an employee after following the appropriate protocol—another reason to wait for the legislative process to work.  It is unclear whether a regulation could legally provide for such indemnification.  Meanwhile, this proposed regulation definitely has the potential of catching even the best-intentioned employers in a new array of litigation due to a myriad of conflicting federal laws and regulations, such as those dealing with civil rights.

**V.    Totality of the Circumstances Standard.**

One of the ways that an employer can be notified of a name discrepancy is through written notification from DHS.  The proposed regulation explains that DHS will take into account the totality of relevant circumstances when making a determination whether the employer had constructive knowledge that the alien was unauthorized to work.  It, therefore,

---

[5] *See* Safe-Harbor, 71 Fed. Reg. at 34,283.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 6 of 8

seems that receipt of notification alone is not absolutely determinative regarding whether an employer had constructive knowledge. Please provide clarification whether this reading is accurate.

Regarding the receipt of a SSA no-match letter, a comparable standard to that of the totality of the relevant circumstances is not applied. Determining whether an employer had constructive knowledge is not purely an objective finding and there should be a comparable standard included in the regulation. Imputation of constructive knowledge in all instances should depend on the totality of relevant circumstances. An example that highlights the importance of SSA taking into account the totality of the circumstances is as follows: It is common that after an immigrant enters the US they informally change their name so to "Americanize" it. More often than not the immigrant does not file for a legal name change and, as a result, this can trigger a no-match and the employee can be subsequently discharged by the employer. It is an instance like this when SSA should take into account the totality of the circumstances. That is what is reasonable and equitable and conforms to the standard used by DHS as noted in the proposed regulation.

## VI.    Accuracy and Effectiveness of the System.

As previously noted, one of the ways by which an employer can be put on notice is by receiving a written notification from DHS. Unlike SSA, DHS does not have a mechanism in place that regularly checks and reports mismatched immigration documents. Rather, DHS generally is made aware of mismatched immigration documents in the context of an I-9 Forms audit. As noted in the proposed regulation, if an employer receives a letter from DHS, s/he is expected to resolve the issue by "tak[ing] reasonable steps, within 14 days of receiving the notice, to attempt to resolve the question raised by DHS about the immigration status document or the employment authorization document."[6] However, DHS provides no specific guidance as to what those steps should be and what an employer should do to rectify the situation. <u>We request that this process be outlined and explained and that time be provided for further comment.</u>

In addition to the substantive issues addressed above, the proposed regulation would also adversely impact the U.S. economy and our country's national security.

## VII.    De-stabilizing Effect on the U.S. Economy.

It is estimated that annually 500,000 essential workers enter the U.S. to perform much needed labor without work authorization. Our economy not only absorbs these needed workers, but it depends on it for our current level of growth. There are currently an estimated 12 million unauthorized workers in the U.S. This proposed regulation will strip needed workers from employers without providing employers with an alternative legal channel by which to recruit to fill the gaps created by a combination of an aging workforce domestically, higher educational attainment by the domestic population, and a booming economy with full levels of employment.

---

[6] *See* Safe-Harbor, 71 Fed. Reg. at 34,285.

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 7 of 8

It is well documented that about five percent of the total U.S. workforce has no work authorization. It could easily be deduced that an even smaller percentage of the total U.S. workforce is working with made up names and social security numbers. Nevertheless, this small percentage of essential workers is overrepresented in sectors of the economy and regions of the country where the gap between the availability of a domestic workforce and the jobs available is greater.

Increasing interior enforcement and strengthening the employment eligibility and verification system without a legalization program for current unauthorized workers and a guest worker program to address our future workforce needs would be detrimental to the U.S. economy and the stability of an essential workforce. This is precisely why the proposed regulation should be coupled with comprehensive immigration reform. Immigration reform must be comprehensive, not disjunctive.

**VIII.    Firing of Immigrant Workers and the Potential Growth of the Underground Economy.**

Another reality of this proposal is that if an employer receives a no-match letter, many employees will simply be fired because employers will not want to risk liability by taking unnecessary steps to remedy the situation on behalf of the employee. If terminated, those who lack work authorization will not simply leave the U.S. Rather, they will likely enter the underground workforce. This is yet one more reason why this proposal should be part and parcel of comprehensive immigration reform. As stated, we request that the regulation be held until Congress negotiates a House and Senate compromise—given that both houses of Congress have spoken of their desire to legislate in this field by passing proposals, which are quite similar in the area of worker employment eligibility and verification.

Furthermore, this proposed regulation addresses the employers who are trying to comply with the law but it does not address those underground employers who are completely non-compliant and do not complete the required I-9 Form and instead pay workers under the table. These indeed are the bad actor employers, yet the regulation gives them a free pass. By not addressing this real and thriving underground economy and only proposing increased regulations on those employers trying to act in accordance with the law, this regulation acts as an incentive for employers and employees to enter the underground economy. Workers in the black-market economy do not pay taxes and remain in the shadows and employers are not held accountable. Creating further incentives to thrive only within the underground economy is neither sound economic policy nor in our country's national security interest.

**IX.    The Fine Line Between Compliance and Violation.**

Out of fear of non-compliance with DHS's proposed regulation, employers might be extra vigilant in trying to verify an employee's identity and eligibility to work in the U.S. However, there is a fine line for the employer between ensuring that the workforce is legal and violating existing anti-discriminations laws. For example, should an employee present

DHS Docket No. ICEB-2006-0004
August 14, 2006
Page 8 of 8

documents other than a Social Security card when completing the I-9 Form and there is
subsequently a no-match letter issued. The employer then confronts the employee and request to
see the Social Security card. Clearly, this would present an issue regarding anti-discrimination
laws already in effect. The Chamber requests that DHS provide clarification on how an
employer should respond to such a situation.

### X.     Conclusion

As explained, the proposed regulations are misguided and will have an adverse effect on
the nation's economy and its overall national security. For the reasons stated above, the
Chamber urges DHS to withdraw this proposed regulation and to wait for Congress to finish its
work on comprehensive immigration reform, as the Administration continues to insist.

We greatly appreciate the excellent relationship we have developed with the DHS and
hope to continue to expand that relationship in the future as we work to address this important
issue.

Respectfully submitted,

Randel K. Johnson
Vice President
Labor, Immigration and Employee Benefits

Angelo I. Amador
Director
Immigration Policy

**Also on behalf of:**

Associated Builders and Contractors

Associated General Contractors of America

American Hotel & Lodging Association

American Seniors Housing Association

College and University Professional Association for Human Resources

Ingersoll Rand Company

National Association of Convenience Stores

Professional Landcare Network

Retail Industry Leaders Association

Tree Care Industry Association

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | MMonroe@iupat.org |
| **Sent:** | Monday, August 14, 2006 2:21 PM |
| **To:** | Regs, Rfs |
| **Cc:** | mmonroe@iupat.org |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |
| **Attachments:** | Scan001.PDF |

DHS Docket No. ICEB-2006-0004

Attached are comments from the International Union of Painters and Allied Trades regarding the proposed regulation.  Thank you for your consideration.

**No-Match Cert. Admin. Record  1898**



INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO

202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators·
Wallcovers· Drywall
Finishers·
Painters· Decorators· Scenic
Artists· Designers· Civil
Service
Workers· Shipyard Workers·
Maintenance
Workers· Building
Cleaners· Metal Polishers·
Metalizers· Public Employees·
Clerical Workers· Professional
Employees· Security Guards·
Safety Engineers· Bridge
Painters· Riggers· Tank
Painters·
Marine Painters· Containment
Workers· Waterblasters·
Vacuum Cleaners· Sign
Painters· Sign and Display
Workers· Bill
Posters· Convention
and Show Decorators and
Builders· Paint Makers·
Glaziers· Architectural Metal
And Glass
Workers· Sandblasters
·Lead Abatement Workers·
Floorlaying and Decorative
Coverings
Workers· Journeyman
And Apprentice Commercial,
Industrial, Highway,
Residential
Construction Workers

ONE AGENDA

*VIA EMAIL*

August 9, 2006

Director
Regulatory and Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave. NW, 2nd Floor
Washington DC, 20529
rfs.regs@dhs.gov

RE:    DHS Docket No. ICEB-2006-0004

Dear Director:

The International Union of Painters and Allied Trades ("IUPAT") respectfully submits the following comments in response to DHS Docket No. ICEB-2006-0004 concerning Safe-Harbor Procedures for Employers Who Receive a No-Match Letter.    IUPAT is an ethnically diverse labor organization representing workers in the United States and Canada in the Finishing Industry.    IUPAT works closely with its signatory contractors, developers, and construction users to train workers with the skills needed to perform difficult jobs safely, and efficiently.    As an advocate for workers, our contractors and America's construction industry, IUPAT is concerned about and interested in the proposed rulemaking issued by the Department of Homeland Security ("DHS") on June 14, 2006.    IUPAT supports efforts to protect our nation and enhance the integrity of our immigration system.    IUPAT does not, however, believe that this proposed rule accomplishes these goals.    Furthermore, IUPAT is concerned about the burden the proposed rule may place on honest workers and contractors and the unintended consequences it may have on the quality of America's construction industry workforce.

I.    Introduction

Current law makes it unlawful for an employer to hire or continue to employ an employee "knowing [the employee] is (or has become) an unauthorized alien with respect to such employment." 8 U.S.C. § 1324a(a)(2). An employer may violate the law even if it lacks actual knowledge that the employee is an unauthorized alien, so long as the employer has "constructive" knowledge of the worker's unlawful status. 8 C.F.R.   § 274a.1(l)(1).   Constructive knowledge may arise if an employer does not investigate suspicious circumstances which would make a reasonable employer question the integrity or veracity of work eligibility information provided by an employee.



# INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO, CLC

202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators ·
Wallcovers · Drywall Finishers ·
Painters · Decorators · Scenic
Artists · Designers · Civil Service
Workers · Shipyard Workers ·
Maintenance Workers · Building
Cleaners · Metal Polishers ·
Metalizers · Public Employees ·
Clerical Workers · Professional
Employees · Security Guards ·
Safety Engineers · Bridge
Painters · Riggers · Tank
Painters ·
Marine Painters · Containment
Workers · Waterblasters ·
Vacuum Cleaners · Sign
Painters · Sign and Display
Workers · Bill
Posters · Convention
and Show Decorators and
Builders · Paint Makers ·
Glaziers · Architectural Metal
And Glass
Workers · Sandblasters
· Lead Abatement Workers ·
Floorlaying and Decorative
Coverings
Workers · Journeyman
And Apprentice Commercial,
Industrial, Highway, Residential
Construction Workers

ONE AGENDA

Existing DHS regulations provide illustrations of circumstances that may give rise to constructive knowledge on the part of an employer. The regulations proposed by DHS June 14, 2006 would add receipt of a DHS or Social Security Administration ("SSA") no-match letter to the list of examples giving rise to any employer having constructive knowledge. The proposed rule also directs employers to follow specific procedures and timelines when they receive no-match letters. If the recommended procedures are followed, employers are eligible for a "safe harbor" from DHS or SSA prosecution (and, as practical matter, some degree of insulation from wrongful termination lawsuits) if it is later determined that the employee at issue is out of status.

As we understand them, the recommended procedures mandate that:

1.  Within 14 days of receiving the no-match letter, the employer must determine whether the discrepancy is the result of a clerical error, such as a typographical or transcription error, in its records. If it is a clerical error, the employer must verify that the corrected name and social security number match the SSA's or DHS's records; correct the error with the SSA or DHS per the instructions in the no-match letter; and record the method, date, and time of the verification and correction. The employer should also update its records to prevent a re-occurrence. All of these steps must be completed within 60 days of the employer's receipt of the no-match letter.

2.  If the discrepancy is not the result of a clerical error, the employer must ask the employee to verify that the employer's records are correct. This request must be made within 14 days of the employer's receipt of the no-match letter. If the records are incorrect, the employer must verify that the corrected name and social security number match the SSA's or DHS's records; correct the error with the SSA or DHS per the instructions in the no-match letter or in another reasonable manner; and record the manner, date, and time of the verification and correction. The employer should also update its records to prevent a re-occurrence of the issue. All of these steps must be completed within 60 days of the employer's receipt of the no-match letter.

3.  If the employee indicates that the employer's records are correct, then the employer should ask the employee to resolve the discrepancy by contacting the SSA or DHS directly. The employee may be given up to 60 days from receipt of the no-match letter in which to correct the discrepancy. Within 3 additional days (i.e., within 63 days after the employer received the no-match letter), the employer must verify that the employee has in fact

INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO, CLC



202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators ·
Wallcovers · Drywall Finishers ·
Painters · Decorators · Scenic
Artists · Designers · Civil Service
Workers · Shipyard Workers ·
Maintenance Workers · Building
Cleaners · Metal Polishers ·
Metalizers · Public Employees ·
Clerical Workers · Professional
Employees · Security Guards ·
Safety Engineers · Bridge
Painters · Riggers · Tank Painters ·
Marine Painters · Containment
Workers · Waterblasters ·
Vacuum Cleaners · Sign
Painters · Sign and Display
Workers · Bill
Posters · Convention
and Show Decorators and
Builders · Paint Makers ·
Glaziers · Architectural Metal
And Glass Workers · Sandblasters
· Lead Abatement Workers ·
Floorlaying and Decorative
Coverings Workers · Journeyman
And Apprentice Commercial,
Industrial, Highway, Residential
Construction Workers

ONE AGENDA

resolved the discrepancy. The employer may accomplish this verification in any reasonable manner, but the proposed regulations set forth a procedure that, if followed, would provide the employer a safe harbor from liability.

4.    If the employer is unable to resolve the discrepancy within 60 days of receiving a no-match letter, or the employer needs to verify that the employee resolved the discrepancy directly with DHS or SSA, the employer must, within 63 days of receiving the no-match letter, complete a new I-9 Form for the employee as if the employee was newly hired. In completing the new I-9 Form, however, the employer may only accept documents containing a photograph of the employee and may not accept any documents containing the social security or alien number that was the subject of the no-match letter. If the employer cannot verify the employee's authorization to work through this process, the employer must terminate the employee or risk being found to have knowingly employed an unauthorized alien. If the employee can provide appropriate documentation, the employer may continue to employ the employee and, if the employee later turns out to be an unauthorized alien, the employer will not be held to have constructive knowledge of the employee's status. Following this "safe harbor" procedure protects employers from liability for unknowingly employing unauthorized aliens. It should also provide an employer with a solid defense to a wrongful or discriminatory discharge claim by an employee who is terminated as a result of a no-match letter.

These procedures constitute a significant burden on employers and failure to follow them may result in serious penalties.

II.    The Proposed Rule Places an Undue Burden on Small and Medium Sized Employers Without any Corresponding Improvement in the Verification Process

Many of IUPAT's signatory contractors are small and medium-sized businesses that usually do not have large administrative staffs. The principals of these enterprises work around the clock to draft bids, meet deadlines for projects, manage employees and address other responsibilities associated with running a successful small business. The proposed procedures will impose considerable administrative burdens on these modest operations as DHS plans to make increasing use of no-match letters to target enforcement efforts.[1]    Already

---

[1] U.S. House of Representatives Committee on Education and the Workforce, *Hearing: Lessons Learned from the Immigration Reform and Control Act of 1986* July 31, 2006 (Testimony of

INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES

202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators ·
Wallcovers · Drywall
Finishers ·
Painters · Decorators · Scenic
Artists · Designers · Civil
Service
Workers · Shipyard Workers ·
Maintenance
Workers · Building
Cleaners · Metal Polishers ·
Metalizers · Public Employees ·
Clerical Workers · Professional
Employees · Security Guards ·
Safety Engineers · Bridge
Painters · Riggers · Tank
Painters ·
Marine Painters · Containment
Workers · Waterblasters ·
Vacuum Cleaners · Sign
Painters · Sign and Display
Workers · Bill
Posters · Convention
and Show Decorators and
Builders · Paint Makers ·
Glaziers · Architectural Metal
And Glass
Workers · Sandblasters
· Lead Abatement Workers ·
Floorlaying and Decorative
Coverings
Workers · Journeyman
And Apprentice Commercial,
Industrial, Highway,
Residential
Construction Workers

ONE AGENDA

overburdened small employers will have to divert resources from running their businesses in order to meet very specific timelines for each worker they are required to re-verify. If they lose track of a single cases involving a no-match letter, it may result in criminal prosecution on the basis of "constructive" knowledge of a worker's immigration status. Such a heavy burden cannot be justified in light of the well-documented flaws in the DHS and SSA databases from which no-match letters are derived.

Studies of DHS' immigration records (both paper and electronic) that form the backbone of the current employment verification system have repeatedly raised concerns about the reliability of the data. As recently as June of this year, the Government Accountability Office warned of serious defects in DHS' newest employment verification program–the "Basic Pilot Program." These defects included the continuing inability to detect identify fraud and long delays in entering data, which resulted in inaccuracies and inconsistencies.[2] Similar problems exist with the SSA's databases. The flaws in the agencies' databases are compounded by the fact that there is no easy way to reconcile conflicting data between DHS and SSA.

The burden associated with forcing employers to undertake burdensome, detailed re-verification procedures cannot be justified when the re-verification process is triggered by and dependent on flawed government databases. Requiring employers to make fast decisions about hiring and firing workers on the basis of such inaccurate data is also likely to result in the sudden loss of employment for many workers who may actually be authorized to work in the United States. Such "false negatives" have a serious impact on workers (and the families of workers) deprived of their jobs. They also deprive employers of valued workers they depend upon to finish projects in a proper and timely manner. All this at a time when the construction industry is experiencing great difficulty in recruiting and retaining skilled, trained labor. In short, DHS should not institute a second set of employee verification procedures until it can guarantee the reliability of the databases used in this re-verification process.

If, however, DHS nevertheless proceeds with imposing this re-verification process, it should greatly increase the length of time workers and employers have to address issues that may be raised by no-match letters. IUPAT believes that the 60 day period used in the proposed rulemaking should be extended to at least 120 days. This longer period will create a realistic possibility that time consuming processes (such as reconciling discrepancies between DHS and SSA files and databases) can be accomplished before an employer is required to take action. DHS's timelines need to recognize the challenges that DHS

---

DHS Immigration Agent John Chakwin discussing desire of DHS enforcement personnel to make greater use of "No-Match" Letters to target immigration enforcement.
[2] Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts, GAO-06895T (June 19, 2006).

INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO, CLC

202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators ·
Wallcovers · Drywall
Finishers ·
Painters · Decorators · Scenic
Artists · Designers · Civil
Service
Workers · Shipyard Workers ·
Maintenance
Workers · Building
Cleaners · Metal Polishers ·
Metalizers · Public Employees ·
Clerical Workers · Professional
Employees · Security Guards ·
Safety Engineers · Bridge
Painters · Riggers · Tank
Painters ·
Marine Painters · Containment
Workers · Waterblasters ·
Vacuum Cleaners · Sign
Painters · Sign and Display
Workers · Bill
Posters · Convention
and Show Decorators and
Builders · Paint Makers ·
Glaziers · Architectural Metal
And Glass
Workers · Sandblasters
· Lead Abatement Workers ·
Floorlaying and Decorative
Coverings
Workers · Journeyman
And Apprentice Commercial,
Industrial, Highway,
Residential
Construction Workers

ONE AGENDA

and SSA will face in responding to the potentially much larger volume of inquiries the proposed "Safe-Harbor" is likely to produce.

III.    DHS' Proposed Rule Will Encourage Document Fraud and Greater Use of Employment Arrangements that Lower Wages in the Construction Industry.

Both the current approach to employer verification and this proposed rule rely upon systems and verification processes that have proven extremely vulnerable to identity theft and fraudulent documents.[3] The re-verification proposed by DHS will simply encourage desperate immigrants and the unethical labor brokers who profit from their work to possess larger quantities of fake or stolen documents.

More importantly, the detailed and burdensome procedures the proposed regulations place on employers will provide employers with more compelling reasons to insulate themselves from responsibility for employment verification by turning to labor brokers or classifying workers as "independent contractors."    Rather than assume the additional obligations within the short time periods proposed by this regulation and the associated risks of criminal and civil sanctions, employers will have greater incentives under this rule to delegate verification responsibilities to middlemen or to workers themselves. Employers will find it easier to use labor brokers or classify workers as self-employed, independent contractors and remain "willfully blind" as to the employment eligibility of the exploited, illegal immigrants who usually accept such arrangements. It is well documented that the already pervasive use of such arrangements deprives the government of tax revenue and exerts massive downward pressure on wages in the construction industry.[4] The government should not adopt policies that accelerate these trends.  Doing so will make it increasingly difficult for people lawfully entitled to work in our country and honest employers to remain in the construction industry.

IV.    Conclusion

Simply put, DHS cannot effectively amend the employee verification process without also closing the massive loopholes created by unscrupulous labor brokers, the misclassification of workers, and the large market in false and stolen identity documents.  Furthermore, DHS should not impose heavy burdens and tight timelines on employers when doing so results in no corresponding improvements to the integrity of the verification process. The proposed rule will simply drive more people to gaps in the system.  It will force employers to expend

---

[3] U.S. House of Representatives Committee on Education and the Workforce, *Hearing: Lessons Learned from the Immigration Reform and Control Act of 1986* July 31, 2006 (Testimony of John Chakwin).

[4] *Projection of the Loss in Federal Tax Revenues Due to Misclassification of Workers*, Coopers & Lybrand (1994); Planmatics, Inc., *Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs* (February 2000).



INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO, CLC

substantial resources on an unreliable verification process.  For all of these reasons, the proposed rule should not be implemented.  If, despite the concerns raised by IUPAT, however, the rule is finalized, it must at least provide more realistic timelines to allow employers, employees and government agencies to address issues raised by no-match letters.

Respectfully Submitted,

Michael Monroe
Administrator
Government Affairs

William McDevitt
Fund Administrator
Labor Management
  Cooperation Initiative

sjb/iupat 1937
f/GA-A-Z-Legislation-Safe Harbor

202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators ·
Wallcovers · Drywall
Finishers ·
Painters · Decorators · Scenic
Artists · Designers · Civil
Service
Workers · Shipyard Workers ·
Maintenance
Workers · Building
Cleaners · Metal Polishers ·
Metalizers · Public Employees ·
Clerical Workers · Professional
Employees · Security Guards ·
Safety Engineers · Bridge
Painters · Riggers · Tank
Painters ·
Marine Painters · Containment
Workers · Waterblasters ·
Vacuum Cleaners · Sign
Painters · Sign and Display
Workers · Bill
Posters · Convention
and Show Decorators and
Builders · Paint Makers ·
Glaziers · Architectural Metal
And Glass
Workers · Sandblasters
· Lead Abatement Workers ·
Floorlaying and Decorative
Coverings
Workers · Journeyman
And Apprentice Commercial,
Industrial, Highway,
Residential
Construction Workers

ONE AGENDA

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | MMonroe@iupat.org |
| **Sent:** | Monday, August 14, 2006 2:18 PM |
| **To:** | Regs, Rfs |
| **Cc:** | mmonroe@iupat.org |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |
| **Attachments:** | Scan001.PDF |

DHS Docket No. ICEB-2006-0004

Attached are comments from the International Union of Painters and Allied Trades regarding the proposed regulation.  Thank you for your consideration.

**No-Match Cert. Admin. Record  1905**



INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO

*VIA EMAIL*

202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators·
Wallcovers·Drywall
Finishers·
Painters·Decorators·Scenic
Artists·Designers·Civil
Service
Workers·Shipyard Workers·
Maintenance
Workers·Building
Cleaners·Metal Polishers·
Metalizers·Public Employees·
Clerical Workers·Professional
Employees·Security Guards·
Safety Engineers·Bridge
Painters·Riggers·Tank
Painters·
Marine Painters·Containment
Workers·Waterblasters·
Vacuum Cleaners·Sign
Painters·Sign and Display
Workers·Bill
Posters·Convention
and Show Decorators and
Builders·Paint Makers·
Glaziers·Architectural Metal
And Glass
Workers·Sandblasters
·Lead Abatement Workers·
Floorlaying and Decorative
Coverings
Workers·Journeyman
And Apprentice Commercial,
Industrial, Highway,
Residential
Construction Workers

ONE AGENDA

August 9, 2006

Director
Regulatory and Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave. NW, 2ⁿᵈ Floor
Washington DC, 20529
rfs.regs@dhs.gov

    RE:    <u>DHS Docket No. ICEB-2006-0004</u>

Dear Director:

The International Union of Painters and Allied Trades ("IUPAT") respectfully submits the following comments in response to DHS Docket No. ICEB-2006-0004 concerning Safe-Harbor Procedures for Employers Who Receive a No-Match Letter. IUPAT is an ethnically diverse labor organization representing workers in the United States and Canada in the Finishing Industry. IUPAT works closely with its signatory contractors, developers, and construction users to train workers with the skills needed to perform difficult jobs safely, and efficiently. As an advocate for workers, our contractors and America's construction industry, IUPAT is concerned about and interested in the proposed rulemaking issued by the Department of Homeland Security ("DHS") on June 14, 2006. IUPAT supports efforts to protect our nation and enhance the integrity of our immigration system. IUPAT does not, however, believe that this proposed rule accomplishes these goals. Furthermore, IUPAT is concerned about the burden the proposed rule may place on honest workers and contractors and the unintended consequences it may have on the quality of America's construction industry workforce.

I.    Introduction

Current law makes it unlawful for an employer to hire or continue to employ an employee "knowing [the employee] is (or has become) an unauthorized alien with respect to such employment." 8 U.S.C. § 1324a(a)(2). An employer may violate the law even if it lacks actual knowledge that an employee is an unauthorized alien, so long as the employer has "constructive" knowledge of the worker's unlawful status. 8 C.F.R. § 274a.1(l)(1). Constructive knowledge may arise if an employer does not investigate suspicious circumstances which would make a reasonable employer question the integrity or veracity of work eligibility information provided by an employee.

**No-Match Cert. Admin. Record  1906**



**INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO, CLC**

202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators ·
Wallcovers · Drywall Finishers ·
Painters · Decorators · Scenic
Artists · Designers · Civil Service
Workers · Shipyard Workers ·
Maintenance Workers · Building
Cleaners · Metal Polishers ·
Metalizers · Public Employees ·
Clerical Workers · Professional
Employees · Security Guards ·
Safety Engineers · Bridge
Painters · Riggers · Tank
Painters ·
Marine Painters · Containment
Workers · Waterblasters ·
Vacuum Cleaners · Sign
Painters · Sign and Display
Workers · Bill
Posters · Convention
and Show Decorators and
Builders · Paint Makers ·
Glaziers · Architectural Metal
And Glass
Workers · Sandblasters
· Lead Abatement Workers ·
Floorlaying and Decorative
Coverings
Workers · Journeyman
And Apprentice Commercial,
Industrial, Highway, Residential
Construction Workers

ONE AGENDA

Existing DHS regulations provide illustrations of circumstances that may give rise to constructive knowledge on the part of an employer. The regulations proposed by DHS June 14, 2006 would add receipt of a DHS or Social Security Administration ("SSA") no-match letter to the list of examples giving rise to any employer having constructive knowledge. The proposed rule also directs employers to follow specific procedures and timelines when they receive no-match letters. If the recommended procedures are followed, employers are eligible for a "safe harbor" from DHS or SSA prosecution (and, as practical matter, some degree of insulation from wrongful termination lawsuits) if it is later determined that the employee at issue is out of status.

As we understand them, the recommended procedures mandate that:

1. Within 14 days of receiving the no-match letter, the employer must determine whether the discrepancy is the result of a clerical error, such as a typographical or transcription error, in its records. If it is a clerical error, the employer must verify that the corrected name and social security number match the SSA's or DHS's records; correct the error with the SSA or DHS per the instructions in the no-match letter; and record the method, date, and time of the verification and correction. The employer should also update its records to prevent a re-occurrence. All of these steps must be completed within 60 days of the employer's receipt of the no-match letter.

2. If the discrepancy is not the result of a clerical error, the employer must ask the employee to verify that the employer's records are correct. This request must be made within 14 days of the employer's receipt of the no-match letter. If the records are incorrect, the employer must verify that the corrected name and social security number match the SSA's or DHS's records; correct the error with the SSA or DHS per the instructions in the no-match letter or in another reasonable manner; and record the manner, date, and time of the verification and correction. The employer should also update its records to prevent a re-occurrence of the issue. All of these steps must be completed within 60 days of the employer's receipt of the no-match letter.

3. If the employee indicates that the employer's records are correct, then the employer should ask the employee to resolve the discrepancy by contacting the SSA or DHS directly. The employee may be given up to 60 days from receipt of the no-match letter in which to correct the discrepancy. Within 3 additional days (i.e., within 63 days after the employer received the no-match letter), the employer must verify that the employee has in fact

INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO, CLC



202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators ·
Wallcovers · Drywall Finishers ·
Painters · Decorators · Scenic
Artists · Designers · Civil Service
Workers · Shipyard Workers ·
Maintenance Workers · Building
Cleaners · Metal Polishers ·
Metalizers · Public Employees ·
Clerical Workers · Professional
Employees · Security Guards ·
Safety Engineers · Bridge
Painters · Riggers · Tank Painters ·
Marine Painters · Containment
Workers · Waterblasters ·
Vacuum Cleaners · Sign
Painters · Sign and Display
Workers · Bill
Posters · Convention
and Show Decorators and
Builders · Paint Makers ·
Glaziers · Architectural Metal
And Glass Workers · Sandblasters
· Lead Abatement Workers ·
Floorlaying and Decorative
Coverings Workers · Journeyman
And Apprentice Commercial,
Industrial, Highway, Residential
Construction Workers

ONE AGENDA

resolved the discrepancy. The employer may accomplish this verification in any reasonable manner, but the proposed regulations set forth a procedure that, if followed, would provide the employer a safe harbor from liability.

4.  If the employer is unable to resolve the discrepancy within 60 days of receiving a no-match letter, or the employer needs to verify that the employee resolved the discrepancy directly with DHS or SSA, the employer must, within 63 days of receiving the no-match letter, complete a new I-9 Form for the employee as if the employee was newly hired. In completing the new I-9 Form, however, the employer may only accept documents containing a photograph of the employee and may not accept any documents containing the social security or alien number that was the subject of the no-match letter. If the employer cannot verify the employee's authorization to work through this process, the employer must terminate the employee or risk being found to have knowingly employed an unauthorized alien. If the employer can provide appropriate documentation, the employer may continue to employ the employee and, if the employee later turns out to be an unauthorized alien, the employer will not be held to have constructive knowledge of the employee's status. Following this "safe harbor" procedure protects employers from liability for unknowingly employing unauthorized aliens. It should also provide an employer with a solid defense to a wrongful or discriminatory discharge claim by an employee who is terminated as a result of a no-match letter.

These procedures constitute a significant burden on employers and failure to follow them may result in serious penalties.

II.  The Proposed Rule Places an Undue Burden on Small and Medium Sized Employers Without any Corresponding Improvement in the Verification Process

Many of IUPAT's signatory contractors are small and medium-sized businesses that usually do not have large administrative staffs. The principals of these enterprises work around the clock to draft bids, meet deadlines for projects, manage employees and address other responsibilities associated with running a successful small business. The proposed procedures will impose considerable administrative burdens on these modest operations as DHS plans to make increasing use of no-match letters to target enforcement efforts.[1] Already

---

[1] U.S. House of Representatives Committee on Education and the Workforce, *Hearing: Lessons Learned from the Immigration Reform and Control Act of 1986* July 31, 2006 (Testimony of

INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES

202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators·
Wallcovers·Drywall
Finishers·
Painters·Decorators·Scenic
Artists·Designers·Civil
Service
Workers·Shipyard Workers·
Maintenance
Workers·Building
Cleaners·Metal Polishers·
Metalizers·Public Employees·
Clerical Workers·Professional
Employees·Security Guards·
Safety Engineers·Bridge
Painters·Riggers·Tank
Painters·
Marine Painters·Containment
Workers·Waterblasters·
Vacuum Cleaners·Sign
Painters·Sign and Display
Workers·Bill
Posters·Convention
and Show Decorators and
Builders·Paint Makers·
Glaziers·Architectural Metal
And Glass
Workers·Sandblasters
·Lead Abatement Workers·
Floorlaying and Decorative
Coverings
Workers·Journeyman
And Apprentice Commercial,
Industrial, Highway,
Residential
Construction Workers

ONE AGENDA

overburdened small employers will have to divert resources from running their businesses in order to meet very specific timelines for each worker they are required to re-verify. If they lose track of a single cases involving a no-match letter, it may result in criminal prosecution on the basis of "constructive" knowledge of a worker's immigration status. Such a heavy burden cannot be justified in light of the well-documented flaws in the DHS and SSA databases from which no-match letters are derived.

