**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Rachel_Cox@ACIP.com |
| **Sent:** | Friday, August 11, 2006 3:48 PM |
| **To:** | Regs, Rfs |
| **Cc:** | Lynn_Shotwell@acip.com |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |
| **Attachments:** | ACIP Comments re ICE No Match.doc |

Sent on behalf of Lynn Shotwell of ACIP.

**No-Match Cert. Admin. Record  2049**

**American Council on International Personnel**
1212 New York Avenue, NW, Suite 800
Washington, DC 20005
• 202-371-6789 • Fax 202-371-5524 • www.acip.com

August 11, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services,
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

Via Electronic Mail

Re:   DHS Docket No. ICEB-2006-0004: Comments on Proposed Rule, "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," published at 71 Fed. Reg. 34281-34285 (June 14, 2006)

Dear Director:

The American Council on International Personnel (ACIP) is pleased to submit the following comments in response to the above referenced proposed rule (the "Proposed Rule"), , issued by the Department of Homeland Security's (DHS) Bureau of Immigration and Customs Enforcement (ICE). The Proposed Rule seeks to establish safe-harbor procedures for employers to follow in response to either of two events: (1) if the employer receives written notice from the Social Security Administration (SSA) that the combination of name and social security number submitted to SSA for an employee does not match agency records; or (2) if the employer receives written notice from DHS that the immigration-status or employment-authorization documentation presented or referenced by the employee in completing Form I-9 was not assigned to the employee.

By way of quick background, ACIP is an organization comprised of nearly 200 corporate and institutional members with an interest in the movement of personnel across national borders. Each of our members employs at least 1,000 employees worldwide, and, in total, ACIP members employ millions of United States citizens and foreign nationals in all industries throughout the United States. ACIP sponsors seminars and produces publications aimed at educating human resource and legal professionals on compliance with immigration laws, while working with Congress and the Executive Branch to facilitate the movement of international personnel.

ACIP members exercise extraordinary care to ensure their hiring and employment practices are in accordance with the law. Our members are committed to working with the government to establish reasonable safe harbor provisions. Examples of ACIP's

focus on compliance include: ACIP has received grants from the Department of Justice's Office of Special Counsel to educate employers on I-9 compliance, and ACIP provides training specifically on IRCA (Immigration Reform Control Act) compliance. Additionally, ACIP has previously advised our members of their affirmative obligation to correct deficiencies identified in no-match letters, including a review of I-9 records if the situation warrants. Some members report being frustrated in this effort by employees who are informed by labor unions or counsel that they should not cooperate.    ACIP welcomes this clarification of employer obligations in response to a no-match letter. We are concerned, however, that the timeframes established by this proposed rule are unrealistic and will undermine rather than support the government's enforcement efforts. We also seek clarification of certain of these obligations which, as currently drafted, are confusing and onerous for employers. Finally, we seek assurance that employers will not be liable for adverse employment actions, such as termination, taken in reliance upon government information.

In the preamble to the proposed rule, ICE stated, "Comments that will provide the most assistance to ICE in developing these procedures will reference a specific portion of the proposed rule, explain the reason for any recommended change, and include data, information, or authority that support such recommended change."  As such, we have included relevant portions of the proposed rule with our corresponding comments following each provision.

## 1. Seek Clarification on Situations Leading to a Finding of Constructive Knowledge

Proposed regulatory language (emphasis added):

8 CFR 274a.1(I)(1) The term knowing includes having actual or constructive knowledge. **Constructive knowledge** is knowledge which may fairly be inferred through notice of certain facts and circumstances that would lead a person, through the exercise of reasonable care, to know about a certain condition. Examples of situations where the employer may, depending on the totality of relevant circumstances, have constructive knowledge that an employee is an unauthorized alien include, but are not limited to, situations where the employer:

    (i) Fails to complete or improperly completes the Employment Eligibility Verification Form, I-9;

    (ii) Acts with reckless and wanton disregard for the legal consequences of permitting another individual to introduce an unauthorized alien into its work force or to act on its behalf;

    (iii) Fails to take reasonable steps after receiving information indicating that the employee may be an alien who is not employment authorized, such as--

      (A) Labor Certification or an Application for Prospective Employer;****

ACIP's Comments:

8 CFR 274a.1(I)(1)(iii)(A) of the proposed rule, states that an employer may be deemed to have constructive knowledge that an employee is an unauthorized alien if the employer fails to take reasonable steps after receiving information indicating that the employee may be an alien who is not employment authorized, such as a labor

certification or an Application for Prospective Employer. ACIP understands the concept of constructive knowledge under current law. We are concerned, however, that the examples provided in this proposed rule, including the provision that is already in the current regulation, confuse this issue. A labor certification alone does not indicate that an employee is not authorized to work. Many foreign nationals legally reside and work in the United States while their labor certification is pending. For example, the foreign national may be working in the US in H-1B status. If a labor certification potentially gives rise to constructive knowledge, what steps should an employer take to ensure they are in compliance? Along the same lines, ACIP would like clarification on what is meant by an Application for Prospective Employer? We assume this may refer to an application filed with the U.S. Citizenship and Immigration Service for immigrant status. Again, however, such form alone does not indicate work authorization status. Given the importance of these new obligations on employers, ACIP would like to suggest that ICE issue a new proposed rule to clarify proposed section 274a.1(l)(1)(iii). In the alternative, ICE should delete these examples.

## 2. Proposed Time Frames and Record Keeping Requirements are Unreasonable

Proposed regulatory language (emphasis added):

8 CFR 274a.1(l)(2)(i) An employer who receives the notice from SSA described in paragraph (l)(1)(iii)(B) of this section will not be deemed to have constructive knowledge that the employee is an unauthorized alien if--
> (A) The employer takes reasonable steps, <u>within 14 days</u>, to attempt to resolve the discrepancy; such steps may include:
>> (1) <u>Checking the employer's records</u> promptly after receiving the notice, to determine whether the discrepancy results from a typographical, transcribing, or similar clerical error, and if so, correcting the error(s), <u>informing the Social Security Administration</u> of the correct information (in accordance with the letter's instructions, if any; otherwise in any reasonable way), <u>verifying with the Social Security Administration</u> that the employee's name and social security account number, as corrected, match in Social Security Administration records, <u>and making a record of the manner, date, and time of such verification</u>; and
>> (2) If no such error is found, promptly <u>requesting the employee to confirm</u> that the name and social security account number in the employer's records are correct--and, if they are correct according to the employee, <u>requesting the employee to resolve the discrepancy</u> with the Social Security Administration, such as by visiting a Social Security Administration office, bringing original documents or certified copies required by SSA, which might include documents that prove age, identity, and citizenship or alien status, and other documents that may be relevant, such as those that prove a name change, or, if the employee states that the employer's records are in error, <u>taking the actions to correct, inform, verify, and make a record</u> described in paragraph (l)(2)(i)(A)(1) of this section; and

*****

8 CFR 274a.1(l)(2)(ii) An employer who receives the notice from DHS described in paragraph (l)(1)(iii)(C) of this section will not be deemed to have constructive knowledge that the employee is an unauthorized alien if--

> (A) The employer takes reasonable steps, <u>within 14 days</u> of receiving the notice, to attempt to resolve the question raised by DHS about the immigration status document or the employment authorization document; and
> (B) In the event that, <u>within 60 days of receiving the notice</u>, the employer does not verify with DHS that the document was assigned to the employee, the employer takes reasonable steps, <u>within an additional 3 days</u>, to verify the employee's employment authorization and identity, such as by following the verification procedure specified in paragraph (l)(2)(iii) of this section.

ACIP's Comments:

ACIP believes that both the 14 day and 60 day requirements are unreasonably short periods of time for these types of obligation. We would like to address several particular issues in this regard:

First, the regulation does not specify when the 14 day clock starts. Does it start the day the Social Security Administration mails the letter as evidenced by the postmark or by the date on the letter? These dates often vary by several days as the letter wends its way through the SSA mail process. Furthermore, the U.S. postal service often takes up to a week to deliver business mail. ACIP would like to propose that the clock start on the day the letter reaches the employer rather than on the date it leaves SSA.

Second, a 14 day timeframe is too short in many employment situations for the letter to even reach the right person. For large employers with multiple locations and hundreds of mailstops, letters are often misdirected either because the mailing address is not clear or because the government mails the letter to the wrong department or office. Once delivered to the employer, it often takes some time to redirect the letter to the appropriate personnel. For example, SSA could send the letter to the payroll office which then needs to forward the letter to the human resources department, which then must route the letter internally to the person(s) responsible for record maintenance. Sometimes, such activities are housed at local offices dispersed throughout the United States. Delays in routing a letter are exacerbated by holidays and vacations. Colleges and universities would experience another problem in complying with this 14 day requirement because their payroll offices close at the end of each semester and for several months over the summer. In these situations, 2 months could easily pass before the letter reaches the right office.

ACIP would like to propose that rather than a strict timeframe for action that instead employers be required to show that they acted within a reasonable timeframe upon receipt of the letter. What is reasonable will vary with the particular employment situation and the facts of each case. At minimum, ACIP believes that 60 days, after the correct person receives the letter, would be a reasonable timeframe for employers to initiate (but not necessarily complete) certain activities. In the alternative, we propose that ICE and SSA establish a procedure whereby employers can designate an official to receive no-match correspondence, or that the letter be sent to counsel in the manner of

other legal correspondence, so that we can better assure that information is delivered to the employer and acted upon in a timely manner.

As we will explain in more detail below, we believe the employer should only be held accountable for actions within the employer's control and should not be held to timeframes where the government itself might be the cause of delays in problem resolution. Similarly, the regulation does not account for the instance where an SSA no-match letter goes directly to an employee at the employer's place of business. For this situation, ACIP requests that any final rule clarify what actions an employer should do to take advantage of the safe-harbor provision.

Third, ACIP would like additional clarification on the employer's obligation during the 14 day period for activities beyond the employer's control. What action should an employer take if it takes the Social Security Administration longer than 14 days to verify any new corrected information? As written, the proposed rule seems to require the employer to document, within 14 days, the verification they receive in communicating with the SSA – even though the employer has no control over SSA's response time. Along the same lines, is the employer's obligation merely to request the employee to resolve the issue? How should an employer respond if an employee is unable or unwilling to take all the required steps within 14 days? Can an employer terminate an employee at this point? ACIP recommends that the final rule make clear that the employer is only responsible for taking steps within the employer's control.

Fourth, ACIP would like clarification of the time frame for the employee's activities. The preamble suggests that the employee's actions must also be completed within 14 days of receipt of the no-match letter. If the employer cannot resolve the situation within 14 days, the employer must request the employee take additional steps to resolve the issue. Does the employee receive an additional 14 days if the employer used the original 14 days? ACIP believes the employer should have enough time, at least 60 days, to attempt to resolve any discrepancy. In the event the employer cannot solve the problem, ACIP recommends the employee be given an additional 60 days to resolve the problem. It is our experience that most employees will act upon this expeditiously, but this additional time will accommodate employees who are unable to immediately contact SSA due to pressing work or family concerns.

Fifth, in relation to the requirement that the employer take reasonable steps within 14 days to attempt to resolve any question raised by DHS about the immigration status document or the employment authorization document, ACIP would like ICE to provide examples of what those steps might involve. For example, will DHS create a separate avenue for employers to follow in the event they receive such a notice from DHS?

Sixth, ACIP also has concerns over the record-keeping requirements. Why must an employer maintain record of the manner, date and time it verified with the appropriate agency that a discrepancy has been resolved? The act of verifying with the appropriate agency that the matter has been resolved should be sufficient. Extensive record-keeping requirements of this nature impose significant costs on employers who must allocate personnel and storage space to create and maintain these records. Finally, in relation to such record-keeping requirements, ACIP is concerned that ICE remains silent on the period for which such records be maintained. Will it be a specific period of

time measured from the date of resolution or will an employer be asked to retain the record for a period of time consistent with other I-9 records or by some other complicated formula based on the employee's dates of employment?

### 3. Seek Clarification on 60 Day Requirement

Proposed regulatory language (emphasis added):

8 CFR 274a.1(l)(2)(i)(B) In the event that, within 60 days of receiving the notice, the employer does not verify with the Social Security Administration that the employee's name matches in the Social Security Administration's records a number assigned to that name and that the number is valid for work or is valid for work with DHS authorization (and, with respect to the latter, verify the authorization with DHS), the employer takes reasonable steps, within an additional 3 days, to verify the employee's employment authorization and identity, such as by following the verification procedure specified in paragraph (l)(2)(iii) of this section.

*****

8 CFR 274a.1(l)(2)(ii)(B) In the event that, within 60 days of receiving the notice, the employer does not verify with DHS that the document was assigned to the employee, the employer takes reasonable steps, within an additional 3 days, to verify the employee's employment authorization and identity, such as by following the verification procedure specified in paragraph (l)(2)(iii) of this section.

ACIP's Comments:

ACIP suggests that any final rule make clear which steps must be completed within 14 days, and which steps must be completed within 60 days.  Under the proposed language, there seems to be a gap in which tasks ICE expects employers to complete within 14 days, and which tasks must be completed within the 60 day timeframe. We request clarification on what occurs between the 14-day and 60-day time period. As far as we can tell, the employer has 14-days to inform the employee of the discrepancy and determine whether it is a clerical mistake.  Then, it seems the employer has 60-days, from the date of receipt of the letter or notice, to ensure and confirm that the discrepancy has been rectified.  We are unclear about the time in between the 14 days and the 60 days.  For example, ACIP believes but would like to clarify that an employer can continue to employ an employee between the 14 and 60-day period, even if there is an unresolved discrepancy.

### 4. Seek Clarification on Whether the New I-9 (After Waiting 60 Days) Is Optional

Proposed regulatory language (emphasis added):

8 CFR 274a.1(l)(2)(iii) The verification procedure referenced in paragraphs (l)(2)(i)(B) and (l)(2)(ii)(B) of this section is as follows:

(A) The employer completes a new Form I-9 for the employee, using the same procedures as if the employee were newly hired, as described in Sec. 274a.2(a) and (b) of this part, except that--

(1) Both Section 1--``Employee Information and Verification''--and Section 2--``Employer Review and Verification''--of the new Form I-9 should be completed within 63 days of receiving the notice referred to in paragraph (l)(1)(iii)(B) or (C) of this section;

(2) No document containing the social security account number or alien number that is the subject of a written notice referred to in paragraph (l)(1)(iii)(B) or (C) of this section, and no receipt for an application for a replacement of such document, may be used to establish employment authorization or identity or both; and

(3) No document without a photograph may be used to establish identity or both identity and employment authorization; and

(B) The employer retains the new Form I-9 with the prior Form(s) I-9 for the same period and in the same manner as if the employee were newly hired at the time the new Form I-9 is completed, as described in Sec. 274a.2(b) of this part.

ACIP's Comments:

The proposed regulatory language provides an employer safe harbor protection *if* the employer re-verifies the employee by repeating the same I-9 process completed upon initial hire. The preamble suggests that this is an extra step that employers *may* take to demonstrate lack of constructive knowledge. The preamble further suggests that employers may take action other than the procedure described in the proposed regulations. Of course, employers who opt for a different course of action would do so at the risk of ICE finding such actions to be insufficient for the safe harbor.

The regulatory language must be clearer so as to not create another mandatory procedural hurdle before the employer may terminate an authorized employee. In fact, both the preamble and the proposed regulation itself should state simply that if the employee's status cannot be verified in 60 days, the employer may terminate the employee in question absent compelling evidence to do otherwise. Indeed, in the event of compelling reasons why the employer should not terminate such employee even after 60 days, such as slow agency response or independent evidence that the employee is in fact legal, then the appropriate next step is for the regulation to permit extending the 60 days to facilitate confirmation of the employee's work authorization or identity. The current regulatory language is unclear and may inadvertently create an expectation or even right of action on the part of an employee for a new I-9 process. The regulation must state unequivocally that re-verification through a new I-9 is *optional,* and that it is only warranted when there is compelling evidence that the additional documentation the employee provides would establish work authorization or identity, such as a U.S. passport.

The irony of requiring the repeat of the I-9 process is that the I-9 system, as currently constituted, is unreliable and is the reason why new regulations are necessary in the first place. The paper-driven verification on Form I-9 does attempts to verify identity or work authorization, but leaves ample opportunity for exposing law-abiding employers to

penalties due to inadvertent paperwork error.  Meanwhile, lawbreakers blatantly violate the law by hiring off-the-books and the immigration authorities can do little to stop them.

## 5.  New I-9 Retention Period Would Create Administrative Burden

Proposed regulatory language (emphasis added):

8 CFR 274a.1(l)(2)(iii) The verification procedure referenced in paragraphs (l)(2)(i)(B) and (l)(2)(ii)(B) of this section is as follows:

\*\*\*\*

> (B) The employer retains the new Form I-9 with the prior Form(s) I-9 for the <u>same period</u> and in the same manner as if the employee were newly hired at the time the new Form I-9 is completed, as described in Sec. 274a.2(b) of this part.

ACIP's Comments:

ACIP is concerned that ICE may intend that the employer manage a wholly new I-9 retention period in instances where completion of a new I-9 is warranted.  Is the employer required to maintain the new I-9 for the longer of three years beyond completion or one year beyond termination regardless of the required retention associated with the originally completed I-9? Must the employer retain both the original I-9 and new I-9 for the longer of three years beyond completion or one year beyond termination, thereby requiring that employers develop systems that accommodate and track I-9 based on multiple event dates??  If so, this requirement would create an administrative burden on employers who already have systems to track maintenance requirements based on the date of initial hire.

Overall, ACIP would like to suggest that the regulatory language itself, not just the preamble language, in any final rule clarify that the regulation is providing examples, but that employers may take other steps to show they acted reasonably and timely looking at the 'totality of the circumstances.'  We thank the Department of Homeland Security for this opportunity to submit comments on the proposed rule and would be happy to provide any additional information necessary to facilitate a workable final rule resulting from this safe harbor proposed rule.

Sincerely,

Lynn Shotwell
Executive Director

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Eugene-Springfield Solidarity Network [essn@efn.org] |
| **Sent:** | Friday, August 11, 2006 2:21 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket_No._ICEB-2006-0004 |

**Attachments:**    DHS no match.doc



DHS no match.doc
(65 KB)

        Please find our comments regarding Docket_No._ICEB-2006-0004 in the attached document.

---
Eugene-Springfield Solidarity Network/ Jobs with Justice PO Box 10272 Eugene, OR  97440
phone: (541) 736-9041
email: essn@efn.org
http://www.solidaritynetwork.org

**No-Match Cert. Admin. Record  2058**



EUGENE-SPRINGFIELD

**ESSN**

SOLIDARITY NETWORK

August 11, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

***Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"***

Dear Sir or Madam:

The Eugene/Springfield Solidarity Network/Jobs with Justice submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The Eugene/Springfield Solidarity Network/Jobs with Justice is a non-profit organization advocating for the rights of working people. We work to protect the economic rights of all working people, especially the right to a decent standard of living, the right to a stable job and the right to organize. We are very concerned about the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States–immigrant and native-born alike.

The Eugene/Springfield Solidarity Network/Jobs with Justice is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We

Eugene-Springfield Solidarity Network/ Jobs with Justice    essn@efn.org
PO Box 10272, Eugene OR  97440    (541) 736-9041    www.solidaritynetwork.org

No-Match Cert. Admin. Record  2059

therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**<u>including U.S. citizens and authorized noncitizens</u>**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **<u>unregulated underground cash economy</u>** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **<u>comprehensive immigration reform</u>**. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration

Eugene-Springfield Solidarity Network/ Jobs with Justice     essn@efn.org
PO Box 10272, Eugene OR  97440     (541) 736-9041     www.solidaritynetwork.org

**No-Match Cert. Admin. Record  2060**

status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all

Eugene-Springfield Solidarity Network/ Jobs with Justice    essn@efn.org
PO Box 10272, Eugene OR  97440       (541) 736-9041       www.solidaritynetwork.org

**No-Match Cert. Admin. Record  2061**

these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,


Claire Syrett
Organizer



Eugene-Springfield Solidarity Network/ Jobs with Justice     essn@efn.org
PO Box 10272, Eugene OR  97440          (541) 736-9041     www.solidaritynetwork.org

No-Match Cert. Admin. Record  2062

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | Cynthia Rice [crice@crla.org] |
| **Sent:** | Friday, August 11, 2006 2:05 PM |
| **To:** | Regs, Rfs |
| **Cc:** | Mark Schacht |
| **Subject:** | Docket No. ICEB-2006-0004 Comments |

**Attachments:**    CRLA CRLAF COMMENTS Docket No ICEB-2006-0004.pdf



CRLA CRLAF
·MMENTS Docket No

      Attached Please find the comments submitted by California Rural Legal
Assistance, Inc., and California Rural Legal Assistance Foundation regarding DHS Docket
No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match
Letter"  These comments are being forwarded as well by overnight mail.

Cynthia L. Rice
Director of Litigation, Advocacy & Training California Rural Legal Assistance, Inc.
631 Howard Street, Suite 300
San Francisco, CA  94105
(415)  777-2752
(415) 543-2752 (facsimile0
crice@crla.org

1

**No-Match Cert. Admin. Record  2063**

# CALIFORNIA RURAL LEGAL ASSISTANCE, Inc.

**Central Office**
631 Howard St., #300
San Francisco, CA 94105
Telephone 415.777.2752
Fax 415.543.2752
www.crla.org

**José R. Padilla**
*Executive Director*

**Luis C. Jaramillo**
*Deputy Director*

**Ralph Santiago Abascal**
*General Counsel*
(1934-1997)

**William G. Hoerger**
**Ilene J. Jacobs**
**Michael M. Meuter**
**Cynthia L. Rice**
*Directors of Litigation, Advocacy,
and Training*

**Regional Offices**

Arvin
Coachella
Delano
El Centro
Fresno
Gilroy
Madera
Marysville
Modesto
Monterey
Oceanside
Oxnard
Paso Robles
Salinas
San Luis Obispo
Santa Barbara
Santa Cruz
Santa Maria
Santa Rosa
Stockton
Watsonville

August 11, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor
Procedures for Employers Who Receive a No-Match Letter"

Dear Director:

California Rural Legal Assistance and California Rural Legal Assistance
Foundation submit the following comments in response to the request for
public comment by the Department of Homeland Security (DHS), Bureau of
Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor
Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg.
34281 (June 14, 2006).

California Rural Legal Assistance, Inc., is a non-profit legal services
organization funded in part by grants from the Legal Services Corporation.
We have 20 offices located in rural California serving the farmworker
community and low wage workers in cities like Coachella, Fresno, Stockton,
Modesto and Santa Rosa. We provide a full range of legal services and
regularly represent farmworkers and others in wage and hour cases and in
proceedings before state and federal social service agencies. California Rural
Legal Assistance Foundation is a non-profit organization which represents the
interests of California farmworkers through legislative and regulatory
advocacy and by providing legal services in the areas of immigration and labor
rights.

Our organizations represent farmworkers and other low wage workers
throughout rural California. In our 40 years of advocacy we have encountered
thousands of cases where employers, social service agencies, the California
Employment Development Department and the Social Security Administration
have provided or inputted inaccurate information into the Social Security
Administration's data base that has affected workers' rights. Legal residents

LSC

Director, Regulatory Management Division,
August 11, 2006
Page 2

and citizens have had to spend months and even years correcting records maintained at various agencies. These errors are caused by mis-spellings, juxtaposition of letters or numbers, cultural differences in writing dates or surnames and, in some cases, deliberate false reporting by employers.

The proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and promote firings and further exploitation of workers that will affect low wage workers irrespective of their immigration status.

California is struggling to effectively control the underground economy that includes agriculture, janitorial work, garment, landscaping and the hospitality industry. As legitimate employers push workers out, unscrupulous employers hire them, cutting their costs by ignoring immigration laws and labor laws. The No-Match Safe-Harbor provisions encourage, rather than discourage, this shift of the workforce We therefore join in the comments submitted by other low wage worker advocates and urge DHS to withdraw this proposed rule in its entirety based on the following concerns:

<u>This proposed rule will harm all workers regardless of immigration status.</u>

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers-including U.S. citizens and authorized noncitizens-could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem. In one recent example, litigated by CRLA, an employer admitted underpaying workers but attempted to have the court take judicial notice of a no match letter claiming that it proved that the worker was not who he claimed to be. Although CRLA prevailed on the evidentiary question, this is typical of the mis-use of such letters.

Director, Regulatory Management Division,
August 11, 2006
Page 3

### The proposed rule will expand the unregulated underground cash economy.

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the unregulated underground cash economy which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers. CRLA has vast experience with such "off the books" wage payment schemes. For years, we have represented a large number of workers who were paid under such schemes. Workers paid "off the books" are much more likely not to receive the pay due them under federal and state law; and to have their employers pocket tax and social security withholdings.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

### The SSA no-match letter program is ill-suited as a tool for immigration enforcement.

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

### The proposed rule is an erosion of privacy rights.

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS

Director, Regulatory Management Division,
August 11, 2006
Page 4

to end-run these privacy protections and commandeer personal information in the SSA database
for their own purposes.

<u>The costs of implementing the proposed rule are prohibitive.</u>

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive
investment in employer and worker education programs in order to combat the rampant panic and
confusion that is almost certain to follow.  The proposed rule also contains unrealistic timetables
for compliance that will derail its implementation.  Further, although this rule purports to make
changes to how DHS interprets these letters, it has a significant impact on the way in which SSA
has to respond to the inevitable increase in employer and worker inquiries about this confusing
rule.  The actual costs of administrating the program will be astronomical for SSA, an agency
whose limited resources should go towards administering Social Security benefits rather than
enforcing immigration law.  The proposed rule should therefore be withdrawn.

<u>The proposed rule is objectionable because compliance is impractical.</u>

The proposed rule does not provide clear guidance on what an employer who receives a DHS
notice is supposed to do though it purports to provide a "safe-harbor."  While the notice
procedure protects the employer, it fails to provide a mechanism for an employee to access and
correct DHS records.  Moreover, the 60-day time period for compliance is unreasonable in
dealing with DHS and does not account for the numerous bureaucratic steps that employees must
go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled
"Safe Harbor Procedures for Employers Who Receive a No-Match Letter."  The proposed rule is
simply the wrong rule at the wrong time.  The Department of Homeland Security should not risk
the livelihoods of hundreds of thousands-possibly millions-of U.S. workers in a poorly conceived
immigration enforcement attempt on the eve of comprehensive immigration reform.  The
proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented
workers and is far outweighed by the exorbitant implementation costs that will be borne by
taxpayers, workers, and businesses.  For all these reasons, we request that the Department of
Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Cynthia L. Rice
California Rural Legal Assistance, Inc.

Mark S. Schacht
California Rural Legal Assistance Foundation

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | Coleman, Jim [JColeman@constangy.com] |
| **Sent:** | Friday, August 11, 2006 12:10 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket No. ICEB-2006-0004 |
| **Attachments:** | NCCR COMMENTS 081106.pdf |

Attached are the comments of the National Council of Chain Restaurants, which are being submitted for filing in the above-referenced rulemaking proceeding. The Council appreciates this opportunity to comment on the proposed regulations.

*James M. Coleman*
**Constangy, Brooks & Smith, LLC**
4100 Monument Corner Drive
Suite 520
Fairfax, Virginia 22030
571-522-6100 - telephone
571-522-6101 - facsimile
www.constangy.com


**\*\*CONFIDENTIALITY NOTICE\*\***

This information contained in the e-mail transmittal is privileged and confidential, intended for the addressee only. If you are neither the intended recipient nor the employee or agent responsible for delivering this e-mail to the intended recipient, any disclosure of this information in any way or taking of any action in reliance on this information is strictly prohibited. If you have received this e-mail in error, please notify the person transmitting the information immediately.

**No-Match Cert. Admin. Record  2068**



NATIONAL COUNCIL OF CHAIN RESTAURANTS
of the ❯ National Retail Federation

Bureau of Immigration and Customs Enforcement

8 CFR Part 274a

[RIN 1653-AA50]

ICE 2377-06

U.S. Department of Homeland Security

DHS Docket No. ICEB – 2006-0004


Comments of the National Council of Chain Restaurants

August 11, 2006


The National Council of Chain Restaurants, a division of the National Retail Federation,

(hereinafter the "Council"), submits the following comments regarding the Notice of Proposed

Rulemaking published by the Department of Homeland Security, Bureau of Immigration and Customs

Enforcement (hereinafter the "DHS"), concerning safe-harbor procedures for employers who receive

so-called "no-match" letters.

I.      NATIONAL COUNCIL OF CHAIN RESTAURANTS

The Council is a national trade industry group representing the interests of nearly forty of the

nation's largest multi-unit, multi-state chain restaurant companies.  Collectively, these companies own

and operate in excess of 50,000 restaurant facilities.  Additionally, through franchise and licensing

agreements, another 70,000 facilities are operated under their trademarks.  In the aggregate, the

Council's member companies and their franchisees employ in excess of 2.8 million individuals.

Liberty Place ♦ 325 7ᵗʰ Street, NW, Suite 1100 ♦ Washington, DC 20004 ♦ (202) 626-8183 ♦ (202) 626-8185 ♦ www.nccr.net

II.     INTRODUCTION

As employers, the member companies of the Council have strived to comply with the employment verification requirements since their enactment in 1986. From the beginning, the employment verification requirements have disproportionately impacted the restaurant industry for three different reasons. First, the restaurant industry is an extremely labor intensive industry. Second, the employee turnover rate is generally high within the industry because the industry employs so many young, part-time and seasonal employees. These two factors combine to create an exceedingly high number of hiring transactions, and more than most other industries. Obviously, each hiring transaction triggers the employment verification process. Thus, the greater the number of transactions, the greater the impact of the employment verification requirements. The third factor that causes a disproportionate impact results from the fact that the industry is the employer of choice for so many young, first-time job holders. A high percentage of the workforce is composed of teenagers, many of whom are entering the workforce for the first time. These young individuals entering the workforce for the first time are the least likely people to possess the necessary documentation to comply with the employment verification requirements, not because they are illegal or otherwise lack authorization for lawful employment, but simply because they have not yet reached the point in their lives where they have had a need to obtain and carry the type of documentation, such as a social security card, that is necessary for employment verification purposes. All of these characteristics of the industry combine to create additional difficulties, beyond those of an ordinary employer, with regard to compliance with the employment verification requirements.

