Public comments to ICEB 2006-0004(C Domingo).txt
From: cdomingo@nd.edu
Sent: Monday, August 07, 2006 4:45 PM
To: Regs, Rfs
Subject: eject new Bush administration immigration regulations


Director Department of Homeland Security

Dear Director Homeland Security,

I join with other citizens and business, labor,immigration and
privacy groups in saying "no" to the proposed regulations
concerning the Social Security Administration (SSA) "no-match"
letters.

These new regulations will result in a harmful impact on all
workers regardless of immigration status. Using such a
notoriously inaccurate and out-of-date system like the SSA
database means workers could face termination by panicked
employers before they can prove they are mistakenly on the list.
This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. Bad employers could
also use the letters to intimidate, threaten or discriminate
against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone--all workers regardless
of immigration status, our state and local governments, our
federal government and our economy. I urge you not to enact
these new regulations and allow Congress to reach a
comprehensive immigration reform solution, including the
historic bipartisan AgJobs proposal negotiated by the United
Farm Workers and growers that is within the bill passed by the
U.S. Senate.


Sincerely,

Caroline Domingo
1118 Allen Street
South Bend, Indiana 46616

No-Match Cert. Admin. Record  2229

Public comments to ICEB 2006-0004(C Waldron).txt
From: craig@ci.oakdale.mn.us
Sent: Monday, August 07, 2006 5:01 PM
To: Regs, Rfs
Subject: eject new Bush administration immigration regulations


Director Department of Homeland Security


Dear Director Homeland Security,

I join with other citizens and business, labor,immigration and
privacy groups in saying "no" to the proposed regulations
concerning the Social Security Administration (SSA) "no-match"
letters.

These new regulations will result in a harmful impact on all
workers regardless of immigration status. Using such a
notoriously inaccurate and out-of-date system like the SSA
database means workers could face termination by panicked
employers before they can prove they are mistakenly on the list.
This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. Bad employers could
also use the letters to intimidate, threaten or discriminate
against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone--all workers regardless
of immigration status, our state and local governments, our
federal government and our economy. I urge you not to enact
these new regulations and allow Congress to reach a
comprehensive immigration reform solution, including the
historic bipartisan AgJobs proposal negotiated by the United
Farm Workers and growers that is within the bill passed by the
U.S. Senate.


Sincerely,

craig waldron
2843 fernwood
roseville, Minnesota 55128

No-Match Cert. Admin. Record  2230

```
                        Public comments to ICEB 2006-0004(CBecerril).txt
From: on behalf of REGS, RFS
To: dhsregs.erulemaking@imc9.ems.lmco.com
Subject: Public comments to ICEB 2006-0004

Please post the comments below to regulations.gov for ICEB 2006-0004

Sangeeta Kochhar
Labat Anderson. Incorporated
Application Specialist
Regulatory Management Division
Office of Executive Secretariat / USCIS
Tel 202-272-8353
sangeeta.kochhar@dhs.gov


-----Original Message-----
From: CeliaB@Cuiab.Ca.Gov [mailto:CeliaB@Cuiab.Ca.Gov]
Sent: Friday, August 04, 2006 7:14 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]



Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I join with other citizens and business, labor, immigration and
privacy groups in saying no to the proposed regulations
concerning the Social Security Administration's (SSA) "no-match"
letters.

These new regulations will result in a harmful impact to ALL
workers regardless of immigration status. Using such a
notoriously inaccurate and out of date system like the SSA
database means that workers could face termination by panicked
employers before they can prove they are on the list mistakenly.
This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. "Bad employers"
could also use the letters to intimidate, threaten, or
discriminate against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.
                                    Page 1
```

No-Match Cert. Admin. Record  2231

Public comments to ICEB 2006-0004(CBecerril).txt

These proposed regulations hurt everyone -- all workers
regardless of immigration status, our state and local
governments, our federal government, and our economy. I urge you
not to enact these new regulations and allow Congress to reach a
comprehensive immigration reform solution.


Sincerely,

Celia Becerril
13172 Potts Dr
San Jose, California 95111

No-Match Cert. Admin. Record  2232

```
                    Public comments to ICEB 2006-0004(G Soriai).txt
From: nenybabe@hotmail.com
Sent: Monday, August 07, 2006 4:38 PM
To: Regs, Rfs
Subject: eject new Bush administration immigration regulations


Director Department of Homeland Security

Dear Director Homeland Security,

I join with other citizens and business, labor,immigration and
privacy groups in saying "no" to the proposed regulations
concerning the Social Security Administration (SSA) "no-match"
letters.

These new regulations will result in a harmful impact on all
workers regardless of immigration status. Using such a
notoriously inaccurate and out-of-date system like the SSA
database means workers could face termination by panicked
employers before they can prove they are mistakenly on the list.
This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. Bad employers could
also use the letters to intimidate, threaten or discriminate
against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone--all workers regardless
of immigration status, our state and local governments, our
federal government and our economy. I urge you not to enact
these new regulations and allow Congress to reach a
comprehensive immigration reform solution, including the
historic bipartisan AgJobs proposal negotiated by the United
Farm Workers and growers that is within the bill passed by the
U.S. Senate.


Sincerely,

Gloria Soria
4100 Piner Road
Santa Rosa, California 95401


                              Page 1
```

No-Match Cert. Admin. Record  2233

```
                        Public comments to ICEB 2006-0004(JHarris).txt
From: on behalf of REGS, RFS
To: dhsregs.erulemaking@imc9.ems.lmco.com
Subject: Public comments to ICEB 2006-0004

Please post the comments below to regulations.gov for ICEB 2006-0004

Sangeeta Kochhar
Labat Anderson. Incorporated
Application Specialist
Regulatory Management Division
Office of Executive Secretariat / USCIS
Tel 202-272-8353
sangeeta.kochhar@dhs.gov


-----Original Message-----
From: jonathanfharris@yahoo.com [mailto:jonathanfharris@yahoo.com]
Sent: Wednesday, August 02, 2006 12:38 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]



Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I join with other citizens and business, labor, immigration and
privacy groups in saying no to the proposed regulations
concerning the Social Security Administration's (SSA) "no-match"
letters.

These new regulations will result in a harmful impact to ALL
workers regardless of immigration status. Using such a
notoriously inaccurate and out of date system like the SSA
database means that workers could face termination by panicked
employers before they can prove they are on the list mistakenly.
This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. "Bad employers"
could also use the letters to intimidate, threaten, or
discriminate against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.
                                Page 1
```

No-Match Cert. Admin. Record  2234

Public comments to ICEB 2006-0004(JHarris).txt

These proposed regulations hurt everyone -- all workers
regardless of immigration status, our state and local
governments, our federal government, and our economy. I urge you
not to enact these new regulations and allow Congress to reach a
comprehensive immigration reform solution.


Sincerely,

Jonathan Harris
9817 Woodsong Ct.
Raleigh, North Carolina 27613

No-Match Cert. Admin. Record  2235

```
                    Public comments to ICEB 2006-0004(M Paulsen).txt
From: melodie.paulsen@medtronic.com
Sent: Monday, August 07, 2006 4:47 PM
To: Regs, Rfs
Subject: eject new Bush administration immigration regulations


Director Department of Homeland Security


Dear Director Homeland Security,

I join with other citizens and business, labor,immigration and
privacy groups in saying "no" to the proposed regulations
concerning the Social Security Administration (SSA) "no-match"
letters.

These new regulations will result in a harmful impact on all
workers regardless of immigration status. Using such a
notoriously inaccurate and out-of-date system like the SSA
database means workers could face termination by panicked
employers before they can prove they are mistakenly on the list.
This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. Bad employers could
also use the letters to intimidate, threaten or discriminate
against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone--all workers regardless
of immigration status, our state and local governments, our
federal government and our economy. I urge you not to enact
these new regulations and allow Congress to reach a
comprehensive immigration reform solution, including the
historic bipartisan AgJobs proposal negotiated by the United
Farm Workers and growers that is within the bill passed by the
U.S. Senate.


Sincerely,

Melodie Paulsen
19003 Channel Lane NE
Wyoming, Minnesota 55092


                              Page 1
```

No-Match Cert. Admin. Record  2236

Reject new Bush administration immigration regulations_bmasck.txt
From: bmasck@hotmail.com
Sent: Wednesday, August 16, 2006 11:01 AM
To: Regs, Rfs
Subject: Reject new Bush administration immigration regulations


Director Department of Homeland Security

Dear Director Homeland Security,

I join with other citizens and business, labor,immigration and
privacy groups in saying "no" to the proposed regulations
concerning the Social Security Administration (SSA) "no-match"
letters.

These new regulations will result in a harmful impact on all
workers regardless of immigration status. Using such a
notoriously inaccurate and out-of-date system like the SSA
database means workers could face termination by panicked
employers before they can prove they are mistakenly on the list.
This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. Bad employers could
also use the letters to intimidate, threaten or discriminate
against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone--all workers regardless
of immigration status, our state and local governments, our
federal government and our economy. I urge you not to enact
these new regulations and allow Congress to reach a
comprehensive immigration reform solution, including the
historic bipartisan AgJobs proposal negotiated by the United
Farm Workers and growers that is within the bill passed by the
U.S. Senate.


Sincerely,

Beth Masck
1208 North Rd
Belmont, California 94002


Page 1

No-Match Cert. Admin. Record  2237

Reject new Bush administration immigration regulationspgregory.txt
From: probyn.gregory@econres.com
Sent: Wednesday, August 16, 2006 9:35 AM
To: Regs, Rfs
Subject: Reject new Bush administration immigration regulations


Director Department of Homeland Security

Dear Director Homeland Security,

I join with other citizens and business, labor,immigration and
privacy groups in saying "no" to the proposed regulations
concerning the Social Security Administration (SSA) "no-match"
letters.

These new regulations will result in a harmful impact on all
workers regardless of immigration status. Using such a
notoriously inaccurate and out-of-date system like the SSA
database means workers could face termination by panicked
employers before they can prove they are mistakenly on the list.
This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased
pressure to go "off the books," promoting an underground economy
and defeating a primary goal of immigration reform. "Good"
employers who follow the rules would be targeted and punished
while "bad" employers who pay in cash and do not keep records
will not be reached by the new regulations. Bad employers could
also use the letters to intimidate, threaten or discriminate
against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

These proposed regulations hurt everyone--all workers regardless
of immigration status, our state and local governments, our
federal government and our economy. I urge you not to enact
these new regulations and allow Congress to reach a
comprehensive immigration reform solution, including the
historic bipartisan AgJobs proposal negotiated by the United
Farm Workers and growers that is within the bill passed by the
U.S. Senate.


Sincerely,

probyn gregory
1766 las palmas
LA, California 90028


                              Page 1


No-Match Cert. Admin. Record  2238

**Khazaeli, Javad M**

**To:**      dhsregs.erulemaking@imc9.ems.imco.com
**Subject:** Public cooments to ICEB 2006-0004

please post the comments listed below to regulations.gov for ICEB 2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Tarragon, Stephen R
**Sent:** Tuesday, July 11, 2006 10:47 AM
**To:** Kochhar, Sangeeta
**Subject:** FW: DHS Docket No. ICEB 2006-0004

please send to regulations. gov
-----Original Message-----
**From:** Kochhar, Sangeeta **On Behalf Of** REGS, RFS
**Sent:** Monday, July 10, 2006 9:10 AM
**To:** Tarragon, Stephen R
**Subject:** FW: DHS Docket No. ICEB 2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Carl Irma Hayes [mailto:carlirma2002@yahoo.com]
**Sent:** Saturday, July 08, 2006 9:18 PM
**To:** rfs.regs@dhs.gov
**Subject:** Re: DHS Docket No. ICEB 2006-0004

I would like to comment on DHS Docket No. ICEB 2006-0004.

First let me say that I am a 54 years old male. I am a retired Social Worker after having worked in deep south Texas ( 5 miles from the Mexico/Texas border) for 30 years. I worked with a population that was made up of about 95% Hispanic and my work peers were about 99% Hispanic. My wife is Hispanic and

9/27/2007

**No-Match Cert. Admin. Record  2239**

we have been married 17 years. I frequently go to Mexico for pleasure. I have a good understanding of the Mexican people and thier needs as they come from Mexico to pursue a better life in the U.S.

Now as to my comment: many of the people I worked with and for were hard working people. They always wanted to do follow the law.  I believe I speak for many people who would say that the IRS should send " no match" letters to the Department of Homeland Security when there is a "no match" at IRS. If someone is breaking the law, let's try to identify them and proceed as the law dictates. It only seems logical to have a process in place that could potentially determine whether someone is are an illegal alien. It seems to me after having been in upper administration in a Texas Department state agency and helping to set local policy for 14 years, rules and guidelines could be put in place to ensure peoples rights are not violated when IRS sends a " no match" letter to Homeland Security.
The only reason I coould see where one would not want to send a " no match" letter to Homeland Security would be if we are not really serious about identifing undocumented aliens and jone would just like to talk about security but doesn't really want to take action.

Thanks you

---

Talk is cheap. Use Yahoo! Messenger to make PC-to-Phone calls. Great rates starting at 1¢/min.

No-Match Cert. Admin. Record  2240

9/27/2007

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | REGS, RFS |
| **To:** | dhsregs.erulemaking@imc9.ems.lmco.com |
| **Subject:** | Public comments to ICEB 2006-0004 |

Please post the comments below to regulations.gov for ICEB 2006-0004

Sangeeta Kochhar
Labat Anderson. Incorporated
Application Specialist
Regulatory Management Division
Office of Executive Secretariat / USCIS Tel 202-272-8353 sangeeta.kochhar@dhs.gov

-----Original Message-----
From: rsichta@terremark.com [mailto:rsichta@terremark.com]
Sent: Friday, July 28, 2006 11:51 AM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket ICEB-2006-0004]

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

Please grow up. Your approach to ferreting out illegal aliens is clearly harmful to anyone with a conscience. Shame on you for being part of such a despicable process.

Your actions neither make the world safer nor do they enhance anyone's freedom, nor do the attack the root cause of the problem the purport to address. They do, however, proffer an atmosphere in which neighbors spy on neighbors. A people who claim to be world leaders on the subject of democracy can do better. Criminalizing good citizens is neither just nor democratic.

Again, shame on you. And double shame if you claim to live by religious principles.

Sincerely,

Bob Sichta
8901 SW 212 Terrace
Miami, Florida 33189

**No-Match Cert. Admin. Record  2241**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | REGS, RFS |
| **To:** | dhsregs.erulemaking@imc9.ems.lmco.com |
| **Subject:** | Public comments to ICEB 2006-0004 |

Please post the comments listed below to regulations.gov for ICEB 2006-0004

Sangeeta Kochhar
Labat Anderson. Incorporated
Application Specialist
Regulatory Management Division
Office of Executive Secretariat / USCIS Tel 202-272-8353 sangeeta.kochhar@dhs.gov


-----Original Message-----
From: npowers@flacathconf.org [mailto:npowers@flacathconf.org]
Sent: Monday, July 24, 2006 6:50 PM
To: Regs, Rfs
Subject: [Docket ICEB-2006-0004] Oppose proposed regulations



Director, Department of Homeland Security


Dear Director, Department of Homeland Security,

Please oppose the proposed regulations on Social Security
Administration "no-match" letters. The Social Security
Administration database is known to be chock full of errors and
thus no-match letters are a poor way to weed out workers who
lack legal authorization to work.

We need to increase the legal options by which employers can be
matched with workers. Penalizing employers for hiring
undocumented workers, without first reforming the immigration
system to permit sufficient visas to meet labor demands, is just
a recipe for more illegal behavior pushed further underground.

Please reject the proposed resolutions.



Sincerely,

Nancy Powers
201 W. Park Ave.
Tallahassee, Florida 32312

No-Match Cert. Admin. Record  2242

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | REGS, RFS |
| **To:** | dhsregs.erulemaking#imc9.ems.lmco.com |
| **Subject:** | Public comments to ICEB 2006-0004 |

Please post the comment below to regulations.gov for ICEB 2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Karen Schatz [mailto:mysonsmom86@hotmail.com]
**Sent:** Sunday, July 02, 2006 10:01 PM
**To:** rfs.regs@dhs.gov
**Subject:** ICEB-2006-0004 - Yes

I favor implementing ICEB-2006-0004. This will help eliminate the job magnet that causes millions of people to cross our border to work here. I know that illegals work in many other industries besides agriculture, such as construction and fast food, which deprives our own citizens of job opportunities. Besides, each illegal that works here costs taxpayers a tremendous amount of money in other expenses such as medical, housing, food stamps, schooling for their children, etc. It is not fair that we taxpayers have to subsidize cheap labor for employers.

Thank you.

**No-Match Cert. Admin. Record  2243**

# Khazaeli, Javad M

**To:** 'dhsregs.erulemaking@imc9.ems.lmco.com'
**Subject:** public Comments to ICEB 2006-0004

please post comment listed below to ICEB 2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Tarragon, Stephen R
**Sent:** Tuesday, July 18, 2006 9:35 AM
**To:** Kochhar, Sangeeta
**Subject:** FW: Comments on DHS proposed rule concerning SSA mismatch.

to regulations.gov
-----Original Message-----
**From:** Kochhar, Sangeeta **On Behalf Of** REGS, RFS
**Sent:** Tuesday, July 18, 2006 9:31 AM
**To:** Tarragon, Stephen R
**Subject:** FW: Comments on DHS proposed rule concerning SSA mismatch.

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Alan Kraemer [mailto:Alan.Kraemer@kraemersnursery.com]
**Sent:** Thursday, July 13, 2006 4:58 PM
**To:** Regs, Rfs
**Subject:** Comments on DHS proposed rule concerning SSA mismatch.

Department of Homeland Security

Docket Number   ICEB-2006-2004

This rule provides no alternative workforce to replace those who are found to be unauthorized to work. A solution would be to authorize those who want to work by requiring them to stay within the Agricultural Industry for their

9/27/2007

**No-Match Cert. Admin. Record  2244**

stay in the US. We need a "workable solution" to the problem. If this is not implemented carefully it would likely deplete enough of the labor force to severly damage many businesses.

Alan J. Kraemer

President
Kraemer's Nursery, INC.
This email is intended solely for the use of the individual to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us at administrator@kraemersnursery.com thank you.

**No-Match Cert. Admin. Record  2245**

**Khazaeli, Javad M**

**To:**        dhsregs.erulemaking@imc9.ems.lmco.com
**Subject:** public comments to ICEB-2006-0004

Please post the comments listed below to regulations.gov for ICEB 2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Tarragon, Stephen R
**Sent:** Thursday, July 20, 2006 10:00 AM
**To:** Kochhar, Sangeeta
**Subject:** FW: DHS Docket No. ICEB-2006-0004 public comment

Pease send to regulations.gov

**From:** Kochhar, Sangeeta **On Behalf Of** REGS, RFS
**Sent:** Thursday, July 20, 2006 9:22 AM
**To:** Tarragon, Stephen R
**Subject:** FW: DHS Docket No. ICEB-2006-0004 public comment

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Blackman, Kristy (REA-CH) [mailto:Kristy.Blackman@reacontract.com]
**Sent:** Wednesday, July 19, 2006 4:08 PM
**To:** Regs, Rfs
**Subject:** DHS Docket No. ICEB-2006-0004 public comment

Proposed Rule states that DHS would consider that a reasonable employer would have acted promptly if they took steps within 14 days of receipt of the no-match letter.

I submit to you that this is not a reasonable time and that you should clarify the term "took steps"  .

**No-Match Cert. Admin. Record  2246**

1. The social security numbers that are included in the letter are not attached to our employees names

2. the SS numbers are in no order

3. the numbers must be scanned or manually entered in the spreadsheet then matched with the company data base in order to determine which employees used the particular number.

4. the payroll clerk or other administrative person must then verify the information was keyed properly. This involves manually reviewing each employees w-4 against the system

This administrative person has a regular job and keeping up with her regular duties while completing steps 1 thru 4 time consuming.

Then letters must be prepared and distributed to employees who work in multiple states.

In some companies an interpreter must communicate or translate this information.

It is not just a matter of having an employee who has nothing else to do to whip something out in two weeks.

*Kristy L. Blackman*
*HR manager, private employer*

**No-Match Cert. Admin. Record 2247**

## Khazaeli, Javad M

**From:**     REGS, RFS
**To:**        dhsregs.erulemaking@imc9.ems.lmco.com
**Subject:** Public comments to ICEB-2006-0004

Please post the comments listed below to regulations.gov for ICEB 2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Charles Baesler [mailto:Charles.Baesler@skofirm.com]
**Sent:** Tuesday, July 25, 2006 10:48 AM
**To:** Regs, Rfs
**Subject:** ICEB-2006-0004

To Whom It May Concern:

I write to address the proposed safe harbor procedures for employers who receive No Match letters. In particular, I write to address what I perceive to be two related deficiencies: (1) the proposed rule does not address the circumstance where an employer who has filled completed I-9's and responded appropriately to SSA no match letters in the past receives recurring letters regarding the same employees, where such employees produce new or different documents each year which appear facially valid; and (2) the proposed reverification process does not provide guidance to employers who receive SSA no match letters on an employee who complied with I-9 requirements at his or her initial hiring by producing a document that does not contain the information that is the subject of the no match letters.

## Background

I represent employers who have hired large numbers of workers whose names ultimately appear on Social Security no match letters. As evidenced by ICE's recent enforcement efforts, there are employers who knowingly hire large numbers of workers who are undocumented, and such employers are either indifferent to I-9 requirements altogether, or they ignore SSA no match letters such that an inference arises that they know the workers are undocumented.

While there are such egregious employers in the US, there are also thousands of employers in the United States who comply in all respects with I-9 rules but due to the nature of their particular industry, the prohibition which has existed until recently against using the Social Security 800 number as a screening tool, and the rampantly availability of fraudulent documents to workers who want them, these law-abiding employers unwittingly hire large numbers of undocumented workers. Further, given anti-discrimination rules which prohibit employers from preferring certain types of documents over others, it is a simple reality that many employers in the United States find themselves in situations where the

**No-Match Cert. Admin. Record  2248**

majority of their workers produce fraudulent Resident Alien Cards to prove identity and work authorization at the I-9 stage.

 Until ICE's recent enforcement initiative, employers were advised repeatedly by Social Security and the Office of Special Counsel that it is unlawful to assume that a person who appears on a SSA mismatch letter is undocumented.  Instead, the employer has been required to give the employee an opportunity to resolve the problem and if he or she was able to do so and produce a new card, then it is appropriate (and perhaps even required, under the view of Office of Special Counsel) to continue to employee the individual.

Employers are vexed by the re-appearance of the named individuals in subsequent years' SSA no match letters.  ICE press releases have pointed to employers whose workers appeared on such lists year after year but take no action, and in the view of ICE, such employers "have to know" that the workers are undocumented.  For the employer who ignores the issue, ICE's conclusion is correct.  However, many employers who have large numbers of employees who appear on the no match list and have tried to comply with the law now find themselves in a terrible situation:  they have retained employees on their payroll who were previously the subject of a SSA mismatch letter, and now they reappear.  An employer who fails to terminate the employee runs the risk of having constructive knowledge of the workers' undocumented status.  Yet in past years, these same employers were advised that they could not, lawfully, simply terminate employees whose names appeared on the SSA mismatch list, and so they have kept the employees on the payroll.  I now hear repeatedly from employers that they must choose between shutting down their business or run the risk of fines or jail time, when they have, to this point, complied with the law.  Indeed, their compliance with the law as it was interpreted by SSA in the past - - do not assume that a worker who appears on the list is undocumented; to do so risks a finding of unlawful discrimination; instead, accept his or her new social security number - - has placed their business in peril.

**The proposed safe harbor does not address the issue of recurring no match letters for persons who use certain List A documents for I-9 purposes**

Under the proposed regulation, an employer who attempts without success to verify an employee's valid Social Security number has the option of reverifying the employee's employment eligibility.  Under the proposed rule, "[N]o document containing the social security account number . . . that is the subject of a written notice . . . may be used to establish employment authorization or identity or both; and no document without a photograph may be used to establish identity or both identity and employment authorization."

What, then, of the employee who produces a Resident Alien Card at the initial I-9 stage, and is the subject of recurring SSA no match notices?  What if the employee claims that his number is correct and that it is a Social Security error?  At each reverification stage, may the employee re-produce his same Resident Alien Card which establishes both identity and work authorization?  Is there any legal basis for the employer to refuse to accept the Resident Alien Card?  Anti-discrimination and document abuse rules indicate that the employer must continue to accept that card.  The safe harbor rules would appear to allow such an employer to continue employing indefinitely an employee whose name continually shows up on the list, simply by going through the exercise year after year of recording information on the same Resident Alien Card.

The safe harbor rules need to address how an employer deals with employees who appear on the list repeatedly.

Thank you for considering this comment.

**No-Match Cert. Admin. Record  2249**

Charles R Baesler, Jr
Stoll Keenon Ogden PLLC
300 West Vine Street
Suite 2100
Lexington KY 40507
phone: (859) 231-3944
fax:     (859) 246-3644
**www.skofirm.com**

PLEASE NOTE:  Every person who is not a US citizen (unless in A or G status) must report address
changes to the USCIS within 10 days or less using Form AR-11 found at the following link:
http://uscis.gov/graphics/formsfee/forms/ar-11.htm

**No-Match Cert. Admin. Record  2250**

**Khazaeli, Javad M**

**To:**      dhsregs.erulemaking@imc9.ems.lmco.com
**Subject:** Public comments to ICEB-2006-0004

Please post the comment below to regulations.gov for ICEB 2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Graham, Brian [mailto:BGraham@winstead.com]
**Sent:** Monday, July 10, 2006 6:53 PM
**To:** rfs.regs@dhs.gov
**Subject:** Comments to Proposed Rule DHS Docket No. ICEB-2006-0004

Dear Director, Regulatory Management Division:

Thank you for providing the public with the opportunity to submit comments in response to your proposed rule "Safe Harbor Provisions for Employers Who Receive a No-Match Letter", as published in Volume 71, No. 114 of the Federal Register (Wednesday, June 14th, 2006).

My comments may be from a slightly unique perspective, in that I was formerly an Assistant District Counsel for the INS in Houston, Texas and am now in private practice representing employers ranging from mom-and-pop operations to Fortune 100 companies. As Assistant District Counsel, I participated in numerous worksite compliance efforts and know first-hand about the laxity allowed by the current system. I remember one case where my INS investigators raided a local car wash and found copies of the documents submitted with the I-9s. Among them was a fake Resident Alien Card where the worker had literally taken a strip of paper, written his own name in block letters, and glued it right over the name imprinted on the card. He did the same for his date of birth. The employer accepted it. It was a shocking lesson in how weak the worksite compliance rules are.

The profusion of Social Security no-match letters in the past few years likewise indicates a fundamental weakness in the rules for I-9 compliance enforcement. Part of the problem, in my view, is that your predecessor agency chose to ignore most of the serious work authorization issues raised by the no-match letters as if the problem would somehow go away on its own. Of course it won't go away without a clearly-drawn line showing when employers must go further in examining immigration documents, and reasonable time limits for doing so. I am pleased to see your agency work towards this goal.

I am skeptical of whether the 14 day period is enough, particularly in the case of larger employers where the chain of command, which is not so different from your own, can lead to delay in documents getting into the right hands. By the time a mismatch letter makes it to the correct individual who can take action, 14 days may well have already passed. Also if the mismatch letter is received during a holiday

**No-Match Cert. Admin. Record  2251**

period the 14-day period is effectively much shorter because in many cases both the employer's human resources personnel and the SSA hotline employees may be unavailable. Therefore, I respectfully urge you to consider altering this time period to 15 business days rather than 14 days. If this seems too long a period, consider that employers who act with reckless disregard let months go by without taking action. A safe harbor provision that reached to 15 business days would, in my view, convey goodwill towards employers who want to do the right thing, but whose internal systems may not be able to accommodate a 14-day turnaround for all of the steps you outline in the proposed rule. It would also eliminate from the dockets cases in which the brightline safe harbor did not apply but employer did the best it could under the circumstances to comply. Again, the reckless violators tend to do nothing at all so whether the period is 14 days or 15 business days, they would still be subject to criminal prosecution. This change would simply accommodate business realities better without creating a loophole.

Secondly, there is a typo in the definition at 8 CFR 274a.1(L)(1)(iii)(A), which states simply "Labor Certification or an Application for Prospective Employer." I think what you are trying to convey is that if the employer is asked to fill out a labor certification for one of its employees, that is in and of itself information indicating that the alien may not be authorized to work. I disagree that this belongs in the same category as the mismatch letters or your agency's notices. Many employers pursue labor certification for persons who are currently authorized to work, but who do not have permanent employment authorization. There is no specific document I am aware of entitled "Labor Certification" or "Application for Prospective Employer", so more precise terminology would be very helpful. In any event, this situation is far too common in reasonable cases to be included on this list. If the employer signs a labor certification for an employee who claims to already be a lawful permanent resident, that is a good example of information conveying there's a problem. However, based on my experience only, that is almost never the case--most labor certifications are filed by employers on behalf of their nonimmigrant employees, or else on behalf of prospective employees.

My third constructive comment is that the safe harbor provision becomes too complex and unwieldly at subsection (2)(i)(A)(2) (describing what the employee should take with them to the Social Security Administration). This provision can be easily construed so that employers feel they need to be responsible for figuring out exactly which documents the employee needs to take to remedy the mismatch. Although this is a safe harbor provision rather than a requirement per se, the typical employer will regard it as a requirement because they want to do the right thing. This is too great a burden to add to employers' plates and seems unnecessary. Another issue is that this provision could cause the employer to get involved in personal details surrounding the employee's name change that are not the employer's business and might violate privacy laws. This provision does not seem necessary. I have been told on several occasions by Social Security Administration officials that they can very easily resolve most mismatch issues in a few minutes. Thus, the employer should only need to tell the employee to take care of it and then follow up with the employee within a set period of time (60 days is reasonable) to see what the result is. The SSA can easily tell the employee which specific documents they need to resolve a mismatch. By simplifying this component of the proposed rule it would relieve the burden for employers, eliminate potential privacy issues, and also make the safe harbor provision easier to follow and administer.

I close by commending your agency for taking the initiative here. We have to confront the reality before us and cannot continue to pretend it doesn't exist. Clarity of the law is in everyone's best interest. Therefore, with just a small amount of tweaking, I am hopeful this regulation will be an aid to employers who wish to do the right thing, and to your agency in doing its job fairly and in good faith.

