1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   AMERICAN FEDERATION OF LABOR, et          No. C 07-04472 CRB
     al.,
12                                             **ORDER GRANTING MOTION FOR**
                     Plaintiffs,               **PRELIMINARY INJUNCTION**
13
             v.
14
     MICHAEL CHERTOFF, et al.,
15
                     Defendants.
16   _____/

17

18          On August 15, 2007, the Department of Homeland Security (DHS) promulgated a

19   final rule entitled "Safe-Harbor Procedures for Employers Who Receive a No-Match Letter."

     See 72 Fed. Reg. 45611 (Aug. 15, 2007).  Plaintiffs, a consortium of unions and business
20
     groups, filed a motion for preliminary injunction, arguing that injunctive relief is appropriate
21
     because they have demonstrated a high probability of success on four theories: that the rule
22
     (1) contravenes the governing statute; (2) is arbitrary and capricious under the Administrative
23
     Procedure Act; (3) is an exercise of *ultra vires* authority by DHS and the Social Security
24
     Administration (SSA); and (4) was promulgated in violation of the Regulatory Flexibility
25
     Act.  The balance of hardships tips sharply in plaintiffs' favor and plaintiffs have raised
26
     serious questions going to the merits.  Accordingly, the motion for a preliminary injunction is
27
     GRANTED.
28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

**BACKGROUND**

A. The SSA No-Match Program

The SSA maintains earnings information on workers for the purpose of determining eligibility for Social Security benefits for which the worker and his dependents may be entitled.  See 42 U.S.C. § 405(c)(2)(A).  Each year, employers submit employee wages to the SSA on Forms W-2 – Wage and Tax Statements – and SSA posts those earnings to its Master Earnings File so that workers receive credit for Social Security benefits.  When SSA is unable to match a worker's name and Social Security Number (SSN) from the Form W-2 with its own records, that worker's earnings are posted to SSA's Earnings Suspense File until they can be matched with SSA records.  See 20 C.F.R. § 422.120(a).

The Earnings Suspense File contains more than 255 million mismatched earnings records and is growing at the rate of 8 million to 11 million records per year.  Request for Judicial Notice in Support of Motion for Temporary Restraining Order and Preliminary Injunction (RJN) Exh. Q at 8.  Although the portion of these earnings that represent unauthorized work is unknown, the United States Government Accountability Office has concluded that the Earnings Suspense File "[c]ontains information about many U.S. citizens as well as noncitizens."  See id.

Since 1994, SSA has attempted to correct mismatched records by sending so-called "no-match" letters to employers requesting corrected information.  See 20 C.F.R. § 422.120(a).  In previous years, these no-match letters have downplayed the immigration implications of a mismatched SSN.  For example, SSA's model 2006 no-match letter for Tax Year 2005 emphasized that receipt of the letter "does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number.  Nor does it make any statement about an employee's immigration status."  RJN Exh. D.[1]

---

[1] SSA's model 2006 letter reassured employers that there are three common reasons why reported information might mismatch SSA's own records, all unrelated to immigration fraud: (1) typographical errors made in spelling an employee's name or listing the SSN; (2) failure of the employee to report a name change; and (3) submission of a blank or incomplete Form W-2.

1

**United States District Court**
For the Northern District of California

B. The Immigration Reform and Control Act of 1986

2        In 1986, Congress passed the Immigration Reform and Control Act (IRCA), Pub. L.

3   No. 99-603, 100 Stat. 3359 (1986), which subjects employers to criminal and civil liability

4   for knowingly hiring unauthorized aliens, see 8 U.S.C. § 1324a(a)(1)(A), and for

5   "continu[ing] to employ the alien in the United States knowing the alien is (or has become)

6   an unauthorized alien with respect to such employment," id. § 1324a(a)(2).  IRCA also made

7   it unlawful for employers to hire new employees without complying with an eligibility

8   verification process established by Congress.  See id. § 1324a(a)(1)(B).  That process

9   requires the employer to fill out a Form I-9 (Employment Eligibility Verification), based on

10  documents presented by the employee that prove identity and work authorization.  Id. §

11  1324a(b).

12       In passing IRCA, Congress also sought to prevent employers from responding to their

13  new obligations by terminating employees solely on the basis of national origin.  "Concern

14  with protecting [lawful workers whose work authorization has been questioned or who lack

15  adequate documentation] from discrimination based on national origin engendered by

16  IRCA's employer sanctions was repeatedly expressed by members of Congress."  Incalza v.

17  Fendi N. Am., Inc., 479 F.3d 1005, 1011 (9th Cir. 2007).  Accordingly, Congress made it an

18  unfair immigration-related employment practice for an employer "to discriminate against any

19  individual (other than an unauthorized alien, as defined in section 1324a(h)(3) of this title)

20  with respect to the hiring, or recruitment or referral for a fee, of the individual for

21  employment or the discharging of the individual from employment . . . because of such

22  individual's national origin."  8 U.S.C. § 1324b(a)(1)(A).

23       To enforce IRCA's anti-discrimination provision, Congress created a Special Counsel

24  for Immigration-Related Unfair Employment Practices, based within the Department of

25  Justice.  See id. § 1324b(c)(1).  Congress delegated to the Special Counsel the power to

26  investigate charges of discrimination based on national origin, and to issue complaints.  See

27  id. § 1324b(c)(2).

28  ───────────────────

See RJN Ex. D.

