4410-10

# DEPARTMENT OF HOMELAND SECURITY

## 8 CFR Part 274a

### [RIN 1653-AA50]

### ICE 2377-06

### DHS Docket No. ICEB-2006-0004

### Safe-Harbor Procedures for Employers Who Receive a No-Match Letter:

### Clarification; Initial Regulatory Flexibility Analysis.

**AGENCY:** U.S. Immigration and Customs Enforcement, DHS.

**ACTION:** Supplemental proposed rule.

**SUMMARY:** The Department of Homeland Security (DHS) is proposing to amend its regulations that provide a "safe harbor" from liability under section 274A of the Immigration and Nationality Act for employers who follow certain procedures after receiving a notice – from the Social Security Administration (SSA), called a "no-match letter," or from DHS, called a "notice of suspect document" – that casts doubt on the employment eligibility of their employees. The prior final rule was published on August 15, 2007 (the August 2007 Final Rule).

Implementation of that rule was preliminarily enjoined by the United States District Court for the Northern District of California on October 10, 2007. The district court based its preliminary injunction on three findings. This supplemental proposed rule clarifies certain aspects of the August 2007 Final Rule and responds to the three findings underlying the district court's injunction.

**DATES**: Comments must be submitted not later than [insert date 30 days after date of publication in the FEDERAL REGISTER].

**ADDRESSES**: You may submit comments, identified by DHS Docket No. ICEB 2006-0004, by one of the following methods:

- Federal eRulemaking Portal: http://www.regulations.gov. Follow the instructions for submitting comments.

- Mail: Marissa Hernandez, U.S. Immigration and Customs Enforcement, 425 I St NW, Suite 1000, Washington DC, 20536. To ensure proper handling, please reference DHS Docket No. ICEB-2006-0004 on your correspondence. This mailing address may also be used for paper, disk, or CD-ROM submissions.

- Hand Delivery/Courier: Marissa Hernandez, U.S. Immigration and Customs Enforcement, 425 I St NW, Suite 1000, Washington DC, 20536.

**FOR FURTHER INFORMATION CONTACT**: Marissa Hernandez, U.S. Immigration and Customs Enforcement, 425 I St NW, Suite 1000, Washington DC, 20536. Telephone: 202-307-0071 (not a toll-free number).

**SUPPLEMENTARY INFORMATION**

**Table of Contents**

I.   Public Participation. ................................................................................... 3
II.  Background. ............................................................................................... 4
     A. History of the Rulemaking. .................................................................. 4
     B. Purpose of the rulemaking. .................................................................. 6
     C. Authority to amend the regulation. .................................................... 11
     D. Clarification of DHS Policy on the Use of No-Match Letters. ............... 13
     E. Anti-Discrimination provisions of the INA. ......................................... 25
     F. Regulatory Flexibility Analysis ........................................................... 27
     G. Further Interpretation in the August 2007 Final Rule. ......................... 30
III. Statutory and Regulatory Reviews. ......................................................... 31
     A. Administrative Procedure Act. ........................................................... 31
     B. Regulatory Flexibility Act. ................................................................. 31

(1) Reasons why the rule is being considered. ........................................ 32
(2) Objectives of, and legal basis for, the proposed rule. ....................... 32
(3) Description of and, where feasible, an estimate of the numbers of small entities to which the rule would apply........................................................ 33
(4) Proposed reporting, recordkeeping, and other compliance requirements......... 35
(5) Significant alternatives considered. ................................................ 37
(6) Duplicate, overlapping or conflicting rules. .................................... 41
C. Unfunded Mandates Reform Act of 1995.............................................. 42
D. Small Business Regulatory Enforcement Fairness Act of 1996 ............................ 42
E. Executive Order 12,866 (Regulatory Planning and Review)................................. 42
F. Executive Order 13,132 (Federalism)................................................ 43
G. Executive Order 12,988 (Civil Justice Reform). ................................... 43
H. Paperwork Reduction Act. ......................................................... 43

## I. Public Participation.

Interested persons are invited to comment on this rulemaking by submitting written data, views, or arguments on all aspects of the rule. DHS invites comments related to the Initial Regulatory Flexibility Analysis for this rule, including comments suggesting significant alternatives that might limit any significant economic impact the rule might have on small entities or comments related to the Small Entity Impact Analysis underlying the rule, available on the docket at ICEB-2006-0004-0232. Comments that will most assist DHS will reference a specific portion of this analysis and explain the reason for any recommended change. Include data, information, and the authority that supports the recommended change. Comments previously submitted to this docket do not need to be submitted again.

Instructions for filing comments: All submissions received must include the agency name and DHS docket number ICEB-2006-0004. All comments received (including any personal information provided) will be posted without change to http://www.regulations.gov. See ADDRESSES, above, for methods to submit comments. Mailed submissions may be paper, disk, or CD-ROM.

Reviewing comments: The Small Entity Impact Analysis and public comments may be viewed online at http://www.regulations.gov or in person at U.S Immigration and Customs Enforcement, Department of Homeland Security, 425 I St, NW, Room 1000, Washington, DC 20536, by appointment. To make an appointment to review the docket you must call telephone number 202-307-0071.

## II. Background.

### A. History of the Rulemaking.

DHS first published a proposed rule in June 2006 that would have provided means for employers to limit the risk of being found to have knowingly employed unauthorized aliens after receiving a letter from the SSA – known as a "no-match letter" – notifying them of mismatches between names and social security numbers provided by their employees and the information in SSA's database or after receiving a letter from DHS – called a "notice of suspect document," that casts doubt on the employment eligibility of their employees. 71 FR 34281 (June 14, 2006). A sixty-day public comment period ended on August 14, 2006.

DHS received approximately 5,000 comments in response to the proposed rule from a variety of sources, including labor unions, not-for-profit advocacy organizations, industry trade groups, private attorneys, businesses, and other interested organizations and individuals. The comments varied considerably; some commenters strongly supported the rule as proposed, while others were critical of the proposed rule and suggested changes. See www.regulations.gov, docket number ICEB-2006-0004.

DHS published a final rule on August 15, 2007, setting out safe harbor procedures for employers who receive SSA no-match letters or notices from DHS calling into question

the information previously provided by their employees when establishing their work eligibility. 72 FR 45611 (Aug. 15, 2007). Each comment received was reviewed and considered in the preparation of the August 2007 Final Rule. The August 2007 Final Rule addressed the comments by issue rather than by referring to specific commenters or comments.

On August 29, 2007, the American Federation of Labor and Congress of Industrial Organizations, and others, filed suit seeking declaratory and injunctive relief in the United States District Court for the Northern District of California. AFL-CIO, et al. v. Chertoff, et al., No. 07-4472-CRB, D.E. 1 (N.D. Cal. Aug. 29, 2007). The district court granted plaintiffs' initial motion for a temporary restraining order against implementation of the August 2007 Final Rule. AFL-CIO v. Chertoff, D.E. 21 (N.D. Cal. Aug. 31, 2007) (order granting motion for temporary restraining order and setting schedule for briefing and hearing on preliminary injunction). On October 10, 2007, the district court granted the plaintiffs' motion for preliminary injunction. AFL-CIO v. Chertoff, D.E. 135 (N.D. Cal. 2007) (order granting motion for preliminary injunction).

The district court concluded that the plaintiffs had raised serious questions about three aspects of the August 2007 Final Rule. Specifically, the court questioned whether DHS had: (1) supplied a reasoned analysis to justify what the court viewed as a change in the Department's position – that a no-match letter may be sufficient, by itself, to put an employer on notice, and thus impart constructive knowledge, that employees referenced in the letter may not be work-authorized; (2) exceeded its authority (and encroached on the authority of the Department of Justice (DOJ)) by interpreting the anti-discrimination provisions of the Immigration Reform and Control Act of 1986 (IRCA), Pub.L. 99-603,

100 Stat. 3359 (1986), 8 U.S.C. 1324b; and (3) violated the Regulatory Flexibility Act, 5 U.S.C 601 et seq., by not conducting a regulatory flexibility analysis. See AFL-CIO v. Chertoff, D.E. 135 (N.D. Cal. Oct. 10, 2007) (order granting motion for preliminary injunction) at 8.

DHS proposes this supplemental rule to address the issues raised by the court in the preliminary injunction order. After addressing these three issues, DHS will seek to have the preliminary injunction dissolved. DHS continues its defense of the case, and this simultaneous rulemaking – which is intended to lead to the rule becoming effective as quickly as possible – is not a concession of any issue pending in the litigation.

