Stephen P. Berzon (SBN 46540)
Scott A. Kronland (SBN 171693)
Danielle E. Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151; Facsimile: (415) 362-8064
skronland@altshulerberzon.com

*Attorneys for Plaintiffs AFL-CIO, et al.*

Robert M. Weinberg (admitted pro hac vice)
Leon Dayan (admitted pro hac vice)
Jennifer Hunter (admitted pro hac vice)
BREDHOFF & KAISER PLLC
805 Fifteenth Street, N.W., Tenth Floor
Washington, DC 20005
Telephone: (202) 842-2600; Facsimile: (202) 842-1888
ldayan@bredhoff.com

*Attorneys for Plaintiff-Intervenors UFCW, et al.*

(Counsel list continued on signature page)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br><br><br><br><br><br><br><br>MICHAEL CHERTOFF, *et al.*<br><br>Defendants. | Case No. C07-4472 CRB<br><br>**CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' AND PLAINTIFF-INTERVENORS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND TO VACATE PRELIMINARY INJUNCTION** |

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………..………………………..…………..iv

INTRODUCTION……………………………………………………………………..................1

SUMMARY OF ARGUMENT…………………………………………………………...…………3

BACKGROUND………………………………………………………………………………7

    A.  Social Security Administration No-Match Letters……………………….…………7

    B.  Employer Verification of Work Authorization and Sanctions……………..………...10

    C.  The DHS Final Rule and Supplemental Final Rule……………………..…………11

    D.  Implementation of the Supplemental Final Rule……………………….………....14

    E.  Procedural History…………………………………………………………….......16

ARGUMENT…………………………………………………………………….………17

    I.  The Supplemental Final Rule is Contrary to the Governing Statute…………..……...27

        A.  The Rule Expands the Meaning of the Statutory Term "Knowing" By Imposing a Duty to Respond to a No-Match Letter, When the Statute Imposes No Such Duty………………………………………………………………...18

        B.  The Supplemental Final Rule is Contrary to Statute Because it Imposes a Reverification Requirement for Existing Employees………………….……..28

        C.  Grandfathering……………………………………………………………....31

    II.  DHS's Decision to Adopt the Supplemental Final Rule is Arbitrary and Capricious Agency Action……………………………………………………….……33

        A.  DHS Refuses to Acknowledge That The Rule Reflects a Major Change in DHS Policy………………………………………………………………...33

        B.  DHS's Proffered Reasons for the Rule Are Insufficient………………..……...35

            1.  In the Absence of Any Reliable Data on the Number of No-Match Employees Who are Unauthorized, DHS Cannot Provide a Reasoned Basis for the Rule…………………………………………………..…..36

            2.  By Relying Upon Criteria that Are Purely in the Discretion of SSA, DHS Has Not Provided a Reasoned Basis for the Rule………………….39

C. By Failing to Consider the Significant Effect the Rule Will Have on Tens of Thousands of Authorized Workers, DHS Acted Arbitrarily and Capriciously……………………………………………………..…..43

1. Confusion Regarding Rule's Applicability……………………………44

2. Social and Economic Costs to Workers…………………………………46

3. Discrimination and Unlawful Termination………………………………47

4. Burden on SSA and Other Impediments to Correcting Records in Time……………………………………………………………...51

III. The SSA Does Not Have Statutory Authority to Determine When Employers Must Re-Verify or Terminate Employees…………………………………………55

IV. The Supplemental Final Rule is Government Action That Would Unconstitutionally Deprive Employees, Without Due Process of Law, of the Right to Continue Their Employment…………………………………………………………………58

CONCLUSION………………………………………………………………..61

# TABLE OF AUTHORITIES

## CASES

*AFL-CIO v. Chertoff*, 552 F. Supp. 2d 999 (N.D. Cal. 2007) .................................................. passim

*Aramark Facility Servs. v. Serv. Employees Intern. Union*,
530 F.3d 817 (9th Cir. 2008) ................................................................................... passim

*Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45 (D.C. Cir. 2000) ............................ 20, 32

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) ....................................... 37, 42, 46

*Carey v. Piphus*, 435 U.S. 247 (1978) ................................................................................... 59

*Cement Kiln Recycling Coalition v. EPA*, 493 F.3d 207 (D.C. Cir. 2007) ............................... 20

*Center for Auto Safety v. Peck*, 751 F.2d 1336 (D.C. Cir. 1985) ........................................... 50

*Chamber of Commerce v. Dep't of Labor*, 174 F.3d 206 (D.C. Cir. 1999) ........................... 20, 56

*Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) ............................................................ 18

*City of Brookings Mun. Telephone Co. v. F.C.C.*,
822 F.2d 1153 (D.C. Cir. 1987) .............................................................................. 35

*Clark v. Martinez*, 543 U.S. 371 (2005) ........................................................................... 25, 26

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) .............................................. 59, 60

*Collins Foods Int'l v. INS*, 948 F.2d 549 (9th Cir. 1991) ..................................................... passim

*Federal Maritime Comm. v. Seatrain Line, Inc.*, 411 U.S. 726 (1973) .................................. 31

*Fox Television Stations Inc. v. FCC*, 489 F.3d 444 (2d Cir. 2007) ......................................... 34

*General Electric Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) ................................................. 20

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ....................................................................... 18, 31

*Gorbach v. Reno*, 219 F.3d 1087 (9th Cir. 2000) (en banc) .................................................. 56

*Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002) ......................................... 30

*Int'l Ladies' Garment Workers' Union v. Donovan*,
722 F.2d 795 (D.C. Cir. 1983) ................................................................................. passim

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989) ...................................... 35

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ........................................................................... 60

*Mester Mfg. Co. v. INS*, 879 F.2d 561 (9th Cir. 1989) ................................................. 22, 25, 26

*Michigan v. EPA*, 268 F.3d 1075 (D.C. Cir. 2001) ................................................................ 56

*Motor Vehicle Mfgs. Ass'n v. State Farm Mutual Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................................................. 33

*Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226 (9th Cir. 1993) ............................................ 44, 47, 51

*Nadarajah v. Gonzales*, 443 F.3d 1069 (9th Cir. 2006) ........................................................ 25

*National Treasury Employees Union v. Chertoff*,
452 F.3d 839 (D.C. Cir. 2006) ............................................................................... 22

CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' AND PLAINTIFF-
INTERVENORS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT AND TO VACATE PRELIMINARY INJUNCTION, Case No. C07-4472 CRB

*National Treasury Employees Union v. Horner,*
  854 F.2d 490 (D.C. Cir. 1988) ................................................... 39

*New El Rey Sausage Co. v. INS*, 925 F.2d 1153 (9th Cir. 1991) ................................ 22, 25, 26, 29

*Northwest Env'l Defense Center v. Bonneville Power Admin.*,
  477 F.3d 668 (9th Cir. 2007) ...................................................... passim

*Oxy USA, Inc. v. FERC*, 64 F.3d 679 (D.C. Cir. 1995) ........................................ 39, 54

*Pacific Coast Fed. of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
  426 F.3d 1082 (9th Cir. 2005) ..................................................... 35

*Port of Seattle, Wash. v. FERC*, 499 F.3d 1016 (9th Cir. 2007).................................. 47

*Posey v. Lake Pend Oreille School Dist. No. 84,*
  546 F.3d 1121 (9th Cir. 2008) ..................................................... 17

*Ramaprakash v. FAA*, 346 F.3d 1121 (D.C. Cir. 2003).................................. 34

*Ratzlaf v. United States*, 510 U.S. 135 (1994) .................................. 24

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) .................................. 35

*Seldovia Native Ass'n v. Lujan*, 904 F.2d 1335 (9th Cir. 1990) .................................. 35

*State Farm Mutual Auto. Ins. Co.*, 463 U.S 29 (1983) .................................. passim

*Telocator Network of America v. F.C.C.*, 691 F.2d 525 (D.C. Cir. 1982).................................. 36

*Truax v. Raich*, 239 U.S. 33 (1915) .................................. 59

*United States v Heredia*, 483 F.3d 913 (9th Cir. 2007) .................................. passim

*United States v. Jewell*, 532 F.2d 697 (9th Cir. 1976).................................. 22, 25, 28

*White v. Lambert*, 370 F.3d 1002 (9th Cir. 2004).................................. 24

*Williams v. United States*, 503 U.S. 193 (1992) .................................. 20, 32

## STATUTES & REGULATIONS

5 U.S.C. § 706(2)(A)........................................................... passim

8 U.S.C. § 1324(a) ........................................................... passim

8 U.S.C. § 1324a ........................................................... passim

8 U.S.C. § 1360(c)(2)........................................................... 57

12 U.S.C. § 164(c) ........................................................... 24

12 U.S.C. § 324 ........................................................... 24

12 U.S.C. § 1782(a)(3)........................................................... 24

12 U.S.C. § 1782(d)(2)(C)........................................................... 24

12 U.S.C. § 1817(c)(4)(C)........................................................... 24

12 U.S.C. § 1847(a) ........................................................... 24

12 U.S.C. § 3110(c)(3)........................................................... 24

12 15 U.S.C. § 1681s-2(a)(1)(A) ........................................................... 24

18 USC § 792 ................................................................................................................... 24

18 U.S.C. § 922(b) ........................................................................................................... 24

18 U.S.C. § 1365(a), (c) ................................................................................................... 24

18 U.S.C. § 2332d(a) ........................................................................................................ 24

18 U.S.C. § 2339(a) .......................................................................................................... 24

18 U.S.C. § 2388(c) .......................................................................................................... 24

18 U.S.C. § 2424(a) .......................................................................................................... 24

21 U.S.C. § 841(c)(2) ....................................................................................................... 24

21 U.S.C. § 843(a) ............................................................................................................ 24

42 U.S.C. § 405(c)(2)(A) .................................................................................................... 7

42 U.S.C. § 432 ................................................................................................................ 56

42 U.S.C. § 901 ................................................................................................................ 56

8 C.F.R. § 274a.1(l)(1) ..................................................................................... 10, 11, 18, 26

20 C.F.R. § 422.120 ......................................................................................................... 7, 9

## OTHER AUTHORITIES

72 Fed. Reg. 45611 (Aug. 15, 2007) ......................................................................... passim

73 Fed. Reg. 15944 .......................................................................................................... 16

73 Fed. Reg. 63843 (Oct. 28, 2008) ........................................................................... passim

73 Fed. Reg. 63993 (Oct. 28, 2008) ................................................................................. 14

H. Rep. 99-682(I) (1986), *reprinted at* 1986 U.S.C.C.A.N. 5649 ...................................... 11, 30,

H. Rep. 99-682(II) (1986), *reprinted in* 1986 U.S.C.C.A.N. 5757 .......................................... 30

H.R. 138, 110th Cong., § 3 (2007) ................................................................................... 57

H.R. 3333, 109th Cong., § 224(a) (2005) ......................................................................... 57

H.R. 6789, 110th Cong., § 602(d) (2008) ......................................................................... 57

H.R. 2954, 110th Cong., § 313 (2007) ............................................................................. 57

S. 1984, 110th Cong., § 256 (2007) .................................................................................. 57

S. 2368, 110th Cong., § 202 (2007) .................................................................................. 57

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 ............................................................................................................... 11

**INTRODUCTION**

This proceeding concerns a renewed effort by the Department of Homeland Security (DHS) to enforce a rule that would fundamentally alter the consequences of Social Security Administration (SSA) "no-match" letters for workers and businesses.  DHS seeks to justify the identical rule that this Court initially enjoined more than a year ago by offering new explanations.  But rather than making a case for the rule, the proffered rationales demonstrate the flaws in the rule and rulemaking process.  New legal and factual developments since the Court's ruling, including a recent Ninth Circuit decision and the DHS's failure to consider the impact of the rule on authorized workers in the face of the most dramatic deterioration in our economy since the Great Depression, also compel the rule's invalidation.

Defendants do not even try to justify or ameliorate the devastating impact the rule will have on U.S. citizen and other authorized workers.  As the Court noted in its preliminary injunction decision, "the government's proposal to disseminate no-match letters affecting more than eight million workers will, under the mandated time line, result in the termination of employment to lawfully employed workers."  The new rule would have precisely the same effect, and this is confirmed by the government's own economic analysis.  Yet the government has simply glossed over the admitted consequences that the rule would have on U.S. citizens and other authorized workers, which will be even more severe under current economic conditions.

In addition, that the supplemental rule exceeds DHS's statutory authority has now been confirmed by the decision in *Aramark Facility Servs. v. Serv. Employees Intern. Union*, 530 F.3d 817 (9th Cir. 2008), which rejected the premise on which the rule rests, namely that "no-match" letters by themselves trigger a mandatory duty to re-verify employees' work authorization status, lest the employer risk criminal liability for "know[ledge]" of a worker's unauthorized status.  While this Court was skeptical of Plaintiffs' conflict-with-statute argument in its preliminary injunction ruling, the *Aramark* decision, when coupled with consideration of how the new rule would function in practice, makes plain that DHS seeks to expand liability far beyond the "knowing" standard that Congress authorized.  DHS seeks to impose obligations on employers to

1

re-verify *every* employee who is the subject of a no-match letter in a manner that is not authorized by the underlying statute.

Specifically, while suggesting that a no-match letter might be only "one factor" that the government might consider in finding liability, DHS simultaneously invokes the anti-discrimination mandate of *uniform* treatment of all workers to erect a rule that compels re-verification of *every* worker who is the subject of a no-match letter. By imposing that duty, DHS exceeds its statutory authority, attributes a significance to no-match letters that is impermissible, requires employers to subject every worker to re-verification whether or not there is a basis for believing the worker lacks employment authorization, and expands the re-verification requirement to grandfathered employees who are statutorily exempt from verification altogether.

Furthermore, and wholly independent of the rule's inconsistency with the statute, the promulgation of the rule is arbitrary and capricious in violation of the Administrative Procedure Act (APA). DHS continues to refuse to candidly acknowledge its change in position, to fail to offer a reasoned showing that the alleged benefits of the new rule outweigh its costs, and, as noted above, to cavalierly disregard the actual consequences of the rule on authorized workers.

To the contrary, the government's disclosure of the actual analysis on which it bases its claim of correlation between a no-match letter and unauthorized employment reveals another key flaw in its reasoning. The alleged relevance of the no-match letters to unauthorized employment depends critically on another agency's, namely SSA's, current internal criteria for triggering the sending of the letters – criteria that SSA (not DHS) controls and is indisputably free to change unilaterally at any time. In fact, a new Office of the Inspector General (OIG) study suggests SSA should actively reconsider its criteria. Yet, even a slight modification by SSA could leave the rule bereft of any justification under DHS's own analysis. Thus, DHS has formulated a permanent rule based on the transient criteria *of a different agency* – criteria that are beyond DHS's control to maintain. Nonetheless, the rule does nothing to change the consequences of no-match letters in the event of changes in the SSA criteria, or to otherwise take into account that

the central foundation on which the rule rests is beyond DHS's control or authority.

Lastly, the rule is the result of DHS willfully turning a blind eye to the country's current economic meltdown and relies on economic data and studies that had obviously been rendered irrelevant by the time the supplemental final rule was published.  At the time of its promulgation on October 28, 2008, the economy had been in virtual freefall for more than a month.  Yet the economic studies and assumptions regarding impacts on workers and businesses on which the government depends were completed much earlier.  Thus, DHS had to know that its economic studies were no longer valid at the time the rule was actually finalized, and that the adverse impacts on workers and businesses would be far greater in the context of an exceptional economic recession.  When seismic events occur after studies are completed but well before a rule is finally published, the government cannot blithely proceed as if nothing has transpired and must, at a bare minimum, reconsider the proposed rule in light of the conditions that actually exist.

## SUMMARY OF ARGUMENT

As an initial matter, Defendants cannot be granted summary judgment because they have not even addressed all of the claims raised by Plaintiffs.  Defendants' motion addresses only three of Plaintiffs' claims, while *all* of Plaintiffs' claims remain to be finally adjudicated on the merits.  *See* Def. Mem. in Support of Mot. for SJ and to Dissolve PI (hereinafter "Def. Mot.") at 13-20; *AFL-CIO v. Chertoff*, 552 F. Supp. 2d 999, 1005 (N.D. Cal. 2007).  Plaintiffs and Plaintiff-Intervenors have filed a cross-motion for summary judgment.  Plaintiffs' and Plaintiff-Intervenors' motion should be granted, and the Defendants' motions for summary judgment and dissolution of the preliminary injunction denied, for the following reasons:

1.  The supplemental final rule is contrary to the governing statute, the Immigration Reform and Control Act (IRCA), 8 U.S.C. § 1324a, because it expands the statutory term "knowing" beyond what Congress intended.  The supplemental final rule redefines the term "knowing" so that "know[ledge]" of employment authorization status is deemed to include "fail[ure] to take reasonable steps after receiving" an SSA no-match letter.  72 Fed. Reg. 45611,

3

45623-24 (Aug. 15, 2007).  The new rule and DHS guidance therefore instruct employers that in order to avoid immigration law liability, they must take "reasonable steps" in response to every no-match letter.  But under a long line of Ninth Circuit cases, the term "knowing" has a well-established meaning that does not include recklessness or negligence.  Indeed, the Ninth Circuit recently clarified, after the issuance of this Court's preliminary injunction decision, that receipt of a no-match letter by itself does not impart knowledge or constructive knowledge of any worker's unauthorized status.  *See Aramark*, 530 F.3d at 825-26, 828.

Although—as this Court has previously observed—the new rule provides on its face for consideration of the "totality of relevant circumstances" (72 Fed. Reg. at 45623) in determining whether the knowledge requirement has been met, the rule nonetheless conflicts with the governing statute because it 1) permits a finding of liability based on receipt of a no-match letter by itself, without any additional incriminating circumstances, and 2) effectively imposes a duty on employers to respond to no-match letters in *every* case, regardless of the particular circumstances of any given employee.

It bears emphasis that, in other parts of IRCA, Congress chose to impose liability for acting in "reckless disregard" of a person's immigration status.  In the employment provisions of IRCA, however, Congress imposed liability only for continuing to employ an employee "knowing" that he or she has unauthorized status.  DHS's rule and accompanying guidance letter seek to import into the employment provisions the same "reckless disregard" standard that Congress rejected.

The supplemental final rule also is contrary to statute because it effectively sets up a work-authorization re-verification system for every one of the millions of existing employees who will be the subject of a no-match letter.  Plaintiffs do not dispute that there may be circumstances in which an employer receives specific, detailed information regarding a worker's unauthorized status and, therefore, risks liability for "knowing[ly]" employing an unauthorized worker unless the employer re-verifies the worker's authorization.  But the mere listing of a Social Security Number on a no-match letter does not by itself constitute that type of

4

information.  By effectively requiring the re-verification of every no-match employee, the DHS rule imposes major additional burdens on employers and increases the potential for national-origin discrimination against employees, thereby undermining the very compromise struck by Congress when it adopted IRCA.