Studies of DHS' immigration records (both paper and electronic) that form the backbone of the current employment verification system have repeatedly raised concerns about the reliability of the data.    As recently as June of this year, the Government Accountability Office warned of serious defects in DHS' newest employment verification program–the "Basic Pilot Program." These defects included the continuing inability to detect identify fraud and long delays in entering data, which resulted in inaccuracies and inconsistencies.[2]    Similar problems exist with the SSA's databases. The flaws in the agencies' databases are compounded by the fact that there is no easy way to reconcile conflicting data between DHS and SSA.

The burden associated with forcing employers to undertake burdensome, detailed re-verification procedures cannot be justified when the re-verification process is triggered by and dependent on flawed government databases. Requiring employers to make fast decisions about hiring and firing workers on the basis of such inaccurate data is also likely to result in the sudden loss of employment for many workers who may actually be authorized to work in the United States. Such "false negatives" have a serious impact on workers (and the families of workers) deprived of their jobs. They also deprive employers of valued workers they depend upon to finish projects in a proper and timely manner. All this at a time when the construction industry is experiencing great difficulty in recruiting and retaining skilled, trained labor. In short, DHS should not institute a second set of employee verification procedures until it can guarantee the reliability of the databases used in this re-verification process.

If, however, DHS nevertheless proceeds with imposing this re-verification process, it should greatly increase the length of time workers and employers have to address issues that may be raised by no-match letters. IUPAT believes that the 60 day period used in the proposed rulemaking should be extended to at least 120 days. This longer period will create a realistic possibility that time consuming processes (such as reconciling discrepancies between DHS and SSA files and databases) can be accomplished before an employer is required to take action. DHS's timelines need to recognize the challenges that DHS

---

DHS Immigration Agent John Chakwin discussing desire of DHS enforcement personnel to make greater use of "No-Match" Letters to target immigration enforcement).
[2] Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts, GAO-06895T (June 19, 2006).

INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO, CLC

202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators ·
Wallcovers · Drywall
Finishers ·
Painters · Decorators · Scenic
Artists · Designers · Civil
Service
Workers · Shipyard Workers ·
Maintenance
Workers · Building
Cleaners · Metal Polishers ·
Metalizers · Public Employees ·
Clerical Workers · Professional
Employees · Security Guards ·
Safety Engineers · Bridge
Painters · Riggers · Tank
Painters ·
Marine Painters · Containment
Workers · Waterblasters ·
Vacuum Cleaners · Sign
Painters · Sign and Display
Workers · Bill
Posters · Convention
and Show Decorators and
Builders · Paint Makers ·
Glaziers · Architectural Metal
And Glass
Workers · Sandblasters
· Lead Abatement Workers ·
Floorlaying and Decorative
Coverings
Workers · Journeyman
And Apprentice Commercial,
Industrial, Highway,
Residential
Construction Workers

ONE AGENDA

and SSA will face in responding to the potentially much larger volume of inquiries the proposed "Safe-Harbor" is likely to produce.

III.    DHS' Proposed Rule Will Encourage Document Fraud and Greater Use of Employment Arrangements that Lower Wages in the Construction Industry.

Both the current approach to employer verification and this proposed rule rely upon systems and verification processes that have proven extremely vulnerable to identify theft and fraudulent documents.[3] The re-verification proposed by DHS will simply encourage desperate immigrants and the unethical labor brokers who profit from their work to possess larger quantities of fake or stolen documents.

More importantly, the detailed and burdensome procedures the proposed regulations place on employers will provide employers with more compelling reasons to insulate themselves from responsibility for employment verification by turning to labor brokers or classifying workers as "independent contractors." Rather than assume the additional obligations within the short time periods proposed by this regulation and the associated risks of criminal and civil sanctions, employers will have greater incentives under this rule to delegate verification responsibilities to middlemen or to workers themselves. Employers will find it easier to use labor brokers or classify workers as self-employed, independent contractors and remain "willfully blind" as to the employment eligibility of the exploited, illegal immigrants who usually accept such arrangements. It is well documented that the already pervasive use of such arrangements deprives the government of tax revenue and exerts massive downward pressure on wages in the construction industry.[4] The government should not adopt policies that accelerate these trends. Doing so will make it increasingly difficult for people lawfully entitled to work in our country and honest employers to remain in the construction industry.

IV.    Conclusion

Simply put, DHS cannot effectively amend the employee verification process without also closing the massive loopholes created by unscrupulous labor brokers, the misclassification of workers, and the large market in false and stolen identity documents. Furthermore, DHS should not impose heavy burdens and tight timelines on employers when doing so results in no corresponding improvements to the integrity of the verification process. The proposed rule will simply drive more people to gaps in the system. It will force employers to expend

---

[3] U.S. House of Representatives Committee on Education and the Workforce, *Hearing: Lessons Learned from the Immigration Reform and Control Act of 1986* July 31, 2006 (Testimony of John Chakwin).
[4] *Projection of the Loss in Federal Tax Revenues Due to Misclassification of Workers*, Coopers & Lybrand (1994); Planmatics, Inc., *Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs* (February 2000).



INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO, CLC

202-637-0720
1-800-437-7347
Fax 202-637-0771

United Unions
Building
1750
New York
Avenue, NW
Washington, DC
20006

ONE VOICE

Representing
Protective and Decorative
Coatings Applicators ·
Wallcovers · Drywall
Finishers ·
Painters · Decorators · Scenic
Artists · Designers · Civil
Service
Workers · Shipyard Workers ·
Maintenance
Workers · Building
Cleaners · Metal Polishers ·
Metalizers · Public Employees ·
Clerical Workers · Professional
Employees · Security Guards ·
Safety Engineers · Bridge
Painters · Riggers · Tank
Painters ·
Marine Painters · Containment
Workers · Waterblasters ·
Vacuum Cleaners · Sign
Painters · Sign and Display
Workers · Bill
Posters · Convention
and Show Decorators and
Builders · Paint Makers ·
Glaziers · Architectural Metal
And Glass
Workers · Sandblasters
· Lead Abatement Workers ·
Floorlaying and Decorative
Coverings
Workers · Journeyman
And Apprentice Commercial,
Industrial, Highway,
Residential
Construction Workers

ONE AGENDA

substantial resources on an unreliable verification process.  For all of these reasons, the proposed rule should not be implemented. If, despite the concerns raised by IUPAT, however, the rule is finalized, it must at least provide more realistic timelines to allow employers, employees and government agencies to address issues raised by no-match letters.

Respectfully Submitted,

Michael Monroe
Administrator
Government Affairs

William McDevitt
Fund Administrator
Labor Management
   Cooperation Initiative

sjb/iupat 1937
f/GA-A-Z-Legislation-Safe Harbor

**Khazaeli, Javad M**

**From:**          Lydia Tamez (LCA) [lydiat@microsoft.com]
**Sent:**          Monday, August 14, 2006 2:21 PM
**To:**            'rfs.regs@dhs.gov'
**Cc:**            Lydia Tamez (LCA)
**Subject:**       DHS Docket Number ICEB 2006 0004

**Attachments:**   DHS001.TIF



DHS001.TIF (694
KB)

Dear Sir or Madam,

Please see the attachment for a comment to the proposed regulation from Microsoft
Corporation.

Thank you.

Sincerely,

Lydia G. Tamez,
Associate General Counsel
Legal and Corporate Affairs
Microsoft Corporation

1

Microsoft Corporation          Tel 425 882 8080
One Microsoft Way          Fax 425 936 7329
Redmond, WA 98052-6399     http://www.microsoft.com/



August 14, 2006

By email:  rfs.regs@dhs.gov

Director, Regulatory Management Division
United States Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW
2nd Floor
Washington, DC 20529

Re:     DHS Docket Number ICEB-2006-0004
        Comment to DHS Notice of Proposed Rulemaking
        (Safe-Harbor Procedures for Employers Who Receive a No-Match Letter)

Dear Sir or Madam:

Microsoft Corporation ("Microsoft"), the world leader in software, services and solutions that help people and businesses realize their full potential, is pleased to submit comments to the captioned Notice of Proposed Rulemaking ("NPRM") published by the Department of Homeland Security (DHS) in the *Federal Register* of June 14, 2006.

Microsoft produces software in over 40 languages and maintains operations in more than 80 countries.  Our company employs approximately 61,000 individuals worldwide, including about 36,000 U.S. workers, primarily at its corporate headquarters in Redmond, Washington. Microsoft strongly supports effective immigration enforcement.  Microsoft is committed to and invests a great deal of resources in meticulous compliance with the requirements of the Immigration and Nationality Act ("INA") and the Immigration Reform and Control Act ("IRCA") with respect to verification of employment authorization and nondiscrimination.

At the outset, Microsoft commends the DHS for seeking to provide greater clarity to employers regarding its enforcement practices and priorities.  Clearer legislation and regulations help responsible employers understand and fulfill their immigration obligations, as Microsoft does now under the existing requirements of the INA and IRCA, among other immigration legislation. Microsoft also appreciates the tremendous challenge that the government faces in tackling the widespread problem of unauthorized employment.  Microsoft supports DHS in its mission to maintain and enhance the integrity of our country's immigration laws by seeking to eliminate, punish and deter crime, fraud and unauthorized employment.  These violations of the law divert precious agency resources from legitimate immigration-benefits applications, stand as an affront to law-abiding employers and workers, and squander taxpayer money in an era of fiscal deficits.

Page 2

We cannot, however, support this NPRM. In Microsoft's view, the NPRM would place employers into an excessive enforcement role, beyond what is contemplated or appropriate based on current law and verification systems. The NPRM would also, if promulgated, result in inappropriate terminations because of lingering flaws in those data and verification systems. Moreover, the NPRM is premature, as Congress is on the brink of a major revision of the nation's employment verification system. Regulatory changes such as this proposal should be coordinated with impending legislative changes, so that employers are not faced with piecemeal and shifting compliance regimes. Microsoft appreciates the opportunity to express its concerns, and these concerns are explained in greater detail in the following paragraphs.

I.     **The NPRM would place employers too deeply into the role of immigration enforcement, even as employers would be constrained to rely upon databases with significant limitations.**

Microsoft opposes the NPRM because it would thrust employers even further into the role of enforcers, to an excessive and inappropriate degree. The NPRM, viewed together with the new DHS initiative, the ICE Mutual Agreement between Government and Employers ("IMAGE"), appears to indicate the position of DHS that employers should assume the duty to detect fraudulent documents, verify information with the government beyond the verification process currently set up under the INA, and undertake other immigration enforcement steps that exceed the proper role of private employers. This significant expansion in the role of employers is a troubling reallocation of immigration enforcement responsibilities to the private sector. This concern is aggravated by the weaknesses of the databases and systems upon which employers must rely under the NPRM, the absence of any reliable online mechanism to detect and prevent false claims to U.S. citizenship, the proliferation of identity theft, and the difficulties surrounding the loss of documents by citizens and legal residents whose possessions are destroyed in natural disasters and other calamities, such as last year's Hurricane Rita in New Orleans.

A.     The Government Accountability Office has identified significant deficiencies in the "no-match" data and the data sources.

According to a July 2006 report from the Government Accountability Office ("GAO"), the data contained within the various SSA databases is inherently unreliable for enforcement, because these databases were not developed to identify unauthorized employment. The Social Security Administration ("SSA") "no-match" data is typically drawn from SSA's Earnings Suspense Files ("ESFs"), where the remitted earnings of workers who are the subject of unresolved "no-match" letters are placed (reported such earnings totaled approximately $519 billion, as of February 2006). However, the GAO states that SSA databases, including the ESFs and the Nonwork Alien Files ("NAFs"), contain incomplete, outdated or misleading data. Enforcement activities should not rely upon obsolete information from databases plagued by technical limitations; and employers should not be forced to terminate employment relationships with valued workers, who are in fact authorized to work in the U.S., because the flawed databases do not contain and cannot provide up-to-date and accurate information.

Page 3

> B.    The "no-match" data is out-of-date by the time the DHS receives it.

Because earnings data is collected once a year and processing of the ESF data is typically completed 21-22 months after the end of the tax year, the "no-match" data will be between two and three years old by the time DHS receives it. For this reason, additional investigation is necessary to determine if unauthorized employment actually occurred. Given the lengthy delay between submission of information to the SSA and the use of that data by DHS, the "no-match" letter may often be both an unreliable trigger for civil and criminal penalties and an unwarranted catalyst prompting unreasonable employer and employee responses. These considerations take on additional weight because the "no-match" data frequently affects U.S. citizens and often results from clerical errors or name changes. The GAO highlights that most reinstatements, which occur when earnings are later credited to individuals' SSA records, are still made to U.S. citizens. The GAO also indicates that a significant number of earnings reports in ESFs belong to U.S. citizens and work-authorized noncitizens.

> C.    The current database systems to retrieve and provide the "no-match" data
> are unreliable.

Further, the database systems that must be consulted in order to carry out the follow-up verifications are not yet fully adequate for this purpose. These databases were not developed to provide and analyze "no-match" data for verification of employment eligibility; they were created specifically to ensure that workers are duly credited with their proper Social Security earnings.

The Basic Pilot Program for verification of employment authorization, created under a mandate of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, is likewise not yet prepared for the demands that would be placed on it. The program has been beset with problems that have not yet been overcome, and the problems would surely be exacerbated if the program were subjected to demands greater than its capacity. An evaluation of this program from the Institute for Survey Research ("ISR") at Temple University, in January 2002, notes that neither SSA nor legacy Immigration and Naturalization Service ("INS") had the capability to enroll and administer a program for the hundreds of thousands of employers in any of the large mandatory programs. The study concludes that the Basic Pilot Program should not be expanded to a mandatory or large-scale deployment. The ISR evaluation notes three key areas that require improvement: necessary computer and technical support improvements, accuracy and timeliness of data from legacy INS, and claims of harm to workers.

DHS provided a follow-up report to Congress in June 2004, which detailed the efforts to resolve the computer and technical problems; but it is unclear how these administrative improvements will hold up under a significant expansion of an electronic verification program. And even if employers performed all of the verification steps required in the proposed regulation, it remains entirely unclear whether the existing databases have the capacity to handle the information and to respond promptly and accurately.

Page 4

1.  *The Basic Pilot Program needs extensive computer and technical support improvements.*

One-third of the employers that participated in the Basic Pilot Program reported technical difficulties with modem connection, software, hardware and telephone lines, both before and after set-up. Moreover, approximately 40% of employers stated that SSA and INS never, or only sometimes, returned their phone calls promptly. Because of these technical limitations, which could become overwhelming with a significant program expansion, the ISR study strongly recommends against expansion of the electronic employment verification system.

2.  *The accuracy and timeliness of INS data need vast improvements.*

The ISR study notes that most federal officials who were interviewed stated that the entire system was hampered by the inadequacies of information in legacy INS databases. In fact, reports indicate that INS itself had provided an estimate of its limitations: 35 percent of cases would not receive INS verification of employment authorization because of delays in updating computer records, complications with name recognitions, and errors in the database.

3.  *Database errors have prompted complaints to the Office of Special Counsel alleging actual or potential harm to individuals.*

Many organizations have reported the consequences of these database errors, including adverse employment actions or practices, which would only be magnified if employers were required to participate in a faulty computer system. Discrimination possibly resulting from the Basic Pilot Program might be less if federal databases contain accurate and up-to-date information. The fact remains, however, that the existing databases are ill-equipped for the task.

In sum, while DHS may have made significant progress in addressing the shortcomings of the Basic Pilot Program, and while that program may ultimately be expanded and made far more reliable if it becomes the basis for a revised verification regime, it is not at this point up to the tasks that could be imposed on it under the NPRM.

D.    The "no-match" data system is not cost-effective.

Reports also indicate that issuance of "no-match" letters is not cost-efficient. Although SSA does not specifically track responses to the "no-match" letters, at the end of 2002 (when 900,000 "no-match" letters were mass-mailed), SSA noticed that the new information either corresponded to corrections from other sources or did not match up with SSA records at all. The "no-match" letters seem ineffective when compared to their cost, both to the SSA and to U.S. businesses, employees and the economy. This inefficiency is highlighted by the fact that 96.4% of earnings are assigned to valid SSA files, so only 0.6% of earnings are posted to the ESF. If SSA's utilization of "no-match" letters, which retrieve data from databases specially designed to maintain and provide access to that exact information, have proven largely unsuccessful, then the effectiveness of immigration enforcement activities that rely upon this data is called into question. This disadvantage is underscored, as discussed above, by the fact that the SSA "no-

Page 5

match" activities are undertaken with the aim of administering benefits and ensuring crediting of earnings to workers, and not with the objective of immigration enforcement against employers and employees.

**II.     The NPRM would have employers rely upon "no-match" data impaired by significant limitations, which in turn would adversely impact employment relationships with authorized workers.**

The implementation of the NPRM would also be almost certain to disrupt businesses and bring about the termination of employees who are in fact authorized to work in the United States. Further use of "no-match" data as an enforcement tool will cause confusion among employers and result in adverse employment actions, including the improper severance of numerous employment relationships with workers possessing valid employment authorization. Allowing the government to construe constructive knowledge based on this "no-match" data will be particularly injurious to employers and employees because a high proportion of the errors are based on mistaken information in flawed databases that could only be corrected through access to information in other government databases, many of which are likewise inaccurate.

When SSA sent the first wave of "no-match" letters in 2002, employers and employees alike were uncertain of the actions and responses required for compliance. Given this widespread confusion and the lack of any increase in matches, SSA revised its policy to scale back the number of employers who thereafter would receive "no-match" letters and modified the text of future letters to inform employers of the prohibition on taking adverse employment actions. Despite these changes, the current process for "no-match" letters has created an excessive risk of mistaken adverse employment actions and increased the likelihood of other serious problems. Implementation of the NPRM as a final rule will heighten the risk of inappropriate and wrongful employee terminations. Situations may undoubtedly arise in which duly authorized employees named in "no-match" letters will be dismissed as a result of errors in government databases, or the inability to quickly confirm employment eligibility through government databases. Employers, in turn, will be forced to terminate employment relationships with valued and productive workers in order to reach "safe harbor" under the terms of the regulation.

The enforcement scheme of the NPRM, reliant as it is on the "totality of the relevant circumstances" test and an overly expansive constructive knowledge standard, does not provide sufficient clarity or flexibility to overcome these risks. In addition, nothing in the NPRM seems to reflect any awareness that the volume and timing of the "no-match" letters, and the number of employees named in each SSA or DHS communiqué, are wholly beyond the control of the employer. This absence of employer control over unforeseen yet burdensome demands increases the risks still more because it heightens the likelihood that the pressures of time will trigger the hasty judgments and reactive behaviors that lead to undeserved terminations and unintended acts of discrimination.

As an example of the inaccuracy of the "no-match" data, consider probable example of the L-2 spouse of an L-1 (intracompany transferee) visa holder. The spouse is eligible for employment authorization upon approval of an application to the United States Citizenship and Immigration Services ("USCIS"), although the application need not be made immediately upon entry to the

Page 6

United States. If the L-2 spouse enters the United States in August 2006, he or she may choose not to work for some time and may be declared as a tax dependent by the L-1 visa holder for tax year 2006. The Internal Revenue Service ("IRS") would provide such a foreign national with a Taxpayer Identification Number ("TIN") for this purpose.

If, however, he or she applies for employment authorization in January 2007, and this application is approved in April 2007, then he or she may begin working, even though the spouse does not have an SSN. The employer would complete the Form I-9 upon the spouse's presentation of a USCIS-issued employment authorization document, which bears a photograph and qualifies as an identity document and an employment eligibility document under IRCA. The employer might use the TIN for purposes of reporting to the IRS, or, if the L-2 spouse has applied for a SSN, the employer may use all zeroes, as instructed by SSA. The employer would report that number to SSA for tax year 2007, and SSA would place the earnings into either an NAF or an ESF.

This information might then be the subject of an SSA "no-match" letter mailed to the employer in late 2009. Under the NPRM, DHS would be able to undertake immigration enforcement actions against the employer based on information that is over two years old, in a situation where prompt resolution of the discrepancy would be extremely difficult and time-consuming. If the employment relationship has been terminated by that time, then the employer would be hard-pressed to resolve the issue at all, let alone within 60 days. (At Microsoft, the policy and practice is to mail a letter to the employee's last known address requesting the SSN, but full resolution of course requires that the employee has not moved and is willing to provide the SSN information.) Thus, reliance upon the "no-match" data and upon flawed databases would create a "false positive" – an appearance that an employer had hired an unauthorized worker – and perhaps trigger an unnecessary government investigation, all because of institutional delays in updating data.

III.    **It is particularly ill-advised to court the problems that would result from the proposal, concerning an improper enforcement role for employers and inevitable inappropriate terminations, in view of impending legislative changes.**

It is not effective policy development to propose a significant regulatory change impacting social security recordkeeping and the employment verification obligations of U.S. employers, just when Congress is poised to act on this very issue, and without full coordination among the relevant executive agencies. Coordinated enforcement efforts among legislation, regulation and enforcement, as well as between the government and employers, will be more reliable and less burdensome. Both the Senate and the House of Representatives have passed bills to overhaul the entire process of employment verification. Section 701 of the House bill, HR 4437, would require the use of an electronic or telephonic verification, while Section 704 would impose penalties upon employers of unauthorized workers (fines begin at $5000 for the first violation, with penalties up to $25,000 for companies subject to more than one cease and desist order). The Senate bill, S 2611, would require the implementation by DHS and SSA of an Electronic Employment Verification System, and participation would be required of all employers.

Clearly, Congress intends soon to create new systems and obligations for employment verification. Given the virtual certainty of an extensive legislative amendment to the procedures

Page 7

for employment verification, including the incorporation of new rules on how information from SSA will be used in enforcement efforts, as suggested by the Administration, the NPRM is premature. The best approach for the new regulation on "no-match" procedures would be to await the legislative changes, so the new regulation can be calibrated to the new law. In this way, both the government and employers may cooperate in enforcement efforts, while avoiding the disconnected and inefficient, and possibly contradicting, implementation of new systems. Microsoft would be pleased to work with the government to participate in unified efforts to implement comprehensive reform as enacted by the Congress. Inconsistency in enforcement efforts, however, can only lead to confusion, as employers try their best to comply with conflicting responsibilities in the face of differing enforcement policies pursued by government agencies.

Indeed, the employment verification programs are just as out-of-date as the databases upon which they rely. Previous efforts at regulatory reform on Form I-9 and employment verification procedures have not generated results. There has been no finalization of earlier I-9 rulemaking initiatives, such as the publication of a proposed I-9 replacement form or an update to the Handbook for Employers, Form M-274, which was published on November 21, 1991, more than 14 years ago. The most recent guidance on this topic was provided by the publication of a September 30, 1997 interim final I-9 rule. The regulatory instructions that do exist do not match those contained in the form itself. Rather than addressing the long-standing problems with the existing system, the NPRM's program would impose upon employers additional obligations that are inconsistent with the existing myriad of piecemeal laws, regulations and cases. Promulgation of this regulation would only serve to spawn confusion among employers who strive to abide by immigration laws with competing policies and contradictory commands.

In sum, it is premature to administratively impose a significant new level of compliance demands and risks upon employers, who already devote considerable resources to these activities, if the system will soon be drastically revised under a comprehensive immigration reform law. Even with the mere proposal of this regulation, there has been confusion among employers about current compliance requirements and how to satisfy them. Because the NPRM would increase rather than decrease uncertainty, DHS should await the likely passage of legislative amendments reforms by the Senate and House of Representatives, within the next months or year, and thereby ensure a coordinated transition.

## IV.    The NPRM is overly broad because it exceeds existing employment verification mandates imposed by Congress.

Congress has clearly entrusted the DHS with the authority to enforce the immigration laws; and Congress has unmistakably mandated and detailed the employment verification procedures with which employers must comply. This guidance assists employers with maintaining a balance between the important dual objectives of verifying an individual's employment eligibility and ensuring protection against immigration-related discrimination. IRCA states that employers will have complied with employment verification requirements upon the examination of identity and employment eligibility documents that reasonably appear on their face to be genuine; in these circumstances, the employer may hire the worker, and indeed in certain circumstances may not refuse to hire the worker or demand additional proof of eligibility. This remains the case as long

Page 8

as the employer does not come into actual or constructive knowledge that the worker is not authorized to be employed. This sets the balance under current law in the role of the employer, by allowing participation in the employment verification process while actual enforcement authority remains with the government, for private employers are ill-equipped to engage in fraud detection and document authentication.

Under the provisions of IRCA, the situations where an employer is deemed to have had constructive knowledge that a worker lacked employment authorization are narrow in scope. In fact, an employer's request for additional documents may constitute document abuse and be deemed an unfair immigration-related employment practice by the Office of the Special Counsel of the Department of Justice. Similarly, the application of the constructive knowledge principle, which is not expressly stated in the relevant statute but superimposed by regulation and caselaw, is clearly limited. As discussed by the Court of Appeals for the Ninth Circuit in *Collins Foods Int'l, Inc. v. INS*, 948 F.2d 549, 555 (9th Cir. 1995), constructive knowledge should be "sparingly applied" because Congress created a narrowly drawn employment verification process that intended to balance the competing goals of preventing unauthorized employment and protecting against unlawful immigration-related job discrimination. The NPRM, however, overreaches because it would substantially expand the situations which could be deemed to give rise to constructive knowledge of unauthorized employment, all while relying upon databases that have been determined to be severely flawed in independent evaluations. Because of the fear of even the possibility of criminal prosecutions for knowingly employing unauthorized workers, most responsible employers will strain in every reasonable way to place their operations within safe harbor, yet still face potential liability for a charge of discrimination.

## V.    The NPRM would impose excessive and disproportionate burdens on companies with many employees.

For companies with many employees, the requirement to reverify employment authorization will create a disproportionate administrative burden. Even if the "no-matches" are exactly 0.5%, an employer with over 10,000 employees, for example, may be required to complete new Forms I-9 for 51 employees within 60 days of receiving the notices. For an employer like Microsoft, which has approximately 61,000 employees, receiving "no-match" letters for exactly 0.05% of staff could require reverification of up to 305 employees. Even if it took merely one hour for each reverification (for example, to retrieve and analyze the employee's file, arrange to meet with the employee, complete the Form I-9, copy the documents presented and return the file), then this task alone would take more than 38 full workdays. Further, the employer must prepare internal records to document the reasonable steps taken in order to avoid constructive knowledge liability under the "totality of the relevant circumstances" test noted in the proposed rule or to attain "safe harbor" treatment. Requiring such time-intensive verification steps within the narrow response period would undoubtedly impose a severe and costly administrative burden on large employers.

The proposal, if made final as currently phrased, could result in an annual effect on the economy of $100 million or more. According to the U.S. Census Bureau, as of 2003, there were 5,767,127 employer and 7,254,745 employer locations (collectively known as "establishments") in the United States. If each employer establishment received one "no-match" notice and expended just $50 in administrative costs to respond, then without regard to the costs of response on

Page 9

employees, the additional costs on the U.S. economy would be over $360 million. These added costs would reverberate throughout the economy and likely result in a major increase in costs or prices, as well as significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based companies to compete with foreign-based companies in domestic or foreign markets.

## VI.    The NPRM provides insufficient time to respond to the "no-match" letter.

The time periods stipulated in the NPRM vastly underestimate the likely time required to resolve "no-match" issues. The employer must check its records within 14 days of receiving the SSA/DHS notice; and the employer and employee have a total of 60 days to resolve the issue. The 14 day period within which to respond and confirm the information against company records, in particular, is too short. For a large employer like Microsoft, 10 of those 14 days will typically be exhausted by mail delivery, first by the United States Postal Service, and then within our internal mail system. In the past, we have received no-match letters from SSA in our general mail room which have been delayed for up to a week or more in arriving at the desk of the responsible staff member (usually because of incomplete addressee information for speedy internal routing). Clearly, the current time limit would leave inadequate time to research and resolve the issue, with extremely high stakes.

Moreover, SSA notes that it may take several weeks or more to get an SSN, depending on how long DHS takes to verify the immigration documents. SSA also states that it may take up to two weeks, and sometimes longer, to get a new or replacement Social Security card. For responses to DHS notices, DHS processing times for applications for employment authorization documents (EADs) are currently between two months and more than three months.

Similarly, 60 days may well be wholly inadequate for diligent follow-up action by employees and employer representatives where the cooperation of third parties (such as state government recordkeeping agencies, DHS, SSA, hospitals and churches maintaining birth and marriage records, and state departments of motor vehicles) is required in order to secure corroborative documentation of identity or employment eligibility. Given that the cooperation of parties outside of the control of the employer and/or the employee may be essential, safe harbor should nonetheless be available in circumstances where an employer can demonstrate that diligent pursuit of required documentation to reverify Form I-9 has occurred beyond a normally applicable safe harbor deadline.

In addition, these applications for substitute documents are possible only if the employee is eligible to apply for them. There may be instances where an individual with employment authorization (whether a U.S. citizen or foreign national) may be unable to present any substitute documents at all for reverification, because he or she does not have and cannot obtain any document(s) that do not reference the SSN and/or Alien number that was the subject of a "no-match" notice from DHS or SSA.

This burden may well be daunting or insurmountable. Under the NPRM, an employee could not present an original letter from SSA retracting its "no-match" notice and reaffirming the validity of the previously challenged SSN. A U.S. citizen under 18 could not present an original school

Page 10

record or report card, clinic, doctor or hospital record, day care or nursery school record, although these documents (which often may lack a photograph) are now acceptable Column B documents that can establish identity for I-9 purposes. In addition, U.S. citizens, lawful permanent residents or nonimmigrants in valid work visa status, whose personal documents are destroyed in hurricanes, fires or natural disasters or who are victims of identity theft and must confirm their identity, may not be in a position to establish satisfactory evidence to allow I-9 reverification without appropriate photo identification.

**VII.    There remains substantial uncertainty whether the very agencies whose collaboration is necessary under the NPRM are in proper accord with the approach set out in the proposed regulation because of competing policy priorities.**

It remains unclear whether all of the relevant agencies are in agreement over the proper role of the "no-match" information in the immigration enforcement regime. Implementation of the NPRM will impact the budgets and operations of SSA and IRS most greatly, but the Equal Employment Opportunity Commission, the Department of Justice and the Office of Special Counsel for Unfair Immigration-Related Employment Practices, and state government recordkeeping agencies and departments of motor vehicles will also be affected. It is extremely dangerous policy and practice to set in place a regulatory system in advance of the full development of a collaborative process involving all of the agencies whose information and cooperation would clearly be necessary to the success of the program, particularly when the chances are significant that Congress will soon design and mandate a new, coordinated system.

In particular, the GAO report notes how the IRS has repeatedly voiced concern that additional disclosure of information may discourage voluntary filing and payment of taxes. As stated above, $519 billion languishes in the ESF as a result of taxpayers and employers complying with their tax payment and withholding obligations. The GAO report specifically notes IRS concerns that if earnings data and other SSA information are shared with DHS, some workers may move into underground jobs and avoid their tax obligations altogether. For its part, the SSA has indicated that its purpose in issuing the "no-match" letters is to ensure that earnings are credited to the accounts of deserving workers.

Data-sharing among agencies is undoubtedly useful in carefully controlled circumstances, but there are other key policy concerns set out in statutes and regulations that govern the collection, use, and sharing of individuals' taxpayer identifying information that might be compromised. The purpose of these laws is to protect sensitive taxpayer identifying data, a concern that is heightened by the current proliferation of identity theft. The IRS is one of the nation's largest repositories of personal information, and data-sharing among agencies may also implicate the Privacy Act of 1974, where data obtained for one purpose may not be used for another purpose without public notification or the individual's consent.

**VIII.   Conclusion**

Microsoft thanks the Department of Homeland Security for the opportunity to comment on this proposed regulation. In summary, Microsoft strongly endorses appropriately strengthened policies for immigration enforcement. This proposal, however, would do more harm than good.

Page 11

The NPRM should be withdrawn so that authority over immigration enforcement remains housed squarely with DHS rather than with employers; adverse employment actions do not injure employers and employees; and policy developments may be calibrated appropriately to impending legislative changes. This will allow employers to ensure compliance with the requirements of legislation and regulations, while maintaining consistency in the execution of the laws.

Sincerely,

Lydia Tamez
Associate General Counsel
Law and Corporate Affairs
Microsoft Corporation

**cc: By facsimile (202-395-3888)**

Steven D. Aitken
Acting Administrator
Office of Information and Regulatory Affairs
Office of Management and Budget
725 17th Street, NW
Washington, DC 20503

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Kevin McColaugh [KMcColaugh@horsecouncil.org] |
| **Sent:** | Monday, August 14, 2006 2:18 PM |
| **To:** | Regs, Rfs |
| **Cc:** | 'Craig Regelbrugge'; jhickey@horsecouncil.org |
| **Subject:** | AHC Comments on DHS Proposed Mismatch Rule |
| **Attachments:** | AHC Comments on DHS Proposed Mismatch Rule.doc |

Please find our comments attached.  Thank you.