III.    COMMENTS

First and foremost, the Council strongly supports clarifications concerning employer's obligations to ensure that their employees are authorized to work in the United States. However, bills currently working their way through Congress will likely bring about significant changes relating to an employer's responsibilities for verifying its workforce. Both the House and the Senate have proposed that investigation of SSA no-match information become a mandatory recordkeeping function, subject

- 2 -

to fines and penalties for paperwork and knowing hire violations for failure to comply. Should such legislative proposals become law, they would supersede the proposed regulation. Given the time and expense that employers will spend to comply with the proposed regulations, the Council recommends that these proposed regulations be suspended until Congress finishes its work so that employers are not forced to change policies and procedures unnecessarily. The new bills notwithstanding, there are certain provisions of the proposed regulations that could be improved and/or clarified. Thus, the following comments will focus on those provisions.

      a.     Time Periods

As mentioned above, many Council members employ tens of thousands of workers and have high rates of turnover. At any given time, many Council members will be investigating the circumstances of and working on corrective action related to hundreds of no-match letters. Many of these employers have thousands of employment locations throughout the country but maintain centralized personnel departments that would be responsible for following the steps set forth in the proposed regulation. It is likely that the no-match letters will take most of, if not the entire 14 days to get to the personnel departments before the verification process can begin. The regulations are not clear as to what constitutes receipt by the employer. As noted above, many days, and often weeks may pass before the no-match letter finds its way to the appropriate employer official. Once the no-match letter does reach the correct official, the review process, which cannot be automated, must be done by individual personnel file review. Thus, the 14-day time frame is not reasonable. Moreover, the 60-day time period is insufficient to allow an employee to schedule time to meet with the appropriate agency office during normal business hours, which will often conflict with the employee's work hours. Additionally, SSA and DHS are very busy and processing times have historically been long. As such, these short time frames will likely cause many Council members and other larger employers to miss opportunities to take advantage of the proposed safe harbor, or cause legitimate employees to lose their jobs because they could not obtain proper authorization documents for re-verification within the 60-day period. The Council recommends that the 14-day period be extended to

- 3 -

45 days, that the 60-day period be extended to 90 days and that that regulations be clarified to establish a measure for what constitutes receipt of the no-match letter by the employer. These time periods more reasonably reflect the realities of the administrative processing time periods of large employers and processing times of the agencies charged with processing the changes.

      b.      Employees on Leave

The proposed regulations do not address a grace period that should be allowed if an employee is on an authorized leave of absence due to FMLA, workers compensation, USERRA, pregnancy, ADA, etc. The Council recommends that the proposed regulations be clarified to include the employer's duties in this regard. The Council recommends that the proposed time periods be tolled until an employee returns from any period of leave.

      c.      Retroactive Application

The proposed regulations do not address whether they would be applicable to no-match letters received before the effective date of the proposed regulations. The Council recommends that the proposed regulations be clarified to establish that they apply only to no-match letters received 60 days after the effective date of any final regulations. This will allow employers time to develop record keeping procedures sufficient to meet the proposed standards.

      d.      Terminated Employees

The regulations should be clarified as to the employer's responsibility, if any, if it receives a no-match letter on an employee who is no longer employed when the letter is received. Similarly, the regulations should clarify the employer's responsibility, if any, if the employee voluntarily terminates after the employer requests that the employee resolve the discrepancy with the appropriate agency. The Council recommends that an employer's obligations and liability relative to no-match letters and the DHS notices cease upon the termination of the subject employee.

      e.      Completing New I-9 Forms

The Council understands the proposed regulations to require employers to complete new I-9 forms when an employee was unable to resolve discrepancies within the 60-day period.

- 4 -

However, the proposed regulations should clarify whether a new I-9 form should be completed to comport with any corrected information that may result from an employer and employee review for clerical errors, or from the employee resolving an error with DHS or SSA.

IV.     CONCLUSION

The Council believes that current Congressional action may supersede these proposed regulations and that DHS should suspend its rulemaking until Congressional action on the bills with related provisions is complete.  If the DHS goes forward with its rulemaking, certain improvements and clarifications in the proposed regulations are in order, as outlined herein, to resolve some ambiguities and achieve a fairer application of the statutory provisions.  For these reasons, the Council urges the DHS to give careful consideration to the foregoing comments.

Respectfully submitted,

James M. Coleman
General Counsel

- 5 -

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | Marisol Jimenez-McGee [marisol@elpueblo.org] |
| **Sent:** | Friday, August 11, 2006 11:05 AM |
| **To:** | Regs, Rfs |
| **Subject:** | RE: DHS Docket No. ICEB-2006-000, "Safe-Harbour Procedures for Employers Who Receive a No-Match Letter" |

**Attachments:** Comment- Docket No ICEB-2006-0004.pdf

To Whom it May Concern:

Attached, please find comments on behalf of El Pueblo, Inc. in regards to DHS Docket No. ICEB-2006-0004, "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." These comments also follow:

---

August 11, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

El Pueblo, Inc. submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

El Pueblo is a nonprofit, statewide advocacy organization dedicated to strengthening the Latino community of North Carolina. This mission is accomplished through leadership development, proactive and direct advocacy, education, and promotion of cross-cultural understanding in partnerships at the local, state, and national levels.

El Pueblo has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States–immigrant and native-born alike.

As a result of this work, El Pueblo is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

**No-Match Cert. Admin. Record  2074**

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform**. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under

**No-Match Cert. Admin. Record  2075**

debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

**No-Match Cert. Admin. Record  2076**

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Marisol Jimenez McGee
Advocacy Director
El Pueblo, Inc.
4 North Blount Street, Suite 200
Raleigh, NC 27601
(919) 835-1525
Fax: (919) 835-1526
Marisol@elpueblo.org

**No-Match Cert. Admin. Record  2077**



**El Pueblo, Inc.**
*Civic Participation · Cultural Program · Leadership Development*
*Advocacy · Education · Health · Public Safety · Youth Program*

4 N. Blount Street, 2nd Floor
Raleigh, NC 27601
919-835-1525
www.elpueblo.org

August 11, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

**Re:**   *DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

El Pueblo, Inc. submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

El Pueblo is a nonprofit, statewide advocacy organization dedicated to strengthening the Latino community of North Carolina. This mission is accomplished through leadership development, proactive and direct advocacy, education, and promotion of cross-cultural understanding in partnerships at the local, state, and national levels.

El Pueblo has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States–immigrant and native-born alike.

As a result of this work, El Pueblo is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

**This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized**

**No-Match Cert. Admin. Record  2078**

<u>noncitizens</u>—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

**The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

**This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform.** The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

**The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

**The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

**The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

**The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Marisol Jimenez McGee
Advocacy Director
El Pueblo, Inc.
4 North Blount Street, Suite 200
Raleigh, NC 27601
(919) 835-1525
Fax: (919) 835-1526
Marisol@elpueblo.org

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Michele Waslin [mwaslin@nclr.org] |
| **Sent:** | Friday, August 11, 2006 10:17 AM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket_No._ICEB-2006-0004 |
| **Attachments:** | comments on SSA No Match proposed regs.doc |

Attached please find comments from the National Council of La Raza.  Please contact me if you need any more information.

Michele Waslin, Ph.D.
Director of Immigration Policy Research
National Council of La Raza
1126 16th St. NW
Washington, DC  20036
202-785-1670 (main)
202-776-1735 (direct)
mwaslin@nclr.org

**No-Match Cert. Admin. Record  2081**

August 11, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

**Re:     *DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for
Employers Who Receive a No-Match Letter"***

Dear Sir or Madam:

The National Council of La Raza (NCLR) submits the following comments in response to the
request of the Department of Homeland Security (DHS), Bureau of Immigration and Customs
Enforcement (ICE) for public comment on the proposed "Safe-Harbor Procedures for Employers
Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The National Council of La Raza (NCLR) – the largest national Hispanic civil rights and
advocacy organization in the United States – works to improve opportunities for Hispanic
Americans. Through its network of nearly 300 affiliated community-based organizations
(CBOs), NCLR reaches millions of Hispanics each year in 41 states, Puerto Rico, and the
District of Columbia. NCLR is also a convener of the Low-Wage Immigrant Worker Coalition,
a nationwide coalition of labor unions, civil rights organizations, immigrant rights organizations,
and others concerned with the rights of low-wage immigrant workers in the U.S.

NCLR has ample experience in dealing with the adverse impact that the Social Security
Administration's (SSA) no-match letters have had on all workers in the United States –
immigrant and native-born alike. Since implementation of employer sanctions in the late 1980s,
the Latino community is particularly cognizant of workplace discrimination against persons who
look or sound "foreign" or have a "foreign" surname. Some employers demand that certain
workers show additional or "better" documents beyond what is required by law – often asking
for immigration documents from U.S. citizens whom they perceive to be immigrants. Other
employers implement unlawful "citizen only" policies. A congressionally-mandated
Government Accountability Office (GAO) report found a widespread pattern of discrimination
resulting solely from employer sanctions, reporting substantial discrimination on the basis of
foreign accent or appearance, or preference of certain authorized workers over others.

**No-Match Cert. Admin. Record  2082**

The SSA no-match letters have added another layer to the impact of employer sanctions as unscrupulous employers now have another tool with which to discriminate and retaliate against workers who try to improve working conditions. Furthermore, legal resident and U.S. citizen Latinos are more likely to endure the harmful impact of the no-match letters. As a result, NCLR has worked with SSA in the past to identify problems with the no-match letters, re-draft the content of the letters employers receive, propose redress policies for workers who are negatively affected, and otherwise ameliorate the potential harm done by SSA no-match letter policies.

As a result of our history with workplace discrimination and SSA no-match letters, NCLR is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will not resolve the problem of undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. Comprehensive immigration reform is necessary to fix the nation's broken immigration system and ensure that workers have proper authorization to work in the U.S.

As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm all workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers – **including U.S. citizens and authorized noncitizens** – could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor-organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule punishes law-abiding employers.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on

**No-Match Cert. Admin. Record  2083**

millions of employers. These new legal obligations will increase pressure on businesses to go "off the books," thereby promoting the unregulated, underground cash economy, potentially resulting in billion-dollar losses in federal, state, and local tax revenues; unfair competition; and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage when competing with "bad" employers who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **Comprehensive immigration reform is the solution.**

NCLR strongly feels that comprehensive immigration reform that includes an earned legalization for undocumented workers is the only practical and realistic solution to our current immigration problem. Enforcement alone will not work, and the SSA no-match letters are not an effective way of resolving the problem of undocumented labor. Moreover, the proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool, but the SSA database does not have the capacity to fulfill this objective. In addition to being error-prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of an SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS

**No-Match Cert. Admin. Record  2084**

to bypass these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable as it does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In conclusion, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands – possibly millions – of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,

*Janet Murguía*

Janet Murguía
President and CEO

**No-Match Cert. Admin. Record  2085**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Ricardo Flores [floresr@publicjustice.org] |
| **Sent:** | Thursday, August 10, 2006 3:08 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket_No._ICEB-2006-0004 |
| **Attachments:** | USCIS 8-10-06 (No-Match Rule).doc |

Attached are my comments on your proposed rule regarding SSA "No-Match Letters."  Thank you for your consideration.

Ricardo A. Flores, Public Policy Director

Public Justice Center

500 East Lexington Street

Baltimore, Maryland 21202

410-625-9409 ext. 224

240-388-1561 cell

410-625-9423 fax

floresr@publicjustice.org

www.publicjustice.org

The Public Justice Center is a non-partisan 501(c)(3) organization and does not support or oppose elected officials, candidates or political parties.

**No-Match Cert. Admin. Record  2086**



500 East Lexington Street
Baltimore, Maryland 21202
(410) 625-9409
fax (410) 625-9423
www.publicjustice.org

**PRESIDENT**
Joy Sakamoto-Wengel, Esquire
Office of the Attorney General
**VICE PRESIDENT**
Taro J. Adachi, M.D., F.A.C.O.G.
Adachi Medical Associates
**TREASURER**
Gregory Hemingway, CPA
University of Maryland Medical System
**SECRETARY**
Professor Michael Pinard
University of Maryland School of Law
Edward M. Buxbaum, Esquire
Whiteford, Taylor & Preston, LLP
Paul S. Caiola, Esquire
Gallagher, Evelius & Jones, LLP
Professor Douglas L. Colbert
University of Maryland School of Law
Robert E. Funk, Jr., Esquire
Professor Michele E. Gilman
University of Baltimore School of Law
Richard S. Gordon, Esquire
Quinn, Gordon, Wolf, Oziel,
Gladine Harvey
Dennis C. Hayes, Esquire
NAACP
Professor
F. Michael Higginbotham
University of Baltimore School of Law
Dennis A. López, MPH
Public Health Consultant
Anthony W. McCarthy
WEAA/WYPR
Keith D. Milligan
Law Offices of Peter G. Angelos, P.C.
Frank J. O'Donnell, S.M., Esquire
Marianist Community
Patrick I. Okolo III, MD, MPH
Sinai Hospital
Nancy E. Paige, Esquire
Office of Administrative Hearings
Professor Jamin Raskin
American University Washington
College of Law
Sheila K. Sachs, Esquire
Gordon, Feinblatt, Rothman, Hoffberger &
Hollander, LLC
John P. Sarbanes, Esquire
Venable, LLP
Lenel Srochi-Meyerhoff
Michael K. Wasno
Flextool Communications Federal
Christine Webber, Esquire
Cohen, Milstein, Hausfeld &
Toll, P.L.L.C.
Janice L. Wilson
**Executive Director**
John Nethercut, Esquire

AUGUST 10, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

**Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"**

Dear Sir or Madam:

The Public Justice Center submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The Public Justice Center is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

- This proposed rule will harm all workers regardless of immigration status.

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations.

- The proposed rule will expand the unregulated underground cash economy.

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new obligations will increase pressure on businesses to go "off the books," thereby promoting the unregulated underground cash economy which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- This proposed rule is an end-run around the legislative process.

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- The SSA no-match letter program is ill-suited as a tool for immigration enforcement.

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

- The costs of implementing the proposed rule are prohibitive.

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- The proposed rule is objectionable because compliance is impractical.

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

For all of the above reasons, we request that the Department of Homeland Security withdraw the proposed rule in its entirety.

Respectfully submitted,

*Ricardo A. Flores*

Public Policy Director
Public Justice Center
500 East Lexington Street
Baltimore, Maryland 21202
410-625-9409 ext. 224
410-625-9423 fax
floresr@publicjustice.org

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Mirna Torres [MTORRES@cliniclegal.org] |
| **Sent:** | Thursday, August 10, 2006 2:24 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |
| **Attachments:** | safeharborprocnomatch.pdf |

**VIA E-MAIL:** rfs.regs@dhs.gov

August 10, 2006

Direct, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

**RE: DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"**

Dear Sir or Madam:

The Catholic Legal Immigration Network, Inc. (CLINIC) submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employees Who Receive a No-Match Letter" at 71 Fed. Reg. 34281 (June 14, 2006).

### CLINIC's Experience of SSA No-Match Letters

CLINIC, a subsidiary of the U.S. Conference of Catholic Bishops (USCCB), supports a national network of community-based immigration programs. The network includes 156 affiliated immigration programs, which have 255 field offices in 48 states. The network employs roughly 1,200 attorneys and "accredited" paralegals who, in turn, serve 400,000 low-income immigrants each year. CLINIC and its network serve the most vulnerable migrants such as refugees, asylum seekers, detainees, families in need of reunification, laborers in the workplace, victims of domestic violence, and survivors of human trafficking. The CLINIC network represents low-income immigrants without reference to their race, religion, ethnic group, or other distinguishing characteristic.

The CLINIC network has had ample experience of the adverse impact on U.S. workers – including work-authorized immigrants and U.S. citizens -- of the Social Security Administration's (SSA's) no-match letters. Every year CLINIC responds to severe problems caused by no-match letters in numerous cases that are brought to its attention by its member agencies, immigrant workers, and employers. These include unjustified terminations, job resignations by persons who are authorized to work, and exploitation of workers. The proposed rule will magnify the adverse impact of SSA no-match letters on workers' rights.

Additionally, the rule will have a limited impact at best on undocumented immigration. In CLINIC's experience, fired workers do not leave the country. Instead, they find more marginal jobs, often in the unregulated and dangerous underground economy.

The proposed rule will also erode privacy rights, circumvent the legislative process, and inappropriately transform SSA no-match letters into an immigration enforcement tool.

**This proposed rule would harm workers regardless of immigration status.**

**No-Match Cert. Admin. Record 2090**

CLINIC fears that many employers will fire workers due to SSA no-match letters before these workers have a chance to correct their records. The SSA database is inaccurate, and "no-matches" often occur because of name changes and clerical errors. Under this rule, hundreds of thousands of workers—including U.S. citizens and authorized noncitizens—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigation for wrongful terminations.

Unscrupulous employers use the SSA no-match letter to stymie labor organizing and to retaliate against workers who have been injured on the job or who complain of unpaid wages or other labor violations. In some cases (including arbitration decisions), employers have used no-match letters as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would exacerbate this problem.

**The proposed rule could expand the underground economy.**

Although the proposed rule purports to provide employers with guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new legal obligations may lead some businesses to go "off the books," resulting in lost revenue, unfair competition, and further exploitation of workers. The proposed rule could have the perverse effect of punishing employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage in relation to those unscrupulous employers who will simply disregard the new rule.

**The proposed rule addresses an issue in pending legislation.**

The proposed rule is badly timed. The House and the Senate have both passed bills that contain work-site enforcement mechanisms. DHS should wait for the legislative process to run its course and then revisit whether it should act on this issue.

**SSA no-match letters should not be used for immigration enforcement.**

The proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool. Yet the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about workers' immigration status or employment authorization. The database contains information about both U.S. citizens and work-authorized non-citizens, many of whom will be presumed to be undocumented simply because they appear on a no-match list. As the text of the "no-match" letter states, the letter was never intended to speak to immigration status. It does not constitute "constructive knowledge" of immigration status under the law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area.

**The proposed rule erodes privacy rights.**

DHS is barred from direct access to the SSA database by laws protecting privacy and confidentiality. These laws protect sensitive and personal information, and aim to ensure compliance with tax laws. These privacy protections will be eroded by using personal and private information in the SSA database for immigration enforcement purposes.

**The costs of implementing the proposed rule will be prohibitive.**

If the proposed rule were implemented, DHS and SSA would need to make a massive investment in employer and worker education programs in order to combat the confusion that would almost certainly follow. The proposed rule also contains unrealistic timetables for compliance. SSA will need to respond to the inevitable increase in employer and worker inquiries about the rule. The actual costs of administrating the program will be high. SSA's limited resources should go towards administering Social Security benefits, rather than enforcing immigration law.

**The proposed rule makes compliance impractical.**

While the rule protects the employer through a "safe harbor," it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

**DHS should reconsider the proposed rule.**

DHS should not risk the livelihoods of U.S. workers with a poorly conceived immigration enforcement measure that will invariably lead to the firing and exploitation of U.S. workers. We respectfully request that DHS withdraw this proposed rule.

CLINIC appreciates your consideration of these views.

Sincerely,

Donald Kerwin
Executive Director, CLINIC


*Mirna R. Torres*
Director of Legalization & Advocacy
Catholic Legal Immigration Network, Inc. (CLINIC)
415 Michigan Avenue, NE, Suite 150
Washington, DC 20017
Tel: 202.756.5550
Fax: 202.635.2649
mtorres@cliniclegal.org
www.cliniclegal.org

**No-Match Cert. Admin. Record 2092**

# CATHOLIC LEGAL
# IMMIGRATION
# NETWORK, INC.

**NATIONAL OFFICE**

McCormick Pavilion • 415 Michigan Avenue, NE • Suite 150 • Washington, DC 20017 • Tel: 202.635.2556 • Fax: 202.635.2649 • Website: www.cliniclegal.org

**FIELD OFFICES**
c/o Catholic Charities
126 Desplaines
Chicago, IL 60661
Tel: 312.612.6712
Fax: 312.559.9209

2400 E. Yandell Street
Suite B
El Paso, TX 79903
Tel: 915.544.6000
Fax: 915.544.6011

12 Irving Street
Framingham, MA 01702
Tel: 508.820.4302
Fax: 508.820.0407

1672 W. Avenue J
Suite 207-A
Lancaster, CA 93534
Tel: 661.729.5546
Fax: 661.729.5547

1530 James M. Wood Blvd.
Box 15095
Los Angeles, CA 90015
Tel: 213.251.3505
Fax: 213.487.0986

501 NE 1st Avenue
Suite 200
Miami, FL 33132
Tel: 305.789.9907
Fax: 305.789.9936

FDR Station
P.O. Box 1390
New York, NY 10150-1390
Tel: 212.826.6251
Fax: 212. 826.6254

564 Market Street
Suite 416
San Francisco, CA 94104
Tel: 415.362.8677
Fax: 415.394.8696

August 10, 2006

Direct, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

**RE: DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"**

Dear Sir or Madam:

The Catholic Legal Immigration Network, Inc. (CLINIC) submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employees Who Receive a No-Match Letter" at 71 Fed. Reg. 34281 (June 14, 2006).

## CLINIC's Experience of SSA No-Match Letters

CLINIC, a subsidiary of the U.S. Conference of Catholic Bishops (USCCB), supports a national network of community-based immigration programs. The network includes 156 affiliated immigration programs, which have 255 field offices in 48 states. The network employs roughly 1,200 attorneys and "accredited" paralegals who, in turn, serve 400,000 low-income immigrants each year. CLINIC and its network serve the most vulnerable migrants such as refugees, asylum seekers, detainees, families in need of reunification, laborers in the workplace, victims of domestic violence, and survivors of human trafficking. The CLINIC network represents low-income immigrants without reference to their race, religion, ethnic group, or other distinguishing characteristic.

The CLINIC network has had ample experience of the adverse impact on U.S. workers – including work-authorized immigrants and U.S. citizens -- of the Social Security Administration's (SSA's) no-match letters. Every year CLINIC responds to severe problems caused by no-match letters in numerous cases that are brought to its attention by its member agencies, immigrant workers, and employers. These include unjustified terminations, job resignations by persons who are authorized to work, and exploitation of workers. The proposed rule will magnify the adverse impact of SSA no-match letters on workers' rights.

Additionally, the rule will have a limited impact at best on undocumented immigration. In CLINIC's experience, fired workers do not leave the country. Instead, they find more marginal jobs, often in the unregulated and dangerous underground economy.

The proposed rule will also erode privacy rights, circumvent the legislative process, and inappropriately transform SSA no-match letters into an immigration enforcement tool.

*CLINIC is a tax-exempt subsidiary of the United States Conference of Catholic Bishops*

# CATHOLIC LEGAL IMMIGRATION NETWORK, INC.

NATIONAL OFFICE

McCormick Pavilion • 415 Michigan Avenue, NE • Suite 150 • Washington, DC 20017 • Tel: 202.635.2556 • Fax: 202.635.2649 • Website: www.cliniclegal.org

**FIELD OFFICES**
c/o Catholic Charities
126 Desplaines
Chicago, IL 60661
Tel: 312.612.6712
Fax: 312.559.9209

2400 E. Yandell Street
Suite B
El Paso, TX 79903
Tel: 915.544.6000
Fax: 915.544.6011

12 Irving Street
Framingham, MA 01702
Tel: 508.820.4302
Fax: 508.820.0407

1672 W. Avenue J
Suite 207-A
Lancaster, CA 93534
Tel: 661.729.5546
Fax: 661.729.5547

1530 James M. Wood Blvd.
Box 15095
Los Angeles, CA 90015
Tel: 213.251.3505
Fax: 213.487.0986

501 NE 1st Avenue
Suite 200
Miami, FL 33132
Tel: 305.789.9907
Fax: 305.789.9936

FDR Station
P.O. Box 1390
New York, NY 10150-1390
Tel: 212.826.6251
Fax: 212. 826.6254

564 Market Street
Suite 416
San Francisco, CA 94104
Tel: 415.362.8677
Fax: 415.394.8696

### This proposed rule would harm workers regardless of immigration status.

CLINIC fears that many employers will fire workers due to SSA no-match letters before these workers have a chance to correct their records. The SSA database is inaccurate, and "no-matches" often occur because of name changes and clerical errors. Under this rule, hundreds of thousands of workers—including U.S. citizens and authorized noncitizens—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigation for wrongful terminations.

Unscrupulous employers use the SSA no-match letter to stymie labor organizing and to retaliate against workers who have been injured on the job or who complain of unpaid wages or other labor violations. In some cases (including arbitration decisions), employers have used no-match letters as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would exacerbate this problem.

### The proposed rule could expand the underground economy.

Although the proposed rule purports to provide employers with guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new legal obligations may lead some businesses to go "off the books," resulting in lost revenue, unfair competition, and further exploitation of workers. The proposed rule could have the perverse effect of punishing employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage in relation to those unscrupulous employers who will simply disregard the new rule.

### The proposed rule addresses an issue in pending legislation.

The proposed rule is badly timed. The House and the Senate have both passed bills that contain work-site enforcement mechanisms. DHS should wait for the legislative process to run its course and then revisit whether it should act on this issue.

### SSA no-match letters should not be used for immigration enforcement.

The proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool. Yet the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about workers' immigration status or employment authorization. The database contains information about both U.S. citizens and work-authorized non-citizens, many of whom will be presumed to be undocumented simply because they appear on a no-match list. As the text of the "no-match" letter states, the letter was never intended to speak to immigration status. It does not constitute "constructive knowledge" of immigration status under the law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area.

**No-Match Cert. Admin. Record  2094**

# CATHOLIC LEGAL IMMIGRATION NETWORK, INC.

NATIONAL OFFICE

McCormick Pavilion • 415 Michigan Avenue, NE • Suite 150 • Washington, DC 20017 • Tel: 202.635.2556 • Fax: 202.635.2649 • Website: www.cliniclegal.org

**FIELD OFFICES**
c/o Catholic Charities
126 Desplaines
Chicago, IL 60661
Tel: 312.612.6712
Fax: 312.559.9209

2400 E. Yandell Street
Suite B
El Paso, TX 79903
Tel: 915.544.6000
Fax: 915.544.6011

12 Irving Street
Framingham, MA 01702
Tel: 508.820.4302
Fax: 508.820.0407

1672 W. Avenue J
Suite 207-A
Lancaster, CA 93534
Tel: 661.729.5546
Fax: 661.729.5547

1530 James M. Wood Blvd.
Box 15095
Los Angeles, CA 90015
Tel: 213.251.3505
Fax: 213.487.0986

501 NE 1st Avenue
Suite 200
Miami, FL 33132
Tel: 305.789.9907
Fax: 305.789.9936

FDR Station
P.O. Box 1390
New York, NY 10150-1390
Tel: 212.826.6251
Fax: 212. 826.6254

564 Market Street
Suite 416
San Francisco, CA 94104
Tel: 415.362.8677
Fax: 415.394.8696

### The proposed rule erodes privacy rights.

DHS is barred from direct access to the SSA database by laws protecting privacy and confidentiality. These laws protect sensitive and personal information, and aim to ensure compliance with tax laws. These privacy protections will be eroded by using personal and private information in the SSA database for immigration enforcement purposes.

### The costs of implementing the proposed rule will be prohibitive.

If the proposed rule were implemented, DHS and SSA would need to make a massive investment in employer and worker education programs in order to combat the confusion that would almost certainly follow. The proposed rule also contains unrealistic timetables for compliance. SSA will need to respond to the inevitable increase in employer and worker inquiries about the rule. The actual costs of administrating the program will be high. SSA's limited resources should go towards administering Social Security benefits, rather than enforcing immigration law.

### The proposed rule makes compliance impractical.

While the rule protects the employer through a "safe harbor," it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

### DHS should reconsider the proposed rule.

DHS should not risk the livelihoods of U.S. workers with a poorly conceived immigration enforcement measure that will invariably lead to the firing and exploitation of U.S. workers. We respectfully request that DHS withdraw this proposed rule.

CLINIC appreciates your consideration of these views.

Sincerely,

Donald Kerwin
Executive Director, CLINIC

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Ramona Gomez [RGomez@afsc.org] |
| **Sent:** | Thursday, August 10, 2006 12:13 PM |
| **To:** | Regs, Rfs |
| **Cc:** | Sandra Sanchez |
| **Subject:** | Public Comments to DHS |
| **Attachments:** | 5 days left Aug 10 2006.doc |

Please find attached my comments regarding SSA "no-match" letters.

Thank you,

Sandra Sanchez

**No-Match Cert. Admin. Record  2096**



**American Friends
Service Committee**

*Central Regional Office*
4211 Grand Avenue · Des Moines, IA 50312 · 515/274-4851 · fax 515/274-2003 · afscdesm@afsc.org · www.afsc.org

**AUGUST 10, 2006**

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:     DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who
Receive a No-Match Letter"*

Dear Sir or Madam:

   THE AMERICAN FRIENDS SERVICE COMMITTEE submits the following comments in
response to the request for public comment by the Department of Homeland Security (DHS), Bureau of
Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers
Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

   THE AMERICAN FRIENDS SERVICE COMMITTEE has ample experience in dealing with
the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all
workers in the United States–immigrant and native-born alike.

   As a result of this work, THE AMERICAN FRIENDS SERVICE COMMITTEE is alarmed by
and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who
Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have
had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary,
unjust, and potentially discriminatory.

   Although it will cause enormous upheavals in the workplace, **the rule will have no impact on
undocumented immigration**. Our past experience with no-match firings and workplace audits is very
clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most
likely in the unregulated underground cash economy.

   Because of this, the proposed rule will result in growth of this underground economy. It will also
erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in
detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We
therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are
summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

   The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of
caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before
workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and
often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of
workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may

**No-Match Cert. Admin. Record  2097**

run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform**. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized non-citizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

**SANDRA SANCHEZ, IMMIGRANTS VOICE PROJECT**
**AMERICAN FRIENDS SERVICE COMMITTEE**
**4211 GRAND AVENUE, DES MOINES, IA 50312**
**515-274-4851**
**515-274-2003**
**SSANCHEZ@AFSC.ORG**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Karen Cone [karen_cone@toc.org] |
| **Sent:** | Tuesday, August 08, 2006 5:49 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |
| **Attachments:** | Comments to the proposed regulations on SSA.doc |

Please see attached comments regarding Docket No. ICEB-2006-0004


Sent on behalf of Joseph Brislin, General Council

TOC Management Services
6825 SW Sandburg Street
Tigard, OR 97223

**No-Match Cert. Admin. Record 2100**



6825 SW Sandburn St
Tigard, OR 97223
503-620-1710

**Practical HR Solutions**

Director Regulatory Management Division
US Citizenship and Immigration Services
Department Homeland Security
111 Massachusetts Avenue NW, 2nd. Floor
Washington, DC 20529

Director:                                    Re:  DHS Docket No ICEB 2006-0004

On behalf of its member companies, TOC Management Services is submitting comments to the proposed regulations on procedures for employers who receive a "no-match letter" from the Social Security Administration (SSA) or the Department of Homeland Security (DHS).

TOC Management Services (TOC) is an employers' association that provides human resource solutions to more than 500 member companies located in five western states.  Approximately 70 percent of TOC's member companies are in the forest products industry and the rest are engaged in manufacturing or other industries.

TOC frequently receives calls from member companies with questions about the process of determining the authenticity of documents submitted by employees and applicants for the Form I-9.  The proposed regulations to create a safe-harbor will be helpful to employers.  However, a number of issues should be clarified in the final regulations to better assist employers in complying with the law.  The issues needing clarification and proposed solutions are presented below.