Respectfully submitted,

**No-Match Cert. Admin. Record  2252**

**F. Brian Graham**
Board Certified, Immigration & Nationality Law,
Texas Board of Legal Specialization

# WINSTEAD

401 Congress Avenue
Suite 2100
Austin, Texas 78701
Direct: (512) 370-2814
Fax: (512) 370-2850
www.winstead.com
bgraham@winstead.com

IRS Circular 230 Required Notice--IRS regulations require that we inform you as follows: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended to be used and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter[s].

Information contained in this transmission is attorney privileged and confidential. It is intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone.

**Khazaeli, Javad M**

**To:** 'dhsregs.erulemaking@imc9.ems.lmco.com'
**Subject:** public Comments on ICEB-2006-0004

please post the comment listed below to regulations.gov for ICEB 2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Tarragon, Stephen R
**Sent:** Tuesday, July 18, 2006 9:34 AM
**To:** Kochhar, Sangeeta
**Subject:** FW: Comments on DHS Docket No. ICEB-2006-0004

please forward to regulations.gov
-----Original Message-----
**From:** Kochhar, Sangeeta **On Behalf Of** REGS, RFS
**Sent:** Tuesday, July 18, 2006 9:31 AM
**To:** Tarragon, Stephen R
**Subject:** FW: Comments on DHS Docket No. ICEB-2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Lisa Parmelee [mailto:lparmelee@cltf.com]
**Sent:** Thursday, July 13, 2006 11:00 AM
**To:** rfs.regs@dhs.gov
**Subject:** Comments on DHS Docket No. ICEB-2006-0004

Currently, we are not required to submit I-9 forms, only to have them on file. How is it then that there would be the opportunity for a no match letter to be sent, given that this information is not submitted? Is this arising due to the proposed online submission/storage?

Lisa Parmelee
Executive Assistant

**No-Match Cert. Admin. Record  2254**

Construction Laborers Trust Funds for Southern California
Collection Office
4401 Santa Anita Avenue
Suite 201
El Monte, CA 91731
(626) 258-9044 x101
(626) 258-9094 (fax)
www.cltf.com

**No-Match Cert. Admin. Record  2255**

## Khazaeli, Javad M

**To:**      'dhsregs.erulemaking@imc9.ems.lmco.com'
**Subject:** Public comments on ICEB-2006-0004

please post the comments listed below to regulations.gov for ICEB 2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Tarragon, Stephen R
**Sent:** Tuesday, July 18, 2006 10:42 AM
**To:** Kochhar, Sangeeta
**Subject:** FW: [Docket No: ICEB-2006-0004] Immigration: Aliens-- Unauthorized and unlawful hiring or continued employment; safe-harbor procedures for employees who receive a no-match letter

to regulations.gov
-----Original Message-----
**From:** Kochhar, Sangeeta **On Behalf Of** REGS, RFS
**Sent:** Tuesday, July 18, 2006 10:40 AM
**To:** Tarragon, Stephen R
**Subject:** FW: [Docket No: ICEB-2006-0004] Immigration: Aliens-- Unauthorized and unlawful hiring or continued employment; safe-harbor procedures for employees who receive a no-match letter

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Peter & Rebecca [mailto:cmelody2@verizon.net]
**Sent:** Monday, July 03, 2006 2:34 PM
**To:** Regs, Rfs
**Subject:** [Docket No: ICEB-2006-0004] Immigration: Aliens-- Unauthorized and unlawful hiring or continued employment; safe-harbor procedures for employees who receive a no-match letter

I am in support of this proposal. As long as employers are not held accountable for hiring people who are not authorized to work in this country, people from other countries will continue to come here illegally and wages will continue to be depressed and citizens will have a more

**No-Match Cert. Admin. Record  2256**

difficult time finding work. Drying up jobs and benefits such as welfare and educational benefits are the best solutions for reducing illegal entry into the U.S.
Rebecca Hicks

No-Match Cert. Admin. Record  2257

**Khazaeli, Javad M**

**To:**        dhsregs.erulemaking@imc9.ems.lmco.com
**Subject:** public comment to ICEB 2006-0004

Please post the below listed comment to regulations.gov for ICEB2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*


-----Original Message-----
**From:** Arlene Frelk [mailto:arlenef@discover-net.net]
**Sent:** Monday, July 10, 2006 1:28 PM
**To:** Regs, Rfs
**Subject:** FW: DHS Docket No.ICEB-2006-0004


-----Original Message-----
**From:** Arlene Frelk [mailto:arlenef@discover-net.net]
**Sent:** Saturday, July 08, 2006 12:09 PM
**To:** 'rsf.regs@dhs.gov'
**Subject:** DHS Docket No.ICEB-2006-0004


Re:  Proposed Rule SSA Mismatch

We are concerned about the inappropriate timing of this proposed rule.  It is a beauracratic effort to accomplish nothing.

All the money, heartache, and turmoil that this would cause is such a waste.  Spend your time and money getting I D cards for all qualified undocumented  people and send the rest back home.

 A good guestworker program will solve all the other immigration problems.

Sincerely

Arlene Frelk
N 11011 US Hwy 12
Merrillan, Wi 54754
715 333 2661

**No-Match Cert. Admin. Record  2258**

**Khazaeli, Javad M**

To:                     dhsregs.erulemaking@imc9.ems.lmco.com
Subject:                public comment to ICEB-2006-0004


please post he following comment to regulations.gov for ICEB 2006-0004

Sangeeta Kochhar
Labat Anderson. Incorporated
Application Specialist
Regulatory Management Division
Office of Executive Secretariat / USCIS Tel 202-272-8353 sangeeta.kochhar@dhs.gov


-----Original Message-----
From: Rob Calabro [mailto:rob.calabro@us.Randstad.com]
Sent: Sunday, July 09, 2006 8:18 AM
To: Regs, Rfs
Subject: Docket No ICEB-2006-0004


As an employee of a staffing industry, temporary labor company, I just wanted to send
comments with respect to the high turnover ratios we experience and how it can impact the
fulfillment of these "safe harbor" procedures.

The attempting to resolve the no-match and/or attempting to re-verify the information with
the employee is often impossible since the employee in question is no longer employed by
our company and the last known address/phone number is not valid for receiving
communication.

Similar to the new procedures that exist with the IRS and its effort to prevent employees
from claiming an invalid exemption from the withholding of federal income taxes, I would
recommend an additional "safe harbor" procedure for a company to be able to submit
information back to DHS that the employee has been terminated and no further follow up
action can be accomplished.  This procedure would be less time-consuming for the employer,
would allow the employer to not be concluded to have "constructive knowledge" and would
provide DHS with more timely information on the employee.

This e-mail message is for the sole use of the intended recipient(s) and may contain
confidential and privileged information. Any unauthorized review, use, disclosure or
distribution is prohibited. If you are not the intended recipient, please contact the
sender by reply e-mail and destroy all copies of the original message.

Robert J. Calabro, CPA
Director of Taxes
Randstad USA
631-694-7528 (tel)
631-694-7469 (fax)
rob.calabro@us.randstad.com

Know, Serve and Trust


1

**No-Match Cert. Admin. Record  2259**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | REGS, RFS |
| **To:** | dhsregs.erulemaking@imc9.ems.lmco.com |
| **Subject:** | Public comment to ICEB 2006-0004 |

Please post the below comment to regulations.gov for ICEB 2006-0004

*Sangeeta Kochhar*
*Labat Anderson. Incorporated*
*Application Specialist*
*Regulatory Management Division*
*Office of Executive Secretariat / USCIS*
*Tel 202-272-8353*
*sangeeta.kochhar@dhs.gov*

-----Original Message-----
**From:** Tarragon, Stephen R
**Sent:** Monday, July 03, 2006 7:57 AM
**To:** REGS, RFS
**Subject:** RE: [Docket No: ICEB-2006-0004];[FR Doc: E6-09303];[Page 34281-34285]; Immigration: Aliens--
Unauthorized and unlawful hiring or continued employment; safe-harbor procedures for employees who receive a
no-match letter

forward to regulations.gov

    -----Original Message-----
    **From:** Kochhar, Sangeeta **On Behalf Of** REGS, RFS
    **Sent:** Friday, June 30, 2006 9:14 AM
    **To:** Tarragon, Stephen R
    **Subject:** FW: [Docket No: ICEB-2006-0004];[FR Doc: E6-09303];[Page 34281-34285]; Immigration:
    Aliens-- Unauthorized and unlawful hiring or continued employment; safe-harbor procedures for employees
    who receive a no-match letter

    *Sangeeta Kochhar*
    *Labat Anderson. Incorporated*
    *Application Specialist*
    *Regulatory Management Division*
    *Office of Executive Secretariat / USCIS*
    *Tel 202-272-8353*
    *sangeeta.kochhar@dhs.gov*

    -----Original Message-----
    **From:** Claudia Loomis [mailto:claudial@mbol.us]
    **Sent:** Thursday, June 29, 2006 4:54 PM
    **To:** Regs, Rfs
    **Subject:** [Docket No: ICEB-2006-0004];[FR Doc: E6-09303];[Page 34281-34285]; Immigration: Aliens--

**No-Match Cert. Admin. Record  2260**

Unauthorized and unlawful hiring or continued employment; safe-harbor procedures for employees who receive a no-match letter

This is a good start for a broken immigration system.  If there are big penalties for employers who hire illegals, they will stop hiring illegals.  If they go "off the books" or if the illegal goes underground, their situation (life) will not be as pleasant and they will eventually go home.  The safe harbor rule is good and gives the employer a chance to do what is right, without penalty.

The IRS should also get involved by denying the law-breaking employer his income tax deduction for any illegal employee's wages.  After all, that employer also has to submit a W-2 or a W-9 and then a 1099 form.  The IRS should be able to catch the "no-match" illegal using these documents and then also turn the information over to Homeland Security and to Immigration Dept..

Thank you, Pres. Bush, for doing what our senate would not do.

Claudia C. Loomis

**No-Match Cert. Admin. Record  2261**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | REGS, RFS |
| **To:** | dhsregs.erulemaking@imc9.ems.lmco.com |
| **Subject:** | Public comments to ICEB 2006-0004 |

Please post the comments below to regulations.gov for ICEB 2006-0004

Sangeeta Kochhar
Labat Anderson. Incorporated
Application Specialist
Regulatory Management Division
Office of Executive Secretariat / USCIS
Tel 202-272-8353
sangeeta.kochhar@dhs.gov


-----Original Message-----
From: maile@austinenglish.org [mailto:maile@austinenglish.org]
Sent: Friday, July 28, 2006 11:17 AM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket ICEB-2006-0004]



Director, Department of Homeland Security


Dear Director, Department of Homeland Security,

I am writing to you to express my opposition to the Social Security Administration's workplace enforcement proposal, and to share my suggestions for a more appropriate plan.

If the SSA database had a better track record, I would be more willing to consider its use in the workplace. However, given its inaccurate performance in pilot locations, we cannot be confident that it will root out those employees using fraudulent documents. How many legal, loyal employees would have to be fired before improvements are made to the database?

Furthermore, I fear that the system would end up rewarding unscrupulous employers "flying under the radar," and disproportionately punish good employers who do claim all of their employees.

I would support discussion of a no-match enforcement proposal

9/27/2007

**No-Match Cert. Admin. Record  2262**

under two conditions. First of all, changes need to be made to improve accuracy. Second, introduction of the enforcement process should be part of the comprehensive immigration reform timeline. Employers and workers will have to adjust to many changes if the House and Senate manage to reconcile their guest worker bills; no-match letter enforcement carries its own set of challenges that policymakers need to anticipate and provide for before putting them into action.

Please don't support an enforcement plan that is not yet ready for national implementation. The country is starting to make headway in what can be a divisive and far-reaching struggle. Please put worksite enforcement in its appropriate place within the context of comprehensive immigration reform.

Sincerely,

Maile Broccoli-Hickey
1503 Sunset Lane
Austin, Texas 78704

**No-Match Cert. Admin. Record  2263**

**Khazaeli, Javad M**

**From:** REGS, RFS
**To:** dhsregs.erulemaking@imc9.ems.lmco.com
**Subject:** Public comments to ICEB 2006-0004

Please post the comments below to regulations.gov for ICEB 2006-0004

Sangeeta Kochhar
Labat Anderson. Incorporated
Application Specialist
Regulatory Management Division
Office of Executive Secretariat / USCIS
Tel 202-272-8353
sangeeta.kochhar@dhs.gov

-----Original Message-----
From: dloeb@igc.org [mailto:dloeb@igc.org]
Sent: Wednesday, August 02, 2006 12:58 AM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I would like to add my voice to thoses of other citizens and
business, labor, immigration and privacy groups who are very
concerned about the Social Security Administration's (SSA)
proposed regulations regarding "no-match" letters as a way to
detect so-called "illegal" immigrants.

These new regulations may well cause harm to ALL workers
regardless of immigration status. Using such an inaccurate and
outdated system like the SSA database means that workers could
face termination by employers who feel that firing a legal
worker on mistaken evidence would be better than taking the risk
of the penalties for having a no-match employee. Of course,
proving that an employee is in fact legal could prove extremely
time consuming, something an employer isnt likely to take on.
The result could be thousands of unlawful firings.

With these new regulations, some employers may actually decide

**No-Match Cert. Admin. Record  2264**

to go "off the books," promoting the creation of an underground
economy and defeating a primary goal of immigration reform.
"Good" employers who follow the rules would be targeted and
punished while "bad" employers who don't keep records and avoid
taxes will not be reached by the new regulations. "Bad
employers" could also use the letters to intimidate, threaten,
or discriminate against workers.

The government's purpose when it issues SSA no-match letters has
never been to police the immigration status of workers. Instead
of being used to credit retirement earnings for workers, these
proposed regulations inappropriately transform harmless no-match
letters into tools of immigration law enforcement.

Most importantly, any worksite immigration enforcement proposal
should be untaken in the context of a comprehensive immigration
reform. The House and the Senate have both passed bills that
contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time is unnecessary and would
complicate the transition to the new system.

As the director of a small business, I have enough government
directives and regulations to follow. For the sake of my
business and our workers, and thousands of other in our shoes, I
urge you not to enact these new regulations and allow Congress
to reach a comprehensive immigration reform solution.


Sincerely,

David Loeb
1328 6th ST
BERKELEY, California 94710

**No-Match Cert. Admin. Record  2265**

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | REGS, RFS |
| **To:** | dhsregs.erulemaking@imc9.ems.lmco.com |
| **Subject:** | Public comments to ICEB 2006-0004 |

Please post the comments below to regulations.gov for ICEB 2006-0004

Sangeeta Kochhar
Labat Anderson. Incorporated
Application Specialist
Regulatory Management Division
Office of Executive Secretariat / USCIS
Tel 202-272-8353
sangeeta.kochhar@dhs.gov


-----Original Message-----
From: handknit@gmail.com [mailto:handknit@gmail.com]
Sent: Wednesday, August 02, 2006 10:58 AM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket
ICEB-2006-0004]



Director, Department of Homeland Security


Dear Director, Department of Homeland Security,

As a proud American citizen and voter I urge you to say no to
the proposed regulations concerning the Social Security
Administration's (SSA) "no-match" letters. Piecemeal solutions
like this are not the answer. Comprehensive reform that
addresses our economy's real needs is the solution.


Sincerely,

Rachel Dornhelm
987 Vermont St #3
Oakland, California 94610

**No-Match Cert. Admin. Record  2266**

## Khazaeli, Javad M

**From:** REGS, RFS
**To:** dhsregs.erulemaking@imc9.ems.lmco.com
**Subject:** Public comments to ICEB 2006-0004

Please post the comments below to regulations.gov for ICEB 2006-0004

Sangeeta Kochhar
Labat Anderson. Incorporated
Application Specialist
Regulatory Management Division
Office of Executive Secretariat / USCIS
Tel 202-272-8353
sangeeta.kochhar@dhs.gov

-----Original Message-----
From: jludwick@viclink.com [mailto:jludwick@viclink.com]
Sent: Friday, August 04, 2006 12:16 PM
To: Regs, Rfs
Subject: Reject Proposed Worksite Enforcement Regulations [Docket ICEB-2006-0004]

Director, Department of Homeland Security

Dear Director, Department of Homeland Security,

I urge you to stop the flow of illegal aliens into our country. Illegal aliens are competing for the jobs of American citizens and as a result wages and working conditions are being deminished.

Please require all businesses to screen out illegal aliens from being hired. The Social Security Administration (SSA) "no-match" letters are a good start.

These new regulations will result in a positive impact to ALL workers regardless of immigration status.

Sincerely,

Jim Ludwick

**No-Match Cert. Admin. Record  2267**

7500 SW Lebold Rd
McMinnville, Oregon 97128

No-Match Cert. Admin. Record  2268

**Khazaeli, Javad M**

| | |
|---|---|
| **From:** | cjbarragan@hotmail.com |
| **Sent:** | Monday, August 07, 2006 5:15 PM |
| **To:** | Regs, Rfs |
| **Subject:** | New Bush administration immigration regulations |

Director Department of Homeland Security

Dear Director Homeland Security,

I have concerns about the proposed regulations involving the
Social Security Administration's "no-match" letters.

The current I-9 regulations have only been halfheartedly
enforced to verify the legal ability of an individual to work in
the United States. Relying on a potentially inaccurate and
out-of-date system like the SSA database may not be the best way
to go.

Regulations should be examined that require all employers and
employees to adhere to: a consistent standard of documents to be
utilized; procedural due process; appropriate retention
parameters; and increased law enforcement where warranted.

I urge you to consider these concerns when examining new
regulations. Thank you.

Sincerely,

Charles Barragan
23 Liberty
San Francisco, California 94110

**No-Match Cert. Admin. Record  2269**

## Khazaeli, Javad M

| | |
|---|---|
| **From:** | REGS, RFS |
| **To:** | dhsregs.erulemaking@imc9.ems.lmco.com |
| **Subject:** | Public comments to ICEB 2006-0004 |

Please post the comments below to regulations.gov for ICEB 2006-0004

Sangeeta Kochhar
Labat Anderson. Incorporated
Application Specialist
Regulatory Management Division
Office of Executive Secretariat / USCIS
Tel 202-272-8353
sangeeta.kochhar@dhs.gov

-----Original Message-----
From: nancydahlberg@earthlink.net [mailto:nancydahlberg@earthlink.net]
Sent: Monday, August 07, 2006 5:01 PM
To: Regs, Rfs
Subject: Reject new Bush administration immigration regulations

Director Department of Homeland Security

Dear Director Homeland Security,

I say "no" to the proposed regulations concerning the Social
Security Administration (SSA) "no-match" letters.

The government's purpose when it issues SSA no-match letters is
not meant to police the immigration status of workers but are
meant to be used to credit retirement earnings for workers.
These proposed regulations inappropriately transform harmless
no-match letters into tools of immigration law enforcement.

Besides, using the notoriously inaccurate and out-of-date system
like the SSA database means workers could face termination by
panicked employers before they can prove they are mistakenly on
the list. This would lead to thousands of unlawful mass firings.

In addition, any worksite immigration enforcement proposal
should happen in the context of comprehensive immigration
reform. The House and the Senate have both passed bills that

**No-Match Cert. Admin. Record  2270**

contain worksite enforcement mechanisms. Implementing the
proposed regulations at this time would complicate the
transition to the new system.

I urge you not to enact these new regulations but to allow
Congress to reach a comprehensive immigration reform solution,
including the historic bipartisan AgJobs proposal negotiated by
the United Farm Workers and growers that is within the bill
passed by the U.S. Senate.


Sincerely,

Nancy Dahlberg
1757 NW 59th St., #301
Seattle, Washington 98107

**No-Match Cert. Admin. Record  2271**



**NATIONAL COUNCIL OF CHAIN RESTAURANTS**
of the ❯ National Retail Federation

June 22, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

RE:     **DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor
        Procedures for Employers Who Receive a No-Match Letter – Request for 120-Day
        Extension of Comment Period**

Dear Director:

The National Council of Chain Restaurants (the "Council") is a national trade industry group
representing the interests of approximately forty of the nation's largest multi-unit, multi-state
chain restaurant companies. Collectively, these companies own and operate in excess of
50,000 restaurant facilities. Additionally, through franchise and licensing agreements, another
70,000 facilities are operated under their trademarks. In the aggregate, the Council's member
companies and their franchisees employ in excess of 2.8 million individuals.

The Council respectfully requests that the 60-day public comment period currently established
in the above-referenced rulemaking proceeding, to expire August 14, 2006, be extended by an
additional 120 days. The reason for this request is to allow time for Congress to act on
comprehensive immigration reform. Both the House and Senate have already passed major
immigration legislation, and in the coming months a conference committee will work to resolve
differences between the two bills. While it is not known at this time what the specifics of a final
compromise legislative package might be, it is clear that there will almost certainly be significant
and comprehensive legislative reform of the immigration laws.

With such potentially significant changes to the immigration laws on the immediate horizon, the
Council respectfully suggests that the Department of Homeland Security should extend the
comment period on this rulemaking proceeding to allow the legislative process to be completed.
Employer obligations under the immigration laws will surely change as a result of Congressional
action, and this has a great potential to change employer obligations that may be triggered upon
receipt of a no-match letter from the Social Security Administration or the Department of
Homeland Security. This, in turn, would likely have significant impact on the establishment of
"safe-harbor" procedures that employers can follow in responding to receipt of such letters.

For these reasons, it appears premature to establish safe-harbor criteria that will likely have to
be changed very quickly based on changed employer obligations under comprehensive reform
of the immigration laws. The administrative burdens associated with such rapid changes, not to
mention the confusion that would be created, are sufficient justification to extend the comment

No-Match Cert. Admin. Record  2272

DHS Letter
June 22, 2006
Page Two

period on this rulemaking proceeding to allow time for the Congressional process to be completed.

The Council respectfully requests an early decision on whether the comment period will be extended, because in the absence of an announced early decision, substantive comments will have to be prepared and filed.

Thank you for your time and attention to this very important matter.

Respectfully submitted,

M. Scott Vinson
Vice President, Government Relations

cc:     Charles Wood
        Regulatory Counsel
        Office of the Principal Legal Advisor
        Bureau of Immigration and Customs Enforcement
        Department of Homeland Security
        425 Eye Street, NW
        Washington, DC 20536

August 9, 2006

**VIA HAND DELIVERY**

Director
Regulatory and Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave. NW
2nd Floor
Washington DC, 20529
rfs.regs@dhs.gov

      RE:   DHS Docket No. ICEB-2006-0004

Dear Director:

The United Brotherhood of Carpenters and Joiners of America ("UBC") respectfully submits these comments regarding the proposed regulations on the Safe-Harbor Procedures for Employers Who Receive a No-Match Letter published in 71 Fed. Reg. 34281-85 on June 14, 2006.  The UBC is a labor organization representing over 500,000 men and women in North America's construction industry.

I.    Introduction

Implementation of any mechanism to verify employment eligibility of workers in the United States is an issue of great concern to the UBC.  Any such system may have considerable, even if unintended, consequences on our members and millions of other American workers in the construction industry.  The construction industry offers opportunities for law-abiding immigrants who come to our nation in search of the American Dream.  It also offers opportunities for unscrupulous labor brokers seeking to profit by an illicit black market in the labor of desperate workers who enter America illegally and are systematically exploited.  The UBC believes that DHS' proposed Safe Harbor rules governing how employers should respond to "No Match" letters from the Social Security Administration ("SSA") hamper the ability of honest, law-abiding immigrants to pursue opportunity in our industry while at the same time

1

increasing demand in our industry for the services of
unscrupulous labor brokers.


II.   DHS and SSA Must Improve the Integrity of Their Data
      Before Mandating Greater Reliance by Employers on it


Studies of DHS' immigration records (both paper and
electronic) that form the backbone of the current
employment verification system have repeatedly raised
concerns about the reliability of the data. As recently as
June of this year, the Government Accountability Office
warned of serious defects in DHS' newest employment
verification program--the "Basic Pilot Program." These
defects included the continuing inability to detect
identify fraud and long delays in entering data, which
resulted in inaccuracies and inconsistencies.[1]


GAO's findings confirm previous studies casting doubt on
the reliability of the data around which the current
employer verification system is built. For example, Temple
University reported that the system maintained a 1.4% false
non-confirmation rate.[2] Such an error rate applied to only
two million employees could result in 28,000 otherwise
eligible workers being denied employment due to erroneous
data. There is no reason to believe that the SSA's
databases are any more reliable. The flaws in the
agencies' databases are compounded by the fact that there
is no efficient way to reconcile conflicting data between
DHS and SSA. The databases are not synchronized. The
proposed rule's mandate that employers rely on such data to
take actions, including firing workers, in order to avail
themselves of a "Safe Harbor" from DHS prosecution is not
wise or just.


Simply put, forcing employers to make rapid decisions in
reliance on the flawed DHS and SSA databases is likely to
result in the sudden loss of employment for many workers
who are actually authorized to work in the United States.

---

[1] Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement
Efforts, GAO-06895T (June 19, 2006).
[2] Findings of the Basic Pilot Evaluation, Institute for Survey Research (Temple University) (June 2002).
See also Report to Congress on the Basic Pilot Program, Department of Homeland Security/U.S.
Citizenship and Immigration Services, June 2004.

2

Such "false negatives" have a serious impact on workers and the families of workers deprived of their jobs. They also harm employers who may lose valued employees or find it harder to hire new workers they need in a competitive labor market. To avoid these potential harms to lawful workers and honest employers, the UBC opposes implementation of the proposed rules.

III.  <u>The Proposed Rule Encourages Identify Theft, Document Fraud, and "Blind" Reliance on Dishonest Labor Brokers</u>

Both the current approach to employer verification and this proposed rule rely upon systems and verification processes that have proven extremely vulnerable to identify theft and fraudulent documents.[3] The proposed rule lacks any mechanism to prevent the presentation of another counterfeit social security card or immigration document containing stolen identity information in response to a re-verification request. In the end, the re-verification will simply encourage people bent on evading the system to possess a greater number of fraudulent or stolen documents. It will drive even more business to the illicit trade in false and stolen identity information.

More importantly, the proposed regulations will give employers further incentives to insulate themselves from responsibility for verifying and now re-verifying workers by turning to labor brokers to provide a workforce. Rather than assume the additional obligations within the short time periods proposed by this regulation and the associated risks of criminal and civil sanctions, employers will have greater incentives under this rule to delegate verification responsibilities to middlemen. Employers will find it easier to use labor brokers and remain "willfully blind" as to the employment eligibility of a subcontracted workforce of exploited, illegal immigrants. It is well documented that the already pervasive use of such arrangements has over the last five to seven years exerted massive downward pressure on wages in the construction industry.[4] The

---

[3] U.S. House of Representatives Committee on Education and the Workforce, *Hearing: Lessons Learned from the Immigration Reform and Control Act of 1986* July 31, 2006 (Testimony of John Chakwin).
[4] Mike Hill, *Construction Pay is Dropping*, Herald Tribune.com, July 31, 2006 http://www.heraldtribune.com/apps/pbcs.dll/article?AID=/20060731/OPINION/607310414/1029. *See also,* Karina Gonzalez, *Moving North to Live in the South*, Chattanooga Times Free Press, August 7, 2006

3

government should not adopt policies that accelerate this trend. Moreover, the transient nature of such subcontracted workforces makes them harder for DHS or SSA to scrutinize. Encouraging greater use of such arrangements is therefore also contrary to more efficient and effective enforcement.

The UBC contends that any rule on employment verification must provide a process that discourages employers from utilizing unscrupulous labor brokers rather than encouraging reliance on them. This can be done by requiring employers to be responsible for verifying any independent contractors they employ, as well as workers provided by subcontractors or labor brokers. But not even this positive step should be taken until there are reliable databases employers can count on in carrying out such a responsibility.

IV.   CONCLUSION

The UBC supports a comprehensive review of the verification system and the many flaws and loopholes that exist in it. We agree with President Bush's statement in his Radio Address of August 5, 2006 that "more effective tools to verify the legal status of workers" are needed as a part of comprehensive immigration reform. We do not believe that the proposed DHS Safe Harbor Regulation is such a tool. Rather, it represents a one-dimensional, piece-meal attempt to address an isolated problem in the system. Such an approach is counterproductive. It simply increases reliance on other well-known loopholes in the system. President Bush has eloquently explained why any legislative changes to address flaws in the immigration system must be comprehensive in nature. The UBC believes that the same arguments apply to regulatory efforts to fix problems with the employment verification system.

The proposed regulation will increase demand for fraudulent documents, increase incidents of identify theft, and encourage employers to evade their verification responsibilities and the associated risks by increasing

---

http://www.tfponline.com/absolutenm/templates/content.aspx?articleid=2887&zoneid=83 (explaining how American construction workers are being replaced by exploited immigrants who "accept arduous work with poor safety condition and for less pay").

4

their reliance on unscrupulous labor brokers. All of these issues need to be addressed in a more comprehensive regulation. By issuing regulations that address one narrow, isolated issue within the verification system, DHS is not helping American workers, legal immigrants, illegal immigrants or honest employers.

Respectfully,

Monte Byers
Chief of Staff
United Brotherhood of Carpenters and
Joiners of America

5



# EWIC  Essential Worker Immigration Coalition

June 28, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N. W., 2nd Floor
Washington, DC 20529

RE:    **DHS Docket No. ICEB-2006-0004 – Rulemaking Proceedings on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter – Request for 120-Day Extension of Comment Period**

Dear Director:

This letter is in response to the above-referenced notice of proposed rulemaking published on June 14, 2006.  As the Essential Workers Immigration Coalition, we are writing to respectfully request that the 60-day public comment period for the proposed regulation referenced above be extended for an additional 120 days, for a total comment period of 180 days.  In order to thoughtfully and adequately respond to the proposed regulation, we ask that additional time be allotted to review and analyze the provisions and the real impact it will have on the business community at large; 60 days is simply an inadequate amount of time to comment responsibly.

Both Chambers of Congress have already passed drastically differing versions of immigration legislation and we now await conference. In addition to the proposed regulation, both the Senate and House bills propose significant changes relating to an employer's responsibilities when verifying its workforce. These forthcoming reform measures will set new standards under which employers must operate regarding the verification of an employee's work authorization eligibility and identity and will specifically address the case when an employer receives a no-match letter from the Social Security Administration or from the Department of Homeland Security.  While the specifics of a lasting comprehensive piece of legislation remain unclear, it seems apparent that broad and sweeping changes to the nation's immigration laws are imminent and necessary.  It is important to let this ongoing, fruitful debate run its course without competing and duplicative proposals.

Essential Worker Immigration Coalition
1615 H Street, NW
Washington, DC 20062
(202) 463-5931 • ewic@uschamber.com • www.ewic.org

**No-Match Cert. Admin. Record  2279**

Therefore, for the reasons stated above, an extension of the comment period for the rulemaking process is needed not only to avoid unnecessary confusion and hardship for employers, but also to intelligently comment on the proposal that would have such a wide-spread impact to all employers and employees.