C. DHS's "Safe Harbor" Rule

On June 14, 2006, DHS proposed to amend 8 C.F.R. § 274a.1, a regulation that sets forth DHS interpretations of terms including "knowing." In short, DHS proposed to add receipt of a no-match letter to a list of examples "that may lead to a finding that an employer had . . . constructive knowledge" of an employee's unauthorized status. Safe-Harbor Procedures for Employers Who Receive a No-Match Letter, 71 Fed. Reg. 34281-01, 34281 (June 14, 2006). In addition, DHS proposed to create "'safe-harbor' procedures that the employer can follow in response to [a no-match] letter and thereby be certain that DHS will not find that the employer had constructive knowledge that the employee referred to in the letter was an alien not authorized to work in the United States." Id.

Before the sixty day comment period ended on August 14, 2006, a variety of sources – including labor unions, industry trade groups and businesses – submitted approximately 5,000 comments. 72 Fed. Reg. at 45611. The rule then lay dormant for over a year while Congress debated immigration reform legislation. On August 15, 2007, the agency issued a final rule, with an effective date of September 14, 2007. See id.

The new rule redefines DHS's definition of "knowing", to provide that:

> The term knowing includes having actual or constructive knowledge. Constructive knowledge is knowledge that may fairly be inferred through notice of certain facts and circumstances that would lead a person, through the exercise of reasonable care, to know about a certain condition. Examples of situations where the employer may, depending on the totality of relevant circumstances, have constructive knowledge that an employee is an unauthorized alien include, but are not limited to, situations where the employer . . . [f]ails to take reasonable steps after receiving information indicating that the employee may be an alien who is not employment authorized, such as . . . [w]ritten notice to the employer from the Social Security Administration reporting earnings on a Form W-2 that employees' names and corresponding social security account numbers fail to match Social Security Administration records.

Id. at 45623-24; see also, 8 C.F.R. § 274a.1(l)(1)(iii)(B) (emphasis added).

The rule's "safe harbor" provision precludes DHS from using receipt of a no-match letter as evidence of constructive knowledge if the employer takes certain actions set forth in the rule. See id. at 45624. Specifically, an employer must check its records for the source of the mismatch within 30 days. See 8 C.F.R. § 274a.1(l)(2)(i)(A). If the discrepancy is not

4

due to error in the employer's records, then the employer must request that the employee confirm his information, and advise the employee to resolve the discrepancy with the SSA within 90 days of the date the employer received the no-match letter. <u>See id.</u> § 274a.1(l)(2)(i)(B). If the employer cannot resolve the discrepancy within 90 days, it must complete a new Form I-9 for the employee. <u>See id.</u> § 274a.1(l)(2)(iii). The employer may not accept any document that contains a disputed social security number; thus, an employee cannot maintain his eligibility and attempt to retain his employment based on a SSN found to not match SSA records, even if the SSN is accurate and the discrepancy is due to SSA error. <u>See id.</u> § 274a.1(l)(2)(iii)(2).

> D. The New SSA "No-Match" Letter & DHS Insert

In an apparent effort to coordinate efforts with DHS, SSA has revised its no-match letter in three ways to bring it into accord with the new safe harbor rule. First, SSA's model 2007 no-match letter for Tax Year 2006 includes a new "common reason" why information reported to SSA does not match the agency's records: "[t]he name or Social Security number reported is false, or the number was assigned to someone else." RJN Exh. E. Second, the no-match letter's assurance of immigration implications is now less reassuring for employers. The new letter informs employers that a no-match letter "does not, <u>by itself</u>, make any statement about an employee's immigration status." (Amendment in emphasis). Third, the letter instructs employers to follow the instructions contained in a DHS letter inserted into the no-match mailing.

In turn, DHS's insert purports to "provide you with additional guidance on how to respond to the [no-match] letter from the Social Security Administration in a manner that is consistent with your obligations under United States immigration laws." RJN Exh. C. Organized in a question-and-answer format, the insert asks: "<u>Can I simply disregard the letter from SSA?</u>" (Emphasis in original). DHS answers:

> <u>No.</u> You have received official notification of a problem that may have significant legal consequences for you and your employees. If you elect to disregard the notice you have received and if it is determined that some employees listed in the enclosed letter were not authorized to work, the Department of Homeland Security could determine that you have violated the

law by knowingly continuing to employ unauthorized persons.  This could lead
to civil and criminal sanctions.

Id.  (Emphasis in original).

In response to the question, "<u>What should I do?</u>," DHS answers that employers should

follow the steps set forth in the safe harbor provision of the new rule.  <u>See id.</u>  Finally, DHS

provides employers with advice on the nexus between the new rule and IRCA's anti-

discrimination provision.  The insert asks, "<u>Will I be liable for discrimination charges</u>

<u>brought by the United States if I terminate the employee after following the steps outlined</u>

<u>above?</u>"  The answer:

> <u>No.</u> . . . [I]f an employer that follows all of the procedures outlined by DHS in
> this letter cannot determine that an employee is authorized to work in the
> United States and therefore terminates that employee, and if that employer
> applied the same procedures to all employees referenced in the mismatch letter,
> then that employer will not be subject to suit by the United States under the
> Immigration and Nationality Act's anti-discrimination provision.

Id.

The government acknowledged at oral argument that if a preliminary injunction is not

granted, SSA plans to mail approximately 140,000 no-match letters to employers, pertaining

to approximately 8 million employees.

E. Procedural History

On August 29, 2007, plaintiffs moved for a temporary restraining order, seeking to

prevent DHS from taking any action to implement the new rule.  Two days later, another

judge of the court granted the motion, concluding that the plaintiffs had "raised serious

questions as to whether the new Department of Homeland Security rule is inconsistent with

statute and beyond the statutory authority of the Department of Homeland Security and the

Social Security Administration."  The Court also found that the plaintiffs had "demonstrated

that the balance of harms tips sharply in favor of a stay based on Plaintiffs' showing that they

and their members would suffer irreparable harm if the rule is implemented while Defendants

would suffer significantly less harm from a delay in implementation of the rule pending

consideration of Plaintiffs' claims."