In developing this supplemental proposed rule, DHS has considered the administrative record of the August 2007 Final Rule and the record of proceedings in the pending litigation. AFL-CIO v. Chertoff, D.E. 129 (N.D. Cal. Oct. 1, 2007) (certified administrative record); D.E. 146-2 (N.D. Cal. Dec. 4, 2007 (errata)) (hereafter AFL-CIO v. Chertoff, D.E. 129). Accordingly, DHS provides the following clarification to the August 2007 Final Rule and publishes an initial regulatory flexibility analysis.

**B. Purpose of the rulemaking.**

DHS, and its predecessor agencies, has been aware for many years that employment in the United States is a magnet for illegal immigration, and that a comparison of names and social security numbers submitted by employers against SSA's data provides an indicator of possible illegal employment:

> **Reducing the employment magnet is the linchpin of a comprehensive strategy to deter unlawful immigration.** Economic opportunity and the prospect of employment remain the most important draw[s] for illegal migration to this country. Strategies to deter unlawful entries and visa overstays require both a reliable process for verifying authorization to work and an enforcement capacity to ensure that employers adhere to all immigration-related labor standards.

\* \* \* \* \*

The Commission concluded that the most promising option for verifying work authorization is a computerized registry based on the social security number; it unanimously recommended that such a system be tested not only for its effectiveness in deterring the employment of illegal aliens, but also for its protections against discrimination and infringements on civil liberties and privacy.

\* \* \* \* \*

The federal government does not have the capacity to match social security numbers with [Immigration and Naturalization Service (INS)] work authorization data without some of the information captured on the I-9.  Congress should provide sufficient time, resources, and authorities to permit development of this capability.

U.S. Commission on Immigration Reform, Becoming an American:  Immigration and

Immigrant Policy 113 - 14, 117 (1997) (emphasis in original); AFL-CIO v. Chertoff, D.E.

129 at 139 - 140, 143.

Similarly, DHS has been aware of the potential for abuse of social security numbers

by aliens who are not authorized to work in the United States.  The abuse of social

security numbers has been the subject of numerous public reports of the Government

Accountability Office and the Inspector General of the Social Security Administration, as

well as congressional hearings.  See, e.g., AFL-CIO v. Chertoff, D.E. 129, at 35 - 661;

Government Accountability Office, Report to the Subcommittee on Terrorism,

Technology and Homeland Security, Committee on the Judiciary, U.S. Senate,

Estimating the Undocumented Population: A "Grouped Answers" Approach to Surveying

Foreign-Born Respondents (GAO Rept. No. GAO-06-775, Sept. 2006) (describes

alternative means of gathering interview data from undocumented aliens to reduce the

"question threat" to some respondents because they fear that a truthful answer could

result in negative consequences); Subcommittee on Oversight and Subcommittee on

Social Security, Committee on Ways and Means, U.S. House of Representatives, <u>Social Security Number and Individual Taxpayers Identification Number Mismatches and Misuse,</u> 108th Cong., 2nd Sess., Serial No. 108-53 (March 10, 2004).

The illegal alien population in the United States and the number of unauthorized workers employed in the United States are both substantial. <u>See, e.g.,</u> J. Passel, Pew Hispanic Center, <u>The Size and Characteristics of the Unauthorized Migrant Population in the U.S.</u> (March 2006), found at http://pewhispanic.org/files/factsheets/17.pdf (approximately 11.2 million illegal aliens in the United States; approximately 7.2 million illegal aliens in the workforce); <u>with</u> M. Hoefer, N. Rytina & C. Campbell, Office of Immigration Statistics, Policy Directorate, U.S. Department of Homeland Security, <u>Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2006</u> (August 2007) found at http://www.dhs.gov/xlibrary/assets/statistics/publications/ill_pe_2006.pdf (estimating unauthorized population of 11,550,000 as of January 2006).

The scale of the problem the rule seeks to address – employment of aliens not authorized to work in the United States – has become more well-defined through the course of the rulemaking and related litigation. The comments submitted in response to the initial proposed rule in 2006 by organizations such as Western Growers, and the public statements by representatives of such organizations, have been bracingly frank:

> In the midst of the combustive debate over immigration reform, we in agriculture have been forthright about the elephant in America's living room:  Much of our workforce is in the country illegally – as much as 70%.

T. Nassif, "Food for Thought," <u>The Wall Street Journal</u>, Nov. 20, 2007, at A19.  <u>See also,</u> Docket ICEB-2006-0004-0145 (August 14, 2006), <u>AFL-CIO v. Chertoff,</u> D. E. 129 at

1306 (comments of the National Council of Agricultural Employers, suggesting over

76% of agricultural workers are not authorized to work in the United States). DHS

recognizes this critical fact – that many employers are aware that large proportions of

their workforce are illegal – and has therefore taken steps within the Department's

existing authorities to assist employers in complying with the law.

Public and private studies in the administrative record of this rulemaking make clear

that social security no-match letters identify some portion of the population of aliens

without work authorization who are illegally employed in the United States. One private

study concluded that "most workers with unmatched SSNs are undocumented

immigrants." C. Mehta, N. Theodore & M. Hincapie, Social Security Administration's

No-Match Letter Program: Implications for Immigration Enforcement and Workers'

Rights (2003) at i; AFL-CIO v. Chertoff, D.E. 129 at 309, 313.

Based on the rulemaking record and the Department's law enforcement expertise,

DHS finds that there is a clear connection between social security no-match letters and

the lack of work authorization by some employees whose SSNs are listed in those letters.

DHS's (and legacy-INS's) interactions with employers who receive no-match letters have

consistently shown that employers are also aware that an employee's appearance on a no-

match letter may indicate the employee lacks work authorization. Nevertheless, as

Mehta, Theodore & Hincapie found, SSA's no-match letters currently "do[] not

substantially deter employers from retaining or hiring undocumented immigrants.

Twenty-three percent of employers retained workers with unmatched SSNs who failed to

correct their information with the SSA." C. Mehta, N. Theodore & M. Hincapie, supra at

ii; AFL-CIO v. Chertoff, D.E. 129 at 314.

9

Some employers may fail to respond to no-match letters because they have consciously made the illegal employment of unauthorized aliens a key part of their business model or because they conclude that the risk of an immigration enforcement action is outweighed by the cost of complying with the immigration laws by hiring only legal workers. See C. Mehta, N. Theodore & M. Hincapie, supra at 2, 20 – 30; AFL-CIO v. Chertoff, D.E. 129 at 314, 316, 334 – 44 (noting employer "complaints" over loss of their illegal workforce when employees are asked to correct their SSN mismatches, as well as the practice by some employers of encouraging workers to procure new fraudulent documents to provide cover for their continued employment). DHS's interactions with employers have also shown, however, that many law-abiding employers are unsure what their obligations are under current immigration law when they receive an SSA employer no-match letter, and that some employers fear accused of having violated anti-discrimination laws if they react inappropriately to no-match letters.

In light of these facts, DHS has concluded that additional employer guidance on how to respond to SSA no-match letters will help law-abiding employers to comply with the immigration laws.[1] Accordingly, in the August 2007 Final Rule and in this supplemental proposed rulemaking, DHS outlines specific steps that reasonable employers may take in response to SSA no-match letters, and offers employers who follow those steps a safe harbor from ICE's use of SSA no-match letters in any future enforcement action to show

---

[1] United States citizens and aliens authorized to work in the United States would also receive an ancillary benefit from improved employer compliance with the bar to employment of aliens not authorized to work in the United States and of correction of records with the Social Security Administration. Correction of the SSA's records to properly credit wages to a citizen or alien authorized to work may increase authorized workers' benefits under the Social Security Act and other laws, and improved employer compliance with the laws barring employment of unauthorized alien workers will likely expand the employment opportunities of those authorized to work in the United States.

that an employer has knowingly employed unauthorized aliens in violation of INA

section 274A, 8 U.S.C. 1324a.