Included among the employees for whom the rule improperly requires re-verification are employees hired before IRCA was adopted.  Congress exempted those employees through a statutory "grandfather" provision.  Even after this Court and commenters explained why clarification was necessary, DHS nonetheless failed to amend its guidance letter to inform employers that "grandfathered" employees are not covered by the rule.  At the least, DHS's failure to do so was arbitrary and capricious.

2.      The supplemental final rule violates the APA because DHS's decision to adopt the rule is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).  This Court found in its preliminary injunction decision that DHS had failed to acknowledge and provide a "reasoned analysis" for its change in historical position regarding the significance of no-match letters, and that such failure constituted arbitrary and capricious agency action.  *AFL-CIO*, 552 F. Supp. 2d at 1006.  Despite this Court's decision and another round of rulemaking, DHS still refuses to acknowledge that it has changed course and fails to provide any reasoned basis in support of the rule.

DHS's proffered reasons for the rule are insufficient.  First, DHS failed to explain why, in the absence of any reliable data on the percentage of no-match employees who are unauthorized, it made the drastic decision to effectively establish an employment re-verification system that will impose substantial compliance costs on employers and, by DHS's own estimates, result in tens of thousands of authorized workers losing their jobs.  There is no reasoned explanation of why the alleged benefits of the new rule justify the huge consequences it would create and no acknowledgement by DHS of the economic and social impact of the rule on thousands of authorized workers who would lose their jobs during a national economic crisis.  This is not the reasoned decision making that the APA mandates.

CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' AND PLAINTIFF-INTERVENORS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND TO VACATE PRELIMINARY INJUNCTION, Case No. C07-4472 CRB

Second, DHS unjustifiably relied on SSA's current criteria for sending out no-match letters, even though DHS recognizes that SSA can change its criteria at any time, the criteria do not take into account unauthorized work, and any modification of the criteria by SSA could cause major economic disruptions and undermine immigration enforcement without regard to unauthorized work.  Delegating authority to an agency that will not take the relevant considerations into account is the essence of arbitrary action.

The rule is also arbitrary and capricious for the independent reason that DHS failed to consider the real and significant impact the rule will have on tens of thousands of U.S. citizens and other authorized workers who will lose their jobs amidst a national economic crisis because of a no-match letter.  There is no reasoned explanation for why DHS did not consider this important aspect of the problem, when an overwhelming number of commenters raised serious concerns about the rule's social and economic impact on authorized workers; DHS does not have data to conclude that all authorized workers will be able to correct their records within the 90-day schedule set out in the rule; and DHS indeed assumes that as many as 70,000 authorized workers with no-matches will be forced into unemployment every year due to the rule.

3.    The DHS/SSA plan to use no-match letters as an immigration-enforcement tool must also be set aside as being in excess of the authority Congress granted to SSA.  Nothing in the authority Congress granted to SSA authorizes it to play any role in the enforcement of the immigration laws, let alone control when employers are required to re-verify or terminate employees.  SSA's action in sending out the DHS guidance letters as part of the no-match mailing and telling employers to follow the instructions contained in DHS's letter is therefore *ultra vires* action.

4.    The supplemental final rule is invalid for the additional reason that it would deprive thousands of workers of their constitutional due process rights.  The rule would require employers, by threat of criminal and civil liability, to discharge employees who are unable to resolve no-match discrepancies within the 90-day period arbitrarily established by the rule.  DHS has promulgated the rule on the assumption that thousands of workers *who in fact are legally*

6

*authorized to work* in the United States will be terminated will be unjustly terminated. Yet the rule does not guarantee workers constitutionally sufficient process. Because the governmental action taken pursuant to the final rule coerces employers to terminate these fully authorized workers, pursuant to an arbitrarily established deadline and without the provision of a constitutionally sufficient hearing, the terminations are attributable to the government and constitute a violation of the Due Process Clause of the Fifth Amendment.

## BACKGROUND

**A.    Social Security Administration No-Match Letters**

The Social Security Act of 1935 authorizes SSA to establish a record-keeping system for the Social Security program. *See* 42 U.S.C. § 405(c)(2)(A).   Employers annually report employee wages using Forms W-2, and SSA posts those earnings to its Master Earnings File, so workers receive credit for them when they apply for Social Security benefits. When SSA is unable to match a worker's name and Social Security Number (SSN) with its records, those earnings are posted to SSA's Earnings Suspense File (ESF) until they can be matched with SSA records. *See* 20 C.F.R. § 422.120.

Wage reports collected by SSA do not contain information about an employee's citizenship or work-authorization status. As former Social Security Commissioner Kenneth S. Apfel has explained in his declaration:  SSA does not know the percentage of earnings reports in the ESF that reflect unauthorized work; nor does SSA know whether a particular earnings report in the ESF reflects unauthorized work. *See generally* Administrative Record ("AR") 648, Docket Nos. 128-29 (GAO Report 06-814R, Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work (July 11, 2006)); *see also* Apfel Decl., Docket No. 12, at ¶8.

There are many reasons unrelated to an employee's work-authorization status that earnings reports may not match SSA records. These include:  1) administrative errors at SSA (for example, erroneous assignment of an SSN previously assigned to another individual); 2) transcription errors in spelling an employee's name or recording the SSN; 3) employee name

changes after marriage or divorce; 4)  employees who use a less "foreign" sounding first name for work purposes; and 5) different naming conventions (such as the use of multiple surnames) that are common in many parts of the world, particularly in some Latin American and Asian countries.  AR 320-21 (Mehta, Theodore & Hincapié, *SSA's No-Match Letter Program: Implications for Immigration Enforcement and Worker's Rights*) (hereinafter "Mehta Study"); 72 Fed. Reg. at 45612 (DHS acknowledging that "[t]here can be many causes for a no-match, including clerical error and name changes"); 73 Fed. Reg. at  63843, 63847 (Oct. 28, 2008) ("there are both innocent and non-innocent reasons for no-match letters").

The ESF contains more than *255 million* mismatched earnings records and is growing at the rate of *8 million to 11 million* records per year.  AR 655 (GAO Report 06-814R).  The most recent Government Accountability Office (GAO) report on the ESF concluded that it "[c]ontains information about many U.S. citizens as well as non-citizens" and that "the overall percentage of unauthorized workers is *unknown*."  *Id*.  When SSA ultimately has been able to resolve data discrepancies, "most  . . . belong to U.S.-born citizens, not to unauthorized workers," which GAO concluded "is an indication that *a significant number of earnings reports in the [ESF] belong to U.S. citizens and work-authorized noncitizens*."  *Id.* (emphasis added).[2]

As part of its effort to credit earnings properly, SSA periodically sends out "no-match" letters to employers.  A no-match letter indicates that Forms W-2 filed by the employer contain name and SSN combinations that do not agree with SSA records.  The no-match letter ordinarily sent to employers is known as an "EDCOR" ("Employer Correspondence Request") letter.  An EDCOR no-match letter lists multiple SSNs that are the subject of a no-match and is merely a voluntary request by SSA to employers for assistance in resolving those mismatches so the

---

[2] SSA's huge databases are generally rife with inaccuracies.  When SSA assigns an SSN to an individual, it creates a Master Earnings File for each person in its "NUMIDENT" database.  Supplemental Administrative Record ("SAR"), Docket Nos. 167-71, at 375 (Office of the Inspector General, SSA, *Congressional Response Report:  Accuracy of the Social Security Administration's Numident File*, A-08-06-26100, Dec. 2006).  A recent report by the SSA's Inspector General concluded that approximately 17.8 million of the records in the Numident file contain discrepancies.  Of those 17.8 million discrepancies, 12.7 million – or 71.3% – relate to native-born U.S. citizens' records.  *See id.* at 379-85.

earnings reports can be properly credited to the wage earners.  73 Fed. Reg. at 63852; *see also* Plaintiffs' Second Request for Judicial Notice (filed Jan. 9, 2009) (hereinafter "Second RJN"), Ex. A, Office of the Inspector General, SSA, Effectiveness of Educational Correspondence to Employers, at 2-3.  Under SSA's current procedures, EDCOR letters are only sent to employers who submit wage reports containing no-matches for at least 11 workers and when the total number of no-matches in a given wage report represents more than 0.5% of the employer's total Forms W-2.  *See* 73 Fed. Reg. at 63848.  As DHS recognizes, SSA could change this criteria in the future.  *See, e.g.*, SAR 1710 (Small Entity Impact Analysis).

Significantly, SSA also sends another type of no-match letter commonly referred to as a "DECOR" ("Decentralized Correspondence") letter.  DECOR letters concern a mismatch involving a single SSN and are designed to be sent directly to individual employees.  But in many cases DECOR letters are sent to employers when SSA does not have an employee's correct address.  *See* 73 Fed. Reg. at 63852; Second RJN, Ex. A at 4; *see also* 20 C.F.R. § 422.120.[3]  In short, employers often receive two different types of no-match letters, EDCOR and DECOR.  According to DHS, the rule is intended to apply only to EDCOR letters.  *See* 73 Fed. Reg. at 63848.  Yet DHS has refused to make explicit in the rule text that the rule applies only to EDCOR letters (73 Fed. Reg. at 63852), creating the potential for employer confusion.  *See*, *e.g.*, SAR 1811-12 (U.S. Chamber of Commerce cmt.).

In December 2008, the OIG for SSA released a report concluding that "EDCOR letters were not effective in communicating wage-reporting problems to employers and reducing the size of the" ESF because many employers with mismatched names did not receive EDCOR letters and employers who did receive letters were not provided with sufficient information to resolve mismatches.  Second RJN, Ex. A at 4.  The report recommended that SSA explore other ways to resolve mismatches.  *See id*. at 8-9.

SSA no-match letters have never before been accompanied by a letter from an immigration enforcement agency.  Until now, SSA's no-match letters explained to employers

9

that the letter "does not imply that you or your employee intentionally gave the government wrong information . . . . Nor does it make any statement about an employee's immigration status." *See AFL-CIO*, 552 F. Supp. 2d at 1002 (quoting SSA's model 2006 letter); *see also id.* at n.1.  Likewise, prior to 2006, the immigration agencies had recognized that SSA no-matches occur for many reasons and therefore that an employer receiving a no-match letter does not "know[]" a worker is unauthorized or have any immigration-law obligation to investigate.  *See id.* at at 1009.

DHS still "cannot determine with certainty the rate at which authorized and unauthorized employees appear in no-match letters."  73 Fed. Reg. at 63857.  *See also, e.g., id.* at 63856 ("[N]o specific data was available to show what percentage of no-match issues were clerical errors, incorrect information submitted by the employee to the employer, or an issue that required a visit to SSA").

**B.    Employer Verification of Work Authorization and Sanctions**

The Immigration Reform and Control Act of 1986 (IRCA) made it unlawful for the first time for employers to "to hire . . . for employment in the United States an alien *knowing* the alien is an unauthorized alien."  8 U.S.C. § 1324a(a)(1)(A) (emphasis added).  IRCA also made it unlawful for an employer "to continue to employ [an] alien . . . *knowing* the alien is (or has become) an unauthorized alien."  8 U.S.C. § 1324a(a)(2) (emphasis added).  Congress imposed both civil penalties for individual violations of IRCA as well as criminal penalties for "pattern and practice" violations.  *See* 8 U.S.C. §§ 1324a(e)(4)-(5), 1324a(f).

IRCA also separately made it unlawful for employers to hire new employees without complying with an initial employment eligibility verification process established by Congress.  8 U.S.C. § 1324a(a)(1)(B).  That process requires the employee to present the employer with documents to show proof of identity and work authorization and requires the employer and employee to complete an employment verification form (Form I-9).  8 U.S.C. § 1324a(b); 8 C.F.R. § 274a.2.  Federal immigration law prohibits the Executive Branch from making any

---

[3] Hereinafter unless otherwise noted, all references to "no-match letters" are to EDCOR letters.

changes to that verification process without advance notice to Congress.  8 U.S.C. § 1324a(d)(3).

When Congress adopted IRCA, it included a "grandfather" clause for current employees. Neither the initial-hire nor the continuing-to-employ provisions apply to anyone hired before the enactment of the statute in 1986.  Pub. L. No. 99-603, § 101(a)(3), 100 Stat. 3359, *codified at* 8 U.S.C. § 1324a Historical and Statutory Notes.  For employees hired after the effective date of the statute, Congress chose not to impose any continuing verification requirement.  *See* H.R. Rep. 99-682(I), at 57, *reprinted in* 1986 USCCAN at 5661 ("The Committee does not intend to impose a continuing verification obligation on employers.").

At the same time Congress imposed employer sanctions, Congress also wanted to prevent employer discrimination based on national origin or citizenship status.  To that end, IRCA made it illegal for employers to discriminate based on national origin or citizenship status by requesting "more or different documents than are required" for the initial I-9 verification or "refusing to honor documents . . . that on their face reasonably appear to be genuine."  8 U.S.C. § 1324b(a)(1), (6).

**C.      The DHS Final Rule and Supplemental Final Rule**

On August 15, 2007, DHS issued a final rule that effectively would presume the employer has knowledge a worker is unauthorized whenever the employer receives an SSA no-match letter, unless the employer re-verifies the employee's work authorization.  72 Fed. Reg. 45611 (Aug. 15, 2007).  On October 28, 2008, DHS issued a supplemental final rule reaffirming the text of the final rule issued on August 15, 2007.  *See* 73 Fed. Reg. at 63867 (stating that the only change in the supplemental final rule is a single typographical correction to the original final rule).

The new rule amends the definition of "knowing" in 8 C.F.R. § 274a.1(l)(1).  The new definition of "knowing" lists, as an example of an employer with "constructive knowledge" that an employee is an unauthorized alien, an employer that "fails to take reasonable steps" after receiving an SSA no-match letter.  The first part of the amended regulation provides:

(1)(1) The term *knowing* includes having actual or constructive knowledge. . . .

Examples of situations where the employer may, depending upon the totality of

the relevant circumstances, have constructive knowledge that an employee is an

unauthorized alien include, but are not limited to, situations where the employer:

. . . .

(iii) Fails to take reasonable steps after receiving information indicating that the

employee may be an alien who is not employment authorized, such as –

. . . .

(B) Written notice to the employer from the Social Security Administration

reporting earnings on a Form W-2 that employees' names and corresponding

social security account numbers fail to match Social Security Administration

records . . . .

72 Fed. Reg. at 45623-24.  The rule nowhere specifies that it applies only to EDCOR no-match letters (which lists multiple SSNs).

Having created a threat of civil and criminal liability for employers receiving SSA no-match letters, the amended regulation then offers employers a "safe harbor."  Under the amended regulation, an employer receiving a no-match letter "will be considered by [DHS] to have taken reasonable steps – and receipt of the written notice will therefore not be used as evidence of constructive knowledge – if the employer" takes the actions specified by DHS.  *Id*. at 45624. These are "the only combination of steps that will guarantee that DHS will not use the employer's receipt of the notices from SSA . . . as evidence of the employer's constructive knowledge that its employee is an unauthorized alien."  *Id*. at 45618.

To qualify for the DHS "safe harbor," an employer that determines the SSA no-match was not the result of its own clerical error must instruct an employee within 30 days of receiving the no-match letter that the employee has 60 days to resolve the discrepancy with SSA.  *Id*. at

45624.  If the employee is unable to resolve the discrepancy with SSA within 90 days of the date of the no-match letter, the employer cannot continue to employ the worker unless the employer can complete within three days a new employment eligibility verification, on a new I-9 form, as if the employee had never been hired and verified in the first place.  *Id.*

To ensure that employers understand that SSA no-match letters now carry *immigration law* obligations, DHS and SSA intend to include an insert letter to the employer from DHS with each SSA no-match letter.  *See* SAR 3803-04 (DHS Insert Letter).  The DHS letter provides "additional guidance on how to respond to the enclosed letter from the Social Security Administration (SSA) in a manner that is consistent with your obligations under United States immigration laws."  *Id.*

The DHS insert letter contains questions and answers, which begin with the following:

**Q:   Can I safely disregard the letter from SSA?**

**A:   No.**  You have received official notification of a problem that may have significant legal consequences for you and your employees.  If you elect to disregard the notice you have received and if it is determined that some employees listed in the enclosed letter were not authorized to work, the Department of Homeland Security (DHS) could use the enclosed SSA letter as evidence that you have violated the law by knowingly continuing to employ persons unauthorized to work in the United States.  This could lead to civil and criminal sanctions.

*Id.* (boldface in original).

After threatening employers with "civil and criminal sanctions," the DHS letter then answers the question **"What should I do?"** by explaining that "You should" follow DHS's new "safe harbor" procedures.  *Id.* (boldface in original).

1    Referencing a newly issued U.S. Department of Justice (DOJ) guidance, 73 Fed. Reg.

2  63993 (October 28, 2008), the DHS letter attempts to provide some assurance to employers that,

3  if they follow those procedures for *every* no-match, they will not be liable for discrimination if

4  they terminate employees as long as "th[e] employer applied the same procedures to all

5  employees referenced in the no-match letter(s) uniformly and without the purpose or intent to

6  discriminate."   *See* SAR 3804 (DHS Insert Letter).   Neither the DHS letter nor the DOJ

7  guidance, however, provide any protection from anti-discrimination liability, because both

8  merely restate the statutory rule that a request for more or different documents made for the

9  purpose of discrimination is prohibited.   8 U.S.C. § 1324b(a)(6).

10  **D.      Implementation of the Supplemental Final Rule**

11    In addition to the DHS letter that will be included with no-match letters if the final rule is

12  implemented, SSA has indicated its plan to revise the no-match letters themselves.   The revised

13  SSA no-match letters would state: "You should follow the instructions contained in . . . the

14  attached letter from the Department of Homeland Security," and "You should not ignore this

15  letter and do nothing.   That could . . . as the Department of Homeland Security has advised us,

16  expose you to liability under immigration law."   *See* Request for Judicial Notice (RJN), Docket

17  No. 93, Exh. E (model 2007 no-match letter); *see also AFL-CIO*, 552 F. Supp. 2d at 1004.

18    If the new no-match letters are sent, employers would immediately face the

19  administrative burdens and expense of compliance.   DHS's own Regulatory Flexibility Act

20  (RFA) analysis (conducted by a contractor Econometrica Inc.) estimates that the regulation's

21  costs to employers will exceed $100 million annually.   SAR 3709-10; *see also* SAR 1744, 1758.