**Kevin J. McColaugh**
American Horse Council
1616 H Street NW, 7th Floor
Washington, DC 20006
(202) 296-4031

**No-Match Cert. Admin. Record  1924**



**AMERICAN**
**HORSE COUNCIL**

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

**Re:    Docket No. ICEB-2006-0004**
**Safe Harbor Procedures for Employers Who Receive a No-Match**
**Letter (FR 71:114, p. 34281)**

To Whom It May Concern:

The American Horse Council is concerned with the Bureau of Immigration and
Customs Enforcement, Department of Homeland Security's ("DHS") Proposed Rule
regarding "no-match" letters published in the *Federal Register* on June 14, 2006 (71
*Federal Register* 34281). We would like to incorporate by reference, in entirety, the
comments filed by the National Council of Agricultural Employers.

The American Horse Council represents 185 equine organizations in Washington, DC
before Congress and the federal regulatory agencies. These organizations include breed
registries, national and state breeders associations, state horse councils, recreational
associations, organizations representing horsemen, horse shows, recreational riders,
rodeos and numerous other equine related stakeholders. These organizations include
several hundred thousand individual horse owners of all breeds and disciplines and
industry service providers involved in virtually every facet of the horse world.

Sincerely,

James J. Hickey, Jr.
President

1616 H Street NW 7th Floor  •  Washington DC 20006  •  202-296-4031  •  Fax 202-296-1970
Email: AHC@horsecouncil.org  •  Web Address: www.horsecouncil.org

No-Match Cert. Admin. Record  1926

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Leslie Miller [lmiller@forgemasteriron.com] |
| **Sent:** | Monday, August 14, 2006 2:15 PM |
| **To:** | Regs, Rfs; BEVERLY BESEDICK |
| **Subject:** | DHS Docket #ICEB-2006-004 |

**Attachments:**    AR-BC320_20060814_121939.pdf



AR-BC320_200608
14_121939.pdf (...

         AR-BC320_20060814_121939.pdf;

1



716 Commercial SE  *  P.O. Box 25444  *  Albuquerque NM  87125
Phone: (505) 242-8284  *  Fax: (505) 242-8327

American Subcontractors Association (ASA)
1004 Duke Street
Alexandria VA  22314-3588
Reference: DHS Docket No ICEB-2006-004
Phone:  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    Fax:  703-836-3482
E Mail: asaoffice@asa-hq.com
August 14, 2006

To Whom It May Concern:

As I read the article on the proposed regulation change on the definition of "knowing" as it is related to unauthorized aliens in the United States, all I could think about is all the extra information the government is now trying to make companies responsible for compiling.  Starting in 1986, companies started having to fill out and keep track of employee information on I-9 forms.  We were given lists of acceptable and unacceptable documents that we were allowed to use for completing the I-9 Form.  We were also informed that we could not pick and chose which documents that we would accept from an individual in completing the I-9 Form.  We were informed that we had to fill out the new I-9 form for each new employee that was hired.

We are also required to call the Social Security Administration to verify that the Social Security Number and Name the employee furnished to us at time of hire match.  Again we were informed that we could not fire an individual who was already hired if their Social Security Number and Name did not match.  We also cannot get this information in advance of hiring an individual at our company.  We could be sued for discrimination.

To protect our company, even though it is not required, we instituted a policy of making copies of all information given to us at the time of hire. This policy has come in handy when we have received the SSA - No Match letters.  I go to the I-9 File folder and pull that specific employee's information to make sure that the information I gave the SSA is both correct and accurate on my end.  If it is, I inform the employee in question to go down to the SSA and get a correct Social Security Number.  If there is a problem with the Social Security Number and the employee name not matching, our company would give the employee in question time off during SSA business hours to go and rectify the problem.  However we would not pay them for this time off.

**No-Match Cert. Admin. Record  1928**

I do not feel that 14 days is sufficient time to correct No Match letters. The SSA starts counting days from the day they send out the request for information. If the No Match letter is mailed during peak mail periods such as when companies mailing out W-2's and tax forms, there could be a delay in a company receiving this information. This would make it hard for the payroll clerk to have the time to properly research the information in the 14 days allotted. I would suggest 20 to 30 days would be more reasonable. Giving a company 60 days to review, complete, and fix all the necessary paperwork for an employee with incorrect information is also unreasonable. If the employee were out on vacation, sick leave, or on Family Leave, the payroll clerk would not be able to talk to the individual until they got back.

The proposal of having an employee bring in completely new documentation after 60 days if the problem with the old Social Security Card cannot be resolved does not eliminate the problem. We would just have to start all over with the paper work using a different name. It takes approximately 2 hrs to fill out the necessary paperwork and make the necessary copies when our company sets up a new employee. We also have to fill out and send the New Mexico State New Hire Reporting Form. This will add approximately another hour of time to get all necessary paper work completed and ready to mail to the correct authorities.

The financial impact on our company is harder to estimate. If we have to fire and hire a new employee, it could cost us potentially $2,500.00 per employee. We are a small company and these new rules would impact our delivery schedules and work load tremendously.

I do not see in any of these proposed changes how the employer will be protected if the employee is no longer at this place of employment. Or with Discrimination or Wrongful Termination suits when we have to let an employee go because of these proposed changes. The government already makes us responsible for many things: filling out I-9 Forms properly, calling to check on Social Security Numbers and Name matches, and documenting the information of whom you talked to, date and time of call in case our company needs prove we called. New Hire Documents so that they can track when new employees are hired. We do this because if the employee owes child support, back child support, garnishments from other settlements the various agencies can collect. The government is adding additional burdens of paperwork to the employer. There is no set safe recourse for the employer to take if the employee refuses or cannot produce the correct documentation.

Sincerely yours,

Robin E Stone-May
Payroll Administrator
ForgeMaster Iron

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | John Farner [jfarner@anla.org] |
| **Sent:** | Monday, August 14, 2006 1:55 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Comments regarding Docket No. ICEB-2006-0004 (FR 71:114, p. 34281) - Safe Harbor Procedures for Employers Who Receive a No-Match Letter |
| **Attachments:** | ANLA_SSA No match_8_14_06.pdf; Monte Lake Testimony before House Small Business Cmte_final.pdf |

Attached, please find the American Nursery and Landscape Association's comments regarding the Safe Harbor Procedures for Employers Who Receive a No-Match Letter proposed rule as well as supporting documentation.

Thank you.

John Farner

_____
*John R. Farner, Jr.*
Director of Legislative Relations
American Nursery and Landscape Association
1000 Vermont Avenue, Suite 300
Washington, DC  20005
Phone: 202-741-4843 (direct)
Cell: 202-436-6639
Fax: 202-789-1893
jfarner@anla.org

**No-Match Cert. Admin. Record  1930**



## AGRICULTURE COALITION FOR IMMIGRATION REFORM

**Statement of Monte B. Lake**
**on behalf of the Agriculture Coalition for Immigration Reform, National Council of**
**Agricultural Employers and American Nursery and Landscape Association**

**before the**

**Subcommittee on Workforce, Empowerment and Government Programs of the House**
**Committee on Small Business**

**June 27, 2006**

Madame Chair Musgrave and members of the Subcommittee:

I appreciate the opportunity to testify on behalf of the Agriculture Coalition for Immigration Reform, referred to as ACIR, and its national co-chair organizational leaders, the American Nursery and Landscape Association (ANLA) and National Council of Agricultural Employers (NCAE). ACIR is a coalition of over 150 state, regional and national agricultural organizations and commodity groups, representing thousands of employers and formed six years ago for the purpose of promoting comprehensive immigration reform as it relates to agricultural employers.

ANLA and NCAE were also actively engaged in the legislative and regulatory process that produced the Immigration Reform and Control Act of 1986 and Illegal Immigration Reform and Immigrant Responsibility Act of 1996. A substantial number of the members of ACIR, ANLA and NCAE are small family farming, ranching and nursery businesses that would be directly and seriously affected by the reform legislation currently being considered by Congress. These organizations are uniquely situated to provide meaningful comments and insights into issues concerning immigration policy and how it affects the employment practices of its members' businesses, and the availability of an adequate agricultural labor supply.

My name is Monte B. Lake. I am a partner in the labor and employment law firm of McGuiness Norris & Williams, LLP in Washington, D.C. In addition to serving as employment and immigration law counsel to ACIR, ANLA and NCAE, I have represented a number of small businesses engaged in agricultural and horticultural operations throughout the United States in their efforts to comply with the requirements of federal immigration and employment law over the past 20 years. In addition, I served as counsel to and was actively engaged in the legislative

and regulatory processes surrounding the adoption of the Immigration Reform and Control Act of 1986 (IRCA) and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA).

In summary, my testimony here today will focus on the enforcement and employment eligibility verification provisions of Title VII of H.R. 4437, the immigration bill passed by the House of Representatives on December 16, 2005 and their anticipated impact on agricultural employers, a substantial number of which are small family-run businesses. American agriculture over the past 20 years has supported a simple, effective and nondiscriminatory process of determining the employment eligibility of new hires. Today, similar to when IIRIRA was being considered 10 years ago, American agriculture would support electronic verification of employment eligibility, as long as the process is simple, manageable, provides a bright line of compliance responsibilities and is coupled with a viable means of obtaining legal workers when there is an insufficient domestic workforce.

My comments on Title VII of H.R. 4437 are made in the context of the failures of IRCA and IIRIRA and the so-called Social Security mismatch problem that has complicated the already difficult, and confusing employer compliance challenges imposed by these laws. After 20 years of experience with ineffective and frustrating employment eligibility verification laws, it is time for Congress to get it right. "Getting it right" means eliminating fraudulent documents through an effective telephonic and electronic verification system but also implementing a simple and user-friendly system that accommodates the practical day to day realities of the hiring process necessarily used by many employers.

It also is imperative that Congress understand that immigration reform must not be limited to an effective employment eligibility verification system that removes the so-called "job magnet" and increased worksite enforcement. Without comprehensive immigration reform that, in addition to eliminating the job magnet that attracts undocumented workers, also includes substantial reform of the H-2A temporary and seasonal agricultural worker program and a means by which experienced agricultural workers may earn legal status, American labor intensive agriculture and related service sectors including landscape installation and maintenance will face a labor catastrophe. As noted later in my testimony, American labor intensive agriculture is predominantly undocumented—not because farmers and ranchers ignore the law—but because the current law is dysfunctional and provides no viable means of obtaining legal agricultural workers. The continued economic viability of U.S. agriculture and related sectors are at stake. We urge this Committee to support efforts to address the immigration problem in a comprehensive manner.

## Lessons from IRCA and IIRIRA

Two essential components of IRCA are employers' obligation to comply with the employment eligibility requirements of the law and face sanctions if they do not, and provisions prohibiting unfair immigration-related employment practices based on citizenship status and national origin. The employer sanctions provisions require employers to provide employees a menu of some 29 different document combinations set forth on the I-9 Form provided by the Department of Homeland Security (DHS) from which applicants can attempt to establish their

2

No-Match Cert. Admin. Record  1932

identity and work authorization. Employers have an obligation to view the documents offered by applicants and make a judgment as to whether they reasonably appear genuine on their face. Court decisions interpreting the facial genuineness of document standard have found it to be a minimal standard that does not require employers to be forensic document experts.

The experience of the employers we have represented over the past 20 years since IRCA's enactment shows that employers are easily confused by the large number of documents that may evidence work eligibility, with many of the documents being unusual or of limited validity, putting employers in a position of uncertainty as to their legality. The small employers we represent strongly favor a limitation on the number of acceptable employment eligibility documents in order to make compliance simpler and less confusing.

The anti-discrimination provisions of IRCA represent a well-intended attempt to prevent employers from assuming that persons of particular ancestry or ethnic backgrounds are likely to be illegal aliens and thus refrain from hiring them. After the enactment of IRCA, agricultural organizations throughout the U.S. conducted extensive compliance programs for employers, informing them of their obligations under these new laws. Such programs often were conducted with the participation of lawyers from the then Immigration and Naturalization Service (INS) and the Department of Justice's Office of Special Counsel for Immigration Related Unfair Employment Practices (OSC). Unfortunately, lawyers from these agencies with very distinct missions often would not agree as to what employer compliance obligations were, given the tension created by one component that encouraged vigilant review of work eligibility documents and another that stressed that employers face discrimination charges if they were too aggressive in evaluating the documents presented during the work authorization process.

The result of these competing provisions of the law was a lack of compliance clarity for the employer community. During the past 20 years we have represented more employers who were charged with discrimination under IRCA for being overly zealous in complying with the employment eligibility requirements, than employers charged with violating the employer sanctions provisions. The specifying of certain documents or requesting more than the minimal amount of documents was treated by OSC as document abuse and a *per se* violation of the antidiscrimination provisions under what it interpreted as a strict liability standard. This resulted in a high level of frustration from well- intended employers caught in the jaws of an IRCA vice that they viewed as inherently contradictory.

In 1996, Congress again turned its attention to immigration reform and attempted to address some of the above-described employer concerns created by IRCA. Under IIRIRA, the so-called document abuse provisions that resulted in numerous discrimination complaints against well-intended employers were modified to clarify that document specification or over-documentation required a showing of discriminatory intent, rather than establishing a strict liability standard. This was a positive development. IIRIRA also amended IRCA to require a reduction in the number of documents acceptable for completion of the I-9 Form. On September 30, 1997, the INS issued an interim rule stating that it intended to implement a new document reduction program and revise the I-9 Form and provide guidance to employers.[1] Until a final rule was issued, employers were informed that they could continue to use the current I-9

---

[1] 62 Fed. Reg. 51,001 (Sept. 30, 1997).

3

Form (edition 11/21/91) and documents listed on it as acceptable without being subjected to liability. Today, nearly 10 years later, a final rule and revised I-9 Form still have not been issued.

IIRIRA also established the pilot electronic employment eligibility verification programs. H.R. 4437 would make the basic pilot program mandatory and universal and my testimony later addresses the features of this legislation.

**The Social Security Mismatch Problem**

For over ten years, agricultural employers, like many others, have received so-called Social Security mismatch letters. These letters are sent by the Social Security Administration (SSA) after employers file the Form W-2 tax and wage information and SSA determines that the names and Social Security numbers (SSN) do not match or that the SSN is invalid. Employers are required to inform employees of the problem and correct any mistakes that resulted in the mismatch. Explanatory materials sent to employers regarding the mismatch problem have stated that the Federal Privacy Act (5 U.S.C. §552a(I)) prohibits the use of the information received from SSA records "for purposes other than that to which it was requested" and that persons who violate this prohibition are subject to fines and imprisonment. The purpose for which the letters are sent is to ensure that SSA wage information is accurately reported to the benefit of the worker.

The employers that we represent have had great concern regarding whether the mismatch letters put them on notice that they may be in violation of the employment authorization provisions of the immigration law, since the Social Security card is one of the most commonly used employment authorization documents. The Privacy Act provisions referenced above suggest that use of the letters for immigration purposes is inappropriate; however, opinion letters issued by INS indicate that under certain circumstances, mismatch letters could provide evidence of constructive knowledge that an employee was in undocumented status in violation of IRCA. Immigration and employment lawyers are not in agreement as to whether mismatch letters impose immigration compliance obligations. There is no doubt, however, that mismatch letters put employers in another untenable position regarding immigration law compliance and add to their anxiety about the legal status of their workers.

On June 14, 2006 DHS issued a proposed rule that states its position that employers that receive SSA mismatch letters may be shown to have constructive knowledge that an employee referred to in the letter is not authorized to work in the U.S. The rule states that an employer that fails to take reasonable steps to follow up on written notice from SSA regarding the validity of an SSN or DHS regarding employment authorization may be liable under immigration law. It also provides a set of procedures that, if followed by the employer, may provide a safe harbor from liability. Under the proposed rule, an employer would have between 14 and 60 days, depending on the circumstances, to verify the legitimacy of an employee's documents, and if an employer could not do so during the required period, it would have to terminate the employee or face potential liability.

4

While DHS' rule is welcome to the extent that it provides clarity and a bright line for compliance steps, it does not eliminate the potential for the employer to be sued for discrimination. A decision recently issued by the U. S. Court of Appeals for the Tenth Circuit in *Zamora v. Elite Logistics, Inc.,* (No. 04-3205) (10th Cir. June 6, 2006), illustrates the treacherous path employers tread when they engage in post-hiring verification of Social Security cards of employees, once the validity of the card has been called into question. The court in *Zamora* reversed a grant summary judgment for the employer in a Title VII discrimination claim based on race or national origin. The case involved circumstances in which an employer followed up on information it received in auditing its I-9 Forms that the plaintiff, who had satisfied the employment verification requirements when initially hired, had a Social Security number that had been used by another person on three different occasions in another state. The employer's effort to verify the validity of plaintiff's Social Security card and the alleged facts that stemmed therefrom resulted in an allegation of discrimination, which the Court of Appeals held needed to be determined by a trier of fact. As has been the case with IRCA's sanctions and antidiscrimination provisions, the Social Security mismatch problem retains the "damned if you do and damned if you don't" dilemma that employers face.

**Does Title VII of H.R. 4437 Correct the Employment Eligibility Verification Problems of IRCA, IIRIRA and the Social Security Mismatch Process or Create New Ones?**

The problems associated with IRCA, IIRIRA and Social Security mismatch letters provide a clear set of standards against which to measure the improvements that Title VII of H.R. 4437 seeks to achieve. Employers will measure the merits of any reformed employment eligibility verification system based on the answers to the following questions:

1. Does the legislation screen out unauthorized persons in a manner that simplifies the hiring process with a minimum of administrative burdens for employers?

2. Does the legislation provide employers clear-cut compliance standards, that if complied with, do not put employers at risk of unlawfully discriminating?

3. Does the legislation impose reasonable penalties upon employers that do not comply with its employment eligibility verification provisions?

4. Does the legislation eliminate the existing confusion with regard to Social Security mismatch letters?

5. Does the legislation provide a viable means for employers to obtain legal workers, in addition to containing a telephonic and electronic employment verification system?

**1. Does the legislation screen out unauthorized persons in a manner that simplifies the hiring process with a minimum of administrative burdens for employers?**

ACIR members support the mandatory and universal employment verification system concept that is incorporated in H.R. 4437 in the context of comprehensive reform. Part of the appeal of its verification approach is that it has the capacity to simplify and bring certainty to the

No-Match Cert. Admin. Record  1935

hiring process and, for the first time, effectively screen out unauthorized workers who have relied upon fraudulent documents in the past.

### The Legislation Must Result in A Significant Reduction of Acceptable Employment Authorization Documents, Preferably a Single Social Security-type Document

While Title VII of H.R. 4437 does not directly reduce the number of documents that may be used to establish identity or employment authorization, section 707 mandates that the Commissioner of Social Security, Secretary of DHS and Attorney General evaluate within 9 months of enactment, the viability of establishing a durable plastic Social Security card with an encrypted machine-readable electronic identification strip with a digital photograph for use as a single employment authorization and identity document. The study would include an assessment of the use of such a card to verify employment eligibility through a unified document database.

ACIR supports the establishment of a single card for purposes of employment verification. It would simplify the hiring process and eliminate the confusion that often accompanies the current process. Moreover, it would help eliminate the problem of document abuse (requesting more or different documents than are required) in violation of IRCA's antidiscrimination provisions that we previously have described. H.R. 4437 would be improved if it provided an alternative means of document reduction if the mandated study concludes that technology or administrative challenges preclude the adoption of a new Social Security card to be the exclusive employment authorization document in the near future.

### The Option of Telephonic or Computer-based Verification Should be Retained

Many small agricultural and small business employers do not have traditional offices. Their businesses often are located in remote rural areas where internet services may not be readily available. Some do not use computers in their businesses. Thus, it is important that the option of telephonic, as opposed to computer-only verification, be available. The House bill allows and should retain this option.

### The Verification Database Should Not be Universally Implemented Prematurely Nor Applied Retroactively In Order to Enable It to Adjust to the Tremendous Demands to Be Imposed Upon It.

ACIR members are concerned about the capacity of a universal and mandatory verification system to handle within a relatively short timeframe the tremendous volume of employer, recruiter and referrer verification requests mandated by the legislation. The timeframes established by H.R. 4407 are ambitious. All employers, recruiters and referrers must use the new verification system to determine the employment eligibility of new hires two years after enactment. Previously hired employees who were hired under the old visual document inspection system must be reverified under the electronic system within 6 years of enactment, unless they are a governmental entity or private employer engaged in business on a military base, nuclear facility, airport or other critical infrastructure, in which case retroactive verification must occur within 3 years after enactment. Entities may voluntarily use the system to reverify employees 2 years after enactment.

6

Our comments are not intended to criticize the intent of H.R. 4437 to ensure that all entities involved in facilitating employment have responsibility for ensuring that only persons who are work authorized obtain employment. We simply want to ensure that the new employment verification system database is not unnecessarily and prematurely overburdened by the demands placed upon it by recruiters, referrers and employers to the extent that it cannot handle the demand and fails to serve its intended purpose. We believe that a 2 year implementation date for prospective hires and retroactive reverification after 6 years may place unmanageable demands upon the system, resulting, among other things, in employers, recruiters and referrers being unable to obtain verification of employment eligibility within the 3 days of a person's hiring. Small employers are fearful that such a result will impose upon employers extensive verification follow-up that will place unreasonable time demands upon what otherwise was intended to be a simple process.

We have several recommendations that we believe would address these potential problems. To address the verification system's capacity to handle the burdens imposed upon it, we recommend that it be phased in gradually. Larger employers are more equipped to deal with the challenges of the new system and should be subject to it first. Smaller employers, which in many instances are least prepared, should be covered after several years. We believe the approach taken in H.R. 19, introduced by Representative Calvert, is a reasonable one that anticipates this problem and would phase in prospective verification over a number years. Under H.R. 19, the largest employers would be subject to the system one year after enactment and the smallest employers seven years later, with a new group, based on the decreasing number of employees, phased in each year in between. The value of such an approach is that the most sophisticated employers would use the system first and the database system would be allowed to gradually accommodate expanded usage through a seven year phase-in. We also believe that the Calvert bill wisely does not impose a retroactive reverification obligation, implicitly recognizing the challenges such a burden involving millions of additional workers would impose on the system. Retroactive verification is arguably unnecessary anyway given the rate of employment change, especially in industries like agriculture. We recommend that retroactive verification be excluded from the proposed legislation.

**2. Does the legislation provide employers clear-cut compliance standards, that if complied with, do not put employers at risk of unlawfully discriminating?**

*Legislation Should Clarify the Verification Responsibilities of Recruiters, Referrers, Independent Contractors and Entities Using Their Services and Avoid Needless Duplication of Effort*

H.R. 4437 mandates verification at many points in the employment process and may require needless duplication. This is potentially problematic because of the sheer volume of

7

inputs it would require into the verification systems database.[2]  The bill does not address directly whether the entity to whom the person is referred after recruitment has the additional obligation to verify the referred worker.  This presents a significant practical compliance problem in the agricultural context where agricultural entities pay a farm labor contractor (FLC), as an independent contractor, a fee to provide workers for a limited duration, with the express understanding that the FLC is the employer for all purposes, including employment eligibility verification.  As with most independent contractor relationships, there is no bright line as to whether an independent contractor relationship exists, and under joint employer principles set forth under the federal Fair Labor Standards Act and Migrant and Seasonal Agricultural Worker Protection Act, a grower who believed the FLC was an independent contractor responsible for I-9 completion may nonetheless found to be the joint employer.  In an abundance of caution, the grower may feel compelled to reverify the worker, even if the recruiter/referrer FLC already has done so.

H.R. 4437 does not clearly set forth principles that address these complex circumstances.  While section 706 of the bill provides a safe harbor for contractors who use subcontractors, the language of this provision appears to be narrowly limited to contractor-subcontractor relationships, rather than entities, such as those in agriculture, that are not contractors but often use contractors, more so than subcontractors.  At a minimum, we suggest that this language be clarified to address these circumstances.

As a result of the uncertainty surrounding this issue, in an abundance of caution, many farmers and ranchers likely would reverify the workers recruited and referred to them by an FLC to avoid an alleged violation of the employer sanctions provisions.  This will result in at least three problems:  1)  farmers and ranchers would undergo additional paperwork and compliance responsibilities already assumed by recruiters and referrers; 2) in doing so, they would undercut their otherwise legitimate claim of not being the employer, exposing them to other unanticipated liability; and 3) the government database would be burdened with duplicative verification requests.

We recommend that the language of any proposal be clarified to address the ambiguity in verification obligations between recruiters and referrers that are contractors and the entities to whom they provide workers.  We believe that if the recruiter and referrer can provide documentation that it has satisfied its verification obligations, that the entity for whom the

---

[2] In agriculture, many employers rely upon farm labor contractors (FLCs) to supply seasonal workers during peak periods of need.  Typically, FLCs will call potential workers, who may be located hundreds of miles away, and recruit them for an agricultural job.  The bill requires that an attempt must be made to determine the employment eligibility of the worker within 3 days of this recruitment contact through entering information into the government's database and documenting on an I-9 Form or its equivalent the pertinent information.  Because H.R. 4437 still requires the employer and recruiter or referrer to make a visual inspection of the documents provided, determine that the identity of the person presenting the documents is who he/she purports to be, and observe the person sign the document verifying the truthfulness of the information provided, all recruitment necessarily must be face to face.  Given the mobility of the agricultural workforce, in which many migrant workers move seasonally throughout the U.S. from crop to crop, this imposes practical challenges that may indirectly disrupt the current farm labor system.  At a minimum, the components of the current regulation that allow recruiters and referrers to designate agents to complete the employment procedures on their behalf, including notaries, associations or employer, should be incorporated into any new law. 8 C.F.R. § 274a.2(b)(iv).

No-Match Cert. Admin. Record  1938

workers provide services should not have to duplicate the verification obligation. This would provide compliance clarity and avoid unnecessarily burdening the verification system's database.

> *In the Event of a System Malfunction, Employers Should Not Be Required to Make Daily Inquiries as to Employment Eligibility*

Section 702 of the bill provides special provisions in the event of a system malfunction and would appear to require employers to make daily inquiries of the system until it registers no nonresponses. For many small employers with limited human resource personnel who hire many seasonal workers on a daily basis, this provision would be a real compliance headache. Not only would employers have to verify each day's new hires, but in addition, would have to continue to seek on a daily basis verification of previous hires for whom the employer could not access the system. We suggest that a reasonable timeframe, such as seven to ten business days after the system failed to give a response, be allowed for employers to verify backlogged verification requests. Otherwise, small employers would become overwhelmed by the administrative burdens and face potential unintentional compliance problems.

> *New Unlawful Discrimination Prohibitions Imposed by the Verification System Should be Set Forth Clearly in the Legislation*

As previously discussed in my testimony, a major problem with IRCA was the confusion it created for employers trying to comply with the verification procedures while avoiding discrimination. H.R. 4437 does not amend the non-discrimination provisions of existing law at the same time that it changes the verification procedures. Section 702 of the bill, however, does require in the design and operation of the verification system that the Secretary of Homeland Security provide reasonable safeguards against the system's resulting in unlawful discriminatory practices based on national origin or citizenship status. While we strongly support a system that is designed to avoid unlawful discrimination, employer obligations in that regard should be expressly stated, rather that implied through an implementation directive to the Secretary. To the extent that H.R. 4437's telephonic and electronic verification system potentially creates new types of discrimination, the bill should amend IRCA's nondiscrimination provisions (8 U.S. C. § 1324b) to provide applicants, employees, and employers a clear statement of any new rights and obligations.

## 3. Does the legislation impose reasonable penalties upon employers that do not comply with its employment eligibility verification procedures?

Section 706 of H.R. 4437 greatly increases the penalties that would be imposed upon employers that are found to have failed to comply with the verification standards by hiring or continuing to employ undocumented workers. ACIR members are especially concerned about the tremendous increase in penalties for paperwork violations. Employers that fail to properly complete the employment eligibility form, such as the current I-9 Form, would face fines of between $1,000 and $25,000 per form. This compares with fines of between $100 and $1,000 under current law for the same violation. Because the document creation and retention obligations apply to every hire, even small employers that have few year-round employees, but

9

that may hire hundreds of seasonal employees for a short period, could be crippled and put out of business by this provision.

The fine would apply with respect to every form completely improperly or not retained for the proper period, even if the violation was inadvertent. In our experience with employer compliance under current law, many well-intended employers unintentionally commit minor paper work violations during the completion of the I-9 Form. While H.R. 4437 has small employer mitigation provisions, the size of the paperwork fines, nonetheless, could be beyond the means of small employers to pay and could ultimately force them out of business.

While ACIR certainly believes that employers who violate the law should be punished, it believes that the punishment should be reasonable and fit the crime. Its members believe that the fines that H.R. 4437 imposes for minor paperwork violations are too extreme and would be unnecessarily punitive for small employers.

## 4. Does the legislation eliminate the existing confusion with regard to Social Security mismatch letters?

We have described the uncertainty and conflicts that exist between various federal statutes that directly or indirectly embrace the Social Security mismatch issue. The newly proposed DHS rule clearly would incorporate the mismatch problem into an employer immigration compliance problem. Enactment of the employment verification procedures of H.R. 4437 would make the proposed rule unnecessary. Because the Social Security card is a central component of the new verification system and presumably fraudulent Social Security numbers will be screened out by the system, employers that hire persons regardless of the nonverification of the card would be subject to employer sanctions. If the verification system works as anticipated, the mismatch issue should be substantially reduced.

Mandatory use of the Social Security Administration's database prior to employment of persons places the issue of a card's validity directly in the employment context. This is a direct and more appropriate way to address the issue than the indirect Social Security mismatch approach that is more directly related to ensuring that tax payments are appropriately credited. This is especially true if the study required by H.R. 4437 results in adoption of a new Social Security card that is the sole employment authorization document, similar to the approach taken in H.R. 98 introduced by Representative Dreier.

We recommend that the Social Security mismatch issue be addressed in the legislation to clarify that employers that receive such letters still have an obligation under the Internal Revenue Code (IRS) to correct any errors in reporting and remain subject to penalties under the IRS Code if they fail to comply. Any additional employer obligations related to the Social Security card as an employment document should be limited to the verification obligations set forth in new legislation. This would have several advantages. It would separate tax and immigration compliance responsibilities, eliminating overlapping obligations and confusion. It also would reduce the chances of discrimination resulting from employer confusion with regard to mismatch letters as described earlier in my testimony in the recent *Zamora* decision.

10

**5. Does the legislation provide a viable means for employers to obtain legal workers, in addition to containing a telephonic and electronic employment verification system?**

ACIR supports the concept of mandatory electronic employment verification as long as the criteria we have described are part of it. The most indispensable part of such a system is its linkage to a viable means of obtaining legal workers in the event that the verification system effectively screens out a sizeable portion of those who apply for agricultural jobs. ACIR members, representing a substantial portion American labor intensive agriculture, anticipate that a verification system such as proposed in H.R. 4437, would screen out a majority of the agricultural workforce. Currently, there is no effective way to replace them. Consequently, it is imperative that any mandatory electronic verification system be accompanied by measures that will allow agricultural employers to obtain legal workers.

The U.S. agricultural work force has become increasingly populated by foreign workers who lack proper work authorization. The U.S. Department of Labor's National Agricultural Worker Survey (NAWS) reported in its 1998-99 survey that 52 percent of seasonal agricultural workers working in the U S. self-identified as not authorized to work in the U.S. This was an increase from 37 percent in the previous survey only three years earlier, and from only about 12 percent a decade earlier. More than 70 percent of the new seasonal agricultural labor force entrants in the NAWS survey self identified as not authorized to work. Most experts agree that the statistics based on self identification in the NAWS survey are likely very conservative. Evidence based on DHS audits and verification of Social Security cards by the Social Security Administration often results in 60 to 80 percent or more of workers' documents being determined to be invalid or not pertaining to the person who presented them.

These statistics do not evidence employer disregard for the current employment verification standards, as employers must accept documents offered by applicants that appear genuine on their face. Unfortunately, the ease with which persons may obtain fraudulent documents that appear legitimate fosters this problem. Yet, employers who refuse to accept such documents risk facing discrimination charges.

The only program agriculture has to obtain legal foreign workers was enacted as the H-2 program in the Immigration and Nationality Act of 1952. In 1956 Congress attempted to streamline the program and redesignated it H-2A. Because of the difficulties in using the program, less than two percent of the seasonal agricultural workforce is brought in through the program.

The H-2A program has been used principally on the east coast in fruit, vegetables, and tobacco. The program's structure and requirements evolved from government-to-government treaty programs which preceded it. Over the years the program has become beleaguered with regulations promulgated by the Department of Labor and adverse legal decisions generated by opponents of the program. Both have rendered it unworkable and uneconomic for many agricultural employers who face labor shortages. The program is characterized by government delays in approving grower applications that adversely affect the harvest of perishable crops; a costly non-market based wage rate set annually by the Department of Labor called the adverse effect wage rate; and costly and burdensome litigation. Now that government policy threatens to

**No-Match Cert. Admin. Record  1941**

eliminate the illegal alien work force, many growers are caught between an unworkable and uneconomical H-2A program and the prospect of insufficient labor to operate their businesses.