### The 14-day time limit
Many companies have large workforces in multiple operations throughout several states but process payroll and human resources from one central location.  For these companies, the 14-day time limit may not be sufficient to determine if either an administrative or typographical error has occurred or if further investigation is required.  The companies may need more than 14 days to contact the employee and obtain the proper verification – especially if holidays, vacation or leaves of absence occur.

### Recommendation for the 14 day period
The 14 days be increased to 21 days.

### The 14-day and 63-day limits should be clarified as applied to nonworking employees.
The proposed regulations begin with a very broad "totality of the circumstances" standard for determining whether an employer had actual or constructive knowledge that an employee was not authorized to work.  Nonetheless, the proposed regulations then narrow the broad "totality" standard to the three steps an employer should take within specific 14- and 63-day time limits commencing from the date the employer receives the SSA or DHS no-match letter.  The three

Formatted: Top: 0.9", Bottom: 0.9"
Deleted: Draft 35
Formatted: Body Text
Formatted [1]
Formatted: Balloon Text
Formatted [2]
Formatted: Superscript
Deleted: ¶
Formatted: Line spacing: single
Deleted: on behalf of it
Deleted: ,
Deleted: s
Deleted: 565
Deleted: member companies to
Deleted: services …to its 565… [3]
Deleted: %
Deleted: the …manufacture…30% …e products or provide services [4]
Deleted: frequent …Human Resource Managers of [5]
Deleted: on
Deleted: to …e…documents presented by new hires and authenticity of documents previously submitted by employees…to obtain [6]
Deleted: creating…there are [7]
Deleted: in the proposed regulations
Deleted: that
Deleted: further …We have identified t…that should be clarified and proposed a recommended solution. [8]
Formatted: Heading 3, Line spacing: single
Deleted:
Formatted: Line spacing: single
Deleted: …14 day…8…must be conducted…For these companies…the …may not be…sufficient to…there [9]
Formatted: Underline
Formatted [10]
Formatted: Underline
Formatted: Line spacing: single
Deleted: ¶
Deleted: 14 day…the 63 day [11]
Deleted: contain …of "totality" [12]
Deleted: T…, however,…63 d [13]

steps and the 14- and 63-day time limits may be appropriate for an employee who is currently working. However, the proposed regulations do not provide any guidance for situations where an employee is on a leave of absence or is not currently working. Such a dilemma can occur when the employee is on a leave of absence with a legally protected right to return to work under any federal or state law, including the federal Family and Medical Leave Act (FMLA), Uniformed Services Employment and Reemployment Rights Act (USERRA), Americans with Disabilities Act (ADA), Pregnancy Discrimination Act, state workers' compensation laws, state leave laws that overlap with FMLA or provide leave for other reasons (e.g., California's leave for a volunteer fire fighter can be extensive for wildfires). The terms of a labor agreement or employment contract can also provide for leaves of absences.

An example; an employee is on a leave of absence under the FMLA when the employer receives the no-match letter from the SSA or DHS. In this situation, TOC believes that the final regulations should clarify when an employer should take the three steps and when the 14- and 63-day time limits start to run.

## Recommendation for leaves of absence

TOC recommends that if the employer receives a no-match letter when its employee is not actively working, the regulations should provide that the three-step process and the 14- and 63-day periods should begin when the employee returns to work. In many cases, it would be difficult or insensitive for the employer to contact an employee on a leave of absence. Using FMLA leave as an example, consider an employee who takes a 12-week FMLA leave to care for a parent who is living in another state and is dying of cancer. The employer may not know how to contact the employee and it would also be insensitive to do so.

## Employees who periodically work for an employer

In some industries, an employee only works periodically for a particular employer. For example, assigning workers from a hiring hall is a common practice in the building trades. An employer can receive an SSA no-match letter for a person who is not currently working for that employer because the building project is completed and the person has returned to the hiring hall. However, the hiring hall may refer the person to the employer who received the no-match letter at a later date.

Many industries hire seasonal employees for retail sales, food processing, timber harvesting, reforestation, forest fire fighting, hotel and restaurant, etc. Here, an employee may not be working for an employer when a SSA no-match letter or DHS inquiry arrives but the person retains the right to return to work for the employer who received the letter during the next season. Where the person is no longer a current employee but may return to employment with the employer who received the no-match letter at a later date, the regulations should clarify how the safe harbor procedures applies to an employer in these circumstances.

## Recommendation for employees who periodically work for the employer

When an employer receives an SSA or DHS no-match letter for a person who is not currently employed but has a right to return to employment at a later date, the regulations should provide that the employer must respond to the SSA letter or DHS inquiry by indicating that the person is no longer working for the employer. However, if the person is recalled or reassigned to work for

**Deleted:** Draft 35
**Deleted:** 63 day
**Deleted:** are
**Deleted:** This can...such as [14]
**Deleted:** military leave under t [15]
**Deleted:** Disabilties
**Deleted:** reasonable [16]
**Deleted:** or under ...t [17]
**Deleted:** apply to related issues
**Deleted:** For ..., [18]
**Deleted:** FMLA
**Deleted:** be ...ied...to explain [19]
**Deleted:** should be clarified... [20]
**Deleted:** ¶
**Deleted:** I
**Deleted:** the ...is received by t [21]
**Deleted:** actually
**Deleted:** ...63 day...time [22]
**Deleted:** start ...¶ [23]
**Deleted:**
**Deleted:** ...In this example [24]
**Deleted:** ¶
**Deleted:** the
**Deleted:** n...an employee ...ed [25]
**Deleted:** union ...s [26]
**Deleted:** the ...from SSA but t [27]
**Deleted:** the
**Deleted:** may be referred ...fre [28]
**Deleted:** ¶
**Deleted:** In ...that ...such as... [29]
**Deleted:** or DHS
**Deleted:** is received ...has a... [30]
**Deleted:** ¶
**Formatted** [31]
**Deleted:** For the... situations w [32]
**Deleted:** better take these kind [33]
**Deleted:** be clarified
**Deleted:** and employee
**Deleted:** .
**Deleted:** ¶
**Formatted** [34]
**Deleted:** the ... is received by t [35]
**Deleted:** should
**Deleted:** return
**Deleted:** or DHS

the employer at a later date, the employer should begin the three-step procedure within the 14- and 63-day time allowed commencing on the date the person reports back to work.

## Joint employers

Many employers have a temporary employment agency provide employees for a trial or probationary period that typically lasts from 30 to 120 days. During the trial period, the person is employed by the temp agency but actually works for the client company so they are joint employers.

Generally, the temp agency provides the payroll function for the employee and the agency will receive the no-match letter. The final regulations need to clarify which entity has the responsibility to commence the three-proposed steps when a joint employment relationship exists.

## Recommendation for joint employers

When the temp agency receives a no-match letter, it should be the agency's duty to notify and keep the client employer appraised of the developments during the 14- and 63-day period. Because the agency is the actual employer, it has the responsibility to terminate the person if the proper SSA or alien number is not obtained and to inform the client employer why the person can no longer be referred to the client company.

## Coordination with other enforcement agencies

The three-step verification procedure to obtain the safe harbor status may result in an employee's termination if he or she does not provide a verified SSA within the 63-day period. Agencies other than DHS enforce federal and state nondiscrimination laws. Will the EEOC, Department of Labor's OFCCP, and the state civil rights agencies agree with the DHS safe harbor regulation that the employment termination was not discriminatory when the employer followed the three steps and the person failed to produce verification within the 63 days?

If there is no coordination among the various enforcement agencies, the employer may be in a difficult situation on day 63. If the employee is terminated when the DHS rules are followed, the employer may face a potential discrimination change. If the employer allows the employee to work on day 64, the DHS rules are violated and the employer faces a DHS sanction but won't face potential discrimination charges. The employer should not be placed in this no-win situation by attempting to comply with the DHS rules.

## Recommendation on coordination with other enforcement agencies

DHS must coordinate with the federal and state civil rights and employment enforcement agencies and obtain agreement that when the DHS time limits and procedures are followed in good faith by the employer, it will also grant a safe harbor for the employer from a discrimination charge if the employee is terminated for not providing a valid SSA within the 63-day time limit.

Very Truly Yours,

Joseph Brislin
TOC General Council

| | | |
|---|---|---|
| **Page 1: [1] Formatted** | **TOC Management Services** | **8/8/2006 11:38:00 AM** |

Font: Arial Narrow, Font color: Dark Blue

| | | |
|---|---|---|
| **Page 1: [1] Formatted** | **TOC Management Services** | **8/8/2006 11:38:00 AM** |

Font: (Default) Arial Narrow, Font color: Dark Blue

| | | |
|---|---|---|
| **Page 1: [2] Formatted** | **TOC Management Services** | **8/8/2006 11:38:00 AM** |

Font color: Dark Blue

| | | |
|---|---|---|
| **Page 1: [2] Formatted** | **TOC Management Services** | **8/8/2006 11:38:00 AM** |

Font: Arial Narrow, 5 pt, Font color: Dark Blue

| | | |
|---|---|---|
| **Page 1: [3] Deleted** | **Kristine Cienfuegos** | **7/24/2006 8:57:00 AM** |

services

| | | |
|---|---|---|
| **Page 1: [3] Deleted** | **Kristine Cienfuegos** | **7/26/2006 4:07:00 PM** |

to its 565

| | | |
|---|---|---|
| **Page 1: [3] Deleted** | **Kristine Cienfuegos** | **7/26/2006 4:08:00 PM** |

the

| | | |
|---|---|---|
| **Page 1: [4] Deleted** | **Kristine Cienfuegos** | **7/24/2006 8:57:00 AM** |

the

| | | |
|---|---|---|
| **Page 1: [4] Deleted** | **Kristine Cienfuegos** | **7/24/2006 8:57:00 AM** |

manufacture

| | | |
|---|---|---|
| **Page 1: [4] Deleted** | **Kristine Cienfuegos** | **7/26/2006 4:08:00 PM** |

30%

| | | |
|---|---|---|
| **Page 1: [4] Deleted** | **Kristine Cienfuegos** | **7/24/2006 8:58:00 AM** |

e

| | | |
|---|---|---|
| **Page 1: [4] Deleted** | **Kristine Cienfuegos** | **7/24/2006 8:58:00 AM** |

products or provide services

| | | |
|---|---|---|
| **Page 1: [5] Deleted** | **Kristine Cienfuegos** | **7/24/2006 8:59:00 AM** |

frequent

| | | |
|---|---|---|
| **Page 1: [5] Deleted** | **Kristine Cienfuegos** | **7/26/2006 4:09:00 PM** |

Human Resource Managers of

| | | |
|---|---|---|
| **Page 1: [6] Deleted** | **Kristine Cienfuegos** | **7/24/2006 8:59:00 AM** |

to

| | | |
|---|---|---|
| **Page 1: [6] Deleted** | **Kristine Cienfuegos** | **7/24/2006 8:59:00 AM** |

e

| | | |
|---|---|---|
| **Page 1: [6] Deleted** | **Kristine Cienfuegos** | **7/26/2006 4:09:00 PM** |

documents presented by new hires and authenticity of documents previously submitted by employees

| | | |
|---|---|---|
| **Page 1: [6] Deleted** | **Kristine Cienfuegos** | **7/24/2006 9:00:00 AM** |

to obtain

| | | |
|---|---|---|
| **Page 1: [7] Deleted** | **Patty Barker** | **8/7/2006 11:46:00 AM** |

creating

| | | |
|---|---|---|
| **Page 1: [7] Deleted** | **Patty Barker** | **8/7/2006 11:47:00 AM** |

there are

| | | |
|---|---|---|
| **Page 1: [8] Deleted** | **Kristine Cienfuegos** | **7/26/2006 4:10:00 PM** |

further

| Page 1: [8] Deleted | Kristine Cienfuegos | 7/26/2006 4:11:00 PM |
|---|---|---|

We have identified t

| Page 1: [8] Deleted | Kristine Cienfuegos | 7/26/2006 4:11:00 PM |
|---|---|---|

that should be clarified and proposed a recommended solution.

| Page 1: [9] Deleted | Patty Barker | 8/7/2006 11:54:00 AM |
|---|---|---|

| Page 1: [9] Deleted | Patty Barker | 8/7/2006 11:52:00 AM |
|---|---|---|

14 day

| Page 1: [9] Deleted | Patty Barker | 8/7/2006 11:54:00 AM |
|---|---|---|

8

| Page 1: [9] Deleted | Patty Barker | 8/7/2006 11:56:00 AM |
|---|---|---|

must be conducted

| Page 1: [9] Deleted | Patty Barker | 8/7/2006 11:57:00 AM |
|---|---|---|

For these companies

| Page 1: [9] Deleted | Patty Barker | 8/7/2006 11:57:00 AM |
|---|---|---|

the

| Page 1: [9] Deleted | Patty Barker | 8/7/2006 11:57:00 AM |
|---|---|---|

may not be

| Page 1: [9] Deleted | Patty Barker | 8/7/2006 11:58:00 AM |
|---|---|---|

sufficient to

| Page 1: [9] Deleted | Patty Barker | 8/7/2006 11:58:00 AM |
|---|---|---|

| Page 1: [9] Deleted | Patty Barker | 8/7/2006 11:58:00 AM |
|---|---|---|

there are

| Page 1: [9] Deleted | Patty Barker | 8/7/2006 11:59:00 AM |
|---|---|---|

involved

| Page 1: [10] Formatted | TOC Management Services | 7/31/2006 10:20:00 AM |
|---|---|---|

Heading 3, Line spacing:  single

| Page 1: [11] Deleted | Patty Barker | 8/7/2006 11:53:00 AM |
|---|---|---|

**14 day**

| Page 1: [11] Deleted | Patty Barker | 8/7/2006 12:00:00 PM |
|---|---|---|

**the 63 day**

| Page 1: [11] Deleted | Patty Barker | 8/7/2006 12:00:00 PM |
|---|---|---|

-

| Page 1: [12] Deleted | Kristine Cienfuegos | 7/26/2006 4:12:00 PM |
|---|---|---|

contain

| | | |
|---|---|---|
| **Page 1: [12] Deleted** of "totality of the circumstances" in | Kristine Cienfuegos | 7/26/2006 4:11:00 PM |
| **Page 1: [12] Deleted** a particular situation | Kristine Cienfuegos | 7/24/2006 9:02:00 AM |
| **Page 1: [13] Deleted** T | Patty Barker | 8/7/2006 12:03:00 PM |
| **Page 1: [13] Deleted** , however, | Patty Barker | 8/7/2006 12:03:00 PM |
| **Page 1: [13] Deleted** 63 day | Patty Barker | 8/7/2006 11:53:00 AM |
| **Page 2: [14] Deleted** This can | Patty Barker | 8/7/2006 12:05:00 PM |
| **Page 2: [14] Deleted** such as | Patty Barker | 8/7/2006 12:07:00 PM |
| **Page 2: [15] Deleted** military leave under the | Karen Davis | 7/27/2006 11:59:00 AM |
| **Page 2: [15] Deleted** the | Karen Davis | 7/27/2006 11:59:00 AM |
| **Page 2: [16] Deleted** reasonable accommodation | Karen Davis | 7/27/2006 11:59:00 AM |
| **Page 2: [16] Deleted** maternity leave under the | Karen Davis | 7/27/2006 11:59:00 AM |
| **Page 2: [17] Deleted** or under | Patty Barker | 8/7/2006 3:33:00 PM |
| **Page 2: [17] Deleted** t | Patty Barker | 8/7/2006 3:34:00 PM |
| **Page 2: [18] Deleted** For | TOC Management Services | 8/8/2006 11:10:00 AM |
| **Page 2: [18] Deleted** , | TOC Management Services | 8/8/2006 11:10:00 AM |
| **Page 2: [19] Deleted** be | Patty Barker | 8/7/2006 3:36:00 PM |
| **Page 2: [19] Deleted** ied | Patty Barker | 8/7/2006 3:36:00 PM |
| **Page 2: [19] Deleted** to explain | Patty Barker | 8/7/2006 3:36:00 PM |
| **Page 2: [19] Deleted** should be taken | Patty Barker | 8/7/2006 3:37:00 PM |
| **Page 2: [19] Deleted** 63 day | Patty Barker | 8/7/2006 11:53:00 AM |
| **Page 2: [20] Deleted** should be clarified | Kristine Cienfuegos | 7/26/2006 3:46:00 PM |

| Page 2: [20] Deleted | Kristine Cienfuegos | 7/26/2006 3:46:00 PM |
|---|---|---|
?

| Page 2: [21] Deleted | Patty Barker | 8/7/2006 3:41:00 PM |
|---|---|---|
the

| Page 2: [21] Deleted | Patty Barker | 8/7/2006 12:10:00 PM |
|---|---|---|
is received by the employer

| Page 2: [21] Deleted | Patty Barker | 8/7/2006 12:10:00 PM |
|---|---|---|
the

| Page 2: [22] Deleted | Patty Barker | 8/7/2006 12:10:00 PM |
|---|---|---|

| Page 2: [22] Deleted | Patty Barker | 8/7/2006 11:54:00 AM |
|---|---|---|
63 day

| Page 2: [22] Deleted | Patty Barker | 8/7/2006 3:39:00 PM |
|---|---|---|
time

| Page 2: [23] Deleted | Kristine Cienfuegos | 7/26/2006 3:47:00 PM |
|---|---|---|
start

| Page 2: [23] Deleted | Kristine Cienfuegos | 7/26/2006 4:13:00 PM |
|---|---|---|

This can occur when the employee is on a leave of absence with a legal protected right to return to work under any federal or state law such as FMLA, USERRA military leave, ADA reasonable accommodation, maternity leave under the Pregnancy Discrimination Act, State Workers Compensation, State leave laws that overlap with FMLA or provide leave for other reasons (e.g. volunteer fire fighter) or under the terms of a labor agreement or employment contract.

| Page 2: [23] Deleted | Kristine Cienfuegos | 7/26/2006 3:48:00 PM |
|---|---|---|

| Page 2: [23] Deleted | Kristine Cienfuegos | 7/26/2006 3:48:00 PM |
|---|---|---|
. For

| Page 2: [23] Deleted | Kristine Cienfuegos | 7/26/2006 4:29:00 PM |
|---|---|---|
when

| Page 2: [24] Deleted | Kristine Cienfuegos | 7/26/2006 3:48:00 PM |
|---|---|---|

| Page 2: [24] Deleted | Kristine Cienfuegos | 7/26/2006 4:29:00 PM |
|---|---|---|
In this example t

| Page 2: [24] Deleted | Kristine Cienfuegos | 7/26/2006 4:29:00 PM |
|---|---|---|
probably

| Page 2: [24] Deleted | Kristine Cienfuegos | 7/26/2006 4:29:00 PM |
|---|---|---|
does not

| Page 2: [25] Deleted | Kristine Cienfuegos | 7/26/2006 4:30:00 PM |
|---|---|---|
n

| Page 2: [25] Deleted | Kristine Cienfuegos | 7/26/2006 4:30:00 PM |
|---|---|---|

an employee

| | | |
|---|---|---|
| Page 2: [25] Deleted | Kristine Clenfuegos | 7/26/2006 4:30:00 PM |
| ed | | |
| Page 2: [26] Deleted | TOC Management Services | 8/8/2006 11:12:00 AM |
| union | | |
| Page 2: [26] Deleted | TOC Management Services | 8/8/2006 11:12:00 AM |
| s | | |
| Page 2: [27] Deleted | Patty Barker | 8/7/2006 3:44:00 PM |
| the | | |
| Page 2: [27] Deleted | Patty Barker | 8/7/2006 3:44:00 PM |
| from SSA but the | | |
| Page 2: [28] Deleted | Patty Barker | 8/7/2006 3:46:00 PM |
| may be referred | | |
| Page 2: [28] Deleted | Patty Barker | 8/7/2006 3:46:00 PM |
| from the hiring hall | | |
| Page 2: [29] Deleted | Patty Barker | 8/7/2006 3:47:00 PM |
| In | | |
| Page 2: [29] Deleted | Patty Barker | 8/7/2006 3:47:00 PM |
| that | | |
| Page 2: [29] Deleted | Patty Barker | 8/7/2006 3:47:00 PM |
| such as | | |
| Page 2: [29] Deleted | Patty Barker | 8/7/2006 3:48:00 PM |
| the | | |
| Page 2: [29] Deleted | Patty Barker | 8/7/2006 4:12:00 PM |
| the | | |
| Page 2: [29] Deleted | Patty Barker | 8/7/2006 4:11:00 PM |
| the | | |
| Page 2: [30] Deleted | Patty Barker | 8/7/2006 4:09:00 PM |
| is received | | |
| Page 2: [30] Deleted | Patty Barker | 8/7/2006 4:13:00 PM |
| has a | | |
| Page 2: [30] Deleted | Patty Barker | 8/7/2006 4:13:00 PM |
| at | | |
| Page 2: [30] Deleted | Patty Barker | 8/7/2006 4:10:00 PM |
| al opportunity | | |
| Page 2: [31] Formatted | TOC Management Services | 8/8/2006 11:21:00 AM |
| Header, Line spacing:  single | | |
| Page 2: [32] Deleted | Kristine Clenfuegos | 7/26/2006 4:31:00 PM |
| For the | | |
| Page 2: [32] Deleted | Kristine Clenfuegos | 7/26/2006 4:31:00 PM |
| situations w | | |
| Page 2: [32] Deleted | Kristine Clenfuegos | 7/26/2006 3:49:00 PM |

| | | |
|---|---|---|
| **Page 2: [32] Deleted** | **Kristine Cienfuegos** | **7/26/2006 3:49:00 PM** |

n

| | | |
|---|---|---|
| **Page 2: [33] Deleted** | **TOC Management Services** | **7/31/2006 10:52:00 AM** |

better take these kinds of situations into account and

| | | |
|---|---|---|
| **Page 2: [34] Formatted** | **TOC Management Services** | **8/8/2006 11:22:00 AM** |

Line spacing:  single

| | | |
|---|---|---|
| **Page 2: [35] Deleted** | **Patty Barker** | **8/7/2006 4:36:00 PM** |

the

| | | |
|---|---|---|
| **Page 2: [35] Deleted** | **Patty Barker** | **8/7/2006 4:32:00 PM** |

is received by an employer and the

| | | |
|---|---|---|
| **Page 3: [36] Deleted** | **Patty Barker** | **8/7/2006 12:30:00 PM** |

commence

| | | |
|---|---|---|
| **Page 3: [36] Deleted** | **Patty Barker** | **8/7/2006 12:11:00 PM** |

three step

| | | |
|---|---|---|
| **Page 3: [36] Deleted** | **Patty Barker** | **8/7/2006 11:54:00 AM** |

63 day

| | | |
|---|---|---|
| **Page 3: [36] Deleted** | **Patty Barker** | **8/7/2006 12:33:00 PM** |

periods

| | | |
|---|---|---|
| **Page 3: [37] Deleted** | **TOC Management Services** | **8/8/2006 11:35:00 AM** |

| | | |
|---|---|---|
| **Page 3: [37] Deleted** | **TOC Management Services** | **8/8/2006 11:40:00 AM** |

E

| | | |
|---|---|---|
| **Page 3: [38] Deleted** | **Patty Barker** | **8/7/2006 12:34:00 PM** |

utilize

| | | |
|---|---|---|
| **Page 3: [38] Deleted** | **Patty Barker** | **8/7/2006 12:34:00 PM** |

to

| | | |
|---|---|---|
| **Page 3: [38] Deleted** | **Patty Barker** | **8/7/2006 12:38:00 PM** |

. The trial period

| | | |
|---|---|---|
| **Page 3: [39] Formatted** | **TOC Management Services** | **8/8/2006 11:24:00 AM** |

Header, Line spacing:  single

| | | |
|---|---|---|
| **Page 3: [40] Deleted** | **TOC Management Services** | **8/8/2006 11:22:00 AM** |

usually

| | | |
|---|---|---|
| **Page 3: [40] Deleted** | **TOC Management Services** | **8/8/2006 11:23:00 AM** |

s

| | | |
|---|---|---|
| **Page 3: [41] Formatted** | **TOC Management Services** | **8/8/2006 11:24:00 AM** |

Line spacing:  single

| | | |
|---|---|---|
| **Page 3: [42] Deleted** | **Karen Davis** | **7/27/2006 12:00:00 PM** |

T

| | | |
|---|---|---|
| **Page 3: [42] Deleted** | **Karen Davis** | **7/27/2006 12:00:00 PM** |

A

| Page 3: [43] Deleted | Patty Barker | 8/7/2006 12:42:00 PM |
|---|---|---|

is normally

| Page 3: [43] Deleted | Patty Barker | 8/7/2006 12:42:00 PM |
|---|---|---|

ing

| Page 3: [44] Deleted | Patty Barker | 8/7/2006 12:47:00 PM |
|---|---|---|

the agency will normally receive

| Page 3: [44] Deleted | Patty Barker | 8/7/2006 12:52:00 PM |
|---|---|---|

The question

| Page 3: [45] Deleted | Patty Barker | 8/7/2006 12:53:00 PM |
|---|---|---|

who

| Page 3: [45] Deleted | Patty Barker | 8/7/2006 12:52:00 PM |
|---|---|---|

| Page 3: [46] Deleted | Kristine Cienfuegos | 7/26/2006 3:52:00 PM |
|---|---|---|

e

| Page 3: [46] Deleted | Kristine Cienfuegos | 7/26/2006 3:52:00 PM |
|---|---|---|

r

| Page 3: [47] Deleted | Patty Barker | 8/7/2006 12:52:00 PM |
|---|---|---|

should be clarified in the regulations.

| Page 3: [48] Deleted | Karen Davis | 7/27/2006 12:00:00 PM |
|---|---|---|

T

| Page 3: [48] Deleted | Karen Davis | 7/27/2006 12:00:00 PM |
|---|---|---|

A

| Page 3: [49] Deleted | Patty Barker | 8/7/2006 12:55:00 PM |
|---|---|---|

the client employer

| Page 3: [49] Deleted | Patty Barker | 8/7/2006 4:46:00 PM |
|---|---|---|

informed

| Page 3: [49] Deleted | Patty Barker | 8/7/2006 11:54:00 AM |
|---|---|---|

63 day

| Page 3: [50] Deleted | Patty Barker | 8/7/2006 12:56:00 PM |
|---|---|---|

it is the agency's responsib

| Page 3: [50] Deleted | Patty Barker | 8/7/2006 4:45:00 PM |
|---|---|---|

ility to

| Page 3: [50] Deleted | Patty Barker | 8/7/2006 12:57:00 PM |
|---|---|---|

the reason

| Page 3: [51] Deleted | TOC Management Services | 8/8/2006 11:25:00 AM |
|---|---|---|

| Page 3: [51] Deleted | TOC Management Services | 8/8/2006 11:40:00 AM |
|---|---|---|

O

| Page 3: [51] Deleted | TOC Management Services | 8/8/2006 11:40:00 AM |
|---|---|---|

E

| Page 3: [51] Deleted | TOC Management Services | 8/8/2006 11:40:00 AM |
|---|---|---|

A

| Page 3: [52] Deleted | Patty Barker | 8/7/2006 12:11:00 PM |
|---|---|---|
| three step | | |
| Page 3: [52] Deleted | Patty Barker | 8/7/2006 12:59:00 PM |
| the | | |
| Page 3: [53] Deleted | Patty Barker | 8/7/2006 12:59:00 PM |
| being | | |
| Page 3: [53] Deleted | Patty Barker | 8/7/2006 12:59:00 PM |
| ed | | |
| Page 3: [54] Deleted | Patty Barker | 8/7/2006 1:03:00 PM |
| There are federal and state non-discrimination laws that are enforced by | | |
| Page 3: [54] Deleted | Patty Barker | 8/7/2006 1:02:00 PM |
| agencies | | |
| Page 3: [54] Deleted | Patty Barker | 8/7/2006 1:06:00 PM |
| if | | |
| Page 3: [55] Deleted | Patty Barker | 8/7/2006 1:06:00 PM |
| the | | |
| Page 3: [55] Deleted | Patty Barker | 8/7/2006 1:08:00 PM |
| follows | | |
| Page 3: [55] Deleted | Patty Barker | 8/7/2006 1:03:00 PM |
| has not produced | | |
| Page 3: [55] Deleted | Patty Barker | 8/7/2006 1:07:00 PM |
| a | | |
| Page 3: [56] Deleted | Patty Barker | 8/7/2006 1:08:00 PM |
| t | | |
| Page 3: [56] Deleted | Patty Barker | 8/7/2006 1:08:00 PM |
| between | | |
| Page 3: [57] Deleted | Kristine Cienfuegos | 7/26/2006 3:56:00 PM |
| will | | |
| Page 3: [57] Deleted | Kristine Cienfuegos | 7/26/2006 3:56:00 PM |
| paradox | | |
| Page 3: [57] Deleted | Kristine Cienfuegos | 7/26/2006 3:55:00 PM |
| have | | |
| Page 3: [58] Deleted | Kristine Cienfuegos | 7/26/2006 3:56:00 PM |
| have | | |
| Page 3: [58] Deleted | Kristine Cienfuegos | 7/26/2006 3:57:00 PM |
| a | | |

No-Match Cert. Admin. Record  2112

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Carrie Tracy [carrie@nwfco.org] |
| **Sent:** | Monday, August 07, 2006 5:36 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |
| **Attachments:** | DHS Docket No. ICEB-2006-0004 .doc |



## *Idaho Community Action Netwo*

1311 West Jefferson Street ~ Boise, ID 83702 ~ (208) 385-9146 ~ Fax (208) 336-09⁹
1151 Oakley ~ Burley, ID 83318 ~ (208) 678-1708 ~ Fax (208) 678-4313

August 7, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

> *Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

Idaho Community Action Network (ICAN) submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

Idaho Community Action Network (ICAN) was founded in January 1999 through a merger of Idaho Citizens' Network (a grassroots group voicing concerns of low-income families) and Idaho Hunger Action Council (a group advocating for low-income families and running a statewide food program). ICAN uses grassroots organizing, direct action, civic participation and other strategies to impact the decisions of powerful public and private bodies – and promote economic, racial, and social justice in the long-term.

ICAN is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most

**No-Match Cert. Admin. Record  2113**

likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm all workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform.** The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

**No-Match Cert. Admin. Record  2114**

9/26/2007

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived

**No-Match Cert. Admin. Record  2115**

immigration enforcement attempt on the eve of comprehensive immigration reform.  The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses.  For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,


LeeAnn Hall
Executive Director


**No-Match Cert. Admin. Record  2116**

9/26/2007

# Idaho Community Action Network

### 1311 West Jefferson Street ~ Boise, ID 83702 ~ (208) 385-9146 ~ Fax (208) 336-0997
### 1151 Oakley ~ Burley, ID 83318 ~ (208) 678-1708 ~ Fax (208) 678-4313

August 7, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:     DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for*
*          Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

Idaho Community Action Network (ICAN) submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

Idaho Community Action Network (ICAN) was founded in January 1999 through a merger of Idaho Citizens' Network (a grassroots group voicing concerns of low-income families) and Idaho Hunger Action Council (a group advocating for low-income families and running a statewide food program). ICAN uses grassroots organizing, direct action, civic participation and other strategies to impact the decisions of powerful public and private bodies – and promote economic, racial, and social justice in the long-term.