The business community looks forward to a timely decision on this important matter in order to adequately prepare and file the appropriate comments.

Sincerely,

The Essential Workers Immigration Coalition

No-Match Cert. Admin. Record 2280

August 6, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue NW
2nd Floor
Washington D.C. 20529

Re: DHS Docket No. ICEB-2006-0004

My remarks and recommendations to the proposed amendments of the
regulations, relating to the unlawful hiring or continued employment of
unauthorized aliens, are a product of my experiences in the public construction
process over a period of twenty-five years.

While the changes you propose may reduce the hiring of illegal immigrants by
employers in the agricultural business it is my opinion that they will have
minimal, if any, effect on the hiring practices of contractors and subcontractors
installing work for public construction projects.

It is a widespread and common practice for prime contractors and their
subcontractors to use immigrants, both legal and illegal, to perform some work of
their public construction contracts. The reason immigrants are employed is so
that these contractors may extort windfall, unwarranted and excessive amounts
of monies from the public contracts by not paying their workers the wages
required by applicable Labor Laws. Some claim that illegal immigrants file fewer
complaints against the contractors who are exploiting them than do legal
immigrants. While most likely true, legal immigrants grievances are also rare.
The reason is simply that, despite being paid less than required by Labor Laws,
the construction business is still the best paying job in town, particularly if the
workers are unskilled or semi-skilled. These immigrants are also aware that if
they weren't willing to accept lesser monies they wouldn't be working.

Be assured that the prime contractors and subcontractors who employ illegal
immigrants and pay them less than Prevailing Wages are quite aware they are
violating public laws but are more than willing to take risks in order to enjoy the
spoils of their corruption. They have few apprehensions that their indiscretions
will be detected. Most often they are not. The few that are apprehended most
often receive minimal penalties. Labor Law violations will generally result in the
necessity for them to make payments of monies to the exploited workers and, as a
rule their company will be disbarred from submitting bids for public construction
contracts for a set number of years. Oftentimes the monies repaid will be only a
fraction of the amount of monies stolen and, if their company is debarred, they
will have already set up a new company that will allow them to continue their
gouging of the public purse. The current penalties for employing illegal

immigrants are even less severe and will, in no way, deter these scheming and disreputable contractors from enjoying the gratuitous monies available to them from the exploitation of a business – public construction- that annually commits public monies in excess of $ 150 billion.

It does not need to be that way!

While violating Labor Laws is usually a misdemeanor, the contractors typically attempt to cover up their infractions by falsifying business and payroll records and submitting false filings and, as a result, commit felonies. Indomitable investigators coupled with aggressive prosecutors are capable of developing enough evidence that will enable them to also charge these contractors with a variety of other infractions that almost always accompany labor law violations including tax evasion, extortion, larceny, corruption, bribery, perjury, and a variety of frauds.

Unfortunately few contractors violating Labor Laws are ever prosecuted for these more severe crimes. The easy way out and the least time consuming for public prosecutors is to make a deal – have the contractor payback some money and be debarred and then close the case. To the corrupt contractors the penalties are quite lenient and rather than serve as deterrents are simply considered to be the cost of doing business.

While it might be a reach convicting employers for tax evasion, extortion, larceny, corruption and bribery, solely on the fact that they intentionally hire illegal immigrants - prosecuting them for false filings, falsified business records, fraud and perjury is quite feasible particularly if the proposed regulations include employer obligations that, if not complied with, would provide ample evidence to charge them with the falsification of documents and submittals, perjury and fraud.

Two employer obligations are recommended for inclusion in the proposed regulations–

1. Employers should be required to verify the legality of all intended employees by requiring them to send the names and Social Security Numbers of intended employees to the Social Security Administration for verification before they begin work.
2. Employers should be required to keep a copy of the documents that were provided by the employee for completion of the Employment Eligibility Verification form, Form I-9.

Social Security Number Verification
The Social Security Administration offers employers very easy and timely means for verifying employee Social Security Numbers. Employers, in fact, are able to verify SSNs over the internet. Up to ten names and SSNs can be verified immediately while larger numbers can be verified within one

2

No-Match Cert. Admin. Record 2282

There will, of course, be other employers who will not discontinue their intentional employment of illegal immigrants simply because they feel that the financial benefits that can be derived from their deceitfulness are worth the risks they take.

Some of these employers will not only persist in their use of illegal immigrants but will continue to list them in their payroll records and documents, including their invalid Social Security Numbers. It would be an easy task to detect their infractions even with minimal oversight.

Other employers will continue to employ illegal immigrants but will simply not list them in their business and payroll records and will not issue them wage statements, pay checks, and W-2 Statements. Wages will be paid in cash and off the books. Fortunately there are, in public construction, sufficient analytical processes available that will readily identify those contractors who conceal employees by not including them in their payroll records and reports and other business documents.

I appreciate having been given an opportunity to submit recommendations for these regulations directed to the concern over the employment of illegal immigrants.

Sincerely,

John Peek

John Peek
Philadelphia, PA 19118
Email – tockwotton@yahoo.com

4



## International Institute Rhode Island

August 8, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

**Re:**   *DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

The International Institute Rhode Island submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The International Institute Rhode Island is an independent non-profit that has been serving immigrants and refugees, one family at a time, since 1921. We serve as a first-stop, full-service immigration referral center providing educational, legal, and social services to immigrants and refugees throughout Rhode Island and southeastern New England.

The International Institute Rhode Island has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States–immigrant and native-born alike.

As a result of this work, the International Institute Rhode Island is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

645 Elmwood Avenue, Providence, RI 02907 · www.iiri.org · tel 401.461.5940 · fax 401.467.6530

**No-Match Cert. Admin. Record 2284**

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**<u>including U.S. citizens and authorized noncitizens</u>**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **<u>unregulated underground cash economy</u>** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **<u>comprehensive immigration reform</u>**. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

No-Match Cert. Admin. Record  2285

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

    This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is _not_ indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

    Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

    DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

    If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

    The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in

Page 3 of 4

dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

William Shuey
International Institute Rhode Island
645 Elmwood Ave.
Providence, RI 02907
(401) 461-5940
Fax: (401) 467-6530
bshuey@iiri.org

No-Match Cert. Admin. Record  2287



2300 RIVER PLAZA DRIVE · SUITE 110
SACRAMENTO, CA 95833
TELEPHONE: 916 / 925-9131
FAX: 916 / 925-9030

California ✦nning Peach Association

August 11, 1006

Director Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave, N.W., 2nd Floor
Washington, DC 20529

**VIA ELECTRONIC MAIL AND U.S. MAIL**

**Re: Docket No. ICEB-2006-0004**
**Safe Harbor Procedures for Employers**
**Who Receive a No-Match Letter**
**(FR 71:114, p 34281)**

To Whom It May Concern:

The California Canning Peach Association hereby submits its comments on the Bureau of Immigration and Customs Enforcement, Department of Homeland Security's Proposed Rule regarding "no-match" letters published in the Federal Register on June 14, 2006.

The California Canning Peach Association is a grower-owned bargaining and marketing cooperative. Our 600 grower members produce nearly 80% of the nation's canned peach supply. Our average grower farms approx. 40 acres of cling peaches which is very labor-intensive process. We rely on seasonal workers to prune trees in the winter, to thin fruit in the spring, and to harvest the fruit during the summer. Simply put, we must have access to a legal and stable workforce to stay in business.

As a result, we would have an interest in, and would be affected by the above-referenced Proposed Rule. We would incorporate by reference, in their entirety, the comments on the Proposed Rule submitted by the National Council of Agricultural Employers. We also concur with the concept of deferring any action on this matter pending enactment of comprehensive immigration reform by Congress.

Thank you for your attention to this matter.

Sincerely yours,

Rich Hudgins
President & CEO



**No-Match Cert. Admin. Record  2288**



**STATE CAPITOL**
P.O. BOX 942849
SACRAMENTO, CA 94249-0012
(916) 319-2012
FAX (916) 319-2112
http://democrats.assembly.ca.gov/members/a12

# Assembly
# California Legislature

**LELAND Y. YEE, Ph.D.**
SPEAKER PRO TEMPORE
ASSEMBLYMEMBER, TWELFTH DISTRICT

余胤良博士
加州眾議院執行議長

**STANDING COMMITTEES:**
APPROPRIATIONS
BUSINESS AND PROFESSIONS
GOVERNMENTAL ORGANIZATION
JOBS, ECONOMIC DEVELOPMENT AND
THE ECONOMY

**SELECT COMMITTEES:**
CHAIR, CALIFORNIA'S FOREIGN
TRADE OFFICES
CHAIR, CHILDREN'S PHYSICAL AND
MENTAL WELL BEING IN DIVERSE
CALIFORNIA COMMUNITIES
AIRPORTS AND THE AIRLINE INDUSTRY
ASIAN TRADE
BRIDGING THE ACHIEVEMENT GAP
CALIFORNIA HORSE RACING INDUSTRY
COASTAL PROTECTION
EMERGING ISSUES IN CALIFORNIA
COMMUNITIES
ENVIRONMENTAL JUSTICE
EQUAL ACCESS TO PRESCHOOL
PROFESSIONAL SPORTS
RUNAWAY PRODUCTION
URBAN YOUTH

**COMMISSION:**
SAN FRANCISCO BAY CONSERVATION
AND DEVELOPMENT COMMISSION

August 14, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigrant Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

Re: "Safe Harbor Procedures for employers who receive a 'No-Match Letter'"

Dear Sir or Madam:

In response to the request by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement for public comment on the proposed "Safe Harbor Procedures for Employers Who Receive a No-Match Letter," I am urging the DHS to withdraw this proposed rule change.

As a public policy maker I understand the far reaching implications of such a broad reaching rule change. Working people throughout the nation and in California in particular, will likely lose their jobs or be forced into untenable employment options due to flawed data or mistaken identity.

Such a massive impact on employees in every industrial sector will have long term and lasting negative ramifications such as an increase in exploitation of immigrant workers regardless of immigration status, hindering the advancement of many workers into better paying jobs, an increase in the underground economy throughout the nation and, as a direct result, the loss of tax revenue and the public services those dollars support for all levels of government.

Moreover, however, I am concerned that the "No-Match Letter" rule will, by default, empower potentially abusive employers by providing a powerful tool for exploitation by essentially extending immigration enforcement duties to employers.

As a representative for a legislative district with a significant number of immigrants from nearly every corner of the globe, and I am concerned that the proposed rule may put those I represent at risk.

The "No Match Letter" is a flawed tool in the effort to reduce illegal immigration into the United States and I respectfully request that the DHS reconsider the implementation of this potentially devastating regulatory change.

Sincerely,

**LELAND Y. YEE, Ph.D.**
Speaker pro Tempore
California State Assembly

CC: Pilar Schiavo

---

DISTRICT OFFICE: 455 GOLDEN GATE AVENUE • SUITE 14600 • SAN FRANCISCO, CA 94102 • (415) 557-2312 • FAX: (415) 557-1178

*Printed on Recycled Paper*



**WEDA**

August 9, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

**Women's Economic development Agency (WEDA)** submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The mission of Women's Economic Development Agency (WEDA) is to assist women in achieving economic independence through a holistic approach to business development and wealth building that encompasses classroom training, technical assistance, mentoring and access to pertinent resources.

**Women's Economic development Agency (WEDA)** has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States—immigrant and native-born alike.

As a result of this work, **Women's Economic development Agency (WEDA)** is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings

**No-Match Cert. Admin. Record  2290**

and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**<u>including U.S. citizens and authorized noncitizens</u>**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **<u>unregulated underground cash economy</u>** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform**. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to

respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Carolina Ramón
Women's Economic Development Agency (WEDA)
Manager, Women's Business Programs
cramon@weda-atlanta.org

*Women's Economic Development Agency (WEDA)*
*659 Auburn Ave, NE. Suite 250*
*Atlanta.GA.30312*
*Phone: (678) 904 22 01 Fax:(678) 749 7008*
*www.weda-atlanta.org*

# *Indiana Horticultural Society* , Inc.

*Serving Indiana's fruit industry*

Office of the Secretary
Dept. of Hort & L.A.,  Purdue University
625 Agricultural Mall Drive
West Lafayette, IN 47907-2010

August 25, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland security
111 Massachusetts Ave. NW, 2nd Floor
Washington,  D.C. 20529

Re: enclosed letter, and reference DHS Docket No. ICOB 2006-0004

Dear Director:

The President of the Indiana Hort Society submitted the enclosed comments on the above referenced docket.  The comment period ended on August 15.  The comments were submitted by U. S. Mail postmarked August 2..  The envelope was returned as undeliverable.  It is my guess that the envelope lacked the Docket number.

Is it possible that these comments could still be considered since they were originally submitted before the deadline?

Thank you for your consideration.

Yours sincerely,

Richard A. Hayden,
Secretary-Treasurer,
Indiana Horticultural Society

cc:   Tom Roney, President, IHS

No-Match Cert. Admin. Record  2294



309 Cumberland Avenue, Suite 201
P.O. 17917, Portland, ME 04112
207-780-1593 • fax: 207-699-2313
info@llapmaine.org • www.ilapmair.e.org

August 9, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

<u>By Priority Mail</u>

**Re:**   **DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"**

Dear Sir or Madam:

The Immigrant Legal Advocacy Project (ILAP) submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

ILAP is Maine's only nonprofit provider of free and low-fee immigration law and related legal assistance to low-income Mainers. We serve between 1500 and 2000 low-income Maine immigrants annually, and their U.S. citizen family members. ILAP has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on immigrant workers and their U.S. citizen family members in Maine.

As a result of our work, ILAP is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:



**No-Match Cert. Admin. Record  2295**



- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**<u>including U.S. citizens and authorized noncitizens</u>**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **<u>unregulated underground cash economy</u>** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **<u>comprehensive immigration reform</u>.** The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens

who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution



whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Sincerely,

Beth Stickney, Esq.
Executive Director

# Filipinos for Affirmative Action

FAA

**AUGUST 2, 2006**

310 8th Street, Suite
Oakland, CA 94607
510/465-9876

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

31080 Union City ·
Suite 104
Union City, CA 94
510/487-8552

*Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for
Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

Filipinos for Affirmative Action joins other citizens and business, labor, immigration and privacy groups in saying no to the proposed regulations concerning the Social Security Administration's (SSA) "no-match" letters. FAA is a 32-year old organization whose mission is to build a strong and empowered Filipino community by organizing constituents, developing leaders, providing services, and advocating for policies that promote social and economic justice and equity.

These new regulations will result in a harmful impact to ALL workers regardless of immigration status. Using such a notoriously inaccurate and out of date system like the SSA database means that workers could face termination by panicked employers before they can prove they are on the list mistakenly. This would lead to thousands of unlawful mass firings.

With these new regulations, some employers may feel increased pressure to go "off the books," promoting an underground economy and defeating a primary goal of immigration reform. "Good" employers who follow the rules would be targeted and punished while "bad" employers who pay in cash and do not keep records will not be reached by the new regulations. "Bad employers" could also use the letters to intimidate, threaten, or discriminate against workers.

The government's purpose when it issues SSA no-match letters has never been to police the immigration status of workers. Instead of being used to credit retirement earnings for workers, these proposed regulations inappropriately transform harmless no-match letters into tools of immigration law enforcement.

In addition, any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would complicate the transition to the new system.

These proposed regulations hurt everyone -- all workers regardless of immigration status, our state and local governments, our federal government, and our economy. I urge you not to enact these new regulations and allow Congress to reach a comprehensive immigration reform solution.

Respectfully submitted,

**CHRISTOPHER PUNONGBAYAN**
**ADVOCACY DIRECTOR**

Board of Directors: Wercelaw Amgott • Robert Penta • Ray Codinera • Channa Garcia
• Eileen Hipolito-Estiko • Trina Villanueva • Ronald Pineda • Agnes Briones • Don Rosku • Executive Director: Lillian Galedo

A United Way Agency

**No-Match Cert. Admin. Record  2299**

August 2, 2006

Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave., NW, 2nd Floor
Washington, DC 20529

Reference: DHS Docket No. ICEB-2006-0004

To whom it may concern,
I am writing concerning the "No Match" letters that are sent to employers and
employees. I am very concerned that the proposed new regulations will have a chilling
effect on immigrant workers, both documented and undocumented. It is unjust for the
Federal government to make such sweeping changes when at the same time asking for
Comprehensive Immigration Reform.

The regulations will burden employers and workers with the consistent errors already
present in the Social Security Administration's Basic Pilot program. Furthermore, it
would be unjust to implement a government mandated layoff of millions of immigrants
because of the federal government's inability to enact Comprehensive Immigration
Reform. Immigrants, both documented and undocumented have been a key force in
the economic growth in the United States during the last several decades—should they
now be penalized for a broken system without systematic reform being enacted.

In addition, the economy will suffer due to employment instability in key industries in
agriculture, food processing and the service sector.

Finally, the new "Safe Harbor" procedures will create injustice in the workplace for
millions of immigrant workers, including hour and wage violations and more unsafe
workplaces. Immigrant workers will become even more invisible and without access to
basic workplace rights.

I would encourage the these regulations be dropped altogether in the hope that
Comprehensive Immigration Reform will be enacted.

Sincerely,

Dennis Sadowski
3245 Nagle Rd.
Avon, OH 44011-2059

No-Match Cert. Admin. Record 2300



**MASSACHUSETTS IMMIGRANT & REFUGEE ADVOCACY COALITION**

105 Chauncy Street, 9th Floor, Boston, MA 02111 · Voice & TTY (617) 350-5480 · Fax (617) 350-5499 · http://www.miracoalition.org

August 4, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

**Re:    *DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"***

Dear Sir or Madam:

The Massachusetts Immigrant and Refugee Advocacy Coalition (MIRA) respectfully submits the following comments to the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

MIRA is a multi-ethnic, multiracial coalition that actively involves hundreds of grassroots immigrant organizations, legal service providers, labor unions, religious organizations, human service agencies, and human rights groups in cooperative efforts. We represent over 100 organizations across the state of Massachusetts, and have strong partnerships with agencies, business and leaders across New England.

MIRA's mission is to protect and promote the rights and opportunities of immigrants and refugees in Massachusetts. In partnership with its members, MIRA advances this mission through education, training, leadership development, organizing, policy analysis and advocacy. Our membership serves low-income refugees and immigrants from around the world.

After numerous discussions with our membership and key stakeholders, we urge DHS to withdraw this proposed rule in its entirety.

The proposed rule will magnify the adverse impact that Social Security Administration (SSA) no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Even though it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Therefore, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As further explained in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool.

**This proposed rule will harm all workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion, employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with the SSA. The SSA database is notoriously inaccurate, and often "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and work-authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigation against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to obstruct labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem, and lead to the further exploitation of all workers.

**The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

**The proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform.** The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

**The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification the letter does not make a statement about his or her immigration status.

Furthermore, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

**The proposed rule is an erosion of our privacy rights.**
DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

**The costs of implementing the proposed rule are prohibitive.**
If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law.

**The proposed rule is objectionable because compliance is impractical.**
The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In conclusion, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter."

The proposed rule is simply the wrong rule at the wrong time. DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses.

For the reasons outlined above, and on behalf of over a hundred organizations in Massachusetts, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Ali Noorani
Executive Director

Eva A. Millona
Policy Director

# NATIONAL IMMIGRATION PROJECT
of the NATIONAL LAWYERS GUILD

Board of Directors

Barbara Hines, Chair
  Austin, TX

Rogelio Nuñez, Treasurer
  Harlingen, TX

Susan Alva
  Los Angeles, CA

Robin Bronen
  Anchorage, AK

Susana De León
  Minneapolis, MN

Rosemary Esparza
  Venice, CA

Linton Joaquin
  Los Angeles, CA

Christina Kleiser
  Knoxville, TN

Michael Maggio
  Washington, DC

Chinwe Obianwu
  Atlanta, GA

Sonia Parras Konrad
  Des Moines, IA

Judy Rabinovitz
  New York, NY

Rebecca Sharpless
  Miami, FL

Marc Van Der Hout
  San Francisco, CA


Staff

Ellen Kemp
  Coordinator/
  Legal Worker

Dan Kesselbrenner
  Director

Ki Kim
  Communications &
  Development

Toy Lim
  Office Manager

Ana Manigat
  Administrative
  Assistant

Malik Ndaula
  Soros Justice Fellow

Paromita Shah
  Associate Director

August 11, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

Re:     DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor
        Procedures for Employers Who Receive a No-Match Letter," 71
        Fed. Reg. 34281 (June 14, 2006).

Dear Director:

The National Immigration Project of the National Lawyers Guild (National Immigration Project) submits the following comments in response to the above-referenced proposed regulation. The National Immigration Project is a not-for-profit corporation that publishes materials, sponsors training sessions, and provides technical assistance on immigration and nationality law. The National Immigration Project has a long history of involvement in protecting the rights of non-citizen workers in the U.S.

Our specific comments follow below.

**DHS lacks authority to regulate SSA "No-Match" letters because Congress conferred exclusive authority to the SSA to administer all aspects of the worker retirement benefit program.**
An agency cannot promulgate regulations that are inconsistent with the will of Congress. Congress intended the Social Security Administration to have exclusive authority to regulate all matters relating to social security. Insofar as the proposed regulations tread impermissibly on the exclusive province of the Social Security Administration, they exceed the scope of DHS' lawful authority.

Section 901 of Title 42 United States Code provides that the Social Security Administration is an independent agency of the United States government. Congress conferred expansive and exclusive authority to the Social Security Administration over all matters related to the various programs it administers. For example, 42 USC § 901(b) provides that:

No-Match Cert. Admin. Record  2304

It shall be the duty of the Administration to administer the old-age, survivors, and disability insurance program under subchapter II of this chapter and the supplemental security income program under subchapter XVI of this chapter.

Congress developed an elaborate and detailed scheme to administer all aspects of the worker retirement program commonly known as "social security." The proposed regulation impinges on Congress' plain intent to confer exclusive authority to the Social Security Administration to regulate matters relating to social security eligibility and social security wages. Reading the Social Security Act as a whole makes manifest that DHS lacks the authority to promulgate regulations that interpret letters sent out by the Social Security Administration or any other matter that touches on social security eligibility. This authority is inconsistent with the intent that Congress expressed in the overall legislative scheme. Justice O'Connor writes, "Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *ETSI Pipeline Project v. Missouri*, 484 U.S. 495 (1988), quoted in *FDA v. Brown & Williamson Tobacco Corporation*.

Congress spoke directly to the Social Security Administration's exclusive authority in this area in SSA-specific legislation that has been enacted subsequent to the enactment of the INA.[1] To the extent that the SSA has exclusive authority in this area, DHS does not have any. Based on the same logic, the Supreme Court found that the Food and Drug Administration (FDA) lacked the authority to regulate tobacco products. *FDA v. Brown & Williamson Tobacco Corporation*, 529 U.S. 120 (2000). Congress' SSA-specific legislation effectively demonstrates that the Department of Homeland Security's agencies have no authority to promulgate regulations that take away the authority of the Social Security Administration to attach significance to its own correspondence. The Department of Homeland Security simply lacks the authority to regulate SSA documents.

## ICE has chronic data management problems.
Even if DHS is deemed to have authority to regulate this issue, the agency has demonstrated alarming incompetence in managing data. The Bureau of Immigration and Customs Enforcement has a long history of trouble handling data. Over the years, ICE and its predecessor have struggled to process, maintain, and manage information. This is a chronic problem. As recently as June 2006 the Government Accountability Office criticized DHS' data entry in the new employment verification program.[2]

The government itself has recognized these problems. Since 1995, the Government Accountability Office (previously the General Accounting Office) has been reporting on data collection and management problems in the Immigration and Naturalization Service (INS) and its successor agency, including INS' problematic overstay estimation methods.[3] The GAO chronicled more generally immigration statistics that are "lacking, misleading, or otherwise

---

[1] The Social Security Protection Act of 2004, for instance.
[2] U.S. Government Accountability Office, "Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts," June 19, 2006.
[3] U.S. General Accounting Office, "Illegal Immigration: INS Overstay Estimation Methods Needed," September 2 1995.

2

inadequate."[4] INS difficulties included obsolete hardware, incompatible and non-interoperable information systems, and uneven system security capabilities.[5] In a 1997 report to Congress, Justice Department Inspector General Michael Bromwich expressed concern about "the integrity of the data . . . and the training and abilities of INS employees who will be responsible for maintaining these systems and recording the transactions that constitute the systems' databases."[6] INS had a long-standing history of using antiquated, inaccurate databases.[7]

In response, the Immigration and Naturalization Service Data Management Improvement Act, HR 4489, was introduced in Congress.[8] Prompted by the events of September 11, 2001, Congress passed the Enhanced Border Security and Visa Entry Reform Act of 2002, which mandated the integration of immigration systems and databases, as well as the integration of data systems and databases that contain federal law enforcement and intelligence information.[9] The legislation set 2003 as the original deadline. Congress extended the deadline until 2005 for full integration.[10]

In 2004, a year after the INS was split up and transferred from the Department of Justice to the Department of Homeland Security, the GAO found that the new Immigration and Customs Enforcement agency was not handling data any better than INS ever had. The GAO found that while ICE was in the process of updating its case management system, it still "lack[ed] complete, accurate and readily available information" and "d[id] not have the capability to record information."[11] Moreover, the GAO found significant data management problems in the new US-VISIT program, established to collect, maintain, and share information on selected foreign nationals.[12]

More recently, in 2005, the GAO concluded that all of DHS "continues to face operational and management challenges that it inherited from its component legacy agencies."[13] These challenges include the development of a department-wide framework for managing information, specifically in the context of immigration law enforcement and the provision of immigration services.

---

[4] In a 2005 status update to this report, GAO found that the "underlying data quality issue" had not been fixed, although the office had provided "substantial guidance in how this recommendation could be fulfilled." U.S. General Accounting Office, "Immigration Statistics: Information Gaps, Quality Issues Limit Utility of Federal Data to Policymakers," July 31, 1998.

[5] U.S. Government Accountability Office, "Information Technology: Immigration and Customs Enforcement Is Beginning to Address Infrastructure Modernization Program Weaknesses but Key Improvements Still Needed," July 2006.

[6] "Despite a deluge of resources, the Immigration and Naturalization Service's management systems don't deliver," Government Executive, February 1, 1999.

[7] Congressional Research Service, "Immigration Enforcement Within the United States," April 6, 2006.

[8] H.R. 4489, Immigration and Naturalization Service Data Management Improvement Act of 2000, Smith (R), Texas.

[9] Id.

[10] Shruti Daté, "Congress extends deadline for INS data system," Government Computer News, May 24, 2000.

[11] U.S. General Accounting Office, "Immigration Enforcement: Better Data and Controls Are Needed to Assure Consistency with the Supreme Court Decision on Long-Term Alien Detention," May 27, 2004.

[12] U.S. General Accounting Office, "Homeland Security: First Phase of Visitor and Immigration Status Program Operating, but Improvements Needed," May 2004.

[13] Id. at note 2.

3

These problems continue. This year the GAO reiterated these concerns, finding "DHS delays in entering data into its databases" in the context of the new employment verification and worksite enforcement program.[14] Moreover, the problems are widespread, affecting all three of the new agencies created out of INS. In the 2006 Annual Report to Congress, the Citizenship and Immigration Services Ombudsman addressed information technology issues, acknowledging intrinsic flaws in the USCIS information management systems, which do not permit adequate case tracking and reporting and fail to connect USCIS and other agencies, including ICE and CBP.[15] He noted the "questionable accuracy" of the information within the systems. In an email interview with CNET News.com, USCIS chief information officer Tarrazzia Martin wrote: "The state of USCIS' current systems prevents it from implementing key initiatives, and has only allowed for incremental change."[16]

A broad range of organizations have recognized the serious limitations of DHS' data collection.[17] Government auditors concur that ICE's databases are notoriously inaccurate. Too much is at stake in the context of employment authorization to place additional requirements on an agency with such a demonstrated record of inadequate data maintenance. This agency is simply not ready to implement a new program so dependent on data management. "No-Match" findings are certain to occur because of name changes and clerical errors. Hundreds of thousands of workers—including U.S. citizens and authorized non-citizens—could lose their jobs as a result. Given ICE and its predecessors' track record in this area, as well as the importance of the regulation to workers in the United States, ICE cannot be trusted to maintain and manage a database that has so much significance for U.S. workers.

**Immigration status changes.**
Immigration status is not static data. It changes both individually and en masse. Thousands of people can have rights conferred on them at once, as when particular foreign nationals are granted temporary protected status. As noted above, ICE has chronic trouble managing data. The nature of the data makes it particularly difficult to collect and maintain.

ICE has already proved that it is not equipped to handle a new program reliant on data management. Since 2003, schools and student-exchange programs have been required to use the internet-based Foreign Student and Exchange Visitor Information System (SEVIS) to store and track personal information about foreign students before, during, and after their stay in the U.S. But university administrators have complained that SEVIS frequently loses data, that it cannot handle large batches of information submitted at once, and that it does not provide real-time access to records. Worse yet, ICE computer problems once caused student visa holders to be jailed overnight or barred from entering the U.S.[18] In a recent report, GAO found that many of these glitches had not been resolved.[19]

---

[14] U.S. Government Accountability Office, "Immigration Enforcement: Weaknesses Hinder Employment Verification and Worksite Enforcement Efforts," June 19, 2006.

[15] Citizenship and Immigration Services Ombudsman, Annual Report to Congress, June 2006.

[16] Declan McCullagh, "Aging computers hobble Homeland Security," CNET News.com, December 15, 2005.

[17] Electronic Privacy Information Center, "US-VISIT Rolls Out the Unwelcome Mat," July 2005; Federation for American Immigration Reform, "House Immigration Subcommittee Oversight Hearing on Electronic Technology Border Control," October 11, 2001.

[18] Id. at note 14.

[19] U.S. General Accounting Office, "Homeland Security: Performance of Information System to Monitor Foreign Students and Exchange Visitors Has Improved, but Issues Remain," June 2004.

4

No-Match Cert. Admin. Record  2307

Another computer malfunction stranded thousands of airline passengers at U.S. border checkpoints last August when a DHS computer crashed, shutting down the government's main immigration database in Virginia.[20]

ICE is already over-burdened with programs that rely on its faulty information and poor data management. The agency has indicated that it is unable to handle the current data flow.[21] This regulation would further strain an already stressed system.