United States District Court
For the Northern District of California

6

1    Since the imposition of a TRO, the parties have submitted substantial briefing and this

2  Court conducted a two-hour hearing to consider the propriety of a preliminary injunction.

3                                      **SUMMARY**

4    At the outset, it should be noted that in the context of a request for preliminary

5  injunction, it is not the court's role to provide a final adjudication of the merits of the claims.

6  Rather, at this stage the court must only determine whether the plaintiffs' claims raise serious

7  issues and if so, whether preliminary relief is warranted to prevent irreparable harm.  As

8  demonstrated by plaintiffs, the government's proposal to disseminate no-match letters

9  affecting more than eight million workers will, under the mandated time line, result in the

10  termination of employment to lawfully employed workers.  This is so because, as the

11  government recognizes, the no-match letters are based on SSA records that include numerous

12  errors.  Moreover, the threat of criminal prosecution (under the guise of a safe-harbor

13  provision), reinforced by a directive that the employer who receives a no-match letter <u>must</u>

14  follow the safe harbor procedures or expose themselves to criminal and civil liability, reflects

15  a major change in DHS policy.  In fact, previous DHS (and INS) guidance recognized that

16  receipt of a no-match letter could not impart criminal liability by itself.  No such comfort is

17  afforded in the newly proposed letter.  Indeed, the opposite is suggested.  While a change in

18  agency policy is not the concern of courts, when there is such a change it must be done in

19  compliance with procedures set forth in the Administrative Procedures Act as well as other

20  Congressional dictates.  It is the Court's view, as set forth below, that DHS has failed to

21  comply with these mandated requirements and, if allowed to proceed, the mailing of no-

22  match letters, accompanied by DHS's guidance letter, would result in irreparable harm to

23  innocent workers and employers.

24                                  **STANDARD OF REVIEW**

25    The standard for evaluating a motion for a preliminary injunction requires this Court

26  to balance the likelihood of success against the hardships to the parties.  A preliminary

27  injunction is appropriate when a plaintiff demonstrates either: (1) a likelihood of success on

28  the merits and the possibility of irreparable injury; or (2) that serious questions going to the

**United States District Court**
For the Northern District of California

7

**United States District Court**
For the Northern District of California

1   merits were raised and the balance of hardships tips sharply in the plaintiff's favor.  <u>See</u>

2   <u>Lands Council v. Martin</u>, 479 F.3d 636, 639 (9th Cir. 2007).  These two formulations are not

3   different tests, but merely extremes on a single continuum: "the less certain the district court

4   is of the likelihood of success on the merits, the more plaintiffs must convince the district

5   court that the public interest and balance of hardships tip in their favor."  <u>Sw. Voter</u>

6   <u>Registration Educ. Project v. Shelley</u>, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per

7   curiam).

8          Alternatively, the Ninth Circuit has stated the traditional test as requiring a plaintiff to

9   establish "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable

10  injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the

11  plaintiff, and (4) advancement of the public interest (in certain cases)."  <u>Taylor v. Westly</u>,

12  488 F.3d 1197, 1200 (9th Cir. 2007).

13                                    **DISCUSSION**

14         Contrary to the government's argument, this case is justiciable because the plaintiffs

15  have standing and the issues are ripe for review.  The plaintiffs have demonstrated that they

16  will be irreparably harmed if DHS is permitted to enforce the new rule.  On the other side of

17  the scale, the government would suffer significantly less harm as a result of a delay in the

18  rule's implementation.  Because the balance of harms tips sharply in favor of the plaintiffs, a

19  preliminary injunction is appropriate if the plaintiffs have raised serious questions going to

20  the merits.  In this Court's opinion, granting plaintiffs' motion is appropriate because they

21  have raised serious questions whether: (1) the rule is arbitrary and capricious because DHS

22  failed to supply a reasoned analysis for the agency's new position that a no-match letter is

23  sufficient, by itself, to put an employer on notice of an employee's unauthorized status; (2)

24  DHS exceeded its authority by interpreting IRCA's anti-discrimination provision; and (3)

25  DHS violated the Regulatory Flexibility Act by not conducting a final flexibility analysis.

26         A. Balance of Hardships

27         The plaintiffs convincingly argue that the balance of hardships tips sharply in their

28  favor because altering the status quo would subject employers to greater compliance costs

8

1   and employees to an increased risk of termination, while imposing significantly less burdens

2   on the government.

3          The magnitude of DHS's safe harbor rule is staggering.  If enacted, DHS and SSA

4   will immediately mail no-match packets to 140,000 employers, identifying no-matches for

5   approximately 8 million employees.  There can be no doubt that the effects of the rule's

6   implementation will be severe.

7          Thousands of employers would bear the "significant" expense of complying with the

8   rule's new 90-day timeframe.  See Dickson Decl. ¶ 4.  Because there has not been an official

9   timeframe for resolving no-match letters in the past, employers have generally resolved

10  mismatch problems "at their leisure."  See id. ¶ 7.  Therefore, many employers who want to

11  take advantage of the safe harbor provision will have to develop costly human resources

12  systems capable of resolving problems within the new time frame.  See id. ("[H]uman

13  resources departments will have to put systems into place designed to resolve mismatches

14  with the employee's cooperation with in the ninety-day window," which "will take time and

15  money to develop and implement.").