### C. Authority to amend the regulation.

The supplemental proposed rule responds to the district court's injunction while

remaining true to the agency's rulemaking powers. In enacting section 103(a) of the

Immigration and Nationality Act of 1952, as amended, 8 U.S.C. 1103(a), and section

102(a)(3), (b)(1), and (e) of the Homeland Security Act of 2002, Pub. L. 107-296, 110

Stat. 2135 (Nov. 25, 2002) (HSA), as amended, 6 U.S.C. 112(a)(3), (b)(1), and (e),

Congress has delegated to the Department of Homeland Security the authority to

promulgate rules that interpret and fill in the administrative details of the immigration

laws. Under Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-

45 (1983), the courts afford due deference to agency interpretations of these laws as

reflected in DHS's rules. The Executive may, as appropriate, announce or change its

policies and statutory interpretations through rulemaking actions, so long as the agency's

decisions rest on a "rational connection between the facts found and the choice made."

Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463

U.S. 29, 43 (1983).

DHS's authority to investigate and pursue sanctions against employers who

knowingly hire or continue to employ unauthorized aliens necessarily includes the

authority to decide what evidence it will rely upon in such enforcement efforts. It also

includes the authority to decide the probative value of the available evidence, and the

conditions under which DHS will commit not to rely on certain evidence. Under the

prior regulations, an employer who had received an SSA no-match letter or DHS letter

and was charged with knowing employment of unauthorized aliens could defend against

an inference that the employer had constructive knowledge of the workers' illegal status

by showing that the employer had concluded, after exercising reasonable care in response

to the SSA no-match letter or DHS letter, that the workers were in fact work authorized.

8 CFR 274a.1(l)(1) (2007). Those regulations, however, provided no detailed guidance

on what steps by the employer would constitute the exercise of reasonable care. In the

August 2007 Final Rule – as supplemented by this proposed rule – DHS limits its law

enforcement discretion by committing not to use an employer's receipt of and response to

an SSA no-match letter or DHS letter as evidence of constructive knowledge for those

employers who follow the procedures outlined in the rule. This limitation on DHS's

enforcement discretion is well within the rulemaking powers of the Secretary of

Homeland Security. See, e.g., Lopez v. Davis, 531 U.S. 230, 240-41 (2001) (upholding

categorical limitation of agency discretion through rulemaking). The rule does not affect

the authority of the SSA to issue no-match letters, or the authority of the Internal

Revenue Service (IRS) to impose and collect taxes, or the authority of DOJ to enforce the

anti-discrimination provisions of the INA or adjudicate notices of intent to fine

employers.

The ongoing litigation involving the August 2007 Final Rule does not constrain

DHS's power to amend the rule. The Executive's amendment to regulations in litigation

is a natural evolution in the process of governance. As the United States Court of

Appeals for the District of Columbia has noted:

> It is both logical and precedented that an agency can engage in new rulemaking to
> correct a prior rule which a court has found defective. See Center for Science in the
> Public Interest v. Regan, 727 F.2d 1161, 1164-65 (D.C. Cir. 1984); Action on
> Smoking and Health v. CAB, 713 F.2d 795, 802 (D.C. Cir. 1983). Where an

injunction is based on an interpretation of a prior regulation, the agency need not seek modification of that injunction before it initiates new rulemaking to change the regulation.

NAACP, Jefferson County Branch v. Donovan, 737 F.2d 67, 72 (D.C. Cir. 1984). See generally Thorpe v. Housing Auth. of Durham, 393 U.S. 268, 281-82 (1969).

Finally, the district court enjoined implementation of the August 2007 Final Rule and the issuance of SSA no-match letters containing an insert drafted by DHS. AFL-CIO v. Chertoff, D.E. 137 (N.D. Cal. 2007) (preliminary injunction). The injunction did not prohibit further rulemaking by DHS, and indeed the district court subsequently stayed further proceedings in the litigation to allow for further rulemaking. AFL-CIO v. Chertoff, D.E. 142 (motion for stay); 144 (statement of non-opposition); 149 (minute order staying proceedings pending new rulemaking) (N.D. Cal. 2007).

**D. Clarification of DHS Policy on the Use of SSA No-Match Letters.**

As indicated in the preamble of the August 2007 Final Rule, employers annually send the Social Security Administration (SSA) millions of earnings reports (W-2 Forms) in which the combinations of employee name and social security number (SSN) do not match SSA records. 72 FR 45612. In certain cases, SSA sends a letter that informs the employer of the combinations that cannot be matched. SSA sends such letters, commonly referred to as employer "no-match letters," to employers whose wage report contains more than ten no-matches and where the no-matches represent more than 0.5% of the total W-2s included in the employer's wage report.

There can be many causes for a mismatch, including clerical error and name changes. One potential cause may be the submission of information for an alien who is not authorized to work in the United States and who may be using a false SSN or an SSN

13

assigned to someone else. Because an SSA no-match letter calls into question the accuracy of the identifying information an employer received and submitted for employees, a no-match letter places an employer on notice of the possibility that some of its employees whose SSNs are listed in the letter may not be who they claimed, and may be unauthorized to work in the United States.

U.S. Immigration and Customs Enforcement (ICE) sends a similar letter (currently called a "notice of suspect documents") after it has inspected an employer's Employment Eligibility Verification forms (Forms I-9) during an investigation audit and has been unable to confirm the validity of an immigration status document or employment authorization document presented or referenced by the employee in completing the Form I-9. Like an SSA no-match letter, a "notice of suspect documents" calls into question the validity of an employee's identifying information, and thus places employers on notice that the subject employees might be unauthorized to work in the United States. Because a "notice of suspect documents" is issued upon ICE's investigation and review of the specific employment authorization documents, receipt of such a notice provides an employer with clear cause to investigate the work authorization status of the employees identified in the notice.

Section 274A(a)(2) of the Immigration and Nationality Act (INA), 8 U.S.C. 1324a(a)(2), states:

> It is unlawful for a person or other entity . . . to continue to employ [an] alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment. [Emphasis added.]

The interaction between SSA's no-match letters and the INA's prohibition on "knowing" employment of unauthorized aliens – and the statement in DHS's (and legacy INS's)

regulations that employers may be found to have "constructive notice" of their workers'

unauthorized status – has been the subject of repeated inquiries from employers and other

interested parties over the past decade. Prior to the release of the August 2007 Final

Rule, legacy INS responded through private correspondence to questions about the

responsibilities of employers who receive SSA no-match letters by explaining that the

INS:

> would not consider notice of this discrepancy [between the name and SSN reported
> by an employee and SSA's records] from SSA to an employer <u>by itself</u> to put the
> employer on notice that the employee is unauthorized to work, or to require
> reverification of documents or further inquiry as to the employee's work
> authorization. Whether an employer has been put on notice of an unauthorized
> employment situation is, however, an individualized determination that depends on
> all the relevant facts, and there may be specific situations in which SSA notice of an
> SSN irregularity would either cause, or contribute to, such a determination.

Letter to Littler Mendelson, from D. Martin, General Counsel, Immigration and

Naturalization Service (Dec. 23, 1997) (emphasis added), <u>AFL-CIO v. Chertoff</u>, D.E. 129

at 3.

This early recorded interpretation was followed by a series of further non-public and

non-binding letters. For example, the agency was asked about the significance of an

employee's presentation of documents bearing a different name and social security

number from that offered during the initial employment verification process,

accompanied by a request that the employer correct the employer's records. In response,

an attorney for the INS noted that such behavior is "not necessarily" an indication that the

employee is not authorized to work in the United States, but that it "constitutes notice to

the employer that requires further inquiry by the employer before the employer can

accept" the new documentation and make changes in the employment verification record.

Letter to Alston & Bird, LLP, from D. Carpenter, Chief, Employer Sanctions and Civil

Document Fraud Division, Office of the General Counsel, INS (date illegible), <u>AFL-CIO</u>

<u>v. Chertoff</u>, D.E. 129 at 6.  The letter further advised the employer to inquire further

when faced with material changes affecting the core employment verification

information, such as the social security number, and noted that the extent of the inquiry

would depend on the nature of the change.

> Because a complete change in name and number calls into question the identity of the
> individual presenting the document to be verified by the employer at the initial
> completion of the Form I-9, the employer may need to make additional inquiries of
> the employee in order to make its determination as to the card's genuineness and
> whether it appears to relate to the employee.

<u>Id</u>. at 7.  The letter also pointed out that questions regarding the anti-discrimination

provisions of the INA should be addressed to the DOJ Office of Special Counsel.  <u>Id</u>.