22    Moreover, according to DHS's own estimates, the rule will lead to the termination of at

23  least between 15,729 and 70,781 *authorized* workers who cannot resolve their no-match with

24  SSA or be re-verified within the deadline.   *See* SAR 1726-1728, 3690 (explaining DHS's

25  assumption that between 786,457 and 3,539,059 individuals named in no-match letters are

26  authorized to work and that 2% of these authorized workers will be unable to resolve the no-

27  match with SSA within 90 days).   Past experiences with SSA no-match letters reinforce that the

28

14

mass and precipitous firing of work-authorized employees, a swelling in "off-the-books"

employment, and a "churning in local labor markets" may result.  *See* AR 327 (Mehta study) (in

empirical study, 53.6% of "employers responded to the receipt of a no-match letter by

discharging the listed workers"); *id.* at 332 (arguing that many workers precipitously fired will

make their way into the underground economy).  Past experience also demonstrates that some

employers will jump to the erroneous conclusion that all employees with no-matches and a

"foreign" appearance or accent lack lawful work authorization and will terminate or choose not

to hire such employees, including U.S. citizens and authorized workers.  *See, e.g.* SAR 1931-33,

1939-40 (Low Wage Immigrant Worker Coalition cmt.); AR 339 (Mehta study) (OSC data

suggests that "no-match letters might be contributing to an increase in national-origin

discrimination").

Other employees suddenly will face a deadline for resolving an SSA database

discrepancy.  SSA field offices generally are open only during business hours, when many

employees are working, and the offices are likely to face an influx of employees attempting to

resolve no-match problems.  Mismatched records for lawful immigrants have taken many

months to resolve with SSA.  *See, e.g.,* AR 1862 (AILA cmt.) (observing that "we see hundreds

of cases, in our limited universe of applicants, where employees visit local SSA offices and SSA

cannot resolve a problem within 30 days, or even as long as 90-120 days"); SAR 3189 (Legal

Aid Services of Oregon cmt.) (describing experience in assisting many farm workers with

correcting no-matches and explaining that "often that process has taken longer than 93 days").

Some workers will be required to travel to remedy the situation. SAR 3292 (California

Professional Assoc. of Specialty Contractors cmt.) (identifying the time and distance concerns

that may prevent employees from correcting the no-match within 90 days).  According to former

Social Security Commissioner Apfel, "it may take considerably in excess of 90 days to resolve

any given mismatched earnings report, even if the worker makes prompt efforts to resolve the

discrepancy." SAR 1850 (Davis, Cowell, & Bowe cmt.) (quoting Apfel).  DHS acknowledges

that in "difficult cases" SSA may be unable to resolve discrepancies within the 90-day

1   timeframe.   72 Fed. Reg. at 45617.  The new rule does not provide for that contingency.

2   **E.      Procedural History**

3         On August 28, 2007, Plaintiffs American Federation of Labor and Congress of Industrial

4   Organizations, *et al.* filed this action to enjoin Defendants from enforcing the August 15, 2007

5   final rule.  Additional labor and business groups from around the country intervened as plaintiffs.

6         On October 10, 2007, this Court entered a preliminary injunction prohibiting Defendants

7   from implementing the no-match rule pending a final judgment on the merits.  The Court ruled

8   that the balance of harms weighed overwhelmingly in favor of a stay until the validity of the rule

9   had been determined, concluding that implementation of the rule would subject thousands of

10  employers to "significant" compliance costs and many authorized employees to an increased risk

11  of termination because they will be unable to resolve no-matches within the allotted timeframe.

12  552 F. Supp. 2d at 1005-07.

13        The Court also held that Plaintiffs had raised at least a serious question regarding whether

14  DHS's action was arbitrary and capricious because the agency had changed its position regarding

15  the significance of no-match letters without a reasoned analysis.  *Id.* at 1009-10.  The Court

16  further held that Plaintiffs had raised a serious question as to whether DHS had impermissibly

17  exceeded its authority by interpreting IRCA's anti-discrimination provisions to preclude

18  enforcement against employers who follow the "safe harbor" procedures of the new rule.  *Id.* at

19  1010-11.  In addition, the Court held that Business Plaintiffs-Intervenors had raised a serious

20  question regarding whether the RFA had been violated by DHS's failure to conduct a final

21  flexibility analysis.  *Id.* at 1011-13.

22        Defendants then requested that the Court stay all further litigation so DHS could conduct

23  supplemental rulemaking.  On March 26, 2008, DHS published a supplemental notice of

24  rulemaking.  *See* 73 Fed. Reg. 15944 (Mar. 26, 2008).  Although the public comment period

25  concluded on April 25, 2008, DHS did not publish a supplemental final rule until six months

26  later, on October 28, 2008.

27        Defendants filed a motion for summary judgment and motion to dissolve the preliminary

28
                                          16

1   injunction on November 6, 2008.  This Court entered a briefing schedule on December 5, 2008,

2   setting January 9, 2008 as the deadline for Plaintiffs' motion for summary judgment and

3   opposition to Defendants' motion to vacate the preliminary injunction.

**ARGUMENT**

4

5   Defendants' motion to vacate the preliminary injunction does not contend that the

6   balance of hardships no longer tips heavily in Plaintiffs' favor.  Defendants' only contention is

7   that they are entitled to final judgment on the merits and, therefore, the preliminary injunction

8   must be vacated.  As shown below, however, Defendants' motions should be denied and

9   summary judgment granted in favor of Plaintiffs.

10   As this Court previously explained, "in the context of a request for preliminary

11   injunction, it is not the court's role to provide a final adjudication of the merits of the claims."

12   *AFL-CIO*, 552 F. Supp. 2d at 1005.  Now that the parties have had the opportunity to brief the

13   issues on cross motions for summary judgment, the Court must proceed to actually adjudicate the

14   claims.  The Court's consideration of the case is also now aided by the additional discussion

15   provided by DHS in the supplemental rulemaking – discussion which more clearly reveals the

16   myriad flaws in DHS's decision to adopt the rule.  Plaintiffs are entitled to summary judgment

17   on the merits of the case.  *See Posey v. Lake Pend Oreille School Dist. No. 84*, 546 F.3d 1121,

18   1126 (9th Cir. 2008) (holding that summary judgment is warranted if "there is no genuine issue

19   as to any material fact and the moving party is entitled to a judgment as a matter of law").

20   **I.      The Supplemental Final Rule is Contrary to the Governing Statute**

21   The supplemental final rule and insert letter are contrary to statute for three reasons.

22   First, they impermissibly stretch the standard of liability embodied in the unambiguous statutory

23   term "knowing" to encompass reckless and negligent conduct, contrary to Congress's intent.

24   Indeed, the recent Ninth Circuit decision in *Aramark* made clear that receipt of a no-match letter

25   by itself simply does not impart knowledge (or constructive knowledge) of any worker's

26   unauthorized status.  *See Aramark Facility Servs. v. Serv. Employees Intern. Union*, 530 F.3d

27   817, 825-26, 828 (9th Cir. 2008).  *Aramark's* holding shows that the central premise of the rule –

28

17

that to avoid liability employers must respond to every no-match letter – is fundamentally flawed.

Second, the rule and insert letter effectively establish—without statutory authorization—a new reverification requirement for *every* one of the millions of existing employees whose SSNs are listed on a no-match letter.  Third, and relatedly, even after another round of rulemaking, the rule and DHS guidance letter continue to state that employers should uniformly re-verify every worker listed on a no-match letter – including employees hired prior to IRCA whom Congress specifically exempted through a "grandfather" provision.

Agency action must be set aside if it is not consistent with a statute adopted by Congress. 5 U.S.C. § 706(2)(A), (C).   Under the familiar test set out in *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), the Court must first determine if Congress' intent is clear.  *Id.* at 842.  In ascertaining Congressional intent, courts look to the text, to the legislative purpose and history, and to the overall structure of the act.  *Gonzales v. Oregon*, 546 U.S. 243, 265, 266 (2006).  Where, as here, "the intent of Congress is clear, that is the end of the matter," *Chevron,* 467 U.S. at 842, and the court must set aside any agency action that is not consistent with that intent.

A.    **The Rule Expands the Meaning of the Statutory Term "Knowing" By Imposing a Duty to Respond to a No-Match Letter, When the Statute Imposes No Such Duty**

Congress made it unlawful in IRCA to hire or employ a worker "*knowing*" the worker is an "unauthorized alien."  8 U.S.C. § 1324a(a)(1)(A) (emphasis added).  IRCA also made it unlawful for an employer "to continue to employ [an] alien . . . *knowing* the alien is (or has become) an unauthorized alien with respect to such employment."  8 U.S.C. § 1324a(a)(2) (emphasis added).   The supplemental final rule redefines "knowing" to include "fail[ure] to take reasonable steps after receiving" an SSA no-match letter.  8 C.F.R. § 274a.1(l)(1)(iii)(B).  Thus, whereas the statute prohibits "knowingly" continuing employment of unauthorized workers, the rule prohibits mere negligence or recklessness in response to a no-match letter.  The rule is thus incompatible with the governing statute.

This Court previously stated that Plaintiffs were unlikely to succeed on the merits of the

conflict-with-statute claim, because the claim appeared to be based on a misinterpretation of the rule as providing that receipt of a no-match letter triggers a finding of constructive knowledge in every case.  The Court stated that "in fact, the regulation is written such that whether an employer has constructive knowledge depends 'on the totality of relevant circumstances.'"  *AFL-CIO*, 552 F. Supp. 2d at 1008.  But Plaintiffs do not dispute that the rule allows for consideration of "the totality of relevant circumstances."  Neither do Plaintiffs contend that a no-match letter can never constitute probative evidence of knowledge regardless of the circumstances.  Rather, as explained below, the rule's superficial reliance on the "totality of relevant circumstances" turns out to be of no moment.  First, the rule permits a finding of constructive knowledge based on receipt of a no-match letter *by itself*, without any additional evidence of illegality.  Second, the rule effectively mandates compliance with its procedures *regardless* of a worker's particular circumstances.

The conclusion that the rule conflicts with the governing statute is also reinforced by the Ninth Circuit's recent holding, in an opinion issued subsequent to this Court's preliminary injunction decision, that an employer's receipt of a no-match letter by itself simply does not impart knowledge of any worker's unauthorized status.  *See Aramark*, 530 F.3d at 825-26, 828.

Plaintiffs elaborate on each of these issues below.

1.    The rule is not saved by its reliance on consideration of "the totality of relevant circumstances."  First, as the Court recognized in its preliminary injunction decision, "DHS's new position is that an employer who receives a no-match letter can, *without any other evidence of illegality*, be held liable under the continuing employment provision."  552 F. Supp. 2d at 1010 (emphasis added).  *See also id.* at 1009-10 (noting that counsel for the government acknowledged during argument in this case that "under the new rule, receipt of a no-match letter by itself *can* be sufficient to impart knowledge that the identified employees are unauthorized").  DHS has not made a single substantive change to the text of the rule in the course of the supplemental rulemaking.  The supplemental final rule thus continues to provide that, depending

19

on the circumstances, an employer that receives a no-match letter and fails to re-verify the employee may *on that basis alone* be held criminally or civilly liable for violating IRCA. Because, however, receipt of a no-match letter by itself simply does not meet the statutory knowledge requirement, the rule conflicts with the statute.

Second, and equally to the point, the rule requires employers to treat no-match letters as if they trigger constructive knowledge in every case. In its preliminary injunction decision, this Court emphatically rejected DHS's assertion that compliance with the safe harbor rule is voluntary, finding that assertion "wholly unavailing." *Id.* at 1013. The Court correctly reasoned:

> Because failure to comply subjects employers to the threat of civil and criminal liability, the regulation is "the practical equivalent of a rule that obliges an employer to comply or to suffer the consequences; the voluntary form of the rule is but a veil for the threat it obscures." [] The rule as good as mandates costly compliance with a new 90-day timeframe for resolving mismatches.

*Id.* (quoting *Chamber of Commerce v. Dep't of Labor*, 174 F.3d 206, 210 (D.C. Cir. 1999)).[4]

DHS has done nothing in the supplemental rulemaking to change the mandatory nature of the rule. In particular, DHS states in the preamble to the supplemental final rule that the rule was designed to "remind[] employers of their *obligation* under the INA to conduct due diligence upon receipt of SSA no-match letters." 73 Fed. Reg. at 63847 (emphasis added). Similarly, the DHS guidance letter continues to advise employers: "Q: Can I safely disregard the letter from SSA? A: No." SAR 3803 (DHS Insert Letter). Rather than change the letter to state that compliance is voluntary, DHS continues to state in its letter that employers "should" comply with the safe harbor procedures. *Id.* at 3803.[5] And indeed, DHS declined to change the letter to

---

[4] *See also General Electric Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (explaining that agency action is "binding as a practical matter . . . if the language of the document is such that private parties can rely on it as a norm or safe harbor by which to shape their actions") (internal quotation marks, citation omitted); *Cement Kiln Recycling Coalition v. EPA*, 493 F.3d. 207, 228 (D.C. Cir. 2007) ("an agency's pronouncement that a document is non-binding will not make it so").

[5] DHS is bound by its own interpretation of the rules in its guidance letter. *See Williams v. United States*, 503 U.S. 193, 200-01 (1992). *See also Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 49 (D.C. Cir. 2000) ("a preamble plus a guidance plus an enforcement letter from EPA could crystallize an agency position").

20

1    indicate that compliance is optional despite this Court's conclusion that the rule effectively

2    mandates compliance.

3        There is also no question that the rule is to be applied *uniformly*, without respect to

4    individualized circumstances.  The rule nowhere instructs employers to consider additional

5    circumstances before determining whether investigation is appropriate.  Neither does the DHS

6    letter tell employers that, if an employee's appearance on the no-match list is the only potential

7    indication of a problem, the employer need not conduct the "safe harbor" steps.  *See also AFL-*

8    *CIO*, 552 F. Supp. 2d at 1010 ("Nothing in the insert suggests that any evidence of illegality

9    other than receipt of a no-match letter is necessary for liability to be imposed.").  Instead, the

10   DHS insert explicitly instructs employers to apply the procedures of the DHS rule "uniformly to

11   *all* employees listed in the enclosed SSA letter" – regardless of the specific circumstances.  SAR

12   3803 (DHS Insert Letter) (emphasis added).  Indeed, the DHS letter also goes on to inform

13   employees that any deviation from uniform application of the rule may subject employers to

14   liability for discrimination.  *See id.* at 3804 (stating that "an employer . . . who treats employees

15   differently" may be liable for discrimination charges but an employer who "applied the same

16   procedures to all employees referenced in the no-match letter(s) *uniformly*" will not be subject to

17   discrimination liability) (emphasis added).  The letter is designed to cause—and certainly will

18   have the effect of causing—employers that lack any evidence pointing to an employee's

19   undocumented status at the time of receiving the letter to take the same steps as employers who

20   have possession of some evidence pointing in that direction at the time of receiving the letter.

21   *See also AFL-CIO*, 552 F. Supp. 2d at 1007 ("[T]here is a strong likelihood that employers may

22   simply fire employees who are unable to resolve the discrepancy within 90 days, even if the

23   employees are actually authorized to work").

24        In sum, the intent and effect of the rule is to require employers to treat every no-match

25   letter as triggering an obligation to re-verify every employee whose SSN is listed in the letter,

26   lest the employer be held liable for "knowing" the worker is unauthorized.  The inclusion of the

27

28

21

phrase "totality of the circumstances" does not limit the scope of the rule.

2.      We return to the statutory language.  IRCA provides for liability only when an employer continues to employ a worker "knowing" he or she is unauthorized.

As the Ninth Circuit case law on IRCA's employer sanctions provision reflects, the term "knowing" had a well-established meaning well before the 1986 Congress's adoption of that term in IRCA.  Sitting en banc, the Ninth Circuit held over three decades ago that the term "knowing" is a "familiar term of art" that encompasses actual knowledge or a state of mind often called willful blindness or constructive knowledge, but does not reach recklessness or negligence.  *United States v. Jewell*, 532 F.2d 697, 703 (9th Cir. 1976) (en banc) (construing "knowingly" in criminal case involving transportation of drugs).  *See Collins Foods Int'l v. INS*, 948 F.2d 549, 555 n.17 (9th Cir. 1991) (relying on *Jewell* in applying IRCA's "knowing" requirement); *New El Rey Sausage Co. v. INS*, 925 F.2d 1153, 1157-58 (9th Cir. 1991) (same); *Mester Mfg. Co. v. INS*, 879 F.2d 561, 567 (9th Cir. 1989) (same).  Because knowing is "a term of art, . . . DHS was not free to treat it as an empty linguistic vessel."  *National Treasury Employees Union v. Chertoff*, 452 F.3d 839, 860 (D.C. Cir. 2006).

As *Jewell* explained, the term "knowing" connotes both "positive knowledge" and willful blindness, *i.e.*, "a mental state in which the defendant is aware that the fact in question is highly probable but consciously avoids enlightenment."  *Jewell*, 532 F.2d at 704.  But "[a] court can properly find wil[l]ful blindness only where it can almost be said that the defendant actually knew."  *Id*.  As the Ninth Circuit has recently reiterated, "willful blindness . . . *is categorically different from negligence or recklessness*."  *United States v. Heredia*, 483 F.3d 913, 918 n.4 (9th Cir. 2007) (en banc) (emphasis added).  "A willfully blind defendant is one who took *deliberate* actions to avoid confirming suspicions of criminality.  A reckless defendant is one who merely knew of a substantial and unjustifiable risk that his conduct was criminal; a negligent defendant is one who should have had similar suspicions but, in fact, did not."  *Id*.[6]

---

[6] *See also* Ninth Circuit Model Criminal Jury Instructions 5.6 ("An act is done knowingly if the defendant is aware of the act and *does not [act or fail to act] through ignorance, mistake, or*

22

1   Thus, where a statute's mens rea is specified simply as "knowing," a defendant cannot be

2   convicted of "knowingly" committing some act absent a finding of actual knowledge or willful

3   blindness.  "[T]o allow conviction without positive knowledge or willful avoidance of such

4   knowledge is to erase the scienter requirement from the statute."  *Heredia*, 483 F.3d at 926

5   (Kleinfeld, J., concurring).

6   In choosing to use the term of art "knowing" in 8 U.S.C. § 1324a(a), "Congress is

7   presumed to have known and adopted" its well-established meaning.  *Jewell*, 532 F.2d. at 703.