Opponents of a viable agricultural worker program suggest there are other ways to address the problem that would result from the removal of the illegal alien agricultural work force than the legal admission of alien agricultural workers. One approach that is suggested is that agricultural employers should be "left to compete in the labor market just like other employers have to do". There are several observations one must make about this "solution". No informed person seriously contends that wages, benefits and working conditions in seasonal agricultural jobs can be raised sufficiently to attract workers away from their permanent nonagricultural jobs in the numbers needed to replace the illegal alien agricultural work force and maintain the economic competitiveness of U.S. producers.

Seasonal farm jobs have attributes which make them inherently uncompetitive with nonfarm work. First and foremost is that they are seasonal. Secondly, many seasonal farm jobs are located in rural areas away from centers of population. Furthermore, to extend the period of employment, workers must work at several such jobs in different areas. That is, they must become migrants. It is highly unlikely that many U.S. workers would be willing to become migrant farm workers at any wage, or that, as a matter of public policy, we would want to encourage them to do so. In fact, the U.S. government has spent billions of dollars over the past several decades attempting to settle domestic workers out of the migratory stream. The success of these efforts is one of the factors that has led to the expansion in illegal alien employment. In addition to seasonality and migrancy, most farm jobs are subject to the vicissitudes of weather, and require physical strength and stamina. Thus it is highly unlikely that a significant domestic worker response would result even from substantial increases in wages and benefits for seasonal farm work.

Nonagricultural employers have some options for responding to domestic labor shortages that agricultural employers do not have. Many nonagricultural employers can "foreign source" the labor intensive components of their product or service without losing the good jobs. Since agricultural production is tied to the land, the labor intensive functions of the agricultural production process cannot be foreign-sourced. We cannot, for example, send the harvesting process or the thinning process overseas. Either the entire product is grown, harvested, transported and in many cases initially processed in the U.S., or all these functions are done somewhere else, even though only one or two steps in the production process may be highly labor intensive. When the product is grown, harvested, transported and processed somewhere else, *all* the jobs associated with these functions are exported, not just the seasonal field jobs. These are the so-called "upstream" and "downstream" jobs that support, and are created by, agricultural production. U.S. Department of Agriculture studies indicate that there are about 3.1 such upstream and downstream jobs for every on-farm job. Most of these upstream and downstream jobs are "good" jobs, *i.e.,* permanent, average or better paying jobs held by citizens and permanent residents. Thus, we would be exporting about three times as many jobs of U.S. citizens and permanent residents as we would farm jobs if we shut off access to alien agricultural workers.

**No-Match Cert. Admin. Record 1942**

Another suggestion has been that recruitment of welfare recipients and the unemployed could replace the illegal aliens. In the late 1990's growers in the San Joaquin Valley of California tried to augment their labor supply by recruiting welfare recipients and the unemployed. They worked with the California welfare agencies and employment development departments in an effort to recruit the rural unemployed. The extensive efforts of two government agencies and agricultural employers resulted in few former welfare recipients and unemployed persons moving into jobs on farms.. The study found that the preponderance of those on the welfare rolls were single mothers with young children. Many were not physically capable of doing farm work, did not have transportation into the rural areas and were occupied with the care of young children.

The unemployed also make, at best, a marginal contribution to the hired farm work force. Relatively high unemployment rates in some rural agricultural counties are often cited as evidence of an available labor supply or even of a farm worker surplus. First it should be noted that labor markets with a heavy presence of seasonal agriculture will always have higher unemployment rates than labor markets with a higher proportion of year round employment. By the very nature of the fact that farm work is seasonal, many seasonal farm workers spend a portion of the year unemployed. Second, unemployed workers tend to share the same values as employed workers. They prefer permanent employment which is not physically demanding and takes place in an inside environment. They share an aversion to migrancy, and often have transportation and other limitations that restrict their access to jobs. The coexistence of unemployed workers and employers with labor shortages in the same labor markets means only that we have a system that enables workers to exercise choices.

Many welfare recipients and unemployed workers cannot or will not do agricultural work. It is reasonable to expect an alien worker program to have a credible mechanism to assure that domestic workers who are willing and able to do farm work have first access to agricultural jobs, and that aliens do not displace U.S. workers. It is not reasonable to expect or insist that welfare and unemployment rolls fall to zero as a condition for the admission of alien workers.

A third alternative to alien workers often suggested is to replace labor with technology, including mechanization. This argument holds that if agricultural employers were denied access to alien labor they would have an incentive to develop mechanization to replace the alien labor. Alternatively, it is argued that the availability of alien labor retards mechanization and growth in worker productivity.

The argument that availability of alien labor creates a disincentive for mechanization is belied by the history of the past two decades. From 1980 to 2000, the output of labor intensive agricultural commodities has risen dramatically while hired agricultural employment has declined. The only way this could have happened is as a result of significant agricultural labor productivity increases. Yet, this was also the period of perhaps the greatest influx of illegal alien farm workers in our history.

It does not appear that there has been a great deal of increase in agricultural mechanization in fruit and vegetable farming since a spasm of innovation and development in the 1960's and 1970's. Indeed, some of the mechanization developed during that period, specifically

**No-Match Cert. Admin. Record 1943**

mechanical apple harvesters, have proven to be uneconomical in the long term because of tree damage as well as fruit damage.

But productivity increases can result from many different factors, of which mechanization is only one. Smaller fruit trees, which require less ladder climbing, trellised trees, and changes in the way trees or vines are pruned are also technological developments which improve labor productivity. The switch from boxes and small containers to bulk bins and pallets in the field has significantly improved labor productivity of some harvesting activities. Use of production techniques and crop varieties that increase yields also improves field labor productivity by making harvesting and other operations more efficient. These appear to be the techniques that farmers have used to achieve the large productivity increases obtained in the 1980's and 1990's.

At the same time as labor intensive agriculture faces a shortage of legal workers, it has for the past several years also been experiencing actual shortages of workers. During the past several years there have been shortages in the lettuce and vegetable harvests in border areas in Arizona and California. During the past year and currently, growers in a number of crops on the West Coast are facing shortages of labor. Other states from coast to coast are reporting labor shortages in a number of crops. Actual labor shortages coupled with shortages of legal workers and the prospect of enforcement only legislation as proposed by the House of Representatives in H.R. 4437, represents the "perfect storm" for labor intensive agriculture. Its future is at risk.

American agriculture has devoted the past ten years to seeking access to a workable agricultural worker program through H-2A and other reforms. Through ACIR and other organizations, it has supported workable employment verification systems as a component of such reforms. If, however, Congress now decides to impose an enforcement only or enforcement first approach to immigration reform, with electronic verification as a key element, without addressing the needs of American agriculture for a reformed worker program, the result will be catastrophic. A system that excludes an anticipated 70 percent of the agricultural workforce without also providing a legal means of replacing it represents a formula for the demise of labor intensive agriculture in this country.

ACIR strongly encourages this Subcommittee to consider not only the necessary components of a workable employment verification system, but the concomitant need for legislation to provide agriculture a viable means of retaining its experienced workforce and obtaining a legal workforce in the future.

Thank you very much for the opportunity to share our views.

14



**ANLA**
American Nursery &
Landscape Association

1000 Vermont Ave, NW, Suite 300, Washington, DC 20005-3922
Tel: 202/789-2900 . Fax: 202/789-1893

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

RE:    **Docket No. ICEB-2006-0004 (FR 71:114, p. 34281)**
       **Safe Harbor Procedures for Employers Who Receive a No-Match Letter**

To Whom It May Concern:

The American Nursery & Landscape Association (ANLA) and the National Christmas Tree
Association (NCTA) appreciate the opportunity to comment on Docket No. ICEB-2006-0004,
the Department of Homeland Security-Bureau of Immigration and Customs Enforcement's
proposed rule regarding Social Security "no-match" letters.  ANLA is the national trade
organization representing the U.S. nursery and landscape industry.  ANLA, formed in 1875,
represents nursery and greenhouse crop growers, landscape design and installation professionals,
independent garden retailers, horticultural distributors, and industry suppliers.  The National
Christmas Tree Association (NCTA) is comprised of 2000 members and 35 state associations
involved in the production and sale of real Christmas trees in all 50 states.  These entities
collectively comprise what is commonly referred to as the "green industry".  Nationally, the
green industry generates annual economic output estimated at over $147 billion.

The green industry has a major stake in the Social Security no-match proposed rule, because a
significant portion of the workforce is comprised of immigrant workers.  Furthermore, ANLA is
a leader in efforts to secure comprehensive immigration reform.  ANLA co-chairs the
Agriculture Coalition for Immigration Reform, and serves on the steering committee of the
Essential Worker Immigration Coalition.  This experience gives our association a broad platform
from which to view developments such as this proposed rule.

ANLA and NCTA believe it would be unwise and unduly harmful for the Agency to proceed
with this rulemaking in the absence of Congressional action on the issue of comprehensive
immigration reform.  Efforts are already well underway to enact reform, and we believe that the
intent of this rule cannot be carried out given the array of policy and jurisdictional conflicts and
complications that surround the issue.  Legislative action will be necessary to resolve many of
these conflicts.  We believe that proceeding with this rule in the absence of legislative action will
cause serious and in some cases irreversible damage to the American economy, and needless
hardship to employers and the workforce.  The Agency should set aside this rulemaking until
Congress acts.

ANLA/NCTA Comments on Docket No. ICEB-2006-0004
August 14, 2006
Page 2

It should be obvious to any observer that America's immigration system is badly broken. Efforts to reform the system in 1986 and 1996 were incomplete at best, and in our view had major flaws. The 1986 Immigration Reform and Control Act (IRCA) provided a legalization mechanism that was of some benefit to the industry; indeed, many employees who legalized under the provisions of IRCA remain employed in the industry even today. Most who have remained have attained important supervisory or highly skilled positions.

However, IRCA failed to implement a longer-term solution to accommodate future flows of workers needed to meet America's changing economic needs. Therefore, it failed to adequately address the factors that have drawn successive waves of economic migrants to enter the U.S. outside of existing but woefully inadequate and constrained legal channels. Secondly, IRCA contained enforcement mechanisms. Among them, IRCA sought to impose employer sanctions, but in hindsight those sanctions mostly succeeded in spawning a market in fraudulent documents, and discrimination litigation against employers who were too picky in reviewing or specifying documents.

In 1996 Congress revisited enforcement issues, and among other actions, it established the Basic Pilot employment eligibility verification system. Yet again, Congress failed to streamline and expand available legal channels for essential workers to enter safely, contribute, and return to their sending countries. The existing H-2A agricultural guest worker program is excessively bureaucratic, often unaffordable, and highly litigious. The service industry's H-2B program functions somewhat better, but is subject to a highly unrealistic and artificially low cap on admissions of 66,000 per year.

In the broadest context, scholars have documented that our government's approach to addressing the illegal immigration challenge over the last 20 years has not only failed, it has had the opposite of its intended effect[1]. In essence, this proposed rulemaking represents a similar piecemeal response that, if finalized outside of a more comprehensive view and approach, will have similar unintended consequences.

**Views of the Green Industry Relative to No-Match Letters**

The following comments address green industry employers' experience and views relative to Social Security Administration (SSA) no-match letters, specifically those issued by SSA as opposed to letters that may be issued by the Department of Homeland Security (DHS) in response to employer I-9 audits. We also wish to incorporate by reference, in their entirety, the comments filed by the National Council of Agricultural Employers (NCAE), an umbrella organization representing a wide array of employer interests specifically on employment law issues. ANLA serves on the board of directors and executive committee of NCAE.

---

[1] *Backfire at the Border – Why Enforcement Without Legalization Cannot Stop Illegal Immigration.* Douglas S. Massey, Princeton University, for the Cato Institute. June, 2005.

ANLA/NCTA Comments on Docket No. ICEB-2006-0004
August 14, 2006
Page 3

In the early 1990's, some green industry employers began receiving no-match letters from the Social Security Administration. When such letters first began to be issued, they were received sporadically, and often long enough after the fact that many of the employees whose information was referenced in the letters were no longer employed. Making matters more confusing, ever since the letters first began to be issued, and to the present, employment law experts have issued varied and often conflicting advice as to the significance of no-match letters and how employers should respond to them. This reality has left well-intended and law-abiding employers in a difficult and confusing, if not untenable, compliance posture.

To the extent that DHS intends to eliminate confusion and create clear, "bright line" standards for employers, ANLA and NCTA appreciate the intent. Employers would like clarity and certainty. However, given the current muddle of legal and jurisdictional issues at play, including Privacy Act implications and discrimination concerns, we believe that legislative reforms that holistically address these fundamental issues and conflicts must occur before a final rule regarding an SSA no-match final rule is issued by DHS.

We have especially deep concerns over the proposed rule's implications relating to potential discrimination lawsuits. Over 20 years, we have watched as more employers have been caught up in discrimination suits than enforcement actions alleging a failure to meet their obligations to verify employment eligibility. The anti-discrimination provisions of Title VII of the Civil Rights Act of 1964 and the anti-discrimination provisions of IRCA, as well as state anti-discrimination laws, pose a real threat to employers that terminate or refuse to hire workers based on SSA no-match letters. This proposed rule will force employers to refuse to hire or to terminate job applicants and employees if, after following the compliance procedures, the documents that they provided cannot be verified under the SSA or DHS databases.

It is precisely because of these types of adverse employment decisions in the context of the employment verification process that employers have been sued for discrimination. Again, the comments of NCAE go into further detail – including citing specific legal decisions that support our contentions. This rulemaking risks worsening employers' exposure to the potentially conflicting obligations that well-intended employers face when verifying employment eligibility and avoiding discrimination claims.

The proposed safe harbor provision would not protect employers from expensive, time-consuming and frustrating litigation to defend against discrimination charges. This ultimately would prove counterproductive to employer compliance with the provisions of the proposed rule.

**Green Industry Employers Will Face Special Compliance Challenges**

Compliance with the proposed rule would be difficult for many green industry employers. Most in the green industry employ a large number of seasonal workers, consistent with the peak seasons (the growing season, the landscape planting and maintenance seasons, and for Christmas trees the fall harvest season). Seasonality results in major hiring in narrow timeframes. Also, in some instances, workers performing highly seasonal or specialized tasks may move several times

ANLA/NCTA Comments on Docket No. ICEB-2006-0004
August 14, 2006
Page 4

among employers to maintain continuous employment. In both cases, following up on employee mismatches within rigorous time frames that coincide with peak production periods could be extremely problematic.

Furthermore, given the seasonal dynamic common in much green industry employment, an employee may not be employed at the time an employer receives a no-match letter. Under such circumstances it would be impossible within a short period of time for an employer to communicate with a former employee listed in a no-match letter in order to satisfy the 14 day requirement under the proposed rule. Former workers seldom leave forwarding telephone numbers where they can be contacted. Some workers may not be in employee status at the time their former employers receive a no-match letter.

In such scenarios, an employer could send a letter to an employee's forwarding address if one is provided, but there is no guaranteed method to ensure that the employee receives and replies to the no-match letter. Many employers would not have the opportunity to have a face to face discussion with the mismatched employee to resolve the issue. This puts employers in a bind in that they could lose the benefit of the safe harbor provision because of the nature of the work and workforce, despite good faith compliance efforts.

The "law of unintended consequences" would become the law of the land if this proposed rule is implemented in the absence of a comprehensive approach to immigration reform. The fact that the limited labor supply available to the green industry is largely undocumented poses substantial problems. The proposed rule would exacerbate these problems, at least for the majority of employers who endeavor to comply with the rule. Meanwhile, unscrupulous employers would benefit, at least for the foreseeable future. Negative consequences – many of them wholly unintended – would arise if the proposed rule were implemented now.

Well-intended employers who are meeting their obligations under current law would likely lose a significant part of their workforce if the proposed rule is finalized. It is likely that a substantial number of workers would not return to work once the employer has placed the burden upon them to verify their work authorization because they would be unable to do so. Good employers would be devastated by losing many employees, potentially at critical peak-demand times. It is likely that employees who quit after being confronted with a no-match situation they could not resolve would simply go to work for a new employer.

Employers who have lost most of their workforce would need to hire new employees, many of whom would end up as no-match employees down the road, continuing a cycle that the proposed rule never intended to put in motion. Meanwhile, the same undocumented employees would merely move to a new employer and subsequently put that employer in the untenable position of needing to confront no-matches at the peril of losing its workforce. Many would eventually end up in the "underground economy." In this regard, the proposed rule punishes good employers and aggravates problems that only a comprehensive legislative solution can remedy.

ANLA/NCTA Comments on Docket No. ICEB-2006-0004
August 14, 2006
Page 5

If the proposed rule takes effect before Congress enacts comprehensive immigration reform legislation, including provisions similar to the AgJOBS agricultural guest worker and earned adjustment of status provisions contained in S. 2611, and similar provisions for service industry employers, it will have a devastating effect on the green industry. From the industry's perspective, needed reforms would overhaul the H-2A guest worker program, address the unrealistic H-2B program cap on admissions, and provide a workable solution for obtaining year-round workers to fill jobs for which insufficient American workers can be found. Also important is a mechanism for retaining trained, trusted, and experienced but unauthorized workers employed in our industries. Because America's immigration system has been broken for so long, many of these workers have attained "key employee" status and their loss would devastate businesses across America. A comprehensive legislative solution should allow these workers to earn legal status subject to strict conditions.

As has been documented by various academics and the U.S. Chamber of Commerce, approaching the no-match situation in isolation could have devastating economic consequences for the United States[2]. According to such sources, it is estimated that annually 500,000 essential workers enter the U.S. without work authorization to perform much needed labor. There is no realistic way for most of them to enter legally. Our economy not only absorbs these needed workers, but it depends on them for our current level of growth. It is estimated that there is currently at least 7 to 8 million unauthorized workers in the U.S. This proposed regulation would in effect strip needed workers from law-abiding employers without providing employers with an alternative legal channel by which to recruit to fill the gaps created by a combination of an aging workforce domestically, higher educational attainment by the domestic population, and a booming economy with full levels of employment.

It is also well documented that about five percent of the total U.S. workforce has no work authorization. This workforce falls disproportionately within agriculture, where government statistics and private estimates suggest that upwards of 75% of the labor force sustaining the sector lacks work authorization.

Increasing interior enforcement and strengthening the employment eligibility and verification system without at the same time creating the tools for employers to actually access an adequate legal workforce would be devastating to the American economy generally, and American agriculture specifically. The law of unintended consequences may also occur – in this case, driving this workforce into the underground economy, where they may be paid cash under the table and cease to contribute payroll taxes including Social Security contributions.

Practically speaking, off shoring offers some possibilities for industries that can produce abroad, but no serious and informed person would suggest that off shoring key elements of our economy – especially our food production – is truly in the national interest. Moreover, agricultural labor experts have documented that for each farmworker job in the American agricultural economy,

---

[2] See *Economic Growth and Immigration – Bridging the Demographic Divide.* American Immigration Law Foundation, November, 2005.

ANLA/NCTA Comments on Docket No. ICEB-2006-0004
August 14, 2006
Page 6

three to four off-farm jobs are supported in the upstream and downstream economy. Most of these jobs would be lost if the U.S. government approaches this challenge in a piecemeal rather than comprehensive fashion.

**Compliance Assistance for Employers**

Recently, the DHS has launched a program to equip employers with "best practices" based approaches to avoiding hiring unauthorized workers. We appreciate the intent of this outreach effort, yet we wish to note the glaring disconnect between the real world and the notion that employers can make this problem go away by employing "best practices." As stated previously, at present, it is estimated that more than 70% of the agricultural labor force lacks work authorization. Percentages are lower, but still high, in many sectors of the service economy including landscape installation and maintenance. Employers are hiring any and every applicant that shows up with documents that appear genuine. If they were truly able to screen out the unauthorized workers, they would not have a workforce. Demographic trends and employment preferences shape this reality.

It is naïve to assume that simply equipping employers with best practices will resolve the challenges at hand. Where are employers to go when they cannot find enough workers? The existing legal channels are either hobbled by bureaucracy or artificially capped.

The only real solution will be a comprehensive approach to immigration reform, one that pairs employer verification obligations with the creation or expansion of realistic legal channels. Monte B. Lake, Esq., legal counsel to ANLA and the Agriculture Coalition for Immigration Reform, recently testified before a House Small Business subcommittee on the issue of electronic employment eligibility verification. His testimony describes the elements of a cohesive, constructive and comprehensive approach to this issue. It also addresses the issue of the use of Social Security information, and how to create a system that features the clarity and "bright lines" that would be helpful to employers. Lake's testimony is attached for reference.

For all these reasons, the proposed regulation should follow enactment of comprehensive immigration reform, not ride ahead of Congressional action. Thank you for carefully considering the views of ANLA and NCTA.

Sincerely,

Robert J. Dolibois, CAE
Executive Vice President

Craig J. Regelbrugge
Senior Director of Government Relations

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | Art Read [aread@friendsfw.org] |
| **Sent:** | Monday, August 14, 2006 1:49 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Comments on Docket No. ICEB-2006-0004 "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" |

**Attachments:** Social Security_2006-08-14.pdf

August 14, 2006

To:

     Director, Regulatory Management Division,
     U.S. Citizenship and Immigration Services,
     Department of Homeland Security,
     111 Massachusetts Avenue, NW, 2nd Floor,
     Washington, D.C.  20529

Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"

Attached please find:  Social Security_2006-08-14.pdf with comments from Friends of Farmworkers, Inc.

\---------------------------------------------
From:
Arthur N. Read
General Counsel
Friends of Farmworkers, Inc.
924 Cherry Street, 4th floor
Philadelphia, PA 19107-2411
Telephone:  (215) 733-0878 ext. 150
Fax:    (215) 733-0876
Email:  aread@friendsfw.org
Web:   http://www.Friendsfw.org/
\---------------------------------------------
This message contains information which may be confidential and privileged.
Unless you are the addressee (or authorized to receive for the addressee) you may not use,
copy or disclose to anyone the message or any information contained in the message.
If you have received the message in error, please advise the sender by reply e-mail and delete the
message.
Thank you very much.

**No-Match Cert. Admin. Record  1951**



## FRIENDS OF FARMWORKERS, INC.
### *Legal Services for Farmworkers*

924 Cherry Street, 4th floor
Philadelphia, PA 19107-2411
*E-mail: aread@friendsfw.org*

Telephone: (215) 733-0878
(800) 729-1607
Fax: (215) 733-0876
Direct: Arthur N. Read (215) 733-0878, ext. 150

August 14, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

Re:     DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers
        Who Receive a No-Match Letter"

Dear Sir or Madam:

Friends of Farmworkers, Inc. submits the following comments in response to the request for
public comment by the Department of Homeland Security (DHS), Bureau of Immigration and
Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who
Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

Friends of Farmworkers, Inc. is a legal service organization founded in 1975 which provides
assistance, representation, and education on legal rights to low wage farm workers, mushroom
workers, food processing workers, and workers from immigrant and migrant communities
throughout Pennsylvania, principally in matters related to their employment and housing.

Friends of Farmworkers has had significant experience in dealing with the adverse impact that
the Social Security Administration's (SSA) no-match letters have had on all workers in the
United States–immigrant and native-born alike.

It is our experience that many employer payroll records for individuals from Latin American
countries where the mother's last name is a part of the full name for individuals often have
inconsistencies in the names of workers. We are currently engaged in a federal class action
lawsuit on behalf of Mexican and Guatemalan workers lawfully employed as H-2B temporary
workers and have received discovery information from the employer and its recruiter in Mexico
for thousands of workers that demonstrate the frequent inaccuracy in these records. Our review
of those records further reflects that since the date of birth in Latin American most often is in the
format of month-date-year rather than date-month-year those payroll records frequently
inaccurately record the date of birth as well.

**Friends of Farmworkers, Inc.**
**August 14, 2006**
**Page** 2

We have encountered work places where social security no match letters have immediately jeopardized employment of large numbers of individuals from Latin American countries and would urge you to be very cautious in adopting regulations that encourage such practices when the no match might well be caused by complete innocent inconsistencies in records.

For several years we represented a union in the mushroom industry, where the union fought unsuccessfully for collective bargaining protections to prevent employers from discharge of worker because of social security no-match letters without a procedure for determining if the asserted problem was based upon erroneous facts or administrative problems which could be readily cured.

As a result of this experience, Friends of Farmworkers is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, the rule will have no impact on undocumented immigration. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

•       This proposed rule will harm all workers regardless of immigration status.

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—including U.S. citizens and authorized noncitizens—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to

**Friends of Farmworkers, Inc.**
**August 14, 2006**
**Page 3**

use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

•     The proposed rule will expand the unregulated underground cash economy.

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the unregulated underground cash economy which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

•     This proposed rule is an end-run around the legislative process.

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

•     The SSA no-match letter program is ill-suited as a tool for immigration enforcement.

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

•     The proposed rule is an erosion of our privacy rights.

**Friends of Farmworkers, Inc.**
**August 14, 2006**
**Page 4**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- The costs of implementing the proposed rule are prohibitive.

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- The proposed rule is objectionable because compliance is impractical.

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Very truly yours,

Arthur N. Read
General Counsel

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Jeff Stone [jstone@oan.org] |
| **Sent:** | Monday, August 14, 2006 11:06 AM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |
| **Attachments:** | DHS comment on SSA no match.doc |

Please find attached our comments on the proposed rules as stated in the Federal Register, Vol. 71, No. 114 on Wednesday, June 14, 2006. I will be mailing a hard copy as well. If you have any questions, feel free to contact me.

Warm Regards,
Jeff

Jeff Stone
Director of Government Relations
Oregon Association of Nurseries
29751 SW Town Center Loop, W
Wilsonville, OR 97070
Direct: 503-582-2003
Cell: 971-235-3868
Email: jstone@oan.org
Website: www.oan.org

**No-Match Cert. Admin. Record 1956**



**OREGON**
ASSOCIATION OF
NURSERIES

29751
SW Town Center
Loop W

Wilsonville, OR
97070

Phone
503.682.5089

Toll-Free
1.800.342.6401

Fax
503.682.5099

Web
www.oan.org

August 10, 2006

Director, Regulatory Management Division
US Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

Re:    DHS Docket No. ICEB-2006-0004

Dear Director:

On behalf of Oregon's nursery industry, it is our pleasure to submit written comments to the DHS proposed rules as printed in the *Federal Register*, Vol. 71, No. 114 on Wednesday, June 14, 2006. We appreciate the department's interest in seeking "safe harbor" clarifications rather than new employer obligations. We welcome guidance to ensure the long term viability of the nursery industry's labor force.

Agriculture, the US Chamber of Commerce, and other business groups have joined together to work with DHS on a solution for "no-match" Social Security Numbers and liability concerns for employers. We have concerns that the proposed rule's timing is not in concert with other large pieces of legislation – primarily Immigration Reform – that would enable the entire "system" to work. As you are aware, agriculture is labor intensive and growers have been operating under a law that is dysfunctional and provides no viable means of obtaining a stable legal workforce.

Several elements should be considered before action is taken by DHS on a "no-match" rule:
- The rule must result in a significant reduction of acceptable employment authorization documents--preferably a single social security-type document.
- The option of telephonic or computer-based verification should be retained.
- The verification database should not be universally implemented prematurely nor applied retroactively in order to enable it to adjust to the tremendous demands to be imposed upon it.

- The rule should clarify the verification responsibilities of recruiters, referrers, independent contractors and entities using their services and avoid needless duplication effort.
- In the event of a system malfunction, employers should not be required to make daily inquiries as to employment eligibility.
- New lawful discrimination prohibitions imposed by the verification system should be set forth clearly in the rule.

The bottom line concern for our industry is the interruption of a productive workforce and an unwieldy and cumbersome verification process that takes growers out of the field and into an office. Any prospective verification process should be gradually phased in over a number of years. The safe harbor elements listed in the rule needs to encompass the reality of agricultural hiring practices and not be construed to a narrow definition of a contractor-subcontractor relationship.

**Oregon Association of Nurseries advice to our growers**

As you are undoubtedly aware, employers must walk a very thin line upon receipt of a no-match letter. On one hand, they have a legal obligation to hire and maintain a legal work force. On the other hand, they have a legal obligation not to discriminate based on race or national origin. If DHS intends to step up enforcement in this area, employers must have a clear pathway to avoid legal liability without jeopardizing their workforce.

Currently, we recommend that employers proceed cautiously when receiving a no-match letter. Employers have an obligation to take reasonable action to address the letter. The nursery association takes seriously the comments made by the Director of the Department of Homeland Security, stating that the department intends to step up enforcement in this area. Employers receiving no-match letters need to examine their own records to be sure that such a letter is not a result of a clerical mistake made when filling out paperwork at the time of hire. If that information was accurately recorded, we ask the employee to resolve the discrepancy with the Social Security Administration. Employers must give an employee a reasonable amount of time to resolve the difference; generally 30 to 60 days is our rule of thumb. We encourage employers to offer the employee time off from work to resolve the issue. If an employee fails to resolve the discrepancy within the time allotted, and cannot provide a good reason for failing to do so, we encourage the employer to contact an immigration lawyer for further advice.

**Conclusion**

Over the past 20 years, agriculture has utilized a nondiscriminatory and effective process of determining the employment eligibility of new hires. The OAN has been in regular contact with the American Nursery & Landscape Association regarding the outcome of this proposed rule, but the larger issue is immigration reform.

It is our view that the no-match rule only works as a component of comprehensive immigration reform. Electronic verification could and should receive the support of agriculture if it is predictable, if it is simple to use and if it is coupled with avenues and means to obtain legal

workers when there is an insufficient domestic workforce. If "no-match" letters were used as a weapon and placed growers in a legal and operational predicament, the result would be that Oregon and national agriculture would face an untenable labor situation.

**The Oregon Association of Nurseries**

As the Director of Government Relations for the Oregon Association of Nurseries, based in Wilsonville, Ore., I submit these comments on behalf of more than 1,500 wholesale growers, retailers, landscapers and suppliers. Oregon's nursery and greenhouse industry is the state's largest agricultural sector. Annual surveys conducted by the Oregon Agricultural Statistics Service consistently show the nursery/greenhouse industry leads all other sectors of Oregon agriculture in sales, payroll and full-time employees. Oregon trails only California and Florida in nursery production and accounts for 15 percent of all U.S. nursery crops.

Other key facts about the Oregon nursery industry:
- Oregon is the nation's largest "exporter" of nursery stock. Over $600 million worth of nursery and greenhouse product — about three-quarters of all production — is sold outside the state.
- Wholesale sales of nursery/greenhouse material were $844 million in 2004, and when combined with Oregon's Christmas tree sector, we generate close to $1 billion in annual sales at the farm gate.
- Oregon's nurseries account for just slightly more than 1 percent of all agricultural land in Oregon, yet produce more than 20 percent of all agricultural sales.
- Oregon is No. 1 in the US in the production of shade trees, coniferous evergreens and Christmas trees; No. 2 among all states in the production of deciduous flowering trees and other broadleaf evergreens; and No. 3 in the production of deciduous shrubs, other ornamentals and fruit and nut plants.

I hope I provided you a useful snapshot of the opportunities and challenges that face nursery growers in Oregon and the Pacific Northwest. Please feel free to call upon Oregon's nursery industry as a partner and resource

Sincerely,

Jeff Stone, Director of Government Relations
Oregon Association of Nurseries

# HP LaserJet 1022 series





**Get great results with this compact black-and-white printer designed for quick business printing.**

- Quick Start—With Instant-on Technology the first page prints in 8 seconds so your print job is finished before many printers have even started.

- Business Impact—Expect professional, business-quality documents with 1200 dpi.

- Fits Anywhere—Make the most of your business with this reliable, space-saving HP LaserJet printer with available built-in wired* or wireless** networking.

\*   HP LaserJet 1022n and 1022nw

\*\* HP LaserJet 1022nw only

www.hp.com

**Use genuine HP LaserJet printing supplies for professional-quality every time.**

- Designed together with the printer for consistently outstanding results.

- Backed by HP's premium protection print cartridge warranty.

- Designed for the way you work with a full range of HP professional-quality everyday and specialty papers.



**No-Match Cert. Admin. Record  1960**

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | Toby Malara [tmalara@americanstaffing.net] |
| **Sent:** | Monday, August 14, 2006 12:46 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-004 |
| **Attachments:** | DHS Social Security Mismatch Comments.doc |

Toby Malara, Esq.
Government Affairs Counsel
American Staffing Association
277 S. Washington St., Suite 200
Alexandria, VA 22314-3675
703-253-2020
703-253-2027 direct
703-253-2053 fax
tmalara@americanstaffing.net
americanstaffing.net

The American Staffing Association is the voice of the U.S. staffing industry. Along with affiliated chapters in most states, ASA promotes the interests of the industry through legal and legislative advocacy, public relations, education,
and the establishment of high standards of ethical conduct.

This electronic message contains information that may be legally confidential or privileged. The information is intended solely for the individual or entity named above, and access by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution, or use of this information is prohibited and may be unlawful. If you have received this electronic message in error, please reply immediately to the sender that you have received the message in error, and delete it.