ICAN is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an

**No-Match Cert. Admin. Record 2117**

immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**<u>including U.S. citizens and authorized noncitizens</u>**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **<u>unregulated underground cash economy</u>** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **<u>comprehensive immigration reform</u>**. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

LeeAnn Hall
Executive Director

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Alicia Hedges [legal@mpalaw.net] |
| **Sent:** | Tuesday, August 15, 2006 3:14 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |


I was hoping to check on the status of these proposed rule changes. As I
understand the 60-day period for comment submissions has ended, as the
notice was published 6-14-06. What will be the next step for these proposed
rule changes?

Thanks,
M. Alicia Hedges
Law Clerk
Azarmehr & Associates, P.C.
Attorneys and Counselors at Law
http://www.mpalaw.net/
2720 Bee Caves Road
Austin, Texas 78746
512.732.0555 phone
512.732.0556 fax

1

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Greg Simons [gsimons@chirla.org] |
| **Sent:** | Monday, August 14, 2006 9:00 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket No. ICEB-2006-0004 |

August 14, 2006**

Director, Regulatory Management Division, U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW,^ 2nd Floor, Washington, D.C. 20529

*/ /*

*/Re: DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who
Receive a No-Match Letter"/*

Dear Sir or Madam:

The Coalition for Humane Immigrant Rights of Los Angeles (hereinafter
CHIRLA) submits the following comments in response to the request for public comment by
the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement
(ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match
Letter," 71 Fed. Reg.
34281 (June 14, 2006).

CHIRLA was formed in 1986 to advance the human and civil rights of immigrants and refugees
in Los Angeles; promote harmonious multi-ethnic and multi-racial human relations; and
through coalition-building, advocacy, community education and organizing, empower
immigrants and their allies to build a more just society.**

CHIRLA has ample experience in dealing with the adverse impact that the Social Security
Administration's (SSA) no-match letters have had on all workers in the United States—
immigrant and native-born alike.

CHIRLA has historically organized in immigrant communities and advocated on behalf of low
income immigrant workers since our foundation. Low income immigrant workers face many
obstacles to a healthy work environment including firings and layoffs due to no match
letters. We also receive calls from employers who are concerned about their obligations
after receiving such letters. Immigrant workers themselves bear the brunt of ineffectual
immigration policies and law and this proposed regulation seems to pile on more of the
same.

As a result of this work, CHIRLA is alarmed by and strongly opposed to the implementation
of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such
a rule will magnify the adverse impact that SSA no-match letters have had on workers'
rights, and trigger mass firings across the nation. These firings will be unnecessary,
unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, *_the rule will have no impact
on undocumented immigration_*. Our past experience with no-match firings and workplace
audits is very clear: the fired workers will not leave the country. They will simply find
other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It
will also erode our privacy rights, and it represents an end-run around the federal
legislative process. As set forth in detail below, the SSA no-match program is simply ill-
suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed
rule in its entirety based on these concerns which are summarized as follows:

· *This proposed rule will harm _all_ workers regardless of immigration

1

**No-Match Cert. Admin. Record  2122**

status.*

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings.
Out of caution, panic, and confusion employers will fire workers who receive an SSA no-
match letter before workers have a chance to correct their records with SSA. The SSA
database is notoriously inaccurate, and often times "no-matches" occur because of name
changes and clerical errors. Hundreds of thousands of workers——*_including U.S. citizens
and authorized noncitizens_*——could lose their jobs. Such firings may run afoul of federal
and state anti-discrimination laws and other worker protections, and lead to costly and
protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing
campaigns and to retaliate against workers who have been injured on the job or complain of
unpaid wages or other labor violations. In documented cases (including arbitration
decisions) from across the country, employers initially ignored SSA no-match letters, and
then decided to use them as a pretext to fire workers who participated in efforts to
improve working conditions and wages. The proposed rule would only exacerbate this
problem.//

· *The proposed rule **will expand the unregulated underground cash
economy.*

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide
employers with general guidance, DHS is in fact imposing a new set of legal obligations on
millions of employers. These legal new obligations will increase pressure on businesses to
go "off the books," thereby promoting the *_unregulated underground cash
economy_* which results in potentially billion-dollar losses in federal, state, and local
tax revenues, unfair competition, and further exploitation and abuse of all workers by
unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good"
employers who keep good records and want to stay on the books. These "good" employers will
be put at a disadvantage compared with "bad"
employers with whom they compete who pay in cash and do not keep records, and who
consequently will not be reached by the new rule.

* *

· *This proposed rule is an end-**run around the legislative process. *

The proposed rule is badly timed. Any worksite immigration enforcement proposal should
happen in the context of *_comprehensive immigration
reform_.* The House and the Senate have both passed bills that contain worksite
enforcement mechanisms. Implementing the proposed regulations at this time would be an
end-run around that process. Immigrant workers should not be subjected to unnecessary,
unjust, and potentially discriminatory mass firings while the current law is clearly under
debate and reformulation.

* *

· *The SSA no-match letter program is ill-suited as a tool for immigration enforcement.*

This proposed rule attempts to transform the SSA no-match letter into an immigration
enforcement tool when the SSA database does not have the capacity to fulfill this
objective. In addition to being error prone, the database does not contain complete
information about a worker's immigration status or employment authorization. Indeed, the
database contains information about both U.S. citizens and work-authorized noncitizens who
employers will presume to be undocumented simply because they appear on a no-match list.
The letter is _not_ indicative of immigration status, and explicitly states on its face
that a worker's identification in the letter does not make a statement about his or her
immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by
itself does not constitute "constructive knowledge"
of immigration status under current law. The proposed rule dramatically alters the

No-Match Cert. Admin. Record  2123

definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

· *The proposed rule is an **erosion of our privacy rights. *

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

· *The costs of implementing the proposed rule are prohibitive.*

* *

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

· *The proposed rule is objectionable because compliance is impractical. *

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S.
workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Angelica Salas

Coalition for Humane Immigrant Rights of Los Angeles - CHIRLA
2533 W. 3rd Street, Suite 101
Los Angeles, CA 90057
(213) 353-1333
(213) 353-1344
asalas@chirla.org

3

**Khazaeli, Javad M**

**From:**          the669watchdog@aol.com
**Sent:**          Monday, August 14, 2006 8:53 PM
**To:**            Regs, Rfs
**Subject:**       Re: "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" [Docket
                   ICEB-2006-0004]


Secretary Michael Chertoff
U.S. Department of Homeland Security
Washington, DC 20528

Dear Secretary Chertoff,

I SUPPORT the regulations proposed by DHS concerning the Social Security Administration's
(SSA) "no-match" letters.

Thank you for considering my views.


Sincerely,

forest wilson
1452 raybell dr
xenia, Ohio 45385

No-Match Cert. Admin. Record  2125

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | edfrm8@aol.com |
| **Sent:** | Monday, August 14, 2006 11:46 AM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket No. ICEB-2006-0004: Stop using SSA "No Match" letters |


Office of Regulatory Counsel Charles Wood
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

Dear Office of Regulatory Counsel Wood,

The Department of Homeland Security (DHS) has issued proposed immigration rules that would
have a disastrous effect on all workers and our economy.
Under the proposed rule, employers could be held liable for violating immigration law if
they continue to employ workers who receive notification that the name and social security
number they gave their employer does not match the Social Security Administration's (SSA)
records (otherwise known as an SSA "no-match" letter) – despite the numerous legitimate
reasons for a "no match."

This may prompt panicked employers to fire thousands of workers before workers have a
chance to resolve the discrepancy.

I demand that the DHS enforce this rule! This proposed rule
could:

(1) Lead to firings of those who do not have authorization to work in this country,
thereby letting our U.S. citizens know we are seriously about enforcing our immigration
laws.

(2) Promote a better economy, because those who do not have authorization to work will
leave and our schools and hospitals will be spared the expense of educating and giving
medical care to this population. We willsave billions of dollars every year.

(3) Realize that that the SSA "no-match" letter is effective in rooting out those
individuals who are in the U.S. illegally. For the workers who have a legitimate mistake
like they haven't changed their maiden name to reflect their married name, all the social
security department would have to do is provide a letter to the employer.


Sincerely,

Edie Foreman

 cc:
Ms Sharon Cornu

1

**No-Match Cert. Admin. Record  2126**

**Khazaeli, Javad M**

**From:**          ubcdah@aol.com
**Sent:**          Sunday, August 13, 2006 8:12 PM
**To:**            Regs, Rfs
**Subject:**       Re: "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" [Docket
                   ICEB-2006-0004]


Secretary Michael Chertoff
U.S. Department of Homeland Security
Washington, DC 20528

Dear Secretary Chertoff,

I want you to support the immigration rules and stop the employer from hiring them any way
you can. this has to stop the only way for it to stop is to fine the employeer, then the
jobs will dry up and the immigration problem will go away


Sincerely,

Douglas Holman
1005 Floyd Culler Court
Oak  Ridge, Tennessee 37830

1

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | nickocchipinti@yahoo.com |
| **Sent:** | Saturday, August 12, 2006 12:03 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Re: "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" [Docket ICEB-2006-0004] |


Secretary Michael Chertoff
U.S. Department of Homeland Security
Washington, DC 20528

Dear Secretary Chertoff,

This is a nation of immigrants; please stop the hippocracy.

I oppose the regulations proposed by DHS concerning the Social Security Administration's
(SSA) "no-match" letters and, in particular, support the comments submitted by National
Immigration Law Center (NILC) on behalf of the Low Wage Immigrant Worker (LWIW) coalition.


Sincerely,

Nicholas Occhipinti
805 29th Street
apt 452
Boulder, Colorado 80303

1

**Khazaeli, Javad M**

| | |
|---|---|
| **Sent:** | Friday, August 11, 2006 7:20 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket No. ICEB-2006-0004 |

August 11, 2006

Director, Regulatory Management Division, U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C.  20529

Re:   DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who
Receive a No-Match Letter"

Dear Sir or Madam:

The City of Santa Fe Immigration Committee submits the following comments regarding the
Department of Homeland Security's proposed "Safe-Harbor Procedures for Employers Who
Receive a No-Match Letter."

The Immigration Committee was established by the Santa Fe City Council in 2001 to monitor
the human rights status of immigrants in this community. In the last five years, this
Committee has received numerous complaints from employees and employers about the impact
of Social Security Administration no-match letters. In some cases, employers have been
confused as to what the letters imply about the eligibility of their employees to work in
this country. In other cases, workers have complained that employers have utilized the
letters to retaliate against them, fire them, or impede collective bargaining
negotiations.
These letters have been disruptive for working families, unions, and for business owners
in Santa Fe.

In an attempt to educate workers and employers about the true nature of the SSA no-match
letter program and the legal limitations regarding work eligibility re-verification, the
Santa Fe City Council passed a resolution on July 26, 2006, declaring a policy of non-
discrimination upon receipt of a no-match letter. Given the City's efforts to mitigate the
current impact of the no-match program, the Immigration Committee is very alarmed and
strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for
Employers Who Receive a No-Match Letter."  Such a rule would magnify the adverse
consequences that SSA no-match letters have had on workers' rights, and trigger mass
firings across the nation.  These firings will be unnecessary, unjust, and potentially
discriminatory for all workers, regardless of immigration status.

We know that the SSA database is known to be inaccurate and out-of-date, and often times
"no-matches" occur because of name changes and clerical errors.  Out of caution, panic,
and confusion employers will fire workers who receive a no-match letter before
workers have a chance to correct their records with SSA.  Some employers could easily use
the letters to undermine labor organizing campaigns and to retaliate against workers who
have been injured on the job or complain of unpaid wages or other labor violations.

The DHS rule would also be imposing a new set of legal obligations on employers.  These
new obligations will increase pressure on businesses to go "off the books," thereby
promoting the unregulated underground cash economy which results in significant losses in
federal, state, and local tax revenues. The proposed rule would have the effect of
punishing "good"
employers who keep good records and want to stay on the books.  These "good" employers
will be put at a disadvantage compared with "bad" employers with whom they compete who pay
in cash and do not keep records, and who consequently will not be reached by the new rule.

Any worksite immigration enforcement proposal of this magnitude should happen in the
context of comprehensive immigration reform enacted by Congress.  Immigrant workers and
employers should not be subjected to this unprecedented enforcement while the current law

1

**No-Match Cert. Admin. Record  2129**

is still under debate and reformulation.

Immigrants play a vital role in the social, cultural and economic life of this city.  We are deeply concerned about the potential negative impact this rule would have on Santa Fe's working families, as well as our local economy.  We therefore request that the Department of Homeland Security withdraw this proposed rule in its entirety. Thank you for taking this into consideration.


Respectfully submitted,
City of Santa Fe Immigration Committee
PO Box 909 Santa Fe, NM  87504
Tel. (505) 955-6949
Fax (505) 955-6401

María Cristina López, Chairperson
Betty Jean Shinas, Vice-Chairperson
María Bueno de Herrera
Matt Davis
Jewel Cabeza de Baca
Marcela Díaz
Elizabeth Hemmer
Erwin López
Erik Mason
Erwin Rivera

Cc: Mayor of the City Santa Fe David Coss

2

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Kristin Koptiuch [koptiuch@asu.edu] |
| **Sent:** | Thursday, August 10, 2006 2:37 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Vote against Docket No. ICEB-2006-0004 |

Dear DHS staff,

I have recently learned about the Department of Homeland Security's proposed immigration rules in Docket No. ICEB-2006-0004.  These rules would have a disastrous effect on all workers (not just immigrants) and on our economy in general! I strongly urge you not to approve these rules!!!

As I understand it, under the proposed rule, employers could be held liable for violating immigration law if they continue to employ workers who receive notification that the name and social security number they gave their employer does not match the Social Security Administration's records (aka the "no-match" letter).  This sounds reasonable on the face of it, but there are numerous legitimate reasons for a "no match." This ruling may prompt panicked employers to fire thousands of workers before workers have a chance to resolve the discrepancy.

Please do not approve or implement these proposed immigration rules.

A concerned citizen,

Kristin Koptiuch
Phoenix, AZ

1

**No-Match Cert. Admin. Record  2131**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | homer simpson [omuhgod@gmail.com] |
| **Sent:** | Thursday, August 10, 2006 11:37 AM |
| **To:** | Regs, Rfs |
| **Subject:** | ICEB-2006-0004 |

Director, Regulatory Management Division-

I am very concerned with the DHS's "safe harbor procedures" rule and am asking it be withdrawn.

I am a transsexual man; I was raised as a female.  Transitioning is unbelievably expensive, from required shrinks (uninsured) to hormones and doctors (uninsured) to name changes (about $160 for the do-it-yourself-er in Oregon).

Why should you care?  Because the Social Security Administration will not change your gender marker on your Social Security card until/unless you have had surgery.  Not only does this mean only people who can afford surgery can get their gender changed at the SSA, it creates an environment of surgery-norm.  Some people don't need or want surgery (lucky flat-chested guys, for instance) and this rule makes them outlaws.

Because trans people are statistically unemployed or underemployed these monitary challenges become nearly insurmountable. When a trans person can find a job without much hassle and are then outed in a letter from the Department of Homeland Security the DHS is only adding to the problem and ultimate cost.  For these reasons I ask you please withdraw this rule.

-Jesse Davis
Eugene OR


--
Justice will not be served until those
who are unaffected are as outraged
as those who are.
-Benjamin Franklin, statesman, author, and inventor (1706-1790)
------------------------------------------------------------
An  infinite God ought to be able to protect himself, without going in partnership with
State Legislatures.
-Robert Green Ingersoll, lawyer, soldier, politician, orator (1833-1899)
------------------------------------------------------------
Sometimes I wonder whether the world is being run by smart people who are putting us on or
by imbeciles who really mean it.
-Mark Twain, author and humorist (1835-1910)
------------------------------------------------------------
Don't let it end like this. Tell them I said something.
- last words of Pancho Villa (1877-1923)

1

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Tobi Hill-Meyer [nodesignation@gmail.com] |
| **Sent:** | Tuesday, August 08, 2006 7:44 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |

Legitimate mismatches are common.

It can be incredibly burdonsome, as well as lead to the distribution of confidential medical information in order to deal with the aftermath of revealed "mis-matches"  I can think of about 5 or 6 "mis-matches" in my records alone.  Due to my hyphenated name, several databases have decided that I am not "Tobi Hill-Meyer," but instead "Meyer T. Hill," "Tobi Meyer," Tobi Hill," and "Meyer Hill."  All of which have appeared in my financial records, employment records, and other records despite my attempts to prevent it.

Additionally, I have recently changed my name.  It would be easy for one agency to not have updated their information and spark a "No Match."

Finally, I am transgender.  Different agencies have different rules for how to document my gender, and my gender will often legally change when I cross state lines.  It is regretably impossible to match all my records due to these incompatible policies.

Despite the legitimacy of my records, having to deal with my employer recieving a "No Match" letter would be onerous, burdonesome, reveal confidential medical information, and put my job in risk.  Please put extreme limits on the "No Match" program, or elliminate it entirely.

--Tobi Hill-Meyer

1

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | lbernbeck@tds.net |
| **Sent:** | Tuesday, August 08, 2006 3:26 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Reject new Bush administration immigration regulations |

```
Director Department of Homeland Security

Dear Director Homeland Security,

Please do not put into effect the proposed regulations concerning the social security
administration "no match"
letters.



Sincerely,

Lois Bernbeck
1230 Gammon Rd
Middleton, Wisconsin 53562
```

**No-Match Cert. Admin. Record  2134**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Miles Vincent Rodríguez [mrodrig@fas.harvard.edu] |
| **Sent:** | Tuesday, August 08, 2006 12:04 AM |
| **To:** | Regs, Rfs |
| **Subject:** | HS Docket No. ICEB-2006-0004 |

Director, Regulatory Management Division

U.S. Citizenship and Immigration Services

Department of Homeland Security

111 Massachusetts Avenue, NW, 2nd Floor

Washington, D.C.   20529

Re: Comments to Notice of Proposed Rulemaking "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" DHS Docket No. ICEB-2006-0004

Dear Sir or Madam:
This note refers to the proposed rule published on June 14, 2006 by the Bureau of Immigration and Customs Enforcement, of the Department of Homeland Security, "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" DHS Docket No. ICEB-2006-0004. The proposed rule would change existing regulations regarding how employers respond to mismatch letters from the Social Security Administration ("SSA") or the Department of Homeland Security ("DHS"). I request that the Department of Homeland Security withdraw this rule and only revisit it in the context of comprehensive immigration reform.

Sincerely,
Miles V. Rodríguez
Harvard University, PhD candidate

No-Match Cert. Admin. Record  2135

**Khazaeli, Javad M**

**From:**          klarsen@gmail.com
**Sent:**          Monday, August 07, 2006 7:35 PM
**To:**            Regs, Rfs
**Subject:**       New immigration regulations are bad


Director Department of Homeland Security

Dear Director Homeland Security,

Please reject the proposed regulations concerning the Social Security Administration (SSA)
"no-match" letters.

These proposed regulations all workers regardless of immigration status, and our economy
overall.

I urge you to allow Congress to find a comprehensive immigration reform solution,
including the historic bipartisan AgJobs proposal that is within the bill passed by the
U.S. Senate.

Thank you for your time.


Sincerely,

Kelli Larsen
3346 NE Blakeley St.
Seattle, Washington 98105

No-Match Cert. Admin. Record  2136

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | therring@centurytel.net |
| **Sent:** | Monday, August 07, 2006 5:57 PM |
| **To:** | Regs, Rfs |
| **Subject:** | eject new Bush administration immigration regulations |

```
Director Department of Homeland Security

Dear Director Homeland Security,

I say "no" to the proposed regulations concerning the Social Security Administration (SSA)
"no-match" letters.



Sincerely,

Thomas Herring
Box 13208
Burton, Washington 98013
```

1

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Miss Billie [missbillie5441@yahoo.com] |
| **Sent:** | Tuesday, August 15, 2006 11:33 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Comment on gender of match letters not corresponding with Real ID |

I saw an article where Homeland Security sends "match letters" to employers, sometimes requiring the records of an employer to agree with Social Security records of an employee.

When a person is hired, all the employer has to go on is the Real ID, which is usually the person's driver license. The gender of a state driver license does not always agree with the gender on a person's Social Security record (such as Alabama).

An employer has only the Real ID to use since it shows gender and the Social Security card does not show gender. It seems reasonable that the identity of an employee for the purpose of employment will be based entirely on the Real ID, which does not always agree with the Social Security record. Like I said, Alabama's driver license does not.

As you should know, the Social Security Administration is very careful about properly indicating the proper gender of a person, requiring sufficient documentation.

---

How low will we go? Check out Yahoo! Messenger's low PC-to-Phone call rates.

**No-Match Cert. Admin. Record  2138**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | JEANNE GERACI [jmgeraci@sbcglobal.net] |
| **Sent:** | Tuesday, August 15, 2006 3:14 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |

Director, Regulatory Management Division                                                August 9, 2006
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C.  20529
RE:  DHS Docket No. ICEB-2006-0004

Voces de la Frontera is a Worker Center that assists low wage workers in southern Wisconsin. During our five years in existence we have advised and educated hundreds of workers and their employers regarding problems with Social Security numbers.   There is a great deal of ignorance on the part of employers and workers regarding how to deal with SSA No Match notification letters. There is an assumption that if worker is an immigrant and there is a problem with their SSA number that if automatically means the worker has a false number. Some employers have engaged in discrimination against immigrant workers especially Latino workers. **The proposed change in the rule will only serve to aggravate this situation even further.** Many workers will be unjustly fired because of computer errors, changes in last names or misspellings of names or other circumstances. Further, Latino and other immigrant workers will be more likely subject to discrimination especially smaller employers who do not have human resources personnel and who will not want to bother with the new burdens placed on them by this proposed rule. The proposed rule modifies the regulations by expanding the list of scenarios that may lead to a finding by the agency that the employer had "constructive knowledge" that an employee was not authorized to work and consequently, by continuing to hire the employee, subject the employer to criminal and civil penalties.  The rule includes a "safe harbor" provision that imposes many new legal obligations employers must follow to avoid new liabilities.

Voces de la Frontera supports a comprehensive approach to immigration reform to fixing what we know to be a broker and outdated immigration system. Therefore, we feel that enforcement only measures such as is the case with the proposed rule, are **not** an effective solution to our current problems.  The proposed rule reflects a sweeping enforcement measure that ignores the economic realities that drive illegal migration, undermines the current legislative proposals seeking to combine worksite enforcement with a regulated worker program, contradicts the President's own goal to enact comprehensive immigration reform, and penalizes millions of well-intention employers and hardworking immigrants.

The House and the Senate have both passed immigration bills with provisions for a modernized employer verification program as well as hefty penalties for U.S. employers and workers who fail to comply with this program. Implementing the proposed rule before the conclusion of the immigration debate undermines the legislative process and could result in conflicting or duplicative plans.  Comprehensive immigration reform is needed and the legislative process is working towards that.  The proposed rule should not be considered apart from this ongoing process to enact comprehensive reform.

The Department of Homeland Security's own supplemental materials to this rule state "[i]n order to fix the problem of illegal immigration and secure our borders a comprehensive solution is required. All elements of this problem must be addressed together, including the creation of a temporary worker program." This proposed rule directly contradicts this statement as it proposes an isolated enforcement measure which fails to address the other key components that DHS itself recognizes as necessary for a workable solution.  The rule should be rejected in its current form and only considered as part of a comprehensive and practical

**No-Match Cert. Admin. Record  2139**

solution.

Many of the country's 11 million undocumented workers will be fired as a result of an employer receiving a no-match letter under the proposed rule. These immigrants will not pack up and leave but rather be driven further underground and into the black market where they will be paid off the books, hurting the US economy and taxpayers. The only realistic way to address the millions of undocumented in this country is through an earned legalization program combined with the other elements needed for a practical fix to our broken immigration system.

There are legitimate concerns that thousands of authorized workers will be fired because of inaccurate data in the immigration and social security databases. In addition, there are a number of legitimate reasons for many mismatches including name changes, marriage, divorce and misspellings. This too will result in wrongful terminations. The modified definition of "constructive notice" raises legal questions which will likely result in costly litigation.

Based on the foregoing reasons, we request that the Department of Homeland Security to withdraw this rule.

Sincerely,


Christine Neumann Ortiz
Executive Director
Voces de la Frontera

**Khazaeli, Javad M**

---

| | |
|---|---|
| **From:** | FCPCChairman [FCPCChairman@cox.net] |
| **Sent:** | Tuesday, August 15, 2006 1:08 AM |
| **To:** | Regs, Rfs |
| **Subject:** | Comment on Proposed rule: DHS Docket No. ICEB-2006-0004 ("Safe-Harbor Procedures for Employers Who Receive a No Match Letter") |

FairfaxCountyPrivacyCouncil.org

14 August 2006

**SUBJECT:  Comment on Proposed rule:  DHS Docket No. ICEB-2006-0004 ("Safe-Harbor Procedures for Employers Who Receive a No Match Letter")**

    I. Executive Summary of Recommendation:  **The Fairfax County Privacy Council ("FCPC") urges modification of this proposed rule to eliminate any reference to a Social Security Number ("SSN") "no match" letter.  In the alternative, FCPC urges that the proposed safe harbor procedures for SSN no match letters be applicable only to situations in which an employee identified in an SSN no match letter had originally certified work authorization on INS Form I-9 with a Social Security Card on INS Form I-9.  Additionally, the requirements that subsequent verification of I-9s must include use of a photo-ID and without any document containing the non-matched SSN should be rescinded as onerous and unconstitutionally invasive.**

    II. Introduction:  The proposed rule as applied to SSN no match letters is unworkable in part because the rule dangerously conflates the protocols of work authorization verification with assignment and disclosure of an Taxpayer ID numbers  by employees to employers.  Neither the Social Security Act, Immigration Reform and Control Act, the Internal Revenue Code, nor any other federal law requires any person to have or use an SSN to live or work in the United States.  Some important facts and authorities include:

        A.  Pursuant to Section 7 of the Federal Privacy Act, federal Department of Homeland Security ("DHS") instructs employers that in regard to the SSN block on INS Form I-9, "This information block is optional. Therefore, an employer cannot require an employee to complete it." DHS Employer Information Bulletin 102 dated 15 March 2005, http://uscis.gov/graphics/services/employerinfo/EIB102.pdf.  See e.g., *EEOC v. Information Systems Consulting, Inc.*, US District Court, Dallas, TX (1992) (the federal Department of Justice (for the federal Equal Employment Opportunity Commission) filed a complaint *against* an employer in Texas who had refused to hire an individual who would not disclose an SSN.  The complaint was styled as a discrimination action.  The case soon turned in favor of the employee, and the court's consent decree ordered that "The defendant ... shall be **permanently enjoined from terminating an employee or refusing to hire an individual for failure to provide a social security number** [emphasis added].... the defendant shall request, pursuant to Section 6724 of the Internal Revenue Service Code {sic}, 26 USC 6724, a waiver of any penalties that may be imposed for failing to include an employee social security number on forms and documents submitted to the IRS.");

        B.  Employers are required to report employee Taxpayer Identification Numbers

**No-Match Cert. Admin. Record  2141**

as "unknown" if the employee does not disclose a Taxpayer Identification Number (TIN), such as an SSN or Individual Taxpayer Identification Number ("ITIN"), on IRS Form W4. 26CFR31.6011(b)-2(c)(4).

C.   If an employee voluntarily discloses an SSN to the employer on IRS Form W-4, but communicates to the employer that her Social Security Card is "not available," employers must accept and report to the IRS the employee's SSN disclosure on IRS Form W-4. 26CFR31.6011(b)-2(b).

D.   No federal law now exists requiring, or authorizing, employers to discharge employees for failure to disclose a TIN or for failure to rectify a name-TIN mismatch reported to the employer by the IRS.  Employers can avoid IRS penalties regarding TIN reporting by communicating their due diligence to the IRS in following 26CFR31.6011(b)-2.  In fact, as the Social Security administration warns employers:  "A mismatch does not make any statement about an employee's immigration status and is not a basis, in and of itself, for taking any adverse action against an employee. Doing so could subject you to anti-discrimination or labor law sanctions."  Employer Reporting Instructions & Information," http://www.ssa.gov/employer/ssnvspamphlet.htm.

E.   Federal, state, and local government agencies may NOT withhold any right, benefit or privilege from any person refusing to disclose her SSN unless the agency is authorized to do so by a specific federal statute.  *Selective Service v. Minn. Public Int. Res. Gp.*, 468 U.S. 841 (1984)(federal statutory authorization required to collect Social Security numbers).  Furthermore, a meaningful Section 7(b) warning is required each and every time time an agency elicits a person's disclosure of an SSN.  *E.g., Doe v. Sharp*, 491 F. Supp. 346, 347-50 (D. Mass. 1980) (Section 7(b) creates affirmative duty for agencies to inform applicant of uses to be made of social security numbers -- "after-the-fact explanations" not sufficient); *Greater Cleveland Welfare Rights Org. v. Bauer*, 462 F. Supp. 1313, 1319-21 (N.D. Ohio 1978).  A violation of citizen SSN privacy rights under Section 7 can be construed as a felony. 42 USC 408.

III.  Discussion:

A.   Failure to Reconcile Statutory Reality on SSNs:  The proposed rule fails to reconcile the fact that Congress has never required workers to obtain assignment of and disclose SSNs to employers upon penalty of dismissal.  The Department proposes by this rule to, without adequate notice to employees who have previously disclosed SSNs to employees on IRS Form W-4, and in violation of the letter and spirit of Section 7 of the Federal Privacy Act, require SSN assignment and correct SSN disclosure by workers subject to SSN no match letters under penalty of loss of employment. Yet under the rule, any employee who fails or refuses to initially disclose an SSN to his employer escapes employer scrutiny as no SSN no match letter would be issued.  And an employee who DOES disclose an unmatched SSN would receive scrutiny even if he did not verify work authorization with a Social Security Card on INS Form I-9.

B.   ID Gridlock:  The Social Security Administration ("SSA") and many state agencies have tightened their identification protocols such that Americans find themselves in ID gridlock, unable to obtain a new ID from one agency because he needs another from another agency, etc., such that many Americans find themselves in ID gridlock which is difficult if not impossible to unscramble without significant time, assistance, and resources.As admitted

**No-Match Cert. Admin. Record  2142**

in the summary of the proposed rule, many Americans receive no match letters even though they are work authorized.  These Americans would still be subject to potentially impossible task of getting their papers in order within a few short weeks.  The proposed rule's various re-verification protocols with the SSA  and INS Form I-9 are onerous because they require the worker and employer to negotiate with federal and state agencies to "get their papers in order" within 63 days even if traveling away on business or perhaps on military deployment away from the civilian employer.