**The proposed regulation violates the constitutional right to due process.**
The regulation is unconstitutional because it does not respect the due process rights of people now present in the U.S. The Due Process clause of the Fifth Amendment protects the rights of all persons present in our country, not just United States citizens. The Supreme Court recognized long ago that the Due Process clause of the Fifth Amendment protects non-citizens, even those who are deportable or unlawfully present in the United States. *Yamataya v. Fisher*, 189 U.S. 86 (1903). The Court has repeated this holding again and again. *Plyler v. Doe*, 457 U.S. 202 (1982); *Mathews v. Diaz*, 426 U.S. 67 (1976). As the Court stated in *Plyler*, "[w]e have clearly held that the Fifth Amendment protects [even] aliens whose presence in this country is unlawful." 457 U.S. at 210.

The U.S. government has a strong interest in regulating workers within its borders. However, this interest must be balanced with the affected person's interest and the risk of erroneous deprivation. *Matthews v. Elridge*, 424 U.S. 319 (1976). In this case the risk of erroneous deprivation is extremely high, and affected persons have a strong interest in the proposed legislation. This regulation is likely to result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion, employers will fire workers who receive a no-match letter, before workers have a chance to correct their records. Again, hundreds of thousands of workers—including U.S. citizens and authorized non-citizens—will be affected.

**Conclusion**
We strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." For the reasons listed above, the Department of Homeland Security should withdraw the proposed regulation.

Thank you for considering our views on this matter.

Respectfully,

Fiona McKinnon
Haywood Burns Fellow

Dan Kesselbrenner
Director

---

[20] Id. at note 14.
[21] U.S. Government Accountability Office, "Information Technology: Immigration and Customs Enforcement Is Beginning to Address Infrastructure Modernization Program Weaknesses but Key Improvements Still Needed," July 27, 2006.

5

 

# CAUSA

August 10, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

**Re:** *DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

CAUSA submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

CAUSA is Oregon's statewide immigrant rights coalition, CAUSA is a statewide, grassroots coalition based in the Latino community. Our mission is to defend and advance the rights and well being of immigrant workers and families in Oregon as we counter the growing anti-immigrant agenda in our state by coordinating with our regional and national allies to further immigrant rights throughout the United States.

CAUSA has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States–immigrant and native-born alike.

As a result of this work, CAUSA is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

1460 Capitol St NE ● Salem, OR 97303 ● tel (503) 763-1694 ● fax (503) 399-1183 ●
oregoncausa@yahoo.com

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **comprehensive immigration reform**. The House and

the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits

rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,

Aeryca Steinbauer, Coordinator
CAUSA
1460 Captitol St NE
Salem, OR 97301
503-982-0243 ext. 213
aeryca@pcun.org



August 4, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

**JEWISH**

**COMMUNITY**

**ACTION**

**2375**

**UNIVERSITY**

**AVENUE WEST**

**SUITE 150**

**SAINT PAUL**

**MINNESOTA**

**55114-1633**

**PHONE (651)**

**632-2184**

**FAX (651)**

**632-2188**

**INTERNET WWW.**

**JEWISH**

**COMMUNITY**

**ACTION.ORG**

**Re:    *DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"***

Dear Sir or Madam:

Jewish Community Action (JCA) submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

Jewish Community Action is a ten year old organization bringing together Jews from diverse parts of the Twin Cities Jewish community to understand and take action on social and economic justice issues. We have been working on issues related to immigrant rights for more than six years, often as part of broad-based coalitions. Key members of our organization are immigration attorneys who specialize in federal immigration and labor law.

JCA has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States—immigrant and native-born alike. Attorneys who are members of JCA have shared stories of the impact on workers in Minnesota and beyond.

As a result of this work, JCA is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:



**Community
Solutions Fund**

No-Match Cert. Admin. Record 2313

WINNER OF THE FORD FOUNDATION'S LEADERSHIP FOR A CHANGING WORLD AWARD, 2004



- **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—<u>including U.S. citizens and authorized noncitizens</u>—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the <u>unregulated underground cash economy</u> which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of <u>comprehensive immigration reform</u>. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

**No-Match Cert. Admin. Record  2314**

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Vic Rosenthal,
Executive Director



**1199P**

**SEIU.**

Service Employees International Union District 1199P, CTW, CL

# Pennsylvania's Health Care Union

**Thomas V. De Bruin**
President

**Neal Bisno**
Secretary-Treasurer

**Kim Patterson**
Executive Vice President

**Jesse Wilderman**
Executive Vice President

**Stephanie Haynes**
Health Systems Vice President

**Kevin Hefty**
Long Term Care Vice President

**Teresa Marcavage**
State Sector Vice President

**Patty Ludwikowski**
Vice President

**Matthew Yarnell**
Vice President

**Executive Board**
Eddie Abreu
Robert Armstrong
Deborah Bonn
Barbara Booth
Margie Butler
Ruth Cheslaw
Hope Cook
Etta Cornman
Denise Cox
Darlene Davis
Kay Fisher
Jocelyn Furko
Dawn Futrell
Kay Good
Bonnie Gould
Linda Graham
Christine Hassleman
Patrice Hlad
Wanda King
Helen Noel
Maria Razanauskas
Lori Reinhart
Sheri Rowles
Wendell Royster
Kathy Shaner
Donna Skrbin
Shirley Steel
Cathy Stoddart
Evelyn Thoroughgood
Michele Uhranowsky
Ruth Visintainer
Colleen Wichrowski
Scott Young
John Ziegler

**VIA FIRST CLASS MAIL**

August 1, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
**Department of Homeland Security**
111 Massachusetts Avenue, NW - 2nd Floor
Washington, DC 20529

RE:    **Proposed Regulations Regarding Social Security No-Match Letters
(Docket No. ICEB-2006-0004)**

To Whom It May Concern:

As President of SEIU District 1199P, I am writing to express our union's opposition to the Department of Homeland Security's proposed regulations regarding Social Security No-Match letters. District 1199P of the Service Employee's International Union (SEIU) represents 20,000 health care workers in the Commonwealth of Pennsylvania.

Health care facilities across the country are facing severe staffing shortages. There are not enough caregivers available to staff our hospitals and nursing homes at levels that ensure every patient receives consistent, high-quality care.

These proposed regulations could seriously exacerbate this crisis. We are concerned that many nurses and other health care workers with legal immigration status could wrongfully lose their jobs due to something as simple as a clerical error. The regulations place an undu burden on employers and employees to correct what might be errors in SSA records. The 63-day window for reconciling discrepancies could also prove to be too restrictive if the SSA is not able to handle the additional demand and workload.

Lastly, with comprehensive immigration reform measures currently working their way through Congress, we feel that the enactment of these regulations would be premature. The bills under consideration in Congress contain numerous enforcement strengthening measures. DHS should wait until a comprehensive immigration reform measure is passed through Congress before revising these regulations.

Sincerely,

Thomas V. De Bruin
President

TVD:ccm

cc:    File (3)

No-Match Cert. Admin. Record 2316

RE: DHS Docket No. ICEB- 2006-0004

August 10, 2006

Director, Regulatory Management Division

U.S. Citizenship and Immigration Services

Department of Homeland Security

111 Massachusetts Avenue, NW, 2nd Floor

Washington, D.C. 20529

We urge you to reject the proposed rule "Safe Harbor for Procedures for Employers" who receive a no match letter from the SSA. We further urge you to comply with the goal of President Bush who stressed on July 31, "we must have comprehensive immigration reform". He said that "the best way to enforce the border is to have a rational way for people -who are doing jobs that Americans aren't doing- to come to this country ...as part of comprehensive reform."

We need immigrant labor. We also need to have an overhaul of the present immigration system – a comprehensive reform -which will include a reform of our admissions system, and effective, targeted enforcement measures. We need a realistic solution for the undocumented population now living in the U.S, many of whom have provided the invaluable, irreplaceable labor that has fueled the economy of this nation for years.

Your mission is to serve the security and well being of this nation. Our economic reality is a vital part of a secure and healthy nation. The fabric of this nation is of one piece. The security of all of those who today are laboring in our fields and factories affects the security of us all.

Please be true to your mission to look to the good of our nation, and support the challenge of a comprehensive immigration reform. Reject this one more isolated rule which would set in motion years of red tape and paper work, but wouldn't touch the real needs in our nation's broken immigration system.

Thank you for your attention to this matter,

Pat Sullivan

Pat Sullivan

P.O. Box 309
Houston, MS 38851

July 27, 2006


Director
Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N. W., 2nd Floor
Washington, DC 20529

RE:  **DHS Docket No. ICEB-2006-0004 Safe-Harbor Procedures for Employers
     Who Receive a No-Match Letter**

Dear Director:

As requested in the Public Participation section of the Proposed Rules, I am
commenting on the time limits described in the rule. I believe a 60-day period granted to
employers after they receive a no-match letter from the Social Security Administration is
a sufficient time frame to resolve discrepancy issues involving social security accounts.
This is based on fact that the general public has much greater access to the Social
Security Administration offices throughout the United States than those dealing with
immigration-related employment issues.

However, when the issue involves resolving discrepancies concerning
immigration-status or employment-authorization documentation presented or referred to
while completing Form I-9, such as a work authorization or a permanent resident card, I
would recommend providing employers at least a 90-day period to verify employee's
identity or employment eligibility. This recommendation is based on the fact that from
the moment an individual submits an application for employment authorization, it takes
the U.S. Citizenship and Immigration Services between 30 and 90 days to acknowledge
receiving the application and additional time to schedule appropriate procedures. Due to
limited locations of regional U.S. Citizenship and Immigration Services offices,
interviews and verification of biometric data have to be scheduled well in advance. Under
these circumstances, it is unreasonable to expect that an employee who failed to apply for
a renewal employment authorization card within the time frame recommended by the U.
S. Citizenship and Immigration Services (90 days prior to expiration) will be able to
produce a renewed card within the 60-day time frame.

The same holds true for conditional residents of the U.S. who obtained their
resident status through marriage to a U.S. citizen or a permanent resident and were issued
a *conditional* permanent resident card, often referred to as a "green card." For various
reasons, some employees fail to apply to remove the conditions on his or her residence in
a timely manner. One of the factors that may contribute to a problem is that both
'conditional' and 'permanent' green cards are named "Permanent Resident Card".

**No-Match Cert. Admin. Record  2318**

Director, Regulatory Management Division
July 27, 2006
Page 2

However, on a conditional green card there is an expiration period of two years listed on its face, which is the only indication of its conditionality. Needless to say, lack of explicit wording on the card leaves the issue open to interpretation by the general public and, as a result, employees don't always apply for a renewal card within the time frame recommended by the U.S. Citizenship and Immigration Services. Therefore, I propose a period of not less than 90 days to be a more reasonable time frame for this part of the proposal.

Sincerely,

*Elvira Alexander*

Elvira Alexander

MITCHELL SILBERBERG & KNUPP L

A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORAT



David S. Rugen
Part
(310) 312-3118 Ph
(310) 231-8318
dsr@msk.c

July 17, 2006

**BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED)**

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW 2nd Floor
Washington D.C. 20529

Re:     Proposed Rule Change to 8 C.F.R. Part 274a - DHS Docket Number ICEB-2006-0004

Dear Director:

        Thank you for providing the opportunity to comment on the proposed changes to Title 8 Code of Federal Regulations Part 274a, Control of Employment of Aliens, 71 Fed. Reg. 34281 (proposed June 14, 2006) (to be codified at 8 C.F.R. pt. 274a). Our comment describes problems associated with the 14 day time limit within which employers must act to assure "safe harbor" from a finding of constructive knowledge that the employer has hired or continues to employ an unauthorized worker.

        Simply stated, this 14 day period does not give employers enough time to follow all of the safe harbor procedures laid out in the proposed rule. According to the proposed rule, within 14 days of a receiving a no-match letter, an employer would have to:

1.      Check its records to determine if the error is clerical or typographical.

2.      If there is a clerical error, the employer must correct the error and inform the Social Security Administration ("SSA") or Department of Homeland Security ("DHS") of the correct information in accordance with the letter's instructions.

3.      The employer would then have to verify with the appropriate agency that the employee's name and social security number now match the agency's records and make a record of the manner, date, and time of such verification.

4.      If the error is not clerical, the employer must ask the employee to verify that the employer's records are correct.

5.      If the employer's records are correct according to the employee, the employer must ask the employee to resolve the discrepancy with the Social Security Administration

11377 West Olympic Boulevard, Los Angeles, California  90064-161
Phone: (310) 312-2000  Fax: (310) 312-3100  Website: www.msk.cc

**No-Match Cert. Admin. Record  2320**

MITCHELL SILBERBERG & KNUPP L

personally by visiting an SSA office and bringing documents that prove citizenship status, name change, or other relevant information.

6.    If the employee states that the employer's records are not correct, the employer must take action to correct the records, inform the relevant agency according to the letter's instructions, and verify the corrected records with the relevant agency.

If the employer does not follow these steps within 14 days, it risks constructive knowledge liability under the proposed rule. Large employers, with many immigrant workers, could receive multiple no-match letters at a time and find the process difficult to keep up with. Smaller employers may not have sufficient staff to deal with the influx of no-match letters. Additional staff may be required just to keep up with the frantic pace of the procedures creating a burdensome obligation on employers. A 30 day or longer time period would give most employers enough time to effectively deal with the no-match letters.

In addition, most analogous federal and state regulations allow employers at least 30 days to reply to government information requests. In the Code of Federal Regulations, when an employer is required to send a report or information to an outside agency regarding an employee, the employer usually gets 30 days or more to do so. *See, e.g.*, 29 C.F.R. §§ 405.4, 520.409, 530.102, 1910.217 (requiring a report of employee injuries to OSHA within 30 days), 1910.1096.

Normally, federal regulations which give employers less than 30 days to act relate to the health and safety of the employees, which requires much more urgent attention on the part of the employer. *See, e.g.*, 10 C.F.R. § 850.24 (notifying employees of health and safety monitoring results); 29 C.F.R. §§ 1903.19, 1910.1001, 1910.1017 (notifying employees of health and safety monitoring results), 1910.1018 (notifying employees of health and safety monitoring results), 1910.1025 (notifying employees of health and safety monitoring results), 1910.1026 (notifying employees of health and safety monitoring results), 1910.1027 (notifying employees of health and safety monitoring results), 1910.1029 (notifying employees of health and safety monitoring results), 1910.1043, 1910.1044, 1910.1045, 1910.1047, 1910.1048, 1910.1050, 1910.1051, 1910.1052, 1910.1450, 1915.1001, 1926.62. Some health and safety regulations even allow 30 days to act. *See, e.g.*, 29 C.F.R. §§ 1910.95. Other instances where an employer must act in less than 30 days include situations where the employer is contesting some government ruling. *See, e.g.*, 29 C.F.R. §§ 825.403 (petition to agency regarding alleged violations), 1903.15.

Other federal law also provides time limits for employers to take certain actions. Employers get at least 30 days to provide written notice to election participants and information to a retirement plan sponsor. *See* 29 U.S.C. §§ 1082, 1399.

Additionally, states have their own labor codes which also provide 30 day or longer time limits for employers to act. In California, if an employee alleges a violation of the labor code, an employer has 33 days to cure the violation. Cal. Lab. Code § 2699.3. Also, employers normally have 30 days to make reports to outside agencies or employees after certain events. *See* Cal. Lab. Code §§ 511, 2809. Certain safe-harbor provisions in California allow an employer 30 days to act. *See* Cal. Lab. Code § 4658.6 (no liability for supplemental job displacement benefit if

**No-Match Cert. Admin. Record  2321**



MITCHELL SILBERBERG & KNUPP L

Director, Regulatory Management Division
July 17, 2006
Page 3

employer meets certain conditions within 30 days). Like the C.F.R., instances where an employer must act in less than 30 days typically have to do with protecting the employee's compensation or health. *See* Cal. Lab. Code §§ 98.2, 3715, 4603.4.

Based on traditional time limits in both federal and state regulations, employers expect to have 30 days to act in response to a government inquiry regarding employees. Employers expect that only actions which require urgency, such as protection of an employee's health and welfare, will require prompt action in less than 30 days.

Situations in which employers would have a particularly difficult time complying with the 14 day time limit include those where multiple no-match letters are received by an employer in a short time period. Even if an employer finds the time to check its records within a few days, the employer must find the time to contact the SSA or DHS according to the specific letter's instructions and inform them of new correct information if there was a typographical error. The employer would then have to verify that the employee's name and social security number now match the agency's records and record this verification. The rule gives no extra time to employers if they make a good faith attempt to correct a clerical error but for some reason their records still do not match the agency's records.

If after searching through its records, an employer finds that the error is not clerical, it must ask the employee to verify that the records are correct and to resolve the discrepancy with the SSA personally. Verification by the employee may take some time and not all employees' actions can be controlled by the employer. If the employee states that the records are incorrect the employer must start all over again and correct the records, inform the agency, and verify the corrected records. The employer gets no additional time for this under the proposed rule. With multiple no-match letters an employer would certainly become overwhelmed while trying to take all of these actions within 14 days. A 30 day or longer time limit would ease the pressure on the employer and make sure that all appropriate steps are taken to ensure accuracy.

In conclusion, the proposed rule's 14 day time limit does not allow enough time for employers to properly and thoroughly follow the safe harbor procedures laid out by the proposed rule. Employers typically expect to have at least 30 days to take action for situations that do not affect an employee's health and safety. A 30 day or longer time limit to take reasonable steps to avoid a constructive knowledge finding would allow employers adequate time to accurately follow the proposed rule's safe harbor procedures.

Respectfully submitted,

David S. Rugendorf
of
MITCHELL SILBERBERG & KNUPP LLP

# American Federation of Labor and Congress of Industrial Organizations



EXECUTIVE COUNCIL

815 Sixteenth Street, N.W.
Washington, D.C. 20006
(202) 637-5000
www.aflcio.org

**JOHN J. SWEENEY**
PRESIDENT

**RICHARD L. TRUMKA**
SECRETARY-TREASURER

**LINDA CHAVEZ-THOMPSON**
EXECUTIVE VICE PRESIDENT

Gerald W. McEntee
Patricia Friend
Robert A. Scardelletti
Michael J. Sullivan
Joseph J. Hunt
Edward C. Sullivan
Edward J. McElroy Jr.
Baxter M. Atkinson
Vincent Giblin
Larry Cohen
Thomas C. Short

Gene Upshaw
Michael Goodwin
John M. Bowers
Capt. Duane Woerth
Cheryl Johnson, R.N.
William Burrus
Ron Gettelfinger
John Gage
William Hite
Warren George
Robbie Sparks

Michael Sacco
William Lucy
R. Thomas Buffenbarger
Harold Schaitberger
Clyde Rivers
Leo W. Gerard
James Williams
William H. Young
Michael T. O'Brien
Gregory J. Junemann
Nancy Wohlforth

Frank Hurt
Leon Lynch
Elizabeth Bunn
Edwin D. Hill
Cecil Roberts
Melissa Gilbert
John J. Flynn
Nat LaCour
Andrea E. Brooks
Laura Rico
Paul C. Thompson

August 14, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

*Re:     DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for
Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

The American Federation of Labor and Congress of Industrial Organizations
(AFL-CIO) submits the following comments in response to the request for public
comment by the Department of Homeland Security (DHS), Bureau of Immigration and
Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers
Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The AFL-CIO represents 53 unions and nearly 9 million workers nationwide. Our
mission is to improve the lives of working families—to bring economic justice to the
workplace and social justice to our nation by enabling working people to have a voice on
the job, in government, in a changing global economy and in their communities.

The AFL-CIO has ample experience in dealing with the adverse impact that the
Social Security Administration's (SSA) no-match letters have had on all workers in the
United States–immigrant and native-born alike.

As a result of this work, the AFL-CIO is alarmed by and strongly opposed to the
implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a
No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match
letters have had on workers' rights, and trigger mass firings across the nation. These
firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm _all_ workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**including U.S. citizens and authorized noncitizens**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **unregulated underground cash economy** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

**No-Match Cert. Admin. Record  2324**

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is <u>not</u> indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

    The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

    In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands--possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Ana Avendaño
Associate General Counsel and
Director, Immigrant Worker Program
AFL-CIO
815 Sixteenth St. N.W.
Washington, D.C. 20006
202-637-3949 (phone)
202-637-5323 (fax)
aavendan@aflcio.org (email)

 

**Office of the Mayor**
City & County of San Francisco

**Gavin Newsom**

AUG 1 4 2006

August 11, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW
2nd Floor
Washington, DC 20529

**Re:    DHS Docket No. ICEB-2006-0004**

To Whom It May Concern:

On behalf of the City and County of San Francisco, I respectfully submit comments on the Department of Homeland Security's (DHS) proposed rule on use of Social Security Administration (SSA) "no-match" letters to enforce immigration law.  San Francisco is deeply concerned about the adverse impact that this proposed rule would have on employees, employers, service delivery, and the economy of our city.

San Francisco is a city of immigrants.  Nearly one in three San Franciscans was born in another country.  Immigrant San Franciscans contribute to several key industries in San Francisco, including hotels and restaurants, construction, health care, and janitorial services.  These industries, the people they serve, and San Francisco's thriving economy would be jeopardized by the loss of immigrant jobs in the wake of fear and confusion caused by the new and unclear enforcement measures in this rule.

**First, we believe that SSA no-match letters are not an appropriate tool for enforcement of immigration law.**  There are a variety of reasons why an employee working lawfully in the United States would mistakenly receive an SSA no-match letter. Common explanations include clerical errors and workers changing their names for marriage or other reasons.  Spanish surnames that include both the mother's and father's last name often cause confusion, as do different conventions for writing dates using the day before the month.  Many immigrant surnames are common and widely used, leading to confusion in government record keeping.  We believe that SSA cannot accurately report the immigration status of people in its database, and that SSA's information should therefore not be used to enforce immigration law.

**Second, the rule would create burdensome, inappropriate, and unclear new requirements for employers** by forcing them to act as agents of the federal government to enforce immigration law.  The new rule would require multiple contacts between

1 Dr. Carlton B. Goodlett Place, Room 200, San

employers, employees, and SSA, as well as new paperwork and documentation requirements, some of which are not clearly defined in the proposed rule.

**Third, this new rule could lead to a large number of law-abiding workers losing their jobs** due to employers misunderstanding the rule, or not wishing to abide by it, and simply terminating any workers who are the subject of a no-match letter, regardless of their true immigration status.  In addition to the crisis created for those workers, this situation would place increased burden on City resources, as those unemployed workers are forced into an underground economy where they no longer pay payroll tax to the City and may also be in need of increased City services as a result of their unemployment.  Frightened workers who have lost their jobs as a result of the federal no-match letter may be less willing to cooperate with law enforcement or to seek medical treatment, which would have a negative impact on public safety and public health.

**Finally, we believe that workers who are subject to a no-match letter may be more vulnerable to abuse** from unscrupulous employers who could use the letter to retaliate against employees for unrelated purposes, or extract employee concessions on wages or working conditions.

San Francisco was founded and made great by immigrants.  Since the time of the Gold Rush, immigrants have come to San Francisco from every country around the world, opening businesses, creating jobs, paying taxes, taking leadership in government, and rebuilding this City after the 1906 and 1989 earthquakes.  We strongly oppose this proposed rule, and urge the Department of Homeland Security to withdraw it.

Sincerely,

Gavin Newsom
Mayor



**FOOD MARKETING INSTITUTE**

655 15TH STREET, N.W., SEVENTH FLO
WASHINGTON, D.C. 20005-5701
TELEPHONE: 202/452-8444
FAX: 202/429-4519
E-MAIL: FMI@FMI.ORG
WEBSITE: WWW.FMI.ORG

August 14, 2006

Regulatory Management Division
U.S Citizen and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue NW., 2nd Floor
Washington DC 20529

**Re:  Safe-Harbor Procedures for Employers Who Receive a No-Match
Letter; DHS Docket No. ICEB-2006-0004**

Dear Sir or Madam,

The Food Marketing Institute (FMI)[1] is pleased to submit these comments in
response to the Bureau of Immigration and Customs Enforcement (ICE) proposed
amended regulation describing an employer's obligations when the employer receives a
no-match letter from the Social Security Administration (SSA) or the Department of
Homeland Security (DHS). 71 Fed. Reg. 34281 (June 14, 2006).

At the outset it is important to note that FMI's members are committed to hiring
and employing only authorized workers and to complying fully with the law and the
regulations in this regard. Indeed, our members annually submit and retain millions of
W-2 forms for employees and I-9s for newly hired workers. The proposed amended
regulation describes safe harbor procedures that an employer can follow when it receives
a letter from SSA or ICE indicating that the combination of social security number and
employee name submitted does not match agency records. By following these
procedures the employer can be certain that it will not be found to have had constructive
knowledge that the employee is an alien not authorized to work in the U.S.

We believe that the proposed regulation can help to provide more certainty for
employers. However, the proposal does raise issues that need clarification. FMI
members, like most employers, do receive "no-match" letters. Most, but not all, of these
letters are caused by clerical errors or name changes. The proposed regulation needs
modification as described below to ensure that it does not impose new burdens on
employers to correct these types of errors. Our comments follow below by issue.

---

[1]     The Food Marketing Institute (FMI) conducts programs in research, education, industry relations
and public affairs on behalf of its 1,500 member companies — food retailers and wholesalers — in the
United States and around the world. FMI's U.S. members operate approximately 26,000 retail food stores
with a combined annual sales volume of $340 billion — three-quarters of all retail food store sales in the
United States. FMI's retail membership is composed of large multi-store chains, regional firms and
independent supermarkets. Its international membership includes 200 companies from 50 countries.

U.S. Citizen and Immigration Services
August 14, 2006
Page 2

**A.    The Employer Must Receive the No-Match Letter**

Proposed Section 274a.1(1)(l)(iii)(B) defines information indicating that the employee may be an alien who is not authorized to work, in part as:

> Written notice from the Social Security Administration that the combination of name and social security account number submitted for the employee does not match Social Security Administration records.

At least one of our members reports that there have been times when a group of employees has received letters from the SSA all on the same day. The employer itself has received no such letter, and the letter is addressed to the employee not the employer. In these circumstances, the employer has not "received" the letter from SSA and in many cases it would not have knowledge that those letters have been sent to the employee. The regulation should explicitly state that a letter must be sent to, and be received by, the employer for it to be considered a "no-match" letter.

**B.    Employment Verification System Notice of Discrepancy and Notification to SSA of Corrections**

Some of our members participate in the Employment Verification System (EVS) wherein they submit a disk to the SSA every month with the names and Social Security Numbers for all newly hired employees and employees who have changed their names. Each month, they receive back from the SSA a list of any discrepancies from the information they provided.

We believe that this list should not be considered a "no-match" letter. If it is, employers would confront serious practical problems in attempting to comply with the regulation. For example, Proposed Section 274a.1(1)(2)(i)(A)(*1*) requires employers to check:

> ...the employer's records promptly after receiving the notice, to determine whether the discrepancy results from a typographical, transcribing, or similar clerical error, and if so, correcting the error(s), informing the Social Security Administration of the correct information (in accordance with the letter's instructions, if any; otherwise in any reasonable way), . . .

If an employer has been notified of a discrepancy through EVS (rather than a No-Match letter), there is no obvious procedure for the employer to correct the error using the EVS system. If employers are required to report this correction through EVS, the regulation should specify the process to be used and provide reasonable alternatives for correcting the information. In addition, as described below, the time frames provided in the regulation would need to be modified to accommodate the EVS process.

**C.    14 Day and 60 Day Time Periods**

Proposed Section 274a.1(1)(2)(i)(A) requires an employer to take certain steps within 14 days to attempt to resolve a discrepancy. First, the employer should check its own records to see if there is a clerical error. If enough error is found, additional steps

U.S. Citizen and Immigration Services
August 14, 2006
Page 3

should be taken, such as asking the employee to confirm his or her name and social security number. If the employee's name and social security number are correct, the employer may ask the employee to resolve the discrepancy with the Social Security Administration.

If the discrepancy still has not been resolved within 60 days and if the employee's identity and work authorization cannot be verified at that time, the employer then "...must choose between taking action to terminate the employee or facing the risk that DHS may find that the employer had constructive knowledge the employee was an unauthorized alien . . ."

While this section of the proposed regulation is not completely clear, it appears that the employer will have 14 days to inform the employee that he or she must address the discrepancy and then the employer has 60 days subsequent to the 14 days to check to make sure the employee has resolved the discrepancy. If the 60 days begins to run from the time the letter is first received by the employer, the employee in many cases will not have enough time to resolve the problem.

These time frames are especially ambitious, and likely unworkable, if the EVS notice is considered a "no-match" letter. Therefore, we urge that the initial 14 day period be extended to at least one month and the 60 day time period be extended to 120 days to allow for more reasonable periods to accomplish the goal of clarifying reported discrepancies.

**D.    Requirement to Fill Out New I-9s**

Proposed Section CFR 274a.1(l)(2)(iii)(A) requires that an employer verify the employee's identity and work authorization within 60 days following notice of a discrepancy by having the employer complete a "... new Form I-9 for the employee, using the same procedures as if the employee were newly hired."

Requiring a new I-9 every time there is a discrepancy that must be corrected would not accomplish the intended goal of verifying the employee's identity. Instead, the employee should be required to present documentation from the SSA within 60 days showing that the discrepancy has been resolved. Otherwise, the employee would be able to present new false documentation to the employer when filling out the new I-9 and no real verification of identity would have occurred.

Moreover, requiring employers to fill out new I-9s for these discrepancies would be burdensome for several reasons. Large employers that use EVS are informed of hundreds of mismatches every month, the majority of which deal with name changes for female employees who are either recently married or divorced and failed to apply for a new social security card. Requiring employers to fill out new I-9s for every mismatch in this situation require a significant amount of work on the part of the employer, with no corresponding benefit to the government. Additionally, this process would create inconsistent results. For example, some employees change their names and properly report this to the SSA. Therefore, these employees would not have a mismatch, but the

**No-Match Cert. Admin. Record  2331**

U.S. Citizen and Immigration Services
August 14, 2006
Page 4

employee's name would be different from that listed on the original I-9. So this would
require some employees who had a name change to fill out a new I-9 (those who initially
forgot to report it to the SSA) but not others (those who had immediately reported their
name change to the SSA). It would seem inconsistent to only require new I-9s for some
name changes but not others.

**E.      Constructive Notice**

There is additional language in the Notice that requires further discussion.

Finally, it is important that employers understand that the resolution of
discrepancies in a no-match letter, or other information that an employee's SSN
presented to an employer matches the records for the employee held in the SSA,
does not, in and of itself, demonstrate that the employee is authorized to work in
the United States.