16         The union plaintiffs have also identified ways in which employees will be irreparably

17  harmed.  Kenneth Apfel, ex-Commissioner of the SSA, believes – based on his prior

18  experience at the agency – that "there will be many legally authorized workers who cannot

19  resolve a mismatched earnings report" by the deadline imposed by the new rule.  See Apfel

20  Decl. ¶ 17.  Because empirical research suggests that mass layoffs often follow receipt of a

21  no-match letter, see Theodore Decl. ¶ 11, there is a strong likelihood that employers may

22  simply fire employees who are unable to resolve the discrepancy within 90 days, even if the

23  employees are actually authorized to work.

24         On the other side of the scale, a preliminary injunction would cause significantly less

25  harm to the government.  The government argues that a preliminary injunction would

26  preclude SSA from sending out no-match letters for the 2006 tax year, "and so frustrate the

27  purpose of providing notice to employers that their employees' social security earnings are

28  not being credited to their accounts."  See Opposition at 54.  But the plaintiffs have not

**United States District Court**
For the Northern District of California

1    requested a preliminary injunction precluding <u>SSA</u> from sending out its traditional no-match

2    letters for tax purposes, as the agency has for over a decade.

3          The government also asserts that a preliminary injunction would be harmful because

4    any delay in sending out no-match letters might push SSA's responsibilities over into the

5    agency's period of peak workload during the months of January-March.  <u>See</u> Rust Decl. ¶ 14.

6    However, the SSA has acknowledged that it could remove the DHS insert and related

7    language from its mailing in 30 days.  <u>See id.</u> ¶ 8.  Thus, even if a preliminary injunction is

8    granted, SSA should be able to coordinate a mailing well before the peak workload season.

9          DHS waited for an entire year after the notice and comment period was closed to

10   promulgate a final rule.  While this Court does not doubt the importance of this rule to DHS,

11   the agency's delay does undercut the assertion that it will be irreparably harmed if the Court

12   maintains the status quo pending a trial on the merits.  Because the balance of hardships tips

13   sharply in favor of plaintiffs, the Court reviews plaintiffs' arguments on the merits with an

14   eye towards whether serious questions are raised.

15          <u>B. Whether the Safe Harbor Rule Contravenes the Governing Statute</u>

16          Plaintiffs argue that the new rule must be invalidated because it is inconsistent with its

17   governing statute, 8 U.S.C. § 1324a.  The Administrative Procedure Act authorizes courts to

18   set aside agency actions that are "not in accordance with the law," or " in excess of statutory

19   jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 7062(A), (C);

20   <u>see also</u> <u>Oregon v. Ashcroft</u>, 368 F.3d 1118, 1129 (9th Cir. 2004) (holding that agency

21   determinations that squarely conflict with governing statutes are not entitled to deference and

22   must be set aside).  Plaintiffs argue that DHS's rule is contrary to § 1324a in three respects:

23   (1) it changes the definition meaning of "knowing" as used in the statute; (2) it is inconsistent

24   with the administrative structure that Congress enacted into law; and (3) it fails to respect the

25   statute's grandfather clause.  For the following reasons, plaintiffs have not raised a serious

26   question whether the safe harbor rule is inconsistent with § 1324a.

27

28

**United States District Court**
For the Northern District of California

### 1. Meaning of "Knowing"

Section 1324a(a)(2) prohibits an employer from continuing "to employ an alien . . . _knowing_ the alien is (or has become) an unauthorized alien with respect to such employment." (Emphasis added). In 1989, the Ninth Circuit held that § 1324a(a)(2) is violated when the employer acts either with actual or constructive knowledge. See Mester Mfg. Co. v. INS, 879 F.2d 561 (9th Cir. 1989). The Ninth Circuit rejected the employer's argument that it did not knowingly continue to employ an illegal alien merely because the employer did not receive positive notice that his employees used false green cards. Id. at 566. The court held that it was sufficient for the INS to notify the employer that three employees were _suspected_ of green card fraud and instruct the employer to confirm that suspicion. The court explained that section 1324a's knowledge requirement is satisfied even where the employer has no "actual specific knowledge of the employee's unauthorized status" so long as the employer receives "specific information" that the employee "[is] likely to be unauthorized," and the employer makes no further inquiry. Id. at 567.

In New El Rey Sausage Co. v. INS, 925 F.2d 1153 (9th Cir. 1991), the Ninth Circuit again held that a constructive knowledge standard is authorized by § 1324a. See id. at 1157. In New El Rey, the INS had warned an employer that his Forms I-9, or Employer Eligibility Verification forms, contained paperwork deficiencies. See id. at 1154. After identifying particular employees with paperwork problems, the INS sued the employer for continuing to employ the allegedly unauthorized workers. The court held that the employer was on constructive notice because he had been "provided with specific, detailed information" explaining "whom [the INS] considered unauthorized and why," but failed to acquire some additionally independent corroboration of authorization other than the employees' self-serving representations. Id. at 1158.

Plaintiffs argue that the rule impermissibly alters the meaning of "knowing," because receipt of a no-match letter does not reasonably inform the employer that the identified employee "[is] likely to be unauthorized." Mester, 879 F.2d at 567. Accordingly, the employer cannot be said to have been properly put on notice of illegality.

11

**United States District Court**
For the Northern District of California

1    The flaw in plaintiffs' argument is their assumption that receipt of a no-match letter

2    triggers a finding of constructive knowledge in every instance.  In fact, the regulation is

3    written such that whether an employer has constructive knowledge depends "on the totality

4    of relevant circumstances."  See 8 C.F.R. 274a.1(l)(1).  Depending on the circumstances, a

5    court may agree with plaintiffs that receipt of a no-match letter has not put an employer on

6    notice that his employee is likely to be unauthorized.  But this Court cannot agree with

7    plaintiffs' fundamental premise that a no-match letter can never trigger constructive

8    knowledge, regardless of the circumstances.  Accordingly, there is no serious question

9    whether DHS's rule improperly alters the meaning of "knowing" as used in § 1324a.