Because such guidance was provided in response to specific questions or to address

particular circumstances, the advice offered by DHS and INS officials over the years has

varied somewhat in tone and emphasis.  Thus, in one letter, the INS Acting General

Counsel indicated that mere receipt of a Social Security no-match letter, without any

"additional evidence that an employee may not be work authorized," "does not impose

any affirmative duty upon the employer to investigate further into the employee's

eligibility to work in the United States."  Letter to California Farm Bureau Federation,

from Michael J. Creppy for Paul W. Virtue, Acting General Counsel, INS, February 17,

[illegible], <u>AFL-CIO v. Chertoff</u>, D.E. 129 at 9.  And in a 1998 letter to a Member of

Congress the INS General Counsel noted that there are "many reasons" for mismatches

and observed that a "SSA notice of a mismatch does not trigger by itself an obligation to

reverify work authorization," while at the same time emphasizing that employers "should

take [steps] to reconcile the mismatch with respect to SSA and IRS reporting."  Letter to

16

Hon. Robert F. Smith, United States House of Representatives, from Paul W. Virtue, General Counsel, INS, Nov. 19, 1998, <u>AFL-CIO v. Chertoff</u>, D.E. 129 at 11.

More recently, one employer sought clarification from DHS on the appropriate course of action in response to a no-match letter. The employer had established a policy instructing their employees to correct mismatches directly with SSA and terminated employees who failed to do so, but had faced objections from "third party organizations" who asked the employer to change this policy and to instead leave any correction of mismatches to the discretion of the employee, <u>See</u> Letter from Tyson Foods, Inc. to Hon. Tom Ridge, Secretary, DHS, Dec. 30, 2004, <u>AFL-CIO v. Chertoff</u>, D.E. 129 at 21. In response, DHS reiterated the same core points from prior correspondence, and suggested that employer should take "reasonable steps" such as reverification if an employee was unable to resolve a discrepancy to the employer's satisfaction, and that "[i]f the employer remains unsatisfied that the employee is authorized to work, termination may be appropriate." Letter to Tyson Foods, Inc. from Daniel Brown, Deputy Associate General Counsel, DHS, March 16, 2005, <u>AFL-CIO v. Chertoff</u>, D.E. 129 at 23. <u>See also</u> Letter to W.E. Welch & Associates, Inc. from Daniel R. Brown, Deputy Associate General Counsel, DHS, March 30, 2005, <u>AFL-CIO v. Chertoff</u>, D.E. 129 at 25 (suggesting that employers could take steps similar to those set forth in the safe harbor rule in response to no-match letters).

The common theme running through the agency's correspondence is that while the mere receipt of an SSA no-match letter may not obligate employers to repeat the full I-9 employment verification process, employers cannot turn a blind eye to SSA no-match letters and should perform reasonable due diligence. <u>See</u> Redacted letter from Paul W.

Virtue, General Counsel, INS, April 12, 1999, <u>AFL-CIO v. Chertoff</u>, D.E. 129 at 16, 17

("We emphasize that although it is incorrect to assume that an SSA discrepancy

necessarily indicates unauthorized status, it would be equally incorrect for an employer to

assume that in all cases it may safely ignore any possible INA relevance or consequence

of SSA discrepancies.... [A]n employer who discovers that its employee has lied on a

Form I-9 about any fact is fully entitled to take reasonable steps ... to ensure that the

employee has not also lied about his or her work authorization or anything else on the

form, and ... if it continues the employment without doing so, it is taking a risk that it

may be held liable if in fact the employee is not authorized.").  The view that (1) SSA no

match letters do not, by themselves, establish that an employee is unauthorized, (2) there

are both innocent and non-innocent reasons for no-match letters, but (3) an employer may

not safely ignore SSA no-match letters, and (4) an employer must be aware of and

comply with the anti-discrimination provisions of the INA, remained the government's

position after the reorganization of the functions of the INS into DHS.  <u>See</u>, <u>e.g.</u>, Letter to

Hon. John N. Hostettler, from Pamela J. Turner, Assistant Secretary for Legislative

Affairs, DHS, August 9, 2004, <u>AFL-CIO v. Chertoff</u>, D.E. 129 at 19.

In light of this history, and of the continuing inquiries regarding employers'

obligations under current immigration law upon receipt of SSA no-match letters, DHS

decided to provide a more comprehensive and public statement of its interpretation of the

INA, and to offer a safe harbor for employers who took specific reasonable steps in

response to no-match letters.  The August 2007 Final Rule describes an employer's

existing obligations under the immigration laws, and the evidentiary use that DHS will

make of such letters found in employers' files from either SSA or DHS.  The August

2007 Final Rule also specifies step-by-step actions that can be taken by the employer that will always be considered by DHS to be a reasonable response to receiving an SSA no-match letter or DHS letter – a response that will eliminate the possibility that either letter can be used as any part of an allegation that an employer had <u>constructive knowledge</u> that it was employing an alien not authorized to work in the United States.

In entering its injunction against the August 2007 Final Rule, however, the district court found that DHS had changed its position on the significance of SSA no-match letters when promulgating that August 2007 Final Rule. While the court acknowledged that the preamble to the August 2007 Final Rule remained consistent with DHS's and INS's prior informal guidance by "assur[ing] employers that 'an SSA no-match letter by itself does not impart knowledge that the identified employees are unauthorized aliens,'" <u>AFL-CIO v. Chertoff</u>, D.E. 135 at 13 (N.D. Cal. Oct. 10, 2007) (quoting 72 Fed. Reg. 45616), the court nevertheless concluded that "DHS decided to change course" in the text of the August 2007 Final Rule by "provid[ing] that constructive knowledge may be inferred if an employer fails to take reasonable steps after receiving nothing more than a no-match letter." <u>Id</u>. Having identified what it believed to be a change in agency position, the court found the prior August 2007 Final Rule to be arbitrary and capricious for failing to provide a "reasoned analysis" supporting that change.

DHS disagrees with the district court's interpretation of both the correspondence from INS and DHS and the August 2007 Final Rule. DHS also believes the legal test applied by the district court was incorrect. Assuming, however, that the court correctly identified a change in the agency's formal position and that the Administrative Procedure Act imposes a "reasoned analysis" requirement on such changes in agency position above and

beyond the ordinary requirements that agency rulemaking reflect a rational connection between the facts found and the agency's decision, DHS has strong reasons for adopting the change in agency policy found by the district court.

The most basic justification for issuance of this rule – and for the "change" in policy found by the district court – is to eliminate ambiguity regarding an employer's responsibilities upon receipt of a no-match letter.  As one organization with nationwide membership commented in response to the initial publication of the proposed rule in 2006:

> [d]isagreement and confusion [of an employer's obligations upon receipt of a no-match letter] are rampant and well-intended employers are left without a clear understanding of their compliance responsibilities. [Organization] members have had substantial concerns regarding whether mismatch letters put them on notice that they may be in violation of the employment authorization provisions of the immigration law, since the Social Security card is one of the most commonly used employment authorization documents.

AFL-CIO v Chertoff, D.E. 129 at 1295, (comment from National Council of Agricultural Employers, Aug 14, 2006).  See also, id. at 849 (comment by the National Federation of Independent Business: "Clarification of the employer's obligation on receiving a no-match letter and the safe harbor provided for in the proposed rule is critical.").

As noted above, all previous agency guidance took the form of letters responding to individual queries from employers, Members of Congress, or other interested parties; neither the INS nor DHS had ever released any formal statement of agency policy on the issue.  In addition, the agency's correspondence over the years had been heavily caveated, at times even equivocal, and although more recent letters from DHS had more clearly articulated employers' obligations upon receiving a no-match letter, those letters did not purport to supplant prior statements by legacy INS.  In the absence of a clear,

authoritative agency position on the significance of no-match letters, employers and labor organizations had been left free to stake out positions on the question that best served their parochial interests, in some cases misconstruing statements in the SSA employer no-match letter aimed at preventing summary firings or discriminatory practices as instead commanding employers to turn a blind eye to the widely-known fact that unauthorized alien workers would often appear on SSA no-match letters. In the face of this ambiguity, well-meaning employers' responses to SSA no-match letters were also affected by concern about falling afoul of the antidiscrimination provisions of the INA. Thus, employers concluded that the risks of inaction in the face of no-match letters – with the possibility of being found to have knowingly employed unauthorized workers in violation of INA 274A – was outweighed by the risks of embarking on an investigation after receiving a no-match letter only to face charges of discrimination.