8   And indeed, the structure of IRCA itself reinforces that Congress intended to adopt the familiar

9   *Jewell* definition of "knowing" in § 1324a(a): when Congress wished to impose liability for

10   recklessness in IRCA, it did so explicitly.

11   As previously stated, the IRCA provision at issue here makes it unlawful for an employer
     to continue to employ an alien . . . *knowing* the alien is (or has become) an

12   unauthorized alien with respect to such employment.

13   8 U.S.C. § 1324a(a)(2) (emphasis added).

14   The 1986 Congress's deliberate use of "knowing" in § 1324a(a)(2) stands in sharp

15   contrast to several other provisions of IRCA.  Section 112 of IRCA amended four different

16   subsections of 8 U.S.C. § 1324(a) to prohibit various offenses relating to harboring of

17   noncitizens, when done "knowing[ly] or in reckless disregard" of their status.  For example, in 8

18   U.S.C. § 1324(a)(1)(A)(ii), Congress prohibited transportation of an alien by

19   [a]ny person who [acts]— *knowing or in reckless disregard* of the fact that an
     alien has come to, entered, or remains in the United States in violation of law[.]

20   (Emphasis added.)  *See also* 8 U.S.C. § 1324(a)(1)(A)(iii) ("knowing or in reckless disregard of

21   the fact that an alien has come to, entered, or remains in the United States in violation of law"); 8

22   U.S.C. § 1324(a)(1)(A)(iv) ("knowing or in reckless disregard of the fact that [the alien's]

23   coming to, entry, or residence is or will be in violation of law"); 8 U.S.C. § 1324(a)(2)

24

25   *accident*.") (emphasis added); Ninth Circuit Model Criminal Jury Instructions 5.7 ("You may
     find that the defendant acted knowingly if you find . . . that the defendant: 1. was aware of a high

26   probability [that the fact in question was true], and 2. deliberately avoided learning the truth.
     You may not find such knowledge, however, if you find . . . that the defendant was simply

27   careless.").

28

1  ("knowing or in reckless disregard of the fact that an alien has not received prior official

2  authorization to come to, enter, or reside in the United States").[7]

3     "It is axiomatic that when Congress uses different text in 'adjacent' statutes it intends that

4  the different terms carry a different meaning."  *White v.*

5     *Lambert*, 370 F.3d 1002, 1011 (9th Cir. 2004).  Congress deliberately and unambiguously

6  chose not to impose liability for recklessness or negligence in § 1324a(a).  Any interpretation of

7  "knowing" in § 1324a(a) that would impose liability on those grounds would render superfluous

8  Congress's repeated use of the phrase "reckless disregard" in conjunction with "knowing"

9  throughout IRCA's statutory scheme.  *See, e.g.*, *Ratzlaf v. United States*, 510 U.S. 135, 140-41

10  (1994) (counseling against interpreting statutory language so as to render some words

11  surplusage).  Yet that is precisely what the rule would do.[8]

12     Against this backdrop, the Ninth Circuit has found "constructive knowledge" sufficient to

13  satisfy IRCA only in factual circumstances amounting to willful blindness, i.e., where "the

14  defendant is aware that the fact in question is highly probable but consciously avoids

---

15

16  [7] Congress also used the same formulation in another immediately adjacent provision, 8 U.S.C. § 1324c, which prohibits document fraud.  *See* 8 U.S.C. § 1324c(a)(5) ("with knowledge or in reckless disregard of").

17

18  [8] The United States Code contains numerous other examples, in both criminal and civil contexts, of the formulation "knowingly or with reckless disregard" or "knowing, or having reasonable cause to believe."  *See, e.g.*, 12 U.S.C. § 164(c) ("knowingly or with reckless disregard"); 18 U.S.C. § 2424(a) ("knowing or in reckless disregard of the fact that the individual is an alien"); 12 U.S.C. § 324 ("knowingly or with reckless disregard"); 12 U.S.C. § 1782(a)(3) (same); 12 U.S.C. § 1782(d)(2)(C) (same); 12 U.S.C. § 1817(c)(4)(C) (same); 12 U.S.C. § 3110(c)(3) (same); 12 U.S.C. § 1847(a), (d)(3) (imposing in subsection (a) criminal penalty for violation of any provision of the chapter when done "knowingly," but imposing civil penalty in subsection (d)(3) for failure to make reports when done "knowingly or with reckless disregard"); 18 U.S.C. § 1365(a), (c) (imposing liability in subsection (a) for tampering with consumer products if done with "reckless disregard," and imposing liability in subsection (c) for "knowingly" communicating false information that a consumer product has been tainted); 15 U.S.C. § 1681s-2(a)(1)(A) ("knows or has reasonable cause to believe"); 18 USC § 792 ("knows, or has reasonable grounds to believe or suspect"); 21 U.S.C. § 843(a)(6) ("knowing, intending, or having reasonable cause to believe"); 18 U.S.C. § 842(h) ("knowing or having reasonable cause to believe"); 18 U.S.C. § 922(b)(1) ("knows or has reasonable cause to believe"); 18 U.S.C. § 922(b)(2) (same); 18 U.S.C. § 2332d(a) ("knowing or having reasonable cause to know"); 18 U.S.C. § 2339(a) ("knows, or has reasonable grounds to believe"); 18 U.S.C. § 2388(c) ("knows, or has reasonable grounds to believe or suspect"); 21 U.S.C. § 841(c)(2) ("knowing, or having reasonable cause to believe); 21 U.S.C. § 843(a)(7) ("knowing, intending, or having reasonable cause to believe").

19

20

21

22

23

24

25

26

27

28

1   enlightenment." *Collins Foods*, 948 F.2d at 555 n.17 (quoting *Jewell*, 532 F.2d 697).  *See also*

2   *Mester*, 879 F.2d at 567 (citing *Jewell* for proposition that "in criminal law, deliberate failure to

3   investigate suspicious circumstances imputes knowledge"); *New El Rey*, 925 F.2d at 1157-58

4   (same).  In *Mester* and *New El Rey*, for example, the Court concluded the statutory knowledge

5   requirement was met because the employer had "'positive information' that the employee was

6   undocumented" in that "the INS specifically visited the employer and notified it that its

7   employees were suspected unlawful aliens and should be terminated if inspection of their

8   documents did not allay the concerns." *Aramark*, 530 F.3d at 825 (distinguishing *Mester* and

9   *New El Rey*).  The employer's failure to investigate further under those circumstances was a

10  deliberate decision to avoid confirming the employees' status.

11          In *Collins Foods*, by contrast, the Ninth Circuit held that an employer could not be

12  charged with the knowledge necessary for an IRCA violation simply because the employer *could*

13  *have* discovered a Social Security card was fraudulent by comparing it to an example in the INS

14  manual, but failed to do so.  948 F.2d at 555.  As the *Collins* Court explained, "[f]ailure to

15  compare the back of a Social Security card with the example in the INS handbook, when neither

16  statute nor regulation requires the employer to do so, falls far short of the 'willful blindness'

17  found in *Mester* and *New El Rey*."  *Id.*  *Collins* also emphasized that "the doctrine of constructive

18  knowledge must be sparingly applied."  *Id.* at 555.

19          The Ninth Circuit has thus consistently applied the *Jewell* standard and been careful to

20  limit the application of constructive knowledge under IRCA to circumstances which would

21  support conviction in a criminal case, no doubt cognizant of the fact that a single standard of

22  liability under IRCA applies to both civil and criminal cases.  *See* 8 U.S.C. §§ 1324a(e)(4)-(5),

23  1324a(f).  As the Supreme Court has instructed, where "[t]he operative language of [the statute]

24  applies without differentiation to" several categories of persons, courts must still arrive at a

25  single, uniform interpretation of that language: "To give these same words a different meaning

26  for each category would be to invent a statute rather than interpret one."  *Clark v. Martinez*, 543

27  U.S. 371, 378 (2005); *see also Nadarajah v. Gonzales*, 443 F.3d 1069, 1077-78 (9th Cir. 2006).

28

25

In redefining "knowing" to include mere "fail[ure] to take reasonable steps after receiving" an SSA no-match letter (8 C.F.R. § 274a.1(l)(1)(iii)(B)), however, the rule impermissibly seeks to expand liability beyond the outer limits of what is required for criminal conviction.  *See Heredia*, 483 F.3d at 926 (Kleinfeld, J., concurring) ("to allow conviction without positive knowledge or wil[l]ful avoidance of such knowledge is to erase the scienter requirement from the statute").  The rule's re-definition of "knowing" is thus unsustainable not only in light of the unambiguous text of the statute and the Ninth Circuit's consistent precedents, but also in light of basic principles of statutory interpretation.  *See Clark*, 543 U.S. at 378.

3.    The rule's fundamental incompatibility with the governing statute is made even more clear once the relevant text, structure and precedent are applied specifically in the factual setting of no-match letters.  As the Ninth Circuit held subsequent to this Court's preliminary injunction decision, an SSA no-match letter "falls short of the 'positive information' from the government that was held to provide constructive notice in *Mester* and *New El Rey* and held lacking in *Collins*."  *Aramark*, 530 F.3d at 828.  As *Aramark* has now clarified, employers simply have no immigration law duty to respond to no-match letters.

The specific question at issue in *Aramark* was whether the employer could be deemed to have "knowing[ly]" hired unauthorized workers if the employer complied with an arbitrator's order to reinstate employees who were the subject of a no-match letter and who failed to resolve the discrepancy within three days.  The Ninth Circuit held that the statutory prohibition on "knowing" hiring of unauthorized workers did not prevent the employer from reinstating the workers in question, because the no-match letter and the workers' failure to resolve the discrepancy did *not* impart constructive knowledge of their status.  530 F.3d at 828-31.

As *Aramark* explained, unlike the information derived from the INS's own data that the agency provided to employers in *Mester* and *New El Rey,* a no-match letter comes from a database of tax information maintained by the SSA, the main purpose of which "is not immigration related, but rather is simply to indicate to workers that their earnings are not being properly credited."  *Aramark*, 530 F.3d at 826.  Equally important, there are many reasons for

26

SSA no-matches that are unrelated to work authorization status, "including typographical errors, name changes, compound last names prevalent in immigrant communities, and inaccurate or incomplete employer records."  *Id.* at 826.  *See also AFL-CIO*, 552 F. Supp. 2d at 1010; 73 Fed. Reg. at 63847.  The *Aramark* Court reasoned,

> [T]he letters Aramark received . . . could be triggered by numerous reasons other than fraudulent documents, including various errors in the SSA's NUMIDENT database.  Indeed the letters do not indicate that the government suspects the workers of using fraudulent documents.  Rather, they merely indicate that the worker's earnings were not being properly credited, *one explanation of which* is fraudulent SSNs.

*Aramark*, 530 F.3d at 828.  Accordingly, the *Aramark* Court held that a no-match letter "falls short of the 'positive information' from the government that was held to provide constructive notice in *Mester* and *New El Rey* and held lacking in *Collins*."  *Id.* at 828.[9]

As *Aramark's* holding reflects, no-match letters simply are not a reliable indicator of any individual worker's lack of work authorization.  SSA's letter does not constitute "positive information" of unauthorized status particularly given that SSA's database does not include information on immigration status and the SSA does not know whether any employee identified in a no-match letter is unauthorized to work.  *See generally* AR 648 (GAO Report 06-814R, Immigration Enforcement: Benefits and Limitations to Using Earnings Data to Identify Unauthorized Work (July 11, 2006)).

After another round of rule-making, the government still has not been able to produce any data demonstrating the extent of correlation between being listed on a no-match letter and a worker's unauthorized status.  As DHS acknowledges in its notice of supplemental final rule, "DHS cannot determine with certainty the rate at which authorized and unauthorized employees appear in no-match letters."  73 Fed. Reg. at 63857.  *See also, e.g.*, *id.* at 63856.  No one knows what percentage of the *255 million-plus* unmatched records relate to unauthorized work; the most

---

[9] The *Aramark* Court also assumed, in dicta, that the final rule "would not treat the no-match letter by itself as creating constructive knowledge of an immigration violation."  530 F.3d at 827-28.  The Ninth Circuit apparently was unaware that DHS interprets its rule to mean that "an employer who receives a no-match letter can, without any other evidence of illegality, be held liable under the continuing employment provision."  *AFL-CIO*, 552 F. Supp. 2d at 1010.

27

recent GAO study reports that this figure is *unknown*.  AR 655 (GAO Report 06-814R).  Indeed, DHS's analysis estimates that as little as 10% of employees listed on no-match letters may be unauthorized.  73 Fed. Reg. at 63857.  *See also infra*, Part II.B.1.

Because a no-match letter is not a reliable indicator that an employee is unauthorized to work, an employer receiving such a letter does not become "aware that the fact in question [i.e., that a worker lacks authorization] is *highly probable*."  *Collins Foods*, 948 F.2d at 555 n.17 (quoting *Jewell*, 532 F.2d at 697) (emphasis added).  And, absent evidence that the no-match letter is a reliable indicator of unauthorized work, a necessary requirement for "constructive knowledge" under the *Jewell* test is lacking.  Equally to the point, an employer that simply handles a no-match letter consistently with the tax code, by making sure the employer correctly transmitted the name and SSN provided by the employee, is not an employer "who took *deliberate* actions to avoid confirming suspicions of criminality," *Heredia*, 483 F.3d at 918 n.4 (emphasis in original), or "consciously avoid[ed] enlightenment."  *Collins Foods*, 948 F.2d at 555 n.17 (quoting *Jewell*, 532 F.2d 697).  *Cf. Heredia*, 483 F.3d at 920 n.10 ("The fact that a tiny percentage of the tens of thousands of packages FedEx transports every day may contain contraband hardly establishes a high probability that any particular package contains contraband.").

Accordingly, the new rule and insert letter conflict with the statute by instructing employers that, in order to avoid liability, they must take "reasonable steps" in response to a no-match letter.  Under the meaning of "knowing" intended by Congress and explicated by the Ninth Circuit in a long line of cases beginning with *Jewell*, the statutory provision imposes no liability for negligence or recklessness.

**B.     The Supplemental Final Rule Is Contrary to Statute Because it Imposes a Reverification Requirement for Existing Employees**

The supplemental final rule also is contrary to statute because it effectively sets up a work-authorization re-verification system for millions of existing employees who are the subject of no-match letters when Congress deliberately declined to impose a system of re-verification.

In its preliminary injunction decision, the Court viewed this claim as unlikely to succeed because IRCA may already require employers "to reverify the authorization of their employees when the government provides employers with 'specific, detailed information' about the allegedly unauthorized employee." 552 F. Supp. 2d at 1008-09. To be sure, IRCA prohibits employers from continuing "to employ an alien . . . knowing the alien is (or has become) an unauthorized alien with respect to such employment." 8 U.S.C. § 1324a(a)(2). Thus, an employer who receives "specific, detailed information" that an employee is unauthorized may have to re-verify the employee or risk liability.

However, as discussed *supra*, receipt of a no-match letter simply does not constitute "specific, detailed information" establishing a worker's unauthorized status. *See supra* at Part I.A.3.; *see also Aramark*, 530 F.3d at 825-26, 828. As *New El Rey* emphasized, DHS cannot "make generalized accusations for the purpose of forcing employers to reverify the authorization of their employees." 925 F.2d at 1158.

Moreover, rather than instructing employers to consider "specific, detailed information" and particular circumstances, DHS mandates that employers apply the procedures of the rule "uniformly to *all* employees listed in the enclosed SSA letter." *See* SAR 3803 (DHS Insert Letter) ("Q: Can I safely disregard the letter from SSA? A: No. . . . Q: What should I do? A: You should take reasonable steps to resolve the mismatch, and apply these reasonable steps uniformly to *all* employees listed in the enclosed SSA letter.") (emphasis added); *id.* at 3804 ("an employer . . . who treats employees differently" may be liable for discrimination charges but an employer who "applied the same procedures to all employees referenced in the no-match letter(s) *uniformly*" will not be subject to discrimination liability). *See also AFL-CIO*, 552 F. Supp. 2d at 1013 (concluding that "[t]he rule as good as mandates costly compliance" with the rule's procedures for resolving mismatches).

The rule thus effectively requires employers to follow the rule's re-verification procedures in response to *every* no-match letter – resulting in re-verification of millions of workers as to whom the employer has not received any "specific, detailed information" regarding

29

unauthorized status.  The rule therefore conflicts with Congress's decision not to enact a system of reverification.

Congress chose only to "establish[] an extensive 'employment verification system,'" "mandat[ing] that employers verify the identity and eligibility of all *new hires* by examining specified documents before they begin work."  *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147-48 (2002) (internal citation omitted) (emphasis added).  IRCA thus requires that employers follow detailed procedures in verifying employment at the time of initial hire.  8 U.S.C. § 1324a(b).  Congress did not provide for any re-verification system, however, because Congress did "not intend to impose a continuing verification obligation on employers."  H. Rep. 99-682(I) at 57 (1986), *reprinted at* 1986 U.S.C.C.A.N. 5649, 5661.

In seeking to impose a uniform procedure for re-verifying all workers whose SSNs are listed in a no-match letter, DHS contravenes Congress's intent and undermines its goals of minimizing the administrative burdens and potential for discrimination caused by IRCA. Sensitive to the concern that IRCA "plac[ed] an undue burden on employers in requiring them to do the paperwork and keep records on employees," H. Rep. 99-682(I) at 90, 1986 U.S.C.C.A.N. at 5694, Congress made a deliberate choice "to minimize the burden and the risk placed on the employer in the verification process."  *Collins*, 948 F.2d at 554.  At the same time, Congress also was of the view that "the imposition of employer sanctions will give rise to employment discrimination." H. Rep. 99-682(II) at 12 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5757, 5761. Accordingly, "IRCA . . . is delicately balanced to serve the goal of preventing unauthorized alien employment while avoiding discrimination against citizens and authorized aliens."  *Aramark*, 530 F.3d at 825 (quoting *Collins Foods*, 948 F.2d at 554).  Congress also provided that if employers go beyond statutorily-required verification procedures, they may be liable for national origin discrimination.  H. Rep. 99-682(I) at 62, 1986 U.S.C.C.A.N. at 5666; 8 U.S.C. § 1324b.[6]

The supplemental final rule would upset the "delicate[] balance" struck by Congress by

---

[6] Congress also took the unusual step of prohibiting the administration from making changes to the verification system without advance notice to Congress.  8 U.S.C. § 1324a(d)(3).

effectively imposing a continuing re-verification process for millions of existing employees whose SSNs are the subject of SSA no-match letters.   *See Collins Foods*, 948 F.2d at 555 (rejecting an expansive definition of "constructive knowledge" because it would "upset that balance"); *see also Aramark*, 530 F.3d at 825 (citing *Collins Foods*).   The rule would result in additional administrative burdens for employers and would cause the termination of existing workers who cannot rectify erroneous no-matches within 90 days.   It also would increase the potential for discrimination against lawfully authorized workers based on national origin.[10] Where, as here, an agency's interpretation would bring about "the very thing which Congress intended to prevent," the Supreme Court has not hesitated to reject the agency's interpretation. *Federal Maritime Comm. v. Seatrain Line, Inc.*, 411 U.S. 726, 739 (1973).