**No-Match Cert. Admin. Record  1961**

# American Staffing Association

Director, Regulatory Management Division
U.S. Citizenship & Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW
2nd Floor
Washington, DC 20529

Re:    DHS Docket No. ICEB-2006-0004

The American Staffing Association (ASA) submits the following comments to the Notice published in the *Federal Register* on June 14, 2006, regarding Social Security No-match or Mismatch Letters. In seeking comments concerning Social Security No-Match Letters, ICE was particularly interested in comments on the propriety of time frames proposed in the rule.

ASA is the voice of the U.S. staffing industry. Along with its affiliated chapters, ASA promotes the interests of the industry through legal and legislative advocacy, public relations, education, and the establishment of high standards of ethical conduct. ASA has been promoting flexible employment opportunities since its founding in 1966. ASA members provide a wide range of employment-related services and solutions, including temporary and contract staffing, recruiting and permanent placement, outsourcing, training, and human resource consulting. Member companies operate more than 15,000 offices across the nation and account for more than 85% of U.S. staffing industry sales.

ASA is uniquely situated to evaluate the impact of the Proposed Rule on the Staffing Industry, which has grown exponentially over the last few decades specifically because it offers flexible employment opportunities. The growth of this industry should not be adversely impacted by these regulations, which presume that all employees work at the same site as the employer. This is not the case in the Staffing Industry and that fact greatly impacts what steps are "reasonable" or what constitutes a "safe harbor" for an employer to follow when it receives a No-Match Letter.

In summary, the Proposed Rule aims to elaborate on the definition of "knowing," in terms of what will constitute constructive knowledge for purposes of determining a violation under the Immigration Reform Control Act. This provision states:

It is unlawful for a person or other entity, after hiring an alien for employment in accordance with paragraph (1) to **continue to employ the alien** in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment.

8 U.S.C. § 1324a(a)(2) (emphasis added). The Proposed Rule amends the definition of "knowing" found in the regulations at 8 CFR § 274a.1(l) by adding that in determining whether or not an employer had knowledge or constructive knowledge, the Immigration Service will

American Staffing Association
DHS Docket No. ICEB-2006-0004
August 11, 2006
Page 2

look to the "totality of relevant circumstances," but will also presume constructive knowledge in a few specific instances, including when an employer receives a Social Security No-Match Letter.[1]

## GENERAL CONCERNS

ASA supports in concept the "totality of the relevant circumstances" test adopted in the proposed rule in evaluating what steps would be reasonable for an employer to take upon receipt of a Social Security No-Match Letter. The key concern is that the "relevant circumstances" must take into account the distinctions between direct hire employers and staffing or contract labor employment firms.

For example, the Proposed Rule presupposes that all employees are physically located at the exact same location where the employer would "receive" notification of the No-Match letter. "Receipt" is not defined in the Proposed Rule. For an employer with a single location, the No-Match letter would be sent to the employer's only address. The "received" date is still unclear because many employers do not date stamp all mail as it comes in the door. This problem is compounded for staffing firms that have multiple office locations. Some large firms may have hundreds of offices nationwide. In such cases, the No-Match letter may very realistically be sent to a company headquarters address based on a centralized payroll system. That notice could be several states or time zones away from the office responsible for placing the employee, and still several states more away from where the employee is actually working.

The Proposed Rule also presumes that everyone listed in the No-Match letter is still a current employee. Although this is also a concern for direct hire employers, it is even more of an issue for staffing or contract labor, which by definition, employs people for far shorter terms. Given that No-Match letters are usually only sent once per year,[2] it is very likely that many individuals identified in such a letter would no longer be employed. ASA wants to make clear that if an employer receives a No-Match letter from the Social Security Administration or notification from the Department of Homeland Security relating to an alien that is <u>NO LONGER EMPLOYED</u>, then it would be "reasonable" for an employer NOT to follow the steps outlined in the Proposed Rule because the employer is NOT "continuing to employ" the individual, as prohibited by the statute.

---

[1] For purposes of this comment, ASA recognizes that the Proposed Rule adds two examples of instances when an employer may receive information that will result in constructive knowledge unless it takes "reasonable steps" under the safe-harbor guidance. When an employer receives: (1) a No-Match letter from the Social Security Administration; OR (2) notification from the Department of Homeland Security in the context of an I-9 Audit that an employee's employment authorization document presented for I-9 purposes does not match agency records for that employee. Given the relative infrequency of I-9 Audits, as compared to receipt of Social Security No-Match letters, this comment will reference only the No-Match context, but all of ASA's comments apply equally in both contexts.

[2] Because of the unique nature of the temporary and contract staffing relationship discussed in these comments and the time staffing firms will require to do the appropriate amount of due diligence investigation on each mismatch, it may be wise for the Social Security Administration to consider issuing No-Match Letters more frequently than once per year. Given the size of some national employers, it may be even more difficult to respond to all of the research inquiries within the very short time periods stated in the Proposed Rule if the request is only sent once per year.

American Staffing Association
DHS Docket No. ICEB-2006-0004
August 11, 2006
Page 3

Finally, the Proposed Rule references a variety of time periods in terms of "days," rather than "business days." ASA is assuming that the Rule intended ALL time periods to reflect business days and just failed to specify it as such. The Proposed Rule references current regulations, which require that I-9's must be completed within three days after a new hire, citing 8 CFR § 274a.2(b)(1)(ii). However, this provision actually states three "business days." Therefore, all of the time periods referenced in the Proposed Rule should be amended to reflect the business day distinction.

## PARTICULAR CONCERNS

The proposed amendment to the regulatory definition of "knowing" includes a new subsection 8 CFR § 274a.1(1)(iii)(C) that outlines the safe harbor "reasonable" steps that an employer can undertake to avoid a finding of constructive knowledge, given receipt of a Social Security No-Match letter relating to a particular individual.

1. In subsection (A)(1), the Service has outlined a 14 day window from "receipt" of the mismatch letter in which an employer must: (1) determine if there is an error in its own records; (2) if so, it must notify the agency as required in the letter; (3) and verify with the agency that the new information is a match.

   - ASA notes that it could easily take 7-14 days just for such a letter to be routed from a company's headquarters in Boston, for example, to the particular branch office responsible for the placement of the employee in Florida so that I-9 documentation can be reviewed. This still does not take into account the time it would take to obtain verification with the Agency that the corrected number is a match.
   - ASA recommends that this time period be 45 days, but no less than 30 days.

2. Subsection (A)(2) requires that if the employer's records are correct, then the employer must notify the employee of the discrepancy and if the employee confirms that the number is accurate, require the employee to resolve any discrepancy directly with the Agency. All of this must be accomplished within the same 14 day window.

   - Direct hire employers may not have a problem with this 14 day time frame, if all that is required is walking down the hall to speak to the employee. Staffing firms, on the other hand, frequently have employees who are physically located several states away and can move from state to state in very short periods of time. Therefore, it would be extremely difficult for staffing firms to comply with this requirement. As explained above, it could take 30 days just to have the paperwork passed to the appropriate office, complete the research in the employee records and then track down the employee and have that person check his or her records. Only when the employee confirms that the number is accurate can the employer advise the employee to resolve it with the agency.

American Staffing Association
DHS Docket No. ICEB-2006-0004
August 11, 2006
Page 4

- ASA again recommends a 45 day time period, but not less than 30 days.
- ASA would also like to confirm that the employer's obligation is to advise the employee to notify the agency and resolve the discrepancy. The employer should not be obligated to transport the employee or document what particular steps the employee took to resolve the discrepancy.

3.  Subsection (B) requires that if 60 days have passed from "receipt" and the employee has not been able to present written documentation from the agency of the correction, then the employer must complete a new I-9 form within three days, without accepting any documents referencing the disputed social security number.

- Because ASA believes that it could take a staffing firm up to 45 days just to complete the first few steps, we do not believe that it is reasonable to assume that an employee could resolve a dispute with a federal agency in only 15 days. The time period allocated must be realistic. The Social Security Administration frequently takes 2-4 weeks just to issue a number, let alone research an error in its own system. To further compound the problem, because of frequent assignment changes common in the staffing industry, an employee may start an inquiry with a Social Security office in Oregon, but then move to Texas, which requires follow up through a different office. This also takes a lot more time.
- ASA recommends that this time period be not less than 90 days, which is consistent with the existing "receipt rule" in the I-9 regulations.

CONCLUSION

ASA supports ICE's effort to provide employers with guidance and a safe harbor for dealing with receipt of No-Match Social Security Letters. ASA requests that the agency incorporate the changes suggested here, which reflect the unique characteristics of temporary and contract staffing.

Respectfully submitted,

AMERICAN STAFFING ASSOCIATION

Edward A. Lenz
Senior Vice President and General Counsel

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Jim Kyger [jkyger@piagatf.org] |
| **Sent:** | Monday, August 14, 2006 12:40 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 comments by PIA |

**Attachments:** ICEB-2006-0004, 8-14-06 comments by PIA.doc

Please find the attached that includes comments on the above cited proposed rule.

Please let me know that you successfully received the attached.


Jim

*(Please note my new address, phone and fax below.)*

Jim Kyger, SPHR, CCP
Director, Human Relations
Printing Industries of America (Washington Office)
601 13th Street, NW
Suite 360N
Washington, DC 20005-3807
202-730-7968
FAX 202-730-7987
JKyger@piagatf.org
www.gain.net

**No-Match Cert. Admin. Record  1966**

# ⓅⒶ Printing Industries of America, Inc.

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave., NW
2nd Floor
Washington, D.C. 20529

Ref: DHS Docket No. ICEB-2006-0004

Below are comments and suggestions on DHS Docket No. ICEB-2006-0004.

Section 274a.2 (a)(2): In the mid 1990s, the list of acceptable documents under List A was changed with both additions and deletions, see Appendix A. Currently, CIS only gives notice to the public of this list of updated documents on its web site. If a request is made to CIS for hard copy of Form I-9, no notice of the update list of acceptable documents is provided. For example, I requested Form I-9 this July from the agency's forms request line (800-870-3676) and received the enclosed Form I-9 (see Exhibit A). It contained no notice that the documents under List A have been revised. For reasons listed below, *the list of acceptable documents for Employment Eligibility and Identity should be revised.*

Section 274a.2 (b)(1)(i)(A): This section should be clarified stating that even if employees require translation and assistance in the completion of Form I-9, they must still sign and date Form I-9 in Section 1. Currently, the proposed language is vague in this regard.

## Call for Issuance of Final Regulation for Revision of Form I-9
On February 2, 1998, the Immigration and Nationalization Service issued a proposed rule in the Federal Register (Vol. 63, No. 21, pp 5287-5314) to revise Form I-9 by eliminating certain documents that were acceptable for Employment Verification and Identity. To date, this proposed rule remains in regulatory limbo, despite brief mentions in press releases and a few web page notices. For example:

- In an agency Press Release dated June 21, 2005, USCIS stated, "DHS is currently in the process of making substantive changes to the Form I-9 in connection with previous rulemakings and plans to introduce a new Form I-9 at the end of this

No-Match Cert. Admin. Record 1967

process." However, as part of the "Regulatory Plan" issued in the Federal Register on October 31, 2005 (Vol. 70, No. 209), neither the USCIS, or the Department of Homeland Security, have any official plans for finalizing this regulation (i.e., no indication that the agency plans on issuing final regulations is mentioned).

USCIS currently does a poor job in consistently notifying employers and the public that the list of acceptable documents for Employment Eligibility and Identity on the 1991 version for Form I-9 is out of date.    For example:

- Only the USCIS web site and two USCIS Employer Informational Bulletins (101 and 102) provide practical notification to employers that the list of acceptable documents under List A of Form I-9 has been revised. We know of no other agency efforts to educate employers and the public that the list of acceptable documents has been revised.
- Despite the regulatory revision of documents permissible for determination of Employment Eligibility and Identity, the USCIS does not enforce the rule of law of its regulation. We know of no cases where the agency has taken action against an employer or employee for using a document that is technically no longer acceptable under the list of documents in Form I-9. In addition, at the American Payroll Association (APA) conference in the spring of 2005, two DHS officials said that the agency was not excercising any enforcement if unacceptable documents under List A of Form I-9 were used. The following appears on page 7 of an APA newsletter from June 10, 2005 where the DHS officials were interviewed.

**"Eligibility documents listed on Form I-9**
**"Q.** The current Form I-9 and the *Handbook for Employers* were last revised in 1991. Some eligibility documents that appear on the form are technically no longer acceptable. If I hired an employee and accepted one of those documents, would I be in jeopardy with respect to ICE enforcement actions.

**"A.** My guess is that later this year you're going to see a new I-9, a new handbook, and new regulations. In the meantime, you can use the old I-9. If you accept somebody as work eligible based on a document that technically is no longer OK, you're in no jeopardy."

(See Exhibit B for portions of the APA newsletter mentioned above.)

**Conclusion**
PIA/GATF fully supports ICE's efforts in the current proposed regulation to resolve issues related to Social Security "no match" letters. However, employers, the government, and general public would also be well served if the DHS also revised Form I-9 to be consistent with or similar to with its proposal in 1998 and in compliance with existing regulatory requirements for documents of Employment Eligibility and Identity. The quote above from DHS officials in the APA newsletter regarding no enforcement if

an employer accepts documents for Employment Eligibility and Identity that are no longer valid gives us serious concern for the overall enforcement of our nation's immigration laws.  Employers are still given outdated Form I-9's through the mail, without any notice that some forms on List A are no longer acceptable.  Also, it is plausible to believe that a majority of employers are currently using Form I-9 without the updated list of acceptable documents under List A.  These employers could be employing illegal workers in good faith who are using counterfeit documents that are not even valid under existing law.  This is not the intent of current immigration law.

**Counterfeiting**
Congress stated in the legislative history of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) that counterfeiting of many of the documents in the Form I-9 list is of great concern, stating:

*The number of permissible documents has long been subject to criticism.  The INS published a proposed regulation in 1993 (with a supplement published on June 22, 1995) to reduce the number of documents from 29 to 16.  This proposal, however, does not reflect the consensus of opinion that documents should be reduced ever further, and that documents that are easily counterfeited should be eliminated entirely (See H.R. Rep. No. 104-469, at 404-05 (1996).))*

Since document counterfeiting has long been established as a problem in this arena and since document counterfeiting remains a problem today, we have great concern that 1) the agency is not enforcing the law where documents are no longer acceptable, and 2) that the agency has no official plans, as stated in the "Regulatory Plan" (from October 31, 2005 Federal Register), to update the List of acceptable documents to establish Employment Eligibility and Identity, and the rest of Form I-9.

If DHS does issue a revised Form I-9, as suggested above, then we suggest that the agency also revise the Handbook for Employers (M-274, revised 11/21/91).  In addition, the agency should use the "citizen/national" breakout designation that it used in its re-branded version of Form I-9, (Rev. 05/31/05)N.  That is, separate boxes for the employee to designate if he/she is "A citizen of the United States" or "A national of the United States".  This separate designation will give USCIS and ICE investigators more useful information during an investigation at an employer's premises.  It is unclear why USCIS issued two versions ("N" and "Y") of Form I-9 on May 31, 2005.  Form Y combined the designation of citizen and national, like the earlier version of Form I-9.

Sincerely,

*Q. Sh*

Jim Kyger, SPHR, CCP
Director of Human Relations

Enclosures

# Appendix A

The following changes have already been made to 8 CFR 274a.2.

The documents were ruled no longer acceptable under "List A" on page 3 of Form I-9 (Federal Register, September 30, 1997, pp. 51001 – 51006).

- Certificate of United States Citizenship (Form N-560 and N-561);
- Certificate of Naturalization (Form N-550 and N-570);
- Re-entry Permit (Form I-327);
- Refugee Travel Document (Form I-571).

The following document was ruled to be no longer acceptable under "List A" on page 3 of Form I-9 (Federal Register, July 19, 1996, pp. 37673-37675).

- Alien Registration Receipt Card Form I-151

The above documents do not meet the Attorney General's three conditions for documents to be contained in List A of Form I-9. The three conditions are as follows:

1. Bear a photograph and personal identification information;
2. Constitute evidence of employment authorization; and
3. Contain "security features to make it resistant to tempering, counterfeiting, and fraudulent use."

The following document was ruled to be acceptable under "List A" on Form I-9 (Federal Register, September 4, 1996, pp. 46534-46537).

- Employment Authorization Document, Form I-766

**Exhibit A**



DEPARTMENT OF HOMELAND SECURITY
EASTERN FORMS CENTER
POST OFFICE BOX 567
WILLISTON, VT 05495-0567

DO NOT MAIL APPLICATIONS TO THIS ADDRESS

First Class Mail

I-9
GHB
JIM KYGER
601 13TH ST NW STE 360N
WASHINGTON DC 20005-3849

Department of Homeland Security
U.S. Citizenship and Immigration Services

OMB No. 1615-0047; Expires 03/31/07

## Employment Eligibility Verification

### INSTRUCTIONS
PLEASE READ ALL INSTRUCTIONS CAREFULLY BEFORE COMPLETING THIS FORM.

**Anti-Discrimination Notice.** It is illegal to discriminate against any individual (other than an alien not authorized to work in the U.S.) in hiring, discharging, or recruiting or referring for a fee because of that individual's national origin or citizenship status. It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1 - Employee.** All employees, citizens and noncitizens, hired after November 6, 1986, must complete Section 1 of this form at the time of hire, which is the actual beginning of employment. The employer is responsible for ensuring that Section 1 is timely and properly completed.

**Preparer/Translator Certification.** The Preparer/Translator Certification must be completed if Section 1 is prepared by a person other than the employee. A preparer/translator may be used only when the employee is unable to complete Section 1 on his/her own. However, the employee must still sign Section 1 personally.

**Section 2 - Employer.** For the purpose of completing this form, the term "employer" includes those recruiters and referrers for a fee who are agricultural associations, agricultural employers or farm labor contractors.

Employers must complete Section 2 by examining evidence of identity and employment eligibility within three (3) business days of the date employment begins. If employees are authorized to work, but are unable to present the required document(s) within three business days, they must present a receipt for the application of the document(s) within three business days and the actual document(s) within ninety (90) days. However, if employers hire individuals for a duration of less than three business days, Section 2 must be completed at the time employment begins. Employers must record: 1) document title; 2) issuing authority; 3) document number, 4) expiration date, if any; and 5) the date employment begins. Employers must sign and date the certification. Employees must present original documents. Employers may, but are not required to, photocopy the document(s) presented. These photocopies may only be used for the verification process and must be retained with the I-9. However, employers are still responsible for completing the I-9.

**Section 3 - Updating and Reverification.** Employers must complete Section 3 when updating and/or reverifying the I-9. Employers must reverify employment eligibility of their employees on or before the expiration date recorded in Section 1. Employers CANNOT specify which document(s) they will accept from an employee.

- If an employee's name has changed at the time this form is being updated/reverified, complete Block A.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee is still eligible to be employed on the same basis as previously indicated on this form (updating), complete Block B and the signature block.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee's work authorization has expired or if a current employee's work authorization is about to expire (reverification), complete Block B and:

  - examine any document that reflects that the employee is authorized to work in the U.S. (see List A or C),

  - record the document title, document number and expiration date (if any) in Block C, and

  - complete the signature block.

**Photocopying and Retaining Form I-9.** A blank I-9 may be reproduced, provided both sides are copied. The Instructions must be available to all employees completing this form. Employers must retain completed I-9s for three (3) years after the date of hire or one (1) year after the date employment ends, whichever is later.

For more detailed information, you may refer to the Department of Homeland Security (DHS) Handbook for Employers, (Form M-274). You may obtain the handbook at your local U.S. Citizenship and Immigration Services (USCIS) office.

**Privacy Act Notice.** The authority for collecting this information is the Immigration Reform and Control Act of 1986, Pub. L. 99-603 (8 USC 1324a).

This information is for employers to verify the eligibility of individuals for employment to preclude the unlawful hiring, or recruiting or referring for a fee, of aliens who are not authorized to work in the United States.

This information will be used by employers as a record of their basis for determining eligibility of an employee to work in the United States. The form will be kept by the employer and made available for inspection by officials of the U.S. Immigration and Customs Enforcement, Department of Labor and Office of Special Counsel for Immigration Related Unfair Employment Practices.

Submission of the information required in this form is voluntary. However, an individual may not begin employment unless this form is completed, since employers are subject to civil or criminal penalties if they do not comply with the Immigration Reform and Control Act of 1986.

**Reporting Burden.** We try to create forms and instructions that are accurate, can be easily understood and which impose the least possible burden on you to provide us with information. Often this is difficult because some immigration laws are very complex. Accordingly, the reporting burden for this collection of information is computed as follows: 1) learning about this form, 5 minutes; 2) completing the form, 5 minutes; and 3) assembling and filing (recordkeeping) the form, 5 minutes, for an average of 15 minutes per response. If you have comments regarding the accuracy of this burden estimate, or suggestions for making this form simpler, you can write to U.S. Citizenship and Immigration Services, Regulatory Management Division, 111 Massachusetts Avenue, N.W., Washington, DC 20529. OMB No. 1615-0047.

NOTE: This is the 1991 edition of the Form I-9 that has been rebranded with a current printing date to reflect the recent transition from the INS to DHS and its components.

---

**EMPLOYERS MUST RETAIN COMPLETED FORM I-9**
**PLEASE DO NOT MAIL COMPLETED FORM I-9 TO ICE OR USCIS**

Form I-9 (Rev. 05/31/05)Y

No-Match Cert. Admin. Record  1972

Department of Homeland Security
U.S. Citizenship and Immigration Services

OMB No. 1615-0047; Expires 03/31/07

## Employment Eligibility Verification

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. ANTI-DISCRIMINATION NOTICE: It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins.

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|

| Address (Street Name and Number) | Apt. # | Date of Birth (month/day/year) |
|---|---|---|

| City | State | Zip Code | Social Security # |
|---|---|---|---|

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):

☐ A citizen or national of the United States
☐ A Lawful Permanent Resident (Alien #) A _____
☐ An alien authorized to work until ___/___/___
(Alien # or Admission #) _____

| Employee's Signature | Date (month/day/year) |
|---|---|

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Preparer's/Translator's Signature | Print Name |
|---|---|

| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C, as listed on the reverse of this form, and record the title, number and expiration date, if any, of the document(s).

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: | | | | |
| Issuing authority: | | | | |
| Document #: | | | | |
| Expiration Date (if any): ___/___/___ | | ___/___/___ | | ___/___/___ |
| Document #: | | | | |
| Expiration Date (if any): ___/___/___ | | | | |

CERTIFICATION - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (month/day/year) ___/___/___ and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment.)

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|

| Business or Organization Name | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|---|

**Section 3. Updating and Reverification.** To be completed and signed by employer.

| A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable) |
|---|---|

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

| Document Title: | Document #: | Expiration Date (if any): ___/___/___ |
|---|---|---|

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|

NOTE: This is the 1991 edition of the Form I-9 that has been rebranded with a current printing date to reflect the recent transition from the INS to DHS and its components.

Form I-9 (Rev. 05/31/05) Y Page 2

# LISTS OF ACCEPTABLE DOCUMENTS

| LIST A | | LIST B | | LIST C |
|---|---|---|---|---|
| **Documents that Establish Both Identity and Employment Eligibility** | **OR** | **Documents that Establish Identity** | **AND** | **Documents that Establish Employment Eligibility** |

| LIST A | LIST B | LIST C |
|---|---|---|
| 1. U.S. Passport (unexpired or expired) | 1. Driver's license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address | 1. U.S. social security card issued by the Social Security Administration (other than a card stating it is not valid for employment) |
| 2. Certificate of U.S. Citizenship (Form N-560 or N-561) | | |
| 3. Certificate of Naturalization (Form N-550 or N-570) | 2. ID card issued by federal, state or local government agencies or entities, provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address | 2. Certification of Birth Abroad issued by the Department of State (Form FS-545 or Form DS-1350) |
| 4. Unexpired foreign passport, with I-551 stamp or attached Form I-94 indicating unexpired employment authorization | | 3. Original or certified copy of a birth certificate issued by a state, county, municipal authority or outlying possession of the United States bearing an official seal |
| 5. Permanent Resident Card or Alien Registration Receipt Card with photograph (Form I-151 or I-551) | 3. School ID card with a photograph | |
| 6. Unexpired Temporary Resident Card (Form I-688) | 4. Voter's registration card | |
| | 5. U.S. Military card or draft record | 4. Native American tribal document |
| 7. Unexpired Employment Authorization Card (Form I-688A) | 6. Military dependent's ID card | |
| | 7. U.S. Coast Guard Merchant Mariner Card | 5. U.S. Citizen ID Card (Form I-197) |
| 8. Unexpired Reentry Permit (Form I-327) | 8. Native American tribal document | 6. ID Card for use of Resident Citizen in the United States (Form I-179) |
| 9. Unexpired Refugee Travel Document (Form I-571) | 9. Driver's license issued by a Canadian government authority | |
| 10. Unexpired Employment Authorization Document issued by DHS that contains a photograph (Form I-688B) | **For persons under age 18 who are unable to present a document listed above:** | 7. Unexpired employment authorization document issued by DHS (other than those listed under List A) |
| | 10. School record or report card | |
| | 11. Clinic, doctor or hospital record | |
| | 12. Day-care or nursery school record | |

**Illustrations of many of these documents appear in Part 8 of the Handbook for Employers (M-274)**

Form I-9 (Rev. 05/31/05)Y Page 3

No-Match Cert. Admin. Record  1974

## Exhibit B



# PAYROLL CURRENTLY

The Biweekly Payroll Compliance Publication Of The American Payroll Association

Volume 13          Issue # 12          June 10, 2005

## SSA Chooses National Payroll Reporting Forum to Announce Internet SSN Verification Is Now Available to All Employers

In her address to more than 450 attendees at the Social Security Administration's National Payroll Reporting Forum on June 2, SSA Commissioner Jo Anne Barnhart enthusiastically announced that all employers now have the capability to almost instantaneously determine whether an employee's name and social security number match information in SSA's database, which goes a long way toward ensuring that correct names and SSNs appear on employees' Forms W-2.

In announcing the rollout, Commissioner Barnhart noted that 96% of participants in the pilot for the Social Security Number Verification Service (SSNVS) who responded to a survey rated it "excellent" or "very good" and that more than 70% rated it higher than other similar federal government programs. She hoped that the ease of use and quick response time of the new system would significantly reduce the number of SSN verification phone calls made to SSA, which numbered more than one million in 2004.

In other developments at the day-long conference, IRS personnel provided a glimpse of their "Vision Draft" of the

redesigned Form 940 for 2006 and discussed their new procedures for identifying underwithheld employees now that employers no longer have to submit questionable Forms W-4 to the Service, while a representative from the Office of Child Support Enforcement discussed the latest developments in moving the child support withholding process toward a paperless environment.

**SSNVS promises real-time SSN verification**

In providing the details of the formal rollout of SSNVS beyond its successful pilot to all employers and third-party processors, Chuck Liptz, SSA's Director of Employer Wage Reporting and Relations Staff, said that employers can now submit up to 10 employee names and SSNs through the Internet to SSA and get immediate results. While this is a very effective method for verifying the information provided by newly hired employees, Liptz also said that employers looking to verify large numbers of employees (e.g., before W-2s are filed) can upload batch files of up to 250,000 names and SSNs and usually receive the results by the next business day.

To use SSNVS, the person who is going to use the system on behalf of an employer must register with SSA's Business Services Online. During the registration process, the individual will choose a password, while a PIN will be displayed on the screen. At this point, the individual will log in at the BSO home page and choose *Verify Social Security Numbers Online* as one of the BSO services that will be used. Because the employer must approve the individual's role as a user of SSNVS, SSA will mail an activation code to the employer, which the individual user must obtain before

being allowed access to SSNVS.

Once an individual sends employee information to SSA for verification through SSNVS, the results generally will contain entries only for those employees whose information does not match SSA's records. However, the results will also show whether any of the submitted employee information matches that of a person who is shown to be deceased in SSA's records.

**SSA plans further expansion of BSO services**

By 2010, SSA hopes to receive 94% of all Forms W-2 from employers over the Internet and is well on the way toward achieving that goal, according to Marti Eckert, Director for Organizational Services and Application Development, with 76% filed electronically for tax year 2004 as of May 28, 2005. To move closer to the ultimate goal, Eckert announced several enhancements being planned for SSA's Business Services Online for the tax year 2005 filing season. These include:

• making W-2-related services available on December 19, 2005, for tax year 2005;

• increasing the number of W-2 Online submissions that can be sent to 50 (20 W-2s in each submission);

• implementing a "save" feature for W-2c Online; and

• implementing household employer registration changes to make the process easier.

**IRS redesigns Form 940, explains new W-4 policy**

After a year spent examining and questioning the need for every line and data item on Form 940 (*Employer's Annual Federal Unemployment (FUTA) Tax Return*) over the last year, Lisa

### Inside this issue...

Forum on Federal Payroll
Issues, Part 3 ......................................... 2

IRS Announces
Quarterly Interest Rates ....................... 5

DOL Wage & Hour
Division Roundup ................................. 7

State and Local News:
Indiana – tax amnesty
Maryland – bonds
Utah – license and bond
requirements ......................... 8

No-Match Cert. Admin. Record  1975

thing to do is to have an agreement with the employee about what pay period(s) the advance will be repaid from and how it will be paid back. I recommend that you have this agreement in writing, though federal law does not require it. Many states have rules for advances, and will only allow you to deduct under certain circumstances. For instance, in some states (including California), you have to have written permission from the employee to take any deduction other than a required deduction. If you do not have written permission, you face penalties if you deduct from an employee's wages.

Another issue involves the employee who leaves your employment and hasn't paid back the advance or returned the tools in his possession. If the employee wants to keep these tools or equipment, then you need to have some sort of agreement with him that this is the case. If you deduct the value of these things from a paycheck, you could create a minimum wage or overtime violation, depending upon the cost.

You make the minimum wage/overtime determinations based on the gross pay, not the net pay. If, after making the deduction, the employee's gross pay is higher than the minimum wage, under federal law it's all right if their net pay goes down to zero if you have an agreement in writing. Remember that you have to look at state rules as well as the federal rules, however.

**U.S. Immigration and Customs Enforcement**
*Role of agency*

*Q.* Over the past couple of years, the former INS and its immigration enforcement and services roles have migrated to the new Department of Homeland Security and two new agencies – U.S. Citizenship and Immigration Services and U.S. Immigration and Customs Enforcement. Can you tell us about this significant organizational change, the mission of these new agencies, how they work together, and their plans to reach out to build strong working relationships with the employer community?

*A.* In March 2003, the Homeland Security Act dismantled the legacy INS.

The INS was divided into three parts. One part is now called Customs and Border Protection, which essentially is the old Border Patrol and the inspectors that you see at the airport. A second part of INS is now Citizenship and Immigration Services. They handle the service side – naturalization, adjustment of status, work authorization, etc. A third part of the former INS is now Immigration and Customs Enforcement. We are the investigative arm of the Department of Homeland Security.

In the immigration arena, we handle everything from national security-related investigations to work-site investigations and detention and removal of aliens. We also handle what used to be called customs investigations – investigations involving illegal imports and exports.

In terms of work-site enforcement, ICE's mission right now, with limited resources, is focused on critical infrastructure – power plants, airports, nuclear facilities, and the like. We make sure that the workers in these facilities are authorized to work.

In terms of outreach to employers, ICE is working on setting up partnerships with employers, trying to help them find the best way to hire an authorized work force. We are looking at providing training in how to spot fraudulent documents. Later this year, we hope to be able to give more specifics on how employers can partner up with DHS.

*Form I-9 electronic signatures, electronic storage*

*Q.* Employers are eagerly awaiting final regulations on collecting electronic signatures on Form I-9 and storing those forms electronically. Can you tell us when the Department of Homeland Security may issue these final rules, and can you provide some high-level insight on what their content may be?

*A.* Until recently, employers were required to keep paper or microfilm or microfiche copies of all Forms I-9. These forms must be kept for three years from the date of hire or one year from the date of termination, whichever is later. In October, the President signed legislation permitting electronic storage and electronic signatures on these forms (see PAYROLL CURRENTLY, Issue No. 25, Vol. 12).

Since then, we've been working on implementing regulations. We are still working on them, even though the law went into effect on April 29. Because the regulation is not out yet, we have posted interim guidance on our Web site (see www.ice.gov/graphics/news/factsheets/i-9employment.htm).

The guidance gives you an idea of what the regulation will look like. We want to make the rules as easy as possible for employers to comply with. What we don't want is to put out a very specific regulation that will constantly need to be updated and that will force employers to use specific technology.

The interim guidance is fairly broad. It describes the information you must capture, namely the information that's on the I-9 form. Exactly how you do it, for the most part, we're leaving up to you so long as you use a system that allows you to produce document trails, audit trails, etc. We hope to have the regulation itself very soon.

*Basic Pilot Program*

*Q.* Can you summarize the Basic Pilot Program for employment eligibility verification, its recent nationwide expansion, and how it may evolve in the future?