      C.  <u>Unnecessary restriction on use of documents containing SSNs</u>:  The proposed rule bars use of documents containing SSNs in regard to INS Form I-9 re-verification by SSN no match letter recipients.  The effect of this bar will be significantly onerous to persons whose only identity document (i.e., driver's license) may contain the person's non-matched SSN

      D.  <u>Unnecessary and burdensome demand for photo-ID re-verification</u>:  The proposed rule requires use of photo ID in regard to INS Form I-9 re-verification by SSN no match letter recipients.  Yet this might be simply impossible for the worker to accomplish, especially given that his SSN containing driver's license is apparently also off limits for re-verification.  Recall that had the worker refused to disclose his SSN to the employer, that no match letter would have been issued, and no re-verification would be taking place.  Finally, the photo registration demand is both unrealistic and an unconstitutional invasion of privacy and religious freedom.  *Jensen v. Quaring*, 472 U.S. 478 (1985)(affirming the 10th Circuit's quashing of mandatory photo registration for driver's licensing).  Surely the Constitutional right to work triggers as much or more Constitutional scrutiny than the common right to drive automobiles.  See also *Lake v. Perdue*, Superior Court of Fulton County, State of Georgia, Case No. 2006-CV-119207 (striking down photo-voter requirements); *Common Cause/Georgia League of Women Voters of Georgia, Inc. v. Billups*, 2006 WL 2089771 (N.D. Ga. 2006)(quashing enforcement of photo voter law; motion for stay of order to quash unanimously denied by 11th Circuit).

   IV.  <u>Conclusion</u>:  The proposed rule regarding employer safe harbor procedures upon receipt of SSN no match letters is unworkable, burdensome, and exceeds the statutory authority of the department.  Innocent American workers and employers will be victimized without any notice by processed they cannot control.

   V.  <u>Recommendation</u>:  The proposed rule should be modified to eliminate any reference to a Social Security Number ("SSN") "no match" letter.  In the alternative, FCPC urges that the proposed safe harbor procedures for SSN no match letters be applicable only to situations in which an employee identified in an SSN no match letter certified work authorization on INS Form I-9 **with** a Social Security Card.  Employer verification that the original INS Form I-9 was completed without a Social Security Card would thus suffice to meet safe harbor standards.  Additionally, the requirements that any subsequent verification of I-9s must include use of a photo-ID and without any document containing the non-matched SSN should be rescinded as unnecessary, onerous, and unconstitutionally invasive.

Sincerely,


Mike Stollenwerk
Chairman
Fairfax County Privacy Council

**No-Match Cert. Admin. Record  2143**

Fairfax County, Virginia

No-Match Cert. Admin. Record  2144

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Charles Breiterman [cbreiterman2002@yahoo.com] |
| **Sent:** | Monday, August 14, 2006 8:06 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Department of Homeland Security docket no. ICEB–2006–0004 |

Safe-Harbor Procedures for Employers
Who Receive a No-Match Letter

The on-line Social Security number verification [http://www.ssa.gov/employer/ssnv.htm] should be mandatory within 14 days of hire, so that employer's would have constructive knowledge within 14 days that any given employee is unauthorized to work.

**No-Match Cert. Admin. Record  2145**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | llbalosangeles@aol.com |
| **Sent:** | Monday, August 14, 2006 8:02 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 Comments Regarding Safe Harbor Procedures for Employers Who Receive a No-Match Letter |

**LATINA LAWYERS BAR ASSOCIATION**
**P.O. Box 86488**
**Los Angeles, CA 90086**

August 14, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

  **LATINA LAWYERS BAR ASSOCIATION** submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

  **LATINA LAWYERS BAR ASSOCIATION** is an organization committed to address the issues of women and girls.  The goals of this organization are to promote the advancement of our members within the legal community and the advancement of Latina women and girls in our communities.

  **LATINA LAWYERS BAR ASSOCIATION** has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States–immigrant and native-born alike.

  As a result of this work, **LATINA LAWYERS BAR ASSOCIATION** is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter."  Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation.  These firings will be unnecessary, unjust, and potentially discriminatory.

  Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**.  Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country.  They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

**No-Match Cert. Admin. Record  2146**

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**<u>including U.S. citizens and authorized noncitizens</u>**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **<u>unregulated underground cash economy</u>** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **<u>comprehensive immigration reform</u>**. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

**No-Match Cert. Admin. Record  2147**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule

**No-Match Cert. Admin. Record  2148**

provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,

Guadalupe Palma, Esq., Trustee
Latina Lawyers Bar Association
PO Box 86488
Los Angeles, CA 90086-0488
llbalosangeles@aol.com

---

**Check out AOL.com today**. Breaking news, video search, pictures, email and IM. All on demand. Always Free.

**No-Match Cert. Admin. Record  2149**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Orrin Baird [bairdo@SEIU.ORG] |
| **Sent:** | Monday, August 14, 2006 4:59 PM |
| **To:** | Regs, Rfs |
| **Subject:** | RE: Docket # ICEB-2006-0004 |

Orrin Baird
Service Employees International Union
1313 L. Street, N.W.
Washington, D.C. 20005
Tel: 202-898-3452
Fax: 202-898-3323
bairdo@seiu.org

**From:** Orrin Baird
**Sent:** Monday, August 14, 2006 4:45 PM
**To:** 'rfs.regs@dhs.gov'
**Subject:** Docket # ICEB-2006-0004

Attached please find the comments of the Service Employees International Union (SEIU).

Orrin Baird
Service Employees International Union
1313 L. Street, N.W.
Washington, D.C. 20005
Tel: 202-898-3452
Fax: 202-898-3323
bairdo@seiu.org

**No-Match Cert. Admin. Record  2150**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Rob Roy [rob-vcaa@pacbell.net] |
| **Sent:** | Monday, August 14, 2006 2:03 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Social Security No-Match Propsed Rules |

Ventura County Agricultural Association is a non-profit trade association which represents the interests of over 150 major agricultural businesses located in Ventura County, California. These members will be directly impacted by the proposed rules and our Association has many concerns for the potential liability of our members attributable to the currenty proposed rules. We respectfully incorporate by reference, in their entirety, the comments filed today by the National Council of Agricultural Emlpoyers, as though fully set forth herein, as the comments of our agricultural trade association on the proposed rules. Respectfully submitted. Robert P. Roy, President and General Counsel.

**No-Match Cert. Admin. Record  2151**

**Khazaeli, Javad M**

---

**From:**    Fred Tsao [ftsao@icirr.org]
**Sent:**    Monday, August 14, 2006 12:22 PM
**To:**       Regs, Rfs
**Subject:** docket #ICEB-2006-0004

August 14, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:*    *DHS Docket No. ICEB-2006-0004*
         *Safe-Harbor Procedures for Employers Who Receive a No-Match Letter*

Greetings:

    The Illinois Coalition for Immigrant and Refugee Rights (ICIRR), a coalition of 130 member organizations throughout the state of Illinois, submits the following comments regarding the proposed rule published by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

    ICIRR is dedicated to promote the rights of immigrants and refugees to full and equal participation in the civic, cultural, social, and political life of our diverse society. In partnership with our member organizations, the Coalition educates and organizes immigrant and refugee communities to assert their rights; promotes citizenship and civic participation; monitors, analyzes, and advocates on immigrant-related issues; and, informs the general public about the contributions of immigrants and refugees. ICIRR has been advocating specifically for the rights of undocumented immigrants, including playing lead roles in the pro-immigrant mobilizations in Chicago that drew hundreds of thousands of people on March 10 and May 1 and leading lobbying delegations to Washington in February and May in support of comprehensive immigration reform legislation that would legalize millions of undocumented workers.

    ICIRR and our member organizations have received dozens of inquiries from individuals and businesses regarding no-match letters issued by the Social Security Administration. ICIRR staff have counseled workers and employers on the implications of these letters, and worked with organizing efforts to support and seek reinstatement for workers who were fired as a result of no-match letters sent to their employers.

    ICIRR strongly opposes the proposed rule primarily due to its certain effect on undocumented workers. Many sectors of the economy rely on immigrant workers, and particularly undocumented workers. In the Chicago area, the accommodation and food services industry, the administrative, support and waste management industry, and manufacturing all rely heavily on undocumented workers, according to a 2004 report by Roosevelt University. Without these workers, these sectors of the

**No-Match Cert. Admin. Record  2152**

economy would contract.  The demand for these workers will only increase as the fast-growing industries expand.

Because of the continuing reliance of our economy on undocumented workers, the "safe-harbor" provisions would have dire consequences for workers and employers alike.  Employers who want to comply will almost certainly discharge workers for whom SSA reports a no-match.  Without these workers, or adequate numbers of authorized workers to replace them, these employers will need to cut back on their capacity, leaving orders unfilled, contracts unfulfilled, and jobs undone.  The workers themselves would become further marginalized; rather than leave the US, they will seek out employers who would be willing to hire them on a cash basis or other compensation (if any).

Indeed, many reputable employers facing no-match situations, rather than stop functioning, may choose to disregard the law and retain these workers.  They may convert these workers into "contractors," or simply start paying them in cash or otherwise "off the books."  This result would deny federal coffers of millions of dollars of tax revenue, and increase the likelihood that immigrant workers will face wage and hour abuses and other exploitation.

Stepped-up enforcement of employer sanctions makes no sense without a more comprehensive fix to the immigration system.  Our nation should not criminalize immigrant workers or the employers who hire them without giving both the chance to bring themselves within the law.  This means at very least changes to our immigration laws that will give undocumented a chance at legal status, allow them to work legally and bring them out of shadows.  Without this broader context of reform, the "safe harbor" provisions will not work, and indeed will only drive workers and employers further underground.

Undocumented immigrants are not the only workers who would be affected by the "safe harbor" rule.  US citizens and other authorized workers could also turn up on no-match letters, due to name changes and errors.  These workers could also lose their jobs if employers indiscriminately fire workers for whom SSA reports a no-match.  Also, many unscrupulous employers use no-match letters as an excuse to break up labor organizing drives or otherwise intimidate both immigrant and native workers from filing grievances and pursuing improved conditions.  This result makes conditions worse for all workers, regardless of their status.

For all these reasons, ICIRR strongly opposes the Department of Homeland Security's proposed "safe harbor" provisions, which will harm millions of undocumented and legal workers, thousands of employers, and potentially our national economy.  We urge DHS to withdraw this ill-conceived proposal.  Thank you for your consideration.

Respectfully submitted


Fred Tsao
Policy Director
Illinois Coalition for Immigrant and Refugee Rights
36 S. Wabash, suite 1425
Chicago IL 60603
312 332-7360 x13
312 332-7044 fax
ftsao@icirr.org


**No-Match Cert. Admin. Record  2153**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Barry Bedwell [bbedwell@cgtfl.com] |
| **Sent:** | Monday, August 14, 2006 11:58 AM |
| **To:** | Regs, Rfs |
| **Cc:** | Gabrielle Kirkland |
| **Subject:** | Comments in re: Social Security Mismatch |

August 14, 2006

**VIA ELECTRONIC MAIL**

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

    **Re:**    **Docket No. ICEB-2006-0004**
          **Safe Harbor Procedures for Employers Who Receive a No-Match Letter**
          **(FR 71:114, p. 34281)**

To Whom It May Concern:

On behalf of the membership of the California Grape and Tree Fruit League, a voluntary public policy association that represents by volume approximately eighty-five percent of the fresh table grape and deciduous tree fruit production in the state, we would like to state our serious concern for the current proposal dealing with mismatched social security numbers. We respectfully request that you reference, in its entirety, the comments filed by the National Council of Agricultural Employers (NCAE) which accurately represents the views of our membership. Thank you for this opportunity to comment and please do not hesitate to contact us should you have any questions.

*Barry J. Bedwell*
President
**California Grape & Tree Fruit League**
(559) 226-6330 office
(559)222-8326 fax
(559)288-7022 cell
bbedwell@cgtfl.com
www.cgtfl.com

**No-Match Cert. Admin. Record  2154**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Kathy Barrett [kbarrett@flare.net] |
| **Sent:** | Monday, August 14, 2006 11:08 AM |
| **To:** | Regs, Rfs |
| **Subject:** | Comments on 71 Federal Register 34281 |

## VIA ELECTRONIC MAIL

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW., 2nd Floor
Washington, D.C. 20529

> Re:     Docket No. ICEB-2006-0004
>           **Safe Harbor Procedures for Employers Who Receive a No-Match Letter**
>           **(FR 71:114, p. 34281)**

To Whom It May Concern:

   Cayuga Marketing LLC hereby submits its comments on the Bureau of Immigration and Customs Enforcement, Department of Homeland Security's ("DHS") Proposed Rule regarding "no-match" letters published in the *Federal Register* on June 14, 2006 (71 *Federal Register* 34281). Cayuga Marketing LLC incorporates by reference, in entirety, the comments filed by the National Council of Agricultural Employers.

   Cayuga Marketing LLC consists of 28 dairy farm businesses located in the Central New York area.   Cayuga Marketing's mission is to: contribute to the long term sustainability of the U.S. Dairy Industry, increase farm profitability through increased returns on milk, lower the cost of production through cost effective inputs and provide services that bring value to Cayuga Marketing farm businesses.

   Cayuga Marketing has a 17-year history of working together to market our milk.  Collectively we employ over 420 people and pay over 12.5 million dollars in salaries and payroll taxes. We are the responsible stewards of 21,000 cows and 36,000 acres of prime farmland.  We contribute 1.5 million dollars in property taxes.  Our gross product sales amount to 94 million dollars which adds 235 million dollars to the local economy.

Kathy Barrett

Projects Director
Cayuga Marketing LLC
kbarrett@flare.net
phone/fax 315 585-6415
790 Lerch Road

**No-Match Cert. Admin. Record  2155**

Geneva, NY 14456

**No-Match Cert. Admin. Record  2156**

**Khazaeli, Javad M**

---

**From:**     Minsu Longiaru [minsulongiaru@yahoo.com]
**Sent:**     Monday, August 14, 2006 9:29 AM
**To:**       Regs, Rfs
**Cc:**        julia.malette@gmail.com
**Subject:** DHS Docket No. ICEB-2006-0004

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re: DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

The Washtenaw County Workers' Center submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The Washtenaw County Workers' Center (WCWC) is a not-for-profit, membership-based organization that works primarily in Ann Arbor and Ypsilanti, Michigan. Its members consist of workers, students, academics, attorneys, and representatives of local community and religious organizations, among others. The WCWC is committed to empowering low-wage and immigrant workers to improve their working and living conditions. The WCWC holds worker rights trainings which teach workers and community members about basic labor rights, conducts ESL classes with a focus on labor and immigration rights, and advocates for individual members facing workplace problems. Additionally, the WCWC works to document and fight discriminatory practices as part of its mission to create unity among low-wage workers.

The Washtenaw County Workers' Center has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States – immigrant and native-born alike. We have seen how even under the current system where employers are specifically instructed not to take adverse action against employees for having received a "no-match" letter, many employers simply fire these employees outright without giving workers a chance to correct the error. One can only imagine the even more widespread and unjust firings that would occur under the proposed rules. The Washtenaw County Workers' Center has also witnessed first-hand no-match letters' harmful effects on the collective bargaining rights of all workers. In one instance, an employer fired an entire group of workers attempting to unionize an automotive supply factory in metro Detroit, supposedly because it had received an SSA "no-match" letter. Unfortunately, it was impossible to corroborate whether this was the case, due to the fact that the employer had never offered the workers an opportunity to correct the "no-match" and had never even provided a copy of the "no-match" letter it had allegedly received. The experience illustrates how easily unscrupulous employers will be able to take

**No-Match Cert. Admin. Record  2157**

advantage of the proposed rules to use "no-match" letters or the mere allegation of having received them as a convenient pretext to undermine all workers' fundamental labor rights. In this particular case, as in many others, the fired workers were a mixture of immigrants and naturalized citizens.

Such situations are very alarming and we believe that the proposed procedures regarding no-matches will only encourage such abuses in the workplace. The Washtenaw County Workers' Center is therefore strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, the rule will have no impact on deterring undocumented immigration. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will actually result in *growth* of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

### This proposed rule will harm <u>all</u> workers regardless of immigration status.

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including <u>U.S. citizens and authorized non-citizens</u>**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

### The proposed rule will expand the unregulated underground cash economy.

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash** economy which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

9/26/2007

**No-Match Cert. Admin. Record 2158**

**This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of <u>comprehensive immigration reform</u>. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

**The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized non-citizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

**The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

**The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

**The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at

the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,
Julia Malette & Minsu Longiaru
Washtenaw County Workers' Center
118 Tyler, Residential College
701 E. University Ave.
Ann Arbor, MI 48109
734-474-7107
contactwcwc@wokercenter.org

Talk is cheap. Use Yahoo! Messenger to make PC-to-Phone calls. Great rates starting at 1¢/min.

**No-Match Cert. Admin. Record  2160**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Bob Bacon [BBacon@tasconcrete.com] |
| **Sent:** | Friday, August 11, 2006 11:28 AM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS proposed regulation on homeland security - Docket No. ICEB-2006-004 |

August 11, 2006

Director Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue N.W. 2nd Floor
Washington, D.C. 20529

Re:  New proposed rules regarding Employee Verification Procedures
     DHS Docket No. ICEB-2006-004

Dear Director:

Our company performs commercial concrete construction work in and around the Houston and Dallas-Ft Worth metropolitan area.  We appreciate the opportunity to comment on the proposed rules regarding Employee Verification Procedures.  We believe strongly that immigration laws should be followed and enforced.  We also believe that the responsibilities placed on employers to assist in the enforcement of these laws should be fair, reasonable and not unduly burdensome.

We recently learned of the new proposed rule changes and are trying to assess the impact of those changes on our company and its ability to both comply with the new rules within the timelines set out in the rules and at the same time perform the work required under our contractual obligations.  Many other companies in our area are also just beginning to review the rules as well and to assess their impact.

At this time, we respectfully request that the Department of Homeland Security extend the time for comment on the rules by 120 days in order for companies such as ourselves to adequately comment on the rules.  We have been operating under the current rules for the past 20 years and to allow only a 60 day window to comment is insufficient to allow careful and thoughtful review.  In addition, both the Senate and the House of Representatives have passed legislation dealing with this subject which will likely impact any proposed or existing rules.

Regarding the proposed rules, and having a limited amount of time to thoroughly review the rules, we would make the following preliminary observations:

1) 14 days may be sufficient to respond to a SSA no-match regarding a single social security number, but it is grossly insufficient to respond to a large number on no-match letters or a long list.

2) Deciding on how and whether to compensate employees for time to go to the social security administration is also an issue to be resolved.  Margins continue to be thin in our business, and employees have little time to spare on their own.  Large numbers of employees doing this all at the same time would be intrusive and expensive.

**No-Match Cert. Admin. Record  2161**

3) Rechecking files for large numbers of no-match letters can take many weeks. Once it is determined that there is no error on our part, it can take several more weeks to prepare and distribute letters to the 150 or more job sites where any one of our 900 employees could be working. Then, there is the question of how long the wait would be for each to get in to see the SSA and how long it might take SSA to check or correct its records. Limiting the time for this whole process to 60 days is likely to result in hundreds of thousands, if not millions, of terminations throughout the nation, rightly or wrongly. In addition, more administrative people would need to be hired to handle the rush involved in this whole process. In the meantime, companies would be in somewhat of a state of limbo regarding new business while waiting to find out how many no-match employees would be able to resolve the problem.

4) Implementation of the proposed rule is likely to cause immediate and massive labor shortages, far beyond the severe labor shortages that exist today. Numerous defaults on existing construction contracts -- all which were entered into under the current rules – will follow throughout the construction industry. Many businesses will find themselves with a large percentage of their workforce unable to obtain proper documentation in the allowed time period so will be forced to default on contracts, close their doors, and/or raid other companies for properly documented workers. New construction will grind to a hault throughout much of the nation with the entire construction industry in disarray and unable to take on new business.

Our company respectfully requests that you extend the time allowed for comment on the proposed rules. Alternatively, we would ask that you consider our preliminary comments on the proposed rules and make changes to these rules.

Sincerely,

Bob Bacon

Executive Vice President,
TAS Commercial Concrete Construction, L.P.

No-Match Cert. Admin. Record  2162

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Rebeca Gamez [rebeca.gamez@gmail.com] |
| **Sent:** | Thursday, August 10, 2006 1:39 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket No. ICEB-2006-0004 |

# CE

### New Immigrant Community Empowerment

AUGUST 10, 2001

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

NEW IMMIGRANT COMMUNITY EMPOWERMENT (NICE) submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

New Immigrant Community Empowerment (NICE) is a cross-cultural, non-profit organization that uses organizing, advocacy, and public education to ensure that new immigrants are active, informed, and influential in civic, governmental and public affairs. Central to NICE's mission is challenging the access gap between recent immigrant communities and government, seeking systemic solutions to improving immigrants' voting rights, full language access, health care, and workplace protections under local, state and federal laws.

NICE has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States–immigrant and native-born alike.

As a result of this work, NICE is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter."  Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation.  These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration** .  Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country.  They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

**No-Match Cert. Admin. Record  2163**

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers— **including U.S. citizens and authorized non-citizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform.** The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

**No-Match Cert. Admin. Record  2164**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized non-citizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality . These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods

of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

**REBECA GAMEZ**
**NICE (NEW IMMIGRANT COMMUNITY EMPOWERMENT)**
**37-41, 77TH STREET, JACKSON HEIGHTS, NY 11372**
**718-205-8796**
**REBECA.GAMEZ@GMAIL.COM**

--
Rebeca Gamez-Djokic
ESL and Workers' Rights Coordinator

New Immigrant Community Empowerment
71-34 Roosevelt Avenue, Lower Level
Jackson Heights, NY 11372
www.nynice.org

Phone: (718) 205 8796
Fax: (718) 505 7130
rebeca.gamez@gmail.com

9/26/2007

**No-Match Cert. Admin. Record  2166**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | John Peek [tockwotton@yahoo.com] |
| **Sent:** | Thursday, August 10, 2006 11:22 AM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |

August 6, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue NW
2nd Floor
Washington D.C. 20529

Re: DHS Docket No. ICEB-2006-0004

My remarks and recommendations to the proposed amendments of the regulations, relating to the unlawful hiring or continued employment of unauthorized aliens, are a product of my experiences in the public construction process over a period of twenty-five years.

While the changes you propose may reduce the hiring of illegal immigrants by employers in the agricultural business it is my opinion that they will have minimal, if any, effect on the hiring practices of contractors and subcontractors installing work for public construction projects.

It is a widespread and common practice for prime contractors and their subcontractors to use immigrants, both legal and illegal, to perform some work of their public construction contracts. The reason immigrants are employed is so that these contractors may extort windfall, unwarranted and excessive amounts of monies from the public contracts by not paying their workers the wages required by applicable Labor Laws. Some claim that illegal immigrants file fewer complaints against the contractors who are exploiting them than do legal immigrants. While most likely true, legal immigrants grievances are also rare. The reason is simply that, despite being paid less than required by Labor Laws, the construction business is still the best paying job in town, particularly if the workers are unskilled or semi-skilled. These immigrants are also aware that if they weren't willing to accept lesser monies they wouldn't be working.

Be assured that the prime contractors and subcontractors who employ illegal immigrants and pay them less than Prevailing Wages are quite aware they are violating public laws but are more than willing to take risks in order to enjoy the spoils of their corruption. They have few apprehensions that their indiscretions will be detected. Most often they are not. The few that are apprehended most often receive minimal penalties. Labor Law violations will generally result in the necessity for them to make payments of monies to the exploited workers and, as a rule their company will be disbarred from submitting bids for public construction contracts for a set number of years. Oftentimes the monies repaid will be only a fraction of the amount of monies stolen and, if their company is debarred, they will have already set up a new company that will allow them to continue their gouging of the public purse. The current penalties for

**No-Match Cert. Admin. Record  2167**

employing illegal immigrants are even less severe and will, in no way, deter these scheming and disreputable contractors from enjoying the gratuitous monies available to them from the exploitation of a business – public construction- that annually commits public monies in excess of $ 150 billion.

It does not need to be that way!

While violating Labor Laws is usually a misdemeanor, the contractors typically attempt to cover up their infractions by falsifying business and payroll records and submitting false filings and, as a result, commit felonies. Indomitable investigators coupled with aggressive prosecutors are capable of developing enough evidence that will enable them to also charge these contractors with a variety of other infractions that almost always accompany labor law violations including tax evasion, extortion, larceny, corruption, bribery, perjury, and a variety of frauds.

Unfortunately few contractors violating Labor Laws are ever prosecuted for these more severe crimes. The easy way out and the least time consuming for public prosecutors is to make a deal – have the contractor payback some money and be debarred and then close the case. To the corrupt contractors the penalties are quite lenient and rather than serve as deterrents are simply considered to be the cost of doing business.

While it might be a reach convicting employers for tax evasion, extortion, larceny, corruption and bribery, solely on the fact that they intentionally hire illegal immigrants - prosecuting them for false filings, falsified business records, fraud and perjury is quite feasible particularly if the proposed regulations include employer obligations that, if not complied with, would provide ample evidence to charge them with the falsification of documents and submittals, perjury and fraud.

Two employer obligations are recommended for inclusion in the proposed regulations–

1. Employers should be required to verify the legality of all intended employees by requiring them to send the names and Social Security Numbers of intended employees to the Social Security Administration for verification before they begin work.
2. Employers should be required to keep a copy of the documents that were provided by the employee for completion of the Employment Eligibility Verification form, Form I-9.

Social Security Number Verification
The Social Security Administration offers employers very easy and timely means for verifying employee Social Security Numbers. Employers, in fact, are able to verify SSNs over the internet. Up to ten names and SSNs can be verified immediately while larger numbers can be verified within one government business day. With such a convenient and uncomplicated process there is no reason why every employer should not be required to verify the name/SNN of every employee and retain a copy of the results received from the Social Security Administration in the employees' personnel files.

After completion of Form W-4, but before employment begins, the employee's name and Social Security Number should be sent to the Social Security Administration for confirmation.

No-Match Cert. Admin. Record  2168

<u>Employment Eligibility Verification (Form I-9)</u>

The instructions for completion of the I-9 form state in Section 2 that

> "Employers must record: 1) document title; 2) issuing authority; 3) document number;
> 4) expiration date, if any; 5) the date employment begins. Employers must sign and date
> the certification. Employees must present original documents. Employer may, but are
> not required to photocopy the document(s) presented. "

On this form the employer attests, under penalty of perjury, that the documents appear to
be genuine.  It would seem that it could be very difficult to prove that an employer, who
intentionally hires illegal immigrants, committed perjury if you do not have the copies of
the "documents" deemed "to appear to be genuine" available so that  a judgment can be
made of the rationality the employer's decision.

The statement "Employers may, but are not required to photocopy the documents
presented" of Section 2-Employer – of the Instructions for the I-9 form should be amended
to state *"Employers are required to photocopy the documents presented and place the
copies in the employee's personnel file."*

The personnel file of each employee, if these recommendations were accepted, would include a
copy of the Form W-4, a completed Employment Eligibility Verification form (Form I-9) with
attachments and verification from the Social Security Administration as to the validity of the
employee's Name and Social Security Number.

Employers who desire to hire only legal immigrants should be less apprehensive if they verified
name/SSN submittals before commencing employment. The Federal government should
consider preparing a manual that would assist these employers to evaluate the authenticity of
the various documents that immigrants can submit in response to Employment Eligibility
Verification Form (I-9).

Many employers, who would normally intend to employ illegal immigrants, will refrain from
this practice, if required to comply with the recommendations specified above.

There will, of course, be other employers who will not discontinue their intentional
employment of illegal immigrants simply because they feel that the financial benefits that can
be derived from their deceitfulness are worth the risks they take.

> Some of these employers will not only persist in their use of illegal immigrants but will
> continue to list them in their payroll records and documents, including their invalid
> Social Security Numbers. It would be an easy task to detect their infractions even with
> minimal oversight.

> Other employers will continue to employ illegal immigrants but will simply not list them
> in their business and payroll records and will not issue them wage statements, pay
> checks, and W-2 Statements. Wages will be paid in cash and off the books. Fortunately
> there are, in public construction, sufficient analytical processes available that will
> readily identify those contractors who conceal employees by not including them in their
> payroll records and reports and other business documents.

**No-Match Cert. Admin. Record  2169**

I appreciate having been given an opportunity to submit recommendations for these regulations directed to the concern over the employment of illegal immigrants.

Sincerely,

John Peek
111 Bethlehem Pike
Philadelphia, PA 19118
Email tockwotton@yahoo.com

Yahoo! Messenger with Voice. Make PC-to-Phone Calls to the US (and 30+ countries) for 2¢/min or less.

No-Match Cert. Admin. Record  2170

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | IHM [houst-ms@ayrix.net] |
| **Sent:** | Thursday, August 10, 2006 11:06 AM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB 2006 - 0004 |

We urge you to reject the proposed rule "Safe Harbor for Procedures for Employers" who receive a no match letter from the SSA. We further urge you to comply with the goal of President Bush who stressed on July 31, "we must have comprehensive immigration reform". He said that "the best way to enforce the border is to have a rational way for people -who are doing jobs that Americans aren't doing- to come to this country ...as part of comprehensive reform."

We need immigrant labor. We also need to have an overhaul of the present immigration system – a comprehensive reform -which will include a reform of our admissions system, and effective, targeted enforcement measures. We need a realistic solution for the undocumented population now living in the U.S, many of whom have provided the invaluable, irreplaceable labor that has fueled the economy of this nation for years.

Your mission is to serve the security and well being of this nation. Our economic reality is a vital part of a secure and healthy nation. The fabric of this nation is of one piece. The security of all of those who today are laboring in our fields and factories affects the security of us all.

Please be true to your mission to look to the good of our nation, and support the challenge of a comprehensive immigration reform. Reject this one more isolated rule which would set in motion years of red tape and paper work, but wouldn't touch the real needs in our nation's broken immigration system.

Thank you for your attention to this matter,

Sheila Griffin
Rosemary Empen

**No-Match Cert. Admin. Record  2171**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Jane H. Fast [jhfast@sbcglobal.net] |
| **Sent:** | Thursday, August 10, 2006 10:28 AM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket_No._ICEB-2006-0004 |

Sir/Madam:
For many years I haves served the Hispanic community in a volunteer organization "Grupo Latinoamericano".
Many of my efforts were to assist those whose information was erroneously entered in the Social Security
Administration's data base. They were being penalized with interest charges for back taxes which took as long as
2 years per case to correct.
And there were the cases where educational programs were denied to children because they did not have a
Social Security card.
Fines were levied against companies who hired Hispanics whether they were correctly documented or not. And
no training was/is provided for the persons in charge of hiring so they can analyze whether the documents are
legitimate or not.
There is no easy solution to these concerns. Therefore, a all-inclusive threat of punishment of the employers will
simply fill the courts with appeals and embitter the public's attitude about our judicial system.
The SSA "no-match" letter is far from the solution. Do NOT pass this legislation. Work for a more equitable
answer.