71 Fed. Reg. at 34284. While this statement may be accurate, we are unclear as to how
this would affect the issue of constructive knowledge, which is the subject of this
rulemaking. The only means employers have to verify the information provided by the
employee is to contact the SSA to see if the information is a match. If, in order to
complete the I-9, an applicant presents a drivers license or state ID along with a social
security card, an employer is not required to request any other documentation. Section 1
of the I-9 form requires the applicant to attest that he or she is a US citizen or to provide
the applicant's permanent resident alien number or the alien authorization to work
number. Unless the employee was using this document for Section 2 as verification, the
employer would not see the actual document and is not required to do anything more.

*       *       *

In conclusion, our industry is committed to employing only authorized workers.
We appreciate the intent of the proposed amendments to the regulation to provide clear
safe harbors so employers can be certain they will not be found to have constructive
knowledge that they have hired an unauthorized worker. We urge that the proposed
regulation be modified and clarified as discussed above to make it as effective and as
practical as possible. We appreciate your consideration of our comments.

Sincerely,

George R. Green
GENERAL COUNSEL TO FMI
Law Offices of George R. Green
12105 Reach Way
Potomac, MD 20854

# CALIFORNIA RURAL LEGAL ASSISTANCE, Inc.

**Central Office**
631 Howard St., #300
San Francisco, CA 94105
Telephone 415.777.2752
Fax 415.543.2752
www.crla.org

José R. Padilla
*Executive Director*

Luis C. Jaramillo
*Deputy Director*

Ralph Santiago Abascal
*General Counsel*
(1934-1997)

William G. Hoerger
Ilene J. Jacobs
Michael M. Meuter
Cynthia L. Rice
*Directors of Litigation, Advocacy,
and Training*

**Regional Offices**

Arvin
Coachella
Delano
El Centro
Fresno
Gilroy
Madera
Marysville
Modesto
Monterey
Oceanside
Oxnard
Paso Robles
Salinas
San Luis Obispo
Santa Barbara
Santa Cruz
Santa Maria
Santa Rosa
Stockton
Watsonville

August 11, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C. 20529

Re:    DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor
Procedures for Employers Who Receive a No-Match Letter"

Dear Director:

California Rural Legal Assistance and California Rural Legal Assistance
Foundation submit the following comments in response to the request for
public comment by the Department of Homeland Security (DHS), Bureau of
Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor
Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg.
34281 (June 14, 2006).

California Rural Legal Assistance, Inc., is a non-profit legal services
organization funded in part by grants from the Legal Services Corporation.
We have 20 offices located in rural California serving the farmworker
community and low wage workers in cities like Coachella, Fresno, Stockton,
Modesto and Santa Rosa. We provide a full range of legal services and
regularly represent farmworkers and others in wage and hour cases and in
proceedings before state and federal social service agencies. California Rural
Legal Assistance Foundation is a non-profit organization which represents the
interests of California farmworkers through legislative and regulatory
advocacy and by providing legal services in the areas of immigration and labor
rights.

Our organizations represent farmworkers and other low wage workers
throughout rural California. In our 40 years of advocacy we have encountered
thousands of cases where employers, social service agencies, the California
Employment Development Department and the Social Security Administration
have provided or inputted inaccurate information into the Social Security
Administration's data base that has affected workers' rights. Legal residents


LSC

Director, Regulatory Management Division,
August 11, 2006
Page 2

and citizens have had to spend months and even years correcting records maintained at various agencies. These errors are caused by mis-spellings, juxtaposition of letters or numbers, cultural differences in writing dates or surnames and, in some cases, deliberate false reporting by employers.

The proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and promote firings and further exploitation of workers that will affect low wage workers irrespective of their immigration status.

California is struggling to effectively control the underground economy that includes agriculture, janitorial work, garment, landscaping and the hospitality industry. As legitimate employers push workers out, unscrupulous employers hire them, cutting their costs by ignoring immigration laws and labor laws. The No-Match Safe-Harbor provisions encourage, rather than discourage, this shift of the workforce We therefore join in the comments submitted by other low wage worker advocates and urge DHS to withdraw this proposed rule in its entirety based on the following concerns:

<u>This proposed rule will harm all workers regardless of immigration status.</u>

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers-including U.S. citizens and authorized noncitizens-could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem. In one recent example, litigated by CRLA, an employer admitted underpaying workers but attempted to have the court take judicial notice of a no match letter claiming that it proved that the worker was not who he claimed to be. Although CRLA prevailed on the evidentiary question, this is typical of the mis-use of such letters.

**No-Match Cert. Admin. Record  2334**

Director, Regulatory Management Division,
August 11, 2006
Page 3

### The proposed rule will expand the unregulated underground cash economy.

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide
employers with general guidance, DHS is in fact imposing a new set of legal obligations on
millions of employers. These legal new obligations will increase pressure on businesses to go
"off the books," thereby promoting the unregulated underground cash economy which results in
potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and
further exploitation and abuse of all workers by unscrupulous employers. CRLA has vast
experience with such "off the books" wage payment schemes. For years, we have represented a
large number of workers who were paid under such schemes. Workers paid "off the books" are
much more likely not to receive the pay due them under federal and state law; and to have their
employers pocket tax and social security withholdings.

The proposed rule also has the perverse effect of punishing "good" employers who keep good
records and want to stay on the books. These "good" employers will be put at a disadvantage
compared with "bad" employers with whom they compete who pay in cash and do not keep
records, and who consequently will not be reached by the new rule.

### The SSA no-match letter program is ill-suited as a tool for immigration enforcement.

This proposed rule attempts to transform the SSA no-match letter into an immigration
enforcement tool when the SSA database does not have the capacity to fulfill this objective. In
addition to being error prone, the database does not contain complete information about a
worker's immigration status or employment authorization. Indeed, the database contains
information about both U.S. citizens and work-authorized noncitizens who employers will
presume to be undocumented simply because they appear on a no-match list. The letter is not
indicative of immigration status, and explicitly states on its face that a worker's identification in
the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does
not constitute "constructive knowledge" of immigration status under current law. The proposed
rule dramatically alters the definition of "constructive knowledge" and makes a stark departure
from existing case law and long-standing federal guidance in this area despite the fact that the
SSA no-match letter provides no evidence of immigration status.

### The proposed rule is an erosion of privacy rights.

DHS is currently barred from direct access to the SSA database by laws protecting our privacy
and tax confidentiality. These laws were put in place to protect sensitive and personal
information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS

Director, Regulatory Management Division,
August 11, 2006
Page 4

to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

<u>The costs of implementing the proposed rule are prohibitive.</u>

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

<u>The proposed rule is objectionable because compliance is impractical.</u>

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands-possibly millions-of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

Cynthia L. Rice
California Rural Legal Assistance, Inc.

Mark S. Schacht
California Rural Legal Assistance Foundation



# AFSCME ®

### American Federation of State, County and Municipal Employees, AFL-CIO

Gerald W. McEntee
President

William Lucy
Secretary-Treasurer

Vice Presidents
Ronald C. Alexander
Columbus, OH

Ken Allen
Portland, OR

Henry L. Bayer
Chicago, IL

Peter J. Benner
St. Paul, MN

George Boncoraglio
New York, NY

Anthony Caso
Boston, MA

Jan Corderman
Des Moines, IA

Greg Devereux
Olympia, WA

Danny Donohue
Albany, NY

David R. Fillman
Harrisburg, PA

Michael Fox
Harrisburg, PA

Albert Garrett
Detroit, MI

Raglan George, Jr.
New York, NY

Alice Goff
Los Angeles, CA

Sherryl Gordon
Trenton, NJ

Salvatore Luciano
New Britain, CT

Roberta Lynch
Chicago, IL

Glenard S. Middleton Sr.
Baltimore, MD

Patricia A. Moss
Worthington, OH

Michael D. Murphy
Madison, WI

Henry Nicholas
Philadelphia, PA

Russell K. Okata
Honolulu, HI

Ellie Ortiz Lopez
San Juan, PR

George E. Popyack
Oakland, CA

Greg Powell
Austin, TX

Joan H. Reed
New York, NY

Eddie Rodriguez
New York, NY

Joseph P. Rugola
Columbus, OH

Kathy J. Sackman
Pomona, CA

Mary E. Sullivan
Albany, NY

David Warrick
Indianapolis, IN

Jeanette D. Wynn
Tallahassee, FL

1625 L Street, N.W., Washington, D.C. 20036-5687
Telephone: (202) 429-1000
Fax: (202) 429-1293
TDD: (202) 659-0446
Website: http://www.afscme.org

August 1, 2006

Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security (DHS)
111 Massachusetts Avenue, NW 2nd floor
Washington, DC 20529

## Re:  DHS Docket No. ICEB-2006-0004

Dear Sir or Madam:

I am submitting these comments on behalf of the 1.4 million members of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO.  AFSCME represents public sector, health care and child care workers.  AFSCME and our affiliates also employ thousands of workers.   We have grave concerns about the provisions in the proposed rules for "Safe Harbor Procedures for Employers Who Receive a No-Match Letter" and urge you to withdraw these regulations for the reasons listed below.

The original intent of the SSA no-match pilot programs was to address the large number of payroll deductions not credited to a valid social security number.  SSA no-match letters were never intended to be a vehicle for immigration law enforcement and are ill-suited to be such a vehicle.

The Social Security Administration (SSA) and DHS databases are frequently inaccurate.  If the proposed regulations are implemented, many authorized workers will be unjustly fired while employers will use the no-match letter to retaliate against and intimidate undocumented workers. The proposed rules will cause enormous problems both for workers and employers but will have no impact on undocumented workers.  The experience with no-match firings and workplace audits is very clear:  the fired workers will not leave the country.  They will simply find other more marginal jobs, most likely in the unregulated cash economy.

Thus, the proposed rule will result in growth of the underground economy.  It will also erode our privacy rights, and it represents an end-run around the federal legislative process.  As explained below, the SSA no-match program is simply not an effective immigration enforcement tool.  We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized below.



**No-Match Cert. Admin. Record  2337**

August 1, 2006
Page 2

<u>This proposed rule will harm all workers regardless of immigration status.</u>

The rule will cause unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion, employers will fire workers who receive an SSA no-match letter before they have a chance to correct their records with SSA. The SSA database is frequently inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers, including U.S. citizens and authorized non-citizens, could lose their jobs. These firings may violate federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to interfere with labor organizing campaigns, retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a reason to fire workers who participated in efforts to improve working conditions. The proposed rule would only exacerbate this problem.

<u>The proposed rule will expand the unregulated underground cash economy.</u>

DHS is imposing a new set of legal obligations on millions of employers. This will increase pressure on businesses to go "off the books," thereby promoting the unregulated cash underground economy which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

<u>The timing is bad because Congress is in the midst of immigration reform.</u>

The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is under debate and probably will be changed. The proposed rule would cause a disruptive change in an immigration system that is already flawed. Any worksite immigration enforcement proposal should happen in the context of comprehensive federal immigration reform.

August 1, 2006
Page 3

<u>The SSA no-match letter program is not an effective tool for immigration enforcement.</u>

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement mechanism when the SSA database does not have the capacity to fulfill this objective. The database has many errors and does not contain complete information about a worker's immigration status or employment authorization. Additionally, the database contains sensitive information about both U.S. citizens and authorized noncitizens. The letter does not address immigration status, and explicitly states that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, under current law, an employer's receipt of a SSA no-match letter does not constitute "constructive knowledge" of immigration status. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area.

<u>The proposed rule would erode privacy rights.</u>

DHS is currently barred from direct access to the SSA's database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and use personal information in the SSA database for their own purposes.

<u>The proposed rule is impossible to implement, and therefore should be withdrawn.</u>

The need for costly and burdensome employer and worker education programs, internal inconsistencies between this proposed rule with long-standing federal policy on no-match letters, federal and state employment and labor laws, and unrealistic timetables for compliance will implementation difficult if not impossible. Therefore, the proposed rule should be withdrawn.

<u>The proposed rule is objectionable because it applies to both SSA no-match letters and DHS notice letters.</u>

While the proposed DHS notice procedure protects the employer, it fails to provide a mechanism for an employee to have access to and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS.

In short, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter," published in the *Federal Register* on June 14, 2006. The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands — possibly millions — of U.S. workers in a poorly-conceived immigration enforcement attempt on the eve of comprehensive immigration reform. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.

August 1, 2006
Page 4


We appreciate the opportunity to submit comments on these proposed regulations

Very truly yours,

Kerry Korpi
Director
Department of Research and
Collective Bargaining Services


KK:CP:gam

# New England Apple Council Inc.
## 7 Main St.
## Goffstown, NH, 03045

VIA ELECTRONIC MAIL AND OVERNIGHT EXPRESS

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

RE:    Docket No. ICEB-2006-0004
       Safe Harbor Procedures for Employers Who Receive a No-Match Letter
       (FR 71:114, p. 34281)

Gentlemen:

    The New England Apple Council (NEAC) submits the following comments on the Department of Homeland Security's Proposed Rule regarding "no-match" letters published in the Federal Register on June 14, 2006. (71 Federal Register 34218)

    NEAC is a grower owned non profit association based in Goffstown, NH. NEAC has 200 farmer members located in all six New England States. Our members are some of the longest users of foreign labor recruited under various LEGAL programs administered by the Department of Labor and USCIS formerly INS. Some of our members have used LEGAL seasonal foreign workers since 1945.

    We were deeply involved in the use of foreign workers prior to the passage of IRCA in 1986. We saw a large increase in usage of H2A workers in the years following its passage (IRCA). Since the early 1990's the usage of H2A workers has decreased by our members at the same time that production has remained constant. The Department of Labor is responsible for the increased use of domestic non H2A workers through referrals from Florida and Puerto Rico. Many of those referrals as well as the friends and family who followed fall into the Social Security "no-match" category. Our members have followed up and notified workers with no-match numbers, only to have them replaced, the workers, by new ones. Our growers have not used the electronic verification program for two reasons.
First, the data base is very far from perfect. Legal workers with newly issued Social Security numbers are seldom included in the data base, and H2A workers are not included by law in the Social Security system.
Secondly, the Office of Special Council for Immigration Related Unfair Employment Practices has been very active in perusing employers under the Anti Discrimination provisions of the Civil Rights Act of 1964 and the Anti Discrimination provisions of

IRCA. To treat domestic employees differently than H2A employees could be considered discrimination, and as I stated H2A employees are not included in the Social Security System, and would always come up as a no-match.

Our advice to our employers has always been upon receipt of a no-match letter to advise the worker to correct the problem, to continue employment, or in most cases to be rehired. (Because of the seasonal nature of the jobs) If they do this and provide corrected numbers or names, the workers, continue or are rehired. If there is a second no-match letter on the same individual he or she is permanently discharged.

At the present time there is no reliable, efficient, system to check all employees through Social Security number verification. Until that is in place your agency should postpone the Proposed Rule. Congress should act on the Social Security "no-match" problem before this rule is implemented.

As a part of our statement we incorporate by reference in its entirety the comments of the Nation Council of Agricultural Employers (NCAE).

Sincerely Yours,

Joseph Young Executive Director

AJG. 14. 2006  5:55PM    SHRM                                    NO. 3366   P. 2



SOCIETY FOR
HUMAN
RESOURCE
MANAGEMENT

August 14, 2006

Richard A. Sloan
Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security
111 Massachusetts Avenue, NW
2nd Floor
Washington, DC  20529

   Re: Proposed Rule on Safe-Harbor Procedures for Employers Who Receive a No-
     Match Letter.  71 Fed. Reg. 34,281 (June 14, 2006)
     ICE 2377-06; Docket No. ICEB-2006-0004; RIN 1653-AA50

Dear Mr. Sloan:

The Society for Human Resource Management (SHRM) submits these comments to the U.S.
Department of Homeland Security ("the Department" or "DHS") in response to the proposed
rule on Safe-Harbor Procedures for Employers Who Receive a No-Match Letter.  This notice of
proposed rulemaking was published in the *Federal Register* on June 14, 2006.  *See* 71 Fed. Reg.
34,281 (June 14, 2006).

SHRM is the world's largest association devoted to human resource management.  Representing
more than 210,000 individual members, the Society's mission is to serve the needs of HR
professionals by providing the most essential and comprehensive resources available.  As an
influential voice, the Society's mission is also to advance the human resource profession to
ensure that HR is recognized as an essential partner in developing and executing organizational
strategy.  Founded in 1948, SHRM currently has more than 550 affiliated chapters within the
United States and members in more than 100 countries.

SHRM's membership comprises HR professionals who are responsible for administering their
employers' hiring policies, including the employment verification process.  SHRM has taken a
multi-faceted approach to obtain feedback from its members on the proposed guidance for
employers who receive a no-match letter, and has incorporated our member feedback in these
comments.

1800 DUKE STREET
ALEXANDRIA, VA 22314-3499 USA
(703) 548-3440 FAX; (703) 836-0367 TDD: (703) 548-6999
WORLD WIDE WEB: HTTP://WWW.SHRM.ORG

No-Match Cert. Admin. Record  2343

Richard A. Sloan
August 14, 2006
Page 2

## DISCUSSION

SHRM appreciates the opportunity to comment on the safe-harbor procedures regarding no-match letters and recognizes the Department's efforts in issuing guidance. For quite some time, many HR professionals have inquired about guidance from both DHS and SSA regarding what an employer should do when it receives a no-match letter. SHRM believes that the proposed regulations provide some guidance on the key issues; however, SHRM has some concerns regarding the proposed time periods and requests additional clarification on certain terms and provisions. In addition, SHRM has concerns as to how the proposed regulation will comport with the proposed legislation that Congress is currently addressing, which includes new procedures for the employment verification process.

The proposed regulations on the safe-harbor procedures provide that: (1) an employer must take "reasonable steps," within 14 days after receipt of a "no-match" letter; and (2) the employer must resolve the discrepancy within 60 days of receipt of the no-match letter. If the discrepancy has not been resolved within the suggested 60-day period, the employer must, within an additional three days, verify the employee's employment authorization and complete a new Form I-9. *See* 71 Fed. Reg. 34,285 (June 14, 2006).

SHRM appreciates the Department's efforts to ensure that employers are employing individuals who are authorized to work in the United States. SHRM realizes that in drafting the proposed guidelines, DHS had to consider the interests of employers, employees, the Social Security Administration, and other governmental entities. However, SHRM believes that the Department must provide guidance with reasonable and clear guidelines for HR professionals. Therefore, as discussed below, SHRM recommends that the Department: (1) increase the proposed period for an employer to take "reasonable steps" to a minimum of 60 days; and (2) permit the employer a minimum of 120 days to resolve any discrepancies after receiving a no-match letter. Furthermore, the Society recommends that the Department provide clarification on certain terms and provisions, and work closely with SSA to coordinate a seamless, uniform process for responding to no-match letters.

### I.      SHRM Recommends that the Department Provide an Employer a Minimum of 60 Days to Take "Reasonable Steps."

The Department has proposed that after receiving a no-match letter, an employer must take certain "reasonable steps" within 14 days of receipt of the no-match letter. *See* 71 Fed. Reg. 34, 285 (June 14, 2006). The Department does not include a complete list of steps that would be deemed reasonable under the proposed rule. However, the Department states that the following steps would be considered reasonable. These include: (1) checking the employer's records for typographical or clerical errors; (2) informing SSA of the correct information; and (3) verifying that the employer's records of the employee's name and social security numbers match the records of SSA. SHRM recommends that the Department provide an illustrative list of examples of steps that would be considered "reasonable." SHRM members make a good-faith effort to ensure that their employees are authorized to work in the United States. Thus, it is imperative

Richard A. Sloan
August 14, 2006
Page 3

that HR professionals are aware of the procedures that they may follow in response to a no-match letter.

### A. SHRM's Concerns with the Proposed Time Period.

SHRM believes that the proposed 14-day period would not provide employers an adequate amount of time to notify the employee. An HR professional working for a large company may have operations or offices in many different geographical areas. If the HR professional receives a no-match letter, and the employee is located in another state, the HR professional must check the employee's records and track the employee in another location. Some SHRM members work for colleges and universities, where the faculty and other employees may not work during the entire calendar year. A professor may teach a course every other semester, and not be available if the employer receives the no-match letter during his "off" semester. Also, many colleges and universities operate with a reduced workforce during the summer months. Thus, even if the employer receives the no-match letter, the HR professional may not be able to immediately contact the employee if the employee is out of the office or on vacation.

There are other reasons that would affect an employer's ability to take reasonable steps in response to a no-match letter within the proposed 14-day period. As more employers implement flexible workplace policies, employees are more likely to telecommute. HR professionals will need additional time to contact employees who telecommute and are not physically present in the office on a daily basis. Thus, both the employer and employee may need additional time. In addition, SSA may send the no-match letter to a different division within the department that does not process the I-9 forms. For example, if SSA sends the letter to the payroll department, the payroll specialist will have to forward the information to the HR department. The forwarding of the no-match letter may add additional time to the process. Given the size and numerous locations of large employers as well as the possibility of an employee's absence from the office, SHRM recommends that the Department increase the time permitted for an employer to take reasonable steps pursuant to the safe-harbor provisions. Therefore, SHRM recommends that DHS grant an employer a *minimum* of 60 days from receipt of the no-match letter to take reasonable steps.

### B. The Department of Homeland Security's Coordination Efforts with the Social Security Administration.

The proposed rule also provides that when an employer verifies an employee's Social Security Number (SSN) with the Social Security Administration, "employers should make a record of the manner, date, and time of any such verification, as SSA may not provide documentation." *See* 71 Fed. Reg. 34,283 (June 14, 2006). SHRM recommends that SSA provide the employer with a confirmation and tracking number within the proposed timeframe for resolving the discrepancy. SHRM also recommends that SSA provide the employer with a sample notice and guidance for the employee to follow when the employee attempts to resolve the no-match discrepancy. SHRM realizes the importance of both SSA and DHS in ensuring that all employees are authorized to work in the United States. Thus, SHRM recommends that both agencies work

Richard A. Sloan
August 14, 2006
Page 4

together and develop a uniform process to confirm and track an employer's attempt to verify an employer's SSN with SSA.

**II.     SHRM Recommends that the Department Establish a 120-day Period to Resolve Any Discrepancies After Receiving a No-Match Letter.**

The Department has proposed a verification procedure that the employer may follow if the discrepancy with the no-match letter is not resolved within 60 days of receipt of the no-match letter. *See* 71 Fed. Reg. 34,285 (June 14, 2006). When an employer receives a no-match letter, it takes time for a corporate entity to identify the issue, call in the employee and ask questions regarding the no-match letter. Even if there is a simple error that must be corrected by SSA, the proposed 60-day period would be inadequate for both SSA to respond and the employer to resolve the discrepancy. Also, there may not be a local SSA office near the employer's location. Furthermore, SSA may not provide the employer with a response within the proposed 60-day period due to a backlog of inquiries, a shortage of staff, or other reasons beyond the employer's control. Therefore, SHRM recommends that the Department provide an employer with a minimum of 120 days to resolve any discrepancies after receiving a no-match letter. SHRM also recommends that the Department provide clear language stating that where the employer has contacted the appropriate government agency within the proposed timeframe, the employer will not be held liable for external factors outside the employer's control. Such factors may include an agency's failure to respond within the timeframe required under the safe-harbor rules. Thus, SHRM recommends that DHS provide a an employer a minimum of 120 days to resolve any discrepancies after receiving a no-match letter, and also address the employer's due diligence in contacting SSA within the applicable time-period.

**III.    SHRM Recommends that the Department Clarify Whether the New Form I-9 is Optional.**

The Department has also proposed guidelines if the discrepancy identified in the no-match letter is not resolved within the proposed 60-day period. Specifically, DHS has proposed that if the discrepancy is not resolved within the proposed 60-day period, and if the employee's identity and work authorization cannot be verified after completing a new Form I-9, the employer has the option of either terminating the employee or risk that DHS may find the employer in violation of the federal immigration laws. *See* 71 Fed. Reg. 34,283 (June 14, 2006). SHRM recommends that the Department clarify whether the completion of the new I-9 form is optional or mandatory for an employer before the employer may terminate the employee. The Department also states that "employers should apply these procedures uniformly to all of their employees having unresolved no-match letters." The Department then indicates that employers that do not provide uniform guidelines may be in violation of applicable anti-discrimination laws. SHRM recommends that the Department provide clear guidance on what actions would constitute as a violation of the "applicable anti-discrimination" laws. SHRM also recommends that the Department coordinate the guidance regarding the discriminatory conduct with the other agencies that have jurisdiction over the anti-discriminatory laws, including the Department of Justice and the Equal Employment Opportunity Commission.

Richard A. Sloan
August 14, 2006
Page 5

**IV.    SHRM Recommends that the Department Clarify the Employee's Work Status During the Proposed Timeframes.**

The proposed rule provides that an employer must take "reasonable steps" within 14 days of receipt of the no-match letter, and must resolve any discrepancies within 60 days of receipt of the no match letter. *See* 71 Fed. Reg. 34,285 (June 14, 2006). The proposed rule does not provide guidance on how the employer should handle the employee's work status between day 14 and day 60. SHRM recommends that the Department clearly state that: (1) an employee whose name is referenced on a no-match letter shall continue to work during the "discrepancy" period; and (2) DHS will not hold the employer liable for violating the federal immigration laws if the employer continues to employ the individual during this period. After the employer notifies the employee about the no-match letter, an employee may fail to return to work. SHRM recommends that the Department provide clear language that the employer shall have the option to terminate the employee within the discrepancy period. The option to terminate would apply in cases where an employee fails to return to work after the employer has notified the employee of the no-match letter, and the employee's absence violates the employer's attendance policy.

**V.    SHRM Recommends That the Department Clarify the Receipt Guidelines.**

The proposed safe-harbor guidelines also describe an employer's obligations and its options for avoiding liability after the employer receives "information indicating that the employee may be an alien who is not employment authorized." *See* 71 Fed. Reg. 34,284 (June 14, 2006). However, the proposed rule does not define what constitutes as "receipt" of such information. Some SHRM members have received no-match letters that were addressed to the employee, not the employer. Although the employer may form a reasonable suspicion that the envelope from SSA contains a no-match letter, the employer cannot confirm the contents of the envelope if the mailing is addressed to the employee. Thus, SHRM recommends that the Department provide clear guidance on what constitutes receipt. Specifically, SHRM recommends that the Department clarify that the no-match letter must be addressed to the employer in order to meet the criteria for "receipt," or require that a copy of the no-match letter be sent to the employer.

Finally, some SHRM members participate in the Employment Verification System (EVS), where they submit a diskette to SSA each month with the names and Social Security Numbers for all newly hired employees and all employees who have notified their employers of a name change. Each month, SSA provides the employer with a list of any discrepancies from the information the employer provided through the EVS. SHRM members have requested guidance on whether the safe-harbor procedures regarding no-match letters would also apply to the receipt of EVS discrepancy information.

**VI.    Conclusion.**

SHRM appreciates the opportunity to submit these comments on the proposed guidance for employers who receive a no-match letter. SHRM applauds the Department for proposing the guidelines. However, SHRM believes that in order to maximize the safe-harbor provisions, the Department of Homeland Security must work closely with the Social Security Administration to

Richard A. Sloan
August 14, 2006
Page 6

ensure that there is a single uniform process.  SHRM looks forward to working with both
agencies to improve the guidance on safe-harbor procedures.

Respectfully submitted,

Michael P. Aitken
Director, Governmental Affairs
Society for Human Resource Management

# *Indiana Horticultural Society*, Inc.

*Indiana's fruit Growers*

Office of the Secretary
Dept. of Horticulture & Landscape Architecture
Purdue University
625 Agricultural Mall Drive
West Lafayette, IN 47907-2010

July 28, 2006

Director, Regulatory Management Div.
U. S. Citizenship & Immigration Services
Department of Homeland Security
111 Massachusetts Ave. NW, 2nd. Floor
Washington, D. C. 20529

Reference DHS Docket No. ICEB-2006-0004

To Whom It May Concern:

The Indiana Horticulture Society represents commercial fruit growers in the state of Indiana. Several of our members use migrant labor to harvest their crops as well as other work. Our membership has taken an active interest in the migrant labor issue as it has developed and has looked closely at the Safe-Harbor Procedures For Employers Who Receive A No-Match Letter.

While we appreciate the much needed guidance in this area, we feel the proposed rule is flawed in several areas as it relates to our member employers.

The time lines of 14, 60 and 63 days are not very realistic for a lot of us. Those hiring harvest labor typically have people working September and October of any year and then they are laid-off. The first correspondence from SSA or DHS is going to come after January 1st. of the following year, typically January thru March. These no-match employees are not going to be available until at best the next September. Even then, they may not be in our employ for a total of sixty (60) days.

If the worker in question is not a legal worker, they probably are aware of the no-match letter mailings and are not going back to the same employer anyway. The employer would be suspect of his documentation.

This is going to be a very difficult area for our member employers to deal with under the guidelines proposed in the rule. One suggestion has been that the time line clock only runs during those times when the employee is present. This would make it at least workable.

I'm sure you are aware that the employer is under heavy penalty for discrimination policy in this area and could not advance the time line to try to resolve the problem.

We hope you will take these comments into consideration as you finalize this rule.

Sincerely,

Thomas E. Roney, Pres.
5717 N. 300 West
Greenfield, IN 46140
Tel. 317-326-2278



LABORERS' INTERNATIONAL UNION OF NORTH AMERICA

August 11, 2006

TERENCE M. O'SULLIVAN
*General President*

ARMAND E. SABITONI
*General Secretary-Treasurer*

*Vice Presidents:*

VERE O. HAYNES

MIKE QUEVEDO, JR.

TERRENCE M. HEALY

RAYMOND M. POCINO

EDWARD M. SMITH
*Assistant to the
General President*

JAMES C. HALE

JOSEPH S. MANCINELLI

ROCCO DAVIS
*Special Assistant to the
General President*

VINCENT R. MASINO

DENNIS L. MARTIRE

MANO FREY

ROBERT E. RICHARDSON

JOSE A. MORENO

JOHN F HEGARTY

MICHAEL S. BEARSE
*General Counsel*

HEADQUARTERS:
905 16th Street, NW
Washington, DC
20006-1765
(202) 737-8320
Fax: (202) 737-2754

**VIA E-MAIL**

Director, Regulatory and Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Ave., N.W., 2nd Floor
Washington DC, 20529
Rfs.regs@dhs.gov

RE:    DHS Docket No. ICEB-2006-0004

Dear Director:

The Laborers' International Union of North America (LIUNA) respectfully submits these comments regarding the proposed regulations on the "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter" published in 71 Fed. Reg. 34281-85 on June 14, 2006.

LIUNA is deeply concerned that the Department of Homeland Security (DHS) is issuing these regulations as a piece meal effort to beef up verification of employment authorization without the benefit of broader immigration reform and a more efficient structure. Unfortunately, LIUNA has ample experience in dealing with such problems under the current treatment of I-9s and the Social Security Administration's (SSA) No-Match letters.