10              *2. Conflict with Structure of Verification Process*

11    Plaintiffs also believe that the rule is contrary to statute because it sets up a work-

12    authorization reverification system.  According to plaintiffs, the rule contravenes the innate

13    structure created by Congress, which limits work eligibility verification to the initial hiring

14    process.  See ETSI Pipeline Project v. Missouri, 484 U.S. 495, 517 (1988) ("[T]he Executive

15    Branch is not permitted to administer [a statute] in a manner that is inconsistent with the

16    administrative structure that Congress enacted into law.").

17    The Ninth Circuit has already rejected the notion that after an employee is hired, "the

18    government has the entire burden of proving or disproving that a person is unauthorized to

19    work."  New El Rey, 925 F.2d at 1158.  "IRCA clearly placed part of that burden on

20    employers," by requiring them to reverify the authorization of their employees when the

21    government provides employers with "specific, detailed information" about the allegedly

22    unauthorized employee.  Id.  Nothing in DHS's rule would alter the fundamental structure

23    that Congress approved when it enacted IRCA.

24              *3. Grandfather Clause*

25    Plaintiffs maintain that the new rule must be set aside because it does not expressly

26    abide by IRCA's grandfather clause, which precludes application of § 1324a(a)(2) to

27    employees hired before the statute's enactment.  The government concedes that the new rule

28    could not apply to grandfathered employees.  See Opposition at 29 n.12.  Although DHS

**United States District Court**
For the Northern District of California

would be wise to demarcate the rule's temporal boundaries in its guidance letter, plaintiffs

have cited to no case law suggesting that the rule is invalid because it does not <u>expressly</u>

include a grandfather provision; the rule's consistency with § 1324a's grandfather clause is

assumed and implicit.

### C. Whether the Safe Harbor Rule is Arbitrary and Capricious

Although the safe harbor rule represents a change in DHS's historical position that no-

match letters cannot, by themselves, put an employer on notice, DHS did not supply a

reasoned analysis for the change. Accordingly, plaintiffs have raised a serious question

whether the rule is arbitrary and capricious and therefore a violation of the Administrative

Procedures Act, 5 U.S.C. § 706(2)(A).

*1. Change in Position*

When an agency adopts a rule that changes the agency's prior position, the agency "is

obligated to supply a reasoned analysis for the change." <u>Motor Vehicle Mfgs. Ass'n v. State</u>

<u>Farm Mutual Auto. Ins. Co.</u>, 463 U.S. 29, 42 (1983). This Court's "review under the APA is

highly deferential, but agency action is arbitrary and capricious if it departs from agency

precedent without explanation. Agencies are free to change course as their expertise and

experience may suggest or require, but when they do so they must provide a reasoned

analysis indicating that prior policies and standards are being deliberately changed, not

casually ignored." <u>Ramaprakash v. FAA</u>, 346 F.3d 1121, 1124-25 (D.C. Cir. 2003) (internal

quotation and citation omitted).

From at least 1997 onward, DHS's predecessor took the position in guidance letters

that "notice from the Social Security Administration to an employer notifying it of a

discrepancy between wage reporting information and SSA records with respect to an

employee does not, by itself, put an employer on notice that the employee is not authorized to

work." RJN Ex. H; <u>see also</u> <u>id.</u> Exh. I ("We would not consider notice of this discrepancy

from SSA to an employer by itself to put the employer on notice that the employee is

unauthorized to work, or to require reverification of documents or further inquiry as to the

employee's work authorization."); <u>id.</u> Exh. J ("[T]he receipt of this SSA [no-match] letter by

United States District Court

For the Northern District of California

1    an employer, without more, would not be sufficient to establish constructive knowledge on

2    the part of the employer regarding the employment eligibility of the named employee.").

3    That position even made its way into the preamble of DHS's safe harbor rule, wherein DHS

4    assured employers that "an SSA no-match letter by itself does not impart knowledge that the

5    identified employees are unauthorized aliens." 72 Fed. Reg. 45616.

6        However, at some point in the six pages separating the preamble and the text of the

7    final rule, DHS decided to change course. The final rule provides that constructive

8    knowledge may be inferred if an employer fails to take reasonable steps after receiving

9    nothing more than a no-match letter. See id. at 45623. At oral argument, the government

10   confirmed that under the new rule, receipt of a no-match letter by itself can be sufficient to

11   impart knowledge that the identified employees are unauthorized. The change in position is

12   further reinforced in DHS's insert, which tells employers that disregarding the no-match

13   letter can lead to civil and criminal sanctions. Nothing in the insert suggests that any

14   evidence of illegality other than receipt of a no-match letter is necessary for liability to be

15   imposed.

16       It is clear to this Court that DHS has changed course. Under the prior regime, receipt

17   of a no-match letter was not, by itself, sufficient to trigger IRCA's liability under

18   § 1324a(a)(2). DHS's new position is that an employer who receives a no-match letter can,

19   without any other evidence of illegality, be held liable under the continuing employment

20   provision. Needless to say, this change in position will have massive ramifications for how

21   employers treat the receipt of no-match letters. DHS may well have the authority to change

22   its position, but because DHS did so without a reasoned analysis, there is at least a serious

23   question whether the agency has "casually ignored" prior precedent in violation of the APA.