The August 2007 Final Rule was designed to remedy this confused situation, by reminding employers of their obligation under the INA to conduct due diligence upon receipt of SSA no-match letters and by formally announcing DHS's view that employers that fail to perform reasonable due diligence upon receipt of SSA no-match letters or DHS suspect document notices risk being found to have constructive knowledge of listed employees' illegal work status. Furthermore, because the constructive knowledge standard applies a "totality of the circumstances" analysis to the facts of a particular case, and so is not reducible to bright-line rules, the August 2007 Final Rule sought to provide greater predictability through a clear set of recommended actions for employers to take, and assured employers that they would not face charges of constructive knowledge based

on SSA no-match letters or DHS letters that had been handled according to DHS's

guidelines.

DHS's position on the evidentiary value of SSA no-match letters in the August 2007

Final Rule, and in this supplemental proposed rulemaking, is also justified by the

growing evidence and consensus within and outside government that SSN no-matches are

a legitimate indicator of possible illegal work by unauthorized aliens. The SSA Office of

the Inspector General (SSA IG) noted that fraud was a significant cause of SSA no-

matches, after reviewing earnings suspense file data for tax years 1999 – 2000:

> [OIG] identified various types of reporting irregularities, such as invalid,
> unassigned and duplicate SSNs and SSNs belonging to young children and
> deceased individuals. While… there are legitimate reasons why a worker's
> name and SSN may not match SSA files… the magnitude of incorrect wage
> reporting is indicative of SSN misuse… SSA's ability to combat SSN misuse
> is hampered because employers do not routinely use the Agency's Employee
> Verification Service (EVS) …

Office of the Inspector General, Social Security Administration, Social Security Number

Misuse in the Service, Restaurant, and Agriculture Industries, Report A-08-05-25-23, at

2-3 (April 2005), AFL-CIO v. Chertoff, D.E. 129 at 453. See generally id. at 35-661.

DHS's view – that no-match letters regularly identify unauthorized alien workers –

was also overwhelmingly affirmed by those who submitted comments on the proposed

rule in 2006. See, e.g., AFL-CIO v Chertoff, D.E. 129 at 866 (comment by U.S.

Chamber of Commerce: "It is estimated that annually 500,000 essential workers enter the

U.S. to perform much needed labor without work authorization. … The proposed

regulation will strip needed workers from employers without providing employers with

an alternative legal channel by which to recruit to fill the gaps …."); Id., at 874 (comment

by Essential Workers Immigration Coalition including same statement); Id., at 850

(comment by National Federation of Independent Business: "a substantial number of workers identified by no-match letters are undocumented immigrants who are unable to provide legitimate social security numbers"); Id., at 858 (comment by Western Growers opposing the rule on grounds that "it would have a most devastating effect on California and Arizona agriculture, where an estimated 50 to 80 percent of the workers who harvest fruit, vegetables and other crops are illegal immigrants"); Id., at 887 (comment by American Immigration Lawyers Association: "[T]he proposed regulation admittedly will 'smoke out' many unauthorized workers."); Id., at 1306 (comment by National Council of Agricultural Employers suggesting that, as a conservative estimate, 76% of agricultural workers are not authorized to work in the United States, that "employers would likely lose a significant part of their workforces," and that "a substantial number of workers would not return to work" when faced with the requirement to verify work authorization "because they would be unable to do so"). See also AFL-CIO v Chertoff, D.E. 135 at 12 (N.D. Cal., Oct. 10, 2007) (preliminary injunction order, noting that "th[e] Court cannot agree with plaintiffs' fundamental premise that a no-match letter can never trigger constructive knowledge, regardless of the circumstances").

SSA's criteria for sending employer no-match letters also inform DHS's position in the August 2007 Final Rule and in this supplementary rulemaking. The SSA does not send employer no-match letters to all employers whose tax filings turn up employees with SSN no-matches. Rather, these letters are only sent to employers whose wage reports reveal at least 11 workers with no-matches, and where the total number of no-matches represents more than 0.5% of the employer's total Forms W-2 in the report. These criteria were adopted by SSA in an effort to balance the efforts to improve the

wage reporting process with available agency resources. Taken together, however, DHS

believes these criteria limit the recipients of employer no-match letters to employers who

have potentially significant problems with their employees' work authorization.

Employers with stray mistakes or <u>de minimis</u> inaccuracies in their records do not receive

employer no-match letters. As a result, DHS finds that employers who receive no-match

letters cannot reasonably assume the problems with their payrolls are merely trivial

clerical errors, and therefore cannot reasonably simply ignore those letters.

    Both pre-existing regulations and consistent case law demonstrate that an employer

can be found to have violated INA section 274A(a)(2), 8 U.S.C. 1324a(a)(2), by having

<u>constructive</u> rather than actual knowledge that an employee is unauthorized to work. The

concept of constructive knowledge appeared in the first regulation that defined

"knowing" for purposes of INA section 274a, 8 CFR 274A.1 (<u>l</u>)(1) (1990); 55 FR 25,928.

As noted in the preamble to that original regulation, that definition of knowledge is

consistent with the Ninth Circuit's holding in <u>Mester Mfg. Co. v. INS</u>, 879 F.2d 561, 567

(9th Cir. 1989) (holding that when an employer who received information that some

employees were suspected of having presented a false document to show work

authorization, such employer had constructive knowledge of their unauthorized status

when the employer failed to make any inquiries or take appropriate corrective action).

<u>See also New El Rey Sausage Co. v. INS</u>, 925 F.2d 1153, 1158 (9th Cir. 1991).

    Here, the rulemaking record demonstrates that it is widely understood by employers

that the appearance of employees' SSNs on an SSA no-match letter may indicate that the

employees lack work authorization, the SSA's practice of generating no-match letters

focuses those letters on employers that DHS believes have non-trivial error levels in their

payrolls, and existing law clearly establishes that employers may be charged with constructive knowledge when they fail to conduct further inquiries in the face of information that would lead a person exercising reasonable care to learn of an employee's unauthorized status. In light of this record, the position DHS articulated in the August 2007 Final Rule – that an employer's failure to conduct reasonable due diligence upon receipt of an SSA no-match letter can, in the totality of the circumstances, establish constructive knowledge of an employee's unauthorized status – was a reasonable "change" from the statements in prior informal agency correspondence.

### E. Anti-Discrimination provisions of the INA.

The preamble to the August 2007 Final Rule explains that employers who adopt the safe-harbor procedures to verify the employee's identity and work authorization must apply them uniformly to all of their employees who appear on employer no-match letters. Failure to do so, the preamble warns, may violate the anti-discrimination provisions of the INA. The preamble further notes that employers who follow the safe harbor procedures set forth in the August 2007 Final Rule uniformly and without regard to perceived national origin or citizenship status will not be found to have engaged in unlawful discrimination. 72 FR 45613 - 14. The DHS insert prepared to accompany the no-match letter had similar language. AFL-CIO v. Chertoff, D.E.7, Exh. C. (N.D. Cal. Aug. 29, 2007).

The district court questioned DHS authority to offer what the court viewed as interpretations – rather than mere restatements – of settled anti-discrimination law, noting that authority for interpretation and enforcement of the INA's anti-discrimination provisions has been entrusted not to DHS but to the DOJ, and concluded that DHS

appeared to have exceeded its authority. See AFL-CIO v. Chertoff, D.E. 135 at 16 (N.D.

Cal. Oct. 10, 2007) (order granting motion for preliminary injunction).

DHS recognizes the jurisdiction of DOJ over enforcement of the anti-discrimination

provisions in section 274B of the INA (8 U.S.C. 1324b). As stated in the preamble to the

August 2007 Final Rule, "DOJ – through its Office of Special Counsel for Immigration-

Related Unfair Employment Practices – is responsible for enforcing the anti-

discrimination provisions of section 274B of the INA, 8 U.S.C. 1324b." 72 FR 45,614.

The August 2007 Final Rule also stated that DHS's rule "does not affect ... the authority

of DOJ to enforce the anti-discrimination provisions of the INA or adjudicate notices of

intent to fine employers." Id.. DHS does not have the authority to obligate the DOJ or its

Office of Special Counsel for Immigration-Related Unfair Employment Practices to a

course of action and the August 2007 Final Rule did not purport to make any such

obligation. Whether an employer has engaged in unlawful discrimination in violation of

INA 274B is a determination that is made by DOJ through the Office of Special Counsel.