Further, "[i]t would be anomalous for Congress to have so painstakingly described" a system for employment verification at the time of initial hire, including the type of documents that must be presented and the employer's obligations in reviewing them, "but to have given [DHS], just by implication, authority to" create from whole cloth its own process for re-verification.  *Gonzales*, 546 U.S. at 262.

In sum, the supplemental final rule violates IRCA by creating a system for reverifying millions of employees who are the subject of a no-match letter, when the statute declines to impose a generalized system of re-verification.

## C.      Grandfathering

In the same fashion, the DHS rule is also contrary to statute because, among the no-match employees for whom re-verification is indiscriminately and uniformly required are workers whom Congress expressly exempted from IRCA.  Even after another round of rule-making, the rule continues to apply to employees who were hired before IRCA was adopted.  Congress exempted these employees from both IRCA's initial-hire and continuing-to-employ prohibitions. *See* Pub. L. No. 99-603 § 101(a)(3), 100 Stat. 3359 (1986) (codified at 8 U.S.C. § 1324a

---

[10] *See, e.g.*, AR 328-29 (Mehta Study); *see also infra*, Part II.C.3.

Historical and Statutory Notes).

This Court concluded in its preliminary injunction decision that "[a]lthough DHS would be wise to demarcate the rule's temporal boundaries in its guidance letter," Plaintiffs' claim was unlikely to succeed because the rule's exemption of grandfathered employees "is assumed and implicit." 552 F. Supp. 2d at 1009. Plaintiffs respectfully disagree that the rule's exemption is implicit. The rule's failure to exempt grandfathered employees must be considered in light of the DHS insert letter, which continues to affirmatively instruct employers that they "should take reasonable steps to resolve the mismatch, and *apply these reasonable steps uniformly to all employees listed in the enclosed SSA letter*." *See* SAR 3803 (DHS Insert Letter) (emphasis added). The letter even warns employers that deviation from uniform application of the rule may open the door to discrimination liability. *See id.* at 3804. DHS is bound by its own interpretation of the rules provided in its guidance letter. *See Williams v. United States*, 503 U.S. 193, 200-01 (1992); *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48-49 (D.C. Cir. 2000) ("a preamble plus a guidance plus an enforcement letter from EPA could crystallize an agency position"). Nowhere does the rule or the letter make clear that, rather than apply the rule's re-verification procedures "uniformly to all employees listed" on the no-match letter, employers should not take any action with respect to grandfathered employees. The rule thus dictates that employers must discharge such employees if they are the subject of a no-match letter and their work-authorization cannot be verified, contravening the controlling statute.

Although DHS easily could have followed the Court's advice and clarified in the supplemental final rule and insert letter that employers should *not* apply the rule's procedures to grandfathered employees, DHS failed to do so. DHS also rejected the requests for clarification of this point contained in comments in the supplemental rulemaking record. *See* 73 Fed. Reg. at 63861 ("A number of commenters argued that this exclusion [of grandfathered employees] should be explicitly stated in the rule text."). The consequence of DHS's failure to provide even a single sentence of clarification is to create a false impression among employers that *all*

1  employees listed in a no-match letter must be re-verified.  Some "grandfathered" workers will be

2  fired for no good reason, as DHS could easily have prevented such confusion.  DHS's failure to

3  modify the rule (or at least the accompanying letter) to exempt grandfathered employees

4  constitutes arbitrary and capricious agency action, and the rule must be validated for that reason

5  as well.

6

7  **II.     DHS's Decision to Adopt the Supplemental Final Rule is Arbitrary and Capricious Agency Action**

8         Even if the supplemental final rule is not contrary to the INA, it violates the

9  Administrative Procedure Act ("APA") because DHS's decision to adopt the rule is arbitrary and

10 capricious within the meaning of 5 U.S.C. § 706(2)(A).  This Court found in its preliminary

11 injunction decision that DHS had failed to acknowledge and provide a "reasoned analysis" for its

12 change in historical position regarding the significance of no-match letters, and that such failure

13 constituted arbitrary and capricious agency action.  552 F. Supp. 2d at 1006.  Despite this Court's

14 decision and another round of rulemaking, DHS still refuses to acknowledge that it has changed

15 course and alternatively maintains that any "perceived change" in course is nonetheless

16 supported by a "reasoned analysis."  73 Fed. Reg. at 63846.

17        As explained below, DHS's continued failure to acknowledge its major change in

18 position constitutes arbitrary and capricious agency action.  More importantly, the rule must be

19 set aside as arbitrary and capricious because DHS's proffered reasons for the rule are

20 insufficient, and because DHS failed to adequately consider the significant impact the rule will

21 have on U.S. citizens and other authorized workers.  *See Motor Vehicle Mfgs. Ass'n v. State*

22 *Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Northwest Env'l Defense Center v.*

23 *Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007).

24        **A.     DHS Refuses to Acknowledge That The Rule Reflects a Major Change in DHS Policy**

25

26        Even after another round of rulemaking, DHS refuses to acknowledge that it has changed

27 its longstanding prior position regarding the significance of no-match letters.  DHS explains in

28

33

1   the preamble to the supplemental final rule that the final rule "was consistent with the informal

2   agency interpretations offered to employers over the past decade" and was "designed to . . .

3   *remind*[] employers of their obligation under the INA to conduct due diligence upon receipt of

4   SSA no-match letters."  73 Fed. Reg. at 63847 (emphasis added).  DHS emphasizes that "there

5   was no agency precedent that had been 'casually ignored' in DHS's promulgation of the August

6   2007 Final Rule." *Id*.  It also refers to the change as a "*perceived* change in policy," *id*. at 63851

7   (emphasis added), and explains that it has provided a "reasoned analysis" for the rule because of

8   this Court's "concerns that DHS had changed its position," *id*. at 63847, not because the agency

9   accepts or admits that it has in fact changed its position.  *See also id*. at 63846 (stating the Court

10  identified "what it believed to be a change in DHS's position").

11      But "[DHS's] approach here is a complete about-face." *Ramaprakash v. FAA*, 346 F.3d

12  1121, 1126 (D.C. Cir. 2003).  As this Court explained in its preliminary injunction decision,

13  "[u]nder the prior regime, receipt of a no-match letter was not, by itself, sufficient to trigger

14  IRCA's liability under § 1324a(a)(2).  DHS's new position is that an employer who receives a no-

15  match letter can, without further evidence of illegality, be held liable under the continuing

16  employment provision."  552 F. Supp. 2d at 1010.  As such, "the threat of criminal prosecution

17  (under the guise of a safe-harbor provision), reinforced by a directive that the employer who

18  receives a no-match letter *must* follow the safe-harbor procedures or expose themselves to

19  criminal and civil liability, reflects a major change in DHS policy." *Id.* at 1005.

20      DHS's failure to candidly acknowledge this "major change in [] policy," *id.*, constitutes

21  arbitrary and capricious agency action because it is "an inexcusable departure from the essential

22  requirement of reasoned decision making." *Ramaprakash*, 346 F.3d at 1125 (internal quotations

23  omitted).  "[A] court must satisfy itself that [an] agency knows it is changing course," *Fox*

24  *Television Stations Inc. v. FCC*, 489 F.3d 444, 456 (2d Cir. 2007) (internal quotations omitted),

25  and an agency accordingly bears the duty to show "that prior policies and standards are being

26  deliberately changed, not casually ignored." *Northwest Env'l Defense Ctr.*, 477 F.3d at 687.

27  Courts may only defer to an agency's change in position "so long as the agency acknowledges

28

34

*and* explains the departure from its prior views." *Seldovia Native Ass'n v. Lujan*, 904 F.2d 1335, 1346 (9th Cir. 1990) (internal quotations omitted).

DHS's failure to acknowledge and explain its change in position impermissibly and unnecessarily obfuscates its actions in a way that is antithetical to the APA's requirement of reasoned decision-making, and therefore renders the rule invalid. The public is entitled to a forthright and accurate explanation of what the agency's policy was in the past, and what its policy is to be going forward. Moreover, DHS's failure to acknowledge its change has tainted DHS's reasoning throughout, as demonstrated below. Because DHS does not acknowledge its drastic change in policy, it fails to provide reasons that can justify a substantial shift in policy with severe consequences for authorized workers and the overall economy.

### B.    DHS's Proffered Reasons for the Rule Are Insufficient

The analysis DHS has now articulated in response to this Court's preliminary injunction decision reveals further the fundamental flaws in the rule and provides an independent basis for striking down the rule as arbitrary and capricious. Under the arbitrary and capricious standard, agency action must be set aside unless the agency has examined the relevant data and articulated a satisfactory explanation for its action that includes a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotations omitted); *Northwest Env'l Defense Ctr.*, 477 F.3d at 687. An agency's decision will be found arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43; *Northwest Env'l Defense Ctr.*, 477 F.3d at 687.[11]

---

[11] The reviewing court "must be able to discern" a rational basis for the agency's decision from "the record and the agency decision." *Northwest Env'l Defense Ctr.*, 477 F.3d at 688; *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *City of Brookings Mun. Telephone Co. v. F.C.C.*, 822 F.2d 1153, 1165 (D.C. Cir. 1987). The court's inquiry into agency decision-making must be "searching and careful." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989); *Pacific Coast Fed. of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082,

1   Here, the rule must be set aside as arbitrary and capricious because DHS's proffered

2   reasons for the rule are insufficient.  First, DHS failed to explain why, in the absence of any

3   reliable data on the percentage of no-match employees who are unauthorized, it made the drastic

4   decision to effectively establish an employment re-verification system that will impose

5   substantial compliance costs on employers and, by DHS's own estimates, result in tens of

6   thousands of authorized workers losing their jobs.  Second, DHS unjustifiably relied on SSA's

7   current criteria for sending out no-match letters, even though DHS recognizes that SSA can

8   change its criteria at any time, the criteria do not take into account unauthorized work, and any

9   modification of the criteria by SSA could cause major economic disruptions and undermine

10  immigration enforcement without regard to unauthorized work.

11          1.      **In the Absence of Any Reliable Data on the Number of No-Match**
                    **Employees Who are Unauthorized, DHS Cannot Provide a Reasoned**
12                  **Basis for the Rule**

13  Defendants' main contention and DHS's stated reasons for the rule stem from the central

14  premise that there is growing evidence and consensus that no-match letters are a potential

15  indicator of unauthorized work.  *See* Def. Mot. at 13-14; 73 Fed. Reg. at 63847-48.  This Court

16  determined in its preliminary injunction decision that "it [was] rational for DHS to use no-match

17  letters as an '*indicator*[] of a potential problem" for purposes of immigration enforcement.  552

18  F. Supp. 2d at 1010 (emphasis added).  But DHS is merely not using no-match letters as a means

19  of diagnosing a potential problem.

20          Rather, in the absence of any reliable data on the percentage of no-match workers who

21  are unauthorized, DHS is using no-match letters unjustifiably as a determinative and singular

22  trigger of an employment re-verification system that, as now demonstrated by the supplemental

23  rulemaking, will impose substantial compliance costs on employers and will result in tens of

24  _____

25  1090 (9th Cir. 2005).  The court must make sure that the agency "identified all relevant issues,
    gave them thoughtful consideration duly attentive to comments received, and formulated a
    judgment which rationally accommodates the facts capable of ascertainment and the policies

26  slated for effectuation."  *Telocator Network of America v. F.C.C.*, 691 F.2d 525, 544 (D.C. Cir.
    1982); *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815 (D.C. Cir. 1983)

27  ("[T]he keystone of [the court's inquiry] is to ensure that the [agency] engaged in reasoned

28                                              36

1   thousands of authorized workers losing their jobs.  *See State Farm*, 463 U.S. at 43 (agency action

2   is arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its

3   action including a rational connection between the facts found and the choice made"); *cf.*

4   *Burlington Truck Lines v. United States*, 371 U.S. 156, 165 (1962) ("The difficulty with the order

5   arises in connection with the findings and conclusions relevant to the choice of remedy.").

6       DHS's decision is expressly dependent on what it considers a "substantial connection"

7   between no-matches and unauthorized work.  *See* 73 Fed. Reg. at 63845.  But DHS's own

8   evidence and Regulatory Flexibility Act (RFA) analysis demonstrate that there is no way to

9   know what percentage of no-match employees is unauthorized.  *See id.* at 63862 ("DHS does not

10  have adequate data to estimate the percentage of unauthorized employees whose SSNs are listed

11  on no-match letters"); *id.* at 63857 ("DHS cannot determine with certainty the rate at which

12  authorized and unauthorized employees appear in no-match letters.").  To the contrary, DHS

13  acknowledges that there are "many" causes for no-match letters, and the most DHS has ever

14  claimed is that one of those many causes *may* be the use of a false SSN by an unauthorized

15  worker.  *See* 72 Fed. Reg. at 45612 ("There can be many causes for a no-match, including

16  clerical error and name changes.  One potential cause may be the submission of information for

17  an alien who is not authorized to work in the United States.").[12]

18      Indeed, given the large amount of uncertainty about the percentage of workers listed in

19  no-match letters who are unauthorized, DHS's own RFA analysis (conducted by an outside

20  contractor) employed a 70% spread by assuming that anywhere between 10% and 80% of

21  employees on no-match letters are unauthorized.  73 Fed. Reg. at 63857; SAR 1726-27 (Small

22  Entities Impact Analysis (SEIA)).  As such, it is undisputed that a significant, if not

23

24  decisionmaking.").
    [12]  *See also* SAR 368 (SSA OIG Response Reports: Accuracy of the SSA's Numident File)
25  (discussing 4.1% error rate in SSA databases and resulting 17.8 million discrepancies relating to
    authorized workers); SAR 174 (Congressional Testimony of Greg Heineman) (describing
26  discrepancies due to marriage and language errors in SSA records); SAR 232 (Hearing on
    Employment Eligibility Verification Systems) (noting that based on 4 percent error rate in SSA
27  databases, there could over 2.5 million lawful workers a year who are misidentified as not
    eligible to work).

28

overwhelming, percentage of no-match workers—as many as 90 percent according to DHS—could be *authorized*, yet still lose their jobs if they fail to resolve a no-match within 90 days.

DHS's own analysis in fact assumes that as many as 2% of authorized workers—up to 70,000 individuals—who are listed in no-match letters will be forced into unemployment every year because of the rule.[13]  73 Fed. Reg. at 63855.  And this figure is conservative.  Richard B. Belzer, Ph.D., an economist who is an expert in federal agency regulatory policies and practices, estimates that the total number of authorized workers who will lose their jobs because of their inability to resolve a no-match may be as high as 165,000 per year.  *See* SAR 1826 (U.S. Chamber of Commerce cmt.) (explaining that based on the five scenarios examined by DHS in its Initial Regulatory Flexibility Act (IRFA) analysis, the rule would cause 37,000 to 165,000 authorized workers to become unemployed).

Meanwhile, even though DHS asserts in the preamble to the supplemental final rule that "the rule will not have an effect on the economy of more than $100 million," 73 Fed. Reg. at 63866, DHS's IRFA analysis and SEIA show that the regulation's costs to small businesses will likely exceed $1 billion per year to implement.  *See* SAR 3709-10 (SEIA); SAR 1813.  As explained in Business Plaintiff-Intervenors' Summary Judgment and Opposition Brief, DHS's estimates significantly understate the actual costs to employers.  *See* Plaintiff-Intervenors' Memorandum in Supp. of Mot. for Sum. Judgment and Opp'n ("Pl-Intervenors' MSJ") at 17-18.  Indeed, costs to employers may be as high as over one billion dollars per year.  *See id.* at 13; SAR 1813 (Professor Belzer estimated that the new rule would cost business between $950 million and $1.6 billion per year).  Employers would have to bear these substantial compliance costs even though based on DHS's own estimates, if only 10% of no-matches correspond to unauthorized workers, there is a more than 30% chance that any particular no-match letter sent to

---

[13] For purposes of the RFA analysis, DHS assumes that, in the overall economy, between 786,457 and 3,539,059 individuals who appear in no-matches are authorized to work and assumes that 2% of these workers will be unable to resolve their no-match discrepancies within 90 days.  *See* SAR 1726-28, 3690.  Based on this assumption, DHS accepts that between 15,729 and 70,781 *authorized workers* will be unable to meet the deadline set forth in the rule and, hence, lose their jobs.

an employer identifying 11 no-match employees will list *only* authorized workers.  *See* SAR 1912 (SEIU cmt.).

Thus, even if it is rational to believe that a no-match letter may provide *some* indication of unauthorized work, DHS's decision to adopt a rule that will impose significant compliance costs on employers, require them to re-verify the immigration status of *all* employees who are listed on a no-match letter, as well as terminate those authorized workers who are unable to resolve their no-matches within 90 days, when there is no reliable data on the percentage of no-matches that relate to unauthorized work, is not the outcome of reasoned decision-making.  *See Int'l Ladies' Garment Workers' Union*, 722 F.2d at 819 (finding rule arbitrary and capricious in part because data in the record provided no meaningful support for agency action); *State Farm*, 463 U.S. at 56 (finding agency action arbitrary and capricious because agency's explanation could not justify its drastic decision to rescind rather than modify the standard at issue).  *See also Oxy USA, Inc. v. FERC*, 64 F.3d 679, 693 (D.C. Cir. 1995) (holding that FERC's position was arbitrary and capricious when it presented no data to support it); *National Treasury Employees Union v. Horner*, 854 F.2d 490, 492 (D.C. Cir. 1988) ("Because OPM has presented no data to support its rational for excepting the positions, we also affirm the district court's finding that the decision was arbitrary and capricious.").