*A.* The Basic Pilot Program was created by Congress in 1996. It's an automated system with a link between SSA records and immigration records. It's on the Internet. You log on to a Web site, get a password, take an online tutorial, and sign a Memorandum of Understanding saying you'll use the system according to the rules and won't discriminate. Then, at the point of hire, you enter I-9 information, and in the vast majority of cases you get an instantaneous return – either a verification of employment eligibility or a non-confirmation of employment eligibility.

It's a very simple system – a red light, green light type of thing. It also provides an audit trail. For example, if there is a problem, it will print out a letter to the employee, and he can take that letter to SSA or CIS to resolve the problem. The information the employee provides will be entered into the system, so that when the employee returns to you and you log on to the Web site again

No-Match Cert. Admin. Record  1976

PAYROLL CURRENTLY    JUNE 10, 2005 · ISSUE # 12

using your unique password, you will see that the problem was resolved.

The Basic Pilot was available to employers in five states up until a year ago. Now, however, Congress has expanded it to employers in all states. Everybody is eligible. To find out more about it, go to http://uscis.gov (click on "Employer Information" and "Employment Verification Pilot Programs").

**Work-site enforcement actions**

*Q.* Your recent and highly-publicized audit of a major retailer and the number of illegal workers discovered in their stores has many employers concerned. Should we expect to see more work-site enforcement actions by ICE? How can I ensure I'm in compliance with immigration laws and protect my company from enforcement actions, especially if I hire independent contractors who hire their own employees?

*A.* Yes, you can expect to see more of these audits. We do them routinely, but not usually to companies that large. That case was two or three years in the making.

How can you protect yourself? Simple due diligence. For example, download the I-9 *Handbook for Employers* from our Web site (http://uscis.gov/graphics/lawsregs/handbook/hand_emp.pdf) and read it. When you're filling out Forms I-9, pay attention to the employment eligibility documents you're given. You're legally authorized, if you choose, to make copies of those documents. You can also use the Basic Pilot Program I described. It's a very good tool.

Make sure that the people you hire as independent contractors are performing the same due diligence in verifying the identity and employment eligibility of the workers they hire.

**Where and how long to keep Form I-9**

*Q.* Is it OK to keep the I-9 in the employee's regular personnel file? How long am I supposed to keep it?

*A.* There's nothing in the law prohibiting an employer from keeping the I-9 in the employee's personnel file. (*Note:* The APA advises you not to keep it in the personnel file but in a separate I-9 file, so that any audits remain narrowly focused.)

**I-9 audit criteria**

*Q.* If I choose to electronically collect and store Form I-9 information, am I more likely to be chosen for an audit by Immigration and Customs Enforcement?

*A.* The short answer to that is no, you are not. The electronic I-9 will facilitate an easier inspection process if an employer is asked for I-9s. But the inspection itself will still be based on intelligence, the type of industry, or other law enforcement factors.

**Eligibility documents listed on Form I-9**

*Q.* The current Form I-9 and the *Handbook for Employers* were last revised in 1991. Some eligibility documents that appear on the form are technically no longer acceptable. If I hired an employee and accepted one of these documents, would I be in jeopardy with respect to ICE enforcement actions?

*A.* My guess is that later this year you're going to see a new I-9, a new handbook, and new regulations. In the meantime, you can use the old I-9. If you accept somebody as work eligible based on a document that technically is no longer OK, you're in no jeopardy.

**Photocopying I-9 documents**

*Q.* Am I allowed to photocopy the identity and work authorization documents that a new worker presents with Form I-9 and keep those copies with the form itself? Do you recommend this? What if an employee objects?

*A.* The law specifically allows you to copy documents that a worker presents for I-9 purposes. It doesn't require it, so you can but you don't have to.

There's always been a debate about whether you should make a copy of these documents. Company lawyers sometimes say, don't make copies because if somebody accepted the wrong document, it'll be evidence and the company might be fined.

On the other hand, there are some pretty good reasons to do it. It provides the employer with a postaudit capability. A lot of the employers that we prosecute give the authority to hire and fire and fill out and certify the I-9 to one person or two people. When authority is that centralized, it can be difficult to postaudit what's going on. It can also be difficult for the company to internally review what's going on.

Another reason to photocopy I-9 documents is that it demonstrates to an investigator who says, let me see your I-9's, that you actually did see the documents. Also, if you're participating in the Basic Pilot program, having a copy of the documents in front of you means there's a greater likelihood that you're going to get the social security number right.

If an employee voices an objection, the employer can still go ahead and make the photocopies.

**I-9 process in a satellite office**

*Q.* How should I handle the preparation of Form I-9 for a new employee who is working alone in a satellite office? There is no one else there to review the employment eligibility documents. Could the new employee fax me copies of the documents? Could we have asked to see the documents at the in-person employment interview and have prepared a tentative I-9 for this employee when he or she was a prospective employee?

*A.* You have to look at the original documents. This means you can't have a fax sent for review. Also, you can't do the review in advance because you can't ask to see the documents before the person is hired.

One way to handle the situation you're describing is to use a notary in the city where the satellite office is located to review the documents. Or you can have the employee send the documents to you overnight for review. **ICE**

## DOL Wage & Hour Division Roundup

The U.S. Department of Labor's Wage & Hour Division recently concluded the following enforcement actions:

• Hertz Local Edition Corp., headquartered in Park Ridge, NJ, has agreed to pay $320,088 in back overtime wages to 834 assistant branch managers. A nationwide

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | Osinski, Ruth [Ruth.Osinski@NFIB.ORG] |
| **Sent:** | Monday, August 14, 2006 10:55 AM |
| **To:** | Regs, Rfs |
| **Subject:** | [Docket No: ICEB-2006-0004];[FR Doc: E6-09303];[Page 34281-34285]; Immigration: Aliens--Unauthorized and unlawful hiring or continued employment; safe-harbor procedures for employees who receive a no-match letter |
| **Attachments:** | Comments 08-14-06 Safe harbor for employers (DHS).doc |

<<Comments 08-14-06 Safe harbor for employers (DHS).doc>>

The attached comments are submitted on behalf of the members of the National Federation of Independent Business.

Ruth Osinski
Legislative Analyst
National Federation of Independent Business
1201 F St., NW
Suite 200
Washington, D.C. 20004
202-314-2046
202-484-1566 (fax)

**Privacy Notice**

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this message and deleting it from your computer.

**No-Match Cert. Admin. Record  1978**



1201 F, St, NW, Suite 200, Washington, DC  20004
(202) 554-9000

August 14, 2006

Hon. Michael Chertoff
Secretary
Department of Homeland Security
Bureau of Immigration and Customs Enforcement
Washington, DC 20528

RE:  PROPOSED RULE ON THE SAFE-HARBOR PROCEDURES FOR EMPLOYERS WHO RECEIVE A
NO-MATCH LETTER (DKT NO ICEB-2006-0004).

Dear Secretary Chertoff:

On behalf of the small-business owners represented by the National Federation of
Independent Business (NFIB), I am writing to offer comments on the Department of Homeland
Security (DHS) Bureau of Immigration and Customs Enforcement's (BICE) Proposed Rule on
the Safe-Harbor Procedures for Employers Who Receive a No-Match Letter, listed in the Federal
Register on June 14, 2006 (71 Fed. Reg. 34281). NFIB appreciates DHS's efforts to give
businesses guidance on how to handle no-match letters.

NFIB is the nation's largest small business advocacy organization, with offices in
Washington, D.C. and all 50 state capitals. NFIB serves the needs of small business on a broad
spectrum of issues. Ninety percent of NFIB members have fewer than 20 employees. The typical
NFIB member employs five workers and reports gross sales of around $350,000 per year.

Clarification of the employer's obligation upon receiving a no-match letter and the safe
harbor provided for in the proposed regulation is critical. This is particularly important given that

Comments by NFIB on the Proposed Rule with Request for Comment                    Page 2
Safe-Harbor Procedures for Employers Who Receive a No-Match Letter
August 14, 2006

DHS now intends to utilize no-match information in their enforcement activities. These
procedures are consistent with the suggested steps given by the Social Security Administration
(SSA) on what to do when you receive a no-match letter.

When SSA began sending no-match letters to employers, businesses were told the intent
was not enforcement of immigration laws but to correct any mistakes so that social security
funds were properly allocated. There are many causes for such a no-match, including clerical
error and name changes. Allowing SSA no-match data to be used by DHS for immigration
enforcement might create anxiety for employers who are told that while unlawful to hire illegal
workers it is also unlawful to scrutinize documents. Employers must accept documents if they
"appear reasonably genuine on their face" or risk the threat of being faced with a discrimination
lawsuit. This regulation will give our small employers who follow the law and verify their
worker's identity and employment eligibility to the best of their ability a safe harbor from fines if
appropriate action is taken upon receipt of a no-match letter.

Employers are obligated to take reasonable action when they have been notified they may
have hired an illegal alien. The guidance put forth by this regulation is necessary because while
the SSA has told employers that the receipt of a no-match does not mean that their employee is
illegal, a substantial number of workers identified by no-match letters are undocumented
immigrants who are unable to provide legitimate social security numbers. The proposed rule
spells out steps to be taken to resolve the discrepancy. If that discrepancy cannot be resolved
within 60 days, the regulation states that the employer must reverify the employee's identity and
employment authorization or terminate the employee.

Because this proposed rule states that inaction after the receipt of a no-match constitutes
knowingly employing an illegal worker, NFIB has concerns about the time frame given to
resolve the issue. First, the regulation should specify whether the employer has 14 calendar days
or 14 government working days. NFIB suggests that employers would need the time frame to be
based on government working days because the resolution involves contacting either SSA or
DHS.

**Comments by NFIB on the Proposed Rule with Request for Comment**                      Page 3
**Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**
**August 14, 2006**

Another concern with the 60-day time frame is that employers only have 14 days to act. This leaves the employee with 46 days to follow-up with any action that needs to done on their part. If an employer participates in the Basic Pilot program an employee who receives a tentative nonconfirmation has only eight days to correct potential problems with SSA. It raises questions as to why employees get 46 days to correct problems with work authorization after a no-match letter and eight days with the Basic Pilot, the effort on behalf of the employee should the same in both instances. Additionally this time frame provides a new opportunity for illegal workers to game the system. This could be a problem for employers because they have to keep employees that have no intention of contacting SSA because they do not have legal work status. According to research by Center for Urban Economic Development at University of Illinois on the no-match program, few corrections are actually made because of these letters since most of the workers identified are not authorized to work. Allowing 46 days gives employees a chance to maintain employment with full knowledge that there will not be any corrections made with SSA or DHS. If the employer suspects that the employee is making no effort to resolve the no-match issue they have no choice but to wait out the remaining 46 days before terminating the employee and starting the hiring and training process, just simply prolonging the inevitable.

NFIB questions why employees cannot correct their information within the same time frame as employers. If a 60-day time frame is adopted, 30 days should be allowed for both the employer and the employee. If DHS intends to keep the employer deadline at 14 days then employees should be given that same deadline.

NFIB is also concerned that DHS will not be flexible with the 14-day deadline. Small businesses often have problems with rigid deadlines that do not allow the agency to evaluate why an employer might have missed the deadline. Thanks in part to the efforts of NFIB, the Occupational Safety and Health Administration allows small businesses to file appeals even if they missed a deadline because of a mistake or with a reasonable excuse. DHS allows themselves flexibility in the rules by stating that DHS will look at all the behaviors of the offending employers specifying that the safe harbor procedures cannot be used to avoid liability if the

**Comments by NFIB on the Proposed Rule with Request for Comment**      Page 4
**Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**
**August 14, 2006**

employer demonstrates they had knowledge their employee was an unauthorized alien. NFIB hopes that DHS will look at all the circumstances surrounding an employer who unknowing hired and illegal worker but inadvertently missed the 14-day deadline.

NFIB urges DHS to carefully consider the full impact the proposed rule will have on small business. By setting forth "options" for avoiding liability, the proposed rule has in effect created additional recordkeeping and other compliance requirements on a substantial number of small entities. Pursuant to the Regulatory Flexibility Act, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, NFIB requests that the agency carefully determine whether the proposed rule will have a significant economic impact.

NFIB appreciates the opportunity to provide comments on DHS's Proposed Rule on the Safe-Harbor Procedures for Employers Who Receive a No-Match Letter. Please do not hesitate to contact us if you have any questions.

Sincerely,

Dan Danner
Executive Vice President
Public Policy and Political

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | NEAC1@aol.com |
| **Sent:** | Monday, August 14, 2006 10:45 AM |
| **To:** | Regs, Rfs |
| **Cc:** | hughes@ncaeonline.org |
| **Subject:** | Docket no. ICEB 2006-0004 |
| **Attachments:** | Social Security NO-Match Letter.doc |

Attached please find comments from the New England Apple Council for Safe Harbor Procedure for Employers who receive a No-Match Letter. The comments are also being sent by overnight currier.

Joseph Young Executive Director

**No-Match Cert. Admin. Record  1983**

New England Apple Council Inc.
7 Main St.
Goffstown, NH, 03045

VIA ELECTRONIC MAIL AND OVERNIGHT EXPRESS

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

RE:   Docket No. ICEB-2006-0004
      Safe Harbor Procedures for Employers Who Receive a No-Match Letter
      (FR 71:114, p. 34281)

Gentlemen:

      The New England Apple Council (NEAC) submits the following comments on the
Department of Homeland Security's Proposed Rule regarding "no-match" letters
published in the Federal Register on June 14, 2006. (71 Federal Register 34218)

      NEAC is a grower owned non profit association based in Goffstown, NH. NEAC
has 200 farmer members located in all six New England States. Our members are some of
the longest users of foreign labor recruited under various LEGAL programs administered
by the Department of Labor and USCIS formerly INS. Some of our members have used
LEGAL seasonal foreign workers since 1945.

      We were deeply involved in the use of foreign workers prior to the passage of IRCA
in 1986. We saw a large increase in usage of H2A workers in the years following its
passage (IRCA). Since the early 1990's the usage of H2A workers has decreased by our
members at the same time that production has remained constant. The Department of
Labor is responsible for the increased use of domestic non H2A workers through referrals
from Florida and Puerto Rico. Many of those referrals as well as the friends and family
who followed fall into the Social Security "no-match" category. Our members have
followed up and notified workers with no-match numbers, only to have them replaced,
the workers, by new ones. Our growers have not used the electronic verification program
for two reasons.
First, the data base is very far from perfect. Legal workers with newly issued Social
Security numbers are seldom included in the data base, and H2A workers are not
included by law in the Social Security system.
Secondly, the Office of Special Council for Immigration Related Unfair Employment
Practices has been very active in perusing employers under the Anti Discrimination
provisions of the Civil Rights Act of 1964 and the Anti Discrimination provisions of

IRCA. To treat domestic employees differently than H2A employees could be considered discrimination, and as I stated H2A employees are not included in the Social Security System, and would always come up as a no-match.

Our advice to our employers has always been upon receipt of a no-match letter to advise the worker to correct the problem, to continue employment, or in most cases to be rehired. (Because of the seasonal nature of the jobs) If they do this and provide corrected numbers or names, the workers, continue or are rehired. If there is a second no-match letter on the same individual he or she is permanently discharged.

At the present time there is no reliable, efficient, system to check all employees through Social Security number verification. Until that is in place your agency should postpone the Proposed Rule. Congress should act on the Social Security "no-match" problem before this rule is implemented.

As a part of our statement we incorporate by reference in its entirety the comments of the Nation Council of Agricultural Employers (NCAE).

Sincerely Yours,

Joseph Young Executive Director

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Bill Isokait [Bisokait@asa-hq.com] |
| **Sent:** | Monday, August 14, 2006 8:57 AM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |

**Attachments:**    ASA Comments on 6-14 Proposals (8-14-06).doc



ASA Comments on
6-14 Proposals...

       Attached please find the comments of the American Subcontractors Association, Inc. on the subject DHS docket number.

```
William A. Isokait
Senior Director & Counsel for
   Government & Industry Relations
American Subcontractors Association, Inc.
1004 Duke Street
Alexandria, VA 22314-3588
Phone: 703-684-3450, ext. 1311
Fax: 703-836-3482
E-mail: bisokait@asa-hq.com
www.asaonline.com
```

1

No-Match Cert. Admin. Record  1986



August 14, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
Second Floor
111 Massachusetts Avenue, N.W.
Washington, D.C. 20529

**Re:  DHS Docket No. ICEB-2006-0004; Rulemaking Proceedings on
Safe-Harbor Procedures for Employers Who Receive a No-Match Request**

Dear Sir or Madam:

The American Subcontractors Association, Inc. (ASA) is a national trade association representing more than 5,000 construction subcontractors, specialty contractors and suppliers. ASA members work in virtually all of the construction trades and on virtually every type of horizontal and vertical construction. The average annual volume of ASA members is approximately $8 million. Sixty-nine percent of ASA members employ fewer than 100 employees; 31 percent employ 100 or more employees. ASA has great interest in any rules that impose new duties or responsibilities on its members with respect to their employees and prospective employees.

Legislation is pending in the U.S. Congress that proposes significant changes relating to employer responsibilities with respect to verifying the identities and eligibility to work of employees and prospective employees. Both the House-passed and Senate-passed bills include specific provisions that address the responsibilities of an employer that receives a no-match letter from the Social Security Administration or the Department of Homeland Security.  It is important to let this debate run its course without competing and duplicative regulatory proposals. ASA believes that the referenced proposals are premature and strongly recommends that DHS wait until the Congressional debate concludes, or at least until the end of the 109th Congress, before it considers changes in the current rules governing employer verification of employees.

The proposed rule would require employers to dramatically change the processes and procedures they have had in effect for 20 years. Following are ASA's comments on specific aspects of the proposals.

AMERICAN SUBCONTRACTORS ASSOCIATION, INC.
1004 Duke Street, Alexandria, VA 22314-3588
Phone: (703) 684-3450 Fax: (703) 836-3482
email: ASAOffice@asa-hq.com

**No-Match Cert. Admin. Record  1987**

ASA Comments
DHS Docket No. ICEB-2006-0004
Page 2 of 3

- The proposed regulation would amend the scope of constructive knowledge in certain circumstances and states that "[E]mployer's obligations under current law, which is that if the employer fails to take reasonable steps after receiving such information, and if the employee is in fact an unauthorized alien, the employer may be found to have had constructive knowledge of that fact." The regulation defines what constitutes a "reasonable response" by an employer to a no-match letter and proposes specific steps to be taken by the employer, within defined periods of time. Taking such measures may allow the employer to avoid liability and mitigate or eliminate potential penalties. The proposal states that an employer should attempt to resolve the discrepancy within 14 days.

  Although 14 days may sound reasonable, this is not a reasonable time period in which to act. This will create significant challenges for both large and small employers. Employers in the construction industry, for example, hire large numbers of workers at the beginning of a project in a short period of time. They may receive several no-match letters at a time. It would be very difficult to resolve all of the letters in the prescribed time period. This becomes especially acute for smaller employers, like many ASA members. They usually do not have full-time administrative staff to address these issues in a 14-day timeframe. Small business owners must often run all aspects of the business, including the bookkeeping, employee supervision and training, as well as perform the administrative responsibilities.

  ASA does not believe that the 14-day time period is reasonable. On the contrary, it will be unduly burdensome for employers and "have a significant economic impact on a substantial number of small entities," in violation of the Regulatory Flexibility Act. The DHS assertion that this proposal would not mandate any new burdens or have a significant economic impact on small entities is not supported by any facts or data in the proposal and is unrealistic.

- One of the ways that an employer can be notified of a no-match is through written notification from DHS. The proposal explains that DHS will take into account the totality of relevant circumstances when making a determination whether the employer had constructive knowledge that the alien was unauthorized to work. However, there is no comparable standard for the Social Security Administration (SSA). SSA should also be required to take into consideration all of the facts surrounding the situation and take into account the totality of the circumstances.

- As noted above, one of the ways by which an employer can be put on notice is by receiving a written notification from DHS. Unlike SSA, DHS does not have a mechanism in place that regularly checks and reports mismatched immigration documents. Rather, DHS usually is made aware of mismatched immigration documents in the context of an audit. As noted in the proposed regulation, if an employer receives a letter from DHS, s/he is expected to resolve the issue by "taking reasonable steps to resolve the question raised by DHS about the immigration status document or EAD." However, DHS provides no specific guidance as to what those steps should be and what an employer should do to rectify the situation. ASA believes that DHS should specify and explain this process before this proposal moves forward.

ASA Comments
DHS Docket No. ICEB-2006-0004
Page 3 of 3

- The DHS proposal fails to recognize the reality of the hiring and initial employment process, particularly in the construction industry. In the first 60 days of employment the employer has often made a substantial investment in new employees in the form of pre-employment screening, new hire paperwork, training (formal and on-the-job), issuance of personal protective equipment and preparation for inclusion in benefit programs. Subcontractors usually work in coordination with other contractors on construction projects. The absence of even one or two employees while they attempt to "pursue the matter" of employment eligibility can seriously impact productivity and construction schedules.

Furthermore, in the real world work environment if an employer receives a no-match letter, many employees will not "confirm that the employer's records are correct" or "pursue the matter personally with the relevant agency." They will either stop reporting for work or put the employer in the position of having to terminate them for failure to provide the documents and verification required by the proposal. This could expose the employer to liability for alleged discrimination. The DHS "solution" to this dilemma is to advise that "then the employer must choose between taking action to terminate the employee or facing the risk that DHS may find that the employer had constructive knowledge that the employee was an unauthorized alien and therefore, by continuing to employ the alien, violated INA section 274A(a)(2), 8 U.S.C. 1324a(a)(2)."

It is also very disruptive, and potentially very expensive, to small employers like many ASA members. Employees who stop reporting for work or must be terminated for failure to comply with this proposal must be replaced, delaying work and exposing employers to liquidated damages penalties or termination for nonperformance. This could have a significant effect on these businesses and the economy. The proposal does not address these potential impacts. ASA does not believe that DHS's characterization of the proposal as not a major rule as defined by the Small Business Regulatory Enforcement Act is supported by the proposal or realistic.

ASA appreciates the opportunity to comment on this proposal. Please include these comments in the record of DHS proceedings on this matter. If you have any questions about these comments, please feel free to contact the undersigned.

Sincerely,

§¨©ª

William A. Isokait
Senior Director & Counsel for
Government & Industry Relations

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | suarez.joan@att.net |
| **Sent:** | Sunday, August 13, 2006 12:10 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket No. ICEB-2006-0004 - Comments on No-Match |
| **Attachments:** | IRATF - No Match letter.doc |

August 13, 2006

Please find attached comments re Docket No.ICEB-2006-0004.

Joan Suarez
Immigrant Rights Action Task Force
Jobs With Justice

**No-Match Cert. Admin. Record  1990**



**Workers' Rights Board**

a project of Jobs with Justice

# St. Louis Area Immigrant Rights Action Task Force

- African Refugee Service
- African Mutual Assistance Association of Missouri
- American Friends Service Committee-St. Louis
- Congolese Community of St. Louis
- Coalition of Black Trade Unionists
- Human Rights Action Service
- Focus Saint Louis
- Granite City Immigration Project
- Islamic Community Center
- Immigration Project-Eastern Missouri Legal Services
- Interfaith Legal Services for Immigrants
- Korezappa – Concerned Haitians and Friends
- Liberian Association
- Labor Council for Latin American Advancement
- Manos Unidas
- Service Employees International Union, Local #1
- Student-Worker Alliance of Washington University
- UNITE-HERE, Midwest Region

August 13, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:*   ***DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"***

Dear Sir or Madam:

The Immigrant Rights Action Task Force (IRATF), a project of St. Louis Jobs With Justice, submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The IRATF is a coalition of organizations and agencies that brings leaders in the varied immigrant communities together to find common areas of interest in regard to public policy and then determining how best we can work to have such policy implemented. Worker rights and comprehensive immigration reform are two such areas to which we have given considerable attention.

As a result of this work, the IRATF has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States–immigrant and native-born alike.

The IRATF is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration.** Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw

**No-Match Cert. Admin. Record  1991**

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Joan Suarez, Convenor
Immigrant Rights Action Task Force
Jobs With Justice
2725 Clifton Avenue
St. Louis, Missouri 63139
314-644-0466
immigrantrights@stl-iwi.org

**Khazaeli, Javad M**

From:     Hispacol2@aol.com
Sent:     Friday, August 11, 2006 8:06 PM
To:       rfs.regs.@dhs.gov
Subject:  DHS Docket No. ICEB=2006-0004, Regarding "Safe-Harbor Procedures of Employers

August 11, 2006


Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for
       Employers Who Receive a Non-Match Letter"

Dear Sir/Madam:

       The Hispanic Coalition, summits the following comments in response to the request for
public comment by the Department of Homeland Security (DHS), Bureau of Immigration and
Custom Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who
Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

       Since 1988, the Hispanic Coalition has been working in South Florida, in one of the
nation's great melting pots.  Immigration issues are a mayor concern in virtually every
neighborhood in our community.  The Hispanic Coalition's ability to reach out, assist and
educate the various ethnic groups, including; Caribbean, Haitians, Asians, Nicaraguans,
Hondurans, Mexicans, Cubans, Europeans and many others for the past 18 years has played a
significant role in helping to keep families together, building unity in diverse communities and
helping people unfamiliar with the United State's Laws.

       The Hispanic Coalition's relationships over the years with legacy INS agencies and the
current USCIS, underscore our long experience in resolving immigration problems.  Our client
base comes from across the State of Florida and our reputation for honesty and effectiveness is
well known.  Our organization workers service between 1,200 and 1,500 families every month
from our 4 locations in the State of Florida.

       The Hispanic Coalition has ample experience in dealing with the adverse impact that the
Social Security Administration's (SSA) no-match letters have had on all workers in the United
States-immigrant and native-born alike.

       As a result of this work, the Hispanic Coalition is alarmed by and strongly opposed to the
implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-
Match Letter."  Such a rule will magnify the adverse impact that SSA no-match letters have had
on worker's rights, and trigger mass firing across the nation.  These firings will be unnecessary,

**No-Match Cert. Admin. Record  1993**

unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, *the rule will have not impact on undocumented immigration. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.*

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- *This proposed rule will harm all workers regardless of immigration status.*

**The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA *database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors.* Hundreds of thousands of workers – including U.S. Citizens and authorized no citizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other workers protection, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The propose rule will expand the unregulated underground cash economy.**

**"Safe-harbor"** for employers is a misnomer. Although the proposed rule supposes to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the *unregulated underground cash economy* which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good record and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform.** The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the

**No-Match Cert. Admin. Record  1994**

proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement**

This proposed rule attempts to transform the SSA no-match letter into a Immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain corrected information about the immigration status of workers and, if they have any, most of the time it's incorrectly. Indeed, the database contains information about both U.S. Citizens and work-authorized no citizens who employers will presume to be undocumented simply because they appear on a non-match list. The letter is **not indicative of immigration status,** and explicitly states on its face that a worker's identification in the letters does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status.

- **The proposed rule is an erosion of our privacy rights**

DHS is currently barred from direct access to the SSA database by laws Protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax law. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be WITHDRAWN.

In sum, the Hispanic Coalition strongly opposes the Department of Homeland Security's proposed regulation, entitled "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simple the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands – possible millions – of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Rosa E. Kasse
President
Hispanic Coalition
5659 W. Flagler Street
Miami, Florida 33134
(305) 262-0060
(305) 262-0518
E-mail; Hispacol2@aol.com

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | Adrienne DerVartanian [adervartanian@nclr.org] |
| **Sent:** | Friday, August 11, 2006 6:47 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket No. ICEB-2006-0004, Comments Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" |
| **Attachments:** | FarmworkerJusticeCommentsSSANoMatch8-06.doc |

**Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"**

Dear Sir or Madam:

Farmworker Justice submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

<<...>>

Adrienne DerVartanian
Staff Attorney/Policy Analyst
Farmworker Justice
1010 Vermont Ave., NW, Suite 915
Washington, DC 20005
Tel. (202) 783-2628, ext. 204
Fax (202) 783-2561
www.fwjustice.org

25 years of service to farmworkers

**No-Match Cert. Admin. Record  1997**



**FARMWORKER
JUSTICE**
—25 YEARS OF SERVICE—

August 11, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

**Re:**     ***DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for
Employers Who Receive a No-Match Letter"***

Dear Sir or Madam:

Farmworker Justice submits the following comments in response to the request
for public comment by the Department of Homeland Security (DHS), Bureau of
Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures
for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

Farmworker Justice's mission is to empower farmworkers to improve their wages
and working conditions, labor and immigration policy, health and safety, and access to
justice through litigation, advocacy, education and coalition-building. Farmworker
Justice plays a major role in policy debates and implementation of immigration and labor
policy affecting agricultural workers.

Farmworker Justice is familiar with the adverse impact that the Social Security
Administration's (SSA) no-match letters have had on all workers in the United States–
immigrant and native-born alike. The Social Security Administration's (SSA) database
has proven to be error prone, harming all workers, regardless of their immigration status
or country of origin. The experience of a packing house worker in the Midwest
highlights the errors inherent in the database. A worker with lawful permanent resident
status was hired but then immediately fired after a no-match result was received from the
telephone SSNVS. As it turns out, the no-match result was erroneous. Although the

No-Match Cert. Admin. Record  1998

worker was eventually offered the opportunity to work again, by that time she had lost the welfare-to-work transportation benefit that would have allowed her to take the job as she was unable to drive.

As a result of such experiences, Farmworker Justice is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule would magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings would be unnecessary, unjust, and potentially discriminatory.

Although it would cause enormous upheavals in the workplace, **the rule would have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers would not leave the country. They would simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule would result in growth of this underground economy. It also represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

**This proposed rule would harm <u>all</u> workers regardless of immigration status.**

The rule could result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers could fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and frequently "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of agricultural workers— **including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

**The proposed rule would expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new legal obligations would increase

pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers would be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

## This proposed rule is an end-run around the legislative process.

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform**. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Worksite enforcement mechanisms must be accompanied by an opportunity for undocumented workers to earn lawful permanent resident status.

There is an immigration crisis in agriculture. According to the latest National Agricultural Workers Survey (NAWS), conducted by the U.S. Department of Labor based on data from 2001-2002, the majority of farmworkers lack work authorization. The solution to this crisis is comprehensive immigration reform that includes an opportunity for undocumented workers to earn permanent legal immigration status. The opportunity for undocumented workers to earn legal immigration status would help create a stable supply of farm labor in the United States, guaranteeing our food security. Imposing immigration enforcement mechanisms without offering opportunities for workers to come out of the shadows and apply for legal immigrant status would push workers further underground and would not resolve the immigration crisis.

Implementing the proposed regulations at this time would be an end-run around the legislative process. Agricultural workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

## The SSA no-match letter program is ill-suited as a tool for immigration enforcement.

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers would presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

**No-Match Cert. Admin. Record 2000**

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically would alter the definition of "constructive knowledge" and would make a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

### The costs of implementing the proposed rule would be prohibitive.

If the proposed rule is to be carried out as envisioned, DHS and SSA would need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that would derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it also would have a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program would be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

### The proposed rule is objectionable because compliance would be impractical.

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." Further, the notice fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer. Many agricultural workers live in rural areas far from an SSA office making it difficult for these workers to reach an SSA office within the limited time frame, particularly given the rigorous demands of the farm labor season.

### Conclusion

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands of agricultural workers, or the food security and agricultural industry of our nation, because of a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all

4

these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,


**BRUCE GOLDSTEIN**
**EXECUTIVE DIRECTOR**
**FARMWORKER JUSTICE**

1010 Vermont Ave., NW, Suite 915 • Washington, DC 20005
(202) 783-2628 • (202) 783-2561 fax • email: fj@nclr.org • www.farmworkerjustice.org

5

**No-Match Cert. Admin. Record  2002**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Cheryl Hall [chall@WGA.com] |
| **Sent:** | Friday, August 11, 2006 6:37 PM |
| **To:** | Regs, Rfs |
| **Cc:** | Jasper Hempel; Jason Resnick |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |
| **Attachments:** | WG SS Mismatch Comments.pdf |

Please see attached.

*Cheryl*

**Cheryl Hall**
Executive Administrative Assistant
Western Growers
PO Box 2130, Newport Beach, CA  92658
Phone: (949) 885-2258
Fax:  (949) 809-6258

**No-Match Cert. Admin. Record  2003**



August 11, 2006

**<u>VIA ELECTRONIC MAIL AND U.S. MAIL</u>**

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

> **Re:    Docket No. ICEB-2006-0004**
> **Safe Harbor Procedures for Employers Who Receive a No-**
> **Match Letter**
> **(FR 71:114, p. 34281)**

To Whom It May Concern:

Attached for your consideration are comments on the proposed regulations from Western Growers, an agricultural trade association that represents the California and Arizona fresh fruit, vegetable and nut industry.