Sincerely,
Jane H. Fast
Yes, there were cases of illegal use of identification but

**No-Match Cert. Admin. Record  2172**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Ken Barger [kbarger@floc.com] |
| **Sent:** | Wednesday, August 09, 2006 6:18 PM |
| **To:** | Regs, Rfs |
| **Subject:** | Docket No. ICEB-2006-0004 |

August 9 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

Re:   DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who
Receive a No-Match Letter"

Dear Sir or Madam:

The Farm Labor Organizing Committee AFL-CIO submits the following comments in response to the
request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration
and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive
a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The Farm Labor Organizing Committee (FLOC) is a labor union of agricultural workers in the eastern
U.S.  Our 15,000 membership is all Latino and many are immigrant workers.  We also represent
thousands of immigrant families in our local communities throughout the Midwest and South, and are
further united with local, regional, and national coalitions of immigrant organizations.  In additional, we
have a network of some 10,000 supporters in our regions and across the U.S.  We have been addressing
immigration issues for almost a decade because many laws and regulations impose undue hardships on
our workers, families, and communities.  We are also highly concerned that much of the current political
debate about immigration is based on hate and discrimination, and does not reflect the high ideals upon
which our society was founded.  In this debate, we have seen much of the worst of who we can be,
rather than the best.

Most important, we believe that current policies and the political debate do not address the *causes* of
migration, and until the causes are examined and resolved there will be no long-term solution to the
issue.

A primary example is the adverse impact that the Social Security Administration's (SSA) no-match
letters have had on all workers in the United States, whether immigrant or native-born.  We have
witnessed these letters being used to intimidate and exploit workers, and to deny them their labor rights.
This practice is being used to violate the *human rights* of workers, contrary to the U.S. international
obligations and to our own civil rights laws.

FLOC is strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for
Employers Who Receive a No-Match Letter."  Such a rule will magnify the adverse impact that SSA no-

**No-Match Cert. Admin. Record  2173**

match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory. Our objections are based on the Social Security program being used outside its jurisdiction as a tool for immigration enforcement, as evidenced by the proposed DHS rules. Since the basic causes of migration are not addressed, the impact will be to simply punish those people who are already suffering even more. There are a number of serious consequences to the stability of our society that must be considered.

One consequence which concerns us is that measures which put vast numbers of people out of work will further the mass movements of protest that began after the harsh provisions in H.R. 4437.

Another consequence is that it will be detrimental to our national and local economies. Production will be disrupted by enormous upheavals in the workplace, millions of consumers will cease to support local businesses, and millions of taxpayers will cease to sustain government services and functions. It will also expand an unregulated underground economy, as masses of fired workers move into cash-based activities.

We are also concerned that the proposed rules will erode our working and privacy rights, and by further marginalizing a huge population can lead to alienation, social disruption, and crime.

At the same time, the rules will little impact on undocumented immigration. Past experience with no-match firings and workplace audits makes it clear that fired workers will not leave the country. Where can they go to support their families? Again, the *causes* of migration are not addressed.

Basically, the administrative rules represent an end-run around the democratic legislative process. The SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety, based on the following concerns:

- This proposed rule will harm all workers regardless of immigration status.

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—including U.S. citizens and authorized noncitizens—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- The proposed rule will expand the unregulated underground cash economy.

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the unregulated underground cash economy which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all

workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- This proposed rule is an end-run around the legislative process.

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- The SSA no-match letter program is ill-suited as a tool for immigration enforcement.

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- The proposed rule is an erosion of our privacy rights.

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- The costs of implementing the proposed rule are prohibitive.

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- The proposed rule is objectionable because compliance is impractical.

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

- The proposed rule puts the whole economy and society at risk.

The proposed rule will have serious economic and social consequences that will jeopardize the stability and well-being of our whole society. Will undermine economic production and sales, and create a vast underground economy. It will promote racism and discrimination, and create alienation and resentment among millions, potentially leading to social disruption and disintegration.

We must also consider the international consequences, and millions of immigrants report back to their relatives and compatriots that America stands for government-sanctioned hate, racism, and discrimination.


In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule ignores the underlying *causes* of migration, and will result in creating outcomes detrimental to the long-term well-being of the whole society. The Department of Homeland Security should not risk the livelihoods of millions of U.S. workers in a poorly conceived administrative attempt at immigration enforcement which is doomed to fail in its intended purpose, particularly as our elected representatives consider comprehensive immigration reform. The proposed rule provides no solution whatsoever to the exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,


Kenneth Barger
Farm Labor Organizing Committee, AFL-CIO
1221 Broadway Street
Toledo, Ohio 43609
419-243-3456

**No-Match Cert. Admin. Record 2176**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Tom Granado [Granado@abc.org] |
| **Sent:** | Wednesday, August 09, 2006 3:53 PM |
| **To:** | Regs, Rfs |
| **Subject:** | 8 CFR part 247a "Safe-Harbor Procedures for Employers Who Receive No-Match Letter" |
| **Importance:** | High |

By when must comments be submitted for this proposed rule? I understand it was changed from the original August 14th deadline.

Tom Granado
Policy Coordinator
Legal and Regulatory Affairs
Associated Builders & Contractors, Inc.
p(703) 812-2005
f (703) 812-8202
granado@abc.org

**No-Match Cert. Admin. Record  2177**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | Carrie Tracy [carrie@nwfco.org] |
| **Sent:** | Monday, August 07, 2006 5:38 PM |
| **To:** | Regs, Rfs |
| **Subject:** | DHS Docket No. ICEB-2006-0004 |
| **Attachments:** | DHS Docket No. ICEB-2006-0004.doc |

| | | | |
|---|---|---|---|
| **Northwest Federation of Community Organizations** *Taking Action, Making Change* | | | |
| **1265 S. Main St, Ste # 305 Seattle, WA 98144** | ☒ | | **Phone: 206-568-5400 Fax: 206-568-5444 www.nwfco.org** |

August 7, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

The Northwest Federation of Community Organziations (NWFCO) submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The Northwest Federation of Community Organizations is a regional network of four grassroots organizations: Idaho Community Action Network (ICAN), Montana People's Action (MPA), Oregon Action (OA), and Washington Citizen Action (WCA). NWFCO's mission is to achieve systemic change by building strong state affiliate organizations and by executing national and regional campaigns that advance economic, racial, and social justice.

NWFCO is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration.** Our past experience with no-match firings and workplace audits is very

**No-Match Cert. Admin. Record  2178**

clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**<u>including U.S. citizens and authorized noncitizens</u>**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **<u>unregulated underground cash economy</u>** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **<u>comprehensive immigration reform</u>**. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

**No-Match Cert. Admin. Record  2179**

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the

9/26/2007

**No-Match Cert. Admin. Record  2180**

livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,


LeeAnn Hall
Executive Director

**No-Match Cert. Admin. Record  2181**

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | REGS, RFS |
| **To:** | dhsregs.erulemaking@imc9.ems.lmco.com |
| **Subject:** | Public comments to ICEB 2006-0004 |
| **Importance:** | High |
| **Attachments:** | SSANoMatchForum2006.doc |

Please post the comments below to regulations.gov for ICEB 2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Sivaprasad, Shoba [mailto:ssivaprasad@immigrationforum.org]
**Sent:** Monday, August 07, 2006 12:13 PM
**To:** Regs, Rfs
**Cc:** Sivaprasad, Shoba
**Subject:** DHS Docket No. ICEB-2006-0004 - Comment by National Immigration Forum
**Importance:** High

Dear Sir or Madam: Attached and pasted below is the National Immigration Forum's comment to DHS Docket No. ICEB-2006-0004.

Sincerely, SSW

**Shoba Sivaprasad Wadhia, Esq.**

Senior Policy Associate/Counsel

National Immigration Forum

50 F Street NW, Suite 300
Washington, DC 20001
Phone: (202) 383-5991
Fax: (202) 347-0058
www.immigrationforum.org

August 7, 2006

Via e-mail: rfs.regs@dhs.gov

Director, Regulatory Management Division

**No-Match Cert. Admin. Record  2182**

U.S. Citizenship and Immigration Services

Department of Homeland Security

111 Massachusetts Avenue, NW, 2nd Floor

Washington, D.C. 20529

<u>Re: Comments to Notice of Proposed Rulemaking "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" DHS Docket No. ICEB-2006-0004</u>

Dear Sir or Madam:

The National Immigration Forum submits the following comment to the proposed rule published on June 14, 2006 by the Bureau of Immigration and Customs Enforcement, of the Department of Homeland Security, "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" DHS Docket No. ICEB-2006-0004. The proposed rule would change existing regulations regarding how employers respond to mismatch letters from the Social Security Administration ("SSA") or the Department of Homeland Security ("DHS").

The National Immigration Forum is one of the nation's premier immigration policy organizations, whose mission is to embrace and uphold America's tradition as a nation of immigrants. The Forum supports a comprehensive solution to our immigration problems which includes effective and targeted enforcement measures that are combined with a reform of our admissions system, and a realistic solution for the undocumented population living in the U.S. This combination is paramount to fixing our broken immigration system.

By contrast, the proposed rule reflects a sweeping enforcement measure that ignores the economic realities that drive illegal migration, undermines the current legislative proposals seeking to combine worksite enforcement with a regulated worker program, contradicts the Administration's own goal to enact comprehensive immigration reform, and penalizes millions of well-intention employers and hardworking immigrants.

*Summary of the Rule*

The proposed rule modifies the regulations by expanding the list of scenarios that may lead to a finding by the agency that the employer had "constructive knowledge" that an employee was not authorized to work and consequently, by continuing to hire the employee, subject the employer to criminal and civil penalties. The rule includes a "safe harbor" provision that imposes many new legal obligations a U.S. employer must follow to avoid liability.

The Forum expresses the following concerns:

**We Must Have Comprehensive Immigration Reform**

Our broken immigration system is a complex problem that calls for a comprehensive, practical and workable solution. We have implemented piecemeal enforcement measures for 20 years and have ample evidence that this has not solved the problem. This proposal is more of the same, another isolated enforcement measure that generates a sound bite but no solution. The proposal separates hardworking

**No-Match Cert. Admin. Record  2183**

immigrants from U.S. employers without creating a legal structure that matches our economic realities and the need for adequate legal channels to meet our economy's labor needs. Only through a combination of robust enforcement measures, a regulated worker program, increased family visas, and an earned path to legal status for the millions of undocumented immigrants living and working in the United States can we fix this problem for good. The proposed rule should only be considered in the context of comprehensive immigration reform.

## Undermines the Legislative Process

The House and the Senate have both passed immigration bills. Both bills contain proposals for a modernized employer verification program as well as hefty penalties for U.S. employers and workers who fail to comply with this program. Implementing the proposed rule before the conclusion of the immigration debate undermines the legislative process and could result in conflicting or duplicative plans. Comprehensive immigration reform is needed and the legislative process is working towards that. The proposed rule should not be considered apart from this ongoing process to enact comprehensive reform.

## Contradicts the Administration's Goal to Enact Comprehensive Immigration Reform

The proposal contradicts the Administration's goal to have comprehensive immigration as it punishes hardworking immigrants and employers who hire them, without recognizing that we need to create alternative legal channels to allow willing workers to work legally for employers who cannot find American workers to meet their labor needs. President Bush, White House officials and Department of Homeland Security officials have all endorsed comprehensive immigration reform. As recently as July 31, President Bush again stressed that, "we must have comprehensive immigration reform" emphasizing that, "the best way to enforce the border is to have a rational way for people who are doing jobs Americans aren't doing to come to this country ...as part of comprehensive reform."

DHS's own supplemental materials to this rule state "[i]n order to fix the problem of illegal immigration and secure our borders a comprehensive solution is required. All elements of this problem must be addressed together, including the creation of a temporary worker program." This proposed rule directly contradicts this statement as it proposes an isolated enforcement measure which fails to address the other key components that DHS itself recognizes as necessary for a workable solution. The rule should be rejected in its current form and only considered as part of a comprehensive and practical solution, as championed by the Administration time and time again.

## Will Result in Massive Firings and Drive U.S. Employers and Hardworking Immigrants Further Underground

Many of the country's 12 million undocumented workers will be fired as a result of an employer receiving a no-match letter under the proposed rule. These immigrants will not pack up and leave but rather be driven further underground and into the black market where they will be paid off the books, hurting the US economy and taxpayers. The only realistic way to address the millions of undocumented in this country is through an earned legalization program combined with the other elements needed for a practical fix to our broken immigration system.

## Additional Concerns

There are legitimate concerns that thousands of authorized workers will be fired because of inaccurate data in the immigration and social security databases. In addition, there are a number of legitimate reasons for many mismatches including name changes, marriage, divorce and misspellings. This too will result in

**No-Match Cert. Admin. Record 2184**

wrongful firings. Moreover, the modified definition of "constructive notice" raises legal questions which will likely result in costly litigation. Finally, the "safe harbor" provision spelled out by the proposed rule would be overly burdensome on the employer and more importantly, does not provide a solution for the millions of immigrants seeking to work legally in the U.S.

Based on the foregoing reasons, we request that the Department of Homeland Security withdraw this rule and only revisit it in the context of comprehensive immigration reform.

.

Respectfully submitted,

National Immigration Forum

50 F Street NW, Suite 300
Washington, DC 20001
Phone: (202) 383-5991
Fax: (202) 347-0058
www.immigrationforum.org

Contact: Shoba Sivaprasad Wadhia, Esq., Senior Policy Associate/Counsel

<<SSANoMatchForum2006.doc>>

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | Alexander, Elvira [EAlexand@dasny.org] |
| **Sent:** | Thursday, August 03, 2006 3:33 PM |
| **To:** | Regs, Rfs |
| **Subject:** | RE: DHS Docket No. ICEB-2006-0004 - Safe-Harbor Procedures for Employers Who Receive a No-Match Letter |

**Attachments:** Comment on DHS Docket No ICEB-2006-0004.pdf

Good afternoon,
On July 27, 2006 I submitted a comment on DHS Docket No. ICEB-2006-0004, Safe-Harbor Procedures for Employers Who Receive a No-Match Letter. It was posted on July 31. Now on the web site it looks like there are two submissions under the name of Elvira Alexander: the first one is a text field of my entry, where it says: Please see the attached document. Please remove that line from public comments. Further, I kindly request that you replace a previous submission with my current attachment. I apologize for any inconveniences this may cause. I would appreciate if you could satisfy my request.

**Please do not post this request as a public submission.** My actual submission, a comment on DHS Docket No. ICEB-2006-0004 Safe-Harbor Procedures for Employers Who Receive a No-Match Letter is attached to this request.

Best regards,
Ms. Elvira Alexander
Phone: 518-257-3474
Fax: 518-257-3550

<<Comment on DHS Docket No ICEB-2006-0004.pdf>>

**No-Match Cert. Admin. Record  2186**

July 27, 2006

Director
**Regulatory Management Division**
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N. W., 2nd Floor
Washington, DC 20529

**RE:    DHS Docket No. ICEB-2006-0004 Safe-Harbor Procedures for Employers
Who Receive a No-Match Letter**

Dear Director:

As requested in the Public Participation section of the Proposed Rules, I am commenting on the time limits described in the rule. I believe a 60-day period granted to employers after they receive a no-match letter from the Social Security Administration is a sufficient time frame to resolve discrepancy issues involving social security accounts. This is based on fact that the general public has much greater access to the Social Security Administration offices throughout the United States than those dealing with immigration-related employment issues.

However, when the issue involves resolving discrepancies concerning immigration-status or employment-authorization documentation presented or referred to while completing Form I-9, such as a work authorization or a permanent resident card, I would recommend providing employers at least a 90-day period to verify employee's identity or employment eligibility. This recommendation is based on the fact that from the moment an individual submits an application for employment authorization, it takes the U.S. Citizenship and Immigration Services between 30 and 90 days to acknowledge receiving the application and additional time to schedule appropriate procedures. Due to limited locations of regional U.S. Citizenship and Immigration Services offices, interviews and verification of biometric data have to be scheduled well in advance. Under these circumstances, it is unreasonable to expect that an employee who failed to apply for a renewal employment authorization card within the time frame recommended by the U. S. Citizenship and Immigration Services (90 days prior to expiration) will be able to produce a renewed card within the 60-day time frame.

The same holds true for conditional residents of the U.S. who obtained their resident status through marriage to a U.S. citizen or a permanent resident and were issued a *conditional* permanent resident card, often referred to as a "green card." For various reasons, some employees fail to apply to remove the conditions on his or her residence in a timely manner. One of the factors that may contribute to a problem is that both 'conditional' and 'permanent' green cards are named "Permanent Resident Card".

Director, Regulatory Management Division
July 27, 2006
Page 2

However, on a conditional green card there is an expiration period of two years listed on its face, which is the only indication of its conditionality. Needless to say, lack of explicit wording on the card leaves the issue open to interpretation by the general public and, as a result, employees don't always apply for a renewal card within the time frame recommended by the U.S. Citizenship and Immigration Services. Therefore, I propose a period of not less than 90 days to be a more reasonable time frame for this part of the proposal.

Sincerely,

*Elv Alexander*

Elvira Alexander

**Khazaeli, Javad M**

---

| | |
|---|---|
| **From:** | Tarragon, Stephen R |
| **Sent:** | Thursday, June 29, 2006 10:05 AM |
| **To:** | Kochhar, Sangeeta |
| **Subject:** | FW: DHS Docket No. ICEB-2006-0004 - Letter Requesting Additional Time to Comment |
| **Attachments:** | 8JZK01_.DOC |

please have posted to regulations.gov
-----Original Message-----
**From:** Kochhar, Sangeeta **On Behalf Of** REGS, RFS
**Sent:** Thursday, June 29, 2006 9:21 AM
**To:** Tarragon, Stephen R
**Subject:** FW: DHS Docket No. ICEB-2006-0004 - Letter Requesting Additional Time to Comment


*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** millerna@GTLAW.com [mailto:millerna@GTLAW.com]**On Behalf Of** REIFFL@GTLAW.com
**Sent:** Wednesday, June 28, 2006 5:18 PM
**To:** Regs, Rfs
**Subject:** DHS Docket No. ICEB-2006-0004 - Letter Requesting Additional Time to Comment


Please see attached letter.

Regards,

Laura, John & Randy

*Laura Foote Reiff*

Co-Chair
Essential Worker Immigration Coalition
1750 Tysons Blvd., Suite 1200
McLean, Virginia 22102
703-749-1372
703-714-8372- Direct Computer Fax
Reiffl@gtlaw.com

---

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we

**No-Match Cert. Admin. Record  2189**

inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

The information contained in this transmission may contain privileged and confidential information.  It is intended only for the use of the person(s) named above. If you are not the intended recipient,  you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, please send an email to postmaster@gtlaw.com.

**No-Match Cert. Admin. Record  2190**



# EWIC    Essential Worker Immigration Coalition

June 28, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N. W., 2nd Floor
Washington, DC 20529

RE:    **DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter – Request for 120-Day Extension of Comment Period**

Dear Director:

This letter is in response to the above-referenced notice of proposed rulemaking published on June 14, 2006. As the Essential Workers Immigration Coalition, we are writing to respectfully request that the 60-day public comment period for the proposed regulation referenced above be extended for an additional 120 days, for a total comment period of 180 days. In order to thoughtfully and adequately respond to the proposed regulation, we ask that additional time be allotted to review and analyze the provisions and the real impact it will have on the business community at large; 60 days is simply an inadequate amount of time to comment responsibly.

Both Chambers of Congress have already passed drastically differing versions of immigration legislation and we now await conference. In addition to the proposed regulation, both the Senate and House bills propose significant changes relating to an employer's responsibilities when verifying its workforce. These forthcoming reform measures will set new standards under which employers must operate regarding the verification of an employee's work authorization eligibility and identity and will specifically address the case when an employer receives a no-match letter from the Social Security Administration or from the Department of Homeland Security. While the specifics of a lasting comprehensive piece of legislation remain unclear, it seems apparent that broad and sweeping changes to the nation's immigration laws are imminent and necessary. It is important to let this ongoing, fruitful debate run its course without competing and duplicative proposals.

Therefore, for the reasons stated above, an extension of the comment period for the rulemaking process is needed not only to avoid unnecessary confusion and hardship for employers, but also to intelligently comment on the proposal that would have such a wide-spread impact to all employers and employees.

The business community looks forward to a timely decision on this important matter in order to adequately prepare and file the appropriate comments.

Sincerely,

The Essential Workers Immigration Coalition

plz reply on my e-mail address for confirmation that you have got my mail.txt
From: khalid butt [khalid_butt1@hotmail.com]
Sent: Wednesday, August 16, 2006 8:31 AM
To: Regs, Rfs
Subject: plz reply on my e-mail address for confirmation that you have
got my mail

Honourable Director
Immigration and Citizenship


Repected sir,
with due regards a wish to draw your attention to the matter that my Green
Card has expired on 05-22-2005 (Green Card# A-091544304).

the reason for the overstay has been sent in detail to the Honourable Mary
Ann Gantner District Director  New York District Office 26 Federal Plaza
N.Y.

in this regard I paid a visit to the American Embassy on 07-10-2006. A local
employee attended me, he didnot even go through my papers but took away my
expired green card. i requested him to atleast give it in writing that he
has received my green card he only mentioned on the blue slip which was
taken from the desk of the American Embassy. i again requested him to
minutely check my papers and thereafter he should give his decision but he
didnot care for that at all.

i wrote a letter to the Honourable Consular General of America in Pakistan,
in return  i received the instruction in the letter.

all these letters and complete ppaers of my medical and other documents in
detail have been sent to
the District Director 26 Federal Plaza for pursual and further necessary
action is required under the law of the USA. I am in favour of doing the
work under the guidelines of the Law of the Land.

in the end it is most respectfully stated that the care may please be
examined in accordance with the Law of the Country. I will be very grateful
to you if the details regarding the fees payment and other requirements
needed in accordance be sent to me in detail i will abide by all the rules
and regulations.

the love and respect for America and the people of that country will always
remain in my heart with respect.


thanks
looking forward


Khalid Ali Butt
Secretary
Govt Of Pakistan
Central Board Of Film Censors
793-A Allama Iqbal Town
Lahore
Pakistan

Office Ph# 92-42-7847299
Res Ph#92-42-5724523,5744646,5033016
Mobile# 92-300-2535257

---

Express yourself instantly with MSN Messenger! Download today it's FREE!

No-Match Cert. Admin. Record  2193

plz reply on my e-mail address for confirmation that you have got my mail.txt
http://messenger.msn.click-url.com/go/onm00200471ave/direct/01/

No-Match Cert. Admin. Record  2194

Please post the comment listed below to regulations.gov for ICEB 2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Tarragon, Stephen R
**Sent:** Thursday, July 20, 2006 10:01 AM
**To:** Kochhar, Sangeeta
**Subject:** FW: DHS Docket No. ICEB-2006-2004

Pease send to regulations.gov

---

**From:** Kochhar, Sangeeta **On Behalf Of** REGS, RFS
**Sent:** Thursday, July 20, 2006 9:22 AM
**To:** Tarragon, Stephen R
**Subject:** FW: DHS Docket No. ICEB-2006-2004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Jennifer Lai [mailto:lai@nilc.org]
**Sent:** Wednesday, July 19, 2006 3:12 PM
**To:** Regs, Rfs
**Cc:** 'Mike Munoz'
**Subject:** DHS Docket No. ICEB-2006-2004

To James Knapp and Paul Gleeson:

Please see the attached letter requesting an extension in the public comment period regarding DHS Docket No. ICEB-2006-2004. We will follow up with you shortly to inquire when you will make a decision on this request. If you have questions, please contact me at lai@nilc.org or (213) 639-3900, ext. 123.

Regards,

Jennifer Lai

**Jennifer Lai**
Employment Policy Attorney (Interim)
3435 Wilshire Blvd.
Suite 2850
Los Angeles, CA  90010
Voice: (213) 639-3900, ext. 123
Fax: (213) 639-3911
E-mail: lai@nilc.org
Web: www.nilc.org

*This e-mail message is intended only for the named recipient(s) above, and may contain confidential or privileged information.  If you receive this message in error, please notify the sender above immediately by reply e-mail and delete this email and any attachments without retaining a copy.*

# Low-Wage Immigrant Worker Coalition

July 12, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N. W., 2nd Floor
Washington, DC 20529

**RE:**    **DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter – Request for 120-Day Extension of Comment Period**

Dear Director:

This letter is in response to the above-referenced notice of proposed rulemaking published on June 14, 2006. As the undersigned 143 groups & 6 individuals, we are writing to respectfully request that the 60-day public comment period for the proposed regulation referenced above be extended for an additional 120 days, for a total comment period of 180 days. The proposed regulation represents a fundamental change in the significance of no-match letters from the Social Security Administration and would have serious implications in workplaces around the country. It is essential that we take the time to carefully analyze the impact of the proposed regulation on the communities we serve and represent and provide thoughtful comments; a 60-day period is insufficient for us to do this.

Moreover, we would like to express our concern about the timing of the proposed regulation. Congress is currently in the process of considering the approach it will take to immigration reform. Each of the two houses has passed its own, very different version of immigration reform legislation. While the two bills are very different, each contains worksite enforcement mechanisms. Any worksite enforcement proposal should not happen outside of the context of comprehensive immigration reform. The proposed regulation would be just that: a third worksite enforcement proposal completely separate from any comprehensive approach. The timing of the proposed regulation simply adds unnecessary confusion to an already-complex situation.

For the reasons expressed above, we urge you to extend the period for public comment in order for us to provide thoughtful and well-informed comments.

Sincerely,

Marielena Hincapié, Esq.
Director of Programs
National Immigration Law Center

---

American Federation of Labor – Congress of Industrial Organizations (ALF-CIO) ● Interfaith Worker Justice (IWJ) ● Jobs with Justice (JWJ) ● National Day Labor Organizing Network (NDLON) ● National Council of La Raza (NCLR) ● National Employment Law Project (NELP) ● National Immigration Law Center (NILC)

**No-Match Cert. Admin. Record  2197**

On behalf of:

Organizations

- ¿Oiste?
- 9to5 Poverty Network Initiative
- ACORN
- American Friends Service Comittee, Project Voice
- American Immigration Lawyers Association
- Argus Ventures, LLC
- Asian American Justice Center
- Asian Law Alliance
- Asian Pacific American Legal Center
- Northshore Bank
- BARCA, Inc.
- Blue Diamond
- Boy Scouts of America
- Canadian Union of Postal Worlers local 810
- CARECEN
- CASAS MEX USA
- Catholic Charities
- Catholic Charities, Migration and Refugee Services
- Saints Peter and Paul Roman Catholic Church
- CCHA
- Center for Civil Justice
- Centro Hispano, Inc.
- Centro Legal de la Raza
- Centro de Amigos
- Change to Win
- Chicago Workers Collaborative
- Catholic Legal Immigration Network, Inc. (CLINIC)
- Coalition for Humane Immigrant Rights of Los Angeles (CHIRLA)
- Coalition for Justice in the Maquiladoras
- Community Health Center, Inc.
- Community Occupational Health Project
- Democratic Organization of Troy Township

- Diocese of Las Cruces
- Diocese of Providence
- Dominican Sisters Ministry of Presence
- El CENTRO de Igualdad y Derechos
- El Centro, Inc.
- El Puente Project
- Employee Rights Center
- Enlace Comunitario
- Faith Community for Worker Justice
- Farm Labor Organizing Committee
- Farmworker Justice
- Federacion de Oaxaqueños del Medio Oeste usa
- Flores & Reyes, Attorneys
- Florida Immigrant Advocacy Center
- Garibay Tax Services
- Global Exchange
- Global Family Legal Services
- Greater Kansas City Fair Trade Coalition
- Guatemala Solidarity Committee Boston
- Hate Free Zone Washington
- Herzfeld & Piotrowski LLP
- Highlander Research and Education Center
- HOPE Teens
- Housing Resources Inc.
- Humphrey & Whidden Insurance Agency, Inc.
- Idaho Community Action Network
- Illinois Coalition for Immigrant and Refugee Rights
- Immaculate Heart Community
- Immigrant Legal Resource Center
- Interfaith Worker Justice
- International Institute Rhode Island
- Jewish Community Action
- Jobs With Justice
- Johnson County Immigrants Coalition

No-Match Cert. Admin. Record  2198

- Justice for Immigrants Coalition of Indiana
- Kent State University
- Korean American Resource and Cultural Center (KRCC)
- Korean Resource Center (KRC)
- Koreatown Immigrant Workers Alliance
- L&P Community Services
- La Causa, Inc.
- La Comunidad, Inc.
- La Familia Latina Unida Campaign
- La Raza Centro Legal
- La Union del Pueblo Entero
- La Voz Libre
- Laborers Latino Caucus
- Latino Faculty Staff
- Latinos United/Unidos of Michigan
- Law Center for Families
- Labor Council for Latin American Advancement (LCLAA)
- Legal Aid Services of Oregon
- Legal Assistance Foundation of Metropolitan Chicago
- League of United Latin American Citizens (LULAC)
- March 10th Committee
- MCTF-Maintenance Cooperation Trust Fund
- Mexican American Legal Defense and Educational Fund
- MFY Legal Services, Inc.
- Mi Casa Mortgage
- Mid America Bank
- Miembro de la Familia Latina Unida
- Milwaukee Renaissance
- MIRA Coalition
- National Immigration Project of the National Lawyers Guild
- National Korean American Service & Education Consortium (NAKASEC)
- National Latino Peace Officers Association, Wisconsin
- National Lawyers Guild

- National Council of La Raza (NCLR)
- Neighborhood Legal Services of Los Angeles County
- New Mexico Conference of Churches
- North Shore Bank
- Our Savior Lutheran Church
- Peace Action WI
- Pipe Organs/Golden Ponds Farm
- Racine Coalition for Peace and Justice
- Saint Anne Catholic Church
- Scalambrino & Arnoff, LLP
- Schwartz, Steinsapir, Dohrmann & Sommers
- Service Employees International Union (SEIU)
- Service Employees International Union (SEIU) Local 1877
- San Francisco Labor Council, Support Training Employment (SFLC STEP) Program
- Sheet Metal Workers International Association (SMWIA)
- Somos Un Pueblo Unido
- Southern California Coalition for Occupational Safety & Health
- Southern Poverty Law Center, Immigrant Justice Project
- SouthWest Organizing Project
- Sr. Bernard Hispanic community
- Students for Peace and Justice, Maimi University
- Sugar Law Center
- SW Creations Collaborative
- SW IA Latino Resource Center
- Teamsters Local 284
- The Cross Border Network for Justice & Solidarity
- The New York Immigration Coalition
- The Perinatal Council
- UCLA School of Law Student
- UE Local 1421
- UE Western Region

No-Match Cert. Admin. Record  2199

Low Wage Immigrant Worker Coalition                                           7/19/2006

- United Network for Immigrants and Refugee Rights (UNIRR)
- UNITE HERE
- UNITE HERE Local 17
- UNITE HERE Local 2
- United Electrical, Radio & Machine Workers of America (UE)
- United Farm Workers
- United Food and Commercial Workers International Union
- University Leadership Initiative
- UNM Law and Society
- US bank

- Voces de la Frontera
- Wahstenaw County Workers Center
- Zig Zag Young Women's Resource Centre Inc.