LIUNA has an abiding interest in the federal government's efforts to implement procedures for verifying workers' employment authorization. Workers founded LIUNA in 1903, and since that time the union has grown to more than 700,000 members by helping workers achieve better wages, good benefits and safer jobsites. LIUNA is one of the fastest-growing unions in North America. LIUNA Laborers work in a broad array of industries, but the majority work in the construction industry, building everything from skyscrapers to tunnels, factories to water treatment plants. Laborers also make buildings safe by removing hazardous materials like asbestos and lead. LIUNA supports comprehensive immigration reform and believes that the current dialogue in Congress is the appropriate venue to address the immigration crisis. Employee verification is only one facet of a complex situation that must be addressed as a whole, rather than piece meal.

**Strong, Proud, United**
No-Match Cert. Admin. Record  2351

Director, Regulatory and Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
August 11, 2006
Page 2

It is our view that the proposed regulations would dramatically increase the administrative burden on employers – especially smaller construction contractors. The burdens imposed by the proposed regulations, and thus the incentives to avoid them, are magnified by a very inefficient verification system.  When combined with the significantly enhanced risks of failure to comply with the re-verification procedures, we believe many more employers will opt to avoid compliance altogether by removing their workers from their payrolls.  The very employers who receive the highest rates of No-Match letters, particularly construction contractors, will be driven to join many of their more ruthless competitors in exploiting the existing underground labor market.

The result will do little to stem the use of unauthorized labor while doing grave injustice to workers in our industry and serious injury to our society.  Accordingly, we request that DHS withdraw these proposed regulations in their entirety to await consideration of the issues as part of an overall immigration reform.

**The Proposed Regulations Rely On Databases that
Are Unreliable and Will Lead to Unnecessary Hardships.**

The defects in the existing immigration and SSA databases make the current employment verification system inaccurate and ineffective.  The resulting errors cause confusion that imposes economic hardship on workers otherwise qualified and available to perform work.

The current system relies on multiple DHS immigration databases that do not communicate with one another and frequently contain inaccurate or conflicting information regarding the legal status of an individual.  Data error and identity theft result in false negatives that deny authorized workers employment and allow unscrupulous employers to accept documents with information obtained through identity theft and document fraud.  The current SSA databases that form the basis for the "No-Match" letters that are issued to employers and are the subject of this regulation suffer from the same defects.

Reviews of DHS's immigration records, both paper and electronic, have repeatedly raised concerns about the accuracy and maintenance of such data.    In 1996, the "Basic Pilot Program"— viewed by DHS as its most sophisticated and automated verification tool — was established to enable employers on a voluntary basis to check the Social Security and alien identification numbers of new hires against Social Security Administration (SSA) and the then Immigration and Naturalization Service's (INS) records.  A subsequent

Director, Regulatory and Management          on
U.S. Citizenship and Immigration Services
Department of Homeland Security
August 11, 2006
Page 3

Temple University report demonstrated the system maintained a 1.4% false non-confirmation rate.[1] While this is a seemingly small percentage, such an error rate applied to only 1 million employees would result in 14,000 otherwise eligible workers being denied employment due to erroneous data. There is no reason to believe that the SSA's databases are any more reliable.

The problem with the quality of the data in DHS and SSA databases used to generate immigration notices or SSA "No-Match" letters is compounded by the continuing lack of internal and external connectivity of these multiple databases. This lack of coordination requires queries of multiple databases and resource intensive efforts to resolve conflicts between inconsistent data on a worker's status.

The proposed rule's reliance on such flawed data increases the number of No-Match letters and thus the burden on employers to respond. This will increase the incentives for employers to implement schemes to move their employees off of their payrolls or to short-circuit the process by firing employees immediately. Implementing the proposed rule while employers and employees are forced to rely on the currently flawed DHS and SSA databases is likely to result in the sudden loss of employment for many workers who are actually authorized to work in the United States. Such "false negatives" have a serious impact on workers and the families of workers deprived of their jobs. They also harm employers who may lose valued employees or find it harder to hire new workers they need in a competitive labor market. Employers and workers will also waste a great deal of time and resources trying to satisfy the enhanced employer verification requirements based on systems known to have flawed data. Such burdens on workers, employers and our economy should not be imposed until DHS and SSA demonstrate that they have markedly improved the integrity of their paper and electronic immigration records.

We support efforts to address the shortcomings of the employment verification process so that it is an accurate tool to determine employment eligibility and to protect our nation. However, the harm that can reasonably be anticipated from the proposed rule's mandate that employers increase their reliance on flawed databases is further exacerbated in the construction industry, where short-term projects are common. Construction employers who require speedy hiring and firing decisions in order to man short-term projects can not be expected to reliably depend on information from flawed DHS and SSA databases. National security is not advanced by rulemakings that increase reliance on flawed systems. This is especially true when the proposed regulation's re-verification process

---

[1] Findings of the Basic Pilot Evaluation, Institute for Survey Research (Temple University) (June 2002). See also Report to Congress on the Basic Pilot Program, Department of Homeland Security/U.S. Citizenship and Immigration Services, June 2004.

Director, Regulatory and Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
August 11, 2006
Page 4

does nothing to stem the ability of unscrupulous contractors to avoid the regulatory system altogether.

**The Proposed Regulations Do Nothing to Prevent Employer
Avoidance Schemes and Would Therefore Exacerbate the
Already Widespread Exploitation of Off-the-Payroll Labor.**

In many low-wage industries and in construction in particular, contractors are classifying large numbers of their workers as "Independent Contractors" or paying them "off the books." Employers of low-income workers frequently misclassify their employees as Independent Contractors, either by giving them an IRS Form 1099 instead of a W-2, or by paying them in cash. This tactic not only saves the employer significant amounts in taxes (including payroll, workers' compensation, and unemployment compensation taxes), it also lets them off the hook for complying with employment regulations, worker protection laws and the need to bargain with unions. Predictably, this underground labor market is already flourishing in the very labor markets, such as construction, that use unauthorized immigrant labor and which would be the intended target of the proposed regulations.[2]

It is a simple fact that employers can reduce the cost of doing business through circumventing compliance with federal and state labor and workplace legislation. In a study prepared for the U.S. Department of Labor, researchers found that one important factor that "drives misclassification is the effort by employers to avoid the costs associated with . . . the regulations and reporting procedures that go along with having employees. Understanding and complying with all the labor laws and worker protection laws is often beyond the capabilities of many small businesses."[3]

The DHS now proposes to add to these incentives the significant additional incentive of avoiding a particularly cumbersome and risky administrative burden of responding to the No-Match letters. Plainly, moving workers off the payroll would avoid the burdens and risks imposed by the instant proposed regulations. Businesses that employ Independent

---

[2]  While the precise magnitude of the problem is difficult to assess, it is plainly huge. For example, estimates for misclassification of construction workers in Massachusetts in 2001-03 range from 14-24% of the workforce. Bernard and Herricks, "The Social and Economic Cost of Employee Misclassification in Construction," A Report of the Construction Policy Research Center at Harvard Law School/Harvard School of Public Health (2004), pp. 1-2.

[3]  Planmatics, Inc., "Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs," (2000) p. 27 (available at http://wdr.doleta.gov/research/FullText_Documents/op%5F05%2D00%2Epdf).

Director, Regulatory and Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
August 11, 2006
Page 5

Contractors do not submit W-2s and do not pay social security taxes to the SSA, and do not receive No-Match letters." Certainly, some workers are legitimately classified as Independent Contractors, but the misclassification of workers is widespread in many industries, including construction. Any additional payroll administrative burdens on construction contractors will only add to this burgeoning problem.

This problem of driving employers out of the employment relationship is not insoluble and does not mean that employer verification can not be part of an effective immigration policy. It does mean that the proposed regulations should not be imposed piece-meal, without provision for reducing false-positive No-Match letters, and disincentives for employers simply to move their workers off their payrolls. Accordingly, it is our view that the proposed regulations will fail in the goal of improving employment verification of suspected unauthorized immigrants. Instead, it will serve to drive even more employers to avoid compliance by exploiting more of their low-wage workers through off-the-payroll arrangements.

**Conclusion**

LIUNA believes a comprehensive review of the verification system and the many flaws and loopholes that exist in it may be very productive. However, piece-meal attempts to patch isolated components of the system are actually counterproductive because they will encourage increased avoidance of the system. Reforming the verification system short of a comprehensive overhaul may actually do more harm to workers, employers, our economy and America's security than the status quo. We respectfully but strongly urge that implementation of this proposed rule be delayed until a more comprehensive approach to employee verification is formulated by DHS or the Congress.

Sincerely yours,

TERENCE M. O'SULLIVAN
General President

mb



NATIONAL
IMMIGRATION
LAW CENTER
www.nilc.org

BOARD OF DIRECTORS
Iris Gomez
*Chair*
Massachusetts Law
Reform Institute

Cynthia Lange
*Secretary*
Fragomen, Del Rey,
Bernsen & Loewy, PC

Allen Erenbaum
*Treasurer*
Mayer, Brown,
Rowe & Maw

Richard Boswell
University of California
Hastings College of Law

Muzaffar Chishti
Immigration Policy
Institute at
New York University
School of Law

Lucas Guttentag
American Civil
Liberties Union,
Immigrants'
Rights Project

Michele Lord
Lord Ross

Linda Wong
Community Development
Technologies Center,
L.A. Manufacturing
Network Initiative

*Organizations listed for
identification purposes only*

EXECUTIVE DIRECTOR
Linton Joaquin

LOS ANGELES
(HEADQUARTERS)
3435 Wilshire Boulevard
Suite 2850
Los Angeles, CA 90010
213 639-3900
fax 213 639-3911

WASHINGTON, DC
1101 14th Street, NW
Suite 410
Washington, DC 20005
202 216-0261
fax 202 216-0266

OAKLAND
405 14th Street
Suite 1400
Oakland, CA 94612
510 663-8282
fax 510 663-2028

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

*Re:*     ***DHS Docket No. ICEB-2006-0004, Comment Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"***

To Whom It May Concern:

Attached are: (1) a hard photocopy of the comment prepared by the Low-Wage Immigrant Worker (LWIW) Coalition regarding **DHS Docket No. ICEB-2006-0004** and submitted via electronic mail on August 14, 2006; and (2) a document confirming the date and time of submission.

Please contact me with questions.

Sincerely,

Jennifer Lai

**Jennifer Lai**
Employment Policy Attorney
National Immigration Law Center
3435 Wilshire Blvd.
Suite 2850
Los Angeles, CA 90010
Voice: (213) 639-3900, ext. 123
Fax: (213) 639-3911
lai@nilc.org

## Marielena Hincapie

| | |
|---|---|
| **From:** | Marielena Hincapie [hincapie@nilc.org] |
| **Sent:** | Monday, August 14, 2006 5:11 PM |
| **To:** | 'rfs.regs@dhs.gov'; 'Arden.Ratana@dhs.gov'; moran@nilc.org |
| **Cc:** | 'aavendan@aflcio.org'; 'frank.clemente@changetowin.org'; 'esolomon@iwj.org'; 'tsmukler@iwj.org'; 'sarita@iwj.org'; 'mwaslin@nclr.org'; 'newman@ndlon.org'; 'pabloalvarado@ndlon.org'; 'asugimori@nelp.org'; 'emsellem@nelp.org'; moran@nilc.org; friedland@nilc-dc.org; lai@nilc.org |

**Subject:** DHS Docket No. ICEB-2006-0004

Dear Sir or Madam:

Attached is the Low-Wage Immigrant Worker Coalition's comment to **DHS Docket No. ICEB-2006-0004**.

Sincerely,

Marielena Hincapié

--------------------------------

Marielena Hincapie, Esq.
Director of Programs
National Immigration Law Center
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA 90010

213-639-3900 x. 112
213-639-3911 (fax)
hincapie@nilc.org  |  www.nilc.org

--------------------------------

The information contained in this e-mail message may be privileged, confidential, or otherwise legally protected from disclosure. It is also covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 et seq. If you are not the intended recipient of this message, you are informed that any retention, copying, distribution, and/or other use or dissemination of any portion of its contents is prohibited. If you believe you have received this e-mail message in error, please contact the sender immediately at hincapie@nilc.org or 213-639-3900, delete the message from any and all electronic files, and destroy all other copies as well. Thank you.

**No-Match Cert. Admin. Record  2357**

# Low-Wage Immigrant Worker Coalition

<u>VIA ELECTRONIC MAIL</u>

August 14, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, D.C. 20529

*Re:    DHS Docket No. ICEB-2006-0004, Comment Regarding "Safe-Harbor Procedures for
Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

The National Immigration Law Center (NILC) submits the following comment on behalf of the
Low-Wage Immigrant Worker (LWIW) Coalition in response to the request for public comment
by the Department of Homeland Security (DHS), Bureau of Immigration and Customs
Enforcement (ICE), on the proposed "Safe-Harbor Procedures for Employers Who Receive a
No-Match Letter," 71 FR 34281 (June 14, 2006).

The LWIW Coalition is co-convened by NILC, the American Federation of Labor – Congress of
Industrial Organizations (AFL-CIO), Change to Win (CtW), Interfaith Worker Justice (IWJ),
Jobs with Justice, the National Council of La Raza (NCLR), the National Day Laborer
Organizing Network (NDLON), and the National Employment Law Project (NELP).

The LWIW Coalition is our nation's broadest collaborative of advocates and organizers working
to improve the living and working conditions of low-income and low-wage immigrant workers.
The mission of the LWIW is to support this community of advocates by sharing strategies and
resources at the local, state, and national levels.

The signatories to these comments have ample experience in dealing with the adverse impact that
Social Security Administration's (SSA's) no-match letters have had on all workers, immigrant
and native-born alike. Through our legal assistance programs and organizing campaigns, we
have interacted with tens of thousands of low-wage workers and their families on matters related
to no-match letters and other Social Security number (SSN) verification matters. We have
assisted individual employees in correcting no-match discrepancies and educated both employers
and employees on their responsibilities in responding to no-match letters through written
materials, trainings, and technical assistance to a broad range of groups in the country.

---

American Federation of Labor – Congress of Industrial Organizations (ALF-CIO) ● Interfaith Worker Justice (IWJ)
● Jobs with Justice (JWJ) ● National Day Labor Organizing Network (NDLON) ● National Council of La Raza
(NCLR) ● National Employment Law Project (NELP) ● National Immigration Law Center (NILC)

**No-Match Cert. Admin. Record  2358**

The LWIW Coalition has also worked closely with SSA through the years to improve language in no-match letters and to include warnings to employers against discriminatory and retaliatory conduct. Our advocacy includes ongoing monitoring of national origin and citizenship status discrimination cases as well as unfair labor practices arising from SSN verification and no-match matters reported to the U.S. Department of Justice Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC), the Equal Employment Opportunity Commission (EEOC), and the National Labor Relations Board (NLRB). Some of the co-conveners of the LWIW have also been engaged in litigation involving employer misuses of no-match information to interfere with workers' rights to organize and exercise their labor rights. Throughout our work, we have remained steadfast in our commitment to safeguard and advance the rights and best interests of low-wage workers, their families, and their communities.

As a result of this work, the LWIW Coalition is alarmed by and strongly opposed to the implementation of the "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that no-match letters have had on workers' rights and trigger massive, potentially unlawful firings of low-wage workers across the nation. Overly cautious employers will fire listed workers before workers have a chance to show they are on the list mistakenly. But despite the disruption it will cause, the rule does nothing to solve our immigration problems.

DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of workers in an isolated, punitive immigration "enforcement" scheme on the eve of enactment of comprehensive immigration reform intended to make our immigration system work again. In the absence of such reform, the proposed changes would only stir up dust.

The proposed rule is simply the wrong rule at the wrong time. Both the House and Senate have passed immigration bills that contain sweeping new worksite verification and enforcement regimes that impose a new electronic verification system on all employers. Implementing the rule before the conclusion of the immigration debate would add a new, unnecessary, and unhelpful set of major changes for employers to learn and implement on top of the ones that will be added just a short while later when the new legislated changes take effect.

Although the rule causes enormous upheavals in the workplace, the rule will have *no* impact on undocumented migration, which is the purported purpose of this proposal. Our experience with no-match firings and workplace audits is very clear: *the fired workers will not leave the country*. In the absence of comprehensive immigration reform that addresses the root causes of undocumented migration, they will simply find other more marginal jobs, most likely in the unregulated cash economy. Because of this, the proposed rule will result in growth of the underground economy, which in turn will result in substantial losses in state and federal tax revenues as well as unfair competition.

In addition to its enormous impact on workers and on our economy, this proposal should be withdrawn because the rule attempts to transform the SSA no-match program into an immigration enforcement tool when the SSA does not have the capacity to fulfill this objective through its database. Additionally, the rule erodes our privacy rights, raises due process concerns, and radically departs from existing case law and longstanding federal guidance in this

area. It provides no solution to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by workers, taxpayers, and businesses. The LWIW Coalition therefore urges DHS to withdraw this rule in its entirety.

Our concerns are set forth in full below.

**The Proposed Rule Harms All Workers Regardless of Immigration Status**

*Hundreds of Thousands—Possibly Millions—of Workers, Including U.S. Citizens and Work-Authorized Noncitizens, Will Face Massive Firings*

As an initial matter, the notion that SSA no-match letters indicate that an individual is not authorized to work in the United States is simply incorrect. SSA no-match letters are *not* reliable indicators of work authorization or immigration status. Instead, these letters simply indicate that there is a discrepancy between a worker's SSN and/or name on file with the SSA based on information reported by employers on Internal Revenue Service (IRS) Form W-2 (Wage and Tax Statement). There are numerous reasons for the discrepancies, *none of which have anything to do with the immigration status or work authorization of workers*. Many of these mismatches are based, instead, on simple human error (such as clerical data entry mistakes and misspellings by the employee, employer, or SSA) or life changes (such as name changes, marriages, and divorces). The proposed rule, however, is based on the faulty premise that SSA no-match letters are foolproof indicators of work authorization. Because this premise is flawed, there are several, disastrous consequences that would flow from implementation of the rule.

This proposed rule will trigger massive firings across the nation. Based on our experience over the years but in particular with SSA's policy in 2002 where the agency sent the no-match letter to almost one million employers, the LWIW Coalition anticipates that the proposed rule will prompt similar panic and confusion among employers. This is likely to result in employers precipitously and indiscriminately firing workers who appear on a no-match list before workers have a chance to show that they are on the list because of the simple human error or life changes described above. As a result, these mass no-match firings may include the terminations of thousands of work-authorized employees who routinely receive SSA no-match letters.

U.S. citizens, lawful permanent residents, and other work-authorized employees were among the estimated 100,000 workers who lost their jobs as a result of the approximately 800,000 no-match letters sent by SSA in 2002.[1] Job losses were most acute in low-wage industries such as agriculture, cleaning, construction, food service, and health care. For example, no-match firings devastated the workforce at Stanford Medical Center in Palo Alto, California, where 83 percent of workers on a no-match list lost their jobs.[2] Based on the severity of the 2002 job losses, the U.S. Chamber of Commerce declared an official labor shortage and urged SSA to change its policy.[3] Under pressure from the Chamber and employers, as well as enormous pressure from

---

[1] Mary Beth Sheridan, "Records Checks Displace Workers: Social Security Letters Cost Immigrants Jobs," *The Washington Post*, Aug. 2, 2002.

[2] "A Crackdown on Workers," *The San Francisco Chronicle*, Aug. 12, 2002.

[3] "*The Immigration Crisis,*" Cox News Service, Aug. 14, 2002.

**No-Match Cert. Admin. Record  2360**

civil, immigrant, and worker rights advocates across the country, SSA agreed to decrease the number of no-match letters.[4]

No-match firings across the nation continued into 2003, however. In August, Peco Foods, Inc. of Canton, Mississippi terminated about 200 workers in response to no-match letters.[5] That same year, Suncast, Inc., a Chicago-area outdoor garden product manufacturer, terminated over 100 employees in response to no-match letters.[6] By the end of 2003, a national survey conducted by the University of Illinois at Chicago's Center for Urban Economic Development determined that approximately 53.6 percent of employers responding to no-match letters terminated the listed workers.[7] Despite strong warnings to employers that appeared on the face of the letter, the study found that workers were summarily fired, often without any opportunity to correct the no-match discrepancies or any explanation of the no-match process.[8]

Documented examples of adverse employment actions against U.S. citizens and other work-authorized noncitizens include:

- Mr. Samuel Harris. In late summer of 2003, Mr. Samuel Harris,[9] an African American man in Virginia, was fired from his job because his employer received an SSA no-match letter regarding a discrepancy with respect to Mr. Harris's SSN. Mr. Harris, who is a U.S. citizen, went to the local SSA office to correct his information. Apparently, SSA had issued Mr. Harris a duplicate SSN that belonged to a deceased person. Although Mr. Harris was able to correct his information with SSA, his employer refused to continue to employ him, thinking that Mr. Harris was engaging in identity theft or similar wrongdoing. He was fired and out of work for several months and had to file an arbitration case to get his job back.[10]

- Mrs. Noelle Lopez. In July 2002, Mrs. Lopez, a worker from North Carolina, was injured on the job. While she was on leave, her employer notified her that it had received an SSA no-match letter for her. She corrected the discrepancy, which was based on a typographical error in the W-2 that her employer had filed with SSA. Weeks later, while still on leave for her injury, the employer asked Mrs. Lopez to reverify that she continued to be eligible to work in the United States because her work authorization had expired. She had employment authorization based on Temporary Status Program (TPS), and had already applied for a renewal, but the Immigration and Naturalization Service (INS) sent her an Employment

---

[4] Chirag Mehta, et al., *Social Security Administration's No-Match Letter Program: Implications for Immigration Enforcement and Workers' Rights* (Center for Urban Economic Development, University of Illinois at Chicago, Nov. 2003) at 7, available at http://www.uic.edu/cuppa/uicued/npublications/recent/SSAnomatchreport.pdf (hereinafter "Mehta"); *Basic Information Brief: SSA "No-Match" Letters* (NILC, Feb. 2005) (hereinafter "NILC Brief") at 2, available at http://www.nilc.org/immsemplymnt/SSA-NM_Pack/Basic_Info_Brief_No-Match_Ltrs-2-15-05.pdf.

[5] Peggy Matthews, "Plan to Round Up, Deport Illegals Angers Activists," *The Clarion-Ledger*, Aug. 12, 2003.

[6] Stephanie Blozen, "Latinos Start Boycott Against Batavia Firms," *The Chicago Tribune*, Aug. 12, 2003.

[7] Mehta, *supra* note 4, at 13.

[8] *Id.* at 15.

[9] All individual worker names have been changed to protect their identities, but the names of workers and employers drawn from media sources are reproduced here as published.

[10] NILC Brief, *supra* note 4, at 4.

Authorization Document (EAD) with someone else's picture. Although she was able to straighten this problem out, when her doctor told her she could go back to work, the employer denied her a job because she had "too many immigration problems."[11]

The proposed rule only exacerbates this risk of unnecessary and unjust firings. Past experience indicates that, rather than navigating a complex series of steps and timetables to a "safe-harbor," panicked and confused employers will simply fire all workers whose names appear on the no-match list. The employer confusion across U.S. worksites is already detectable.

- <u>Mr. James Heggen</u>. Shortly after DHS issued the proposed rule, an employer in Massachusetts refused to hire Mr. Heggen, a lawful permanent resident of the United States, for a permanent clerical position due to a typographical error on his Social Security card. Mr. Heggen's name appears as "Heggen" on his alien registration card or "green card," but on his Social Security card, his name is spelled "Hegen"—with one less "g." Based on this missing "g," the employer denied Mr. Heggen a permanent position, claiming that it had to be *more careful in these times*. Mr. Heggen is Black and was born in the United Kingdom. His parents immigrated to the U.K. from the Caribbean. Together, the family immigrated to the United States when Mr. Heggen was a child. Because he and his parents received their permanent immigration documents decades ago, Mr. Heggen cannot file for a correction of his Social Security card locally, and, therefore, not quickly. Correcting this minor Social Security discrepancy could take several months. Frustrated after being denied this permanent position, Mr. Heggen contacted a local community-based legal services organization for assistance. This organization immediately sent a letter to the employer, setting forth the potential illegality of the employer's actions. Subsequently, the employer hired Mr. Heggen on a temporary basis. The week of August 7, 2006, after additional consultation with the organization, the employer hired Mr. Heggen for the permanent position.[12]

Recent media accounts of the proposed rule reveal that employers are already contemplating massive no-match firings as a response to the new rule. A construction company president told the *Tampa Tribune*, after attending a seminar for employers on the proposed rule, that some of his company's workers "won't be working for us in the future" if the rule is implemented and that he had great concern about "filling those spots."[13] *The Ledger* of Lakeland, Florida, reported that while the proposed rule may lead to penalties for employers, "workers, in turn, would lose their jobs," an effect which for Florida's largest growers' organization amounts to a "threat to national security."[14] An employment attorney representing several large employers reported to the *Washington Post* that, "From a practical standpoint, [the proposed rule] will have the effect [of employers] having to terminate employees. It will be devastating to many

---

[11] *Id.*

[12] Telephone interviews with Ingrid Nava, Employment Unit, Greater Boston Legal Services, Boston, Mass., July 28, 2006, and Aug. 10, 2006.

[13] Lindsay Peterson, "Proposal Targets Illegal Immigration," *The Tampa Tribune*, June 15, 2006.

[14] Kevin Bouffard, "Proposal May Pinch Growers," *The [Lakeland, FL] Ledger*, July 11, 2006, available at http://www.theledger.com/apps/pbcs.dll/article?AID=/20060711/NEWS/607110399/1004.

No-Match Cert. Admin. Record  2362

industries if people comply with it."[15] The proposed rule thus has placed the livelihoods of hundreds of thousands—possibly millions—of workers and their families on the line.

*The Proposed Rule Will Result in Increased Citizenship Status, National Origin, and Racial Discrimination*

The proposed rule creates two sets of potential employment discrimination: discriminatory firings and discriminatory refusal to hire. A disproportionate number of names on no-match lists are "foreign-sounding" names of newcomers to the United States, and many SSA letters are sent to employers with large numbers of newcomers in their workforces. Employers who believe they will face business disruption due to the letters have an incentive to prefer employees they think are less likely to receive the letters. Employers may also choose to simply dismiss employees who appear or sound foreign. These discriminatory employment actions would run afoul of federal and state antidiscrimination laws and other worker protections and lead to costly and protracted wrongful termination litigation.

Employment discrimination against authorized noncitizen workers—particularly against Latinos, Latinas, and Asians—was rampant after the passage of the 1986 Immigration Reform and Control Act (IRCA). A 1990 U.S. General Accounting Office (GAO) study reported a pattern of discrimination that resulted solely from employer sanctions, including discrimination on the basis of foreign accents or appearance and preferences of certain authorized workers over others. In fact, the GAO estimated that an average of 19 percent of employers—almost one in five—participated in one or more discriminatory practices as a result of the 1986 law. These results were confirmed by nearly a dozen studies conducted locally during the 1990s by human rights commissions and other organizations, which also found significant discrimination resulting from the implementation of employer sanctions.[16]

Employment discrimination has also increased since SSA began sending close to a million no-match letters in 2002. The number of immigration-related unfair employment referrals and investigations fielded by OSC has risen dramatically. From 1994 to 2000, OSC conducted only 20 investigations into firings stemming from employers that fired workers based on SSN verification matters. From 2001 to 2003, OSC opened 29 investigations. Three of the investigations opened after 2001 resulted in settlements favorable to workers, and ten investigations were open as of 2003.[17] Although recent statistics are unavailable, OSC recognized in its April 2005 quarterly newsletter that OSC "staff members frequently provide assistance to workers" who face adverse employment actions by employers based on the no-match letters.[18]

[15] Cindy Skrycki, "DHS Wants Workers, Papers to Match," *The Washington Post,* July 11, 2006 (quoting Monte B. Lake, an employment and immigration attorney).
[16] *Immigration Reform: Employer Sanctions and the Question of Discrimination,* GGD-90-62 (GAO, Mar. 29, 1990), available at http://archive.gao.gov/d24t8/140974.pdf.
[17] Mehta, *supra* note 4, at 25.
[18] *OSC Update* (OSC, U.S. Department of Justice, Civil Rights Division, Apr. 2004) at 2.

*The Proposed Rule Will Result in Increased Employer Retaliation Against Workers Who
Exercise Their Workplace Rights*

The proposed rule also places all workers at a higher risk of employer retaliation for labor
organizing and raising complaints about worksite conditions. Unscrupulous employers already
use the SSA no-match letter to stymie organizing campaigns and to retaliate against workers who
have been injured on the job or complain of unpaid wages or other labor violations. In
documented cases (including arbitration decisions) from across the country, employers initially
ignored SSA no-match letters and then decided to use them as a pretext to fire workers who
participated in efforts to improve working conditions and wages. The proposed rule would only
exacerbate this problem.

- North Carolina. In July 2006, during a heated legal battle over recent union election results,
  at least 24 Latino immigrant workers at a modular building construction company were
  suspended without pay because they were listed on a no-match letter. All 24 had voted to
  unionize. Many of the 24 have also initiated race and sex-based discrimination charges
  against their employer with the EEOC. A former supervisor at the company reported to the
  press: "These workers have been used and abused. As supervisors, we were told we needed
  production and to crack the whip to get it. We were told not to worry because these workers
  are just wetbacks and have no legal rights." A large group of African American workers
  have also filed complaints against this company with the EEOC. To protest the no-match
  firings, workers walked out on the day the firings took place. The workers and their union
  are also contemplating race and sex-based discrimination class action lawsuits.[19]

- California. In 2006, after months of intensive organizing, a group of nursing home workers,
  mainly immigrant Latina workers, marched to their manager's office to announce that they
  had joined together as a union in order to improve wages and working conditions and would
  seek formal recognition for their union under federal labor law. That afternoon, a head
  manager called one of leaders of the march into the office, pulled out a photocopy of that
  worker's Social Security card, wrote "NO GOOD" in bold letters across the photocopy, and
  suspended the leader without pay. Angered by management's action, the workers from the
  morning march crowded back into the manager's office and demanded reinstatement for their
  suspended colleague, denouncing management's action as a blatant anti-union tactic. Caught
  off guard, the manager immediately reinstated the suspended union leader. While these
  workers were successful, other workers have not been able to mobilize as effectively against
  manipulation of SSN verification issues by employers.[20]

- Oregon. In 2006, a Latina immigrant worker had been working as a housekeeper at an
  assisted living center. When it came time for her to qualify for health insurance and other
  benefits, the employer produced an SSA no-match letter. The worker suspects that the

---

[19] Telephone interview with Homer Marmalejo, United Brotherhood of Carpenters and Joiners of America,
organizer, Aug. 8, 2006; *see also* Bob Shiles, "Roger Carter Suspends More Than 20 Undocumented Workers,"
*Kinston [NC] Free Press*, July 19, 2006.
[20] Interview with Guadalupe Palma, Service Employees International Union, Long Term Care Division, Coordinator
III, in Los Angeles, CA, Aug. 1, 2006.