24           *2. Rational Connection*

25       An agency action is also arbitrary and capricious if the agency fails to examine the

26   relevant data and articulate a satisfactory explanation for its action including a "rational

27   connection between the facts found and the choice made." Motor Vehicle Mfgs. Ass'n, 463

28

1    U.S. at 43.  But this Court must "uphold a decision of less than ideal clarity if the agency's

2    path may reasonably be discerned."  Id. (citation omitted).

3           According to plaintiffs, DHS has failed to articulate a rational connection between the

4    use of no-match letters for immigration purposes and any evidence that no-match letters are

5    reliable indicators of illegality.  To be sure, plaintiffs are correct that there are numerous

6    reasons unrelated to illegality that a mismatch might exist, including name change or

7    typographical error.  Nonetheless, the agency's path is reasonably discernable to this Court.

8    As the rule's preamble explains, "[o]ne potential cause" for an earnings report where the

9    employee name and social security number does not match SSA records "may be the

10   submission of information for an alien who is not authorized to work in the United States and

11   who may be using a false SSN or a SSN assigned to someone else."  See 72 Fed. Reg. at

12   45612.  A discrepancy in the SSA database is not a tell-tale sign of ineligibility, but because

13   ineligibility is one reason why discrepancies occur, it is rational for DHS to use no-match

14   letters as an "indicator[] of a potential problem."  See id. at 45622.  Accordingly, DHS has

15   sufficiently articulated a rational connection between the facts found and the choice made.

16          D. Ultra Vires Action

17          "It is axiomatic that an administrative agency's power to promulgate legislative

18   regulations is limited to the authority delegated by Congress."  Bowen v. Georgetown Univ.

19   Hosp., 488 U.S. 204, 208 (1988).  Plaintiffs have raised a serious question whether DHS

20   exceeded its authority by interpreting the anti-discrimination provisions of the IRCA.

21                 1. DHS's Interpretation of IRCA's Anti-Discrimination Provision

22          Concerned that § 1324a's prohibition on the employment of unauthorized aliens

23   would result in employers discriminating against applicants on the basis of nationality,

24   Congress enacted an anti-discrimination provision that prohibits employers from

25   discriminating against any person "with respect to the hiring, or recruitment or referral for a

26   fee, of the individual for employment or the discharging of the individual from

27   employment--(A) because of such individual's national origin, or (B) in the case of a

28

15

1   protected individual . . . because of such individual's citizenship status."  8 U.S.C. §

2   1324b(a)(1).

3        The DHS insert provides employers with the reassurance that if they follow the safe

4   harbor provision as set forth in the new rule before terminating an employee, and apply the

5   same procedure to all employees referenced in the mismatch letter, "then that employer will

6   not be subject to suit by the United States under the [IRCA's] anti-discrimination provision."

7   Similarly, the final rule states that "employers who follow the safe harbor procedures set

8   forth in this rule uniformly and without regard to perceived national origin or citizenship

9   status as required by the provisions of 274B(a)(6) of the INA will not be found to have

10  engaged in unlawful discrimination."  72 Fed. Reg. at 45613-14.

11       But Congress delegated to DOJ – through its Office of Special Counsel for

12  Immigration-Related Unfair Employment Practices (Special Counsel) – the responsibility of

13  enforcing the anti-discrimination provisions of § 1324b.  See 72 Fed. Reg. at 45614; see also

14  8 U.S.C. § 1324b(c).  The government has failed to cite to any authority that enables DHS to

15  make the determination whether to sue an employer for violating IRCA's anti-discrimination

16  provision.  There is therefore a serious question whether DHS has impermissibly exceeded

17  its authority – and encroached on the authority of the Special Counsel – by interpreting

18  IRCA's anti-discrimination provisions to preclude enforcement where employers follow the

19  safe-harbor framework.  See Nat'l Treasury Employees Union v. Chertoff, 452 F.3d 839, 865

20  (D.C. Cir. 2006) (invalidating provision of DHS rule that infringed on another agency's

21  statutory authority).

22                    *2. DHS Authority to Prescribe Tax Reporting Obligations*

23       Plaintiffs argue that DHS cannot dictate how employers respond to no-match letters

24  because that authority rests with the IRS.  To be certain, the IRS has the exclusive authority

25  to sanction employers for failing to comply with the tax code by submitting inaccurate or

26  incomplete tax forms.  See 26 U.S.C. § 6721.  It does not follow, however, that DHS is

27  precluded from relying on no-match letters as one indicator of possible non-compliance with

28  immigration law.  If DHS were attempting to levy sanctions for violations of the tax code,

1   plaintiffs' argument would have merit.  But DHS is authorized to and may punish employers

2   for violating immigration law by knowingly continuing to employ unauthorized employees.

3                       *3. SSA Authority to Enforce Immigration Law*

4        Plaintiffs' assertion that SSA is exceeding its authority by enforcing immigration laws

5   is also unpersuasive.  Although the proposed SSA no-match letter would notify employers

6   that they should follow the instructions contained in DHS's insert, that reference hardly

7   renders SSA an enforcer of immigration law.  Put simply, the SSA does not exceed the

8   bounds of its enabling statute by referring employers to a document produced by another

9   agency.

10               E. Regulatory Flexibility Act

11        The business plaintiffs argue that the safe harbor rule was promulgated in violation of

12   the Regulatory Flexibility Act (RFA) because DHS failed to conduct a final flexibility

13   analysis even though the rule will have a significant impact on small businesses.

14        The RFA requires agencies, when promulgating a final rule, to prepare a regulatory

15   flexibility analysis that describes, among other things, "a summary of the significant issues

16   raised by the public comments in response to the initial regulatory flexibility analysis, a

17   summary of the assessment of the agency of such issues," and "the steps the agency has

18   taken to minimize the significant economic impact on small entities."  5 U.S.C. § 604(a).