A statement by one agency about the authority of another agency does not, in and of

itself, encroach on the authority of that other agency, and DHS's statements in the August

2007 Final Rule were reviewed through an interagency process that was created to

improve the internal management of the Executive Branch. Executive Order 12866, 58

FR 51735 (Oct. 4, 1993), as amended by Executive Order 13258, 67 FR 9385 (Feb. 28,

2002), as amended by Executive Order 13422, 72 FR 2763 (Jan. 23, 2007). Nevertheless,

in light of the district court's concerns about DHS's possible encroachment into the

authority of DOJ, DHS hereby rescinds the statements in the preamble of the August

2007 Final Rule describing employers' obligations under anti-discrimination law or

26

discussing the potential for anti-discrimination liability faced by employers that follow

the safe-harbor procedures set forth in the August 2007 Final Rule.  For example, DHS is

rescinding conclusive statements from the preamble of the August 2007 Final Rule such

as "employers who follow the safe harbor procedures . . . will not be found to have

engaged in unlawful discrimination."  72 FR 45613 – 14.  DHS will also revisit the

language in its insert letter after this rule is finalized.  These rescissions do not change

existing law or require any change to the rule text.  The language added by the August

2007 Final Rule to 8 CFR 274a.1(*l*)(3) clarifies that a written notice from SSA or DHS

calls into question the validity of an employee's identity or work authorization

documents, such that those documents may not any longer, "on their face reasonably

appear to be genuine and to relate to the individual."  That assessment of the presumptive

reliability of documents associated with SSA no-match letters or with DHS notices of

suspect documents is squarely within the regulatory expertise and authority of DHS.

Employers seeking guidance regarding their anti-discrimination obligations in

following the safe harbor procedures in the August 2007 Final Rule, as modified by this

supplemental rule, should follow the direction provided by DOJ on the website of the

Office of Special Counsel for Immigration-Related Unfair Employment Practices,.  See

http://www.usdoj.gov/crt/osc/index.html.  Employers may also seek advice on a case-by-

case basis through OSC's toll-free employer hotline at: 1-800-255-8155.  DOJ's public

guidance on employers' anti-discrimination obligations will also be published in a

**Federal Register** notice when DHS promulgates this rule as a final rule.

F.  **Regulatory Flexibility Analysis**

27

As discussed in the preamble of the August 2007 Final Rule, a number of commenters suggested that the rule would have a substantial economic impact on the economy, and on small entities in particular. The preamble indicated however that the suggested impact was speculative and that there was no evidence in the record to substantially support the conclusion that the rule would impose significant compliance costs on small entities. This conclusion was based on DHS's view of the August 2007 Final Rule as one that clarified DHS's interpretation of the INA, described how DHS would exercise its prosecutorial discretion, and set forth a voluntary safe harbor – not as a rule that would create any new duties, mandate any new burdens, or impose any new or additional compliance costs on employers. Accordingly, DHS certified that the August 2007 Final Rule would not have a significant economic impact on a substantial number of small entities, and therefore declined to provide a Regulatory Flexibility Analysis. See 72 FR at 45,621 and 45,623.

The district court nevertheless concluded that the safe harbor in the rule amounted to a mandate that effectively created compliance obligations for employers that received no-match letters. Having found the rule to be a mandate rather than a voluntary safe harbor rule, the court found it likely that small businesses would incur significant costs associated with complying with the safe harbor rule:

> Because failure to comply subjects employers to the threat of civil and criminal liability, the regulation is the practical equivalent of a rule that obliges an employer to comply or to suffer the consequences; the voluntary form of the rule is but a veil for the threat it obscures. The rule as good as mandates costly compliance with a new 90-day timeframe for resolving mismatches. Accordingly, there are serious questions whether DHS violated the RFA by refusing to conduct a final flexibility analysis.

See AFL-CIO v. Chertoff, D.E. 135 at 19 (N.D. Cal., Oct. 10, 2007) (order granting preliminary injunction) (internal quotations and citations omitted). In light of the district

court's conclusion that a regulatory flexibility analysis would be required, DHS is providing an initial regulatory flexibility analysis (IRFA) in this supplemental proposed rule, based on economic analysis that is being published in the docket of this rulemaking (ICEB-2007-00xx-0002), and which is summarized below in section III.B.

DHS's decision to publish an IRFA in this supplemental rulemaking is not a concession that the rulemaking is a "legislative rule." DHS continues to view the August 2007 Final Rule and this supplemental rule as interpretive rules, and does not believe that these rulemakings bear any of the hallmarks of a legislative rule. See Hemp Industries Ass'n v. Drug Enforcement Admin., 333 F.3d 1082, 1087 (9th Cir. 2003) (identifying three circumstances in which a rule is legislative); Syncore Int'l Corp. v. Shalala, 127 F.3d 90, 94 (D.C. Cir. 1997) (interpretive rule "typically reflects an agency's construction of a statute that has been entrusted to the agency to administer" and a statement of policy "represents an agency position with respect to how it will treat – typically enforce – the governing legal norm. By issuing a policy statement, an agency simply lets the public know its current enforcement or adjudicatory approach"). DHS is not invoking its legislative rulemaking authority to mandate a specific action upon a certain event; rather this rulemaking informs the public of DHS's interpretation of Section 274A of the INA and describes how DHS will exercise its discretion in enforcing the INA's prohibition on knowing employment of unauthorized aliens. Moreover, although the district court questioned whether DHS has changed its position on the evidentiary force of no-match letters in enforcement proceedings against employers, neither the August 2007 Final Rule nor this supplemental rulemaking departs from any prior legislative rule. See Oregon v. Ashcroft, 368 F.3d 1118, 1134 (9th Cir. 2004). As noted above, the only record of the

agency's previous position lies in correspondence between the agency and individuals and employers seeking advice on their specific questions.

Thus, although DHS continues to believe that the Regulatory Flexibility Act does not mandate the analysis that has been undertaken here, see Central Texas Tel. Coop. Inc. v. FCC, 402 F.3d 205, 214 (D.C. Cir. 2005), the Department has decided to publish the IRFA and its supporting economic analysis, in response to the preliminary injunction entered by the Northern District of California and in order to allow for public review and comment on the costs that may be incurred by employers who choose to adopt the safe harbor procedures set forth in this rule.

### G. Further Interpretation in the August 2007 Final Rule.

DHS is proposing to further clarify two aspects of the August 2007 Final Rule. First, the rule instructs employers seeking the safe harbor that they must "promptly" notify an affected employee after the employer has completed its internal records checks and has been unable to resolve the mismatch. After reviewing the history of the rulemaking, DHS believes that this obligation for prompt notice would ordinarily be satisfied if the employer contacts the employee within five business days after the employer has completed its internal records review. DHS emphasizes that an employer does not need to wait until after completing this internal review to advise affected employees that the employer has received the no-match letter and request that the employees seek to resolve the mismatch. Immediately notifying an employee of the mismatch upon receipt of the letter may be the most expeditious means of resolving the mismatch.

Second, plaintiffs in the litigation before the Northern District of California raised a

question as to whether under the August 2007 Final Rule an employer could be found

liable on a constructive knowledge theory for failing to conduct due diligence in response

to the appearance of an employee hired before November 6, 1986 in an SSA no-match

letter.  When Congress enacted INA section 274A as part of the 1986 Immigration

Reform and Control Act, it included a grandfather clause in that legislation exempting

workers hired before IRCA's date of enactment from the provisions of section

274A(a)(1) and (a)(2).  See Pub. L. No. 99-603, section 101(a)(3), 100 Stat. 3359 (1986).

Because those statutory bars against hiring or continuing to employ individuals without

work authorization do not apply to workers within that grandfather clause, the August

2007 Final Rule, as published and as supplemented by this rulemaking, does not apply to

any such workers that may be listed in an SSA no-match letter.

### III. Statutory and Regulatory Reviews.

#### A. Administrative Procedure Act.

DHS is publishing this proposed rule as a proposed rule in the **Federal Register** as a

discretionary request for public comment.  The rule is not a legislative rule governed by

the notice and comment, or by the delayed effective date provisions of 5 U.S.C. 553.