> ## 2.    By Relying Upon Criteria that Are Purely Within the Discretion of SSA, DHS Has Not Provided a Reasoned Basis for the Rule

Even though "DHS cannot determine with certainty the rate at which authorized and unauthorized employees appear in no-match letters," 73 Fed. Reg. at 63857, it relies on SSA's current criteria for sending no-match letters as a basis for supporting the rule.  *See id.* at 63848. It maintains that SSA's procedures for sending no-match letters better target employers with potential unauthorized workforce problems, presumably increasing the (unknown) probative value of no-match letters for immigration-enforcement purposes.  *See id.*

But this proffered basis for the rule must also be rejected, because reliance on the current criteria used by SSA to conclude that the rule reasonably targets employers with potential

unauthorized workforce problems is entirely insufficient.  *See State Farm*, 463 U.S. at 43; *Northwest Env'l Defense Ctr.*, 477 F.3d at 687 (agency cannot offer an explanation for its decision that "runs counter to the evidence," or is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise").  As explained below, SSA has the power and discretion to change its criteria for issuing no-match letters at any time and in any fashion without considering the connection between its criteria and DHS's concern with unauthorized work and, indeed, SSA has done so in the past.  As a result, contrary to reasoned decision-making, the rule effectively delegates to SSA the broad authority to alter immigration-enforcement objectives and cause major economic disruptions by simply changing its criteria or processes for sending out no-match letters.

For example, if SSA re-adopted its policy of sending no-match letters to every employer with even one mismatched W-2, there is no question that many more small business entities and other employers who because of the size of their workforce have not received these letters in the past would suddenly be affected by DHS's new rule.  *See, e.g.,* AR 498 (CRS Report – Social Security Benefits for Noncitizens: Current Policy and Legislation) (noting that from 1993 through 2000, SSA issued 110,000 no-match letters per year to employers only if 10 or more employees had discrepancies, but in 2001, SSA issued 950,000 no-match letters to employers for every employee with a discrepancy).  SSA offices, as a result, might find it even more difficult to respond to the increase in no-match visits within the 90-day deadline set forth in the rule.  Since DHS already acknowledged in its rulemaking that "[it] does not have sufficient data to conclude that 100% of all legal employees will correct their no-matches within the 93-day schedule set out in the rule," 73 Fed. Reg. at 63856, it follows that even fewer authorized employees would be able to correct their no-matches within the required timeframe if SSA changed its criteria for sending no-match letters, and as a result even greater numbers of authorized workers would lose their jobs.

DHS asserts in the preamble to the supplemental final rule that using no-match letters as an immigration enforcement tool is justified because SSA's current policy of sending no-match

40

letters only when an employer submits a wage report reflecting at least 11 workers with no-matches and when the total number of no-matches in a given wage report represents more than 0.5% of the employer's total Forms W-2 in the report reliably targets only employers with potentially significant problems with their employees' work authorization.  *See id*. at 63848. This explanation, however, is tenuous at best.  As an initial matter, SSA's current policy is not a reasonable proxy for unauthorized work because SSA did not select this policy based on weeding out employers with only de minimis inaccuracies, as DHS seems to imply.  *See id*.  Indeed, it was adopted by SSA to balance out efforts to improve the wage reporting process with available agency resources.  *See* SAR 1912 (SEIU cmt.).  SSA simply does not know the percentage of earnings reports in the ESF that reflects unauthorized work; nor does SSA know whether a particular earnings report relates to unauthorized work.[14]

But even assuming SSA's current criteria reliably or reasonably target only employers with potentially significant problems with their employees' work authorization, DHS acts arbitrarily and capriciously in relying, for its conclusions about the significance of no-match letters, upon criteria that are entirely in the discretion of SSA and, therefore, that could be changed at any time.  That is, even if the current criteria SSA use to trigger no-match letters may be correlated to unauthorized work, there is nothing in the rule preventing SSA from altering its criteria in the future, thereby rendering more tenuous the correlation between no-match letters and unauthorized work.

Moreover, DHS itself acknowledges in its supplemental rulemaking that "[t]he rule text is written in general terms to allow the safe harbor procedures to apply to notices that SSA may issue in the future."  73 Fed. Reg. at 63852.  And its own analysis indicates that SSA has changed its criteria in the past and that nothing prevents it from doing so again in the future.  *See*

---

[14] *See* AR 603 (GAO Report 06-458T, Social Security Numbers: Coordinated Approach to SSN Data Could Help Reduce Unauthorized Work (Feb. 16, 2006)) ("The ESF contains hundreds of millions of records, many unrelated to unauthorized work, making it difficult to use for targeting limited resources.  While the ESF may help identify some of the most egregious employers of unauthorized workers, in terms of poor earnings reports, its focus is not on unauthorized workers.  Our work has shown that most of the reinstatements from the file belong to U.S.-born

SAR 1710 (SEIA) ("SSA has used other criteria in the past and it is possible that these criteria will change in the future.  For this [] analysis, we will assume that SSA will continue to use the current criteria."); 73 Fed. Reg. at 63855 ("DHS recognizes that the impact on small entities could vary if SSA alters its matching processes or changes its criteria for issuing no-match letters.").

Many commenters raised this important aspect of the problem and criticized DHS's failure to consider the impact that a change in SSA policy could potentially have on small entities.[15]  In response, DHS stated that "the RFA does not require DHS to speculate about every contingency that could have some impact on small entities, such as the potential for another agency to exercise its discretion differently," and that because it was "unaware of any plans to change SSA's policies for issuing [employer] no-match letters, any attempt in the IRFA or [Final RFA] to analyze hypothetical changes in SSA policy would be mere speculation."  73 Fed. Reg. at 63855.  But SSA is not simply "another agency" whose policy changes may impact other agencies' policies and procedures.  SSA is the *only agency* that can trigger under the safe-harbor rule sending out no-match letters.  *See Burlington Truck Lines*, 371 U.S. at 174 (finding agency action arbitrary and capricious where agency did not "act with a discriminating awareness of the consequences of its action").  The fraction of employers with no-matches that receive no-match letters is strictly and exclusively determined by SSA's convenience.

Moreover, that SSA could change its criteria is not simply theoretical.  Indeed, as

citizens, not to unauthorized workers.").

[15] *See, e.g.*, SAR 1993 (Change to Win cmt.) (noting that DHS relies on assumption that SSA will continue with its current EDCOR criteria despite the fact that they may be changed at any time); SAR 1812 (U.S. Chamber of Commerce cmt.) (observing that SSA did not choose its EDCOR criteria based on employers with serious work authorization problems and that SSA could change its EDCOR criteria at any time); SAR 1839 (Belzer, *Fatal Defects*) ("[T]he fraction of employers with no-matches that receives either an EDCOR or an Employer DECOR letter is strictly determined by SSA's convenience); SAR 1845 (AFL-CIO cmt.) ("DHS acts arbitrarily and capriciously in relying for its conclusions about the significance of no-match letters upon criteria that are purely discretionary with SSA and, therefore, that could be changed at any time."); SAR 1911 (SEIU cmt.) (noting that SSA could change its EDCOR standard at any time); SAR 2006 (National Association of Home Builders cmt.) (noting that if SSA changes its criteria for EDCOR letters, DHS's "entire Impact Analysis is invalid").

referenced above, in the past SSA has sent no-match letters to employers regarding every single employee with an SSN discrepancy, *see* AR 498 (CRS Report – Social Security Benefits for Noncitizens: Current Policy and Legislation), and the evidence in the record actually shows that instead of limiting the number of no-match letters sent to employers, SSA wants to expand this program.[16]  *See* SAR 1813 (U.S. Chamber of Commerce cmt.).

Thus, because DHS relies for its conclusions about the significance of no-match letters upon criteria that could be changed at any time—causing major economic disruptions and undermining immigration enforcement—without regard to unauthorized work, this proffered rationale for the rule must also be rejected as arbitrary and capricious.

### C.    By Failing to Consider the Significant Effect the Rule Will Have on Tens of Thousands of Authorized Workers, DHS Acted Arbitrarily and Capriciously

The rule is also arbitrary and capricious for the independent reason that DHS failed to consider the real and significant impact the rule will have on tens of thousands of U.S. citizens and other authorized workers who will lose their jobs amidst a national economic crisis because of a no-match letter.  There is no reasoned explanation for why DHS did not consider this "important aspect of the problem" as required by *State Farm Mutual Auto. Ins. Co.*, 463 U.S. at 43, when an overwhelming number of commenters raised serious concerns about the rule's social and economic impact on authorized workers; DHS does not have sufficient data to conclude that all authorized workers will be able to correct their records within the 90-day schedule set out in the rule, *see* 73 Fed. Reg. at 63856; and, as this Court concluded in its preliminary injunction decision, the rule "will [] result in the termination of employment to lawfully employed workers," *AFL-CIO*, 552 F. Supp. 2d at 1005.  As already explained, DHS indeed assumes that as many as 70,000 authorized workers with no-matches will be forced into unemployment every year due to the rule.

Under the arbitrary and capricious standard, while an agency need not respond to every

---

[16] Indeed, even SSA's December 2008 OIG report indicates that SSA is dissatisfied with the EDCOR process and is reevaluating those procedures.  *See* Exh. A, Second RJN.

43

comment it receives, it cannot ignore known or common aspects of the rulemaking that are "specifically mentioned in the notice of hearings and comments received." *Int'l Ladies Garment Workers' Union*, 722 F.2d at 817.  An agency "must respond in a reasoned manner to explain how [it] resolved any significant problems raised by the comments, and to show that resolution led the agency to the ultimate rule." *Id.* at 818 (internal quotations and citations omitted).  Failure to do so "amounts to an artificial narrowing of options which is antithetical to reasoned decision-making." *Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1232 (9th Cir. 1993) (internal quotations and citations omitted).

DHS addresses the impact the rule will have on authorized workers by asserting the following: "To the extent that the employees referenced in these comments are authorized to work, the employees have an incentive to correct the no-match situation.  If such situation stands uncorrected the employees may not receive credit for their earnings."  72 Fed. Reg. at 45621; *see also* 73 Fed. Reg. at 63856 (same).  While this incentive may exist for employees, DHS's reference to it is entirely unresponsive to the serious concerns about the ability of SSA to resolve no-matches and ignores important aspects of the issue.  As a result, the rule must be set aside as arbitrary and capricious.

### 1.    Confusion Regarding Rule's Applicability

As briefly explained in the background section, SSA has a policy of sending employers a no-match letter when the W-2s they file result in no-matches for more than 10 employees, if they represent more than 0.5% of the W-2s submitted by that employer.  SAR 1811 (U.S. Chamber of Commerce cmt.).  This no-match letter listing multiple SSNs is known as an "EDCOR" letter.  However, SSA has a policy of also sending employers a letter for a *single* worker when SSA does not have a personal address for the worker.  *Id.*  This no-match letter is known as a "DECOR" letter.  Currently SSA sends out more DECOR letters every year than EDCOR letters to employers.  *See id.* ("EDCOR letters amount to about 140,000 a year); SAR 1471 (explaining that SSA sent employers 2 million DECOR letters in 2002 and 1.7 million DECOR letters in 2006).

44

1    Several commenters made DHS aware that nothing in the rule or guidance letter

2    explicitly limits the rule to EDCOR letters and, as a result, that the rule is likely to have an even

3    broader impact on authorized workers than DHS cares to admit.[17]  Commenters specifically

4    explained that, without explicit instructions in the rule or guidance letter that the rule applies

5    only to EDCOR letters, employers will treat *all* no-match letters from SSA—both EDCOR and

6    DECOR—the same way, which would obviously result in a greater impact on authorized

7    workers.  As a practical matter, given the high risk of potential civil and criminal liability

8    imposed by the rule, there is no reason to believe that employers will act any other way.

9    DHS in fact acknowledges in the preamble to the supplemental final rule that "the rule

10    text does not explicitly identify the 'EDCOR' letter from SSA . . . as the notice from SSA to

11    which the safe harbor procedures apply," 73 Fed. Reg. at 63852, but then asserts that "the

12    reference to *plural* no-matches and to W-2 reports" in the rule somehow distinguishes the

13    "EDCOR" letter (addressed to employers that list multiple no-matches) from the "DECOR"

14    letter (addressed to a single employee or to an employer regarding a single no-match).  *Id.*

15    It is insufficient, however, for DHS to simply assume that employers that are not experts

16    in SSA correspondence would note or respond to such subtle guidance, particularly when the

17    consequences of the employer's failure to correctly interpret the guidance letter is such a severe

18    _____

19    [17] *See* SAR 1865-66 (Essential Worker Immigration Coalition cmt.) (noting that DHS's estimates do not take into account firings as a result of the DECOR letters and that the guidance letter does not distinguish between EDCOR and DECOR letters); SAR 1811 (U.S. Chamber of Commerce

20    cmt.) (noting that the supplemental rule nowhere states that it does not apply to DECOR letters and that the Chamber has received inquiries from many employers about the application of the proposed rule to DECOR letters); *id.* at 1812 ("There is no question that given the high risk

21    imposed by the no-match regulation . . . employers [will] go back to treating all no-match letters from SSA – both EDCOR and DECOR – alike to avoid any potential liability."); SAR 1930

22    (Low Wage Immigrant Worker Coalition cmt.) (noting that nothing in language of rule limits it to EDCOR letters); SAR 1835, 1837-39 (Richard R. Belzer, *Fatal Defects in the Design of DHS'*

23    *Safe-Harbor Rule Interim Regulatory Flexibility Analysis*) (concluding that the language of the safe harbor rule appears to apply to both EDCOR and DECOR letters, creating greater impact on

24    authorized workers); SAR 1471 (Immigration Policy Center, *Immigration Policy in Focus:  The Social Security Administration No-Match Program:  Inefficient, Ineffective and Costly*) (noting

25    that "estimates . . . only take into account the number of workers that will be fired in response to the EDCOR no-match letter . . . .  The estimates do not reflect the number of workers that may

26    be fired in response to the DECOR no-match letter").  *See also* SAR 2013 (National Council of Chain Restaurants cmt.) (expressing confusion about how to respond to no-match letters that are

27

28    45

increase in the negative impact of the rule.  *See Burlington Truck Lines v. United States*, 371

U.S. at 174 (agency must "act with a discriminating awareness of the consequences of its

action").  This is particularly the case when employers may be receiving both types of letters

during the same timeframe.  Indeed, the only possible consequence of DHS's failure to provide

clarification on this issue is to create a false impression among employers that all employees

listed in any type of no-match letter must be re-verified, and this of course is contrary to the rule

and, therefore, arbitrary and capricious.

### 2.    Social and Economic Costs to Workers

Many commenters also expressed serious concerns about the significant social and

economic costs that the rule will impose on authorized workers, including loss of wages and

unemployment.[18]  As already noted, DHS itself acknowledges that tens of thousands of

authorized workers will be impacted by the rule.  According to one study in the administrative

record, the estimated aggregate social welfare loss to authorized workers suffering

unemployment as a result of the rule could be between $8 billion and $37 billion per year.  *See*

SAR 1815, 1833 (U.S. Chamber of Commerce cmt.) (discussing and including study by Richard

B. Belzer, Ph.D.).

---

addressed to employee but come to employer's place of business).
[18] *See* SAR 1815 (U.S. Chamberof Commerce cmt.) (discussing and including study by Richard B. Belzer, Ph.D. regarding social and monetary costs the rule would impose on authorized workers); SAR 1859 (Essential Worker Immigration Coalition cmt.) (same); SAR 1930 (Low-Wage Immigrant Worker Coalition cmt.) (same); SAR 1865-66 (Essential Worker Immigration Coalition cmt.) (predicting that "far more than 70,000" authorized workers will be terminated because employees apply the safe-harbor rule to EDCOR and DECOR letters alike); SAR 1931 (Low-Wage Immigrant Worker Coalition cmt.) (same); SAR 1914 (Service Employees International Union cmt.) (identifies costs, including lost productivity and lost wages,  incurred when authorized employees must take time off from work to travel to SSA offices and attempt to correct SSA records; SAR 1966 (CLINIC cmt.) (same); SAR 1947 (Ballard Spahr Andrews & Ingersoll cmt.) (providing an example of a member of the State Bar of Arizona who is an authorized worker, erroneously categorized as a no-match, and who was unable to resolve her no-match status, resulting in her earnings between 2005 and 2007 remaining unallocated); SAR 3402 (Working Hands Legal Clinic cmt.) (explaining that an authorized worker who was able to resolve a no-match error nonetheless lost his job because the employer "refused to accept the information stating that 'it's just too risky'"); SAR 1825-26 (U.S. Chamberof Commerce cmt.) (identifies costs authorized workers will face in undertaking time-consuming and expensive steps to correct records with SSA).

1    In response to these comments, DHS asserts that the RFA does not require it to consider

2    costs to employees.  *See* 73 Fed. Reg. at 63854.  While this may or may not be accurate, there is

3    no question that DHS could have considered this "important aspect" of the rule's impact under

4    another analysis.  *State Farm*, 463 U.S. at 43.  Indeed, DHS acknowledges in the preamble that

5    costs borne by employees "could be considered under other analyses and reviews that DHS and

6    other agencies may conduct in reaching decisions on regulatory matters," but then fails to

7    explain why it decided not to consider this relevant factor.  73 Fed. Reg. at 63854.  This was

8    arbitrary and capricious agency action given the undisputed evidence that the rule will impact

9    tens of thousands of authorized workers and given the devastating estimated social welfare costs

10   associated with the rule.  *See Mt. Diablo Hosp.*, 3 F.3d at 1232 (explaining that an agency

11   "ignoring relevant factors" amounts to an "artificial narrowing of options which is antithetical to

12   reasoned decisionmaking"); *cf. Port of Seattle, Wash. v. FERC*, 499 F.3d 1016, 1035 (9th Cir.

13   2007) (stating that "an agency must account for evidence in the record that may dispute the

14   agency's findings").

15          Moreover, DHS should have re-evaluated the rule's economic impact after the historic

16   and catastrophic economic changes that occurred during September and October 2008, before the

17   supplemental final rule was published.  *See* Business Plaintiff-Intervenors' MSJ, at 21 (citing

18   caselaw for the proposition that it is axiomatic that a rule speaks as of the date it is issued, and

19   that the agency is required to evaluate changed circumstances between the time a rule is

20   proposed and the time it is finalized).  The adverse impacts of the rule are likely to be even

21   greater in the context of the current recession.  *See, e.g.,* SAR 1962 (MALDEF cmt.).  DHS's

22   action is arbitrary and capricious for this reason as well.