Please contact me at (949) 863-1000 or at 17620 Fitch Street, Irvine, CA  92614 if you have any questions about our comments.

Sincerely,

Jasper E. Hempel
Executive Vice President,
General Counsel

No-Match Cert. Admin. Record  2004

COMMENTS OF

**WESTERN GROWERS**

In Response To

**DEPARTMENT OF HOMELAND SECURITY**

Proposed Regulation On

**Safe-Harbor Procedures for Employers Who Receive a No-Match Letter**

**8 CFR Part 274a**

**[RIN 1653-AA50]**

**ICE 2377-06**

**DHS Docket No. ICEB-2006-0004**

**Introduction**

Western Growers respectfully but strongly objects to adoption of the proposed so-called "safe-harbor procedure" regulation that imposes a constructive knowledge standard on employers who receive Social Security "No-Match" letters. Without Congress first enacting comprehensive immigration reform that contains and implements a workable and legal guest worker program, the proposed rule is potentially devastating and ruinous to California and Arizona fresh fruit, vegetable and nut growers, packers, shippers and processors.

In our opinion, the proposed rule is ill-conceived, puts California and Arizona farmers in further jeopardy of discrimination lawsuits, does not acknowledge that enhanced border security and enforcement is already resulting in labor and crop shortages and is irrationally punitive to the United States agricultural sector.

**Western Growers**

Western Growers is an agricultural trade association whose almost 3,000 members grow, pack and ship 90 percent of the fresh vegetables and nearly 70 percent of the fresh fruit and nuts grown in Arizona and California, about one-half of the nation's fresh produce. Western Growers members grow the best medicine in the world -- fresh fruits, vegetables, and nuts.

Western Growers is a member of the Agricultural Coalition for Immigration Reform (ACIR) and the National Coalition of Agricultural Employers (NCAE). Both are large national coalitions of agricultural employers who support comprehensive immigration reform and who have filed separate, more legally oriented comments on the proposed regulations. Western Growers is also a signatory to those comments and those comments are incorporated herein. Western Growers will focus here on more general impacts of the proposed regulations on its members.

Western Growers, ACIR and NCAE strongly support AgJOBS, which is included in the Senate's Comprehensive Immigration Reform package, and reform of the H-2A temporary agricultural worker program which currently is inaccessible to most farmers in California and Arizona. We also support an earned adjustment of status for experienced agricultural workers currently employed in agriculture. These experienced farm workers are necessary to maintain current levels of agricultural production.

To help our members stay competitive in an increasingly fierce global marketplace, Western Growers provides a host of services on which our members rely, including representation in government affairs; communications and media relations; and international trade and transportation services, just to name a very few.

One of our services, for example, is offered by our affiliated Western Growers Assurance Trust (WGAT). WGAT is the largest provider of health benefits for the fresh produce industry offering a variety of health care, dental, vision service and life insurance plans to fresh produce farmers, their employees, and others affiliated with the agriculture industry. Today, more than 100,000 farm employees and their dependents receive employer sponsored health benefits through WGAT. For over 30 years WGAT has contracted directly with doctors, dentists, pharmacies and hospitals in Mexico to provide seasonal farmworkers with access to healthcare in Mexico. This benefit may be jeopardized if the proposed rule is implemented.

A Western Growers core belief is that the U.S. economy needs additional workers to do many of the jobs that U.S. workers will not do and especially in agriculture. It is beyond dispute that Americans do not raise their children to perform farm labor or otherwise work in the fields, vineyards, and orchards of our country's farms.

The reality is that Western Growers members just do not have enough agricultural workers today (See Crop and Labor Loss section below) and the adoption of the proposed regulation will only exacerbate the situation and drive more farmers out of business or out of the United States.

The simple fact is: our crops are going to be harvested by foreign workers. The only issue is whether or not the harvesting occurs in the United States where our economy will benefit from the 3.5 jobs created upstream and downstream for every farmworker job, or whether another country will reap those economic benefits.

Comprehensive immigration reform that contains a reliable, legal guest worker program must be established so that workers can come legally to our country and become legally employed in jobs where there are insufficient domestic workers to do the job. Until then, this proposed rule must not be adopted.

**Legal Impact on Arizona and California Fresh Produce Sector by Proposed Regulation**

Today, under the Immigration Reform and Control Act of 1986 [IRCA] and Illegal Immigration Reform and Immigrant Responsibility Act of 1996 [IIRIRA], if a prospective employee presents identity and work authorization documents that appear valid on their face, the agricultural employer must accept those documents without further investigation or risk being sued for discrimination and bias.

The proposed regulation puts too much responsibility on employers to

distinguish genuine identity papers, such as birth certificates and Social Security cards, from sophisticated forgeries readily available for nominal cost across the border.

Current immigration law requires the employer try to resolve a social security mismatch when a No-Match Letter is received. But, a U.S. Department of Justice regulation states the letter is not proof of illegality and that the employee cannot be fired solely because of a no-match letter. The proposed rule turns that regulation upside down.

In our opinion, the proposed regulation would create a presumption of illegal status when the employer gets a mismatch letter. If the employer doesn't resolve the mismatch in 60 days, the employer must fire the employee or risk prosecution for knowingly hiring an illegal immigrant.

Penalties for failing to resolve the mismatch include civil fines and criminal prosecution on either felony or misdemeanor charges, depending upon the frequency of violations by the employer.

But, if the regulation is passed, trying to resolve the mismatch also places Arizona and California farmers in the "Catch-22" situation of being sued for discrimination. The most recent example of this real dilemma can be found in the case of *Zamora v. Elite Logistics, Inc.*, (No. 4-3205) (10th Cir., June 6, 2006), in which the employer is required to go to trial because the employer tried to verify legal status of a Hispanic employee.

The proposed regulation affects all employers but it would have a most devastating effect on California and Arizona agriculture, where an estimated 50 to 80 percent of the workers who harvest fruit, vegetables and other crops are illegal immigrants. We hasten to add that our employers are not now knowingly hiring illegal immigrants because they do comply with IRCA and all other existing law.

In our opinion, mere adoption of this proposed regulation without a guest-worker program in place will immediately cut off any hope of our members hiring agricultural employees, putting agricultural employers out of business, forcing operations to Mexico and other foreign countries and thereby increasing our dependence on other countries for our food supply.

First passing and implementing comprehensive immigration reform that includes a reliable and legal guest worker program, where guest workers would be provided a counterfeit-proof ID card, in our opinion, solves the Social Security no-match issue far better than this proposed rule.

**Enforcement is Already Working:     Labor and Crop Shortages are Accelerating and Farmers Are Moving Out of Country Because of  Failure of Immigration Reform and Labor Shortages**

Western Growers members are reporting labor shortages in increasing numbers throughout California and Arizona due in part to the ever tightening enforcement of the Southwest border. If our farmers cannot obtain an adequate labor supply, they will be forced to go out of business and sell their farms to developers, or alternatively, they will move their production to Mexico or other countries where those willing to do agricultural work are plentiful.  The marketplace has dictated that production must be moved out of the United States where there is insufficient harvest labor.

Western Growers is currently conducting a member labor and crop loss survey. The partial responses initially reflect that California and Arizona Western Growers members have already incurred crop losses of $4,954,000 to date resulting from labor shortages caused by increased border enforcement and failure to enact immigration reform.

More alarming, perhaps, is the fact that the partial survey results show that WG members have moved 12,255 acres of high value fruit and vegetable production to Mexico over the past couple of years.  This means that additional tens to hundreds of millions dollar in crop value have moved to Mexico in addition to countless on and off- farm jobs.  The trend continues with a couple of members reporting that they plan to move 1400 acres to Mexico within the year. Anecdotal information from Yuma, Arizona shows that less vegetable acreage is being leased in the Yuma area than ever before with reports that acreage is being replaced in Mexico.

Consumers and, therefore, supermarkets and food service vendors demand a year round supply of the highest quality fresh fruits, nuts and vegetables. It is unacceptable for the producer to fail to deliver these products to market because of a shortage of harvest labor. If the supermarket or food service vendor cannot obtain domestically grown fresh produce when it needs it, they will buy that produce from Mexico, China, Chile or any other country that will provide that supply.

As we move crop production out of the United States and as we import more produce, the United States will become increasingly dependent on foreign nations for its food. We will then be as dependent on foreign food as we are now dependent on other countries for oil.

In our very strong opinion, maintaining a safe, healthy and abundant domestic supply of fresh fruits, nuts and vegetables is a national security imperative that cannot be ignored.  The proposed regulations, we believe, will hasten the departure to other countries of our domestically grown fresh fruits,

vegetables and nuts.

**Conclusion**

As stated at the outset, Western Growers respectfully but strongly objects to the adoption of the proposed regulations.   Adoption of the proposed regulations now, we fervently believe, could put the Arizona and California fresh produce sector out of business, a result that no one wants - not the President, not the Department of Homeland Security, not Congress, not American consumers or Western Growers members.

Western Growers implores the Department of Homeland Security to not pursue the proposed regulations until comprehensive immigration reform that includes a guest worker program has been passed by Congress, signed by the President and regulations implementing comprehensive immigration reform have been adopted.   Thank you for your consideration.

**Khazaeli, Javad M**

| From: | Ruth Clark [RClark@tindallfoster.com] |
|---|---|
| **Sent:** | Friday, August 11, 2006 6:04 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No.ICEB-2006-0004 |
| **Attachments:** | Comments to Proposed Rule.pdf |

Dear Sir or Madam:

Attached, please find our comments to the proposed rule regarding safe-harbor procedures for employers who receive a no-match letter.

In Kind Regards,

Ruth Clark
Law Clerk
Tindall & Foster, P.C.
600 Travis St, Suite 2800
Houston, TX 77002-3094
Phone: (713) 229-0636, ext. 1114
RClark@tindallfoster.com

The information contained in this e-mail message is legally privileged and confidential information intended only for the use of the recipient(s) named above. If the reader of this e-mail is not an intended recipient, you have received this e-mail in error and any review, dissemination, distribution or copying is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by return e-mail and permanently delete the copy you received. Thank you.

**No-Match Cert. Admin. Record  2011**

HARRY L. TINDALL*
CHARLES C. FOSTER**
ROBERT F. LOUGHRAN**
ANGELA G. PENCE*
MAGALI S. CANDLER**
KAREN KATZ FELDMAN**
LEIGH N. GANCHAN**
H. RICHARD SINDELAR III†
MATTHEW G. THOMPSON
KRISTEN T. BURKE
ANGELIQUE MONTANO
ANDREW G. THORLEY
CAMILLE WHITWORTH
DELISA J. FUTCH
J. JAY STRIMEL
CORINA M. FARIAS
JENNIFER A. SALOMON
MAGGIE MURPHY
JARRED J. SLATER
MARK S. CROSS
RYAN C. CHARGOIS

# TINDALL & FOSTER, P.C.

**ATTORNEYS AT LAW**
600 TRAVIS STREET, SUITE 2800
HOUSTON, TEXAS 77002-3094
TELEPHONE: (713) 229-8733
FAX: (713) 228-1303
www.tindallfoster.com

BOARD CERTIFIED-TEXAS BOARD
OF LEGAL SPECIALIZATION

*FAMILY LAW

** IMMIGRATION & NATIONALITY LAW

†OF COUNSEL

AUSTIN OFFICE
100 CONGRESS AVENUE, SUITE 1500
AUSTIN, TX 78701-2751
TELEPHONE: (512) 476-9478
FAX: (512) 494-8066
www.tindallfoster.com

August 10, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N.W. 2nd Floor
Washington, D.C. 20529

RE:     Comments to Proposed Rule
        DHS Docket No. ICEB-2006-0004

Dear Sir or Madam:

In response to the Department of Homeland Security's request for comments to its proposed rule entitled "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," we submit the following comments:

Section 1:

The proposed rule places an undue burden on an employer to verify with the relevant agency that the discrepancy has been resolved. While the proposed rule does provide a phone number to verify a Social Security Number with the Social Security Administration, it does not provide contact information for the employer to verify information with the Department of Homeland Security. In addition, the employer cannot control if the relevant agency fails to respond to its request for verification in a timely manner.

It is unreasonable for an employer to check its records, correct its records (if there is an error), inform the relevant agency, and verify that the name and number, as corrected, match agency records- within 14 days of the receipt of the no-match letter. This is an unreasonable time frame, particularly in cases where the no-match letter references a large number of employees. We propose that 90 days is a more reasonable time frame.

No-Match Cert. Admin. Record  2012

Section 2:

The proposed rule places an undue burden on an employer to verify with the relevant agency that the discrepancy has been resolved. While the proposed rule does provide a phone number to verify a Social Security Number with the Social Security Administration, it does not provide contact information for the employer to verify information with the Department of Homeland Security. In addition, the employer cannot control if the relevant agency fails to respond to its request for verification in a timely manner.

It is unreasonable to expect the employer to take such steps within 14 days of receipt of the no-match letter. In addition, the employer may not be able to verify the information with the relevant agencies in such a short time frame. We propose that 90 days is a more reasonable time frame.

Section 3:

It is unreasonable to expect the employer to review its own records, follow-up with its employees, verify records with the relevant agencies, and complete a new Form I-9 within 63 days of receipt of the no-match letter. We propose that 123 days is a more reasonable time frame.

The proposed reasonable verification procedure does not solve the problem of unauthorized immigrants providing false documentation to employers. In fact, this proposed procedure encourages more fraud by unauthorized workers. Undocumented workers will simply provide a different Social Security Number or Alien Number every year, and the employer will continue to receive no-match letters from the Government. This plan does not create a solution, it merely delays dealing with the problem for one more year.

Thank you very much for providing us with an opportunity to submit comments to this proposed rule.

Sincerely,

Charles C. Foster

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | Sheila Gleeson [sheila@ciic-usa.org] |
| **Sent:** | Friday, August 11, 2006 5:30 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 comments from the CIIC |
| **Attachments:** | SS no match comments to DHS 06.doc |

Comments are below and attached as a word document.

August 11, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C.  20529

Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who
Receive a No-Match Letter"

Dear Sir or Madam:

The Coalition of Irish Immigration Centers submits the following comments in response to the request
for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and
Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a
No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The Coalition of Irish Immigration Centers is a national umbrella organization that represents Irish
organizations throughout the United States. Our members provide a range of direct services to
immigrants including: visa and citizenship information and social services information, referral and
support. We support comprehensive immigration reform as the only effective way to resolve the myriad
of problems with the current immigration system. We believe effective and targeted enforcement
measures combined with a reform of our admissions system, and a real solution for the
undocumented population living in the U.S is the way to move forward.

Irish immigration centers across the country have had ample experience in dealing with the adverse
impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the
United States. The proposed changes will result in further problems and increased numbers of
immigrants being fired by employers who have receive a No-Match Letter. In our experience there are
legitimate reasons for many mismatches including name changes, marriage, divorce and misspellings.
If the proposed rule changes are implemented the result will be more wrongful firings. The "safe
harbor" provision in the proposed rule would be overly burdensome for employers and does not
provide a solution for the millions of immigrants seeking to work legally in the U.S.

As a result of this experience the Coalition of Irish Immigration Centers is concerned about and
strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who
Receive a No-Match Letter." Such a rule will magnify the negative impact that SSA no-match letters
have had on workers' rights, and could result in mass firings across the nation.  We believe that while
it will cause major problems in the workplace and harm all workers regardless of their immigration
status it will have no impact on the issue of uncommented immigration. The SSA no-match program is
ill-suited as an immigration enforcement tool.  We therefore urge DHS to withdraw this proposed rule
in its entirety.

Respectfully submitted,

**No-Match Cert. Admin. Record  2014**

Sheila Gleeson
Executive Director
Coalition of Irish Immigration Centers
551 Washington Street, Suite 4
Boston, MA 02135
Tel: 617-987-0193
Fax: 617-987-0193
sheila@ciic-usa.org

**No-Match Cert. Admin. Record  2015**



COALITION OF IRISH
IMMIGRATION CENTERS

August 11, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

**Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for
Employers Who Receive a No-Match Letter"**

Dear Sir or Madam:

The Coalition of Irish Immigration Centers submits the following comments in response
to the request for public comment by the Department of Homeland Security (DHS),
Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor
Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June
14, 2006).

The Coalition of Irish Immigration Centers is a national umbrella organization that
represents Irish organizations throughout the United States. Our members provide a range
of direct services to immigrants including: visa and citizenship information and social
services information, referral and support. We support comprehensive immigration reform
as the only effective way to resolve the myriad of problems with the current immigration
system. We believe effective and targeted enforcement measures combined with a reform of
our admissions system, and a real solution for the undocumented population living in the
U.S is the way to move forward.

Irish immigration centers across the country have had ample experience in dealing with
the adverse impact that the Social Security Administration's (SSA) no-match letters have
had on all workers in the United States. The proposed changes will result in further
problems and increased numbers of immigrants being fired by employers who have
receive a No-Match Letter. In our experience there are legitimate reasons for many
mismatches including name changes, marriage, divorce and misspellings. If the proposed
rule changes are implemented the result will be more wrongful firings. The "safe harbor"
provision in the proposed rule would be overly burdensome for employers and does not
provide a solution for the millions of immigrants seeking to work legally in the U.S.

As a result of this experience the Coalition of Irish Immigration Centers is concerned
about and strongly opposed to the implementation of the proposed "Safe-Harbor
Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify

551 Washington Street, Suite 4 · Brighton, MA 02135
t. 617-987-0193 · f. 617-987-0193 · e. info@ciic-usa.org
www.ciic-usa.org

**No-Match Cert. Admin. Record  2016**



COALITION OF IRISH
IMMIGRATION CENTERS

the negative impact that SSA no-match letters have had on workers' rights, and could result in mass firings across the nation. We believe that while it will cause major problems in the workplace and harm all workers regardless of their immigration status it will have no impact on the issue of uncommented immigration. The SSA no-match program is ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety.

Respectfully submitted,

Sheila Gleeson
Executive Director
Coalition of Irish Immigration Centers
551 Washington Street, Suite 4
Boston, MA 02135
Tel: 617-987-0193
Fax: 617-987-0193
sheila@ciic-usa.org

.

**No-Match Cert. Admin. Record  2017**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Fiona McKinnon [mckinnon@virginia.edu] |
| **Sent:** | Friday, August 11, 2006 5:27 PM |
| **To:** | Regs, Rfs |
| **Cc:** | dan@nationalimmigrationproject.org |
| **Subject:** | DHS Proposed Regulations (71 Fed. Reg. 34281) |
| **Attachments:** | DHS_no-match_reg_comments_final.doc |



DHS_no-match_reg
_comments_fina...

        Please find attached the National Immigration Project of the National Lawyers
Guild comments to DHS Proposed Regulations (71 Fed. Reg.
34281). Thank you for considering our comments.

Fiona McKinnon
Haywood Burns Fellow

1

# NATIONAL IMMIGRATION PROJECT
of the NATIONAL LAWYERS GUILD

**Board of Directors**

Barbara Hines, Chair
  Austin, TX

Rogelio Nuñez, Treasurer
  Harlingen, TX

Susan Alva
  Los Angeles, CA

Robin Bronen
  Anchorage, AK

Susana De León
  Minneapolis, MN

Rosemary Esparza
  Venice, CA

Linton Joaquin
  Los Angeles, CA

Christina Kleiser
  Knoxville, TN

Michael Maggio
  Washington, DC

Chinwe Obianwu
  Atlanta, GA

Sonia Parras Konrad
  Des Moines, IA

Judy Rabinovitz
  New York, NY

Rebecca Sharpless
  Miami, FL

Marc Van Der Hout
  San Francisco, CA

**Staff**

Ellen Kemp
  Coordinator/
  Legal Worker

Dan Kesselbrenner
  Director

Ki Kim
  Communications &
  Development

Toy Lim
  Office Manager

Ana Manigat
  Administrative
  Assistant

Malik Ndaula
  Soros Justice Fellow

Paromita Shah
  Associate Director

August 11, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

**Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).**

Dear Director:

The National Immigration Project of the National Lawyers Guild (National Immigration Project) submits the following comments in response to the above-referenced proposed regulation. The National Immigration Project is a not-for-profit corporation that publishes materials, sponsors training sessions, and provides technical assistance on immigration and nationality law. The National Immigration Project has a long history of involvement in protecting the rights of non-citizen workers in the U.S.

Our specific comments follow below.

**DHS lacks authority to regulate SSA "No-Match" letters because Congress conferred exclusive authority to the SSA to administer all aspects of the worker retirement benefit program.**
An agency cannot promulgate regulations that are inconsistent with the will of Congress.  Congress intended the Social Security Administration to have exclusive authority to regulate all matters relating to social security.  Insofar as the proposed regulations tread impermissibly on the exclusive province of the Social Security Administration, they exceed the scope of DHS' lawful authority.

Section 901 of Title 42 United States Code provides that the Social Security Administration is an independent agency of the United States government. Congress conferred expansive and exclusive authority to the Social Security Administration over all matters related to the various programs it administers.  For example, 42 USC § 901(b) provides that:

No-Match Cert. Admin. Record  2019

> It shall be the duty of the Administration to administer the old-age, survivors, and disability insurance program under subchapter II of this chapter and the supplemental security income program under subchapter XVI of this chapter.

Congress developed an elaborate and detailed scheme to administer all aspects of the worker retirement program commonly known as "social security." The proposed regulation impinges on Congress' plain intent to confer exclusive authority to the Social Security Administration to regulate matters relating to social security eligibility and social security wages. Reading the Social Security Act as a whole makes manifest that DHS lacks the authority to promulgate regulations that interpret letters sent out by the Social Security Administration or any other matter that touches on social security eligibility. This authority is inconsistent with the intent that Congress expressed in the overall legislative scheme. Justice O'Connor writes, "Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *ETSI Pipeline Project v. Missouri*, 484 U.S. 495 (1988), quoted in *FDA v. Brown & Williamson Tobacco Corporation.*

Congress spoke directly to the Social Security Administration's exclusive authority in this area in SSA-specific legislation that has been enacted subsequent to the enactment of the INA.[1] To the extent that the SSA has exclusive authority in this area, DHS does not have any. Based on the same logic, the Supreme Court found that the Food and Drug Administration (FDA) lacked the authority to regulate tobacco products. *FDA v. Brown & Williamson Tobacco Corporation*, 529 U.S. 120 (2000). Congress' SSA-specific legislation effectively demonstrates that the Department of Homeland Security's agencies have no authority to promulgate regulations that take away the authority of the Social Security Administration to attach significance to its own correspondence. The Department of Homeland Security simply lacks the authority to regulate SSA documents.

**ICE has chronic data management problems.**
Even if DHS is deemed to have authority to regulate this issue, the agency has demonstrated alarming incompetence in managing data. The Bureau of Immigration and Customs Enforcement has a long history of trouble handling data. Over the years, ICE and its predecessor have struggled to process, maintain, and manage information. This is a chronic problem. As recently as June 2006 the Government Accountability Office criticized DHS' data entry in the new employment verification program.[2]

The government itself has recognized these problems. Since 1995, the Government Accountability Office (previously the General Accounting Office) has been reporting on data collection and management problems in the Immigration and Naturalization Service (INS) and its successor agency, including INS' problematic overstay estimation methods.[3] The GAO chronicled more generally immigration statistics that are "lacking, misleading, or otherwise

---

[1] The Social Security Protection Act of 2004, for instance.
[2] U.S. Government Accountability Office, "Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts," June 19, 2006.
[3] U.S. General Accounting Office, "Illegal Immigration: INS Overstay Estimation Methods Needed," September 26, 1995.

2

National Immigration Project Comments re. DHS Proposed Regulations (71 Fed. Reg. 34281)

inadequate."[4] INS difficulties included obsolete hardware, incompatible and non-interoperable information systems, and uneven system security capabilities.[5] In a 1997 report to Congress, Justice Department Inspector General Michael Bromwhich expressed concern about "the integrity of the data . . . and the training and abilities of INS employees who will be responsible for maintaining these systems and recording the transactions that constitute the systems' databases."[6] INS had a long-standing history of using antiquated, inaccurate databases.[7]

In response, the Immigration and Naturalization Service Data Management Improvement Act, HR 4489, was introduced in Congress.[8] Prompted by the events of September 11, 2001, Congress passed the Enhanced Border Security and Visa Entry Reform Act of 2002, which mandated the integration of immigration systems and databases, as well as the integration of data systems and databases that contain federal law enforcement and intelligence information.[9] The legislation set 2003 as the original deadline. Congress extended the deadline until 2005 for full integration.[10]

In 2004, a year after the INS was split up and transferred from the Department of Justice to the Department of Homeland Security, the GAO found that the new Immigration and Customs Enforcement agency was not handling data any better than INS ever had. The GAO found that while ICE was in the process of updating its case management system, it still "lack[ed] complete, accurate and readily available information" and "d[id] not have the capability to record information."[11] Moreover, the GAO found significant data management problems in the new US-VISIT program, established to collect, maintain, and share information on selected foreign nationals.[12]

More recently, in 2005, the GAO concluded that all of DHS "continues to face operational and management challenges that it inherited from its component legacy agencies."[13] These challenges include the development of a department-wide framework for managing information, specifically in the context of immigration law enforcement and the provision of immigration services.

---

[4] In a 2005 status update to this report, GAO found that the "underlying data quality issue" had not been fixed, although the office had provided "substantial guidance in how this recommendation could be fulfilled." U.S. General Accounting Office, "Immigration Statistics: Information Gaps, Quality Issues Limit Utility of Federal Data to Policymakers," July 31, 1998.

[5] U.S. Government Accountability Office, "Information Technology: Immigration and Customs Enforcement Is Beginning to Address Infrastructure Modernization Program Weaknesses but Key Improvements Still Needed," July 2006.

[6] "Despite a deluge of resources, the Immigration and Naturalization Service's management systems don't deliver," Government Executive, February 1, 1999.

[7] Congressional Research Service, "Immigration Enforcement Within the United States," April 6, 2006.

[8] H.R. 4489, Immigration and Naturalization Service Data Management Improvement Act of 2000, Smith (R), Texas.

[9] Id.

[10] Shruti Daté, "Congress extends deadline for INS data system," Government Computer News, May 24, 2000.

[11] U.S. General Accounting Office, "Immigration Enforcement: Better Data and Controls Are Needed to Assure Consistency with the Supreme Court Decision on Long-Term Alien Detention," May 27, 2004.

[12] U.S. General Accounting Office, "Homeland Security: First Phase of Visitor and Immigration Status Program Operating, but Improvements Needed," May 2004.

[13] Id. at note 2.

3

National Immigration Project Comments re. DHS Proposed Regulations (71 Fed. Reg. 34281)

These problems continue. This year the GAO reiterated these concerns, finding "DHS delays in entering data into its databases" in the context of the new employment verification and worksite enforcement program.[14] Moreover, the problems are widespread, affecting all three of the new agencies created out of INS. In the 2006 Annual Report to Congress, the Citizenship and Immigration Services Ombudsman addressed information technology issues, acknowledging intrinsic flaws in the USCIS information management systems, which do not permit adequate case tracking and reporting and fail to connect USCIS and other agencies, including ICE and CBP.[15] He noted the "questionable accuracy" of the information within the systems. In an email interview with CNET News.com, USCIS chief information officer Tarrazzia Martin wrote: "The state of USCIS' current systems prevents it from implementing key initiatives, and has only allowed for incremental change."[16]

A broad range of organizations have recognized the serious limitations of DHS' data collection.[17] Government auditors concur that ICE's databases are notoriously inaccurate. Too much is at stake in the context of employment authorization to place additional requirements on an agency with such a demonstrated record of inadequate data maintenance. This agency is simply not ready to implement a new program so dependent on data management. "No-Match" findings are certain to occur because of name changes and clerical errors. Hundreds of thousands of workers—including U.S. citizens and authorized non-citizens—could lose their jobs as a result. Given ICE and its predecessors' track record in this area, as well as the importance of the regulation to workers in the United States, ICE cannot be trusted to maintain and manage a database that has so much significance for U.S. workers.

**Immigration status changes.**
Immigration status is not static data. It changes both individually and en masse. Thousands of people can have rights conferred on them at once, as when particular foreign nationals are granted temporary protected status. As noted above, ICE has chronic trouble managing data. The nature of the data makes it particularly difficult to collect and maintain.

ICE has already proved that it is not equipped to handle a new program reliant on data management. Since 2003, schools and student-exchange programs have been required to use the internet-based Foreign Student and Exchange Visitor Information System (SEVIS) to store and track personal information about foreign students before, during, and after their stay in the U.S. But university administrators have complained that SEVIS frequently loses data, that it cannot handle large batches of information submitted at once, and that it does not provide real-time access to records. Worse yet, ICE computer problems once caused student visa holders to be jailed overnight or barred from entering the U.S.[18] In a recent report, GAO found that many of these glitches had not been resolved.[19]

---

[14] U.S. Government Accountability Office, "Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts," June 19, 2006.
[15] Citizenship and Immigration Services Ombudsman, Annual Report to Congress, June 2006.
[16] Declan McCullagh, "Aging computers hobble Homeland Security," CNET News.com, December 15, 2005.
[17] Electronic Privacy Information Center, "US-VISIT Rolls Out the Unwelcome Mat," July 2005; Federation for American Immigration Reform, "House Immigration Subcommittee Oversight Hearing on Electronic Technology Border Control," October 11, 2001.
[18] Id. at note 14.
[19] U.S. General Accounting Office, "Homeland Security: Performance of Information System to Monitor Foreign Students and Exchange Visitors Has Improved, but Issues Remain," June 2004.

No-Match Cert. Admin. Record  2022

Another computer malfunction stranded thousands of airline passengers at U.S. border checkpoints last August when a DHS computer crashed, shutting down the government's main immigration database in Virginia.[20]

ICE is already over-burdened with programs that rely on its faulty information and poor data management. The agency has indicated that it is unable to handle the current data flow.[21] This regulation would further strain an already stressed system.

**The proposed regulation violates the constitutional right to due process.**

The regulation is unconstitutional because it does not respect the due process rights of people now present in the U.S. The Due Process clause of the Fifth Amendment protects the rights of all persons present in our country, not just United States citizens. The Supreme Court recognized long ago that the Due Process clause of the Fifth Amendment protects non-citizens, even those who are deportable or unlawfully present in the United States. *Yamataya v. Fisher*, 189 U.S. 86 (1903). The Court has repeated this holding again and again. *Plyler v. Doe*, 457 U.S. 202 (1982); *Mathews v. Diaz*, 426 U.S. 67 (1976). As the Court stated in *Plyler*, "[w]e have clearly held that the Fifth Amendment protects [even] aliens whose presence in this country is unlawful." 457 U.S. at 210.

The U.S. government has a strong interest in regulating workers within its borders. However, this interest must be balanced with the affected person's interest and the risk of erroneous deprivation. *Matthews v. Elridge,* 424 U.S. 319 (1976). In this case the risk of erroneous deprivation is extremely high, and affected persons have a strong interest in the proposed legislation. This regulation is likely to result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion, employers will fire workers who receive a no-match letter, before workers have a chance to correct their records. Again, hundreds of thousands of workers—including U.S. citizens and authorized non-citizens—will be affected.

**Conclusion**

We strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." For the reasons listed above, the Department of Homeland Security should withdraw the proposed regulation.

Thank you for considering our views on this matter.

Respectfully,


Fiona McKinnon                          Dan Kesselbrenner
Haywood Burns Fellow                    Director

---

[20] Id. at note 14.
[21] U.S. Government Accountability Office, "Information Technology: Immigration and Customs Enforcement Is Beginning to Address Infrastructure Modernization Program Weaknesses but Key Improvements Still Needed," July 27, 2006.

National Immigration Project Comments re. DHS Proposed Regulations (71 Fed. Reg. 34281)


Cc:    Secretary Michael Chertoff, U.S. Department of Homeland Security
       Director Eduardo Aguirre, U.S. Citizenship and Immigration Services
       Assistant Secretary Michael Garcia, Immigration and Customs Enforcement

**No-Match Cert. Admin. Record  2024**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Rich A Hudgins [rhudgins@calpeach.com] |
| **Sent:** | Friday, August 11, 2006 4:39 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Comments on Proposed Rule |
| **Attachments:** | immigrationltr081106.pdf |

Attached is the file containing our comments on the proposed rule regarding "no-match" letters.

Please contact me if you are unable to open this file. Thank you.

Rich Hudgins

**No-Match Cert. Admin. Record  2025**



2300 RIVER PLAZA DRIVE / SUITE 110
SACRAMENTO, CA 95833
TELEPHONE: 916 / 925-9131
FAX: 916 / 925-9030

# California Canning Peach Association

August 11, 1006

Director Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave, N.W., 2nd Floor
Washington, DC 20529

**VIA ELECTRONIC MAIL AND U.S. MAIL**

Re: Docket No.  ICEB-2006-0004
**Safe Harbor Procedures for Employers**
**Who Receive a No-Match Letter**
(FR 71:114, p 34281)

To Whom It May Concern:

The California Canning Peach Association hereby submits its comments on the Bureau of Immigration and Customs Enforcement, Department of Homeland Security's Proposed Rule regarding "no-match" letters published in the Federal Register on June 14, 2006.