Individuals
- Annie Beaman
- Katie Bjorkman
- Francisco Castillo
- Lisa Fuelleman
- Ann Mathews
- Vane Nava

No-Match Cert. Admin. Record  2200

Please post the comment listed below to regulations.gov for ICEB 2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Tarragon, Stephen R
**Sent:** Tuesday, July 11, 2006 10:48 AM
**To:** Kochhar, Sangeeta
**Subject:** FW: DHS Docket No. ICEB-2006-0004

please send to regulations.gov
-----Original Message-----
**From:** Kochhar, Sangeeta **On Behalf Of** REGS, RFS
**Sent:** Monday, July 10, 2006 9:11 AM
**To:** Tarragon, Stephen R
**Subject:** FW: DHS Docket No. ICEB-2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Tom Delaney [mailto:tomdelaney@landcarenetwork.org]
**Sent:** Friday, July 07, 2006 12:22 PM
**To:** Regs, Rfs
**Subject:** FW: DHS Docket No. ICEB-2006-0004

<<uscis rulemaking.doc>>

Tom Delaney
Director of Government Affairs
**Professional Landcare Network**
804 Cole Dr

Lilburn, GA 30047-5420
Phone: 770-925-7113
E-Mail: tomdelaney@landcarenetwork.org
www.landcarenetwork.org

**Focused, specialized education, targeted specifically to your needs. Sign up today for PLANET's Specialty Symposium at landcarenetwork.org.**

--
No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.1.394 / Virus Database: 268.9.9/382 - Release Date: 7/4/2006

--
No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.1.394 / Virus Database: 268.9.9/382 - Release Date: 7/4/2006



July 6, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N. W., 2nd Floor
Washington, DC 20529

> **RE:** **DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter – Request for 120-Day Extension of Comment Period**

Dear Director:

This letter is in response to the above-referenced notice of proposed rulemaking published on June 14, 2006. I am writing to request that the 60-day public comment period for the proposed regulation referenced above be extended for an additional 120 days, for a total comment period of 180 days. In order for our association and industry to respond to the proposed regulation, **during our busiest time of the year,** I ask that additional time be allotted to review and analyze the provisions and the real impact it will have on our industry; 60 days is simply an inadequate amount of time to comment responsibly.

Congress has already passed two very different versions of immigration legislation and we now have to await conference. Both the Senate and House bills propose significant changes relating to an employer's responsibilities when verifying its workforce. The resulting compromise will likely set new standards under which employers must operate regarding the verification of an employee's work authorization eligibility and identity and will specifically address the case when an employer receives a no-match letter from the Social Security Administration or from the Department of Homeland Security.

For the reasons stated above, an extension of the comment period for the rulemaking process is needed not only to avoid unnecessary confusion and hardship for our industry, but also to be able to comment on the proposal that would have such a wide-spread impact.

Sincerely,

*Thomas J. Delaney*

Thomas J. Delaney
Director of Government Affairs

Please post the comments below to regulations.gov for ICEB 2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Marielena Hincapie [mailto:hincapie@nilc.org]
**Sent:** Monday, August 14, 2006 11:46 PM
**To:** Regs, Rfs; Ratana, Arden C
**Subject:** DHS Docket No. ICEB-2006-0004
**Importance:** High

Dear Sir or Madam:

Attached is the Low-Wage Immigrant Worker Coalition's comment to **DHS Docket No. ICEB-2006-0004**.

Sincerely,

Marielena Hincapié

---

Marielena Hincapie, Esq.
Director of Programs
National Immigration Law Center
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA 90010

213-639-3900 x. 112
213-639-3911 (fax)

hincapie@nilc.org   |   www.nilc.org

---

The information contained in this e-mail message may be privileged, confidential, or otherwise legally protected from disclosure. It is also covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 et seq. If you are not the intended recipient of this message, you are informed that any retention, copying, distribution, and/or other use or dissemination of any portion of its contents is prohibited. If you believe you have received this e-mail message in error, please contact the sender immediately at hincapie@nilc.org or 213-639-3900, delete the message from any and all electronic files, and destroy all other copies as well. Thank you.

# Low-Wage Immigrant Worker Coalition

**VIA ELECTRONIC MAIL**

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

*Re:*    *DHS Docket No. ICEB-2006-0004, Comment Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

The National Immigration Law Center (NILC) submits the following comment on behalf of the Low-Wage Immigrant Worker (LWIW) Coalition in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE), on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 FR 34281 (June 14, 2006).

The LWIW Coalition is co-convened by NILC, the American Federation of Labor – Congress of Industrial Organizations (AFL-CIO), Change to Win (CtW), Interfaith Worker Justice (IWJ), Jobs with Justice, the National Council of La Raza (NCLR), the National Day Laborer Organizing Network (NDLON), and the National Employment Law Project (NELP).

The LWIW Coalition is our nation's broadest collaborative of advocates and organizers working to improve the living and working conditions of low-income and low-wage immigrant workers. The mission of the LWIW is to support this community of advocates by sharing strategies and resources at the local, state, and national levels.

The signatories to these comments have ample experience in dealing with the adverse impact that Social Security Administration's (SSA's) no-match letters have had on all workers, immigrant and native-born alike. Through our legal assistance programs and organizing campaigns, we have interacted with tens of thousands of low-wage workers and their families on matters related to no-match letters and other Social Security number (SSN) verification matters. We have assisted individual employees in correcting no-match discrepancies and educated both employers and employees on their responsibilities in responding to no-match letters through written materials, trainings, and technical assistance to a broad range of groups in the country.

---

American Federation of Labor – Congress of Industrial Organizations (ALF-CIO) ● Interfaith Worker Justice (IWJ)
● Jobs with Justice (JWJ) ● National Day Labor Organizing Network (NDLON) ● National Council of La Raza
(NCLR) ● National Employment Law Project (NELP) ● National Immigration Law Center (NILC)

The LWIW Coalition has also worked closely with SSA through the years to improve language in no-match letters and to include warnings to employers against discriminatory and retaliatory conduct. Our advocacy includes ongoing monitoring of national origin and citizenship status discrimination cases as well as unfair labor practices arising from SSN verification and no-match matters reported to the U.S. Department of Justice Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC), the Equal Employment Opportunity Commission (EEOC), and the National Labor Relations Board (NLRB).  Some of the co-conveners of the LWIW have also been engaged in litigation involving employer misuses of no-match information to interfere with workers' rights to organize and exercise their labor rights. Throughout our work, we have remained steadfast in our commitment to safeguard and advance the rights and best interests of low-wage workers, their families, and their communities.

As a result of this work, the LWIW Coalition is alarmed by and strongly opposed to the implementation of the "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter."  Such a rule will magnify the adverse impact that no-match letters have had on workers' rights and trigger massive, potentially unlawful firings of low-wage workers across the nation. Overly cautious employers will fire listed workers before workers have a chance to show they are on the list mistakenly.  But despite the disruption it will cause, the rule does nothing to solve our immigration problems.

DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of workers in an isolated, punitive immigration "enforcement" scheme on the eve of enactment of comprehensive immigration reform intended to make our immigration system work again.  In the absence of such reform, the proposed changes would only stir up dust.

The proposed rule is simply the wrong rule at the wrong time.  Both the House and Senate have passed immigration bills that contain sweeping new worksite verification and enforcement regimes that impose a new electronic verification system on all employers.  Implementing the rule before the conclusion of the immigration debate would add a new, unnecessary, and unhelpful set of major changes for employers to learn and implement on top of the ones that will be added just a short while later when the new legislated changes take effect.

Although the rule causes enormous upheavals in the workplace, the rule will have *no* impact on undocumented migration, which is the purported purpose of this proposal.  Our experience with no-match firings and workplace audits is very clear: *the fired workers will not leave the country*. In the absence of comprehensive immigration reform that addresses the root causes of undocumented migration, they will simply find other more marginal jobs, most likely in the unregulated cash economy.  Because of this, the proposed rule will result in growth of the underground economy, which in turn will result in substantial losses in state and federal tax revenues as well as unfair competition.

In addition to its enormous impact on workers and on our economy, this proposal should be withdrawn because the rule attempts to transform the SSA no-match program into an immigration enforcement tool when the SSA does not have the capacity to fulfill this objective through its database.  Additionally, the rule erodes our privacy rights, raises due process concerns, and radically departs from existing case law and longstanding federal guidance in this

No-Match Cert. Admin. Record  2206

area. It provides no solution to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by workers, taxpayers, and businesses. The LWIW Coalition therefore urges DHS to withdraw this rule in its entirety.

Our concerns are set forth in full below.

## The Proposed Rule Harms All Workers Regardless of Immigration Status

*Hundreds of Thousands—Possibly Millions—of Workers, Including U.S. Citizens and Work-Authorized Noncitizens, Will Face Massive Firings*

As an initial matter, the notion that SSA no-match letters indicate that an individual is not authorized to work in the United States is simply incorrect. SSA no-match letters are *not* reliable indicators of work authorization or immigration status. Instead, these letters simply indicate that there is a discrepancy between a worker's SSN and/or name on file with the SSA based on information reported by employers on Internal Revenue Service (IRS) Form W-2 (Wage and Tax Statement). There are numerous reasons for the discrepancies, *none of which have anything to do with the immigration status or work authorization of workers*. Many of these mismatches are based, instead, on simple human error (such as clerical data entry mistakes and misspellings by the employee, employer, or SSA) or life changes (such as name changes, marriages, and divorces). The proposed rule, however, is based on the faulty premise that SSA no-match letters are foolproof indicators of work authorization. Because this premise is flawed, there are several, disastrous consequences that would flow from implementation of the rule.

This proposed rule will trigger massive firings across the nation. Based on our experience over the years but in particular with SSA's policy in 2002 where the agency sent the no-match letter to almost one million employers, the LWIW Coalition anticipates that the proposed rule will prompt similar panic and confusion among employers. This is likely to result in employers precipitously and indiscriminately firing workers who appear on a no-match list before workers have a chance to show that they are on the list because of the simple human error or life changes described above. As a result, these mass no-match firings may include the terminations of thousands of work-authorized employees who routinely receive SSA no-match letters.

U.S. citizens, lawful permanent residents, and other work-authorized employees were among the estimated 100,000 workers who lost their jobs as a result of the approximately 800,000 no-match letters sent by SSA in 2002.[1] Job losses were most acute in low-wage industries such as agriculture, cleaning, construction, food service, and health care. For example, no-match firings devastated the workforce at Stanford Medical Center in Palo Alto, California, where 83 percent of workers on a no-match list lost their jobs.[2] Based on the severity of the 2002 job losses, the U.S. Chamber of Commerce declared an official labor shortage and urged SSA to change its policy.[3] Under pressure from the Chamber and employers, as well as enormous pressure from

---

[1] Mary Beth Sheridan, "Records Checks Displace Workers: Social Security Letters Cost Immigrants Jobs," *The Washington Post*, Aug. 2, 2002.

[2] "A Crackdown on Workers," *The San Francisco Chronicle,* Aug. 12, 2002.

[3] *"The Immigration Crisis,"* Cox News Service, Aug. 14, 2002.

civil, immigrant, and worker rights advocates across the country, SSA agreed to decrease the number of no-match letters.[4]

No-match firings across the nation continued into 2003, however. In August, Peco Foods, Inc. of Canton, Mississippi terminated about 200 workers in response to no-match letters.[5] That same year, Suncast, Inc., a Chicago-area outdoor garden product manufacturer, terminated over 100 employees in response to no-match letters.[6] By the end of 2003, a national survey conducted by the University of Illinois at Chicago's Center for Urban Economic Development determined that approximately 53.6 percent of employers responding to no-match letters terminated the listed workers.[7] Despite strong warnings to employers that appeared on the face of the letter, the study found that workers were summarily fired, often without any opportunity to correct the no-match discrepancies or any explanation of the no-match process.[8]

Documented examples of adverse employment actions against U.S. citizens and other work-authorized noncitizens include:

- Mr. Samuel Harris. In late summer of 2003, Mr. Samuel Harris,[9] an African American man in Virginia, was fired from his job because his employer received an SSA no-match letter regarding a discrepancy with respect to Mr. Harris's SSN. Mr. Harris, who is a U.S. citizen, went to the local SSA office to correct his information. Apparently, SSA had issued Mr. Harris a duplicate SSN that belonged to a deceased person. Although Mr. Harris was able to correct his information with SSA, his employer refused to continue to employ him, thinking that Mr. Harris was engaging in identity theft or similar wrongdoing. He was fired and out of work for several months and had to file an arbitration case to get his job back.[10]

- Mrs. Noelle Lopez. In July 2002, Mrs. Lopez, a worker from North Carolina, was injured on the job. While she was on leave, her employer notified her that it had received an SSA no-match letter for her. She corrected the discrepancy, which was based on a typographical error in the W-2 that her employer had filed with SSA. Weeks later, while still on leave for her injury, the employer asked Mrs. Lopez to reverify that she continued to be eligible to work in the United States because her work authorization had expired. She had employment authorization based on Temporary Status Program (TPS), and had already applied for a renewal, but the Immigration and Naturalization Service (INS) sent her an Employment

---

[4] Chirag Mehta, et al., *Social Security Administration's No-Match Letter Program: Implications for Immigration Enforcement and Workers' Rights* (Center for Urban Economic Development, University of Illinois at Chicago, Nov. 2003) at 7, available at http://www.uic.edu/cuppa/uicued/npublications/recent/SSAnomatchreport.pdf (hereinafter "Mehta"); *Basic Information Brief: SSA "No-Match" Letters* (NILC, Feb. 2005) (hereinafter "NILC Brief") at 2, available at http://www.nilc.org/immsemplymnt/SSA-NM_Pack/Basic_Info_Brief_No-Match_Ltrs-2-15-05.pdf.

[5] Peggy Matthews, "Plan to Round Up, Deport Illegals Angers Activists," *The Clarion-Ledger,* Aug. 12, 2003.

[6] Stephanie Blozen, "Latinos Start Boycott Against Batavia Firms," *The Chicago Tribune,* Aug. 12, 2003.

[7] Mehta, *supra* note 4, at 13.

[8] *Id.* at 15.

[9] All individual worker names have been changed to protect their identities, but the names of workers and employers drawn from media sources are reproduced here as published.

[10] NILC Brief, *supra* note 4, at 4.

Authorization Document (EAD) with someone else's picture. Although she was able to straighten this problem out, when her doctor told her she could go back to work, the employer denied her a job because she had "too many immigration problems."[11]

The proposed rule only exacerbates this risk of unnecessary and unjust firings. Past experience indicates that, rather than navigating a complex series of steps and timetables to a "safe-harbor," panicked and confused employers will simply fire all workers whose names appear on the no-match list. The employer confusion across U.S. worksites is already detectable.

- Mr. James Heggen. Shortly after DHS issued the proposed rule, an employer in Massachusetts refused to hire Mr. Heggen, a lawful permanent resident of the United States, for a permanent clerical position due to a typographical error on his Social Security card. Mr. Heggen's name appears as "Heggen" on his alien registration card or "green card," but on his Social Security card, his name is spelled "Hegen"—with one less "g." Based on this missing "g," the employer denied Mr. Heggen a permanent position, claiming that it had to be *more careful in these times.* Mr. Heggen is Black and was born in the United Kingdom. His parents immigrated to the U.K. from the Caribbean. Together, the family immigrated to the United States when Mr. Heggen was a child. Because he and his parents received their permanent immigration documents decades ago, Mr. Heggen cannot file for a correction of his Social Security card locally, and, therefore, not quickly. Correcting this minor Social Security discrepancy could take several months. Frustrated after being denied this permanent position, Mr. Heggen contacted a local community-based legal services organization for assistance. This organization immediately sent a letter to the employer, setting forth the potential illegality of the employer's actions. Subsequently, the employer hired Mr. Heggen on a temporary basis. The week of August 7, 2006, after additional consultation with the organization, the employer hired Mr. Heggen for the permanent position.[12]

Recent media accounts of the proposed rule reveal that employers are already contemplating massive no-match firings as a response to the new rule. A construction company president told the *Tampa Tribune,* after attending a seminar for employers on the proposed rule, that some of his company's workers "won't be working for us in the future" if the rule is implemented and that he had great concern about "filling those spots."[13] *The Ledger* of Lakeland, Florida, reported that while the proposed rule may lead to penalties for employers, "workers, in turn, would lose their jobs," an effect which for Florida's largest growers' organization amounts to a "threat to national security."[14] An employment attorney representing several large employers reported to the *Washington Post* that, "From a practical standpoint, [the proposed rule] will have the effect [of employers] having to terminate employees. It will be devastating to many

---

[11] *Id.*

[12] Telephone interviews with Ingrid Nava, Employment Unit, Greater Boston Legal Services, Boston, Mass., July 28, 2006, and Aug. 10, 2006.

[13] Lindsay Peterson, "Proposal Targets Illegal Immigration," *The Tampa Tribune,* June 15, 2006.

[14] Kevin Bouffard, "Proposal May Pinch Growers," *The [Lakeland, FL] Ledger,* July 11, 2006, available at http://www.theledger.com/apps/pbcs.dll/article?AID=/20060711/NEWS/607110399/1004.

No-Match Cert. Admin. Record  2209

industries if people comply with it."[15]  The proposed rule thus has placed the livelihoods of hundreds of thousands—possibly millions—of workers and their families on the line.

*The Proposed Rule Will Result in Increased Citizenship Status, National Origin, and Racial Discrimination*

The proposed rule creates two sets of potential employment discrimination: discriminatory firings and discriminatory refusal to hire.  A disproportionate number of names on no-match lists are "foreign-sounding" names of newcomers to the United States, and many SSA letters are sent to employers with large numbers of newcomers in their workforces.  Employers who believe they will face business disruption due to the letters have an incentive to prefer employees they think are less likely to receive the letters.  Employers may also choose to simply dismiss employees who appear or sound foreign.  These discriminatory employment actions would run afoul of federal and state antidiscrimination laws and other worker protections and lead to costly and protracted wrongful termination litigation.

Employment discrimination against authorized noncitizen workers—particularly against Latinos, Latinas, and Asians—was rampant after the passage of the 1986 Immigration Reform and Control Act (IRCA).  A 1990 U.S. General Accounting Office (GAO) study reported a pattern of discrimination that resulted solely from employer sanctions, including discrimination on the basis of foreign accents or appearance and preferences of certain authorized workers over others.  In fact, the GAO estimated that an average of 19 percent of employers—almost one in five—participated in one or more discriminatory practices as a result of the 1986 law.  These results were confirmed by nearly a dozen studies conducted locally during the 1990s by human rights commissions and other organizations, which also found significant discrimination resulting from the implementation of employer sanctions.[16]

Employment discrimination has also increased since SSA began sending close to a million no-match letters in 2002.  The number of immigration-related unfair employment referrals and investigations fielded by OSC has risen dramatically.  From 1994 to 2000, OSC conducted only 20 investigations into firings stemming from employers that fired workers based on SSN verification matters.  From 2001 to 2003, OSC opened 29 investigations.  Three of the investigations opened after 2001 resulted in settlements favorable to workers, and ten investigations were open as of 2003.[17]  Although recent statistics are unavailable, OSC recognized in its April 2005 quarterly newsletter that OSC "staff members frequently provide assistance to workers" who face adverse employment actions by employers based on the no-match letters.[18]

---

[15] Cindy Skrycki, "DHS Wants Workers, Papers to Match," *The Washington Post*, July 11, 2006 (quoting Monte B. Lake, an employment and immigration attorney).

[16] *Immigration Reform: Employer Sanctions and the Question of Discrimination*, GGD-90-62 (GAO, Mar. 29, 1990), available at http://archive.gao.gov/d24t8/140974.pdf.

[17] Mehta, *supra* note 4, at 25.

[18] *OSC Update* (OSC, U.S. Department of Justice, Civil Rights Division, Apr. 2004) at 2.

No-Match Cert. Admin. Record  2210

*The Proposed Rule Will Result in Increased Employer Retaliation Against Workers Who Exercise Their Workplace Rights*

The proposed rule also places all workers at a higher risk of employer retaliation for labor organizing and raising complaints about worksite conditions. Unscrupulous employers already use the SSA no-match letter to stymie organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- <u>North Carolina</u>. In July 2006, during a heated legal battle over recent union election results, at least 24 Latino immigrant workers at a modular building construction company were suspended without pay because they were listed on a no-match letter. All 24 had voted to unionize. Many of the 24 have also initiated race and sex-based discrimination charges against their employer with the EEOC. A former supervisor at the company reported to the press: "These workers have been used and abused. As supervisors, we were told we needed production and to crack the whip to get it. We were told not to worry because these workers are just wetbacks and have no legal rights." A large group of African American workers have also filed complaints against this company with the EEOC. To protest the no-match firings, workers walked out on the day the firings took place. The workers and their union are also contemplating race and sex-based discrimination class action lawsuits.[19]

- <u>California</u>. In 2006, after months of intensive organizing, a group of nursing home workers, mainly immigrant Latina workers, marched to their manager's office to announce that they had joined together as a union in order to improve wages and working conditions and would seek formal recognition for their union under federal labor law. That afternoon, a head manager called one of leaders of the march into the office, pulled out a photocopy of that worker's Social Security card, wrote "NO GOOD" in bold letters across the photocopy, and suspended the leader without pay. Angered by management's action, the workers from the morning march crowded back into the manager's office and demanded reinstatement for their suspended colleague, denouncing management's action as a blatant anti-union tactic. Caught off guard, the manager immediately reinstated the suspended union leader. While these workers were successful, other workers have not been able to mobilize as effectively against manipulation of SSN verification issues by employers.[20]

- <u>Oregon</u>. In 2006, a Latina immigrant worker had been working as a housekeeper at an assisted living center. When it came time for her to qualify for health insurance and other benefits, the employer produced an SSA no-match letter. The worker suspects that the

---

[19] Telephone interview with Homer Marmalejo, United Brotherhood of Carpenters and Joiners of America, organizer, Aug. 8, 2006; *see also* Bob Shiles, "Roger Carter Suspends More Than 20 Undocumented Workers," *Kinston [NC] Free Press,* July 19, 2006.

[20] Interview with Guadalupe Palma, Service Employees International Union, Long Term Care Division, Coordinator III, in Los Angeles, CA, Aug. 1, 2006.

**No-Match Cert. Admin. Record  2211**

employer had received the letter earlier, but held it just before the benefits would have kicked in.[21]

- <u>Oregon</u>. In 2003, an employer in Oregon approached a group of workers who had complained about violations of their minimum wage and overtime rights, alleging that it had just received an SSA no-match list. The employer was requiring the workers to reverify their immigration status, and would not provide a copy of the letter to workers. Interestingly, this was *before* SSA began sending no-match letters to employers in March 2003.[22]

- <u>New York</u>. In 2002, a group of immigrant workers in New York went on strike to protest against poor working conditions. After receiving a no-match letter that the employer had initially ignored, the employer decided to use the no-match letter as a basis to reverify the immigration status of workers involved in the strike.[23]

If immigrant workers cannot enforce labor laws or organize under existing labor laws, it is less likely that native workers can assert these rights. The proposed rule thus poses enormous challenges for all low-wage workers. All workers face an increased risk of firings, retaliation, and abuse. U.S. citizens and authorized noncitizen workers could lose their jobs in discriminatory firings. Hundreds of thousands—possibly millions—of working families could be harmed, and therefore DHS should suspend this proposed rule immediately.

**Although the Proposed Rule Will Cause Enormous Upheavals in the Workplace, the Rule Has *No* Impact on Undocumented Immigration and Will Only Expand the Unregulated Underground Cash Economy**

Our experience with SSA no-match firings and workplace audits in the context of our current broken immigration system is clear: *the fired workers will not leave the country.* They will simply find other more marginal jobs, most likely outside of the traditional economy and "off the books" in the unregulated underground cash economy. Moreover, although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new obligations will increase pressure on "good" employers to take employees off the books, which also leads to growth of the underground economy. Expansion of the underground economy results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers. This result is nearly inevitable for any "crackdown" on workers and employers that is not accompanied by serious and practical reforms of the underlying immigration system.

*No-Match Firings Will Not Decrease the Number of Undocumented Workers in the United States*

Based on our recent experience under the current broken immigration system, high levels of SSA no-match firings will *not* drive undocumented workers and their families away from the United

---

[21] Brent Hunsberger, "Crackdown Coming on Bogus Papers," *The Oregonian,* June 25, 2006.

[22] NILC Brief, *supra* note 4, at 5.

[23] *Id.* at 4.

No-Match Cert. Admin. Record  2212

States. Instead, these workers immediately accept the next available low-wage job, even if it is off the books, out of sheer economic necessity, given the levels of poverty at which they and their families and communities must survive.[24] When poverty is combined with an employer demand for below-market wage rates and an absence of government enforcement of labor protections in low-wage industries, undocumented workers will almost certainly remain in the United States even after a no-match firing. The vast majority will reenter the labor force in unreported, cash-based employment relationships where they face further exploitation and abuse. Economists describe this effect as "churning" or unproductive turnover.[25] The SSA no-match program has been criticized for creating "policy-induced churning in local labor markets as workers are either fired or quit their jobs only to join the overcrowded pool of workers vying for positions in traditional immigrant occupations."[26] Fired workers do *not* simply leave the United States.

Undocumented workers constitute a large and growing segment of the workforce in the nation as a whole. The share of these workers in industries such as agriculture, cleaning, construction, food service, and other low-wage occupations is approximately three times the share of native workers in these types of jobs.[27] On any given day in our nation, more than 250,000 undocumented immigrants work as janitors, 350,000 work as housekeepers and maids, and 300,000 are groundskeepers.[28] In the aggregate, such workers are an integral part of the U.S. economy, constituting a full 5 percent of the civilian labor force or 7.2 million workers.[29]

Unscrupulous employers have long taken advantage of the availability and reduced cost of undocumented immigrant labor in both the traditional economy and in the underground economy. Undocumented workers are more likely to earn below minimum wage (two-thirds of undocumented workers earn below minimum wage compared to one-third of all workers).[30] IRCA's failed employer sanctions regime, along with the lack of government enforcement of labor protections in low-wage industries, has given free rein to unscrupulous employers. Such

---

[24] It has been estimated that nearly half of all immigrant workers are low-income, defined as earning less than 200 percent of the minimum wage. Randy Capps, et al., *A Profile of the Low-Wage Immigrant Workforce* (The Urban Institute, Nov. 2003) at 2, available at http://www.urban.org/UploadedPDF/310880_lowwage_immig_wkfc.pdf. Fifty-six percent of all young children of immigrants live in poverty; sixty-four percent of foreign-born children of immigrants live in low-income families. In immigrant families where both parents work, 24 percent of children live in poverty compared to 11 percent of the children of native workers. Randy Capps, et. al, *Health and Well-Being of Young Children of Immigrants* (The Urban Institute, Feb. 2005) at 2, available at http://www.urban.org/UploadedPDF/311182_immigrant_families_5.pdf.

[25] *See* Avner Ahituv and Robert I. Lerman, *Job Turnover, Wage Rates, and Marital Stability: How Are They Related?* (The Urban Institute, Nov. 2004) at 5, available at http://www.urban.org/publications/411148.html (distinguishing "churning" and unproductive turnover from worker mobility).

[26] Mehta, *supra* note 4, at 18.

[27] Jeffrey S. Passel, *Unauthorized Migrants: Numbers and Characteristics: Basic Briefing Prepared for Task Force on Immigration and America's Future* (Pew Hispanic Center, June 2005) at 26–28, available at http://pewhispanic.org/reports/report.php?ReportID=46.

[28] Jeffrey S. Passel, *Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Pew Hispanic Center, Mar. 2006) at 11–12 (hereinafter "Passel"), available at http://pewhispanic.org/files/reports/61.pdf.

[29] *Id.* at 9.

[30] Jeffrey S. Passel, et al., *Undocumented Immigrants: Facts and Figures* (The Urban Institute, Jan. 2004) at 2, available at http://www.urban.org/url.cfm?ID=1000587.

No-Match Cert. Admin. Record  2213

employers routinely manipulate immigration law into a tool that sharpens wage differentials between undocumented and documented low-wage workers and suppresses wages for all. Even legitimate employers have admitted to the temptation to engage in similar practices or risk going out of business.[31] In recent years, Department of Justice (DOJ) and DHS officials have finally begun to recognize these wage differentials and the harm caused by an economic system that produces lower wages based on differences in immigration status.[32]

Increasingly, there is evidence demonstrating that raising the wages and working conditions of low-wage workers will actually reduce undocumented immigration by making the existing workforce more attractive to employers.[33] Closing the wage differentials between differently work-authorized individuals and ensuring that all low-wage workers—current and future, documented and undocumented—have similar levels of mobility and enjoy full labor protections are the more effective ways to prevent undocumented immigration to the United States and to hold exploitative corporations accountable. A structural demand for undocumented labor can be reduced only by building a strong floor underneath all workers.

Poorly-conceived, punitive enforcement-only schemes like the proposed rule will force millions into the underground economy. The proposed rule will not decrease the numbers of undocumented workers in the United States, nor will it decrease their levels of employment. It will only decrease wage levels and deepen wage differentials based on immigration status, creating even more economic incentive for employers to hire undocumented workers. Accordingly, DHS should suspend this proposed rule and work with Congress and the Administration to pass comprehensive immigration reform that will address the underlying issue of undocumented migration.

*The Imposition of New Legal Obligations on Millions of Employers Will Push Them into the Underground Economy*

Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new and onerous set of legal obligations on millions of employers. The rule essentially deputizes employers as *de facto* immigration enforcement officers.

The proposed example of what constitutes "constructive knowledge," at Section 274a.1(l)(1)(iii)(B) of the proposed rule, is not the employer's *receipt* of a no-match letter, but

---

[31] K. M. Donato, et al., "Stemming the Tide? Assessing the Deterrent Effects of the Immigration Reform and Control Act," *Demography* 29 (2005) at 139–58.