No-Match Cert. Admin. Record  2364

employer had received the letter earlier, but held it just before the benefits would have kicked in.[21]

- <u>Oregon</u>. In 2003, an employer in Oregon approached a group of workers who had complained about violations of their minimum wage and overtime rights, alleging that it had just received an SSA no-match list. The employer was requiring the workers to reverify their immigration status, and would not provide a copy of the letter to workers. Interestingly, this was *before* SSA began sending no-match letters to employers in March 2003.[22]

- <u>New York</u>. In 2002, a group of immigrant workers in New York went on strike to protest against poor working conditions. After receiving a no-match letter that the employer had initially ignored, the employer decided to use the no-match letter as a basis to reverify the immigration status of workers involved in the strike.[23]

If immigrant workers cannot enforce labor laws or organize under existing labor laws, it is less likely that native workers can assert these rights. The proposed rule thus poses enormous challenges for all low-wage workers. All workers face an increased risk of firings, retaliation, and abuse. U.S. citizens and authorized noncitizen workers could lose their jobs in discriminatory firings. Hundreds of thousands—possibly millions—of working families could be harmed, and therefore DHS should suspend this proposed rule immediately.

**Although the Proposed Rule Will Cause Enormous Upheavals in the Workplace, the Rule Has *No* Impact on Undocumented Immigration and Will Only Expand the Unregulated Underground Cash Economy**

Our experience with SSA no-match firings and workplace audits in the context of our current broken immigration system is clear: *the fired workers will not leave the country.* They will simply find other more marginal jobs, most likely outside of the traditional economy and "off the books" in the unregulated underground cash economy. Moreover, although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new obligations will increase pressure on "good" employers to take employees off the books, which also leads to growth of the underground economy. Expansion of the underground economy results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers. This result is nearly inevitable for any "crackdown" on workers and employers that is not accompanied by serious and practical reforms of the underlying immigration system.

*No-Match Firings Will Not Decrease the Number of Undocumented Workers in the United States*

Based on our recent experience under the current broken immigration system, high levels of SSA no-match firings will *not* drive undocumented workers and their families away from the United

---

[21] Brent Hunsberger, "Crackdown Coming on Bogus Papers," *The Oregonian*, June 25, 2006.
[22] NILC Brief, *supra* note 4, at 5.
[23] *Id.* at 4.

**No-Match Cert. Admin. Record 2365**

States. Instead, these workers immediately accept the next available low-wage job, even if it is off the books, out of sheer economic necessity, given the levels of poverty at which they and their families and communities must survive.[24]  When poverty is combined with an employer demand for below-market wage rates and an absence of government enforcement of labor protections in low-wage industries, undocumented workers will almost certainly remain in the United States even after a no-match firing.  The vast majority will reenter the labor force in unreported, cash-based employment relationships where they face further exploitation and abuse. Economists describe this effect as "churning" or unproductive turnover.[25]  The SSA no-match program has been criticized for creating "policy-induced churning in local labor markets as workers are either fired or quit their jobs only to join the overcrowded pool of workers vying for positions in traditional immigrant occupations."[26]  Fired workers do *not* simply leave the United States.

Undocumented workers constitute a large and growing segment of the workforce in the nation as a whole.  The share of these workers in industries such as agriculture, cleaning, construction, food service, and other low-wage occupations is approximately three times the share of native workers in these types of jobs.[27]  On any given day in our nation, more than 250,000 undocumented immigrants work as janitors, 350,000 work as housekeepers and maids, and 300,000 are groundskeepers.[28]  In the aggregate, such workers are an integral part of the U.S. economy, constituting a full 5 percent of the civilian labor force or 7.2 million workers.[29]

Unscrupulous employers have long taken advantage of the availability and reduced cost of undocumented immigrant labor in both the traditional economy and in the underground economy.  Undocumented workers are more likely to earn below minimum wage (two-thirds of undocumented workers earn below minimum wage compared to one-third of all workers).[30] IRCA's failed employer sanctions regime, along with the lack of government enforcement of labor protections in low-wage industries, has given free rein to unscrupulous employers.  Such

---

[24] It has been estimated that nearly half of all immigrant workers are low-income, defined as earning less than 200 percent of the minimum wage. Randy Capps, et al., *A Profile of the Low-Wage Immigrant Workforce* (The Urban Institute, Nov. 2003) at 2, available at http://www.urban.org/UploadedPDF/310880_lowwage_immig_wkfc.pdf. Fifty-six percent of all young children of immigrants live in poverty; sixty-four percent of foreign-born children of immigrants live in low-income families.  In immigrant families where both parents work, 24 percent of children live in poverty compared to 11 percent of the children of native workers.  Randy Capps, et. al, *Health and Well-Being of Young Children of Immigrants* (The Urban Institute, Feb. 2005) at 2, available at http://www.urban.org/UploadedPDF/311182_immigrant_families_5.pdf.

[25] *See* Avner Ahituv and Robert I. Lerman, *Job Turnover, Wage Rates, and Marital Stability: How Are They Related?* (The Urban Institute, Nov. 2004) at 5, available at http://www.urban.org/publications/411148.html (distinguishing "churning" and unproductive turnover from worker mobility).

[26] Mehta, *supra* note 4, at 18.

[27] Jeffrey S. Passel, *Unauthorized Migrants: Numbers and Characteristics: Basic Briefing Prepared for Task Force on Immigration and America's Future* (Pew Hispanic Center, June 2005) at 26–28, available at http://pewhispanic.org/reports/report.php?ReportID=46.

[28] Jeffrey S. Passel, *Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Pew Hispanic Center, Mar. 2006) at 11–12 (hereinafter "Passel"), available at http://pewhispanic.org/files/reports/61.pdf.

[29] *Id.* at 9.

[30] Jeffrey S. Passel, et al., *Undocumented Immigrants: Facts and Figures* (The Urban Institute, Jan. 2004) at 2, available at http://www.urban.org/url.cfm?ID=1000587.

-9-

employers routinely manipulate immigration law into a tool that sharpens wage differentials between undocumented and documented low-wage workers and suppresses wages for all. Even legitimate employers have admitted to the temptation to engage in similar practices or risk going out of business.[31] In recent years, Department of Justice (DOJ) and DHS officials have finally begun to recognize these wage differentials and the harm caused by an economic system that produces lower wages based on differences in immigration status.[32]

Increasingly, there is evidence demonstrating that raising the wages and working conditions of low-wage workers will actually reduce undocumented immigration by making the existing workforce relatively more attractive to employers.[33] Closing the wage differentials between differently work-authorized individuals and ensuring that all low-wage workers—current and future, documented and undocumented—have similar levels of mobility and enjoy full labor protections are the more effective ways to prevent undocumented immigration to the United States and to hold exploitative corporations accountable. A structural demand for undocumented labor can be reduced only by building a strong floor underneath all workers.

Poorly-conceived, punitive enforcement-only schemes like the proposed rule will force millions into the underground economy. The proposed rule will not decrease the numbers of undocumented workers in the United States, nor will it decrease their levels of employment. It will only decrease wage levels and deepen wage differentials based on immigration status, creating even more economic incentive for employers to hire undocumented workers. Accordingly, DHS should suspend this proposed rule and work with Congress and the Administration to pass comprehensive immigration reform that will address the underlying issue of undocumented migration.

*The Imposition of New Legal Obligations on Millions of Employers Will Push Them into the Underground Economy*

Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new and onerous set of legal obligations on millions of employers. The rule essentially deputizes employers as *de facto* immigration enforcement officers.

The proposed example of what constitutes "constructive knowledge," at Section 274a.1(l)(1)(iii)(B) of the proposed rule, is not the employer's *receipt* of a no-match letter, but

---

[31] K. M. Donato, et al., "Stemming the Tide? Assessing the Deterrent Effects of the Immigration Reform and Control Act," *Demography* 29 (2005) at 139–58.

[32] In the prosecution of Tyson Foods for the hiring of undocumented workers, assistant U.S. Attorney John P. MacCoon stated: "This trial is about corporate greed. . . . It's about what happens when a corrupt corporate culture makes the bottom line the all-consuming priority." Sherri Day, "Prosecutors in Smuggling Case against Tyson Contend Trial Is about Corporate Greed," *The New York Times*, Feb. 6, 2003. In the Tyson Foods case, the government hinged its $140 million pre-indictment settlement demand against defendant Tyson Foods on a novel "wage suppression" theory. The government claimed that Tyson Foods had reaped enormous profits by recruiting undocumented workers into its ranks and paying them at below-market wage rates. In his authorization of trial for the case, DHS Secretary Chertoff fully endorsed the DOJ's attempts to recover "suppressed wages." Thomas Green, et al., "Deputizing—and Then Prosecuting—America's Businesses in the Fight against Illegal Immigration," *Amer. Crim. L. R.*, June 22, 2006, at 5, 7.

[33] Ivan Light, "How L.A. Kept Out a Million Migrants," *The Los Angeles Times*, Apr. 16, 2006.

---

the employer's *failure to act* after receiving a no-match letter. By defining the "failure to take reasonable steps" upon receipt of a no-match letter as creating constructive knowledge, the proposed regulation makes it necessary for a law-abiding employer to take some action in response to a no-match letter. Therefore, as set forth in Sections 274a.1(l)(2)(i) and 274a.1(l)(2)(iii) of the proposed rule, an employer who receives a no-match letter is essentially forced to apply due diligence to a series of complicated steps that demonstrate correction of each "no-match" discrepancy. If the employer fails to resolve the correction in the allotted time, the employer faces a finding that it had constructive knowledge of hiring an undocumented worker. This finding could be used against the employer in a federal prosecution that could result in civil and criminal penalties. This is a radical change from the longstanding position that the various federal agencies implicated in this SSA no-match issue have taken.

Employers who wish to avoid loss of profits and productivity while minimizing exposure to the heightened risk of federal immigration liability under the proposed rule will be forced into one of three no-match evasion strategies:

First, employers will take their businesses off the books and into the underground economy. For one thing, keeping workers off the books means avoiding government scrutiny and additional no-match letters. For another, there are immediate financial incentives for employers to keep workers off the books. The proposed rule thus has a perverse effect of targeting and punishing "good" employers who keep good records and want to stay on the books. These good employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records and who consequently will not be reached by the new rule.

Second, employers will intentionally misclassify their employees as "independent contractors" as a means of evading this responsibility.

Finally, employers will engage in subcontracting schemes by interposing intermediary labor contractors between themselves and their employees, pretending their workers are employees of these sham contractors and exposing workers to marginal, fly-by-night employment practices by middlemen.

*Growth of the Underground Economy Results in Massive Losses to State and Federal Coffers and Unfair Competition*

A policy that results in more employers choosing to keep their employees off the books or intentionally misclassifying employees is harmful to state and federal government coffers and creates unfair competition against "good" employers. Certain employers will see a clear and immediate economic advantage to taking their employees off the books. At a minimum, they will reduce their payroll costs by an average of 8 percent by ceasing to pay costs for federal legally required benefits, including Social Security, Medicare, unemployment insurance and workers' compensation.[34] For employers who, as a policy or due to a collective bargaining agreement, provide other benefits, such as life, health or disability insurance, paid leave, or retirement and savings benefits, the potential total savings could add up to an average of 29.9

---

[34] *Employer Costs for Employee Compensation* (U.S. Department of Labor Bureau of Labor Statistics, Mar. 2006), available at http://www.bls.gov/news.release/ecec.nr0.htm.

percent of total payroll costs.[35] This means massive losses to state and federal coffers and a competitive advantage over employers who are not cutting these costs.

The projected loss in federal tax revenues ranges from $19 million to $1.9 billion annually. This range is derived from the following figures: In June 2006, the total U.S. labor force was estimated at 144.4 million workers.[36] As set forth above, about 7.2 million undocumented workers were employed in March 2006, accounting for a full 5 percent of the civilian labor force.[37] International accounting and consulting firm Price Waterhouse Coopers has projected that over 5 million U.S. workers would be misclassified as independent contractors (to avoid paying legally required benefits) in 2005 and that the federal tax revenue losses due to misclassification in 2004 would be $4.7 billion.[38]

Based on this projection and these worker population estimates, if only one-third of all undocumented workers or at least two million workers, or 1.4 percent of all U.S. workers, were to be pushed off the books as a result of the proposed regulation, the loss to federal coffers would be approximately $1.9 billion in one year. Alternatively, making a conservative assumption that 100,000 workers are pushed off the books as a result of the proposed regulation, the loss to federal coffers would be approximately $19 million annually.

The losses to the Unemployment Insurance (UI) trust fund alone ranges from $277 million to $13.8 million per year. This range is derived from the following figures: A study for the U.S. Department of Labor estimating the impact of employee misclassification on the UI trust fund alone was computed for the period from 1990–1998.[39] Assuming a 1 percent level of misclassification, the study determined that the loss would be an annual average of $198 million to the UI trust fund alone.

Based on this study for the DOL, assuming that at least 2 million workers were to be pushed off the books as a result of the proposed regulation, the impact on the UI trust fund alone would be an average of over $277 million annually. Alternatively, assuming that only 100,000 workers, or .07 percent of the workforce, are pushed off the books (the estimated number that lost their jobs due to no-match letters in 2002), the impact on the UI trust fund alone would be $13.8 million per year.

Employers who go off the books will experience an enormous net savings in taxes, which will create a competitive advantage for them over employers whose payroll-related expenses are

---

[35] *Id.*

[36] *Employment Situation Summary* (U.S. Department of Labor Bureau of Labor Statistics, July 2006), available at http://www.bls.gov/news.release/empsit.nr0.htm.

[37] Passel, *supra* note 28, at 11–12.

[38] *Projection of the Loss in Federal Tax Revenues Due to Misclassification of Workers* (Coopers and Lybrand, now Price Waterhouse Coopers, for Coalition for Fair Worker Classification, June 1994) at 5, available at http://www.carpenters.org/misclassification/State and Other Research Studies/Coopers-Lybrand--Projection of Loss of Federal Rev Due to Missclassification.pdf.

[39] *Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs* (Planmatics, Inc. for U.S. Department of Labor Employment and Training Administration, Feb. 2000) at 87, available at http://wdr.doleta.gov/owsdrr/00-5/00-5.pdf.

No-Match Cert. Admin. Record  2369

higher because they are playing by the rules. A report prepared for the U.S. Department of Labor observed: "[C]ost considerations and aggressive competition are twin pressures that induce an employer to engage in behavior that creates an inequitable playing field in the business community for employers who correctly classify their employees and pay taxes."[40]

The State of California even developed a joint-agency strike force to address abuses created in the underground economy. This strike force has observed the impact of this employer behavior on "good" employers: "[W]hen businesses operate in the underground economy, they gain an unfair competitive advantage over businesses that comply with various business laws. This causes unfair competition in the marketplace and forces law-abiding businesses to pay higher taxes and expenses."[41] When the desire to avoid government scrutiny is combined with the immediate economic savings from avoiding payment of taxes and employer-provided benefits, some employers will see a clear competitive advantage in taking their workforce underground. The implementation of this proposed rule thus disadvantages those employers who play by the rules.

**DHS Should Suspend The Proposed Rule Because the SSA No-Match Program Is Ill-Suited As an Immigration Enforcement Tool**

*The SSA No-Match Program Cannot Meet the Needs and Objectives of Immigration Enforcement Because the SSA Database Is Not an Immigration Database*

Each year employers send IRS Forms W-2 to SSA indicating their employees' annual earnings. SSA matches each worker's name and SSN to the Numerical Identification File (NUMIDENT), which is SSA's primary database of SSN holders.[42]

NUMIDENT is *not* an immigration database and is made up of information collected from applications for initial or replacement SSNs.[43] The database contains only limited and incomplete immigration information.[44]

---

[40] *Id.*

[41] *2003 Annual Report: California Joint Enforcement Strike Force on the Underground Economy* (Employment Development Department, State of California, June 30, 2004) at 3, available at http://www.edd.ca.gov/taxrep/txueo03.pdf; *see also* Francois Carerre, et al., *The Social and Economic Costs of Employee Misclassification in Construction* (Construction Policy Research Center at Harvard Law School and Harvard School of Public Health, Dec. 2004), at 7 (noting that "[m]isclassification creates challenges for compliant employers because it creates an uneven 'playing field.' Employers who respect the law and classify employees appropriately have a higher wage bill and can get underbid by contractors that do not comply and have lower costs.").

[42] *Report to Congress on the Basic Pilot Program* (U.S. Citizenship and Immigration Services, June 2004) (hereinafter "USCIS Report") at 2.

[43] Kevin Jernigan, "Eligible to Work? Experiments in Verifying Work Authorization," *Migration Policy Institute Insight,* Nov. 2005 (hereinafter "Jernigan") at 3.

[44] The database "contains information on name, date of birth, and citizenship status of persons issued Social Security cards, which enables SSA to confirm work authorization for U.S. citizens and some noncitizens who are permanently work authorized." USCIS Report, *supra* note 42, at 2. SSA collects immigration status information only on those persons who are work-authorized incident to status, such as lawful permanent residents, asylees, and refugees. *Id.* at 4.

---

- 13 -

Even the limited immigration status information in NUMIDENT regularly becomes inaccurate because it is *not* automatically updated when a worker's immigration status or work authorization changes.[45] NUMIDENT is particularly inaccurate with respect to work-authorized noncitizens in its use with the Basic Pilot Program. According to U.S. Citizenship and Immigration Services (USCIS), work authorization for more than 50 percent of the cases of noncitizens could not be electronically confirmed by NUMIDENT, compared with 0.2 percent for native-born citizens.[46]

If there is a match of the SSN and the first seven letters of the surname between NUMIDENT and the W-2, the earnings are posted to the individual worker's Master Earnings Record. About 10 percent of submissions *cannot* be matched. SSA then does more than 20 "front-end validation routines," which are automated processes that manipulate names and SSNs to correct mistakes and find a correct match.[47] These "front-end validations" do *not* involve collection or use of immigration data.

If a valid record cannot be identified, SSA posts the earnings to its Earnings Suspense File (ESF). The ESF contains earnings reports with names and SSNs that do not match SSA records. SSA then performs "back-end" processes to try to match the earnings. SSA's "back-end" processes do not involve collection or use of immigration data.

The SSA back-end processes include using corrections generated through IRS processes. The back-end processes also include generating SSA no-match letters to employees and employers.[48] No-match letters are just one of the "back-end" processes that SSA regularly uses to ensure that earnings are properly attributed to workers. These letters are sent by SSA to inform employers and employees that the worker is not getting proper credit for their earnings due to a discrepancy.

*Immigration Status or Lack of Immigration Status Cannot Be Presumed from Posting to the ESF*

The ESF contains hundreds of millions of records, and a "significant number of earnings reports in the ESF still belong to U.S. citizens and work-authorized noncitizens."[49] The percentage of ESF records belonging to unauthorized workers is entirely unknown. The majority of reinstatements (matching to a worker's Master Earnings Record) are still made to U.S.-born citizens.[50] ESF records do not in any way indicate immigration status. The information in ESF

---

[44] The SSN application form itself focuses on noncitizens' work authorization rather than immigration status. *See* Form SS-5 (May 2005), available at http://www.ssa.gov/online/ss-5.pdf.

[45] Jernigan, *supra* note 43, at 12.

[46] USCIS Report, *supra* note 42, at 4–5.

[47] *Social Security, Better Coordination Among Federal Agencies Could Reduce Unidentified Earnings Reports*, GAO-05-154 (GAO, Feb. 2005) (hereinafter "GAO Feb. 2005") at 7–8.

[48] *Id.*

[49] *Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work*, GAO-06-814R (GAO, July 11, 2006) (hereinafter "GAO July 2006") at 8.

[50] *Id.; see also* GAO Feb. 2005, *supra* note 47, at 18.

No-Match Cert. Admin. Record  2371

consists of the worker's name, SSN, employer's identification number, and the earnings amount.[51]

The ESF simply consists of information on workers whose records do not match SSA records, for reasons that include errors or obsolete data, lack of an SSN, missing first or last names, or use of nonalphabetic characters.[52]  The lack of an SSN is a particularly instructive example of an innocent basis for inclusion in the ESF that is frequently and wrongly cited as a basis for determining lack of work authorization.  Both the SSA and the IRS advise employers to use all zeros or to write in *"applied for"* when the worker has applied for but not yet received an SSN.[53]

SSA no-match letters are therefore *not* reliable indicators of work authorization or immigration status.  There is no way to accurately determine whether a SSA no-match letter is the result of typographical error, out-of-date information, or some other legitimate reason, let alone to determine an illegitimate reason.[54]  The SSA itself has repeatedly recognized that its no-match letter does not indicate immigration status or lack of authorization to work.  The current no-match letter explicitly states that a worker's identification in the letter "makes no statement" about his or her immigration status.[55]  The SSA database simply does not have the capacity to meet the needs and objectives of an immigration enforcement program.  Because of these limitations, this proposal will only result in an adverse impact on workers and our economy, including the increased discrimination and abuse of workers described above.  DHS should therefore suspend this rule.

**The Rule Modification Would Give DHS Indirect Access to Tax Information It Cannot Access Directly**

DHS should also suspend this proposed rule because it attempts to indirectly access sensitive tax information that is protected by federal law.  Specifically, Section 6103 of the Internal Revenue Code protects the confidentiality of taxpayer returns and taxpayer information and provides only limited exceptions to the sharing of personal identifying data.  This confidentiality is deemed essential to voluntary tax compliance.  The GAO has explicitly recognized that the ESF includes "sensitive taxpayer information that is protected by various laws and regulations" and that statutory authority would be required to provide DHS access.[56]

---

[51] GAO July 2006, *supra* note 49, at 8.

[52] *Id.; see also* GAO Feb. 2005, *supra* note 47, at 11–12.

[53] GAO Feb. 2005, *supra* note 47, at 11, n. 4.

[54] In testimony last month before the House Committee on Ways and Means, the Commissioner of Social Security emphasized that the source of SSA's database information is the Form W-2, and "there is no citizenship or immigration status information on that document." *See* Statement of The Honorable Jo Anne B. Barnhart, Commissioner, Social Security Administration, *Testimony Before the House Committee on Ways and Means* (July 26, 2006), available at http://waysandmeans.house.gov/hearings.asp?formmode=view&id=5172.

[55] Letter, Hurt, Assoc. Comm. for Central Op. SSA (Oct. 9, 2004) (hereinafter "Hurt Letter").

[56] GAO July 2006, *supra* note 49, at 8.

No-Match Cert. Admin. Record  2372

No statutory authority currently exists to provide DHS with access to this information.[57] As a result, DHS cannot presently obtain no-match information directly from SSA.

SSA no-match letters to employers frequently include taxpayer identity and return information. This rule allows DHS to commandeer the information contained in no-match letters and therefore allows DHS to circumvent the tax code's confidentiality restrictions. DHS should not be permitted to do by rule change what it cannot do without additional statutory authority.

Breaching the confidentiality of tax records would have the counterproductive result of discouraging tax compliance. Moreover, it would encourage employers and workers alike to enter the underground economy and not pay into our tax and Social Security systems.

**The Proposed Rule Dramatically Alters the Definition of "Constructive Knowledge" and Makes a Stark Departure from Existing Case Law and Longstanding Federal Guidance on No-Match Letters**

As an evidentiary matter, an employer's receipt of an SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule alters the definition of constructive knowledge and makes a stark departure from existing case law and longstanding federal guidance in this area.

In the seminal *Collins Food Intn'l v. I.N.S* case, the Ninth Circuit cautioned against the expansion of the doctrine of constructive knowledge: "IRCA . . . is delicately balanced to serve the goal of preventing unauthorized alien employment while avoiding discrimination against citizens and authorized aliens. The doctrine of constructive knowledge has great potential to upset that balance, and it should not be expansively applied." 948 F.2d 549, 554-555 (9th Cir. 1991).

Accordingly, the court instructed that "[a] finding of constructive knowledge requires "willful blindness" and "to expand the concept of constructive knowledge . . . would not serve the intent of Congress, and is certainly not required by [IRCA]." *Id.* at 555.

Contrary to DHS's assertions in the supplemental text, the proposed regulation would extend the definition of "constructive knowledge" well beyond the holdings in *Collins* and in *Mester Manufacturing Co. v. INS*, 879 F.2d 561 (9th Cir. 1989), and other constructive knowledge cases arising under the employer sanctions provision of the Immigration and Nationality Act, 8 U.S.C. § 1324a.

Indeed, the supplemental text misrepresents *Mester* by stating that the employer in that case merely received some evidence that the employee was not authorized to work. This is simply incorrect, and significantly downplays the type of information received by the employer, and relied upon by the court in its decision. In *Mester*, the court held that an employer had constructive knowledge of a worker's unlawful status when it received information directly *from*

---

[57] In contrast, such authority exists with respect to the Nonwork Alien File, which includes information about workers who are working though they have been issued nonwork SSNs.

*the INS* that an employee was an "illegal alien" but did not terminate the employee for two weeks. *Id.* at 567–68.

Consistent with *Mester*, cases have found constructive knowledge only where the employer has been provided specific information from a source knowledgeable about a worker's immigration status, where the employer failed to complete the Form I-9 (coupled with other suspicious circumstances), or in egregious circumstances. *See U.S. v. Jonel, Inc.* 1998 WL 804705 (OCAHO), \*14 (Labor Department notice to employer that workers were unauthorized constituted constructive knowledge); *New El Ray Sausage Co. v. I.N.S.*, 925 F.2d 1153, 1157 (9th Cir. 1991) (INS gave employer "specific and detailed information" that it was employing undocumented workers); *U.S. v. American McNair*, 1OCAHO 285 (1991) (employee failure to present any work authorization documents and notification of employer that he was ineligible for amnesty constituted constructive knowledge); *U.S. v. Fragale,* 1999 U.S. Dist. LEXIS 12616 (E.D. Pa. 1999) (constructive knowledge when human resources manager and foreperson in charge of hiring told employer that a large percentage of workforce was undocumented, and employer had received notice from INS that some workers were undocumented).

Moreover, in its attempt to convert the SSA no-match letter into a method of verifying immigration status or authorization to work, the proposed rule directly contravenes longstanding federal guidance from SSA, OSC, and former INS General Counsel.

SSA's position on no-match letters and immigration enforcement is set forth in clear terms on the face of the letter itself. The letter provides the following warning to employers:

> IMPORTANT: This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number. Nor does it make a statement about an employee's immigration status.[58]

For years, INS General Counsel has instructed employers along identical lines:

> If the document or documents presented to verify work authorization appear on their face to be genuine and to reasonably relate to the individual, the subsequent receipt of the SSA letter mentioned above does *not* impose any affirmative duty upon the employer to investigate further into an employee's eligibility to work in the United States. In addition, the receipt of this SSA letter by the employer, *without more*, would *not* be sufficient to establish constructive knowledge on the part of the employer regarding the employment eligibility of the named employee.[59]

---

[58] Hurt Letter, *supra* note 55.

[59] Letter, Virtue, Acting Gen. Coun. INS, HQ 274A (Feb. 17, 1994) (emphasis added); for reference, the LWIW Coalition has attached this letter as Exhibit 1 to this comment.

OSC has also provided similar guidance:

> The receipt of a no-match letter, standing alone, does not indicate to an employer that he or she need question the genuineness of documents or information previously presented to complete an INS Form I-9.[60]

This proposed regulation thus turns established federal guidance on no-match letters on its head. At the very least, the proposal will result in conflicting guidance from multiple federal agencies and cause employer and employee confusion.

## The Costs of Implementing the Proposed Rule are Prohibitive

If the proposed rule is to be carried out as envisioned, the government will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. Employer confusion is already evident from high number of questions submitted employers in their comments opposing the rule. In particular, many employers have submitted questions regarding the rule's unrealistic and unreasonable timetables for compliance.

Therefore, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA ultimately has to respond to the inevitable increase in employer (and employee) inquiries about this confusing rule. The actual costs of the current SSA no-match letter program are already substantial.[61] The actual costs of administrating a new program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law.

## The Procedure to be Followed Under the Proposed Rule When an Employer Receives Notice from DHS Denies Employees Due Process of Law

Section 274a.1(l)(1)(iii)(C) of the proposed rule includes the following as a circumstance that would amount to constructive knowledge where the employer "[f]ails to take reasonable steps after receiving information indicating that the employee may be an alien who is not employment authorized, such as . . . [w]ritten notice from the Department of Homeland Security that the immigration status document or employment authorization document presented or referenced by the employee in completing Form I-9 was assigned to another person, or that there is no agency record that the document was assigned to any person."

---

[60] Letter, Sarah DeCosse, Sr. Tr. Atty OSC (Apr. 1, 2004).

[61] *See* Mehta, *supra* note 4, at 7, n. 2 (noting that SSA's current attempts to reduce the ESF through no-match letters have cost U.S. taxpayers the following amounts: "$5.4 million to send notices to every individual whose name and SSN do not match SSA's records; $600,000 to send 944,000 notices to all employers who submitted wage reports with at least one item posted to the ESF; more than $200,000 for system maintenance and cyclical changes; and an average of $9.00 for each call to SSA's national toll free telephone number generated by the notices. SSA estimates that the agency received about 100,000 inquiries throughout 2002 regarding the TY 2001 letter.").

No-Match Cert. Admin. Record 2375

Under Section 274a.1(l)(2)(iii), an employer who receives such a notice will not be deemed to have constructive knowledge of the employee's unauthorized status if the employer takes reasonable steps to resolve the question raised by DHS and, if the employer does not verify with DHS that the document was assigned to the employee, the employer completes a new I-9. The employee cannot use the alien registration number, or "A-number," that is the subject of the written notice from DHS.

While this procedure may protect the employer, it entirely leaves out any possibility for the *employee* to have access to his or her DHS immigration file and any opportunity to correct errors in the file that would lead to DHS providing erroneous information to the employer. This access and an assured opportunity to correct errors in immigration records are critical because immigrants do not have easy, automatic, timely access to their immigration records, and immigration records are error-prone.