19        The RFA has an exception, however, that relieves an agency from its obligation to

20   conduct a flexibility analysis if the agency "certifies that the rule will not, if promulgated,

21   have a significant economic impact on a substantial number of small entities."  Id. § 605(b).

22   The certification must include "a statement providing the factual basis for" the agency's

23   determination that the rule will not significantly impact small entities.  See id.

24        When DHS promulgated the rule, it explained that a final regulatory flexibility

25   analysis was not necessary because "[t]he rule does not mandate any new burdens on the

26   employer and does not impose any new or additional costs on the employer, but merely adds

27   specific examples and a description of a 'safe harbor' procedure to an existing DHS

28

United States District Court
For the Northern District of California

17

United States District Court
For the Northern District of California

1    regulation for purposes of enforcing the immigration laws and providing guidance to

2    employers." 72 Fed. Reg. at 45623.

3        In its briefing to this Court, DHS offered for the first time a new justification for not

4    conducting an RFA analysis: the safe harbor rule is interpretive and therefore the

5    requirements of the RFA do not apply.  See Central Texas Telephone Co-op., Inc. v. FCC,

6    402 F.3d 205, 214 (D.C. Cir. 2005) (holding that RFA does not apply to interpretive rules).

7    But "[a]gency decisions must generally be affirmed on the grounds stated in them." Ass'n of

8    Civilian Technicians v. Fed. Labor Relations Auth., 269 F.3d 1112, 1117 (D.C. Cir. 2001)

9    (citation omitted).  "The rule barring consideration of post hoc agency rationalizations

10   operates where an agency has provided a particular justification for a determination at the

11   time the determination is made, but provides a different justification for that same

12   determination when it is later reviewed by another body." Independence Mining Co., Inc. v.

13   Babbitt, 105 F.3d 502, 511 (9th Cir. 1997) (citation omitted).  Here, DHS provided one

14   reason for not conducting a RFA analysis in the rule, and now offers another justification for

15   purposes of litigation.  Because post hoc rationalizations provide an inadequate basis for

16   review, it is unlikely that this Court will even be able to consider DHS's most recent

17   rationale.  See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419 (1971).[2]

18       The government must, therefore, defend its decision to not conduct a flexibility

19   analysis on the justification provided in the rule, i.e., because the rule will not have a

20   significant effect on small businesses.  Plaintiffs have raised serious doubts about the

21

22       [2] If the government's new rationalization can be considered, then this Court will have to
23   determine whether the new rule is interpretive and therefore not subject to the RFA's
     requirements.  It appears at first blush that the government's position has merit because the safe-
24   harbor rule does not bear any of the three hallmarks of a legislative rule.  See Hemp Industries
     Ass'n v. Drug Enforcement Admin., 333 F.3d 1082, 1087 (9th Cir. 2003) (identifying three
25   circumstances in which a rule has the "force of law" and is therefore legislative).  First, even
     absent the safe harbor rule, the Attorney General could bring an enforcement action for
26   violations of IRCA's continuing employment provision, see 8 U.S.C. § 1324a(e)(9), on the
     theory that receipt of a no-match letter constitutes constructive knowledge under a totality of the
27   circumstances test, see 8 C.F.R. § 274a.1(l)(1).  Second, DHS did not expressly invoke its
     legislative authority.  Third, although the safe harbor rule contradicts INS guidance letters on
28   the effect of receiving no-match letters, the rule "is not inconsistent with any legislative rule."
     Oregon v. Ashcroft, 368 F.3d 1118, 1134 (9th Cir. 2004) (emphasis in original).

18

1    veracity of DHS's prediction that the safe harbor rule will "not impose any new or additional

2    costs" on employers.  Plaintiffs' declarations establish that small businesses can expect to

3    incur significant costs associated complying with the safe harbor rule.  These costs include

4    dedicating human resources staff to track and resolve mismatches within the 90-day

5    timeframe, see Dolibois Decl. ¶ 4, hiring "legal and consultancy services" to help employers

6    comply, see Silvertooth Decl. ¶ 9, and paying for the training of in-house counsel and human

7    resources staff, see id.; Dickson Decl. ¶ 7.

8        DHS's response that the safe harbor rule will impose no costs because compliance is

9    "voluntary" is wholly unavailing.  It is true that the safe harbor rule does not mandate

10   compliance.  This Court's "concern, however, is with the practical effect . . . of the rule, not

11   its formal characteristics."  Chamber of Commerce v. Dep't of Labor, 174 F.3d 206, 209

12   (D.C. Cir. 1999).  Because failure to comply subjects employers to the threat of civil and

13   criminal liability, the regulation is "the practical equivalent of a rule that obliges an employer

14   to comply or to suffer the consequences; the voluntary form of the rule is but a veil for the

15   threat it obscures."  Id. at 210.  The rule as good as mandates costly compliance with a new

16   90-day timeframe for resolving mismatches.  Accordingly, there are serious questions

17   whether DHS violated the RFA by refusing to conduct a final flexibility analysis.

18       F. Justiciability

19       The government argues that plaintiffs' motion must be denied because they lack

20   standing to challenge the DHS rule and because plaintiffs' claims are not ripe.  Although

21   justiciability is a threshold matter, this Court finds it helpful to address the issue last because

22   the preceding analysis of the merits demonstrates how the change in policy proposed by DHS

23   would cause immediate injury to employers and employees alike if implemented.

24       *1. Standing*

25       "An organization may bring an action on behalf of its members if: (1) the individual

26   members would have standing to sue; (2) the organization's purpose relates to the interests

27   being vindicated; and (3) the claims asserted do not require the participation of individual

28   members."  Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1119 (9th Cir. 2005).