#### B. Regulatory Flexibility Act.

On the basis of the analysis in section II.F of this preamble, DHS provides below its

Initial Regulatory Flexibility Analysis, as described under the Regulatory Flexibility Act,

5 U.S.C. 603(b), (c).  A small entity impact analysis is included in the docket and

summarized here.  This section also describes the alternatives to the proposed rule that

DHS has identified and considered in this supplemental rulemaking.  As noted above,

DHS invites comments related to this Initial Regulatory Flexibility Analysis and the accompanying Small Entity Impact Analysis, including comments on the assumptions underlying that analysis.

    **(1)  Reasons why the rule is being considered.**

As discussed more fully in section I.D, DHS, as well as private employers in general, have become increasingly aware of the potential for abuse of social security numbers by aliens who are not authorized to work in the United States.  DHS is responsible for the enforcement of the statutory prohibition against the hiring or continued employment of aliens who are not authorized to work in the United States.  INA section 274A(a)(1), (2), 8 U.S.C. 1324a(a)(1), (2); HSA section 101, 6 U.S.C. 111.  Given employers' evident confusion regarding how to respond to SSA no-match letters, DHS has concluded that it needs to clarify employers' duties under the immigration laws, and set forth guidance for employers who seek to fulfill their obligation not to hire or employ aliens who are not authorized to work in the United States.

    **(2)  Objectives of, and legal basis for, the proposed rule.**

The objective of the August 2007 Final Rule and this supplemental proposed rule is to provide clear guidance for employers on how to comply with the statutory bar against hiring or continuing employment of aliens who are not authorized to work in the United States.  INA section 274A(a)(1), (2), 8 U.S.C. 1324a(a)(1), (2).  The objective of this statute is to eliminate the "magnet" effect of employment opportunities that induces aliens to enter or remain in the United States illegally.  DHS exercises investigative and prosecutorial discretion in enforcing this statute, and this interpretive rule explains how

DHS will exercise that discretion, and provides guidance to employers who wish to limit their risk of liability under the immigration laws.

(3)  **Description of and, where feasible, an estimate of the numbers of small entities to which the rule would apply.**

To estimate the small entities affected, DHS uses the generally accepted Office of Management and Budget, Economic Classification Policy Committee, North American Industrial Classification (NAIC), pursuant to 44 U.S.C. 3504(e), and the size determinations by the Small Business Administration (SBA) for SBA and other programs. 13 CFR 121.101(a); 121.201; 121.902 (size standards promulgated for SBA programs and applicable to other agency programs). The definition of what constitutes a small business varies from industry to industry and generally depends on either the number of employees working for a business or the amount of annual revenue a business earns.

DHS requested information from SSA to assist in better identifying the number of small entities that could be expected to establish safe-harbor procedures. Specifically, DHS requested that SSA provide the names and addresses of the companies already identified by SSA in its preparation to release no-match letters in September 2007. This raw data would have permitted DHS to conduct research to determine the North American Industry Classification System industry to which the specific companies belonged, to research the annual revenue and/or the number of employees of these companies through standard sources, and thus to apply the appropriate small business size standards. With these analyses, DHS anticipated that it would be able to provide a

rough estimate of the number of employers expected to receive a no-match letter that met the SBA's definitions of small businesses.

However, SSA informed DHS that it was unable to provide DHS with the names and addresses of the employers expected to receive a no-match letter, citing the general legal restrictions on disclosure of taxpayer return information under section 6103 of the Internal Revenue Code of 1986, 26 U.S.C. 6103.  DHS also approached the Government Accountability Office (GAO) and the Small Business Administration, Office of Advocacy, to seek any data that these agencies might be able to provide, and to consult about the analysis to be included in this IRFA.  GAO supplied some additional data, but SBA informed DHS that it had no data – other than general small business census data – that was relevant to this rulemaking and that could assist in our analysis for purposes of this IRFA.  Consequently, DHS does not have the data necessary to determine the precise number of small entities expected to receive a no-match letter.

Nevertheless, SSA was able to provide some general information.  SSA provided a table showing a distribution of the number of employers that were slated to receive a no-match letter for Tax Year 2006, according to the number of Form W-2s filed by the employer.  As this data did not exclude small entities, DHS believes that the universe of small entities that would have received a no-match letter for Tax Year 2006 is contained within the table that SSA provided.  Even though this data did not provide the number of small entities, this data was useful to DHS while conducting the small entity impact analysis contained in the docket.  See ICEB-2006-0004-0232, Exhibit A.5.  DHS was not able to determine whether the affected small entities will include small businesses, small non-profit organizations, and / or small governmental jurisdictions.  Unless there is

34

reason to believe small non-profits or public employers might implement the rule's safe harbor procedures differently from private employers, the cost structure for such entities would be no different from small firms. DHS is unaware of any data to suggest there would be a difference.

### (4) Proposed reporting, recordkeeping, and other compliance requirements.

The proposed rule suggests, but does not require, that employers retain records of their efforts to resolve SSA no-match letters. This suggestion is based on the possible need of an employer to demonstrate the actions taken to resolve a Social Security no match if and when ICE agents audit or investigate that employer's compliance with INA section 274A, 8 U.S.C. 1324a. While the rule encourages employers seeking to establish eligibility for the safe-harbor to keep a record of their actions, the rule does not impose any requirement for an employer to make or retain any new documentation or records.

Companies that choose to adopt the safe-harbor procedures in the rule would reasonably be expected to incur costs related to administering and implementing those procedures. Company-level costs could include the labor cost for human resources personnel, certain training costs, legal services, and lost productivity. A detailed analysis of safe-harbor-related costs that companies may incur is available in the docket of this rulemaking. While several commenters to the rule proposed in 2006 expressed concerns about the costs to businesses relating to the termination and replacement of unauthorized workers, DHS finds that those costs cannot properly be considered costs of this rule. The INA expressly prohibits employers from knowingly hiring or knowingly continuing to employ an alien who is not authorized to work in the United States. If an employer performs the due diligence described in the rule, and loses the services of unauthorized

employees as a result, those costs of terminating and/or replacing illegal workers are attributable to the INA, not to this rule.

Table 1 below, summarizes the average cost per firm that DHS estimates will be incurred by businesses that receive a no-match letter and choose to adopt the safe harbor procedures set forth in this rule. Because DHS does not have adequate data to estimate the percentage of unauthorized employees whose SSNs are listed on no-match letters, for the purpose of this analysis, DHS estimated costs based on various ratios of authorized to unauthorized workers (i.e. 20% unauthorized – 80% authorized). As Table 1 shows, the expected costs of adopting the safe harbor procedures in this rule are relatively small on an average cost per firm basis. In interpreting these costs, these estimates were based on a series of assumptions which are explained in detail in the small entity impact analysis included in the docket. Consequently, the costs a specific firm incurs may be higher or lower than the average firm costs estimated in Table 1.

| Table 1: Total Costs Per Firm by Employment Size Class | | | | | |
|---|---|---|---|---|---|
| Employment Size Class | Percentage of Current No-Match Employees Assumed to Be Unauthorized | | | | |
| | 10% | 20% | 40% | 60% | 80% |
| 5-9 | $ 3,737 | $ 3,633 | $ 3,425 | $ 3,217 | $ 3,009 |
| 10-19 | 4,020 | 3,891 | 3,634 | 3,376 | 3,119 |
| 20-49 | 5,786 | 5,568 | 5,132 | 4,695 | 4,259 |
| 50-99 | 7,517 | 7,214 | 6,606 | 5,998 | 5,391 |
| 100-499 | 22,488 | 21,148 | 18,469 | 15,789 | 13,110 |
| 500+ | $ 33,759 | $ 31,660 | $ 27,462 | $ 23,265 | $ 19,067 |

Table 1 does not reflect the termination or replacement costs of unauthorized workers. The termination and replacement of unauthorized employees will impose a burden on employers, but INA section 274A(a)(1), (2), 8 U.S.C. 1324a(a)(1), (2), expressly prohibits employers from knowingly hiring or knowingly continuing to employ an alien who is not authorized to work in the United States. Accordingly, costs that result

36

from employers' knowledge of their workers' illegal status are attributable to the Immigration and Nationality Act, not to the August 2007 Final Rule or this supplemental proposed rule, and its provision of a safe harbor. Similarly, any costs incurred by seasonal employers who face difficulties in hiring new employees in the place of unauthorized workers whose SSNs were previously listed on SSA no-match letters are attributable to the Immigration and Nationality Act bar to knowingly hiring workers who are not authorized to work in the United States.