23                     **3.      Discrimination and Unlawful Termination**

24          Hundreds of commenters expressed concern as well that the rule may lead employers to

25   engage in discriminatory and otherwise unlawful firings of authorized workers.[19]  In particular,

26

27   _____

[19] *See, e.g.*, AR 1095-96 (U.S. Equal Employment Opportunity Commission cmt.) (expressing
concern that the rule may lead employers "simply to terminate employees upon receipt of no-

28

many of the comments provided specific examples of firings and other discriminatory treatment based on national origin as a result of no-match letters in the past.[20]  Many other comments addressed how the rule would exacerbate the problem of some employers using no-match letters to undermine labor campaigns, retaliate against workers who assert their labor rights or as an excuse to terminate higher-paid, senior employees.[21]

---

match letters"); AR 1430 (National Roofing Contractors Association cmt.) (predicting that some employers will engage in "ethnic profiling" to avoid liability under the new rule); AR 1830-32 (Greater Boston Legal Services cmt.); AR 1837-38 (Pennsylvania Immigration and Citizenship Coalition cmt.); AR 1953 (Friends of Farmworkers, Inc. cmt.) (same); SAR 3500 (Edward Olivos cmt.) (asserting that the rule will "legitimize discrimination at work based on race and immigrant status"); SAR 3527 (ACLU and ACLU-NC cmt.) (expressing concern that rule will promote more discrimination based on perceived immigration status at the hiring stage); SAR 1384 (Stanley Mailman, "Social Security Mismatch Letters Jeopardize Jobs") (noting NILC concern that "the program gives employers an incentive to turn away job applicants with 'foreign sounding' names"); SAR 3603 (Dairy Producers of New Mexico cmt.) ("The efforts of this rule have the actual effect of targeting all Hispanic workers whether authorized for employment or not."); SAR 3608 (Asian Pacific American Legal Center cmt.) (arguing that there is substantial likelihood that employers will fire Asian Americans or "refuse to hire Asian Americans in the first place to avoid the *perceived* risk that the employee is more likely to be undocumented"); SAR 3619 (MALDEF cmt.) ("[M]any employers will simply choose to treat potential employees differently . . . based upon national origin or foreign sounding names"); SAR 1965 (Catholic Legal Immigration Network cmt.) (same).

[20] *See, e.g.*, SAR 1931-33 (Low Wage Immigrant Worker Coalition cmt.) (discussing five specific cases involving discrimination as a result of the no-match rule, including a case in which an employer used no-match letters to fire only Guatemalan workers); *id.* at 1939 (discussing additional examples, including Honduran national who has filed a complaint with the OSC and workers at a manufacturing plant in Chicago who allege discriminatory firings); SAR 3144 (CASA of Maryland, Inc.) (after receiving no-match letter, employer fired only the Nicaraguan workers who appeared in the letter);  SAR 1396-97 (The New Standard, *Employer's Use "No-Match" Social Security Letters to Fire Immigrants*) (describing two Applebee's employees who allege that they were fired based on their national origin after their names appeared in a no-match letter); AR 1170 (Low Wage Immigrant Worker Coalition cmt.) (describing case of Latino workers who were fired after appearing on a no-match letter and statement of former supervisor that he was told by management that "wetbacks" do not have any rights); AR 339 (Mehta Study) (OSC data suggests that "no-match letters might be contributing to an increase in national-origin discrimination").

[21] *See, e.g.,* SAR 1965 (CLINIC cmt.) (explaining that the rule will allow unscrupulous employers to undermine labor and employment rights by retaliating against worker organizing, erasing benefits associated with seniority, and defeating workplace-related claims); SAR 2192 (National Council of La Raza cmt.) (same); SAR 2237-38 (Immigrant Legal Advocacy Project cmt.) (same); SAR 2041 (Friends Committee on National Legislation cmt.) (describing how the rule enables employers to retaliate against workers who have been injured on the job or who complain of labor violations); SAR 2051 (Valentin cmt.) (same); SAR 2124 (United Electrical, Radio, & Machine Workers of America Local 1421 cmt.) (same); SAR 2157 (Farm Labor Organizing Committee cmt.) (same); SAR 2161 (Melgarejo cmt.) (same); SAR 2168 (Quintano cmt.) (same); SAR 2174 (Dean cmt.) (same); SAR 2180 (Erickson cmt.) (same); SAR 2182 (Wenger cmt.) (same); SAR 2185 (Harris cmt.) (same); SAR 2187 (Fried cmt.) (same); SAR

48

1    Despite all the comments on this issue, DHS failed to adequately address and resolve the

2    significant problems raised by these numerous comments and therefore to provide a reasoned

3    explanation for adopting the rule.  *See Int'l Ladies' Garment Workers' Union*, 722 F.2d at 818

4    (agency must show that "resolution [of significant problems raised by the comments] led the

5    agency to the ultimate rule").  Most critically, DHS did not thoughtfully consider the serious

6    concern raised by commenters that in the past employers have discriminated against and

7    unlawfully fired certain workers because of no-match letters, and therefore that the rule will

8    serve to *exacerbate* such illegal practices because no-match letters will now come with high-

9    stakes consequences.  Indeed, given the high risk of liability under IRCA that the rule creates, it

10   is reasonable to assume that employers will now have a greater incentive to fire first and ask

11   questions later.

12       DHS addresses this issue only by explaining in the preamble to the original final rule that

13   concerns over unwarranted firings "appear to be directed at the issuance of SSA no-match letters

14   themselves, rather than the application of th[e] safe-harbor procedure," and that "DHS will not

15   be directing the SSA to issue (or not issue) a no-match letter to an employer."  72 Fed. Reg. at

16   45621; 73 Fed. Reg. at 63852.  But this response is entirely unsatisfying and inadequate because

17   it does not address the ultimate concern that the rule will *exacerbate* the problem, not per se

18
_____

19   2188 (United Workers Association cmt.) (same); SAR 2195 (Finley cmt.) (same); SAR 2198
     (Baxt cmt.) (same); SAR 2204 (Wu cmt.) (same); SAR 2208 (Madrigal cmt.) (same); SAR 2219
20   (Bacon cmt.) (same); SAR 2220 (De Pablo cmt.) (same); SAR 2225 (Boehr cmt.) (same); SAR
     2230 (Arndt cmt.) (same); SAR 2234 (Wilde cmt.) (same); SAR 2247 (Garner cmt.) (same);
21   SAR 2255 (Jaeckle cmt.) (same); SAR 2256 (California Partnership cmt.) (same); SAR 2259
     (Maine Labor Council for Latin American Advancement cmt.) (same); SAR 2282 (Rural
22   Organizing Project cmt.) (same); SAR 2294 (Brown cmt.) (same); SAR 2297 (Benesh cmt.)
     (same); SAR 2299 (del Rosario cmt.) (same); SAR 2300 (Watson cmt.) (same); SAR 2303
23   (Washtenaw County Workers Center cmt.) (same); SAR 2304 (Durliat cmt.) (same); SAR 2306
     (Hernandez cmt.) (same); SAR 2074-75  (Interfaith Worker Justice cmt.) (describing how some
24   employers take out old no-match letters from their files when employees lodge a labor complaint
     or engage in organizing); SAR 2076 (Interfaith Worker Justice cmt.) (providing an example of a
25   company which, upon receiving no-match letters, fired members of the union organizing
     committee and other employees sympathetic to the union and made promises for higher wages
26   and other improvements in violation of the National Labor Relations Act);  SAR 2099-2101
     (Central Florida Jobs with Justice cmt.) (describing their experience with employers who use no-
27   match letters to interfere with workers' rights and how the rule will exacerbate this problem).

28
_____
CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' AND PLAINTIFF-
INTERVENORS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT AND TO VACATE PRELIMINARY INJUNCTION, Case No. C07-4472 CRB

1   create it.

2   As explained in Part I *supra*, in adopting IRCA, Congress struck a delicate balance

3   between subjecting employers to criminal and civil liability for knowingly hiring and continuing

4   to employ unauthorized workers and protecting lawful workers whose work authorization had

5   been questioned or who lacked adequate documentation from discrimination based on national

6   origin engendered by IRCA's employer sanctions.  Congress's concerns turned out to be well

7   founded.  IRCA required the Government Accountability Office to report to Congress on this

8   issue, and the GAO reported that employer sanctions were responsible for "a widespread pattern

9   of discrimination."  RJN, Docket No. 93, Exh. L at 6.  GAO estimated that "227,000 employers .

10  . . began a practice, as a result of IRCA, not to hire job applicants whose foreign appearance or

11  accent led them to suspect they might be unauthorized aliens . . . [and] an estimated 346,000

12  employers . . . applied IRCA's verification system only to persons who had a 'foreign'

13  appearance or accent."  *Id*. at 5.  GAO also estimated that "an additional 43,000 employers . . .

14  began hiring only persons born in the United States or not hiring persons with temporary work

15  eligibility documents.  These practices are illegal and can harm people, particularly those of

16  Hispanic or Asian origin."  *Id*. at 7.  In total, GAO found that nearly 20 percent of employers

17  surveyed "began one or more discriminatory practices as a result of the law."  *Id*.

18  Thus, "while it is true that "[a]n agency need not address every conceivable issue or

19  alternative, no matter how remote or insignificant," *Center for Auto Safety v. Peck*, 751 F.2d

20  1336, 1356 n.15 (D.C. Cir. 1985), in light of the significant comments on this issue and

21  Congress's concern in IRCA with protecting lawful workers against discrimination, DHS acted

22  arbitrarily and capriciously by failing to seriously consider the fact that the rule may exacerbate

23  discriminatory and otherwise unlawful firings.  Indeed, as the record shows, foreign-born

24  workers are disproportionately likely to appear in no-match letters due to language barriers,

25  naming conventions, transliteration, and failure to update immigration status, and therefore may

26  be at a greater risk of being discriminated against by employers if they are listed in a no-match

27

28

letter.[22]

### 4.    Burden on SSA and Other Impediments to Correcting Records in Time

Lastly, DHS also failed to adequately consider the serious impediments workers are likely to encounter in attempting to resolve their no-matches, which is an obvious and "important aspect of the problem" that merited thoughtful consideration by DHS.  *See State Farm*, 463 U.S. at 43.  In particular, several commenters explained that DHS did not consider the administrative burden and strain that the rule would impose on SSA offices across the country and, therefore, what actual effect that will have on authorized workers being able to resolve their no-matches within the 90-day timeframe.  DHS asserted in the preamble to the August 2007 Rule only that it believed any costs on DHS and SSA that the rule would impose "[could] be resolved through the regular fiscal budgeting for the Executive Branch."  72 Fed. Reg. at 45622.  But such a generalized and conclusory statement does not justify DHS's failure to address the specific burdens that SSA will likely face in resolving no-matches within the rule's 90-day deadline.  *See Mt. Diablo Hosp.*, 3 F.3d at 1234 (explaining that an agency's explanation for a particular choice must "enable a reviewing court to see what major issues of policy were ventilated by the . . . proceedings and why the agency reacted to them the way it did").

---

[22] *See, e.g.*, AR 320 (Mehta Study) ("Immigrants are more likely to be identified in no-match letters because they often use compound, maternal or paternal last names; have commonly misspelled names; and often inconsistently spell their names on various legal documents."); SAR 3527 (ACLU and ACLU-NC cmt.) (authorized workers with names that require transliteration from another alphabet or who do not speak English are more likely to appear in no-match letters); SAR 3607 (Asian Pacific American Legal Center) (describing Asian naming traditions and transliteration issues that are likely to lead to no-match letters); SAR 2433 (Asian Law Caucus cmt.) (same); SAR 2304 (Guadalupe Center cmt.) (frequently they see no-matches based on Spanish naming conventions); SAR 2747 (California Rural Legal Assistance cmt.) (in their experience, errors in SSA information frequently affect Latinos and non-English speakers); SAR 3120 (National Automobile Dealers Association cmt.) (same); *See also* SAR 173 (Congressional Testimony of Greg Heineman) (7% of recently naturalized citizens have not updated their NUMIDENT records); SAR 232 (Congressional Testimony of Steven Schaeffer of the Social Security Administration Office of the Inspector General) (the error rate in SSA data is higher for foreign-born U.S. citizens); SAR 239 (Congressional Testimony of Tyler Moran) (errors in SSA records "disproportionately affect[] immigrants"); SAR 1016 (Westat, Interim Findings of the Web-Based Basic Pilot Evaluation) (there is an "unacceptably high tentative nonconfirmation rate for foreign-born U.S. citizens); SAR 1201-02, *id*. (19% of the erroneous non-confirmations

51

The record is replete with evidence indicating that SSA may not be in a position to provide the additional services called for in the supplemental final rule, and that requiring SSA to provide these services would increase the agency's backlogs, causing the agency to fall further behind.[23]  Indeed, DHS acknowledges no commitment by SSA that it can resolve all no-matches within the 90-day deadline and, as already explained, assumes that as many as 70,000 authorized workers could lose their jobs for failure to resolve a no-match.

The record is also replete with comments showing that, even if the rule does not exacerbate SSA's bureaucratic delays, it will already be difficult for certain workers to correct their records within the 90-day timeframe due to long work days, unavailability of records, lack of transportation, and language and cultural barriers.[24]  *See, e.g.*, SAR 3151 (Chicago Lawyers' Committee for Civil Rights under Law cmt.) (explaining that minority workers and workers who live in rural or suburban areas will experience difficulty in meeting the 90-day deadline due to

---

for foreign-born U.S. citizens were a result of invalid SSNs).

[23] *See, e.g.*, SAR 212 (Congressional Testimony of Steven Schaeffer, Asst. Inspector General for Office of Audit, SSA OIG) ("If even a portion of the estimated numberholders whose NUMIDENT records contained discrepancies were required to visit an SSA office to correct their information, the Agency's workload may significantly increase"); SAR 232 (Hearing on Employment Eligibility Verification Systems) (noting SSA processing time overall—not specific to no-match—taking over 900 days); SAR 169-70 (Congressional Testimony of Barbara Kennelly) (noting that phone calls at SSA already go unanswered, lines at local SSA offices are increasing, and some local SSA offices are being closed and SSA's administrative budget has been severely underfunded).  *See also* SAR 175-76, 179 (Congressional Testimony of Greg Heineman) (51% of callers to SSA receive a busy signal, wait times at field offices are often two to four hours, and 19 field offices closed since 2006); *id* ("SSA's service delivery system is already stressed to the breaking point"); SAR 239 (Congressional Testimony of Tyler Moran) (wait times are currently "two to three hours, with some over four hours"); SAR 3157 (South Asian Americans Leading Together cmt.) (noting that SSA is overburdened with large backlog of disability cases); SAR 3185 (Asian American Institute cmt.) (SSA is overburdened, getting 60 million calls a year); SAR 1473 (Immigration Policy Center, *Immigration Policy in Focus*) (SSA is overburdened by increasing numbers of retirees, it has lost field offices and staff, and many employees are retiring); SAR 1898-2000 (AILA cmt.) (SSA underfunded and already overburdened by E-verify).

[24] SAR 1814, 1823-25 (U.S. Chamber of Commerce cmt.) (describing the delays caused when workers must make in-person visits to local government offices to obtain certified birth certificates, marriage licenses, divorce decrees, and other documents); SAR 1850 (Davis, Cowell, & Bowe cmt.) (quoting Kenneth S. Apfel, former head of SSA, as saying that it "may take considerably in excess of ninety days to resolve any given mismatched earnings report, even if the worker makes prompt efforts to resolve the discrepancy" due to SSA's strained staffing levels, bureaucratic delays, language barriers, and other factors).

1  lower rates of private-car ownership and fewer personal and vacation days in low-wage jobs);

2  SAR 3181 (New York Farm Bureau cmt.) (describing the particular hardships seasonal workers

3  face in taking days off to resolve no-match discrepancies because their short period of

4  employment must serve as their income for the entire year); SAR 3206 (Society for Human

5  Resources Management cmt.) (noting that workers may require more than 90 days to resolve no-

6  match discrepancies due to job or family demands and the need to obtain evidence to support the

7  SSA database correction); SAR 1850 (UNITE HERE cmt.) (explaining how those who do not

8  speak English are likely to encounter particular difficulty in resolving no-matches).[25]

9       DHS's response to this particular aspect of the problem was simply that the 90-day

10  deadline is reasonable because, without a deadline, employers will not be able to confirm

11  whether their employees are in fact authorized to work.  73 Fed. Reg. at 63864.  But this

12  reasoning is narrowly focused on the effect of the timeframe on employers, not employees.

13  Dozens of employers and other groups requested that the 90-day period be made longer because

14  it is unrealistic to assume that all workers will be able to resolve discrepancies with SSA within

15  that period of time.[26]  Moreover, DHS arbitrarily dismissed this concern by asserting, without

16

17  ———————————————————

18  [25] *See also* SAR 3230 (Associated Builders and Contractors, Inc. cmt.) (construction workers
    particularly likely to have difficulty resolving no-matches within 90 days); SAR 3265-66
19  (American Nursery and Landscape Association cmt.) (noting that, because of seasonal hiring
    needs, workers in landscaping will find it difficult to correct a no-match within 90 days); SAR
20  3278 (Valderama cmt.) (describing the difficulties employees face in obtaining information from
    the government and correcting information in government databases); SAR 3280 (Eber cmt.)
21  (same); SAR 3282 (Rivera cmt.) (same); SAR 3284 (Ortiz cmt.) (same); SAR 3287 (Adams
    cmt.) (same); SAR 3309 (Yepez cmt.) (same); SAR 3311 (Torres cmt.) (same); SAR 3313
22  (Brook cmt.) (same); SAR 3317 (Jaramillo cmt.) (same); SAR 3315 (Martinez cmt.) (same);
    SAR 3319-71 (various individual commenters) (same); SAR 3292 (California Professional
23  Association of Specialty Contractors cmt.) (identifying the time and distance concerns that may
    prevent employees from correcting the no-match within 90 days); SAR 3576 (Filipinos for
24  Affirmative Action cmt.) (same); SAR 3584 (Society of American Florists cmt.) (same); SAR
    3303 (National Council of Agricultural Employers cmt.) (estimating that job losses due to
25  terminations for failure to meet the 90-day correction period could exceed 160,000 per year);
    SAR 3525 (ACLU and ACLU-NC cmt.) (stating that SSA field offices receive over 60 million
26  phone calls annually and more than half of the callers receive a busy signal and explaining that
    SSA itself has acknowledged that the 90-day period is insufficient to resolve mismatches for
    certain workers).

27  [26] *See, e.g.*, SAR 3206 (Society for Human Resource Management cmt.); SAR 3215 (American
    Trucking Association cmt.); SAR 3303 (National Council of Agricultural Employers cmt.); SAR
28
    53

1    any basis, that it believed that only a small segment of workers in the end will have to visit SSA

2    offices to resolve their no-matches, because most employers will be able to resolve them

3    internally.  73 Fed. Reg. at 63856.  This assertion is simply unsupported by any evidence in the

4    record and thus unavailing.  *See Oxy USA, Inc.*, 64 F.3d at 693 (D.C. Cir. 1995) (agency action

5    arbitrary and capricious when no data to support it).