The California Canning Peach Association is a grower-owned bargaining and marketing cooperative. Our 600 grower members produce nearly 80% of the nation's canned peach supply. Our average grower farms approx. 40 acres of cling peaches which is very labor-intensive process. We rely on seasonal workers to prune trees in the winter, to thin fruit in the spring, and to harvest the fruit during the summer. Simply put, we must have access to a legal and stable workforce to stay in business.

As a result, we would have an interest in, and would be affected by the above-referenced Proposed Rule. We would incorporate by reference, in their entirety, the comments on the Proposed Rule submitted by the National Council of Agricultural Employers. We also concur with the concept of deferring any action on this matter pending enactment of comprehensive immigration reform by Congress.

Thank you for your attention to this matter.

Sincerely yours,

Rich Hudgins
President & CEO



**No-Match Cert. Admin. Record  2026**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Reiko Ross [rr@dcbsf.com] |
| **Sent:** | Friday, August 11, 2006 4:31 PM |
| **To:** | ICE Federal Rulemaking |
| **Subject:** | DHS Docket No. ICEB 2006-0004 |
| **Attachments:** | UNITE08-11 Comments on DHS proposed regs.pdf |

COMMENT on Proposed Rule: "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"
Agency: Bureau of Immigration and Customs Enforcement, Dept. of Homeland Security

FROM:
Kristin L. Martin
UNITE HERE!
595 Market Street, Suite 1400
San Francisco, CA 94105
(415) 597-7200
Fax: (415) 597-7201
klm@dcbsf.com

Legal Department

Richard G. McCracken, International Counsel

Bruce Raynor, General President
John W. Wilhelm, President/Hospitality Industry

# UNITEHERE!

595 Market Street, Suite 1400
San Francisco, CA 94105
Tel (415) 597-7200
Fax (415) 597-7201

Director, Regulatory Management Division
U.S. Citizenship & Immigration Services
Department of Homeland Security
111 Massachusetts Ave., NW, 2d Floor
Washington, D.C.  20529

>　　Re:　　　　Comments on the regulation proposed by the Department of
>　　　　　　　Homeland Security regarding "Safe-Harbor Procedures for
>　　　　　　　Employers Who Receive a No-Match Letter"
>　　　　　　　DHS Docket No. ICEB-2006-0004

Dear Director:

This letter provides UNITE HERE International Union's comments on the regulation proposed by the Department of Homeland Security regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter."  UNITE HERE represents approximately 450,000 workers, many of whom are immigrants, in the food service, laundry, hotel, gaming, textile and retail distribution industries.  As we explain below, Subsections 274a.1(l)(1)(iii)(B), 274a.1(l)(2)(i)(A)(1-2) and 274a.1(l)(2)(iii) of the proposed regulation should not be adopted because the Department of Homeland Security lacks authority either to limit the documents that may be used in the I-9 process or to require employers to use the Social Security Administration's telephone hotline to verify corrected social security numbers.

**A.**　　　**The Department of Homeland Security lacks authority to limit the documents that may be used to satisfy the I-9 verification requirement**

Section 274a.1(l)(2)(iii) of the proposed regulation restricts the documents that may be used to satisfy the I-9 requirement to documents bearing a photograph and not containing the social security number that appeared on the no-match letter.  The Department of Homeland Security does not have authority to limit the documents that can be used.

Director, Regulatory Management Division
August 11, 2006
Page 2

The Immigration Reform and Control Act sets out what documents may be used to satisfy the I-9 requirements, and includes documents without photographs and that bear a social security number. 8 U.S.C. § 1324a(b)(1)(C, D). Importantly, the statute gives the Attorney General authority to expand, by regulation, the statutory list of documents that may be used to satisfy the I-9 requirements, 8 U.S.C. § 1324a(b)(B)(ii), (C)(ii), and (D)(ii), and also to restrict, by regulation, the use of documents listed in the statute if the Attorney General finds that such a document "does not reasonably establish such authorization or identity or is being used fraudulently to an unacceptable degree." 8 U.S.C. § 1324a(b)(E). The Attorney General's statutory authority to establish which documents may be used to satisfy the I-9 requirement was not transferred to the Department of Homeland Security. 8 U.S.C. § 1103(a) (transferring functions to the Secretary of Homeland Security "except insofar as the Act or such laws [relating to the immigration and naturalization of aliens] relate to the powers, functions, and duties conferred upon the President, Attorney General . . . .")

**B.      The Department of Homeland Security lacks authority to require employers to verify corrected social security numbers**

Section 274a.1(l)(2)(i)(A)(1) and (2) of the proposed regulation requires employers to verify corrected social security numbers with the SSA. The description of the proposed regulation published in the Federal Register states that the SSA's telephone hotline should be used to conduct this verification. 71 Fed. Reg. 34281, 34283 (June 14, 2006). This is a second area where the proposed regulation oversteps the Department of Homeland Security's authority.

By statute, the President is authorized to monitor and evaluate whether the I-9 system "provides a secure system to determine employment eligibility in the United States," to "examine the suitability of existing Federal and State identification systems for use for this purpose," 8 U.S.C. § 1324a(d)(1)(A), and to implement changes in the I-9 system. 8 U.S.C. § 1324a(d)(1)(B). However, the President may not make such changes without complying with certain procedural requirements. The President must give at least sixty days notice (depending on the magnitude of the change) to House and Senate Committees on the Judiciary about changes to the system and a written report regarding the proposed change. 8 U.S.C. § 1324a(d)(3)(A). In making changes, the President must also take into account the results of voluntary pilot projects, such as the Basic Pilot Project. 8 U.S.C. § 1324a(d)(1)(B). The Basic Pilot Project requires participating employers to use the same SSA telephone hotline to verify employees' social security

Director, Regulatory Management Division
August 11, 2006
Page 3

numbers that the proposed regulation advises no-match letter recipients to use. Thus, the
verification system that the proposed regulation imposes on no-match letter recipients
replicates the Basic Pilot Project in substantial part. The Department of Homeland
Security may not usurp the President's authority to make changes to the I-9 system and
skirt the procedural prerequisites to incorporating the SSA telephone verification process
into the I-9 system.

**C.    The proposed regulation imposes new obligations on employers that
receive no-match letters**

The drafters of proposed regulation attempt to avoid these limits on the
Department of Homeland Security's authority by characterizing the proposed regulation
as clarifying employers' existing obligations rather than creating new duties, and by
labeling the steps that no-match letter recipients are advised to take as creating a "safe-
harbor" rather than imposing a new, mandatory obligation on such employers. These
characterizations are inaccurate.

The proposed example of what constitutes constructive knowledge, at Section
274a.1(l)(1)(iii)(B), is not the employer's *receipt* of a no-match letter, but the employer's
*failure to act* after receiving a no-match letter. By defining the "failure to take reasonable
steps" upon receipt of a no-match letter as creating constructive knowledge, the proposed
regulation makes it mandatory that an employer take some action in response to a no-
match letter. Under the proposed regulation, if an employer receives a no-match letter
and does nothing, the employer has constructive knowledge that the named employees are
undocumented.

This obligation that a no-match letter recipient take some action to verify the
named employees' authorization to work is a change to existing law. No employer has
ever been convicted of knowingly continuing to hire undocumented immigrants because
the employer failed to take action upon receipt of a no-match letter. An opinion letter
issued by the INS's Office of General Counsel in 1999 states that receipt of a no-match
letter does not create constructive knowledge and described employers' obligations to
follow-up on no-match letters as "for SSA purposes" and "not required by the INA."
Paul W. Virtue, HQCOU 90/10.15-C (April 12, 1999).

Director, Regulatory Management Division
August 11, 2006
Page 4

The Department of Homeland Security's explanation of the proposed regulation relies on the Ninth Circuit's decisions in Mester Mfg. Co. v. INS, 879 F.2d 567 (9th Cir. 1989) and New El Rey Sausage Co. v. INS, 925 F.2d 1153 (9th Cir. 1991) for the proposition that a deliberate failure to investigate suspicious circumstances imputes knowledge.  However, the Ninth Circuit has narrowly construed Mester Manufacturing and New El Rey Sausage to cases "in which the fact in question is *highly probable* but [the employer] consciously avoids enlightenment." Collins Foods Int'l, Inc. v. U.S. INS, 948 F.2d 549, 555 n.17 (9th Cir. 1991) (quoting United States v. Jewell, 532 F.2d 687, 698 (9th Cir. 1976)) (emphasis added).  This is because "IRCA . . . is delicately balanced to serve the goal of preventing unauthorized alien employment while avoiding discrimination against citizens and authorized aliens.  The doctrine of constructive knowledge has great potential to upset that balance, and it should not be expansively applied.  . . .  To preserve Congress' intent in passing the employer sanctions provisions of IRCA, then, the doctrine of constructive knowledge must be sparingly applied." Id. at 554-55.  Receipt of a no-match letter does not make it "highly probable" that the named employees are undocumented.  As the comments published with the proposed regulation acknowledge, "[t]here are many causes for such a no-match, including clerical error and name changes." 71 Fed. Reg. at 34281-82.  Moreover, the proposed regulation applies to all employees named on a no-match letter, even if the employee did not use a social security card to verify her authorization to work in the United States.[1]

In sum, Subsections 274a.1(l)(1)(iii)(B), 274a.1(l)(2)(i)(A)(1-2) and 274a.1(l)(2)(iii) of the proposed regulation should not be adopted because they exceed the Department of Homeland Security's authority.

Very truly yours,

Kristin L. Martin

KLM:rr

50/C:\DCB\KLM\UNITE08-11 Comments on DHS proposed regs.wpd
8/11/2006/13:23:06 UNITE 3200

---

[1] In contrast, in Mester Manufacturing and New El Rey Sausage, it was found to be "highly probable" that the employees were undocumented because the INS notified their employers that the employees had used invalid immigration documents to verify their authorizations to work in the United States.

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Sherwin Siy [siy@epic.org] |
| **Sent:** | Friday, August 11, 2006 4:16 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket No. ICEB-2006-0004; Comments of EPIC |

**Attachments:**    EPIC_EV_cmts.pdf



EPIC_EV_cmts.pdf
   (233 KB)

        Attached please find the comments of the Electronic Privacy Information Center
on the proposed rulemaking regarding safe-harbor procedures for employers who receive a
no-match letter (Docket No.
ICEB-2006-0004).

Sincerely,
Sherwin Siy
Staff Counsel
Electronic Privacy Information Center
202-483-1140 ext. 110

1

**No-Match Cert. Admin. Record  2032**

DEPARTMENT OF HOMELAND SECURITY

Amendments to 8 CFR Part 27a

Docket No. ICEB-2006-0004

Notice of Proposed Rule Making

---

## COMMENTS OF THE ELECTRONIC PRIVACY INFORMATION CENTER

By notice published on June 14, 2006, the Department of Homeland Security ("DHS") requested public comments on its intent to adopt amendments to Part 274a of Title 8 of the United States Code of Federal Regulations.[1] The amendments would change the system relating to the unlawful hiring or continued employment of aliens not authorized to work in the United States. The amendments describe the legal obligation of an employer upon receipt of a no-match letter from the Social Security Administration or the DHS. The amendments also provide a "safe-harbor" that would protect the employer against DHS action if the employer follows the procedures described in the amendments. Pursuant to this notice, the Electronic Privacy Information Center ("EPIC") submits these comments to address the substantial privacy issues and burdens placed on employees by these amendments.

EPIC has a well-documented interest in the use and abuse of Social Security numbers as a means of identification and authentication.[2] On March 16, 2006, EPIC testified before the U.S. House of Representatives Committee on Ways and Means about

---

[1] Safe Harbor Procedures for Employers Who Receive a No-match Letter, 71 Fed. Reg. 34,281 (Jun. 14, 2006) (to be codified at 8 C.F.R. pt. 274a).
2 EPIC, Social Security Numbers, http://www.epic.org/privacy/ssn/.

the high-risk issues associated with using the Social Security Number as an identifier and an employment verification tool.[3] In April 2006, EPIC published a report on the expansion of the Basic Pilot Program, which uses SSNs to verify employee identity and citizenship.[4] Social Security numbers have become a classic example of "mission creep," where a program designed for a specific, limited purpose has been transformed for additional, unintended purposes, sometimes with disastrous results. Recent efforts to expand employment verification programs based upon SSN identification could amplify existing problems by stretching the uses of the SSN even further beyond their original purpose, putting employees' jobs at additional risk.

### Introduction

The proposed rules, which would amend the current regulatory definition of "knowledge", shift the burden of employment eligibility verification to employees and have significant privacy implications. EPIC strongly urges that DHS reject this proposal, which could easily expose citizens to a system with a high probability for error and risk. However, if DHS does accept the proposal, EPIC recommends that the time frame delineated for obtaining verification following receipt of a no-match letter be extended. Further, EPIC recommends that DHS create clear guidelines for employer use of this system to prevent prescreening use for discriminatory hiring practices.

The Immigration Reform and Control Act of 1986 (IRCA) made it illegal for employers to "knowingly" employ unauthorized workers, and Basic Pilot grew out of the

---

3 Social Security Number High-Risk Issues: Hearing Before the Subcomm. On Social Security of the H. Comm. on Ways and Means, 109 Cong. (statement of Marc Rotenberg, Executive Director, EPIC), available at http://www.epic.org/privacy/ssn/mar_16test.pdf.
4 Expansion of Basic Pilot Would Steer Employment Verification Toward Disaster, Spotlight on Surveillance (EPIC April 2006), http://www.epic.org/privacy/surveillance/spotlight/0406/default.html.

requirement for work-eligibility verification.[5] A new employee is required to fill out an Employment Eligibility Verification form or I-9, which requires ID.[6] Employers do not need to verify the authenticity of the ID documents, but they do need to keep a copy of them on file.[7] The documents must merely pass a good-faith test: Do they look real? If the documents reasonably appear to be genuine and related to the employee, the employer must accept these as valid. If they do not appear reasonably genuine or related to the employee, the employer must reject the employee and may contact USCIS for assistance.

If an employee originally submitted fraudulent documents, but subsequently obtained valid documentation, the employer is not required to terminate. If the employer discovers that the documents are not valid, the employer must question the employee and provide time for the employee to rectify the situation and fill out a new I-9 form. The current laws do not provide a specified time frame for this process. If an employee is found to be unauthorized, the employer must terminate her employment. Employers who do not end employment of unauthorized workers or who knowingly hire unauthorized workers may be fined up to $11,000 for each ineligible employee.[8]

Title 8, Part 274a of the Code of Federal Regulations sets out employer requirements for hiring and employment purposes using the I-9 process. Currently, section 274a.1 provides the definitions for use in this part. The amendments proposed would specifically affect paragraph (l) of this section, which defines "knowing" as it relates to the employer's knowledge of an employee's or potential employee's ineligibility

---

5 8 U.S.C. § 1324a et seq (1986).
6 Illegal Immigration Reform and Immigrant Responsibility Act, 8 U.S.C. §1324a(b) (1996) (hereinafter "IRIRA").
7 IRIRA, supra.
8 Id.

to work. The current definition includes not only actual but constructive knowledge and provides three examples in which constructive knowledge may be found, if the employer:

- Fails to complete or improperly completes the Employment Eligibility Verification Form I-9;

- Has access to information that would indicate that the alien is not authorized to work, such as Labor Certification and/or an application for Prospective Employer; or

- Acts with reckless and wanton disregard for the legal consequences of permitting another individual to introduce an unauthorized alien into its work force or to act on its behalf.

Helpfully, the definition also specifies that knowledge may not be inferred from an employee's foreign appearance or accent. Further, this section does not permit employers to request additional or different documentation.[9]

The proposed rules would amend the definition of "knowledge" in the current regulations. The amendments would create a "safe harbor" for employers that comply with the prescribed procedures, insulating them from DHS prosecution. However, the amendments shift the burden of verification and correction to employees by imposing unrealistic time frames and obligating the employee to effect any changes necessary due to system error. An additional burden falls on employees who are unable to obtain verification within the required time frame, by limiting the list of acceptable

---

[9] 8 C.F.R. pt. 274a.1(l)

identification and eligibility documents that may be used for submitting a mandatory, second I-9 form.

## I.     The Proposed 60-Day Time Restriction is Insufficient for Employees to Resolve Discrepancies with the SSA and the DHS

The current regulations do not provide any specific steps for an employer to take once he or she discovers that the documents presented by the employee may not be valid.[10] EPIC appreciates that the proposed amendments set out specific time frames for the verification process. However, the sixty-day period is insufficient time for employers and employees to make the necessary corrections.

The amended regulations allow for a sixty-day period for the verification process from the day that the employer receives notice of a no-match.[11] This includes fourteen days in which the employer must check its own records for clerical errors or similar mishaps.[12] If no error is found, the employer must question the employee as to the accuracy of the recorded information. If there is no clerical error, the employee must then correct the error via the SSA or USCIS offices within sixty days of the employer's receipt of no-match notification.[13]

Sixty days is unlikely to be a realistic time frame for obtaining corrections and replacement documents from already overburdened and backlogged agencies. The time allotted must include the number of days the SSA and DHS offices will take to process a verification request and provide a response.

---

[10] 71 Fed. Reg. 34,281.
[11] 71 Fed. Reg. 34,285 § (l)(2)(i)(B).
[12] 71 Fed. Reg. 34,285 § (l)(2)(i)(A).
[13] 71 Fed. Reg. 34,285 § (l)(2)(i).

**No-Match Cert. Admin. Record  2037**

The problems associated with the limited time frame proposal are particularly troubling for non-citizen employees. Non-citizens are subject to a two-tiered process for verification. First the SSA verifies that the number is valid and related to the employee; then SSA verifies with DHS that the number is valid for work in the United States.[14] This two-step process will make it difficult for non-citizen employees to obtain any necessary corrections and/or replacement documents within the allotted sixty days. For non-citizens, this may be a time-consuming task. To obtain a corrected Social Security card, non-citizens must provide documents proving immigration status, work eligibility, identity and, where relevant, proof of legal name change.[15] If there is a discrepancy with the non-citizen's DHS records, a considerable amount of time would be expended in processing the changes in the SSA record, in addition to the time required to first resolve the DHS record.

In the case of such discrepancies, employees could be faced with a time frame of only a few days in which to obtain authorized employment eligibility verification. As a result, many employees will have to undergo the additional verification procedure specified for circumstances in which the verification was not obtained within the sixty days. This process requires the employee and the employer to submit a new Form I-9. This new Form I-9 requires that the employee establish his or her identity and employment authorization using documents that do not contain Social Security numbers

---

[14] 71 Fed. Reg. 34,285 § (l)(2)(i)(B).

[15] This identity requirement is satisfied by such DHS documents as Form I-551, I-94 with unexpired foreign passport or work permit card (I-766 or I-688B). The immigration status requirement is satisfied by the I-94 document, Arrival/Departure Record. Additionally, non-citizen students must also show either their I-20 Certificate of Eligibility for Nonimmigrant Student Status or DS-2019 Certificate of Eligibility for Exchange Visitor Status. *See* Social Security Administration, *Evidence Requirements*, http://www.socialsecurity.gov/ss5doc/ (last visited Aug. 11, 2006).

or alien numbers.[16]  Because the rules specify that employers must complete this form within three days following the failure to obtain verification, employees subjected to this process will have little time to provide the necessary documentation. The onus falls to the employee to secure these documents in advance.

EPIC recommends that before adopting these rules, the DHS conduct a study of the average time it takes for both citizen and non-citizen employees to verify both Social Security numbers and DHS work authorization. This study should include an assessment of data entry errors and delays, and should also include processing time for DHS and SSA.

## II.  The proposed system shifts the burden of fixing database errors to the employees

The proposed amendments specifically state that employers should direct their employees who are the subject of no match letters to contact the SSA or DHS offices to obtain verification of employment eligibility. However, studies have shown that these agencies are not consistently responsive. An evaluation of the Basic Pilot Program, which created a web-based verification system, found that 39 percent of employers reported that SSA either never or "only sometimes" returned their calls. The evaluation also noted that 43 percent of employers reported the same problem for communications with the

---

[16] This effectively reduces the list of acceptable I-9 documents that establish identity &/or employment eligibility for non-citizens. Therefore, the only documents an employee could provide would be: an unexpired foreign passport with an attached Form I-94 indicating unexpired employment authorization; driver's license; and Certification of Birth Abroad issued by the Department of State. Form I-688 Unexpired Temporary Resident Card and Form I-688A Unexpired Employment Authorization Card have been cancelled.  *See* Citizenship and Immigration http://www.uscis.gov/graphics/formsfee/forms/i-695.htm.

**No-Match Cert. Admin. Record  2039**

Immigration and Naturalization Services.[17] Additionally, one in eight verification submissions were never resolved, indicating a high level of non-responsiveness.

It is unreasonable to place the entire burden of seeking correction of records on employees without adequately addressing this problem within the administration. EPIC recommends that the regulations also require that agencies respond within a reasonable time period, which should be significantly less than the time period allotted for verification in order to provide an opportunity for reconsideration and appeal. The rules should clearly allow for employees to receive extensions on deadlines based upon delays within the agencies. EPIC also recommends that the regulations require the agencies to publish annual reports, or include in their annual reports, the disposition of no match verification as initiated by the employee.

### III.    No-match letters may affect an individual's employability.

The proposed rules set out very specific requirements for employers to meet, but only in the context of meeting the standards for a qualified immunity from DHS action. Neither the rules nor the proposed amendments address any requirements for employers in relation to their treatment of the employee. Although the SSA indicates that these letters "are not a basis, in and of themselves, for taking any adverse action against an employee,"[18] employers have little incentive to continue employment of an individual stigmatized by a potential error. This would have a disparate impact on minorities as they

---

[17] H. Small Business Comm. Subcomm. on Workforce, Empowerment, and Government Programs, Jun. 27, 2006, (Prepared Remarks of Angelo Amador, Director of Immigration Policy, U.S. Chamber of Commerce), *available at*
http://wwwc.house.gov/smbiz/hearings/databaseDrivenHearingsSystem/displayTestimony.asp?hearingIdDa teFormat=060627a&testimonyId=565.

[18] SOCIAL SECURITY ADMINISTRATION, OFFICE OF INCOME SECURITY PROGRAMS, EMPLOYER'S GUIDE TO FILING TIMELY AND ACCURATE W-2 WAGE REPORTS 29 (Apr. 2004), *available at*
http://www.ssa.gov/employer/guidewebnew.doc.

**No-Match Cert. Admin. Record  2040**

are more likely to appear "foreign," falsely signaling to the employer a higher probability of final no match. This situation might also lead to pre-emptive discrimination on the part of employers, who might be less likely to consider those seeking employment who are new citizens, documented non-citizen workers, minorities, or members of other groups commonly perceived to be potential no-matches for employment eligibility.

EPIC recommends that the proposed amendments add a section on the rights of employees and prospective employees. This section should guarantee the employee or prospective employee be free from adverse action, such as termination, suspension or denial of employment because of the no-match status pending final confirmation of a no-match. Additionally, the section should include specific information on an appeals process that an employee or prospective employee may take if the SSA erroneously provides a final no-match confirmation. Finally, the rights of employees and perspective employees should include the opportunity to recover lost wages and attorney fees.[19] Further, the regulations should include a provision guaranteeing the pending status investigation shall remain confidential; the employer shall not disclose such information to any one other than the employee who is the subject of the record, except as necessary for the processing of employment paperwork.

## IV.    This system of no match letters is prone to errors, as evidenced by similar programs.

The proposed regulations create an employment eligibility verification system dependent on government-controlled databases. As previous programs have demonstrated and Justice Sandra Day O'Connor noted, it is not reasonable "to rely on a recordkeeping

---

[19] Amador Remarks, *supra* note 17.

system that has no mechanism to ensure its accuracy over time."[20] Databases have been shown to yield inaccurate results and delayed entry of information and updates.

Government databases have historically displayed "extremely high" error rates.[21] When applied to a large number of individuals, even small error rates can have adverse effects on millions. In testimony before a subcommittee of the U.S. House of Representatives, Angelo Amador, Director of Immigration Policy at the U.S. Chamber of Commerce, emphasized that even a one percent error rate "would translate into the improper disqualification of about 1.4 million potential workers." Further, Mr. Amador offered several examples of government database error rates:

> [E]rror rates for Internal Revenue Service data and programs are typically in the range of 10-20%. A General Accountability Office ("GAO") study on databases used for alien employment verification, pre-Basic Pilot, found that 20% of a sample of Immigration and Naturalization Services ("INS") data on aliens was incomplete and 11% of the files contained information that was erroneous. The National Law Journal reported approximately ten years ago that files on 50,000 Guatemalan and Salvadoran aliens regularly contained the first, middle, and surnames in the wrong field. This is still a common occurrence today because Hispanics tend to have compound names and the first part of the last name is routinely written as the middle name. . . . Even Social Security files have been found to contain error rates in 5-20% of cases.[22]

Two prime examples of recent problems with database-focused programs are the Basic Pilot program, which specifically applies to employment eligibility verification, and the No-Fly lists, which produced letters prohibiting access to flying on commercial

---

20 Arizona v. Evans, 514 U.S. 1, 17 (1995) (O'Connor, J., concurring).
21 Amador Remarks, *supra* note 17.
22 *Id.*

airlines in much the same way the no-match letters prohibit employment with private businesses.

## A.  Basic Pilot Program

The Basic Pilot Program, which was created in 1999 and expanded in 2004, set up a web-based application for employers to use on a voluntary basis to verify employment eligibility. This program relies on SSA and DHS databases.  There have been noted problems with the system, including a high error rate, the inability to detect identity fraud, the slow response of the agencies upon which the program depends, and the noncompliance of employers.[23] Expanding and formalizing Basic Pilot, as the proposed regulations set out to do, places even more burdens on a system ill-equipped to handle the lighter load of a pilot program.

In 2005, the General Accounting Office issued a report identifying several problems with the application of the Basic Pilot Program. For instance, delays in updating records and data entry hindered expedient verifications and corrections. The GAO report found that delays in data entry and processing resulted in the need to run queries manually.[24]

> "Although the majority of pilot program queries entered by participating employers are confirmed via the automated SSA and DHS verification checks, about 15 percent of queries authorized by DHS required manual verification by immigration status verifiers in fiscal year 2004. According to USCIS, immigration status verifiers typically resolve cases referred to them for verification within 24 hours, but a small number of cases take longer. For example, nine employers we interviewed reported that a small

---

23 U.S. Gen. Accounting Office, Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts 5 (2005).
24 GAO Report at 23.

EPIC Comments                              11                Department of Homeland Security
No-Match Safe Harbor                                        Docket No. ICEB-2006-0004

> number of immigration status verifier verifications took longer
> than 24 hours to resolve, with a few verifications taking as long as
> 2 weeks to resolve."[25]

Slow updates to name change and status change cause errors that result in erroneous no-match letters. Studies have shown the error rate for Basic Pilot to be 20 percent.[26] These errors disparately affect persons of Hispanic descent because they often have compound names, which prove difficult for the database.[27] In addition to these errors, another problem with Basic Pilot is a lack of consistent quality control. A study completed by Temple University found that one in eight verification submissions were never resolved.[28]

### B. No Fly List

The proposed regulations effectively set up a "no work" list, similar to the "no fly" list maintained by the Transportation Security Administration (TSA), which is now part of the Department of Homeland Security and authorized by law to maintain watch lists of names of individuals suspected of posing "a risk of air piracy or terrorism or a threat to airline or passenger safety." While initially denying to the media that such a list existed, the TSA finally acknowledged its existence in October 2002.[29]

Documents obtained by EPIC, evidenced a hundred complaints filed by irate passengers who felt they had been incorrectly identified for additional security or were

---

25 GAO Report at 22-23.

26 Amador Remarks, *supra* note 17.

27 *Id.*

28 Institute for Survey Research and Westat, *Findings of the Basic Pilot Program Evaluation* (U.S. Dep't of Justice 2002), http://www.uscis.gov/graphics/aboutus/repsstudies/piloteval/PilotEvalComplete.htm.

29 EPIC, Documents Show Errors in TSA's "No Fly" and "Selectee" Watch Lists, http://www.epic.org/privacy/airtravel/foia/watchlist_foia_analysis.html (last visited Aug. 3, 2006).

denied boarding.[30] The complaints describe the bureaucratic maze passengers find themselves in if they happen to be mistaken for individuals on the lists. In one case, where a passenger was flagged by the first generation Computer Assisted Passenger Pre-Screening System (CAPPS) as a 'risk' who should be subject to additional screening, the TSA stated that airlines are responsible for the administration of the system.[31] Accordingly, the TSA directed the passenger to contact the airline to resolve the issue. In another case, a local FBI office in New Jersey, at the behest of Congressman Bill Pascrell, requested that the TSA remove a woman from the list because she was flagged due to her name's similarity to that of a wanted Australian man.[32] In an e-mail dated July 2002, an FBI counter-terrorism officer acknowledged that different airlines have different procedures when the passenger's name is similar to one on the list.[33] The example of the no fly and selectee lists can illustrate the immense problems that will surface when private companies are deputized to enforce federal regulations. However, in the case of employment verification, an even larger number of individuals and businesses are affected.

The error rates inherent in large databases dealing with data culled from a variety of sources will almost certainly surface in the employment verification context. At best, these errors will cost numerous individuals the time necessary to correct records. However, they may also cost employees their much-needed jobs and wages.

---

[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*

V.    **Using the SSN as employment verification is not one of the original purposes of the SSN and poses serious privacy risks.**

The Social Security Number (SSN) was created in 1936 as a nine-digit account number assigned by the Secretary of Health and Human Services for the purpose of administering the Social Security laws. SSNs were first intended for use exclusively by the federal government as a means of tracking earnings to determine the amount of Social Security taxes to credit to each worker's account. Over time, however, SSNs were permitted to be used for purposes unrelated to the administration of the Social Security system. For example, in 1961 Congress authorized the Internal Revenue Service to use SSNs as taxpayer identification numbers.[34]

In passing the Privacy Act of 1974, Congress was specifically reacting to and rejecting calls for the creation of a similar idea, a one-stop "federal data center" for personal information. A 1977 report issued as a result of the Privacy Act highlighted the dangers and transfers of power from individuals to the government that occur with centralization of personal information.[35]

It is because the SSN is used as both identifier and authenticator that identity theft has increased in incidence and prevalence. Because the SSN is relied upon so heavily by business, it is the personal identifier that impostors seek in order to commit crime. Congress' goal in addressing identity theft and privacy should seek to limit availability of the SSN generally and to induce businesses to rely upon alternative identifiers.[36] EPIC

---

[34] H. Subcomm. on Social Security, H. Comm. on Ways and Means, May 11, 2000 (Statement of Marc Rotenberg, Executive Director, EPIC), *available at* http://www.epic.org/privacy/ssn/testimony_0500.html.
[35] Privacy Prot. Study Comm'n, *Personal Privacy in an Information Society: The Report of the Privacy Protection Study Commission* (1977), available at http://www.epic.org/privacy/ppsc1977report/c1.htm.
[36] Letter from Chris Jay Hoofnagle, Associate Director, EPIC, & Ed Mierzwinski, Consumer Program Director, Nat'l Assoc. of State PIRGs, U.S. PIRG, to Clay Shaw, H. Comm. on Ways and Means,

recommends that use of the SSN be eliminated in the employment eligibility verification process. Instead, each person would be issued an employee identification number, entirely distinct from the SSN. One example would be a number format that included a "checksum" – a formula that allows one to immediately verify whether the number has a proper form. Credit card numbers already are issued in this fashion so that they cannot be guessed or faked easily.[37] This would curb the widespread use of SSNs that has significantly contributed to identity theft.

## Conclusion

These proposed amendments would continue employees' exposure to a system with a high probability for error and risk. EPIC urges DHS to reject this proposal and create a more secure system for employment eligibility verification. However, if DHS does continue this practice, EPIC recommends that the time frame delineated for obtaining verification following receipt of a no-match letter be studied and extended to provide adequate time for the most complex case – a non-citizen employee who is identified as having discrepancies in both his SSA and DHS records. Further, EPIC recommends that DHS create clear guidelines for employers' use of this system to prevent prescreening use for discriminatory hiring practices. This should be addressed in the form of rights guaranteed to employees. However, EPIC strongly recommends that DHS reconsider the use of Social Security numbers as a verification and identification tool.

Respectfully Submitted,

---

Subcomm. on Social Security, July 2, 2006, *available at* http://www.epic.org/privacy/ssn/ ssnanswers7.2.04.html.
[37] *Id.*

EPIC Comments                                    15                    Department of Homeland Security
No-Match Safe Harbor                                                   Docket No. ICEB-2006-0004

**No-Match Cert. Admin. Record  2047**

Courtney Anne Barclay
Sunni Yuen
IPIOP Clerks

Sherwin Siy
Staff Counsel

**No-Match Cert. Admin. Record  2048**