[32] In the prosecution of Tyson Foods for the hiring of undocumented workers, assistant U.S. Attorney John P. MacCoon stated: "This trial is about corporate greed. . . . It's about what happens when a corrupt corporate culture makes the bottom line the all-consuming priority." Sherri Day, "Prosecutors in Smuggling Case against Tyson Contend Trial Is about Corporate Greed," *The New York Times*, Feb. 6, 2003. In the Tyson Foods case, the government hinged its $140 million pre-indictment settlement demand against defendant Tyson Foods on a novel "wage suppression" theory. The government claimed that Tyson Foods had reaped enormous profits by recruiting undocumented workers into its ranks and paying them at below-market wage rates. In his authorization of trial for the case, DHS Secretary Chertoff fully endorsed the DOJ's attempts to recover "suppressed wages." Thomas Green, et al., "Deputizing—and Then Prosecuting—America's Businesses in the Fight against Illegal Immigration," *Amer. Crim. L. R.*, June 22, 2006, at 5, 7.

[33] Ivan Light, "How L.A. Kept Out a Million Migrants," *The Los Angeles Times*, Apr. 16, 2006.

---

- 10 -

**No-Match Cert. Admin. Record 2214**

the employer's *failure to act* after receiving a no-match letter. By defining the "failure to take reasonable steps" upon receipt of a no-match letter as creating constructive knowledge, the proposed regulation makes it necessary for a law-abiding employer to take some action in response to a no-match letter. Therefore, as set forth in Sections 274a.1(l)(2)(i) and 274a.1(1)(2)(iii) of the proposed rule, an employer who receives a no-match letter is essentially forced to apply due diligence to a series of complicated steps that demonstrate correction of each "no-match" discrepancy. If the employer fails to resolve the correction in the allotted time, the employer faces a finding that it had constructive knowledge of hiring an undocumented worker. This finding could be used against the employer in a federal prosecution that could result in civil and criminal penalties. This is a radical change from the longstanding position that the various federal agencies implicated in this SSA no-match issue have taken.

Employers who wish to avoid loss of profits and productivity while minimizing exposure to the heightened risk of federal immigration liability under the proposed rule will be forced into one of three no-match evasion strategies:

First, employers will take their businesses off the books and into the underground economy. For one thing, keeping workers off the books means avoiding government scrutiny and additional no-match letters. For another, there are immediate financial incentives for employers to keep workers off the books. The proposed rule thus has a perverse effect of targeting and punishing "good" employers who keep good records and want to stay on the books. These good employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records and who consequently will not be reached by the new rule.

Second, employers will intentionally misclassify their employees as "independent contractors" as a means of evading this responsibility.

Finally, employers will engage in subcontracting schemes by interposing intermediary labor contractors between themselves and their employees, pretending their workers are employees of these sham contractors and exposing workers to marginal, fly-by-night employment practices by middlemen.

*Growth of the Underground Economy Results in Massive Losses to State and Federal Coffers and Unfair Competition*

A policy that results in more employers choosing to keep their employees off the books or intentionally misclassifying employees is harmful to state and federal government coffers and creates unfair competition against "good" employers. Certain employers will see a clear and immediate economic advantage to taking their employees off the books. At a minimum, they will reduce their payroll costs by an average of 8 percent by ceasing to pay costs for federal legally required benefits, including Social Security, Medicare, unemployment insurance and workers' compensation.[34] For employers who, as a policy or due to a collective bargaining agreement, provide other benefits, such as life, health or disability insurance, paid leave, or retirement and savings benefits, the potential total savings could add up to an average of 29.9

---

[34] *Employer Costs for Employee Compensation* (U.S. Department of Labor Bureau of Labor Statistics, Mar. 2006), available at http://www.bls.gov/news.release/ecec.nr0.htm.

percent of total payroll costs.[35] This means massive losses to state and federal coffers and a competitive advantage over employers who are not cutting these costs.

The projected loss in federal tax revenues ranges from $19 million to $1.9 billion annually. This range is derived from the following figures: In June 2006, the total U.S. labor force was estimated at 144.4 million workers.[36] As set forth above, about 7.2 million undocumented workers were employed in March 2006, accounting for a full 5 percent of the civilian labor force.[37] International accounting and consulting firm Price Waterhouse Coopers has projected that over 5 million U.S. workers would be misclassified as independent contractors (to avoid paying legally required benefits) in 2005 and that the federal tax revenue losses due to misclassification in 2004 would be $4.7 billion.[38]

Based on this projection and these worker population estimates, if only one-third of all undocumented workers or at least two million workers, or 1.4 percent of all U.S. workers, were to be pushed off the books as a result of the proposed regulation, the loss to federal coffers would be approximately $1.9 billion in one year. Alternatively, making a conservative assumption that 100,000 workers are pushed off the books as a result of the proposed regulation, the loss to federal coffers would be approximately $19 million annually.

The losses to the Unemployment Insurance (UI) trust fund alone ranges from $277 million to $13.8 million per year. This range is derived from the following figures: A study for the U.S. Department of Labor estimating the impact of employee misclassification on the UI trust fund alone was computed for the period from 1990–1998.[39] Assuming a 1 percent level of misclassification, the study determined that the loss would be an annual average of $198 million to the UI trust fund alone.

Based on this study for the DOL, assuming that at least 2 million workers were to be pushed off the books as a result of the proposed regulation, the impact on the UI trust fund alone would be an average of over $277 million annually. Alternatively, assuming that only 100,000 workers, or .07 percent of the workforce, are pushed off the books (the estimated number that lost their jobs due to no-match letters in 2002), the impact on the UI trust fund alone would be $13.8 million per year.

Employers who go off the books will experience an enormous net savings in taxes, which will create a competitive advantage for them over employers whose payroll-related expenses are

---

[35] *Id.*

[36] *Employment Situation Summary* (U.S. Department of Labor Bureau of Labor Statistics, July 2006), available at http://www.bls.gov/news.release/empsit.nr0.htm.

[37] Passel, *supra* note 28, at 11–12.

[38] *Projection of the Loss in Federal Tax Revenues Due to Misclassification of Workers* (Coopers and Lybrand, now Price Waterhouse Coopers, for Coalition for Fair Worker Classification, June 1994) at 5, available at http://www.carpenters.org/misclassification/State and Other Research Studies/Coopers-Lybrand--Projection of Loss of Federal Rev Due to Misclassification.pdf.

[39] *Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs* (Planmatics, Inc. for U.S. Department of Labor Employment and Training Administration, Feb. 2000) at 87, available at http://wdr.doleta.gov/owsdrr/00-5/00-5.pdf.

No-Match Cert. Admin. Record  2216

higher because they are playing by the rules. A report prepared for the U.S. Department of Labor observed: "[C]ost considerations and aggressive competition are twin pressures that induce an employer to engage in behavior that creates an inequitable playing field in the business community for employers who correctly classify their employees and pay taxes."[40]

The State of California even developed a joint-agency strike force to address abuses created in the underground economy. This strike force has observed the impact of this employer behavior on "good" employers: "[W]hen businesses operate in the underground economy, they gain an unfair competitive advantage over businesses that comply with various business laws. This causes unfair competition in the marketplace and forces law-abiding businesses to pay higher taxes and expenses."[41] When the desire to avoid government scrutiny is combined with the immediate economic savings from avoiding payment of taxes and employer-provided benefits, some employers will see a clear competitive advantage in taking their workforce underground. The implementation of this proposed rule thus disadvantages those employers who play by the rules.

**DHS Should Suspend The Proposed Rule Because the SSA No-Match Program Is Ill-Suited As an Immigration Enforcement Tool**

*The SSA No-Match Program Cannot Meet the Needs and Objectives of Immigration Enforcement Because the SSA Database Is Not an Immigration Database*

Each year employers send IRS Forms W-2 to SSA indicating their employees' annual earnings. SSA matches each worker's name and SSN to the Numerical Identification File (NUMIDENT), which is SSA's primary database of SSN holders.[42]

NUMIDENT is *not* an immigration database and is made up of information collected from applications for initial or replacement SSNs.[43] The database contains only limited and incomplete immigration information.[44]

---

[40] *Id.*

[41] *2003 Annual Report: California Joint Enforcement Strike Force on the Underground Economy* (Employment Development Department, State of California, June 30, 2004) at 3, available at http://www.edd.ca.gov/taxrep/txueo03.pdf; *see also* Francois Carerre, et al., *The Social and Economic Costs of Employee Misclassification in Construction* (Construction Policy Research Center at Harvard Law School and Harvard School of Public Health, Dec. 2004), at 7 (noting that "[m]isclassification creates challenges for compliant employers because it creates an uneven 'playing field.' Employers who respect the law and classify employees appropriately have a higher wage bill and can get underbid by contractors that do not comply and have lower costs.").

[42] *Report to Congress on the Basic Pilot Program* (U.S. Citizenship and Immigration Services, June 2004) (hereinafter "USCIS Report") at 2.

[43] Kevin Jernigan, "Eligible to Work? Experiments in Verifying Work Authorization," *Migration Policy Institute Insight,* Nov. 2005 (hereinafter "Jernigan") at 3.

[44] The database "contains information on name, date of birth, and citizenship status of persons issued Social Security cards, which enables SSA to confirm work authorization for U.S. citizens and some noncitizens who are permanently work authorized." USCIS Report, *supra* note 42, at 2. SSA collects immigration status information only on those persons who are work-authorized incident to status, such as lawful permanent residents, asylees, and refugees. *Id.* at 4.

---

Even the limited immigration status information in NUMIDENT regularly becomes inaccurate because it is *not* automatically updated when a worker's immigration status or work authorization changes.[45]  NUMIDENT is particularly inaccurate with respect to work-authorized noncitizens in its use with the Basic Pilot Program.  According to U.S. Citizenship and Immigration Services (USCIS), work authorization for more than 50 percent of the cases of noncitizens could not be electronically confirmed by NUMIDENT, compared with 0.2 percent for native-born citizens.[46]

If there is a match of the SSN and the first seven letters of the surname between NUMIDENT and the W-2, the earnings are posted to the individual worker's Master Earnings Record.  About 10 percent of submissions *cannot* be matched.  SSA then does more than 20 "front-end validation routines," which are automated processes that manipulate names and SSNs to correct mistakes and find a correct match.[47]  These "front-end validations" do *not* involve collection or use of immigration data.

If a valid record cannot be identified, SSA posts the earnings to its Earnings Suspense File (ESF).  The ESF contains earnings reports with names and SSNs that do not match SSA records.  SSA then performs "back-end" processes to try to match the earnings.  SSA's "back-end" processes do not involve collection or use of immigration data.

The SSA back-end processes include using corrections generated through IRS processes.  The back-end processes also include generating SSA no-match letters to employees and employers.[48]  No-match letters are just one of the "back-end" processes that SSA regularly uses to ensure that earnings are properly attributed to workers. These letters are sent by SSA to inform employers and employees that the worker is not getting proper credit for their earnings due to a discrepancy.

*Immigration Status or Lack of Immigration Status Cannot Be Presumed from Posting to the ESF*

The ESF contains hundreds of millions of records, and a "significant number of earnings reports in the ESF still belong to U.S. citizens and work-authorized noncitizens."[49]  The percentage of ESF records belonging to unauthorized workers is entirely unknown.  The majority of reinstatements (matching to a worker's Master Earnings Record) are still made to U.S.-born citizens.[50]  ESF records do not in any way indicate immigration status.  The information in ESF

---

[44] The SSN application form itself focuses on noncitizens' work authorization rather than immigration status. *See* Form SS-5 (May 2005), available at http://www.ssa.gov/online/ss-5.pdf.

[45] Jernigan, *supra* note 43, at 12.

[46] USCIS Report, *supra* note 42, at 4–5.

[47] *Social Security, Better Coordination Among Federal Agencies Could Reduce Unidentified Earnings Reports*, GAO-05-154 (GAO, Feb. 2005) (hereinafter "GAO Feb. 2005") at 7–8.

[48] *Id.*

[49] *Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work*, GAO-06-814R (GAO, July 11, 2006) (hereinafter "GAO July 2006") at 8.

[50] *Id.; see also* GAO Feb. 2005, *supra* note 47, at 18.

No-Match Cert. Admin. Record  2218

consists of the worker's name, SSN, employer's identification number, and the earnings amount.[51]

The ESF simply consists of information on workers whose records do not match SSA records, for reasons that include errors or obsolete data, lack of an SSN, missing first or last names, or use of nonalphabetic characters.[52]   The lack of an SSN is a particularly instructive example of an innocent basis for inclusion in the ESF that is frequently and wrongly cited as a basis for determining lack of work authorization.  Both the SSA and the IRS advise employers to use all zeros or to write in *"applied for"* when the worker has applied for but not yet received an SSN.[53]

SSA no-match letters are therefore *not* reliable indicators of work authorization or immigration status.  There is no way to accurately determine whether a SSA no-match letter is the result of typographical error, out-of-date information, or some other legitimate reason, let alone to determine an illegitimate reason.[54]   The SSA itself has repeatedly recognized that its no-match letter does not indicate immigration status or lack of authorization to work.  The current no-match letter explicitly states that a worker's identification in the letter "makes no statement" about his or her immigration status.[55]   The SSA database simply does not have the capacity to meet the needs and objectives of an immigration enforcement program.  Because of these limitations, this proposal will only result in an adverse impact on workers and our economy, including the increased discrimination and abuse of workers described above.  DHS should therefore suspend this rule.

**The Rule Modification Would Give DHS Indirect Access to Tax Information It Cannot Access Directly**

DHS should also suspend this proposed rule because it attempts to indirectly access sensitive tax information that is protected by federal law.  Specifically, Section 6103 of the Internal Revenue Code protects the confidentiality of taxpayer returns and taxpayer information and provides only limited exceptions to the sharing of personal identifying data.  This confidentiality is deemed essential to voluntary tax compliance.  The GAO has explicitly recognized that the ESF includes "sensitive taxpayer information that is protected by various laws and regulations" and that statutory authority would be required to provide DHS access.[56]

---

[51] GAO July 2006, *supra* note 49, at 8.

[52] *Id.; see also* GAO Feb. 2005, *supra* note 47, at 11–12.

[53] GAO Feb. 2005, *supra* note 47, at 11, n. 4.

[54] In testimony last month before the House Committee on Ways and Means, the Commissioner of Social Security emphasized that the source of SSA's database information is the Form W-2, and "there is no citizenship or immigration status information on that document." *See* Statement of The Honorable Jo Anne B. Barnhart, Commissioner, Social Security Administration, *Testimony Before the House Committee on Ways and Means* (July 26, 2006), available at http://waysandmeans.house.gov/hearings.asp?formmode=view&id=5172.

[55] Letter, Hurt, Assoc. Comm. for Central Op. SSA (Oct. 9, 2004) (hereinafter "Hurt Letter").

[56] GAO July 2006, *supra* note 49, at 8.

**No-Match Cert. Admin. Record  2219**

No statutory authority currently exists to provide DHS with access to this information.[57] As a result, DHS cannot presently obtain no-match information directly from SSA.

SSA no-match letters to employers frequently include taxpayer identity and return information. This rule allows DHS to commandeer the information contained in no-match letters and therefore allows DHS to circumvent the tax code's confidentiality restrictions. DHS should not be permitted to do by rule change what it cannot do without additional statutory authority.

Breaching the confidentiality of tax records would have the counterproductive result of discouraging tax compliance. Moreover, it would encourage employers and workers alike to enter the underground economy and not pay into our tax and Social Security systems.

**The Proposed Rule Dramatically Alters the Definition of "Constructive Knowledge" and Makes a Stark Departure from Existing Case Law and Longstanding Federal Guidance on No-Match Letters**

As an evidentiary matter, an employer's receipt of an SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule alters the definition of constructive knowledge and makes a stark departure from existing case law and longstanding federal guidance in this area.

In the seminal *Collins Food Intn'l v. I.N.S* case, the Ninth Circuit cautioned against the expansion of the doctrine of constructive knowledge: "IRCA . . . is delicately balanced to serve the goal of preventing unauthorized alien employment while avoiding discrimination against citizens and authorized aliens. The doctrine of constructive knowledge has great potential to upset that balance, and it should not be expansively applied." 948 F.2d 549, 554-555 (9th Cir. 1991).

Accordingly, the court instructed that "[a] finding of constructive knowledge requires "willful blindness" and "to expand the concept of constructive knowledge . . . would not serve the intent of Congress, and is certainly not required by [IRCA]." *Id.* at 555.

Contrary to DHS's assertions in the supplemental text, the proposed regulation would extend the definition of "constructive knowledge" well beyond the holdings in *Collins* and in *Mester Manufacturing Co. v. INS*, 879 F.2d 561 (9th Cir. 1989), and other constructive knowledge cases arising under the employer sanctions provision of the Immigration and Nationality Act, 8 U.S.C. § 1324a.

Indeed, the supplemental text misrepresents *Mester* by stating that the employer in that case merely received some evidence that the employee was not authorized to work. This is simply incorrect, and significantly downplays the type of information received by the employer, and relied upon by the court in its decision. In *Mester*, the court held that an employer had constructive knowledge of a worker's unlawful status when it received information directly *from*

---

[57] In contrast, such authority exists with respect to the Nonwork Alien File, which includes information about workers who are working though they have been issued nonwork SSNs.

**No-Match Cert. Admin. Record 2220**

*the INS* that an employee was an "illegal alien" but did not terminate the employee for two weeks. *Id.* at 567–68.

Consistent with *Mester*, cases have found constructive knowledge only where the employer has been provided specific information from a source knowledgeable about a worker's immigration status, where the employer failed to complete the Form I-9 (coupled with other suspicious circumstances), or in egregious circumstances. *See U.S. v. Jonel, Inc.* 1998 WL 804705 (OCAHO), *14 (Labor Department notice to employer that workers were unauthorized constituted constructive knowledge); *New El Ray Sausage Co. v. I.N.S.,* 925 F.2d 1153, 1157 (9th Cir. 1991) (INS gave employer "specific and detailed information" that it was employing undocumented workers); *U.S. v. American McNair,* 1 OCAHO 285 (1991) (employee failure to present any work authorization documents and notification of employer that he was ineligible for amnesty constituted constructive knowledge); *U.S. v. Fragale,* 1999 U.S. Dist. LEXIS 12616 (E.D. Pa. 1999) (constructive knowledge when human resources manager and foreperson in charge of hiring told employer that a large percentage of workforce was undocumented, and employer had received notice from INS that some workers were undocumented).

Moreover, in its attempt to convert the SSA no-match letter into a method of verifying immigration status or authorization to work, the proposed rule directly contravenes longstanding federal guidance from SSA, OSC, and former INS General Counsel.

SSA's position on no-match letters and immigration enforcement is set forth in clear terms on the face of the letter itself. The letter provides the following warning to employers:

> IMPORTANT: This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number. Nor does it make a statement about an employee's immigration status.[58]

For years, INS General Counsel has instructed employers along identical lines:

> If the document or documents presented to verify work authorization appear on their face to be genuine and to reasonably relate to the individual, the subsequent receipt of the SSA letter mentioned above does *not* impose any affirmative duty upon the employer to investigate further into an employee's eligibility to work in the United States. In addition, the receipt of this SSA letter by the employer, *without more,* would *not* be sufficient to establish constructive knowledge on the part of the employer regarding the employment eligibility of the named employee.[59]

---

[58] Hurt Letter, *supra* note 55.

[59] Letter, Virtue, Acting Gen. Coun. INS, HQ 274A (Feb. 17, 1994) (emphasis added); for reference, the LWIW Coalition has attached this letter as Exhibit 1 to this comment.

OSC has also provided similar guidance:

> The receipt of a no-match letter, standing alone, does not indicate to an employer that he or she need question the genuineness of documents or information previously presented to complete an INS Form I-9.[60]

This proposed regulation thus turns established federal guidance on no-match letters on its head. At the very least, the proposal will result in conflicting guidance from multiple federal agencies and cause employer and employee confusion.

### The Costs of Implementing the Proposed Rule are Prohibitive

If the proposed rule is to be carried out as envisioned, the government will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. Employer confusion is already evident from high number of questions submitted employers in their comments opposing the rule. In particular, many employers have submitted questions regarding the rule's unrealistic and unreasonable timetables for compliance.

Therefore, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA ultimately has to respond to the inevitable increase in employer (and employee) inquiries about this confusing rule. The actual costs of the current SSA no-match letter program are already substantial.[61] The actual costs of administrating a new program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law.

### The Procedure to be Followed Under the Proposed Rule When an Employer Receives Notice from DHS Denies Employees Due Process of Law

Section 274a.1(l)(1)(iii)(C) of the proposed rule includes the following as a circumstance that would amount to constructive knowledge where the employer "[f]ails to take reasonable steps after receiving information indicating that the employee may be an alien who is not employment authorized, such as . . . [w]ritten notice from the Department of Homeland Security that the immigration status document or employment authorization document presented or referenced by the employee in completing Form I-9 was assigned to another person, or that there is no agency record that the document was assigned to any person."

---

[60] Letter, Sarah DeCosse, Sr. Tr. Atty OSC (Apr. 1, 2004).

[61] *See* Mehta, *supra* note 4, at 7, n. 2 (noting that SSA's current attempts to reduce the ESF through no-match letters have cost U.S. taxpayers the following amounts: "$5.4 million to send notices to every individual whose name and SSN do not match SSA's records; $600,000 to send 944,000 notices to all employers who submitted wage reports with at least one item posted to the ESF; more than $200,000 for system maintenance and cyclical changes; and an average of $9.00 for each call to SSA's national toll free telephone number generated by the notices. SSA estimates that the agency received about 100,000 inquiries throughout 2002 regarding the TY 2001 letter.").

No-Match Cert. Admin. Record  2222

Under Section 274a.1(l)(2)(iii), an employer who receives such a notice will not be deemed to have constructive knowledge of the employee's unauthorized status if the employer takes reasonable steps to resolve the question raised by DHS and, if the employer does not verify with DHS that the document was assigned to the employee, the employer completes a new I-9. The employee cannot use the alien registration number, or "A-number," that is the subject of the written notice from DHS.

While this procedure may protect the employer, it entirely leaves out any possibility for the *employee* to have access to his or her DHS immigration file and any opportunity to correct errors in the file that would lead to DHS providing erroneous information to the employer. This access and an assured opportunity to correct errors in immigration records are critical because immigrants do not have easy, automatic, timely access to their immigration records, and immigration records are error-prone.

For years, government agencies have criticized the quality and accuracy of immigration records.[62] Problems with immigration records have continued even after the dissolution of the INS and the creation of new immigration agencies in DHS. The information technology environment at USCIS has been criticized as inefficient, and USCIS continues to rely on manual and paper-based processes.[63] As an example of how DHS records and processes go awry, in December 2005 DHS had to "recall more than 60,000 green cards because a computer glitch miscalculated immigrants' residency start dates."[64] USCIS sent letters instructing immigrants to mail their cards back. Unfortunately, USCIS sent the letters to many immigrants whose green card "resident since" dates were actually correct. USCIS then advised community-based organizations working with immigrants that its information technology staff was working to determine who received the mailing in error and that USCIS intended to send out a second letter to all individuals who received the initial letter in error.

Moreover, under current law, immigrants have access to their immigration files (both "alien files" and Border Patrol requests) only by filing Freedom of Information Act (FOIA) requests. FOIA requests for files must be made in writing and mailed to a central location, at the National Records Center in Missouri.[65] This means that immigrants who need access to their files to determine the nature of the erroneous information and then to correct this information as envisioned under Section 274a.1(l)(iii)(C) of the proposed rule are dependent on FOIA procedures which are not designed for this purpose. The lengthy and unpredictable timetables and cumbersome process for the FOIA process make it difficult for immigrants to both obtain their files and then correct mistaken information within Section 274a.1(2)(ii)'s compliance period.

The proposed rule thus raises critical due process concerns for immigrants. It fails to guarantee adequate access and an assured opportunity to immigrants who wish to correct errors in their

---

[62] *INS Data:The Track Record* (NILC, 2003), available at http://www.nilc.org/immlawpolicy/misc/INS_data_accuracy.pdf.

[63] *USCIS Faces Challenges in Modernizing Information Technology,* OIG-04-41 (DHS, Office of Inspector General, Sept. 2005), available at http://www.dhs.gov/interweb/assetlibrary/OIG_05-41_Sep05.pdf.

[64] Solomon Moore, "Green Cards Recalled Because of Glitch," *The Los Angeles Times,* Dec. 6, 2005.

[65] *See* USCIS, *Freedom of Information and Privacy Acts,* http://www.uscis.gov/graphics/aboutus/foia/index.htm.

No-Match Cert. Admin. Record  2223

immigration records. It creates penalties for employees when their immigration status or documents cannot be confirmed. It does not, however, set any time period for DHS to respond to immigrants' requests to review their files, nor does it place any obligation on DHS to correct immigrants' records in a timely fashion.

### The Proposed Rule May Exceed DHS's Authority

*DHS May Not Have Authority to Restrict the List of Acceptable Documents for the Reverification Process*

The proposed rule would create an exception to the list of documents that can be used to reverify the worker's employment authorization and identification as part of the I-9 requirement. But it appears that DHS may lack the ability to impose such restrictions. According to the INA, only the Attorney General has authority to promulgate regulations restricting the list of acceptable documents. 8 U.S.C. § 1324a(b)(1)(E). According to the statute, the Attorney General may only restrict the list of acceptable documents if he "finds, by regulation that any [of the listed documents] does not reliably establish [employment] authorization or identity or is being used fraudulently to an unacceptable degree." *Id.* Importantly, this power of the Attorney General was not transferred to the DHS upon its creation and the dissolution of the former Immigration and Nationality Service. 8 U.S.C. § 1103(a) (transferring powers under the INA to the Secretary of the DHS, *except* those that "relate to the powers, functions, and duties conferred upon" "the Attorney General," among others) (emphasis added). There is no indication in 8 U.S.C. § 1324a(b)(1)(E) and accompanying notes that the provision was ever amended to transfer the AG's authority to promulgate regulations to the DHS.

Despite this express statutory rule exclusively vesting the ability to restrict the congressionally approved list of I-9 documents to the Attorney General, Section 274a.1(l)(2)(iii) of the proposed rule would give DHS the power to restrict which documents are acceptable in the reverification process. According to that section, only documents bearing a photograph and *not* containing the SSN that triggered the no-match letter will satisfy the reverification requirement under the I-9 process. *Id.* Under current law, however, documents lacking photographs and those that include Social Security numbers are acceptable—even if the SSN triggers a no-match letter. 8 U.S.C. § 1324a(b)(1)(C), (D). Therefore, the proposed rule may inappropriately usurp the Attorney General's exclusive power to alter the congressionally created list of approved documents for reverification of a worker's status under the I-9 process and should be rejected.[66]

### RECOMMENDATION

In sum, we strongly oppose the Department of Homeland Security's proposed regulation. DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of workers in an isolated, punitive immigration "enforcement" scheme on the eve of enactment of *comprehensive immigration reform*. Although the rule will cause enormous upheavals in the workplace, the rule will have *no* impact on undocumented migration, which is the purported purpose of this

---

[66] The proposed rule may also violate INA Section 274A(d)(3), which requires notice by the President to the House and Senate Judiciary Committees before changes are made to the employment eligibility verification system. We do not know whether the President has provided such notice to the appropriate committees.

No-Match Cert. Admin. Record  2224

proposal.  Our experience with no-match firings and workplace audits is very clear:  *the fired workers will not leave the United States*.  In the absence of comprehensive immigration reform that addresses the root causes of undocumented migration, they will simply find other more marginal jobs, most likely in the underground economy.  Because of this, the proposed rule will result in growth of the underground economy, which results in substantial losses in state and federal tax revenues as well as unfair competition.  The proposed rule is simply the wrong rule at the wrong time.  It provides no solution to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by workers, taxpayers, and businesses.  For all these reasons, we recommend that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

**The Low-Wage Immigrant Worker (LWIW) Coalition**

**Co-Convened By:**

American Federation of Labor – Congress of Industrial Organizations (AFL-CIO)
Change to Win (CtW)
Interfaith Worker Justice (IWJ)
Jobs with Justice
National Council of La Raza (NCLR)
National Day Laborer Organizing Network (NDLON)
National Employment Law Project (NELP)
National Immigration Law Center (NILC)

**Contact:**

Marielena Hincapié, Esq.
Director of Programs
National Immigration Law Center
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA  90010
Phone: 213-639-3900
Fax: 213-639-3911
www.nilc.org

# EXHIBIT 1

### To DHS Docket No. ICEB-2006-0004;
**Comment Regarding "Safe Harbor Procedures for Employers Who Receive a No-Match Letter"**

### Submitted by:
**The Low-Wage Immigrant Worker (LWIW) Coalition**

### Date:
**Monday, August 14, 2006**

Immigration and Naturalization Service

HQ 274A

Office of the General Counsel

425 Eye Street N.W.
Washington, D.C. 20536

FEB 1 7 1994

Mr. Carl G. Borden
California Farm Bureau Federation
Office of the General Counsel
1601 Exposition Boulevard, FB3
Sacramento, CA 95815-5318

Dear Mr. Borden:

This letter is in response to your correspondence dated August 11, 1993, concerning the receipt of a letter from the Social Security Administration (SSA). The SSA letter in question informs an employer that the social security number of an employee does not agree with SSA records. Specifically, you ask whether an employer who receives this letter from SSA can continue to rely on the employment eligibility documents presented by that employee, assuming the documents appear on their face to be genuine and to relate to the employee?

If the document or documents presented to verify work authorization appear on their face to be genuine and to reasonably relate to the individual, the subsequent receipt of the SSA letter mentioned above does not impose any affirmative duty upon the employer to investigate further into an employee's eligibility to work in the United States. In addition, the receipt of this SSA letter by an employer, without more, would not be sufficient to establish constructive knowledge on the part of the employer regarding the employment eligibility of the named employee. As you correctly note in your correspondence, this letter from SSA could be prompted by a number of different reasons having nothing to do with an employee's eligibility to work in the United States.

The answer provided above specifically applies to a situation where the employer receives such a letter from SSA and the employer has no additional evidence that an employee may not be work authorized. It should be noted, however, that if an employer receives notice from the Immigration and Naturalization Service (INS) that a social security card or other document presented to establish work authorization is not valid, the employer does have a duty to inquire further to ensure that the individual is authorized to work in the United States before the employer can continue to employ that individual. In addition, while an employer has no affirmative duty to inquire into an employee's

No-Match Cert. Admin. Record 2227

employment eligibility based solely upon receipt of a letter from
SSA, if for some reason the employer discovers evidence that an
employee may not be authorized to work in the United States, the
employer must inquire further to verify the employment
eligibility of that employee.  If the employer is unable to
verify work authorization, the employer cannot continue to employ
that individual.

It should be noted that telephonic inquiries from employers
regarding the employment authorization of employees will not be
honored by INS.[1]  However, if an employer suspects fraud, as it
relates to INS documents, the employer may ask INS to physically
examine the documents.

I hope that the above information is helpful to you.  If you have
any further questions, please contact Michael C. McGoinner,
Associate General Counsel at (202) 514-2895.

Sincerely,

*Michael J. Creppy*

for Paul W. Virtue
Acting General Counsel

---

[1]    (The only exception is where the written consent of that
individual has been obtained.)  See Salinas-Pena v. INS, No. 86-
1033-DA (D.Oregon, March 16, 1988).

- 2 -