For years, government agencies have criticized the quality and accuracy of immigration records.[62] Problems with immigration records have continued even after the dissolution of the INS and the creation of new immigration agencies in DHS. The information technology environment at USCIS has been criticized as inefficient, and USCIS continues to rely on manual and paper-based processes.[63] As an example of how DHS records and processes go awry, in December 2005 DHS had to "recall more than 60,000 green cards because a computer glitch miscalculated immigrants' residency start dates."[64] USCIS sent letters instructing immigrants to mail their cards back. Unfortunately, USCIS sent the letters to many immigrants whose green card "resident since" dates were actually correct. USCIS then advised community-based organizations working with immigrants that its information technology staff was working to determine who received the mailing in error and that USCIS intended to send out a second letter to all individuals who received the initial letter in error.

Moreover, under current law, immigrants have access to their immigration files (both "alien files" and Border Patrol requests) only by filing Freedom of Information Act (FOIA) requests. FOIA requests for files must be made in writing and mailed to a central location, at the National Records Center in Missouri.[65] This means that immigrants who need access to their files to determine the nature of the erroneous information and then to correct this information as envisioned under Section 274a.1(l)(iii)(C) of the proposed rule are dependent on FOIA procedures which are not designed for this purpose. The lengthy and unpredictable timetables and cumbersome process for the FOIA process make it difficult for immigrants to both obtain their files and then correct mistaken information within Section 274a.1(2)(ii)'s compliance period.

The proposed rule thus raises critical due process concerns for immigrants. It fails to guarantee adequate access and an assured opportunity to immigrants who wish to correct errors in their

---

[62] *INS Data: The Track Record* (NILC, 2003), available at http://www.nilc.org/immlawpolicy/misc/INS_data_accuracy.pdf.

[63] *USCIS Faces Challenges in Modernizing Information Technology*, OIG-04-41 (DHS, Office of Inspector General, Sept. 2005), available at http://www.dhs.gov/interweb/assetlibrary/OIG_05-41_Sep05.pdf.

[64] Solomon Moore, "Green Cards Recalled Because of Glitch," *The Los Angeles Times*, Dec. 6, 2005.

[65] *See* USCIS, *Freedom of Information and Privacy Acts*, http://www.uscis.gov/graphics/aboutus/foia/index.htm.

immigration records. It creates penalties for employees when their immigration status or documents cannot be confirmed. It does not, however, set any time period for DHS to respond to immigrants' requests to review their files, nor does it place any obligation on DHS to correct immigrants' records in a timely fashion.

### The Proposed Rule May Exceed DHS's Authority

*DHS May Not Have Authority to Restrict the List of Acceptable Documents for the Reverification Process*

The proposed rule would create an exception to the list of documents that can be used to reverify the worker's employment authorization and identification as part of the I-9 requirement. But it appears that DHS may lack the ability to impose such restrictions. According to the INA, only the Attorney General has authority to promulgate regulations restricting the list of acceptable documents. 8 U.S.C. § 1324a(b)(1)(E). According to the statute, the Attorney General may only restrict the list of acceptable documents if he "finds, by regulation that any [of the listed documents] does not reliably establish [employment] authorization or identity or is being used fraudulently to an unacceptable degree." *Id.* Importantly, this power of the Attorney General was not transferred to the DHS upon its creation and the dissolution of the former Immigration and Nationality Service. 8 U.S.C. § 1103(a) (transferring powers under the INA to the Secretary of the DHS, *except* those that "relate to the powers, functions, and duties conferred upon" "the Attorney General," among others) (emphasis added). There is no indication in 8 U.S.C. § 1324a(b)(1)(E) and accompanying notes that the provision was ever amended to transfer the AG's authority to promulgate regulations to the DHS.

Despite this express statutory rule exclusively vesting the ability to restrict the congressionally approved list of I-9 documents to the Attorney General, Section 274a.1(l)(2)(iii) of the proposed rule would give DHS the power to restrict which documents are acceptable in the reverification process. According to that section, only documents bearing a photograph and *not* containing the SSN that triggered the no-match letter will satisfy the reverification requirement under the I-9 process. *Id.* Under current law, however, documents lacking photographs and those that include Social Security numbers are acceptable—even if the SSN triggers a no-match letter. 8 U.S.C. § 1324a(b)(1)(C), (D). Therefore, the proposed rule may inappropriately usurp the Attorney General's exclusive power to alter the congressionally created list of approved documents for reverification of a worker's status under the I-9 process and should be rejected.[66]

### RECOMMENDATION

In sum, we strongly oppose the Department of Homeland Security's proposed regulation. DHS should not risk the livelihoods of hundreds of thousands—possibly millions—of workers in an isolated, punitive immigration "enforcement" scheme on the eve of enactment of *comprehensive immigration reform.* Although the rule will cause enormous upheavals in the workplace, the rule will have *no* impact on undocumented migration, which is the purported purpose of this

---

[66] The proposed rule may also violate INA Section 274A(d)(3), which requires notice by the President to the House and Senate Judiciary Committees before changes are made to the employment eligibility verification system. We do not know whether the President has provided such notice to the appropriate committees.

proposal. Our experience with no-match firings and workplace audits is very clear: *the fired workers will not leave the United States*. In the absence of comprehensive immigration reform that addresses the root causes of undocumented migration, they will simply find other more marginal jobs, most likely in the underground economy. Because of this, the proposed rule will result in growth of the underground economy, which results in substantial losses in state and federal tax revenues as well as unfair competition. The proposed rule is simply the wrong rule at the wrong time. It provides no solution to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by workers, taxpayers, and businesses. For all these reasons, we recommend that the Department of Homeland Security withdraw this proposed rule in its entirety.

Respectfully submitted,

**The Low-Wage Immigrant Worker (LWIW) Coalition**

**Co-Convened By:**

American Federation of Labor – Congress of Industrial Organizations (AFL-CIO)
Change to Win (CtW)
Interfaith Worker Justice (IWJ)
Jobs with Justice
National Council of La Raza (NCLR)
National Day Laborer Organizing Network (NDLON)
National Employment Law Project (NELP)
National Immigration Law Center (NILC)

**Contact:**

Marielena Hincapié, Esq.
Director of Programs
National Immigration Law Center
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA 90010
Phone: 213-639-3900
Fax: 213-639-3911
www.nilc.org

No-Match Cert. Admin. Record 2378



Immigration and Naturalization Service

HQ 274A

Office of the General Counsel                  425 Eye Street N.W.
                                               Washington, D.C. 20536

FEB 17 1994

Mr. Carl G. Borden
California Farm Bureau Federation
Office of the General Counsel
1601 Exposition Boulevard, FB3
Sacramento, CA 95815-5318

Dear Mr. Borden:

This letter is in response to your correspondence dated August
11, 1993, concerning the receipt of a letter from the Social
Security Administration (SSA).  The SSA letter in question
informs an employer that the social security number of an
employee does not agree with SSA records.  Specifically, you ask
whether an employer who receives this letter from SSA can
continue to rely on the employment eligibility documents
presented by that employee, assuming the documents appear on
their face to be genuine and to relate to the employee?

If the document or documents presented to verify work
authorization appear on their face to be genuine and to
reasonably relate to the individual, the subsequent receipt of
the SSA letter mentioned above does not impose any affirmative
duty upon the employer to investigate further into an employee's
eligibility to work in the United States.  In addition, the
receipt of this SSA letter by an employer, without more, would
not be sufficient to establish constructive knowledge on the part
of the employer regarding the employment eligibility of the named
employee.  As you correctly note in your correspondence, this
letter from SSA could be prompted by a number of different
reasons having nothing to do with an employee's eligibility to
work in the United States.

The answer provided above specifically applies to a situation
where the employer receives such a letter from SSA and the
employer has no additional evidence that an employee may not be
work authorized. It should be noted, however, that if an employer
receives notice from the Immigration and Naturalization Service
(INS) that a social security card or other document presented to
establish work authorization is not valid, the employer does have
a duty to inquire further to ensure that the individual is
authorized to work in the United States before the employer can
continue to employ that individual.  In addition, while an
employer has no affirmative duty to inquire into an employee's

employment eligibility based solely upon receipt of a letter from
SSA, if for some reason the employer discovers evidence that an
employee may not be authorized to work in the United States, the
employer must inquire further to verify the employment
eligibility of that employee.  If the employer is unable to
verify work authorization, the employer cannot continue to employ
that individual.

It should be noted that telephonic inquiries from employers
regarding the employment authorization of employees will not be
honored by INS.[1]  However, if an employer suspects fraud, as it
relates to INS documents, the employer may ask INS to physically
examine the documents.

I hope that the above information is helpful to you.  If you have
any further questions, please contact Michael C. McGoings,
Associate General Counsel at (202) 514-2895.

Sincerely,

Paul W. Virtue
Acting General Counsel

---

    [1]  (The only exception is where the written consent of that
individual has been obtained.)  See Salinas-Pena v. INS, No. 86-
1033-DA (D.Oregon, March 16, 1988).

- 2 -



**NATIONAL COUNCIL OF LA RAZA**

National Office
Raul Yzaguirre Building
1126 16th Street, N.W.
Washington, DC 20036
Phone: 202.785.1670
Fax: 202.776.1792
www.nclr.org

**Janet Murguía,** President

August 11, 2006

Director, Regulatory Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, NW, 2nd Floor
Washington, DC 20529

*Re:*     ***DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"***

Dear Sir or Madam:

The National Council of La Raza (NCLR) submits the following comments in response to the request of the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) for public comment on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

The National Council of La Raza (NCLR) – the largest national Hispanic civil rights and advocacy organization in the United States – works to improve opportunities for Hispanic Americans. Through its network of nearly 300 affiliated community-based organizations (CBOs), NCLR reaches millions of Hispanics each year in 41 states, Puerto Rico, and the District of Columbia. NCLR is also a convener of the Low-Wage Immigrant Worker Coalition, a nationwide coalition of labor unions, civil rights organizations, immigrant rights organizations, and others concerned with the rights of low-wage immigrant workers in the U.S.

NCLR has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States – immigrant and native-born alike. Since implementation of employer sanctions in the late 1980s, the Latino community is particularly cognizant of workplace discrimination against persons who look or sound "foreign" or have a "foreign" surname. Some employers demand that certain workers show additional or "better" documents beyond what is required by law – often asking for immigration documents from U.S. citizens whom they perceive to be immigrants. Other employers implement unlawful "citizen only" policies. A congressionally-mandated Government Accountability Office (GAO) report found a widespread pattern of discrimination resulting solely from employer sanctions, reporting substantial discrimination on the basis of foreign accent or appearance, or preference of certain authorized workers over others. The SSA no-match letters have added another layer to the impact of employer sanctions as unscrupulous employers now have another tool with which to discriminate and retaliate against workers who try to improve working conditions. Furthermore, legal resident and U.S. citizen Latinos are more likely to endure the harmful impact of the no-match letters. As a result, NCLR has worked with SSA in the past to identify problems with the no-match letters, re-draft the

**Regional Offices:** Atlanta, Georgia • Chicago, Illinois • Los Angeles, California • New York, New York
Phoenix, Arizona • Sacramento, California • San Antonio, Texas • San Juan, Puerto Rico
LA RAZA: The Hispanic People of the New World

**No-Match Cert. Admin. Record  2381**

content of the letters employers receive, propose redress policies for workers who are negatively affected, and otherwise ameliorate the potential harm done by SSA no-match letter policies.

As a result of our history with workplace discrimination and SSA no-match letters, NCLR is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation. These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will not resolve the problem of undocumented immigration**. Our past experience with no-match firings and workplace audits is very clear: the fired workers will not leave the country. Comprehensive immigration reform is necessary to fix the nation's broken immigration system and ensure that workers have proper authorization to work in the U.S.

As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

- **This proposed rule will harm all workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers – **including U.S. citizens and authorized noncitizens** – could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor-organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

- **The proposed rule punishes law-abiding employers.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These new legal obligations will increase pressure on businesses to go "off the books," thereby promoting the unregulated, underground cash economy, potentially resulting in billion-dollar losses in federal, state, and local tax revenues; unfair competition; and further exploitation and abuse of all workers by unscrupulous employers.

**No-Match Cert. Admin. Record  2382**

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage when competing with "bad" employers who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

- **Comprehensive immigration reform is the solution.**

NCLR strongly feels that comprehensive immigration reform that includes an earned legalization for undocumented workers is the only practical and realistic solution to our current immigration problem. Enforcement alone will not work, and the SSA no-match letters are not an effective way of resolving the problem of undocumented labor. Moreover, the proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of comprehensive immigration reform. The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is under debate and reformulation.

- **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool, but the SSA database does not have the capacity to fulfill this objective. In addition to being error-prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of an SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

- **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to bypass these privacy protections and commandeer personal information in the SSA database for their own purposes.

- **The costs of implementing the proposed rule are prohibitive.**

**No-Match Cert. Admin. Record  2383**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

- **The proposed rule is objectionable because compliance is impractical.**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable as it does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In conclusion, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands – possibly millions – of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,


Janet Murguía
President and CEO

# LA RAZA
# CENTRO LEGAL, Inc.

—a non profit community law center

——— 474 Valencia Street, Suite 295, San Francisco, CA 94103 ——— (415) 575-3500 ——— Fax: (415) 255-7.

August 8, 2006

Director, Regulatory Management Division,
U.S. Citizenship and Immigration Services,
Department of Homeland Security,
111 Massachusetts Avenue, NW, 2nd Floor,
Washington, D.C.  20529

**Re:** *DHS Docket No. ICEB-2006-0004, Regarding "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter"*

Dear Sir or Madam:

LA RAZA CENTRO LEGAL submits the following comments in response to the request for public comment by the Department of Homeland Security (DHS), Bureau of Immigration and Customs Enforcement (ICE) on the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter," 71 Fed. Reg. 34281 (June 14, 2006).

Founded in 1973, La Raza Centro Legal is a multicultural community social justice center based in the Mission District of San Francisco.  Our mission is to create a more just and inclusive society in the interests of the Latino, indigenous, immigrant and low-income people of the Bay Area. We provide legal services that meet people's basic needs in eviction defense, homelessness prevention, housing discrimination, immigration, senior law, and employment law. Each year, Centro Legal serves over 12,000 individuals and is one of the leading civil rights organizations in the Bay Area.

LA RAZA CENTRO LEGAL has ample experience in dealing with the adverse impact that the Social Security Administration's (SSA) no-match letters have had on all workers in the United States–immigrant and native-born alike. On several occasions, when our clients attempt to assert their legal rights on the job, employers use SSA no-match letters to intimate the workers into accept unlawful working conditions. Our experience with SSA no-match letters has shown us that far from being used to assure the proper use of Social Security cards, the letters are used as tools of intimidation and harassment by unscrupulous employers.

As a result of this work, LA RAZA CENTRO LEGAL is alarmed by and strongly opposed to the implementation of the proposed "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter."  Such a rule will magnify the adverse impact that SSA no-match letters have had on workers' rights, and trigger mass firings across the nation.  These firings will be unnecessary, unjust, and potentially discriminatory.

Although it will cause enormous upheavals in the workplace, **the rule will have no impact on undocumented immigration**.  Our past experience with no-match firings and

No-Match Cert. Admin. Record  2385

workplace audits is very clear: the fired workers will not leave the country. They will simply find other more marginal jobs, most likely in the unregulated underground cash economy.

Because of this, the proposed rule will result in growth of this underground economy. It will also erode our privacy rights, and it represents an end-run around the federal legislative process. As set forth in detail below, the SSA no-match program is simply ill-suited as an immigration enforcement tool. We therefore urge DHS to withdraw this proposed rule in its entirety based on these concerns which are summarized as follows:

ñ **This proposed rule will harm <u>all</u> workers regardless of immigration status.**

The rule will result in unnecessary, unjust, and potentially discriminatory mass firings. Out of caution, panic, and confusion employers will fire workers who receive an SSA no-match letter before workers have a chance to correct their records with SSA. The SSA database is notoriously inaccurate, and often times "no-matches" occur because of name changes and clerical errors. Hundreds of thousands of workers—**<u>including U.S. citizens and authorized noncitizens</u>**—could lose their jobs. Such firings may run afoul of federal and state anti-discrimination laws and other worker protections, and lead to costly and protracted litigations against employers for wrongful terminations.

Unscrupulous employers already use the SSA no-match letter to stymie labor organizing campaigns and to retaliate against workers who have been injured on the job or complain of unpaid wages or other labor violations. In documented cases (including arbitration decisions) from across the country, employers initially ignored SSA no-match letters, and then decided to use them as a pretext to fire workers who participated in efforts to improve working conditions and wages. The proposed rule would only exacerbate this problem.

ñ **The proposed rule will expand the unregulated underground cash economy.**

"Safe-harbor" for employers is a misnomer. Although the proposed rule purports to provide employers with general guidance, DHS is in fact imposing a new set of legal obligations on millions of employers. These legal new obligations will increase pressure on businesses to go "off the books," thereby promoting the **<u>unregulated underground cash economy</u>** which results in potentially billion-dollar losses in federal, state, and local tax revenues, unfair competition, and further exploitation and abuse of all workers by unscrupulous employers.

The proposed rule also has the perverse effect of punishing "good" employers who keep good records and want to stay on the books. These "good" employers will be put at a disadvantage compared with "bad" employers with whom they compete who pay in cash and do not keep records, and who consequently will not be reached by the new rule.

ñ **This proposed rule is an end-run around the legislative process.**

The proposed rule is badly timed. Any worksite immigration enforcement proposal should happen in the context of **<u>comprehensive immigration reform.</u>** The House and the Senate have both passed bills that contain worksite enforcement mechanisms. Implementing the proposed

regulations at this time would be an end-run around that process. Immigrant workers should not be subjected to unnecessary, unjust, and potentially discriminatory mass firings while the current law is clearly under debate and reformulation.

ñ    **The SSA no-match letter program is ill-suited as a tool for immigration enforcement.**

This proposed rule attempts to transform the SSA no-match letter into an immigration enforcement tool when the SSA database does not have the capacity to fulfill this objective. In addition to being error prone, the database does not contain complete information about a worker's immigration status or employment authorization. Indeed, the database contains information about both U.S. citizens and work-authorized noncitizens who employers will presume to be undocumented simply because they appear on a no-match list. The letter is not indicative of immigration status, and explicitly states on its face that a worker's identification in the letter does not make a statement about his or her immigration status.

Moreover, as an evidentiary matter, an employer's receipt of a SSA no-match letter by itself does not constitute "constructive knowledge" of immigration status under current law. The proposed rule dramatically alters the definition of "constructive knowledge" and makes a stark departure from existing case law and long-standing federal guidance in this area despite the fact that the SSA no-match letter provides no evidence of immigration status.

ñ    **The proposed rule is an erosion of our privacy rights.**

DHS is currently barred from direct access to the SSA database by laws protecting our privacy and tax confidentiality. These laws were put in place to protect sensitive and personal information, and to ensure compliance with tax laws. This proposed rule is an attempt by DHS to end-run these privacy protections and commandeer personal information in the SSA database for their own purposes.

ñ    **The costs of implementing the proposed rule are prohibitive.**

If the proposed rule is to be carried out as envisioned, DHS and SSA will need to make a massive investment in employer and worker education programs in order to combat the rampant panic and confusion that is almost certain to follow. The proposed rule also contains unrealistic timetables for compliance that will derail its implementation. Further, although this rule purports to make changes to how DHS interprets these letters, it has a significant impact on the way in which SSA has to respond to the inevitable increase in employer and worker inquiries about this confusing rule. The actual costs of administrating the program will be astronomical for SSA, an agency whose limited resources should go towards administering Social Security benefits rather than enforcing immigration law. The proposed rule should therefore be withdrawn.

ñ    **The proposed rule is objectionable because compliance is impractical.**

**No-Match Cert. Admin. Record  2387**

The proposed rule does not provide clear guidance on what an employer who receives a DHS notice is supposed to do though it purports to provide a "safe-harbor." While the notice procedure protects the employer, it fails to provide a mechanism for an employee to access and correct DHS records. Moreover, the 60-day time period for compliance is unreasonable in dealing with DHS and does not account for the numerous bureaucratic steps that employees must go through to correct their records with the various agencies and with their employer.

In sum, we strongly oppose the Department of Homeland Security's proposed regulation, entitled "Safe Harbor Procedures for Employers Who Receive a No-Match Letter." The proposed rule is simply the wrong rule at the wrong time. The Department of Homeland Security should not risk the livelihoods of hundreds of thousands—possibly millions—of U.S. workers in a poorly conceived immigration enforcement attempt on the eve of comprehensive immigration reform. The proposed rule provides no solution whatsoever to the hiring and exploitation of undocumented workers and is far outweighed by the exorbitant implementation costs that will be borne by taxpayers, workers, and businesses. For all these reasons, we request that the Department of Homeland Security withdraw this proposed rule in its entirety.


Respectfully submitted,

Hillary Rosen, Esq.
La Raza Centro Legal
474 Valencia Street, Suite 295
San Francisco, CA 94103
(415) 553-3415
(415) 255-7593 fax
hillary@lrcl.org

*Representing, Educating and Promoting the Restaurant/Hospitality Industry*

1200 SEVENTEENTH STREET NW, WASHINGTON DC 20036-3097 202/331-5900 FAX: 202/331-2429

NATIONAL
RESTAURA
ASSOCIAT

Director, Regulatory & Management Division
U.S. Citizenship and Immigration Services
Department of Homeland Security
111 Massachusetts Avenue, N.W., 2nd Floor
Washington, DC                                                      August 11, 2006

Reference:     DHS Docket No. ICEB – 2006 – 0004

Dear Sir or Madam:

Pursuant to the notice in the Federal Register dated June 14, 2006, the National Restaurant Association ("NRA") respectfully submits comments on the proposed regulations in Docket No. ICEB – 2006 – 0004 issued by the Bureau of Immigration and Custom Enforcement, Department of Homeland Security ("DHS").

The National Restaurant Association is an Internal Revenue Code section 501 (c)(6) trade association, incorporated    under Illinois Not-for-Profit law, with its principal headquarters in Washington, DC.  NRA is the leading national trade association representing the food service industry in the United States, with over 375,000 member locations. It represents all segments of the food service industry, including quick service establishments, casual dining, and fine dining restaurants. NRA also provides personal memberships for persons actively engaged in the food service industry in a management or supervisory capacity; not-for-profit enterprise members engaged in the industry; educational memberships, including both students and faculty members; and allied corporate members who supply the industry with goods or services.

The restaurant industry is the largest private sector employer in the U.S., with over 12.5 million employees in some 925,000 locations.  Restaurant industry sales for 2006 are forecast to increase 5.1%; and equal 4% of the U.S. gross domestic product. The overall economic impact of the industry is expected to exceed $1.3 trillion in 2006.  The restaurant industry provides work for more than 9% of those employed in the U.S., with an anticipated growth increase of 1.9 million more jobs during 2006. Eating and drinking places are mostly small businesses with 70% having fewer than 20 employees. Research demonstrates that a typical employee in the foodservice industry is female (55%), under 30 years of age (54%), and works part-time (averaging 25 hours a week.)

## BACKGROUND

The proposed regulation concerns the legal obligations employers may have under immigration laws when they receive so-called "no-match" letters from DHS or the Social Security Administration ("SSA").  Employers annually send to SSA employee earning reports (W-2 Forms), which contain, among other things, each employee's name and social security number ("SSN"). When the Social Security Administration (SSA) checks

the W-2 information against its records as to name and SSN, it may believe a discrepancy exists, i.e. the SSN number submitted with the name on the W-2 form may not match the SSA records. The SSA in turn may send the employer a letter that there appears to be a discrepancy between its records and the information submitted on the W-2 Form. A similar letter may be sent to the employer by DHS resulting from inspection of an employer's I-9 forms. Such letters are commonly referred to as "no-match" letters.

## CURRENT LAW

The Immigration and Nationality Act ("INA"), 8 USC 1324 (a)(2), provides in relevant part that it is:

> Unlawful for [an employer]... after hiring an alien...
> to continue to employ the alien...<u>knowing</u> the alien
> is (or has become) an unauthorized [worker in the
> U.S] ... (Emphasis added)

While the statute does not explicitly define the word "knowing", the agency by regulation has construed the term to mean not only "actual knowledge" the employer may possess that a worker is unauthorized to work in the U.S., but also "constructive knowledge", i.e. knowledge that "may <u>fairly be inferred</u> through notice of certain facts and circumstances which would lead a person, through the exercise of reasonable care, to know about a certain condition." 8 CFR 274 a.l.1 (1) (1). Neither the current regulation nor any court precedent, however, construes receipt of a no-match letter to itself imply constructive knowledge on an employer that a worker is unauthorized to work in the US.

## PROPOSED RULE

The proposed rule would amend the current regulation codified at 8 CFR 274 a.1.1 (1) (1) by: (1) adding two new examples where "constructive knowledge" may be imputed to an employer; and (2) a "safe-harbor" provision outlining certain steps an employer may take as supposedly being "reasonable" after receiving a no-match letter in order to avoid a finding of "constructive knowledge."

## NRA COMMENTS

1.  Proposed Rule Should be Stayed Pending Congressional Action

Both the U.S. Senate and House of Representatives have passed significant immigration reform bills (S. 2611/H.R. 4437). Both bills propose important changes concerning employer responsibilities in verifying work eligibility of its workforce, including new standards regarding employer verification of an employee's work authorization. Importantly, both bills also specifically address situations when an employer receives a no-match letter from SSA or DHS. See, e.g., Section 301-305 in S.2611; Sections 701-

**No-Match Cert. Admin. Record  2390**

711 in H.R. 4437. Indeed, Section 707 in H.R. 4437, for example, specifically addresses social security card - based employment eligibility obligations of SSA and DHS.

Clearly, it is premature for DHS to be issuing proposed regulations on specific matters now being addressed by Congress. Taking a new regulatory position when Congress has proposed alternative approaches may needlessly confuse employers on what to do when no-match notices are received and perhaps even be inconsistent with statutory directives.

2.    New Proposal Amends Current Law By Increasing Potential Legal Liability of Employers

Neither case law nor the existing regulation indicates that receipt by an employer of a no-match letter itself could result in a finding of constructive knowledge that a worker is an alien unauthorized to work in the U.S. DHS should not amend the regulation codified at 8 CFR 274a.1 (1)(1) to expand the potential liability under the statute of employers due to receipt of a no-match notice.

The current regulation defines "constructive knowledge" as knowledge that "may be fairly inferred" through notice of facts which would indicate, through the exercise of reasonable care, that an employer knew about a certain condition. Receipt of a no-match letter, however, does not "fairly infer" that a worker is unauthorized to work in the U.S.. DHS' own proposal states in the "Background" portion of the notice that "there are many causes for such a no-match, including clerical error."

The National Restaurant Association respectfully suggests that the proposed approach by DHS concerning no-match letters not be elevated in the regulation as evidence of "constructive knowledge," but be used only as suggestive, non-mandatory guidelines as to possible steps employers may take upon receipt of a no-match letter. No-match notices should not be used to create a new basis for legal liability under the statute.

3.    The Times Suggested for Steps Employers Should Initially Take Are Not Reasonable

The proposed regulatory amendment outlines times and the steps an employer should initially take after receiving a no-match letter. DHS considers the proposed times to be "reasonable." NRA disagrees.

The proposal states that within 14 days of receipt of the no-match letter, an employer should (1) check its personnel payroll records to see if there is a clerical error; (2) if there is no clerical error, the employer should approach the employee and confirm that the information provided by the employee is accurate; and (3), if the employee insists the information is accurate, the employee should be directed to the SSA (or DHS) to correct the matter. First, 14 days is unclear if this means 14 calendar days, including weekends, holidays, or 14 business days. It should be business days. Second, in the restaurant industry such a short time frame is inadequate, particularly since employment may be erratic, and not a consistent day-after – day work time for many employees. The typical employee in the food service industry, as NRA's research demonstrates, works only part-

time, i.e., 25 hours a week. Third, employers in the restaurant industry who have received no-match letters have informed NRA that many times the no-match list includes more than just one name. Indeed, our members have told us that many SSA letters contain multiple names, sometimes 8,10 and even up to 15 names. To expect employers under such circumstances to complete the procedures outlined for multiple employees in just 14 days is neither practical nor reasonable.

NRA proposes that a more reasonable approach would be:

> (1) that any amended standard should be flexible, such that employers may take the identified steps not within a specified time, but "within a reasonable time, considering the number of employees involved, the particular work requirements, etc."; and

> (2) that 45 business days should be a suggested time period as normally being "reasonable" when only one name is identified on the no-match notice. The regulation should state that additional names or other particular employment situations may warrant greater time beyond 45 days.

### 4.  60 Day Time Period for Verification and Action Employer Should Take Are Not Reasonable

The proposal describes verification procedures that an employer may follow if the discrepancy in the no-match notice is not resolved within 60 days. The proposal also states that if the employee's identity and work authorization cannot be verified in that time frame, the "employer must choose between…terminating the employee or facing the risk that DHS may find the employer has constructive knowledge that the employee was an unauthorized alien."

First, NRA does not believe that a 60 day time period to resolve any discrepancy is either realistic or reasonable in the food service industry. As stated previously, a typical restaurant employee is part-time. Employment is also erratic, resulting many times in time gaps that exist between actual days worked by employees. The proposal also suggests flexibility up to 90 days. With the exigencies of the work schedules in the restaurant industry and the requirements to work with government agencies, 120 days would seem a more reasonable minimal time period for resolution. NRA has received numerous calls from restaurant employers over the past few years who have received "no-match" letters. After contacting the SSA, not one of those employers that discussed their situation with NRA indicated that the problem was resolved in anything less than 120 days, if at all.

Second, the proposal would require the employer, if the no-match notice is not resolved and the work authorization cannot otherwise be verified within that limited time frame, to either (1) fire the employee or (2) face the risk that DHS may find the employer had constructive knowledge that the employee was an unauthorized alien. DHS should not put employers in such a legal dilemma by essentially elevating the existence of a no-

match notice into either a statutory violation or suggesting that employers terminate employees.

## CONCLUSION

NRA applauds DHS for setting forth proposed steps employers may take if they receive a no-match letter from DHS or SSA. Receipts of no-match notices have caused considerable confusion in the food service industry.   However, NRA respectfully suggests that the proposals should not be finalized at this time until the Congress has an opportunity to complete the comprehensive immigration reform legislation currently under consideration.  It makes little sense for regulations to outline approaches that are completely covered in provisions in both bills now being considered by Congress. NRA also suggests in the alternative that if DHS wants to move forward before Congress acts, the proposals should be finalized only in the form of non-mandatory guidelines.   They should be precatory, and not used as a basis to impute constructive knowledge and potential legal liability on employers.


Respectfully Submitted,

NATIONAL RESTAURANT
ASSOCIATION

By:
_____
Steven C. Anderson,
President & CEO

_____
John Gay
Senior Vice President, Government
Affairs and Public Policy

_____
Peter G. Kilgore
Senior Vice President, General
Counsel & Corporate Secretary