**United States District Court**
For the Northern District of California

1    Individual members have standing to sue if they can demonstrate that "that an actual or

2    threatened injury exists, which is fairly traceable to the challenged action, and that such

3    injury is likely to be redressed by a favorable decision." Id.

4         In order to have standing to seek injunctive relief, a plaintiff must demonstrate a

5    likelihood of repeated injury or future harm to the plaintiff in the absence of the injunction.

6    See City of Los Angeles v. Lyons, 461 U.S. 95, 103 (1982) (describing the standing

7    requirement for injunctive relief as requiring that the "threat to the plaintiffs" of future injury

8    be "sufficiently real and immediate"). The government's argument that the organizational

9    plaintiffs here have not alleged sufficient facts to demonstrate that any of their members have

10   suffered an actual injury or face an imminent future injury is unpersuasive.

11        The new rule presents employers with the Hobson's choice of complying with DHS's

12   "safe harbor" procedures or confronting liability for knowingly employing unauthorized

13   workers. Presented with that choice, it is certain that many employers represented by the

14   organizational plaintiffs will be forced to develop systems for resolving no-match letters

15   within the new 90-day timeframe. Indeed, plaintiffs have submitted declarations

16   demonstrating that some businesses, such as the Chamber of Commerce of the United States

17   of America, already have begun to develop costly programs and systems for ensuring

18   compliance with the safe harbor framework. See Dickson Decl. ¶ 7. Thus, the business

19   plaintiffs have established not only imminent, but actual injury.

20        The union plaintiffs have also demonstrated a likelihood of immediate future harm.

21   Plaintiffs have submitted uncontroverted evidence that DHS's planned no-match mailing will

22   identify approximately 600,000 members of the AFL-CIO as employees with mismatched

23   names and SSNs. See Reich Decl. ¶ 4. As the SSA itself concedes, the agency will not be

24   able to resolve all mismatches – even if the mismatch is the result of SSA error – within the

25   safe harbor's 90-day window. See 72 Fed. Reg. at 45617 (acknowledging that the 90-day

26   timeframe may not be sufficient for "difficult" cases). Accordingly, there can be no doubt

27   that at least some of the 600,000 AFL-CIO members who are identified in no-match letters,

28   though authorized, will be fired pursuant to the safe harbor provision because they cannot

United States District Court
For the Northern District of California

1  resolve the discrepancy within 90 days.  Loss of a job is an economic injury that constitutes

2  injury in fact for standing.  See San Diego County Gun Rights Comm. v. Reno, 98 F.3d

3  1121, 1130 (9th Cir. 1996).[3]

4          The government also argues that the plaintiffs lack standing because they seek a

5  remedy that will not provide them with any effective relief.  The government's argument is

6  based on the fundamental misconception that the business plaintiffs seek relief from the cost

7  of resolving no-match letters under the current regime.  To the contrary, the business

8  plaintiffs complain of the costs associated with developing new systems and programs

9  necessary for resolving no-match letters under the safe-harbor rule's 90-day timeframe.  The

10  business plaintiffs have demonstrated redressability because the costs of complying with the

11  DHS rule would disappear if the rule were not implemented.

12          Similarly, the union plaintiffs complain of the economic injury that will result from

13  the new rule's 90-day timeframe and the rule's elevation of a no-match letter to a piece of

14  evidence that can, by itself, impute constructive knowledge.  If the rule is not implemented,

15  the injuries of which the union plaintiffs complain will also be redressed.  Accordingly, the

16  plaintiffs have standing to challenge the safe-harbor rule.

17              *2. Ripeness*

18          A challenge to an administrative action is ripe when the issues are fit for judicial

19  determination – i.e., because the issues do not require further factual development – and there

20  is a "direct and immediate" risk of hardship to the plaintiff.  See Abbott Labs. v. Gardner,

21  387 U.S. 136, 153 (1967).  Pursuant to Abbott, the test for ripeness is not whether the

22  agency's rule has actually been adopted and is seriously meant to be enforced, but whether

23  the threat of its enforcement reasonably affects conduct.  See id. ("[W]here a regulation

24  requires an immediate and significant change in the plaintiffs' conduct of their affairs with

25  serious penalties attached to noncompliance, access to the courts . . . must be permitted,

26  absent a statutory bar or some other unusual circumstance.").

27  ─────────────

28          [3] The government argues that the threat of termination is too speculative to constitute an injury in fact.  Because of the magnitude of the planned no-match mailing – affecting 8 million workers – the threat of termination is not speculative, but certain.

United States District Court
For the Northern District of California

1    Here, the issues are fit for judicial determination because the central questions are

2 primarily legal: whether the DHS rule conflicts with statute, whether the rule is arbitrary and

3 capricious, whether DHS and SSA exceeded their statutory authority, and whether DHS

4 violated the Regulatory Flexibility Act.  Moreover, the regulation, if enforced, would require

5 an immediate and significant change in the plaintiffs' conduct.  As noted above, some

6 employers have already begun to change their conduct – by creating new programs to

7 properly implement the safe harbor framework within 90 days – in response to the threat of

8 enforcement.  Accordingly, access to the courts must be permitted.

9    **CONCLUSION**

10    Because the balance of harms tips sharply in favor of plaintiffs and plaintiffs have

11 raised serious questions going to the merits, the motion for a preliminary injunction is

12 GRANTED.  The parties shall meet and confer on the form of the injunction, and submit a

13 proposed order by October 12, 2007.

14    **IT IS SO ORDERED.**

15

16

17 Dated: October 10, 2007                           _____
                                                    CHARLES  R. BREYER
18                                                  UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28