In summary, DHS does not believe that this safe harbor rule imposes any mandate that forces employers to incur "compliance" costs for purposes of the Regulatory Flexibility Act. Even assuming that the safe harbor rule requires certain action on the part of employers that receive no-match letters, DHS does not believe that the direct costs incurred by employers who choose to adopt the safe harbor procedures set forth in this rule would create a significant economic impact when considered on an average cost per firm basis. To the extent that some small entities incur direct costs that are higher than the average estimated costs, however, those employers could reasonably be expected to face a significant economic impact. As discussed above, DHS does not consider the cost of complying with preexisting immigration statutes to be a direct cost of this rulemaking. Thus, while some employers may find the costs incurred in replacing employees that are not authorized to work in the United States to be economically significant, those costs of complying with the Immigration and Nationality Act are not direct costs attributable to this rule.

(5)  **Significant alternatives considered.**

37

DHS has considered several alternatives to the proposed rule. For the most part, however, the alternatives would not provide employers with necessary guidance and assurances against liability under the INA, nor would the alternatives improve employers' compliance with INA section 274A, 8 U.S.C. 1274a.

(a) **No action.** Taking no action to clarify employers' responsibilities under INA section 274A, 8 U.S.C. 1324a, was considered. Taking no action, however, would not resolve any of the problems identified and addressed by this proposed rule. Employers will remain confused and unlikely to act to resolve no-match letters in a manner consistent with their responsibilities under current immigration law, and will continue to face possible liability based in part on their failure to respond to no-match letters. Employers would continue to employ unauthorized aliens in violation of the INA.

(b) **Specific industry or sector limitations.** DHS considered limiting the proposed rule to specific industries previously noted to be at high-risk of abuse of social security numbers in employment, including agriculture, services and construction. See, e.g., Social Security Number Misuse in the Service, Restaurant, and Agriculture Industries, supra; AFL-CIO v. Chertoff, D.E. 129 at 400 (GAO analysis of SSA data noting 17% of ESF filings by eating and drinking places; 10% by construction, and 7% by agriculture), and industry comments, supra. DHS also considered promulgating a rule that applied only to critical infrastructure employers because of the increased need to prevent identify fraud by employees in high-risk facilities. None of these alternatives were acceptable because none addresses the larger population of aliens working without authorization. These alternatives would also offer unfairly selective assurances to employers in certain sectors against liability under INA section 274A, while depriving

38

other employers of the same protection. Nor would any of these alternatives reduce the impact specifically on small businesses.

Focusing on the three economic sectors with the most egregious violators of the INA might have had an impact on a significant portion of the alien population that comes to the United States to work. As discussed more fully in the small entity impact analysis in the docket, the degree to which specific industry sectors violate the bar to employment of unauthorized aliens is, however, speculative. DHS does not have access to the data files indicating the number of employers by industry sector who would receive no-match letters under current SSA policies. DHS requested industry sector specific data from SSA but was informed that SSA does not possess this data. Non-empirical, anecdotal evidence, such as the admissions of the President of the Western Growers' Association, supra, that between 50 to 80% of their employees are unauthorized aliens serves as a less reliable indicator than empirical evidence. Even if such anecdotal evidence is sufficient to guide decisions about investigation and enforcement priorities, it is not an adequate basis for limiting the effect of formal agency guidance to a specific sector of the economy.

Partial enforcement tends, moreover, as a matter of experience, to have the effect of redirecting unauthorized workers into un-enforced or under-enforced sectors. And limiting the applicability of the rule to specific industries or sectors would not mitigate the rule's impact on small business. Accordingly, DHS rejected the industry-specific approach as insufficient to accomplish the goal of improving overall employer compliance and reducing the population of aliens illegally working in the United States.

A critical-infrastructure approach provided other benefits, focusing on high-risk facilities and organizations.  Critical infrastructure encompasses, however, segments of industries that are not entirely discrete.  Focusing on critical infrastructure would have had salutary effects in certain areas, but not overall.  Moreover, DHS has already taken, and continues to take, other steps in working with critical infrastructure partners to improve employer compliance with the INA and reduce the employment of aliens not authorized to work in the United States.

 **(c) Phased implementation for small employers**.  DHS considered phasing in the implementation of the rule by delaying its applicability to small entities, but concluded that such an approach would harm, not help, small employers.  Because employers' obligation not to knowingly employ unauthorized workers and the constructive knowledge standard for employer liability flow from the INA, all employers, including small entities, are already subject to those legal requirements.  DHS cannot exempt small entities from the INA, and so delaying the applicability of this rule for small entities would not excuse small employers from their existing legal obligations.  Instead, delaying implementation of this rule for small entities would deny them access to the safe harbor protection offered to employers who follow the procedures set forth in this rule, effectively leaving small employers exposed to greater liability risk while offering protection to larger employers.

 **(d) Extended time allowance for small employers**.  DHS also considered extending the time periods in the rule for employers who wish to obtain the protection of the safe harbor to check their internal records to confirm the no-matches were not the result of some administrative error by the employer.  The time allotted for this procedure

was extended from 14 days to 30 days in the August 2007 Final Rule, in response to comments from large and small employers. DHS is unaware of any evidence that small businesses, with smaller payrolls, would need more time to review their records than would large organizations with thousands of employees, and DHS concluded that a further extension would not provide small employers with a meaningful benefit.

(e) **Mandatory steps without assurances of safe harbor**. DHS also considered requiring all employers to take specific actions whenever they received a no-match letter and their records indicated that a social security number was used as a verification document in Form I-9 processing. Requiring employers to take affirmative steps to resolve social security no-match letters (as outlined as discretionary steps in the proposed rule) could result in fuller compliance with the bar to employment of aliens who are not authorized to work in the United States. But such a mandatory scheme implies that the steps set forth in the rule are the only reasonable response to a SSA no-match letter, a conclusion that cannot be supported by the evidence currently before DHS. Furthermore, the relative gains from a mandatory scheme, in the absence of additional statutory authority to impose sanctions for violations of that mandate, are likely to be very small. Employers that consciously or recklessly violate the INA will not alter their behavior under either a mandatory or voluntary safe-harbor regime, while responsible employers who want to comply with the INA will benefit from the guidance provided in the proposed safe harbor rule and will improve their hiring and employment practices to ensure compliance with the INA.

(6) **Duplicate, overlapping or conflicting rules.**

41

DHS is unaware of any duplicate, overlapping, or conflicting Federal regulations on this subject. DHS would welcome specific comments identifying any such regulations, including specific citations to provisions of Federal regulations that are duplicative, overlap or conflict, with reasons why the commenter believes that such duplication, overlap or conflict exists.

### C. Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in one year, and it would not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995, Pub. L. No. 104-4, 109 Stat. 48 (1995), 2 U.S.C. 1501 et seq.

### D. Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996, Public Law 104–121, 804, 110 Stat. 847, 872 (1996), 5 U.S.C. 804(2). This rule has not been found to be likely to result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic or foreign markets.

### E. Executive Order 12,866 (Regulatory Planning and Review).

Because this rule affected a number of different agencies and provides guidance to the public as a statement of policy or interpretive rule, the final rule was referred to the Office of Management and Budget pursuant to Executive Order 12866, as amended.

Multiple agencies reviewed and considered the draft and substantial consultation between agencies occurring during that process. This supplemental proposed rule reflects that consultation.

**F.  Executive Order 13,132 (Federalism).**

This rule does not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order No. 13,132, 64 FR 43,255 (Aug. 4, 1999), this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

**G.  Executive Order 12,988 (Civil Justice Reform).**

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order No.12,988, 61 Fed. Reg. 4729 (Feb. 5, 1996).

**H.  Paperwork Reduction Act.**

Under the Paperwork Reduction Act of 1995, 44 U.S.C. 3501, et seq., all Departments are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule. While employers seeking to establish eligibility for the safe-harbor are encouraged to keep a record of their actions, this rule does not impose any additional information collection burden or affect information currently collected by ICE.

**List of Subjects in 8 CFR Part 274a**

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

Accordingly, for the reasons stated in the preamble to the proposed rule at 71 FR 34281 (June 14, 2006) and the preamble to the final rule at 72 FR 45611 (Aug. 15, 2007), and as further explained in the preamble to this supplemental proposed rule, the Department of Homeland Security proposes to repromulgate, without change, the regulations published at 72 FR 45611, as 8 CFR 274a.1(l).

**Michael Chertoff,**
**Secretary**

44