6          Thus, given the overwhelming array of comments demonstrating the serious and real

7    impediments that could prevent workers from correcting their records in time, it was arbitrary

8    and capricious for DHS not to have considered this issue more carefully.  In particular, there is

9    no reason for DHS not to have developed reasonable alternatives to the 90-day deadline, or at

10   least to have considered specific ways to mitigate the burdens on SSA and workers even within

11   this required timeframe, in light of the above concerns.  *See Int'l Ladies' Garment Workers'*

12   *Union*, 722 F.2d at 815-18.  In addition, given that due process violations are likely to result

13   from employers terminating workers who are unable to resolve their no-matches within the 90-

14   day deadline set forth in the rule, failure to adequately consider viable alternatives to the 90-day

15   deadline renders the agency's decision-making even more arbitrary and capricious.  *See infra*,

16   Part IV.  Although DHS briefly addresses and dismisses some alternatives, its consideration of

17   those alternatives ultimately was hampered by its failure to grasp the obstacles posed by SSA's

18   administrative limitations.

19         In sum, because DHS failed to "respond in a reasoned manner to explain how [it]

20   resolved significant problems raised by the comments [regarding the impact of the rule on

21   authorized workers], and to show that resolution led the agency to the ultimate rule," *Int'l*

22   *Ladies' Garment Workers' Union*, 722 F.2d at 818, the rule must be set aside as arbitrary and

23   capricious.

24   _____

25   3476 (Dairy Producers of New Mexico cmt.); SAR 1851 (UNITE HERE cmt.); SAR 1922
     (Western Growers cmt.); SAR 1971 (Small Business Administration Office of Advocacy cmt.);
26   SAR 2001 (American Staffing Association cmt.); SAR 2595 (American Hotel and Lodging
     Association cmt.); SAR 3056 (North Carolina Farm Bureau Federation cmt.); SAR 2271 (United
27   States Hispanic Chamber of Commerce cmt.); SAR 2636 (Greater Washington Chamber of
     Commerce cmt.); SAR, 2660 (Colorado Restaurant Association cmt.); SAR 3028 (American

28
                                                    54

1

2

**III.    The SSA Does Not Have Statutory Authority to Determine When Employers Must Re-Verify or Terminate Employees**

3

4

5

6

7

8

Regardless of whether the supplemental final rule is otherwise lawful, the DHS/SSA plan to send DHS guidance along with no-match letters and to revise the no-match letters themselves to instruct employers to comply with the rule effectively permits SSA not only to coerce compliance with immigration laws but to determine when employers must re-verify or terminate employees under the immigration laws.  This planned action is wholly outside of SSA's statutory authority and must be invalidated as *ultra vires*.

9

10

11

12

This Court preliminarily determined that Plaintiffs were unlikely to succeed on their claim against SSA because "SSA does not exceed the bounds of its enabling statute by referring employers to a document produced by another agency."  552 F. Supp. 2d at 1011.  Plaintiffs do not contend that SSA may not "refer" individuals to documents produced by another agency.

13

14

15

16

17

18

19

20

21

22

23

Rather, Plaintiffs contend that SSA's plan goes much further than simply "referring." SSA plans to affirmatively expend its resources to send the DHS insert letter along with its no-match letters.  Further, SSA proposes to revise the no-match letter to instruct employers that "[they] *should* follow the instructions contained in . . . the attached letter from the Department of Homeland Security," and "*should not* ignore this letter and do nothing.  That could . . . expose you to liability under immigration law."  RJN, Exh. E (model 2007 no-match letter) (emphasis added).[27]  SSA thus specifically instructs employers to take action in response to DHS's letter or risk legal consequences.  The practical effect of SSA's letter is not simply to make employers aware of DHS's guidance, but to use the SSA's authority to increase the likelihood that employers will re-verify and terminate no-match employees.  *Cf. AFL-CIO*, 552 F. Supp. 2d at 1010 (threats of civil and criminal liability on receipt of a no-match letter "will have massive

24

25

26

27

Horse Council cmt.); SAR 2016 (National Restaurant Association cmt.).

[27] Despite at least one request from a commenter to the supplemental proposed rule, *see* SAR 1913 (SEIU cmt.), Defendants have not provided an updated version of the revised no-match letter that will accompany the DHS insert.  We can only assume, then, that SSA has not abandoned its plan to send the revised letter it provided in 2007 in which it instructs employers that they "should" follow the DHS guidance.

28

1    ramifications for how employers treat the receipt of no-match letters"); *Chamber of Commerce v.*

2    *Dept. of Labor*, 174 F.3d 206, 210 (D.C. Cir. 1999) (whether an agency's actions create new

3    legal obligations is judged by their "practical" effect).

4        Moreover, SSA alone determines when and under what criteria no-match letters are sent

5    – and therefore SSA has the sole ability to trigger the operation of the rule.  DHS has effectively

6    delegated to SSA the authority to determine when an employer is required to re-verify or

7    terminate an employee in order to comply with the immigration laws.

8        This active involvement in enforcement of immigration laws bears no relationship to the

9    purposes for which SSA was established.  Federal agencies are purely "creature[s] of statute,"

10    and they have no authority beyond what Congress has conferred.  *Michigan v. EPA*, 268 F.3d

11    1075, 1081 (D.C. Cir. 2001); *see also Gorbach v. Reno*, 219 F.3d 1087, 1093, 1099 (9th Cir.

12    2000) (en banc) (setting aside agency action that exceeded agency's statutory authority).

13        Congress established the SSA "as an independent agency" to "administer the old-age,

14    survivors, and disability insurance program . . . and the supplemental security income

15    program."  42 U.S.C. § 901.  Congress has also granted SSA authority to process tax reports,

16    but that authority is specifically limited to the use of tax information returns for the purposes of

17    administering social security benefits. The Social Security Act provides that "[t]he Secretary of

18    the Treasury shall make available information returns . . . to the Commissioner of Social

19    Security *for the purposes of* this subchapter and subchapter XI of this chapter," both of which

20    concern social security benefits.  42 U.S.C. § 432.  SSA thus has no authority to determine

21    when employers must re-verify or terminate employees or to coerce compliance with

22    immigration laws.  *Michigan*, 268 F.3d at 1083 (noting that the provision granting the EPA

23    authority to administer a program did "not speak of underlying, residual, or even default EPA

24    jurisdiction, authority, or power" and the court would therefore not presume that EPA power

25    existed outside of the situations specifically listed).

26        It bears emphasis that Congress has considered and so far declined to provide SSA the

27    authority to do precisely what it proposes to do here.  The REAL GUEST Act of 2005 would

28

56

have required the Commissioner of Social Security to notify employers of employees'

mismatched Social Security numbers and "instruct employers to notify listed employees that they

have 10 business days to correct the mismatch with the Social Security Administration or the

employer will be required to terminate their employment."  H.R. 3333, 109th Cong., § 224(a)

(2005).   Bills introduced in the past Congress would also have permitted the SSA to instruct

employers to terminate employees with no-matches.  *See, e.g.*, S. 2368, 110th Cong., § 202

(2007) (requiring SSA to send no-match letters informing employer to notify employees and to

terminate employees if they cannot correct the mismatch within ten days); H.R. 6789, 110th

Cong., § 602(d) (2008) (same but permitting 30 days).[28]

That Congress would reserve to itself the decision whether and when the SSA may

engage in immigration enforcement action is appropriate.  Whether to use the tax reporting

system to enforce the immigration laws presents significant policy concerns because it may

reduce the ability of the SSA to perform the functions it is currently authorized to perform and

decrease compliance with the tax laws.  The Commissioner of SSA has acknowledged that

extending SSA's authority to include tax or immigration enforcement "would take resources

away from SSA's primary mission and could adversely affect public trust and confidence in the

program."  SAR 81 (Congressional Testimony of James B. Lockhart, Commissioner of the

Social Security Administration); *see also id.* at 83 ("Congress would want to carefully consider

the impact of such a change on SSA priorities and costs.").  Unless and until Congress addresses

these issues for itself and grants SSA the authority to use no-match letters to coerce compliance

with the immigration laws, SSA's actions are invalid.

---

[28] *See also, e.g.*, H.R. 138, 110th Cong., § 3 (2007) (requiring employers receiving no-match letters to re-verify employee's work authorization); H.R. 2954, 110th Cong., § 313 (2007) (same); S. 1984 110th Cong., § 256 (2007) (amending 42 U.S.C. § 405(c)(2) to require SSA to "establish a reliable, secure method" to compare name and social security information provided by employee to SSA records for purpose of establishing work authorization).

In addition, when Congress decided to allow DHS limited access to certain information collected by SSA, it expressly granted such access.  *See* 8 U.S.C. § 1360(c)(2) (directing SSA to provide DHS with the "Nonwork Alien File," which contains the records of earnings reported on Forms W-2 using a specific series of SSNs issued to aliens who lack work authorization).

57

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.    The Supplemental Final Rule is Government Action That Would Unconstitutionally Deprive Employees, Without Due Process of Law, of the Right to Continue Their Employment**

Quite apart from its other deficiencies, the supplemental final rule would, if it took effect, deprive thousands of workers of their constitutional due process rights.  Implementation of the rule must be enjoined for this reason as well.  The supplemental final rule would effectively require employers, under threat of criminal and civil liability, to discharge employees who are unable to resolve no-match discrepancies with the SSA within the rule's arbitrary deadline.  DHS has promulgated the rule on the assumption that this will be the result for at least 15,729 and perhaps as many as 70,781 employees per year *who in fact are legally authorized to work* in the United States.  Because the governmental action taken pursuant to the supplemental final rule coerces employers to take this action, these terminations of fully authorized workers— pursuant to an arbitrarily established deadline and without the provision of a constitutionally sufficient hearing—are attributable to the government and constitute a violation of the Due Process Clause of the Fifth Amendment.

There is no dispute that, if the supplemental final rule is permitted to take effect, many thousands of employees who are fully authorized to work in the United States will be erroneously discharged from their employment because of their inability to obtain a resolution of the no-match issue within the arbitrary 90-day deadline.  *See supra*, Part II.C.4.  On DHS's own assumptions, implementation of the supplemental final rule will result in the erroneous termination of up to 70,781 authorized workers per year.  Indeed, this Court has already found that, "[a]s the SSA itself concedes, the agency will not be able to resolve *all* mismatches—even if the mismatch is the result of SSA error—within the safe harbor's 90-day window," and "[a]ccordingly, there can be no doubt" that some employees, "though authorized, will be fired pursuant to the safe harbor provision because they cannot resolve the discrepancy within 90 days."  *AFL-CIO*, 552 F. Supp. 2d at 1014.  The government's summary judgment brief does not

58

take issue with this finding.  *See supra*, Part II.B.1.

It is precisely the function of the Due Process Clause to prevent such erroneous administrative determinations with the resulting "mistaken or unjustified deprivation of life, liberty, or property."  *Carey v. Piphus*, 435 U.S. 247, 259 (1978).  Among the property rights so safeguarded is, as the Supreme Court has long held, "[t]he right to earn a livelihood and to continue in employment[.]"  *Truax v. Raich*, 239 U.S. 33, 38 (1915); *see also id.* at 41 ("[T]he right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure.").

The Due Process Clause requires that a deprivation of the property interest in retaining employment must "be preceded by notice and opportunity for hearing appropriate to the nature of the case."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).  There is no need to consider in any detail the precise nature of the "hearing" that would be required before employees are to be discharged from their jobs pursuant to the supplemental final rule, for the "process" set forth in the rule fails the test of Due Process in one clear and obvious respect – the arbitrary termination of that process upon the passage of 90 days, regardless of whether or not the SSA has, within that time, been able to determine the employee's work authorization status.  Even if the employee's opportunity to attempt to resolve his or her work authorization status with the SSA could otherwise be deemed the pre-deprivation "hearing" to which the employee is entitled, the rule's provision for that "hearing" is fatally flawed by its requirement that the employer—on pain of forfeiting its "safe harbor" protection from prosecution—discharge the employee after an arbitrary deadline regardless of whether that period has been sufficient, under the circumstances, to permit the SSA to resolve the matter.

That a "process" which is subject to such an arbitrary deadline is constitutionally insufficient is apparent from evaluating the three interests that the courts are to balance in determining whether the process provided in any given circumstance is sufficient:

1

2

3

4

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors:  First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

5    *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

6          In the first place, the Supreme Court has attached considerable weight to the private

7    interest of the employee in retaining his or her employment:  "[T]he significance of the private

8    interest in retaining employment cannot be gainsaid.  We have frequently recognized the severity

9    of depriving a person of the means of livelihood."  *Loudermill*, 470 U.S. at 543.  And, as the

10   Court noted, the employee's ability to find work elsewhere would be burdened by the cloud

11   under which he or she had left the previous job, *id.* – and that consideration would surely be

12   acute in the case of a "no-match" termination compelled by the government.

13         Similarly, the risk of an erroneous deprivation is obvious; indeed, as noted above, DHS

14   assumes that thousands, and perhaps tens of thousands, of authorized employees will be fired

15   erroneously if the supplemental final rule is implemented.  The government has no idea what

16   portion of the employees who are subject to no-match letters are in fact authorized workers.  *See*,

17   *e.g.*, SAR 1726-28 (using estimates ranging from 20% to 90%); *supra*, Part II.B.1.  And it is

18   clear that in many of these cases the SSA, for a variety of reasons, simply will not be able to

19   complete its attempt to resolve an employee's case within the 90 days allotted by the rule.  *See*

20   72 Fed. Reg. at 45617 (SSA acknowledgment that 90 days may not be sufficient in all cases); *see*

21   *also supra*, Part II.C.4.  Clearly, an alternative procedure that allowed the employee to continue

22   to work beyond any such arbitrary deadline until the SSA was able to resolve the employee's no-

23   match would be "of obvious value in reaching an accurate decision."  *Loudermill*, 470 U.S. at

24   543.

25         The government's interest in bringing the process to an expeditious conclusion,

26   legitimate as it may be, cannot outweigh these two considerations.  Indeed, where the employee

27   has acted expeditiously and in good faith to seek SSA resolution of the discrepancy, it cannot be

28
                                                60

1    a governmental interest of any weight to insist that the employee be terminated before the SSA

2    has been able to resolve the matter.

3         In short, by compelling employers to discharge their workers who are the subject of no-

4    match letters after an arbitrary deadline regardless of the SSA's ability to resolve the employee's

5    case within the limits of that arbitrary deadline, the government deprives employees, without due

6    process of law, of their property interest in maintaining their employment.  For this reason as

7    well, the rule is contrary to law and its implementation must be enjoined.

8                                      **CONCLUSION**

9         For the foregoing reasons, Plaintiffs' and Plaintiff-Intervenors' motion for summary

10   judgment should be granted, and Defendants' motions for summary judgment and to dissolve the

11   preliminary injunction should be denied.

12

13   Dated:  January 9, 2009               ALTSHULER BERZON LLP

14                                         by:   /s/Scott A. Kronland

15                                         *Attorneys for Plaintiffs AFL-CIO et al.*

16                                         ADDITIONAL COUNSEL

17                                         Lucas Guttentag (SBN 90208)
                                           Jennifer Chang Newell (SBN 233033)
18                                         Mónica M. Ramírez (SBN 234893)
                                           Harini P. Raghupathi (SBN 257358)
19                                         Caroline P. Cincotta (SBN 261056)
                                           AMERICAN CIVIL LIBERTIES UNION
20                                         FOUNDATION
                                           Immigrants' Rights Project
21                                         39 Drumm Street
                                           San Francisco, CA 94111
22                                         Telephone: (415) 343-0770
                                           Facsimile: (415) 395-0950
23                                         E-mail: jnewell@aclu.org

24                                         Omar C. Jadwat
                                           AMERICAN CIVIL LIBERTIES UNION
25                                         FOUNDATION
                                           Immigrants' Rights Project
26                                         125 Broad Street, 18th Floor
                                           New York, NY 10004
27                                         Telephone: (212) 549-2620

28
                                           61

1

Facsimile: (212)-549-2654
Email: ojadwat@aclu.org

2

3

Alan L. Schlosser (SBN 49957)
Julia Harumi Mass (SBN 189649)
ACLU FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-1478
E-mail: aschlosser@aclu.org

4

5

6

7

Linton Joaquin (SBN 73547)
Marielena Hincapié (SBN 188199)
NATIONAL IMMIGRATION LAW CENTER
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA 90010
Telephone: (213) 674-2850
Facsimile: (213) 639-3911
Email: Joaquin@nilc.org

8

9

10

11

12

*Attorneys for Plaintiff Central Labor Council of
Alameda County*

13

14

David A. Rosenfeld (SBN 58163)
Manjari Chawla (SBN 218556)
WEINBERG, ROGER & ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501-1091
Telephone: (510) 337-1001
Facsimile: (510) 337-1023
Email: drosenfeld@unioncounsel.net

15

16

17

18

*Attorneys for Plaintiffs San Francisco Labor
Council,
San Francisco Building and Construction Trades
Council,
and Central Labor Council of Alameda County*

19

20

21

22

Jonathan P. Hiatt (SBN 63533)
James B. Coppess
AFL-CIO
815 Sixteenth Street, N.W.
Washington, D.C. 20006
Telephone: (202) 637-5053
Facsimile: (202) 637-5323
Email: jcoppess@aflcio.org

23

24

25

26

*Attorneys for Plaintiff AFL-CIO*

27

28

CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' AND PLAINTIFF-
INTERVENORS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT AND TO VACATE PRELIMINARY INJUNCTION, Case No. C07-4472 CRB

Matthew Ross (SBN 084703)
Philip Monrad (SBN 151073)
LEONARD, CARDER, LLP
1330 Broadway, Suite 1430
Oakland, CA 94612
Telephone: (510) 272-0169
Facsimile: (510) 272-0174
E-mail: MRoss@leonardcarder.com
PMonrad@leonardcarder.com

*Attorneys for Plaintiff-Intervenors UFCW et al.*

CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' AND PLAINTIFF-INTERVENORS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND TO VACATE PRELIMINARY INJUNCTION, Case No. C07-4472 CRB

**ECF CERTIFICATION**

I, Scott A. Kronland, am the ECF User whose identification and password are being used to file this **CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' AND PLAINTIFF-INTERVENORS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND TO VACATE PRELIMINARY INJUNCTION**.  In compliance with General Order 45.X.B., I hereby attest that all counsel for plaintiffs and plaintiff-intervenors have concurred in this filing.

Dated: January 9, 2009                                         /s/   Scott A. Kronland

CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' AND PLAINTIFF-INTERVENORS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND TO VACATE PRELIMINARY INJUNCTION, Case No. C07-4472 CRB